```
 1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF NEW YORK
 2

 3     ----------------------------------------
       PAUL D. CEGLIA,
 4
                                    Plaintiff,
 5

 6
                    - vs -          Docket Number
 7                                  10-CV-569

 8
       MARK ELLIOT ZUCKERBERG,
 9     Individually, and FACEBOOK, INC.

10                         Defendants.

11     ----------------------------------------

12                     TRANSCRIPT OF ORAL ARGUMENT
                  BEFORE THE HONORABLE RICHARD J. ARCARA
13                    UNITED STATES DISTRICT JUDGE

14
       APPEARANCES:
15

16     For the Plaintiff:        PAUL A. ARGENTIERI, ESQ.,
                                  TERRENCE M. CONNORS, ESQ.,
17                                and JAMES W. GRABLE, JR., ESQ.

18

19     For the Defendants:       LISA T. SIMPSON, ESQ.
                                  MICHAEL B. POWERS, ESQ.
20                                and SEAN C. McPHEE, ESQ.

21
       Court Reporter:           YVONNE M. GARRISON, RPR
22                                Official Court Reporter
                                  U.S.D.C., W.D.N.Y.
23                                68 Court Street
                                  Buffalo, New York 14202
24                                716-847-2477

25     Taken on July 20, 2010 at 11:09 a.m.
```

Proceedings

1          THE CLERK:  Civil Action 2010-569A, Ceglia versus

2   Zuckerberg and other parties, oral argument on defendant's

3   motion to vacate and dissolve temporary restraining order.

4          Counsel, please state your name and the party you

5   represent for the record.

6          MR. CONNORS:  Good morning.  Terrence M. Connors,

7   James W. Grable, and Paul Argentieri.  We're representing Paul

8   Ceglia.

9          MR. POWERS:  Good morning, Your Honor.  I'm Mike

10  Powers from Phillips Lytle; Sean McPhee from Phillips Lytle;

11  and Lisa Simpson from Orrick, Herrington for Facebook.

12         THE COURT:  Is everyone admitted?

13         MS. SIMPSON:  Yes, Your Honor.

14         THE COURT:  Ms. Simpson, you're up.

15         MS. SIMPSON:  Yes, Your Honor.

16         THE COURT:  Okay.  Let's go.

17         MS. SIMPSON:  Good morning, Your Honor.

18         THE COURT:  Good morning.

19         MS. SIMPSON:  I think the issues here today are quite

20  simple.  There really are two.  The first is whether this TRO

21  is expired, and we think that it is; the second issue is if

22  this TRO is not expired, whether it comports with the Federal

23  Rules, and the answer to that is that it does not.

24         As Your Honor's probably aware from reading the

25  papers, this TRO was obtained on July -- or June 30th in the

Proceedings

1    State Court of Allegany County.  It was obtained ex parte.

2    Defendant's were not provided any notice of the hearing.

3            The order itself was part of an order to show cause

4    by which the plaintiffs sought permanent injunctive relief and

5    accounting.  It was not in anticipation of what we could tell

6    was a preliminary injunction.  But what was part of this

7    document that the Court signed was a one-paragraph temporary

8    retraining order that was incredibly broad.  What it did was it

9    actually says that it restrains Facebook from transferring,

10   selling or assigning any of its assets.  This is a very --

11           THE COURT:  I think they agree with that.

12           MS. SIMPSON:  How did he agree with that?

13           THE COURT:  No, I think the plaintiff agrees with

14   that.

15           MS. SIMPSON:  They agree that it's too broad.

16           THE COURT:  I think that's the impression that I got

17   from reading the papers, that they agreed to have it modified.

18           MS. SIMPSON:  Yes, Your Honor.  But the question

19   isn't whether to modify it, the question is whether the TRO, as

20   issued, is defective.

21           THE COURT:  Okay.

22           MS. SIMPSON:  And, indeed, it is.

23           And I'd like to start first with the fact that we

24   really don't think it's in place anymore.  If you look at the

25   state court order, it is very clear on its face that the TRO

Proceedings

1    was intended to be in place until July 9.  It doesn't say until

2    hearing from the parties.  It doesn't say until the parties

3    appear to discuss this issue.  It doesn't say, you know, at the

4    resolution of the issues on this motion.  What it says is until

5    July 9.  It's a straightforward date.

6         THE COURT:  Once it came over here in federal court

7    then what happened?

8         MS. SIMPSON:  Well, once it came over here in federal

9    court the rule is very clear.  Once you get to federal court,

10   under removal, where there's a TRO in place, it is true that

11   the TRO carries over to the federal court, but only to the

12   extent that it would have been in place in the state court.

13        THE COURT:  You don't think it goes over 14

14   additional days from the time it's removed here?

