# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-11923-DPW

CONNECTU LLC                           .
    Plaintiff                       .

        V.                             .

                                     .BOSTON, MASSACHUSETTS

MARK ZUCKERBERG, et al               .   JUNE 22, 2006
    Defendants                       .

. . . . . . . . . . . . . . .

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE ROBERT B. COLLINGS
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:                 Jonathan Gelchinsky, Esquire
For the Plaintiff:           Finnegan, Henderson, Farabow, Garrett &
                             Dunner, LLP 55 Cambridge Parkway
                             Cambridge, MA  02142 (617) 452-1600

                             John F. Hornick, Esquire
                             Margaret A. Esquenet, Esquire
                             Finnegan, Henderson, Farabow, Garrett &
                             Dunner, LLP 901 New York Avenue, N.W.
                             Washington, DC  20001 (202) 408-4000

                             G. Hopkins Guy, III, Esquire I.
                             Neel Chatterjee, Esquire Monte
                             cooper, Esquire Orrick, Herrington
                             & Sutcliffe LLP 1000 March Road
                             Menlo Park, CA  94025 (650)
For the Defendants:          614-7400

Court Reporter:

Proceedings recorded by digital sound recording, transcript
produced by transcription service.

Certified Court Transcriber
240 Chestnut Street
Wrentham, Massachusetts 02093
(508) 384-2003

*MARYANN V. YOUNG*

For the Defendants: Jeremy P. Oczek, Esquire
                    Steven Bauer, Esquire
                    Proskauer Rose, LLP One
                    International Place
                    Boston, MA  02110 (617)
                    526-9600

                     Rudy Gadre, Esquire
                    General Counsel for Facebook Inc.

*MARYANN V. YOUNG*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-11923-DPW

CONNECTU LLC                    .
    Plaintiff                   .
                           .

     V.                         .
                           .   BOSTON, MASSACHUSETTS
MARK ZUCKERBERG, et al          .   JUNE 22, 2006
    Defendants                  .
. . . . . . . . . . . . . .

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE ROBERT B. COLLINGS
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:
For the Plaintiff:        Jonathan Gelchinsky, Esquire
                          Finnegan, Henderson, Farabow, Garrett &
                          Dunner, LLP
                          55 Cambridge Parkway
                          Cambridge, MA  02142
                          (617) 452-1600

                          John F. Hornick, Esquire
                          Margaret A. Esquenet, Esquire
                          Finnegan, Henderson, Farabow, Garrett &
                          Dunner, LLP
                          901 New York Avenue, N.W.
                          Washington, DC  20001
                          (202) 408-4000

For the Defendants:       G. Hopkins Guy, III, Esquire
                          I. Neel Chatterjee, Esquire
                          Monte cooper, Esquire
                          Orrick, Herrington & Sutcliffe LLP
                          1000 March Road
                          Menlo Park, CA  94025
                          (650) 614-7400

Court Reporter:

Proceedings recorded by digital sound recording, transcript
produced by transcription service.

---

*MARYANN V. YOUNG*
Certified Court Transcriber
240 Chestnut Street
Wrentham, Massachusetts 02093
(508) 384-2003

For the Defendants:        Jeremy P. Oczek, Esquire
                           Steven Bauer, Esquire
                           Proskauer Rose, LLP
                           One International Place
                           Boston, MA  02110
                           (617) 526-9600

                           Rudy Gadre, Esquire
                           General Counsel for Facebook Inc.

I N D E X

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Divya Narendra | 6 | Page 12 stipulation as to | | |
| | | citizenship; witness excused. | | |
| Mark Zuckerberg | 14 | 138, 155 | 184 | -- |

| EXHIBITS | DESCRIPTION | IDENT. | IN EVID. |
|---|---|---|---|
| 14 | Harvard Document HU-151-152 | 32 | |
| 13a | TFB 6974-6976-3 Pages | 38 | |
| 13 | TFB 6977-1 Page | | 38 |
| 26 | Lease for Westbrook in Los Alts | | 63 |
| 34 | Lease for Menlo Park, Sherman Avenue | | 66 |
| 10 | TFB 56-83 FaceBook Inc. Corporate Docs. | | 79 |
| 15 | New Play Info Sheet | | 80 |
| 16 | Agreement between FaceBook Inc. and | | |
| | Zuckerberg 7/29/04 | | 84 |
| 19a-k | Series of Agreements | | 96 |
| 18 | W-4 for 2003 | | 99 |
| 28 | Original Agreement with Equinex | | 106 |
| 29 | Silicon Valley Bank Statement | | 107 |
| 31 | Silicon Valley Bank Billing Statement | | 110 |
| 30 | Silicon Valley Bank Certification of Deposit | | 111 |
| 27 | Invoice from Savvy | | 115 |
| 21 | Form 1040 for 2004 | | 120 |
| 37 | Tax Return - TFB 7636-49 (unredacted) | | 125 |
| 22 | California Resident Income Tax Return 2004 | | 129 |

3

| | EXHIBITS | DESCRIPTION | IDENT. | IN EVID. |
|---|---|---|---|---|

Defendants':

| | B | Copy of M. Zuckerberg's driver's | | |
|---|---|---|---|---|
| | | License, 2 Russell Place, Dobbs Ferry | | 167 |
| | E | Voter Registration Form | | 170 |
| | K | Sublet agreement for La Jennifer Way | | 171 |

4

1          **P R O C E E D I N G S**

2          (Court called into session)

3                THE CLERK:  The Honorable Robert B. Collings

4     presiding.  The case of ConnectU v. Mark Zuckerberg, et al,

5     Civil Action No. 04-11923 will now be heard before this Court.

6     Will counsel please identify themselves for the record.

7                MR. HORNICK:  Good morning, Your Honor, John Hornick

8     for plaintiff, ConnectU.  I want to apologize, I had a terrible

9     case of bronchitis this week.  I'm hoping I don't have a

10    coughing fit today.  I have with me my colleague, Margaret

11    Esquenet and also my colleague John Gelchinsky from our

12    Cambridge office.  And also in the courtroom today we have five

13    summer associates from our Cambridge office who are here to

14    observe.  Three of them are, I'm sorry, one of them is from

15    Boston College, one is from NYU and three are from Harvard

16    University.

17                THE COURT:  Okay.  Good morning.

18                MR. GUY:  Good morning, Your Honor.  I'm Hopkins Guy

19    with Orrick, Herrington & Sutcliffe for the defendants FaceBook

20    and for Mark Zuckerberg.  With me is Neel Chatterjee and Monte

21    Cooper of my firm.  Also, Steve Bauer with the Proskauer Rose

22    firm.  Also we have Rudy Gadre.  If you could stand, Rudy.

23    He's general counsel at the FaceBook.

24                THE COURT:  Thank you.

25                MR. GUY:  Thank you.

5

1       THE COURT:  Good morning.  All right, the case is

2  here for an evidentiary hearing on the issue of the citizenship

3  of Messrs. Zuckerberg and Narendra at the time the original

4  complaint was filed, and the plaintiff may begin presentation

5  of evidence.

6       MR. HAMPTON:  Your Honor, if I might just interrupt

7  quickly.  Daniel Hampton on behalf of defendant Eduardo

8  Saverin.

9       THE COURT:  Oh, I'm sorry.

10      MR. HAMPTON:  I apologize, Your Honor.  And with me

11  is Annette Hurst from Heller Ehrman whose been recently

12  admitted pro hac vice in the case, also representing Eduardo

13  Saverin.  We also have a couple of observers in the courtroom.

14      THE COURT:  All right.  Sorry, I didn't realize over

15  in the corner there.  All right, you may proceed.

16      MR. HORNICK:  Yes, Your Honor.  We will call our

17  witness, Mr. Narendra.

18      THE COURT:  Okay.  Come forward, stand in the witness

19  box and raise your right hand.

20     (Plaintiff witness, Divya Narendra, sworn)

21      THE COURT:  Please be seated.

22      MS. ESQUENET:  Your Honor, two issues.  First, we

23  would like the Court to lay the rule on witnesses and exclude

24  any witnesses not currently testifying from the courtroom for

25  the time being?

1        THE COURT:  Yeah.  Any objection?

2        MR. GUY:  I'm sorry, I didn't hear the--

3        THE COURT:  She wants to sequester witnesses.

4        MR. GUY:  No objection, Your Honor.

5        THE COURT:  All right.  Anyone that's going to be a

6   witness please leave the courtroom and remain outside.

7        MS. ESQUENET:  And, Your Honor, is there a particular

8   place that Your Honor would like me to stand to question the

9   witness or is the table appropriate in this court?

10       THE COURT:  That's fine.

11                      DIRECT EXAMINATION

12  BY MS. ESQUENET:

13  Q    Mr. Narendra, could you please state your full name for

14  the record?

15  A    Divya Camar Narendra.

16  Q    Could you please tell the Court where you were born?

17  A    I was born in New York City.

18  Q    And where did you grow up?

19  A    I grew up in New York City.

20  Q    Where did you do your schooling?

21  A    Up until high school I went to school in New York City.

22  Q    And where did you go after high school?

23  A    After high school I went to college in Cambridge,

24  Massachusetts.

25  Q    What year did you begin college?

1   A    2000.

2   Q    Which school did you go to?

3   A    Harvard College.

4   Q    Did you always live on campus at Harvard College?

5   A    During the school years I always lived on campus.  Over

6   the summer periods sometimes I would live on campus, sometimes

7   I would live at home and elsewhere.

8   Q    Did you return to New York for breaks and summer

9   vacations?

10  A    Generally speaking, yes.

11  Q    Mr. Narendra, did Harvard ever ask you to provide a

12  permanent address?

13  A    Yes, they did.

14  Q    And what address did you provide when you were at Harvard?

15  A    I gave my parents' home address, 69-47 Cliverdale (ph)

16  Boulevard in New York City.

17  Q    And you mentioned that was your parents' address?

18  A    Yes, that's my parents' address.

19  Q    Is that where you grew up?

20  A    Yes.

21  Q    Do you still consider that your permanent address?

22  A    No, I don't.

23  Q    Why not?

24  A    After graduating college I moved to my apartment in

25  Manhattan at 16 Park.

1   Q    And when did you graduate?

2   A    I graduated in 2004.

3   Q    Could you specify the date?

4   A    Around June of 2004.

5   Q    June of 2004.  And did you move immediately upon

6   graduation?

7   A    Yes.

8   Q    Since June 2004 you've been residing in 16 Park Avenue in

9   New York City, New York?

10  A    That's correct.

11  Q    Mr. Narendra, I'd like you to turn your attention to

12  September 2, 2004.  Where were you living then?

13  A    I was living at 16 Park in New York.

14  Q    Did you own the apartment at the time?

15  A    Yes.

16  Q    When did you buy the apartment?

17  A    It was purchased in June of 2004.

18  Q    Were your personal belongings in the apartment at the time

19  in September of 2004?

20  A    Yes.

21  Q    Did you keep any personal belongings anywhere else?

22  A    Not really.  Most of my personal belongings were in my

23  apartment, and the ones that weren't were at my parents' place

24  in Queens.

