1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF NEW YORK

2

3     ----------------------------------------
      PAUL CEGLIA,

4
                               Plaintiff,

5

6
                  - vs -        Docket Number

7                               10-CV-569A

8

      MARK ZUCKERBERG,

9
                               Defendant.

10    ----------------------------------------

11
                      TRANSCRIPT OF ORAL ARGUMENT

12          BEFORE THE HONORABLE RICHARD J. ARCARA
                     UNITED STATES DISTRICT JUDGE

13

14
      APPEARANCES:

15

16    For the Plaintiff:        JAMES W. GRABLE ESQ., and
                                 TERRENCE M. CONNORS, ESQ., and

17                               PAUL A. ARGENTIERI, ESQ.

18

19    For the Defendant:        ORIN S. SNYDER ESQ.

20

21    Court Reporter:           YVONNE M. GARRISON, RPR
                                 Official Court Reporter

22                               U.S.D.C., W.D.N.Y.
                                 68 Court Street

23                               Buffalo, New York 14202
                                 716-847-2477

24

25    Taken on October 13, 2010 at 9:13 a.m.

 1              THE CLERK:  Civil Action 2010-569A, Ceglia versus

 2      Zuckerberg and other parties.  Oral argument on plaintiff's

 3      motion for remand.

 4              Counsel, please state your name and the party you

 5      represent for the record.

 6              MR. GRABLE:  Good morning, Your Honor.  James Grable

 7      appearing with Terry Connors and Paul Argentieri for the

 8      plaintiff, Paul Ceglia.

 9              MR. SNYDER:  Good morning Your Honor.  Orin Snyder

10      appearing for the defendant.

11              THE COURT:  Okay.  Good morning, everyone.

12              I guess Mr. Grable, or Mr. Connors.

13              MR. GRABLE:  I'm up, Your Honor.

14              THE COURT:  Go ahead, sir.

15              MR. GRABLE:  I have a better answer, Judge, on the

16      issues before you.  And what you have before you is obviously a

17      motion to remand.

18              But the burden, as you know from the papers and from

19      your prior experience with these issues, is not ours.  The

20      burden of proof, by clear and convincing evidence, rests at all

21      times with Mr. Zuckerberg.

22              He's provided you with his factual showing.  He's put

23      in his submission that he argues to you necessitates denial of

24      our motion to remand and proves that there is, in fact,

25      diversity jurisdiction.

1              But his submission falls woefully short.  The reason

2     for that is because he's got one foot in New York and one foot

3     in California.  And the law presumes that the domicile that he

4     used as a shield in the prior litigation pending in

5     Massachusetts can't now be used as a sword.

6              THE COURT:  Aren't the circumstances quite a bit

7     different?  Then he was in college.

8              MR. GRABLE:  He wasn't anymore.

9              THE COURT:  Pardon me?

10             MR. GRABLE:  He wasn't anymore.

11             THE COURT:  Okay.  But he -- this was how long ago --

12    ten years ago?

13             MR. GRABLE:  2004 was the date -- in September of '04

14    was the date that the 2007 --

15             THE COURT:  He didn't have a company then in

16    California, right?

17             MR. GRABLE:  He did.

18             THE COURT:  He had a company then?

19             MR. GRABLE:  He did.  He had incorporated in

20    California a few --

21             THE COURT:  What year was that?

22             MR. GRABLE:  That was in 2004, a few months before

23    that action was filed in September.  He also had --

24             THE COURT:  He's got 12, 1500 employees right now?

25             MR. GRABLE:  Right.  And I don't know how many

1   employees he had back then, but he was closing in on a million

2   users for Facebook.  He was no longer attending Harvard and he

3   was living the same sort of existence that the proof shows he's

4   living now, a transient short of duffle bag,

5   apartment-to-apartment existence, not buying any real property

6   in California, not laying down any roots --

7           THE COURT:  Does he have any real property in

8   New York?

9           MR. GRABLE:  We don't know.

10          THE COURT:  Okay.

11          MR. GRABLE:  We don't know.  I think the answer to

12  that question is no.

13          THE COURT:  Now, his license expired in New York,

14  right?

15          MR. GRABLE:  No.

16          THE COURT:  His license is valid today?

17          MR. GRABLE:  Correct.  It has not expired.  It

18  expires in May of 2015.  And when he got his California license

19  his declaration asserts that the State of California punched a

20  hole in the license to render it invalid.  But as far as I can

21  tell under New York law he can walk into the Department of

22  Motor Vehicles tomorrow in Dobbs Ferry and get a driver's

23  license if he wants one.

24          THE COURT:  Is that significant?

25          MR. GRABLE:  Not by itself, maybe.  But there's a

1  whole host of factors, as you know.

2          You've addressed these issues before and you know

3  that the Court's used the totality of the circumstances

4  approach.  You've used the standard that the Second Circuit

5  uses, which is a true, fixed home.  That's the standard that

6  the case law talks about, that's the standard you used in '06

7  in the Hodge case, and more recently in 2010 in the New York

8  case.

9          And, obviously, Judge, when you look at a

10  month-to-month tenancy with an expired lease, appliances

11  provided by the landlord, ZIP codes all over the place --

12          THE COURT:  But they're all in California.

13          MR. GRABLE:  They are.  As far as I can tell they're

14  all --

15          THE COURT:  How does that work to your benefit?

16          MR. GRABLE:  Well.  Because --

17          THE COURT:  They're all in California.

18          MR. GRABLE:  Right.

19          THE COURT:  If he had some in New York I could

20  understand your argument.  I don't understand the argument

21  because they're all in New York -- I mean, they're all in

22  California.

23          MR. GRABLE:  Right.  Because the standard is true,

24  fixed home, it becomes relevant.  And you're going to be

25  assessing the totality of the circumstances here and with a

1   litigant who's got one foot in one state and one foot in

2   another and has proven to his own advantage, as a matter of law

3   and fact just a few years prior, that his domicile is in New

4   York, the law presumes that the domicile continues.

5        They have to clear almost the highest burden in our

6   system, short of beyond a reasonable doubt.  They have to prove

7   to you by clear and convincing evidence that the proof

8   establishes that he's picked up his roots in New York, in Dobbs

9   Ferry, and moved his roots to California.

10       And not much has changed since that decision in

11  '07 --

12       THE COURT:  A lot changed, hasn't it?

13       MR. GRABLE:  Only with respect to Facebook.  Facebook

14  has gotten bigger, but it was big at the time.

15       THE COURT:  How many employees?

16       MR. GRABLE:  I think about 1500.

17       THE COURT:  That's quite a bit.

18       MR. GRABLE:  He had a lot of employees back then,

19  too.  And he was closing in on almost a million users at the

20  time of the decision.

21       THE COURT:  How many employees did he have in the

22  summer of 2004, ballpark?

23       MR. GRABLE:  I'm not sure.  I'm not sure.

24       THE COURT:  Was it more than 50?

25       MR. GRABLE:  I believe -- I believe it was below 50,

1    but I'm not sure of that.

