UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

PAUL D. CEGLIA, an individual,                    :

           Plaintiff,                          :

   -against-                                      :          CIVIL ACTION NO. 10-569(RJA)

MARK ELLIOTT ZUCKERBERG, an          :          **FIRST AMENDED COMPLAINT**
individual, and FACEBOOK, INC., formerly
known as TheFaceBook, Inc., a Delaware         :          **TRIAL BY JURY DEMANDED**
corporation,

          Defendants.                        :

                                     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

        Plaintiff PAUL D. CEGLIA ("Ceglia") alleges:

## NATURE OF THE ACTION

      1.      On April 28, 2003, Mark Elliott Zuckerberg ("Zuckerberg") entered a written

contract (the "Agreement") with Ceglia "for the continued development of the software, program

and for the purchase and design of a suitable website for the project Seller [Zuckerberg] has

already initiated that is designed to offer the students of Harvard university (sic) access to a

wesite (sic) similar to a live functioning yearbook with the working title of 'The Face Book.'"

The Agreement further provides that:  "It is agreed that Purchaser [Ceglia] will own a half

interest (50%) in the software, programming language and business interests derived from the

expansion of that service to a larger audience."

      2.      As a matter of law, the Agreement established a general partnership between

Ceglia and Zuckerberg for the development and commercialization of "The Face Book," the

concept and website with the initial title of "thefacebook.com" and the business interests derived

therefrom (the "General Partnership").  As described in the Agreement, Ceglia contributed

capital to the General Partnership.  And, according to the Agreement, Zuckerberg contributed the software, programming language and website in its then-current form that he had started to design to offer the students of Harvard University access to a website similar to a live functioning yearbook with the working title "The Face Book."  The course of conduct between Ceglia and Zuckerberg, after the formation of the General Partnership, shows Ceglia also contributed his time, ideas, knowhow and other "sweat equity" to the General Partnership.  As described in the Agreement and the course of conduct after the formation of the General Partnership, Zuckerberg also contributed his time, ideas, knowhow and other "sweat equity" to the General Partnership.  Their respective contributions resulted in the creation of software, programming language, a website, other intellectual property and business interests, all of which became property of the General Partnership — of which the parties intended and the Agreement specified that Ceglia is the 50% owner.

3.      As of February 2, 2004, Zuckerberg had not completed "The Face Book" website. On that same day — February 2, 2004 — Zuckerberg sent to Ceglia emails complaining that a provision in the Agreement giving Ceglia an additional 1% interest in the business for each day after January 1, 2004 that "The Face Book" website was not complete, was unfair because it would give Ceglia over 80% ownership of the business, including thefacebook.com website.  On February 3, 2004, Ceglia agreed to waive the provisions in the Agreement that increased his ownership interest in the General Partnership to over 80%.  Perhaps not coincidentally, the very next day, on February 4, 2004, Zuckerberg informed Ceglia by email that the "thefacebook.com" website had launched.

4.      After the website launched, the website was an immediate success.  Zuckerberg then embarked upon a secret scheme to misappropriate the General Partnership's assets and

opportunities for himself.  Zuckerberg did this by concealing the website's success from Ceglia

and misrepresenting to Ceglia that Harvard students were not interested in the website, that he

was losing interest in the venture and was considering abandoning it.  Zuckerberg then

misappropriated the General Partnership's (1) opportunity to expand the website and the Face

Book project beyond Harvard University students and (2) assets, and contributed them to a

corporation formed in July 2004, but never informed Ceglia or accounted for them to the General

Partnership or Ceglia.  The corporation is now known as Facebook, Inc.  Whatever interest

Zuckerberg received from contributing the assets of the General Partnership to the corporation

— including, but, not limited to, cash, stock, stock options, restricted stock units or any other

consideration received by or promised to Zuckerberg — was and is property of the General

Partnership.  Ceglia brings this action to recover, among other things, his 50% share of the

interest acquired by General Partnership as a result of Zuckerberg's actions.

## PARTIES

5.      Plaintiff Ceglia is a resident of Wellsville, New York with an address of 2558

Hanover Hill Road, Wellsville, New York.

6.      Defendant Zuckerberg currently resides in California.

7.      Defendant Facebook, Inc. is a corporation organized under the laws of the State of

Delaware and maintains its principal place of business in Palo Alto, California.  Facebook, Inc.

was incorporated on July 29, 2004, under the name of TheFaceBook, Inc.  On September 30,

2005, it changed its name to Facebook, Inc.

## JURISDICTION AND VENUE

8.      On July 9, 2010, this matter was removed to this Court by Defendants on the

ground of complete diversity under 28 U.S.C. § 1332.  Complete diversity jurisdiction exists

under 28 U.S.C. § 1332 as this action is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and cost.

9.     This Court has supplemental jurisdiction over the Plaintiff's causes of action arising under New York State statutory and common law pursuant to 28 U.S.C. § 1367(a).

