UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PAUL D. CEGLIA,

              Plaintiff,

     v.

MARK ELLIOT ZUCKERBERG and
FACEBOOK, INC.,

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Civil Action No. 1:10-cv-00569-RJA

**DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION FOR EXPEDITED DISCOVERY**

Thomas H. Dupree, Jr.
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
(202) 955-8500

Terrance P. Flynn
HARRIS BEACH PLLC
726 Exchange Street
Suite 1000
Buffalo, NY 14210
(716) 200-5120

Orin Snyder
Alexander H. Southwell
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue, 47th Floor
New York, NY 10166-0193
(212) 351-4000

June 2, 2011

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND................................................... 4

    1.    Zuckerberg's Work For StreetFax In 2003............................................ 4

    2.    In 2010, Ceglia Reappears And Claims To Own 84 Percent
        Of Facebook, Inc......................................................................................... 5

    3.    Ceglia Abandons His Original Claims And Changes His Story........... 6

CEGLIA'S DOCUMENTS ARE FORGERIES ........................................................ 7

    1.    The Purported Contract Is A Forgery. ................................................... 7

    2.    The Purported Emails Are Forgeries. ................................................. 10

    3.    Ceglia's Long History Of Scams And Criminal Misconduct. ........... 13

ARGUMENT .................................................................................................................... 15

    I.    Federal Courts Have Broad Discretion To Order Expedited, Staged
        Discovery. .................................................................................................. 16

    II.    Defendants Have Demonstrated Good Cause...................................... 19

        A.    Expedited Discovery Is Warranted To Prevent Fraud On The Court
              And Further Tampering With Electronic Records.................................. 19

        B.    Expedited Discovery Will Not Prejudice Ceglia. .................................. 21

        C.    Defendants Seek Narrowly Tailored Relief............................................ 22

CONCLUSION................................................................................................................. 23

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Affymetrix, Inc. v. PE Corp.*,
219 F. Supp. 2d 390 (S.D.N.Y. 2002) .................................................................................. 19

*Amari v. Spillan*,
2008 WL 5378339 (S.D. Ohio Dec. 19, 2008) ....................................................................... 17

*Ayyash v. Bank al-Madina*,
233 F.R.D. 325 (S.D.N.Y. 2005) .............................................................................. 16, 17, 20

*Ceglia v. Zuckerberg*,
2011 WL 1108607 (W.D.N.Y. Mar. 28, 2011)........................................................................ 6

*Crawford-el v. Britton*,
523 U.S. 574 (1998)................................................................................................................ 18

*Damiano v. Sony Music Entertainment, Inc.*,
168 F.R.D. 485 (D.N.J. 1996) ................................................................................................ 19

*Mann v. Levy*,
776 F. Supp. 808 (S.D.N.Y. 1991).......................................................................................... 19

*Occidental Chem. Corp. v. OHM Remediation Servs.*,
168 F.R.D. 13 (W.D.N.Y. 1996).............................................................................................. 18

*OMG Fidelity, Inc. v. Sirius Technologies, Inc.*,
239 F.R.D. 300 (N.D.N.Y. 2006)...................................................................................... 16, 21

*Physicians Interactive v. Lathian Systems Inc.*,
2003 WL 23018270 (E.D. Va. Dec. 5, 2003) .............................................................. 4, 17, 20

*Semitool, Inc. v. Tokyo Electron Am., Inc.*,
208 F.R.D. 273 (N.D. Cal. 2002)...................................................................................... 18, 21

*Stern v. Cosby*,
246 F.R.D. 453 (S.D.N.Y. 2007) ..................................................................................... 4, 16, 19

*U.S. Commodity Futures Trading Commission v. Atwood & James, Ltd.*,
2009 WL 666970 (W.D.N.Y. Jan. 23, 2009).......................................................................... 17

*UnitedHealthCare Services v. Miller*,
No. 1:09-cv-00276-RJA-LGF (W.D.N.Y. Apr. 20, 2009) ..................................................... 17

**Statutes & Rules**

Fed. R. Civ. P. 26 ............................................................................................................. 3, 16, 18


**Other Authorities**

John Anderson, *Ceglia saved e-mails to Facebook CEO Zuckerberg from Fassett House*,
WELLSVILLE DAILY, Apr. 13, 2011 ...................................................................................... 20

John Cassidy, *Me Media: How Hanging out on the Internet became big business*, THE
NEW YORKER, May 15, 2006 ............................................................................................... 7

Geoffrey A. Fowler and Scott Morrison, *Fight over Facebook Origins Escalates*, WALL
ST. J. B1 (Apr. 13, 2011) ...................................................................................................... 3

Kashmir Hill, *Facebook Calls Paul Ceglia A "Scam Artist" In The Other Facebook
Ownership Lawsuit*, www.forbes.com (May 26, 2011) ........................................................ 21

Claire Hoffman, *The Battle For Facebook*, ROLLING STONE, Jun. 26, 2008 ................................ 7

David Kirkpatrick, THE FACEBOOK EFFECT (2010) ...................................................................... 7

Lesley Stahl, *The Face Behind Facebook*, 60 MINUTES – CBS NEWS, Jan. 13, 2008,
www.cbsnews.com/stories/2008/01/10/60-minutes/main3697442.shtml .............................. 7

Alan J. Tabak, *Hundreds Register for New Facebook Web site – Facemash creator seeks
new reputation with latest online project*, THE HARVARD CRIMSON, Feb. 9, 2004 ................. 8

Bob Van Voris, *Facebook Would-Be Owner Says He Owes His Claim to Arrest*,
Bloomberg, Aug. 2, 2010 ...................................................................................................... 5

