UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

------------------------------------- X

PAUL D. CEGLIA, an individual,

      Plaintiff,

-against-

MARK ELLIOTT ZUCKERBERG, an individual, and FACEBOOK, INC., formerly known as TheFaceBook, Inc., a Delaware corporation,

      Defendants.

------------------------------------- X

CIVIL ACTION NO. 10-569(RJA)

**DECLARATION OF PAUL D. CEGLIA IN OPPOSITION TO DEFENDANTS' MOTION FOR EXPEDITED DISCOVERY AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR MUTUAL EXPEDITED DISCOVERY**

I, Paul D. Ceglia, declare and state as follows:

1. I am a resident of Wellsville, New York with an address of 2558 Hanover Hill Road, Wellsville, New York.

2. I respectfully submit this declaration in opposition to Defendants' Motion for Expedited Discovery and in support of Plaintiff's Cross-Motion for Mutual Expedited Discovery.

3. I hereby affirm the truth of the allegations in the First Amended Complaint filed on April 11, 2011.

4. I have read the Declaration of Mark Zuckerberg in Support of Defendants' Motion for Expedited Discovery.

5. Mr. Zuckerberg's statements about our agreement are false.

6. On April 28, 2003, I met Mark in the lobby of the Radisson Hotel in Boston, Massachusetts.

7. On that same date, Mark and I signed the Agreement that is attached hereto as Exhibit A.

8. I drafted the Agreement by cutting and pasting from two different forms that were provided to me by two different people. I then modified the combined document to include the terms to which Mark and I had agreed. I then printed the Agreement and brought it to the meeting on April 28, 2003, where Mark reviewed the agreement, added a line on the first page, which we both initialed, and then we signed Agreement.

9. My original copy of the Agreement remains in my possession today.

10. The original copy of the Agreement has been examined by two independent experts. As described in the declarations filed by them, neither expert has found any evidence showing that the Agreement is anything but genuine. I understand that these experts have stated that additional forensic testing, which may destroy portions of the Agreements, is available to further determine the genuineness of the Agreement. I believe this additional testing should be done immediately.

11. In addition, I have copies of numerous emails that I exchanged with Mark Zuckerberg in 2003 and 2004, and many of these emails are quoted in my First Amended Complaint. It had been my practice to copy emails related to my business dealings from my msn.com email account into Microsoft Word documents, which were then saved on to floppy discs. I saved emails in Word documents because I knew of no other way to save emails from online email accounts on to either my computer or floppy discs. I have accumulated hundreds of these floppy discs containing copies of emails in Word documents and other documents.

12. The emails quoted in my First Amended Complaint were retrieved from Word documents saved on my floppy discs. I understand that forensic, electronic document experts

have examined the Word documents containing the emails quoted in the First Amended Complaint. Those forensic, electronic document experts have found the metadata associated with the Word documents containing the emails quoted in the First Amended Complaint. I understand that the metadata, among other things, shows when the documents were created and last revised. I understand that the forensic, electronic document experts have found that the metadata associated with the Word documents containing the emails quoted in the First Amended Complaint shows that the Word documents were created and last revised within a month or so of the dates of the emails saved within the Word documents.

13.  I have given the forensic, electronic document experts unfettered access to my home and office. I understand that they have collected and forensically preserved hundreds of floppy discs and CD's, a couple of computers and a hard drive. I have not attempted to conceal or withhold any of my electronically stored information from the forensic, electronic document experts.

14.  This case and the tactics of Mark and Facebook have taken and continue to take a terrible toll on me, my wife, our two sons, and even our parents.

15.  I have been repeatedly called a liar in the press and in the papers filed by Defendants in this action.

16.  I have been accused by Mark Zuckerberg's counsel and counsel for Facebook (who are one in the same) of committing fraud. I have been the subject of ridicule. I have been followed and understand that declarations have been submitted by private investigators that contain inaccurate information.

