UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

------------------------------------- X

PAUL D. CEGLIA, an individual,      :

         Plaintiff,      :

   -against-      :

MARK ELLIOTT ZUCKERBERG, an      :
individual, and FACEBOOK, INC., formerly
known as TheFaceBook, Inc., a Delaware      :
corporation,
      :
         Defendants.
      :

      :

------------------------------------- X

CIVIL ACTION NO. 10-569(RJA)

**DECLARATION OF VALERY N. AGINSKY, PH.D. IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR EXPEDITED DISCOVERY AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR MUTUAL EXPEDITED DISCOVERY**

I, Valery N. Aginsky, Ph.D., declare and state as follows:

1.     I respectfully submit this declaration in support of Plaintiff's Opposition to Defendants' Motion for Expedited Discovery and Plaintiff's Cross-Motion for Mutual Expedited Discovery.

2.     I have personal knowledge of the matters set forth in this Declaration.

3.     I am a forensic chemist and document dating specialist at Aginsky Forensic Document Dating Laboratory, Inc. ("AFDDL") and was formally at Riley, Welch & Aginsky Forensic Document Examinations, Inc., Lansing, Michigan. I received my Ph.D. in 1980 in the field of analytical chemistry from the Military Academy of Chemical Defense in Moscow, USSR. At AFDDL, I am responsible for the physical and chemical examinations of ink, paper and other materials of documents. As indicated in my Curriculum Vitae, I have authored a number of publications and presented at scientific conferences regarding my findings on various subjects pertaining to document

and ink analysis.  A true and correct copy of my curriculum vitae is attached hereto as

Exhibit A.  I am currently affiliated with the following professional associations:  the

American Society of Questioned Document Examiners, the International Association for

Identification, the International Association of Forensic Sciences, and the American

Society for Testing & Materials.

      4.     I was asked to examine an original, signed version of the "Work For Hire"

Contract between Paul Ceglia, StreetFax LLC and Mark Zuckerberg dated April 28, 2003

(the "Agreement") for purposes of analyzing its authenticity.  A copy of the Agreement is

attached hereto as Exhibit B.

      5.     My examination was limited to non-destructive testing of the Agreement.

As it is usually preferable not to damage the document, the process of forensic ink

comparison always begins with the physical examination of the inks using techniques

designed to obtain as much information as possible from the ink (and the document as a

whole) by visual examination and other nondestructive means, such as microscopic,

ultraviolet (UV), and infrared (IR) absorption and IR luminescence (IRL) examinations.[1]

      6.     The Agreement is a two page document that includes printed text on each

page.  The printed text is black.  Based upon my visual examination of the Agreement,

each page of the document was produced with an office machine system utilizing black

toner.  Office machine systems that produce documents with toner technology include

laser printers, photocopiers, and some facsimile machines.  On page 1 of the Agreement,

there is an interlineation hand written with black ballpoint ink.  On page 2 of the

---

[1] ASTM Standard Guide E1422-05, "Standard Guide for Test Methods for Forensic Writing Ink
Comparison." Published January 2006. Originally approved in 1991. Last previous edition approved in
2001 as E 1422 - 01.

2

Agreement, there are two signatures and the entries of the date all written with black ballpoint ink.

7.      My microscopic examination revealed that the sequence in which the printed and handwritten entries were made on pages 1 and 2 of the Agreement was logical.  By this, I mean that the text on page 1 was printed first and then the interlineation was added, and page 2 was printed first and then it was signed and dated.  I determined this by observing under the microscope that in each of the points of intersections of the handwritten and printed lines the ink from the interlineation and the signatures is on top of the corresponding printed portion of the document.

8.      My visual, UV, IR absorption and IRL examinations revealed that pages 1 and 2 of the Agreement were printed on the same type of 8 ½" x 11" white paper.  The paper of both pages has matching characteristics such as color, thickness, short and long wave UV fluorescence, IR luminescence, opacity, and surface texture.

9.      Based on my visual, microscopic, UV, IR absorption and IRL examinations of the Agreement, I found no discernable difference in ink used to write the interlineation on page 1 of the Agreement and to sign and date the Agreement on page 2.

10.     Based on my visual, microscopic, UV, IR absorption and IRL examinations of the Agreement, I found no discernable difference in the toner on pages 1 and 2 of the Agreement.

