UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

PAUL D. CEGLIA,

                    Plaintiff,

              -vs-                        10-CV-569A

MARK ELLIOTT ZUCKERBERG and
FACEBOOK, INC.,

                    Defendants.

--------------------------------------


          Proceedings held before the

      Honorable Leslie G. Foschio,  U.S.

      Courthouse, 68 Court Street, Buffalo,

      New York on June 30, 2011.


      APPEARANCES:

      JEFFREY ALAN LAKE, ESQ.,
      Appearing for Plaintiff.

      ORIN S. SNYDER, ESQ.,
      MATTHEW BENJAMIN, ESQ.,
      TERRANCE P. FLYNN, ESQ.,
      Appearing for Defendants.


      AUDIO RECORDER:  Sandra Wilson

      TRANSCRIBER:     Michelle L. McLaughlin, RPR,
                       Official Reporter,
                       U.S.D.C. W.D.N.Y.
                       716/332-3560


      (Proceedings recorded by electronic sound
      recording, transcript produced by computer.)

1          THE CLERK:  On the record.  Ceglia versus

2     Zuckerberg and Facebook.  Appearing for the

3     plaintiff is Jeffrey Lake and appearing for the

4     defendants are Orin Snyder, Matthew Benjamin and

5     Terrence Flynn.  We're here for oral argument on

6     the parties' motions for expedited discovery and

7     also a scheduling conference.

8          THE COURT:  Good afternoon.  You are

9     Mr. Lake?

10          MR. LAKE:  Yes, your Honor.  Good

11     afternoon.

12          THE COURT:  Welcome to our court.

13          MR. LAKE:  Thank you very much.

14          THE COURT:  Mr. Snyder.

15          MR. SNYDER:  Good afternoon, your Honor.

16          THE COURT:  That's first chair,

17     Mr. Benjamin and what's your name again?  By the

18     way, with all these changes of counsel, we can only

19     hope and assume that there won't be anything

20     affecting Mr. Flynn, because we are always

21     interested in making sure that our former U.S.

22     attorneys are gainfully employed.

23          MR. FLYNN:  Thank you, your Honor.

24          THE COURT:  All right.  We've got the

25     motions.  We know what they say.  We've read them.

1    Very intriguing to say the least.

2         And we're ready to hear from Mr. Snyder, and

3    then we'll hear from Mr. Lake, and we'll ask

4    questions along the way.

5         I guess I would want to emphasize that any

6    questions I may ask are not intended to indicate

7    the Court's views on the merits.  Obviously this is

8    a very significant case, subject to the defendant's

9    views about the authenticity of the underlying

10   agreement.  Rather, the questions are intended to

11   assist me in understanding, if I can use the term,

12   the big picture, so that I can make an informed and

13   reasonable decision on, first of all, the question

14   of whether these motions should be granted at all,

15   or need to be granted, and if so, in what form, and

16   to then inform the Court about how to handle the

17   case as we go forward to the extent that we need to

18   go forward.

19        Then, of course, I fully understand the two

20   questions are totally intermixed, especially in the

21   defendant's view.  So just bear with me with my

22   questions and understand that I'm not trying to in

23   any way second guess any of your theories or

24   arguments, but I'm just trying to understand better

25   what we're trying to accomplish.

1        So, Mr. Snyder, you have the floor for the

2   moment.

3            MR. SNYDER:  Thank you, your Honor.  May I

4   approach, your Honor?

5            THE COURT:  Oh, that's the other thing.

6   If you prefer to be seated and at counsel table for

7   whatever reason, you're welcome to do it.  If you

8   prefer to stand and deliver, use the podium.

9            MR. SNYDER:  Thank you.  Good afternoon,

10  your Honor.

11           THE COURT:  Good afternoon.

12           MR. SNYDER:  Your Honor, our motion

13  presents overwhelming evidence that this plaintiff

14  is committing what we believe is an unmitigated

15  fraud on this court which strikes at the heart of

16  the integrity of the judicial process and this

17  court's processes.  We seek expedited discovery to

18  fully expose the nature and magnitude of the fraud,

19  although we believe our papers have gone way beyond

20  the requisite showing of prima facie evidence of

21  fraud to establish an overwhelming case of fraud.

22       I think the case begins, your Honor, to give

23  the Court background, this plaintiff waited seven

24  years to file a lawsuit claiming a multi-billion

25  dollar interest in one of the most well-known

1      companies in the world.  There are statute of

2      limitation and laches problems which affect the

3      case, but we believe the case can and should end

4      before those issues even need to be resolved.

5          This case is based on a fraudulent contract and

6      fabricated emails.  The case --

7                  THE COURT:  Fraudulent in the sense that

8      it's nonexistent?

9                  MR. SNYDER:  The contract attached to the

10     complaint and the amended complaint is a doctored,

11     fraudulent document which this plaintiff, perhaps

12     in concert with others, manufactured for the

13     purpose of bringing this lawsuit.

14                 THE COURT:  That's one thing I'm not quite

15     clear on, and I may have missed something in the

16     papers.  Is it Mr. Zuckerberg's position that he

17     never signed anything?

18                 MR. SNYDER:  No, your Honor.

19     Mr. Zuckerberg did sign --

20                 THE COURT:  Could I finish the question?

21                 MR. SNYDER:  I'm sorry.  Yes, your Honor,

22     of course.

23                 THE COURT:  Anything in any written

24     instrument that carried both his signature and

25     Mr. Ceglia's, the plaintiff?

1          MR. SNYDER: As Mr. Zuckerberg attested to

2   in his declaration, your Honor, he did sign a

3   contract with this plaintiff in 2003 before

4   Facebook was even a figment of his imagination,

5   much less a concept or a company, concerning an

6   entity known as StreetFax. StreetFax was a failing

7   and ultimately failed company that this plaintiff

8   tried to get off the ground. Mr. Zuckerberg, who

9   was a freshman at Harvard looking for extra income,

10  answered an ad on Craigslist and performed limited

11  computer services.

12          THE COURT: Such as?

13          MR. SNYDER: Such as coding, programming

14  work. Mostly coding, creating software for this

15  system, StreetFax, which had to do with taking

16  pictures of street intersections and --

17          THE COURT: What did Mr. Ceglia contribute

18  to that project?

19          MR. SNYDER: The StreetFax project?

20          THE COURT: Yes.

21          MR. SNYDER: It was ironically, your

22  Honor, and I say this not to -- to cast aspersions,

23  but Mr. Ceglia ironically started StreetFax --

24          THE COURT: But you wouldn't mind if it

25  did consistent with your --

 1              MR. SNYDER:  Well, it's the record, your

 2     Honor.

 3              THE COURT:  -- published position.

 4              MR. SNYDER:  Well, the facts compel this

 5     comment, your Honor.  StreetFax ironically was

 6     borne out of Mr. Ceglia's theft of that company

 7     from people for whom he worked.

 8              THE COURT:  Is that in the record

 9     anywhere?

10              MR. SNYDER:  It's in the public record.

11              THE COURT:  I mean, in the papers that are

12     before me?  I don't remember reading that.

13              MR. SNYDER:  I don't believe so, your

14     Honor.

15              THE COURT:  So this is new information to

16     me?

17              MR. SNYDER:  New information, but there

18     was a litigated --

19              THE COURT:  He somehow stole StreetFax?

20              MR. SNYDER:  Yes, and there was a

21     litigation in Boston federal court where the

22     founders of a predecessor entity sued him, and

23     there ultimately was a settlement out of which

24     Mr. Ceglia obtained the right to use the StreetFax

25     name.  It was his -- so it wasn't even his idea.

1    It was a company that he used to work for that had

2    the exact same identical idea and concept.  So

3    Mr. Zuckerberg did, in fact --

4         THE COURT:  Same identical idea and

5    concept as?

6         MR. SNYDER:  Taking photographs of street

7    intersections and uploading them on the Internet.

8         THE COURT:  That's the project that he

9    engaged with Mr. Zuckerberg about?

10        MR. SNYDER:  Yes, your Honor.  So

11   Mr. Zuckerberg for a period of months performed

12   limited services --

13        THE COURT:  So what was Mr. Ceglia's role

14   in this project, this coding programming software?

15        MR. SNYDER:  As best as we can understand

16   from the limited information we have, he was

17   running the company.  He was looking for customers,

18   trying to find financing, and the kind of things

19   that one does trying to get a fledgling startup

20   company --

21        THE COURT:  Did he give Mr. Zuckerberg the

22   specifications for the software that he was

23   attempting to write or build for this street

24   intersection identification program?

25        MR. SNYDER:  Yes, your Honor.  They had

1    conversations about the project, and

2    Mr. Zuckerberg, who, even at that time, was a

3    proficient software developer and coder, was able

4    to develop software code to enable that system to

5    operate.  Ironically, Mr. Ceglia did not pay

6    Mr. Zuckerberg for the work performed.

7              THE COURT:  I see all of that -- those

8    allegations in there.

9              MR. SNYDER:  Sure.

10             THE COURT:  But he did receive some money?

11             MR. SNYDER:  A modest sum of money but --

12             THE COURT:  How much?

13             MR. SNYDER:  I believe he was paid in

14   total about in $9,000 and was owed --

15             THE COURT:  9,000?

16             MR. SNYDER:  -- more than that, and --

17             THE COURT:  Not exactly modest to a

18   college student.

19             MR. SNYDER:  It wasn't, but he did a

20   considerable amount of work.

21             THE COURT:  I'm sure.

22             MR. SNYDER:  So he --

23             THE COURT:  He was a proficient coder too.

24             MR. SNYDER:  At the time he was, even at

25   the time he was.

1          THE COURT:  Received no training,

2     self-taught?

3          MR. SNYDER:  Self-taught, but also took

4     computer courses in high school and in college.

5          THE COURT:  Okay.  Which Mr. Ceglia, he

6     had no competence in that regard, that technical

7     way?

8          MR. SNYDER:  To the extent we're

9     knowledgeable of his technical skills, they were

10    limited, and he certainly needed to engage an

11    independent contractor to perform those services

12    for him.  But what's clear is that that project had

13    absolutely nothing to do with anything related to

14    Facebook, a social media network, or any related

15    concepts.

16       And -- and, your Honor, the emails which we've

17    told your Honor about which exist today on the

18    Harvard University server, 176 of them actually,

19    all tell a narrative of a relationship between

20    Mr. Zuckerberg on the one hand and StreetFax and

21    Mr. Ceglia on the other that relates only entirely

22    exclusively to StreetFax.

23          THE COURT:  And they in no way corroborate

24    or are consistent with those emails that are

25    purportedly genuine emails between the plaintiff

1     and Mr. Zuckerberg that are attached to the

2     complaint?

3              MR. SNYDER:  Correct, your Honor.  In

4     fact, they tell a narrative that, when read

5     side-by-side with the fictional narrative told in

6     the amended complaint, make the narrative in the

7     amended complaint not only fantastical, but almost

8     impossible as a matter of logic and reason, because

9     at the same time that the authentic emails that

10    reside today on the Harvard server and date

11    from 2004 indicate a deadbeat Mr. Ceglia unable to

12    pay Mr. Zuckerberg, begging for forbearance,

13    begging for forgiveness --

14             THE COURT:  That's in the --

15             MR. SNYDER:  Right.

16             THE COURT:  I see those.

17             MR. SNYDER:  The Court --

18             THE COURT:  Are your -- do the emails that

19    are in your papers, are those all the emails?

20             MR. SNYDER:  Those are three, your Honor.

21             THE COURT:  Those are the three.

22             MR. SNYDER:  The reason we only attached

23    three is interesting, your Honor.  We believe that

24    if we attached all of them, it would just provide

25    this plaintiff with a roadmap for how to even

1    better try to perfect his fraud as he goes forward.

2              THE COURT:  That's why you're opposed to

3    mutual discovery in the sense of at least allowing

4    the plaintiff to obtain discovery contemporaneous

5    or in advance potentially of yours?

6              MR. SNYDER:  Yes.  We're prepared to give

7    this plaintiff 176 emails that document --

8              THE COURT:  176?

9              MR. SNYDER:  -- that document a narrative,

10   the true relationship between these parties, but

11   not until, your Honor, he provides us with his

12   supposed evidence --

13             THE COURT:  I understand.  Okay.

14             MR. SNYDER:  Right.

15             THE COURT:  I just needed to -- and how

16   many are there all together?  You said --

17             MR. SNYDER:  176, your Honor.

18             THE COURT:  Over what period?

19             MR. SNYDER:  This is from middle of 2003

20   through and including the middle of 2004 when

21   Mr. Zuckerberg gave up on ever receiving a dime

22   from this man.

23             THE COURT:  More than the 9,000 that he

24   received?

25             MR. SNYDER:  Correct.

1          THE COURT:  And did Mr. Zuckerberg

2     actually deliver some software, code or --

3          MR. SNYDER:  Code that --

4          THE COURT:  -- otherwise?

5          MR. SNYDER:  Yes, code that Mr. Ceglia and

6     his co-workers deemed and described as beautiful

7     and very effective and exactly what they had wanted

8     and ordered.  So --

9          THE COURT:  And then after that nothing

10    happened between the two parties until

11    Mr. Zuckerberg was served in this action?

12         MR. SNYDER:  Right.  Until out of the blue

13    in June of last year this complaint fell from the

14    sky alleging the existence of a contract which

15    Mr. Zuckerberg has sworn to this Court and --

16         THE COURT:  Well, it didn't fall from the

17    sky.  It was served on Mr. Zuckerberg.

18         MR. SNYDER:  As if it fell from the sky.

19         THE COURT:  As if it fell from the sky.

20    Mr. Ceglia never wrote or corresponded with

21    Mr. Zuckerberg to say consistent with the

22    complaint, you know, in case you've forgotten,

23    we're partners --

24         MR. SNYDER:  No, your Honor.

25         THE COURT:  -- in Facebook and where's my

1    office, and could you order some furniture, and

2    when am I going to get an accounting and 50 percent

3    of the profits for the last fiscal year, nothing

4    like that?

5            MR. SNYDER:  No.  Despite the fact by

6    early 2010 Facebook had close to 400 or 500 million

7    customers or users, Mr. Ceglia remained silent

8    sitting on his alleged multi-billion dollar

9    interest.  And it's our belief that it wasn't until

10   shortly before Mr. Argentieri filed the complaint

11   on behalf of Mr. Ceglia in the state court, it was

12   shortly at or around that time that he concocted

13   this entire fraud.  And the amended -- the original

14   complaint was bad enough because it attached what

15   was a fraudulent document, and what --

16           THE COURT:  Which one was that?

17           MR. SNYDER:  The complaint.  The contract.

18   The contract.

19           THE COURT:  Well, the amended complaint

20   also attaches --

21           MR. SNYDER:  I'm sorry, the original

22   complaint was bad enough.  But when we made

23   clear --

24           THE COURT:  Bad enough in the sense of?

25           MR. SNYDER:  Of based on an outright

1    pervasive fraud.  In other words --

2              THE COURT:  Was it more pervasive than the

3    amended complaint?

4              MR. SNYDER:  The amended complaint doubles

5    down on the fraud.

6              THE COURT:  Oh.

7              MR. SNYDER:  And it does so --

8              THE COURT:  So it's worse?

9              MR. SNYDER:  It's worse.  And it does so,

10   your Honor, because after the filing of the

11   original complaint, Facebook made clear publicly

12   that it was going to vigorously fight this lawsuit

13   and that it regarded that document as a fraud, i.e.

14   it was not going to succumb or acquiesce to a

15   opportunistic and bogus lawsuit.

16       And so when the amended complaint was filed for

17   the very first time it alleges the existence, of

18   course, of several dozen emails between

19   Mr. Zuckerberg and the plaintiff purportedly

20   concerning Facebook.  The emails, of course, were

21   not attached to the amended complaint.  People call

22   them emails, but they were really words printed on

23   a document captioned amended complaint.  The emails

24   are outright fabrications.

25       Mr. Zuckerberg has submitted a sworn

1    declaration to this Court that he did not write or

2    receive a single one of those so-called emails.

3              THE COURT:  And they're not among the --

4    what's in the Harvard server.

5              MR. SNYDER:  Correct.  The foremost

6    computer forensic experts in the country, the

7    Department of Justice and other government entities

8    rely on Stroz Friedberg, although it's a private

9    company, often for their forensic computer skills,

10   have confirmed that these made-up emails do not

11   exist, do not reside --

12             THE COURT:  And that they are made up?

13             MR. SNYDER:  And --

14             THE COURT:  And that they are made up,

15   fabricated?

16             MR. SNYDER:  The linguistic expert has

17   compared the text and tone of the supposed emails

18   described in the amended complaint to

19   Mr. Zuckerberg's authentic voice in the genuine

20   emails and has corroborated Mr. Zuckerberg's sworn

21   testimony that he did not send or receive any of

22   those emails.

23             THE COURT:  In his opinion.

24             MR. SNYDER:  In his opinion.  What makes

25   this even more disturbing is the changing story

1     about where these emails actually -- so-called

2     emails exist.  Mr. Ceglia told the press in an

3     article we cite in our papers, the Wellsville

4     Daily, that the computers that the emails were on

5     were at his parents' house.

6              THE COURT:  I saw that.

7              MR. SNYDER:  And now we know why he didn't

8     attach those emails to his complaint, because his

9     story has now changed, and he no longer has emails.

10    What he has, your Honor, are word documents into

11    which he supposedly cut and paste emails, and these

12    documents are not on a computer at his parents'

13    house or apparently on the other computer, but

14    reside on a floppy disk.

15             THE COURT:  Where is that located again?

16             MR. SNYDER:  We believe it's now in the

17    custody of one of his experts.

18             THE COURT:  So we won't be needing to

19    seize the computer that's allegedly located in the

20    parents' home?

21             MR. SNYDER:  We do, your Honor, because we

22    believe that may be an instrument --

23             THE COURT:  Still?

24             MR. SNYDER:  -- of the fraud.  Yes, your

25    Honor.

1          THE COURT:  There may still be things in

2     there that your forensic people can reconstruct and

3     analyze?

4          MR. SNYDER:  Yes.  Including, your Honor,

5     interestingly an important piece of forensic

6     evidence that has been used by prosecutors and

7     civil litigants alike, and you actually see it in

8     the Casey Anthony case now which is in the public

9     eye.

10          THE COURT:  The who case?

11          MR. SNYDER:  The Casey Anthony, that's

12     that mother who is alleged to have killed her

13     child.

14          THE COURT:  Oh, sad case.

15          MR. SNYDER:  Yes, very.  Is search -- Web

16     searches conducted by defendants and wrongdoers --

17     and we believe Mr. Ceglia's a wrongdoer here --

18     often reveal and expose the wrongdoing, meaning to

19     say it may well be that Mr. Ceglia at or around the

20     time that was hatching this fraud in or around June

21     of 2010, was searching the Internet, maybe on a

22     computer he has in his possession, custody or

23     control if he hasn't destroyed or disposed of those

24     or at his parents' house, for information, how-to

25     material for doctoring contracts, for backdating

1    emails --

2              THE COURT:  The Web site that shows you

3    how to do airshots emails.

4              MR. SNYDER:  Correct.  Correct.

5              THE COURT:  That's the kind of thing might

6    be revealed if you could search the parents'

7    computer?

8              MR. SNYDER:  Or whatever computer he used

9    at or around time we believe the fraud was -- was

10   being hatched, including, for example, email

11   searches about the history of Facebook and

12   chronology, so that when he was fabricating his

13   amended complaint more recently, he was doing it,

14   to the extent he could, consistent with external

15   facts that might make his narrative more plausible.

16       Now, if you read his opposition papers --

17              THE COURT:  I have.

18              MR. SNYDER:  If one reads his opposition

19   papers.  Of course, you have, your Honor.  The

20   hand-selected polygraph examiner who is supposed to

21   somehow rehabilitate or give credibility to this

22   plaintiff only created more red flags, because it's

23   telling that this polygrapher either didn't ask

24   Mr. Ceglia about these fake emails, because there's

25   no information in there about the fake emails, or

1     he did ask and he failed that part of the test,

2     meaning he couldn't --

3              THE COURT:  There's a suggestion that his

4     counsel may have told the examiner not to ask that

5     question?

6              MR. SNYDER:  Correct.

7              THE COURT:  Do you have any basis for that

8     assertion?

9              MR. SNYDER:  Well, we had --

10             THE COURT:  That's a pretty serious

11    assertion.

12             MR. SNYDER:  I don't know -- I think it's

13    a very --

14             THE COURT:  You did say that.

15             MR. SNYDER:  It's a very fair inference,

16    your Honor --

17             THE COURT:  No, no, you said that.  You

18    speculated that plaintiff's counsel may have

19    directed the polygraph examiner not to ask

20    questions about the emails.

21             MR. SNYDER:  Or --

22             THE COURT:  Do you have any basis for

23    that?

24             MR. SNYDER:  I don't, your Honor.  I think

25    it's a fair inference that either the polygrapher

1    was instructed not to ask the question, or he asked

2    the question and was given an answer which was a

3    failing answer, because if the purpose of the

4    polygrapher was to give credibility to the

5    plaintiff's story, and fundamental to that story

6    was the email part of the story, it makes no sense

7    that the polygrapher wouldn't ask those questions

8    and get -- and get answers.  But back to the fraud

9    that started the case, which is the bogus

10   contract --

11          THE COURT:  How do you think -- why would

12   you think the polygraph operator would have known

13   about the emails?

14          MR. SNYDER:  Well, certainly the polygraph

15   examiner was working with counsel and with the

16   plaintiff for the purpose of preparing that

17   submission.  And so he either was instructed or not

18   instructed to ask about the emails, which is a

19   central part of this case.  And either way I

20   think --

21          THE COURT:  You think the emails are a

22   central part of the case?

23          MR. SNYDER:  They're central to the extent

24   that they confirm the fraud, meaning to say that

25   the emails are additional confirmation that this

1    plaintiff is perpetuating the most serious kind of

2    fraud on the court imaginable.

3                THE COURT:  And when the polygraph

4    examination was conducted, plaintiff's counsel was

5    aware that that was your position?

6                MR. SNYDER:  Fully aware.  We'd already

7    submitted --

8                THE COURT:  How would they have seen that,

9    through this motion?

10               MR. SNYDER:  Yes.  On June 2nd we

11   submitted our motion.

12               THE COURT:  When was the polygraph exam

13   again, I forgot?

14               MR. SNYDER:  Between June 2nd and June

15   10th.

16               THE COURT:  Thank you.

17               MR. SNYDER:  We hired, your Honor,

18   Professor Romano, Frank Romano from Rochester

19   Institute of Technology, who is considered, if not

20   the world renowned expert in document examination,

21   at the very top of -- of that industry.  Again,

22   hired by the United States Department of Justice --

23               THE COURT:  I read his credentials.

24               MR. SNYDER:  His report is also

25   devastating, because he concludes without even

1    inspecting the original and conducting the testing

2    that we think is so important to confirm and fully

3    expose the fraud, he concludes based on the copy

4    that this is amateurish forgery, and your Honor has

5    read, of course, so I won't repeat the actual

6    factual findings that --

7              THE COURT:  And, of course, they have an

8    expert who I thought rather neatly rebutted that.

9              MR. SNYDER:  I don't think so, your Honor.

10             THE COURT:  You don't think so?

11             MR. SNYDER:  I thought the expert was

12   hedgy.

13             THE COURT:  Well, he attempted to neatly

14   rebut it.

15             MR. SNYDER:  I thought he hedged, was

16   equivocal, and actually did not come out and say

17   that the document was authenticate.  All he said is

18   that page 1 sits on page 2, and there are

19   indentations on page 2 from page 1 which, of

20   course, could and we believe was done at or around

21   the time the forgery occurred many, many years

22   after this relationship ended.

23        But, as your Honor saw, when the plaintiff

24   doctored page 1 of the contract to manufacture the

25   contract for this lawsuit, he made a mistake that

1    we believe also exposed his fraud with the LLC.

2    And they make short shrift of that, but the fact

3    that page one says StreetFax, LLC, page 2 says

4    StreetFax, Inc.

5           THE COURT:  I don't want to quibble too

6    much, and I have read all of this, so -- but I

7    thought there was a plausible explanation for that.

8    He just assumed it was a corporation and being a

9    layperson put down LLC according to the plaintiff.

