UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
              :

PAUL D. CEGLIA,                       :

         Plaintiff,         :    Civil Action No. 1:10-cv-00569-RJA

        v.                :    **DECLARATION OF**

MARK ELLIOT ZUCKERBERG and    :    **ALEXANDER H. SOUTHWELL**
FACEBOOK, INC.,             :

         Defendants.    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

     I, ALEXANDER H. SOUTHWELL, hereby declare under penalty of perjury that the following is true and correct:

     1.    I am an attorney licensed to practice law in the State of New York and admitted to practice before this Court.  I am a partner in the law firm of Gibson, Dunn & Crutcher LLP ("Gibson Dunn"), counsel of record for Mark Elliot Zuckerberg and Facebook, Inc. ("Facebook") in the above-captioned matter.  I make this declaration, based on personal knowledge, in support of Defendants' Opposition to Ceglia's Motion to Compel and Cross-Motion to Compel Compliance with the July 1 Order, dated August 4, 2011.

     2.    This declaration first describes Defendants' timely submission of Mr. Zuckerberg's sworn declaration to Plaintiff on July 15, 2011, pursuant to the Court's Order, dated July 1, 2011 (the "Order") (Doc. No. 83).  Next, this declaration addresses Plaintiff's willful failure to comply with the Order in two respects: his failure to produce all of the Electronic Assets and refusal to permit Defendants' examination of the Hard-Copy Documents pursuant to the Order.  Finally, this declaration describes select results from Defendants' Electronic Assets inspection.  Throughout, this declaration details our good-faith efforts to resolve these disputes

prior to filing Defendants' Cross-Motion, in compliance with Western District of New York

Local Rule 7(d)(4).

### MR. ZUCKERBERG'S DECLARATION WAS TIMELY PROVIDED TO PLAINTIFF

3.      In his Motion to Compel Defendant Zuckerberg's Compliance with the Court's

Order of July 1, 2011, filed on July 25, 2011 ("Plaintiff's Motion") (Doc. No. 91), Plaintiff

asserted that Mr. Zuckerberg has not "provided a sworn declaration certifying his good-faith

efforts to locate the handwriting samples by the July 15, 2011 deadline set forth in the Order."

Plaintiff's Motion at ¶ 6.

4.      Plaintiff's counsel, Jeffrey A. Lake, submitted a sworn declaration in support of

that motion, in which he stated under penalty of perjury that Mr. Zuckerberg "has not filed his

Certification of Good-Faith Efforts either by service or the Court's ECM/ECF system."

Declaration of Jeffrey A. Lake (Doc. No. 91-5) at ¶ 6.

5.      The Order required Mr. Zuckerberg to provide a sworn declaration by July 15,

2011, certifying his good-faith efforts to locate as many of his handwriting samples as possible,

but no more than thirty (30), written in the specified time period.

6.      The Order also required Plaintiff to provide a sworn declaration by July 15, 2011,

certifying his production of all computers and electronic media in his possession, custody, or

control for inspection by Defendants.

7.      On July 14, 2011, Plaintiff filed a declaration executed by his counsel, Mr. Lake,

purporting to certify his production of these computers and electronic media.  (Doc. No. 87).

8.      Following this filing, on July 14, 2011, I had an in-person conversation with Mr.

Lake in Buffalo, New York, in which I expressed surprise that Mr. Lake had filed his declaration

rather than providing it directly to Defendants' counsel.  I informed Mr. Lake that neither the

Order nor the Local Rules require the filing of discovery material, such as declarations related to compliance with an expedited discovery order.  I informed Mr. Lake of our intention to provide such declarations to Plaintiff's counsel directly, rather than to file them.

9.      Mr. Lake told me that he understood and did not object to our stated intention to provide such declarations to Plaintiff's counsel directly.

10.      Pursuant to the Order, on July 15, 2011, I provided Mr. Lake by email with Mr. Zuckerberg's sworn declaration certifying his good-faith efforts to locate handwriting samples, as well as my supporting declaration.  A true and correct copy of that email without the attached declarations is attached hereto as Exhibit A.

