UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

PAUL D. CEGLIA,                    *          Docket No.
                                   *          1:10-cv-00569-RJA
                                   *
            Plaintiff,             *
                                   *
                                   *          Buffalo, New York
            v.                     *          August 17, 2011
                                   *
                                   *          2:04 p.m.
                                   *
MARK ELLIOT ZUCKERBERG and         *          ORAL ARGUMENT
FACEBOOK, INC.,                    *
                                   *
            Defendants.            *
                                   *
* * * * * * * * * * * * * * *

                    TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE LESLIE G. FOSCHIO
                UNITED STATES MAGISTRATE JUDGE


APPEARANCES:


For the Plaintiff:            JEFFREY A. LAKE, ESQ.
                              LAKE, APC
                              835 5th Avenue, Suite 200A
                              San Diego, California  92101

                              PAUL A. ARGENTIERI, ESQ.
                              LAW OFFICE OF PAUL A. ARGENTIERI
                              188 Main Street
                              Hornell, New York  14843

For the Defendants:           ORIN SNYDER, ESQ.
                              AMANDA AYCOCK, ESQ.
                              GIBSON, DUNN & CRUTCHER LLP
                              200 Park Avenue, 47th Floor
                              New York, New York  10166-0193

                              TERRANCE P. FLYNN, ESQ.
                              HARRIS BEACH PLLC
                              726 Exchange Street, Suite 1000
                              Buffalo, New York  14210

1    Court Reporter:           JOLENE LAMPHIER,
                               Notary Public
2                              Jack W. Hunt & Associates, Inc.
                               1420 Liberty Building
3                              Buffalo, New York 14202
                               (716) 853-5600
4
          Proceedings recorded by mechanical stenography,
5                transcript produced by computer.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

13:43:18  1        **THE CLERK:**  Ceglia versus Zuckerberg.  Appearing for

14:04:32  2   the Plaintiff is Jeffrey Lake and Paul Argentieri.  Appearing

14:04:34  3   for the Defendant is Orin Snyder and Amanda Aycock and Terrance

14:04:39  4   Flynn.  We are here for oral arguments on Plaintiff's motion to

14:04:43  5   compel and Defendants' cross motion to compel.

14:04:52  6        **THE COURT:**  Good afternoon.  Welcome back.  I read the

14:04:57  7   papers.  We have a court reporter thinking that people may want

14:05:28  8   to have a transcript and if they do, put the people to work

14:05:33  9   here.

14:05:37  10       I've read the papers.  I think the first thing to deal

14:05:41  11   with is the issue of Mr. Lake's letter to the Court indicating

14:05:48  12   that the Court's description of items 1 through 4, particularly

14:05:56  13   two documents mentioned in the log that purport to be a contract

14:06:01  14   for StreetFax between the Plaintiff and Mr. Zuckerberg, might

14:06:08  15   not have been correctly -- correctly denominated in the Court's

14:06:15  16   decision in order of Friday afternoon, August the 12th, which we

14:06:18  17   were trying to accommodate the parties so that each side would

14:06:22  18   know to what extent they could adverse to these documents in

14:06:25  19   dispute in the course of today's hearing.

14:06:28  20       And I read Mr. Snyder's response indicating that the

14:06:45  21   Court got it right and that perhaps the Court ought to

14:06:50  22   reconsider item 29 as not being confidential in as much as that

14:06:59  23   those emails were also appended to the complaint, another fact

14:07:05  24   the Court may not have focused on when I wrote the note.

14:07:10  25       Of course, the parties did not make a lot of argument

14:07:15  1   about each and every item so it's somewhat easy to understand

14:07:20  2   how we might not have focused on the fact that those emails were

14:07:25  3   also appended to the contract.

14:07:27  4        I'm here to start off the proceedings by entertaining

14:07:31  5   Mr. Lake's motion, which I suppose can be fairly denominated as

14:07:37  6   a request for reconsideration on that point.  I suppose

14:07:42  7   Mr. Snyder's letter could also be considered to be a

14:07:45  8   cross-request for reconsideration as to item 29.

14:07:51  9        And so how did -- how do you -- why do you think the

14:07:59  10  confidentially of those items should be retained even if from

14:08:07  11  a -- from a drafting point of view there is allegedly some

14:08:14  12  variations between the two documents, one being what looks to be

14:08:18  13  a straight-up software development contract for StreetFax and

14:08:24  14  the other one to have a work-for-hire, which appears to include

14:08:28  15  the reference to the Facebook ownership interest, allegedly

14:08:33  16  created in favor of Mr. Ceglia.  Both documents, at least

14:08:42  17  purportedly, given the Plaintiff's proffering of them as

14:08:47  18  confidential, were executed by Mr. Zuckerberg.

14:08:51  19       I guess part of my curiosity is are you -- your

14:08:59  20  argument is that there were in fact two contracts that the

14:09:06  21  StreetFax contracted alluded to in items 1 through 4 are one

14:09:11  22  contract, but the contract at issue in the case, which was

14:09:15  23  appended to the complaint is yet a completely different

14:09:20  24  contract.

14:09:20  25       It just struck me when I wrote the decision that they

14:09:23  1   were -- they were essentially the same.  And it's probably true

14:09:29  2   that it is -- it is true of course that the appended contract

14:09:32  3   does specifically reference the Facebook ownership interest, if

14:09:36  4   you will, but other than that, the thrust of both the documents

14:09:43  5   refers to the creation of this StreetFax software product, which

14:09:50  6   is really the whole avenue, if you will, of all of the other

14:09:57  7   documents as you proffered as being confidential, which I upheld

14:10:01  8   your argument on, didn't I?

14:10:03  9         MR. LAKE:  Your Honor, I'd be happy to address that,

14:10:06  10  but before I do, if I may request that I think we are currently

14:10:09  11  under a protective order.  We're about to be talking about some

14:10:14  12  very sensitive information that I think is protected.

14:10:17  13        THE COURT:  Well, I'm not asking you to quote from it.

14:10:17  14        MR. LAKE:  Right.

14:10:19  15        THE COURT:  But you're telling me --

14:10:19  16        MR. LAKE:  No.  No, I'm not, except I have a feeling

14:10:22  17  that we have an entire press corps behind me and if we are going

14:10:27  18  to be talking about protected documents, until and if and when

14:10:30  19  the protected order is lifted, I think it would be appropriate

14:10:33  20  that we excuse anyone who is associated with the press or a

14:10:38  21  nonparty to this matter so that we can have a open discussion.

14:10:42  22        And if the Judge, you know, Your Honor rules that

14:10:46  23  there is no reason for our discussion to be protected, then they

14:10:51  24  can review the transcript, but I am uncomfortable --

14:10:54  25        THE COURT:  Can't you just make your general

14:10:56  1    observations about why both should be considered confidential

14:11:00  2    without quoting from them?

14:11:01  3         **MR. LAKE:**  The work-for-hire contract was attached to

14:11:06  4    the complaint.  That has not been designated as confidential.

14:11:10  5    It's been produced.  The other documents that were produced, as

14:11:14  6    a result of the Court's July 1st, 2011 expedited discovery

14:11:26  7    order, have been designated confidential as a result of the

14:11:26  8    protective order that was requested and drafted by the

14:11:27  9    Defendants.

14:11:27  10        They drafted it and such a way that there was broad

14:11:31  11   language.  It was an all-encompassing protective order.  I think

14:11:36  12   the reason for that is because, at this point in the litigation,

14:11:39  13   we have produced all of the information that has been requested

14:11:42  14   of us and they now want to be able to use that for a couple

14:11:46  15   reasons.  One --

14:11:47  16        **THE COURT:**  Look, the question is whether or not the

14:11:49  17   documents referred to as 1 through 4 carry with them a

14:11:53  18   reasonable expectation of confidentially at the time of the

14:11:58  19   designation.

14:11:58  20        **MR. LAKE:**  Yes, I think two of them --

14:12:00  21        **THE COURT:**  Both documents substantially refer -- if

14:12:05  22   you count out the number of lines, substantially refer to the

14:12:10  23   StreetFax project.  Isn't that a fair statement?

14:12:14  24        **MR. LAKE:**  There's actually four documents.  Two of

14:12:17  25   them --

14:12:17  1          **THE COURT:**  Two of them are emails to some lawyer.

14:12:20  2          **MR. LAKE:**  Correct.  We designated those as attorney

14:12:23  3  client privilege.  That was your order --

14:12:25  4          **THE COURT:**  Well, you haven't -- I gave you until this

14:12:28  5  morning to produce.  I stayed as to the confidentially issue,

14:12:33  6  production issue, but your request said nothing about the

14:12:38  7  attorney client privilege so I'm assuming that you agree they

14:12:42  8  are not privileged.

14:12:43  9          **MR. LAKE:**  No, they are privileged.

14:12:45 10          **THE COURT:**  Did you take an appeal to Judge Arcara?

14:12:49 11          **MR. LAKE:**  No.

14:12:50 12          **THE COURT:**  Are you going to ask for a writ of

14:12:54 13  mandamus from the second circuit?

14:12:56 14          **MR. LAKE:**  No, Your Honor.  I was unable to procure a

14:12:59 15  declaration from the lawyer that they were sent to in time for

14:13:02 16  this hearing because I don't think I could give you a hearsay

14:13:05 17  declaration saying that that attorney --

14:13:07 18          **THE COURT:**  You had the burden.

14:13:09 19          **MR. LAKE:**  No, I understand that.

14:13:09 20          **THE COURT:**  You were the one that nominated them as

14:13:11 21  attorney client privilege.  It's Hornbook --

14:13:14 22          **MR. LAKE:**  No, I understand.

14:13:15 23          **THE COURT:**  -- textbook law that you carry the burden

14:13:17 24  and there was very little offered to me in connection with the

14:13:23 25  -- in opposition for the de-designation motion by the

14:13:28  1    Defendants.  I did the best I could.  I gave you the benefit of

14:13:31  2    the doubt as to the confidentially order on all four items.

14:13:36  3            **MR. LAKE:**  Yeah.

14:13:37  4            **THE COURT:**  We're here to hear how it was that I

14:13:41  5    mistook some facts in some material way that affects the

14:13:44  6    analysis of whether Mr. Ceglia at the time of the designation

14:13:48  7    carried a reasonable expectation of confidentially.

14:13:51  8            **MR. LAKE:**  Right, and what I'm --

14:13:52  9            **THE COURT:**  And I have not seen anything from the

14:13:57  10   Plaintiff that suggests that there is any substantial

14:14:00  11   disagreement with my analysis, that none of the four are

14:14:05  12   protected by the attorney client privilege.

14:14:08  13           **MR. LAKE:**  Right, I was going to address all four --

14:14:11  14           **THE COURT:**  Isn't that fair?  If you're sitting in my

14:14:13  15   chair, is that not a fair perception?

14:14:15  16           **MR. LAKE:**  I think it's a fair perception.  I think

14:14:18  17   that in order for me to meet my burden at the time of

14:14:22  18   admissibility, should this case proceed to trial, that I would

14:14:24  19   have to give you more information in regards to the two emails.

14:14:27  20   I agree with that.

14:14:28  21           **THE COURT:**  Wait a minute.  Wait a minute.  As to

14:14:30  22   admissibility, I'm not sure what you mean.

14:14:32  23           **MR. LAKE:**  Right.  We've produced them pursuant to

14:14:34  24   your order.

14:14:34  25           **THE COURT:**  You produced --

14:14:36  1        **MR. LAKE:**  They've read them.

14:14:37  2        **THE COURT:**  You produced all of them?

14:14:39  3        **MR. LAKE:**  Yes, we produced them to the Defendants.

14:14:42  4        **THE COURT:**  I thought you had not produced the first

14:14:46  5    four because you were concerned with attorney client privilege.

14:14:47  6        **MR. LAKE:**  We produced items 2 and 4.  We designated

14:14:50  7    them as confidential.  We did not produce items 1 and 3, which

14:14:53  8    were the emails.  But in light of your order of last Friday, we

14:14:55  9    did produce them.  They have them.

14:14:58  10        **THE COURT:**  Well, if I made a mistake, you destroyed

14:15:02  11    the privilege by your production.

14:15:04  12        **MR. LAKE:**  Well, the issue now is confidentiality.

14:15:07  13        **THE COURT:**  You did not ask for a stay for review from

14:15:11  14    me or from Judge Arcara.  There is no, as you say, pending

14:15:17  15    request for mandamus review by the second circuit, which I'm

14:15:22  16    sure they would have given you a stay if you asked for one.

14:15:25  17        **MR. LAKE:**  We didn't do that.

14:15:26  18        **THE COURT:**  I think none of those items are

14:15:28  19    privileged.

14:15:29  20        **MR. LAKE:**  But we've produced them.

14:15:31  21        **THE COURT:**  Okay.

14:15:32  22        **MR. LAKE:**  What I'm concerned with is confidentially.

14:15:35  23        **THE COURT:**  And the question is whether there was a

14:15:37  24    reasonable expectation at the time they were designated as being

14:15:40  25    confidential.

14:15:41  1    My problem is I see a document that's signed by one of

14:15:45  2  the two parties to the contract and I can't understand how one

14:15:50  3  party can now assert that it's confidential if the other party

14:15:56  4  has received a copy by virtue of being a party to it.

14:15:59  5    **MR. LAKE:**  No, if we take the emails and separate

14:16:02  6  them, that's items 1 and 3, and we talk about the other two

14:16:06  7  documents, 2 and 4, number 4 is that -- that document is a TIFF

14:16:14  8  image, which essentially is a photograph of a page that was

14:16:21  9  attached to the original complaint --

14:16:25 10    **THE COURT:**  As allegedly signed by Mr. Zuckerberg?

14:16:28 11    **MR. LAKE:**  That's right.  That's page two.

14:16:30 12    **THE COURT:**  How can your client have a reasonable

14:16:33 13  expectation of confidentially?

14:16:35 14    **MR. LAKE:**  Page one of that --

14:16:36 15    **THE COURT:**  This is item 4?

14:16:47 16    **MR. LAKE:**  Yeah, item 4.  Item 4, the reason that that

14:16:47 17  was designated as privileged is if it was considered in

14:16:47 18  conjunction with item number 2, that was our fear because item

14:16:49 19  number 2 is not identical --

14:16:52 20    **THE COURT:**  If you use the word privilege, you're

14:16:56 21  confusing me because we've just established the privilege has

14:16:59 22  been lost.  In my opinion, there was no privilege.  You failed

14:17:03 23  to show that any of these pieces of paper were submitted in

14:17:03 24  connection with a request for confidential legal advise or

14:17:08 25  services by Mr. Cole or any other lawyer.

14:17:10  1          MR. LAKE:  Right.  I think I'm not articulating my

14:17:14  2   position clearly.  I'm not worried about the production.  That's

14:17:18  3   been produced.  I'm worried about the protective order.

14:17:25  4          THE COURT:  I know, but when you use the word

14:17:26  5   privilege, you are, to me, combining apples and oranges.

14:17:30  6          MR. LAKE:  Okay.  What I'm trying to say is that item

14:17:31  7   number 2, which is designated at scan TIFF 001 --

14:17:37  8          THE COURT:  Yes.

14:17:38  9          MR. LAKE:  -- was never attached to the original

14:17:40 10   complaint.  It was different.  It's a different document.

14:17:41 11          THE COURT:  And I'll see that.

14:17:42 12          MR. LAKE:  And --

14:17:43 13          THE COURT:  I acknowledge that.

14:17:45 14          MR. LAKE:  Right.

14:17:46 15          THE COURT:  My drafting might not have been as precise

14:17:50 16   as it could have been in that regard, but my thought was that

14:17:53 17   the substance, the printed text, is substantially the same as

14:18:01 18   the contract that was attached to the complaint.  Is that not a

14:18:06 19   fair characterization?

14:18:08 20          MR. LAKE:  Portions of it are, but portions of it are

14:18:11 21   erratically different.  In fact --

14:18:13 22          THE COURT:  As to the Facebook issue?

14:18:15 23          MR. LAKE:  Correct.  The document that you're

14:18:17 24   referring to, there has been no foundation laid.

14:18:21 25          In fact, there was a declaration submitted by Mark

14:18:25  1    Zuckerberg himself to the contrary as to item 4, which is page

14:18:27  2    two.  He's already told this Court that he never signed the

14:18:31  3    document that was attached to the complaint.  We have a

14:18:33  4    declaration in the file that says that.

14:18:35  5         The second page that you're looking at, which is

14:18:37  6    designated as scan TIFF 002, is exactly that page.  Mark

14:18:42  7    Zuckerberg denies signing it.

14:18:43  8         Now, as of over the last couple days, in my view of

14:18:48  9    violation of the protective order, the Defendants are claiming

14:18:51  10   that they have found a smoking gun.  And the smoking gun that

14:18:54  11   they have provided to the press was item 2 and item 4 and they

14:18:59  12   are claiming that they are somehow connected, that they were

14:19:04  13   somehow drafted by Mr. --

14:19:09  14        **THE COURT:**  But you said you did not provide -- you

14:19:11  15   provided 2 and 4 to them.

14:19:13  16        **MR. LAKE:**  That's correct.

14:19:14  17        **THE COURT:**  But there is something still on the

14:19:17  18   confidentially?

14:19:17  19        **MR. LAKE:**  Correct.

14:19:18  20        **THE COURT:**  So how did they provide them to the --

14:19:22  21        **MR. LAKE:**  They attached them -- well, first of all,

14:19:23  22   they took press interviews.  Second, and I have copies of

14:19:25  23   articles written, they filed a motion with unredacted statements

14:19:28  24   saying that they found --

14:19:29  25        **THE COURT:**  Which they corrected.

14:19:31   1          **MR. LAKE:**  Yes.

14:19:32   2          **THE COURT:**  And apparently that did not leak out to

14:19:34   3   the general public.

14:19:36   4          **MR. LAKE:**  No, they did.  They did.  It's been

14:19:39   5   published in numerous articles talking about the smoking gun

14:19:39   6   authentic contract.

14:19:43   7          Then on Monday --

14:19:44   8          **THE COURT:**  That is not something the Court has any --

14:19:46   9   that was apparently a clerical or a procedural error on the part

14:19:51  10   of the Defendants.  I'm well-aware of their efforts to correct

14:19:51  11   it.

14:19:52  12          What I'm not aware of is what you just said, that

14:19:55  13   there was actually any sharing of that from the clerk's office

14:19:58  14   as a result of that mistaken file.

14:20:01  15          **MR. LAKE:**  They also attached it saying that --

14:20:02  16          **THE COURT:**  You're saying there was?  So somehow

14:20:06  17   somebody got into our ECF system despite the efforts of our --

14:20:14  18          **THE CLERK:**  [Inaudible.]

14:20:14  19          **THE COURT:**  But that actually happened?

14:20:18  20          **THE CLERK:**  Yes.

14:20:19  21          **THE COURT:**  I was not aware of that.

14:20:21  22          **MR. LAKE:**  I can read you a quote.  There are numerous

14:20:27  23   articles written that quote the redacted portions.

14:20:27  24          **THE COURT:**  Mr. Lake, I only dealt with the motion

14:20:29  25   that was in front of me, which was the de-designation motion.

14:20:33  1    This problem with the clerk's office was totally unforeseen.

14:20:37  2    And if in fact the mistake was made, it appears to have been a

14:20:42  3    good-faith error on the part of the Defendants.

14:20:46  4        **MR. LAKE:**  Except for that when we received the

14:20:48  5    Court's order on Friday, and in the order it referenced, and I

14:20:52  6    highlighted this from the letter that I sent you Monday, that

14:20:56  7    because the Court's opinion was that item 2 and item 4 were what

14:21:01  8    were already attached to the complaint, that therefore, there

14:21:04  9    was no protection that should be required.

14:21:06  10       We wrote -- immediately wrote a letter to

14:21:09  11   Mr. Southwell that said Mr. Southwell, it's clear that the

14:21:14  12   Judge's order is erroneous because item 2 is not the same as the

14:21:19  13   first page of the contract that was attached to the complaint.

14:21:23  14       We are planning on addressing the Court on Monday

14:21:25  15   morning.  Please abstain from publishing or making public under

14:21:30  16   the protective order item number 2, which is scan TIFF number 1,

14:21:36  17   until we have the opportunity to address the Court.

14:21:39  18       We did that on Monday.  Monday night they filed a

14:21:41  19   pleading that had item number 2, the scan TIFF version, attached

14:21:45  20   to it.  It's been picked up by the press and published.

14:21:51  21       **THE COURT:**  Wait, what?

14:21:52  22       **MR. LAKE:**  That was on Monday.

14:21:54  23       **THE COURT:**  Doc number 110, is that what you're

14:21:58  24   referring to?

14:21:59  25       **MR. LAKE:**  Yeah.  And then on Tuesday, the Court

14:22:12  1    issued the new --

14:22:12  2         **THE COURT:**  I put a stay on the order.

14:22:12  3         **MR. LAKE:**  Right, but what happened between Friday in

14:22:12  4    receiving the order, recognizing that those pages were

14:22:13  5    different, notifying the Defendants of the error, notifying the

14:22:17  6    Court on Monday, between that time period, they went out and

14:22:21  7    published that actual document, which I think not only was it a

14:22:25  8    violation by the protective order to allude to it, but calling

14:22:27  9    it a smoking gun, calling it an authentic contract, then filing

14:22:30 10    an unredacted opposition where they refer to it again, then

14:22:36 11    getting a letter that clearly points out where we were, then

14:22:40 12    publishing the actual document itself and then the next day the

14:22:43 13    Court plans to stay on the order I don't think is a good-faith

14:22:46 14    understanding.

14:22:47 15         **THE COURT:**  Mr. Lake, are you referring -- when you

14:22:50 16    said they filed a repleading revealing the --

14:22:54 17         **MR. LAKE:**  Yeah, in reply, as their attachment to the

14:22:58 18    reply.

14:22:59 19         **THE COURT:**  Well, that's what I'm looking for.  You

14:23:04 20    say that would be in the brief?

14:23:04 21         **THE CLERK:**  111.

14:23:06 22         **THE COURT:**  I'm trying to locate where exactly there

14:23:09 23    was a divulgation, if you will, of the document in anything that

14:23:14 24    was filed.

14:23:15 25         **THE CLERK:**  Document 111.

14:23:17 1          **MR. SNYDER:**  Your Honor, it's Exhibit A to the

14:23:20 2   Southwell declaration 111-1.

14:23:31 3          **THE COURT:**  That's Mr. Southwell's declaration?

14:23:34 4          **MR. SNYDER:**  Yes, Your Honor.

14:23:35 5          **THE COURT:**  Exhibit A?

14:23:36 6          **MR. SNYDER:**  Yes, Your Honor.

14:23:40 7          **THE CLERK:**  Document 111.

14:23:47 8          **THE COURT:**  Just give us a moment.  We'll find it.

14:23:54 9          **MR. SNYDER:**  May I approach, Your Honor?

14:23:55 10         **THE COURT:**  Yes, it could possibly -- just to

14:24:10 11  expedite.  Now, I understand your point.  Go ahead.

14:24:18 12         **MR. LAKE:**  Well, the point is it was not an accident,

14:24:21 13  that that was published on that day and it was not in a

14:24:26 14  good-faith error because they didn't understand the order that

14:24:30 15  was issued on Friday because we pointed it out to them.  We also

14:24:34 16  told them we would be addressing it with you Monday, which is

14:24:37 17  what we did.

14:24:38 18         And they took that opportunity, before you had an

14:24:41 19  opportunity to revise your order, to publish that to the press

14:24:44 20  in violation of what I believe is the protective order.  And I

14:24:48 21  think that that is extremely prejudicial because not only was it

14:24:52 22  done purposely, it was done for two reasons, I think.

14:24:55 23         Number one, and it's what we've seen through this

14:24:58 24  entire case, and that is the continued rhetoric that somehow

14:25:04 25  Mr. Ceglia is a liar and a fraud and a forger and now that I --

14:25:08  1    somehow my integrity is at issue.

14:25:12  2              I've read 40 pages of essentially the same thing,

14:25:18  3    calling us liars.  They cited four cases.  None of them are on

14:25:22  4    point.  None of this is before the Court.  We have not had an

14:25:25  5    opportunity to conduct our discovery.  We have not made any such

14:25:31  6    excursions, but when there is a protective order in place, not

14:25:34  7    only -- and we haven't gotten to the actual discovery order.

14:25:34  8              We haven't seen any emails yet, and we'll discuss this

14:25:38  9    later, but in violation of the protective order, they're doing

14:25:42  10   it for two reasons.  One, they want to poison the jury pool.  No

14:25:48  11   doubt about it.  They want everybody to think that Paul Ceglia

14:25:51  12   somehow doesn't have a deal with Mark Zuckerberg.

14:25:53  13             Second thing they want to do is they want to try this

14:25:56  14   case in the press.  They want the press to see everything that

14:25:59  15   they write, whether it's founded, whether it's based on fact,

14:26:03  16   whether it's supported by declarations of the party or not.

14:26:05  17             They can exercise their litigation privilege all day

14:26:10  18   long.  They do it every chance they get.  They do it by

14:26:12  19   conducting press interviews.  They do it by filing papers and

14:26:15  20   they do it by alluding to things if they don't think it is under

14:26:21  21   protective order.

14:26:21  22             Then in this case, they went a step further and

14:26:24  23   actually produced the documents, which they now claim is a

14:26:25  24   smoking gun and some authentic contract which there is no basis

14:26:29  25   for that, there is no foundation.

14:26:30  1        Mark Zuckerberg himself has never said -- although now

14:26:35  2    I hear they're changing their position and they're saying yes,

14:26:39  3    the second page is authentic.  Mark Zuckerberg did sign this

14:26:43  4    second page.  That's what I'm reading in the press.  That's what

14:26:46  5    it sounds like their argument now is.

14:26:49  6        So if that's the case, what is with this declaration

14:26:52  7    saying I never signed it?  That's why the protective order is so

14:26:56  8    important.  And it was drafted broadly by them for this very

14:27:00  9    purpose.  That's why we designated all of this as confidential.

14:27:03 10        We're either going to have this case heard, and we're

14:27:06 11    going to have it heard on the merits the way it should be or

14:27:09 12    this case is going to be in the press, which I think is

14:27:12 13    extremely prejudicial to our client and that's why I'm upset

14:27:16 14    with what happened with this particular document.

14:27:19 15        **THE COURT:**  I understand.  Anything else?

14:27:23 16        **MR. LAKE:**  Well, you asked --

14:27:25 17        **THE COURT:**  I asked at the beginning how Mr. Ceglia

14:27:29 18    could expect a contract between himself and Mr. Zuckerberg to be

14:27:34 19    a confidential item vis-a-vis the general public at the time he

14:27:46 20    designated it as such.

14:27:46 21        **MR. LAKE:**  And the answer to that is the contract

14:27:48 22    between Ceglia and Zuckerberg has been made public when it was

14:27:51 23    attached to the Complaint.  The document you're looking at is

14:27:53 24    not the contract that was entered into between Zuckerberg and

14:27:56 25    Ceglia.

14:27:57  1          THE COURT:  How then would Mr. Zuckerberg's purported

14:28:03  2  signature get on it?

14:28:05  3          MR. LAKE:  It's two different pages.  They're not even

14:28:08  4  the same.  Those are TIFF images.  There's no native format

14:28:09  5  behind that.  We don't know when that was drafted.  We don't

14:28:11  6  know by who.  We don't even if it was made by Mr. Zuckerberg

14:28:17  7  planted on Mr. Ceglia's computers.

14:28:20  8          THE COURT:  I thought the document came from you.

14:28:22  9  That's why you wanted to designate it as confidential.

14:28:23 10          MR. LAKE:  Right.  There's been no showing of who

14:28:25 11  wrote it, when or how it got there, which is exactly why the

14:28:28 12  next phase of this proceeding needs to be expedited discovery.

14:28:33 13          THE COURT:  How would you have a expectation of a

14:28:35 14  piece of paper being confidential when it came from you with --

14:28:39 15  I mean, these signatures or what purport to be signatures on it

14:28:43 16  from the Court's perspective, if you put yourself in my

14:28:48 17  position, being submitted to me on a claim that it's

14:28:51 18  confidential?

14:28:52 19          MR. LAKE:  You're looking at two different documents.

14:28:54 20          THE COURT:  Ho can it be considered to be

14:28:56 21  confidential?

14:28:56 22          MR. LAKE:  Right.  Scan TIFF 2, my understanding is

14:28:59 23  the same as the second page of the work-for-hire contract that

14:29:02 24  was attached to the complaint.

14:29:04 25          If the Court looks at that independently, I agree with

14:29:09  1   you that that is not a confidential document.  If you are you

14:29:12  2   looking at it in conjunction with scan TIFF 1 and you believe

14:29:17  3   the Defendants claim that that is the smoking gun authentic

14:29:21  4   contract, although they have no proof of it --

14:29:25  5         **THE COURT:**  Scan TIFF 1?

14:29:26  6         **MR. LAKE:**  That's page one.

14:29:28  7         **THE COURT:**  Item 1 in the log?

14:29:31  8         **MR. LAKE:**  That's item 2.

14:29:34  9         **THE CLERK:**  Right.

14:29:35 10         **MR. LAKE:**  Item 1 is the emails we just already

14:29:37 11   discussed.

14:29:38 12         **THE COURT:**  Coming back to item 2 --

14:29:40 13         **MR. LAKE:**  Right.

14:29:43 14         **THE COURT:**  -- what is your argument?

14:29:46 15         **MR. LAKE:**  Right.  The argument is that --

14:29:46 16         **THE COURT:**  Why should I not -- in the way that it was

14:29:50 17   submitted to the Court, why wouldn't I deduce that the two

14:29:53 18   pieces of paper go together?

14:29:55 19         **MR. LAKE:**  Because page two goes with the

14:29:59 20   work-for-hire contract that was attached to the complaint.  And

14:30:01 21   the reason we know that is because --

14:30:05 22         **MR. SNYDER:**  Your Honor, perhaps I can clarify.

14:30:07 23         **THE COURT:**  Just a second.  The log -- who prepared

14:30:30 24   the log?

14:30:30 25         **MR. LAKE:**  The Defendants' experts.

14:30:34  1          **THE COURT:**  Well, didn't you have something to do with

14:30:36  2    it?

14:30:37  3          **MR. LAKE:**  No, Your Honor.  If you recall, the way the

14:30:39  4    order was described that they, Stroz Friedberg, who was their

14:30:45  5    experts --

14:30:45  6          **THE COURT:**  Yes.

14:30:46  7          **MR. LAKE:**  -- were to do a relevant search and when

14:30:50  8    they did, they were to produce a log of what they considered to

14:30:52  9    be presumed relevant documents.

14:30:54  10          **THE COURT:**  Right.

14:30:54  11          **MR. LAKE:**  And we were only allowed to do two things.

14:30:56  12    We were allowed to look at that designated things as either

14:31:00  13    privileged and/or confidential --

14:31:01  14          **MR. SNYDER:**  That's not accurate.

14:31:03  15          **THE COURT:**  Before this log was submitted to the

14:31:05  16    Court, you had a chance to examine it?

14:31:07  17          **MR. LAKE:**  Right.

14:31:07  18          **THE COURT:**  So if you're the Court, wouldn't you

14:31:10  19    fairly conclude that this document, the log, was something that

14:31:15  20    both parties represented to the Court as a accurate reflection

14:31:22  21    of the Plaintiff's assertion of both attorney client privilege

14:31:26  22    and confidentiality per the confidentially agreement?

14:31:31  23          **MR. LAKE:**  Right, and we designated two --

14:31:33  24          **THE COURT:**  Just one second.

14:31:33  25          **MR. LAKE:**  Okay.

14:31:34  1          **THE COURT:**  So far so good.  So when I'm reading, as

14:31:37  2    I'd now would like to draw your attention to the verbiage

14:31:42  3    associated with item 2, it says page one of signed and dated

14:31:49  4    StreetFax.

14:31:50  5          If I'm going to say anything that in your view is

14:31:53  6    going to compromise the potential argument that it remains

14:31:58  7    confidential, then just say so.  Just say so.  I'll stop and say

14:32:03  8    you read it with me silently.

14:32:06  9          **MR. LAKE:**  No, I have it here.  I know what it says.

14:32:08 10          **THE COURT:**  And then you move your eye down to item 4,

14:32:12 11    if you're the Court, would it not be a fair inference to believe

14:32:19 12    that the two pages were intended and are in fact physically

14:32:24 13    joined into a single contract?

14:32:26 14          **MR. LAKE:**  If you look down to item 12 --

14:32:29 15          **THE COURT:**  Am I missing something here?

14:32:31 16          **MR. LAKE:**  Yeah, you are.

14:32:32 17          **THE COURT:**  What is it?

14:32:33 18          **MR. LAKE:**  If you look at item 12, it says what

14:32:38 19    appears to be, because when they wrote this.  They did that.

14:32:38 20          **THE COURT:**  How is the Court expected to go through

14:32:41 21    these manipulations when there's a request to enforce the

14:32:45 22    confidentially order and all I'm given is this and nothing else?

14:32:53 23          **MR. LAKE:**  No.

14:32:53 24          **THE COURT:**  I mean, may I be excused for not following

14:32:53 25    your train of thinking here, Mr. Lake?

14:32:53   1          **MR. LAKE:**  No, Your Honor.

14:32:55   2          **THE COURT:**  I may not be excused?

14:32:55   3          **MR. LAKE:**  You may be excused from whatever you like.

14:32:59   4   My point is this --

14:32:59   5          **THE COURT:**  That's right.  But is it a fair inference

14:33:02   6   for the Court to believe that items -- items 2 and 4 are part

14:33:06   7   and parcel of the same contract based on what you both presented

14:33:11   8   to me?

