UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PAUL D. CEGLIA,

                Plaintiff,

      v.

MARK ELLIOT ZUCKERBERG and
FACEBOOK, INC.,

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Civil Action No. 1:10-cv-00569-RJA


**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR THIRD
MOTION TO COMPEL AND FOR OTHER RELIEF**


Thomas H. Dupree, Jr.
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
(202) 955-8500

Orin Snyder
Alexander H. Southwell
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue, 47th Floor
New York, NY 10166-0193
(212) 351-4000

Terrance P. Flynn
HARRIS BEACH PLLC
726 Exchange Street
Suite 1000
Buffalo, NY 14210
(716) 200-5120


October 14, 2011

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 4

ARGUMENT ...................................................................................................... 5

I.    THIS COURT SHOULD DIRECT CEGLIA TO COMPLY WITH THE COURT'S DISCOVERY ORDERS ....................................................... 5

    A.    Ceglia Must Identify And Produce His Removable Storage Devices .................................................................................... 5

    B.    Ceglia Must Consent To The Inspection Of The Adelphia Email Account ...................................................................................... 5

    C.    Ceglia Must Identify And Produce The Electronic Copies And Images Of The Purported Contract In The Possession Of His Experts Valery Aginsky and John Paul Osborn ......................... 6

    D.    Ceglia Must Produce Electronic Files In Their Native Format. ................. 8

    E.    Ceglia Must Provide A Detailed Account Of The Items He Has Lost Or Destroyed, Or That He Claims Do Not Exist. ............................ 10

    F.    The Court Should Overrule Ceglia's Grossly Improper "Privilege" Designations ........................................................................ 12

    G.    The Court Should Order Disclosure Of Additional Webmail Information ............................................................................ 14

II.    THE COURT SHOULD AWARD DEFENDANTS THEIR REASONABLE ATTORNEYS' FEES AND OTHER RELIEF. ....................... 15

CONCLUSION ................................................................................................. 16

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aguilar v. ICE,*
    255 F.R.D. 350 (S.D.N.Y. 2008) ............................................................. 9

*United States v. Int'l Bhd. of Teamsters,*
    111 F.3d 210 (2d Cir. 1997)................................................................... 14

*Victor Stanley, Inc. v. Creative Pipe, Inc.,*
    269 F.R.D. 497 (D. Md. 2010)................................................................. 9

## Statutes

28 U.S.C. § 1746 ............................................................................................. 5

## Other Authorities

Charles Alan Wright, Arthur R. Miller & Richard L. Marcus,
    8B FED. PRAC. & PROC. CIV. § 2219 (3d ed. 2011) .............................. 8

## Rules

Fed. R. Civ. P. 37......................................................................................... 3, 15

W.D.N.Y. R. 7 ................................................................................................ 4

## MEMORANDUM OF LAW

Defendants Mark Zuckerberg and Facebook, Inc. respectfully submit this memorandum of law in support of their third motion to compel compliance with this Court's discovery orders and for other relief.

## INTRODUCTION

As his case collapses around him, Paul Ceglia and his lawyers continue to obstruct the expedited discovery ordered by this Court on July 1. Indeed, in a set of extraordinary declarations, Ceglia's lawyers have now admitted under oath that their client has been instructing them to disobey this Court's discovery orders. *See* Declaration of Jeffrey A. Lake at ¶ 2 (Doc. No. 153-1) ("Mr. Ceglia instructed me not to comply with" the Court's August 18 Order); Declaration of Nathan A. Shaman at ¶ 3 (Doc. No. 153-2) ("Mr. Ceglia continued to refuse to comply with the August 18 Order.").[1] Ceglia's bad faith tactics have also included submitting false certifications, concealing documents he has specifically been ordered to produce, and destroying removable USB storage devices containing critical evidence.

