UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

PAUL D. CEGLIA,

                                    Plaintiff,

v.

MARK ELLIOT ZUCKERBERG, Individually, and
FACEBOOK, INC.

                                    Defendants.

Civil Action No. : 1:10-cv-00569-RJA

**MEMORANDUM IN SUPPORT OF MOTION FOR SANCTIONS AGAINST DEFENDANTS FACEBOOK AND ZUCKERBERG FOR SPOLIATION OF EVIDENCE**

## MEMORANDUM

## RELEVANT FACTS AND EVIDENCE

The complaint in this matter was filed on June 30, 2010.   A scan of the Facebook Contract was attached to the complaint.  See. Doc. No. 1.

## THE AUTHENTICITY OF THE FACEBOOK CONTRACT HAS BEEN ESTABLISHED

There are a number of other tests that can be performed on The Facebook Contract to confirm its authenticity.  Plaintiff's experts have performed nearly all available tests.

1.  Larry Stewart, a recognized expert in document examination, Stewart decl. at ¶1-10, tested the toner on both of the Facebook Contract to determine if they match.  Stewart decl. at ¶52-59.  The toner on both pages of the Facebook Contract match.  Stewart decl. at ¶55.

1

2. The toner on both pages of the Facebook Contract can be tested to determine what make and model of printer was used to print the document.  Stewart decl. at ¶56-59.  The toner on the document was from one manufacturer of printers, HP.  Stewart decl. at ¶56.  The HP 1100 printer was first sold to the public starting in 2001 and discontinued in 2005.  Id. at ¶58.  The HP 3200 series printer was first sold to the public in 200 and discontinued in March of 2002.  Id. at ¶59.

**PAPER TESTING**

Paper tests can be performed to confirm the consistency of the two pieces of paper.  Valery Aginsky confirmed that the two pieces of paper, page one and page two of the Facebook Contract are identical.  Doc. No. 66 at ¶8.  He confirmed that the ink used to compose interlineations on page one of the agreement was the same ink used to date the Facebook Contract on page two.  Id. at ¶9.  Aginsky confirmed Stewart's analysis that the toner used on page one matches the toner used on page two.  Id. at ¶10.

James Blanco, another noted document examination expert, See Declaration of James Blanco ¶1-6, confirmed the match of the two pages constituting the Facebook Contract.  Blanco decl. at ¶21(d).

James Blanco also examined the opacity, or visibility of light as seen through the paper, and texture of pages one and two of the Facebook Contract.  Id. at ¶21(e).  Both of those features as measured on each page, match, meaning page one and page two are the same type of paper.

2

The paper can be examined to see if the writing between the printed lines on page one (interlineations as they are called) created matching indentations on page two.  Id. at ¶21(c).  That test was performed by Mr. Blanco and the writing on page one did indeed create the precise indentations observable on page two and they match precisely the location of the writing on page one.  Id.  That necessarily means that while the interlineations were being written as they appear on page one of the Facebook Contract, page two of the Facebook Contract was directly underneath page one.  Id.

## SIGNATURE COMPARISON OF ZUCKERBERG

The signature on page two of the Facebook Contract has been compared to many known samples of Mark Zuckerberg's signature taken from legal documents in other cases.  Id. at ¶21(a).  The signature on the second page of the Facebook Contract is authentic.  Id. It is Mark Zuckerberg's signature.  Id.

Although not necessary now, the court nearly obtained a concession on this point from Mr. Snyder:  "I'm saying it may be [Defendant Zuckerberg's signature on page two of the Facebook Contract] in the sense that it appears to be Mr. Zuckerberg's signature, meaning to say it appears to be his signature or a very good copy of his signature…."  June 30, 2011 Transcript at 57.

The court then continued seeking clarification by asking Mr. Snyder, "are you conceding that it is [Defendant Zuckerberg's signature]?"  Id. at 58.  Mr. Snyder responded this murky clarification:  "I'm conceding that Mr. Zuckerberg recognizes

that to appear to be his signature, or someone who copied what looks very much like his signature."  Id.

## STAPLE HOLE ANALYSIS

The Facebook Contract is a two page document whose pages were once stapled together in the upper lefthand corner.  Tests can be performed to examine the staple holes in each page created by that stapling.  Id. at ¶21(b).  Mr. Blanco confirmed that the staple holes on both pages align.  Id.  This establishes that the two pages were together, page one on top of page two, when a staple was inserted to each of them.  Id.  Mr. Stewart also analyzed the staple holes in page one and page two of the document and confirmed there was "no reason to suggest a page one substitution."  Stewart decl. at ¶50-51.

