UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

PAUL D. CEGLIA,

                Plaintiff,

v.

MARK ELLIOT ZUCKERBERG, Individually, and
FACEBOOK, INC.

                Defendants.

Civil Action No. : 1:10-cv-00569-RJA

**DECLARATION OF LARRY F. STEWART IN SUPPORT OF MOTION FOR SANCTIONS AGAINST DEFENDANTS FOR SPOLIATION OF EVIDENCE**

     LARRY F. STEWART submits this second supplemental declaration in support of Plaintiff's Motion for Sanctions against Defendants for Spoliation of Evidence and hereby declare under penalty of perjury and pursuant to 28 U.S.C. 1746 that the following is true and correct:

1. I, Larry F. Stewart, make this declaration upon personal knowledge.

2. I am a retained expert for Paul D. Ceglia in the above captioned case.

3. I am presently Chief Forensic Scientist and President of Stewart Forensic Consultants, LLC, San Luis Obispo, California and Washington, DC.

4. My education includes an Associate of Arts Degree from Florida Technological University Orlando, Florida in 1976, a Bachelor of Science in Forensic Science Degree from the University of Central Florida in 1979, and a Master of Forensic Sciences Degree from Antioch University received in June of 1983.

5. I have received numerous specialised training courses in the forensic sciences

1

from 1976 through the present from such institutions as McCrone Research Institute, Virginia Polytechnic Institute and State University, U.S. Air Force Office of Special Investigations, U.S. Justice Department, F.B.I. Quantico, U.S. Secret Service, Perkin-Elmer Corporation, and various private organizations.

6. My work experience includes Forensic Chemist for the United States Bureau of Alcohol, Tobacco and Firearms; Counterfeit Specialist, Questioned Document Examiner, Senior Document Examiner/National Expert for the United States Secret Service; Chief, Questioned Document Branch and Laboratory Director/ Chief Forensic Scientist for the United States Secret Service.

7. I have also been an instructor or guest speaker in forensic science for numerous groups and agencies, to include; U.S. Secret Service, Antioch School of Law, George Washington University, UCLA, Catholic University, U.S. Department of State, International Law Enforcement Academy, Naval Criminal Investigative Service and U.S. Air Force.

8. I have testified as an expert witness in state, federal and military courts of law, as well as testified or been deposed in foreign court systems to include; Austria, Australia, Canada, Germany, Sri Lanka and Thailand. I have also testified at The Hague in the Netherlands and three times before the U.S. Congress.

9. I served the U.S. Government as a forensic scientist for over 25 years and have been in private practice for over 5 years.

10. My current curriculum vitae is attached as Attachment 1.

11. I have not yet prepared a report in this matter, but following are my preliminary observations and findings.

12. I was present at the law offices of Harris Beach in Buffalo, NY starting July 16, 2011 through July 19, 2011 observing the work of Facebook's document experts.

13. I was not allowed to examine the questioned documents during that time.

14. I did, however, observe Facebook's experts repeatedly exposing the "Work For Hire" Facebook Contract to high intensity and ultraviolet (UV) lights.

15. At one point during the testing I commented directly to plaintiff's counsel that the defendant's experts were unnecessarily repeating tests and over-exposing the documents to intense lights and that their actions could cause damage.

16. It is widely known that optical brighteners in paper can fade through exposure to UV light causing paper to yellow (Attachment 2).

17. Furthermore, certain types of wood and paper compositions "yellow" when exposed to ultraviolet light (Attachment 3).

18. On July 25, 2011, I was first allowed to examine the Facebook Contract.

19. On that date, I captured multiple images of the Facebook Contract and immediately noticed an odd yellowing on one side only of both pages.

20. The yellow discoloration/damage evident in the Facebook Contract is, in my opinion, likely the result of repeated exposure of the document to high intensity and/or UV lights.

21. Until recently, I was uncertain of when this damage occurred.

22. Upon review of the videotapes made of the examinations by both defendant's and plaintiff's experts, it is evident that the Facebook Contract yellowed dramatically between the time when the document was provided to the defendant's experts and when it was made available to the plaintiff's experts.

23. In the Buffalo examination video the Facebook Contract can be clearly seen as visibly white when compared to the much more yellowed six-page StreetFax Contract (See times 1:14-1:30 on video clip embedded in Memorandum of Law in Support of Motion for Sanctions for Spoliation).

