UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| PAUL D. CEGLIA, | Civil Action No. 1:10-cv-00569-RJA |
| Plaintiff, | **DECLARATION OF JAMES A. BLANCO IN SUPPORT OF MOTION FOR SANCTIONS AGAINST DEFENDANTS FOR SPOLIATION OF EVIDENCE** |
| v. | |
| MARK ELLIOT ZUCKERBERG, Individually, and FACEBOOK, INC. | |
| Defendants. | |

   I, JAMES A. BLANCO submit this declaration in support of Plaintiff's Motion for Sanctions against Defendants for Spoliation of Evidence and hereby declare under penalty of perjury and pursuant to 28 U.S.C. 1746 that the following is true and correct:

1.   I am James A. Blanco, all of the facts set forth in this declaration are of my own personal knowledge and if called as a witness I could and would competently testify as to the following:

**EXAMINER'S PROFESSIONAL BACKGROUND AND WORK HISTORY:**

2.   I am a Forensic Document Examiner and I maintain a full time practice in

1  Forensic Document Examinations. My business addresses are 55 New Montgomery
2  Street, Suite 712 San Francisco California 94105 and 655 North Central Avenue 17th
3  Floor, Glendale California 91203 and 1629 K Street N.W. Suite 300 Washington, DC
4  20006.  I have been in the field of Forensic Document Examinations for over twenty
5  five years. My training, experience and qualifications as a Forensic Document
6  Examiner are set forth in my three page curriculum vitae which is attached and
7  incorporated hereto as EXHIBIT 1. My training included review of such notable cases
8  as the Zodiac Killer and the Howard Hughes Will.
9  3.     I formally subscribe to the Collaborative Testing Services tests which are
10 controlled tests with known results. These are the same tests given to forensic
11 document experts in government laboratories that are accredited by ASCLAD
12 (American Society of Crime Laboratory Directors). I continue to pass these ongoing
13 tests maintaining a <u>zero personal examiner error rate</u>.  In my government positions I
14 also accurately passed all of the "CTS" tests.
15 4.     I was formerly commissioned with the Federal Bureau of Alcohol, Tobacco and
16 Firearms working as a full time Forensic Document Examiner employee in their
17 Western Regional Forensic Science Crime laboratory. In this position I worked cases
18 for the numerous field offices ("Posts of Duty") in the United States and in the U.S.
19 Protectorates and Territories of the Special Agents of ATF which also occasionally
20 involved joint investigation cases involving DEA and FBI questioned documents cases.
21 I left this position on good terms for a full time Forensic Document Examiner employee
22 position with the California Department of Justice where I examined cases for
23 hundreds of government and law enforcement agencies throughout the State of
24 California.  I left this position on good terms to enter private practice as a Forensic
25 Document Examiner and have been in full time private practice now for fifteen years.
26 5.     In addition to civil casework, I also maintain the exclusive contract with the
27 California Secretary of State's Office for Forensic Document services wherein I service
28 their Forensic Document casework regarding voting fraud cases, and I also work cases

for numerous other government agencies both inside and outside of California including the Montana Division of Criminal Investigation, the Federal Defenders offices in Anchorage, Florida, Puerto Rico, and other agencies.

6. I have rendered expert opinions regarding questioned documents on over 6,000 occasions. I have qualified and testified as an expert witness concerning questioned documents in excess of two hundred times in both Federal and Superior Courts in numerous States and also abroad in Mexico, Singapore and the High Court of South Africa. I have never been prevented from testifying in any venue.

7. I was present at the law offices of Harris Beach in Buffalo, NY on July 15, 2011 and observed the entire day of examinations of the original questioned "*Work For Hire Contract*" by the Facebook's document experts Peter Tytell, Gus Lesnevich (and his assistant Khody Detwiler), as well as Michael Zontini of Foster and Freeman who was working closely with the Facebook document experts, especially with Peter Tytell who spent much of his time using the VSC machine[1]. Although the two-page questioned document being examined and that I later examined is titled the "Work For Hire Contract" I will refer to it as the "Facebook Contract" to be consistent with legal filings in the case. I had been informed that the experts for Facebook had already spent the entire previous day examining the Facebook Contract.

