IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTS


CONNECTU, INC., CAMERON
WINKLEVOSS, TYLER WINKLEVOSS
and DIVYA NARENDRA,
                    Plaintiffs,
vs.                                 No. 1:07-CV-10593-DPW
                                    USDS District of
FACEBOOK, INC., MARK                Massachusetts
ZUCKERBERG, EDUARDO SAVERIN,
DUSTIN MOSKOVITZ, ANDREW
MCCOLLUM AND THE FACEBOOK, LLC,

        Defendants.




           CONFIDENTIAL - ATTORNEY'S EYES ONLY
              DEPOSITION OF AARON GREENSPAN
               Thursday, November 29, 2007


            SHEILA CHASE & ASSOCIATES
                  REPORTING FOR:
               LiveNote World Service
            221 Main Street, Suite 1250
            San Francisco, California  94105
               Phone:  (415) 321-2300
               Fax:  (415) 618-0743

Reported by:
JANIS JENNINGS, CSR, CRP




        Deposition of AARON GREENSPAN, taken
    on behalf of the Defendant, at Orrick, Herrington
    & Sutcliffe, LLP, 1000 Marsh Road, Menlo Park,
    California, 94306, beginning at 9:12 A.M. on
    Thursday, November 29, 2007, before JANIS L.
    JENNINGS, Certified Shorthand Reporter No. 3942,
    CRP

            A P P E A R A N C E S

FOR THE PLAINTIFFS:

        THOMAS E. WALLERSTEIN, ESQ.
        QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
        555 Twin Dolphin Drive, Suite 560
        Redwood Shores, California  94065
        Phone: 650.801.5000
        Fax: 650.801.5100
        tomwallerstein@quinnemanuel.com

FOR THE DEFENDANTS FACEBOOK, INC., MARK ZUCKERBERG,
DUSTIN MASKOVITZ, ANDREW MCCOLLUM and THEFACEBOOK,
LLC:

        MONTE M.F. COOPER, ESQ.
        THERESA SUTTON, ESQ.
        ORRICK, HERRINGTON & SUTCLIFFE, LLP

```
1000 Marsh Road
Menlo Park, California  94025-1015
Phone: 650.614.7400
Fax: 650.614.7401
mcooper@orrick.com
tsutton@orrick.com
```

FOR THE DEFENDANT EDUARDO SAVERIN:

```
NATHAN E. SHAFROTH, ESQ.
HELLER EHRMAN, LLP
333 Bush Street
San Francisco, California  94104-2878
Phone: 415.772.6000
Fax: 415.772.6268
nathan.shafroth@hellerehrman.com
```
FOR THE DEPONENT:
```
DAVID M. FURBUSH, ESQ.
PILLSBURY WINTHROP SHAW PITTMAN, LLP
2475 Hanover Street
Palo Alto, California  94304-1114
Phone: 650.233.4000
Fax; 650.233.4545
david.furbush@pillsburylaw.com
```

Also Present:  Peter Hibdon, Videographer


                    I N D E X

DEPOSITION OF
AARON GREENSPAN

                                       Page

    Examination by Mr. Cooper            8

    Examination by Mr. Wallerstein     279

    Further Examination by Mr. Cooper  299

    Examination by Mr. Shafroth        300

                     EXHIBITS
No.              Description              Page
Exhibit 1   Notice of Deposition of Aaron Greenspan   38
Exhibit 2   Email dated 8/1/03 from Harvard SEC;      40
            No. AG000136

Exhibit 3   Article from The Harvard Crimson
            "Student Site Stirs Controversy";
            Nos. AG1-2                                70

Exhibit 4   Letter dated 8/13/03 from Harvard SEC;
            No. AG000127                              88
Exhibit 5   Email thread dated 8/22/03 from Lowell
            House Senior Tutor; Nos. AG71-76          97

Exhibit 6   Email dated 9/18/03 from Aaron
            Greenspan; No. AG80                      103
Exhibit 7   Email dated 9/19/03 from Harvard
            College SEC; No. AG82                    115

Exhibit 8   Email dated 9/18/03 from Harvard
            College SEC; No. AG79                    134

Exhibit 9     Member list; Nos. AG13-70                    197

          I N D E X  (Continued)

                    EXHIBITS

No.                    Description              Page
Exhibit 10    Email thread dated 9/20/03 from Lowell-
              Open-Request@toad.hcs.harvard.edu;
              Nos. AG83-90                            219
Exhibit 11    Usage Statistics for www.kirkland.
              harvardsec.org; Nos. AG1127-1235        223

Exhibit 12    Email dated 10/10/03 from Harvard
              College SEC; Nos. AG99-100              230
Exhibit 13    Usage Statistics for www.kirkland.
              harvardsec.org; Nos. AG1236-1246        231

Exhibit 14    Usage Statistics for www.kirkland.
              harvardsec.org; Nos. AG1247-1257        234
Exhibit 15    The Harvard Crimson Article dated
              12/11/03 "Put Online a Happy Face";
              No. FBMA0000272                         236
Exhibit 16    Email thread dated 12/6/03 from Andrew
              Colin Stillman; Nos. AG104-105          238

Exhibit 17    Meeting agenda dated 12/14/03 for the
              Harvard University Faculty of Arts and
              Sciences; Nos. FBMA0000273-279          242

Exhibit 18    Email dated 1/6/04 from Mark Elliot
              Zuckerberg; No. AG111                   247
Exhibit 19    Email thread dated 1/6/04 from Mark
              Elliot Zuckerberg; No. AG112            249

Exhibit 20    Web page "Friendster Beta," "Friendster
              Tour," "Friendster Terms of Service
              Agreement," "Friendster Privacy Policy" 251

Exhibit 21    Email thread dated 1/6/04 from Mark
              Elliot Zuckerberg; No. AG113            254
Exhibit 22    Email thread dated 1/6/04 from Mark
              Elliot Zuckerberg; No. AG114            257

          I N D E X  (Continued)

                    EXHIBITS

No.                    Description              Page

Exhibit 23    The Harvard Crimson article "New
              Online Facebook Launched"; No. AG09     267
Exhibit 24    Usage Statistics for www.kirkland.
              harvardsec.org; Nos. AG1258-1267        270

Exhibit 25    Usage Statistics for www.kirkland.
              harvardsec.org; Nos. AG1268-1278        270
Exhibit 26    Usage Statistics for www.kirkland.
              harvardsec.org; Nos. AG1279-1289        270

Exhibit 27    Graph titled Usage by Country for
              September 2003; Nos. AG164-195          270
Exhibit 28    Article titled "Authoritas";
              Nos. FBMA0001483-1787                   270

Exhibit 29    Article from The New York Times titled

3

"Who Founded Facebook?  A New Claim
Emerges"; 4 pages                          270

Exhibit 30   HouseSYSTEM Demonstration DVD      301

MENLO PARK, CALIFORNIA; THURSDAY, NOVEMBER 29, 2007;
                    9:12 A.M.
                    --oOo--
          THE VIDEOGRAPHER:  Good morning.  Here
begins the videotaped deposition of Aaron Greenspan,
tape 1, Volume I, in the matter of ConnectU versus
Facebook, in the United States District Court,
District of Massachusetts.  The case number is
1:07-CV-10593-DPW.
          Today's date is November 29th, 2007, and
the time is 9:12.
          The video operator is Peter Hibdon
representing LiveNote World Service, 221 Main
Street, Suite 1250, San Francisco, California.
          The court reporter is Janis Jennings of
Sheila Chase reporting on behalf of LiveNote World
Service.
          Today's deposition is taking place at
1000 Marsh Road, Menlo Park, California.
          Would counsel please identify themselves
and state whom they represent.
          MR. COOPER:  Monty Cooper representing
all defendants, except Eduardo Saverin, with the
Law Firm of Orrick, Herrington & Sutcliffe.  With
me is Theresa Sutton also of Orrick, Herrington &
Sutcliffe.
          MR. SHAFROTH:  Nathan Shafroth from
Heller Ehrman, LLP, representing Eduardo Saverin.
          MR. WALLERSTEIN:  Tom Wallerstein with
Quinn, Emanuel, Urquhart, Oliver & Hedges
representing the plaintiffs.
          MR. FURBUSH:  David Furbush representing
the witness.
          THE VIDEOGRAPHER:  Thank you.
          Will the court reporter please swear in
the witness.

               AARON GREENSPAN,
          The deponent herein, was sworn and
          testified as follows:

               EXAMINATION
BY MR. COOPER:
     Q.   Mr. Greenspan, good morning.  I'm Monte
Cooper.  I represent all defendants except Eduardo
Saverin in this matter.
          Have you ever had your deposition taken
before?
     A.   Yes.
     Q.   All right.  How many times?
     A.   Total?  One.
     Q.   Okay.  I presume then that you know some

of the basic rules.  I just want to repeat them so
that we're all on the same page.

First of all, always try and answer yes or
no as opposed to uh-huh or huh-huh or something that
gives an indirect reference if it's in a written
transcript.

The second thing is I would ask as a
courtesy to your own attorney that you take a moment
after every question in case he has an objection or
in case counsel for the plaintiffs might have an
objection.  They are allowed to interpose it, but
unless your attorney instructs you otherwise, you
must go ahead and answer the question to the best
of your ability.

Do you understand that?

A.    Yes.

Q.    All right.  Also you are -- it's at
your convenience today so I don't want you to feel
uncomfortable.  If you need to take a bathroom break
or if you have some reason you need to take a break,
feel free to let us know and we'll accommodate.

It is our expectation, or my expectation,
that I should be able to get you out of here at a
relatively decent time, and I do not expect that
this deposition will last any greater length than
necessary and hopefully it will not disrupt your
day too badly.

Having said that, are you on any type
of medication or is there any disability today
that would prevent you from answering any questions
truthfully?

A.    No.

Q.    Okay.  Mr. Greenspan, can you just tell us
first of all where you live.

A.    I live in Palo Alto.

Q.    All right.  Palo Alto, California?

A.    Yes.

Q.    All right.  You understand that you're
being videotaped today?

A.    I do.

Q.    All right.  And you understand that the
testimony you give, both in written form and perhaps
in video form, can later be shown and repeated back
to a court of law, including any trial of this
matter?

A.    I do.

Q.    All right.  So you understand the
obligations of truthfulness and candor, I assume?

A.    Yes.

Q.    All right.  Did you prepare for today's
deposition?

A.    I did.

Q.    All right.  Did you meet with counsel
prior to today's deposition?

A.    Yes.

Q.    All right.  Did you meet with anybody else
prior to today's deposition?

A.    Regarding this deposition?

Q.    Yes.  Yes.  I'm sorry.

A.    No.

Q.    Okay.  Just at a high level, do you have
any sense of how long you prepared for today's
deposition?

A.    A few hours.

Q.    Okay.  Was that yesterday or --

A.    Some of those hours were yesterday.

Q.   But it was over a period of time?

A.   Much of what I will tell you has been, you know, acquired by me over a long period of time so...

Q.   I understand that.  Let me just rephrase.  I just want to say:  You prepared for a couple of hours yesterday and maybe some other time, but in the aggregate, just a couple hours for today's deposition.  That's all.

A.   Correct.

Q.   Okay.  How long have you resided in Palo Alto?

A.   Since July of 2006.

Q.   All right.  Did you reside anywhere else?  Or where did you reside prior to Palo Alto?

A.   Actually, I was in Atherton for two months and then Mountain View and then Palo Alto.  So I've been in California since July of 2006, and I lived in Texas before that.

Q.   Okay.  And how long did you live in Texas?

A.   About one year.

Q.   All right.  Let me step back.  Can you just give me an overview of your education.

A.   I went to Harvard College for my undergraduate education.

Q.   All right.  And when did you go to Harvard College?

A.   From September of 2001 until June of 2004.

Q.   Did you graduate early?  Let me strike that.

Did you graduate from Harvard?

A.   Yes.

Q.   All right.  So if you graduated in June 2004, did you graduate in three years?

A.   Yes.

Q.   All right.  Where did you grow up?

A.   I grew up in Cleveland, Ohio.

Q.   Okay.  What was your major at Harvard?

A.   Economics.

Q.   I'm sorry?

A.   Economics.

Q.   All right.  Did you have any computer science courses while you were at Harvard?

A.   Yes.

Q.   How many?

A.   One course and one independent study.

Q.   All right.  What was the one course in?

A.   It was called "Computer Science 50."

Q.   Okay.  That's an introductory computer science course?

A.   Yes.

Q.   All right.  Do you have any programming skills?  Computer programming skills?

A.   I suppose you can say that I do.

Q.   All right.  Have you ever coded in C++, for instance?

A.   Yes.

Q.   All right.  What computer languages have you coded in?

A.   Basic, PASCAL, C, C++, SQL, Axcess Basic, Visual Basic, PHP, CSS, JavaScript, HTML, and probably others.

Q.   Okay.  You mentioned SQL.

A.   Yes.

Q.   How proficient are you in SQL?

A.   Very.

Q.   All right.  Did you program in SQL before
you went to Harvard?
A.   Yes.
Q.   And for how long did you program in SQL
before you went to Harvard?
A.   I believe two years.
Q.   Okay.  You mentioned PHP.
A.   Yes.
Q.   All right.  Did you program in PHP before
you went to Harvard?
A.   Yes.
Q.   In fact, PHP often works together with
SQL; correct?
A.   It can.
Q.   All right.  How proficient do you consider
yourself to be in programming PHP?
A.   Very.
Q.   Okay.  You mentioned HTML.
A.   Yes.
Q.   All right.  Did you program in HTML before
you went to Harvard?
A.   Yes.
Q.   All right.  How proficient do you consider
yourself to be in programming HTML?
A.   Very in HTML.
Q.   All right.  You also mentioned JavaScript.
A.   Yes.
Q.   All right.  Did you program in JavaScript
before you went to Harvard?
A.   Yes.
Q.   All right.  How proficient would
you consider yourself to be in programming in
JavaScript?
A.   Moderate to very.
Q.   All right.  While you were at Harvard, did
you program any -- strike.
        When you say you are very proficient
in programming in SQL, can you give me an overview
of some of the types of projects you've done in
programming in SQL?
A.   It's difficult to do a project in SQL
alone.
Q.   Okay.
A.   However, I've used SQL in conjunction with
a range of projects from projects that I've been
paid for through my company to projects I did while
I was at school.
Q.   Are you familiar with the programming
language called PERL?
A.   Yes.
Q.   Are you able to program in PERL?
A.   To a limited extent, yes.
Q.   Now, you say you're familiar with PHP,
HTML, SQL, JavaScript and the like; correct?
A.   Yes.
Q.   All right.  Would you agree with me that
those particular programs are frequently used in
what is known as "web design"?
A.   They are used in web-based development.
Q.   Okay.  And what do you consider web-based
development to be?
A.   In contrast to web design, which I
consider the graphic design of websites, I consider
web-based development to be the development of
computer code that allows web pages to be
constructed in a specific manner, which may be

or may not be dependent upon the graphic design.
    Q.   Okay.  Now, when you say that you consider
web-based development separate from web-based design
and it's because of the graphics, are you talking
about the user interface?
    A.   In part.
    Q.   And also the applications that can be
presented, for instance, by a browser?
    A.   I'm not sure I understand the question.
    Q.   Have you ever heard the term "front
end" --
    A.   Yes.
    Q.   -- in terms of computer science?
        You have?
    A.   Yes.
    Q.   All right.  Do you consider yourself --
okay.
        What do you understand the expression
"front end" to refer to?
    A.   This is actually a controversial topic,
but my understanding is the graphic design and user
interface of a website.
    Q.   All right.  Now, the programs that you
reflected that you have a capacity of programming
in are frequently used for front end design or front
end development; correct?
    A.   The programming languages that I listed
previously would be considered used for back end
development.
    Q.   Okay.  SQL -- all right.  Strike that.
        What do you consider back end development
to be?
    A.   I consider back end development to be
related to the database structure of a website and
the logic flow of the website itself.
    Q.   All right.  And the database structure of
a website, is that often called "schema"?
    A.   Schema is a word that can be used to refer
to the database structure.
    Q.   All right.  Do you consider yourself
primarily fluent in back end design then?
    A.   No.
    Q.   All right.  In the context of front end
design, what programs do you typically use?
    A.   Adobe PhotoShop, Adobe Illustrator, Adobe
In-Design, Macromedia Flash, Adobe Streamline and
various other graphic design tools.
    Q.   Okay.  Would that include, for instance,
Microsoft Visual?
    A.   No.  Microsoft Visual Studio is
typically not used in PHP and is used to construct
web-based -- or, I'm sorry -- Windows-based
applications.
    Q.   All right.  Do you do any Windows-based
development?
    A.   Not presently.
    Q.   Now, you mentioned, for instance, types of
applications like Flash are what you used for front
end design?
    A.   Not exclusively.
    Q.   Well, Adobe Flash and several others that
you listed; correct?
    A.   Yes.
    Q.   And that's to design an interface that is
presented by a web browser, for instance, to a user
that views the site; correct?

A.   Yes.  That is primarily what the front end is for.

Q.   All right.  And do you consider yourself proficient in front end design in those types of applications?

A.   Yes.

Q.   Okay.  And then in terms of back end design, you referred to it primarily as SQL, HTML, PHP and the like; correct?

A.   Correct.

Q.   And you also consider yourself proficient in back end design; correct?

A.   Yes.

Q.   All right.  How long have you been programming front end-type web development applications?

A.   Since 1996.

Q.   All right.  So prior to Harvard?

A.   Yes.

Q.   All right.  And does that continue through the present day?

A.   Yes.

Q.   All right.  How long have you been developing back end applications?

A.   I've been developing databases since 1995 and web-based applications since 2001.

Q.   Okay.  And is that continuing through the present?

A.   Yes.

Q.   All right.  When you say you developed back end data -- that you developed a database, does that include the database that's populated, for instance, by the information generated by SQL?

A.   To my knowledge, almost every relational database in use since the early 1990s populates its data with SQL.

Q.   Okay.  But you do understand what I'm referring to in terms of what "populating a database" means; correct?

A.   My understanding of populating a database is inserting information into the database.

Q.   All right.  That typically occurs on a -- that can frequently occur on a type of a computer called a "server"; correct?

A.   Among others.

Q.   All right.  When you were at Harvard, were you doing any front end design for any type of web development project?

A.   Yes.

Q.   All right.  Can you list those projects.

A.   Let's see, are you interested in projects that I worked on for my company?  For Harvard itself?  For my own amusement?  Or all of the above?

Q.   Well, let's break them out.  And before we go into it, you say "my company" in that last answer.  What company are you referring to?

A.   Think Computer Corporation.

Q.   All right.  And what is -- is Think Computer Corporation a company that was created by you while you were at Harvard or sometime before?

A.   I incorporated the company in 1998.

Q.   So you incorporated it three years before you -- three years before you entered Harvard?

A.   A little bit more than three years, yes.

Q.   Okay.  Where did you incorporate?

A.   Ohio.

Q.   All right.  Did you have a position with
Think Computer Corporation?
     A.   President and CEO.
     Q.   All right.  Were there any other officers
of the company prior to your entering Harvard?
     A.   Neil Greenspan is the vice president and I
believe the secretary.
     Q.   Okay.  Neil Greenspan, is he related to
you?
     A.   Yes.
     Q.   Is he your brother?
     A.   No.
     Q.   Is he your father?
     A.   Yes.
     Q.   Okay.  Did you have any other company that
you started prior to entering Harvard?
     A.   Yes.
     Q.   And what was that?
     A.   Think Computer Foundation.
     Q.   First of all, what type of company was
Think Computer Corporation?
     A.   At the time I incorporated it, it
primarily focused on computer services such as
IT consulting and computer repair.
     Q.   And "IT" is Information Technologies?
     A.   Yes.
     Q.   Was it a for-profit company?
     A.   Think Computer Corporation was and is a
for-profit company.
     Q.   Okay.  And you still ran it even when you
were at Harvard?
     A.   Yes.
     Q.   All three years you were at Harvard?
     A.   Yes.
     Q.   All right.  Other than you and your
father, did anyone else assist in the running of
the corporation while you were at Harvard?
     A.   No.
     Q.   You said it initially was involved with
IT and computer services; correct?
     A.   Correct.
     Q.   Did it evolve into something else?
     A.   Yes.
     Q.   All right.  Can you give me the
evolutionary history of Think Corporation.
     A.   In 2001 I decided to focus on computer
software development and web-based software
development instead of on computer services.
     Q.   And by "web-based development," does that
mean web design?
     A.   It includes web design.
     Q.   All right.  Can you just give me some
overview of some types of projects you did in
web-based design or web-based development while
you were with Think Corporation while at Harvard.
     A.   I created a database and website for
the Harvard University Psychology Department, a
prosopagnosia research project, which is a face
blindness disorder where you cannot recognize
people's faces.  And that website was called
faceblind.org, and I designed everything related
to that website.
          I did do other projects for clients I had
had prior to Harvard, including I believe a company
called Worldview Technologies in New York.  And at
this point I cannot remember a whole lot of what I

was working on for Think in 2001, but I had a number
of clients who I would do work for regularly.

Q. Okay. Did Think Corporation do any work
for any other Harvard department other than the
psychology department?

A. During my time at Harvard, no. But since
then, yes.

Q. Okay. During the time you were at
Harvard, what -- you said that you also did
front end design for Harvard separate from
Think Corporation when you were listing earlier.

Do you recall saying that?

A. Yes.

Q. All right. What did you have in mind when
you said you did web design for Harvard?

A. What I said was: Do you want me to
list the projects I worked on for Think Computer
Corporation for Harvard or for all of the above?
I don't know that I said that I actually did
projects for Harvard, and if I said that, I was
referring to projects I would have done for Harvard
through Think Computer.

Q. Okay. And that -- to the best of your
knowledge, that's the projects you were just
listing; correct?

A. Yes; that's one of them.

Q. All right. Now, you also said -- you
asked me if I wanted to inquire about any that you
may have done just for yourself, any type of web
development you did for yourself.

A. Correct.

Q. Were there projects you did just for
yourself while you were at Harvard?

A. Yes.

Q. All right. What were those?

A. The first project that I worked on for
my own benefit and the benefit of my friends was a
web-based email system for Harvard students which I
called FASt Webmail.

Q. When did you develop FASt?

A. I don't remember the precise date, but it
was sometime in 2001, I believe.

Q. And it was an email delivery system?

A. No. It was a web-based email system.

Q. And by "web-based email system," what
do you mean?

A. It was a website that allowed you to check
your email using no other tools than the website
itself.

Q. Did that -- was it limited to any
particular email account? By that I mean was it
limited only to Harvard email addresses or was it
any type of email address?

A. It was designed specifically to work with
Harvard's email server and by virtue of that design,
it was limited to Harvard email addresses.

Q. All right. And that would be a
fas.harvard.edu address?

A. Correct.

Q. Now, you said you started with FASt.

A. That was the first project I remember
doing.

Q. All right. What other projects did you do
while at Harvard for yourself?

A. The next project was called CriticalMass
which was a web-based course review system that

allowed students to post reviews either using their
own name or anonymously.

Q.   And by "a web-based course review" you
mean the students would critique the teacher or the
professor and the course itself?

A.   Either or both.

Q.   Was it essentially like a comment-based
system?

A.   Comments were used in the system.

Q.   All right.  Was it a ranking system?

A.   It also provided rankings.

Q.   Are you familiar with Slashdot?

A.   Yes.  I think that's right.

Q.   All right.  And are you familiar with the
ranking system employed by Slashdot?

A.   I believe I know what ranking system
you're referring to.

Q.   All right.  Would you agree that Slashdot
provides comments as well as provides editorial
comments on new applications?

A.   Yes.

Q.   All right.  I'm just trying to figure out
if CriticalMass worked similar to Slashdot.

A.   It did not.

Q.   Okay.  Going back to FASt.  Did you
publish that tool to all Harvard students?

A.   It was available for all Harvard students
to use.

Q.   Where was -- what server was it run off
of?

A.   Think Computer's primary web server.

Q.   All right.  And where was Think Computer's
primary web server?

A.   Physically?

Q.   Yes.

A.   Hoboken, New Jersey, at the time.

Q.   All right.  And were you remotely logging
into it to administer it?

A.   I did on occasion.

Q.   Okay.  And how was it published to the
Harvard students?

A.   I don't understand your question.

Q.   How was information made available to
Harvard students to know that they could use FASt?

A.   I told them.

Q.   All right.  And was that by word of mouth
or by email, or both?

A.   I don't recall.

Q.   And you were familiar with the
houseSYSTEM -- by that I mean the houses that
students live in at Harvard?

A.   Yes.

Q.   All right.  Which house did you live in?

A.   Starting my sophomore year I lived in
Lowell House.

Q.   That's L-o-w-e-l-l; correct?

A.   Correct.

Q.   All right.  And did you always reside in
Lowell House or did you reside anywhere else while
you were at Harvard?

A.   No.  Prior to residing in Lowell House, I
live in Gray's Hall.

Q.   Okay.  In 2003 were you in Lowell?

A.   During parts of 2003, yes.

Q.   Throughout the Harvard course year in
2003, were you in Lowell?

A.   Yes.

Q.   All right.  Was there a methodology
that you could send emails to all students in
the Lowell House if you had some reason to?

A.   No.

Q.   All right.  By that I meant was there a
Lowell House group distribution email account?

A.   There was a mailing list called
Lowell-Open, but it did not reach all students in
Lowell House.

Q.   Okay.  How did you become a member of
Lowell-Open?

A.   One had to subscribe to the mailing list
by either sending an email to the list itself or by
using the website set up for that specific purpose.

Q.   Was the same true, if you know, for
other houses at Harvard?

A.   To my knowledge, most of the other
houses had similar mailing lists, but not all of them were
set up in an identical manner.

Q.   All right.  Do you know how the -- are
you familiar with the house at Harvard called
Pforzheimer?

A.   "Pforzheimer"?

Q.   Yes.

A.   Yes.

Q.   All right.  Do you know how its group
email, if any, was set up?

A.   I don't recall precisely.

Q.   All right.  Are you familiar with the
house called Kirkland?

A.   Yes.

Q.   All right.  Do you know how Kirkland's
house group email server was set up or address was
set up?

A.   I don't recall.

Q.   I'm sorry?

A.   I don't recall.

Q.   Okay.  Was the use of group email
addresses one of the ways you disseminated knowledge
about FASt?

A.   No.  As I mentioned, I made FASt email in
2001, or I believe 2001, and at that time I was not
in a house and so I had no access to house lists.

Q.   All right.  Did you run FASt after you
entered a house?

A.   Yes.

Q.   After you entered -- and the house that
you entered was Lowell?

A.   Yes.

Q.   After you entered Lowell, did you then
disseminate information about FASt by group email?

A.   No.

Q.   Okay.  Was FASt still operating when you
entered Lowell?

A.   To my knowledge it was.

Q.   All right.  But were you taking any effort
to publicize it in any way different than you had
before you entered Lowell?

A.   Not as its own product, no.

Q.   Do you have a sense how many people knew
about FASt at Harvard?

A.   Approximately 20 to 30.

Q.   All right.  You indicated that the server
that operated for FASt was in Hoboken, New Jersey?

A.   Yes.

Q.   Did you have administrative rights to that server?

A.   Yes.

Q.   Did you have the ability to review server logs?

A.   I did.

Q.   And did that include usage logs?

A.   Define "usage logs."

Q.   Were you able to determine how frequently people were logging into the FASt website?

A.   Yes.

Q.   All right.  Do you have a sense in the 2001 time frame how frequently people were logging into FASt?

A.   Of those people who knew about it, at least once a day.

Q.   Okay.  Now, you then said at some point you developed a program called CriticalMass, I believe?

A.   Yes.

Q.   All right.  When did you develop CriticalMass?

A.   During the fall semester of 2002, if my memory is correct.

Q.   And CriticalMass was a web-based course review initially?

A.   CriticalMass was a web-based course review system.

Q.   All right.  Do you have a sense how many people knew about CriticalMass about the time it began operation?

A.   At the time it began operation, I don't know.

Q.   Did you try and publicize CriticalMass?

A.   Yes.

Q.   How did you do that?

A.   I might have used the Lowell-Open mailing list, but primarily I believe it was publicized through articles in The Crimson.

Q.   And The Crimson is The Harvard Crimson?

A.   Yes.

Q.   And that's the university magazine or newspaper; correct?

A.   It's the university newspaper.

Q.   Okay.  And when you say that you primarily tried to publicize it through The Harvard Crimson, was that by editorial?

A.   An editorial was at one point written about CriticalMass in The Crimson.

Q.   All right.  Were there other ways that Crimson publicized CriticalMass?

A.   I believe also in addition to the editorial an article was also written.

Q.   So to the best of your knowledge, there were two articles in The Crimson about it?

A.   I don't know specifically how many times it was mentioned, but there were at least two articles.

Q.   Okay.  How long did CriticalMass operate?

A.   Independently?

Q.   Yes.

A.   Until August of 2003.

Q.   What happened in August of 2003?

A.   I combined CriticalMass with other projects I had made at Harvard into houseSYSTEM.

Q.   And houseSYSTEM is yet another project

that you worked on at Harvard?

A.   Yes.

Q.   And that was for your own interests?

A.   I would say more than my own interests.
It was for the interests of the student body in
general.

Q.   Okay.  houseSYSTEM, when did you first
start working on it, separate from -- just so I'm
clear on this -- separate from CriticalMass?

A.   I began working on it during the summer
of 2003.

Q.   Okay.  And sometime in August of 2003 you
integrated CriticalMass into houseSYSTEM?

A.   No.

Q.   All right.  You said CriticalMass operated
independently up until August 2003.

A.   Correct.

Q.   What did you mean by "independently"?

A.   I meant outside of any other project.

Q.   All right.

A.   Your previous question was incorrect as a
statement because I integrated CriticalMass as I
worked on the project throughout the summer but only
took down the independent version in August.

Q.   Okay.  Was CriticalMass integrated in some
fashion into houseSYSTEM by August 2003?

A.   Yes.

Q.   Okay.  What was houseSYSTEM as of August
2003?

A.   Generally speaking, it was a student
portal that allowed students to set up proposed
course schedules, to review courses, to buy and
sell textbooks, to buy and sell items from other
students, to post on a message board for each house,
to provide contact information for each house in a
standardized fashion, to provide pictures of each
house in color, which for Harvard was something new,
and to generally foster a better sense of community
within each house.

Q.   Now, when you say "each house," you're
referring to each of the Harvard houses like Lowell?

A.   Yes.  And also there was a site for the
Harvard Yard for freshmen.

Q.   All right.  And the Harvard Yard is
the houses like Gray's Hall that you referred to;
correct?

A.   It comprises those residences.

Q.   All right.  Do you recall when houseSYSTEM
was made available to the Harvard student body?

A.   It was made available publicly on
August 1st, 2003.

Q.   And how was it made available -- let me
first break those in two.

You say "made available publicly."  What
do you mean by "publicly"?

