UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

PAUL D. CEGLIA,

Civil Action No. : 1:10-cv-00569-RJA

                          Plaintiff,

**MEMORANDUM OF LAW IN
SUPPORT OF MOTION FOR
ORDER VACATING DOC. NO. 83,
ORDER GRANTING ONE-SIDED
EXPEDITED DISCOVERY**

v.

MARK ELLIOT ZUCKERBERG, Individually, and
FACEBOOK, INC.

                          Defendants.

## MEMORANDUM

## RELEVANT FACTS AND EVIDENCE

The complaint in this matter was filed on June 30, 2010. Doc. No. 1. The amended complaint included excerpts of emails Mr. Ceglia exchanged with Defendant Zuckerberg. Id. Defense counsel has repeatedly emphasized the need for expedited discovery. The court has said that '[o]ne of the reasons for the accelerated discovery in the first place was to get at the bottom of the allegation that this is a fraud….[o]r not." Doc. No. 121 at 154.

## DEFENSE COUNSEL ASSERTS FACEBOOK CONTRACT IS FRAUD

The court asked if Snyder was assuring it that "all the experts are going to be in agreement it's a fraud." Doc. No. 94 at 32. "That is our expectation," Snyder assured the court. Id.

Snyder also urged the court that "there are tests that can be done

microscopically in terms of paper and toner." Id. at 33. "Or if we could prove, for example, that a toner or ink or paper fiber didn't exist at the time or the like." Id. at 37.

This court indicated its hesitation about permitting the one-sided expedited discovery. "[I]t is an unusual request." Id. at 50.

The court's stated basis for the "sequential production" was the concern of potential manipulation. Doc. No. 121 at 124.

In response to Snyder's confident assertion that the Facebook Contract, after analysis, would be found to be a fake, the court stated, "if it turns out that the plaintiff's experts...come to a completely different conclusion...The case seems to me to go forward." Doc. No. 94 at 31.

Snyder continued by asserting that "I don't regard there to be dueling experts in this case." Id. at 38. The court replied, "yet." Id.

Snyder stated that "the threshold question in this case, your Honor, is the *authenticity* of the contract and the emails." Id. at 50. Emphasis added.

"Is that the only reason to not grant mutual discovery, expedited discovery, is the potential for [Ceglia] to engage in a further fraud to rebut the Harvard email?" the court asked. Id. Snyder replied that "[t]here are two or three other reasons." Id.

The other reason, according to Snyder, was "because this plaintiff has not demonstrated good cause to go beyond expedited discovery on the core foundational documents in this case." Id. at 51. This argument by counsel demonstrated a trip

to a reality distortion field by stating that "[t]he contract is a fraud whether we prove it scientifically or otherwise." Id. at 111.

""[B]ogus contract…."  Doc. No. 121 at 110.  "[T]he contract attached to the complaint was a fraud."  Id. at 111.

## DEFENSE COUNSEL ASSERTS CEGLIA EMAILS ARE A FRAUD

Defense Counsel Oren Snyder has repeated a claim that the emails excerpted as part of the complaint are not authentic.  "[F]abricated emails."  Doc. No. 94 at 5. "The emails are outright fabrications."  Id. at 15.  "[S]upposed emails."  Id. at 16. "[S]o called emails exist."  Id. at 17.  "[F]ake emails."  Id. at 19.  "[T]he emails are fake."  Id. at 72.  [B]ogus emails."  Id. at 108.  "Fraudulent emails."  Id. at 111. "[T]hese emails are bogus."  Id. at 115.  "[F]raudulent emails."  Id. at 127 and 135. "[T]hose emails were concocted."  Id. at 135.  "[A]lleged emails in the complaint, in addition to be fraudulent…."  Id. at 136.  "[B]ogus emails."  Id. at 138.  "[H]is fraud on the court based on these emails…."  Id. at 149.  "[H]is so-called emails."  August 17, 2011 Transcript at 42.  "[S]o called emails."  Id. at 44, 63.  "[M]ade-up emails." Id. at 49.  "[P]urported emails."  Id at 63.  "[T]he so-called emails."  Id. at 108, 109.

