UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PAUL D. CEGLIA,

                Plaintiff,

      v.

MARK ELLIOT ZUCKERBERG and
FACEBOOK, INC.,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Civil Action No. 1:10-cv-00569-RJA


**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION TO STRIKE AND FOR SANCTIONS**

Thomas H. Dupree, Jr.
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
(202) 955-8500

Terrance P. Flynn
HARRIS BEACH PLLC
726 Exchange Street
Suite 1000
Buffalo, NY 14210
(716) 200-5120

Orin Snyder
Alexander H. Southwell
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue, 47th Floor
New York, NY 10166-0193
(212) 351-4000

November 15, 2011

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................. 2

ARGUMENT ........................................................................................................................ 6

     I.     The Court Should Sanction Boland For His Duplicitous Misconduct In Procuring An Inaccurate Declaration Intended To Mislead This Court. ................ 7

     II.    The Court Should Strike The Boland-Drafted Affidavit From The Record. .......... 8

CONCLUSION ..................................................................................................................... 9

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Chambers v. NASCO, Inc.*,
  501 U.S. 32 (1991).............................................................................................. 7

*Longcrier v. HL-A Co.*,
  595 F. Supp. 2d 1218 (S.D. Ala. 2008)............................................................. 8, 9

**Rules**

22 NYCRR Part 1200, Rule 4.1.................................................................................. 8

22 NYCRR Part 1200, Rule 4.4.................................................................................. 8

22 NYCRR Part 1200, Rule 8.4.................................................................................. 8

## MOTION TO STRIKE AND FOR SANCTIONS

Defendants Mark Zuckerberg and Facebook, Inc. respectfully submit this memorandum in support of their motion to strike and for sanctions.

## INTRODUCTION

Attorney Dean Boland entered his appearance after six law firms had dropped Plaintiff Paul Ceglia as a client in this case.  Ceglia has been caught red-handed destroying critical electronic evidence; he has submitted false declarations under oath; and he has instructed his lawyers to disobey this Court's orders.  All of this misconduct has been in furtherance of an elaborate campaign by Ceglia and others to defraud Defendants and this Court by filing and prosecuting a lawsuit seeking billions of dollars based upon a phony contract.  When Boland became the latest lawyer to step through Ceglia's revolving door, he announced that he and his client would turn over a new leaf and proceed in a spirit of cooperation and good faith.

Those promises have now been exposed as illusory.  As explained in the superseding declaration of videographer Robert Gianadda accompanying this motion, Boland willfully deceived Gianadda into signing an inaccurate and misleading declaration.  Boland then filed the declaration the next day with this Court, after telling Gianadda it was going to be used for a different purpose.  Boland's obvious goal was to create evidence to support his baseless claim that Defendants are responsible for Ceglia's most recently discovered act of fraud and evidence tampering — the artificial "baking" of the doctored  "contract" with Zuckerberg to give the document an "aged" appearance.  But this effort has now self-destructed.

As the videographer describes in his superseding declaration, Boland drafted a misleading declaration that omitted critical information the videographer had provided him in order to give this Court the false impression that Defendants' experts, rather than Ceglia, were responsible for tampering with the purported contract.  Gianadda Decl. at ¶ 4.  Gianadda

1

specifically told Boland that the color of the purported contract <u>did not change</u> over the course of

the inspection by Defendants' experts.  *Id*. at ¶ 4.  This fact destroys Ceglia's story by confirming

that Ceglia, rather than Defendants' experts, is responsible for the document's current

appearance.  But Boland <u>omitted</u> this critical fact and misleadingly drafted Gianadda's

declaration so as to suggest <u>the exact opposite</u> conclusion.

Boland then "pressured" Gianadda to sign the declaration, misrepresenting that it was

nothing more than a "convenient way to start a dialogue" between Boland and counsel for

Defendants.  *Id*. at ¶ 7.  Boland failed to disclose his true intention:  to file the declaration as

evidence in support of Ceglia's motion for spoliation sanctions.  As a result of Boland's tactics,

Gianadda signed the Boland-drafted document — and Boland promptly filed it with the Court.

To make matters worse, after sandbagging the videographer and filing the declaration, Boland

boasted of his conquest on his website that he uses to try to generate public interest in this

abusive lawsuit.  *See* Southwell Decl. at ¶ 9.  When Gianadda realized that Boland had

"willingly misled" him, he signed a new declaration to correct the record.  Gianadda Decl. at ¶ 9.

