UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PAUL D. CEGLIA,

          Plaintiff,

v.

MARK ELLIOT ZUCKERBERG and
FACEBOOK, INC.,

          Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Civil Action No. 1:10-cv-00569-RJA

**DECLARATION OF ROBERT GIANADDA**

     I, ROBERT GIANADDA, hereby declare under penalty of perjury that the following is true and correct:

     1.     I am a certified videographer who was retained by both parties in the above-captioned matter to videotape the inspection of certain hard copy documents in this case. I submit this declaration to supersede my declaration of November 10, 2011.

     2.     In the last few days, I received a number of phone calls from Plaintiff's attorney Dean Boland. Initially, Mr. Boland asked about my role as a videographer for the inspection and I explained my limited role and the standard procedures I employed as a videographer, as Mr. Boland had not been present at the inspection or involved in the case at that time. Mr. Boland also asked me about some lighting differences in the video I shot of the inspection. I explained that any differences were due to the fact that the video I shot at the offices of Harris Beach in Buffalo, New York on July 14th, 15th, 16th, 19th, and August 27th had primarily artificial light whereas the video shot on July 25th was at a different location—the offices of Edelson McGuire in Chicago, Illinois—where the light was primarily natural.

     3.     Mr. Boland asked me if I noticed anything out of the ordinary when Mr. Argentieri removed the documents for inspection from two envelopes at around 9:11am on July

14th at the offices of Harris Beach in Buffalo. I told Mr. Boland that I did not notice anything out of the ordinary and that the documents appeared to be eight pages of white paper. When I told Mr. Boland that the documents appeared white, what I meant was that they had a whitish color, and that the paper was not some other color like blue or green. When I described the documents as white, however, I did not mean to describe the shade or intensity of white. I was approximately a yard away, behind the camera and could not discern and do not recall whether the documents were bright white, dull white, cream-colored, manila white, yellow-white or tinged in any way. I have no opinion as to what shade or intensity of white the documents were.

4. I did tell Mr. Boland clearly, however, that the documents Mr. Argentieri removed from the envelopes on the morning of July 14th did not change color at all from the moment Mr. Argentieri removed them to the last day of inspection on August 27th, based on the video of the inspection. In addition, because I was approximately a yard away and did not pay attention to other attributes of the documents such as the ink or the print, I told Mr. Boland that I did not have any memory of what the ink or print looked like. Indeed, I have no opinion about the ink or print on the documents presented for inspection.

5. In the course of our conversations, Mr. Boland asked that I execute a declaration. He never told me the purpose of the declaration or what he intended to do with it. I felt uncomfortable with this request because I am a disinterested third-party and did not want to get in the middle of the case. Mr. Boland sent me a draft declaration by email anyway.

6. I later spoke to Defendants' counsel, Alex Southwell, and relayed to him my conversation with Mr. Boland. Because I am a court-authorized videographer jointly retained by the parties, Mr. Southwell informed me that he intended to speak to Mr. Boland about Mr.

2

Boland asking me to execute a declaration. I told Mr. Southwell that I would not sign the declaration until he had talked to Mr. Boland.

7. After that conversation, I spoke to Mr. Boland again and relayed to him my conversation with Mr. Southwell. Mr. Boland told me that he did not really communicate with Mr. Southwell by phone, but only by email. Mr. Boland then suggested that I simply execute the declaration and send it to both him and Mr. Southwell, as that would be a "convenient way to start a dialogue" between Mr. Boland and Mr. Southwell concerning the content of a declaration from me and then I would not be "in the middle" anymore. Mr. Boland pressured me to execute the declaration during our call but did not explain why there was an immediate need that I execute it last night. Mr. Boland did not inform me that he was going to be using the declaration in court, but suggested that it would be a vehicle for him to start a dialogue with Mr. Southwell. I went along with Mr. Boland's request, affixed my electronic signature to the declaration Mr. Boland drafted and emailed it to both Mr. Boland and Mr. Southwell last night.

8. Had I known at that time Mr. Boland was going to use the November 10th declaration in court as evidence, I would not have signed it.

9. I later had another conversation with Mr. Southwell and I now realize that because I have executed the declaration, Mr. Boland may attempt to file it with the court, even though he did not tell me the purpose he intended and I did not authorize him to use my declaration in any way. I now feel like I was misled by Mr. Boland. I do not consider Mr. Boland to have been candid or forthright with me. Indeed I feel that he willingly misled me about his intentions with the November 10th declaration.

3

10. I learned today that my November 10 declaration was filed in court by Mr. Boland. I went today to the offices of Harris Beach, where I met with Terry Flynn; Alex Southwell was on the phone. I went over the declaration word by word with them, made some edits, and agree with every word in this declaration.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 11th day of November, 2011 at Buffalo, New York.

_____  11/11/11
Robert Gianadda