UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

PAUL D. CEGLIA,

                                   Plaintiff,

v.

MARK ELLIOT ZUCKERBERG, Individually, and
FACEBOOK, INC.

                                   Defendants.

Civil Action No. : 1:10-cv-00569-RJA

**MEMORANDUM IN SUPPORT
OF MOTION FOR ORDER
PROHIBITING DEFENDANTS
FROM RELIANCE ON
ARGUMENT THAT CEGLIA
EMAILS ARE FRAUDS IN ANY
DISPOSITIVE MOTION FILED
DURING OR AT THE END OF
EXPEDITED DISCOVERY**

## <u>MEMORANDUM</u>

Mr. Ceglia filed the amended complaint in this matter on April 11, 2011. Doc. No. 39. Included with that filing were the text of email exchanges between Mr. Ceglia and Mr. Zuckerberg. Id.

Since the filing of that document, Defendants have maintained a steady barrage of unsupported claims those emails are frauds.

Defense Counsel Oren Snyder has repeatedly claimed these emails are not authentic. "[F]abricated emails." Doc. No. 94 at 5. "The emails are outright fabrications." Id. at 15. "[S]upposed emails." Id. at 16. "[S]o called emails exist." Id. at 17. "[F]ake emails." Id. at 19. "[T]he emails are fake." Id. at 72. [B]ogus emails." Id. at 108. "Fraudulent emails." Id. at 111. "[T]hese emails are bogus." Id. at 115. "[F]raudulent emails." Id. at 127 and 135. "[T]hose emails were concocted." Id. at 135. "[A]lleged emails in the complaint, in addition to be

fraudulent…."  Id. at 136.  "[B]ogus emails."  Id. at 138.  "[H]is fraud on the court

based on these emails…."  Id. at 149.  "[H]is so-called emails."  August 17, 2011

Transcript at 42.  "[S]o called emails."  Id. at 44, 63.  "[M]ade-up emails."  Id. at 49.

"[P]urported emails."  Id at 63.  "[T]he so-called emails."  Id. at 108, 109.

## THE EMAIL EXCHANGES BETWEEN CEGLIA AND ZUCKERBERG ARE AUTHENTIC

Plaintiff and Defendants have a contrast in style.  Plaintiff presents evidence

supporting his arguments or claims.  This motion continues that approach.  In 2003

and 2004 Mr. Ceglia used MSN webmail to exchange emails with Mr. Zuckerberg.

Declaration of Paul Ceglia at ¶4.  Those programs routinely deleted email content to

maintain user account sizes.  Id. at ¶6.  During and just after Mr. Zuckerberg and

Mr. Ceglia discontinued regular email communication, Mr. Ceglia decided to

preserve his email exchanges with Mr. Zuckerberg.  Id. at ¶7.  He copied the text

and header information from each of the emails between the two of them and pasted

that content into a Microsoft Word document.  Id.  He then saved those files to

floppy disks.  Id. at ¶8.  Those emails include various discussions about the terms

and effect of the Facebook Contract that was an exhibit to the original complaint

filed in New York State Court.  Id. at ¶9.  Those emails included discussions

between Mr. Ceglia and Mr. Zuckerberg where they expanded the concepts of

Facebook's original idea.  Id. at ¶10.  In those emails, Mr. Ceglia clearly established

that Mr. Zuckerberg was to use Mr. Ceglia's previously developed search engine to

quickly implement the start up of Facebook.  Id. at ¶11.

Shortly after the filing of the amended complaint, Mr. Ceglia provided those floppy disks to computer forensics expert Jerry Grant.  Id. at ¶12.

## CEGLIA AND ZUCKERBERG DISCUSS FACEBOOK

Ceglia exchange numerous emails with Mr. Zuckerberg discussing aspects of the emerging Facebook website and social network.  Exhibit A.

