IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CONNECTU, INC., CAMERON
WINKLEVOSS, TYLER WINKLEVOSS,
AND DIVYA NARENDRA,

              Plaintiffs,

       v.

FACEBOOK, INC., MARK
ZUCKERBERG, EDUARDO SAVERIN,
DUSTIN MOSKOVITZ, ANDREW
McCULLUM, AND THEFACEBOOK LLC,

            Defendants.

CIVIL ACTION NO. 1:07-cv-10593-DPW

(CONSOLIDATED WITH CIVIL ACTION
NO. 1:04-cv-11923-DPW)


**CAMERON WINKLEVOSS, TYLER WINKLEVOSS AND DIVYA NARENDRA'S
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR DISCOVERY UNDER FED.R.CIV.P. 60(B)**

## **TABLE OF CONTENTS**

I. INTRODUCTION .................................................................................................. 1

II. THE CIRCUMSTANCES STRONGLY INDICATE THAT THE FACEBOOK
DEFENDANTS WRONGFULLY WITHHELD THE LEAKED INSTANT
MESSAGES.......................................................................................................... 3

    A.    The Facebook Defendants Failed To Produce The Leaked IMs Despite
The Founders 2005 Request For All Of Mr. Zuckerberg's Communications
Relating To Harvard Connection. ......................................................................... 3

    B.    The Leaked IMs Were Reportedly Sent From The Laptop Mr. Zuckerberg
Used At Harvard. .................................................................................................. 4

    C.    The Facebook Defendants' Conducted A "Thorough" Forensic Examination
Of Mr. Zuckerberg's Laptop.................................................................................. 5

    D.    The Facebook Defendants Never Indicated They Were Withholding
Responsive Communications.................................................................................. 7

    E.    Defendants Repeatedly Promised To Supplement Their Production And
Represented To Plaintiffs And The Court That They Were Not Withholding
Documents. ........................................................................................................... 8

    F.    The January 2006 Meeting Reported In *The New Yorker* Article. ......................... 9

    G.    The Facebook Defendants Repeatedly Claimed They Had Complied With
All Discovery Obligations and Promised To Promptly Produce Responsive
Documents As They Were Discovered................................................................. 11

    H.    The Parmet Dispute............................................................................................ 11

III. THE FOUNDERS ARE ENTITLED TO AN INQUIRY AND DISCOVERY UNDER
*ANDERSON* ...................................................................................................... 14

    A.    Legal Standard. .................................................................................................. 14

    B.    The Failure To Produce The IMs Suggests Misconduct, But Confirmatory
Discovery Is Necessary....................................................................................... 16

    C.    Discovery Also Is Necessary To Determine Whether The Failure To Produce
The Leaked IMs Substantially Interfered With The Founders' Preparation
Of This Action. ................................................................................................... 17

D.    Discovery Is Necessary To Determine Whether The Misconduct Was Intentional And Whether The Presumption Of Substantial Interference Arises. ................................................................................................ 21

IV.    THE DISCOVERY NEEDED TO ESTABLISH WHETHER THE SUPPRESSION WAS INTENTIONAL OR INADVERTENT ................................................. 22

V.    CONCLUSION ............................................................................................... 24

CERTIFICATION PURSUANT TO LOCAL RULE 7.1(a)(2) ................................... 24

CERTIFICATE OF SERVICE ..................................................................................... 24

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Beatrice Foods Co.,*
127 F.R.D. 1, 5-6 (D.Mass. 1989) ........................................................................... 12

*Anderson v. Cryovac, Inc.,*
862 F.2d 910, 928-930 (1st Cir. 1988) ............................... 2, 3, 15, 16, 17, 21, 23, 24

*Armstrong v. Rohm & Haas Co.,*
349 F.Supp.2d 71, 81 (D.Mass.2004) ...................................................................... 20

*Arrow Intern., Inc. v. Spire Biomedical,*
635 F.Supp.2d 46, 58 (D. Mass. 2009) .................................................................... 20

*Broomfield v. Kosow,*
349 Mass. 749 (1965) ................................................................................................ 18

*Cardullo v. Landau,*
329 Mass. 5, 8 (1952) ............................................................................................... 18

*Conerly v. Flower,*
410 F.2d 941 (8th Cir. 1969) .................................................................................... 14

*Damiani v. Rhode Island Hospital,*
704 F.2d at 17 (1st Cir. 1983) .................................................................................. 22

*DeCotis v. D'Antona,*
350 Mass. 165, 168 (1966) ....................................................................................... 18

*Foster v. Hurley,*
444 Mass. 157, 167 (2005) ....................................................................................... 19

*Genesis Technical & Financial v. Cast Navigation,*
74 Mass.App.Ct. 203, 212 (2009) ............................................................................ 19

*Hamilton v. School Committee of City of Boston,*
725 F.Supp. 641, 643 (D.Mass. 1989) ..................................................................... 14

*Hickman v. Taylor,*
329 U.S. 495, 511 (1947) .......................................................................................... 17

*In re Parametric Technology Corp.,*
300 F.Supp.2d 206, 216 (D.Mass. 2001) ................................................................. 20

*Judge v. Gallagher,*
  17 Mass.App.Ct. 636 (1984) ........................................................................ 18

*Kelly v. Greer,*
  334 F.2d 434, 436 (3d. Cir. 1964) ............................................................... 14

*Kleinschmidt v. U.S.,*
  146 F.Supp. 253, 256 & n. 4 (D.Mass. 1956) .............................................. 18

*McCall–Bey v. Franzen,*
  777 F.2d 1178, 1186 (7th Cir. 1985) .......................................................... 14

*Novelty, Inc. v. Mountain View Marketing, Inc.,*
  265 F.R.D. 370, 375 (S.D.Ind. 2009) ............................................................. 3

*Reisman v. KPMG Peat Marwick LLP,*
  57 Mass.App.Ct. 100, 787 N.E.2d 1060, 1066–67 (2003) ........................... 20

*Rozier v. Ford Motor Co.,*
  573 F.2d 1332 (5th Cir.1978) ....................................................................... 15

*Smith v. Jenkins,*
  626 F.Supp.2d 155, 171 (D.Mass. 2009) ..................................................... 18

*Square Constr. Co. v. Washington Metropolitan Area Transit Authority,*
  657 F.2d 68 (4th Cir. 1981) ........................................................................ 15

*Sterski v. Kirzhnev,*
  2011, WL 923499 (D. Mass., March 15, 2011) (unpublished) ...................... 22

*Stridiron v. Stridiron,*
  698 F.2d 204 (3d Cir.1983) .......................................................................... 14

*Tew v. Chase Manhattan Bank, N.A.,*
  728 F.Supp. 1551, 1555 (S.D.Fla.1990) ....................................................... 20

*Triange Capital Corp. v. I.M.C. Management Corp.,*
  127 F.R.D. 444, 446 (D. Mass. 1989) .......................................................... 14

