UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

PAUL D. CEGLIA,

                    Plaintiff,

v.

MARK ELLIOT ZUCKERBERG, Individually, and
FACEBOOK, INC.

                    Defendants.

Civil Action No. : 1:10-cv-00569-RJA

**DECLARATION OF DEAN BOLAND IN OPPOSITION TO DEFENDANTS' MOTION TO STRIKE ROBERT GIANADDA'S FIRST DECLARATION AND FOR SANCTIONS**

## MEMORANDUM

DEAN BOLAND, submits this declaration and hereby declares under penalty of perjury and pursuant to 28 U.S.C. 1746 and under the laws of the United States that the following is true and correct:

1. I make this declaration upon personal knowledge.

2. I am counsel for Mr. Ceglia in this matter.

3. I had conversation with Robert Gianadda by phone on Wednesday afternoon, November 9, 2011.

4. I introduced myself to him over the phone as Mr. Ceglia's lawyer in the Facebook case.

5. I asked him if he was willing to discuss his observations of the Facebook Contract during his work as the videographer for the Defendants' experts' examination of that document. He responded, "sure, no problem."

6. I asked him if he recalled his involvement in that case. He responded "yes."

7. I asked him if he recalled being at the offices of Harris Beach on July 14, 2011 for the unveiling of the Facebook Contract to Facebook's experts as they were prepared to begin their examination of it. He responded, "yes."

8. I intentionally did not pose any leading questions to Mr. Gianadda.

9. I then asked him, "how did the Facebook Contract appear to you when you first saw it removed from the envelope by Mr. Argentieri?"

10. He responded, as is typed verbatim in Doc. No. 212, his initial declaration, "I did not notice anything out of the ordinary regarding the documents." Doc. No. 212 at ¶16.

11. He then added, unsolicited by me, "[t]hey looked like white documents, eight total white pages." Id at ¶17.

12. Mr. Gianadda authored his entire declaration, Doc. No. 212. I merely typed what he said, verbatim.

13. After the response regarding "eight white pages" I then told him that the Facebook Contract now looks manila envelope yellow on one side. He responded, "No."

14. I asked him what he meant by "no," and he replied, "no, they didn't look that way on the first day, they looked like eight pages."

15. I then asked him if he was willing to sign a declaration to that effect. He said, without hesitation, "yes." Our conversation ended as I told him I would call him the next day when I was back in my office to finalize his

declaration.

16. I called him the next day, Thursday, November 10, 2011 to take dictation from him as to the precise wording of his declaration. At the very beginning of that call, he interrupted me and said, "in the spirit of full disclosure, I want you to know that after I spoke with you, Alex Southwell from Gibson Dunn called me. He wanted to know what you and I talked about. He wanted all the details of our conversation. I felt I should tell him because I am a neutral, disinterested third party."

17. I responded, "that's fine with me. I will even put a line about neutrality that in the declaration if that would make you more comfortable." He responded, "Yes, that would be good."

18. "How do you want that worded?" I asked him. He then gave me the language that appears in paragraph 8 of his declaration, Doc. No. 212 and I typed it into his declaration as he spoke.

19. Before sending him the draft of the declaration, I inquired if he had MS Word to view and edit the document to insure I had typed his words correctly.

20. He told me he was a "mac guy" and used a word processing program called Pages for Mac computers. I also use Mac computers and replied, "Perfect, I will send it to you in Pages so you can make any changes you want." I then told him to send me the signed copy back in pdf format to insure he was comfortable it could not be altered after he signed it.

21. He told me he had to handle some family events and would send me the declaration in about 30 minutes.

22. I called him about two hours later and he said, "I am concerned about sending you this after receiving another phone call from Alex Southwell." I asked why. He re-iterated that he didn't want to be perceived as taking sides and "in my business" he said, "that is important for the future of my professional career here in New York."

23. Mr. Gianadda then asked me to call Mr. Southwell to ask Mr. Southwell's "permission" for Mr. Gianadda to send me the signed declaration.

24. Mr. Gianadda repeated several times throughout this phone call about his belief he had to obtain Mr. Southwell's permission to go any further providing his truthful declaration to me.

25. "I am totally fine signing this as it is, I just want to make sure it is okay with Mr. Southwell," he re-iterated.

26. I told him that I do not speak to Mr. Southwell on the phone that much and that we regularly email each other, therefore, I suggested he email us simultaneously to deliver the declaration to both of us, which he did.

27. To this day, Mr. Gianadda has not contacted me to express any reservation or concern about the truthfulness of his first declaration.

28. The declaration he was provided had the case number, case caption, the name of the court and the title "Declaration of Robert Gianadda." It also contained language, which he read, indicating he was making the

statements therein under the penalties of perjury.

29. After discussing his willingness to provide the declaration, Mr. Gianadda insisted that paragraphs be added attesting to his neutrality. Those paragraphs are verbatim quotes of Mr. Gianadda dictated to me during our phone call.

30. There are no statements made to me by Mr. Gianadda about the coloration of the documents that were omitted from the declaration 212.

31. I have read Mr. Gianadda's altered declaration, Doc. No. 218.

32. The "what I meant" sections appearing in 3 of that document do not reflect any part of the conversations I had with him.

33. Mr. Gianadda did not offer and I did not ask him anything about his recollection of the ink or printed words on any document.

34. I never told Mr. Gianadda that the purpose of obtaining his declaration was "starting a dialogue" with Mr. Southwell.

35. Mr. Gianadda never stated to me anything about the topics involved in Doc. No. 218 at ¶4 except that he was three feet away when he observed the documents on the morning of July 14, 2011.

36. I informed him that I was seeking his declaration as there was currently an issue in this case about when the now obvious yellowing on the Facebook Contract occurred.

37. The declaration draft and final version sent to Mr. Gianadda had the case number, the case caption, and the parties listed at the top as appear in

Document 212.

38. Mr. Gianadda is correct that neither he nor I raised the issue of what might become of his declaration.

39. I had no intention of filing Mr. Gianadda's declaration with the court unless necessary in reply to what was then scheduled responses due by Defendants.

40. After receipt of Mr. Gianadda's signed declaration, I consulted with Mr. Argentieri and Mr. Ceglia regarding the rapidly changing concern expressed by Mr. Gianadda following his conversations with opposing counsel regarding the potential professional effect the truth in this declaration could have on his business.

41. I speculated that the pressure Mr. Gianadda was expressing he was feeling would potentially cause him to decide to alter his statement.

42. Before that pressure steered his statement toward a conclusion more favorable to Defendants, a decision was made to file the declaration as it was also supportive of pending motions.

43. I never applied any pressure on Mr. Gianadda. I have never met Mr. Gianadda in person.

44. I only had two relatively brief phone conversations with Mr. Gianadda before he agreed to sign his declaration.

   I declare under penalty of perjury that the foregoing is true and correct. Executed on this 28th day of November, 2011 at Cleveland, Ohio.

/s/Dean Boland
Dean Boland
Attorney for Plaintiff