UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
PAUL D. CEGLIA, :
:
             Plaintiff, :
:
   v. : Civil Action No. 1:10-cv-00569-
: RJA
MARK ELLIOT ZUCKERBERG and :
FACEBOOK, INC., :
:
             Defendants. :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# DEFENDANTS' OMNIBUS OPPOSITION TO CEGLIA'S SIX MOTIONS

Thomas H. Dupree, Jr.
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
(202) 955-8500

Orin Snyder
Alexander H. Southwell
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue, 47th Floor
New York, NY 10166-0193
(212) 351-4000

Terrance P. Flynn
HARRIS BEACH PLLC
726 Exchange Street
Suite 1000
Buffalo, NY 14210
(716) 200-5120

November 28, 2011

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 3

    I.      THIS COURT SHOULD REJECT CEGLIA'S REQUEST THAT IT VACATE THE EXPEDITED DISCOVERY ORDERS THAT HE CONTINUES TO WILLFULLY AND CONTUMACIOUSLY DEFY. ................ 3

    II.     CEGLIA'S SUGGESTION THAT ZUCKERBERG "SPOLIATED" EMAILS FROM THE HARVARD ACCOUNT IS FRIVOLOUS AND ITSELF SANCTIONABLE. ..................................................................... 5

    III.    CEGLIA SEEKS TO BAR DEFENDANTS FROM PRESENTING THE COURT WITH EVIDENCE DEMONSTRATING THAT THE PURPORTED CONTRACT IS A FAKE. .............................................. 7

    IV.    CEGLIA SEEKS TO BAR DEFENDANTS FROM PRESENTING THIS COURT WITH EVIDENCE DEMONSTRATING THAT HE FABRICATED THE "EMAILS" IN HIS FIRST AMENDED COMPLAINT. ................................................................................................ 9

    V.     CEGLIA BAKED THE PURPORTED CONTRACT. ....................................... 10

    VI.    CEGLIA'S NEWLY-HATCHED "FINGERPRINT" CLAIM IS MERITLESS. ............................................................................................... 15

CONCLUSION .............................................................................................................. 17

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Faulkner v. Arista Records LLC,
  No. 07 Civ. 2318 (LAP), 2011 WL 2135082 (S.D.N.Y. May 26, 2011) .................................. 8

**Statutes**

28 U.S.C. § 1927 ................................................................................................................. 3

**Other Authorities**

Jennifer Preston, *House Leaders Plan Facebook Hackathon*, N.Y. Times (Nov. 17, 2011) ......... 6

**DEFENDANTS' BRIEF IN OPPOSITION**

Defendants Mark Zuckerberg and Facebook, Inc. respectfully submit this omnibus opposition to Plaintiff Paul Ceglia's six motions addressing various aspects of the expedited discovery ordered by this Court.

**INTRODUCTION**

By filing six motions containing arguments so frivolous that they border on the absurd, Paul Ceglia leaves no doubt that he has entered — in the words of his newest lawyer — a "reality distortion field."  Doc. No. 202 at 3.

Having been caught tampering with and destroying critical evidence, Ceglia now accuses Defendants of spoliation.  Having been caught baking the fake contract in an attempt to give it an "aged" appearance and prevent ink dating, he now insists that Defendants are responsible.  And having repeatedly been found in violation of this Court's expedited discovery orders, he now has the audacity to demand that this Court vacate the very orders he continues to defy.

The obvious purpose of Ceglia's flurry of filings is twofold.  First, he seeks to conceal the indisputable and overwhelming evidence of his fraud and misconduct through a barrage of meritless motions that no reasonable lawyer would have signed.  Every time Ceglia gets caught red-handed committing some new act of litigation fraud, he files a new motion asking this Court to suspend reality and believe that day is night, that up is down, and that <u>Defendants</u> are the ones responsible for his criminal misconduct and wrongdoing.  The fact that he waited for months, and then filed a frivolous request for a temporary restraining order on the eve of Thanksgiving is proof positive that Ceglia's barrage of motions is intended to harass Defendants and drive up litigation costs in hopes of extorting a settlement.

