UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
PAUL D. CEGLIA,  :
  :
        Plaintiff,  :  Civil Action
  :  No. 1:10-cv-00569-RJA
  v.  :
  :  **DECLARATION OF**
MARK ELLIOT ZUCKERBERG and  :  **PETER V. TYTELL**
FACEBOOK, INC.,  :
  :
        Defendants.  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

    I, Peter V. Tytell, am competent to testify to the matters set forth herein and make this declaration of my own personal knowledge and belief.

1. I respectfully submit this declaration in Support of Defendants' Omnibus Opposition to Ceglia's Six Motions.

2. I am a forensic document examiner practicing in New York City. For over 40 years I have worked on document cases submitted by courts, prosecutors, public defenders, law firms, government crime laboratories, private individuals, banks, and insurance companies both within and outside the United States. I have studied, lectured, taught, and been consulted as an expert in all areas of document examination, including, *inter alia*, the authentication of genuine documents and the detection of falsely made or altered documents, as well as methodological issues in forensic document examination.

3. I am a diplomate of the American Board of Forensic Document Examiners (US), a diplomate of the Forensic Science Society (UK), holding the Society's Diploma in Document Examination as a qualified specialist in forensic document examination; and am a member of the American Academy of Forensic Sciences (Questioned Document section), the American Society for Testing and Materials

– 2 –

(Committee on Forensic Sciences Membership Secretary, Past-Chairman and currently Vice-Chairman of the Sub-Committee on Questioned Documents, and recipient of the ASTM Forensic Sciences Award), the American Society of Questioned Document Examiners, the Evidence Photographers International Council, and have participated in meetings of these and other learned organizations in North America and Europe.

4. I am also an active participant in the work of the Scientific Working Group for Documents (SWGDOC) and was a founding member of the editorial board of the *International Journal of Forensic Document Examiners*. I have been recognized as an expert witness on numerous occasions in State and Federal Courts in the United States as well as in the courts of other countries. A true and correct copy of my full professional resume is attached hereto as Exhibit A.

5. I participated in the Court-ordered Hard-Copy Document Inspection in the above-captioned matter on July 14 and 15, 2011, at the offices of Harris Beach in Buffalo, New York.

6. This declaration sets forth certain observations made during my examination of documents on July 14 and 15, 2011.

7. This declaration also includes comments on certain statements in Plaintiff's Memorandum in Support of Motion for Sanctions Against Defendants Facebook and Zuckerberg for Spoliation of Evidence, supporting declarations, and related filings (Docs. 188–194, filed 11/01/11).

8. This declaration is not a report of the results of my examinations. A report of the results of those examinations will be submitted to the Court when appropriate.

9. I was present on July 14, 2011 at the offices of Harris Beach in Buffalo, New York, when Paul Argentieri, attorney for Plaintiff, first presented to Defendants

for inspection the two-page document headed *"WORK FOR HIRE" CONTRACT*, dated April 28, 2003 (the "Work for Hire document") and a six-page document headed *StreetFax Back-End Technical Specification*, dated April 28, 2003 (the "Specification document"). I examined these documents on July 14 and 15, 2011.

10. Prior to July 14, 2011, I had reviewed images of the Work for Hire document, including those images attached to the Amended Complaint, Ex. A (Doc. 39-1, filed 04/11/11); to the declaration of John Paul Osborn, dated 6/16/11 (Doc. 62, filed 6/17/11); and to the declaration of Valery N. Aginsky, Ph.D., dated 6/16/11 (Doc. 66, filed 6/17/11).

11. I have subsequently reviewed the video made of the examinations conducted on July 14 and 15, 2011, as well as portions of the video made of examinations conducted on July 16, July 19, July 25, and August 27, 2011 (the "Video").

12. I have also reviewed the following filings in this matter:
    - Plaintiff's Notice of Motion for Sanctions for Spoliation of the Facebook Contract by Defendants (Doc. 188, filed 11/01/11);
    - Plaintiff's Memorandum in Support of Motion for Sanctions Against Defendants Facebook and Zuckerberg for Spoliation of Evidence (Doc. 189, filed 11/01/11) (the "Plaintiff's Memo"), along with the attached Ex. A (Doc. 190) and Ex. B (Doc. 191);
    - the declaration of Larry F. Stewart, dated 11/1/11 (Doc. 192, filed 11/01/11);
    - the declaration of Paul Argentieri, dated 11/1/11 (Doc. 193, filed 11/01/11);
    - the declaration of James A. Blanco, dated 10/31/11 (Doc. 194, filed 11/01/11); and
    - the declaration of Dean Boland, dated 11/1/11 (Doc. 195, filed 11/01/11).

13. I have also reviewed a number of images which I have been informed were received from Plaintiff as part of discovery production, including images supplied by Dr. Valery N. Aginsky, and Messrs. Paul Argentieri, James A. Blanco, Kevin Cross, John Paul Osborn, Eric Speckin, and Larry F. Stewart.

