UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

PAUL D. CEGLIA,

                           Plaintiff,

         v.

MARK ELLIOT ZUCKERBERG, and
FACEBOOK, INC.,

                           Defendants.
_____

|  |  |
|---|---|
| | **DECISION**<br>**and**<br>**ORDER** |
| | **10-CV-00569A(F)** |

APPEARANCES:       BOLAND LEGAL, LLC
                          Attorneys for Plaintiff
                          DEAN M. BOLAND, of Counsel
                          18123 Sloane Avenue
                          Lakewood, Ohio 44107

                          PAUL A. ARGENTIERI, ESQ.
                          Attorney for Plaintiff
                          188 Main Street
                          Hornell, New York 14843

                          GIBSON, DUNN & CRUTCHER, LLP
                          Attorneys for Defendants
                          ORIN S. SNYDER and
                          ALEXANDER H. SOUTHWELL, of Counsel
                          200 Park Avenue
                          47th Floor
                          New York, New York 10166-0193
                                   and
                          THOMAS H. DUPREE, JR., of Counsel
                          1050 Connecticut Avenue, N.W.
                          Washington, District of Columbia 20036

                          ORRICK, HERRINGTON & SUTCLIFFE LLP
                          Attorneys for Defendants
                          LISA T. SIMPSON, of Counsel
                          51 West 52nd Street
                          New York, New York 10019

HARRIS BEACH LLP
Attorneys for Defendants
TERRANCE P. FLYNN, of Counsel
Larkin at Exchange
726 Exchange Street
Suite 1000
Buffalo, New York 14210

## JURISDICTION

This case was referred to the undersigned by Honorable Richard J. Arcara on

May 27, 2011 for pretrial matters.  The action is presently before the court on

Defendants' Fee Application filed January 20, 2012 (Doc. No.  286) for attorney's fees

and costs awarded pursuant to this court's Decision and Order filed January 10, 2012

(Doc. No. 283).

## BACKGROUND and FACTS[1]

The parties to this action dispute the authenticity of a contract ("the contract")[2]

allegedly executed between Plaintiff Paul D. Ceglia ("Plaintiff") and Defendant Mark

Elliot Zuckerberg ("Zuckerberg"), on April 28, 2003, pursuant to which Plaintiff and

Zuckerberg, then a student at Harvard University ("Harvard"), established an agreement

for the development and commercialization of two separate Internet business ventures,

including an on-line database developed by Plaintiff, and the social-networking website

created and maintained by Zuckerberg, and now known as Defendant Facebook, Inc.

("Facebook").  Throughout this litigation, Defendants have been represented by several

---

[1] The Facts are taken from the pleadings and motion papers filed in this action.

[2] A copy of the contract is attached as Exhibit A to the Amended Complaint (Doc. No. 39).

2

law firms, including lead counsel Gibson, Dunn & Crutcher, LLP ("Gibson Dunn"), with offices in New York City and Washington, D.C., and local counsel Harris Beach LLP ("Harris Beach").  Plaintiff has been consistently represented by local counsel Paul A. Argentieri, Esq. ("Argentieri"), and by a series of lead counsel including, most recently, Boland Legal, LLC ("Boland"), of Lakewood, Ohio.

At the request of the parties, the undersigned, by Order filed July 1, 2011 (Doc. No. 83) (July 1, 2011 Order"), directed expedited discovery designed to establish whether the putative contract on which Plaintiff sues, and related emails allegedly exchanged between Plaintiff and Zuckerberg, are authentic or forgeries, and also directed Plaintiff to produce certain emails and to make all computers and electronic media within Plaintiff's possession available for inspection by Stroz Friedberg LLC ("Stroz Friedberg"), a digital forensic consulting firm whose services Defendants have retained in this action.  Plaintiff, however, failed to produce certain email account information ("Plaintiff's email account information"), including addresses and passwords for all the email accounts Plaintiff had used since 2003.  The parties then filed cross-motions seeking to compel discover under the July 1, 2011 Order and, as relevant to this discussion, the undersigned, by Order filed August 18, 2011 (Doc. No. 117) ("August 18, 2011 Order"), directed Plaintiff to identify all email accounts accessible through web-based interfaces Plaintiff had used since 2003, and to provide to Stroz Friedberg, by August 29, 2011, on consent forms to be provided by Stroz Friedberg, the email account information necessary to access the email accounts.

Plaintiff, however, did not timely provide, as ordered by the court, his email account information on the consent forms supplied by Stroz Friedberg but, rather,

provided the email account information on modified consent forms restricting

Defendants' use of such information until after the court had resolved Plaintiff's motion

to stay discovery filed on August 29, 2011, thereby rendering the email account

information useless.  Accordingly, on September 1, 2011, Defendants filed their

Accelerated Motion to Compel (Doc. No. 128), advising of Plaintiff's failure to fully

comply with the August 18, 2011 Order, and seeking a court order directing Plaintiff

provide his unqualified consent on the Stroz Friedberg consent forms, asserting that

Plaintiff's conditioning of his consent to resolution of Plaintiff's objections to the August

18, 2011 Order was a self-imposed stay of discovery, initially ordered by the court on

July 1, 2011, which had already been denied three times.[3]  Also filed on September 1,

2011, was yet another motion by Plaintiff objecting to discovery pursuant to the August

18, 2011 Order (Doc. No. 131).

Plaintiff, on September 2, 2011, moved to delay the deadline for filing papers in

response to the Accelerated Motion to Compel until Judge Arcara ruled on Plaintiff's

then-pending objections to the August 18, 2011 Order (Doc. No. 134).  On September

16, 2011, Judge Arcara denied Plaintiff's most recent objections to the August 18, 2011

Order (Doc. No. 145), and, on September 20, 2011, the undersigned denied as moot

Plaintiff's Motion to Delay (Doc. No. 146).

By Order filed September 28, 2011 (Doc. No. 152) ("September 28, 2011

---

[3] Plaintiff initially objected during oral argument on August 18, 2011 to the discovery ordered by the August 18, 2011 Order, which request was denied by the undersigned.  (Doc. No. 116).  On August 19, 2011, Plaintiff filed objections to the denial of his motion to stay (Doc. No. 118), and Judge Arcara, on August 22, 2011, denied the request as unsupported by any legal basis and directed Plaintiff to file a supplemental legal memorandum setting forth the basis for the requested stay (Doc. No. 119). Accordingly, Plaintiff filed the court-ordered legal memorandum on August 22, 2011(Doc. No. 120), and, on August 26, 2011, Judge Arcara denied the motion to stay (Doc. No. 125).

Order"), the undersigned granted the Accelerated Motion to Compel, directing Plaintiff's full compliance with the August 18, 2011 Order by September 30, 2011, and also ordering Plaintiff to show cause why Defendants' request for sanctions, including costs and attorney's fees based on Plaintiff's failure to fully comply with the August 18, 2011 Order, should not be granted.  Plaintiff's response, filed October 7, 2011 (Doc. No. 153), included affidavits from his former attorneys who explained that the delayed production of Plaintiff's email account information was at Plaintiff's behest and against his attorneys' advice.  In a Decision and Order filed January 10, 2012 (Doc. No. 283) ("D&O"), the undersigned imposed a civil contempt sanction of $ 5,000 on Plaintiff, based on Plaintiff's unwarranted refusal to comply with the August 18, 2011 Order, and ordered Plaintiff to pay Defendants their expenses, including attorney's fees, incurred in connection with the Accelerated Motion to Compel.  D&O at 28.  Defendants were also directed to file within ten days an affidavit of costs and attorney's fees incurred.  D&O at 30.  No objections to the D&O were filed by Plaintiff.  According to the docket for this action, on January 23, 2012, Plaintiff paid the $ 5,000 civil contempt sanctions.

As directed in the Decision and Order, Defendants filed on January 20, 2012, Defendants' Fee Application (Doc. No. 285) ("Fee Application"), and the supporting Declaration of Alexander H. Southwell, Esq. (Doc. No. 286) ("Southwell Declaration"), with attached exhibits A through D ("Defendants' Exh(s) __").  On January 30, 2012, Plaintiff filed in opposition a Memorandum (Doc. No. 288) ("Plaintiff's Response").  On February 1, 2012, Defendants filed Defendants' Reply Memorandum in Support of Their Fee Application (Doc. No. 289) ("Defendants' Reply"), and the Supplemental Declaration of Alexander H. Southwell in Support of Defendants' Fee Application (Doc.

