UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

|  |  |  |
|---|---|---|
| PAUL D. CEGLIA, | x : : | |
| Plaintiff, | : : : | |
| v. | : : | Civil Action No. 1:10-cv-00569-RJA |
| MARK ELLIOT ZUCKERBERG and FACEBOOK, INC., | : : : | |
| Defendants. | : : x | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS

Thomas H. Dupree, Jr.
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
(202) 955-8500

Orin Snyder
Alexander H. Southwell
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue, 47th Floor
New York, NY 10166-0193
(212) 351-4000

Terrance P. Flynn
HARRIS BEACH PLLC
726 Exchange Street
Suite 1000
Buffalo, NY 14210
(716) 200-5120

March 26, 2012

# TABLE OF CONTENTS

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................... 1

BACKGROUND ..................................................................................................... 10

ARGUMENT ......................................................................................................... 20

    I.     THIS COURT HAS THE INHERENT POWER TO DISMISS
          THIS LAWSUIT ............................................................................ 20

          A.     Dismissal Is The Proper Remedy When The Plaintiff Has
               Perpetrated A Fraud On The Court ........................................... 20

          B.     Dismissal Is Warranted When The Plaintiff Has Destroyed
               Evidence And Engaged In Litigation Misconduct.................... 26

    II.    THIS LAWSUIT IS A FRAUD ON THE COURT AND MUST BE
          IMMEDIATELY DISMISSED .......................................................... 28

          A.     The Discovery Of The StreetFax Contract Proves That  The Work
               For Hire Document Is A Forgery............................................. 28

          B.     Forensic Testing Further Establishes That The Work For Hire
               Document Is A Forgery ........................................................... 38

          C.     The Purported "Emails" Quoted In The Amended Complaint
               Are Fabricated........................................................................ 45

    III.    THIS LAWSUIT MUST BE IMMEDIATELY DISMISSED BECAUSE
          CEGLIA HAS DESTROYED CRITICAL EVIDENCE AND
          COMMITTED SEVERE LITIGATION MISCONDUCT.................... 51

          A.     Ceglia Created A New Version Of The Forged Work For Hire
               Document And Then "Baked" It............................................... 51

          B.     During The Pendency Of This Litigation, Ceglia Willfully
               Destroyed USB Drives That Contained Electronic Images Called
               "Zuckerberg Contract" In A Folder Called "Facebook Files"................ 57

          C.     Ceglia Twice Reinstalled Windows On His Computer In An
               Attempt To Destroy Evidence ................................................. 59

          D.     Ceglia Has Deleted Electronic Copies Of The Work For Hire
               Document And Other Relevant Electronic Evidence During This
               Lawsuit................................................................................... 61

E.     Ceglia Has Engaged In Extensive Litigation Misconduct ........................ 62

CONCLUSION ...................................................................................................................... 66

# TABLE OF AUTHORITIES

**Cases**                                                                   **Page(s)**

*Airplanes of Boca, Inc. v. United States ex rel. FAA*,
    254 F. Supp. 2d 1304 (S.D. Fla. 2003) ................................................................. 46

*Aoude v. Mobil Oil Corp.*,
    892 F.2d 1115 (1st Cir. 1989)................................................. 21, 22, 23, 24

*Brady v. United States*,
    877 F. Supp. 444 (C.D. Ill. 1994) .............................................................. 24

*Cerasani v. Sony Corp.*,
    991 F. Supp. 343 (S.D.N.Y. 1998) ............................................................ 13

*Cerruti 1881 S.A. v. Cerruti, Inc.*,
    169 F.R.D. 573 (S.D.N.Y. 1996) ............................................................... 24

*Chambers v. NASCO, Inc.*,
    501 U.S. 32 (1991).................................................................................. 7, 20

*Combs v. Rockwell Int'l Corp.*,
    927 F.2d 486 (9th Cir. 1991) ..................................................................... 24

*Cook v. Am. S.S. Co.*,
    134 F.3d 771 (6th Cir. 1998) ..................................................................... 25

*Corto v. Nat'l Scenery Studios*,
    1997 WL 225124 (2d Cir. May 5, 1997) .......................................... 21, 25

*DAG Jewish Directories, Inc. v. Y & R Media, LLC*,
    2010 WL 3219292 (S.D.N.Y. Aug. 12, 2010)............................ 22, 23, 25

*Davis v. Speechworks Int'l, Inc.*,
    2005 WL 1206894 (W.D.N.Y. May 20, 2005)......................................... 28

*Greviskes v. Univs. Research Ass'n*,
    417 F.3d 752 (7th Cir. 2005) ..................................................................... 65

*Gutman v. Klein*,
    2008 WL 4682208 (E.D.N.Y. Oct. 15, 2008)......................................... 27

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.*,
    322 U.S. 238 (1944)................................................................... 20, 21, 26

*Jensen v. Phillips Screw Co.*,
    546 F.3d 59 (1st Cir. 2008)....................................................................... 25

iii

*Jimenez v. Madison Area Technical Coll.*,
    321 F.3d 652 (7th Cir. 2003) ................................................................ 24

*Leon v. IDX Sys. Corp.*,
    464 F.3d 951 (9th Cir. 2006) ................................................................ 27

*Link v. Wabash R.R. Co.*,
    370 U.S. 626 (1962) ............................................................................. 22

*Martina Theatre Corp. v. Schine Chain Theatres, Inc.*,
    278 F.2d 798 (2d Cir. 1960) ................................................................ 21

*Nat'l Hockey League v. Metro. Hockey Club, Inc.*,
    427 U.S. 639 (1976) ............................................................................. 22

*Penthouse Int'l, Ltd. v. Playboy Enters., Inc.*,
    663 F.2d 371 (2d Cir. 1981) ................................................................ 64

*Pope v. Fed. Express Corp.*,
    974 F.2d 982 (8th Cir. 1992) ................................................................ 24

*Reilly v. NatWest Mkts. Grp.*,
    181 F.3d 253 (2d Cir. 1999) ................................................................ 26

*Sentis Grp., Inc. v. Shell Oil Co.*,
    559 F.3d 888 (8th Cir. 2009) ................................................................ 25

*Shangold v. Walt Disney Co.*,
    275 F. App'x 72 (2d Cir. 2008) ............................................. 7, 22, 23, 39, 42

*Shangold v. Walt Disney Co.*,
    2006 WL 71672 (S.D.N.Y. Jan. 12, 2006) ............................................ 23

*Silvestri v. Gen. Motors Corp.*,
    271 F.3d 583 (4th Cir. 2001) ................................................................ 27

*S. New England Tel. Co. v. Global NAPs Inc.*,
    624 F.3d 123 (2d Cir. 2010) ............................................................ 26, 28

*State Farm Mut. Auto. Ins. Co. v. Grafman*,
    274 F.R.D. 442 (E.D.N.Y. 2011) ......................................................... 27

*Sun World, Inc. v. Lizarazu Olivarria*,
    144 F.R.D. 384 (E.D. Cal. 1992) ......................................................... 24

*United States v. Amiel*,
    95 F.3d 135 (2d Cir. 1996) ................................................................... 40

*United States v. Dixon*,
   650 F.3d 1080 (8th Cir. 2011) ............................................................ 40

*United States v. Hollins*,
   811 F.2d 384 (7th Cir. 1987) .............................................................. 40

*United States v. Parsons*,
   967 F.2d 452 (10th Cir. 1992) ............................................................ 40

*United States v. Wilson*,
   441 F.2d 655 (2d Cir. 1971) ............................................................... 40

*Vargas v. Peltz*,
   901 F. Supp. 1572 (S.D. Fla. 1995) ..................................... 22, 24, 26, 27

*West v. Goodyear Tire & Rubber Co.*,
   167 F.3d 776 (2d Cir. 1999) ......................................................... 26, 28

*Zinn v. United States*,
   _ F. Supp. 2d _, 2011 WL 6202890 (S.D. Fla. 2011) ............................ 46

## Statutes And Rules

15 U.S.C. § 260a(a) ................................................................................ 47

Fed. R. Civ. P. 37(b) .............................................................................. 26

## Other Authorities

27 Am. Jur. Proof of Facts 3d 489 § 84 (1994) ........................................ 40

*A Special Report on Social Networking:  Global Swap Shops*,
   Economist, Jan. 30, 2010 .................................................................. 13

Steven Bertoni, *How Much Is Facebook Worth?*,
   Forbes, Jan. 18, 2010 ....................................................................... 13

Simon Briggs, *Winklevoss Twins Lose Their Facebook Status*,
   Sunday Telegraph, Apr. 4, 2010 ........................................................ 13

John Cassidy, *Me Media: How Hanging out on the Internet Became Big Business*,
   New Yorker, May 15, 2006 ................................................................ 38

Libby Copeland, *Click Clique: Facebook's Online College Community*,
   Wash. Post, Dec. 28, 2004 ................................................................ 13

Eisenberg, *Timberlake Join Social Network*,
   Film J. Int'l, Nov. 1, 2009 ................................................................ 14

*Gawking Over "Clone" Site*,
  N.Y. Post, Feb. 21, 2010 ........................................................................................... 13

Maria Halkias, *Stores' Newest Friend in Sales?  Marketers Turn to Social
  Networking on Facebook*, Dallas Morning News, Dec. 17, 2008 ........................... 13

Dan Herbeck, *Court Hears WNYer Suit Alleging Facebook Stake*,
  Buffalo News, Oct. 14, 2010 .................................................................................... 16

Dan Herbeck, *WNYer Loses Bid to Move Facebook Suit*,
  Buffalo News, Mar. 29, 2011 ................................................................................... 16

Claire Hoffman, *The Battle for Facebook*,
  Rolling Stone, June 26, 2008 ................................................................................... 38

Michiko Kakutoni, *Company on the Verge of a Social Breakthrough*,
  N.Y. Times, June 8, 2010 ......................................................................................... 13

David Kirkpatrick, *The Facebook Effect* (2010) ................................................... 10, 38

Michael Levenson, *Facebook, ConnectU Settle Dispute*,
  Boston Globe, June 27, 2008 ................................................................................... 13

Claire Cain Miller, *For Start-Ups, Late Bursts of Private Cash*,
  N.Y. Times, Apr. 1, 2010 ......................................................................................... 13

*On SecondMarket, Facebook Worth More Than Yahoo*,
  Silicon Valley/San Jose Bus. J., June 4, 2010 ........................................................ 13

Emil Protalinski, *Exclusive: Paul Ceglia Says Facebook Is Doing The Forgery*,
  ZDNet, Aug. 16, 2011 ................................................................................................ 3

James Quinn, *Facebook Nears $800m Revenue*,
  Daily Telegraph, June 19, 2010 .............................................................................. 13

Brad Stone, *Valuing Facebook*,
  N.Y. Times, July 4, 2008. ........................................................................................ 13

Alan J. Tabak, *Hundreds Register for New Facebook Web Site*,
  Harvard Crimson, Feb. 9, 2004 .............................................................................. 10

*The Trailer for "The Social Network,"*
  Dealbook, June 28, 2010 ......................................................................................... 13

*Twins "Face" Future*,
  N.Y. Post, Dec. 27, 2009 ......................................................................................... 13

Bob Van Voris, *Facebook Would-Be Owner Says He Owes His Claim To Arrest*,
  Bloomberg.com, Aug. 2, 2010 ................................................................................. 15

Christina Warren, *First Poster for "The Social Network,"*
  Mashable, June 19, 2010........................................................................................... 13

Kaja Whitehouse, *What Is "Face" Value? – New Investment Pegs Zuckerberg's*
  *Site at $20B*, N.Y. Post, May 4, 2010 ...................................................................... 13

Joe Windish, *The Social Network: The Movie*,
  Moderate Voice, May 17, 2010 ................................................................................ 13

Jay Yarow, *Is the Facebook Movie Going To Be Terrible?*,
  Bus. Insider, June 20, 2010...................................................................................... 13

## PRELIMINARY STATEMENT

This lawsuit is a fraud.  Overwhelming objective evidence proves that Paul Ceglia and his co-conspirators have **forged documents**, **fabricated emails** and **committed spoliation** and other egregious, bad faith acts of **litigation misconduct**.  This case should be immediately dismissed.

Ceglia is a convicted felon with a long history of running scams, in at least one case through the use of forged documents.  Last summer, based on Defendants' substantial showing of fraud, this Court granted expedited discovery to allow Defendants to assemble evidence that Ceglia is perpetrating a fraud on the court based on his forged contract — the "Work for Hire Document" — and the fabricated "emails" he claims to have exchanged with Zuckerberg.  Defendants told the Court that once they had gathered additional evidence confirming the fraud through a forensic examination of Ceglia's computers, email accounts, and the Work for Hire Document itself, they would then move to dismiss this lawsuit.

The evidence is in.  And it is devastating for Ceglia and his cohorts.  As detailed below, Defendants have now established — beyond any conceivable doubt and based on objective scientific and forensic evidence — what common sense so powerfully demonstrates:  **the Work for Hire Document is forged, the purported emails are fabrications, and this entire lawsuit is a fraud and a lie**.  Ceglia and his co-conspirators have compounded their wrongdoing by destroying and tampering with evidence, obstructing discovery, and defying court orders.  They have no right to continue their abuse of the judicial system in hopes of extorting a settlement through their fraudulent scheme.

At the outset of this case, Mark Zuckerberg stated under oath that he never signed the forged Work for Hire Document that Ceglia attached to his Complaint.  Zuckerberg Decl. (Doc.

No. 46) ¶ 5.  He explained that he signed only an agreement to perform limited website development work for a now-defunct company named StreetFax — an agreement that said nothing about Facebook or any other social networking website.  *Id*. ¶¶ 7-10.  Ceglia responded with a declaration in which he agreed that he and Zuckerberg signed only one agreement — but he claimed that Zuckerberg's account was false and that the agreement they signed was the Work for Hire Document, not a contract that only concerned StreetFax.  Ceglia Decl. (Doc. No. 65) ¶¶ 5-8.

　　　　This Court ordered Ceglia to make his computers available for inspection, and when Defendants' experts examined his hard drives, they made a case-ending discovery:  **they found the authentic StreetFax Contract**.  It was stored as an attachment to two emails that Ceglia had sent on March 3, 2004 from the ceglia@adelphia.net account to Jim Kole — an initial member of StreetFax who at the time was a lawyer at the international law firm Sidley Austin.  The subject line of Ceglia's first email to Kole read:  "page 1 of 2 for Streetfax contract w mark"; the subject line of his second email read:  "2 of 2 for streetfax contract."  Exactly as Zuckerberg had attested, the authentic StreetFax Contract concerned only StreetFax — it said nothing about Facebook.  *See* Report of Stroz Friedberg, LLC (Declaration of Alexander H. Southwell dated March 26, 2012 ("Southwell Decl."), Ex. A) ("Stroz Friedberg Report"), at 11-14.

　　　　The discovery of the StreetFax Contract left no doubt about the nature and extent of Ceglia's crime.  He had created the forged Work for Hire Document by doctoring the text of page 1 of the StreetFax Contract, adding in provisions purportedly giving him ownership of Facebook, then appended the doctored page 1 to the authentic page 2 of the StreetFax Contract (or a close facsimile thereof) — the page that contained Zuckerberg's signature.

During expedited discovery, Ceglia initially tried to conceal the hard drive containing the StreetFax Contract.  When Defendants found the StreetFax Contract during their forensic examination and exposed his fraud for all the world to see, Ceglia played the last, desperate card in his hand — he asserted that Zuckerberg and his lawyers had created a forged document themselves and somehow planted it on his hard drive.  *See* Emil Protalinski, *Exclusive: Paul Ceglia Says Facebook Is Doing The Forgery*, ZDNet, Aug. 16, 2011 (Southwell Decl., Ex. I).  Defendants soon exposed this lie as well.  With the Court's permission, they issued a subpoena to Sidley Austin, which found Ceglia's emails and the StreetFax Contract on the law firm's server, where the documents had resided since 2004.  *See* Stroz Friedberg Report at 18.

