UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
            :
PAUL D. CEGLIA,           :
            :
         Plaintiff,     :     Civil Action No. 1:10-cv-00569-RJA
            :
    v.           :     **DECLARATION OF**
            :     **ALEXANDER H. SOUTHWELL**
MARK ELLIOT ZUCKERBERG and  :
FACEBOOK, INC.,       :
            :
        Defendants.   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

     I, ALEXANDER H. SOUTHWELL, hereby declare under penalty of perjury that the following is true and correct:

     1.     I am an attorney licensed to practice law in the State of New York and admitted to practice before this Court. I am a partner in the law firm of Gibson, Dunn & Crutcher LLP ("Gibson Dunn"), counsel of record for Mark Elliot Zuckerberg and Facebook, Inc. ("Facebook") in the above-captioned matter. I make this declaration, based on personal knowledge, in support of Defendants' Motion to Dismiss, Motion to Stay Discovery, and Motion for Judgment on the Pleadings, as well as to provide the Court with Defendants' expert reports pursuant to the Court's expedited discovery orders. *See* July 1, 2011 Order (Doc. No. 83) at 3; August 18, 2011 Order (Doc. No. 117) ¶ 9.

     2.     This declaration first provides the Court, as a convenience, with a summary of Defendants' six expert reports. These reports, filed with the Court as exhibits to this declaration with the letters noted below include:

Ex. A  **Report of Stroz Friedberg, LLC** (digital forensics and electronic evidence)

Ex. B  **Report of Gerald M. LaPorte** (forensic document examiner and chemist)

Ex. C  **Report of Frank J. Romano** (forensic document examiner and print and typeface expert)

Ex. D  **Report of Albert Lyter** (forensic document examiner and chemist)

Ex. E  **Report of Gus R. Lexnevich** (forensic document examiner and handwriting expert)

Ex. F  **Report of Peter V. Tytell** (forensic document examiner)

3.       This declaration also describes and authenticates other documentary and other evidence in support of Defendants' Motions.

## DEFENDANTS' EXPERT REPORTS

### Report of Stroz Friedberg, LLC

4.       Founded in 2000, Stroz Friedberg, LLC ("Stroz Friedberg") is an international firm specializing in critical areas of digital risk management, including digital forensics, electronic discovery, data breach and cybercrime response, and business intelligence services and investigations.  The firm was founded by Edward Stroz, a former Federal Bureau of Investigation Special Agent who was responsible for the formation of the FBI's Computer Crime Squad in New York City, and Eric Friedberg, a former Assistant U.S. Attorney in the U.S. Attorney's Office for the Eastern District of New York, who served as the Computer and Telecommunications Coordinator (CTC), the lead computer crimes prosecutor; the Chief of Narcotics; and Senior Litigation Counsel.  The rest of Stroz Friedberg's management also includes former federal and state prosecutors and former law enforcement officers with both government and private-sector experience in traditional and cyber-based investigations, digital forensics, data preservation and analysis, infrastructure protection, and electronic discovery.

5.       I refer the Court to Stroz Friedberg's report for a complete description of its qualifications, its conclusions, and the factual bases for those conclusions.  A true and correct copy of the expert report of Stroz Friedberg ("Stroz Friedberg Report") is attached hereto as Exhibit A, with information designated by Ceglia as confidential redacted in the publicly-filed declaration.

6.      In granting Defendants' Motion for Expedited Discovery (Doc. No. 45), aimed at uncovering evidence related to the authenticity of the purported "WORK FOR HIRE CONTRACT" ("Work for Hire Document"), and the purported emails contained in the Amended Complaint (Doc. No. 39) ("Purported Emails"), this Court compelled the production of specified electronic assets and media in the possession, custody, or control of Plaintiff.  *See* July 1, 2011 Order (Doc. No. 83); Electronic Asset Inspection Protocol (Doc. No. 85).  Specifically, the Court's order required Plaintiff to "produce . . . the following electronic assets: (1) the native electronic version of the [Work for Hire Document] and all electronic copies of th[at] contract . . .; (2) the original, native electronic files consisting of or containing the [Purported Emails] and all electronic copies of the Purported Emails; and (3) all computer and electronic media in Plaintiff's possession, custody, or control . . . ."  Doc. No. 83 at 2.

7.      Additionally, in granting Defendants' Cross-Motion (Doc. No. 99) and Third Motion to Compel (Doc. No. 155), this Court compelled Plaintiff to identify his webmail accounts, to consent to their acquisition and inspection by Stroz Friedberg, and to provide consent to the webmail providers to produce preserved copies of the accounts to Stroz Friedberg for inspection pursuant to the Electronic Assets Inspection Protocol.  *See* August 18, 2011 Order (Doc. No. 117), ¶ 5; November 3, 2011 Order (Doc. No. 208).

