UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
————————————————————————————————————

PAUL D. CEGLIA

                        Plaintiff,

                -vs-                              10-CV-569A

MARK E. ZUCKERBERG,
FACEBOOK, INC.,

                        Defendants.
------------------------------------

            Proceedings held before the

        Honorable Leslie G. Foschio,

        U.S. Courthouse, 2 Niagara Street,

        Buffalo, New York on April 4, 2012.

        APPEARANCES:

        DEAN BOLAND, ESQ.,
        SANFORD DUMAIN, ESQ.,
        ROBERT CALIHAN, ESQ.,
        PETER SKIVINGTON, ESQ.,
        STEVEN TEPPLER, ESQ.,
        Appearing for Plaintiff.

        ORIN SNYDER, ESQ.,
        ALEX SOUTHWELL, ESQ.,
        AMANDA AYCOCK, ESQ.,
        TERRANCE FLYNN, ESQ.,
        THOMAS DUPREE, ESQ.,
        MATTHEW BENJAMIN, ESQ.,
        Appearing for Defendants.

        AUDIO RECORDER:  Sandra Wilson

        TRANSCRIBER:     Michelle L. McLaughlin, RPR,
                         Official Reporter,
                         U.S.D.C. W.D.N.Y.
                         716/332-3560

        (Proceedings recorded by electronic sound
        recording, transcript produced by computer.)

1          THE CLERK:  On the record, Ceglia versus

2    Zuckerberg and Facebook.  Appearing for the

3    plaintiff are Dean Boland, Sanford Dumain.

4          MR. DUMAIN:  Good afternoon, your Honor.

5          THE CLERK:  Robert Calihan, Peter

6    Skivington and Steven Teppler.

7      Appearing for the defendants are Orin Snyder.

8          THE COURT:  Excuse me.  Mr. Skivington,

9    why are you seated in the back area?

10          MR. SKIVINGTON:  I've come to sit with the

11    parents.  If that's all right with the Court, I'll

12    be happy to sit up there.

13          THE COURT:  Oh, with the parents.  The

14    parents of --

15          MR. BOLAND:  My client's parents, your

16    Honor, Mr. and Mrs. Ceglia.

17          THE COURT:  Why would he need to be seated

18    with the parents if he's counsel of record?

19          MR. BOLAND:  Well, I didn't have any role

20    in that.

21          THE COURT:  If you're going to -- we're

22    hoping that you'd participate since you're a new

23    counsel, and so we want you front and center.

24          MR. SKIVINGTON:  Thank you, your Honor.

25          THE COURT:  Maybe there's an extra chair

1    you can pull up to counsel's table instead of

2    sitting -- I didn't realize that there weren't

3    going to be enough chairs.  Pull up a chair, make

4    yourself comfortable.  There's another one back

5    there if somebody needs another one.

6       We've had the pleasure of I think -- I think

7    we've had the pleasure of Mr. and Mrs. Ceglia's

8    company in the past, so I don't know that they need

9    counsel to comfort them here during the

10   proceedings.

11      Okay.  Who was the last one Mr. McEvoy, Sandra?

12            THE CLERK:  No, Mr. McEvoy is just a

13   litigation support from the law firm of Milberg.

14   He might be speaking too.

15            THE COURT:  Okay.

16            THE CLERK:  Appearing for the defendants

17   Orin Snyder, Amanda Aycock, Terrence Flynn, Alex

18   Southwell and Thomas Dupree and Matthew Benjamin.

19      We're here on a Rule 16(b) hearing and also a

20   hearing on defendants' motion to stay discovery.

21            THE COURT:  It's your motion, Mr. Snyder.

22            MR. SNYDER:  Thank you, your Honor.  Good

23   afternoon.

24            THE COURT:  Good afternoon.  Use the

25   podium.  I'm assuming you would like to stand and

1    deliver as you usually do.

2         MR. SNYDER:  Thank you, your Honor.  I

3    appreciate it.  Your Honor, last June, more than

4    nine months ago, I stood before this court in the

5    old courtroom I think on Court Street, and at that

6    time the defendants asked your Honor to order

7    targeted expedited discovery based on a fraction of

8    the evidence before the Court today, but enough

9    evidence to provide a substantial basis for

10   demonstrating that the Work for Hire document

11   attached to the complaint is a forgery, that the

12   purported emails quoted in the amended complaint

13   are fabrications, and on that basis your Honor,

14   over Ceglia's opposition, ordered targeted

15   discovery.

16       And at that time I told your Honor exactly what

17   we envisioned.  That expedited discovery that was

18   narrowly targeted to confirm the inauthenticity of

19   the Work for Hire document would yield further

20   corroborating, confirmatory evidence of the fraud.

21   I told your Honor that our experts, upon

22   examination of the original document and

23   Mr. Ceglia's computers and electronic media would

24   conclusively prove that this plaintiff is

25   perpetrating a fraud on the Court.  I told your

1   Honor at that time that we would file a motion to

2   dismiss the lawsuit pursuant to the inherent power

3   doctrine, which, of course, empowers this Court to

4   exercise a critical gatekeeping function that

5   protects courts, juries, and our judicial system

6   from becoming in the words of the United States

7   Supreme Court, quote, "mute and helpless victims of

8   deception and fraud."

9        Your Honor granted that motion ordering

10  targeted expedited discovery designed to test the

11  authenticity of the Work for Hire document, the

12  so-called emails, all of which Mr. Ceglia had

13  access to, continued to have access to for the past

14  nine months and have access to prior to the

15  commencement of this fraudulent lawsuit.

16       Now, what happened during the next nine months

17  was nothing less than extraordinary.  First, of

18  course, the Court ordered discovery.  When I say

19  over the plaintiff's opposition, he wanted

20  so-called reciprocal discovery, broad discovery,

21  Mr. Zuckerberg's deposition, access to Facebook's

22  computers, the whole kit and caboodle.  And on a

23  fraction of the evidence before this Court, your

24  Honor said no, it needs to be targeted to core

25  issues of fraud in the case.

1        What happened next your Honor is aware of.

2   Smoking gun forensic proof, objective proof of the

3   fraud.  First and foremost, we found the authentic

4   contract on both the plaintiff's hard drive and the

5   hard drive of the international law firm Sidley and

6   Austin where it has sat since March of 2004.  And

7   because that's an authentic contract that's existed

8   in the real world for many, many years, his Work

9   for Hire document must be necessarily a forgery,

10  because the one thing the parties agree on is that

11  there's only one contract that is real.  It's

12  either the Work for Hire document or the StreetFax

13  contract.  To this date --

14       THE COURT:  Just to clarify, on the second

15  page of the StreetFax contract is -- with the

16  signatures, I mean, that's part of the StreetFax

17  contract, correct?

18       MR. SNYDER:  They match up, yes.  Yes,

19  they are.

20       THE COURT:  Well, I mean, that's it.

21  That's what I was found on the drive.

22       MR. SNYDER:  Yes, your Honor.

23       THE COURT:  There's never been an original

24  of it discovered so far?

25       MR. SNYDER:  Correct.  At the outset of

1    the case we informed the Court that Mr. Zuckerberg

2    does not have and did not keep since his freshman

3    year at Harvard many things that he had as a 18- or

4    19-year-old in college including the original of

5    the contract.  But I did tell your Honor that if we

6    had access to his computers, and remember he hid

7    the Seagate computer from this Court.  He lied to

8    this Court when he committed a sworn document, lied

9    to this Court in sworn statements concealing the

10   Seagate computer because it had the StreetFax

11   contract on it.

12           THE COURT:  Is that the one that was lost

13   as well?

14           MR. SNYDER:  No, what was --

15           THE COURT:  The large hard drive.

16           MR. SNYDER:  What was lost, we say

17   spoliated, were the USB devices containing page 1

18   and page 2 of StreetFax contract.

19           THE COURT:  Yes, but there was a larger --

20   there was a larger hard drive that was lost too.

21           MR. SNYDER:  I don't think so, your Honor.

22   It was the USB devices that were destroyed.

23           THE COURT:  Okay.  Just the USB.

24           MR. SNYDER:  Or spoliated.

25           THE CLERK:  Now, what I'm getting at is

1    the StreetFax document is -- it's not denominated

2    in any of the papers as a contract.  It just said

3    StreetFax on it, correct?

4          MR. SNYDER:  It's a written instrument

5    signed by both parties.

6          THE COURT:  I know that.  But we refer to

7    it as StreetFax contract --

8          MR. SNYDER:  I do, because it's an

9    agreement.

10          THE COURT:  Yes, but that's not the

11    labeling on the document.

12          MR. SNYDER:  It Says StreetFax --

13          THE COURT:  That's my point.

14          MR. SNYDER:  And it is without question,

15    yes, a legal instrument that is a contract or

16    agreement.  Yes, your Honor.

17          THE COURT:  I'm not focusing on that.  I'm

18    just focusing on the actual physical appearance of

19    the document.

20          MR. SNYDER:  Correct, your Honor.

21          THE COURT:  And my next question is -- and

22    why I'm still a little fuzzy on this, I don't know

23    after reading all these papers -- is it your

24    contention that the Work for Hire document contract

25    is a fake both as to the first page and the second

1    page which contains the signatures, or is the

2    second page actually a copy, mirror copy?

3              MR. SNYDER:  It appears to be --

4              THE COURT:  M-I-R-R-O-R.

5              MR. SNYDER:  Yes.  It appears --

6              THE COURT:  Of the -- excuse me, StreetFax

7    contract.

8              MR. SNYDER:  Yes.  Page 2 appears to be

9    either an exact duplicate of the authentic real

10   page 2 of the StreetFax contract or a near perfect

11   facsimile.  But it appears to be a duplicate.  Of

12   course we were not there when Mr. Ceglia and his

13   cohorts fabricated the document.  And, of course,

14   when we talk about the Work for Hire document, we

15   now know forensically, objectively, scientifically

16   that during the course of this lawsuit Mr. Ceglia

17   created a second version of the Work for Hire

18   document, which I'll get to in a moment.

19             THE COURT:  Which is the one he turned

20   over, not the one that's attached to the amended

21   complaint.

22             MR. SNYDER:  Yes, and the leading

23   handwriting expert in the world, who the United

24   States government hires for their most important

25   cases, because they don't have someone in-house as

1    good, found 20 points of difference.  One is enough

2    like a fingerprint.  He has 20.  That, standing

3    alone, is the most egregious fraud before your

4    Honor when we were in the well of this court.  This

5    man created a second version of the document he is

6    suing on.

7              THE COURT:  Question is why?  Why would he

8    do that?

9              MR. SNYDER:  Because he needed to create

10   another version to bake.  Let me get to that in a

11   moment, your Honor.

12             THE COURT:  He didn't attach the original

13   to the amended complaint.

14             MR. SNYDER:  No, he attached a copy.

15             THE COURT:  Correct.

16             MR. SNYDER:  But he was test --

17             THE COURT:  There is no original.

18             MR. SNYDER:  Well, he has the original.

19   He has presumably two originals.

20             THE COURT:  Your argument is that the

21   document that was turned over for inspection in

22   July that was baked is the original?

23             MR. SNYDER:  Is a different version of the

24   original that he used to copy what he attached to

25   the complaint.  They're two separate documents.

1              THE COURT:  That's exactly my point.

2              MR. SNYDER:  Yes.

3              THE COURT:  But we've never seen the

4      original.  We don't have the original.

5              MR. SNYDER:  The first original we don't

6      have.  The second original we've all examined.  Now

7      what's extraordinary --

8              THE COURT:  No, it's a copy.

9              MR. SNYDER:  But we all have inspected the

10     original that Mr. Argentieri produced in July.

11             THE COURT:  And you're saying that was

12     recently fabricated.

13             MR. SNYDER:  I'm saying that it has been

14     scientifically determined that that is a different

15     document than the document, a copy of which is

16     attached to the complaint.  There's no question

17     about that.  Now, to this day, either Ceglia --

18             THE COURT:  Why would he do that?

19             MR. SNYDER:  What's that?

20             THE COURT:  Why would that be?

21             MR. SNYDER:  This is a man who was

22     manipulating --

23             THE COURT:  Why would you take the

24     original of the copy that's attached to the

25     complaint and bake it if you were going to bake it,

1    rather than create another instrument and bake it?

2              MR. SNYDER:  If you want me to speculate

3    about the criminal mind, I can speculate.  For

4    example, he wanted to obviously he baked or

5    subjected the document he gave us to light

6    treatment to bake it and create an aged appearance,

7    and he had the first fabricated document that

8    Mr. Argentieri had in the safe deposit box that he

9    gave a copy of to his experts, and he wanted to

10   test the baking on a new original document.  Before

11   we know, there's a third and fourth and fifth and

12   sixth and seventh sitting in a drawer somewhere.

13             THE COURT:  Well, according to Stroz

14   Friedberg, there were test forgeries --

15             MR. SNYDER:  Correct.

16             THE COURT:  -- floating around that

17   suddenly got discovered as well.

18             MR. SNYDER:  Correct.  To this day either

19   Mr. Ceglia or any of his lawyers, including his

20   newest ones, have been willing to submit a sworn

21   declaration, much less anything certified under

22   Rule 11, and we've sent them all Rule 11 letters,

23   your Honor, denying the authenticity of the

24   StreetFax contract.  Incredibly, your Honor, if you

25   read the 17-page opposition brief cataloging a

1    laundry list of supposed fact issues, it doesn't

2    mention -- it doesn't mention much less deny or

3    dispute the authenticity of the StreetFax contract.

4         All we've heard is one of the newest lawyers

5    saying to a national newspaper incredibly, not

6    pursuant to Rule 11, not in this Court making a

7    representation to your Honor, that Mr. Zuckerberg

8    planted the StreetFax contract after hacking into

9    the plaintiff's computer and presumably scanning it

10   on to his computer and presumably in 2004, who

11   knows when, emailing it to Sidley Austin.  I

12   challenge any of the lawyers in this courtroom to

13   make that representation to your Honor that they

14   have a good-faith basis in law or fact for that

15   assertion which is preposterous, defamatory, and

16   false.

17        And let me tell you something, your Honor, you

18   do not get discovery, you do not get to first base

19   based on the martians have landed kind of

20   allegations.  It's no different than a bank robber

21   saying it wasn't me on the photo.  It wasn't my

22   fingerprints.  The martians invaded my body, and it

23   was the martians.  This is as fantastical an

24   allegation supported by not a shred of evidence.

25             THE COURT:  You don't believe in cyber

1     fairies?

2              MR. SNYDER:  I don't I believe in cyber

3     fairies or little blue monsters in 2004 not only

4     scanning on to Mr. Ceglia's computer the StreetFax

5     contract, but then emailing a Mr. Kole, where

6     there's no evidence they even knew who Mr. Kole

7     was.

8              THE COURT:  Mr. Lake made this assertion

9     originally, didn't he?

10             MR. SNYDER:  Mr. Lake did.  But

11    Mr. Lake --

12             THE COURT:  In court in the old

13    courthouse.

14             MR. SNYDER:  He did.  And we will remember

15    that statement in court that he made.

16             THE COURT:  I'm just pointing out that

17    it's not the first time we've heard it, and it was

18    on the record.

19             MR. SNYDER:  No.  And the reason, your

20    Honor, we didn't make this motion in September, as

21    your Honor is aware which we devoutly wanted to do

22    --

23             THE COURT:  The point is that Mr. Lake's

24    assertion was never followed up on by the

25    plaintiff.

1          MR. SNYDER:  Never followed up by the

2     plaintiff, and more over there is not a shred of

3     evidence to support that speculation.  It would be

4     like saying if the murder weapon was found in the

5     defendant's possession, accusing, without any

6     basis, some other party of planting the evidence,

7     without a shred of support, and the law does not

8     allow parties to make irresponsible allegations.

9        Now, of course, the critical point here, maybe

10    the Milberg firm knows this, maybe they don't.

11    When he concealed the Seagate hard drive for the

12    purpose of defrauding this Court and my client,

13    meaning not telling us the truth that this contract

14    existed, which irresponsibly was not in the DLA

15    complaint either.  Of course DLA is out of the

16    case.  What did Mr. Ceglia swear to this Court and

17    Mr. Argentieri, who's not here either today.  I

18    don't know where he is.

19          THE COURT:  Where is Mr. Argentieri,

20    Mr. Boland?

21          MR. BOLAND:  Your Honor, he wasn't able to

22    make the trip.  He's out in California at the time

23    being.

24          THE COURT:  He didn't know that we had

25    this scheduled for some time?

1          MR. BOLAND:  Oh, no.  He's fully aware.

2     He's getting all the ECF notifications as well.

3          THE COURT:  I see.

4          MR. SNYDER:  So --

5          THE COURT:  What is he doing in

6     California?

7          MR. BOLAND:  I'm not sure what the

8     conflict was, your Honor.  I can find out and have

9     him communicate to you.

10          THE COURT:  In a case of this magnitude he

11     had a conflict he couldn't resolve in favor of

12     being here?

13          MR. BOLAND:  I don't know if it was

14     personal or not, I'm not sure.

15          THE COURT:  He certainly hasn't notified

16     the Court about his unavailability, has he, Sandra?

17          THE CLERK:  No, Judge.

18          MR. BOLAND:  We have several other able

19     counsel here to assist me, your Honor, so I think

20     that nothing -- it won't hold the Court back.

21          THE COURT:  Well, I wasn't suggesting

22     otherwise.  I was just suddenly surprised to

23     realize he wasn't here.

24          MR. BOLAND:  I assure you, your Honor, we

25     won't hold anything back by the fact that he's not

 1   here.  We'll keep it moving forward for you.

 2            THE COURT:  I don't think that's the

 3   point, Mr. Boland.

 4            MR. BOLAND:  Very well.

 5            THE COURT:  Go ahead.

 6            MR. SNYDER:  Of course, your Honor, the

 7   question is whether able counsel appearing before

 8   this Court noticing appearances in this matter are

 9   aware that Mr. Ceglia, when he was caught

10   red-handed with the Seagate hard drive with the

11   contract that no one disclosed on this side to the

12   court, but we new existed.  We told your Honor day

13   one Mark Zuckerberg signed a StreetFax contract.

14   We didn't know we were going find it on his

15   computer.  We thought we might, and he tried to

16   hide it from the Court.  And what did he say when

17   he was caught?  He said I sent that email to James

18   Kole.  He was my lawyer.

19        Your Honor, it is privilege and confidential,

20   do not show it to the other side.  Did he say that

21   anyone planted it?  No, he didn't.  So he was

22   either lying to your Honor at that time under oath

23   committing perjury, or today his lawyers to the

24   Wall Street Journal, maybe to this court, are

25   misrepresenting the facts or asserting facts

1   without a shred of evidence which directly

2   contradicts their client's sworn testimony to your

3   Honor that this was a communication that he sent to

4   his lawyer.  It can't be both.

5       Now we're here, your Honor, nine months later,

6   and it is the height of cynicism that these lawyers

7   accuse us of delay.  We have spent 20 hours with

8   your Honor.  And we appreciate your Honor's time

9   and thoughtfulness on five motions to compel.  We

10  wanted to move to dismiss in September.  We

11  couldn't because at every turn this plaintiff and

12  his lawyers obstructed the court-ordered discovery

13  in acts of defiance and obstruction that in and of

14  themselves, not only constitute independent grounds

15  for dismissal, but in our judgment are paradigmatic

16  grounds for Rule 37 dismissal of this case.  That's

17  the -- I don't know if it's Roman two or Roman

18  three of our motion to dismiss.  Five separate

19  motions requiring hundreds of pages of briefing

20  consuming more than 15 hours of hearings,

21  Mr. Benjamin points out, all of which we believe

22  parenthetically the plaintiffs and the law firms

23  that have represented him are responsible under

24  Rule 11.

25      Incidentally, Mr. Ceglia hasn't paid the

1   $75,000 in fees that this Court awarded more than

2   six weeks ago.  But we're here, your Honor,

3   because -- nine months later, because it took us

4   five trips to make this plaintiff compliant, and he

5   still hasn't complied.

6       Let me tell your Honor something that we

7   haven't spelled out --

8               THE COURT:  Hasn't complied with?

9               MR. SNYDER:  Yet he's still in defiance of

10  your Honor's orders.

11              THE COURT:  I thought we cleared up those

12  problems with the supplemental declarations.  I was

13  going to ask you about that.

14              MR. SNYDER:  No, your Honor.

15              THE COURT:  Go ahead.  Go ahead.

16              MR. SNYDER:  I'm not sure if the Milberg

17  firm is aware of this either.  On April 2011, this

18  plaintiff created an email account

19  getzuch@gmail.com, referring to Mark Zuckerberg.

20  Get zuch.  He failed to disclose that to your Honor

21  in his sworn declaration on August 29th, 2011.  He

22  lied to this Court, one of multiple lies.

23              THE COURT:  But didn't he file some

24  supplemental declarations pursuant to my recent

25  D and O that granted your motion in both respects?

1          MR. SNYDER:  Yes, but let me tell, your

2     Honor, what happened in the interim.

3          THE COURT:  Okay.

4          MR. SNYDER:  On January 28th, 2012, before

5     Stroz Friedberg found this account, he deleted all

6     of its content.  Deleted it, everything in the

7     account during the pendency of this lawsuit,

8     getzuch@gmail.com.  It was only after Stroz

9     Friedberg identified it, and then he played games

10    with us and failed to get us the forms for a long

11    time with more -- more dog-ate-my-homework kind of

12    excuses that we got it, and like the Seagate

13    computer and everything else he withheld, and the

14    reason we were so dogged for five motions to compel

15    is we knew that every time this criminal plaintiff

16    was hiding evidence, it was because there was more

17    under the rock to find, and that's what happened

18    with the get zuch email.  And it's what happened --

19         THE COURT:  Did you discuss that deletion

20    in your spoliation argument?

21         MR. SNYDER:  It's in the Stroz Friedberg

22    report, your Honor.

23         THE COURT:  Oh.

24         MR. SNYDER:  Now, of course -- so the

25    spoliation, which I'm not going to go through and

1    document, is an independent grounds for -- for

2    dismissal, and certainly a stay.  And I've

3    litigated, your Honor, the question of spoliation,

4    many times under the Zubulake.  In fact, Mr. Dupree

5    and I were just in the Appellate Division in New

6    York on that issue.  And to say that this is a

7    clear case for spoliation dismissal is an

8    understatement.  It is difficult to imagine a

9    series of facts here, not only authorizing the

10   Court to dismiss based on the litigation misconduct

11   here, all of which is cataloged in our papers.

12       But making this a case not only would the

13   Second Circuit summarily affirm dismissal here, but

14   it would be a fact pattern that would be so

15   egregious that I --

16            THE COURT:  You know it's dangerous to

17   predict how appellate courts will rule.

18            MR. SNYDER:  Well, this one --

19            THE COURT:  Or any court for that matter.

20            MR. SNYDER:  You know, your Honor, this is

21   the equivalent of the confession, the videotape,

22   the eyewitness, the fingerprints, and the DNA, and

23   then some more evidence that I can't think of.

24   It's difficult to imagine -- if someone presented

25   this fact pattern in law school, the students would

1    think it was make believe.  No one could be this

2    abusive of the judicial system, lawyers, and

3    litigant, because, of course, the lawyers who

4    withdrew from the case previously told your Honor

5    that their client, Mr. Ceglia, instructed them to

6    obstruct your Honor's orders, and then withdrew

7    from the case, promptly causing the sanction.

8        Now, your Honor, we're here today -- that's the

9    background.  And we're here today of course --

10             THE COURT:  The Milberg is a distinguished

11   firm of course.

12             MR. SNYDER:  I don't know -- I don't know

13   whether they're a distinguished firm.

14             THE COURT:  You don't know the firm at

15   all?

16             MR. SNYDER:  I know the firm well.

17             THE COURT:  Well --

18             MR. SNYDER:  I know they are a law firm.

19             THE COURT:  -- how could you know them if

20   they weren't distinguished?  You only deal with

21   distinguished law firms, right?

22             MR. SNYDER:  I would prefer not to

23   comment.

24             THE COURT:  Okay.  In any event, the point

25   is their position is that their client's entitled

1    to his day in court.

2          MR. SNYDER:  Yes.  They're wrong --

3    they're entitled to his day in court.  They've had

4    their day in court for nine months.  They're going

5    to have their day in court today.  They have an

6    opportunity to oppose our motion to dismiss, and

7    they have had access to all the evidence that is

8    necessary to review before we did.

9      Your Honor's expedited discovery order simply

10   put us on equal footing where the plaintiff was

11   before he filed this lawsuit.  But I'll address

12   that in a moment, your Honor.

13     I just want to make this point.

14          THE COURT:  Before -- well, we don't know,

15   because we never I think have discussed it with

16   Mr. Boland directly, or for that matter Mr. Lake

17   when he was in the case, as to what extent the

18   plaintiff's own crew of experts have delved into

19   the issues more profoundly than your experts have.

20   We don't even know, or do we?

21          MR. SNYDER:  Well, let me --

22          THE COURT:  We'll find out.

23          MR. SNYDER:  I do know, and if they

24   didn't, they've had years to do it presumably.  But

25   beyond that, I do know and can represent to this

1    Court that the DLA Piper law firm, before filing

2    the amended complaint, knew or should have known

3    about all of the evidence -- let me withdraw.  Knew

4    or should have known of a substantial amount of the

5    evidence that we present in our motion to dismiss,

6    and failed to present that to the Court in the

7    complaint.  And presumably the Milberg firm knows

8    that as well.  That's for a different day, your

9    Honor.

10        The point is we know that their team of experts

11   examined the document that Mr. Argentieri pulled

12   out of his envelope in July.  We know that their

13   experts say January of 2011, we're reviewing the

14   computers, and everything -- everything else.

15        So we're here today, your Honor, because the

16   Court expedited discovery, served its precise

17   intended purpose.  This is a case study, your

18   Honor, and will be for years I think for litigants

19   across the country for when expedited discovery is

20   necessary and appropriate.  Because what it did is

21   it produced the additional evidence, forensic

22   evidence of the fraud.

23        But for today the Court need not decide our

24   motion to dismiss in order to grant a stay.  In

25   order to stay we call plenary discovery which is

1    the abusive, wide-ranging fishing expedition that

2    they want to subject my clients to in the face of

3    this fraud to extract the settlement that all their

4    documents make clear is their design here.   In

5    order to stay plenary discovery and defer entry of

6    a scheduling order, the Court need only conclude

7    that our motion to dismiss hand substantial

8    grounds.

9        If we had substantial grounds in 2011 when your

10   Honor ordered expedited discovery, we have

11   substantial grounds times ten today.   This is not a

12   close question.   Rule 26 --

13           THE COURT:   I don't think I found that.   I

14   think that --

15           MR. SNYDER:   Good cause.

16           THE COURT:   Whatever, colorful basis,

17   something like that.

18           MR. SNYDER:   I think it was good cause.

19           THE COURT:   Sure.

20           MR. SNYDER:   Rule 26 gives this Court

21   broad discretion.

22           THE COURT:   Perhaps a little less than

23   substantial basis, or do you think they're the

24   same?

25           MR. SNYDER:   You know, your Honor, the

1    test is stated as substantial grounds or -- it's in

2    the disjunctive -- does not appear to be without

3    foundation in law.  So I think --

4              THE COURT:  Pretty forbearant standard.

5              MR. SNYDER:  I think it's a flexible

6    standard that gives the Court the broad discretion

7    as the fact finder that is appropriate.  And so

8    your Honor has the broadest of discretion here

9    that -- that turns on a balancing of well known

10   factors that your Honor in the Steuben Foods

11   case -- it's actually a leading case in the

12   circuit.

13             THE COURT:  Steuben.

14             MR. SNYDER:  Steuben.

15             THE COURT:  As in Steuben glass.

16             MR. SNYDER:  Yes.

17             THE COURT:  After the Baron.  That's

18   why -- that's why my courtroom is named after

19   Wyoming county.

20             MR. SNYDER:  I'm from Manhattan, your

21   Honor.

22             THE COURT:  I know, that's why I'm trying

23   to educate you.

24             MR. SNYDER:  Named after --

25             THE COURT:  We were in the Big Apple

1    recently, my wife and I, for a wonderful vacation

2    trip.

3              MR. SNYDER:  Named after the Mannahatta

4    Indian, Native Americans.

5              THE COURT:  By the way, if I sound a

6    little horse, it's because my son and I attended a

7    certain hockey game last night.

8              MR. SNYDER:  Yes.

9              THE COURT:  And on to the Rangers.

10             MR. SNYDER:  So the balancing of the

11   factors, you know, whether dispositive motion is

12   pending --

13             THE COURT:  Excuse me, Philadelphia.

14             MR. SNYDER:  Yes.  Whether a dispositive

15   motion is pending, of course, it is, and if so, its

16   strength.  Here we say not only do we have

17   substantial grounds and foundation in law, but a

18   motion to dismiss that is powerful, and --

19             THE COURT:  Could I ask you a question

20   about the -- one of the expert's points.  This is

21   rather technical.  The specification referred to by

22   Professor Tytell, the six-page specification, I was

23   intrigued by his analysis of the signature on the

24   signature line which co-dates -- or is of the same

25   date as the purported Work for Hire instrument.

