UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

PAUL D. CEGLIA,

Civil Action No. : 1:10-cv-00569-RJA

Plaintiff,

**RESPONSE TO MOTION TO
SHOW CAUSE**

v.

MARK ELLIOT ZUCKERBERG, Individually, and
FACEBOOK, INC.

Defendants.

## MEMORANDUM

Plaintiff filed several motions which this court denied.  Defendants seek

sanctions for two of those motions under 18 U.S.C. 1927.  The order (Doc. No. 457)

is unclear whether the court is seeking Rule 11 sanctions for the filing of some or all

of the motions addressed in the order.  Therefore, in an abundance of caution,

Plaintiff will address the standard for sanctions under Rule 11 as it applies to all

motions referenced in the court's order, Doc. No. 457.

### TWO DIFFERENT STANDARDS OF ANALYSIS

### 18 U.S.C. 1927

Defendants seek sanctions under 18 U.S.C. 1927 for Plaintiff's filing of the

Motion to Vacate and Motion to Disqualify.  The standard for determining

sanctionable conduct under 18 U.S.C. 1927 is as follows:

"[A] claim is entirely without color when it lacks **any** legal or factual basis."

*Sierra Club v. United States Army Corps of Eng'rs*, 776 F.2d 383, 390 (2d Cir.1985).

Emphasis in the original.

Conversely, a claim is colorable "when it has some legal and factual support,

considered in light of the reasonable beliefs of the individual making the claim."

*Nemeroff v. Abelson*, 620 F.2d 339, 348 (2d Cir.1980).

## RULE 11

The Rule 11 standard for determination of sanctions is applied differently

when the court on its own motion, seeks such sanctions.  The standard for

determining sanctionable conduct to be applied to presumably all five motions

subject to the Order to Show Cause is a higher standard of "bad faith."  *In re Pennie*

*& Edmonds LLP*, 323 F.3d 86, 87 (2d Cir. 2003).  "[B]ecause the 'safe harbor'

protection does not exist when a lawyer's submission is challenged in a show cause

proceeding initiated by a trial judge, the more rigorous standard of bad faith should

apply. That position draws support from the Advisory Committee's expectation that

court-initiated sanction proceedings will ordinarily be used only in situations that

are 'akin to a contempt of court.'"  Id.  Citing to Fed.R.Civ.P. 11 advisory

committee's note to 1993 Amendments. -

The Second Circuit has made it clear that when a court initiates an order to

show cause there is "strong support for the proposition that, when applying

sanctions under Rule 11 for conduct that is 'akin to a contempt of court,' a **bad**

**faith standard should apply**.” *In re Pennie & Edmonds LLP*, 323 F.3d 86, 87 (2d Cir. 2003).  Emphasis added.

### THE BAD FAITH STANDARD

Bad faith, for example, has been construed as “not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; it contemplates a state of mind affirmatively operating with furtive design or ill will.” *United States v. Hoffman*, 03-CR-211S, 2011 WL 284458 (W.D.N.Y. Jan. 26, 2011).

To ensure, however, that fear of an award of attorneys' fees against them will not deter persons with colorable claims from pursuing those claims, the Second Circuit has declined to uphold awards under the bad-faith exception absent both “‘clear evidence’ that the challenged actions ‘are entirely without color, and [are taken] for reasons of harassment or delay or for other improper purposes’” and ‘a high degree of specificity in the factual findings of [the] lower courts.’”
*Dow Chemical Pacific Ltd.*, 782 F.2d at 344 (citations omitted); see *Weinberger*, 698 F.2d at 80; *Nemeroff v. Abelson*, 620 F.2d 339, 348 (2d Cir.1980); *Browning Debenture Holders' Committee*, 560 F.2d at 1089.

### THE COURT'S SEEKING OF RULE 11 SANCTIONS

Plaintiff will address the standard for imposing sanctions regarding each of the five motions at issue in the court's order, Doc. No. 457.

