# EXHIBIT E

# EXHIBIT K-1

**REDACTED**

TFB007661

**REDACTED**

# REDACTED

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

# REDACTED

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

# REDACTED

SAVVY000123

# REDACTED

SAVVY000132

**REDACTED**

SAVVY000105

**REDACTED**

SAVVY000106

**REDACTED**

SAVVY000107

**REDACTED**

SAVVY000108

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

FB000158

**REDACTED**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

FB000159

**REDACTED**

0088916.04

CONFIDENTIAL -- SUBJECT TO PROTECTIVE ORDER

FB000160

**REDACTED**

EQ000007

**REDACTED**

EQ000008

**REDACTED**

EQ000009

**REDACTED**

EQ000010

# REDACTED

EQ000011

**REDACTED**

EQ000012

**REDACTED**

EQ000013

**REDACTED**

EQ000018

**REDACTED**

EQ000019

# REDACTED

EQ000020

**REDACTED**

EQ000021

# REDACTED

EQ000022

**REDACTED**

EQ000023

**REDACTED**

EQ000024

**REDACTED**

EQ000025

**REDACTED**

# REDACTED

**REDACTED**

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CONNECTU LLC, | CIVIL ACTION No.: 1:04-cv-11923 (DPW) |
| Plaintiff, | |
| v. | |
| MARK ZUCKERBERG, EDUARDO SAVERIN, DUSTIN MOSKOVITZ, ANDREW MCCOLLUM, CHRISTOPHER HUGHES AND THEFACEBOOK, INC., | |
| Defendants. | |
| MARK ZUCKERBERG, and THEFACEBOOK, INC., | |
| Counterclaimants, | |
| v. | |
| CONNECTU LLC, CAMERON WINKLEVOSS, TYLER WINKLEVOSS, and DIVYA NARENDRA, | |
| Counterdefendants. | |

## DEFENDANTS AND COUNTERCLAIMANTS' RESPONSES TO PLAINTIFF AND COUNTERDEFENDANTS' FIRST SET OF INTERROGATORIES

Defendants and counterclaimants Mark Zuckerberg and TheFacebook, Inc., and

Defendants Eduardo Saverin, Dustin Moskovitz, Andrew McCollum, and Christopher

Hughes (collectively "Defendants") respond to the First Set of Interrogatories of Plaintiff

and Counterclaimant Defendant ConnectU LLC and additional Counterclaim Defendants

## Verification

I, Mark Zuckerberg, declare and state:

I have read DEFENDANTS' OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, served herewith, and to the best of my present knowledge and belief, based in whole or in part upon information provided to me by others, this response is true and correct.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on ___May 30___, 2005 in Palo Alto, California.


_____
Mark Zuckerberg

CERTIFICATE OF SERVICE

I, Daniel K. Hampton, hereby certify that on this 31st day of May, 2005, I served a copy of the within document on the following counsel of record, via facsimile transmission and confirmation copy via first class mail:

John F. Hornick, Esq.
Finnegan, Henderson, Farabow,
Garrett & Dunner, L.L.P.
901 New York Avenue, N.W.
Washington, D.C. 20001; and

Jonathan M. Gelchinsky, Esq.
Finnegan, Henderson, Farabow, Garrett &
Dunner, L.L.P.
55 Cambridge Parkway
Cambridge, MA 02142

Daniel K. Hampton

# 2856366_v4

**REDACTED**

TFB000056

**REDACTED**

TFB000057

**REDACTED**

CONFIDENTIAL
TFB007066

**REDACTED**

Case 1:10-cv-00569-RJA-LGF   Document 129-11   Filed 06/04/10   Page 41 of 138

**REDACTED**

1   G. HOPKINS GUY, III (State Bar No. 124811)
       hopguy@orrick.com
2   I. NEEL CHATTERJEE (State Bar No. 173985)
       nchatterjee@orrick.com
3   MONTE COOPER (State Bar No. 196746)
       mcooper@orrick.com
4   THERESA A. SUTTON (State Bar No. 211857)
       tsutton@orrick.com
5   YVONNE P. GREER (State Bar No. 214072)
       ygreer@orrick.com
6   ORRICK, HERRINGTON & SUTCLIFFE LLP
    1000 Marsh Road
7   Menlo Park, CA  94025
    Telephone:    650-614-7400
8   Facsimile:    650-614-7401

9   Attorneys for Plaintiffs
    THE FACEBOOK, INC. and MARK ZUCKERBERG

10

11              UNITED STATES DISTRICT COURT

12           NORTHERN DISTRICT OF CALIFORNIA

13                  SAN JOSE DIVISION

14

15   THE FACEBOOK, INC. and MARK          Case No.  5:07-CV-01389-RS
     ZUCKERBERG,
16                                         **DECLARATION OF MARK E.
                     Plaintiffs,           ZUCKERBERG IN SUPPORT OF
17                                         PLAINTIFFS' MOTION FOR
           v.                              PARTIAL SUMMARY JUDGMENT
18                                         RE DEFENDANTS' LIABILITY
     CONNECTU, INC. (formerly known as     PURSUANT TO CALIFORNIA
19   CONNECTU, LLC), PACIFIC               PENAL CODE SECTION 502(C) AND
     NORTHWEST SOFTWARE, INC.,             15 U.S.C. § 7704(A)(1) AND 15 U.S.C. §
20   WINSTON WILLIAMS, WAYNE CHANG,        7704(B)(1)**
     and DAVID GUCWA,
21                                         Date:     February 13, 2008
                     Defendants.           Time:     9:30 A.M.
22                                         Judge:    Honorable Richard Seeborg

23

24

25

26

27

28

1  website to extract, copy, or use any information on the Facebook website for ConnectU-related

2  purposes.

3         I declare under penalty of perjury that the foregoing is true and correct to the best

4  of my knowledge.

5         Executed this 3rd day of January 2008, at Palo Alto, California.

6

7

8                                          Mark E. Zuckerberg

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**REDACTED**

**REDACTED**

**REDACTED**

REDACTED

Page 4 of 5

**REDACTED**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PAUL D. CEGLIA,                                    :

             Plaintiff,                          :

                                :    Civil Action No. 1:10-cv-00569-RJA

      v.                                           :

MARK ELLIOT ZUCKERBERG, Individually, and :
FACEBOOK, INC.,

             Defendants.                         :

                                :

                                :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DECLARATION OF MARK
ELLIOT ZUCKERBERG IN
SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFF'S
MOTION TO REMAND**

     I, MARK ELLIOT ZUCKERBERG, declare and state as follows:

     1.     I am the Founder, Chairman, and Chief Executive Officer of Facebook, Inc.

("Facebook"). Facebook is headquartered in Palo Alto, California.

     2.     I reside in Palo Alto, California, and intend to make my home and work in Palo

Alto for the indefinite future.

     3.     I respectfully submit this affidavit to provide the Court with facts and evidence

establishing that at the time this lawsuit was filed on June 30, 2010, and at the time this lawsuit

was removed to federal court on July 8, 2010, my domicile was – and continues to be –

California.

     <u>**Residence, Employment, and Property in California**</u>

     4.     I have lived year-round in California since the summer of 2004. I have resided in

my current Palo Alto, California home since March 1, 2009. I do not have any other residences.

My residence is within ten minutes' walking distance from Facebook's headquarters, located at

I declare under penalty of perjury that the foregoing is true and correct. Executed in Palo Alto, California on August 25, 2010.

Mark Elliot Zuckerberg

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

PAUL D. CEGLIA,

                Plaintiff,

    v.

MARK ELLIOT ZUCKERBERG and
FACEBOOK, INC.,

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

Civil Action No. 1:10-cv-00569-RJA

**DECLARATION OF MARK
ELLIOT ZUCKERBERG IN
SUPPORT OF DEFENDANTS'
MOTION FOR EXPEDITED
DISCOVERY**

I, MARK ELLIOT ZUCKERBERG, declare and state as follows:

1.     I am the Founder, Chairman, and Chief Executive Officer of Facebook, Inc.

("Facebook").

2.     I respectfully submit this declaration in support of Defendants' Motion for

Expedited Discovery.

3.     I have reviewed the Amended Complaint filed in this lawsuit, as well as the

document attached as Exhibit A to the Amended Complaint.

4.     I understand that Plaintiff Paul Ceglia alleges that Exhibit A is an agreement that

entitles him to partial ownership of Facebook, and that he and I signed this document on April

28, 2003.

5.     I did not sign the document attached as Exhibit A to the Amended Complaint.

6.     In early 2003, while I was a freshman at Harvard University, I saw an online job

listing regarding development of a web site. I responded to the listing and learned that the

project was for a company called StreetFax, which used the web site StreetFax.com.

7.    In or about April 2003, I entered into a written contract with StreetFax, pursuant to which I agreed to provide limited web site services solely in connection with the development of StreetFax's web site.  The contract was provided to me by Ceglia.

8.    The document attached as Exhibit A to the Amended Complaint is not the written contract that I signed.

9.    The written contract I signed concerned only the development of StreetFax's web site.  It did not mention or concern Thefacebook.com or any related social networking service or web site.

10.    I did not enter into any agreement, written or otherwise, with StreetFax, Ceglia, or anyone affiliated with Ceglia concerning Facebook or any related social networking web site.

11.    I conceived of the idea for Facebook in or about December 2003.

12.    I never referred to Facebook, publicly or privately, as "The Page Book."

13.    I also understand that Ceglia alleges that the text quoted in Paragraphs 32 through 55 of the Amended Complaint comes from e-mails that he and I allegedly sent each other.

14.    I did not write or receive any of the alleged e-mails quoted in the Amended Complaint.


I declare under penalty of perjury that the foregoing is true and correct.  Executed in Palo Alto, California on June 1, 2011.


                                                Mark Elliot Zuckerberg

**REDACTED**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**REDACTED**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**REDACTED**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

FB000149

**REDACTED**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**REDACTED**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**REDACTED**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**REDACTED**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

# EXHIBIT K-2

**ATTENTION**

Failure to file notice in the appropriate states will not result in a loss of the federal exemption. Conversely, failure to file the appropriate federal notice will not result in a loss of an available state exemption unless such exemption is predicated on the filing of a federal notice.

**FORM D**

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

SEC MAIL RECEIVED PROCESSING
MAY 0 6 2005
WASH. D.C. 107 SECTION

05054385

**FORM D**

NOTICE OF SALE OF SECURITIES
PURSUANT TO REGULATION D,
SECTION 4(6), AND/OR
UNIFORM LIMITED OFFERING EXEMPTION

1326801

| SEC USE ONLY | |
|---|---|
| Prefix | Serial |
| DATE RECEIVED | |

Name of Offering (☐ check if this is an amendment and name has changed, and indicate change.)
Options to purchase Common Stock and the underlying shares of Common Stock

Filing Under (Check box(es) that apply):   ☐ Rule 504   ☐ Rule 505   ☒ Rule 506   ☐ Section 4(6)   ☐ ULOE

Type of Filing:   ☒ New Filing   ☐ Amendment

**A. BASIC IDENTIFICATION DATA**

1. Enter the information requested about the issuer

Name of Issuer   (☐ check if this is an amendment and name has changed, and indicate change.)
TheFacebook, Inc.

| Address of Executive Offices   (Number and Street, City, State, Zip Code) 471 Emerson Street, Palo Alto, CA  94036 | Telephone Number (Including Area Code) (914) 646-8593 |
|---|---|
| Address of Principal Business Operations   (Number and Street, City, State, Zip Code) (if different from Executive Offices) | Telephone Number (Including Area Code) |

Brief Description of Business
Online directory

PROCESSED
MAY 1 2 2005
THOMSON E FINANCIAL

Type of Business Organization
☒ corporation              ☐ limited partnership, already formed          ☐ other (please specify):
☐ business trust           ☐ limited partnership, to be formed

Actual or Estimated Date of Incorporation or Organization:   Month [0][7]   Year [0][4]   ☐ Actual ☐ Estimated

Jurisdiction of Incorporation or Organization: (Enter two-letter U.S. Postal Service abbreviation for State:
CN for Canada; FN for other foreign jurisdiction)   [D][E]

**GENERAL INSTRUCTIONS**

**Federal:**

Who Must File: All issuers making an offering of securities in reliance on an exemption under Regulation D or Section 4(6), 17 CFR 230.501 et seq. or 15 U.S.C. 77d(6).

When To File: A notice must be filed no later than 15 days after the first sale of securities in the offering. A notice is deemed filed with the U.S. Securities and Exchange Commission (SEC) on the earlier of the date it is received by the SEC at the address given below or, if received at that address after the date on which it is due, on the date it was mailed by United States registered or certified mail to that address.

Where To File: U.S. Securities and Exchange Commission, 450 Fifth Street, N.W., Washington, D.C. 20549.

Copies Required: Five (5) copies of this notice must be filed with the SEC, one of which must be manually signed. Any copies not manually signed must be photocopies of the manually signed copy or bear typed or printed signatures.

Information Required: A new filing must contain all information requested. Amendments need only report the name of the issuer and offering, any changes thereto, the information requested in Part C, and any material changes from the information previously supplied in Parts A and B. Part E and the Appendix need not be filed with the SEC.

Filing Fee: There is no federal filing fee.

**State:**

This notice shall be used to indicate reliance on the Uniform Limited Offering Exemption (ULOE) for sales of securities in those states that have adopted ULOE and that have adopted this form. Issuers relying on ULOE must file a separate notice with the Securities Administrator in each state where sales are to be, or have been made. If a state requires the payment of a fee as a precondition to the claim for the exemption, a fee in the proper amount shall accompany this form. This notice shall be filed in the appropriate states in accordance with state law. The Appendix to the notice constitutes a part of this notice and must be completed.

