UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

PAUL D. CEGLIA,

                                        Civil Action No. : 1:10-cv-00569-RJA

                              Plaintiff,

                                        **MEMORANDUM IN RESPONSE
                                        TO DEFENDANTS' MOTION TO
v.                                      DISMISS FOR FRAUD ON THE
                                        COURT**

MARK ELLIOT ZUCKERBERG, Individually, and
FACEBOOK, INC.

                              Defendants.

Respectfully submitted,

/s/ Paul Artentieri

Dean Boland                   Paul A. Argentieri
Boland Legal, LLC             188 Main Street
1475 Warren Road              Hornell, NY 14843
Unit 770724                   607-324-3232 phone
Lakewood, OH 44107            607-324-6188
216-236-8080 phone            paul.argentieri@gmail.com
866-455-1267 fax
dean@bolandlegal.com

TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

LEGAL FRAMEWORK FOR THE COURT'S ANALYSIS OF DEFENDANTS' MOTION.......3

    RECOGNITION THAT THERE ARE DUELING EXPERTS ON EVERY RELEVANT
    ISSUE........................................................................................................3

CASE LAW IS INSTRUCTIVE ON THE COURT'S CONDUCT WITH DUELING EXPERTS.4

COURT MUST BE JUDGE AND JURY TO DECIDE WHICH OPINIONS TO RELY UPON ...5

RECONCILIATION WITH CONSTITUTIONAL AND JUDICIAL PRECEDENT ....................5

NO REASONABLE JURY STANDARD .......................................................................8

CLEAR AND CONVINCING STANDARD ...................................................................9

PLAINTIFF AND PLAINTIFF'S EXPERTS HAVE DECLARED THE FB CONTRACT
AUTHENTIC...........................................................................................................10

EXPERT TESTIMONY NOT SUPERIOR TO NON-EXPERT TESTIMONY...........................10

UNBALANCED ACCESS TO INFORMATION ...........................................................10

RESPONSE TO MOTION TO DISMISS........................................................................11

FACEBOOK CONTRACT IS AUTHENTIC..................................................................11

FORENSIC DOCUMENT EXAMINERS CONFIRM THE AUTHENTICITY OF THE FB
CONTRACT ...........................................................................................................12

DEFENDANTS' CHALLENGE TO THE AUTHENTICITY OF THE FB CONTRACT FAIL..19

DAUBERT CRITERIA...............................................................................................22

CIRCUMSTANCES UNLIKELY TO YIELD RELIABLE RESULTS........................................25

INCONVENIENT TRUTH ABOUT LAPORTE'S RESULTS...................................................27

CONTAMINATION ARGUMENT ...............................................................................30

LESNEVICH ANALYSIS RELIES ON DOCTORED DOCUMENTS HE TESTIFIED WERE
UNSUITABLE FOR EXAMINATION ...........................................................................32

FATAL FLAW IN LESNEVICH ANALYSIS.................................................................33

ROMANO'S UNQUALIFIED STATEMENTS ABOUT AN ALTERED DOCUMENT ............36

CORROBORATIVE EVIDENCE ...............................................................................38

PLAINTIFF'S AUTHENTIC EMAILS.........................................................................38

DEFENDANTS' COMPUTER EXPERTS' LACK QUALIFICATION TO ASSERT FRAUD...39

DEFENDANTS' EXPERTS' CHALLENGE TO THE EMAILS' AUTHENTICITY .................41

ADDITIONAL UNEXAMINED EMAILS FROM THE HARVARD COLLECTION................41

DEFENDANTS AUTHENTICITY CHALLENGE REGARDING WHITE SPACE
FORMATTING FAILS ..........................................................................................43

DEFENDANTS' CHALLENGE TO EMAILS AUTHENTICITY VIA ABBREVIATION
INCONSISTENCIES FAILS.....................................................................................44

REFUTATION OF DEFENDANTS' FRAUD CLAIM BASED UPON COORDINATED
UNIVERSAL TIME ANOMALIES ............................................................................45

OTHER EVIDENCE IN THIS CASE CONTRADICTS THE UTC ERROR = FRAUD CLAIM
..........................................................................................................................46

DEFENDANTS' CLAIMS FAIL TO STUDY OR TEST AFFECT OF MICROSOFT WORD...48

MR. McMANEMIN'S STYLE MARKERS ................................................................49

SEAGATE HARD DRIVE HAS BEEN MISREPRESENTED..................................................50

RE-INSTALLATION OF THE WINDOWS OPERATING SYSTEM ON PLAINTIFF'S
PARENTS' COMPUTER .......................................................................................50

THE COMPLETE FRAUD OF THE STREET FAX DIGITAL IMAGES...................................52

DESPITE IMAGES SO POOR THEY CANNOT BE EVALUATED ..........................................53

DEFENDANTS PRESS ON..........................................................................................53

DEFENDANTS CONCEALED DEFICIENCIES IN THE STREET FAX DIGITAL IMAGES .53

DEFENDANTS' ADMIT DIGITAL IMAGES' AUTHENTICITY UNKNOWN .......................54

DIGITAL IMAGES NOT INDICATIVE OF AUTHENTIC DOCUMENTS..............................55

EMAIL ALLEGEDLY SENT WITH DIGITAL IMAGE ATTACHMENTS IS NOT AUTHENTIC..................................................................................................56

DEFENDANTS MISCHARACTERIZE THEIR TECHNOLOGY RELATED EVIDENCE ......56

SEAGATE SYSTEM CLOCK ................................................................57

DEFENDANTS' IGNORED MALWARE INFESTATION ON SEAGATE HARD DRIVE .......58

ROOTKIT MALWARE TOOL PERMITS HACKERS REMOTE ACCESS TO COMPUTERS.59

DEFENDANT ZUCKERBERG IS A RENOWNED HACKER..................................59

EVIDENCE FROM SEAGATE HARD DRIVE IS COMPLETELY CONTAMINATED...........60

DEFENDANTS' CHARACTER ASSAULT ON PLAINTIFF ......................................61

DEFENDANTS' SPOLIATION CLAIMS HAVE BEEN VANQUISHED ..................................61

USB DRIVE..........................................................................................61

RE-INSTALLATION OF WINDOWS ................................................................63

DAMAGE TO THE FACEBOOK CONTRACT ..........................................................63

LITIGATION MISCONDUCT..........................................................................64

CONCLUSION..........................................................................................64

<u>PRELIMINARY STATEMENT</u>

Regardless of how often Defendants repeat their claims of fraud, the evidence shows that the Facebook contract is authentic.  There is no fraud by Plaintiff in this case.  Plaintiff has stated under oath, multiple times, that the Facebook Contract examined by Defendants' experts in July 2011 (the FB Contract) was signed by himself and Defendant Zuckerberg on April 28, 2003.  Doc. No. 65 at 2.  Plaintiff's experts confirmed Plaintiff's sworn testimony that the FB contract is authentic with the reports they submitted to this court.  e.g. Doc. Nos. 415, 416.

While Plaintiff's experts remain steadfast,  Defendants' "fraud" theory has changed since reviewing Plaintiff's reports.  From the start of this case until June 2012, Defendants have argued that the FB Contract examined by their experts was a "page one substitution."  Since receiving Plaintiff's experts' reports in June of 2012, Defendants must now abandon their "page one substitution" theory.  The depositions of our experts and the admissions of their experts have proven how bankrupt the "page one substitution" theory is.  It is time for Defendants to admit the truth -  the FB Contract is authentic and enforceable.

Recent depositions revealed that Defendants' experts contradict each other.  For example Peter Tytell disagreed with Gerald LaPorte as to the measurements of the paper thickness of the two pages of the FB Contract; Lesnevich opined in Doc. No. 52 that the scan of the FB Contract attached to the original complaint was so degraded that it was useless for an examination and comparison, but later relied on an examination and comparison of that same image for his declaration supporting Defendants' motion to dismiss.  Doc. No. 329.  Laporte used an ink dating method claiming to properly date the ink on page one, while Defendants' other expert, Albert Lyter, found the ink on the FB Contract unsuitable for ink age determination.  Doc. No. 328 at 9.

The disagreement among Defendants' experts alone denies them satisfying the clear and convincing standard which is outlined below.  This case presents what this court has repeatedly referred to as "dueling experts."  The parties have presented thousands of pages of expert reports.  Plaintiff's experts have concluded that the FB Contract is authentic.  The depositions of Defendants experts reveal they exaggerated their results and overstated the certainty of their fraud conclusions.  These dueling experts underline the correctness of the court's stated position that it would not "get in the way of a jury.  I started out on that point, and I intend to stick with it."  Transcript of Hearing, 12-13-11 at 183.

The court has raised the dueling experts issue several times.

[COURT] If there are conflicting expert opinions, does the court conduct a bench trial, or is it a  jury trial, an advisory jury trial?  I've never heard of such a thing. This is a totally new concept.  Transcript of Hearing, 6-30-11 at 35.

[Court] [H]ow he managed to finesse Mr. Ceglia here would be pretty damaging and devastating if you had dueling expert opinions.  There's no question about that. I don't think anybody quarrels with that. Id. at 157.

"What I'm asking is either in that case or Judge Larimer's case were there dueling experts?"  Id at 38.  Mr. Snyder responded "I don't believe so, but I don't regard there to be dueling experts in this case."  Id.  Emphasis added.    To which the court, foreseeing the impossibility of Defendants request responded, "Yet"  Id.  In December 2011, after Mr. Snyder again tried to mislead the court by deceitfully stating, "I believe that the experts [in this case] are not duelling experts." the court accurately corrected the record by clarifying "My point is simply this: Plaintiff has proffered experts who have not caved."  Transcript of Hearing, 12-13-11 at 202.  Plaintiff's June 2012 reports show that not only have Plaintiff's experts not caved, but have overwhelmed Defendants' "avalanche" of pages of reports exposing them.  Dueling experts exist despite Defendants' contrary promises.  In the face of Defendants drive to dismiss amidst dueling

experts, this court has correctly stated that "[i]t's a very substantial case, to say the least, so fairness considerations become to me even heightened."  Transcript of Hearing, 12-13-11 at 202.

<u>LEGAL FRAMEWORK FOR THE COURT'S ANALYSIS OF DEFENDANTS' MOTION
RECOGNITION THAT THERE ARE DUELING EXPERTS ON EVERY RELEVANT ISSUE</u>

Defendants' motion to dismiss argues this court can exercise its gatekeeping function and resolve disputed facts.  Doc. No. 319 at 34.  Their motion, however, asks this court to determine which of two dueling experts to side with on the authenticity of the FB contract and the emails.  The Defendants' argument asks this court to "get in the way of a jury" which this court emphasized it would not do.  Transcript, December 13, 2011 at 183.  This court has previously highlighted the impropriety of the use of inherent power in the face of dueling experts.

> [COURT].  So what I'm getting at is, if it turns out that the <u>plaintiff's experts</u>, after concomitant testing, using the same protocols, <u>come to a completely different conclusion</u>, even under inherent power, which is the first time I've heard that that's your strategy here procedurally....The case seems to me to go forward to jury trial.  Transcript, June 30, 2011 at 31.  Emphasis added.

> THE COURT: How does the court do that then? <u>If there are conflicting expert opinions</u>, does the court conduct a bench trial, or is it a jury trial, an advisory jury trial? I've never heard of such a thing. This is a totally new concept.  Id. at 35.  Emphasis added.

> THE COURT: Isn't the <u>authenticity of the document ultimately for the jury</u>?
> MR. BOLAND: Absolutely. It is, Your Honor....

> THE COURT: Well, isn't it obvious from the papers that there's going to be two     sides to this story?  Transcript, December 13, 2011 at 69.  Emphasis added.

> [MR. BOLAND].  They started all of this by saying there would be no -- there'd be universal opinions on our side, and they've now creeped towards "Well, we're going to have an expert, but you're going to have an expert," and <u>they're putting you in the position of a jury</u> at that point as opposed to just deciding a motion that's universally proven.  Transcript, December 13, 2011 at 183.  Emphasis added.

THE COURT: Well, I assure you, unless they elect to proceed on a bench trial before myself, that is not going to happen. <u>I'm not going to get in the way of a jury</u>. I started out on that point, and I intend to stick with it.  Id.  Emphasis added.

Using inherent power now requires the court make admissibility decisions regarding evidence and qualification decisions about expert testimony without the benefit of the procedures outlined by the federal rules of procedure and evidence for those tasks.  Contesting the authenticity of a document pre-trial merits a hearing on the issue.  Challenging the qualifications, methodology and results derived from expert tests pre-trial merits a Daubert hearing.  Therefore, if the court intends to rely on the expert reports of Mr. Laporte and Mr. Lesnevich in consideration of the motion to dismiss, Plaintiff is hereby requesting a Daubert hearing on on both of them.  Defendants urge bypassing those protections to sweep aside Plaintiff's right to these types of pre-trial hearings and a jury trial.

<u>CASE LAW IS INSTRUCTIVE ON THE COURT'S CONDUCT WITH DUELING EXPERTS</u>

Defendants argue this court can weigh dueling expert opinions and side with theirs.  The Second Circuit is instructive on the handling of dueling experts pre-trial under analogous situations.

In re *Visa Check/Mastermoney Antitrust Litigation v. Visa U.S.A, Inc.* 280 F.3d 124, the Second Circuit directed that "a district court may not weigh conflicting expert evidence or engage in 'statistical dueling' of experts.  The question for the district court [pre-trial] is... <u>not whether the evidence will ultimately be persuasive</u>." Id. at 292–93.  Emphasis added.

Whatever the competing views of the [experts], it is solely for the jury to weigh and assess the credibility of dueling experts. See, e.g., *Valdez v. Ward*, 219 F.3d 1222, 1238 (10th Cir. 2000) (determination of whose expert's "testimony at trial was more credible was an issue solely

within the province of the jury") (citing *United States v. Bohle*, 475 F.2d 872, 874 (2d Cir.1973)).

*In re Joint E & S Dist. Asbestos Lit.*, 52 F.3d 1124, 1135 (2d Cir.1995) ("Trial courts should not

abrogate the jury's role in evaluating the evidence and the credibility of expert witnesses by

simply choosing sides in the battle of the experts") (internal quotation marks and alterations

omitted); *Kreppel v. Guttman Breast Diag. Inst., Inc.,* No. 95 CIV. 10830(MHD), 2000 WL

369390, *3 (S.D.N.Y. April 11, 2000)  *Alli KATT, Plaintiff, v. CITY OF NEW YORK*  151

F.Supp.2d 313 S.D. New York.

## COURT MUST BE JUDGE AND JURY TO DECIDE WHICH OPINIONS TO RELY UPON

Expert testimony that fails to satisfy Daubert is inadmissible.  If a Daubert hearing would

exclude one or more of the Defendants' experts (as unqualified) or their methods (as unscientific,

not generally accepted, peer reviewed, no known error rate, etc) or their conclusions (not

rationally based on their testing) then that expert's opinion could not logically be relied upon to

support Defendants' defense of fraud on the court.  A non-Daubert qualified expert (or expert

opinion) is not clear and convincing evidence of anything.