15        MS. SIMPSON:  No, the test that's set out, both in

16   Ultracashmere and Carrabus both cited in our -- or Carrabus

17   both cited in our brief, and the Granny Goose case by the

18   Supreme Court, say that what happens is you look at the shorter

19   of the duration of what was supposed to happen in the state

20   court or what's going to happen in the federal court.  And so

21   what we're looking at --

22        THE COURT:  Doesn't Granny Goose say it stays in

23   affect?

24        MS. SIMPSON:  Well, any -- under 1450, 28 Section

25   1450, an order that was put into place in the state court --

Proceedings

1               THE COURT:  Okay.

2               MS. SIMPSON:  -- upon removal carries over to the

3       federal court.

4               Our position is that that same very day was also the

5       day that the TRO expired.

6               THE COURT:  Doesn't the time run from the date of the

7       removal?

8               MS. SIMPSON:  The time under the Federal Rules, yes.

9               THE COURT:  So 14 days from the date it was removed.

10              MS. SIMPSON:  Under the Federal Rules, it would be

11      14 days from the date of removal.  But our position is that the

12      state court order, itself, on its face --

13              THE COURT:  No matter, even if I don't agree with

14      you --

15              MS. SIMPSON:  Yes.

16              THE COURT:  -- it expired on Friday?

17              MS. SIMPSON:  Yes, Your Honor.

18              THE COURT:  This Friday.  Assuming it's 14 days.

19              MS. SIMPSON:  Yes.

20              THE COURT:  You're taking the position it doesn't

21      extend it until Friday.  It's whatever the time was, July --

22              MS. SIMPSON:  July 9th.

23              THE COURT:  July 9th.

24              MS. SIMPSON:  Yes.

25              THE COURT:  Well, continue your argument.

Proceedings

1         MS. SIMPSON:  Okay.  So either the TRO expired on

2    July 9th, which is our position, in which case we're here, you

3    know, just making sure that that is indeed the case, or, as

4    Your Honor points out, it does expire on Friday.

5         But since we're here arguing about this TRO I don't

6    think that we should wait until Friday for a resolution of this

7    issue because of the mass defects that are in place with this

8    TRO.  It is not following the Federal Rules at all.

9         And, once again, when we look -- when we bring a TRO

10   over from the state court and consider it in federal court the

11   Federal Rules apply and that is very clearly set forth in the

12   Granny Goose case.

13        So we look at the Federal Rules of Procedure.  We

14   look at Rule 65.  And when we look at Rule 65 we see that this

15   TRO has numerous procedural defects before we even get to the

16   standard for a TRO.  The order does not describe plaintiff's

17   injury, it does not state why the harm was irreparable, it does

18   not state why the TRO issued without notice.  Those are all

19   requirements set forth in 65(b).

20        It does not state the reasons why it issued.  It does

21   not state its terms specifically.  And it does not describe in

22   reasonable detail the acts to be restrained by Facebook.  And

23   those are all requirements set forth by 65(d).  Not one of

24   those procedural requirements are met here.

25        And with all of those procedural deficiencies, the

Proceedings

1    TRO fails before we get any further.  And that's the case in

2    the Rabbi decision which is cited in our papers.

3         If we move on past that, and again, we shouldn't even

4    be getting to these questions because the TRO is so

5    procedurally deficient on its face, but if we move to the

6    issues that -- that generally govern whether a TRO should

7    issue, the standard is pretty clear.  A TRO can issue if there

8    is irreparable and immediate injury and if there was likelihood

9    of success on the merits or, alternatively, if there are

10   serious questions as to the success on the merits and the

11   equity weigh in favor of an injunction.

12        THE COURT:  I'm just -- you mentioned about notice.

13        MS. SIMPSON:  Yes.

14        THE COURT:  And issuing a TRO without written or oral

15   notice to adverse party or its attorney only if: Specific facts

16   in an affidavit or a verified complaint clearly show that

17   immediate and irreparable injury, loss, or damage will result

18   to the movant before the adverse party can be heard in

19   opposition; and the movant's attorney certifies in writing any

20   efforts made to give notice and the reasons why it should not

21   be required.

22        You're saying those requirements weren't done?

23        MS. SIMPSON:  Those requirements were not met, Your

24   Honor.

25        THE COURT:  So your position is that notice had to be

Proceedings

1  given?

2          MS. SIMPSON:  Well, it either had to be given, or if

3  you look at 65(b)(2), where it says you have to state why --

4          THE COURT:  And that wasn't done here?

5          MS. SIMPSON:  Notice did not, no.

6          THE COURT:  Okay.  All right.

7          MR. CONNORS:  Your Honor, may I interpret for a

8  moment?

9          THE COURT:  I would appreciate hearing just one side

10  at a time, Mr. Connors.