25  Q    Did you keep any personal belongings outside of New York

9

1    State?

2    A    No.

3    Q    You said you graduated in June of 2004 and moved back to

4    New York City upon graduation, is that accurate?

5    A    That's accurate.

6    Q    And why did you move back to New York City?

7    A    I had taken a job at Credit Suisse Securities in their New

8    York office which started pretty much right after I graduated.

9    Q    When did you start at Credit Suisse specifically?

10   A    July 9, 2004.

11   Q    Has your office always been in New York City since

12   starting your employment with Credit Suisse?

13   A    Yes, it's always been in New York.

14   Q    Were you working on Credit Suisse on September 2nd of 2004?

15   A    Yes.

16   Q    When did you accept your offer to be employed by Credit

17   Suisse?

18   A    Sometime in the beginning of 2004.

19   Q    Are you currently working for Credit Suisse?

20   A    Yes.

21   Q    In their New York Office?

22   A    Correct.

23   Q    On average, how many hours a week do you work for Credit

24   Suisse?

25   A    During what time period?

1  Q   When you first began in July of 2004?

2  A   I would say around then I was working around 80 hours a

3  week.

4  Q   And what about in September of 2004?

5  A   Probably a little bit more than that.

6  Q   Could you estimate how many hours a week at the time?

7  A   Say 80 to 100 hours a week.

8  Q   Is that typical since your employment at Credit Suisse?

9  A   Yeah, it's been a pretty full workload for the last two

10  years.

11  Q   Did you pay income taxes in New York in 2004?

12  A   Yes.

13  Q   And did you pay income taxes in any other state in 2004?

14  A   No.

15  Q   Do you have a New York driver's license?

16  A   Yes.

17  Q   Did you have one in 2004?

18  A   Yes.

19  Q   Have you ever had a driver's license in any other state?

20  A   No, I have not.

21  Q   Do you consider yourself a citizen of New York?

22  A   Yes, I do.

23  Q   Have you ever considered yourself a citizen of any other

24  state?

25  A   No.

11

1   Q    Mr. Narendra, are you a founder of the

2   HarvardConnection.com website?

3   A    Yes, I am.

4   Q    Did the name of the website change at any point?

5   A    Yes.  Well so, the name of the website was virtually

6   HarvardConnection.com up until the point where The FaceBook

7   essentially launched.  So while Mark was working on, working

8   with us on the website it was always harvardconnection.com.

9   After the FaceBook launched, we decided to change the name and

10  turn it into ConnectU.com, which sort of came alongside

11  changing the actual - we essentially scraped the code from

12  Harvard Connection and sort of started, you know, with a new

13  code set and a new look and also a new name, ConnectU.

14  Q    You testified that was when Mark was working with you.  Is

15  that Mr. Mark Zuckerberg?

16  A    That's correct.

17       MR. GUY:  Objection, Your Honor.  This doesn't seem

18  to have anything to do with citizenship.

19       THE COURT:  How does it have anything to do with

20  citizenship?

21       MS. ESQUENET:  Your Honor, we have, plaintiff has

22  made the argument that Mr. Narendra was not a member of

23  ConnectU on the relevant date, September 2--

24       THE COURT:  That's not--

25       MS. ESQUENET:  --2004.

1      THE COURT:  --that's not what this evidentiary

2  hearing is about.  The evidentiary hearing is on the

3  citizenship of these two individuals at the time the complaint

4  was filed.  So the objection is sustained.

5      MR. GUY:  Your Honor, if we can short-circuit this.

6  We will stipulate that Mr. Narendra was a citizen of the state

7  of New York.  That seems to be where Ms. Esquenet is going.  We

8  can short-circuit all of this if we just accept that.

9      THE COURT:  Is that satisfactory?

10      MS. ESQUENET:  We actually made that offer several

11  weeks ago to defendants--

12      THE COURT:  No, my question is, is that satisfactory?

13      MS. ESQUENET:  Yes, that is satisfactory.  We

14  stipulate to Mr. Narendra's citizenship in New York.

15      THE COURT:  All right.  Thank you.  Is there any

16  further need to have any questioning of Mr. Narendra?

17      MS. ESQUENET:  Could I have a moment, Your Honor?

18      THE COURT:  Sure.

19      MR. HORNICK:  Your Honor, my only concern is that we

20  have filed a supplemental brief making argument and presenting

21  evidence that Mr. Narendra was not a member on September 2nd

22  and, therefore, it doesn't really matter where he was citizen.

23      THE COURT:  That's not what this evidentiary hearing

24  is about is it?

25      MR. HORNICK:  Well that's fine, Your Honor.

1   THE COURT:  It's about the citizenship of the

2   parties.

3   MR. HORNICK:  I'm just concerned--

4   THE COURT:  I haven't gotten any motion to expand the

5   scope of this evidentiary hearing.

6   MR. HORNICK:  That's fine, Your Honor.  I just am

7   worried about the cross-examination.

8   THE COURT:  Well there isn't going to be any because

9   the issue has been resolved as to Mr. Narendra.

10   MR. HORNICK:  Thank you.

11   THE COURT:  Okay.  Any reason why this gentleman

12   cannot be excused?

13   MR. GUY:  We excuse the witness, Your Honor.

14   THE COURT:  All right.  Thank you very much,

15   Mr. Narendra.  You're excused.

16   THE WITNESS:  Thank you.

17   (Witness excused)

18   THE COURT:  I'll hear the next witness, please, for

19   the plaintiff.

20   MR. HORNICK:  Your Honor, we have no objection to the

21   defendants doing direct examination of their witness and then

22   we'll cross-examine him.

23   THE COURT:  Is that satisfactory?

24   MR. GUY:  Your Honor, I want to make sure and I'd

25   like to have a clear record that it is their burden, it is

14

1   their burden to prove by preponderance.  We'd like them to

2   close their evidence on that point and so we would like them to

3   call the witness first.

4           THE COURT:  Okay.  Go ahead.

5           MR. HORNICK:  That's fine, Your Honor, we'll call the

6   witness first.  We call Mr. Mark Zuckerberg.

7           THE COURT:  Would someone call him in the--

8           UNIDENTIFIED:  They've gone out to get him, Your

9   Honor.

10  (Pause)

11          THE COURT:  Please come forward, sir, stand in the

12  witness box and raise your right hand.

13      (Plaintiff witness, Mark Zuckerberg, sworn)

14          THE COURT:  Please be seated.

15                      DIRECT EXAMINATION

16  BY MR. HORNICK:

17  Q   Good morning, Mr. Zuckerberg.  How are you today?

18  A   Pretty good.  How are you?

19  Q   Now, I understand that you've been the CEO of the FaceBook

20  Inc. since it incorporated; is that right?

21          THE COURT:  Excuse me, could we have his name and his

22  place of residence, please?

23          MR. HORNICK:  Oh I'm sorry, Your Honor.

24  BY MR. HORNICK:

25  Q   Mr. Zuckerberg, could you state your name and residence

1  for the record, please?

2  A    My name is Mark Elliott Zuckerberg.  I go by Mark

3  Zuckerberg.  I'm currently living in Palo Alto, California.

4  Q    What's your address in Palo Alto, California?

5  A    259 Ramona Street.

6  Q    Before you lived at 259 Ramona Street where did you live?

7  A    The last place I lived for any number of months straight

8  was 3 Vasilakos Court in Menlo Park.

9         THE COURT:  All right.  Noreen, could you put the

10  microphone closer to him, please.

11         THE CLERK:  We just need you to sit right up closer--

12         THE COURT:  Yeah.

13         THE WITNESS:  Okay.

14         THE COURT:  Speak right into the microphone--

15         THE WITNESS:  Right.

16         THE COURT:  --cause you've got a soft voice and it's

17  not carrying too well.

18         THE WITNESS:  Sure.  I'll also talk louder.

19         THE COURT:  That's better.

20         THE WITNESS:  Yeah.

21         THE COURT:  Okay.  Put the question again, please.

22  BY MR. HORNICK:

23  Q    What was the period of time during which you lived at

24  Vasilakos Court?

25  A    I think it was for about three months in the summer of

1   2005.

2   Q    And before you lived at Vasilakos Court, where did you

3   live?

4   A    I lived at 1324 Sherman Avenue in Menlo Park.

5   Q    How long did you live at Sherman Avenue?

6   A    From mid-January 2005 to I think around mid-June of 2005

7   or early June.

8   Q    Where did you live before you lived at Sherman Avenue?

9   A    I lived at 1743 Westbrook Avenue in Los Altos, California.

10  Q    How long did you live at Westbrook?

11  A    I've stayed there I guess it would be from mid-September

12  2004 to mid-January until I moved into Sherman.

13  Q    Can you say more specifically when in mid-September of

14  2004 you moved into Westbrook?

15  A    I think we have dates from the deposition, but I don't

16  remember off the top of my head.  I think it was around maybe

17  September 14th or so, September 15th.

18  Q    Where did you live before you lived at Westbrook?

19  A    The last place I stayed for a significant period of time

20  before that was, I guess it was 819 Jennifer Way in Palo Alto.

21  Q    And how long did you stay at Jennifer Way in Palo Alto?

22  A    I think it was just under three months.

23  Q    What time period was that?

24  A    Mid-June 2004 up until a few days before moving into

25  Westbrook in September.

1  Q    And where did you live before you lived at Jennifer Way?

2  A    Before that I was in New York for I think two or three

3  weeks at my home and then before that at Harvard.

4  Q    When you say you were at your home in New York, what was

5  that place?

6  A    What was the address?

7  Q    Yes.

8  A    2 Russell Place Dobbs Ferry, New York.

9  Q    That's your parents' address, correct?

10  A    Sure--

11  Q    That's where you grew up?

12  A    --my parents address, my home, yeah.

13  Q    That's where you grew up, right?

14  A    Yeah.

15  Q    All right.  Now it's correct to say that you have been the

16  CEO of TheFaceBook Inc. since it incorporated, correct?

17  A    I believe so, yeah.

18  Q    And you attended Harvard during the spring 2004 term,

19  correct?

20  A    Yes.

21  Q    You lived on campus at that time; isn't that right?

22  A    Yes.

23  Q    And June in 2004 you left Massachusetts and you went to

24  California for the summer, correct?

25  A    I don't know if I was in Massachusetts at all in June

1    2004.

2    Q    Okay.   So in June of 2004 you went to California for the

3    summer, correct?

4    A    Yes.

5    Q    Okay.   Now when you lived at the Jennifer Way address in

6    Palo Alto you signed the lease for that apartment, correct?

7    A    I believe so.

8    Q    And do you recall what address you provided on the

9    Jennifer Way lease?

10    A    I think it was the 2 Russell Place address for my home in

11    New York.

12    Q    Did you actually put that address on the lease or did

13    someone else put it on the lease for you?

14    A    I didn't write the lease, but I must have given them the

15    address.

16    Q    And when you signed that lease you had no other address at

17    that time, isn't that right, other than the address you could

18    give for your parents?

19    A    Yeah, other than my permanent home, yeah.

20    Q    You no longer had an address at Harvard at that time,

21    correct?

22    A    Actually, I'm not sure if that's true.   The same mailbox

23    may have carried over from year to year at Harvard.   But I mean

24    that's where I was staying at the time.