2              THE COURT:  Now, you've got 1500 people.

3              MR. GRABLE:  But, Judge, the circumstances then were

4    whether it's 50 or 1500.

5              THE COURT:  You don't think there's a difference?

6              MR. GRABLE:  Well, I think there was a difference in

7    terms of Facebook, but I don't think there's a difference in

8    terms of Mark Zuckerberg.  Mark Zuckerberg hasn't done anything

9    to lay down roots in California that's different than what he

10   was doing then except that the company he works for, which he

11   worked for back then, is just a lot bigger now.  But he still

12   hasn't bought any property in California, he still hasn't

13   done the kind of --

14             THE COURT:  The company he works for.  I think you're

15   missing something else.  He owns it.

16             MR. GRABLE:  Right, and he did back then.

17             THE COURT:  Well, that's pretty significant, when you

18   own a company with 1500 employees.

19             MR. GRABLE:  Well, that's --

20             THE COURT:  All the ZIP codes are all in California?

21             MR. GRABLE:  Employment is one factor.

22             THE COURT:  Okay, I agree.

23             MR. GRABLE:  And you know that, Judge.  I'm not

24   telling you anything you don't know.

25             THE COURT:  I understand.

1          MR. GRABLE:  And what you have here are a host of

2    other factors that leave him the opportunity to, if his

3    litigation strategy is suited by the argument, suggests that he

4    lives in Dobbs Ferry.

5          THE COURT:  Where did he vote?

6          MR. GRABLE:  He voted -- we know that he voted

7    once --

8          THE COURT:  The last time he voted was where?

9          MR. GRABLE:  In California.

10         THE COURT:  Isn't that significant also?

11         MR. GRABLE:  No.

12         THE COURT:  Okay.

13         MR. GRABLE:  Not one -- one vote cast in one

14   presidential election.  We don't know when -- if he's voted in

15   New York.  He says that in '04 he doesn't recall or can say to

16   the Court that he didn't vote in New York after '04.  But we

17   don't know how many times he voted in New York prior to that.

18         And we also know, Judge, from the proof in the

19   record, that if he decides that he wants to go in November in a

20   couple of weeks and vote for Paladino or Cuomo he can fly back

21   to Dobbs Ferry and cast a vote there.

22         And we also know, Judge, and this relates to

23   information that came to light after the briefs were submitted,

24   that one of the other factors that you have considered and that

25   other Courts considered --

1          THE COURT:  We're talking about since September 13th?

2          MR. GRABLE:  Correct.

3          THE COURT:  That's from your reply papers?

4          MR. GRABLE:  Right.

5          THE COURT:  Okay.

6          MR. GRABLE:  Social, charitable, cultural ties, we

7   know that Mr. Zuckerberg has just given away or pledged to give

8   away $100 million of Facebook ownership to the Newark School

9   District.  Now, the Newark School District is 30 miles from

10  Dobbs Ferry.  We also know, and we didn't point this out in our

11  papers --

12         THE COURT:  How does that help you?

13         MR. GRABLE:  Judge, one of the factors is whether

14  someone has taken steps to manifest an intention to put down a

15  fixed home in California.  He didn't donate that money to

16  Oakland.  He didn't donate that money to Palo Alto --

17         THE COURT:  What's his connection with New Jersey?

18         MR. GRABLE:  Well, it's 30 miles from Dobbs Ferry,

19  it's just across the George Washington Bridge.

20         THE COURT:  Well, but it isn't in New York.

21         MR. GRABLE:  No.

22         THE COURT:  Your argument, obviously, would be

23  stronger if it were in New York.

24         MR. GRABLE:  It would be stronger, but we also have,

25  Judge, Exhibit M --

1          THE COURT:  What difference would it make whether it

2   was New Jersey or Texas?

3          MR. GRABLE:  Well, I think 30 miles away, it's closer

4   to his parents' home in Dobbs Ferry than we are right now to

5   Hornell, New York or Youngstown, New York.  And you can take

6   judicial notice of that under Rule 201.

7          THE COURT:  How would I write a decision and say that

8   the Court finds it significant that the school district in

9   which he made this very generous donation is 30 miles from

10  New York City on the issue of domicile?

11         MR. GRABLE:  Well, the way I think the Court could do

12  it is in describing the factors, one of which was --

13         THE COURT:  Would you really want to argue that in

14  the Second Circuit?

15         MR. GRABLE:  I'd be happy to.

16         Judge, one of the factors, as you know, is where --

17  home is where you lay down your roots, the phrase that they use

18  in their submission.  Home is where --

19         THE COURT:  How flexible are domiciles?  I mean, like

20  today a lot of people are trying to get a domicile in Florida,

21  you know, wealthy people, they don't like the whole New York

22  system of tax structure.

23         MR. GRABLE:  Right.

24         THE COURT:  And there's all kinds of things you have

25  to do to try to get domiciled in Florida.  I'm somewhat

1    familiar -- I did some research on that myself and it's really,

2    really hard to do.  I mean, it looks, I mean, you have -- but

3    all these things that I was looking at when I was checking that

4    out, just this is months ago, seems to have -- he doesn't seem

5    to have any of those still in New York.  He's -- what does he

6    do in New York right now?

7            MR. GRABLE:  Well, he's got his voter registration --

8            THE COURT:  I know you want a hearing.  That's

9    something I seem to get the impression you're driving here for

10   a hearing.

11           MR. GRABLE:  If you're going to conclude that they've

12   gotten close to their burden of clear and convincing evidence,

13   then I think a hearing is necessary.

14           THE COURT:  Does he pay taxes in New York?

15           MR. GRABLE:  I don't think he does.  He paid taxes

16   once in California.  And --

17           THE COURT:  Do you really think that he is going to

18   pick up, leave his multi, I guess, multi-million, maybe even

19   more, I'm not sure, and go back and, I'll say this lightly, and

20   move back in his parents' apartment?

21           MR. GRABLE:  No.  But that's not the standard.

22   That's not --

23           THE COURT:  Well, that's where he lived, wasn't it,

24   his parents' basement when he was in New York?

25           MR. GRABLE:  The prior finding of domicile that he

 1  argued for was that he had never left the domicile that was the

 2  domicile of his birth.  And to prove that he's left that

 3  domicile --

 4          THE COURT:  Well, of course, then he was in college.

 5          MR. GRABLE:  Right, right.

 6          THE COURT:  Big difference.

 7          MR. GRABLE:  But I think the district court's

 8  conclusion in Massachusetts was that the time in college and

 9  when he was in New Hampshire at boarding school, that that was

10  sort of transient.  I would argue in much the same way that his

11  existence now is transient.

12          You know, you don't live, Judge, people who have set

13  down roots and have a true, fixed home, you don't live with a

14  month-to-month tenancy with an expired lease --

15          THE COURT:  Why is that so important?  I mean, month

16  to month, so what?

17          MR. GRABLE:  It's important because they have to

18  show, they have to establish --

19          THE COURT:  Okay.

20          MR. GRABLE:  That Dobbs Ferry is no longer the place

21  and that his residence in California is his fixed home.