10.     This Court has personal jurisdiction over the Defendant Facebook, Inc. because this Defendant is authorized by the New York Department of State to do and does business in this State.

11.     This Court has personal jurisdiction over Defendant Zuckerberg as he has committed tortious acts within the State of New York and/or tortious acts outside the State of New York which impact a New York resident. This Court also has personal jurisdiction over Defendant Zuckerberg as he is engaged in substantial activity within this State and because he maintains an interactive website that is directed towards this State's persons and entities. Defendant is doing business and has done business in this State and District by offering for use his products and services.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(3) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

13.     In 2002 and 2003, Ceglia was developing an on-line database that would be, and was, deployed through a website known as StreetFax.com. StreetFax.com compiled into a database photographs and other information related to traffic intersections that were intended to allow insurance adjusters to easily obtain such information to assist them in handling claims.

14.     From time-to-time, Ceglia hired programmers, web developers and other individuals to assist him with developing StreetFax.com.  He frequently located such individuals through on-line, help wanted advertisements on craigslist.com.

15.     In 2003, Ceglia posted advertisements seeking programmers who would be able to develop the search engine feature for StreetFax.com that would provide non-specific name searching, synonymous term linking and the ability to comment on specific photographs.  Those features, along with others, would allow someone with an account to search for and find the name and location of a specific intersection, and offering the top closest results if an exact match could not be found.  This allowed a user to find the right name even if the user misspelled that name or used an abbreviation that did not match what was entered into the database.

16.     In early 2003, Zuckerberg responded to Ceglia's craigslist.com advertisement.

17.     Upon learning Ceglia's requirements, and after several lengthy conversations about the possibility and strategy of creating a search engine that could find a specific name as long as the spelling was "close," in a telephone conversation in April 2003, Zuckerberg told Ceglia that he was working on a great project.  Zuckerberg told Ceglia if Ceglia hired him to work on the StreetFax.com project and helped fund the development of his other project, Zuckerberg would give Ceglia a one-half interest in Zuckerberg's other project.

18.     Zuckerberg explained to Ceglia that the other project would involve an on-line, interactive yearbook, which initially would be targeted at students attending Harvard University, where Zuckerberg was also a student.  Zuckerberg told Ceglia that this project was inspired by the on-line year book used at the boarding school that he attended.  Zuckerberg further explained to Ceglia that the project could be expanded beyond Harvard University.  Zuckerberg told Ceglia that the project's working title was "The Face Book."

19.     Ceglia accepted Zuckerberg's offer and agreed to pay Zuckerberg $1,000 for his work on StreetFax.com and $1,000 for work to be performed to continue to develop "The Face Book."

20.     Ceglia and Zuckerberg agreed to meet at the Radisson Hotel in Boston, Massachusetts, on April 28, 2003 to sign a written contract.

21.     From his home office in Wellsville, New York, on April 25, 2003, Ceglia prepared the agreement on his computer, combining two different forms of agreements that were given to him in the past and modifying them to capture the terms that Zuckerberg and Ceglia agreed to over the telephone.  The agreement covered both the work Zuckerberg agreed to do for StreetFax.com and their agreement concerning The Face Book.  Ceglia printed and saved the agreement on April 25, 2003.

22.     On April 28, 2003, Ceglia, accompanied by Karin Petersen, met Zuckerberg in the lobby of the Radisson Hotel in Boston.  Ceglia provided the agreement to Zuckerberg, who spent a significant amount of time reviewing the agreement.  Zuckerberg asked for one change on the first page of the agreement, which was handwritten on to the first page of the document and initialed by Zuckerberg and Ceglia.  Zuckerberg and Ceglia then signed the Agreement, which is attached hereto as Exhibit A.  Except for the handwritten interlineations made on April 28, 2003, Ceglia made no changes to the agreement after printing it on April 25, 2003.

23.     The Agreement provides in pertinent part that:

> [I]t is for the continued development of the software, program and for the purchase and design of a suitable website for the project Seller has already initiated that is designed to offer the students of Harvard university (sic) access to a wesite (sic) similar to a live functioning yearbook with the working title of "The Face Book"
>
> It is agreed that Purchaser will own a half interest (50%) in the software, programming language and business interests derived from the expansion of that service to a larger audience.

24.     The Agreement defines "Seller" as "Mark Zuckerberg, his agents, employees, suppliers, or sub-contractors, furnishing materials equipment, or services."  The Agreement defines "Purchaser" as "Paul Ceglia."

25.     The Agreement further provides that:

> The Agreed upon Cost that the Seller and the Buyer (sic) have agreed upon are as follows: Buyer (sic) agrees to pay the seller (sic) the Sum of $1000 a piece for the work to be performed for Streetfax and $1,000 for the work to be performed for "The Page Book" (sic).

26.     During their conversations before the execution of the Agreement and thereafter, Ceglia and Zuckerberg discussed using the name "The Face Book" and "The Page Book" for their venture and, thus, the terms were synonymous.  Indeed, when viewed in the context of the Agreement (along with the other typographical errors, misspellings and failures to consistently use defined terms found in the Agreement), in this provision, the Agreement's reference to "The Page Book" clearly is to the same "The Face Book" venture, which is referenced in other parts of the Agreement.