Jose Antonio Vargas, *The Face of Facebook*, THE NEW YORKER, Sept. 20, 2010 ........................ 7

**DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION FOR EXPEDITED DISCOVERY**

Defendants Mark Zuckerberg and Facebook, Inc. respectfully move this Court to grant

expedited, phased discovery and to issue an order: (a) compelling immediate production of the

original signed version of the purported contract attached to the Amended Complaint, the native

electronic version of that document, and all copies of the purported contract in electronic or hard-

copy form; (b) compelling immediate production of the purported emails described in the

Amended Complaint in their original, native electronic form, as well as all copies of the

purported emails in electronic or hard-copy form; and (c) immediately seizing, and permitting

Defendants to inspect, every computer in Plaintiff Paul Ceglia's possession, custody, or control,

including the computers at his parents' house. Because this discovery will bring this case to an

immediate end by establishing that the purported contract and emails are forgeries, this Court

should order that all other discovery be stayed until Defendants' requested discovery is

completed.

## INTRODUCTION

Paul Ceglia alleges that he owns a substantial share of Facebook, Inc., and bases his

claims on what he says is a contract signed by Mark Zuckerberg and emails memorializing their

purported partnership. The contract is a cut-and-paste job, the emails are complete fabrications,

and this entire lawsuit is a fraud.

Zuckerberg has now declared under oath that he did <u>not</u> sign the contract attached to

Ceglia's complaint, and that he did <u>not</u> write or receive any of the purported emails quoted in the

Amended Complaint. *See* Zuckerberg Decl., ¶¶ 5, 14. Moreover, Defendants retained digital

forensic examiners to review Zuckerberg's Harvard email account and found <u>none</u> of the

purported emails in it. *See* Rose Decl., ¶ 7. What they <u>did</u> find were the <u>genuine</u> emails between

Ceglia and Zuckerberg from the same time period — and those emails directly contradict Ceglia's made-up story. *Id.*, ¶ 8. Ceglia and Zuckerberg did exchange emails, and did sign an agreement, but their discussions and agreement concerned <u>only</u> some coding work that Zuckerberg performed for StreetFax.com — a web site that posted photographs of traffic intersections for use by insurance adjustors. Zuckerberg and Ceglia <u>never</u> discussed Facebook and they <u>never</u> signed a contract concerning Facebook — a fact that is not surprising given that Zuckerberg did not even <u>conceive</u> of Facebook until long after the purported contract was signed in April 2003. Zuckerberg Decl., ¶ 11. Ceglia appears to have doctored the genuine contract — which concerns StreetFax and StreetFax alone — and then fabricated emails to make it appear that he and Zuckerberg were actually discussing and reaching agreements about Facebook.

One of the nation's top experts in document authentication has examined the purported contract and concluded that it is an "amateurish forgery." Romano Decl., ¶ 16. The document is riddled with numerous tell-tale signs of fraud, such as the fact that page 1 (which purports to convey an interest in "The Face Book") has different margins and formatting from page 2 (which contains the signatures, yet does not mention "The Face Book"). Moreover, although the purported contract is dated <u>April</u> 2003, page 1 refers to "StreetFax LLC" — an entity that was not created until <u>August</u> 2003.

Ceglia's claim that he signed a contract with Zuckerberg entitling him to a significant ownership share of Facebook, Inc. — and then forgot about it for seven years — is incredible on its face, and the many indicators of fraud that permeate this case would call into serious question the allegations of any plaintiff. But Paul Ceglia is not just any plaintiff. He is a convicted felon and well-known scam artist who has spent the last decade of his life ripping people off. Any possible doubt that this lawsuit is a fraud evaporates when one considers Ceglia's long criminal

history, which includes a first-degree felony conviction in Texas in 1997; an arrest, followed by a no-contest plea, in Florida in 2005; a land scam that Ceglia orchestrated in the mid-2000s that included fraudulent sales of property in New York and Florida facilitated by falsified government documents; and criminal and civil charges in 2009 brought by the Allegany County District Attorney's Office and the New York Attorney General's Office for defrauding citizens in upstate New York through a scam involving the sale of wood pellets used to heat homes. *See* Henne Decl. ¶¶ 5-24. As then-Attorney General Andrew Cuomo publicly stated: Paul Ceglia has "repeatedly lied" in his efforts to cheat and defraud. *Id.*, Ex. B.

The fact that Ceglia has spent the past seven years as a hustler engaged in various land swindles and wood-pellet scams further highlights the fraudulent nature of his claims in this case. If Ceglia were in fact the owner of a substantial stake in Facebook, why would he have resorted to a life of crime?

Ceglia has refused to produce the original version of the purported contract; he has failed even to produce copies of the alleged emails; and his own lawyer admitted to the *Wall Street Journal* that he was initially "skeptical of Mr. Ceglia's claims." Geoffrey A. Fowler and Scott Morrison, *Fight over Facebook Origins Escalates*, WALL ST. J. B1 (Apr. 13, 2011). Ceglia's lawyer nonetheless asserted that the contract was "authentic" because he "brought in an outside expert to examine the computer file used to create the contract and to verify when it was first created." *Id*. Defendants are entitled to test that assertion before they are unfairly subjected to months of full-blown discovery in a case that rests on what will quickly be shown to be forged documents.