17. While I have made some mistakes in my life, I accept responsibility for those actions.

18. To assist with proving that the Agreement is valid I under went a polygraph or lie detector examination to once and for all end the relentless claims against me. On June 12, 2011, I participated in a polygraph exam conducted by Western New York Polygraph Services, Inc. I was advised that the results of the polygraph indicated that I was telling the truth that the Agreement attached as Exhibit A is valid and is signed by Mark Zuckerberg. I respectfully suggest that Mark Zuckerberg undergo the same polygraph examination I have in order to expose who is really telling the truth.

19. I am in favor of any actions to expedite this matter and speed up testing of the document to advance the case. However, it seems only fair that I be given access to certain pertinent evidence in Defendants' possession and that we proceed with mutual expedited discovery.

I declare under the penalty of perjury that the foregoing is true and correct. Executed in Buffalo, New York on June 12, 2011.

_____
PAUL D. CEGLIA

# EXHIBIT A
# TO DECLARATION OF
# PAUL D. CEGLIA

## "WORK FOR HIRE" CONTRACT

### SECTION 1- GENERAL PROVISIONS

**1. Definitions**

The following terms have the meaning specified when used herein:
PURCHASER - Paul Ceglia
CONTRACTOR/SELLER - Mark Zuckerberg, his agents, employees, suppliers, or sub-contractors, furnishing materials equipment, or services.
CUSTOMER – StreetFax LLC the entity contracting for construction or other services form the Purchaser or which the goods and/or services provided hereunder are for incorporation into the work or are required to facilitate completion of Purchaser's contract with such entity.
PRIME CONTRACT – This contract between Purchaser and Seller.

**2. Entire Agreement**

The contract between the Purchaser and Seller as a Purchase agreement and "work made for hire" reflects two seperate business ventures, the first being for the work to be performed directly for the StreetFax Database and the Programming language to be provided by Seller.
Second it is for the continued development of the software, program and for the purchase and design of a suitable website for the project Seller has already initiated that is designed to offer the students of Harvard university access to a wesite similar to a live functioning yearbook with the working title of "The Face Book"

It is agreed that Purchaser will own a half interest (50%) in the software, programming language and business interests derived from the expansion of that service to a larger audience.

**3. Payment Terms**

No insurance or premium charges or price increases will be allowed unless authorized by Purchaser in writing. No increase in price from that stated on the face hereof will be considered throughout the duration of the order.
The Agreed upon Cost that the Seller and the Buyer have agreed upon are as follows: Buyer agrees to pay the seller the Sum of $1000 a piece for the work to be performed for Streetfax and $1,000 for the work to be performed for "The Page Book".
Late fees are agreed to be a 5% deduction for the seller if the project is not completed by the due date and an additional 1% deduction for each day the project is delayed beyond that point.
The agreed upon project due date ifor the StreetFax software is May 31, 2003. *Providing web design is finshed by May 27, 2003* MZ
The agreed upon completion for the expanded project with working title "The Face Book" shall be January 1 2004 and an additional 1% interest in the business will be due the buyer for each day the website is delayed from that date.
Additional funds may be provided for either project on an as needed basis at the sole diiscretion of the Buyer.

**4. Changes**

a) BY PURCHASER – Purchaser agrees that no further revision shall be implemented until or unless approved by the seller. Those revisions shall be transmitted for written approval to seller.
b) BY SELLER – The Seller agrees that no further revision shall be implemented until or unless approved by Buyer. Those revisions shall be transmitted for written approval to the Street Fax Purchasing Department.

**5. Purchaser's Property/Seller's Responsibility**

For the StreetFax database Buyer agree to pay for and maintain the cost of upkeep for the servers needed for it's operation.

For "The Face Book" Seller agrees to maintain and act as the sites webmaster and to pay for all domain and hosting expenses from the funds received under this contract, and Seller agrees that he will maintain control of these services at all times.