11.     Where, as here, nondestructive techniques cannot discriminate between the inks being compared, then chemical methods are to be used, which involves destructive testing.  This destructive testing would require taking a few samples of each ink from the paper for their chemical analysis.  As a rule, chemical methods are more

effective for discriminating between inks of the same type and color than the physical (nondestructive) methods.  It is widely accepted in the field of forensic writing ink analysis that a combination of two chemical methods, thin-layer chromatography (TLC) and gas chromatography-mass spectrometry (GC-MS), allows the examiner to retrieve maximum information about the composition of writing ink.

12.    Writing inks are made of colorants (dyes, pigments) and a carrier (vehicle). Ballpoint ink vehicles consist of two main ingredients - solvents that are used to dissolve or disperse the colorants, and the resins that are used to thicken the inks.  TLC analyzes ink colorants (ink colored components) and GC-MS analyzes ink vehicle components (volatile solvents, resins and other noncolored ink components, such as modifiers, lubricants, thickeners, by-products, etc.)  That is, each of these two chemical methods, TLC and GC-MS, can provide only some partial information about the composition of writing ink.  In order for an ink component to be analyzed by TLC or GC-MS this component should be first extracted (dissolved) from a sample of the ink on paper in an appropriate organic solvent.  Though some components of ballpoint ink may not be extractable and thus can be analyzed neither by TLC nor by GC-MS, nevertheless, the amount of extractable ballpoint ink's components (present in the ink in a particular relative concentration) is typically significant enough to produce a "chemical fingerprint" ("barcode") of the ink.  In simple terms, TLC can analyze approximately one half of the ink composition (1/2 of the "chemical fingerprint" of an ink), and GC-MS can analyze the other half of the ink composition (the other 1/2 of the "chemical fingerprint" of the ink). Thus, these two methods perfectly complement each other.[2]

_____

[2] Aginsky, V.N. "Using TLC and GC-MS to Determine whether Inks Came from the Same Manufacturing Batch," *Journal of the American Society of Questioned Document Examiners,* 2006, Vol. 9, pp. 19-27.

13.     The sampling procedure will require removing small portions of the interlineation on page 1 and the signatures and the entries of the date on page 2 of the Agreement. This would be accomplished with a hypodermic needle sized hole punch, which removes hole punches of less than 1 mm in diameter. The bored out ink samples are then removed with a plunger and placed in separate vials that are then capped and labeled accordingly.

14.     Further analysis can determine if the Agreement was created within the last two years. Ballpoint inks age on paper (at a rate that can be measured by the available ink aging techniques) within up to two years. Depending on its composition (formulation), ink can cease aging within a period of time less than 2 years. Under normal environmental conditions, this period of time can be as short as approximately 6 months, for fast aging ballpoint inks, and as long as approximately 2 years, for slowly aging ballpoint inks. If the ink aging analysis reveals that the ink on the Agreement is still aging, then the document was created within the last two years. However, if the ink has ceased to age, then the document is likely at least 6 months old (if the ink is a fast aging ink) and may likewise be older than two years (if the ink is a slow aging ink). This analysis also requires additional destructive testing.

I declare under the penalty of perjury that the foregoing is true and correct. Executed in East Lansing, Michigan on June 16, 2011.

Valery N. Aginsky, Ph.D.

# EXHIBIT A
# TO DECLARATION OF
# VALERY N. AGINSKY

# VALERY N. AGINSKY, Ph.D.

## Curriculum Vitae

**Position:**   *Forensic Chemist / Ink and Document Dating Specialist*
Aginsky Forensic Document Dating Laboratory, Inc.
East Lansing, Michigan

**Education:**   *Ph.D. Analytical Chemistry - 1980*
Military Academy of Chemical Defense (formerly known as the Chemical
Faculty of the Institute of Mechanical Engineering prior to 1940), Moscow, USSR

*M.S. Analytical Chemistry - 1977*
Military Academy of Chemical Defense, Moscow, USSR

**Training:**   *Gas Chromatography-Mass Spectrometry*, Hewlett-Packard – 1994
*Chromatography*, Moscow State University – 1990

*Examination of Questioned Documents*, Forensic Science Center
of the Ministry of the Interior, Moscow, USSR – 1983-1985

*Examination of Explosives*, Forensic Science Center
of the Ministry of the Interior, Moscow, USSR – 1980