10          MR. SNYDER:  That would make sense, your

11   Honor, if page 2 also said StreetFax, LLC.  But it

12   didn't.  Page 2 of the contract said StreetFax,

13   Inc.

14          THE COURT:  We're talking about a layman

15   who put together a, basically, a kitchen-table

16   contract to his potential advantage or

17   disadvantage, and didn't consult a lawyer, if it is

18   an authentic contract and -- but coming back to the

19   point, Mr. Zuckerberg does agree that he signed

20   some sort of an instrument with Mr. Ceglia.  We

21   sort have got away from that.

22          MR. SNYDER:  Yes, and that's what makes

23   the fraud so pernicious, because he is using --

24          THE COURT:  Where is that contract?

25          MR. SNYDER:  I think Mr. Argentieri, lead

1    counsel, who is not present, but he's lead counsel,

2    has it allegedly, according to reports.  We've been

3    asking to see it for a year.

4            THE COURT:  So you think there's two

5    instruments?  There's the original which is the

6    real contract between Mr. Zuckerberg and Mr. Ceglia

7    relative to Street Search that's in the safe

8    deposit box, and what was attached to the complaint

9    is this concoction?

10           MR. SNYDER:  No, your Honor.

11           THE COURT:  No.

12           MR. SNYDER:  The one that is in the safe

13   is the fraudulent document --

14           THE COURT:  Oh.

15           MR. SNYDER:  -- which we want to test.

16           THE COURT:  The original?

17           MR. SNYDER:  The original version of the

18   doctored contract, which came into existence we

19   believe recently.

20           THE COURT:  I was talking about the

21   contract that Mr. Zuckerberg apparently agrees he

22   did sign with Mr. Ceglia.

23           MR. SNYDER:  I do not know, your Honor, if

24   the plaintiff still has a copy of the authentic

25   real contract.

1          THE COURT:  Because the plaintiff could --

2     claims that this is the original contract.

3          MR. SNYDER:  Of course, right.

4          THE COURT:  But Mr. Zuckerberg was not

5     given a copy or duplicate of the actual Street

6     Search contract that he agrees that apparently he

7     did sign.

8          MR. SNYDER:  Your Honor, he was 18 years

9     old at the time.  He was a freshman at college.

10    And this event in his life at the time was a

11    meaningless event.  It was insignificant in the

12    context of his life.  Like most 18 year olds who

13    pack up their dorms and move away for the summer,

14    whether he had it or didn't have it, doesn't have

15    it today, it was a --

16          THE COURT:  Does he recall having it?

17          MR. SNYDER:  He certainly recalls signing

18    the contract, and recalls without qualification,

19    without question, without ambiguity that the only

20    business he did with this man related to StreetFax,

21    period.  I mean, there's no question in his mind

22    about that.  And, in fact, Facebook did not --

23          THE COURT:  His recollection is quite

24    clear about the contract and its terms and

25    conditions and its purpose and objectives relating

1    to coding, delivery of program, software to carry

2    out Mr. Ceglia's specifications for the Street

3    Search software?

4              MR. SNYDER:  Crystal clear.

5              THE COURT:  Crystal clear.  And he was

6    getting money for it, and -- but -- and he signed

7    it, but he doesn't recall whether he ever obtained

8    a copy, was given a copy by Mr. Ceglia at that

9    time.

10             MR. SNYDER:  Whether -- he may have been

11   given a copy, but he certainly doesn't have one

12   today anymore than he has many of his belongings.

13             THE COURT:  That's what I'm asking.  Does

14   he recall getting a copy?

15             MR. SNYDER:  He does not recall getting a

16   copy, although he may have gotten a copy.

17             THE COURT:  I see.

18             MR. SNYDER:  And the point here, your

19   Honor --

20             THE COURT:  And he didn't search his

21   records in connection with the lawsuit to see if

22   it's --

23             MR. SNYDER:  We do not have a copy --

24             THE COURT:  -- maybe in his parent's attic

25   somewhere in some box, you know --

1          MR. SNYDER:  Your Honor, if we --

2          THE COURT:  -- versus --

3          MR. SNYDER:  If he only knew when he was

4   18 that he was going to go on to found Facebook

5   turned into a big company, and that eight years

6   later some man would sue him, he probably would

7   have saved the contract.  But like most 18-year-old

8   kids, packing up their boxes, moving from one place

9   to another, many of his possessions, personal and

10  otherwise, destroyed, left behind.  And this was no

11  more important than any other meaningless piece of

12  paper at the time.  In fact, he hadn't gotten paid,

13  gave up on getting paid, so the piece of paper, the

14  authentic contract, the StreetFax contract wasn't

15  worth the paper it was written on at that time.

16      So, we have established prima facie evidence,

17  your Honor, that expedited targeted discovery is

18  necessary.

19          THE COURT:  Well, can we focus on that for

20  a second?

21          MR. SNYDER:  Sure.

22          THE COURT:  Where would we end up if we

23  had targeted expedited discovery focusing on the

24  authenticity issue?

25          MR. SNYDER:  In the event, your Honor --

1          THE COURT:  Procedurally.

2          MR. SNYDER:  Yes, your Honor.  What we

3   would propose is a 30-day period, 30 days after the

4   production of what we say are the instruments of

5   the fraud, which we've delineated in our motion,

6   within 30 days we would conduct all the testing.

7          THE COURT:  I'll get to that.  That's the

8   protocol I think.

9          MR. SNYDER:  Yes.

10          THE COURT:  I want to talk about that.

11   What I'm asking is, is the objective here to

12   persuade the plaintiff that he is a liar and a

13   fraud artist, and his lawyers and get them to

14   basically throw the towel in?

15          MR. SNYDER:  I can't get inside the head

16   of this plaintiff because he appears --

17          THE COURT:  That's my point, what is

18   the --

19          MR. SNYDER:  My objective is to obtain

20   evidence, which we would then present to this Court

21   in support of a motion to dismiss the complaint on

22   the grounds that the plaintiff is committing, has

23   committed and intends to commit a fraud on this

24   Court.  And the case law is clear that under this

25   Court's inherent power, there is no more

1    appropriate reason to dismiss a complaint than --

2              THE COURT:  See, that's not in your

3    papers, that's why I asked the question.  I'm

4    having difficulty understanding where we are going

5    procedurally.  Because from all the plaintiff has

6    put in, it sure looks like they have no intention

7    of throwing the towel in, that their experts are

8    quite competent, if not equally competent or even

9    more competent than your experts, and that it would

10   be -- and that's why I'm asking this question.  It

11   would be a surprise to me if -- if as a result of

12   all the testing that you would accomplish -- and

13   I'm not saying I'm not going to allow you to do it

14   here, I'm just trying to understand what is it I'm

15   signing up for.

16             MR. SNYDER:  That's --

17             THE COURT:  What is it that I'm signing up

18   on behalf of Judge Arcara for?

19             MR. SNYDER:  I think --

20             THE COURT:  If I could finish.  And that

21   is, does it position you then to make a motion for

22   partial summary judgment?  I mean, how -- how does

23   it stop the case -- how does it stop the case

24   unless they concede as a result of the destructive

25   testing and otherwise that the -- that Mr. Ceglia's

1    got either a very bad recollection, or all of the

2    nasty things that you attribute to him are true, in

3    which case, there are two sworn affidavits here,

4    and who knows what the U.S. attorney might be

5    thinking about with these affidavits.

6         So what I'm getting at is, if it turns out that

7    the plaintiff's experts, after concomitant testing,

8    using the same protocols, come to a completely

9    different conclusion, even under inherent power,

10   which is the first time I've heard that that's your

11   strategy here procedurally, how does the case

12   terminate?  The case seems to me to go forward to

13   jury trial.

14             MR. SNYDER:  I think that that's the right

15   question, and if I may respond?

16             THE COURT:  Thank you.

17             MR. SNYDER:  Thank you.  First

18   preliminarily, I respectfully disagree that the

19   experts who submitted declarations on behalf of the

20   plaintiff endorse or attest to under oath the

21   authenticity of either the emails or the contract.

22   What they do is they make observations about that

23   evidence.  But none attest to the authenticity.  In

24   fact, it's the opposite.  Again, they -- the expert

25   who submitted a declaration concerning the emails

1    said I understand these are emails, and all he said

2    was documents, which I understand are emails --

3              THE COURT:  Concentrate on the contract.

4              MR. SNYDER:  And on the contract there was

5    no testimony given by the experts that this was an

6    authentic contract, that it was a legitimate

7    contract, that they tested it in the ways that

8    document examiners need to test documents to

9    ascertain authenticity.

10             THE COURT:  What is your point?  You're

11   saying to me that, Judge, not to worry, when we get

12   through with this document and they get through

13   with the document, all the experts are going to be

14   in agreement it's a fraud.

15             MR. SNYDER:  That is our expectation.  And

16   in the event that we are able to establish that

17   based on this testing, we believe at that time this

18   Court would not only --

19             THE COURT:  In the event that you are able

20   to establish it?

21             MR. SNYDER:  Yes.

22             THE COURT:  No.  You say you will

23   establish it.

24             MR. SNYDER:  We expect to establish it.

25   Until the testing is done your Honor --

1            THE COURT:  You can't be sure.

2            MR. SNYDER:  I can't be sure.  Because the

3      testing is multi-facetted.  It's actually

4      fascinating --

5            THE COURT:  So is it possible that your

6      experts -- your experts would change direction and

7      say, look --

8            MR. SNYDER:  No.

9            THE COURT:  -- it is authentic.

10           MR. SNYDER:  It's impossible that my

11     experts will say that it's authentic.

12           THE COURT:  Because?

13           MR. SNYDER:  Because they've already

14     determined based on visual observation, Mr. Romano

15     has, and other evidence, that it's amateurish

16     forgery.  The question is --

17           THE COURT:  Why do they need to see it

18     through expedited discovery?

19           MR. SNYDER:  Because there are additional

20     tests that need to be conducted based on document

21     forensic examination protocols that are necessary

22     to fully confirm the conclusion based on visual

23     inspection that the document is a fraud.  For

24     example, there are tests that can be done

25     microscopically in terms of paper and toner.  There

1    are optical lights that can be used to see

2    differences in ink, paper, and opaqueness of the

3    pages.  There's ink extractions which don't hurt

4    the integrity of the document to sample and

5    identify whether the ink is the same on both pages

6    and how old it is.  There are differences in paper

7    fibers --

8             THE COURT:  I'm familiar with those

9    things.

10            MR. SNYDER:  -- and the like, your Honor.

11            THE COURT:  We had a case under my

12   criminal jurisdiction many years ago where we got

13   into these very same issues.

14            MR. SNYDER:  So there's no chance that any

15   of our experts will change their view.  The

16   question is the quality --

17            THE COURT:  There's no chance?

18            MR. SNYDER:  No chance.  The question is

19   quality and quantum of evidence that we would like

20   to present to this Court in support of a motion to

21   dismiss --

22            THE COURT:  Okay.

23            MR. SNYDER:  And the case law is clear

24   that even where a plaintiff raises --

25            THE COURT:  Under inherent authority?

 1              MR. SNYDER:  Yes.

 2              THE COURT:  I see.

 3              MR. SNYDER:  Even where a plaintiff raises

 4    his right hand and swears to something, if the

 5    evidence on the other side confirms the existence

 6    of a fraud --

 7              THE COURT:  How does the court do that

 8    then?  If there are conflicting expert opinions,

 9    does the court conduct a bench trial, or is it a

10    jury trial, an advisory jury trial?  I've never

11    heard of such a thing.  This is a totally new

12    concept.  Inherent power I understand.  But in this

13    context, your papers don't elaborate, and that's

14    why I'm asking these questions.

15              MR. SNYDER:  Right.  We didn't --

16              THE COURT:  I don't want to sign up for

17    the proverbial marching up the mountain only to

18    have to march down again, even though I'm very

19    sensitive to all the concerns that are raised here.

20              MR. SNYDER:  Let me give the legal

21    framework and then some of the practical --

22              THE COURT:  Let's put it this way.  I want

23    to make sure that once we launch this in the way

24    that you're requesting, that we know exactly where

25    we're going procedurally.

1          MR. SNYDER:  Thank you.  So let me give

2     your Honor, first, a legal framework and then a

3     procedural framework in response to your question.

4     Judge Larimer in the Campos case, which was a 2006

5     decision, stated that a plaintiff's knowing

6     presentation of a falsified document to a court is

7     sufficient ground for dismissal of his complaint.

8     That cited a First Circuit case, A-O-U-D-E versus

9     Mobile Oil which is a very well written decision by

10    the First Circuit --

11         THE COURT:  Judge Larimer's decision would

12    be enough for me, so tell me about the Campos case,

13    what type of a case was it?

14         MR. SNYDER:  In that case there was a

15    falsified document submitted by a prisoner in

16    connection with a grievance which contained

17    information which at the time of the alleged -- at

18    the time the document was allegedly written, wasn't

19    and couldn't have been known.  It was a future

20    event, so he would have had to have been a psychic

21    to know the future.  So in other words, proof

22    positive that it was a fraud.

23         THE COURT:  So kind of like the

24    Streetscape LLC issue, so to speak?

25         MR. SNYDER:  Or if we could prove, for

1    example, that a toner or ink or paper fiber didn't

2    exist at the time or the like.

3              THE COURT:  I understand, okay.  And Judge

4    Larimer -- did you -- is that in your papers?  If

5    you could just tell me the reference, I don't need

6    to pursue it any further.

7              MR. SNYDER:  Yes.  It's 418 F.Supp 277.

8              THE COURT:  Thank you.  That's enough.  So

9    there's authority for the court on its own motion

10   or on motion of the opposing party to make a

11   factual finding of fraud, dismiss the complaint,

12   and if you don't like it, take an appeal.

13             MR. SNYDER:  Correct.  And the first

14   department -- the First Circuit decision has

15   language which I think is very instructive.  The

16   First Circuit in that case that Judge Larimer cited

17   with approval said it strikes us as elementary that

18   a federal district court possesses the inherent

19   power to deny the court's processes to one who

20   defiles the judicial system by committing fraud on

21   the court.  The present case is a near classic

22   example of the genre of fraud of the court.  This

23   is a case where a plaintiff fabricated a purchase

24   agreement, gave it to his lawyer, read the

25   complaint before it was filed, as Mr. Ceglia did,

1    because he verified the original complaint,

2    realized that counsel acting on his behalf proposed

3    to annex the bogus agreement to the complaint, thus

4    representing it to be authentic, and nevertheless

5    authorized the filing.  This tactic plainly

6    hindered defendant's ability to prepare and present

7    its case, while simultaneously throwing a monkey

8    wrench into the judicial machinery.

9              THE COURT:  And there were no opposing

10   opinions about it?

11             MR. SNYDER:  There were.

12             THE COURT:  In that case?

13             MR. SNYDER:  In that case --

14             THE COURT:  Other than the -- other than

15   the litigant?

16             MR. SNYDER:  The litigant.

17             THE COURT:  Just that?

18             MR. SNYDER:  The litigant --

19             THE COURT:  No.  What I'm asking is either

20   in that case or Judge Larimer's case were there

21   dueling experts?

22             MR. SNYDER:  I don't believe so, but I

23   don't regard there to be dueling experts in this

24   case --

25             THE COURT:  Yet.

1           MR. SNYDER:  -- in the sense of actually

2      addressing the authenticity of these documents.

3           THE COURT:  Okay.  Counsel, you've

4      answered my question.

5           MR. SNYDER:  Thank you.

6           THE COURT:  Thank you.  Did you want to

7      turn to the -- to the protocol issue and the scope

8      of discovery issues?

9           MR. SNYDER:  Yes.  Thank you, your Honor.

10     There is no dispute here.  In fact, the plaintiff

11     agrees and concedes that targeted discovery and

12     expedited discovery is warranted.  The question, of

13     course, as your Honor just identified is the proper

14     protocol.

15        We believe that the plaintiff should be

16     directed within five days, seven days, whatever the

17     Court deems appropriate, to produce to the

18     defendants the documents and electronic material --

19          THE COURT:  I'm sorry, I think we're not

20     on the same page.

21          MR. SNYDER:  Sure.

22          THE COURT:  No, pun intended here.  I'm

23     looking at Mr. Evans's declaration.  Did I miss one

24     of your expert declarations that had attempted to

25     articulate the protocols, and if I did I apologize.

1          MR. SNYDER:  Yes, your Honor.  It was

2     Mr. Rose.

3          THE COURT:  Mr. Rose, I'm sorry.

4          MR. SNYDER:  McGowan.  I'm sorry, it was

5     McGowan.

6          THE COURT:  McMenamin -- McGowan.  So I

7     did miss it.  Is it the same as Mr. Evans's

8     protocol?

9          MR. SNYDER:  Essentially other than the

10    plaintiff wants --

11         THE COURT:  What page should I look on in

12    his --

13         MR. SNYDER:  It would be paragraph 17 and

14    18 of his declaration, which is the next to last

15    page.

16         THE COURT:  He refers to a protocol, but I

17    guess that's what threw me off.  I didn't actually

18    see one, unless it's in Exhibit A or B, and I've

19    been looking for it and didn't see it.  But I did

20    see something that sure looked like a protocol to

21    me.  I'm not sure I agree with it, but I sure

22    know -- I could at least sense it was genuinely an

23    effort to articulate a protocol, and that's at

24    page 3 and 4 of Mr. Evans's declaration.

25         MR. SNYDER:  He does describe in his

1    affidavit --

2              THE COURT:  Look, I'm simply trying to --

3              MR. SNYDER:  Sure.

4              THE COURT:  If you don't have it, just say

5    so, and I just need to know whether or not you

6    agree with Mr. Evans's protocol, so I don't have to

7    spend too much more time talking about the

8    protocol.

9              MR. SNYDER:  I can go through each test we

10   want to perform and tell your Honor each declarant

11   talks about how --

12             THE COURT:  Let me tell you why I'm

13   concerned about it.

14             MR. SNYDER:  Sure.

15             THE COURT:  Because when I leave on

16   vacation next week for two weeks if we -- since we

17   are going to launch discovery in this case one way

18   or another, I don't want to be called long distance

19   with a problem, Judge, we can't proceed with the

20   test because there's a disagreement on the issue of

21   the protocols.

22             MR. SNYDER:  The way I would describe the

23   protocol is each of our declarants --

24             THE COURT:  If you can't stipulate to it,

25   then before I do what I'm going to do next week,

1    probably overnight and tomorrow, the three sides,

2    you, Mr. Lake, and myself, are going to have to

3    agree on a protocol, and I'm just trying to

4    understand is this okay?

5              MR. SNYDER:  No, your Honor.  Each

6    declarant in support of our motion provides the

7    Court with how they will go about, that is, their

8    protocol, examining the documents and the

9    information that we are seeking in expedited

10   discovery.

11             THE COURT:  Then I somehow missed what

12   Mr. McGowan was trying to say.  He just refers to

13   Stroz Freeburg's protocol, but I don't know what

14   they are.

15             MR. SNYDER:  If you look at his affidavit

16   paragraph 9, 10, 11 --

17             THE COURT:  Oh.

18             MR. SNYDER:  -- and 12, 13, 14, and 15, he

19   describes for the Court the analysis and inspection

20   protocol.

21             THE COURT:  That's not a protocol.

22             MR. SNYDER:  Those are the tests that he

23   intends --

24             THE COURT:  I know, but that's not a

25   protocol.

1          MR. SNYDER:  I think the protocol --

2          THE COURT:  The protocol is how you go

3     about doing it so as not to have a dispute at the

4     end as to whether or not the opinion is competent.

5          MR. SNYDER:  Right.

6          THE COURT:  And if the parties aren't in

7     agreement, then I have a problem.

8          MR. SNYDER:  Well, we don't believe the

9     plaintiff's consent to or are in agreement with our

10    protocol is necessary.

11         THE COURT:  No, but I would sure like to

12    avoid motion practice over it, that's what I'm

13    trying to get at.  And it's a very practical

14    question.  And reading over Mr. Evans's, it just

15    seemed to be -- to be reasonable, and I'm asking

16    whether you agree or disagree.  Did Mr. McGowan

17    look at Mr. Evans's proposed protocol and did he

18    agree or disagree with it?

19         MR. SNYDER:  He did look it over, your

20    Honor.

21         THE COURT:  And what's his -- what is his

22    opinion of it?

23         MR. SNYDER:  His request is he would like

24    to conduct the test that he describes in his

25    affidavit, not necessarily in the order, sequence,

1    or manner that Mr. -- that the plaintiff's

2    expert --

3                    THE COURT:  Okay.

4                    MR. SNYDER:  -- suggests.

5                    THE COURT:  So you're saying there is at

6    this point no intent to agree to a protocol that

7    both sides are in agreement with.  You're telling

8    me that you're going to go ahead and test the

9    materials according to your expert's protocol.

10   Judge, you don't have to approve it, so don't worry

11   about it, and that's it.

12                   MR. SNYDER:  Right.

13                   THE COURT:  And so if I got a call from

14   Mr. Lake saying, Judge, we don't agree with the way

15   they're going about it, it's so what, you'll have a

16   chance to do your own testing, and if there's an

17   issue of competency, whatever, as to the ultimate

18   opinion that's derived, Judge, you'll just have to

19   make the decision at that point based on dueling

20   protocols.

21                   MR. SNYDER:  Let me say this, the Evans

22   protocol, your Honor, relates only to the

23   electronic assets, not to the documents.

24                   THE COURT:  I'm trying to avoid hiring my

25   own expert to guide me on whether or not it was

1    done properly.

2              MR. SNYDER:  I understand.  The Evans

3    protocol, the so-called Evans protocol relates only

4    to the electronic assets, the computer, the hard

5    drives, the floppy discs.

6              THE COURT:  Oh, okay.

7              MR. SNYDER:  Not to the document testing.

8    That's a separate set of tests conducted by

9    different experts who have, in their declarations,

10   set forth with clarity their protocol.

11             THE COURT:  Oh, I see.  Okay.  Thank you.

12             MR. SNYDER:  The Evans protocol -- the

13   only major difference between the Evans protocol

14   and the protocol that would be employed by Stroz

15   Friedberg relates to the appointment of independent

16   examiners, and it's our position that we should be

17   able to conduct our tests ourself.  Otherwise

18   there's no substantial material --

19             THE COURT:  Okay.

20             MR. SNYDER:  -- difference in the protocol

21   as it relates to the electronic assets.

22             THE COURT:  So do I have your point

23   whereas I thought that I was being asked to approve

24   a protocol, that in actuality I need not be

25   concerned about that.  Is that your -- is that --

1          MR. SNYDER:  I don't think the Court needs

2     to be concerned about what specific tests are going

3     to be conducted.

4          THE COURT:  If you choose the wrong one,

5     then it's your problem.

6          MR. SNYDER:  Correct, your Honor.

7          THE COURT:  You're pretty confident?

8          MR. SNYDER:  I'm pretty confident that

9     Stroz Friedberg will follow the -- go by the book,

10     and there will be no question about what they did

11     or didn't do.

12          THE COURT:  So if I had a question for

13     Mr. Lake, where at page 5 of the Evans declaration

14     articulating a series of protocols, that the Court

15     shall enter an order identifying the specific

16     electronic data that is to be imaged by the

17     independent consultant, because there's not --

18     because in your view --

19          MR. SNYDER:  Sorry, your Honor.

20          THE COURT:  Go ahead.  You need to

21     consult, that's okay.  Since you are attempting to

22     persuade the Court -- the Court doesn't get

23     involved with an independent consultant, again, I

24     don't have be concerned about that issue.

25          MR. SNYDER:  Yes, your Honor.

1            THE COURT:  Thank you.  Tell me about --

2    then we'll let you take a break and get Mr. Lake

3    front and center.  Take a break from your

4    presentation.  Tell me about why we shouldn't have

5    mutual targeted accelerated discovery on this

6    issue.

7            MR. SNYDER:  Your Honor, the plaintiff has

8    not demonstrated good cause to justify his broad

9    discovery requests.  We're willing to and have said

10   in our papers, offered to provide plaintiff

11   discovery into the critical emails on the Harvard

12   server that describe the relationship between

13   plaintiff --

14           THE COURT:  But only after the plaintiff

15   discloses and produces his emails, because you

16   think he can lay his hands on software that will

17   enable him to fabricate yet new emails --

18           MR. SNYDER:  Yes, your Honor.

19           THE COURT:  -- to make them appear as if

20   they're old emails that rebut, contradict,

21   undermine the Harvard emails.