11.      Neither Mr. Lake nor any of Plaintiff's other counsel ever contacted me or any of Defendants' counsel to claim that Plaintiff had not received Mr. Zuckerberg's declaration, despite my ongoing discussion with Mr. Lake regarding various issues related to the Court-ordered expedited discovery during the days following July 15th.  Neither Mr. Lake nor any of Plaintiff's other counsel ever contacted me or any of Defendants' counsel to express an opinion that Mr. Zuckerberg's declaration should have been filed with the Court.  The first indication I or any of Defendants' counsel had that there was an issue of any kind regarding Mr. Zuckerberg's declaration was when, on July 25, 2011, Plaintiff filed Plaintiff's Motion.  Needless to say, Mr. Lake did not attempt to meet and confer with Defendants' counsel prior to filing the motion, as required by Western District of New York Local Rule 7(d)(4).

12.      On the afternoon of July 26, 2011, I participated in a phone conversation with Mr. Lake regarding, *inter alia*, Plaintiff's Motion.  During the course of that conversation, Mr. Lake said that he had received *my* declaration concerning the handwriting search, but he did not recall receiving Mr. Zuckerberg's.  As explained above, I sent my declaration along with Mr.

Zuckerberg's in a single email on July 15, 2011.  I explained this in my conversation with Mr. Lake.  Mr. Lake asked me to forward him the email and acknowledged that he might have overlooked Mr. Zuckerberg's declaration.  Mr. Lake stated his intention to review his email and to consider what action to take to rectify his misrepresentation to the Court.  Mr. Lake said that such action might include withdrawal of that portion of Plaintiff's Motion and/or an apology, noting that he would be "happy to publicize" such an action.

13.     I forwarded my July 15th email to Mr. Lake on the afternoon of July 26, 2011.  Mr. Lake confirmed receipt via email, but gave no further reaction.  When I further inquired by email as to what action Mr. Lake intended to take to rectify his misrepresentation to the Court that Mr. Zuckerberg did not timely provide his declaration, Mr. Lake replied in a manner that was non-responsive.  A true and correct copy of that email exchange is attached hereto as Exhibit B.

14.     As of the signing of this Declaration, Mr. Lake has not corrected his misrepresentation to the Court that Mr. Zuckerberg did not timely provide his declaration.

## PLAINTIFF'S FAILURE TO PRODUCE ELECTRONIC ASSETS

15.     The Order also required Plaintiff to produce on or before July 15, 2011, the following electronic assets: (1) the native electronic version of the purported contract attached to the Amended Complaint and all electronic copies of the purported contract including the forms described in paragraph 8 of the Declaration of Paul D. Ceglia, dated June 12, 2011; (2) the original, native electronic files consisting of or containing the purported emails described in the Amended Complaint and all electronic copies of the purported emails; and (3) all computers and electronic media in Plaintiff's possession, custody, or control, including but not limited to the electronic assets listed in paragraph 6 of the Declaration of John H. Evans, dated June 17, 2011,

and all assets certified to by Plaintiff pursuant to the Order (collectively. the "Electronic Assets").

16.     The Order further required Defendants to produce, five days *after* Plaintiff's production of the Electronic Assets and his sworn declaration certifying compliance, all emails between Mr. Zuckerberg and Plaintiff and/or other persons associated with StreetFax that were captured from Zuckerberg's Harvard email account.   This sequence was intended to mitigate the risk that Plaintiff would use the emails produced by Defendants to falsify new documents.

17.     On July 13, 2011, in anticipation of meeting with Mr. Lake the next day and of Plaintiff's impending production of the Electronic Assets, my partner Orin Snyder sent Mr. Lake a letter reminding him of Plaintiff's ongoing duty to preserve all evidence relevant to this litigation since at least the filing of the Original Complaint on June 30, 2010.  The letter further requested that Plaintiff certify compliance with his preservation obligations.  A true and correct copy of that letter is attached hereto as Exhibit C.