14:33:12   9          **MR. LAKE:**  Right.  And that's why --

14:33:13  10          **THE COURT:**  Is that not fair?

14:33:14  11          **MR. LAKE:**  That's why we ask for oral argument so we

14:33:17  12   can make any clarifications.

14:33:18  13          **THE COURT:**  But we are trying to go back in time to

14:33:18  14   explain to you how I arrived --

14:33:18  15          **MR. LAKE:**  No, I understand.

14:33:22  16          **THE COURT:**  -- at the conclusion I arrived at.

14:33:23  17          **MR. LAKE:**  And I also know the cat's out of the bag

14:33:26  18   because it's already been produced.

14:33:37  19          **THE COURT:**  Well, that part I was not aware that it

14:33:37  20   was out of the bag insofar as you already explained it to me.

14:33:37  21   And truthfully, when I saw Mr. Southwell's filing, I guess I

14:33:38  22   didn't realize that it was unredacted and that he was then --

14:33:44  23   and that that filing occurred --

14:33:47  24          **MR. LAKE:**  Monday.

14:33:48  25          **THE COURT:**  -- before your letter came to me, is that

14:33:50  1    what you're saying?

14:33:51  2         **MR. LAKE:**  I wrote a letter to him on Friday asking

14:33:53  3    him to be professional and to acknowledge that there could be an

14:33:56  4    error in the order and not to publish item 2.

14:34:00  5         **THE COURT:**  So when he alludes to it and attaches

14:34:03  6    Exhibit A to document 111, he is flouting your requests?

14:34:09  7         **MR. LAKE:**  Yeah, he is expressly ignoring it.

14:34:12  8         **THE COURT:**  Yes or no?

14:34:12  9         **MR. LAKE:**  Yes.

14:34:12  10        **THE COURT:**  So he then gets your letter.  He doesn't

14:34:15  11   attempt to withdraw it.  He doesn't attempt to redact it as he

14:34:21  12   had done on an earlier occasion and that's the basis for your

14:34:23  13   assertion, that they acted in a way that is deserving, I'm

14:34:27  14   assuming you're going to suggest, of sanctions of some form or

14:34:33  15   another.

14:34:33  16        And I was not aware that the cat was out of the bag in

14:34:37  17   the sense that the media had actually quoted verbatim or had

14:34:41  18   actually examined Exhibit A --

14:34:43  19        **MR. LAKE:**  And published it.

14:34:44  20        **THE COURT:**  And published it.  I was not aware of

14:34:47  21   that.

14:34:48  22        **MR. LAKE:**  Hundreds of times.

14:34:49  23        **THE COURT:**  So can we come back to the question of

14:34:52  24   whether, if we examine each line of items 2 and 4, whether

14:34:57  25   joined or unjoined with the document that's attached to the

14:35:01  1    complaint, would you give -- attempt to give me a ball park

14:35:04  2    estimate of your own as to what percentage of all of the

14:35:09  3    verbiage in two documents are the same and what percentages are

14:35:12  4    materially different?

14:35:14  5              **MR. LAKE:**  Paragraphs --

14:35:16  6              **THE COURT:**  Approximately.

14:35:17  7              **MR. LAKE:**  There are two paragraphs that reference

14:35:20  8    Facebook on --

14:35:21  9              **THE COURT:**  Out of how many paragraphs?

14:35:22 10              **MR. LAKE:**  On the first page there are seven and on

14:35:27 11    the second page it's identical.

14:35:29 12              **THE COURT:**  So if you add them together, how many

14:35:32 13    paragraphs of the entirety of the document, both first page and

14:35:37 14    second page --

14:35:37 15              **MR. LAKE:**  Well --

14:35:38 16              **THE COURT:**  -- refer to Facebook, approximately?

14:35:41 17              **MR. LAKE:**  On the work --

14:35:44 18              **THE COURT:**  50 percent?

14:35:45 19              **MR. LAKE:**  On the work-for-hire contract --

14:35:47 20              **THE COURT:**  20 percent?

14:35:49 21              **MR. LAKE:**  There are 18.

14:35:49 22              **THE COURT:**  10 percent?

14:35:50 23              **MR. LAKE:**  There are 18 paragraphs.  The second page

14:35:57 24    it's paragraphs eight through 18, those are boilerplate.  On

14:36:03 25    page one, paragraphs one through seven, talks about what the

14:36:08  1    terms are to be in regards to the computer programming work and

14:36:13  2    the -- this Facebook purchase.  And those are set forth in

14:36:18  3    paragraphs two and three.

14:36:19  4          So the majority of the first page has to do with what

14:36:24  5    the duties and obligations Mark Zuckerberg has for Paul Ceglia.

14:36:29  6    On the second page it's all boilerplate.  So I would say that

14:36:33  7    the percentages are large, but it doesn't matter because the two

14:36:37  8    paragraphs that matter are paragraphs two and three.  And if

14:36:40  9    you, the Court is inclined --

14:36:43  10         THE COURT:  And those two paragraphs -- do I get this

14:36:50  11   part of it straight too, those two paragraphs are indeed

14:36:54  12   included in --

14:36:54  13         MR. LAKE:  Yes, yes.

14:36:54  14         THE COURT:  So the only material difference between

14:36:57  15   items 2 and 4 as to the confidentially issue are two paragraphs

14:37:04  16   that are already made public by the Plaintiff?

14:37:06  17         MR. LAKE:  No.

14:37:07  18         THE COURT:  No?

14:37:08  19         MR. LAKE:  No.  There is --

14:37:10  20         THE COURT:  What am I -- how can you say -- I thought

14:37:14  21   we just agreed that those are the two paragraphs that make this

14:37:18  22   lawsuit what it is, and they are public.

14:37:20  23         MR. LAKE:  There is different language.  The title is

14:37:23  24   different.  The fact that there is no metadata on the second

14:37:29  25   scan TIFF 2, because it's a TIFF file as opposed to a word file,

14:37:33  1    and we'll get to that later.

14:37:35  2         I'm sure Mr. Snyder is going to point out that the

14:37:39  3    final version made, a soft copy of the work-for-hire contract,

14:37:42  4    was not produced.  I submitted a certification saying it's

14:37:45  5    because it could not be located.  I'm sure it will --

14:37:47  6         **THE COURT:**  Again, I'm trying to help you, I believe,

14:37:50  7    Mr. Lake, by keeping you on track.  The question is:  Now that

14:37:55  8    we've got some sense of what portion of the verbiage in the

14:38:02  9    contract attached to the complaint and the contract, if you

14:38:04  10   will, that we're discussing are different, what I'm trying to

14:38:10  11   understand now is if you excise out the two paragraphs allegedly

14:38:19  12   pertaining to Facebook out of items 2 and 4, on what basis does

14:38:25  13   the Plaintiff retain a reasonable belief in the confidentially

14:38:29  14   of the remaining paragraphs?

14:38:31  15        **MR. LAKE:**  Okay.  Just --

14:38:32  16        **THE COURT:**  Is that a fair question?

14:38:34  17        **MR. LAKE:**  Of course it's a fair question.  I'll

14:38:35  18   try --

14:38:35  19        **THE COURT:**  Thank you.

14:38:36  20        **MR. LAKE:**  I'll try to give you the best answer I can.

14:38:39  21        **THE COURT:**  Thank you.

14:38:39  22        **MR. LAKE:**  First, the two paragraphs that talk about

14:38:42  23   the terms of Facebook are the two paragraphs -- you're right.

14:38:45  24   In paragraph five it references Facebook.  In other paragraphs

14:38:49  25   the language is different.

14:38:50  1        We've done an analysis word by word of these two

14:38:54  2   contracts side by side.  I didn't bring that with me.  I didn't

14:38:59  3   think I would be going into this level of minutia.  I apologize.

14:39:03  4   I can have it sent over immediately.

14:39:03  5        **THE COURT:**  Well, you're the one who raised it.

14:39:03  6        **MR. LAKE:**  The title is different.  And if where

14:39:03  7   you're going is that we should redact anything that's different

14:39:07  8   between the two --

14:39:07  9        **THE COURT:**  No, no.  I'm simply asking myself the

14:39:11 10   question if I'm Mr. Ceglia, on what basis do I have a reasonable

14:39:23 11   belief that these two pieces of paper are documents which the

14:39:26 12   public wouldn't otherwise have access to and are within the four

14:39:31 13   corners of the confidentially requirements of proprietary,

14:39:36 14   business, personal, technical.

14:39:41 15        **MR. LAKE:**  Right, or otherwise privileged.

14:39:44 16        **THE COURT:**  And otherwise privileged.  And we just

14:39:48 17   decreed that on the privilege issue I overruled you and that you

14:39:54 18   acquiesced in the rules.

14:39:54 19        **MR. LAKE:**  Correct.

14:39:54 20        **THE COURT:**  So don't tell me about privilege.

14:39:54 21        **MR. LAKE:**  No, I wasn't -- if I said privilege, I

14:39:56 22   didn't mean it.

14:39:56 23        **THE COURT:**  You did.

14:39:56 24        **MR. LAKE:**  I meant to say prejudicial.  And the reason

14:40:00 25   I --

14:40:00  1          **THE COURT:**  You said privileged.

14:40:02  2          **MR. LAKE:**  Okay.  Well, if I misspoke, I apologize.  I

14:40:05  3   meant to say prejudicial, not privileged.

14:40:05  4          **THE COURT:**  Prejudicial?

14:40:05  5          **MR. LAKE:**  Correct.

14:40:07  6          **THE COURT:**  And that is in the confidentially

14:40:09  7   agreement?

14:40:09  8          **MR. LAKE:**  There is a catchall provision in there that

14:40:12  9   talks about -- and it's in the papers.  But it is a broad

14:40:18 10   provision in the confidentially agreement and --

14:40:24 11          **THE COURT:**  Or otherwise reasonably designable as

14:40:27 12   confidential.  It's quite circular actually.

14:40:30 13          **MR. LAKE:**  Yeah.

14:40:31 14          **THE COURT:**  And I didn't draft it.

14:40:33 15          **MR. LAKE:**  I know.

14:40:33 16          **THE COURT:**  But you people signed up for it.

14:40:37 17          **MR. LAKE:**  Right.

14:40:37 18          **THE COURT:**  So we're back to confidentially and what

14:40:39 19   I'm trying to understand is that how a document that you

14:40:41 20   provided, and you agreed is confidential with the people who for

14:40:46 21   the defense quote collaborated with you and drafted the

14:40:50 22   confidentiality agreement thought that a document that you

14:40:53 23   submitted to the Court with what purports to be a signature by

14:40:57 24   Mr. Zuckerberg, which is between the Plaintiff and

14:41:00 25   Mr. Zuckerberg -- I'm trying to remember if their names appears

14:41:09   1    on the first page.  I can't see because the copy I have is not

14:41:12   2    that good, conceivably could be something that should have

14:41:18   3    been -- or perhaps a confidential nature or otherwise could be

14:41:22   4    retained.

14:41:25   5        If three-quarters of the verbiage is the same as the

14:41:30   6    document that's in the complaint, as you say, I perhaps could

14:41:34   7    have used a slightly different phraseology in what I wrote.  But

14:41:40   8    the core concept is that we're looking at something that already

14:41:44   9    has been made public by the Plaintiff.

14:41:46  10        Moreover, it's a document that the Plaintiff is

14:41:49  11    representing to the Court was signed by Mr. Zuckerberg.

14:41:51  12    Otherwise, you would not have allowed to it to be sent to me in

14:41:55  13    that form.  You would have said oh, well, that name Zuckerberg

14:41:58  14    on there, we don't know who put that on there.  It came from our

14:42:02  15    files, but how could we possibly be held to warranting that

14:42:06  16    that's Mr. Zuckerberg's signature.

14:42:08  17        If you're looking at it, and if you're looking at it

14:42:10  18    as I am as a neutral, it looks like it's being represented as a

14:42:15  19    document that was signed by your client and Mr. Zuckerberg.

14:42:18  20    Ergo, how could Mr. Ceglia believe that it was a confidential

14:42:23  21    document?  Particularly when Mr. Zuckerberg is seriously

14:42:27  22    defending the case as he is.

14:42:28  23        **MR. LAKE:**  Right.  I would agree with you 100 percent

14:42:31  24    completely as to page two.  But as to page one, I disagree.  I

14:42:35  25    disagree for the same reasons that the defense disagrees with

14:42:39  1   our interpretation for our work-for-hire contract.

14:42:41  2        **THE COURT:**  We just went through about 10 minutes ago

14:42:44  3   a process by which you also agreed that the Court could

14:42:47  4   reasonably construe these submissions as indicating that the two

14:42:50  5   pages are bound together as a single document.

14:42:55  6        **MR. LAKE:**  No.

14:42:55  7        **THE COURT:**  Why it was portrayed the way it was was

14:42:57  8   never portrayed to the Court.

14:42:57  9        **MR. LAKE:**  No.

14:42:57 10        **THE COURT:**  I've heard no argument as to this issue.

14:43:02 11   I'm not getting this argument for the first time.

14:43:05 12        **MR. LAKE:**  I will --

14:43:06 13        **THE COURT:**  Maybe I should have waited until today to

14:43:08 14   go down and rule on all 120 items.  I don't think the parties

14:43:13 15   wanted that.  At least I got the impression that they were

14:43:18 16   appreciative of the effort that we made to give you a ruling.

14:43:22 17   And now it's the clear both loose phenomena.  No good deed goes

14:43:29 18   unpunished, right, Mr. Lake?

14:43:30 19        **MR. LAKE:**  That's right.  And if I was prepared to

14:43:30 20   spend all day and go through 120, but I do appreciate the

14:43:30 21   Court's efforts.

14:43:42 22        I will respectfully disagree that scan TIFF item 001

14:43:42 23   goes with 002 and I will never concede that.

14:43:45 24        **THE COURT:**  But you will agree that the way it was

14:43:48 25   portrayed, that that was a logical conclusion?

14:43:51  1        **MR. LAKE:**  Oh, yes.  No, your logic makes perfect

14:43:56  2   sense.

14:43:58  3        **MR. SNYDER:**  On that point just to complete the record

14:44:04  4   because I think --

14:44:04  5        **THE COURT:**  I know you like to use the podium.  Would

14:44:04  6   you want to stand and deliver?  Step to the podium.  If you can

14:44:05  7   get in the habit of being seated, then stay there.

14:44:05  8        **MR. SNYDER:**  Just to complete the record, of course

14:44:08  9   your Your Honor has reviewed the emails that the Plaintiff sent

14:44:11 10   in 2004 attaching the StreetFax contract.  And in those emails,

14:44:17 11   which Your Honor has ruled properly and correctly --

14:44:29 12        **THE COURT:**  1 and 3?

14:44:31 13        **MR. SNYDER:**  Yes, Your Honor.  As your Your Honor

14:44:37 14   perceived, the Plaintiff, in 2004, states and admits indeed what

14:44:40 15   Mr. Lake was trying to --

14:44:41 16        **THE COURT:**  I thought I overlooked that.

14:44:42 17        **MR. SNYDER:**  Page one and two.

14:44:44 18        **THE COURT:**  I left you something to talk about.

14:44:46 19        **MR. SNYDER:**  Yes, thank you.  In fact, the Plaintiff

14:44:48 20   in 2004, which was --

14:44:53 21        **THE COURT:**  I understand your point.  Both of them

14:44:56 22   purport to say RE StreetFax contracts and the first one, page

14:45:02 23   one of two for that and the second document is two of two were

14:45:06 24   --

14:45:06 25        **MR. SNYDER:**  Right.

14:45:07  1        **THE COURT:**  -- for the same thing.  So what else was I

14:45:10  2   supposed to conclude?

14:45:11  3        **MR. SNYDER:**  The contemporaneous emission by the

14:45:15  4   Plaintiff in email stated in 2004 --

14:45:15  5        **THE COURT:**  Anything else on that?

14:45:16  6        **MR. SNYDER:**  No, Your Honor.

14:45:17  7        **THE COURT:**  What do you want me to do about the item

14:45:19  8   29 that arguably should have been ruled as not confidential?  Do

14:45:25  9   you want to push that?

14:45:36 10        **MR. SNYDER:**  I don't think there'd be any opposition

14:45:36 11   since the text of that purported email, which went --

14:45:36 12        **THE COURT:**  Well, I mean they're in the public domain.

14:45:36 13        **MR. LAKE:**  That's fine.  There are other designations.

14:45:36 14   I'm not --

14:45:36 15        **THE COURT:**  I don't know why they even went over.

14:45:39 16   Probably why I gave it the benefit of the doubt, thinking it's

14:45:43 17   new material and couldn't possibly be confidentiality as to the

14:45:47 18   emails that were attached to the complaint --

14:45:48 19        **MR. LAKE:**  Your Honor, those were --

14:45:49 20        **MR. SNYDER:**  They --

14:45:50 21        **THE COURT:**  Low and behold, certainly that's what I --

14:45:51 22   I made that error too.

14:45:53 23        **MR. SNYDER:**  Given the time constraints, there were

14:45:56 24   other designations that we wanted to address, we don't even need

14:46:04 25   to do it today, but just so Your Honor is aware, 40 through 45,

14:46:10  1    which Your Honor upheld as confidential actually contain among

14:46:15  2    the most damning evidence uncovered on the --

14:46:19  3         **THE COURT:**  It's not a matter of whether it's damning.

14:46:22  4    It's a matter of whether it should be treated as confidential or

14:46:25  5    not.

14:46:25  6         **MR. SNYDER:**  Well, it's certainly not confidential

14:46:28  7    because it's information that reflects the utilization without

14:46:35  8    disposing its contents in court.  The utilization of various

14:46:38  9    computer --

14:46:39  10        **THE COURT:**  Would you say that this is -- I mean, now,

14:46:43  11   I'm not a computer engineer and as you can see from my decision,

14:46:47  12   I have to rely on the absence of any help from the parties --

14:46:50  13        **MR. SNYDER:**  Yes, Your Honor.

14:46:51  14        **THE COURT:**  -- on getting a glossary of some of the

14:46:54  15   numerous high-tech terms that were used by your computer mavins

14:46:59  16   from our able information management staff and I have a

14:47:03  17   representative here in case I need more help.

14:47:06  18        In looking at it from a non-technical point of view

14:47:12  19   and the absence of technical assistance from either the defense

14:47:16  20   or the Plaintiff, would you think the that layman would look at

14:47:20  21   this material and say this is technical information or

14:47:24  22   non-technical information?

14:47:25  23        **MR. SNYDER:**  I think Your Honor was correct under the

14:47:28  24   circumstances to sustain a confidentially designation based on

14:47:33  25   the information available to the Court.

14:47:34  1          We did not --

14:47:36  2          **THE COURT:**  Do you seriously think that this is

14:47:39  3  non-technical information?

14:47:40  4          **MR. SNYDER:**  It turns out to be not technical

14:47:42  5  information.  Although --

14:47:43  6          **THE COURT:**  Turns out?

14:47:44  7          **MR. SNYDER:**  Yes, on its face I could see how someone

14:47:44  8  without --

14:47:47  9          **THE COURT:**  So if you had an idea that it turns out

14:47:49 10  not to be technical, I should have been told about it when you

14:47:53 11  asked for the de-designation, don't you think?

14:47:56 12          **MR. SNYDER:**  Well, Your Honor, we did not -- we only

14:47:57 13  challenged the two most important documents and what we could

14:48:00 14  do --

14:48:01 15          **THE COURT:**  Look, you're the ones who want expedition.

14:48:04 16  I'm giving it to you and now you're saying well, maybe not so

14:48:07 17  much, Judge.  No.

14:48:07 18          **MR. SNYDER:**  Your Honor, we can address these other

14:48:10 19  documents at a future date?

14:48:11 20          **THE COURT:**  If you want to, you can't -- I'm not going

14:48:14 21  to prohibit you from further motions.  But for today's purposes,

14:48:20 22  there is no motion before me to reconsider my ruling as to item

14:48:24 23  29?

14:48:24 24          **MR. SNYDER:**  At this point, no, Your Honor.

14:48:25 25          **THE COURT:**  Your request for reconsideration is

14:48:28  1    granted.  And upon further reconsideration, the Court finds its

14:48:33  2    original ruling was correct.  The two documents are interlinked

14:48:36  3    and the substantial portion of the verbiage in both has already

14:48:41  4    been revealed to the public.

14:48:42  5         And the document, as represented to the Court, was a

14:48:45  6    bilateral contract, if so, then Mr. Ceglia, in my humble

14:48:52  7    estimation, could not entertain a reasonable belief in continued

14:48:54  8    confidentiality.

14:48:54  9         **MR. SNYDER:**  On 29, Your Honor, my colleagues --

14:48:57 10         **THE COURT:**  So therefore, the Court adheres to its

14:49:00 11    original ruling for the reason stated.

14:49:02 12         **MR. SNYDER:**  On 29, my colleagues are reminding me

14:49:05 13    that that is an email as to which the Plaintiff put in the

14:49:10 14    complaint, the purported email.

14:49:11 15         There's been no objection so we would respectfully

14:49:15 16    request that since it's before the Court, we discuss that the

14:49:17 17    Court de-designate item 29 just because -- -

14:49:20 18         **THE COURT:**  Do you have a problem with that, Mr. Lake?

14:49:22 19         **MR. LAKE:**  If it's the email that was attached to the

14:49:26 20    complaint, I would agree with Mr. Snyder that it's been made

14:49:27 21    public by the Plaintiff.

14:49:27 22         **THE COURT:**  There's been an awful lot of papers and I

14:49:27 23    have to make the comparison again for the parties.  Are you able

14:49:32 24    to provide the Court with that careful analysis?

14:49:34 25         **MR. LAKE:**  Right.

14:49:34  1          **THE COURT:**  We did the best we could.

14:49:36  2          **MR. LAKE:**  No, I understand.

14:49:36  3          **THE COURT:**  Upon mutual agreement, the parties will

14:49:42  4    amend their order saying there is a de-designation of item 29.

14:49:46  5          **MR. SNYDER:**  Thank you.

14:49:46  6          **THE COURT:**  Now, as to the merits of the two motions,

14:49:50  7    I would like to proceed in the order it's presented taking up,

14:49:51  8    first of all, Mr. Lake's motion to compel Mr. Zuckerberg's

14:49:55  9    production, I think, of the, if I could use the term loosely,

14:49:59  10   Harvard emails, at which turns on a interpretation of the

14:50:04  11   Court's order regarding production.

14:50:10  12          And I read the papers and I'm prepared to hear further

14:50:17  13   discussion, not too lengthy please, so we could then turn to the

14:50:21  14   more lengthy issues provided in the cross motion, which I would

14:50:27  15   purpose to go through item by item, hear arguments.

14:50:28  16          Again, I've read the papers.  I do have a few

14:50:32  17   questions and I would purpose to a make a series of rulings on

14:50:36  18   each and every issue that's presented.

14:50:36  19          Does anybody need to take a comfort break before we

14:50:49  20   proceed?  Very good.  Mr. Lake, you have the floor.

14:50:50  21          **MR. LAKE:**  Thank you, Your Honor.

14:50:52  22          Right now we're just talking about the 175 or so

14:50:55  23   emails that when you issued your order on July 1st, 2011 were to

14:51:01  24   be produced by the Defendants.

14:51:03  25          If you recall at the time, we were arguing and

14:51:06  1   negotiating that particular order.  The fear that was presented

14:51:20  2   by the defense was that if we didn't provide the Plaintiff's

14:51:20  3   information first and we received their emails, that Paul Ceglia

14:51:20  4   would somehow run out and fabricate some other emails.

14:51:25  5        That was the argument that was made.  We didn't think

14:51:27  6   that was something that was plausible, but we understood it and

14:51:31  7   agreed that if we produced our information, that within five

14:51:34  8   days they would be presented and they would give us the emails.

14:51:37  9        Compliant with the order, we produced all the

14:51:40 10   information that we had.  I did a very, I think above and beyond

14:51:46 11   diligent search for everything that I could find.

14:51:48 12        We coordinated that the production of that information

14:51:51 13   in three cities, Sarasota, Buffalo, Chicago simultaneously.  We

14:51:55 14   produced difference forensic images, as well as hard drives and

14:52:00 15   discs and everything we could.  We were trying to coordinate

14:52:03 16   everything together.  We put it all out, we gave it to their

14:52:09 17   experts, Stroz Friedberg, and they took it and started to do

14:52:12 18   their relevant search for what they were looking for.

14:52:16 19        No where in the order that I read says that there was

14:52:19 20   a condition precedent that we had to in some way comply with the

14:52:25 21   order based upon their interpretation, that was allow them any

14:52:31 22   grounds to violate the order.  Rather, they were supposed to

14:52:35 23   provide them five days after.  They didn't.

14:52:37 24        There's no condition precedent and even if there was,

14:52:40 25   it was met.  It was met first when everything was submitted to

14:52:45  1   Stroz and it was even further complied with, even though I don't

14:52:50  2   think it was necessary, when the certifications were filed by me

14:52:53  3   and Mr. Ceglia saying that we had produced everything that was

14:52:59  4   within Mr. Ceglia's possession, custody and control.  If that's

14:53:02  5   the case, then the time should have started ticking then, and

14:53:05  6   that would have been at the end of July.

14:53:08  7        Then even further, we had a series of meetings and

14:53:13  8   conversed through emails and letters where we, out of

14:53:16  9   professional courtesy, said you've seen everything, we've

14:53:20 10   certified everything, we'll give you until August 7th.  Just

14:53:24 11   produce the emails because we're entitled to them.  They still

14:53:28 12   refused.

14:53:29 13        We think that was a deliberate violation of the order.

14:53:32 14   It may have been because they disagreed with the interpretation

14:53:35 15   of the order.  We were all here when it was written.  We

14:53:38 16   complied to the best of our ability and we simply believe that

14:53:41 17   we're entitled to get those emails now.  Simple as that.

14:53:45 18        **THE COURT:**  Maybe not.  Mr. Snyder?

14:53:47 19        **MR. SNYDER:**  Thank you, Your Honor.  Your Honor, this

14:53:51 20   does dovetail with our motion to compel in that it's our

14:53:56 21   position that the order by its terms does require the Plaintiff

14:54:02 22   to produce the electronic assets and then five days later we are

14:54:07 23   required to produce the so-called Harvard emails.

14:54:12 24        We had the Harvard emails ready on a disc on the 20th,

14:54:16 25   which would have been our production date had the Plaintiff

14:54:19  1    produced the electronic assets as required.  He failed miserably

14:54:24  2    to comply with the order in numerous material ways.

14:54:27  3          We met and conferred with Mr. Lake, pointed out this

14:54:32  4    serious lapse in omission.  By way of example, Your Honor, the

14:54:36  5    authentic contract, which we will address later, the one that in

14:54:40  6    2004 this Plaintiff acknowledged was the authentic contract was

14:54:46  7    found on the so-called Seagate computer.

14:54:50  8          That's a computer that this Plaintiff in a

14:54:55  9    certification identified in an affidavit earlier on in the case.

14:54:58  10   That on the 15th when he produced his electronic assets to us,

14:55:03  11   low and behold that one was not included.  Somehow that one was

14:55:08  12   omitted, but we pointed that out.  Three days later they coughed

14:55:11  13   that one up.  That was on the 18th, three days after the due

14:55:15  14   date.

14:55:16  15         That gave us serious concern because it was not

14:55:19  16   coincidence, now that we know the true facts.  That one computer

14:55:21  17   he failed to give us was the computer on which the authentic

14:55:25  18   contract was ultimately located.

14:55:27  19         There are other material ways which are essential to

14:55:31  20   our motion to compel in which this Plaintiff failed to produce

14:55:35  21   his electronic assets.

14:55:37  22         **THE COURT:**  Well, let's stick with the language of the

14:55:39  23   order.

14:55:39  24         **MR. SNYDER:**  Sure.

14:55:40  25         **THE COURT:**  It says the Plaintiff shall produce by the

14:55:42  1    15th a series of electronic assets, if you will or however you

14:55:50  2    want to describe it, including electronic files, computers,

14:55:55  3    electronic media and the like.

14:55:57  4             MR. SNYDER:  Yes.

14:55:58  5             THE COURT:  And then five days after such production

14:56:05  6    -- we didn't number these paragraphs.  We probably should have.

14:56:11  7    It's on the bottom of page two that five days subsequent to that

14:56:13  8    production of the so-called electronic assets and his sworn

14:56:15  9    declaration, Defendants shall produce the emails that are at

14:56:19 10    issue, correct, Mr. Lake?  That's what you're referring to,

14:56:23 11    captured from Mr. Zuckerberg's Harvard email account.  Which

14:56:28 12    apparently there are such documents, correct, Mr. Snyder?

14:56:30 13             MR. SNYDER:  Yes, and they reside on a disc and they

14:56:33 14    were ready to be produced had he produced the electronic assets

14:56:45 15    in the sworn declaration --

14:56:45 16             THE COURT:  Well, aside from the Seagate, which I

14:56:45 17    guess has now been resolved because you have it --

14:56:45 18             MR. SNYDER:  We have it late, but we have not

14:56:45 19    received --

14:56:45 20             THE COURT:  Well, there was something else.  It was

14:56:46 21    the computer at home, at his parents' home?

14:56:49 22             MR. SNYDER:  That was another one that --

14:56:50 23             THE COURT:  Slipped passed them?

14:56:53 24             MR. SNYDER:  -- slipped passed them.

14:56:55 25             THE COURT:  But that's been corrected with an apology.

14:56:59  1          **MR. SNYDER:**  That's been corrected with all sorts of

14:57:00  2  things.  I haven't heard the apology, but --

14:57:04  3          **THE COURT:**  I thought they indicated the fact that

14:57:05  4  they had overlooked --

14:57:05  5          **MR. SNYDER:**  All right.  Perhaps.

14:57:06  6          **THE COURT:**  I'm trying to understand what else is --

14:57:08  7          **MR. SNYDER:**  I'll tell you what's critical --

14:57:10  8          **THE COURT:**  What else is it that is out there that you

14:57:12  9  haven't got that was --

14:57:13  10          **MR. SNYDER:**  If Your Honor recalls that the grave

14:57:16  11  concern we had is that the amended complaint --

14:57:19  12          **THE COURT:**  Yes, I --

14:57:19  13          **MR. SNYDER:**  It was the email that gave us concern

14:57:28  14  because of course we believe if we gave them the authentic

14:57:31  15  Harvard emails when he produced his so-called emails, he would

14:57:31  16  create more fiction.

14:57:35  17          What this Plaintiff failed to do on the 15th, as

14:57:38  18  required by this Court, is produce any electronic native email

14:57:43  19  files.  Remember, Your Honor, Stroz Friedberg swore to this

14:57:47  20  Court that the bogus emails were counted in the amended

14:57:51  21  complaint.

14:57:51  22          **THE COURT:**  Well, is there a difference between the

14:57:53  23  email files he did produce and the native version thereof?

14:57:56  24          **MR. SNYDER:**  Yes.  What he gave us, Your Honor, are

14:57:58  25  floppy discs that contain cut and paste jobs that he wants

14:58:03  1  everyone to believe were once actual emails.  What he did not

14:58:06  2  produce, Your Honor, was a single --

14:58:08  3          THE COURT:  Excuse me.  Were there any emails on the

14:58:11  4  floppy disc?

14:58:11  5          MR. SNYDER:  No, they were documents which purport to

14:58:14  6  be emails.  Meaning to say, they were cut and paste jobs of

14:58:18  7  words on pages, which the Plaintiff and the Plaintiff alone word

14:58:22  8  -- it required, in other words --

14:58:25  9          THE COURT:  Do you have any examples of it so I could

14:58:28 10  see what --

14:58:28 11          MR. SNYDER:  Yes, we'll get you examples.

14:58:30 12          THE COURT:  I mean, where did you come up with the

14:58:32 13  words cut and paste?

14:58:33 14          MR. SNYDER:  In other words, they're not real emails.

14:58:34 15          THE COURT:  How do you know that?

14:58:36 16          MR. SNYDER:  Because they're not on the Harvard server

14:58:38 17  because they are factually inconsistent with the historical

14:58:44 18  facts of the time.  And because, Your Honor, they're no where to

14:58:49 19  be found on any of the computers that he gave us.

14:58:51 20          What was found on the computers that he gave us, the

14:58:54 21  2004 email with the authentic contract.  And isn't it telling,

14:58:58 22  Your Honor, that the authentic contract is attached to actual

14:59:02 23  emails in native form in an email account on this Plaintiff's

14:59:02 24  Seagate computer?

14:59:08 25          THE COURT:  What do you mean by "native"?

14:59:09  1          MR. SNYDER:  Meaning it's native to resident on the

14:59:16  2  actual computer and found in the sent box of an email account,

14:59:22  3  which this Plaintiff used on his Seagate computer.  So he had a

14:59:28  4  Outlook account that he used to send and receive emails in 2004.

14:59:33  5          Our experts found that email account, went to sent

14:59:37  6  box.  In the sent box found --

14:59:39  7          THE COURT:  Found an email account where?

14:59:41  8          MR. SNYDER:  On the Seagate computer, which he

14:59:46  9  produced.  On that account on his computer were the emails in

14:59:52 10  2004 that he sent to Mr. Cole, which attached the authentic

14:59:58 11  contract, the StreetFax contract that had nothing to do with

15:00:02 12  Facebook.