Ceglia's misconduct has been aimed at covering up his fraud. But the limited expedited discovery Defendants have obtained to date has already uncovered smoking-gun evidence that

---

[1]    On September 28, 2011, this Court ordered Ceglia to show cause why sanctions should not be imposed for his "failure to fully and promptly" comply with the Court's August 18 discovery order. Doc. No. 152. On October 7, Ceglia's lawyers filed two sworn declarations in which they accused their client of instructing them to disobey this Court's discovery orders. Doc. No. 153. Today, Defendants will file their response, which will demonstrate that severe sanctions are warranted under Rule 37, and that Plaintiff's counsel may not hide behind Ceglia's brazen defiance of this Court. Indeed, the decision by Ceglia's lawyers to turn on their client and publicly accuse him of wrongdoing by disclosing their confidential communications with him — as part of an effort to protect themselves and shift the blame to their client — raises serious questions as to whether they have violated their professional duties and may continue to represent Ceglia in this matter.

the purported contract at the heart of this case is a fabrication — and that Ceglia compounded his crime by manufacturing fake emails between himself and Zuckerberg.  Discovery has also uncovered the <u>authentic</u> contract — a contract that concerns the defunct StreetFax website and has nothing to do with Facebook — embedded in the electronic data on Ceglia's computer.

The Court has already granted Defendants' two prior motions to compel and has directed Ceglia to show cause why he should not be sanctioned for his defiance of court orders.  This <u>third</u> motion has been necessitated by Ceglia's brazen refusal to produce several key categories of documents that this Court directed him to do initially in its July 1 Order — and then again in its August 18 Order, which directed Ceglia to cure his noncompliance with the July 1 Order.

Defendants respectfully ask this Court to order Ceglia to comply with six specific discovery obligations:

**First**, this Court ordered Ceglia to identify and produce all removable storage devices in his possession since June 30, 2010.  *See* August 18 Order at ¶ 2(F).  As the Court is well aware, Ceglia concealed the existence of many of these devices — some of which he used to manipulate key documents during the pendency of this lawsuit — and has now "lost" or destroyed this evidence.  Defendants have just uncovered <u>another</u> USB device recently used by Ceglia — one that he neither identified nor produced.  Defendants request an order compelling Ceglia to amend his certification and produce this device forthwith.

**Second**, this Court ordered Ceglia to provide access to all email accounts that he has used since 2003.  *See* August 18 Order at ¶ 5; September 28 Order at ¶ 2.  Ceglia still has not complied.  Specifically, he has not granted access to the Adelphia.net account that he used in 2004 to transmit the authentic contract.  Defendants request an order compelling Ceglia to provide the requisite consent immediately.

**Third**, this Court ordered Ceglia to produce electronic copies or images of the purported contract that are in the possession of his experts John Paul Osborn and Valery Aginsky.  *See* August 18 Order at ¶ 2.  Ceglia has refused to comply.  Defendants request an order approving the issuance of subpoenas to Osborn and Aginsky for these documents and of targeted interrogatories to the two experts.

**Fourth**, this Court ordered Ceglia to provide a detailed account of what happened to the items he claims to have "lost" and his efforts to locate them.  *See* August 18 Order at ¶ 2.  Ceglia has not provided such an account.  Defendants request an order compelling a supplemental declaration addressing these issues forthwith.

**Fifth**, this Court ordered Ceglia to produce all files in their "native format" — a format that includes metadata.  *See* August 18 Order at ¶ 3.  Ceglia has refused to comply.  Defendants request an order compelling the immediate production of all files in their native format.

**Sixth**, Ceglia's two privilege logs contain numerous, obviously improper privilege designations.  He has asserted plainly nonexistent "privileges" such as "relevance."  This Court should overrule Ceglia's designations in their entirety and direct him to produce all documents listed on his privilege logs.

In addition to directing Ceglia's immediate compliance with the Court's orders, this Court should order Ceglia to request his webmail providers to release to Stroz Friedberg all account access logs, usage logs, and registration records, as well as any preserved copies of the accounts, in order to verify the integrity of the email accounts to which Ceglia finally provided access.  To the extent required by the providers, this Court should grant Defendants permission to subpoena the providers.  The Court should also invoke its authority under Federal Rule of Civil Procedure 37 and its inherent power, and award Defendants their reasonable attorneys' fees

and all other relief to which they may be entitled.  There is <u>no</u> justification — let alone

"substantial" justification — for Ceglia's knowing, intentional and obdurate refusal to comply

with repeated court orders, thereby leaving Defendants no choice but to seek relief from this

Court.  *See* Fed. R. Civ. P. 37(a)(5) (court "must" award attorneys' fees upon granting a motion

to compel, unless the opposing party's nondisclosure was "substantially justified" or where a fee

award would be unjust).