Overall, none of Mr. Blanco's test results revealed evidence to suggest that page one of the Facebook Contract had been substituted in for some other previous page one.  Id. at ¶22.

Images of the Facebook Contract were captured by the following persons before it was provided to Facebook's experts for evaluation:

Paul Osborn captured multiple images of the Facebook Contract which have been produced to Defendants.   Declaration of Dean Boland at ¶5-8.



Valery Aginsky captured multiple images of the Facebook Contract using which were previously produced to Defendants.   Boland decl. at ¶10-11.

Kevin Cross captured multiple images of the Facebook Contract which were previously produced to Defendants.  Boland decl. at ¶13-15.



In each set of documents, the appearance of the Facebook Contract is printed matter and original signatures and writing on two **white** pieces of paper.

Paul Argentieri drove to Buffalo, New York on July 13, 2011, the day before Facebook's experts' planned evaluation of the Facebook Contract and checked in at the Embassy Suites in Buffalo on Delaware Avenue.  Argentieri decl. at ¶3. Argentieri had the Facebook Contract in a cardboard FEDEX envelope and a separate six page document, a software specification document drafted by Zuckerberg, in a separate FEDEX envelope.  Argentieri decl. at ¶4.  Sometime after checking in at the hotel on July 13, 2011, Argentieri was introduced to the manager of the hotel and an off-duty police officer present as part of a 24 hour guard duty for the hotel safe.  Argentieri decl. at ¶5.  His best recollection is that on the morning of July 14, 2011, counsel for Defendants and Argentieri arrived at the area where the

hotel safe was located.  Argentieri decl. at ¶6.  Both parties' counsel observed the removal of the two documents from the safe still inside their envelopes.  Argentieri decl. at ¶7.  A courier was hired who went with both counsel transporting the envelope to the conference room of the law offices of Harris Beach in Buffalo, local counsel for Defendants.  Argentieri decl. at ¶8.  A videographer was retained by both parties to document the work of Facebook's experts.  Argentieri decl. at ¶9.

At 9:11 am on July 14, 2011, in view of the video camera, Argentieri then opened the envelope displaying the documents to the camera and laying them on the conference table in full view of everyone.



Argentieri observed the Facebook Contract as two pieces of white paper that otherwise appeared to be some years old, consistent with the age of the document, i.e. eight years.  Argentieri decl. at ¶11. The video of this event shows the Facebook Contract visible as two white pieces of paper just as Argentieri observed the

Facebook Contract that morning.  Argentieri decl. at ¶12 and video clip above.   As the document was placed on the table, no one in the room remarked about the condition of the document in any way.  Argentieri decl. at ¶13.  Therefore, at the time the Facebook Contract was delivered to Facebook's experts it was in the typical condition one would expect of a document that was at that time eight years old.  No distinct yellowing was visible on the document.  Argentieri decl. at ¶14.

That same routine began each day of the evaluation by Facebook's experts on July 15th, July 16th and July 19th.   Argentieri decl. at ¶15.  The sealed, signed envelope stayed in the hotel safe under 24 hour armed each day from July 14th through July 19th.   Argentieri decl. at ¶16.  At the end of each day, counsel for both parties witnessed the insertion of the documents back into a new envelope which was signed in permanent marker across the seal.  Argentieri decl. at ¶17.  Attorneys for both counsel accompanied a courier returning the sealed, signed envelope to the hotel safe where the armed guard was waiting.  Argentieri decl. at ¶18.

At the end of fourth day of testing, on July 19, 2011, the Facebook Contract and six page specification sheet were inserted into a new envelope which is sealed and signed by Defense counsel and Argentieri.   Exhibit A to Motion for Sanctions for Spoliation by Defendants.

After July 19, 2011 Argentieri had possession and transported the Facebook Contract and six page specification sheet in the sealed, signed envelope to Chicago. Argentieri decl. at ¶20.  The purpose of the envelope being taken to Chicago was so that Plaintiff's experts could obtain ink and paper samples for testing.  Argentieri

decl. at ¶21.