24. Those images were captured when the documents were being presented to the defendant's for testing.

25. At the end of the Buffalo testing the documents were placed in envelopes, sealed and then signed by both counsel across the seals.  See Exhibit B to Memorandum of Law in Support of Motion for Sanctions for Spoliation.

26. The Chicago examination was subsequently conducted 6 days later (July 25, 2011).

27. Based on the videotape of the Chicago examination, it appears that the Facebook Contract was presented while still in its sealed and signed condition (See time :13 on EXHIBIT B to Memorandum of Law in Support of Motion for Sanctions for Spoliation).

28. This sealed and signed envelope bears the date of "7/19/11," the date of the conclusion of the defendant's forensic testing in Buffalo.

29. This leads to the logical conclusion that the discoloration and deterioration of

the Facebook Contract occurred as a result of the work conducted in Buffalo by the defendant's experts.

30. My first physical examination of the Facebook Contract occurred in Chicago on July 25, 2011.

31. Upon my physical examination of the Facebook Contract, I observed that the two pages are both 8 ½" X 11", non-watermarked, "bond-type" paper.

32. I found that the two pages were consistent in coloration and surface texture.

33. Both pages of the Facebook Contract were highly yellowed on the obverse or face side, only.

34. This was quite noticeable and odd.

35. Although quite yellow on the face side, both pages of the Facebook Contract were white on the reverse or back side.

36. There are several methods by which a piece of paper of this type can become discoloured.

37. They include age, heat, contact with chemicals, or exposure to intense or UV lights.

38. Except for intense or UV light exposure, each of the remaining methods necessarily would have yellowed both sides of the pieces of paper comprising the Facebook Contract.

39. The fact that the yellowing on the two pages of the Facebook Contract is only found on one (the face) side is notable and appears consistent with overexposure of the documents while laying on their back during testing.

5

40. I observed Facebook's experts repeating the same tests on the Facebook Contract numerous times and performing far more testing than would typically be needed to make proper scientific determinations about the authenticity of the document.

41. A typical evaluation of documents in my field can involve the use of a machine called a video spectral comparator.

42. One such model is known as the Foster Freeman VSC4.

43. That is one of the pieces of equipment utilized by the defendant's experts in Buffalo.

44. A video spectral comparator, e.g. the Foster Freeman VSC4, can aid an examiner in determining the characteristics of a document by utilizing intense illumination sources, e.g. UV along with filters.

45. Typically these examinations are done as quickly as possible to limit over exposure of the document to these intense lights.

46. Facebook's experts exposed the Facebook Contract repeatedly for long periods of time to intense and UV lights.

47. It is my understanding that the Foster Freeman VSC4 instrument contains an ultraviolet light that is above the document as the document is being viewed inside its closed chamber.

48. This could explain why the two pages of the Facebook Contract are yellowed on their face sides only.

49. The damage to the Facebook Contract does not appear to be due to heat

6

exposure since logically if heat was the cause one would expect consistent damage on both sides of the pages and not just on the face of each page.

50. One of the tests I conducted was a physical examination of the folds in the pages and the staple holes found on the pages of the Facebook Contract.

51. After those preliminary examinations, I found no reason to suggest page substitution.

52. Another test I conducted on the documents was an analysis of the printing method(s) used to produce the printing found on the two pages of the Facebook Contract.

53. Physical analysis resulted in a determination that both pages 1 and 2 of the Facebook Contract were printed with an office machine that utilized toner, e.g. a laserjet printer.

54. Following, I conducted a chemical analysis of the toner found on the pages of the Facebook Contract.

55. Preliminary test results indicate that the toner found on page 1 matches that found on page 2.

56. The toner was compared against my library of standards and was found to be consistent with toner from a Hewlett Packard (HP) 1100/3200 series printer.

57. At this point, the toner has not been found to be consistent with any other toner from my library of standards.

58. The HP 1100 series printer was first introduced to the public in 2001 and they were discontinued in May of 2005.

59. The HP 3200 series printer was first introduced to the public in 2000 and they were discontinued in March of 2002.

60. The Facebook Contract bears the date "4/28/03."

I hereby declare under penalty of perjury and pursuant to 28 U.S.C. 1746 that the following is true and correct:

DATED: November 1, 2011.

/s/ Larry Stewart
───────────────────────────
Declarant

8