8. Over the course of the day I was not allowed to get too close to the examinations in progress by the Facebook experts. Counsel for Facebook as well as Facebook experts made it clear that I was to stay on the far side of the room and only watch from a distance.

9. I observed Facebook's experts repeatedly exposing the Facebook Contract to UV light as well as other light sources. Even though I was on the other side of the room, I could see the lights of the VSC glowing from around the sides. I further noted that the documents were repeatedly tested on the "ESDA" machine. This machine tests for the presence of latent handwriting impressions on documents. In preparation to place

---

[1] VSC stands for "Video Spectral Comparator" and is a document imaging system of Foster and Freeman.

documents on the ESDA machine, they are first humidified. I noted that the ESDA machine was being used quite a lot over the course of the day. From what I observed, the documents in question were being repeatedly humidified, then subjected to intense lighting.

10. I was so concerned about the excessive processing by Facebook experts that at one point I asked Mr. Tytell, who was at the VSC machine, what settings he was using for his UV examinations as there are three possible settings on the VSC imaging system for UV examinations. My concern was due to my personal experience with the virtually identical VSC imaging system that I use in my own office (the VSC4Plus), where I have observed that even the most benign UV setting of 365 nanometers can still have damaging effects to documents if they are subjected too long to Ultra Violet light.

11. My concern at that time rose to such a level that I shared it with Plaintiff's Counsel.

12. Indeed, by the time I was finally allowed to examine the document pages after 5:00 pm on July 15th, I observed deterioration (fading/yellowing) of the Facebook Contract pages and I also noted that the writing pen inks were virtually gone. That is, I observed only traces of writing pen inks for the interlineation on page one and for the signatures and date entries on page two. The level of ink evaporation and deterioration on both pages of the Facebook Contract sheets was extensive. So much ink had vanished in places that what can be observed mostly are just depressions in the paper with very faint traces of ink hues.

13. I took high resolution color scans of the Facebook Contract pages to archive a record of the condition of the pages at the time that I received them for examinations. To be clear, my images were taken <u>after</u> the Facebook experts had performed about twenty hours of testing and analysis. I come to that time estimate since I was advised that the examinations by Facebook Experts went from around 9:00 am the previous day (Thursday July 14th 2011) until after 9:00 pm that same evening, and then adding

those twelve hours to the eight hours of processing I observed as of Friday July 15th, 2011 gave me the rough estimate of twenty hours. The images I took at 5:00 pm on July 15th 2011 are consistent with the fading/yellowing appearance of the two-page Facebook Contract at the top of the image of documents revealed in the July 25 2011 video at 9:28:05. I have been informed that this image is when the documents were unsealed for further investigation in Chicago after the Buffalo production. Note that now the Facebook Contract is yellowed in comparison to the six page *Technical Specification* document whereas when the documents were first presented for inspection on Thursday morning on July 14th 2011 in Buffalo, before the Facebook experts started their examinations, the Facebook Contract is whiter than the *Technical Specification* document.

14. The imagery of the scans that I took show the discoloration now evident in the questioned Facebook Contract, and my imagery also shows the writing pen ink damage, which both in my opinion, could very well have been the result of the repeated exposure of the documents to UV and other light sources during the testing by Facebook's experts as well as, and in conjunction with the other examinations, testing and imaging of the Facebook Contract by the Facebook experts.

15. I observed Facebook's experts repeating the same tests on the Facebook Contract repeatedly and performing far more testing than was needed to make proper scientific determinations about the authenticity of the document.

16. The VSC imaging system is typically used to analyze and compare writing pen inks and to compare optical brighteners of papers and, or to check overt and covert security features on document pages such as Passports and other Identity documents. No such security features were present on the Facebook Contract pages, consequently only writing pen ink and machine toner could be tested which precludes the need for excessive processing.

17. Since mechanical printing and handwriting appeared on the faces (fronts) of each of the document pages, it is likely that Facebook experts did not spend much time

exposing the reverse sides to the VSC lights. Since the front sides of the Facebook Contract pages are more deteriorated/"yellowed" than the reverse sides, that supports a contention that overexposure and over processing by Facebook experts contributed to the document pages now revealing a more deteriorated condition on their front sides than on their reverse sides.