A.   Some members of the student body had
access to houseSYSTEM before because they were
assisting in its development, but the student
body as a whole had access as of August 1st.

Q.   Okay.  And how did the student body as a
whole have access as of August 1st?

A.   They could visit the website for their
respective residence on the Internet.

Q.   Okay.  houseSYSTEM, where was the server
that operated for it located?

A.   Hoboken, New Jersey.

Q.   All right.  Is it the same server that you
used for FASt?

A.   Yes, it was.

Q.   All right.  And so, again, you still
had administrative rights to the server as well;
correct?

A.   Yes.

Q.   All right.  Did that permit you to view
the amount of usage of the site?

A.   Yes, it did.

Q.   On a daily basis?

A.   If I so desired, yes.

Q.   And also on a monthly basis?

A.   In aggregate, I suppose, yes.

Q.   Mr. Greenspan --

MR. COOPER:  Let's mark this (indicating).
(Whereupon, Greenspan Exhibit 1 was
marked for identification.)

BY MR. COOPER:

Q.   Mr. Greenspan, I put in front of you a
notice of deposition, Exhibit 1.

Prior to today, did you receive a copy of
this document?

A.   Not to my knowledge.

Q.   If you turn to the third page of the
subpoena.

Do you see that?

A.   This page (indicating)?

Q.   Yes.  Do you know if you received a copy
at least of the subpoena?

A.   I did.

Q.   All right.  And there's on the final page
of the document a list of items that are listed
under an Attachment A.

A.   Yes.

Q.   All right.  Those are documents that were
requested by the subpoena.  Do you understand that?

A.   Yes.

Q.   All right.  Did you in fact look for
documents that fell into the various categories
shown 1 through 11 on Schedule A -- or Attachment A?

A.   I did.

Q.   All right.  Can you tell me what sources
you searched to respond to the subpoena.

A.   From my own memory, digital files I have
from my time at Harvard and paper files from my time
at Harvard.  That's primarily it.

Q.   All right.  When you say you have digital
files from your time at Harvard, are those files on
your own computer at home, for instance?

A.   They are files on my own computer.

Q.   Are they also files on any website you
operate?

A.   Yeah.  I'm sorry.  Not on websites I
operate.  But, for example, The Crimson's website
would be a website that I looked at.

Q.   Okay.  And you still have copies of your
Harvard email with you?

A.   I do.

Q.   Do you have a complete copy of all emails
you had while you were at Harvard?

A.   I have a copy of every email I did not
delete; yes.

Q.   Okay.  And those were amongst the records
you searched as well; correct?

A.   Yes.

          MR. COOPER:  All right.  I will mark
Exhibit 2.
          (Whereupon, Greenspan Exhibit 2 was
          marked for identification.)
BY MR. COOPER:
     Q.   Mr. Greenspan, I put in front of you
apparently a text document that was an email that
was sent at an earlier date dated August 1st, 2003.
          Is this one of the documents that you
were able to produce as part of this litigation in
response to the subpoena?
     A.   Yes.
     Q.   All right.  First of all, the email
account says that it was sent from Harvard SEC,
info@harvardsec.org.
          Do you see that?
     A.   I do.
     Q.   All right.  Harvard SEC, is that a group
that you belonged to?
     A.   Yes.
     Q.   All right.  It's a student organization at
Harvard?
     A.   Yes.
     Q.   All right.  What was the formal name of
that student organization?
     A.   At one point in time it was the Harvard
Student Entrepreneurship Council.  Later on we were
asked to change it to the Harvard College Student
Entrepreneurship Council.
     Q.   Is that because someone was using the
acronym SEC, another student group?
     A.   No.
     Q.   All right.  What was the reason you were
asked to change the title?
     A.   I wish I knew.
     Q.   All right.  Who asked you to change the
title?
     A.   Judith Kidd.
     Q.   Who is Judith Kidd?
     A.   She was and I believe is a dean at Harvard
College.
     Q.   All right.  As of August 1st, 2003,
however, the group was still called Harvard SEC;
correct?
     A.   At that time it was called Harvard SEC.
     Q.   How many students were members of the
organization, if you know?
     A.   I don't recall.
     Q.   Do you have an idea of approximately how
many?
     A.   I believe there were probably 25
active members and many other people who may
have considered themselves members but were
not necessarily active.
     Q.   Okay.  Did you have any position with
Harvard SEC?
     A.   At the time of this document's creation,
I was the president.
     Q.   All right.  That means you were president
of Harvard SEC as of Friday August 1st, 2003?
     A.   Yes.
     Q.   All right.  And as a student group at
Harvard it had rights to create its own email
account; correct?
     A.   As a student group at Harvard it had a
right to create an email account on the Harvard

Computer Society server, which we elected not to
use.

    Q.   Okay.  Do you know -- the email in front
of us says "Harvard SEC."  Do you know how many
people had rights to that email address?

    A.   Harvard SEC is not an email address.
Which email address are you referring to?

    Q.   In the "From" line, it says From:  Harvard
SEC.

        MR. FURBUSH:  "Info@harvardsec.org"?

        MR. COOPER:  Yes.

        THE WITNESS:  Two people had access to
that email account.

BY MR. COOPER:

    Q.   Okay.  And who were those two people?

    A.   Myself and Felix Yu.

    Q.   All right.  Now, it says that it was sent
to houseSYSTEM administrator.

    A.   Yes.

    Q.   All right.  Who was houseSYSTEM
administrator?

    A.   Me.

    Q.   All right.  What email account would
houseSYSTEM administrator have been using?

    A.   Info@harvardsec.org, I believe.

    Q.   Okay.  The email in front of me
indicates -- it has the title "Welcome to
houseSYSTEM."

    A.   Yes.

    Q.   All right.  Was this an introductory email
that you prepared to send to other students to
introduce -- to let them know about the creation of
houseSYSTEM?

    A.   Yes.

    Q.   All right.  Do you know to whom this email
was sent, if anybody, other than the people in the
"From" and "To" line on this email?

    A.   Approximately 500 other students who were
on SEC's mailing list at the time.

    Q.   Okay.  How did the SEC generate a mailing
list?

    A.   People who signed up for CriticalMass,
Textbook Central, and the club itself were all on
that mailing list.

    Q.   All right.  And they -- and people who
had signed up for those projects would have a
harvard.edu address?

    A.   By and large they did.

    Q.   All right.  Did people outside the Harvard
community actually have access at times?

    A.   Yes.

    Q.   Okay.  So you did have -- or you did
have email accounts that this could go to outside
of harvard.edu email addresses?

    A.   Theoretically, yes.

    Q.   Do you know one way or the other?

    A.   For example, I may have shown my father
who is not at a fas.harvard.edu account.

    Q.   Okay.  But the email shown on Exhibit 2
was sent to approximately 500 people, to the best
of your knowledge?

    A.   Approximately and to the best of my
knowledge, yes.

    Q.   And that was largely the Harvard
community; correct?

    A.   Yes.

Q.   All right.  Is the text that's shown on
Exhibit 2 the text that was actually also sent to
all students?
        MR. FURBUSH:  Did you say "all students"?
        MR. COOPER:  Or the 500 or so that he's
referring to.
        THE WITNESS:  This is not a copy of a
prepared email in the sense that it was written
ahead of time.  This is a copy of the email that
was actually sent.
BY MR. COOPER:
Q.   Okay.  That's -- you anticipated my next
question.  This is the email that was distributed to
all students that you were referring to to notify
them of the existence of houseSYSTEM; correct?
A.   Yes.
Q.   All right.  In the email it states that
you already have an account.
        Do you see that in this first paragraph?
A.   Yes.
Q.   And by "account" is that meaning that that
was the fact they were on the distribution list?
A.   As I mentioned previously, members of
CriticalMass were automatically integrated into this
site as well as members of Textbook Central, and so
their accounts for those sites was effectively the
account they already had for houseSYSTEM.
Q.   Okay.  And what information comprised the
account?  Let me strike that.
        Did you have to register to be a member of
FASt?
A.   No.
Q.   All right.  Did you have to register to be
a member of CriticalMass?
A.   Yes.
Q.   All right.  What information do you
have to provide to register to be a member of
CriticalMass?
A.   I don't recall, but among other things,
first name, last name, email address, gender
perhaps.  Basic personal identification information.
Q.   All right.  Now, you said that you have a
lot of experience in back end development; correct?
A.   Yes.
Q.   And one of the things back end does is
populate a database; correct?
A.   One of the things SQL can do is insert
data into a database.
Q.   All right.  Was CriticalMass an SQL-based
program?
A.   CriticalMass did use SQL for its database.
Q.   All right.  So when it populated its
database, the information that was used in the
database would have included the email addresses;
correct?
A.   Yes.
Q.   All right.  And you understand that a
database will be set up by fields; correct?
A.   Yes.
Q.   All right.  So one of the fields would be
an email address; correct?
A.   Yes.
Q.   All right.  And one of the other table
fields might have been the name of the student;
correct?
A.   Yes.

19

Q.    All right.  Because you said you thought
they might have to register by first and last name.
A.    To the best of my ability to recall, yes.
Q.    Yes.  And that information necessarily
would also be populated into the database if it
existed; correct?
A.    When you say "if it existed," if it were
supplied by the student, yes.
Q.    That's exactly what I meant.  Thank you.
In the first sentence of the second
paragraph you say, "Plan your shopping period.  See
who owns the textbooks you want.  Sell your fridge.
Browse the message board."
Do you see all that?
A.    Yes.
Q.    All right.  How did houseSYSTEM facilitate
planning a shopping period?
A.    I designed a web-based calendar that
showed a week-long view to which you could add
hypothetical courses that you were interested in
taking -- or I should say actual courses that you
were hypothetically interested in taking, and the
end result was a view of your possible week for
school in which you could see which classes
conflicted with each other.
Q.    Similarly, how would a student who
owns textbooks know -- it says, "See who owns
the textbooks you want."  How would the student
advertise that they have the textbooks they want
on the houseSYSTEM?
A.    People would not advertise the textbooks
they themselves wanted at first, but eventually you
could either say that you were interested in these
classes through the shopping period schedule and
therefore you had an inherent interest in the
textbook for those courses, or later you could say
I am interested in these books specifically, and
people who owned those books already could read that
request and contact you with information on how to
obtain them.
Q.    All right.  Did houseSYSTEM link students
in different houses?
A.    It did.
Q.    All right.  So if were you in Lowell
House, you weren't limited to selling your
refrigerator to another student in Lowell House?
A.    Correct.
Q.    All right.  How did it link the houses?
A.    Although to the viewer it appeared that
each house had its own website through houseSYSTEM,
because all of them were sharing the same database
on the back end, there really wasn't any difference
between the sites except for the front end; meaning
the photographs, the color scheme, the wording for
the house, et cetera.
Q.    Now, when you say on the front end the
color scheme and all that wording and all that would appear
different, does that mean if I were in Lowell House,
a Lowell House graphical user interface would
present itself to me?
A.    That's correct.
Q.    And if I was in Pforzheimer House, a
Pforzheimer House graphical user interface would
present itself to me?
A.    Also correct.
Q.    But because they had a common database,

I as a Pforzheimer student could still see what was
being sold by a Lowell student?

    A.   Yes.

    Q.   All right.  And for the same reason I
could email somebody in Lowell House if I was in
Pforzheimer House as long as I knew what their
email address was?

    A.   You could also do that without
houseSYSTEM; but yes.

    Q.   Let me clarify.  It does say "Check
your email" in the second sentence of the second
paragraph; correct?

    A.   Yes.  But presumably you'd only want and
be able to check your own email address.

    Q.   All right.  But did you have an ability to
send email from houseSYSTEM, too?

    A.   houseSYSTEM was tied to my FASt web mail
project and because of that, you could send email.
But as I mentioned, the email system inherently
allows you to communicate with people outside your
own domain.

    Q.   Okay.  It also refers to browsing a
message board --

    A.   Yes.

    Q.   -- this email I'm referring to.

    Was there one message board or many
message boards set up on houseSYSTEM?

    A.   Many.

    Q.   Okay.  And did they involve a number of
group activities, for instance?

    A.   Group activities?

    Q.   Well, let me -- could it be something like
if you were trying to find fans of the television
show Lost, would you be able to do that on a message
board?

    A.   Sure, I supposed so.

    Q.   All right.  What were the types of message
boards that were set up is all I'm getting at?

    A.   Academics, extra curricular activities,
traveling.  I don't recall all of them, but there
were several.

    Q.   And could it include group interests?
Like I was referring to, like common interests in a
television show?

    A.   Sure.

    Q.   Okay.  Or common interests in a type of
activity that everybody might be interested in, like
a party?

    A.   Yes.

    Q.   Okay.  It says "Search Google" in the
second sentence of the second paragraph.

    A.   Yes.

    Q.   All right.  How did you present an
interface from houseSYSTEM to the World Wide Web?

    A.   There was one search box on the home
page that allowed you to choose what you wanted to
search and one of the options was Google.

    Q.   Okay.  And could it also have been Yahoo?

    A.   No.

    Q.   How did you limit what the search options
were?

    A.   By specifically delineating them in the
HTML I wrote for that page.

    Q.   All right.  What search engines did you
delineate for houseSYSTEM besides Google, if any?

    A.   To the best of my knowledge, the FAS name

directory, the FAS phone directory, Google, The HSA
Unofficial Guide and possibly others, but I think
that was all of them.
    Q.   It also says, "Query The HSA Unofficial
Guide for a Thai restaurant you haven't already been
to."
    A.   That's correct.
    Q.   "HSA" is Harvard Student Administration?
    A.   Harvard Student Agencies.
    Q.   Okay.  Did you have a direct reference to
the unofficial guide -- some type of guide prepared
by HSA?
    A.   The HSA Unofficial Guide is a paper and at
that time it was also an electronic document, and I
specifically negotiated with HSA for the ability to
query their guide directly.
    Q.   All right.  Did any other student or
Harvard activity groups also allow you to link to
their activities?
    A.   Not in the same manner.
    Q.   Okay.  Did they allow them in some other
manner?
    A.   At some point I developed a website for
the Harvard Chemistry Club and integrated its
calendar, or attempted to, with houseSYSTEM.
    Q.   Any others?
    A.   Not that I recall.
    Q.   Okay.  It says, "See if you have
packages."
    A.   Yes.
    Q.   What are you referring to there?
    A.   Unfortunately, this feature never
actually panned out because of the administration's
opposition.  But the idea was to have
superintendents type in a package that you received
at the front desk so that you wouldn't have to go
check a clipboard every 10 minutes when you were
expecting a package.
    Q.   All right.  And that's because packages
come to each of the houses to a specific individual;
correct?
    A.   To the superintendent.
    Q.   Right.  And you would add an expectation
that superintendents would all have access to
houseSYSTEM, too; correct?
    A.   They did have access, but nobody actually
used that particular feature.
    Q.   Okay.  But it was the hope that they
would have used it to notify students whenever a
new package arrived; correct?
    A.   That was the hope.
    Q.   Okay.  It says "Get a job."
    A.   Yes.
    Q.   What did you mean by that?
    A.   Alumni had access to houseSYSTEM so that
they could post job openings at their companies and
students had access to upload their resumes, so my
intention was to make an easy way for people to get
jobs.
    Q.   Okay.  It says, "Hitch a ride to
Barcelona."
    A.   Yes.
    Q.   And how would a student communicate an
interest in getting a ride to Barcelona from another
student?
    A.   On the student exchange section there was

a specific area for rides, and if a student was
going to a particular destination and had room for a
passenger, then they could post that information on
that section.

Q. All right. Then it says "Reserve rooms."

A. Yes.

Q. What rooms are you referring to?

A. Unfortunately, this is another feature
that never worked but was well intentioned to
coordinate room reservations throughout the Harvard
campus, which were extremely decentralized and
difficult to work with.

Q. Did you set up in the system the capacity
for that to have occurred if it had been popular
enough to?

A. As I recall, I did do considerable work on
a room reservation schema.

Q. Okay. And did that also include a room
reservation script?

A. I don't recall. I don't think so.

Q. All right. But you definitely set up the
back end for it?

A. Yes.

Q. Okay. Did you also set up the back end
for the "See if you have packages" function?

A. I don't recall.

Q. Okay. It then says, "Find out which
houses have bright blue doors."

A. Yes.

Q. Okay. How would a student know which
houses have bright blue doors?

A. houseSYSTEM featured over 250 photographs
of the houses, or if not over, then approximately
250, and some of them in fact did have bright blue
doors.

Q. All right. These were like JPEG images?

A. I believe they were JPEG images.

Q. Did houseSYSTEM have the capacity to have
multimedia?

A. Yes.

Q. All right. What multimedia was permitted
on houseSYSTEM?

A. There was a Flash trailer for houseSYSTEM,
which was if you want to use the word "multimedia"
to describe video, the main multimedia associated
with the site.

Q. Okay. Did it have audio capacity on the
site?

A. That particular trailer did have an audio
track.

Q. Okay. Was there any other form of video
available other than that Flash?

A. Not at the time, no.

Q. At a later time there was?

A. At a later time there could have been. In
2003 video had not yet really gained the traction
that it has today.

Q. Okay. You list, "Give the administrators
those evasive preregistration statistics that they
can't seem to come up with."

A. Yes.

Q. What is that a reference to?

A. At the time there was a substantial
controversy on campus at Harvard -- excuse me --
regarding the concept of preregistration. The
center of the controversy was that the deans claimed

preregistration would better allow them to allocate
resources for courses, but students opposed that
because it meant that they could no longer try out
as many courses as they wanted to.

       And this particular sentence is conveying
the notion that on houseSYSTEM one could posit
possibilities for classes that one wanted to take
without necessarily being committed to take those
classes, and in so doing still generate the interest
statistics that the administration needed without
eliminating students' capability to shop courses.

     Q.   You say the "sentence is conveying
the notion that on houseSYSTEM one could posit
possibilities for classes."  What do you mean by
"posit possibilities for classes"?

     A.   If I wanted to try out 20 classes for my
upcoming semester, I could put all of those classes
onto my shopping period scheduler.  I wouldn't have
to take all 20 of them, but the database would still
register that I was interested in all of those
courses.

     Q.   All right.  Was this an interactive
program then?

     A.   Define "interactive."

     Q.   Did it require input and then would give
you further output that you could manipulate for
additional inquiries?

     A.   By that definition, yes.

     Q.   All right.  Maybe a better word would be
it was an iterative program?

     A.   Most software is iterative at some level;
so yes.

     Q.   Okay.  But do you understand -- I'm
talking hierarchically within the graphic itself.

     A.   You could click on a course in the
scheduler and find out more about that course, and
if you so chose, you could then change your mind
based on the next round of information you received.

     Q.   Okay.  That's exactly what I was trying to
figure out.

       It says here, "Now it's all in one place"
and "It's all student run" -- or "Now it's all in
one place.  It's all student run."

       Do you see that?

     A.   Yes.

     Q.   When it says "it's all student run" what
did you mean?

     A.   I meant that all of the above features
described in the preceding paragraph were put
together by and maintained by students such as
myself and my peers in the Student Entrepreneurship
Council.

     Q.   You said you had administrative rights for
houseSYSTEM.

     A.   Yes.

     Q.   Did anybody else?

     A.   I don't recall.

     Q.   You said you were the president of the
Harvard SEC as of August 1st, 2003.

     A.   Yes.

     Q.   Who were the other officers?

     A.   I know their names, but I'm not sure
I remember all of their titles.  Rodica Buzescu,
Piriya Tantrativud; he's Thai.  Wentao Mo, Rui Dong.
We had a rotating spot to get outside input which
was at one point filled by Phillip Dreyfus.  I'm

sure that there are documents available which list
all of their names, but I think that's the majority
of the people involved.

Q.   All right.  Did they have any roles in
operating houseSYSTEM?

A.   Yes.

Q.   All right.  Who besides yourself operated
houseSYSTEM?

A.   Define "operated."

Q.   First, let's take it one step at a time.
Were you the exclusive person -- did you exclusively
create the back end for houseSYSTEM?

A.   Yes.

Q.   Did you exclusively create the front end
for houseSYSTEM?

A.   I exclusively created it, but it was
modified by Wentao.

Q.   And that was one of the people you
mentioned was another officer of Harvard SEC?

A.   Yes.

Q.   All right.  Did anybody else assist in
modifying any portion of houseSYSTEM?

A.   Not the code or the design, although
I did get feedback, of course, from other people
which then influenced the work that I did after
that feedback was received.

Q.   And would the feedback be in the form of
saying what features were popular and what features
weren't?

A.   That is one form of feedback.

Q.   And another form of feedback, I take
it, as you said, for instance, the Harvard
administration wouldn't let you see if the packages
function -- you had anticipated that houseSYSTEM
would allow you to know when packages were
available, and I think you said that Harvard didn't
permit that eventually?

A.   I don't know that I said Harvard didn't
permit it.  I said it wasn't used, and that, yes, it
could be another form of feedback.

Q.   All right.  Any other forms of feedback?

A.   I believe we received a considerable
number of emails from the students with their
positive and negative thoughts about the site.

Q.   When you say "we received," was there a
group email account created for everybody who was a
member of Harvard SEC?

A.   No.  Because that would have been a large
number of people.  The mailing list was fairly
large.

Q.   Okay.  So would it have been primarily you
who would receive the feedback?

A.   I suppose primarily, but also Felix had
a lot to do with reading and responding to emails.

Q.   Okay.  Besides sending out this email on
August 1st, 2003, to the 500 or so you say were on
your distribution list already, did you take any
other action to publicize houseSYSTEM?

A.   Yes.

Q.   And by "you" I'm referring, first of all,
specifically to you personally.

A.   Yes.

Q.   All right.  What else did you do?

A.   As I mentioned, I created the multimedia
trailer for the site which I believed would attract
interest.  I at one point created posters that

were printed and posted throughout the campus.  I
designed magazine advertisements that were printed
in Venture Magazine for houseSYSTEM.  We created
banners and other printed materials for
distribution.

       We stood outside the freshmen dining hall
with leaflets for students as they walked in to eat.
We sent out emails.  We coordinated with the
Technology Entrepreneurship Center at Harvard as
much as we were able to.

       And we attempted to set up a kind of
marketing event with HSA as part of our deal
regarding the unofficial guide access where we were
permitted to market houseSYSTEM to freshmen when
they came to register for the new school year in
September.

       There were considerable marketing
activities surrounding houseSYSTEM.

    Q.   All right.  And you referred to "we."
Does that mean other members of Harvard SEC also
were making efforts to advertise?

    A.   Yes.  A majority of the efforts that
the other people I mentioned were responsible for
involved marketing.

    Q.   Okay.  So would it be fair to say it was
your intention to publicize houseSYSTEM to the
entire Harvard community?

    A.   Yes.

    Q.   Did you take any action to actually
advertise it to the alumni?

    A.   Yes.

    Q.   What specifically did you do to let the
alumni know?

    A.   My father is a Harvard alum and so I told
him.  I had clients who were Harvard alumni and I
told them.  I sent out emails.  I got in touch with
people I worked with in the past who were Harvard
alums and told them about it, and encouraged them to
tell their friends, et cetera.

    Q.   All right.  You also mentioned the
multimedia banner was intended to generate interest.
In what way would the general community know about
the multimedia banner?

    A.   The multimedia trailer was online at the
link in the last paragraph before the footer of this
email in Exhibit 2.

    Q.   So it was available at an http worldwide
website harvardsec.org/project/housesystem.html?

    A.   That's correct.

    Q.   And that http site was made available to
all students if they actually -- if they knew to
find it in their web browser?

    A.   Yes.

    Q.   All right.  And house -- am I correct to
know that harvardsec.org was itself set up under
the Harvard system to advertise the organization?

    A.   I'm not sure what you mean "set up under"
or "the Harvard system."

    Q.   www.harvardsec.org was its own website;
correct?

    A.   Yes, by definition.

    Q.   Okay.  How would a Harvard student know
that website existed?

    A.   They would have to receive an email with
the link or find the link on another page or hear
of the link from a friend or read it somewhere in

general.

Q.   Do you know if Harvard had anywhere on its own interface a list of student organizations?

A.   It did.

Q.   And was Harvard SEC listed among them?

A.   This is a source of serious contention.

Q.   All right.  What is the serious contention?

A.   When I applied to Harvard, there was a group called the Technology and Entrepreneurship Center at Harvard, which still exists, and I use the word "group" because it was not clear at the time whether this was a student group, which is how it was presented, or some other entity.

In reality it was an official center at Harvard with an endowment account and that center spun off a student group which was then presented to students as the entire center.

That group was led by an individual who managed through his efforts to substantially reduce the amount of interest in technology and entrepreneurship at Harvard, and so eventually I was elected the club's president and changed its name to distance the club effectively from itself due to its poor reputation.

And in changing the name I thought that we would still have Harvard student group status while the administration later decided that it effectively revoked our student group status, and that was the source of contention.

Q.   You say the administration later decided it effectively revoked your student group status.  As of August 1st, 2003, had it done so?

A.   Can you rephrase that?

Q.   In your last response you said, "And in changing the name I thought that we would still have Harvard student group status while the administration later decided that it effectively revoked our group status."

A.   Correct.

Q.   And what I'm focusing on is:  You say the administration later decided that they effectively revoked your group status.

A.   Correct.  It was apparently a retroactive decision.

Q.   As of August 1st, 2003, had Harvard done that, though?

A.   I don't recall the precise timeline of when Rodica received approval from Susan Cooke for the name change in University Hall.  But I believe as of August 1st, 2003, everyone in the club I was running believed that we were a Harvard student group.

Q.   All right.  Do you know one way or the other whether or not your group was listed amongst the student organizations on the Harvard website?

A.   I do know that the Technology and Entrepreneurship Center at Harvard Student Association was listed as a student group, which in turn referred to the Harvard SEC once we changed the name.

Q.   Okay.  So at some point in time a student could find out about Harvard SEC via the Harvard site itself?

A.   I don't know that for certain, but it's entirely plausible.

Q.   All right.  And at least you yourself found the technology group -- or I forget the official title you gave, but you yourself as a student applicant saw that group; correct?

A.   Yes.  And I found that group I believe through the Division of Engineering and Applied Sciences' website.

Q.   In publicizing the houseSYSTEM in about August 1st, 2003, did you also in any way try and use The Harvard Crimson as a resource?

A.   My intention was, as much as possible, to get positive coverage for the site in The Crimson.

Q.   Did that actually happen?

A.   In my opinion, no.

MR. COOPER:  Okay.  Do you want to take a break right now or do you want to --

MR. FURBUSH:  At some point, but there's no urgency.

MR. COOPER:  Do you mind if I just ask about this (indicating)?

And, Mr. Greenspan, we've been going about an hour and a half, then we can take a break.

THE WITNESS:  That's fine.

(Whereupon, Greenspan Exhibit 3 was marked for identification.)

THE WITNESS:  Thanks.

BY MR. COOPER:

Q.   Mr. Greenspan, I put in front of you as Exhibit 3 an online copy of The Harvard Crimson, an article called "Student Site Stirs Controversy," published August 8th, 2003, by Laura Krug.

Do you see this?

A.   Yes.

Q.   Do you recall ever having seen this article prior to today?

A.   Yes, I do.

Q.   The date is one week after your houseSYSTEM started; correct?

A.   Correct.

Q.   And it refers to in the first paragraph, "A sharp debate raged on Lowell House's open email list this week after security issues were raised concerning a new student-run web portal launched last Friday that promised a place to trade textbooks, read and give feedback on classes and plan a class schedule."

A.   Correct.

Q.   One thing I should ask before I go on with this:  You said that you had by August 1st, 2003, integrated the functions of CriticalMass into houseSYSTEM.

A.   That's correct.

Q.   Is there a reason you don't mention rating courses in the email that was sent out on August 1st?

A.   I don't think there was a particular reason, no.

Q.   All right.  But that was a function that also was available from houseSYSTEM as of that date; correct?

A.   Yes.  And there were actually other functions as well that are not listed in Exhibit 2, but I was writing marketing copy.  It was probably written late at night; the night before, and I figured people wouldn't actually be interested in an exhaustive, detailed list of every feature.

Q.   Okay.  Did you have as part of your
database a list of all courses available at Harvard?

A.   Yes.

Q.   How did you populate your database?  From
what source did you populate your database with that
information?

A.   The Harvard Registrar.

Q.   Okay.  And the Harvard Registrar was an
open email -- or an open website?

A.   Yes.

Q.   Well, what I want to make clear is:  Did
you get the information online or did you get it in
hard copy?

A.   I got it online.

Q.   All right.  And then you used the online
information to populate your database with all
course information made available at Harvard?

A.   Correct.

Q.   All right.  Just generically, what other
major functions existed in houseSYSTEM that weren't
listed in your original email?

A.   I actually think one of the most --
well, there were two features that were extremely
frequently used that I didn't even intend to become
major features I think.  One of them was simply
having contact information for the administrators at
each house which was easily available in the same
place on every site.  Previously that had been hard
to find.

     The second was the pictures for each house
compromised an effective online photo album which
people would frequently view, and I could tell this
by looking at the logs and seeing them reloading the
home page again and again for no other reason than
to see the pictures.

Q.   Could students upload their own pictures
to the site?

A.   Eventually they could, although it was not
a popularly-used feature.

Q.   Do you know how or when it was made
available?

A.   I don't recall.

Q.   Could students upload, for instance, any
other type of information to the site?  Say like
student text?

A.   Student text?

Q.   Could they upload any text information to
the site?

A.   Well, yes, that was the entire point of
the site.

Q.   Okay.  I mean by that did they have -- did
each user have their own unique, for instance, user
page?

A.   No.  For the specific reason that -- well,
if you continue your line of questioning regarding
this article, you will find that there were privacy
issues involved and I was extremely afraid of being
kicked out of school for, quote-unquote, "violating
user privacy."

Q.   Okay.  Before this controversy erupted,
though, did any user have any specific user
information that they would be presented upon
using houseSYSTEM?