## WHERE ARE WE NOW?

After months of such assertions as noted above, Plaintiff's experts have run a battery of tests on the Facebook Contract.  Plaintiff's experts have performed nearly all available tests.  Snyder hinted at toner and ink tests, paper tests, etc. as means to determine the authenticity of the Facebook Contract.  Well, those tests, and more, have all been done now and the answer is, as the court stated, "somebody

might infer that [The Defendants' experts] are having difficulty reaching the

conclusion that the Defendants would like them to reach." Id. at 151.  See also Doc.

No. 194 and 197, Declarations of Plaintiff's experts regarding authentication testing

of the Facebook Contract.

## THE FACEBOOK CONTRACT IS AUTHENTIC

1.  There are a number of other tests that can be performed on The Facebook

    Contract to confirm its authenticity.  Plaintiff's experts have performed nearly all

    available tests.

1.  Larry Stewart, a recognized expert in document examination, Doc. No. 197,

    Declaration of Larry Stewart at ¶1-10, tested the toner on both of the Facebook

    Contract to determine if they match.  Id. at ¶52-59.  The toner on both pages of

    the Facebook Contract match.  Id. at ¶55.

2. The toner on both pages of the Facebook Contract can be tested to determine

    what make and model of printer was used to print the document.  Id. at ¶56-59.

    The toner on the document was from one manufacturer of printers, HP.  Id. at

    ¶56.  The HP 1100 printer was first sold to the public starting in 2001 and

    discontinued in 2005.  Id. at ¶58.  The HP 3200 series printer was first sold to the

    public in 200 and discontinued in March of 2002.  Id. at ¶59.

## PAPER TESTING

    Paper tests can be performed to confirm the consistency of the two pieces of

paper.  Valery Aginsky confirmed that the two pieces of paper, page one and page

two of the Facebook Contract are identical.  Doc. No. 66 at ¶8.  He confirmed that

the ink used to compose interlineations on page one of the agreement was the same ink used to date the Facebook Contract on page two.  Id. at ¶9.  Aginsky confirmed Stewart's analysis that the toner used on page one matches the toner used on page two.  Id. at ¶10.

James Blanco, another noted document examination expert, See Doc. No. 194, Declaration of James Blanco ¶1-6, confirmed the match of the two pages constituting the Facebook Contract.  Id. at ¶21(d).

James Blanco also examined the opacity, or visibility of light as seen through the paper, and texture of pages one and two of the Facebook Contract.  Id. at ¶21(e).  Both of those features as measured on each page, match, meaning page one and page two are the same type of paper.

The paper can be examined to see if the writing between the printed lines on page one (interlineations as they are called) created matching indentations on page two.  Id. at ¶21(c).  That test was performed by Mr. Blanco and the writing on page one did indeed create the precise indentations observable on page two and they match precisely the location of the writing on page one.  Id.  That necessarily means that while the interlineations were being written as they appear on page one of the Facebook Contract, page two of the Facebook Contract was directly underneath page one.  Id.

## SIGNATURE COMPARISON OF ZUCKERBERG

The signature on page two of the Facebook Contract has been compared to many known samples of Mark Zuckerberg's signature taken from legal documents

in other cases.  Id. at ¶21(a).  The signature on the second page of the Facebook

Contract is authentic.  Id. It is Mark Zuckerberg's signature.  Id.

Although not necessary now, the court nearly obtained a concession on this

point from Mr. Snyder:  "I'm saying it may be [Defendant Zuckerberg's signature on

page two of the Facebook Contract] in the sense that it appears to be Mr.

Zuckerberg's signature, meaning to say it appears to be his signature or a very good

copy of his signature…."  Doc. No. 94 at 57.