This Court should sanction Boland for willfully misleading the videographer to sign what

Boland knew was an inaccurate declaration, which Boland then filed for the purpose of giving

this Court a false impression and concealing Ceglia's latest act of fraud.  This Court should also

strike the declaration (Doc No. 212) that Boland procured through this misconduct.  Indeed, the

declarant himself, Gianadda, has acknowledged that the original declaration drafted by Boland is

not accurate and has now submitted what he describes as a "superseding" declaration.

## FACTUAL BACKGROUND

As a result of the expedited discovery ordered by this Court, Defendants recently

obtained several high-resolution images of the purported contract taken by Ceglia's experts in

January 2011.  These images differ dramatically from the images taken in July 2011, when Ceglia finally made the purported contract available for inspection by Defendants under court order.  In the January images, the ink is fresh and dark.  But in the July images, the ink is faded and the document as a whole has a strikingly different color and an "aged," or baked, appearance.  The dramatic difference is definitive proof that sometime between January and July of this year, Ceglia — and/or those working in concert with him — tampered with the purported contract by attempting to age it through an artificial process.  Defendants notified this Court of these findings in a motion filed October 31, Doc. No. 185, and intend to present their full findings when they submit their expert reports in accordance with this Court's order, Doc. No. 117.

Confronted with this irrefutable evidence of his client's fraud, Ceglia's attorney Boland responded with the outlandish claim that the inspection performed by Defendants' experts somehow caused the color of the document to change.  Doc. No. 188.  Boland's assertion was frivolous on its face:  the images of the document captured before Defendants' experts began their inspection show that the ink was already yellowed and faded in appearance when Paul Argentieri first produced it for inspection.

At this point, Boland put his scheme into effect.  In hopes of creating evidence to support his baseless claim that Defendants somehow altered the document, he called the local court-authorized videographer, Robert Gianadda, who had video-taped the inspection of the purported contract pursuant to this Court's order.  Gianadda Decl. at ¶ 2.  Boland began grooming Gianadda by asking about the role of the videographer and discussing the standard procedures followed by a professional in the field.  *Id*.; *see also* Flynn Decl. ¶ 6.  Boland then asked Gianadda whether he "noticed anything out of the ordinary" on July 14 — the first day of the

inspection — when Boland's co-counsel Paul Argentieri removed the purported contract from the envelope and the inspection began.  Gianadda Decl. at ¶ 3.  Gianadda said that from his perspective — approximately one yard away and behind the camera — the documents "appeared white," by which Gianadda meant that the pages had a "whitish color" and were not, for example, on blue or green paper.  *Id*.  Gianadda could not discern and does not recall "whether the documents were bright white, dull white, cream-colored, manila white, yellow-white or tinged in any way." *Id*.  He simply has "no opinion as to what shade or intensity of white the documents were."  *Id*.

Gianadda told Boland "clearly" that "the documents Mr. Argentieri removed from the envelopes on the morning of July 14th did not change color at all from the moment Mr. Argentieri removed them to the last day of inspection" more than one month later.  Gianadda Decl. at ¶ 4.  Gianadda also told Boland that he "did not have any memory of what the ink or print [on the purported contract] looked like." *Id*.  Of course, this testimony — which Boland concealed from the Court when he drafted and filed the declaration — is critical, because it puts the lie to Ceglia's story that the document changed color <u>after</u> Argentieri removed it from the envelope and therefore confirms that Ceglia, or others working in concert with him, tampered with the document <u>before</u> it was produced to Defendants for inspection in July 2011.

Boland asked Gianadda to sign a declaration that Boland had drafted.  Gianadda Decl. at ¶ 5.  This request made Gianadda "uncomfortable" because he viewed himself as a disinterested third-party and "did not want to get in the middle of the case." *Id*.; *see also* Flynn Decl. at ¶ 4.  Boland sent Gianadda the declaration anyway — and did not mention to Gianadda what he intended to do with it.  Gianadda Decl. at ¶ 5.