On November 22, 2003, Defendant Zuckerberg asks Mr. Ceglia for more money to continue funding development of the Facebook social networking site:

**Paul, I have recently met with a couple of upperclassmen here at Harvard that are planning to launch a site very similar to ours. If we don't make a move soon, I think we will lose the advantage we would have if we release before them. I've stalled them for the time being and with a break if you could send another $1000 for the facebook project it would allow me to pay my roommate or Jeff to help integrate the search code and get the site live before them. Please give me a call so that we can talk more about this. Best, Mark**  Exhibit A at 5-6.

In 2004 following the emergence of The Facebook social network, two Harvard upper classmen sued Defendant Zuckerberg and Facebook claiming he had stolen the idea for Facebook from them.  See *ConnectU, LLC v. Mark Zuckerberg, et. al*. Civil Action No. 04-11923-DPW.

During the development of the Facebook social network Defendant Zuckerberg acknowledged using the search engine code designed for Paul Ceglia in the Facebook social network design.

**The possibility of working in the Carribean coding for you is something to consider, though I would prefer that it was in the winter. That said, I've been tweaking the search engine today and I'm pleased with**

**its results. I'd like to use it for the Harvard site, I think it will really help people find each other, even if they spell names incorrectly.  Would it be agreeable with you if I adapt the source code? Thanks!**
**>Mark**  Exhibit A at 6.

Defendant Zuckerberg also negotiated with Mr. Ceglia regarding the

Facebook Contract's terms regarding ownership and penalties for Defendant

Zuckerberg's late completion of various programming and design tasks.

**From: Mark Elliot Zuckerberg <mzuckerb@fas.harvard.edu >**

**To: paul ceglia <paulceglia@msn.com>**

**Subject: Going live**

**Date: Mon, 2 Feb 2004 09:18:25 -0400**

**Paul, I have a rather serious issue to discuss with you, according to our contract I owe you over 30% more of the business in late penalties which would give you over 80% of the company. First I want to say that I think that is completely unfair because I did so much extra work for you on your site that caused those delays in the first place and second I don't even think it is legal to charge such a huge penalty. Mostly though I just won't even bother putting the site live if you are going to insist on such a large percentage.  I'd like to suggest that you drop the penalty completely and that we officially return to 50/50 ownership.**  Exhibit A at 9.

Defendant Zuckerberg mentions stealing some code from the two

upperclassmen, obviously referring to the Winklevoss' twins whom sued him

previously.

**From: Mark Elliot Zuckerberg <mzuckerb@fas.harvard.edu >**

**To: paul ceglia <paulceglia@msn.com>**

**Subject:**

**Date: Fri, 28 Nov 2003 18:47:06 -0400**

**I've been using some of Jeffs old code for different parts of the site, I'm hoping he will be able to write something for us.I'm not sure what course of action I should take regarding the upperclassmen. they have given me a bunch of their code to read and it is really an amateur attempt at best, though there is some functionality I think I'll borrow. I don't think database functionality has even crossed their underdeveloped minds. I feel like they are my two dumb ox and I will steer them where ever I please. Since they trust me (and think I'm so grateful to them for including me) I am sure that I can delay them beyond our own sites release. I'm questioning if I should just pull their plug and hack the code I want or just stall them and see how far I can lead them along. Best,**
**Mark**  Exhibit A at 5.

The email exchanges swing between StreetFax related discussions and Facebook related discussions.

## THE EMAIL CONTENT CONFIRMS MR. CEGLIA

Contrary to Defendants' claims of fraud with regard to the emails, Jerry Grant, a computer forensics expert, analyzed the floppy disks onto which Mr. Ceglia copied the email content in 2003 and 2004.  Exhibit B

Jerry Grant has more than 25 years of professional computer forensic expert and systems analysis experience.  Declaration of Jerry Grant at ¶3.  He is currently a computer forensics investigator for the Western District of New York's Federal Defender's Office.  Id. at ¶4.  He has conducted training and lectures on computer forensics topics nationwide.  Id. at ¶6-7.  His experience ranges from working with operating systems, all popular software applications, computer hardware and configurations to the technical workings of a computer hard drive.  Id. at ¶8.