*Warsofsky v. Sherman,*
  326 Mass. 290, 93 N.E.2d 612 (1950) ......................................................... 18

*Wilson v. Jennings,*
  344 Mass. 608, 615 (1962) ........................................................................... 18

**Statutes**

Fed.R.Civ.P. 26(e) ................................................................................................ 8

Fed.R.Civ.P. 60 ............................................................................................... 1, 24

Fed.R.Civ.P. 60(b) ..................................................................................... 2, 14, 17

Rule 60(b)(3) ................................................................................................ 2, 14

**Other Authorities**

11, Wright, Miller, Kane, *Federal Practice & Procedure*,
    § 2852 at pp. 233-235 & ns. 7 & 9 (2d ed. 1995) .................................. 14

12, *Moore's Federal Practice*, § 60.43[1][a] at p. 60-138 (3rd ed. 2011) .................................. 15

**Articles**

*Silicon Alley Insider* .......................................................................... 1, 10

*The New Yorker* .......................................................... 1, 2, 4, 9, 10, 13, 16, 17

## I.   INTRODUCTION

The Founders move under Fed.R.Civ.P. 60 ("Rule 60") for an inquiry into whether, two years before the mediation, the Facebook Defendants and their attorneys reviewed damaging instant message communications ("IMs") sent by Mark Zuckerberg at Harvard, determined that these IMs were responsive to discovery requests, and then suppressed this evidence.

If genuine, the leaked IMs would have been critical evidence supporting the Founders' breach of fiduciary duty and fraud claims. 1:04-cv-11923 Dkt. 1, pp. 7-10 (initial complaint); Dkt. 1, pp. 14-17 (2007 complaint).[1]  If Facebook had produced the evidence of their breach of fiduciary duty, the Founders would have been able to fully develop their claim for a constructive trust, a sweeping remedy under Massachusetts law that might well have led to the Founders obtaining a significant percentage of Mr. Zuckerberg's interest in Facebook.

The basis for this motion emerged in 2010, long after the 2008 mediation and settlement. First, in mid-2010, a selection of allegedly *bona fide*[2] IMs were published in the *Silicon Alley Insider*.[3]  Second, *The New Yorker* reported in September 2010 that Facebook executives and attorneys reviewed these leaked IMs in a January 2006 meeting. *See* Meade Decl., Ex. 1 (the leaked IMs) & Ex. 2 (*The New Yorker* article). In the leaked IMs, Mr. Zuckerberg expressed his

---

[1]    For the convenience of the Court, most of the other documents cited herein are attached as exhibits to the Declaration of Tyler Meade. Other docket citations are to 1:07-cv-10593 except where another case number is specified.  In most cases, page citations are based on the document's original pagination, rather than the docket pagination added at the top at the time of filing.  The following syntax identifies the few exceptions "at p. 3 *of 14*."

[2]    As indicated, the Founders do not know whether these IMs are genuine. The "allegedly *bona fide*" qualification stated in the text applies to each reference to "IMs." Likewise, the Founders do not know whether *The New Yorker* article is accurate.  Any reference to that article in this brief should be viewed with this understanding in mind.

[3]    This publication is now known as the *Business Insider. See* N. Carlson, "At Last – The Full Story Of How Facebook Was Founded," *Business Insider*, Mar. 5, 2010, <http://www.businessinsider.com/how-Facebook-was-founded-2010-3> (accessed April 15, 2011).

intent to deceive the Founders into thinking he was working in partnership with them to develop a planned social networking site, when in fact he intended to usurp the opportunity and develop his own site which became Facebook.

While Mr. Zuckerberg was leading the Founders to believe he was developing their site, he was sending IMs to others stating that he was intentionally delaying his work with the Founders to develop Facebook. ("But they made a mistake haha. They asked me to make it for them. So I'm like delaying it so it won't be ready until after the Facebook thing comes out"). Meade Decl., Ex. 1 at p. 4 of 7. In one IM, Mr. Zuckerberg bluntly describes his intentions with respect to his business dealings with the Founders: "I'm going to f*** them." *Id.* at p. 5 of 7 (expletive altered). According to *The New Yorker* article entitled "The Face of Facebook," *a small group of lawyers and Facebook executives reviewed the messages, in a two-hour meeting in January, 2006, at the offices of Jim Breyer, the managing partner at the venture-capital firm Accel Partners, Facebook's largest outside investor.* Meade Decl., Ex. 2 (*The New Yorker* article) (emphasis added). Yet Facebook apparently never produced these IMs.

The First Circuit's decision in *Anderson v. Cryovac, Inc.*, 862 F.2d 910, 928-930 (1st Cir. 1988) demonstrates that an inquiry is warranted here. In *Anderson*, as here, the Plaintiffs learned during the pendency of an appeal that key evidence (there, a water contamination report) was not produced in discovery, and they brought a motion to set aside the judgment under Rule 60(b). *Id.* at 922. The district court refused discovery and then denied the motion. *Id.* at 923. The First Circuit held that it was error to deny the motion without first inquiring whether the failure to produce the evidence was intentional: "[w]here there has been an unrevealed failure to make discovery, the offender's knowledge and intent is of decretory significance in a proceeding under Rule 60(b)(3)." *Id.* at 930. The reason an inquiry is required is that different standards apply in

deciding a Rule 60(b)(3) motion depending on whether the suppression was accidental or intentional. *Id.* at 925-27.

The threshold for an inquiry under *Anderson* is met here. As in *Anderson*, significant evidence was withheld in discovery. In order to know what, if any, relief the Founders are entitled to, the Court must first determine, through an inquiry, whether the Facebook Defendants intentionally suppressed the leaked IMs.

## II. THE CIRCUMSTANCES STRONGLY INDICATE THAT THE FACEBOOK DEFENDANTS WRONGFULLY WITHHELD THE LEAKED INSTANT MESSAGES

### A. The Facebook Defendants Failed To Produce The Leaked IMs Despite The Founders 2005 Request For All Of Mr. Zuckerberg's Communications Relating To Harvard Connection.

The Founders served their initial discovery requests in April 2005, requesting among other things: "All email(s) and other communications between Mark Zuckerberg and any other person relating in any way to the website that was to be known as Harvard Connection." Meade Decl., Ex. 3 at pp. 5-6 (Request No. 7). On May 31, 2005, the Facebook Defendants responded in pertinent part:[4] "Defendants will produce non-privileged responsive documents to the extent such documents exist in their possession and are located by a reasonable search." *Id.* The leaked IMs are clearly communications from Mr. Zuckerberg relating to the Harvard Connection website. Yet Facebook Defendants apparently never produced the leaked IMs.

---

[4] The Facebook Defendants purported to assert generalized objections in response to Request No. 7, but these objections were ineffective as a matter of law. *See, e.g., Novelty, Inc. v. Mountain View Marketing, Inc.*, 265 F.R.D. 370, 375 (S.D.Ind. 2009) ("Objections are valid only if they specifically apprise the opposing party, and the Court, about the nature of the otherwise responsive documents that the responding party will not produce. . . . Thus, 'general objections' made without elaboration, whether placed in a separate section or repeated by rote in response to each requested category, are not 'objections' at all-and will not be considered") (internal citation omitted).