Second, Ceglia is desperate to portray this as a case of dueling experts, when in fact the irrefutable evidence leaves no room for debate: the "Work for Hire" agreement attached to his

1

First Amended Complaint is a forgery. Indeed, the fact that Ceglia has been abandoned by his initial slate of purported experts and has been reduced to retaining one "expert" (James A. Blanco) who was expelled from the American Academy of Forensic Scientists for wrongdoing and ethical violations, and another (Larry Stewart) who was actually indicted and prosecuted by the United States Department of Justice for perjury in the course of offering expert testimony, is a clear indicator that Ceglia has now hit rock bottom.

As this Court directed, Defendants will present their experts' findings and move to dismiss this fraudulent lawsuit once Ceglia has complied with the expedited discovery orders. In the meantime, this Court should summarily deny Ceglia's pending motions:

- Ceglia's motion to vacate the expedited discovery orders (Doc. No. 202) should be denied because Ceglia still has not fully complied with them, and because cancelling expedited discovery before it is complete would reward Ceglia for his ongoing, contumacious defiance of this Court's orders.

- Ceglia's motion for sanctions based on the purported "spoliation" of emails from Zuckerberg's Harvard account (Doc. No. 199) should be denied because no emails were deleted from the Harvard account.

- Ceglia's motion to prohibit Defendants from mentioning the authentic contract found on Ceglia's own computer (Doc. No. 228) should be denied because he has already represented that he emailed this document to Jim Kole — a document that constitutes incontrovertible proof that the purported "Work for Hire" agreement attached to the First Amended Complaint is a fake and Ceglia's entire lawsuit is a lie.

- Ceglia's motion to prohibit Defendants from mentioning his fake emails in their forthcoming motion to dismiss (Doc. No. 224) should be denied because evidence of Ceglia's fraud is highly relevant to this Court's determination as to whether this lawsuit may proceed.

- Ceglia's motion for sanctions based on the purported "spoliation" of the fabricated contract through exposure to UV light (Doc. No. 189) should be denied because there is conclusive and indisputable proof that Ceglia and/or others working in concert with him "baked" the document, thereby fading the ink and giving the pages an odd discoloration, <u>before</u> it was produced to Defendants' experts for inspection.

- Ceglia's motion for sanctions based on the purported "spoliation" of the fabricated contract caused by handling without gloves (Doc. No. 214) should be denied because Ceglia's lawyers and experts never suggested there might be relevant fingerprint evidence on the document and in fact handled it repeatedly themselves without gloves during the examination.

In light of the fact that Ceglia has filed <u>six</u> frivolous motions for sanctions or other relief within a very short time period, as well as a patently baseless request for a temporary restraining order on Thanksgiving — <u>none</u> of which has a colorable factual or legal basis, and <u>all</u> of which appear intended solely to harass Defendants — this Court would be well within its discretion to issue an order under 28 U.S.C. § 1927. That section empowers district courts to award attorneys' fees and other relief against any party — or lawyer — who "multiplies the proceedings in any case unreasonably and vexatiously" by filing a series of vexatious and meritless motions as Ceglia has done here.

## ARGUMENT

**I.  THIS COURT SHOULD REJECT CEGLIA'S REQUEST THAT IT VACATE THE EXPEDITED DISCOVERY ORDERS THAT HE CONTINUES TO WILLFULLY AND CONTUMACIOUSLY DEFY.**

This Court granted expedited discovery on July 1, 2011, based on Defendants' showing that Ceglia had fabricated the Work for Hire agreement and the purported emails, and was perpetrating a fraud on the Court. Doc. No. 83. Even at that time, Defendants had overwhelming evidence of litigation fraud. The expedited discovery this Court ordered has

3

uncovered even <u>more</u> evidence of Ceglia's fraud.  Among other things, Defendants' experts found a copy of the <u>authentic</u> contract on Ceglia's own computer.  And when they were finally permitted to examine the bogus contract, they discovered that Ceglia had <u>baked</u> the document as part of an unsuccessful attempt to give the document an aged appearance and prevent Defendants from dating the ink.