14. At 9:11 AM on the morning of July 14, 2011, in a conference room at the offices of Harris Beach, Mr. Argentieri removed the Work for Hire document from a United States Postal Service (USPS) Priority Mail envelope and placed the two pages on the conference table.  Mr. Argentieri then removed the Specification document from another USPS Priority Mail envelope and placed it on the conference table. [1]

15. As soon as I saw the documents that Mr. Argentieri had placed on the table, I was extremely surprised by the appearance of the Work for Hire document.

16. I did not announce my observations of the questioned document in the presence of opposing counsel.

17. The Work for Hire document did not look like an eight-year old document that had been kept under normal storage conditions.

18. The Work for Hire document did not appear as I had anticipated based upon my review of both the declaration of Plaintiff's ink expert Dr. Aginsky, dated June 16, 2011 and the images of the Work for Hire document that Plaintiff had previously submitted to the Court.

19. Most surprising to me, and immediately noticeable, was the appearance of the writing ink on the document.

---

[1] In his declaration Mr. Argentieri states that he had the Work for Hire document "in a cardboard FEDEX envelope" and the Specification document "in a separate FedEx envelope" (Argentieri decl. at ¶4).  However, I remember—and the Video confirms—that Mr. Argentieri took the respective documents from USPS Priority Mail envelopes.

20. Because Dr. Aginsky stated in his June 16 Declaration that the writing ink on both page 1 and page 2 of the Work for Hire document was "black ballpoint ink" (Aginsky decl. at ¶6), and because of the appearance of the writing in Plaintiff's previously-filed images of the document, I had anticipated seeing black ballpoint ink of normal density.

21. The ink that I saw on the Work for Hire document on the morning of July 14 was neither black nor of normal density.

22. I observed that the ink on both pages of the Work for Hire document was light tan or faded brown, not at all the sort of appearance that I would expect for black ballpoint ink after eight years of normal storage.

23. After the initial surprise of the condition of the ink on the Work for Hire document, later in my examinations I noted that not only was the ink discolored, but also the paper of the face of each page was discolored. The front of each page had an off-white or ivory cast, while the reverse of each page was a relatively brighter white.

24. As is my practice, before I conducted further examination—indeed, even before I left the room to provide Defendants' counsel with my initial impressions—I took high-resolution scans (600 dpi) of the front and reverse of each page of the Work for Hire document. The taking of these initial scans can be seen on the Video of the inspection, beginning with the front of page 1 at Video 09:15:27 and concluding with the reverse of page 2 at Video 09:25:32. My observations described above—the faded, tan-colored ink and the off-white coloration of the front of the paper—are documented in these initial scans of the Work for Hire document.

25. True and correct copies of these initial scans are attached hereto as Exhibit B.

26. As part of my examinations, I viewed the Work for Hire document under long-wave ultraviolet illumination.

    a. Examination under ultraviolet illumination is considered non-destructive and is standard practice in forensic document examination.

    b. The American Society for Testing and Materials ("ASTM") publishes consensus standards in the field of forensic document examination commonly relied upon by forensic document examiners. The ASTM standards, some of which are specifically referenced below, state that ultraviolet examination should be used in the examination of a questioned document.

    c. ASTM E2331 *Standard Guide for Examination of Altered Documents* refers to ultraviolet illumination, infrared, and infrared luminescence as non-destructive methods. A true and correct copy of this Standard is attached hereto as Exhibit C.

    d. ASTM E2325 *Standard Guide for Non-destructive Examination of Paper* also characterizes ultraviolet illumination, as well as infrared and infrared luminescence as non-destructive methods for the examination of paper. A true and correct copy of this Standard is attached hereto as Exhibit D.

    e. ASTM E1422 *Standard Guide for Test Methods for Forensic Writing Ink Comparison* also characterizes ultraviolet examination as a non-destructive optical examination. A true and correct copy of this Standard is attached hereto as Exhibit E.

    f. Plaintiff's own expert Dr. Aginsky acknowledged that ultraviolet and infrared examinations are non-destructive in his June 16 declaration. Aginsky Decl. at ¶5.

    g. Plaintiff's own expert Mr. Stewart characterizes ultraviolet testing as "non-destructive" on his website. A true and correct copy of that webpage is attached hereto as Exhibit F.

27. Some examinations on July 14 involved the use of a Foster + Freeman VSC-40. Some examinations on July 15 involved the use of a Foster + Freeman VSC-400.

    a. A VSC is an imaging system used in forensic document examination. A VSC is a "non-destructive" means of forensically examining a document. A true and correct copy of the Foster + Freeman VSC 400 Brochure is attached hereto as Exhibit G.

    b. A VSC is capable of both viewing and recording the response of documents and inks when exposed to light of varying wavelengths, including visible, infrared (in both reflected and luminescence mode), ultraviolet, as well as transmitted, coaxial, and oblique lighting. A VSC also contains a powerful magnification tool, allowing detailed examination of a document. Ultraviolet illumination is only one potential use of the VSC.