No. 290) ("Southwell Reply Declaration"), with attached exhibit A ("Defendants' Reply Exh. A").  In addition attorney's fees, Defendants request the court direct that Plaintiff be prohibited from further prosecution of the instant action until Plaintiff has paid Defendants' attorney's fees.  Oral argument was deemed unnecessary.

Based on the following, Defendants' Fee Application is GRANTED in part and DENIED in part; Defendants are awarded in connection with their Accelerated Motion to Compel $ 75,776.70 in attorney's fees, and are also entitled to an award of costs, including attorney's fees, incurred preparing and defending the Fee Application, but Defendants' request for an order prohibiting Plaintiff from filing any papers in support of this action until such fees are paid is DENIED.


## DISCUSSION

As stated, Defendants were awarded attorney's fees and costs incurred in connection with preparing and defending the Accelerated Motion to Compel, as a sanction pursuant to Fed.R.Civ.P. 37(a)(5)(A) and 37(b)(2)(C) ("Rule 37"), and Defendants were directed to file affidavits of costs and attorney's fees relevant to the determination of the fee award.  D&O at 28.  Defendants' Fee Application seeks fees for five attorneys who worked on the Accelerated Motion to Compel, requesting a total of $ 84,196.33 in attorney's fees.[4]  Defendants maintain they are not seeking full reimbursement of the attorney's fees incurred in connection with the Accelerated

---

[4] Although Defendants' request for expenses was granted by the undersigned, other than attorney's fees, Defendants are not seeking to recover any costs incurred in connection with the Accelerated Motion to Compel.

Motion to Compel but, rather, to avoid any dispute over the reasonableness of the fees requested, have excluded certain work, declined to seek reimbursement for several timekeepers who worked on the Accelerated Motion to Compel, and have reduced by 25 % the hourly attorney rates for those attorneys for whose work Defendants do seek reimbursement, asserting that because they have already voluntarily and substantially reduced both the hours and hourly rates, their requested fees should not be further reduced.  Fee Application at 1, 9, 14, 18-19; Southwell Declaration ¶¶ 3, 16, 18. Defendants also request an award of attorney's fees incurred preparing the Fee Application, maintain that Plaintiff should be ordered to pay the court-awarded attorney's fees within 14 days of this Decision and Order, and also seek an order prohibiting Plaintiff from filing any papers, other than those responsive to the Fee Application, until Plaintiff satisfies the full attorney's fee award.  *Id*. at 20.

Plaintiff, in opposing the Fee Application, argues Defendants' hourly attorney rates are not reasonable compared to rates for comparable legal services within the Western District of New York.  Plaintiff's Response at 4-5.  According to Plaintiff, the "forum rule" requiring awards for attorney's fees be calculated based on the prevailing hourly rate in the geographic area where the case is litigated should be applied because this action is a breach-of-contract case, Defendants cannot make the requisite particularized showing to support the use out-of-district counsel with special expertise, and who charge higher hourly rates, to obtain substantially better results that what could be procured using local counsel at lower hourly rates, and because such fees are intended to be compensatory, rather than punitive.  *Id*. at 5-9.  Plaintiff also asserts Defendants' attorneys failed to adequately document their time and engaged in "block-

7

billing" wherein multiple tasks were aggregated into single billing entries, rendering it difficult, if not impossible, to discern what portion of such entries constituted work on the Accelerated Motion to Compel. *Id*. at 9-11.  Plaintiff questions the amount of attorney's fees requested given that Defendants' papers filed with regard to the Accelerated Motion to Compel were not voluminous.  *Id*. at 11-12.  Finally, Plaintiff argues there is no legal authority supporting Defendants' request for a court order prohibiting Plaintiff from filing further papers until the fee award is paid.  *Id*. at 12-13.

In further support of the Fee Application, Defendants dispute Plaintiff's characterization of this action as a "garden-variety contract dispute," and draws the court's attention to the fact that in litigating this matter Plaintiff has not relied on local counsel.  Defendants' Reply at 1-3.  Defendants maintain that the attorney hourly attorney rates sought are reasonable when compared to "other peer global law firms with attorneys located in New York City."  *Id*. at 3-4.  Defendants argue Plaintiff misrepresents Defendants' assertions regarding the reconstruction of some of the billing entries, and that summaries of contemporaneous time records are sufficient to support a fee application.  *Id*. at 4-5.  Defendants point out that Plaintiff has not refuted the number of hours for which Defendants seek attorney's fees, but rather, merely trivializes the work required to litigate the Accelerated Motion to Compel.  *Id*. at 6. Finally, Defendants advise that although Plaintiff opposes Defendants' request for a court order prohibiting Plaintiff from filing additional papers prior to satisfying the attorney's fees award, Plaintiff does not object to Defendants' request that Plaintiff be ordered to pay the awarded attorney's fees within 14 days of the filing of this Decision and Order.  *Id*.

1.    **Lodestar Method**

Here, the undersigned found that the court must, upon granting Defendants'

Accelerated Motion to Compel, award attorney's fees under Rule 37(a)(5)(A) and,

based on the imposition of the $ 5,000 civil contempt sanction, award attorney's fees

under Rule 37(b)(2)(C).  D&O at 24-28.  Although Rule 37(a)(5)(A) addresses those

situations in which a party incurs expenses in making a motion to obtain a court order

for discovery, whereas Rule 37(b) addresses the situation where expenses are incurred

as a result of the violation of a court order directing discovery, both Rules 37(a)(5)(A)

and 37(b)(2)(C) require payment of attorney's fees unless the disobedient party's

nondisclosure was substantially justified, which Plaintiff had failed to establish.  *Id*.

The Second Circuit Court of Appeals has not opined as to how to calculate

attorney's fees awarded as a sanction pursuant to Rule 37, yet has discussed an award

of attorney's fees as a sanction for a violation of Fed.R.Civ.P. 11.  *See*, *e.g.*, *Eastway*

*Construction Corp. v. City of New York*, 821 F.2d 121, 122 (2d Cir.) (reviewing district

court's award of attorney's fees as Rule 11 sanctions), *cert. denied*, 484 U.S. 918

(1987).  Traditionally, "[i]n determining a fee award, the typical starting point is the so-

called lodestar amount, that is 'the number of hours reasonably expended on the

litigation multiplied by a reasonable hourly rate.'"  *Healey v. Leavitt*, 485 F.3d 63, 71 (2d

Cir. 2007) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)).[5]  The Second

Circuit has held that when awarding attorney's fees as a sanction, the "lodestar amount

"need not routinely be awarded."  *Eastway Construction Corp.*, 821 F.2d at 121-22

---

[5] Unless otherwise indicated, bracketed material has been added.

(discussing that attorney's fee awarded as Rule 11 sanction can vary from lodestar amount, yet must still be within a range reasonable to achieve deterrent objective of such award).  Nevertheless, a "presumption of reasonableness" attaches to the lodestar figure.  *Farbotko v. Clinton County of New York*, 433 F.3d 204, 208 (2d Cir. 2005).  As such, in determining the amount of attorney's fees to be awarded Defendants as a sanction, the court commences with the lodestar or "presumptively reasonable fee," which is then adjusted as necessary to assure Rule 37's deterrent objective is achieved.[6]

In calculating the lodestar amount, the initial burden is on the requesting party to submit evidence supporting the number of hours worked and the hourly rate claimed.  *Hensley*, 461 U.S. at 433.  This "lodestar" calculation should exclude fees for work that is "excessive, redundant or otherwise unnecessary," as well as hours dedicated to severable unsuccessful claims.  *Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999) (citing *Hensley*, 461 U.S. at 433-35).  To prevent the court from reviewing and ruling on each item for which reimbursement is requested, courts have permitted a