The discovery of the authentic StreetFax Contract on Ceglia's own hard drive and the Sidley Austin server — attached to emails that Ceglia himself sent in 2004 — brings this case to an end.  These documents are indisputably genuine.  They could not have been "planted" because they have existed since 2004, years before Ceglia emerged from the woodwork with his fraudulent claims.  Indeed, when Defendants discovered the StreetFax Contract and the emails to Kole on Ceglia's hard drive, he initially claimed that he sent them in 2004, asserting that they were privileged communications with his attorney; it was only after this Court overruled his frivolous privilege assertion and ordered him to produce them that Ceglia did an about-face and declared, for the first time, that the documents were "planted."  Moreover, forensic examination has revealed that TIFF images of the StreetFax Contract were uploaded onto Ceglia's computer minutes before the emails were sent to Kole — further proving that it could not have been planted.  And the email exchange in the following days between Kole and Ceglia discussing the StreetFax Contract and the work Zuckerberg was performing for StreetFax is additional, indisputable proof of authenticity.  *See* Stroz Friedberg Report at 15-17.

3

There is no need for further analysis.  The discovery of the StreetFax Contract proves that the Work for Hire Document is a forgery and compels the immediate dismissal of this fraudulent lawsuit.

Separate and apart from the indisputable electronic evidence establishing fraud, Defendants' experts have conducted extensive forensic testing on the physical Work for Hire Document itself.  This testing has further confirmed that the Work for Hire Document is a recently-created forgery.  Gerald LaPorte — a world-renowned forensic chemist and document dating specialist — tested the ink from the handwritten notations purportedly made when the document was signed in 2003.  **LaPorte determined that the ink is less than two years old.** *See* Report of Gerald M. LaPorte (Southwell Decl., Ex. B) ("LaPorte Report"), at 15.  Professor Frank Romano — one of the nation's leading document authentication experts with more than 50 years in the field — examined the typesetting and formatting of the Work for Hire Document and reached the same conclusion:  Page 1 of the Work for Hire Document is an "amateurish forgery." Report of Frank J. Romano (Southwell Decl., Ex. C) ("Romano Report"), at 2.  Romano found, among other things, that page 1 of the Work for Hire Document is printed in a very similar — but demonstrably different — font than page 2.  *Id.* at 9.

In fact, the Work for Hire Document is a historical impossibility.  The origins of Facebook have been exhaustively detailed and it is widely known that Zuckerberg did not even conceive of Facebook until around December 2003, making it impossible as a matter of historical fact that he could have signed a contract in April 2003 giving Ceglia an ownership stake in the non-existent business.  In addition, while page 1 of the authentic StreetFax Contract refers to "StreetFax, Inc.," when Ceglia retyped the forged page 1 of the Work for Hire Document, he mistakenly wrote in "StreetFax LLC" — a careless and devastating error when

4

forging a document purportedly signed in April 2003, as StreetFax LLC was not created until
<u>August</u> 2003.

Ceglia's fraud does not stop there.  His Amended Complaint — filed months after he
brought this case — purported to quote from "email" exchanges he claimed to have had with
Zuckerberg.  But Ceglia did not attach any emails to his Amended Complaint, and when this
Court ordered him to produce them, it turned out that **they did not exist**.   The so-called "emails"
were actually phony text that Ceglia had typed into backdated Microsoft Word documents.
Forensic examination of these documents revealed Ceglia's botched attempt at electronic
forgery.  *See* Stroz Friedberg Report at 23-26.  The Word documents were created on a
backdated computer — that is, a computer on which Ceglia had reset the system clock to dates in
2003 and 2004, to make it appear that the documents had been created around the time he
claimed to have been emailing with Zuckerberg.  But he erred by resetting the system clock to
October 2003 — a date before some of the "emails" contained in these documents were even
allegedly sent.  Additionally, when Ceglia typed in the make-believe text purportedly reflecting
the times the emails were sent, he mistakenly entered Eastern Daylight Time, forgetting that
during many of the months in question, Eastern Standard Time was in effect.  *See id.* at 27-28.

That Ceglia's "emails" quoted in the Amended Complaint are all fakes is further
confirmed by the fact that all purport to have been sent to and from Zuckerberg's Harvard email
account — yet <u>not a single one</u> exists on the Harvard server.  What <u>does</u> exist in the Harvard
account are numerous emails between Zuckerberg, Ceglia, and StreetFax employees concerning
Ceglia's failure to pay Zuckerberg for his StreetFax work — and Ceglia's repeated pleas for
forgiveness and his promises to scrape together the money he owed Zuckerberg.  The <u>real</u> emails
in Zuckerberg's account show that Zuckerberg <u>never</u> discussed Facebook or any social

networking website with Ceglia or his colleagues, and that Ceglia's story of a purported "partnership" with Zuckerberg to launch Facebook is a complete fiction. *See* Declaration of Bryan J. Rose dated March 26, 2012 ("Rose Decl.").

The authentic StreetFax Contract was not the only smoking gun evidence found on Ceglia's computer. Defendants also discovered seven different versions of the Work for Hire Document that are very similar (but not identical) to the version attached to Ceglia's Complaint — test forgeries that Ceglia had created last year during the course of this litigation. The metadata for these documents reveal Ceglia's attempts at backdating and document manipulation, as he repeatedly created different versions of the document and attempted to backdate them by adjusting the system clock on his computer. Ceglia also made extensive use of a hex editor — a program commonly used by electronic forgers that allows a user to edit the raw data that make up a file in a manner that makes the fraudulent changes to the document more difficult to detect — in testing the ways he could attempt to modify and manipulate Word documents without leaving a digital fingerprint. *See* Stroz Friedberg Report at 41-43.

The overwhelming objective evidence confirms what common sense makes clear: the Work for Hire Document is a forgery. Ceglia is a convicted felon — a career criminal and scam artist whose past crimes include stealing retirement funds from senior citizens, forging government documents as part of a land swindle, and running a scheme to defraud local residents by tricking them into buying nonexistent wood pellets. He is a grifter and hustler who would not have "forgotten" for seven years that he was the rightful owner of one of the most prominent companies in the world. This lawsuit is a shakedown aimed at extorting a fast payoff. Indeed, after Ceglia filed his Complaint, his lawyers immediately sought a meeting to discuss settlement — a strategy Ceglia candidly described in his "Lawsuit Overview" document that he used when

shopping his case to law firms.  Southwell Decl., Ex. G.  Ceglia has publicly boasted that he

believes he has leverage given Facebook's upcoming initial public offering.  As he said in an

email he sent to the Wellsville *Daily Reporter*: "You won't go public Mark [Zuckerberg], you

won't IPO, you won't pass go . . . I won't let you sell this company out from under me not while

I have the power to stop you."  *See* John Anderson, *Ceglia: Facebook planted a fake contract on

my computer*, Daily Reporter, Aug. 17, 2011 (Southwell Decl., Ex. H).

   This Court should not permit itself to be the instrument of Ceglia's attempted shakedown.

The Court is not powerless to protect the integrity of its own process and the rights of those that

Ceglia and his co-conspirators seek to victimize.  When fraud has been established, as it has

here, nothing requires a court to permit the fraudulent lawsuit to proceed through full discovery

or into summary judgment or trial.  To the contrary, the case must be dismissed immediately.

   The law is clear.  The Supreme Court and the Second Circuit have repeatedly held that

federal district courts have the inherent power to dismiss lawsuits where a plaintiff has submitted

forged documents or is otherwise perpetrating a fraud on the court.  *See Chambers v. NASCO,

Inc.*, 501 U.S. 32, 45 (1991) (explaining that "outright dismissal of a lawsuit" under the court's

inherent authority "is within the court's discretion"); *Shangold v. Walt Disney Co.*, 275 F. App'x

72, 73 (2d Cir. 2008) (affirming dismissal for fraud on the court because "the defendants

established, by clear and convincing evidence, that [the plaintiffs] submitted fraudulent evidence

to the district court in order to bolster their claim").  Here, of course, Ceglia has done far more

than merely file a forged document — he has based his entire lawsuit on the forgery.

   Finally, Ceglia's egregious misconduct during the course of this litigation provides an

independent ground for dismissal.  Ceglia has tampered with and destroyed critical evidence at

the heart of this case, including the Work for Hire Document on which his claims are based.

While the case was pending, Ceglia created a new physical version of that document — a new forgery, different from the forgery attached to his Complaint — and he produced that new version to Defendants' experts for their physical inspection.  Gus Lesnevich, one of the country's leading forensic document examiners, concluded that the document Ceglia produced to Defendants' experts and the document attached to his Complaint were different when he compared the handwritten interlineations in the documents and found 20 significant dissimilarities.  *See* Report of Gus R. Lesnevich (Southwell Decl., Ex. E) ("Lesnevich Report"), at 3.  Those dissimilarities establish that Ceglia created the new version of his forged contract by tracing the interlineations in the version attached to his Complaint — but he botched his tracing.

Before Ceglia produced his new version of the Work for Hire Document to Defendants' experts, he also attempted to give that version of the document an artificially aged appearance and frustrate ink analysis by "baking" it through extended exposure to light, resulting in a document with faded ink and off-white pages that looks very different from the version that Ceglia attached to his Complaint.  In fact, Defendants' experts discovered small indentations and nondiscolored areas at the top of each page — like the tan lines caused by a swimsuit — where Ceglia appears to have used clothespins or binder clips to suspend the document and expose it to sunlight.  Even Ceglia seems to acknowledge that he went too far, conceding that the Work for Hire Document "now appears as if someone altered it."  Doc. No. 199 at 8.  Given that Ceglia's own expert has acknowledged that the document's appearance was different when he examined it in January 2011, *see* Southwell Decl., Ex. P (Aginsky Interrogatories), at 7-8, and given that the document was in Ceglia's possession until Defendants' experts first examined it in July 2011, there is no doubt about who tampered with it.

In addition to altering the Work for Hire Document, Ceglia also destroyed six USB devices containing critical electronic evidence, including files entitled "Zuckerberg Contract page1.tif" and "Zuckerberg Contract page2.tif" that he stored in a folder labeled "Facebook Files." *See* Stroz Friedberg Report at 49-50.  There is no question that his destruction of this obviously relevant and potentially critical evidence was intentional and in bad faith, given that he had used three of the six devices while this lawsuit was ongoing.  In addition to spoliating the USB devices, he has twice during this litigation reinstalled Windows on his hard drive — another common tactic used by electronic forgers — in an attempt to overwrite the data on it.  *Id.* at 46-48.  The prejudice to Defendants is extreme:  while there is no way to identify all of the evidence that has now been lost forever, it is certain that the evidence was very harmful to Ceglia or else he would not have destroyed it.

Ceglia has also openly and repeatedly defied the orders of this Court.  When the Court directed him to produce the electronic evidence that he had not yet destroyed, Ceglia responded by instructing his attorneys not to comply with the Court's orders.  His attorneys notified this Court of their client's unlawful request and then promptly withdrew from the case.  This Court found that Ceglia had demonstrated "a plain lack of respect" for court orders "which cannot be countenanced."  Doc. No. 283 at 22.  In fact, Ceglia's contumacious defiance of court orders continues to this day.  Defendants recently learned that he has been concealing the existence of four email accounts that he has been using, including one entitled getzuck@gmail.com.

*        *        *

Ceglia has abused the judicial process.  He is perpetrating a fraud on the Court, Defendants, and the public.  This is a paradigmatic case for dismissal.  The Court should exercise its inherent authority and dismiss this lawsuit with prejudice.

## BACKGROUND

**(1)     Facebook Becomes One Of The Most Prominent, Well-Known Companies In The World.**

Mark Zuckerberg conceived of the idea for Facebook around December 2003, Zuckerberg Decl. (Doc. No. 46) ¶ 11, and launched Thefacebook.com on the afternoon of February 4, 2004.  Zuckerberg Decl. (Doc. No. 29-2) ¶ 25; David Kirkpatrick, *The Facebook Effect* 30 (2010) (Southwell Decl., Ex. J) ("On the afternoon of Wednesday, February 4, 2004, Zuckerberg clicked a link on his account with Manage.com.  Thefacebook.com went live."); Alan J. Tabak, *Hundreds Register for New Facebook Web Site*, Harvard Crimson, Feb. 9, 2004 (Southwell Decl., Ex. K) ("After about a week of coding, Zuckerberg launched thefacebook.com last Wednesday afternoon.").

In the years that followed, Facebook developed into the world's most popular social networking website.  It is a company that spans the globe and has revolutionized the ways in which people connect and share with one another.  Its growth has been extraordinary:

- February 2004:  Thefacebook.com launches
- December 2004:  1 million active users
- December 2005:  6 million active users
- December 2006:  12 million active users
- December 2007:  58 million active users
- December 2008:  145 million active users
- December 2009:  360 million active users
- June 2010:  482 million active users

*See* Facebook, Inc., Registration Statement 46-47 (Am. No. 2 to Form S-1) (Mar. 7, 2012), http://www.sec.gov/Archives/edgar/data/1326801/000119312512101422/d287954ds1a.htm.  Today, Facebook has more than 800 million active users.  *Id.*  The company employs more than 3,200 people, and its users spend more than 10.5 billion minutes per day on the site.  *Id.* at 85, 100.

> **(2)**      **In April 2003, Long Before Facebook Was Conceived, Zuckerberg**
> **Agreed To Perform Freelance Computer Programming Services As**
> **An Independent Consultant For StreetFax.**

In early 2003, while Zuckerberg was a freshman at Harvard University, and long before

he had created or even conceived of Facebook, he responded to an online job listing regarding

the development of a website.  Zuckerberg Decl. (Doc. No. 46) ¶¶ 6, 11.  He learned that the

project was for a company named StreetFax.  *Id*. ¶ 6.  StreetFax provided an on-line database of

photographs of traffic intersections for use by insurance adjustors on its website, StreetFax.com.

Am. Compl. (Doc. No. 39) ¶ 13.  Paul Ceglia was Zuckerberg's primary point of contact at

StreetFax.  *See id.* ¶¶ 15-16; Zuckerberg Decl. (Doc. No. 46) ¶ 7.

On April 28, 2003, Zuckerberg entered into a written contract with Street Fax, Inc., titled

"STREET FAX," under which he agreed to provide limited website development services for

StreetFax.com.  Zuckerberg Decl. (Doc. No. 46) ¶ 7; Southwell Decl., Ex. L ("StreetFax

Contract").  Ceglia provided the StreetFax Contract to Zuckerberg, and he and Zuckerberg

signed it.  Zuckerberg Decl. (Doc. No. 46) ¶ 7; Southwell Decl., Ex. L; Doc. No. 241-1.  The

StreetFax Contract stated that StreetFax would pay Zuckerberg a total of $18,000 for his

services:  "Buyer [Street Fax Inc.] agrees to pay seller [Zuckerberg] the Sum of $3,000 at the

onset of this contract.  The Buyer agrees to pay seller $2,000 on the due date of the project, and

upon completion Buyer agrees to pay seller an additional $13,000 US dollars within Thirty days

of delivery of the Final approved program."  *See* Southwell Decl., Ex. L § 3.  Zuckerberg and

Ceglia also signed a second, six-page document on April 28, 2003, titled "StreetFax Back-End

Technical Specification."  Because Ceglia has designated that document as confidential, it is

attached to the Declaration of Amanda M. Aycock dated March 26, 2012, which is being

publicly filed in redacted form.