8.      Accordingly, pursuant to the Court's July 1, 2011 Order and Electronic Asset Inspection Protocol, Stroz Friedberg created "forensically-sound copies" of the electronic assets produced by Plaintiff and the webmail providers and searched those electronic assets "in order to identify only documents, data, fragments, and artifacts that reasonably appear to be related to the authenticity of the [Work for Hire Document] and the [Purported Emails]."  Doc. No. 85 at 2.

9.      Stroz Friedberg found direct and compelling digital forensic evidence that the documents relied upon by Ceglia to support his claim are forged.  Stroz Friedberg also found what it believes to be the authentic contract between Ceglia and Mark Zuckerberg.  That contract contains no references to Facebook.  *See* Stroz Friedberg Report at 2.

10.      There is no digital forensic evidence on the Ceglia Media supporting a conclusion that the Work for Hire Document or the Purported Emails are authentic documents dating from 2003 and 2004.  To the contrary, the digital forensic evidence strongly indicates that these documents were created by Ceglia at a later date.  *See* Stroz Friedberg Report at 4.

11.      As described more fully in its report, Stroz Friedberg made the following findings bearing on the authenticity of the Work for Hire Document and the Purported Emails:

a.      Stroz Friedberg did not find any exact copies of the Work for Hire Document on the hundreds of pieces of media produced by Paul Ceglia, including three computers, three hard drives, 174 floppy disks, and 1,087 CDs (hereinafter, the "Ceglia Media").  *See* Stroz Friedberg Report at 2, 10.

b.      Stroz Friedberg did find a signed copy of an April 28, 2003 contract between Ceglia and Mark Zuckerberg, entitled "STREET FAX," concerning Mr. Zuckerberg's work on the StreetFax project (hereinafter, the "StreetFax Contract").  The StreetFax Contract differs substantially from the Work for Hire Document; the StreetFax Contract concerns only Mr. Zuckerberg's work on the StreetFax project and includes no references to Facebook.  *See* Stroz Friedberg Report at 2.

c.      The StreetFax Contract was found as two image files, each file being a scanned copy of one page of the two-page contract.  The image file of the second page of

the StreetFax Contract was saved to Ceglia's computer on March 3, 2004 at

10:35:21 a.m., and then sent out via email approximately two minutes later at

10:37:15 a.m.  The image file of the first page of the StreetFax Contract was

saved to Ceglia's computer on March 3, 2004 at 10:38:35 a.m., and then sent out

via email less than one minute later at 10:39:11 a.m.  These images were

attached to two emails from ceglia@adelphia.net to Jim Kole of Sidley Austin

Brown & Wood LLP ("Sidley Austin") (hereinafter, the "StreetFax Emails").

The first of the two emails reads: "Hi Jim, Hope all is well, I am at 727 490

5751 when your ready.   Ill send page two next I should be here for the next

hour.   Paul."  The second of the two emails includes an attachment but has no

text in the body of the email.  *See* Stroz Friedberg Report at 2, 11-17.

d.   Sidley Austin also produced copies of the StreetFax Emails, which it has

maintained since March 3, 2004.  Stroz Friedberg determined that the content of

the emails and the attached copy of the StreetFax Contract produced by Sidley

Austin are the same as the content of the emails and the attached copy of the

StreetFax Contract found on the Ceglia Media.  *See* Stroz Friedberg Report at 2,

18-22.

e.   Stroz Friedberg identified seven unsigned electronic documents on the Ceglia

Media that are variants of the Work for Hire Document.  All of these electronic

documents were backdated to appear as if they were created at earlier dates.

They appear to be part of an effort to create a fraudulent contract.  *See* Stroz

Friedberg Report at 2, 33-38.

f.   Stroz Friedberg did not find any of the Purported Emails in native file format, that is to say, as files in an email format.  They do not exist in native format on any of the Ceglia Media or in any of Ceglia's webmail accounts examined by Stroz Friedberg.  *See* Stroz Friedberg Report at 3, 23.

g.   Stroz Friedberg did identify the Microsoft Word documents into which Ceglia claims to have copied-and-pasted the text of the Purported Emails.  All of these Word documents were backdated to appear as if they were created at earlier dates.  *See* Stroz Friedberg Report at 3, 23-26.

h.   The Purported Emails themselves, which Ceglia has proffered as authentic communications with Mark Zuckerberg, are fabricated.  Many of the Purported Emails contain the wrong time zone stamp.  For example, all of the Purported Emails purportedly sent from October 26, 2003 to April 4, 2004 contain the "-0400" stamp that reflects Eastern Daylight Time.  However, Eastern Daylight Time was not in effect during this time.  There is no place in the Continental United States from which Ceglia could have sent these Purported Emails with an accurate "-0400" time zone stamp.  *See* Stroz Friedberg Report at 3, 27-28.

i.   The Purported Emails have formatting differences in the email headers that are inconsistent with Ceglia's explanation that he simply copied-and-pasted the emails into Word documents.  These formatting inconsistencies include differences in the number of spaces following the colon in the "To" and "From" fields and the way in which the word "Tuesday" is abbreviated.  These formatting differences indicate that the Purported Emails were either typed or

edited manually and were not solely the result of a copy-and-paste operation. *See* Stroz Friedberg Report at 3, 29-31.