1    And pointing out that the ink seems to be

2    substantially different.  And I'm just wondering

3    why you didn't allude to that in your analysis.

4    It's not discussed in either Mr. Southwell's

5    excellent executive summary, nor in your brief.

6           MR. SNYDER:  Miss Aycock tells me because

7    it is purportedly confidential, meaning the

8    plaintiff, for some reason --

9           THE COURT:  Well, the substance is, but

10   not the point of the signatures.

11          MR. SNYDER:  For some reason the

12   plaintiff -- my team tells me we were --

13          THE COURT:  Overcautious.

14          MR. SNYDER:  We were overcautious because

15   of what we thought was inappropriate

16   confidentiality designation --

17          THE COURT:  Yeah, but you already alluded

18   to it in his report, which was published to me,

19   wasn't it, or were those redacted out?

20          MR. SNYDER:  All redacted.

21          THE COURT:  Oh, okay.

22          MR. SNYDER:  That's the only reason.

23          THE COURT:  Okay.

24          MR. SNYDER:  So, your Honor.  The second

25   factor is the extensiveness of the discovery sought

1      and the burden of the discovery.  And the third, of

2      course, is the prejudice.

3          So, in terms of the grounds, we have four

4      separate independent grounds for dismissal,

5      inherent power, dismissal for fraud on the Court,

6      and let me just address the question of fact

7      finding.

8          Of course, your Honor is required to find facts

9      in determining whether under its inherent power

10     dismissal is warranted.  That's the very point.  It

11     doesn't transform this into a Rule 56 motion.  The

12     function of the Court as the gatekeeper to protect

13     this great judicial system of ours is to find facts

14     to determine whether we and your Honor and the

15     public are victims of fraud.  And so if you look,

16     for example, at the Shangold case, which is --

17          THE COURT:  I'm familiar with those cases.

18     You don't have to go through them.  The question I

19     had under my query regarding Federal Rule of

20     Evidence 1008 subdivision A was this, and that is I

21     didn't see any cases cited where the issue was

22     related to -- I didn't see any cases in your

23     discussion of the inherent power where the court

24     was confronted with -- where any court discussed

25     whether or not that rule of evidence pertains,

1    regardless of whether or not the contract at issue

2    was a purportedly a fraud.

3              MR. SNYDER:  I think that -- perhaps

4    because although it was -- it was a provocative

5    question that your Honor posed, it is apples and

6    oranges, because Rule 1008 is a component, of

7    course, of the best evidence rule, which is a trial

8    evidence rule, and necessarily we believe does not

9    apply in the context of motion to dismiss, which is

10   why no court has ever interpreted the rule to limit

11   a court's inherent power.  If it did limit the

12   court's power to dismiss a lawsuit as a fraud, then

13   the inherent power doctrine would be substantially

14   circumscribed, and it is why in the context, for

15   example, of motions for sanctions the courts across

16   the country have held that playing that important

17   function of gatekeeper policing conduct before the

18   Court, the Court is not restricted by the Federal

19   Rules of Evidence.

20             THE COURT:  Just, I note -- I read

21   carefully Judge Wholes hobbles -- I'm

22   pronouncing -- interesting decision in the DAG

23   Jewish Directories case you cited.

24             MR. SNYDER:  Yes.

25             THE COURT:  And that, of course, was a

 1   contract that was at issue.

 2           MR. SNYDER:  Yes.

 3           THE COURT:  And he found it to be

 4   fraudulent and threw the case out.

 5           MR. SNYDER:  Yes.

 6           THE COURT:  But the rule of evidence issue

 7   didn't arise, that's my point.

 8           MR. SNYDER:  Right.  I think it didn't

 9   arise because it was in a pretrial setting, and

10   under the courts inherent powers, so it was

11   inapplicable.

12           THE COURT:  So you don't see that rule

13   as -- as Congress's statement that whenever there's

14   an allegation of fraudulent contract, it's a

15   question for the jury?

16           MR. SNYDER:  I think that --

17           THE COURT:  Vel non.

18           MR. SNYDER:  I think that that's an

19   impossible reading of the rule in light of the

20   Second Circuit and Supreme Court's precedent

21   authorizing, empowering, and commanding trial

22   courts in the federal court system to police fraud

23   and dismiss cases based on fraud, which in many

24   context, requires fact finding, and in some

25   instances fact finding --

1           THE COURT:  Directed to a purported

2     contract.

3           MR. SNYDER:  Fact finding concerning a

4     purported contract.  And, of course, it is a -- one

5     of the -- it is not an uncommon modus operandi of

6     litigation fraud.  I mean, there are different

7     species of litigation fraud, bribing witnesses,

8     fabricating documents.

9           THE COURT:  Yes.

10          MR. SNYDER:  And fabricating contracts

11    certainly is a popular one.  Now, your Honor -- so,

12    on the first element, plaintiff fails miserably to

13    show that a stay is not warranted.  Firstly, they

14    blatantly -- and maybe it was a typo, I don't know.

15    I don't know who wrote the brief.  Maybe

16    Mr. Argentieri is writing the briefs in California.

17    I don't know.  But they blatantly misstate the

18    legal standard in a signed pleading that they filed

19    in opposition to our motion.  They say that -- that

20    the dispositive motion must be, quote, certain to

21    prevail.  Well, that is an untrue statement of the

22    law, as this Court wells knows.

23          THE COURT:  Where do they say that?

24          MR. SNYDER:  They do.  Document 345.

25    (indiscernible).

1            THE COURT:  Where is that in your papers?

2            MR. SNYDER:  On page 10.

3            THE COURT:  Is that the quotation?

4            MR. SNYDER:  They cite -- interesting they

5       cite a -- no, your Honor.  They mischaracterize the

6       Eastern District of California case, Eastern

7       district of California case.  First of all, they

8       miss -- first of all, they cite a case out of the

9       district, even though they knew or should have

10      known that the Second Circuit binding, controlling

11      Second Circuit and Southern District -- and Western

12      District authority, and then failing to cite

13      relevant cases, they then distort the

14      out-of-jurisdiction case they cite, and I have not

15      studied Ninth Circuit law recently on this point.

16      For all I know it's different.  I haven't studied

17      it.  I don't think it's important whether it is or

18      isn't different, because the Second Circuit's

19      rule --

20            THE COURT:  I see your point.  They then

21      go on to pair -- not paraphrase but echo the

22      quotation in the Eastern District of California

23      case saying there is no certainty that defendant's

24      motion would prevail.  I understand.  And

25      therefore -- and yet the discovery will be futile.

1    I understand thank you.  I missed that.

2                MR. SNYDER:  They tell your Honor the law

3    is -- which is extraordinary since your Honor wrote

4    one of the leading decisions in this circuit on

5    this point.

6                THE COURT:  Really?  Did I?

7                MR. SNYDER:  I mean, people cite it.

8                THE COURT:  I had no idea it was leading.

9                MR. SNYDER:  It's cited.

10               THE CLERK:  Thank you.

11               MR. SNYDER:  What I mean, your Honor, is

12   they tell your Honor --

13               THE COURT:  Flattery will get you

14   absolutely no place.

15               MR. SNYDER:  I understand, but I can't

16   help it.

17               THE COURT:  I know.

18               MR. SNYDER:  They tell your Honor that it

19   must be certain that the motions will prevail.

20   That is a false statement of the controlling law.

21   There's no other way to say it.  So -- so we've met

22   that standard with respect to the evidence of

23   plaintiff's fraud last summer, when we sought

24   expedited discovery, and since then, because of the

25   overwhelming evidence we've uncovered, obviously

1    our case for dismissal is even stronger, so

2    awarding the plaintiff the plenary discovery now

3    that your Honor determined he was not entitled to

4    in July would make no sense and would reward this

5    plaintiff who comes to the court with the

6    uncleanest of hands and with an unpaid sanction and

7    worse for his disobedience.

8        So the first factor we think is 99-to-1 in our

9    favor.  The burden on defendants is obvious.  Now,

10   Mr. -- the first moment I was in court in this case

11   in front of Judge Arcara on the frivolous motion to

12   remand, that was where -- that was the first series

13   of lies they told after filing the complaint, which

14   is that somehow Mr. Zuckerberg, they said, was an

15   itinerant traveler who was living out of a

16   backpack, which, of course, was all make believe.

17   But the first -- I can tell your Honor the first

18   time I saw Mr. Argentieri and his counsel, and he

19   said oh, we should talk, we're going to get

20   Mr. Zuckerberg's deposition.  Get zuch.  He has an

21   email account to that effect.  That's been their

22   goal from day one to subject Facebook and my

23   clients to e-discovery.  They brought some vendor

24   from the Milberg firm who is presumably going to

25   tell your Honor that how they should scrounge

1   through all of Facebook's computers since 2003.

2   That's what they want.

3        Committing a criminal fraud in this court,

4   spoliating evidence, lying to your Honor

5   repeatedly, they want to conduct discovery of

6   Facebook's computer dating back to 2003, make

7   forensic images of all the computers, search every

8   one of the thousands of computers and documents,

9   and there's absolutely no valid basis for this

10  abuse of discovery, which ironically is broader

11  even than what the lawyer -- I can't remember which

12  one -- said to your Honor they wanted when they

13  were opposing our request for expedited discovery.

14            THE COURT:  Mr. Lake.

15            MR. SNYDER:  Mr. Lake, right.  So the

16  purpose of all this is laid out in their litigation

17  overview document, which was Mr. Argentieri and

18  Mr. Homburg, whoever he is, extortion document

19  which was the one that they used to try to sell a

20  piece of this lawsuit to a law firm.  And that

21  document makes clear that the sole purpose from day

22  one was to jack up Facebook, harass Facebook into a

23  settlement, which Mr. Ceglia told the press, quote,

24  "You won't go public, Mark.  You won't IPO, you

25  won't past go.  I won't let you sell this company

1    out from under me, not while I have the power to

2    stop you."  It's difficult to imagine when you put

3    the litigation overview document together with that

4    statement, a more clear expression of the true

5    motive behind this fraudulent lawsuit, which is the

6    second factor, to harass and abuse the defendants

7    through the discovery process using a criminal

8    fraud, as present litigation, as the mechanism to

9    try to extract the settlement that they want, but

10   will never, ever get.

11        Now, the third factor is prejudice.  In the

12   good cause -- in the determination of whether a

13   stay is appropriate.  These newest lawyers and

14   Mr. Ceglia have not identified any cognizable

15   prejudice that would result from a stay of plenary

16   discovery pending a ruling on defendant's

17   dispositive motions because, of course, we have the

18   motion for judgment on the pleadings as well.

19        So, instead what he says is we're really moving

20   for summary judgment, and on summary judgment

21   cases, we're entitled to all sorts of discovery,

22   and the Court can't find facts.  I've addressed all

23   of that.  The point here is a simple one.  A party

24   perpetuating a fraud does not have the right --

25             THE COURT:  You don't think they're

1    entitled to some discovery directed to when the

2    statute of limitations accrued and the possibility

3    of equitable estoppel based on Welling?

4           MR. SNYDER:  No.  I think that under

5    Rule 12 if your Honor believes that there are facts

6    outside the pleading that are necessary to resolve

7    that motion -- we believe there are none, the

8    proper -- your Honor has two choices.  Your Honor

9    can deny the motion and say it's premature.  Your

10   Honor can convert the motion to a Rule 56 motion,

11   in which case we would say, if your Honor were

12   inclined to do that, put that motion in abeyance,

13   because the fraud here is the threshold issue and

14   there's no need even to waste time on that, if your

15   Honor --

16          THE COURT:  Put statute of limitations and

17   laches aside?

18          MR. SNYDER:  We believe it is ripe,

19   because there are facts in the public record, facts

20   of which this Court could take judicial notice that

21   make this case woefully time barred, and make the

22   application of laches as a matter of law clear.

23   But back to the question of the third factor, the

24   prejudice.  A party perpetrating a litigation fraud

25   forfeits the right to engage in plenary discovery.

1    That's the whole purpose of the inherent power

2    doctrine to short circuit the fraud before the

3    system, the victim defendant, and the public are

4    abused through the course of litigation, because

5    the goal the fraudulent lawsuits often is to

6    subject defendants to cost, expense, and burden of

7    discovery to provoke a settlement.

8        So, it's our view, your Honor, that this

9    plaintiff has had access to the very original

10   document and electronic copies that we have

11   examined, and our experts have determined,

12   corroborate and constitute ironclad proof of fraud.

13   They've had those materials for years, all of his

14   so-called emails, all of his computers, his floppy

15   disks, his CDs, his hard drives, his web mail

16   accounts.  Indeed he had access to materials that

17   no longer exist, because he destroyed them.  So he

18   had greater access than we or the Court.

19            THE COURT:  When did you say he -- I must

20   have -- I tried to read all of Stroz Friedburg's

21   report.  I didn't read line-by-line all of the

22   others.  I didn't have time.  But just -- is there

23   a reference in there wherein they say that they

24   found that it was deleted.  I think that's the Get

25   Zuch account was deleted.

1          MR. SNYDER:  The Get Zuch account was --

2     all the content in that email account was deleted

3     on February 28th, 2012.

4          THE COURT:  2012?

5          MR. SNYDER:  January 28th, 2012.  Stroz

6     Friedberg identified it on February 1, 2012, lo and

7     behold.

8          THE COURT:  I'm confused how.  Stroz

9     Friedberg received the account, they had access to

10    the account on what date?

11         MR. SNYDER:  What happened was --

12    February 1st is when he they found it.  They found

13    a remnant of it, or they found some forensic

14    reference to it.

15         THE COURT:  He identified it before,

16    didn't he?

17         MR. SNYDER:  No.  He lied to this Court

18    when he submitted his supplemental affidavit on

19    August 29.

20         THE COURT:  But he -- but he then gave us

21    a --

22         MR. SNYDER:  Well, when Stroz Friedberg

23    said we found it, once again he said oh, yeah, I

24    forgot about it.  Forgot about it?  He just -- he

25    just wiped out all the contents.

1          THE COURT:  When did that supplemental

2     declaration get filed where he did acknowledge it?

3          MR. SOUTHWELL:  Your Honor, it was in --

4          THE COURT:  This is Mr. Southwell speaking

5     for the record.

6          MR. SOUTHWELL:  Thank you, your Honor.  It

7     was after Stroz Friedberg identified references to

8     the Get Zuch account in his other email accounts.

9     That information was disclosed.  At that point

10    Mr. Boland offered to make -- to provide the

11    consents, and we provided the consents to gmail.

12    We went back and forth.  We had a fifth motion to

13    compel, and we very recently got the information

14    from that account, which is what revealed that back

15    in January that there is no content from earlier

16    than January of 2012, i.e. the deletion.

17         MR. SNYDER:  As he submitted a declaration

18    now to (indiscernible) account yet?

19         MR. SOUTHWELL:  Now he has put in the

20    supplemental declaration I think that your Honor is

21    referring to --

22         THE COURT:  Yes.

23         MR. SOUTHWELL:  -- which does, in fact,

24    I'd now after --

25         THE COURT:  What was the date of that

1   supplemental declaration, anybody --

2            (Indiscernible cross-talk)

3            THE COURT:  One at a time.

4            MR. BOLAND:  I'm sorry, your Honor,

5   there's actually two of those.  He offered a

6   declaration which just identified the newly

7   discovered accounts which he had not used, so he

8   had forgotten them.  And in an abundance of

9   caution --

10           THE COURT:  What was the date of that?

11           MR. BOLAND:  I'll have to look -- I'll

12  look and find it, your Honor, and then he

13  submitted --

14           THE COURT:  I'm trying to understand

15  whether he gave the declaration before or after he

16  emptied out the account.

17           MR. SNYDER:  After.  After, your Honor,

18  for sure.  So when Mr. Boland says to your Honor,

19  again he didn't -- he didn't say that under oath.

20  Maybe he will certify that he's saying it under

21  Rule 11 that he hasn't used it, that's a lie.

22  Because all of the content was deleted by the

23  plaintiff on January 28th, 2012.  It's difficult to

24  imagine a more relevant use by a litigant than

25  deleting an email account during the course of this

1    litigation entitled Get Zuch, meaning get my

2    client.  Presumably damage, harm, victimize my

3    client, which is what he is doing here.

4            THE COURT:  So, that's why I'm focusing on

5    it.  So you're saying that if the declaration

6    post-dates the deletion, the declaration is false?

7            MR. SNYDER:  The declaration --

8            THE COURT:  Do I have it correctly?

9            MR. SNYDER:  The declaration is not

10   only --

11           THE COURT:  No.  No.  I'm really concerned

12   about this sequence, since you raise it.  And seems

13   to me to be a very simple question.  Why can't I

14   get a straightforward answer?

15           MR. SNYDER:  The declaration, your Honor,

16   was dated by -- dated February 22, 2012.

17           THE COURT:  You're going too fast.  Slow

18   down.

19           MR. SNYDER:  So let me give the whole

20   chronology carefully and slowly.

21           THE COURT:  Please.

22           MR. SNYDER:  In April of 2011 --

23           THE COURT:  Yes.

24           MR. SNYDER:  -- unbeknownst to us during

25   the course of this litigation, the plaintiff

1    created an account entitled getzuch@gmail.com.  As

2    a result of various acts of misconduct your Honor

3    granted our motion and required Mr. Ceglia to

4    supplement his prior sworn declaration.

5         On August 29, 2011, he submitted a new

6    declaration purportedly curing the previous

7    declaration, which was false and incomplete.  He

8    did not disclose in his August 2011 declaration the

9    existence of the account he had created several

10   months earlier.

11              THE COURT:  Get Zuch.

12              MR. SNYDER:  Yes.

13              THE COURT:  I got that.

14              MR. SNYDER:  On February 1st, 2012, Stroz

15   Friedberg, during its forensic examination,

16   identified four new web mail accounts --

17              THE COURT:  Excuse me, February --

18              MR. SNYDER:  1st, 2012, Stroz Friedberg

19   identified four new web mails accounts --

20              THE COURT:  Yes.

21              MR. SNYDER:  -- about which we were

22   unaware because Mr. Ceglia in his various sworn

23   statements failed to disclose them.  We then sought

24   a motion to compel to get access to those accounts.

25   And after wrangling --

1          THE COURT:  And get a complete declaration

2     including them.

3          MR. SNYDER:  And after wrangling, all

4     sorts of false starts, and snide, snarky emails,

5     which I can show your Honor at some point --

6          THE COURT:  I read them all.  I granted

7     your motion.

8          MR. SNYDER:  We finally -- I got access to

9     the account --

10          THE COURT:  Yes.

11          MR. SNYDER:  -- after much expense and

12     burden --

13          THE COURT:  Yes.

14          MR. SNYDER:  -- and found that on

15     January 28th, 2012, contrary to Mr. Boland's

16     representation to your Honor moments ago, this

17     plaintiff deleted all of the content of that

18     email -- of that email account.  It's gone.

19     Forever.  He spoliated --

20          THE COURT:  When did he supplement --

21          MR. SNYDER:  And then finally --

22          THE COURT:  Yes.

23          MR. SNYDER:  -- on February 29 -- 22, 21

24     days after Stroz Friedberg first identified it, but

25     after we disclosed to Mr. Boland our findings, and

1    almost a month after Mr. Ceglia knew that he had

2    sanitized, deleted the account, he submitted a

3    sworn declaration to your Honor swearing pursuant

4    to the penalty of perjury that he was -- "I was

5    recently made aware of additional email accounts

6    accessed from our computer analyzed by defendants'

7    electronic discovery firm. At the time of

8    completing any prior declaration, I did not recall

9    the existence of any of these email accounts,

10   otherwise they would have been disclosed in these

11   declarations per the Court's orders. These email

12   accounts were not concealed by anyone by their

13   omission from prior declarations". And he goes on,

14   "immediately being informed of the existence, I

15   completed consent forms and give them to my

16   lawyer." And then with respect to the Get Zuch, he

17   does not address it -- oh, he does say "It's my

18   understanding that signed consent forms for the

19   accounts, which include the Get Zuch account, were

20   provided to defendants' counsel immediately after

21   receipt by my lawyer." Then he says, cherry on the

22   top, "I do not have any recollection at this time

23   of any additional email accounts I may have created

24   and/or used, other than those already disclosed to

25   defendants."

1          Now this was an another perjurious submission

2     because he is telling your Honor falsely that he

3     didn't recall the existence, and they weren't

4     concealed from anyone, when, in fact, he created

5     the account in April of 2011 and failed to disclose

6     them to your Honor in August of 2011.  And if it

7     happened to have slipped his mind that he created a

8     Get Zuch account, he should have remembered it in

9     February 2012, because on January 28th, 2012, he

10    took the active unlawful step of deleting its

11    contents.

12         So we now have all of that content missing, as

13    well as the USB device with page 1 and page 2.tiff

14    of the very contract on which he's suing which he

15    also withheld and concealed from the court.  We

16    respectfully submit that those two acts of defiance

17    alone constitute grounds for summary dismissal of

18    the case immediately without any further review of

19    any evidence.  And without making any predictions,

20    the notion that the Second Circuit United States

21    Court of Appeals wouldn't summarily affirm that and

22    refer it for consideration by all sorts of

23    different tribunals is -- is -- is -- let me just

24    say that it's difficult to imagine more defiant act

25    of relevant, prejudicial case-ending spoliation

1    than those two.  He's suing on a contract, page 1

2    and page 2 of which were on a tiff file that we

3    found -- we found the original authentic contract

4    on a tiff file that he concealed.  It's on a USB

5    device that he spoliates.  That was his first

6    efforts to hide the authentic StreetFax contract.

7        He didn't think we would find his Seagate hard

8    drive, so he spoliates the USB device with tiff

9    page 1, page 2.  He hides the Seagate, so then when

10   we found the Seagate, he had a problem.  So because

11   the act of spoliation now has relevance and

12   conduct.  We understand why he destroyed the USB

13   device.

14       And then the Get Zuch, of course, we'll never

15   know what he used that account for you because that

16   electronic data is lost, lost forever.  So --

17           THE COURT:  No way that it can be

18   reconstructed?

19           MR. SNYDER:  Our request, your Honor, is

20   that the Court stay discovery, defer setting a

21   discovery schedule until this Court has ruled on

22   defendants' dispositive motions, and I'm happy to

23   answer any other questions and certainly respond to

24   anything --

25           THE COURT:  You're willing to allow them

1    to conduct some limited discovery of their experts

2    -- or your experts?

3           MR. SNYDER:  It's our position, your

4    Honor, that no discovery is necessary or

5    appropriate.  What we said in our reply brief is

6    that if your Honor is inclined to permit some

7    discovery, and I know your Honor made comments to

8    that affect that your Honor was thinking that might

9    be something to consider at a prior hearing, it

10   should be limited solely and narrowly tailored

11   consistent with the case law to the relevant

12   forensic issues raised in -- in defendants' motion

13   dismiss, which would be some discovery directed our

14   experts, and if they have their own experts --

15          THE COURT:  Do you agree?  I don't think

16   you do, but I just want to make sure I have it

17   straight, do you agree that there conceivably could

18   be any reason for a deposition of any of your

19   experts on any grounds?

20          MR. SNYDER:  I could see that there would

21   be -- I don't think it's at all necessary, meaning

22   to say I think this Court is within its sound

23   discretion to dismiss this case on the record

24   before it on multiple, multiple grounds without any

25   additional development of the record.  I think that

1  plaintiff has been afforded every process and

2  privilege that is due given the facts and

3  circumstances of the fraud, and, frankly, his

4  egregious litigation conduct here, which I think is

5  relevant to where this Court is going to open up

6  this Court's processes any further to this

7  plaintiff.  So it's our position that your Honor

8  can and should dismiss the case on the record

9  before it.

10  We made the -- we made the alternative argument

11  just to let your Honor know that in the event that

12  the Court was thinking about some kind of

13  discovery, the most we think that would be at all

14  even arguably appropriate would be limited to

15  depositions of our experts, and if they have any

16  experts who are willing to swear to anything, that

17  we would depose them.  But anything beyond that

18  would be -- would be inappropriate and --

19  THE COURT:  I'm thinking about the cost of

20  unnecessary delay and although I did allude to a

21  possible fairness consideration back in December in

22  regard to expert discovery or expert opinions I

23  should say, I just -- concerned about the amount of

24  time that that would be required to be completed,

25  and then, of course, assumedly -- which we'll find

1    out momentarily from one or more of plaintiff's

2    attorneys -- to what extent -- whether the --

3    regardless of the breadth of discovery that may be

4    permitted, if any, in the event that there is some

5    thought about taking expert depositions, exactly

6    what would be the justification for it under these

7    circumstances?

8            MR. SNYDER:  I mean, I think, your Honor,

9    that that --

10           THE COURT:  I mean, I -- at the time we

11   were discussing it, I had no idea of what exactly

12   your experts were going to say and how they were

13   going to say it, but I do now.

14           MR. SNYDER:  We think that the request for

15   any discovery of our experts is for the same

16   purpose as their -- their request for any

17   discovery, which is to delay and impose more

18   burden.  I think that, for example, if your Honor

19   was reviewing the evidence and at any time had any

20   questions about any of the evidence as -- as the

21   fact finder and gatekeeper that your Honor -- in

22   that role, it would be certainly appropriate if

23   your Honor had any questions while reviewing the

24   record, which is extensive, there are ways in which

25   your Honor communicates very effectively with

1    counsel.  You did with respect to 1008 and all

2    sorts of other issues.  And if during the course of

3    your Honor's review of the extensive record, your

4    Honor had any questions, there are ways that the

5    parties can address them more efficiently and

6    targeted, than, you know, 28 days of depositions

7    where there will be 14 other motions to compel and

8    false emergencies, and the like, and the discovery

9    of the StreetFax contract ends this case.  The

10   spoliation ends this case, and, your Honor, doesn't

11   even need to --

12           THE COURT:  The analysis of the --

13           MR. SNYDER:  Work for Hire document.

14           THE COURT:  Well, I was thinking of the

15   floppy disks and the alleged copying of the emails

16   between Mr. Ceglia and Mr. Zuckerberg --

17           MR. SNYDER:  Yes.

18           THE COURT:  -- which seeming to implicate,

19   according to your experts, computer system clock

20   manipulations and back dating, which is really

21   quite interesting.

22           MR. SNYDER:  And I will say that we are

23   aware that one or more of the law firms involved in

24   this case before filing pleadings before this Court

25   had access to all of those electronic media and

1    conducted their own examination and never informed

2    this Court, because they knew or should have known,

3    that those computers were -- were riddled and

4    polluted with the most abusive evidence of

5    manipulation, and no one on this table is going to

6    challenge Stroz Friedberg.

7        Indeed, your Honor made reference to the

8    Milberg firm.  I have no awareness of this.  I

9    would imagine the Milberg firm has hired Stroz

10   Friedberg, and I imagine if this gentleman here was

11   put under oath, he would tell you that the Stroz

12   Friedberg firm is the best in class.  There is no

13   close number two to them.  The United States

14   government hires them when they need help.  And

15   they have sworn to your Honor to all of this

16   evidence, and I would like to -- I challenges any

17   of these lawyers to tell your Honor why any of that

18   is wrong.

19       Mr. Dumain tells the Wall Street Journal that

20   there was a plant and a hack.  Does he have a --

21   does he have any forensic evidence to support that?

22   What do his experts say to justify discovery?

23            THE COURT:  He said that to the Wall

24   Street Journal?

25            MR. SNYDER:  He did.

1          THE COURT:  I didn't see that.  Well then

2     I don't keep -- I don't read the Wall Street

3     Journal.

4          MR. DUMAIN:  I'm sorry, your Honor, I did

5     not say that to the Wall Street Journal.

6          THE COURT:  Oh, okay.  Thank you.  One

7     last question.  I know we're not here for oral

8     argument on the motion to dismiss, and, of course,

9     you'll want to perhaps have some rebuttal, and this

10    is all very important, so I'm completely at your

11    disposal as far as the amount of time you wish to

12    take in presenting your positions, but I was

13    intrigued by this discussion in -- let me see,

14    Miss Aycock's declaration -- I want to give her

15    some credit here -- and the Stroz Friedberg report

16    pages 41 to 43.  It wasn't clear to me when the

17    plaintiff used the hex editor, and I wasn't quite

18    clear on what the -- I know we're not here for oral

19    argument on the merits of the motion, but --

20         MR. SNYDER:  We would be happy to answer

21    any questions.

22         THE COURT:  Excuse me.  It's not clear --

23    I mean, it does sort of bear on the question of the

24    stay, which then forces the Court to look to some

25    degree at the merits and probability of success on

1    the motion to dismiss.