### MOTION TO STRIKE EXPERT REPORT OF GERALD LAPORTE DOC. NO. 385

Because the court is seeking Rule 11 sanctions for these motions, the requirement to impose sanctions is a finding of bad faith.  A finding of bad faith requires:

1. Clear evidence that the motions are "entirely without color" and

2. Clear evidence that "the motions were filed for reasons of harassment or delay"; and

3. "a high degree of specificity in the factual findings of the trial court".  *Dow Chemical Pacific Ltd.*, *Weinberger*, *Nemeroff* and *Browning Debenture Holders' Committee.*

## A Colorable Argument

In seeking to strike LaPorte from this case, Plaintiff made two independent arguments both sufficient to exclude the witness if adopted by the court.  One argument was LaPorte's intentional violation of FRCP 26(a) and the other was his submission of a report containing claims regarding the validity of a test whose validity the witness had previously testified was "inconclusive" or "unreliable."

The defense offered *no response* whatsoever to the accusation that LaPorte *intentionally* violated Rule 26(a).  The court, in its order denying this motion, also did not oppose Plaintiff's contention that the rule violation was *intentional*.  This argument is not only colorable, it is conceded by Defendants and this court.  Plaintiff offered ample court decisions in which experts had been excluded from cases for the mere negligent omission of cases in violation of Rule 26(a).  Where the court disagreed with Plaintiff, questioning his literacy, was the argued *reason* for

LaPorte's omission of the cases.  However, the reason for the omission does not make the rule violation.  The intentional omission is the violation without more argument necessary.  Therefore, Plaintiff's essential argument, a violation of the rules, was not only *with merit*, but was not opposed by Defendants and was *accepted* by the court.  The court merely disagreed with the "why" of LaPorte's omission advanced by Plaintiff.  It did not, however, as Defendants did not, advance an alternative "why" for that intentional omission.  This is not the stuff of sanctionable filings for either timing or substance reasons.  This is clearly a colorable argument given that it was conceded by all parties and the court.

The court dispatched with Plaintiff's argument about LaPorte's contradictory testimony admitting the unreliability or inconclusiveness his flavor of the PE test fixating on the use of one word in those two transcripts, "exactly."  It is a reasonable reading of LaPorte's testimony in which he testifies about the reliability of ink dating on multiple occasions and on only one of those occasions qualifies the reliability with the amorphous word "exactly."

It is without question that the witness in prior testimony, as recent as 22 months before applying his flavor of the PE test in this case, stated the PE test historically netted results that were "inconclusive."  The court found the witness' use of the word "exactly" remedied any testimony in which the witness did not qualify the reliability of his test with any such words.  There are without doubt many more testimonial references by the witness to the unreliability of the PE test

that are not qualified with a word such as "exactly" in comparison to the one instance where the undefined time range use of the word "exactly" is used.

In the context of the scientific field where LaPorte's flavor of the PE test has not been independently tested and has never passed a Daubert challenge, his repeated testimony about the unreliability of his test without interposing the qualifying word like "exactly" certainly raises an issue suitable for a good faith motion to this court.

The speaker himself, LaPorte, never entered a declaration explaining his use of the word "exactly" in this context nor his failure to use the word in the multitude of other references to the reliability of his flavor of the PE test. He also did not enter a declaration that Larry Stewart authorized his use of the PE test at any time while Mr. Stewart supervised him at the Secret Service. At best, the parties and the court are speculating as to why LaPorte used the word "exactly" where he did and why he failed to use the word in every other statement about his version of the PE test and what it means in either context. In this way, Plaintiff represents one of the participants in this case arguing about the import of the use of the qualifying word "exactly." This court disagreed with Plaintiff's argument in this regard, but the argument was not without factual basis. In fact, the court's interpretation of the meaning of that word was based on entirely the same facts that Plaintiff relied upon for arguing his interpretation of the use and non-use of that qualifying word in various contexts.

The court also found that it is not clear that LaPorte was pulled from the

*Rago* case because of the unreliability of his version of the PE test.  That finding

highlights that the reasons behind LaPorte being pulled from that case are

reasonably argued by Plaintiff.  Plaintiff argued that the unreliability of LaPorte's

test was the factor hastening his removal from the case.  The court found that may

or may not be the motivation for his removal from the case.  As of this writing,

Plaintiff is as likely to be correct about this argument as he is not.  It would

improper to sanction him for making an argument that could well be on point

regarding what happened and Defendants, nor LaPorte, offered any declaration

disputing that argument.