## A. BASIC IDENTIFICATION DATA

2.  Enter the information requested for the following:

- Each promoter of the issuer, if the issuer has been organized within the past five years;
- Each beneficial owner having the power to vote or dispose, or direct the vote or disposition of, 10% or more of a class of equity securities of the issuer;
- Each executive officer and director of corporate issuers and of corporate general and managing partners of partnership issuers; and
- Each general and managing partner of partnership issuers.

| Check Box(es) that Apply: | ☐ Promoter | ☒ Beneficial Owner | ☒ Executive Officer | ☒ Director | ☐ General and/or Managing Partner |
|---|---|---|---|---|---|

Full Name (Last name first, if individual)

Zuckerberg, Mark

Business or Residence Address  (Number and Street, City, State, Zip Code)

471 Emerson Street, Palo Alto, CA  94036

| Check Box(es) that Apply: | ☐ Promoter | ☒ Beneficial Owner | ☒ Executive Officer | ☐ Director | ☐ General and/or Managing Partner |
|---|---|---|---|---|---|

Full Name (Last name first, if individual)

Parker, Sean

Business or Residence Address  (Number and Street, City, State, Zip Code)

471 Emerson Street, Palo Alto, CA  94036

| Check Box(es) that Apply: | ☐ Promoter | ☒ Beneficial Owner | ☒ Executive Officer | ☐ Director | ☐ General and/or Managing Partner |
|---|---|---|---|---|---|

Full Name (Last name first, if individual)

Moskovitz, Dustin

Business or Residence Address  (Number and Street, City, State, Zip Code)

471 Emerson Street, Palo Alto, CA  94036

| Check Box(es) that Apply: | ☐ Promoter | ☐ Beneficial Owner | ☐ Executive Officer | ☐ Director | ☐ General and/or Managing Partner |
|---|---|---|---|---|---|

Full Name (Last name first, if individual)



Business or Residence Address  (Number and Street, City, State, Zip Code)



| Check Box(es) that Apply: | ☐ Promoter | ☐ Beneficial Owner | ☐ Executive Officer | ☐ Director | ☐ General and/or Managing Partner |
|---|---|---|---|---|---|

Full Name (Last name first, if individual)



Business or Residence Address  (Number and Street, City, State, Zip Code)



| Check Box(es) that Apply: | ☐ Promoter | ☐ Beneficial Owner | ☐ Executive Officer | ☐ Director | ☐ General and/or Managing Partner |
|---|---|---|---|---|---|

Full Name (Last name first, if individual)



Business or Residence Address  (Number and Street, City, State, Zip Code)



(Use blank sheet, or copy and use additional copies of this sheet, as necessary.)

## B. INFORMATION ABOUT OFFERING

| | | Yes | No |
|---|---|---|---|
| 1. | Has the issuer sold, or does the issuer intend to sell, to non-accredited investors in this offering? | ☐ | ☒ |

Answer also in Appendix, Column 2, if filing under ULOE.

| | | | |
|---|---|---|---|
| 2. | What is the minimum investment that will be accepted from any individual? | $ | 6,840 |

| | | Yes | No |
|---|---|---|---|
| 3. | Does the offering permit joint ownership of a single unit? | ☐ | ☒ |

4. Enter the information requested for each person who has been or will be paid or given, directly or indirectly, any commission or similar remuneration for solicitation of purchasers in connection with sales of securities in the offering. If a person to be listed is an associated person or agent of a broker or dealer registered with the SEC and/or with a state or states, list the name of the broker or dealer. If more than five (5) persons to be listed are associated persons of such a broker or dealer, you may set forth the information for that broker or dealer only.

Full Name (Last name first, if individual)

Business or Residence Address (Number and Street, City, State, Zip Code)

Name of Associated Broker or Dealer

States in Which Person Listed Has Solicited or Intends to Solicit Purchasers

(Check "All States" or check individual States) .................................................................................... ☐ All States

| [ AL ] | [ AK ] | [ AZ ] | [ AR ] | [ CA ] | [ CO ] | [ CT ] | [ DE ] | [ DC ] | [ FL ] | [ GA ] | [ HI ] | [ ID ] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [ IL ] | [ IN ] | [ IA ] | [ KS ] | [ KY ] | [ LA ] | [ ME ] | [ MD ] | [ MA ] | [ MI ] | [ MN ] | [ MS ] | [ MO ] |
| [ MT ] | [ NE ] | [ NV ] | [ NH ] | [ NJ ] | [ NM ] | [ NY ] | [ NC ] | [ ND ] | [ OH ] | [ OK ] | [ OR ] | [ PA ] |
| [ RI ] | [ SC ] | [ SD ] | [ TN ] | [ TX ] | [ UT ] | [ VT ] | [ VA ] | [ WA ] | [ WV ] | [ WI ] | [ WY ] | [ PR ] |

Full Name (Last name first, if individual)

Business or Residence Address (Number and Street, City, State, Zip Code)

Name of Associated Broker or Dealer

States in Which Person Listed Has Solicited or Intends to Solicit Purchasers

(Check "All States" or check individual States) .................................................................................... ☐ All States

| [ AL ] | [ AK ] | [ AZ ] | [ AR ] | [ CA ] | [ CO ] | [ CT ] | [ DE ] | [ DC ] | [ FL ] | [ GA ] | [ HI ] | [ ID ] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [ IL ] | [ IN ] | [ IA ] | [ KS ] | [ KY ] | [ LA ] | [ ME ] | [ MD ] | [ MA ] | [ MI ] | [ MN ] | [ MS ] | [ MO ] |
| [ MT ] | [ NE ] | [ NV ] | [ NH ] | [ NJ ] | [ NM ] | [ NY ] | [ NC ] | [ ND ] | [ OH ] | [ OK ] | [ OR ] | [ PA ] |
| [ RI ] | [ SC ] | [ SD ] | [ TN ] | [ TX ] | [ UT ] | [ VT ] | [ VA ] | [ WA ] | [ WV ] | [ WI ] | [ WY ] | [ PR ] |

Full Name (Last name first, if individual)

Business or Residence Address (Number and Street, City, State, Zip Code)

Name of Associated Broker or Dealer

States in Which Person Listed Has Solicited or Intends to Solicit Purchasers

(Check "All States" or check individual States) .................................................................................... ☐ All States

| [ AL ] | [ AK ] | [ AZ ] | [ AR ] | [ CA ] | [ CO ] | [ CT ] | [ DE ] | [ DC ] | [ FL ] | [ GA ] | [ HI ] | [ ID ] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [ IL ] | [ IN ] | [ IA ] | [ KS ] | [ KY ] | [ LA ] | [ ME ] | [ MD ] | [ MA ] | [ MI ] | [ MN ] | [ MS ] | [ MO ] |
| [ MT ] | [ NE ] | [ NV ] | [ NH ] | [ NJ ] | [ NM ] | [ NY ] | [ NC ] | [ ND ] | [ OH ] | [ OK ] | [ OR ] | [ PA ] |
| [ RI ] | [ SC ] | [ SD ] | [ TN ] | [ TX ] | [ UT ] | [ VT ] | [ VA ] | [ WA ] | [ WV ] | [ WI ] | [ WY ] | [ PR ] |

(Use blank sheet, or copy and use additional copies of this sheet, as necessary.)

## C. OFFERING PRICE, NUMBER OF INVESTORS, EXPENSES AND USE OF PROCEEDS

1. Enter the aggregate offering price of securities included in this offering and the total amount already sold. Enter "0" if answer is "none" or "zero." If the transaction is an exchange offering, check this box ☐ and indicate in the columns below the amounts of the securities offered for exchange and already exchanged.

| Type of Security | Aggregate Offering Price | Amount Already Sold |
|---|---|---|
| Debt | $_____ | $_____ |
| Equity | $_____ | $_____ |
| ☒ Common   ☐ Preferred | | |
| Convertible Securities (including warrants) Stock Options | $ 6,840.00 | $ 6,840.00 |
| Partnership Interests | $_____ | $_____ |
| Other (Specify _____) | $_____ | $_____ |
| Total | $ 6,840.00 | $ 6,840.00 |

Answer also in Appendix, Column 3, if filing under ULOE.

2. Enter the number of accredited and non-accredited investors who have purchased securities in this offering and the aggregate dollar amounts of their purchases. For offerings under Rule 504, indicate the number of persons who have purchased securities and the aggregate dollar amount of their purchases on the total lines. Enter "0" if answer is "none" or "zero."

| | Number Investors | Aggregate Dollar Amount of Purchases |
|---|---|---|
| Accredited Investors | 1 | $ 6,840.00 |
| Non-accredited Investors | _____ | $_____ |
| Total (for filings under Rule 504 only) | 0 | $ 0 |

Answer also in Appendix, Column 4, if filing under ULOE.

3. If this filing is for an offering under Rule 504 or 505, enter the information requested for all securities sold by the issuer, to date, in offerings of the types indicated, in the twelve (12) months prior to the first sale of securities in this offering. Classify securities by type listed in Part C - Question 1.

| Type of Offering | Type of Security | Dollar Amount Sold |
|---|---|---|
| Rule 505 | _____ | $_____ |
| Regulation A | _____ | $_____ |
| Rule 504 | _____ | $_____ |
| Total | _____ | $ 0 |

4. a. Furnish a statement of all expenses in connection with the issuance and distribution of the securities in this offering. Exclude amounts relating solely to organization expenses of the issuer. The information may be given as subject to future contingencies. If the amount of an expenditure is not known, furnish an estimate and check the box to the left of the estimate.

| | | |
|---|---|---|
| Transfer Agent's Fees | ☐ | $_____ |
| Printing and Engraving Costs | ☐ | $_____ |
| Legal Fees | ☒ | $ 50.00 |
| Accounting Fees | ☐ | $_____ |
| Engineering Fees | ☐ | $_____ |
| Sales and Commissions (specify finders' fees separately) | ☐ | $_____ |
| Other Expenses (identify) _____ | ☐ | $_____ |
| Total | ☒ | $ 50.00 |

## C. OFFERING PRICE, NUMBER OF INVESTORS, EXPENSES AND USE OF PROCEEDS

   b.   Enter the difference between the aggregate offering price in response to Part
C - Question 1 and total expenses furnished in response to Part C - Question 4.a.  This
difference is the "adjusted gross proceeds to the issuer."

$_____6,790.00

5.   Indicate below the amount of the adjusted gross proceeds to the issuer used or proposed to be
used for each of the purposes shown.  If the amount for any purpose is not known, furnish an
estimate and check the box to the left of the estimate.  The total of the payments listed must
equal the adjusted gross proceeds to the issuer set forth in response to Part C - Question 4.b
above.

| | Payments to Officers, Directors, & Affiliates | Payments to Others |
|---|---|---|
| Salaries and fees ........................................................... | ☐ $_____ | ☐ $_____ |
| Purchase of real estate ................................................... | ☐ $_____ | ☐ $_____ |
| Purchase, rental or leasing and installation of machinery and equipment.................................. | ☐ $_____ | ☐ $_____ |
| Construction or leasing of plant buildings and facilities.............................. | ☐ $_____ | ☐ $_____ |
| Acquisition of other businesses (including the value of securities involved in this offering that may be used in exchange for the assets or securities of another issuer pursuant to a merger) ................................... | ☐ $_____ | ☐ $_____ |
| Repayment of indebtedness ............................................. | ☐ $_____ | ☐ $_____ |
| Working capital ............................................................... | ☐ $_____ | ☐ $  6,790.00 |
| Other (specify): _____ | ☐ $_____ | ☐ $_____ |
| _____ | ☐ $_____ | ☐ $_____ |
| Column Totals .................................................................. | ☐ $_____0 | ☒ $  6,790.00 |
| Total Payments Listed (column totals added) ..................................... | ☒ $  6,790.00 | |

## D. FEDERAL SIGNATURE

The issuer has duly caused this notice to be signed by the undersigned duly authorized person.  If this notice is filed under Rule 505, the
following signature constitutes an undertaking by the issuer to furnish to the U.S. Securities and Exchange Commission, upon written request
of its staff, the information furnished by the issuer to any non-accredited investor pursuant to paragraph (b)(2) of Rule 502.

| Issuer (Print or Type) TheFacebook, Inc. | Signature | Date April    , 2005 |
|---|---|---|
| Name of Signer (Print or Type) Mark Zuckerberg | Title of Signer (Print or Type) Chief Executive Officer | |

---

## ATTENTION

**Intentional misstatements or omissions of fact constitute federal criminal violations.  (See 18 U.S.C. 1001.)**

Failure to file notice in the appropriate states will not result in a loss of the federal exemption. Conversely, failure to file the appropriate federal notice will not result in a loss of an available state exemption unless such exemption is predicated on the filing of a federal notice.

# FORM D



OMB APPROVAL

**PROCESSED**

AUG 09 2005

THOMSON
FINANCIAL

*132680*

## UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

### FORM D

NOTICE OF SALE OF SECURITIES
PURSUANT TO REGULATION D,
SECTION 4(6), AND/OR
UNIFORM LIMITED OFFERING EXEMPTION

05062893

| SEC USE ONLY | |
|---|---|
| Prefix | Serial |
| DATE RECEIVED | |

---

Name of Offering  (☐ check if this is an amendment and name has changed, and indicate change.)
Domain Name Transfer

Filing Under (Check box(es) that apply):   ☐ Rule 504   ☐ Rule 505   ☒ Rule 506   ☐ Section 4(6)   ☐ ULOE

Type of Filing:   ☒ New Filing   ☐ Amendment

### A. BASIC IDENTIFICATION DATA

1.  Enter the information requested about the issuer

| Name of Issuer  (☐ check if this is an amendment and name has changed, and indicate change.) TheFacebook, Inc. | | |
|---|---|---|
| Address of Executive Offices   (Number and Street, City, State, Zip Code) 471 Emerson Street, Palo Alto, CA 94301 | | Telephone Number (including Area Code) (650) 853-1300 |
| Address of Principal Business Operations (if different from Executive Offices)   (Number and Street, City, State, Zip Code) | | Telephone Number (including Area Code) |
| Brief Description of Business Online directory | | |

AUG 08 2005
WASH. D.C.
213

Type of Business Organization
☒ corporation    ☐ limited partnership, already formed    ☐ other (please specify):
☐ business trust    ☐ limited partnership, to be formed

|  | Month | Year |  |
|---|---|---|---|
| Actual or Estimated Date of Incorporation or Organization: | 0 7 | 0 4 | ☐ Actual ☐ Estimated |

Jurisdiction of Incorporation or Organization:  (Enter two-letter U.S. Postal Service abbreviation for State:

CN for Canada; FN for other foreign jurisdiction)   D E

---

## GENERAL INSTRUCTIONS

**Federal:**

**Who Must File:**  All issuers making an offering of securities in reliance on an exemption under Regulation D or Section 4(6), 17 CFR 230.501 et seq. or 15 U.S.C. 77d(6).

**When To File:**  A notice must be filed no later than 15 days after the first sale of securities in the offering.  A notice is deemed filed with the U.S. Securities and Exchange Commission (SEC) on the earlier of the date it is received by the SEC at the address given below or, if received at that address after the date on which it is due, on the date it was mailed by United States registered or certified mail to that address.

**Where To File:**  U.S. Securities and Exchange Commission, 450 Fifth Street, N.W., Washington, D.C. 20549.

**Copies Required:**  Five (5) copies of this notice must be filed with the SEC, one of which must be manually signed.  Any copies not manually signed must be photocopies of the manually signed copy or bear typed or printed signatures.