## RECONCILIATION WITH CONSTITUTIONAL AND JUDICIAL PRECEDENT
### 7th Amendment

The Seventh Amendment to the Constitution guarantees Plaintiff a "right of trial by jury."

Defendants seek to deprive Plaintiff of that right using its motion to dismiss for fraud on the

court.  Following the guidance of the founding fathers established in the 7th Amendment,

Plaintiff is entitled to a jury determination of his claims.  A dismissal in this case would violate

Plaintiffs Constitutional rights.

"The Seventh Amendment to the Constitution guarantees a jury trial in law cases,
where there is substantial evidence to support the claim of the plaintiff in an action. If a
single witness testifies to a fact sustaining the issue between the parties, or if reasoning

minds might reach different conclusions from the testimony of a single witness, one of which would substantially support the issue of the contending party, the issue must be left to the jury. Trial by jury is a fundamental guaranty of the rights of the people, and judges should not search the evidence with meticulous care to deprive litigants of jury trials."  (dissenting) *Galloway v. United States*, 319 U.S. 372, 407.

The Second Circuit has clarified, "none of [the] evidence presented more than the usual problems that are the result of conflicting testimony which, in a jury trial, it is the jury's duty to solve if it can."  *Lynch v. U.S.* 162 F.2d 987.  The court in *Lynch* distinguished its decision from *Galloway* on the facts and ruled consistent with the sentiments reflected in the *Galloway* dissent excerpted above.

Rule 1008

As the court noted, sua sponte, in its order of December 16, 2011, Doc. No. 272, Federal Rule of Evidence 1008 "the court requests that the parties consider the effect, if any, of the second sentence of Fed.R.Evid. 1008, on any such motion".  FRE Rule 1008 clearly mandates that "in a jury trial, the jury determines — in accordance with Rule 104(b) — any issue about whether: (a) an asserted writing, recording, or photograph ever existed", especially when the asserted writing is the central document of the case.  Plaintiff responded to the court's question with a full brief on every federal case considering the application of FRE 1008 to circumstances identical to this case.  Doc. No. 275.  Every relevant case supports Plaintiff's persistent argument that Defendants' defense of "fraud," especially reliant on its claim of having a competing contract, is resolved by a jury and not by a judge sitting as a jury in contravention of FRE 1008. Following the guidance of FRE 1008, the case should reach a jury to decide the authenticity of the FB contract.

Federal Rule of Evidence 901

The Facebook contract is authenticated and, therefore, admissible.  FRE 901.  *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 58 Fed. R. Evid. Serv. 1196 (9th Cir. 2002).  (once the trial judge determines that there is prima facie evidence of genuineness, the evidence is admitted and the trier-of-fact makes its own determination of the evidence's authenticity and weight);  *U.S. v. Goichman*, 547 F.2d 778, 1 Fed. R. Evid. Serv. 459 (3d Cir. 1976).  Under this standard, Plaintiff's contract will be authenticated at trial.  Plaintiff's testimony along with Plaintiff expert testimony far surpass Rule 901's authentication requirements.  Therefore, Defendants seek dismissal alleging fraud within documents that will be authenticated, are relevant, and therefore are admissible at trial.

Erie Doctrine

It is a long standing principle of jurisprudence that a federal court sitting in a diversity of citizenship case is obligated to adhere to state substantive law. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).  Under New York substantive law, there is a distinction between extrinsic and intrinsic evidence when a court is asked to consider a Fraud on the Court motion. This is because New York law permits collateral attacks on judgments obtained by extrinsic, but not intrinsic, fraud. *Altman v. Altman*, 150 A.D.2d 304, 542 N.Y.S.2d 7, 9 (N.Y.App.Div.1989)).  The Chief Justice concluded that the crucial considerations under Erie were whether the failure to apply state law was likely to result in forum-shopping, and the degree to which the failure to apply state law would discriminate unfairly against citizens of the forum state. *Hanna v. Plumer* 85 S.Ct. 1141.  This court should interpret and apply New York State law to Defendants' motion.  That application should result in a denial of the motion as it rests on an allegation of "intrinsic" fraud which is properly resolved by a jury trial.  It is undisputed that

giving Defendants this additional dispositive motion, a fraud on the court dismissal, in diversity cases will  encourage forum shopping and discriminate unfairly against citizens of the forum state.

## NO REASONABLE JURY STANDARD

The court has the inherent power to dismiss a case for fraud on the court arguing an extrinsic fraud claim.  While seemingly in contrast, Plaintiff also holds that 1.) he is entitled to a jury trial because the 7th amendment to the Constitution provides him that right; 2.) FRE Rule 1008 clearly mandates that the jury determines any issue about the authenticity of the FB contract; 3.) the FB contract should be admitted as evidence under FRE 901, and 4.) NY substantive law applies.  The apparent conflict between the inherent power of the court and the constitutional rights of an individual and judicial precedent can be resolved with the proper definition of what the standard of proof for Defendants' motion to dismiss for fraud on the court should be - that is the "clear and convincing" standard.  Clear and convincing is defined as evidence such that no reasonable jury could find in favor of the non-moving party.  *Univ. of Rochester v. G.D. Searle & Co., Inc.*, 249 F. Supp. 2d 216, 220-21 (W.D.N.Y. 2003).  ("Thus, a moving party...must submit such clear and convincing evidence of invalidity that no reasonable jury could find otherwise.")  In this case that standard equates to a standard that no reasonable jury could find in favor of the authenticity of the FB Contract.  Id.

Short of that finding, the 7th Amendment entitlement to a jury trial prevails.  Defendants argue, as they must, that their evidence satisfies the clear and convincing standard obviating the need for a trial.  If no reasonable jury could find in favor of the authenticity of the FB contract,

then the FB contract would never be admissible under Rule 901 or Rule 1008 and the case would

be dismissed on summary judgement for lack of evidence.

CLEAR AND CONVINCING STANDARD

It is important to note, Defendants have presented only expert opinions in support of their

fraud on the court claim.  Plaintiff has countered each and every expert opinion.  Defendants

were unable to identify even one fact disputing the authenticity of the FB contract or the emails -

just opinions.  A fact is an observable reality that can be confirmed by any disinterested third

party.  Facts cannot be contested with opinions.  In *Shangold v. Walt Disney Co.*, 275 F. (2d Cir.

2008), it was a fact that the Palm Pilot personal digital assistant device was not publicly available

until well after the time of creation of the allegedly authentic manuscript bearing that term.

Therefore, that indisputable fact proved the fraud of the document and was the basis for the

court's determination of fraud on the court.  In *Aoude v. Mobil Oil Corp.*, 892 F.2d, 1118 (1st Cir.

1989)), it was a fact that Aoude had forged the purchase agreement, because Aoude admitted it.

Therefore, again, that indisputable fact provided a sound basis for the court's determination of

fraud on the court in *Aoude*.  In both *Shangold* and *Aoude* it was not an expert's disputed opinion

that swayed the court.  It was a confirmed and undisputed fact.  It would have been clear in both

Shangold and Aoude that no reasonable jury could have found in favor of the authenticity of their

central documents.

One sided paid opinions can never satisfy the clear and convincing standard, even if

uncontested, because a jury is not obligated to accept expert opinion as fact. *Powers v. Bayliner*

*Marine Corp.*, 83 F.3d 789, 798 (6th Cir.1996).  Defendants are not asking the court to be a trier-

9

of-facts, they are asking the court to be a <u>trier-of-opinions</u>.  The only undisputed expert opinions

that can be considered facts were presented by Plaintiff.

## <u>PLAINTIFF AND PLAINTIFF'S EXPERTS HAVE DECLARED THE FB CONTRACT AUTHENTIC</u>

Plaintiff and Plaintiff's experts have declared the FB contract authentic.  Therefore, a

reasonable jury could find Plaintiff and Plaintiff's experts' testimony persuasive and find in favor

of the authenticity of the Facebook contract.  As such, it is impossible for the Defendants to

argue that no reasonable jury could find in favor of authenticity. If an expert can conclude the FB

Contract is authentic, obviously so too could a juror.  On this basis alone the Defendants' motion

to dismiss, Doc. No. 318, should be denied.

## <u>EXPERT TESTIMONY NOT SUPERIOR TO NON-EXPERT TESTIMONY</u>

While Plaintiff has provided overwhelming expert testimony supporting the authenticity

of the contract and emails, overcoming Defendants' motion <u>does not require it.</u>  "[I]t is well

established that a lay jury can refuse to credit an expert's opinion, even if another expert was not

called to rebut it."  *Powers*.  To find otherwise would be to allow a parties financial resources to

dramatically influence the outcome of a case, as <u>a wealthy party can hire far more experts for far</u>

<u>more hours than an average person</u> could afford. Despite this legal reality, Plaintiff has rebutted

each of the Defendants' experts' claims of Fraud on the Court with expert testimony.

## <u>UNBALANCED ACCESS TO INFORMATION</u>

Defendants have not been required to share with Plaintiff in discovery most of their

known evidence.  Defendants did not adhere to the requirements of Rule 26 during the

depositions of their experts and never produced the actual test results, case notes, images and

other evidence that their experts relied upon to reach their conclusions.  Plaintiff's ability to fully

respond to Defendants' motion to dismiss defense is limited by the restrictions placed on him in receiving this information in discovery.  Although unclear from the orders thus far, Plaintiff is apparently being asked to rebut the Defendants' experts' allegations without being able to review any of test results supporting the experts' conclusions.  When Mr. LaPorte was asked during his deposition if he had his test results, he responded, "I was instructed by the Gibson, Dunn attorneys that there was an ongoing dispute and to leave my notes back at my hotel."  LaPorte Depo. at 145.

## RESPONSE TO MOTION TO DISMISS

Defendants memorandum in support of their motion to dismiss alleging a fraud on the court, Doc. No. 319,  sets out three bases by which they believe the court may dismiss this case. Defendants have first alleged that Plaintiff has committed a fraud on the court by presenting to Defendants a contract and emails that they claim are forgeries.  Doc. No. 319 at 28.  Second, Defendants allege that Plaintiff has engaged in spoliation of destroyed evidence.  Third, that Plaintiff's litigation misconduct merits dismissal.  Doc. No. 319 at 34.

## FACEBOOK CONTRACT IS AUTHENTIC

Paul Ceglia has sworn under oath that he and Mark Zuckerberg signed the Facebook Contract[1] on April 28, 2003.  (Doc. No. 65 at 2).  Defendant Zuckerberg acknowledges having a business relationship with Plaintiff.  (Doc. No. 46 at 2)  He acknowledges signing a contract on April 28, 2003 with Plaintiff.  (Id.)  He does not deny signing a software specification agreement on April 28, 2003 with Plaintiff.  Defendant Zuckerberg acknowledges receiving his own original copy of the FB Contract on April 28, 2003 and subsequently discarding that original copy

---

[1] The Facebook Contract (FB Contract) refers to the only original document in this case, the two page contract presented to Defendants' experts for examination in July 2011.

sometime in 2003 or 2004.  (4-4-12 hearing, at 7)  Defendant Zuckerberg received money from

Plaintiff and admits to having written a complex code capable of searching through millions of

unique names for Plaintiff.  Zuckerberg simply denies that the contract had provisions within it

that sold the rights to 50% of a then concept company, Facebook. To Defend his position, experts

were hired to offer opinions that Page one had been substituted from the original contract

Zuckerberg admitted signing.

Along with Plaintiff's declarations and Defendant Zuckerberg's admissions, Plaintiff has

presented voluminous expert reports confirming the authenticity of the FB Contract.

<u>FORENSIC DOCUMENT EXAMINERS CONFIRM THE AUTHENTICITY OF THE FB
CONTRACT</u>

<u>JAMES BLANCO</u>

James Blanco is a Forensic Document Examiner who maintains a full time practice in

Forensic Document Examinations with offices in San Francisco, Los Angeles and Washington

DC. His training included review of such notable cases as the Zodiac Killer and the Howard

Hughes Will.  Mr. Blanco regularly passes, with a zero personal examiner error rate, ongoing

proficiency tests given to forensic document examiners in government laboratories accredited by

ASCLD (American Society of Crime Laboratory Directors).  His most recent such test concerned

whether or not a page had been substituted in a three-page contract. Mr. Blanco's test result

accuracy was 100%.

Mr. Blanco's document examination background included experience with the Federal

Bureau of Alcohol, Tobacco and Firearms maintaining a Top Secret Security Clearance.  He

worked cases for the numerous field offices in the United States and in the U.S. Protectorates and

Territories of the Special Agents of ATF, occasionally involving joint investigations with the

DEA and FBI.  Blanco has worked as a Forensic Document Examiner with the California Department of Justice, examining cases for hundreds of government and law enforcement agencies.  He entered private practice and has been so engaged for fifteen years.

In addition to civil casework, Blanco maintains the exclusive contract with the California Secretary of State's Office for Forensic Document examination services.  He has been hired by government agencies in California, Montana, Alaska, Florida and Puerto Rico.

His experience spans rendering expert opinions regarding questioned documents on over 7,000 occasions and he has testified as an expert witness concerning questioned documents in excess of two hundred times in both federal and state courts.

> The original Facebook Contract...examined by all of the document experts is an authentic, unaltered document.  The sum of the evidence reveals that page 1 of the Facebook Contract was originally executed together with page 2 as a companion document.  Based on the detailed forensic analysis of this two-page document, there is no justification or support for the defendant's theory of a page 1 substitution, forgery or fraud. The sum of the evidence shows that page 1 was not a later inserted page to the original two-page document set.  Doc. No. 415 at 232.

Blanco's declaration lists eighteen (18) supporting reasons for this opinion.  Doc. No. 415 at ¶233:

1. The "Mark Zuckerberg" signature on page 2 of the Facebook Contract was written by Mark Zuckerberg.
2. The "Mark Zuckerberg" signature on page 2 of the Facebook Contract was not written by Paul Ceglia.
3. The "MZ" initials on page 1 of the Facebook Contract were written by Mark Zuckerberg.
4. The "MZ" initials on page 1 of the Facebook Contract were not written by Paul Ceglia.
5. Paul Ceglia wrote the hand printed interlineation on page 1 of the Facebook Contract.
6. Mark Zuckerberg did not write the hand printed interlineation on page 1 of the Facebook Contract.
7. There is no forensic basis, in practice or from the literature in the field, that supports the novel "two physical documents" theory by defendants' expert Gus Lesnevich. This theory at its root, does not make logical sense as no explanation has been offered as to why a person would craft "two physical documents" that contain the same precise typewritten and handwritten information with absolutely no changes in any terms or conditions. Nor

has an explanation been offered as to why, even if this had occurred, it would constitute a fraud.