11          Go ahead.

12          MS. SIMPSON:  So, moving on to the standards for a

13  TRO, and as I mentioned, those are immediate irreparable harm,

14  likelihood of success on the merits, we don't get much past the

15  immediacy requirement here.  There is no reason why this

16  individual, Mr. Ceglia, waited for over six years to assert his

17  rights.  The requirements under a TRO are that these rights be

18  asserted immediately and there has to be some urgency and some

19  need for a TRO to protect the parties.

20          There's no plausible reason why there's an urgency

21  here.  And Mr. Ceglia didn't even attempt to explain the delay

22  that has taken -- you know, that has taken him six years to

23  bring this to our attention.

24          That missing element of the TRO pictured here is

25  critical and crucial and it actually -- we don't even need to

Proceedings

```
1    go past that.  Without that kind of immediacy or urgency there

2    really is no basis for a TRO here.

3            And that is set forth in the Kalipharma case and the

4    arm -- Amhad case, both cited in our brief, where in the

5    Kalipharma case it was only seven months and the Court said

6    seven months, that's way too long to wait for a TRO.  We have

7    over six years here, which is much longer than seven months.

8            THE COURT:  When does the time start to run?

9            MS. SIMPSON:  The time?

10           THE COURT:  The seven years or the six years?

11           MS. SIMPSON:  Oh, it begins to run in February of

12   '04, according to plaintiff.  Plaintiff asserted in their

13   papers that the contract was entered into in April of '03.

14           THE COURT:  When did the breach occur?

15           MS. SIMPSON:  The breach occurred, according to

16   plaintiff, in February, '04 when the Facebook site was complete

17   and the ownership interest was not transferred.

18           THE COURT:  Do me one favor.  Explain to me this

19   contract.

20           MS. SIMPSON:  Your Honor, I would love to explain to

21   you the contract.  We have some serious questions --

22           THE COURT:  Tell me about the facts as you

23   understand -- or maybe I should ask the plaintiff.  Maybe that

24   would be better.

25           But, as you understand it, because I'm trying to get
```

Proceedings

1    a grasp for what happened back in 2004.

2            MS. SIMPSON:  Yes, Your Honor.

3            THE COURT:  As you understand them.

4            MS. SIMPSON:  We have serious questions about the

5    authenticity of this contract, Your Honor.

6            THE COURT:  Okay.  Well, that's not right now.  But

7    just so -- background, so I can get a better feel what happened

8    here.

9            MS. SIMPSON:  Well, Your Honor, as far as I know --

10           THE COURT:  Give me a little history of this.

11           MS. SIMPSON:  Mr. Zuckerberg did indeed have a

12   contract with Mr. Ceglia.  That --

13           THE COURT:  Give me the background of how this all

14   started.

15           MS. SIMPSON:  I actually don't know the entire

16   background.

17           THE COURT:  Okay.

18           MS. SIMPSON:  What the contract asserts is that there

19   was a relationship about Facebook and there is not one.  So I

20   can't give you --

21           THE COURT:  There is not one?

22           MS. SIMPSON:  There is not one, no.

23           THE COURT:  Well, your client was how old at the

24   time?  I'm trying to figure out what happened.

25           MS. SIMPSON:  He was 18.

Proceedings

```
 1              THE COURT:  Eighteen?

 2              MS. SIMPSON:  Eighteen.

 3              THE COURT:  And he's a student somewhere?

 4              MS. SIMPSON:  He's a student at Harvard.

 5              THE COURT:  Harvard.

 6              MS. SIMPSON:  He's a freshman at Harvard.

 7              THE COURT:  Tell me what's going on so I can get an

 8    idea.

 9              MS. SIMPSON:  He's a freshman at Harvard.  He's a

10    computer coder.

11              THE COURT:  Okay.

12              MS. SIMPSON:  And, from our understanding, he was

13    contacted by Ceglia or he contacted Ceglia and was -- agreed to

14    do work --

15              THE COURT:  How did that come about?

16              MS. SIMPSON:  -- on a project for Ceglia.

17              I actually don't know the details of that.

18              THE COURT:  All right.  So I just took a three-days

19    course on computers and I still don't know a lot about them,

20    okay.  So I'm trying to understand exactly how this all came

21    about.

22              But he's a student at Harvard.  And he's doing what?

23              MS. SIMPSON:  He is looking for money.

24              THE COURT:  All right.  Okay.

25              MS. SIMPSON:  And one of his skills was being able to
```

Proceedings

1    code.  So he agreed to code for Mr. Ceglia with respect to a

2    project called Street Fax.

3              THE COURT:  Called what?

4              MS. SIMPSON:  Street Fax.

5              THE COURT:  Street back?

6              MS. SIMPSON:  Street Fax, F-A-X, which is actually

7    one of the projects mentioned in the document submitted by

8    plaintiff.