25    Q    But you had left your Harvard dorm room, correct?

1   A    I'm not sure if that lease was set before then or not.   I

2   mean, I knew that I was looking at places while I was at

3   Harvard.

4   Q    When you were at Harvard and you moved to California for

5   the summer, you left your dorm room, correct?

6   A    Yeah.

7   Q    And you took everything out of it right?

8   A    I didn't, I mean I removed things from my dorm room.   I

9   didn't take them to California.

10  Q    But there was nothing of yours, your belongings were, none

11  of those were left in the dorm room after you moved out and

12  went to California for the summer, correct?

13  A    I mean, not my specific dorm room.   I moved them into

14  storage in the Kirkland House.

15  Q    Now when you were living at Jennifer Way in the summer of

16  2004 you received mail there, correct?

17  A    Yeah.

18  Q    And while you were living there at Jennifer Way, you hired

19  lawyers, correct?

20  A    Yes.

21  Q    And they were California lawyers, correct?

22  A    Yes.

23  Q    It was the Heller Ehrman law firm, correct?

24  A    Yes.

25  Q    Now, while you were in California in the summer of 2004

1   isn't it true that you wanted to unify TheFaceBook.com's

2   operations in one place?

3         MR. GUY:  Objection, vague, Your Honor.

4         THE WITNESS:  I don't--

5         THE COURT:  The objection's what?

6         MR. GUY:  Objection is vague, Your Honor.  Unify,

7   just what does he mean by that?

8         THE COURT:  Well, if the witness doesn't understand

9   the question he may say so.  I don't know what Federal Rule of

10   Evidence there is that says an objection can be made on the

11   grounds it's vague.  If you understand the question you may

12   answer it, sir, otherwise the attorney will rephrase it.

13   A   I'll try to answer.  I wanted everyone to be in California

14   for the summer.  I thought it would be most efficient if we

15   were in one place but I wasn't set on moving out there.

16   BY MR. HORNICK:

17   Q   But that wasn't my question.  What I asked you is when you

18   were there for the summer, did you want to unify

19   TheFaceBook.com's operations in one place?

20   A   I feel like there are a lot of different components to

21   that.  So--

22   Q   All right, well, let's take you back to April 25th of 2006.

23   Do you recall being deposed in a different case on that date?

24   A   I don't remember--

25   Q   Okay.

1  A    --the specific date.

2  Q    We'll be more specific.

3  A    Sure, yes.

4  Q    Are you aware that FaceBook Inc. has a lawsuit pending

5  against ConnectU in California, correct?

6  A    Yes.

7  Q    And you recall being deposed in that case?

8  A    Yeah.

9  Q    Okay.  Do you recall whether that deposition was in April

10  of this year?

11  A    It may have been, sure.

12        MR. HORNICK:  Just one second.

13  (Pause)

14        MR. HORNICK:  Your Honor, how would you like us to

15  proceed with exhibits?  I know that there was this, almost set

16  up but I don't think it was working; is that right?  It doesn't

17  actually focus on the screen, is that right?

18        MR. GUY:  I believe it works.

19        MR. HORNICK:  Oh, you do?  Okay.  All right, in that

20  case I think we can probably use the--

21        THE COURT:  We deal with exhibits the way we always

22  deal with exhibits in an evidentiary hearing.  They're marked

23  for identification, and then when they're moved to admission,

24  if they're admitted the identification suffix comes off.

25        MR. HORNICK:  Well, Your Honor, what I meant was I

22

1    actually have not presented evidence in this courtroom, and I

2    wasn't sure how, whether you wanted us to use the overhead or

3    whether you would like copies to be handed to the Court.

4            THE COURT:  It's completely up to you.

5    (Pause)

6            MR. GUY:  Your Honor, may the witness be shown a

7    copy?

8            THE COURT:  Well, let's see if we're going to use it

9    first.

10           MR. GUY:  Okay.

11           THE COURT:  Is there a teenager in the room that can

12   help them out?

13           MR. GUY:  Your Honor, we had offered to split this

14   with them and they had refused so this is their first time

15   using it.  We're happy to show them how to do it but they

16   didn't want to offer or learn before.

17           MR. HORNICK:  No one asked me, Your Honor.  I don't

18   know what he's talking about.

19           THE COURT:  All right.

20           MR. GUY:  We're happy to turn it on for them.

21           THE COURT:  This is typically the type of thing that

22   goes on between counsel in this case, and I don't want any part

23   of it.

24           MR. HORNICK:  Please do.  I'd love your assistance.

25   Thank you.

23

1   (Pause)

2   BY MR. HORNICK:

3   Q    All right, Mr. Zuckerberg, what we have done here is we've

4   put on the screen a page of testimony from your deposition on

5   April 25th of 2006 in the California case, and you have before

6   you a copy of that transcript.  You do recall being deposed in

7   that case, correct?

8   A    Yes.

9   Q    All right.  Now on page 164 of that transcript you were

10  asked a question – do you have 164 in front of you?

11  A    Yes.

12  Q    Yeah.  On 164 at line 13 you were asked a question: "If

13  the Savvy contract, which is March 24, 2004, can you tell me

14  when you actually stopped using managed?"

15       And then you provided an answer to that question.  Do you

16  see that?

17  A    Yes.

18  Q    Okay.  Then on the next page, if you go to page 165,

19  toward the end of your answer beginning on line 10, you said,

20  "So when we moved out to California we wanted to unify in one

21  place.  That's when we ended up with Equinex."  Do you see

22  that?

23  A    Yes.

24  Q    And that was your testimony at the time; is that right?

25  A    Yeah.

24

1  Q    Was that correct at the time?

2  A    Yes.

3  Q    Okay.  And then you were asked a question, "Okay, but

4  you're talking about Savvy server activity in October of 2004,

5  right?"  And you answered, "Yeah."  Do you see that?

6  A    Yes.

7  Q    Okay.

8          MR. GUY:  Your Honor, he did not read the entire

9  answer in that sentence.  If he would, please, for the--

10         THE COURT:  I think you left out still.

11         MR. HORNICK:  Oh, I apologize, Your Honor.

12         MR. GUY:  No, and the line before that.  He also left

13  out the, after the comma.

14         MR. HORNICK:  I will read--

15         THE COURT:  No, he didn't.

16         MR. GUY:  That's when we ended up with Equinex.

17         THE COURT:  I heard him read that.

18         MR. HORNICK:  I read that.

19         THE COURT:  He read that.

20         MR. GUY:  All right.

21  BY MR. HORNICK:

22  Q    And then you asked the question, question, "Okay, but

23  you're still talking about Savvy server activity in October of

24  2004, right?"  And then you answered, "Yeah", correct?

25  A    Yes.

25

1    Q    Okay.  And then you said, then you were asked, "And you

2    moved out to California in June of 2004", and you said,

3    "Uh-huh", correct?

4    A    Yes.

5    Q    Okay.  And then you were asked, "So again, I ask you, I

6    ask you, is that, can you identify the time at which you

7    stopped using the managed servers."  Do you see that?

8    A    Yes.

9    Q    And then you were asked, I'm sorry, you answered, "So I

10   think that we stopped using the manage servers and the savvy

11   servers after we were set up at Equinex."  Do you see that?

12   A    Yes.

13   Q    And that was your testimony at the time, correct?

14   A    Yes.

15   Q    Okay.  Now I'd like to turn to page 156.

16   (Pause)

17   BY MR. HORNICK:

18   Q    Now on page 156 - let me start with 155 you were asked,

19   "When you say you pulled all of your servers out of there, what

20   do you mean."  Do you recall being asked that question?

21   A    Where is this?  Sorry.

22   Q    This is on page 155, line 22.

23   A    Okay.

24   Q    And then you answered--

25   A    Yes.

26

1    Q    --you answered, I don't know if we pulled our physical

2    servers.  We stopped using those servers because their servers

3    had become unreliable too.  Do you see that?

4    A    Yes.

5    Q    And you were referring then to what?  Which servers were

6    they?

7    A    It was the network of Savvy.

8    Q    The Savvy network servers, correct.

9    A    Yeah, well the network mostly, not the servers.

10   Q    The servers that were being hosted by Savvy, correct?

11   A    Yeah.  I mean it was the network that was mostly

12   unreliable not the actual machines, yeah.

13   Q    And then you said, "They had some days when they were down

14   for like six hours or more and we were paying a lot of money we

15   didn't think that was good."  Do you see that?

16   A    Yes.

17   Q    Okay.  And then you said, "Since we were out in California

18   we just found a facility nearby", correct?

19   A    Yes.

20   Q    And that was Equinex, correct?

21   A    Yes.

22   Q    Okay.  And you bought some servers in California, correct?

23   A    Yes.

24   Q    Okay.  And then you said that you put them there, you mean

25   you put the servers at Equinex, correct?

1   A    Yes.

2   Q    Equinex was a California facility, correct?

3   A    Yes.

4   Q    Okay.  And then you said you transferred all the data.

5   You say, "Transfer all the data from that location and run the

6   site from California", correct?

7   A    Yes.

8   Q    Okay.  So what you meant was that you transferred all the

9   data from the servers that were with Savvy, correct?

10   A    Yes.

11   Q    You transferred that data to the servers that were now at

12   Equinex in California, correct?

13   A    Yes.

14   Q    And you ran TheFaceBook.com website from California?

15   A    Yes.

16   Q    And this was at what time?

17   A    I think this was around late August or September 2004.

18   Q    Mr. Zuckerberg, I'd like you to take a look at the first

19   page of that deposition transcript that you have before you.

20   This deposition, is a transcript of the deposition that was

21   taken of you in the California case, correct?

22   A    Yes.

23   Q    And you read this deposition transcript after it was

24   taken, correct?

25   A    I have.

28

1   Q    And you made whatever corrections you wanted to make to

2   it, correct?

3   A    Yes.

4   Q    And you signed an errata sheet for that deposition

5   transcript, correct?

6   A    Yes.

7            MR. HORNICK:  Your Honor, do you have any objection

8   to us moving all our exhibits into evidence at the end or would

9   you like us to do it as we proceed?

10           THE COURT:  I think it's probably easier to do it as

11  you proceed.

12           MR. HORNICK:  All right.  Well, I'd like to move this

13  particular Exhibit 7 into evidence at this time.

14           THE COURT:  What's Exhibit 7?

15           MR. HORNICK:  This is the deposition transcript of

16  Mr. Mark Zuckerberg taken in the California case on April 25th

17  of 2006.

18           THE COURT:  Well, it's already in the record.  You

19  pointed it out to him.  I don't think there's any reason for

20  the whole deposition to go in.

21           MR. GUY:  Thank you, Your Honor.

22           MR. HORNICK:  Well, Your Honor, in that case we'll

23  just move in the pages that we've used at this time.  We may be

24  using additional papers at a later time.

25           THE COURT:  No, I don't know why you need to move

1    them in.  He's acknowledged that that was his testimony.  It

2    is in evidence.

3           MR. HORNICK:  Okay.

4           THE COURT:  It will appear in the transcript of these

5    proceedings.  I don't think there's any need.  We have enough

6    paper in this case.