22          THE COURT:  He's been in California how long now?

23  Couple years?

24          MR. GRABLE:  Since before the decision in

25  Massachusetts.  In fact, since before the date the

 1   Massachusetts action was filed.

 2           THE COURT:  He's been there six years?

 3           MR. GRABLE:  Right.  And he was there with all these

 4   same hallmarks when the Massachusetts Court --

 5           THE COURT:  That's not quite the same.

 6           MR. GRABLE:  The only difference is the size of

 7   Facebook.  That's the only difference.

 8           THE COURT:  Well --

 9           MR. GRABLE:  And, Judge, we didn't point it out in

10   our reply papers, but in going through their exhibits last

11   night in preparing for this, if you take a look at Exhibit M,

12   which is one of his -- and if you don't have it up there I

13   apologize.

14           THE COURT:  I have it somewhere up here.

15           MR. GRABLE:  It's one of his bank account statements

16   that he attached.  You saw all those redacted records that he

17   attached to his submission to try to meet his burden.  And the

18   bank account record, as far as I can tell, the co-joint owner

19   of that bank account is his father in Dobbs Ferry.

20           Now, listen, any one of these factors is probably not

21   enough to reach a conclusion with respect to residence and

22   domicile, but you're looking at the entire picture and they

23   have to establish for you that things changed.  The

24   Massachusetts decision went their way, it's their burden to

25   show that something's changed.

1          THE COURT:  All right.  Let's hear from them.

2          MR. SNYDER:  Thank you, Your Honor.

3          I think Your Honor is absolutely right, that this is

4     not one of those cases where there are substantial ties in

5     multiple states, and the Court has to weigh and evaluate the

6     significance of them.

7          We welcome the burden of proof here, Your Honor.  And

8     we have not only carried it by clear and convincing evidence, I

9     think we've carried it by beyond any reasonable doubt.  It's

10    hard to imagine a clearer case of a party --

11         THE COURT:  Well, you would have a stronger case if

12    he had a home in California.

13         MR. SNYDER:  For the past -- yes.  Well, he does,

14    Your Honor.  For the past six years he's lived continuously in

15    California.

16         THE COURT:  I mean, actually buy a piece of property.

17         MR. SNYDER:  Sure.

18         THE COURT:  A home, pay taxes, live there.  And maybe

19    have a family and kids going to school and things like that.

20         MR. SNYDER:  Certainly, Your Honor.

21         But this is a man who for the past six years has

22    continuously lived within blocks of where he has been building

23    and running his company.  He's lived continuously for six years

24    in Northern California.

25         THE COURT:  What are all these ZIP codes?

1           MR. SNYDER:  There are ZIP codes that all start with

2      a nine.

3           THE COURT:  How many are there altogether?  I didn't

4      count them.  Maybe about six or seven.

5           MR. SNYDER:  Well, Your Honor, the plaintiff creates

6      a false portrait of what he claims to be a dizzying array of

7      five ZIP codes.  First of all, it's factually wrong and it's

8      also a silly argument.  The facts are there are five ZIP codes;

9      his current residence, which is blocks away from Facebook --

10          THE COURT:  He has a month to month?

11          MR. SNYDER:  Yes, month to month.

12          THE COURT:  Okay.

13          MR. SNYDER:  His work address at Facebook, where he

14     receives some mail as most of us receive mail both at work and

15     home.  He has a post office box in order to protect his

16     security and privacy.  He chooses to receive some mail of a

17     personal nature --

18          THE COURT:  Does he have a post office box anywhere

19     else?

20          MR. SNYDER:  No, just in Northern California.

21          THE COURT:  Okay.

22          MR. SNYDER:  He has a former home address in

23     Palo Alto to which some mail gets inadvertently sent.

24          THE COURT:  That's a former address?

25          MR. SNYDER:  His prior residence in Northern

 1   California, blocks away from Facebook.

 2              THE COURT:  Prior to -- what do you mean by prior?

 3              MR. SNYDER:  Meaning the place he lived before his

 4   current address.

 5              THE COURT:  I understand that, but when was that?

 6              MR. SNYDER:  That was about two or three years ago,

 7   Your Honor.

 8              THE COURT:  Okay.

 9              MR. SNYDER:  And then the fifth one is a

10   typographical error, so there was an inversion of two numbers.

11   So there are really only four ZIP codes, the fifth one was a

12   typographical error where numbers were interposed.

13              So the reason the argument is silly is all of these

14   ZIP codes confirm our point, which is that Mr. Zuckerberg has a

15   fixed and permanent residence in Northern California, blocks

16   away from the company he runs.

17              THE COURT:  Has he been in New York at all the last

18   few years?

19              MR. SNYDER:  According to his affidavit he travels

20   out of California rarely and sporadically.  I think he said in

21   his affidavit six weeks out of the year he spends time outside

22   of Northern California.  All the rest of his time is spent at

23   Facebook in Palo Alto where he lives and works.

24              Your Honor, counsel said that he's living a duffle

25   bag existence, a transient.  He's done nothing to lay down

1    roots.  It's the opposite.  Every piece of evidence before this

2    Court points to California and California only as the place --

3              THE COURT:  You'll have to admit it is a little

4    strange to be running this huge company, I guess, worth a lot

5    of money, you're there and you're living in a month-to-month

6    apartment, I guess.

7              MR. SNYDER:  No, Your Honor.  I think not, with all

8    due respect --

9              THE COURT:  Really?

10             MR. SNYDER:  I think it's very common for a

11   20-something year old person who is focused on his job and his

12   work, particularly in this economy, to choose to live month to

13   month rather than maybe to purchase a home or to sign a

14   long-term lease.

15             And, again, Your Honor, we believe that this evidence

16   confirms the fact that Mr. Zuckerberg has lived continuously in

17   California, is in California today, blocks away from where his

18   headquarters is --

19             THE COURT:  Let me ask you this:  I don't want to get

20   too personal, but does he have a girlfriend or a boyfriend in

21   California he lives with?

22             MR. SNYDER:  There are press reports of which the

23   Court can take judicial notice that he has had a long time

24   girlfriend.

25             THE COURT:  Where is she from?

1          MR. SNYDER:  She's in Northern California with him.

2          THE COURT:  And they live together in this

3    month-to-month apartment?

4          MR. SNYDER:  I think the press reports indicate that

5    that's the case, Your Honor, yes.

6          THE COURT:  Okay.

7          MR. SNYDER:  So there is not only stability in

8    Northern California, but there is permanent -- Your Honor, this

9    is a 26-year old man who has spent almost a quarter of his life

10   blocks away from one of the fastest growing, most

11   well-recognized companies in the world.  There's not a shred of

12   evidence that this man has any roots in New York.  There's not

13   a shred of evidence, not a piece of evidence in this record

14   that he is living in a duffle bag anywhere, anywhere, period.