27.     The Agreement provides immediately below the interlineations on the first page of the agreement and adjacent to Zuckerberg's initials:

> The agreed upon completion for the expanded project with working title "The Face Book" shall be Janruary (sic) 1 (sic) 2004 and an additional 1% interest in the business will be due the buyer for each day the website is delayed from that date.

28.     The Agreement provides continued performance as follows:

> For "The Face Book" Seller agrees to maintain and act as the sites (sic) webmaster and to pay for all domain and hosting expenses from the funds received under this contract, and  Seller agrees that he will maintain control of these services at all times.

29.     Ceglia paid Zuckerberg the $1000 called for in the Agreement for the continued development of The Face Book.  Ceglia also paid Zuckerberg for the work on StreetFax.com, some of which was used for The Face Book.

30.     As a matter of law, the Agreement created a general partnership (defined above as the "General Partnership") between Zuckerberg and Ceglia.  Zuckerberg's and Ceglia's contributions to the General Partnership became, and would become, property of the General Partnership.  The fruits of those contributions — such as the creation of the software, program, the purchase and design of a suitable website and business interests derived from the expansion of that service or website to a larger audience — also became property of the General Partnership.  Further, as a result of the formation of the General Partnership, Zuckerberg and Ceglia owed each other fiduciary duties of, among other things, candor, loyalty and good faith.

31.     After Zuckerberg and Ceglia signed the Agreement, they began to communicate with each other concerning both the StreetFax.com project and The Face Book project.  Those communications occurred over the telephone and through the use of emails.  In particular, Zuckerberg and Ceglia communicated with each other concerning the design and functionality of The Face Book website, various ways that they could generate income from The Face Book website, various ways they could expand The Face Book to a larger audience beyond Harvard University, and technical and other challenges in developing The Face Book website.

32.     On July 30, 2003, Zuckerberg sent an email to Ceglia informing Ceglia that:

> . . . I've been tweaking the search engine today [referring to the StreetFax.com project] and I'm pleased with its results.  I'd like to use it for the Harvard site [referring to The Face Book], I think it will really help people find each other, even if they spell names incorrectly.  Would it be agreeable with you if I adapt the source code?  Thanks!

33.     On September 2, 2003, Zuckerberg sent an email to Ceglia explaining that:

I have been away for a few days without internet, during that time I revised the business plan for the Harvard site. I would like to talk to you on the phone about it in detail. As you mentioned last week, the issue we must resolve is how to produce a revenue stream from the users. My conclusion this past week is to charge Alumni $29.95 a month. With this in mind, considering just 300 people, and the projection of a $9000 monthly revenue, we could, as you suggested, rapidly expand to other colleges. Further, since the plan involves more than one college, the name can't have Harvard in it and remains unresolved. Additionally, both original names >facebook.com and pagebook.com are unavailable, so there is no actual domain name either. thefacebook.com and thepagebook.com are both available but are clearly not a premium quality domain as they are much harder to remember.

34.     On September 2, 2003, Ceglia responded to Zuckerberg:

I like your thinking about funding expansion, I'm not sure a monthly fee is the way to go though, we are having a hard time getting adjusters to pay it and it's their business. I'd be concerned that we wouldnt (sic) get enough people on there to keep anyone interested. Maybe we could make it free until it was popular and then start charging? I wouldn't worry too much about a name if they are both already gone, are any of them due to expire? It took us ages to find Streetfax.com and the minute I did I just knew that is what I was waiting for. Let's talk about it on the phone, call me tonight if you get this in time. I suggest we look into a licencing (sic) agreement with Harvard (sic), I had one once with Syracuse University and it was pretty easy, then we could have a store on the site and sell sweatshirts, mugs, t shirsts (sic) and stuff to alumni and have some money coming in right away.

35.     Ceglia provided Zuckerberg an additional $1000 in November 2003.

36.     On November 22, 2003, Zuckerberg sent Ceglia an email that read in the subject line, "Urgent!  Let's Talk."  The email informed Ceglia that:

I have recently met with a couple of upperclassmen here at Harvard that are planning to launch a site very similar to ours. If we don't make a move soon, I think we will lose the advantage we would have if we release before them. I've stalled them for the time being and with a break if you could send another $1000 for the facebook (sic) project it would allow me to pay my roommate or Jeff to help integrate the search code and get the site live before them. Please give me a call so that we can talk more about this.

37.     Communications between Zuckerberg and Ceglia concerning their development of The Face Book and the website planned by the Harvard upperclassmen described in Zuckerberg's November 22, 2003 email continued through the balance of 2003.