Federal Rule of Civil Procedure 26(d)(1) empowers this Court to order expedited discovery based on a showing of reasonableness and good cause — a standard that courts have

deemed satisfied where there has been a showing of possible fraud on the court or a need to preserve electronic evidence before it can be tampered with or destroyed. *See, e.g.*, *Stern v. Cosby*, 246 F.R.D. 453, 457 (S.D.N.Y. 2007) (granting expedited discovery to prevent possible fraud on the court); *Physicians Interactive v. Lathian Systems Inc.*, 2003 WL 23018270 (E.D. Va. Dec. 5, 2003) (granting expedited discovery to preserve electronic evidence).

The facts that Defendants have already gathered overwhelmingly establish that good cause exists to permit Defendants to take expedited, surgically-targeted discovery that will readily establish that the contract and emails are fabricated, and that this lawsuit is nothing more than Paul Ceglia's latest scam. The discovery will include forensic examination of Ceglia's computers, as well as the original version of the purported contract. When this testing confirms that all of these documents are forgeries, this lawsuit will end immediately.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. Zuckerberg's Work For StreetFax In 2003.

In early 2003, Mark Zuckerberg was a freshman at Harvard University. Zuckerberg Decl., ¶ 6. He saw an online job listing regarding development of a web site. *Id*. He responded to the listing and learned that the project was for a company called StreetFax, which used the web site StreetFax.com. *Id*. StreetFax.com was a web site that provided a database of photographs of traffic intersections for use by insurance adjustors.

In or about April 2003, Zuckerberg agreed to provide limited web site development services for StreetFax and signed a contract memorializing this agreement. Zuckerberg Decl., ¶ 7. The contract was provided to Zuckerberg by Paul Ceglia. *Id*.

The document attached as Exhibit A to the Amended Complaint is <u>not</u> the contract that Zuckerberg signed. Zuckerberg Decl., ¶ 8. The contract that Zuckerberg signed only concerned

web site development for StreetFax.  *Id*., ¶ 9.  It did not mention or concern Thefacebook.com, or any related social networking service or web site.  *Id*.  Zuckerberg did not enter into, and has never entered into, any contract or agreement with Ceglia or StreetFax, concerning Thefacebook.com, or any related social networking web site.  *Id*., ¶ 10.

Zuckerberg performed his web development work for StreetFax and it is undisputed that Ceglia had no contact or communications with Zuckerberg during the years that followed.

### 2. In 2010, Ceglia Reappears And Claims To Own 84 Percent Of Facebook, Inc.

Zuckerberg launched Thefacebook.com on February 4, 2004, more than nine months after he purportedly signed the contract attached to Ceglia's complaint.  In the years that followed, Facebook underwent astronomical growth and is now widely celebrated as one of the great recent success stories in American business.  What started as a small company managed by Zuckerberg and a handful of friends from a room in a summer sublet has now transformed into a business with thousands of employees and more than 500 million users worldwide.  It is a company that spans the globe and has revolutionized the ways in which people connect and share with one another.

In 2010 — more than six years after Zuckerberg's dealings with StreetFax — Ceglia emerged from out of the blue with a lawsuit.  Ceglia attached to his complaint a document purporting to be a contract he signed with Zuckerberg in April 2003.  That document addresses not just the StreetFax project but makes references to a project described variously as "The Face Book" and "The Page Book."  Ceglia claimed that the purported contract entitled him to 84 percent of Facebook, Inc.  As to why he had remained silent for the past seven years, Ceglia explained that he had recently discovered the purported contract when he was looking through his papers in the wake of one of his recent arrests.  *See* Bob Van Voris, *Facebook Would-Be*

*Owner Says He Owes His Claim to Arrest*, Bloomberg, Aug. 2, 2010. Ceglia stated that his lawsuit against Zuckerberg "wouldn't have been possible if state troopers hadn't come to his house in October to arrest him for fraud." *Id*.

Ceglia filed his lawsuit in state court, alleging a breach of contract claim. Defendants removed the case to this Court on diversity grounds. Ceglia sought remand on the theory that Zuckerberg — who has lived and worked year-round in California for years, as would be expected of the CEO of a major California-based company — is actually a domiciliary of New York. This Court rejected Ceglia's argument and denied remand. *Ceglia v. Zuckerberg*, 2011 WL 1108607 (W.D.N.Y. Mar. 28, 2011).

**3. Ceglia Abandons His Original Claims And Changes His Story.**

During the remand proceedings, Defendants pointed out the incredible nature of Ceglia's claims and declared that his lawsuit was a fraud based on a fabricated contract. In response, Ceglia did an about-face. He pulled back his original complaint, retained new lawyers, and filed a new complaint filled with new facts and new legal theories. The Amended Complaint is fundamentally inconsistent with the original complaint. Among other things, Ceglia dropped his claim that he owns 84 percent of Facebook, Inc., replacing it with a demand for 50 percent of Zuckerberg's stake. Ceglia also alleged, for the first time, that he formed a general partnership with Zuckerberg. Whereas Ceglia had originally claimed that he signed the contract in 2003 and apparently forgot about it until 2010 when he discovered it amidst his papers, he <u>now</u> claimed that after signing the contract he and Zuckerberg engaged in an intense period of creative collaboration during which Ceglia contributed sweat equity, along with many innovative business and marketing ideas. *See* Amended Compl., ¶¶ 31-52. These new allegations are based

on what Ceglia alleges are emails to and from Zuckerberg — emails that are not mentioned in the original complaint and are not attached to the Amended Complaint.

## CEGLIA'S DOCUMENTS ARE FORGERIES

Mark Zuckerberg has sworn under oath that he did not sign the contract attached to Ceglia's Amended Complaint, that he did not write the emails Ceglia attributes to him, and that he did not receive any of the emails Ceglia claims to have sent him. Zuckerberg Decl. ¶¶ 5, 14. As set forth below, the evidence Defendants have gathered to date corroborates Zuckerberg's sworn statements and confirms that Ceglia's documents are forgeries.