Data, drawings, tooling, patterns, materials, specifications, and any other items or information supplied to Seller under this order are the property of the Purchaser and must be returned upon completion of this order. Such items or information are to be used solely in the performance of the work by the seller and shall not be used or disclosed for any other purpose whatsoever without Purchaser's prior express written consent.

**6. Settlement of Controversies**

In the event that this purchase order is for materials or equipment which is excluded from this Prime Contract, and in the case of disputes between the Purchaser and the Customer or between the Purchaser and the Seller regarding materials or equipment to be furnished by the Seller, the Seller agrees to be bound to the same extent that the Purchaser is bound by the terms of the Prime Contract, and by any and all decisions and determinations made thereunder, provided that the Seller shall have the right to participate in the settlement of any dispute to the extent that the Seller will be affected thereby.
No interest shall accrue on any payment(s) otherwise due the Seller, which is withheld or delayed as a result of any such dispute, except to the extent that the Purchaser is ultimately paid interest on monies due the Seller. The Seller shall not be held liable if the Seller follows instructions of the Purchase and it is later determined that the Purchaser's instructions were not in compliance with the terms and specifications of the Prime Contract. Pending final disposition of a dispute hereunder, the Seller shall carry on the work unless otherwise agreed I writing by the purchaser.
In all isntances the final authority should rest with the final Specifications.

**7. Patent Indemnity**

Purchaser hold seller harmless for an infringement sellers work may constitute on patents held by and third party that result from the direct request for the work made by purchaser in this "work made for hire" agreement. The Seller hereby agrees to be responsible for all claims against the Purchaser of the Customer for alleged infringement of patents by reason of the Purchaser's or Customer's possession, use, or sake of any materials or equipment furnished hereunder by the Seller or by reason of the performance of any work hereunder by the Seller. The Seller agrees to defend at it's sole expense all suits against the Purchaser and/or the Customer and to save and hold harmless the Purchaser and the Customer from and against all costs, expensed, judgements, and damages of any kind which the Purchaser or the Customer may be obliged to pay or incur by reason of any such alleged or actual infringement of a patent or patents. The Purchaser and the Customer agree to render whatever assistance it reasonably can I the way of information and access to records for the defense of any such suit.
This indemnity shall not extend to alleged or actual infringements resulting from the Seller's compliance with the Purchaser's or Customers's design, instructions, processes, or formulas provided, however, that the Seller agrees to be responsible if it is reasonable to assume the the Seller should have been aware of a possible alleged or actual infringement resulting from the Purchaser's or Customer's design, instructions, processes, or formulas and fails to notify the Purchasers of such possibility.

### 8. Assignment of Subcontracting
Neither this order nor any rights, obligations, or monies due hereunder are assignable or transferable (as security for advances or otherwise) without the Purchaser's prior written consent, and except as to purchases of raw materials or standard commercial articles or parts, the Seller shall not subcontract any major portion of the work encompassed by this order without the Purchaser's prior written approval. The Purchaser shall not be required to recognize any assignment or subcontract made without its prior written consent.

The buyer accepts that there will be two other subcontractors working on this project their work will be accepted provided a noncompete and "work made for hire agreement" are in place.

### 9. Proprietary Rights
It is acknowledged that this is a work made for hire agreement and that all Intellectual property rights or patent rights are that of Streetfax Inc. All code in portion or in its complete form remain the property of StreetFax Inc. If the items to be supplied hereunder have been designed in accordance with specifications or data furnished or originated by the Purchaser or its Customer, such items shall not be reproduced except with the approval of the Purchaser and, as applicable, its Customer and all drawings, photographs, data, software, and other written material or information supplied in connection therewith shall at all times remain the property of the Purchaser or its Customer and be returned promptly upon request at the completion, termination or cancellation of this order. In the event that StreetFax defaults on it payment terms rights would be granted to seller.