**Professional
Experience:**   Aginsky Forensic Document Dating Laboratory, Inc.
East Lansing, Michigan
*Forensic Chemist / Document Dating Specialist* (since April 2008)

Riley, Welch & Aginsky Forensic Document Examinations, Inc.
Lansing, Michigan
*Forensic Chemist / Document Dating Specialist* (April 2005 to March 2008)

Riley, Welch & Associates Forensic Document Examinations, Inc.
Lansing, Michigan
*Forensic Chemist / Document Dating Specialist* (1998 to April 2005)

Forensic Science Center of the Ministry of the Interior, Moscow, Russia
*Senior Research Chemist* (1980 to 2000)

Uses reliable ink dating methods (proven through outside proficiency testing)
developed as a result of many years of research of the methodology developed
and published by Dr. Antonio Cantu.  These methods measure certain parameters
of ink that decrease as ink ages on paper.  They analyze *ink volatile components*
(their residues are always present in ink lines, no matter the ink age) and enable

_absolute_ ink age determination: one determines a time frame within which a questioned entry has been written, not relative to other known dated entries, as _relative_ ink age determination technology requires.

Involved in methods development, technical assistance to investigative personnel, including training and presentations to legal proceedings and routine examination of evidence. Developed several techniques for examining questioned documents, counterfeit currency, currency exposed to an exploding dye-pack, drugs of abuse, explosives, gunshot residues, and determining the age of ink on documents.

Over 25 years of professional research and practical experience in the field of forensic document examination: the dating of writing, stamp pad and printing inks, alteration of records, indented writings, erasures/eradications/obliterations, sequence of strokes, paper/ink/toners (*civil and criminal cases involving altered or counterfeit documents, medical records, checks, Wills, deeds, legal contracts, insurance records, computer-printed and photocopied documents, as well as documents involved in copyright and patent infringement cases*).

*Methods:* microscopy, microspectrophotometry, electrostatic imaging analysis, video enhancement techniques, infrared spectroscopy, ultraviolet/visual spectrophotometry, thin-layer chromatography, and gas chromatography-mass spectrometry.

**Honors/Awards:**    *Diploma and the First Prize for new techniques on Dating Inks*
Ministry of the Interior, 1993

*Award for excellence in service (Best Forensic Chemist)*
Ministry of the Interior, 1982

*Silver medal in chemistry at the 1976 All-Union Contest of Scientific Works*, *M*inistry of Defense

*Co-Chair of the Questioned Documents Sections at the First International Forensic Science Symposium, Moscow, Russia, 1994, the 13th and 14th Meetings of the International Association of Forensic Sciences, Dusseldorf, Germany, 1993, and Tokyo, Japan, 1996.*

**Teaching
Experience:**    Conducted numerous training seminars for the personnel of forensic laboratories in Russia and the former Soviet Union in the framework of the Ministry of the Interior's training programs:

- *Technical and Chemical Examination of Counterfeit Currency*
- *Detecting and Dating Alterations Made to Documents*
- *Ink/Paper Comparison by Thin-Layer Chromatography and Other*

*Analytical Methods*
- *Detection and Characterization of Explosive Residues*

Served as visiting examiner to the Division of Identification and Forensic Science, Israel Police Headquarters, 1996 & 1997.

Conducted seminars on ink analysis and dating for the Division of Identification and Forensic Science, Israel Police Headquarters, Jerusalem, Israel, 1995; Ministry of Justice and Ministry of the Interior Combined Scientific Council for Forensic Science and Criminalistics, Moscow, Russia, 1997;   the Forensic Sciences Division of the Canada Customs and Revenue Agency, Ottawa, Canada, 1998; Istanbul University, Institute of Forensic Sciences, Istanbul, Turkey 2000.

Conducted a seminar on Quantitative Thin-Layer Chromatography (Internal Standard Method) at the Russian-German Summer School on Thin-Layer Chromatography, Moscow, Russia, 1993.

**Court**
**Testimony:** Testified regarding ink analysis and ink and document dating in criminal and civil matters and in arbitrations in the United States, Canada, Russia, Cayman Islands, Hong Kong, Israel, and Gibraltar.