22           MR. SNYDER:  Yes.  But our experts have

23   searched the Harvard server, have sworn to this

24   Court --

25           THE COURT:  Isn't that -- I know how -- I

1    know what your answer is, but I can't help but ask

2    the question.  He would be running an enormous risk

3    to attempt to pull a stunt like that, wouldn't he?

4            MR. SNYDER:  This plaintiff, your Honor,

5    has proven to be brazen to the point of almost --

6            THE COURT:  I knew it.  I knew it.

7            MR. SNYDER:  -- almost comical

8    proportions.  This is a man, your Honor, who --

9            THE COURT:  But you could detect that

10   fraud, couldn't you?

11           MR. SNYDER:  We have detected his frauds

12   across the country.

13           THE COURT:  That is my point.  But it

14   wouldn't stop him because he's so brazen.

15           MR. SNYDER:  You know that movie Catch Me

16   If You Can with Leonardo DiCaprio and no one can

17   catch him, that was fiction.  Most --

18           THE COURT:  No, it wasn't.

19           MR. SNYDER:  Partial fiction.

20           THE COURT:  Okay.

21           MR. SNYDER:  Most thieves -- most thieves

22   and fraud doers when they're amateurs get caught.

23   This plaintiff when he ripped off people in

24   Florida --

25           THE COURT:  Okay.

1          MR. SNYDER:  -- got caught.  This man when

2     he ripped off people in this area selling them wood

3     pellets, got caught --

4          THE COURT:  A serial fraud artist.

5          MR. SNYDER:  -- they put the handcuffs on

6     him just miles away from here.

7          THE COURT:  That's your position.

8          MR. SNYDER:  And he's gotten caught here

9     again.  So I have no idea how his mind operates --

10          THE COURT:  But the point is that I think

11     what you're simply -- you're agreeing with me,

12     that, yeah, if he was given mutual discovery and

13     access to those Harvard emails, he'll defraud

14     again, but, guess what, he'll get caught.  So

15     what's the harm in it?

16          MR. SNYDER:  The harm in it is we'll be in

17     court having to file yet additional motions,

18     undergo even more expense and burden, and I don't

19     think that this plaintiff should be rewarded, given

20     the showing we've made, and these emails that we

21     have are safely in our possession.

22          THE COURT:  But getting caught for

23     committing further fraud on the court doesn't sound

24     like being rewarded, but I understand your point,

25     okay.  Is that the only reason not to permit mutual

1  discovery?  Because it is a -- it is an unusual

2  request.

3          MR. SNYDER:  Well, your Honor --

4          THE COURT:  I mean, I've been on the bench

5  20 years and I've never seen anything like this.

6  But then again, I've never seen anything like this.

7          MR. SNYDER:  The threshold question in

8  this case -- the threshold question in this case,

9  your Honor, is the authenticity of the contract and

10  the emails.  Therefore, it's our position that all

11  of the expedited discovery within a 30-day window

12  should address those two critical core documents,

13  and not a fishing expedition into all of the

14  subjects that this plaintiff --

15          THE COURT:  Is that the only reason to not

16  grant mutual discovery, expedited discovery, is the

17  potential for him to engage in a further fraud to

18  rebut the Harvard email?

19          MR. SNYDER:  There are two or three other

20  reasons.

21          THE COURT:  Okay.  What are they?

22          MR. SNYDER:  The other reason --

23          THE COURT:  I know I read the papers, but

24  it's a lot of material, and I like to hear it again

25  so --

1              MR. SNYDER:  Yes.  The other reason, your

2        Honor, is not only because we don't want to give

3        him a roadmap, but because this plaintiff has not

4        demonstrated good cause to go beyond expedited

5        discovery on the core foundational documents in the

6        case.  And if he is given that mutual discovery

7        into other more wide-ranging issues in this case,

8        it will burden and prejudice us.  There will be

9        time, there will be more expense.  It will delay

10       the case.

11          And it's not necessary here, because what we're

12       proposing can short circuit the case and avoid

13       months of protracted discovery of the kind that

14       this plaintiff is proposing.  In addition, your

15       Honor, there is a, I think, institutional interest

16       that this Court can and should have in not

17       permitting a plaintiff, based on fraudulent

18       documents, to then have a license to conduct a

19       fishing expedition into matters unrelated to the

20       authenticity of those core documents until and

21       unless he can establish their authenticity.  So for

22       him to go searching around Facebook's records and

23       Mr. Zuckerberg's records about a whole host of

24       topics unrelated to these two core documents, we

25       think would --

1            THE COURT:  In other words, all of the

2      things that he -- I'm drawing your attention to,

3      and you know what I'm referring to, page 12 and 13

4      of the plaintiff's memorandum, there are listed

5      therein one, two, three, four, five categories of

6      which don't sound burdensome --

7            MR. SNYDER:  I can address each, your

8      Honor.

9            THE COURT:  Yes, that's my point.  What is

10     wrong with, for example, getting all documents

11     constituting or reflecting or referring to

12     agreements between plaintiff and Zuckerberg --

13            MR. SNYDER:  Well, your Honor --

14            THE COURT:  -- what's wrong with that?

15            MR. SNYDER:  We have none, so that's --

16            THE COURT:  That's the first time I've

17     heard that.  Did you say that in your reply?  I

18     don't remember that.

19            MR. SNYDER:  We have -- I said to your

20     Honor today that Mr. Zuckerberg doesn't have a copy

21     of the contract, and therefore we would agree to

22     mutual discovery on that, and there's nothing to

23     exist.

24            THE COURT:  The only emails that refer to

25     it are the ones we've been discussing, and you

1    don't want those to be provided for the reasons you

2    stated.

3            MR. SNYDER:  We will provide those emails

4    after Mr. Ceglia --

5            THE COURT:  So that request is actually

6    okay.

7            MR. SNYDER:  Yes, your Honor.

8            THE COURT:  As a request, as a mutual

9    request.  But as long as it's sequenced.

10           MR. SNYDER:  Yes.

11           THE COURT:  Well see, then that -- that is

12   an argument in favor of mutual discovery.

13           MR. SNYDER:  As we said in our papers --

14           THE COURT:  Don't you see that?

15           MR. SNYDER:  As we said in our papers --

16           THE COURT:  You see that?

17           MR. SNYDER:  Yes, your Honor, I do.

18           THE COURT:  Thank you.  All right.  Lets

19   move to the second one.  All documents constituting

20   or reflecting or referring to communications

21   between plaintiff and Zuckerberg, which

22   communications include, but are not limited to --

23   oh, this is the one -- actually this is repetitive

24   of the first one.

25           MR. SNYDER:  Yes.

1              THE COURT:  So we've discussed that.  And

2     then the one you don't like especially is the next

3     one, all documents including communications

4     created, dated, received before July 30th,

5     '04 referring to Facebook, et cetera.

6              MR. SNYDER:  Right.  That, your Honor, is

7     a fishing expedition --

8              THE COURT:  That sort of begs of question.

9              MR. SNYDER:  Begs the question.  And it's

10    a fishing expedition, and it goes way beyond

11    whether these documents are authentic or a

12    fabrication.

13             THE COURT:  Because we still have to

14    decide authenticity, right?

15             MR. SNYDER:  Yes.

16             THE COURT:  All documents constituting,

17    reflecting, or referring to payments made to

18    Zuckerberg.  This would be the $9,000 worth of

19    payments.  He doesn't have those either.

20             MR. SNYDER:  We have some checks, your

21    Honor.  But it's -- I think, again --

22             THE COURT:  You have some?

23             MR. SNYDER:  Yes, your Honor.  And I don't

24    think that that is --

25             THE COURT:  Do you have a problem giving

1    those over?

2            MR. SNYDER:  I do in the sense that I just

3    think it's inappropriate for this plaintiff to

4    have --

5            THE COURT:  Have any discovery whatsoever

6    because he's a con artist.

7            MR. SNYDER:  Because --

8            THE COURT:  You don't like him.

9            MR. SNYDER:  I have no feelings about him

10   one way or another.

11           THE COURT:  You don't?

12           MR. SNYDER:  I don't, your Honor.  Other

13   than that I think he should be brought to justice.

14           THE COURT:  You wouldn't invite him over

15   for dinner, would you?

16           MR. SNYDER:  I would not.

17           THE COURT:  Okay.  Then you do have some

18   feelings.  I'm only kidding, trying to lighten the

19   load here.

20           MR. SNYDER:  Yes, your Honor.  Look, your

21   Honor, whether or not Mr. Zuckerberg wrote a few --

22   received a few checks --

23           THE COURT:  It's not a biggy.  It doesn't

24   impact on the ability to conduct competent analysis

25   showing lack of authenticity, but there's no good

 1    cause for it.

 2              MR. SNYDER:  There's no good cause for it.

 3              THE COURT:  How about this one, the last

 4    one.  No less than 30 handwriting samples from

 5    Mr. Zuckerberg written between January 1st, '03,

 6    and July 31st, '04.  What about that?

 7              MR. SNYDER:  There's no good cause even

 8    remotely for that, your Honor.

 9              THE COURT:  Well, isn't there -- isn't

10    there one implied?  I mean Mr. Zuckerberg stated

11    under oath he didn't sign this agreement.

12              MR. SNYDER:  He did not sign --

13              THE COURT:  But he did sign some

14    agreement.

15              MR. SNYDER:  Correct.  So the question is

16    not whether the signature --

17              THE COURT:  So the question is whether

18    it's his signature on this agreement.

19              MR. SNYDER:  That's not a disputed issue

20    in the case.

21              THE COURT:  It's not?

22              MR. SNYDER:  Whether he signed -- whether

23    that is his signature.

24              THE COURT:  I thought you just told me it

25    was.

1           MR. SNYDER:  That signature appears on

2    page --

3           THE COURT:  He didn't sign it.

4           MR. SNYDER:  The signature appears on

5    page 2 of the agreement.  Page 1 of the agreement

6    is the page that contains the fraudulent and

7    doctored language about Facebook.

8           THE COURT:  Then again, maybe I'm just a

9    tad confused.  Are you saying that page two is an

10   authentic copy of the page two of the agreement

11   that he did sign relative to the Street project?

12          MR. SNYDER:  I'm saying it may be in the

13   sense that it appears to be Mr. Zuckerberg's

14   signature, meaning to say it appears to be his

15   signature or a very good copy of his signature.

16   And the content of page 2 is not inconsistent with

17   a Zuckerberg-StreetFax relationship concerning

18   StreetFax.  Page 2 says nothing about Facebook --

19          THE COURT:  It's all about page 1, which

20   is an initialing --

21          MR. SNYDER:  Correct.  And page 2, your

22   Honor --

23          THE COURT:  -- which is not a signature.

24          MR. SNYDER:  It's two letters of the

25   alphabet in capital letters.

1          THE COURT:  Exactly.  So that's why this

2     last one, although facially, would seem to be

3     relevant to the issue of authenticity is actually

4     not, because you're conceding that page two

5     signature is Zuckerberg's.

6          MR. SNYDER:  Or a very, very good copy.

7          THE COURT:  Are you conceding that it is?

8          MR. SNYDER:  I'm conceding that

9     Mr. Zuckerberg recognizes that to appear to be his

10    signature, or someone who copied what looks very

11    much like his signature.

12         THE COURT:  But he can't say that that's

13    not the document that he didn't sign.

14         MR. SNYDER:  Excuse me?  It appears to be

15    consistent with page 2 -- from his recollection as

16    a freshman at Harvard, it appears to be consistent

17    with his recollection of the deal relating to

18    StreetFax and parenthetically, your Honor, there

19    are multiple places in page two where, if the real

20    deal related to Facebook, you would expect to see

21    references to Facebook, and instead the references

22    are all to StreetFax on page 2.

23         THE COURT:  For example?

24         MR. SNYDER:  For example, they're

25    indemnification provisions, they're copyright

1    ownership provisions, and they all the relate to --

2    they all relate to StreetFax, and if, in fact,

3    Mr. Zuckerberg --

4              THE COURT:  Look, this was between two

5    laymen, one very unsophisticated college sophomore

6    or freshman was he?

7              MR. SNYDER:  Freshman.

8              THE COURT:  But very precocious and

9    brilliant obviously, and another person who wasn't

10   a lawyer.  And the thing is obviously almost half

11   unintelligible from a lawyer's point of view --

12             MR. SNYDER:  One thing -- I respectfully

13   disagree, your Honor, because one thing that is

14   intelligible --

15             THE COURT:  You get my point?

16             MR. SNYDER:  Yes.

17             THE COURT:  It's not surprising that

18   there -- the second page has all of this arguably

19   irrelevant boilerplate that he admittedly cut and

20   pasted from who knows where and tried to be his own

21   lawyer, and we know what Abe Lincoln said about

22   being your own lawyer, and so this is what you end

23   up with.

24             MR. SNYDER:  Respectfully --

25             THE COURT:  I don't know that it's

1    terribly probative.

2           MR. SNYDER:  Respectfully, your Honor, I

3    think it's the opposite, and it's highly probative.

4    Page 1, which is the doctored contract that this

5    plaintiff made up, is replete with references to

6    Facebook.  Page 2 is not just a form document.

7    Page 2 refers to StreetFax, so this plaintiff would

8    have had to insert StreetFax on page 2, and it

9    makes utterly no sense that this plaintiff would be

10   given a 50 percent interest in Facebook on page 1,

11   and an interest -- and contract regarding StreetFax

12   on page 1, but page 2 would only discuss StreetFax.

13   It makes no sense.

14          THE COURT:  If there was a two-page

15   agreement between Zuckerberg and Ceglia at the

16   beginning, it's arguable that the second -- no, the

17   second page is equally a fabrication somehow?

18          MR. SNYDER:  No, the second page --

19          THE COURT:  It's all right.

20          MR. SNYDER:  -- is consistent with the

21   StreetFax agreement.

22          THE COURT:  So he basically doctored up

23   another document and stapled the two things

24   together and called it the contract.

25          MR. SNYDER:  Which is why the world's most

1    renowned document expert at the Rochester Institute

2    of Technology, the leading center of the world for

3    document examination, just on a visual examination

4    of page 1 called it an amateurish forgery pursuant

5    to the penalties of perjury, that's what this man,

6    before he even got his hands on the original one

7    and conducted the other tests that he would like to

8    conduct.

9              THE COURT:  Well, an opinion is an

10   opinion.  I don't know that anybody's been

11   prosecuted for giving an inaccurate opinion.  All

12   right.  Thank you for that.

13       All right.  What else do you want to tell me

14   before we let Mr. -- sorry to keep you on your feet

15   so long.

16             MR. SNYDER:  No, your Honor, it's fine.

17   Unless the Court has any questions, I think we've

18   covered everything.

19             THE COURT:  I think you've helped me on

20   mutuality.  You've helped me on the protocol issue.

21   The reason I raise the protocol issue is because in

22   your letter you thought we should adjourn or

23   dispense with the 16(b) aspects of today's hearing

24   and then, of course, you point out except for the

25   issue of mutuality, but that goes to your motion,

1    and protocol, so I'm trying to discuss protocol

2    because you discussed protocol.

3            MR. SNYDER:  Yes, your Honor.

4            THE COURT:  Now you're telling me I don't

5    need to be concerned about protocol.  That's why I

6    raised it.

7            MR. SNYDER:  May I discuss one other

8    topic, your Honor, which is --

9            THE COURT:  So now it's not important for

10   the Court to address the issue of protocol?

11           MR. SNYDER:  If by protocol you mean what

12   the --

13           THE COURT:  What did you mean in your

14   letter when you used the word protocol?

15           MR. SNYDER:  What the Court does not need

16   to worry about is how our forensic experts are

17   going to examine the computers, the tests they're

18   going to conduct on the floppy discs and the hard

19   drives.  They're going to do that by the book.

20           THE COURT:  Yeah.

21           MR. SNYDER:  By protocol I meant what

22   they're going to deliver to us, when they're going

23   to deliver it to us, and the like.

24           THE COURT:  And that is listed where?

25           MR. SNYDER:  In our order, your Honor, our

1    proposed order I think.

2              THE COURT:  Which is part of -- I know I

3    have --

4              MR. SNYDER:  I can hand up another one for

5    the Court.  May I approach, your Honor?

6              THE COURT:  Yeah.  Thank you.  All right.

7    Okay.  And do you have a copy of this, Mr. Lake?

8              MR. LAKE:  Their proposed order?  Yes.

9              THE COURT:  Okay.  Thank you.  Why don't

10   we give you a break?

11             MR. SNYDER:  Thank you, your Honor.

12             THE COURT:  Thank you.  Mr. Lake.  And

13   again, you may be seated or you may use the podium,

14   at your pleasure, sir.

15             MR. LAKE:  I'll tell you what, I'll stand

16   up until I get tired, and if I need to I'll sit

17   back down, how's that?

18             THE COURT:  All right.  What do you think,

19   Terry, a candidate for the U.S. attorney's

20   basketball team?

21             MR. LAKE:  That's right.  If my back and

22   ankles weren't ruined, I'd play a lot more

23   basketball.  But now I spend most of my time

24   playing baseball, so -- I can still pitch and

25   catch.  It's just hard to run around in the

1    outfield.

2          THE COURT:  I wouldn't want to be swinging

3    against you, okay.

4          MR. LAKE:  I won't throw you a curve ball,

5    I promise.

6          THE COURT:  Extra points.  All right.

7          MR. LAKE:  Good afternoon.  My name is

8    Jeff Lake, and I represent Paul Ceglia.  As you

9    know, I've been in this case now for my second day,

10   so, I have a little bit less information than

11   perhaps counsel for Facebook.

12         THE COURT:  We're a little dubious about

13   that, Mr. Lake.

14         MR. LAKE:  Excuse me?

15         THE COURT:  We're a little dubious about

16   that, because you gained general admission in this

17   court in April?

18         MR. LAKE:  That's right.  That's right.  I

19   know Mr. Ceglia and Mr. Argentieri.  I have served

20   as Mr. Ceglia's person counsel, but not in this

21   matter until yesterday.

22         THE COURT:  But you're not unfamiliar with

23   the case?

24         MR. LAKE:  I am familiar with the case.

25         THE COURT:  Okay.

1          MR. LAKE:  I just have not had an

2     opportunity to review the case files that were

3     generated by Mr. Connors, Mr. Vacco, or Mr. Hall.

4     That information has not been provided to me yet,

5     so there is a vast --

6          THE COURT:  Understood.

7          MR. LAKE:  -- universe of information I

8     haven't seen.  I have read the papers though.

9          THE COURT:  For purposes of the motion, I

10    think it looks to me like it's all there.  But you

11    go ahead and comment as best you can.  We really do

12    need to move forward with this case.  That's why I

13    denied the defendant's motion because I frankly

14    didn't understand what he was saying.  If he had

15    explained himself a little more thoroughly about

16    the protocol issue, maybe I would have.  And I just

17    don't like granting motions if I don't fully

18    understand them.  And the same for you.  The case

19    is quite significant, and I felt as defendants

20    obviously pointed out, look, they're not the ones

21    who decided to change counsel on Mr. Ceglia's side

22    and neither is the Court, and that's why we decided

23    to go forward, and we're most grateful that you

24    came to be with us, and we ordered up a beautiful

25    day, and if you're not actually --

1          MR. LAKE:  I actually brought this with me

2     from California.

3          THE COURT:  Is that right?

4          MR. LAKE:  Hopefully I'll bring a lot more

5     just like them.

6          THE COURT:  Let's hope so.

7          MR. LAKE:  Thank you.  And I appreciate

8     that.  I, you know, the reason that there's a

9     change in counsel obviously is between the former

10    lawyers and the client --

11         THE COURT:  I'm not interested.

12         MR. LAKE:  I can't address that issue.

13         THE COURT:  It's okay.

14         MR. LAKE:  All I can tell you is what I

15    know, and the first thing in that regard is that

16    that there is no doubt and no dispute that we want

17    to move this case forward as quickly and

18    expeditiously as possible.  Our biggest concern is

19    fairness and neutrality.  We have --

20         THE COURT:  Why do you have good cause or

21    even any reasonable basis to participate in the

22    accelerated discovery going to the issue -- beyond

23    the issue of authenticity, as we denominated the

24    request as stated, and then you have some other

25    ones that you would like to proffer at pages 12 and

1   13 of your former counsel's papers.

2          MR. LAKE:  Right.  Actually I agree with

3   you that we need to break this into compartments,

4   and I agree with counsel that the first order of

5   business is to talk about the authenticity of the

6   original documents that we have.  Until a few

7   minutes ago we had no idea whether or not

8   Mr. Zuckerberg had maintained or preserved the

9   original copy -- or the original that he was given

10  in April of 2003.  We know that there were two

11  originals that were signed.  Each party was given

12  one.

13          THE COURT:  Duplicate originals?

14          MR. LAKE:  Correct.  Mr. Ceglia preserved

15  his.  Mr. Zuckerberg has either --

16          THE COURT:  So we don't have a best

17  evidence problem here?  I forgot to ask Mr. Snyder

18  about that.

19          MR. LAKE:  Right.  Whether theirs was

20  lost, destroyed --

21          THE COURT:  We're good, because we have

22  Mr. Ceglia's original?

23          MR. LAKE:  Correct.  We do.  We have the

24  best evidence of the contract that was entered into

25  between Mr. Ceglia and Mr. Zuckerberg and we

1    have --

2              THE COURT:  Indeed the only evidence that

3    under the rule you --

4              MR. LAKE:  We need.

5              THE COURT:  -- you have to have.

6              MR. LAKE:  That's right.  That's right.

7    And that means that everything else we're talking

8    about is ancillary to the core issue of this case,

9    and that is, is this agreement, did they make a

10   deal, and if so, what are those terms?  And if the

11   jury finds that there's a deal, then we can discuss

12   what Mr. Ceglia is entitled to.

13             THE COURT:  But you feel that you need

14   these documents -- in other words, even if we

15   didn't have this motion -- and this is an issue I

16   didn't get a chance to speak to Mr. Snyder about --

17   what I would ordinarily expect would be service of

18   first set of interrogatory document requests.  And

19   what's not clear, and I think this is the heart of

20   -- well, aside from their perturbation over your

21   client's lack of candor here and truthfulness,

22   would you -- how are these requests germane to the

23   issue of authenticity?

24             MR. LAKE:  And the answer to that --

25             THE COURT:  And you can see I focused on

1    the handwriting samples because I thought, well,

2    gee that's certainly --

3              MR. LAKE:  That's --

4              THE COURT:  -- important.

5              MR. LAKE:  That's directly on point.

6              THE COURT:  But now he says well no,

7    actually, Judge, we don't really -- which I didn't

8    understand from his papers, we're not really

9    quarreling about the second page per se, and we

10   don't need to be concerned about whether that's

11   Zuckerberg's signature or not, because it probably

12   is.  And that indeed is the second page of the

13   original document that your client has an original

14   duplicate of, and unfortunately Mr. Zuckerberg

15   can't find his.  It's the first page, which is the

16   initialing, and we don't know who -- or maybe you

17   can tell us, because again I don't recall seeing it

18   in the papers.

19             MR. LAKE:  Both parties.

20             THE COURT:  Pardon me?

21             MR. LAKE:  Both parties initialed the

22   front.

23             THE COURT:  I agree, but who wrote the

24   language in, that's a little unclear.

25             MR. LAKE:  Mr. Ceglia.

1          THE COURT:  Mr. Ceglia.

2          MR. LAKE:  Right.  You're right, and --

3          THE COURT:  So how do you get a

4    handwriting sample of a person making an initialing

5    with regular lettering?

6          MR. LAKE:  Well, I would -- I would

7    imagine that Mr. Zuckerberg has signed checks,

8    applications, taxes.  There are --

9          THE COURT:  Other sources by which that

10   initialing can be determined --

11         MR. LAKE:  Can be authenticated to say

12   yes --

13         THE COURT:  -- to be his or not.  I see.

14   I see.

15         MR. LAKE:  -- I wrote, I signed an

16   agreement.

17         THE COURT:  That's why you need 30

18   handwritten samples, and you would include in that

19   possibly initialing.

20         MR. LAKE:  Yes.

21         THE COURT:  Even though this particular

22   request doesn't say so.

23         MR. LAKE:  It should have said initials as

24   well.