18.     On July 14, 2011, following the filing of Mr. Lake's declaration purporting to certify Plaintiff's production of all computers and electronic media in his possession, custody, or control, I had an in-person conversation with Mr. Lake in Buffalo, New York, about the specific items required to be produced pursuant to the Order.  Specifically, I told Mr. Lake that the Order required Plaintiff's production to include all of the Electronic Assets, including the electronic documents specified in the Order.  I also told Mr. Lake that the Order required a declaration certifying compliance from Plaintiff himself, rather than from his attorney.

19.     In this conversation, Mr. Lake asserted that he had not initially understood the Order in this way, but acknowledged that it was a proper reading of the Order.  Mr. Lake added

that his computer forensics consultant was working to identify the specific electronic documents required to be produced and he would provide those documents.

20.     On July 15, 2011, Plaintiff filed a sworn declaration regarding his production of the Electronic Assets (Doc. No. 88).  Plaintiff attested that he had produced all computers in his possession, custody, or control, and specifically that he had produced to Defendants an image of a Seagate hard drive.  Those representations were false.

21.     On July 15, 2011, I learned from Defendants' computer forensics experts that the image of the Seagate hard drive had not been produced at the Electronic Asset inspection site in Chicago.  Later that same evening, I sent Mr. Lake an email expressing my concern that Plaintiff's Electronic Asset production did not comply fully with the Order.  I noted in particular Plaintiff's failure to provide for inspection the image of the Seagate hard drive that Plaintiff had sworn had been produced in his declaration.  A true and correct copy of that email is attached hereto as Exhibit D.

22.     On the afternoon of July 16, 2011, Mr. Lake replied to that email only to note that the image of the Seagate hard drive, which Plaintiff swore had been produced on July 15, 2011, would actually be produced on July 18, 2011.  A true and correct copy of that reply email is attached hereto as Exhibit E.  Plaintiff ultimately produced this image of the Seagate hard drive on July 18, 2011.

23.     On the afternoon of July 16, 2011, Mr. Lake had an in-person conversation in Buffalo with one of my associates, Matthew Benjamin.  I understand from Mr. Benjamin that Mr. Lake informed Mr. Benjamin that Plaintiff would be producing an additional computer from Plaintiff's parents' house.  Plaintiff ultimately produced this computer on July 19, 2011, despite

the fact that Plaintiff had sworn on July 15th that he had already produced all computers in his

possession, custody, or control to Defendants.

24.     On July 19, 2011, I had another in-person conversation with Mr. Lake in Buffalo

regarding Plaintiff's failure to produce the electronic documents required to be produced by the

Order.  Mr. Lake reiterated that his computer forensics consultant, along with an attorney from

Edelson McGuire LLC, was working to identify these electronic documents, and that they would

provide those documents to Defendants.  I asked why Mr. Lake did not simply ask Mr. Ceglia for

the locations of the electronic documents required to be produced.  To my surprise and concern,

Mr. Lake responded that Mr. Ceglia was not involved with producing the Electronic Assets,

adding that Mr. Ceglia was currently living in Ireland.

25.     Because our concerns had not yet been resolved or even fully addressed by

Plaintiff's counsel—and indeed had only been exacerbated by the news of Mr. Ceglia's

nonparticipation and whereabouts—I sent a letter to Mr. Lake on July 20, 2011, reiterating our

concern that Plaintiff's Electronic Asset production was not in compliance with the Order.  The

letter suggested reasonable means by which Plaintiff could expeditiously comply with the Order,

such as by identifying the specified materials on electronic assets already produced or providing

an explanation of the non-existence of an item.  In the letter, I indicated that we would accept

compliance as late as July 25, 2011—ten days after the court-ordered deadline and five days after

the date of the letter.  A true and correct copy of that letter is attached hereto as Exhibit F.  Mr.

Lake did not respond to that letter in any way before filing Plaintiff's Motion.

26.     Given clear evidence that Plaintiff misrepresented his compliance with the Order's

requirement concerning production of Electronic Assets in his sworn declaration, we had and

continue to have grave concerns that Plaintiff does not intend to comply with the Order, while at the same time representing to the Court that he has done so.