15:00:02 13          But, Your Honor, the so-called emails that he quotes

15:00:06 14  in the amended complaint are no where to be found on any

15:00:09 15  computers that he gave us.  They're only on floppy discs as Word

15:00:15 16  documents, which are not attached to any computer, not attached

15:00:19 17  to any metadata, which would date and corroborate and

15:00:24 18  authenticate the so-called emails, and whose authenticity turns

15:00:32 19  on the Plaintiff's word and the Plaintiff's word alone.  And

15:00:35 20  that's why we've cross-moved Your Honor to compel Plaintiff to

15:00:39 21  consent to the acquisition of his webmail account, Gmail --

15:00:44 22          THE COURT:  Just a second.  I'm trying to focus on

15:00:46 23  whether he's turned over all of the electronic assets.  You're

15:00:51 24  saying that these -- I guess I'm not sure what you're saying at

15:00:57 25  this point.

15:00:57  1          MR. SNYDER:  Right.  So the point --

15:00:57  2          THE COURT:  You have documents on the Seagate

15:01:00  3  computer, which you claim are not emails?

15:01:03  4          MR. SNYDER:  No, they are emails, Your Honor.

15:01:05  5          THE COURT:  I thought you said they weren't?

15:01:06  6          MR. SNYDER:  No, the Seagate emails --

15:01:08  7          THE COURT:  Excuse me --

15:01:09  8          MR. SNYDER:  The floppy discs are bogus Word documents

15:01:13  9  that are --

15:01:13 10          THE COURT:  So how does that bear on the issue that I

15:01:15 11  have to decide he is not entitled to his discovery?

15:01:19 12          MR. SNYDER:  He has not turned over to us any native

15:01:22 13  email files.

15:01:26 14          THE COURT:  How would you know if an email file on

15:01:31 15  these supposed emails, if you saw them --

15:01:35 16          MR. SNYDER:  This goes to the USB device, Your Honor,

15:01:39 17  because this Plaintiff, since the commencement of this lawsuit,

15:01:45 18  accessed, Your Honor, remote storage devices, USB devices, on

15:01:56 19  which he had files that were critical to this lawsuit.  He did

15:01:59 20  not identify them in his sworn certification to the Court, he

15:02:03 21  concealed them and now they're destroyed or secreted somewhere.

15:02:08 22          Those devices though left a digital fingerprint on the

15:02:13 23  Plaintiff's computers and on the Plaintiff's computer files.

15:02:15 24  And those devices, Your Honor, go to the heart of this case and

15:02:20 25  Plaintiff's fraud.

15:02:21  1        And our experts were able to determine that those

15:02:24  2   devices were used by this Plaintiff since the lawsuit was

15:02:36  3   commenced and contained files that included Zuckerberg contract

15:02:36  4   page two dot TIFF.  Remember, the TIFF file is what the

15:02:37  5   authentic contract was in.

15:02:39  6        **THE COURT:**  What you claim is the authentic contract.

15:02:50  7        **MR. SNYDER:**  Well, I could erect that, Your Honor, in

15:02:50  8   detail.  The other file was Zuckerberg contract page one dot

15:02:51  9   TIFF.  Those were extracted from the computer, erased from the

15:02:56 10   computer, put on a storage device.

15:03:01 11        The storage device was taken off the computer, just

15:03:03 12   like this, Your Honor, pulled off the computer, thrown in the

15:03:06 13   river, destroyed, hidden, not produced to us.

15:03:09 14        **THE COURT:**  Or as you suggest, Lake Erie.

15:03:12 15        **MR. SNYDER:**  Lake Erie.  I thought the Hudson River

15:03:15 16   would be too parochial so we used Lake Erie.

15:03:20 17        **THE COURT:**  And what you just gestured to was a flash

15:03:26 18   drive, correct?

15:03:26 19        **MR. SNYDER:**  Yes.  This is grave a situation of

15:03:27 20   spoliation in a case that is imaginable.

15:03:30 21        **THE COURT:**  If it is spoliation.

15:03:32 22        **MR. SNYDER:**  Well, Your Honor, let's just say,

15:03:34 23   Plaintiff's excuse for not producing this critical evidence is,

15:03:37 24   quote --

15:03:37 25        **THE COURT:**  Excuse me.  I'm trying to understand the

15:03:40   1    notion of the fact that are you saying that there are documents

15:03:44   2    on the floppies that purport to be emails, but really aren't?

15:03:49   3             **MR. SNYDER:**  Yes.

15:03:49   4             **THE COURT:**  Because they're not in native form?

15:03:51   5             **MR. SNYDER:**  Yes.

15:03:52   6             **THE COURT:**  Native form is what you mean by native

15:03:56   7    format, correct?

15:03:56   8             **MR. SNYDER:**  Yes.  And, Your Honor, there are

15:03:59   9    documents --

15:03:59  10             **THE COURT:**  My question is so what.  You have the

15:04:04  11    Seagate and you have the floppy discs and --

15:04:08  12             **MR. SNYDER:**  And he has not produced any of -- any

15:04:08  13    computer.

15:04:10  14             **THE COURT:**  Why should I believe that there are some

15:04:15  15    -- well, apparently there are some other drives out there that

15:04:18  16    he --

15:04:19  17             **MR. SNYDER:**  Correct.

15:04:19  18             **THE COURT:**  -- didn't turn over --

15:04:20  19             **MR. SNYDER:**  Correct.

15:04:21  20             **THE COURT:**  -- because they were listed on the

15:04:23  21    confidentially log, is that right?

15:04:25  22             **MR. SNYDER:**  Let me say it this way:  When I -- yes.

15:04:26  23    When I present my motion to compel, there are so many serious

15:04:30  24    lapses here --

15:04:31  25             **THE COURT:**  Well, just a second.  What did they say in

15:04:32  1    response to that?  What did you hear from Mr. --

15:04:35  2         MR. SNYDER:  About the emails?

15:04:36  3         THE COURT:  Well, the emails aren't really what's not

15:04:40  4    been turned over because you have what you have even though you

15:04:43  5    believe they're not authentic emails.

15:04:43  6         MR. SNYDER:  Correct.

15:04:45  7         THE COURT:  It's really that they're part of a paper

15:04:48  8    trail or a digital trail that leads you to believe that there

15:04:52  9    are other sources of relevant documents --

15:04:54 10         MR. SNYDER:  Form example, on these --

15:04:55 11         THE COURT:  -- on these mysterious drives.

15:04:57 12         MR. SNYDER:  They're not mysterious, Your Honor.  They

15:04:59 13    are --

15:04:59 14         THE COURT:  Well, it's a mystery as to where they are.

15:05:01 15         MR. SNYDER:  Right, they existed in the real world.

15:05:04 16    They left digital fingerprints on his computer.

15:05:05 17         THE COURT:  I didn't mean phantom by mysterious.

15:05:07 18         MR. SNYDER:  And they're exactly the kind of files

15:05:09 19    that the -- TIFF files that were attached to --

15:05:12 20         THE COURT:  So what you are really are saying is you

15:05:15 21    have circumstantial evidence to believe that there are other

15:05:18 22    sources, i.e. drives, the USB drives.

15:05:21 23         MR. SNYDER:  We believe, with all due respect --

15:05:24 24         THE COURT:  Universal Serial Bus.

15:05:27 25         MR. SNYDER:  Yes.  And we believe, Your Honor, not to

15:05:31  1    mix words, it's direct and irrefutable scientific evidence that

15:05:33  2    this Plaintiff stored on remote storage devices files essential

15:05:39  3    to his fraud in this case.  Indeed, one of the files is called

15:05:42  4    Facebook files.  They then says he's unable to locate these

15:05:46  5    devices.  This is implausible and not credible.

15:05:49  6            Remember, Your Honor, this is a man who saved hundreds

15:05:52  7    of floppy discs, supposedly, and CDs, supposedly, dating back a

15:05:57  8    decade, supposedly, containing these made-up emails, supposedly.

15:06:01  9    So this is the man who saves thousands of floppy discs per

15:06:07 10    decade, but the USB device with the first page and second

15:06:08 11    page --

15:06:09 12            **THE COURT:**  Just a second.  Can you take a pause here?

15:06:13 13            **MR. SNYDER:**  Yes.

15:06:18 14            **THE COURT:**  I need to consult my technical assistant.

15:06:18 15    For the record, this is Mr. Brian Loliger.  He's the deputy

15:06:24 16    assistant manager of our information system.

15:07:21 17            **MR. SNYDER:**  There's one other critical category --

15:07:23 18            **THE COURT:**  They could have been on another computer

15:07:25 19    and then put on a drive, correct?

15:07:28 20            **MR. SNYDER:**  The USB that was located by our forensic

15:07:33 21    experts was attached to specific computers, that's how we were

15:07:36 22    able to trace --

15:07:37 23            **THE COURT:**  But they may be created on a another

15:07:41 24    computer and then temporarily stored on the drive?

15:07:44 25            **MR. SNYDER:**  We don't know where they were created.

15:07:46  1   We know that the files existed on computers, that we have, were

15:07:50  2   moved onto a storage device, a storage device in Lake Erie or

15:07:55  3   somewhere else, and we don't have the documents on the computer

15:07:57  4   because they were wiped and they are somewhere on a disc or not.

15:08:01  5        There's another category though of electronic assets

15:08:04  6   that this Plaintiff willfully withheld and did not produce, and

15:08:08  7   this is critical as well.  As Your Honor knows, it's our

15:08:15  8   position that the document attached to the complaint is a fraud,

15:08:19  9   a fabrication, a phoney.

15:08:20  10       So we asked this Plaintiff to produce to our experts

15:08:24  11  all electronic copies of the purported contract.  What do you

15:08:29  12  know, we didn't get a single one.

15:08:31  13       All we have, Your Honor, is the two-page hard copy

15:08:35  14  document that is attached to the complaint and the purported

15:08:38  15  original that he made available for hard copy inspection, which

15:08:42  16  is suspicious and irregular.

15:08:47  17       **THE COURT:**  What is your point about electronic

15:08:50  18  copies?

15:08:51  19       **MR. SNYDER:**  He did not produce a single electronic

15:08:54  20  version of the bogus contract from his computer, from his CDs,

15:08:56  21  from his hundreds of floppy discs.

15:08:59  22       He didn't produce a single electronic image of the his

15:09:09  23  signed version of his bogus contract.  He didn't produce any

15:09:09  24  electronic documents containing the unsigned version of the

15:09:11  25  contract that's attached to the complaint.

15:09:13  1          As a result, all we have is his two-page document

15:09:18  2   attached to the complaint and the piece of paper that he calls

15:09:22  3   an original.

15:09:23  4          THE COURT:  Is it not possible that there aren't any?

15:09:26  5          MR. SNYDER:  No, and I'll tell Your Honor why.  His

15:09:28  6   experts have images that were scanned off of a computer.

15:09:31  7          THE COURT:  His experts?

15:09:32  8          MR. SNYDER:  Let me address this.  What they did find,

15:09:36  9   Your Honor, only aggravates our concern and highlighted our

15:09:40 10   grave concerns about both the destruction of evidence and the

15:09:46 11   withholding of evidence, and why we didn't produce the emails.

15:09:50 12          What they did find are Plaintiff's test attempts at

15:09:54 13   creating a phoney document --

15:09:56 14          THE COURT:  Your experts?

15:09:57 15          MR. SNYDER:  Yes.  We found seven unsigned electronic

15:10:02 16   drafts of the bogus contract that our experts said were telltale

15:10:06 17   practice forgeries, but they had different margins --

15:10:11 18          THE COURT:  Where were they?

15:10:12 19          MR. SNYDER:  They were found on the Plaintiff's

15:10:15 20   computer.  And what we found, Your Honor, our experts found that

15:10:19 21   he had different margins, different spaces.  They were irregular

15:10:23 22   on different ways on page one as the Plaintiff was trying to cut

15:10:23 23   and paste and manipulate words to create a bogus page one.

15:10:27 24          And what we found is not a single electronic version

15:10:32 25   of the signed copy.  And none of these documents, the seven of

15:10:37  1    those versions, drafts of the two-page documents attached to the

15:10:41  2    complaint matched what was attached to the complaint.  So

15:10:44  3    they're eight versions with different formats and margins and --

15:10:48  4         **THE COURT:**  Is it possible that he erased them?

15:10:52  5         **MR. SNYDER:**  Is it possible that he erased --

15:10:55  6         **THE COURT:**  Deleted.

15:10:56  7         **MR. SNYDER:**  The signed electronic copy -- well, he

15:11:00  8    had seven copies.

15:11:04  9         **THE COURT:**  Hard copies?

15:11:05 10         **MR. SNYDER:**  No, he had seven electronic copies of

15:11:09 11    different drafts of the bogus contract, different margins,

15:11:11 12    different spacing as he was trying to Jerry-rig page one to look

15:11:15 13    a certain way.  But what we doesn't have on his computer is the

15:11:19 14    version that ultimately was printed out and attached to the

15:11:23 15    complaint.

15:11:24 16         **THE COURT:**  And the reason for that would be that he

15:11:28 17    deleted it.

15:11:28 18         **MR. SNYDER:**  He deleted it or he was required, Your

15:11:32 19    Honor, also in the order -- but it's not like a production

15:11:36 20    requirement.

15:11:36 21         He also was required, Your Honor, and this was

15:11:37 22    critical and it was discussed with Your Honor to both produce

15:11:40 23    and identify and he failed to identify any of this for us.  He

15:11:45 24    failed to identify where the contracts were, what was the

15:11:48 25    authentic contract, what he purported to represent.

15:11:52  1        So we have now seven versions of fake forgeries or

15:11:57  2   practice forgeries.  Which one does he contend is the so-called

15:12:01  3   contract?  He can't contend any of them are the so-called

15:12:05  4   contract because none of them match what's attached to the

15:12:08  5   complaint.  So our question is where is the electronic version

15:12:11  6   of the document that's attached to the complaint.

15:12:13  7        **THE COURT:**  So if the Court agreed with you, my order

15:12:15  8   would be to comply fully with --

15:12:18  9        **MR. SNYDER:**  Yes.

15:12:19 10        **THE COURT:**  Let's see.  The paragraph that requires

15:12:21 11   him to not only to produce it, but to identify --

15:12:25 12        **MR. SNYDER:**  Yes, Your Honor.

15:12:25 13        **THE COURT:**  -- as to the electronic version of the

15:12:30 14   final alleged contract between the parties?

15:12:34 15        **MR. SNYDER:**  Yes, Your Honor.

15:12:35 16        **THE COURT:**  And so if he gives you an affidavit saying

15:12:41 17   I don't have it, I don't know what happened to it, it may have

15:12:46 18   been -- I may have intentionally deleted it or unintentionally

15:12:51 19   deleted it, but I can't tell you more, that would be compliant?

15:12:56 20        **MR. SNYDER:**  That would be partial compliance.  There

15:12:59 21   are other ways in which he did not comply as well.

15:13:00 22        **THE COURT:**  I know that, but as to that issue --

15:13:02 23        **MR. SNYDER:**  I suppose so.

15:13:04 24        **THE COURT:**  Okay.

15:13:05 25        **MR. SNYDER:**  Plaintiff did not produce a single --

15:13:07  1      **THE COURT:**  What's the next issue I have?  Are you

15:13:10  2  going to go through each one?

15:13:13  3      **MR. SNYDER:**  If it's helpful to the Court.

15:13:14  4      **THE COURT:**  Because the question is whether he is in

15:13:16  5  compliance or not so as to trigger your obligation and how many

15:13:21  6  more examples of non-compliance, which could result in an order

15:13:27  7  from the Court from that would, number one, forgo any

15:13:29  8  obligations on your part agreeing with you that the discovery,

15:13:33  9  if you will or production, was to be sequential and conditional

15:13:38  10  on the one hand and on the other hand, provide enforcement of

15:13:43  11  the order by virtue of further order compelling him to provide

15:13:49  12  these supplemental disclosures.

15:13:51  13      **MR. SNYDER:**  The way I count that, I think there are

15:13:54  14  five ways in which he --

15:13:54  15      **THE COURT:**  I'm trying to assist Mr. Lake so he knows

15:13:57  16  when he is expected to attempt to rebut.

15:13:57  17      **MR. SNYDER:**  I think there are five categories I'd

15:14:00  18  like to --

15:14:00  19      **THE COURT:**  We just discussed one, the first category?

15:14:04  20      **MR. SNYDER:**  Okay.  The first category in no

15:14:08  21  particular order is his failure to produce the USB device or --

15:14:12  22      **THE COURT:**  Or devices.

15:14:13  23      **MR. SNYDER:**  Or devices, right.

15:14:13  24      **THE COURT:**  This would be the -- what's the word I'm

15:14:18  25  looking for?

15:14:18  1          MR. SNYDER:  Pen drives.

15:14:21  2          THE COURT:  The undisclosed drives --

15:14:21  3          MR. SNYDER:  Yes.

15:14:22  4          THE COURT:  -- that were attached and upon which

15:14:24  5   materials were created, arguably in native format, but are now

15:14:31  6   not produced because you don't have the drives so you don't know

15:14:35  7   what's on there.

15:14:36  8          MR. SNYDER:  We do know what's on there and that's why

15:14:38  9   it is so serious, Your Honor.  What's on there -- a digital

15:14:49 10   fingerprint was left on the computer.  We can trace from the

15:14:49 11   computer to the now destroyed or secreted --

15:14:50 12          THE COURT:  Drives.

15:14:51 13          MR. SNYDER:  -- storage device the following files,

15:14:52 14   Zuckerberg contract page one dot TIFF, Zuckerberg contract page

15:14:58 15   two dot TIFF in a folder labelled Facebook files.  Again, the

15:15:04 16   very same type of TIFF image files as the authentic contract

15:15:10 17   from 2004.

15:15:10 18          THE COURT:  Okay.

15:15:11 19          MR. SNYDER:  And those are gone and the Plaintiff

15:15:13 20   either should produce the storage devices and the documents that

15:15:17 21   are on them or provide a certification telling the Court why,

15:15:21 22   since the commencement of the lawsuit he accessed them, but why

15:15:26 23   today they're either gone or supposedly lost.  That's the first

15:15:32 24   category.

15:15:32 25          THE COURT:  Or you could depose him.

15:15:35  1          MR. SNYDER:  I don't think there's any -- I think it

15:15:36  2     speaks for itself.  It's difficult to imagine more willful

15:15:42  3     spoliation than that when the question in the case is where is

15:15:44  4     the authentic page one of the contract --

15:15:44  5          THE COURT:  I think that we're all familiar with the

15:15:49  6     reasonable case law of spoliation issues and electronic

15:15:51  7     discovery.  And we know that conceivably when you have a

15:15:55  8     spoliation issue, the Court may require an evidentiary hearing.

15:16:00  9          I'm trying to avoid doing that and I'm trying to keep

15:16:04 10     clear for everybody's benefit this afternoon that we're not here

15:16:07 11     to accuse the Plaintiff of spoliation.

15:16:12 12          You may think that has occurred, but as far as the

15:16:17 13     Court is concerned, the only issue before it is whether or not

15:16:20 14     there is enough of an indication that there is more out there

15:16:24 15     that needs to be produced by the Plaintiff before your

15:16:27 16     obligation, which it is sequential, to produce the so-called

15:16:31 17     Harvard emails is triggered.  That's all I want to be clear

15:16:35 18     about.

15:16:35 19          MR. SNYDER:  The first category --

15:16:37 20          THE COURT:  If you need -- if you think you need to

15:16:39 21     depose him or to understand whether or not -- I mean, you can

15:16:45 22     see the two things get very interrelated at some point.

15:16:50 23          I mean, on the one hand is there a something showing

15:16:54 24     that he has failed to fully comply with discovery obligations

15:16:56 25     under the order.  That's what we're discussing.  And if they're

15:16:59  1   not what amounts to spoliation, it is arguably closely related

15:17:04  2   issue depending on what we find.

15:17:04  3        MR. SNYDER:  And I would suggest, Your Honor, that I

15:17:06  4   agree, and in the future when we present the Court with our full

15:17:12  5   finding of the forensic examination and other information and

15:17:15  6   these discovery issues are resolve one way or another --

15:17:18  7        THE COURT:  Could you just -- so we can move ahead

15:17:20  8   here, we're not running out of time, but just --

15:17:24  9        MR. SNYDER:  The second --

15:17:25 10        THE COURT:  -- quickly denominate -- we've got item 1,

15:17:28 11   those are the so-called USB devices.  If you could just for the

15:17:32 12   record so I can call upon Mr. Lake to respond --

15:17:34 13        MR. SNYDER:  He should be required to produce --

15:17:38 14        THE COURT:  What are the other four items that give

15:17:41 15   rise to the current belief that he's not fully complied to the

15:17:42 16   order so as to trigger your obligations to produce?

15:17:44 17        MR. SNYDER:  He should identify and produce all

15:17:49 18   electronic copies of the purported contract.  He's failed to do

15:17:54 19   that.

15:17:54 20        THE COURT:  We've talked about that.

15:17:55 21        MR. SNYDER:  He should identify and produce all of

15:17:57 22   the --

15:17:57 23        THE COURT:  This is number three?

15:17:59 24        MR. SNYDER:  Yes.  All of the forms described in

15:18:02 25   paragraph eight of the Plaintiff's June 12th, 2011 declaration.

15:18:08  1  Those are the forms from which the contract was actually

15:18:15  2  created.  He's failed to identify those or produce any

15:18:22  3  electronic assets containing those files.

15:18:24  4       **THE COURT:**  Are these items listed in Mr. Southwell's

15:18:29  5  declaration?

15:18:31  6       **MR. SNYDER:**  Yes, Your Honor.

15:18:32  7       **THE COURT:**  And that would be, just in the interest of

15:18:34  8  time perhaps, if you could give me a reference to -- I know I

15:18:37  9  saw it.  I'm just looking for it now so we can perhaps move more

15:18:43  10  quickly here.  These would be pages -- we've got page 13 and 14.

15:18:54  11  We've got electronic images of the StreetFax agreement.  I think

15:19:00  12  those were the ones you were referring to.  Six removable media

15:19:07  13  devices would be the so-called missing drives.  And then are the

15:19:10  14  other items listed somewhere that I could look at and follow

15:19:14  15  along with you?

15:19:17  16       **MR. SNYDER:**  Yes.  One moment, Your Honor.

15:19:19  17       **THE COURT:**  Sure.  And again, for Mr. Lake's benefit

15:19:23  18  too if you can --

15:19:47  19       **MR. LAKE:**  There's a list on page four in their reply

15:19:53  20  under heading two, electronic documents.

15:19:56  21       **THE COURT:**  That would be doc number 110?

15:19:59  22       **MR. LAKE:**  Yes, page four at the bottom, Roman numeral

15:20:04  23  II, paragraph A, first paragraph.

15:20:14  24       **THE COURT:**  Well, I knew I saw something in

15:20:19  25  Southwell's affidavit, but now I realize it wasn't quite as

15:20:21  1   complete as I thought.  It covers two of the items we've just

15:20:27  2   discussed with Mr. Snyder.

15:20:29  3          MR. SNYDER:  I can go over the request, Your Honor.  I

15:20:32  4   haven't --

15:20:32  5          THE COURT:  And the request of them are the categories

15:20:35  6   at the bottom of page four, is that it?  The June 12th

15:20:46  7   declaration.

15:20:47  8          MR. SNYDER:  Your Honor, page 10 of our brief filed on

15:20:57  9   August 4th has a nice summary --

15:21:15  10         THE COURT:  What's the date of the brief again?

15:21:17  11         MR. SNYDER:  Yes, Your Honor, it's August 4th.

15:21:32  12         THE COURT:  What page?

15:21:33  13         MR. SNYDER:  Yes, Your Honor, page 10.

15:21:35  14         THE COURT:  We're looking at the first full paragraph?

15:21:37  15         MR. SNYDER:  Right.

15:21:38  16         THE COURT:  So is this the same listing of

15:21:41  17   unsatisfactory issues, production issues, as recapitulated at

15:22:01  18   the bottom of page four of the doc number 110, the so-called

15:22:01  19   Defendants' reply?  I just want to make sure we have everything

15:22:01  20   in front of us right here.

15:22:05  21         Page 10 refers to, while you're looking yourselves,

15:22:08  22   native electronic version of the purported contract.  Native

15:22:12  23   electronic version being the native format of it, just so we're

15:22:21  24   using correct terminology.  And then all electronic copies of

15:22:28  25   the purported contract, including those in the possession of his

15:22:32  1   attorneys or his experts --

15:22:34  2          MR. SNYDER:  And that's critical, Your Honor, because

15:22:36  3   we believe that the fraudulent contract changed over time and

15:22:41  4   that versions that his experts, his agents, may have or do have

15:22:47  5   may indeed be similar to the version A that was attached to the

15:22:53  6   complaint --

15:22:53  7          THE COURT:  The only word is may.

15:22:54  8          MR. SNYDER:  Well, we know that -- and produced in

15:22:58  9   hard copy form to us so we want to see those electronic images.

15:23:04  10         THE COURT:  I understand.  And then the next category

15:23:07  11  or part of the second one is mentioned about the purported

15:23:11  12  contracts are those in any webmail account.

15:23:16  13         And you think that -- let see here.  And you think or

15:23:19  14  that you thought that you should order then from the acquisition

15:23:25  15  and inspection of the webmail account by your expert Stroz

15:23:30  16  Friedberg.

15:23:30  17         MR. SNYDER:  Yes, Your Honor.

15:23:31  18         THE COURT:  And that's not an issue that was addressed

15:23:33  19  with the order?

15:23:33  20         MR. SNYDER:  No, Your Honor, and that was a new

15:23:35  21  request which we raised, and I raised moments ago, which is

15:23:38  22  that, we believe, Your Honor --

15:23:39  23         THE COURT:  But he did not disclose having such email

15:23:42  24  accounts.

15:23:42  25         MR. SNYDER:  We know that he has at least --

15:23:43  1          **THE COURT:**  Well, he hasn't disclosed it in any

15:23:46  2  declaration?

15:23:46  3          **MR. SNYDER:**  No, Your Honor.

15:23:47  4          **THE COURT:**  Do you think he has one?

15:23:48  5          **MR. SNYDER:**  We know he has at least two, one is a

15:23:52  6  Gmail account and the other is a Hotmail or Microsoft account.

15:23:57  7  And we believe that those, given the overwhelming evidence of

15:24:01  8  fraud before the Court and discovery misconduct, may well

15:24:07  9  contain additional evidence of fraud.

15:24:10  10         **THE COURT:**  And how do you know that he has this, what

15:24:13  11  you call, Gmail account and a so-called Hotmail account?

15:24:18  12         **MR. SNYDER:**  He's been CCed in different emails that

15:24:21  13  have come into our possession that contain those addresses.

15:24:27  14         **THE COURT:**  So there is a discrepancy between his

15:24:31  15  declaration and the facts?

15:24:32  16         **MR. SNYDER:**  Well, he didn't identify those accounts,

15:24:34  17  no.

15:24:35  18         **THE COURT:**  Right.  Okay.  And then the last -- not

15:24:38  19  the last category.  The next category is electronic forms

15:24:45  20  described in the June 12th declaration.

15:24:47  21         **MR. SNYDER:**  Those are the so-called forms that claims

15:24:49  22  he used to create the contract attached to the complaint.  I

15:24:52  23  guess the templates or the forms that he claims to have filled

15:24:56  24  in when we created the account and we have no electronic copies

15:25:03  25  of any such forms.

15:25:05  1        THE COURT:  Was the June 12th declaration an Exhibit

15:25:08  2   to any of the documents, June 14th perhaps?

15:25:16  3        MR. SNYDER:  I can approach and hand it to Your Honor.

15:25:33  4        THE COURT:  And that would be in paragraph -- what

15:25:35  5   paragraph would you be referring to there?

15:25:42  6        MR. SNYDER:  Paragraph eight, Your Honor.

15:25:43  7        THE COURT:  Paragraph eight.  All right.  Mr. Lake,

15:25:48  8   make a note of it.  We're talking about the forms referred to in

15:25:51  9   paragraph eight.  They are claiming that they're looking for the

15:25:57 10   electronic version of those forms.  Is that specifically what

15:26:02 11   hasn't been produced?

15:26:04 12        MR. SNYDER:  He has not identified or produced any

15:26:07 13   such forms and I just want to emphasize again, the

15:26:12 14   identification requirement was critical to the order because of

15:26:18 15   our concerns that he was not going to point out where documents

15:26:24 16   were or what documents represented the so-called contract.

15:26:29 17        THE COURT:  And then the original or again so-called

15:26:32 18   native electronic or native form -- you don't have the word

15:26:37 19   format in there, but you say native electronic files consisting

15:26:43 20   of or containing the purported emails.

15:26:47 21        MR. SNYDER:  Yes, and that goes to the issue that all

15:26:50 22   he's produced to us are floppy discs that contain Word document

15:26:50 23   files, but not the native email files.

15:26:54 24        And the difference, Your Honor, is important of

15:26:58 25   course.  I can show Your Honor the difference.  We have the 2004

15:27:02  1    email that this Plaintiff sent, by which we looked at earlier

15:27:05  2    today, attaching page one and page two of the StreetFax contract

15:27:10  3    are native emails.

15:27:13  4         What's he's attached -- what he's cut and pasted by

15:27:17  5    his own admission onto a Word document is not a native email.

15:27:22  6    It's a Word document that he says represents a pasting of an

15:27:27  7    email that he took from a native format, but he hasn't produced

15:27:31  8    any native format.

15:27:32  9         And the irony here is what we're purporting to

15:27:36 10    produce, once he is in compliance, are native emails from Mark

15:27:41 11    Zuckerberg's Harvard account, which contain none of the

15:27:47 12    so-called emails recited in the narrative and in the amended

15:27:50 13    complaint.  So we want him to produce all native email files

15:27:57 14    containing the purported emails.  He's produced none.

15:29:07 15         **THE COURT:**  My technical assistant tells me that some

15:29:12 16    of these forms in native form could be on a server somewhere and

15:29:17 17    Mr. Ceglia might not know how to actually produce them, is that

15:29:28 18    not true?

15:29:28 19         **MR. SNYDER:**  I don't know what he knows or does not

15:29:28 20    know, but I know he was required to identify and produce the

15:29:28 21    forms and he didn't do either.  And if he didn't do that --

15:29:32 22         **THE COURT:**  I mean, if he told you how he came to have

15:29:35 23    access to these forms, that would be -- and if from his

15:29:40 24    explanation it was clear that they did not reside on his

15:29:43 25    computer, that would be satisfactory, wouldn't it?

15:29:45  1        **MR. SNYDER:**  We would then evaluate that at the time.

15:29:47  2        **THE COURT:**  Okay.  Thank you.

15:29:48  3        **MR. SNYDER:**  And the final category which is the USB

15:29:51  4   devices, which we've already addressed, Your Honor.

15:29:54  5        **THE COURT:**  Yes, okay.  And your view is that until he

15:29:57  6   provides that, there is still the risk that, as I remember you

15:30:08  7   very saliently drawing the Court's attention to that Mr. Ceglia,

15:30:12  8   in your view, could attempt to manufacture evidence, if you

15:30:15  9   will.

15:30:15 10        **MR. SNYDER:**  Yes, Your Honor, in light of the ample

15:30:18 11   evidence --

15:30:18 12        **THE COURT:**  To respond to what he received --

15:30:20 13        **MR. SNYDER:**  Yes.

15:30:21 14        **THE COURT:**  -- from Mr. Zuckerberg before he -- the

15:30:23 15   record of his electronic -- his electronic records going to the

15:30:29 16   purported contract have been pinned down, if you will.

15:30:33 17        **MR. SNYDER:**  Yes, and in forming that is not only the

15:30:33 18   fact or facts that we brought before the Court about the fraud

15:30:38 19   that he's perpetrated, but also the recent discoveries from the

15:30:42 20   forensic testing, which show that this Plaintiff, Your Honor,

15:30:45 21   has recently been in the past several months engaged in

15:30:50 22   backdating, manipulation and alteration of numerous documents,

15:31:01 23   which when we present our report to the Court, will be fully

15:31:06 24   explicated.  But we did not make the decision to not produce the

15:31:10 25   emails with that consideration of all the facts.

15:31:13  1          And an important one was the fact that this Plaintiff,

15:31:17  2     in addition to destroying or spoliating this device, also was

15:31:23  3     engaged in backdating and manipulation of critical documents

15:31:28  4     that go to the heart of this case.  And until and unless he --

15:31:35  5          THE COURT:  What's the best example of this alleged

15:31:39  6     backdating, please?

15:31:40  7          MR. SNYDER:  There is ample evidence on this

15:31:43  8     Plaintiff's computer that he has been, since the date of this

15:31:44  9     lawsuit, manipulating dates and dating applications to backdate

15:31:48  10    documents.

15:31:49  11         THE COURT:  As regard to this case?

15:31:52  12         MR. SNYDER:  Yes, Your Honor.

15:31:53  13         THE COURT:  Or regard to something else?

15:31:55  14         MR. SNYDER:  This case.

15:31:56  15         THE COURT:  Can you give me an example?

15:31:57  16         MR. SNYDER:  I think at this point, no, Your Honor,

15:32:00  17    because there are still some documents that are designated as

15:32:04  18    confidential.

15:32:04  19         THE COURT:  Had I upheld it as confidential?

15:32:07  20         MR. SNYDER:  Yes, Your Honor.  And that's something

15:32:09  21    that we can address --

15:32:10  22         THE COURT:  And what items are they?  I mean,

15:32:29  23    everything I see on here goes back to the 2003, 2004 timeframe.

15:32:34  24         MR. LAKE:  Again, Your Honor, I think we are treading

15:32:37  25    into protected water.

15:32:39   1          **THE COURT:**  I just want to know what we overlooked.

15:32:42   2          **MR. SNYDER:**  For example, Your Honor --

15:32:42   3          **MR. LAKE:**  You didn't.