## BACKGROUND

On July 1, 2011, this Court granted Defendants' Motion for Expedited Discovery.  Doc.

No. 83.  When Ceglia failed in large part to comply, Defendants moved to compel.  This Court

granted Defendants' motion and directed Ceglia's compliance in its order dated August 18.  Doc.

No. 117.

That order did little to change Ceglia's lawless ways, as he continued to defy his

discovery obligations in key respects.  Among other things, he refused to provide his consent to

the Stroz Friedberg firm accessing his email accounts, necessitating a second motion to compel.

This Court again directed Ceglia's compliance, and ordered him to show cause why he should

not be sanctioned.  Doc. No. 152.

In moving to compel Ceglia's compliance with the webmail searches — a discrete

request as to which time was of the essence given Ceglia's ongoing destruction of evidence —

Defendants noted their intent, once they had completed their review of Ceglia's documents, to

file the instant motion addressing the many other remaining deficiencies in Ceglia's production.

Doc. Nos. 129 n.1, 149 n.1.

Pursuant to Local Rule 7(d)(4), Defendants have described their attempts to resolve the

issues identified below in the supporting Declaration of Alexander H. Southwell.

**ARGUMENT**

**I.    THIS COURT SHOULD DIRECT CEGLIA TO COMPLY WITH THE COURT'S DISCOVERY ORDERS.**

As shown below, Ceglia's discovery responses are manifestly deficient in six key areas. Defendants request an order compelling the immediate production of the missing items.  In addition, Ceglia should be directed to furnish another supplemental declaration, as his August 29 declaration has now been revealed as false and incomplete in material respects.  Notably, even though Ceglia signed his August 29 declaration from his apparent hideout in Ireland, he carefully omitted the statement — required under federal law, *see* 28 U.S.C. § 1746 — that his declaration was made under penalty of perjury under the laws of the United States.  That omission not only renders his declaration immediately suspect, it violates the express terms of this Court's order. *See* August 18 Order at ¶ 1 ("Plaintiff shall provide a supplemental sworn declaration . . . in accordance with 28 U.S.C. § 1746.") (emphasis added).

**A.    Ceglia Must Identify And Produce His Removable Storage Devices.**

The August 18 Order required Ceglia to identify and produce all electronic media, including all removable storage devices, in his possession, custody, or control since June 30, 2010.  *See* August 18 Order at ¶ 2(F).   Although Ceglia provided a declaration purporting to identify all such devices, Defendants have now discovered that Ceglia has been concealing yet another removable storage device that he has been recently using:  a Seagate FreeAgent GoFlex USB device, internal identifier NA056T98&0.  *See* Declaration of Michael F. McGowan at 25-27.  Ceglia should be directed to amend his declaration and produce this device immediately.

**B.    Ceglia Must Consent To The Inspection Of The Adelphia Email Account.**

The August 18 Order directed Ceglia to "identify all email accounts accessible through web-based interfaces that [he] has used since 2003, including but not limited to his gmail.com,

5

msn.com, tmail.com, and Adelphia.net accounts," and that he "consent to the acquisition and inspection by Stroz Friedberg of the contents of all such accounts."  *See* August 18 Order at ¶ 5 (emphasis added); *see also* September 28 Order at ¶ 2.

Ceglia still has not consented to the inspection of the Adelphia account, ceglia@adelphia.net.  This is the account from which he sent the two smoking-gun emails to Jim Kole attaching the authentic contract in 2004.  *See* McGowan Decl. at ¶ 29.  Ceglia's excuse is that it was his parents, not he, who opened the account.  Ex. A to Southwell Decl. ("August 29 Ceglia Decl.") at ¶ 178-179.  But this is not a valid ground on which to withhold the information: Because Ceglia used the account to send highly relevant emails, he indisputably possesses the account information, and this Court's order encompasses all email accounts "that [he] has used since 2003" regardless of whether the particular account was opened in his name or his parents' name.  *See* August 18 Order at ¶ 5 (emphasis added).  Indeed, the August 18 Order specifically directed that he consent to the inspection of the Adelphia account.

The Court should order Ceglia to immediately consent to the inspection by Stroz Friedberg of the Adelphia account, and to indicate such consent on the form provided by Stroz Friedberg, pursuant to the terms of the August 18 Order.