Argentieri produced on July 25, 2011, the same sealed and signed envelope as is shown being opened at the law offices of Edelson and McQuire in Chicago. Exhibit B to Motion for Sanctions for Spoliation by Defendants.  Argentieri decl. at ¶26.  The Facebook Contract is visible on that July 25, 2011 video alongside the six page document specification sheet.  Argentieri decl. at ¶23 and Exhibit B to Motion for Sanctions for Spoliation by Defendants.

The Facebook Contract now shows obvious, distinct yellowing on the front of each of the two pages of the document.  Argentieri decl. at ¶24.  Exhibit B to Motion for Sanctions for Spoliation by Defendants.  The yellowing evident on the front of both pages of the Facebook Contract on July 25, 2011 is beyond the yellowing apparent in the six page specification sheet.  Argentieri decl. at ¶25.  The now evident yellowing on the front of each page of the Facebook Contract was not present on it when it was first provided to Facebook's experts on the morning of July 14, 2011.  Argentieri decl. at ¶26 and See video clip embedded in Motion for Sanctions for Spoliation by Defendants.

Below are images of the Facebook Contract captured by Larry Stewart reflecting its yellowed condition on July 25, 2011 **<u>after</u>** Facebook's experts finished their four days of testing and analysis.  Stewart decl. at ¶19.



Larry Stewart captured multiple images of the Facebook Contract which were previously produced to Defendants.  Boland decl. at ¶16-19.

**THE BEFORE AND AFTER IMAGES OF THE FACEBOOK CONTRACT**

Below is a comparison showing the discoloration appearing on the Facebook Contract after Plaintiff's experts received it back from Facebook's experts.

| BEFORE FACEBOOK EXPERTS | AFTER FACEBOOK EXPERTS |
|---|---|

The yellowing now apparent on the Facebook Contract appears only on the front side of page one and front side of page two.  Coincidentally, these are the sides of the Facebook Contract with the terms of the agreement, initials, interlineations and signatures in ink.  That is, this is the key side of both pieces of paper of the key piece of evidence in this case.

## WHEREFROM THE YELLOWING?

The only plausible explanation for the now yellow discoloration on the Facebook Contract on the front of both pages is persistent exposure to UV light.  As has been shown, that excessive over-exposure  to UV light occurred during Facebook's experts repetitive four days of testing of the Facebook Contract.  Stewart decl. at ¶15, ¶46 and See also Blanco decl. at ¶9, ¶11, ¶12, ¶14, ¶15 and ¶18.

## REPETITIVE TESTING, LONG-TERM UV EXPOSURE

Facebook's experts tested the Facebook Contract from July 14, 2011 until July 19, 2011 taking the intervening July 17th and July 18th off.  Argentieri decl. at ¶16.  Facebook's experts repeatedly exposed the Facebook Contract to UV light as well as other light sources.  Blanco decl. at ¶9, Stewart decl. at ¶14.  Stewart remarked to plaintiff's counsel at the time that the over-exposure of the Facebook Contract to such intense UV light could damage the document.  Id. at ¶15.  The Facebook Contract was repeatedly tested on the ESDA machine which required that it be humidified and then subjected to intense lighting.  Id.  The document was repeatedly placed into a "VSC" machine.  Id. at ¶10.  The VSC imaging system is typically used to analyze and compare writing pen inks and other document

features.  Id. at ¶16.  Facebook's experts repeated the identical tests, one after the other, for the four days of testing, performing far more testing than was needed to make proper scientific determinations about the authenticity of the Facebook Contract.  Id. at ¶15.  Mr. Blanco found the repeated exposure to UV light excessive. Id. at ¶18.  It is widely known by experts in the field that optical brighteners in paper fade through exposure to UV light.  Stewart decl. at ¶16.  The recognized primer and technical authority in the field of document examination, Wilson R. Harris, wrote a manual discussing the damage to documents from excessive UV light exposure.  Id. at ¶20.  He noted that "deep yellowing" and fading of ink will occur with over-exposure to UV light.  Id.  Another study of this phenomenon found that every one hour of UV irradiation of paper is equivalent to the natural aging of a document by approximately 182 days.  Id.

Mr. Blanco was so concerned about the excessive processing of the document potentially damaging it that he asked Facebook's experts how intense their UV light setting was on the VSC machine they were using to expose the Contract's pages to UV light.  Id. at ¶10.  Facebook's experts refused to disclose the settings on their VSC machine.