18. Over the course of my attendance at the document inspection I found the repeated examinations of the questioned documents by the Facebook experts to be excessive especially in respect to UV exposure.

19. Even the least destructive setting of UV (365 nanometers) can still be damaging surprisingly over short periods of time. I performed tests on my VSC4-Plus unit using just the 365 nanometer UV light and then covering the main document with narrow strips of paper. Even this setting at only one hour gave the test document "tan lines" demonstrating the damage that can be caused by UV long range light.

20. The book <u>Suspect Documents Their Scientific Examination</u> by Wilson R. Harrison is a recognized primer in the field of Forensic Document Examination and a technical authority. Harrison's book gives the following warnings[2] regarding the dangers of over exposure of documents to both UV and infrared lights:

> "As ultra-violet light is highly actinic, the exposure of a document to a powerful source should be restricted to the minimum, for the dyestuffs in some coloured inks and in many typewriter ribbons are fugitive and may fade appreciably even during comparatively short exposures. This fading may have serious consequences for there may be no known procedure whereby the colour may be restored.... **The deep yellowing of the cheaper grades of paper and the rapid fading of coloured inks**, especially those used in typewriter ribbons, when they are exposed to sunlight immediately spring to mind in this connection. Eventual deterioration is experienced by the best qualities of paper and the majority of inks, only the process takes longer"…

> "In the course of laboratory examination, documents may have to be exposed to powerful sources of ultra-violet light or infra-red radiation. It should be borne in mind that a short exposure to a powerful source of ultra-violet radiation is likely to do far more harm than months of exposure to ordinary daylight. Infra-red sources will cause a serious rise in the temperature of a document unless suitable precautions are taken with respect to ventilation. It should be a matter of routine to mask as much of the document as possible and to use all possible means to decrease the time of exposure."

---

[2]SUSPECT DOCUMENTS THEIR SCIENTIFIC EXAMINATION By Wilson R. Harrison, M.S.c., Ph.D. Pages 82, 89, 90, 458, 459

Another study revealed that "Thus, every hour of UV irradiation accelerates the aging by approximately 182 days."[3]  Consequently, it should be clear that UV exposure can cause serious damage to both paper and inks on documents.

21. I have not yet prepared a report in this case but some of my preliminary findings are as follows based upon my examinations and analysis of the original Facebook Contract:

    a) I also evaluated the signature on page two of the Facebook Contract and confirmed, by comparison to other legal documents signed by Mr. Zuckerberg in other cases, that the signature on page two of the Facebook Contract is Mr. Zuckerberg's.

    b) I have examined the staple holes at the upper left-hand corner of both pages of the Facebook Contract and I have determined that the staple holes on both pages align demonstrating that these two pages of the Facebook Contract have only been stapled one time wherein they were actually stapled together.

    c) The impression from the handwritten interlineation appearing on page one is present as a latent handwriting impression on page two. What that means is that page one was over the top of page two at the time that the handwritten interlineation was made on page one.

    d) Using a micrometer I measured both pages of the Facebook Contract and each page measured ("micked") at .011 thousands.

    e) I examined the opacity and the coddling features (texture) of pages 1 and 2 of the Facebook Contract and these features were the same between both pages.

22. None of these examinations revealed evidence to suggest that page 1 had been substituted out for some supposed other previous page 1 for the Facebook Contract.

---

[3] EVALUATION OF LASER DESPORPTION MASS SPECTROMERTRY AND UV ACCELERATED AGING OF DYES ON PAPER AS TOOLS FOR THE EVALUATION OF A QUESTIONED DOCUMENT. By Donna M. Grim, B.S., Jay Siegel, Ph.D., and John Allison, Ph.D.  Journal of Forensic Science November 2002-Vol 47, Number 6, Pgs 1,2,3,5,6,7,8

1 ///
2       I hereby declare under penalty of perjury and pursuant to 28 U.S.C. 1746 that
3 the following is true and correct:
4 DATED: October 31, 2011.

                                                     /s/ James Blanco
                                                     Declarant