A.   Information was available on users.  There
was no user profile page per se.

Q.   Okay.

A.   But if you read enough book profiles or
course profiles, you could composite an idea of
what a user was taking in terms of course load,
what books they owned, et cetera.
Q.   Okay.
A.   But that was done very intentionally at
the time.
Q.   Now, in The Harvard Crimson article dated
August 8th, that refers to the Lowell House open
email list?
A.   I believe so, yes.
Q.   Do you have an understanding what that is?
A.   I do.
Q.   All right.  What is it?
A.   As we discussed previously, it was a
mailing list available to some but not all Lowell
House undergraduates and graduate students.
Q.   And in that sense, that's the same type of
email list you said you understood existed at all
other houses, but although perhaps not in the same
precise function?
A.   Yes.  And by that I mean some of the lists
were open -- though they were all called "open,"
some of them were actually open to outside postings;
others were not.
Q.   By "outside postings" you mean outside the
house or outside Harvard?
A.   Outside the house but still de facto
within Harvard.  Technically if they were open to
anyone outside the house, I believe they were open
to anyone that was approved, whether or not they
were actually at Harvard.
Q.   Okay.  But some house lists were exclusive
to only members of the house?
A.   Yes.
Q.   Okay.  Do you know which houses those
were?
A.   As I mentioned earlier, I don't recall.
There were 12 mailing lists, all of them run
completely differently so...
Q.   Okay.  And that's because there were
12 houses; correct?
A.   Yes.
Q.   Now, it says that this sharp debate on
Lowell's House's open email list emerged sometime
on or before August 8th, 2003.  Do you have an
understanding of what that's referring to?
A.   Yes, I do.
Q.   Okay.  What is it referring to?
A.   Effectively there were certain individuals
in Lowell House who believed that houseSYSTEM was
insecure, and despite my repeated attempts to
dissuade this belief, they persisted in writing
inflammatory messages that concerned many people.
Q.   And do you know if those messages went
outside of Lowell?
A.   Apparently because I don't believe
Laura Krug was in Lowell House.
Q.   Okay.  Do you know when this concern by
others emerged about the security issue?
A.   Between August 1st and August 6th, I
believe.
Q.   Okay.  Down at the bottom it says that --
very near the bottom do you see where it says,
"Greenspan said enthusiasm seemed high"?
A.   I do see that.

Q.   All right.  Did you talk to Laura Krug for
this article?

A.   Yes.

Q.   All right.  And then it says, "Between the
launch of the portal on August 1st and Tuesday night
400 accounts have been registered."

Do you see that?

A.   Yes.

Q.   All right.  And in the first paragraph it
said the site launched on a Friday.

A.   It does say that, yes.

Q.   So all I'm getting at is:  Does that in
any way refresh your recollection if whether or not
400 accounts had been registered as of August 5th,
2003, with houseSYSTEM?

A.   I'm not sure whether or not Laura's
reporting is precisely accurate, but it seems to be
consistent with my memory that 400 accounts had been
registered as of the time of this article which was
August 8th.

Q.   All right.  All I'm getting at is:  To the
best of your knowledge, somewhere between 4- and 500
people were using it at the very outset?

A.   Correct.

Q.   Okay.  It says here that in the second
paragraph, "While its creator lauded it as a
much-needed resource for students, critics said they
were concerned that the site's web-based email
function -- which requires a user to provide their
Faculty of Arts and Sciences (FAS) account
password -- poses a security risk."

A.   I'm sure that's somewhere in here.

Q.   It's in the second paragraph of the entire
article.

A.   Oh, yes.

Q.   I just want to know:  What is the Faculty
of Arts and Sciences FAS account password?

A.   The fas.harvard.edu server uses a
Unix-crypted password which is required to gain
access to any of its resources, including email, and
I believe that is the password being referred to.

Q.   Did you have to provide your FAS account
password to register with the site?

A.   At the time I believe you did so as to
verify that you would later be able to check your
email.

Q.   All right.  Did it require any other type
of password to register?

A.   No.

Q.   All right.  And you understand what I
mean, if you had a user account, did you need a
separate password to access houseSYSTEM?

A.   I do understand that; and, no, you did not
need another password.

Q.   All right.  So the FAS account password
was very specific to the use of the email?

A.   Correct.  Had we not required the email
feature, then we would not have required that FAS
password.

Q.   Okay.  As a result of this controversy,
did you have to take down houseSYSTEM at all?

A.   I had to suspend the ability of the
sign-up page to work.  I was encouraged to take
it down, but I did not take down the whole site.

Q.   All right.  So you changed a feature of
the registration process but you didn't take down

the site?

    A.   I effectively disabled the registration process but I did not take down the site.

    Q.   All right.  By disabling the registration process, though, you did not make the site unavailable to anybody who wanted to use it?

    A.   That's not entirely true.  There may have been people who wanted to use it who could not register.

    Q.   After you disabled the registration function, could any new users use the site?

    A.   When you say "new," if you mean people who had already registered, those members who were already in the database could still use the site, but those people who wanted to effectively be entered into the database could not because the page to sign up was no longer functioning.

    Q.   All right.  That's exactly what I was referring to.

    My only question now is:  Did there come a time when users other than those who had originally registered could in fact gain access to the site?

    A.   Yes.  Almost two months later.

    Q.   All right.  And that would have been about October 2003?

    A.   Late September.

    Q.   Late September.

    MR. COOPER:  Okay.  Why don't we take a break.

    THE VIDEOGRAPHER:  This marks the end of tape 1 in the deposition of Aaron Greenspan.

    Off the record at 10:36.

    (Off the record.)

    THE VIDEOGRAPHER:  This marks the beginning of tape 2 in the deposition of Aaron Greenspan.

    On the record at 10:51.

BY MR. COOPER:

    Q.   Mr. Greenspan, before we broke we were discussing the August 8th, 2003, Crimson article "Student Site Stirs Controversy."  At a high level, can you describe what the controversy was relating to the houseSYSTEM that erupted in the week after you first launched it.

    A.   At a high level, the controversy was surrounding the requirement for students to use their FAS passwords to sign up.

    Q.   Was the concern that the use of the FAS password was unsecure?

    A.   No.  Initially the concern was that non-Harvard entities requesting FAS passwords; meaning students requesting FAS passwords, was prohibited and so people felt as though this was someone outside of Harvard asking for people to betray their Harvard credentials.

    Q.   Okay.  In the article about two-thirds of the way down it says, "Greenspan defended the security of his site, saying that a student's houseSYSTEM account is kept completely separate from his or her Harvard student account."

    Do you see that?

    A.   Yes.

    Q.   As you sit here today, do you have an understanding of what is meant by that sentence?

    A.   No.

    Q.   Okay.  Below that it seems to quote you

saying "'We can't access those and shouldn't access those,' he said.  'Our database is kept separate from that.'"

        Do you see that?

A.   Yes.

Q.   All right.  Again, do you have an understanding of what you meant by saying, "Our database is kept separate from that," if that's an accurate quote?

A.   If the quote is accurate, I believe it refers to the point in my conversation with Laura Krug, whenever that was for the purpose of producing this article, in which I was referring to the notion that we would be able to with a student's Harvard ID and password somehow log into Harvard's student records database.

Q.   All right.  That's what I was trying to get at.  houseSYSTEM didn't operate off of two separate databases, did it?

A.   It operated off of one primary database.

Q.   And that's the database that was in Hoboken, New Jersey; correct?

A.   Correct.

Q.   All right.  MySQL would populate that database and not a Harvard server; correct?

A.   Correct.  There was no connection whatsoever to any Harvard official server except for the email feature which relied on the Harvard email server.

Q.   It relied on the Harvard email server for sending and receiving; correct?

A.   No.  It relied on the Harvard email server for authentication.

Q.   All right.  I thought you said earlier you had a table set up in your own database that also required the identification of the Harvard email address by each registered user.

A.   That's correct.

Q.   All right.  But the database you're referring to is for authentication for the actual access of the information by that student; correct?

A.   I'm referring to a lot of databases so the houseSYSTEM authentication mechanism worked as follows:  A student would provide their email address and password, houseSYSTEM would without reading that password forward the password along to Harvard's email server.  Harvard's email server would say either yes, that is correct, or no, that incorrect.  If it is was correct, it would also send back the number of new messages, and if it was correct, the hash of the password provided would match the hash stored in the database.

Q.   Okay.  So when you referred to hash match, you're referring to an encryption program; correct?

A.   Technically hashing and encryption are different, so no.

Q.   Is it common to refer to hashing as a form of encryption, though?

A.   Unfortunately, yes.

Q.   Okay.  Would you at least agree it's an authentication methodology?

A.   Yes.

Q.   All right.  And the hashing that was done by houseSYSTEM was done against the authentication information that was provided by Harvard concerning the student password?

A.    It was provided by Harvard students, not
provided by Harvard.

Q.    Right.  But that information existed
outside of houseSYSTEM; correct?

A.    I'm not sure what you mean.

Q.    All houseSYSTEM did was authenticate.  It
does not actually store the password information;
correct?

A.    Correct.  It stored password hashes but it
did not store passwords.

Q.    And all I'm getting at is:  The password
was not one of the database fields that was set up
in your database; correct?

A.    The database field itself is called
a "password" in that schema, but it contains
anywhere from a 32 to 40 bite hash.

Q.    And that 32 to 40 bite hash is not
information that even you could read and know
what it was; correct?

A.    I could not read it with the human eye and
tell you what the password was.

Q.    Right.  That's all.

Now, you said that you had to disable
for about a two-month -- or suspend for a two-month
period the registration page for houseSYSTEM.

A.    Correct.

Q.    During that period if you were not a
registered user of houseSYSTEM, were there any
functions that you nonetheless could utilize on
houseSYSTEM even though you weren't registered?

A.    Yes.

Q.    All right.  What functions?

A.    The photos that appeared for each site
and the contact information for each house and the
ability to search using the search box provided on
the home page possibly to view photos that had been
uploaded to the photo album, even though it was not
heavily used, but I don't think that most of the
functionality was available unless you were a
registered user.

Q.    Okay.  Could you still use the course
function that had been originally part of
CriticalMass?

A.    No.

Q.    All right.  And you couldn't use the
system that had been part of FASt?

Well, let me strike that.

Was FASt also ever integrated into
houseSYSTEM?

A.    Yes.  That was the source of this entire
controversy.

Q.    All right.  The FASt use of email
information is the same system that allowed a
Harvard student to use the email system on
houseSYSTEM?

A.    There was no difference between the email
system I had set up freshman year which elicited no
protests and the email system that I integrated to
houseSYSTEM my sophomore to junior year which
elicited enormous protest.

Q.    All right.  And that function, I take it,
was part of what was disabled?

A.    No, that was not disabled.

Q.    All right.  Was it modified?

A.    Eventually it was removed, but it was not
modified.

Q.   Okay.  When was it eventually removed?

A.   I don't recall, but at some point after this article was written.

MR. COOPER:  Okay.

(Whereupon, Greenspan Exhibit 4 was marked for identification.)

BY MR. COOPER:

Q.   Mr. Greenspan, at some point did you -- were you required -- let me strike that.

I put in front of you an email from Harvard SEC, info@harvardsec.org, to houseSYSTEM Administrator, a letter from Aaron Greenspan.

Do you see that?

A.   I do.

Q.   Are you familiar with this email?

A.   Yes.

Q.   Was this email generated by you?

A.   I wrote this email.

Q.   All right.  Did you send this email to anybody?

A.   Yes.

Q.   Who did you send this email to?

A.   Every member of houseSYSTEM.

Q.   Okay.  And did you send it on or about August 13th, 2003?

A.   I sent it on August 13th, 2003.

Q.   Okay.  And then when you say you sent it to "Every member," does that mean the 4- to 500 registered users that existed as of between August 1st, and August 5th, about 2003?

A.   I sent it to the approximately 4- to 500 members as of August 13th, 2003.

Q.   Did you send it to anybody else?

A.   I'm sure I showed it to my parents, but I don't believe I sent it to them.

Q.   All right.  Did you show it to The Harvard Crimson?

A.   Not intentionally, but I'm fairly certain they received a copy of it.

Q.   All right.  Do you have a recollection of The Harvard Crimson publishing portions of this email?

A.   I remember a follow-up article which may have quoted from this email, but I don't specifically remember those portions.

Q.   Okay.  It says that you started CriticalMass -- it says in the very first sentence, "I started CriticalMass about a year ago to try and improve the information available to Harvard College students about courses."

A.   That's correct.

Q.   So does that now in any way refresh your recollection as to about when you started CriticalMass?

A.   No, because it's about as precise as I what I told you before, which is I started it sometime in the fall of the semester of 2002 which would have been about a year prior to August of 2003.

Q.   Okay.  But CriticalMass had been in existence for almost one full year when you launched houseSYSTEM; correct?

A.   That's correct.

Q.   Okay.  So can you give me an overview of what the letter is about.

A.   Well, the letter is about the controversy

35

that erupted over the password issues and the
college's, in my belief, unfounded request that I
turn over the entire database to them so that they
could assess the security risk and if necessary
force students to change their passwords, which they
eventually did.

        There was some dispute about what they
actually asked me to do.  As I recall, during
telephone conversations and through email, they
asked me to turn over the entire database.
Dean Gross and other administrators were later
quoted as saying they only wanted certain fields
from that database, but that is not what I recall
them asking for.

    Q.   The database they were requesting was
the database schema that was available in Hoboken;
correct?

    A.   Put that way, it's not entirely correct.
They were requesting the contents of one table of
the houseSYSTEM database.

    Q.   And that table was the table that included
the hash; correct?

    A.   That is correct.

    Q.   All right.  Did you in fact turn over the
hash information?

    A.   Under duress, yes.

    Q.   Okay.  Were you required as a result of
that action to in any way modify the database?

    A.   When you say "modify the database," do
you mean modify the database structure or do you
mean modify the database contents?

    Q.   Did you continue to have a password table
in the database?

    A.   There never was a password table, but
I continued to have a member table containing a
password field.

    Q.   Okay.  Was that field maintained after
this action?

    A.   Yes.

    Q.   Okay.  What type of information populated
it after this action?

    A.   If by "action" you mean sending this
email, there was no change in either the structure
or the contents of that field as a result of this
email.

    Q.   All right.  Did you change your hashing
methodology in any way?

    A.   Not as a direct result of this email,
but as a result of some of the posts on Lowell-Open
which called into question the security of the MD5
hashing algorithm.

    Q.   All right.  To take those in two steps.
All Open, are you referring to an email list?

    A.   Lowell-Open, as we've discussed, is an
email list for Lowell House.

    Q.   Oh, I thought you said "All Open."  That's
why I said --

    A.   Oh, no problem.

    Q.   And MD5 is a form of hashing; correct?

    A.   Yes.

    Q.   All right.  And not as a result of this
controversy but for other reasons you changed the
hashing methodology?

    A.   Well, I mean, this controversy and those
other reasons are all sort of one and the same.  So,
yes, I changed it because of the controversy, not

because of this particular email in Exhibit 4.

Q.   Okay.  But that change did not require you to change the database field; correct?

A.   Not the name of the field.  It required me to change the size of the field from 32 bytes to 40 bytes.

Q.   And, therefore, technically you had to change the content for all the passwords because they were now encrypted in a different method; correct?

A.   No.  There was no way that I could change the contents because I didn't know what the password was to start with.  So the users had to change the contents by virtue of logging on again.

Q.   Okay.  But with that -- with that change, and only that change, it was essentially the same database as it was previously; correct?

A.   Correct.

Q.   All right.  And it still maintained a field that included the email address; correct?

A.   Yes.

Q.   And that would include Harvard email addresses; correct?

A.   Yes.

Q.   Okay.  After these events, did you continue to develop houseSYSTEM?

A.   Yes.

Q.   Are you familiar with something called "Facebook" used by the houses at Harvard?

A.   Not to be overly precise, but when you say "Facebook," I assume you're referring to the generic paper and online Facebooks that existed many years before I attended Harvard and when I attended.

Q.   That's exactly what I'm referring to.  Those paper and online Facebooks are in fact pictures of students that reside in particular houses; correct?

A.   That is correct.

Q.   And they include some other generic information about the students as well; correct?

A.   Yes.

Q.   Like hometown?

A.   Yes.

Q.   Okay.  But you were familiar with them as of August 2003?

A.   I was familiar with them as of probably August 2001 when I received a request to supply my own photograph for my class' freshmen Facebook.

Q.   Okay.  And you were aware they were available online through each of the individual houses as well; correct?

A.   I believe every house had an online version, but I don't know if that's true.

Q.   All right.  Now, is it also true that the online versions were not made available outside of the members of the house?

A.   In most cases, that is true.  Some houses, like with the open lists, had different policies about security and privacy and so it was easier to access some than others.

Q.   Would you agree that as of August 2003, though, nobody had -- no website as yet had served the function of providing virtually all the Facebook information available in one site?

A.   That is correct.

Q.   All right.  Was it a goal at any time

while you were associated with Harvard SEC to
in fact unify and/or make available all Facebook
information in one site?

A. Yes.

Q. Was that a goal as of August 2003?

A. Yes.

Q. All right. How far in advance -- when did
that goal first arise, if you know?

A. I don't remember the exact date.

Q. At some point in time did you begin work
on a function that would unify the Facebooks as part
of houseSYSTEM?

A. Yes.

Q. When did you begin, if you recall?

A. I don't recall.

Q. Was it in progress as of the time
that this issue about security arose involving
houseSYSTEM?

A. It may have been. I don't recall, as I
said, the exact date that I thought of it.

Q. All right. Is it you personally, you
believe, that thought of this idea?

A. I know that it is me personally.

Q. Okay. It wasn't suggested in any way by
any of the other members of SEC; Harvard SEC?

A. No.

MR. COOPER: Okay.

(Whereupon, Greenspan Exhibit 5 was
marked for identification.)

BY MR. COOPER:

Q. And, Mr. Greenspan, I put in front of you
a multi-page email dated Friday, August 22nd, 2003,
from Lowell House Senior Tutor given the email
address lo-abst@fas.harvard.edu to Aaron Greenspan.
Have you seen this email previously?

A. Yes.

Q. All right. And is the email address
greensp@fas.harvard.edu an email address you used
while you were at Harvard?

A. Yes.

Q. Do you know who the Lowell House Senior
Tutor is?

A. Yes.

Q. Who was that?

A. Jay Ellison.

Q. Do you have an understanding why he was
sending you this email?

A. Roughly that it was his job to enforce
disciplinary action in Lowell House.

Q. All right. It was his job to enforce
disciplinary action?

A. Correct.

Q. Was he contemplating some sort of
disciplinary action against you?

A. Yes.

Q. What was the reason for that?

A. The aforementioned controversy surrounding
passwords.

Q. Did he in fact take any disciplinary
action?

A. In the end, no. It would have been the
administrative board that took disciplinary on his
recommendation, I believe, but because of long
emails such as these I was able to avoid the
aforementioned disciplinary action.

Q. All right. So you weren't disciplined for

this event then?

A. Not officially.

Q. By that, there is a thing called the Harvard Administration Board; correct?

A. There is an administrative board.

Q. And they have the power to impose sanctions on students; correct?

A. That is my understanding.

Q. But you were never -- no sanction was ever imposed on you by the Harvard Administration Board; correct?

A. As I said, not officially.

Q. Okay. In your personal view, was it imposed unofficially?

A. I felt very unwelcome at Harvard after much of this transpired.

Q. Okay. In turning to the email on page 2, there's a paragraph 5.

First of all, it appears that within this email is an email that you had previously drafted on August 22nd, 2003, at 12:57 p.m.

A. That's correct.

Q. All right. And paragraph 5, therefore, on page 2 would have been drafted by you?

A. Yes.

Q. All right. First of all, in the first sentence it says, "As you know, participation in houseSYSTEM is a completely voluntary act. Any student is free to use or not use the system as is his wish."

Do you see that?

A. Yes.

Q. Would you consider, therefore, houseSYSTEM to be what is called an "opt-in" type of program?

A. Yes.

Q. All right. The next sentence, it says, "Regarding the Facebook specifically, it is our view that due to the fact that the feature is not yet complete, and as a result of our intended design, which would make inclusion of any piece of identifying information in the Facebook completely optional on top of houseSYSTEM'S existing voluntary nature, there would be little chance for a violation of anyone's privacy."

Do you see that?

A. I do.

Q. All right. Does that refresh your recollection whether you were working on the Facebook function in August of 2003?

A. It makes it clear that I was working on it in August of 2003. It does not make it clear whether I was working on it on August 13th, 2003.

Q. Okay. Do you know who you were referring to when you say "it is our view," the plural "our"?

A. I was referring to the board of the Student Entrepreneurship Council, as houseSYSTEM was the SEC's project primarily.

Q. Okay. So by -- at least by August 22nd, 2003, you had shared your idea of a unified Facebook integrated with houseSYSTEM with your other members of Harvard SEC?

A. Yes. And apparently I had also begun working on it by then.

Q. When you started working on this idea, did you publicize the idea that you were working on it?

A. I did not as a standard practice publicize

ideas that I was in the middle of.  But I did often
work on things with the intent of publicizing them
later.

Q.    Okay.  Do you recall how many people
knew that you and/or Harvard SEC were working on
its Facebook system before it actually launched?

A.    Probably only those people involved with
the SEC in its board would have known.

Q.    All right.  Did you know how the Lowell
House Senior Tutor knew; Jay?

A.    I don't remember the precise series of
events, but I believe I had a long series of phone
conversations and at one point a meeting with Jay
Ellison in which we discussed a number of topics,
many of which are addressed here.

Q.    Okay.  But one of the subjects definitely
was the development of a Facebook system for
integration with houseSYSTEM; right?

A.    Yes, I do recall discussing that in person
with Jay Ellison.

Q.    Okay.  Who is Paul Bottino?

A.    Paul Bottino was the administrator of the
Technology and Entrepreneurship Center at Harvard.

Q.    And was Harvard SEC in any way associated
with the technology at the Entrepreneurship Center?

A.    As I mentioned before, the original name
for the SEC was the TECH Student Association; "TECH"
is the acronym for Technology Entrepreneurship
Center at Harvard.  And so by virtue of that
affiliation we were affiliated with Paul Bottino.

Q.    All right.  Did he have an official title
with respect to Harvard SEC?

A.    Advisor.

Q.    Was he in any way involved in the
development or operation of houseSYSTEM?

A.    No.

Q.    He was just a faculty advisor to the
group?

A.    I don't believe he's on the faculty
technically, but he was an advisor to the group.

Q.    Okay.  Was he made aware while you were
developing the Facebook function that you were doing
so on houseSYSTEM?

A.    I don't believe so.  He was only minimally
involved with the group.

Q.    Do you have a recollection when the
Facebook system was completed?

A.    To the best of my knowledge, it was done
on or around September 19th, 2003.

Q.    Okay.  And why do you have that date in
mind?

A.    I believe there's an email that was sent
out around then telling people that they could sign
up for it.

MR. COOPER:  Okay.

(Whereupon, Greenspan Exhibit 6 was
marked for identification.)

BY MR. COOPER:

Q.    Mr. Greenspan, I put in front of you
Exhibit No. 6 an email dated Thursday, September
18th, 2003, from you to the SEC Management Team,
team@harvardsec.org.

Do you see that?

A.    Yes.

Q.    First of all, who is the SEC Management
Team?

A.   I listed their names earlier.  They were
the people in various positions of the SEC on the
board.

Q.   Okay.  It's the same group that you
mentioned previously that had officer positions of
some sort, although you couldn't recall specific
titles?

A.   Correct.

Q.   Okay.  Did you in fact generate this
email?

A.   I wrote it.

Q.   All right.  It states, "Hey guys, the
initial Facebook code is done for houseSYSTEM.
Try testing it out and see what you think."

A.   Correct.

Q.   All right.  First of all, did anybody else
create the code for -- the Facebook code other than
you?

A.   No.

Q.   All right.  In what language was the
Facebook code written?

A.   It was written in several languages;
including PHP, SQL and HTML, JavaScript and CSS.

Q.   Now you say, "Try testing it out and see
what you think."

A.   Correct.

Q.   How would the SEC Management Team have
access to test the code?

A.   They would have signed into houseSYSTEM,
attempted to upload a photograph, attempted to type
in information about themselves, and attempted to
then view that information about themselves and
possibly of others.

Q.   Okay.  As of September 18th, 2003, the
registration page was still disabled, correct, for
houseSYSTEM?

A.   I don't know for sure.  I think it may
have been right around the time that we turned it
back on.

Q.   All right.  In the development phase was
there a beta site that you were working with for the
Facebook?

A.   No.  This was all a pretty small project
when it started, although it got much bigger later,
and we didn't spend a lot of time creating a
formalized development process, especially even
that I was the only real developer.

Q.   All right.  Was the code you were working
on available online at any point prior to its
launching?

A.   Do you mean the source code?

Q.   Yes.

A.   The source code was executable and
rendered the website when executed, but it was not
available in its raw form except on my own hard
drive.

Q.   Okay.  During the period in which it was
being developed in its executable form, could any
of the 4- to 500 registered users who could still
access houseSYSTEM also use it even while it was in
development?

A.   They could have used it had they known it
was there, but they would not have known that it was
there because I would not have put links to it until
it was ready to be used.

Q.   Okay.  And by that you're saying you

hadn't developed the front end applications to
permit somebody using the site to even recognize
the code was being developed?

    A.    That's one way of putting it.

    Q.    Okay.  When it was completed, what type of
link did you create?  Was it a hyperlink?

    A.    It was a hyperlink.

    Q.    All right.  And it opened up a new browser
application?

    A.    It opened a web page for the Facebook.

    Q.    All right.  Did the Facebook run off the
database as was in Hoboken?

    A.    Yes.

    Q.    It used the same database schema as it
related to registered users?

    A.    It relied on the members' table and on
additional tables.

    Q.    Okay.  What were the additional tables it
relied on?

    A.    That information I think is confidential.

    MR. COOPER:  We can say under the
protective order, if all counsel agree, that just
this portion we'll treat as confidential and will
only be known by the attorneys.

    MR. FURBUSH:  Do you want to discuss this
with me?

    THE WITNESS:  Yeah.

    MR. FURBUSH:  Okay.  Can we take a break?

    MR. COOPER:  Sure.  You understand if you
need a copy of the protective order, we can get it.

    Do you have any objection if this portion
is made confidential, attorneys' eyes only?  We've
done that with third parties so...

    MR. FURBUSH:  Okay.  Let me understand
this.  It's not obvious to me what the issue is so
let me discuss it with Mr. Greenspan.

    MR. COOPER:  Okay.

    THE VIDEOGRAPHER:  Off the record at
11:23.

    (Off the record.)

    THE VIDEOGRAPHER:  Back on the record at
11:31.

    MR. FURBUSH:  We're going to designate
this portion as attorneys' eyes only.

    MR. COOPER:  I'm may be able to actually
separate that.  I'm going to try to go out of the
table and then I'll tell you if I have to go back
in.  If you want to designate it for now, that's
fine, too.

    MR. FURBUSH:  Why don't we see what your
questions are.

    MR. COOPER:  Are we on?

    THE VIDEOGRAPHER:  Yes.

BY MR. COOPER:

    Q.    Mr. Greenspan, in your Universal -- in
unifying the Facebook, tell me what information you
included in houseSYSTEM.

    A.    Do you mean for specific user profiles?

    Q.    Yes.

    A.    A user was allowed to upload their own
personal photograph to say where they lived; on
campus or off, to say what their cell phone number
was, what their telephone number was on Harvard's
own phone system, what their email address was, if
they had something like a favorite quote.

    And the number of fields associated with

the user's profile grew over time, but I believe
those were the primary ones that existed as well as
I believe their AIM screen names, and so a lot of
people used that to communicate.

Q.   Okay.  You could upload a photograph --
would it be limited only to the Facebook photograph?

A.   Which Facebook photograph?

Q.   Okay.  The Facebooks that were used in the
actual houses, the online Facebooks, they included
the student's photograph; correct?

A.   Correct.

Q.   In your Facebook that you've developed you
said that the student was allowed to upload their
own personal photograph?

A.   That's correct.

Q.   Was it limited only to the photograph that
was available on the online Facebook or was it any
student photograph they could upload?

A.   Any student photograph.  And, in fact, we
encouraged people to upload a non-Harvard photograph
since Harvard considered itself to own the copyright
to that image.

Q.   All right.  Were they allowed to upload
more than one photo or were they limited to one
photo?

A.   For the purposes of the Facebook itself,
they could upload one photo, but there was also the
associated photo album feature which would allow
you to upload or to link to, which is a better way
of putting it, multiple photographs.

Q.   All right.  And the associated photo album
feature, you say it would link to it.  You could
have a link on your user profile?

A.   No.  As I said, there really weren't user
profiles and so you could upload things to the photo
album which would be associated with your name.
And, again, this photo album for reasons of space
limitation used links rather than actual uploads,
but -- so you could upload photographs to that
album, but they would not be tied to your profile
because there were no profiles per se for the
aforementioned privacy reasons.

Q.   Okay.  What information was made
immediately available when you -- if I opened up
a Facebook page, what would I see?

A.   You would have seen a grid of everybody
on the Facebook in the similar manner to the Harvard
Facebooks or the online Facebooks with all the
information I mentioned before and their
photographs.

Q.   All right.  And by a "grid," that would
mean like a row of, say, five faces that all were
associated with students in one particular house and
below that five more?

A.   It was a row of three and then three, and
you could see everyone in every house or you could
limit it to a specific house or a specific building.

Q.   Okay.  But you would see their name and
their photograph?

A.   Among other pieces of information, yes.

Q.   And they could also include their
telephone number?

A.   Yes.

Q.   And their email address?

A.   Yes.

Q.   And their instant message account

information?
         A.    Yes.
         Q.    All right.  Did it include the typical
information that also was associated with the
Facebooks, like hometown?
         A.    I don't actually recall hometown being in
the Facebooks that Harvard provided.  I believe it
was in the freshmen Facebook but not the house
Facebooks.
         Q.    How about school?
         A.    Meaning like high school?
         Q.    No, no.  I'm sorry.  The different schools
at Harvard.  Like, say, the School of Engineering or
Economics.
         A.    Those aren't actually schools at Harvard;
so no.
         Q.    Let me restate that.
               There are two different issues and I
want to take them...  Would it permit you to list
your major?
         A.    I believe when you signed up for
houseSYSTEM, it asked you both for your intended or
current major and your future plans for employment.
So I think those may have actually been listed
there, yes.
         Q.    Okay.  And if you were in, for instance,
the medical school or the law school, were you --
well, first of all, was this limited only to
undergraduates?
         A.    No.  I believe it did say if you were
at the graduate school or the Kennedy School of
Government or -- I'm fairly certain it said what
class you were in, that kind of information about
where you were in your educational career.
         Q.    All right.  It was contemplated this could
be used by alumni, too, then?
         A.    At the time I wasn't focusing on alumni,
but I certainly was encouraging alumni to sign up
for houseSYSTEM and all of its various components,
but that wasn't my real core target.
         Q.    Okay.  Did it permit users outside Harvard
to access this information in any way?
         A.    No.
         Q.    All right.  Was that because you still
needed to have a Harvard email account to actually
use the system?
         A.    That was one reason.  Another reason was I
didn't want people outside of Harvard to access it.
         Q.    Okay.  So was there any feature that would
allow prospective employers, for instance, to view
the information?
         A.    That would depend if prospective employers
happened to be Harvard alums or not.
         Q.    Is there anywhere a student could post
their resume in the Facebook or anywhere else on
houseSYSTEM?
         A.    Yes.
         Q.    And where was that?
         A.    Under the job section.
         Q.    And the job section was a section that
existed all the way from the beginning of the launch
of houseSYSTEM; correct?
         A.    I don't recall exactly.
         Q.    Could the student link to that on their
page with their Facebook photo?
         A.    I suppose they could have if they were

clever about it, but it wasn't directly linked.

Q.   All right.   Now, without telling me the
specific fields, all the new information; say, the
Facebook JPEG -- or the photo uploaded, the school
or whatever new information you had to generate that
was not previously part of the registration process.
You had to create new tables for them; correct?