The court then continued seeking clarification by asking Mr. Snyder, "are you

conceding that it is [Defendant Zuckerberg's signature]?"  Id. at 58.  Mr. Snyder

responded with this murky clarification:  "I'm conceding that Mr. Zuckerberg

recognizes that to appear to be his signature, or someone who copied what looks

very much like his signature."  Id.

## STAPLE HOLE ANALYSIS

The Facebook Contract is a two page document whose pages were once

stapled together in the upper lefthand corner.  Tests can be performed to examine

the staple holes in each page created by that stapling.  Id. at ¶21(b).  Mr. Blanco

confirmed that the staple holes on both pages align.  Id.  This establishes that the

two pages were together, page one on top of page two, when a staple was inserted to

each of them.  Id.  Mr. Stewart also analyzed the staple holes in page one and page

two of the document and confirmed there was "no reason to suggest a page one

substitution."  Doc. No. 197 at ¶50-51.

Overall, none of Mr. Blanco's test results revealed evidence to suggest that page one of the Facebook Contract had been substituted in for some other previous page one.  Doc. No. 194 at ¶22.

## DEFENDANT'S POSITION NOW

As the court pointed out on August 17, 2011, "I think if [the Defendants' experts] felt they had established that these signatures and initialings are refabrications, they would be done.  They wouldn't be asking for additional samples.  But the fact that they feel the need for additional samples, somebody might infer that they are having difficulty reaching the conclusion that the Defendants would like them to reach."  Doc. No. 121 at 151.

It is obvious now, more than two months on from the court's commentary on this point, that Defendants have nothing.  More to the point, even if they have what they believe is "something" it runs right into Plaintiff's experts' opinions and we have, as the court has put it, "dueling experts."

Snyder stated, "[T]he threshold question in this case, your Honor, is the authenticity of the contract and the emails."  Doc. No. 94 at 50.  And, that was Defendants support for the "unusual request" of one-sided expedited discovery.  That justification is no more.

As for the emails, this relates to Plaintiff's pending motion for sanctions against Defendant Zuckerberg, Doc. No. 198-199.  One way, perhaps the best way, for Ceglia to have demonstrated the authenticity of his email evidence is to examine Zuckerberg's Harvard email account and find evidence of the sending or receiving of

those same emails Ceglia has excerpted in the complaint.  That opportunity may be gone now.  Id.  As we know, while this case was pending, in fact, at least four months after it was pending, someone accessed Mr. Zuckerberg's Harvard email account and began systematically deleting emails.  Id.  Who would do that?  Why would someone do that?  Did someone with access to Mr. Zuckerberg's account suddenly get hit with regret about evidence in that account of emails to or from someone?  Mr. Zuckerberg is a well seasoned Defendant against charges of theft, forgery, fraud, perjury and general anti-social misbehavior.  He was aware that emails in his Harvard email account were discoverable evidence not to be deleted while this case was pending.

## **CONCLUSION**

The court questioned defense counsel at length for the reasons justifying expedited discovery.  Those justifications were provided and, it is fair to say, reluctantly accepted by the court in what it termed an "unusual request."  That unusual request was supported by unusual allegations that have now disappeared into the land of dueling experts and evidence tampering by defendants.  The Defendants have presented nothing to support their justification for continuing expedited discovery.  The evidence Plaintiff has now developed, *and presented to this court* removes any basis to rely on defense counsel's justifications for expedited discovery.  Therefore, Plaintiff asks that this court issue an order vacating Doc. No. 83 which granted Defendants' motion for expedited discovery and scheduling all

hearings and matters necessary to begin regular discovery consistent with the

Federal Rules.

Respectfully submitted,

/s/Dean Boland

---

Paul A. Argentieri
188 Main Street
Hornell, NY 14843
607-324-3232 phone
607-324-6188
paul.argentieri@gmail.com

Dean Boland
18123 Sloane Avenue
Lakewood, Ohio 44107
216-236-8080 phone
866-455-1267 fax
dean@bolandlegal.com