The Boland-drafted declaration was inaccurate and misleading in many respects.  Even though Gianadda had specifically told Boland that the documents "did not change color at all" over the course of the inspection by Defendants' experts, Boland omitted that critical fact.  And even though Gianadda had told Boland "clearly" that he "did not have any memory" of what the ink or print on the purported contract looked like, Boland omitted that fact as well.  Instead, Boland included the statement that the pages of the purported contract and spec sheet "looked like white documents" (Doc. No. 212 at ¶ 17) — even though Gianadda meant only that the paper was white rather than, say, green or blue, and he could not discern whether the pages were yellowed or "tinged in any way."  Gianadda Decl. at ¶ 3.

Gianadda then notified counsel for Defendants that Boland had contacted him and was pressuring him to sign a declaration.  Gianadda Decl. at ¶ 5; Southwell Decl. at ¶ 6; Flynn Decl. at ¶ 2.  At approximately 5 p.m. on November 10, Gianadda spoke by phone with Defendants' counsel Alexander Southwell.  Gianadda Decl. at ¶ 6; Southwell Decl. at ¶ 6.   Southwell told Gianadda that he intended to contact Boland to discuss the issue.  Gianadda Decl. at ¶ 6; Southwell Decl. at ¶ 6.   Gianadda told Southwell that he would not sign the declaration until Southwell and Boland had spoken.  Gianadda Decl. at ¶ 6; Southwell Decl. at ¶ 6.

At some point between 5 p.m. and 8:45 p.m. that night, Boland called Gianadda again.  Gianadda told Boland that he wanted Boland and Southwell to discuss his declaration before he signed anything.  Gianadda Decl. at ¶ 7.  Boland then said that he "did not really communicate with Mr. Southwell by phone," and that Gianadda should simply sign the declaration as a "convenient way to start a dialogue" between Boland and Southwell.  Gianadda Decl. at ¶ 7.  Boland told Gianadda that this way, Gianadda would not be "in the middle" any more.  *Id*. Gianadda felt "pressured" by the lawyer, and did not understand "why there was an immediate

need" that he execute the declaration that very night, but ultimately bowed to Boland's pressure and signed, thinking that this would facilitate a discussion between the parties about the need for, and content of, his declaration.

At no point in their conversations did Boland tell Gianadda what he intended to do with the videographer's declaration.  Gianadda Decl. at ¶ 9.  If Boland had been truthful — and told Gianadda that he planned to file the declaration with this Court in support of Ceglia's motion for spoliation sanctions — Gianadda would not have signed it.  *Id*. at ¶ 8.

Boland filed Gianadda's declaration the very next morning.  Doc. No. 212.  He then boasted of his conquest on an Internet website he uses to promote this fraudulent lawsuit. Southwell Decl. at ¶ 9.  When Gianadda learned what had happened, he realized that Boland had "willingly misled" him and that Boland had not been "candid or forthright" in their conversations.  Gianadda Decl. at ¶ 9.  Gianadda then executed a new declaration — one that "supersede[s]" the corruptly-procured and misleading Boland-drafted declaration — in order to correct the record.  Gianadda Decl. at ¶ 1; Flynn Decl. ¶ 4, 7.

## ARGUMENT

Boland embarked on a course of conduct aimed at deceiving a witness, Gianadda, and procuring an inaccurate declaration for purposes of misleading this Court.  Rather than address the <u>real</u> contract that was discovered on Ceglia's own computer, Boland and Ceglia seek to further the ongoing fraud by attempting to cloud the waters with deceptive declarations and frivolous arguments concerning the <u>fake</u> contract Ceglia manufactured and tried to artificially age.  The Court should invoke its inherent power to sanction Boland for procuring and filing an inaccurate declaration intended to mislead this Court and strike that declaration from the record.

**I.     The Court Should Sanction Boland For His Duplicitous Misconduct In Procuring An Inaccurate Declaration Intended To Mislead This Court.**

This Court has the inherent power to impose sanctions for litigation abuse.  *See*

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991).  "[T]he inherent power extends to a full range of

litigation abuses," and "can be invoked even if procedural rules exist which sanction the same

conduct."  *Id*. at 46, 49.  Inherent power sanctions have been upheld where, as here, a party or

lawyer has engaged in bad-faith litigation misconduct.  *Id*. at 52.

Boland's misconduct easily satisfies the bad-faith standard.  He procured a misleading

declaration through deceit, then promptly filed it with this Court to support a frivolous motion.