On Thursday March 31, 2011 he received 41 floppy disks from Mr. Ceglia for review.  Id. at ¶9.  On the next day, he created forensically sound, bit by bit, images

of each floppy disk for analysis.  Id.

Following the creation of the forensic copies, he performed an initial review of the floppy diskettes and determined that the first two were relevant to this matter. Id. at ¶10.  He further analyzed the two relevant disks to determine the dates and times that various documents on those disks were created.  Id.  He also analyzed those disks specifically examining them for the following forensically relevant items:

a.   File Allocation Tables (FAT 12)

    i.   The File allocation Table is the area of the drive that contains the name, date and location of files on the floppy disk (similar to the table of contents of a book).  This is reviewed to compare the contents of the actual files that exist to the names in the FAT for discrepancies.  It is also reviewed to determine if any residual information exists indicating duplicate files and or the names of previously deleted files that might be of interest.  In this case nothing was located that would indicate fraud. Id. at 11(a)(i)

b.   File Dates/Times (Created, Modified Accessed)

    i.   The File dates/times are the actual dates/times on the physical files that reside on the floppy disk.  These are compared to any internal dates found within the document content themselves to determine if there are any discrepancies.  This is used to determine if the content matches the timeframe that the files were created and/or edited.  In this case, no

discrepancies existed that would indicate fraud.  Id. at 11(b)(i)

c.    Metadata Dates/Times (Created, Modified, Accessed, Printed)

i.    Like the file dates/time, Metadata dates/times are internal to the document and do not change if a document is copied from one device to another.   The are reviewed and compared to the File Dates/Times as well to determine the sequence of events.   In this case nothing was located that would indicate fraud.  Id. at 11(c)(i)

d.    Total Edited Time Metadata Field

i.    This field is part of the internal Metadata of the document and is updated by the Word Processing program that is used to create/edit the document.   The field was reviewed to determine the actual time spent editing the content.  In this case, the content of the documents was large compared to the logged editing time which is consistent with the pasting of data from the clipboard instead of typing or manually editing the content. Id. at 11(d)(i)

e.    All Other Metadata fields

i.    Any additional fields that contain data are reviewed for additional information related to the origin of document and/or the machine created on.   In this case additional information on other computers, users and companies was located, but nothing was found indicating fraud. Id. at 11(e)(i)

f.    Fonts Used

    i.    The font types are reviewed and compared to the fonts available at the time of the create/modify date of the document.   This is done to determine if the document was created at a later date and the actual file and metadata dates were false.   In this case all fonts were correct and nothing indicated any signs of fraud.   Id. at 11(f)(i)

g.    Allocated Space

    i.    The allocated space is the space that is taken up on the floppy disk from existing files.   This is reviewed to determine what parts of the actual floppy disk the data resides on as well as to determine if any hidden or encrypted data exists.   In this case nothing was located to indicate any fraud.   Id. at 11(g)(i)

h.    Unallocated Space

    i.    The unallocated space is the space that may contain data from previously deleted files.   It is examined to review deleted data and to perform keyword searches for the content of deleted files.   This is also done to look for any forensic artifacts of a file wiping process or to locate relevant data for comparison.   In this case nothing was found that would indicate any fraud.   Id. at 11(h)(i)

i.    Slack Space

    i.    The Slack Space is similar to the unallocated space but is the leftover data from another file that is at the end of an existing file.   This is similar to a 2 hour movie on a VCR tape that was overwritten by a 1

hour movie.   The first hour of the tape is the new movie but the last hour is the leftover last half of the old movie.   This is examined to look for pieces of deleted data to compare to the actual files on the floppy disk to uncover evidence of file versions/editing.   In this case, nothing was found to indicate that.  Id. at 11(i)(i)