**B.**	**The Leaked IMs Were Reportedly Sent From The Laptop Mr. Zuckerberg Used At Harvard.**

If *The New Yorker* article is accurate, the leaked IMs were sent from the computer Mr. Zuckerberg used at Harvard. Meade Decl., Ex. 2 at p. 5 of 12 ("To prepare for litigation against the Winklevosses and Narendra, Facebook's legal team searched Mr. Zuckerberg's computer and came across IMs he sent while he was at Harvard"). Circumstances suggest this computer was a laptop that has been variously described by Defendants as "Device 371-01," Mr. Zuckerberg's "original computer which he used at Harvard," and the "hard drive" he used in the 2003-2004 timeframe.[5]

Initially, the Facebook Defendants claimed this computer was lost. In an August 18, 2005 court filing, Joshua Walker, an attorney at Orrick, Herrington & Sutcliffe LLP ("Orrick"), the firm representing the Facebook Defendants wrote: "Plaintiff incorrectly makes much of the absence of Zuckerberg's computer that is no longer in his possession. Defendant Zuckerberg would be willing to provide the hard drive he had during the winter of 2003-04, but despite extensive searches, he does not have it." Meade Decl., Ex. 6 at p. 15. In fact, Max Kelly, the person whom the Facebook Defendants designated most knowledgeable about their forensic review of the relevant Facebook computers, testified that this computer was not lost. According to Mr. Kelly, Mr. Zuckerberg used this laptop until late July 2005 when he turned it over to IT personnel at Facebook. Meade Decl., Ex. 11 at pp. 177-178; *see also id* at Ex. 10 at p. 3.

---

[5]	*See* Meade Decl., Ex. 4 ("We currently have reason to believe the devices we have located are (a) Mark Zuckerberg's original computer which was used while Mr. Zuckerberg was at Harvard"), Ex. 5 ("This CD contains . . . from Mark Zuckerberg's original computer he used at Harvard"), Ex. 6 at p. 15 (stating that Mr. Zuckerberg "Frequently us[ed] his laptop as a server" while at Harvard), Ex. 7 at p. 1 (referring to "the laptop computer that Mark Zuckerberg used at Harvard"), Ex. 8 ("this disk contains . . . from Mark Zuckerberg's hard drive (previously designated 371-01"), Ex. 9 at p. 19 ("when the Facebook was created, the server actually was a laptop computer"), Ex. 10 at p. 12 ("device 371-01 is a hard drive that Mark Zuckerberg used in the 2003-2004 timeframe").

- 4 -

By October 2005 at the latest, Mr. Zuckerberg's laptop was in Orrick's possession.
Meade Decl., Ex. 11 at pp. 177-179.  In a November 17, 2005 email, Mr. Walker announced that
Orrick had "recently located additional electronic devices which may include data from early to
mid 2004."  Meade Decl., Ex. 12 at p. 1.  In a November 23, 2005 letter, Orrick attorney Robert
Nagel identified one of these devices as "Mark Zuckerberg's original computer which was used
while Mr. Zuckerberg was at Harvard."  Meade Decl., Ex. 4.

### C. The Facebook Defendants' Conducted A "Thorough" Forensic Examination Of Mr. Zuckerberg's Laptop.

By their own admission, the Facebook Defendants thoroughly examined the contents of
all relevant computers, including Mr. Zuckerberg's laptop.  Meade Decl., Ex. 4 at p. 1.  On
November 18, 2005, lead attorney I. Neel Chatterjee of Orrick described the Facebook
Defendants' search to the Court:

> THE COURT: Okay.  Now when you say you searched, what have you done with respect to hard drives?
> MR. CHATTERJEE: We have, do you mean have we imaged them, is that your question?  We—
> THE COURT: Have you looked for deleted items on them?
> MR. CHATTERJEE: Yes.  We've, I mean obviously there's –
> THE COURT: *Have you, have you done what they, if they got the mirror image, have you done what they're going to do?*
> MR. CHATTERJEE: *We've done some of it.  We're going to do some more of it because, we notified them yesterday.  We think we've found some additional material.  We're not sure what it is, and we're trying to take the forensic images and provide that information to them if it's responsive.*
> THE COURT: Well, it seems to me that the way, the way things work is that the plaintiff makes a request for evidence that's relevant to the claims and defenses of either party of which they're entitled to under the rules.  *If they've requested this stuff and you have not objected to it, then it seems to me it's your burden to produce it.*  And I normally would not go to allowing one party to have a mirror image of another party's computer unless I was, unless I had some reason to believe number one that it wasn't being, that, you know, that defendant wasn't doing it to the extent that they were obligated to do it under the federal rules, or there was some sort of chicanery involved, and I think that's, that's where we are on, on this particular things.
> MR. CHATTERJEE: *We, we've produced everything we've been able to find and we've searched fairly thoroughly of all, all the electronic devices we've been able to find to*

*date, and we continue to do that.* So, Your Honor, I mean, we've produced the code that we've been able to find. Now what the plaintiff wants to find, is they want to find the Harvard connection code –
THE COURT: Right.
MR. CHATTERJEE: – on these laptops. It isn't there. They may not be happy about that, but that's a truism. They want to find Harvard connection code copied into the Facebook code that we produced. That isn't there. They're not happy about that. We've, there are some pieces of information –
THE COURT: Well, they're not convinced it's not there. That, that's the issue.
MR. CHATTERJEE: Right, and Your Honor, we searched and, and –
THE COURT: Right.
MR. CHATTERJEE: – some evidence simply may not exist anymore. We, we've looked thoroughly for it, and I'm not sure the Draconian relief of mirror imaging every single one of these systems is going –
THE COURT: *You're saying it [mirror imaging] would do no good because you've already done it, and you can't find it.*
MR. CHATTERJEE: *Yes, Your Honor.*[6]

Meade Decl., Ex. 9 at pp. 20-22 (emphasis added).

On November 23, 2005, Orrick attorney Robert D. Nagel sent a letter indicating that the Facebook Defendants' ongoing analysis had progressed sufficiently for him to report that Defendants believed that the recently located devices contained "responsive information." Meade Decl., Ex. 4. By January 7, 2006, Defendants' analysis of Mr. Zuckerberg's laptop was sufficiently complete for them to produce selected documents. Meade Decl., Ex. 5. Defendants produced additional documents from Mr. Zuckerberg's laptop the following month. Meade Decl., Ex. 8.