As this Court is well aware, Ceglia has obstructed and refused to comply with this Court's orders.  He filed numerous bad-faith requests for stays, extensions, and reconsideration, Doc. Nos. 116, 120, 126, 134, 164, and tried to conceal dozens of documents based on frivolous assertions of privilege.  Doc. Nos. 107, 156-2, 156-4, 208.  And when those obstructionist efforts failed, he simply defied this Court rather than comply.  This Court has <u>repeatedly</u> found that Ceglia violated not only the initial July 1 order, but also the <u>subsequent</u> orders that were aimed at enforcing his compliance with the July 1 order.  *See* Doc. Nos. 117, 208 (orders on motions to compel).  There is no question that Ceglia's continued and ongoing violation of court orders is willful and deliberate.  His attorneys swore under oath that Ceglia had expressly directed them to disobey this Court's orders, Doc. Nos. 153-1, 153-2, and then promptly withdrew from the case.

To this day, Ceglia <u>still</u> has not fully complied with the discovery ordered by this Court, as this Court recognized in its most recent order.  Doc. No. 208.  Ceglia now has the audacity to ask the Court to vacate the very orders that he is willfully and contumaciously defying.  This Court should summarily reject this outrageous request.  Cancelling expedited discovery before it is complete would reward Ceglia for his cynical and contumacious misconduct.

Ceglia mistakenly argues that the "findings" of <u>his own</u> experts preclude the need for expedited discovery.  Doc. No. 202 at 8.  The fact that Ceglia has retained several publicly discredited, self-styled "experts" to report that they see no evidence of fraud does not obviate the

4

need for expedited discovery. As this Court explained in issuing its July 1 order, Defendants will submit their expert reports <u>once expedited discovery is complete</u>. Because Ceglia has not produced the discovery ordered by this Court — and indeed has been obstructing and stonewalling discovery from the moment the Court first ruled — there is absolutely no reason for this Court to vacate its orders.

## II. CEGLIA'S SUGGESTION THAT ZUCKERBERG "SPOLIATED" EMAILS FROM THE HARVARD ACCOUNT IS FRIVOLOUS AND ITSELF SANCTIONABLE.

Ceglia and his lawyers could not possibly have filed Document No. 199 in good faith. They contend that Mark Zuckerberg deleted emails from his Harvard account. The basis for this claim is their false assertion that Defendants' computer forensics expert, Bryan Rose, "discovered that emails present in Defendant Zuckerberg's Harvard email account in October 2010 had been deleted between that time and April 2011." Doc. No. 199 at 3.

Rose said no such thing. As he explained in his declaration filed on June 24, 2011 (Doc. No. 73), what Ceglia falsely portrays as "deleted" emails is simply the result of the ordinary de-duplication process. There are no "missing" or "deleted" emails. As Rose explained more than five months ago, Stroz Friedberg initially identified 17 emails that were present in the Harvard account as of October 2010, but did not appear to be present as of April 2011. *Id*., ¶ 4. This comparison was conducted using an automated de-duplication process. *Id*. When Rose further examined those 17 emails, he confirmed that <u>all 17 are in fact present</u> in the April 2011 version of the account. *Id*., ¶ 5. He explained:

> The reason that the 17 emails appeared to be present only in the October 2010 [version] was a result of minor formatting differences and technical

5

> issues. For example, some of the emails had extra white space in the Subject line.
>
> In summary, every email in the October 2010 [version] is present in the April 2011 [version]. <u>No email from the October 2010 [version] has been deleted or lost</u>.