28. I have reviewed scanned images made prior to Defendants' examination on July 14, 2011. These images were made in January of 2011 by Plaintiff's experts Dr. Aginsky and Mr. Osborn (Boland decl. at ¶¶ 3–11). A comparison of these scanned images with the scanned images I made immediately after Mr. Argentieri produced the Work for Hire document for inspection on July 14 show a significant difference in the appearance of the document.

29. The illustration to the right compares an image of the interlineations and initials on page 1 of the Work for Hire document taken from the scanned image of page 1 from Dr. Aginsky (file dated January 13, 2011, 9:53 AM) with the similar portion of the scanned image of page 1 that I made (file dated July 14, 2011, 9:18 AM).

30. The illustration to the right compares an image of the signatures and dates on page 2 of the Work for Hire document taken from the scanned image of page 2 from Dr. Aginsky (file dated January 13, 2011, 10:05 AM) with the similar portion of the scanned image of page 2 that I made (file dated July 14, 2011, 9:22 AM).



31. These images show that significant changes in the appearance of the writing ink, as well as the paper, occurred sometime after the scanning of the documents by Plaintiff's expert on January 13, 2011, and sometime prior to Mr. Argentieri producing the Work for Hire document for examination on the morning of July 14, 2011.

32. None of Plaintiff's experts was present on the morning of July 14, 2011, to see the condition of the Work for Hire document when Mr. Argentieri first provided it for examination. Mr. Blanco did not actually view the document until July 15, 2011 (Blanco decl. at ¶12). Mr. Stewart did not actually examine the document until July 25, 2011 (Stewart decl. at ¶18).

33. Mr. Stewart states in his declaration the he relied on selected portions of the Video as the basis for his opinions about the condition of the Work for Hire document on July 14, 2011, at the commencement of examinations by Defendants' experts and subsequently. (Stewart decl. at ¶¶23, 24, 27).

34. Mr. Stewart's reliance on these Video images to draw a "logical conclusion" about the appearance of these documents is inappropriate and wrong. Colors and brightness on video can fluctuate with factors such as the type of lighting (natural or artificial, incandescent or fluorescent), the white balance on the camera, changes in camera focus and aperture, and others.

35. The clip embedded in the Plaintiff's Memo (at p. 7) does not accurately reproduce the condition of the Work for Hire document or its visual appearance relative to the Specification document on the morning of July 14, 2011.

36. A combination of factors (*e.g.*, the bright overhead lighting of the Harris Beach conference room, the dynamic range present in the scene in front of the camera, and the capability of the camera to record it) resulted in overexposed, washed-out images of documents in certain areas of the frame in many segments of the Video.

37. In the video clip embedded in the Plaintiff's Memo (at p. 7) the two pieces of paper placed on the conference table by Mr. Argentieri are so washed out that one cannot determine which piece of paper is page 1 and which is page 2; one cannot even be sure if the pages are face-up or face-down on the table, if those two pages actually are the Work for Hire document, or if there are just two blank sheets of paper on the table.

38. The problem with relying upon the video clip embedded in the Plaintiff's Memo (at p. 7) to evaluate the appearance of the documents is again made apparent

just a few minutes later when page 2 of the Work for Hire document is moved across the table to the right side of the frame.  As the page is moved, its appearance darkens and yellows, and when it comes to rest next to the Specification document one can see that this page of the Work for Hire document is darker and yellower than the Specification document next to it.  Video at 09:16:10–29. At that point, it becomes apparent that there is, in fact, text on the document, although the signatures and the dates—in what Dr. Aginsky had described as "black ballpoint ink"—are not evident.  See portion of video still below.



39. Comparison of the video clip from the morning of July 14, 2011, embedded in the Plaintiff's Memo (at p. 7) with the Video clip from morning of July 25, 2011, (Plaintiff's Memo, Ex. B, Doc. 191) is also inappropriate and wrong.  Besides the inherent lack of accurate reproduction of the documents in the July 14, 2011, video clip discussed above, the differences between the harsh overhead lighting of the Harris Beach conference room and the softer, more even lighting, which included natural light from the windows, of the Edelson McGuire conference room affects the appearance of the Work for Hire document on the video.

40. I have also reviewed a scan of the Work for Hire document taken by Mr. Stewart on July 25, 2011. Based on that scan, the Work for Hire document does not appear to have undergone any further deterioration from the time I first saw and scanned it on the morning of July 14, 2011.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 28th day of November 2011, in New York, New York.

_/s/ Peter V. Tytell_

Peter V. Tytell