---

[6]Although the Second Circuit recently attempted to reconcile the lodestar method with the method, set forth in *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714 (5th Cir. 1974) ("the *Johnson* method"), describing "a one-step inquiry that considered twelve specific factors to establish a reasonable fee," *Simmons v. New York City Transit Authority*, 575 F.3d 170, 174 (2d Cir. 2009), the Supreme Court has since considered the issue of attorney's fees, approving the traditional lodestar method over the more subjective *Johnson* method.  *Perdue v. Kenny A.*, __ U.S. __, 130 S.Ct. 1662, 1672 (2010).  The Court further explained there is a "strong presumption" that the lodestar figure is reasonable, but that such presumption "may be overcome in those rare circumstances in which the lodestar does not adequately take into account a factor that may properly be considered in determining a reasonable fee."  *Id.* at 1673.  *See also Millea v. Metro-North Railroad Company*, 658 F.3d 154, 166 (2d Cir. 2011) ("Both this Court and the Supreme Court have held that the lodestar – the product of a reasonable hourly rate and the reasonable number of hour required by the case – creates a 'presumptively reasonable fee.'" (citing *Perdue*, 130 S.Ct. at 1673, and *Arbor Hill Concerned Citizens Neighborhood Assoc. v. County of Albany*, 522 F.3d 182, 183 (2d Cir. 2008)).  The court thus first applies the lodestar method to determine the amount of attorney's fees to award and then, if necessary, adjusts the resulting lodestar figure to reflect consideration of any special circumstances.

percentage-based reduction from the number of hours submitted as a means of trimming excess time from the fee request.  *McDonald v. Pension Plan of the NYSA-ILA Pension Trust Fund*, 450 F.3d 91, 96 (2d Cir. 2006) ("A district court may exercise its discretion and use a percentage deduction as a practical means of trimming fat from a fee application.") (internal quotation marks and citation omitted); *see Walker v. Coughlin*, 909 F.Supp. 872, 881 (W.D.N.Y. 1995) (reducing by 15 % the total hours requested).

In the instant case, the form in which  Defendants' Fee Application presents the fees Defendants seek establishes the fees were calculated according to the lodestar method.  The five Gibson Dunn attorneys for whose work Defendants seek payment from Plaintiff include senior partner Orin S. Snyder ("Snyder"), partner Thomas H. Dupree, Jr. ("Dupree"), partner Alexander H. Southwell ("Southwell"), sixth-year associate Matthew Benjamin ("Benjamin"), and second-year associate Amanda Aycock ("Aycock").  The following schedule sets forth these attorneys' standard and claimed, *i.e.*, discounted, hourly billing rates, the hours each attorney worked, and the total fees claimed by each attorney calculated using the claimed rate:

| Attorney | Standard Rate | Claimed Rate | Hours | Total Fees |
|---|---|---|---|---|
| Snyder | $    955 | $    716.25 | 9.75 | $  6,983.44 |
| Dupree | 850 | 637.50 | 21.75 | 13,865.63 |
| Southwell | 825 | 618.75 | 24.50 | 15,159.38 |
| Benjamin | 670 | 502.50 | 44.65 | 22,436.63 |
| Aycock | 450 | 337.50 | 76.30 | 25,751.25 |
| **Total:** | | | **176.95** | **$84,196.33** |

The parties do not quarrel over Defendants' calculation of the attorney's fees requested

according to the lodestar method, yet Plaintiff protests Defendants' request for

attorney's fees insofar as Defendants seek payment of their attorney's fees at out-of-

district rates specifically, the metropolitan New York City region in the Southern District

of New York, which are substantially higher than the prevailing hourly rates in Buffalo in

the Western District of New York.  Plaintiff also maintains that the number of hours for

which Defendants seek attorney's fees is excessive, and that the use of "block-billing"

makes it impossible to determine how much time was actually spent on the Accelerated

Motion to Compel.


**2.      Presumptively Reasonable Rate**

Defendants' Fee Application calculates the fees for their lead counsel, Gibson

Dunn, according to Gibson Dunn's hourly rates charged at their New York City firm in

the Southern District of New York, voluntarily discounted by 25% to avoid any dispute

over the reasonableness of such fees.  Fee Application at 1, 6-9, 14.  Plaintiff

challenges the hourly rate used to calculate such fees as exceeding the prevailing

market rate for the Western District of New York, despite this being a breach-of-contract

action for which the use of out-of-district counsel is unnecessary to obtain substantially

better results.  Plaintiff's Response at 4-8.  Defendants, however, maintain that this

action is more than a "'garden variety' contract dispute," as indicated by the fact that

Plaintiff has retained at least four out-of-district law firms, including DLA Piper LLC, one

of the largest and most expensive law firms in the world, whose hourly rates exceed

those of Gibson Dunn, a fact not disputed by Plaintiff.  Defendants' Reply at 1.

Defendants maintain that the special expertise of Gibson Dunn is necessary given the

extraordinary circumstances of this action, corroborated by the fact that Plaintiff has created an extensive document titled "Lawsuit Overview: Paul D. Ceglia v. Mark Elliot Zuckerberg & Facebook, Inc."  ("Lawsuit Overview")[7] which Plaintiff has used in attempting to attract top-tier law firms to represent him.  *Id*. at 1-2.  Defendants also have voluntarily discounted their standard hourly rates by 25%, and the discounted rates at which Defendants seek reimbursement ("claimed rate") are significantly less than comparable law firms.  *Id*. at 14.

Preliminarily, Plaintiff's arguments proffered in opposition to Defendants' use of out-of-district hourly rates in calculating the attorney's fees sought fail to perceive any distinction between attorney's fees awarded pursuant to a fee-shifting statute, and attorney's fees awarded as a sanction.  Prevailing Second Circuit opinions implicitly recognize that the reasoning behind the calculation of attorney's fees awarded under a fee shifting statute, such as the Americans with Disabilities Act, 42 U.S.C. § 12205, and the Voting Rights Act, 42 U.S.C. § 19731(e), is not precisely analogous to an award of attorney's fees as a disciplinary sanction pursuant, as here, to Rule 37.  "The general purpose of fee-shifting statutes . . . is to permit plaintiffs with valid claims to attract effective legal representation and 'thereby to encourage private enforcement of civil rights statutes, to the benefit of the public as a whole.'"  *Green v. Torres*, 361 F.3d 96, 100 (2d Cir. 2004) (quoting *Quaratino*, 166 F.3d at 426).  As such, in calculating an award of attorney's fees pursuant to a fee-shifting statute, much consideration is given to the "forum rule" which provides that "courts should generally use the hourly rates

---

[7] A copy of the Lawsuit Overview is attached as Exh. A to the Southwell Reply Declaration.

employed in the district in which the reviewing court sits."  *Simmons*, 575 F.3d at 174

(internal quotation omitted).

In contrast, attorney's fees awarded as sanctions are not intended only as

compensation of reimbursement for legal services, but also serve to deter abusive

litigation practices and, as such, district courts have discretion in determining the

amount of an attorney's fee awarded as sanctions.  *Caisse Nationale de Credit*

*Agricole-CNCA, New York Branch v. Valcorp, Inc.*, 28 F.3d at 259, 266 (2d Cir. 1994)

("*Caisse Nationale*") (acknowledging "principal objective" of sanctions "is not

compensation of the victimized party, but rather the deterrence of baseless filings and

the curbing of abuses" arising in the litigation process).  Although the sanctions at issue

in *Caisse Nationale* were awarded pursuant to Fed.R.Civ.P. 11, the Second Circuit's

recent reiteration that sanctions awarded pursuant to Rule 37 are also intended as a

deterrent to misbehavior in litigation establishes there is a close analogy between Rule

11 and Rule 37 sanctions.  Specifically,

> Rule 37 sanctions serve other functions unrelated to the prejudice suffered by
> individual litigants:
>
> > Disciplinary sanctions under Rule 37 are intended to serve three
> > purposes.  First, they ensure that a party will not benefit from its own
> > failure to comply.  Second, they are specific deterrents and seek to obtain
> > compliance with the particular order issued.  Third, they are intended to
> > serve a general deterrent effect on the case at hand and on other
> > litigation, provided that the party against whom they are imposed was in
> > some sense at fault.

*Southern New England Telephone Company v. Global NAPs Inc.*, 624 F.3d 123, 149
(2d Cir. 2010) (quoting *Update Art, Inc. v. Modiin Publ'g, Ltd.*, 843 F.2d 67, 71 (2d Cir.
1988)).