The StreetFax Contract did not mention or concern Facebook or any related social networking service or website.  Zuckerberg Decl. (Doc. No. 46) ¶ 9; Southwell Decl., Ex. L.  Zuckerberg did not enter into, and has never entered into, any contract or agreement with Ceglia or StreetFax concerning Facebook or any related social networking website.  Zuckerberg Decl. (Doc. No. 46) ¶ 10.  Indeed, as noted above, Zuckerberg did not even conceive of Facebook until around December 2003, eight months after the execution of the StreetFax Contract.

Zuckerberg performed his web development work for StreetFax in 2003 and early 2004.  But Ceglia paid Zuckerberg less than half of what he was owed: $9,000 out of $19,500.[1]  *See* Rose Decl., Ex. F.  In a series of emails, Ceglia repeatedly acknowledged this debt and begged Zuckerberg for forbearance as Ceglia scrambled to find funds to pay the amount due.  For example, in a February 16, 2004 email to Zuckerberg, Ceglia wrote:

> I can fully understand your frustration and hope that you have felt and feel from me sincere regret for such huge delays. . . .  If there is any way I can assure you that I have absolutely every intention of paying you what is owed plus some when we finally catch up to our sales goals it would be appreciated to a level I [can't] express in words.  After all this time please allow us a little more time to make things right with you. . . .  I will nervously await your reply and hope you can grant us more time.

Rose Decl., Ex. G.

Ultimately, however, Ceglia never paid Zuckerberg anything more and their communications soon ended.  Zuckerberg last emailed Ceglia in March 2004, and Ceglia sent his last email to Zuckerberg in May 2004.  *See* Rose Decl., Exs. I, L.  Ceglia and Zuckerberg had no further communication after May 2004.

---

[1]  In November 2003, Ceglia had also agreed to pay Zuckerberg to build a separate "scroll search" functionality for the StreetFax website for $1,500, in addition to the $18,000 that Zuckerberg was due under the StreetFax Contract.  *See* Rose Decl., Exs. D, F.

     **(3)**     **In 2010, Ceglia Emerges From The Woodwork And Claims That He Owns 84% Of Facebook Based On A Fraudulent Contract — The "Work For Hire" Document.**

By June 2010, Facebook had long been the subject of widespread media coverage. The press had reported extensively on the extraordinary growth that Facebook had experienced since 2004.[2] Numerous sources reported that Facebook had been valued in the tens of billions of dollars and there was widespread public speculation that the company would soon undertake an initial public offering.[3] In addition, there had been numerous reports concerning the 2008 settlement of a lawsuit brought by Cameron Winklevoss, Tyler Winklevoss, and Divya Narendra, who claimed partial ownership of Facebook.[4] This lawsuit was the subject of a movie — "The Social Network" — that purported to recount the origins of Facebook and Zuckerberg's dispute with the Winklevosses. In June 2010, there was substantial publicity surrounding the forthcoming release of the movie, which arrived in theaters that October.[5]

---

[2]  *See, e.g.*, Libby Copeland, *Click Clique: Facebook's Online College Community*, Wash. Post, Dec. 28, 2004; Maria Halkias, *Stores' Newest Friend in Sales? Marketers Turn to Social Networking on Facebook*, Dallas Morning News, Dec. 17, 2008; Michiko Kakutoni, *Company on the Verge of a Social Breakthrough*, N.Y. Times, June 8, 2010; *see also Cerasani v. Sony Corp.*, 991 F. Supp. 343, 354 n.3 (S.D.N.Y. 1998) (court may take judicial notice of "widespread newspaper coverage").

[3]  *See, e.g.*, James Quinn, *Facebook Nears $800m Revenue*, Daily Telegraph, June 19, 2010; *On SecondMarket, Facebook Worth More Than Yahoo*, Silicon Valley/San Jose Bus. J., June 4, 2010; Kaja Whitehouse, *What Is "Face" Value? – New Investment Pegs Zuckerberg's Site at $20B*, N.Y. Post, May 4, 2010; Claire Cain Miller, *For Start-Ups, Late Bursts of Private Cash*, N.Y. Times, Apr. 1, 2010; *A Special Report on Social Networking: Global Swap Shops*, Economist, Jan. 30, 2010; Steven Bertoni, *How Much Is Facebook Worth?*, Forbes, Jan. 18, 2010, at 29.

[4]  *See, e.g.*, Simon Briggs, *Winklevoss Twins Lose Their Facebook Status*, Sunday Telegraph, Apr. 4, 2010; *Gawking Over "Clone" Site*, N.Y. Post, Feb. 21, 2010; *Twins "Face" Future*, N.Y. Post, Dec. 27, 2009; Michael Levenson, *Facebook, ConnectU Settle Dispute*, Boston Globe, June 27, 2008; Brad Stone, *Valuing Facebook*, N.Y. Times, July 4, 2008.

[5]  *See, e.g.*, *The Trailer for "The Social Network,"* Dealbook, June 28, 2010; Jay Yarow, *Is the Facebook Movie Going To Be Terrible?*, Bus. Insider, June 20, 2010; Christina Warren, *First Poster for "The Social Network,"* Mashable, June 19, 2010; Joe Windish, *The Social Network:*

In the midst of this widespread media coverage of Facebook's reported valuation, the settlements arising out of litigation surrounding the company's founding and ownership, and the forthcoming release of "The Social Network," Ceglia commenced this action in the New York Supreme Court for Allegany County.  On June 30, 2010, he filed a three-page complaint in which he claimed to own 84% of Facebook.  *See* Compl. (Doc. No. 1-4).  The Complaint alleged that, "[o]n April 28, 2003, [Zuckerberg] and [Ceglia] entered into a written contract, including but not limited to, [Ceglia] acquiring [a] Fifty Percent (50%) interest in the business of [Zuckerberg] and Facebook."  *Id.* ¶ 4.  The Complaint also alleged that Ceglia and Zuckerberg had agreed that, "after January 1, 2004, [Ceglia] would acquire an additional 1% interest in the business, per day, until the website was completed"; that "the website, thefacebook.com, was completed and operational on February 4th, 2004"; and that Ceglia had therefore "acquired an additional 34% interest in the business for a total of eight four percent (84%)."  *Id.* ¶¶ 6-8.

Ceglia attached to his Complaint a document entitled "'WORK FOR HIRE' CONTRACT," purporting to be the contract he signed with Zuckerberg on April 28, 2003 (the "Work for Hire Document").  Compl., Ex. B.  The first page of the Work for Hire Document states that it "reflects two seperate [sic] business ventures," the first being Zuckerberg's work for StreetFax, and the second being "a website similar to a live functioning yearbook with the working title of 'The Face Book.'"  *Id.* § 2.  The Work for Hire Document purportedly provides that Ceglia would pay Zuckerberg $1,000 for Zuckerberg's development of the StreetFax website, and would pay Zuckerberg an additional $1,000 for "the work to be performed for 'The Page Book.'"  *Id.* § 3.  The Work for Hire Document goes on to state that Ceglia would "own a half interest (50%) in the software, programming language and business interests derived from

---

*The Movie*, Moderate Voice, May 17, 2010; *Eisenberg, Timberlake Join Social Network*, Film J. Int'l, Nov. 1, 2009.

the expansion of ['The Face Book'] to a larger audience," and that Ceglia would receive an additional 1% interest "for each day the website is delayed" beyond January 1, 2004. *Id.* §§ 2-3. Page 2 of the document contains the signatures of Zuckerberg and Ceglia, and page 1 contains a handwritten interlineation with the initials "PC" and "MZ." Compl., Ex. B. All references to "The Face Book" or "The Page Book" appear on page 1.

When reporters asked Ceglia why he had remained silent for the past seven years regarding his claim to own 84% of Facebook, Ceglia explained that he had forgotten about the Work for Hire Document but had fortuitously discovered it when he was looking through his papers in the wake of his most recent arrest for consumer fraud. *See* Bob Van Voris, *Facebook Would-Be Owner Says He Owes His Claim To Arrest*, Bloomberg.com, Aug. 2, 2010, http://www.bloomberg.com/news/2010-08-02/facebook-would-be-owner-says-he-owes-claim-to-arrest-andrew-cuomo-lawsuit.html.

**(4)    When Defendants Make Clear They Will Not Submit To Extortion, Ceglia Responds By Hiring New Lawyers And Filing An Amended Complaint With New Allegations And Purported "Emails."**

Ceglia's lawsuit was nothing more than an attempted shakedown. Days after he filed his Complaint, Ceglia's counsel, Paul Argentieri, made clear the true motive behind this lawsuit — to extract a quick payment. To this end, Argentieri suggested an immediate meeting to discuss "settlement." Declaration of Lisa Simpson ¶ 4. Defendants refused, and made clear that they had no intention of acquiescing to Ceglia's extortionate demands. After Ceglia tried to keep this lawsuit out of federal court based upon spurious arguments concerning Zuckerberg's domicile, Defendants' attorneys told Ceglia's lawyers that the lawsuit was fraudulent and that Ceglia's Work for Hire Document was a forgery. In this regard, Defendants' counsel asked Ceglia's lawyers to make the physical Work for Hire Document available for inspection. Ceglia's lawyers declined Defendants' request.

15

Defendants also made clear in court hearings that "this entire lawsuit is a fraud."  Doc.

No. 34 at 33.  And they responded to press inquiries by explaining that Ceglia's lawsuit is a

"scam" and a "fraud brought by a convicted felon with a well-documented record of scamming

honest people."  *See* Dan Herbeck, *WNYer Loses Bid to Move Facebook Suit*, Buffalo News,

Mar. 29, 2011; Dan Herbeck, *Court Hears WNYer Suit Alleging Facebook Stake*, Buffalo News,

Oct. 14, 2010.

Defendants' unwavering position that they would not submit to extortion made Ceglia

realize that he was unlikely to get a quick payoff based on his original Complaint.  He thus

embarked on a quest to hire new lawyers who might be able to repackage and bolster his

fraudulent claims.  To that end, Ceglia's attorney Paul Argentieri sent a pitch document entitled

"Lawsuit Overview" to "multiple top tier law firms."  Southwell Decl., Ex. G at 3.  The Lawsuit

Overview — which Defendants obtained after this Court rejected Ceglia's attempt to conceal it

through frivolous claims of "privilege" (Doc. No. 208 ¶ 14; Doc. No. 156-2 at 4) — left no doubt

as to Ceglia's intentions.  It compared Ceglia's claims to the claims asserted by the

Winklevosses, pointedly noting that the Winklevoss lawsuit "settled for a reported $65 million of

shares in Facebook."  Southwell Decl., Ex. G at 5.  The Lawsuit Overview mapped out Ceglia's

strategy to extract a large payment from Defendants through "immediate settlement

negotiations."  *Id.*

DLA Piper LLP apparently found Ceglia's pitch attractive and signed on to represent

him.  Their team was headed by Robert Brownlie, who had previously worked at the Milberg

Weiss law firm, and was augmented by attorneys from Lippes Mathias Wexler Friedman LLP.

These lawyers filed Ceglia's Amended Complaint on April 11, 2011.  Am. Compl. (Doc. No.

16

39).  Like the original Complaint, the Amended Complaint attached a copy of the Work for Hire

Document as an exhibit and claimed that Zuckerberg had breached the purported contract.

But the Amended Complaint went well beyond the original version by purporting to

quote what Ceglia alleged were "emails" between Ceglia and Zuckerberg — emails that had not

been mentioned in the original Complaint or at any time during the then nine-month pendency of

the lawsuit.  Ceglia also changed his legal theories.  He abandoned his claim that he owned 84%

of Facebook, Inc., replacing it with a comparatively more modest, yet still preposterous, demand

for 50% of the shares that Zuckerberg received upon the formation of Facebook, Inc.  *See* Am.

Compl. ¶¶ 3-4 & pp. 23-24.  Ceglia also alleged, for the first time, that he had formed a general

partnership with Zuckerberg.  *Id.* ¶ 57.  Whereas Ceglia had originally claimed that he signed the

Work for Hire Document in 2003 and forgot about it until 2010, he now claimed that, after

signing the Work for Hire Document, he and Zuckerberg engaged in an intense, months-long

period of creative collaboration during which Ceglia contributed sweat equity to Facebook, along

with many innovative business and marketing ideas — after which they had an emotionally

charged falling out in 2004 and Ceglia forgot about Facebook until 2010.  *See id.* ¶¶ 31-55.

### (5)    Defendants Seek Expedited Discovery To Obtain Corroborating Evidence Of Ceglia's Fraud In Anticipation Of Filing A Motion To Dismiss.

On June 2, 2011, Defendants moved for expedited discovery into Ceglia's fraud.  Doc.

No. 45.  Their motion was supported by declarations from Zuckerberg and some of the world's

top forensic experts.  Doc. Nos. 46-53.  Zuckerberg attested that he did not sign the Work for

Hire Document; that he and Ceglia had signed a contract that only concerned StreetFax and had

never signed any agreement concerning Facebook; and that he did not write or receive any of the

"emails" quoted in the Amended Complaint.  Zuckerberg Decl. (Doc. No. 46) ¶¶ 5-14.

Defendants also submitted declarations from leading experts in document authentication and

digital forensic examination.  These experts determined that Ceglia's Work for Hire Document was an "amateurish forgery," Romano Decl. (Doc. No. 48) ¶ 16, and that Zuckerberg's Harvard email account did not contain any of the alleged "emails" — and in fact contained numerous authentic emails directly contradicting Ceglia's made-up version of events.  *See* Rose Decl. (Doc. No. 47) ¶¶ 7-8 & Exs. D-F.

Defendants also introduced evidence that Ceglia is a professional con artist with a long criminal history.  A comprehensive background investigation conducted by the nationally renowned investigative firm Kroll Associates, Inc. revealed that Ceglia is a convicted felon with a lengthy track record of scams and swindles.  Henne Decl. (Doc. No. 49).  For example, in 2005, Ceglia was arrested in Florida for trespass while trying to sell property in a private orange grove — property that he did not own — to an elderly couple.  *Id.* ¶ 12.  Notably, Ceglia forged government documents as part of this scheme, which involved the sale of worthless land in numerous states and foreign countries.  *Id.* ¶¶ 12-15.  In 2009, Ceglia was again arrested and charged with consumer fraud by the Allegany County District Attorney's Office — and sued by then-Attorney General Andrew Cuomo — for running another scam in which he purported to sell wood pellets to local residents for heating purposes, but then kept their money and never delivered the pellets.  *Id.* ¶¶ 5-8.

Defendants explained to the Court that this lawsuit is Ceglia's latest scam, and that expedited discovery would obviate the need for full discovery or further proceedings, such as summary judgment or trial, because it would "bring this case to an immediate end by establishing that the purported contract and emails are forgeries."  Doc. No. 45 at 1.  Defendants stated that their "objective [was] to obtain evidence, which [Defendants] would then present to this Court in support of a motion to dismiss the complaint on the grounds that [Ceglia] is

18

committing, has committed and intends to commit a fraud on this Court." Doc. No. 94 at 29.

Defendants stated that "[t]he integrity of the judicial process is best served by terminating a

fraudulent lawsuit at its inception rather than by permitting the fraud to move forward and

draining more resources from the innocent parties and the Court." Doc. No. 45 at 19.

On the eve of the expedited discovery hearing, Ceglia's lawyers at DLA Piper withdrew

from the case en masse, as did his lawyers with the Lippes Mathias firm. Ceglia — represented

by Paul Argentieri and a new lawyer, Jeffrey Lake — consented to expedited discovery. He

claimed that he wanted to "get to the truth as quickly as possible" and that he "wishe[d] to

establish the authenticity of these documents right away." Doc. No. 58 at 2, 14. Ceglia agreed

that, if expedited discovery demonstrated that the Work for Hire Document was a fraud, there

would be no need for full discovery or any further proceedings. At that point, he acknowledged,

the parties and the Court "should talk about having this case dismissed and moving on." Doc.