j.   Stroz Friedberg found evidence that a hex editor was used on documents found on the Ceglia Media.  Hex editors can be used to create electronic forgeries because they allow the manipulation of data at a level that makes traditional digital forensic analysis of the fraudulent change to the document more difficult, if not impossible, to detect.  *See* Stroz Friedberg Report at 3, 41-43.

k.   Stroz Friedberg found substantial evidence of possible spoliation, including multiple reinstallations of the Windows operating system during the pendency of this litigation on the computer that contained the StreetFax Contract.  Stroz Friedberg also found evidence that relevant files were deleted and overwritten in February 2011.  In addition, Stroz Friedberg found evidence that email data was deleted from the recently disclosed getzuck@gmail.com email account.  *See* Stroz Friedberg Report at 3, 46-48.

l.   Stroz Friedberg identified substantial evidence of the existence of several pieces of media that Ceglia did not turn over, identify, or otherwise account for, some of which appear to have contained versions of a contract between Ceglia and Mr. Zuckerberg, namely: "Zuckerberg Contract page1.tif" and "Zuckerberg Contract page2.tif."  Three pieces of this undisclosed media were used during the pendency of this litigation.  *See* Stroz Friedberg Report at 4, 49-50.

### Report of Gerald M. LaPorte

12.     Mr. LaPorte is a world-renowned expert in ink and paper analysis.  He is a

Forensic Chemist and Document Dating Specialist who trained with the United States Secret

Service in the field of questioned document examination.[1]

13.     I refer the Court to Mr. LaPorte's report for a complete description of his

experience and qualifications, his conclusions, and the factual bases for those conclusions.  A

true and correct copy of the expert report of Gerald M. LaPorte ("LaPorte Report") is attached

hereto as Exhibit B, with information designated by Ceglia as confidential redacted in the

publicly-filed declaration.

14.     Pursuant to the Court's July 1, 2011 Order and July 1, 2011 Hard-Copy

Inspection Protocol (Doc. No. 84), on July 16, 2011, Mr. LaPorte examined the hard-copy

documents produced by Plaintiff.  Plaintiff produced two documents for inspection: a two-page

purported Work for Hire Document, and a six-page document titled "StreetFax Back-End

Technical Specification."  Mr. LaPorte conducted several non-destructive examinations of both

documents, including visual, optical, and microscopic analysis.  Mr. LaPorte also extracted

miniscule samples of the documents' ink, toner, and paper for chemical analysis.

15.     Based on his examinations, Mr. LaPorte concluded the following:  (a) It is "highly

probable" — meaning that the evidence is "very persuasive" and that Mr. LaPorte is "virtually

certain" — that the handwritten interlineation on page 1 of the Work for Hire Document is less

than 2 years old; (b) pages 1 and 2 of the Work for Hire Document "were not produced

---

[1]  Mr. LaPorte is currently employed full time within the United States Department of Justice as the Forensic Policy Program Manager and Acting Associate Director in the Office of Investigative and Forensic Sciences at the National Institute of Justice.  He has permission to operate as an independent consultant in civil matters and has done so since 2008.  His findings and conclusions in this matter do not represent the views of the United States government.

contemporaneously"; and (c) there is "unequivocal evidence" that the Work for Hire Document was "spoliated between January 2011 and July 14, 2011."  LaPorte Report at 23-25.

    a.    It is virtually certain that the handwritten interlineation on page 1 of the Work for Hire Document is less than 2 years old:

        i.    Mr. LaPorte observed that, in the ink of the handwritten interlineation on page 1, the level of a chemical ingredient called 2-phenoxyethanol (PE) was unusually high and far exceeded levels of PE that would have existed in a document that was actually more than 2 years old. *See* LaPorte Report at 15.  PE is a solvent found in over 85% of blue and black ballpoint inks that evaporates for 2 years after the ink is applied to paper.  *See* LaPorte Report at 7.

        ii.    Mr. LaPorte analyzed the levels of PE in the ink plugs removed from the handwritten interlineation on page 1, the down stroke of the "PC" initials on page 1, the signature in the name of Paul Ceglia on page 2 and the signature in the name of Mark Zuckerberg on page 2.  *See* LaPorte Report at 15.

        iii.    Mr. LaPorte determined that the level of PE in the interlineation on page 1 was extremely high, and therefore performed the PE test for ink dating.  *See* LaPorte Report at 15.[2]

---

[2]  The levels of PE in the Ceglia and Zuckerberg signatures on page 2 were insufficient to obtain an accurate measurement of the PE evaporation.  The low levels of PE could be attributable to any number of factors, including the age of the ink, the formula of the ink, and exposure to heat.  *See* LaPorte Report at 16.  There also was insufficient ink available from the initials on page 1 to conduct PE ink dating.  Notably, however, the level of PE was significantly high relative to the amount of PE typically found in inks that are known to be more than two years old.  *See id.*

iv.   The amount of PE decreased an average of 64%, more than 2.5 times the 25% benchmark — indicating that the ink from this sample is still "fresh" (less than 2 years old).  *See* LaPorte Report at 15.