2            MR. SNYDER:  Of course.

3            THE COURT:  And the notion of a hex editor

4    was totally new to me and novel, and it had sort of

5    an oh, what shall we say, a mysterious -- I'll use

6    that term diplomatically -- ring to it or aura, and

7    yet I couldn't quite figure out why it was in your

8    papers.  And I realize there's some degree of

9    speculation involved, but I just thought I'd -- I

10   would just express candidly a lack of clarity or

11   understanding as to what your point was about it.

12   Particularly when was it that -- when was it that

13   Stroz Friedberg thought that he might have used it.

14   And were you attempting to imply perhaps that he

15   did use it somehow to create the Work for Hire

16   contract or some other documents?  I really

17   couldn't -- I'm trying to understand what the

18   relevance of it is.

19           MR. SOUTHWELL:  Your Honor, I would be

20   very happy to address --

21           THE COURT:  Or maybe a supplemental

22   briefing, but to the extent that it was intriguing

23   to me and had a certain, like I say, an aura of

24   mystery about it -- I suppose to be very candid, it

25   had more than an aura of mystery.  It had an aroma

1   of suspiciousness about it.

2           MR. SOUTHWELL:  Agreed, your Honor.  It's

3   a very interesting issue.  The Aycock declaration

4   is actually filed publicly --

5           THE COURT:  I mean, as I understand it,

6   this hex editor allows a person to manipulate data

7   in a way that's indiscernible to normal forensic

8   analysis.

9           MR. SOUTHWELL:  Indeed, your Honor.

10          THE COURT:  What conceivable use could

11  this plaintiff have made of it in the context of

12  this case.

13          MR. SOUTHWELL:  A very good question, your

14  Honor.

15          THE COURT:  Well, thank you for that.

16          MR. SOUTHWELL:  I can't actually respond,

17  your Honor.  Those documents have been designated

18  as confidential by the plaintiff --

19          THE COURT:  Really?

20          MR. SOUTHWELL:  -- which is why we did not

21  disclose --

22          THE COURT:  They're in the Aycock

23  declaration.

24          MR. SOUTHWELL:  -- in the public record --

25          THE COURT:  Oh, okay.

1              MR. SOUTHWELL:  -- the substance of the

2     Aycock declaration.

3              THE COURT:  Well, you're not disclosing

4     the documents to give me your opinion as to why you

5     allude to them to the Court.  I don't think, do

6     you?

7              MR. SOUTHWELL:  I think it is certainly a

8     very suspicious --

9              THE COURT:  Do you have any objection to

10     that, Mr. Boland.

11              MR. BOLAND:  No, your Honor, none at all.

12     I'd like to hear what he has to say.

13              THE COURT:  You'd be intrigued to know

14     too, wouldn't you?

15              MR. BOLAND:  I'd be intrigued to know.

16              THE COURT:  And you don't need it to be

17     redacted?

18              MR. BOLAND:  No.  Whatever he has to say,

19     your Honor, we'll have a response.  I'm interested

20     to hear.

21              THE COURT:  Thank you.

22              MR. SOUTHWELL:  Your Honor, hex editor

23     programs are known for manipulating the underlying

24     code of a document.  And there are other documents

25     in the record and attached to the Aycock

1    declaration which illustrate the use of a hex

2    editor to apparently manipulate the metadata, the

3    data underlying the document that shows its

4    providence, which is all suggestive of an attempt

5    to create a fraudulent document.  And we would

6    submit, your Honor, that this is directly related

7    to the supposed Work for Hire document which has

8    been advanced in this case, and that the -- what he

9    refers to test forgeries.

10            THE COURT:  He wouldn't need to use a hex

11   editor to finesse that, would he?

12            MR. SOUTHWELL:  For the electronic version

13   of it.

14            THE COURT:  There's no indication from

15   Stroz Friedberg that he did.

16            MR. SOUTHWELL:  Actually, yes, your Honor,

17   for the electronic version.

18            THE COURT:  That's what I'm not grasping

19   here.

20            MR. SOUTHWELL:  So there's -- they have

21   advanced a hard copy version, you know, a purported

22   original.  There was one attached to the complaint.

23   There was the one presented for inspection in

24   response to the Court's order which we have put in

25   evidence is, in fact, different than the one that

1    was attached to the complaint.  But we also

2    expected to find an electronic version of it

3    because, of course, Mr. Ceglia has said under oath

4    that he created it on a word processing program and

5    then printed it.  One would expect to find an

6    electronic version.

7             THE COURT:  But there was none.

8             MR. SOUTHWELL:  None was found, but what

9    was found were numerous test forgeries, documents

10   which were indicative of attempts to create that

11   electronic version of the document, and then

12   deleted versions that appeared to be related to

13   those documents.  And there was evidence of a hex

14   editor being used in relation to that, a program

15   that can be used to alter or manipulate underlying

16   data, much like the backdating, your Honor, that

17   you focused on.  When you backdate system clock,

18   you are changing or trying to change the metadata

19   behind the documents.  Those are all the forensic

20   artifacts that one looks for to try to ascertain

21   the authenticity of documents.

22             THE COURT:  You're saying that he -- well,

23   if he's manipulating code -- he doesn't need to

24   manipulate code.  He had a -- which I just, because

25   we're working on the -- as you know, we reserved

1    decision on the motion to compel the ten documents

2    asserted to be work -- attorney-client privileged

3    and work product.  We're working on that issue.

4              MR. SNYDER:  Yes, your Honor.

5              THE COURT:  And something came up there,

6    and I looked at it and I said geez, I thought he

7    didn't have -- he claimed he didn't have the

8    StreetFax contract.  Well, as it turned out what I

9    mistakenly understood to be the StreetFax contract

10   was actually the StreetFax -- what the heck was it

11   called, specimen or --

12             MR. SOUTHWELL:  Specification?

13             THE COURT:  No.  Some other word.  I'm

14   stumbling now.  Format or template where he used

15   that document to engage in negotiations to get the

16   StreetFax project up and running.  And without

17   breaking the confidentiality, there is a document

18   in Miss Aycock's declaration wherein the StreetFax

19   format, if that's what it's called or something

20   else, was used, and there's a signature by somebody

21   that apparently engaged in some commercial

22   relationship with the plaintiff relative to the

23   project.

24             MR. SOUTHWELL:  Right.

25             THE COURT:  So my point is that if he was

1    able to create that text, which you've agreed as to

2    the second page is identical to the Work for Hire

3    document, then you can see what -- as a

4    nontechnical person who's struggling to understand

5    all of this high-tech terminology is trying to

6    grasp, then why would it be necessary to use a hex

7    editor to create the entirety of the Work for Hire

8    document?

9            MR. SOUTHWELL:  I think, your Honor,

10   because --

11           THE COURT:  Is that a fair question?

12           MR. SOUTHWELL:  Yes.  And let me try to

13   respond this way, your Honor.  One would expect to

14   find a electronic version of this Work for Hire

15   document.

16           THE COURT:  You know what I'm talking

17   about.  I'm now referring to the Work for Hire --

18   or, excuse me, the StreetFax template or whatever

19   this word is that I can't remember.  It's revealed

20   in the documents that you --

21           MR. SOUTHWELL:  Right.

22           THE COURT:  -- that you submitted to me.

23           MR. SOUTHWELL:  There's the authentic

24   StreetFax contract, and there are other related

25   contracts to that authentic StreetFax contract, all

1    of which corroborate the authentic StreetFax

2    contract.

3            THE COURT:  No, no, no.  This is a

4    document -- this is like the original.  It's almost

5    as if what I'm trying to describe to you and if

6    there's a word in the document you have it in front

7    of you, you can see it.  It's like template or

8    specification, or something, wherein he created

9    this document with all his legal verbiage -- sort

10   of a kitchen table contract by a nonlawyer, always

11   a dangerous thing obviously, as this case shows

12   dramatically -- and it was that.  That was in his

13   possession, and it was in his system.  So why would

14   he need a hex editor to create another page of it?

15           MR. SOUTHWELL:  Your Honor, because, I

16   would submit, he was trying to create an electronic

17   version of his fabricated contract to further his

18   fraud to show --

19           THE COURT:  Why would he need to use a hex

20   editor to do that?  That's what I'm not getting.

21           MR. SOUTHWELL:  Because it's supposed to

22   be from 2003, and he's creating it in 2011.  It's

23   supposed to be from 2003 if it's for real, but it's

24   really from 2011 when he's creating it.  So he

25   needs to use the hex editor, much like he's

1    backdating --

2           THE COURT:  But he knows -- according to

3    you, he knows how to backdate a computer, the

4    metadata.  What does the hex editor get him?

5           MR. SOUTHWELL:  There's more to backdating

6    then simply backdating the system clock.  You use

7    the hex editor to wash over or cover up some of the

8    tracks of creating the document recently.  So there

9    are examples that are detailed there of multiple

10   documents that appear to be test forgeries, ten

11   different copies of this Work for Hire sort of

12   template.  And there are six documents that appear

13   to be used to test the effects of modifying a Word

14   document with a hex editor.  And there are files

15   that you are called text to copy over to test

16   document, document to paste into.  And those were

17   all saved in folders called work to copy into

18   beginning folder.

19          THE COURT:  Okay.  Okay.

20          MR. SOUTHWELL:  And all of that was used

21   for the sole purpose of testing the use of a hex

22   editor, and as in Stroz Friedberg's experience,

23   that is how electronic forgers forge their

24   documents.  They need to test it out.  It's not

25   something they can just do.

1          THE COURT:  Its only use is for illegal

2     purposes?

3          MR. SOUTHWELL:  No, your Honor.  There are

4     other purposes, but in this context given what was

5     found by Stroz Friedberg on Mr. Ceglia's machine.

6          THE COURT:  When did he use it though?

7     That's the other thing that was not clear to me in

8     the -- in the Stroz Friedberg report.  Or maybe I

9     missed it.

10         MR. SOUTHWELL:  That is a good question,

11    your Honor.

12         MR. BOLAND:  They didn't even find the

13    program, your Honor.  It's not even on the

14    computer.  So they have no idea when it was used.

15    The program itself doesn't exist or anything like

16    it on the computer according to their report.

17         MR. SOUTHWELL:  Right.  But what does

18    exist is documents which include phrases like "this

19    is a Word document that has been newly created.  I

20    will test how the coding comes into the hex

21    editor."

22         THE COURT:  What I'm trying to drive at is

23    it just sort of amateur's effort to self-aggrandize

24    him or herself because they now have this text

25    editor thing that they can play with and manipulate

1    and feel like they're engaging in some sort of

2    high-tech, you know, manipulation, and wow, isn't

3    this neat.  I'm able to you fool around with it

4    with a hex editor.  But does it necessarily follow

5    that it was used in connection with committing the

6    fraud that's alleged here against the defendant?

7              MR. SOUTHWELL:  I think it certainly does,

8    your Honor.  It certainly does.

9              MR. SNYDER:  Your Honor, let me just --

10             THE COURT:  I don't want to dwell on it

11   this.  It's just that --

12             MR. SNYDER:  Your Honor, what it shows --

13             THE COURT:  I have dwelled on it.

14             MR. SNYDER:  What it demonstrates I think

15   by clear and convincing evidence if not beyond a

16   reasonable doubt that Mr. Ceglia created the Work

17   for Hire document by merging a new fake page 1 with

18   an already existing document, page 2 of the

19   authentic StreetFax contract, and then used a hex

20   editor and other forensic manipulations to try to

21   create fingerprints on page 1 of the document that,

22   when forensic experts looked at it, it will look

23   like it was created in 2003.  And so this program

24   in this context is used to edit raw data that make

25   up the file, rather than the text of the file, and

1    indeed that was his attempt to create an electronic

2    version of the document that contains a 2003, what

3    I would say is metadata.

4        Now, if there's any doubt about that --

5            THE COURT:  But you don't need hex editor

6    capability to manipulate metadata.

7            MR. SNYDER:  No, but that is -- it's a

8    tool in the same way -- there are lots of ways to

9    commit a murder.  There's lots of ways to commit

10   document forgery.

11           THE COURT:  That's my point.  I had the

12   impression from Stroz Friedberg that his

13   manipulation of metadata was based on other --

14           MR. SNYDER:  It was manifold.

15           THE COURT:  Other high-tech interventions

16   by the plaintiff, not from the hex editor.

17           MR. SNYDER:  Yes.  It is manifold, meaning

18   the test forgeries and the other forensic data

19   revealed multiple attempts, some successful, some

20   not, to manipulate metadata.  There was backdating

21   for sure, but there also was the use of the hex

22   editor, and then, of course, there was what I would

23   say is undeniable proof of -- of document --

24           THE COURT:  Stroz Friedberg actually say

25   that the hex editor technique was used to create

1    the fake Work for Hire contract.

2           MR. SOUTHWELL:  Yes.  If you refer to

3    page 42 of the Stroz Friedberg report, they refer

4    to this document that was discovered on

5    Mr. Ceglia's computer called --

6           THE COURT:  Just a second.  Wait a minute.

7    Forty-two?

8           MR. SOUTHWELL:  42.

9           THE COURT:  You have that, right,

10   Mr. Boland?

11          MR. BOLAND:  Yes, your Honor, if they're

12   talking about the report that was provided by Stroz

13   Friedberg.

14          THE COURT:  You have it right there -- you

15   probably have it right there on the screen because

16   you're so high tech, right?  You're totally

17   automated.  Completely automated lawyer.  Okay.

18   I've got page 42.  Go ahead, Mr. Southwell.

19          MR. SOUTHWELL:  Yes, your Honor.  It

20   refers to the SFwebWorkforHireMZ.com file.

21          THE COURT:  Yes, I've read that.

22          MR. SOUTHWELL:  Which was one of --

23   earlier in the Stroz Friedberg report they talk

24   about the seven backdated versions of the Work for

25   Hire document, unsigned versions.

Case 1:10-cv-00569-RJA-LGF   Document 350   Filed 04/12/12   Page 68 of 219

1           THE COURT:  Yes.

2           MR. SOUTHWELL:  This is one of them.  And

3    as Stroz Friedberg reports, shows evidence of the

4    use of a hex editor or similar tool --

5           THE COURT:  Yes.

6           MR. SOUTHWELL:  -- and they then explain

7    how they see that.  And the reason they see that

8    and come to that conclusion is that when viewing

9    the metadata of the file using a common program

10   called Metadata Assistance, it appears there's no

11   information.

12       And then if they -- if you turn the page to 43,

13   all right, so using a normal tool, it's blank if

14   you will.  There's no information of metadata.

15   When they have then used a more sophisticated

16   forensic tool, which they describe on page 43,

17   there is, in fact, metadata found, and it indicates

18   that the document originated in a certain folder.

19   The folder is C:\documents and settings:iasia,

20   I-A-S-I-A \My Documents\StreetFax\contracts\work

21   for hires.  And it was authored by the user Brendan

22   Ceglia.

23           THE COURT:  Who is Brendan Ceglia?

24           MR. SOUTHWELL:  We understand that is the

25   plaintiff's brother.

1          THE COURT:  So the plaintiff's brother was

2     involved in manufacturing the fake Work for Hire

3     contract using hex editor, is that what this says

4     in layman's language?

5          MR. SOUTHWELL:  That a computer and user

6     registered to him, whether it was him or it was, in

7     fact, you know, Mr. Paul Ceglia --

8          MR. SNYDER:  If you recall, your Honor,

9     this is not first time we've encountered Brendan

10     Ceglia in this case.  It was his daughter who was

11     the recipient supposedly of confidential emails

12     that they tried to --

13          THE COURT:  I don't remember the name of

14     the father, which is -- I may have missed that.

15          MR. SNYDER:  It was Jessica Ceglia --

16          THE COURT:  I remember her.  Yes, I

17     remember her being mentioned.  I didn't recall

18     Brendan, however.  So that's what I'm -- that's the

19     answer to my question --

20          MR. SOUTHWELL:  Yes, your Honor.

21          THE COURT:  If I read this with or without

22     Mr. Healy's assistance, which I'll probably have to

23     ask for, I'll eventually get it straight that

24     this -- this text and this -- this -- and these two

25     pages of the Stroz Friedberg report assert that

1    the -- that a person by the name of Brendan Ceglia

2    had something to do with the creation of the fake

3    first page of the Work for Hire document using the

4    hex editor capability.

5              MR. SOUTHWELL:  Yes, and specifically,

6    your Honor, the conclusions Stroz Friedberg makes

7    is that there are changes that have been made to

8    the file in such a way that do not preserves its

9    structure, including metadata, which is indicative

10   of the use of a hex editor or similar tool to

11   manipulate the file.

12             THE COURT:  So it is relevant?

13             MR. SOUTHWELL:  Yes, your Honor.

14             THE COURT:  Thank you.  Okay.  I'm glad I

15   asked.

16             MR. SNYDER:  Your Honor, there's one more

17   issue I just want to address, because it is

18   addressed in the opposition brief, which is

19   statements made by plaintiff's counsel concerning

20   what we call the spoliation of the original

21   contract when Mr. -- the yellowing of the document.

22   And this is another example of counsel making

23   irresponsible statements to this Court without a

24   good-faith basis in fact.  So, the objective

25   evidence, meaning photographs and videos taken

1    minutes after Mr. Argentieri removed the

2    documents --

3              THE COURT:  We're now talking about the

4    baking problem?

5              MR. SNYDER:  Yes -- from the envelope are

6    crystal career on this point.  There's no discovery

7    needed, your Honor, using common sense and good

8    judgment as a fact finder can look at those

9    photographs, can look at those videos, and can see

10   that the document that Mr. Argentieri took out of

11   the envelope after having it in his possession,

12   custody, and control throughout this litigation in

13   a safe deposit box --

14             THE COURT:  Well, unless --

15             MR. SNYDER:  -- is yellowed.

16             THE COURT:  Yeah.

17             MR. SNYDER:  And there is no claim that

18   we, the defendants, had any access to that document

19   between January when his experts copied one version

20   of it and it was white and July when Mr. Argentieri

21   removed it, put it on the table before we touched

22   it, and it was photographed.  Your Honor, can look

23   at those photographs, look at the time stamp, and

24   again, unless the martians landed and somehow

25   changed the time and date stamp on the camera,

1   maybe there's an allegation that Mr. Zuckerberg or

2   someone hacked into the camera of the expert, or --

3   so -- so what happens is every time we have

4   evidence of fraud, they make up stuff.  They don't

5   swear to it.  They don't certify pursuant to

6   Rule 11.  Mr. Ceglia says nothing, it's always

7   counsel.  And then sometimes the counsel leave the

8   lawsuit, and we can't even ask them where they --

9          THE COURT:  Mr. Snyder, eye contact helps

10   so I can butt in here a little bit.  Thank you.

11   Now that you brought this up, I recall at an

12   earlier argument there was some reference to you

13   knowing who had access to, and who actually opened

14   the safe deposit box.

15          MR. SNYDER:  Yes.

16          THE COURT:  And I had the impression you

17   were going to make something of that in connection

18   with the baking problem.

19          MR. SNYDER:  We will make something of

20   that in further proceedings.  We think that's

21   relevant, not to the motion to dismiss, whether

22   Mr. Argentieri had or did not have access to it.

23   But we can -- there is no dispute that between

24   January when plaintiff's experts copied the one

25   version of the original contract, and that's a

1    white and not the discolored copy, and in July when

2    Mr. Argentieri produced it, there's no suggestion

3    that we had access to that document.

4         THE COURT:  No, no, I thought you were

5    going to bolster your argument by giving the Court

6    a certified copy of some sort of an affidavit from

7    a bank executive who would provide the

8    authentication for the records of person signing in

9    and out for the safe deposit box during that

10   relevant time frame.

11        MR. SNYDER:  To be honest, we could have.

12   The reason we didn't is because we think the

13   dispositive relevant fact, which is undisputed, is

14   that the document was within the plaintiff's and

15   his agent's custody and control from January until

16   the minute Mr. Argentieri removed it in its

17   spoliated, discolored fashion.  And I will note

18   Mr. Argentieri isn't here to address it.  But I

19   will note that Mr. Argentieri knew or should have

20   known, but failed to disclose to this Court that

21   the document that he removed from the envelope was

22   a completely different color and in a completely

23   different condition than the document that his

24   experts copied in January, much less a different

25   copy than the one attached to his complaint.

1    That's a separate issue.

2         But certainly when Mr. -- when Mr. Flynn,

3    Mr. Benjamin, Mr.  Southwell, and Miss Aycock and

4    all their experts looked at that document, there

5    was a gasp in the room because it looked so

6    different.  Mr. Argentieri knew it looked

7    different, never told this Court that.

8              THE COURT:  My point is that when it was

9    tendered to -- which expert was it for the

10   plaintiff who looked at it, Ajenski?

11             MR. SNYDER:  Yes, your Honor.

12             MR. SOUTHWELL:  Ajenski and Mr. Osborne.

13             THE COURT:  Osborne and Ajenski.  Was it

14   tendered to them physically by the plaintiff

15   himself in person?

16             MR. SNYDER:  They swore to this Court that

17   they took a -- yes, a -- a --

18             THE COURT:  Who hand it had to them?

19             MR. SOUTHWELL:  Mr. Argentieri.

20             MR. SNYDER:  Mr. Argentieri.

21             THE COURT:  Mr. Argentieri.

22             MR. SNYDER:  Yes, he did.  He handed them

23   a white document that was not miscolored, but

24   handed us a yellow one that was miscolored.

25             THE COURT:  And the question I have is if

1    it's just all Ceglia's signatures -- who was on the

2    safe deposit box?

3            MR. SOUTHWELL:  Your Honor, we do have

4    records that Mr. Lake has provided.  They show

5    Mr. Argentieri and Mr. Ceglia signing the documents

6    out.  We'd be happy to provide those, your Honor,

7    but there's no dispute --

8            THE COURT:  But the intriguing question is

9    how many times did it get signed out and by whom?

10           MR. SNYDER:  Right.  The records are

11   not --

12           THE COURT:  And for what period of time?

13           MR. SOUTHWELL:  The records show access to

14   the box.  They don't, in fact, show whether it was

15   signed out or brought back.  But the point --

16           THE COURT:  How does that work?

17           MR. SNYDER:  In fact, your Honor, we

18   thought of pursuing this.  In other words we

19   thought of pursuing evidence from the safe -- from

20   the bank, maybe witnesses to prove that up.  But

21   frankly, your Honor, there comes a point in time

22   when enough is enough.  Do I think that if that

23   issue was tested that we would be able to --

24           THE COURT:  I'll bet you now that I asked

25   about it, you're rethinking your position.

1          MR. SNYDER:  Maybe Mr. Flynn will --

2          THE COURT:  All I'm asking is very simple

3     questions.  Isn't it so that when the bank allows

4     somebody to go into a safe deposit box, they don't

5     allow you to walk out with it unless there's some

6     sort of receipting process so the bank doesn't get

7     accused of negligence?

8          MR. SOUTHWELL:  I don't know the

9     procedures of this bank.

10         THE COURT:  Well, I mean, if it came out

11    of the box, how could it be exposed to ultraviolet

12    light with clothes pins if it didn't leave the

13    premises?

14         MR. SNYDER:  It did leave the premises.

15         THE COURT:  That's exactly my point.

16         MR. SNYDER:  It left the premises.  We

17    don't know exactly for how long.

18         THE COURT:  But that's -- how can -- I

19    mean, the bank, do they let people open safe

20    deposit boxes and walk out with the contents only

21    to be (indiscernible) at a later time?  I don't

22    think so.

23         MR. SNYDER:  We -- the point is, there's

24    no question that Mr. Argentieri, Mr. Ceglia took

25    physically an original document out of the safety

1    deposit box and took it somewhere.

2              THE COURT:  How do you know that?

3              MR. SNYDER:  The records show that.

4              THE COURT:  That's what I'm asking, what

5    does the record show?

6              MR. SOUTHWELL:  Your Honor, to be clear

7    there's no dispute that it was in plaintiff's

8    custody prior to when it was produced to us in

9    July.

10             THE COURT:  Well, from a legal point of

11   view.  I'm trying to understand about the physical

12   point of view.

13             MR. SOUTHWELL:  The experts, Mr. Ajenski

14   and Osborne have stated that they received the

15   document in Chicago, that Mr. Argentieri brought it

16   to them in Chicago essentially.  Mr. Argentieri has

17   told us that he took it out of the safe deposit box

18   and brought it to the experts in Chicago.  The

19   safety deposit box records show accesses to the

20   box.  They do not, in fact, show what was taken out

21   or what was put in.  They show accesses.  The only

22   accesses -- and there are dates -- are by

23   Mr. Ceglia or Mr. Argentieri.  We'd be happy to

24   provide that to your Honor.  Because there's no

25   dispute that the document was in the custody and

1   control of the plaintiff prior to --

2          THE COURT:  Or his agent.

3          MR. SOUTHWELL:  Or his agents prior to

4   ever being presented to our experts, it was just

5   not a germane fact to that point.

6          THE COURT:  Thank you.  Anything else,

7   Mr. --

8          MR. SNYDER:  No, your Honor.  Thank you

9   for the time.  I appreciate it.

10          THE COURT:  Do we need a break,

11   Mr. Boland?

12          MR. BOLAND:  Yes, your Honor.  Thank you.

13          THE COURT:  A break?

14          MR. BOLAND:  A brief break would be fine.

15          THE COURT:  How much time would you like?

16          MR. BOLAND:  Ten minutes, your Honor.

17          THE COURT:  Ten minutes.  Okay, we'll

18   resume in ten minutes.

19          MR. SNYDER:  I would just like -- I'm

20   sorry, your Honor.  I would just like --

21          THE COURT:  Just a second please.  Still

22   on the record.

23          MR. SNYDER:  I just want it on the record,

24   Miss Aycock has written for me a quote that

25   Mr. Dumain did make to the Wall Street Journal.

1          THE COURT:  Who, Mr. Dumain?

2          MR. SNYDER:  Dumain I think.

3          THE COURT:  Dumain.  Is it pronounced

4     Dumain, sir?

5          MR. DUMAIN:  Yes, your Honor.

6          MR. SNYDER:  Quote, "It didn't take

7     sophisticated hacking to send something from that

8     account", period, close quote.  Wall Street Journal

9     quote attributed to Mr. Dumain on Mr. March 27th,

10    2012.  I think Mr. Dumain just told, your Honor, he

11    didn't say that when I said hacking and planting,

12    perhaps he was being literal because maybe he

13    didn't use the verb plant but he certainly used the

14    word hack and by that statement, not certified

15    under Rule 11, I don't know what the good-faith

16    basis in fact is for it.

17         THE COURT:  Well, we'll find out.

18         MR. SNYDER:  He is accusing my client of

19    hacking into a computer, a criminal act, to send

20    the authentic StreetFax contract to Sidley and

21    Austin, an audacious and outlandish claim if

22    there's no evidence for it, and there is no

23    evidence.

24         THE COURT:  We'll explore that further.  A

25    ten-minute break.

1          MR. BOLAND:  Thank you, your Honor.

2          (Short recess was taken.)

3          THE CLERK:  Continuation of Rule 16(b)

4    hearing and oral argument on defendants' motion to

5    stay discovery.

6          THE COURT:  By the way, on that

7    Rule 16(b), the reason this is a Rule 16(b)

8    conference is because -- this is not criticism --

9    contrary to what we were told back in December, we

10   did not see the imminent motion to dismiss.  And I

11   realize, now that I see it, why that would be.  But

12   not having heard anything, I felt rather than start

13   communicating with defendants in a way that would

14   suggest in any shape or form favoritism, I would

15   just put out a Rule 16(b) invitation and see what

16   happened.  And this is what happened.  So --

17          MR. SOUTHWELL:  We appreciate that, your

18   Honor.  As I said, we were hoping to file in

19   September, and -- and when we saw --

20          THE COURT:  In January.

21          MR. SOUTHWELL:  In September of 2011 we

22   actually we thought --

23          THE COURT:  Well, I know, but --

24          MR. SOUTHWELL:  -- we would file

25   originally, and then in January, but we kept on

1    finding the evidence under the rocks.

2            THE COURT:  I understand -- well, no, no

3    it's not a criticism.  I just want to comment as to

4    why the Rule 16(b) invitation was sent.  It wasn't

5    because I felt that there had to be a Rule 16(b)

6    conference.  But I felt I had not received any

7    indication from defendants about the imminency or

8    lack thereof --

9            MR. SOUTHWELL:  Yes, your Honor.

10           THE COURT:   -- of the motion, and

11   therefore my obligation as the case management

12   Judge was to issue the order.  It was not because

13   Judge Arcara, contrary to Mr. Boland's belief,

14   directed it.

15           MR. SOUTHWELL:  Thank you.

16           THE COURT:  Oh, by the way, just to let

17   you know.

18           MR. BOLAND:  I was commenting on the

19   preamble to the order.