## No Evidence of Harassment or Bad Faith Delay

Plaintiff could not have filed a motion to strike LaPorte's report until a

thorough review of that report by his experts along with an exhaustive analysis of

LaPorte's list of cases.  That analysis took time resulting in the filing of that motion

when it was filed, immediately after the conclusion of that review of LaPorte's

report and disclosures.

## Factual Errors in Doc. No. 457

In addressing this motion, the court also made an incorrect factual finding.

The court found that Plaintiff's expert, Larry Stewart, supervised LaPorte in 2008

when he offered the PE test in *United States v.Rago*, Docket No. 08-CR-10268-WGY

(D. Mass.)

Mr. Stewart has offered numerous declarations in this case including one filed on June 4, 2012 where he confirmed that he "left the [Secret Service] in 2005" Doc. No. 416-3 at 8 para 385.  Therefore, he could not have supervised LaPorte during this time and Defendants did not argue otherwise.  The court relied on this non-fact to make a factual determination.

Finally, this court's order denying this motion did not find that it was filed in bad faith.  No evidence in this record supporting a "clear" finding of bad faith exists.

## FIRST MOTION TO COMPEL IMAGES, SCANS OF DEFENDANTS' PAPER EXPERTS DOC. NO. 389

Plaintiff' First Motion to Compel (Doc. No. 389) was criticized by the court as follows:

"Plaintiff's argument relies on a misconstruction of the July 1, 2011 and April 4, 2012 Orders."  The court ordered Plaintiff to hand over all images captured by his experts of the contract(s) at issue.  (Doc. No. 390 at 3); Order - (Doc. No. 208 at 11).

Plaintiff reviewed the court's July 1, 2011 order and reasonably interpreted that its order would entitle Plaintiff to the same copies of all of Defendants images, scans and photographs captured by their experts.  It is only now apparent, after receipt of the court's order denying this motion and issuing a show cause order, that Plaintiff's interpretation is incorrect.  The court, ruling on this issue found that the motion was premature as we made a binding agreement to deal with this during the two month deposition phase based upon statements of prior counsel at the end of the April 4, 2012 hearing.  Since April 4, 2012, Plaintiff has made repeated requests

for this material in correspondence to Defendants on May 7, 2012 and emails since that time with no response.   Plaintiff is not in receipt of the requested expert materials just days prior to scheduled depositions.  This court's order denying this motion did not find that it was filed in bad faith and no evidence in this record supporting a "clear" finding of bad faith exists regarding this motion.

## MOTION FOR DISCOVERY - HARVARD EMAILS DOC. NO. 396

This court held that Plaintiff's Motion for Discovery (Doc. No. 396) sought to reargue motions already addressed by the court without any justification for doing so.  In that motion, Plaintiff sought emails in the following categories:

1. Emails that are referenced within the body of other emails; and

2. Emails between the parties from late February, early March of 2003 up until June of 2003 the date of the first email provided by Defendants in their production; and

3. Emails between the parties after November 2003, the last date of emails provided by Defendants in their production.

The court notes that the current posture of discovery in this case is limited to "that necessary to determine an issue crucial to this action, i.e., the authenticity of the Contract and the supporting emails."  Doc. No. 457 at 26-27.

This motion was not and could not be a rehash of previous motions because it was reliant entirely on the contents of the Harvard email production received after April 4, 2012.  Plaintiff could only file this motion after receiving the production of the Harvard emails.  Therefore, Plaintiff had not previously filed a motion seeking

emails that were embedded in the body of other emails seeking their production. Plaintiff submitted an unchallenged declaration that he sent an electronic copy of the Facebook Contract to Defendant Zuckerberg.  (Doc. No. 398 at 2).  As such, emails missing from the Harvard Production from that critical time frame are something that Plaintiff was compelled to address to this court as it bears on the authenticity of the contract and the supporting emails all in one.  Plaintiff's counsel was entitled to rely on Plaintiff's factual claims in this regard. " An attorney is entitled to rely on his or her client's statements as to factual claims when those statements are objectively reasonable."  In *Kamen v. American Telephone & Telegraph Co.,* 791 F.2d 1006 (2d Cir.1986).