**Information Required:**  A new filing must contain all information requested.  Amendments need only report the name of the issuer and offering, any changes thereto, the information requested in Part C, and any material changes from the information previously supplied in Parts A and B.  Part E and the Appendix need not be filed with the SEC.

**Filing Fee:**  There is no federal filing fee.

**State:**

This notice shall be used to indicate reliance on the Uniform Limited Offering Exemption (ULOE) for sales of securities in those states that have adopted ULOE and that have adopted this form.  Issuers relying on ULOE must file a separate notice with the Securities Administrator in each state where sales are to be, or have been made.  If a state requires the payment of a fee as a precondition to the claim for the exemption, a fee in the proper amount shall accompany this form.  This notice shall be filed in the appropriate states in accordance with state law.  The Appendix to the notice constitutes a part of this notice and must be completed.

DOCSSV1:414590.1

A. BASIC IDENTIFICATION DATA

2.   Enter the information requested for the following:

- Each promoter of the issuer, if the issuer has been organized within the past five years;
- Each beneficial owner having the power to vote or dispose, or direct the vote or disposition of, 10% or more of a class of equity securities of the issuer;
- Each executive officer and director of corporate issuers and of corporate general and managing partners of partnership issuers; and
- Each general and managing partner of partnership issuers.

| Check Box(es) that Apply: | ☐ Promoter | ☒ Beneficial Owner | ☒ Executive Officer | ☒ Director | ☐ General and/or Managing Partner |
|---|---|---|---|---|---|

Full Name (Last name first, if individual)

Zuckerberg, Mark

Business or Residence Address  (Number and Street, City, State, Zip Code)

471 Emerson Street, Palo Alto, CA  94036

| Check Box(es) that Apply: | ☐ Promoter | ☒ Beneficial Owner | ☒ Executive Officer | ☒ Director | ☐ General and/or Managing Partner |
|---|---|---|---|---|---|

Full Name (Last name first, if individual)

Parker, Sean

Business or Residence Address  (Number and Street, City, State, Zip Code)

471 Emerson Street, Palo Alto, CA  94036

| Check Box(es) that Apply: | ☐ Promoter | ☒ Beneficial Owner | ☒ Executive Officer | ☐ Director | ☐ General and/or Managing Partner |
|---|---|---|---|---|---|

Full Name (Last name first, if individual)

Moskovitz, Dustin

Business or Residence Address  (Number and Street, City, State, Zip Code)

471 Emerson Street, Palo Alto, CA  94036

| Check Box(es) that Apply: | ☐ Promoter | ☒ Beneficial Owner | ☐ Executive Officer | ☐ Director | ☐ General and/or Managing Partner |
|---|---|---|---|---|---|

Full Name (Last name first, if individual)

Accel Partners and its affiliates

Business or Residence Address  (Number and Street, City, State, Zip Code)

428 University Avenue, Palo Alto, CA  94301

| Check Box(es) that Apply: | ☐ Promoter | ☒ Beneficial Owner | ☐ Executive Officer | ☒ Director | ☐ General and/or Managing Partner |
|---|---|---|---|---|---|

Full Name (Last name first, if individual)

Thiel, Peter

Business or Residence Address  (Number and Street, City, State, Zip Code)

471 Emerson Street, Palo Alto, CA  94036

| Check Box(es) that Apply: | ☐ Promoter | ☐ Beneficial Owner | ☐ Executive Officer | ☒ Director | ☐ General and/or Managing Partner |
|---|---|---|---|---|---|

Full Name (Last name first, if individual)

Breyer, Jim

Business or Residence Address  (Number and Street, City, State, Zip Code)

428 University Avenue, Palo Alto, CA  94301

(Use blank sheet, or copy and use additional copies of this sheet, as necessary.)

## B. INFORMATION ABOUT OFFERING

|  |  | Yes | No |
|---|---|---|---|
| 1. | Has the issuer sold, or does the issuer intend to sell, to non-accredited investors in this offering? ................................ | ☐ | ☒ |

Answer also in Appendix, Column 2, if filing under ULOE.

2. What is the minimum investment that will be accepted from any individual? ....................................................... $ __45,373.99__

|  |  | Yes | No |
|---|---|---|---|
| 3. | Does the offering permit joint ownership of a single unit? ................................ | ☐ | ☒ |

4. Enter the information requested for each person who has been or will be paid or given, directly or indirectly, any commission or similar remuneration for solicitation of purchasers in connection with sales of securities in the offering. If a person to be listed is an associated person or agent of a broker or dealer registered with the SEC and/or with a state or states, list the name of the broker or dealer. If more than five (5) persons to be listed are associated persons of such a broker or dealer, you may set forth the information for that broker or dealer only.

Full Name (Last name first, if individual)
_____

Business or Residence Address (Number and Street, City, State, Zip Code)
_____

Name of Associated Broker or Dealer
_____

States in Which Person Listed Has Solicited or Intends to Solicit Purchasers

(Check "All States" or check individual States)................................................................................................ ☐ All States

| [ AL ] | [ AK ] | [ AZ ] | [ AR ] | [ CA ] | [ CO ] | [ CT ] | [ DE ] | [ DC ] | [ FL ] | [ GA ] | [ HI ] | [ ID ] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [ IL ] | [ IN ] | [ IA ] | [ KS ] | [ KY ] | [ LA ] | [ ME ] | [ MD ] | [ MA ] | [ MI ] | [ MN ] | [ MS ] | [ MO ] |
| [ MT ] | [ NE ] | [ NV ] | [ NH ] | [ NJ ] | [ NM ] | [ NY ] | [ NC ] | [ ND ] | [ OH ] | [ OK ] | [ OR ] | [ PA ] |
| [ RI ] | [ SC ] | [ SD ] | [ TN ] | [ TX ] | [ UT ] | [ VT ] | [ VA ] | [ WA ] | [ WV ] | [ WI ] | [ WY ] | [ PR ] |

Full Name (Last name first, if individual)
_____

Business or Residence Address (Number and Street, City, State, Zip Code)
_____

Name of Associated Broker or Dealer
_____

States in Which Person Listed Has Solicited or Intends to Solicit Purchasers

(Check "All States" or check individual States)................................................................................................ ☐ All States

| [ AL ] | [ AK ] | [ AZ ] | [ AR ] | [ CA ] | [ CO ] | [ CT ] | [ DE ] | [ DC ] | [ FL ] | [ GA ] | [ HI ] | [ ID ] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [ IL ] | [ IN ] | [ IA ] | [ KS ] | [ KY ] | [ LA ] | [ ME ] | [ MD ] | [ MA ] | [ MI ] | [ MN ] | [ MS ] | [ MO ] |
| [ MT ] | [ NE ] | [ NV ] | [ NH ] | [ NJ ] | [ NM ] | [ NY ] | [ NC ] | [ ND ] | [ OH ] | [ OK ] | [ OR ] | [ PA ] |
| [ RI ] | [ SC ] | [ SD ] | [ TN ] | [ TX ] | [ UT ] | [ VT ] | [ VA ] | [ WA ] | [ WV ] | [ WI ] | [ WY ] | [ PR ] |

Full Name (Last name first, if individual)
_____

Business or Residence Address (Number and Street, City, State, Zip Code)
_____

Name of Associated Broker or Dealer
_____

States in Which Person Listed Has Solicited or Intends to Solicit Purchasers

(Check "All States" or check individual States)................................................................................................ ☐ All States

| [ AL ] | [ AK ] | [ AZ ] | [ AR ] | [ CA ] | [ CO ] | [ CT ] | [ DE ] | [ DC ] | [ FL ] | [ GA ] | [ HI ] | [ ID ] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [ IL ] | [ IN ] | [ IA ] | [ KS ] | [ KY ] | [ LA ] | [ ME ] | [ MD ] | [ MA ] | [ MI ] | [ MN ] | [ MS ] | [ MO ] |
| [ MT ] | [ NE ] | [ NV ] | [ NH ] | [ NJ ] | [ NM ] | [ NY ] | [ NC ] | [ ND ] | [ OH ] | [ OK ] | [ OR ] | [ PA ] |
| [ RI ] | [ SC ] | [ SD ] | [ TN ] | [ TX ] | [ UT ] | [ VT ] | [ VA ] | [ WA ] | [ WV ] | [ WI ] | [ WY ] | [ PR ] |

(Use blank sheet, or copy and use additional copies of this sheet, as necessary.)

1. Enter the aggregate offering price of securities included in this offering and the total amount already sold. Enter "0" if answer is "none" or "zero." If the transaction is an exchange offering, check this box ☐ and indicate in the columns below the amounts of the securities offered for exchange and already exchanged.

| Type of Security | | Aggregate Offering Price | Amount Already Sold |
|---|---|---|---|
| Debt ....... | | $_____ | $_____ |
| Equity ....... | | $ 45,373.99 | $ 45,373.99 |
| | ☐ Common ☒ Preferred | | |
| Convertible Securities (including warrants) ....... | | $_____ | $_____ |
| Partnership Interests....... | | $_____ | $_____ |
| Other (Specify _____)....... | | $_____ | $_____ |
| Total ....... | | $ 45,373.99 | $ 45,373.99 |

Answer also in Appendix, Column 3, if filing under ULOE.

2. Enter the number of accredited and non-accredited investors who have purchased securities in this offering and the aggregate dollar amounts of their purchases. For offerings under Rule 504, indicate the number of persons who have purchased securities and the aggregate dollar amount of their purchases on the total lines. Enter "0" if answer is "none" or "zero."

| | Number Investors | Aggregate Dollar Amount of Purchases |
|---|---|---|
| Accredited Investors ....... | 1 | $ 45,373.99 |
| Non-accredited Investors ....... | _____ | $_____ |
| Total (for filings under Rule 504 only) ....... | 0 | $ 0 |

Answer also in Appendix, Column 4, if filing under ULOE.

3. If this filing is for an offering under Rule 504 or 505, enter the information requested for all securities sold by the issuer, to date, in offerings of the types indicated, in the twelve (12) months prior to the first sale of securities in this offering. Classify securities by type listed in Part C - Question 1.

| Type of Offering | Type of Security | Dollar Amount Sold |
|---|---|---|
| Rule 505....... | _____ | $_____ |
| Regulation A....... | _____ | $_____ |
| Rule 504....... | _____ | $_____ |
| Total....... | 0 | $ 0 |

4. a. Furnish a statement of all expenses in connection with the issuance and distribution of the securities in this offering. Exclude amounts relating solely to organization expenses of the issuer. The information may be given as subject to future contingencies. If the amount of an expenditure is not known, furnish an estimate and check the box to the left of the estimate.

| | | |
|---|---|---|
| Transfer Agent's Fees ....... | ☐ | $_____ |
| Printing and Engraving Costs ....... | ☐ | $_____ |
| Legal Fees....... | ☒ | $ 20,000.00 |
| Accounting Fees ....... | ☐ | $_____ |
| Engineering Fees ....... | ☐ | $_____ |
| Sales and Commissions (specify finders' fees separately)....... | ☐ | $_____ |
| Other Expenses (identify) _____ ....... | ☐ | $_____ |
| Total....... | ☒ | $ 20,000.00 |

## C. OFFERING PRICE, NUMBER OF INVESTORS, EXPENSES AND USE OF PROCEEDS

b.    Enter the difference between the aggregate offering price in response to Part C - Question 1 and total expenses furnished in response to Part C - Question 4.a.  This difference is the "adjusted gross proceeds to the issuer."

$    25,373.99

5.   Indicate below the amount of the adjusted gross proceeds to the issuer used or proposed to be used for each of the purposes shown.  If the amount for any purpose is not known, furnish an estimate and check the box to the left of the estimate.  The total of the payments listed must equal the adjusted gross proceeds to the issuer set forth in response to Part C - Question 4.b above.

| | Payments to Officers, Directors, & Affiliates | | Payments to Others | |
|---|---|---|---|---|
| Salaries and fees | ☐ $ | | ☐ $ | |
| Purchase of real estate | ☐ $ | | ☐ $ | |
| Purchase, rental or leasing and installation of machinery and equipment | ☐ $ | | ☐ $ | |
| Construction or leasing of plant buildings and facilities | ☐ $ | | ☐ $ | |
| Acquisition of other businesses (including the value of securities involved in this offering that may be used in exchange for the assets or securities of another issuer pursuant to a merger) | ☐ $ | | ☐ $ | |
| Repayment of indebtedness | ☐ $ | | ☐ $ | |
| Working capital | ☐ $ | | ☒ $ | 25,373.99 |
| Other (specify): _____ | ☐ $ | | ☐ $ | |
| _____ | ☐ $ | | ☐ $ | |
| Column Totals | ☐ $ | 0 | ☒ $ | 25,373.99 |
| Total Payments Listed (column totals added) | | | ☒ $ | 25,373.99 |

## D. FEDERAL SIGNATURE

The issuer has duly caused this notice to be signed by the undersigned duly authorized person.  If this notice is filed under Rule 505, the following signature constitutes an undertaking by the issuer to furnish to the U.S. Securities and Exchange Commission, upon written request of its staff, the information furnished by the issuer to any non-accredited investor pursuant to paragraph (b)(2) of Rule 502.

| Issuer (Print or Type) TheFacebook, Inc. | Signature _MR_ | Date Aug. 1 , 2005 |
|---|---|---|
| Name of Signer (Print or Type) Mark Zuckerberg | Title of Signer (Print or Type) Chief Executive Officer   CEO | Mark Zuckerberg |

---

## ATTENTION

**Intentional misstatements or omissions of fact constitute federal criminal violations.  (See 18 U.S.C. 1001.)**

# EXHIBIT K-3

Mark Zuckerberg
2734 Harvard Yard Mail Center
Cambridge, MA 02138
914.646.8593

## StreetFax Back-End Technical Specification

*Non-technical Explanation:*

To make the specification more readable, I will give an overview of the functionality of the system described by the set of scripts and applications below.

The first section deals with logon and security. The first script makes sure that the interface through which users log into the system is completely secure, using the latest methods of commercial cryptography. It will verify if the user has the privileges to enter the system, and if they do, it admits them. The second script protects the system from being entered through a page other than the logon page. If the only security was at the logon screen, then a person could just go to a different page and bypass the logon completely. This script will ensure that the user is logged in before it grants access to any page on the site. The third script in this section will allow the site administrators to create and edit usernames and account information. This is critical for customers who do not create their accounts through the site.

The second section deals with e-commerce. Much of the discussion here is about the different options of registration with SSL and VeriSign. The scripts we develop will use these technologies to perform secure e-commerce transactions. It will allow users to register on a subscription and individual-use basis. All actions performed by users in this section of the site will be logged in a database and can be used to generate reports later on.