8. The staple holes and secondary staple hole impressions/detent marks of page 1 of the Facebook Contract match the staple holes and secondary staple hole impressions/detent marks of page 2 of the Facebook Contract. That is, the staple hole on both pages align demonstrating that these two pages of the Facebook Contract have only been stapled one time wherein they were actually stapled together.

9. On this regard, the evidence does not support any theory that page 1 was attached to page 2 by hand using a staple (that is, not using an actual stapler but connecting the two pages together with a staple by hand).

10. The impression from the hand printed interlineation from page 1 of the Facebook Contract was discovered on page 2 of the Facebook Contract demonstrating that page 1 was over the top of page 2 of the Facebook Contract when the hand printed interlineation was written on page 1 of the Facebook Contract.

11. When the staple holes and detent marks of page 1 of the Facebook Contract are positioned directly over the staple holes and detent marks of page 2 of the Facebook Contract, the position of the visible hand printed interlineation from page 1 also lines up over the same position on page 2 where the indented impression was discovered.

12. Both sheets of paper of page 1 and page 2 of the Facebook Contract pages measured at 0.11 mm and visual inspection revealed that the opacity and cockling features of both pages were the same. The report of Mr. Rantanen that "The fiber content of the two vials is consistent with coming from the same mill and production run" confirms my paper thickness measurements and visual findings that the two sheets of paper are the same.

13. The front sides of page 1 and page 2 of the Facebook Contract were deteriorated/ "yellowed", the probable cause having been the result of defendants' experts excessive document processing and mishandling of the documents. Their denials in their reports on these issues demonstrate their unwillingness to acknowledge the danger of damaging documents due to excessive exposures to various lighting sources, humidity and heat. In tandem with their mishandling of the important case documents was their apparent lack of interest to gain information about the unusual environmental storage conditions that were part of the documents history (see pages 173, 176, 177 herein). As such, inquiries of "provenance" information is important to art collectors, it should equally be important to the Forensic Document Examiner.

14. With regard to this deterioration, there are two lighter areas at the tops of each of the front sides of the contract pages, the origin of which cannot be definitively determined; however the patterns more accurately fit the profile of the shapes of fingers which transferred suntan lotion, oil or other products or substances off of the fingers (whether gloved or not) onto the documents, offering those void/"tab" areas of the documents protection while the document pages were being processed by defendants' experts. Consequently,

15. Defendants' experts clip, clothespin, spring binders & clasp-like items theory does not explain the lighter areas at the top pages as alleged. The sizes and shapes of these "tab" areas are admittedly different. Further, the edges are not squared, therefore, this theory by

defendants' experts does not explain the evidence. Neither did defendants' experts consider alternate possibilities that better fit the profile of the "tab" imagery. Based upon the present evidence, it is more probable that the origin of the "void" or "tab" areas at the top of the two pages of the Facebook Contract were caused by the collective examinations of defendants' experts.

16. The divot and gouge marks and buckles in the paper of the Facebook Contract do not fit the explanations offered by defendants' experts. These marks are better explained as having been created by fingernail gouge marks in the paper and the result of aggressive handling and movement of the Facebook Contract pages during examinations by defendants' experts.

17. The font (typestyle) of page 1 of the Facebook Contract is obviously different than the font of page 2 of the Facebook Contract. However the different fonts are indicative of laypersons creating a contract, which on its own, does not provide indicia of a forged document.

18. Regarding any question about the use of the same or different writing instruments for the entries on page 1 and page 2 of the two Facebook Contract pages, since in everyday commerce it is customary that two parties to a contract would sign and write on a document with one pen, and since in other situations it is also customary that different pens are used for the various signatures, initials and for other handwritten information such as an interlineation; consequently, it is insignificant in the context of this document problem whether a same or else different writing implements were used to prepare the document. Neither situation provides grounds to argue for fraud (page 64 Declaration of Larry Stewart dated June 4, 2012).

Blanco's report contains several unchallenged conclusions establishing the authenticity of the FB contract. He analyzed the staple holes in both pages confirming that their primary and secondary markings match between the two pages (Doc. No. 415 at 233). This contradicts entirely the "page one substitution" theory Defendants had been advancing before receiving Plaintiff's expert reports.[2]

Defendants' experts included two experienced and qualified handwriting examiners, Peter Tytell and Gus Lesnevich. Neither of those experts were asked or offered to examine the

---

[2] It is important to note that Defendants' "page one substitution" argument was consistent throughout expedited discovery and only began to evolve into at least three other contradictory theories by Defendants after their receipt of Plaintiff's expert reports.

handwriting on either page of the FB contract.  "I was not tasked with an examination of handwriting or signatures specifically."  Tytell Depo. at 49.

Blanco did examine the handwriting.  Blanco concluded that the initials "MZ" on page one of the FB contract were authored by Defendant Zuckerberg.  Doc. No. 415 at 103-107.  Blanco determined that the signature "Mark Zuckerberg" on page two of the FB contract was authored by Defendant Zuckerberg.  Doc. No. 415 at 86-99.  Blanco observed many similarities in handwriting features that led to his opinions that Defendant Zuckerberg wrote his signature on page two and initialed the interlineation on page 1 of the FB contract.

## LARRY STEWART

Larry Stewart is a world renowned forensic scientist with over 27 years of credited service to the federal government and an additional six years in private practice.  He earned an Associate of Arts degree from Florida Technological University in Orlando, a Bachelor of Science in Forensic Science from the University of Central Florida and a Master of Forensic Sciences degree from Antioch University in Yellow Springs, Ohio.  He worked for the U.S. Government as a forensic scientist for over 25 years.  His tenure with the government included work on notable cases including;

1. The Unabomber; and
2. The John Wilkes Booth diary; and
3. Numerous accused Nazi war criminals, e.g. John Demjanjuk, a.k.a. Ivan the Terrible; and
4. The reinvestigation of the Dr. Martin Luther King murder; and
5. The reinvestigation of the Kennedy assassination/CIA conspiracy theory; and
6. The Quedlinburg Treasure; and
7. The 1933 Saint-Gaudens Double Eagle gold coin; and
8. The Jon Benet Ramsey murder investigation; and
9. The 9/11 terrorist attacks, and the DC Sniper investigation; and
10. The 2010 Brazilian presidential election scandal.

He has participated as an expert witness in state, federal and military courts of law, and foreign courts in Austria, Australia, Canada, Germany, Sri Lanka, and Thailand, The Hague in the Netherlands and has testified three times before the U.S. Congress.  Before beginning his private practice, Mr. Stewart was the Laboratory Director and Chief Forensic Scientist for the United States Secret Service.  He managed up to 120 scientists, technicians, and support staff in the areas of document analysis, handwriting, fingerprints, trace evidence, audio and video analysis, photography, toolmarks, computer evidence and counterfeit analysis.  In 2005, Mr. Stewart began the independent forensic consulting and investigative firm known as Stewart Forensic Consultants, LLC and its subsidiary, Global Investigative & Intelligence Services.

Since retiring from government service in 2005, Mr. Stewart has been asked to continue to work with the federal government providing assistance to the U.S. Department of Justice and the U.S. State Department.  Furthermore he was requested to work on forensic projects with the United Nations.  In his work on the 2010 Brazilian presidential election scandal, his analysis of the ink and paper revealed forged and fraudulent documents.  Mr. Stewart is independently tested for proficiency and maintains a 100% accuracy rating.

Plaintiff's expert Larry Stewart analyzed the paper, toner, layout and typography of the FB Contract.  (Doc. No. 416).  His conclusions are consistent with the authenticity of the FB Contract.

> After a thorough and exhaustive forensic testing of the Facebook Contract (Work For Hire) (Exhibit Q1), there is no indication to suggest the Contract is anything other than genuine. In addition, there is no evidence to support that the Facebook Contract is altered."  Doc. No. 416-3 at 453.

The toner on both pages is the same and dates from the 2000-2005 time period and not later than that.  Doc. No. 416 at 92, 103.  The two pieces of paper comprising the FB contract are

both consistent with being from the same production run.  Doc. No. 416-2 at 308,  and Doc. No.

421 at 2.  The differences in margin widths within the FB Contract are common in authentic

documents.  Doc. No. 416-1 at 245.  Finally, no scientifically reliable and valid ink dating

methodology is suitable for use on the FB Contract.  Doc. No. 416 at 212.  Mr. Stewart

concluded that "based on the forensic analysis of the Facebook Contract, there is no justification

or support for the Defendants' theory of a page 1 substitution, forgery or fraud." Doc. No. 416-3

at 454.

VALERY AGINSKY

Dr. Aginsky is a forensic ink Chemist.  Doc. No. 66 at 7.  He received his PhD in

analytical chemistry in 1980 and offers his services as an expert throughout the country. Id.  He

was retained by Plaintiff early in the case, prior to Defendants testing, to conduct non-destructive

testing on the contract.

Dr. Aginsky confirmed "[T]hat pages 1 and 2 of the Agreement were printed on the same

type of 8 1/2" x 11" white paper.  The paper of both pages has matching characteristics such as

color, thickness, short and long wave UV fluorescence, IR luminescence, opacity and surface

texture."  Doc. No. 66 at 3.  In fact Defendants' expert Tytell, in his deposition testimony,

supported the position of Aginsky, Blanco and Stewart when he testified that the two pages of the

Facebook contract measured such that any supposed difference in thickness was  "not enough to

definitely say that the two pages were of a different caliper."  Tytell Depo. at 126.

Dr. Aginsky also found "no discernible difference" in the ink used to write the

interlineation on page one and to sign and date page one or in the toner on pages one and two.

Doc. No. 66 at 9, 10.  Dr. Aginsky was one of the few experts to examine the authentic FB

Contract before it was damaged by Defendants' experts in July of 2011 via excessive exposure to various sources of intense light over four days.  Doc. No. 416 at 31.

WALTER RANTANEN

Walter Rantanen is the Technical Leader of the preeminent paper testing facility in the country, Integrated Paper Services.  He tested plugs from both pages and found the pages to be consistent with originating from the "same mill and production run."  Doc. No. 421 at 2.  "Spot tests show the same consistent reactions for starch and pH levels between the two samples. The fiber content of the two vials is consistent with coming from the same mill and production run." Id.

DEFENDANTS' CHALLENGE TO THE AUTHENTICITY OF THE FB CONTRACT FAIL

Plaintiff has offered expert testimony confirming 1.) the paper on Page one and two of the FB Contract have matching characteristics (Aginsky - Doc. No. 66 at 8) and is consistent with coming from the same paper mill and production run (Rantanen - Doc. No. 421 at 2);  2.) there is no discernible difference in the ink used to write the interlineation on page one and the signature and date on page two (Aginsky - Doc. No. 66 at 9), 3,) the toner on both pages is the same (Stewart - Doc. No. 416 at 92, 103), 4.) the two pages were stapled together only once (Blanco - Doc. No. 415 at ¶233), 5.) the interlineation on page one made clear matching indentations on page two (Blanco - Doc. No. 415 at ¶233), and 6.) Defendant Zuckerberg signed page two and initialed page one (Blanco - Doc. No. 415 at ¶233).

At best, Defendants can only offer expert opinions that challenge those offered by Plaintiff's experts.  Defendants' rely primarily on Gerald LaPorte and less so on several other document examiners challenging the authenticity of the FB Contract.

GERALD LAPORTE

Defendants' expert Gerald LaPorte is the most junior of all the document examiners in this case. Doc. No. 416-2 at ¶ 311. He reached several conclusions after examining the document and the ink on the document. He concluded that the two pieces of paper comprising the FB contract were different thicknesses. Doc. No. 326 at 12. He concluded the ink on the two pages was different. Doc. No. 326 at 14. He concluded the levels of some ink components differed between the pages. Doc. No. 326 at 15, 16. These findings support the Defendants' "page one substitution" theory. Stewart concluded, "It becomes a stretch of the imagination for the Defendants' experts to argue that the two Facebook Contract pages were created separately, at widely different times, and on different systems, when we now know the pages are consistent with being from the same paper mill and production run." Doc. No. 416-2 at 308.

Mr. LaPorte's thickness measurements are contradicted by Defendants' expert Tytell. Tytell Depo at 127. LaPorte's conclusions are contradicted by paper expert Rantanen. Doc. No. 421 at 2. LaPorte admitted the different measurements he observed are consistent with the two pieces of paper comprising the FB contract from originating from the same ream of paper. LaPorte Depo at 223.

LaPorte concluded that the toner appearing on the two pages of the FB Contract is different. Doc. No. 326 at 13. This conclusion is contradicted by Stewart. Doc. No. 416 at 92. Stewart is the only expert in this case with his own extensive library of toner standards necessary for the comparison he made in his report. Stewart concluded that the toner on both pages of the FB Contract are the same. Doc. No. 416 at 92, 103. He identified the manufacturer of the toner as Hewlett-Packard, the model of printer, and the time when that toner was commercially

available.  Id.  These conclusions confirm the 2003 printing date and authenticity of the FB

contract.

No expert identified the ink formulation used on either page of the FB Contract.  LaPorte

concluded the ink on pages one and two of the FB Contract were different formulations.  Doc.

No. 326 at 14.  Aginsky's examination found "no discernible difference" between the inks on

page one and two.  Doc. No. 66 at 3.  Even if LaPorte's conclusion was confirmed by other

experts, it has more bark than bite.  The reality of persons signing documents includes the use of

different pens by those signers.  As Mr. LaPorte himself admits "I know for a fact I've done

things in the office where I've written stuff and then either I forgot to sign and somebody comes

back and says oh, you forgot to sign this, and you sign under here, and I use -- you know, I use a

different pen or I use the same pen. There's just a lot of different scenarios."  Doc. No. 386-2.

Therefore, the existence of different ink formulations on the document is no indication of

fraud,  Doc. No. 416-2, at 9.   LaPorte's conclusion is contradicted by Defendant's expert Tytell.

"The optical examination of the ink of the Work for Hire document that I conducted revealed two

groups of ink: one that included the interlineation on page 1 and the signatures and dates on page

2; the other that included just the initials on page 1." Tytell Dec Doc 330 Page 11.

Both parties' ink experts chose not to perform "ink age" tests on the Facebook Contract

with the exception of Laporte, the most junior and least experienced examiner on either side.

Doc. No. 416-3 at ¶438.  In 1985, Stewart, was the first ink chemist to suggest the measurement

of Phenoxyethanol (PE) as a means of determining the age of ink.  Stewart, Larry F., Ballpoint

Ink Age Determination by Volatile Component Comparison - A Preliminary Study,  Journal of

Forensic Sciences, JFSCA, Vol. 30, No. 2, April 1985, pp. 405-411.  Others such as Aginsky and

LaPorte used Stewart's initial findings to attempt to develop PE tests such as the one referenced in LaPorte's report.  Stewart found that "It is not possible to perform ink age determination on the Facebook Contract."  Doc. No. 416-3 at ¶ 382-440.  "This is due to the degradation of the ink and paper, the lack of knowledge of the storage conditions and their potential affect on aging characteristics and the failure to identify the formula of inks so as to have basic knowledge of the original compositions."  Id.