9              THE COURT:  Okay.

10             MS. SIMPSON:  You'll see the document --

11             THE COURT:  That's the one that's real hard to read?

12             MS. SIMPSON:  Yes, the one that's very hard to read.

13             It has two parts and part is in relation to Street

14   Fax and the other part is directly relating to Facebook.

15             THE COURT:  Okay.

16             MS. SIMPSON:  Mr. Ceglia and Mr. Zuckerberg did work

17   together on the Street Fax project for a period of time.

18   Whether it was pursuant to this particular contract, we don't

19   believe so.  The -- the exact termination of that relationship

20   was roughly around the end of 2003, as far as we understand.

21             And with respect to the contract that we have in

22   front of us, we have some serious questions because there are

23   many inconsistencies and many undefined terms and things that

24   don't make sense if you look at it on its face.

25             Specifically, you'll see that there's a mention in

Proceedings

1   there of Facebook and then there's another mention in there of

2   Pagebook, and those are inconsistent.  The consideration in the

3   contract is directed directly to Pagebook.  There's no

4   consideration at all in the contract that relates to Facebook.

5            THE COURT:  Just one second.  It's really hard to

6   read this contract.

7            MS. SIMPSON:  Precisely, Your Honor.

8            THE COURT:  Are you saying -- again, I'm trying to

9   get background.  I can't figure out -- your client signed this?

10           MS. SIMPSON:  Our client entered a contract with

11  Ceglia.  Whether he signed this piece of paper we are unsure at

12  this moment.

13           THE COURT:  Well, it does appear to have his

14  signature on it.

15           MS. SIMPSON:  It does appear to have a signature on

16  it.

17           THE COURT:  And the plaintiff's signature.

18           MS. SIMPSON:  It does appear to have two signatures

19  on it.  We do have questions about that.

20           THE COURT:  All right.

21           MS. SIMPSON:  We'd like to see the original.

22           THE COURT:  Okay.  Do you have a clean copy of this?

23           MS. SIMPSON:  I have the same copy.

24           THE COURT:  Mr. Terrence (sic), do you have a copy of

25  this?

Proceedings

```
 1              MR. CONNORS:  I do, Your Honor.
 2              THE COURT:  Can I see it?  I'm trying to read this
 3    and I just couldn't read it.
 4              MR. CONNORS:  We have the same.  This one is a little
 5    better, Your Honor.
 6              THE COURT:  Do you mind if I take ten minutes?  Do
 7    you have a copy of this?
 8              MS. SIMPSON:  I presume it's similar to yours.
 9              (A recess was taken at 11:25 a.m.)
10              (Proceedings continued at 11:38 a.m.)
11              THE COURT:  Before I hear from you, Mr. Connors,
12    would you please explain to me this contract?
13              MR. CONNORS:  Sure.
14              THE COURT:  Because I read it quickly, and I'm not
15    sure I understand it.  And I'm sure it's just because of my
16    deficiencies, but I'm having trouble understanding it.
17              MR. CONNORS:  Your Honor, I think I can provide some
18    insight into that.
19              I would note though, as you're well aware, we became
20    involved on Friday, this past Friday, and filed a notice of
21    appearance on that day.  So we're catching up as well, but I
22    can give you some background information.
23              THE COURT:  Yeah, just generally so I can --
24              MR. CONNORS:  In the spring of 2003, Paul Ceglia was
25    about 28 or 29 years at that time.  He was a -- a web designer.
```

Proceedings

 1   He was involved in collecting and perfecting databases, which

 2   he thought would be the future of the internet.  It's back in

 3   2003 now, so there's still a lot to come.

 4           He had this business called Street Fax, F-A-X, and

 5   basically what he would do is he would seek to develop a

 6   database that would consist of millions of photographs of

 7   streets throughout the United States.

 8           He would contract with insurance companies so that

 9   they'd have that accessible through a click of their mouse.

10   They could get into his database and get a photo.  If there's

11   an auto accident at Main and Court they would be able to get

12   there and take a look at that, saving themselves a lot of money

13   and not having to send the adjusters out and all of those

14   investigators.

15           THE COURT:  Is this like Google Earth?

16           MR. CONNORS:  A little bit like that, although

17   specifically with respect to streets, Street Fax.

18           THE COURT:  Okay.

19           MR. CONNORS:  And what he needed in the spring of

20   2003 was a website engineer.  He needed someone to help him

21   develop the database itself.  So he advertised.  He put out the

22   advertisements on Craigslist.  And, lo and behold, he got a

23   number of bids.  One of them was from a freshman at Harvard by

24   the name of Mark Elliot Zuckerberg.  He was, in addition to

25   being an enrolled student there, was the -- at least claimed to

Proceedings

 1    be the captain of their computer team and had the access to the

 2    background of Harvard for these types of computer projects.