7    BY MR. HORNICK:

8    Q    We're handing you, Mr. Zuckerberg, a copy of Exhibit 14.

9    A    Yes.

10   (Pause)

11   BY MR. HORNICK:

12   Q    Now, you have before you what we've marked as Exhibit 14,

13   which is a document that was produced by Harvard University

14   during production numbers HU-151 and 152.  Do you see that

15   before you?

16   A    Yeah.

17   Q    Do you remember me asking you about this exhibit during

18   your deposition on June 8th, two weeks ago?

19   A    Yes.

20   Q    Well when, there came a time when you cancelled your

21   housing at Harvard for the fall of 2004; isn't that right?

22   A    Yes.

23   Q    And when was that that you cancelled the housing?

24   A    I mean, as we talked about before I don't remember the

25   exact date, but I mean I think that I sent something into them

1   so they have records of that and this is probably that.

2   Q    Let's look at page, the second page of this exhibit, which

3   is - it has number HU-152 in the lower corner.  Do you see

4   that?  Do you have it before you?

5   A    Yes.

6   Q    Okay.  And on the last - and this is entitled housing

7   history Mark Zuckerberg.  Do you see that?

8   A    Yes.

9   Q    And the last line of this document says Kirkland House

10  [unassigned], and then it says contract cancelled.  Do you see

11  that?

12  A    Yes.

13  Q    And it says L on 8/13/04.  Do you see that?

14  A    Yes.

15  Q    Now does this refresh your recollection as to whether you

16  cancelled your housing for the fall of 2004 on or before August

17  13th of 2004?

18  A    I still don't remember, but if this is accurate, then I

19  assume that that means that I did.

20  Q    Sometime before Harvard cancelled your housing for the

21  fall of 2004 you notified them that you wanted to cancel your

22  housing for the fall of 2004, correct?

23  A    Yeah, I seem to remember that.

24  Q    And that was because you had decided not to go back to

25  Harvard for the fall of 2004, correct?

1  A    For the fall, yes.

2  Q    Now, did you ever request a leave of absence from Harvard?

3  A    I don't remember.  I'm not sure exactly how that works.  I

4  just failed to not register but I don't know.  I'm not sure.

5  Q    Now, we've handed you a document that we have marked as--

6        MR. HORNICK:  Before we do that I suppose I should

7  move Exhibit 12 into evidence.

8        THE COURT:  Exhibit 12 or 14?

9        MR. HORNICK:  Was it 14?

10        MS. ESQUENET:  14.

11        MR. HORNICK:  14, sorry, Your Honor, yes.

12        MR. GUY:  Your Honor, we object.  There's no

13  foundation for this.  This is a document from Harvard.  He's

14  used it to refresh the witness' recollection.  He has that

15  testimony.  We have an objection to admission of this document.

16        MR. HORNICK:  I don't think we have any objection

17  that this is an authentic document produced by Harvard

18  University, Your Honor.

19        MR. GUY:  I think they're offering it for the truth

20  of what it purports, Your Honor--

21        THE COURT:  Well--

22        MR. GUY:  --that the L on 8/13/04 would mean letter

23  and I--

24        THE COURT:  Well, you've got to lay a foundation.  If

25  you want to get that in as a business record then you've got to

1    lay the proper foundation.  So it would be marked and to the

2    clerk it would be marked as Exhibit 14 for identification.

3         (Exhibit No. 14, marked for identification)

4         MR. HORNICK:  Thank you, Your Honor.  Well, Your

5    Honor, for the purposes of a foundation we have the first page

6    of this exhibit which is HU-151, which is certification from

7    Harvard University from a Joshua Macintosh who certifies that

8    he's employed by the director of housing at Harvard College,

9    and in that capacity he is the custodian of certain records of

10   Mark Zuckerberg.  And copies of Mr. Zuckerberg's housing

11   records as described in a subpoena that we issued to Harvard

12   University on May 23rd are provided and attached hereto, to the

13   certification.  And he certifies that the records that he

14   attaches, which is HU-152 are true and accurate copies of the

15   originals, which are kept in the ordinary course of business at

16   Harvard University.  And that is signed by--

17        THE COURT:  Well, if he came in and testified to that

18   I suppose it would be a different question, but you've got to

19   authenticate a document you want to introduce into evidence.  A

20   certification, it's not a self authenticating document is what

21   I'm saying, and if you could show me a rule of evidence that

22   would permit that to be admitted I'd be glad to consider it,

23   but I think you need the custodian of the record to testify

24   that it's kept in the ordinary course of business, it's the

25   ordinary course of business to keep the record and that's true

33

1   and accurate copies of the records kept in the ordinary course

2   of business.  So it's marked for identification at this time

3   only.

4           MR. HORNICK:  All right.  Thank you, Your Honor.

5   We'll consider whether we need to authenticate it further and

6   we have the testimony.

7           THE COURT:  I don't think you've authenticated it at

8   all--

9           MR. HORNICK:  Well--

10          THE COURT:  --and that's the reason for my ruling.

11          MR. HORNICK:  My point, Your Honor, is that we'll

12  consider whether we need to authenticate it as the Court's

13  instructed and--

14          THE COURT:  Okay.

15          MR. HORNICK:  --for the time being we have the

16  testimony.

17  BY MR. HORNICK:

18  Q    Now, we'll turn to Exhibit 13.  What we have here is a

19  document that was produced by the defendants in this case.  It

20  bears a production number of TFB-6974 through 6977.  Do you see

21  that Mr. Zuckerberg?

22  A    Yes.

23  Q    All right.  Now, I'd like you to turn specifically to the

24  last page of this document, which has the production number

25  TFB-6977.  Do you have that before you?

1    A    Yes.

2    Q    And now this is a letter from Harvard University to you,

3    correct, addressed to you?

4    A    Yes.

5    Q    It's addressed to you at your parents' address, correct?

6    A    Sure.

7    Q    And it's dated August 24th of 2004, correct?

8    A    Yes.

9    Q    All right.  Now it says, "Dear Mark, at its meeting the

10   administrative board of Harvard College voted to grant you a

11   leave of absence as of May 28, 2004."  Do you see that?

12   A    Yes.

13   Q    Is it your understanding that you were granted a leave of

14   absence by Harvard University as of May 28th of 2004?

15   A    Based on this document I guess so.

16   Q    It's your understanding--

17              THE COURT:  I'm sorry, I didn't hear your answer,

18   sir.

19              THE WITNESS:  Based on this document I guess so.

20   Sorry, I'll try to get closer.

21              THE COURT:  Well, we don't guess in court.  You can

22   testify as to your best recollection, but please don't answer

23   based on guesses.  So you may answer the question, please,

24   without reference to guessing.

25   BY MR. HORNICK:

35

1  Q    So the question was is it your understanding that Harvard

2  University granted you a leave of absence effective May 28th of

3  2004?

4         MR. GUY:  Objection, Your Honor.  I'll ask that he

5  lay a foundation as to whether he's ever seen this document

6  before.

7         THE COURT:  No.  You don't need to lay a foundation

8  for something to refresh someone's recollection.  The objection

9  is overruled.

10         MR. GUY:  Thank you.

11  BY MR. HORNICK:

12  Q    My question specifically, Mr. Zuckerberg, was is it your

13  understanding that you were granted a leave of absence by

14  Harvard University as of May 28th of 2004?

15  A    Yes.

16  Q    Now, did you request that leave of absence?

17  A    I don't remember doing so, but this document seems to say

18  that I did or that someone else did on my behalf if that's

19  possible?

20  Q    Did someone else request a leave of absence on your

21  behalf?

22  A    I don't know.

23  Q    Who would have requested a leave of absence on your

24  behalf?

25  A    I'm not sure.  Maybe my parents, I'm not sure how that

1  works.

2  Q    Did you ask your parents to request a leave of absence on

3  your behalf?

4  A    I don't think so.

5  Q    Did you receive this letter from Harvard University?

6  A    I wasn't at home when this letter was sent home.  So -

7  sir, could you clarify that?

8  Q    Is it your understanding that this letter was sent to you

9  from Harvard University?

10  A    I think so, yeah.

11  Q    Did you ever see this letter before you were deposed on

12  June 8th?

13  A    I don't remember it.  It doesn't, I don't know.  I don't

14  really remember seeing it.

15  Q    How did your lawyers get this letter to produce to us?

16        MR. GUY:  Objection.  Lacks foundation.

17        THE COURT:  He may answer if he knows.

18  A    I don't know.

19        MR. HORNICK:  Your Honor, we would move this exhibit

20  into evidence on the basis that it was produced by the

21  defendants.  I don't think they can reasonably challenge its

22  authentication even though the witness doesn't know if he ever

23  saw the document before.  I don't think there can be any

24  question that this is a document that was received, sent to

25  Mr. Zuckerberg, at some, received by him and by his parents and

37

1  then somehow given to counsel and somehow produced to us.

2          MR. GUY:  No objection to that one, Your Honor.

3          THE COURT:  No objection?

4          MR. GUY:  No objection.

5          THE COURT:  All right.  You had pre-marked that as

6  17?

7          MR. HORNICK:  13, Your Honor.

8          THE COURT:  13, all right.  That's admitted as

9  Plaintiff's Exhibit 13.

10          MR. GUY:  Your Honor, I don't believe that they ever

11  focused on any of the other letters.  It was only the last page

12  they focused on.  That would be that letter.  If we can just

13  have that--

14          THE COURT:  Well, he's admitting - he's moving

15  admission of the whole document.  What is your position with

16  respect to the whole document?

17          MR. GUY:  Position is they haven't examined him on

18  any of the others, and they really don't relate to this issue.

19  So I would ask that only the back page TFB-6977 be admitted.

20          THE COURT:  And what's your objection to the first

21  two?

22          MR. GUY:  Well, they're different documents, Your

23  Honor, and I don't think the witness has been questioned on

24  them at all.

25          THE COURT:  Well, it's not a pre-requisite for

1  admissibility that the witness can be questioned about them.

2          MR. GUY:  Well, they haven't been authenticated and

3  there's no foundation laid for--

4          THE COURT:  All right, all right.  He's objecting on

5  the lack of authentication, so you're going to have to do more

6  on that.  But I will admit the last page and we'll make - let's

7  make that 13 in evidence, and let's make the first three pages

8  13(a) for identification.

9      (Plaintiff's Exhibit 13A, marked for identification)

10      (Plaintiff's Exhibit 13, admitted)

11          THE COURT:  Let me give this back to you.  Noreen,

12  that's 13(a) for identification.  That's 13 in evidence.

13  BY MR. HORNICK:

14  Q   Mr. Zuckerberg, you sent something to Harvard University

15  asking them that they do something with respect to the fall of

16  2004, correct?

17  A   Yeah, that's what I remember.

18  Q   But you don't know whether you requested a leave of

19  absence or whether you requested or said you wouldn't need

20  housing or whether you did both in that correspondence,

21  correct?

22  A   I think specifically it was housing but it may have been

23  both.

24  Q   Now this was a letter that you sent to Harvard?

25  A   I think it was more of a form.

1   Q    Form, but you don't have a copy of that form, correct?

2   A    No.

3   Q    And if you sent any other kind of correspondence to

4   Harvard requesting a leave of absence or not to use housing for

5   the fall of 2004, you don't have a copy of that, correct?