15         THE COURT:  Do his parents still live in New York?

16         MR. SNYDER:  In Dobbs Ferry, certainly.

17         THE COURT:  Okay.

18         MR. SNYDER:  And the law, Your Honor, as Your Honor

19   has held and as the Second Circuit has held in case after case,

20   the law does not require that you shed every vestige of your

21   past life.  And this, Your Honor, is not a close call because

22   case after case has found that a party has moved from one

23   domicile to another and left behind far more remnants of their

24   past than Mr. Zuckerberg has.

25         Your Honor's decision in the Hodge case, I think, is

1    very instructive.  In that case Your Honor wrote the evidence

2    indicates that the defendant was domiciled in New York State

3    when this action was commenced.  Although he still held a

4    Wisconsin driver's license he had left his employment, sold his

5    property and closed his bank accounts in Wisconsin.  He resided

6    in New York with his family, had bank accounts in New York,

7    worked in New York and paid New York State taxes.  He had left

8    his employment, sold his property and closed his bank accounts

9    in Wisconsin.  In short, he had severed all ties to Wisconsin

10   with no apparent attempt to return.  There's simply no evidence

11   to suggest that he was domiciled in Wisconsin at the time the

12   action was commenced.

13           Your Honor, this case where Mr. Zuckerberg long ago

14   changes domicile from New York to California is even stronger.

15   In Hodge the defendant had only lived in New York for two

16   years.  Here, Mr. Zuckerberg has lived continuously, without

17   any indication of any intent to move for six years in

18   California.

19           In Hodge the defendant was a visiting professor in

20   the University in Beijing.  Here Mr. Zuckerberg works only in

21   California.  There's no evidence that he works anywhere else or

22   has worked anywhere else for the past six years.

23           And in Hodge the defendant --

24           THE COURT:  Does he do a lot of traveling at all?

25           MR. SNYDER:  No, Your Honor.

1          THE COURT:  He gets up every day, goes to work in

2    this office?

3          MR. SNYDER:  Yes, Your Honor.  There are public

4    reports in which Mr. Zuckerberg has said he spends sometimes

5    16 hours a day poured over his desk at Facebook.  He has poured

6    his life in building this company since 2004 and he set down

7    his roots in 2004 in California.  And those roots have grown

8    deeper and stronger.  Every --

9          THE COURT:  Let me ask this:  Now, Palo Alto is, I

10   guess, is the tech capital of the world.

11         MR. SNYDER:  Yes, Your Honor.

12         THE COURT:  Is that why he picked -- because of the

13   nature of his business?  Is that why he selected that area?

14         MR. SNYDER:  Yes, Your Honor.

15         THE COURT:  Versus some other area?

16         MR. SNYDER:  Yes, Your Honor.  Originally he went in

17   2004 because he thought it would be fun to live there, but he

18   also thought it would be good as he was thinking -- as he was

19   building this fledgling company -- to be in Silicon Valley.

20         He moved there in 2004, Your Honor and not only has

21   he not moved, but he's put down roots in every aspect of his

22   life.  It's where he lives.  It's where he works.  It's where

23   he pays taxes.  It's where he votes.  It's where his financial

24   bank accounts are.  It's where his professionals are.  It's

25   where his mailing address is.  It's where he receives bills and

1    more and more and more.

2           There is no evidence of roots in New York.  There is

3    no evidence of an intent to return to New York.  There is no

4    evidence, Your Honor, that this -- that this party,

5    Mr. Zuckerberg, is a transient.

6           I think it is, frankly, a silly argument to suggest

7    that Mark Zuckerberg, who has lived continuously for six years

8    in California, blocks away from the company that he is pouring

9    his life into, is a transient, as if he is somehow a nomad,

10   traveling the world in a duffle bag with no apparent direction.

11   There's no evidence of that.  It's -- it's hyperbole at best

12   and, at worst, Your Honor, it's frankly false.

13          THE COURT:  Now, one of the arguments Mr. Grable is

14   making is the fact that the company is basically the same, the

15   only difference is there is 50 employees versus 1500 employees.

16   Is that a good argument?

17          MR. SNYDER:  No.  It's factually wrong --

18          THE COURT:  Okay.

19          MR. SNYDER:  -- Your Honor, for the following

20   reasons.  It ignores the facts.  It ignores reality.  Over the

21   past six years --

22          THE COURT:  Well, the reality is 50 versus 1500.

23          MR. SNYDER:  In the summer of 2004, Mark Zuckerberg

24   and a handful of friends were building this fledgling company

25   out of a living room of a group house.  There are a handful of

1    employees.  Things have changed dramatically and fundamentally

2    since that time.

3              THE COURT:  What kind of a house did you call it?

4              MR. SNYDER:  It's a group house.  They're a bunch of

5    college kids living in a house together.

6              THE COURT:  In California?

7              MR. SNYDER:  Yes, in Northern California.

8              THE COURT:  This is 2004?

9              MR. SNYDER:  In the summer of 2004.

10             THE COURT:  Where did the 50 people all work?

11             MR. SNYDER:  No, there were a handful of employees.

12   There were not 50 employees in summer of 2004, Your Honor.

13             THE COURT:  When the Judge made the decision in

14   Massachusetts, how many about were employed or working?

15             MR. SNYDER:  In the summer of 2004 there were a

16   handful of employees.  It was not a large company, Your Honor.

17   And things changed abruptly and unexpectedly at the end of 2004

18   and the ConnectU court itself, the Court of Massachusetts held

19   that by the fall of 2004 the landscape changed.

20             Mr. Zuckerberg's life in California, at that point,

21   became more permanent because the company took off.  And

22   instead of returning to Harvard as scheduled he set down roots

23   in Northern California in the fall of 2004 and never moved.

24             And, Your Honor, those roots are as deep and strong

25   as -- as not only are necessary to meet our burden, but more

1    than -- stronger than necessary to meet our burden.  As I

2    said --

3              THE COURT:  There's a building?

4              MR. SNYDER:  Today?

5              THE COURT:  Yeah.

6              MR. SNYDER:  Yes.  Yes, there are multiple --

7              THE COURT:  What does it say on the building?

8              MR. SNYDER:  Facebook.  There are multiple buildings.

9    Facebook is a major corporation located in Palo Alto, with

10   multiple large buildings employing well over 1500 people.

11             THE COURT:  Brand new buildings that he built?

12             MR. SNYDER:  Yes, Your Honor.

13             THE COURT:  So all these buildings were built by him?

14             MR. SNYDER:  No.  These are brand new buildings that

15   are now housed -- that now house Facebook, meaning Facebook has

16   expanded dramatically and as it's expanded it's moved into

17   larger offices which are called campuses.  That's what they're

18   called in the Silicon Valley.

19             THE COURT:  Okay and so --

20             MR. SNYDER:  And so Facebook is housed today in

21   multiple campuses or office buildings.

22             THE COURT:  He doesn't own the building, he leases

23   them?

24             MR. SNYDER:  I believe, I believe that they are

25   leased by Facebook.