38.     On January 1, 2004, the date on which the The Face Book website was due to be launched, Zuckerberg sent an email to Ceglia informing him that:

> I just wanted to extend to you a Happy New Year and tell you that all individual parts for the back end of the site have been completed. The extra $1000 really helped get us further ahead and if there is any way you can send some additional funding I believe we will be online in a few weeks. I think it is unnecessary at this point, with all of the extra work I have done for you, to hold me to the original completion date. I should not be penalized for delays that were out of my control, namely that there have been so many unspecified requests from the Streetfax project that you wanted to be placed as a priority, thereby delaying my start on our second project. Thus, I am requesting a written waiver on your part exempting me from the obligation to give you additional ownership in the project that is outlined in our original contract.

39.     Ceglia responded on the same day with an email explaining to Zuckerberg that he could not remember the relevant terms of the Agreement and did not have access to it. Consequently, he could not respond to Zuckerberg's request for a waiver.  Zuckerberg replied by email to Ceglia, informing him that he would scan the Agreement and send it to him.

40.     The same day, Ceglia then responded by email:

> Mark, Thanks I'll look forward to reviewing the details, just a quick question, we seem to be having an issue with the backend that has really been causing us some grief, I know that you're position is that you,ve (sic) done all the work in the contract and then some, I guess I am somewhat torn as on one hand in your interest you want me to consider not enforcing my contract while also then making it clear that more money is owed to you for things that weren't a part of yours, does that make sense to you? It doesnt (sic) to me .. I am wondering if you see where I am coming from here? You can't have it both ways Mark

41.     Zuckerberg replied:  "I'll just get this site online as quickly as I can ..."

42.     On January 5, 2004, Ceglia sent an email to Zuckerberg, asking him when The Face Book website would be launched:

> It is well past January 1st and to my knowledge you don't have a single thing done for the site, (sic) I gave you an extra $1k in November so we could rush it ahead of these other guys and as far as I know you don't even have a domain name or a home page built, let alone the actual database. For now I suggest you use my search engine and we work out the details. I'm starting to think you just blew that money Mark. You know perfectly well that you can't just take a persons (sic) investment and then spend it on women and beer or whatever you do up there in Harvard. I've been stalled long enough on this thing and if I don't see something soon (sic) I'll have no choice but to contact the school and perhaps your parents in Dobbs Ferry and let them know whats (sic) been going on.

43.     Zuckerberg responded on January 6, 2004:

> Threats to call my parents are uncalled for and unprofessional and you would be seriously violating our trust by doing so, I have done what I can with the small amount of money you have invested and I will have something live for you to view soon. Again I want to state that under no circumstances do you have my permission to contact my parents as they have nothing to do with my business and just because I am young doesnt (sic) mean I'm afraid of my parents (sic) response. Please do not contact them about this issue, they would probably just laugh you off anyway.

44.     On January 13, 2004 and January 16, 2004, Ceglia and Zuckerberg exchanged emails concerning the functionality of The Face Book's website and whether they should adapt the search engine built for StreetFax.com to it.

45.     Recognizing that the delay in launching The Face Book website had the potential to seriously dilute his interest in the venture, Zuckerberg sent an email to Ceglia on February 2, 2004, that read:

> Paul, I have a rather serious issue to discuss with you, *according to our contract I owe you over 30% more of the business in late penalties which would give you over 80% of the company.* First I want to say that I think that is completely unfair because I did so much extra work for you on your site that caused those delays in

the first place and second I don't even think it is legal to charge such a huge penalty. Mostly though I just won't even bother putting the site live if you are going to insist on such a large percentage. I'd like to suggest that you drop the penalty completely and that we officially return to 50/50 ownership.

[Emphasis added.]

46.   On February 3, 2004, Ceglia responded:

OK fine Mark 50/50 just as long as we start making some money from this thing. I'm looking forward to hearing how it goes but I am so busy right now with a few other projects that my time is very thin .. Let's get it live and open up the store. Have you had a chance to inquire about getting a merchandizing license? We really will need that soon so we can start bringing in some money, everyone buys t shirts and mugs, especially the parents .. they deserve bragging rights at home with the tuition they have to pay. Also what about putting in something like a Christian corner? I've only been to Harvard a few times but the idea of being able to find other Christians online without having to do the un PC thing of asking someone face to face sounds to me like it would have some real value, if only the spiritual kind. :-) and the other thing is links to hotlines, why couldnt (sic) we have the rape crisis hotline, the suicide hotline, drug rehab and so on right there so when someone really needs something they could link over to the site they wanted? Same thing for local pizza and chinese (sic) or whatever, that way it could really be a resource that a person could use.

47.   After finally learning that Ceglia would waive the provision in the Agreement for delivering The Face Book website late, Zuckerberg then informed Ceglia on February 4, 2004 that the website was live:  "Paul, [¶] 'thefacebook.com' opened for students today, when you get a chance take a look at it. I'll let you know how it goes."