### 1. The Purported Contract Is A Forgery.

Ceglia's claim that Zuckerberg entered into a contract concerning Thefacebook.com in April 2003 is impossible as a matter of historical fact. Zuckerberg did not conceive of the idea for Facebook until in or about December 2003. *See* Zuckerberg Decl., ¶ 11.

This timing is confirmed by numerous public sources. The creation of Facebook has been widely documented and there is no evidence that Zuckerberg had even <u>thought of</u> Thefacebook.com in April 2003, let alone that his thinking was sufficiently advanced that he would enter into contracts to secure capital and grant ownership rights in the business.[1]

---

[1]  *See, e.g.*, David Kirkpatrick, THE FACEBOOK EFFECT 19-30 (2010) ("At the [fall 2003] semester's end everyone in [Zuckerberg's mathematics course] went out to dinner and ended up talking about the need for a 'universal facebook.' So Zuckerberg went home and built one. . . . Zuckerberg later said that it was the *Crimson*'s editorials [published towards the end of the 2003 fall semester] about Facemash that gave him the initial idea for how to build Thefacebook."); Jose Antonio Vargas, *The Face of Facebook*, THE NEW YORKER, Sept. 20, 2010 (discussing winter of early 2004, Zuckerberg is quoted as describing how he and his friends "would hang out and go together to Pinocchio's, the local pizza place, and talk about trends in technology. We'd say, 'Isn't it obvious that everyone was going to be on the Internet? Isn't it, like, inevitable that there would be a huge social network of people?'"); Claire Hoffman, *The*

[Footnote continued on next page]

In addition to being impossible as a matter of historical fact, the purported contract is an obvious cut-and-paste job. This is apparent from the face of the document. Among other things, the column widths and margins are inconsistent, which indicates that the document has been altered and reproduced. Many words and sentences simply make no sense, and the document is riddled with internal inconsistencies and contradictions strongly indicative of fraud. Tellingly, there are many discrepancies between page 1 (which purports to convey an interest in "The Face Book") and page 2 (the page with Ceglia's and Zuckerberg's signatures, and which makes no mention of "The Face Book" or anything similar). Ceglia appears to have taken page 2 of the signed StreetFax contract and appended it to a doctored version of page 1, which Ceglia has edited by adding references to "The Face Book."

One notable difference is that page 1 and page 2 refer to StreetFax by different names: page 1 refers to "StreetFax LLC," whereas page 2 refers to "StreetFax Inc." This is a critical distinction. <u>StreetFax LLC did not exist in April 2003 when the contract was purportedly signed</u>

---

[Footnote continued from previous page]

*Battle For Facebook*, ROLLING STONE, Jun. 26, 2008 ("Zuckerberg has said under oath that he began writing the code for TheFacebook.com, his site's first incarnation, in January . . . . It took him maybe a week or two, he claims, in between homework and finals. He was inspired, he said, by an editorial in *The Harvard Crimson* about his Facemash debacle [in November 2003]."); Lesley Stahl, *The Face Behind Facebook*, 60 MINUTES – CBS NEWS, Jan. 13, 2008, www.cbsnews.com/stories/2008/01/10/60-minutes/main3697442.shtml (describing the creation of thefacebook.com as occurring after the fall 2003 release of Facemash.com); John Cassidy, *Me Media: How Hanging out on the Internet became big business*, THE NEW YORKER, May 15, 2006 (describing the initial conception of Thefacebook.com as occurring in November/December 2003 and its launch in February 2004); Alan J. Tabak, *Hundreds Register for New Facebook Web site – Facemash creator seeks new reputation with latest online project*, THE HARVARD CRIMSON, Feb. 9, 2004 ("When Mark E. Zuckerberg '06 grew impatient with the creation of an official universal Harvard facebook, he decided to take matters into his own hands. After about a week of coding, Zuckerberg launched thefacebook.com last Wednesday afternoon.").

— it was formed in August 2003. *See* Henne Decl., Ex. I (StreetFax LLC Articles of Organization). This is strong evidence that page 1 is a recent forgery: Ceglia apparently forgot that the LLC did not exist in April 2003 when he set to work doctoring the purported contract.

Frank Romano is Professor Emeritus at the Rochester Institute of Technology and one of the leading experts in the field of document authentication; his career in the printing industry has spanned more than 50 years. Professor Romano examined the copy of the purported contract attached to the Amended Complaint and identified many "significant inconsistencies" between page 1 and page 2. These include:

- All references to the "The Face Book" and "The Page Book" appear only on page 1. Romano Decl., ¶ 16.

- There are significant differences between the widths of the columns, margins, and "gutter" (the space between the columns) on pages 1 and 2. Specifically, the column widths are wider on page 1 than page 2, while the widths of the margins and "gutter" are narrower on page 1 than page 2. *Id.*, ¶ 14(d).

- The type size on page 1 is larger than the type size on page 2. Similarly, the type density on page 1 is darker than the type density on page 2. *Id.*, ¶ 14(c).

- On page 1, the spacing between the paragraphs varies between single, double, and triple spacing. On page 2, the spacing between paragraphs is uniformly single. *Id.*, ¶ 14(b).

- The indents on page 1 are wider than the indents on page 2. It is highly unusual for such inconsistencies to appear within a document because formatting is usually set up in advance and consistent throughout the document. *Id.*, ¶ 14(a).