### 10. Termination
A. DEFAULT – The Purchaser may terminate this order or any part thereof by written notice if the Seller:
   a) fails to make deliveries or to complete performance of its obligations hereunder within the time specified or in accordance with the agreed schedules unless such failure is due to acts of God, strike or other causes which are beyond the control of the Seller.
   b) Fails to comply with the terms and conditions of the purchase order and does not cure such failure within a period of ten (10) calendar days after written notice thereof.
   c) Makes an assignment for the benefit of creditors without prior written consent of the Purchaser, becomes insolvent or subject to proceedings under any law relating to bankruptcy, insolvency, or the relief of debtors.

Should the Purchaser elect to terminate for default, the Purchaser may take possession of all or any of the items to be supplied hereunder which are in the Seller's possession without regard to stage of completion and may complete or cause the work to e completed on such items or may manufacture or procure similar items. Any additional costs or expense incurred by the Purchaser over and above the original purchase price from the Seller plus freight costs shall be for the account of the Seller.

In all events, the Purchaser shall not be or become liable to the Seller or any third party claiming through or under the Seller for any portion of the price of any items that Purchaser elects not to accept following notice of termination for default.

### 11. Liens
The Seller agrees to deliver the items to be supplied hereunder free and clear of all liens, encumbrances, and claims of laborers or material men and the Purchaser may withhold payment pending receipt of evidence in form and substance satisfactory to it of the absence of such items, claims and encumbrances.

### 12. Governing Law
This Purchase Order and any material relating thereto shall be governed by the laws of the state in which the Purchaser's office that issues the order is located.

### 13. Recovery of Damages
If the Seller should recover any damages as a result of antitrust violations in any manner due to price fixing on the part of another manufacturer or Seller, the Seller shall pay over to the Purchaser any ages Purchaser has suffered as a result of the same price fixing within a reasonable time after the damages are recovered by the Seller.

### 14. Notice of Labor Disputes
a) Whenever the Seller has knowledge that any actual or potential labor dispute is delaying or threatens to delay the timely performance of this order, the Seller shall immediately give notice thereof, including all relevant information with respect thereto, to the Purchaser.
b) The Seller shall insert the substance of this clause including this paragraph (b) in any subtier supply agreement hereunder as to which a labor dispute may delay the timely performance of this order except that each such subtier supply agreement shall provide that in the event its timely performance is delayed or threatened by delay by an actual or potential labor dispute, the subtier Seller shall immediately notify its next higher tier Seller or Sellers, as the case may be, of all relevant information with respect to such dispute.

### 15. Indemnity Requirements for Contractors/Seller
Contractor/Vendor shall defend, indemnity and save Street Fax from any and all claims, suits, losses, damages, or expenses, whether caused or contributed to by the negligence of Street Fax, its agents, or employees, or otherwise, on account of injuries to or death of any and all persons whomsoever, including the Contractor/Vendor, subcontractors, employees of Contractor/Vendor, the subcontractor, and of Street Fax and any and all damage to property to whomsoever belonging, including property owned by, rented to, or in the care, custody, or control of the parties hereto arising or growing out of, or in any manner connected with the work performed under this contract, or caused or occasioned, in whole or in party by reason of or arising during the presence of the person or of the property of Contractor/Vendor, subcontractors, their employees, or agents upon or in proximity to the property of Street Fax Notwithstanding the foregoing, nothing herein contained is to be construed as an indemnification against the sole negligence of Street Fax.

### 16. Publicity
Seller shall not publish photographs or articles, give press releases or make speeches about or otherwise publicize the existence or scope of this Purchase Order, or any generalities or details about this Purchase Order without first obtaining the written consent of Buyer.

### 17. Seller's Disclosure
Any information relating to the Seller's designs, manufacturing processes or manufactured products which the Seller may disclose to the Buyer in connection with the performance of the contract may be used by the Buyer for any purpose relating to the contract and to its performance without liability therefor to the Seller.

### 18. General Notes
Seller shall reference this purchase order number on all documents and/or correspondence related to this order.

The signatures below will execute this contract.

Buyer – Paul Ceglia, StreetFax    4/28/03

Seller – Mark Zuckerberg

MZ Zuby  04.28.03