**Professional**
**Affiliations:**           American Society of Questioned Document Examiners (2008 - present)

International Association for Identification,
Questioned Documents Section (1992 - present)

International Association of Forensic Sciences,
Questioned Documents Section (1993 - present)

Ministry of Justice and Ministry of the Interior Combined Scientific Council for Forensic Science and Criminalistics (Russia, 1995-1999)

Regional Representative for the Russian Charted Division of the International Association for Identification (1998 - 2000)

American Society for Testing & Materials (2003 - present)

Contributing member of the Scientific Working Group for Questioned Document Examiners

**Professional**
**Publications:**           More than 20 peer-reviewed articles on ink analysis and dating, including chapters in three books and two encyclopedias (see below).

# Professional Publications

## Books

1. Writing Media and Documents. Chapter 28. *Handbook of Analytical Separations.* Vol. 6 – Forensic Science (Second Edition), M.J. Bogucz (Ed.), ELSEVIER, Amsterdam – Boston – Heidelberg – London – New York – Oxford – Paris – San Diego – San Francisco – Singapore – Sydney – Tokyo, 2008.

2. Document Analysis / Analytical Methods. *Encyclopedia of Forensic Sciences*, J.A. Siegel (Ed.), Academic Press, Harcourt Publishers Ltd., 2000.

3. Writing Media and Documents. Chapter 19. *Handbook of Analytical Separations.* Vol. 2 – Forensic Science, M.J. Bogucz (Ed.), ELSEVIER, Amsterdam – New York – Oxford – Shannon – Singapore – Tokyo, 2000.

4. An Application of Chromatographic Methods for Dating Questioned Documents. *Chromatography (Celebrating the 125th Birthday of the Inventor of Chromatography, Dr. Michael Tswett)*, O. Kaiser, R.E. Kaiser, H. Gunz, and W. Gunther (Eds.), InCOM, Duesseldorf, Germany, 1997.

5. A New Version of the Internal Standard Method in Quantitative Thin-Layer Chromatography. Chapter 4.6. *Handbook of Modern Thin-Layer Chromatography,* O.G. Larionov (Ed.), Russian Academy of Science, Chromatography Council, Moscow, Russia, 1994 (in Russian).

6. Aginsky, V.N. and Dildin, Yr. M., *Forensic Examination of Explosives*, VNII MVD SSSR, Moscow, USSR, 1982 (in Russian).

7. Aginsky, V.N., Safronenko, T.I., and Sorokina, G.I., *Forensic Examination of Questioned Documents*, VNII MVD SSSR, Moscow, USSR, 1987 (in Russian).

8. Aginsky, V.N., Safronenko, T.I., and Sorokina, G.I., *Detecting and Dating Alterations Made to Documents*, VNII MVD SSSR, Moscow, USSR, 1989 (in Russian).

9. Aginsky, V.N., Zibrov, G.S., and Sorokina, G.I., *Analysis of Drugs, **Inks**, Petroleum Products, and Explosives by Reversed Phase Thin-Layer Chromatography*, Forensic Science Center of the Russia's Ministry of the Interior, Moscow, 1993 (in Russian).

10. *Dating Stamp Pad Inks on Documents*, Forensic Science Center of the Russia's Ministry of the Interior, Moscow, 1998 (in Russian).

## Peer-Reviewed Articles and Presentations at Scientific Conferences

11. A New Application of Instrumental Planar Chromatography in Forensic Analysis, *Journal of Planar Chromatography*, Vol. 4, 1991, pp. 167-169.

12. Some New Ideas for Dating Ballpoint Inks – A Feasibility Study, *Journal of Forensic Sciences*, Vol. 38, No. 5, Sept. 1993, pp. 1134-1150.

13. Comparative Examination of Inks by Using Instrumental Thin-Layer Chromatography and Microspectrophotometry, *Journal of Forensic Sciences*, Vol. 38, No. 5, Sept. 1993, pp. 1111-1130.

14. Forensic Examination of "Slightly Soluble" Inks Pigments Using Thin-Layer Chromatography, *Journal of Forensic Sciences*, Vol. 38, No. 5, Sept. 1993, pp. 1131-1133.

15. Mechanism and Kinetics of the Aging of Some Ink Dyes. *Advances in Forensic Sciences*. Vol. 3 - Forensic Criminalistics, Proceedings of the 13th Meeting of the International Association of Forensic

Sciences, Dusseldorf 1993, B. Jacob and W. Bonte, Eds., Verlag Dr. Koster, Berlin, 1995.

16. Discrimination between Naturally and Artificially Aged Ballpoint Inks, ibid.

17. Determination of the Age of Ballpoint Pen Ink by Gas and Densitometric Thin-Layer Chromatography, *J. Chromatography*, 1994, Vol. 678.