25         THE COURT:  Exactly.

1          MR. LAKE:  And this is why.  And I'm with

2     you on this point.  This case is not about what's

3     happening with Facebook now.  It's not about

4     Facebook's users.  It's about -- the only degree it

5     has anything to do with Facebook now is its

6     investors and whether or not they can invest in

7     something that Mr. Zuckerberg owns.  Other than

8     that, this case is about Mr. Ceglia and

9     Mr. Zuckerberg and what happened in 2003 and 2004.

10    So we can't lose sight of that.  All of the

11    evidence that we're going to present is going to be

12    evidence from that time period.  And so we need to

13    focus on that time period and that includes --

14          THE COURT:  I understand that.  But that's

15    the -- that's the relevance of -- and that's the

16    good cause or the reasonable basis for that

17    request.

18          MR. LAKE:  Right, for the signatures and

19    the initials.

20          THE COURT:  That's why you feel you need

21    mutuality.

22          MR. LAKE:  Correct.

23          THE COURT:  Certainly on that one.

24          MR. LAKE:  Yes.

25          THE COURT:  How about the others?

1          MR. LAKE:  Yes.  Okay.  And here's what it

2     comes down to.  The defense has taken an

3     all-or-nothing defense to this case.  They are not

4     saying we disagree with the terms of the contract,

5     and we may not be liable for any monetary damages.

6     What they are saying is -- and they said it under

7     the penalty of perjury, we didn't sign it, the

8     emails are fake, this has nothing to do with us,

9     that's it.  Which means conversely to their

10    position where they think that their experts, by

11    the way, who have never seen the original contract.

12    All their opinions that they submitted in their

13    declarations to support their motion are based upon

14    reading a photocopy taken from a pleading that --

15          THE COURT:  Were any of your experts given

16    access to the original?  I can't recall.

17          MR. LAKE:  Yes, absolutely.

18          THE COURT:  That's right.

19          MR. LAKE:  The opinions that were

20    expressed in our expert's declarations were as a

21    result of reviewing the actual original contract.

22          THE COURT:  Right.

23          MR. LAKE:  So, they're maintaining this

24    case is a fraud, and that Mr. Ceglia is a fraud.

25    They haven't provided any evidence to us at all.

1   The only thing they've done is continuously and

2   systematically attacked Mr. Ceglia's credibility,

3   his character, and all of these inadmissible events

4   that may or may not have occurred in his past.

5   They haven't focused on the issue of this case at

6   all until today for the very first time admitting

7   to you, oh, we don't have a contract.  We don't.

8   We had it.  We don't know where it is.

9       So what we need to do in this case is, if

10   they're the pot calling the kettle black, and they

11   want to dive in to the history of Mr. Ceglia

12   because they think it's admissible, relevant

13   evidence, then they should also understand how

14   their client got to where he is, and what he has

15   done over this time period as a serial --

16   absolutely -- not only did he admit it, he

17   advertised it that he was a computer hacker, that

18   he has broken into servers and emails, and he is a

19   professional at manipulating electronic data.  He

20   has been sued by his partners over the creation of

21   Facebook, the foundation of Facebook, the selling

22   of Facebook, and selling multiple shares.

23            THE COURT:  So how -- just give me any

24   explanation as to how, for example, the one that

25   they're particularly touchy about, which is all

1    documents including communications as defined above

2    created, dated, or received before July 30th, '04,

3    referring, reflecting, or relating to The Facebook,

4    facebook.com, Facebook -- you know what I'm

5    referring to, The Pagebook, thepagebook.com or any

6    other online service or Web site that is similar to

7    a live functioning yearbook, including the funding

8    for or of any such projects.  How does that help --

9              MR. LAKE:  What is the relevance of that?

10             THE COURT:  -- help -- help to establish

11   authenticity?

12             MR. LAKE:  The idea --

13             THE COURT:  And I realize you just stepped

14   in.

15             MR. LAKE:  I know.  I anticipated this

16   question.  It's the same question I asked myself.

17   We need to know these answers.  And we'd like to

18   know them quickly, because we disagree with

19   counsel.  We think that once this information is --

20             THE COURT:  You're not answering the

21   question.

22             MR. LAKE:  Right.  Here's why.  Because

23   they're saying that the dispositive emails that

24   support their position that the contract is fake

25   are the Harvard emails that they're willing to

1    produce.  What they did not say is that

2    Mr. Zuckerberg had the opportunity to and may have

3    deleted all of the emails on the Harvard server

4    that he didn't like that had to do with Mr. Ceglia.

5    We contacted Harvard as well, and we asked them --

6    my predecessors did -- is it possible to tell if

7    Mr. Zuckerberg was using his email account?  And

8    the answer to that question is yes.  And, in fact,

9    we know he was in his email account in October

10   of 2010.  So we know he was in there doing

11   something.  We don't know what.  We said is it

12   possible for you, Harvard, to tell us if

13   Mr. Zuckerberg deleted any of the emails on his

14   account?  And they said no.  We have no way to tell

15   what has been removed.  All we can tell you is what

16   is there.

17       So, it is highly probable that Mr. Zuckerberg

18   has discussed the idea of Facebook and StreetFax

19   and his relationship with Mr. Ceglia with more than

20   just Mr. Ceglia himself.  He may have addressed it

21   with his girlfriend, with his roommates, with

22   Eduardo Severin, with the Winklevosses, with --

23   there's a whole host of people.

24             THE COURT:  Admissions.

25             MR. LAKE:  Right.  That are beyond the 176

1    purported emails that were between him and

2    Mr. Ceglia, not to mention from what I understand

3    from reading the declaration, they asked Harvard

4    for -- or search for the emails that were there.

5    They didn't ask for the deleted emails.  As far as

6    I know, there may be a deleted email file --

7              THE COURT:  I'm following you.

8              MR. LAKE:  -- that they didn't ask for.

9    We don't know.  It's impossible for us to know,

10   because the only person who has access to that is

11   Mr. Zuckerberg, and Mr. Zuckerberg is not going to

12   give us anything unless --

13             THE COURT:  You're going to need to depose

14   him then.

15             MR. LAKE:  Absolutely.  We're going to

16   have to depose lots of people, because --

17             THE COURT:  That's not in your request

18   here.

19             MR. LAKE:  No.  Because --

20             THE COURT:  Because --

21             MR. LAKE:  Here's the way I would lay this

22   out.  First of all, we haven't had a Rule 26(f)

23   conference at all about --

24             THE COURT:  I haven't mentioned that.  I

25   thought I had ordered that --

1           MR. LAKE:  We had attempted -- Mr. Hall

2    and Mr. Vacco attempted to meet and confer with

3    Mr. Snyder on June 6th and 7th.  It was in

4    Mr. Hall's declaration.  There was a letter that he

5    received on June 7th summarily denying any

6    discussion of the evidence of this case, so --

7           THE COURT:  Well, that's not the point.

8    The point is both sides were under court order to

9    production proposed --

10           MR. LAKE:  Right.

11           THE COURT:  Rule 16(b) schedules.

12           MR. LAKE:  And they didn't do it.

13           THE COURT:  And I was not favored with

14    that.

15           MR. LAKE:  I know.  And I'm here to tell

16    you that I want to get this moving, and in order to

17    get to our 16(b) conference --

18           THE COURT:  We're at it.

19           MR. LAKE:  -- the first thing we need to

20    do is I think to have a 26(f) conference and

21    develop a protocol if necessary.

22           THE COURT:  Maybe, maybe not.

23           MR. LAKE:  In that regard by the way, your

24    Honor, I prepared an ESI, which is electronic

25    stored information, protocol.  This protocol has

1     been used widely throughout the United States.

2     It's very detailed.  It is different from Mr. Evans

3     and Mr. McGowan's, what they set forth in their

4     declaration.  If I had an opportunity, like you, I

5     will sit down with whoever needs to be present and

6     take all the time we need, if we're going to get to

7     the ESI portion of this, do it now before we get to

8     the Rule 16(b) conference so we can give you a

9     discovery schedule that is workable, that is fair,

10    that is mutual, and that will drive to the core

11    issue in this case, and that is whether or not

12    there is a contract or a deal between Ceglia and

13    Zuckerberg.  They say no.  We say yes.

14        There's only two ways that we can prove that.

15    Number one is the original contract it itself.  We

16    have it.  We're willing to provide it and allow

17    them to do whatever testing they want under a very

18    strict set of protocols.  Here's why.

19            THE COURT:  That's where -- under a very

20    strict set of protocols agreed to by the parties or

21    ordered by the Court?

22            MR. LAKE:  Well, I actually --

23            THE COURT:  I mean, well, we talked about

24    that with Mr. Snyder.  They said they have their

25    own protocol, don't worry about that, because

1    they're very good protocols.

2              MR. LAKE:  Right.

3              THE COURT:  And we run the risk that if we

4    don't do it right, the results of our reviews will

5    be struck down or nullified or excluded.

6              MR. LAKE:  Well, that -- what they're

7    asking you to do is trust, and trust their experts

8    that they're --

9              THE COURT:  As long as they don't destroy

10   the document, what's the harm in it?  Let them take

11   their --

12             MR. LAKE:  That's true for the original

13   document.  For the electronic information, I'm

14   highly suspect, because we know that Mr. Zuckerberg

15   and his team are the most capable people in the

16   world at manipulating electronic information, and I

17   have no distrust for counsel.  We met.  We spoke

18   yesterday.  It was amenable, professional.  I have

19   no trouble.  I have done an amazing amount of work

20   on Mark Zuckerberg, and all of the pleadings that

21   have been written so far have focused on the

22   character of Mr. Ceglia.  My predecessors have not

23   elected to go down that road as far as how these

24   two compare with their veracity.  So --

25             THE COURT:  So as -- if we do launch

1     accelerated discovery relative to authenticity, I

2     now have to review that document, or you have to

3     sit with Mr. Snyder and his colleagues and

4     review -- has he seen it?  Have you tendered it to

5     him before today, before this afternoon?

6              MR. LAKE:  No, I just finished it this

7     morning.

8              THE COURT:  Oh, okay.

9              MR. LAKE:  I've been working hard, but I

10    did have to sit on a plane for a few hours

11    yesterday.

12             THE COURT:  You're doing great.

13             MR. LAKE:  The other reason we have

14    concern, and this is again something that I did

15    since I've been in the case is the case of In Re:

16    Facebook PPC Advertising Litigation, which came out

17    of the United States District Court for the

18    Northern District of California in San Jose.  This

19    was a case that came out in -- just very recently

20    in December of 2010.  It was not a published

21    opinion.  But it has to do with the electronically

22    stored information that Facebook was involved with

23    in this case.  And the judge in that case, which

24    were Judge Howard Lloyd wrote this opinion.  They

25    talk about Rule 26(f) and what's called the Sedona

1   principles.  And the Sedona principles --

2           THE COURT:  I'm familiar with that.

3           MR. LAKE:  Okay.  Say that discovery --

4           THE COURT:  I can't recite them to you,

5   but I know what they are.

6           MR. LAKE:  I can paraphrase it for you.

7   It is that discovery is a party-driven process, not

8   a court-driven process.  They've taken the position

9   in this case that discovery is going to be a motion

10  practice, motion, motion, motion, motion, and that

11  they want to continue to do that.

12      I would submit that under the Facebook case,

13  because of the reasons that Judge Lloyd stated --

14  and I can give you a copy of this opinion if you

15  would like -- the parties should meet and confer.

16  We need to decide what we need to do first.  As you

17  know, there's been no discovery propounded in this

18  case at all.  We don't know what they want other

19  than they want original computers, which cause me

20  grave concern for a couple reasons.

21      One is they'll contain irrelevant, inadmissible

22  evidence, and two, there may be privileged and

23  attorney work product on those computers.  And I

24  have no faith that if I turn over a computer that

25  may have that information on it to my adversary in

1    this case of what could possibly happen.  I think

2    that was the reason that --

3              THE COURT:  No claw backs.

4              MR. LAKE:  Right.

5              THE COURT:  Well, technically that could

6    be required.

7              MR. LAKE:  Yeah.  We need to --

8              THE COURT:  But in the meantime, the

9    damage is partially done.

10             MR. LAKE:  It's done.  It's done.

11             THE COURT:  Because they've seen it.

12             MR. LAKE:  Right.  We can't have that.

13   What we need to do is find a way to get them what

14   they need to establish -- if I understand their

15   theory correctly the fraud occurred in 2009

16   or 2010.  I think that's what Mr. Snyder just said.

17   We're claiming that the contract, the negotiation,

18   the work that was done was done in 2003 and 2004

19   including -- and you asked a very pointed question

20   that I made a note of, that was what was

21   Mr. Zuckerberg doing for StreetFax and why?  And

22   the answer was he was programming, he was coding,

23   he was writing source.  The next question that I

24   was hoping you would ask, but I'm going to raise

25   that issue is, what happened to that coding and

1    that programming and all of that source material?

2              THE COURT:  I did ask that question.  He

3    delivered it to Mr. Ceglia.

4              MR. LAKE:  You know what else he did with

5    it?

6              THE COURT:  I did ask that question.  I

7    thought I did.

8              MR. LAKE:  You know what else --

9              THE COURT:  I meant to.

10             MR. LAKE:  That is one of the things he

11   did with it.  Guess what else he did with it?

12             THE COURT:  He delivered it.  Did he keep

13   a copy?

14             MR. LAKE:  He may have used it to build a

15   platform for Facebook.  If he did that, we're

16   entitled to discover that.

17             THE COURT:  Out of the Streetscape thing?

18             MR. LAKE:  If the information that was

19   being -- that was being derived by Mark Zuckerberg

20   at that time was used for Facebook, we have an

21   absolute right to know that, and we are entitled to

22   discover that.  Because that --

23             THE COURT:  Facebook is a derivative work

24   of Street Scape?

25             MR. SNYDER:  It may be.

1          THE COURT:  Maybe.

2          MR. LAKE:  It is not a very far leap at

3     all --

4          THE COURT:  But you have to --

5          MR. LAKE:  -- to know that.

6          THE COURT:  But your client has it.

7          MR. LAKE:  Yeah, we have it.

8          THE COURT:  So what is it that --

9          MR. LAKE:  How do we know what they used

10    at Facebook until we -- we don't have Facebook's

11    information.  We don't have their platform.  We

12    don't have the source coding that they used.

13          THE COURT:  You're saying that if you're

14    able to make a comparative of the original Facebook

15    code with the Street Scape code --

16          MR. LAKE:  StreetFax.

17          THE COURT:  StreetFax code that -- source

18    code, you would be able to see that it is, in fact,

19    a derivative, at least in part from it, is that

20    what your point is, and thus corroborating the

21    authenticity issue?

22          MR. LAKE:  You may see that, yes.  That's

23    an issue in this case.  Absolutely it is.

24          THE COURT:  Your former colleagues didn't

25    -- I mean your former counsel didn't raise that

1    point, but you are.

2            MR. LAKE:  No, they didn't, but I am.  The

3    other issue they didn't raise is the fact

4    Mr. Zuckerberg knew more people at Harvard that

5    were working on this project than just Mr. Ceglia.

6    We know that because we have emails --

7            THE COURT:  Working on which project?

8            MR. LAKE:  Both, the StreetFax project and

9    the Facebook project.  So there could have been

10   communication between Mr. Zuckerberg and all of

11   those other people that concerned, not only

12   StreetFax, but also concerned Facebook, because it

13   was being done at the same time.  And if it was the

14   same work that was being applied two different

15   places by multiple people, then limiting the scope

16   of discovery to 176 self-serving emails on the

17   Harvard server is far too narrow.

18           THE COURT:  But the thrust of their motion

19   and I think, again -- pardon me if I'm a little

20   confused at this point -- and your agreement with

21   it is that the scientists will determine

22   authenticity.  These other things you're talking

23   about are quite collateral?

24           MR. LAKE:  Right.  That's right.

25           THE COURT:  So why do I need to be

1    authorizing discovery about Facebook source code to

2    make this comparative on the possibility that

3    indeed one was derived from the other as arguable

4    corroboration of the authenticity of the contract?

5    But if the science can produce the definitive

6    answer, then whether or not it's derivative or not

7    is irrelevant?

8         MR. LAKE:  Which comes back to my original

9    point --

10         THE COURT:  Is that a fair question?

11         MR. LAKE:  It's a fair question.  I'll

12    give you the answer.

13         THE COURT:  Thank you.

14         MR. LAKE:  The answer is, as Mr. Snyder

15    pointed out, if there is something on the original

16    document that was not in existence in April

17    of 2003, the ink that was used has a chemical in it

18    that was not introduced into printing until 2010,

19    right, lights out, ball game, got it.  We don't

20    think that is going to be shown for the reason that

21    we believe in the veracity of Mr. Ceglia's story

22    and the authenticity of the contract.  So step one

23    is to make that determination.  If it is

24    dispositive, then I agree with Mr. Snyder.  They

25    should talk about having this case dismissed and

1    moving on.

2         I don't think you're going to find that.  I

3    think what you're going to find, and you've seen

4    this from the reports you've seen already, that the

5    paper, the ink, and everything else is consistent

6    with the timing of the negotiation and execution of

7    the contract.  I think they're going to concede

8    that, and they almost did today, although

9    Mr. Snyder hedged at the end by saying well, he's

10   not conceding that that's actually his signature on

11   the contract.  We're just conceding it's one that

12   looks like his.  Okay.  So, let's figure that out.

13        In order to do that, we're perfectly amenable

14   to have all the tests that are done.  Here's what

15   my fear is, and I think you can do this also under

16   Rule 26(c) and when you decide where it's done, how

17   it's done, who's present, all of those sorts of

18   things, that's why I believe DLA Piper asked for a

19   neutral to do that.  Because if we get a list of

20   tests, and the tests are -- we agree on who can do

21   the tests, then you can say, give me the original,

22   I'll give it to the expert, the expert can do all

23   the tests that you guys asked for.  He can give you

24   his independent conclusions, and if it's

25   dispositive, case over.

1        Then comes to your next question.  What if it's

2    not?  Are you going to file a summary judgment,

3    because you're not going to win a summary judgment

4    because there's going to be a question of fact.

5    Well, our experts are going to be certain.  They're

6    not going to change their minds -- we just heard

7    that -- no matter what the testing.  If that's the

8    case, why allow them to test the contract at all?

9               THE COURT:  I asked him that question.

10              MR. LAKE:  And he said, well, no that's

11   not exactly true.  We really would like to see if

12   there's more.  Okay.  Fine.  Let's do that first.

13   Let's do it now.  But let's make sure it's fair.

14       I was going to ask to do the same thing for

15   their contract, but now I don't need to because

16   theirs doesn't exist.  That's step one.  Because if

17   they're right, and this contract is conclusively

18   fraudulent, if it is dispositive of this case,

19   there's no need to take the second step.  The case

20   is over.  We all go home.

21              THE COURT:  You would concede?  You would

22   concede?

23              MR. LAKE:  If it is unequivocal, yes.

24              THE COURT:  You would withdraw, because --

25              MR. LAKE:  I would have to.  I don't want

1   to partake in a fraud on the Court.

2            THE COURT:  Well, if you would --

3            MR. LAKE:  That's not why I'm here.

4            THE COURT:  But the point is that the

5   case, for all practical purposes, somehow somewhere

6   under the inherit power analysis would go away.

7   Okay.

8            MR. LAKE:  How am I going to defeat that?

9   If all the experts agree that the paper that it was

10  written on was 2010 paper, yeah, case is over.

11  What I think you're going to see though is you're

12  going to have their experts that are going to be

13  unwilling to move from their position no matter

14  what evidence they see.  And you're going to see

15  our experts who are going to give their fair and

16  accurate assessment and give their opinions.

17       An issue was raised actually today about that

18  and say how come plaintiff's experts haven't come

19  out and conclusively stated their position?  And

20  the answer is twofold.  Number one, they haven't

21  been deposed yet, so it's not required.  And number

22  two, because they haven't concluded their testing,

23  because we have not been willing to do anything to

24  jeopardize the integrity of the original agreement

25  without permission of the Court, because we don't

 1    want to be accused of manipulating the data or the

 2    evidence.

 3              THE COURT:  I understand.

 4              MR. LAKE:  So how can they give a final

 5    opinion until they finish their investigation?

 6    That needs to be done first.  I would submit to you

 7    today that's as far as we go.  We sit down, we

 8    figure out what we're going to do with that

 9    document so it's fair.  Once that's done --

10              THE COURT:  And is that something you can

11    do today while you're here, or do we --

12              MR. LAKE:  Your Honor, I travel great

13    distance.  I'm planning on spending a lot of time

14    here.  I can do it today, tomorrow, Saturday.

15    Fourth of July it would be tough, but I'm even

16    willing to do that.

17        Then we come to the second step if that is

18    inconclusive.  Because I don't think that either

19    party will prevail on a summary judgment unless

20    it's absolutely clean cut, which means that if

21    we're going to go to the authenticity issue, we

22    need to have a bifurcated trial.  We need to cut

23    this down and not talk about all of the

24    discovery -- this is one of their fears, time,

25    delay, expense, litigating and discovering issues

1   beyond authenticity until that question is solved.

2   And I don't disagree with that.  I don't think we

3   need to be talking about the legal ramifications of

4   the contract until we have a trier of fact, I would

5   submit a jury, to tell us if the contract is real

6   or not.

7            THE COURT:  We're getting ahead of

8   ourselves.  So far, if you're -- it sounds to me

9   like you're in basic agreement with Mr. Snyder,

10   which is that the science -- I'll use that -- or

11   the scientists, the experts, can give us a

12   definitive answer on authenticity --

13            MR. LAKE:  I won't go that far, because I

14   don't know.  I'm not an expert in this field.  I

15   know they've retained great experts.  We've

16   retained great experts.  And I think --

17            THE COURT:  Now I lost you.  I thought --

18   I thought you just said that that's exactly what

19   they will do.

20            MR. LAKE:  No.  Here's what they're going

21   to say.  Here's what I think they're going to say.

22            THE COURT:  Oh, I know what -- I misspoke.

23   You're taking my use of the word authenticity as

24   more of a verb form perhaps than a noun.  Whether

25   it's authentic or not, the experts will attempt to

1    give us an opinion.  They will either agree or

2    disagree, and the methodology they will use is, for

3    want of a better term, and scientific, if you will,

4    Daubert qualified, scientific, reliable, accepted

5    within the field, methodology for making such

6    tests.  Do you agree with that?

7              MR. LAKE:  I agree with that.

8              THE COURT:  Thank you.  Now here's my

9    point in the interest of time.

10             MR. LAKE:  Okay.

11             THE COURT:  Therefore, except arguably for

12   the issue of handwriting samples, including

13   initialing samples, none of the other requests that

14   the plaintiff has proffered for which mutual

15   accelerated discovery should be granted would be

16   pertinent.  Do you agree?

17             MR. LAKE:  Not for the original document

18   itself, no.

19             THE COURT:  Exactly.  So -- so that's what

20   I'm trying to get to.  If we're in agreement that

21   we need to attack the authenticity issue, then we

22   need to attack it primarily on the basis of

23   scientific methodology.  And the only one of these

24   numerous mutual discovery requests that are

25   proffered here that seem arguably reasonably could

1    bear on that question is the issue of his

2    initialing, right?

3              MR. LAKE:  Yes.

4              THE COURT:  Thank you.  So if I overruled

5    the request for serial accelerated discovery, but

6    grant it to the extent -- but grant your request

7    for mutual discovery, it would only be limited to

8    the handwriting samples.

9              MR. LAKE:  If we're talking about the

10   original document only.  If we go beyond that --

11             THE COURT:  I think that's all we're

12   talking about here.

13             MR. LAKE:  No.  They have also asked for

14   all our computers.

15             THE COURT:  Oh, the computers.

16             MR. LAKE:  And what I'm saying is we can't

17   get to that until we solve the first problem.

18   Because if that's -- here's what's going to happen.

19             THE COURT:  So your point is we only need

20   to attack the authenticity of the contract.  We

21   don't even have to get into the computers or the

22   emails right now.

23             MR. LAKE:  No.  What we do is we sit down

24   with them and do a 26(f) conference, take a look at

25   my protocol together without the Court, following

1    the Sedona principles, and if it turns out not to

2    be dispositive on the original document, we come

3    back to you with a 26(f) conference and a 16(b)

4    hearing, and then we go after the emails and the

5    electronic ESI -- electronically stored information

6    portion of the case, because that's the

7    corroborating evidence to the original contract.