27.     In sum, as of the signing of this declaration, Plaintiff still has not produced the following Electronic Assets: the native electronic version of the purported contract attached to the Amended Complaint; all electronic copies of the purported contract (which includes those in possession of the Plaintiff's agents, including his lawyers and experts John Paul Osborn and Valery Aginsky, or those in any webmail account); the electronic forms described in Mr. Ceglia's June 12, 2011 declaration; the original, native electronic files consisting of or containing the purported emails; and all electronic copies of the purported emails.

28.     To the extent some of those Electronic Assets exist on computers or electronic media already produced, Plaintiff has neither represented that fact nor identified the location of those Electronic Assets on computers or electronic media already produced.  Nor has Plaintiff produced the Electronic Assets called for by the Order, but which would not be on the computers or electronic media produced, such as copies of the purported contract in the possession of Plaintiff's agents, including his lawyers and experts John Paul Osborn and Valery Aginsky, or in any webmail account.

## PLAINTIFF'S OBSTRUCTION OF DEFENDANTS' EXAMINATION

29.     The Order, as well as the Court's Hard-Copy Inspection Protocol, dated July 1, 2011 (the "Hard-Copy Protocol") (Doc. No. 84) required Plaintiff to produce for Defendants' examination on or before July 15, 2011, the following hard-copy documents: (1) all original signed version of the purported contract attached to the Amended Complaint; (2) all copies of the purported contract in hard-copy form, created on or before June 30, 2010; and (3) all copies of the purported emails described in the Amended Complaint in hard-copy form (collectively, the

"Hard-Copy Documents").  Neither the Order nor the Hard-Copy Protocol limited the

examination, testing, or sampling that Defendants' experts could perform on the Hard-Copy

Documents.  The Hard-Copy Protocol simply required that Defendants provide notice of such

testing, and that any physical sampling—the extraction of tiny samples of the ink, toner, and

paper from the Hard-Copy Documents for further analysis—must be done in the presence of both

parties' representatives.  See Hard-Copy Protocol at ¶¶ 3-4.

30.     Prior to the commencement of Defendant's inspection of the Hard-Copy

Documents, Mr. Lake raised with me by telephone a number of issues related to the Hard-Copy

inspection.  First, Mr. Lake requested that his handwriting expert be permitted to examine the

Hard-Copy Documents prior to the physical sampling by Defendants' experts.  Second, Mr. Lake

demanded that Defendant Zuckerberg produce handwriting samples for Plaintiff's expert's

examination two weeks prior to the date of production in the Order.  Third, Mr. Lake insisted

that we limit the number of physical samples Defendants' experts were permitted to take.

31.     I asked Mr. Lake to explain his concerns and make a proposal.  Mr. Lake did so in

an email on July 13, 2011.  A true and correct copy of that email is attached hereto as Exhibit G.

32.     On July 14, 2011, I had an in-person conversation with Mr. Lake in Buffalo

concerning his proposal.  While not agreeing to Mr. Lake's proposal, Defendants made a number

of accommodations in order to address some of Mr. Lake's stated concerns. Specifically,

although the Order did not contemplate any inspection by Plaintiff's experts until the conclusion

of Defendants' experts' inspection, Defendants agreed to accommodate Plaintiff's handwriting

expert's inspection on July 15, 2011, while Defendants' experts' inspection was ongoing and prior

to the sampling by Defendants' experts that was to take place on July 16, 2011.  Regarding

sampling the Hard-Copy Documents, I agreed with Mr. Lake that Defendants' experts would

start with a set number of samples and then allow Plaintiff's experts to extract the same number

of samples.  We further agreed that we would discuss the precise location of the ink samples and

that if after both sides took the set number of ink samples there was sufficient additional ink

available, we would discuss taking additional samples.