15:32:43   4          **MR. SNYDER:**  There's an application that techie's use

15:32:49   5   called a hex editor and it is something that is used to

15:33:08   6   manipulate metadata on a computer, including to manipulate the

15:33:13   7   dates attached to different documents.  There's ample evidence

15:33:18   8   that --

15:33:18   9          **THE COURT:**  Well, I think you told me about that when

15:33:20  10   we first considered this back in June --

15:33:23  11          **MR. SNYDER:**  Yes.

15:33:23  12          **THE COURT:**  -- that there is indeed a website that you

15:33:26  13   can go to that teaches you how to make --

15:33:28  14          **MR. SNYDER:**  Yes.

15:33:29  15          **THE COURT:**  -- documents appear to have a different

15:33:31  16   creation date than actually was the case.

15:33:34  17          **MR. SNYDER:**  Absolutely.

15:33:35  18          **THE COURT:**  Is that what you're talking about?

15:33:36  19          **MR. SNYDER:**  Yes, Your Honor.

15:33:37  20          **THE COURT:**  It's the same program you're referring to?

15:33:39  21          **MR. SNYDER:**  It's one of many -- or several that exist

15:33:43  22   to accomplish that end.  And what's relevant about it here, Your

15:33:46  23   Honor, and not to get into the nuts and bolts of it --

15:33:49  24          **THE COURT:**  You're saying that some of these documents

15:33:51  25   that I thought were technical and/or personal, if not

15:33:56   1   business-based, back in the time when they were created were

15:34:00   2   fabricated --

15:34:00   3        **MR. SNYDER:**  No.

15:34:01   4        **THE COURT:**  -- and put up on the privileged log?

15:34:03   5        **MR. SNYDER:**  No, were test-runs of that program.

15:34:08   6        **THE COURT:**  So why wasn't that revealed to me on

15:34:13   7   privilege log?

15:34:14   8        **MR. SNYDER:**  This is something that when we give our

15:34:17   9   full report, pursuant the Court's order, we're going to bring to

15:34:21  10   the Court's attention because the experts are still in the

15:34:24  11   process of evaluating the data.

15:34:27  12        For example, if Your Honor looks at documents 41 and

15:34:32  13   42 and 43 --

15:34:32  14        **THE COURT:**  The ones that --

15:34:32  15        **MR. SNYDER:**  Yes.

15:34:33  16        **THE COURT:**  -- we discussed earlier that look like

15:34:35  17   technical information to me?

15:34:37  18        **MR. SNYDER:**  Yes.  In fact, those are documents,

15:34:38  19   without revealing their substance because they are still

15:34:42  20   confidential, which demonstrate this Plaintiff's use of this

15:34:45  21   computer program, which is used to cut and paste and manipulate

15:34:51  22   documents.

15:34:53  23        **THE COURT:**  So where it says in the document here that

15:34:56  24   it's a doc file that appears to be the test results of modifying

15:35:01  25   a Microsoft Word document, that's what you're referring to?

15:35:04  1          **MR. SNYDER:**  Yes, Your Honor.

15:35:05  2          **THE COURT:**  How would I know that?

15:35:07  3          **MR. SNYDER:**  You would not, Your Honor.  But when we

15:35:09  4   would report to Your Honor next month pursuant to the order --

15:35:14  5          **THE COURT:**  So you're going to ask me to reconsider my

15:35:17  6   ruling as to those items?

15:35:19  7          **MR. SNYDER:**  Yes, but we thought it appropriate to do

15:35:22  8   so once the forensic testing was completed.

15:35:36  9          **THE COURT:**  Okay.

15:35:36 10          **MR. SNYDER:**  Which we can't do until this Plaintiff is

15:35:36 11   in compliance.  In addition, Your Honor --

15:35:36 12          **THE COURT:**  I was trying to get Mr. Lake to respond.

15:35:36 13          **MR. SNYDER:**  One of the other reasons why we did not

15:35:36 14   produce the emails was his requirement was not only to produce

15:35:40 15   electronic assets, but to provide a certification.

15:35:43 16          He provided a document which purported to be a

15:35:47 17   certification, but it was so manifestly incomplete and false

15:35:51 18   that it gave us additional concern about the integrity.

15:35:57 19          **THE COURT:**  So if I direct him to either identify,

15:35:59 20   produce or explain the four or five categories of

15:36:05 21   incompleteness, if I can use that term --

15:36:06 22          **MR. SNYDER:**  Yes.

15:36:06 23          **THE COURT:**  -- as a euphemism here, and then ask him

15:36:14 24   to recertify based on that production, that will then trigger

15:36:18 25   your obligation to --

15:36:20  1        **MR. SNYDER:**  If he is in compliance for sure.  We have

15:36:23  2   nothing to hide with those Harvard emails.  We are happy to

15:36:28  3   provide them once he is in compliance.

15:36:30  4        **THE COURT:**  Yes, but the problem -- you're a judicial

15:36:33  5   officer, as I am, presiding here.  If he is in compliance,

15:36:37  6   according to your view --

15:36:39  7        **MR. SNYDER:**  Well, I think in --

15:36:40  8        **THE COURT:**  -- how do I finally decide ultimately

15:36:42  9   whether he is in compliance or not unless I let you depose him

15:36:48 10   and ultimately have a hearing when I assess credibility?

15:36:51 11        **MR. SNYDER:**  Let me assess that correctly.  This

15:36:51 12   Plaintiff has --

15:36:53 13        **THE COURT:**  Is that a fair question?

15:36:54 14        **MR. SNYDER:**  Yes, but this Plaintiff has filed in this

15:36:57 15   court a false certification that is demonstratively false.  No

15:37:01 16   deposition's required, no more inquiries required to conclude

15:37:07 17   that.

15:37:07 18        **THE COURT:**  Well, let me play devil's advocate to tee

15:37:12 19   up Mr. Lake's response.  Except for the, I think, Seagate and

15:37:17 20   the home computer in his parents' home, the Plaintiff hasn't in

15:37:24 21   any way shape or form so far actually acquiesced any of these

15:37:28 22   assertions, has he?

15:37:32 23        **MR. SNYDER:**  Well, Your Honor, he hasn't acquiesced to

15:37:35 24   a lot of assertions that are mysterious to us, but there's one

15:37:37 25   assertion that is --

15:37:37  1          **THE COURT:**  That may be mysterious, but for my

15:37:42  2   purposes of agreeing with you, I have to basically evaluate all

15:37:45  3   of this technical explanation and decide whether it is rounded

15:37:49  4   enough to warrant an inference.

15:37:51  5          And the purpose of a circumstantial evidence case is

15:37:54  6   deciding whether there is a strong likelihood, reasonable

15:38:00  7   likelihood, more likely than not likelihood that he is not in

15:38:04  8   compliance, absent bringing him in here at and assessing his

15:38:09  9   creditability under cross examination, which is the ultimate way

15:38:13 10   that we, in our system, decide whether something is true or not

15:38:17 11   true.

15:38:17 12          **MR. SNYDER:**  Well, when something is so true that

15:38:18 13   no --

15:38:18 14          **THE COURT:**  With or without expert assistance.

15:38:21 15          **MR. SNYDER:**  Your Honor, just days -- this Plaintiff

15:38:24 16   filed is a declaration where he swore under oath pursuant to the

15:38:28 17   penalties of perjury --

15:38:30 18          **THE COURT:**  Which document are we talking about?

15:38:30 19          **MR. SNYDER:**  This is his July 15th declaration.

15:38:34 20          **THE COURT:**  Okay.  Just a second.  Is it one of your

15:38:50 21   Exhibits?

15:38:50 22          **MR. SNYDER:**  Actually, July 17th.  This would be

15:38:54 23   document 65.  I think I handed that up to Your Honor.

15:39:00 24          **THE COURT:**  Document 65, did you say.

15:39:02 25          **MR. SNYDER:**  Yes, Your Honor.

15:39:03  1          THE COURT:  Okay.  Very good.  Go ahead.

15:39:05  2          MR. SNYDER:  So he swore under oath that he

15:39:07  3  identified --

15:39:08  4          THE COURT:  Where is -- what paragraph am I looking

15:39:10  5  at?

15:39:15  6          MR. SNYDER:  Okay.  Yes.  On paragraph 13, he falsely

15:39:24  7  swears I have not attempted to conceal or withhold any of my

15:39:30  8  electronically-stored information from the forensic document

15:39:32  9  experts.  That was his sworn testimony to Your Honor.

15:39:35 10          In fact, unbeknownst to him, in the USB device, which

15:39:41 11  contained the first and second page of the contract at issue in

15:39:47 12  this case, left a digital fingerprint on his computer and he

15:39:55 13  knowingly the only inference can be knowingly failed to disclose

15:40:01 14  the existence of that remote storage device to this Court and he

15:40:05 15  did not give it to our experts.

15:40:07 16          And the inference is that he did not give it to our

15:40:10 17  experts because it contained evidence that he didn't want us to

15:40:13 18  see.  And indeed we know it contained evidence as relevant to

15:40:17 19  this case as anything the first and second page of the contract

15:40:17 20  at issue.

15:40:23 21          And he declared to Your Honor in document number 91

15:40:27 22  filed on July 15th yet again as required by the Court's July 1

15:40:33 23  order, I hereby identify all computers and electronic media in

15:40:38 24  my possession, custody or control, then he lists everything

15:40:42 25  including the Seagate computer and a fails to disclose the

15:40:46  1    remote storage device.

15:40:47  2         **THE COURT:**  Well, he wouldn't have it if they're gone

15:40:50  3    or they didn't exist, in his estimation.  He wouldn't have them

15:40:53  4    in his possession or control.

15:40:53  5         **MR. SNYDER:**  Well, they're two inferences.  One, he

15:40:56  6    destroyed them knowingly and willfully.  Two, he lost them

15:41:02  7    sometime between accessing them after the commencement of this

15:41:05  8    lawsuit and when he was required by Your Honor to produce them,

15:41:08  9    but failed to disclose to anyone not realizing that in the

15:41:13  10   bowels of one of his computers that there had been an electronic

15:41:17  11   fingerprint that proved the existence of his missing pen drive.

15:41:27  12        And if his pen drive, Your Honor, we could not

15:41:27  13   ascertain what was on it and it was just a missing --

15:41:30  14        **THE COURT:**  Pen or pin?

15:41:31  15        **MR. SNYDER:**  Pen remote drive.  If we did not even

15:41:34  16   know what was on it and all we know was that the Plaintiff had a

15:41:38  17   device that was now gone, we would be concerned enough, but we

15:41:41  18   know that this device stored page one and two of a contract that

15:41:45  19   he calls the Facebook contract.

15:41:49  20        And we believe that is the instrument of the fraud.

15:41:52  21   We believe that is where a version of this contract exists,

15:41:55  22   which will provide additional evidence, additional evidence of

15:41:59  23   the fraud that's at the heart of this case.

15:42:02  24        And so --

15:42:03  25        **THE COURT:**  Additional evidence?

15:42:04  1          **MR. SNYDER:**  Additional evidence, yes.

15:42:06  2          **THE COURT:**  How so?

15:42:07  3          **MR. SNYDER:**  We don't have it.  We -- our experts

15:42:10  4   are --

15:42:10  5          **THE COURT:**  How do you know there's additional

15:42:12  6   evidence then?

15:42:13  7          **MR. SNYDER:**  I think that given its willful either

15:42:18  8   destruction or withholding, that is a inference which the second

15:42:23  9   circuit permits under these circumstances given the extreme

15:42:29  10  prejudice to us by disappearance.  At a minnimum --

15:42:30  11         **THE COURT:**  But if Mr. Lake stands up and says Your,

15:42:33  12  Honor, I talked to my client and he's happy to give us a

15:42:36  13  supplemental affidavit that explains it, he's forgotten about

15:42:40  14  these drives and since he may have used them, they're not lost,

15:42:45  15  not in his possession, which he regrets, sorry, then he hasn't

15:42:50  16  concealed anything, nor has he withheld anything.

15:42:52  17         **MR. SNYDER:**  Well, he has concealed and probably

15:42:56  18  destroyed.  He could be swearing falsely again to the Court and

15:42:59  19  I would respectfully submit that a future date --

15:42:59  20         **THE COURT:**  He could --

15:43:00  21         **MR. SNYDER:**  At a future date we will address that.

15:43:03  22         **THE COURT:**  All right.

15:43:04  23         **MR. SNYDER:**  And this Plaintiff comes to the Court

15:43:06  24  with unclean hands and those kinds of certifications, I think,

15:43:11  25  should be give very little weight.

15:43:13 1        **THE COURT:**  Let's hear from Mr. Lake.  I want to hear

15:43:17 2    from his side before I can make a ruling.  Thank you.

15:43:20 3        **MR. LAKE:**  Thank you, Your Honor.  I'm going to

15:43:23 4    address the points as they were presented, if that's okay.

15:43:27 5        First, there was a discussion about the Seagate

15:43:30 6    computer and an allegation that it was not produced on July 15th

15:43:36 7    as required by the order.  That's not true.  It was actually

15:43:39 8    produced in Sarasota, the actual loose hard drive of the Seagate

15:43:44 9    computer.

15:43:44 10       What was not produced on the 15th was a forensic image

15:43:48 11   of that identical hard drive.  And I was made aware of that on

15:43:53 12   the 16th by Mr. Southwell.  We had hired a lawyer to attend with

15:43:58 13   the experts.  They were all there in Chicago.  I couldn't be

15:43:58 14   there.  I was in Buffalo.

15:44:03 15       At the end of the day, for some reason, I don't know

15:44:04 16   what, they hadn't made an image of it.  Mr. Southwell notified

15:44:08 17   me, I notified them that produce it.  It was Friday and on

15:44:12 18   Monday they hadn't produced all of their of images anyway.

15:44:15 19       We confirmed that they had found it and we produced it

15:44:18 20   immediately and I wrote Mr. Southwell a letter and apologized

15:44:22 21   for that.  And they not only had the hard drive itself, but they

15:44:25 22   also got the image.  So they had that on the 15th.

15:44:29 23       The other one was the issue over his parents'

15:44:32 24   computer.  And we had a long debate back at the end of June

15:44:35 25   about what computers needed to be produced.

15:44:39   1        If you recall, we sat around for over two hours.  Paul

15:44:44   2   Ceglia was going to have to search the entire world to find any

15:44:47   3   computer had he had ever touched.

15:44:50   4        And it was conceded that that was impractical and

15:44:55   5   probably impossible result.  And as a result, he would only have

15:44:56   6   to supply the computers that were within his possession, custody

15:44:59   7   and control.

15:45:00   8        There was the issue of one computer at his parents'

15:45:04   9   house that was referenced in a Wellsville newspaper last year

15:45:09  10   that might have had some information on it.  We asked for those

15:45:10  11   computers and we produced that on the 15th.

15:45:13  12        Then out of an abundance of caution and a diligent

15:45:18  13   search of all electronically-stored information that we could

15:45:21  14   find to comply with the order, we asked Mr. Ceglia, Paul's dad,

15:45:28  15   Carmen, if there were any other computers that may have been

15:45:32  16   accessed by Paul Ceglia, his son.  He said he didn't think so,

15:45:37  17   but that he had one more computer, that was his personal

15:45:40  18   computer.

15:45:40  19        Out of an abundance of caution, I notified

15:45:43  20   Mr. Benjamin and said we have another computer.  We don't think

15:45:48  21   that it needs to be produced.  We don't think it was in

15:45:51  22   Mr. Ceglia's custody, possession or control, but you know what,

15:45:54  23   if you want it, you can have it.  Do you want it.  He said yes

15:45:57  24   and so we said fine.  Have your guy or gal come up and make an

15:46:01  25   image of it.  So we brought it up the next day, they did.

15:46:04  1        **THE COURT:**  They did not?

15:46:05  2        **MR. LAKE:**  No, they did.

15:46:06  3        **THE COURT:**  They did.

15:46:07  4        **MR. LAKE:**  Yeah.  We produced -- those are the

15:46:11  5   computers they're talking about and that was the first line of

15:46:14  6   their argument that why they didn't need to produce the emails.

15:46:18  7        Next, they talk about the USB devices and the

15:46:21  8   certifications that go along with that.  And this has been a

15:46:24  9   issue that we have been debating now for many weeks.  And asking

15:46:34 10   me to produce those USB devices would be like asking me to

15:46:34 11   produce a unicorn or leprechaun.  They don't exist.

15:46:35 12        I've asked and I've asked and I have asked again.  I

15:46:38 13   have searched everywhere that is practicable for me to look and

15:46:42 14   I cannot produce them because I can't find them.  And I have

15:46:47 15   been told by everyone I've asked they don't have them.

15:46:51 16        **THE COURT:**  Can I ask you two quick questions?  Take a

15:46:54 17   pause.  Number one, you've heard the Defendants' arguments as to

15:46:58 18   why they believe, regardless of what you just said, why at some

15:47:03 19   point in time they did exist.

15:47:05 20        **MR. LAKE:**  Yeah, they did find --

15:47:05 21        **THE COURT:**  And the relevance -- excuse me.  Do you

15:47:09 22   correlate with their technical analysis as to the basis of their

15:47:13 23   belief that these devices at some time, the so-called pen

15:47:18 24   drives, existed?

15:47:19 25        **MR. LAKE:**  There were actually six that were

15:47:21  1    referenced --

15:47:21  2         **THE COURT:**  Because if I hold you just for one more

15:47:24  3    second before you respond, based on what I heard you just say, I

15:47:28  4    don't think it would be unfair if I were to conclude that you

15:47:33  5    concede that at one point they did exist.

15:47:34  6         **MR. LAKE:**  Oh, no.  They absolutely did exist.

15:47:37  7         **THE COURT:**  And when did they exist.

15:47:38  8         **MR. LAKE:**  Well, we know that they existed by virtue

15:47:42  9    of a report that shows that they were inserted into a computer,

15:47:47 10    now what we don't know is whose they are.

15:47:50 11         **THE COURT:**  Well, how would you characterize on behalf

15:47:52 12    of your client the date of their approximate existence and the

15:47:57 13    date of their approximate nonexistence?  Is that a fair way to

15:48:00 14    put that?

15:48:01 15         **MR. LAKE:**  Yeah, there's a report and they have it and

15:48:03 16    that's what Mr. Snyder is referring to.

15:48:06 17         **THE COURT:**  What do you say as to the timeframe that

15:48:09 18    these USB storage devices existed?

15:48:13 19         **MR. LAKE:**  I'm conceding that of the six devices that

15:48:16 20    are referred to, one was produced, according to the reports that

15:48:21 21    I'm reading, the same one they got, that at some point there

15:48:27 22    were USB devices that were inserted into a computer and so as

15:48:33 23    of --

15:48:33 24         **THE COURT:**  When approximately are those dates, the

15:48:40 25    timeframe?

15:48:41 1          **MR. LAKE:**  I'm trying to see if I can tell the dates

15:48:43 2 that they were.

15:48:44 3          **THE COURT:**  Mr. Snyder would like to attempt to assist

15:48:49 4 you.

15:48:49 5          **MR. LAKE:**  I think the experts will tell you and when

15:48:52 6 he brings his motion when they were last --

15:48:56 7          **THE COURT:**  No, tell me when they first existed.

15:48:59 8          **MR. LAKE:**  That I don't know and I don't think you can

15:49:01 9 tell.  I think all you can tell --

15:49:03 10          **THE COURT:**  Why is that?

15:49:03 11          **MR. LAKE:**  Well, I think the only thing we have is a

15:49:06 12 -- he's correct.  When you take a thumb drive, the little device

15:49:09 13 he showed you, and you put it into the computer, the computer

15:49:13 14 reads it and says what the device is.

15:49:16 15          **THE COURT:**  So do you have a record of doing so?

15:49:17 16          **MR. LAKE:**  Yes.  And that's what he's referring to.

15:49:20 17          **THE COURT:**  Would not that record indicate when it was

15:49:23 18 inserted?

15:49:24 19          **MR. LAKE:**  Yes.

15:49:25 20          **THE COURT:**  When is the earliest date that one of

15:49:28 21 these drives was inserted?

15:49:30 22          **MR. LAKE:**  No, the experts would have to tell you that

15:49:33 23 because we'd have to pull the report and read it.  They may have

15:49:36 24 that.

15:49:37 25          **MR. SNYDER:**  Presumably, the Plaintiff would know.

15:49:40   1         **THE COURT:**  Well, I'm just asking what the record

15:49:42   2    shows what we have in front of us.  I'm going to ask another

15:49:46   3    question, Mr. Snyder.  Bear with me.

15:49:47   4         I just want to know, you have all of this technical

15:49:51   5    assistance and a lot of money for it and you're telling me that

15:49:54   6    while you know the drive was inserted, you can't tell me when it

15:49:57   7    was first inserted on the computer?

15:49:59   8         **MR. LAKE:**  The experts could run a report on that and

15:50:03   9    they could probably tell you that.  I don't have that report

15:50:03  10    with me.

15:50:03  11         Their experts may have done that and they may be able

15:50:07  12    to produce the report.  I'm not denying the existence because I

15:50:10  13    saw the report that said that --

15:50:11  14         **THE COURT:**  Would the Court fairly conclude that they

15:50:14  15    existed and were inserted in the computer in the 2003 and 2004

15:50:20  16    timeframe?

15:50:21  17         **MR. LAKE:**  That I don't know.

15:50:23  18         **THE COURT:**  How about the 2005, 2006 timeframe?

15:50:26  19         **MR. LAKE:**  Again, Your Honor, I don't know.

15:50:28  20         **THE COURT:**  Well, apparently they were inserted

15:50:31  21    sometime before today.

15:50:33  22         **MR. LAKE:**  Yes.

15:50:33  23         **THE COURT:**  Otherwise, they wouldn't be the subject of

15:50:37  24    this report.

15:50:37  25         **MR. LAKE:**  Right.

15:50:38  1        **THE COURT:**  So should the Court fairly conclude for

15:50:42  2   the sake of asking the next question provide a foundation that

15:50:47  3   they existed and were inserted in the computer, say, within the

15:50:51  4   last five years?

15:51:00  5        **MR. LAKE:**  I think the one that they're -- I don't

15:51:01  6   know, but I think the one that -- well, I'm looking at a report.

15:51:04  7        **THE COURT:**  You know what my next question is going

15:51:06  8   be.  I'm not trying to beat a dead horse.

15:51:06  9        **MR. LAKE:**  The question is --

15:51:07 10        **THE COURT:**  My next question obviously is did you ask

15:51:10 11   your client the question.

15:51:11 12        **MR. LAKE:**  Yes, of course I did.

15:51:12 13        **THE COURT:**  And what did he say?

15:51:13 14        **MR. LAKE:**  He said -- I asked him even specifically by

15:51:17 15   name because we had a list of the names.

15:51:17 16        **THE COURT:**  What did he say?

15:51:20 17        **MR. LAKE:**  He said I do not have them.  I cannot

15:51:23 18   produce them.

15:51:24 19        **THE COURT:**  Did you ask him when they were used.

15:51:27 20        **MR. LAKE:**  I didn't know -- well, I asked him if he

15:51:31 21   had them, but I didn't know where they were used.

15:51:33 22        **THE COURT:**  Did you next him the next obvious question

15:51:35 23   which is --

15:51:36 24        **MR. LAKE:**  Where are they?

15:51:38 25        **THE COURT:**  -- what happened to them?

15:51:39  1          **MR. LAKE:**  Yes, I did.

15:51:40  2          **THE COURT:**  And what was his answer?

15:51:42  3          **MR. LAKE:**  His answer was I lost them, I misplaced

15:51:51  4   them.

15:51:51  5          **THE COURT:**  Those were his words?

15:51:51  6          **MR. LAKE:**  I'll have to give you a declaration.  I'm

15:51:51  7   paraphrasing what I recall from my conversation, but I had a

15:51:51  8   direct conversation with him.

15:51:51  9          The other thing that --

15:51:53  10         **THE COURT:**  While he's in Ireland?

15:51:55  11         **MR. LAKE:**  Correct.  The other thing he said is that

15:51:59  12  he wanted to know what computers the thumb drives were put in

15:52:04  13  because they may not have been his and so I said that's a fair

15:52:10  14  question.

15:52:10  15         Because if somebody had access to the computers that

15:52:14  16  we turned over, for example his father's, which was not Paul's,

15:52:20  17  that he didn't use, but we turned it over anyway, if his father

15:52:22  18  would have put a thumb drive in that computer, it wouldn't be

15:52:23  19  within Paul Ceglia's possession, custody or control anyway.

15:52:27  20         So we went a step further and asked of his parents if

15:52:30  21  they had a thumb drive that they may have used.  Paul Ceglia

15:52:34  22  told me that if other people used his computer while he wasn't

15:52:37  23  there and they had it --

15:52:38  24         **THE COURT:**  Sounds to me that from everything

15:52:43  25  Mr. Snyder has said, that we're not talking about the parents'

15:52:43   1    computer.

15:52:43   2              **MR. LAKE:**  No, they're.

15:52:44   3              **THE COURT:**  The analysis of the experts points to

15:52:47   4    computers that were used by Mr. Ceglia at the residence, is that

15:52:52   5    correct.

15:52:52   6              **MR. SNYDER:**  Yes, Your Honor.  And indeed --

15:52:54   7              **THE COURT:**  So why would you need to ask that

15:52:57   8    question?

15:52:57   9              **MR. LAKE:**  Because while I followed up with the

15:52:59  10    question that -- the obvious question to ask is where are they,

15:53:03  11    where would they be, give them to me, I need to produce them --

15:53:07  12              By the way, and I think it's a good time to point this

15:53:11  13    out, the whole thing is they're implying that we're somehow

15:53:13  14    withholding evidence that could be important to their case and

15:53:16  15    that we have thrown the pen drive into Lake Erie.  And I think

15:53:21  16    we have to add that'd be a long toss from Hornell to Lake Erie.

15:53:27  17              So here's why I think this whole line of accusation to

15:53:34  18    me is unfounded and it's frankly offensive.  Because if he was

15:53:39  19    going to throw anything into Lake Erie, do you have it think it

15:53:42  20    would have been the pen drive or do you think it would have been

15:53:45  21    the computer?

15:53:46  22              **THE COURT:**  I have no idea whether spoliation has

15:53:49  23    occurred, but I'm trying to find out whether there is a failure

15:53:54  24    to identify and a failure to produce.

15:53:55  25              If you're telling me, as I think you are, and if I'm

15:53:59  1   not hearing correctly, this is the time to tell me and

15:54:02  2   straighten me out, that Mr. Ceglia concedes that there were

15:54:06  3   drives connected to his computers upon which documents that were

15:54:14  4   created in relationship to this lawsuit existed or were

15:54:20  5   produced, that arguably his declaration was incomplete insofar

15:54:25  6   as it failed to identify the prior existence of such devices,

15:54:31  7   storage devices.

15:54:33  8         **MR. LAKE:**  I will clarify.  You're right that there

15:54:36  9   were pen drives, but they were identified.  And they were

15:54:39 10   identified -- and this is where I think there's been some

15:54:43 11   difference in interpretation of the order because this whole

15:54:48 12   issue of what is supposed to be identified and what is not, the

15:54:54 13   Stroz report that you've seen a copy of identifies everything

15:54:58 14   that was produced and it does identify it in very great details.

15:55:03 15   All I can identify is what I have.

15:55:05 16         And the only things that are relevant to our

15:55:10 17   discussion today is the document and whether or not it was

15:55:15 18   authentic and that has to do with the forensic testing and the

15:55:18 19   electronically-stored information.

15:55:19 20         And so what we did was he asked for all of it over and

15:55:23 21   over again.  We produced it all.  Than ran their search and we

15:55:26 22   made a detailed report identifying everything that was on the

15:55:29 23   computer.

15:55:30 24         **THE COURT:**  I need to get calibrated here.  I know

15:55:33 25   that those documents are items listed in the report of your

15:55:40  1   expert, I just need to see it.  What should I look at to see

15:55:46  2   that to track Mr. Lake's statement?

15:55:50  3        **MR. LAKE:**  It's the big Excel spreadsheet.

15:55:56  4        **MR. SNYDER:**  It's Exhibit I to the Southwell

15:56:00  5   declaration, which is --

15:56:07  6        **MR. LAKE:**  It's lists 120 items that were produced.

15:56:13  7        **THE COURT:**  I'm looking for the expert statement of

15:56:16  8   the things that were identified by Mr. Ceglia.

15:56:19  9        **MR. SNYDER:**  Yes, if I can approach, Your Honor.

15:56:23 10        **THE COURT:**  That's not what you're referring to,

15:56:26 11   right, Mr. Lake?

15:56:26 12        **MR. LAKE:**  No, I'm referring to the Stroz Friedberg

15:56:30 13   report.

15:56:30 14        **THE COURT:**  Somewhere there is an expert statement

15:56:33 15   about what he expects to be produced per the order.

15:56:37 16        **MR. SNYDER:**  Yes, it's Plaintiff's privilege log and

15:56:41 17   it contains.

15:56:42 18        **THE COURT:**  No, it's in the expert's declaration.

15:56:46 19        **MR. SNYDER:**  May, I approach Your Honor?

15:56:48 20        **MR. LAKE:**  Are you referring to the John Evans

15:57:01 21   declaration?

15:57:02 22        **THE COURT:**  I think so.  Is that what you're referring

15:57:05 23   to?

15:57:06 24        **MR. LAKE:**  No.  Mr. Snyder is, I think, arguing that I

15:57:09 25   didn't identify things that were produced or should have been

15:57:12  1   produced.

15:57:13  2        THE COURT:  Isn't there an expert declaration which

15:57:17  3   states in a series of items what's to be turned over from the

15:57:23  4   Plaintiff?

15:57:23  5        MR. LAKE:  No, there's an order.  We have an order.

15:57:28  6        MR. SNYDER:  Your Honor, may I approach?

15:57:32  7        THE COURT:  I'm recalling something very specific

15:57:34  8   here.

15:57:34  9        MR. SNYDER:  It is document 61 which is the

15:57:39 10   declaration of John Evans' support of Plaintiff's opposition.

15:58:01 11        THE COURT:  I am trying to correlate your statement to

15:58:01 12   what Mr. Evans said that alleged the custody from Mr. Ceglia and

15:58:05 13   has in possession certain hardware, 169 floppy discs, 1075 CDs,

15:58:12 14   one laptop computer.  Also in his possession is an image of a

15:58:13 15   second hard drive and so forth.

15:58:15 16        MR. LAKE:  Right, we produced all that.

15:58:27 17        THE COURT:  Okay.

15:58:27 18        MR. LAKE:  And they're not claiming that we didn't.

15:58:27 19        THE COURT:  Okay.  Now, what you're referring to is

15:58:27 20   Plaintiff Ceglia's completeness of his declaration?

15:58:29 21        MR. LAKE:  Right.

15:58:29 22        THE COURT:  This is referenced by looking at something

15:58:33 23   else?

15:58:34 24        MR. LAKE:  Yes.  What they're --

15:58:35 25        THE COURT:  And what it is that I should look at

15:58:38  1    there?

15:58:38  2        **MR. LAKE:**  That would be the report that was

15:58:44  3    originally drafted by Stroz that we turned into the privilege

15:58:47  4    and confidential log.  That lists 120 items that were produced.

15:58:53  5        And see, the trouble is --

15:58:53  6        **THE COURT:**  What I'm trying to understand is if

15:58:56  7    Mr. Ceglia's conceded to you that there were these six or so

15:59:01  8    drives that he used in connection with -- I don't know how to

15:59:06  9    phrase it.  Producing documents which have --

15:59:11  10        **MR. LAKE:**  No.  What is known to me is what was

15:59:16  11   discovered by Stroz because I read the Stroz report and it lists

15:59:22  12   several external hard drives, thumb drives, pen drives, whatever

15:59:22  13   you want.

15:59:28  14        We had asked Mr. Ceglia and his family to produce all

15:59:35  15   of the electronically-stored information they he had.  They

15:59:39  16   produced a thumb drive, it was a Maxtor 3200 USB device,

15:59:42  17   laptops, computers, loose hard drives, floppy discs, CDs.

15:59:45  18        We asked them to compile everything and give them to

15:59:48  19   us.  They did.  We produced them to Stroz, who then did their

15:59:53  20   search, came up with the report and we produced that timely as

15:59:57  21   we were supposed to.

15:59:57  22        In that report, there were items referenced, including

16:00:00  23   one pen drive.  They're calling it a pen drive because that's

16:00:04  24   what it's referred to, but it's a USB device.  That made

16:00:06  25   reference to a file called Facebook that supposedly contained

16:00:12  1    TIFF scan 001 and scan TIFF 002.  Presumably those are the --

16:00:15  2         **THE COURT:**  Did those references come off of the

16:00:18  3    parents' computers?

16:00:23  4         **MR. LAKE:**  No.

16:00:24  5         **THE COURT:**  Just one at a time.

16:00:25  6         **MR. SNYDER:**  No, it was not off the parents'

16:00:27  7    computers.  It was off one of the computers, I don't know which

16:00:30  8    one offhand because we don't have the expert's final report.

16:00:34  9         One of the Plaintiff's computers had a electronic

16:00:37  10   fingerprint that told us the computer transferred onto a pen

16:00:41  11   device, a storage device, removable storage device, Zuckerberg

16:00:49  12   contract page one dot TIFF, Zuckerberg contract page two dot

16:00:49  13   TIFF.  Those pen drives were not produced to us, not identified

16:00:53  14   by the Plaintiff.

16:00:53  15        **THE COURT:**  So you can see what my question is.  Maybe

16:00:55  16   I'm not articulating it well enough, but based on what we just

16:01:00  17   heard and what I thought I was hearing over the past hour, these

16:01:03  18   pen drives don't associate with the parents' computer, they

16:01:07  19   associate with the computer that Mr. Ceglia has used.  And

16:01:10  20   apparently, according to their expert analysis, used in

16:01:14  21   connection with I'll call it issues associated with this

16:01:19  22   lawsuit.