    **C.**    **Ceglia Must Identify And Produce The Electronic Copies And Images Of The Purported Contract In The Possession Of His Experts Valery Aginsky And John Paul Osborn.**

The August 18 Order required Ceglia to identify and produce the scanned copies or images of the purported contract taken by his experts.  *See* August 18 Order at ¶ 2(B).  This evidence is critical because it will reveal the appearance of that document at the time Ceglia's experts initially examined and took pictures of it many months ago.  Defendants' forensic examination of the purported contract indicates that Ceglia may have altered the document between the time he initially provided it to his experts and the time he made it available for

inspection to Defendants.  Comparing the appearance of the document at these two moments in time will establish that Ceglia — and possibly those working in concert with him — tampered with the purported contract in furtherance of the fraudulent scheme.  *See* August 17, 2011 Hearing Transcript at 106-108.

Ceglia has violated the August 18 Order by failing to produce images that are currently in the possession of two of his experts:  the forensic document examiner John Paul Osborn, and the forensic ink chemist Valery Aginsky, both of whom have provided sworn expert declarations to this Court.  *See* Doc. Nos. 62, 66.

With regard to Osborn, Ceglia has produced no images from his files.  Ceglia fails to offer an explanation for his contemptuous defiance of his discovery obligation other than to blithely assert that Osborn "has been unavailable to assist me in my efforts thus far."  *See* August 29 Ceglia Decl. at ¶ 37.  This is not an acceptable response:  Osborn is serving as Ceglia's paid expert in this case and should provide Ceglia with materials from his casefile at Ceglia's request.  At a minimum, Ceglia should explain in a declaration why Osborn has suddenly become "unavailable" and should describe his efforts to secure Osborn's cooperation.  Ceglia should not be heard to argue that Osborn is refusing to cooperate because Ceglia is not paying his bills.  *Cf.* August 29 Ceglia Decl. at ¶ 30 (noting that Ceglia and his expert James Blanco are engaged in a fee dispute over Ceglia's failure to pay his bills).   Defendants have stated on the record that they will pay the cost of obtaining the scans from Osborn.  *See* August 17, 2011 Hearing Transcript at 108.

Since Ceglia has refused to produce the images in Osborn's possession, Defendants respectfully request permission to subpoena Osborn for the images and scans in his possession and to issue targeted interrogatories to Osborn regarding the same.

With regard to Aginsky, Ceglia produced only two Photoshop (PSD) files, consisting of page one and page two of the purported contract.  But while Ceglia attributes these files to Aginsky, it is not clear that these files actually came from Aginsky.  First, the embedded metadata contains no information identifying who created the files.  *See* McGowan Decl. at ¶ 24. Second, professional forensic document examiners like Aginsky typically take high-resolution scans and photographs in a raw-image format, such as TIFF or JPEG.  *See* Declaration of Gerald M. LaPorte at ¶¶ 7-9.  For that reason, the fact that Ceglia produced these images in Photoshop format is highly suspicious and indicative of fraud, as Photoshop can be used to change colors or alter the image with ease.  *See* LaPorte Decl. at ¶ 12.  Third, given the sheer number of high-resolution digital images that the other experts in the case have taken, it is highly likely that these are not the only images that Aginsky made of the purported contract.

Defendants therefore respectfully request permission to subpoena Aginsky for the images and scans in his possession and to issue targeted interrogatories to Aginsky regarding the same. In addition, if Ceglia continues to represent that these two Photoshop files are the only scans that Aginsky took of the purported contract — and that Photoshop is their native format — this Court should order Ceglia to provide a sworn statement by Aginsky certifying their authenticity, and further certifying that these two files are in fact the only images in his possession.

### D.    Ceglia Must Produce Electronic Files In Their Native Format.

The August 18 Order required that all electronic files be "produced in their native format."  *See* August 18 Order at ¶ 3.  A "native format" production includes the metadata accompanying each file.  As the leading treatise on federal procedure explains, "electronically stored information <u>with metadata and embedded data intact</u> may be said to be in 'native format.'" Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, 8B FED. PRAC. & PROC. CIV. § 2219 (3d ed. 2011) (emphasis added).  *See also, e.g.*, *Victor Stanley, Inc. v. Creative Pipe, Inc.*,

269 F.R.D. 497, 511 (D. Md. 2010) (the production of electronically stored information "in its native format would include metadata"); McGowan Decl. at ¶ 11 (native format includes metadata).