## METHODS OF YELLOWING A DOCUMENT

There are several methods by which a piece of paper like that which is page one and page two of the Facebook Contract can become discolored.  Stewart decl. at ¶36.  Those methods include exposing a document to heat, chemicals or exposure to intense UV light.  Id. at ¶37.  Every method, except exposure to UV light,

necessarily discolors a document on both sides.  Id. at ¶38.  The use by Facebook's experts of the VSC4 machine required pages one and two of the document to be placed on their back and then exposes to high intensity UV light.  Id. at ¶44, 47, 48. The yellowing now evident on the Facebook Contract is consistent with the document being placed on its back during testing in which it was exposed to high intensity UV light for excessively long periods of time.  Id. at ¶39.  The yellowing is not consistent with damage from heat.  Id. at ¶49.

### TESTING CONFIRMS YELLOWING CAUSED BY FB EXPERTS

Mr. Blanco has in his lab a Foster machine that is in all material respects identical to the one used by Facebook's experts.  Blanco decl. at ¶10.  Mr. Blanco performed a tests on samples of paper.  Id. at ¶19.  He set the intensity of the UV light to its lowest setting.  Id.  He then covered a piece of paper, comparable to the paper in the Facebook Contract, with strips of opaque paper leaving lines of exposed paper.  Id.  He then used the VSC machine to expose that test paper to an hour of UV light at the lowest setting.  Id.  That one hour produced noticeable "tan lines" in the document demonstrating that document damage of the type visible now in the Facebook Contract can be caused by even one hour of exposure to UV light.  Id.

The yellowing now evidence in the Facebook Contract is like the result of repeated exposure of the document to high intensity UV light.  Stewart decl. at ¶20. Facebook's experts repeating the same tests on the Facebook Contract constituted "far more testing than would be needed to make proper scientific determinations about the authenticity of the document."  Id. at ¶40.

## THE HARM CAUSED BY EXCESSIVE UV EXPOSURE

The yellowing caused by the repeated exposure to UV light in successive, repetitive testing by Facebook's experts has now prejudiced the Plaintiff in the following ways:

1. It has provided Defendants with an argument that the now discolored document is a fraud because of the discoloration Facebook's experts created; and

2. Without a sanction from this court prohibiting the argument, Defendants can now argue that *Ceglia caused* the yellowing in some attempt to alter the evidence in his favor which is contrary to the evidence as shown in this motion.

3. It has provided Defendants with the argument that the Facebook Contract, now yellow on one side and white on the other, establishes the document cannot be trusted even if Defendants are not permitted to claim Ceglia caused the yellowing; and

4. Even with an order that neither party can comment about the document's now yellow appearance on the front side of each page, its very appearance places doubt in the minds of jurors. Typical jurors would undoubtedly have seen, used, relied upon and handled single or multi-page documents such as the

Facebook Contract in the state it was in when Plaintiff's counsel delivered to

Facebook's experts for testing, i.e. white and appearing to be an eight year old

document.  The jurors' collective experience may well tell them that this

document, now yellowed on the front side only of each page for a reason they

may never be told by the court or parties, is not authentic, i.e. not appearing as

typical documents jurors are used to seeing in their everyday lives.

Without an order prohibiting these types of arguments, Defendants are able

to engage in a pernicious form of argument given the extensive testing already done

on the document confirming its authenticity.  While the past transcripts in this case

are replete with *argument by Defense counsel* that the Facebook Contract is a fraud,

we now have *scientific evidence* that the Facebook Contract is authentic.  We also

have scientific evidence that Facebook's experts received a white two page

document, The Facebook Contract, and yellowed that document via excessively

exposing it to UV light and other light sources over four days of repeated tests.

## LEGAL ANALYSIS
## THE SPOLIATION RULE IN THE SECOND CIRCUIT

There is definitive guidance from the Second Circuit on the standard to apply

to spoliation claims.  That case is *Residential Funding Corporation v. DeGeorge*

*Financial Corp.,* 306 F.3d 99.  In *DeGeorge* the court held "[T]he sanction of an

adverse inference may be appropriate in some cases involving the negligent

destruction of evidence because each party should bear the risk of its own

negligence."  Id. at 108.

16

"[The] sanction [of an adverse inference] should be available even for the negligent destruction of documents if that is necessary to further the remedial purpose of the inference. It makes little difference to the party victimized by the destruction of evidence whether that act was done willfully or negligently. The adverse inference provides the necessary mechanism for restoring the evidentiary balance. The inference is adverse to the destroyer not because of any finding of moral culpability, but because the risk that the evidence would have been detrimental rather than favorable should fall on the party responsible for its loss." *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 75 (S.D.N.Y.1991). See generally *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir.1998) (stating that an adverse inference instruction serves the remedial purpose, "insofar as possible, of restoring the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party").