A.   Yes, they did require new tables.

Q.   Okay.   But they were still run off of one
database; correct?

A.   Correct.

Q.   All right.   I just -- that's all I'm
trying to get at.

They're not run off of multiple databases
in different locales; correct?

A.   Correct.   All of the tables for
houseSYSTEM and for Facebook were united under
one database schema.

MR. COOPER:   That was all I was ever
trying to get at.

(Whereupon, Greenspan Exhibit 7 was
marked for identification.)

BY MR. COOPER:

Q.   Mr. Greenspan, I put in front of you
an email from Harvard College SEC to a variety
of apparently house email accounts; correct?

A.   Correct.

Q.   Have you seen this email before?

A.   Yes.

Q.   Did you generate this email?

A.   I wrote it.

Q.   All right.   First of all, the Harvard
College SEC email address, that's the email account
for the student organization that ran houseSYSTEM;
correct?

A.   That's correct.

Q.   And you had access to that email account;
correct?

A.   Yes.

Q.   All right.   The first entity it's sent to
is Adams House, adams-schmooze@hcs.harvard.edu?

A.   Correct.

Q.   And is that the open email list for Adams
House at Harvard?

A.   Yes.

Q.   All right.   The second party it's sent to
is Cabot House, cabot-open@lists.hcs.harvard.edu.

A.   Correct.

Q.   Is that the open house for Cabot House?

A.   Yes, it is.

Q.   All right.   The third party it's sent
to is Dunster House which is moose-droppings@
lists.hcs.harvard.edu.   Is that the open email list
for Dunster House?

A.   Yes.

Q.   All right.   And then the fourth listing
is Kirkland House which is Kirkland-list@
lists.hcs.harvard.edu.

Do you see that?

A.   Yes.

Q.   And is that the open house list for
Kirkland House?

A.   Yes.

Q.   All right.   Then fourth is Lowell House,
Lowell-open@lists.hcs.harvard.edu.   That is the open
email list we've previously discussed for Lowell

House?
    A.   Yes.
    Q.   And you were part of that list, too;
correct?
    A.   My personal email address was subscribed
to the Lowell-Open email list.
    Q.   So you would receive any emails that --
you would have actually received a copy of your own
email here; correct?
    A.   Both at my personal address and at the
SEC's address, yes.
    Q.   That's my point.  You would have received
it at your personal address because it went to
Lowell House; correct?
    A.   Correct.
    Q.   All right.  And then the next house
that's listed is Mather House, which is mather-open@
lists.hcs.harvard.edu.
        Do you see that?
    A.   Yes.
    Q.   Is that the Mather House-Open list?
    A.   Yes.
    Q.   Open email list.
        The next one is Pforzheimer House,
pfoho-open@lists.hcs.harvard.edu.
        Do you see that?
    A.   Yes.
    Q.   And that's the Pforzheimer House-Open
email list; correct?
    A.   Yes.
    Q.   And then the next one is Quincy House
which is quincy-open@lists.hcs.harvard.edu.
        Do you see that?
    A.   Yes.
    Q.   And that's the Quincy House-Open email
list; correct?
    A.   Yes.
    Q.   And then Winthrop House is the final one,
throptalk@lists.hcs.harvard.edu.
        Do you see that?
    A.   Yes.
    Q.   And that's the Winthrop House-Open email
list; correct?
    A.   Correct.
    Q.   So would it be fair to say with this email
you were trying to contact every single Harvard
house for which you knew had an open email account
list?  A subscriber list?
    A.   Not precisely.  I knew that other houses
had open lists as well, but I could not access them
and so I was trying to contact every house that had
an open list that I could access.
    Q.   And if I wasn't clear by that, that's
exactly what I was referring to.  This is not a
complete list of all the houses at Harvard, is it?
    A.   No.
    Q.   All right.  And that's because earlier
you said some houses had open lists but they were
exclusive to the users or the students that resided
in that house and were not made available outside;
correct?
    A.   That's correct.
    Q.   All right.  Now, the subject heading of
this email is "New!  The houseSYSTEM Universal
Facebook."
    A.   Yes.

Q.   All right.  Is this the email you said
that you recalled sending on September 19th to
announce the launching of the Facebook system on
houseSYSTEM?

A.   This I believe is that email.

Q.   All right.  And you called it "The
Universal Facebook"?

A.   Yes.  I also called it "The Facebook."

Q.   Do you see in the first sentence you say,
"Have you ever wanted to find someone in another
house?"

A.   Yes.

Q.   All right.  How would someone using
the Universal Facebook find someone else in another
house?

A.   All they would have to do is click and
they would see people in other houses.

Q.   Okay.  That's because you had integrated
virtually every house; correct?

A.   It's because, as I mentioned before, all
of the houseSYSTEM sites shared a single, unified
database.

Q.   When you launched the universal
houseSYSTEM, did you populate it with the pictures
that were available on the internal houseSYSTEM
Facebooks?

A.   No.  I knew that it had been tried before
by another student who had received fairly severe
disciplinary action for doing so.

Q.   All right.  Who was that other student?

A.   Mark Zuckerberg.

Q.   And what was the program that you were
thinking of?

A.   Facemash I believe is what he called it.

Q.   All right.  As of September 19th, 2003,
you were familiar with Facemash?

A.   I guess this is my mind confusing things
in retrospect because I don't think he made that
until November.

      But that being said, I did know that
Harvard claimed to own the copyright of those
photographs.  I knew that Harvard was especially
sensitive about copyright and trademark issues from
my experience dealing with the administration, and
I thought taking such actions would be extremely
unwise in light of the conversations I'd already
had with Jay Ellison.  And in turn, when I saw that
someone else had done that, I thought it seemed like
a poor idea.

Q.   Okay.  But as of September 19th, 2003
then, there wasn't like a default in which the
Facebook photo appeared no matter what?

A.   No.  You were required to upload your own
photograph.

Q.   All right.  Was every student who was in a
Facebook already in the database or did they have to
opt in even to be listed?

A.   Students had to opt in to be listed.

Q.   So even though it's a universal Facebook,
at this point it didn't include every student at
Harvard?

A.   Correct.  Nor was every student at Harvard
signed up for houseSYSTEM.  The meaning of the word
"universal" was that it could be more than just one
house.

Q.   All right.  As of September 19th, 2003, do

you have a sense of how many users you had?
    A.   No.  But I'm sure documents exist that
could give you that number.
    Q.   Okay.  You referenced in the first
paragraph, "How about a freshman?"
       Do you see that?
    A.   Yes.
    Q.   Was that because the freshmen Facebooks
were different than the house Facebooks?
    A.   It was because there was no online
freshman Facebook.  Period.
    Q.   Okay.  That's because the freshmen
received theirs in hard copy; correct?
    A.   Correct.
    Q.   All right.  And it was your hope that you
would be able by this application to permit the
freshmen to generate online Facebooks in addition to
those students who already had them as a result of
being upperclassmen?
    A.   That's right.
    Q.   All right.  And then it says, "Ever been
frustrated by house website restrictions?"
    A.   Yes.
    Q.   What are you referring to in "house
website restrictions"?
    A.   Excuse me.  As mentioned previously, some
websites were more restrictive with information than
others, and because of that sometimes you had to be
physically in a house to use its Facebook.  Other
times you had to have a special password.  Other
times you had to use your Harvard ID.  Other times
you could see it no matter what.
    Q.   Okay.  But if a student opted in, then
they explicitly gave permissions to override any
of the privacy issues that you just referred to;
correct?
    A.   That was my opinion, that if you chose to
post information about yourself on a website that
was clearly publicly available, then you effectively
waived your right to privacy surrounding those
pieces of information that you chose to post.
    Q.   All right.  In the middle paragraph it
says, "The Harvard College SEC presents the newest
feature on houseSYSTEM; the Facebook."
       Do you see that?
    A.   Yes.
    Q.   Okay.  Do you recall on houseSYSTEM if
it was presented as "The Facebook" or "The Universal
Facebook"?
    A.   Clearly this email displays that it was
presented as both.
    Q.   Okay.  Do you have a recollection what
title just opened up?
    A.   I recall using Universal Facebook and
Facebook interchangeably so I don't remember if some
graphics said one thing and some pieces of text said
another, but both were used.
    Q.   All right.  And you were the exclusive
author of that code; correct?
    A.   Correct.
    Q.   It says, "Now you can find exactly who
you're looking for, as long as they're a houseSYSTEM
member and they've opted-in."
    A.   Correct.
    Q.   All right.  And that's a reflection of the
fact, as you stated, you first needed to register

in order to be a member of the Facebook; correct?
     A.   Correct.
     Q.   All right.  But then it says, "And with
one out of every eight Harvard College students
signed up, and many new members each day, there's a
good chance they have."
     A.   Correct.
     Q.   Do you have a sense -- do you, as you
sit here today, know what approximately "one out
of every eight Harvard College students" would
translate to in terms of students as of September
19, 2003?
     A.   800.
     Q.   All right.  And that's because --
     A.   There were 6400 students total in the
undergraduate student body, and that was the number
I was using when I said one out of every third --
"one of every eight Harvard College students."
     Q.   And as I understand it, there was
some other unknown number that would have been
potentially either alumni or students in the other
colleges, like law school or medical school?
     A.   Yes.  There could have been other students
in the graduate schools and alumni.
     Q.   Okay.  And then it says, "Start using
the houseSYSTEM Facebook today!  Visit your house's
houseSYSTEM site, or to become a member, visit."
          Do you see that?
     A.   Yes.
     Q.   And then it gives a link,
http://www.harvardsec.org/projects/housesystem.html.
     A.   Correct.
     Q.   Would you have sent that out if the
registration page was still deactivated?
     A.   No.
     Q.   All right.  Does this help refresh
that the page had been reactivated at least as
of September 19th?
     A.   Yes.  It seems as though it would have
been extremely foolish to send out something that no
one could sign up for.  The email that would make it
very clear whether or not the site was up is the
email from Jay Ellison saying, "You can turn on the
site," but I don't know if that email is available
here or not.
     Q.   Okay.  There was a -- Jay Ellison was an
administrator?
     A.   He was the Lowell House Allston Burr
Senior Tutor who I corresponded with in Exhibit 5.
     Q.   Was he an upperclassman?
     A.   No.  He was a professor or an assistant
professor.
     Q.   Okay.  But at some point between the
August 22nd, 2003 letter and your September 19th,
2003 letter, he gave you permission to go forward
with houseSYSTEM?
     A.   Yes.  After considerable negotiations.
     Q.   All right.  What restrictions, if any,
were imposed on you?
     A.   There were changes we had to make to
houseSYSTEM in the form of changes to graphics,
additional legal disclaimers, changes to our
security statement, the change I had already made
to the hashing algorithm.  There were changes I had
to make to Think Computer Corporation's website.
Permission I had to obtain from several departments

at Harvard, permission I had to obtain from the
master of each house regarding content related to
their house.

      There were a number of steps, many of
which I thought were unnecessary and overly
burdensome that we had to endure before we were
allowed to let people sign up for the site again.

    Q.   Why did you have to make changes to the
Think Corporation's website?

    A.   The way I saw it, the Harvard
administration was looking for excuses to
keep houseSYSTEM down because they saw it as a
competitive threat to the my.harvard portal and to
their newly-launched college site, which I had no
knowledge of because it had not yet been launched
when this was all raging.

      And one of the ways they felt that they
could exert control over me was through my company
since Harvard has fairly Draconian regulations
regarding student-run enterprises, and because
Harvard was one of my clients and still is, and I
had listed Harvard on my website as a client, they
felt as though it would be suddenly necessary for me
to obtain permission in order to use Harvard's name
on that website.

    Q.   That had nothing to do with the specific
function of the Universal Facebook; correct?

    A.   No.  It had to do with houseSYSTEM, but it
did not have specifically to do with the Universal
Facebook.  They raised other objections, as you can
tell from Exhibit 5, about the Universal Facebook,
but most of them were founded on misunderstandings
caused by their unwillingness to listen to what I
was actually telling them.

    Q.   Okay.  Was there a link to houseSYSTEM on
the Think Corporation website?

    A.   No.

    Q.   Was there something about houseSYSTEM on
the Think Corporation website that they would have
any reason to require a change to it?

    A.   No.  Their problem was that I was listing
the Harvard International Review as a client.

    Q.   Okay.  And that was separate from
houseSYSTEM all together; correct?

    A.   Correct.  Both Harvard University and
Harvard International Review were clients, but they
were apparently unaware of that and thought that I
was trying to twist Harvard International Review
into Harvard.

    Q.   Okay.  Do you know if there was a
link anywhere outside of -- on the World Wide Web
to houseSYSTEM that wasn't associated with the
Harvard site?

    A.   I would have no way of knowing that.

    Q.   All right.  There were none that you know
of?

    A.   At the time there were links to
CriticalMass from outside Harvard because it had
been covered in The Boston Globe.  I don't know
if those links to CriticalMass would have then
forwarded to houseSYSTEM.  But it is conceivable
both from those external links and from links from
search engines that people outside of Harvard could
have found houseSYSTEM.

      And especially because students don't
always reside in their dormitories and occasionally

go home for vacation, such as during August for
summer vacation, that people outside of Harvard
would have been exposed to and seen houseSYSTEM and
its various components.

Q.   You said that CriticalMass had received
press in The Boston Globe?

A.   I do recall talking to a reporter from
The Boston Globe and I think I recall reading an
article about it there.

Q.   Was it just -- what was the subject
that was being discussed?  I mean, why was
CriticalMass a newsworthy item to The Globe, if
you recall?

A.   CriticalMass stemmed from a very unhappy
experience I had had in an economics course where
I wrote a letter to the department head of the
economics department at Harvard and had the
professor removed from his own class.  That,
according to The Globe, was newsworthy.  And because
I made CriticalMass as a result of that, I'm fairly
certain that it received some coverage.  I could be
wrong, but I think it did.

Q.   Someone who was using the course
evaluation function or CriticalMass function on
houseSYSTEM, would their name appear anonymously
or would it appear under their user ID?

A.   At their option it could appear
anonymously, and it was a popular feature among
students who feared repercussions from professors.

Q.   In Exhibit 7 there, the final paragraph
says, "Don't forget you can also buy and sell
textbooks and other items, review courses, and trade
DVDs all on houseSYSTEM -- and it's completely
free."

A.   Correct.

Q.   All right.  Those are the functions that
already existed as of August 1st, 2000 -- those are
amongst the functions that already existed as of
August 1st, 2003; correct?

A.   Yes.

Q.   All right.  And then it says, "Keep an eye
open for the next feature:  The houseSYSTEM Jobs
center."

A.   Yes.

Q.   Okay.  What was the houseSYSTEM Jobs
center?

A.   As mentioned earlier, it was a place where
you could upload your resume as a student or post
job openings as an alum.

Q.   When I asked earlier I guess I wasn't
clear.  As of the time of the launch of the
Facebook, that function didn't exist?

A.   Apparently not.

Q.   Okay.  Did it exist sometime shortly
thereafter, if you know?

A.   I assume it existed shortly thereafter
September 19th -- or shortly after September 19th,
I should say.

Q.   Okay.  Do you recall it launching before
the end of 2003?

A.   Oh, absolutely.

Q.   Okay.  In Exhibit 7 were you aware of how
many students had in any way subscribed to any of
the houses other than Lowell House on the open email
list?

A.   So you're asking how many people were on

each house email list?

Q.   Did you have an understanding of
approximately how many you were reaching?

A.   Total by sending to all of the lists?

Q.   Yes.

A.   This is a very approximate guess, but I
would estimate between 4- and 5,000 students.

Q.   All right.  And why do you make that
estimate?

A.   I would say that of each house, probably
half of the houses subscribed to the open list.
However, people talk to each other and they send
emails to one another and if one student saw
something on the open list and his roommate or her
roommate was not on that list, they could still
forward it.  And so I think that probably if you
were to send an email to every or almost every house
list, you would certainly reach several thousand
students.

Q.   All right.  As of September 19th, 2003,
were you familiar personally with Mark Zuckerberg?

A.   I believe I had seen on the Lowell-Open
house list an email from one of his friends
regarding his CourseMatch system which surprised me
because of its similarity to CriticalMass.  I sent
him an email asking him if he'd be interested in
talking, I think, because of that CourseMatch
system, but I never got a response, to the best
of my knowledge.

MR. COOPER:  By the way, before I mark it,
were you comfortable about there was no need for
the attorney -- all right.

I'll mark as Exhibit 8 (indicating).

(Whereupon, Greenspan Exhibit 8
was marked for identification.)

BY MR. COOPER:

Q.   Mr. Greenspan, you said that you became
familiar with Mr. Zuckerberg because of CourseMatch;
is that correct?

A.   That is correct.

Q.   All right.  And before then you had not
heard or knew -- not heard of him or knew him, to
the best of your knowledge?

A.   I might have passed him once in Harvard
Yard, but I did not know him.

Q.   Okay.  I just put in front of you a
September 18th, 2003 email from you to Mark
Zuckerberg.

Do you see this?

A.   Yes.

Q.   And you said that you had been shown a
link by somebody at Lowell House to CourseMatch;
correct?

A.   An email was sent over the Lowell-Open
mailing list.  I was not personally shown anything
really.

Q.   And did you then send this email to Mark
shortly after being shown the email or seeing the
email about CourseMatch?

A.   It appears that way, yes.

Q.   All right.  As you sit here today, do you
recall how CourseMatch operated?

A.   I remember the site as doing something
that I considered but I decided not to do for
privacy reasons.  Again, which was that you could
make a list of everybody taking a particular course,

which the official course sites did not allow you
to do, and I did have that capability through
houseSYSTEM; and, in fact, it was quite easy to do
from a database programming perspective.  But I
once again was weary of upsetting some of the
oversensitive people in the Harvard community.
    Q.   In the email you sent him you say "Neat
site."
    A.   Yes.
    Q.   Is that -- was that sincere?  Did you like
Mark's site, coursematch.com?
    A.   "Neat" and "like" are different words.
And I was sincere in thinking that this site
represented a good idea, and as I mentioned, it was
an idea I had thought of previously.  But I would
not say that I liked it because, of course, I was
attached to my own creation, and what I liked was
the idea that there was someone else out there
capable of both having and executing those kinds of
ideas.
    Q.   Okay.  Coursematch.com, it required a
Harvard email address to sign up; correct?
    A.   I don't remember.
    Q.   All right.  It was devoted to Harvard
courses, though; correct?
    A.   I assume so.  I don't really remember much
of that website except that it was black and red.
    Q.   Okay.  And that it matched courses with
interests; correct?
    A.   Something like that.
    Q.   All right.  In your email you said, "It's
pretty similar to what we've been working on with
houseSYSTEM.  I don't know if you've seen it yet."
      Do you see that?
    A.   I do.
    Q.   And then it states -- then you give a
link, http://www.kirkland.harvardsec.org.
      Do you see that?
    A.   That's correct.
    Q.   All right.  By the inclusion of Kirkland,
is that a reference to Kirkland House?
    A.   Yes.
    Q.   All right.  Did the harvardsec.org have
the ability to identify the members by their houses
in addition to administration?
    A.   The theoretical ability was there based on
the originating host name or IP address of the user,
but we were not taking advantage of that.  I simply
looked up where Mark lived and sent them an
appropriate link.
    Q.   Do you know if you got a response back
from this email?
    A.   As I mentioned earlier, I don't believe I
did.
    MR. COOPER:  Okay.  I'll give you the
option.  It's 12:05 right now.  If you'd like to
take a break for lunch.  One thing that might
facilitate is right after lunch I can then have that
set up (indicating) so we can get it out of the way
and just move on.
    THE WITNESS:  And then come back to the
documents?
    MR. COOPER:  Yes.
    THE WITNESS:  Okay.  It's fine with me.  I
don't really care either way.
    MR. COOPER:  All right.  I think that

might work best for everybody.

   THE VIDEOGRAPHER:  Off the record at
12:05.

   (Whereupon, lunch recess was taken from
   12:05 p.m. to 1:15 p.m.)

   THE VIDEOGRAPHER:  Back on the record at
1:15.

BY MR. COOPER:

  Q.   Mr. Greenspan, earlier in the depo today
I indicated or I showed you a copy of the subpoena
that we had served on you; correct?

  A.   Correct.

  Q.   And one of the things that we had
requested was a demonstration of houseSYSTEM,
paragraph 11.

   Do you see that?  This is Exhibit 1.

  A.   Yes.

  Q.   All right.  As you sit here today, do
you still have the code that you used to develop
houseSYSTEM?

  A.   I still possess it through Think
Computer's ownership of it, yes.

  Q.   All right.  Think Computer ownership at
some point at a later date took ownership of the
houseSYSTEM; correct?

  A.   Yes.

  Q.   And "later date," I'm talking about a
later date than September 19th, 2003.

  A.   Yes.

  Q.   All right.  And does Think Computer also
have possession of the database that was used with
houseSYSTEM?

  A.   Yes.

  Q.   All right.  And that's the SQL database?

  A.   Correct.

  Q.   All right.  Does Think Computer operate a
website?

  A.   Yes.

  Q.   And Think Computer is still in existence;
correct?

  A.   Yes.

  Q.   And you're still the CEO; correct?

  A.   Yes.

  Q.   All right.  Does the website that Think
Computer operates have the ability to link with the
code that was in fact the code you developed for
houseSYSTEM?

  A.   Technically it does.

  Q.   All right.  In complying with
paragraph 11, the demonstration of houseSYSTEM, are
you prepared today to make such a demonstration?

  A.   I am.

  Q.   All right.  Will it be a demonstration of
houseSYSTEM showing the system as it existed as of
September 19th, 2003?

  A.   No.  It will be a demonstration as it
existed as of somewhere around May of 2004.

  Q.   Are you able to discern where in showing
us the demonstration changes -- what functions
existed in it that also existed prior to February
4th, 2004?

  A.   I can do my best to point out those
changes.

  Q.   Okay.  Are you able to comfortably state
today that you have firsthand knowledge of what the
design of houseSYSTEM was between September 19th,

2003 and May 2004?

A.   I'm comfortable saying that my knowledge
is better than anyone else's but that my memory is
not perfect, nonetheless.

Q.   Okay.  Do you believe the demonstration
you give today will nonetheless give us a relatively
accurate view of what the system looked and operated
like in 2003?

A.   Yes.

Q.   Okay.  Did you keep the code in the
regular course of your business as Think Computer?

A.   Yes.

Q.   All right.  And was it the practice of
Think Computer to make records like the computer
code that we'll be seeing?

A.   Yes.

Q.   All right.  And you're a custodian of that
code; correct?

A.   Correct.

Q.   All right.  Now, you are prepared today to
link to Think Computer to give us the demonstration
of houseSYSTEM?

A.   I don't think I would phrase it that
way, but I am prepared to give a demonstration
of houseSYSTEM.

Q.   How are you -- what are you going to be
showing us?  That's all I'm asking for.

A.   I will show you a website which is at a
different address than the initial website, since
it's no longer possible to use that address that was
used in 2003 and 2004.

Q.   And that's the harvardsec.org address?

A.   Yes.  That domain is no longer something I
have control over.  And I will --

THE VIDEOGRAPHER:  I'm only shooting the
screen right now.

MR. COOPER:  That's fine.  It's still
being transcribed.

THE WITNESS:  So I will show you the
same website as it existed before only at a
different address.  It is maintained by Think
Computer but it is not necessarily linked to by
Think Computer.

BY MR. COOPER:

Q.   Okay.  Can you call up the user interface
for the houseSYSTEM for us to see as of right now?

A.   Yes, I am.  Would you like me to right
now, or no?

Q.   Yes.  Please.

You understand as of this moment we're
only transcribing your words because the camera is
focused on the demonstration.

A.   I do understand that.

Q.   Okay.

A.   The first thing I should point out is that
because the configuration of the server has changed
and because the domain names are now different, the
site randomizes which house it chooses every time
you visit it.  This time it has chosen Cabot House
at random, but if could have chosen any other one.
And if I were to exit the browser and go back in,
it might choose a different one, but it's just for
demonstration purposes.

Q.   Okay.  But in 2003 when the houseSYSTEM
was operating at Harvard, if you lived in
Pforzheimer House, you would call up your house;

correct?
    A.   That's correct.
    Q.   So your default would be the house you
resided in?
    A.   Yes.
       MR. WALLERSTEIN:  Can you say what you
typed into the address?
       THE WITNESS:  Just now or in 2003?
       MR. WALLERSTEIN:  Just now.
       THE WITNESS:  I typed:
housesystem.thinkcomputer.com.
BY MR. COOPER:
    Q.   All right.  Now, we're looking at a user
interface that has the label "Cabot House"?
    A.   Correct.
    Q.   Is this a true and accurate representation
of what your user interface looked like in or about
September 19, 2003 for houseSYSTEM?
    A.   Yes.
    Q.   It has a sign-in registration for email.
    A.   It has a sign-in link for students for
alumni and for faculty & staff.
    Q.   The sign-in has -- I see in the upper
right hand a sign-in that gives an email form.
    A.   There is a form that asks for an email
address and a password.
    Q.   Was that in existence in 2003?
    A.   Yes.
    Q.   All right.  Was the email account that you
would give your Harvard email account typically?
    A.   Typically.
    Q.   And the password would be your FAS
password?
    A.   Before that was changed to overt the
dispute over the FASt webmail system, yes.
    Q.   All right.  Did it always have the three
links for students, alumni, faculty & staff that
appear below that?
    A.   No.
    Q.   All right.  When was that feature added?
    A.   I don't recall.
    Q.   Did it always have the statement, "This
connection is not secure"?
    A.   No.
    Q.   Do you know when that was added?
    A.   Shortly after the controversy surrounding
password issues.
    Q.   Now, it called up an image of Cabot House
at Harvard; correct?
    A.   Yes.
    Q.   All right.  Was that a feature that
existed when this site originally launched?
    A.   Yes.
    Q.   And there's a trademark "houseSYSTEM" at
the top with what -- from my distance, looks like
the Harvard possibly shield?
    A.   Yes.  It is the logo for the SEC,
actually.
    Q.   Okay.  And that branding existed on
houseSYSTEM from the beginning?
    A.   Yes.
    Q.   Okay.  From this site what would a user --
what is the earliest site that you -- what is the
earliest time you remember that faculty and staff
were permitted to sign in?
    A.   As I said, I don't recall.

Q.   All right.  Do you have a recollection
when the earliest time was that alumni could sign
in?

A.   I believe that that feature was created
simultaneous with the Jobs feature.  I don't know
when the Jobs feature went online without referring
to documents, but I would guess that it was about
the same time.

Q.   Okay.  And earlier this morning you
testified that the Jobs feature went online sometime
after September 19th, 2003, but before January 1st,
2004?

A.   That's correct.

Q.   Okay.  So whenever the alumni feature
appeared, it was sometime in 2003, after September
19th?

A.   To the best of my knowledge, yes.

Q.   Now, in the search -- and there's a search
box, a search tool on the front.

A.   Yes.

Q.   Is that the search tool that you referred
to in your earlier documents that permitted you to
use Google?

A.   Yes, it is.  And I can demonstrate that
pretty easily, I think.

There are several features within this box
to search the HSN Unofficial Guide, a Google search
of Harvard, an Inktomi search of Harvard, the FAS
Name Directory, the FAS E-mail Directory and all of
Google.

Q.   Were all six of those search options
permitted as of September 19th, 2003?

A.   Yes.

Q.   All right.  So a user could search both
internally within the university and externally?

A.   Correct.

Q.   If you go down, it says, "House resources
shuttles to."  What is that?

A.   Cabot House was located in what is known
as the Quad, which is far from Harvard Yard for
students to walk on foot, and so there were shuttles
going back and forth constantly to various locations
at Harvard which are listed here.  And this for
some reason isn't working perfectly, but it used
to display the shuttle times.

Q.   And that feature existed in or about
September 19th, 2003?

A.   I believe so, yes.

Q.   All right.  And then you have, "For all
Visitors" some information resources about Cabot
House?

A.   Correct.

Q.   And then "Administration," what is that?

A.   I believe that is the feature that -- what
you see, the contact information for people who ran
that house.

Q.   Would that be like a resident advisor?

A.   That would be one example of an
administrator.

I believe this should still work if I
click on it.  So you can see these are of course out
of date now, but you can get in touch with these
various people because their names are hyperlinked
to their email addresses.

Q.   Okay.  And you had that for all houses
that were available on the system?

A.   Correct.

Q.   All right.  Going back.  When it says "About Cabot House" what type of information was made available?

A.   It's a summary of the house's history and unique features about the house as well as a picture for each house, as well as a copyright attribution at the bottom.

The laptop doesn't seem to be cooperating right now.  There you go (indicating).

Q.   Okay.  This says, "Last Updated September 24, 2003."

A.   That is what it says.

Q.   So to the best of your recollection, this is actually a web page that was last changed on or about September 24th, 2003?

A.   Correct.

Q.   Okay.  Going back and going back yet again, you have "Rules" for all visitors.

A.   This is a page that never actually worked, I believe, but it was intended to be updated at some point in the future.

Q.   All right.  What was it originally intended to do?

A.   I was hoping that the reaction from the house administrators would be less severe and that they'd be willing to actually put useful information up on here, but that never actually happened.

Q.   And would that be like administrative rules for the university?

A.   Sure.

Q.   All right.  In order to keep people out of trouble, I assume?

A.   More or less.

Q.   And that was not ever enabled?

A.   No.  Because it required the cooperation of the university.

Q.   Okay.  And the university wouldn't permit you to post that information?

A.   I don't know if they would have or not, but they did not cooperate.

Q.   Okay.  Going back -- going to "Parties/ Alcohol."

A.   That would be the same kind of situation, I believe.

Q.   Was it originally intended that you would have the ability to notify students of where parties were occurring on campus?

A.   Yes.  In conjunction with the calendar which is also on the home page.

Q.   Okay.  So it was intended to give the students an opportunity to know of social events involving parties or alcohol?

A.   This was intended to be an adjunct to the Rules section because there are a number of rules for each house regarding parties and alcohol.

The more direct answer to your question -- oops -- is that under the Calendar here (indicating), you could submit an event, such as a party, although at this point should I log in?  Because this is one of those features that requires a login.