He made false representations to the videographer, telling him that the declaration was nothing

more than a "convenient way to start a dialogue" — never disclosing that he actually intended to

file it with the Court and wield it against Defendants.  When Gianadda expressed concern that he

was being dragged into the midst of litigation — and felt "uncomfortable" doing what Boland

was "pressuring" him to do — Boland falsely told Gianadda that by signing the declaration, the

videographer would no longer be "in the middle."  As an experienced lawyer, Boland certainly

knew that by turning the court-authorized videographer into a fact witness, he was <u>placing him</u>

squarely "in the middle" of the dispute.

Moreover, the declaration that Boland drafted and misled Gianadda into signing is

incomplete and misleading.  Boland intentionally omitted critical facts that Gianadda told him,

including Gianadda's statements that the documents "did not change color at all" over the course

of the inspection by Defendants' experts, and that Gianadda "did not have any memory" of what

the ink or print on the purported contract looked like.  Instead, Boland had Gianadda approve a

statement — that the pages "looked like white documents" (Doc. No. 212 at ¶ 17) — carefully

crafted to leave this Court with the false impression that Gianadda meant that the pages had not

been yellowed or tinged in any way.  Gianadda Decl. at ¶ 3.  In fact, as Gianadda has explained,

he has "no opinion as to what shade or intensity of white the documents were."  *Id*.

Boland's conduct is inconsistent with numerous New York Rules of Professional

Conduct, including Rule 4.1 (Truthfulness in Statements to Others, which provides that "a

lawyer shall not knowingly make a false statement of fact or law to a third person"); Rule 4.4

(Respect for Rights of Third Persons, which provides that "a lawyer shall not . . . use methods of

obtaining evidence that violate the legal right of [a third] person"); and Rule 8.4 (Misconduct,

which provides that a lawyer shall not engage in "conduct involving dishonesty, fraud, deceit or

misrepresentation" or that is "prejudicial to the administration of justice").

## II.    The Court Should Strike The Boland-Drafted Affidavit From The Record.

At a minimum, the Court should strike the Boland-drafted declaration from the record.

Not only is the declaration the product of deceit and undue pressure, but Gianadda has executed

a new declaration that is intended to supersede the Boland-drafted document.  *See* Gianadda

Decl. at ¶ 1 ("I submit this declaration to supersede my declaration of November 10, 2011.").

In *Longcrier v. HL-A Co.*, 595 F. Supp. 2d 1218 (S.D. Ala. 2008), the court found that the

defendant's lawyers had acted improperly by obtaining declarations through misrepresentation

and trickery, and struck them from the record.  The court concluded that the lawyers had

"engaged in conduct that would reasonably be expected to mislead and deceive the [declarants]

concerning the nature, purposes and implications of their participation in the declaration

process."  *Id*. at 1228.  Specifically, the lawyers had told the declarants that their declarations

would be used for an "innocuous" purpose — and concealed their intent to file the declarations

in court.  *Id*.; *cf*. Gianadda Decl. at ¶¶ 7, 9 (Boland "did not tell me the purpose he intended" and

represented that signing the declaration would be nothing more than a "convenient way to start a

dialogue" between the parties, then filed the declaration the next morning).  The *Longcrier* court

held that the declarations had been "obtained under false pretenses," noting that "[i]f informed of the truth about why they were being asked questions and being instructed to sign declarations, [the declarants] might have chosen not to participate" in the interviews or sign the declarations. *Id*. at 1228 & n.13.  *Cf.* Gianadda Decl. at ¶ 8 ("Had I known at that time Mr. Boland was going to use the November 10th declaration in court as evidence, I would not have signed it.").

## CONCLUSION

For the foregoing reasons, this Court should impose sanctions on Dean Boland and strike the Boland-drafted declaration (Doc. No. 212) from the record.


Dated:          New York, New York
                November 15, 2011

                                          Respectfully submitted,

                                          /s/ Orin Snyder
Thomas H. Dupree, Jr.                     Orin Snyder
GIBSON, DUNN & CRUTCHER LLP               Alexander H. Southwell
1050 Connecticut Avenue, NW               Matthew J. Benjamin
Washington, DC 20036                      Amanda M. Aycock
(202) 955-8500                            GIBSON, DUNN & CRUTCHER LLP
                                          200 Park Avenue, 47th Floor
                                          New York, NY 10166-0193
Terrance P. Flynn                         (212) 351-4000
HARRIS BEACH PLLC
726 Exchange Street
Suite 1000
Buffalo, NY 14210
(716) 200-5120


*Attorneys for Defendants Mark Zuckerberg and Facebook, Inc.*