j.    Temporary Files

i.    The temporary files are those that are created during the editing/ printing of a document.   These are then normally deleted after the document is saved or printed.   These were reviewed, similar to the remnants of the slack space, to look for evidence of versions and/or editing.   In this case, nothing was found to indicate other edited versions of any document relevant to fraud.  Id. at 11(j)(i)

k.    Carved Files

i.    The carved files are the files/remnants that were deleted on the floppy disk but could be recovered.   These were reviewed like the Slack Space and Temporary Files for evidence of file versions and editing.   In this case, nothing was found to indicate fraud.  Id. at 11(k)(i)

l.    Carved Folders

i.    Carved folders are folders that were once deleted but could be recovered similar to the carved files.   Recovering a folder could uncover evidence of the actual files that once existed in them for comparison like the other processes.   In this case, nothing was found to indicate fraud. Id. at 11(l)

(i)

m.   File Header Information

   i.   The file header information is the beginning of a file that is unique and determines the type of document (Word 97, Rich Text, etc). These were compared to the versions of software that existed on the date/time the document was created. This is done to determine if the file was created with a program that did not exist at that time indicating fraud. In this case, all file headers matched the available versions of the programs at that time so nothing was found to indicate fraud. Id. at 11(m)(i)

n.   File Comparisons for changes

   i.   I compared files with the same and/or similar names to determine if they were exact. This was done to determine if there were multiple versions of the files or slightly modified versions that would indicate manipulation. In this case nothing was found to indicate fraud. Id. at 11(n)(i)

o.   Versions of Programs/Documents (Word 97, Word 2002, Word 6.0, Microsoft RTF, Works 5.0)

   i.   Similar to comparing the File Header Information, the versions of the programs indicated by the headers were compared to make sure they did indeed exist at the date/time of the file creation. The programs matched the header information, so in this case nothing was found to indicate fraud. Id. at 11(o)(i)

p.  OLE Streams (Individual Components of Documents)

  i.  The OLE Streams are individual parts of a file/document within the file itself.  These were reviewed to compared the types of OLE that existed at the time and to match them to the programs used.  In this case, nothing was found to indicate fraud.  Id. at 11(p)(i)

q.  0 Length Files (Remnants of deleted files)

  i.  The 0 Length Files are names of deleted files that were leftover in the File Allocation Table. These items are individually carved to recover any dates and/or information for comparison.  In this case, nothing was found to indicate fraud.  Id. at 11(q)(i)

r.  Pasted E-Mail header contents

  i.  He compared the portions of the pasted e-mails that contained actual e-mail header information.  This would be the underlying information that the e-mail servers would use to actually deliver the e-mail.  This was compared to determine if the format, and information pasted, matched a true e-mail header format.  In this case, they appear to be formatted properly and nothing was found to indicate fraud.  Id. at 11(r)(i)

s.  RTF Specification Versions and Dates

  i.  The RTF Specification is the blueprint of the Rich Text Format files that were located on the floppy disks.  He reviewed the actual versions of the file format that existed at the time the files were created. This was done similar to comparison to the versions of the software used to determine

if the physical structure of the file matched the specification out at the time.  In this case, nothing was found to indicate fraud.  Id. at 11(s)(i)

t.   DOC Binary File Format Specification Versions and Dates

  i.   Similar to the RTF Specification, one exists for the DOC files (Microsoft Word).   This was reviewed and compared to the existing files on the floppy disks and in this case, nothing was found to indicate fraud.  Id. at 11(t)(i).

It is apparent from this analysis that Mr. Ceglia copied the text of email exchanges with Defendant Zuckerberg onto these floppy disks in 2003 and 2004. These emails, as one would expect from typical email inbox content, include Facebook related exchanges and those that are unrelated to Facebook.   They contain harsh language exchanged, at times, between two partners working together on at least two projects, including Facebook, working out the typical issues of a start-up business.   In contrast, Defendants' experts alternate between a self-styled thorough analysis of email evidence applicable to Mr. Ceglia's claims and a superficial style of analysis when checking Defendant Zuckerberg's email records.