By February 6, 2006, Defendants' forensic examination of the laptop was apparently complete. Mr. Nagel declared in a letter: *"The hard drive from this laptop was thoroughly*

---

[6]    Curiously, Mr. Chatterjee told the Court at this hearing that Defendants were still looking for the computer that Mr. Zuckerberg had used at Harvard, even though it was clearly in Orrick's possession by then. Compare Meade Decl., Ex. 9 at p. 29 ("The person at the fulcrum is Mark Zuckerberg and if, if we, we don't have the, the computer we, we are still looking for it, and we may find it, that he had during the relevant time period, that's the issue") with Ex. 10 at p. 15 (acknowledging that Mr. Zuckerberg's computer, *i.e.* Device 371-01, was turned over to Orrick in October 2005).

*forensically examined and all recoverable files were recovered.*" Meade Decl., Ex. 7 at p. 2

(emphasis added); *see also id.* at p. 1 (making clear that the laptop referenced in the

aforementioned quote is "the laptop computer that Mark Zuckerberg used at Harvard").

### D. The Facebook Defendants Never Indicated They Were Withholding Responsive Communications.

The Facebook Defendants led the Founders and this Court to believe that they were

withholding only two narrow categories of documents. On August 18, 2005, after noting that

they had produced "thousands of pages of documents," the Facebook Defendants told this Court:

"The only documents being withheld are documents created after May 21, 2004, and student

records of Mark Zuckerberg which predate his involvement in HC." Meade Decl., Ex. 6 at p. 6;

*see also id.* at Ex. 9 at p. 52. Mr. Zuckerberg's electronic communications from late 2003 and

early 2004 relating to the Harvard Connection website do not fit into either of these categories.

As the litigation progressed, the Facebook Defendants continued to represent that they

had not withheld documents. In November 2005, Mr. Chatterjee told the Court: "[W]e've

produced everything we've been able to find." Meade Decl., Ex. 9 at p. 21; *see also id.* at Ex. 6

at p. 18 ("Plaintiff's case appears to rest on the shortness of time taken by Mark Zuckerberg to

complete theFacebook.com website. All documents from that time period (i.e. early 2004) have

been produced, except pre-HC student records"). Likewise, in February 2006, the Facebook

Defendants stated that they had "produced everything they have been able to find . . . based upon

a thorough, diligent search." Meade Decl., Ex. 7 at p. 2.

Defendants told the Founders that they had produced all documents that predated May

21, 2004 "regardless of relevance." Meade Decl., Ex. 9 at p. 44 (the Founders' prior counsel

stated on the record his understanding that "The defendants agreed to produce responsive pre

May 21st documents 'irrespective of relevance'" which understanding was not corrected by

Defendants); *id.* at pp. 47-48 (Defendant Saverin's counsel states: "Where we use the May 21, 2004 date, it was really, Your Honor, just a, an attempt by us to reach some kind of compromise to offer the plaintiff some of the documents that they had asked for even though the requests themselves were vastly overbroad"); *see also id.* at Ex. 10 at p. 1 ("At every opportunity, Facebook Defendants have complied with ConnectU's numerous requests for information from the various recovered electronic devices, *even where the requests were of questionable relevance*") (emphasis added).

E.    **Defendants Repeatedly Promised To Supplement Their Production And Represented To Plaintiffs And The Court That They Were Not Withholding Documents.**

Throughout the litigation, Orrick attorneys represented to the Founders that they would promptly produce any newly found responsive documents, consistent with their obligation under Fed.R.Civ.P. 26(e), which provides: "A party who has . . . responded to an interrogatory, request for production, or request for admission . . . must supplement or correct its . . . response: [¶] (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."  For example:

- The November 17, 2005, email from Mr. Walker of Orrick regarding the "additional electronic devices" that had been located included this representation: "We currently have no information that suggests whether or not the devices contain responsive documents or relevant information. *If they do, and without prejudice to our present motions, we will supplement earlier responses and production as necessary, including those which you discussed with Monte Cooper*

*and Rob Nagel on Wednesday, November 16.*" Meade Decl., Ex. 12 (emphasis added).

- The November 23, 2005 letter from Mr. Nagel of Orrick stated the following with respect to the newly located devices and Orrick's continuing obligation to produce responsive information: "*If responsive materials (including any software code) are found, we will immediately supplement our production . . .*" Meade Decl., Ex. 4 (emphasis added).

- A similar promise to supplement was made in a November 30, 2005 letter. Referring again to the newly discovered devices, Mr. Nagel promised: "If the existence of responsive content is confirmed, Facebook *Defendants will promptly supplement their production with any responsive information discovered on these devices*." Meade Decl., Ex. 13 (emphasis added).

Yet, for the two years between the reported January 2006 meeting and the January 2008 agreement to stay discovery pending mediation, Orrick apparently never produced the leaked IMs.

**F.**    **The January 2006 Meeting Reported In *The New Yorker* Article.**

The Facebook Defendants did not produce the IMs, even though they reportedly discussed and reviewed them with counsel in a two hour meeting in January 2006, two years before the February 2008 mediation.

Indeed, the September 2010 article in *The New Yorker* included at least three revelations that support ordering an inquiry.  Meade Decl., Ex. 2 (*The New Yorker* article).[7]  ***First, and most importantly, the author, Jose Antonio Vargas, reported that "Facebook's legal team" found***

---

[7]    J. Vargas, "The Face of Facebook," *The New Yorker*, Sept. 20, 2010, <http://www.newyorker.com/reporting/2010/09/20/100920fa_fact_vargas> (accessed April 15, 2011).

*the IMs in conjunction with "litigation against the Winklevosses."* Second, Mr. Vargas reported that Facebook executives and attorneys reviewed and discussed the leaked IMs in a January 2006 meeting, more than two years before the February 2008 mediation. Mr. Vargas quotes a reliable source, Facebook director and prominent venture capital investor Jim Breyer, to support that this meeting in fact occurred. Third, Mr. Zuckerberg appears to publicly acknowledge that these IMs are genuine. Here is the most relevant part of the article:

> *To prepare for litigation against the Winklevosses and Narendra, Facebook's legal team searched Zuckerberg's computer and came across Instant Messages he sent while he was at Harvard.* Although the IMs did not offer any evidence to support the claim of theft, according to sources who have seen many of the messages, the IMs portray Zuckerberg as backstabbing, conniving, and insensitive. *A small group of lawyers and Facebook executives reviewed the messages, in a two-hour meeting in January, 2006, at the offices of Jim Breyer, the managing partner at the venture-capital firm Accel Partners, Facebook's largest outside investor.*
>
> The technology site Silicon Alley Insider got hold of some of the messages and, this past spring, posted the transcript of a conversation between Zuckerberg and a friend, outlining how he was planning to deal with Harvard Connect:
> FRIEND: so have you decided what you are going to do about the websites?
> ZUCK: yea i'm going to fuck them
> ZUCK: probably in the year
> ZUCK: *ear
> …
> According to two knowledgeable sources, there are more unpublished IMs that are just as embarrassing and damaging to Zuckerberg. But, in an interview, *Breyer told me, "Based on everything I saw in 2006,* and after having a great deal of time with Mark, my confidence in him as C.E.O. of Facebook was in no way shaken." Breyer, who sits on Facebook's board, added, "He is a brilliant individual who, like all of us, has made mistakes." When I asked Zuckerberg about the IMs that have already been published online, and that I have also obtained and confirmed, he said that he "absolutely" regretted them. "If you're going to go on to build a service that is influential and that a lot of people rely on, then you need to be mature, right?" he said. "I think I've grown and learned a lot."