*Id.*, ¶ 5-6 (emphasis added). Ceglia simply ignores what Rose actually said and bases his entire motion on the completely false premise that Rose discovered that emails had been deleted from the Harvard account. This is not the first time that Ceglia has advanced this bankrupt theory. On July 1, 2011, in denying Ceglia's request for expedited discovery, this Court already rejected Ceglia's claim that Rose "admitted" that emails were deleted from the Harvard account. *See* Docs. No. 58 (Ceglia brief raising this claim); 83 (order denying Ceglia motion). The fact that Ceglia is recycling frivolous, previously-rejected arguments confirms that this motion was not filed in good faith.

Ceglia's brief takes a bizarre detour when it argues that sanctions are warranted based on Facebook's "corporate philosophy" of "hacking." Doc. No. 199 at 11-14. But as the *New York Times* has recently explained, in the context of Facebook's "Hackathon" event, "[h]ackathon is a term used to describe an event where programmers come together to build applications in a collaborative process." *See* Jennifer Preston, *House Leaders Plan Facebook Hackathon*, N.Y. Times (Nov. 17, 2011), available at http://thecaucus.blogs.nytimes.com/2011/11/17/house-leaders-plan-facebook-hackathon/. There is nothing remotely sinister about Facebook's "hacker" ethos, which simply prizes creativity and outside-the-box thinking.

6


### III. CEGLIA SEEKS TO BAR DEFENDANTS FROM PRESENTING THE COURT WITH EVIDENCE DEMONSTRATING THAT THE PURPORTED CONTRACT IS A FAKE.

As this Court is well aware, Defendants discovered the authentic contract on Ceglia's own computer. Precisely as Mark Zuckerberg described it in his declaration, Doc. No. 46, the agreement *only* concerns the terms under which Zuckerberg provided limited work for the failed website StreetFax. It says *nothing* about Facebook, the "Page Book," or any sort of social networking website.

Based on their examination of Ceglia's computers, Defendants also discovered that Ceglia had emailed the authentic contract on March 3, 2004 to Jim Kole, an attorney at the international law firm of Sidley Austin, who was an initial member of StreetFax. The email was sent from the ceglia@adelphia.net email account and the Subject line read "Streetfax contract w mark." In the cover note, Ceglia wrote: "Hi Jim, Hope all is well, I am at 727 490 5751 when your ready. Ill send page two next I should be here for the next hour. Paul." *See* Ex. A to Southwell Decl.; Southwell Decl. at ¶ 11. Ceglia's 2004 emails to Kole and the authentic contract are also stored on the server at the Sidley Austin law firm. The authentic contract and corroborating transmittal emails are irrefutable proof that the "Work for Hire" agreement attached to Ceglia's First Amended Complaint is a fake.

Ceglia now says that the authentic contact and his emails transmitting the contract are actually forgeries that were created by Mark Zuckerberg in 2004. But when Stroz Friedberg originally discovered the authentic contract and the transmittal emails on Ceglia's computers, Ceglia did *not* claim that they were forgeries. Quite the contrary, he claimed that they were attorney-client privileged communications Ceglia sent to his lawyer, describing them on his August 2nd privilege log as emails "from Paul Ceglia to his attorney Jim Kole, Esq." Ex. B to Southwell Decl; *see also* Southwell Decl. at ¶ 13. Ceglia thus represented to this Court that the

7

very communications he now swears under oath to have never seen before, Doc. No. 220, were in fact emails he sent to Mr. Kole seeking legal advice. Only when this Court overruled Ceglia's attempt to conceal these documents through a frivolous privilege claim, and ordered him to produce them, did Ceglia do an about-face and start arguing that they were forgeries that had been planted on his computer.