*See also National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 643

(1976) (stating Rule 37 sanctions may serve both to "penalize those whose conduct may be deemed to warrant" them and to "deter those who might be tempted to such conduct in the absence of such a deterrent.").

Even after a party's compliance with a discovery order following imposition of sanctions, the awarded sanctions remain justified by their deterrent purposes. *Southern New England Telephone Company*, 634 F.3d at 149.  Specifically, if a party flouts its discovery obligations by choosing to wait for a court order before providing discovery responses, "the effect will be to embroil trial judges in day-to-day supervision of discovery, a result directly contrary to the overall scheme of the federal discovery rules."  *Id*. (quoting *Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1068 (2d Cir. 1979) ("Under the deterrence principle of [*National Hockey League*], plaintiff's hopelessly belated compliance should not be accorded great weight.  Any other conclusion would encourage dilatory tactics, and compliance with discovery orders would come only when the backs of counsel and the litigants were against the wall.").

Although an award of expenses, including attorney's fees, under Rule 37(b)(2)(C), *i.e.*, for failing to comply with court-ordered discovery was, historically, optional, an amendment in 1970 "placed the burden on the disobedient party to avoid expenses by showing that his failure is justified or that special circumstances make an award of expenses unjust."  F.R.C.P. 37, Advisory Committee Note to 1970 Amendments.  Further, allocating to the disobedient party the burden of making a showing sufficient to avoid expenses brought Rule 37(b)(2)(C) in conformity with Rule 37(a)(5)(A)'s requirement that expenses, including attorney's fees, be awarded to the

moving party on a successful motion to compel discovery unless the nonmovant

establishes the failure to produce was justified by some special circumstances. *See*

*Novak v. Wolpoff & Abramson LLP*, 536 F.3d 175, 178 (2d Cir. 2008) (remanding to

district court for reconsideration of decision not to award expenses in connection with

sanctions award under Rule 37(b)(2) where district court's order failed to state any

basis for denying expenses, thereby suggesting district court found either special

circumstances or substantial justification applied).

Plaintiff's first challenge, that the hourly attorney rates used to calculate the fees

to be awarded should be the prevailing rates in the Buffalo, New York area, rather than

in the New York City metropolitan area, is without merit.  In particular, in calculating, in

this case, attorney's fees awarded as a sanction, the court is not required to apply the

forum rule, calculating the attorney's fee award based only on prevailing attorney rates

in the district in which the reviewing court sits; rather, the court has discretion to use

out-of-district rates in fixing the amount of an attorney's fee awarded as a sanction.  *On

Time Aviation, Inc. v. Bombardier Capital, Inc.*, 354 Fed.Appx. 448, 452 (2d Cir. 2009)[8]

(holding district court entitled to use out-of-district hourly rates to calculate attorney's

fee awarded as Rule 11 sanction to advance purpose of Rule 11 to deter baseless

filings, rather than to shift fees).  *See also Caisse Nationale*, 28 F.3d 259, 266 (2d Cir.

1994) (that attorney's fee awarded for Rule 11 sanction may have duplicated attorney's

fee awarded as part of judgment provided no basis for setting aside award of sanctions

---

[8] Although *On Time Aviation Inc.*, 354 Fed.Appx. 448, is designated as "not selected for publication in the Federal Reporter," Fed.R.App.P. 32.1(a) provides that "[a] court may not prohibit or restrict the citation of federal judicial opinions, orders, judgments, or other written dispositions that have been: (i) designated as 'unpublished,' 'not for publication,' 'non-precedential,' 'not precedent,' or the like; and (ii) issued on or after January 1, 2007."

because primary objective of Rule 11 sanctions is not compensation of victimized party, but deterrent to baseless filings and curbing of abuses).

It is significant that the cases on which Plaintiff relies in support of his argument that attorney's fees awarded as sanctions are to be calculated using the prevailing market rate for attorneys with similar experience in the forum district either concern fee awards made to the prevailing party pursuant to a fee-shifting provision or statute, *see*, *e.g.*, *Simmons*, 575 F.3d at 174 (attorney's fees awarded pursuant to ADA's fee-shifting provision); and *Arbor Hill Concerned Citizens Neighborhood Association* ("*Arbor Hill*"), 522 F.3d at 191 (attorney's fees awarded pursuant to fee-shifting provision of Voting Rights Act of 1965), or simply fail to contemplate the possibility of a distinction between the compensatory nature of an award of attorney's fees made pursuant to a fee-shifting statute following an award on the merits, and the punitive nature of a fee award made to sanction a party for undesirable conduct.  *See*, *e.g.*, *Rates Technology, Inc. v. Mediatrix Telecom, Inc.*, 2011 WL 1322520 (E.D.N.Y. Mar.  31, 2011) (relying on fee-shifting cases in following forum rule in calculating attorney's fees to be awarded as discovery sanction); and *Carovski v. Jordan*, 2008 WL 3540372 (W.D.N.Y. Aug. 12, 2008) (same).  Accordingly, none of the cases Plaintiff reference in support of his argument that the forum rule applies to the instant award of attorney's fees is controlling.

Nor is Plaintiff's argument, Plaintiff's Response at 8, that the imposition and payment of the $ 5,000 civil contempt sanction renders the required attorney's fees award compensatory, rather than punitive in nature, supported, as Plaintiff asserts, by *Miltope Corporation v. Hartford Casualty Insurance Company*, 163 F.R.D. 191, 195

17

(S.D.N.Y. 1995), where the court discussed the appropriate sanction for a party's failure to timely respond to discovery requests.  Although the court acknowledged that Rule 37(b)(2) requires the party failing to comply with court-ordered discovery to pay the reasonable expenses, including attorney's fees, caused by the failure, *Miltope Corp.*, 163 F.R.D. at 194, the court, for unexplained reasons, proceeded to impose a fine on the noncompliant party, but did not also impose the required attorney's fees.  *Id*. at 195. In support of its decision, the court cited *J.M. Cleminshaw Co. v. City of Norwich*, 93 F.R.D. 338, 351-52 n. 11 (D.Conn. 1981), wherein Judge Cabranes noted that "the typical discovery sanction under Rule 37 is an assessment of costs and fees payable to the victimized party.  The purpose of such sanctions is largely compensatory."  Not discussed by the *Miltope Corp.*, court, however, is the context in which such statement occurred, *i.e.*, a discussion of what constitutes adequate notice prior to imposing discovery sanctions.  *Id*.  Nor does the portion of the *J.M. Cleminshaw Co.* decision referenced by the *Miltope Corp.* court include the subsequent discussion that "there is a punitive or deterrent element in all discovery sanctions."  *J.M. Cleminshaw Co.*, 93 F.R.D. at 338, n. 11 (citing cases).  Despite the punitive element of all discovery sanctions, including attorney's fees, no special procedural protections of notice and an opportunity to be heard was required before imposing attorney's fees.  *Id*.  As such, *Miltope Corp.*, also fails to provide support to Plaintiff's argument on this point.

Given that the conceptual difference between attorney's fees awarded pursuant to a fee-shifting statute is to fairly compensate the prevailing party, not to induce compliance with discovery obligations, it is the reality that attorneys often take on such cases either *pro bono*, in which case an attorney fee award is, by itself, a form of bonus

to the attorney who otherwise would be uncompensated for his efforts, or on a contingent fee basis in which case the attorney again undertakes to represent the prevailing party fully assuming the risk of never being compensated for the legal work expended in the action.  Under these circumstances, an award of attorney's fees is an inducement to the prevailing party's legal counsel as it assures compensation of the attorney without reduction of the party's award.