No. 94 at 86-87.

On July 1, 2011, based on Defendants' showing of "good cause" — *i.e.*, the declarations

and expert reports establishing fraud through the evidence available at that time — the Court

granted Defendants' motion and ordered expedited discovery. Doc. No. 83 at 1. The Court

ordered Ceglia to produce all original signed versions of the Work for Hire Document, all hard

copies of that document, and all hard copies of the purported "emails" described in the Amended

Complaint. *Id.* It also required Ceglia to produce the native electronic version and all purported

electronic copies of the Work for Hire Document, the original, native electronic versions and all

electronic copies of the purported "emails" described in the Amended Complaint, and all of his

computers and electronic media. *Id.* at 2.

What Defendants and the Court had anticipated would be a brief period of expedited discovery extended to nearly nine months.  The delay was directly and entirely attributable to Ceglia's bad faith litigation strategy of stonewalling, concealing and destroying evidence, and contemptuously defying court orders.  The difficulties and delays in securing Ceglia's compliance were compounded by his revolving door of lawyers and law firms.  Over the course of the expedited discovery period, <u>five</u> law firms abandoned their representation of Ceglia (DLA Piper; Connors Vilardo; Lippes Mathias; Edelson McGuire; and Lake APC).  Two of his lawyers withdrew after swearing under oath that Ceglia had ordered them not to comply with the orders of this Court.

Defendants moved <u>five times</u> to compel Ceglia's compliance — and this Court granted all five motions.  The Court ultimately imposed sanctions on Ceglia for his willful and bad faith litigation misconduct, finding that Ceglia had demonstrated "a plain lack of respect" for court orders "which cannot be countenanced."  Doc. No. 283 at 22.

Despite Ceglia's obstructionism, the expedited discovery served its purpose.  Precisely as Defendants had predicted, the expedited discovery produced massive amounts of evidence revealing the fraud, as discussed in detail below.

## ARGUMENT

## I. THIS COURT HAS THE INHERENT POWER TO DISMISS THIS LAWSUIT.

### A. Dismissal Is The Proper Remedy When The Plaintiff Has Perpetrated A Fraud On The Court.

**1.** The United States Supreme Court has held that district courts have the inherent power to dismiss lawsuits that are based on fraud.  *See Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 250 (1944) (a district court is "warranted in dismissing [a] case" once it "learn[s] of the fraud"); *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991) (explaining that

"outright dismissal of a lawsuit" under the court's inherent authority "is within the court's discretion").

Indeed, it is "elementary" that "a federal district court possesses the inherent power to deny the court's processes to one who defiles the judicial system by committing a fraud on the court." *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir. 1989). As the Second Circuit has explained, "[a] court has inherent authority . . . to conduct an investigation to determine if it is the victim of a fraud, and may impose sanctions, including dismissal, upon determining that such a fraud has taken place." *Corto v. Nat'l Scenery Studios*, No. 95-5080, 1997 WL 225124, at *3 (2d Cir. May 5, 1997).

The inherent power to dismiss is a long-recognized and critical gatekeeping authority that protects courts and juries from becoming "mute and helpless victims of deception and fraud." *Hazel-Atlas*, 322 U.S. at 246. "[T]ampering with the administration of justice . . . involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society." *Id.* As Judge Friendly explained, "fraud on the court" is "that species of fraud which does or attempts to defile the court itself . . . so that the judicial machinery can not perform in the usual manner its impartial task of adjudging cases that are presented for adjudication." *Martina Theatre Corp. v. Schine Chain Theatres, Inc.*, 278 F.2d 798, 801 (2d Cir. 1960) (internal quotation marks omitted). Accordingly, to "protect the sanctity of the judicial process" and "maintain institutional integrity," a court may exercise its inherent dismissal power to "combat those who would dare to practice unmitigated fraud upon the court itself" and "defend [its] integrity against" such "unscrupulous marauders." *Aoude*, 892 F.2d at 1118-19.

21

Dismissal for fraud not only punishes the wrongdoer, but serves the court's institutional interests by vindicating the court's authority and "deter[ring] those who might be tempted to such conduct in the absence of such a deterrent." *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976) (per curiam). Such dismissals also conserve judicial resources and "achieve the orderly and expeditious disposition of cases." *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630-31 (1962). Indeed, it would undermine the legitimacy of the judicial system to permit a plaintiff to continue pursuing a lawsuit that has been shown to be fraudulent.

   **2.**   Dismissal is warranted when the moving party has introduced clear and convincing evidence of fraud on the court. *See Shangold v. Walt Disney Co.*, 275 F. App'x 72, 73 (2d Cir. 2008) (affirming dismissal for fraud on the court because "the defendants established, by clear and convincing evidence, that [the plaintiffs] submitted fraudulent evidence to the district court in order to bolster their claim of copyright infringement"); *Aoude*, 892 F.2d at 1118 ("A 'fraud on the court' occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense."); *DAG Jewish Directories, Inc. v. Y & R Media, LLC*, No. 09-7802, 2010 WL 3219292, at *4-5 (S.D.N.Y. Aug. 12, 2010) (dismissing the case because "plaintiff's forgery has been proven by clear and convincing evidence"). Indeed, "[t]he federal case law is well established that dismissal is the appropriate sanction where a party manufactures evidence which purports to corroborate its substantive claims." *Vargas v. Peltz*, 901 F. Supp. 1572, 1581 (S.D. Fla. 1995).

   In determining whether a litigant is perpetrating a fraud, a court need not be credulous and is entitled to bring to bear its common sense. Just because Ceglia has alleged a delusional

and fantastical scenario does not create a disputed question of fact that must be sent to the jury. In dismissing the plaintiff's case for fraud on the court based on his submission of a forged contract, the *Aoude* court made clear that a court should exercise "common sense" in determining whether to terminate a fraudulent lawsuit.  892 F.2d at 1121.

District courts within the Second Circuit and elsewhere have invoked their inherent power to dismiss — before the case proceeded to summary judgment or trial — upon determining that the plaintiffs submitted a forged document in support of their claim.  For example, in *Shangold*, the district court granted the defendants' motion to dismiss, No. 03-9522, 2006 WL 71672, at *6 (S.D.N.Y. Jan. 12, 2006), and the Second Circuit affirmed, 275 F. App'x at 73-74.  The plaintiffs had sued Disney and its subsidiaries for copyright violations, basing their claims on what they said were notes for a movie proposal that they had written years before the defendants published a book with a similar narrative.  The defendants demonstrated that the notes were fake — they referred to a product not yet on the market at the time the notes were written — and the court dismissed the complaint as a fraud.  Similarly, in *DAG Jewish Directories*, 2010 WL 3219292, at *4-5, the court granted the defendants' motion for sanctions and dismissed the plaintiff's lawsuit based on "overwhelming objective evidence" that the plaintiff had fabricated a document submitted in support of its claim in a way that "could not have been accidental" — and the plaintiff's attempts to explain away the evidence of forgery were "entirely unconvincing."

There are many similar cases involving dismissal based on a forged document.  In the seminal *Aoude* decision, the plaintiff attached a forged contract to his complaint.  The district court granted the defendant's motion to dismiss, and the First Circuit affirmed, describing the plaintiff's conduct as "a near-classic example" of fraud on the court.  892 F.2d at 1118; *see also*

*id.* at 1117-22; *see also, e.g.*, *Jimenez v. Madison Area Technical Coll.*, 321 F.3d 652, 655-57

(7th Cir. 2003) (affirming dismissal of suit alleging racial discrimination where the plaintiff had

forged letters and emails containing racially discriminatory language); *Pope v. Fed. Express*

*Corp.*, 974 F.2d 982, 983-84 (8th Cir. 1992) (affirming dismissal of employment-discrimination

suit where plaintiff submitted note from her supervisor that the district court determined was a

forgery); *Combs v. Rockwell Int'l Corp.*, 927 F.2d 486, 488-89 (9th Cir. 1991); *Cerruti 1881 S.A.*

*v. Cerruti, Inc.*, 169 F.R.D. 573, 583 (S.D.N.Y. 1996) (Mukasey, J.); *Vargas*, 901 F. Supp. at

1581 ("the intentional misconduct committed by Plaintiff . . . in fabricating evidence justifies

dismissal of this action"); *Brady v. United States*, 877 F. Supp. 444, 452-54 (C.D. Ill. 1994); *Sun*

*World, Inc. v. Lizarazu Olivarria*, 144 F.R.D. 384, 390-91 (E.D. Cal. 1992).  In all of these cases,

the district court refused to permit the suit to proceed to a decision on the merits at summary

judgment or trial, and instead dismissed the plaintiff's complaint or granted a default judgment

against the defendant as soon as the fraud on the court was established.

    **3.**     On December 16, 2011, this Court issued an order asking the parties to "consider

the effect, if any," of Federal Rule of Evidence 1008 on this motion to dismiss.  Doc. No. 272 at

3.  Rule 1008 is a component of the Best Evidence Rule and applies only in determining whether

evidence is admissible at trial.  It does not apply in the context of a motion to dismiss, and no

court has ever interpreted Rule 1008 to limit a court's inherent power to dismiss a lawsuit as a

fraud on the court.  Indeed, in all of the cases discussed above, the court — not the jury —

determined that the document in question was a forgery and dismissed the lawsuit based on that

determination.

    The Southern District of New York's approach in *DAG Jewish Directories* is illustrative.

In that case, the defendants argued that the plaintiffs had forged a document they had filed to

support their claims, and the district court convened an evidentiary hearing and took evidence to

determine whether the document was authentic. 2010 WL 3219292, at *3. After the hearing, the

district court made credibility findings and determined, by clear and convincing evidence, that

the plaintiffs had forged the document and committed a fraud on the court. *Id*. at *3-5. Based on

its factual findings, the district court exercised its inherent power to dismiss the case. *Id*. at *5.

The Second Circuit has emphasized a district's court responsibility to protect the integrity

of its process through its "inherent authority" to conduct investigations "to determine if it is the

victim of a fraud" — and to impose sanctions up to and including dismissal "upon determining

that such a fraud has taken place." *Corto*, 1997 WL 225124, at *3. This authority would be

rendered a nullity if, upon determining that a party is perpetrating a fraud on the court, the court

was compelled by Rule 1008 to permit the fraudulent claim to go to a jury. Nothing in the

Federal Rules of Evidence requires such an anomalous and untenable result.

Each of the cases cited in Ceglia's brief addressing Rule 1008, *see* Doc. No. 275 at 3-6,

addresses the court's role in determining the admissibility of evidence under the Federal Rules of

Evidence. This motion to dismiss does not involve questions of admissibility, and a court does

not rule on questions of admissibility when determining whether a party is perpetrating a fraud

on the court by submitting forged documents. That is why, when deciding a motion for

sanctions, the court is not restricted by the Federal Rules of Evidence, *see, e.g.*, *Jensen v. Phillips

Screw Co.*, 546 F.3d 59, 66 n.5 (1st Cir. 2008); *Cook v. Am. S.S. Co.*, 134 F.3d 771, 774-75 (6th

Cir. 1998), but may rely on any materials that "bear indicia of reliability." *Sentis Grp., Inc. v.

Shell Oil Co.*, 559 F.3d 888, 901 (8th Cir. 2009).

The Court at a prior hearing also raised the question whether judicial fact-finding in the

context of a motion to dismiss for fraud on the court is appropriate. Not only is judicial fact-

finding appropriate in this context, it is <u>required</u>.  That is because, when the Court exercises its

gatekeeping function and dismisses fraudulent lawsuits based on its inherent power, it

necessarily resolves disputed facts.  Any other outcome would turn courts into "mute and

helpless victims of deception and fraud," *Hazel-Atlas*, 322 U.S. at 246, powerless to prevent

demonstrably fraudulent claims from going to the jury.

### B.    Dismissal Is Warranted When The Plaintiff Has Destroyed Evidence And Engaged In Litigation Misconduct.

District courts also have the power to dismiss lawsuits when a party has spoliated

evidence or committed severe misconduct in the course of litigation.  A court may rely upon

Federal Rule of Civil Procedure 37(b) or its inherent power as the basis for dismissal.  *See West*

*v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999); *Reilly v. NatWest Mkts. Grp.*,

181 F.3d 253, 267 (2d Cir. 1999); Fed. R. Civ. P. 37(b); *see also Vargas*, 901 F. Supp. at 1582

("Federal courts have the inherent power to dismiss an action for misconduct that abuses the

judicial process and threatens the integrity of that process—including misconduct unrelated to

the merits of the case.").

Courts regularly impose the sanction of dismissal or default judgment against a party that

destroys critical evidence.  For example, in *Southern New England Telephone Co. v. Global*

*NAPs Inc.*, 624 F.3d 123 (2d Cir. 2010), the Second Circuit affirmed the district court's entry of

a default judgment against defendants who had "engaged in the willful destruction of evidence"

that was "obviously germane" to the litigation.  *Id.* at 148 (emphasis removed).  After the district

court had ordered the defendants to produce their financial records, nearly 20,000 files on a

computer used by the defendants' financial bookkeeper were "destroyed using a program called

'Window Washer.'"  *Id.* at 142-43.  Similarly, in *Gutman v. Klein*, the district court entered a

default judgment against the defendants for "the spoliation of crucial evidence on [a] laptop

computer." No. 03-1570, 2008 WL 4682208, at *1 (E.D.N.Y. Oct. 15, 2008) (magistrate

recommendation), *adopted*, 2008 WL 5084182 (E.D.N.Y. Dec. 2, 2008). Based on preliminary

evidence that the defendants had tampered with the computer, the court in *Gutman* appointed

Stroz Friedberg to conduct a forensic analysis. 2008 WL 4682208, at *2. Stroz Friedberg found

that numerous files had been deleted from the computer — including files with "names identical

to those marked 'Privileged' or 'Confidential' on [the defendants'] privilege log" — and that

additional forms of tampering had occurred, such as changing the computer's system clock and

reinstalling its operating system. *Id.* at *3-5, 8. The court concluded that a default judgment was

warranted because "the most serious forms of spoliation merit the harshest sanctions, and in this

case, the destruction of evidence was of the worst sort: intentional, thoroughgoing, and

(unsuccessfully) concealed." *Id.* at *12.

There are many other cases in which courts have dismissed for similar misconduct. *See,*

*e.g.*, *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006) (affirming dismissal where

plaintiff's conduct "amounted to willful spoliation because he knew he was under a duty to

preserve all data on [his] laptop, but [he] intentionally deleted many files and then wrote a

program to write over deleted documents"); *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 593-94

(4th Cir. 2001) (affirming dismissal because the plaintiff had spoliated "the vehicle [that] was the

central piece of evidence in his case against General Motors" when he allowed the vehicle to be

repaired before notifying General Motors of his claim); *State Farm Mut. Auto. Ins. Co. v.*

*Grafman*, 274 F.R.D. 442, 447, 450-52 (E.D.N.Y. 2011) (entering default judgment against

defendant who had either "destroyed" or "deliberately withheld" audio recordings of

conversations that went "to the heart of plaintiff's case" because "[l]esser sanctions would

neither adequately deter nor remedy misconduct of this severity"); *Vargas*, 901 F. Supp. at 1581-

27

82 ("The persistent pattern of misconduct committed by Plaintiff . . . which includes a 'fraud on the court,' fabrication of evidence, perjury, and obstruction of the discovery process, covers the full range of litigation abuses and warrants dismissal of the present action.") (internal quotation marks omitted).