b.   Pages 1 and 2 of the Work for Hire Document were not produced at the same time:

i.   **Formatting and typeface**.  The formatting of the paragraphs and the typeface of the text (font) on page 1 of the Work for Hire Document are different than the formatting and typeface used on page 2.[3]  *See* LaPorte Report at 10.

ii.   **Paper**.  Based on an analysis of physical characteristics, optical properties, and chemical compositions, Mr. LaPorte determined that different paper was used for pages 1 and 2 of the Work for Hire Document.  *See* LaPorte Report at 10-12.

iii.   **Toner**.  Based on a chemical analysis, Mr. LaPorte determined that the toner on page 1 of the Work for Hire Document was different than the toner on page 2.  Thus, either a different printing device or different cartridge of toner was used to produce pages 1 and 2.  *See* LaPorte Report at 12-13.

iv.   **Ink**.  Based upon both optical and chemical examination, Mr. LaPorte determined that different inks were used to create the handwritten

---

[3]  Professor Frank Romano, a renowned typeface expert, made more specific findings concerning the typeface and formatting differences in the Work for Hire Document, which are discussed below.

entries on page 1 and page 2, and that two different inks were used to sign page 2.  *See* LaPorte Report at 13-14.

c.   There is unequivocal evidence that the Work for Hire Document was deliberately exposed to sunlight or another intense energy source for a prolonged period in order to degrade the document and its ink, probably over a span of weeks between January 2011 and July 14, 2011:

    i.   **Initial Observations.**  Mr. LaPorte immediately observed signs of degradation in the Work for Hire Document when he first examined it on July 16, 2011, and viewed these same signs of degradation in the July 14, 2011 scans of the document.  The handwritten notations on both pages of the document appeared light brownish or tan, and they were noticeably degraded and faded compared to the copy of the document attached to the Amended Complaint.  The paper was also unusually tensile (stiff), and the fronts of the pages were a discolored off-white compared to the backs.  *See* LaPorte Report at 3, 8-9.

    ii.   **Earlier Scans**.  Scans taken in January of 2011 by Messrs. Aginsky and Osborn clearly show that the black ballpoint ink was not degraded and there is no evidence of paper degradation in any of their images.  *See* LaPorte Report at 8.

    iii.   **Paper and Fluorescing Tabs**.  Based upon examination using a UV source, the fronts of pages 1 and 2 did not fluoresce nearly as brightly as the backs; that is, the front appeared dull under a UV source while the back appeared bright and illuminated.  In addition, two rectangular

areas or tabs approximately 1 cm wide in the top portions of pages 1 and 2 fluoresced very brightly — as bright as the back of the pages — when compared to the rest of the UV dull front.  *See* LaPorte Report at 11-12.

1. This "UV dull" appearance is caused when the optical brightening agents, or chemicals used to enhance the white appearance of paper, deteriorate.  Such deterioration can happen when, for instance, paper is subjected to intense and/or prolonged sunlight over a period of weeks.  *See* LaPorte Report at 11.

2. The fluorescing tabs are the result of masking those areas while the remainder of the face of the document was exposed to the treatment that caused the photo-degradation of the ink and paper.  *See* LaPorte Report at 11-12.

3. Mr. LaPorte found further evidence of this masking in the trough-like impressions located at each fluorescing tab, indicating that pressure was being applied with whatever was "masking" the area.  Although he could not identify exactly what was used, he noted that a clothespin or clasp-like item attached to a document during exposure would create the same or similar impressions.  *See* LaPorte Report at 12.

4. Additionally, consistent with photo-degradation, both pages of the Work for Hire Document exhibited significant cockling, or a "wrinkling" effect, which can occur in paper when moisture is removed through extensive drying. *See* LaPorte Report at 10.

iv. **Ink**. The ink on the Work for Hire Document exhibits characteristics of severe degradation due to a photochemical reaction. Studies have shown that certain types of black ballpoint writing inks will deteriorate and appear brownish due to dye degradation. *See* LaPorte Report at 9.

v. Based on these forensic observations, studies of prolonged exposure of ink to sunlight, and the fact that Ceglia has proffered, in multiple declarations and briefs, an account that cannot feasibly explain the document's degradation, Mr. LaPorte determined that there is "unequivocal evidence" that the Work for Hire Document was deliberately exposed to sunlight or another intense energy source for a prolonged period. This intentional exposure occurred sometime after January of 2011, when Plaintiff's experts Valery Aginsky and John Paul Osborn took high-resolution scans of the document, and sometime prior to the inspection by Defendants' experts in July 2011. *See* LaPorte Report 23-24.