20           THE COURT:  I know.

21           MR. BOLAND:  I misunderstood.

22           THE COURT:  I know.  That's just a minor

23   point.  I just wanted to clear the air on that --

24       All right.  Mr. Boland and Mr. Dumain, you have

25   the floor.

1              MR. BOLAND:  Your Honor, as --

2              THE COURT:  How do I ignore all of the

3     seemingly persuasive indicia or troublesome

4     indicators of potential fraud?

5              MR. BOLAND:  One way, your Honor, is full

6     discovery for our side, because you haven't heard

7     half the story.  So it's like the old law school

8     analogy, you come around the corner -- you heard a

9     gun shot, you run around the corner, and there's a

10    person lying there bleeding and someone over them

11    holding a gun.  What's your first reaction?  Wow,

12    they just shot them.  And then you walk up and ask

13    the person what happened, and it turns out later

14    they're telling the truth, and they say someone

15    just walked by and shot my friend.  Totally

16    different story.

17             THE COURT:  Yeah, but if you have a

18    confession --

19             MR. BOLAND:  My point is, your Honor, your

20    first instinct about something is not always the

21    right one until you get the other half of the

22    story.

23             THE COURT:  I see.  So, do -- do any of

24    your experts say that the -- or do you say that the

25    StreetFax contract that was discovered in the

1      plaintiff's emails with Mr. Kole is a fabrication

2      in itself and is not the original contract?

3              MR. BOLAND:  Well, the defendants have

4      offered no evidence to authenticate the document.

5              THE COURT:  What do you say?

6              MR. BOLAND:  Well, what I say, your Honor

7      is first of all, the metadata -- we've only had

8      what four or five days to review what you pointed

9      out is hundreds of pages.

10             THE COURT:  But the StreetFax contract has

11     been submitted to you since last summer.

12             MR. BOLAND:  Yes, your Honor.  On that

13     point I can speak.  We've had --

14             THE COURT:  That's the point I'm talking

15     about.

16             MR. BOLAND:  Well, we weren't sure what

17     their motion to dismiss was going to --

18             THE COURT:  Is it a fraud?

19             MR. BOLAND:  -- to discuss.  Is the

20     document was not created by our side, so whoever

21     created a fraudulent --

22             THE COURT:  Well, I mean, you've had --

23     excuse me.

24             MR. BOLAND:  A fraudulent document, yes.

25     It's not the contract between these two parties.

1          THE COURT:  Have your experts reviewed it?

2          MR. BOLAND:  The document itself?

3          THE COURT:  Yes.

4          MR. BOLAND:  Yes, we have experts who have

5    looked at it.  And we're going to have expert

6    reports as part of our response.

7          THE COURT:  And do they say it's a fraud?

8          MR. BOLAND:  They indicate that it claims

9    to be a scan, but has no metadata of being a scan.

10   That's a problem.

11         THE COURT:  Has no metadata of being a

12   scan.

13         MR. BOLAND:  Scanners, when you scan a

14   document into electronic format, put -- typically

15   put metadata into that file including the name

16   Canon scanner, HP, Epson, whatever it might be.

17   The defendants claim that document was scanned by

18   someone.  Mr. Ceglia is their target of choice,

19   although they have no evidence he created that

20   document at all.  And yet the metadata embedded in

21   that document strangely has the information

22   regarding the scanner stripped out by someone.  So

23   who -- who took that out?  Perhaps the defendants

24   know about the use of a hex editor in the

25   production of that document, but we certainly

1     don't.

2          So now it's not even clear that document was

3     scanned by anyone.

4               THE COURT:  But it also was found on one

5     of Mr. Ceglia's drives, wasn't it?

6               MR. BOLAND:  No, your Honor, that's a good

7     point.  The persuasiveness that you asked about

8     should connect somehow to the credibility of what

9     you're hearing.  That, in fact, is something the

10    Court is being misled about in pleadings

11    constantly.  The defendants are very careful to not

12    delineate what evidence they're finding on my

13    client's computers and what evidence they're

14    finding on his parent's computer, a computer that

15    he never had access to, he never owned, he never

16    purchased.

17              THE COURT:  So the parents sent Mr. Kole

18    the document even though your client, on the

19    record, asserted a an attorney-client privilege

20    between himself and Mr. Kole as to the document.

21              MR. BOLAND:  Your Honor, I am not

22    saying --

23              THE COURT:  Not inconsistent?

24              MR. BOLAND:  It's not inconsistent and

25    here's why.

1          THE COURT:  Because?

2          MR. BOLAND:  Because the privilege logs

3     that we obtained and the documents therein, first

4     of all, were reviewed by prior to counsel simply

5     say from lawyer to client.  And then the contents

6     therein are reviewed, and then there was an

7     assertion of privilege made based on whatever

8     communications Mr. Lake and Mr. Ceglia had on that

9     matter.

10          THE COURT:  No, no, Mr. Kole and

11     Mr. Ceglia.

12          MR. BOLAND:  I understand, your Honor.

13     I'm talking about the privilege assertion in this

14     case.

15          THE COURT:  The privilege assertion was

16     between -- by Mr. Lake --

17          MR. BOLAND:  Yes.

18          THE COURT:  -- on behalf of Mr. Ceglia,

19     that the communication wherein the -- what the

20     defendants call the smoking gun actual StreetFax

21     contract was attached --

22          MR. BOLAND:  Correct.

23          THE COURT:  -- was privileged.  And that

24     assertion was made on behalf of Mr. Ceglia by

25     Mr. Lake, and I had to rule on it.  And I did.  And

1    I overruled it.  And Mr. Lake didn't appeal.  So if

2    Mr. Ceglia through his agent Mr. Lake is asserting

3    a privilege as to such document, including the

4    StreetFax contract that we are now talking about,

5    purportedly the original and only agreement between

6    plaintiff and defendant, how can it not be said

7    that the document was in your client's possession

8    at the time that was transmitted?

9              MR. BOLAND:  First of all, your Honor,

10   this is an email purporting to be from eight years

11   ago.

12             THE COURT:  You understand the question?

13             MR. BOLAND:  I do understand the question.

14   My client sent a bunch of emails to Jim Kole and

15   has no specific recollection of this email being

16   sent, and he said so on the record.

17             THE COURT:  That's not what he told his

18   lawyer to tell this Court back in -- whenever the

19   issue was argued.

20             MR. BOLAND:  Well, I don't know what his

21   specific conversation was with Mr. Lake.  I wasn't

22   there.  But he --

23             THE COURT:  Well, you can have asked him.

24             MR. BOLAND:  I could have.

25             THE COURT:  It's a pretty serious problem,

1    isn't it?

2          MR. BOLAND:  I don't think so, your Honor,

3    because I think he can assert privilege over an

4    email that he doesn't recall whether he sent it or

5    not to just say, look, it appears to be a

6    communication with my lawyer, assert the

7    privilege --

8          THE COURT:  I distinctly remember

9    Mr. Lake's very, very vigorous argument in that

10   regard, and I don't recall any equivocation on his

11   part relating to his -- Mr. Ceglia's insistence

12   that this was a privileged communication between

13   himself and Mr. Kole.  And now you're telling me in

14   that retrospect Mr. Ceglia is saying, well, not so

15   much.  I don't really recall it.  I have no idea

16   why I told Lake to say all of that.  Is that what

17   you're trying to tell me?

18         MR. BOLAND:  No, your Honor.  What I'm

19   telling you is the email was not sent from my

20   client's email account.  It was sent from his

21   parent's email account to the lawyer.

22         THE COURT:  Well, a copy of it resided on

23   his hard drive, didn't it?

24         MR. BOLAND:  No, your Honor.  It resided

25   on his parent's computer.  And --

1          THE COURT:  So his parents sent it -- why

2     would they send it to Mr. Kole?

3          MR. BOLAND:  No, your Honor.  I'm not

4     saying his parents sent the email.  An email was

5     sent from their account.  I could sit behind your

6     computer -- if you give me your credentials, I can

7     send an email from your account.  You didn't send

8     it.  That's what we're saying.

9          THE COURT:  Perhaps his brother, Brendan,

10    the one that allegedly had some involvement with

11    the hex -- H-E-X, for the court reporter.  H-E-X,

12    right -- editor usage, perhaps he sent it?

13         MR. BOLAND:  Your Honor, discovery is

14    going to help perhaps us answer those question.

15         THE COURT:  The family pet came and

16    somehow put his paw on the computer keyboard and it

17    got sent, or computer poltergeist got into the

18    family home and did it?

19         MR. BOLAND:  No, your Honor.  It's more

20    straightforward than that.  The only person

21    involved in this case who has all of the

22    credentials to access that email account is Mark

23    Zuckerberg.  He had them back in 2003 and 2004 when

24    he had --

25         THE COURT:  So we're back to the hacking

1     cyber warfare TV show 24 technique argument that

2     Mr. Lake proffered way back last summer, but has

3     never been developed or supported by Mr. Ceglia?

4            MR. BOLAND:  No, your Honor.  This is one

5     of the key reasons --

6            THE COURT:  Or is even in your papers in

7     favor of -- I mean, is that why you want to go into

8     all the computers at Facebook and examine each and

9     every one of them to see whether or not there's

10    some evidence of electronic cyber warfare going on

11    here?

12           MR. BOLAND:  That statement was never

13    made, your Honor.  So I have no interest in going

14    to every one of Facebook's computers.  There was

15    no --

16           THE COURT:  I thought --

17           MR. BOLAND:  -- demand made.  That's

18    Mr. Southwell's recollection of the conversation,

19    or perhaps out of a context comment, whatever he's

20    making.

21           THE COURT:  The question withdrawn.

22           MR. BOLAND:  No interest.

23           THE COURT:  All right.  Would you say that

24    all of the experts that are involved in this very

25    voluminous report are incompetent?

1          MR. BOLAND:  All of them?

2          THE COURT:  Yes.

3          MR. BOLAND:  No.  One of them is --

4          THE COURT:  Who's that?

5          MR. BOLAND:  -- for sure.  Gerald LaPorte.

6  Who is offering testimony about a test, the PE

7  test, which is the lynchpin of their case, that the

8  interlineations on page 1 are somehow less than two

9  years old.  This test -- what they don't tell you,

10  he's -- Mr. LaPorte has been carrying this around

11  to federal and state courts for years trying to get

12  it past Daubert and has failed.  He has like the

13  Energizer Bunny of junk science.

14      This test has absolutely no reliability behind

15  it.  Again, expert discovery will bring that out

16  and perhaps even a Daubert hearing, because this is

17  not something the Court should rely on.  It's

18  akin -- it's not even reliable as astrology,

19  because that's more accurate.

20          THE COURT:  How about Stroz Friedberg's

21  finding relative to the apparent fabrication of the

22  so-called Ceglia-Zuckerberg emails regarding

23  StreetFax -- excuse me, regarding Facebook, are

24  they also based on junk science?

25          MR. BOLAND:  They're not, your Honor.  But

1    what they do is they don't follow the trail all the

2    way to the end.  I'll give you a perfect example of

3    what Mr. Snyder brought up in his comments to you.

4    He told you about you couldn't imagine a more

5    egregious conduct by a party than Mr. Ceglia

6    deleting the contents of his getzuch@gmail.com

7    account.  On page 25 of Stroz Friedberg's report --

8    it's document 325 at the bottom -- not only if you

9    read those two paragraphs, that's not what they

10   say.  They never say there were any emails in that

11   account that were deleted.  Mr. Snyder is

12   misleading the Court about what that paragraph

13   says.  It's right there in black and white.

14        In addition, they use words throughout their

15   report that are not the words of experts.  Like, it

16   is likely this happened.  It is presumedly the

17   case, which is in this Get Zuch paragraph.  The

18   only evidence they have that they put in their

19   report is an email mentions the activation of a

20   Facebook account, and the email address that you

21   have to use to get a Facebook account, as they

22   should know, is included in the reference.  They

23   don't say in that paragraph that a getzuch@gmail

24   account email was ever sent from that account.

25             THE COURT:  No, no, you didn't catch my --

1    you didn't catch my question.  I'm referring to the

2    extensive discussion in the Stroz Friedberg report

3    regarding the question of whether the emails

4    attached to the amended complaint were

5    fabrications.

6             MR. BOLAND:  Yes, I am aware of that, your

7    Honor.

8             THE COURT:  That's what I'm asking you

9    about.  Is that incompetent expert opinion?

10            MR. BOLAND:  It is, and I'll tell you why.

11   Because they use the same weasel words in there,

12   same things -- and I've read it once or twice now,

13   and I'll read it again, because they keep popping

14   up.  Every time you read the report, you see more

15   qualifiers like this in that specific topic.  They

16   say there's no way these emails could have these

17   time stamps because of the difference between

18   daylight savings time, provided the computer clock

19   was correctly set.

20       Well, that begs the question, was the computer

21   clock correctly set?  Did someone set it?  Did a

22   program reset it?  Did Mr. Ceglia travel somewhere

23   to a time zone where he reset it?  They have no

24   idea.  So, assuming a fact they don't know, which

25   could convert their whole conclusion to nonsense,

1    they then give you this conclusion which appears to

2    be strong.  And it's throughout their report, your

3    Honor.  Virtually every conclusion they give has

4    they qualifiers.

5        The hex editor is another one.  They say a hex

6    editor or similar program was used.  Okay.  What

7    program?  When was it installed?  Guess what, your

8    Honor?  There's no evidence of a program like that

9    installed anywhere on any computer.  So they could

10   have said -- Mr. Snyder's words -- we have evidence

11   that aliens came down and did this.  Of course,

12   they have no evidence of aliens involved in the

13   computer at all.

14       And, in fact, a hex editor is so common a

15   program that I used one last week to solve a

16   problem of metadata creation dates in my files

17   being messed up from this case, and from the

18   production from the defendants.  Things happen on

19   computers.  Programs cause metadata to change and

20   were fouling up my ability to synchronize files.

21   So I used a hex editor to correct the dates on my

22   files.  It's very commonly used for a number of

23   issues to correct problems with computers, and the

24   defendants know that.

25            THE COURT:  You don't deny that it was

1   found on his -- on some of his Microsoft Word

2   files.

3               MR. BOLAND:  What was found?

4               THE COURT:  Hex editors.

5               MR. BOLAND:  No, your Honor.  The report

6   does not -- the report says that the contents of

7   some Word documents had words like hex editor in

8   them.  I'm testing things with a hex editor.

9   There's no evidence a hex editor was used.  What

10  they say is, you know, the metadata of some of

11  these files --

12              THE COURT:  Why would somebody using the

13  computer assert the usage of a hex editor if they

14  weren't using it?  And I had the impression from

15  the report, and as explained further by

16  Mr. Southwell, that the objective indicia of such

17  use confirmed that indeed it was used by

18  Mr. Brendan Ceglia.

19              MR. BOLAND:  Your Honor, it doesn't

20  confirm it.  It's subjective entirely.  They find

21  things like metadata which doesn't look right and

22  then they simply conclude hex editor is the

23  solution.

24              THE COURT:  All right.  We'll go further

25  with this.

1          MR. BOLAND:  Very well.

2          THE COURT:  What I'm trying to understand

3    is, if you have all of they powerful counter

4    arguments that, in your opinion, undermine the

5    competency of these expert -- plethora of expert

6    opinion, why isn't it your papers?  Why do you -- I

7    mean, you now say well, we're back to the fact that

8    the StreetFax contract was somehow embedded

9    improperly in Mr. Ceglia's -- well, in the parent's

10   computer, that it didn't exist on his hard drive.

11   You don't address the fact that if he -- that if

12   the Work for Hire contract was authentic, why is

13   there no electronic record of it in any of his --

14   in any of the media that he turned over to the

15   defendants for examination?  There's utterly no

16   comment on that, Mr. Boland, in your papers.

17          MR. BOLAND:  Your Honor, the defendant --

18          THE COURT:  I'm the one that's raising it

19   because I'm concerned about why isn't in your

20   papers.

21          MR. BOLAND:  And I can answer that

22   question.

23          THE COURT:  And what's that?

24          MR. BOLAND:  The defendants have had nine

25   months to put together these hundred pages.  We've

1    had less than less than nine days to go through.

2            THE COURT:  That's not true.  You've had

3    all of the paperwork, all of the discovery at your

4    disposal since the lawsuit was started.

5            MR. BOLAND:  Your Honor --

6            THE COURT:  You've had experts look at it

7    preliminarily.  You knew that they were going to

8    make this motion to dismiss, although it took them

9    longer than expected.  And now you're telling me

10   that you're surprised by all of this expert

11   analysis and accusation?

12           MR. BOLAND:  No, your Honor, that's not my

13   point.  My point is the conclusions in their

14   hundreds of pages of reports are --

15           THE COURT:  Let me put it to you this

16   way --

17           MR. BOLAND:  -- are very specific

18   things --

19           THE COURT:  Are you saying that none of

20   your experts or any experts that you might retain

21   or intend to retain to prosecute this case have

22   offered to you any preliminary opinions supporting

23   the authenticity of this contract?

24           MR. BOLAND:  Yes, they've already provided

25   them in prior pleadings.  There's issues in dispute

1     with their various expert reports, the toner, the

2     paper, the ink, Mr. Zuckerberg's signature, the

3     staple hole issue.  They're merely rebutting stuff

4     in most of those papers that we've already

5     submitted in declarations to be the opposite, the

6     classic dueling experts.  It's already there.  We

7     need discovery to fully address every specific

8     opinion they issued there, and frankly --

9           THE COURT:  You might need a deposition.

10    You got their report in effect.  But what other

11    discovery, if you will, do you feel you need in

12    order to counter act this avalanche of -- of

13    evidence pointing towards the conclusion that the

14    defendants are drawing, which is that the document

15    on which your client is suing is a fake?

16          MR. BOLAND:  First of all, your Honor, it

17    won't be an avalanche once we have a full

18    opportunity to explore a bunch of conclusions in

19    there that, frankly, we didn't anticipate, because

20    they're not supported by science.  Our experts

21    didn't think, for example, that one of their

22    experts would come forward with a PE test that is

23    complete junk science, and then try to support

24    their entire case with that.

25        So now they've done so.  Now our experts need

1    time to not only respond, but that expert needs to

2    be held to account in a deposition and full

3    discovery as to why he did that.  In addition, the

4    comments that were being made by Mr. Lesnevich

5    where he claims to have drawn lines on letters, and

6    then the conclusion he drew, there must be another

7    paper document.  That's the only solution.  That

8    conclusion --

9              THE COURT:  No, that's not the conclusion.

10   The conclusion is that if there was only one

11   authentic document, how can there be two that --

12   and we know there are more than one because of the

13   difference in the lettering.

14             MR. BOLAND:  Correct.  But what he ignores

15   in there --

16             THE COURT:  But that's the point.

17             MR. BOLAND:  We had no idea that they were

18   going to make that conclusion.  Here's why.

19   Because it's not supported by anything they have in

20   their evidence.  What he ignores, for example, your

21   Honor, is there are more than 20 parts of those two

22   compared pieces of writing that are exact

23   duplicates that are incapable of a human being

24   creating them exactly.  So what the logical

25   conclusion will be from our experts is, the result

1    of these differences that he points out are created

2    by machines scanning and scanning and quality of

3    scans, and it could not possibly be a human writing

4    those words twice on two different documents that,

5    in the majority of their aspects, they completely

6    overlay.

7         No expert on our side or their side is going to

8    say a human being can write a sentence twice and

9    have the majority of it or any of it be an exact

10   duplicate, overlay perfectly.  And most of those

11   words do, which tells you a human being didn't do

12   that.  There are two scans.  Let me just emphasize

13   that for the record.

14             THE COURT:  Two scans of what?

15             MR. BOLAND:  Lesnevich in his report is

16   examining two scans, two electronic documents and

17   saying because I see differences in these, I

18   conclude there's two different underlying paper

19   documents.  That conclusion is not supported by

20   anyone in his field at all.  It won't pass Daubert,

21   and that's why we need full discovery definitely on

22   the experts for that issue.  And all the issues

23   that they raise, the toner, the paper differences,

24   the staple holes.  We have to go after all of them

25   because they're simply either going to be proven to

1    be wrong, or at the very least, our experts will

2    have all the credible testimony needed to

3    demonstrate that this is a jury question.

4              THE COURT:  Well, what testimony --

5    what -- I'm listening carefully.  I'm trying to

6    understand.  Conceivably what -- for example, in

7    Mr. LaPorte's case because of this evaporation it's

8    this ink evaporation issue, is that what you're

9    referring to?

10             MR. BOLAND:  Yes, called a PE test,

11   commonly is what I've learned in the last nine

12   days.

13             THE COURT:  I read about that.  All right.

14   Query, what would be gained by deposing Mr. LaPorte

15   about that test?

16             MR. BOLAND:  I'll give you an example.

17             THE COURT:  How does your expert need --

18   what would your expert need to know from

19   Mr. LaPorte to enable your expert to say that it's

20   an incompetent test.  You already know it is.

21             MR. BOLAND:  No, it's the reverse.

22             THE COURT:  Presumably your expert knows

23   it.

24             MR. BOLAND:  That's their evidence.  Their

25   expert should tell us what is the basis for that

1    opinion.  He has to support it.

2             THE COURT:  He's given it to you.  You say

3    you know that it's incompetent.  It's not -- it's

4    not accepted.  So your expert will be able to say

5    under oath it's not accepted, and here's I why.

6    What possible deposition testimony would you gain

7    from Mr. LaPorte that you don't already know he

8    based on the documentation that's before us as a

9    matter of record?

10            MR. BOLAND:  His credibility as a witness

11   is in issue.  And when he can't answer questions

12   about the basic fundamentals that he claims

13   underlie that test, that's something important for

14   the Court to understand.  These aren't two equal

15   experts.  It's somebody who is trying to pull the

16   wool over the Court's eyes with this venire of

17   science, and he needs to be held to account for

18   that, explain it.  And when he says, you know, I

19   really don't know, and what we've already found in

20   the short few days that we've been able to examine

21   his report, and his -- the background on this test

22   that he used, which, frankly, we're surprised the

23   defendants are basing their case on it, is that he

24   has in different depositions claimed that this test

25   was reliable back starting 2002.  In another case

1    he said well, it wasn't reliable until 2005.  And

2    in yet another case he said it wasn't reliable

3    until 2008.  His credibility is in issue.  And that

4    credibility can't be brought out.

5            THE COURT:  So you suspect if you depose

6    him, he'll stutter and stammer hem and haw and

7    refuse to answer and can't answer, don't know, and

8    so forth, and his credibility as an expert will be

9    destroyed, and he'll have to go into some other

10   line of work.  Is that what you think is going to

11   happen?

12           MR. BOLAND:  I think he'll be exposed as

13   trying to offer something on this Court that

14   doesn't meet the standard under Daubert.  And the

15   Court can't rely on it in a motion to dismiss.  And

16   if we just submit our report, the Court doesn't

17   know the full omissions that are in his report

18   without him having to account for that.

19       And Lesnevich as well.  He makes a conclusion

20   that no one in his field makes.  He should be

21   required to support it.

22           THE COURT:  How can you say that?  Because

23   you just told me you haven't had any other experts

24   examine the documents on that very point.

25           MR. BOLAND:  Our experts have been able to

1    read his report and say no one uses that analysis

2    to conclude --

3            THE COURT:  So it's not true that you're

4    totally hamstrung here in terms of responding.

5    Your experts have reviewed this voluminous

6    document.  You just said that.

7            MR. BOLAND:  The handwriting -- the

8    Lesnevich report's been reviewed, the LaPorte

9    report has been red by them, yes.

10           THE COURT:  Does that mean reviewed?

11           MR. BOLAND:  I would say so.

12           THE COURT:  Okay.

13           MR. BOLAND:  And they're constantly coming

14   up with new information every time they go through

15   it that needs to be addressed by these witnesses.

16           THE COURT:  Why wasn't any of that put in

17   your papers?

18           MR. BOLAND:  Because, your Honor, we've

19   only had a few days to find out --

20           THE COURT:  Well, yes, but, what, you just

21   found out this morning or over the weekend after

22   this was filed with the Court on Sunday?

23           MR. BOLAND:  That -- that paper only

24   addressed whether they're entitled to a delay or

25   not.  We're not prepared to argue the merits of the

1    motion to dismiss today.

2             THE COURT:  I'm not.  I'm trying to

3    understand the potential merits, that's what I'm

4    required to do, aren't I?

5             MR. BOLAND:  Yes, your Honor, and the

6    point we're making is you can't understand them

7    until we get discovery necessary to every issue

8    they've raised, and they raised issues beyond --

9             THE COURT:  Oh, you --

10            MR. BOLAND:  -- what they claim.

11            THE COURT:  -- you certainly are going to

12   have an opportunity to respond to the merits of the

13   motion.  I have to basically look under the covers

14   and take a peek-a-boo at the strength of all of

15   this material, which I have done.  And what I'm

16   listening to you say is that so have you.  But

17   interestingly none of what you're telling me now in

18   oral argument is in any way alluded to in your

19   papers.

20            MR. BOLAND:  I understand that, your

21   Honor, but there's a fundamental unfairness here

22   for us to have the short period of time and try to

23   cobble together a response to their nine months of

24   work.

25            THE COURT:  But you agreed to the

1    scheduling order.

2              MR. BOLAND:  For the issue about deferring

3    or delaying discovery, yes.

4              THE COURT:  You agreed to the scheduling

5    order for today's hearing.  There was no request to

6    adjourn today's hearing to give you more time to

7    respond to their motion to stay discovery.

8              MR. BOLAND:  On that issue --

9              THE COURT:  Did you?

10             MR. BOLAND:  No, we did not.

11             THE COURT:  Well then, how can you now

12   stand here and say that you're hobbled and you're

13   being compromised in terms of your ability to

14   respond?

15             MR. BOLAND:  Because the basis you're

16   using to analyze whether their motion is solid or

17   not is essentially, please respond, Mr. Boland, to

18   65 pages of a brief and 400 pages of exhibits, and

19   do it now.  That's what the discovery will be for

20   is to show the Court that that document you have

21   there, which looks -- which is half the story,

22   looks so persuasive is going to look like every

23   other case that goes to a jury, and there's going

24   to be experts and evidence on every point that they

25   make that the Court is currently persuaded by, and

1    we have not had a full opportunity to explore.

2            THE COURT:  Because you're going to -- for

3    example, as to the Work for Hire agreement you're

4    going to put a document request out on

5    Mr. Zuckerberg for a copy of that contract, is that

6    it?

7            MR. BOLAND:  We think Mr. Zuckerberg needs

8    to come forward with the copy of the contract he

9    has or --

10           THE COURT:  He said he doesn't have any

11   such contract under oath.

12           MR. BOLAND:  He said he never --

13           THE COURT:  Because he never signed such a

14   thing.

15           MR. BOLAND:  If you read his declaration,

16   your Honor, he says I never signed an agreement

17   involving Facebook.  We want him to be deposed and

18   explain what -- through discovery, did he sign the

19   two-page document that is the authentic contract?

20   Hand it to him with gloves on and ask him to say.

21   He's never said that.  They made a representation

22   in their motion that he did.  If you look at the

23   reference, it's Mr. Snyder saying that he, you

24   know, did or did not or we're not sure.

25   Mr. Zuckerberg has to come in and say I didn't sign

1   it.  So far -- and I'm talking about the specific

2   document that my client's alleging is the actual

3   contract.

4           THE COURT:  Somehow I recall a declaration

5   to the effect that what you purport -- what

6   plaintiff purports is the actual contract, i.e. the

7   Work for Hire contract was never signed by

8   Mr. Zuckerberg.  I don't know why I'm recalling

9   that.

10          MR. SNYDER:  You're correct, your Honor.

11          MR. BOLAND:  My recollection of the

12   declaration --

13          THE COURT:  At my age, who knows.  It's

14   possible that I'm not as sharp as I should be.

15          MR. BOLAND:  A clearer declaration would

16   be an exhibit during a deposition where he is

17   handed with gloves on the actual two-page document

18   and says once and for all, I did not sign that

19   page 2.  That's not -- that is not the contract I

20   signed.  He has not done that yet.  In fact, he has

21   not even said that the -- under oath, that the

22   document attached to the Kole email is the contract

23   that he signed.  They have offered no experts, no

24   experts to declare that that document is the

25   authentic document.  That's an important omission

1    from their filing so far.  No expert has said

2    either that the StreetFax -- what they're calling

3    the StreetFax contract is authentic.  No expert

4    said that.  Or that Mr. Zuckerberg signed that

5    document.  No expert said that either.

6              THE COURT:  Yeah, but there's an

7    implication of that, and I tried to get at it

8    earlier with regard to the contemporaneity of the

9    undisputed execution of the spec by Mr. Zuckerberg

10   with the contemporaneous timeframe that we're

11   talking, as to the -- well, that's the issue at

12   hand -- and the expert's opinion that that was

13   signed contemporaneously, but the second page of

14   the Work for Hire document wasn't signed

15   contemporaneously.