Plaintiff's motion was reliant on this court's order that Defendants submit to us all relevant Harvard emails that it captured from Defendant Zuckerberg's account.  Another issue raised in the motion was Defendants' diligence or wilful blindness as to other sources of Harvard emails that Defendants chose not to explore thereby blocking Plaintiff from potentially relevant emails as intended in the court's order.

Plaintiff's motion, therefore, was necessary to enforce the court's order. Plaintiff was not arguing, nor did Defendants' argue, that Plaintiff had shown or was required to show the necessity of those emails.  That necessity was already established by the court ordering them to be produced.  Moreover, the essence of deleted emails is that their content is unknown thereby making the importance of knowing them all the more critical.  Plaintiff alleged and Defendants did not

dispute nor did this court that Plaintiff sent emails to Defendant Zuckerberg before April 2003 one of which contained an electronic copy of the Facebook Contract. This email alone not only bears on the issue of the contract's authenticity, it indisputably proves it.

The court in its denial of this motion speculated that phone calls between the parties obviated Plaintiff's need for seeing these deleted emails. Defendant made no such argument. This is another factual claim that is subject to reasonable dispute on all sides. And, with no record of the contents of those phone calls, nearly a decade old at this point, it cannot be known whether the deleted emails contained some, all or none of the contents of those phone conversations. Plaintiff could not have reasonably foreseen that this court would conclude that because Plaintiff stated that he talked on the phone with Defendant Zuckerberg, it could conclude so convincingly that Plaintiff's "story" (as the court termed it) that the parties exchanged emails was untrue. Plaintiff could also not reasonably conclude that this court would find that the motion for discovery of the deleted emails was moot because Plaintiff "must have got them." This factual claim assumes that the emails in the Harvard production are authentic, unaltered and complete with or without attachments as they originally existed. It pre-judges the authenticity of these emails leading the court to the conclusion that Plaintiff must have received them. If the Harvard production emails are not authentic, Plaintiff never received them. If that production is incomplete, Plaintiff is deprived access to emails that he did send to Defendant Zuckerberg or receive from him that are relevant to this case

including the one with the attached Facebook Contract.  Plaintiff is also deprived

access to emails that would authenticate the emails attached to the Amended

Complaint.

Moreover, Defendants are in complete control of other obvious sources of

Harvard emails which they intentionally did not examine further depriving Plaintiff

of access to emails that the court's July 1, 2011 order contemplated and the liberal

standard of a party's discovery duties also contemplate.

Defendants do not dispute, nor did this court find, that Plaintiff's argument

that Harvard emails have been deleted is factually incorrect.

Plaintiff's motion seeking an order compelling the disclosure of those emails

and the good faith effort by Defendants to look in all likely sources for those emails

is not in bad faith inviting sanctions.

## **MOTION TO VACATE DOC. NO. 426**

It was quite coincidental, but critical, that during the preparation of the

motion to strike LaPorte's report, case law emerged reminding Plaintiff that this

court is sitting in diversity and that while sitting in diversity this court must apply

substantive New York state law.  An examination of New York substantive state

law then revealed that post-trial judgments cannot be reversed in New York state

courts by arguing an intrinsic fraud occurred during trial.  Those New York state

cases even created a bright line between intrinsic and extrinsic fraud defining it in

a way that was helpful to this court's analysis.  Likewise, there are *no cases*

permitting a pre-trial dismissal of a case based upon claims of intrinsic fraud.  By

analogy, Plaintiff argued that the reasoning in those New York state substantive cases applicable to post-judgment reversals should be **extended** to pre-trial dismissals on the same basis.  Finally, there are no cases allowing any type of dismissal, based upon intrinsic fraud or extrinsic fraud, pre-trial or post-trial, in state or federal court, when the object of that claimed fraud is disputed by dueling experts.

Neither Defendants nor this court have disagreed that the above analysis is and was a correct statement of the law.  The Defendants merely argued for an extension of the application of the holding of a single case, *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991), to the circumstance of this case.  Plaintiff argued that the holding in *Chambers* was not applicable to the circumstances of this case and its holding could not be extended to support the remedy that Defendants' motion to dismiss seeks.

The Defendants' and this court's reliance on *Chambers* for support of the court's inherent power to dismiss *under these circumstances* can only be by analogy.  Like plaintiff argued, by analogy that New York law prohibited the remedy Defendants seek here, Defendants argued and this court found, *by analogy,* that *Chambers* supported the court's exercise of inherent power under these circumstances.