The third section deals with searching the database of images. The user will enter two streets to search for their intersection, and then a script we write will search the database. If multiple intersections are found, the user will be shown a list with the towns and states to choose from. If, after reviewing the choices, there is still no an accurate match, the user will be routed to another page which will ask them to specify a state and city for a more detailed search. From their selection, the user is taken to another page with the list of intersections matching their search in the specified area. The user can choose an intersection to search for images. If only a single intersection is returned from the original search, then the images from that intersection are automatically brought up. The images will be displayed in alphabetical order with any signs at the top of the page above the photographs of the intersections. The script that retrieves the images from the database will also construct the necessary sentence describing the image from information in the database. If at any point no intersection is found, the user will be taken to a site that asks them if they want to pay to have those images acquired for them within 24 hours, this screen will appear as a half page with the nearest possible matches above it. They can search these pictures by clicking on any one of the intersections to

view it, and then by navigating back ard selecting the next intersection. There will also be a script to get the number of images matching an intersection.

The fourth section deals with saving and retrieving adjuster comments and layout settings from the database. This will allow adjusters to write comments and retrieve them later on. They will also be able to specify a layout for the screen, but we have not designed the possible layouts yet so no further explanation can be given at this point. A sample outline has been received consisting of 4 different layout types.

The fifth, sixth, and seventh sections deal with the very back-end implementation and architecture of the server and database. The database will be robust enough to be able to efficiently search the collection of images and be able to store them in a number of conventions, although the convention of "direction+street1+street2" will be accepted for now. The server will be equipped with the latest and most flexible web server, database server, and a solid hosting package. It was also have a built in interface for retrieving intersections from a given area and editing their database entries.

The eighth section deals with the client/photographer interface. Once a client requests an image, the photographer whose territory the intersection is in is notified that they need to take the picture. The dispatcher is also notified that the photograph needs to be taken by a new entry on the open requests page. This open requests page will give information on when the request was made, who made the request, and what intersection was requested. After 40 minutes, if the photographer assigned to that territory has not responded to the notification and confirmed its receipt, the specific request on the open requests page will turn a different color. When the photographer does respond to this initial request, the open requests page will display this and an email will be automatically generated and sent back to the adjuster informing them that their request has been received and accepted by the nearest photographer, and that their photos will be provided guaranteed. At selected intervals, if the photographer has not yet responded or uploaded the images, the dispatcher is again notified that the photographs still need to be taken. The system will continue to email the photographer and update the open requests page with the time remaining and status on the situation until the images are uploaded to the system. On the street, once the images have been taken, the photographer can upload them to the server, which will require the photographer to sign in to their homepage prior to upload. From here, the photographer must enter the request's claim number, which will be automatically generated with each new request. After the appropriate claim number has been entered, the server uploads the pictures to the site and updates the open requests page by graying the area. At this point, a link appears and the dispatcher has five minutes to approve or reject the photographs before the server automatically notifies the adjuster through email that their pictures are on site. There will be a link in the email that will allow the adjuster to link directly to the page which has his or her images. If the dispatcher rejects the pictures, then no notice is given to the adjuster and the process is taken over manually.

The ninth and tenth sections deal with allotting time for administrative discussions and algorithm planning.

*Database Structure and Scripting:*

1.  Logon Scripts
    a.  A script to validate logon information by referencing the user information table in the database. Validation includes taking the username and password and making sure they match and that the account is still valid. This script will also acquire the privileges of the user to ensure that only searches they are entitled to will be performed. It will use special security measures and encryption to maintain the integrity of users' passwords. This script will also log all user logons in a separate table in the database. Estimated Development Time: 1 day.
    b.  A script to check for the logon key on all other privileged parts of the site. This script will protect against people bypassing the logon screen and accessing user-only parts of the site. EDT: ½ day.
    c.  A script to add users and edit users. EDT ½ day.

2.  Financial Scripts
    a.  A script to interface with the credit card validation component. This script will use security measures like secure socket layer (SSL) to ensure the integrity of the transactions. Two different scripts will need to be developed to deal with subscription and individual use transactions. All transactions will be logged in a separate table in the database. *Note:* The credit card validation component and SSL certificate will carry additional costs. There are several options for e-commerce, and these can be discussed later. EDT: 4 days.

3.  Search Scripts
    a.  A script to interface with the database of images, which is given two street names. If no such intersection exists, then the names of intersections which are similar to the one entered are returned and the search can be repeated. If multiple intersections match the street names entered, then a new page comes up which asks the user to specify a state or city. From the selection, if there are still multiple matches, another page comes up that lets the user choose which intersection they want to retrieve images of. All searches will be logged, along with which user performed them, in a separate table in the database. EDT: 3 days.
    b.  A script to retrieve images from the database, given a unique intersection in some state. The script will display all images found in the database along with a sentence describing the image, its orientation, and the street it was taken from. If no images are found, it will ask the user if they would like those images to be acquired. If so, a notice will be sent to an email address or list of email addresses. Either way, the fact that no results came up will be recorded in a separate table in the database along with the user's response to acquiring the images. EDT: 3 days.
    c.  A subscript to reference the main script and return how many intersections and/or images match a given set of intersections. EDT: ¼ day.

    d.   A subscript to include speed limits in the capacity of the search engine. This script will return images of the speed limits in the queried regions using the keywords described. A full explanation of all keywords will be needed to write this script. EDT: 2 days.

4.   Adjuster Preference Scripts
    a.   A script to store adjusters' comments about images from their queries in the database. This script will take the comments that adjusters enter about the images and it will save the comments in the database for later retrieval when the same images are viewed. EDT: ½ day.
    b.   A script to query adjusters' comments about images from the database. This script will return and display the current adjuster's saved comments about the currently viewed images in the allotted area for marking notes. EDT: ½ day.
    c.   A script to store adjusters' viewing preferences about the layout of the screen. Several different layout options will be available (they are not specified here but they will be in the final specification), and this script will save each adjuster's settings in the database. EDT: ½ day.
    d   A script to query adjusters' viewing preferences from the database and incorporate these settings into the display. The script will apply the given display settings into the screen format. As mentioned in 4.c, the different settings available to the adjusters will be specified in the final version of the spec. EDT: 1½ days

    e.   *A script that allows Back end Administrators to view & edit all Intersections within a given city through a drop down menu bar.*

5.   Database Architecture
    a.   An application to build the appropriate table structure from the image files in the system. This program will make an entry in the main table in the database for each image file in the database. This is the conversion necessary to get from the raw image collection to the organized database we will use in the site. The program will be robust enough to handle images within different directory structures as long as the same naming convention is used throughout the file system. This will allow images of a given intersection to be stored in a separate folder, or in a conglomerate folder with images from other intersections, as long as each image follows the same naming convention. For this version of the specification, the file naming convention in use unilaterally will be "directional+street1+street2". EDT: 3½ days.
    b.   Configuration of an efficient table structure in the database. This construction will provide the framework for the database so that it can be populated with all of the necessary data fields. EDT: 2 days.

*Server Specification and Applications.*
1.   Package Research
    a.   As we have not yet decided how to host the final application, some research must be done to figure out the best option in this area. It seems doubtful that we will be able to find a non-specific contract agreement with some well-known hosting company that will meet our specifications for access requirements and applications that need to be run. Therefore, it might seem

best to purchase a server and take care of hosting ourselves. We will look into all of these options. EDT: 1½ days.

2. Server Configuration
   a. Stable Internet configuration. EDT: 1 day.
   b. Apache web server configuration. EDT: ¾ day.
   c. PHP pre-processor configuration. EDT: ⅔ day.
   d. MySQL configuration and phpMyAdmin interface installation. EDT: ¾ day.
   e. Photographer access configuration. EDT: ¾ day.

3. Photographer Application
   a. A web interface between the photographers and the dispatcher. A script that that will automate sending emails to client, photographer, and dispatcher. The client will be emailed upon receipt of their request and again once the request has been completed to tell them that their images are ready. The correct photographer will be contacted to take the images, and then will be warned on regular intervals if the photographs have not been taken and uploaded to the server. An email will be sent to the photographer to confirm the upload of the images when the job is done. An email will be sent to the dispatcher to notify him of the request, and warning emails will be sent on regular intervals to tell the dispatcher if the request has not yet been filled. A confirmation email will be sent to the dispatcher to confirm that the request has been filled. *Note:* This is a major change from the original specification. The original photographer application was discarded and this one replaced it for the initial development. EDT: 4 days.

*Internal and External Administravia:*
1. Communication
   a. Correspondence through emails and phone with you about progress, questions, and other general information exchange. EDT: 1 day.
   b. Correspondence and meetings with my team about progress, development, and other general information exchange. EDT: 1 day.
   c. Quality Assurance of all work done by my team. EDT: 3 days.

*Algorithm Design:*
1. Planning and Design
   a. Architecting the main algorithms in the search engine, database population, file naming, and general site security. EDT: 2 days.

*Enhancements (Not Included):*
1. Police Reports and Building Inspection
   a. These will essentially require new sections of the database and new database population algorithms. It seems to make sense to save these aspects of the project until later unless they are absolutely necessary in the first version of StreetFax.

2.  Highlighted Maps
    a.  This feature will be difficult to implement since it will require someone to go
        through the database and add information to all of the old entries. At this
        point, that does not seem like an economical use of resources. We can try to
        implement this enhancement later on, perhaps using a different algorithm.

3.  Automated Database Applications
    a.  It was a little unclear to me what sort of automated database cleanup you
        wanted, but I definitely see room for redundant entry filtering, data linking,
        and priority sorting to help increase the efficiency of the system. This can
        come after the basic development.
    b.  Scripts that query the database to find results from a specific photographer and
        that email photographers when photographs have not been submitted on time.
        This functionality also seems less important in getting the system up and
        running.

4.  Robust Photographer Interface
    a.  This feature will take the form of a powerful custom server application that
        photographers can log into to use dynamic functionality within the assignment
        and request systems. It will also provide the photographers with extra tools
        for batch uploading and perhaps editing of their images.

5.  Anti-Hacker System
    a.  An additional system to ensure the security of the server and maintain the
        integrity of the information inside. Since some of the data, namely credit card
        numbers and passwords, is sensitive, this extra functionality is highly
        recommended in the long term.

This specification will be approved with appropriate signatures below.

Paul Ceglia, Street Fax

_Paul Ceglia_  4/28/03

Mark Zuckerberg

_MZuck_  04.28.03



**REDACTED**

**REDACTED**



**REDACTED**

**REDACTED**



**REDACTED**



# EXHIBIT K-7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

------------------------------------- X

PAUL D. CEGLIA, an individual,                          :

        Plaintiff,                                      :        CIVIL ACTION NO. 10-569(RJA)

    -against-                                           :        **DECLARATION OF PAUL D. CEGLIA
                                                                     IN OPPOSITION TO DEFENDANTS'
MARK ELLIOTT ZUCKERBERG, an                              :        MOTION FOR EXPEDITED
individual, and FACEBOOK, INC., formerly                         DISCOVERY AND IN SUPPORT OF
known as TheFaceBook, Inc., a Delaware                   :        PLAINTIFF'S CROSS-MOTION FOR
corporation,                                                     MUTUAL EXPEDITED DISCOVERY**

        Defendants.                                     :

                                                        :

------------------------------------- X

I, Paul D. Ceglia, declare and state as follows:

    1.     I am a resident of Wellsville, New York with an address of 2558 Hanover Hill

Road, Wellsville, New York.

    2.     I respectfully submit this declaration in opposition to Defendants' Motion for

Expedited Discovery and in support of Plaintiff's Cross-Motion for Mutual Expedited Discovery.

    3.     I hereby affirm the truth of the allegations in the First Amended Complaint filed

on April 11, 2011.

    4.     I have read the Declaration of Mark Zuckerberg in Support of Defendants'

Motion for Expedited Discovery.

    5.     Mr. Zuckerberg's statements about our agreement are false.

    6.     On April 28, 2003, I met Mark in the lobby of the Radisson Hotel in Boston,

Massachusetts.

7.     On that same date, Mark and I signed the Agreement that is attached hereto as Exhibit A.

8.     I drafted the Agreement by cutting and pasting from two different forms that were provided to me by two different people. I then modified the combined document to include the terms to which Mark and I had agreed. I then printed the Agreement and brought it to the meeting on April 28, 2003, where Mark reviewed the agreement, added a line on the first page, which we both initialed, and then we signed Agreement.

9.     My original copy of the Agreement remains in my possession today.

10.    The original copy of the Agreement has been examined by two independent experts. As described in the declarations filed by them, neither expert has found any evidence showing that the Agreement is anything but genuine. I understand that these experts have stated that additional forensic testing, which may destroy portions of the Agreements, is available to further determine the genuineness of the Agreement. I believe this additional testing should be done immediately.

11.    In addition, I have copies of numerous emails that I exchanged with Mark Zuckerberg in 2003 and 2004, and many of these emails are quoted in my First Amended Complaint. It had been my practice to copy emails related to my business dealings from my msn.com email account into Microsoft Word documents, which were then saved on to floppy discs. I saved emails in Word documents because I knew of no other way to save emails from online email accounts on to either my computer or floppy discs. I have accumulated hundreds of these floppy discs containing copies of emails in Word documents and other documents.

12.    The emails quoted in my First Amended Complaint were retrieved from Word documents saved on my floppy discs. I understand that forensic, electronic document experts

have examined the Word documents containing the emails quoted in the First Amended

Complaint. Those forensic, electronic document experts have found the metadata associated

with the Word documents containing the emails quoted in the First Amended Complaint. I

understand that the metadata, among other things, shows when the documents were created and

last revised. I understand that the forensic, electronic document experts have found that the

metadata associated with the Word documents containing the emails quoted in the First

Amended Complaint shows that the Word documents were created and last revised within a

month or so of the dates of the emails saved within the Word documents.

13.     I have given the forensic, electronic document experts unfettered access to my

home and office. I understand that they have collected and forensically preserved hundreds of

floppy discs and CD's, a couple of computers and a hard drive. I have not attempted to conceal

or withhold any of my electronically stored information from the forensic, electronic document

experts.

14.     This case and the tactics of Mark and Facebook have taken and continue to take a

terrible toll on me, my wife, our two sons, and even our parents.

15.     I have been repeatedly called a liar in the press and in the papers filed by

Defendants in this action.

16.     I have been accused by Mark Zuckerberg's counsel and counsel for Facebook

(who are one in the same) of committing fraud. I have been the subject of ridicule. I have been

followed and understand that declarations have been submitted by private investigators that

contain inaccurate information.