LaPorte does not know if the PE testing method used by other experts evaluating PE are reliable to age ink.  LaPorte depo. P 67 at 14.  LaPorte's PE testing method has never been published or peer reviewed.  Doc. No. 416-3 ¶ 383.  LaPorte's method is unproven and has not met the strict requirements set forth in the forensic community for peer review and blind reproducibility studies. LaPorte Depo. 251 at 8.  LaPorte's PE testing method has not been disclosed and therefore has not been reproduced by other experts in the field an no other expert has reviewed him conducting his version of the PE test. The most recent published articles concerning PE testing all discuss the shortcomings and warn against using the techniques in casework.[3]

DAUBERT CRITERIA

The admissibilty of expert testimony is governed by the *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993).  The court operate as a gatekeeper preventing junk science from being relied upon in court proceedings.  *Daubert* has several criteria applicable to scientific or expert testimony.  Mapping those criteria over LaPorte's PE testing method yields the inevitable conclusion that his method does not satisfy *Daubert*.

---

[3] (Weyermann, Almog, Bugler and Cantu, "Minimum Requirements for Application of Ink Dating Methods Based on Solvent Analysis in Casework," Forensic Science International, 2011)

1. <u>Whether the theory or technique can be and has been tested:</u>  Mr. LaPorte acknowledged that he has never published the step-by-step procedure he uses.  (LaPorte Depo. at 248)  His procedure cannot be tested if it is never disclosed in detail.  Even more generally, Mr. Laporte acknowledges that he has not published any modifications that he as made on his method since 2004, despite admitting that he has modified that method since 2004.  (LaPorte Depo. at 244)  Mr. LaPorte acknowledged that he doesn't know if anyone else is doing the test as he does it.  LaPorte Depo. at 246.

2. <u>Whether the technique has been subject to peer review and publication:</u>  The method used by LaPorte has not been published, therefore, it has not been peer reviewed.

3. <u>The technique's known or potential rate of error:</u>  LaPorte admits he has never conducted an error rate test on unknown samples using his method.  LaPorte Depo. 251 at 8. When asked what the error rate is, Mr. LaPorte responded that "Well, I would never say that an error rate is zero percent. I can say that I've never experienced an error."  LaPorte Depo. at 250.  Not suprising considering he's never conducted even a single test on unknown "blind" samples.  A self proclaimed error rate of zero will certainly not meet Daubert criteria for a known or potential rate of error.  LaPorte's circuitous answer on this point equates to an unknown error rate for his version of PE testing. LaPorte admits that his test has never been proficiency tested. LaPorte Depo 252 at 9.

4. <u>The existence of standards controlling the technique's operation:</u>  LaPorte acknowledged no governing standard for PE testing.  LaPorte Depo. at 253.

5. <u>The level of the theory's or technique's acceptance within the relevant discipline:</u>

Numerous articles list the validation problems with PE testing in general.[4]  LaPorte

agreed that those reports contain "debatable topics" regarding PE testing.  LaPorte Depo.

at 255.  LaPorte's method of PE testing has not reached a general acceptance level in the

scientific community.  No state or federal agency relies on LaPorte's PE testing method

including the federal government agency for which he is employed.

LaPorte's PE testing method fails to satisfy any of the Daubert criteria.  His conclusions

drawn from that testing are not properly relied upon by this court now or at any stage of this

case.  There is no reported decision finding LaPorte's PE testing method satisfies Daubert.  There

is no reported decision finding PE testing in general satisfies Daubert.  There are reported

decisions excluding, for failure to satisfy Daubert, expert opinions purporting to date ballpoint

ink writing using other techniques and in various circumstances.  *EEOC v. Ethan Allen, Inc.*, 259

F. Supp. 2d 625 (N.D. Ohio 2003);  *Learning Curve Toys, L.P. v. PlayWood Toys, Inc.*, 2000 U.S.

Dist. LEXIS 5135 (N.D. Ill. 2000).

LaPorte and his version of the PE testing method were withdrawn in the face of a Daubert

challenge in a recent case.  *United States v. Rago*, Docket No. 08-CR-10268-WGY (D. Mass.)

("Rago")  This court identified in Doc. No. 457 at 18 that:

> [s]ignificantly, the basis for the Rago defendant's in limine motion to exclude
> LaPorte's testimony was that the PE testing performed by LaPorte featured 'differences
> in ink and unknown storage conditions.'  Rago motion at 7n. 1.  As such, the defendant's
> references to LaPorte's trial testimony in Padilla was relevant to establish that the

---

[4] 1.) Weyermann, C. "Mass Spectrometric Investigation of the Aging Processes of Ballpoint Ink for the Examination of Questioned Documents," Inaugural Dissertation, Justus-Liebig-University Giessen, September 2005., 2.) Weyermann, C., et al., "A GC/MS Study of the Drying of Ballpoint Pen Ink on Paper," Forensic Science International 168, 2007.  3.) Weyermann, Mazzella and Margot, "Commentary on Comparison of Natural and Artificial Aging of Ballpoint Inks," Journal of Forensic Science, July 2009. and 4.) Weyermann, Almog, Bugler and Cantu, "Minimum Requirements for Application of InkDating Methods Based on Solvent Analysis in Casework," Forensic Science International 210, 2011.

circumstances under which PE testing performed in connection with the criminal proceedings in Rago were not, based on LaPorte's previous trial testimony, similar to those likely to yield reliable results, including that the specifically identified ink in question be written on the same paper and stored under the same, known, environmental conditions.  Doc. No. 457 at 18.

<u>CIRCUMSTANCES UNLIKELY TO YIELD RELIABLE RESULTS</u>

The court highlighted in LaPorte's own testimony above that PE testing is not reliable when conducted on ink that is <u>not written on the same paper</u> and the <u>storage conditions are unknown</u>.  Id.  LaPorte's report claims the paper on pages one and two of the Facebook Contract are different.  Doc. No. 326 at 12.  LaPorte also had no information about the storage conditions of the Facebook Contract before releasing his report.  LaPorte Depo. at 190.  Therefore, LaPorte's conclusions in his report in this case are unreliable based upon LaPorte's own criteria which the court identified in Doc. No. 457 at 18.

Mr. LaPorte testified in Padilla on the subject of the evaporation rate of PE: "It really depends on the type of document that it's on, the storage conditions of the document, the type of ink that has been used and so forth."  LaPorte Depo., Exhibit 8, page 66.  In this case, he produced his report not knowing the "type of document that it's on" nor "the storage conditions of the document" nor "the type of ink that has been used."  Id.

TYPE OF INK

First, the "type of ink that has been used" influences the results.  Id.  Stewart found that "It is not possible to perform 'Ink age' determination on the Facebook Contract. Doc. No. 416-3 at ¶ 382-440.  Defendants' own expert, Albert Lyter, found the ink on the document was not suitable for ink age testing. Doc. No. 328 at 9.

STORAGE CONDITIONS

"Laporte chose to perform ink age tests.  He did the testing with no regard to storage conditions of the document or the damaged state of the ink and paper."  Doc. No. 416-3 at ¶439. LaPorte and other experts in his field mandate consideration of storage conditions to qualify their findings.  As common sense would indicate, when measuring a component like PE that evaporates over time, the temperature, humidity, proximity to other sources of PE, etc. are important factors in validating a PE test reliant on evaporation rates.  In the latest published research on PE testing notes that requirement:  (Weyermann, Almog, Bugler and Cantu, "Minimum Requirements for Application of Ink Dating Methods Based on Solvent Analysis in Casework," Forensic Science International, 2011), the research clearly shows the requirement.

LaPorte testified that his testing results "really depend[] on...the storage conditions of the document..."  LaPorte Depo., Exhibit 8, page 66.  Although LaPorte's version of the PE test relied on the evaporation rate of PE, he was unaware of the freezing point of PE, that is, the temperature at which PE evaporation would cease.  LaPorte Depo. at 186.

The FB contract LaPorte tested, had been stored at below the freezing temperature for a majority of each year for each year of its storage.  Doc. No. 422 at 2.  LaPorte admitted he had not studied the results of freezing, for even part of a year, on the reliability of the eventually extracted PE.  LaPorte Depo. at 186.  LaPorte has also not studied how excessive UV light exposure by Defendants' experts may have affected the PE testing on the ink.  LaPorte Depo. at 233.  The effects of freezing on the ink matrix[5] are unknown by LaPorte.  LaPorte Depo. at 228. Since Mr. LaPorte relies on this ink matrix to continue to trap PE within it during and after

---

[5] Ink matrix would be the entire formulation of ink, if you will: the combination of the dyes and/or pigments, the solvents, the resins, and so forth.  LaPorte Depo. at 228

.

heating the second sample, not knowing the effect of freezing on the matrix and how it may

release additional PE into a tested sample negates the test results in their entirety as PE that was

expected to stay trapped may not.

TYPE OF PAPER

"It really depends on the type of document that it's on"  (LaPorte Depo., Exhibit 8, page

66).  Before submitting his report, LaPorte did no paper testing.  No Defense expert tested the

paper at all in the detailed way Plaintiff's expert Rantanen did.

NOT USED FOR COMPARISON

LaPorte previously testified that PE testing should only be used to compare the ages of

two different entries of the same ink formulation.  "The only time that we would use that test,

there would have to be certain circumstances around that document.  First of all, we would use it

to compare."  LaPorte Depo., Exhibit 8, page 66.  LaPorte's conclusion about the average loss

rate of PE from the FB Contract resulted from testing the ink on page one only.  He did not

conduct PE testing on the ink on page two.  Therefore, LaPorte was unable to compare the PE

extraction percentage from the ink on page two with that of page one.  Doc. No. 326 at 17.

INCONVENIENT TRUTH ABOUT LAPORTE'S RESULTS

In this case, LaPorte ran the PE test on two samples and averaged those results.  Doc. No.

326 at 16.  That average loss of PE between the two samples during his testing was 64%.  Id.

These tested ink samples were only from page one of the FB Contract.  Id.   Therefore, LaPorte

concluded that the tested ink on page one of the FB Contract had been placed on that paper at

any time from 24 months before he tested until right before he tested it.  Id.

In a report LaPorte submitted in April 2012 for another case, he found the ink on those documents showed an average loss of 71% of the PE.  LaPorte Depo., Exhibit #3 at 13. However, in that case, he concluded that the 71% average loss dated the ink to be 69 days or newer.  Id. at 17  LaPorte concluded that the amount of PE detected in those samples was indicative of fresh ink.  Id.  In the April 2012 case, he then tested the ink 11 days later and found an average loss of 46% of PE and concluded the ink was 80 days old.  Id.  In this case LaPorte concluded that the ink on the interlineation is less than two years old (Doc. No. 326 at 16), however he failed to disclose to the court that those same results suggest that the ink was less than three months old as he concluded in the April 2012 case.

When asked during his deposition if the average loss of PE he found in this case was unusually high, Mr. LaPorte responded that "[i]n all the casework I've ever done, 71 percent is the highest [referring to the April 2012 report], and the 64 percent I got in this case is the second highest." LaPorte Depo. at 169.

In LaPorte's April 2012 report, he presents an illustration that shows that PE evaporates rapidly during the first few months and then no longer evaporates at a measurable rate after about 24 months.  LaPorte Depo at 63.  Illustration at LaPorte Depo. Exhibit 3 at 7.  Other experts (Aginsky and Brazeau) have presented similar charts using actual data to demonstrate how the evaporation rate changes over time.  LaPorte Depo. Exhibit #7.

LaPorte's report and the claimed validity of his PE method relies heavily on citations to Aginsky.  Doc. No. 326, at 9 footnotes.  Even though Plaintiff did not submit a report from Aginsky on June 4, 2012, Defendants deposed him.  During that deposition, Aginsky stated that if the test is done correctly "[I]t is possible to determine that the ink is younger than six months if

[the loss of PE during the test] exceeds 50 percent." Aginsky Depo. at 179.  Therefore, the main developer of the PE test confirmed that average PE evaporation loss rates exceeding fifty (50) percent (lower than those LaPorte reported) would indicate that the ink was less than 6 months old, if the test conditions allowed for a legitimate test.  Its worth noting, that Dr. Aginsky took the time to make it clear that "It should be a conditional conclusion because it depends on the storage conditions." Aginsky Depo. at 180.

LaPorte admitted during his deposition that the ink he tested could be less than three months old.  LaPorte Depo. at 187.  LaPorte did his PE testing on August 28, 2011.  Doc. No. 326 at 3.  Using LaPorte's analysis from his April 2012 testing in another case yields a conclusion that the ink in the interlineation of page one of the Facebook contract was less than three months old.  LaPorte Depo., Exhibit #3 at 13.  Using Aginsky's responses during his deposition yields a conclusion that, if the test were legitimate, the ink in the interlineation of page one of the Facebook contract would be less than six months old.  Using every other known PE evaporation curve (all of which were shown to LaPorte during his deposition) yields a conclusion that, if the test were legitimate, the ink in the interlineation of page one of the Facebook contract was less than three months old.  LaPorte Depo. Exhibit #7.

LaPorte conducted his tests in August 2011.  Going back six months, the widest possible margin given his results, his previous testimony, his report in other cases and all the data on charts from PE testing in the published record, for LaPorte's PE testing method to be valid, the tested ink must have been placed on the FB Contract later than February of 2011.  Defendants, however, have insisted throughout this case that the FB Contract produced to them in July 2011 is faded or discolored in comparison to the Aginsky scans of that same document taken in

January 2011.  Therefore, Defendants have conceded that the document examined by their experts in July 2011 was the same document scanned by Aginsky in January 2011.  If Defendants were to now back off this claim realizing how it invalidates LaPorte's PE testing, that means their entire spoliation claim is vanquished as they have no scan of the FB Contract from January 2011 to which a comparison of the FB Contract they examined in July 2011 makes any sense.

It is impossible, therefore, that LaPorte's PE testing fixing the age of the ink in February 2011 is correct.  One of two reasons is behind these irreconcilable facts:  1.) His PE testing method is invalid or 2.) the ink samples he tested were contaminated with PE from another source.  This inconvenient truth of LaPorte's results illustrates the unreliability of his expert opinion.

## CONTAMINATION ARGUMENT

While it is not Plaintiff's burden to explain the inconvenient truth of the illogical results LaPorte obtained from his invalid test, one possible explanation is contamination.  Thousands of household products contain PE.[6]

LaPorte was unaware of any products contained PE, stating "I don't believe that many household products contain phenoxyethanol" (LaPorte Depo. at 216), but when pressed for an answer as to how many household products do contain phenoxyethanol, Laporte admitted, "I don't know" (LaPorte Depo at 216) and when further pressed for any basis in support of his claim or research that he had done he simply  replied, "I haven't, no." LaPorte Depo at 217.  It is a mystery to Plaintiff how a self professed expert in PE could fail to know that thousands of products contain PE.