 3              He bid a rather low amount of money.  Said I'll do it

 4    for a $1,000.  I'll help you develop this database, he said,

 5    but I've got a project of my own.  I'm developing an online

 6    yearbook for Harvard kids now.  I'm thinking about expanding

 7    it.

 8              And our guy basically said, yeah, yeah, whatever you

 9    want, I'll give you a $1,000 for that, but I want my database.

10    I want you to work on my database.  So the function of this

11    contract was primarily to deal with the work for hire that was

12    required by Mark Zuckerberg to perform for Mr. Ceglia.

13              But it also provided for an investment in the project

14    that at that time was a fledgling project, you know, with the

15    dot com bust occurring earlier, probably little chance of

16    success.  Who would know it would turn into what it turned into

17    today.

18              And so the contract language was added that's pretty

19    clear, Your Honor.  It says that it's for the continued

20    development of the software program.

21              THE COURT:  Where are you reading?

22              MR. CONNORS:  If you go to --

23              THE COURT:  Paragraph --

24              MR. CONNORS:  Two, entire agreement.

25              THE COURT:  Okay.

Proceedings

1          MR. CONNORS:  First sentence is:  It reflects two

2    separate business ventures.

3          That's clearly true.  The first is what I want you to

4    do for me, Mr. Zuckerberg, Street Fax database and programming

5    language, that's what I expect from you and your Harvard

6    computer team.

7          Now, the entire agreement reflects two separate

8    business ventures.  That's paragraph 2.  The first is what

9    you're doing for me.  The second is for the continued

10   development of the software program and for the purchase and

11   design of a suitable website for the project seller has already

12   initiated.  That's Zuckerberg's project.  And he's designing it

13   to offer the students of Harvard University access to a website

14   similar to a live, functioning yearbook with the working title

15   of the Facebook.

16         And then it says it's agreed that the purchaser,

17   Mr. Ceglia, he's identified in the very first phrase, will own

18   a half interest, 50 percent in the software programming

19   language and business interests derived from the expansion of

20   that service, Facebook, to a larger audience.

21         And so what happens eventually, Your Honor, is Street

22   Fax goes into business, doesn't do as well.  And then years

23   later Facebook takes off to the point where now it's -- today

24   on the news they say it celebrated its five hundred millionth

25   customer.

Proceedings

1          And Mr. Ceglia has this contract that, you know, your

2    questions were direct; is that his signature?

3          Zuckerberg's been served for 11 days.  They've come

4    up with a number of procedural defenses, but no one ever said

5    it's not his signature, it's a fake or it's a fake contract.

6          Basically we have a contract here that, obviously

7    it's going to be subject to some interpretation, I mean that's

8    what lawsuits are for, but basically it's a fairly clear

9    work-for-hire arrangement detailing two specific projects, and

10   that's essentially the background of the projects.

11         THE COURT:  Okay.  Thank you.

12         Ma'am.

13         MR. CONNORS:  Could I interrupt for one moment,

14   Judge?

15         Only to mention this, Your Honor, and obviously it's

16   your call in this.  But I know that with respect to TRO's and

17   provisional remedies this Court and all courts are very serious

18   about how they look at these and what they want to do with them

19   because of the nature of the relief that's sought.

20         I reached out to Mr. Powers on Friday after we got

21   into it.  I had a very brief conversation with Ms. Simpson a

22   day or two earlier, but I hadn't -- I hadn't entered an

23   appearance.  But I reached out to Mike and I said, listen, we

24   ought to step back from this and talk about this before this

25   goes down a track of litigation that, quite frankly, isn't as

Proceedings

1    important to us as the litigation of the contract.  Is there

2    some way that we could present to the Court some type of

3    alternative disposition that wouldn't require us to invent the

4    wheel in the TRO, work and litigate that and get involved in

5    some type of a preliminary injunction hearing when there's all

6    sort of other key issues involved, not the least of which is

7    subject matter jurisdiction.  There's issues that revolve

8    around the contract itself, discovery.

9            And what I think is we ought to step back from it and

10   try to work out a proposal to give you an agenda as to what

11   would be the key items and the most important items.  I think

12   getting bogged down in this TRO issue -- there's issues with

13   the TRO.  There's problems.  There's no question about that.

14           And since we've gotten and looked at it, we're really

15   willing to acknowledge that.  But we need to get to the meat of

16   this dispute, which, we think, the meat of that dispute is this

17   two-page contract.  So we think it might work out if we stepped

18   back a little bit and had some discussion about the procedural

19   options available to both sides.

20           THE COURT:  Ms. Simpson.

21           MS. SIMPSON:  Your Honor, we're always happy to have

22   a discussion.  We would never say no to that.

23           I do have some concerns.  One is that we have a stay

24   in place of this TRO.  And if, for some reason, we're

25   abandoning the determination on that TRO today, I would want

Proceedings

1    that stay to remain in place.  And I'm a little concerned about

2    the suggestion of a conversation --

3            THE COURT:  The TRO would actually expire even if --

4    I know you disagree -- but even the worst of situations for

5    you, I guess, it would be Friday.