6   A    No.

7   Q    Now when you sent in your housing form saying that you

8   wouldn't need housing for the fall of 2004, you had decided to

9   stay in California and not to go back to school for the fall of

10  2004, correct?

11  A    Sorry, could you repeat that?

12  Q    Yes.  When you sent in your housing form you had decided

13  to stay in California and not go back to school for the fall of

14  2004, correct?

15  A    I assume so, yeah.

16  Q    Well, you did or you didn't?

17  A    I mean, I don't recall exactly what I was thinking at that

18  time.  I may have just thought that it was likely that I

19  wouldn't go back and, therefore, I didn't want housing.  But I

20  assume that that's what I was thinking at that time.

21  Q    Well, let's look at some deposition testimony that you

22  gave in the California deposition on April 25th.

23  (Pause)

24  BY MR. HORNICK:

25  Q    Now, you have before you, again, what we've marked for

40

1   identification as Exhibit 7.  Mr. Zuckerberg, this is your

2   deposition testimony from the April 25, 2006 deposition in the

3   California case, correct?

4   A    Yeah.

5   Q    Okay.

6         THE COURT:  Excuse me, could you focus that a little

7   better.  It's awfully blurry.

8         MR. HORNICK:  I'm not sure we can, Your Honor.  You

9   worked on this this morning and you weren't able to focus it

10  any better than this so, right?

11        UNIDENTIFIED:  Yes, that's correct.

12        THE COURT:  Okay.

13        MS. ESQUENET:  Your Honor, we have a spare copy if

14  you'd like.

15        THE COURT:  No, that's all right.  I'll make do.

16  BY MR. HORNICK:

17  Q    Now beginning at line three at page 184, you were asked a

18  question, "Let me take a look and see."  And then the

19  questioner said, "at some point in time did you make the

20  decision to actually stay in California full time."  Do you see

21  that?

22  A    Yes.

23  Q    And then your attorney objected and then you answered at

24  line eight, "Yeah, I didn't go back to school."  That was your

25  answer at that time, correct?

41

1    A    Yes.

2    Q    And you – that was a correct answer when you gave it,

3    correct?

4    A    Yeah.

5    Q    Okay.  Now that deposition as I said was April 25th of

6    2004, correct?

7    A    Yes.

8    Q    And that was before the Court's May 1st order calling your

9    citizenship into question, correct?

10          THE COURT:  I'm sorry, what did you say the date of

11   the deposition was?

12          MR. HORNICK:  April 25th of 2006.  I'm sorry, Your

13   Honor--

14          THE COURT:  Thank you.

15          MR. HORNICK:  --I did say 2004.

16          THE COURT:  You did.

17   BY MR. HORNICK:

18   Q    And that was before the Court's May 1, 2006 order calling

19   your citizenship into question, correct?

20   A    Yeah.  I mean, I don't know the exact dates but yeah.

21   Q    Now, when you moved to California in the summer of 2004

22   you liked being there, right?

23   A    I'm sorry?

24   Q    You liked being in California; isn't that right?

25   A    It was a fun summer.

42

1  Q    It was a fun summer, okay.  You wanted to be in

2  California because that's where the start-up companies were

3  located; isn't that right?

4  A    Well, those are the reasons I came out for the summer, a

5  reason.

6  Q    And at that time in the summer of 2004 TheFaceBook.com

7  website depended on you, didn't it?

8  A    Yes.

9  Q    Okay.  And if you had left TheFaceBook it wouldn't have

10 done well, correct?

11 A    Yeah.  I mean that's all in the deposition.

12 Q    And you had solidified all of TheFaceBook's operations in

13 California over the summer of 2004, correct?

14 A    So by operations you're referring to where the servers

15 were?

16 Q    Servers were in California, correct?

17 A    I mean, yeah, but they were in California before we

18 managed, anyway, but yeah, yes.

19 Q    Okay.  And the operations were in California?

20 A    By operations you mean the servers, right?

21 Q    Your running of the website was also in California as of

22 the summer of 2004, correct?

23 A    But that's just because we were there, but yes, yes.

24 Q    Okay.  Dustin Moskovitz was your roommate at Harvard,

25 correct?

1   A    Yes.

2   Q    And he was with you in the summer of 2004 in California,

3   correct?

4   A    Yes.

5   Q    And he's still there, right?

6   A    He is.

7   Q    And Andrew McCollum he was your friend; is that right?

8   A    Yes.

9   Q    Still your friend, right?

10  A    Yes.

11  Q    And he was in California in the summer of 2004 as well?

12  A    Yes.

13  Q    All right.  And since September of 2004 you've remained in

14  California, correct?

15  A    I'm still there.  I haven't remained there like ever

16  since.  I mean I've gone back, but yes, I'm still there.

17  Q    You've gone back where?

18  A    I've gone other places.  I've gone back to Boston, back to

19  New York.

20  Q    But you've been living in California since the summer of

21  2004?

22  A    Yeah.

23  Q    Now, did you ever inform Harvard University that you would

24  return to school in the fall of 2005?

25  A    No, I didn't because I didn't go back to school.  But it's

44

1  not my understanding that I had to.

2  Q    And you have not informed Harvard of your wish or of a

3  wish to return to school at any time, correct?

4  A    Yeah, that's correct.  I mean, it's my understanding that

5  I can just tell them when I when I want to go back and then I

6  can go back.

7  Q    Let's have Exhibit 13 again.

8         THE COURT:  Excuse me, what year had you completed in

9  June of 2004?  What year in school?

10        THE WITNESS:  Oh, my sophomore year.

11        THE COURT:  Thank you.

12        THE WITNESS:  Yeah.

13  BY MR. HORNICK:

14  Q    Well, we're going to go, put back before you Exhibit 13,

15  last page of that exhibit.

16        THE COURT:  Actually, that's 13(a) now because--

17        MR. HORNICK:  13(a), thank you, Your Honor.

18  BY MR. HORNICK:

19  Q    And--

20        THE COURT:  I'm sorry, no.  I made a mistake.  That's

21  13.  I apologize.  That's the one that's in evidence.

22        MR. HORNICK:  Ah, okay.  This is Exhibit 13.

23        THE COURT:  Go ahead, sorry.

24        MR. HORNICK:  No problem, Your Honor.

25  BY MR. HORNICK:

1   Q    Now, I'm going to refer you specifically to the third

2   paragraph of this letter from Harvard University to you dated

3   August 24th of 2004.  And I wanted to ask you based upon your

4   understanding or based upon that letter, I don't really care

5   which, what was the deadline for your request to return to

6   Harvard for the spring of 2005?

7   A    For the spring of 2005?

8   Q    Yes.

9   A    Hold on.

10  (Pause)

11  A    I mean, it doesn't say here.

12  BY MR. HORNICK:

13  Q    Doesn't say here, all right.  Let's look at--

14  A    But this is just for housing not for returning in general.

15  Q    All right, well let me rephrase the question then.  What

16  is your understanding of the deadline to request housing at

17  Harvard University for the spring of 2005?

18  A    I have no understanding of that.

19  Q    All right.  Let's look at this paragraph.  It says here,

20  third paragraph, "If you haven't already done so I'm enclosing

21  the application for returning students form which you should

22  return to the undergraduate housing office in University Hall

23  by February 1 for the following fall term and by September 30

24  for the following spring term."  Do you see that?

25  A    Yeah.

1  Q   Okay.  Now, is it your understanding that the deadline

2  for you to request housing for the spring 2005 term was

3  September 30th of 2004?

4  A   I mean, it doesn't say 2004 but, sure.

5  Q   All right.  Did you request housing for the spring of 2005

6  by September 30th of 2004?

7  A   No.

8  Q   All right.  And what was the deadline to request housing

9  at Harvard University for the fall of 2005?

10  A   For the fall 2005 it says February 1st, right.

11  Q   So by February 1st of 2005 you had to request housing for

12  the fall of 2005, correct?

13  A   Yeah, if I wanted housing.

14  Q   Did you do that?

15  A   No.

16  Q   No.  What was the deadline to request housing for the

17  spring of 2006?

18  A   I don't know.

19  Q   It would have been September 30th of 2005, correct?

20  A   I have no idea.

21       MR. GUY:  Objection.  Lacks foundation, calls for

22  speculation.

23       THE COURT:  He can answer if he knows.

24       THE WITNESS:  I don't.

25  BY MR. HORNICK:

1  Q    Now, this letter isn't telling you that you have to meet

2  these dates by a particular year, correct?

3  A    It's not, no.

4  Q    And you testified that it doesn't matter when you go back

5  to Harvard, correct?

6  A    Yeah, that's true.

7  Q    All right.  So it's your understanding based upon your

8  reading of this letter that was addressed to you, that your

9  deadline to request housing for the spring of 2006 would have

10  been September 30th of 2005?

11  A    No.  I mean I feel like these dates can probably change.

12  I'm not sure.

13  Q    So the letter doesn't mean anything to you; is that right?

14  A    I think it's referring to the next terms, but I--

15  Q    Does it say that?

16  A    No, but that would be how I read it.

17  Q    Okay.

18  A    I mean I could be wrong but.

19  Q    All right.  Did you request housing for the spring of 2006

20  term at any time?

21  A    Spring 2006?

22  Q    Yes.

23  A    No.

24  Q    All right.  And did you request housing for the fall of

25  2006 at any time?

1   A     No.

2   Q     All right.  Now after you left Harvard at the end of the

3   spring 2004 term, whatever belongings you didn't take with you

4   to California and whatever belongings you didn't store at your

5   parents' house you gave away, correct?

6   A     No, that's not correct.

7   Q     All right.  Let's have Exhibit 4.

8   (Pause)

9          MR. HORNICK:  I'd like to point out to everyone in

10  court included that in referring to this exhibit we are using

11  here what was a rough draft of the transcript.  This was the

12  best one that we had available when we submitted this to the

13  Court on June 10th, and, therefore, the page number, when I

14  refer to a page number in the transcript, I'm referring to this

15  number.  This is the number that when we had this only in

16  electronic form this is the number that appeared to break the

17  pages.  So I am not referring to the page at the bottom of the

18  page that says page referring to the number that appears--

19         THE COURT:  And this is the same deposition you talked

20  about--

21         MR. HORNICK:  Yes.  This is--

22         THE COURT:  --we referred to earlier.

23         MR. HORNICK:  --same one that I--

24         THE COURT:  Okay.

25         MR. HORNICK:  --referred to earlier.  That's right,

1   Your Honor.

2   BY MR. HORNICK:

3   Q    Now during your deposition I asked you the question, "Did

4   there come a time when you moved your personal belongings from

5   Massachusetts to California."   Correct?

6   A    Yes.

7   Q    And then your attorney objected and then you answered, "I

8   mean, I still haven't moved all my personal belongings from

9   Massachusetts to California.   But there are specific things,

10  which I guess I needed which I couldn't get again, which I

11  probably moved.   A bunch of the stuff I just left there and

12  gave to other people to use."   Do you see that?

13  A    Yes.

14  Q    That was correct testimony at the time, correct?

15  A    Yeah.   The question that you just asked unless I misheard

16  it was did I give stuff away at the end of the school year.