1          THE COURT:  Okay.

2          MR. SNYDER:  Mr. Zuckerberg --

3          THE COURT:  How long are these leases for?

4          MR. SNYDER:  Long-term leases, I believe.  But I

5   don't have the information.  I can certainly provide it to the

6   Court.

7          THE COURT:  Okay.

8          MR. SNYDER:  But Facebook, Your Honor, today is a

9   company with 500 million members.  500 million customers.

10          THE COURT:  How many did they have in 2004?

11          MR. SNYDER:  In 2004 they had -- by December of '04

12   they had a million, Your Honor, one million.  But in the summer

13   of '04 far fewer.

14          What happened is in the fall of 2004 things change

15   dramatically.  There was a infusion of venture capital, the

16   company took off and that's when Mr. Zuckerberg said I'm not

17   going back to Harvard anytime soon.  I'm going to build and run

18   this company.  He's done that continuously and with zeal and

19   vigor for six years with no intent to be anywhere else other

20   than blocks away from this company which today is one of the

21   most well-recognized, fastest growing companies in the world.

22          THE COURT:  How does the corporate structure -- how

23   is that set up?  Is he the president, the owner?

24          MR. SNYDER:  He's the CEO.

25          THE COURT:  CEO.

1          MR. SNYDER:  Yes, Your Honor, he runs the company.

2          THE COURT:  Okay.  Was there a president also or just

3     the CEO?

4          MR. SNYDER:  There's a chief operating officer.

5          THE COURT:  Okay.

6          MR. SNYDER:  Who reports directly to Mr. Zuckerberg.

7     But Mr. Zuckerberg has been from day one and continues to be

8     today a hands-on CEO, running the company based in Silicon

9     Valley, Palo Alto.  And that is why he lives there, and that is

10    why he makes his roots there, and that is why he has no

11    intention of living anywhere else, Your Honor, nor is there any

12    evidence of an intent to live anywhere else.  According to --

13         THE COURT:  Well, the plaintiffs are saying that it

14    takes issue and says that he's trying to take -- I think the

15    word is strategic litigation advantage, I think that was

16    basically the phrase that they used.

17         MR. SNYDER:  That's not true at all, Your Honor.

18         THE COURT:  Okay.

19         MR. SNYDER:  The landscape --

20         THE COURT:  Why do you disagree with that?

21         MR. SNYDER:  Because the issue in the ConnectU case

22    was whether Mr. Zuckerberg was a New York domiciliary in

23    September of 2004.  He was.  He hadn't set down roots in

24    California yet.  He hadn't paid taxes, he hadn't registered his

25    car, he hadn't registered to vote, he hadn't set up a life.  He

1    was intending to return to Harvard.  He was a kid at that time.

2            THE COURT:  Now, he's paying now California taxes?

3            MR. SNYDER:  Yes, Your Honor.

4            THE COURT:  Is it a -- it's a private company?

5            MR. SNYDER:  Yes, Your Honor.

6            THE COURT:  Incorporated in California?

7            MR. SNYDER:  I believe it's incorporated -- it's

8    headquartered in California.  I believe it's incorporated in

9    Delaware as most companies are.

10           THE COURT:  Okay.

11           MR. SNYDER:  But this is a Northern California-based

12   company, it's a significant employer in the area.  And this is

13   where Mr. Zuckerberg lives, as any of us --

14           THE COURT:  Other than his parents that still live in

15   New York.

16           MR. SNYDER:  Yes, sir.

17           THE COURT:  Other than that, is there any connection

18   at all in New York?

19           MR. SNYDER:  Other than that historic tie, that

20   connection to his parents and his childhood, which is we --

21   most of us have, who live somewhere other than where we were

22   born, there is no evidence of a single connection to New York

23   that is relevant for domicile purposes.

24           What he points to is a driver's license and a voter

25   registration --

1          THE COURT:  Well, the driver's license, he still has

2     a New York State driver's license, I guess?

3          MR. SNYDER:  Well, Your Honor, let me address the

4     driver's license.

5          Mr. Zuckerberg owns a car that has been registered in

6     California since March of 2008.  He's possessed a valid

7     California driver's license since May of 2006.

8          They point to the fact that his New York driver's

9     license supposedly remains valid, and this is wrong both

10    factually and legally.  First of all, you could only, under

11    California law, have a -- a -- a -- well, let me back up.

12         He has a California license.  His vehicle is

13    registered in California, he renewed that in 2004.  And what he

14    didn't do is call up New York State and say I have a California

15    license.

16         But, Your Honor, in the Hodge case and many other

17    courts have held the fact that you have an old license is not

18    inconsistent with a change of domicile.  It's grasping at

19    straws.  And in that case, Hodge, there are far more

20    connections to the old domicile than here.  All they have is a

21    driver's license from your hometown that doesn't expire until a

22    certain date.  There's no evidence that he uses that license,

23    there's no evidence that he has any vehicles in New York,

24    there's nothing that connects him to New York, Your Honor,

25    other than that which, in the Hodge case Your Honor said that

1   despite the fact that he had a Wisconsin driver's license

2   there's simply no evidence to suggest that he was domiciled in

3   Wisconsin because he severed all ties to Wisconsin.

4           Mr. Zuckerberg has severed all ties to New York in

5   every way that the Second Circuit looks at this issue and has

6   established the kind of roots that make domicile in California

7   not only obvious, but not even a close question.

8           THE COURT:  When was the -- the day that he renewed

9   his New York State driver's license?

10          MR. SNYDER:  He renewed his California --

11          THE COURT:  No, no, New York State.

12          MR. SNYDER:  I don't believe he's renewed it.

13          THE COURT:  Well, when did he get it?

14          MR. SNYDER:  '05 is the date --

15          MR. GRABLE:  October 13th, 2005.

16          THE COURT:  What do you say about that?  This is

17  after 2004?

18          MR. SNYDER:  Well, Your Honor --

19          THE COURT:  We're going to take a brief break.

20          (A recess was taken at 9:43 a.m.)

21          (Proceedings continued at 9:51 a.m.)

22          MR. SNYDER:  Your Honor, I can address your question

23  directly about the driver's license, which confirms beyond any

24  question that Mr. Zuckerberg's roots are in and have been for

25  years in California, not in New York.

1            The driver's license, which is Exhibit M to

2    Mr. Zuckerberg's affidavit, is an invalidated driver's license

3    that has been has been punched out.  And by that I mean -- what

4    I mean is --

5            THE COURT:  What driver's license are you talking

6    about?

7            MR. SNYDER:  His New York driver's license.

8            THE COURT:  Okay.

9            MR. SNYDER:  Exhibit K.  I'm sorry, it's Exhibit K.

10           THE COURT:  I don't have it in front of me.

11           MR. SNYDER:  Well, in any event, Your Honor, the

12   New York driver's license in evidence was issued on

13   October 13th, 2005.

14           If I can hand it up to Your Honor.

15           THE COURT:  Yeah, I'll take it.  I have it here.

16           MR. SNYDER:  Under California law when an applicant

17   such as Mr. Zuckerberg appears at the Department of Motor

18   Vehicle Bureau in California and has an out-of-state license,

19   he must bring the valid out-of-state driver's license to the

20   Motor Vehicle Department in California and the out-of-state

21   license will be invalidated, punched out and returned to the

22   applicant.