48.   Ceglia responded on February 4, 2004:

Congrats Mark! The site looks great, Just wondering if we might think of another title for it without the the, but plenty of time for that, I'll try and think of some names, I looked for weeks to finally find streetfax.com and that is how I named it, backwards from the availability, (sic) I'm sure you checked to see if just facebook.com was available? you (sic) know another thing i've (sic) been thinking of that I perfected in Streetfax is going city to city, (sic) If you went city to cityh (sic) with this I think it would be far easier

than just trying to open it up to all ivy league (sic) schools at once, actually get on the ground in each place, we send a half dozen guys into the city on bikes and within a few weeks we have photos of every intersection in the place, so the same thing could be done onlyh (sic) putting up flyers to promote the site, just brainstorming some ideas on how we can start making some money.

49.     On February 6, 2004, Zuckerberg then writes to Ceglia:

Sorry it's taken me a few days to respond, (sic) Now that the sites (sic) live I feel I must take creative control and I just can not risk injuring my sites (sic) reputation by cheapening it with your idea of selling college junk, nor do I wish to spend my time shipping out coffee mugs to rich alumni. The site is cool as it is and I don't care about making any money on it right now, I just want to see if people will use it. If I had the rest of the money I was owed by you for all that extra work I did I wouldn't even need to make money at all on this site. That is money I am entitled to and is rightfully mine.

50.     Taken aback by Zuckerberg's February 6 email, Ceglia responded on February 7,

2004:

Mark, all I can think is your parents have handed you everything your entire life and after all this time and energy and MONEY that you think in your head that an Ok way to act is to just say- oh I've changed my mind I don't think it's cool to make money and that that should be that. Then you have the nerve to suggest that I should pay you more money if I get you right, so that you dont (sic) have to try to make money on the site we've built?? It's one thing to say you don't want to sell coffee mugs but I don't see why since the margins are excellent and with minimal effort we could generate some decent revenue for us while keeping the site free to students. It's one thing to say "I'd like to discuss with you other ways we could produce revenue for the site, like advertising, we could sell ads locally I am sure and to places that already sell alumni stuff (but we will be losing the margins) angel investors are just con men and until we have some decent revenue we aren't going to get a dime from them without giving up the whole thing and anyway at this point it's just a freaking harvard (sic) thing. I need to be able to get on the actual site and see where we can place some ads and we need to get some bike couriers to go around promoting the site so we can get some people using it FIRST! But we need to get some advertising on the site right away if you like that route better so alumni are used to seeing some ads from the beginning. Isn't there a way to count how many people click to

their site from ours?

51.     On April 6, 2004, Zuckerberg wrote Ceglia an email, representing to him that he

is considering abandoning The Face Book website, claiming he was too busy to work on it and

there was a lack of interest in it among students:

> Paul, I have become too busy to deal with the site and no one
> wants to pay for it, so I am thinking of just taking the server down.
> My parents have a fund that I can tap into for my college expenses
> and I would just like to give you your two thousand dollars back
> and call it even on the rest of the money you owe me for the extra
> work. At this point I won't even really be able to work on the
> facebook until Summer.

52.     Ceglia responded almost immediately:

> You've got some nerve talking about me owing you with the
> CRIMINAL stunts you've pulled (sic) Reasonable people go to
> court to resolve their differences they don't go stealing things
> dude, you stole code, not once, not twice but THREE TIMES! Do
> you have any idea the damage you've done??? Grow up, take a
> fucking ethics class, choke yourself with that silver spoon of yours.

53.     The "CRIMINAL stunts" and other activities referred to in Ceglia's April 6, 2004

email involved Zuckerberg's efforts to sabotage the StreetFax.com website on multiple occasions

by hacking into it and altering the code, causing it to shutdown.  Zuckerberg did that because

Ceglia refused to pay Zuckerberg more than what they agreed for the work Zuckerberg had done

on the StreetFax.com website.

54.     Contrary to Zuckerberg's representations to Ceglia, and unknown to Ceglia,

thefacebook.com website was an immediate success and well received by the students at

Harvard.  In fact, the website was so well received that other Harvard students and other

individuals expressed an interest in investing in the website and participating in its development.

Beginning with Zuckerberg's February 6, 2004 email to Ceglia, Zuckerberg was intentionally

attempting to sour their business relationship in order to convince Ceglia to abandon it.

55.     On July 22, 2004, Zuckerberg wrote to Ceglia an email, that read:

> Paul,
> I am guessing that you don't want to talk to me but I wanted to say
> happy birthday and that I hope to resolve our differences. I see that
> what I did was wrong and I am really sorry that I behaved as I did.
> Please give me your address and I will mail you back the $2000 for
> your trouble, more if it will repair our business relationship.
> Another summer is here and I still don't have any time to build our
> site, I understand that I promised I would, but other things have
> come up and I am out in California working during break. I just
> don't want the obligation of having to answer to you for not
> following through and I won't be able to.
> Best,
> Mark

56.     At the time Zuckerberg wrote his July 22, 2004 email, he had received or was about to receive funding from angel investors and was in the process of meeting with venture capital funds to provide additional capital.  At no time did Zuckerberg inform Ceglia of these facts.