Professor Romano concluded:

> Based on my professional experience and judgment, my opinion is that Page 1 and Page 2 of [the document] were printed at different times on different printers. This strongly indicates that, at least in part, [the document] is forged. Furthermore, all the references to "The Face Book" or "The Page Book" appear on Page 1. <u>Thus, it is my conclusion that Page 1 of [the document] is an amateurish forgery</u>.

Romano Decl., ¶ 16 (emphasis added).

### 2.    The Purported Emails Are Forgeries.

Defendants engaged digital forensic examiners to review all of Zuckerberg's emails contained in the email account he used while a student at Harvard. That account contains emails from the 2003-2004 time period. The emails Ceglia quotes in his Amended Complaint <u>do not exist</u> in the account. They are complete fabrications.

The process through which Zuckerberg's Harvard emails were obtained and reviewed is set forth in the attached declaration of Bryan Rose, a former Assistant United States Attorney. As Mr. Rose explains, the highly-regarded digital forensics firm Stroz Friedberg obtained a complete and accurate copy of the entire contents of Zuckerberg's Harvard University email account, including both sent and received mail, as the account existed in October 2010. Rose Decl., ¶ 5. It also obtained a copy of Zuckerberg's account as it existed in April 2011. *Id*., ¶ 4. Stroz Friedberg ran searches on all emails in the account using search terms containing the words and phrases taken from the purported emails excerpted in Ceglia's Amended Complaint. *Id*., ¶ 7. Based on these searches, Mr. Rose determined that the purported emails were not in Zuckerberg's email account. *Id*.

However, the account <u>did</u> contain more than 175 emails between Zuckerberg and Ceglia (or other persons affiliated with StreetFax) from 2003 and 2004. These verifiably genuine

emails establish that Ceglia's entire case is fiction and the story he tells in his Amended Complaint is a lie.

The <u>real</u> facts, as reflected in the emails captured from Zuckerberg's account, are as follows:

- Zuckerberg exchanged more than 175 emails with Ceglia or other persons affiliated with StreetFax. <u>None</u> of these emails — not a single one — mentions "The Face Book," "The Page Book," Thefacebook.com, or any web site created by Zuckerberg. Rose Decl., ¶ 8.

- The <u>only</u> topic of discussion between Zuckerberg and Ceglia (or his associates) was the StreetFax project. *Id.*

- The emails show Ceglia profusely apologizing to Zuckerberg for failing to pay Zuckerberg for his work on the StreetFax web site and asking for more time to scrape the money together. For example, in a February 16, 2004 email to Zuckerberg, Ceglia wrote: "I can fully understand your frustration and hope that you have felt and feel from me sincere regret for such huge delays. . . . If there is any way I can assure you that I have absolutely every intention of paying you what is owed plus some when we finally catch up to our sales goals it would be appreciated to a level I cant express in words. After all this time please allow us a little more time to make things right with you. . . . I will nervously await your reply and hope you can grant us more time." Rose Decl., Ex. D.

- The emails show an increasingly desperate Ceglia offering excuse after excuse for his delay in paying, and claiming that he was seeking to sell his property to raise the money he owed Zuckerberg. For example, in a March 20, 2004 email to

Zuckerberg, Ceglia wrote: "I unfortunately dont have any cash to give you right now" but "I have even listed my only rental property for sale in the hopes of clearing up my past debts." Rose Decl., Ex. E.

- The emails also show Ceglia attempting to persuade Zuckerberg to accept StreetFax equity (which was worthless) in lieu of payment. For example, in a March 31, 2004 email to Zuckerberg, Ceglia wrote: "As I try to come up with solutions one that I havent before thought of comes to mind. Stock. . . . . [I] realize that with our inability to pay you so far that this might not sound like an attractive offer . . . . It would be a tremendous load of my mind to reach an agreement with you Mark on this, I really hope you find this agreeable." Rose Decl., Ex. F.

These indisputably genuine emails — as they appear on the account maintained by Harvard University — directly contradict the invented narrative set forth in Ceglia's Amended Complaint and establish beyond any possible doubt that the purported emails Ceglia discusses in his Amended Complaint are fabrications. Out of the more than 175 emails, there is not <u>a single one</u> in which Zuckerberg and Ceglia discuss Facebook or any social networking web site.

It is utterly implausible that Ceglia would have been begging a Harvard sophomore for extra time to raise money to pay a small debt, "nervously await[ing] [his] reply" (Rose Decl., Ex. D), without once mentioning Ceglia's purported 50 percent stake in the Facebook business. Nor do the authentic emails contain any evidence — as his Amended Complaint alleges, *see* ¶¶ 45-46 — that, just a few weeks before, he had relinquished an additional 34 percent stake (the purported late penalty) voluntarily and without compensation. The <u>authentic</u> Ceglia emails — which show Ceglia apologizing, begging Zuckerberg's forgiveness, offering excuse after excuse,

asking for more time, even promising to sell his property to raise the money he owed Zuckerberg — demonstrate that the narrative in Ceglia's complaint is utter fiction.