18. A New Version of the Internal Standard Method in Quantitative Thin-Layer Chromatography, *Journal of Planar Chromatography*, July/August 1994, Vol. 7, pp. 309-314.

19. A Microspectrophotometric Method for Dating Ballpoint Inks - A Feasibility Study, *Journal of Forensic Sciences*, Vol. 40, No. 3, May 1995, pp. 475-478.

20. Dating and Characterizing Writing, Stamp Pad and Jet Printer Inks by Gas Chromatography/Mass Spectrometry, *International J. Forensic Document Examiners*, 1996, No. 2, pp.103-115.

21. Accelerated Aging – Its Use in Methods for Dating Ink (Letter to the Editor), *International J. Forensic Document Examiners*, 1996, No. 3.

22. Ink Dating – The State of the Art in 1996, Proceedings of the 14th Meeting of the International Association of Forensic Sciences, Tokyo 1996, Shunderson Communications, 1997, Vol. 4.

23. Current Methods for Dating Inks – Which is the Best? Presented at the 49th Annual Meeting of the American Academy of Forensic Sciences, New York, NY, 1997.

24. Dating Ink on Questioned Documents – The State of the Art in 1997, presented at the First European Meeting of Forensic Science, Lausanne, Switzerland, 1997.

25. Measuring Ink Extractability as a Function of Age – Why the Relative Aging Approach is Unreliable and why it is More Correct to Measure Ink Volatile Components than Dyes, *International J. Forensic Document Examiners*, 1998, No. 3.

26. Ink Dating – The State of the Art, presented at the 50th Annual Meeting of the American Academy of Forensic Sciences, San Francisco, CA, 1998.

27. Application of GC/MS to the Dating and Analysis of Ink on Documents, presented at the Hewlett-Packard Analytical Forum, Moscow, Russia, April 1998.

28. Ink Dating – The State of the Art, presented at the First Regional Symposium on Criminalistics, April 20-22, 2000, Istanbul University, Institute of Forensic Sciences, Turkey.

29. Determining the Sequence of Non-Intersecting Media on Documents: Ballpoint Pen Ink and Laser Toner Entries, *Journal of the American Society of Questioned Document Examiners*, 2002.

30. Current Methods for Dating Ink on Documents, presented at the 60th Annual Conference of the American Society of Questioned Document Examiners, San Diego, California, August 14-19, 2002, and at the Midwestern Association of Forensic Scientists Fall 2002 Meeting, Milwaukee, Wisconsin, September 15-20, 2002.

31. Using TLC and GC-MS to Determine whether Inks Came from the Same Manufacturing Batch, presented at the 63rd Annual Conference of the American Society of Questioned Document Examiners, Montreal, Canada, August 11-16, 2005.

32. Using TLC and GC-MS to Determine whether Inks Came from the Same Manufacturing Batch, *Journal of the American Society of Questioned Document Examiners*, Vol. 9, No. 1, 2006, pp. 19-27.

33. Current Methods for Dating Ink on Documents, presented at the 65th Annual Conference of the American Society of Questioned Document Examiners, Boulder, Colorado, August 11-16, 2007.

34. Gaudreau, M. and Aginsky, V.N. Essentials of the Solvent Loss Ratio Method, presented at the 68th

Annual Meeting of the American Society of Questioned Document Examiners, Victoria, B.C., August 28 – September 2, 2010.

## Other Professional Publications

35. Aginsky, V.N. and Sorokina, G.I., "Detecting Explosives in Post Explosion Debris Contaminated by Petroleum Products", *Expertnaya Praktika [Expert Practice]*, Vol. 19, 1982, pp. 73-75 (in Russian).

36. Aginsky, V.N. and Sorokina, G.I., "Detection of Explosive Residues Intruded into Asphalt", *Expertnaya Praktika [Expert Practice]*, Vol. 20, 1983, pp. 109-110 (in Russian).

37. Aginsky, V.N. and Sorokina, G.I., *Detection and Quantitative Determination of Clonidine and Other Psychotropic Drugs in Beverages*, VNII MVD SSSR, Moscow, USSR, 1990 (in Russian).

38. Aginsky, V.N., "A New Application of Instrumental Planar Chromatography in Forensic Analysis," presented at the 6th International Symposium on Instrumental Planar Chromatography (TLC), Interlaken, Switzerland, April 23-26, 1991.