8    If it's unconclusive or inconclusive --

9              THE COURT:  Inconclusive, right.

10             MR. LAKE:   -- then that's the next step.

11             THE COURT:  But if their experts conclude

12    it's an authentic document, we don't need to look

13    at the computer or the email.

14             MR. LAKE:  That's right.  Now we talk

15    about the legality of their agreement.  What is --

16    what if --

17             THE COURT:  Then we talk about whether or

18    not there's a cause of action for this -- I wanted

19    to ask him about it but I didn't in the interest of

20    time -- whether or not there's actually -- excuse

21    me, your cause of action, whether or not the

22    defendants are going to make a motion, which they

23    obviously don't want to do until this authenticity

24    issue is resolved, for failure to state a claim or

25    statute of limitations issues.

1        MR. LAKE:  That's right.  And that's

2   another legal issue that should be postponed.

3        THE COURT:  Because, frankly, I'm not so

4   clear whether or not this complaint states a cause

5   of action under your partnership theory.  I mean --

6        MR. LAKE:  I can tell you in the last 48

7   hours I have not briefed that issue, your Honor.

8        THE COURT:  Oh, I didn't expect you to.

9   But you remember your basic partnership law, you

10  have to have intent, you have to have conduct

11  consistent, you have to have joint operation, all

12  the usual common law indicia of partnership, none

13  of which are alleged in your complaint.  I don't

14  understand why it's not just a breach of contract

15  action I guess is what I'm saying, but that's for

16  another discussion I suppose.

17       MR. LAKE:  Like I said, your Honor, I

18  haven't drafted any of these pleadings.

19       THE COURT:  I know.  And we may still have

20  a second amended complaint because we're still

21  early here perhaps.  But, all right.  Thank you.

22       MR. LAKE:  In the interest of time here's

23  what I would respectfully request.

24       THE COURT:  Okay.

25       MR. LAKE:  That their request for

1  expedited discovery be rejected other than a

2  protocol for the original contract itself.

3           THE COURT:  Okay.

4           MR. LAKE:  And that upon the conclusion of

5  that testing that, if necessary, we conduct our

6  16(b) hearing --

7           THE COURT:  Well, further discovery.

8  We're conducting the 16(b).  We're doing both.

9           MR. LAKE:  Okay.  Great.  And in the

10  meantime we work on an electronically stored

11  information discovery protocol, and if we get to

12  the issue of --

13           THE COURT:  Which would only be necessary

14  if -- if the results are inconclusive.

15           MR. LAKE:  Correct.

16           THE COURT:  In the sense that we have

17  dueling experts.

18           MR. LAKE:  Correct.  And with that

19  discovery, we -- if you would like, I have no

20  problem with this either, we just focus again on

21  the corroboration of the authenticity issue as

22  opposed to --

23           THE COURT:  That would get into your other

24  requests.

25           MR. LAKE:  That's right.  So now we can

1    talk about what do we get -- because we want their

2    computers, we want their email.  We want all the

3    things they want from us.

4              THE COURT:  I follow you.

5              MR. LAKE:  As long as it's good for them

6    and it's good for us, then it's good for me.  And

7    that's what I would propose.

8              THE COURT:  So we don't need -- you don't

9    see us moving forward at this time with any paper

10   discovery other than a protocol sort of -- not even

11   discovery, it's just protocol.

12             MR. LAKE:  I think we should put together

13   a list of the witnesses that we intend to call when

14   it comes to testifying about the original document,

15   our experts, of course.  We put together a list of

16   witnesses --

17             THE COURT:  We're ahead of ourselves.

18             MR. LAKE:  Yeah, that were involved with

19   this.

20             THE COURT:  That will only be necessary if

21   the -- if we have contradicting opinions --

22             MR. LAKE:  Right.

23             THE COURT:  -- on authenticity.

24             MR. LAKE:  But I think as lawyers we

25   should be doing that with the anticipation --

1          THE COURT:  Well, I was hoping you were

2     going to do it, but I can see now, upon further

3     review, thank you very much for taking the time,

4     that the authenticity issue is tightly related to

5     the science, and the science can go forward, and

6     how it turns out is a question of time, and we'll

7     see.

8          MR. LAKE:  Right.  The only thing I do not

9     want to do is leave the contract in their hands

10    alone.

11         THE COURT:  The contract.

12         MR. LAKE:  The original document.

13         THE COURT:  Well, you know, that's a good

14    question.  That gets back to this independent

15    expert idea.

16         MR. LAKE:  Right.  We can have all our

17    experts there.  I'm not saying preclude them from

18    having their experts submit what they want.

19         THE COURT:  Why can't you observe the

20    proceeding?

21         MR. LAKE:  That's what I mean.  If our

22    experts are there, their experts are there, and

23    somebody's doing it, and we're all there together,

24    and it's being documented and where everybody is --

25         THE COURT:  That's what I meant by a

1     protocol.

2               MR. LAKE:  Yeah.  Right.

3               THE COURT:  Well, then --

4               MR. LAKE:  But their proposed protocol I

5     think was --

6               THE COURT:  If we did that, then the Court

7     doesn't need to designate its own expert.  We could

8     just let them designate their experts, and your

9     people go out to -- what's the name of that Franz

10    company there?

11              MR. SNYDER:  Stroz Friedberg.  Your Honor,

12    we'd even be willing to come to a designated

13    location that the plaintiff suggests in Buffalo or

14    the environs, and our experts would go wherever the

15    contract is, and they need a couple of days, and

16    whoever wants to watch to their heart's content is

17    fine with us.

18              UNIDENTIFIED VOICE:  Your Honor, we have

19    an office in Ithaca, which is close to where

20    supposedly this document is located.  We can

21    accommodate the plaintiff.  He doesn't want it to

22    leave that county, we're just one county over.

23              MR. LAKE:  That's great, and they can take

24    their samples.  They can do what they want to do.

25    I just don't want to walk down this road later and

1    have them say this contract is -- there's something

2    wrong with it, because it's been changed.  There is

3    a hole in it or there's something that is on here

4    now, and we say wait, it's because --

5              THE COURT:  You can photograph it.  You

6    can preserve its integrity by having a legal

7    photographer take a picture of the thing.  You can

8    have a -- I don't know, sort of an escrow agent

9    observe the proceedings --

10             MR. LAKE:  Exactly.

11             THE COURT:  -- I suppose and file an

12   affidavit that based on his or her observations the

13   protocol was satisfied, the document was not

14   tampered with, and that person escorts somebody,

15   the custodian, perhaps the plaintiff himself, back

16   to the safe deposit box and observe that it's put

17   back under lock and key.

18             MR. LAKE:  That's right.

19             UNIDENTIFIED VOICE:  Your Honor, we have

20   an expert from RIT (indiscernible).

21             THE COURT:  Well, given the importance of

22   this document, I'm starting to become a little

23   concerned about the security aspects of this whole

24   thing.

25             MR. LAKE:  Believe me, me too.

1          THE COURT:  Well, I mean, there's a lot at

2     stake here.

3          MR. LAKE:  Yes.  That's an understatement.

4     We're not talking about just money.  We're talking

5     about potential criminal repercussions, so this

6     document is very, very important to us.  And to

7     maintain its integrity is equally important.  We're

8     not trying to hide it.  We're willing to share it

9     so we can get to the bottom of it.

10          THE COURT:  I know, but we don't want any

11     tampering.  We don't want any loss.

12          MR. LAKE:  It's not that I distrust the

13     lawyers or anyone.  It's just -- I just distrust

14     everyone.

15          THE COURT:  No, no, it's not a matter of

16     distrust.  It's just a matter of reality.  We've

17     got to be concerned about the security aspects of

18     this thing, and I'll make no comment on whether the

19     security arrangements that have been made are

20     adequate.  I don't know.  I mean, one could make

21     the argument --

22          MR. LAKE:  We're doing the best we can.

23     That's why it's been saved.

24          THE COURT:  Well, there are other ways to

25     secure something.  There are commercial security

1   agencies that are -- probably have higher levels of

2   security than a bank safe deposit boxes.

3           MR. LAKE:  That's a good point.  Now

4   you're scaring me.

5           THE COURT:  Didn't mean to.

6           MR. LAKE:  The point is this.

7           THE COURT:  I don't think I could scare

8   you, you're pretty big.

9           MR. LAKE:  I'm not that scared.

10          THE COURT:  I would be concerned.  You've

11  got these fantastic movies with all this apparatus,

12  Tom Cruise comes down like a spiderman and --

13          MR. LAKE:  Right, exactly.

14          THE COURT:  So we don't --

15          MR. LAKE:  That's why Mr. Snyder and I

16  could sit down, talk about how much time we have to

17  do it, where we want to do it, what test they want,

18  who's going to be there.

19          THE COURT:  I'm following you fine.

20          MR. LAKE:  We can start doing that today,

21  tomorrow --

22          THE COURT:  Thank you.

23          MR. LAKE:  I would ask you one thing just

24  as far as timing goes.

25          THE COURT:  Yes.

1          MR. LAKE:  Mr. Argentieri is not here

2    today, as you know.  It's okay for me to be here.

3    He's on the west coast.  He returns on July 12th.

4          THE COURT:  Didn't fully expect him to be

5    here.  Would have liked to have met him.

6          MR. LAKE:  Here's the reason I mentioned

7    that.

8          THE COURT:  He's on the west coast, you're

9    on the east coast.

10          MR. LAKE:  I know.  It's funny how things

11   work out.  Mr. Argentieri has access to the

12   document, and therefore -- unless he makes a

13   special trip back, then I would respectfully

14   request that whatever --

15          THE COURT:  He's the only one that has

16   access?  He's the owner of the box, is that it?

17          MR. LAKE:  That's my understanding, yes.

18   His client at the time --

19          THE COURT:  Well, as a practical matter,

20   we're not ready to start testing this afternoon or

21   tomorrow, are we, Mr. Snyder?

22          MR. SNYDER:  We're ready to test as soon

23   as the document can be made available for testing.

24          MR. LAKE:  Right.

25          THE COURT:  Really?

1          MR. SNYDER:  Yes.

2          THE COURT:  When will Mr. Argentieri --

3          MR. LAKE:  July 12th.

4          THE COURT:  July 12th.

5          MR. LAKE:  Right.  That's a week -- or

6     it's a week and a half.

7          THE COURT:  Well, I don't know.  He may

8     have to make a special trip, sorry to say.

9          MR. LAKE:  Well --

10         THE COURT:  I mean, it's a --

11         MR. LAKE:  It's not that --

12         THE COURT:  It's a twist.

13         MR. LAKE:  I'm bringing it to the Court's

14    attention.  I don't want anyone to be surprised.

15         THE COURT:  Well, thank you.  That's why

16    we're here.  Thank you.  I appreciate it.

17         MR. LAKE:  He's there.  If he doesn't have

18    to make a special trip --

19         THE COURT:  Well, he may have to.

20         MR. LAKE:  I would say let's make a list

21    of timing and see what we can do and get it done.

22         MR. SNYDER:  Your Honor, may I be heard

23    briefly?

24         THE COURT:  Yes, I just want to finish up

25    with Mr. Lake.

1          MR. SNYDER:  I'm sorry.

2          THE COURT:  So you and I are in agreement

3    that if I -- that I can grant this motion limited

4    to the document and allow limited mutual discovery

5    pertinent -- pertaining to handwriting and

6    initialing samples --

7          MR. LAKE:  Correct.

8          THE COURT:  -- during the relevant period.

9          MR. LAKE:  Yes.

10          THE COURT:  From the relevant period, if

11    they're available, and again we don't know.

12          MR. LAKE:  That's true.  If they're not,

13    then I would like a good explanation for that, but

14    I would imagine they are.

15          THE COURT:  Now on these emails with

16    Mr. Zuckerberg's access to them at Harvard, how do

17    we secure those going --

18          MR. LAKE:  We put a litigation hold.  We

19    sent that to Harvard so that they wouldn't be

20    touched.

21          THE COURT:  Oh, are they compliant with

22    that now?

23          MR. LAKE:  Don't know.

24          THE COURT:  Do they have the ability to

25    comply with it?

 1          MR. LAKE:  The only person who can do

 2     anything with those emails is Mr. Zuckerberg.  He's

 3     the only one that has access to that account.

 4          THE COURT:  So a hold to Harvard doesn't

 5     do anything, because technically they can't --

 6          MR. LAKE:  Well, they're not going to shut

 7     down his account, and they're not going to delete

 8     all the emails.

 9          THE COURT:  Say that again, they're not

10     going to shut his account, but they're -- how could

11     they prevent Mr. Zuckerberg from doing anything

12     adverse?

13          MR. LAKE:  They can't.

14          THE COURT:  That's the point I'm getting

15     at.

16          MR. LAKE:  If Mr. Zuckerberg does, it goes

17     back to my point, and that is they're giving us all

18     the things that serve their case, but we have no

19     idea what he's deleted, and we can't know that.

20     It's impossible for us to know, because we can't

21     get access to that.

22          THE COURT:  Thank you.

23          MR. LAKE:  Yes.

24          THE COURT:  Mr. Snyder, rebuttal?

25          MR. SNYDER:  Your Honor, could we take a

1    bathroom break?

2              THE COURT:  Sure.  You want me to wait

3    here while you --

4              (Short recess was taken.)

5              THE COURT:  Okay.  Mr. Snyder, you heard

6    the other side, and you can see what the Court's

7    interested in possibly doing here, and that is

8    granting and denying the motion in part limited to

9    the inspection testing of the alleged original

10   contract.

11             MR. SNYDER:  Yes, your Honor.

12             THE COURT:  Subject to some kind of a

13   protocol which you'd have to stay this -- you know,

14   meet and confer, if you will, on the protocol if

15   you still -- if that's -- if you agree with that.

16   If not, then tell me why not.  Subject to the

17   security issue, I'll call it the security issue, of

18   the document, and granting very limited mutual

19   discovery relating to handwriting samples slash

20   initial samples from Mr. Zuckerberg.  And I am

21   concerned about these -- the integrity of those

22   Harvard emails.

23             MR. SNYDER:  Let me address that directly.

24             THE COURT:  If you can address that too,

25   and then also -- and maybe you can address this

1    right up front is that if the conclusions of the

2    experts are in equipoise, in other words if they're

3    not -- if the plaintiff's experts don't effectively

4    concur with -- substantially concur with the

5    defendant's experts, who will presumably in this

6    hypothetical -- it's a hypothetical -- will find

7    that the document is not authentic, that you would

8    precind (sic) from a motion to dismiss based on

9    fraud, or you would push ahead?

10            MR. SNYDER:  Shall I answer that one?

11            THE COURT:  Yes, answer that one first.

12            MR. SNYDER:  Your Honor --

13            THE COURT:  Maybe it's not a fair

14    question, because it's a possibility you hadn't

15    thought of.

16            MR. SNYDER:  No, it's a fair question.  If

17    our expert -- if our experts conclude that the

18    contract and the emails -- because I want to

19    address the critical omission in Mr. Lake's

20    presentation.  He's running a million miles away

21    from those bogus emails.  And the fraud in this

22    case that is represented by those emails is as

23    serious, and we need to test that as well.

24            THE COURT:  We do, but only if the

25    document -- if the document is unauthentic, you

1    don't need to look at the emails, do you?

2            MR. SNYDER:  With all due respect I

3    strenuously disagree --

4            THE COURT:  Why?  I don't get it.

5            MR. SNYDER:  -- for the following reason.

6    In the event that the forensic tests, because he

7    has done the fraud well enough to avoid scientific

8    detection, in the event that he's done that, but

9    the emails turn out to be demonstrably

10   scientifically fraudulent, concocted this year for

11   the amended complaint, the case would still be

12   dismissed summarily under the Court's inherent

13   power.

14           THE COURT:  Oh, I see.

15           MR. SNYDER:  Yes, your Honor.  And so it

16   is critical to our motion --

17           THE COURT:  So even if he actually has --

18   there is this agreement for -- to establish a

19   purported partnership in Facebook, or a contract

20   wherein, as a result of this modest funding of

21   Mr. Zuckerberg's efforts collateral to the Street

22   Scape project, Mr. Zuckerberg wisely or unwisely

23   inked in a provision or signed a document that a

24   court conceivably -- a jury could conceivably find

25   was a contract for 50 percent ownership in this --

1    in this now successful company, you would say that

2    if he concocted the emails, which he then arguably

3    didn't have to do, but if he did, the case would be

4    dismissed.

5           MR. SNYDER:  The premise of the question I

6    disagree with.

7           THE COURT:  Is that your point?

8           MR. SNYDER:  The premise of the question I

9    disagree with, your Honor.

10          THE COURT:  Okay.

11          MR. SNYDER:  There is no legitimate,

12   authentic contract that Mark Zuckerberg ever signed

13   in his entire life, much less in 2003, with this

14   plaintiff concerning Facebook.  There's no question

15   on this earth that he never signed a contract with

16   Paul Ceglia that had anything to do with Facebook,

17   period.  If, however, when he manufactured,

18   doctored, cut and paste a bogus document to make it

19   appear as if this was a Facebook contract, and if

20   this fraud is such that it will evade scientific

21   detection at this early stage of the litigation, if

22   he did that, but then concocted bogus emails, which

23   he did --

24          THE COURT:  Which were scientifically

25   detected.

1              MR. SNYDER:  Correct.  That's -- to use

2      Mr. Lake's phrase -- lights out.  It doesn't mean

3      the contract is authentic.  The contract is a fraud

4      whether we prove it scientifically or otherwise.

5      But if he concocted emails to bolster, support --

6              THE COURT:  By inductive reasoning.

7      Fraudulent emails, therefore fraudulent contract.

8              MR. SNYDER:  Fraudulent emails, therefore

9      case over, because he's committing a fraud on the

10     court.

11             THE COURT:  That's my point.

12             MR. SNYDER:  Yes, but there never was --

13     yes, but there never was -- the premise of your

14     question was, your Honor, even if Mr. Zuckerberg

15     inadvertently or improvantly signed, he never did

16     sign anything with this man relating to Facebook

17     ever.  And there is no question on earth about

18     that.  Mr. Zuckerberg is as certain of that as he

19     is as certain of anything.  However --

20             THE COURT:  If your experts -- if your

21     experts determine that indeed the contract is

22     authentic and Mr. Zuckerberg, whether wisely or

23     unwisely, put his initials on that first page, you

24     would argue that if the subsequent downstream

25     emails that were created by the plaintiff for

1    whatever reasons, thinking he needed to bolster his

2    position, and he unwisely concocted and fabricated

3    emails in conjunction with this lawsuit, then even

4    if he had a winning hand, he lost it by virtue of

5    the concoction of the subsequent emails, that's

6    your point.

7              MR. SNYDER:  On that hypothetical, which

8    is fact --

9              THE COURT:  That's all I was asking you.

10             MR. SNYDER:  On that hypothetical, which

11   is factually not supportable.  It doesn't --

12             THE COURT:  We don't know yet.

13             MR. SNYDER:  Well, we know.  And

14   Mr. Zuckerberg has sworn to this Court.

15             THE COURT:  I don't.  And neither do your

16   experts, because they haven't seen the original.

17             MR. SNYDER:  Our experts have seen a copy,

18   and that was enough for them to conclude that it

19   was an amateurish forgery.

20             THE COURT:  Well, then we don't need to

21   test the original.

22             MR. SNYDER:  We do need to test the

23   originals.

24             THE COURT:  Well, there you go.

25             MR. SNYDER:  Your Honor, Mr. Lake is --

1          THE COURT:  You get my point?

2          MR. SNYDER:  Yes.  The emails are critical

3     to his complaint.  The emails are fraudulent, and

4     it would be -- we submit it would be fundamentally

5     unfair for him to avoid forensic testing of the

6     instruments of his fraud which contributed to the

7     amended complaint.

8          THE COURT:  You want to do both.

9          MR. SNYDER:  It is fundamental to our

10    motion that we do both.

11         THE COURT:  Is there any possibility of

12    spoliation as to these emails?

13         MR. SNYDER:  None.

14         THE COURT:  They've already been stored,

15    haven't they?

16         MR. SNYDER:  Belt and suspenders.  Harvard

17    University is --

18         THE COURT:  No, no.  I'm talking about his

19    emails.  The ones that you want to test.  Haven't

20    they all been lodged with a document security

21    expert or somebody?

22         MR. SNYDER:  Mr. Ceglia and his experts

23    have identified a number of computer files and hard

24    drives and the like which contain instruments of

25    his fraud, and we want and have asked this Court to

1    direct --

2              THE COURT:  I thought they had all been

3    turned over is my point.

4              MR. SNYDER:  They're being held by their

5    expert.

6              THE COURT:  That's right.  So is there any

7    realistic possibility of Mr. Ceglia getting at them

8    to destroy them, to destroy evidence basically?

9              MR. SNYDER:  The ones he's turned over to

10   the expert I think are in safe hands with the

11   expert.

12             THE COURT:  That's my point.

13             MR. SNYDER:  Whether there are others that

14   he hasn't turned over, we know at a minimum his

15   parents' computer has not been turned over, and he

16   has told the press --

17             THE COURT:  He turned over his alleged

18   computer.

19             MR. SNYDER:  He has turned over a variety

20   of electronic media which he's identified.

21             THE COURT:  I thought your point is he

22   turned over his computer, but not the one in his

23   parents' home.

24             MR. SNYDER:  What he's turned over is 169

25   floppy discs, 1,075 CDs, one laptop computer, and

1     the associated hard drive, and an image of a second

2     hard drive.

3             THE COURT:  The only hardware that we're

4     not accounting for is the one that he acknowledges

5     is lodged with his parents and may contain relevant

6     information.

7             MR. SNYDER:  Yes, unless one of these

8     images of a second hard drive is that parents'

9     computer, we do not know.  It is fundamental to our

10    motion and fairness that we be entitled now, at the

11    same time we test the original document in the safe

12    deposit box, that we are able to forensically test

13    the computers and electronic media in his

14    possession, custody and control, because there are

15    tests that can be done that we believe can identify

16    and establish that these emails are bogus, that

17    they don't -- that these Word documents rather is

18    bogus.

19            THE COURT:  But you agree that if their

20    experts throw in the towel in effect and say this

21    is an unauthentic document as Mr. Lake

22    acknowledges, for example, that the ink or the

23    paper is post 2003, 2004, you would stop there.

24    You would say, Judge, Mr. Lake would stop there

25    too.

1            MR. SNYDER:  No, your Honor.  I think with

2    all due respect both for creating the full

3    record --

4            THE COURT:  Yes.

5            MR. SNYDER:  -- here --

6            THE COURT:  Yes.

7            MR. SNYDER:  -- it is fundamentally

8    important, critical, that the electronic testing of

9    the computer files and electronic media occur.  For

10   example, what software --

11           THE COURT:  Simultaneously with the

12   document.

13           MR. SNYDER:  Simultaneously.  What

14   software was used to create the documents?  Did it

15   exist in 2003?

16           THE COURT:  Yeah.

17           MR. SNYDER:  What's the manufacture dates

18   of the media?  Did they exist in 2003?

19           THE COURT:  I can understand all these,

20   sure.

21           MR. SNYDER:  And then critically there is

22   metadata analysis that might be able to be done on

23   this floppy disc.  Unfortunately, the emails aren't

24   on a server.  If they were on an actual server the

25   way Mr. Zuckerberg's emails are on a server --

1              THE COURT:  Somebody could get at them.

2              MR. SNYDER:  The metadata would be much

3      more plentiful.

4              THE COURT:  Accessible.

5              MR. SNYDER:  And accessible.  But there

6      may be metadata on these floppy discs on which

7      these Word documents reside on which he cut and

8      paste emails --

9              THE COURT:  I'm sure that -- I understand

10     exactly what you're getting at.

11             MR. SNYDER:  And that's not going to --

12             THE COURT:  I guess it's just a matter

13     of -- I'm trying to be practical and expeditious

14     here at this point.  If we don't have to do

15     something, why do it.

16             MR. SNYDER:  We critically have to do it.

17     And I think the email forensic testing is as

18     important, as important, as testing of the

19     contract.  And we would be deprived the

20     opportunity, because we've established more than a

21     prima facie case.  Your Honor, we've submitted

22     expert affidavit after expert affidavit --

23             THE COURT:  I know.  I know.

24             MR. SNYDER:  -- on this point.

25             THE COURT:  Relax for a second.  So the

1    only piece of hardware I have to be concerned about

2    if I agree with you that you ought to be permitted

3    to do what you just wanted to do that you don't

4    have access -- that isn't accounted for -- I'll use

5    that term loosely -- is the computer that's sitting

6    in the parents' home?