33.     On July 16, 2011, Defendants and Plaintiff reached an agreement regarding the

specific number and general location of ink samples that each party would have the opportunity

to take initially.  A true and correct copy of Plaintiff's suggested exam protocol for ink and paper

sampling, a portion of which Defendants agreed to, is attached hereto as Exhibit H.

34.     On July 19, 2011, at the conclusion of that day of Defendants' examination of the

Hard-Copy Documents, I again discussed in person with Mr. Lake in Buffalo taking additional

samples from the available ink based on the request of Defendants' experts.  In part because

Plaintiff's expert had already left for the airport, Mr. Lake indicated that we should wait to

discuss this issue further until after Plaintiff's experts took their samples, which was scheduled to

occur at Plaintiff's request six days later on July 25, 2011.  Mr. Lake agreed that if there were

sufficient ink available after Plaintiff's experts' sampling, then he would allow Defendants'

experts to extract more ink samples.

35.     On July 25, 2011, in order to observe Plaintiff's testing on July 25, 2011 and in

anticipation of the additional sampling by Defendants' expert after Plaintiff's experts' sampling, I,

another Gibson Dunn attorney, and Defendants' expert Dr. Albert Lyter III traveled to the offices

of Edelson McGuire LLC in Chicago, Illinois, where Plaintiff had arranged to conduct their

inspection.  Mr. Lake was not present for the inspection, although Plaintiff's counsel Paul

Argentieri and attorneys from Edelson McGuire who represented Plaintiff[1] were present.

36.     At the conclusion of Plaintiff's inspection and sampling on July 25, 2011,

Defendants' expert Dr. Lyter informed me that there was substantial additional ink on the Hard-

Copy Documents from which both parties' experts could take multiple samples.  See also Lyter

Declaration at ¶¶ 10-11.  I then raised with Mr. Argentieri taking a small number of additional

samples of the available ink on the Hard-Copy Documents, as I had agreed with Mr. Lake to

discuss upon completion of Plaintiff's experts' inspection and sampling.  Mr. Argentieri refused

to allow Dr. Lyter to take any more samples of the Hard-Copy Documents, demanding that we

seek Court intervention.  Mr. Argentieri stated that he would not consider any further sampling

whatsoever until after Plaintiff's experts obtained results from their sampling.  When I pressed

Mr. Argentieri on the existence of available ink for sampling, as our expert had confirmed, he

refused to state whether his expert believed there was sufficient ink or not.

37.     On the afternoon of July 26, 2011, I participated in a phone conversation with Mr.

Lake regarding, *inter alia*, further ink sampling by Defendants' experts of the Hard-Copy

Documents.  Mr. Lake also refused to allow Defendants' experts to take any more samples of the

Hard-Copy Documents, demanding that we seek Court intervention.  Mr. Lake acknowledged

our prior agreement that further sampling would be permitted if there were ink left available to

sample.  However, Mr. Lake now refused to allow sampling because he stated that one of his

---

[1]   On the morning of July 26, 2011, the day after the Hard-Copy Document inspection at the offices of Edelson McGuire, Jay Edelson informed me by telephone that his firm would not have any further involvement with the Ceglia case and would not be filing a notice of appearance.  Since then, I understand that Edelson McGuire has had no further involvement in this case.

experts informed him there was not enough ink available on the documents.  Mr. Lake did not
identify this expert.

38.     As mentioned above, I understand from Defendants' expert, Dr. Lyter, that there
is substantial additional ink available on the Hard-Copy Documents to permit the extraction of
multiple samples by both sides.  See Lyter Declaration at ¶¶ 10-11.  As the Court knows, Dr.
Lyter is widely respected as one of the nation's leading experts in ink analysis.

## SELECT RESULTS FROM ELECTRONIC ASSETS INSPECTION

39.     Pursuant to the Electronic Asset Inspection Protocol entered by Judge Foschio on
July 1, 2011 (the "Electronic Asset Protocol") (Doc. No. 85), the computer forensics and
electronic discovery firm Stroz Friedberg, LLC ("Stroz Friedberg") conducted an examination of
the Electronic Assets.  Specifically, Stroz Friedberg analyzed the Electronic Assets produced by
Plaintiff, identified Presumed Relevant Material, and provided that Presumed Relevant Material
to Plaintiff on or about July 27, 2011.