16:01:19  23        **MR. LAKE:**  I don't know that.  All I know --

16:01:21  24        **THE COURT:**  Well, you do know it because you just

16:01:23  25   heard it and it's in the expert report, which maybe you haven't

16:01:27  1  had the benefit of seeing that.

16:01:29  2          **MR. LAKE:**  I have not seen the expert reports.

16:01:32  3          **THE COURT:**  But you can see the Court's view here is

16:01:36  4  that I'm eleven age carefully to this and it sounds to me like

16:01:40  5  the Plaintiff is agreeing that such drives were connected to his

16:01:44  6  computer, which corroborates, I think, if I can use that term

16:01:50  7  with what the expert found.

16:01:52  8          And for the Plaintiff not to have in the certification

16:01:55  9  recall that such drives existed at some point in time, but have

16:02:00 10  since been lost or mislaid strikes me as withholding relevant

16:02:07 11  information.  Do you agree with that?

16:02:09 12          **MR. LAKE:**  No, I don't.

16:02:09 13          **THE COURT:**  Why not?

16:02:10 14          **MR. LAKE:**  Because we produced everything we had in a

16:02:13 15  different form.

16:02:14 16          **THE COURT:**  You, we, but not the Plaintiff.

16:02:16 17          **MR. LAKE:**  Well, no, the Plaintiff certified --

16:02:18 18          **THE COURT:**  You may have certified, but it sounds to

16:02:21 19  me that the Plaintiff is agreeing that he didn't.  He couldn't

16:02:23 20  produce, according to what you just told us, because he doesn't

16:02:26 21  have it, but he didn't even identify it because he forgot about

16:02:30 22  it.

16:02:30 23          **MR. LAKE:**  No, he -- well, I don't know.  All I know

16:02:33 24  is that --

16:02:33 25          **THE COURT:**  He obviously didn't forget about it

16:02:36  1    because he acknowledged to you that he had lost or mislaid them

16:02:40  2    when you confronted him with the oversight.

16:02:43  3          **MR. LAKE:**  I asked him.

16:02:43  4          **THE COURT:**  Right, exactly the point.

16:02:45  5          **MR. LAKE:**  At the time of the --

16:02:46  6          **THE COURT:**  So how can it be said that he forgot about

16:02:49  7    it?

16:02:49  8          **MR. LAKE:**  Because the certification was due on July

16:02:52  9    15th, that was according to the order.  On July 15th we turned

16:02:56  10   over all the information to Stroz Friedberg, all of it, and we

16:02:59  11   have not had an opportunity to review it because we were

16:03:02  12   precluded from reviewing it because we had to give it over to

16:03:06  13   Stroz Friedberg, which we did.  And we submitted our

16:03:08  14   certification because I asked everybody what it was.

16:03:11  15          Then two weeks later, we get back what they found and

16:03:13  16   we find that there's things that we didn't include and so the

16:03:17  17   certification at the time that it was made is completely

16:03:20  18   accurate.  Now, the question --

16:03:21  19          **THE COURT:**  It's not complete.

16:03:23  20          **MR. LAKE:**  Well, no, because the order, the way that

16:03:25  21   we understood it, was --

16:03:26  22          **THE COURT:**  Let's put it this way, if he had

16:03:28  23   remembered at the time that he made the certification that the

16:03:32  24   six drives existed and that he used them in connection with his

16:03:35  25   computer, would he have been obliged to disclose that in his

16:03:40  1    certification?

16:03:40  2         **MR. LAKE:**  I'm not sure.  I think if he did, he would

16:03:52  3    have told me because I asked him that specific question.

16:03:52  4         If what you're getting to is that now that Stroz

16:03:52  5    Friedberg's identified these six drives, one was produced, if

16:03:53  6    you want a certification from Mr. Ceglia that says this is mine

16:03:57  7    or it isn't or I don't know what this one is or I did use that

16:03:59  8    or I didn't use that, I don't think that's difficult to get.

16:04:03  9    That's easy to get.

16:04:04  10        I don't think it's helpful because what I know is that

16:04:07  11   whether he certifies it or not and whether or not we have one

16:04:11  12   more declaration from the Plaintiff or the Defendant about

16:04:14  13   whether or not they -- that he ever committed perjury, backdated

16:04:17  14   or manipulated documents or had done anything that was unethical

16:04:21  15   or questions their veracity, I think we are going to have an

16:04:27  16   entire stack on both sides that are going to probably balance

16:04:30  17   out.

16:04:31  18        **THE COURT:**  I'm looking at the stack that I have in

16:04:33  19   front of me.

16:04:34  20        **MR. LAKE:**  Well, that's because we haven't started our

16:04:37  21   discovery yet.

16:04:37  22        **THE COURT:**  I understand that.  I am just trying to

16:04:40  23   grasp how the Plaintiff could now recall that there were such

16:04:43  24   drives.

16:04:44  25        On the one hand -- and they were used on this computer

16:04:46  1   apparently, but in the same breath recall, but only in response

16:04:50  2   to your question, that had he had since been, quote, mislaid or

16:04:54  3   lost.

16:04:55  4          **MR. LAKE:**  Right.

16:04:56  5          **THE COURT:**  How would he know?

16:04:57  6          **MR. LAKE:**  Because I pointed them out to him and said

16:04:57  7   Stroz Friedberg --

16:04:59  8          **THE COURT:**  How would he know they were mislaid or

16:05:02  9   lost if he did not disclose them in the first place?

16:05:03  10         **MR. LAKE:**  Because I asked him to search for anything.

16:05:06  11  He didn't produce them.  I recognize them as a result of the

16:05:06  12  Stroz report.  I said that.

16:05:10  13         **THE COURT:**  When you asked him if he mislaid them, did

16:05:13  14  you ask him if he had searched for them?

16:05:13  15         **MR. LAKE:**  Yes, and he said I searched for them the

16:05:28  16  first time you asked me.  Here is what happened:  We had an

16:05:29  17  order on July 1st.  We were to produce all of the information

16:05:32  18  that we discussed.  I asked for the information.  What I was

16:05:37  19  given, I produced.

16:05:39  20         Stroz Friedberg then generated a report.  When I got

16:05:42  21  the report, I noticed and was made aware by the Defendants via

16:05:48  22  letter and/or an email, I don't know which, that there were

16:05:52  23  items that were not produced, specifically the USB drives.

16:05:55  24         I then went back to Mr. Ceglia and said I know I asked

16:05:59  25  you to produce everything, you told me you didn't have it.

16:06:02   1   There are some specifics now that have been brought out.  Do you

16:06:07   2   recall what these are and can you produce them, and he said

16:06:12   3   Jeff, I gave you everything I had and why are you asking me to

16:06:15   4   produce something I don't have.  And I said because I've been

16:06:19   5   asked to follow up.  We want to be in compliance with the order.

16:06:23   6   Do you have anything else for me.

16:06:24   7          **THE COURT:**  Okay.

16:06:25   8          **MR. LAKE:**  No, I do not.  And that's where we are.

16:06:28   9          **THE COURT:**  Okay.

16:06:28  10          **MR. LAKE:**  That's why I think a certification is

16:06:31  11   accurate.

16:06:32  12          **THE COURT:**  Okay.

16:06:32  13          **MR. LAKE:**  So that's what happened with the USB

16:06:35  14   drives.

16:06:35  15          **THE COURT:**  Can we move onto the other categories?

16:06:39  16          **MR. LAKE:**  So that's the USB.  Number two was no

16:06:41  17   native electronic emails.

16:06:45  18          **THE COURT:**  Electronic version of the purported

16:06:48  19   contracts.

16:06:48  20          **MR. LAKE:**  Oh, you want to do that one first?  Okay.

16:06:48  21   The native contract, what they're talking about is when Stroz

16:06:57  22   did their search, they found on certain devices, whether it was

16:07:00  23   a hard drive, a CD or a floppy drive, several drafts of the

16:07:06  24   work-for-hire contract, the contract that was attached to the

16:07:10  25   complaint, the contract that we contend as a authentic contract

16:07:15  1    as opposed to the StreetFax contract, which we contend was not

16:07:20  2    the authentic contract.

16:07:20  3         They asked us for any soft or native electronic

16:07:24  4    versions of that contract.  We said sure.  And so in our search,

16:07:30  5    we asked for the all the computers that could have been used and

16:07:33  6    any storage devices that might have had that on it and we

16:07:37  7    produced them.

16:07:38  8         Now, the Defendants are upset that although they claim

16:07:42  9    there are seven drafts, none of those drafts are identical

16:07:48  10   verbatim to the work-for-hire contract that was produced.  And

16:07:52  11   they want to know -- I think what they're asking us where is

16:07:55  12   that.

16:07:55  13        And my answer would be the same and that is I gave you

16:07:59  14   everything we had.  Whether or not it's the final version or

16:08:02  15   draft one, two, three, four, five, six, seven, I don't know.  I

16:08:06  16   have -- I have no other means to search for it.

16:08:10  17        We have provided all the computers and all the discs

16:08:13  18   that were associated with them, other than the ones that we just

16:08:17  19   discussed.  And all they have are -- if it's a draft, it's a

16:08:22  20   draft.

16:08:22  21        If it existed at some point in time, which certainly

16:08:26  22   it did because there was a original of it made, that at this

16:08:34  23   point does not exist.  What does exist are the drafts and the

16:08:40  24   drafts can be analyzed.  They can be --

16:08:43  25             **THE COURT:**  They should be there, but they're not

16:08:45  1    there?

16:08:46  2          **MR. LAKE:**  No, they are.  They have them.  We produced

16:08:49  3    them.

16:08:49  4          **THE COURT:**  No, no.  The seven drafts that you say you

16:08:52  5    don't have.

16:08:53  6          **MR. LAKE:**  No, we do have and they were produced.

16:08:56  7          **THE COURT:**  Oh, they were produced so the Defendants

16:08:57  8    are incorrect in saying that they weren't?

16:09:00  9          **MR. LAKE:**  No, what they think is the final version of

16:09:03  10   the work-for-hire contract, that was signed by Mark Zuckerberg

16:09:20  11   and Paul Ceglia that looks like this, I think what they're

16:09:20  12   saying is they haven't found one that's exactly in this form.

16:09:20  13   That the versions that we produced are not identical to this.

16:09:22  14   They are similar.  They are soft copy electronic versions.

16:09:28  15         **THE COURT:**  Well, shouldn't there be one?

16:09:30  16         **MR. LAKE:**  If there was one, I would have produced it.

16:09:33  17   I produced everything that I found, whether it would be draft

16:09:37  18   one or draft seven, I gave over the computers and the discs and

16:09:40  19   everything.

16:09:40  20         **THE COURT:**  If they're not lodged there, then somehow

16:09:44  21   it got lost or should there have been one in your estimation?

16:09:47  22         **MR. LAKE:**  Well, there had to have been one so it

16:09:50  23   could have been printed and signed.

16:09:51  24         **THE COURT:**  That's the point that I'm interested in.

16:09:52  25   What conceivably could have happened to it?

16:09:54  1        **MR. LAKE:**  I don't know.  In 2003 it could have been

16:09:57  2    deleted.  It could have been -- and I think this is what

16:09:59  3    Mr. Snyder's point is that he thinks it was actually stored on

16:10:04  4    the thumb drive and the thumb drive is missing.  I think that's

16:10:08  5    the argument he was making.

16:10:10  6        My point is this:  We turned over everything.  There

16:10:13  7    were many, many drafts and if they want to argue later that

16:10:17  8    those drafts are not the original contract, that is something

16:10:19  9    that is not before us today.

16:10:21 10        What's before us today is whether or not I adequately

16:10:25 11    complied with the order.  And I'm submitting that I did because

16:10:28 12    I produced all of the computers that have all of the soft copies

16:10:32 13    of all of the documents that were at issue with the expedited

16:10:35 14    discovery order.

16:10:35 15        **THE COURT:**  Is that true, in the interest of time, of

16:10:37 16    the other areas of request, all electronic copies --

16:10:40 17        **MR. LAKE:**  The emails -- the point about the emails

16:10:44 18    and there is actually --

16:10:45 19        **THE COURT:**  No, no.  About the ones in possession of

16:10:47 20    his attorneys or his experts Mr. Osborn or Ms. Aginsky.

16:10:53 21        **MR. LAKE:**  Yeah, they were produced.  They were as

16:10:55 22    item 5 and item 8.

16:11:01 23        **MR. SNYDER:**  That's just wrong, Your Honor.

16:11:04 24        **MR. LAKE:**  No.  How could he know what's in the

16:11:06 25    possession Mr. Ceglia's attorneys?  I mean, if he can explain

16:11:11   1    that, then maybe he could explain why I'm wrong.

16:11:14   2              **THE COURT:**  Repeat what you just said.

16:11:15   3              **MR. LAKE:**  He's somehow saying that he knows what's in

16:11:19   4    the possession of Mr. Ceglia's attorneys.  I want to know how he

16:11:23   5    knows that.

16:11:24   6              **THE COURT:**  We'll find out.  You're saying those were

16:11:25   7    produced.  Those are items 5 and 8 on the so-called privileged

16:11:31   8    log.  What about the webmail accounts?

16:11:32   9              **MR. LAKE:**  Okay.  The webmail accounts are beyond the

16:11:34  10    scope of the order because the order asked for two things, to

16:11:36  11    produce the original contract for forensic testing for

16:11:41  12    authenticity and information relating to the emails that were

16:11:43  13    attached to the first amended complaint.

16:11:45  14              It did not ask for, nor were we required to produce,

16:11:50  15    every email account and everything on every email account that

16:11:53  16    may have been in existence.

16:11:56  17              So the reason -- and Mr. Snyder's submitted this as a

16:12:00  18    new request.  This is not anything that was contemplated at the

16:12:04  19    time of the July 1st order.

16:12:06  20              They have subsequently found that Mr. Ceglia had

16:12:08  21    different email accounts and now they want them, the same way

16:12:12  22    that we want every one of Mr. Zuckerberg's emails and every one

16:12:17  23    of Mr. Zuckerberg's computers and every bit of code that was

16:12:18  24    written by Mr. Zuckerberg for Mr. Ceglia and every bit of code

16:12:23  25    that was utilized to launch Facebook in 2004 and we'll be able

16:12:28  1    to answer the same questions.

16:12:29  2         But that was not what was contemplated in the

16:12:33  3    discovery order so that's why that wasn't produced.  This is a

16:12:37  4    new request and we can address it when they produce all the

16:12:41  5    things that I just asked for.  We can consider that on a

16:12:45  6    separate date.

16:12:49  7         Next is the native electronic emails and we have

16:12:52  8    already submitted by Paul Ceglia an opposition to the motion for

16:12:57  9    expedited discovery that there are no native electronic emails

16:13:06 10    in his custody, possession and control regarding the email chain

16:13:10 11    between him and Mark Zuckerberg at the end of 2003 through the

16:13:14 12    end of July of 2004 because it was a Microsoft Outlook ISP

16:13:20 13    account that he didn't have access to and it was his custom and

16:13:25 14    practice, as was in 2003 of '04, that the way it worked was that

16:13:29 15    in order for him to save his emails, he would copy them, put

16:13:34 16    them on a Word document and then make a report, which we did

16:13:34 17    supply.

16:13:40 18         They are no other native electronic emails because

16:13:43 19    they were, as I mentioned and has already been declared,

16:13:47 20    converted into a word document and saved on discs and those

16:13:50 21    discs were produced.  So I can't produce the native electronic

16:13:55 22    emails.

16:13:56 23         **THE COURT:**  Why would it be that there would be no

16:13:59 24    electronic form of those emails?

16:14:01 25         **MR. LAKE:**  The way I understand it, and this was

16:14:04  1    discussed before I became involved in the case, but reading the

16:14:09  2    declaration and talking with our computer expert, that in order

16:14:13  3    to save those emails, you would have to essentially copy them

16:14:16  4    and paste them onto a different document and save them.  That's

16:14:20  5    what he did and we already got that declaration so I can't

16:14:24  6    produce those.

16:14:25  7         And as far as identifying what they are, they've been

16:14:30  8    identified again in our log that was produced.  And then, I

16:14:37  9    think --

16:14:53  10        **THE COURT:**  What timeframe are we referring to with

16:14:56  11   regard to those emails that you say could not be --

16:14:58  12        **MR. LAKE:**  April of 2003 though July of 2004.

16:15:26  13        **THE COURT:**  Go ahead.

16:15:26  14        **MR. LAKE:**  And I'd be happy to submit that declaration

16:15:26  15   to you.

16:15:37  16        **THE COURT:**  Quick rebuttal?

16:15:37  17        **MR. SNYDER:**  I mean, I'll just say --

16:15:37  18        **THE COURT:**  I mean, let me just say it sounds to me,

16:15:37  19   just to help you, that perhaps the Plaintiff has a point that he

16:15:37  20   has disclosed, as best he could.

16:15:37  21        And the two items that strike me as being plausibly

16:15:42  22   out there, as far as knowing what happened to them or whether

16:15:45  23   they exist and what's on them are the drives, I'll shorthand

16:15:49  24   that, and the website -- webmail accounts, which he claims are

16:15:55  25   not within the four corners of the order.  And just glancing

16:15:58  1    through it myself, it seems to me might be right.

16:16:02  2              MR. SNYDER:  I respectfully --

16:16:04  3              THE COURT:  Unless you got something more specific to

16:16:06  4    show that he's just flat out wrong.

16:16:09  5              MR. SNYDER:  Yes, he's flat out wrong.  He did not get

16:16:12  6    any images of the signed purported contracts that they sent to

16:16:17  7    their experts for testing earlier in the case before we believed

16:16:24  8    they manipulated the original document and gave it to us.

16:16:28  9              So that in the possession of their experts are scanned

16:16:32 10    images of the purported contract bearing signatures.  Those have

16:16:38 11    not been produced to us.  They do not want to produce those to

16:16:42 12    us because our experts believe they will be different than the

16:16:46 13    other versions of the purported contract floating around in this

16:16:50 14    case.

16:16:51 15              THE COURT:  Can we hear what the answer to that is?  I

16:16:54 16    think he said that there is no such thing.

16:16:57 17              MR. LAKE:  No, I thought he was referring to the -- if

16:17:00 18    there had been a soft version of the contract emailed to an

16:17:04 19    attorney or expert, and we produced that.

16:17:08 20              We concede that there was an email that was sent and I

16:17:12 21    compared it and it had item 5 and item 8 on it.  I saw the email

16:17:18 22    that was sent.  I saw the attachment.  I printed it out.

16:17:22 23              I printed out 5 and 8, laid them side by side.  They

16:17:26 24    were the same.  If what he's trying to ask for now is that he

16:17:31 25    wants information and work product of undesignated expert --

16:17:36  1          **THE COURT:**  No, no.  He's saying that --

16:17:38  2          **MR. SNYDER:**  Let me be very clear.  Their expert had

16:17:40  3  in their possession at one point the original ink contract.  The

16:17:46  4  experts took scans of them.  They have those scans, we want to

16:17:51  5  see those scans.

16:17:52  6          **THE COURT:**  The three dimensional scans?

16:17:55  7          **MR. SNYDER:**  Yes.  We want to see those scans because

16:17:56  8  we believe that when they scanned the original contract, it

16:17:56  9  looked one way and then when it was made available to us for

16:18:01 10  physical inspection more recently, it looked a different way and

16:18:03 11  had been altered in different ways that we'll disclose to the

16:18:09 12  Court when the expert testing has been completed.

16:18:12 13          **THE COURT:**  They were altered by the experts?

16:18:16 14          **MR. SNYDER:**  No, altered to the by the Plaintiff.

16:18:18 15          **THE COURT:**  If they were turned over to the experts,

16:18:21 16  how would he have continued access to it?

16:18:21 17          **MR. SNYDER:**  He took physical custody of the original

16:18:24 18  back and had it for some number of months before he made it

16:18:28 19  available to us over his objection pursuant to Your Honor's

16:18:31 20  order.

16:18:31 21          But at an earlier point in time, he gave the original

16:18:35 22  contract, made it available to his experts, his experts took

16:18:38 23  pictures or scans of them.  We want those pictures and scans.

16:18:42 24  They're not protected.  They're not work product.  They're

16:18:46 25  evidence in the case.

16:18:47  1          **THE COURT:**  I thought you were talking about some

16:18:48  2   native version of the contract.

16:18:50  3          **MR. SNYDER:**  That too.

16:18:52  4          **THE COURT:**  I guess I'm a little confused about what

16:18:55  5   it is you're driving at.  Electronic forms of the declaration of

16:19:01  6   the 12th or the original electronic emails?

16:19:04  7          **MR. SNYDER:**  Your Honor, there are three different

16:19:09  8   electronic categories of the contract.  One, any electronic

16:19:12  9   versions of the original alleged contracts -- of the alleged

16:19:17 10   contract that resides in any of his computers or storage

16:19:20 11   devices, we have none and that's what's attached to the

16:19:24 12   complaint.  Whether it's on a computer, a CD, a floppy disc or a

16:19:28 13   storage device.  That's one.

16:19:29 14          Two, any image of the original contract, meaning the

16:19:35 15   original one that was in the safe deposit box that was taken

16:19:39 16   either by the Plaintiff or by the Plaintiff's experts at any

16:19:43 17   point in time.

16:19:46 18          **MR. LAKE:**  And, Your Honor, the order requires the

16:19:49 19   production of copies of the purported contract in hard copy form

16:19:53 20   created on or before June 30th, 2010.  That's at the first page

16:19:58 21   of the order.  It doesn't say all of the work product ever.

16:20:03 22          **MR. SNYDER:**  That's hard copy only, Your Honor, not

16:20:09 23   electronic.

16:20:09 24          **MR. LAKE:**  Right.  And we produced the electronic,

16:20:09 25   that's what I'm saying.  Now, they're saying they want -- he

16:20:09  1   says he wants a scan of the hard copy that was taken after June

16:20:14  2   30th, 2010.  That's outside of the scope of the order.

16:20:17  3              **MR. SNYDER:**  No, it's not.  It's an electronic.

16:20:18  4              **THE COURT:**  Just a second.  So it's not a native

16:20:31  5   electronic version, according to you?  It's not a original

16:20:34  6   native file --

16:20:36  7              **MR. SNYDER:**  But it is an electronic copy, Your Honor.

16:20:41  8   It's an image that their experts took off the original contract

16:20:46  9   and we want those images.  They're suppressing them because that

16:20:50  10  is --

16:20:50  11             **MR. LAKE:**  No, because it was not created on or before

16:20:53  12  June 30th, 2010.  The order says created.  If he's saying a scan

16:21:00  13  was created on or before June 30th, 2010, he's right, but there

16:21:06  14  aren't any.

16:21:06  15             If he wants our non-designated expert's work product,

16:21:13  16  he's not entitled to it.  Rule 26 protects that and the order

16:21:17  17  itself says created.

16:21:19  18             So if that scan would have been created before June

16:21:22  19  30th, 2010, he's right, but what he's asking for is a new

16:21:34  20  request.  He's asking for us to divulge to the Court our

16:21:34  21  undesignated expert work product.

16:21:34  22             **MR. SNYDER:**  Mr. Lake is mistaken.  He's referring to

16:21:36  23  his hard copy assets.  It's clear in document 83 the so-called

16:21:42  24  electronic asset order that he is directed to produce all

16:21:47  25  electronic copies of the purported contract in the possession,

16:21:49  1    custody and control of this Plaintiff.

16:21:52  2          And the expert's files are electronic copies of the

16:21:55  3    purported contract, which they imaged off of the original and

16:21:59  4    referenced in the various declarations to this Court.

16:22:03  5          They do not want us to see those images because those

16:22:08  6    images contain pictures that look different than the images

16:22:11  7    taken off the original contract today.

16:22:15  8          **MR. LAKE:**  Electronic copies of the native electronic

16:22:19  9    copies, that was just debated.  That's what was on the

16:22:22  10   computers.  He's now trying to expand that into our expert work

16:22:25  11   product.

16:22:25  12         **MR. SNYDER:**  No.

16:22:25  13         **MR. LAKE:**  And that was contained in the order.

16:22:26  14         **THE COURT:**  Just a second.  If I can make sure I'm

16:22:30  15   tracking down what you gentlemen are telling me.  The order

16:22:32  16   refers to turning over all original signed versions of the

16:22:37  17   purported contract attached to the complaint.  That's not what

16:22:41  18   we're referring to.

16:22:42  19         Next, all copies of the purported contract in hard

16:22:45  20   copy form created on or before June 30th.  That's not what we

16:22:50  21   are referring to.  All copies of emails, not relevant.

16:22:54  22         And then we go on in the second order paragraph on

16:22:58  23   page two.  Required to produce the following electronic assets:

16:23:05  24   Native electronic version of the purported contract.  That's not

16:23:09  25   what we're referring to.  There's no date of creation associated

16:23:15  1   with that.  The original native electronic file consisting of or

16:23:22  2   containing the emails.  That's not pertinent.

16:23:22  3        **MR. SNYDER:**  Your Honor, what --

16:23:24  4        **THE COURT:**  So what I'm trying to understand is how

16:23:27  5   this image of the original contract made by the Plaintiff or an

16:23:32  6   expert falls within these categories.

16:23:35  7        **MR. SNYDER:**  Your Honor, missed the actual operative

16:23:39  8   language.  In the conjunctive, it says the native electronic

16:23:44  9   version of the purported contract and all electronic copies of

16:23:49 10   the purported contract.

16:23:50 11        **THE COURT:**  Oh, I see.  This image is an electronic

16:23:54 12   copy.

16:23:57 13        **MR. SNYDER:**  That's exactly what it is.

16:23:57 14        **MR. LAKE:**  No.  An electronic copy, he's talking about

16:24:00 15   the native -- the stuff that's on the discs.  What we just

16:24:03 16   covered, the seven drafts.

16:24:03 17        **MR. SNYDER:**  No, Your Honor.

16:24:04 18        **MR. LAKE:**  That's why we have native electronic and

16:24:07 19   all electronic copies.

16:24:09 20        **THE COURT:**  How is this image created?

16:24:13 21        **MR. LAKE:**  Whatever images there are, it could have

16:24:17 22   been a photocopy, it could have been a scanner, could have been

16:24:21 23   a camera.

16:24:22 24        **THE COURT:**  You're referring to the high-definition of

16:24:24 25   the scanned original?

16:24:25  1          **MR. SNYDER:**  Yes, Your Honor.

16:24:26  2          **THE COURT:**  The one that comes up in questions of

16:24:28  3    additional detailing?

16:24:28  4          **MR. SNYDER:**  Yes, Your Honor.

16:24:29  5          **THE COURT:**  Okay.  That's an electronic -- what's

16:24:35  6    construed to be an electronic copy?

16:24:37  7          **MR. SNYDER:**  Sure.

16:24:38  8          **THE COURT:**  You and --

16:24:40  9          **MR. SNYDER:**  And his experts have very expensive

16:24:42  10   high-resolution electronic equipment to produce those electronic

16:24:47  11   copes.

16:24:47  12         **THE COURT:**  I'm not familiar with it.  Does it come

16:24:49  13   out it -- it's created digitally and then it's produced in real

16:24:57  14   images.

16:24:57  15         **MR. SNYDER:**  Yes.  It's a high-resolution,

16:25:00  16   high-powered scan.  Some of these machines cost thousands and

16:25:01  17   thousands of dollars.

16:25:01  18         **THE COURT:**  But it scans and what's scanned is scanned

16:25:04  19   into a digital --

16:25:05  20         **MR. SNYDER:**  Yes.

16:25:06  21         **THE COURT:**  Digital signals.

16:25:09  22         **MR. SNYDER:**  It's a digital file that's created --

16:25:12  23         **THE COURT:**  It's stored and then it's reproduced in

16:25:14  24   like a digital photograph?

16:25:16  25         **MR. SNYDER:**  It's a digital file that's created by an

16:25:19  1    electronic picture taken of the physical document.

16:25:22  2         **MR. LAKE:**  Your Honor, that's not what was

16:25:24  3    contemplated when we made this order.  That's not what this

16:25:27  4    order says.  They should have designated it under scan and what

16:25:27  5    they're asking for now is a work product of a non-designated

16:25:32  6    expert.

16:25:33  7         This was never made clear.  It is not clear in the

16:25:36  8    order.  This is not what was contemplated.  We gave them the

16:25:41  9    electronic copies we discovered.  Now, what they're trying to do

16:25:44  10   is conduct inappropriate discovery.

16:25:44  11        **THE COURT:**  I thought that scan was to be shared

16:25:47  12   between the parties.

16:25:49  13        **MR. LAKE:**  No, we gave them the actual document.  They

16:25:51  14   took this their own scans.

16:25:53  15        **MR. SNYDER:**  Your Honor, the reason this is so

16:25:55  16   critical and the reason they're getting so upset by this, two of

16:26:00  17   their experts, Aginsky and Osborn, provided this Court a sworn

16:26:05  18   declaration and they talk about images they took of the original

16:26:09  19   contract.

16:26:10  20        When they took those images of the original contract,

16:26:11  21   the contract looked one way.  Our experts believed that in the

16:26:15  22   interim, this Plaintiff, and others, may be acting in concert

16:26:19  23   with him, altered the document in ways to perpetuate his fraud

16:26:22  24   on the Court.

16:26:22  25        We want to compare the image taken at a earlier date

16:26:27  1   by his experts, which they -- the dates they were taken, to the

16:26:34  2   image that was taken of the document today and we will present

16:26:37  3   that to Your Honor in the fullest of time.  And we believe that

16:26:39  4   there will be further evidence of the --

16:26:41  5            THE COURT:  What's the answer to his argument that

16:26:43  6   it's undesignated work product of an expert that requires you to

16:26:48  7   show compelling need?

16:26:50  8            MR. SNYDER:  It's a completely erroneous analysis.

16:26:53  9   These are two experts who have submitted affidavits to this

16:26:56  10  Court.  They have joined issues these two experts on this

16:27:01  11  central question on the so-called authenticity of the contract.

16:27:05  12           We're not asking to invade any work product.  We're

16:27:08  13  not asking to invade any communications.  We simply want the

16:27:12  14  electronic image taken of the evidence that is an essential

16:27:16  15  piece of evidence in this case.  They took a picture of a

16:27:27  16  document.  We want the picture.  Under no case doctrine or

16:27:27  17  theory is it privileged.

16:27:27  18           THE COURT:  It becomes a fact rather than an opinion

16:27:29  19  or something like that?  Is that what you're saying is the

16:27:32  20  analysis that arguably would be --

16:27:33  21           MR. SNYDER:  It's not work product.  It doesn't

16:27:35  22  contain any mental impression, any legal analysis.  It is

16:27:38  23  simply --

16:27:38  24           THE COURT:  It's not attorney work product, but why

16:27:42  25  doesn't it fall within the provision under Rule 26 that prevents

16:27:47  1   you, in effect, from piggybacking on a adversary's expert?

16:27:52  2        **MR. SNYDER:**  We don't want to invade the expert's

16:27:56  3   expertise or opinion.  We want the physical evidence --

16:27:57  4        **THE COURT:**  You would pay for a copy if there was any

16:28:00  5   cost?

16:28:00  6        **MR. SNYDER:**  We would pay for a copy and we want the

16:28:04  7   physical evidence.

16:28:05  8        **THE COURT:**  Is it possible to make a copy of it or --

16:28:05  9        **MR. SNYDER:**  It existed, Your Honor.  It exists in the

16:28:08  10  expert's file today.

16:28:09  11       **THE COURT:**  I know that, but can it be in fact

16:28:12  12  technically printed?  Can they make more prints of it?

16:28:15  13       **MR. SNYDER:**  Yes, Your Honor.

16:28:17  14       **MR. LAKE:**  Your Honor, first of all, I didn't brief

16:28:19  15  this.  Secondly, it's not in front of the Court.  Thirdly, it's

16:28:22  16  improper.  And fourth, it couldn't have been contemplated at the

16:28:26  17  time the order was drafted because they hadn't seen the contract

16:28:30  18  to come up with this theory that it could be different from the

16:28:34  19  time they saw it because they hadn't seen it.  So they're

16:28:34  20  putting the cart way before the horse.

16:28:37  21       **THE COURT:**  I've heard enough on this.

16:28:39  22       **MR. SNYDER:**  And Your Honor, on the native emails, I

16:28:40  23  just want to point out the very obvious fact, which is that

16:28:45  24  Mr. Lake said that the reason that the so-called emails exist as

16:28:51  25  Word documents, cut and pasted onto a floppy disc, is because in

16:28:55  1    2003 and 2004, that's the way this Plaintiff did it.  Of course

16:28:59  2    that's false.

16:29:01  3         The way this Plaintiff did it is documented and

16:29:04  4    confirmed scientifically in the native emails that we found on

16:29:09  5    his computer, which he sent in 2004 to Sidley and Austin

16:29:09  6    containing the authentic contract.

16:29:09  7         So when it comes time for the authentic contract to

16:29:18  8    find the native emails on his computer, not cut and pasted into

16:29:24  9    Word documents, that low and behold have a StreetFax contract

16:29:25  10   that says nothing about Facebook.

16:29:28  11        When it comes time for him to discuss the so-called

16:29:30  12   emails with Mark Zuckerberg, which are fraudulent and created by

16:29:37  13   this Plaintiff as a faux pas, they don't exist on the native

16:29:39  14   email files, we don't get the native email files because he says

16:29:43  15   his custom and practice at the time was to cut and paste into

16:29:47  16   Word documents.

16:29:48  17        That's a lie because we have his native emails from

16:29:51  18   2004, which isn't a cut and past into a Word document, which has

16:29:56  19   the critical evidence in the case that shows that the contract

16:30:01  20   attached to the complaint is a fraud.