Ceglia has failed to comply with the "native format" requirement because the documents he produced did not include the accompanying metadata.  Obtaining the metadata is critical to determining, among other things, when the document was created or modified — and by whom. As Judge Maas has explained:  "Metadata, frequently referred to as 'data about data,' is electronically-stored evidence that describes the history, tracking, or management of an electronic document."  *Aguilar v. ICE,* 255 F.R.D. 350, 354 (S.D.N.Y. 2008).  Metadata "includes all of the contextual, processing, and use information needed to identify and certify the scope, authenticity, and integrity of active or archival electronic information or records."  *Id.* (quotation marks omitted).  "[M]etadata is often crucial to understanding an electronic document. For this reason, . . . embedded metadata is generally discoverable and should be produced as a matter of course."  *Id.* at 355 (quotation marks omitted).  Metadata is generally available in two forms:  "file system" metadata (which can record the date and time a file was created, modified, and last accessed) and "embedded" metadata (which captures similar information within the file itself).  *See* McGowan Decl. at ¶¶ 6-10 (discussing different types of metadata).

Here, Ceglia was <u>specifically ordered</u> to produce the metadata through the requirement that he produce all electronic files in their native format.  He has refused to do so.  In fact, <u>none</u> of the files that he produced on August 29, 2011 were produced in complete native format preserving all metadata.  Ceglia's chosen method of production — to package up all the electronic documents as a ZIP file — failed to preserve <u>any</u> file system metadata.  As for the embedded metadata, some of it was updated by his attorneys prior to production, and — even

more disturbingly — some embedded metadata was completely removed in a manner that suggests intentional and fraudulent manipulation and a willful disobedience of the Court's order. *See* McGowan Decl. at ¶ 18.

The missing metadata can be used to determine the files' provenance, including whether they are duplicates of documents Ceglia has already produced or whether they constitute new documents. *Id.* at ¶ 15. For example, the law firm Edelson McGuire LLC apparently produced the two TIFF files containing the authentic contract. These files look exactly like the authentic contract that Stroz Friedberg discovered on Ceglia's computer, attached to emails Ceglia sent to Jim Kole in 2004. But the absence of metadata prevents Defendants' experts from determining whether the files produced by Edelson McGuire are the same files that Ceglia sent to Kole, or whether they originated from a different source. *Id.* at ¶¶ 16-17.

This Court should direct Ceglia to comply with the order that he produce the documents in native format — which includes both the file system metadata as well as the embedded metadata within each file. It will not be difficult for Ceglia to comply with the Court's order. The McGowan Declaration explains the simple and well-recognized steps for producing electronic documents in their native format. *See* McGowan Decl. at ¶ 14.

### E.   Ceglia Must Provide A Detailed Account Of The Items He Has Lost Or Destroyed, Or That He Claims Do Not Exist.

The August 18 Order directed Ceglia to produce three specific categories of items: the forms he claims to have used to create the alleged contract (¶ 2(D)); certain specified removable storage devices (¶ 2(E)); and all computers or electronic media that have been in his possession, custody or control since June 30, 2010 (¶ 2(F)).

The order further provided that if Ceglia was unable to locate items within these three categories, he must "describe in detail his good-faith efforts to conduct a diligent search" for

them.  *See* ¶ 2.  The description was to include "a detailed account of the non-existence, loss, or destruction of each such item, including the approximate date on which each item was lost, destroyed, or otherwise disposed of."  *Id.*

The <u>entirety</u> of Ceglia's "detailed" description of the loss of each item, and his efforts at retrieval, consists of a single sentence:  "After a diligent search and a reasonable inquiry, I have not been able to locate any responsive items in my possession, custody, or control."  *See* August 29 Ceglia Decl. at ¶¶ 130, 137, 144, 146, 149, 151, 183.

This is plainly insufficient.  Ceglia has not made the slightest effort to comply with this Court's order that he provide "<u>a detailed account</u> of the non-existence, loss, or destruction of <u>each such item</u>, including the approximate date on which each item was lost, destroyed, or otherwise disposed of."  August 18 Order at ¶ 2 (emphases added).  Indeed, his breezy one-sentence non-response, repeated like a mantra throughout his declaration, is an affront to the Court and strongly suggests that here too, he has specifically instructed his lawyers not to comply with this Court's orders.  *See* Declaration of Jeffrey A. Lake at ¶ 2 ("Mr. Ceglia instructed me not to comply with" the Court's August 18 Order); Declaration of Nathan A. Shaman at ¶ 3 ("Mr. Ceglia continued to refuse to comply with the August 18 Order.").