Both the Federal Rules of Civil Procedure and this Court's inherent power allow sanctions to be issued when a party destroys evidence that it could reasonably foresee would be relevant to litigation. *Jones v. Bremen High Sch. Dist. 228*, No. 08-C-3548, 2010 U.S. Dist. LEXIS 51312, at *14 (N.D. Ill. May 25, 2010).  The Defendants cannot sincerely argue that they could not foresee the Facebook Contract would be "relevant to to the litigation."

## **SANCTIONS**

Once spoliation of evidence, especially the key evidence in this case, has been established, appropriate sanctions for spoliation of evidence may include the issuing

of a default judgment or an adverse jury instruction against the spoliating party.

*Bryant v. Gardner*, 587 F. Supp. 2d 951, 958 (N.D. Ill. 2008); Fed. R. Civ. P. 37(b)(2).

Default judgment may be entered against a spoliating party when there is "clear

and convincing evidence of willfulness, bad faith or fault by the noncomplying

party." *Krumwiede v. Brighton Assocs.*, No. 05-C-3003, 2006 U.S. Dist. LEXIS

31669, at *25 (N.D. Ill. May 8, 2006).

A federal court may impose sanctions upon a party who engages in spoliation

in derogation of court order.  See Fed.R.Civ.P. 37(b)(2); *John B. Hull, Inc. v.*

*Waterbury Petroleum Prods., Inc.*, 845 F.2d 1172, 1176 (2d Cir.1988).  However, this

court is empowered to impose sanctions absent a specific court order.

## SPECIFIC DISCOVERY ORDER
## NOT NECESSARY TO IMPOSE SANCTIONS

Even without a discovery order, the court "may impose sanctions for

spoliation, exercising its inherent power to control litigation." *Chambers v..*

*NASCO, Inc.*, 501 U.S. 32, 43–45, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991); *Sassower*

*v. Field*, 973 F.2d 75, 80–81 (2d Cir.1992), cert. denied, 507 U.S. 1043, 113 S.Ct.

1879, 123 L.Ed.2d 497 (1993).  The court's authority to impose sanctions will only be

reversed for abuse of discretion.

## DISTRICT COURT HAS WIDE DISCRETION TO SANCTION PARTIES

Sanctions for spoliation, including dismissal, are reviewed by the Circuit for abuse

of discretion. *Complaint of Consolidation Coal Co.*, 123 F.3d 126, 131 (3d Cir.1997),

cert. denied, 523 U.S. 1054, 118 S.Ct. 1380, 140 L.Ed.2d 526 (1998)); *Sieck v. Russo*, 869 F.2d 131, 134 (2d Cir.1989).

The Circuit "will reject the district court's factual findings in support of its imposition of sanctions only if they are clearly erroneous." *Friends of Animals, Inc. v. United States Surgical Corp.*, 131 F.3d 332, 334 (2d Cir.1997) (per curiam)).

The district court possesses "broad discretion in crafting a proper sanction for spoliation" but such sanction is to "serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." Id.

## PURPOSE OF THE SANCTIONS

The spoliation sanction is fashioned to: "(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore 'the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir.1998)).

Here, as another spoliation motion filed simultaneous with this one reveals, Facebook is engaged in a multi-pronged campaign resulting in damaged or destroyed evidence. It acts with no concern for the authority of this court, flouting the Plaintiff's rights, personally castigating him in the media, all the while seemingly unconcerned with the paucity of its own evidence. The Facebook Contract, the key evidence in the case, about which Defendants have repeated questioned as to authenticity, now appears as if someone altered it - and that someone is the Defendants.

## THE MOST SERIOUS SANCTION IS
## NOT LIMITED TO A FINDING OF BAD FAITH

Although the facts demonstrate bad faith, purposeful over-exposure to UV by Defendants' experts, convincing the court of bad faith is unnecessary to obtain the most severe sanction.

For Plaintiff's engaging in spoliation on par with Defendants in this case, dismissal is not limited only to matters where the a Plaintiff has acted with bad faith or willful intent, but is permitted where there is any fault of the sanctioned party. See *Bobal v. Rensselaer Polytechnic Institute*, 916 F.2d 759, 764 (2d Cir.1990). A default judgment in favor of Plaintiff is the corollary here to punish the intentional spoliation of the Plaintiff's evidence.