Q.   All right.  So as I understand it, we are looking in the Calendar feature of houseSYSTEM?

A.   Correct.

Q.   And this was another one of the features

that existed even as it launched in August 1st,
2003; correct?
    A.   Yes.  The calendar was always there.
So I'm going to log in at this point.
    Q.   You don't need to tell us your email or
address, but can you generally say how you are
logging in?
    A.   I am entering my email address into the
email field and I'm entering a password into the
password field and then I'm clicking "Go."
    Q.   Okay.
    A.   So this is taking us directly to the
Calendar page which I asked for before.
    Q.   Okay.
    A.   I believe there is a category for
"Parties" here under the category field on the
Calendar page.  So if you wanted to post just to
your house or to all houseSYSTEM sites that you
were having a party and that it may or may not be
sponsored by any one of these organizations, then
you could do that using this form.
    Q.   How did you get the organizations list?
    A.   I found it somewhere and created an SQL
query and entered it into the database.
    Q.   All right.  How many organizations did you
have listed?
    A.   I believe there are 303.
    Q.   And are they all Harvard organizations or
are there some that are non-Harvard related?
    A.   These are, to the best of my knowledge,
all Harvard-related organizations.
    Q.   So they would include, say, something
like -- well, you have a category as "Youth at
Harvard Against Handgun Violence," that would be
a student organization?
    A.   Yes.
    Q.   Okay.  And then going back to the
categories, how did you come up with those fields?
    A.   I thought of them.
    Q.   All right.  So these were just your own
development of what might be useful information for
students?
    A.   Correct.
    Q.   And they included both academic and
leisure; correct?
    A.   Correct.  There are some social and some
academic parts.
    Q.   And you broke even the social and academic
parts into individual categories of their own, like
party and leisure; correct?
    A.   Correct.  As I said earlier, part of the
intent of houseSYSTEM was to foster a better sense
of community within the houses, which I thought was
something that Larry Summers had expressed a desire
for and which I saw a need for myself.
    Q.   Were you trying to develop a social
community?
    A.   That's another way of saying what I just
said, I believe.
    Q.   Okay.  The Description field, what was the
purpose of that?
    A.   The Description field would appear
elsewhere on this site as the main heading for that
event.  So if I were going to throw a party or, for
example, put on a recruiting event for a company,
I'm not sure if this field would have anything in

it for a sponsor, but I might say "Think Computer
Recruiting Event" as a description.

Q.    And then the "Date" would be the date of
the event?

A.    That's correct.  And you could choose a
date from a calendar.  Well, maybe one that hasn't
already happened.

Q.    All right.  And then the "Time" would be
the time of the event?

A.    Correct.  So this could be any kind of
text entry, such as 12:00 p.m.

Q.    And then you have a "Harvard Map"
location.  Was that a feature to show where the
event was occurring?

A.    Yes.

Q.    You have a number of addresses listed that
are prominent within Cambridge?

A.    This is every location at Harvard
according to the Harvard map.

Q.    Okay.  Was the Harvard map a map that was
made available to students through the general site?

A.    It is a publicly-available website.

Q.    But there's something that's common called
"The Harvard Map" by Harvard students; correct?

A.    I don't know if most students even knew
it existed, but I found it and took advantage of the
information it provided.

Q.    All right.  And the information it
provided is provided by the university itself on
its own website; correct?

A.    Correct.

Q.    Okay.  Going to "Location," you would type
in the same thing as in on the Harvard map or would
you type something else?

A.    I was afraid that if you were going to
have something off of campus, you might not find it
in the Harvard map and so I provided a text field so
that you could type something else, like Atherton,
California.

Q.    All right.  So if there was going to be a
function for a sorority at a restaurant in the north
end, you could point to that as well, correct, the
north end of Boston?

A.    Correct.

Q.    "Website," what is the website function?

A.    If there was a website devoted to that
event in particular, then you could type it in.  So
if I had -- this page doesn't actually exist, but if
I had a recruiting page for Harvard students, then I
might type that in.

Q.    Okay.  And then the "Memo," would that be
a description of the event?

A.    Yeah.  That would be a more thorough
description than the actual description mentioned
earlier.

Q.    Okay.  And then it says, "To upload a
poster for your event choose a JPEG file on your
hard drive."

A.    Correct.  Which I don't believe is
actually working anymore, but if you did have a
poster that you created to advertise the event,
one of the advantages of houseSYSTEM over the
traditional method of postering was that you could
put it up digitally, not have to wake up 6:30 in
the morning when it was 32 degrees outside, and you
could broadcast it to a much wider audience.

Q.   All right.  Were there any restrictions
on what type of poster could be used to advertise
an event?
A.   None that I enforced in particular.
Q.   All right.  So it could be any JPEG image
that was associated with the event?
A.   Correct.
Q.   All right.  Do you know if students
actually used the function of uploading JPEGs for
calendar events on or after August 1st, 2003 on
houseSYSTEM?
A.   They did.
Q.   All right.  And did they do that before
the end of 2003?
A.   The easiest way to check is for me to show
you that section, which I can do if you would like.
Q.   Before you go.  I just want to know:  The
poster function, that would be where the JPEG was
uploaded?
A.   Yes.  By clicking the browse button you
can find a JPEG file on your hard drive.
Q.   All right.  So you'd go to your own local
system, upload it and then it would be uploaded to
your system?
A.   Yes.  Where "your system" means my server.
Q.   Thank you.  It would be uploaded to
the server operated out of Hoboken that ran the
houseSYSTEM'S website?
A.   Correct.
Q.   All right.  And you could save that
information and it would be made available to other
students?
A.   Correct.
     I believe this is working now.  But if I
click "Save," then you should get -- a strange error
message.  But once upon a time it did work.  I guess
this isn't a valid URL.  It's smarter than I know.
Q.   You said that you could show us how
to upload -- or there was someplace where that
permitted the JPEGs uploaded?
A.   Yes.  So before this deposition I
uploaded a sample poster to demonstrate that kind
of functionality.  The laptop is again doing its own
thing, I think.
     If you go back to the home page, you can
see that on the calendar there should now be two
events; there's the Facebook deposition and there's
the Think Computer recruiting event, which I just
typed in.
Q.   And it had an RSVP function?
A.   It had an automatic RSVP function which,
to my knowledge, is something that I invented.
Q.   All right.  Did a student get to see who
else had RSVPed?
A.   Yes.  So by clicking "RSVP" here, it says,
"You have successfully been added to the RSVP list
for this event."  It shows you the information I
typed in last night for this event, and it also
shows you a thumbnail of the poster I uploaded,
which says this is a JPEG, the kind of poster a
Harvard student might make.  Ask then you can see
the RSVP list below which also links to my email
address.
Q.   Okay.  Now, going back outside this.
A.   Do you mean going back to the home page?
Q.   Yes.  I'm sorry.  Unless there's any other

function on that that you wanted to show us.

    A.   No.  That's the basic gist of the calendar/RSVP/poster features which are all integrated.

    Q.   All right.  Now, there's an "Around Campus Find Summer Housing" function.

    A.   This is something I added toward the end of houseSYSTEM'S life where a lot of people on the open lists were trying to find summer housing, having a difficult time doing it, and I thought that rather than restricting information by house, which was typical at Harvard, it would make more sense to use an integrated message board where you could post things that everybody could see rather than only some people.

    Q.   That was added sometime towards the end of houseSYSTEM at Harvard?

    A.   Yes.  It was added right before the summer when people would have been looking for summer housing.

    Q.   So would it be fair to say spring semester 2004?

    A.   Yes.

    Q.   Now, below it you have a Facebook deposition at ad club?

    A.   This is an automatic query based on the fact that I uploaded a poster recently.  So the most recent posters to be uploaded would have been displayed on the home page so that they were prominently visible.

    Q.   Would they be displayed to all students using the houseSYSTEM?

    A.   I believe that depending upon the choice that you made at the outset about where to display the event, yes or no.

    Q.   Okay.  Now you have "General Resources, Choose a Resource."

    A.   Correct.

    Q.   Before we move on, are you able to pull up any calendar events that were actually created by houseSYSTEM users in 2003?

    A.   Oops.  That was bound to happen.  I'm referring to the water spilling, not the answer to your question.

    I believe I can.

    Q.   Can you do so for us, please, if it's possible.

    A.   I'll make an attempt.  I'm not sure if this is going to work or not.

    This is one for the Mission Hill After School Program on February 22nd, 2004 (indicating). This is one for the SEC itself (indicating).  This is one for the SEC as well (indicating).

    Q.   And it's March 5th, 2004?

    A.   Correct.  This is the Social Enterprise Club which was the other SEC on campus (indicating).

    Q.   The second one you showed I believe had an October 13th, 2003 date.  Can you go back to that. October 17th, 2003.

    A.   Correct.

    Q.   So that would be an example of one that was available in the fall of 2003?

    A.   Yes.

    Q.   Okay.  If you could go back to the home page.

    Now, a function you warned us that is

different now is it randomizes the picture of the
house.
     A.   There are two separate randomization
events going on.  One of them is that when you first
go to the site, it randomizes which house it will
supply to you throughout your session on the site.
The randomization of the pictures is a feature which
is the same now as it was then.
     Q.   All right.  So if I were a member of
Cabot House in October of 2003, the fact that it
changed from an external view of the house to this
view of the internal cathedral actually might have
happened then?
     A.   Not necessarily with these same two
pictures.  But, yes, you would have seen a
randomized set of pictures for that house in 2003.
     Q.   Okay.  Going down to "General Resources"
again.  You have a "Choose a Resource" function and,
for instance, it includes "Academic Calendar" and
"Athletics."
     A.   Correct.
     Q.   All right.  What are these resources and
what were their functions in 2003?
     A.   Because Harvard is a decentralized
organization, many of the websites that students
rely on on a daily basis which are officially run
are in widely disbursed locations that are hard to
find.  And so this makes it -- for students in 2003
it made it easier to find those resources that they
might want to use, such as the academic calendar,
the dining hall menu, et cetera.
     Q.   It also included, for instance, a link to
The Crimson?
     A.   The Crimson is one of many resources that
Harvard students use on a daily basis.
     Q.   And so it would link to the online version
of The Crimson?
     A.   Yes.
     Q.   All right.  Were all those general
resources available in or about October 1st, 2003?
     A.   Yes.
     Q.   Returning to the home page.  You have
"For houseSYSTEM Members Only" -- well, going back
"For All Visitors," we never got to "Newsletter"?
     A.   I was hoping, once again, that houses
would use these resources on a regular basis.  I
don't think the newsletter ever really took off.
     Q.   Okay.  Was the newsletter devoted to
houseSYSTEM or some other type of newsletter?
     A.   I was hoping that the house official
newsletters could be distributed.
     Q.   Okay.  But each house at Harvard has
its own newsletter that's distributed to its own
students; correct?
     A.   Possibly.
     Q.   All right.  Some houses have?
     A.   Yes.
     Q.   And you were hoping that those could be
posted online as part of this resource?
     A.   Yes.
     Q.   All right.  If you go to the top
right-hand corner of your opening page, the
web page.
     A.   The top right-hand corner?
     Q.   Yes.  It seemed to change when you logged
in.

        A.   These links became available when you log
in (indicating) as well as these links at the top
(indicating).
        Q.   Did those links always become available or
were they added later?
             Let me strike that because that doesn't
give you a time.
             In or about October 1st, 2003, which of
those links existed?
        A.   In October 2003 had I logged in using this
exact same account, all of those links would have
existed.
        Q.   All right.
        A.   I believe anyway.
        Q.   The icons changed, too, above it.  "My
Account," "Mission Control" and "Signout"?
        A.   Correct.
        Q.   Now, I assume "Signout" existed in 2003?
        A.   Yes.  It's a core feature of the site.
        Q.   And "My Account" existed in 2003?
        A.   Yes.
        Q.   "Mission Control," what is that?
        A.   That's my administrative area to run
the site which no one else would have seen except
possibly the one other person I mentioned who might
have had administrative access.
        Q.   All right.  Now, your name, "Aaron
Greenspan," "New," "Total," appeared as the new
icon.
        A.   This table did appear (indicating).
        Q.   All right.  And so did the icons below it?
        A.   Correct.
        Q.   Were those features that would be
presented to students in 2003?
        A.   Yes.
        Q.   And that would include email?
        A.   Yes.
        Q.   And "Packages" is the function that we
talked about that was never enabled?
        A.   Yes.
        Q.   And "FaceNet," is that a later name for
Facebook?
        A.   Yes.
        Q.   So that there's lack of confusion, I
understand your documents refer sometimes to "the
Facebook" and "the houseSYSTEM."  The houses also
have their own Facebooks.  For this deposition can
we from now on refer to yours as the "Universal
Facebook" so there's no confusion in the record?
        A.   For that purpose, yes.
        Q.   Okay.  And I understand you testified
earlier it sometimes also was called "The Facebook."
        A.   Correct.
        Q.   All right.  But FaceNet, is that the same
thing as the Universal Facebook?
        A.   It's related.
        Q.   All right.  Can you show us the Universal
Facebook function?
        A.   Yes.  I can try to show you as close to
what existed in 2003 as possible because that code
did change considerably over time.
        Q.   Okay.  Can you show us as close as
possible and tell us what changes occurred over
time functionally.
        A.   Sure.  This may or may not work.
             So this is a pretty decent representation

of what the original Facebook looked like
(indicating).  You can see there are three across
cells for people's information.  Sometimes
photographs would not upload correctly and so you
would get this "Corrupt Photograph" message.  Some
people chose not to upload a photograph.

         This is actually just a demo account.
But this is an actual student who did not have
a photograph or type in any valid information
possibly.

         As I said, there were privacy concerns.
And there's --
     Q.   Could you stop and go back up slightly.
Do you see Lauren Broughton?
     A.   Yes.
     Q.   All right.  Earlier I was asking what
additional information the students could upload
to include with their photos, and I recall you said
you did think address could be included?
     A.   Yes.
     Q.   All right.  But it looks like the
addresses that are contemplated would be the student
address or could it also include their hometown?
     A.   I don't believe there was a hometown
field.
     Q.   But there was an address field?
     A.   Yes.  For their address on campus.
     Q.   All right.  And there is also a class
field?
     A.   Correct.
     Q.   And we talked about if you could list your
major; it appears that you can.
     A.   Yes.
     Q.   And Miss Broughton has an engineering
sciences listed.
         And you said that phone numbers were
permitted and Miss Broughton has an example;
correct?
     A.   Yes.
     Q.   And next to her, Alton Buland has a mobile
telephone permitted?
     A.   Correct.
     Q.   And then her email account is listed,
including her Harvard email account?
     A.   Correct.
     Q.   Now, there's a list -- there's an
indication there for "Future Plans."  Was that a
field that any student could always fill in?
     A.   Yes, but it was not required.
     Q.   All right.  But was it there from the
beginning?
     A.   Yes.
     Q.   All right.  Because several of the
students on the page you're just showing us now
have future plans.
     A.   It was on the sign-up page, as I recall,
from the beginning.
     Q.   All right.  And below Miss Broughton,
Rodica Buzescu also has her AOL Instant Message
address also made available.
     A.   Correct.
     Q.   And that was again a field that was
optional for any student?
     A.   Yes.
     Q.   All right.  And then below Miss Broughton
you have a quote, "If you are single there is always

one thing you should take out with you on a Saturday
night...your friends.  Carrie Bradshaw."
          Do you see that?
     A.   Yes.
     Q.   All right.  Was the quote field again an
available field made available to every student?
     A.   Yes.
     Q.   All right.  Was it character limited?
     A.   Not to my knowledge.
     Q.   All right.
     A.   Well, let me clarify that.  It wasn't
character limited by anything that I wrote into the
code.  The database itself may have limited it to a
certain number of characters.
     Q.   Okay.  And as is evident from these
photos and as you said earlier, the students were
encouraged to upload photos other than their
official Facebook photo; correct?
     A.   Correct.
     Q.   You were going down.  I didn't mean to
stop you.  I just wanted -- Miss Broughton had some
exemplary fields we hadn't discussed earlier so...
     A.   Okay.  So continuing down you can see that
there were several people who signed up for the
Facebook.
     Q.   Do you know approximately when this
snapshot was taken?
     A.   This isn't a snapshot so this is being
read from the database in real time.  It is
consistent with the database as of, as I said,
May 2004, just about -- using the same formatting
that existed in May 2003 -- I'm sorry -- in October
2003.
          There is one exception which I'd like to
point out, which is that at the top this is missing
(indicating) because this Facebook key is no longer
in existence and part of the code.  And also,
there's no header for the same reason.  And I
believe that the header that would have shown up
there at the time is this -- well, not that.  Well,
I'm not sure where it is, but there was a Facebook
graphic there.
          MR. COOPER:  Can we go off the record for
one second?
          THE VIDEOGRAPHER:  Off the record at 1:53.
          (Off the record.)
          THE VIDEOGRAPHER:  This marks the end of
tape 2 in the deposition of Aaron Greenspan.
          Off the record at 1:54.
          (Off the record.)
          THE VIDEOGRAPHER:  This marks the
beginning of tape 3 in the deposition of Aaron
Greenspan.
          On the record at 2:02.
BY MR. COOPER:
     Q.   Mr. Greenspan, right before the break you
said there was a Facebook graphic there and you were
referring to the graphic in front of us right now.
It has now added a Universal Facebook graphic, has
it not?
     A.   Yes.  I was able to repair the broken code
that prevented it from showing up so that is how it
looked in 2003.
     Q.   So in 2003, the current -- taking away the
properties, in 2003 below "Cabot House" a user would
see Universal Facebook as a title and then you would

see that Facebook; correct?

A.   Currently it says "Limit To None" so right now it's not restricting which Facebook you see. But you would see the Facebook for effectively all houses in Harvard Yard.

Q.   Currently you see all houses; correct?

A.   Correct.

Q.   If you put on, for instance, Pforzheimer, would that would be one of the houses that you could call up?

A.   Yes.  Again, it may or may not work now, but that was the idea.  And it did work then.

Q.   All right.  Does it appear to work now?

A.   I don't think so because actually the domain name, as I mentioned, no longer exists.

Q.   Okay.  Two questions:  When you signed in initially into the web page and you entered an email address, could it be any email address that you registered with?

A.   No.

Q.   All right.  So if I had an AOL address, I wouldn't be able to use that to register?

A.   Correct.

Q.   Was it effectively limited to harvard.edu addresses?

A.   Yes.

Q.   Okay.  Now, when you clicked on -- we saw someone who had listed her AIM Instant Message account.  If you clicked on that, what would you receive?

A.   First, let me clarify my last answer. Yes, for students.  Alumni and faculty were treated differently.

Q.   In what way could alumni and faculty log in differently?

A.   Alumni needed a post.harvard.edu address but not necessarily a fas.harvard.edu address.

Q.   All right.  And that's because Harvard's email server had set up different email fields for alumni and students; correct?

A.   Yes.

Q.   But they are both ultimately harvard.edu addresses?

A.   Yes.  Faculty I believe could use any address so long as they could verify that they were actually a faculty.

Q.   So if I were a Professor of History and you verified that I in fact was using the system, I could use AOL in that unique context?

A.   I'm not exactly sure.  We wrote some sort of algorithm to verify identity, but that is possibly a true statement.

Q.   Was verification typically done just by -- somebody on Harvard SEC actually knew the professor and knew that the address was accurate?

A.   That may have been the case sometimes. We didn't have a ton of professor participation so I don't think it came up that often.

Q.   Okay.  Now, again, I was asking if you clicked on somebody's, for instance, instant AOL Instant Message address or account name, what would happen?

A.   If you look at the hyperlink, which I can't point to with the mouse without actually losing it, on the bottom of the screen it says, "AIM:  Go IM?  Screen name = the user screen name &

message = Hi, I found you on houseSYSTEM.  Are you there?"

          So effectively what that would do is bring up a window in AOL Instant Messenger that would send that person a message saying, "Hi, I found you on houseSYSTEM.  Are you there?" as soon as they pressed "Enter."

    Q.    Did you have that capacity for other instant message services, like Yahoo?

    A.    No.

    Q.    All right.  Was it limited strictly to AOL?

    A.    Yes.

    Q.    Okay.  In this case are you familiar with an individual named Cameron Winklevoss?

    A.    In the context of this case, yes.

    Q.    Are you familiar with someone named Tyler Winklevoss?

    A.    Once again, in the context of this case, yes.

    Q.    Are you familiar with someone named Divya Narendra?

    A.    Under the same limited scope, yes.

    Q.    All right.  When you were at Harvard, were you ever familiar with a website called Harvard Connection?

    A.    Not by that name, no.

    Q.    Were you ever familiar with a website called ConnectU?

    A.    Yes.

    Q.    www.connectu.com?

    A.    Yes.

    Q.    All right.  When did you first become familiar with connectu.com?

    A.    May 2004.

    Q.    Okay.  On or about the time it launched?

    A.    Yes.

    Q.    What similarities between your Universal Facebook and the ConnectU website as it launched in May 2004 are you aware of, if any, as you sit here today?

    A.    Several.

    Q.    All right.  Can you show us some of those similarities at your convenience?

    A.    Without accessing ConnectU's website, not easily.

    Q.    Can you just do some generic ones you are aware of off the top of your head?

    A.    Off the top of my head, I was aware of ConnectU as having a user profile which had a photograph of a person on the left and information about that person on the right.

          I can't say for certain that that's a similarity between houseSYSTEM and ConnectU or between the Harvard formatted Facebooks and ConnectU; but either way it is a similarity.

          I was also aware of ConnectU launching at some point a textbook exchange portion of their site and within that portion of the site I did notice that the order of the fields for data input for textbooks was exactly the same as the order of the fields I had created for houseSYSTEM.

    Q.    Is that textbook site that you're referring to called Jungleloo?

    A.    I believe that is what it was called.

    Q.    What about it again?  When you say within

68

the portion of the site you noticed that "the order
of the fields for the data input...was exactly the
same," when you say "the order of the fields," what
are you referring to?
     A.   This is going into a feature I have not
yet demonstrated to you on houseSYSTEM.  But there
was a portion called "Student Exchange" which let
you trade books, book requests, items, music, movies
and rides.
          And you can see these are some of the
books I typed in.  There's some errors because of
the changes in software since 2003, but you get
the general idea.
          And when you went to add a book listing,
it asks you for certain pieces of information about
that book, and so far as I could tell at the time,
or at least I have this recollection of thinking,
that the order in which these fields were asked for
was exactly the same on both sites.
     Q.   So that would be the title, author, ISBN
number for the publication, the edition course.  I
can't see because the cursor is over it.  Is that
"marking"?
     A.   Marking, as in were there highlights in
the book or things that were crossed out.
     Q.   Overall condition, price, sold, not sold
and then a memo?
     A.   Correct.  I don't know if ConnectU had
all these fields or some of them, but I remember
thinking that it did look similar.
     Q.   Okay.  And this was the exchange program
that was mentioned even in the August 1st, 2003,
email that announced houseSYSTEM; correct?
     A.   Correct.
     Q.   It wasn't just limited to books in your
emails it also included DVDs, for instance?
     A.   Correct.  There was a "Movies" section.
     Q.   All right.  "Movies" could either be DVD
or even VHS, I assume?
     A.   Yes.  In fact, it said "DVD" or "VHS."
     Q.   Okay.  And you could list the title,
format, value.  And it was sort of like a Craig's
List-type function?
     A.   Yes.
     Q.   What's "Rides"?
     A.   As I mentioned earlier, if you wanted to
go, for example, to Barcelona, you could say that --
well, that did not work particularly well.  You
could say where you were going from, where you were
going to, when, if it was a round trip, and some
information about that trip.
     Q.   Okay.  At just a high level, what other
features of houseSYSTEM have we not seen that you
had prepared to demonstrate this afternoon?
     A.   Well, you haven't seen CriticalMass, the
message board, jobs, or posters, so you basically
haven't seen most of it.
     Q.   Okay.  Can you show us CriticalMass.
     A.   This is the course review portion
(indicating), which you view the top 10 and bottom
10 courses at Harvard according to students.  You
could make lists of your favorite courses, your
least favorite courses, which was called the
"Blacklist," and see a general combined list in each
case.  And you could see a randomly-selected course
evaluation from a student.

One of the most prominent features was the
"Shopping List" where you could add courses that you
were interested in taking which were in turn linked
to the favorite and blacklist entries as well as
books for those courses which you could buy from
people at Harvard.  And you could add up 20 courses
to this list if you were truly insane and wanted to
take that many at once.

And when you were done, you can click on
"View Your Schedule" and it would make a calendar
for the your week that highlighted the courses that
conflicted with each other and the courses that were
"Nonconflicting," as it says in the key.

And if it had courses that had yet to be
scheduled by Harvard, they showed up up here in
"To Be Determined," (indicating).

And as you asked earlier about them being
interactive, you could click on a course to see more
information about that course.

Q.   Now, you said this was similar to
CourseMatch?

A.   I believed so.

Q.   And what were the similarities that you
recall?

A.   From a general database standpoint, it
seemed like you would require basically the same
information into making both products.

Q.   And that's because you needed to know what
courses the students were going to be taking?

A.   Among other things, yes.

Q.   Okay.  Any other similarities?

A.   As I said earlier, I don't recall a
CourseMatch.  I don't think I spent a long time
looking at it, but it did seem similar.

Q.   Going back to my questions about Harvard
Connection.  In addition to the population of the
fields in your Universal Facebook and the user
interface for the student text exchange, what other
similarities, if any, can you recall?

A.   I don't recall any other similarities that
stood out to me at the time.

Q.   Do you have any others that stand out to
you now?

A.   I think anything that I would consider
similar now in addition to what I recalled at
the time is probably influenced by media coverage
surrounding this case and so I wouldn't say that
I do.

Q.   At the time that ConnectU launched, do you
recall any significant differences between that site
and your own?

A.   There were significant differences in the
visual appearance of the site; for example, the home
page was all black.

Q.   ConnectU's home page was all black?

A.   Yes.  Although the trailer page for the
SEC was also all black, but that wasn't the home
page of the site.

ConnectU also seemed to be going for a
different target audience almost -- well, maybe
not a different target audience.  But it seemed to
have a completely different purpose.  My site was
designed to be useful to people.

And, frankly, my impression of ConnectU's
site in May when it launched was that it was a copy
of Facebook.  Because I had known Facebook, as in

Mark Zuckerberg's creation, since February when it launched and I only found out about ConnectU afterward.  I don't know if that is a factual belief or not, but that was my first impression.

Q.   Were you familiar -- we'll go back to this, but for now you also said that you wanted to show us the Jobs site.

A.   The Jobs portion was fairly straightforward.  I could as an administrator list job postings for my own company and see other job listings that existed and students could upload their resumes and I could click on any of them and see them.

Q.   And, now, is this how the particular portion of houseSYSTEM looked or existed in or about the time the Job function launched in 2003?

A.   Yes.

Q.   You mentioned at least two other sites that we hadn't seen yet.

A.   Yes.  I have to hold on for the computer again.

     The Poster section gave you an easy view of all the posters that had been uploaded.

Q.   So the Poster function you showed us earlier not only could be displayed on the home page, but it also would be displayed here?

A.   Correct.  If you wanted to see posters of other events on campus all at once, you can just go here (indicating) and click on a poster to find out more about it.  And it was often the exact same poster you would see outside because people would just print out these images and put them on bulletin boards.

Q.   All right.  And, in fact, you just called up an example that existed on December 2nd, 2003.

A.   Correct.

Q.   I don't believe we have seen the Message Board.

A.   I mentioned earlier that there were both academic and social things on the Message Board.  Academics was the most popular of them all; 25 messages can be considered popular.  There were also references to television shows, multiple places.  And when you clicked on a message board, you could show a threaded view with both anonymous posts and actual people's names that gave you more information about whatever they wanted to talk about.

Q.   Can you go back to the last function?

A.   This message (indicating)?

Q.   Yes.  It's a standard message board format?

A.   Yes.  You can reply to messages, type your own, add a post.

Q.   And create a new thread?

A.   Correct.

Q.   Were there -- again, you mentioned another section we haven't seen yet.

A.   Well, FaceNet was the version of the Universal Facebook I created after the facebook.com launched on February 4th, 2004.

Q.   Now, prior to the launch of facebook.com on February 4, 2004, did you have an Invite Friends function?

A.   No.

Q.   All right.  That was a function that you

created after Facebook?

A.   Correct.  There were a number of features
I created after the launch of Facebook to compete,
in what I thought was a healthy manner, with Mark
Zuckerberg's project.  And I deliberately created
several new features that Mark's site did not yet
have.

Q.   And can you give me an overview of those
features that Mark's site did not yet have?

A.   One of them was the ability to say how you
met somebody instead of just listing them as your
friend.  Here you can say the strength and where you
met.  Although there were limited choices, you still
had that ability.  And then when you were ready to
confirm them, you could highlight their rows and hit
"Confirm" or "Delete" as you saw fit.

Q.   When was that feature added?

A.   Early March 2004.

Q.   Are there other features that you're
thinking of that you thought were advantageous
because they were absent from Mark's site as of
February 2004?

A.   We had a birthday reminder system.
The best evidence I have of that, since it's not
apparent from the front end of the site, is that
in the Mission Control section for myself there was
an automated time-based task link for a birthday
reminder system.  And I'm not exactly sure what will
happen.  I don't want to end up emailing a lot of
people.  I don't mean to so...

Q.   That's fine.

A.   That was there, which Mark did not have.

Q.   Anything else?

A.   We had the ability to draw your network in
pdf format.  This does not work now, but you could
see a visual representation of people you knew in a
web style using software from AT&T.

And though Mark later did that, he did not
have that at the time, and he did it a different way
which was less advantageous.

And we had the Photo Album which did not
exist on Mark's site.  And then once you clicked on
a particular person, you could see right on their
profile specific sections for other parts of the
site, such as CriticalMass and books they had listed
on Student Exchange.

So those were most, I think, but not
necessarily all the features that I put in right
away.

Q.   All right.  When did you add the birthday
feature?

A.   I don't recall exactly.

Q.   It was after February 4th, 2004, though?

A.   Yes.  After February 4th and probably
before March 31st.

Q.   And when did you add the network feature,
the Draw Your Own Network feature?

A.   As soon as I launched FaceNet.  I don't
recall the exact date for that either.

Q.   But the launch of FaceNet occurred after
February 4th, 2004?

A.   Yes.

Q.   All right.  When did you add the
Photo Album feature?

A.   I believe in the fall of 2003.

Q.   So the Photo Album feature existed before

the launch of Facebook?

A.    Correct.

Q.    Can you show us that again.

A.    Here's an example photograph of my
friends.  Well, maybe.  It was there a second ago.

Q.    And where would this be posted if you were
a registered user in October of 2003?

A.    Where would this be posted?

Q.    Yes.  Where would the photo albums exist?
I mean, how would a student know where to find any
particular photo album?

A.    The intent was for them to click on the
link on their respective site that simply said
"Photo Album."  There wasn't much of a search
interface.

Q.    All right.  What I guess I'm getting at
is:  If you lived in Cabot House, and let's say both
of us lived in Cabot House, if I uploaded one set of
photos at noon and then you uploaded another set of
photos 5:00 p.m., would they all be shown together
as part of Cabot House's photo album?

A.    Yes.

Q.    All right.  And were they then available
to be viewed by somebody at, say, Pforzheimer House?

A.    Yes, somebody at Pforzheimer could have
gone and looked at them.

Q.    But it wouldn't say that the noon photos
were uploaded by Monte Cooper and the 5:00 p.m. ones
were uploaded by Aaron Greenspan.  It would be all
put together under Cabot House?