### DEFENDANTS' COMPUTER EXPERTS SUPERFICIAL WORK

A representative of computer forensics firm Stroz Friedberg, Mr. Bryan Rose, has offered two declarations in this matter.  Doc. Nos. 47 and 73.

In Doc. No. 47, he summarizes the assignment given to him by Defendants as follows:

"On April 15, 2011 at the direction of Gibson Dunn, Stroz Friedberg

preserved the contents of a Harvard University email account assigned to and used by Mr. Zuckerberg." Doc. No. 47 at ¶4. How did he "preserve" this information? From what source? Was he directly obtaining this information from Harvard's servers? Were these the same servers used back in 2003 and 2004 when Mr. Zuckerberg's email exchanges with Mr. Ceglia occurred?

What's missing from this assertion by Mr. Rose is a declaration from someone at Harvard attesting to the accuracy or completeness of whatever source Mr. Rose "collected" his information from. Who told Mr. Rose that what he was preserving, on whatever computer, was, in fact, the entire contents of Mr. Zuckerberg's Harvard University email account? What were the qualifications of that hearsay declarant to know that Mr. Rose was "collecting" the entire contents of Mr. Zuckerberg's email account? Mr. Rose does not declare that he knows these "contents" to be everything that ever existed in Mr. Zuckerberg's email account. What backups did Harvard periodically make of user email accounts? Are those backups available to be examined by a computer forensics expert? Is Harvard saying that no emails were deleted from Mr. Zuckerberg's account at any time?

This email account "contents" was only the information that "resided on Harvard's server at the time of collection, including both sent and received email." Id. Mr. Rose can only say that his collection obtained everything on Harvard's server, *at the time of collection*. He cannot assure this court that he has reviewed all emails that have ever been exchanged using this account. He cannot assure this court that no emails were ever deleted from the account before he obtained his

"collection" or before Harvard, somehow, preserved the "contents" of Mr. Zuckerberg's email account.  Certainly a large institution like Harvard regularly made backups of user email accounts.  How often were they made and where are those backups stored now?  Mr. Rose does not know and does not indicate he even asked these questions of the Harvard person, (perhaps a technical person or perhaps office staff) who directed him to wherever the "contents" of the account were that he preserved.  Mr. Rose fails to confirm that his "preservation" of the email accounts was an accurate forensic copy[1] of the data on the computer he accessed.

Making matters tenuously worse, in the very next paragraph, Mr. Rose acknowledges that he has to rely on the honesty, integrity and competence of some unnamed person who "provided Stroz Friedberg with a copy of Mr. Zuckerberg's Harvard email account as it resided on Harvard's server in October 2010."  Id. at ¶5.  Nowhere in any declaration does Mr. Rose assure the court he confirmed the accuracy or completeness of that email record.  Garbage in, garbage out, is often the phrase used in the computer world for not conferring a computer's output with any more reliability than its input.  If Mr. Rose was provided a partial, incomplete, inaccurate, erroneous copy of Zuckerberg's account data as of October 2010, his evaluation of that data is flawed from the start.

---

[1] Forensic Copy is defined as an exact copy of an entire physical storage media (hard drive, CD-ROM, DVD-ROM, tape, etc.), including all active and residual data and unallocated or slack space on the media.  Compresses and encrypts to ensure authentication and protect chain of custody.  Forensic copies are often called "image" or "imaged copies." See Bit Stream Back-up and Mirror Image. Sedona Glossary of ESI Terms, 2007.