Meade Decl., Ex. 2 at p. 5 of 12 (*The New Yorker* article) (emphasis added).

The Facebook Defendants' representations to Plaintiffs and this Court cannot be squared with this report of the January 2006 meeting.

**G.** **The Facebook Defendants Repeatedly Claimed They Had Complied With All Discovery Obligations and Promised To Promptly Produce Responsive Documents As They Were Discovered.**

Following the reported January 2006 meeting, the Facebook Defendants continued to represent that they would supplement their production of documents as new information was discovered. For example, in the March 29, 2006 court filing, two months after the reported January 2006 meeting, Orrick attorney Monte Cooper wrote: "*If any existing discovery responses are incorrect or ambiguous, the Facebook Defendants will, of course, supplement them.*" Meade Decl., Ex. 10 at p. 18 (emphasis added).

Orrick also claimed that it had fully complied with its discovery obligations. In the March 29, 2006 filing, Mr. Cooper stated: "At every opportunity, Facebook Defendants have complied with ConnectU's numerous requests for information from the various recovered electronic devices." *Id.* at p. 1. Likewise, in a related April 24, 2006 filing, approximately three months after the January 2006 meeting, Mr. Cooper declared: "Facebook Has Not Suppressed Evidence." Meade Decl., Ex. 14 at p. 8 (underlining in original).

During a July 25, 2007 hearing regarding discovery, the Court stated that it would be "very disappointed" if there were a delay in discovery, adding "do you understand Mr. Chatterjee?" Orrick attorney Chatterjee responded: "I do, your Honor. *We haven't slowed a single thing down on discovery.*" Meade Decl., Ex. 15 at p. 46 (emphasis added). Chatterjee made this claim a year and a half after the reported January 2006 review of IMs that were never produced.

**H.** **The Parmet Dispute.**

By July 2007, the parties agreed to create a protocol for the imaging and analysis of Defendants' various electronic devices, but disagreed on the breadth of the search that the

- 11 -

Founders' forensic expert, Jeff Parmet, would perform. Meade Decl., Ex. 16 at pp. 2-3, 6-9. By this time, the Founders' former counsel had focused discovery efforts on a search for code rather than other material such as Mr. Zuckerberg's communications regarding Harvard Connection. *See generally*, Meade Decl., Ex. 9 at pp. 10-12. This is understandable given Defendants' response to Request No. 7, their representations that they had produced all documents from before May 21, 2004 regardless of relevance, and their many promises to supplement their production as new documents were discovered.[8]

The Facebook Defendants insisted on and obtained a strict protocol that would only allow a search for code and that also prevented the expert, Mr. Parmet, from communicating freely with the Founders and their counsel (the parties who hired him). Meade Decl., Ex. 16 at pp. 6-9 & Ex. 17 at pp. 5-6, 8. Ostensibly, these measures were necessary to protect personal information and Mr. Zuckerberg's privacy. Meade Decl., Ex. 17 at p. 3, Ex. 10 at p. 2 & Ex. 14 at p. 6 ("Facebook and the individual defendants should not be required to turn their computers over to ConnectU to enable its 'expert' to leaf through irrelevant, private information belonging to the individual Defendants. The subject computers have been used not only for developing code, but by young men with private lives and other interests besides software").

The Court adopted the final version of the Protocol in a September 13, 2007 Order. Meade Decl., Ex. 18. By December 2007, Mr. Parmet apparently viewed some undisclosed information on Zuckerberg's laptop. Reportedly, Mr. Parmet raised this issue with Orrick on December 14, 2007. Meade Decl., Ex. 19 at pp. 7-8. Orrick apparently told Mr. Parmet that

---

[8]     Because the Facebook Defendants led the Founders to believe that all documents responsive to Request No. 7 had been produced (if they predated May 21, 2004, as the leaked IMs do), the Founders' prior counsel cannot be faulted for not bringing a motion to compel such communications. *See Anderson v. Beatrice Foods Co.*, 127 F.R.D. 1, 5-6 (D.Mass. 1989) (addressing the failure to bring a motion to compel where plaintiffs were led to believe no additional documents existed "By [a] lack of candor and subsequent misdirection").

Defendants would produce the documents, or at least those that were responsive to discovery requests and not privileged. *Id.* at p. 23.

Without access to the Parmet documents, the Founders do not know whether the leaked IMs are among what the computer forensic expert Jeff Parmet found. Presumably, they are – that is unless there are two categories of information on Mr. Zuckerberg's laptop that the Facebook Defendants failed to produce. If so, *The New Yorker* article also raises concerns about the June 2, 2008 hearing in this Court. The Court asked Facebook's counsel a series of questions about the documents Mr. Parmet found. First, the Court asked whether they were in "the production track" at the time the Parmet dispute arose (which was in December 2007) and Mr. Chatterjee answered affirmatively. Meade Decl., Ex. 19 at pp. 29-30. Next, the Court asked "Well, where were these documents that Mr. Parmet referred to in the disclosure queue?" *Id.* at p. 30. Mr. Chatterjee responded that they were going to be produced "in mid-to-late February" 2008. *Id.* at p. 30.

At first blush, there appears to be nothing wrong with Mr. Chatterjee's last response, and an inquiry may reveal that it was appropriate. On the other hand, if (a) the leaked IMs are what Mr. Parmet found, and (b) *The New Yorker* article is accurate and Defendants and their litigation team had known about these communications for more than two years and not disclosed them, Mr. Chatterjee's response is incomplete at best. A more candid response would have disclosed that the Facebook Defendants had known about the documents for more than two years but had not produced them, at which point the Court would have had the opportunity to inquire further.