The fact that these documents from 2004 were found on Ceglia's <u>own computer</u> — as well as on the Sidley Austin server — coupled with Ceglia's attempts to conceal them with frivolous assertions of privilege, is overwhelming proof that these documents are genuine. Ceglia's attempt to explain away these documents is preposterous. According to Ceglia, in 2004 Mark Zuckerberg (then a sophomore at Harvard) foresaw this lawsuit filed in 2010 and set to work creating a fabricated StreetFax agreement that deleted all references to Facebook. Zuckerberg then discovered that Ceglia's father had an Adelphia email account, somehow obtained the password to that account and accessed it, and emailed the fabricated document to the Sidley Austin lawyer, pretending that he was Ceglia and asking the lawyer to call him back. Ceglia's crazy theory underscores his desperation and leaves no doubt that he and his lawyers are willing to say things they know are not true if they think it gives them a chance to avoid dismissal and sanctions.

Ceglia's request that this Court ignore the authentic contract found on his <u>own</u> computer — and his own emails transmitting the contract and describing it as the "Streetfax contract w mark" — should be summarily denied. *See, e.g.*, *Faulkner v. Arista Records LLC*, No. 07 Civ. 2318 (LAP), 2011 WL 2135082, at *3 (S.D.N.Y. May 26, 2011) (holding that Plaintiffs' motion to strike on authenticity grounds certain documents that were produced by Plaintiffs "teeters on the edge of sanctionable" and is "meritless"). The suggestion that these are "unauthenticated"

8

documents is baseless: they were found on Ceglia's own computer and have been residing on the Sidley Austin server for years. Ceglia's empty claim in his declaration that he has never seen these documents before provides no basis for excluding the authentic contract and corroborating emails from this case.

### IV. CEGLIA SEEKS TO BAR DEFENDANTS FROM PRESENTING THIS COURT WITH EVIDENCE DEMONSTRATING THAT HE FABRICATED THE "EMAILS" IN HIS FIRST AMENDED COMPLAINT.

Ceglia also seeks to muzzle Defendants from stating the truth in their forthcoming motion to dismiss — that Ceglia fabricated the "emails" he included in his First Amended Complaint — and from presenting this Court with the evidence establishing his fraud. Doc. No. 224. This is yet another frivolous request that should be summarily denied. Indeed, the fact that Ceglia is basing this lawsuit on fake emails is <u>highly</u> relevant to the question whether this case should be dismissed, and will be one of the many reasons supporting Defendants' forthcoming motion to dismiss. Ceglia's attempt to prevent this Court from even <u>considering</u> this issue — or seeing the evidence that Defendants have gathered during expedited discovery — is a telling acknowledgment that he knows he has been caught in a fraud.

At this point, there can be no reasonable argument that the "emails" Ceglia purported to reproduce in this First Amended Complaint are genuine. They are obvious fakes. Ceglia himself admits that he does not have any emails. Rather, he claims that he has some floppy disks with word processing documents that contain text that says he cut-and-pasted from emails with Zuckerberg. This is the stuff of late-night comedy; it is not even remotely plausible.

If there were any possible doubt on this score, the fact that Zuckerberg's Harvard account does not contain <u>a single one</u> of Ceglia's purported emails confirms that they are fakes. *See* June 2, 2011 Rose Decl. (Doc. No. 47) at ¶ 7. In fact, the genuine emails that were found on the

9

server contain dozens of exchanges between Zuckerberg, Ceglia and others concerning the Streetfax project. *Id.*, ¶ 8. Not a single email with Ceglia or his associates mentions Facebook or any type of social networking website. *Id.*

Ceglia discusses at length the "findings" of his "expert" Jerry Grant. Doc. No. 224 at 5. But Grant is very careful to avoid saying that the purported emails described in the First Amended Complaint are authentic; indeed, he does not even say that the two floppy disks he analyzed have anything to do with the purported emails. Doc. No. 226 at ¶ 10. Rather, all he is willing to say is that he conducted some tests on the disks themselves, none of which could confirm Ceglia's fraud. *See id.*, ¶ 11.