In decided contrast, however, attorney's fees awarded as a sanction, whether under Rule 11, Rule 37, or pursuant to the court's inherent power to manage its docket and punish litigation misconduct, are intended to penalize the offending or noncompliant party in order to achieve an efficient civil litigation system for the federal courts.  Presumably, a party does not decide to retain counsel outside the forum district in anticipation of succeeding on a sanctions motion during the litigation.  Rather, the decision to retain outside counsel is often guided by where the party is physically located, with many litigants choosing legal representation located within the same geographic area as the venue of the court.  The court is aware that a party located other than within this district will often retain lead counsel located within the same geographic area as the party's residence, and that local counsel, *i.e.*, an attorney maintaining an office in this district, is also retained only because Rule 83.2(a)(1) of the Western District of New York's Local Rules of Civil Procedure, compels it.  *See Kawan Food Manufacturing SDN BHD v. Bengal Sea Foods USA Canada, Inc.*, 2008 WL 5483106, at * 3 (E.D.N.Y. Dec. 1, 2008) ("The primary purpose of local counsel is their expertise of the procedural rules in the prevailing district." (citing *Marler v. Amoco Oil Co., Inc.*, 793 F.Supp. 656, 659 (E.D.N.C. 1992)).  Of course, as in this case, selection

of counsel outside the forum is often influenced by the apparent expertise of such counsel.

Moreover, attorney's fees awards have been calculated under a fee-shifting provision using substantially higher out-of-district rates when the action was commenced in the Southern District of New York, and later transferred to the Southern District of Florida, without requiring the party to establish an exception to the forum rule. *See Tiara Condominium Ass'n, Inc. v. Marsh USA, Inc.*, 697 F.Supp.2d 1349, 1363 (S.D.Fla. 2010) (following insured plaintiff's rejection of defendant insurer's offer of judgment, district court entered judgment of no liability in favor of insurer on insured's breach of contract and negligence claims, and awarded defendant, under Florida's offer of judgment statute, expenses, including attorney's fees calculated at rates substantially higher than those in the forum, finding it reasonable for New York defendant to continue maintaining New York City law firm's representation after case, which was filed in Southern District of New York, was later transferred to Southern District of Florida). This case thus supports the conclusion that strict adherence to the forum rule is unjustified in calculating a sanctions-based attorney's fee award pursuant to Rule 37.

The court, therefore, is not required to calculate the fee award for Defendants' New York attorneys based on the prevailing rate in the Buffalo, New York area located within this district.  Accordingly, Defendants attorney's fee award will be calculated based on the claimed hourly rates for the time expended by Defendants' lead counsel, Gibson Dunn, located in New York City.[9]

---

[9] The same analysis applies to the rates charged by Mr. Dupree, although located in Washington, D.C., whose rate is comparable to his New York City colleagues.

Alternatively, even assuming, *arguendo*, that despite the punitive nature of attorney's fees awarded pursuant to Rule 37, the forum rule applies to the calculation of such fees, here, the circumstances of the action support an exception to the forum rule and the use of the out-of-district hourly rates claimed by Gibson Dunn.  As stated, the forum rule provides that generally, the hourly rates employed in the district in which the reviewing court sits are used in calculating the presumptively reasonable attorney's fee. *Simmons*, 575 F.3d at 174.  The Second Circuit has, however, "disavowed 'strict adherence to the forum rule' where 'circumstances have warranted it.'" *Id*. (quoting *Arbor Hill*, 483 F.3d at 120).  Specifically,

> when faced with a request for an award of higher out-of-district rates, a district court must first apply a presumption in favor of application of the forum rule.  In order to overcome that presumption, a litigant must persuasively establish that a reasonable client would have selected out-of-district counsel because doing so would likely (not just possibly) produce a substantially better net result.  In determining whether a litigant has established such a likelihood, the district court must consider experience-based, objective factors.  Among the objective factors that may be pertinent is counsel's special expertise in litigating the particular type of case, if the case is of such nature as to benefit from special expertise.

*Id*.  at 175-76.

The "touchstone" of the forum rule requires a court to award attorney's fees that are "'*just high enough* to attract competent counsel.'" *Id*. at 176 (italics in original and quoting *Arbor Hill*, 493 F.3d at 121).  Here, the record also establishes Defendants are entitled to an exception to the forum rule.

In particular, a party's decision as to what law firm to retain is often guided by the litigant's perception of the gravity of the case and what is at stake.  It bears mentioning that despite Plaintiff's characterization of the instant litigation simply as a "breach-of-contract case," Plaintiff's Response at 7, Plaintiff ultimately seeks a 50% ownership

21

interest in Facebook, estimated to be valued between $ 50 billion and $ 125 billion

when its initial public offering ("IPO") was filed on February 1, 2012.  Randall Smith,

*Facebook's $ 100 Billion Questions: How to Value History's Biggest Tech IPO?  The*

*Answer Will Depend on Growth and Advertisers*, Feb. 3, 2012, *available at*

http://online.wsj.com/article/SB10001424052970204662204577199491268866920.html

(last visited Feb. 14, 2012).[10]  Plaintiff's reference to the instant case as a "breach-of-

contract action" ignores the reality that what is at dispute is more than the correct

interpretation of a contract or whether circumstances establish a breach; the initial

focus of this action has been to determine whether the document on which Plaintiff

relies is authentic.  Resolution of that issue requires forensic procedures not typically

seen in this court, including the examination by information technology experts of

numerous computers and Internet accounts, able to extract remnants of information

initially created up to nine years ago, skills that are beyond the purview of many

otherwise adept at information technology, in addition to handwriting and document

authentication experts, as well as the litigation skills, technical knowledge, and

experience of counsel capable of marshaling such relevant evidence and expertise.

Defendants maintain that because this action "is based on a forged contract and

involves a purported, but baseless, multi-billion-dollar claim against one of the best

known companies in the world," the action's defense "is appropriately led by a team of

experienced litigators, local and out-of-district, with backgrounds and experience in

---

[10] It is generally proper to take judicial notice of articles and Web sites published on the Internet. *See Wang v. Pataki*, 396 F.Supp.2d 446, 458 n. 2 (S.D.N.Y. 2005) (taking judicial notice of *Village Voice* newspaper and its "web equivalent" as being "newspapers of general circulation," citing *Hotel Employees & Restaurant Employees Union, Local 100 v. New York Department of Parks & Recreation*, 311 F.3d 534, 549 (2d Cir. 2002)).

prosecuting criminal fraud issues." Fee Application at 15.  Defendants also assert they

relied on Gibson Dunn's "prior experience and relationships" to retain "the world's

leading document examiners and experts in computer forensics, who have been

instrumental in uncovering [Plaintiff's] fraud."  *Id*.  The court observes that when Plaintiff

commenced this action, he was represented by DLA Piper LLC ("DLA Piper"), a large

New York law firm whose hourly rates, according to a chart provided by Defendants, the

accuracy of which Plaintiff does not challenge, exceed those charged by the Gibson

Dunn attorneys in this case.  Defendants' Exh. D (listing DLA Piper's hourly billing rates

as ranging between $ 530 and $ 1,120 for partners and between $ 320 and $ 730 for

associates).[11]

Defendants's assertion that the special expertise of Gibson Dunn is necessary

given the extraordinary circumstances of this action is also corroborated by statements

within the Lawsuit Overview which Plaintiff has used in attempting to attract "top-tier"

law firms to represent him.  As relevant, the Lawsuit Overview provides

**Objective**

> [Plaintiff] is seeking to engage a law firm to represent him in a.)
> immediate settlement negations and b.)  the Lawsuit going forward.
> [Plaintiff] will be interviewing top tier law firms.  The successful firm will
> demonstrate 1.)  A strong desire to represent [Plaintiff], 2.)  A commitment
> to developing a close working relationship with [Plaintiff], and 3.)  A
> contingency based fee arrangement that is fair for both parties.  All firms
> interviewed have already demonstrated that they have the experience and
> competency to represent [Plaintiff].

Lawsuit Overview at 3 (underlining added).

---

[11]  Interestingly, Plaintiff has not indicated that, had he been awarded attorney's fees in a
comparable dispute with Defendants when represented by DLA Piper, he would have submitted a fee
application for work performed by DLA Piper attorneys at hourly billing rates in the local Buffalo market.

The Lawsuit Overview further explains that Plaintiff originally hired Argentieri to file this action, and that "Argentieri has and will continue to advise [Plaintiff] in the case." *Id.* Notably, although Plaintiff also engaged the leading Buffalo law firm of Connors & Vilardo, LLP for representation, that law firm and Plaintiff "have mutually agreed that *because of* [*the*] *size, complexity and commitment required of this case, a larger firm is necessary to properly represent* [*Plaintiff's*] *interests going forward*."  *Id.* (italics added). Following Connors & Vilardo's withdrawal, consistent with the requirements as stated in the Lawsuit Overview, DLA Piper entered the case on behalf of Plaintiff.  Plaintiff's Notice of Substitution of Counsel (Doc. No. 38), filed April 11, 2011.