As this Court has recognized, "[d]ismissal is appropriate if there is a showing of willfulness, bad faith, or fault on the part of the sanctioned party." *Davis v. Speechworks Int'l, Inc.*, 2005 WL 1206894, at *3 (W.D.N.Y. May 20, 2005); *see also West*, 167 F.3d at 779.  A court need not wait for "lesser sanctions" to prove ineffective; if dismissal "is appropriate on the overall record," the court must terminate the lawsuit.  *S. New England Tel. Co.*, 624 F.3d at 148.

## II.     THIS LAWSUIT IS A FRAUD ON THE COURT AND MUST BE IMMEDIATELY DISMISSED.

The expedited discovery ordered by this Court has confirmed the obvious:  the Work for Hire Document and the purported emails quoted in the Amended Complaint are forgeries.  They were manufactured by Ceglia and/or his co-conspirators for the purpose of extorting money from Defendants through this fraudulent lawsuit.  Because the objective evidence of fraud is far more than just clear and convincing — indeed, it is overwhelming — the Court should exercise its inherent power and dismiss.[6]

### A.     The Discovery Of The StreetFax Contract Proves That The Work For Hire Document Is A Forgery.

Defendants' forensic experts discovered electronic images of the StreetFax Contract on the hard drive of Ceglia's own computer.  They were attached to emails that Ceglia sent on March 3, 2004 from the ceglia@adelphia.net email account to Jim Kole — a lawyer at the

---

[6] Pursuant to the Court's expedited discovery orders, Defendants' sworn expert reports cited herein are attached to the accompanying Southwell Declaration as Exhibits A through F.  As a convenience to the Court, the Southwell Declaration includes a summary of each report at paragraphs 4-33.

international law firm of Sidley Austin who was an initial member of StreetFax — at Kole's

email account at Sidley, jkole@sidley.com.  The Sidley firm also produced the same emails and

the StreetFax Contract from the Sidley server, where they reside to this day.  *See* Stroz Friedberg

Report at 11-22.

The discovery of the StreetFax Contract is fatal to Ceglia's claim.  Ceglia and Zuckerberg

agree that they signed a single contract on April 28, 2003.  *See, e.g.*, Am. Compl. ¶¶ 21-22;

Ceglia Decl. (Doc. No. 65) ¶¶ 5-8; Zuckerberg Decl. (Doc. No. 46) ¶¶ 7-10.  Thus, the StreetFax

Contract and the Work for Hire Document cannot <u>both</u> be real.  One has to be a forgery.

Because irrefutable forensic proof establishes that the StreetFax Contract existed in 2004 — and

that Ceglia was emailing it at that time to other members of StreetFax — it is an indisputable

factual certainty that the StreetFax Contract is real and the Work for Hire Document is a forgery.

Indeed, there is <u>no</u> evidence that the Work for Hire Document existed prior to June 2010, when

Ceglia filed his original Complaint and attached a copy of the document as an exhibit.

Even Ceglia has acknowledged the import of the discovery of the StreetFax Contract on

his hard drive and the Sidley Austin server.  His <u>only</u> explanation is that Zuckerberg or his

lawyers created a forged document and planted it on Ceglia's computer.  *See* Southwell Decl.,

Ex. I.  There is no evidence remotely supporting this fantastical scenario — and, as shown

below, overwhelming forensic evidence confirms that the StreetFax Contract is the agreement

that Zuckerberg and Ceglia signed in April 2003.

**1.**      Although Ceglia was ordered to produce all computer hard drives in his

possession, he initially failed to produce his Seagate hard drive.  Defendants demanded its

production and ultimately obtained it.  When Stroz Friedberg examined the hard drive, they

discovered the StreetFax Contract preserved in two TIFF image files.  *See* Stroz Friedberg

Report at 11-14.  Just as Zuckerberg had attested, Zuckerberg Decl. (Doc. No. 46) ¶¶ 7-10, the

StreetFax Contract only concerns StreetFax and says nothing about Facebook:



Stroz Friedberg Report, Exs. F, H.

The electronic images of the StreetFax Contract were attached to two emails that Ceglia

sent on March 3, 2004, using the email account ceglia@adelphia.net.  Ceglia sent the emails to

Jim Kole at his work address, jkole@sidley.com.  *See* Stroz Friedberg Report at 12-14.

The subject line of the first Ceglia-to-Kole email states:  "page 1 of 2 for Streetfax

contract w mark."  The text of that email states:  "Hi Jim, Hope all is well, I am at 727 490 5751

when [you're] ready.  [I'll] send page two next I should be here for the next hour.  Paul."[7]  The

subject line of the second Ceglia-to-Kole email states:  "2 of 2 for streetfax contract."  That email

---

[7]  Notably, the telephone number in the first Ceglia-to-Kole email was presented as a contact number for StreetFax in a contemporaneous email sent by Ceglia's StreetFax colleague, Karin Petersen.  *See* Rose Decl., Ex. E.

has no text.  *See* Stroz Friedberg Report at 12-13.  Screenshots of the Ceglia-to-Kole emails

appear below:



Stroz Friedberg Report, Exs. E, G.

Ceglia scanned the two images of the StreetFax Contract to his computer shortly before he sent the emails to Kole.  Stroz Friedberg found a deleted file on Ceglia's Seagate hard drive entitled "Scan0001.tif" — the image of the first page of the StreetFax Contract.  That image was scanned onto Ceglia's computer on March 3, 2004 at 10:38:35 a.m., less than one minute before Ceglia sent the file to Kole.  Stroz Friedberg also recovered a deleted file from Ceglia's Seagate hard drive entitled "Scan0002.tif" — the image of the second page of the StreetFax Contract. That image was scanned onto Ceglia's computer on March 3, 2004 at 10:35:21 a.m., less than two minutes before the same file was sent to Kole.  *See* Stroz Friedberg Report at 15-16.

Stroz Friedberg further established, based on evidence associated with a computer application called Google Desktop, that the StreetFax Contract could not have been "planted" on Ceglia's computer as a way to defeat his claims in this lawsuit.[8]  That application was installed on Ceglia's Seagate hard drive between October 23, 2006 and July 11, 2007.  Based on the searchable index of files created by Google Desktop, the Ceglia-to-Kole emails existed on the Seagate hard drive the first time the application was run — no later than July 2007, three years before Ceglia surfaced and claimed an interest in Facebook.  *See* Stroz Friedberg Report at 54.

**2.**      Defendants issued a subpoena to Sidley Austin, which located and produced the exact same Ceglia-to-Kole emails and the StreetFax Contract from the law firm's server.  This constitutes independent and indisputable objective evidence that Ceglia sent the StreetFax Contract and emails to Kole, and it definitely refutes the preposterous notion that they were "planted" on Ceglia's hard drive.  The emails and attachments are identical.  The metadata for

---

[8]  Google Desktop allows a user to search his computer for files.  It does so by building a searchable database, or index, of the contents of the computer.  That index provides historical evidence of the files that existed at various points in time on a computer where the application was installed.

the emails on the Sidley server perfectly match the metadata for the emails on Ceglia's hard

drive; the two attachments are exact forensic matches as well.  *See* Stroz Friedberg Report at 18.

By examining their Internet headers, Stroz Friedberg also confirmed that the emails were

actually sent by Ceglia and received by Sidley on March 3, 2004.  When an email message is

transmitted, each server that is used in the transmission affixes the date and time at which the

message was received by the server to the message's Internet header.  This information can be

used to reconstruct an email message's path through the Internet.  The Internet header for the

first Ceglia-to-Kole email establishes that it was sent from a computer with a particular IP

address to a server at adelphia.net on March 3, 2004, and received by that server at 10:37:10 a.m.

(Eastern Standard Time).  The email was then sent to a server at sidley.com and received on

March 3, 2004 at 9:38:01 a.m. (Central Standard Time).  The email was then routed internally

from one Sidley Austin server (mail02) to another (chexchange04), and received by the Sidley

Austin server chexchange04 on March 3, 2004 at 9:38:08 a.m. (CST).  The Internet header for

the second Ceglia-to-Kole email establishes the same pattern:  it was sent from a computer with

the same IP address as the first email to a server at adelphia.net and received by that server on

March 3, 2004 at 10:39:06 a.m. (EST); it was then received by a sidley.com server on March 3,

2004 at 9:41:30 a.m. (CST), routed internally from one Sidley Austin server (mail01) to another

(chexchange03); and it was received by the Sidley Austin server chexchange03 at 9:43:01 a.m.

(CST).  The routing information confirms that these are genuine emails sent from the Ceglia

account to the Sidley Austin firm.  *See* Stroz Friedberg Report at 19-23.

**3.**      The authenticity of the StreetFax Contract is further confirmed by the follow-up

email correspondence between Ceglia and Kole occurring soon after Ceglia sent Kole the images

of the StreetFax Contract on March 3, 2004.  During expedited discovery, Ceglia produced a

printout of an email exchange he had with Kole about the StreetFax Contract over the following two days, on March 4 and 5, 2004. *See* Southwell Decl., Ex. M; Stroz Friedberg Report at 16-17.

In these emails, Ceglia and Kole discuss Kole's draft of a letter to Zuckerberg concerning the money Zuckerberg was owed for the StreetFax project. Ceglia writes that the draft "[l]ooks great. Much less threatening than I could have mustered. Do you think at this point it [is] still wise to pay him the money he requests . . . ?" Kole responds with the suggestion that if Ceglia has "any cash to spare," the letter could include "a statement that I have a payment for him that I will hold in escrow" pending resolution of the dispute. Ceglia then observes that "[f]unds are indeed very tight right now," and states that he does not "want to pay this kid another dime." *See* Stroz Friedberg Report at 17.

The printout contains the following handwritten note, apparently from Kole: "I think I'll just make a veiled reference to payments that could be made if he settles the matter as a businessman rather than a cyber-briber. PLEASE, PLEASE fax me the contract as I can't read the one sent earlier to understand his or your breach of [crossed-out text] argum[ent]." *See id.* Kole's handwritten note confirms that, just days before, on March 3, 2004, Ceglia emailed Kole the low-resolution, scanned images of the StreetFax Contract that were found on Ceglia's hard drive and the Sidley Austin server. *See id.*

4.     When Stroz Friedberg discovered the authentic StreetFax Contract and the Ceglia-to-Kole emails on Ceglia's hard drive during expedited discovery last summer, Ceglia did <u>not</u> claim that they were forgeries planted by Zuckerberg. Quite the contrary, he conceded their authenticity by claiming that they were communications with his purported lawyer, Jim Kole, and consequently were protected by the attorney-client privilege. *See* Southwell Decl. (Doc. No.

241), Ex. B, at 1 (describing them as communications "from Paul Ceglia to his attorney Jim

Kole, Esq."); *see also* Southwell Decl. (Doc. No. 241) ¶ 13.  It was only when this Court rejected

his frivolous privilege claim and ordered him to produce the documents that Ceglia — realizing

that they exposed his fraud for the world to see — abruptly switched gears and announced that

they were not in fact emails he had sent to Kole, but rather were forgeries that Zuckerberg had

planted on his hard drive.

The significance of this series of events is obvious.  If the StreetFax Contract and the

emails to Kole were forgeries that Zuckerberg had planted, Ceglia would have said so loudly and

immediately.  Instead, when Stroz Friedberg showed the documents to him and told him they had

been found on his hard drive, he acknowledged that they were genuine — and tried strenuously

and unsuccessfully to suppress the Ceglia-to-Kole emails by asserting frivolous privilege claims

over them that this Court swiftly rejected.

**5.**     Zuckerberg exchanged many emails with representatives of StreetFax during

2003 and 2004 — emails that have been preserved on the server at Harvard University and

obtained by Stroz Friedberg.  These emails further confirm that the StreetFax Contract is genuine

and the Work for Hire Document is a forgery.

During this time period, Zuckerberg and StreetFax frequently communicated by email

about the terms of the parties' agreement, including the nature of the work Zuckerberg had

agreed to perform, the deadline by which he would complete the work, and the amount of money

StreetFax owed him.  Consequently, the emails refer to, and in some cases quote directly from,

the StreetFax Contract, using language that appears in the StreetFax Contract but <u>not</u> in the Work

for Hire Document.  These emails further confirm that the StreetFax Contract existed in 2003

and 2004 and is the genuine agreement that Ceglia and Zuckerberg signed.

One difference between the StreetFax Contract and the Work for Hire Document appears in the documents' respective Section 3s — the provision concerning late fees — on page 1.  The StreetFax Contract's Section 3 reads:

> "Late fees are agreed to be a 5% deduction for the seller if project is not completed by due date and an additional 1% deduction for each day the project is <u>late thereafter</u>."

Southwell Decl., Ex. L § 3 (transcription) (emphasis added).  In contrast, the Work for Hire Document's version of Section 3 reads:

> "Late fees are agreed to be a 5% deduction for the seller if the project is not completed by <u>the</u> due date and an additional 1% deduction for each day the project is <u>delayed beyond that point</u>."

Am. Compl., Ex. A § 3 (emphasis added).

In an August 28, 2003 email to Zuckerberg, StreetFax member Karin Petersen quoted from Section 3 of what she described as "the actual contract itself."  *See* Rose Decl., Ex. C. Petersen wrote:  "Late fees are agreed to be a 5% deducation for the seller if project is not completed by due date and an additional 1% deducatin for each day the project is late thereafter." *Id.* (typographical errors in original).  This contemporaneous quotation from what Petersen calls "the actual contract" uses the phrases "by due date" and "late thereafter" — just like the StreetFax Contract — and does <u>not</u> use the made-up phrases from the Work for Hire Document: "by the due date" and "delayed beyond that point."

Another telling difference between the StreetFax Contract and the Work for Hire Document concerns the amount of money StreetFax would pay Zuckerberg.  Under the StreetFax Contract, Zuckerberg was to be paid $18,000, plus an additional $1,500 based on a subsequent agreement to build a scroll-search function, for a total of <u>$19,500</u>.  In contrast, under the Work for Hire Document, Zuckerberg was to be paid only <u>$2,000</u>.

36

The emails between Zuckerberg and StreetFax stored on the Harvard server reflect an

agreement to pay the amount specified by the StreetFax Contract and not the Work for Hire

Document:

- <u>August 15, 2003 email from Ceglia to Zuckerberg</u>:  "I sent a check for $5,000 to you today mark."  Rose Decl., Ex. B.

- <u>August 16, 2003 email from Zuckerberg to Ceglia</u>:  "[W]e've done more than $8000 worth of work, and probably more than the whole $18000 of the entire project."  Rose Decl., Ex. B.

- <u>January 25, 2004 email from Zuckerberg to Petersen</u>:  "The deal was for $18k.  I received $3k upfront and $5k over the summer, and that's it for the original deal.  There was a side deal for the scroll search which was for $1.5k of which I have been paid $1k. . . .  To date I have received $9k out of a total $19.5k that was owed to me."  Rose Decl., Ex. F.

- <u>February 21, 2004 email from Zuckerberg to Ceglia</u>:  "I am owed $19,500 - $9000 = $10,500."  Rose Decl., Ex. H.

In fact, Ceglia himself has produced the three checks totaling $9,000 that he wrote to

Zuckerberg.  The first check, dated April 25, 2003, constitutes the $3,000 upfront payment that is

specified in the StreetFax Contract and mentioned in Zuckerberg's January 25, 2004 email.  *See*

Southwell Decl., Ex. N; *see also* Rose Decl. Ex. F.  The second check, dated August 4, 2003,

constitutes the "summer" $5,000 payment mentioned in Ceglia's August 15, 2003 email and

Zuckerberg's January 25, 2004 email.  *See* Southwell Decl., Ex. O; *see also* Rose Decl., Exs. B,

F.  And the third check, dated November 24, 2003, constitutes the $1,000 payment for the

separate "scroll search" functionality mentioned in Zuckerberg's January 25, 2004 email.  *See*

Compl., Ex. C; *see also* Rose Decl., Ex. D (Nov. 15, 2003 email in which Ceglia agrees to pay

Zuckerberg an additional $1,500 for the separate "scroll search" functionality).  Together, these

payments add up to $9,000 — the total that Zuckerberg sets forth in his emails to Petersen and

Ceglia.  *See* Rose Decl., Ex. F.