13

**Report of Frank J. Romano**

16.     Frank Romano is Professor Emeritus at the Rochester Institute of Technology

(RIT) School of Print Media.  He is a leading expert in the fields of document authentication and

typeface and printing technology.  His career in the printing industry has spanned over 50 years.[4]

17.     I refer the Court to Professor Romano's report for a complete description of his

experience and qualifications, his conclusions, and the factual bases for those conclusions.  A

true and correct copy of the expert report of Professor Frank J. Romano is attached hereto as

Exhibit C.

18.     In May 2011, Professor Romano examined the scanned copy of the Work for Hire

Document attached to Ceglia's Amended Complaint.  Observing "numerous significant

inconsistencies" between page 1 and page 2 of the document, Professor Romano determined that

page 1 is an "amateurish forgery."  Romano Decl. (Doc. No. 48) ¶¶ 14, 16.  This Court granted

Defendants' Motion for Expedited Discovery based in part on that expert conclusion.

19.     Professor Romano examined the hard-copy documents produced by Ceglia on

July 14, 2011.  He conducted a non-destructive visual, optical, and microscopic examination of

both documents.  *See* Romano Report at 2.

20.     The results of that examination confirmed Professor Romano's earlier

observations.  In particular, Professor Romano concluded "beyond any reasonable doubt and

---

 4  Professor Romano has worked with every known printing process and, in many cases,
authored the first articles and books on the subject.  His 50 published books cover every aspect
of document origination, reproduction, and distribution; his 10,000-term "Encyclopedia of
Graphic Communications" has been called the standard reference in the field.  In 1977, Professor
Romano received the National Composition Association Distinguished Service Award, the
highest honor of the typographic industry, which has been awarded to only 11 other recipients.
Professor Romano has also consulted extensively with various United States government
agencies and the United Nations and has testified before the United States Congress.  *See*
Romano Report at 1-2.

with the highest degree of certainty possible" that (a) the Work for Hire Document "is, at least in part, forged" and that page 1 of the document is an "amateurish forgery"; (b) pages 1 and 2 of the document "were printed on different printers," and page 1 of the document was printed on "a more recent printer" than page 2; (c) the typographical features of page 1 and page 2 of the StreetFax Contract are "significantly more consistent" than the same features of page 1 and page 2 of the Work for Hire Document, and page 1 of the Work for Hire Document appears to be a "modification" of page 1 of the StreetFax Contract.  *See* Romano Report at 11.

    a.    Professor Romano's examination of the hard-copy Work for Hire Document confirmed the numerous bases for his initial conclusion that the Work for Hire Document is a forgery, and that page 1 of the document is an amateurish forgery:

        i.    **Fonts**:  The two pages of the Work for Hire Document are composed in <u>different fonts</u>.  Page 1 is composed in Times New Roman, while page 2 is composed in Garamond.  These fonts appear similar to the naked untrained eye, but are distinguishable under close expert examination due to the fonts' different x-heights (the height of lowercase letters a, e, u, x, and the bowls of p, b, q, etc.).  *See* Romano Report at 4.

        ii.    **Margin, column, and gutter width**:  There are significant differences in the widths of the margins, columns, and gutters (the space between columns) on page 1 and page 2 of the Work for Hire Document.  The column widths are unusually wide on page 1, and the gutter and

margin widths are unusually narrow.  These anomalies are not present on Page 2.  *See* Romano Report at 5.

iii.  **Formatting**:  The indents on page 1 are uncommonly wider than the indents on page 2.  Moreover, subparagraph (a) in section 4 on page 1 contains an errant return code, unlike the hanging indents in section 14 on page 2, which are consistently indented.  *See* Romano Report at 6.

iv.  **Spacing between paragraphs**:  The spacing between paragraphs on page 1 is inconsistent, varying between single, double, and triple spacing.  The spacing between paragraphs on page 2 is uniform.  *See* Romano Report at 7.

1.  Fonts, point sizes, and formats are typically established in advance and consistent throughout a multi-page document, and Professor Romano determined that it is "highly unusual to observe so many inconsistencies between the first and second pages of a two-page document that purports to be a unitary item."  *See* Romano Report at 7.

b.  Based on his examination of the hard-copy Work for Hire Document, Professor Romano also concluded that pages 1 and 2 of the Work for Hire Document were printed on different printers, and that page 1 was printed on a more recent printer.

i.  All printers lay down toner differently, in ways that can be distinguished by viewing the edges of the letters (the "edge gradient") under magnification.   *See* Romano Report at 8.

ii.   Professor Romano determined that the letters on page 1 of the Work for Hire Document had a smoothed edge gradient, and thus were produced by a printer that used modern scaling and resolution enhancement technologies.  The letters on page 2 had a relatively jagged edge gradient, and thus were produced by a printer that did not use either scaling or resolution enhancement technologies.  *See* Romano Report at 8.

iii.   Based on this analysis, Professor Romano also determined that the printer that produced page 1, which applied newer scaling and resolution enhancement technologies, was the <u>more recent</u> of the two printers used.  *See* Romano Report at 8.