16             MR. BOLAND:  I'm not sure what expert

17   report you're referring to with that.  I don't

18   recall that distinction.

19             THE COURT:  That would be the Tytell

20   declaration that I alluded to earlier.

21             MR. BOLAND:  Our experts have previously

22   already said --

23             THE COURT:  So the point I'm making is --

24             MR. BOLAND:  -- that the ink matches --

25             THE COURT:  -- that it's not true that

1    there isn't some expert opinion about the concept

2    that this StreetFax contract is the authentic

3    contemporaneously executed contract between the

4    parties, which is corroborated by the expert's

5    comparison of the second page of that document with

6    the sixth page of the specification that was dated

7    and signed by Mr. Zuckerberg, presumably on the

8    same date at the same time.  So it's -- when you

9    say there's no expert opinion authenticating the

10   StreetFax contract as the true contract between the

11   parties, I don't think that's correct.

12           MR. BOLAND:  But their expert --

13           THE COURT:  You get my point?

14           MR. BOLAND:  Yes, your Honor.  I don't

15   recall that specific detail of Mr. Tytell's report.

16   I read it already once, and I've read all of them

17   once, but it's a lot of material, as the Court

18   knows.  But be that as it may --

19           THE COURT:  That's a pretty decisive

20   point.  I don't know why I'm interested.  I'm

21   apparently the only one in the courtroom that's

22   interested in it.

23           MR. BOLAND:  Because it's a --

24           THE COURT:  No one else is interested.

25   Just like I was interested in the hex editor.

1          MR. BOLAND:  It's flawed science comparing

2     a piece of paper and a digital image.  That's the

3     problem with it.  The guys in Tytell's industry in

4     his field, as our experts will come to tell you,

5     don't do that.  They are doing all kinds of things

6     in this case that they've never done.

7          THE COURT:  Tytell didn't have the

8     original of the spec?

9          MR. BOLAND:  No, he's comparing the

10    original of the spec with a digital image of what

11    they call is the real contract is what you just

12    laid out.  The experts don't do that and say that

13    the digital image is real.  They might say the

14    original --

15          THE COURT:  We don't have the original of

16    the StreetFax contract, is that right?

17          MR. BOLAND:  No.  And if Mr. Zuckerberg

18    who claims that's the real contract had that

19    document, which he so far concealed from the Court,

20    because he's never given a statement like

21    Mr. Ceglia was required.  Where is it?  If you

22    don't have it, what did you do with it?  When did

23    you do that with that?  How hard have you looked

24    for it?  Mr. Ceglia was required to do all that

25    regarding some USB drives which the defendants have

1    no evidence have anything relevant to this case.

2       This document is completely at the heart of

3    this case, and if it were true, the case would be

4    over.  So it's very interesting that they don't

5    come forward with an explanation of where that

6    document is, except Mr. Snyder, who is not a

7    witness and not under oath, spouting about how 18

8    year Olds leaving college throw their papers aside,

9    which may or may not be an interesting fact about

10   college students.  That's not Mr. Zuckerberg saying

11   here's what I did with it, here's how hard I looked

12   for of it, and I don't have it.  And you even

13   alluded to that, your Honor, at a prior hearing

14   saying did he check his parents attic?  Who knows.

15   But that document is missing.  And it was missing

16   at a time when he and Ceglia, according to the

17   defendants had a legal dispute going.

18            THE COURT:  That assumes there was a

19   duplicate copy.

20            MR. BOLAND:  Mr. Zuckerberg has admitted

21   he received a copy of the document.

22            THE COURT:  A duplicate original I should

23   say.

24            MR. BOLAND:  Yes.  He's admitted he

25   received a copy of that document that he signed on

1    that date.  He has admitted that.

2            THE COURT:  A copy, but the original then

3    per force that implies that Mr. Ceglia had the

4    original.

5            MR. BOLAND:  There might have been two

6    originals signed by both of them.  I don't know the

7    detail on that.  That's one thing that hasn't come

8    out in either of our papers.  I'll find that out

9    for you.

10        But nonetheless, your Honor, that document was

11   subject to litigation at the time that

12   Mr. Zuckerberg disposed of it, if he even disposed

13   of it when he was 18 or 19 leaving Harvard.  So

14   there's an issue there under Second Circuit case

15   law with regard to whether that counts as

16   spoliation of that document.  Because there was an

17   ongoing legal dispute between him and Mr. Ceglia

18   over the StreetFax payments, et cetera, and that is

19   one of the concerns that we have.  That he's

20   allowed to destroy, discard, and say dog ate my

21   homework on the key document in this case, and then

22   attempt with these experts and weasel words to

23   shoot from the weeds that an original we have which

24   you can look at and everyone in this room, with

25   gloves on, can take a look at.

1         And it's -- these experts are purporting to do

2     something monumental that's never been done, and

3     that is try to persuade the Court that a real piece

4     of paper that experts have looked at and are

5     disputing, I'll agree with that.  Their experts are

6     now disputing what ours say about the authenticity

7     of it.  This one's fraudulent because we found a

8     digital image somewhere that nobody knows how it

9     got there, nobody knows whether it was scanned or

10    not, nobody knows it's providence whatsoever.  But

11    trust us, your Honor, that digital image is the

12    real one, and this thing right in front of you,

13    that's a fake even though the experts disagree on

14    whether it is.  And that's the basis of their fraud

15    (indiscernible).

16         THE COURT:  Would you agree that if there

17    was an electronic version of the Work for Hire

18    contract, an electronic version of it created by

19    not Mr. Zuckerberg, but by your client, and it

20    would seem that he was the author of these

21    documents -- of that document, correct?

22         MR. BOLAND:  Yes, your Honor, there are

23    those documents.  They exist.

24         THE COURT:  There is an electronic version

25    of the Work for Hire contract in your client's

1    possession on one of his computers?

2            MR. BOLAND:  Yes.  Let me clarify.

3    There's not --

4            THE COURT:  Yes?

5            MR. BOLAND:  There's not one signed.

6    There's not one signed.  There's the Word documents

7    that he used to eventually printout and have

8    Mr. Zuckerberg sign.  They talked about those in

9    Stroz Friedberg's report claiming backdating on

10   those documents.

11           THE COURT:  The so-called test forgeries?

12           MR. BOLAND:  Yes, that's their claim of

13   that.  But let me talk to you about that, your

14   Honor, because this backdating issue is again a red

15   herring.  I just mentioned earlier, I had to use a

16   hex editor myself a week ago, and I'll tell you

17   why.  Because I'm downloading documents from this

18   case off of ECF, I'm getting productions from their

19   experts, and I'm getting other files from prior

20   counsel, and all of a sudden my computer won't

21   synchronize them.  And guess what I found out, your

22   Honor?  A bunch of those documents when they landed

23   on my computer have creation dates of 2004 and

24   1969, predating the development of an iPad or

25   anything else.

1          So something went haywire with the programs on

2     my machine and started redoing create dates to my

3     files.  I'm not backdating my computer.  Stuff

4     happens on computers.  And what Stroz Friedberg

5     wants you to believe is there's a book somewhere

6     with every possible way a file can be backdated,

7     and we've checked off every one.  And you know what

8     one's left?  Forgery, that's it.  Nefarious.  But

9     that's false.  And they know it's false.

10          They know that there are so many variables on

11     computers, especially a computer they never had

12     access to as it operates, there's no way they can

13     say the only way these got backdated is some evil

14     intent by the person operating that program.

15     That's just patently false.  I had backdated

16     documents that I used a hex editor to fix so I

17     could have them on my iPad here today.  And any

18     legitimate expert would have pointed that out.

19     Just like portions of the report -- I want to point

20     out one other thing, your Honor, that goes to the

21     credibility of Stroz Friedberg and why, when you

22     say avalanche of data, it might be an avalanche,

23     but it's full of a bunch of rocks and wood and all

24     kinds of things that are injurious.

25          For example, on page 15 of their report -- this

1    is the difference between reading the details which

2    we are all doing and some perhaps in the media or

3    defense counsel want to highlight just look at that

4    header, your Honor, under capital A, the StreetFax

5    contract was found on two different Ceglia hard

6    drives.  Now if you stop there, you're thinking,

7    wow, Paul had two computers and these contracts

8    were found on it.  But what's the reality?  In the

9    paragraph they totally change that 180 degrees.

10   Guess what the two hard drives are, your Honor?

11   One hard drive produced by Mr. Ceglia, actually his

12   parent's hard dive, which they neglect to mention,

13   and a forensic copy of that hard drive.

14       So this is the misleading nature of this

15   report.  And these are only some of the things that

16   we found in this short time looking at the report,

17   and there's plenty more to be found.  These

18   conclusions are exaggerated.  Some have, as I

19   mentioned before, these words like "presumably",

20   "it's likely", "we can't think of another reason".

21   Well, they can't think of another reason because

22   they're advocates, they're not experts.  This is

23   not a legitimate expert report, which advocates --

24            THE COURT:  Your experts are experts, not

25   advocates?

1           MR. BOLAND:  They're not.  They're going

2      to call it like they see it.  That's the only

3      experts I've ever dealt with.  I've had experts

4      tell me before, you know what, Mr. Boland, I've got

5      bad news for you and your client.  I got good news

6      for you and your client.  I have no news.  I don't

7      know what happened.  Experts who do advocacy like

8      is replete in this report --

9           THE COURT:  Hired guns.

10          MR. BOLAND:  -- that's an issue of

11     credibility.

12          THE COURT:  Hired guns.

13          MR. BOLAND:  I don't know if you call them

14     hired guns, but they're former prosecutor working

15     with a former prosecutor, and this is a piece of

16     advocacy.  It's basically a lawyer's document to

17     further argue the case, because when you say

18     there's no way these things can be backdated except

19     forgery or some nefarious tasks, and you know for a

20     fact that things like I just described to you

21     happen everyday with people's computers, you're

22     being an advocate.  You're not telling the truth.

23     You're misleading and omitting things.

24          Just like when Mr. Snyder stood up, I don't

25     know an hour or so ago, and tried to make you

1   believe that Mr. Ceglia had sent emails from that

2   Get Zuch email account and then deleted them.  It's

3   false.  Stroz Friedberg says right in their report

4   not a single thing about an email out of that

5   account.  And you know what the January 28th

6   reference is to?  That's an email Mr. Ceglia was

7   required to send from the account to Google's legal

8   department, because that's what was required for

9   the consent, so that the legal department could

10  grab the contents of the account that he never used

11  and gave it to them.  Now they don't believe they

12  never used it.

13          THE COURT:  Are you talking about the

14  deleted account?

15          MR. BOLAND:  There's not a deleted

16  account, your Honor.

17          THE COURT:  There's not.  They were

18  misinformed by Google that it was deleted?

19          MR. BOLAND:  Google did not tell them it

20  was deleted.  Stroz Friedberg is misleading you --

21  actually not Stroz Friedberg.  Stroz Friedberg is

22  kind of using some weasel words that there may have

23  been emails.

24          THE COURT:  Well, was the account deleted

25  or not?

1          MR. BOLAND:  No.  The account was there,

2     live.

3          THE COURT:  Can we get a copy of it then?

4          MR. BOLAND:  They have a copy.  He never

5     used it.  Your Honor, I can set up an email account

6     and never send an email.  There's none wrong with

7     it.

8          THE COURT:  Why would you do a thing like

9     that?

10          MR. BOLAND:  That's something to figure

11     out down the road.  I have no idea why.

12          THE COURT:  You don't do that.

13          MR. BOLAND:  Pardon me?

14          THE COURT:  You don't do that.

15          MR. BOLAND:  No, I use my emails accounts

16     to send emails back and forth.

17          THE COURT:  Sure.

18          MR. BOLAND:  My point is, Mr. Ceglia had

19     up to now we have eight or nine email accounts.

20     Another factor where Mr. Snyder says he lied to

21     you, he concealed.  He has up to eight email

22     accounts that he had in the past, including two

23     that their clients set up for him back in '03 and

24     '04 that Mr. Ceglia didn't remember.  It's

25     legitimate that they didn't remember them since

1    their client didn't remember them, and he's the one

2    who set them up for him.

3            THE COURT:  And they never told him that

4    they had set them up, is that what you're saying?

5            MR. BOLAND:  I'm not saying what

6    communication there was.  But if their client set

7    up the email and my client was supposed to use it,

8    the fact that my client didn't remember it means

9    it's concealed?

10           THE COURT:  Zuckerberg set up email

11   accounts for Mr. Ceglia --

12           MR. BOLAND:  Yes.

13           THE COURT:  -- as part of the StreetFax

14   project?

15           MR. BOLAND:  Yes.  And it was in

16   Mr. Ceglia's declaration.  I don't remember which

17   one recently.  But we told them that.  We said, oh,

18   by the way, there's additional email accounts I may

19   have used, but Mr. Zuckerberg set them up for me.

20   You'd have to talk to him about who the hosting

21   company was that he put them with.  So, they didn't

22   mention those.  Were they concealing those?  Of

23   course they weren't.  Mr. Zuckerberg didn't

24   remember doing that, I presume, back in '03.  I'll

25   give the guy the benefit of the doubt.

1        But when it comes to Mr. Ceglia, he's over

2    there huddled around all this information, you

3    know, that he knows about, and he's not giving it

4    to the Court.  Well, it's kind of interesting how

5    the same factual scenario they paint a different

6    way.

7              THE COURT:  So all of these analyses by

8    Stroz Friedberg about the fabrication of the

9    purported Zuckerberg-Ceglia emails going back

10   to 2003 are -- we should discard -- I mean, I

11   should be unpersuaded by them.

12             MR. BOLAND:  No, the analysis --

13             THE COURT:  For example, I remember one of

14   them -- one of the points they made was that one of

15   the purported email communications that your client

16   allegedly, I don't know, downloaded or copied to

17   some sort of floppy was a communication between

18   Zuckerberg and Ceglia about the startup of the

19   Facebook website.

20             MR. BOLAND:  Right.

21             THE COURT:  And according to the email

22   which Mr. Ceglia has said is authentic, Zuckerberg

23   said well we just went -- we just started up the

24   website.

25             MR. BOLAND:  Right.

1          THE COURT:  And Zuckerberg says to him

2     well, come and look at it.  And of course the date

3     and the time show that it was operational in the

4     morning of some date, when history has recorded

5     that it was operational in the afternoon.  And

6     Ceglia not being a Harvard student would never had

7     access to it.  So that email is authentic?

8          MR. BOLAND:  Well, your Honor, you just

9     added in two pieces of information that are not in

10    the record under any declaration, that that Harvard

11    server was live at a particular time and date.

12    There's no documentation from an expert, but more

13    importantly, Mr. Zuckerberg saying I'm going to say

14    under oath this is the date and time I did it.

15    They referenced a newspaper article which says

16    well, the server went live at this time.  But what

17    about what Mr. Zuckerberg has to say about I let a

18    bunch of people, which everyone knows is done with

19    a new software service.  You just don't roll it out

20    there and say I hope it works.  You have tons of

21    beta testers they call him.  His friends, Eduardo

22    Saverin, Dustin Moskovitz, the other individuals

23    who testified under oath in the ConnectU case and

24    the Saverin case which are other records that we

25    need to access for this issue which they've raised.

1    When did Facebook go live?  They raised the issue

2    as a fact.

3        Well, we're entitled to discovery.  And there's

4    discoverable information in both those cases.  In

5    addition, there would be discoverable information

6    on the computers Mr. Zuckerberg used at that time

7    to run the Facebook server out of his dorm room.

8    And we know where those computers are.  There's no

9    cost or burden issue here.  Those are preserved

10   allegedly and their originals are.

11           THE COURT:  I know I'm jumping around a

12   little bit.  I apologize for that.  You're -- very

13   interested in your comments.  I forgot which expert

14   it was that commented on the difference in the

15   toner application between page 1 of the purported

16   Work for Hire --

17           MR. BOLAND:  Yes, your Honor.

18           THE COURT:  -- and page 2.

19           MR. BOLAND:  Yes.  Here's just one of the

20   problem with that.

21           THE COURT:  Page 2 opinion is that the

22   type of toner and application that was used was not

23   available in 2003.

24           MR. BOLAND:  And they're merely rebutting

25   our expert who has already said he has an entire

1   library of toners, and he put it to a specific

2   printer from that time.  It was only available

3   from 2000 to 2005.  So their expert says that's

4   wrong.

5       Well, our expert has already declared, I can

6   tell you it's right.  I have the library of ink

7   standards or toner standards from them, and that's

8   when it's from.  That's dueling experts, your

9   Honor.  That's not sufficient for any of this that

10  they put out.

11      So I think you can see in just the few days

12  I've had to confer with experts, review these

13  documents, confer with the other lawyers, legal

14  research.

15          THE COURT:  I can't recall which expert,

16  you're talking about Aginsky maybe or which expert

17  is it that offered the opinion about the

18  commonality of the toners?

19          MR. BOLAND:  From our side?

20          THE COURT:  Yes.

21          MR. BOLAND:  The expert was Larry Stewart

22  in a declaration he filed.  I don't recall the

23  document number off the top of my head.  But he

24  specifically outlined his analysis of the toner,

25  and he didn't just, well, it's the same.  He gave

1       them make and model of the printer that used that

2       toner and when it was manufactured.

3               THE COURT:  Would -- I forget which expert

4       it is on the defendants' side that commented on the

5       difference in the font between page 1 of the Work

6       for Hire instrument which is at issue here and

7       page 2.

8               MR. BOLAND:  Mr. Romano.

9               THE COURT:  Professor Romano perhaps?

10              MR. BOLAND:  I don't know if he's a

11      professor or not.

12              THE COURT:  He's the head of the

13      something.

14              MR. SOUTHWELL:  Professor at RIT.

15              THE COURT:  At RIT.  He certainly doesn't

16      sound like a hired gun, but beside that, he in his

17      opinion said that the first page that the Work for

18      Hire so- called contract is in New Roman, the

19      second page in is Garamond.  The StreetFax contract

20      which the defendants claim is the -- is the actual

21      contract both pages are in Garamond.  Do you recall

22      that?

23              MR. BOLAND:  You already responded to

24      this, your Honor, in a prior hearing on the record

25      where you said to the defendants well, when people

1   put together documents from multiple sources, which

2   has been my client's declaration in this case,

3   copy, paste, copy, paste, let's make a document,

4   these are exactly the kind of differences you find.

5   Moreover, your own staff could tell you that when

6   they save and open and import Word documents, it is

7   a common feature of doing that that fonts get

8   changed, and you're in a middle of the document,

9   and all of a sudden the font's different.

10  Microsoft Word does that all the time.  There's no

11  nefarious behavior.

12          THE COURT:  But Professor Romano says the

13  whole page was New Roman and the second page was

14  Garamond.

15          MR. BOLAND:  The same response, your

16  Honor.  The difference in fonts --

17          THE COURT:  I mean, if it's a document

18  that was signed authentically and honestly on a

19  certain date of 2003, you're saying that when

20  Mr. Ceglia created the document he used different

21  fonts for the first page, i.e., New Roman, but used

22  Garamond for the second?

23          MR. BOLAND:  Well --

24          THE COURT:  Does that make sense?

25          MR. BOLAND:  Let's assume that analysis by

1    Mr. Romano is correct.  He also says in his report

2    that these are incredibly similar, but slightly

3    different fonts.  So that's important, your Honor.

4    Visually this document to a non-professor at RIT is

5    not going to look like it's written in some kind of

6    child-like font, and on the back page it's in some

7    kind of script.  They're two very similar but

8    slightly different fonts.  He even had to zoom in

9    on the fonts in his report to show --

10            THE COURT:  That's what he's paid to do.

11            MR. BOLAND:  I understand.

12            THE COURT:  I mean that's exactly how you

13    go about detecting fraud.

14            MR. BOLAND:  But Mr. Ceglia is not --

15            THE COURT:  Get down to the details.

16            MR. BOLAND:  I understand that.  But

17    Mr. Ceglia printed a two-page document.  They're

18    both very similar, he went -- let's go to Boston to

19    have signed.  There was nothing that would indicate

20    he had made a mistake and cobbled together

21    something that created a different font on a page.

22    Again --

23            THE COURT:  It is curious though that

24    Garamond style is -- is apparently according to

25    Professor Romano, the same for the StreetFax

1    document which defendants believe to be the true

2    document.

3            MR. BOLAND:  Well, that may or may not be

4    the case, and I'll tell you why.  The StreetFax

5    document is of such poor quality, it's hard to even

6    view it.  The one that's attached to the Kole email

7    is very difficult to view.  So how he can

8    conclude --

9            THE COURT:  I think the defendants took

10   the trouble to transpose it under oath I think did

11   they not?

12           MR. BOLAND:  But they didn't transpose it

13   claiming they had the right font.  They just

14   transposed the content of it.

15           THE COURT:  Well, that's the point.

16           MR. BOLAND:  But I'm saying to view it

17   visually and say that's all Garamond font, who

18   knows what our expert who now -- that was never an

19   argument they made before.  It's new in these

20   series of documents.

21           THE COURT:  That's why I raised it.

22           MR. BOLAND:  Yes.  And there's many others

23   that I certainly --

24           THE COURT:  It sounds to me like you have

25   a good possibility of countering the motion to

1    dismiss with contrary expert opinion that would

2    demonstrate the authenticity of the Work for Hire

3    document.

4            MR. BOLAND:  There's part of it we can

5    counter with expert opinion.  But there's other of

6    it that we have to actually depose their experts

7    and get them to declare how they arrived at certain

8    conclusions, because, frankly, our experts are

9    looking at the report and saying I don't know how

10   he gets there, because they're just so wildly

11   outside of what the field does.

12           THE COURT:  Which experts were those?

13           MR. BOLAND:  LaPorte.

14           THE COURT:  No, no --

15           MR. BOLAND:  Lesnevich.

16           THE COURT:  -- which experts have already

17   reviewed this document since it was filed on March

18   26th and told you what you just said.

19           MR. BOLAND:  They reviewed portions of it.

20           THE COURT:  Who?

21           MR. BOLAND:  Larry Stewart, Jim Blanco.

22           THE COURT:  Anybody else?

23           MR. BOLAND:  And we've had -- may I have a

24   moment your Honor to ask Mr. Dumain a question?

25           THE COURT:  Sure.

1              (Off the record discussion.)

2              MR. BOLAND:  Your Honor, there's one other

3      expert we've had review Stroz Friedberg's report,

4      not in total, but have gone over it to try to find

5      some of the conclusions, that's Silent is the name

6      of the company that's already been involved in this

7      case.  They have imaged some media a long time ago.

8      And then there's one other expert we haven't yet

9      disclosed.  It's purely a consulting expert that

10     has evaluated it.  So we will be disclosing them at

11     some point if we intend to use them.

12         But my point is, your Honor, that's just the

13     experts.  There's more in this motion than just

14     experts.  You just pointed out when did Facebook

15     start?  Mr. Zuckerberg has never declared what

16     document he signed or didn't sign under oath.  Is

17     it the StreetFax digital image that he signed, and

18     is he going to declare that he didn't sign the

19     contract that he has with my client?  He has now

20     put that that issue --

21              THE COURT:  If that is -- if there's a

22     hiatus or a lacuna in the record regarding Mr.

23     Mr. Zuckerberg's personal knowledge of when the

24     Facebook website became operational, that can be

25     easily cured by a supplemental declaration.  We

1    don't need a deposition, do we?

2              MR. BOLAND:  Yes, we do --

3              THE COURT:  Why?

4              MR. BOLAND:  -- because we have a right to

5    get all these things under oath, not only these

6    issues here --

7              THE COURT:  Well, if it comes in a

8    declaration under oath, what's wrong -- that's a

9    simple fact, isn't it?

10             MR. BOLAND:  That is, your Honor.  But

11   there's wider facts than that.  They have based

12   their motion to dismiss --

13             THE COURT:  That's one thing, we don't

14   need to depose Zuckerberg on that issue.

15             MR. BOLAND:  We don't, but there's no need

16   to get a declaration from him on it either, because

17   there's a ton of stuff that he has to be deposed

18   on.  The emails to begin with.  Where are all the

19   computers he used in 2003 and 2004?  They've made

20   claims that these emails between him and my client

21   don't exist.  Mr. Zuckerberg needs to declare what

22   computers he used during that time to interact with

23   the Harvard server.  And we have to analyze the

24   Harvard server to determine if that's even true.

25             THE COURT:  Excuse me, how could that

1    possibly bear on the competency of the expert

2    opinions which tend to suggest, which is I think an

3    understatement, that the Work for Hire document is

4    a fake?

5            MR. BOLAND:  I'm -- I'm not talking about

6    the experts at this point.

7            THE COURT:  Well, I am.

8            MR. BOLAND:  I'm saying beyond just the

9    experts.  Well, okay.

10           THE COURT:  I want to know how knowing

11   about all of Zuckerberg's computers would in any

12   way implicate and undermine the expert opinions

13   that are elaborated in this document?

14           MR. BOLAND:  Your Honor, because we're

15   entitled to challenge Stroz Friedberg's conclusions

16   which are completely subjective and in dispute

17   about how these anomalies as they call it arrive on

18   Paul Ceglia's parent's computer and in these

19   emails.  And it is not without a good-faith basis

20   to the following facts which are known.

21   Mr. Zuckerberg was disciplined at Harvard for

22   gaining unauthorized access to Harvard computers.

23   That's known.  Although the record's sealed, and

24   once we get into that record, we'll know precisely

25   what he admitted to doing.

1          THE COURT:  What does that have to do with

2     the competency of Stroz Friedberg's analyses.

3          MR. BOLAND:  Because their analyses fails

4     to look at could that computer have been

5     compromised.  What about their own emails that they

6     produced --

7          THE COURT:  Which computer?

8          MR. BOLAND:  The computer on which that

9     evidence was found.  There's no talk about, hey, we

10    confirmed that there was no -- no individual got

11    access to that computer in any unauthorized way

12    through viruses or through anything that would

13    indicate hacking.  Not Mr. Zuckerberg, any person,

14    someone on his behalf, some -- whoever.

15         THE COURT:  I'm talking about the emails

16    that are attached to the amended complaint which

17    tend to corroborate the theory of the plaintiff

18    that there's a contract relative to ownership of

19    Facebook, correct?

20         MR. BOLAND:  Yes.

21         THE COURT:  Okay.  So, the question is, in

22    the absence of hard copy of the emails which your

23    client claims he received or -- and/or sent to

24    Zuckerberg which are attached to the amended

25    complaint, he somehow managed to recreate the text

1    on a floppy disk using a word processer, correct?

2            MR. BOLAND:  I don't think so.  I think he

3    copied them directly to that device is what

4    happened.

5            THE COURT:  Right.

6            MR. BOLAND:  From what I remember from his

7    declaration.

8            THE COURT:  He copied them somehow, right,

9    to the floppy, right?

10           MR. BOLAND:  Yes.

11           THE COURT:  Stroz Friedberg has pointed

12   out numerous indications that suggest that those

13   emails are fabrications, have they not?

14           MR. BOLAND:  I wouldn't say numerous.

15   There's three or four.

16           THE COURT:  Yes.

17           MR. BOLAND:  But they haven't explained

18   how the server --

19           THE COURT:  How would knowing where

20   Mr. Zuckerberg's computers at Harvard are located

21   or how many there were of them in any way, shape,

22   or form allow you to refute the accuracy of Stroz

23   Friedberg's analysis?

24           MR. BOLAND:  Because if these Harvard --

25   these emails end up on the Harvard server,

1    somewhere Stroz Friedberg hasn't looked, because

2    they took a biased analysis, that would disprove --

3              THE COURT:  That's a different point than

4    the point you just made.

5              MR. BOLAND:  -- the entirety of it.

6              THE COURT:  You said you need to know

7    where all the computers are.  Now you're accusing

8    Harvard of having an incompetently operated server.

9              MR. BOLAND:  No.

10             THE COURT:  Yes, you are.

11             MR. BOLAND:  Let me be clear.

12             THE COURT:  Yes, you are.

13             MR. BOLAND:  Stroz Friedberg did not

14   look --

15             THE COURT:  Yes, they did.  They received

16   copies, according to Harvard, of all -- they did a

17   dump of all the information on Zuckerberg's account

18   in the Harvard servers, found nothing that

19   pertained to Facebook.

20             MR. BOLAND:  And here's what they didn't

21   get, backup tapes of that server to compare to what

22   was available on that server when Harvard gave it

23   to them.  There could be a difference there.  In

24   addition, they didn't get any data --

25             THE COURT:  Why is that not in your

1    papers?  I mean, it seems, Mr. Boland, that you

2    kind of sort of like Tennyson's brook here, it just

3    kind of keeps on flowing, you know.  I mean, are

4    you suggesting that the information that Stroz

5    Friedberg received from the Harvard people was

6    somehow manipulated?