## PROCEDURAL VERSUS SUBSTANTIVE MOTION TO VACATE ISSUE

The court also swept aside Plaintiff's argument regarding the motion to vacate with the following statement:

**Thus, the extrinsic-intrinsic distinction on which Plaintiff relies is of a procedural, not a substantive nature, not binding on this court and, moreover, is irrelevant as Defendants' Motion to Dismiss is based on the court's well-established inherent authority to reject at the outset of a case claims based on demonstrable fraud. Accordingly, it is Plaintiff's Motion to Vacate, rather than Defendants' Motion to Dismiss, that is without any foundation in law. Plaintiff's Motion to Vacate is DENIED.**

"Thus the extrinsic-intrinsic distinction on which Plaintiff relies is of a procedural, not a substantive nature...."  Plaintiff diligently reviewed the relevant case law on this issue before filing the motion to vacate.  His position that the granting of a motion to dismiss is substantive was based on the absence of case law to the contrary.  It was also based upon the reasonable factual argument that a dismissal of Plaintiff's entire case must be something that can be defined as substantive.

Plaintiff found no book of lists of procedural versus substantive matters making this distinction for courts in diversity a simple exercise in turning to the proper page of such a book.  Plaintiff's analysis of the law applicable to this question, therefore, cannot be said to be so without merit to be presented in bad faith.  In fact, Plaintiff's brief is the only document advancing *any* case law on this point and the court did not find that Plaintiff's case law was somehow not on point, frivolously argued or otherwise inserted into the argument for some improper purpose.  As the above quote indicates, this court *disagrees* with Plaintiff's well supported contention in this regard, that the dismissal of his entire case is substantive, not merely procedural.  But, that disagreement is not tantamount to

reducing Plaintiff's argument to one that is presented in bad faith.   Plaintiff's

argument has sufficient merit that the numerous cases he offered in his motion

discuss the argument and rule, ultimately, in the direction Plaintiff urged in his

motion.   In contrast, as the above quote makes evident, Defendants offered *no case

law* support for any contention that dismissing Plaintiff's case, pre-trial, upon

intrinsic fraud claims disputing by dueling the parties and dueling experts is

somehow, merely procedural.

### PROCEDURAL/SUBSTANTIVE DISTINCTION

### Erie Railroad Company v. Tompkins -1938

In *Erie* the Supreme Court asserted that Congress is powerless to declare

"substantive rules of common law applicable in a state."   Erie v. Tompkins 58 S.Ct.

at 822.   Justice Brandeis did not refer to "procedure" in his opinion for the Court.

Justice Reed, in his concurring opinion, observed that "no one doubts federal power

over procedure."   Id. at 828.

To this day the terms "substance" and "procedure" often are used in a highly

conclusory fashion, both by lawyers and by courts, in connection with various

aspects of the *Erie* doctrine.

### Guaranty Trust Company of New York v. York - 1945

This conclusory reference to a presumed substantive/procedural divide lasted

until the Supreme Court itself rejected the idea in 1945.   No longer could *Erie*

questions be resolved according to a simple dichotomy between substance and

procedure.   The trouble with that presumed dichotomy, as Justice Frankfurter

pointed out in *Guaranty Trust Company of New York v. York* 1945, 65 S.Ct. 1464 is

that "substance" and "procedure" are the same key-words to very different

problems. Neither "substance" nor "procedure" represents the same invariants.

Each implies different variables depending upon the particular problem for which it

is used. *Guaranty Trust* at 1469.

In the course of rejecting substance and procedure as the determinative

concepts under *Erie*, the Supreme Court in *Guaranty Trust* substantially redefined

the *Erie* doctrine.   The holding in *Guaranty Trust* was that a state statute of

limitations must be applied by a federal court in a diversity case, even though

statutes of limitations may be regarded as "procedural" for other purposes such as

applying choice-of-law rules.   Likewise, here, the Defendants seek to dismiss

Plaintiff's claim arguing a statute of limitations violation.   In that motion,

Defendants cite exclusively to New York substantive law on the point.

The ruling in *Guaranty Trust* followed from what the Court perceived to be

the policy of *Erie*—namely, that "the outcome of the litigation in the federal court

should be substantially the same, inasmuch as legal rules determine the outcome of

litigation, as it would be if tried in State court.:  Id. at 1470.