17.     While I have made some mistakes in my life, I accept responsibility for those actions.

18.     To assist with proving that the Agreement is valid I under went a polygraph or lie detector examination to once and for all end the relentless claims against me. On June 12, 2011, I participated in a polygraph exam conducted by Western New York Polygraph Services, Inc. I was advised that the results of the polygraph indicated that I was telling the truth that the Agreement attached as Exhibit A is valid and is signed by Mark Zuckerberg. I respectfully suggest that Mark Zuckerberg undergo the same polygraph examination I have in order to expose who is really telling the truth.

19.     I am in favor of any actions to expedite this matter and speed up testing of the document to advance the case. However, it seems only fair that I be given access to certain pertinent evidence in Defendants' possession and that we proceed with mutual expedited discovery.

I declare under the penalty of perjury that the foregoing is true and correct. Executed in Buffalo,

New York on June 12, 2011.

_____

PAUL D. CEGLIA

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

PAUL D. CEGLIA,

Civil Action No. : 1:10-cv-00569-RJA

Plaintiff,

v.

MARK ELLIOT ZUCKERBERG, Individually, and
FACEBOOK, INC.

Defendants.

**DECLARATION
OF PAUL CEGLIA IN SUPPORT OF
MOTION TO PROHIBIT
DEFENDANTS' RELIANCE ON
EMAILS AS FRAUD ARGUMENT IN
DISPOSITIVE MOTION**

PAUL CEGLIA, submits this declaration and hereby declares under penalty of perjury and pursuant to 28 U.S.C. 1746 and under the laws of the United States that the following is true and correct:

1.  I make this declaration upon personal knowledge.

2.  I am the Plaintiff in this matter.

3.  Included with the Amended Complaint were copies of the text and header information of emails I exchanged with Mr. Zuckerberg. Doc. No. 39.

4.  I copied the text and header information from emails that were stored in my MSN webmail account.

5.  I copied this text and header information in 2003 and 2004.

6.  MSN webmail routinely deleted email content to maintain user account sizes.

7.  During and just after I discontinued regular email communication with Mr. Zuckerberg, I copied the text and header information from various emails between us and pasted that content into a Microsoft Word document.

8.  I saved those files to floppy disks.

1

9. Those emails include various discussions about the terms and effect of the Facebook Contract that was attached as an exhibit to the original complaint.

10. Those emails also include discussions between myself and Mr. Zuckerberg where we expanded the concepts of the Facebook's original idea.

11. In those emails it was clearly established that Mark was to use the search engine I had developed to quickly implement start up of Facebook.

12. Shortly after the filing of the amended complaint, I provided those floppy disks containing the Word documents with the contents of the email exchanges to computer forensics expert Jerry Grant.

I hereby and hereby declare under penalty of perjury and pursuant to 28 U.S.C. 1746 and under the laws of the United States that the following is true and correct:

DATED:     November 17, 2011

_____
Declarant

2

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

PAUL D. CEGLIA,

Civil Action No. : 1:10-cv-00569-RJA

                                        Plaintiff,

v.

MARK ELLIOT ZUCKERBERG, Individually, and FA-
CEBOOK, INC.

                                        Defendants.

**DECLARATION
OF PAUL CEGLIA IN SUPPORT OF
MOTION TO PROHIBIT DEFEND-
ANTS' RELIANCE ON ALLEGED
EMAIL BETWEEN CEGLIA AND
KOLE IN ANY DISPOSITIVE MO-
TION**

PAUL CEGLIA, submits this declaration and hereby declares under penalty of perjury and pursuant to 28 U.S.C. 1746 and under the laws of the United States that the following is true and correct:

1.    I make this declaration upon personal knowledge.

2.    I am the Plaintiff in this matter.

3.    During Expedited Discovery I became aware of a claim by Defendants' that they found an email supposedly authored and sent by me to Jim Kole. Exhibit A.

4.    I am also aware that Defendants claim this email contained an attachment which is an un-authenticated digital image of what purports to be a two page document signed by myself and Mr. Zuckerberg. Exhibit B.

5.    Jim Kole was an attorney working with me back in 2003 and 2004 regarding various issues including the Street Fax business.

6.    I have seen the supposed email referenced above. Exhibit A.

7.    I do not recall authoring or sending the above referenced email to Jim Kole.

8.    I have seen a copy of the unauthenticated digital image referenced above. Exhibit B.

1

9.   In March of 2011 I found this unauthenticated digital image, read it, and with an abundance of caution, I turned it over in discovery.  Prior to March of 2011 I had never before seen this document.

10.  I signed the contract with Mr. Zuckerberg that was attached to the Complaint in this case which included the terms relating to Facebook as they appear on page one of that contract.

11.  I signed a six page software specification agreement with Mr. Zuckerberg as well.

12.  The unauthenticated digital image Defendants intend to rely on in this case that is referenced above, appears to have an identical page two to the Facebook Contract attached to the Complaint, however, it appears to have a different page one that has been substituted into that document by someone.

13.  The email account allegedly used to allegedly send this email was ceglia@adelphia.net.

14.  I have never owned nor had the username or password to any such account.

15.  I am aware that my father had an email account with the name ceglia@adelphia.net.

16.  I do not recall ever sending an email to anyone using the ceglia@adelphia.net email account.

17.  In 2003 and 2004 I am aware that my father used the same password for all his accounts for ease of recalling his passwords.

18.  My father also had an account with my Street Fax business and that account information was stored on the Street Fax business computers.

19.  Mark Zuckerberg as part of his work for Street Fax, had administrative access to all Street-Fax user accounts, including that of my father.

20.  That necessarily means, Mark Zuckerberg had access to the username and password of my father's Street Fax user account which is the identical email address and password my fa-

2

ther used for his ceglia@adelphia.net email account at that time.

21. Mark Zuckerberg, therefore, had all the credentials necessary to access and to send and receive email via my father's ceglia@adelphia.net email account at the time this unauthenticated email with its unauthenticated digital image was allegedly transmitted.

I hereby and hereby declare under penalty of perjury and pursuant to 28 U.S.C. 1746 and under the laws of the United States that the following is true and correct:

DATED: November 17, 2011

_____
Declarant

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

PAUL D. CEGLIA,

                                  Plaintiff,

v.

MARK ELLIOT ZUCKERBERG, Individually, and
FACEBOOK, INC.

                            Defendants.

Civil Action No. : 1:10-cv-00569-RJA

**COMPREHENSIVE
DECLARATION
OF PAUL CEGLIA REGARDING
ALL EMAIL ACCOUNTS USED
SINCE 2003**

      DECLARANT, submits this declaration and hereby declares under penalty of perjury and pursuant to 28 U.S.C. 1746 and under the laws of the United States that the following is true and correct:

1.     I make this declaration upon personal knowledge.

2.     I have submitted two declarations in this matter that included listings of email accounts I have used since 2003.

3.     The complete list of email accounts that I have used since 2003 is as follows:

    a.     paulcceglia@gmail.com, provided in Declaration signed August 29, 2011, Attached as Exhibit A to this Declaration.

    b.     paulcceglia@msn.com, provided in Declaration signed August 29, 2011.

    c.     My parents Adelphia.net account which was used on one occasion to show them how to send an email, provided in Declaration signed August 29, 2011.

1

d.  A Tmail account provided by T-Mobile for use on my then existing mobile phone which account has not been used since 2005, provided in Declaration signed August 29, 2011.

e.  landlubber39@yahoo.com, provided in Declaration signed February 22, 2012, Attached to as Exhibit B to this Declaration.

f.  paulc@hush.com, provided in Declaration signed February 22, 2012.

g.  alleganypellets@gmail.com, provided in Declaration signed February 22, 2012.

h.  getzuck@gmail.com, provided in Declaration signed February 22, 2012.

i.  paul@streetfax.com, provided in Declaration signed February 22, 2012 and originally created by Mark Zuckerberg.

j.  PDCeglia@streetfax.com, provided in Declaration signed February 22, 2012 and originally created by Mark Zuckerberg.

4.  Defendants' experts have had access to all computers that I have in my possession, custody and control and have been produced pursuant to this court's order.

5.  Other than the computers thus far produced, I have no other sources of information available to find any additional email accounts used, if any, to respond to the court's order.

6.  I have no further knowledge at this time of any other email accounts I have used since 2003.

I hereby declare under penalty of perjury and pursuant to 28 U.S.C. 1746 and

2

under the laws of the United States that the following is true and correct:

DATED: March 29, 2012.

_____
Paul Ceglia

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PAUL D. CEGLIA,

              Plaintiff,

    v.

MARK ELLIOT ZUCKERBERG and
FACEBOOK, INC.,

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Civil Action No. 1:10-cv-00569-RJA

## SUPPLEMENTAL DECLARATION OF PAUL D. CEGLIA

I, Paul D. Ceglia, submit this Declaration in compliance with the Court's August 18, 2011 Order (Doc. No. 117) and hereby declare:

1.    I make this declaration based upon personal knowledge.

## CATEGORY (A)

2.    The follow list is organized by the name of the law firm or expert firm at which the files listed are located.

### Jeffrey A. Lake, A.P.C.

3.    Location: 835 5th Avenue, Suite 200A, San Diego, California 92101

4.    It is my understanding that Lake, A.P.C. is in possession of copies of all of the documents listed below, which are being produced along with this declaration.

### Paul Argentieri & Associates

5.    Location: 188 Main Street, Hornell, New York 14843

6.    Scan of page 1 of "'Work for Hire' Contract" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "Zuckerberg_Contract_page1.tif".

EXHIBIT A

7.      Scan of page 2 of "'Work for Hire' Contract" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "Zuckerberg_Contract_page2.tif".

**Connors & Vilardo, LLP**

8.      Location: 424 Main Street, Buffalo, New York 14202

9.      PDF scan of copy of "'Work for Hire' Contract" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, that was attached to the original Complaint, filename: "Contract.pdf".

10.     PDF compilation, filename: "Ceglia.pdf", containing (Note: some pages have been redacted because they are irrelevant, proprietary, and/or not within the scope of Category (A) of the Court's August 18, 2011 Order):

      a.   At pages 1-2: Scanned version attached to the complaint of the "'Work for Hire' Contract" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003.

      b.   At pages 3-4: Scanned version attached to the complaint of the "'Work for Hire' Contract" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003.

**Kasowitz, Benson, Torres & Friedman LLP**

11.     Location: 1633 Broadway, New York, New York 10019.

12.     Scanned version attached to the complaint of the "'Work for Hire' Contract" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "Lawsuit Overview.pdf". Note: some pages have been redacted because they are irrelevant, proprietary, and/or not within the scope of Category (A) of the Court's August 18, 2011 Order.

## DLA Piper

13.     Location: Various virtual and physical locations.

14.     It is my understanding that DLA Piper has in its possession electronic copies or images of the "'Work for Hire' Contract" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003. (*See* Exhibit A to Declaration of Nathan Shaman, dated August 29, 2011.)

15.     It is my further understanding that these items were obtained previously by Stroz Friedberg by copying my electronic media in the possession of Project Leadership Associates. (*See id.*)

16.     It is my further understanding that identification and production of all items responsive to Category (A) that are in the possession of DLA Piper would require an enormous expenditure of time and money, and only would lead to the identification and production of items already being produced with this declaration.

## Edelson McGuire, LLP

17.     Locations: 350 North LaSalle, 13th Floor, Chicago, Illinois 60654; 5715 Firestone Court, Sarasota, Florida 34238.

18.     Scan of portion of page 2 of "'Work for Hire' Contract" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "VSC Printout001.pdf".

19.     Scan of portion of page 1 of "'Work for Hire' Contract" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "VSC Printout002.pdf".

20.     Scan of portion of page 1 of "'Work for Hire' Contract" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "VSC Printout003.pdf".

21.     Scan of portion of page 1 of "'Work for Hire' Contract" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "VSC Printout004.pdf".

22.     Scan of portion of page 2 of "'Work for Hire' Contract" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "VSC Printout005.pdf".

23.     PowerPoint containing scan of portions of pages 1 and 2 of "'Work for Hire' Contract" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "facebook signatures.pptx".

24.     PowerPoint containing scan of portions of pages 1 and 2 of "'Work for Hire' Contract" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, original filename: "facebook signatures.pptx", new filename: "facebook signatures(2).pptx".

### Aginsky Forensic Document Dating Laboratory, Inc.

25.     Location: 6280 Heathfield Drive, East Lansing, Michigan 48823

26.     Scan of page 1 of "'Work for Hire' Contract" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "WorkForHireContract_page1.psd".

27.     Scan of page 2 of "'Work for Hire' Contract" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "WorkForHireContract_page2.psd".

### Blanco & Associates, Inc.

28.     Location: 655 North Central Avenue, 17th Floor, Glendale, California 91203.

29.     It is my understanding that Blanco & Associates may have in its possession items that are responsive to Category (A). (*See* Exhibit C to Declaration of Nathan Shaman, dated August 29, 2011.)

30.     It is my further understanding that Blanco & Associates has refused to assist my compliance with the August 18, 2011 Order due to an outstanding balance. (*See id.*)

31.     It is my further understanding that identification and production of all responsive items in the possession of Blanco & Associates would require an enormous expenditure of time

and money, and only would lead to the identification and production of items already being produced with this declaration.

## Capsicum Group, LLC

32.    Location: The Cira Centre, 2929 Arch Street, Suite 1525, Philadelphia, Pennsylvania 19104.

33.    It is my understanding that Capsicum may have in its possession items that are responsive to Category (A). (*See* Exhibit D to Declaration of Nathan Shaman, dated August 29, 2011.)

34.    It is my further understanding that identification and production of all responsive items in the possession of Capsicum would require an enormous expenditure of time and money, and only would lead to the identification and production of items already being produced with this declaration.

## Osborn & Son

35.    Location: 1273 Bound Brook Road, Suite 15, Middlesex, New Jersey 08846

36.    It is my understanding that Osborn & Son may have in its possession items that are responsive to Category (A).

37.    It is my further understanding that John Paul Osborn has been unavailable to assist me in my efforts thus far.

## Project Leadership Associates

38.    Location: 120 South LaSalle, Suite 1200, Chicago, Illinois 60603

39.    It is my understanding that PLA may have in its possession items that are responsive to Category (A). (*See* Exhibit E to Declaration of Nathan Shaman, dated August 29, 2011.)

40.     It is my further understanding that identification and production of all responsive items in the possession of PLA would require an enormous expenditure of time and money, and only would lead to the identification and production of items already being produced with this declaration. (*See id.*)

### Speckin Forensic Laboratories

41.     Location: 2400 Science Parkway, Suite 200, Okemos, Michigan 48864

42.     Scan of portion of page 2 of "'Work for Hire' Contract" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "VSC Printout001.pdf".