_____

[6] http://www.goodguide.com/ingredients/273522-phenoxyethanol

Numerous experts touched both pages of the FB contract with their bare hands, including Defendants' expert Mr. Tytell.  Tytell depo at 74.  Mr. Laporte was unaware of the admissions made by Mr. Tytell that he had frequently, during his examination, used hand soap - a product known to contain PE. see fn. 6.

Despite his admissions that he does not know of household products containing PE that could have contaminated the document, and despite never researching household products that have PE in them that could have contaminated the document, LaPorte stated during his deposition "I'm a hundred percent confident that there wasn't any phenoxyethanol contamination."  LaPorte Depo. at 220.  This statement is based on nothing but his advocacy for his client.

## LAPORTE'S TESTING WAS INTENTIONALLY LIMITED

Mr. LaPorte admits that with "a document with a single signature and a date and somebody said was that signature created on that purported date, that would not be a situation that I would recommend PE [testing] be used because there is nothing to compare it against."  Doc. No. 386-2.  LaPorte Depo. in *Giorgio, et al v. Rosenblum*, Docket No. MON-L-2652-06, August 26, 2009 at *21.

LaPorte also admits that he "didn't see a high level of PE in the Mark Zuckerberg signature. So I only saw it in the interlineation and then the PC initials." LaPorte Depo 218 at 23. Talking about his ink dating methodology LaPorte makes clear that "this testing requires a minimum of 4 ink plugs" Doc. No. 326 at 17. Dr. Lyter, as the spokesman for getting the samples only LaPorte would test, stated "Defendants' experts now require additional samples from the ink of the Purported Contract and Hard-Copy Document to conduct further analysis. Specifically, Defendants' experts require:...C. At least 4 more samples from the purported "PC" initials on page 1 of the Purported Contract."  Doc. No. 112 at 3, Paragraph 8.

This court then ordered "Plaintiff shall permit Defendants' experts to conduct the ink sampling described in paragraph 8 of the Declaration of Dr. Albert Lyter III, dated August 15, 2011." Doc. No. 117 Page 3 at paragraph 8.  Mr. LaPorte had the road cleared for him to get the four samples he needed to test both the PC initials and the interlineation.  Yet, shockingly, Mr. LaPorte intentionally took only half the amount he knew he needed to test the PE on the PC initials. LaPorte Depo. at 276.  This intentional refusal to test the PE level as he had previously sworn he needed can not be reconciled. Perhaps Mr.LaPorte did not want any inconsistent results getting in the way of the Defendants betting the company on his much needed "result"?  Any reasonable unbiased scientist would have preferred the opportunity to confirm the results of the PE test on the interlineation with the results that could have been obtained from testing the PC initials.  Mr. LaPorte's failure to perform the test as extensively as the court allowed, completely discredits his ability to offer highly probably results and provides a colorable basis to question if LaPorte knew what the results were going to be before he chose the samples he would and would not take.

## LESNEVICH ANALYSIS RELIES ON DOCTORED DOCUMENTS HE TESTIFIED WERE UNSUITABLE FOR EXAMINATION

Lesnevich's analysis rests on his comparison of two documents, the copy of the FB contract attached to the complaint, (Lesnevich report Doc. No. 329 at 3, reference to "Exhibit Q-2") and the two page paper FB contract examined by Defendants' experts in July 2011.  Id., reference to "Exhibit Q-4".  However, what Lesnevich and Defendants have overlooked, is Lesnevich's own words, nearly a year earlier, under oath, disclaiming the validity of the very comparison that underlies his report attached to Defendants' motion to dismiss.

In Doc. No. 52 Lesnevich swears to this court that the copy of the FB contract attached to the complaint in this matter is unsuitable for expert examination.  Lesnevich Declaration Doc. No. 52 Paragraphs 15.-16.  "[T]he poor reproduction quality and distortion of the questioned written entry . . . makes the scanned copy unsuitable for examination and comparison of the handwriting that appears on the document."  This sworn statement invalidates his conclusions in his later report attached to Defendants' motion to dismiss, Doc. No. 329, because they rely on this identical, and worthless, comparison.

In his new opinion, Lesnevich compared the FB Contract with a version of the FB Contract obtained via an email from Paul Argentieri and eventually attached to the complaint. Doc. No. 329 at 4.  Lesnevich performed a comparison of the FB Contract with a copy of the contract attached to the complaint in this matter.  Id.  From that comparison, he concluded that there must exist two documents purporting to be the FB contract.  Id. at 31.  From that comparison, Lesnevich makes the novel claim that the page one interlineation establishes "The physical document that was used to create the image attached to Ceglia's Complaint, filed June 30, 2010 (Q-2), is not the same document as that produced to Defendants' expert Peter V. Tytell in July 2011 (Q-4) ".  Id.  He arrives at this conclusion from an analysis of a small portion of the handwriting on the first page of the contract.  Id. at 5.

## FATAL FLAW IN LESNEVICH ANALYSIS

Lesnevich's comparison and resulting conclusions suffer from an additional fatal, embarrassing flaw.  It harkens back to LaPorte's ignorance about the storage conditions of the FB Contract undermining the validity of his conclusions.  Lesnevich's comparison, and therefore his entire conclusion, rests on comparing the FB Contract with what was a copy of the FB Contract

prepared by Plaintiff and Paul Argentieri.  Id. at 5.  The problem for Lesnevich is, he failed to

inquire as to how Argentieri prepared that copy.  The Q2 item Lesnevich analyzed was prepared

Argentieri as follows:

> The original Facebook Contract was:
> 1. Copied on a grocery store coping machine, then
> 2. Scanned using unknown settings to an electronic file, then
> 3. Emailed from Plaintiff to his attorney, Mr. Argentieri, who
> 4. Printed the scan on an office printer, then
> 5. Copied the printout using the darkening feature of the copy machine, then
> 6. Submitted the complaint to the court where it was scanned.
> 7. Mr. Lesnevich printed the scan on a color printer, and finally
> 8. Scanned the printout to use for comparison.
>
> The Q1 image that Lesnevich analyzed was prepared as follows:
> a. The original Facebook Contract was,
> b. Copied on a grocery store coping machine, then
> c. Scanned using unknown settings to an electronic file, then
> d. Emailed from Plaintiff to his attorney, Mr. Argentieri.
> e. Mr. Lesnevich printed the scan on a color printer, and finally
> f. Scanned the printout to use for comparison.

Plaintiff Ceglia made a copy of the Facebook contract at the local grocery store to ensure

that the still stapled original contract would not be damaged by a scanning machine.  Argentieri

Declaration at 2.  Plaintiff then scanned the photocopy to create the tiff file that was attached to

the email sent from Plaintiff to his attorney Mr. Argentieri.  Id.  Mr. Argentieri then printed out

the scan he received by email and copied the scan using a photocopier in his office.  Id.  The

consistently poor quality of the coping machine required Mr. Argentieri to change the settings on

his copier by darkening the resulting copy as much as possible.  Id.  Therefore, the resulting copy

attached to the complaint as filed by Mr. Argentieri was a grossly altered version of the FB

Contract as necessary to enable the court and others in receipt of that filing to read it.  Id.

Therefore, Lesnevich's comparison and conclusions are flawed and unreliable because he was unwittingly comparing a grossly altered copy of the FB contract with the original.  Doc. No. 319 at 31.  Even if this court finds Lesnevich's unprecedented, never-before-Daubert qualified analysis and conclusion reliable, he performed this method on altered documents making his conclusions unreliable anyhow.

Finally, Lesnevich prepared this comparison in complete opposition to his previous sworn statements that such a comparison was unsuitable and unreliable.  Doc. No. 52.

<u>DAUBERT FAILURES WITH LESNEVICH METHODOLOGY</u>

Lesnevich's comparison method used in his report has never been published or peer reviewed.  It is not a method generally accepted by those in his field.  In short, this method fails to satisfy Daubert entirely.  Moreover, the conclusions drawn from this method are also unpublished, never peer reviewed with no known error rate and completely subjective and spurious.

There is no published literature supporting either the Lesnevich analysis nor the conclusions derived from that analysis.  The application of the Daubert criteria to this methodology predictably yields an inadmissible, confusing and unscientific conclusion.  There is no determined error rate for this analysis.  There is no published literature peer reviewing this analysis or the reliability of the conclusions derived from it.  This analysis nor the conclusions derived from it are generally accepted in the scientific community.  There is no repeatable, testable or verifiable analysis in the report.  It is pure subjective opinion posing as science.  Mr Lesnevich is no stranger to offering conclusions outside of his area of expertise.  Earlier in the case he stated to this court that he conducted a thermal heat transfer experiment, based on the

fact that the contract had been carelessly left on top of a running computer for several hours during the contracts testing, hardly a suitable location for a document of this worth. Yet Lesnevich claims to have used a similar computer to test the heat released, as if, in a brake failure lawsuit, a person could drive a similar car and then state to the court that the brakes worked fine. Lesnevich has no training in thermal heat transfers anymore than he does in digital image forensics, which would encompass the realm of differences in digital images.

<u>ROMANO'S UNQUALIFIED STATEMENTS ABOUT AN ALTERED DOCUMENT</u>

Frank Romano may have a distinguished career in something, but he is not a qualified forensic document examiner. Doc. No. 327 at 15. He has none of the qualifications of any of the other experts in this case. However, despite that lack of qualification, he opined early in this case that the FB Contract was an "amateurish forgery." Id. at 12. He did that by visually examining the copy of the FB Contract attached to the complaint in this matter that was altered by Paul Argentieri using settings on his office copier as noted above. Id. at 3. Romano's conclusion, therefore, is worthless from the outset. Plaintiff has an additional contract with another third party involved in the Street Fax project whose fonts precisely mirror the fonts Romano claims are indicative of fraud within the FB Contract.

<u>PETER TYTELL</u>

Peter Tytell was present the morning of July 14, 2011 - the first day of Defendants' experts analysis of the FB Contract. Doc. 330 Page 2. He issued a report attached to Defendants' Motion to Dismiss, that concluded that the FB Contract was a page one substitution. Doc. 330 at 13. Although he has four decades of experience examining handwriting, Tytell Depo at 32, he claims he never suggested to Defendants, nor did Defendants' attorneys ask him to

examine the handwriting on the FB Contract.  Id. at 34.  These claims are not believable unless

Defendant Zuckerberg knew that analysis would result in precisely the conclusion Blanco arrived

at - i.e. Defendant Zuckerberg authored the signature on page two of the FB Contract.  Doc. No.

415 ¶ 233 at item 1.

Tytell disagrees with LaPorte's conclusion he could reliably measure the thickness of the

two pages of the FB Contract.  Tytell Depo at 127.  Finally, by the time his deposition occurred,

Tytell was repudiating the conclusions in his former report, the "page one substitution" theory

and now adopting Lesnevich's theory of two underlying and completely forged documents.

Tytell Depo at 69, 72, 61.

Only after receipt of the Blanco and Stewart reports did Tytell then examine the

handwriting, so he claims.  Tytell Depo at 64.  This is despite the fact that Plaintiff's expert

Blanco had stated on November 1, 2011, See Doc. No. 194, that he analyzed the signature on

page two of the FB contract concluding that Mark Zuckerberg authored his signature on the

document.  This opinion was given by Blanco five months prior to defendants' filing of their

motion to dismiss for fraud on the court.

Tytell has admitted performing significant additional work after receiving copies of the

Plaintiff's expert reports. Tytell Depo. at 64.   He disclaimed any intention to produce a report on

this additional work.  Id. at 72.  He claims Defendants have not asked him to produce a report

from this work.  Id. at 65.  One can expect the Defendants will attempt to insert this additional

expert report into their reply, now post deposition, to shield it from inquiry.  Tytell is at the

intersection of the damage to the FB Contract.  His scans and Lesnevich's demonstrate that he

presided over the damage to Plaintiff's key evidence in this case.  Then, while over-exposing it to

excessive sources of light in the first twenty-four hours of his examination, he repeatedly

contaminated it with his bare hands adding untold amounts of PE to the document which LaPorte

used in his faulty test.  There is nothing scientific about Tytell's approach to this case.  The video

is clear evidence of the repeated damage done to Plaintiff's key evidence by this expert and those

he was supervising.  Tytell has every motivation to obscure and minimize his misconduct in

damaging this evidence as he carries, unbelievably, no insurance to protect him from the

obviously monstrous financial claim attending his either intentional or incompetent damaging of

Plaintiff's evidence.  Tytell Depo. at 74.

CORROBORATIVE EVIDENCE

As the court has previously stated, the FB Contract is the primary document at the heart

of this case.  Doc. No. 457 at 2.  The defendants have concurred with the court on this point.  The

FB Contract documents the relationship between the parties in 2003.  It is the original paper

contract signed in ink by the two parties.  Doc. No. 65 at 2.  The rest of the supposed "evidence"

of fraud suggested by the Defendants is a red herring, attempting to pull the court's attention

away from the only question that matters:  Could a reasonable jury find the FB contract

authentic?

The supporting evidence that Plaintiff has presented in this case serves only one purpose.

It validates the FB contract.  Even without the supporting evidence, Plaintiff's experts have

proven the FB Contract is authentic.  The FB Contract is the key document that contains the

terms of the agreement between Plaintiff and Defendant Zuckerberg.

PLAINTIFF'S AUTHENTIC EMAILS

Plaintiff copied and pasted one hundred and twelve (112) emails between Plaintiff, Defendant Zuckerberg and related parties.  Doc. No. 224.  Fifty-one (51) of those copied emails were also found by Defendants in Defendants Harvard email record.  The presence of nearly half of Plaintiff's copied emails on the Harvard server demonstrates they represent authentic communications between the two parties.

Plaintiff stored the copied emails on floppy disks, see Doc. No. 418 at 2.  Those floppy disks are not tied to any computer in this case.   Id. at 9.  Plaintiff provided a sworn declaration explaining how he copied those emails from his web based email account into a series of Microsoft Word documents.  Doc. No. 65 at 2.  Since the use of floppy disks were common to computers in 2003-2004, those emails were stored in Word files contained on them.  Doc. No. 418 at 10.  Plaintiff produced those retained floppy disks to Defendants.  Doc. No. 325 at 11.

Plaintiff's computer forensics expert, Jerry Grant, examined the floppy disks containing those MS Word files which, in turn, contained the copies of the emails.  Doc. No. 418 at 10.  Mr. Grant identified and examined twenty (20) forensically relevant artifacts on those floppy disks and within the MS Word files.  Id. at 3-9.  That examination confirmed that the copies of the emails were placed into the MS Word files in which they were found in the 2003-2004 time frame consistent with Plaintiff's sworn declarations.  Id.  He found no indication that the MS Word files were fraudulent.  Id.  Grant testified that without knowing the accuracy or inaccuracy of the computer clock into which the floppy disks were inserted, the reason for any metadata anomalies within these MS Word files is unknowable.  Id. at 9.