6            MS. SIMPSON:  Yes.  No, I don't disagree that it

7    expires Friday.  I'm -- in the longest counting of the days.

8    So I would request that it remain stayed until Friday.

9            But I do have some concerns because I would -- I

10   wouldn't want you not be up front because there is virtually no

11   restraints that Facebook would agree to, you know, to have in

12   place in this case.  So if that's what --

13           THE COURT:  You haven't talked at all, have you,

14   except on the telephone?

15           Do you want to talk to Mr. Connors for --

16           MS. SIMPSON:  I think he's aware of the fact that we

17   are not looking to put a restraint in place of any kind.

18           THE COURT:  And his position, as far as you know,

19   was?

20           MS. SIMPSON:  Perhaps --

21           THE COURT:  Plaintiff wants a TRO.

22           MS. SIMPSON:  I'm sorry, Your Honor?

23           THE COURT:  Plaintiff wants a TRO of some sort.

24           MS. SIMPSON:  Right.  And we're not willing to put a

25   TRO in place.

Proceedings

1              THE COURT:  Of any kind?

2              MS. SIMPSON:  Of any kind.

3              THE COURT:  So it wouldn't do much good to talk right

4     now, or would it?

5              MS. SIMPSON:  It wasn't my proposal.  I'm happy to

6     have a conversation.  I don't know what the --

7              THE COURT:  Well, I'll tell you what.  Go over to

8     Judge Curtin's courtroom and why don't you have a little

9     conversation.  I'm going to be here all day.  Talk.

10             And if you get into a -- you start swinging at each

11    other, let me know, come on back in here and we'll continue.

12    But certainly if people can talk to each other civilly, maybe

13    you can make some progress without the Court's intervention.

14    If you can't, come on back here and I'm here.

15             So, Denise, would you open up Judge Curtin's

16    courtroom, and just the lawyers will be permitted in there.

17    Nobody else.

18             MS. SIMPSON:  Yeah --

19             THE COURT:  Maybe Mr. Connors -- or maybe you'll

20    agree to some TRO.  I don't know.  But Judge Curtin always took

21    that position.  It's always good to have lawyers talk before

22    the Court gets involved.  And it's because lawyers are much

23    better at it than judges are.

24             And so why don't you go in there for five minutes.

25    If it's useless, fine.  If you want to spend the whole day in

Proceedings

1    there, be my guest.  I'm here.  Okay.

2              MS. SIMPSON:  Okay.  Your Honor, there are a number

3    of points I'd like to raise with respect to --

4              THE COURT:  I know.  We'll just pick up where you

5    left off.

6              MS. SIMPSON:  All right.  Thank you.

7              THE COURT:  All right.  We'll take a recess.

8              (A recess was taken at 11:48 a.m.)

9              (Proceedings continued at 1:07 p.m.)

10             THE COURT:  All right.  Ms. Simpson.

11             MS. SIMPSON:  Yes.

12             THE COURT:  Mr. Connors.

13             MR. CONNORS:  May I?

14             Your Honor, thank you for the opportunity to speak

15   about the subject that's brought us in front of you today.

16             I think we've made some progress.  And what we would

17   like to inform you is that both sides agree that there are

18   other issues that we should be focusing on.

19             There is a priority to other parts of this lawsuit

20   other than provisional remedies.  In that regard, Your Honor,

21   we recognize and agree that the procedural posture of this case

22   is that there is a stay of the temporary restraining order

23   remaining in place right now; that the parties agree that at

24   the latest the temporary retraining order expires on Friday.

25   That would make any motion to dissolve or modify the temporary

Proceedings

1   restraining order rendered moot as of Friday.  And we're in

2   agreement with that procedural posture.

3          The only thing the parties would state to the Court

4   is that for the future, both sides reserve their right to any

5   provisional remedies that they might be entitled to as a matter

6   of law or that they would desire to seek in the future.

7          So that, essentially, what will happen is we'll

8   attend to the business of litigation right now.  We'll look at

9   the case.  If something happens that we think is -- warrants a

10  provisional remedy, we'll apply to you under the correct rule

11  of Federal Rules of Civil Procedure.

12         In the meantime, we'll look at the other issues, some

13  of which we addressed here today that deal with the lawsuit,

14  the contract, the subject matter jurisdiction, personal

15  jurisdiction, all these issues.

16         THE COURT:  Okay.  So by operation of law -- well,

17  the stay will be in effect until Friday.  Friday by operation

18  of law the TRO will dissolve.