17  And I mean, I guess like the spring term ended May 28th.   And I

18  heard your question as did you give away your stuff that you

19  didn't take to New York then, and the answer that I gave was,

20  no, because I put a lot of stuff into storage because I was

21  planning on coming back to Harvard in the fall.   So at the end

22  of the summer when I went back to Harvard and I had all the

23  stuff in the storage, some of that stuff I then took and put in

24  my house in New York and some of the stuff like my mattress I

25  just gave to a friend.

1  Q     Well, the next question I asked you was, "Do you have

2  things in storage in Massachusetts?"  Correct?

3  A     Yes.

4  Q     And you answered, "No."

5  A     I have nothing in storage now, yeah.

6  Q     You have nothing in storage now.  So you're saying that

7  you gave away your remaining personal belongings in

8  Massachusetts sometime after you went to California in the

9  summer of 2004?

10 A     Yeah, it was in September of 2004.

11 Q     When in September of 2004 did you give away your remaining

12 personal belongings in Massachusetts?

13 A     It was in between Jennifer and Westbrook.

14 Q     All right, so that was--

15 A     So in the few day period there when I didn't have a place

16 to go and I went back to the east coast.

17 Q     All right.  So that few day period between the time that

18 you moved out of Jennifer Way and the time that you moved into

19 Westbrook was around September 11th of 2004, correct?

20 A     Yeah.  It was, yeah, those few days.

21 Q     So it was at that time around September 11th that you gave

22 away your remaining personal belongings in Massachusetts?

23        MR. GUY:  Objection.  That mischaracterize his

24 testimony.  He's done that twice now.

25        THE COURT:  Well, if it mischaracterizes his

51

1  testimony the witness may say so.

2  THE WITNESS:  I'm sorry, could you repeat that?

3  MR. HORNICK:  Yes.

4  BY MR. HORNICK:

5  Q   So you gave away the remainder of your personal belongings

6  in Massachusetts around September 11th of 2004, correct?

7  A   Well, the ones I didn't bring back to New York, yes.

8  Q   Okay.

9  (Pause)

10  BY MR. HORNICK:

11  Q   Mr. Zuckerberg, this, I believe I might have said earlier

12  that this is a testimony that we referred to earlier, but I

13  believe this might be the first time that we've referred to

14  this deposition transcript.  Could you look at the first page

15  of this transcript, please?

16  A   Yeah, sure.

17  Q   All right.  Now you were deposed by me on June 8th of 2004

18  in California, correct?

19  A   Yes.

20  Q   And this deposition transcript says on--

21  MR. GUY:  Your Honor, I think it's 2006.

22  THE COURT:  You keep saying 2004.

23  MR. HORNICK:  Yes, I apologize, Your Honor.  2004 is

24  a key date in this case and that's the date that I've been

25  focusing on almost continually in my daily life for the past

1    several months.

2    BY MR. HORNICK:

3    Q    But what I meant was that I deposed you on June 8th of

4    2006, correct?

5    A    Yes.

6    Q    Okay.  And you have before you the transcript of that

7    deposition, correct?

8    A    Yes.

9    Q    And have you had the opportunity between the time you were

10   deposed and today to read that transcript?

11   A    Yeah.

12   Q    Okay.  And have you created one of those correction pages

13   for this transcript?

14   A    Not yet.

15   Q    Not yet, okay.  Now when I deposed you on June 8th of 2006,

16   you said that during the summer of 2004 you had spent some of

17   the money that your parents had put aside for you for your

18   college education, correct?

19   A    Yes.

20   Q    All right.  And you said you'd spent much of that money,

21   correct?

22   A    Yes.

23   Q    But you said you weren't sure if you'd spent it all,

24   correct?

25   A    Yeah.

53

1   Q   Do you know how much of it you'd spent?

2   A   No.

3   Q   Could you assign a percentage to how much of it is left?

4   A   Oh, it's all left now.

5   Q   It's all left now because you've replenished it?

6   A   Well, I spent the money once I was relatively confident

7   that we'd get investment and then part of the investment deal

8   was to pay myself back for that loan to the company.

9   Q   But in the summer of 2004 you had spent a good part of the

10  money that your parents had put aside for your college,

11  correct?

12  A   Yeah.

13  Q   And when was it that you were able to replenish?

14  A   I think it was a few weeks later.

15  Q   A few weeks later?

16  A   Although, I'm not sure of the exact dates.  But it wasn't

17  that long.

18  Q   You first got your first infusion of venture capital in

19  April of 2005, correct?

20  A   No.  It was September of 2004.  I mean, it was a smaller

21  round.  It was around - I don't know.

22  Q   All right.  So from, the money that you--

23          MR. GUY:  Your Honor, if he has - allow him to

24  complete the last answer.

25          THE WITNESS:  No, no, I was done.  Don't worry.

54

1          THE COURT:  One of the problems, I wish you'd speak

2  a bit more distinctly, Mr. Zuckerberg.  You have a tendency to

3  mumble and sometimes it's hard to hear exactly what you're

4  saying.  So please try and speak a little bit more distinctly.

5          THE WITNESS:  Okay.  Sorry.

6  BY MR. HORNICK:

7  Q    Now, you moved down to your summer - strike that.

8        During the summer of 2004, you were living in what you

9  referred to as a summer sub-let, correct?

10 A    Yeah.

11 Q    And that was Jennifer Way, correct?

12 A    Yes.

13 Q    All right.  And you moved out of there around September

14 11th or September 12th of 2004, correct?

15 A    Yes.

16 Q    And you moved out of there because your lease ran out,

17 correct?

18 A    Yeah.

19 Q    And sometime before you moved out you bought a car,

20 correct?

21 A    Yes.

22 Q    It's a Ford Explorer, correct?

23 A    Yes.

24 Q    And you bought that car in California?

25 A    Yes.

1  Q    And it was registered in California when you bought it?

2  A    That's my understanding, yes.

3  Q    And you kept it registered in California after you bought

4  it, correct?

5  A    I didn't change it.

6  Q    And you obtained insurance for that car online yourself,

7  correct?

8  A    Yes.

9         THE COURT:  I'm sorry; I'm not understanding this.

10 You purchased a car that was already registered and you kept

11 the registration of the previous owner, is that what you're

12 saying?

13        THE WITNESS:  That's my understanding.  Well, the car

14 was registered.  I don't know if it was ever transferred over.

15        THE COURT:  So you're testifying you bought a car and

16 you didn't register it in your own name and kept the

17 registration in the name of the previous owner?  Is that what

18 you're - I'm just trying to understand your testimony,

19 Mr. Zuckerberg.

20        THE WITNESS:  Yeah.  That's my understanding.

21        THE COURT:  All right.  Proceed.

22 BY MR. HORNICK:

23 Q    Is it in fact your understanding that you didn't register

24 that car in your own name?

25 A    That's what I remember, yeah.

56

1   Q    So when you got that car, you bought it from somebody on

2   Craig's List in California, correct?

3   A    Yes.

4   Q    All right.  So when you got that car you didn't need to

5   fill out any forms to show that it was your car?

6   A    I don't know.  I don't remember.

7   Q    And you don't know if you sent in any forms to the state

8   of California showing that now you owned that car?

9   A    I don't remember.  I, I, I'm really not sure.

10  Q    And you don't remember whether the state of California

11  sent you a registration certificate showing that you own that

12  car?

13  A    I, I don't remember.

14  Q    All right.  And you don't remember if the state of

15  California sent you any license plates to put on that car?

16  A    It already had license plates.

17  Q    They didn't send you any new license plates?

18  A    I don't think so.

19  Q    Did they send you any kind of a sticker or anything that

20  you needed to apply to the license plates or the windshield?

21  A    At some point I think so, yeah.

22  Q    Was that after you bought the car?  Shortly after you

23  bought it or was it long after you bought it?

24  A    I think it was a little while after.

25  Q    All right.  So you had that car from about September of

57

1    2004 until December of 2004, correct?

2    A    Yes.

3    Q    December of 2004--

4    A    Well, we had the car after that too, but yes.

5    Q    So December 2004 you leased a new Infiniti, correct?

6    A    Yes.

7    Q    You leased that car in California?

8    A    Yes.

9    Q    And it was registered to you in California?

10   A    Yes.

11   Q    And you obtained insurance for that car through the

12   dealership, correct?

13   A    I think it was the same insurance that I got for the Ford.

14   Q    All right.  Now when you got that Infiniti did you keep

15   the Explorer?

16   A    Yeah, I mean other people drove it too.

17   Q    Okay.

18   A    The one thing that's possible is that it was registered to

19   someone else in the house, and I just didn't fill out the

20   paperwork for that.  But I really don't know how that, how this

21   stuff works.

22   Q    But you bought the car, right?

23   A    I mean, I physically paid a check to someone for the car,

24   yes.

25   Q    You used your money to pay for it?

58

1  A    Yes.

2  Q    Now after you moved out of the summer sublet you, and some

3  friends went to New York and stayed at your parents' house for

4  about two or three days, correct?

5  A    Yes.

6  Q    And that was because you hadn't lined up any other new

7  place to live by the time that the summer sublet had run out,

8  correct.

9  A    Yes.

10 Q    Okay.  Now, in September of 2004 did you have any plans to

11 go to New York and stay there for an indefinite period of time?

12 A    Sorry, end of September--

13 Q    Yes.

14 A    Could you repeat that?

15 Q    In September of 2004 did you have any plans to go to New

16 York and stay there for an indefinite period of time?

17 A    No formal plans.

18 Q    Did you have any plans at all?

19 A    Not really.

20 Q    Okay.  And while you were in New York your intent was to,

21 and to be more specific while you were in New York for those

22 few days in September of 2004, your intent was to return to

23 California and stay there, correct?

24 A    No, my intent was to go to California and stay there for a

25 short period of time but not stay there indefinitely or

1   anything.

2   Q    Well, let's look at Exhibit 7 again, page 205.

3   A    Which one, is that this one?

4   Q    It's the other one.

5   A    Oh, it is, yeah.

6   (Pause)

7              THE COURT:  Go ahead.

8   BY MR. HORNICK:

9   Q    I'd like to direct your attention to page 204 of Exhibit

10  7.  Do you have that before you?

11  A    Yeah.

12  Q    On line 15 you were asked, "What was your purpose of going

13  to New York in early September of 2004."  Do you see that?

14  A    Yes.

15  Q    And then you gave an answer.  You said, "You didn't have a

16  place to stay in California?"  Correct?

17  A    Yeah.

18  Q    And then you gave some additional answer to that question.

19  Then on the next page, top of page 205, you were asked, "Was

20  your intent to stay in New York when you first went there?"  Do

21  you see that?

22  A    Yeah.

23  Q    And then your attorney objected and you answered, "No, the

24  intent was to find a place to stay in California for a little

25  while longer and then, in California, go back to California."

60

1   Do you see that?

2   A    Yes.

3   Q    Okay.  Then you were asked again, "So prior to going to

4   New York in September, you intended to stay in California?"

5   And - do you see that question?

6   A    Yeah.

7   Q    All right.  Then your attorney objected and then you

8   answered, "I wouldn't say that I went back to California for a

9   little longer, yeah."  Do you see that?