23           And -- because under California law no person shall

24   have in his or her possession more than one driver's license,

25   meaning one valid driver's license.

1            THE COURT:  Can California invalidate a New York

2     State license?

3            MR. SNYDER:  They can punch it out.  And they did.

4            THE COURT:  What do you mean punch it out?

5            MR. SNYDER:  They punch a hole in it, Your Honor.

6            THE COURT:  What does that do?

7            MR. SNYDER:  It renders it invalid.

8            THE COURT:  Under New York law or California law?

9            MR. SNYDER:  Under --

10            THE COURT:  It's a New York driver's license.

11            MR. SNYDER:  Under California law.  The

12     California invalidates --

13            THE COURT:  How can California invalidate a New York

14     driver's license?

15            MR. SNYDER:  I think a condition to getting a license

16     in California is that you -- that you surrender your New York

17     driver's license and get it punched out.  At which point --

18            THE COURT:  Is there some agreement between New York

19     and California that says that?

20            MR. SNYDER:  In any event, Your Honor, the question

21     is what was Mr. Zuckerberg's intent with respect to his

22     driver's license?

23            THE COURT:  And he had a New York driver's license in

24     2005.

25            MR. SNYDER:  Yes, he did.  And he brought it to

1    California in 2006 when he decided he no longer wanted to be a

2    New York driver but a California driver.  They -- he gave them

3    the license, they punched a hole in it.  And since 2006 --

4         THE COURT:  What do you mean they punched a hole in

5    it?  I don't know what that means.  Some clerk over in

6    California punched a hole and that invalidates it?

7         MR. SNYDER:  Correct, Your Honor.

8         THE COURT:  Can we go to the bureau in Buffalo --

9         MR. SNYDER:  The question is what was

10   Mr. Zuckerberg's intent with respect to California?  And his

11   intent when he got his driver's license in 2006 --

12        THE COURT:  Okay.

13        MR. SNYDER:  -- was to lay down roots in California.

14   And since 2006 that has been the driver's license he possesses

15   and uses.  And the question in this case, Your Honor, of

16   course, is as of June of 2010, where was Mr. Zuckerberg

17   domiciled?

18        And since -- and in 2010, Your Honor, as I said, just

19   to repeat and then I'll move on to one more issue and then sit

20   down -- Mr. Zuckerberg lives, works, pays taxes, votes, owns

21   and registers a car, has a driver's license, maintains his bank

22   accounts, has his professionals, all in California, none in New

23   York.

24        And since 2004 many things have changed.  He didn't

25   pay taxes in California then.  He pays taxes there now.

 1          As Your Honor sees, he didn't have a driver's license

 2     then in California.  He has since 2006 and does today.  He

 3     wasn't registered to vote in California, he didn't vote in

 4     California.  Today he's registered to vote in California and

 5     that's where he last voted.  He didn't have professionals in

 6     California in 2006, that's where all his professionals reside

 7     today.

 8          And, of course, Facebook has changed.  A major

 9     company employing over 1600 people in Palo Alto with 500

10     million active customers and users.  Mr. Zuckerberg is the

11     hands-on CEO of that company where he shows up to work every

12     day and works in California, nowhere else.

13          And so, Your Honor, what this really is about, I

14     believe, this motion is an effort to get jurisdictional

15     discovery because --

16          THE COURT:  What do you mean?

17          MR. SNYDER:  The plaintiffs have asked for discovery

18     or a hearing.  They've asked to take more evidence on this

19     issue.

20          THE COURT:  Yeah.

21          MR. SNYDER:  And Your Honor has an overwhelming

22     record before you, and there are no facts left for plaintiff to

23     discover.  There are no facts left to develop.

24          The declaration that we submitted is clear,

25     comprehensive, specific and it's really dispositive.  The

 1   exhibits are clear.  All the hallmarks of California domicile

 2   that the Second Circuit and Your Honor in his prior decisions

 3   focus on in this totality of circumstances analysis not only

 4   point to California but point to California and California

 5   only.

 6        And the Second Circuit, Your Honor, and courts within

 7   the Second Circuit routinely rely on affidavits and

 8   affirmations without conducting any jurisdictional discovery,

 9   without bringing witnesses from across the country into

10   hearings to rule on the question of domicile.

11        Your Honor recently found, just this summer in the

12   New York Life case, that affirmations alone may provide a

13   sufficient evidentiary basis to make domicile determinations.

14        And here the only reason to have jurisdictional

15   discovery would be to harass and delay.  And that's bad enough

16   in a typical case, but I think Your Honor is aware that it's

17   our position this entire lawsuit is a fraud.

18        THE COURT:  What about this argument that they're

19   making, they don't cite any cases, and I've obviously spent a

20   little time in researching this, it's -- there's a strict

21   presumption against removal in favor of remand.

22        What case are you relying on for that?

23        And the other one is presumption of continuing

24   domicile.  That I can understand.  You say there's a strict

25   presumption against removal in favor of remand.  I'm sure there

1    was a case that you're relying on and you didn't cite it when

2    you made that --

3            MR. GRABLE:  Bear with me, Your Honor.

4            THE COURT:  I really want to know that.  So we'll

5    take another minute.

6            (A recess was taken at 9:58 a.m.)

7            (Proceedings continued at 10:10 a.m.)

8            THE COURT:  Mr. Grable, did you find it?

9            MR. GRABLE:  I did, Your Honor.

10           It's at page 5 of our initial memorandum, Shamrock

11   Oil and Gas Corp versus Sheets.  The cite is 313 United States

12   100, pages 108 and 109.  That's a 1941 case.

13           THE COURT:  1941?

14           MR. GRABLE:  That's right.

15           THE COURT:  Okay.

16           MR. GRABLE:  And it's still good law.

17           THE COURT:  I was one year old.

18           MR. GRABLE:  Well, Judge Skretny, on June 25th, '09

19   quoted or cited to it in saying:  Because the federal courts

20   are courts of limited jurisdiction and as removal of a case

21   raises issues of federalism, removal statutes are narrowly

22   construed and doubts are resolved against removal.

23           That's Williams versus Beemiller, 05-CV-836, 2009,

24   Westlaw 1812819.  And within that pages five and six of our

25   initial memorandum we've cited to some additional cases within

1    that string cite.

2           THE COURT:  Anything further?

3           MR. SNYDER:  Yes, Your Honor.

4           I would just say, Your Honor, that there's not a

5    single case in the Second Circuit or anywhere else that we have

6    found or read in advance of this hearing where a court has

7    found a party to be a New York domiciliary based on the kind of

8    flimsy facts that this plaintiff has proffered to the Court.

9    This is not a close call.

10          There are case after case after case, some of which

11   Your Honor decided, where the facts pointing to the old

12   domicile were far stronger than in this case, yet the courts

13   have found a change of domicile.

14          THE COURT:  Mr. Grable, read that to me again, what

15   you just read.