57.     On July 29, 2004, Zuckerberg either incorporated or participated in the incorporation of an entity under the laws of the State of Delaware now known as Facebook, Inc. Zuckerberg misappropriated the General Partnership's (1) opportunity to expand the website and the Face Book project beyond Harvard University students and (2) assets, and contributed them to Facebook, Inc., but never informed Ceglia or accounted for them to the General Partnership or Ceglia.  To the contrary, Zuckerberg misrepresented to Ceglia that he was not continuing to work on further development of The Face Book, further expanding of The Face Book to a larger audience or commercializing The Face Book for profit.  In exchange for contributing the General Partnership's assets to Facebook, Inc. and in taking the General Partnership's opportunity for himself, Zuckerberg received and/or was promised to later receive cash, stock, stock options, restricted stock units and/or other consideration.

58.     Ceglia never accepted a repayment of investment in The Face Book project and never relinquished his 50% interest in the General Partnership.

### FIRST CLAIM FOR RELIEF
(Declaratory Relief Against Zuckerberg)

59.     Ceglia realleges paragraphs 1 through 58, inclusive, and by this reference incorporates the same as though fully set forth herein.

60.     Ceglia contends that:

a.      The Agreement, together with the course of conduct between Zuckerberg and Ceglia after the execution of the Agreement, as matter of law, created a General Partnership under New York Partnership law, of which Ceglia was a 50% owner;

b.      Pursuant to New York Partnership Law § 10(a), "A partnership is an association of two or more persons to carry on as co-owners a business for profit;"

c.      The respective contributions of Ceglia and Zuckerberg became, and would become, property of the General Partnership; and

d.      The fruits of those contributions — such as the creation of the software, program, the purchase and design of a suitable website, thefacebook.com, and business interests derived from the expansion of that service or website to a larger audience — also became property of the General Partnership.

61.     Ceglia is informed and believes and thereon alleges that Zuckerberg disputes the foregoing contentions.

62.     Consequently, an actual controversy and dispute exists between Ceglia and Zuckerberg concerning the formation, operation and assets of the General Partnership.

63.     All necessary parties are before the Court so that it can grant declaratory relief.

64.     Therefore, Ceglia is entitled to declaratory relief under 28 U.S.C. §§ 2201 and 2202.

65.     As a result of the foregoing dispute, a judicial determination of the parties' rights and obligations is necessary.

## SECOND CLAIM FOR RELIEF
(Breach of Fiduciary Against Zuckerberg)

66.     Ceglia realleges paragraphs 1 through 65, inclusive, and by this reference incorporates the same as though fully set forth herein.

67.     As alleged above, starting in approximately April 2004 through July 2004, Zuckerberg misrepresented to Ceglia that thefacebook.com was not successful, that he was too busy to deal with the website, that he had lost interest in the website and that he was shutting the website down.

68.     Ceglia relied on the foregoing misrepresentations in that after July 2004, he had no reason to follow up on whether the website and the business interests of the General Partnership was a success or failure or to determine whether Zuckerberg was continuing with the activities of the General Partnership.

69.     On or around July 29, 2004, having lulled Ceglia into believing the General Partnership would go nowhere, Zuckerberg misappropriated the opportunity of the General Partnership to expand the website and The Face Book project beyond Harvard University students and the assets of the General Partnership and contributed those assets to Facebook, Inc. and took the partnership opportunity for himself.  Zuckerberg also concealed his contribution of the General Partnership's assets to Facebook, Inc., and the existence of Facebook, Inc., from Ceglia.  Zuckerberg did so for his own personal gain.

70.     In taking the actions described above, Zuckerberg breached his fiduciary duties of candor, loyalty and good faith.

71.     As a result of Zuckerberg's breach of fiduciary duty, all consideration received by him or was promised to him in exchange for the General Partnership's assets, including, but not limited to, cash, stock, stock options, restricted stock units and/or any other consideration, were received, and continue to be held, by him in constructive trust for the benefit of the General Partnership and Ceglia as a 50% owner of the General Partnership.

### THIRD CLAIM FOR RELIEF
(Constructive Fraud Against Zuckerberg)

72.     Ceglia realleges paragraphs 1 through 71, inclusive, and by this reference incorporates the same as though fully set forth herein.

73.     As alleged above, starting in approximately April 2004 through July 2004, Zuckerberg knowingly misrepresented to Ceglia that thefacebook.com was not successful, that he was too busy to deal with the website, that he had lost interest in the website and that he was shutting the website down.

74.     Ceglia relied on the foregoing misrepresentations in that after July 2004, he had no reason to follow up on whether the website and the business interests of the General Partnership was a success or failure or to determine whether Zuckerberg was continuing with the activities of the General Partnership.