That conclusion is further confirmed by linguistic analysis of the alleged emails Ceglia purports to quote in the Amended Complaint. Gerald McMenamin is Professor Emeritus of Linguistics at California State University in Fresno and a forensic linguist who has rendered expert opinions in more than 600 cases. Professor McMenamin studied the text of the purported Zuckerberg emails that appear in Ceglia's Amended Complaint and determined that it is probable that Zuckerberg was <u>not</u> the author. *See* McMenamin Decl. ¶ 4. Professor McMenamin performed a stylistic analysis — examining the language and tone used in a sample of emails genuinely authored by Zuckerberg to Ceglia and other persons affiliated with StreetFax during the relevant time period — and compared them to the language and tone of the purported emails. *Id.*, ¶¶ 8-10. He determined, among other things, that the Amended Complaint purports to quote Zuckerberg spelling certain words differently than Zuckerberg repeatedly spells them in authentic Zuckerberg emails. *Id.*, ¶ 11. Likewise, the sentence structure of the purported emails differs from the sentence structure in authentic Zuckerberg emails. *Id.* Based on these and many other discrepancies, Professor McMenamin concluded that "it is probable that Mr. Zuckerberg is <u>not</u> the author" of the purported emails in the Amended Complaint. *Id.*, ¶ 4 (emphasis added).

### 3. Ceglia's Long History Of Scams And Criminal Misconduct.

Ceglia is a professional con artist. A comprehensive background investigation conducted by the nationally renowned investigative firm Kroll Associates, Inc. established that Ceglia is a career criminal who has engaged in fraud, subterfuge and falsification of documents. From his 1997 felony conviction through his 2009 arrest for scamming New Yorkers, Ceglia has a long record of criminal and fraudulent behavior that spans decades. The following is a summary of

Ceglia's known criminal history, as investigated and attested to by Don Henne, a former Lieutenant Commander and officer in the New York City Police Department with 20 years of law enforcement experience.

- In March 1997, Ceglia was convicted in Texas of aggravated possession of a controlled substance, a first-degree felony. Court filings indicate he was in possession of more than 400 grams of psilocybin, including diluents. Psilocybin is a hallucinogenic compound found in certain mushrooms. Ceglia was sentenced to 10 years of probation and paid $15,000 of a $25,000 fine; the remaining $10,000 was suspended. Henne Decl., ¶ 10.

- In May 2005, Ceglia was arrested in Florida for trespass while trying to sell property in a private orange grove to an elderly couple. Ceglia falsely told the arresting officer that he had an easement along the grove. The rightful property owner confirmed that no such easement existed and insisted on pressing charges. In October 2005, Ceglia pleaded no contest to first-degree misdemeanor trespass, and was ordered to pay a fine. *Id.*, ¶ 12.

- That trespass incident appears to be part of a wide-ranging criminal land scam involving the fraudulent sale of land in New York and Florida. Working from his base in Wellsville, Ceglia defrauded numerous victims by, among other things, (1) fraudulently misrepresenting tracts of land as buildable or useable as residential tracts when, in fact, they were not; (2) engaging in "shill bidding" on eBay, thus artificially inflating the price of the land being auctioned; and (3) in some cases, simply accepting down payments and financing payments for land that he did not own and was in no position to sell. *Id.*, ¶¶ 16-24.

- Ceglia's falsification of documents did not begin with this case. Ceglia furthered his land scam by forging official government documents. Kroll investigators shared with Florida authorities the purported government document that Ceglia had provided to at least two of his victims to facilitate his sales of non-buildable land. After examining the document, the Director of the Polk County (Florida) Land Development Division stated that it had likely been doctored by removing the conditions necessary for a building permit to be obtained and having "whited out" the identifying parcel number. *Id.*, ¶¶ 20-22.

- In 2009, Ceglia was arrested and charged with consumer fraud by the Allegany County District Attorney's Office and sued by then-Attorney General Andrew Cuomo. Ceglia was charged with running a scam in which local residents bought wood pellets for heating purposes that he never actually delivered. *Id.*, ¶¶ 5-8. Resolution of the civil case was contingent on Ceglia paying $25,000 in penalties, and more than $100,000 in restitution to the dozens of customers that he victimized. *Id.*, ¶ 6.

## ARGUMENT

District courts within the Second Circuit have broad discretion to expedite and sequence discovery. As shown below, Defendants have established good cause warranting expedited discovery into the authenticity (or lack thereof) of the purported contract and emails on which Ceglia bases his claims. All other discovery should be stayed until this initial inquiry is complete.

## I.       Federal Courts Have Broad Discretion To Order Expedited, Staged Discovery.

District courts may grant expedited discovery under Federal Rule of Civil Procedure 26(d)(1) based on "the flexible standard of reasonableness and good cause." *Ayyash v. Bank al-Madina*, 233 F.R.D. 325, 327 (S.D.N.Y. 2005).  Determining whether good cause exists typically requires weighing the prejudice the moving party will suffer from delay against the prejudice, if any, that the responding party will suffer from expedited discovery.  *See OMG Fidelity, Inc. v. Sirius Technologies, Inc*., 239 F.R.D. 300, 305 (N.D.N.Y. 2006) (granting expedited discovery based on "a comparison of the potential prejudice which will be suffered by the defendant if discovery is permitted, and that which will be experienced by the plaintiff if denied the opportunity for discovery at this stage").

Courts have found the "good cause" standard satisfied in cases where there are indications that an ongoing fraud is threatening the integrity of the judicial process.  For example, in *Stern v. Cosby*, 246 F.R.D. 453, 457-58 (S.D.N.Y. 2007) (Chin, J.), the court granted expedited discovery into whether the defendant was "attempting to obstruct justice by offering to pay money" to witnesses for their testimony, because if the defendant "was actually attempting to obstruct justice, her efforts could very well have endangered the integrity of the judicial process."  The court explained that the victimized party's "desire to explore this question expeditiously — before full and normal discovery — is reasonable and understandable."  *Id*. The court granted expedited discovery based on the plaintiff's prima facie evidentiary showing that a fraud on the court was occurring.  *See id*. (explaining that the defendant's lawyer "may have to do things in a different sequence from what she would otherwise have preferred, but I am sufficiently concerned about what I have heard . . . that I believe these matters should be explored expeditiously").