39. Aginsky, V.N., Sorokina, G.I., and Zibrov, G.S., "Detection, Identification and Comparative Examination of Narcotics and Drugs of Abuse," Proceedings of the Forensic Science Symposium, Linkoping, June 1992, Report 27, National Laboratory of Forensic Science, Linkoping, Sweden, 1993.

40. Aginsky, V.N., Savilov, A.P., and Sorokina, G.I., "Chromatographic Screening of Drugs of Abuse," Proceedings of the Forensic Science Symposium, Moscow, March 1994, Forensic Science Center of the Ministry of the Interior, Moscow, Russia, 1994.

41. Aginsky, V.N., "Increasing the Reliability of the Identification of Separated Substances in Densitometric Thin-Layer Chromatography", *Advances in Forensic Sciences*. Vol. 3 - Forensic Criminalistics, Proceedings of the 13th Meeting of the International Association of Forensic Sciences, Dusseldorf 1993, B. Jacob and W. Bonte, Eds., Verlag Dr. Koster, Berlin, 1995.

42. Aginsky, V.N., "A New Approach in Determining the Age of Inks Using Densitometric Thin-Layer Chromatography," ibid.

43. Aginsky, V.N., "Instrumental Techniques for Comparing Similarly Colored Inks," ibid.

44. Aginsky, V.N., Lesnikov, V.A. and Sorokina, G.I., "Time of Shooting - Feasibility of Discriminating "Fresh" and "Old" Organic Gunshot Residues," Proceedings of the 14th Meeting of the International Association of Forensic Sciences, Tokyo 1996, Shunderson Communications, 1997, Vol. 4.

45. Aginsky, V.N., "Determining the Sequence of Non-Intersecting Media on Documents – Ballpoint pen ink and laser toner entries," presented at the 49th Annual Conference of the American Society of Questioned Document Examiners, Des Moines, Iowa, August 2001.

# EXHIBIT B
# TO DECLARATION OF
# VALERY N. AGINSKY

# "WORK FOR HIRE" CONTRACT

## SECTION 1- GENERAL PROVISIONS

### 1. Definitions

The following terms have the meaning specified when used herein:
PURCHASER - Paul Ceglia
CONTRACTOR/SELLER – Mark Zuckerberg, his agents,
employees, suppliers, or sub-contractors, furnishing materials equipment, or
services.
CUSTOMER – StreetFax LLC the entity contracting for
construction or other services form the Purchaser or which the goods and/or
services provided hereunder are for incorporation into the work or are
required to facilitate completion of Purchaser's contract with such entity.
PRIME CONTRACT – This contract between Purchaser and
Seller.

### 2. Entire Agreement

The contract between the Purchaser and Seller as a Purchase agreement and
"work made for hire" reflects two seperate business ventures, the first being
for the work to be performed directly for the StreetFax Database and the
Programming language to be provided by Seller.
Second it is for the continued development of the software, program and for
the purchase and design of a suitable website for the project Seller has
already initiated that is designed to offer the students of Harvard university
access to a wesite similar to a live functioning yearbook with the working
title of "The Face Book"

It is agreed that Purchaser will own a half interest (50%) in the software,
programming language and business interests derived from the expansion of
that service to a larger audience.

### 3. Payment Terms

No insurance or premium charges or price increases will be allowed
unless authorized by Purchaser in writing. No increase in price from
that stated on the face hereof will be considered throughout the
duration of the order.
The Agreed upon Cost that the Seller and the Buyer have agreed
upon are as follows: Buyer agrees to pay the seller the Sum of $1000 a piece
for the work to be performed for Streetfax and $1,000 for the work to be
performed for "The Page Book".
Late fees are agreed to be a 5% deduction for the seller
if the project is not completed by the due date and an additional 1%
deduction for each day the project is delayed beyond that point.
The agreed upon project due date for the StreetFax software is
May 31, 2003. *Providing web designer is funded by May 29, 2003 MZ*
The agreed upon completion of the expanded project with working title
"The Face Book" shall be January 1 2004 and an additional 1% interest in
the business will be due the buyer for each day the website is delayed from
that date.
Additional funds may be provided for either project on an as needed basis at
the sole discretion of the Buyer.