7                MR. SNYDER:  I would say that Mr. Ceglia

8    should be directed that any -- anything -- any

9    computer or electronic media in his possession,

10   custody, or control be made available, because we

11   need to be sure that --

12               THE COURT:  There could be others?

13               MR. SNYDER:  There could be others, and so

14   that he's subject to this Court's order, and we

15   know he's acted responsibly.

16               THE COURT:  How do we know that he's

17   turning over everything that's out there?

18               MR. SNYDER:  We don't.

19               THE COURT:  We don't.

20               MR. SNYDER:  But the emails are critical

21   to his so-called partnership counts.

22               THE COURT:  Did he say exactly for sure

23   that there are relevant emails in the computer at

24   the parents' home?

25               MR. SNYDER:  Yes.  May I approach, your

1   Honor?  I can show you the article.

2          THE COURT:  Oh, it's in the -- is it in

3   your papers.

4          MR. SNYDER:  It's in our papers, but I can

5   show your Honor the article.

6          THE COURT:  I remember, but I don't think

7   I can get at it that quickly.

8          MR. LAKE:  The quote's actually by Mr.

9   Brownly.

10         THE COURT:  Sorry.  I heard somebody

11  speak.  Mr. Lake, was that you?

12         MR. LAKE:  I haven't seen what he's showed

13  you, but I think he's showing you a Wellsville news

14  article in which Mr. Brownly spoke, not Mr. Ceglia.

15         MR. SNYDER:  Ceglia told the Daily

16  reporter the computers that the emails were on were

17  at his parents' house.

18         THE COURT:  Yes, it's hearsay.

19         MR. LAKE:  It doesn't say it's his

20  parents' computer.

21         THE COURT:  I didn't mean to suggest that

22  it was his parents' computer.  I had the impression

23  it was his computer that happened to be at his

24  parents' home.

25         MR. LAKE:  Right.  I think Mr. Snyder's

1    request was for Mr. Ceglia's --

2              THE COURT:  I understood it that way.

3              MR. LAKE:  I think he's requesting

4    Mr. Ceglia's parents' computer though.

5              THE COURT:  Oh, I'm sorry.  Thank you.

6              MR. LAKE:  That's what I think the --

7              THE COURT:  You want them all, is that it?

8              MR. SNYDER:  Any computer in his

9    possession, custody, control over which he has

10   dominion we believe should be subject to the order.

11   In addition to --

12             THE COURT:  We're talking about a lot of

13   ground here.  We really are -- you're talking about

14   any computers to which he had access.  It could be

15   computers at the public library.

16             MR. SNYDER:  Possession, custody, or

17   control.

18             THE COURT:  Well, I don't know that he has

19   custody, possession, or control over a computer

20   that belongs to his parents.

21             MR. SNYDER:  If he used that computer to

22   create these emails according to him, we should

23   have access to that computer.  That's the

24   limiting --

25             THE COURT:  I don't want to quibble with

1    you, but it doesn't sound like custody, possession,

2    or control.  You know, such limited access, is it

3    really possession at that point?  We could argue

4    about it.

5              MR. SNYDER:  In any event, your Honor --

6              THE COURT:  I understand the point.  I

7    understand your point.  You're trying to sweep as

8    broadly as you can.

9              MR. SNYDER:  But to not test the

10   electronic media and computers which contain the

11   instruments of his fraud --

12             THE COURT:  Let's just call it the

13   electronic evidence.

14             MR. SNYDER:  The electronic evidence.

15             THE COURT:  Thank you.

16             MR. SNYDER:  And we have made more than a

17   prima facie showing of an entitlement to expedited

18   target of discovery there, which can be done in a

19   way that is --

20             THE COURT:  How about timing.  Different

21   experts working on the electronic evidence versus

22   the hard copy evidence?

23             MR. SNYDER:  We can do everything in 30

24   days.

25             THE COURT:  Well --

1          MR. SNYDER:  Upon receipt of the -- of the

2     evidence.

3          THE COURT:  One doesn't depend on the

4     other?

5          MR. SNYDER:  No.  The contract can be done

6     in two days, and they can observe it, they can

7     photograph it, they can take notes, they can have

8     witnesses.

9          THE COURT:  How are we going to do that in

10    a way that preserves the integrity of the document

11    that's satisfactory to plaintiff as well?

12         MR. SNYDER:  Your Honor, I don't think

13    there's any question --

14         THE COURT:  Do you need to sit down --

15         MR. SNYDER:  No.

16         THE COURT:  -- over dinner tonight --

17         MR. SNYDER:  No.

18         THE COURT:  -- at Rue Franklin or wherever

19    and get this hammered down?

20         MR. SNYDER:  No, your Honor.

21         THE COURT:  No.

22         MR. SNYDER:  Because the testing that is

23    done, ink extractions, toner extractions, paper

24    extractions are accepted forensic techniques --

25         THE COURT:  I'm sure they are.

1          MR. SNYDER:  -- that don't destroy the

2    integrity of the document at all.

3          THE COURT:  But I'm just saying, how long

4    does it take?  Okay.

5          MR. SNYDER:  And will take a matter of a

6    day, at most two, all of our document experts.

7          THE COURT:  But you agree he can send a

8    representative?

9          MR. SNYDER:  We welcome a representative.

10          THE COURT:  That's my point.  Don't we

11    need to set that forth in writing so it's

12    stipulated and --

13          MR. SNYDER:  What I would say --

14          THE COURT:  I can approve it or something.

15          MR. SNYDER:  What I would say is the Court

16    should order on or before July 8th the document be

17    made available at a designated location, whether

18    it's RIT, or whether our offices in Ithaca, or a

19    well-lit conference room at the bank, at which time

20    our experts will have a two-day period between the

21    hours of 9:00 a.m. and 5:00 p.m. with a one-hour

22    lunch break --

23          THE COURT:  They could conduct this

24    testing in the bank?

25          MR. SNYDER:  They could bring their

1    equipment to a conference room if they had to.

2              THE COURT:  Really?

3              MR. SNYDER:  In other words, whatever is

4    convenient.

5              THE COURT:  They don't have to take it to

6    a laboratory or anything like that?

7              MR. SNYDER:  It would be preferable for

8    one of our experts to bring it to their location.

9              THE COURT:  I don't have a problem

10   ordering that as long as it is done in a way that

11   satisfies the plaintiff that they have somebody

12   that observes and protects the physical existence

13   of this document.  I mean, even to the extent of

14   having a security officer armed.  I mean, you

15   know --

16             MR. SNYDER:  Your Honor, we've been asking

17   for 365 days --

18             THE COURT:  This is not your typical bank

19   fraud case.

20             MR. SNYDER:  We've been asking for one

21   year to see this contract.  We'll look at the

22   contract and examine it wherever it is.

23             THE COURT:  I was going to ask you about

24   that, but I guess I won't, and that is why did you

25   wait so long to bring this motion?

1         MR. SNYDER:  Well, it was the --

2         THE COURT:  After two hours I should have

3    already asked you that.

4         MR. SNYDER:  It was the amended complaint,

5    your Honor.

6         THE COURT:  Which is essentially the same

7    thing.

8         MR. SNYDER:  And the amended complaint

9    contained these fraudulent allegations --

10        THE COURT:  It's still the same document.

11        MR. SNYDER:  -- about the emails, and at

12   that point we determined that --

13        THE COURT:  I'm just curious, why did you

14   wait until after Judge Arcara ruled?  Why couldn't

15   you have asked for immediate discovery on the

16   authenticity issue?

17        MR. SNYDER:  We believed that waiting for

18   a ruling on the remand was the appropriate

19   procedural avenue, rather than making a motion

20   while the jurisdiction of the case was still up in

21   the air.

22        THE COURT:  The discovery would have been

23   valid in both courts though.  I mean, if you were

24   concerned about his fraudulent behavior, sort of

25   nip it in the bud.

 1          MR. SNYDER:  We were concerned from day

 2     one about the fraudulent behavior.

 3          THE COURT:  I know.  I'm just curious why

 4     you didn't bring the motion immediately if it was

 5     such a big issue.

 6          MR. SNYDER:  We were waiting for the

 7     judge's ruling.

 8          THE COURT:  But you didn't need that.

 9     Still would have been entitled to discovery.  Could

10     have asked the Court for permission.

11          MR. SNYDER:  Yes, your Honor.

12          THE COURT:  Just curious.

13          MR. SNYDER:  The --

14          THE COURT:  Anyway -- so you really don't

15     have a good answer for that.

16          MR. SNYDER:  I do.  We believed it was

17     appropriate to wait until Judge Arcara decided.

18          THE COURT:  Because you thought you

19     couldn't do it, or it would be disrespectful to the

20     judge to ask for permission to do this authenticity

21     issue immediately?

22          MR. SNYDER:  We knew that it would be

23     contested, and we thought that before the Court

24     determined its jurisdiction, it was not appropriate

25     to burden the Court with motion practice.  That was

1    the decision that we made.

2              THE COURT:  Okay.  Maybe.  Considering

3    what's at stake, I'm not sure I agree with you.

4    But that's beside the point.  I'm just curious.

5              MR. SNYDER:  And we didn't think the fraud

6    would be any less ripe upon ruling -- that ruling

7    than before.

8              THE COURT:  Well, it tends to go to the

9    reason for the -- I mean, I'm satisfied that we

10   probably need to go forward here.  But as we were

11   thinking about it, it just struck me, if you were

12   concerned about spoliation or more tampering, well

13   then why didn't you bring the motion immediately

14   contemporaneous with the removal?

15             MR. SNYDER:  We did upon filing -- we did

16   immediately send a preservation notice to

17   Mr. Ceglia and his lawyers, and in addition, your

18   Honor, it was the filing of the amended complaint

19   and the allegations about these emails that are

20   fraudulent emails that are --

21             THE COURT:  Really piqued your interest.

22             MR. SNYDER:  Made it clear that --

23             THE COURT:  Aroused your concerns.

24             MR. SNYDER:  Made it clear that immediate

25   intervention was necessary.

1          THE COURT:  All right.  I gotcha.  Thank

2     you.  That's a fair answer.  Thank you.

3          MR. SNYDER:  So in terms of the Harvard

4     emails, your Honor expressed concern about those.

5          THE COURT:  Yes, please.

6          MR. SNYDER:  Those are safe and secure

7     with belt and suspenders.  First, Harvard

8     University has preserved and is preserving those;

9     second, as we set forth in our papers, our motion

10    papers, Stroz Friedberg imaged, that is took

11    electronic photographs and images of the contents

12    of the Harvard server as it relates to

13    Mr. Zuckerberg --

14         THE COURT:  So they can audit any

15    further --

16         MR. SNYDER:  Correct.

17         THE COURT:  -- not tampering, but attempt

18    to modify --

19         MR. SNYDER:  Yes.

20         THE COURT:  -- in any way shape or form.

21         MR. SNYDER:  Yes.  And that image is the

22    image from which the 176 emails were printed.

23         THE COURT:  So you're willing to give the

24    plaintiff a copy of that image?

25         MR. SNYDER:  No, your Honor, because

1     that's Mark Zuckerberg's emails to his professors,

2     to his parents, and to everyone under the sun about

3     his entire life.  That was his personal email

4     account that he used.  What we are prepared to give

5     him in a sequenced fashion are every single email

6     to and from the plaintiff and his confederates at

7     StreetFax.  Now what's interesting is --

8                THE COURT:  But you don't know -- but

9     there are no -- he had access, but your papers

10    point out that there was no actual modification,

11    deletion, or tampering with the existing emails.

12    That there was a perception that three had been

13    manipulated --

14                MR. SNYDER:  No, that was nonsense.

15                THE COURT:  -- but it turns out not.

16                MR. SNYDER:  That was nonsense, your

17    Honor.  Every image of the Harvard computer --

18                THE COURT:  But they don't know that,

19    because they haven't seen the evidence that

20    establishes that they were not tampered with.

21                MR. SNYDER:  There's no evidence of

22    tampering.  There's only speculation.

23                THE COURT:  You say so because your expert

24    says so.

25                MR. SNYDER:  Your Honor, they haven't made

1      any showing, no prima facie showing, no threshold

2      showings.  It's rank speculation that there's any

3      so-called tampering.

4              THE COURT:  I'm just pointing out as a

5      fact.  I'm not making an argument for them,

6      counsel.  I'm just pointing out as a fact, as

7      Mr. Lake sits there and as I sit there, we have to

8      take your expert's word for it.

9              MR. SNYDER:  You have to take the sworn

10     testimony of Stroz Friedberg.  Mr. Stroz --

11             THE COURT:  That's all I'm pointing out.

12             MR. SNYDER:  Mr. Stroz is a former FBI

13     agent.  Mr. Friedberg is the former assistant

14     United States attorney, and they have sworn to this

15     Court that they took an image of the Harvard

16     server, and Mr. Zuckerberg had 176 emails to and

17     from the plaintiff.

18             THE COURT:  Is there any way for him to

19     get any access to anything from the expert that

20     would give them comfort that, in fact, they didn't

21     make a mistake, and they're not being especially

22     excessively loyal to your side of the case?

23             MR. SNYDER:  There's no evidence, your

24     Honor.  There's no even threshold showing that

25     that's the case.  There's only conjecture,

1    speculation, and innuendo as compared to sworn

2    testimony by forensic experts that it is not so.

3              THE COURT:  Okay.

4              MR. SNYDER:  So the Harvard emails are

5    secure, and -- and are not --

6              THE COURT:  And any further accessing of

7    the emails by Mr. Zuckerberg is being monitored?

8              MR. SNYDER:  Yes.

9              THE COURT:  And the -- because of the

10   image, post -- if it turns out that Harvard reports

11   further accessing by Mr. Zuckerberg, the expert

12   then can go in and take another look and see what

13   changes were made.

14             MR. SNYDER:  Yes, your Honor.

15             THE COURT:  But then how do we get to see

16   them and know that there were changes and what

17   changes were made?

18             MR. SNYDER:  Your Honor, we have the 176

19   emails printed out.

20             THE COURT:  Yeah.

21             MR. SNYDER:  There's no evidence that

22   there are any other emails on that server.

23             THE COURT:  So it's really an exercise in

24   futility -- I mean, it just doesn't make any

25   difference.

1          MR. SNYDER:  Exactly, your Honor.

2          THE COURT:  Okay.

3          MR. SNYDER:  But the thing I think is

4     important to emphasize --

5          THE COURT:  The body of knowledge that's

6     relevant is already captured --

7          MR. SNYDER:  Yes, your Honor.

8          THE COURT:  -- and there's nothing.

9          MR. SNYDER:  Preserved for all time.

10         THE COURT:  Thank you.

11         MR. SNYDER:  I think it's critical to

12    underscore, your Honor, that Mr. Lake is urging

13    this Court to not order testing of the computers

14    and electronic media that relates to the fraudulent

15    emails.  And that is not surprising, because those

16    emails were concocted, not only for this lawsuit,

17    but in this calendar year for this lawsuit, because

18    they were not attached to, referenced in the first

19    complaint.

20         THE COURT:  Okay.

21         MR. SNYDER:  And so what we're requesting

22    is expedited discovery in the next 30 days or 30

23    days after production of the relevant evidence of

24    both the original document, which he calls a

25    contract, and -- to be observed by whomever the

1    plaintiff designated or wishes or to be recorded

2    however he wishes, and secondly, the immediate

3    production of both the electronic media and

4    computers specifically identified by the plaintiff

5    in his papers, that is, the 169 floppy discs, the

6    1,075 CDs, the one laptop, associated hard drive.

7              THE COURT:  160 -- I know it's in here

8    somewhere.

9              MR. SNYDER:  It's 169 floppy discs.

10             THE COURT:  Right.

11             MR. SNYDER:  1,075 CDs, one laptop

12   computer, and the associated hard drive.  And an

13   image of a second hard drive.  That's the specific

14   inventory that they have provided, but we

15   respectfully urge this Court to order Mr. Ceglia

16   also to make available to us other computers and

17   electronic media in his possession, custody, or

18   control, because we have established a prima facie

19   case, indeed an overwhelming case, that he has --

20             THE COURT:  Particularly including any

21   computers --

22             MR. SNYDER:  Yes.

23             THE COURT:  -- located at his parents'

24   home.

25             MR. SNYDER:  Yes.  Let me tell your Honor

1    one thing that is incredibly important.  We have on

2    the Harvard server today a server that can be

3    authenticated as dated from 2003 and 4, emails to

4    and from Mr. Zuckerberg and Mr. Ceglia and

5    StreetFax.  That server has none of the emails

6    obviously alleged in the complaint.

7        What's telling is that Mr. Ceglia in his

8    complaint makes no reference to the authentic

9    emails anywhere.  Anywhere.  Doesn't reference

10   them, and presumably he has -- we'll see whether

11   there are any on any of these electronic media,

12   what he's done with those.  That will be very

13   interesting to see if he has evidence of the

14   original authentic emails, which, of course, tell a

15   story that's inconsistent with his story.

16             THE COURT:  Okay.  After we get done with

17   this phase, and we need to abide the reports of the

18   experts before we decide how to proceed further.

19             MR. SNYDER:  Here's what we propose, your

20   Honor.  Within a period of time -- we were going to

21   suggest ten days, but perhaps it should be 30 or

22   20, whatever the Court thinks is appropriate.  Upon

23   the conclusion of the forensic testing we will

24   provide the Court with a report, a letter, an

25   affidavit setting forth our findings and informing

1    the Court of our intentions, whether at that point

2    we intend to move to dismiss on the grounds of

3    fraud pursuant to this Court's inherent power and

4    other authorities, which would empower the Court to

5    dismiss the case based on fraudulent documents

6    being at the heart of the case.

7        In the event that the forensic testing led us

8    to a conclusion which fell short of that, but was

9    not inconsistent with fraud, we then would propose

10   to the Court whether we needed additional

11   discovery, limited and targeted, and if so, what

12   kind.  And if not, how the case would then proceed.

13            THE COURT:  Which will be in the nature of

14   a proposed scheduling order?

15            MR. SNYDER:  Yes, your Honor.

16            THE COURT:  Thank you.

17            MR. SNYDER:  In that case, it may well be,

18   not to get too nuanced, following up on your

19   Honor's comment, this case is woefully time barred.

20   This case is barred by laches.  The partnership

21   claim fails to state a claim.

22            THE COURT:  Did you plead that as an

23   affirmative defense?

24            MR. SNYDER:  Yes, we did.

25            THE COURT:  Okay.

1          MR. SNYDER:  And the fact is that it may

2     well be that a second threshold question in this

3     case, and we've attempted to even put this in our

4     papers, would be the staleness of this case.

5     Because -- because this plaintiff waited well over

6     six years, close to seven years, to file this

7     lawsuit following the alleged breach.  And his --

8     the alleged emails in the complaint, in addition to

9     being fraudulent, actually ironically are fatal to

10    his contract claim because they indicate that as

11    early as 2004 -- early 2004 according to his

12    fictional tail, Mr. Zuckerberg, according to his

13    story, rebuked him and told him he would have no

14    involvement in Facebook.  Never happened.  It's

15    fiction.  But at that time his cause of action

16    would have ripened, and he filed a lawsuit six and

17    a half years later.  Time barred.  Stale, and so --

18          THE COURT:  Well, is it?

19          MR. SNYDER:  It may well-be --

20          THE COURT:  I was doing that calculation

21    myself.  In fact, we were looking at Massachusetts

22    wanted to make sure there wasn't a choice of law

23    here on statute of limitations, but it turns out

24    they're both six years.

25          MR. SNYDER:  Correct, your Honor.

1          THE COURT:  But I was measuring it from

2     the beginning of -- the latter part of the

3     July '04.

4          MR. SNYDER:  There are a couple of

5     different times you can time it.  It's either July

6     of '04.  It's early -- I think it's March, or --

7          THE COURT:  It looked to me like if there

8     was a repudiation or -- or a refusal to acknowledge

9     an ownership interest, it occurred not earlier than

10    the end of July.

11         MR. SNYDER:  It did.  It occurred in the

12    spring according to his story.

13         THE COURT:  Oh, is that right?

14         MR. SNYDER:  Yes, your Honor.

15         THE COURT:  Funny I thought that it was in

16    July based on our reading of it.  So it's time

17    barred.  Six years.

18         MR. SNYDER:  It's time barred.

19         THE COURT:  Past six years.

20         MR. SNYDER:  Yes.  And there are other

21    facts and circumstances.

22         THE COURT:  Well, we were curious about

23    the concept of this, whether there's adequate

24    pleading of a partnership, and then that gets into

25    whether there was a demand made by one partner upon

1    the other for some benefit from the partnership,

2    which we don't see was made, or at least not

3    pleaded, in which case then it's not ripe, and the

4    lawsuit, in that sense, is premature.  But that's

5    really beside the point.

6          MR. SNYDER:  The last time Mr. Zuckerberg

7    heard from Mr. Ceglia before he filed this

8    fraudulent lawsuit --

9          THE COURT:  Yeah.

10          MR. SNYDER:  -- was when Mr. Ceglia for

11    the last time --

12          THE COURT:  Yeah.

13          MR. SNYDER:  -- asked for forbearance on

14    the payments that were owed on StreetFax work.

15          THE COURT:  Yeah.

16          MR. SNYDER:  And that was some time in the

17    middle of 2004.

18          THE COURT:  Not to be facetious, but we

19    were thinking well, if he didn't show up at

20    headquarters asking to measure the room for new

21    drapes, then the partnership breach didn't accrue.

22          MR. SNYDER:  Yes, your Honor.  But the

23    point of the partnership is the bogus emails are

24    fundamental to that partnership claim, which is why

25    we need discovery.

 1            THE COURT:  And what was the form of

 2   Mr. Zuckerberg's rebuke that gives us an accrual

 3   date that's beyond six years?

 4            MR. SNYDER:  Well, allegedly --

 5            THE COURT:  I can't recall.

 6            MR. SNYDER:  -- according to his

 7   narrative, allegedly --

 8            THE COURT:  Yeah.

 9            MR. SNYDER:  -- he was being denied his

10   partnership entitlements well before July of 2004

11   according to his narrative.

12            THE COURT:  Okay.

13            MR. SNYDER:  In addition, there are other

14   facts and circumstances which, if the Court does

15   not mind, I would like not to talk about now in

16   terms of statute of limitations, because I am

17   concerned about this plaintiff.

18            THE COURT:  No.  No.  What I was getting

19   at about that was whether or not we could dispose

20   of the case on a statute of limitations motion, or

21   failure to state a claim, instead of going through

22   all this scientific testing.  But it sounds like

23   that's probably what we should do, so --

24            MR. SNYDER:  It may well be that -- what

25   I'm saying, your Honor, is that it may be that in

1      the event that the scientific testing cannot

2      definitively establish the fraud --

3               THE COURT:  We'll have to cross those

4      bridges --

5               MR. SNYDER:  -- we may then immediately

6      cross that bridge.

7               THE COURT:  Right.  Thank you.

8               MR. SNYDER:  Thank you.

9               THE COURT:  All right.  Quick rebuttal.

10     Surrebuttal.

11              MR. LAKE:  Yes, please.  First of all --

12              THE COURT:  Because I need to make a

13     ruling.  I think I'm ready.

14              MR. LAKE:  But --

15              MR. SNYDER:  I didn't address the MZ

16     though.

17              THE COURT:  The who?

18              MR. SNYDER:  The initials.

19              THE COURT:  Yes.  Thank you.  You know, as

20     you were turning, I said oops, what about the

21     initials.  Sorry, Mr. Lake.

22              MR. LAKE:  That's okay.

23              MR. SNYDER:  Thank you.

24              THE COURT:  Why not give him that limited

25     discovery mutually speaking?

1           MR. SNYDER:  Your Honor, he has not

2    established --

3           THE COURT:  After all, he came all the way

4    from San Diego on a moment's --

5           MR. SNYDER:  You know, we're giving him

6    the 176 emails.  And as it relates to the initials,

7    it's our position that he has utterly failed to

8    establish a prima facie need -- evidence for a need

9    for that.  We don't think it's probative, because

10   it's two capital letters on a page.  Two capital

11   letters on a page.