40.     Pursuant to the Electronic Asset Protocol, Mr. Lake's associate Nathan Shaman
sent Defendants and Stroz Friedberg a privilege log on the afternoon of August 2, 2011.  A true
and correct copy of this privilege log is attached hereto as Exhibit I.  That privilege log identified
two documents from the Presumed Relevant Material that Plaintiff maintains are subject to the
attorney-client communication privilege.  That privilege log further asserted that all 120 items on
the log of Presumed Relevant Material were confidential under the parties' Joint Stipulated
Protective Order.

41.     In the privilege log, Plaintiff described the two purportedly privileged
communications [THIS TEXT HAS BEEN REDACTED DUE TO CEGLIA'S IMPROPER
CONFIDENTIALITY DESIGNATIONS].  A true and correct copy of the initial list of members

of StreetFax LLC, [REDACTED] and subsequently filed with the State of Nevada, is attached hereto as Exhibit J.

42.     Pursuant to the Electronic Asset Protocol, in the evening of August 2, 2011, Stroz Friedberg produced to counsel for Defendants all Presumed Relevant Material not designated as privileged by Plaintiff.  The Presumed Relevant Material include a substantial amount of evidence that is highly probative of the inauthenticity of the purported contract at the heart of this case, including:

> A.     [FOUR SENTENCES HAVE BEEN REDACTED DUE TO CEGLIA'S IMPROPER CONFIDENTIALITY DESIGNATIONS].  True and correct copies of these files are attached hereto as Exhibit K.[2]  Plaintiff has designated these files as confidential.

> B.     [TWO SENTENCES HAVE BEEN REDACTED DUE TO CEGLIA'S IMPROPER CONFIDENTIALITY DESIGNATIONS].  Plaintiff did not produce these files for inspection.  Plaintiff has designated this evidence as confidential.

43.     On August 3, 2011, my partner Orin Snyder sent Mr. Lake a letter objecting to the designation of all of the Presumed Relevant Material as confidential.  A true and correct copy of this letter is attached hereto as Exhibit M.

44.     Later that day, Mr. Shaman responded to demand more specific objections to Plaintiff's designations.  A true and correct copy of this letter is attached hereto as Exhibit N.

---

[2]  Because the electronic images located by Stroz Friedberg are somewhat blurry, a transcription of Exhibit K, prepared by a Gibson Dunn legal assistant, is attached hereto as Exhibit L to facilitate the Court's review.

45.     Later that evening, Mr. Snyder sent Mr. Shaman a letter reiterating Defendants' objection to each and every confidentiality designation by Plaintiff.  A true and correct copy of this letter is attached hereto as Exhibit O.

46.     Later that day, Mr. Shaman responded to state that Plaintiff would further review each confidentiality designation and provide a revised privilege log.  A true and correct copy of this letter is attached hereto as Exhibit P.  In a subsequent email, Mr. Shaman agreed to provide the revised privilege log by 3:00 p.m. on August 4, 2011.  A true and correct copy of that email is attached hereto as Exhibit Q.

47.     On August 4, 2011, Mr. Shaman sent Mr. Snyder a letter maintaining that all of Plaintiff's blanket confidentiality designations are appropriate.  A true and correct copy of this letter is attached hereto as Exhibit R.

48.     Later that day, Mr. Snyder responded by requesting that Plaintiff de-designate as confidential, at a minimum, the documents described in Paragraph 42A of this declaration.  A true and correct copy of this letter is attached hereto as Exhibit S.

49.     Later that day, Mr. Shaman sent Mr. Snyder a letter maintaining that all of Plaintiff's blanket confidentiality designations are appropriate.  A true and correct copy of this letter is attached hereto as Exhibit T.


I declare under penalty of perjury that the foregoing is true and correct.  Executed on this ___ day of August, 2011 at New York, New York.

_____
Alexander H. Southwell