16:30:04  21        And so when he doesn't produce to us native email

16:30:08  22   files containing the alleged contract or containing his alleged

16:30:11  23   emails with Mark Zuckerberg and tells this Court under oath that

16:30:16  24   it's because it's his practice to cut and paste, not thinking

16:30:18  25   we're going to find the native email with TIFF one and TIFF two

16:30:23  1   because he put it on his pen drive, which he no longer has, not

16:30:27  2   thinking we'd fine it, is the height of cynicism.

16:30:34  3          And on that point, Your Honor, when I say authentic

16:30:35  4   contract and the bogus contract and Your Honor says that's what

16:30:38  5   we're going to get, I think it's critical to frame this whole

16:30:42  6   discussion with the following:  This Plaintiff, at the same time

16:30:46  7   he was telling Your Honor that the authentic contract should be

16:30:51  8   confidential, was telling the press apparently in rambling

16:30:55  9   emails last night all about the so-called -- or the authentic

16:30:58  10  contract, which he says we planted on his computers before he

16:31:03  11  produced them to us.

16:31:05  12         We went in the clouds and we planted them into his

16:31:11  13  computer by osmosis, a immaculate conception, we don't know he

16:31:14  14  claims it, but he claims somehow we invaded, like martians, his

16:31:18  15  computer and planted this contract and that he's going to prove

16:31:20  16  that it's not authentic and Mr. Lake has the audacity to say

16:31:25  17  that there's no foundation for that and there's no

16:31:25  18  corroboration.

16:31:29  19         And he knows or should know because he has the Stroz

16:31:34  20  Friedberg report that there's ample and substantial

16:31:37  21  authentication corroboration proof-positive that the emails that

16:31:41  22  he sent in 2004 to Sidley and Austin containing the authentic

16:31:48  23  StreetFax contracts were sent in 2004, existed in 2004 and are

16:31:52  24  true and authentic, and were not planted by us.  And how he can

16:31:56  25  say that to this Court is outrageous.

16:31:58  1          And let me tell Your Honor why:  We not only have --

16:32:02  2          **THE COURT:**  He didn't say that.

16:32:04  3          **MR. SNYDER:**  Oh, yes, he did.

16:32:05  4          **THE COURT:**  Mr. Lake did.

16:32:07  5          **MR. SNYDER:**  Mr. Lake said that they were planted,

16:32:08  6  that we believe they were planted, that was the word he used,

16:32:10  7  meaning that somehow Facebook or its agents inserted into his

16:32:15  8  computer this alleged contract.

16:32:15  9          **THE COURT:**  When did Mr. Lake say that?

16:32:17 10          **MR. SNYDER:**  About 12 minutes ago because I wrote it

16:32:21 11  down, planted in quotes.  And it's absurd.  His client said the

16:32:23 12  same thing and then he said there's no foundation and no basis

16:32:27 13  to believe that this authentic contract is authentic.  He knows

16:32:32 14  or should know that that's false because Stroz has told him that

16:32:32 15  in a variety of ways.

16:32:34 16          And let me tell Your Honor three things on that and

16:32:38 17  it's relevant to all of this:  From day one, we made clear that

16:32:42 18  the complaint attached to the -- the contract attached to the

16:32:44 19  complaint was a fraud.  We now have the authentic contract

16:32:48 20  between Zuckerberg and StreetFax.  It is exactly what Zuckerberg

16:32:53 21  swore to under oath was the case.

16:32:55 22          Now, this was found on the hard drives of the

16:32:57 23  Plaintiff's computer.  It was attached to an email sent to the

16:32:59 24  law firm of Sidley and Austin, an international law firm.  We

16:33:03 25  not only have the native email --

16:33:15  1          **THE COURT:**  Is that where Mr. Cole is associated with?

16:33:15  2          **MR. SNYDER:**  Yes.  But if I can approach, Your Honor,

16:33:15  3  we also have the metadata that was underlying that original

16:33:19  4  email.

16:33:20  5          And if there's any question, we also have a

16:33:23  6  photograph, which I'll give to Plaintiff's counsel, of the sent

16:33:26  7  outbox that Mr. Ceglia sent in 2004, which attached page one and

16:33:35  8  page two of the contract.

16:33:37  9          We also have a copy of the sent box that shows that it

16:33:42 10  existed and was sent in 2004.  We also have has authenticating

16:33:49 11  evidence and corroborating evidence, other forensic evidence --

16:33:54 12          **THE COURT:**  Of what?

16:33:55 13          **MR. SNYDER:**  Of the authenticity of this StreetFax

16:33:58 14  contract in 2004 that Mr. Ceglia describes himself in in an

16:34:04 15  admission, page one and two of the StreetFax contract.

16:34:08 16          **THE COURT:**  I'm trying to connect what you're saying

16:34:11 17  with the existence of this image that they claim --

16:34:14 18          **MR. SNYDER:**  Yes.  I'll tell Your Honor.  We contacted

16:34:15 19  Sidley and Austin.  Sidley and Austin has confirmed, Your Honor,

16:34:19 20  that the emails and the authentic contract sent by the Plaintiff

16:34:24 21  to Sidley and Austin in March of 2004 have been on the Sidley

16:34:29 22  and Austin computer server for over seven years.

16:34:33 23          **THE COURT:**  Say again.

16:34:34 24          **MR. SNYDER:**  Sidley and Austin has confirmed that the

16:34:38 25  email sent to Mr. Ceglia sent to Sidley and Austin attaching

16:34:44  1    page one and page two of the StreetFax contract with Mark, the

16:34:48  2    authentic contract that says nothing about Facebook, was sent

16:34:54  3    contemporaneous, has been on their server since 2004.

16:34:58  4          And low and behold, it looks as exactly as it does on

16:35:02  5    Mr. Ceglia's computer, which is why the notion that it is

16:35:07  6    planted is outrageous and it's with not only no basis, but

16:35:09  7    reckless to even assert in open court.

16:35:12  8          This is the nail in the coffin on any fantastical

16:35:16  9    claim that somehow the authentic StreetFax contract --

16:35:20  10         **THE COURT:**  Maybe it was planted on Sidley and

16:35:24  11    Austin's computer too.

16:35:25  12         **MR. SNYDER:**  Maybe.

16:35:26  13         **THE COURT:**  And maybe they didn't know it because they

16:35:28  14    didn't look until now and it looked to them that it was always

16:35:32  15    there.

16:35:32  16         **MR. SNYDER:**  But to believe Mr. Ceglia, you would have

16:35:34  17    to think there was a mass conspiracy among people that dates

16:35:40  18    back in time and it is --

16:35:41  19         **THE COURT:**  Okay.  What does that have to do with this

16:35:45  20    image?

16:35:45  21         **MR. SNYDER:**  It has to do with the image of the noose

16:35:48  22    is tightening up around the neck of this Plaintiff in this case

16:35:51  23    and he knows it.

16:35:52  24         And these scans are going to be further evidence of

16:35:55  25    the fraud because when his experts took pictures of the

16:35:58  1    contract, we believe it was before this Plaintiff got his hands

16:36:02  2    again on this original contract and started monkeying around

16:36:06  3    with it in ways that our experts will discloses more fully when

16:36:10  4    they conclude their tests.  And so we want to see those scans --

16:36:15  5         THE COURT:  And the Plaintiff's expert would be

16:36:17  6    innocent of any knowledge of this, right?

16:36:19  7         MR. SNYDER:  Presumably so.

16:36:20  8         THE COURT:  But they did make this original scan,

16:36:23  9    which would give you a basis of comparison, right?

16:36:26  10        MR. SNYDER:  Yes, Your Honor.

16:36:26  11        THE COURT:  And as a basis of comparison, you think

16:36:29  12   it's not protected non-testifying expert work product under Rule

16:36:34  13   26?

16:36:34  14        MR. SNYDER:  Yes.  And I could put it at a finer

16:36:35  15   point --

16:36:35  16        THE COURT:  Because it's a fact rather than a --

16:36:38  17   rather than the use of expertise, if you will, at Plaintiff's

16:36:42  18   cost.

16:36:42  19        MR. SNYDER:  And this isn't mere speculation.

16:36:45  20        THE COURT:  It's like an expert on accident

16:36:47  21   reconstruction taking a photograph of, say, an interest.

16:36:51  22        MR. SNYDER:  Yes.

16:36:52  23        THE COURT:  And the photograph arguably would not be

16:36:56  24   protected because anybody can take a photograph, it doesn't

16:36:59  25   require any expertise.

16:37:00  1          **MR. SNYDER:**  Yes, Your Honor.

16:37:01  2          **THE COURT:**  The analysis of it might be, but not the

16:37:01  3   photograph itself.

16:37:01  4          **MR. SNYDER:**  Precisely.

16:37:03  5          **THE COURT:**  Is that a fair statement?  Maybe that's

16:37:05  6   not a bad --

16:37:05  7          **MR. SNYDER:**  That's precise, Your Honor.  That's

16:37:08  8   precisely so.  And this is not speculation in our part.  Our

16:37:11  9   experts, who I think your Your Honor is aware are very

16:37:15  10  credentialed, among the best in the world --

16:37:15  11         **THE COURT:**  Well, his experts are pretty

16:37:19  12  well-credentialed too.

16:37:19  13         **MR. SNYDER:**  That's for another day.

16:37:20  14         **THE COURT:**  No, no.  It's going to come up

16:37:24  15  momentarily.

16:37:24  16         **MR. SNYDER:**  Our experts, who are among -- who are

16:37:27  17  used by the U.S. Government --

16:37:28  18         **THE COURT:**  I have your point.

16:37:29  19         **MR. SNYDER:**  But the --

16:37:30  20         **THE COURT:**  The question is for purposes of the order

16:37:33  21  whether or not it's an electronic version of the original.

16:37:38  22         **MR. SNYDER:**  Yes.

16:37:38  23         **THE COURT:**  And even though Mr. Lake didn't think of

16:37:43  24  it that way, and maybe you didn't either --

16:37:46  25         **MR. SNYDER:**  We did.  We found seven multiple letters

16:37:48  1    on this, Your Honor.

16:37:50  2         THE COURT:  Well, before -- not during the time you

16:37:53  3    were drafting --

16:37:53  4         MR. SNYDER:  When we were drafting it, it was uniquely

16:37:56  5    within our awareness and we were contemplated what --

16:37:57  6         THE COURT:  Why don't you say images --

16:38:00  7         MR. SNYDER:  Because an electronic copy is an image,

16:38:08  8    Your Honor.

16:38:08  9         MR. LAKE:  Right.  Sure.

16:38:11 10         THE COURT:  Pardon me.

16:38:11 11         MR. SNYDER:  I think he said yeah, right.  Sure.

16:38:12 12         And, Your Honor, this is not speculation on our part

16:38:14 13    that this document that was made available to us for physical

16:38:18 14    inspection several weeks ago has undergone manipulation by the

16:38:23 15    plaintiff.

16:38:24 16         Our experts, and I could represent to the Court will

16:38:27 17    elucidate this further, observed on the original document that

16:38:31 18    was made available to us, highly unusual attributes, which are

16:38:36 19    highly suggestive of manipulations in efforts to artificially

16:38:42 20    treat the document.

16:38:43 21         And we believe --

16:38:44 22         THE COURT:  That is on their scan?

16:38:45 23         MR. SNYDER:  This is on our scan.

16:38:47 24         THE COURT:  Your scan?

16:38:48 25         MR. SNYDER:  And when we see the scan that was taken

16:39:01  1   at an earlier time, we believe that those scans may look

16:39:01  2   different.

16:39:01  3       **THE COURT:**  So the trier of fact would conclude that

16:39:01  4   if these deviations exist and aren't otherwise explained, it

16:39:04  5   could inferentially be explained by some sort of manipulation of

16:39:08  6   the Plaintiff, even if the Plaintiff denied such?

16:39:11  7       **MR. SNYDER:**  After the commencement of the lawsuit.

16:39:13  8       **THE COURT:**  Concurrent?

16:39:14  9       **MR. SNYDER:**  Correct.

16:39:16  10      **MR. LAKE:**  Your Honor, this is a fantastic argument

16:39:19  11  and he's practicing for his motion for summary judgement.  And

16:39:22  12  as soon as we're done with discovery and all of our experts have

16:39:26  13  produced their evidence and they have produced their evidence,

16:39:28  14  he can file a summary judgement, he can read the transcript back

16:39:32  15  to you again --

16:39:33  16      **THE COURT:**  Oh, I think he's intending to file

16:39:35  17  something other than a summary judgement motion.

16:39:38  18      **MR. SNYDER:**  That's correct, Your Honor.  We do intend

16:39:40  19  to file something other than a summary judgement motion.

16:39:40  20      **THE COURT:**  I'm not encouraging it, but I can see it.

16:39:44  21  I can see it coming over Lake Erie as we know it, over the

16:39:47  22  Hudson.

16:39:47  23      **MR. SNYDER:**  Over the Hudson to Lake Erie.

16:39:52  24      **THE COURT:**  All right.

16:39:54  25      **MR. LAKE:**  And when he brings his motion for summary

16:39:54  1   judgement or whatever motions he wants, we'll address them.  And

16:39:57  2   in the meantime --

16:39:58  3        **THE COURT:**  In the interest of time, we still have

16:40:00  4   what other issues?  I'm about to resolve this first issue about

16:40:04  5   the sequential production slash adequacy of this Plaintiff's

16:40:09  6   certification slash production.  We still have to deal with the

16:40:16  7   issue of the additional testing on the ink tests.

16:40:21  8        **MR. SNYDER:**  The ink testing and the Rule 11

16:40:24  9   certification.

16:40:25 10        **MR. LAKE:**  And mediation.

16:40:29 11        **MR. SNYDER:**  Mediation, Your Honor, there is no

16:40:31 12   mediation.

16:40:33 13        **THE COURT:**  Thank you.  Thank you.

16:40:36 14        On the Plaintiff's request for production, the motion

16:40:39 15   is denied.  The Court's order clearly contemplates sequential

16:40:45 16   production, after the adequacy of the Plaintiff's production per

16:40:49 17   the order.

16:40:50 18        I find that based on the arguments presented by the

16:40:55 19   Defendant and the Plaintiff, that the Plaintiff owes the

16:41:01 20   defendant a further certification and/or production relative to

16:41:07 21   the USB drives, the additional drives, the --

16:41:20 22        Well, actually, I'm persuaded that the Plaintiff needs

16:41:23 23   to provide a supplemental certification either explaining why

16:41:31 24   they don't exist or why they no longer exist as to the native

16:41:35 25   electronic version of the purported contract, all electronic

16:41:39  1   copies of the purported contract, including those in the

16:41:42  2   possession of his attorneys or experts.

16:41:50  3          I am also ruling that the image of the original

16:41:59  4   contract in the possession of Plaintiff's expert is also within

16:42:04  5   the disclosure and the production requirement of the order at

16:42:09  6   page two, first -- second ordering paragraph, native electronic

16:42:17  7   version of the contract attached to the complaint and all

16:42:18  8   electronic copies of the purported contract, including the forms

16:42:21  9   described in paragraph A of Mr. Ceglia's declaration.

16:42:26  10         I'm overruling any objection that this is expert work

16:42:30  11  product pursuant to Rule 26 of the non-testifying Plaintiff's

16:42:36  12  experts.

16:42:37  13         As to the webmail, it is not within the four corners

16:42:42  14  of the electronic asset production.  However, based on the

16:42:47  15  presentation and without -- and in a need to accelerate

16:42:52  16  resolution of this phase of discovery, I am requiring the

16:42:56  17  Plaintiff to -- what is it we want to do here?  We want to

16:43:00  18  consent to the acquisition and inspection of his webmail

16:43:05  19  accounts by the Defendants' experts pursuant to the protocol,

16:43:10  20  Mr. Snyder?

16:43:10  21         **MR. SNYDER:**  Yes, Your Honor.

16:43:11  22         **THE COURT:**  That is so ordered.  That production --

16:43:14  23  all of this production will be provided within 10 days.  What

16:43:21  24  haven't I covered here?

16:43:23  25         Electronic forms described in his June 12th

16:43:29  1    declaration, Mr. --  and the native electronic files consisting

16:43:32  2    of or containing the purported emails and all electronic copies

16:43:36  3    of all such emails.

16:43:38  4          Now, Mr. Lake says there are none in the possession of

16:43:41  5    the Plaintiff.  What are we going to do with that?

16:43:42  6          **MR. SNYDER:**  You know, I think that in the end his

16:43:45  7    client will swear to whatever his truth is about the subject and

16:43:49  8    then we'll evaluate it from there.

16:43:51  9          **THE COURT:**  Shall we require a supplemental

16:43:53 10    declaration identifying and/or producing those items as well?

16:43:58 11          If he has explanations that he wants to put forth

16:44:02 12    under oath, Mr. Lake, we will -- obviously that's what will be

16:44:08 13    forthcoming.

16:44:09 14          But I'm satisfied that we need another round of the

16:44:14 15    Plaintiff to reflect on these issues and to make a very explicit

16:44:20 16    declaration responding to these additional requests.  And that

16:44:24 17    will be within 10 days.

16:44:28 18          **MR. LAKE:**  Your Honor, if we may.  Can we have it

16:44:30 19    written up in an order so I can provide it to --

16:44:32 20          **THE COURT:**  Yes.

16:44:33 21          **MR. SNYDER:**  Thank you.

16:44:33 22          **THE COURT:**  My intention here is that upon receipt of

16:44:39 23    these supplemental certifications and/or productions, that the

16:44:45 24    -- we need the webmail, don't we?  Do you want the webmail

16:44:49 25    before you produce the Harvard emails?

16:44:53  1          **MR. SNYDER:**  For sure, Your Honor.

16:44:54  2          **THE COURT:**  For sure.

16:44:54  3          **MR. SNYDER:**  And so Your Honor is aware, yes, because

16:44:58  4   we believe that he --

16:44:59  5          **THE COURT:**  I'm just trying to get off on the

16:45:02  6   production.  Your production was required within -- what was it

16:45:04  7   again?

16:45:04  8          **MR. SNYDER:**  Five days, Your Honor.

16:45:06  9          **THE COURT:**  Within five days of the later now court

16:45:11  10  ordered supplemental certification and/or production, as well as

16:45:17  11  the acquisition and inception of the webmail accounts.

16:45:22  12         Upon completion of those tasks, the Defendants'

16:45:27  13  obligations to provide the disc containing all of the so-called

16:45:40  14  Harvard emails will be triggered.  Is that correct, Mr. Snyder?

16:45:40  15         **MR. SNYDER:**  Yes, Your Honor.

16:45:40  16         **THE COURT:**  Thank you.  Now, as far as a written order

16:45:40  17  is concerned, because the Defendant is the prevailing party on

16:45:43  18  this issue, I'm going to direct the Defendant to draft the

16:45:47  19  Court's order in written form, much as we did with the original

16:45:52  20  order, present it to Mr. Lake.

16:45:54  21         If there's disagreement over text, the Court will be

16:45:59  22  available at 10:00 tomorrow to deal with the issue.  And we

16:46:04  23  haven't gotten to the ink testing issue, which I think I'm about

16:46:09  24  to tackle.  And that is so ordered.

16:46:12  25         **MR. LAKE:**  Your Honor, if I may be heard briefly.

16:46:14  1    One, if it can be 10 days from the actual order as opposed to

16:46:19  2    today, even that extra day will help me so we that we can get to

16:46:24  3    work.

16:46:24  4         THE COURT:  Yeah, 10 days from the filing of the

16:46:26  5    actual order.

16:46:27  6         MR. LAKE:  Thank you.  And then secondly, and this

16:46:29  7    came up before just so it's clear, the way we interpreted the

16:46:34  8    protocol for the electronically-stored information was we were

16:46:40  9    entitled to the emails five days after producing that

16:46:44 10    information to Stroz because once that information left our

16:46:47 11    hands and was in Stroz's possession, the clock should start

16:46:52 12    ticking and we should be able to get the emails within five days

16:46:55 13    of production to Stroz, not five days from Stroz because Stroz

16:47:00 14    is going have to go through it again, to a relevancy search,

16:47:04 15    produce another log.

16:47:04 16         We're going to have our five days to review it for

16:47:08 17    privilege and confidentiality.  I don't know how much

16:47:11 18    information is in these email accounts.  I don't know what they

16:47:14 19    are, but Stroz is going to have to go through the same procedure

16:47:18 20    as last time.  That could take up to -- it took them about a

16:47:21 21    week before.  It could take another week or more or less.  I

16:47:25 22    don't know since I have never seen any of this information.  So

16:47:28 23    I want some clarification as to --

16:47:31 24         THE COURT:  Production according to the order is --

16:47:34 25    I'm not sure I can find the object of the sentence.  Production

16:47:40  1  to whom, Mr. Snyder?

16:47:41  2        **MR. SNYDER:**  It's silent.  I think.

16:47:44  3        **THE COURT:**  Yeah, that's what I thought.

16:47:45  4        **MR. SNYDER:**  I think under the circumstances that it

16:47:47  5  is fair and prudent to trigger our production obligations upon

16:47:54  6  five days upon our receipt of the findings because until such

16:48:00  7  time we will have no way of knowing if the Plaintiff is

16:48:03  8  compliant.

16:48:03  9        **THE COURT:**  He's saying five days after this Stroz and

16:48:07  10  Friedberg --

16:48:07  11        **MR. SNYDER:**  Right.  And we think that it should be

16:48:11  12  five days after we have the results of Stroz Friedberg because

16:48:15  13  until that time, we'll have no way of knowing if the Plaintiff

16:48:16  14  is continuing to play games or incompliant.

16:48:19  15        And to be clear, the emails, Your Honor, the Harvard

16:48:22  16  emails are ready to be produced.  They're on a disc.

16:48:26  17        **THE COURT:**  I know you said that, but I'm focussing on

16:48:29  18  this webmail account issue.  Your request is that Stroz and

16:48:36  19  Friedberg inspect it.

16:48:36  20        **MR. SNYDER:**  Yes.

16:48:37  21        **THE COURT:**  Well, I mean, if that's the last thing,

16:48:40  22  then that right there has to be five days after they look at it.

16:48:44  23        **MR. SNYDER:**  Right, five days after they report to us

16:48:44  24  --

16:48:48  25        **THE COURT:**  You're not going to look at it?

16:48:49  1          MR. SNYDER:  No, but they'll report to us that it is

16:48:52  2   in compliance.  He has given them proper access, that they have

16:48:57  3   been able to conduct the searches.

16:48:57  4          THE COURT:  How about that, Mr. Lake?

16:48:59  5          MR. LAKE:  Well, what's left in our possession, they

16:49:03  6   are going to have a complete copy of it.  If anything has

16:49:06  7   changed, they'll know.

16:49:08  8          MR. SNYDER:  I think Stroz Friedberg could act

16:49:14  9   expeditiously and we could say five days after Stroz Friedberg

16:49:18 10   gives us the results, but in no event say later than, say --

16:49:26 11          MR. LAKE:  Why not the day?  The day that Stroz

16:49:30 12   Friedberg turns it over then it's done.

16:49:31 13          THE COURT:  I know you're anxious and we want you to

16:49:35 14   have them.  That is obviously a major point.  But the other

16:49:37 15   major point is there's no question in my mind that the reason

16:49:40 16   for the sequential was because of the concern of potential

16:49:43 17   manipulation.

16:49:45 18          Whether well-founded or not, it's besides the point.

16:49:49 19   That was our judgement at the time of this so I'm just not quite

16:49:52 20   sure how to frame the triggering mechanism that --

16:49:55 21          MR. SNYDER:  We think that be should five days.  We

16:49:58 22   will produce the Harvard emails five days after Stroz Friedberg

16:50:03 23   reports that the Plaintiff has complied with the order with

16:50:05 24   respect to the webmail-based account.

16:50:10 25          THE COURT:  The emails at Harvard are already set in

16:50:13  1  stone, so to speak?

16:50:14  2          **MR. SNYDER:**  Yes.

16:50:14  3          **MR. LAKE:**  We don't know that.

16:50:15  4          **MR. SNYDER:**  Harvard University has preserved them.

16:50:19  5          **THE COURT:**  No one is suggesting that Mr. Zuckerberg

16:50:23  6  can go back and plant or manipulate those --

16:50:27  7          **MR. SNYDER:**  The Plaintiff has suggested that.

16:50:29  8          **MR. LAKE:**  Of course he's suggested that.

16:50:31  9          **THE COURT:**  We have seen no evidence of that?

16:50:33 10          **MR. SNYDER:**  No evidence whatsoever.

16:50:33 11          **MR. LAKE:**  Because we haven't propounded discovery

16:50:36 12  yet.

16:50:36 13          **THE COURT:**  Well, you know, you play the hand that's

16:50:43 14  dealt to you in this business.

16:50:44 15          **MR. LAKE:**  Understood.

16:50:46 16          **THE COURT:**  So it's five days after Stroz -- draft the

16:50:49 17  order this way.  I see you have Ms. Aycock's able assistance in

16:51:04 18  that department.  So five days after they report to Defendants'

16:51:04 19  attorney.

16:51:08 20          Next issue is the -- in the interest of time, why do

16:51:08 21  you need -- let's take a five minute break.

16:57:24 22          (A recess was then taken.)

16:57:24 23          **MR. SNYDER:**  Should I address the sampling?

16:57:35 24          **THE COURT:**  No, I think I can move through that more

16:57:35 25  quickly.  I read all of the papers on that and the question I

16:57:35  1   have is why does your expert need the additional samples?  I

16:57:38  2   don't think that's explained.

16:57:39  3        **MR. SNYDER:**  That's an excellent question, Your Honor,

16:57:41  4   and I can give you an explanation.  We didn't explain it for a

16:57:45  5   particular reason.

16:57:46  6        **THE COURT:**  You can remain seated.  If you really feel

16:57:48  7   you need to stand, come to the podium.

16:57:52  8        **MR. SNYDER:**  Your Honor, our experts observed on the

16:57:54  9   original document that was taken out of the safe deposit box

16:58:01 10   that Mr. Argentieri has custody of an incredibly unusual

16:58:05 11   document, unlike any our experts have ever seen and these are

16:58:09 12   the leading forensic experts --

16:58:12 13        **THE COURT:**  You're talking about the original alleged

16:58:14 14   contract that gives rise to Mr. Ceglia's 50 percent interest in

16:58:19 15   the --

16:58:19 16        **MR. SNYDER:**  Yes, Your Honor.  It is a highly unusual

16:58:23 17   irregular document.  It is a faded goldish-brown ink that has an

16:58:30 18   odd ecru tinge on the front of page one.  It is highly

16:58:34 19   suggestive of having undergone artificial --

16:58:39 20        **THE COURT:**  My question is I mean, they've taken a

16:58:44 21   number of samples.

16:58:45 22        **MR. SNYDER:**  No, Your Honor.  Let me explain the basis

16:58:48 23   of our request.

16:58:50 24        **THE COURT:**  What is all these pictures I have in front

16:58:53 25   of me and all the little black dots --

16:58:53  1          **MR. SNYDER:**  I will explain.  First, Your Honor, in an

16:58:57  2    attempt to accommodate Plaintiff's counsel, we agreed in the

16:59:01  3    first instance to limit the number of initial ink samples that

16:59:07  4    our experts would take on the understanding, clear

16:59:10  5    understanding, which I don't think Mr. Lake would dispute, that

16:59:14  6    we would be permitted the opportunity to take additional samples

16:59:19  7    later.  Mr. Lake agreed.

16:59:20  8          He said if there are sufficient ink samples available,

16:59:24  9    after Plaintiff's experts had done their ink sampling, then he

16:59:28 10    would consent to and not object to our experts extracting

16:59:33 11    additional samples.

16:59:34 12          **THE COURT:**  They changed their mind.

16:59:35 13          **MR. SNYDER:**  Right.

16:59:36 14          **THE COURT:**  So tell me why your expert needs the

16:59:39 15    initial samples.

16:59:40 16          **MR. SNYDER:**  Because we did not take as many samples

16:59:43 17    as we would have to accommodate Mr. Lake who wanted to take his

16:59:48 18    samples.

16:59:50 19          **THE COURT:**  Why didn't they take.

16:59:52 20          **MR. SNYDER:**  It would have taken more time.

16:59:54 21          **THE COURT:**  Who cares.

16:59:55 22          **MR. SNYDER:**  Hindsight being 20/20, we shouldn't have

16:59:57 23    accommodated Mr. Lake and we should have taken all our samples.

17:00:02 24          **THE COURT:**  You're telling me that your expert, when

17:00:04 25    they had the opportunity to take critical samples of the

17:00:08   1   document, didn't take all the samples that their expertise told

17:00:12   2   them to take because they actually acquiesced to some arm waving

17:00:17   3   by the Plaintiff that they wanted to stop that process in order

17:00:21   4   to commence their own process --

17:00:23   5         **MR. SNYDER:**  Yes, Mr. Lake --

17:00:24   6         **THE COURT:**  -- risking that we would end up in a

17:00:27   7   courtroom arguing over whether or not those additional --

17:00:29   8         **MR. SNYDER:**  No, not thinking --

17:00:29   9         **THE COURT:**  Just a second.  Those additional samples

17:00:33  10   are critical to your ability to analyze the authenticity of the

17:00:38  11   document?

17:00:38  12         **MR. SNYDER:**  No, Your Honor, I'm not say saying that.

17:00:41  13         **THE COURT:**  What are you telling me?

17:00:41  14         **MR. SNYDER:**  Mr. Lake threatened that if we did not

17:00:45  15   stop testing, he would go to court and pull the document.  And

17:00:47  16   Mr. Flynn was there and Mr. Southwell was there and we never --

17:00:53  17         **THE COURT:**  How could he take the testing?

17:00:55  18         **MR. SNYDER:**  How would take -- physically take the

17:00:55  19   document.

17:00:56  20         **THE COURT:**  How could he do such a thing?

17:00:58  21         **MR. SNYDER:**  He threatened it.  And we said in

17:00:58  22   accomodation --

17:01:00  23         **THE COURT:**  He'd be guilty of interfering with the

17:01:01  24   administration of the court order.

17:01:05  25         **MR. SNYDER:**  Mr. Flynn can talk to the Court about

17:01:07  1    credibility.

17:01:08  2           THE COURT:  He threatened to run away with the

17:01:11  3    document and I wasn't consulted at that time?

17:01:15  4           MR. FLYNN:  May I, Your Honor?

17:01:16  5           THE COURT:  Just a second.  I want to understand the

17:01:17  6    logic behind that.

17:01:17  7           MR. SNYDER:  I was not present so I feel more

17:01:24  8    comfortable asking Mr. Flynn to address the Court.

17:01:24  9           THE COURT:  So after this procedure was done, it was

17:01:26  10   always the Defendants' need to ask for another round of samples?

17:01:33  11          MR. SNYDER:  No, Your Honor.

17:01:35  12          THE COURT:  No?

17:01:35  13          MR. SNYDER:  Because we believe consistent with

17:01:37  14   Mr. Lake's representation to us that he would give us the

17:01:41  15   document back to complete our sampling and there is more than

17:01:44  16   enough ink left --

17:01:46  17          THE COURT:  At that time?

17:01:46  18          MR. SNYDER:  When his expert was done.  That was his

17:01:48  19   request and we said no harm no foul.  If you want to test it and

17:01:52  20   give it back to us and then we --

17:01:53  21          THE COURT:  Running the risk that we would end up in

17:01:56  22   this situation?

17:01:57  23          MR. SNYDER:  We never dreamt that he would pull the

17:02:00  24   charade of suggesting that there's not enough ink to test --

17:02:03  25          THE COURT:  Did you or your expert memorialize this

17:02:07  1  insufficient testing at the time?  Did you advise the Court of

17:02:13  2  it?

17:02:13  3      **MR. SNYDER:**  I would have to ask Mr. Flynn.  I wasn't

17:02:16  4  present.

17:02:16  5      **THE COURT:**  Why should the Court -- although I'm

17:02:20  6  making the Plaintiff's argument.  Why shouldn't Mr. Lake say

17:02:27  7  this is a recent concoction that the Plaintiff the -- that the

17:02:32  8  Defendants had dreamed up here because their expert botched the

17:02:35  9  first round --

17:02:35  10      **MR. SNYDER:**  No, our expert did it perfectly.

17:02:38  11      **THE COURT:**  Or they're really not expert or they want

17:02:41  12  to destroy the document.

17:02:42  13      **MR. SNYDER:**  Okay.  Your Honor, there are three ways

17:02:42  14  to respond to this.  One, the order has no --

17:02:44  15      **THE COURT:**  These are fair questions, aren't they?

17:02:46  16  You might not like them.

17:02:47  17      **MR. SNYDER:**  With all due respect, I don't think they

17:02:50  18  are and I'll tell Your Honor why.

17:02:51  19      **THE COURT:**  Okay.

17:02:52  20      **MR. SNYDER:**  The protocol does not restrict our

17:02:55  21  ability to take ink samples or say how and in what order they

17:02:59  22  should be taken.

17:02:59  23      We were in a cooperative group process in terms of how

17:03:10  24  these documents would be tested, whose expert would to be where,

17:03:10  25  these people were in a room for days and days and days

17:03:11  1    accommodating in a way --

17:03:12  2         THE COURT:  Excuse me.  Referring to representatives

17:03:14  3    of the Defendants?

17:03:15  4         MR. SNYDER:  Counsel for the Defendants, counsel for

17:03:18  5    Plaintiffs were in Mr. Flynn's office for a period of days.  And

17:03:22  6    Ms. Aycock was there, Mr. Southwell, Mr. Benjamin was there and

17:03:25  7    Mr. Lake was there, Mr. Argentieri was there, the experts were

17:03:30  8    there.