Ceglia's unsupported claim that he conducted a "diligent" search from Ireland should not be tolerated.  Indeed, the very reason this Court required Ceglia to explain the disappearance of the highly relevant evidence and his search efforts was because he has been concealing and destroying critical evidence — including pages of the contract at issue in this case — during the pendency of this lawsuit.  Permitting Ceglia to thumb his nose at the Court by providing a rote one-sentence "description" of his search efforts will only reward him for his spoliation and

misconduct.  This Court should direct Ceglia to comply with this Court's order by providing the explanation required by Paragraph 2 of the August 18 Order.

### F.   The Court Should Overrule Ceglia's Grossly Improper "Privilege" Designations.

Ceglia's so-called "privilege logs" continue his pattern of concealment and obfuscation. Ceglia has produced two privilege logs:  one dated August 29 (attached as Exhibit B to Southwell Declaration), and one dated October 11 (attached as Exhibit D to Southwell Declaration).  These logs purport to withhold a variety of documents for various reasons, most of which do not constitute genuine privileges.  This Court should overrule Ceglia's frivolous "privilege" designations and direct the immediate production of those documents.

### 1.   The August 29 Privilege Log.

First, Ceglia has improperly withheld certain scans taken by his experts on the basis of the work-product doctrine.   This Court has already <u>expressly rejected</u> Ceglia's attempt to withhold the scans on this basis.  *See* August 17, 2011 Hearing Transcript at 119 ("I am also ruling that the image of the original contract in the possession of Plaintiff's expert is also within the disclosure and the production requirement of the order . . . I'm overruling any objection that this is expert work product . . .").

Second, Ceglia improperly withholds 11 documents on the basis that they are "Irrelevant/Outside Scope of August 18, 2011 Order/Trade Secret."  Ceglia's claim that a document is "irrelevant" or outside the scope of the order is not a recognized privilege. Moreover, under the agreed-upon protocol for inspecting electronic documents, it is Stroz Friedberg, not Ceglia's lawyers, who determine which documents may be relevant.  *See* Electronic Asset Inspection Protocol, Doc. No. 85.  Nor is a purported "trade secret" privilege a basis for withholding a document.  To the extent Ceglia believes a document contains a trade

12

secret, his recourse is to designate the document as "confidential" under the agreed-upon protective order, not to withhold it from production.

Third, although this Court directed Ceglia to produce "all electronic versions of any emails or purported emails by and among Defendant Zuckerberg, Plaintiff and/or other persons associated with StreetFax," August 18 Order at ¶ 2(C), Ceglia improperly withholds eight "scan[s] of printed email[s]" between Zuckerberg and a StreetFax employee. Ceglia claims these emails are privileged on the basis of "Cumulative/Equally Available to Defendants." This is not a legally recognized privilege, and there is obviously no way to determine whether these emails are duplicates until Defendants have seen the alleged emails. Moreover, given that Ceglia has fabricated emails in this case and engaged in wide-ranging misconduct, it is cynical in the extreme for him to claim that any purported email is "equally available to Defendants." And Ceglia can raise no claim of burden given that it is not Ceglia, but Stroz Friedberg, that would be providing the eight emails to Defendants.

### 2. The October 11 Privilege Log.

Ceglia's October 11 privilege log withholds relevant documents found by Stroz Friedberg in the course of the webmail search ordered by this Court — an order that Ceglia instructed his lawyers to disobey. Stroz Friedberg identified 12 presumptively relevant documents in Ceglia's Gmail account. Ceglia is now withholding 11 of the 12 documents based on bogus claims of "privilege." This Court should overrule every one of his frivolous designations.