Courts have held that negligent wrongs, like intentional wrongs, are proper subjects for general deterrence. See *Penthouse Int'l, Ltd. v. Playboy Enters., Inc.*, 663 F.2d 371, 387 (2d Cir.1981) (citing G. Calabresi, The Cost of Accidents, 133–173 (1970)). Not only have negligent wrongs been found proper subjects for deterrence, but federal courts have dismissed under Rule 37 as punishment for negligence.  See *Thiele v. Oddy's Auto and Marine Inc.*, 906 F.Supp. 158, 162–63 (W.D.N.Y.1995) (evidence negligently lost by plaintiff necessitated dismissal under Fed.R.Civ.P. 37); *Brancaccio v. Mitsubishi Motors Co., Inc.*, 1992 WL 189937, at *2 (S.D.N.Y.1992) (plaintiff's negligent loss of the defective product, after her expert had examined it, but where defendant had not, made necessary dismissal under Rule 37.

## SPOLIATION BY EXPERTS IS APPLICABLE
## TO PARTIES RETAINING THAT EXPERT

Gross negligence by Defendant's experts is a sufficient act to impose a default judgment against Defendants. "[G]ross professional incompetence no less than deliberate tactical intransigence may be responsible for the interminable delays and costs that plague modern complex law suits." *Penthouse*, 663 F.2d at 387.

While the sanction of a directed verdict is a drastic remedy that should be applied only when the spoliation was willful and there is no other adequate remedy to restore the wronged party to the position it would be in if the evidence had not been destroyed, this is an appropriate case to apply that sanction. *Chambers v. NASCO*, 501 U.S. 32, 42–45, 111 S.Ct. 2123, 2131–2133 (1991); *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir.1999); *Valentine v. Museum of Modern Art*, 29 F.3d 47, 49 (2d Cir.1994); *John B. Hull Inc. v. Waterbury Petrol, Prods., Inc.*, 845 F.2d 1172, 1176 (2d Cir.1988).

## APPROPRIATE REMEDIES UNDER THE LAW FOR FACEBOOK'S SPOLIATION

As a result of Facebook's intentional spoliation of the Facebook Contract, the law entitles Plaintiff to a Default judgment against Facebook and the setting of a trial date on damages. No hearing is necessary on this issue as a showing of bad faith or intent, which is demonstrated by the evidence, because bad faith is not required to be shown for Mr. Ceglia to obtain a default judgment as a sanction. If the court is not persuaded of Defendants' bad faith damage to the Facebook Contract and finds Defendants' negligence is also insufficient to sanction

Defendants via default judgment, it can impose a range of other sanctions including, but not limited to:

1.  An order prohibiting Facebook or Zuckerberg from challenging the authenticity of the Facebook Contract on any basis; or

2.  An order prohibiting Facebook or Zuckerberg from challenging the authenticity of the Facebook Contract based in any way on its now yellowed appearance; or

3.  An instruction to the jury that the parties have stipulated that the yellow appearance of the Facebook Contract is in no way an indication that the document is not authentic and the jury should disregard it's yellowed appearance in making their determination about the Facebook Contract's authenticity; or

4.  An order prohibiting Defendants from making a "page one substitution" argument as they have throughout the hearings in this case; or

5.  An adverse instruction to the jury that they should presume that Defendants Facebook and Zuckerberg intentionally damaged Mr. Ceglia's Facebook Contract because the undamaged Facebook Contract would tend to contradict their claim that the Facebook Contract was not genuine; and

6.  An order prohibiting Defendants from commenting in any way to the jury about the yellowing that Facebook's experts caused to appear on the Facebook Contract; and

7. Attorney's Fees, Expert Witness Fees and any other relief the court deems

   proper that was expended in investigating, preparing this motion and

   conducting any scheduled hearing on the spoliation conduct of Facebook.


Respectfully submitted,

/s/Dean Boland
_____

Paul A. Argentieri                Dean Boland
188 Main Street                   18123 Sloane Avenue
Hornell, NY 14843                 Lakewood, Ohio 44107
607-324-3232 phone                216-236-8080 phone
607-324-6188                      866-455-1267 fax
paul.argentieri@gmail.com         dean@bolandlegal.com