A.    I don't exactly remember how it worked at
the time, but I think many of the features on here
I did stamp with people's names so I would have
expected that to work the same way.

Q.    Was there a text feature in which you
could make any comments about the photos?

A.    I don't recall.  I seem to remember
putting in a memo field, but I don't know exactly.

Q.    Do you know when that occurred or even if
it did occur?

A.    I don't recall.

Q.    You were in the midst of going to show us
some features in the Universal Facebook.  I didn't
mean to cut you off earlier.  Did we see everything?

A.    The one part you have not seen is the way
that you would edit your profile which is part of
the My Account section.

Q.    Okay.  Can you show us that, please.

A.    This is the FaceNet profile section of
My Account (indicating) which is also linked to at
the top of the screen.  And as you can see, there
are fields for a quote, favorite books, favorite
movies, a random fact and favorite email closing.
And you can then upload a photograph over here
(indicating) and determine privacy settings for
each piece of information here (indicating).

Q.    All right.  Now, were each of these
options made available before January 1st, 2004?

A.    Some of them were; some of them were not.

Q.    Can you tell me which ones, to the best
of your recollection, were available before January
1st, 2004?

A.    I believe that "Quote" was available and I
believe some of the privacy settings were available.

       Also I've just noticed that one of
the things I must have added after the launch of

Facebook was the ability to tie it to multiple
IM networks, not just AOL Instant Messenger.

    Q.   And that's because ICQ and MSN are also
messaging systems; correct?

    A.   Correct.

    Q.   But in all other respects do all of
the fields look like those that existed as of the
original launch of Universal Facebook?

    A.   To me they did.

    Q.   Going back up, "Favorite Email Closing,"
did that exist before January 1st, 2004?

    A.   I don't believe so.

    Q.   All right.  Do you know when you added it?

    A.   It must have been very close to February,
early February of '04, or even there's a possibility
I added that particular one in late January of '03
because I remember the precise person who suggested
it and thought it would be a funny thing to have in
the site.

    Q.   All right.  Who was the precise person who
suggested it?

    A.   Brad Rosen.

    Q.   And is he a friend?

    A.   Yes.

    Q.   Was he a member of Harvard SEC?

    A.   No.  He was a member of houseSYSTEM,
however.

    Q.   Okay.  And you have a specific
recollection of his making the recommendation
for its inclusion?

    A.   Yes.

    Q.   And it occurred before February 4th, 2004?

    A.   As I said, it may have, but it was
definitely around that time frame.

    Q.   "A Random Fact," do you know when you
added that feature?

    A.   I believe that would have been included in
March of 2004.

    Q.   All right.  "Favorite Movies"?

    A.   I believe the same is the case for
"Favorite Movies" and "Favorite Books."

    Q.   But "Quote" existed from the beginning?

    A.   Yes.

    Q.   If you go back, you had a "Check
Connections" or you had something called
"Connections."

    A.   There are two links.

    Q.   All right.  When was the Connection
feature -- the features underneath "Connection"
added?

    A.   After February 4th, 2004.

    Q.   All right.  Were those amongst the
features you added to be competitive with Facebook?

    A.   Yes.

    Q.   Okay.  Are there any other features of
houseSYSTEM that you haven't had a chance to show
us that you believe would be useful for us to see,
as you sit here today?

    A.   It's hard for me to predict relevance
to your case, but I can show you two additional
features that were respectively not used very much,
or if at all, and were in the middle of being
developed.

        One of them was, again, assuming
cooperation from the university, an alarm system
that could reach a lot of students simultaneously if

there were some sort of safety problem.  Harvard had
had a lot of safety-related issues during the time
I was there with people being an assaulted on the
street, and so I thought rather than using the open
lists, which were often inefficient and didn't reach
the whole university, that administrators could
optionally turn on this bar at the top (indicating)
to reach many students.  That never actually
happened, but it was easy to program.

      And then another feature I was working
on was something I called "Organizations" which was
a way for student groups to centralize a message
board, document uploads, photos, pretty much
everything that a student group would want to talk
about in one place.

      I don't know that this ever really worked
very well, but you can see that I started making
calendars and a message board and posters and things
of that nature.

Q.   Okay.  I saw a function "Search Emails" --
"Search Email Addresses."

A.   On FaceNet there is an ability to search
for people by name or email.

Q.   When did that get added?

A.   After February 4th, 2004, and before
March 31st.

Q.   Okay.  Is that because that feature
existed in Facebook when it launched in February
4th, 2004?

A.   In part, yes.

Q.   And "Invite Friends," when did you add
that feature?

A.   During the same time frame.

Q.   All right.  And, again, was that a
response to the fact a similar feature existed
if Facebook when it launched?

A.   No.  Because I don't believe the similar
feature did exist in Facebook when it launched.

Q.   Well, did Facebook have the ability to
identify friends when it launched?

A.   Yes.

Q.   And did Facebook have a function called
"Poke"?

A.   To my knowledge, yes.

Q.   Okay.  And did Poke allow other people
with similar interests to recognize that you might
want to say hello or something to them cyber net or
in a social context?

A.   My understanding was that it was a joke
feature that had no practical purpose and could
not be used with people not on the system, which is
different than "Invite Friends" which was designed
to be a way to reach out to people who were not yet
a member.

Q.   Okay.  Well, on Facebook, though, you
could list your friends, correct, as of February
1st, 2004?

A.   Correct.

Q.   And you could add new friends.  That was a
function of the site as of that date; correct?

A.   Correct.

Q.   And you could let people know that you
wanted to invite them as friends; correct?

A.   No.  You could not let people not on the
system know that, to the best of my knowledge.

Q.   All right.  So your recollection is that

feature did not exist?

A.   Correct.  My recollection is that people
signed up for Facebook for two reasons:  Word of
mouth and The Crimson.

Q.   Okay.  Do you agree at some point in time
Facebook added a feature that allowed you to let
other individuals using the site know that you would
like them to be a member of your friend list?

A.   I believe that happened several years
later, but I don't know the exact date when it did.

Q.   All right.  So to the best of your
recollection, your invitation system existed before
Facebook's?

A.   To the best of my knowledge, yes.

MR. COOPER:  Okay.  I think we can go back
with the video on him.

THE VIDEOGRAPHER:  Short break?

MR. COOPER:  Sure.

THE VIDEOGRAPHER:  Off the record at 2:34.

(Off the record.)

(Whereupon, Greenspan Exhibit 9 was
marked for identification off the
record.)

THE VIDEOGRAPHER:  Back on the record at
2:47.

MR. COOPER:  While off the record I
believe all counsel can stipulate that exhibits 1
through 8 are nonconfidential even if marked as
confidential.  But Exhibit 9, which begins
with AG13 and extending through AG70, shall in
fact remain confidential.

MR. FURBUSH:  That's agreed.

BY MR. COOPER:

Q.   Mr. Greenspan, while we were off the
record we had marked what has been marked as
Exhibit 9.  It appears to be a spreadsheet log
that was produced by you in this case?

A.   It is a spreadsheet version of the
houseSYSTEM member table with certain fields
removed; yes.

Q.   All right.  And does this information
contain the names of individuals who signed up or
who registered for houseSYSTEM during its existence
while it operated at Harvard?

A.   Yes.

Q.   And it first gives the members by ID --
member ID; correct?

A.   Yes.

Q.   And you, in fact, are Member ID No. 1?

A.   Correct.

Q.   And then it gives first and last names;
for instance, you're Aaron Greenspan; correct?

A.   Correct.

Q.   And then it gives a field for "Mailbox."
Is that the Harvard mailbox that was used by the
student?

A.   Yes.

Q.   All right.  Then it gives a "Residence
ID," and that's the residence ID used by the
student?

A.   That is the residence ID assigned by the
system.

Q.   And the Residence ID, did that assign it
by house?

A.   By building.

Q.   Okay.  And that's because the freshmen

are halls in addition to the houses being for
upperclassmen; correct?

    A.   Correct.

    Q.   And then it gives room number?

    A.   Correct.

    Q.   So and then a phone number if its been
registered by the user?

    A.   Correct.

    Q.   And then email which was necessitated to
sign in?

    A.   Yes.

    Q.   All right.  Then if a website was
provided, it was also listed?

    A.   Yes.

    Q.   All right.  Where was the website when it
was listed on the houseSYSTEM?

    A.   I believe it was on the sign-up page.

    Q.   Okay.  Was that in existence before or
after February 4th, 2004?

    A.   Before.

    Q.   And then it gives the AOL Instant Message
ID?

    A.   Screen name; yes.

    Q.   All right.  And then if they also have a
Microsoft MSN IM ID, it would give that?

    A.   Yes.

    Q.   And then an ICQ, which is a form of
Internet communication, if they had a screen name
or an identifier for that, it would give it?

    A.   Yes.

    Q.   All right.  And then home state or
providence, if they -- they could give that field?

    A.   Yes.

    Q.   All right.  And then class, which existed
even in October 2003?

    A.   Yes.

    Q.   And next was a concentration which you
assigned an ID for?

    A.   Correct.

    Q.   And that would have been created by you;
correct?

    A.   It would have been assigned by the system.

    Q.   All right.  And the system -- but, for
instance, there is nothing at Harvard that says
the School of Engineering is ID 20, for instance;
correct?

    A.   Correct.  Which is why it was assigned by
the system.

    Q.   Okay.  That's all I was...
        "Change Concentration," what was that?

    A.   It looks like an unused field for the most
part that I may have intended to represent whether
or not somebody had changed their concentration from
one thing to another.

    Q.   So if someone had changed like from
physics to economics, in theory they could fill
in that field?

    A.   Correct.

    Q.   And then "Future Plans," it seems to have
an ID assigned to it.

    A.   Correct.

    Q.   Is that because it was a drop-down menu on
the houseSYSTEM site?

    A.   Yes.

    Q.   All right.  And then either "Anonymous,"
"No" or "Yes" is the next field?

A.   Correct.

Q.   All right.  "Source" is the next field.
What is that?

A.   I intended it to be a field to track the
way they had found houseSYSTEM.  It looks like it
was not used.

Q.   And "Resume" was because -- is the next
field?

A.   Yes.  This was also not used.

Q.   But we saw "Resume" was available on the
Job function?

A.   Correct.

Q.   All right.  This isn't referring to the
Job function?

A.   This field was not used.

Q.   Okay.  Do you know if -- did students
post their resumes ever to the Job site on
houseSYSTEM if you know?

A.   As you saw during the demonstration, yes.

Q.   Okay.  So this field doesn't correspond to
if they uploaded their resume on Jobs?

A.   Correct.

Q.   Okay.  "Level."  What is "Level"?

A.   There were a number of security levels
built into the site; one being administrator, I
believe 5 being a normal user or an SEC member,
7 being an alum.  They corresponded to different
kinds of usage scenarios.

Q.   All right.  And there's somebody who has
an 8.

A.   That may very well be.

Q.   You don't have a recollection what it is?

A.   No.

Q.   "Remote Host" is the next field.

A.   Yes.

Q.   Now, that would be the host computer from
which the individual would log on?

A.   To be precise, it's the DNS host name of
the computer that was used to log on.

Q.   How was that information generated?

A.   The server, which is receiving the request
for information, such as a website, sends out a new
request to the DNS server that it's been configured
to use.

     The DNS server forwards along a series
of requests until it finds the DNS server for the
appropriate domain; in this case harvard.edu.  That
request is passed back on the chain of DNS servers
until it returns data to the originating requester
function which then finds its way back to the
database.

Q.   Is there a reason some people have the
Remote Host information available and others don't?

A.   There is a reason.  I don't know what it
is in each case, but there is always a reason.

Q.   All right.  But every single person who
ever logs into houseSYSTEM, whether they're on
campus or in California, is going to have an IP
number; correct?  Or IP address?

A.   Based on my knowledge of how TCP/IP works,
yes.

Q.   All right.  So do you have any reason
why if you could, for instance, track an IP number
or a DNS address for somebody who is using
spencerstewart.com, like user No. 7 -- or user
No. 8, you wouldn't know for the user No. 9 what

their IP address is?

A.    It's possible that user 9 never logged in, though it seems unlikely.  It's possible that user 9 never logged in when I was tracking remote hosts.

Q.    Okay.  Do you know when you started tracking remote hosts?

A.    Not precisely.

Q.    All right.  As an administrator, you had the right to see what IP address is logged into your system, though; correct?

A.    Correct.  The remote host was always tracked by the Apache server logs which are a separate document, but they may or may not have appeared in this table.

Q.    Okay.  You have a time stamp in the next column.

A.    That is correct.

Q.    And that appears to be the time stamp for last use?

A.    Not precisely, but approximately, yes.

Q.    What makes it approximate?

A.    MySQL is designed to automatically update the first field with the time stamp type with the last time that the record was modified regardless of whether it was modified even with the exact same data.

Q.    Okay.  So all users who are in a particular class will be given the last date when that type of log occurs; correct?

A.    Regardless of class, anytime a user signed into the site, that field would have been automatically updated.

Q.    Okay.  The Create stamp is the next field.

A.    Yes.

Q.    And that's the date that the user first logged on?

A.    It's the date that the record was created.

Q.    Okay.  Which is, would you agree, representative that the user had sometime on or about that date logged into the system?

A.    In the vast majority of the cases, that would be true.

Q.    All right.  And then they were assigned a member ID by the houseSYSTEM?

A.    I believe whoever prepared this spreadsheet just repeated the first column at the end of the spreadsheet for convenience.

Q.    Where was this spreadsheet generated from?

A.    I used MySQL Administrator which is a Windows-based program to export the data from MySQL to a comma-separated file, the comma-separated file was presumably imported to another program like XL and then printed.

Q.    Is this an accurate reflection of the identities of individuals that you know at one time or another accessed the houseSYSTEM?

A.    Yes.

Q.    Is it a true and accurate representation of the dates that the individuals may have accessed the system, for instance, for the first time in the Create file?

A.    Yes.  With the only exception being my own record which had a modified time stamp at the very beginning based on my working with the demo to keep it functioning.

Q.   So your own only concern is that you have
a modified time stamp that unlike any other user
shows a last used date of July 29th, 2007, which
is after houseSYSTEM ceased to operate at Harvard;
correct?

A.   Correct.  The only other possible
exception is the demo account which falls under the
same kind of exception.

Q.   Right.  But in all other respects all the
other user information relates to -- was generated
while the houseSYSTEM was operating at Harvard;
correct?

A.   Correct.

Q.   And it's all accurate, to the best of your
understanding; correct?

A.   Correct.

Q.   And it all reflects the information
that users entered into their user registration
information when they logged in; correct?

A.   Correct.

Q.   User No. 45 on the very first page is an
individual named Victor Gao.

A.   Yes.

Q.   Do you know Victor Gao?

A.   Not personally.

Q.   You've never met Mr. Gao?

A.   Not to my knowledge.

Q.   All right.  Do you have an understanding
if he had a relationship into the development of
Harvard Connection?

A.   I believe he did.

Q.   Okay.  First of all, are you familiar with
what Harvard Connection is?

A.   My understanding is that it's the previous
name of ConnectU.

Q.   Okay.  And you have an understanding that
Victor Gao is associated with the development of
that website?

A.   That is my understanding.

Q.   But while you were at Harvard you didn't
know Mr. Gao?

A.   Correct.

Q.   Okay.  If you go to the entry logs for
Mr. Gao which I believe is No. 45.

A.   I'm sorry.  Do I have the entry logs?

Q.   No.  If you follow to page 2 where that
information is generated.

A.   Yes.

Q.   You'll see he has a create stamp of
3/9/2003, I believe?

A.   Yes.

Q.   So is it safe to say based on the manner
in which these records were always maintained
Mr. Gao signed into houseSYSTEM sometime on or
around March 9th, 2003?

A.   I believe Mr. Gao signed in to
CriticalMass or signed up for CriticalMass on
March 9th, 2003.

Q.   And that's because as of March 9th, 2003,
houseSYSTEM hadn't been made available to the
general populous; correct?

A.   It did not exist.

Q.   Yes.  Now, it has the last time stamp of
February 15th, 2004.

A.   Correct.

Q.   So that means Mr. Gao did sign into the

system sometime around February 15th, 2004 again;
correct?

    A.   That is the last time he signed into
houseSYSTEM but not necessarily the only time.

    Q.   But that was after the Universal Facebook
was created; correct?

    A.   Correct.

    Q.   Do you know if Mr. Gao ever created a
Universal Facebook profile?

    A.   I don't recall.

    Q.   Okay.  Go to page 15, AG15, entry No. 73.

        If you go to entry No. 73, do you see
Nathan Rosenberg?

    A.   Yes.

    Q.   All right.  Do you know Mr. Rosenberg?

    A.   No.

    Q.   And if you look at 73, he created his
profile on or about April 8th, 2003?

    A.   Correct.

    Q.   That, again, would be when CriticalMass
was in existence but not houseSYSTEM?

    A.   Correct.

    Q.   But his last usage occurred March 7th,
2004; correct?

    A.   Correct.

    Q.   Which is after Universal Facebook was
created; correct?

    A.   Yes.

    Q.   All right.  If you go down to entry
No. 132 on the same page, you'll see Joe Jackson.

    A.   Yes.

    Q.   Did you know Joe Jackson while you were at
Harvard?

    A.   I believe there were two Joe Jacksons
at Harvard in my class and I believe I knew one
of them.

    Q.   Which Joe Jackson do you believe you know?

    A.   I don't know.

    Q.   Okay.  Let me restate it.

        Did the Joe Jackson you know, was he
involved with computer science?

    A.   He was interested in technology and had
red hair.  That's about all I remember.

    Q.   All right.  Do you know if he was involved
with the development of Harvard Connection?

    A.   I have no idea.

    Q.   The Joe Jackson that is No. 132 first
signed into the houseSYSTEM -- or into CriticalMass
on 12/17/2002; correct?

    A.   Yes.

    Q.   And his last use was February 15th, 2004;
correct?

    A.   Yes.

    Q.   All right.  If you go to page 61, you'll
see entry 1645, Cameron Winklevoss.

    A.   Correct.

    Q.   And that's the Cameron Winklevoss you
understand is associated with the development of
ConnectU?

    A.   Yes.

    Q.   All right.  It appears Mr. Winklevoss
signed in on March 15th, 2004, for the first time.

    A.   It appears he signed up on that day.

    Q.   Right.  And that's after the Universal
Facebook had been created; correct?

    A.   Correct.

Q.   And it looks like his last usage was
September 17th, 2004.  Correct?
     A.   Yes.
     Q.   And he logged in from a remote site with
the IP address 209.58.148.120; correct?
     A.   Yes.
     Q.   All right.  Did you ever discuss
houseSYSTEM with Mr. Winklevoss?
     A.   No.
     Q.   Have you ever discussed houseSYSTEM with
Tyler Winklevoss?
     A.   I never discussed anything with either of
them.
     Q.   All right.  Have you ever talked with
either Mr. -- Cameron or Tyler Winklevoss?
     A.   No.
     Q.   Have you ever talked with Divya Narendra?
     A.   Not to my knowledge.
     Q.   Okay.  If you go to page 29, you'll see --
you understand what I'm talking about, AG29 down at
the bottom?
     A.   Yeah.
     Q.   Would you agree that user No. 541 is
Chris Hughes?
     A.   Yes.
     Q.   And Chris Hughes signed on about September
13th, 2003?
     A.   Yes.
     Q.   And his last usage was about March 18th,
2004?
     A.   Correct.
     Q.   And then user No. 547 on the same page is
Dustin Moskovitz?
     A.   Yes.
     Q.   And he signed onto the system on September
13th, 2003?
     A.   Yes.
     Q.   And his last usage was February 15th,
2004; correct?
     A.   Correct.
     Q.   Do you know Chris Hughes?
     A.   I have spoken with him.
     Q.   All right.  Did you know him in 2003?
     A.   No.
     Q.   Do you know if he has a relationship with
Facebook; the Facebook that I represent?
     A.   I'm aware that during the time that I was
in Harvard he was Facebook's spokesperson.
     Q.   Right.  And did you talk with him when he
was still at Harvard?
     A.   No.
     Q.   All right.  You've talked with him after
you both left Harvard?
     A.   Yes.
     Q.   And do you know when that was?
     A.   Sometime during the summer of 2007.
     Q.   What was the subject of the discussion?
     A.   It was related to his work with the
Obama campaign.
     Q.   Okay.  It had nothing to do with this
lawsuit?
     A.   I had one conversation with him over the
phone in which we discussed the Obama campaign and
he mentioned that he was aware of houseSYSTEM.
     Q.   Okay.  But that was the only time you
spoke with him?

    A.   We exchanged emails after that but they were again focused on the Obama campaign, and houseSYSTEM may again have been mentioned, but the lawsuit itself was not the focus of our discussion.

    Q.   Okay.  Do you know Dustin Moskovitz?

    A.   I have met Dustin.  I don't know him well.

    Q.   All right.  Did you meet him while he was still at Harvard?

    A.   Yes.

    Q.   All right.  How often did you meet with him?

    A.   Once.

    Q.   All right.  Was that before or after the Facebook launch?

    A.   Before.

    Q.   Were you aware he was a -- that he had signed on to houseSYSTEM?

    A.   At the time I don't think I bothered to check.  But after that I became aware.

    Q.   All right.  What was the circumstance that you met Dustin Moskovitz?

    A.   I was having dinner with Mark Zuckerberg.

    Q.   All right.  Now, if you look at user 1234.

    MR. FURBUSH:  What page are you on?

BY MR. COOPER:

    Q.   That would be on page 49.

    A.   Yes.

    Q.   Mark Zuckerberg is listed there; correct?

    A.   Correct.

    Q.   And he signed on about January 8th, 2004; correct?

    A.   No.

    Q.   January 6th, 2004?

    A.   Yes.

    Q.   Okay.  One thing, it appears that the numbers or the users are assigned the number that they are chronologically; is that correct?

    A.   Meaning that users are assigned in the order that -- are assigned member IDs in the order they sign up?

    Q.   Yes.

    A.   That is correct.  They are not always chronological if a record gets deleted, but generally speaking, that that is the algorithm.

    Q.   So to the best of your knowledge, these should be relatively accurate?

    A.   Yes.

    Q.   So Mark Zuckerberg signed into houseSYSTEM on or about January 6th, 2004?

    A.   Under his own name, yes.

    Q.   All right.  Do you have an understanding that he signed on under any other name before then?

    A.   I have an understanding that I sent him an email with a link as early as September 18th, 2003, in which case I would have expected him to click on that link, though he may not have signed in.  And I also have an understanding that he was roommates with Dustin Moskovitz and Chris Hughes and may have used one of their accounts.

    Q.   But you don't have any personal knowledge of that?

    A.   No.

    Q.   So as far as your records reflect, the first time Mark Zuckerberg, at least under his name, signed in was on January 6, 2004?

    A.   Correct.

Q. And that's after the Universal Facebook
was made available; correct?

A. Yes.

Q. And the last date that shows for a
Mr. Zuckerberg was May 22nd, 2004?

A. Yes.

Q. Now, if you go back to page 61. User 1669
is Eduardo Saverin?

A. Yes.

Q. All right. And he signed in on or about
for the first time March 19th, 2004?

A. Yes.

Q. And his last use was the same day?

A. Correct.

Q. And, in fact, it was one minute after he
had signed on?

A. To be precise, that means that he signed
up at 3:36 p.m. and signed in a minute later for
an unknown period of time based on this document.

Q. Okay. But that appears to be the only
date that he ever used the houseSYSTEM; correct?

A. Correct.

Q. All right. Do you know Eduardo Saverin?

A. Not personally, no.

Q. Okay. What efforts were made by you to
publicize the Universal Facebook after it launched
on September 19th, 2003?

A. As I've described, we sent emails, we told
people in person about it, I attempted to contact
The Crimson to get some press about it. Members of
SEC's board designed posters. We attempted, as
I've discussed, to gain administrative support for
efforts that were designed to improve student life.
We tried many different things.

Q. So is it safe to say you tried to
publicize Universal Facebook as widely as possible
to the Harvard community?

A. Yes.

Q. Did you feel you were successful in
getting information out broadly to the Harvard
community?

A. To a very limited extent I was successful
in retrospect.

(Whereupon, Greenspan Exhibit 10
was marked for identification.)

MR. COOPER: I think this will be one
you'll agree can be nonconfidential again, but we
will can take care of it at the end.

BY MR. COOPER:

Q. Mr. Rosenberg [sic], I put in front of you
a --

A. Greenspan.

Q. Sorry. Mr. Greenspan, I put in
front of you a series of emails ending with
one dated Saturday, September 20th, 2003, from
Lowell-Open-Request@toad.hcs.harvard.edu to
Lowell-Open@toad.hcs.harvard.edu.

A. Yes.

Q. Is this still the Lowell-Open email
account that people could register for at
Lowell House?

A. Yes.

Q. And is it you sending this email?

A. This is a digest of several emails sent by
the mail server.

Q. All right. Do you believe you have seen

this email before today?

A.   Yes.

Q.   All right.  Did you produce this email from your own records?

A.   I did produce it from my own records. I did not write the entire document.

Q.   Did you write a portion of the document?

A.   Yes.

Q.   There's a part called "For" on the first page called "Today's Topics"?

A.   Yes.

Q.   First of all, is this representative of a type of email that was routinely sent out to the open mailing list at Lowell House?

A.   Yes.

Q.   How was it typically one of these emails created, if you know?

A.   In the same manner as any other emails. Somebody would write something intending to reach a large audience and send it through their typical email program.

Q.   All right.  Well, you said you wrote a portion of this.

A.   Correct.

Q.   All right.  How was it that you only wrote a portion rather than the whole thing?

A.   I wrote a message which is in this document listed in the index as message 5.  And sent that to one email address which is representative of the mailing list, which would in turn would mail multiple people.

Q.   Okay.  First of all, there is on the first page "Today's Topics."

A.   Correct.

Q.   Were these types of emails meant to be sort of a newsletter that were sent out to the registered members of Lowell House that were on the open email server?

A.   Perhaps in a manner of speaking. Newsletters tend to be officially mandated and edited.  This is unedited and unofficial.

Q.   All right.  Do you know who Eli Sprecher is?

A.   No.  But presumably he also lived in Lowell House.

Q.   All right.  And you see on page 86 he references CourseMatch, or 85, 86 he references CourseMatch?

A.   Yes.

Q.   And do you see where he says, "CourseMatch allows you upon registering to see who's in your classes and what classes others are taking"?

A.   Yes.

Q.   This is the CourseMatch that Mark Zuckerberg created?

A.   Given that Mark Elliott Zuckerberg is cc'd on the message, it would appear that way.

Q.   In fact, Mark Zuckerberg was cc'd on this very email; correct?

A.   As I just said, yes.

Q.   Okay.  Do you recall that CourseMatch allowed individuals upon registering to see who was in their classes and what classes others were taking?

A.   As I've mentioned repeatedly, I have a very fuzzy memory of CourseMatch and I don't

actually recall that functionality, but that is
what the email says.
    Q.  All right.  Message 5, which is below it,
is the message you say you created.
    A.  Yes.
    Q.  All right.  And that's because it's sent
from Harvard College SEC?
    A.  Yes.
    Q.  All right.  And, again, it appears to
be the global email announcing the creation of the
Universal Facebook; correct?
    A.  Yes.
    Q.  So this was again part of the campaign to
publicize that Universal Facebook was available and
online?
    A.  Correct.
       (Whereupon, Greenspan Exhibit 11
       was marked for identification.)
BY MR. COOPER:
    Q.  Mr. Greenspan, I put in front of
you Exhibit No. 11, "Usage Statistics for
www.kirkland.harvardsec.org"?
    A.  Correct.
    Q.  And is this a document you generated?
    A.  It's a document I possess.  I did not
generate it.
    Q.  Do you know how this document was created?
    A.  Using a software application called
Webalyzer 2.01.
    Q.  All right.  Do you know who used it to
create this document?
    A.  This document was created automatically.
    Q.  All right.  Who gave the command to the
computer to create this document?
    A.  At some point in time much earlier I did
on a recurring basis.
    Q.  Okay.  Are you able to say that this is
the type of document that was made at or near the
time of the information contained in it?
    A.  According to the document, it was created
on October 1st, 2003, at 8:21 p.m.
    Q.  Do you have any reason to doubt the
accuracy of that statement?
    A.  No.
    Q.  And it's for a summary period of
September 2003?
    A.  Yes.
    Q.  And you were one of the people who
had knowledge of how this computer software could
generate this information?
    A.  Correct.
    Q.  And you were one of the people who
regularly kept it as part of your activities?
    A.  When you say "kept it," what do you mean?
    Q.  You had custodial rights over this by
virtue of the fact it was maintained by the server;
correct?
    A.  Yes.
    Q.  And you had the access rights to the
information stored on the server?
    A.  Yes.
    Q.  And it was the practice of Harvard SEC to
make this type of record?
    A.  It was the practice of Think Computer to
automatically generate this kind of document for all
of its hosting clients.

Q.   Okay.  But, again, Think Computer is an
entity over which you personally have access rights;
correct?

A.   Yes.

Q.   And it can be considered the custodian of
this document; correct?

A.   It could be considered the creator, I
suppose.

Q.   Okay.  Could you at a high level tell me
what the information is that's contained in this
document.

A.   It's a summary of statistics based
on the Apache logs for the virtual site
www.kirkland.harvardsec.org.

Q.   So is this the usage site for -- does
this reflect the amount of usage in the month of
September for houseSYSTEM by Kirkland House?

A.   It reflects part of the usage.

Q.   What else does it reflect?

A.   Nothing.

Q.   Okay.  On page 1 it gives total hits.

A.   Yes.

Q.   Is that the total number of times the
site was contacted by somebody from Kirkland House
in September 2003?

A.   It's the total number of http requests
received by the server.

Q.   And when it says "Total files," what do
the files refer to?

A.   Both web pages and graphics and style
sheets associated with them and other miscellaneous
files that are used to support those pages.

Q.   All right.  And then it gives total
visits?

A.   Correct.

Q.   And then it gives -- is that the number of
actual times the site was visited by somebody from
Kirkland in the month of September?

A.   Yes.  Though I believe that number should
be treated as approximate.

Q.   Okay.  And why should it be treated as
approximate?

A.   If two people using the same IP address
visited the site one after another, there would be
pretty much no way to distinguish between them.

Q.   Did you maintain this type of information
for all houses?

A.   Yes.

Q.   So there should be similar usage
statistics for Pforzheimer House?

A.   Yes.

Q.   I didn't see that in part of your
subpoena.  Would you have any concern about
producing that at a later date to your attorney
to produce to us just for Pforzheimer House?

MR. FURBUSH:  You didn't see that in the
documents we sent you?

MR. COOPER:  I didn't see it.  I saw only
Kirkland.

THE WITNESS:  I would have no problem
producing that.
BY MR. COOPER:

Q.   Okay.  All right.  And I assume similar
statistics exist for other houses, including like
Lowell and the like; correct?