Did Harvard IT staff search unallocated space[2] for deleted emails from Mr. Zuckerberg's account in preparing that October 2010 data set?  Was there any evidence Harvard has about remote connection by anyone to Mr. Zuckerberg's email account from an Internet connected computer somewhere on campus or off campus at any time since Mr. Zuckerberg opened his Harvard email account?  Were any devices connected to the Harvard email server at any relevant time that could have retained copies of Mr. Zuckerberg's deleted or un-deleted emails?  Stroz Friedberg has provided extensive data about devices attached to various computers provided by Mr. Ceglia and his parents.  It curiously provides zero information about this relevant fact relating to the Harvard email server.  Purely an oversight on their part, or perhaps no "direction" was given to Mr. Rose to fully investigate the email records he was provided.  Mr. Rose examined whatever it was that Harvard told him was responsive to his request.  We do not even know what Mr. Rose requested from Harvard, therefore, we do not know what is yet to be discovered about Mr. Zuckerberg's email account still retained by Harvard.

Mr. Rose then lists all the search terms he used in searching the incomplete email records.  Doc. No. 47, Exhibit B.  Who provided him with these search terms?  If defense counsel provided those search terms, they have waded into expert witness

---

[2] Unallocated space is defined as the area of computer media, such as a hard drive, that does not contain normally accessible data. Unallocated space is usually the result of a file being deleted. When a file is deleted, it is not actually erased, but is simply no longer accessible through normal means. The space that it occupied becomes unallocated space, i.e., space on the drive that can be reused to store new information. Until portions of the unallocated space are used for new data storage, in most instances, the old data remains and can be retrieved using forensic techniques. Sedona Glossary of ESI Terms, 2007.

territory and are now arguably subject to interrogatories and deposition to inquire about their role in what is an expert function, i.e. searching email records electronically.  If Mr. Rose chose these search terms it is quite odd indeed how he came to choose such random phrases out of the blue.  Id.  The court can examine that exhibit for itself and reasonably conclude that someone provided these terms to Mr. Rose and that he did not simply wake from a strategizing dream and roll over to scribble them on his bedside notepad.

Who told Mr. Rose to only complete these rudimentary search tasks?  Why did he not search unallocated space or ask to have access to the servers at Harvard and "collect" his data from there.  Why no questions about backups, or copies of email records in other places than just on Harvard's servers?  Why no questions about whether Mr. Zuckerberg or anyone else ever connected to that email server from various other Internet connected computers in the world?

As case law has held, computer forensics is not reduced to a keyboard jockey poised in front of a monitor awaiting supplies of search terms from lawyers.  No expert is needed if that is the entirety of the domain of such experts.

**Whether search terms or "keywords" will yield the information sought is a complicated question involving the interplay, at least, of the sciences of computer technology, statistics and linguistics. See George L. Paul & Jason R. Baron, Information Inflation: Can the Legal System Adapt?; 13 Ricn. J.L. & TECH. 10 (2007). Indeed, a special project team of the Working Group on Electronic Discovery of the Sedona Conference is studying that subject and their work indicates how difficult this question is. See The Sedona Conference, Best Practices Commentary on the Use of Search and Information Retrieval, 8 THE SEDONA CONF. J. 189 (2008), available at http://www.thesedonaconferen ce.org/content/miscFiles/ Best_Practices_Retrieval_ Methods_revisecLcover_and_preface.pdf. Given**

**this complexity, for lawyers and judges to dare opine that a certain search term or terms would be more likely to produce information than the terms that were used is truly to go where angels fear to tread. This topic is clearly beyond the ken of a layman and requires that any such conclusion be based on evidence that, for example, meets the criteria of Rule 702 of the Federal Rules of Evidence.** *U.S. v. O'Keefe*, 537 F.Supp.2d 14 (2008).

Mr. Rose never accounts for the ability of Mr. Zuckerberg, or Harvard staff or some third party intruding Mr. Zuckerberg's email account to hit the "delete" key and destroy Ceglia emails forever. The absence of the Ceglia/Zuckerberg emails at issue in Mr. Zuckerberg's email account inbox (which has not been conclusively examined back to 2003 in any event) is not proof that the emails were never exchanged with Mr. Ceglia. It is not proof that Mr. Ceglia's emails are fakes at all. The defense knows this, or they should know this, if they bothered to ask Stroz Friedberg. It is without doubt that Mr. Rose will not offer any sworn statement in any form that makes the claim that to a reasonable degree of scientific certainty, the absence of Ceglia's emails in Mr. Zuckerberg's Harvard email inbox is proof of fraud. That claim is a legal argument, and it is a legal argument unsupported by evidence. Arguments like these should be accorded the same weight as the evidence supporting them - in this case, zero.