## III. THE FOUNDERS ARE ENTITLED TO AN INQUIRY AND DISCOVERY UNDER *ANDERSON*

### A. __Legal Standard.__

Under Rule 60(b)(3), "the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: [¶] . . .(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party." Fed.R.Civ.P. 60(b). This rule applies to the Order of dismissal (Dkt. 353) entered by this Court pursuant to the 2008 settlement. 11, Wright, Miller, Kane, *Federal Practice & Procedure*, § 2852 at pp. 233-235 & ns. 7 & 9 (2d ed. 1995) (Rule 60(b) applies to "a final judgment, order, or proceeding); *see also Triange Capital Corp. v. I.M.C. Management Corp.*, 127 F.R.D. 444, 446 (D. Mass. 1989) (acknowledging authority under Rule 60(b) to vacate court-approved settlement); *Conerly v. Flower*, 410 F.2d 941 (8th Cir. 1969) (consent judgment set aside under Rule 60(b)(3)); *Kelly v. Greer*, 334 F.2d 434, 436 (3d. Cir. 1964) (citing Rule 60(b) for the following proposition: "Of course the district court has jurisdiction to vacate its own orders of dismissal which were based upon the stipulation of the parties in reliance upon their settlement agreement"); *McCall–Bey v. Franzen*, 777 F.2d 1178, 1186 (7th Cir. 1985) (recognizing that "Any time a district judge enters a judgment, even one dismissing a case by stipulation of the parties, he retains, by virtue of Rule 60(b), jurisdiction to entertain a later motion to vacate the judgment on the grounds specified in the rule, some of which have no time limit").[9]

The withholding of information that should have been disclosed in discovery may be grounds for relief under Rule 60(b)(3). *See, e.g., Stridiron v. Stridiron*, 698 F.2d 204 (3d Cir.1983); *Square Constr. Co. v. Washington Metropolitan Area Transit Authority*, 657 F.2d 68

---

[9]     It should be noted that the latter two cases implicate a dispute of authority as to a district court's authority to enforce a settlement agreement, but that is not an issue here. *See generally Hamilton v. School Committee of City of Boston*, 725 F.Supp. 641, 643 (D.Mass. 1989).

(4th Cir. 1981); *Rozier v. Ford Motor Co.*, 573 F.2d 1332 (5th Cir.1978). This is true even if the failure to disclose is unintentional. 12, *Moore's Federal Practice*, § 60.43[1][a] at p. 60-138 (3rd ed. 2011).

In *Anderson v. Cryovac,* the First Circuit set forth the standards for analyzing Rule 60(b)(3) motions. Like this case, *Anderson* involved the failure to produce evidence responsive to discovery requests. *Anderson*, 862 F.2d at 922. The First Circuit held that even in the context of errors made in good faith "[f]ailure to disclose or produce materials requested in discovery can constitute 'misconduct' within the purview of this subsection [Rule 60(b)(3)]." *Id.* at 923. The party seeking to set aside a judgment under Rule 60(b)(3) must prove the misconduct by "clear and convincing evidence." *Id.* at 923-924, 926. Of course, not all discovery misconduct requires setting aside a judgment. Rather *Anderson* holds that in order to re-open the case as a consequence of discovery abuse "the challenged behavior must *substantially* have interfered with the aggrieved party's ability fully and fairly to prepare for and proceed at trial." *Id.* at 924 (emphasis in original)(citations omitted). "Substantial impairment may exist, for example, if a party shows that the concealment precluded inquiry into a plausible theory of liability . . . ." *Id.* at 925.

In *Anderson*, the First Circuit established different standards for proving "substantial interference" depending on whether the misconduct was intentional or accidental. *Id.* at 926. "The burden can also be met by presumption or inference, if the movant can successfully demonstrate that the misconduct was knowing or deliberate. Once a presumption of substantial interference arises, it can alone carry the day, unless defeated by a clear and convincing demonstration that the consequences of the misconduct were nugacious." *Id.* Alternatively, if the misconduct was not intentional, then no presumption applies and the movant must prove "by

.- 15 -

a preponderance of the evidence that the nondisclosure worked some substantial interference with the full and fair preparation or presentation of the case." *Id.*

**B.      The Failure To Produce The IMs Suggests Misconduct, But Confirmatory Discovery Is Necessary.**

*Anderson* held that "[o]nce a proper discovery request has been seasonably propounded, we will not allow a party sentiently to avoid its obligations by filing misleading or evasive responses or by failing to examine records within its control." *Id.* at 929.  There, a water contamination report was not produced despite numerous discovery requests.  The court found that the district court had erred in denying a motion for inquiry where the plaintiffs had diligently requested the report and the defendant had actual or constructive knowledge of the report but failed to produce it.  *Id.*

In the present case, the detailed factual summary above shows the Founders made similarly diligent requests calling for the production of the leaked IMs.  The Facebook Defendants promised to produce all responsive documents and affirmatively led the Founders to believe that, in fact, they had produced all responsive documents.  They also repeatedly promised to supplement their production promptly, as the federal discovery rules require, as they found new responsive documents.  One question to be addressed by further inquiry is whether the Facebook Defendants had the IMs "within [their] control" at that time.  If the facts in *The New Yorker* article are true—particularly, if Facebook and its attorneys met in January 2006 and reviewed the leaked IMs, then the failure to produce them *at that time* certainly constitutes misconduct under *Anderson.*  In addition, if this January 2006 meeting took place as reported, many of Facebook's statements to the court cited above may constitute misconduct.  In short, while there are strong indications that misconduct occurred, the discovery requested in this motion is necessary to confirm the misconduct.

**C.     Discovery Also Is Necessary To Determine Whether The Failure To Produce The Leaked IMs Substantially Interfered With The Founders' Preparation Of This Action.**

It is not yet possible to address the import of the conduct outlined in this motion for at least three reasons.  First, if *The New Yorker* article is accurate, there are many more damaging IMs that the Founders have not yet had a chance to review or analyze.[10]  Second, the Founders' lead counsel have been denied access to the pleadings and discovery files and thus are operating with one hand tied behind their back.  *See* Dkts. 338, 339.[11]  There cannot be any meaningful analysis until the undersigned counsel has access to all of the relevant information.  *Hickman v. Taylor*, 329 U.S. 495, 511 (1947) ("Proper preparation of a client's case demands that [the lawyer] assemble information, sift what he[/she] considers to be the relevant from the irrelevant facts, prepare his[/her] legal theories and plan his[/her] strategy without undue and needless interference.  That is the historical and the necessary way in which lawyers work in our system of jurisprudence to promote justice and to protect their clients' interests.").  Third, as described below, the relevant analysis differs depending upon whether the failure to disclose this information was intentional or unintentional.  *See* § III.D., *infra.*  But this much is clear: As in *Anderson,* the suppressed evidence was not "some fribbling matter of marginal relevance." *Anderson*, 862 F.2d at 930.  If genuine, the leaked IMs strongly support many of the allegations in the Complaints, including that Mr. Zuckerberg breached the fiduciary duties he owed to ConnectU and acted with fraudulent intent.

---

[10]     Meade Decl., Ex. 2 at p. 5 of 12 ("According to two knowledgeable sources, there are more unpublished IMs that are just as embarrassing and damaging to Zuckerberg")
[11]     The Founders' new counsel filed a motion to obtain the complete file to confirm that the leaked IMs were never produced, but this motion was deemed moot after this Court entered judgment. Dkts. 338, 339. Separately, the Founders will renew that motion on the grounds that the jurisdictional landscape has changed with the filing of this motion for inquiry under Rule 60(b).