Ceglia also challenges statements from the declaration of Defendants' expert Bryan Rose concerning the emails found on the Harvard server. Doc. No. 224 at 12-19. These arguments, however, are both misplaced and premature. As this Court directed, the expedited discovery phase is to focus on the authenticity of <u>Ceglia's</u> purported emails (as well as the alleged Work for Hire agreement). To the extent Ceglia wishes to challenge the findings of Defendants' experts concerning the <u>genuine</u> emails they found on the Harvard server, the proper time to do that would be once the expedited discovery phase is complete and Defendants have produced the genuine Harvard emails, if this case is still ongoing at that point. Ceglia's motion is a transparent and improper attempt to frustrate the expedited discovery schedule ordered by this Court, under which Defendants will first examine Ceglia's production, submit their expert reports, and move to dismiss this fraudulent lawsuit.

### V.    CEGLIA BAKED THE PURPORTED CONTRACT.

The first time that Defendants or their experts saw the original version of Ceglia's alleged "Work for Hire" agreement was when Paul Argentieri removed it from a U.S. Postal Service

10

envelope at the offices of Harris Beach in Buffalo, New York at 9:11 a.m. on July 14, 2011. At that moment, it was evident that someone had tampered with the document: the ink was faded and the pages had an off-white or ivory tinge.

The Work for Hire agreement looked very different in January 2011. As a result of this Court's expedited discovery orders, Defendants have obtained the images of the document that Ceglia's experts took in January 2011. In those images, the ink on the document was <u>dark</u> and the pages did <u>not</u> have an off-white or ivory tinge. *See* Aginsky Decl. at ¶ 6, 8 (Doc. No. 66). Indeed, Ceglia's own expert described the ink as "black ballpoint ink" in his June 16, 2011 declaration. *Id.* at ¶ 6. But the Work for Hire agreement that Argentieri removed from the envelope on July 14 was remarkably different. The faded ink and odd discoloration of the paper indicate that, at some point between January and July 14 — a time period during which the document was exclusively in the possession of Ceglia and his lawyers — someone attempted to artificially "age" the document and prevent testing of the ink by "baking" it. As Ceglia himself admits, the Work for Hire agreement "now appears as if someone altered it." Doc. No. 199 at 8.

In light of the indisputable fact that the appearance of the document has been altered while in his possession, Ceglia's last, desperate recourse is to insist that Defendants' experts are responsible for the change. According to Ceglia, Defendants' experts faded the ink and discolored the document by subjecting it to ultraviolet light over the course of their examination. This claim is demonstrably false and could not have been made in good faith.

<u>Before</u> Defendants' experts began analyzing the Work for Hire agreement, they imaged it so as to memorialize how the document appeared before their inspection began. Those images indisputably show that the ink was <u>already</u> faded and the document <u>already</u> had an off-white or ivory tinge when Mr. Argentieri removed it from his envelope. Presented below is a comparison

of how the document looked (a) in January 2011 and (b) seven minutes after Argentieri removed it from the envelope on July 14, <u>before</u> Defendants' experts began their examination:



In fact, the videographer Robert Gianadda has stated under oath that "the documents Mr. Argentieri removed from the envelopes on the morning of July 14th did not change color at all from the moment Mr. Argentieri removed them to the last day of inspection on August 27th, based on the video of the inspection." Doc. No. 218 at ¶ 4. As this Court is aware, Ceglia's counsel Dean Boland tricked Mr. Gianadda and corruptly procured a declaration that Boland had misleadingly drafted so as to convey a false impression to this Court that the document had changed in appearance over the course of Defendants' examination — the precise <u>opposite</u> of what Gianadda had actually told Boland. *Id.*, ¶ 9 ("I now feel like I was misled by Mr. Boland. I do not consider Mr. Boland to have been candid or forthright with me.").[1]

---

[1] This misconduct required Defendants to file a Motion to Strike and for Sanctions on November 15, 2011 (Doc. No. 216).

12

Likewise, the accompanying declarations from Defendants' experts Peter Tytell, Gus Lesnevich, and Gerald LaPorte also confirm that the Work for Hire agreement was already discolored and the ink was already faded when it was first presented to them by Mr. Argentieri, prior to any testing.  *See* Tytell Decl. at ¶ 19-23; Lesnevich Decl. at ¶ 10; LaPorte Decl. at ¶ 8-9.