Furthermore, despite Plaintiff's insistence that this action is a simple breach of contract dispute for which Defendants had sufficient options to retain competent legal counsel from among the Buffalo legal community, going so far as to list five of the largest local law firms which have extensive experience with contract disputes, one such firm having handled during the past five years 37 contract dispute actions in the Western District of New York, Plaintiff's Response at 7-8, and Exhibit, judicial notice is taken of an Internet website, dean@bolandlegal.com, *available at* http://bolandlegal.com/site (last visited Feb. 14, 2012), promoting Boland Legal, LLC, Plaintiff's current lead counsel, as having particular expertise with legal issues involving technology.  *See United States v. Bari*, 599 F.3d 176, 180 (2d Cir. 2010) (finding no reversible error where district court conducted independent Internet search to confirm intuition regarding availability of yellow rain hats for sale because such search was akin to taking judicial notice of a fact that was "capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." (quoting

24

Fed.R.Evid. 201(c)).  According to the law firm's website,

> When your business or litigation involves technology, your attorney must be fully conversant in technology to insure courts are properly educated about the inherent technology issues of these cases and that nothing gets missed.
>
> For your technology business or litigation matter, you need a technology attorney.

dean@bolandlegal.com:About Dean Boland: Qualified Computer Expert, *available at* http://bolandlegal.com/site/4620-2.

Certainly, the record in this case demonstrates Plaintiff's perception that the issues presented would involve a plethora of such technology related issues, particularly involving sophisticated computer forensics and document testing technology, proved to be correct.  As such, Plaintiff's own documents, actions, and choice of legal counsel establish Plaintiff's perceived need for exceptional counsel with expertise in technology related law.

Given that Defendants have maintained throughout the course of this litigation that the putative contract is a forgery created by Plaintiff such that Plaintiff, by bringing this action, is committing a fraud on the court, Defendants also have need of counsel with experience in criminal matters, particularly forgeries.  Plaintiff does not discuss whether any attorney at any of the five suggested comparable local firms is "a technology attorney" or has the requisite criminal law experience as Plaintiff's attorney, Mr. Boland, or Defendants' attorneys.  Simply put, Defendants should not, especially given the extraordinarily large economic value placed at risk by Plaintiff's claim, be expected to limit their choice of counsel to local law firms with experience litigating contract disputes simply to pay less in legal fees given the lower prevailing hourly rates in the local market, where Plaintiff chose to file this case, when Plaintiff has implicitly

acknowledged the particulars of this action require a firm with special expertise.  Nor

should Defendants be penalized for their equally correct judgment in retaining out-of-

district counsel with the special competence necessary to effectively defend this action.

Plaintiff cannot have it both ways.  Defendants thus have established a particular need

supporting their choice of legal counsel outside this district.

Having established that the attorney's fees awarded Defendants should be

calculated using out-of-district rates either because of the punitive, as opposed to

compensatory nature of such fees, or because the facts of this case establish the

reasonableness of retaining legal counsel of the special capability of Gibson Dunn, the

court addresses whether the claimed hourly rates, which Defendants have voluntarily

discounted by 25%, are reasonable.

Plaintiff argues, Plaintiff's Response at 9, that Defendants' hourly rates, even

discounted 25%, are unreasonably high as they still are nearly three times the highest

rate awarded by this court to out-of-district attorneys.  In support of this argument,

however, Plaintiff references caselaw where out-of-district counsel were awarded

attorneys fees pursuant to a fee-shifting statute and the presumption of applying in-

district rates was not overcome.  *See, e.g., Disabled Patriots of America, Inc. v. Niagara*

*Group Hotels, LLC*, 688 F.Supp.2d 216, 224-25 (W.D.N.Y. 2010) (awarding attorney's

fees pursuant to ADA's fee-shifting provision, calculated using hourly rates of $ 200 and

$ 240 for out-of-district attorneys, rather than the $ 350 and $ 425 hourly rates

requested).

To establish the prevailing market rate, the party awarded attorney's fees must

offer evidence that the requested hourly rate is in line with the market rates in the

community.  *Blum v. Stenson*, 465 U.S. 886, 896 n. 11 (1984).  "[T]he fee applicant has

the burden of showing by 'satisfactory evidence - in addition to the attorney's own

affidavits' - that the requested hourly rates are the prevailing market rates."  *Farbotko*,

433 F.3d at 209 (quoting *Blum*, 465 U.S. at 896 n. 11).  Ideally, included in the fee

applicant's attorney's affidavits should be information regarding the credentials of each

attorney seeking reimbursement, as well as an affidavit by a disinterested local

practitioner attesting to the relevant prevailing market rates.  *McDonald*, 450 F.3d at 97

& n. 5.  A district court may also take "judicial notice of the rates awarded in prior cases

and the court's own familiarity with the rates prevailing in the district."  *Farbotko*, 433

F.3d at 209.

        With regard to the hourly rates requested, Defendants have submitted exhibits,

including copies of biographies for each of the five Gibson Dunn attorneys for whom

Defendants seek reimbursement of their fees, Defendants' Exh. A, as well as two

charts displaying the hourly rates charged by attorneys at comparable law firms.

Defendants' Exhs. C and D.  According to the biographies, Gibson Dunn Senior Partner

Snyder, whose regular hourly rate is $ 955, has over 25 years of experience litigating

both civil and criminal matters, including high-profile and sensitive matters for numerous

prominent clients, and also has extensive experience in cases involving fraud, the

media, entertainment and technology.  Defendants' Exh. A at 2.  Mr. Snyder's litigation

skills have been recognized in several publications including, *inter alia*, *Chambers USA:

America's Leading Lawyers for Business*, *The Best Lawyers in America*, *New York

Magazine's Best New York Lawyers*; the *US Legal 500*, and *New York Super Lawyers

2011*.  *Id*.  Mr. Snyder's role relevant to the instant Fee Application was limited to

providing strategic counseling and reviewing and editing briefs and letters.  Fee Application at 6.

Gibson Dunn partner Dupree, whose regular hourly rate is $ 850, works in the law firm's Washington, D.C. officer, previously served in the Civil Division at the U.S. Department of Justice from 2007 to 2009, becoming the Principal Deputy Assistant Attorney General where he was responsible for managing cases involving regulatory, commercial, constitutional and national security matters for numerous federal agencies, the White House, and senior federal officials.  Defendants' Exh. A at 5.  Mr. Dupree has represented clients throughout the country on both trial and appellate matters, arguing more than 60 appeals in federal courts and has appeared in all thirteen federal circuits. *Id*.  Mr. Dupree's role with regard to this Fee Application has been drafting and editing the legal memoranda.  Fee Application at 7.  Gibson Dunn partner Southwell, whose regular hourly rate is $ 825, is co-chair of the law firm's Information Technology and Data Privacy practice group, specializing in complex civil litigation, white-collar criminal defense, internal investigation matters, information technology, theft of trade secrets and intellectual property, computer fraud, national security, and network and data security issues.  Defendants' Exh. A at 6.  While serving as an Assistant United States Attorney in the Southern District of New York between 2011 and 2007, Mr. Southwell concentrated on investigating and prosecuting computer hacking and intrusion cases, intellectual property and other high-technology offenses, securities fraud, wire and mail fraud, child exploitation, and immigration crimes.  *Id*. at 6-7.  Mr. Southwell also is an Adjunct Professor of Law at Fordham University School of Law, teaching a "seminar on cyber-crimes, covering computer misuse crimes, intellectual property offenses, the

Fourth Amendment in cyber-space, computer evidence at trial, date breach and privacy

issues, and information security . . . ." *Id*. at 7.  With regard to the instant Fee

Application, Mr. Southwell's role has been identifying and leading the discovery on

critical compliance issues, developing strategy, corresponding with experts regarding

the webmail consents, client communications, correspondence with opposing counsel,

review and revising legal memoranda, and drafting attorney declarations.  Fee

Application at 8.