37

These payments are completely consistent with the terms of the StreetFax Contract and, importantly, utterly inconsistent with the terms of the Work for Hire Document.  By Ceglia's own admission he paid Zuckerberg $9,000, yet the Work for Hire Document calls for a total payment of only $2,000.

6.      A different contemporaneous contract that Ceglia entered into with a third party further confirms his fraud.  Because Ceglia has designated that contract as confidential, this evidence is described at paragraphs 3-9 of the Aycock Declaration and pages 37-38 of the Stroz Friedberg Report, which are being filed publicly in redacted form.

**B.      Forensic Testing Further Establishes That The Work For Hire Document Is A Forgery.**

Ceglia's claim that he and Zuckerberg signed the Work for Hire Document in April 2003 is a historical impossibility:  Zuckerberg did not even <u>conceive</u> of the idea for Facebook until approximately December 2003.  Zuckerberg Decl. (Doc. No. 46) ¶ 11.  The origins of Facebook have been extensively documented by the press, and there is no evidence whatsoever that Zuckerberg had so much as thought of Facebook as early as April 2003, let alone was sufficiently advanced in his thinking that he would sell ownership interests in the venture.[9]

---

[9] *See, e.g.*, David Kirkpatrick, *The Facebook Effect* 28 (2010 ("At [the fall 2003] semester's end everyone in [Zuckerberg's mathematics course] went out to dinner and ended up talking about the need for a 'universal facebook.'  So Zuckerberg went home and built one. . . . Zuckerberg later said that it was the *Crimson*'s editorials [published toward the end of the 2003 fall semester] about Facemash that gave him the initial idea for how to build Thefacebook."); Claire Hoffman, *The Battle for Facebook*, Rolling Stone, June 26, 2008 ("Zuckerberg has said under oath that he began writing the code for TheFacebook, his site's first incarnation, in January . . . .  It took him maybe a week or two, he claims, in between homework and finals.  He was inspired, he said, by an editorial in The Harvard Crimson about his Facemash debacle [in November 2003].")); John Cassidy, *Me Media: How Hanging out on the Internet Became Big Business*, New Yorker, May 15, 2006 (describing the initial conception of Thefacebook.com as occurring in November/December 2003 and its launch in February 2004).

This fact alone conclusively establishes that the Work for Hire Document is a forgery. There is <u>no</u> evidence — in this case or anywhere in the extensive public record — suggesting that Zuckerberg had begun planning Facebook as early as April 2003.  The Work for Hire Document is impossible as a matter of historical fact.  *See Shangold*, 275 F. App'x at 73-74 (dismissing lawsuit for fraud on the court when plaintiff submitted forged document referring to a product that was not invented until months after the document was ostensibly written).

Forensic testing on the physical document confirms what the historical record demonstrates:  the Work for Hire Document is a recently-created forgery.  There is no evidence that the Work for Hire Document existed before it first appeared attached to Ceglia's Complaint.

1.     Ceglia claims that the handwritten ink interlineation on page 1 of the Work for Hire Document was added on April 28, 2003.  *See* Am. Compl. ¶ 22.  Forensic testing of that ink has now shown this to be false:  the ink is less than two years old.

Gerald LaPorte is a world-renowned forensic chemist and document dating specialist who trained with the United States Secret Service and has nearly two decades of experience in forensic science.  He works full time for the United States Department of Justice as the Forensic Policy Program Manager and Acting Associate Director in the Office of Investigative and Forensic Sciences at the National Institute of Justice.  He has permission to operate as an independent consultant in civil matters and has done so since 2008.  *See* LaPorte Report at 1.

In this case, LaPorte conducted a well-established chemical ink dating test and concluded that it is "highly probable" — meaning that the evidence is "very persuasive" and that Mr. LaPorte is "virtually certain" — that the ink on the Work for Hire Document is less than two

years old and that the interlineation was written after August 2009.[10]  LaPorte Report at 2.

LaPorte's analysis involved the measurement of a solvent found in many inks called

phenoxyethanol (PE).  The ink is dated by comparing the PE ratio of the ink before and after

heating.  The standard benchmark in the field is that, if the amount of PE that evaporates is

greater than 25%, it indicates that the ink is "fresh" — *i.e.*, less than two years old.  LaPorte ran

this test twice on ink samples taken from the interlineation on page 1 of the Work for Hire

Document.  He determined that the level of PE decreased an average of <u>64%</u>, more than twice

the accepted benchmark for ink that is less than two years old.  He thus concluded — to a virtual

scientific <u>certainty</u> — that the ink was placed on the Work for Hire Document within the last two

years and not in 2003.  *See id.* at 15, 23.

> **2.**     Professor Frank Romano — one of the nation's leading document authentication

experts with more than 50 years in the field — also examined the Work for Hire Document.

Based on its typesetting and formatting, Professor Romano concluded, "with the highest degree

of certainty possible," that page 1 of the Work for Hire Document is an "amateurish forgery."

Romano Report at 11.

> Professor Romano is Professor Emeritus at the Rochester Institute of Technology.  He

has worked with every known printing process and, in many cases, authored the first articles and

---

[10]   The "highly probable" standard is the highest standard of proof for a forensic document
examiner apart from "absolute certainty."  *See* LaPorte Report at 2 n.2; *see also* 27 Am. Jur.
Proof of Facts 3d 489 § 84 (1994).  A document examiner's "highly probable" conclusion has
been held sufficient to support a criminal conviction beyond a reasonable doubt.  *See, e.g.*,
*United States v. Dixon*, 650 F.3d 1080, 1082-83 (8th Cir. 2011); *United States v. Parsons*, 967
F.2d 452, 455 (10th Cir. 1992); *United States v. Hollins*, 811 F.2d 384, 389-90 (7th Cir. 1987);
*see also United States v. Amiel*, 95 F.3d 135, 143-44 (2d Cir. 1996) (affirming conviction for
mail fraud based on expert testimony that defendants sold forged artwork); *United States v.
Wilson*, 441 F.2d 655, 656 (2d Cir. 1971) (affirming conviction for forgery even though
handwriting expert's opinion lacked "absolute certitude").  Thus, a "highly probable" conclusion
is necessarily sufficient to support a finding by clear and convincing evidence.

books on the subject.  His 50 published books cover every aspect of document origination, reproduction, and distribution; his 10,000-term "Encyclopedia of Graphic Communications" has been called the standard reference in the field.  *See* Romano Report at 1-2.

Professor Romano bases his conclusion that the Work for Hire Document is an "amateurish forgery" on many objective grounds.  For one thing, the two pages of the Work for Hire Document are composed in different fonts:  Page 1 is in Times New Roman, while page 2 is composed in Garamond.  This demonstrates that the two pages were not part of a single document.  There are many other inconsistencies.  For example, there are significant differences between the widths of margins, columns and gutters on the two pages.  The indents on page 1 are wider than the indents on page 2.  And the spacing on page 1 varies between single, double and triple spacing, whereas the spacing on page 2 is uniform.  *See* Romano Report at 4-7.

**3.**    Ceglia's Amended Complaint alleges that he "printed and saved" the Work for Hire Document on April 25, 2003, and it was signed three days later.  But forensic analysis has now conclusively determined that the first and second pages of the document were printed <u>separately</u> — with different printers, different toner, and different paper.

Professor Romano has concluded — "with the highest degree of certainty possible" — that Ceglia used different printers to print the two pages of the Work for Hire Document.  Printers lay down toner in ways that can be distinguished by viewing the edge of the letters — the "edge gradient" — under magnification.  Moreover, printers may use scaling and resolution enhancement technologies to scale letters and smooth their edges.  Professor Romano found that page 1 of the Work for Hire Document had a smoother edge gradient than page 2, and that only page 1 was produced by a laser printer that used scaling and resolution enhancement

technologies.  He therefore concluded that page 1 was printed on a newer printer with more

advanced technology than page 2.  *See* Romano Report at 8.

Similarly, Mr. LaPorte concluded that the paper used for pages 1 and 2 of the Work for

Hire Document was different.  The texture of page 2 was significantly more tensile, or stiff, than

that of page 1.  The pages also had different thickness and opacity, and illuminated differently

under ultraviolet light.  Mr. LaPorte confirmed these physical observations through chemical

analysis, determining that the two pieces of paper had different chemical compositions.  *See*

LaPorte Report at 8, 11-12.  Mr. LaPorte further concluded, based on a reliable and widely

accepted chemical analysis, that the toner on pages 1 and 2 of the Work for Hire Document came

from different sources.  *See* LaPorte Report at 12-13.

4.      An additional indicator that the Work for Hire Document is a recently-created

forgery is the fact that it refers to "StreetFax LLC" — an entity that <u>did not exist</u> in April 2003.

StreetFax LLC was not created until <u>August</u> 2003.  *See* Henne Decl. (Doc. No. 49-9), Ex. I

(StreetFax LLC Articles of Organization).  When Ceglia created the forged Work for Hire

Document in preparation for this lawsuit, he simply forgot when StreetFax LLC had been

incorporated, and he inserted into the fabricated contract a historical anomaly — yet another tell-

tale sign of fraud.  *See Shangold*, 275 F. App'x at 73-74.

5.      After reviewing hundreds of electronic devices produced by Ceglia, Stroz

Friedberg did not find anywhere — on any of Ceglia's computers, hard drives, floppy disks,

CDs, or other media — an electronic copy of the Work for Hire Document, which should have

existed were it authentic.  *See* Stroz Friedberg Report at 10.  Instead, Stroz Friedberg found

seven versions of the Work for Hire Document that are very similar but not identical to the

version attached to the Amended Complaint — test forgeries that Ceglia created in the course of this litigation.  *See id.* at 33-38.

The existence of multiple electronic copies of the Work for Hire Document is telling because, as Stroz Friedberg explains, electronic forgers often create and delete multiple versions of a document in the course of creating a forgery.  *See id.* at 25.  Ceglia's particular test forgeries provide additional evidence of fraud:  All seven versions of the Work for Hire Document contain metadata anomalies that reveal tampering with the document through backdating or other forms of manipulation.  *See id.* at 33.  For example, one of the documents is named "SFWebWorkForHireMZ.doc."  Stroz Friedberg discovered it on a floppy disk produced by Ceglia.  This document's metadata reveal a last-<u>written</u> date (April 24, 2003) that is later than its last-<u>accessed</u> date (April 22, 2003).  But it is impossible — absent tampering and backdating — to have a last-written date for a document that is later than the last-accessed date.  That is because a document cannot be "written" (*i.e.*, the user modifying the content of the file) without being "accessed" (*i.e.*, the user opening the file).  *See id.* at 33-34.  Based on additional metadata analysis, Stroz Friedberg concludes that this file was copied to the floppy disk on or after February 18, 2011, using a computer with a system clock that was backdated — that is, a computer on which the system clock was reset to an earlier date to make it appear that the documents were created on that date.  *See id.* at 34-35.

Stroz Friedberg found the six other versions of the Work for Hire Document on a CD produced by Ceglia.  <u>All</u> of these documents have a similar metadata anomaly indicating fraud:  The last-<u>printed</u> dates are later than the last-<u>modified</u> dates, which is not possible absent system clock manipulation.  Stroz Friedberg concludes that, at some point after these files were printed on February 15, 2011, they were accessed and saved on a computer with a system clock

backdated to April 25, 2003 — the date that Ceglia's Amended Complaint alleges he saved a copy of the Work for Hire Document. *See id.* at 35-36.

One of Ceglia's test forgeries also contains metadata that reveal Ceglia's step-by-step construction of the Work for Hire Document through a trial-and-error process of insertions, deletions, and other manipulations. That document is named "Work for Hire ContractMZ.doc." The document's metadata reveal that Ceglia repeatedly manipulated this document and changed its name, and that it was a test document that Ceglia used in creating the fraudulent Work for Hire Document. The document originated as a file called "page1feb4threepm.doc" in a desktop folder called "Maybe got it\Page 1." It was then saved as a new file, "MP1and2.doc," in a new desktop folder called "merged." It was renamed as "Zuck Contract.doc," moved to a new desktop folder called "Finished Docs," and then renamed again as "Work for Hire Contract.doc." The document was then saved directly to the computer desktop and to a removable media (*e.g.*, a CD) as "Work for Hire ContractMZ.doc." These names and locations strongly indicate that Ceglia created the Work for Hire Document by merging a new "page 1" with an already-existing document — namely, page 2 of the StreetFax Contract. *See* Stroz Friedberg Report at 39-40.

Moreover, all seven of Ceglia's electronic versions of the Work for Hire Document contain margin and formatting alterations that further demonstrate Ceglia's forgery in action. The margins and formatting on page 1 of these documents has been manipulated through the manual reduction of white space, allowing more text characters can fit on the page. *See id.* at 36-37. For example, in the "Work for Hire ContractMZ.doc" document, although the margin between the columns on page 2 is 0.32 inches, the margin between the columns on the Page 1 is set much narrower — 0.03 inches. This and other formatting discrepancies demonstrate that

Ceglia was manipulating the margins and spacing to create space on page 1 to add references to "The Face Book" when he created his forged Work for Hire Document.

Stroz Friedberg also found several documents produced by Ceglia that demonstrate he made extensive use of a hex editor — a program that allows a user to edit the raw data that make up a file, rather than the text of the file. Hex editors are commonly used by electronic forgers because they can manipulate data in a way that is difficult, if not impossible, to detect using traditional digital forensic analysis. Because Ceglia has designated these documents as confidential, this evidence is described at paragraphs 11-15 of the Aycock Declaration and pages 41-43 of the Stroz Friedberg Report, which are being publicly filed in redacted form.

### C.     The Purported "Emails" Quoted In The Amended Complaint Are Fabricated.

**1.**     The Amended Complaint purported to quote from email exchanges between Ceglia and Zuckerberg — "emails" that Zuckerberg swore under oath that he never sent or received. Zuckerberg Decl. (Doc. No. 46) ¶¶ 13-14. After Ceglia filed his Amended Complaint, he made a startling admission: he did not actually have any of the emails. Ceglia Decl. (Doc. No. 65) ¶¶ 11-12.

Instead, when ordered to produce these purported emails, he produced three Microsoft Word documents containing text that he claims he cut-and-pasted from emails with Zuckerberg. Evans Decl. (Doc. No. 61) ¶¶ 8-11; Ceglia Decl. (Doc. 225) ¶ 8. The fact that he failed to produce these purported emails in their native electronic format — that is, the format in which the emails were actually sent or received in a program such as Microsoft Outlook or in a web-based email account — is an obvious indicator of fraud. Ceglia simply typed text into a Word document and declared it was the text of emails with Zuckerberg.

Stroz Friedberg has determined that the Word documents containing the phony emails are forgeries created on a backdated computer. Stroz Friedberg Report at 23-26 & Ex. I-K. Ceglia reset the system clock on his computer to dates in 2003 and 2004, to make it appear that the Word documents were created at approximately the same time that he claims to have corresponded by email with Zuckerberg. As set forth in detail in the Stroz Friedberg Report, the forensic examination of the files' metadata revealed that Ceglia left digital fingerprints on these Word files showing that he created them through the use of a backdated computer. *Id*. at 24-26. In fact, Ceglia botched the backdating. Two of the files have a "last written" date of October 21, 2003. This is impossible if Ceglia pasted emails from November and December 2003 into one document, and emails from July 2004 into the other. If Ceglia were telling the truth, the "last written" date for the Word documents — a date that reflects the last time Ceglia made changes to the document — would have to be a date corresponding to the date of the last email or later. *Id*.