c.   Professor Romano also analyzed the authentic StreetFax Contract found on Ceglia's computers.  He found that the typographical features of page 1 and page 2 of the StreetFax Contract are "significantly more consistent" than the same features of page 1 and page 2 of the Work for Hire Document, and that page 1 of the Work for Hire Document appears to be a "modification" of page 1 of the StreetFax contract.

i.   Both pages of the StreetFax Contract are composed in Garamond.  *See* Romano Report at 9.

ii.   The column and gutter widths on page 1 and page 2 of the StreetFax Contract appear more typical, and appear consistent between the two pages of that document.  *See* Romano Report at 9.

iii.   The indents on page 1 and page 2 of the StreetFax Contract are more consistent.  *See* Romano Report at 9.

iv.   Sub-paragraph (a) in section 4 on page 1 of the StreetFax Contract does not contain the errant return code found in the same subparagraph of the Work for Hire Document.  *See* Romano Report at 9.

v.   The spacing between paragraphs on page 1 of the StreetFax Contract is significantly more consistent.  *See* Romano Report at 9.

### Report of Dr. Albert Lyter, III

21.   Dr. Albert Lyter is a forensic chemist who has specialized in analyzing the authenticity of documents for over 36 years.  He has testified more than 200 times in over 35 states and abroad.

22.   I refer the Court to Dr. Lyter's report for a complete description of his experience and qualifications, his conclusions, and the factual bases for those conclusions.  A true and correct copy of the expert report of Dr. Albert Lyter ("Lyter Report") is attached hereto as Exhibit D, with information designated by Ceglia as confidential redacted in the publicly-filed declaration.

23.   Dr. Lyter examined the hard-copy Work for Hire Document and a six-page document dated April 28, 2003 entitled "StreetFax Back-End Technical Specification," that were both produced by Ceglia on July 19, 2011.  *See* Lyter Report at 1-2.

24.   Based on his examinations, Dr. Lyter concluded the following:  (a) the Work for Hire Document was intentionally exposed to excessive environmental conditions, probably sunlight for an extended period of time, which caused the deterioration of the paper and the ink now present on the document; (b) the presence of the indentations and "tabs" of bright

fluorescence in the upper portions of the pages are evidence that the treatment to which the Work

for Hire document was subjected was intentional;  and (c) the intentional deterioration of the

Work for Hire Document thwarted his ability to assess the authenticity of the Work for Hire

Document using thin-layer chromatography (TLC) analysis.  *See* Lyter Report at 8-9.

    a.    On July 19, 2011,  Dr. Lyter immediately observed that the handwritten ink on the Work for Hire Document was significantly deteriorated, containing numerous breaks and spaces that had no visible ink.  Moreover, the color of the ink was unusual, ranging from yellow to brown.  The ink also had an unusual, non-reflective, dull appearance.  Typically, ball pen ink is quite reflective and shiny.  *See* Lyter Report at 3.

    b.    Dr. Lyter also observed the uneven fluorescence of the pages of the Work for Hire Document.  That is, the majority of the front of both pages showed an unusually dull fluorescence, but two small square areas at the top of each page fluoresced more brightly in a manner typically expected from a document containing optical brighteners like the Work for Hire Document.  *See* Lyter Report at 3-4.

    c.    Dr. Lyter also observed indentations in the surface of the paper around the smaller areas of brighter fluorescence at the top of each page of the Work for Hire Document, and noted that the size and shape of those indentations are similar to those formed when a sheet of paper is clamped with a clip or spring binder.  *See* Lyter Report at 4.

    d.    The presence of the indentations and small squares of bright fluorescence in the upper portions of the pages, coupled with Ceglia's incorrect assertions that

Defendants' experts discolored the Work for Hire Document are evidence that the treatment to which the Work for Hire Document was subjected was intentional.  *See* Lyter Report at 8-9.

25.     Dr. Lyter's chemical and ink-dating analyses based on TLC were thwarted by the intentional deterioration of the Work for Hire Document that had occurred prior to Defendants' experts' inspection.  *See* Lyter Report at 9.

a.     Dr. Lyter intended to conduct a chemical analysis, known as thin-layer chromatography (TLC), of the handwritten ink on the Work for Hire Document for two primary purposes:  ink identification and ink dating.  TLC is a separation technique in which writing ink is separated into its various components, which can then be compared to the components of other ink samples.  Further, some inks contain dating "tags," or unique components included in the ink formula to allow identification of the year of production of the ink, that can be identified using TLC.  *See* Lyter Report at 7.

b.     However, the deterioration of the inks on the Work for Hire Document hindered the TLC analysis, which produced results that were quite unusual for ball pen inks.  Rather than separate into distinct bands of color, the components of the extracted ink elongated over diffuse areas, which was tonally uncharacteristic of the dye components normally found in ball pen ink.  *See* Lyter Report at 8.

c.     Dr. Lyter was unable to perform ink identification and relative aging analysis, because of the intentional deterioration of the Work for Hire Document.  *See* Lyter Report at 9.

    d.    Given the appearance of the images taken by Plaintiffs' experts Valery Aginsky and John Paul Osborn in January 2011, Dr. Lyter concluded that the intentional excessive environmental exposure of the document occurred sometime between January 2011 and July 2011, when the document was produced to Defendants' experts.