7              MR. BOLAND:  No, it was incomplete.

8              THE COURT:  How do you know that?

9              MR. BOLAND:  Because --

10             THE COURT:  Did your experts tell you

11   that?

12             MR. BOLAND:  Stroz Friedberg has told us

13   what they received, and it didn't include backup

14   tapes of those servers.  It didn't include any

15   information about what devices Mr. Zuckerberg used

16   to connect to his email in 2003 and 2004, like a

17   laptop, where he could very easily, Stroz will tell

18   you, save emails to a laptop that are no longer on

19   the server.  We don't know that.  Harvard didn't

20   tell us that.  Why?  Because Stroz didn't ask for

21   that, because it doesn't help their client's case.

22             THE COURT:  So you're looking for

23   Zuckerberg laptops in 2003.

24             MR. BOLAND:  Well, we know where the

25   laptops are.  We're looking to see if those laptops

1    connected to the Harvard server and then obviously

2    would have emails on them, copies of emails that

3    would be discoverable to compare.

4            THE COURT:  Wouldn't necessarily

5    technically the emails have to be lodged on the

6    Harvard server if they were connected?

7            MR. BOLAND:  No.

8            THE COURT:  No?

9            MR. BOLAND:  And your assistant --

10           THE COURT:  Why would you be connected to

11   the server?

12           MR. BOLAND:  You can connect with a laptop

13   to a server, and you can send emails from the

14   server.  You can download them from your laptop and

15   then execute a command to delete them off the

16   server.

17           THE COURT:  And the server never remembers

18   the emails?

19           MR. BOLAND:  Servers turn over so fast,

20   they overwrite those parts of the hard drive.  It

21   can be gone within days.

22           THE COURT:  But the backup would pick it

23   up?

24           MR. BOLAND:  There is a backup tape that

25   has to be looked at.  It might pick it up.

1          THE COURT:  So -- so Stroz Friedberg as to

2     this issue were not competent experts because they

3     did not request the backup tapes for that period of

4     time relative to Zuckerberg's account?

5          MR. BOLAND:  I wouldn't use the word

6     competent.  I would say they're biased.  They

7     purposely didn't look where there could be

8     information that would hurt their client.  Just

9     like they didn't examine the computers that Parmet

10     currently has in its possession.  Why would they

11     bother to examine those, your Honor?  Because it

12     could potentially have evidence discoverable in

13     this case.

14          THE COURT:  Who was that again, Parmet?

15          MR. BOLAND:  We talked about these earlier

16     in the case.  These are several computers that

17     Mr. Zuckerberg has admitted using in 2003, 2004,

18     for both electronic communication, email and

19     texting.

20          THE COURT:  The name rings a bell, but I

21     can't remember exactly what it was.

22          MR. BOLAND:  Parmet is a computer forensic

23     firm that has possession of what are claimed to be

24     copies of Zuckerberg's computers from the time when

25     he started Facebook in his dorm room, including,

1    your Honor, what they claim is the laptop that was

2    used as the original server to run Facebook.  And

3    guess what information that will have?  When

4    Facebook weren't live, and who was a beta tester

5    and could see Facebook, and could college kids --

6    I'm sorry, could people outside of college get

7    access to that laptop?  That laptop has that

8    evidence, and Stroz Friedberg ignored it.  They did

9    this multi-page report.

10            THE COURT:  How do you know there is such

11    a laptop?

12            MR. BOLAND:  Because the defendants have

13    said already on the record that that -- in fact, we

14    had a conference about this on the day before

15    Thanksgiving.  Mr. Snyder said I know all about

16    those computers.  Mr. Zuckerberg used them when he

17    was a freshman at Harvard.  And they were --

18            THE COURT:  That included -- I don't

19    remember any reference to a laptop.  I guess I

20    should have, but I didn't.

21            MR. BOLAND:  Multiple laptops and loose

22    hard drives that are still preserved, so there's no

23    cost or burden to producing them for our expert to

24    evaluate.  And those could have information.  It's

25    a perfect example, your Honor.  What if there's a

1    single email on one of those laptops which are

2    entirely discoverable under the Court's discretion

3    that say I got this guy in New York that gave me

4    $2,000, but I'm going to tear up the contract, I'm

5    not paying him.  Guess what?  Everything in that --

6    that you see in that document right there just blew

7    up.  One email.

8         And what they're not looking at with their

9    experts is what's there.  And the question is, why

10   aren't they looking at it, and why doesn't

11   Mr. Zuckerberg come forward with his contract, or

12   explain where it is?  And I think there's reasons

13   for that, and we're entitled with a good-faith

14   inference to say we need to discover that.  It's

15   not going to hurt them.  It's no burden on them at

16   all.  It's already been produced.

17        And you're looking at what you say is an

18   avalanche, and it's persuasive, and I've just

19   demonstrated to you a single email could change

20   that from persuasive to a losing case for them,

21   which it is, because the contract is valid.  And

22   they're using this digital mumbo-jumbo to try to

23   get rid of an actual paper document.

24        And there's absolutely no support for the

25   notion that you can take an original document --

1     and the rules regard what we have as an original --

2     and come up with some copy.  Because the digital

3     image they're talking about is not an original, and

4     say that digital copy overcomes the original.

5     Sorry, your original loses.  No.  1008, as the

6     Court asked us to brief, says otherwise.  Well,

7     asked us to consider.  Let me be clear.

8              THE COURT:  Yeah.

9              MR. BOLAND:  And we did brief.  All the

10    case law in there says otherwise.  They're

11    challenging the authenticity of this document.

12    1008 says judges back off and juries step in.

13             THE COURT:  In other words, there's no

14    inherent power to dismiss based on fraud where the

15    underlying dispute is over the allegedly fraudulent

16    contract.  There just no power.  The Court is -- is

17    forbidden, if you will, or disempowered from acting

18    on a request to dismiss based on fraud where the

19    fraud inheres in the contract that is at dispute.

20    That's what you're thinking?

21             MR. BOLAND:  Yes, your Honor.  Because

22    admissibility, as you point out at the last

23    hearing, is weight.

24             THE COURT:  That's my concern too when I

25    asked you to look at the issue.  But you haven't

1    provided any authority that says so.

2            MR. BOLAND:  In the brief that we provided

3    had every federal case which has dealt with

4    Rule 1008, and they all clearly say -- they don't

5    qualify it.  They don't say, well, if you challenge

6    it with a lot of experts, now the judge can step

7    in.  It doesn't say that.  They want you to extend

8    it to that.  They want you to extend it to 1008

9    means, if you challenge the authenticity but with a

10   really big stack of paper, now the judge can take

11   it out of the jury's hands.  That's the case law --

12   that's the order they want you to write.  That's

13   the law they want you to establish.

14           THE COURT:  Well, I mean it is a clear and

15   convincing standard that we have to apply, correct?

16           MR. BOLAND:  It is, and we are entitled,

17   in fairness, to rebut the clear and convincing

18   standard with as wide a discovery as necessary to

19   go at every issue they raised.  That's why deposing

20   Mr. Zuckerberg is critical.  He has to say under

21   oath answers to all this.  Again, imagine he says

22   under oath, here's the date and time Facebook went

23   live.  But his computers held by Parmet say no, no,

24   it went live two weeks earlier.  That's a

25   credibility issue which we wouldn't want the Court

1    to rely on some news report as opposed to the

2    comparison of an individual who has admitted

3    committing forgeries and frauds himself,

4    Zuckerberg, with regard to this company and its

5    business records under oath.  That's the person

6    we're talking about.

7        And so it is not defamatory for me to say I'm a

8    little concerned that Mr. Zuckerberg's statement

9    about when he started Facebook might not be

10   accurate perhaps from his memory or perhaps for

11   some other reason, but the computers will tell us

12   everything that was going on then.  Does he have

13   emails there?  Computers will tell us.  When did

14   Facebook go live?  The computers will tell us.

15           THE COURT:  You're talking about the

16   computers in the other -- in the Boston lawsuit

17   that you didn't know about before.

18           MR. BOLAND:  Yes, sir, because they're

19   arguing --

20           THE COURT:  I understand.

21           MR. BOLAND:  -- the emails that my client

22   sent in both '03 couldn't have been sent.  Well,

23   we'll know for sure once we look there now we,

24   won't we?  We'll have a better clue.

25           THE COURT:  You'll want those downloaded

1    by your experts as they -- you want access to those

2    computers under the protocol that we have?

3                MR. BOLAND:  Yes, your Honor.  I think the

4    Court would agree that's fair.  They had their

5    protocol.  It worked very well.  They didn't

6    disagree with it when it was entered into.  And you

7    just have to flip the parties.

8                THE COURT:  They preserved them.  I think

9    there are four computers involved, is that what I

10   recall?

11               MR. BOLAND:  The Parmet computers?

12               THE COURT:  Right.

13               MR. BOLAND:  I think it's four related to

14   Mr.  Zuckerberg, but there's two or three others

15   related to other founders which also could have

16   discoverable information on them, communications

17   between them.  But it's not just that, your Honor.

18   It's the depositions -- I'm sorry, the now sealed

19   information in the other two cases.  There's

20   deposition testimony and guess what it's about?

21   When was Facebook founded, who founded it, who was

22   involved, who gave money.  Those are all the

23   central issues to this case that are now hidden

24   behind a wall of a sealed record.

25               THE COURT:  Why is that?

1          MR. BOLAND:  Because the parties when they

2     settled the claims that Mr. Zuckerberg has settled

3     twice now, one that he defrauded an early stage

4     investor, sounds familiar.  He settled that case,

5     and part of the settlement was to seal the record.

6     That's Eduardo Saverin's case.  The second case,

7     the ConnectU case, was the now famous case that

8     became the movie, The Social Network, another claim

9     of breach of contract, unjust enrichment, some

10     fraud thrown in.

11          THE COURT:  How would when Facebook became

12     operative and all of that, how would that bear on,

13     again, the question of whether or not the expert

14     opinions that they proffered show that the contract

15     was a fake?

16          MR. BOLAND:  Perfect.  The emails that my

17     client says indicate the time that Mark Zuckerberg

18     was telling him that Facebook went live, those

19     witnesses are all testifying about when Facebook

20     went live, and the computers will say so.  It will

21     bolster my client's email as opposed to contradict

22     their expert and their lawyers who argue otherwise.

23          THE COURT:  You know who those people are?

24          MR. BOLAND:  Which people?

25          THE COURT:  Who know -- have personal

1     knowledge of when, in fact, it went live?

2          MR. BOLAND:  I have none at all.

3     Discovery will bear that out, because the people

4     who were founders will be able to tell us.  They'll

5     be able to say we know when it went live.  We

6     testified in these now sealed cases.

7        And there's one other point about the computers

8     I want to make, your Honor.  I was contacted in

9     late November out of the blue by a lawyer named

10    Tyler Mead from California who represented at that

11    time ConnectU, the Winklevoss twins, et cetera.  He

12    was aggressively pursuing cracking open the

13    settlement that those twins had entered into, and

14    he said to me, I don't know want you sending me

15    emails.  I don't want any record we talked.  I want

16    you to go to the ConnectU docket and look at these

17    specific documents, because Facebook has computers

18    which I believe have evidence that will help you

19    and will help my clients, and they are I trying to

20    destroy them.  We had our whole conversations about

21    that as the court knows.

22       Here's a tie-in.  Mr. Snyder finally resolved

23    that issue by sending a letter to me and to the

24    Court saying, we'll preserve those computers, and

25    we know that they will be preserved, because the

1    defendants in that case -- I'm sorry, the

2    plaintiffs in that case have withdrawn all their

3    motions.  They disappeared.  And Mr. Tyler Mead

4    refused to return my phone calls following that

5    incident.  They've just gone off.

6           THE COURT:  I don't recall Mr. Snyder's

7    representation being that way.  My recollection,

8    for whatever it's worth, subject to whatever the

9    record shows, is that he agreed that those

10   computers would be preserved, period.

11          MR. BOLAND:  He did agree to that, but

12   also in his communication he stated that the

13   motions were being withdrawn by that lawyer, Tyler

14   Mead, and all of a sudden there's another issue

15   there.  Why were those individuals withdrawing from

16   the case?  What happened there?  And again, it

17   shows you how fiercely Facebook is trying to

18   protect those computers from my client seeing them.

19          THE COURT:  Are you suggesting that

20   something happened to Mr. Mead or something at the

21   hands of Facebook or something?  I'm not sure what

22   your point is.

23          MR. BOLAND:  No.  I'm suggesting that they

24   are fiercely protecting those computers from my

25   client for a reason.  I don't know what the reason

1    is, but there's a reason, and they went so far as

2    to resolve the Winklevoss case.

3              THE COURT:  It doesn't sound like it

4    unless Mr. Snyder has been -- maybe that's your

5    point -- he's been finessed, bamboozled by his own

6    client.  He's representing to the Court that

7    they've been preserved, and now we're going to go

8    back and look at them and they're not preserved, is

9    that what your point is?

10             MR. BOLAND:  No, your Honor.  I'm not

11   talking about preservation at all.  I'm talking

12   about the lengths they've gone to that's all.

13             THE COURT:  Well, if they have preserved

14   the computers, how can you say that they're

15   fiercely trying to prevent people from having

16   access to them?

17             MR. BOLAND:  Two different things, your

18   Honor.  They're not violating the Court's orders.

19   They're preserving them.

20             THE COURT:  Yeah.

21             MR. BOLAND:  But they --

22             THE COURT:  Implying that they -- that

23   they're available --

24             MR. BOLAND:  That case went away.

25             THE COURT:  -- to be reviewed if

1      necessary.

2              MR. BOLAND:  Yes.  That case went away

3      because the Winklevoss twins wanted access to those

4      computers, and Facebook said we're not comfortable

5      with that, and somehow that case disappeared.  And

6      now they're doing the same thing here by saying

7      there's no justification for us to access those

8      computers.  And I just pointed out to you multiple

9      factual issues they raised that those computers

10     will answer.

11             THE COURT:  I thought it all had to do

12     with -- I mean, I don't know anything about these

13     things because I've never read the book and I've

14     never seen the movie, and I don't intend to until

15     after this case is over, whenever that may be,

16     which means I may never see the movie or read the

17     book at the rate we're going.  But I always thought

18     that that subject that you're referring to had to

19     do with who owned the software, and that that's

20     what was resolved in that litigation for better or

21     worse, and the ownership -- I mean, I'm talking

22     about from a copyright point of view of the

23     software, not a business contractual point of view

24     such as is raised in this case -- what does that

25     have to do with whether or not this Work for Hire

1    agreement giving Mr. Ceglia half ownership or

2    84 percent or whatever figure one wants to pick, is

3    authentic?

4           MR. BOLAND:  What I'm talking about, your

5    Honor --

6           THE COURT:  I'm losing you here.

7           MR. BOLAND:  I understand.  In those

8    pleadings which some of which were excerpted into

9    this record, it was clear that evidence from those

10   computers bears on the issue of electronic

11   communications between early parties involved in

12   the founding of Facebook which would include my

13   client, and that they weren't turned over to the

14   Winklevoss twins, and the Winklevoss twins sued yet

15   again saying they were defrauded into a settlement.

16   That's all my point is.

17      And when we brought that to the Court's

18   attention, the Winklevoss twins -- I have no

19   information why, but I think we can all speculate

20   what happened there -- immediately, after

21   vociferously going after Mark Zuckerberg for a year

22   and a half because they felt defrauded, just

23   disappeared.  And then those computers are now not

24   going to be accessed by those individuals, because

25   their case is over.

1          And they're trying the same thing here to

2     prevent Mr. Ceglia from seeing them, and we have a

3     reason to believe that their basis for doing so is

4     that there's information on those computers that

5     are relevant to that stack of documents you have

6     there.  And as I pointed out, a single email

7     message could burn that whole package down.  And

8     that's the fairness -- or the unfairness of

9     limiting our discovery to just a few experts and

10    then ruling on the motion.  We're entitled to

11    respond with all discoverable relevant evidence.

12          They've had nine months.  They agreed to a year

13    of fact discovery before they filed all these

14    motions.  They thought that was a suitable time.

15    Not saying the Court would agree, but the parties

16    agreed.  They've had nine months.  I think it's

17    reasonable that we get discovery on all these

18    issues, computers, the sealed cases, and all the

19    experts, and we can do that in six months, which is

20    less time than they have.  I think that's

21    reasonable.  I don't think there's anything

22    unreasonable that they can argue about that, except

23    to protect evidence that know is going to turn the

24    case around.

25          If you have know further questions, your Honor,

1    I'll be seated and answer anything else afterwards.

2              THE COURT:  Thank you.  Any rebuttal, Mr.

3    Snyder?

4              MR. SNYDER:  I do, your Honor, but may we

5    just have a three-minute restroom break?

6              THE COURT:  Oh, sure.  Take a five-minute

7    comfort break.

8              (Short recess was taken.)

9              THE COURT:  Plaintiff's counsel may have

10   flights that have to be caught.  Unless they're

11   going to make a presentation, they're welcome to

12   depart at any time without hurting my feelings.  If

13   they wish to be heard, step to the podium and let

14   me hear what you have to say.  For example, I don't

15   know, does Mr. Dumain want to rebut the assertion

16   of the plaintiff regarding accusing Mr. Zuckerberg

17   of illegal hacking?

18             MR. DUMAIN:  Your Honor, if you want to

19   hear what I said --

20             THE COURT:  No, no, it's up to you.

21             MR. DUMAIN:  I'll simply say this, your

22   Honor.  When your Honor looks at the transcript,

23   you'll see that what Mr. Snyder said that I said to

24   the Wall Street Journal bears very little

25   relationship to the quote he then read later.  I

1    was asked by the Wall Street Journal about these

2    sort of issues, and in that specific topic I said,

3    "That's one of the things that will have to be

4    developed.  I don't have an answer for you today."

5    And she said, "well, can you speculate?"  And I

6    said, "Well, it has been speculated that

7    Mr. Zuckerberg had the ability to hack in, and it's

8    not hard to do."  That's what the quote was.

9              THE COURT:  Oh.  So they -- they -- the

10   reporter for the Wall Street Journal sort of, you

11   know, gave it a little twist, if you will, and made

12   it sound like you were making that as an assertion

13   against Mr. Zuckerberg?

14             MR. DUMAIN:  I think Mr. Snyder gave it

15   more of a twist than the reporter did.

16             THE COURT:  I see.  Okay.  Reporter got it

17   right, and Snyder didn't.  Reporters always get it

18   right, you know that.

19             MR. DUMAIN:  I won't go so far --

20             THE COURT:  Especially since there are a

21   few in the room.

22             MR. DUMAIN:  I want go so far as to

23   suggest that Mr. Snyder is always wrong.

24             THE COURT:  When I was corporation counsel

25   in the city of Buffalo way back when, there was a

1    reporter for the Buffalo News, Franklin Beule.  He

2    was an expert on baseball by the way.  And I had

3    just returned from Notre Dame Law School to be

4    corporation counsel under a leave of absence, and I

5    never knew the man.  He was very -- a very charming

6    and soft-spoken gentleman, somewhat my senior.  And

7    he would come into my office with his hands in his

8    pockets, and he would ask me questions, and I guess

9    they liked to talk me because I was probably one of

10   the few high-ranking city officials who liked to

11   talk -- not liked to talk, but was willing to

12   talked to media, so I guess I made a lot of good

13   copy backing in that era.

14        But anyway, he would come in and ask me a

15   series of questions on something fairly technical

16   that was pending before the common council or

17   whatever it was, some major issue.  And I would

18   make some comments at some length explaining the

19   legalities of it, and he would walk out.  Next day

20   in the newspaper he would write a column about it.

21   And I was astounded to read that what I had said to

22   him was quoted verbatim, including commas.  It was

23   the most amazing thing I've ever seen.  I was so

24   impressed.

25             MR. DUMAIN:  Your Honor, the only comment

1   I make about speaking to reporters is that I

2   generally try not to do it.  At the end of this,

3   the reporter thanked me for taking the time to

4   speak with her.  And I said, "Well, frankly it's

5   because my daughter is a young journalist, so I'm

6   feeling more sympathetic to journalists trying to

7   get information."  And but I think after this

8   exchange, your Honor, I'm probably going to stop

9   doing that.

10          THE COURT:  Don't worry about it.

11          MR. DUMAIN:  The other thing I was just

12   going to say, your Honor, one is -- nothing to do

13   with the merits -- but I just wanted your Honor to

14   know I was born in Utica, so I do have some upstate

15   blood in me.

16          THE COURT:  Well, you're closer to Buffalo

17   than Mr. Snyder, so we'll give you a point for

18   that.

19          MR. DUMAIN:  Thank you, your Honor.

20          THE COURT:  And that's close to Rome where

21   my senior law clerk is from originally.

22          MR. DUMAIN:  And I have relatives in Rome,

23   your Honor.  But the point I wanted to make of

24   substance, your Honor, is simply is this.  We spent

25   much of the afternoon talking about the expert

1    reports that defendants submitted.  And I

2    appreciate that there's a lot there, and I

3    appreciate that there's a lot the plaintiff needs

4    to rebut in order to overcome the motion to

5    dismiss.  But this is the motion to stay, not the

6    motion to dismiss.  And I think it's only fair,

7    your Honor, that the plaintiff had the ability to

8    prevail on that motion with whatever facts are

9    reasonably out there, not just rebut the experts,

10   although obviously we'll make every attempt to do

11   that persuasively.  But if there are facts out

12   there in addition to that that support the

13   plaintiff's claim, we're entitled to that on a

14   motion where the defendants are trying to get rid

15   of this case in totality.

16        What we can get in discovery here is not

17   burdensome to them.  Deposing the experts is not

18   burdensome to them.  Getting those computers that

19   Mr. Boland talked about is no burden to them, and

20   getting the discovery that they've already produced

21   that's in the can in other litigation is no burden

22   to them, and that's what I would submit would be

23   reasonable.

24            THE COURT:  Well, I don't know that they

25   have access to all of that Boston litigation.

1          MR. DUMAIN:  Oh, I think they do.  I think

2     they do.  They were a party to it.  Talking about

3     case -- I'm talking about cases where Zuckerberg --

4          THE COURT:  Oh, I see, Mr. Zuckerberg is a

5     party to it.  Yeah.

6          MR. DUMAIN:  And with that, I appreciate

7     your offer to allow me to leave early, but I will

8     stay.

9          THE COURT:  Stay with us for a while.

10          MR. DUMAIN:  I will stay.  Thank you, your

11     Honor.

12          THE COURT:  All right.  Mr. Snyder.

13          MR. SNYDER:  Thank you, your Honor.  Your

14     Honor asked a question of Mr. Boland why isn't this

15     in the papers, and the answer is clear.  Because

16     had what much of what he said been put in the

17     papers, it would have had to be signed pursuant to

18     Rule 11, and they did not want to do that.  And

19     that's because I counted at least four -- so I'll

20     highlight those and then address some other

21     points -- egregious and disturbing

22     misrepresentations made by Mr. Boland about

23     evidence and other material facts,

24     misrepresentations that are so glaring that I would

25     respectfully submit to your Honor that this Court

1    cannot and should not trust or credit anything he

2    says in this court that isn't certified.

3        Let me catalog them.  They're very clear and

4    explicable.  First, he said that with pitched voice

5    repeatedly that the ink testing is junk science.  I

6    don't have the quotes written down.  I stopped

7    writing them down.  But he basically said, your

8    Honor, repeatedly no one has endorsed that, that

9    that's nonsense and we will show that.

10            THE COURT:  The evaporation technique.

11            MR. SNYDER:  The PE testing.

12            THE COURT:  Yes.

13            MR. SNYDER:  That is false, and it must be

14    knowingly false.  The reason why is first -- let me

15    just give you some background of the test and then

16    I'll give you the punch line.  So, first of all, he

17    said every court that has considered it, it's never

18    survived a Daubert challenge.  False.  Provide a

19    citation.  There are none.

20        Second, background fact, government forensic

21    laboratories around the world PE testing to date

22    ink.  But here it is, PE testing has been

23    scientifically examined and validated in numerous

24    studies cited by LaPorte.  At least five of them,

25    your Honor, were authored in full or in part by

1    who?  Plaintiff's own expert, Valery Aginsky.  So,

2    if you go to Mr. LaPorte's -- so, if you go to

3    Mr. LaPorte's affidavit provided to the Court on

4    page 7 he cites, Aginsky, Current Methods for

5    Dating Documents, Which is Best?  1997, Aginsky,

6    Measuring Ink, Extractability is a Function of Age,

7    et cetera, et cetera.

8         But there's more.  Mr. LaPorte published an

9    article on PE ink dating when he was at the Secret

10   Service that was coauthored by four other authors

11   at the Secret Service.  Now, articles published by

12   members of the Secret Service must go through an

13   elaborate vetting process, reviewed by branch

14   chiefs, lab directors, and then the public affairs

15   department.  All of those department heads approved

16   Mr. LaPorte's article on PE testing, including the

17   lab director at the time, who?  Plaintiff's expert,

18   Larry Stewart.  So Mr. Boland told, your Honor,

19   that this was junk science that no one had ever

20   whatever --

21             THE COURT:  Accepted it.

22             MR. SNYDER:  Except his two experts.

23   That's point one.  Point two is he told your Honor

24   falsely that when he had no answer for the

25   StreetFax contract, no answer to explain the

1   StreetFax contract and how it was sent in an email

2   signed Paul from the Seagate drive with his phone

3   number to Sidley Austin.  And your Honor asked him

4   about the privilege log, and he said falsely to

5   your Honor oh, well, that was just -- I don't know,

6   maybe Lake.  And then he said it was said -- it was

7   just said to his lawyer.  That's false.  That's

8   wrong.

9        Document 241-2 filed in this case on

10  October 28th, 2011, lists as the first item in the

11  privilege log, March 3, 2004, email from Paul

12  Ceglia -- from Paul Ceglia to his attorney, Jim

13  Kole, Esquire.  And those -- page 1 of signed and

14  dated StreetFax contract, attorney-client

15  privileged.  That is a judicial admission that is

16  binding as a matter of law and ends the case

17  without the need to subject Facebook and

18  Mr. Zuckerberg to more expense and burden of any

19  discovery.  I'll submit to your Honor case law

20  after this hearing that when -- when -- when a

21  party submits a pleading that represents facts to a

22  court, that's binding.

23            THE COURT:  I know that, Mr. Snyder.

24            MR. SNYDER:  And Mr. Boland knowingly

25  mischaracterized this document.  There's a third

1    one that is equally egregious.

2             THE COURT:  Is this the third

3    misrepresentation?

4             MR. SNYDER:  Yes.

5             THE COURT:  I just want to -- while you're

6    looking for it --

7             MR. SNYDER:  Yes.

8             THE COURT:  -- I just want to note however

9    what I think he said was that the -- I'm not sure

10   what he really meant by it, but the implication was

11   that, I guess, the admission is not an admission

12   because he said it came from the parent's computer.

13            MR. SNYDER:  No, but that was a different

14   point, which was absurd.

15            THE COURT:  Oh.

16            MR. SNYDER:  The point is that he was

17   saying it didn't even say from Paul Ceglia to Jim

18   Kole.  It just said to his attorney, as if somehow

19   in excess of an abundance of caution they just

20   designated in a blanket way all emails that they

21   thought might be to an attorney.  No.  The lead --

22   the number one document they sought to shield is

23   the StreetFax contract page one, and they describe

24   in perfect detail its province.

25       Mr. Boland said, again, falsely, wrongly,

1    nobody knows its province.  Guess who knows its

2    province?  His client knows its province, because

3    in a judicial admission he told your Honor its

4    province.  It's an email from Paul Ceglia.  There's

5    no further inquiry necessary.  And there's no way

6    to get around that unless he's going to accuse

7    Mr. Lake of misrepresenting him again when -- like

8    he did when Lake said that he instructed him not to

9    file --

10           THE COURT:  I'm trying to recall

11   specifically.  The attachment, the StreetFax was

12   signed what was sent to Kole?

13           MR. SNYDER:  Yes, your Honor.

14           THE COURT:  Signatures were on there?

15           MR. SNYDER:  Yes, your Honor.

16           THE COURT:  All right.  And Mr. Zuckerberg

17   has under oath acknowledged that that was the

18   contract?

19           MR. SNYDER:  What mr. Zuckerberg submitted

20   on June 1, 2001, it's the third he

21   misrepresentation that Mr. Boland made.

22           THE COURT:  Oh, okay.

23           MR. SNYDER:  He said repeatedly,

24   amazingly, I would say disturbingly, that Mark

25   Zuckerberg didn't deny signing the Work for Hire

1    contract.  He said that repeatedly.  Paragraph 5 of

2    Mr. Zuckerberg's declaration, which is document 46,

3    "I did not sign the document attached as Exhibit A

4    to the amended complaint."