The intent of *Erie* was to insure that, in all cases where a federal court is

sitting in diversity, the outcome of the litigation in the federal court should be

substantially the same, so far as legal rules determine the outcome of a litigation,

as it would be if tried in a State court.

In place of a substance-procedure distinction, *Guaranty Trust* announced an **outcome-determinative test for *Erie* questions**, under which the applicability of state law turned on whether "it significantly affect[s] the result of a litigation for a federal court to disregard a law of a State that would be controlling in an action upon the same claim by the same parties in a State court."  Id. at 1470.  However, the outcome-determinative test was the law of the land until 1965.

## HANNA V. PLUMER OF 1965

Then, in 1965 the Supreme Court clarified the Erie Doctrine making that decision the most current interpretation of it.  In Hanna v. Plumer 85 S.Ct. 1136 the Court addressed specifically the relationship between the Federal Rules of Civil Procedure and the command of *Erie*.

The Supreme Court granted certiorari "because of the threat to the goal of uniformity of federal procedure posed by the decision below."  Id. at 1139.

In an opinion by Chief Justice Warren, the Court held "made it clear that Erie-type problems were not to be solved by reference to any traditional or commonsense substance-procedure distinction."  Id. at 1141.

The court's language in denying Plaintiff's motion to vacate indicate its belief that the current law regarding application of the *Erie* doctrine relies on a traditional or commonsense substance procedure distinction.  The Supreme Court in *Hanna* makes clear that this issue is not resolved by making a substance-procedure distinction.

The Chief Justice concluded that the crucial considerations under *Erie* were whether the failure to apply state law <u>was likely to result in forum-shopping</u>, and the degree to which the failure to apply state law <u>would discriminate unfairly against citizens</u> of the forum state.  Id. at 1141.  Emphasis added.  As an example pertinent to the court's order, the Supreme Court in *Chambers* analyzed the application of the *Erie* doctrine to the circumstances of that case and determined that the court's use of inherent power imposing attorney sanctions could not conceivably result in forum shopping.  The Supreme Court in *Chambers* did not remark at all about whether a court's use of inherent power to dismiss a case, pre-trial, if substantive state law would not permit dismissal would or would not encourage forum shopping.

## <u>COURT'S INHERENT POWER NOT IN CONFLICT WITH ERIE DOCTRINE PROVIDED DEFENDANTS MEET CLEAR AND CONVINCING STANDARD</u>

Plaintiff agrees that this court, of course, has the inherent power to dismiss this case pre-trial for fraud provided Defendants meet the rigorous clear and convincing standard.  The clear and convincing standard is well defined as evidence so convincing that "no reasonable jury could find otherwise."  *Univ. of Rochester v. G.D. Searle & Co., Inc.*, 249 F. Supp. 2d 216, 220-21 (W.D.N.Y. 2003).  To meet the clear and convincing standard, Defendants would have to show that no jury could find in favor of authenticity of the Facebook Contract or the emails attached to the Amended Complaint. The June 4, 2012 submission of Plaintiff's experts' reports, however, make it impossible for Defendants to meet this standard.  Absent meeting

the clear and convincing standard, the Defendants' appeal to this court's inherent authority are meaningless and overreaching.

The court rejected Plaintiff's argument regarding the applicability of state law reliant on the conclusory procedural/substantive distinction.  The Supreme Court case law outlined above establishes that Plaintiff's arguments regarding the application of the *Erie* doctrine are supported by relevant U.S. Supreme Court cases.  In the alternative, Plaintiff's arguments urge a reasonable extension of New York state law relative to post-trial reversals to pre-trial dismissals - precisely what Defendants' seek here.  Therefore, Plaintiff's arguments have ample legal and factual support and were filed in good  faith.

## MOTION TO DISQUALIFY DOC. NO. 437

Once the New York substantive law issue became critical to the analysis of the motion to dismiss for intrinsic fraud, the issue of the dual representation under New York law was then analyzed.  No prior counsel had considered the effect of Defendants' counsel's dual representation.  That analysis resulted in the motion to disqualify being filed.  The urgency of that motion was Plaintiff's good faith belief that the disqualification of Defendants' counsel mid-stream of depositions would result in those depositions being repeated, in whole or in part, at some later date when appropriate and independent counsel for Facebook entered an appearance.