43.     Scan of portion of page 1 of "'Work for Hire' Contract" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "VSC Printout002.pdf".

44.     Scan of portion of page 1 of "'Work for Hire' Contract" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "VSC Printout003.pdf".

45.     Scan of portion of page 1 of "'Work for Hire' Contract" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "VSC Printout004.pdf".

46.     Scan of portion of page 2 of "'Work for Hire' Contract" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "VSC Printout005.pdf".

### Stewart Forensic Consultants, LLC

47.     Location: 793A East Foothill Boulevard, Suite 200, San Luis Obispo, California 93405

48.     Scan of faxed copy of "StreetFax Back-End Technical Specification" signed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "Zuckerberg Street Fax Specifications.pdf". Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

49.     Scan of page 1 of "'Work for Hire' Contract" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "Zuckerberg Contract page1.tif".

50.     Scan of page 2 of "'Work for Hire' Contract" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "Zuckerberg Contract page2.tif".

51.     Scan of page 1 of "'Work for Hire' Contract" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "Untitled-1.tif".

52.     Scan of back of page 1 of "'Work for Hire' Contract" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "Untitled-2.tif".

53.     Scan of page 2 of "'Work for Hire' Contract" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "Untitled-3.tif".

54.     Scan of back of page 2 of "'Work for Hire' Contract" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "Untitled-4.tif".

55.     Scan of page 1 of "'Work for Hire' Contract" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "q1.tif".

56.     Scan of page 2 of "'Work for Hire' Contract" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "q1_0002.tif".

57.     PDF compilation containing Items 44-45, filename: "q1_0004.pdf". Note: some pages have been redacted because they are irrelevant, proprietary, and/or not within the scope of Category (A) of the Court's August 18, 2011 Order.

58.     Scan of portion of page 2 of "'Work for Hire' Contract" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "051.tif".

59.     Scan of portion of page 2 of "'Work for Hire' Contract" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "052.tif".

60.    Scan of portion of page 2 of "'Work for Hire' Contract" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "053.tif".

61.    Scan of portion of page 1 of "'Work for Hire' Contract" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "054.tif".

62.    Scan of portion of page 1 of "'Work for Hire' Contract" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "055.tif".

### Sylint Group, Inc.

63.    Location: 240 N. Washington Boulevard, Suite 240, Sarasota, Florida 34236

64.    It is my understanding that Sylint may have in its possession items that are responsive to Category (A).  (*See* Exhibit B to Declaration of Nathan Shaman, dated August 29, 2011.)

65.    It is my further understanding that all of these items are contained on the forensic images already provided to Stroz Friedberg. (*See id.*)

66.    It is my further understanding that identification and production of all responsive items in the possession of Sylint would require an enormous expenditure of time and money, and only would lead to the identification and production of items already produced to Stroz Friedberg.

### CATEGORY (B)

### Jeffrey A. Lake, A.P.C.

67.    Location: 835 5th Avenue, Suite 200A, San Diego, California 92101

68.    It is my understanding that Lake, A.P.C. is in possession of copies of all of the documents listed below, which are being produced along with this declaration.

### Paul Argentieri & Associates

69.     Location: 188 Main Street, Hornell, New York 14843

70.     Microsoft Word document entitled, "'Work for Hire' Contract," filename: "Work for Hire ContractMZ.doc".

71.     Microsoft Word document entitled, "Street Fax," filename: "work for hire SF template.doc".  Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

### **Connors & Vilardo, LLP**

72.     Location: 424 Main Street, Buffalo, New York 14202

73.     PDF compilation, filename: "Ceglia.pdf", containing (Note: some pages have been redacted because they are irrelevant, proprietary, and/or not within the scope of Category (B) of the Court's August 18, 2011 Order):

> a.  At pages 5-10: Scan of faxed copy of "StreetFax Back-End Technical Specification" signed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003.  Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.
>
> b.  At pages 11-16: Scan of faxed copy of "StreetFax Back-End Technical Specification" signed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003.  Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.
>
> c.  At pages 17-22: Scan of "StreetFax Back-End Technical Specification" signed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003.  Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

d.  At pages 23-25: Scan of "Street Fax" contract apparently executed by Randy Kato on May 5, 2003. Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

e.  At page 26: Scan of unexecuted "Agreed upon Contract Points for StreetFax, Inc." Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

f.  At page 27: Scan of unexecuted "Confidentiality Agreement". Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

g.  At pages 28-31: Scan of unexecuted "Exhibit B Sales Representative Contract". Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

h.  At page 33: Scan of untitled document apparently executed by Paul Ceglia on November 20, 2003, Sandor Sienkiewicz on an unknown date, and Teddy Sienkiewicz on November 20, 2003. Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

i.  At page 34: Scan of untitled document apparently executed by Paul Ceglia on November 20, 2003, Sandor Sienkiewicz on an unknown date, and Teddy Sienkiewicz on November 20, 2003. Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

j.  At page 35: Scan of untitled, unexecuted document. Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

k.  At page 36: Scan of untitled document apparently executed by Paul Ceglia on November 20, 2003, Sandor Sienkiewicz on an unknown date, and Teddy Sienkiewicz on November 20, 2003.  Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

l.  At pages 37 - 40: Scan of "Sales Representative Agreement" apparently executed by Paul Ceglia on November 10, 2003 and [illegible] on November 10, 2003.  Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

m.  At page 41: Scan of page 1 of "Sales Representative Agreement".  Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

n.  At pages 42-45: Scan of unexecuted "Exhibit B Sales Representative Contract".  Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

o.  At pages 46-47: Scan of unexecuted "Confidentiality Agreement".  Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

p.  At pages 63-70: Scan of pages 1-8 of "Operating Agreement for StreetFax LLC".  Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

q.  At pages 71-74: Scan of unexecuted "Exhibit B Sales Representative Contract".  Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

r.   At pages 76-86: Scan of "Operating Agreement for StreetFax LLC" apparently executed by Karin Petersen on November 20, 2003 and Teddy Sienkiewicz on November 20, 2003.   Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

s.   At pages 87-88: Scan of unexecuted "Loan Agreement".   Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

t.   At pages 89-90: Scan of unexecuted "StreetFax LLC.  Promissory Note". Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

u.   At pages 91-96: Scan of unexecuted "Operating Agreement for StreetFax LLC".  Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

v.   At pages 97-100: Scan of unexecuted "Exhibit B Sales Representative Contract".  Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

w.   At pages 101-102: Scan of unexecuted "Confidentiality Agreement".  Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

x.   At pages 118-125: Scan of pages 1-8 of "Operating Agreement for StreetFax LLC".  Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

EXHIBIT A

y. At pages 126-129: Scan of unexecuted "Exhibit B Sales Representative Contract". Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

z. At pages 131-141: Scan of "Operating Agreement for StreetFax LLC" apparently executed by Karin Petersen on November 20, 2003 and Teddy Sienkiewicz on November 20, 2003. Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

aa. At pages 142-143: Scan of unexecuted "Loan Agreement". Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

bb. At pages 144-145: Scan of unexecuted "StreetFax LLC. Promissory Note". Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

cc. At pages 146-151: Scan of unexecuted "Operating Agreement for StreetFax LLC". Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

dd. At page 152: Scan of "Agreed upon Contract Points for Kapasate, Inc." apparently executed by Paul Ceglia, Teddy Sienkiewicz, Karin Petersen, and Sandor Sienkewicz, and notarized by Diane M. Galloway. Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

ee. At pages 153-155: Scan of "Acknowledgement Form for Consultants/Independent Contracts, Temporary and Leased Workers"

13
EXHIBIT A

apparently executed by Sandor Sienkiewicz on February 19, 2003 and apparently witnessed by Paul Ceglia on February 19, 2003. Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

ff. At pages 156-158: Scan of "Acknowledgement Form for Consultants/Independent Contracts, Temporary and Leased Workers" apparently executed by Teddy Sienkiewicz on February 19, 2003 and apparently witnessed by Paul Ceglia on February 19, 2003. Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

gg. At page 159: Scan of "Agreed upon Contract Points for Kapasate, Inc." apparently executed by Paul Ceglia, Teddy Sienkiewicz, Karin Petersen, and Sandor Sienkiewicz, and notarized by Diane M. Galloway. Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

hh. At page 160: Scan of "Release Form" with printed name of Teddy Sienkiewicz. Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

ii. At pages 160-161: Scan of handwritten "Agreed upon Contract Points for Kapasate". Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

jj. At page 162: Scan of email from paulceglia@msn.com to tsienkiewicz@tmail.com, dated December 15, 2003, containing text of

"Confidentiality Agreement". Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

kk. At pages 163-165: Scan of pages 2-4 of unexecuted "Exhibit B Sales Representative Contract". Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

ll. At pages 167-170: Scan of "Consulting/Sales Representative Agreement" apparently executed by Paul Ceglia on December 29, 2003 and William Schellinger on December 20, 2003. Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

mm. At pages 172-173: Scan of "Agreed upon Contract Points for StreetFax LLC." apparently executed by Paul Ceglia, Teddy Sienkiewicz, Karin Petersen, and Sandor Sienkiewicz, and apparently witnessed by Julie Horvath-Krol and [illegible] Dylewska. Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

nn. At page 174: Scan of untitled document apparently executed by Paul Ceglia on November 4, 2004 and Kala Pierson on February 11, 2004. Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

oo. At page 205: Scan of unexecuted "Release Form". Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

pp. At page 206: Scan of unexecuted "Release Form". Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

qq. At page 207: Scan of unexecuted "Release Form" with printed name of Sandor Sienkiewicz and numerous interlineations. Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

rr. At page 208-209: Scan of unexecuted "Acknowledgement Form for Consultants/Independent Contractors, Temporary and Leased Workers". Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

ss. At page 210: Scan of unexecuted "Release Form" with printed name of Teddy Sienkiewicz and numerous interlineations. Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

tt. At page 211: Scan of "Release Form" with printed name of Teddy Sienkiewicz, and apparently signed by Teddy Sienkiewicz on February 15, 2003 and Paul Ceglia on February 15, 2003. Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

uu. At page 212: Scan of "Release Form" with printed name of Sandor Sienkiewicz, and apparently signed by Sandor Sienkiewicz on February 14, 2003 and Paul Ceglia on February 14, 2003. Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

vv. At page 213: Scan of last page of "aplus.net Dedicated Server Terms and Conditions" apparently executed by Paul Ceglia on June 2, 2004. Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

ww.   At page 214: Scan of "aplus.net Acceptable Use Policy" apparently executed by Paul Ceglia on June 2, 2004. Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

xx. At page 215: Scan of different "aplus.net Acceptable Use Policy" apparently executed by Paul Ceglia on June 2, 2004. Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

yy. At page 216-217: Scan of "aplus.net Dedicated Server Terms and Conditions" apparently executed by Paul Ceglia on June 2, 2004. Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

**Kasowitz, Benson, Torres & Friedman LLP**

74.     Location: 1633 Broadway, New York, New York 10019.

75.     Scan of page 1 of purported "Street Fax" contract apparently executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "Scan0001.tif".

76.     Scan of page 2 of purported "Street Fax" contract apparently executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "Scan0002.tif".

### DLA Piper

77.     Location: Various virtual and physical locations.

78.     It is my understanding that DLA Piper has in its possession electronic versions of the "'Work for Hire' Contract" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003. (*See* Exhibit A to Declaration of Nathan Shaman, dated August 29, 2011.);

79.     It is my further understanding that these items were obtained previously by Stroz Friedberg by copying my electronic media in the possession of Project Leadership Associates. (*See id.*)

80.     It is my further understanding that identification and production of all items responsive to Category (B) that are in the possession of DLA Piper would require an enormous expenditure of time and money, and only would lead to the identification and production of items already being produced with this declaration.

### Edelson McGuire, LLP

81.     Locations: 350 North LaSalle, 13th Floor, Chicago, Illinois 60654; 5715 Firestone Court, Sarasota, Florida 34238.

82.     Scan of page 1 of purported "Street Fax" contract apparently executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "Scan0001.tif".

83.     Scan of page 2 of purported "Street Fax" contract apparently executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "Scan0002.tif".

## Blanco & Associates, Inc.

84.     Location: 655 North Central Avenue, 17th Floor, Glendale, California 91203.

85.     It is my understanding that Blanco & Associates may have in its possession items that are responsive to Category (B). (*See* Exhibit C to Declaration of Nathan Shaman, dated August 29, 2011.)

86.     It is my further understanding that Blanco & Associates has refused to assist my compliance with the August 18, 2011 Order due to an outstanding balance. (*See id.*)

87.     It is my further understanding that identification and production of all responsive items in the possession of Blanco & Associates would require an enormous expenditure of time and money, and only would lead to the identification and production of items already being produced with this declaration.

## Capsicum Group, LLC

88.     Location: The Cira Centre, 2929 Arch Street, Suite 1525, Philadelphia, Pennsylvania 19104.

89.     It is my understanding that Capsicum may have in its possession items that are responsive to Category (B). (*See* Exhibit D to Declaration of Nathan Shaman, dated August 29, 2011.)

90.     It is my further understanding that identification and production of all responsive items in the possession of Capsicum would require an enormous expenditure of time and money, and only would lead to the identification and production of items already being produced with this declaration.

## Project Leadership Associates

91.     Location: 120 South LaSalle, Suite 1200, Chicago, Illinois 60603

92.     It is my understanding that PLA may have in its possession items that are responsive to Category (B). (*See* Exhibit E to Declaration of Nathan Shaman, dated August 29, 2011.)

93.     It is my further understanding that identification and production of all responsive items in the possession of PLA would require an enormous expenditure of time and money, and only would lead to the identification and production of items already being produced with this declaration. (*See id.*)

## Stewart Forensic Consultants, LLC

94.     Location: 793A East Foothill Boulevard, Suite 200, San Luis Obispo, California 93405

95.     Scan of faxed copy of "StreetFax Back-End Technical Specification" signed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "Zuckerberg Street Fax Specifications.pdf". Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

96.     Scan of page 1 of "StreetFax Back-End Technical Specification" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "q2.tif". Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

97.     Scan of back of page 1 of "StreetFax Back-End Technical Specification" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "q2_0001.tif". Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

98.     Scan of page 2 of "StreetFax Back-End Technical Specification" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "q2_0002.tif". Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

99.     Scan of back of page 2 of "StreetFax Back-End Technical Specification" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "q2_0003.tif". Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

100.    Scan of page 3 of "StreetFax Back-End Technical Specification" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "q2_0004.tif". Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

101.    Scan of back of page 3 of "StreetFax Back-End Technical Specification" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "q2_0005.tif". Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

102.    Scan of page 4 of "StreetFax Back-End Technical Specification" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "q2_0006.tif". Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

103.    Scan of back of page 4 of "StreetFax Back-End Technical Specification" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "q2_0007.tif". Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

104.    Scan of page 5 of "StreetFax Back-End Technical Specification" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "q2_0008.tif". Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

105. Scan of back of page 5 of "StreetFax Back-End Technical Specification" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "q2_0009.tif". Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

106. Scan of page 6 of "StreetFax Back-End Technical Specification" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "q2_0010.tif". Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

107. Scan of back of page 6 of "StreetFax Back-End Technical Specification" executed by Paul Ceglia and Mark Zuckerberg, dated April 28, 2003, filename: "q2_0011.tif". Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

108. PDF compilation of Items 37-48, filename: "q2_0012.pdf". Note: This document is hereby designated as confidential pursuant to the Joint Stipulated Protective Order.