DEFENDANTS' COMPUTER EXPERTS' LACK QUALIFICATION TO ASSERT FRAUD

There are experts working throughout courts today that are Certified Fraud Experts. Neither of Defendants' computer experts are certified fraud experts.  Rose Depo. at 208, McGowan Depo. at 7.  In contrast, Plaintiff's computer forensics expert, Neil Broom, is a certified fraud expert.  Doc. No. 417 at 2.  Plaintiff's expert, Neil Broom, found that all the "anomalies" identified by Stroz were not conclusive evidence of fraud. Doc. No. 417.

Stroz Friedberg issued a report with the words "forgery" and "fraud" throughout.  Doc. No. 325.  Other Defense experts decried using such terms as improper.  "My job is to provide a scientific analysis, objective evidence, and then you determine or the court determines whether that's been forged or not."  Laporte Depo. at 24.  Plaintiff's expert, John Paul Osborn underlines this point in his deposition indentifying "forgery" as a legal term, not something experts should put into their reports.  Osborn Depo. at 102.  Defendants' computer experts agreed that no anomaly they identified is conclusive of fraud.  "[If you isolate any individual piece, it's possible to say there are other possibilities, but, again, that's not what we do."  Rose Depo. at 154 Instead, their computer experts' forgery/fraud claim arises from their opinion that "in the aggregate" these otherwise common anomalies are indicative of forgery/fraud.  Id. at 50.  There is no published literature in the field of fraud analysis supporting this "in the aggregate" fraud conclusion coming from non-fraud data.

Being the only trained, qualified and certified Fraud Expert in this case, Mr. Broom's findings are conclusive on the topic of supposed fraud.  Defendants have accused Plaintiff of committing a fraud on the court for more than a year and yet, they failed to retain a qualified fraud expert, but only offered unqualified experts to opine about fraud.

Mr. Rose is not only unqualified to give opinions about fraud, he has no computer forensics certifications at all.  Doc. No. 325 at 72.  Mr. Rose insists that the fact he works at Stroz Friedberg should be enough, even though he admits that "I have not been an expert witness in other cases." Rose Depo. at 100.  Mr. McGowan has no formal computer forensics certifications.  Doc. No. 325 at 77.  His only certification came from an online class to become certified in the use of EnCase software.  McGowan Depo. at 7.  These are the only two employees Stroz Friedberg felt sufficiently qualified to sign the report.

## DEFENDANTS' EXPERTS' CHALLENGE TO THE EMAILS' AUTHENTICITY

These emails were created by copying Plaintiff and Defendant Zuckerberg's web based emails from the MSN (Microsoft owned) web based email program using the Windows operating system and pasting those emails into MS word.  Doc. No. 65 at 2.  Neither of the Defendants' computer experts have any training from Microsoft on either the Windows operating system, the MSN web based email server operation or MS Word.  Rose Depo. at 239.  Neither attempted to contact Microsoft before offering opinions on the operation of Windows, the MSN server or Microsoft Word.  Rose Depo. at 240.

Defendants' experts challenge the authenticity of Plaintiff's emails in four ways:

1. The emails do not appear in Defendant Zuckerberg's Harvard email record; and
2. The emails contain "formatting differences"; and
3. The emails contain "abbreviation differences"; and
4. The emails contain the incorrect timestamp.

## ADDITIONAL UNEXAMINED EMAILS FROM THE HARVARD COLLECTION

The main challenge to the authenticity of Plaintiff's emails has been the absence of those emails within the Defendant Zuckerberg's Harvard email record.  Doc. No. 319 at 5.  In expedited discovery the court ordered Defendants to produce emails from Zuckerberg's Harvard

email record relevant to this case.  Doc. No. 83.  However, during deposition, Rose revealed that

a previously concealed additional collection of Harvard emails was received by them dating to

November 2003.  Rose Depo. at 42.  Rose further disclosed that there were "Ceglia -

Zuckerberg" emails present on the November 2003 retrieval that were not included in the

October 2010 production of emails presented to Plaintiff.  Id. at 186.  Defendants have yet to

produce a report on the analysis of that November 2003 collection.  It is anticipated that if and

when they do provide that report, there will be evidence on that additional collection that

corroborates the authenticity of the copies of emails Plaintiff retained.

Defendants' expert McGowan admitted to analyzing twenty eight (28) other devices

belonging to Defendant Zuckerberg that were preserved from prior litigation some of which date

from the 2003-2004 timeframe .  McGowan Depo. at 61.  McGowan acknowledged finding

electronic communications authored by Defendant Zuckerberg on those devices. Id. at 66.  He

could not recall any other details of those communications.  Id. at 66.  He could not recall if there

were references to "StreetFax" on those 28 devices.  Id. at 82.

Rose claimed no knowledge of the analysis of those devices:

Q. Who supervised that collection of that evidence?
A. I don't know.
Q. And who did the actual work and analyzing those 15 or 20 computers?
A. I don't know.  Rose Depo. at 84

However, McGowan testified that Rose supervised the analysis of those devices.

Q. The entire analysis of those 28 devices, whatever documentation arose or was
generated from that analysis, who at Stroz Friedberg has had access to that information
that you know of?
A. That I'm aware, that I know of, it's the individuals who had been working on this
portion of the analysis: myself, Mr. Kunkel, Mr. Rose.   (McGowan Depo. at 84)
Q. [C]an you describe Mr. Rose's involvement in the analysis of those 28 computers? 28
devices, I will use your term.

A. Yes. Mr. Rose...sometime during the course of the examination...he began to be more involved in the day-to-day supervision, up until that point in time it had been Mr. Friedberg, but I consulted with both of them in terms of the approach, discussed the keywords, and they would have been involved in communications with Gibson, Dunn. McGowan Depo. at 126.  Emphasis added.

Rose and McGowan were extremely hesitant to discuss their findings of the analysis of

those twenty-eight (28) devices.  Their conflicting testimony proves there is substantial relevant

evidence being concealed by Defendants.  This is one glaring example of the unequal access to

evidence in this case that has plagued Plaintiff's ability to comprehensively respond to

Defendants' motion to dismiss.

### DEFENDANTS AUTHENTICITY CHALLENGE REGARDING WHITE SPACE FORMATTING FAILS

Defendants' computer experts cite three factors challenging the authenticity of the MS

Word files containing copies of the parties' emails.

The first of their claims is that among those emails, there are formatting differences.

Doc. No. 319 at 52.  Those formatting differences take the form of differences in the amount of

white space following the word "to" in the header of the emails.  Doc. No. 325 at 34.

Plaintiffs expert Grant very clearly found that this white space is not conclusive evidence

of fraud and cannot be used to discredit the emails authenticity.  Doc. No. 418 at 13.

Stroz admits producing evidence to this court from the Harvard emails and creating

formatting differences in those emails.  Doc. No. 73.  During the email collection process, Stroz

experts, created "minor formatting differences" in those Harvard emails and had some

unspecified "technical issues" causing those emails to appear differently.  Id.  Rose

acknowledged creating these formatting differences.  Rose Depo. at 49.  He denied those

formatting differences were indicative of fraud by anyone.  Rose Depo. at 48.  He could not

explain how those differences were created.  Rose Depo. at 49.  For Defendants, formatting

differences in Plaintiff's emails equal fraud while formatting differences in their evidence do not

equal fraud.  Therefore, Stroz's conclusions of fraud based upon formatting differences are

biased, spurious and irrelevant.

<u>DEFENDANTS' CHALLENGE TO EMAILS AUTHENTICITY VIA ABBREVIATION
INCONSISTENCIES FAILS</u>

Stroz pointed to the "inconsistency" of the abbreviation style of the word "Tuesday" in

some of the emails as proof of fraud.  Doc. No. 325 at 34.  What Stroz conceals from the court is

that they compared the abbreviation style of the word "Tuesday" in two emails dated February 3,

2004 and April 6, 2004 - more than two months apart.  Id. at 35.  They then conclude that "[t]his

internal inconsistency...should not exist if the purported emails actually were copied and pasted

from one authentic source."  Id.  Stroz Friedberg has no idea how MSN handled the abbreviation

of days of the week in email headers in February 2004 compared to how it was handled in April

2004. Rose Depo. at 169, 172.  Obviously, if MSN changed its computer programming and

attendant abbreviation scheme between February and April 2004, that perfectly explains this

anomaly.

In addition, Stroz conceals from this court that if Plaintiff copied his emails while

viewing them using different internet browsers, that could well account for this inconsistency.[7]

Id. at 168.  Stroz does not know what browser Plaintiff was using to copy and paste these emails.

Id. at 169.  Stroz does not know how all the browsers available in 2004 would have handled the

---

[7] An internet browser is a software application permitting a user to view content on the Internet.  There are currently
many such browsers (e.g. Internet Explorer, Firefox, Safari, Opera and more) and there were multiple browsers
available for use during the time these emails were copied and pasted.

display or formatting of email from MSN and all browsers do not format webmail accounts the same. Id. at 168.

Stroz has no idea how MSN servers were configured to display days of the week in any month in any year relevant to their analysis or whether that display was changed by MSN or by virtue of the browser Plaintiff used to view his webmail account to enable copying and pasting. Stroz admitted that copying web based emails, designed using HTML[8], could result in formatting changes. Rose depo at 139.

## REFUTATION OF DEFENDANTS' FRAUD CLAIM BASED UPON COORDINATED UNIVERSAL TIME ANOMALIES

The final item of Stroz's flimsy limp toward a fraud conclusion is a supposed error in the listed Coordinated Universal Time in the emails. Doc. No. 325 at 31. This so-called conclusion is a qualified statement by Stroz at best. The emails, Stroz tentatively states, "appear to contain timestamps that are inconsistent..." Id. at 26. Stroz states that these UTC timestamps should be accurate, "in the absence of an inaccurate system clock." Id. at 31. Of course, Stroz has no idea what computer the floppy disks containing the emails was ever inserted into. Files on a computer obtain their time values relative to the setting on the computer clock of the computer where those files reside. Doc. No. 418 at 9. Files on floppy disks, of course, obtain their time values from the computer clock of the computer into which those floppy disks are inserted while the relevant files on the floppy disks are being used. Id.

Stroz's reference to the qualifier of their conclusion of fraud that it depends "the absence of an inaccurate system clock" cannot be tested. If the floppy disks were created using a

---

[8] HTML stands for Hypertext Markup Language a common programming language used for web pages on the Internet in 2003-2004.

computer with either an "inaccurate system clock" or an incorrectly set clock time, that would explain the timestamp anomaly. However, that will never be known since the computer from 2003 or 2004 into which these floppies were inserted to make the resulting MS Word documents containing the copied and pasted emails is long gone. This is as one would expect given that a computer from 2003 or 2004 would not even function today with any current software versions, accessories or other hardware.

Microsoft generally discredits the reliability of the "last accessed" timestamp, since it is easily altered by system operations that are not directly user-initiated. Doc. No. 418 at 3. Stroz Friedberg themselves have published opinions with the very same conclusion of unreliability stating that "metadata are generally only as accurate as the underlying computer clock time." Id.

OTHER EVIDENCE IN THIS CASE CONTRADICTS THE UTC ERROR = FRAUD CLAIM

Even if this court were able to bypass the obvious unknown variable of the "inaccurate system clock" noted above, the UTC error is not indicative of fraud at all.

Plaintiff was required to produce to Defendants, and to this court, item 379. Doc. No. 357. This item was a single email sent from Plaintiff's counsel to Plaintiff and not shared with any other persons. The relevant materials log provided by Stroz listing this item confirms it is a single email between Plaintiff's counsel and Plaintiff. Exhibit A. It contained several attachments. Id. Within this single email are references to other emails that were exchanged between Plaintiff's counsel, plaintiff and a few of the referenced emails were exchanged with third parties. Id. Defendant has never challenged the authenticity of item 379 nor the emails referenced within it.

As important background, Daylight Savings Time for <u>2011</u> began on Sunday, March 13, 2011.[9]  Therefore, using Stroz's own explanation of UTC timestamps, any emails sent in 2011, but, before March 13, 2011, should contain a UTC timestamp of -0500.   However, a cursory examination of item 379 reveals an email exchanged between plaintiff's former counsel, Aaron Marks and an assistant to Mr. Argentieri, Jason Holmberg, dated Thursday, March 10, 2011 displaying a UTC timestamp of -0400.  See Item 379.  Item 379 also contains other emails between those same two parties, dated March 9, 2011 and March 8, 2011 also displaying a UTC timestamp of -0400.

Eastern Standard Time for <u>2004</u> ended on April 4, 2004.  Therefore, emails sent or received before April 4, 2004 would display a UTC timestamp of -0500.  Further down in item 379, there are several emails allegedly exchanged between Plaintiff and his then lawyer Jim Kole, dated Wednesday March 3, 2004.  These allegedly authentic emails, which Plaintiff disputes, should therefore have a UTC timestamp of -0500.  They do not.  However, this UTC timestamp error here, on evidence that Defendants want this court to believe is authentic, is somehow not indicative of these emails being fraudulent according to Stroz.  Again, we run up against the back and forth swing of Defendants' computer experts.  This UTC anomaly is only an indicator of fraud if it is found on evidence that contradicts Defendants' fraud claims. When it is found on evidence Defendants want this court to accept as authentic, the anomaly is not an indicator of fraud.

_____

[9] http://www.timeanddate.com/worldclock/clockchange.html?n=263&year=2011

Finally, some of the emails referenced in item 379 contain accurate UTC timestamps amidst those that are inaccurate.  This soup of uncertainty reveals that Stroz's reliance on UTC timestamps to declare fraud is spurious at best and dishonest at worst.

Jerry Grant did the only full analysis of the metadata on the MS Word files found on the floppy disks.  Doc. No. 418.  Defendants experts do not dispute the accuracy of the data Mr. Grant uncovered.  Rose Depo. at 227.  All of the metadata associated with the MS Word files containing the copied and pasted emails is consistent with Paul Ceglia's recounting of how and when the those MS Word documents were created.  Doc. No. 418 at 3-9.  Therefore, that metadata is consistent with the authenticity of the content of those MS Word documents.

Despite all of this overwhelming evidence of authenticity and obvious refutation of Defendants' claims of fraud, even if this court finds the emails "clearly and convincingly" inauthentic, their absence as corroborating evidence does not provide clear and convincing evidence contradicting Plaintiff and his experts who have established the FB Contract is authentic.  In fact, demonstrable evidence that corroborating evidence is inauthentic would not be clear and convincing evidence that the core evidence was inauthentic.  Defendants have not found clear and convincing evidence to challenge the authenticity of the FB Contract or any of the corroborating evidence.