19         Is that the right word, dissolve?

20         MR. CONNORS:  It is, Your Honor.

21         MS. SIMPSON:  Yes, Your Honor.

22         THE COURT:  Use that word --

23         MR. CONNORS:  It's the statute.

24         THE COURT:  Vacated or something.  But since the

25  Supreme Court uses dissolve, I'll use dissolve.

Proceedings

```
 1              So then an answer is due, I guess.  Is that the next

 2    step?

 3              MS. SIMPSON:  That would be the next step, Your

 4    Honor.

 5              THE COURT:  And that will be 20 days from when, today

 6    or --

 7              MS. SIMPSON:  It's 20 days from the -- I think the

 8    service.  I don't think that changes.  The service of the

 9    complaint.

10              THE COURT:  Well, that's an issue, too, isn't it?

11              MS. SIMPSON:  Well, the service issue was concerning

12    the TRO with respect to Mr. Zuckerberg.

13              THE COURT:  Okay.

14              MS. SIMPSON:  It was not properly served, but he was

15    served with a complaint.

16              THE COURT:  Okay.  So when will the 20 days start to

17    run?

18              MS. SIMPSON:  Do you have dates?  It is 21 days from

19    service of the summons, I'm sorry.  I haven't done the math on

20    which day that is.

21              I will say that defendant most likely intends to make

22    a motion to dismiss and so may request additional time.

23              The date is July 27th, Your Honor.

24              THE COURT:  Today is the 20th.

25              MS. SIMPSON:  Yes.
```

Proceedings

1              THE COURT:  And it's your intent to file a motion to

2     dismiss?

3              MS. SIMPSON:  Correct, Your Honor.

4              THE COURT:  Okay.  So as far as the Court's

5     concerned, what do you want me to do?

6              MS. SIMPSON:  I haven't spoken with plaintiff's

7     counsel about that next step yet, Your Honor.  I don't know if

8     he would consent to a brief extension in order for us to do

9     that.  Also --

10             THE COURT:  Do you want to go back into the chambers?

11             MR. CONNORS:  I would consent, Your Honor, to an

12    appropriate extension.  As I say, there's other issues that

13    might deal with subject matter jurisdiction as well.  I think

14    we probably need to get into some dialogue.

15             If Your Honor could perhaps pick a date to bring us

16    back or report back to you at some point, I think that might be

17    the most advisable method.

18             THE COURT:  Give me a date.

19             MS. SIMPSON:  The other thing I would mention, Your

20    Honor, is I think that plaintiff may intend to file an amended

21    complaint, in which case it would make more sense, I think, in

22    terms of resources to wait on our motion to dismiss until we

23    see that amended complaint.  So again, we'll probably do some

24    chatting and get back to you.

25             THE COURT:  I'm going to take a five-minute break.

Proceedings

1   You put together a schedule that is agreeable with both

2   parties, and I will go along with it, I think, unless there's

3   some conflict, okay.

4          MS. SIMPSON:  Yes.

5          THE COURT:  Work out a date.  Give me the schedule

6   for everything.  We'll put it in place and you'll prepare an

7   order for me confirming those dates, all right.

8          MS. SIMPSON:  Okay.

9          THE COURT:  Mr. Powers has nothing to do today.  He

10  can draft the order.  I will be back in whenever you want me

11  back.

12         (A recess was taken at 1:11 p.m.)

13         (Proceedings continued at 1:26 p.m.)

14         THE COURT:  Okay.  All right.

15         MR. CONNORS:  Your Honor, we have reached agreement,

16  and with the help of your law clerk, on or before August 6th,

17  2010, parties shall provide the Court with a proposed

18  scheduling order setting forth the dates to answer, move to

19  dismiss, and/or move to remand.

20         In the interim, parties agree that the stay of the

21  TRO shall be in effect until July 23rd, at which time the TRO

22  will expire on its own terms.

23         The parties stipulate that the time to answer shall

24  be extended until September 8th, 2010, unless otherwise

25  extended in stipulated scheduling order, and the plaintiff

Proceedings

```
 1   reserves all rights to move for provisional remedies if
 2   appropriate.
 3            THE COURT:  Do you agree with that, ma'am?
 4            MS. SIMPSON:  I do.
 5            I just have one edit, which I didn't catch in the
 6   first round, and that is the time to answer or otherwise move,
 7   the second time that's mentioned.  I think we did that the
 8   first time, but not the second time.
 9            THE COURT:  Just sit down.  Take your time.
10            (Off the record discussion.)
11            MR. CONNORS:  Ms. Simpson pointed out that, Your
12   Honor, with respect to the time to answer, she also wants to be
13   able to move to file motions against the complaint as well, so
14   that that stipulation should include the time to answer or move
15   extended until September 8th, 2010.
16            And I pointed out there's an earlier reference to the
17   motions as well, but that will be the subject to a scheduling
18   order proposed to the Court.  So we'll have basically a double
19   review over any of those dates.
20            THE COURT:  What about this amended complaint that
21   you're thinking about?  If you file -- do you intend to maybe
22   file an amended complaint?
23            MR. CONNORS:  It's definitely something --
24            THE COURT:  What is that going to do to all the
25   scheduling?
```