10  A    Yeah.

11  Q    Okay.  Then you were asked again, Did you just say, "I

12  intend to stay in California?" Do you see that?

13  A    Yeah.

14  Q    All right.  Then your attorney objected again and you

15  said, "Do you want me to answer this?"  And the questioner

16  answered yes.  Do you see that?

17  A    Yeah.

18  Q    And then you said, "That's not what I said.  I said I

19  intended to go back to California and stay after that."  Do you

20  see that?

21  A    Yeah.

22  Q    That was your testimony at the time, correct?

23  A    Yes.

24  Q    Okay.  Now when you returned to California from New York

25  around September 12th of 2004, you moved into an unfurnished

1  house on Westbrook Avenue, correct?

2  A    Yes.

3  Q    That was in Los Altos, California, correct?

4  A    Yes.

5  Q    That was around September 14th or so of 2004?

6  A    Yeah.

7  Q    Okay.  And you signed the lease for that property,

8  correct?

9  A    I don't know if I did.

10  (Pause)

11  BY MR. HORNICK:

12  Q    Mr. Zuckerberg, you've been handed what we've marked as

13  Exhibit 9 which was, I'm sorry, Exhibit 26 which was Exhibit 9

14  of your deposition on June 8th of 2006.  Can you tell us what

15  this document is?

16  A    It looks like the lease.

17  Q    The lease for what?

18  A    For the place in Los Altos in Westbrook.

19  Q    Westbrook Avenue address, this is the lease for that

20  address; is that right?

21  A    Yeah.

22  Q    And is that your signature that appears on the last page?

23  A    Yes.

24  Q    Well, FaceBook Inc. paid the rent for the Westbrook Avenue

25  house, correct?

62

1    A    Yeah, that's my understanding.

2    Q    And as I asked you before this was an unfurnished house,

3    correct?

4    A    Yes.

5    Q    And you bought furniture for it, correct?

6    A    A very small amount.

7    Q    I'm sorry?

8    A    A small amount, yeah.

9    Q    But you bought furniture for that house?

10   A    Like a mattress, yeah, a couch.

11   Q    You bought a mattress and a couch?

12   A    Yes.

13   Q    Yes.  But any furniture for this house?

14   A    A table to sit and work on.  Some chairs.

15   A    You testified that you probably bought some appliances for

16   the house too, correct?

17   A    Yeah.

18   Q    This was all new stuff that you bought for the house,

19   right?

20   A    I assume so, yeah.

21   Q    You bought it with your money?

22   A    We split a lot of the stuff that was just for the house.

23   Q    But you used some of your own money to buy furniture for

24   this house, correct?

25   A    I assume so, yeah.

63

1    Q    You did or you didn't?

2    A    I don't remember.

3    Q    Who else would have paid for this furniture if it wasn't

4    you?

5    A    Dustin or Sean or Andrew.

6    Q    Now, during the deposition I asked you if you bought

7    furniture for the house and you said you did, correct?

8    A    I did.

9         MR. HORNICK:  We'd like to move this Exhibit 26 into

10   evidence.

11        THE COURT:  Any objection?

12        MR. GUY:  None, Your Honor.

13        THE COURT:  It's admitted.

14        MR. HORNICK:  I'll give it--

15        THE COURT:  Just put it on the clerk's desk.

16   (Plaintiff's Exhibit No. 26, admitted)

17   BY MR. HORNICK:

18   Q    And while you were at the Westbrook Avenue address you

19   opened a gas and electric account in your name, correct?

20   A    Yeah, I believe so.

21   Q    And you opened a cable account in your name as well,

22   correct?

23   A    Yes.

24   Q    And in January 2005 you moved to the house on Sherman

25   Avenue in Menlo Park, California, correct?

1   A    Yeah.

2   Q    Okay.  And you moved there only because one of your

3   roommates was having an allergic reaction to something at

4   Westbrook, correct?

5   A    That's correct.

6   Q    If not for that problem, you would have stayed out the

7   Westbrook lease term, correct?

8   A    By that time, yeah, we had decided to stay for the spring

9   term as well.

10  Q    And when you moved to the Sherman Avenue address you took

11  your furniture with you, correct?

12  A    Yes, yes.

13  (Pause)

14  BY MR. HORNICK:

15  Q    I'm handing you what's been marked as Exhibit 34,

16  Mr. Zuckerberg, which is Exhibit 10 to your deposition on June

17  8th.  Can you identify this document for us?

18  A    This looks like the lease for the Menlo Park, Sherman

19  Avenue house.

20  Q    The lease for the Sherman Avenue House.  And did you sign

21  this lease?

22  A    It looks like it, yes.

23  Q    Let's look at the last page.  You signed this lease in

24  both your own name and the name of TheFaceBook, correct?

25  A    Yes.

1  Q    Is that your handwriting next to your signature there on

2  the line that says tenant?

3  A    No.

4  Q    No.  But it says TheFaceBook/Mark Zuckerberg and then your

5  signature following that, correct?

6  A    Yes.

7  Q    And the city that you provided there under your name is

8  Los Altos, California, correct?

9  A    Well, I mean, I didn't write that but that's what's there,

10 yes.

11 Q    But that was - was that Los Altos address or city and

12 state on this document when you signed it?

13 A    I don't remember.  I assume so.

14        MR. HORNICK:  I'd like to move this Exhibit 34 into

15 evidence?

16        THE COURT:  Any objection?

17        MR. GUY:  None, Your Honor.

18        THE COURT:  It's admitted, Exhibit 34.

19    (Plaintiff's Exhibit No. 34, admitted)

20 BY MR. HORNICK:

21 Q    Now in the fall of 2005 you moved into an unfurnished

22 apartment on Ramona Street in Palo Alto, correct?

23 A    Yes.

24 Q    And you still live there today, correct?

25 A    Yes.

1  Q    And you plan to stay there, correct?

2  A    I, I guess.  I don't know, I mean, there's a lease on that

3  too so I'm not sure what's going to happen.

4  Q    Well, during your deposition I asked you, "Is it your plan

5  to stay at Ramona?"  And you said, "I mean at this point I have

6  no issue until I need to move or it makes sense to move, sure."

7  Do you recall that that was your testimony?

8         MR. GUY:  Your Honor, I'd ask that he publish the

9  transcript.

10        MR. HORNICK:  Be happy to show it to you.

11        THE COURT:  Well no.  He may ask him if he remembers.

12  If he doesn't remember he can look at the transcript.

13  A    I mean, I don't remember that but.

14  BY MR. HORNICK:

15  Q    All right.  Well let's look at page 102, 102 of that big

16  thick Exhibit 4 that's in front of you.

17  (Pause)

18  A    Okay, I see it now.

19  BY MR. HORNICK:

20  Q    In line three I asked you, "Is it your plan to stay in

21  Ramona?"  Do you see that?

22  A    Yes.

23  Q    And you answered, "I mean at this point I have no issue

24  until I need to move or it makes sense to move, sure."  That

25  was your testimony at the time, correct?

67

1  A    Yes.

2  Q    Okay.  Now, since you moved to California in June of 2004

3  you spent all or the total of about two or three weeks there,

4  correct?

5  A    I'm sorry, could you repeat that?

6  Q    Since you moved to California in June of 2004, you've

7  spent all but about two or three weeks there, correct?

8  A    It's probably a bit longer than that, but I mean it's,

9  yes, some number of weeks.

10 Q    Except for some number of weeks you've been in California,

11 living in California since summer of 2004, correct?

12 A    For the most part, yeah.

13 Q    And what number of weeks has it been that you have not

14 been in California since June of 2004?

15 A    I'm not sure exactly but down to the east coast a lot.

16 Q    When you were outside of California during 2004 after you

17 moved there in June, did you intend to return to California?

18 A    Sorry, could you repeat that?

19 Q    Yes.  When you were outside of California in 2004 after

20 moving there in June, did you intend to return to California?

21 A    So are you specifically talking about the time that I left

22 in September?

23 Q    Any time that you left California during 2004 after you

24 moved there in June, did you intend to return to California?

25 A    I mean, I can only recall that one time and, yes, would be

68

1   the answer for that time.

2   Q    Now, in September of 2004, did you have any plans to go to

3   New York and stay there for an extended period of time?

4   A    No formal plans at that point, no.

5   Q    Did you have any plans?

6   A    No.

7   Q    Do you live at your parents' house now?

8   A    I don't stay there, no.

9   (Pause)

10  BY MR. HORNICK:

11  Q    I refer you to the other transcript, the smaller one.

12  This is a transcript of your April 25, 2006 deposition in

13  California, and I'd ask you to look at page 30, line seven.

14  During that deposition you were asked, "How long, if you know,

15  how long has your family lived at the Dobbs Ferry address in

16  New York."  Do you see that?

17  A    Yes.

18  Q    And you answered, "I don't know the exact number of years

19  but I've lived there, like I've lived there my whole life

20  growing up.  I don't live there now."  That was your answer at

21  that time, correct?

22  A    Yeah.

23  Q    Do you have any current plans to return to Harvard

24  University?

25  A    Not at the moment.

1  Q    I'm going to hand you a set of documents that's been

2  marked as Exhibit 10.  These are documents that were produced

3  by FaceBook defendants bearing production numbers TFB-56--

4             THE COURT:  Hold on.  Excuse me just a second.

5             MR. HORNICK:  Yes.

6             THE COURT:  I have to confer with Noreen.  I'm--

7             MR. HORNICK:  Certainly.

8  (Pause)

9             THE COURT:  Go ahead, Mr. Hornick.

10            MR. HORNICK:  Thank you, Your Honor.

11 BY MR. HORNICK:

12 Q    This is a set of documents that was produced by

13 TheFaceBook defendants bearing production numbers TFB-56

14 through 83.  You testified earlier that you are the CEO of

15 FaceBook Inc., correct?

16 A    Yes.

17 Q    And you've been the CEO since FaceBook Inc. was

18 incorporated, correct?

19 A    That's my understanding.

20 Q    Can you tell me what these documents are?

21            MR. GUY:  Your Honor, this is a compilation of

22 multiple documents within this exhibit.  I would object to

23 treating them collectively like that, and they span a frame of

24 time from 2004 well into 2005.

25            THE COURT:  You may answer.  Look at the documents,

1  Mr. Zuckerberg, and then you can answer the question.

2          THE WITNESS:  Do you want me to look at all of them?

3          THE COURT:  Do you want to look at all of them?

4          MR. HORNICK:  Your Honor, you can, I'm sorry.

5  BY MR. HORNICK:

6  Q   Mr. Zuckerberg, you can go through them one document at a

7  time and you can identify it.

8          THE COURT:  All right.  You--

9  BY MR. HORNICK:

10  Q   Let's start, let's start - I'll help you through it.

11          THE COURT:  Excuse me, excuse me.  You may look at

12  all of them Mr. Zuckerberg, please.