16          MR. GRABLE:  Because the federal courts are of

17   limited jurisdiction and as removal of a case raises issues of

18   federalism, removal statutes are narrowly construed and doubts

19   are resolved against removal.

20          THE COURT:  Wait a minute.  You're saying there's --

21   in your reply you said strict presumption.  Where did you come

22   up with that?

23          MR. GRABLE:  From the Shamrock Oil and the Williams

24   versus Beemiller.

25          THE COURT:  Read the language in that case that

1    supports that, strict presumption against removal.

2              MR. GRABLE:  It says the removal provisions are to be

3    strictly construed against removal.  That's at pages 108 and

4    109 of Shamrock.

5              THE COURT:  That's the same as strict presumption?

6              MR. GRABLE:  Right.  Strict construction.

7              THE COURT:  Okay.

8              MR. GRABLE:  Sure.  I mean, I think the law is --

9    from 1941 to today recognizes the notion that plaintiff's

10   choice of forum is the one that governs and that there was

11   strict presumption against removal when removal is challenged

12   in a remand motion that the other side bears the burden.

13             THE COURT:  What do you say to that?

14             MR. SNYDER:  We respectfully disagree.  We think that

15   that is a misstatement of the law.

16             THE COURT:  Well, he's pretty much quoting.

17             MR. SNYDER:  I'm not aware of the Second Circuit

18   adopting a strict presumption against removal.

19             I'm aware of the Second Circuit, in case after case,

20   evaluating the totality of the facts and determining whether

21   complete diversity of jurisdiction exists.  If it does, the

22   removal is proper.

23             Here there is complete diversity of jurisdiction.

24             THE COURT:  I suppose if there was a close case that

25   you would lose.

1          MR. SNYDER:  I think on a close case where there are

2    doubts --

3          THE COURT:  Then probably the law would seem to

4    suggest that -- against removing.

5          MR. SNYDER:  I think if we failed to carry our burden

6    of clear and convincing evidence and it's a close case, then

7    removal would be inappropriate.

8          THE COURT:  Okay.

9          MR. SNYDER:  That's not this case.  It's not close to

10   this case.

11         And, again, Your Honor, I haven't seen a single case

12   remotely similar to this one where the Court has found that a

13   person like Mr. Zuckerberg, who's poured his life into

14   California for six years, made his roots there in every

15   meaningful way that the Courts look at this question, is

16   somehow, nonetheless, a domicile of his birth place, where he

17   has no meaningful context other than the fact that his parents,

18   whom he loves, lived there, and because he has cell phone,

19   which Mr. Grable didn't mention, with a 917 area code.  It's

20   absurd.  It's preposterous to think this Californian is a New

21   Yorker because six or seven years ago when he was 20 years old

22   on summer vacation he slept in his birth home.  It makes no

23   sense.

24         THE COURT:  I think I know the answer to this, but he

25   doesn't pay New York State taxes?

1         MR. SNYDER:  No, Your Honor.

2         THE COURT:  Is there income tax in California?

3         MR. SNYDER:  A lot of it, yes.  He pays.

4         THE COURT:  He pays California income tax?

5         MR. SNYDER:  He pays California income tax, Your

6    Honor, and has paid California taxes for year after after

7    year.  For almost a quarter of his life, he's paid California

8    taxes.  He does not pay New York taxes.

9         THE COURT:  Now, Mr. Grable, I'll let you come back.

10        MR. GRABLE:  He paid California taxes in 2008, a

11   quarter of his life.  But that's not the proof in the record

12   before you.

13        The proof in the record before you, Judge, is a lot

14   of I believes, I think so, 914, not 917, which is a New York

15   area code on that cell phone, valid New York driver's license

16   that California can't revoke, that's up to New York to do that,

17   valid voter registration in Dobbs Ferry, the domicile that he

18   used offensively to get out of the ConnectU subject matter

19   jurisdiction pickle, contributions 30 miles from his Dobbs

20   Ferry home, his dad in Dobbs Ferry, who is dentist there, is on

21   his joint bank account there, that's exhibit M.  He's living in

22   a month-to-month tenancy.

23        Facebook, it was one million or close to one million

24   users then, now it's 500 million.  A million is still a big

25   company.

 1          And so when they say I can't find any set of facts or

 2     any cases that would support the notion that he's a New York

 3     domiciliary, they need look no farther than the Massachusetts

 4     decision where they proved he was a New York domiciliary, when

 5     all of these same hallmarks that they now mock were in place,

 6     voter registration in New York, valid New York driver's

 7     license, New York area codes, connections to his parents.  The

 8     connections that they mock now --

 9          THE COURT:  The last time he voted, he voted in

10     California.

11          MR. GRABLE:  That's 2008, in the presidential

12     election, the only time that we know of that he voted.

13          And, Judge, you asked some great questions today

14     about, you know, various hallmarks of domicile.  And the

15     answers you got were, I think it's this, I don't know.  That's

16     sort of our point.  They have the burden of proof by clear and

17     convincing evidence.

18          And so at Hodge is a great example of a case where

19     you had less question marks, you had less question marks in

20     Hodge in '06 and you ordered jurisdictional discovery.  And

21     then you had argument after the jurisdictional discovery.

22     That's 2006 Westlaw 2669467.

23          And Mr. Snyder hasn't found a Second Circuit case

24     that supports the proposition that there is a presumption in

25     favor of remand and against removal.  He should have read

1    Pampillonia versus RJR Nabisco, which is cited at page 6 of our

2    initial brief, which stands for the very clear proposition that

3    all factual and legal questions must be resolved in favor of

4    plaintiff's choice of state court, 138 F.3d 459, 461.  That's

5    Second Circuit, 1998.  That's a Second Circuit decision that's

6    still valid law.

7            And, Judge, you know, when he uses words like

8    preposterous and absurd and fraud, it's a thinly-veiled way of

9    trying to shift the burden back to the plaintiff.  And that's a

10   burden we never bear at this stage.

11           At the very least discovery is warranted.  We think

12   it's not a close call.

13           That's the one thing I agree with Mr. Snyder on.

14   It's not a close call.  He didn't meet his burden.  And the

15   reason he didn't meet his burden is that their proof raises

16   more questions than answers.  It's not the proof of someone who

17   has put down roots.  It's proof of somebody who's living in a

18   month-to-month tenancy.

19           Sure, he's got a big company.  He had a big company

20   back then and so that hasn't changed.

21           And the magistrate judge in Massachusetts who had

22   that day-long hearing and heard all the proof and let the

23   parties do discovery before that hearing, he found in

24   Zuckerberg's favor.

25           THE COURT:  What would you discover if you had a

1   hearing on this?

2          MR. GRABLE:  Here's some of the things I would ask

3   him.

4          THE COURT:  Okay.  It was a magistrate judge's

5   decision?

6          MR. GRABLE:  It was a magistrate judge's report and

7   recommendation that the district court adopted.