75.     On or around July 29, 2004, having lulled Ceglia into believing the General Partnership would go nowhere, Zuckerberg misappropriated the opportunity of the General Partnership to expand the website and The Face Book project beyond Harvard University students and the assets of the General Partnership and contributed those assets to Facebook, Inc. and took the partnership opportunity for himself.  Zuckerberg also knowingly concealed his

contribution of the General Partnership's assets to Facebook, Inc., and the existence of

Facebook, Inc., from Ceglia despite his duty to disclose such information to Ceglia.  Zuckerberg

did so for his own personal gain.

76.     Zuckerberg's actions described above constitute constructive fraud.

77.     As a result of Zuckerberg's constructive fraud, as a member of the General

Partnership, Ceglia has been deprived of his 50% interest in all consideration received by

Zuckerberg or promised to Zuckerberg in exchange for the General Partnership's assets,

including, but not limited to, cash, stock, stock options, restricted stock units and/or any other

consideration.

78.     As a result of Zuckerberg's constructive fraud, all consideration received by him

or was promised to him in exchange for the General Partnership's assets, including, but not

limited to, cash, stock, stock options, restricted stock units and/or any other consideration, were

received, and continue to be held, by him in constructive trust for the benefit of the General

Partnership and Ceglia as a 50% owner of the General Partnership.

79.     As a further result of Zuckerberg's actions, Ceglia has suffered actual damages in

an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF
(Actual Fraud Against Zuckerberg)

80.     Ceglia realleges paragraphs 1 through 79, inclusive, and by this reference

incorporates the same as though fully set forth herein.

81.     As alleged above, starting in approximately April 2004 through July 2004,

Zuckerberg knowingly misrepresented to Ceglia that thefacebook.com was not successful, that

he was too busy to deal with the website, that he had lost interest in the website and that he was

shutting the website down.

82.     Ceglia relied on the foregoing misrepresentations in that after July 2004, he had no reason to follow up on whether the website and the business interests of the General Partnership was a success or failure or to determine whether Zuckerberg was continuing with the activities of the General Partnership.

83.     On or around July 29, 2004, having lulled Ceglia into believing the General Partnership would go nowhere, Zuckerberg misappropriated the opportunity of the General Partnership to expand the website and The Face Book project beyond Harvard University students and the assets of the General Partnership and contributed those assets to Facebook, Inc. and took the partnership opportunity for himself.  Zuckerberg also knowingly concealed his contribution of the General Partnership's assets to Facebook, Inc., and the existence of Facebook, Inc., from Ceglia despite his duty to disclose such information to Ceglia.  Zuckerberg did so for his own personal gain.

84.     Zuckerberg's actions described above constitute actual fraud.

85.     As a result of Zuckerberg's fraud, as a member of the General Partnership, Ceglia has been deprived of his 50% interest in all consideration received by Zuckerberg or promised to Zuckerberg in exchange for the General Partnership's assets, including, but not limited to, cash, stock, stock options, restricted stock units and/or any other consideration.

86.     As a further result of Zuckerberg's actions, Ceglia has suffered actual damages in an amount to be determined at trial.

### FIFTH CLAIM FOR RELIEF
(Declaratory Relief Against Zuckerberg and Facebook, Inc.)

87.     Ceglia realleges paragraphs 1 through 86, inclusive, and by this reference incorporates the same as though fully set forth herein.

88.     Ceglia contends that:

      a.      Zuckerberg misappropriated the opportunities and the assets, including business interests, of the General Partnership for himself;

      b.      Zuckerberg contributed the misappropriated assets of the General Partnership to Facebook, Inc. and took the General Partnership's opportunity for himself;

      c.      In exchange for the misappropriated assets of the General Partnership that Zuckerberg contributed to Facebook, Inc., Zuckerberg received and was promised to receive cash, stock, stock options, restricted stock units and/or other consideration;

      d.      The cash, stock, stock options, restricted stock units and/or other consideration property received by or promised to Zuckerberg in exchange for the misappropriated assets were, and are, the property of the General Partnership; and

      e.      By virtue of his 50% ownership interest in the General Partnership, Ceglia is entitled to receive 50% of the total equity interest in Facebook, Inc. received by, and promised to Zuckerberg, including, but not limited to, stock, stock options and restricted stock units.

89.      Ceglia is informed and believes and thereon alleges that Zuckerberg and Facebook, Inc. dispute the foregoing contentions.

90.      Consequently, an actual controversy and dispute exists between Ceglia and Zuckerberg and Facebook, Inc. concerning the foregoing.

91.      All necessary parties are before the Court so that it can grant declaratory relief.

92.      Therefore, Ceglia is entitled to declaratory relief under 28 U.S.C. §§ 2201 and 2202.

93.      As a result of the foregoing dispute, a judicial determination of the parties' rights and obligations is necessary.

## SIXTH CLAIM FOR RELIEF
(Breach of Contract Against Zuckerberg)

94.     Ceglia realleges paragraphs 1 through 93, inclusive, and by this reference incorporates the same as though fully set forth herein.

95.     The Agreement constituted a valid contract between Ceglia and Zuckerberg.

96.     Ceglia has performed all conditions and covenants required of him under the Agreement and was not, and is not, in breach of any terms of the Agreement.