Indeed, this Court has granted expedited discovery based on the movant's argument that immediate and targeted discovery was necessary to determine whether the opposing party was perpetrating a fraud. *See UnitedHealthCare Services v. Miller*, No. 1:09-cv-00276-RJA-LGF (W.D.N.Y. Apr. 20, 2009). In that case, the plaintiff UnitedHealthCare Services suspected that the defendant had engaged in a fraudulent scheme by fabricating insured employee accounts and seeking reimbursement for fictional insurance claims. This Court determined that the company had demonstrated good cause and ordered expedited discovery to obtain documents and depositions concerning the potential fraud. *Id.* (ECF #7). Similarly, the Court granted expedited discovery in *U.S. Commodity Futures Trading Commission v. Atwood & James, Ltd.*, 2009 WL 666970, at *5 (W.D.N.Y. Jan. 23, 2009), explaining that good cause existed to permit expedited discovery "for the purpose of discovering the nature, location, status and extent of [the opposing party's] alleged wrongdoing (including but not limited to the possible involvement of others) . . . ." Other courts have reached similar conclusions. *See, e.g.*, *Ayyash*, 233 F.R.D. at 326-27 (Lynch, J.) (granting expedited discovery into the location of defendants' assets based on plaintiff's "strong evidentiary showing" that defendants had engaged in fraud); *Amari v. Spillan*, 2008 WL 5378339, at *1, 3 (S.D. Ohio Dec. 19, 2008) (plaintiff's "need for" expedited discovery "outweigh[ed] the prejudice to Defendants" where a three-year "scam" involving fraudulent financial transactions had deprived plaintiff of stock).

The "good cause" standard is also satisfied when delaying discovery could result in the alteration or destruction of evidence. In *Physicians Interactive v. Lathian Systems Inc.*, 2003 WL 23018270 (E.D. Va. Dec. 5, 2003), which involved claims of computer-server hacking and theft of software code, the court found "unusual circumstances or conditions that would likely prejudice" the plaintiff absent expedited discovery — "electronic evidence [was] at issue," and

"[e]lectronic evidence can easily be erased and manipulated." *Id*. at *10. The court allowed the plaintiff "to enter the sites where the computers used in the alleged attacks [were] located and to obtain a 'mirror image' of the computer equipment containing electronic data relating to Defendants' alleged attacks on" the plaintiff's server. *Id*.

Finally, the "good cause" standard is satisfied where "expedited discovery would ultimately conserve party and court resources and expedite the litigation." *Semitool, Inc. v. Tokyo Electron Am., Inc.*, 208 F.R.D. 273, 276 (N.D. Cal. 2002). In *Semitool*, the court granted "narrowly tailored" expedited discovery, emphasizing that the plaintiff sought nothing more than "existing documents and a physical inspection." *Id*. at 277. The court reasoned that "this is a case where the parties are both represented by sophisticated counsel and have engaged in pre-litigation discussion for over a year." *Id*. For those reasons, "the Court is unable to discern any real prejudice to Defendants in advancing discovery by a modest amount of time." *Id*.

District courts also enjoy broad authority to sequence discovery. This power is expressly conferred by Federal Rule of Civil Procedure 26(d), which provides that a district court may order that discovery proceed in stages based on the convenience of parties or witnesses, or when "the interests of justice" so warrant. The Supreme Court has explained that this Rule "vests the trial judge with <u>broad discretion</u> . . . to dictate the sequence of discovery." *Crawford-el v. Britton*, 523 U.S. 574, 598 (1998) (emphasis added). The broad discretion conferred by the Federal Rules "create[s] many options for the district judge," who may, for example, permit "only a focused deposition . . . before allowing any additional discovery" or who "may postpone all inquiry regarding [a party's] subjective motive until discovery has been had on objective factual questions." *Id*. at 599. *See also Occidental Chem. Corp. v. OHM Remediation Servs.*, 168 F.R.D. 13, 14 (W.D.N.Y. 1996) (Foschio, J.) ("Rule 26(d) authorizes the court to order the

sequence of discovery upon motion" and "[a]n order regarding the sequence of discovery is at the discretion of the trial judge"); *Affymetrix, Inc. v. PE Corp.*, 219 F. Supp. 2d 390, 398-99 (S.D.N.Y. 2002) (sequencing discovery); *Damiano v. Sony Music Entertainment, Inc.*, 168 F.R.D. 485, 493 (D.N.J. 1996) (same); *Mann v. Levy*, 776 F. Supp. 808, 813 (S.D.N.Y. 1991) (same).

## II. Defendants Have Demonstrated Good Cause.

This Court should grant Defendants targeted, expedited discovery into the authenticity — or lack thereof — of the documents on which Ceglia has based his lawsuit.

### A. Expedited Discovery Is Warranted To Prevent Fraud On The Court And Further Tampering With Electronic Records.

There is considerable evidence that Ceglia is perpetrating a fraud on the Court. As demonstrated above, Defendants have already gathered substantial proof that Ceglia fabricated the emails quoted in his Amended Complaint, just as he doctored the contract on which he bases this entire lawsuit. Here, as in *Stern*, 246 F.R.D. at 457, expedited discovery is warranted to halt an ongoing scheme to frustrate the administration of justice. Forcing Defendants to endure months of burdensome discovery based on Ceglia's fraudulent claims would be a manifest injustice. There is absolutely no reason to subject Defendants to depositions, written discovery and document production when this entire lawsuit will be terminated once Ceglia produces for inspection his computers and the originals of the documents on which he bases his claims. Nor should the Court be forced to devote judicial resources to supervising a concocted lawsuit that rests on a lie. The integrity of the judicial process is best served by terminating a fraudulent lawsuit at its inception rather than by permitting the fraud to move forward and draining more resources from the innocent parties and the Court.