### 4. Changes

a) BY PURCHASER – Purchaser agrees that no further revision shall
be implemented until or unless approved by the seller. Those
revisions
shall be transmitted for written approval to seller.
b) BY SELLER – The Seller agrees that no further revision shall be
implemented until or unless approved by Buyer. Those
revisions shall be transmitted for written approval to the Street
Fax Purchasing Department.

### 5. Purchaser's Property/Seller's Responsibility

For the StreetFax database Buyer agree to pay for and maintain the cost of
upkeep for the servers needed for it's operation.

For "The Face Book" Seller agrees to maintain and act as the sites webmaster
and to pay for all domain and hosting expenses from the funds received under
this contract, and Seller agrees that he will maintain control of these services
at all times.

Data, drawings, tooling, patterns, materials, specifications, and any other
items or information supplied to Seller under this order are the
property of the Purchaser and must be returned upon completion of this
order. Such items or information are to be used solely in the performance
of the work by the seller and shall not be used or disclosed for any other
purpose whatsoever without Purchaser's prior express written consent.

### 6. Settlement of Controversies

In the event that this purchase order is for materials or equipment which is
excluded from this Prime Contract, and in the case of disputes between the
Purchaser and the Customer or between the Purchaser and the Seller
regarding materials or equipment to be furnished by the Seller, the Seller
agrees to be bound to the same extent that the Purchaser is bound by the
terms of the Prime Contract, and by any and all decisions and determinations
made thereunder, provided that the Seller shall have the right to participate in
the settlement of any dispute to the extent that the Seller will be affected
thereby.
No interest shall accrue on any payment(s) otherwise due the Seller, which is
withheld or delayed as a result of any such dispute, except to the extent that
the Purchaser is ultimately paid interest on monies due the Seller. The Seller
shall not be held liable if the Seller follows instructions of the Purchase and it
is later determined that the Purchaser's instructions were not in compliance
with the terms and specifications of the Prime Contract. Pending final
disposition of a dispute hereunder, the Seller shall carry on the work unless
otherwise agreed I writing by the purchaser.
In all instances the final authority should rest with the final Specifications.

### 7. Patent Indemnity

Purchaser hold seller harmless for an infringement sellers work may
constitute on patents held by and third party that result from the direct request
for the work made by purchaser in this "work made for hire" agreement.
The Seller hereby agrees to be responsible for all claims against the
Purchaser of the Customer for alleged infringement of patents by reason of
the Purchaser's or Customer's possession, use, or sake of any materials or
equipment furnished hereunder by the Seller or by reason of the performance
of any work hereunder by the Seller. The Seller agrees to defend at it's sole
expense all suits against the Purchaser and/or the Customer and to save and
hold harmless the Purchaser and the Customer from and against all costs,
expensed, judgements, and damages of any kind which the Purchaser or the
Customer may be obliged to pay or incur by reason of any such alleged or
actual infringement of a patent or patents. The Purchaser and the Customer
agree to render whatever assistance it reasonably can I the way of
information and access to records for the defense of any such suit.
This indemnity shall not extend to alleged or actual infringements resulting
from the Seller's compliance with the Purchaser's or Customers's design,
instructions, processes, or formulas provided, however, that the Seller agrees
to be responsible if it is reasonable to assume the Seller should have been
aware of a possible alleged or actual infringement resulting from the
Purchaser's or Customer's design, instructions, processes, or formulas and
fails to notify the Purchasers of such possibility.

8. Assignment of Subcontracting

Neither this order nor any rights, obligations, or monies due hereunder are assignable or transferable (as security for advances or otherwise) without the Purchaser's prior written consent, and except as to purchases of raw materials or standard commercial articles or parts, the Seller shall not subcontract any major portion of the work encompassed by this order without the Purchaser's prior written approval. The Purchaser shall not be required to recognize any assignment or subcontract made without its prior written consent.

The buyer accepts that there will be two other subcontractors working on this project their work will be accepted provided a noncompete and "work made for hire agreement" are in place.

9. Proprietary Rights

It is acknowledged that this is a work made for hire agreement and that all Intellectual property rights or patent rights are that of Streetfax Inc. All code in portion or in its complete form remain the property of StreetFax Inc.If the items to be supplied hereunder have been designed in accordance with specifications or data furnished or originated by the Purchaser or its Customer, such items shall not be reproduced except with the approval of the Purchaser and, as applicable, its Customer and all drawings, photographs, data, software, and other written material or information supplied in connection therewith shall at all times remain the property of the Purchaser or its Customer and be returned promptly upon request at the completion, termination or cancellation of this order. In the event that StreetFax defaults on it payment terms rights would be granted to seller.