12          THE COURT:  Are you going to have any

13   handwriting experts look at this?

14          MR. SNYDER:  No, your Honor.

15          THE COURT:  Are you going to have any

16   handwriting experts look at it Mr. -- you already

17   have, haven't you, Mr. Lake?

18          MR. LAKE:  Yes.

19          THE COURT:  Well, are you representing to

20   us that -- that those experts have said we would

21   like to see some originals --

22          MR. LAKE:  Yes.

23          THE COURT:  -- on the handwriting issue?

24          MR. LAKE:  That was put in the motion.

25   Absolutely.

1          THE COURT:  I suppose your point is that

2     it can't -- the two concepts can't be consistent.

3     One expert can't say --

4          MR. SNYDER:  It's two letters, your Honor.

5          THE COURT:  -- that -- that this is --

6     well, if the paper is post '03, '04, then another

7     expert can't some along and say oh, but that's his

8     initial.

9          MR. SNYDER:  Your Honor, it's two letters.

10         THE COURT:  Right?  Well, I'm just saying

11    hypothetically.

12         MR. SNYDER:  Hypothetically this plaintiff

13    could have --

14         THE COURT:  Can't -- those two things

15    can't --

16         MR. SNYDER:  This plaintiff -- there are a

17    number of possibilities.  For example, on the

18    authentic page 1, which we don't have before this

19    Court.

20         THE COURT:  But you will.

21         MR. SNYDER:  The authentic page 1 may be

22    gone forever, your Honor.  The authentic --

23         THE COURT:  The first one is a fraud.  The

24    second -- I see your point.

25         MR. SNYDER:  The real page 1 that existed

1    in the real world that related only to StreetFax.

2           THE COURT:  The one that Zuckerberg had

3    but mislaid, and the one that the plaintiff

4    presumably had either purposely mislaid or --

5           MR. SNYDER:  Yes, your Honor.

6           THE COURT:  -- or destroyed.

7           MR. SNYDER:  Right.

8           THE COURT:  -- or has and refuses to

9    disclose.

10          MR. SNYDER:  We don't know whether that

11   original document contained Mark Zuckerberg's

12   initials MZ.  It could have.  We don't know whether

13   the plaintiff forged Mark Zuckerberg's MZ.  We

14   don't know whether he took Mark Zuckerberg's MZ

15   from the original page 1 and plastered on to the

16   bogus page 1 that's in front of this Court.

17      What we do know beyond any doubt in the world

18   is that page 1 as it existed in the real physical

19   world never bore the word Facebook, related to

20   Facebook, because it didn't exist at the time.  It

21   wasn't even a figment of Mr. Zuckerberg's

22   imagination, and that's where Mr. Ceglia --

23          THE COURT:  Tripped up.

24          MR. SNYDER:  -- tripped up really badly.

25   Because there's no question about that.  That --

1      that when Mark Zuckerberg was a freshman at Harvard

2      doing limited work for StreetFax and being just a

3      regular student that he wasn't even dreaming about,

4      thinking about, imagining something called

5      Facebook.

6              THE COURT:  Thank you.

7              MR. SNYDER:  Thank you.

8              MR. LAKE:  Couple points, your Honor.

9      Listening to defendant's argument there, we might

10     as well just quit, because they're so certain that

11     this case is over, there's no point in moving

12     forward.  And I have to tell you we respectfully

13     disagree.  We believe that this case has merit, and

14     we intend to prove that to this Court.

15             THE COURT:  Yes.  Why the hesitancy over

16     access and testing of the hardware -- I'll call it

17     that -- for the electronic evidence versus the

18     document evidence?

19             MR. LAKE:  A couple things.  One,

20     Mr. Zuckerberg and his team are the best in the

21     world at manipulating computer data.

22             THE COURT:  They're not going to be able

23     to manipulate the computer that's sitting in his

24     parents' home.

25             MR. LAKE:  Sure they can.

1          THE COURT:  Really?

2          MR. LAKE:  Sure.  They can -- they can

3     manipulate data however they want.  I have no doubt

4     of that in my mind.

5          THE COURT:  They can somehow creep through

6     the telephone lines into his mom's computer, get it

7     lit up, and start fooling around with the hard

8     drive?

9          MR. LAKE:  Sure.

10          THE COURT:  Really?

11          MR. LAKE:  I believe that there's no limit

12     to what they can do to manipulate electronic data,

13     which is exactly why they are focusing completely

14     on their computers --

15          THE COURT:  Even if the computer wasn't

16     connected to the Internet?

17          MR. LAKE:  They can take all the

18     information off the data and trade a digital image

19     of it --

20          THE COURT:  No.  No.  I understand the

21     science theory behind what you just said, but if

22     that computer physically isn't connected, if they

23     don't have an Internet account, say, and he's just

24     in there doing his thing on floppy discs or hard

25     drive, how do they get in there?  Do they send

1    secret agents in there to take it out and bring it

2    over to the lab and fool around with it?

3              MR. LAKE:  If I give them a floppy disc

4    and they take it --

5              THE COURT:  Like Mission Impossible or

6    something like that?

7              MR. LAKE:  -- who knows what it's going to

8    be when it comes back.  That's why --

9              THE COURT:  No.  No.  I understand that.

10   I'm just trying to understand your theory about

11   getting into the computer with the knowledge of a

12   computer owner presupposes being physically

13   connected to, you know, somebody's cable television

14   system with Internet service.

15             MR. LAKE:  Right.  Hacking into somebody's

16   email has to be done online for all I understand.

17   But that's why the ESI protocols were so important

18   when it comes to the preservation and discovery of

19   electronic data.  It is a big, big deal.  And the

20   idea of -- first of all, their request is so broad,

21   like we said before, it takes no consideration for

22   relevance.  It takes no consideration for

23   privilege.

24             THE COURT:  But the logic of your position

25   as you just stated it is that I have to presuppose

1    that conceivably already happened, and therefore

2    we're playing into their hands by giving them

3    access to the computer, and then they say, viola,

4    look what we found, knowing that they implanted it

5    themselves.

6         MR. LAKE:  They could have.  I don't know.

7    I hope not.  Here's my concern.

8         THE COURT:  Well, if they've already done

9    it, then the damage is done, so we might as well

10   find out about it --

11        MR. LAKE:  Well, that's why they want it.

12        THE COURT:  -- so your client can say

13   look, oh, my god, I didn't put this in there.  They

14   must have.

15        MR. LAKE:  Right.  So if the damage is

16   done and the emails have already been manipulated,

17   then we go back to your original argument is, we

18   have to rely on the contract.  Our contract needs

19   to be tested first.  They say no, we don't want to

20   talk about the contract, because the contract might

21   be good, and we're still going to dismiss this case

22   because the emails are bad.

23        THE COURT:  That's what I finally got Mr.

24   Snyder to agree that that was a possibility.

25        MR. LAKE:  Right.  They're ignoring the

1    contract.  They don't care what the contract says.

2    They don't believe it.  They don't care.  What they

3    care about is electronic data --

4         THE COURT:  But look, what's the harm in

5    it?  I mean, if everything is above board here,

6    then let them take a look.  They won't find

7    anything that's damaging.

8         MR. LAKE:  And that's exactly right.  I

9    think Mr. Snyder misspoke --

10        THE COURT:  Well, it is exactly right.

11        MR. LAKE:  -- earlier.

12        THE COURT:  That's the point that

13   Mr. Snyder's making.

14        MR. LAKE:  When he said we are not willing

15   to produce the information they requested, that's

16   not true.  We in this case are absolutely willing

17   and bound to produce all relevant non-privileged

18   information, and we will do that under the proper

19   protocol and proper sequence.

20        THE COURT:  Well, it's just a matter of

21   timing I think.  If we're going to work on the

22   contract, why not work on the computers as well?

23        MR. LAKE:  Right.  And that's fine, if we

24   can do it mutually.  Right now this is a one-way

25   street.  They're demanding all of this from us, and

1    they're not willing to give us anything.

2              THE COURT:  Well, they are.  They said

3    they would give you access to the Harvard emails.

4              MR. LAKE:  Just the ones between Ceglia

5    and Zuckerberg.  If they want to have our entire

6    universe of computer data, then we should have the

7    exact same access to theirs.

8              THE COURT:  But if the document is

9    unauthentic, it's unnecessary to look at those

10   corroborating -- I'll use that term loosely.

11             MR. LAKE:  And the same thing is true for

12   them.

13             THE COURT:  Well, I think -- not quite,

14   because as I attempted to carefully question

15   Mr. Snyder on which was, what is the relevance of

16   getting your hands on potential fraudulent

17   concocted sub downstream emails, and the answer is

18   I think, even though he doesn't want to say

19   anything that -- let anything pass his lips that

20   sounds like he's conceding a point here, as a good

21   lawyer should -- he is saying well, it's -- even if

22   the contract is good, his fraud on the court based

23   on these emails is enough to dismiss the case.

24   That's essentially why I asked the question,

25   otherwise I agree with you.

1        MR. LAKE:  That's his theory.

2        THE COURT:  Well, it's not a bad one.  I'm

3   asking for a refutation of it, and I don't hear

4   one.

5        MR. LAKE:  No.  I will.

6        THE COURT:  Let's hear it.

7        MR. LAKE:  First of all, it's the

8   fundamental fairness.

9        THE COURT:  It's getting close to dinner

10  time.

11       MR. LAKE:  I know.

12       THE COURT:  And your --

13       MR. LAKE:  Respectfully, your Honor --

14       THE COURT:  And you gentlemen I think are

15  going to be doing some homework tonight and

16  tomorrow morning to favor me with a protocol that I

17  can sign off and an order which will cover the

18  points that I'm going to announce a decision on

19  momentarily.

20       MR. LAKE:  If I understand their request,

21  it is they want everything that we could possibly

22  have with unfettered access I think is the term

23  that they requested to any potential computer hard

24  drive, anything now without any discussion about

25  relevance or privilege.  And we have to trust them

1    not to burn us with that.

2              THE COURT:  Well, that's a valid point.  I

3    mean, what do we -- I don't know the answer to

4    that, but presumably there's something that we can

5    put into a protocol that -- I don't know how we --

6    we need somebody to screen what's coming up on the

7    hard drive to spot anything that's potentially

8    privileged, and then immediately agree right then

9    and there to delete it or set it aside or strike it

10   or put some parentheses around it somehow.

11             MR. SNYDER:  We do propose to the Court,

12   your Honor, in our McGowan paragraph 17 in terms of

13   a protocol to protect private or privileged emails,

14   there's an established protocol that is widely

15   accepted in the field which we would -- which we

16   would follow where Stroz Friedberg tenders to

17   counsel or the owner of the computer --

18             THE COURT:  What page is that, sir?

19             MR. SNYDER:  Your Honor, it's the next to

20   last page.  I don't think it's paginated.  It's

21   paragraph 17.

22             MR. LAKE:  You're right.  That protocol is

23   give us -- give our expert your stuff and trust us

24   that our expert won't tell us things that we're not

25   supposed to know.  I think that's what the protocol

1  says.

2         THE COURT:  Well, I think the protocol

3  that I would approve would allow you to be there

4  and observe the printout of the -- of the hard

5  drive so that privilege documents can be arguably

6  identified and deleted or exempted from the

7  expert's scrutiny.

8         MR. LAKE:  Your Honor, I drafted a very

9  comprehensive protocol for this that nobody's seen

10  yet because I've just did it this morning.

11         THE COURT:  They're about to see it.

12         MR. LAKE:  Okay.

13         THE COURT:  Trust me.  And the only issue

14  is why shouldn't I authorize the testing, if you

15  will, of the electronic evidence as I refer to it?

16         MR. LAKE:  Because this case is like any

17  other case, and that is we need to limit the scope

18  of the evidence that's going to be presented for

19  the relevant issues.  Right now we're talking about

20  one issue, and that's authenticity of a contract.

21  There's been no propounding of discovery.  We

22  haven't gotten any of their emails.  They haven't

23  seen all of ours.  They're jumping ahead of the --

24         THE COURT:  But this testing process could

25  be dispositive, and it could be dispositive of both

1    based just on the contract, and if not the

2    contract, then based on the fraudulent emails.

3              MR. LAKE:  But you know what else could be

4    dispositive?

5              THE COURT:  What?

6              MR. LAKE:  The email that Mark Zuckerberg

7    wrote to his girlfriend that says -- in 2003 that

8    says Paul Ceglia is a dummy and he should have

9    never entered into this contract, because I'm going

10   to steal his platform, which, by the way, what

11   happens if that exists?  How do we know unless we

12   get an opportunity to look at the same thing that

13   they're asking for from us?

14             THE COURT:  Let's take it a step at a

15   time.

16             MR. LAKE:  Okay.  Which is exactly what I

17   want to do.  And here's -- one question you asked

18   earlier is why didn't they ask for the contract

19   earlier?  And in fact last July Terry Connors, when

20   he was plaintiff for Paul Ceglia, offered it to

21   them and offered it to them to do whatever

22   destructive testing they wanted, and they elected

23   not to.

24             THE COURT:  Really?

25             MR. LAKE:  Yes.  And I will submit a

1    declaration under penalty of perjury from

2    Mr. Connors if you need it.

3            THE COURT:  What's the inference I should

4    draw from that?

5            MR. LAKE:  They're in such a huge rush now

6    for some reason, and a year -- well, not a year,

7    but I think it was in July.

8            THE COURT:  But you're in agreement that

9    it would be useful to get it done.

10           MR. LAKE:  Oh, absolutely.  I want to get

11   it done, but I want to get it done right so it's

12   not prejudicial or unfair to me.

13           THE COURT:  I want it done right too.

14   Thank you.

15           MR. LAKE:  Second thing, and this is where

16   I think we're going with this.  You asked them how

17   long it would take to finalize their testing, and

18   they said two days.  Then you asked them -- and

19   this is for the contract itself.  Then you asked

20   them how long it would take for their experts to

21   produce a report on those findings, and they said

22   ten to 30 days.  They are now focusing on the

23   emails.  We know why.  That's where they think that

24   they're going to have the meat of their case.

25       We spent two hours talking about how it was

1    important to go through the physical document first

2    and when you came out with your tentative, they

3    freaked out, and this is what we spent the last

4    hour listening to.

5              THE COURT:  I wouldn't go that far.  He

6    maintained his equilibrium pretty well.

7              MR. LAKE:  No, he does.  He's an excellent

8    lawyer as you pointed out.  According to their own

9    math, we're talking about a 12-to-30-day resolution

10   of the physical contract issue.

11             THE COURT:  Well I'm impressed that it can

12   be done that quickly, to be honest with you.

13             MR. LAKE:  Yeah.

14             THE COURT:  I don't know.  I mean, we

15   don't have a lot of experience with this type of

16   testing issue.  As I said, I did have a criminal

17   case where we got into this.  And I can't remember

18   how long it took, but it took a while.  We had ink

19   testing and everything else.

20             MR. LAKE:  So here's what I propose.

21             THE COURT:  It's a criminal antitrust

22   case.

23             MR. LAKE:  We have to fight --

24             THE COURT:  Contempt criminal antitrust.

25             MR. LAKE:  We have to fight about an ESI

1    protocol, no doubt about it, and it's got to be

2    fair, and it's got to be done right.

3         THE COURT:  Yes.  It's going to be done

4    right.  No, no.  Whatever direction I give will

5    definitely take your security interests into

6    account.  I have no intention of just letting them

7    get their hands around this stuff without your

8    being able to be physically present, protected.  I

9    mean, you want a Wackenhut officer to be present,

10   that's fine.

11        MR. LAKE:  Also, they have --

12        THE COURT:  At your expense.

13        MR. LAKE:  Right.  Thank you.  They have

14   also provided no legal authority for one-sided

15   expedited discovery.  There isn't any.  What

16   they're trying to do is manipulate the law about

17   expedited discovery, which is permissible, we agree

18   with --

19        THE COURT:  Well, I'm trying to find a

20   basis to give you what you asked for, but I'm

21   having difficulty other than the initialing -- we

22   went over this several times.  Believe me, I'm not

23   in favor of unilateral discovery, and --

24        MR. LAKE:  And here's where I'm at a

25   distinct disadvantage.

1          THE COURT:  And I'm having difficulty

2    understanding how the other non-signature requests

3    conceivably are relevant to the science that's

4    going to be applied to the testing of both the

5    document and the electronic evidence.  That's the

6    difficulty I'm having.  I don't have any problem

7    with the idea that if it comes out ambiguously that

8    it's relevant, and your interesting hypothetical

9    about his emails to some female acquaintance --

10          MR. LAKE:  Or male.

11          THE COURT:  -- how he managed to finesse

12   Mr. Ceglia here would be pretty damaging and

13   devastating if you had dueling expert opinions.

14   There's no question about that.  I don't think

15   anybody quarrels with that.  But it's -- it's the

16   potential definitiveness of this testing now that's

17   hard to ignore.

18          MR. LAKE:  Here's the problem with that,

19   and here's --

20          THE COURT:  The problem with what?

21          MR. LAKE:  Here's the problem I have.

22   One, I'm at a distinct disadvantage because I have

23   not reviewed the entire case file, so I don't know

24   a lot of information.

25          THE COURT:  Such as?

1            MR. LAKE:  Such as what emails and other

2    witnesses my predecessors have interviewed that are

3    going to corroborate the theory that Mr. Ceglia had

4    spoken with other witnesses about --

5            THE COURT:  Inconsistent with his

6    position?

7            MR. LAKE:  Correct.  I do have though --

8            THE COURT:  You can still get those.

9            MR. LAKE:  I know.  But I --

10           THE COURT:  How would that affect the

11   testing?

12           MR. LAKE:  No.  We're talking about two

13   different things.  I don't mind about testing all

14   the relevant emails that aren't privileged.  And I

15   agree that under the right protocol, we should do

16   that, and we should do theirs.

17       Here's my fear.  We know for a fact that

18   Mr. Zuckerberg and Facebook have hired people that

19   have been traversing this country, and they have

20   been interviewing potential witnesses in this case.

21   They have hired a lawyer in Florida to try to --

22           THE COURT:  What's your point?  This is a

23   $25 billion lawsuit.

24           MR. LAKE:  They're trying to start a

25   criminal investigation in Florida against our

1     client.

2               THE COURT:  What's your point?

3               MR. LAKE:  They are going to witnesses --

4               THE COURT:  What's your point?

5               MR. LAKE:  -- and bullying them --

6               THE COURT:  What's your point?

7               MR. LAKE:  If I give you an email that I

8     have from a potential witness, the same fear -- if

9     they give us an email -- say he's going to write a

10    bunch of corroborating ones, my fear is if I

11    divulge a witness that I know that corroborates our

12    story, they're going to go out and they're going to

13    get to that witness.

14              THE COURT:  We're not asking you to

15    divulge any witnesses.  We're asking you to produce

16    a contract and some electronic hardware and

17    software, hard drives, floppies.

18              MR. LAKE:  Right.  We're willing to

19    produce all the information on that, and then tell

20    us which ones that you think are not true, and then

21    do the research on that.  And what we're saying

22    is --

23              THE COURT:  No, no, no.  We're trying to

24    figure out whether they're fraudulent or not.

25    That's a scientific exercise.

1          MR. LAKE:  Right.  But not every email

2     that Paul Ceglia has ever written in his life, only

3     the ones that are germane to the veracity and the

4     authenticity of this contract.

5          THE COURT:  Well, I hardly doubt that

6     they're going to be looking at every email he ever

7     wrote in his life.

8          MR. LAKE:  That's what they asked for.

9     They've asked for every computer in his possession,

10    custody, or control.

11         THE COURT:  Well, they want to make sure

12    they don't miss anything.

13         MR. LAKE:  Right.

14         THE COURT:  But they're not going to

15    examine it unless it appears to be germane to the

16    issue at hand, i.e. whether or not there was a

17    relationship on the Facebook project.

18         MR. LAKE:  No.  They will examine every

19    single email and document and transaction and key

20    stroke that is contained there.

21         THE COURT:  So we can cover that through

22    the protocol where your observer says oh,

23    year 2000, no; 2001, no; 2002 well, let's take a

24    look.  And then individually pinpoint the ones

25    that, in your opinion, aren't germane, and if

1    there's a dispute, oh, well, I guess that's where I

2    come in.  But hopefully we won't come into that,

3    because it will be pretty evident, sort of res ipso

4    loquitur as to which ones are and which ones aren't

5    within the reasonable purview of the expert's need

6    to make his or her examination.

7            MR. SNYDER:  I apologize, your Honor.  I

8    think Mr. Lake may not understand.  The forensic

9    examination of the electronic evidence will be

10   accomplished both according to his forensic expert

11   and our forensic expert according to the

12   widely-accepted practice of making an image of

13   those assets.  That image will then be brought to

14   our expert's laboratory --

15           THE COURT:  Well, it's the image that he's

16   concerned about.

17           MR. SNYDER:  -- to be tested.

18           THE COURT:  He's saying you're going to

19   make an image of everything.

20           MR. SNYDER:  And the protocol --

21           THE COURT:  And your investigators are

22   then going to fan out with these leads and start

23   hammering people out there.

24           MR. SNYDER:  Well, we have a sworn

25   affidavit, your Honor, from a nationally regarded

1    expert who has told this Court how their protocol

2    would protect against any examination of or

3    intrusion into private or privilege emails.

4         THE COURT:  I don't know that it says it

5    that clearly.  He says he has it, but -- I mean, I

6    have to accept his word for it, right?

7         MR. LAKE:  Right.  His protocol says that

8    the inspection sessions and remove to safe place

9    and in the presence of both parties.  What he's

10   saying is their experts are going to monitor and

11   examine the entire universe in front of both

12   parties, and that's fundamentally unfair for two

13   reasons.  Number one, it's going to include

14   irrelevant, possibly privileged information, and

15   two, it doesn't give us access to any discovery on

16   the information that they have.

17        THE COURT:  I understand that.  We went

18   through that already.

19        MR. LAKE:  Right.

20        THE COURT:  I'm focusing on the

21   possibility of your being -- exposing to them

22   irrelevant information that could be harmful in

23   some way or another that isn't pertinent to the --

24   to the expert's evaluation, that's what I'm

25   focusing on.

1          MR. LAKE:  Thank you, your Honor.

2          THE COURT:  And I'm not quarreling with

3    the fact that it's not crystal clear from

4    paragraph 17 of Mr. McGowan's declaration as to

5    just how this will be done.  I have to accept on

6    faith that it will be done, and if you need to have

7    it spelled out, then that's what you're going to do

8    between now and tomorrow with counsel to lay out in

9    a protocol that we can stipulate to with or without

10   your -- hopefully with your approval, and if not,

11   over my signature.

12         MR. LAKE:  Understood.  Two things, one, I

13   think we're -- if we can do the protocol for the

14   original contract first, we're talking about a

15   30-day window, and that will give us 30 days to

16   develop the ESI protocol and start it immediately.

17   And I'm perfectly okay with that.  But we need to

18   incorporate --

19         THE COURT:  You have the document there.

20   It will take them 15 minutes to review it.  I have

21   a hunch that they have an expert in the courtroom

22   with them that are available certainly by phone to

23   consult on it.  I suspect by noon tomorrow there

24   ought to be a document tendered to the Court for

25   the Court's approval that will cover these issues.

1          MR. SNYDER:  And, your Honor --

2          THE COURT:  If I have to bring you back

3     tomorrow afternoon for some further discussion

4     about it, I will.  But I'm trying to avoid that.

5          MR. SNYDER:  Your Honor --

6          THE COURT:  It's my day off.

7          MR. SNYDER:  In the event --

8          THE COURT:  I am semi-retired.  Believe it

9     or don't.

10         MR. LAKE:  Your Honor, like I said, you

11    can have me here any day, and I'll be here.

12         THE COURT:  That's the spirit.

13         MR. LAKE:  I'm still standing.

14         THE COURT:  We need more lawyers like

15    that.  That's great.

16         MR. LAKE:  I just want to make sure we

17    address my second concern, and that is what's good

18    for the goose is good for the gander.

19         THE COURT:  Well, that's the one that

20    bites.  And I think I know what I have to do there.

21         MR. LAKE:  Okay.

22         THE COURT:  And enough said.  Thank you.

23         MR. LAKE:  Thank you very much.

24         THE COURT:  Done a good job.  Tell your

25    client I said so.  All right.