17:03:30  9         It was a cooperative back and forth, during which

17:03:33 10    Mr. Lake said can you guys stop -- don't -- can you limit the

17:03:39 11    number of ink test samples you're going to take, let my experts

17:03:40 12    take some ink and then we'll give the document back to you and

17:03:40 13    your experts can continue.

17:03:43 14         THE COURT:  Didn't your experts challenge that --

17:03:43 15         MR. SNYDER:  No.

17:03:45 16         THE COURT:  -- and say why do we need to do that?

17:03:46 17         MR. SNYDER:  Nope, we didn't do that.  It wasn't a big

17:03:48 18    deal to us.  We were getting the document back and there's more

17:03:49 19    than enough ink to go around.

17:03:52 20         THE COURT:  That's not the point.  It doesn't

17:03:55 21    interfere with the integrity of the testing process?

17:03:57 22         MR. SNYDER:  Absolutely not because all we --

17:03:58 23         THE COURT:  It doesn't subject the expert's

17:04:02 24    examination as to the validity of the process?

17:04:02 25         MR. SNYDER:  Absolutely not because the expert can

17:04:05  1    document --

17:04:05  2              THE COURT:  Famous last words.

17:04:07  3              MR. SNYDER:  No.  We're very confident that our expert

17:04:10  4    can and will document following to the letter the procedures

17:04:13  5    that --

17:04:14  6              THE COURT:  I'm just trying to move this along.  It

17:04:17  7    was an unexpected request coming from Mr. Lake and rather than

17:04:21  8    to contest it and play hardball by calling the Court for

17:04:25  9    assistance --

17:04:26 10              MR. SNYDER:  Right.

17:04:26 11              THE COURT:  -- you just accommodated him?

17:04:29 12              MR. SNYDER:  Yes, because Dr. Lyter, our expert, said

17:04:33 13    there is more than enough ink to go around.  When we get the

17:04:36 14    document back, we'll finish our testing.

17:04:36 15              THE COURT:  And Mr. Lake seemed to acquiesce in that

17:04:40 16    statement?  Was that representation made at that time.

17:04:45 17              MR. SNYDER:  Yes, that representation was made to

17:04:46 18    Mr. Southwell by Mr. Lake and the reason they don't want --

17:04:48 19              THE COURT:  But none of that is in any of the papers.

17:04:51 20    There's no affidavit submitted.

17:04:51 21              MR. SNYDER:  Well, Mr. Southwell does put in a

17:04:53 22    affidavit swearing to all of that.

17:04:56 23              THE COURT:  Oh, really?  Where is that?

17:04:57 24              MR. SNYDER:  And un-objected to.  Mr. Lake has not

17:05:02 25    sworn to the contrary.

17:05:27  1              THE COURT:  Where is that?

17:05:27  2              MR. SNYDER:  This will be number 97, Your Honor.  And

17:05:50  3      in his affidavit, Mr. Southwell describes --

17:05:52  4              THE COURT:  What paragraph?

17:05:53  5              MR. SNYDER:  Paragraphs 29 through 34 and 34 is the

17:05:58  6      relevant paragraph where he describes, Mr. Southwell, his

17:06:04  7      conversation with Mr. Lake and Mr. Lake does not put in any

17:06:12  8      affidavit to the contrary, nor could he.

17:06:24  9              THE COURT:  Well, you act like Lake demanded that

17:06:28 10      Zuckerberg produce handwriting samples.  I don't understand what

17:06:32 11      that has to do with what we're discussing.

17:06:42 12              MR. SNYDER:  No, I think paragraph 34 of document 97,

17:06:45 13      it's a August 4th declaration --

17:06:47 14              THE COURT:  Maybe it's a wrong one.  We have

17:06:51 15      Southwell.  We unfortunately don't have a document on here --

17:06:55 16      it's 40-some paragraphs, is that it?

17:06:58 17              MR. SNYDER:  Yes, Your Honor.  It's 49 paragraphs.

17:07:01 18              THE COURT:  Just tell me which one.

17:07:04 19              MR. SNYDER:  Paragraph 34.

17:07:09 20              THE COURT:  At the conclusion of that day, I then

17:07:12 21      discussed with Mr. Lake something about taking additional

17:07:17 22      samples.  That's not the scenario that you've given me based on

17:07:22 23      the request of the Defendants' experts.

17:07:27 24              Impart because the Plaintiff's expert had already left

17:07:30 25      for the airport, Lake indicated we should wait to discuss this

17:07:34  1    problem, which was scheduled to occur after the Plaintiff's

17:07:37  2    experts took samples.  That doesn't sound exactly like what

17:07:41  3    you're saying.

17:07:41  4         **MR. SNYDER:**  Your Honor, if you read the last

17:07:41  5    paragraph --

17:07:44  6         **THE COURT:**  Paragraph?

17:07:44  7         **MR. SNYDER:**  Sentence.  Mr. Lake agreed if there is

17:07:46  8    sufficient ink available after Plaintiff's experts also sample,

17:07:50  9    then he would allow Defendants' experts to extract more ink

17:07:55 10    samples.

17:07:55 11         **THE COURT:**  I see that, but what I'm trying to point

17:07:58 12    out is the actual interruption of the -- the expert wanted to

17:08:01 13    take more so Mr. Lake suddenly jumped and said, well, no.  I

17:08:02 14    need for us to have our person look at it and then your expert

17:08:07 15    said okay.  So that's not exactly what's coming through here.

17:08:11 16    But I don't want to quibble over it.

17:08:13 17         The point is that your view is that you accommodated

17:08:16 18    Mr. Lake and to your chagrin you now find out that that was a

17:08:20 19    mistake.

17:08:20 20         **MR. SNYDER:**  Yes, Your Honor.  And the order does not

17:08:22 21    restrict our ability to take ink samples and there's more than

17:08:27 22    sufficient ink.

17:08:27 23         **THE COURT:**  So I'm trying to understand something

17:08:28 24    that's not revealed in the papers as far as I can tell and that

17:08:32 25    is why does your expert feel at this point that the additional

17:08:37  1    samples are necessary.

17:08:40  2         **MR. SNYDER:**  Because it is our expert's preliminary

17:08:44  3    belief, based on his initial samples --

17:08:46  4         **THE COURT:**  No, no.  You're not getting the drift

17:08:49  5    here.  If he took five samples --

17:08:52  6         **MR. SNYDER:**  Yes.

17:08:52  7         **THE COURT:**  -- and needed 10, then his position would

17:08:55  8    be well I'm not done.

17:08:57  9         **MR. SNYDER:**  Correct.

17:08:57  10        **THE COURT:**  He's knows I have to get an additional

17:09:00  11   five samples.

17:09:01  12        **MR. SNYDER:**  That's correct.

17:09:02  13        **THE COURT:**  What I'm trying to understand is why.

17:09:04  14        **MR. SNYDER:**  I'll telling Your Honor right now.

17:09:04  15        **THE COURT:**  Okay.

17:09:07  16        **MR. SNYDER:**  Because based on his initial sample,

17:09:10  17   whether it's five or four or nine, whatever the number is --

17:09:13  18        **THE COURT:**  He wouldn't have known that at the time.

17:09:15  19        **MR. SNYDER:**  No.  Based on the initial sampling --

17:09:19  20        **THE COURT:**  He wouldn't have known what his initial --

17:09:22  21        **MR. SNYDER:**  Well, he would have known generally he

17:09:24  22   needed to take more than he took.

17:09:26  23        **THE COURT:**  That's my point.  What is the reason for

17:09:28  24   the need?

17:09:29  25        **MR. SNYDER:**  I'm not an ink expert, but I'm told you

17:09:32  1    need more samples than he took to conduct the chemical testing

17:09:37  2    to determine whether the ink dates from 2003 or not.

17:09:39  3              **THE COURT:**  I read that in his affidavit.

17:09:41  4              **MR. SNYDER:**  Yes.

17:09:42  5              **THE COURT:**  I understand that, but what's not in his

17:09:45  6    affidavit is what you're now trying to tell me which is that he

17:09:59  7    couldn't make any definitive estimations of the dating of the

17:09:59  8    ink because he didn't take enough samples in the first place.

17:09:59  9              **MR. SNYDER:**  Because we accommodated the Plaintiff.

17:10:01  10             **THE COURT:**  Exactly.

17:10:01  11             **MR. SNYDER:**  Correct.

17:10:02  12             **THE COURT:**  Whether he would have taken ill or whether

17:10:04  13   the power would have gone out and he would have to evacuate the

17:10:07  14   building, the fact of the matter is what you're telling me is

17:10:10  15   that he then knew and has always known that he needed X number

17:10:16  16   of samples, but he only took Y.

17:10:21  17             **MR. SNYDER:**  Yes.

17:10:21  18             **THE COURT:**  And he only took Y because he accommodated

17:10:26  19   Mr. Lake.

17:10:27  20             **MR. SNYDER:**  Given the condition of the document also,

17:10:31  21   because it's been treated in a variety of ways that are highly

17:10:38  22   suspicious with light and perhaps chemicals, he did not know

17:10:40  23   that a certain test would be useful until he was able to further

17:10:45  24   evaluate the treatment of the paper as well.

17:10:48  25             **THE COURT:**  So I'm fine with whatever his rational is

17:10:52  1   and if the real truth of the matter is that he took 10 samples,

17:10:57  2   say, and he then tested and found out that he needed 15, then

17:11:01  3   just tell me --

17:11:02  4        **MR. SNYDER:**  That's not the case.

17:11:03  5        **THE COURT:**  -- he always needed 15.  He only took 10,

17:11:07  6   he took the test, he then evaluated the result and he said

17:11:12  7   ah-ha, I do need the additional five just as I knew I did when I

17:11:17  8   first started.

17:11:17  9        **MR. SNYDER:**  It's actually both.  It's both that he

17:11:20 10   needed more when he stopped testing and we on accommodated their

17:11:25 11   request to limit the number of --

17:11:26 12        **THE COURT:**  And then he tested --

17:11:26 13        **MR. SNYDER:**  And he was said I was right, I need more.

17:11:29 14        **THE COURT:**  Okay, fine.  Thank you.  And it's because,

17:11:32 15   which is not in an affidavit, you have to represent hearsay here

17:11:36 16   to me, right?

17:11:36 17        He's telling you that in his scientific opinion is

17:11:41 18   this for the record because I really don't know the answer and

17:11:44 19   I'm sure that Mr. Lake is finding this of interest as well, his

17:11:49 20   preliminary testing confirmed that original judgement that I

17:11:52 21   just can't make a definitive determination without the

17:11:57 22   additional samples.

17:11:57 23        **MR. SNYDER:**  Yes, he needs additional samples to --

17:12:00 24        **THE COURT:**  Even though it wouldn't be clear to you or

17:12:04 25   I as to why the additional samples would be potentially

17:12:07  1    definitive upon dating the actual ink.

17:12:07  2         **MR. SNYDER:**  I represent that to Your Honor and

17:12:10  3    Dr. Lyter represented it to me in person.

17:12:13  4         **THE COURT:**  So we have to rely to the expert.

17:12:15  5         **MR. SNYDER:**  And let me just say in terms of the

17:12:17  6    availability of ink samples, their expert --

17:12:20  7         **THE COURT:**  Availability is beside the point.  I'll

17:12:23  8    get to availability because I read all about availability.

17:12:28  9    Mr. Lake can respond to this, I just want to get this out.

17:12:31 10         As I read Mr. Stewart's affidavit, Mr. Stewart does

17:12:36 11    not in terms negate what we just discussed, that as if --

17:12:45 12         **MR. SNYDER:**  We don't know if Mr. Stewart has

17:12:49 13    concluded about the ink, whether the ink is dry enough quote

17:12:52 14    unquote to be from 2003.

17:12:54 15         **THE COURT:**  But there is nothing in his affidavit that

17:12:57 16    contradicts his representation to me about Mr. Lyter's opinion

17:13:03 17    that he needs the -- his focus, the Plaintiff's focus, is you're

17:13:08 18    going to destroy the document if you allow anymore samples.

17:13:12 19         **MR. SNYDER:**  I would respectfully say, Mr. Stewart

17:13:15 20    does not say destroy.

17:13:17 21         **THE COURT:**  And even though -- it is starting to

17:13:19 22    clarify in my mind what this is coming down to.  Even though --

17:13:23 23    was Mr. Stewart present during this?  Mr. Stewart never piped up

17:13:29 24    apparently during the process and said time-out.  If you take

17:13:32 25    another attempt to take one more punch at this thing, you'll

17:13:36  1    destroy the integrity of the document.

17:13:38  2         **MR. SNYDER:**  No, never.  And he doesn't say destroy in

17:13:42  3    the affidavit.

17:13:42  4         **THE COURT:**  Well, he is saying it now.

17:13:42  5         **MR. SNYDER:**  He doesn't, Your Honor.  It's actually

17:13:43  6    interesting, Mr. Stewart doesn't say that.  It says something

17:13:43  7    that is so general that to repeat right now would be

17:13:43  8    meaningless.

17:13:49  9         He says that -- he doesn't say there's not sufficient

17:13:52 10    ink.  There's tons of ink.  He says that it will compromise the

17:13:57 11    physical integrity of the contract.

17:14:00 12         We have no idea what that means.  It doesn't say there

17:14:03 13    is insufficient ink or anything like that.  And during the

17:14:05 14    examination --

17:14:05 15         **THE COURT:**  Okay.  Mr. Lake, what's the answer to

17:14:08 16    that?

17:14:08 17         **MR. LAKE:**  Your Honor, if you're going to deny them

17:14:11 18    anymore ink samples, I won't --

17:14:13 19         **THE COURT:**  Well, I want to hear why there's a big

17:14:16 20    issue about it.  Because if you look at Mr. Lyter's affidavit,

17:14:21 21    there surely does seem to be enough ink available without

17:14:27 22    compromising the physical integrity of the document.

17:14:31 23         And the other point I made is that in terms of getting

17:14:34 24    the correct samples in order for either expert to make a

17:14:39 25    scientific appraisal of the authenticity of the document based

17:14:41  1    on the age of the ink, Mr. Stewart does not in terms contradict

17:14:47  2    Mr. Lyter's assertion that -- well as reported to us now, I

17:14:51  3    guess in fairness to your -- to Mr. Stewart, he can't -- he

17:14:54  4    would not -- he's not here so it's probably not fair to ask you

17:14:59  5    that question.  And I don't ask you that question.

17:15:03  6           But interestingly, he does not, and you did not

17:15:07  7    quarrel with the possibility of taking additional ink samples.

17:15:11  8    It must have been apparent to you that but for your request that

17:15:14  9    Lyter would have continued to draw additional ink samples at

17:15:18 10    that time.  Is that not a fair reconstruction of the scenario?

17:15:30 11           **MR. LAKE:**  No.

17:15:30 12           **THE COURT:**  No?

17:15:30 13           **MR. LAKE:**  Allow me to reconstruct it because actually

17:15:30 14    I was there and I participated in this.  And I can speak for

17:15:30 15    myself, thank you.

17:15:31 16           What happened was we negotiated the physical hard copy

17:15:38 17    inspection to protocol.  There was not a negotiation as to how

17:15:43 18    many ink samples could be taken or where for the simple reason

17:15:47 19    that we didn't have the original document.

17:15:48 20           And so after our meeting, we concluded that we would

17:15:52 21    try to meet and confer between the experts once they saw the

17:15:57 22    ink.

17:15:58 23           We went to Harris Beach, we had the experts meet and

17:16:02 24    confer.  I was asked to provide a ink sample protocol, which

17:16:08 25    included the number -- and this was also true for the paper and

17:16:11  1    the toner, by the way.  The number of samples that would be

17:16:14  2    taken and their locations.

17:16:16  3         I met with my experts and asked them what would be

17:16:19  4    necessary for them to conduct their tests.  And therefore to

17:16:24  5    double that number so that the other side could have the same

17:16:28  6    number of samples and find places on the document where they

17:16:32  7    could take those samples.  These are the black dots you've seen.

17:16:36  8         We wrote it up.  We gave it to them.  We had Mr. Flynn

17:16:41  9    and the other defense lawyers and their experts look at it.

17:16:41  10   They said this isn't enough.  We want more.

17:16:46  11        And we said how much more do we want.  And they came

17:16:50  12   back with a number and our experts says that's too much.  We're

17:16:54  13   not going to be able to take the ink samples that we need if all

17:16:59  14   of these samples are taken.

17:17:01  15        We tried to negotiate a number.  At that point we

17:17:05  16   couldn't agree.  And I said okay.  Well, fine at this point we

17:17:08  17   need to go see the Judge.  Let's go see Judge Foschio.  We can

17:17:13  18   present this to him and he can give us a ruling.

17:17:17  19        I did that, not because they were accommodating me,

17:17:21  20   but because I was concerned about the document itself.  We

17:17:25  21   continued our meet and confer and came to the conclusion that we

17:17:28  22   would -- we wrote it up and we signed it.

17:17:32  23        It said we'll take this many samples because remember,

17:17:36  24   the Defendants were adamant that we couldn't touch our own

17:17:40  25   document until they were done with it.  We weren't allowed to

17:17:44   1   test it.  We weren't even allowed to watch them do their

17:17:45   2   testing.  If we looked over that shoulder, they shooed us away.

17:17:49   3   If we were going to determine what they were going to do, that

17:17:51   4   was not going to happen.

17:17:51   5        I said either we need to go see the Judge right now

17:17:54   6   and get this sorted out or alternatively if you want to go

17:17:58   7   forward under the protocol that we devised and agreed to, if

17:18:03   8   after our experts have had a chance to take their ink samples,

17:18:07   9   which occurred days later in Chicago, if my experts agreed, then

17:18:14  10   I will allow it.  That part is true.

17:18:16  11        In Chicago, we took our samples.  The document looks

17:18:20  12   like Swiss cheese.  As you can see, there is very little ink

17:18:25  13   left.  That have had plenty to do it.  They said we want to take

17:18:30  14   more.  Mr. Argentieri was there.  He got on the phone, talked to

17:18:32  15   our expert.  Our expert says we have plenty, they have plenty.

17:18:35  16   The document is being --

17:18:41  17        **THE COURT:**  Does your expert have more than they have?

17:18:43  18        **MR. LAKE:**  No, we have the exact amount.  And the

17:18:46  19   reason we didn't address some of the issues that Mr. Snyder just

17:18:50  20   brought up in our papers is because in their opposition and

17:18:53  21   reply, they never gave any good reason why they wanted more.

17:18:57  22   They just said there is more, therefore we want it.

17:19:00  23        They never said this is the test we want, this is why

17:19:02  24   we need it, this is what we're going to conduct, this is why we

17:19:04  25   don't have enough.

17:19:06  1          And the other thing they didn't mention is they have

17:19:09  2   two ink experts and they have not declared whether or not they

17:19:13  3   split the samples.

17:19:14  4          So if 10 ink samples were taken from one signature, at

17:19:18  5   this point I don't know if they have one person doing all their

17:19:20  6   ink testing or if they divided it to five and five and the

17:19:22  7   reason they want more is because they want 10 and 10.

17:19:26  8          All I know is that when we, to accommodate them, said

17:19:31  9   we either talk to the judge right now and get this sorted out or

17:19:36  10  you can take the amounts we agreed to and if our experts say

17:19:37  11  more, fine.  If they don't, no.  Our expert said no, so I said

17:19:40  12  no, which is exactly what I had maintained all along.

17:19:45  13         And then in their motion, all they basically said is

17:19:48  14  we want more.  They didn't say if they were going to divide them

17:19:50  15  up, they didn't say what the tests were.  They didn't say

17:19:50  16  anything so that's why I didn't respond to the arguments that

17:19:54  17  Mr. Snyder just made because they were never presented to us

17:19:57  18  even-keeled.

17:19:57  19         **THE COURT:**  I realize it and that's why I am because I

17:19:59  20  couldn't tell either.  But your expert is satisfied with the

17:20:03  21  number of samples they have?

17:20:06  22         **MR. LAKE:**  Yeah, they've taken a ton.  They've taken

17:20:10  23  dozens.  I mean, there's ink samples taken all over the place.

17:20:15  24         And I don't understand what the good cause is for

17:20:18  25  taking more, other than they're not satisfied with the tests

17:20:22  1    that they conducted so far and they want to do more testing to

17:20:26  2    try to get different results.  That's all I can think of.

17:20:30  3         **MR. SNYDER:**  Your Honor, may I hand a document up to

17:20:44  4    Your Honor, which I think will clarify the question and I can

17:20:44  5    show Your Honor why.

17:20:44  6         I don't know if Your Honor is at all focused or

17:20:44  7    concerned about availability of ink, but that is a non-issue and

17:20:44  8    it really is and I'll show Your Honor why.

17:20:47  9         **THE COURT:**  That's your expert's.

17:20:52  10        **MR. SNYDER:**  If I can approach, Your Honor, I want to

17:20:55  11   give your Your Honor a different high-resolution copy of that,

17:20:58  12   which will show dramatically in color, and we'll give one to the

17:21:08  13   Plaintiff, just how much ink is left.

17:21:10  14        Those dots indicate where the ink was extracted.  Your

17:21:14  15   Honor can see just how much ink is available.

17:21:17  16        **THE COURT:**  How many more do they want to take and

17:21:20  17   where are they going to focus their pin prints?

17:21:24  18        **MR. SNYDER:**  It is spelled out in Mr. Lyter's

17:21:29  19   declaration.  And I will point out to the Court as well that we

17:21:29  20   have high-resolution scan of this document taken before any

17:21:37  21   testing was done.  And so on paragraph --

17:21:43  22        **THE COURT:**  Two more from the probably more critical

17:21:47  23   authenticity is of the initialing of the alleged

17:21:51  24   Mr. Zuckerberg's MZ and only one from the M and one from the Z.

17:21:56  25        **MR. SNYDER:**  Yes.  As you see from the authentic

17:21:59  1    contract found on the Plaintiff's email account in 2004, the

17:22:01  2    actual inter-lineage in the authentic contract is not the bogus

17:22:07  3    inter-lineage that is found on the document attached to the

17:22:10  4    complaint.  And paragraph nine explains why we --

17:22:15  5            **THE COURT:**  Say that again.

17:22:16  6            **MR. SNYDER:**  If Your Honor looks at the authentic

17:22:19  7    contract that we found on the Plaintiff's hard drive on the

17:22:22  8    Seagate computer, Your Honor will see that the inter-lineation

17:22:26  9    there in handwriting on the actual authentic contract that's

17:22:31 10    been on Sidley and Austin's computer for seven years, having

17:22:36 11    been sent by the Plaintiff, is different than the handwriting

17:22:39 12    than appears on the fraudulent contract at the heart of this

17:22:43 13    lawsuit.

17:22:43 14            **THE COURT:**  And I'm not going to attempt to make that

17:22:46 15    comparison.  That would be the one that I would be most

17:22:51 16    concerned about is that that's such a small, relatively

17:22:55 17    speaking, lettering and it seems to be a major target.

17:22:59 18            **MR. SNYDER:**  But, A, there is plenty of ink to test

17:23:04 19    and, B, there are high-resolution scans and there's no question

17:23:09 20    about --

17:23:09 21            **THE COURT:**  I didn't ask that question.  I come back

17:23:10 22    to the document.  You know, Mr. Lake, if you look at the MZ over

17:23:15 23    here, have you seen this document?  I'm pointing to the

17:23:19 24    high-resolution document which highlights that portion of the

17:23:23 25    contract dealing with a -- I can't even read what it says, but

17:23:27  1   it looks like initially PC and MZ, that doesn't seen like, does

17:23:34  2   it, if you took two more red dots on it that there's going to be

17:23:38  3   any physical serious impairment.  Do you see what I'm getting

17:23:45  4   at?

17:23:45  5        **MR. LAKE:**  I do, but keep in mind that for every

17:23:49  6   sample they take our experts are going to want to take --

17:23:52  7        **MR. SNYDER:**  I thought that he didn't need more

17:23:56  8   samples.

17:23:56  9        **THE COURT:**  I thought your experts were quite

17:24:00  10  satisfied, with your powerful argument, and they didn't need

17:24:01  11  more.

17:24:01  12       **MR. LAKE:**  Yes.

17:24:01  13       **THE COURT:**  You're now saying that your experts maybe

17:24:03  14  are suggesting there is more valid scientific proof to having

17:24:05  15  more samples?

17:24:05  16       **MR. LAKE:**  No.  So my choices are there's and ink and

17:24:09  17  they get to take it or you've had enough and they get to take

17:24:13  18  it.

17:24:13  19       **THE COURT:**  Look, you know, I've been thinking about

17:24:15  20  this right along and since I first saw the issue, one

17:24:20  21  alternative would be for me to retain my own expert, at your

17:24:26  22  expense, I was hoping to avoid that, or to call the experts

17:24:29  23  tomorrow and let them be examined on the witness stand, and I

17:24:33  24  was hoping to avoid that by propounding the questions I

17:24:38  25  propounded to Mr. Snyder to get to the bottom of why these

17:24:43  1    additional samples are necessary.

17:24:44  2          On the one hand, if I -- if I error on your side, I'm

17:24:52  3    potentially compromising -- I've been asked to throw a dart in

17:24:55  4    the closet.  You're compromising the Defendants' ability to

17:24:59  5    defend.  And looking for the prejudice to your side from the

17:25:03  6    comment I just made in terms of seeing whether you -- it's hard

17:25:09  7    as a non-expert to see how there would be any compromising if

17:25:14  8    two more dots were made, but as you said, then your people would

17:25:17  9    need more if you're getting more.

17:25:20 10          But against that, you do have this whole high-profile

17:25:24 11    image that was done of this document to preserves ultimately for

17:25:28 12    the trier of facts the ability to assess what this looks like.

17:25:31 13          And I understand there's nothing like the best

17:25:34 14    evidence of the document itself.  Arguably under the best

17:25:38 15    evidence rule, I don't know what will happen.  You've got the

17:25:41 16    burden.

17:25:41 17          I don't know whether they'll stipulate weight that if

17:25:45 18    for some reason additional tests, if you will, would make this

17:25:54 19    -- potentially make it difficult for the trier of fact to

17:25:56 20    examine the physical document itself and assess it's

17:26:00 21    authenticity versus use of a copy of an image copy.  I don't

17:26:10 22    know what the answer to that is, I'm trying to be fair.

17:26:16 23          In the absence of a -- well, of course in fairness you

17:26:21 24    didn't know what your position was going to be.  Your expert

17:26:25 25    really hasn't had a chance to say whether he agrees or disagrees

17:26:27  1   with that and conceivably would need more samples.

17:26:28  2        **MR. LAKE:**  We don't even know what tests -- the only

17:26:31  3   test that we know that they're planning on taking is a extremely

17:26:38  4   sensitive and precise chemical testing.

17:26:40  5        **THE COURT:**  I assume you have to draw out a piece of

17:26:44  6   the paper with the ink for that.

17:26:46  7        **MR. SNYDER:**  Mr. Stewart --

17:26:47  8        **THE COURT:**  Although, all you're doing is putting some

17:26:50  9   sort of a, you know, magic x-ray on it or laser beam on it or

17:26:55  10  something.

17:26:56  11       **MR. SNYDER:**  Mr. Stewart knows full-well what

17:27:06  12  testing --

17:27:06  13       **THE COURT:**  Then you wouldn't compare the document at

17:27:06  14  all.

17:27:06  15       **MR. SNYDER:**  Mr. Stewart knows full-well several

17:27:07  16  things because Mr. Lyter attests to it and Mr. Stewart doesn't

17:27:12  17  contest it.

17:27:13  18       He knows, first of all, that there are -- there is the

17:27:17  19  high-resolution scanned image.  Second, forensic document

17:27:24  20  examiner often and commonly extract a great percentage of ink

17:27:25  21  available in the document than what we're proposing here.

17:27:29  22       And finally, in terms of burden, we've given -- and he

17:27:32  23  also knows full-well what chemical testing we want to conduct

17:27:35  24  because experts in this field know that there are certain

17:27:39  25  chemical tests that you do, that you perform, to test and date

17:27:44  1   ink and the concentration of various chemicals in the ink.

17:27:50  2        So he knows what tests we're going to conduct and he

17:27:54  3   knows that those are commonly performed and he knows that

17:27:57  4   document examiners often take much more ink than would be taken

17:28:01  5   here.

17:28:02  6        And if you look at our showing, it's specific and

17:28:05  7   focused and all he says is that it will compromise the physical

17:28:10  8   integrity of the document, which is meaningless.

17:28:13  9        We don't know what he means.  Does that mean you're

17:28:16 10   not going to be read the writing?  Does that mean -- it's a

17:28:19 11   meaningless verbiage.

17:28:20 12        **THE COURT:**  Fine.  Fine.  Anything further?

17:28:22 13        **MR. LAKE:**  Yes, Your Honor, a couple things.  First,

17:28:26 14   just because they think that my expert may know what kind of

17:28:30 15   test they're conducting is not a good reason too tell us what

17:28:35 16   testing so we can respond this.

17:28:38 17        They do this a lot.  They come back for a second bite

17:28:42 18   of the apple.  They don't ask for a Gmail account and then they

17:28:42 19   come back and ask for it.

17:28:44 20        They -- we say we can come to the Court and come up

17:28:46 21   with a protocol for ink samples, but they'd rather do their test

17:28:51 22   and come back for more.  We've seen this pattern over and over

17:28:53 23   so far they have been very successful with it.

17:28:57 24        Here's my concern:  They're supposed to have their

17:28:59 25   reports out September 6th.  If their expert report comes out

17:29:04   1    September 6th and says I didn't have enough ink --

17:29:05   2            **THE COURT:**  Where does that date come from?

17:29:07   3            **MR. SNYDER:**  That's in the old order.  We're going to

17:29:10   4    need to address the date.

17:29:12   5            **THE COURT:**  The July 1st order.

17:29:14   6            **MR. LAKE:**  That's when their reports come out.

17:29:14   7            **MR. SNYDER:**  September 9th is when, assuming

17:29:19   8    compliance, we were required to give our report.

17:29:21   9            **THE COURT:**  Go ahead.

17:29:22  10            **MR. LAKE:**  Anyway, they haven't shown to me any reason

17:29:29  11    to take it with specificity.  They haven't shown any reason for

17:29:35  12    urgency.  They haven't given any reason why they can't come back

17:29:39  13    after their report is issued and we can see what their experts

17:29:41  14    are actually saying instead of a declaration saying I want more

17:29:45  15    because I want more ink and I want to do some sort extremely

17:29:48  16    sensitive testing.

17:29:50  17            They have had an opportunity to come before this Court

17:29:52  18    before and they didn't.  They had an opportunity to negotiate

17:29:56  19    protocol with our experts and they did.  They had a opportunity

17:29:58  20    to take a lot of ink samples and they did.  They had a chance to

17:30:03  21    conduct whatever tests they wanted on that ink and presumably

17:30:06  22    they did.

17:30:06  23            They are obligated to come up with their findings and

17:30:09  24    if their findings are that the tests that they did are

17:30:14  25    inconclusive or that the amount ink that they were able to

17:30:16  1    take --

17:30:17  2         **THE COURT:**  Well, you should be actually heartened by

17:30:19  3    the fact that they are not conclusive.

17:30:21  4         **MR. LAKE:**  We can infer that.

17:30:22  5         **THE COURT:**  I think if they felt they had established

17:30:25  6    that these signatures and initialings are refabrications, they

17:30:30  7    would be done.  They wouldn't be asking for additional samples.

17:30:33  8         But the fact that they feel the need for additional

17:30:35  9    samples, somebody might infer that they are having difficulty

17:30:38  10   reaching the conclusion that the Defendants would like them to

17:30:41  11   reach.

17:30:42  12        **MR. LAKE:**  They've already admitted that the ink on

17:30:44  13   page two is from 2003.  We know that because they're claiming

17:30:51  14   that the scan TIFF page two is what they like to call the

17:30:55  15   authentic contract --

17:30:56  16        **MR. SNYDER:**  Your Honor, just to highlight a point --

17:30:59  17        **THE COURT:**  That's why I focused on the MZ initials --

17:31:02  18        **MR. SNYDER:**  Your Honor, if I could focus on this and

17:31:05  19   it's critical.  What our experts have no concluded without any

17:31:09  20   question of clarity is that this document, they speak in terms

17:31:13  21   of likely, likely underwent artificial treatment, light, heat

17:31:19  22   and chemicals to create the appearance of a document that is

17:31:23  23   older than it is --

17:31:25  24        **THE COURT:**  A document --

17:31:26  25        **MR. SNYDER:**  -- to dry ink and to do other things.

17:31:30  1   That's why the ink testing is critical because it has to be seen

17:31:34  2   our request in the context of the other findings about what was

17:31:38  3   done to this document that creates this suspicious

17:31:46  4   golden-brownish ink and discoloration and all sorts of other

17:31:50  5   things --

17:31:50  6        THE COURT:  So these additional things are focused on

17:31:54  7   that.

17:31:55  8        MR. SNYDER:  No, it's focused on the ink.

17:31:55  9        MR. LAKE:  They haven't presented that in any of their

17:31:57 10   motions or declarations or anything.  How do I respond to that?

17:32:05 11        THE COURT:  Do you think Mr. Stewart can rebut what he

17:32:08 12   just said if he's given a chance to?

17:32:10 13        MR. LAKE:  He's talking about artificial aging.  He's

17:32:14 14   not talking about why they're going to take ink samples.

17:32:22 15        THE COURT:  I meant to ask this question about the age

17:32:25 16   of the documents.  What's the name of the law firm that he

17:32:28 17   mailed this original document to?

17:32:30 18        MR. SNYDER:  He emailed it to Sidley and Austin, which

17:32:33 19   is an international firm based in Chicago, in March of 2004.