First, Ceglia withholds two documents — emails from Jessica Ceglia to Paul Ceglia — on the basis of "attorney-client privilege." This is untenable. Jessica Ceglia is not a lawyer, and her possession of a document vitiates any attorney-client privilege that Paul Ceglia could even arguably claim. As this Court explained in rejecting Ceglia's prior effort to conceal evidence on

the basis of improper attorney-client privilege designations, "the privilege requires that only confidential communications with an attorney for the purpose of seeking legal advice or services are within its scope." Doc. No. 107 at 2 (citing *United States v. Int'l Bhd. of Teamsters*, 111 F.3d 210, 214 (2d Cir. 1997)). Moreover, "[t]he burden is on the party asserting the privilege to demonstrate the requirements for the privilege have been satisfied," Doc. No. 107 at 2, and Ceglia has made no such showing here.

Second, Ceglia is withholding ten documents on the basis that they are "Outside Scope of Expedited Discovery Orders." As noted above, this is not a recognized privilege. Moreover, the Electronic Asset Inspection Protocol — which the Court ordered — provides that it is Stroz Friedberg, not Ceglia, that makes relevance determinations and that Ceglia can only attempt to withhold documents on the basis of privilege. *See* Doc. No. 85.

### G. The Court Should Order Disclosure Of Additional Webmail Information.

Ceglia's contumacious conduct related to his webmail accounts, including his repeated instructions to his attorneys to disobey the Court's orders and his well-documented history of spoliation, raises serious concern that Ceglia has destroyed relevant emails in those accounts in violation of his preservation obligations. That concern is amplified by the fact that once access was finally provided, Stroz Friedberg located only two presumptively relevant emails with attachments in the Gmail and MSN accounts. This near-total absence of relevant documents is highly suspect. Even more disturbingly, Ceglia's MSN account did not contain any of the numerous emails that Ceglia has represented that he sent Mr. Zuckerberg from his MSN account. In sum, Ceglia's repeated refusals to obey the Court's orders and obstructionism, his submission of false declarations, the general absence of presumptively relevant documents, and the specific absence of any emails from Ceglia to Zuckerberg in the MSN account, strongly suggest that Ceglia recently deleted relevant emails from his webmail accounts.

14

To ensure that Ceglia has not tampered with his email accounts by deleting emails during or prior to his monthlong campaign of delay and obstruction, Defendants respectfully request the Court order Ceglia to request the relevant webmail providers — Gmail, Microsoft, Tmail, and Adelphia — to release all account access logs, usage logs, and registration records, as well as any preserved copies of the accounts, to Stroz Friedberg pursuant to Plaintiff's consent and the Electronic Asset Inspection Protocol. Defendants also request leave to issue any subpoenas the providers may require for Stroz Friedberg to obtain this information. Months ago, Defendants submitted preservation requests to some of these providers. Therefore, Stroz Friedberg could simply compare the preserved accounts to the accounts Stroz Friedberg was finally permitted to access after this Court put a halt to Ceglia's obstruction.

## II.   THE COURT SHOULD AWARD DEFENDANTS THEIR REASONABLE ATTORNEYS' FEES AND OTHER RELIEF.

This motion to compel has been necessitated by what has become Ceglia's established pattern of intentionally defying this Court's discovery orders and forcing Defendants to litigate every step of the way. Ceglia and his attorneys have clearly made a conscious choice that it is to their strategic advantage to stonewall and obstruct rather than comply in good faith. Indeed, as new evidence of Ceglia's criminal fabrications continue to surface, he has ramped up his efforts to conceal or destroy the evidence that remains. For all of these reasons, this Court should award Defendants their reasonable attorneys' fees and costs under Rule 37 or its inherent power. *See supra* n.1.

**CONCLUSION**

For the foregoing reasons, this Court should grant Defendants' motion to compel, and

award Defendants all other relief, including attorneys' fees, to which they may be entitled.


Dated:          New York, New York
                October 14, 2011

                                        Respectfully submitted,

                                        /s/ Orin Snyder
Thomas H. Dupree, Jr.                   Orin Snyder
GIBSON, DUNN & CRUTCHER LLP             Alexander H. Southwell
1050 Connecticut Avenue, NW             Matthew J. Benjamin
Washington, DC 20036                    Amanda M. Aycock
(202) 955-8500                          GIBSON, DUNN & CRUTCHER LLP
                                        200 Park Avenue, 47th Floor
                                        New York, NY 10166-0193
Terrance P. Flynn                       (212) 351-4000
HARRIS BEACH PLLC
726 Exchange Street
Suite 1000
Buffalo, NY 14210
(716) 200-5120

*Attorneys for Defendants Mark Zuckerberg and Facebook, Inc.*