A.   Correct.

Q.    If you go to page 1230.  You have a
"Top 26 of 386 total URLs"?

A.    Yes.

Q.    Are these the top 26 URLs that were being
accessed in the month of September by Kirkland House
that were made available through houseSYSTEM?

A.    Yes.

Q.    All right.  No. 1 seems to be blank.  Is
there a reason for that?

A.    It's not blank.  It's the root.

Q.    So that's the main page?

A.    It's the home page, yes.

Q.    Okay.  No. 5 is Facebook.

A.    Correct.

Q.    And it suggests 45 hits were made in the
month of September 2003 alone from Kirkland House?

A.    Correct.

Q.    Do you have a knowledge between when
Facebook launched on the houseSYSTEM in September
2003 and in February 4th, 2004, how many hits were
made to the Facebook site in aggregate from all
houses?

A.    I don't know.

Q.    Would it be in the tens of thousands?

A.    It could be, but I don't know.

Q.    Would you at least agree it was in the
thousands?

A.    I wouldn't want to put a number on it
without actually looking at the documents.

Q.    Would you be able to generate that
information?

A.    I suppose I could.

Q.    Would you have any objection, again, if
you could, at a later date generating it for your
attorney, just that information?

A.    I suppose so, though it would take a
while, but I could do my best.

Q.    Okay.  But this document reflects that in
the month of September alone from Kirkland House
Facebook was hit 45 times on houseSYSTEM; correct?

A.    Beginning as of September 23rd, yes.  So
really this represents a week rather than a month.

Q.    All right.  And it was already the No. 6
most popular hit -- or the No. 5 most popular
hit even though over half the month it was not
available; correct?

A.    Yes.  Though I believe that's actually
misleading.

Q.    Why do you think it's misleading?

A.    The Facebook by virtue of its
functionality has many more files associated
with that page than most of the other pages on
houseSYSTEM.

So, for example, if there are a hundred
people on the Facebook, that means a hundred
additional graphics have to be rendered and
displayed.  So though it may look from this table
to be one of the more popular features, in actuality
it was one of the less popular features.

Q.    Do you have an understanding why it was
less popular?

A.    I don't have an accurate understanding.  I
only have hypotheses.

Q.    Okay.  You don't need to guess so...

A.    You say, "You don't need to guess"?

Q.    No, you don't need to.

(Whereupon, Greenspan Exhibit 12
was marked for identification.)

BY MR. COOPER:

Q.   Mr. Greenspan, I put in front of you an
email dated October 10th, 2003, from Harvard College
SEC to Harvard College SEC.  Is this again an email
you generated?

A.   Yes.

Q.   All right.  And is it intended to
advertise to subscribers to the Harvard College
SEC group email new features of the houseSYSTEM?

A.   Yes.

Q.   All right.  And in the middle of the page
would you agree that you're including amongst the
new systems Facebook?

A.   Yes.

Q.   And if you go down, would you agree it now
includes "Jobs"?

A.   Yes.

Q.   So does that refresh your recollection
that "Jobs" was available on houseSYSTEM as of at
least October 10th, 2003?

A.   Yes.

(Whereupon, Greenspan Exhibit 13
was marked for identification.)

BY MR. COOPER:

Q.   By the way, before we go.  When you had
sent out an email like Exhibit No. 12, was it your
intention to try by doing so to popularize Facebook,
among other features, the Universal Facebook?

A.   Yes.

Q.   All right.  And did you send out this type
of newsletter on a regular basis?

A.   Well, as you can see, this was Volume I,
Issue 1, and so at that point, no.  Later on other
newsletters would be sent, but it was not on a
specific time period interval.  It was more sporadic
as features were completed.

Q.   Did you try and send it to more than just
the Harvard SEC group email account?

A.   It was sent to the mailing list on
houseSYSTEM for both SEC members and houseSYSTEM
members.

Q.   Okay.  But, again, the idea was to try and
get as many people to know about the new features on
houseSYSTEM as possible; correct?

A.   Correct.

Q.   And that included Facebook; correct?

A.   The Facebook was one of the features.

Q.   The Universal Facebook?

A.   Yes.

Q.   Okay.  Exhibit 13 appears to be the usage
statistics for Kirkland House for October 2003;
correct?

A.   Correct.

Q.   And if you go to page 1241, you'll see
again "Top 10 of 12" entry pages.

A.   Correct.

Q.   And it lists Facebook No. 2 with 154 hits.

A.   I must be looking at the wrong place.
Which page again?

Q.   1241.

A.   Sorry.  Yes.

Q.   All right.  And, actually, if you look
at page 1240, the previous page, Facebook is again
listed as the fifth most popular site with the same

number of hits, 154; correct?

    A.   Correct.

    Q.   Did you see a spike in the number of people looking at the site after you launched -- looking at houseSYSTEM after you launched Facebook?

    A.   No.

        (Telephone interruption.)

        MR. COOPER:  Can we go off the record?

        THE VIDEOGRAPHER:  Off the record at 3:31.

        (Off the record.)

        THE VIDEOGRAPHER:  Back on the record at 3:31.

BY MR. COOPER:

    Q.   So, Mr. Greenspan, before the interruption you said that you did not see a spike in usage after you launched Universal Facebook?

    A.   No.

    Q.   Did you expect that there was going to be a surge after you launched Universal Facebook?

    A.   No.

    Q.   Why didn't you expect a spike?

    A.   Why would I have?

    Q.   Did you have any expectation Universal Facebook would prove to be popular?

    A.   No.

    Q.   All right.  What did you think was likely to be the most popular feature of houseSYSTEM?

    A.   My guess in August of 2003 was that the Shopping Periods Scheduler would be the single most popular feature.

    Q.   And why was that?

    A.   Because that was the most controversial issue of 2002, 2003.  Preregistration was a big concern to people back then and that was the issue I was really trying to address.

    Q.   Did that assumption prove correct?

    A.   I believe so.

        (Whereupon, Greenspan Exhibit 14

        was marked for identification.)

BY MR. COOPER:

    Q.   Mr. Greenspan, I put in front of you the usage statistics for Kirkland House for November 2003.

    A.   Correct.

    Q.   And, again, this is the same type of record as Exhibit 13 and 11; correct?

    A.   Yes.

    Q.   And they were all generated by your software via Think Tank?

    A.   Think Computer; yes.

    Q.   If you turn to page 1250, it lists again the top 30 of 406 URLs visited.

    A.   Yes.

    Q.   And it lists Facebook again at No. 5?

    A.   Correct.

    Q.   And this time it has dropped to 107 hits?

    A.   Correct.

    Q.   Do you know if the decrease in the number of hits from September -- or, I mean, from October was in any way attributable to the Thanksgiving break?

    A.   That's one possible explanation.

    Q.   Do you know any other reason?

    A.   It's not something I've thought a lot about.

    Q.   Okay.  Did you become aware of any call at

Harvard for the development of a Universal Facebook
even after you developed yours?
    A.   Yes.
    Q.   All right.  And what was the context that
you became aware of?
    A.   The Crimson wrote an article, I can't
remember if it was connected to Mark Zuckerberg's
Facemash creation or not, but it seemed as though
students were demanding such an application which
I thought I had already created.
    Q.   Did you react to that article?
    A.   Yes.
    Q.   All right.  And how did you react?
    A.   I wrote to The Crimson.
    Q.   Did they publish your letter?
    A.   No.
        MR. COOPER:  Okay.
        (Whereupon, Greenspan Exhibit 15
        was marked for identification.)
BY MR. COOPER:
    Q.   Mr. Greenspan, I just put in front of you
a December 11th, 2003, online edition of The Harvard
Crimson Opinion "Put on a Happy Face."
    A.   Yes.
    Q.   And it begins with the sentence, "After
the ill-fated 'facemash' debacle -- where, for a few
short-lived hours, students perused their peers'
often-unbecoming likenesses online -- it seemed that
Harvard students' hopes of a campus-wide, electronic
facebook had been dashed."
    A.   Yes.
    Q.   Is this the article you were referring to?
    A.   This may have been one of several articles
actually; but yes.
    Q.   All right.  Do you see in the same
paragraph, it says, "But, if not for pesky privacy
issues, the site's 450 visitors and 22,000
photo-views before being shut down are clear
indicators that a campus-wide facebook is in order"?
    A.   Yes.
    Q.   All right.  And do you have an
understanding that Facemash was a program
developed by Mark Zuckerberg?
    A.   That is my understanding.
    Q.   All right.  And then it calls for "a
campus-wide facebook is in order"?
    A.   Yes.
    Q.   And is that statement one of the
statements you reacted to in trying to contact
The Harvard Crimson about your own Facebook?
    A.   Yes.
    Q.   Did you talk with anybody at The Harvard
Crimson?
    A.   I exchanged an emails with one of
The Crimson's members.
    Q.   Do you know who that individual was?
    A.   I can't remember his name.
    Q.   Do you know a person named Andrew
Stillman?
    A.   It sounds like a familiar name.  It may
have been the person.
        MR. COOPER:  Okay.
        (Whereupon, Greenspan Exhibit 16
        was marked for identification.)
BY MR. COOPER:
    Q.   Mr. Greenspan, I put in front of you a

December 6th, 2003 email.
    A.  Yes.
    Q.  It's from Andrew Stillman to Aaron
Greenspan.
    A.  Correct.
    Q.  And it says, "Aaron, thanks for emailing
me.  I've seen houseSYSTEM'S Facebook, and while it
definitely serves some of the needs that the UC is
pushing for in our proposed facebook (such as
accessibility of IM screen names and cell phone
numbers), I think the two are fundamentally
different projects."
    A.  Correct.
    Q.  All right.  Do you recall this email?
    A.  Yes.
    Q.  All right.  Can you give me the
circumstances for why it was sent to you?
    A.  I had sent Andrew Stillman an email the
day before because of seeing a third email on the
Undergraduate Council mailing list and was surprised
that they were not aware that the houseSYSTEM
Facebook already existed.
    Q.  All right.  Did you ever talk with him
directly?
    A.  Did I talk with Andrew Stillman directly?
    Q.  Yes.
    A.  No.  Though I did talk with Rohet Chopra
directly.
    Q.  All right.  And who is Rohet Chopra?
    A.  He was the president of the Undergraduate
Council.
    Q.  And the Undergraduate Council is the
"UC" referred to in the email?
    A.  Yes.
    Q.  All right.  He indicates, "We are aiming
for an opt-out facebook, using Harvard ID photos,
while houseSYSTEM is using an opt-in model, with
user-submitted photos."
    A.  Correct.
    Q.  Did you feel that was an important
difference between your own Facebook and the one
that the Undergraduate Council was trying to
develop?
    A.  I thought it represented yet another
example of foolishness on the part of the
Undergraduate Council.
    Q.  And what was the foolishness?
    A.  Making an opt-out facebook through the
administration would be much harder than making an
opt-in facebook.
    Q.  And why did you think that?
    A.  Because I had already tried to work with
the administration.
    Q.  And had you originally at some point
wanted your Facebook to be opt-out?
    A.  No.
    Q.  All right.  Had you at some point wanted
to use at least all of the Facebook photos that were
available from the houses?
    A.  No.
    Q.  What was the biggest issue you had faced
with the administration regarding your Facebook, if
anything?
    A.  They were concerned about privacy, and
an opt-out model inherently implied that people
should have their privacy rights ignored and then

considered.

 Q. All right.  Who did you talk with at Harvard about this issue?

 A. Among other people, Jay Ellison.

 Q. And Jay Ellison was again the house --

 A. Allston Burr Senior Tutor.

 Q. For Lowell House; correct?

 A. For Lowell House.

 Q. Did you talk with anybody else?

 A. At some point I spoke with President Summers.

 Q. Was that before or after December 6th, 2003?

 A. Before.

 Q. Okay.  And what did President Summers say?

 A. He was generally sarcastic and unhelpful.

 Q. All right.

  (Whereupon, Greenspan Exhibit 17
  was marked for identification.)

BY MR. COOPER:

 Q. Mr. Greenspan, I put in front of you the Harvard Undergraduate Council agenda for December 14th, 2003.

  Have you ever seen this document before today?

 A. I may have, but not recently.

 Q. Okay.  If you look on page 2, there is an online facebook proposal.

 A. Correct.

 Q. Do you have an understanding of whether or not this is the online facebook proposal that you were responding to on December 6th to Mr. Stillman?

 A. On December 5th I was responding to an email, and I don't remember what that email said, but I'm sure it was connected to this document.

 Q. Okay.  And that's because you were aware that the Harvard Undergraduate Council was trying to develop some type of facebook, a universal facebook?

 A. That was my understanding based on the email that I had read.

 Q. All right.  Did you have an understanding whether this proposal was widely known in Harvard?

 A. My understanding of the Undergraduate Council's mailing list was that it was extremely secretive, and although they did produce nominally open documents, such as this one, their website was in such poor shape that it was almost impossible to find them.

 Q. Did you see any similarities between your proposal -- your own existing Facebook, Universal Facebook, and the one proposed by the Harvard Undergraduate Council?

 A. Having just seen this, I'd have to take some time to read it.

 Q. You can take a moment.

  MR. COOPER:  Off the record for one second.

  THE VIDEOGRAPHER:  Off the record at 3:43.

  (Off the record.)

  THE VIDEOGRAPHER:  Back on the record at 3:44.

  THE WITNESS:  I'm ready when you are.

BY MR. COOPER:

 Q. Do you see any similarities between the universal online facebook proposal provided by Andrew Stillman and the Universal Facebook that you

already had available on houseSYSTEM?

A.   Yes.

Q.   What are those similarities?

A.   The UC apparently wanted to centralize this facebook through the my.harvard portal engine. HouseSYSTEM was a similar, if not alternative, portal.

The listings were searchable and sortable, and did display house and concentration.  They did show a student's photo, although the ID photo, concentration and year of graduation and directory contact information.

They also had cell phone numbers, instant messenger screen names.  Web pages were not displayed but were asked for.  Courses currently previously enrolled in were tracked by the database, student organizations were tracked by the database. There was a quote box.  There were a number of similarities.

Q.   And what were the principal differences, if any, that you saw?

A.   All of the differences in the proposal are really tied to the fact that the UC is a semi-official body and they would then be required to go through official channels to make this and therefore use Harvard photographs, Harvard servers, et cetera.  Whereas, my efforts were not officially endorsed.

Q.   After your initial email exchange with Andrew Stillman on December 5th, did you have any other communications with him?

A.   I don't recall.

Q.   All right.  Did you have any communications with anybody on the Undergraduate Council after that date?

A.   I likely did, yes.

Q.   Regarding the facebook, I should say? Universal facebook.

A.   Regarding the Facebook, I'm not sure.

Q.   And I'm talking about the universal facebook or the facebook proposal by the university.

A.   I understand.  I'm still not sure.

Q.   Earlier you said that at some point you actually came to know Mark Zuckerberg?

A.   Yes.

Q.   All right.  When was that about?

A.   Beginning in November 2003 I started carrying on an email exchange with Mark regarding I guess the article I had read about him in 15 Minutes about his Synapse MP3 player.

Q.   All right.  And beginning in November 2003, did you ever meet with Mark in person?

A.   I met with Mark on January 8th, 2004, for dinner which is the first time I met him.

Q.   Is that the same time that you say you also met Dustin Moskovitz?

A.   Yes.

Q.   Okay.  But until January 8th, 2004, you had never met Mark Zuckerberg?

A.   Not in person.

Q.   Okay.  Did you invite Mark Zuckerberg to join Harvard SEC?

A.   Yes.

Q.   Did he?

A.   He never appeared in person.

Q.   Did he register to the Harvard SEC email

group?

A.   Not to my knowledge.  He did register for houseSYSTEM, of course.

Q.   Okay.  And that's reflected in the logs that we saw earlier?

A.   Yes.

Q.   All right.  Did there come a point in time when you started talking with Mark about development of a web application?

A.   There came a point in time when Mark started talking to me about the development of a web application.

Q.   All right.  Do you know when about that was?

A.   I don't recall precisely, but I thought it was around December of 2003.

MR. COOPER:  Okay.
(Whereupon, Greenspan Exhibit 18 was marked for identification.)

BY MR. COOPER:

Q.   Mr. Greenspan, I put in front of you an email from Mark Elliott Zuckerberg to Aaron Jacob Greenspan dated Tuesday, June 6th, 2004.

Do you see this?

A.   Yes.

Q.   And in the first sentence Mark Zuckerberg states, "Aaron, I was thinking of making a web app that would use the Harvard course catalog, but I'm a little worried about the university getting upset after the whole Facemash episode."

Do you see that?

A.   Yes.

Q.   All right.  And "web app" stands for web application; correct?

A.   Yes.

Q.   Was this the web app that you were just referring to yourself?

A.   I believe so.

Q.   All right.  Is this the communication that you recall having with Mark about it?  The first communication?

A.   I believe so.

Q.   All right.  Do you see where he says, "I know you used info from the catalog in your Shopping List Scheduler in houseSYSTEM (which is awesome by the way), so I was wondering if you had to get permission to use the material, and if so, who you contacted."

A.   Correct.

Q.   All right.  The Shopping List Scheduler is the Shopping List Scheduler you said you thought would be probably the most popular function of houseSYSTEM; correct?

A.   Correct.

Q.   All right.  And by the content of this email it suggests that Mark had seen your site by then?

A.   Both that he had seen it and thought it was "awesome."

Q.   Okay.  Did you have any discussion with him about this inquiry?

A.   Yes.

Q.   All right.  What was the nature of that discussion?

A.   We discussed where I had obtained the data and why he wanted it.

Q.    And where had you obtained the data?

A.    As I said before, from the Harvard
Registrar's website.

Q.    Okay.  And did you tell Mark that?

A.    I believe so.

Q.    All right.  Did you do so by email?

A.    Yes.

        (Whereupon, Greenspan Exhibit 19
        was marked for identification.)

BY MR. COOPER:

Q.    Mr. Greenspan, I put in front of you a
January 6th, 2004, email from Mark Zuckerberg to
you which also includes an email from January 6th,
2004, at the bottom from you to Mark; correct?

A.    Correct.

Q.    And you inquired, "What kind of app were
you thinking of"; correct?

A.    Yes.

Q.    And you were wondering if you could
integrate it into houseSYSTEM?

A.    Correct.

Q.    Mark Zuckerberg responded, "I actually did
think about integrating it into houseSYSTEM before
you even suggested it but decided that it's probably
best to keep them separated at least for now."
Correct?

A.    Correct.

Q.    Did you have an understanding what the
application was that Mark was developing?

A.    I had some guesses.

Q.    What were your guesses?

A.    I guessed that he was making a Friendster
for Harvard.

Q.    And what do you mean by "a Friendster for
Harvard"?

A.    A social network that allowed you to
explicitly list your friends and coordinate that
by what he had asked for, or based on what he had
asked for, with the list of courses at Harvard.

Q.    Why did you have that suspicion?

A.    He had already made a CourseMatch and
Facemash, which combined, seemed to lead in that
direction.

Q.    All right.  And why do you think they led
in that direction?

A.    I don't know why I thought that.  That
just seemed to be the obvious thing that he would
make next.

Q.    As of January 6th, 2004, had you ever
signed up for Friendster?

A.    No.

Q.    Have you ever seen it?

A.    I believe I'd seen it once.

Q.    All right.  What was the context in which
you had seen it?

A.    A friend of mine told me about it and I
went to the website and looked at it.

        (Whereupon, Greenspan Exhibit 20
        was marked for identification.)

BY MR. COOPER:

Q.    Mr. Greenspan, I put in front of you some
archived web information from www.friendster.com
from December 2003 from the Internet Web Archive.
        Are you familiar with that tool?

A.    Yes.

Q.    All right.  If you take a look just

generically through the pages that are placed
in front of you, does this look like the site
Friendster as you understood it to exist in or
about December of 2003?

    A.   Yes.

    Q.   Okay.  And it allowed friends to connect
with other friends; correct?

    A.   Yes.

    Q.   You used the word "social network."  What
do you understand a social network to be?

    A.   In an academic sense, any representation
of your connections to other people, whether in a
paper or digital format, whether that's a diagram
or a table.

    Q.   All right.  Did you consider your
houseSYSTEM to be a social network?

    A.   No.

    Q.   All right.  Is that because it didn't have
the ability to link friends?

    A.   Yes.

    Q.   Was that a pretty important feature for it
to be a social network?

    A.   Yes.

    Q.   All right.  Did you ever have the thought
of exporting houseSYSTEM or something like it to
other universities?

    A.   Yes.

    Q.   All right.  When did you have that
thought?

    A.   August 1st, 2003.

    Q.   All right.  That was your intent from the
beginning?

    A.   Yes.

    Q.   All right.  Did you make any effort to
actually export it to other sites?  Other colleges,
I should say.

    A.   Much later, yes.

    Q.   All right.  During the period between
August 1st, 2003, and February 1st, 2004, did you
make even any preliminary efforts to see if it
could be exported to other universities?

    A.   No.

    Q.   All right.  But it was at all times your
intention to do so?

    A.   Yes.

    Q.   All right.  Did you tell people that?

    A.   I told at least one other person that.

    Q.   Who was that other person?

    A.   My father.

    Q.   Okay.  Do you have any recollection of
telling any of your friends?

    A.   Yes.

    Q.   Okay.  But you don't recall which friends?

    A.   There's a good chance it was two or three
of my closer friends.

    Q.   Okay.  And that would have been before
February 1st, 2004 as well?

    A.   Yes.

    Q.   All right.  Did you have a sense of
turning it into anything like a social network
if you exported it to other colleges?

    A.   Once I was out of Harvard and no longer
subject to the whims of the administration, I
entertained that as a possibility, but not while I
was under threat of being kicked out of the school.

    Q.   Okay.  Did you continue to have

communications with Mark Zuckerberg after he
sent you the email about the web application?
    A.   Yes.
        MR. COOPER:  All right.
        (Whereupon, Greenspan Exhibit 21
        was marked for identification.)
BY MR. COOPER:
    Q.   Mr. Greenspan, I put in front of you an
email exchange between you and Mark Zuckerberg again
dated January 6th, 2004.
        In the first of them you write to Mark
saying, "I had to enlist the assistance of three
lawyers in order to avoid Harvard following through
on its repeated threats of 'disciplinary action,'
but those threats don't relate to the course list
at all."
    A.   Correct.
    Q.   All right.  So that was your advising
about other issues that had arisen with respect
to houseSYSTEM; correct?
    A.   I was advising him about issues related
to Facemash, actually, based on my own experience
with houseSYSTEM.
    Q.   Well, what I meant is:  When you said you
enlisted "the assistance of three lawyers in order
to avoid Harvard following through on its repeated
threats of 'disciplinary action,' but those threats
don't relate to the course list at all," it was
a reference to the fact that the dispute that
necessitated your having three lawyers had nothing
to do with your being able to identify course lists
for houseSYSTEM; correct?
    A.   Correct.
    Q.   And, in fact, in this email you indicated
that you just imported the list from the Registrar's
site and put it in a table after some crazy string
parsing?
    A.   Correct.
    Q.   So that was taking the information
available from the public Harvard site about all
course materials and then parsing it into your
database table; correct?
    A.   Correct.
    Q.   And then having the "string parsing";
meaning that you had to make some adjustments
for linking the information; correct?
    A.   Yes.
    Q.   All right.  And then you say, "I'm sure
you'd have no trouble doing the same, but you'll
quickly find that Harvard's Oracle backend for
courses is really a piece of crap."
        "Harvard's Oracle backend" is a reference
to Harvard's own database; correct?
    A.   Yes.
    Q.   All right.  In his response to you he
says -- Mark says, "I actually already have that
stuff parsed and if you ever need it, just let me
know."
    A.   Yes.
    Q.   And that's the course information he's
referring to; correct?
    A.   Yes.
    Q.   And that's actually consistent with his
having created CourseMatch; correct?
    A.   Yes.
    Q.   All right.  And then he says, "I know

you have a version of it since you're using it
for houseSYSTEM, but if you need one with course
descriptions and pre-reqs, I can give that to you
if you're interested and don't already have those
fields."

    A.   Correct.

    Q.   All right.  So in the CourseMatch that had
been prepared by Mark, he had course descriptions
made available; correct?

    A.   Apparently.

    Q.   And he had also identified prerequisites
for the courses; correct?

    A.   Yes.

    Q.   And did you have that information on
houseSYSTEM?

    A.   No.

        (Whereupon, Greenspan Exhibit 22
        was marked for identification.)

BY MR. COOPER:

    Q.   Mr. Greenspan, I put in front of you
another pair of emails from January 6th, 2004,
in which in the first one you state, "Mark, very
interesting.  That might actually be useful."

        Do you see that?

    A.   Yes.

    Q.   And that's a reference with his providing
you with the prerequisite and course description
information; correct?

    A.   Yes.

    Q.   And then you invite him to keep
houseSYSTEM going; correct?

    A.   That is correct.

    Q.   All right.  And then in the first sentence
above it says, "I'm definitely considering joining
SEC and I still want to come to a meeting sometime
when I get a chance."  Correct?

    A.   He says he's definitely considered it,
yes.

    Q.   All right.  And, again, that's consistent
with your recollection that he actually never made a
meeting; correct?

    A.   Correct.

    Q.   He then says, "The general problem I have
with these things is I don't...have a long attention
span for lots of coding."

    A.   That is what he claims.

    Q.   All right.  And then he says, "I like
coming up with ideas and implementing them quickly,
which is why I've stuck mostly to web development
recently."

    A.   Correct.

    Q.   Did you have an understanding of what web
development he was referring to?

    A.   My best guess was CourseMatch and
Facemash.

    Q.   Did you after this email exchange have
any -- you said you had meeting with him and Dustin
Moskovitz on January 8th, 2004?

    A.   That's correct.

    Q.   What was the substance of that meeting?

    A.   We discussed our own experiences with the
Harvard administration.  We discussed houseSYSTEM.
We discussed his secretive project that he was
keeping on the "DL," as he put it, and had dinner.

    Q.   All right.  Did he put it, say, "on the
DL" in an email, if you know?

A.    Both verbally and in the email that has
that verbiage.
Q.    And did he give you details about what
was the -- and "DL" stands for download?
A.    That's my understanding.
Q.    And did he give you any information about
it?
        MR. FURBUSH:  What does that mean?
        MR. COOPER:  Download.
        THE WITNESS:  It's a colloquial way of
saying keeping it confidential.
        MR. COOPER:  Welcome to the world of
computer speak.
        MR. FURBUSH:  Okay.
        THE WITNESS:  Not all computer engineers
speak like that, I'll have you know.
BY MR. COOPER:
Q.    I understand.  But I also know many who
do.
A.    Sure.
Q.    And you're referring to Exhibit 19;
correct?
A.    Yes.
Q.    And in that it says, "For now I'm trying
to keep the project on the DL so I rather not
disclose the details, but we can definitely speak
about it once I'm ready to release it."
A.    Yes.  He said he rather not discuss the
details.
Q.    But you had already created a surmise that
it was a Friendster-like environment for Harvard?
A.    I asked him in person, point blank, "Is it
a Friendster for Harvard?"  And he said he could not
tell me.
Q.    All right.  But by January 8th you already
had your suspicions?
A.    By January 6th I already had my
suspicions.
Q.    Okay.  But when you asked him point
blank --
A.    Yes.
Q.    -- so...
A.    Yes.
Q.    Did he say why he couldn't tell you?
A.    No.
Q.    All right.  Did you have -- did you
gain any other information about the project he
was working on?
A.    Only that he thought it would be cool and
that he thought it would relate to graph theory.
Q.    And by "graph theory" what did you
understand that to mean?
A.    The underlying academic theory behind
social networks where you --well, behind social
networks and other kinds of networks in which
there are nodes that have to link to each other.
Q.    Okay.  And, again, that's like a friend
connection; correct?
A.    That could be one example of a node where
each node is effectively a person and connections
between nodes are friendships.
Q.    All right.  Did Dustin Moskovitz say
anything about the project?
A.    He was very quiet the whole time.
Q.    All right.  How long did this conversation
last?

A.    Approximately an hour.
Q.    All right.  Was it devoted specifically to
the subject of the project on the DL?
A.    As I said, we discussed the Harvard
administration houseSYSTEM and Mark's project.
Q.    Did he talk about any project he was doing
for anybody else at the same time?
A.    No.
Q.    All right.  Did you have any conversations
with him after January 8th and before February 4th,
2004?
A.    I believe I did.
Q.    Do you know when that was?
A.    No.
Q.    Do you know the circumstances?
A.    We talked with moderate frequency on
AOL Instant Messenger.
Q.    Okay.  But did you discuss the project he
was working on?
A.    During that time frame, I don't know.  If
we had discussed it, he would not have been telling
me that that's what we were discussing.
Q.    Did a period of time come where you
realized the project on the DL was Facebook?
A.    As soon as it launched, yes.
Q.    And was the project as it launched
consistent with what you had suspected he was
working on?
A.    Entirely.
Q.    And it was a social network; correct?
A.    Yes.
Q.    What differences existed with the Facebook
as it launched and your Universal Facebook as it
existed in the fall?
A.    One difference was that the Facebook that
Mark created was a standalone product not integrated
with other features at the time that it launched.
Its visual interface was much different than
houseSYSTEM'S.  Its code was in pretty poor shape,
as I recall, and was not very efficient.
        There were more fields for people to work
with and there was a difference in focus in that
while I was trying everything I could to not focus
on people, Mark had devoted everything to focusing
on the personal profile.
Q.    And you said, "Its code was in pretty
poor shape."  Was that from doing a right click
and looking at the see source or show source?
A.    No.  That was just from seeing the URLs
that were generated when you clicked on links.
Q.    All right.  You say "there was a
difference in focus."  What do you mean?
A.    As I said, houseSYSTEM, because of privacy
issues, was not designed to focus on personal
profiles.  Facebook was.
Q.    Did you think Facebook was similar to
Friendster?
A.    Yes.
Q.    All right.  In what ways was it similar to
Friendster?
A.    There were personal profiles.
Q.    All right.  And were they also both friend
links?
A.    Yes.
Q.    All right.  And Friendster, you would
agree, is a social network?

A.   Yes.

Q.   And when you told Mark -- when you asked
Mark if it was going to be a Friendster for Harvard,
did you have an understanding he knew what you meant
by "Friendster"?

A.   Yes.

Q.   Okay.  What other similarities did you see
between it and Friendster; Facebook as it launched?

A.   Both had the potential for gross privacy
violations, in my opinion.

Q.   What similarities in terms of content?

A.   I didn't spend a lot of time looking at
the content on Friendster except for my one friend's
profile so I really couldn't say beyond the typical
fields you see on social networks, which are name,
perhaps birth date, hometown, et cetera.

Q.   And would you agree it's often frequently
on social networks to have email addresses listed?

A.   Yes.

Q.   When Facebook launched, it was confined to
allowing you to use a harvard.edu address?

A.   Correct.

Q.   Did you become aware that it expanded to
other colleges?

A.   At some point in time.

Q.   How soon did you yourself ever sign up to
Facebook after it launched?

A.   Approximately one or two hours.

Q.   Okay.  How did you find out about its
launch?

A.   I received an email from Rodica Buzescu
relaying an email to the Harvard UAs, which were
user assistants, talking about Facebook's launch and
the fact that it was already lined up for Crimson
coverage.