This disinformation is repeated in pleadings and Mr. Snyder's repetitive public pronouncements and long courtroom monologues such as those in Doc. No. 94. The sheer frequency of repetition of a claim adds no weight to its veracity despite counsel apparently thinking this is so.

Finally, the insufficiency of Mr. Rose's superficial evaluation of incomplete

evidence in Zuckerberg's email record is exposed by his colleague, Michael

McGowan.  In Mr. McGowan's declaration, Doc. No. 51, he provides the following

explanation of where it is proper to look for evidence (Note that this long list of

details to insure a search is complete relate to Stroz Friedberg's interest in

searching **Mr. Ceglia's email records**):

**[E]vidence relating to authenticity can be extracted from many locations on any computers on which the documents in question were created, saved, viewed or modified.  These locations include the computer system, application and security logs, the unallocated space of the computers from which deleted files or file fragments may be recovered, the portion of the hard drives that stores the dates and times that files were created, last accessed, and modified; and the files that show what documents were recently accessed.**  Id at ¶4.

The comparison here reveals Stroz Friedberg is an advocate for Defendants,

not a neutral expert.  When Ceglia's email record is concerned, the above paragraph

details all sorts of items to examine and consider to confirm the authenticity of that

record.  By stark contrast, when Defendant Zuckerberg's email record is to be

"examined" no such probing examination is necessary.

In its zeal to advocate for the Defendants, Stroz Friedberg forgot this Ceglia-

related detailed explanation of where to look for evidence.  When examining

evidence of Defendant Zuckerberg's email record, it asked none of the above

questions, searched in none of the suggested locations and failed to disclose this to

the court when making sworn declarations purporting to be comprehensive searches

of Mr. Zuckerberg's Harvard email account records.  Either Mr. McGowan is right

about how to properly search, or Mr. Rose is right, but they cannot both be right.

The defense can respond when they feel it is appropriate as to which declarant mislead the court about how to properly and completely search for email records.

Mr. McGowan's declaration was designed to persuade the court about how extensive a search *needed to be done of Mr. Ceglia's computers*.  Mr. Rose's declaration omitted that extensive search methodology and was designed to persuade the court that an extensive search *had been done of Mr. Zuckerberg's Harvard email account records*.  As the record reveals, the extensive search that Mr. McGowan urged was necessary was not done at all when Mr. Rose confronted Defendant Zuckerberg's email records.  It is not a difficult logic problem to figure out why that disconnect exists between Mr. McGowan's comprehensive search methodology suggestion applicable to Ceglia's computers and Mr. Rose's superficial search methodology deployed on Defendant Zuckerberg's email records.

## THE 175 SUPPOSEDLY ONLY RELEVANT EMAILS

Defendants' claim that there are only 175 relevant emails between Zuckerberg and Ceglia in 2003 and 2004.  It is beyond doubt that these are not the sum total of the relevant emails to be hunted for in Mr. Zuckerberg's account.  It takes little imaginative energy to posit a range of emails that would not contain Mr. Ceglia's name or StreetFax and yet be discoverable, relevant and admissible in this case.  Here are a few hypotheticals to prove the point.

1. An email from Zuckerberg to someone else, anyone else, with a message that says in part, "I am working with this New York guy, doing some other coding for him, he gave me several thousand dollars for part of facebook, but I am just

leading him on.  He's not going to get anything."

2. Email from someone else to Zuckerberg:  "Are you sure that guy is going to give you the $2,000 we need to complete the facebook site design?  You said he was a dumb wanna-be entrepreneur with some photo program for intersections and a database, but we really need the money and don't need problems from a guy claiming he owns half the company."