The Founders alleged that a fiduciary relationship arose by virtue of Mr. Zuckerberg's agreement to use his best efforts to write software, his involvement with overall website development, his pledges of commitment to ConnectU, his acceptance of confidential code and proprietary and confidential management information and procedures, and his knowing acceptance of ConnectU's trust in exchange for a monetary interest in ConnectU. 1:04-cv-11923 Dkt. 1 at ¶¶ 15-18; 1:04-cv-11923 Dkt. 13 at ¶¶ 15-18; Dkt. 1 at ¶¶ 20-21; *see also Broomfield v. Kosow*, 349 Mass. 749 (1965) (one of the hallmarks of a fiduciary relationship is "confidence reposed and accepted"); *Warsofsky v. Sherman*, 326 Mass. 290, 93 N.E.2d 612 (1950) (joint venturers owe a fiduciary obligation to one another).[12]

Whether a fiduciary duty arose because Mr. Zuckerberg accepted the confidences reposed in him or because he agreed to join the ConnectU venture or both, he owed a duty of utmost loyalty to the Founders. *Cardullo v. Landau*, 329 Mass. 5, 8 (1952) ("It is well settled that partners owe each other a fiduciary duty of 'the utmost good faith and loyalty.'"); *DeCotis v. D'Antona*, 350 Mass. 165, 168 (1966) ("participants in a joint venture are subject to the same fiduciary duties imposed upon members of a partnership"). The few IMs that have been made

---

[12]    This is true even if: (1) the contours of the relationship had not been perfectly defined; *Wilson v. Jennings*, 344 Mass. 608, 615 (1962) (finding of a joint venture upheld notwithstanding ambiguity in the nature of the relationship); (2) the arrangement did not constitute a formal partnership or even a traditional joint venture; *Judge v. Gallagher*, 17 Mass.App.Ct. 636 (1984) (upholding finding of a fiduciary relationship among joint venturers where the arrangement was "sufficiently similar to such an endeavor to create a fiduciary relationship"); (2) there may not have been an agreement for Mr. Zuckerberg to share in company losses; *Kleinschmidt v. U.S.*, 146 F.Supp. 253, 256 & n. 4 (D.Mass. 1956) (finding a joint venture even though there was no agreement to share in company losses, stating "All of the partnership characteristics need not be present"); (3) the Founders may have retained the lion share of control; *Judge v. Gallagher*, 17 Mass.App.Ct. at 640 ("While the 'right to participate in the control or management of the enterprise' is important, and may even be an essential element of a 'textbook joint venture,' the evidence bears out the conclusion that [one of the plaintiffs] 'was more than a spectator in the enterprise.'") (citations omitted); *see also Smith v. Jenkins*, 626 F.Supp.2d 155, 171 (D.Mass. 2009) ("Whether a relationship of trust and confidence exists is a question of fact....")

available to the public constitute strong evidence of a breach of this duty in that they substantiate the Founders' allegations that Mr. Zuckerberg usurped a business opportunity belonging to ConnectU. 1:04-cv-11923 Dkt. 1, at ¶¶ 1, 19, 23; *see also id.* at ¶¶ 41-47.[13] They show that Mr. Zuckerberg knowingly and deliberately used deception and false promises to thwart ConnectU while he secretly launched Facebook.

Notably, the Founders' breach of fiduciary duty claim gives rise to a sweeping remedy available under Massachusetts law that could require Mr. Zuckerberg to forfeit a significant percentage of his stake in Facebook. "Under Massachusetts law, a court will declare a party a constructive trustee of property for the benefit of another if he acquired the property through fraud, mistake, breach of duty, or in other circumstances indicating that he would be unjustly enriched." *Genesis Technical & Financial v. Cast Navigation*, 74 Mass.App.Ct. 203, 212 (2009) (emphasis added), quoting *Foster v. Hurley*, 444 Mass. 157, 167 (2005). Had Facebook produced these documents in 2006, the Founders would have been well on their way to proving these allegations and advancing their claim that they were entitled to a constructive trust remedy under which they would potentially own a significant percentage of Facebook.

The leaked IMs are equally important to the Founders' fraud allegations, *i.e.*, that Mr. Zuckerberg knowingly and willfully induced the Founders to rely on his false promises to complete the ConnectU code while he secretly developed and launched Facebook. 1:04-cv-

---

[13]    The 2007 Complaint augmented these allegations, alleging that Mr. Zuckerberg understood that he would "be included in the overall development and control of the project" and that he agreed "to develop the Harvard Connection Code, and to help launch, promote, and operate the site and business, in exchange for a beneficial interest in the website, include a monetary interest in any revenue or other proceeds or benefits from the website." Dkt. 1 at ¶ 28; *see also id.* at ¶¶ 17-21, 24-32, 41, 73-80. While the first Complaint included a generalized prayer for "Other relief as the Court may deem appropriate", the 2007 Complaint explicitly sought imposition of a constructive trust for this breach of fiduciary duty. *Id.* at p. 11, ¶ G; 1:04-cv-11923 Dkt. 1 at p. 11, ¶ F.

11923 Dkt. 1 at ¶¶ 59-60, 63; 1:04-cv-11923 Dkt. 13 at ¶¶ 71-72, 75; Dkt. 1 at ¶¶ 92-93, 96. There appears to be little dispute that the Founders relied on Mr. Zuckerberg's promises to their detriment; Mr. Zuckerberg secretly built and launched Facebook while he was supposed to be completing the code for and otherwise assisting with the launch of Harvard Connection. As with most fraud cases, it was the scienter element that was in dispute: Did Mr. Zuckerberg knowingly make a false representation for the purpose of inducing reliance?[14]

If the leaked IMs are genuine, this is the rare fraud case in which there is *direct* evidence of fraudulent intent. *See Arrow Intern., Inc. v. Spire Biomedical*, 635 F.Supp.2d 46, 58 (D. Mass. 2009) ("direct evidence of intent is rarely available"); *In re Parametric Technology Corp.*, 300 F.Supp.2d 206, 216 (D.Mass. 2001) ("It is perhaps possible to imagine a case where fraudulent intent could be proved by direct evidence, but in most cases proof of a state of mind such as scienter is accomplished by inferences drawn from circumstantial evidence."). As one district court put it, "Certain issues such as fraud, intent, and knowledge . . . . can often only be proved by reliance upon circumstantial evidence *except in the rare case where there is uncontroverted proof of a 'smoking gun.'*" *Tew v. Chase Manhattan Bank, N.A.*, 728 F.Supp. 1551, 1555 (S.D.Fla.1990) (emphasis added). The IMs are the proverbial "smoking gun" on the fraud claim – that is if the requested inquiry reveals they are genuine.

According to one of the leaked IMs, Mr. Zuckerberg told his friend and business partner to check out their website, and then stated: "But they made a mistake haha. They asked me to make it for them. So I'm like delaying it so it won't be ready until after the Facebook thing

---

[14]     *See Armstrong v. Rohm & Haas Co.*, 349 F.Supp.2d 71, 81 (D.Mass.2004) (citing *Reisman v. KPMG Peat Marwick LLP*, 57 Mass.App.Ct. 100, 787 N.E.2d 1060, 1066–67 (2003)) (holding that to prove fraud, a plaintiff must "show that (1) the defendant made a false representation of material fact, (2) with the knowledge of its falsity, (3) for the purpose of inducing the plaintiff to act in reliance thereon, (4) the plaintiff relied upon the representation, (5) the plaintiff acted to his detriment.").