Ceglia argues that the video of the inspection depicts the Work for Hire agreement "as two white pieces of paper."  Doc. No. 189 at 7.  But the low-resolution video simply cannot capture the faded ink.  Indeed, at certain points on the video as the light in the room hits the document in a certain way, the document becomes so "white" that the text actually disappears.  Nor is the video capable of capturing precise shades of color, such as the difference between a "white" document and a "white" document with a yellowish or off-white tinge.  Colors on this type of low-resolution video can vary significantly depending on whether the room is illuminated with natural or artificial light, the white/dark balance on the camera, changes in camera focus and aperture, and a host of other factors.  *See* Tytell Decl. at ¶ 34.

Ceglia also relies heavily on the self-serving claims of Paul Argentieri that someone other than himself or his client must have tampered with the Work for Hire agreement.  But even if this Court were willing to take Argentieri at his word, the fact that his declaration contains numerous obvious inaccuracies — such as his repeated statements under oath that he carried the purported contract and spec sheet in a "FEDEX envelope" when the video shows him removing the documents from a U.S. Postal Service envelope (*see* Tytell Decl. at ¶ 14 and n.1) — provide even less reason to trust his powers of observation and to credit his self-serving claims about the shadings of documents and the like.

In any event, the question before this Court is <u>when</u> the document's appearance changed, and the images reproduced above that were captured before Defendants' testing began —

13

coupled with Gianadda's, Tytell's, Lesnevich's and LaPorte's uniform testimony that the color of the document did not change over the course of Defendants' experts' examination — confirm that the document's appearance had changed before Argentieri produced it on July 14th.  These facts render irrelevant Ceglia's lengthy speculation of how the examination methods used by Defendants' experts supposedly caused the yellowing of the document.  Doc. 189 at 12-14.  Nonetheless, Ceglia is mistaken on numerous grounds.  While he speculates that Defendants' experts damaged the Work for Hire agreement by exposing it to ultraviolet light, the truth is that the equipment the Defendants' experts used is not destructive and did not discolor the document.  See Tytell Decl. at ¶ 26-27; LaPorte Decl. at ¶ 12.  In fact, Ceglia's own expert, Valery Aginsky, subjected the Work for Hire agreement to testing with ultraviolet light, see Aginsky Decl. (Doc. 66) ¶ 5; another of Ceglia's experts advertises ultraviolet testing as "nondestructive" on his website, see Tytell Decl. at ¶ 26(g); and ultraviolet testing is widely recognized throughout the professional literature as both nondestructive and necessary to determining the authenticity of a paper document.  See Tytell Decl. at ¶ 26.  Ceglia's claims as to VSC and ESDA testing conducted by Defendants' experts are equally mistaken.  All of those tests are standard within the profession and none of them changed the appearance of the ink or the color of the pages.  See Tytell Decl. at ¶ 40; LaPorte Decl. at ¶ 11.

      Finally, Ceglia devotes pages of his brief — under the delusional header "THE AUTHENTICITY OF THE FACEBOOK CONTRACT HAS BEEN ESTABLISHED" — to explicating the theories of his publicly-discredited "experts" Larry Stewart and James Blanco.  But neither Stewart nor Blanco is willing to state, under oath, that the Work for Hire agreement is authentic and not a forgery.  And while both Stewart and Blanco try to create the impression that Ceglia did not bake the document, neither "expert" has any response to the fact that the

14

image of the Work for Hire agreement captured in January 2011 differs radically from the image of the altered document captured the morning of July 14th, seven minutes after Argentieri removed it from the envelope and <u>before</u> Defendants' testing began. In any event, Stewart's and Blanco's "preliminary findings" are incomplete, inaccurate, and at times incoherent, and Defendants will submit their own expert reports at the time directed by this Court — once Ceglia has finally and fully complied with this Court's expedited discovery orders.