Gibson Dunn sixth-year associate Benjamin, whose regular hourly rate is $ 670,

was recognized in *Super Lawyers New York* magazine as a Rising Star in litigation, and

his practice focuses on white collar criminal defense, internal and regulatory

investigations, and complex commercial litigations, with corporate and individual clients

in the financial services, health care, technology, construction, and manufacturing

industries.  Defendants' Exh.  A at 8.  In connection with the Fee Application, Mr.

Benjamin has identified key issues presented by Plaintiff's noncompliance,

corresponded with experts regarding the webmail consent forms, developing strategy,

drafting client communications with opposing counsel, reviewing and revising legal

memoranda, coordinating filing and drafting declarations.  Fee Application at 8.  Gibson

Dunn second-year associate Aycock, whose regular hourly rate is $ 450, works in the

law firm's litigation department.  Defendants' Exh.  A at 9.  Aycock received her Juris

Doctor, *cum laude*, from the University of Pennsylvania Law School, and also has a

French Master of Global Business Law, *cum laude*, from the Sorbonne and Sciences

Politiques.  *Id*.  With regard to the Fee Application, Aycock conducted research

pertaining to factual and legal issues, provided summary and analysis of such research,

drafted and finalized documents for filing, performed proof-reading and cite-checking of papers to be filed, and drafted declarations and correspondence with clients and opposing counsel.  Fee Application at 8-9.

Plaintiff does not challenge the hourly rates these five Gibson Dunn attorneys maintain are their standard rates, nor does Plaintiff question whether any of Gibson Dunn's high-profile clients actually pays such rates.[12]  Plaintiff also does not question Defendants' decision to voluntarily reduce their attorney's standard hourly rates by 25%.  Moreover, a comparison of Gibson Dunn's hourly rates for 2011, both standard and discounted, with other similar firms in the New York City region and other large metropolitan areas of the United States, as listed in a 2011 NLJ Billing Survey ("2011 Billing Survey"),[13] establishes such rates are comparable to those charged by similar law firms.  For example, the standard hourly rate charged in 2011 by the well-known law firm of Hughes Hubbard & Reed in New York City ranged from $ 625 to $ 990 for partners, and from $ 270 to $ 695 for associates.  *Id*. at 1.  The 2011 Billing Survey lists the hourly billing rates for Hodgson Russ, the largest law firm located in Buffalo, at $ 685 as the highest partner billing rate and $ 420 as the highest associate billing rate.  *Id*.  When these rates are compared to Defendants' voluntarily reduced rates, ranging from $ 337.50 for second-year associate Ms. Aycock, to $ 716.25 for senior partner Mr. Snyder, the Gibson Dunn rates are similar.

---

[12] For example, Mr.  Snyder's corporate clients include, *inter alia*, Cablevision, CNN, Sony, Time Warner, and Turner Broadcasting Systems.  Defendants' Exh. A.  High-profile individual clients include, *inter alia*, Julie Andrews, Anderson Cooper, Bob Dylan, The Rolling Stones, Jerry Seinfeld, Bruce Springsteen, and Barbara Walters. *Id.*

[13] A copy of the 2011 Billing Survey is filed as Defendants' Exh. D.

Moreover, the time records submitted by Defendants establish that the work on the Accelerated Motion to Compel was arranged so that those attorneys whose hourly rates were lower performed substantially more work than those whose hourly rates are significantly higher, with 76.30 of the total 176.95 hours performed by Ms. Aycock, 44.65 hours by Mr. Benjamin, 24.5 hours by Mr. Southwell, 21.75 hours by Mr. Dupree, and only 9.75 hours by Mr. Snyder.  The claimed work distribution establishes that, appropriately, the most work was performed by the lowest level associates at lower rates than the partners.  *See Beech Cinema, Inc. v. Twentieth Century Fox Film Corp.*, 480 F.Supp. 1195, 1197 (S.D.N.Y. 1979) ("Many of the functions performed by the partners could have been satisfactorily accomplished by associates, with a considerable saving in fees."), *aff'd*, 622 F.2d 1106 (2d Cir. 1980).  In fact, when the total fees claimed, $ 84,196.33, is divided by the total number of hours worked, 176.95, the resulting hourly rate is $ 475.82, which is less than the average 2011 hourly rate for DLA Piper associates, calculated, according to the rates listed in the 2011 Billing Survey, the accuracy of which Plaintiff has not challenged, at $ 525.[14]

Based on Defendants' submissions in support of its attorneys' hourly rates, the authenticity or accuracy of which Plaintiff does not dispute, the court finds that Gibson Dunn's hourly billing rates are in line with the prevailing market rates for attorneys of similar credentials at large New York City law firms.  As such, the court will apply the hourly rates claimed by Defendants' attorneys, as discounted by Defendants.

---

[14] The 2011 Billing Survey lists DLA Piper's 2011 Associate Billing Rate as ranging from a low of $ 320 to a high of $ 730, the average of which is $ 525.

3.      **Adequacy of Time Records**

Plaintiff argues Defendants' failed to submit documentation establishing the

Gibson Dunn attorneys kept contemporaneous billing records, and also engaged in

impermissible "block-billing" whereby the time expended on multiple tasks was

aggregated into a single billing entry, such that it is impossible to assess whether the

hours billed are reasonable.  Plaintiff's Response at 9-11.  According to Plaintiff,

although Southwell attempted to edit from such block-billed entries the time that did not

pertain to the Accelerated Motion to Compel for which the undersigned awarded

Defendants' request for sanctions, Mr. Southwell's personal observations as to the

other attorneys' work is insufficient to support the requested hours.  *Id*. at 10.

Although the practice of "block-billing" renders it difficult, if not impossible, for the

court to evaluate the reasonableness of the time spent on a given task, block-billing is

not prohibited in the Second Circuit.  *See Green v. City of New York*, 403 Fed.Appx.

626, 630 (2d Cir. 2010) (affirming district court's 15% across-the-board reduction of

hours based on pervasive block billing in time entries submitted by counsel, concluding

that the practice raised questions regarding the reasonableness of the entries).  Rather

than attempt to identify specific hours that should be eliminated for duplication of efforts

or vagueness, the court is permitted to make a simple reduction in the number of hours

to "trim the fat."  *McDonald*, 450 F.3d at 96 (citing *Kirsch v. Fleet Street, Ltd.*, 148 F.3d

149, 173 (2d Cir. 1998) (deducting a "reasonable percentage of the number of hours

claimed" to account for "excessive, redundant, or otherwise unnecessary" hours)).  See

*New York State Association for Retarded Children v. Carey*, 711 F.2d 1136, 1146 (2d

Cir. 1983) (recognizing that because "it is unrealistic to expect a trial judge to evaluate

and rule on every entry in an application," a specific percentage cut is "a practical means of trimming fat from a fee application.").

In the instant case, Defendants explain that although the Gibson Dunn attorneys did keep detailed and contemporaneous billing records, they were not required to attach such billing records to the Fee Application. Defendants' Reply at 5-6. Rather, a review of Defendants' documentation in support of its attorney's Fee Application, including a billing schedule listing which attorneys worked on the Accelerated Motion to Compel on which dates and for how long, Defendants' Exh. B ("Billing Schedule") establishes that, despite some disfavored block-billing, contemporaneous time records were kept by each attorney who worked on the matter from which Mr. Snyder, who was personally involved with the Accelerated Motion to Compel, was able to extrapolate the precise number of hours actually spent on the task. Southwell Declaration ¶¶ 15-17; Defendants' Reply at 4. Further, the Billing Schedule presented in support of this motion includes a narrative description of the specific task performed on a particular date, identifies the Gibson Dunn attorney who performed the task and the relevant hours billed by the attorney for the task. Defendants' Exh. B. Contrary to Plaintiff's assertion that the Billing Schedule is nothing more than a "guesstimate" as to how much time was actually spent on the Accelerated Motion to Compel and, thus, fails to support the attorney's fees requested, Plaintiff's Response at 3, a district court can award attorney's fees "in the absence full contemporaneous records," so long as the court finds a reasonable basis for making such exception. *Scott v. City of New York*, 626 F.3d 130, 132-34 (2d Cir. 2010) (remanding attorney fee award to district court to explain basis on which attorney was excepted from submitting contemporaneous time

records with fee application).