2.     In addition to bungling the backdating of his Microsoft Word documents, Ceglia also botched his fabrication of the text of the "emails" themselves. Each of the purported "emails" contains a "Date" line that includes the time zone from which the email was supposedly sent. The time zone is identified by its deviation from Coordinated Universal Time. Thus, Eastern Daylight Time is represented as "-0400," and Eastern Standard Time is represented as "-0500." *See Zinn v. United States*, _ F. Supp. 2d _, 2011 WL 6202890, at *3 n.3 (S.D. Fla. 2011) (Eastern Daylight Time is four hours behind Coordinated Universal Time); *Airplanes of Boca, Inc. v. United States ex rel. FAA*, 254 F. Supp. 2d 1304, 1307 n.1 (S.D. Fla. 2003) (Eastern Standard Time is five hours behind Coordinated Universal Time). *See* Stroz Friedberg Report at 27.

46

Between October 26, 2003 and April 4, 2004, Eastern <u>Standard</u> Time was in effect.  *See*

Uniform Time Act, 15 U.S.C. § 260a(a) (2003) (providing that daylight savings time lasted from

the first Sunday of April to the last Sunday of October).  But all of the "emails" Ceglia

purportedly exchanged with Zuckerberg within this time period contain a "-0400" stamp

reflecting Eastern <u>Daylight</u> Time.  These "emails" are a physical impossibility:  there is no place

in the Continental United States from which Ceglia could have sent these "emails" with those

time stamps on those dates.  *See* Stroz Friedberg Report at 27-28.  When he fabricated the

emails, Ceglia forgot to spring forward and fall back.

Ceglia was careless in other respects.  Although he claims that he cut-and-pasted the text

of the emails from his MSN webmail account into Word documents Ceglia Decl. (Doc. No. 225)

¶¶ 3-7, the documents contain telling errors demonstrating that Ceglia typed the text of these

purported emails.  For one thing, the "Date" field in the purported emails sometimes abbreviates

the word "Tuesday" as "Tue," and sometimes as "Tues".  But the "Date" field is <u>automatically</u>

<u>generated</u> by the email program, and the fields would therefore contain a consistent abbreviation

if Ceglia's cut-and-paste story were true.  Similarly, there is sometimes a single space after the

colon in the "From:" and "To:" fields in Ceglia's purported emails, and there are sometimes two

or three spaces.  Again, the formatting of these fields is automatically generated and does not

vary from one email to the next within a webmail program such as MSN.  The only explanation

for these and other discrepancies found by Stroz Friedberg is that the fabricated "emails" were

typed in manually.  These errors further confirm that Ceglia did not cut-and-paste genuine

emails, but rather created them himself out of whole cloth.  *See* Stroz Friedberg Report at 29-31.

The substance of the purported emails also contradicts matters of historical fact.  To take

just one of the more glaring examples, Ceglia produced an "email" that Zuckerberg supposedly

sent him at 8:27 a.m. on February 4, 2004.  In that "email," Zuckerberg allegedly wrote that

Thefacebook.com had "opened for students today" and encouraged Ceglia to "take a look" at the

website.  Ceglia responded at 10:30 a.m. that morning, writing "Congrats Mark!  The site looks

great."  Rose Decl., Ex. K.

This exchange is a historical impossibility.  Thefacebook.com website did not go live and

become available to students until the afternoon of February 4, 2004.  This timing has been

confirmed by numerous reporters who have written on the by now well-documented origins of

Facebook.  *See supra* at 10.  Moreover, the site was only open to Harvard students and Ceglia

(not a Harvard student) could not have accessed it.

**3.**      Stroz Friedberg reviewed all of Zuckerberg's emails contained in his Harvard

email account.  It ran searches on all of those emails using search terms containing the words and

phrases taken from Ceglia's purported "emails" quoted in his Amended Complaint.  Rose Decl.

¶ 4.  Based on these searches, Stroz Friedberg determined that the purported "emails" do not

exist in Zuckerberg's email account.  *Id*.

Moreover, the verifiably genuine emails between Zuckerberg and Ceglia leave no doubt

that Ceglia's entire story is make-believe.  None of the emails — not a single one — exchanged

between Zuckerberg and Ceglia mentions "The Face Book," "The Page Book,"

Thefacebook.com, or any website created by Zuckerberg.  The only topics of discussion between

Zuckerberg and Ceglia (or his associates) were the StreetFax project and Ceglia's failure to pay

Zuckerberg for his programming work on that project.  Rose Decl. ¶¶ 5-7.

According to the fictitious narrative reflected in the fabricated "emails," Ceglia, while

frustrated with Zuckerberg's delays on the Facebook website, graciously agreed to surrender his

majority stake in the company in exchange for a 50-50 partnership.  *See* Am. Compl. ¶ 46.  But

the genuine emails on the Harvard server tell a completely different story and one that has

absolutely nothing to do with Facebook.

The real emails establish that Ceglia profusely apologized to Zuckerberg for failing to

pay him for his work on the StreetFax website and asked for more time to scrape the money

together.  In a February 16, 2004 email to Zuckerberg, Ceglia wrote:

> "I can fully understand your frustration and hope that you have felt and feel from
> me sincere regret for such huge delays. . . .  If there is any way I can assure you
> that I have absolutely every intention of paying you what is owed plus some when
> we finally catch up to our sales goals it would be appreciated to a level I [can't]
> express in words.  After all this time please allow us a little more time to make
> things right with you. . . .  I will nervously await your reply and hope you can
> grant us more time."

Rose Decl., Ex. G.

The real emails also demonstrate that an increasingly desperate Ceglia offered excuse

after excuse for his delay in paying, and claimed that he was seeking to sell his property to raise

the money he owed Zuckerberg.  In a March 20, 2004 email to Zuckerberg, Ceglia wrote:  "I

unfortunately [don't] have any cash to give you right now," but "I have even listed my only

rental property for sale in the hopes of clearing up my past debts."  Rose Decl., Ex. J.

The real emails also show Ceglia attempting to persuade Zuckerberg to accept StreetFax

equity (which was worthless) in lieu of payment.  In a March 31, 2004 email to Zuckerberg,

Ceglia wrote:  "As I try to come up with solutions one that I [haven't] before thought of comes to

mind.  Stock. . . . [I] realize that with our inability to pay you so far that this might not sound like

an attractive offer . . . .  It would be a tremendous load [off] my mind to reach an agreement with

you Mark on this, I really hope you find this agreeable."  Rose Decl., Ex. K.

The numerous emails in which Ceglia begs for forgiveness and forbearance put the lie to

the fictional narrative in his fabricated "emails," in which he and Zuckerberg have an equal

partnership and Ceglia angrily presses Zuckerberg for payment.  If Ceglia in fact had leverage over Zuckerberg, as he has alleged, it is utterly implausible that Ceglia would have begged Zuckerberg for extra time to raise money to pay a small debt.

    **4.**    Professor Gerald McMenamin — Professor Emeritus of Linguistics at California State University in Fresno and a forensic linguist who has rendered expert opinions in more than 600 cases — studied the text of the purported Zuckerberg emails that appear in Ceglia's Amended Complaint and determined that it is probable that Zuckerberg was not the author.  *See* McMenamin Decl. (Doc. No. 50) ¶ 4.

    Professor McMenamin performed a stylistic analysis — examining the language and tone used in a sample of emails genuinely authored by Zuckerberg to Ceglia and other persons affiliated with StreetFax during the relevant time period — and compared them to the language and tone of the purported emails.  McMenamin Decl. (Doc. No. 50) ¶¶ 8-10.  He determined that the Amended Complaint purports to quote Zuckerberg spelling certain words differently than Zuckerberg repeatedly spells them in authentic Zuckerberg emails.  *Id*. ¶ 11.  Likewise, the sentence structure of the purported emails differs from the sentence structure in authentic Zuckerberg emails.  *Id*.  Based on these and many other discrepancies, Professor McMenamin concluded that "[i]t is probable that Mr. Zuckerberg is not the author" of the purported emails in the Amended Complaint.  *Id*. ¶ 4.

*    *    *

    Defendants have established, by clear and convincing evidence, that Ceglia is perpetrating a fraud on the court through the submission of a forged Work for Hire Document and fabricated emails.  The Court should accordingly dismiss this case with prejudice.

**III.   THIS LAWSUIT MUST BE IMMEDIATELY DISMISSED BECAUSE
CEGLIA HAS DESTROYED CRITICAL EVIDENCE AND COMMITTED
SEVERE LITIGATION MISCONDUCT.**

Dismissal is warranted for an additional and independent reason:  Ceglia has tampered

with and intentionally destroyed critical evidence at the heart of this case.  He attempted to give

the Work for Hire Document an artificially aged appearance and thwart ink analysis by "baking"

it through extended exposure to sunlight or another intense energy source of multi-wavelength

light.  He also willfully destroyed six USB devices, including one containing image files entitled

"Zuckerberg Contract" that he had stored in a folder entitled "Facebook Files."  In addition to

these egregious acts of tampering and document destruction, Ceglia has engaged in numerous

acts of bad faith litigation misconduct.  Among other things, he has concealed evidence he was

ordered to produce, submitted false declarations under oath, and directed his attorneys not to

comply with this Court's orders.  Standing alone, any one of these acts of misconduct would

warrant severe sanctions.  Taken together they require that this lawsuit be dismissed.

**A.   Ceglia Created A New Version Of The Forged Work For Hire
Document And Then "Baked" It.**

From the moment this lawsuit was filed, Defendants asked Ceglia to produce the original

version of the Work for Hire Document.  Ceglia refused.  It was only after this Court ordered

him to do so that he finally made the document available for inspection by Defendants' experts.

But when Ceglia's lawyer Paul Argentieri removed the purported original from a U.S. Postal

Service envelope at a law office in Buffalo on the morning of July 14, 2011, it was immediately

apparent that something was wrong:  the pages had an off-white color, the ink was faded, and the

document as a whole looked completely different from the version that had been attached to

Ceglia's Complaint.

Expedited discovery has shown not only that the document's unusual appearance was caused by Ceglia's amateurish attempt to give it an aged appearance and frustrate ink analysis by "baking" it, but also that the Work for Hire Document that Ceglia made available for inspection by Defendants on July 14, 2011 is not even the same document that Ceglia attached to his Complaint — it is a <u>new</u> forgery.

  **1.**  Gus Lesnevich is one of the nation's top forensic document examiners. He scrutinized four images of the Work for Hire Document that Ceglia produced during the course of this litigation. Lesnevich determined, beyond a reasonable doubt, that these four scans of the Work for Hire Document are images of at least <u>two different physical documents</u>. *See* Lesnevich Report at 30. That is, Ceglia has proffered at least two different physical versions of the Work for Hire Document as the same document.

  As explained in his report, Lesnevich observed at least 20 significant dissimilarities in the handwriting on page 1 of the Work for Hire Documents, specifically the interlineation and initials.[11] Lesnevich Report at 3-30. At first glance, the interlineations of the versions of the Work for Hire Documents appear similar, as can be seen in the following images of two of the documents discussed in the Lesnevich Report, defined as Q-1 and Q-3:

---

[11] As Lesnevich describes in his report, he analyzed four images of versions of the Work for Hire Document produced by Ceglia: (1) the version of the Work for Hire document Ceglia emailed to Argentieri on June 27, 2010, just three days prior to his filing of the Complaint on June 30, 2010 ("Q-1"); (2) the version of the Work for Hire document attached to the Complaint ("Q-2"); (3) the version of the Work for Hire document produced to, and scanned by, Plaintiff's expert Valery Aginsky in January 2011 ("Q-3"); and (4) the version of the Work for Hire document produced to Defendants' experts for inspection on July 14, 2011 ("Q-4"). Lesnevich Report at 2. The Lesnevich Report details the differences between the four documents. The examples herein are portions of Q-1 and Q-3 for ease of illustration purposes. Because Ceglia's spoliation of the Work for Hire Document so deteriorated and faded the ink of the version produced to Defendants' experts (Q-4), the dissimilarities that Lesnevich observed and attested to are more easily seen in the scan by Aginsky (Q-3). Those images are compared to Q-1 herein because the version of the Work for Hire Document that Ceglia attached to his Complaint (Q-2) is a slightly lower-quality image.



However, based on his expertise and training, Lesnevich identified at least 20 dissimilarities in the handwriting on page 1 of the documents.  *See* Lesnevich Report at 3.  This establishes Lesnevich's ultimate conclusion: Ceglia has produced at least two different physical versions of the Work for Hire Document.  The Lesnevich Report illustrates in detail all 20 dissimilarities, but the numerous dissimilarities in the word "May" illustrate the point.   The images below show these dissimilarities, which include differences in the slants and alignment of letters and the shape and strokes of letters.



| Q-1: legs of the "M" are parallel | Q-3: legs of the "M" are not parallel |
| --- | --- |

| Q-1: the "A" slants upward | Q-3: the "A" slants downward |
|---|---|
|  |  |
| **Q-1: arm of the "Y" is perpendicular** | **Q-3: arm of the "Y" is slanted approximately 80 degrees** |
|  |  |
| **Q-1: left side of the "M" is closed** | **Q-3: left side of the "M" is open** |
|  |  |
| **Q-1: right side is significantly higher than left side of the "M"** | **Q-3: right side is not higher than the left side of the "M"** |
|  |  |
| **Q-1: stem of the "Y" is higher** | **Q-3: stem of the "Y" is not as high** |

Thus, Ceglia actually forged at least two different Work for Hire Documents:  one that he filed in June 2010, and a different forgery that he gave to Defendants' experts in July 2011 when it came time to forensically examine the document.

**2.**     After Ceglia produced the new version of the Work for Hire Document to his own experts, he "baked" that version of the document by exposing it to light for extended periods. His objective was to give the document an aged appearance and to frustrate efforts to identify and date the ink before he produced the document to Defendants' experts.  But Ceglia went too far.  His baking efforts so discolored the paper and faded the ink that he has been forced to admit that something unnatural occurred and the document "now appears as if someone altered it." Doc. No. 199 at 8.

In apparent recognition of the fact that this lawsuit terminates immediately if he is shown to have "baked" the Work for Hire Document, Ceglia has contended that Defendants' experts altered the document's appearance through their testing.  But the indisputable visual evidence — high-resolution images of the document captured seven minutes after Argentieri removed it from the envelope, before Defendants began their testing — shows that the ink was already faded and the pages already had an off-white color.  The images below compare the appearance of the Work for Hire Document (a) on January 13, 2011, in an image taken by Ceglia's expert, and (b) on July 14, 2011, seven minutes after Argentieri removed the document from its envelope and before Defendants' testing began.  The dramatic difference establishes that sometime between January 13, 2011 and July 14, 2011, Ceglia (or one of his co-conspirators) "baked" the Work for Hire Document:





Report of Peter V. Tytell (Southwell Decl., Ex. F) ("Tytell Report"), Figs. 5-8.

Ceglia's own experts have acknowledged that the document they examined in January 2011 was very different from the document that was presented to Defendants on July 14, 2011. Ceglia's expert Aginsky described the ink as it appeared in January 2011 as "black ballpoint ink," Aginsky Decl. (Doc. No. 66) ¶ 6, and has admitted in interrogatory responses that when he inspected the document in January 2011, it had black ink and was not faded. Southwell Decl., Ex. P at 7. However, by the time Argentieri produced the document on July 14, the ink was no longer black and it was dramatically faded. The ink now appeared brown or even yellowish in places and contained numerous breaks and spaces where there was no visible ink at all. *Id.* at 8.