### Report of Gus R. Lesnevich

26.    Gus R. Lesnevich has over 40 years of experience as a forensic document examiner.  He was certified by the Department of Defense, United States Army, as an Examiner of Questioned Documents in 1970.  In 1974, he was recruited by the United States Secret Service, where he served as a Forensic Document Examiner specializing in signature identification for eight years.  Since leaving the Secret Service in 1981, he has been in private practice.

27.    I refer the Court to Mr. Lesnevich's report for a complete description of his experience and qualifications, his conclusions, and the factual bases for those conclusions.  A true and correct copy of the expert report of Gus R. Lesnevich ("Lesnevich Report") is attached hereto as Exhibit E.

28.    Mr. Lesnevich examined the hard-copy documents produced by Ceglia on July 15, 2011.  When it became apparent that there were discrepancies in the handwriting on the versions of the Work for Hire Document that Ceglia had produced, particularly on the interlineations on page 1, Mr. Lesnevich conducted further examination of those images. Specifically, Mr. Lesnevich compared the handwriting on: (1) image of the Work for Hire Document in TIFF file format sent by Ceglia to Paul Argentieri on June 27, 2010; (2) image of the Work for Hire Document attached to Ceglia's Complaint, filed June 30, 2010; (3) image of

the Work for Hire Document taken by Ceglia's expert Valery Aginsky during his January 13,

2011 examination of the Work for Hire Document; and (4) image of the Work for Hire

Document taken by Defendants' expert Peter V. Tytell during Defendants' July 14, 2011

examination of the Work for Hire Document present by Paul Argentieri (collectively, the

"Questioned Documents").  *See* Lesnevich Report at 2.

29.     Based on his examination of the Questioned Documents, each of which Plaintiff

Paul Ceglia has proffered as an image of the same physical document, Mr. Lesnevich concluded

the following:

  a.   There are at least 20 significant dissimilarities between the handwritten

       interlineations on the Questioned Documents.

       i.    These dissimilarities include slant/slope dissimilarities between the

             letters and numbers, differences in letter formation and design

             (particularly loops and curves), differences in the letter spacing or

             placement on the document, dissimilarities in beginning and ending

             stroke, differences in the height relationship within each word or

             number, and differences in alignment of words or numbers in

             comparison to the typed text surrounding the word or number.  *See*

             Lesnevich Report at 3.

  b.   Based on his examination of the questioned handwritten interlineations,

       including but not limited to the 20 significant dissimilarities described above,

       Mr. Lesnevich concludes to the highest degree of certainty possible, beyond any

       reasonable doubt, that Ceglia has proffered at least two different physical

       documents as the Work for Hire Document: (1) the physical document that was

filed with the Complaint and (2) the physical document that was produced to

Defendants' experts in July 2011.  *See* Lesnevich Report at 3.

**Report of Peter V. Tytell**

30.     Peter V. Tytell is a forensic document examiner with over 40 years of experience.

31.     I refer the Court to Mr. Tytell's report for a complete description of his

experience and qualifications, his conclusions, and the factual bases for those conclusions.  A

true and correct copy of the expert report of Peter V. Tytell ("Tytell Report") is attached hereto

as Exhibit F, with information designated by Ceglia as confidential redacted in the publicly-filed

declaration.

32.     Mr. Tytell examined the hard-copy documents produced by Ceglia on July 14 and

15, 2011.  Mr. Tytell's examination involved analysis, comparison, and evaluation of the ink,

paper, and printed text of the Work for Hire Document using non-destructive visual,

microscopic, and optical techniques.  *See* Tytell Report at 1.

33.     Based on his examinations, Mr. Tytell concluded the following:

a.      The two-page Work for Hire Document is not consistent with the normal

preparation of a two-page document.  Rather the use of multiple type styles and

the pattern of ink usage indicate preparation of the two pages at different times.

*See* Tytell Report at 10-11.

b.      The deteriorated condition of the ink and paper on the Work for Hire Document

when Argentieri produced it at 9:11 AM on July 14, 2011 are classic indicia of

an attempt to artificially accelerate the aging of a document, an attempt that took

place in prior to the production of the Work for Hire Document on July 14,

2011.  *See* Tytell Report at 12.  This conclusion is based on:

      i.     Comparison of Plaintiff's experts' scans of the Work for Hire

Document taken in January 2011 with the faded brown or light tan ink

of the document as produced on July 14, 2011 (*see* Tytell Report at 4);

and

     ii.    Examination of the Work for Hire Document, which revealed

anomalous features consistent with exceptional exposure of the front

of the pages, but not the reverse, to abnormally extreme environmental

conditions while hung-up with clips or clothespins (*see* Tytell Report

at 6).