5        Now Mr. Boland told your Honor that he was not

6    clear and more clarity was required.  How can one

7    be more clear than that?  And in case there was any

8    doubt, in paragraph 8 he asserts "The document

9    attached as Exhibit A to the amended complaint is

10   not the written contract I signed.  The written

11   contract I signed concerned only the development of

12   StreetFax's website, period.  It did not mention or

13   concern the Facebook.com or any related social

14   networking service or website."

15       Paragraph 10, "I did not enter into any

16   agreement, written or otherwise, with StreetFax,

17   Ceglia, or anyone affiliated with Ceglia concerning

18   Facebook or any related social networking site."

19   He swore to that and submitted it to your Honor

20   before Stroz Friedberg found the Work for Hire

21   document, StreetFax document on the concealed

22   Seagate hard drive.  So he identifies perfectly

23   in 2011 the StreetFax contract of which he did not

24   keep a copy, which Mr. Ceglia did keep a copy.

25       The next egregious misrepresentation --

1          THE COURT:  But the point is that he --

2    did he also go on to say at some point that the

3    StreetFax contract is the correct contract?

4          MR. SNYDER:  He hasn't, but certainly that

5    would be easy to do.

6          THE COURT:  But he's willing to, you're

7    sure?

8          MR. SNYDER:  Oh, for sure.  The next

9    egregious misrepresentation, which, again, it's

10   almost -- it's almost bizarre that he would -- that

11   Mr. Boland would do this, because it's so contrary

12   to the evidence.  He said there's no evidence -- in

13   referring to the USB devices that his client

14   spoliated during this case, he said, quote,

15   "There's no evidence as anything relevant to this

16   case."  That's what he told your Honor.

17      Now, it's a matter of objective science that

18   attached to those USB devices or stored on those

19   USB devices were documents entitled Zuckerberg.tif.

20   The tiff file is the form of the StreetFax contract

21   found on the Seagate hard drive.  I challenge these

22   attorneys to identify a document more relevant and

23   central to this case than page 1 and page 2 of the

24   StreetFax contract in tiff form.

25      Mr. Boland told your Honor casually and falsely

1    that there's no evidence that's anything relevant

2    to this case.  It renders everything he says not

3    certified pursuant to Rule 11, I would say,

4    superfluous.  And your Honor points out that

5    they've had years to authenticate the Work for Hire

6    document.  They've had years to -- they've had

7    since August to dispute the StreetFax contract.

8    They knew it was coming.  DLA Piper we have reason

9    to believe was aware of the StreetFax contract

10   before they even filed the amended complaint and

11   their experts were too.  So they all knew or should

12   have known that this was coming, and did nothing at

13   all to come up with an explanation for it other

14   than this newfangled one that Mr.  Dumain says he

15   was now speculating about, and that Mr. Boland was

16   tongue-tied when he tried to articulate, all of

17   which is noise and irrelevance what these attorneys

18   say, because their clients said in a judicial

19   admission that page one of the signed and dated

20   StreetFax contract -- that's their words in there

21   privilege log -- page 1 of signed and dated

22   StreetFax contract between Mark Zuckerberg and Paul

23   Ceglia is attached to a March 3, 2004, email from

24   Paul Ceglia to his attorney, Jim Kole.  It's

25   irrelevant what they say.

1      Their client has told, your Honor, the province

2   of that document.  That ends the case without any

3   need for the abusive discovery into prior

4   litigations, and computers, and laptops, all of

5   which is based on Mr. Boland's rank speculation,

6   what if we find an email?  Well, on that theory, he

7   should be able to depose everyone.  What if I

8   depose Mark Zuckerberg's cousin or brother or

9   sister?  Maybe they'll come up with some admission.

10      A plaintiff before this Court destroying

11   evidence, spoliating evidence, with a mountain of

12   evidence that this is a fraudulent lawsuit does not

13   have the right to conduct that kind of discovery

14   when it is not central to the question before this

15   case, is the StreetFax contract authentic and real,

16   and is the Work for Hire document a fake?

17      Now, they seem to have though all sorts of

18   experts who are prepared to opine on this issue.

19   So what I would respectfully submit is the

20   appropriate procedure is that the plaintiff be

21   given an opportunity, whatever is a reasonable

22   amount of time, to submit all of their expert

23   affidavits, and -- in opposition.  If the Court has

24   questions or wants further information, the Court

25   can direct the parties to address specific targeted

1   questions.  The Court knows the record extremely

2   well.  That is the efficient process.

3          THE COURT:  I'm trying to.

4          MR. SNYDER:  That is the fair process

5   under these circumstances.  It will avoid months of

6   discovery -- six months will turn into a year and a

7   half -- untold expense, millions of dollars of

8   additional costs, delay, discovery litigation.  If

9   we were here five times on his non-compliance, you

10  can imagine how many times we'll be before this

11  Court on discovery fights based on their

12  speculation, and when he referenced -- I couldn't

13  believe that Mr. Boland brought up that

14  Thanksgiving eve abusive motion, because it just is

15  emblematic of the litigation approach here, which

16  is to drive up cost, drive up expense, mention the

17  Winklevoss twins as many times as they can, as if

18  that has anything to do with this criminal fraud on

19  the court.

20      And so what is what is fair in these

21  circumstances is the procedure I outlined.

22      Two more points.  It's not irrelevant that this

23  is not the first time that Mr. Ceglia has been

24  before a court accused of crimes.  It's not

25  irrelevant --

1          THE COURT:  Wait.  Wait.  Wait.  Wait a

2     minute.  He's not accused in this Court of

3     anything.

4          MR. SNYDER:  We are accusing him of

5     committing a criminal act.  It's not the first time

6     that this plaintiff has been -- defrauded people.

7     He's been arrested for defrauding people.  He has

8     forged government documents to steal money from

9     senior citizens in land scams.  He's addressed none

10    of that to date.  We set that out in June that this

11    is a serial felon who has been scamming and ripping

12    off people for years.  And he's been scamming this

13    Court and scamming us from day one.  And to now

14    give him license to conduct wide-ranging discovery,

15    when on the good cause showing your Honor didn't

16    think it was appropriate, would be not only

17    rewarding him for his misconduct, but delivering

18    him exactly what he hoped he could get from the

19    judicial machinery when he concocted this document

20    and filed this lawsuit, which is the final point.

21      Mr. Boland said something that was fascinating.

22    He said the original trumps the digital.  The

23    original trumps the digital.  All the case law says

24    that.  Judges back off, juries step in.  It's a --

25    it's a gimmick.  It's a -- maybe even a little bit

1   of a limerick.  But the original doesn't trump the

2   digital when the objective evidence and science

3   shows that the original is fake, and the plaintiff

4   has admitted in a document submitted to your Honor

5   that he sent the digital.

6       1008 is irrelevant in the context of the

7   exercise of inherent power.  He says we can't take

8   it out of a jury's hands.  That's precisely what

9   the Supreme Court and the Second Circuit instructs

10  trial courts to do where there's clear and

11  convincing evidence of fraud.  Not rewarding the

12  recidivist felon by permitting him to depose Mark

13  Zuckerberg and rummage through computers that have

14  nothing do with the central issues before this

15  Court.  And I have every confidence in the world

16  that your Honor, after reading our papers and the

17  opposition papers, if your Honor thinks any

18  additional information is necessary, that your

19  Honor will let us know, and we can address it in an

20  efficient, fair way as opposed to turning the

21  plaintiff's loose on Facebook and Mr. Zuckerberg,

22  which would be giving them exactly what in their

23  litigation overview plan they hoped for when they

24  concocted this lawsuit.  Thank you.

25              THE COURT:  So is there something that you

1   need to say in response to that, Mr. Boland?

2          MR. BOLAND:  Yes, your Honor, briefly.

3   Mr. Snyder has a habit and I'm not going to go into

4   the details of misstating what I said, and then

5   arguing against it.  It's kind of a debate

6   technique that's really not effective if you've

7   ever had kind of public speaking training.  So I'm

8   not going to go into it.

9      He made several misstatements and argued

10  against them --

11         THE COURT:  I think its called a straw

12  man.

13         MR. BOLAND:  Yes.  Well, we'll use that

14  term.  And so I'm not going to address them.  I

15  think the Court knows exactly what I said, and that

16  he makes up stuff and then argues against himself,

17  and he wins the argument -- or I don't know if he

18  wins.  Perhaps he'll win on his ride home or

19  something.

20     Our expert, Mr. Stewart, is not going to

21  endorse the PE test.  That's a false statement.

22  There's no report out there including what he

23  referenced where Larry Stewart's going to say, you

24  know, this test is really reliable.  In fact the

25  opposite.  He will eventually communicate to this

1    Court after our reasonable six-month period of

2    discovery that he was the supervisor for their

3    expert, Gerald LaPorte, and issued memos at the

4    Secret Service telling him you may not use this

5    test in any case work in our agency, because it is

6    not reliable.  You can continue to test it.  You

7    can continue to go in a back room somewhere and run

8    samples and try to figure out why it's junk.  But

9    you will not use it in case work.  And there is not

10   a government agency in the United States which

11   relies on that test.  He knows better.

12       You know what he's talking about

13   internationally known, Canada.  Two people in

14   Canada that were trained by Mr. Aginsky.

15   Mr. Aginsky is an expert who took a photograph of

16   this contract, offered some information about

17   nondestructive testing of the ink.  He was not

18   hired, will never be hired in this case to talk

19   with PE testing.  We have determined, ourselves and

20   the other experts, that that test, as he pointed

21   out, which was kind of a strange comment, show me

22   the case where the PE test has failed to pass a

23   Daubert test.  Well, if it's failed to pass a

24   Daubert test, it wouldn't get into any trial

25   anywhere.  But we will have cases where --

1            THE COURT:  Usually -- well not usually,

2      but oftentimes courts do write written opinions

3      when you have Daubert exclusion motions.

4            MR. BOLAND:  They do, but there's

5      challenges to Daubert where Mr. LaPorte -- the

6      lawyers have Mr. LaPorte slink away and withdraw.

7      As soon as the pleadings come in, he bails out.

8      Because -- and there's cases -- federal cases we

9      will point out to you, and even criminal cases

10     which is a travesty where he has attempted to take

11     someone's liberty based on his testimony on science

12     he knows is garbage.  And that's happened in the

13     past with federal agencies and others who have come

14     in and talked about striations on bullets or other

15     types of science, which years down the road has

16     proven either to be bad science or the expert

17     themselves has fabricated data, and then all kinds

18     of trials have to start all over again.

19        This is not a shocking thing for a man who

20     currently works for the government and then

21     moonlights on the side in these kinds of cases to

22     have been engaged in using a test that his own

23     government agency he works for doesn't allow him to

24     use.  But when he moonlights at 4 or 500 bucks an

25     hour, getting his checks from Facebook, he's more

1    than happy to use that ridiculous junk science and

2    try to persuade you in paperwork that that's a

3    basis for determining that that ink is less than

4    two years old.

5        Your Honor, we're asking for something that's

6    eminently reasonable, and it appeals to this

7    Court's sense that it expressed in December of

8    fairness.  And in these cases with substantial

9    claims like this, the Court I think hit it on the

10   head when you said this -- the issue of fairness is

11   heightened.  And to dismiss a case and claims of

12   this type by merely allowing us to submit some

13   paperwork to attempt to respond to nine months of

14   work that they've put in with a ton of conclusions

15   that we would not have anticipated, I think goes

16   against what the Court indicated its inclination

17   was, which was to be fair to Mr. Ceglia.  This is

18   reasonable discovery.

19       It's -- if the defendants are concerned about

20   whatever information's going to be found on those

21   computers that it thinks are not relevant, the ESI

22   protocol that was used, that they used and agreed

23   to and that we would adhere to would resolve that.

24   They can strike for privilege everything they want.

25   Nothing gets released.  And if they have concerns

1    about information being other than for attorney's

2    eyes only, they can make a motion, and they can

3    have that information control.

4        But this is a claim that merits minimal three

5    months less than the discovery they received so

6    that we can properly rebut, not just the experts,

7    but the factual claims, the claims about when or if

8    my client electronically communicated with their

9    client.  It is -- it would -- it's an outrageous

10   statement for them to make that computers that

11   Mr. Zuckerberg used to communicate by email, et

12   cetera, with people in '03 are an improper place

13   for us to look to see if my client's emails, which

14   he pulled off his Harvard server, if he did, are

15   sitting there.  That's not outrageous.  This is a

16   good-faith discovery request.

17             THE COURT:  Yes.  But we do come -- before

18   you leave the podium, we do come back to the

19   StreetFax contract issue, don't we?

20             MR. BOLAND:  In what regard?

21             THE COURT:  Well, I mean it was fairly

22   well established based on the privilege log filing

23   from your client that the StreetFax contract was a

24   document that he acknowledged as a contract between

25   himself and Zuckerberg.

1              MR. BOLAND:  Well --

2              THE COURT:  I mean, we just heard from

3       Mr. Snyder about the privilege log.

4              MR. BOLAND:  The privilege log related to

5       an email communication between himself and

6       Mr. Kole.  I think, your Honor --

7              THE COURT:  And it references the

8       StreetFax contract, doesn't it?

9              MR. BOLAND:  It references the StreetFax

10      contract, but the privilege designation does not --

11      they show no case law which indicates that a

12      privilege designation means that the lawyer is

13      saying and the client is saying everything in that

14      document is totally authentic, no one altered my

15      email, no one altered the attachment.  It's all

16      exactly as I sent it.  That's not what a privilege

17      designation says.

18              THE COURT:  It's not an admission that

19      it's a contract between Zuckerberg and your client?

20              MR. BOLAND:  Not at all.  Especially

21      because the attachment's not readable.  So to

22      impute to my client knowledge that he actually

23      reviewed that attachment and said oh, yeah, that's

24      definitely something I sent to Jim Kole, it's not

25      readable.  When you bring that document up on a

1    screen, can't read it.  When you print it, it

2    prints eight and a half by 11, it's unreadable.

3    Now they transposed it somehow and put in a

4    certification about that, but that doesn't change

5    the fact that the document's unreadable.

6        And moreover, you know from your practice of

7    law, and these lawyers know as well, the way these

8    privilege designations can be done is individuals

9    saying, look, that's a letter between my client and

10   so and so, that's privilege.  Let's move on to the

11   next one.  I'm not representing how it was done,

12   but I'm telling your Honor that that designation of

13   a document that later turns out to be something

14   that wasn't authored by my client doesn't convert

15   it into something authored by my client.  It just

16   doesn't.

17              THE COURT:  He made a mistake is what

18   you're saying.

19              MR. BOLAND:  There could be a wide variety

20   of reasons.  He made a mistake, or he read it and

21   said what are all these extra words, or what is

22   this attachment?  I never sent attachment like this

23   to Jim Kole.  These are emails from '04 they're

24   claiming, that's at that time eight years earlier.

25   So if someone presented you an email from eight

1    years ago between you and a client and said is this

2    privileged?  Your reaction would be, of course,

3    it's privileged, it's me and my client, and then

4    later you discover oh, wait a minute, I know I sent

5    a bunch of emails between my client, but, you know,

6    what, that's not one of them.  I thought it was,

7    but it's eight years old.

8            THE COURT:  I forgot to ask you, which

9    expert is it that did the analysis which showed

10   that the baked so-called first page, if not the

11   second page of the so-called Work for Hire contract

12   was exposed to ultraviolet light?  Which expert was

13   that.

14           MR. SOUTHWELL:  Mr. Tytell.

15           THE COURT:  Tytell.

16           MR. SOUTHWELL:  And Mr. LaPorte, both.

17           THE COURT:  I forgot to ask you, I guess

18   I'm assuming I know what the answer is now, that

19   your experts will explain that it's, you know, junk

20   science.

21           MR. BOLAND:  No.

22           THE COURT:  That the -- that the document

23   was taken out of the safe deposit box -- at one

24   point when it was submitted to Mr. Aginsky for

25   analysis it, it had an appearance.  And then later,

1    six months later, it had a different appearance,

2    and according to their experts, Tytell and --

3              MR. SOUTHWELL:  Mr. LaPorte.

4              THE COURT:  LaPorte, Mr. LaPorte, it

5    showed through scientific analysis that it had been

6    subjected to intense ultraviolet light --

7              MR. SNYDER:  Or sunlight, right.

8              THE COURT:  In order to create certain

9    characteristics and help to dry out the ink that

10   was on the document, particularly the ballpoint

11   interlineations and the signatures.  The pictures

12   are worth a thousand words.  I mean, they do tend

13   to show, don't they, that the document had peculiar

14   spacings in it as if it was being clasped in order

15   to be exposed to sunlight?

16             MR. BOLAND:  Yes, your Honor.  I can

17   address that in two ways.

18             THE COURT:  That's not evidence of

19   spoliation by your client?

20             MR. BOLAND:  Not at all, and I'll explain

21   why.  We went over this issue if December, and the

22   Court had me do a demonstration for Mr. Snyder's

23   benefit of why, for the ink fading issue, comparing

24   one scan where the ink appears intense and vibrant,

25   and another scan taken later by a different person

1    with an unknown machine and unknown settings where

2    the ink appears faded was the repeated apples to

3    bowling pins thing that we talked about.  And the

4    Court asked Mr. Snyder, "Do you understand what

5    Mr. Boland's arguing about why you can't compare

6    those?"  And he said, "I don't understand it."  We

7    took a break, and I visually demonstrated it on the

8    record with exhibits and pointed out to the Court,

9    and then you said to him, do you understand.  It

10   now?

11      So we dealt with the ink fading issue.  They're

12   comparing two disparate scans and trying to say

13   because they're different, therefore something was

14   done to the document.  Now that's on the fading.

15      On the yellowing, our experts don't have

16   anything they need to say to prove who yellowed the

17   document.  Here's why.  I showed you at the

18   December hearing, it's on the record, their own

19   expert Tytell's scan the day they got the document

20   to evaluate, their own expert Lesnevich's scan 24

21   hours later, and I put them side-by-side.  These

22   came from their pleadings, not mine.  And you said

23   to Mr. Snyder "It appears from that demonstration

24   Mr. Boland's just done that the document was

25   discolored while it was in your expert's

1    possession."  And Mr. Snyder said, "We reject that,

2    your Honor."

3        But a picture is worth a thousand words.  I

4    don't have the exact exhibit that I used, but it's

5    on the record of that transcript, and the Court

6    agreed -- it wasn't difficult to agree, because you

7    can see a light-colored document and a yellow one,

8    and it's their two experts.  In the first 24 hours

9    that they had that document, they subjected it to

10   excessive UV light.

11           THE COURT:  Not according to the latest

12   report.  They actually put a timer on it, and the

13   amount of time that it was exposed to the UV

14   analysis was a matter of seconds.

15           MR. BOLAND:  That's their claim.  But it's

16   not --

17           THE COURT:  Well --

18           MR. BOLAND:  Fine, your Honor, let's say

19   that that's their claim.  It's undeniable from

20   their exhibits that document got yellow within 24

21   hours of them getting it.  And moreover, in

22   addition to getting yellow during that time, their

23   expert's using that VSC machine.  Guess what the

24   VSC machine has in it to make sure the paper

25   doesn't move while you're putting it under that

1    intense light?  It has clips.

2              THE COURT:  That match the clips in the

3    image?

4              MR. BOLAND:  I don't think they're going

5    to match the clips, and here's why.  They put the

6    document in and out so many times that it was

7    slightly jogged to the left or to the right, and

8    they kept exposing it in different areas to that

9    intense UV light.  They did this over four days.

10      Our experts already gave declarations to this

11   Court saying they have never before seen such an

12   excessive use of that machine.  So, by doing that,

13   they have not only yellowed the document, they've

14   then created those little marks, but moreover,

15   where are we now about challenging this ink fading

16   issue?

17      Here's a fairness problem for the Judge to

18   consider.  We can't go back because they yellowed

19   it in their possession.  How do we go back now and

20   say no, the ink wasn't that faded when you got it,

21   because you burned the thing up with UV light, and

22   you ruin our opportunity to challenge it.  Now

23   isn't that convenient that they make an allegation

24   with expert reports that in a sense they've tied

25   our hands behind our back and say you can't

1    challenge it, but we should be entitled to a

2    dismissal on that basis, even though we've ruined

3    the document for you to rebut us.

4        And that's something else that we'll bring up

5    in our response after our reasonable period of

6    discovery is that there's a fairness issue with us

7    being able to rebut certain things they argue

8    because they damaged the key evidence in the case.

9        If you have no further questions, your Honor,

10   that's all I had to say.

11            THE COURT:  Thank you.  Well, I think

12   we're going to -- did you want to respond to that,

13   Mr. Snyder, briefly?  Anything?

14            MR. SNYDER:  I have nothing further to

15   say, your Honor.

16            THE COURT:  Okay.  We're going to grant

17   the motion in part and deny it in part.  We're

18   going to stay general discovery, but permit a

19   limited period of expert discovery for the

20   plaintiff and the defendants.

21       I'll give the plaintiffs 60 days to depose

22   defendants' experts to prepare an opposition to the

23   motion to dismiss.  And then how much time after

24   that would you need to file your written response,

25   including your reports?

 1              MR. BOLAND:  Your Honor, 60 days.

 2              THE COURT:  Sixty days?

 3              MR. BOLAND:  Yes.

 4              MR. SNYDER:  My question is, your Honor --

 5     and we put this in our papers.  We welcome expert

 6     depositions.  Certainly we think more in the record

 7     the better in terms of our expert reports.  So,

 8     what we said in our papers is that if your Honor

 9     was inclined to give expert discovery, that we

10     think it's appropriate for them to give us their

11     expert reports presumedly before those depositions

12     so that we have -- that's the normal procedure that

13     you exchange expert reports before depositions so

14     that our experts have an opportunity to read and be

15     prepared to respond to.  Otherwise, they're going

16     to be asked 400 questions at a deposition about

17     technical tests and other things that our experts

18     won't have a chance to study or respond to.

19         So if the goal here is to provide your Honor

20     with the best information, as opposed to some

21     ambush, then the best procedure we believe is that

22     they give us their expert reports responding to our

23     expert reports, they depose our experts, we can

24     depose their experts.  Certainly we should have the

25     opportunity to depose their experts.  And then they

1    can put in their opposition papers, and we'll put

2    in our reply papers that utilize that material.

3        If our experts are deposed by Mr. Boland with a

4    deposition outline that is their expert report, but

5    they're not giving us the expert report, it's just

6    unfair.  And that's so expert discovery obviously

7    generally proceeds in that -- in that fashion.  So,

8    if they want a period of days to submit their

9    expert report and then --

10           THE COURT:  I think part of the difficulty

11   is in this instance they need -- the experts need

12   to have the defendants' experts deposed in order to

13   do a thorough job of filing or preparing a report.

14           MR. SNYDER:  But under rule -- under the

15   expert rules, I mean, civil procedure it's

16   anomalous for one side to put in their expert

17   reports, and then be deposed.

18           THE COURT:  Well, I know that.  But this

19   is a little different.

20           MR. SNYDER:  I don't think it is

21   different.  I think he's characterized it that way

22   to gain an unfair tactical advantage, so that he

23   doesn't have to show his hand before he takes our

24   expert depositions.  This is the normal case where

25   we've given our experts.  I mean, usually we

1   have -- one side is given the expert reports, the

2   other side gives their expert reports.  Sometimes

3   they're simultaneous exchanges.  And then

4   depositions proceed.  I've never heard of expert

5   discovery proceed in the fashion where one party

6   gets one side's expert reports and takes

7   depositions, and then has the opportunity to put in

8   their own reports, unless we then after they submit

9   their reports, you know, can have supplemental

10  reports.  But we're just going to be in an

11  inefficient mode there.

12      So I think they should have 30 days, let's say,

13  or whatever they want, to give us their expert

14  reports.  Then we depose their experts.  They

15  depose their experts, and we can provide the Court

16  with whatever information in connection with the

17  motion to dismiss is -- is appropriate.

18      I don't see this as any different than the

19  normal case, only Mr. Boland says we don't know

20  what they're talking about.  Well, the expert

21  reports are very clear in terms of methodology,

22  tests utilized, conclusions drawn.

23          THE COURT:  I think that's his point, that

24  he wants to depose your experts on exactly all of

25  the issues -- not issues, but analyses that are put

1   forth in the reports.  So there's no -- what

2   surprise is there in that?

3            MR. SNYDER:  The reason the Federal Rules

4   provide for either simultaneous exchange of reports

5   or the sequential series of reports before

6   depositions is precisely to avoid the kind of

7   deposition ambush that the advisory committee notes

8   to the expert rules talk about.  So it would be

9   unfair for us -- for our experts to be deposed with

10  them keeping their expert reports in their back

11  pocket.  We should see their expert reports.

12           THE COURT:  I think that's the point,

13  they're not going to have a report until they

14  depose your client.

15           MR. BOLAND:  Yes, and they already agreed

16  to give us the reports in expedited discovery.

17  That was their agreement to give them to us.

18           THE COURT:  That's why --

19           MR. SNYDER:  But then we're going to have

20  the anomaly where their expert reports --

21           THE COURT:  I know.

22           MR. SNYDER:  -- talk about our

23  depositions.  It really makes no good sense and

24  would be unfair.  They've already been talking to

25  their experts.  Their experts have an opportunity

1     to comment on our report so that our expert is

2     aware of and can prepare to rebut their expert's

3     challenge.

4              THE COURT:  Let's say they file a

5     report -- just take the scenario -- in response to

6     your motion.

7              MR. SNYDER:  Yes.

8              THE COURT:  And this is all preparatory to

9     filing a formal document rebutting the motion --

10             MR. SNYDER:  Yes.

11             THE COURT:  -- to dismiss.  I haven't even

12    addressed the statute limitations laches issue,

13    which I almost hesitate to go there, because I

14    think I know what Mr. Boland is going to say.  He

15    says we need plenary discovery on that in order to

16    establish accrual dates and so forth.  I'm hesitant

17    to even launch that one, but we may have to.

18        But he's saying that in order for him to

19    prepare a response to this motion, his expert needs

20    to be able to query your expert about their

21    methodologies above and beyond what they read in

22    the document.

23             MR. SNYDER:  I would respectfully submit

24    that that's not the way the Federal Rules treat

25    expert discovery precisely for the reason I said,

1    that it's either simultaneous exchange of reports,

2    sequential exchange responsive reports, which is

3    what I'm proposing, followed by depositions, for

4    the precise purpose that the drafters of the rule

5    want to avoid the kind of surprise and inefficiency

6    that will result if our experts have to rebut

7    expert -- because his deposition questions will be

8    substantially informed by consultation with

9    experts, who then will prepare a report.

10        And so, it would be anomalous for him to take

11   our depositions and contrary to the Federal Rules

12   of Evidence dealing with experts to take our

13   expert's deposition without first giving us the

14   report.  This is -- in every case a plaintiff can

15   say well, I want to test the defendant's expert's

16   methodology, we can't put it in a report yet.  But

17   that's not what the expert rules provide for.  They

18   just -- and -- and it would be very unfair for any

19   of the experts.

20             THE COURT:  If we do that, it's going to

21   be a very elongated process.

22             MR. SNYDER:  I don't think so, not

23   particularly.

24             MR. BOLAND:  Your Honor, the rules also

25   contemplate full fact discovery before the experts

1   have done what he describes.  We don't have that

2   here.  This isn't -- he said early on this is not

3   the normal case.  Now all of a sudden when it

4   conveniences them, it's the normal case, do the

5   normal thing.

6       This is not the normal case.  They agreed to

7   give us the reports.  We've had no fact discovery,

8   and you're giving us this opportunity to depose

9   their experts.  I think it's eminently fair given

10  how one side of the discovery has been thus far.  I

11  don't think there's anything unfair about it at

12  all.  I think in Mr. Snyder's world we just should

13  get nothing and just walk out of here and every

14  client he represents should have the same result.

15              THE COURT:  Well --

16              MR. SNYDER:  Your Honor, we're simply

17  saying that in the most efficient and fair way is

18  for them to give us their expert reports, for

19  expert depositions on both sides to proceed, and

20  then --

21              THE COURT:  And then what?

22              MR. SNYDER:  And then they'll file their

23  opposition, and we will file our reply in the

24  ordinary course.  And we can do it as expeditiously

25  as your Honor wishes.  You know, we have no

1      interest in -- in delay here at all.  I mean, as we

2      said in our reply papers, we're happy to have

3      expert depositions.  We invite a bigger record on

4      the fraud.  The more evidence of fraud in the

5      record, the better.  We think it's -- obviously we

6      respect your Honor's ruling.  I put it in the reply

7      paper because I thought your Honor might rule a

8      deposition.

9              THE COURT:  Well, I am inclined to do

10     that.  I'm sort of trying to be consistent.  I

11     raised the issue myself back in December.

12             MR. SNYDER:  Sure.

13             THE COURT:  And here we are now where we

14     have to proceed.  All I'm looking for is an

15     efficient way to get to the opposition papers.