As noted in our motion to disqualify, the motion is one that must be raised by counsel when an apparent ethical violation is in progress.  Plaintiff analyzed and detailed for the court several existing conflicts between the Defendants as well as

potential future conflicts.  Defendants did not oppose any of those arguments of current and future conflicts.  These are factual arguments that are not only with merit, they were substantively unopposed by Defendants.

This court simply posited that it found it implausible that any conflicts could arise between the parties.  This perceived implausibility, however, does not address the existing and potential conflicts Plaintiff provided in his motion.  It also does not address that the standard involved does not contain any notion of plausibility per se.  Further, although Defendants claimed to have signed waivers of any potential conflicts, they have not produced those waivers leaving for speculation as to when they were signed, by whom and containing what description of conflicts that were waived.  The record of this case contains no information as to the waivers Defendants signed.

The court then made a factual finding of the date of breach of the Facebook Contract.  It held that Facebook did not even exist when the contract was breached. Doc. No. 457 at 38.  The date of the allegation of the first potential breach of the agreement is within the Amended Complaint.  That date is coincident with the precise date Facebook incorporated.  It may well be through future discovery that this date is not the precise date of breach as Defendant Zuckerberg may have submitted his interest (and that of Plaintiff's) in all the intellectual property making up the Facebook business to Defendant Facebook, Inc. at some point later than July 2004.

Even the court itself noted that, "Plaintiff's sensitivity to the Code of Professional Responsibility is commendable" Doc. No. 451 at 7.  And, given Plaintiff's counsel's duty to raise potential ethical violations to the court, it cannot be said that this motion was in bad faith.  Plaintiff cited to factual scenarios present and future that outlined existing conflicts and those on the horizon.  This court merely disagreed, relying on the same facts as Plaintiff, that those conflicts existed or were possible.  It is a dangerous precedent indeed to sanction Plaintiff's counsel for his good faith raising of a potential ethical issue which was not a mere defamatory statement, but a detailed analysis of existing and potential conflicts.

## THE PRESUMED INTENT TO DELAY DISCOVERY

The court held that Plaintiff's motions "give[] rise to more than suspicion that such motions were filed solely to **[1]** unreasonably and vexatiously multiply the proceedings, and  **[2]** especially to derail the schedule for the limited discovery of experts set forth in the April 4, 2012 Order."

Plaintiff's request to delay discovery in some of his motions, was the opposite of an attempt to multiply proceedings.  In fact, the outcome of those motions, if favorable to Plaintiff, would have necessitated a 16(b) conference to embark on regular discovery, Doc. No. 426 , or a brief delay in the expert discovery for the Defendants to obtain new counsel, Doc. No. 437.  Both of these requests were designed streamline the proceedings avoiding duplication of tasks in the event depositions were partially underway and either motion required a change of direction in the case.

Congress's use of the verb "multipl[y]" in the text of the statute clearly contemplates that, to be sanctionable thereunder, **conduct must have an effect** on an already initiated proceeding. 28 U.S.C.A. § 1927.  Emphasis added.

The court's presumed intent of these motions is compared against their effect. None of Plaintiff's motions delayed any part of this case.  The court presumed Plaintiff's intent in its order to show cause.  Putting that aside, the effect of the motions resulted in no derailing of discovery.

Plaintiff's motions not only do not seek to derail discovery, but to expand it in ways that Plaintiff argued fairness dictates.  In none of plaintiff's motions did he seek to delay discovery.  The motion to disqualify, if granted, would have delayed discovery as a feature of the need for the parties to obtain new counsel, but that delay would not have benefited Plaintiff.  Plaintiff has been seeking full discovery since the outset of this case, not a delay or deferral of discovery as Defendants have repeatedly sought and been granted.   The motion to vacate sought to **end the delay** of regular discovery.

Each motion dealt with a separate and important issue.  They all were supported by factual and legal arguments.  Plaintiff, unlike Defendants, does not have the desire or resources to multiply these proceedings.  His motions were filed in good faith, supported by ample case law, but case law which this court disagreed with.  And, as noted above, that disagreement by the court was in many cases, without a disagreement as to the validity of Plaintiff's underlying case law or its analysis.  The court simply disagreed.