### Sylint Group, Inc.

109. Location: 240 N. Washington Boulevard, Suite 240, Sarasota, Florida 34236

110. It is my understanding that Sylint may have in its possession items that are responsive to Category (B). (*See* Exhibit B to Declaration of Nathan Shaman, dated August 29, 2011.)

111. It is my further understanding that all of these items are contained on the forensic images already provided to Stroz Friedberg. (*See id.*)

112. It is my further understanding that identification and production of all responsive items in the possession of Sylint would require an enormous expenditure of time and money, and only would lead to the identification and production of items already produced to Stroz Friedberg.

## CATEGORY (C)

### Jeffrey A. Lake, A.P.C.

113.    Location: 835 5th Avenue, Suite 200A, San Diego, California 92101

114.    It is my understanding that Lake, A.P.C. is in possession of copies of all of the documents listed below, which are being produced along with this declaration.

### Kasowitz, Benson, Torres & Friedman LLP

115.    Location: 1633 Broadway, New York, New York 10019.

116.    Email from ceglia@adelphia.net to jkole@sidley.com, dated March 3, 2004, filename: "page 1 of 2 for Streetfax contract w mark.msg".

117.    Email from ceglia@adelphia.net to jkole@sidley.com, dated March 3, 2004, filename: "2 of 2 for streetfax contract.msg".

### DLA Piper

118.    Location: Various virtual and physical locations.

119.    It is my understanding that DLA Piper does not have in its possession electronic versions of any emails or purported emails by and among Mark Zuckerberg, myself and/or other persons associated with Street Fax. (*See* Exhibit A to Declaration of Nathan Shaman, dated August 29, 2011.)

### Capsicum Group, LLC

120.    Location: The Cira Centre, 2929 Arch Street, Suite 1525, Philadelphia, Pennsylvania 19104.

121.    It is my understanding that Capsicum Group, LLC may have in its possession items that are responsive to Category (C). (*See* Exhibit D to Declaration of Nathan Shaman, dated August 29, 2011.)

122.     It is my further understanding that identification and production of all responsive items in the possession of Capsicum Group, LLC would require an enormous expenditure of time and money, and only would lead to the identification and production of items already being produced with this declaration.

### Project Leadership Associates

123.     Location: 120 South LaSalle, Suite 1200, Chicago, Illinois 60603

124.     It is my understanding that PLA may have in its possession items that are responsive to Category (C). (*See* Exhibit E to Declaration of Nathan Shaman, dated August 29, 2011.)

125.     It is my further understanding that identification and production of all responsive items in the possession of PLA would require an enormous expenditure of time and money, and only would lead to the identification and production of items already being produced with this declaration. (*See id.*)

### Sylint Group, Inc.

126.     Location: 240 N. Washington Boulevard, Suite 240, Sarasota, Florida 34236

127.     It is my understanding that Sylint may have in its possession items that are responsive to Category (C). (*See* Exhibit B to Declaration of Nathan Shaman, dated August 29, 2011.)

128.     It is my further understanding that all of these items are contained on the forensic images already provided to Stroz Friedberg. (*See id.*)

129.     It is my further understanding that identification and production of all responsive items in the possession of Sylint would require an enormous expenditure of time and money, and

only would lead to the identification and production of items already produced to Stroz Friedberg.

## CATEGORY (D)

130. After a diligent search and a reasonable inquiry, I have not been able to locate any responsive items in my possession, custody, or control.

## CATEGORY (E)

### Gigaware USB Device, 20051942520C8D20CDB2&O

131. Upon information and belief, I was in possession of this media device in 2010.

132. Upon information and belief, the link files referenced in items 76-90 of the Stroz Friedberg Presumed Relevant Materials Log refer to files I copied to this media device in July 2010.

133. Furthermore, it is my understanding that the access dates for this media device correspond to the dates on which those link files were created on my Toshiba laptop because the drive was first accessed on the Toshiba on June 17, 2010 and later accessed on the Toshiba on September 16, 2010.

134. "Zuckerberg Contract page1.tif" was a scan of the first page of my "'Work for Hire' Contract" with Mark Zuckerberg that I made several days before the original complaint was filed. (*See* Declaration of Paul Argentieri, dated August 29, 2011.) Several copies of this file are being produced along with this declaration.

135. "Zuckerberg Contract page2.tif" was a scan of the second page of my "'Work for Hire' Contract" with Mark Zuckerberg that I made several days before the original complaint was filed. (*See id.*) Several copies of this file are being produced along with this declaration.

136. Upon information and belief, the files "DOC212.pdf," "DOC213.pdf," "DOC214.pdf," "DOC215.pdf," and "DOC221.pdf" were PDF files of documents related to (1) filings made prior to removal of this case to federal court or (2) filings from *Facebook, Inc. v. ConnectU, Inc.* (Civ. No. 07-01389, N.D. Cal.) and related litigation.

137. After a diligent search and reasonable inquiry of my attorneys, experts, and family, I am unable to locate this media device in my possession, custody, or control.

### Maxtor 3200 USB Device 604010193447&0

138. It is my understanding that this media device was produced to Stroz Friedberg for inspection at the offices of Sylint Group, Inc. in Sarasota, Florida on July 15, 2011.

139. It is my further understanding that the internal identifier of this hard drive is 604010193447&0.

140. It is my further understanding that the external identifier, contained on the hard drive enclosure, is L42PMZBG.

141. In my declaration of July 15, 2011 (Doc. No. 88), I identified this hard drive by its external identifier, listed above.

### SanDisk Cruzer Micro USB Device, 200524439016A86122A2&O

142. It is my understanding that this media device was first accessed on my Toshiba laptop on July 22, 2009 and later accessed on December 22. 2010.

143. It is my further understanding that there is a record of access to this device on my parents' loose Seagate hard drive on September 29, 2010.

144. I do not recall using this media device, and after a diligent search and reasonable inquiry of my attorneys, experts, and family, I am unable to locate this media device in my possession, custody, or control.

## USB 2.0 USB Flash Drive USB Device, 76562f5793a65e&o

145.    The Presumed Relevant Materials Logs produced by Stroz Friedberg indicate that the only computer to which this media device was connected was my one of my parents' computers.

146.    I do not recall using this media device, and after a diligent search and reasonable inquiry of my attorneys, experts, and family, I cannot locate it in my possession, custody, or control.

## Ut165 USB2 FlashStorage USB Device, 00000000000069&0

147.    It is my understanding that this device was first accessed by one of my parents' computers on May 5, 2010.

148.    The Presumed Relevant Materials Logs produced by Stroz Friedberg indicate that the only computer to which this media device was connected was one of my parents' computers.

149.    I do not recall using this media device, and after a diligent search and reasonable inquiry of my attorneys, experts, and family, I cannot locate it in my possession, custody, or control.

## Kingston DataTraveler 2.0 USB Device, 5B8407000A4B&O

150.    The Presumed Relevant Materials Logs produced by Stroz Friedberg indicate that the only computer to which this media device was connected was one of my parents' computers.

151.    I do not recall using this media device, and after a diligent search and reasonable inquiry of my attorneys, experts, and family, I cannot locate it in my possession, custody, or control.

27
EXHIBIT A

## CATEGORY (F)

### Sylint Group, Inc.

152. Location: 240 N. Washington Boulevard, Suite 240, Sarasota, Florida 34236

153. One (1) Seagate 120GB internal hard drive SN: 3JT1JQF6

154. One (1) Maxtor 300GB external USB drive SN: L42PMZBG

155. Five (5) 3.5" floppy disks

156. Twelve (12) CDs/DVDs

157. All of the above were produced for inspection on July 15, 2011.

### Project Leadership Associates

158. Location: 120 South LaSalle, Suite 1200, Chicago, Illinois 60603

159. One (1) Toshiba laptop SN: 69500395Q

160. 169 3.5" floppy disks

161. 1,075 CDs/DVDs

162. An electronic image of one (1) Seagate 120GB internal hard drive SN: 3JT1JQF6

163. All of the above were produced for inspection on July 15, 2011, except the image of the Seagate hard drive, which was produced for inspection on July 18, 2011.

### Carmen and Vera Ceglia

164. Location: Wellsville, New York

165. One (1) Compaq SR5000 computer SN: 3CR8190BXZ with Samsung hard drive, SN: S19JJ1DQ400135

166. One (1) Acer computer with Hitachi hard drive, SN: GEK834RBUWEP2A

167. The Compaq computer was produced for inspection on July 15, 2011.

168.   The Acer computer was produced for inspection on July 19, 2011.

### Paul Ceglia

169.   Location: Ireland

170.   An electronic image of one (1) Maxtor 300GB external USB drive SN: L42PMZBG

171.   This image is an exact duplicate of the Maxtor hard drive produced for inspection on July 15, 2011 and therefore will not be produced. (*See* August 18, 2011 Order at 3, ¶ 3.)

### CATEGORY (G)

172.   The only items responsive to this Category are identified above under Category (E).

### CERTIFICATION OF PRODUCTION

173.   I hereby certify that all files, computers, and electronic media identified above are being produced to Defendants on August 29, 2011, with the exception of those files named in the Privilege Log produced with this declaration.

### IDENTIFICATION OF EMAIL ACCOUNTS

### Gmail

174.   Email account: paulceglia@gmail.com

175.   Password: ███████

### MSN

176.   Email account: paulceglia@msn.com

177.   Password: ███████

### Adelphia

178.   I have not used, since 2003, an Adelphia.net email account that belongs to me.

179.   The Adelphia.net account I used in the past belonged to my parents.

### Tmail

180.   Tmail was an email account provided by T-Mobile for use on the original T-Mobile Sidekick smart phone.

181.   This account was accessible directly from the Sidekick.

182.   I do not know how to access this account, and I have not used this account since 2005.

### The Native Emails Attached to the Amended Complaint

183.   I continue to certify that I performed a diligent search for and reasonable inquiry as to the native emails attached to the Amended Complaint, and I have produced all electronic media that might contain such files.

I hereby certify and declare under penalty of perjury that the foregoing is true and accurate.

**DATED: August 29, 2011**

s/ Paul Ceglia
Paul D. Ceglia

30
EXHIBIT A

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

PAUL D. CEGLIA,

Civil Action No. : 1:10-cv-00569-RJA

Plaintiff,

**DECLARATION
OF PAUL CEGLIA REGARDING
RECENTLY DISCOVERED
EMAIL ACCOUNTS**

v.

MARK ELLIOT ZUCKERBERG, Individually, and
FACEBOOK, INC.

Defendants.

DECLARANT, submits this declaration and hereby declares under penalty of perjury and pursuant to 28 U.S.C. 1746 and under the laws of the United States that the following is true and correct:

1. I make this declaration upon personal knowledge.

2. I was recently made aware of additional email accounts accessed from a computer analyzed by Defendants' electronic discovery firm.

3. At the time of completing any prior declarations, I did not recall the existence of any of these email accounts, otherwise, they would have been disclosed in those declarations per the court's orders. These email accounts were not concealed from anyone by their omission from prior declarations.

4. At the time of the filing of any prior declarations regarding email accounts, I did not recall creating or using the following email accounts:

   a. landlubber39@yahoo.vom

1

EXHIBIT B

     b.     paulc@hush.com

     c.     alleganypellets@gmail.com

     d.     getzuck@gmail.com

     e.     paul@streetfax.com

     f.     PDCeglia@streetfax.com

5.     Immediately upon being informed of the existence of the accounts listed in a-d above, and being provided consent forms for accessing same, I completed those consent forms, signed them and returned them to my lawyer, Dean Boland.

6.     The email addresses in e and f above, were created by Defendant Zuckerberg.

7.     Upon recalling those email accounts in e and f above, I immediately disclosed that fact to my counsel who disclosed that fact to Defendants' counsel. I have no belief that any data related to those two accounts still exists.

8.     The email addresses in e and f above, were hosted by a server used for operating the streetfax business.

9.     To the best of my recollection, the vendor providing that server space was called ServPath.

10.     The streetfax business was shut down sometime in 2006.

11.     The hosting of those email accounts on those servers would have been terminated in conjunction with the close of the business.

12.     My counsel has communicated to Defendants' counsel the historical existence of these additional email accounts that Defendant Zuckerberg created.

13.     He has also offered that I will sign any consent forms Defendants' deem

2

EXHIBIT B

necessary to attempt to recover any data from these email accounts.

14. He has also offered that Plaintiff will consent to the issuance of a subpoena to whatever entity Defendants' believe may retain the data related to the accounts in e and f.

15. It is my understanding the signed consent forms for accounts in a-d were provided to Defendants' counsel immediately after receipt by my lawyer.

16. I do not have any recollection at this time of any additional email accounts I may have created and or used other than those already disclosed to Defendants.

I hereby and hereby declare under penalty of perjury and pursuant to 28 U.S.C. 1746 and under the laws of the United States that the following is true and correct:

DATED: February 22, 2012.

Declarant - Paul Ceglia

3

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

PAUL D. CEGLIA,

                            Plaintiff,

v.

MARK ELLIOT ZUCKERBERG, Individually, and
FACEBOOK, INC.

                            Defendants.

Civil Action No. : 1:10-cv-00569-RJA

**DECLARATION**
**OF**
**PAUL CEGLIA REGARDING**
**AUTHORSHIP OF LAWSUIT**
**OVERVIEW.PDF**

      DECLARANT, submits this declaration and hereby declares under penalty of perjury and pursuant to 28 U.S.C. 1746 and under the laws of the United States that the following is true and correct:

1.     I make this declaration upon personal knowledge.

2.     Pursuant to the Court order, Doc. No. 317, I have taken reasonable steps to gain the knowledge contained in this declaration.

3.     Paul Argentieri is the sole author of the Lawsuit Overview.pdf document.

4.     There is no other author of the Lawsuit Overview.pdf document.

      I hereby declare under penalty of perjury and pursuant to 28 U.S.C. 1746 and under the laws of the United States that the following is true and correct:

DATED: March 30, 2012.