## DEFENDANTS' CLAIMS FAIL TO STUDY OR TEST AFFECT OF MICROSOFT WORD

Each of the copied emails were pasted into a series of MS Word documents.  Doc. No. 65 at 2.  In addition to all the unknowns that Stroz admits to in their now discovered, but previously concealed, information, they acknowledge knowing nothing about how Microsoft Word could have altered these emails once pasted into an MS Word document.  Rose Depo. at 172.  Over

their nine months of analysis of this case, no one from Stroz Friedberg even bothered to test how MS Word would handle such a copy and paste.  Id. at 173.  They did not reach out to the manufacturer of the software for guidance on that issue either.  Id.  They did not contact the developer of the MSN webmail service to determine how this abbreviation practice was implemented.  Id.  They did not attempt to configure an MSN webmail server as it might have been configured back in 2004 when Plaintiff was accessing it to copy and paste these emails.  Id.  They did not even run a current test to determine how different browsers would both display and transfer data to an MS Word document using a copy and paste function.  Id.  Their analysis was either incomplete or they intentionally avoided learning information that would harm their client's case.

Finally, Stroz concedes that they do not dispute any of Jerry Grant's findings regarding the forensically relevant data he examined.  Rose Depo. at 227.  It should be noted, that Mr. Grant has no dueling counter expert.

<u>MR. McMANEMIN'S STYLE MARKERS</u>

Gerald McManemin performed a stylistic analysis of wording contained in the emails attached to the amended complaint with wording found in thirty five (35) other emails sent by Defendant Zuckerberg around the same time.  Doc. No. 50.  McManemin's opinion was, "It is probable that Mr. Zuckerberg is not the author of the QUESTIONED writings."  Id. at 2.

The outgoing president of the International Association of Forensic Linguists, Ronald R. Butters, publicly questioned whether McMenamin could actually establish that Mr. Zuckerberg likely did not write the e-mails based on such slender evidence.  (New York Times, July 24, 2011, "Decoding Your E-Mail Personality").  Mr. Butters further clarified his statement by

stating, "I simply questioned the validity of McMenamin's report, which I focused on in my IAFL conference talk earlier this month not because I think that AuAt is cargo-cult science but only to suggest that it might be possible for forensic linguists to set some sort of standards for reliability and methodology, standards that, I would argue, McMenamin's report does not meet."[10]

It should suffice as refuting evidence to this court to know that Mr. McMenamin hand selects his comparison words after having read the questioned and known writings.

### SEAGATE HARD DRIVE HAS BEEN MISREPRESENTED

Defendants and their computer experts intentionally misled this court regarding the origin of evidence in their experts' reports.  Doc. No. 319.  The key mischaracterization of evidence is that the "key" evidence, aka the "smoking gun" originated from a computer owned by Plaintiff, when it did not.  In addition, the majority of anomalies existing on the computer evidence all originate on a Plaintiff's parents' computer - a device that Plaintiff did not purchase, own, use or access.  Doc. No. 419.

### RE-INSTALLATION OF THE WINDOWS OPERATING SYSTEM ON PLAINTIFF'S PARENTS' COMPUTER

Defendants' intentionally misled this court with the follwing headline:

"Ceglia Twice Reinstalled Windows On His Computer In An Attempt To Destroy Evidence." Id. at 67.

This headline falsely states that "Ceglia Twice Re-Installed Windows..."  Defendants presented no evidence that Plaintiff re-installed Windows on any computer.  They presented no evidence that Plainiff re-installed Windows on the computer at issue in this section of their

---

[10] University of Pennsylvania Blog, http://languagelog.ldc.upenn.edu/nll/?p=3309

motion - <u>Plaintiff's parents' computer to which he had no access</u>.  Doc. No. 419. at 2.  The rest of

the headline continues their false accusation.  "...Reinstalled Windows on <u>His</u> Computer...."  Id.

Emphasis added.  Defendants knew when writing this false statement that the computer at issue,

in fact, the hard drive at issue, referred to as the Seagate drive, was not Plaintiff's hard drive and

was never within any computer Plaintiff purchased, owned or had access to.  Doc. No. 419 at 2.

The proof of this fact is the absence of any evidence Defendants have produced or will produce

disputing these facts of the ownership of the Seagate drive.

That false headline then proceeds to refer to "Ceglia attempted to delete electronic data

from his Seagate hard drive...."  Doc. No. 319 at 67.  Again, there is no evidence that Plaintiff

had access to much less attempted to delete any data from the Seagate drive.  Defendants do not

identify deleted data from the Seagate drive relevant to this case.  Defendants attribute this re-

installation of the Windows operating system on Plaintiff's parents' computer to Plaintiff with no

evidence.  They then say, this "evidence" establishes Plaintiff's bad faith in several respects.  Id.

at 68.  Any bad faith claim attached to this "evidence" is not attributable to Plaintiff at all.  With

no evidence that Plaintiff had access to his parents' computer, such bad faith arguments are

sound and fury signifying nothing.

As noted above, this computer has no connection to Plaintiff as it was purchased, owned,

used and accessed exclusively by his parents.  Doc. No. 419 at 2.  Plaintiff never installed or re-

installed any operating system on this computer.  Id.  Moreover, Defendants do not point to a

single piece of evidence destroyed or obscured from access by the re-installation of the Windows

operating system on a computer that plaintiff never accessed.  This claim defines the word

tenuous.  The court noted this problem in Defendants' attempt to connect the Seagate drive to

Plaintiff.

> MAGISTRATE JUDGE FOSCHIO:  So when we talk about the drives that were on the
> parents' computer, isn't it plausible that they -- that they were used, but they were not
> used by Mr. Ceglia....
> MR. SNYDER: Is it plausible, yes.  Transcript of Hearing, 11-2-11 at 70.

The court correctly queried that "The question is: Under these circumstances, why should

we believe if it's a parent computer and we don't know who inserted the hard drive that relevant

evidence conceivably has been lost as a result?"  Id. at 68.

<u>THE COMPLETE FRAUD OF THE STREET FAX DIGITAL IMAGES</u>

Defendants sought and obtained the deposition of Hany Farid.  He is one of the nation's

leading digital imaging analysis experts.  Farid Depo. Exhibit 53.  He reviewed the TIFFs that

Defendants claim are digital images of unknown origin and unknown authenticity, but yet

comprise an authentic contract between Plaintiff and Defendant Zuckerberg.  Id. Exhibit 52.  His

review of those documents resulted in him concluding they are too low quality to reach any

opinion about their authenticity.  Id.  Dr. Farid did not produce an expert report in this case, but

Defendants chose to depose him anyhow.  During that deposition, Dr. Farid indicated that as an

expert he would not use the word "fraud."  Farid Depo. at 46.  He went further to say that he was

"not qualified" to say whether the document was a "fraud" or not.  Id.  Stroz Friedberg, who are

not digital imaging experts, felt qualified to call the FB Contract a fraud based upon their visual

review of the Street Fax digital images - images that the nation's leading expert could not reach a

conclusion on.  Farid said he is "not in the business of" determining someone's intention when

confronted with digital images that contain signs of manipulation. Id. at 51.  In contrast to Stroz,

he also agreed that merely seeing signs of manipulation in a computer file is insufficient to determine fraud.  Id. at 47.

## DESPITE IMAGES SO POOR THEY CANNOT BE EVALUATED DEFENDANTS PRESS ON

Defendants submitted two digital images in TIFF format claiming they represent an agreement between the parties.  Doc. 325 at 15.  Those two TIFF images were supposedly recovered from Plaintiff's parents' computer.  Id.  Stroz intentionally obscured this disconnect between this evidence and Plaintiff in their report by calling it part of the "Ceglia media." Nonetheless, it is clear now that these TIFF images were recovered from a computer that Plaintiff did not purchase, Doc. No. 419 at 1  did not possess, (Id.) and never accessed (Id.) or asked anyone else to access on his behalf.  Id.

## DEFENDANTS CONCEALED DEFICIENCIES IN THE STREET FAX DIGITAL IMAGES

Plaintiff has specifically, under oath, denied having signed any agreement such as is represented to be in the digital images supposedly recovered from his parents' computer.  Ceglia Declaration.  The supposed recipient of the emails to which these digital images were attached, attorney Jim Kole, does not recall receiving those emails and has not authenticated the digital images.  The court asked Defendants' counsel Mr. Snyder if Defendant Zuckerberg would be willing to say the StreetFax digital images are the correct contract, to which Mr. Snyder replied, "Oh, for sure."  Hearing Transcript, 4-4-12 at 165.  To date, Defendant Zuckerberg has not provided the court with any copy of any contract, nor has he authenticated the Street Fax images found on the Seagate hard drive.

Plaintiff's expert Blanco refutes Defendants "page one substitution" theory:

"Page 1 of the STREET FAX "smoking gun" document was not the original companion page attached to page 2 of the Facebook Contract:"  Doc. No. 415 at 90.

In  Paragraph 234 of Blanco 's Declaration, Doc No. 415, he states that :

"The STREET FAX "smoking gun" document exists only as two computer image ("tiff") files;  no original has been produced for analysis. Although these two image files offer extremely poor legibility, it was determined that the STREET FAX page 1 does not represent a supposed original to page 2 of the Facebook Contract for the following reasons:

1. The presence of the actual staple in the STREET FAX image file argues that had page  1 of the STREET FAX document really been the original companion page to page 2 of the Facebook Contract, then page 2 of the Facebook Contract should reveal an extra set of staple holes, which it does not.  Doc. No. 415 ¶ 234. 1.
2. The visible hand printed interlineation as observed on page 1 of the STREET FAX   tiff image was not the source of the hand printed latent image on page 2 of the Facebook Contract since it does not match the proper position of where the latent impression was discovered on page 2 of the original of the Facebook Contract examined by the document expert.  Id. at ¶234. 2.
3. The "PC" initials discovered as a latent writing impression on page 2 of the original Facebook Contract match the position of the visible "PC" initials on page 1 of the original of the Facebook Contract and do not match the position of the "PC" initials observed on the poor quality tiff image of page 1 of the STREET FAX document reference EXHIBIT 33 hereto Blanco Declaration Doc No. 415 ¶234. 3.
4. In support of item 2 above, the verb "is," which appears as the visibly hand printed verb in the interlineation on page 1 of the Facebook Contract, and which also appears as the latent handwritten verb on page 2 of the Facebook Contract, is not the same  verb for the interlineation on the STREET FAX document.  The verb used for the  STREET FAX hand printed interlineation was the word "has" rather than "is." Doc. No. 415 ¶ 234. 4.
5. The column measurements between the two pages of the STREET FAX document are substantially different from one another." Id. at ¶234. 5.

<u>DEFENDANTS' ADMIT DIGITAL IMAGES' AUTHENTICITY UNKNOWN</u>

Stroz claims the Street Fax digital images represent the authentic contract between Plaintiff and Defendant Zuckerberg.  Doc. No. 325 at 57.  Stroz makes this claim despite admitting they are not digital imaging experts.  Rose Depo. at 20.  Defendants' lawyers argued in

Doc. No. 319 that "Ceglia scanned the two images of the StreetFax Contract to his computer shortly before he sent the emails to Kole."  Doc. No. 319 at 40.  This claim is contradicted by Defendants' experts Stroz who admitted at deposition that the Street Fax images were created somewhere else, i.e. not on Plaintiff's parents' computer, and placed onto that computer.  Rose Depo at 25.  Stroz admits that the digital images could have been placed on Plaintiff's parents' computer remotely.  Id. at 68.  Stroz admits they do not know if these digital images are originals, copies or dramatically altered from how they appeared when originally captured.  Id. at 26.  Stroz admits that the file names of the two digital images are indicative of default file names applied by scanner software.  Id. at 92.  However, Stroz also admits the file named Scan0001.tif was created after the file names Scan0002.tif.  Id at 93.  Stroz has no explanation for how this occurred given that scanner software is not designed to sequentially number scans in descending order.  Id. at 95.

### DIGITAL IMAGES NOT INDICATIVE OF AUTHENTIC DOCUMENTS

The digital images were illegible.  "[T]o do a full examination of a document, you need to at least be able to read the document."  Farid Depo. at 56.  Defendants' computer expert, Rose was unable to read the document.  Rose Depo. at 30. and 159 confirms it as fact  Defendants originally supplied these images to the court as apparent 8½ x 11 sized exhibits to their motion.  Doc. No. 111-1.  Defendants' failed to inform the court that they enlarged these exhibits at many times their actual, authentic resolution.  McGowan Depo. at 141.  The actual size of these two digital images is 2.4" x 3.2" as noted only in Mr. Broom's report  (Doc. No. 417 at 21) and conceded at deposition by Stroz.  Id. at 102.  McGowan agreed these exhibits were not displayed at their original resolution/size when included in Defendants' filings in this case.  Id. at 141.

This is one of many instances of Defendants misleading the court by omitting critical details about their evidence.

<u>EMAIL ALLEGEDLY SENT WITH DIGITAL IMAGE ATTACHMENTS IS NOT AUTHENTIC</u>

The email to which the StreetFax digital images were attached was not sent from Plaintiff's email account.  Doc. No. 325 at 23.  It was not sent using a computer Plaintiff owned, used or had access to.  Id. at 15.  Stroz claimed in deposition that Plaintiff "signed" these emails, but eventually admitted that "signed" here meant someone type the four letters "PAUL."  Rose Depo. at 64.  Stroz admitted they did not know who type the word "PAUL."  Id.

<u>DEFENDANTS MISCHARACTERIZE THEIR TECHNOLOGY RELATED EVIDENCE</u>

Plaintiff was renting a home in Florida at the time the Kole email was allegedly sent from his parents' computer.   The Kole email itself lists a Florida area code phone number, a land line as a return phone call number in the email.  Doc. No. 325 at 16.  On the date attributed to the Kole email, Plaintiff resided in Florida with his wife who was eight months pregnant.  They were caring for their other one year old baby.  Among the emails produced by Defendants from Defendant Zuckerberg's Harvard email account was one received from Plaintiff dated March 11, 2004.  Exhibit B.  This email was received by Defendant Zuckerberg just one week after the supposed sending of the Kole emails and their attached digital images.  In that March 11, 2004 email, Plaintiff tells Defendant Zuckerberg that he is transitioning back to New York to be near his family for the birth of his second child.  Id.  Transitioning back a week after Defendants suggest he was already there.