Proceedings

```
 1              MR. CONNORS:  Our thought on that when it came up in

 2   discussions is that we probably ought to address the matters

 3   such as subject matter jurisdiction and remand first, get that

 4   buttoned down, and then decide what we're going to do with

 5   respect to any --

 6              THE COURT:  Do you agree with that, ma'am?

 7              MS. SIMPSON:  Yes, Your Honor.

 8              THE COURT:  What I don't want to do is get into a

 9   procedural quagmire.  All these amended complaints, motion to

10   dismiss and which one are we talking about.  It just doesn't

11   get easy to work through that sometimes.

12              MS. SIMPSON:  Right.

13              THE COURT:  So what I'd like to do is try to keep --

14   I mean, you are all obviously entitled to file whatever motions

15   you deem appropriate.  But I'd like to keep it in some kind of

16   order, so I'm not dealing with orders, you know, motions to

17   dismiss, there's amended complaint filed thereafter and then

18   we've got to file another motion to dismiss the amended

19   complaint.  And it gets all bogged down in procedure.

20              And, first of all, it's very expensive to do all

21   that, it's time-consuming for the Court.  In the long run,

22   strategically, I don't think either side gets an advantage.

23              MS. SIMPSON:  Right.

24              THE COURT:  So let's go through the time frame one

25   more time.
```

Proceedings

 1          MS. SIMPSON:  Well, Your Honor, if I could speak to

 2  that for a second.  That is precisely why I raised the amended

 3  complaint earlier, and I think what we're anticipating doing

 4  with our scheduling order is to take those issues in a logical

 5  order.  So we'll deal with the motion to remand first and

 6  plaintiff will decide whether they wish to make that motion.

 7  If they do we'll put a briefing schedule in for that.

 8          Then we'll deal with the question of whether an

 9  amended complaint is going to be filed.  And if it is, then

10  we'll put in dates for the amended complaint.  And then we'll

11  put in dates for the motion to dismiss, depending on whether

12  there's an amended complaint or a complaint, we'll move to

13  dismiss whichever one the plaintiff has decided to put forth.

14          THE COURT:  Go through those dates one more time.

15          MS. SIMPSON:  I would just say that the date on the

16  answer that we've put in this stip was -- we had actually

17  requested that the answer date just be stipped out until the

18  date that we put in the scheduling order but folks thought we

19  should have a concrete date in there.  So I don't expect that

20  date to stick.

21          THE COURT:  I think we're better off with concrete

22  dates.

23          MS. SIMPSON:  I don't think that date is going to

24  stick because as soon as we set out the scheduling order it's

25  going to move, depending on what the plaintiff is doing.

Proceedings

```
 1              THE COURT:  So what do you propose?

 2              MR. CONNORS:  We can always move it.

 3              MS. SIMPSON:  I think it's fine for now, is what I

 4    think.

 5              THE COURT:  Okay.  There's going to come a time, just

 6    so you know, there's going to come a time when there's going to

 7    be a scheduling order put in place that I'm going to put in

 8    place and you're going to have to follow that one.

 9              MS. SIMPSON:  Understood.

10              THE COURT:  Right now, because we're at the

11    preliminary stages, I'll let you do it, because you've got to

12    make decisions on procedurally how you want to proceed.

13              But there's going to come a time where I'm going to

14    put an order in and we're going to follow that order.

15              MS. SIMPSON:  We hope to give you an order you can

16    enter on the 6th.

17              THE COURT:  That's by August 6th?

18              MS. SIMPSON:  Yes.

19              THE COURT:  And it will set forth all the dates?

20              MS. SIMPSON:  Yes, Your Honor.

21              THE COURT:  And I guess we're going to hold to those

22    dates, unless there's an amended complaint filed, is that --

23              MS. SIMPSON:  Well, I'm hoping that the order will

24    encompass whether an amended complaint will be filed or not.

25              THE COURT:  Of course, if I remand it back to the
```

Proceedings

1    state court this is all moot.

2            MS. SIMPSON:  This is all moot.

3            THE COURT:  Okay.  All right.  Anything else?

4            MR. CONNORS:  No, Your Honor.

5            THE COURT:  Thank you, very much.

6            MS. SIMPSON:  Thank you, very much.

7            (Proceedings concluded at 1:32 p.m.)

1                          CERTIFICATION

2

3          I certify that the foregoing is a correct

4   transcription of the proceedings stenographically recorded by

5   me in this matter.

6

7

8                              S/Yvonne M. Garrison, RPR

9                              YVONNE M. GARRISON, RPR
                               Official Reporter
10                             U.S.D.C., W.D.N.Y.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25