13  (Pause)

14          THE COURT:  All right.  Put the question--

15          THE WITNESS:  Okay.

16  BY MR. HORNICK:

17  Q   You've had an opportunity to go through these documents,

18  Mr. Zuckerberg?

19  A   Yeah, I looked at them.

20  Q   Can you tell the Court generally what they are?

21  A   They're I guess filings about starting the corporation or

22  articles of incorporation, and there's stuff in there about

23  California basically issuing us the right to do business in

24  California.

25  Q   These are FaceBook Inc. corporate documents, correct?

71

1   A   Yeah.

2   Q   All right.  Let's look - first I'll ask you, when did

3   TheFaceBook Inc. incorporate?

4   A   I'm not sure exactly.  It was sometime during the summer

5   of 2004.

6   Q   Let's look at page numbers TFB-58 through 61, and based

7   upon looking at those documents, does it either refresh your

8   recollection as to when FaceBook Inc. was incorporated or can

9   you tell the Court based upon looking at these documents when

10  FaceBook Inc. was incorporated?

11  A   Yeah.  It looks like it was the 29th of July.

12  Q   Of what year?

13  A   2004.

14  Q   So TheFaceBook Inc. was incorporated on July 29th of 2004,

15  correct?

16  A   Sure.

17  Q   And your attorneys, your California attorneys incorporated

18  TheFaceBook Inc. at your request, correct?

19  A   Yes.

20  Q   TheFaceBook Inc. is now FaceBook Inc. correct?

21  A   Yes.

22  Q   In the summer of 2004 before TheFaceBook.com was

23  incorporated - strike that question.

24      In the summer of 2004 before TheFaceBook Inc. was

25  incorporated, TheFaceBook.com website was located and run from

1    the La Jennifer way address where you were living, correct?

2    A    Sorry, it was--

3    Q    In the summer of 2004 before TheFaceBook Inc. was

4    incorporated the FaceBook.com website was located and run from

5    the Jennifer way address where you were living, correct?

6    A    I mean, the people who are running the website were in La

7    Jennifer Way, yeah, but I mean the servers weren't if that's

8    what you're asking.

9    Q    The servers were somewhere else in California?

10   A    Well, at that point they may have been with Savvy, which

11   was in New York but, yeah, they were at one of the co-location

12   facilities.

13          THE COURT:  I'm sorry, that last - I didn't hear any

14   of the last five words you spoke because you mumbled again.

15          THE WITNESS:  They were in--

16          THE COURT:  Could you repeat the last part of your

17   answer, please?

18          THE WITNESS:  Sure.  They were in one of the

19   co-location facilities.

20   BY MR. HORNICK:

21   Q    And the co-location facilities one of them was Equinex

22   which is in California, correct?

23   A    Yes.

24   Q    And the other one was, the other co-location facility was

25   Savvy, correct?

73

1   A    Yes, but we--

2   Q    Where were those servers?

3   A    We didn't move into Equinex until later in the summer

4   though.

5   Q    Summer of 2004, correct?

6   A    Yeah.

7   Q    And just tell the Court what a co-location facility is?

8   A    When you're running a website with a bunch of servers you

9   need a place to put the servers and so there are these

10  facilities which specialize in storage and they provide all the

11  things that you need for the server.  So, I mean, they have

12  good air conditionings so that they don't overheat and melt.

13  They have good power, generally redundant power, so if there's

14  a power outage then the servers don't go down.  They're usually

15  resistant somewhat to natural disasters, so I mean depending on

16  the area they can be built to be resistant to earthquakes or

17  floods or whatever makes sense.  And they generally have good

18  Internet connections so that your servers can have fast

19  responses to people making requests to them.

20  Q    So sometime in the summer of 2004 the servers for

21  TheFaceBook.com website were in your co-location facility in

22  California, correct?

23  A    At some point during the summer?

24  Q    Yes.

25  A    Yes.

1   Q    Yes, okay.  And you were running TheFaceBook.com website

2   from your Jennifer Way address, correct?

3   A    Yeah, and I was programming and administrating it from

4   that address I think is like a--

5   Q    All right.

6   A    --pretty accurate way to describe it.

7   Q    All right, after TheFaceBook Inc. was incorporated, it was

8   located at Jennifer way where you were living, correct?

9   A    Yeah, I think so.

10   Q    Okay.  Now while you were living at the Westbrook Avenue

11   address TheFaceBook Inc. and TheFaceBook.com website were being

12   run from the Westbrook Avenue address, correct?

13   A    That's my understanding, yeah.

14   Q    Let's look at page, in this document you have before you

15   TFB, it's Exhibit 10, TFB-59.  Can you tell the Court what this

16   document is?

17   A    It's a certificate of incorporation for the company.

18   Q    The company being TheFaceBook Inc., correct?

19   A    Yes.

20   Q    Did you sign the certificate of incorporation?

21   A    Yeah, that's - TFB-000061.

22   Q    And what date did you sign FaceBook Inc.'s certificate of

23   incorporation?

24   A    It says July 26th.

25   Q    Did you sign it on that date?

1   A   I don't remember.

2   Q   Did you sign it on or about that date?

3   A   Yeah.

4   Q   All right.  And your attorney prepared this document for

5   you to sign, correct?

6   A   Yeah, I think so.

7   Q   Okay.  And on the prior page, which is TFB-60 – do you

8   have that before you?

9   A   Yes.

10  Q   Your attorney typed in the address 819 La Jennifer Way

11  Palo Alto, California, correct?

12  A   Yes, that's what's there.

13  Q   And you read this – I'm sorry?

14  A   That's what's there, yes.

15  Q   Your attorney's typed that into this document, correct?

16  A   I don't know who checked--

17        MR. GUY:  Objection, lacks foundation.

18        THE COURT:  He may answer if he knows.

19  A   I don't know who typed that in.

20  BY MR. HORNICK:

21  Q   Well, your attorneys prepared this document, correct?

22        MR. GUY:  Same objection, Your Honor.

23        THE COURT:  He may answer if he knows.

24  A   My guess would be that they put the content in the

25  document.  I don't know if they put the address on the end of

1  the document.

2  BY MR. HORNICK:

3  Q    Who put this address on here if it wasn't your attorneys?

4  A    I have no idea.

5  Q    All right.

6  A    Maybe like a paralegal or something.

7  Q    Did you object to the Jennifer Way California address

8  appearing on this document when you signed it?

9  A    I don't know.  I signed it.

10  Q    I'm taking you back now to July of 2004.  When you signed

11  this document, did you object to that address being on the

12  document?

13  A    So, I mean the reason why I'm saying I don't know is I

14  don't know if I like object in the sense of asking like why

15  this address and not another one?  But I mean I signed it so I

16  guess I accepted that address.

17  Q    Why didn't you tell your attorneys to put your New York

18  address on this document before you signed it?

19  A    I can't answer exactly what I was thinking at that time,

20  but I mean it might have been that I need to receive mail, like

21  the specific thing at that address and that's where I was at

22  that time.

23  (Pause)

24  BY MR. HORNICK:

25  Q    I'll refer you to the thick deposition transcript again

1    which is Exhibit 4.

2              MR. HORNICK:  We may need that one that you have

3    before you again so you might want to keep that handy.

4    BY MR. HORNICK:

5    Q    We'll put before you Exhibit 4, page 149.  During your

6    June 8th deposition, I asked you, "Why didn't you tell them,

7    your attorney, to use your New York address in this document?"

8    Do you see that?

9    A    Yeah.

10   Q    Okay.  And what was your answer.

11   A    Because I didn't really think it mattered.

12   Q    All right.  You testified because "I didn't really think

13   it mattered."  You said, "I mean if I'd written it I would have

14   supplied that address because it's more important, but I mean

15   for what they were trying to do it seemed like this was okay I

16   suppose."  Do you see that?

17   A    Yeah.

18   Q    And then you said, "I might have even asked them if it was

19   okay and then said, yes."  Do you see that?

20   A    Yeah.

21   Q    You said, "Like I'm not sure."  That was your testimony at

22   the time, correct?

23   A    Yes.

24   Q    FaceBook Inc. is a Delaware corporation, correct?

25   A    Yes.

78

1          THE COURT:  All right, it's 11:00.  We're going to

2   take the morning recess.  I will be doing some criminal

3   arraignments during the 20 minute recess, but you can leave

4   your things at the desk.  You don't have to move them.  And

5   we'll reconvene in this case at 11:20.

6          MR. HORNICK:  11:20, thank you, Your Honor.

7          THE COURT:  All right.  We'll be in recess until the

8   criminal case is read.

9   (Recess)

10          THE CLERK:  All rise.  Court is back in session.

11          THE COURT:  All right, you may be seated.  And you

12   may continue with your examination of Mr. Zuckerberg.

13          MR. HORNICK:  Thank you, Your Honor.  I'd like to

14   move Exhibit 10 into evidence.

15          THE COURT:  10 being, please?

16          MR. HORNICK:  10 was the TheFaceBook Inc. corporate

17   documents.

18          THE COURT:  Any objection?

19          MR. GUY:  No, Your Honor.

20          THE COURT:  All right, they're admitted.

21      (Plaintiff's Exhibit No. 10, admitted)

22   (Pause)

23   BY MR. HORNICK:

24   Q   Mr. Zuckerberg, I'm handing you what's been marked as

25   Exhibit 15.  Can you tell the Court what this document is?

1  A     It's labeled new, new play information sheet.

2  Q     Have you ever seen this document before?

3  A     I must have.  I filled it out.

4  Q     That's your handwriting filling it out, correct?

5  A     Yes.

6  Q     And when did you fill out this document?

7  A     I don't know.  Does it say on it?

8  Q     Well, I'm asking you if you know when you filled out this

9  document?

10  A     I don't.  I assume it's sometime after the hire date which

11  is listed as September 1, 2004.

12  Q     Is that your handwriting identifying the hire date as

13  September 1st of 2004?

14  A     Yes.

15  Q     And what hire date is this referring to?  Hired by whom?

16  A     I assume this is TheFaceBook Incorporated.

17  Q     When you filled out this document what address did you

18  provide under your name in the personal data section?

19  A     The place I was currently living in Los Altos.

20  Q     It was the Westbrook Avenue address, correct?

21  A     Yes.  I mean it must have been at least a few weeks after

22  the hire date that's listed.

23  Q     So you're saying that because you didn't move into

24  Westbrook Avenue until sometime around mid-September of 2004,

25  this document must have been filled out sometime after you

1    moved into Westbrook, correct?

2    A    Well, I wasn't really aware of Westbrook before a few days

3    before I moved in.

4        MR. HORNICK:   I'd like to move this Exhibit 15 into

5    evidence.

6        THE COURT:   Any objection?

7        MR. GUY:   None, Your Honor.

8        THE COURT:   All right, it's admitted.

9        (Plaintiff's Exhibit No. 15, admitted)

10   (Pause)

11   BY MR. HORNICK:

12   Q    We have put before you a document that has been marked as

13   Exhibit 16.   It was Exhibit 33 during your June 8, 2006

14   deposition.   Do you see this document?

15   A    Yep.

16   Q    Now this document is mostly white space.   That's because

17   all of the, most of the information was what we call redacted

18   out of it by your counsel, correct?

19   A    Sure.

20   Q    Can you tell us what this document is?

21   A    I think we went through this during the deposition and

22   switched it.

23   Q    Well, you need to tell the Court today.

24   A    Okay.

25   Q    What is this document?