8          THE COURT:  Okay.

9          MR. GRABLE:  What about social clubs?  Social clubs,

10  where do you belong to your clubs?  Do you belong to any clubs

11  in New York?  Mr. Snyder said -- he turned and looked for an

12  answer on how often it is --

13         THE COURT:  What do you think you'd get for an

14  answer?

15         MR. GRABLE:  I don't know.  Maybe he belongs to some

16  clubs in New York and that's why he has a 914 area code and a

17  joint bank account --

18         THE COURT:  Why would he have a membership in a

19  New York club?

20         MR. GRABLE:  I don't know.  Maybe because, according

21  to his own declaration, he says I've spent no more than ten

22  days in New York during the past year.  He's out of California

23  six weeks in the past year.  Now, is that by itself proof that

24  he doesn't have domicile in California?  No.

25         THE COURT:  In the six weeks, where was he?

1          MR. GRABLE:  He doesn't say.  He says six weeks

2    outside of California and no more than ten days in New York.

3    That's paragraph 11.

4          Now, he doesn't say whether during those ten days he

5    stayed with mom and dad.  Dad has the joint bank account with

6    him.  He doesn't say whether during those ten days he was

7    scouting out locations so he could tell Oprah that he was going

8    to give 100 million to a location 30 miles down the road.  We

9    don't know enough, and that's sort of the point.

10          Their burden is to prove that there is sufficient

11    subject matter jurisdiction which, as you know, Judge, is a

12    threshold question in every case.  And it's so important a

13    question in every case that it's an issue --

14          THE COURT:  You want to ask him about social clubs.

15    What else?

16          MR. GRABLE:  What other bank accounts does he have,

17    if any?  And why does he have a joint bank account with his

18    father in Dobbs Ferry who is dentist and doesn't reside in

19    California?

20          Why does he still have a valid voter registration

21    that hasn't been revoked or that he hasn't taken any steps to

22    eliminate in New York State?

23          Why has he not done what the New York Vehicle and

24    Traffic Law requires and notified New York of his change of

25    address so that his license would be cancelled?

1          THE COURT:  Well, apparently it hasn't been

2   cancelled.

3          MR. GRABLE:  Well, I guess, maybe the clerk who

4   punched the hole in the license thinks so.  But the State of

5   New York certainly doesn't, based on his DMV abstract.

6          The New York area code?

7          Why did you give the money, 100 million pledged to

8   Newark and not to Oakland, Palo Alto in your backyard.

9          THE COURT:  Wait a minute, it's still in New Jersey.

10          MR. GRABLE:  30 miles, though, Judge.  It's like here

11   to Niagara Falls.

12          THE COURT:  Wait a minute.  No, it isn't.

13          MR. GRABLE:  Sure it is.

14          THE COURT:  Niagara Falls is in New York.  Buffalo is

15   in New York.  New Jersey is in New Jersey.

16          MR. GRABLE:  Two bridges to get to Niagara Falls, one

17   George Washington Bridge to get to Newark.

18          THE COURT:  Different states.

19          MR. GRABLE:  There's no inspection booth there to

20   cross that George Washington Bridge.  He's putting down his

21   money and putting down his pledges and his PR moves in the

22   place where, I submit, the proof may show that that's what he

23   regards to be the place where he has his continuing roots.

24          And so the issue, Judge, is should you do what you

25   did in Hodge, and proceed carefully so that we address this

1    issue of subject matter?

2            THE COURT:  I think I always proceed carefully.

3            MR. GRABLE:  And, Judge, I guess the issue is we

4    would be -- you know, we would be able to address this issue of

5    subject matter jurisdiction in a deposition with Mr. Zuckerberg

6    later on, too.

7            So when they say this is an effort to harass or

8    burden or somehow engage in a fishing expedition, subject

9    matter jurisdiction is always relevant, every stage of the

10   case.  You could find sua sponte at the trial in this case if

11   there's a lack of subject matter jurisdiction if you had the

12   facts before you.

13           Why don't we find out now?  Why don't we find before

14   we start down the road of saying that this is the forum we

15   belong in when we're in court of limited jurisdiction and a

16   court that the defendant Zuckerberg bears the burden of showing

17   that he's entitled to be in.

18           THE COURT:  All right.  Some spectators are yawning.

19   So I guess we heard enough.

20           MR. SNYDER:  Could I briefly address the

21   jurisdictional discovery, Your Honor?

22           Because I think Your Honor asked the direct question

23   and the answer was telling.

24           Your Honor, if Mr. Grable was correct in every case

25   you would get jurisdictional discovery based on speculation, a

1    fishing expedition.  You can always say are you a member of

2    social club in Timbuktu?  Do you have a bank account in

3    Wisconsin?  There's no evidence in the record that

4    Mr. Zuckerberg has or does any of those things in New York.

5    All of the evidence is that it happens in California.

6            Where you get jurisdictional discovery is where you

7    have meaningful contacts in two different jurisdictions and the

8    Court needs to understand what is the import and impact of

9    those meaningful connections, not I want to ask fishing

10   expedition off-the-wall questions about well, when you go to

11   New York you say you were there only ten days, maybe you really

12   were there 100 days.  Or do you, you know, do you march in

13   parades in New York?  You could invent thousands of

14   hypothetical questions which are based on pure speculation in

15   an effort to get a deposition.  But that's not the law.

16           And Your Honor made that very clear this summer in

17   the New York Life case where, based on affirmations such as you

18   have before you here, you found a sufficient evidentiary basis

19   to rule on domicile without putting the parties, without

20   putting counsel, without putting the Court through the burden,

21   expense and yes, harassment, Your Honor, of depositions and

22   discovery.

23           And what makes the harassment here more

24   inappropriate, with all due respect is, as Your Honor is aware,

25   it is the defendant's position that this case itself is a fraud

1     bought by a convicted felon.

2             THE COURT:  We're not going to get into that.

3             MR. SNYDER:  But it makes the request here, Your

4     Honor, a tactic, yes, to harass; yes, to force Mr. Zuckerberg,

5     who's running a company with many obligations, to be subjected

6     to questions like do you belong to a social club in New York,

7     do you have bank accounts in New York, notwithstanding the fact

8     that he has provided Your Honor with a sworn statement, signed

9     under the penalties of perjury, telling Your Honor that

10    California is his home, his bank accounts are there, his life

11    is there, his roots are there and there's no evidence to the

12    contrary and therefore absolutely no basis for jurisdictional

13    discovery here.

14            Thank you, Your Honor.

15            THE COURT:  Thank you very much, gentlemen.

16            MR. GRABLE:  Thank you, Judge.

17            MR. SNYDER:  Thank you, Judge.

18            (Proceedings concluded at 10:15 a.m.)

19

20

21

22

23

24

25

```
1                        CERTIFICATION

2

3          I certify that the foregoing is a correct

4    transcription of the proceedings stenographically recorded by

5    me in this matter.

6

7

8                                    S/Yvonne M. Garrison, RPR

9                                    YVONNE M. GARRISON, RPR
                                     Official Reporter
10                                   U.S.D.C., W.D.N.Y.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```