97.     Zuckerberg breached the Agreement on or about July 29, 2004, when he incorporated or participated in the incorporation of Facebook, Inc. and failed to provide Ceglia 50% of the capital stock of Facebook, Inc.

98.     As a result of Zuckerberg's breach of contract, Ceglia has suffered damages in an amount to be proven at trial.

## SEVENTH CLAIM FOR RELIEF
(Breach of the Implied Covenant of Good Faith and Fair Dealing Against Zuckerberg)

99.     Ceglia realleges paragraphs 1 through 98, inclusive, and by this reference incorporates the same as though fully set forth herein.

100.     The Agreement constituted a valid contract between Ceglia and Zuckerberg.

101.     Ceglia has performed all conditions and covenants required of him under the Agreement and was not, and is not, in breach of any terms of the Agreement.

102.     Zuckerberg breached the implied covenant of good faith and fair dealing arising from the Agreement on or about July 29, 2004, when he incorporated or participated in the incorporation of Facebook, Inc. and failed to provide Ceglia 50% of the capital stock of Facebook, Inc.

103.    As a result of Zuckerberg's breach of contract, Ceglia has suffered damages in an amount to be proven at trial.

WHEREFORE, Plaintiff PAUL D. CEGLIA, prays for the following relief:

**A.    For the First Claim for Relief**

1.    A declaration that:

a.    The Agreement, together with the course of conduct between Zuckerberg and Ceglia after the execution of the Agreement, as matter of law, created a general partnership of which Ceglia was a 50% owner;

b.    The respective contributions of Ceglia and Zuckerberg became, and would become, property of the General Partnership; and

c.    The fruits of those contributions — such as the creation of the software, program, the purchase and design of a suitable website, thefacebook.com, and business interests derived from the expansion of that service or website to a larger audience — also became property of the General Partnership.

**B.    For the Second, Third and Fourth Claims for Relief**

2.    An accounting of all consideration received by Zuckerberg or was promised to him in exchange for the General Partnership's opportunities and assets, including, but not limited to, cash, stock, stock options, restricted stock units and/or any other consideration, and in property or other interests into which the foregoing has been transmuted.

3.    The imposition of a constructive trust for the benefit of the General Partnership and Ceglia as a 50% owner of the General Partnership on all consideration received by Zuckerberg or was promised to him in exchange for the General Partnership's assets, including,

but not limited to, cash, stock, stock options, restricted stock units and/or any other

consideration, and in property or other interests into which the foregoing has been transmuted.

    4.      Damages according to proof.

    5.      Putative and exemplary damages.

**C.**    **<u>For the Fifth Claim for Relief</u>**

    6.      A declaration that:

    a.      Zuckerberg misappropriated the opportunities and the assets, including

business interests, of the General Partnership for himself;

    b.      Zuckerberg contributed the misappropriated assets of the General

Partnership to Facebook, Inc. and took the General Partnership's opportunity for himself;

    c.      In exchange for the misappropriated assets of the General Partnership that

Zuckerberg contributed to Facebook, Inc., Zuckerberg received and was promised to receive

cash, stock, stock options, restricted stock units and/or other consideration;

    d.      The cash, stock, stock options, restricted stock units and/or other

consideration property received by or promised to Zuckerberg in exchange for the

misappropriated assets were, and are, the property of the General Partnership; and

    e.      By virtue of his 50% ownership interest in the General Partnership, Ceglia

is entitled to receive 50% of the total equity interest in Facebook, Inc. received by, and promised

to Zuckerberg, including, but not limited to, stock, stock options and restricted stock units.

**D.**    **<u>For the Sixth and Seventh Claims for Relief</u>**

    7.      Damages according to proof.

**E.**    **<u>For All Claims for Relief</u>**

    8.      All recoverable court costs and fees.

9.      Attorneys' fees, expenses and costs, including expert witness fees, to the extent available by law or contract.

10.     Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

Dated: New York, New York.                    Respectfully submitted,
      April 11, 2011

                                                   DLA PIPER LLP (US)
                                                   John Allcock (seeking admission)
                                                 Robert W. Brownlie (seeking admission)
                                               Gerard A. Trippitelli (seeking admission)

By:  _/s/Christopher P. (Kip) Hall_____
     Christopher P. (Kip) Hall
     kip.hall@dlapiper.com
     Carrie S. Parikh
     carrie.parikh@dlapiper.com
     1251 Avenue of the Americas, 27th Floor
     New York, NY  10020-1104
     212.335.4500
     Attorneys for Plaintiff
     PAUL D. CEGLIA

     Paul Argentieri (co-counsel)
     paul.argentieri@gmail.com
     188 Main St.
     Hornell, NY 14843
     607.324.3232

     Dennis C. Vacco (co-counsel)
     dvacco@lippes.com
     Kevin J. Cross (co-counsel)
     kcross@lippes.com
     665 Main Street, Suite 300
     Buffalo, NY 14203
     716.853.5100