Expedited discovery is also warranted to prevent further tampering with emails and other electronic records that "can easily be erased and manipulated." *Physicians Interactive*, 2003 WL 23018270, at *10 (authorizing expedited imaging of computer equipment). An order seizing Ceglia's computers and permitting Defendants to examine them will ensure that electronic evidence — at least as it currently exists — will be preserved and not subject to further tampering. The order should encompass the computers at Ceglia's parents' house, which Ceglia has publicly stated contain the purported emails with Zuckerberg. *See* John Anderson, *Ceglia saved e-mails to Facebook CEO Zuckerberg from Fassett House*, Wellsville Daily, Apr. 13, 2011. Because Ceglia has ample "incentive . . . to hide" or delete evidence of his criminal acts, *Ayyash*, 233 F.R.D. at 327, time is of the essence.

The examination of Ceglia's computers will be performed using fast and widely-accepted forensic testing procedures. Michael McGowan has extensive experience in e-forgery investigations and has testified many times as a digital forensics expert, including on behalf of the United States Department of Justice in connection with an Enron task force prosecution. As he explains in the attached declaration, it is critical that Ceglia's computers — and the native electronic versions of the purported contract and emails — be examined. *See* McGowan Decl., ¶¶ 9-16. Under Mr. McGowan's direction, the Stroz Friedberg firm will examine the metadata and other electronically stored information on Ceglia's computers to assess the authenticity of the purported contract and emails.

Immediate production of the original ink-written version of the purported contract is equally necessary, for the reasons set forth in the attached declarations of Gus Lesnevich, a former forensic document examiner for the United States Secret Service, Lesnevich Decl. ¶¶ 15-18, and Albert Lyter, an expert in ink analysis who has served as an instructor at the FBI

Academy and has testified in numerous high-profile cases, Lyter Decl., ¶¶ 6-7.  As Mr.

Lesnevich explains, "the poor reproduction quality and distortion" of the scanned copy make it

"unsuitable" for analyzing the signatures and handwriting on the document.  Lesnevich Decl.,

¶ 15.  And as Dr. Lyter makes clear, because the changes associated with aging to writing ink,

printing ink and toner typically occur for only approximately two years, "delay in the

examination of the document may limit the ability to precisely determine the age of its

materials."  Lyter Decl., ¶ 6(a).

## B.  Expedited Discovery Will Not Prejudice Ceglia.

In contrast to the substantial harm to Defendants and the judicial system if this lawsuit is

permitted to proceed to full discovery, Ceglia will suffer <u>no</u> prejudice from being required to

produce the documents and emails on which he bases his lawsuit.  These are "core documents

central to [his] underlying case" that he would have to produce "in the normal course of

discovery" in any event.  *Semitool*, 208 F.R.D. at 276.  Indeed, Ceglia's lawyer has publicly

stated that he is already "prepared to move the case forward into discovery."  *See* Kashmir Hill,

*Facebook Calls Paul Ceglia A "Scam Artist" In The Other Facebook Ownership Lawsuit*,

www.forbes.com (May 26, 2011).  In *OMG Fidelity*, the court explained that because "the

discovery now sought will take place at some juncture," and because postponing discovery

would frustrate the defendant's hope of bringing a prompt motion for relief, there was "no reason

to delay."  239 F.R.D. 300, 305.

So too here.  Particularly in light of the public assertions by Ceglia's lawyer that he

possesses forensic proof that these documents are genuine, this Court should order that his claim

be promptly verified through well-recognized testing procedures.  Defendants anticipate that they

will be able to complete a forensic examination of the purported contract and emails promptly.

Having waited <u>seven years</u> to bring this lawsuit, Ceglia cannot complain that he will be prejudiced by a short delay.

### C. Defendants Seek Narrowly Tailored Relief.

The expedited, phased relief that Defendants seek is narrowly tailored and supported by good cause. Defendants respectfully request an order:

1. Compelling immediate production of the original signed version of the purported contract attached to the Amended Complaint, the native electronic version of that document, and all copies of the purported contract in electronic or hard-copy form;

2. Compelling immediate production of the purported emails described in the Amended Complaint in their original, native electronic form, as well as all copies of the purported emails in electronic or hard-copy form; and

3. Immediately seizing, and permitting Defendants to inspect and image, every computer in Ceglia's possession, custody, or control, including the computers at his parents' house, which Ceglia has publicly identified as containing the purported emails.

The Court should stay all other discovery until this initial phase of discovery has been completed.

## CONCLUSION

For the foregoing reasons, this Court should grant Defendants' Motion for Expedited

Discovery.

Dated:     New York, New York
            June 2, 2011

                                          Respectfully submitted,

                                          /s/ Orin Snyder
Thomas H. Dupree, Jr.                     Orin Snyder
GIBSON, DUNN & CRUTCHER LLP               Alexander H. Southwell
1050 Connecticut Avenue, NW               GIBSON, DUNN & CRUTCHER LLP
Washington, DC 20036                      200 Park Avenue, 47th Floor
(202) 955-8500                            New York, NY 10166-0193
                                          (212) 351-4000


Terrance P. Flynn
HARRIS BEACH PLLC
726 Exchange Street
Suite 1000
Buffalo, NY 14210
(716) 200-5120

*Attorneys for Defendants Mark Zuckerberg and Facebook, Inc.*