10.   Termination

A. DEFAULT – The Purchaser may terminate this order or any part thereof by written notice if the Seller

a)   fails to make deliveries or to complete performance of its obligations hereunder within the time specified or in accordance with the agreed schedules unless such failure is due to acts of God, strike or other causes which are beyond the control of the Seller.

b)   Fails to comply with the terms and conditions of the purchase order and does not cure such failure within a period of ten (10) calendar days after written notice thereof.

c)   Makes an assignment for the benefit of creditors without prior written consent of the Purchaser, becomes insolvent or subject to proceedings under any law relating to bankruptcy, insolvency, or the relief of debtors.

Should the Purchaser elect to terminate for default, the Purchaser may take possession of all or any of the items to be supplied hereunder which are in the Seller's possession without regard to stage of completion and may complete or cause the work to e completed on such items or may manufacture of procure similar items. Any additional costs or expense incurred by the Purchaser over and above the original purchase price from the Seller plus freight costs shall be for the account of the Seller.

In all events, the Purchaser shall not be or become liable to the Seller or any third party claiming through or under the Seller for any portion of the price of any items that Purchaser elects not to accept following notice of termination for default.

11.   Liens

The Seller agrees to deliver the items to be supplied hereunder free and clear of all liens, encumbrances, and claims of laborers or material men and the Purchaser may withhold payment pending receipt of evidence in form and substance satisfactory to it of the absence of such items, claims and encumbrances.

12   Governing Law

This Purchase Order and any material relating thereto shall be governed by the laws of the state in which the Purchaser's office that issues the order is located.

13.   Recovery of Damages

If the Seller should recover any damages as a result of antitrust violations in any manner due to price fixing on the part of another manufacturer or Seller, the Seller shall pay over to the Purchaser any ages Purchaser has suffered as a result of the same price fixing within a reasonable time after the damages are recovered by the Seller.

14.   Notice of Labor Disputes

a)   Whenever the Seller has knowledge that any actual or potential labor dispute is delaying or threatens to delay the timely performance of this order, the Seller shall immediately give notice thereof, including all relevant information with respect thereto, to the Purchaser.

b)   The Seller shall insert the substance of this clause including this paragraph (b) in any subtier supply agreement hereunder as to which a labor dispute may delay the timely performance of this order except that each such subtier supply agreement shall provide that in the event its timely performance is delayed or threatened by delay by an actual or potential labor dispute, the subtier Seller shall immediately notify its next higher tier Seller or Sellers, as the case may be, of all relevant information with respect to such dispute.

15. Indemnity Requirements for Contractors/Seller

Contractor/Vendor shall defend, indemnity and save Street Fax from any and all claims, suits, losses, damages, or expenses, whether caused or contributed to by the negligence of Street Fax, its agents, or employees, or otherwise, on account of injuries to or death of any and all persons whomsoever, including the Contractor/Vendor, subcontractors, employees of Contractor/Vendor, the subcontractor, and of Street Fax and any and all damage to property to whomsoever belonging, including property owned by, rented to, or in the care, custody, or control of the parties hereto arising or growing out of, or in any manner connected with the work performed under this contract, or caused or occasioned, in whole or in party by reason of or arising during the presence of the person or of the property of Contractor/Vendor, subcontractors, their employees, or agents upon or in proximity to the property of Street Fax Notwithstanding the foregoing, nothing herein contained is to be construed as an indemnification against the sole negligence of Street Fax.

16. Publicity

Seller shall not publish photographs or articles, give press releases or make speeches about or otherwise publicize the existence or scope of this Purchase Order, or any generalities or details about this Purchase Order without first obtaining the written consent of Buyer.

17. Seller's Disclosure

Any information relating to the Seller's designs, manufacturing processes or manufactured products which the Seller may disclose to the Buyer in connection with the performance of the contract may be used by the Buyer for any purpose relating to the contract and to its performance without liability therefor to the Seller.

18. General Notes

Seller shall reference this purchase order number on all documents and/or correspondence related to this order.

The signatures below will execute this contract.

Buyer – Paul Ceglia, Streetfax

4/28/03

Seller – Mark Zuckerberg

MZ Zckbg 04.28.03