1        Here's the parameters of the Court's ruling.

2   We're going to grant the motion in part in this

3   sense.  We're granting the motion as to both the

4   document and the electronic discovery or evidence,

5   excuse me.  We're going to require the plaintiff to

6   provide within a time stated by the defendant all

7   of these electronic evidence items, the computers,

8   the floppy discs, the CDs, the original document,

9   of course, within a stated period.  I don't know,

10  what's your -- what's your request there Mr. --

11          MR. SNYDER:  We had said, your Honor,

12  July 8th.

13          THE COURT:  July 8th.  Fine.  And we're

14  going to permit -- we're going to require the

15  parties to meet and confer and attempt to stipulate

16  to a protocol that will permit the examination of

17  these materials for scientific testing as to their

18  authenticity in accordance with the protocol, which

19  will secure the physical integrity of the tendered

20  items, including the personal delivery of the

21  materials by the plaintiff, attendance by the

22  plaintiff or a representative, including security

23  officers, during the testing process.  A review of

24  the hard drives to attempt to filter out any

25  potentially privileged or other irrelevant

1     material.  This will occur -- I don't know --

2     within what period of time after the items are

3     delivered?

4               MR. SNYDER:  The testing of the --

5               THE COURT:  Yes.

6               MR. SNYDER:  -- of all materials, your

7     Honor?

8               THE COURT:  Yes.  Not later than --

9               MR. SNYDER:  Within 30 days, your Honor.

10              THE COURT:  All right.  Not later than

11    August 8th.  Thereafter, the defendant will provide

12    a report to the Court as to the result of the

13    testing by the various experts.  And following

14    such, the parties may contact the Court to schedule

15    a Rule 16(b) conference to schedule further

16    proceedings, including appropriate motions.

17              MR. SNYDER:  Your Honor, that -- thank

18    you, your Honor.

19              THE COURT:  Those are the parameters.  I

20    would appreciate defendant tendering an order to

21    the Court detailing these -- these findings -- or

22    these conclusions, these directions by tomorrow

23    morning at 10 o'clock.

24              MR. SNYDER:  Yes, your Honor.

25              THE COURT:  Give Mr. Lake a chance to

1    review them.  If he has any objections, he can let

2    the Court know and tender a written statement, and

3    we'll review it before we sign the order and file

4    it.

5            MR. SNYDER:  Thank you, your Honor.  One

6    point of clarification, we will meet with Mr. Lake

7    and confer pursuant to your Honor's order

8    earnestly.

9            THE COURT:  Both on the language of the

10   order as well as the --

11           MR. SNYDER:  Yes.

12           THE COURT:  -- protocol that we discussed.

13           MR. SNYDER:  Yes.  And in the event,

14   however, and I don't want to jinx it, because hope

15   springs eternal.  In the event that we cannot --

16           THE COURT:  You can be seated.  I don't

17   want you to throw out a disc there.  We don't

18   want --

19           MR. SNYDER:  -- obtain consent of Mr. Lake

20   to a protocol, and we will try mightily to come to

21   an agreement --

22           THE COURT:  In this case submit dueling

23   protocols, and if I need to call you over here

24   tomorrow to discuss it in chambers, we will.  But

25   by the end of the day I will sign a protocol.

1           MR. SNYDER:  Thank you, your Honor.

2           MR. LAKE:  Your Honor, I have a couple

3  questions, because I'm unclear.  First --

4           THE COURT:  Excuse me.  One last thing.  I

5  apologize.  Thank you.  Thank you, Mr. Lake.  And

6  as to the mutual discovery -- that's why I said

7  granted in part.  We are going to direct that the

8  plaintiff receive no less than 30 handwriting

9  samples of Mr. Zuckerberg, including samples of his

10  initials written or -- written or -- I guess that's

11  the right word, written.

12           MR. LAKE:  Originals?

13           THE COURT:  Samples.

14           MR. LAKE:  Right, not photocopied samples

15  but original wet ink.

16           THE COURT:  Oh, is that what it should

17  say?  It doesn't say that here.

18           MR. LAKE:  Yeah.

19           THE COURT:  It has to be originals?

20           MR. LAKE:  It's the same point as the

21  original contract.

22           THE COURT:  I know, but that's not what's

23  written here.

24           MR. LAKE:  Okay.  I'm sorry, your Honor.

25  Like I said, I got here today --

1              THE COURT:  I know.  You're doing great.

2              MR. LAKE:  I'm asking you for a wet --

3              THE COURT:  I'm not -- you just tell me

4     what it is.

5              MR. SNYDER:  So, your Honor, this was

6     eight years ago, so --

7              THE COURT:  I know.  If you don't have

8     it -- I mean, it sounds to me like somebody thought

9     that there were -- I don't remember anybody saying

10    that there weren't 30 samples available.  That's

11    why I'm -- I'm not trying to be picky here, but

12    nobody -- defendant hasn't said that they're not

13    available.

14             UNIDENTIFIED VOICE:  (Indiscernible).

15             THE COURT:  All right.  So we didn't focus

16    on the issue of 30.  So what's a reasonable --

17             MR. LAKE:  That's a reasonable number.

18    It's the timing.  Here's what I wanted to talk

19    about.

20             THE COURT:  If I say no less, that

21    presupposes there are at least 30.  I guess not

22    having heard that there wouldn't be --

23             MR. LAKE:  Right.  So the question is how

24    long is it going to take them to gather 30

25    signatures and 30 initials, and if they can't do it

1   by the 8th --

2           THE COURT:  Well, we may have to put a

3   separate timeframe on this.  I'm just trying to

4   point out why I'm ruling in limited part in your

5   favor.  I'm trying to give you some mutual

6   discovery.

7           MR. LAKE:  Thank you.

8           THE COURT:  I don't want to be accused of

9   being an unilateralist here.

10          UNIDENTIFIED VOICE:  (indiscernible).

11          THE COURT:  I would say that -- I would

12  say maybe now that you've told me that you can't --

13  nobody can at this point, but again it wasn't

14  addressed, and I should have addressed it, but I

15  didn't.  A lot of other things.  So, handwriting

16  samples, to the extent that the parties can agree

17  on a number, then I would like to see a number.

18  But I'm assuming there are some available.

19      Defendant will be directed to make a good-faith

20  effort to search his files and locate as many as

21  are available, not more than -- I mean, as many as

22  possible.  I don't know, help me out here with a --

23          UNIDENTIFIED VOICE:  Can we report back to

24  you by a date that we can conduct a good-faith

25  effort to identify (indiscernible).

1          THE COURT:  Or however many you have.  If

2     they're not there, and if we get an affidavit from

3     Mr. Zuckerberg that he's made this personal search,

4     which he would have to do either himself personally

5     or through some personal assistants, I don't know

6     how to deal with it except that I think that they

7     are entitled to it and in fairness would like some

8     effort to produce them.

9          MR. SNYDER:  Yes, your Honor.  Although,

10     obviously, you know our position that it's not

11     relevant to the fraud issue.

12          THE COURT:  Well, you're welcome to take

13     an appeal to Judge Arcara.  Fourteen days.

14        But I want to see some effort to produce these

15     handwriting samples.  And I would like to see a

16     report back within a reasonable time.  I don't know

17     what that would be.  Probably -- it would seem to

18     me 10, 20 days?

19          MR. LAKE:  Two weeks, your Honor.

20          THE COURT:  Two weeks exactly, that's what

21     I was thinking.  Either produce the sample -- well,

22     I would want an affidavit from Mr. Zuckerberg as to

23     his good faith efforts to locate such, and

24     including the originals.  And if the originals are

25     somehow not available, then copies.

1            Now, my able law clerk who has extensive

2    experience in real estate pointed out that if he

3    has had any real estate transactions, particularly

4    such as buying a home --

5            MR. SNYDER:  No, your Honor.

6            THE COURT:  -- then there should be public

7    records including his initials on each and every

8    page of such things as a mortgage agreement.

9            UNIDENTIFIED VOICE:  It's interesting,

10   Judge Arcara brought this up too.

11           THE COURT:  Did he?

12           UNIDENTIFIED VOICE:  (Indiscernible.)

13           THE COURT:  I see.  Okay.  Well, that's

14   true.  I mean, if he was a college freshman, he

15   probably wasn't likely to be owning a home yet.

16           MR. LAKE:  Your Honor, though he did have

17   bank accounts, he did rent a home in Palo Alto.

18   There are a lot of things he could have signed.

19           THE COURT:  I'm going with this date,

20   but -- these dates, but your experts have said

21   that -- and I know the defendants would object to

22   anything later than this, but are they saying in

23   effect that a person's handwriting materially

24   changes after a seven-year period and therefore

25   later samples are not useful?

1          MR. LAKE:  I haven't spoken to them, I

2    don't know.  I think it's because that was the

3    relevant time period that they had them.

4          THE COURT:  Yeah.

5          MR. LAKE:  I would say if they don't have

6    enough from that time period, that they could try

7    to produce them as close to that time period as

8    possible.

9          THE COURT:  Not music to your ears.

10          MR. SNYDER:  Your Honor, that's not what

11    they're asking for, and it's --

12          THE COURT:  What do you mean?

13          MR. SNYDER:  In other words, they're

14    saying that they want the samples from a specified

15    time period.  Pursuant to your Honor's order, we'll

16    look for originals, and if they don't exist copies

17    for that relevant time period.

18          THE COURT:  Yeah.  I think for present

19    purposes we're stuck with this.  I mean, that's

20    what they asked for.  That's what I'm giving you.

21    That's what you asked for.  That's what prior

22    counsel asked for.  If there is a further request,

23    we'll have to debate about it.

24          MR. SNYDER:  Yes, your Honor.

25          THE COURT:  But for now, that's all I can

1    do.  I'm not going to open up a whole new category

2    of argument here.

3              MR. SNYDER:  Your Honor --

4              THE COURT:  And so that's why it's in

5    part, and the order should include language that

6    carries forth on the idea of getting ahold of those

7    samples to the extent that they're available, and

8    there was a good-faith effort to locate same.

9              MR. LAKE:  Your Honor, a couple more

10   things that I have questions.

11             THE COURT:  Sure.

12             MR. LAKE:  One, I think I heard him say

13   they are going to produce the 176 emails from the

14   Harvard server?

15             THE COURT:  They did.  And we want to

16   include that too, some language that will allow

17   Mr. Lake to get his hands on for his expert

18   examination the -- call them the Harvard emails.

19             MR. LAKE:  Thank you, your Honor.

20             MR. SNYDER:  Your Honor, we requested, in

21   light of our showing in the papers, that those

22   emails be produced in a sequenced fashion, and we

23   respectfully urge the Court to order a sequence

24   production.  We have overwhelming proof that this

25   plaintiff has committed fraud in the past, and he's

1    committing fraud here, and to protect the integrity

2    of the process, there is no harm, no foul, and I

3    think it would be prudent under the circumstances

4    to permit sequenced discovery within the Court's

5    discretion to do so.  He will get the emails.

6    He'll be able to examine them, but only after we

7    have his emails, so he can't monkey around anymore.

8              THE COURT:  What's the harm in that?

9              MR. LAKE:  Well, the harm -- the harm is

10   that we don't know when that is.  Why don't we do

11   it simultaneously then?

12             THE COURT:  What do you mean when that is?

13             MR. LAKE:  You just asked us to provide

14   them -- and I have a question as to how to do

15   that -- everything within the universe that we

16   have.  Why don't they give us their emails at the

17   exact same time?

18             THE COURT:  Well, that's the issue.

19   That's the issue.

20             MR. LAKE:  Right.

21             THE COURT:  What's the harm in doing it

22   sequentially?  You eventually get it.

23             MR. LAKE:  To me it comes back to the same

24   issue, and that is once I read those emails, they

25   may lead me to other people that I can talk with.

1    And the fear that they have that Mr. Ceglia is

2    going to go out and conduct future fraud, which we

3    still submit he has not at all in this case, and

4    otherwise, it's irrelevant and I don't know about

5    it.  We have the same issue with them tampering

6    with witnesses, and as soon as we learn who the

7    witnesses are --

8              THE COURT:  Beside the point.

9              MR. LAKE:  -- they can go out and --

10             THE COURT:  It's beside the point.  If you

11   have evidence of witness tampering, then you're

12   obliged to bring it to the attention of the Court

13   and seek sanctions.  We'll turn it over to the U.S.

14   Attorney's office.  The request is granted.

15             MR. SNYDER:  Thank you, your Honor.

16             THE COURT:  You can put that in the order

17   too.

18             MR. LAKE:  So they will be provided upon

19   as to --

20             THE COURT:  You'll get the Harvard emails

21   after you provide the electronic discovery that

22   will include all the emails that Mr. Ceglia has

23   identified.

24             MR. LAKE:  Right.  That would be within

25   the next day or so after that?

1              THE COURT:  Well, yeah, I guess.  Once

2      they're able to make an image, get the image of

3      the -- of the Ceglia emails, and, yeah, you'll turn

4      over the Harvard emails.

5              MR. SNYDER:  Once -- your Honor, what I

6      would propose the order recite is that upon three

7      days, five days of our receipt of all the

8      electronic evidence and certification by the

9      plaintiff that he has done so --

10             THE COURT:  All right.

11             MR. SNYDER:  Pursuant to the penalty of

12     perjury.

13             THE COURT:  Certification.  Good point.

14             MR. SNYDER:  We then in five days from

15     that will provide the Harvard emails.

16             THE COURT:  That's fine.

17             MR. LAKE:  So five days.  Okay.

18             THE COURT:  Five days after Mr. Ceglia

19     provides a certification and tenders the hardware

20     and the software as they are.

21             MR. SNYDER:  Thank you, your Honor.

22             MR. LAKE:  Here's -- now, your Honor --

23             THE COURT:  Now, what was your

24     clarification?

25             MR. LAKE:  I have a couple clarifications.

1    You want us to provide them with the electronic

2    information.  How do you want us to do that?  I

3    can't imagine just walking in to Gibson Dunn and

4    handing them a bunch of computers.

5              THE COURT:  That's the protocol.

6              MR. SNYDER:  It's as easy as pie, just for

7    your Honor's information.  Stroz Friedberg and

8    their experts speak the exact same language.

9    They'll get on a plane or a train or bus, they'll

10   go to Illinois.  They went to the same school.

11   They go to the same conferences.  And they'll do

12   what they always do.  They'll take the images.

13   There will be no controversy.  There will be no

14   ranker.  It's done every day, your Honor.  It's

15   easy as pie, and we'll set it forth in our

16   protocol.

17             THE COURT:  Famous last words.

18             MR. LAKE:  Yeah.

19             THE COURT:  But that's what we're here

20   for.

21             MR. LAKE:  And here's another -- and he

22   raises the issue that I was going to next, and that

23   is by July 8th as --

24             THE COURT:  If you want to try to tattoo

25   some language into the protocol in your discussions

1    this evening and tomorrow morning to address what

2    we're just talking about, feel free to try.  I'm

3    happy to attempt to accommodate you.  I don't want

4    you to feel that you're being oppressed here.

5              MR. LAKE:  Okay.  Thank you.  Here's why.

6    I told you I would be anywhere you want me, and I

7    will.  I'm going to have to go to Illinois

8    obviously to talk to my experts and get this

9    organized and get the information pursuant to their

10   protocol.  That's going to take me -- you know, I'm

11   going to do that.

12      My son is playing in the Junior Olympics up in

13   Minneapolis.  He's a volleyball player, and the

14   Junior Olympics are Sunday through Wednesday,

15   because they do it over the holiday weekend.  He'll

16   be a senior this year, and he's being highly

17   recruited to play NCAA I ball.  This is the first

18   time --

19             THE COURT:  I'm assuming he takes after

20   his daddy as far as vertical --

21             MR. LAKE:  Thank you.  This is the first

22   time the college recruiters are allowed to speak

23   with him.

24             THE COURT:  I understand.

25             MR. LAKE:  I was hoping to go to

1   Minneapolis from Sunday through Wednesday.  It's

2   going to be impossible for me --

3            THE COURT:  Look, we're going to get this

4   done.  This is a matter of timing --

5            MR. SNYDER:  I would just say, your Honor,

6   I have -- I have children and obligations as well.

7   Paul Argentieri is lead counsel in this case, your

8   Honor.  He's lead counsel.  And he is more than

9   competent to take care of this.  Mr. Lake can speak

10  on the phone.  We speak to our experts almost

11  exclusively on the phone.  There's nothing magic

12  about this.  This is all done according to accepted

13  protocols.  We're not coming in with ray guns and

14  SWAT teams.  We're coming in pursuant to an

15  established widely accepted protocol that will use

16  to get the electronic assets and test them.  It can

17  all be done on the phone, and frankly --

18           THE COURT:  Mr. Argentieri is not able

19  to --

20           MR. LAKE:  Mr. Argentieri is --

21           THE COURT:  He's got to come back anyway

22  and get into the vault, or get into the safe

23  deposit box here.

24           MR. LAKE:  Right.  So we still have that

25  problem, and that's a logistical problem that I'm

1   not sure I can accommodate by the 8th.

2           THE COURT:  Oh, yes, you will.

3           MR. LAKE:  Okay.  I'll notify -- what I

4   was saying is, if he's coming back on the 11th or

5   12th -- if he's flying back on the 11th, he'll be

6   here the 12th.  I was hoping to spend three days

7   watching my son and talking to colleges.

8           THE COURT:  Well, there's no reason why

9   you can't.  I think what the point of counsel is

10   that you've got two lawyers working on this case.

11   You're doing great on your own.  Mr. Argentieri is

12   available, and we need to -- we need to move

13   forward.

14           MR. LAKE:  My --

15           THE COURT:  Make sure you get up to see

16   your son.  Just hand it off to Mr. Argentieri.

17           MR. LAKE:  Well, your Honor, as you know

18   from my declaration I submitted for my motion for

19   continuance today, Mr. Ceglia is in earnest

20   negotiations with several prominent national firms.

21   I don't know what the -- you know, what that is

22   producing today, because I'm here.

23           THE COURT:  I hope by the time we're done

24   we haven't run the entirety of the Martindale

25   Hubbell directory here, but --

1          MR. LAKE:  Well, they're half way through

2     if they got to Lake.

3          THE COURT:  Just as long as Mr. Flynn is

4     kept fully employed.

5          MR. LAKE:  Right.  My request would be

6     this, and it's -- I'm not asking for much time at

7     all, because I just think the 8th is tight.  I

8     think that if we move it one week, it's reasonable.

9     It will have everyone here.  We'll be ready.  We

10    can do this right.  It's not that we don't want to

11    do it.

12         THE COURT:  Will a week make a difference

13    from the defendant's point of view?

14         MR. LAKE:  I don't know how it could

15    possibly make a difference.  They could have done

16    this a year ago.  Sorry, your Honor.

17         MR. SNYDER:  Your Honor --

18         THE COURT:  I think the answer is we can

19    give them another week, it looks like.

20         MR. SNYDER:  I mean, as a matter of human

21    courtesy and human decency --

22         THE COURT:  Well, this is the Western

23    District of New York.

24         MR. SNYDER:  Your Honor, the problem here

25    is Mr. Argentieri, who's lead counsel, who doesn't

1    seem to want to come to court, doesn't seem to want

2    to sign federal pleadings, yet has the contract in

3    his vault, somehow is not responsible for the

4    conduct of this case.  And we are subjected, a

5    company that employs thousands of people, has

6    investors across the world, to a fraudulent

7    lawsuit, your Honor, and under those

8    circumstances --

9              THE COURT:  Well, you could have asked for

10   it sooner.

11             MR. SNYDER:  Under those circumstances we

12   believe the 8th is appropriate, and that this is a

13   delay tactic, frankly, because you can pick up the

14   phone, Mr. Lake, and call your experts, and there

15   is no magic to what has to happen.  There's no

16   dancing elves that need to be hired to effectuate

17   the transfer the data.  It's done every day in

18   America.

19             THE COURT:  You want to go to what date?

20             MR. LAKE:  The 15th.  Your Honor, just to

21   address that point, I haven't even met my experts

22   yet.  I have not talked to them once, so -- and it

23   is the 4th of July weekend for them.  They are not

24   here today.  I don't think it's unreasonable to ask

25   for the 15th.

1                THE COURT:  The 15th.

2                MR. LAKE:  Thank you, your Honor.

3                THE COURT:  Anything else?

4                MR. SNYDER:  No, your Honor.

5                THE COURT:  Mr. Lake?

6                MR. LAKE:  No.  I guess we'll talk

7     about --

8                THE COURT:  I'll be looking forward to the

9     order and the protocol.

10                MR. SNYDER:  Yes, your Honor.

11                THE COURT:  Ten o'clock tomorrow morning.

12                MR. SNYDER:  Yes, your Honor.

13                THE COURT:  And I will come in if

14     necessary to resolve any disputes, but if they

15     are -- if it's indicated to my able assistant that

16     they're ready for signature, I'll come in and sign

17     them.

18                MR. SNYDER:  Thank you, Judge.

19                THE COURT:  If there's an issue, then

20     we'll have you appear, and we'll discuss it in

21     chambers or on the record to the extent necessary.

22                MR. LAKE:  So we're ordered back here at

23     10 o'clock tomorrow morning to meet and confer, is

24     that what I just heard?

25                THE COURT:  No.  You are meeting and

1   conferring as soon as you leave the courtroom.  You

2   can stay here and meet and confer.  I will ask the

3   public to adjourn, if you will, so that the room

4   can become a conference room rather than a

5   courtroom.  Or you can go to wherever you want to

6   go to, either over dinner or to Mr. -- I don't

7   know, to Mr. Flynn's place.  He can get his jitney

8   service up here and take you over there in the

9   Larkin express and continue your conversations

10  there, have food brought in, or walk over to

11  Chef's.

12          MR. SNYDER:  Somewhere with a speakerphone

13  would be helpful.

14          THE COURT:  Speakerphone.  Well, there you

15  go.  That might be a little difficult for us here.

16  It sounds like you're going to go over to Mr.

17  Flynn's place.

18          MR. SNYDER:  Do you have a speakerphone in

19  your conference room?

20          THE COURT:  Of course.  Wait until you see

21  this place.  It's amazing.  No, I don't mean his

22  office.  I mean the building that it's in.  The

23  Larkin building.  Do you know what that is, the

24  Larkin Company of the turn of the century?  They

25  brought in product in on railroad cars on one end

1    of the building, and at the other end it came out

2    in boxes for shipment like mail order.  Household

3    goods of every kind imaginable all over the

4    country.  And now it's -- it was at one point an

5    abandoned warehouse, and then Mr. Zemski took over

6    and just had a birthday party with a cake shaped

7    like the Larkin building.  This is a very famous

8    structure in American history actually.  They have

9    a big plaque explains it all.  And Mr. Flynn can

10   explain it.  You'll really get -- it will be a real

11   education for you.

12        So, get at it, and I'll be here at ten to sign,

13   and if I have to talk to you individually and we

14   have to tweak it because you can't agree on

15   something that's major, that's what I'll do.

16            MR. SNYDER:  Your Honor, just to inform

17   the Court I'm going -- I have to be in New York,

18   but I have colleagues here, and they will be

19   dealing with Mr. Lake, and I'll be available.

20            THE COURT:  Why do you have to go to New

21   York?

22            MR. SNYDER:  Personal matter.

23            THE COURT:  Oh.

24            MR. SNYDER:  Thank you, your Honor.

25            THE COURT:  Okay.  So your other

1    colleagues are going to be able to hammer this

2    thing down?

3              MR. SNYDER:  For sure.  And I will as

4    well, your Honor.  Just not physically present.

5              THE COURT:  Oh, you're going to skip

6    dinner at Chefs, is that my understanding?

7              MR. SNYDER:  Yes, your Honor.

8              THE COURT:  What?  Wait a minute.  I ought

9    to reconsider this ruling here.  All right.

10        Anything further?  There being none, I'll see

11   the papers that I requested tomorrow morning.

12   We're adjourned.

13             MR. SNYDER:  Thank you, your Honor.

14             MR. LAKE:  Thank you, your Honor.

15             *      *      *      *      *      *

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2

3          I certify that the foregoing is a

4     correct transcription, to the best of my

5     ability, from the electronic sound recording

6     of the proceedings in this matter.

7

8

9                         s/Michelle L. McLaughlin
                          Michelle L. McLaughlin, RPR
10                             Official Reporter
                            U.S.D.C., W.D.N.Y.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25