17:32:39 20        THE COURT:  That's Mr. Cole?

17:32:41 21        MR. SNYDER:  Mr. Cole.  He emailed the authentic

17:32:47 22   contract.  Mr. Cole was actually a member of StreetFax, LLC and

17:33:01 23   it's unclear --

17:33:01 24        THE COURT:  Whether he was even being consulted as an

17:33:01 25   attorney.

17:33:01  1          **MR. SNYDER:**  What we do know --

17:33:01  2          **THE COURT:**  Well, he was, but he wasn't being

17:33:02  3  consulted as an attorney.

17:33:04  4          **MR. SNYDER:**  At least on the face of the email he

17:33:06  5  certainly wasn't.

17:33:07  6          **THE COURT:**  So it wasn't as if Mr. Ceglia didn't have

17:33:10  7  a professional relationship with Sidley and Austin.

17:33:14  8          **MR. SNYDER:**  He had a professional relationship with

17:33:17  9  Mr. Cole.  We're not aware --

17:33:18  10          **THE COURT:**  A business relationship.

17:33:19  11          **MR. SNYDER:**  We're not aware of what the relationship

17:33:23  12  was or wasn't.  We're aware that Sidley and Austin has the

17:33:24  13  authentic contract on its email server and it's been sitting

17:33:27  14  there since 2004.  That we are aware of.  A fact that

17:33:31  15  Mr. Ceglia --

17:33:31  16          **THE COURT:**  Mr. Cole was operating as a business

17:33:34  17  person, but using law firm facilities?

17:33:36  18          **MR. SNYDER:**  We don't know.

17:33:36  19          **MR. LAKE:**  Your Honor, all of these assertions are

17:33:41  20  being made by Mr. Snyder today.  We have not seen any

17:33:44  21  declarations along these lines.  We have not taken any

17:33:48  22  depositions.  We have not had any documents produced.  All we

17:33:51  23  have had is whatever Mr. Snyder has --

17:33:51  24          **THE COURT:**  One of the reasons for the accelerated

17:33:54  25  discovery in the first place was to get at the bottom of the

17:33:57  1   allegation that this is a fraud and that's what we're going to

17:34:00  2   do.

17:34:00  3        **MR. SNYDER:**  And on that point, Your Honor, there is

17:34:03  4   something --

17:34:03  5        **THE COURT:**  Or not.  There is a reasonable question of

17:34:04  6   fact about it.

17:34:05  7        **MR. SNYDER:**  There is something about the Sidley and

17:34:09  8   Austin question that we want to address to Your Honor, which we

17:34:14  9   think is highly pertinent --

17:34:15  10       **THE COURT:**  Can I rule first?

17:34:15  11       **MR. SNYDER:**  Yes.

17:34:16  12       **THE COURT:**  I'm granting the Defendants' request for

17:34:18  13  the reasons stated, put that in your order as well, per

17:34:25  14  Mr. Lyter's request -- limited to Mr. Lyter's request.

17:34:29  15       **MR. SNYDER:**  Three brief things, Your Honor.  First,

17:34:32  16  on the Rule 11 certification, that's been unopposed --

17:34:33  17       **THE COURT:**  No, no.  Are you able to draft some

17:34:36  18  language in the order agreeing to that?

17:34:37  19       **MR. SNYDER:**  Yes.

17:34:38  20       **THE COURT:**  When are you going to do that?

17:34:40  21       **MR. SNYDER:**  We'll get that to you by 5:00 p.m.

17:34:45  22  tomorrow.

17:34:45  23       **THE COURT:**  10:00 a.m.

17:34:46  24       **MR. SNYDER:**  10:00 a.m. tomorrow.

17:34:46  25       **THE COURT:**  Right.

17:34:47  1          **MR. SNYDER:**  Whatever Your Honor says.

17:34:50  2          **THE COURT:**  And what about the date for the ultimate

17:34:54  3  disclosure?

17:34:54  4          **MR. SNYDER:**  There are two things, Your Honor.  We

17:34:56  5  would say that right now under the old order that assumed

17:35:03  6  compliance --

17:35:03  7          **THE COURT:**  Just tell me what the new date is.

17:35:05  8          **MR. SNYDER:**  We could put that in the order.  Sometime

17:35:09  9  later in September.

17:35:17  10          **THE COURT:**  The order calls for you advising the Court

17:35:21  11  the results of the report, all reports documenting the

17:35:26  12  examination of the hard copy documents and electronic access.

17:35:32  13          **MR. SNYDER:**  We would like to submit the report which

17:35:35  14  will likely be a motion.

17:35:36  15          **THE COURT:**  I'm not inviting your motion.

17:35:39  16          **MR. SNYDER:**  30 days after the Plaintiff complies with

17:35:42  17  the order, which we anticipate will be sometime later in

17:35:45  18  September.

17:35:46  19          **THE COURT:**  30 days after they comply?

17:35:48  20          **MR. SNYDER:**  Yes.

17:35:48  21          **THE COURT:**  Now, how are those going to physically

17:35:51  22  comply?  They have to get the document out of the safety deposit

17:35:56  23  bank and meet you somewhere?

17:35:56  24          **MR. ARGENTIERI:**  I believe Dr. Lyter can come to

17:36:02  25  Hornell.  He brought the equipment to Buffalo.

17:36:04  1          THE COURT:  Well, whatever you can work out.

17:36:04  2          MR. FLYNN:  We did all the testing at Harris Beach, we

17:36:10  3  can do it there again.

17:36:11  4          MR. LAKE:  We did that to accommodate them.  If they

17:36:16  5  want to take more testing, the documents in Hornell.

17:36:18  6          MR. ARGENTIERI:  It's not going to take very long,

17:36:21  7  Judge.  It's just going to take maybe an hour to take these

17:36:24  8  samples.

17:36:24  9          MR. FLYNN:  You accommodated us --

17:36:27 10          THE COURT:  Somebody's going to have to drive.

17:36:29 11          MR. ARGENTIERI:  I just said Dr. Lyter.

17:36:29 12          MR. SNYDER:  This Plaintiff had filed a lawsuit in

17:36:37 13  this district, it's in this district --

17:36:37 14          MR. ARGENTIERI:  It is in the district.

17:36:39 15          THE COURT:  Wherever you do it, where did you -- do it

17:36:44 16  at Harris and Beach just like you did the other testing.  Put

17:36:50 17  that in the order.

17:36:50 18          Now, quickly because --

17:37:02 19          MR. SNYDER:  Two things quickly.  To Rule 11

17:37:06 20  certification is unopposed and we're going to put that in the

17:37:10 21  order --

17:37:10 22          THE COURT:  I don't understand that.  Why don't you

17:37:12 23  just make a motion, if you feel so inclined?  And can under

17:37:15 24  second circuit law there be a dismissal be of a sanction?

17:37:18 25          MR. SNYDER:  Yes, under this Court's inherent power --

17:37:23  1          **THE COURT:**  Well, no, I'm talking about Rule 11.

17:37:23  2          **MR. SNYDER:**  Rule 11 -- we believe these two attorneys

17:37:23  3   who are appearing in this case and have not yet signed a

17:37:28  4   pleading should be required to certify pursuant to Rule 11 --

17:37:29  5          **THE COURT:**  Look, I understand what Rule 11 says.  I'm

17:37:32  6   just trying to get at this.

17:37:33  7          **MR. SNYDER:**  They could be personally sanctioned for

17:37:36  8   maintaining --

17:37:37  9          **THE COURT:**  And the Plaintiff can be sanctioned in

17:37:40 10   effect by having the case dismissed.

17:37:43 11          **MR. SNYDER:**  Correct, but he can also be personally

17:37:46 12   sanctioned under other rules of the Court.

17:37:46 13          **THE COURT:**  I just want to focus on the Rule 11.  Why

17:37:51 14   can't you simply -- why do you need me to direct them to show

17:37:54 15   cause of why they shouldn't be held in violation of Rule 11 when

17:37:59 16   Rule 11 has its own very discreet procedural requirements?  I

17:38:09 17   just want to understand why it's part of this motion.

17:38:09 18          **MR. SNYDER:**  Because we believe --

17:38:09 19          **THE COURT:**  You can make the motion on your own.  You

17:38:16 20   don't need my permission --

17:38:16 21          **MR. SNYDER:**  If these gentlemen would agree that they

17:38:18 22   would not oppose the Rule 11 motion on the basis that they have

17:38:23 23   not signed a plea, then we would not require a Rule 11

17:38:27 24   certification.

17:38:28 25          But we believe that having not signed the amended

17:38:33  1    complaint, Mr. Argentieri did not sign it, that these men may

17:38:37  2    have as a defense if we move for sanctions under Rule 11, that

17:38:41  3    they didn't sign a plea --

17:38:41  4         **THE COURT:**  I thought you cited case law that the Rule

17:38:48  5    11 breaches subsequently appearing counsel who is relying on an

17:38:58  6    advocate -- who advocates on and relies on from a previously

17:39:01  7    filed document.  I thought you told me that was prevailing case

17:39:13  8    law.

17:39:13  9         **MR. SNYDER:**  We did.

17:39:13  10        **THE COURT:**  If that's true, why couldn't you just make

17:39:13  11   a motion?  Why do you have to get me involved at this point?

17:39:13  12        **MR. SNYDER:**  Because we believe having consulted civil

17:39:15  13   procedure experts that the better practice, and many judges

17:39:19  14   require that subsequently appearing attorneys certify under Rule

17:39:24  15   11 that they have a reasonable basis to prosecute a complaint

17:39:28  16   that they haven't signed.

17:39:30  17        And we would have no request for this if they would

17:39:32  18   simply in open court represent to Your Honor that they would not

17:39:37  19   oppose Rule 11 motions on the grounds that they didn't

17:39:40  20   physically sign the amendment.

17:39:42  21        But I can assure, Your Honor --

17:39:42  22        **THE COURT:**  If they say that on the record, then you

17:39:42  23   won't make the ruling?

17:39:45  24        **MR. SNYDER:**  Correct.  I can assure they won't say it

17:39:47  25   on the record though.

17:39:49  1        **THE COURT:**  Do you want to respond to that?

17:39:51  2        **MR. LAKE:**  All I can say --

17:39:53  3        **THE COURT:**  Excuse me.  I'm not going to force an

17:39:56  4   officer of the Court to say things that they don't want to say.

17:39:59  5   You heard me.  If he wants me make a motion, it's just one more

17:40:05  6   motion.  If you want to avoid that by making some statements on

17:40:10  7   the record, feel free, but I'm not directing you to.

17:40:11  8        **MR. LAKE:**  Your Honor, I've tried to avoid being here

17:40:14  9   today.  I've tried to comply with everything they've asked for.

17:40:18 10   So far, everything that I've done has been rejected and there's

17:40:22 11   been motions filed all along the way.

17:40:22 12        If they're filing a Rule 11 motion, they're going to

17:40:25 13   do it anyway.  They might as well just file their motions just

17:40:28 14   like they've filed everything else.

17:40:28 15        **THE COURT:**  All right.  That request is denied without

17:40:32 16   prejudice.

17:40:32 17        **MR. SNYDER:**  The final thing, Your Honor, is that we

17:40:35 18   would request that Your Honor permit us to issue a subpoena to

17:40:40 19   Sidley and Austin tomorrow.

17:40:41 20        **THE COURT:**  Is that in the papers?

17:40:43 21        **MR. LAKE:**  No.

17:40:43 22        **MR. SNYDER:**  No, this is a new request, Your Honor.

17:40:46 23   But it is because we just discovered on the Sidley and Austin

17:40:51 24   email severer the authentic complaint.

17:40:54 25        Your Honor has overruled any privileged objections to

17:40:59  1   that, those emails, and the attachments, any confidentiality

17:41:01  2   objections.  I spoke to Sidley and Austin --

17:41:04  3         **THE COURT:**  Can we take the ADR issue first?  I was

17:41:07  4   waiting for you to tell me that you're moving for me to --

17:41:13  5   excuse me.  No, that's their motion.  I'm sorry.  It is your

17:41:18  6   turn.  I apologize.

17:41:19  7         **MR. SNYDER:**  So sitting on the Sidley and Austin sever

17:41:22  8   is the authentic contract and the two emails to that attachment.

17:41:25  9         **THE COURT:**  Well, it's a document that you claim is

17:41:28 10   the authentic document.

17:41:29 11         **MR. SNYDER:**  Sidley and Austin is prepared to --

17:41:32 12         **THE COURT:**  Why don't they?

17:41:33 13         **MR. SNYDER:**  Because they want a subpoena, they're a

17:41:35 14   law firm.  And there was litigation about its confidentially and

17:41:39 15   the privileged nature so we either want an order permitting them

17:41:44 16   to turn over in light of the overruling of the privilege and

17:41:50 17   confidentiality objection to --

17:41:52 18         **THE COURT:**  What about Rule 45?

17:41:53 19         **MR. SNYDER:**  We would like to issue a subpoena, but

17:41:55 20   there is a stay of discovery, except as ordered by this Court so

17:41:58 21   we would civilly request that we be permitted to issue a

17:42:02 22   subpoena.

17:42:02 23         **THE COURT:**  Pursuant to Rule 45.

17:42:03 24         **MR. SNYDER:**  Pursuant to Rule 45.  They will produce

17:42:04 25   to the Plaintiff and the to Defendant the emails and attachments

17:42:09  1   which the Plaintiff already produced on his computers to us so

17:42:15  2   we can --

17:42:15  3            **THE COURT:**  Does Mr. Lake know about this?

17:42:18  4            **MR. SNYDER:**  Yes, he does because he called Sidley and

17:42:22  5   Austin and was trying to interfere with their giving us that

17:42:25  6   document.

17:42:26  7            **MR. LAKE:**  Oh, come on.  Are you kidding?

17:42:28  8            **MR. SNYDER:**  I'm not kidding.

17:42:31  9            **MR. LAKE:**  I got a call from somebody I've never met

17:42:34 10   and I returned a call.  That's all I've done.  I haven't talked

17:42:35 11   to anyone.

17:42:35 12            **THE COURT:**  So you deny that you interfered?

17:42:38 13            **MR. LAKE:**  Yeah.

17:42:39 14            **THE COURT:**  So you oppose the request?

17:42:41 15            **MR. LAKE:**  Of course.

17:42:42 16            **THE COURT:**  Because?

17:42:43 17            **MR. LAKE:**  Because we have a stay on discovery because

17:42:43 18   we're trying to get through the expedited discovery and when

17:42:46 19   that's done, if they want to file a subpoena then they can.

17:42:49 20            **THE COURT:**  Why do you need it as part of expedited

17:42:52 21   discovery on the purpose of whether this is a fabrication or

17:42:56 22   not?

17:42:56 23            **MR. SNYDER:**  Because sitting on the Sidley and Austin

17:43:00 24   computer server since 2004 is the StreetFax contract which is

17:43:00 25   the authentic and completely dissimilar to the contract attached

17:43:06  1    to the complaint.

17:43:06  2          **THE COURT:**  Well, how does getting that help you to

17:43:09  3    prove fabrication?

17:43:10  4          **MR. SNYDER:**  It's proof positive that the Plaintiff in

17:43:15  5    2004 described his contract with Mark Zuckerberg to be a

17:43:20  6    StreetFax contract, the copy of which we have says nothing

17:43:23  7    about --

17:43:23  8          **THE COURT:**  You already know that this document that's

17:43:26  9    on their can the computer storage system is what is it is.  The

17:43:30 10    Plaintiff's saying --

17:43:30 11          **MR. SNYDER:**  The Plaintiff says.

17:43:31 12          **THE COURT:**  They disclosed and it's not privileged per

17:43:35 13    my order.  And Mr. Lake has not able to -- or not pursuing this

17:43:42 14    issue.  And Judge Arcara --

17:43:43 15          **MR. SNYDER:**  Mr. Lake has said to Your Honor --

17:43:45 16          **THE COURT:**  So I'm not sure what --

17:43:46 17          **MR. SNYDER:**  -- and the Plaintiff has said to the

17:43:49 18    world that we planted that on their computer.  Getting it from

17:43:53 19    Sidley and Austin is the death nail in the argument because it's

17:44:00 20    been on their computer for seven years.

17:44:03 21          **MR. LAKE:**  How do we know that?

17:44:04 22          **THE COURT:**  How do we know that?  Well, I suppose

17:44:06 23    that's a fair question, but it doesn't really answer whether he

17:44:10 24    should be entitled to get whatever is out there at this time and

17:44:14 25    make whatever arguments he wants to make about it.

17:44:16  1          If Sidley and Austin want to pursue a cross motion in

17:44:22  2   the district of Chicago, we can issue a subpoena out of that

17:44:24  3   district under Rule 45, I believe.

17:44:27  4          **MR. SNYDER:**  Or this one.  We can issue it here or

17:44:38  5   there.  100 miles.

17:44:38  6          **THE COURT:**  Well, Chicago's more than 100 miles away.

17:44:47  7          **MR. SNYDER:**  They just need a subpoena.  That's it.

17:45:04  8          **THE COURT:**  I don't see any harm in it.  The request

17:45:06  9   is granted and proceed accordingly.  It wouldn't affect the

17:45:13 10   September disclosure on expert testimony.

17:45:27 11          **MR. SNYDER:**  No.  And on that, Your Honor September

17:45:27 12   9th was the date in original order and what we request is that

17:45:27 13   we make our report to the Court 30 days after compliance.

17:45:32 14          **THE COURT:**  I think 30 days is fine.  All right.

17:45:41 15   Let's finish up.  One further request from the Plaintiff.

17:45:44 16          **MR. LAKE:**  This case was ordered for mediation before

17:45:47 17   I became involved.

17:45:52 18          **THE COURT:**  I don't know how that could have happened.

17:45:55 19   It wasn't referred to me until after the remanned issue was

17:45:59 20   resolved.  We'll find out in a second.

17:46:05 21          **THE CLERK:**  It was automatically referred to mediation

17:46:09 22   July 9th, 2010.

17:46:11 23          **THE COURT:**  Was that when the referral was made?

17:46:13 24          **THE CLERK:**  No, no.  The notice of removal from state

17:46:17 25   clerk to here it's automatically referred to mediation.

17:46:21  1          **THE COURT:**  I see.

17:46:22  2          **THE CLERK:**  So whenever it's active.

17:46:25  3          **THE COURT:**  I understand.  I would not have expected

17:46:28  4  that because of the remanned motion, but whatever.

17:46:31  5          **MR. SNYDER:**  It was a stay of Rule 16 though, Your

17:46:35  6  Honor, that was issued subsequently.

17:46:37  7          **THE COURT:**  This mediation operates on a -- but it's

17:46:41  8  not stay discovery.

17:46:41  9          **MR. SNYDER:**  No.

17:46:43 10          **THE COURT:**  So what's your concept here?

17:46:45 11          **MR. LAKE:**  My concept here is if you believe

17:46:48 12  everything that you heard today --

17:46:49 13          **THE COURT:**  Yes.

17:46:49 14          **MR. LAKE:**  -- that this case should resolve and that

17:46:53 15  we should begin --

17:46:53 16          **THE COURT:**  Why do you say that?

17:46:55 17          **MR. LAKE:**  Because the Plaintiffs are at the pinnacle

17:46:57 18  of where they believe they will be.

17:46:59 19          **THE COURT:**  No, I don't have to believe everything

17:47:01 20  that they've said is true.  What I have to believe is that there

17:47:05 21  is a colorable basis that is sufficient to proceed with this

17:47:09 22  accelerated discovery and that's all I have found.

17:47:13 23          **MR. LAKE:**  Okay.

17:47:14 24          **THE COURT:**  I don't believe anything at this point as

17:47:16 25  far as this case is concerned.  I believe the Defendant has made

17:47:20  1    out enough of a showing to warrant accelerated discovery and

17:47:25  2    that's all I have found.

17:47:25  3         **MR. LAKE:**  Okay.  Fair enough and thank you.  I

17:47:28  4    appreciate that.

17:47:28  5         The reason I made that request is because despite the

17:47:37  6    Defendants' continued position that they will litigate this case

17:47:40  7    until their death unless they get a dismissal of prejudice.

17:47:44  8         I think every client, not attorney, but actual client

17:47:46  9    needs to determine whether or not any litigation is based and

17:47:49 10    should be resolved as a matter of principal or as a matter of

17:47:53 11    economics.

17:47:54 12         And that if the Plaintiffs are truly in the position

17:47:56 13    that they believe they are in at this moment, that they should

17:47:59 14    invite mediation.

17:48:06 15         **THE COURT:**  Defendants.

17:48:06 16         **MR. LAKE:**  Defendants, excuse me.  True for the

17:48:09 17    Plaintiff too.  We are about to conclude --

17:48:09 18         **THE COURT:**  You're the one that's raised it so I'm

17:48:13 19    assuming that you are requesting it?

17:48:15 20         **MR. LAKE:**  Right.

17:48:15 21         **THE COURT:**  That's the way I read your papers.

17:48:17 22         **MR. LAKE:**  Right.  And what I was going to say is that

17:48:18 23    we are about to conclude the expert --

17:48:19 24         **THE COURT:**  Why don't we have that request in front of

17:48:25 25    us before we go on?

17:48:26  1          **MR. LAKE:**  We should have.  If I was here, I would

17:48:28  2      have made it.

17:48:31  3          **THE COURT:**  Well, you were.

17:48:31  4          **MR. LAKE:**  No, I came in the day the motion, if you

17:48:34  5      recall.  All the papers were filed by the time I got here.

17:48:35  6          **THE COURT:**  There was no mention of it.

17:48:40  7          **MR. LAKE:**  No.

17:48:40  8          **THE COURT:**  Was that on your mind.

17:48:42  9          **MR. LAKE:**  It's always on my mind.

17:48:44 10          **THE COURT:**  At that time?

17:48:45 11          **MR. LAKE:**  At that time we hadn't conducted the

17:48:48 12      discovery and I hadn't had an opportunity to even review the

17:48:50 13      case file from the lawyers.  I was completely in the dark.

17:48:53 14          **THE COURT:**  Fair enough.  Fair enough.

17:48:54 15          **MR. LAKE:**  If you recall, I was in the case 48 hours.

17:48:58 16          **THE COURT:**  Mr. Ceglia had confident counsel

17:49:02 17      throughout and Mr. Argentieri is here and we appreciate that, he

17:49:04 18      is what was the name of the law firm that filed the --

17:49:07 19          **MR. LAKE:**  DLA Piper.

17:49:11 20          **THE COURT:**  Is that formally Piper Marbury perhaps?

17:49:15 21          **MR. LAKE:**  Yes.  They merged with Gray Carey and

17:49:18 22      another firm.

17:49:19 23          **THE COURT:**  They certainly knew about the ADR and made

17:49:24 24      no effort to launch that.

17:49:26 25          **MR. LAKE:**  As Mr. Snyder very correctly pointed out, I

17:49:32  1    can't speak for them.

17:49:32  2         **THE COURT:**  I understand.

17:49:33  3         **MR. LAKE:**  So my request is this:  We are about to

17:49:37  4    conclude the expedited portion of the discovery.  We are about

17:49:40  5    to begin a full-blown discovery effort on our own upon the

17:49:45  6    Defendants.

17:49:45  7         **THE COURT:**  No, you aren't because there's a stay, is

17:49:47  8    that not true?

17:49:48  9         **MR. LAKE:**  Once that's done, we'll have our Rule 26

17:49:52 10    and --

17:49:52 11         **THE COURT:**  You have request to it or you'll have a

17:49:54 12    Rule 16.  Or we're going to have a motion, at least that's what

17:49:58 13    I'm gathering, that is going to confront me pretty soon.

17:50:02 14         **MR. LAKE:**  That's exactly my point.  Why should we go

17:50:05 15    through all that if this case can resolve.  We don't know that

17:50:06 16    unless the clients have an opportunity to decide how they want

17:50:08 17    to pursue at this time.

17:50:10 18         I think we're at a critical juncture.  I think this is

17:50:13 19    a good time that if the Plaintiff truly believes in their

17:50:15 20    decision they can assert that in a mediation, then why don't we

17:50:17 21    give a shot at resolving this case?  If it's a matter of

17:50:23 22    principal --

17:50:23 23         **THE COURT:**  Do you have an answer to that?

17:50:25 24         **MR. LAKE:**  If it's a matter of economics --

17:50:28 25         **MR. SNYDER:**  Yes, Your Honor.

17:50:29  1        **THE COURT:**  I realize that we do have a mediation

17:50:32  2  program.  I had not understood that this case had already been

17:50:35  3  referred to it.  People don't need the Court's mediation to

17:50:39  4  mediate obviously.

17:50:41  5        **MR. SNYDER:**  To be clear, my client has no interest in

17:50:45  6  mediating or resolving this case.  We believe that this case is

17:50:49  7  a serious and egregious fraud on the Court that goes not only to

17:50:55  8  the integrity of the judicial process, but has victimized my

17:51:04  9  clients, their employees, their shareholders and the public.

17:51:04 10        There is no basis for mediation.  We believe this case

17:51:07 11  will be ripe for dismissal upon Plaintiff's compliance with the

17:51:12 12  expedited discovery order.

17:51:13 13        We believe that there will be no basis under

17:51:16 14  controlling second circuit law for full-blown discovery given

17:51:21 15  the fraud in the Court that has been presented to the Court and

17:51:24 16  will be presented to the Court and the other discovery of uses

17:51:28 17  and misconduct --

17:51:29 18        **THE COURT:**  Those have nothing to do with mediation.

17:51:32 19        **MR. SNYDER:**  And therefore, there is no need to

17:51:36 20  mediate because we will not, my clients, settle or resolve this

17:51:40 21  case short of the Plaintiff dismissing the case with prejudice

17:51:45 22  and even then we might not consent to that unless they pay costs

17:51:52 23  and attorney fees.

17:51:53 24        **MR. LAKE:**  Your Honor, if he's saying that --

17:51:55 25        **THE COURT:**  You would not consent to what?

17:52:00  1        **MR. SNYDER:**  We're not going to consult with my client

17:52:05  2   because we don't even consent to a dismissal with prejudice of

17:52:05  3   attorney fees and cost.

17:52:08  4        Meaning to say, if they were prepared tomorrow to

17:52:12  5   dismiss this case with prejudice, as long as we waive fees and

17:52:13  6   cost, I know that Mr. Stretch and I would have a long

17:52:18  7   conversation has he would with his principals about whether that

17:52:20  8   was acceptable to us.

17:52:21  9        **THE COURT:**  I understand.  Again, I don't want to be

17:52:24 10   too technical, especially at the hour we're at here, but there

17:52:27 11   is no motion to opt out of mediation, it has been literally --

17:52:35 12   in Judge Arcara's order, literally right from the beginning.

17:52:40 13        So on the other handled I suppose that we've stayed

17:52:44 14   discovery and we stayed the --

17:52:46 15        **MR. SNYDER:**  And we understood, Your Honor, the ADR

17:52:48 16   deadlines being tied to Rule 16 under the Court's order, which

17:52:54 17   is why we assumed that everything had been stayed but that which

17:52:59 18   is the proceeding pursuant to Your Honor's order.

17:53:02 19        **THE COURT:**  I understand.

17:53:02 20        **MR. LAKE:**  Your Honor, if he is saying his client is

17:53:04 21   unwilling to negotiate this case in good faith, we know where we

17:53:10 22   stand.  We are willing to sit down and be open and honest and be

17:53:15 23   frank --

17:53:15 24        **THE COURT:**  Well, why didn't you do that without a

17:53:18 25   mediator?

17:53:19   1          MR. LAKE:  Because if we have a mediator here, then we

17:53:22   2   are going to be under mediation contact.  If defense counsel

17:53:27   3   wants to me meet with me privately.

17:53:31   4          THE COURT:  I'm not speaking out of turn here, but

17:53:33   5   obviously the parties can always settle a case.  All you have to

17:53:37   6   do is send Mr. Snyder a demand.

17:53:40   7          MR. LAKE:  Right, but I think with the presence of a

17:53:45   8   mediator it would go a long way.  And if Mr. Zuckerberg is

17:53:48   9   personally unwilling to attend, then we can talk about that and

17:53:51  10   have him available --

17:53:51  11          THE COURT:  Mr. Ceglia would come in from Ireland.

17:53:55  12          MR. LAKE:  If Mr. Zuckerberg will be here, he'll be

17:53:57  13   here.  If they want to --

17:53:58  14          THE COURT:  You didn't answer the question.

17:54:00  15   Mr. Ceglia will come in from Ireland?  Is he changing his

17:54:01  16   domicile or something?  Are you able to say?

17:54:04  17          MR. LAKE:  Well, I can't speak to that, but I will

17:54:07  18   tell you that if the Court orders the parties to a mediation

17:54:11  19   that he will be here to resolve the case.

17:54:14  20          THE COURT:  Is it is a extended vacation in Ireland.

17:54:18  21          MR. LAKE:  You'd have to ask him that.

17:54:18  22          THE COURT:  I thought you might know.

17:54:21  23          MR. LAKE:  I've talked to him about resolution and if

17:54:26  24   Mark Zuckerberg and Facebook are serious about resolving this

17:54:29  25   case, there are many, many good reasons and if I can make that

17:54:31  1    presentation to the Defendants and we have a mediator, I think

17:54:32  2    we can give a good run in resolving this case.

17:54:36  3            If they don't want to do that, they made that

17:54:38  4    statement, they want the case to go to the end of the appeal

17:54:41  5    process, now we know.  Now it will go forward.  I'm offering

17:54:46  6    this:  Negotiate in good faith.  We're willing to do it now.

17:54:51  7    Whatever they want to do.

17:54:52  8            **THE COURT:**  You wouldn't be willing to do that after

17:54:55  9    the expert reports are in?

17:54:57 10            **MR. LAKE:**  I think now is the best time to do that

17:55:02 11    and not just for my benefit, but for the defense's benefit

17:55:05 12    because there is a lot of information that we have that is

17:55:08 13    about to come out.  And I think they have the benefit to settle

17:55:12 14    now too.

17:55:12 15            **THE COURT:**  You have information that's about to come

17:55:15 16    out?  What do you mean by that?

17:55:17 17            **MR. LAKE:**  I think once we conduct discovery and we

17:55:20 18    turn over the information that we know exists that --

17:55:22 19            **THE COURT:**  I'm talking about the expert testimony.

17:55:25 20            **MR. LAKE:**  Oh, our experts have done testing too,

17:55:28 21    sure.  They're going to be able to respond to their report and

17:55:31 22    our experts have certainly conducted their investigation as

17:55:34 23    well, sure.

17:55:35 24            **THE COURT:**  That's right.  The order doesn't right

17:55:37 25    them to report it, only requires --

17:55:39  1     **MR. SNYDER:**  We will be filing a motion so the rules

17:55:42  2  will kick into gear and they will have their response time.  And

17:55:46  3  what we anticipate is that we will be filing a motion which

17:55:50  4  we'll attach as declarations or affidavits the findings of our

17:55:55  5  experts as it is relevant to the filing of fraud.

17:55:58  6     **MR. LAKE:**  Well, then the question of course is if

17:55:59  7  that is filed I will be under the presumption that their expert

17:56:02  8  report is going to be deemed confidential and not be made

17:56:05  9  available to the press because it includes information that is

17:56:09 10  the result of protected discovery.

17:56:13 11     **MR. SNYDER:**  We can address that down the line.  Yeah,

17:56:15 12  we disagree, but it's not right for presenting now.

17:56:19 13     **THE COURT:**  Are you saying that a mediation order for

17:56:23 14  this time would be futile?

17:56:34 15     **MR. SNYDER:**  Futile.  We have no interest in mediating

17:56:34 16  or settling this case.  Period.  With no disrespect to the Court

17:56:34 17  or its process.

17:56:35 18     **THE COURT:**  All right.  Well, it puts me in a little

17:56:39 19  awkward position because the program does contemplate mediation

17:56:41 20  after the motion to opt out, but there's been no motion to opt

17:56:43 21  out.

17:56:43 22     But considering that we're operating in a unusual

17:56:48 23  procedure here with how with this started with the accelerated

17:56:54 24  discovery, I'm reluctant to order a mediation procedure at this

17:56:58 25  time.

17:56:59  1        I'll take another look at it after the expert reports

17:57:02  2   are filed and see where we're at.  I'm not foreclosing it, but

17:57:06  3   listening to Mr. Snyder, I don't want to waste anybody's time.

17:57:10  4   That request is denied for the reason stated.

17:57:14  5        Anything further on behalf of the Plaintiff, Mr. Lake?

17:57:16  6        **MR. LAKE:**  I don't think so.

17:57:17  7        **THE COURT:**  Anything else for the Defendants,

17:57:20  8   Mr. Snyder?

17:57:21  9        **MR. SNYDER:**  No, thank you, the Court, for its time.

17:57:21 10        **THE COURT:**  Well, thank you for bearing with me and

17:57:30 11   we'll look forward to that order to come in tomorrow.

         12        **MR. LAKE:**  Thank you, Your Honor.

         13      (Proceedings concluded at 5:57 p.m.)

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

1                              INDEX

2                    DIRECT    CROSS    REDIRECT    RECROSS

3    WITNESSES FOR THE
        GOVERNMENT
4
     None
5

6    WITNESSES FOR THE
        DEFENSE
7
     None
8

9
     EXHIBITS                    MARKED        RECEIVED
10
     GOVERNMENT'S
11
     None
12

13   DEFENDANT'S

14   None

15

16

17

18

19

20

21

22

23

24

25

1  "I certify that the foregoing is a correct transcript from the

2  record of proceedings in the above-entitled matter."

3

4   S / Jolene Lamphier            August 22, 2011
    Signature                      Date

5

6  JOLENE LAMPHIER

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25