Q.   All right.  Did you have an understanding
how it was lined up for Crimson coverage?

A.   No.

Q.   All right.  Was there a time when the site
was in fact covered by Crimson?

A.   Several.

Q.   All right.  And was it pretty immediately
after its launch?

A.   To the best of my recollection, yes.

Q.   All right.  Did you continue on to develop
your own site?

A.   I developed several websites after that.

Q.   Let me rephrase.

Did you continue to try and further
develop the Universal Facebook after launch?

A.   Yes.

Q.   And you said earlier there were some
features that you even added as a result of
Facebook's popularity; correct?

A.   Correct.

Q.   Including the linking to friends?

A.   Correct.

(Whereupon, Greenspan Exhibit 23
was marked for identification.)

BY MR. COOPER:

Q.   Do you know the date you launched your
own -- the FaceNet?

A.   I don't recall exactly.

Q.   FaceNet was simply a modification of the
Universal Facebook; correct?

A.   Correct.

Q.   All right.  And this article -- I put
in front of you as Exhibit 23, a March 19th, 2004,
email -- or article, the online edition of
The Harvard Crimson.

Do you see this?

A.   Yes.

Q.   Do you recall reading this?

A.   Yes.

Q.   And it says, "Earlier this week," the
week of March 19th, 2004, "Aaron J. Greenspan '06
launched FaceNet, a website providing Harvard
affiliates with services similar to those offered
by the facebook.com, a popular site that has already
attracted more than 7,000 students and alumni
through friendship networks."

A.   Correct.

Q.   As of the date that Facebook launched,
February 4th, 2004, approximately how many users
were there of the houseSYSTEM?

A.   1,438.

Q.   All right.  And you're again looking at
Exhibit 9, correct, to ascertain that number?

A.   Yes.

Q.   So that's because again it's chronological
so you can make an estimation by the user ID as of
the February 4th date; correct?

A.   Correct.

Q.   So there were 1400 users of the
houseSYSTEM.  That's about one-quarter of the
population of the Harvard undergraduate body;
correct?

A.   Correct.

Q.   How many of those do you have an
estimation were familiar -- how regularly did you
see hits on your Universal Facebook site before
Facebook launched?

A.   There would be a lot of traffic at the
beginning of each semester, but not as much for the
rest of the time.

Q.   Okay.  On this March 19th, 2004 article
there's a quote from Zuckerberg's roommate
Christopher R. Hughes.

A.   Correct.

Q.   And it says he did not view FaceNet as a
competitor?

A.   Apparently.

Q.   Did you ever talk to Chris Hughes about
that comment?

A.   No.

Q.   Do you have any reason to doubt his view
on that?

A.   Yes.  He was a spokesman.

Q.   All right.  Well, do you see where
it says, "'We don't really have an attitude of
competition,' Hughes says, 'I have seen the FaceNet
website and it looks fine.'"

A.   Correct.

Q.   And then he says, "'It looks like an
interesting website.  But we are not worried or
competitive.  That's not our attitude at all.'"

A.   Correct.

Q.   Did you see any effort by Facebook's
founders in any way to undermine FaceNet?

A.   It depends what you mean by "undermine,"
but I did get a competitive vibe from Mark.

Q.   Okay.  But you would agree that their

public statement here actually doesn't even
criticize your site?
    A.   I would agree with that.
       BY MR. COOPER:  He has to go off the
record.  I would say five minutes and then I'm done.
Is that okay with everybody?
       THE VIDEOGRAPHER:  This marks the end of
tape 3 in the deposition of Aaron Greenspan.
       Off the record at 4:14.
       (Off the record.)
       (Whereupon, Greenspan Exhibits 24,
       25, 26, 27, 28 and 29 were marked for
       identification off the record.)
       THE VIDEOGRAPHER:  This marks the
beginning of tape 4 in the deposition of Aaron
Greenspan.
       On the record at 4:29.
BY MR. COOPER:
    Q.   Mr. Greenspan, we're going to go quickly
through.
       We previously marked during the break
Exhibit 24.  It's the usage statistics for
www.kirkland.harvardsec.org for December 2003.
    A.   Correct.
    Q.   This is the same type of usage statistics
for houseSYSTEM that we saw for September, October
and November; correct?
    A.   Correct.
    Q.   And once again on page 1261, beginning
on 1261 extending to 1262, it lists the top 27 of
623 total URLs that were hit during the month of
December 2003 on houseSYSTEM?
    A.   Correct.
    Q.   And, again, it lists Facebook at 5 at
107 hits?
    A.   Yes.
    Q.   On Exhibit 25, it's the same statistics
generated by you, as I understand it, for January
2004?
    A.   Yes.
    Q.   All right.  Generated by your company at
your behest for January 2004?
    A.   Yes.
    Q.   All right.  And for January 2004, the
top 30 of 1,012 URLs on page AG1271 reflects again
Facebook --
    A.   Yes.
    Q.   -- in the fifth position with 106?
    A.   Yes.
    Q.   And Exhibit 26 is the same
information, yet again usage statistics for
www.kirkland.harvardsec.org for February 2004?
    A.   Yes.
    Q.   And this would be for the period
immediately following the launch of Facebook?
    A.   It would include that period, yes.
    Q.   All right.  And the top 30 of 1985 URLs
on page 1282 to 1283.
    A.   Yes.
    Q.   And it shows that Facebook is now dropped
to No. 8 with only 68 hits?
    A.   Correct.
    Q.   Did you see a loss of interest in the
Universal Facebook immediately following the launch
of Facebook by Mark Zuckerberg?
    A.   I would not say immediately following,

given that there was already not that much interest
in the Facebook that I had created.  But generally
speaking, yes.
     Q.   Would you look at Exhibit 27.
     A.   Yes.
     Q.   Is this a document you generated?
     A.   It is a similar statistical document from
exhibits 26, 25, et cetera.
     Q.   Is it generated from the same user
information available on the New Jersey server
that was --
     A.   Yes.  It's part of the same program, in
fact.
     Q.   All right.  Can you just tell me, is this
information that's shown on Exhibit 27 limited to
www.kirkland.harvardsec.org?
     A.   Yes.  Though most of the graphs in
this particular document appear to be completely
meaningless.
     Q.   But whatever information is in here should
also be the same information that's, for instance,
in Exhibit 26?
     A.   Yes.
     Q.   You created an online book as a result of
your experiences from Harvard?
     A.   I wrote a book; yes.
     Q.   All right.  It's available from your
website; correct?
     A.   The first chapter is presently available;
yes.
     Q.   And at previous times the whole volume was
available; correct?
     A.   Correct.
     Q.   And it's called "Authoritas"?
     A.   It's called "Authoritas," yes.
     Q.   And that's a play on Harvard's choice of
its shield word "Veritas"?
     A.   It is a play on Harvard's motto.
     Q.   All right.  In this book do you describe
your discussions with Mark Zuckerberg?
     A.   Yes.
     Q.   All right.  If you turn to page -- does
this appear to be a version of Authoritas as it
existed previously on your website?
     A.   At one time, yes.
     Q.   And has it been further modified in the
time since it was available on your website?
     A.   Yes.
     Q.   Is it being published by anybody, do you
know?
     A.   I don't know.
     Q.   Has it been -- and you don't have to
give me details.  I just want to know:  Has it been
submitted to a publisher?
     A.   Yes.
     Q.   Okay.  But you do agree at an earlier time
I was able to download this version of the book?
     A.   Yes.
     Q.   All right.  In whatever version -- at
whatever point in time this version exists, can you
turn to 1784.
     A.   Yes.
     Q.   You have a paragraph at the start, it
says, "In addition to financing, Mark also attracted
a lawsuit from the founders of a website called
ConnectU, a dating site run by several Harvard

undergraduates who hired him to design and program
their project in the fall of 2003."
    A.   Correct.
    Q.   How did you know that their site was a
dating site?
    A.   It had been covered fairly extensively in
The Crimson and other media outlets.
    Q.   Okay.  In the final sentence of that
paragraph it says, "ConnectU eventually diversified,
branching into the used textbook exchange
marketplace with the web page form whose user
interface exactly matched houseSYSTEM'S."
    A.   Correct.
    Q.   All right.  And that's the Jungleloo web
page you were telling me about earlier?
    A.   Yes.
    Q.   And then it says, "One of ConnectU's three
founders as well as its programmer were houseSYSTEM
members."
    A.   Yes.
    Q.   Are you referring to Cameron Winklevoss?
    A.   As one of the three founders, yes.
    Q.   All right.  And was the programmer
Victor Gao?
    A.   Yes.
    Q.   And how did you know Victor Gao was a
programmer associated with ConnectU?
    A.   Once again, ConnectU has been covered both
in The Crimson and other media outlets.
    Q.   All right.  But it wasn't because of
personal knowledge?
    A.   No.
    Q.   All right.  Earlier this fall did you
discuss the events of surrounding the development
of houseSYSTEM and its Universal Facebook with
The New York Times?
    A.   Yes.
    Q.   All right.  Looking at Exhibit 29,
is that a copy of the article that resulted from
The New York Times as a result of your discussion?
    A.   Yes.
    Q.   There's a quote attributed to you on the
second page of the article.
    A.   I'm sure that's true.
    Q.   It says, in the third full paragraph on
page 2 of 4, "In an interview at a cafe here this
week, Mr. Greenspan said that he had mostly made
peace with the fact that Mr. Zuckerberg will be
the first of his classmates to become a
billionaire."
    A.   It says that.
    Q.   Did you in fact express that sentiment to
The New York Times reporter?
    A.   When he asked me if I would be okay with
the idea that Mark Zuckerberg would be the first
of my classmates to become a billionaire, I said
something to the effect that I had gotten pretty
used to that idea.
    Q.   Okay.  And then there's another -- below
that, a couple paragraphs below, there's a quote,
"'I've had a long time to think about this and I'm
not as bitter as I was a year ago,' Mr. Greenspan
said."
    A.   Correct.
    Q.   Do you believe that's an accurate quote
from you?

A.    Yes.

Q.    And is it fair to say you are not bitter about any of the events -- or as bitter as you were in the past about the events surrounding houseSYSTEM as it relates to Facebook?

A.    I think I meant exactly what I said, that I'm not as bitter as I was a year ago.

Q.    Would you consider yourself still bitter?

A.    I don't know how somebody can go through all this and not come out bitter.

Q.    Is that specifically related to Facebook or is it related to many of the other issues that were associated with houseSYSTEM?

A.    Well, the issues associated with houseSYSTEM were bad enough.  Facebook made them worse.

Q.    Okay.  Do you have any plans to sue Mark Zuckerberg about the development of Facebook?

A.    I don't know.

Q.    Do you believe that Facebook employs any of your ideas?

A.    Yes.

Q.    All right.  Do you believe it employs its own original ideas as well?

A.    I would have no knowledge of that, but I think it might.

Q.    Okay.

MR. COOPER:  I believe that's all for me.  Of course we should make sure that Nathan doesn't have any questions, or stipulate on the record he doesn't.

MR. SHAFROTH:  Are we still on?

THE VIDEOGRAPHER:  Yes.

MR. SHAFROTH:  I don't have any questions.

THE WITNESS:  I don't have any answers.

EXAMINATION

BY MR. WALLERSTEIN:

Q.    Good afternoon, Mr. Greenspan.

A.    Good afternoon.

Q.    My name is Tom Wallerstein and I represent the plaintiffs in this case, in case you didn't pick that up earlier.

You've had your deposition taken before?

A.    I have.

Q.    What was that about?

A.    It was regarding a trademark opposition in the United States Patent and Trademark Office.

Q.    And when was that?

A.    From January of 2002 through May of 2004.

Q.    Can you date your deposition any more precisely?

A.    I'm sorry.  Can you say that again?

Q.    Can you date your deposition any more precisely?

A.    Oh, it would have been over the summer of 2003; I believe it was June 25th, 2003, I think.

Q.    Do you currently write any blogs?

A.    I don't have a blog, but I do write.

Q.    What do you mean by that?

A.    Well, I've written a book.  And I occasionally write other essays, but I don't have a blog.

Q.    Do you publish the essays in any way?

A.    Sometimes I do.

Q.    How so?

A.    I do a personal website.  I think of a
blog as being a collection of very short, day-to-day
activities, but I do have a collection of things
I've written publicly available.
    Q.    On your personal website?
    A.    Yes.
    Q.    What's that website?
    A.    www.aarongreenspan.com.
    Q.    Any other websites that you've published
any writings on?
    A.    I have on occasion written white papers
through Think Computer Corporation which talk
about computer-related issues, such as security,
but I don't think that beyond those I have any
publicly-available writings that are not published
through some sort of a newspaper or other
publication.
    Q.    When you were writing Authoritas, were you
keeping a journal?
    A.    No.
    Q.    Was there any other document that you used
that became Authoritas?
           MR. FURBUSH:  Objection.  Vague.
           THE WITNESS:  I don't understand the
question.
BY MR. WALLERSTEIN:
    Q.    How did you write Authoritas; the method?
    A.    I decided in August of 2000 -- I think
in '3 -- oh, no, I'm sorry, August of 2004 that I
wanted to start writing a book and I began typing
in Microsoft Word.  And I got the first 80 pages
down, revised it, moved on to the next segment of
the book and repeated until I had something that I
thought was a full story.
    Q.    So in Authoritas, for example, you
describe a January 2004 meeting at Kirkland House
that you've testified about earlier today, and you
have quotations from things that were said at the
meeting.
           You started Authoritas in August 2004?
    A.    I believe that's correct, yes.
    Q.    So those quotations were from your memory?
    A.    Yes.
    Q.    Did you have any written memorialization
of, for example, that conversation?
    A.    Of that particular conversation, no.  Of
other conversations that are described in the book,
yes.
    Q.    What were those other memorializations?
    A.    For example, my conversation with
Larry Summers were written down based on my
memory immediately after the conversation.
    Q.    When was that conversation?
    A.    October of 2003.
    Q.    So in October of 2003, you had a
conversation and then you memorialized that
conversation somewhere?
    A.    Yes.
    Q.    Where was that?
    A.    On a file on my computer.
    Q.    What was your purpose of doing that?
    A.    Larry Summers is a prominent individual.
He had treated me in a way which I found, frankly,
to be repulsive and I did not want to forget about
it.
    Q.    Did you ever memorialize any conversations

108

you had with Zuckerberg prior to August 2004?

    A.   Some of the conversations I had with Mark were conducted in writing to start with.  So I did not actively memorialize them, but by virtue of their medium they were already in writing.

    Q.   Beyond those?

    A.   I don't recall writing down any of the personal conversations I had with him, but the things that I have quoted from during that conversation are actually fairly limited in the scope of an hour long conversation and I remember them quite well.

    Q.   I think you testified you have never met Cameron Winklevoss.

    A.   I don't believe so.

    Q.   And you've never met Tyler Winklevoss?

    A.   The same applies.

    Q.   And you've never met Divya Narendra?

    A.   I don't think I have.

    Q.   And prior to -- at any time have you exchanged written correspondence with any of those three gentlemen?

    A.   Not directly.

    Q.   Indirectly?

    A.   It's possible that they were on a mailing list for one of my classes and something I wrote was delivered to them, but not directly.

    Q.   At the January 8 meeting, 2004 meeting, that you described earlier today and in your book with Zuckerberg at Kirkland House, the meeting was about an hour long?

    A.   Give or take a few minutes, I would estimate it at an hour.

    Q.   And how long into the meeting was it before Dustin Moskovitz appeared?

    A.   He was there the entire time.

    Q.   Who got there first?  Did you get there first or did they?

    A.   I don't remember.  I think I did.

    Q.   Okay.  And so then when Zuckerberg shows up, he was with Dustin Moskovitz?

    A.   Yes.

    Q.   Did that surprise you?

    A.   No.

    Q.   And then when you had your conversation with Zuckerberg, Moskovitz was part of that?

    A.   Yes.

    Q.   And so he heard everything that both of you said presumably?

    A.   Unless he was blocking his ears, he did hear it.  I don't know if he remembers it.

    Q.   At that conversation was there any mention of Harvard Connection?

    A.   No.

    Q.   And was there any mention of ConnectU?

    A.   No.

    Q.   When Zuckerberg discussed the DL project he was working on, did he tell you that he was working on that project with Moskovitz?

    A.   The way he put it was that his roommate Dustin was helping him out.

    Q.   And you didn't have any other meetings with Zuckerberg at Kirkland House; right?

    A.   If I did have meetings with Zuckerberg after that, they were mostly related to the independent study we were taking together.

Q.   What was that?

A.   Computer Science 91r which was focused on voice recognition using PHP.

Q.   Did there come a time when you came to believe that Zuckerberg had been working with Cameron, Tyler or Divya on a web app?

A.   No.  Not until I read about it in the newspaper just like everybody else.

Q.   Is everything in Authoritas true?

A.   To the best of my knowledge it has gone through revisions based on feedback from people I know and I've stressed to them that I wanted feedback to ensure its accuracy.  The draft that has been produced here, which I strongly object to having in the public record, is old and therefore probably less accurate than the latest draft.

MR. WALLERSTEIN:  I don't think it has been designated confidential so perhaps you may want to...

MR. COOPER:  We can talk about that off the record.

MR. WALLERSTEIN:  I'm sorry.  I thought they had produced that.

MR. COOPER:  It was produced in the case back when it was downloaded which was sometime back.

MR. FURBUSH:  To the extent you have the ability to designate it as confidential, we'd like to do so.

MR. COOPER:  Okay.  I'll have to inform multiple parties.  I can't guarantee who has and hasn't seen it.  I believe it was produced a long time ago.  I'm not sure.  But I'm happy to convey that request on to all parties.

MR. FURBUSH:  If I can just explain.  The main concern is that Mr. Greenspan is -- he would like to publish this as a book that people will pay for.  And, you know, it would be -- it would undermine efforts to get the book published and to have, you know, successful sale of the book to have this thing floating around.

MR. COOPER:  We understand that.  I'm not opposed to doing whatever we can.  He is protected by copyright.  And one thing that may put everyone at ease -- I don't believe we can under the protective order use this for any purpose other than the case.  So that at least in its own -- it hasn't even been discussed in any depo or any other matter until today so...

I mean, I'm happy to talk with you and all counsel about it later.  It's just I can't deny that this was downloaded from a public site at the time it was, and I don't know who has seen it and who hasn't, but it isn't a situation where anybody is trying to exploit --

MR. FURBUSH:  Okay.  Well, just so it's clear.  Again, we don't need to take up your time on this, but Mr. Greenspan is not giving permission to people to keep duplicating this and passing it around.  Okay.  And to the extent that he has copyrights or any other right to, you know, prevent that, he would like to invoke those rights.  He's not waiving them.

MR. COOPER:  Yes, I understand.  I don't think anybody is going to give him any grief about it.

MR. FURBUSH:  Okay.

BY MR. WALLERSTEIN:
    Q.   Mr. Greenspan, you don't plan on making
any further edits to Authoritas?  In other words
it's complete; correct?
    A.   No.
    Q.   I'm sorry.  The question was vague.
        Do you plan on making any further edits
to Authoritas?
    A.   Possibly.
    Q.   Have you made edits to the version of
Authoritas that has been produced here today
regarding your conversation at Kirkland House?
    A.   I think I may have inserted some material,
but not extensively.
    Q.   What was the source of the new material
you inserted?
    A.   My memory.
    Q.   And that current version you're
describing, that has not been produced and is
not available to us?
    A.   Correct.
    Q.   I want to talk about houseSYSTEM in its
earlier inception, say, as of October 1, 2003.  At
that time, why did you -- why was it necessary for
someone to submit an .edu email address?
    A.   The reason that we restricted it was so
that we would only get Harvard students signing up
because we did not want outside users to use the
site.
    Q.   Why not?
    A.   Mostly because of privacy concerns.
    Q.   Would that include potential employers?
    A.   Inevitably, yes.
    Q.   So for the job posting function, for
example, your contemplation, at least as of
October 2003, was that those people were posting
their resume to be accessed by potential employers
who were also Harvard students or alums?
    A.   Who were also Harvard alums, yes.
    Q.   And did you have any -- well, the site as
of October 2003 was not generating revenue; correct?
    A.   Correct.
    Q.   At that time did you have any plan to
generate revenue with the site?
    A.   Yes.  By opening it to other schools,
I thought those school administrations might be
willing to pay for the use of the software or we
might be able to sell advertising on the site.
    Q.   Did you memorialize those intentions
anywhere?
    A.   Well, we did sell advertising on the site
at some point.  But the plans to open it to other
schools didn't really materialize until I graduated
and was working in Boston in 2005, at which point I
think I wrote a letter to the head of Yale's IT
department.
    Q.   When did you begin selling advertising?
    A.   March of 2004.
    Q.   Did you ever consider charging user fees?
    A.   No.
    Q.   As of October 2003, was it possible using
houseSYSTEM to send messages through the system to
other users?
    A.   Indirectly through first FASt web mail and
then the official FAS web mail system, yes.
    Q.   How about through any proprietary

houseSYSTEM function?
     A.   No.  Not except for the message board
which would have been to a user but also to every
user.
     Q.   And as of October 2003, was there any
functionality in houseSYSTEM that allowed users
to upload their thesis?
     A.   There was no feature for theses
specifically.
     Q.   Were there features that allowed users
to upload -- other than photographs, upload other
information that could include a thesis?
     A.   Not in October of 2003.
     Q.   And in October 2003, was houseSYSTEM open
to faculty?
     A.   I believe so.
     Q.   And, in any case, it was open to faculty
at some point or prior to January 2004?
     A.   Yes.
     Q.   Do you know Luke O'Brien?
     A.   I believe he's a reporter.
     Q.   Have you spoken to him?
     A.   Yes.
     Q.   Did you tell him that you know
Mark Zuckerberg as dishonest?
     MR. COOPER:  Objection to form.
     THE WITNESS:  I don't know what that
means.
     MR. COOPER:  It means you can go ahead and
answer despite my objection.
     THE WITNESS:  Okay.
     MR. WALLERSTEIN:  Can you clarify your
objection, Counsel?
     MR. COOPER:  You asked him did you tell
him that you know Mark as dishonest.  The question,
as I read it, is are you asking him attributing a
hearsay statement or are you asking him if that was
a statement he made?
     MR. WALLERSTEIN:  Thank you.  Let me
rephrase it.
BY MR. WALLERSTEIN:
     Q.   Did you tell Mr. O'Brien words to the
effect of "I know Mark Zuckerberg as dishonest"?
     A.   Yes.
     Q.   And did you tell Mr. O'Brien words to the
effect, "I've seen him"; meaning Zuckerberg, "lie"?
     A.   Yes.
     Q.   What were you referring to?
     A.   Specifically a speech that he gave at
Stanford I believe sometime in 2005 as part of
the ETL forum in which he explained how he created
Facebook in response to a question that was asked to
him, "Why did you create Facebook?" or something to
that effect.
     And he said, "Harvard did not have a
Facebook so I made it."
     That's a paraphrasing of what he said, but
it was clear that his memory had failed him or he
was lying, and I don't think his memory had failed
him.
     Q.   Do you have any other reasons to believe
that Zuckerberg is dishonest?
     A.   Several.
     Q.   Such as?
     A.   The fact that I am presently involved in
litigation against him by at least one party.  Also

the way that he communicated with me when I knew him
personally in 2003 and 2004 often stopped short of
lying but was conducted in such a manner as to be
evasive on a fairly frequent basis.  Also statements
he made during the CS 91r course were frequently at
odds with actions he took which made me sometimes
question his true motives.

    Q.   Can you give me an example of that?

    A.   He would often claim to be working very
hard on something and then not turn it in.  He would
not show up to class often, which is, to be fair,
something that a lot of students do.  But in a
10-person seminar it was pretty noticeable.

    He also would say things like:  I have a
friend who is setting up 10 servers at a data center
and needs to know how to do such and such.

    And I would ask him, "Who is your friend?"
and he would avoid the question by saying something
like, "Well, you wouldn't know him."  But chances
are if there were somebody at Harvard setting up
10 servers in a data center, I would have known
them, and I think he was referring to himself or
to Dustin.  I could be wrong, though.

    Q.   When you say "He would often claim to be
working very hard on something and then not turn it
in," can you elaborate on that.

    A.   Mark's role during the course was to work
on what are known as "Fast Fourier Transforms."
They were an integral part of the product that
we were trying to create, and at some point our
professor decided that Mark was absent from class
so often that he was going to reassign Mark's job
to somebody else.

    Mark sent me an instant message, since it
was my job to manage all the programmers, in which
he was extremely upset about this and there really
was not much I could do because the professor had
already made the reassignment.

    Q.   Are you aware of any other examples where
Zuckerberg claimed to be working hard on something
and then you learned that he had not been?

    A.   Well --

    MR. COOPER:  Objection to form.

BY MR. WALLERSTEIN:

    Q.   Go ahead.

    A.   I'm aware of other people who make
allegations against him, but I don't know anything
about the validity of those allegations.

    Q.   Okay.  To what do you attribute Facebook's
success?

    A.   Well, that's a very vague question.  I
think there are several factors.  It would take a
long time to list them all, but I think what's
important to me is that my contribution did affect
what he created.

    Q.   But your contribution was then later
actualized in the houseSYSTEM; right?

    MR. COOPER:  Objection to form.

    THE WITNESS:  My contribution was
houseSYSTEM and it came before Facebook so I would
not say "later."  I guess I'm not sure I understand.

BY MR. WALLERSTEIN:

    Q.   Well, how important do you think it was
that Facebook launched before your site became
functional with FaceNet?

    MR. COOPER:  Objection to form.

         THE WITNESS:  Important to what or to
whom?
BY MR. WALLERSTEIN:
     Q.   To the success of Facebook.
          Let me try it again.
          How important do you believe it was to
the success of Facebook that it launched before
houseSYSTEM became functional with FaceNet?
         MR. COOPER:  Objection to form.
         THE WITNESS:  I don't think it was
important at all.
BY MR. WALLERSTEIN:
     Q.   Can you give me maybe the top three
reasons you think that Facebook has more users
as of January 2005 than houseSYSTEM?
         MR. COOPER:  Objection to form.
         THE WITNESS:  Well, I can give you
at least three.  One of them is that the social
networking nature of the site lends itself to
exponential growth.  A second is that Facebook was
the beneficiary of an inordinate amount of press
coverage which was typically glowing in its favor.
A third is the fact that it had a $12 million
investment by 2005 which allowed for significant
expansion.
BY MR. WALLERSTEIN:
     Q.   The first factor you mentioned, the
exponential growth proclivities of social
networking, that applied -- that feature would
apply to FaceNet as well; right?
         MR. COOPER:  Objection to form.
         THE WITNESS:  It would theoretically.
BY MR. WALLERSTEIN:
     Q.   And so why not actually?
         MR. COOPER:  Again, objection to form.
         THE WITNESS:  Because of the second
factor, I think I listed, which was the press.
There were wide disparities in the press coverage
for houseSYSTEM and for Facebook.
BY MR. WALLERSTEIN:
     Q.   And among the press you're referring to is
The Crimson?
     A.   Primarily.
     Q.   And do you have theories as to why
The Crimson gave more favorable coverage to Facebook
than to the FaceNet feature of houseSYSTEM?
         MR. COOPER:  Objection to form.
         THE WITNESS:  I do have theories.
         MR. WALLERSTEIN:  Okay.  That's all I
have.
         MR. COOPER:  I just want to clarify two
small things.
/ / /
/ / /

                FURTHER EXAMINATION
BY MR. COOPER:
     Q.   You said you did have a revenue model at
the same point for FaceNet?
     A.   We sold advertising.
     Q.   I believe during the demonstration
there were actually some banners or some sort
of advertisement on the bottom of the --
     A.   Yes, that's correct.
     Q.   And was that the type of banner that was
available when FaceNet actually went to the revenue
model?

                        114

     A.   Yes.
     Q.   I guess all -- I just want to make sure.
What we were seeing was part of the archival of
FaceNet and was not actually an overlap by any
current web information --
     A.   No.
     Q.   -- concerning advertising?
     A.   Those were the images on display at the
time.
     Q.   Okay.  And then you indicated that
Mark Zuckerberg is suing you?
     A.   No, I did not.
     Q.   Okay.  I misunderstood.  All right.  Then
strike that.
          MR. SHAFROTH:  Well, I mean, if we just
want to clarify that part of the record.

                    EXAMINATION
BY MR. SHAFROTH:
     Q.   When you referred to litigation that you
were involved in against Mark Zuckerberg, were you
in fact just referring to this case which was
brought by ConnectU and to your participation in
this deposition?
     A.   Yes.  My understanding was that this is
litigation that I am now involved as I am sitting
here.
          MR. SHAFROTH:  That's all.
          THE VIDEOGRAPHER:  This is the end of
videotape No. 4, Volume I, in the deposition of
Aaron Greenspan.
          The original videotapes will be retained
by LiveNote World Service.
          Going off the record.  The time is 5:09.
          (Off the record.)
          MR. COOPER:  By agreement before the
deposition began we were recording, we hope, the
demonstration that was given by Mr. Greenspan of
the houseSYSTEM.  During this deposition it was my
understanding our IT group is trying to burn a CD
which will be made Exhibit 30, and, to the best
of my knowledge, it should be a true and accurate
representation of the demonstration by video, with
the understanding that somebody unplugged the
computer before it may have completed.
          With that understanding, if you have to
leave now, I'll get it to you separately.  I'm going
to check before you even leave if it's available.
          Is that fair?
          MR. WALLERSTEIN:  That's fine.
          (Whereupon, Greenspan Exhibit 30 was
          marked for identification off the record.)
          (Whereupon, at 5:11 p.m. the
          deposition concluded.)
                    --oOo--




                    DECLARATION


     I hereby declare under penalty of perjury that the

foregoing is my deposition under oath; that these are
the questions asked of me and my answers thereto; and
that I have read my deposition and have made the
corrections, additions, or changes to my answers that I
deem necessary.

      In witness whereof, I hereby subscribe my name
this     day of                          , 2007.


                          AARON GREENSPAN




                  CERTIFICATE OF REPORTER

      I, JANIS L. JENNINGS, a Certified Shorthand
Reporter of the State of California, do hereby certify:
      That the foregoing proceedings were taken
before me at the time and place herein set forth; that
any witnesses in the foregoing proceedings, prior to
testifying, were placed under oath; that a verbatim
record of the proceedings was made by me using machine
shorthand which was thereafter transcribed under my
direction; further, that the foregoing is an accurate
transcription thereof.
      I further certify that I am neither
financially interested in the action nor a relative or
employee of any attorney of any of the parties.
      IN WITNESS WHEREOF, I have this date
subscribed my name.

Dated:


                          JANIS JENNINGS
                          CSR NO. 3942