3. Email to Zuckerberg from another early investor in Facebook:  "Is that Cernia (sp?) or whatever guy still in the company?  I thought you were going to take care of that, offer him double his investment back and just tell lie to him that the company wasn't going well and you felt obligated to give him his investment back.  What happened to that arrangement?  Is he still doing his intersection photo program?"

Again, Mr. McGowan of Stroz Friedberg offers this when urging the court to permit a wide-ranging search of Mr. Ceglia's computers:

> **While some information relevant to authenticity can be extracted from individual files, much more such information is available from an inspection of all of the computers or electronic media on which the files were created, viewed, stored or modified.  Critical information relating to backdating or e-forgery can be gleaned from a computer's file system; a computer's application, security and event logs; the metadata on unrelated files; and the unallocated space of digital media...to name just a few.**  Doc. No. 51 at ¶13.

Hypocritically, none of the above searching or inquiries were made relating to Mr. Zuckerberg's Harvard email accounts.

It is now obvious that a thorough review of Zuckerberg's email inbox is

necessary and not merely a cherry-picked set of 175 emails that, conveniently, do not mention his Facebook Contract with Mr. Ceglia.  The Defendants' evidence is nothing more than diversion on this point.  Ceglia exchanged emails with Zuckerberg and has the text of those emails, contemporaneously saved, and Zuckerberg says he never exchanged those emails with Ceglia.  Mr. Ceglia authenticates those emails by his sworn declaration.  Computer expert confirms Mr. Ceglia's declaration by detailed, exhaustive computer analysis of the files containing that email record.  Any contrary argument or even testimony is not proof of fraud, it is proof of a jury question.

"Defendants' have already gathered substantial proof that Ceglia fabricated the emails quoted in his Amended Complaint, just as he doctored the contract on which he bases this entire lawsuit."  Doc. No. 45 at 19.  Knowing what we all know now, this statement could no longer be made by defense counsel without risking a fraud on the court sanction himself.  There is no "substantial proof", but merely irrelevant emails cherry-picked from an incomplete record searched with lawyer supplied search terms probing no further.  This is not "proof" much less "substantial proof" unless by using the word "substantial," Mr. Snyder meant, no proof at all.

Defendants now only have arguments, the same litany of repeated adjectives ("fraud" "fabrication" "false" "doctored") etc. they have spewed throughout this lawsuit.    Any argument is just that - an argument.   It is not proof, it is not substantial proof, it is the words of lawyers and up to this point, those words stand unsupported in a sea of words the Defendants rely on instead of evidence.  Without

a complete evaluation of all potential copies of any emails Defendant Zuckerberg sent or received from 2003 forward, this court is unable to fully assess any email related fraud claim from either party.    In fairness, before this court can comprehensively rule on any fraud claim by the Defendants, Mr. Ceglia should be given the opportunity to use a neutral expert to fully, completely and competently examine all available email evidence relating to Mr. Zuckerberg.

## CONCLUSION

For the foregoing reasons, Mr. Ceglia respectfully requests this court prohibit Defendants from reliance on any argument that the Ceglia Zuckerberg email exchanges are fraudulent as part of any motion to dismiss filed before full discovery has been completed.  In addition, he respectfully requests this court permit Mr. Ceglia expedited discovery as to all potential sources of information about Mr. Zuckerberg's email accounts for the relevant time period of 2003 to the present time in order to provide this court even more evidence supporting Ceglia's established authenticity of the email exchanges included as exhibits to this motion.

Respectfully submitted,

/s/Dean Boland
_____

Paul A. Argentieri                              Dean Boland
188 Main Street                                 18123 Sloane Avenue
Hornell, NY 14843                               Lakewood, Ohio 44107
607-324-3232 phone                              216-236-8080 phone
607-324-6188                                    866-455-1267 fax
paul.argentieri@gmail.com                       dean@bolandlegal.com