- 20 -

comes out." Meade Decl., Ex. B at p. 4. In another leaked IM, Mr. Zuckerberg reportedly states: "I feel like the right thing to do is finish the Facebook and wait until the last day before I'm supposed to have their thing ready and then be like 'look yours isn't as good as this so if you want to join mine you can…otherwise I can help you with yours later.'") More bluntly, when another friend asked him what he was going to do about the other members of the ConnectU team, Zuckerberg allegedly wrote an instant message saying: "Yeah, I'm going to f*** them . . . probably in the [ear]." *Id.* at p. 6 (bracketed information reflects correction appearing on next line of alleged IM; expletive altered).

### D. Discovery Is Necessary To Determine Whether The Misconduct Was Intentional And Whether The Presumption Of Substantial Interference Arises.

Under *Anderson*, the burden of proving that the failure to produce evidence substantially interfered with a party's ability to fully and fairly prepare for trial differs substantially depending on whether the suppression was intentional or accidental. Without knowing whether the failure to produce the leaked IMs was intentional or inadvertent, this Court cannot know whether to apply a presumption of substantial interference against the Facebook Defendants. In *Anderson*, the trial court declined to conduct an analogous inquiry into whether the defendants' failure to produce the water contamination report was intentional suppression. The First Circuit held that "the judge erred in rejecting plaintiffs' motion to inquire", 862 F.2d at 930, and remanded the action, instructing the trial court to "first conduct an evidentiary hearing and determine whether appellee, acting alone or in concert . . . knowingly or intentionally concealed the Report." *Id.* at 932 (internal citation omitted).

Until the Court determines whether the failure to produce IMs was intentional suppression or inadvertent conduct, the Court will not be able to fashion appropriate relief, as

there are a wide range of remedies available under Rule 60 and this Court's inherent powers.  *See*

*Sterski v. Kirzhnev*, 2011 WL 923499 (D. Mass., March 15, 2011) (unpublished) (Court has

inherent power to impose sanctions for bad faith conduct or an attempt to perpetrate a fraud on

the court).  Moreover, until the Founders learn the extent of the suppression and the contents of

*all* of the responsive documents withheld, they cannot know what relief to request.

## IV.    THE DISCOVERY NEEDED TO ESTABLISH WHETHER THE SUPPRESSION WAS INTENTIONAL OR INADVERTENT

Recognizing that motions under Rule 60(b)(3) require "thoughtful consideration of all the

factors involved," *Damiani v. Rhode Island Hospital*, 704 F.2d 12, 17 (1st Cir. 1983), and that the

following information is necessary to identify the extent of and reasons for defendants' failure to

timely produce all responsive documents, the ConnectU Founders seek an Order directing:

1.    That prior counsel of record for the Founders provide the undersigned counsel:

Complete, un-redacted copies of all (a) documents and other tangible things

produced by all parties, including all documents designated confidential, (b)

pleadings (defined in the broadest possible terms to include not only motions,

status reports, and other court filings, but also deposition notices, discovery

requests, discovery responses and other discovery documents), including those

filed under seal and/or designated confidential, (c) deposition transcripts and

exhibits, including those filed under seal and/or designated confidential, and (d)

court transcripts, sealed and unsealed;

2.    That Defendants provide to the undersigned counsel all withheld electronic

communications that are responsive to any discovery requests;

3.    That the documents found by Mr. Parmet and submitted to this Court for *in*

*camera* review be provided to the undersigned counsel, or in the alternative that

this Court review those documents *in camera* to determine which should be turned over to the ConnectU Founders;

4.  That the Parmet protocol be suspended to the extent necessary to allow the undersigned counsel to communicate directly with Jeff Parmet regarding his findings;

5.  That Defendants provide the undersigned counsel and the Court with a list of persons who attended all or part of the January 2006 meeting, whether in person or by telephone;

6.  That Defendants provide the Court with the following documents for *in camera* inspection: all documents and communications of any kind, including but not limited to emails, that mention, refer to, or in any way relate to (a) the January 2006 meeting, or (b) unproduced documents responsive to any discovery requests;

7.  That the ConnectU Founders be permitted to conduct videotaped depositions of Max Kelly and all others involved in all forensic examinations of electronic devices; and

8.  That the Court schedule an evidentiary hearing following the procedure approved in *Anderson*, 862 F.2d at 929, at which the Court questions the Orrick litigation team,[15] counsel for other Facebook Defendants, Mr. Zuckerberg, Mr. Kelly, Mr. Breyer and any other knowledgeable individuals identified by the Court regarding their reported failure to timely produce all responsive documents in discovery.

---

[15] Plaintiffs submit that the following current and former Orrick attorneys should be Ordered to attend and testify at the evidentiary hearing: G. Hopkins Guy, III, I. Neel Chatterjee, Theresa A. Sutton, Monte Cooper, Joshua H. Walker, and Robert D. Nagel.

## V.    CONCLUSION

Under Rule 60 and the First Circuit's decision in *Anderson*, The Founders request that

this Court conduct an inquiry to determine whether Facebook intentionally or inadvertently

failed to timely produce the leaked IMs.   Depending on the results of the inquiry, the Founders

may or may not seek further relief under Rule 60 or this Court's inherent power.   Under

*Anderson*, any request for a remedy is premature.

Dated:  August 19, 2011                  Respectfully submitted,

CAMERON WINKLEVOSS, TYLER WINKLEVOSS and
DIVYA NARENDRA,

By their attorneys,

*/s/ Tyler Meade*
Tyler Meade, Cal. State Bar No. 160838 (*Pro Hac Vice*)
  *tyler@meadeschrag.com*
Michael Schrag, Cal. State Bar No. 185832 (*Pro Hac Vice*)
  *michael@meadeschrag.com*
MEADE & SCHRAG, LLP
1816 Fifth Street
Berkeley, CA  94710
(510) 843-3670
(510) 843-3679 (fax)

### CERTIFICATION PURSUANT TO LOCAL RULE 7.1(a)(2)

I, Tyler Meade, hereby certify that counsel for the Founders, the Facebook Defendants,
and ConnectU have conferred and have attempted in good faith to resolve or narrow the issue
presented herein.

*/s/ Tyler Meade*
Tyler Meade

### CERTIFICATE OF SERVICE

I, Tyler Meade, hereby certify that this document filed through the ECF system will be
sent electronically to the registered participants as identified on the Notice of Electronic Filing
(NEF) and paper copies will be sent to those indicated as nonregistered participants on or before
August 19, 2011.

*/s/ Tyler Meade*
Tyler Meade