## VI. CEGLIA'S NEWLY-HATCHED "FINGERPRINT" CLAIM IS MERITLESS.

Ceglia argues that Defendants' experts "spoliated" the alleged Work for Hire agreement when they touched it without gloves at several points during the course of their examination. Doc. No. 214. Like the purported contract itself, the feigned shock and outrage in Ceglia's brief are manufactured. His arguments are entirely without merit and should be rejected.

First and foremost, neither Ceglia nor his many lawyers and purported experts ever — at any point in this litigation — stated or even hinted that Plaintiff contemplated the possibility of testing the hard-copy documents for fingerprints, let alone that Plaintiff intended to do so. Although Ceglia has put forth a group of publicly-discredited "experts" to opine on many physical aspects of the document such as paper, ink, indentations, etc., he has never before suggested that the documents might contain fingerprints relevant to the question of authenticity or his claims. *See* Southwell Decl. at ¶ 7.

When the examination began, no one on Ceglia's team suggested that gloves were necessary. As the examination proceeded over the course of several days in the presence of lawyers and experts from both sides, no one on Ceglia's team suggested that gloves were necessary. And when the examination concluded, no one on Ceglia's team suggested that gloves had been necessary. *See id.*, ¶ 8.

15

Not only did Ceglia's lawyers and experts fail to advise Defendants' experts to wear gloves, <u>they handled the documents themselves without gloves</u>. For example, Ceglia's expert Blanco touched the documents approximately eight different times on a single day, including one instance where he rubbed the documents on his arm. Lesnevich Decl. at ¶ 16. Even Argentieri touched the documents with his bare hands. *Id.*

For Ceglia's newest lawyer — who was not present at any of these examinations — to assert months later that he is "shocked" that the experts did not use gloves is misplaced and cynical in the extreme. The statement on page 2 of his motion — that "[i]t is especially egregious that the other experts in the room did not immediately stop that expert from handling the [document] in a way that undoubtedly contaminated it" — is particularly cynical, given that he is speaking of Ceglia's <u>own</u> experts (not to mention his co-counsel Argentieri), all of whom were present throughout and several of whom handled the documents themselves without gloves. If Ceglia's newest lawyer now believes that there may have been relevant fingerprint evidence on the documents, he has only Mr. Argentieri and Ceglia's many purported experts to blame for failing to mention this concern at any point in the history of this litigation, or to request that it be addressed in the hard-copy inspection protocol that both sides negotiated and agreed upon. *See* Doc. No. 84.[2]

---

[2] Ceglia suggests in passing, Doc. No. 214 at 3, that Defendants' experts harmed the purported contract when they placed it on top of a computer that had been turned on and "generating heat." To test this theory, Defendants turned on the same computer and left it running for 240 hours with a thermometer sensor on top. During the entire course of this controlled test, the temperature of the computer top never varied more than approximately one degree from the room temperature. *See* Lesnevich Decl. at ¶ 18. No serious lawyer would have suggested that the purported contract was baked and yellowed through this process.

## CONCLUSION

For the foregoing reasons, this Court should deny Ceglia's six motions in their entirety.

Dated:    New York, New York
          November 28, 2011

                                        Respectfully submitted,

                                        /s/ Orin Snyder
Thomas H. Dupree, Jr.                   Orin Snyder
GIBSON, DUNN & CRUTCHER LLP             Alexander H. Southwell
1050 Connecticut Avenue, NW             Matthew J. Benjamin
Washington, DC 20036                    Amanda M. Aycock
(202) 955-8500                          GIBSON, DUNN & CRUTCHER LLP
                                        200 Park Avenue, 47th Floor
                                        New York, NY 10166-0193
Terrance P. Flynn                       (212) 351-4000
HARRIS BEACH PLLC
726 Exchange Street
Suite 1000
Buffalo, NY 14210
(716) 200-5120

*Attorneys for Defendants Mark Zuckerberg and Facebook, Inc.*

17