In the instant case, the court's determination of the amount of attorney's fees to award would not have been aided by the contemporaneous records containing some block-billed entries.  Rather, the detailed narrative on the Billing Schedule, which was compiled from the contemporaneous billing records, but adjusted by excising from any block-billed entries the time that was spend on matters other than the Accelerated Motion to Compel, as determined by Mr. Snyder who, based on his personal knowledge and experience with the case, was better able to make such determination than either the court or Plaintiff, is more helpful to the court.  Nevertheless, block-billing is disfavored.  *See Mautner v. Hirsch*, 831 F.Supp. 1058, 1077 (S.D.N.Y. 1993) (excluding in their entirety attorney fees requested for hours combined together in blocks without any breakdown as too vague), *aff'd*, 32 F.3d 37 (2d Cir. 1994).

Accordingly, with the exception of a 10% reduction to "trim" any "fat" remaining in the claimed attorney's fees, Defendants' Fee Application is GRANTED; Defendants are awarded $ 75,776.70 in attorney's fees.


**4.      Reasonableness of Claimed Hours**

Plaintiff asserts the number of hours for which Defendants seek attorney's fees in connection with the Accelerated Motion to Compel is excessive because the motion involved only three court filings containing seven pages of substantial facts and law, and 13 pages of exhibits and affidavits.  Plaintiff's Response at 11-12.  According to Plaintiffs, "Defendants seek more than $ 84,000 in attorney's fees in connection with those 20 pages of filed pleadings."  *Id*. at 12.  Defendants argue in opposition that

34

Plaintiff has not specifically refuted any of the hours for which Defendants request attorney's fees but, rather, "trivializes" the amount of work with a "flippant response" describing Defendants' papers filed in connection with the Accelerated Motion to Compel as "a grand total of 22 pages, rounded up."  Defendants' Reply at 6.

Defendants seek reimbursement for a total of 176.95 hours expended by five attorneys who worked on the Accelerated Motion to Compel.  According to Defendants, the Accelerated Motion to Compel was necessitated by Plaintiff's "month-long campaign of obstruction," and necessitated considerable time expended for multiple legal memoranda, correspondence with counsel, legal research, and the handling of the email information consent forms.  Defendants' Reply at 6.  The Billing Schedule's entries are consistent with this assertion.

Plaintiff does not challenge a single entry in the Billing Schedule Defendants submit in support of these hours as excessive, redundant or unnecessary.  See *Kirsch*, 148 F.3d at 173 (deducting a "reasonable percentage of the number of hours claimed" to account for "excessive, redundant, or otherwise unnecessary" hours).  In the absence of specific objections to the number of hours claimed, the district judge cannot be expected to review, evaluate and rule on every entry in an attorney's fee application. *New York State Ass'n for Retarded Children*, 711 F.2d at 1146.  Plaintiff, by failing to submit any evidence challenging the accuracy and reasonableness of the hours charged, has waived such objection.  *Blum*, 465 U.S. at 892 n. 5.  Accordingly, the court makes no reduction to the number of hours for which Defendants seek attorney's fees.

5.      **Fees for Fee Application Preparation**

Defendants seek an award of attorney's fees for the time spend preparing the

Fee Application.  Fee Application at 19-20.  Plaintiff has not responded in opposition to

this request.

A party awarded attorney's fees is also entitled to compensation "for time

reasonably spent in preparing and defending" the fee application.  *Weyant v. Okst*, 198

F.3d 311, 316 (2d Cir.1999).  That *Weyant* involved an award of attorney's fees

pursuant to the civil rights fee-shifting statute, 42 U.S.C. § 1988, does not dissuade a

similar award in connection with attorney's fees awarded as a sanction.  Accordingly,

Defendants are entitled to recover attorney's fees and costs incurred in connection with

the preparation and defense of their attorney's fee award.


6.      **Prohibition Against Filing Papers**

Defendants urge the court to issue, in light of "Plaintiff's extensive record of

discovery misconduct and recent blizzard of meritless and premature motions," an order

prohibiting Plaintiff from filing additional, non-responsive papers or pleadings, or

otherwise prosecuting this action, until and unless the attorney's fees awarded herein

are paid in full.  Defendants' Memorandum at 20.  According to Defendants, "[p]ayment

of a sanction is the cost a party must bear 'for the privilege of continuing to litigate.'"  *Id*.

at 2 (quoting *Corely v. Rosewood Care Center, Inc.*, 142 F.3d 1041, 1057 (7th Cir.

1998).  In opposition, Plaintiff asserts Defendants' reliance on *Corley* is misplaced given

that at issue in *Corley* was the payment of a court-imposed sanction, not an attorney's

fee award.  Plaintiff's Response at 12.  In further support of their request, Defendants

maintain that in *Corely*, the court affirmed the district court's requirement that the sanctioned party "immediately" satisfy the imposed sanction before resuming litigation of the case.  Defendants' Reply at 7.

First, Defendants' reliance on *Corely* in support of Defendants' request for a court order prohibiting Plaintiff from further prosecuting this action until and unless the attorney's fees awarded are paid in full is inapposite.  Rather, in *Corely*, the Seventh Circuit did state that "when a party or its counsel are sanctioned in the course of litigation, immediate payment of the sanction is the cost the two must bear for the privilege of continuing to litigate," *Corely*, 142 F.3d at 1057, implying the district court had prohibited the sanctioned plaintiff from further prosecuting the action until and unless payment of the court-imposed sanction was made; yet the issue before the court was not whether the sanctioned party was prohibited from further litigating the action until the sanction was paid, but whether, after paying the sanction, the sanctioned party could challenge on appeal the court's imposition of the sanction.  *Id*.  at 1057-58.  Whether the sanctioned party was precluded from litigating the action until the imposed fine was satisfied simply is not discussed and, as such, *Corely* does not support Defendants' request.

This interpretation of *Corely* is consistent with the Seventh Circuit's recent consideration of a sanctioned party's failure to pay a court-imposed sanction in *Williams v. Adams*, 660 F.3d 263 (7th Cir. 2011).  The plaintiff in *Williams* brought a § 1983 action against police officers alleging false arrest.  *Williams*, 660 F.3d at 264-65.  After the plaintiff survived summary judgment, the plaintiff was ordered to file a final pretrial order, which plaintiff's repeated failure to do ultimately resulted in a court-imposed

37

sanction in excess of $ 9,000.  *Id*. at 265.  When the plaintiff was unable to pay the fine,

the defendants filed a motion to dismiss the action for failure to obey a court order,

which the district court granted. *Id*.  On appeal, the Seventh Circuit, stating "a plaintiff's

inability to pay a monetary sanction imposed in a civil lawsuit should not automatically

justify the alternative sanction of dismissal," held that dismissal of the action was too

harsh a sanction and reversed the judgment of dismissal.  *Id*. at 266-67 (noting a

possible favorable judgment and the action's settlement value as potential sources of

payment of the sanction).  This is consistent with the Second Circuit's direction that an

order of dismissal predicated solely on a plaintiff's failure to pay sanctions and file

security for costs is an abuse of discretion.  *Selletti v. Carey*, 173 F.3d 104, 113 (2d Cir.

1999).  Rather, prior to dismissing an action for failure to pay court-imposed sanctions,

the court must consider the sanctioned party's ability to pay, as well as whether the

sanctioned party would likely have the funds to pay the sanction from a damages award

should the action ultimately be decided in favor of the sanctioned party.  *Id*. at 111-13.

     Accordingly, this aspect of Defendants' Fee Application is DENIED.

**CONCLUSION**

Based on the foregoing, in accordance with the January 10, 2012 Decision and

Order (Doc. No. 283), Defendants Fee Application is GRANTED in part and DENIED in

part; Defendants are awarded in connection with their Accelerated Motion to Compel

**$ 75, 776.70** in attorney's fees.  Defendants are further ORDERED to file **within ten**

**(10) days**, affidavits of attorney's fees and costs incurred preparing and defending the

Fee Application.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      February 14, 2012
            Buffalo, New York