In addition to the faded ink, the fronts of the pages of the Work for Hire Document had an off-white color, whereas the backs of the pages were brighter white. And the pages themselves were unusually stiff. As Defendants' expert LaPorte has concluded, there is "unequivocal evidence" that the Work for Hire Document was spoliated between January 2011 and 9:18 a.m. on July 14, 2011. LaPorte Report at 17, 18, 23.

Defendants' experts also discovered small rectangular tabs that were <u>not</u> discolored at the top of each document.  Like tan lines from a swimsuit, these tabs indicate areas that were covered up while the rest of the document was exposed to light.  Defendants' experts also discovered indentations on the pages that correspond to the tabbed areas.  All of this strongly indicates that Ceglia hung the document up to the light using clips or clothespins:



Ultraviolet illumination — page 1 front below, page 2 front above

Tytell Report, Fig. 9; *see also* LaPorte Report, Ex. I; Tytell Report, Ex. C.

For all these reasons, Defendants' experts have concluded, based on the forensic evidence and their extensive experience in this area, that the current appearance of the Work for Hire Document was caused by intentional excessive exposure to light.  *See* LaPorte Report at 13; Report of Albert Lyter (Southwell Decl., Ex. D), at 7-9.

**B.      During The Pendency Of This Litigation, Ceglia Willfully Destroyed USB Drives That Contained Electronic Images Called "Zuckerberg Contract" In A Folder Called "Facebook Files."**

Ceglia has destroyed critical evidence, willfully and in bad faith, during the pendency of this litigation.  He has admitted that he no longer has <u>six</u> USB devices — removable storage devices that Ceglia attached to his computer and used to store highly relevant documents, and then destroyed once Defendants discovered their existence and this Court ordered him to produce them.

These storage devices contained electronic files entitled "Zuckerberg Contract page1.tif" and "Zuckerberg Contract page2.tif" in a folder labeled "Facebook Files."  These electronic image files are in the same TIFF format as the electronic images of the StreetFax Contract that Ceglia attached to his emails to Kole in 2004.  Given the titles and formats of these files, it is virtually certain that the storage devices contained electronic images of the document central to this case.  There is no question that his destruction was intentional, as he had used one of the devices as recently as April 4, 2011, and three were used while this litigation was pending.  *See* Stroz Friedberg Report at 49-50.

Ceglia initially concealed the existence of these devices, in blatant defiance of this Court's order that Ceglia produce "all computers and electronic media in [his] possession, custody, or control."  Doc. No. 83 at 2.  Ceglia thought that he could hide and manipulate the devastating evidence proving that his claims are fraudulent by storing the documents on removable devices rather than on the computers that he knew would be inspected.  He apparently did not realize that when a storage device of this type is attached to a computer, it leaves a digital fingerprint.  *See* Stroz Friedberg Report at 49-51.

When Stroz Friedberg conducted its forensic examination of Ceglia's computers and discovered that Ceglia had been using these electronic storage devices, Defendants moved to compel their production.  Doc. No. 99; Doc. No. 110.  Caught red-handed, Ceglia claimed that the devices had mysteriously vanished.  Given that Ceglia had used some of the devices during the pendency of this lawsuit, his claim that they had inadvertently been misplaced was a transparent lie.  The Court directed Ceglia to provide a detailed explanation of his search efforts for each storage device, and to identify the circumstances surrounding the disappearance of each item, including the date on which each item supposedly vanished.  *See* Doc. No. 117 ¶ 2.

Ceglia refused to comply.  Rather than provide the detailed explanation the Court had

required, Ceglia filed a supplemental declaration that simply repeated the same one-sentence

response for every one of the missing devices:  "After a diligent search and reasonable inquiry of

my attorneys, experts, and family, I am unable to locate this media device in my possession,

custody, or control."  Ceglia Decl. (Doc. No. 176-1) ¶ 137; *see also id.* ¶¶ 144, 146, 149, 151,

183.  The Court then ordered Ceglia to return from Ireland to the United States to search for the

"missing" USB devices.  Doc. No. 208 ¶¶ 1-2.  Although Ceglia returned and purported to

conduct a "search," he failed to locate or produce a single one of the missing storage devices.

This is a clear-cut case of willful, bad faith spoliation of evidence.  It is not remotely

plausible that Ceglia simply misplaced all six devices, including devices that he has been using

<u>during this lawsuit</u> — particularly when he has retained hundreds of floppy disks and CDs dating

back to the early 2000s.  The fact that Ceglia concealed the existence of these devices — even

when under a court order to disclose them — is further proof that this was not an inadvertent

mistake but rather bad faith destruction of evidence.

The prejudice to Defendants is obvious and substantial.  The names of the documents and

folder that Ceglia has disposed of — "Zuckerberg Contract" and "Facebook Files" —

demonstrate that they almost certainly contained a copy of some version of the contract at issue

in this case.  And the fact that Ceglia disposed of them strongly suggests that they would have

further established that his suit is a fraud.  If they supported Ceglia's claims, he would not have

destroyed them.

### C.    Ceglia Twice Reinstalled Windows On His Computer In An Attempt To Destroy Evidence.

Ceglia attempted to delete electronic data from his Seagate hard drive twice during the

pendency of this litigation, including once after he was aware that it contained the authentic

StreetFax Contract.  He attempted to do so by reinstalling the Windows operating system on the hard drive — a destructive action that overwrites existing data, and a common way that electronic forgers try to cover up their crimes.  *See* Stroz Friedberg Report at 46-47.

On March 29, 2011, Ceglia's experts captured an image of the Seagate hard drive.  They then returned the hard drive to Ceglia and he continued to use it.  *See* Stroz Friedberg Report at 46.  Ceglia admits that he knew during this time that the StreetFax Contract was on his computer.  *See* Ceglia Decl. (Doc. No. 230) ¶ 9.  On July 15, 2011, Stroz Friedberg captured a new image of his hard drive.  Stroz Friedberg Report at 7.

When Stroz Friedberg examined the first captured image, they discovered from the registry information that someone had reinstalled Windows on the hard drive on December 29, 2010 — six months after Ceglia filed this lawsuit.  Then, when they examined the second captured image and looked at the registry information, they found a Windows reinstallation date of December 27, 2010.  *See* Stroz Friedberg Report at 46-47.

This evidence establishes Ceglia's bad faith in several respects.  One, it shows that he twice reinstalled Windows <u>after</u> the lawsuit began — a transparent attempt to destroy the electronic data stored on his hard drive.  There is no legitimate reason for Ceglia to have reinstalled Windows (*e.g.*, he was not installing a new version of Windows, and there is no reason to believe his computer was not operating properly).  Two, it shows that one of the reinstallations occurred after the computer had been imaged by his experts and Ceglia knew the StreetFax Contract was stored on the hard drive — but before it had been turned over to Defendants.  Three, it shows that Ceglia backdated the second reinstallation.  (If the December 27, 2010 reinstallation date were genuine, it would have shown up in the registry captured on March 29, 2011.)  *See* Stroz Friedberg Report at 46-47.  It is unlikely that the full scope of

Ceglia's destruction of evidence will ever be known.  Although Defendants found at least one copy of the StreetFax Contract on the hard drive, there is no way to know what files may have been lost forever.

> **D.**   **Ceglia Has Deleted Electronic Copies Of The Work For Hire Document And Other Relevant Electronic Evidence During This Lawsuit.**

In addition to his destruction of USB devices and his efforts to erase data through his repeated reinstallation of Windows on his hard drive, Ceglia has deleted all electronic copies of the version of the Work for Hire Document that is attached to his Amended Complaint.  Stroz Friedberg did not find a single electronic copy of that version of the document on any of Ceglia's computers, CDs, floppy disks or his other electronic media.  But Stroz Friedberg did find forensic evidence establishing that Ceglia possessed such an electronic copy immediately before he filed this suit:  Ceglia attached a scan of the filed Work for Hire Document to an email that he sent to Paul Argentieri on June 27, 2010, just three days before he filed his original Complaint. *See* Southwell Decl., Ex. S.  He also attached a copy of the Work for Hire Document to an email that he sent to Karin Peterson, a former StreetFax employee, on June 29, 2010.  In light of this evidence, as well as the evidence that Ceglia created seven very similar versions of the Work for Hire Document during the pendency of this litigation — his test forgeries — his failure to produce an electronic copy of the actual Work for Hire Document can only be attributed to his having destroyed or concealed it.  *See* Stroz Friedberg Report at 10, 33.

Stroz Friedberg found that Ceglia also deleted additional relevant electronic files while this case was pending.  Ceglia produced floppy disks showing the existence of deleted files entitled "mark emails 082903," "Work for Hire ContractMZ.doc," and "Work for hire SF template.doc."  These files were last accessed on February 18, 2011, and were deleted on or after that date.  *See* Stroz Friedberg Report at 47.  Ceglia also initially failed to disclose a Yahoo!

account named landlubber39@yahoo.com.  That account was closed at Ceglia's request on

August 4, 2010 — more than a month after Ceglia filed his original Complaint.  At that time,

Yahoo! notified Ceglia that it would delete the contents of the account within 90 days, but Ceglia

took no action to preserve the email in the account.  *See id.* at 48.  The Internet history on one of

Ceglia's computers also revealed an undisclosed webmail account, getzuck@gmail.com, that

Ceglia had used on April 18, 2011.  But when Stroz Friedberg obtained access to the contents of

the account — after substantial stonewalling by Ceglia — it found that the earliest email in the

account was dated January 28, 2012.  Given that Ceglia had used the account months earlier, it

appears that he deleted the data in this account on or before January 28, 2012.  *See id.* at 48.

### E.    Ceglia Has Engaged In Extensive Litigation Misconduct.

In addition to the many egregious acts of evidence tampering and destruction described

above, Ceglia has engaged in a long campaign of litigation misconduct from the beginning of

this case.  He has stonewalled and obstructed discovery, filed false declarations under oath and

made frivolous assertions of privilege in an effort to conceal his wrongdoing, and he has directed

his attorneys to disobey this Court's orders.  All of this has caused the expedited discovery

ordered by the Court to extend to nearly nine months.

Ceglia's misconduct and concealment have forced Defendants to file five motions to

compel.  All five were granted.  This Court has found that Ceglia intentionally violated this

Court's orders, going so far as to direct his attorneys not to comply.  The Court concluded that

Ceglia has demonstrated "a plain lack of respect" for court orders "which cannot be

countenanced."  Doc. No. 283 at 22.

That disrespect continues today.  Defendants continue to uncover evidence that Ceglia

has been willfully concealing evidence in defiance of this Court's repeated orders.  To take just

one example, Defendants recently discovered the existence of <u>four</u> previously undisclosed

webmail accounts that Ceglia has been using.  *See* Doc. No. 295 at 6.  One of these undisclosed accounts discussed above, getzuck@gmail.com, appears to have been created by Ceglia to use specifically in connection with this lawsuit.  *See id*.  Ceglia's failure to disclose the existence of this account was obviously not inadvertent.

Ceglia's sweeping misconduct includes the following:

**Defiance of Court Orders**.  Ceglia has repeatedly defied this Court's many orders to compel.  His own lawyers attested under oath that Ceglia directed them not to comply with the Court's orders — and then promptly withdrew from the case.

**Concealment of Evidence**.  Where he has been unable to destroy evidence, Ceglia has sought to conceal it in defiance of court orders directing its production.  For example, Ceglia attempted to conceal the Seagate hard drive that contained the StreetFax Contract.  Another of Ceglia's bad faith tactics was to conceal the identities of his agents who possess relevant documents.  For example, Ceglia concealed the existence of Jerry Grant (a computer expert retained by Ceglia who possessed copies of the purported emails with Zuckerberg) and Jason Holmberg (a fellow wood pellet salesman who possessed, and appears to have drafted, the "Lawsuit Overview" document).

**Frivolous Claims of Privilege**.  Ceglia has made frivolous assertions of attorney-client privilege in an effort to suppress documents that have devastated his case.  For example, Ceglia made frivolous privilege claims concerning his emails to Jim Kole transmitting the StreetFax Contract, *see* Doc. No. 107 at 1-3, and the "Lawsuit Overview" document revealing his goal of extorting a fast settlement from Defendants.  He has even claimed attorney-client privilege over his communications with his family members who are not attorneys.

**False Declarations**.  Ceglia has submitted multiple sworn declarations containing statements that have been shown to be false.  For example, in his July 15, 2011 declaration, he falsely attested that he had "identif[ied] all computers and electronic media in my possession, custody or control."  Ceglia Decl. (Doc. No. 88) ¶ 2.  He has also produced inaccurate webmail consent forms on numerous occasions as a way of obstructing discovery.  Ceglia's lawyers have likewise submitted declarations containing false statements.  For example, Paul Argentieri submitted declarations asserting that it was Defendants' experts who discolored and spoliated the Work for Hire Document.  *See* Argentieri Decl. (Doc. No. 193); Argentieri Decl. (Doc. No. 257).

**Trickery Of Witnesses**.  Ceglia's lawyer Dean Boland tricked the court videographer, Robert Gianadda, into signing a misleading Boland-drafted declaration, then promptly filed the corruptly-procured document with the court.  The videographer was so disturbed and outraged by Boland's deceit that he filed a supplemental declaration setting the record straight and stating:  "I now feel like I was misled by Mr. Boland.  I do not consider Mr. Boland to have been candid or forthright with me."  *See* Gianadda Decl. (Doc. No. 218) ¶ 9.

**Frivolous Motions**.  Ceglia has repeatedly filed frivolous motions for the sole purpose of harassment, including numerous motions for sanctions, motions to vacate the expedited discovery orders, motions to stay production, motions to preclude Defendants from mentioning Ceglia's fraud to a jury, and the list goes on.  Ceglia even filed a frivolous Thanksgiving-eve motion for a temporary restraining order.  All of these motions have been denied or withdrawn. None has been granted.

Ceglia's extensive record of obstruction, stonewalling, and bad faith litigation misconduct provides an independent basis for dismissal and is yet another reason why this fraudulent lawsuit cannot be allowed to proceed.  *See, e.g., Penthouse Int'l, Ltd. v. Playboy*

*Enters., Inc.*, 663 F.2d 371, 388 (2d Cir. 1981) (affirming dismissal based on party's deliberate refusal to comply with court's discovery order as part of a "prolonged and vexatious obstruction of discovery with respect to closely related and highly relevant records"); *Greviskes v. Univs. Research Ass'n*, 417 F.3d 752, 759 (7th Cir. 2005) (affirming dismissal "where a record of delay existed in [plaintiff's] litigation strategy of refusing to stipulate to basic facts, submitting multiple frivolous motions to dismiss the evidentiary hearing, engaging in fraudulent misconduct, and throwing roadblocks in the process of awarding attorney's fees").

## CONCLUSION

The Court should dismiss Ceglia's Amended Complaint with prejudice, award

Defendants their reasonable costs and attorneys' fees, and award all other relief to which

Defendants may be justly entitled.


Dated:          New York, New York
                March 26, 2012

                                              Respectfully submitted,

                                              /s/ Orin Snyder
Thomas H. Dupree, Jr.                         Orin Snyder
GIBSON, DUNN & CRUTCHER LLP                   Alexander H. Southwell
1050 Connecticut Avenue, NW                   Matthew J. Benjamin
Washington, DC 20036                          Amanda M. Aycock
(202) 955-8500                                GIBSON, DUNN & CRUTCHER LLP
                                              200 Park Avenue, 47th Floor
                                              New York, NY 10166-0193
Terrance P. Flynn                             (212) 351-4000
HARRIS BEACH PLLC
726 Exchange Street
Suite 1000
Buffalo, NY 14210
(716) 200-5120


*Attorneys for Defendants Mark Zuckerberg and Facebook, Inc.*