## EVIDENCE IN SUPPORT OF DEFENDANTS' MOTIONS

34.    A true and correct copy of the "Lawsuit Overview," produced by Ceglia during

expedited discovery, is attached hereto as Exhibit G.

35.    A true and correct copy of the article by John Anderson entitled "Ceglia:

Facebook planted a fake contract on my computer," published in the Wellsville *Daily Reporter*

on August 17, 2011, is attached hereto as Exhibit H.

36.    A true and correct copy of the article by Emil Protalinski entitled "Exclusive:

Paul Ceglia Says Facebook is Doing the Forgery," published in *ZDNet* on August 16, 2011, is

attached hereto as Exhibit I.

37.    A true and correct copy of pages 28-30 of the book by David Kirkpatrick entitled

"The Facebook Effect," published by Simon and Schuster in 2010, is attached hereto as Exhibit

J.

38.    A true and correct copy of the article by Alan J. Tabak entitled "Hundreds

Register for New Facebook Web site—Facemash creator seeks new reputation with latest online

project," published in *The Harvard Crimson* on February 9, 2004, is attached hereto as Exhibit K.

39.     A true and correct copy of a transcription of the StreetFax Contract, prepared by a Gibson Dunn word processing support assistant and reviewed by Gibson Dunn attorney Amanda Aycock, is attached hereto as Exhibit L.

40.     A true and correct copy of the photograph of a printout of emails exchanged between Paul Ceglia and Jim Kole on March 4 and 5, 2004, produced by Ceglia during expedited discovery, is attached hereto as Exhibit M.

41.     A true and correct copy of a cashier's check produced by Ceglia during expedited discovery, made out to Mark Zuckerberg, dated April 25, 2003, in the amount of $3,000.00, is attached hereto as Exhibit N.

42.     A true and correct copy of a check produced by Ceglia during expedited discovery, made out to Mark Zuckerberg, dated August 4, 2003, in the amount of $5,000.00, is attached hereto as Exhibit O.

43.     A true and correct copy of the Responses to the Interrogatories of Valery N. Aginsky, Ph.D., dated December 2, 2011, produced by Aginsky pursuant to the Court's November 3, 2011 Order (Doc. No. 208) ¶ 12, is attached hereto as Exhibit P.

44.     A true and correct copy of the Articles of Organization of Thefacebook LLC, formerly a limited liability company organized under the laws of Florida, is attached hereto as Exhibit Q.

45.     A true and correct copy of the Amended and Restated Articles of Organizations of thefacebook LLC, a limited liability company organized under the laws of Florida, is attached hereto as Exhibit R.

46.     A true and correct copy of an email sent from Ceglia to Argentieri on June 27, 2010, and its attachments, which were produced by Argentieri in this redacted form during expedited discovery, are attached hereto as Exhibit S.

47.     A true and correct copy of an article by Alison Frankel entitled "Now appearing for Facebook claimant Paul Ceglia:  Milberg," published at *ThomsonReuters News & Insight* on March 5, 2012 is attached hereto as Exhibit T.

48.     A true and correct copy of an email from Dean Boland to me with the subject line, "Consent to court order/subpoena to obtain email account information," dated February 17, 2012 is attached hereto as Exhibit U.

49.     A true and correct copy of an email from Dean Boland to me with the subject line, "Recent letter regarding claimed non-compliance," dated February 17, 2012 is attached hereto as Exhibit V.

50.      A true and correct copy of an email from Dean Boland to me with the subject line, "Subpoenas to my client's parents" dated January 9, 2012 is attached hereto as Exhibit W.

51.     On a number of occasions during the month of March 2012, I have been in touch with Plaintiff's counsel in order to confer on a proposed discovery plan and case management order, pursuant to Federal Rule of Civil Procedure 26(f) and the Court's February 15, 2011 Order (Doc. 293).

52.     In the course of one of those discussions—a telephonic meet-and-confer on March 14, 2012—Plaintiff's counsel indicated that they would be seeking extraordinarily expansive discovery from Defendants.  Somewhat incredibly, Plaintiff's counsel explained that they intend to seek to have their e-discovery vendor come to our clients' offices in order to make forensic images of all of the computers that Mr. Zuckerberg and every employee of Facebook

currently uses or have used since 2003. They then intend to search every single one of those thousands or tens of thousands of computers for anything they deem discoverable. Then, Plaintiff's counsel proposes to follow the protocol established for expedited discovery, giving Defendants five days to review anything Plaintiff designates as discoverable for privilege. To be clear, this request goes far beyond even the relief this Court found factually warranted in granting Defendants' request for expedited discovery. Moreover, Plaintiff's counsel proposed a discovery schedule spanning sixteen months, including expert discovery, in which to pursue this completely baseless, improper, and harassing fishing expedition.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 26th day of March, 2012 at New York, New York.

Alexander H. Southwell