16             MR. SNYDER:  They wanted six months for

17     something, so they were prepared to live with six

18     months.  We can live with three, six months.  So if

19     they want to have 60 days to file their expert

20     reports, 60 days for depositions, that's 120 days,

21     that's -- how many months is that?  That's only

22     four months.  They can put in their opposition in a

23     month, that's five months.  We'll put in our reply

24     in three weeks or a month, that's six-month period.

25     The whole thing will be submitted to your Honor.

1          THE COURT:  And then when will you do

2    their depositions?

3          MR. SNYDER:  If we think that anything is

4    pertinent for our reply papers, we'll put them in

5    our reply papers.  And your Honor then will have an

6    even bigger and better record of fraud than your

7    Honor has now.  I have every confidence in the

8    world that that will be the result.  It will just

9    be justice a little bit delayed.

10       And if your Honor believes that expert

11   discovery is necessary, I think the cost to the

12   system, and, frankly, to us, is that extra time.

13   Because there's no way to short circuit 12

14   depositions.  And I don't think we can short

15   Circuit giving us their reports.  That's just not

16   fair, and it is contrary to the Federal Rules

17   governing experts.  And so we're happy to, again,

18   augment the record concerning the fraud.  The only

19   cost is a little more delay, but they were prepared

20   to do six months of some kind of discovery.  So

21   we'll -- we can even do it quicker than that if

22   your Honor wanted.  We would do depositions in 45

23   days.  We can do depositions in 30 days.

24          THE COURT:  I don't know, is that

25   realistic for you, Mr. Boland?

1              MR. BOLAND:  I don't think so, your Honor.

2      And I think that this fairness that Mr. Snyder

3      keeps talking about, it eludes him that this case

4      -- and the Court has been eminently fair to the

5      defendants and to the plaintiffs in what was agreed

6      to by Mr. Lake prior to us coming on the case.

7          There is no unfairness to them having agreed to

8      have given us their expert reports, and now we get

9      to depose their experts.  They want to dismiss my

10     client's entire claim with no fact discovery.  It's

11     hardly unfair to let us depose their experts, and

12     after that deposition when they see all the holes

13     in their expert's analysis, and approaches, and

14     whether they're even valid experts and Daubert

15     qualified, they can respond with whatever they

16     think is appropriate that they need another

17     opportunity to supplement the report to sort of

18     rehabilitate them, let them do that.  That's fine.

19         But to say it's unfair that they've had

20     one-sided discovery, they've had all the fact

21     evidence, and now they also get to see our expert

22     reports, which we can't complete until we hear what

23     the basis is for some of the conclusions in these

24     expert reports, which, frankly, our experts can't

25     even anticipate, because some of them are so

1    outside the field of what those experts do, they

2    have no idea the basis of some of those conclusions

3    in there, because no other expert in their field

4    has come up with those kinds of conclusions.  It's

5    just -- it's not doable for them.  They're going to

6    say I don't know what to put in this report to

7    approach that, because I don't know what his data

8    is that backs up the facts.

9            MR. SNYDER:  Your Honor, there's not been

10   one-sided discovery.  Their experts and the

11   plaintiff had access to the same Work for Hire

12   document StreetFax contract and backdated and other

13   manipulated files that our experts have had.

14   They've had it for a longer period of time than

15   we've had.  And if they were content to have six

16   months of discovery, all we're proposing is take

17   that six months and conform it to your Honor's

18   discovery protocols, as opposed to the discovery

19   protocol they wanted.  And if -- and if Mr. Boland

20   is comfortable doing it faster, we'll do it as fast

21   as he wants.  As fast as he wants, we can do it.

22           MR. SOUTHWELL:  Your Honor, if I could

23   just add one point on this.  You're talking about

24   not having access to what the results of the tests

25   are.  Exhibit L to Mr. LaPorte's test is the

1    comparison of the concentrated 2PE results.  This

2    is the data that he relies on that Mr. Boland is

3    somehow claiming we don't know until we depose him.

4    Of it's right there in the report.  It's all

5    spelled out in the report.

6              MR. BOLAND:  That's a cherry picked one

7    page.  It's not spelled out.  The PE test to begin

8    with has absolutely no data underlying its entire

9    science.

10             MR. SNYDER:  There is no reason to suspend

11   the Federal Rules of Civil Procedure governing

12   expert discovery if your Honor is ordering expert

13   discovery.  The rules are well considered.

14   Congress promulgated that rule after many smart men

15   and women gave commentary about how expert

16   discovery should proceed.  And to -- to sidestep

17   that established, well-recognized, and fair,

18   reasonable procedure of either simultaneous

19   exchange or sequential exchange in advance of

20   depositions, again, makes no sense given that it is

21   the plaintiff here to is perpetuating the fraud and

22   comes to this court with unclean hands, given all

23   the evidence of his own misconduct.

24        And so I think that what we're asking for is --

25   is appropriate, reasonable, and in accordance with

1    standard operating procedure. And to allow him to

2    take depositions of experts while concealing from

3    us what his expert opinions are is -- there's no

4    good reason for that whatsoever. And again, we are

5    prepared to go as fast as Mr. Boland wants, if he's

6    concerned about delay, as the plaintiff.

7           MR. BOLAND: It's not argument about

8    delay. It's about fairness.

9           THE COURT: Well, I'm just trying to

10   reacquaint myself, Mr. Southwell, with the sequence

11   for deposition of experts, says if Rule 26(a)(2)(B)

12   requires a report from the expert, the deposition

13   may be conducted only after the report is provided.

14   (a)(2)(B), unless otherwise stipulated or ordered,

15   this disclosure must be accompanied by a written

16   report. Unless otherwise stipulated or ordered by

17   the court. So it's not ironclad, Mr. Snyder.

18          MR. BOLAND: It's not an abuse of

19   discretion either.

20          MR. SNYDER: Well, what's ironclad is

21   the -- as I recall from the advisory committee

22   notes is the purpose of that is to -- and behind

23   the new expert discovery rules -- they're not so

24   new anymore -- is to avoid surprise, and to provide

25   as much information to each party so that experts

1    can make informed deposition testimony, and to be

2    efficient, because otherwise you would do a

3    piecemeal --

4              THE COURT:  Well, I can --

5              MR. SNYDER:  -- game of gotcha, game of

6    surprise.

7              THE COURT:  I mean, what I'm -- what I'm

8    concerned about is we're going to have this

9    elongated process where there's going to be

10   rebuttal report, then there's going to be a

11   surrebuttal report based on deposing their experts.

12   It's going to go back and forth, back and forth.

13             MR. SNYDER:  No, your Honor, it won't be.

14   No.  No, no.  No.  There will be a period, they'll

15   give us the report.  We will have expert

16   depositions.  They'll file their opposition brief

17   and attach whatever they want to attach to it.  We

18   will file our reply brief and attach whatever we

19   want to attach to it.  Whether it's another report,

20   whether it's a deposition testimony.  We would be

21   doing that in any event, that is filing an

22   opposition brief or reply brief --

23             THE COURT:  No, my point is we're going to

24   get a report from them, then there's going to be a

25   deposition of your experts.

1          MR. SNYDER:  Yes.

2          THE COURT:  Then there's going to be

3     another report.

4          MR. SNYDER:  Maybe not.

5          MR. BOLAND:  Absolutely.

6          MR. SNYDER:  No, your Honor.  My hope

7     would be -- my hope to, your Honor --

8          THE COURT:  Yeah.

9          MR. SNYDER:  -- is that my expert

10    witnesses, all of them, will address on the record

11    everything they need to address when confronted

12    with the report that their expert has.

13         THE COURT:  In their opposition papers, I

14    see.

15         MR. SNYDER:  And if in our opposition

16    papers we need to submit an affidavit saying Romano

17    from RIT wants to address these three issues,

18    here's a two-page affidavit.  It's efficient.  And

19    giving the Court the best information.

20         THE COURT:  It's going to take a lot of

21    time.

22         MR. BOLAND:  It's efficient with no

23    cross-examination to an affidavit either.  So how's

24    that -- that's strike on fairness.

25         THE COURT:  Well, we've got to move

1    forward here.  So we'll give you two months to file

2    your expert reports that you intend to rely on in

3    opposing the plaintiff's -- the defendant's motion

4    to dismiss.  And we will give you two months within

5    which to schedule depositions and conduct

6    depositions of the defendant's experts, that is to

7    say, those who have filed reports in defendants'

8    motion to dismiss.

9        We will then give you two additional months

10   Mr. Snyder, in which to file the plaintiff's

11   opposition to the motion to dismiss, correct?

12           MR. SNYDER:  Well, two months for

13   Mr. Boland.

14           THE COURT:  Yes.

15           MR. SNYDER:  The one question I had, your

16   Honor, where do --

17           THE COURT:  That's what I'm trying to get

18   to here.

19           MR. SNYDER:  What I thought --

20           THE COURT:  What I'm not still clear about

21   is, do you need to depose them --

22           MR. SNYDER:  Yes.

23           THE COURT:  -- before --

24           MR. SNYDER:  Yes.

25           THE COURT:  -- the plaintiff's opposition

1   papers are filed?

2          MR. SNYDER:  Yes.  I think that all the

3   deposition, expert deposition should be closed

4   within two months.  We can do them all in two

5   months.  And then they file their opposition, and

6   we file our reply.

7          THE COURT:  All right.  So here we go.

8   The plaintiff's expert will file their reports

9   opposing -- in opposition to the defendants' motion

10  to dismiss, and then within the following two-month

11  period both parties may depose each other's

12  experts.

13         MR. SNYDER:  Yes, your Honor.

14         THE COURT:  Mr. Boland?

15         MR. BOLAND:  Yes, your Honor.  Sixty days

16  is fine.

17         THE COURT:  All right.  And then following

18  the close of expert depositions, the plaintiff

19  shall file its opposition to defendants' motion to

20  dismiss.  And then within 30 days the defendant may

21  file its reply.

22         MR. DUMAIN:  Your Honor --

23         THE COURT:  Two months.  Two months after

24  the close of expert depositions the plaintiff shall

25  file his opposition to defendants' motion to

1    dismiss.  Defendant shall file a reply within 30

2    days thereafter.

3              MR. SNYDER:  That's fine, your Honor.

4              THE COURT:  Oral argument at the Court's

5    discretion.

6              MR. DUMAIN:  I just have one question,

7    your Honor.  I don't at all question your Honor's

8    right to change your mind, but is that what just

9    happened?  Because everything you said before that

10   seemed to indicate that you would allow us to take

11   the depositions of their experts before --

12             THE COURT:  I changed my mind.

13             MR. DUMAIN:  Okay.

14             THE COURT:  I'm trying to keep this as --

15   what's the word I'm looking for?  Non-controversial

16   as possible.  And I'm concerned that if I do what I

17   thought made sense in terms of a timetable, that I

18   might get some sort of an appeal, and then I got a

19   district judge turning me around, and I've got to

20   do this all over again.  So I'm just a little

21   sensitive about that.  And I want to make sure that

22   this thing goes along reasonably fairly and

23   smoothly, even though it's going to take a little

24   more time than I perhaps would prefer.

25             MR. DUMAIN:  I understand that, your

1    Honor.  But everything else that has happened up to

2    this point has been out of the ordinary.  And so,

3    to suddenly -- when they produce their expert

4    reports first, and when they had all the discovery

5    they wanted, and we had no discovery of things that

6    we say we need to respond to the motion to dismiss,

7    to suddenly say, well, we're going to turn it into

8    an ordinary schedule, I do think is unfair, your

9    Honor, but I understand your Honor's point.

10            THE COURT:  Well, I think it's not ideal,

11   and I'm just trying to avoid unnecessary issues,

12   shall we say.  And he's quite right that the

13   general practice as you all well know is that those

14   expert reports get filed.  If he's concerned about

15   some sort of the, you know, surprise, I just don't

16   want to have that issue creep into this litigation

17   at this time.

18            MR. DUMAIN:  The general practice --

19            THE COURT:  I don't see any prejudice to

20   your side to require your experts to file some

21   reports at this point.

22            MR. DUMAIN:  May I ask two other brief

23   questions, your Honor?

24            THE COURT:  Sure.

25            MR. DUMAIN:  Do you also contemplate, your

1    Honor, the exchange of document discovery that

2    typically is done with expert discovery, like the

3    documents that they based their opinions on?

4    Because deviating from that --

5              THE COURT:  That's already been revealed.

6              MR. DUMAIN:  Well, if it has, they'll have

7    nothing more to produce.

8              THE COURT:  What's that?

9              MR. DUMAIN:  If it has, they'll have

10   nothing more to production.  But certainly expert

11   depositions without the normal expert written

12   discovery under Rule 26 deviates from the norm,

13   your Honor.

14             MR. SNYDER:  Everything they relied on we

15   got from their computers and --

16             THE COURT:  I thought it was fairly well

17   understood that what the basis of the defendants'

18   experts opinions were.  Basically it is what it is

19   as stated in this record, pretty definitively and

20   under oath.  Don't you think?

21             MR. DUMAIN:  I think then they'll have

22   nothing else to produce.

23             THE COURT:  Well, you want sort of like a

24   safety mechanism here just in case there was

25   something that they relied on that they didn't

1   reveal?

2           MR. DUMAIN:  Well, as we're discussing it,

3   why don't we deal with that if something comes up

4   in the deposition, we'll deal with it.

5           THE COURT:  I was going to say that seems

6   to me -- again just in the interest of time,

7   Mr. Dumain --

8           MR. DUMAIN:  That's fair.  The only

9   request I wanted to make, your Honor, and I don't

10  even if there's objection to it.  From what I read

11  in the press, I think Facebook has given the

12  Harvard emails to the press.  They haven't given

13  them to us.

14          THE COURT:  I meant to ask that.  I'm

15  getting a little off, mix and matching here.  But I

16  wanted to ask, and I know this is a little off the

17  point about the schedule.  Based on the

18  supplemental declarations that I ordered pursuant

19  to granting your motion -- your sixth motion

20  perhaps for -- to compel, that it was my

21  perception, perhaps erroneously, that the plaintiff

22  was now in compliance with the August 18th order,

23  thus triggering the obligation of the defendants to

24  provide to the plaintiff the so-called Harvard

25  emails that you've been carrying around in your

1    vest pocketing in a CD all these many months,

2    Mr. Snyder.

3              MR. SNYDER:  Right.  Again, like the

4    motion to dismiss, we had hoped to produce those

5    emails in September and move to dismiss, and I

6    think we're close.

7              THE COURT:  What is that he owes you?

8              MR. SNYDER:  There's one area where --

9    and, again, often when there's obstruction or

10   equivocation, there's something lurking that is

11   important, if not dispositive, as in the case of

12   the StreetFax contract.  So the one -- one area is

13   he's not complied with his duty to effectively

14   facilitate the acquisition of a webmail account for

15   the so-called Hush mail email account, which is a

16   Canadian-based encrypted web provider, and --

17             THE COURT:  Did I not address that?

18             MR. SNYDER:  You did, but they have not --

19   what they did in the past is kind of not fill out

20   the forms correctly, give us incomplete

21   information, and it has taken a while to acquire

22   each webmail account.  We still haven't acquired

23   the Hush mail account yet.  As soon as we do --

24             THE COURT:  Well, is that because of any

25   fault on his part not complying.

 1               (Indiscernible cross-talk).

 2               THE COURT:  One at a time.  One at a time.

 3               MR. SOUTHWELL:  Your Honor, this is -- we

 4      had some back and for with Hush mail about the form

 5      of the consents that Mr. Ceglia filled out.

 6               THE COURT:  Yeah.  Right.

 7               MR. SOUTHWELL:  And thanks, your Honor,

 8      for clarifying it.  And so we're now waiting for

 9      the results of Hush mail based on Mr. Boland's last

10      provision of the consent and whether Hush mail will

11      accept that form.  As soon as we know that they

12      will accept it and we get the contents, we'll know

13      that he has facilitated access.

14               THE COURT:  But hasn't he done exactly

15      what you told him to do?

16               MR. SNYDER:  We don't know.

17               MR. SOUTHWELL:  No.  He did whatever --

18      Hush mail is the one that decides what

19      requirements --

20               THE COURT:  Is this a moving target by the

21      provider?

22               MR. SOUTHWELL:  We have conveyed what Hush

23      mail said.  He has not done exactly what Hush mail

24      asked for.  He's explained to Hush mail why he

25      didn't do that.  It has to do with they requested

1    that Mr. Boland execute a declaration that

2    Mr. Ceglia was declaring it in his presence.  And

3    Mr. Boland explained he wasn't able to do that.  We

4    have not yet heard.  I've inquired of Hush mail as

5    to whether this is acceptable.  They have not told

6    us whether it is acceptable yet.  So we're almost

7    there.

8                THE COURT:  That was not part of the

9    motion, that particular point.

10               MR. SOUTHWELL:  Well, it was -- Mr. Ceglia

11   has an obligation to facilitate access to --

12               THE COURT:  No, but you specified exactly

13   what it was that he had not done.  I directed him

14   to do it.

15               MR. SOUTHWELL:  Right.

16               THE COURT:  He did it.

17               MR. SOUTHWELL:  That was to provide a

18   consent.  He provided a consent, but it was not

19   sufficient.

20               THE COURT:  Which we learned after the

21   motion was filed.

22               MR. SOUTHWELL:  Correct.

23               THE COURT:  So we have a new issue.

24               MR. SOUTHWELL:  And we're hoping that we

25   can resolve it, and that we should know -- again,

1    that we should know.  If mr. Ceglia was here in the

2    United States it would be easy for him to sign it

3    in front of Mr. Boland and it would be a nonissue,

4    but --

5              THE COURT:  How about a video conference,

6    would they accept that?

7              MR. SOUTHWELL:  I was hoping, your Honor,

8    that we could simply resolve it with Mr. Boland

9    hopefully in the next few days.

10             THE COURT:  But Mr. Ceglia is not -- he's

11   not noncompliant with my order at this point, is

12   he?

13             MR. SOUTHWELL:  We don't know.  We don't

14   know because they have not said he's in compliance,

15   and so we're waiting for that confirmation that

16   he's compliant before we know that he's in

17   compliance, and that he's do not what needs to do

18   to facilitate access, which was what your Honor had

19   required.  We think we're very close, and as soon

20   as that occurs, we'll --

21             THE COURT:  Okay.  So that's the answer,

22   Mr. Dumain, I guess.

23             MR. BOLAND:  Your Honor, can I correct the

24   record, your Honor?  Mr. Ceglia is completely in

25   compliance.  He got a consent form.  He did

1    everything in his power and signed it, so did I,

2    and we sent it to this Canadian company.  It is not

3    a feature of his noncompliance because a Canadian

4    email company is not satisfied with everything that

5    he can provide in that document.  That's just not

6    accurate.  He's totally in compliant now, and if

7    that company decides they don't like the form of

8    information he provided, even though he provided

9    everything they requested, that's not

10   noncompliance.

11            THE COURT:  But -- and you will cooperate

12   in providing a new form.

13            MR. BOLAND:  Absolutely.

14            THE COURT:  Absolutely.

15            MR. BOLAND:  Every form --

16            THE COURT:  But you want the Harvard

17   emails?

18            MR. BOLAND:  Pardon me?

19            THE COURT:  You'll want that CD that

20   Mr. Snyder has got in his vest pocket.

21            MR. BOLAND:  We don't want it.  The Court

22   ordered him to give it to us.  So we want you --

23            THE COURT:  You don't want it, I'm sure

24   he'll be happy not to give it to you.

25            MR. BOLAND:  They ordered to provide it,

1    that's what they're saying.

2              THE COURT:  I know.

3              MR. BOLAND:  It's a little bizarre they

4    provide it to the press before us.

5              THE COURT:  That I don't know about, and

6    it would be surprised if that happened.

7              MR. SNYDER:  Again --

8              MR. BOLAND:  That's just par for the

9    course.

10             MR. SNYDER:  Mr. Boland asserts facts as

11   an officer of this court without any good-faith

12   basis to believe that.  What he just told your

13   Honor is a lie.  It's not true.

14             THE COURT:  He didn't say it.  Mr. Dumain

15   said it.

16             MR. SNYDER:  Well --

17             MR. BOLAND:  The press is saying they got

18   they two emails from the defendants.  Harvard

19   emails got sent to them.  So that's a good-faith

20   basis.  They relied on the press in their motion,

21   so we can too.

22             MR. SNYDER:  We attached emails to our

23   motion to dismiss.  Those are in the public record.

24   And the press has read those emails that are in the

25   public record, as anyone accessing the public

1    record can.  So we did not give the press the CD

2    that I've been holding since September to give to

3    Mr. Lake had Mr. Ceglia not obstructed discovery.

4              THE COURT:  All right.

5              MR. SNYDER:  It's not true.

6              THE COURT:  If I can cut the Gordian knot

7    here, I find that the plaintiff is substantially in

8    compliance with its obligation under the August

9    18th order as regard these email accounts, and I

10   direct that the defendants provide him with the

11   reciprocal discovery to which they're entitled

12   forthwith.

13             MR. SNYDER:  Happy to do so.

14             MR. BOLAND:  Very well.

15             THE COURT:  What else, Mr. Dumain?

16             MR. DUMAIN:  Nothing else.  Thank you very

17   much, your Honor.

18             MR. BOLAND:  Nothing's else, your Honor.

19             THE COURT:  All right.  What about the

20   motion to dismiss on statute of limitations

21   grounds?  What conceivable discovery do you need to

22   fairly oppose that motion, Mr. Boland?

23             MR. BOLAND:  Well, your Honor, there's a

24   lot of factual issues that can relate to when the

25   statute of limitations begins to run.  Their bald

1    assertion is the moment Mr. Zuckerberg incorporated

2    something --

3            THE COURT:  Well, this is the time to be

4    very specific, because if I don't hear something

5    very specific in the next five minutes, I'm going

6    to direct that you file an opposition to that

7    motion within two months after the close of expert

8    discovery.

9            MR. BOLAND:  Well, your Honor, can we have

10   a short period of time to respond to that question

11   with regard -- in writing to the defendants, to the

12   court with what fact discovery and what our basis

13   is?

14           THE COURT:  All right.

15           MR. BOLAND:  Whatever the Court thinks is

16   reasonable, because --

17           THE COURT:  I'm not saying I'm going to

18   give you any.  All I said in December was that

19   considerations of fairness, given the magnitude and

20   complexity of the case sort of triggered in my mind

21   a need to have expert discovery.  I wouldn't even

22   have to do that.  You didn't like what you get, you

23   can appeal to the district judge.  But I've decided

24   to go down that path because I'm now persuaded that

25   you're still entitled to that, as I thought you

1      might be in December, notwithstanding the plethora

2      of information and the appearance of competency of

3      the defendants' experts.

4           But as to the statute of limitations issue and

5      the laches issues -- by the way, they say that

6      laches is inapplicable here because it's a money

7      judgment request, Mr. Snyder.  There was no mention

8      of that in your reply.  They say that laches is

9      unavailable to you, because this is a money

10     judgment request, and laches is only available in

11     an equitable relief.  You didn't address that in

12     your reply.  You want to address that in a

13     supplemental reply?

14               MR. SNYDER:  Yeah.

15               THE COURT:  Okay.  Fine, you do that, then

16     I'll give them a chance to respond.  But on the

17     concept of -- obviously we don't need, I think,

18     expert discovery or disclosures or anything else or

19     opinions on whether or not there's a valid statute

20     of limitations slash laches defense that requires

21     dismissal, I'm wanting to hear from you why you

22     need any fact discovery beyond what's already in

23     this record on these motions.  That's also

24     available to you to fairly oppose that motion.

25               MR. BOLAND:  Yes, your Honor.  That's what

1    I was requesting before.  I wasn't clear.

2              THE COURT:  And you feel like you need

3    additional time.  It's late.  We've been at it now

4    for quite a long time.  And you'd like an

5    opportunity to further brief have that?

6              MR. BOLAND:  Yes, your Honor, a brief that

7    lays out why we feel we need factual discovery on

8    those legal issues.

9              THE COURT:  What fact discovery you need

10   specifically.

11             MR. BOLAND:  And what fact discovery we

12   believe we need we'll tie it in to the issues.

13             THE COURT:  Okay.

14             MR. BOLAND:  And I think that's

15   reasonable.

16             THE COURT:  You can provide that within

17   what time?

18             MR. BOLAND:  Seven days, your Honor.

19             THE COURT:  Seven days?

20             MR. SNYDER:  May I address that form a

21   minute, your Honor?  Because we've been subjected,

22   as your Honor knows from the one sanctions motion

23   that was granted to an inordinate amount of

24   litigation as a result of this fraudulent act of

25   filing the lawsuit.

1              We respectfully submit that under Rule12(c) the

2       proper procedure is for -- instead of having more

3       multiple layers of briefing upon briefing, is for

4       this plaintiff to file in the ordinary course an

5       opposition to our motion under Rule 12(c).  If in

6       that opposition, which is addressed to the face of

7       the pleading he thinks he needs discovery, I don't

8       even know -- I guess that argument is --

9              THE COURT:  I guess technically that you

10      refresh me that it's 12(c) there really wouldn't be

11      any discovery.

12             MR. SNYDER:  No, your Honor.  So our

13      position is that if the Court believes that on the

14      face of the pleading and facts in the public record

15      or facts as to which the Court permissibly can take

16      judicial notice, there is an insufficient basis in

17      law to dismiss on the pleadings, your Honor will

18      deny that motion, and we'll either -- and that will

19      be the end of it.  But to have briefing on why

20      there should be discovery under Rule 12(c) we think

21      is inept.

22             THE COURT:  Doesn't he have a point there,

23      Mr. Boland, now that we've focused on it a little

24      more clearly?

25             MR. BOLAND:  Your Honor, we've addressed

1    this in our brief that -- that the statute of

2    limitations on Mr. Ceglia's claim is triggered

3    based on facts that aren't addressed in the

4    pleadings.  We don't have --

5             THE COURT:  Well, that's the argument

6    you'll make in opposition, and if we agree with

7    you, we'll deny the motion and we'll proceed on

8    that claim.

9             MR. BOLAND:  But there are discovery

10   issues which -- there's some -- we'd like at least

11   the opportunity to argue that there's discovery we

12   need to address that issue.  And seven days seems

13   reasonable, your Honor, to just brief that.

14            THE COURT:  Yeah.

15            MR. SNYDER:  Your Honor, that's their

16   opposition brief, and it's not an appropriate

17   argument to make under Rule 12, because the

18   argument is --

19            THE COURT:  Look, let's do this.  It's

20   already ten to five.  We've really devoted a lot of

21   energy to this, and I compliment both sides for

22   their patience and their advocacy.  Very helpful.

23   Let's just do that.  We'll give you seven days to

24   tell me why you think you're entitled to discovery

25   to oppose that motion.

1          MR. BOLAND:  Yes, your Honor.  Very well.

2          THE COURT:  We'll give the defendants

3     seven days, and one of the arguments first and

4     foremost will be, Judge, it's irrelevant.  It's a

5     12(c) motion.  Make the argument, I'll evaluate it,

6     we'll make a ruling.  If we're wrong, somebody will

7     appeal, and that will be that.  Otherwise, it will

8     go away as an issue.  And then at that point we'll

9     direct -- if we don't permit discovery on that

10     motion, then we will probably direct that your

11     formal response to it be filed at the same time as

12     your motion to -- your opposition to the motion to

13     dismiss.

14          MR. BOLAND:  Very well.

15          THE COURT:  Would that be reasonable?

16          MR. BOLAND:  Yes, your Honor.

17          MR. SNYDER:  May I just say, your Honor,

18     for the record that every time that the plaintiff

19     seeks to impose additional costs and burden and

20     prevails upon your Honor to grant them that relief,

21     it's of vexatious multiplication of litigation for

22     which we, at the end of this case intend to hold

23     the plaintiff and all counsel fully responsible.  I

24     just wanted to say that in connection with this,

25     which is, again, an exemplification of their

1    strategy here.  Cause Facebook and the defendants

2    to spend more time and more money --

3              THE COURT:  You can attempt to hold

4    anybody responsible for the cost of litigation that

5    you'd like, just don't include me.

6              MR. SNYDER:  No, your Honor.  Thank you.

7              THE COURT:  Anything further on behalf of

8    the plaintiff?

9              MR. BOLAND:  No, your Honor.  Thank you.

10             THE COURT:  Defendant.

11             MR. SNYDER:  Thank you, your Honor.

12             THE COURT:  We are adjourned.  Have a safe

13   trip back everyone that's traveling.

14             MR. DUMAIN:  Thank you.

15             *      *      *      *      *      *

16

17

18

19

20

21

22

23

24

25

1                       CERTIFICATION

2

3          I certify that the foregoing is a

4      correct transcription, to the best of my

5      ability, from the electronic sound recording

6      of the proceedings in this matter.

7

8

9                          s/Michelle L. McLaughlin
                           Michelle L. McLaughlin, RPR
10                             Official Reporter
                           U.S.D.C., W.D.N.Y.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25