## APPLYING THE 18 U.S.C. 1927 STANDARD
## TO THE TWO RELEVANT MOTIONS

Defendants' argue sanctions are appropriate for Plaintiff's filing of two

motions:  The Motion to Vacate (Doc. No. 426) and the Motion to Disqualify (Doc.

No. 437).

## MOTION TO VACATE DOC. NO. 426

For Defendants to obtain the sanctions they seek, they must meet the

standard noted above:  "[A] claim is entirely without color when it lacks **any** legal or

factual basis." *Sierra Club v. United States Army Corps of Eng'rs*, 776 F.2d 383, 390

(2d Cir.1985).  Emphasis in the original.

The factual and legal basis for this motion is detailed above and incorporated

here by reference.  This motion clearly had a legal basis as was previously

demonstrated.

Conversely, a claim is colorable "when it has some legal and factual support,

considered in light of the reasonable beliefs of the individual making the claim."

*Nemeroff v. Abelson*, 620 F.2d 339, 348 (2d Cir.1980).

The court is required to view all arguments regarding the existence of a

factual or legal basis in a light most favorable to Plaintiff.  *Nemeroff*.

Viewed in a light most favorable to plaintiff, the motion to vacate was a good

faith request to extend post trial reversal case law to Defendants' pre-trial dismissal

motion.  It also was a clear outlining of the absence of any case law permitting the

remedy Defendants' seek under circumstances peculiar to this case as noted above.

## MOTION TO DISQUALIFY DOC, NO. 437

For Defendants to obtain the sanctions they seek, they must meet the standard noted above: "[A] claim is entirely without color when it lacks **any** legal or factual basis." *Sierra Club*.  Emphasis in the original.

The factual and legal basis for this motion is detailed above and incorporated here by reference.  This motion clearly had a legal basis as was previously demonstrated.

Conversely, a claim is colorable "when it has some legal and factual support, considered in light of the reasonable beliefs of the individual making the claim." *Nemeroff v. Abelson*, 620 F.2d 339, 348 (2d Cir.1980).

The court is required to view all arguments regarding the existence of a factual or legal basis in a light most favorable to Plaintiff.  *Nemeroff*.

Viewed in a light most favorable to plaintiff, the motion to disqualify was a good faith argument that Defendants' counsels' dual representation was a violation of the New York rules governing conduct of attorneys.  This argument, commended by the court for its sensitivity to ethical concerns, does not satisfy the *Sierra Club* standard for sanctionable conduct as noted above.

## CONCLUSION

Each of Plaintiff's motions were filed in good faith with ample legal and factual support as noted above.  Plaintiff is a single person pursuing a claim against one of the world's richest corporations with unlimited resources.  Certainly, Plaintiff does not benefit from the multiplication of these proceedings or the work involved in

filing motions merely for sport.  Plaintiff has the sword of a case ending motion poised over his head, ever present, inspiring him to raise every reasonable and legally supported argument to ensure his right to a jury trial.  As the court has previously stated on the record, "It's a very substantial case, to say the least, so fairness considerations become to me even heightened, and -- and the fact is there are experts out there, whether you, [Mr. Snyder], like it or not, that -- that tend to line up on the -- on the Plaintiff's [side]."  Transcript of Hearing, December 13, 2011. The court continued by stating, quite correctly, something that is true up and to this day:  "My point is simply this:  Plaintiff has proffered experts who have not caved." Id.

Plaintiff accepts the court's denial of his motions and those denials serve as sufficient rebuke of Plaintiff.  He takes note of the court's interest in safeguarding the orderly and efficient expert discovery without further unnecessary delay.  Given the need for heightened fairness, the Plaintiff respectfully requests the court view the motions filed in a light most favorable to Plaintiff and refrain from imposing sanctions.

Respectfully submitted,

/s/Dean Boland

Paul A. Argentieri
188 Main Street
Hornell, NY 14843
607-324-3232 phone
607-324-6188
paul.argentieri@gmail.com

Dean Boland
1475 Warren Road
Unit 770724
Lakewood, Ohio 44107
216-236-8080 phone
866-455-1267 fax
dean@bolandlegal.com