_____
Paul Ceglia

1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

PAUL D. CEGLIA,

Civil Action No. : 1:10-cv-00569-RJA

Plaintiff,

**DECLARATION
OF PAUL CEGLIA**

v.

MARK ELLIOT ZUCKERBERG, Individually, and
FACEBOOK, INC.

Defendants.

DECLARANT, submits this declaration and hereby declares under penalty of

perjury and pursuant to 28 U.S.C. 1746 and under the laws of the United States

that the following is true and correct:

1.   I make this declaration upon personal knowledge.

2.   On or about January or February of 2003 I posted an advertisement on

Craigslist New York for a computer programmer.

3.   The advertisement did not include my phone number.

4.   I accepted applications, including the one from Mark Zuckerberg, via email

only.

5.   On or about February or March of 2003 I selected Mark Zuckerberg as the

contractor.

6.   Throughout February, March and April of 2003 time I exchanged multiple

emails with Mark Zuckerberg to begin to explain in greater detail the work I

1

_____
Paul Ceglia

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

PAUL D. CEGLIA,

Civil Action No. : 1:10-cv-00569-RJA

Plaintiff,

**DECLARATION
OF PAUL CEGLIA**

v.

MARK ELLIOT ZUCKERBERG, Individually, and
FACEBOOK, INC.

Defendants.

DECLARANT, submits this declaration and hereby declares under penalty of perjury and pursuant to 28 U.S.C. 1746 and under the laws of the United States that the following is true and correct:

1.      I make this declaration upon personal knowledge.

2.      I located the Facebook Contract[1] on or about June 27th 2010.

3.      I located the Facebook Contract in my house in Wellsville, New York.

4.      The document was found within a Hope Chest on the North wall of my spare room.

5.      In that Hope chest were a series of other documents dating to the same time.

6.      During the Winters of 2003 through 2008 I closed down my house in Wellsville New York.

7.      I shut off the electricity at the main breaker and left the house for extended periods of time during freezing New York Winter conditions.

---

1       To eliminate any confusion, the Facebook Contract designates the two page document presented to Defendants' experts for evaluation in July of 2011.

1

8. For at least five months before, during and after the winter of 2003-2004, five months during and after the winter of 2004-2005, five months before, during and after the winter of 2005-2006, six months before, during and after the winter of 2006-2007 and four months before and during winter of 2007-2008, my house in Wellsville New York, along with all of its contents, were subject to freezing and subfreezing temperatures.

9. During the winter of 2008-2009 I lived in my home. My home was heated with a wood stove and a gas fireplace as it has no central heating.

10. During the winter of 2008-2009, I kept my spare room closed off to keep the heat in the lived in rooms of my home.

11. During the winter of 2009-2010 I heated my home with a wood stove and a pellet stove. I still had no central heating and kept my spare room closed off from the rest of the house to conserve heat.

12. The winterizing of my house in Wellsville, New York included draining the water lines and pipes to prevent ruptures from frozen water.

13. Almost every year that effort was still unsuccessful and I would regularly have to replace lengths of copper piping each spring from ruptures caused by frozen pipes.

14. I did not heat my home while absent at the times listed above.

2

I hereby declare under penalty of perjury and pursuant to 28 U.S.C. 1746 and

under the laws of the United States that the foregoing is true and correct:

DATED:  June 2, 2012

_____

Paul Ceglia

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

PAUL D. CEGLIA,

                                    Plaintiff,

v.

MARK ELLIOT ZUCKERBERG, Individually, and
FACEBOOK, INC.

                                    Defendants.

Civil Action No. : 1:10-cv-00569-RJA

**SUPPLEMENTAL
DECLARATION
OF PAUL CEGLIA**

PAUL CEGLIA, submit this second supplemental declaration in compliance with the Court's December 16, 2011 Order (Doc. No. 272) and hereby declare under penalty of perjury and pursuant to 28 U.S.C. 1746 and under the laws of the United States that the following is true and correct:

1.    I make this declaration upon personal knowledge.

2.    To my knowledge, Jerry Grant is in possession of the forensic images of 41 floppy disk drives provided to him by my counsel Paul Argentieri.    Those forensic copies of the 41 floppy disk drives are currently being stored in Mr. Grant's office in [location of his office].

3.    To my knowledge, Mr. Grant has provided, in response to this court's order, Doc. No. 272, a forensically sound copy or copies of all of the above mentioned forensic copies that are in his possession.

4.    As to Doc. No. 272 3(A), Mr. Grant does not have in his possession, custody or

1

control and has never had in his possession, custody or control any copies or images of the contract attached to any complaint in this action.

5.  As to Doc. No. 272 3(B), my recollection is that there is an electronic version of the contract on one of the floppy disks.

6.  As to Doc. No. 272 3(C), there are emails between myself and Mark Zuckerberg contained on at least one of the floppy disk copies that are in Mr. Grant's possession.  Forensically sound copies of those copies of floppy disks have been provided to Stroz Friedberg on two occasions, one before this court's order Doc. No. 272, in July 2011 and again after this court's order, in December of 2011.

7.  As to Doc. No. 272 3(D), the 41 floppy disks provided to Mr. Grant for him to make copies of were provided to him by my counsel Paul Argentieri.

8.  As to Doc. No. 272 3(E), Mr. Grant was provided the original floppy disks and made forensically sound copies of them before returning those floppy disks to Paul Argentieri.   Mr. Grant was not provided copies of any computers or electronic media from any source.

9.  All items identified in this Supplemental Declaration have been made available to Defendants and to Stroz Friedberg in July of 2011 and again in December of 2011.

10. As to Doc. No. 272 at ¶5, there are no additional files to be made available to Defendants and/or Stroz Friedberg.   All files, as noted above, were made available to Defendants and Stroz Friedberg in July of 2011 and again in December of 2011.

2

I hereby and hereby declare under penalty of perjury and pursuant to 28 U.S.C. 1746 and under the laws of the United States that the following is true and correct:

DATED: December 23, 2011.

Paul D. Ceglia

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

PAUL D. CEGLIA,

                            Plaintiff,

v.

MARK ELLIOT ZUCKERBERG, Individually, and
FACEBOOK, INC.

                              Defendants.

Civil Action No. : 1:10-cv-00569-RJA

**DECLARATION
OF
PAUL CEGLIA**

      PAUL CEGLIA, submits this declaration and hereby declares under penalty of perjury and pursuant to 28 U.S.C. 1746 and under the laws of the United States that the following is true and correct:

1.    I make this declaration upon personal knowledge.

2.    Before completing this declaration I was provided and did read in its entirety the court's most recent order, Doc. No. 208.

3.    I learned from counsel on the evening of November 2, 2011 that I was required to return to the United States and personally search for the USB devices that would be outlined in an order from this court.

4.    Those devices were identified in the court's order, Doc. No. 208, ¶2.

5.    On Thursday, November 3, 2011 I purchased a plane ticket and arrived in Buffalo New York on November 3, 2011.

6.    On November 4, 2011 at 5:35 am, I began my search for the following six USB devices as identified in the court's order, Doc. No. 208.

    a. Gigaware USB Device, 20051942520C8D20CDB2&O

    b. SanDisk Cruzer Micro USB Device, 200524439016A86122A2&O

    c.  USB 2.0 USB Flash Drive USB Device, 76562f5793a65e&o

    d. Ut165 USB2 FlashStorage USB Device, 00000000000069&0

    e.  Kingston DataTraveler 2.0 USB Device, 5B8407000A4B&O

    f.  Seagate FreeAgent GoFlex USB Device, NA056T98&0

7.    I searched in all locations that may contain any of the devices as identified in the court's order, Doc. No. 208 ¶2 and the above identical list, 6a-f.

8.    This search included searching for all relevant computers and electronic media in my possession, custody or control since June 30, 2010 including, but not limited to the devices listed in the court's order, Doc. No. 208 and the above identical list in 6a-f.

9.    Starting at 5:35 am on November 4, 2011, I looked through my parents' office desk at their home office in Wellsville, New York.

10.   I moved the desk to examine behind it and underneath it.

11.   At 6:18am I conducted a google search for images of each device in the hopes acquiring a visual aid to assist in my search. I was able to locate images of 6a and 6b above, but not 6c or 6d.

12.   I was able to locate an image for the devices listed in 6e and 6f above.

13.   At 6:41am with the available pictures and a notepad in hand I continued to search behind the other office desk at my parents' house, under and behind the computer monitor, in the desk's side shelves. I also looked in and around the printer stand, under the printer and behind the stand.

14.   I then checked the two dressers my parents keep in their office searching in the drawers and behind the dresser unit. I also searched in my parents spare bedroom, under the beds,

2

and behind the furniture and in baskets or other receptacles in those rooms.

15.   I searched my niece Jessica's bedroom, behind her furniture and bed.

16.   I searched my parents' kitchen, looking in the cabinets that my parents keep rental records in. I searched through the two pen holders they keep on the window sill and searched all kitchen storage locations and receptacles.

17.   After breakfast at 7:41am I searched my parents living room, the chairs, couch, under their cushions, behind and underneath the furniture.

18.   I then continued to search for all of the listed devices by searching through my parents' file folders.

19.   At 12:20 pm I drove to my house in Wellsville and began searching my own office there.

20.   I searched through the top of my desk and all the organizers on it.

21.   I searched the drawers of my main office desk looking in the hanging folders themselves and removed them to look in the drawers themselves. I then moved the desk to look behind it and under it.

22.   I searched my computer station, looking on the shelves to that station and under my printer. I then moved the station to look underneath it.

23.   Next, I searched my hope chest and searched through some miscellaneous electronics. I removed the contents of the hope chest to examine in detail. I then searched several brief cases and attache cases I keep to the side of the hope chest.

24.   Next, I searched my metal safety box and examined the contents of each shelf and drawer. I searched my file drawers and behind the units themselves.

25.   at 1:36pm I began to search my living room, searching under the couch cushions, behind the furniture, around the television and around the fireplace and mantle.

26.  I then searched my bedroom, the nightstands, dressers and any bedroom receptacles.

27.  I searched my boys' room, search through the their toys and my wife's sewing supplies.

28.  I searched all kitchen receptacles.

29.  I then searched my car, under the seats, glove box and trunk.

30.  I then search on and around my Yamaha keyboard.

31.  I then searched my other car and made sure that I looked everywhere that I could imagine a USB stick falling from my pocket being found.

32.  On Saturday, November 6, 2011, at 6:03am I began a search of the office on main street that Paul Argenteiri and I rented to manage this case.

33.  Once arriving there, I searched the main room that contained a bookshelf, office safe, couch and billiards table.

34.  I searched the bookshelf near the office safe, the couch cushions, behind and underneath the couch. I also checked under and around the billiards table.

35.  I searched my main office desk, checking behind my printer and underneath it. I looked on my bookshelf and behind it. I then searched my computer station and its shelving unit.

36.  I searched Paul Argentieri's desk and shelves and the office search was complete.

37.  I was informed by counsel that some discussion occurred at the November 2, 2011 hearing regarding property I own in the Bahamas and the possibility of some of the devices referred to in ¶2 of the court's order, Doc. No. 208, may be at that location.

38.  I was last in the Bahamas at my property on February 14, 2008. I have not returned to that property since that time, nor had anyone transport any of my personal property, including any computers, electronics, storage devices or USB devices of any kind, to my Bahamas property.

4

39.   My Toshiba laptop identified by Stroz Friedberg as having at least one of these USB devic-

es attached to it in the past, was purchased by me sometime in 2009.  Therefore, it is im-

possible that any of these devices were ever transported by me or anyone else on my behalf

to the Bahamas as noted above and could not be there since February 14, 2008.

40.   My Toshiba laptop was regularly used by people other than me including, but not limited to

the following people that I can recall:

a. My wife.

b. My parents.

c.  Hired Contractors

d. Other friends from time to time.

41.   Any of the devices identified in the court's order, Doc. No. 208, that were attached to par-

ents' computer, I have no knowledge at all about those devices.

42.   As to the information about when these devices were acquired by me, how they were used,

and how and when they were last in my possession, custody or control, I state as follows:

43.   As to the Gigaware and Sandisk devices below, I cannot recall with certainty which of

those devices was the one USB device I owned and used and which was one that I did not

own or use.  Therefore, for either the Gigaware or the SanDisk device, whichever was the

one that I owned and used infrequently, the following is my recollection:

a. I do not have a firm recollection of the precise date when I acquired this device.  My best

speculation is that I acquired it in late 2008 or early 2009.

b. I used it to transfer files between my laptop and other computers/devices and to transport

files to a printer for printing and other similar tasks.

c. To the best of my recollection I last had this device, either the Gigaware or SanDisk device

5

in sometime in 2010.

d. I have no recollection of how these items came to no longer be in my possession, custody or control

e. As to the other device of either the Gigaware or Sandisk that I did not own or use the following is true:

    1. I do not recall ever acquiring this device.

    2. I do not recall ever using this device

    3. I do not recall ever disposing of this device.

ii.    Gigaware USB Device, 20051942520C8D20CDB2&O

    1. See above.

iii.    SanDisk Cruzer Micro USB Device, 200524439016A86122A2&O

    1. See above.

iv.    USB 2.0 USB Flash Drive USB Device, 76562f5793a65e&o

    1. I do not recall ever acquiring this device.

    2. I do not recall ever using this device

    3. I do not recall ever disposing of this device.

v.    Ut165 USB2 FlashStorage USB Device, 00000000000069&0

    1. I do not recall ever acquiring this device.

    2. I do not recall ever using this device

    3. I do not recall ever disposing of this device.

vi.    Kingston DataTraveler 2.0 USB Device, 5B8407000A4B&O

    1. I do not recall ever acquiring this device.

    2. I do not recall ever using this device

3.   I do not recall ever disposing of this device.

vii.   Seagate FreeAgent GoFlex USB Device, NA056T98&0

1.   I am aware that Stroz Friedberg's computer expert, Mr. McGowan, has stated that
this device "appears to have been connnected" to my Toshiba laptop as recently
as April 4, 2011.  Doc. No. 157 at ¶26.

2.   I have no recollection of acquiring this device at any time.

3.   I have no recollection of using this device.

4.   I have no recollection of when, if ever, this device was no longer in my posses-
sion, custody or control or how it would have come to no longer be in my pos-
session, custody or control.

5.   Although Stroz Frieberg stated the device "appears to have been connected" to
my laptop, I have no recollection of it actually being connected to my laptop.

I hereby and hereby declare under penalty of perjury and pursuant to 28 U.S.C. 1746 and
under the laws of the United States that the following is true and correct:

DATED: December 1, 2011.

_____
Declarant

7