The FB contract was stored in New York since it was signed by the parties.  Doc. No. 65 at 1.  If the contract had been in Florida where Plaintiff resided at the time, he would have sent

the document to his lawyer himself, from his own email account.  Plaintiff's parents were never

involved in sending emails to Plaintiff's lawyer Jim Kole at any time.  At best, Defendants' have

to argue that Plaintiff was in New York at the time the Kole emails were allegedly sent.  To argue

in the alternative, that Plaintiff was merely visiting New York on March 4, 2004 when the Kole

emails were sent, is illogical.  The Kole emails contain a contact phone number.  That number is

Plaintiff's land line phone number installed at his Florida residence in March of 2004.  Sending

the Kole emails while sitting in New York but providing a Florida area code phone number and

land line for contact is illogical.  The mere existence of the StreetFax digital images, even if

unaltered and legible, does <u>not</u> prove that FB contract is a fraud.  In *DAG Jewish Directories,*

*Inc. v. Y & R Media, LLC,* No. 09-7802, 2010 WL 3219292, at*4-5 (S.D.N.Y. Aug. 12, 2010) the

court dismissed after determining the party offering a copy of a contract was committing a fraud

on the court.  The court's basis for this determination and the dismissal was that the opposing

party had the original of the contract.  The court found that the existence of the original of the

contract justified regarding the copy as a fraud.  Likewise here, <u>the existence of the FB contract,</u>

<u>proves that the Streetfax digital images are frauds.</u>

SEAGATE SYSTEM CLOCK

Stroz opined that the difference between the system clock on the computer that used the

Seagate Hard Drive and an internet time clock was proof of fraud.  These far reaching statements

about a computer that 1.) was not ever used by Plaintiff and 2.) had been stored in a garage

without power for two years, Doc. No. 419 at 6, demonstrate the advocacy of Stroz Friedberg for

their client. Mr. Rose, while happy to mislead this court in their 'report' admits when questioned

directly about his knowledge of the affect on a system clock when a computer is unplugged for

several years had no knowledge.

> Q. How does a computer know what time it is if you unplug it from the wall, for
> example?  Doesn't it have a battery that helps keep track of the time for a while?
> A. I don't know.
> Q. Have you ever heard of a CMOS battery?
> A. No.  Rose Depo at.251.

A CMOS battery has been a feature of computers for more than three decades.  It

provides power to the computer when turned off for short periods of time and unplugged keeping

items like the computer clock current.  It is indeed shocking that Rose, employed at Stroz as a

computer expert, is not even aware of this basic computer component running the system clock

and how it can malfunction or cease to function when the computer it is in is unplugged for an

extended period of time.

## DEFENDANTS' IGNORED MALWARE INFESTATION ON SEAGATE HARD DRIVE

Defendants rest the primary evidence of supposed fraud on a computer Plaintiff did not

own (his parents' did) did not use and did not have access to.  Doc. No. 419 at 2.  In addition,

Defendants' experts claim they never bothered to scan the Seagate drive for the presence of

Malware.[11]  Rose Depo. at 70.

Plaintiff's expert, Neil Broom, <u>did</u> scan the Seagate drive and that scan revealed shocking

amounts and types of malware.  Doc. No. 417 at 7.  The Seagate drive was infested with viruses,

trojans and what is known as a RootKit.  Id.  Defendants' experts agree with Broom's

conclusions on this point.  Rose Depo. at 71.  As a result, none of the information from the

---

[11] Malware is a generic term to describe a broad category of malicious computer code that is placed on a user's computer and can perform unauthorized tasks without the knowledge of the user.

Seagate hard drive can be trusted as proof of anything.  Doc. No. 417 at 8.  The Kole email with

the Street Fax digital images attached was found in this computer virus cess pool.

## ROOTKIT MALWARE TOOL PERMITS HACKERS REMOTE ACCESS TO COMPUTERS

As Mr. Broom clearly states "It is reasonable to deduce from the results of the Malware

Detection Software that the Seagate hard drive was infected with numerous malware files that

potentially left the system open for compromise from an external source."  Doc. No. 417 at 8.

"A rootkit is a program or a program kit that hides the presence of malware in the system.
The placement of a rootkit is not normally something that is undertaken by a user with their own
system and is generally an indicator of malicious activity." Doc. No. 417 at 11.

This allows a hacker to continue to maintain control over a computer without the user

becoming aware.

## DEFENDANT ZUCKERBERG IS A RENOWNED HACKER

The abundance of these hacking tools on the Seagate drive are but a mere coincidence, so

say the Defendants.  Defendant Zuckerberg is a notorious hacker.[12] [13] [14] He regularly hires

reknowned and criminal hackers to join Defendant Facebook's company.[15]Defendant Zuckerberg

being the only party in this case with the credentials to send an email from Plaintiff's parents'

account, Doc. No. 419 at 2, also another coincidence say the defendants.

In 2004, Defendant Zuckerberg engaged in aggressive tactics to deprive Eduardo Saverin

of his ownership stake in Facebook.[16]  A lawsuit alleging a fraudulent attempt by Defendant

---

[12] http://www.businessinsider.com/how-mark-zuckerberg-hacked-into-the-harvard-crimson-2010-3

[13] http://www.businessinsider.com/how-mark-zuckerberg-hacked-connectu-2010-3

[14] http://www.thecrimson.com/article/2003/11/4/hot-or-not-website-briefly-judges/

[15] http://articles.businessinsider.com/2011-06-27/tech/30076797_1_george-hotz-3gs-sony

[16] http://gawker.com/5643915

Zuckerberg to cheat his one time investor and business partner, Saverin, out of his investment, was settled.[17]  Again in 2004, Defendant Zuckerberg was alleged to have cheated the Winklevoss twins and another owner of ConnectU out of the entire idea for Facebook.  *Connect, Inc. et. al. v. Facebook, et. al*. Case No. 1:07-CV-10593-DPW.

It is undisputed by Defendants, as it cannot be disputed, that Defendant Zuckerberg had the ability, information and motive necessary in 2004 to hack Plaintiff's parents' computer containing the Seagate hard drive.  Despite the overwhelming evidence of a hacking event occurring on Plaintiff's parents' computer, Plaintiff has no burden to prove this event took place. Plaintiff brings this information to the court's attention so that:

1.) The court can understand the feasibility, confirmed by Stroz Friedberg, of a hack occurring to cause an email to be sent with altered images attached and

2.) To demonstrate that a reasonable jury could conclude that the FB Contract's authenticity is not questioned by the existence of the unauthenticated StreetFax digital images.

<u>EVIDENCE FROM SEAGATE HARD DRIVE IS COMPLETELY CONTAMINATED</u>

The court should not use any evidence obtained from the Seagate hard drive for the following reasons:

1. The Seagate hard drive was not within a computer purchased by Plaintiff; and
2. The Seagate hard drive was not within a computer used by Plaintiff; and
3. The Seagate hard drive was not within a computer accessed by Plaintiff; and
4. The Seagate hard drive was infested with Malware, viruses and a Rootkit that compromised the integrity of all electronic evidence and permitted a hacker unfettered access to the computer containing the Seagate drive; and
5. Defendant Zuckerberg was in 2004 and is currently a renowned hacker; and

---

[17] http://gawker.com/5143256/facebook-founders-settle-their-feud

6. The existence of the FB contract proves the unauthenticated StreetFax digital images are fraudulent.

## DEFENDANTS' CHARACTER ASSAULT ON PLAINTIFF

The vast resources devoted to attempting to destroy Plaintiff's character is evidence in the Henne declaration.  Doc. No. 49.  Defendants lack of solid proof supporting their motion to dismiss motivated them to insert this worthless dredging up of tired claims, exaggerated statements, anonymous sources and outright lies.  Id. The attached declaration is from a person who had business dealings with Plaintiff.  The Defendants' "investigators" contacting him asked questions designed to solicit specific responses for use by Defendants in misstating their fraud claims bordering on slander. Kleinfeldt Declaration

Plaintiff's character at trial is not subject to such baseless attacks.  FRE 404(a)(1).  In addition, the Henne declaration is weakened to the point of worthless as it relies on anonymous sources.  Perhaps there is good reason for this given that known sources have consistently refuted the claims in Doc. No. 49.  Kleinfeldt Declaration.

## DEFENDANTS' SPOLIATION CLAIMS HAVE BEEN VANQUISHED

The second of Defendants' three legs of the motion to dismiss for fraud on the court alleges Plaintiff has engaged in spoliation of evidence. Doc. No. 319 Page 51.  That spoliation claims cites three pieces of purportedly spoiled evidence:  USB drives containing relevant files; Doc. No. 319 Page 57.  The re-installation of the Windows operating system on one of the examined hard drives; Doc. No. 319 Page 59.  The damage to the FB contract. Doc. No. 319 Page 51.

## USB DRIVE

Defendants claim Plaintiff "[W]illfully destroyed six USB devices, including one containing image files entitled "Zuckerberg Contract" that he had stored in a folder entitled "Facebook Files." (Doc. No. 319 at 59).  Defendants' claim is not that the USB devices themselves are relevant evidence, but rather that they may have contained files relevant to the case, just as a filing cabinet would not typically be relevant apart from the files contained in the filing cabinet.  Specifically, Defendants claim files named Zuckerberg Contract page1.tiff and Zuckerberg Contract page2.tiff were once located on a now missing USB drive and may be relevant to the case.  (Doc. No. 325 at 54).  Defendants claim the spoliation of these files warrants dismissal.  (Doc. No. 319 at 59).  Only two of the six USB drives identified were ever attached to a computer owned by Plaintiff.  Doc. No. 139-2 at 26-28.

This spoliation claim was rooted out as spurious thanks to the work of Plaintiff's expert Neil Broom and the concession by Defendants' expert Bryan Rose.  In his deposition, Rose admitted that when two files have the same filename and same file size, Mr. Rose testified "I think it's very likely[,]" the files are duplicates.  Rose Depo. at 196.  He was then asked, even without knowing the content, "are these files likely duplicates?"  To which he responded, "yeah." Id.  Rose highlights two files that were allegedly stored on a USB device but not produced by Plaintiff.  Id. at 200.

During his deposition, Mr. Rose was shown a comparison of A.) the file names and file sizes identified in the embedded metadata properties of two link files that show files named Zuckerberg Contract page1.tiff and Zuckerberg Contract page2.tiff were once on the missing USB drive with, B.) the file name and file size of two files produced in discovery.  The file name and file sizes of the files produced during discovery were the same as the file name and file size

of those claimed to have been present on the now missing USB device.  Id. at 202-207.  Finally, Rose acknowledged that the two files already produced in discovery having the same file name and file size as those allegedly on the missing USB drive, were likely duplicates.  Id. at 196. Therefore, any claim of spoliation regarding these supposedly missing files is vanquished as duplicates of those files were produced in discovery by Plaintiff.

RE-INSTALLATION OF WINDOWS

Defendants argue that the re-installation of windows on the Seagate hard drive, which wasn't owned or used by Plaintiff, is proof of spoliation of evidence.  Doc. No. 417 at 33.  The re-installation was done after the Seagate hard drive had already been imaged for use in the case. Id.  Since no information could have been lost as a result of the re-installation, there could not have been any spoliation.  Id.  Since Plaintiff did not purchase, own, use or have access to the computer containing the Seagate drive, this spoliation claim is likewise spurious and irrelevant.

DAMAGE TO THE FACEBOOK CONTRACT

Plaintiff filed a motion for sanctions for Defendants' spoliation of the FB contract.  Doc. No. 214.  Plaintiff presented proof that Defendants' experts over-exposed the Facebook contract to intense ultra-violet (UV) and other light sources.  Id.  The court denied Plaintiff's motion not because he disputed the claim of Defendants' causing discoloration to the FB Contract.  Doc. No. 272.  Without commenting on who caused the discoloration, the court commented, "[t]he discoloration in it self is not a form of spoliation."  Hearing Transcript, 12-13-11 at 184.

Defendants damage to the FB Contract harms Plaintiff while Defendants do not claim any harm came from their allegation of Plaintiff's baking of the contract.  Defendants do not allege the condition of the FB Contract prevented any testing they intended to conduct.

However, Plaintiff detailed the harm the now yellowed FB Contract has caused him and will cause him at the trial of this matter.  Transcript Hearing, 12-13-11 at 68.  Plaintiff demonstrated to the court at the December 13, 2011 hearing the obvious discoloration caused by Defendants' experts' examination of the document.  Hearing Transcript, 12-13-11 at 121.  This court noted case law supporting the fact that "discoloration of the document" is not spoliation.  Hearing Transcript, 12-13-11 at 185.  Even if discoloration were a form of spoliation, Defendants' experts, including LaPorte, noted no problems testing the ink on the FB Contract.  This reality means Defendants' claim of spoliation carries no weight as they admit they were not prejudiced by their argued, without proof, discoloration of the document by Plaintiff.

<u>LITIGATION MISCONDUCT</u>

The third leg of Defendant's motion seeks dismissal for "litigation misconduct."  This motion seeks to duplicate a sanction against Plaintiff that had already been imposed.  Given that Defendants have already sought and this court has imposed sanctions and awards of attorneys fees their urge that this court impose another sanction for that conduct  oppressive and inappropriate.

<u>CONCLUSION</u>

In light of the evidence and admissions stated above, it should now be clear that a reasonable jury could find in favor of the authenticity of the Facebook Contract. Defendants have failed to challenge the authenticity of the FB Contract and the emails with evidence sufficient to meet the "clear and convincing" standard.  There is no dispositive, scientifically unarguable fact that has been presented such that no reasonable jury could find in favor of the authenticity of the Facebook Contract.

Plaintiff's experts confirmed Plaintiff's sworn testimony that the FB contract is authentic. e.g. Doc. Nos. 415, 416.  Defendants "page one substitution" theory has unraveled at the seams, forcing Defendants to either admit the truth or invent a new theory.

Defendants' experts contradict each other on key points in their argument.  LaPorte's ink testing is now exposed for the unscientific, subjective approach that it is.  Plaintiff's experts have concluded that the FB Contract is authentic.  The depositions of Defendants experts reveal they exaggerated their results and overstated the certainty of their fraud conclusions.  There can be no dispute that this case is one of "dueling experts" which this court has indicated would prohibit the remedy Defendants seek - stripping Plaintiff of his right to a jury trial.  "[COURT] [I won't] get in the way of a jury.  I started out on that point, and I intend to stick with it."  Transcript of Hearing, 12-13-11 at 183.

"My point is simply this: Plaintiff has proffered experts who have not caved."  Transcript of Hearing, 12-13-11 at 202.  And, Alas, those experts have not caved at all, but instead, become stronger and more comprehensive of their refutation of Defendants' experts' positions. Plaintiff's June 2012 reports have overwhelmed Defendants' "avalanche" of pages of reports exposing them as exaggerated and more accurately described as a snow job than an avalanche. Dueling experts exist despite Defendants' contrary promises.  "It's a very substantial case, to say the least, so fairness considerations become to me even heightened."  Transcript of Hearing, 12-13-11 at 202.  Above all, Plaintiff's jury trial right and the court's nod to fairness, require denial of Defendants' motion to dismiss.

Respectfully submitted,

/s/ Paul Artentieri

Dean Boland
Boland Legal, LLC
1475 Warren Road
Unit 770724
Lakewood, OH 44107
216-236-8080 phone
866-455-1267 fax
dean@bolandlegal.com

Paul A. Argentieri
188 Main Street
Hornell, NY 14843
607-324-3232 phone
607-324-6188
paul.argentieri@gmail.com