Page 1

1

2              UNITED STATES DISTRICT COURT

3              WESTERN DISTRICT OF NEW YORK

4

5    PAUL D. CEGLIA,              )
                                  )
6              Plaintiff,         )
                                  )
7         vs.                     )   No. 1:10-cv-00569
                                  )        (RJA)
8    MARK ELLIOT ZUCKERBERG,      )
     Individually, and           )
9    FACEBOOK, INC.,              )
                                  )
10             Defendants.        )
     ------------------------     )

11

12

13

14

15

16                      August 3, 2012

17                      10:56 a.m.

18

19         Deposition of PETER V. TYTELL, held at

20      the offices of Gibson, Dunn & Crutcher LLP,

21      200 Park Avenue, New York, New York, before

22      Laurie A. Collins, a Registered Professional

23      Reporter and Notary Public of the State of New

24      York.

25

Page 2

```
 1
 2    A P P E A R A N C E S:
 3
 4         BOLAND LEGAL, LLC
 5         Attorneys for Plaintiff
 6              1475 Warren Road
 7              Unit 770724
 8              Lakewood, Ohio 44107
 9         BY:   DEAN BOLAND, ESQ.
10              (via telephone)
11
12         GIBSON, DUNN & CRUTCHER LLP
13         Attorneys for Defendants
14              200 Park Avenue
15              New York, New York 10166-0193
16         BY:   ALEXANDER H. SOUTHWELL, ESQ.
17              SRIPRIYA NARASIMHAN, ESQ. (a.m. only)
18              MATTHEW BENJAMIN, ESQ.
19              AMANDA AYCOCK, ESQ.
20
21
22
23
24
25
```

1

2              (Mr. Tytell not yet present.)

3              MR. SOUTHWELL:  It's Alex Southwell.

4      Laurie Collins is here from Veritext.  I'm

5      going to ask that she go on the record and

6      then let's just go through a few things, and

7      then we can proceed.

8              MR. BOLAND:  That sounds good.

9              MR. SOUTHWELL:  So I guess just a few

10     things so that it's clear, you know.

11     Dr. McMenamin is here and available.  You sent

12     an e-mail last night at about 8 p.m. that

13     seemed to cancel that deposition, although,

14     frankly, it was never really explicit.  I find

15     that often your e-mails don't specifically

16     respond to the issues.  And so, you know, you

17     didn't ever explicitly say you did not want to

18     proceed with Dr. McMenamin.  He's here, in any

19     event, and Mr. Tytell is also here.

20             I presume you do not want to proceed

21     with Dr. McMenamin; is that right?

22             MR. BOLAND:  Yes, my understanding was

23     we were going to try and do Mr. Tytell's

24     deposition today because he is traveling after

25     the 13th; right?

1                    Proceedings

2          MR. SOUTHWELL:  Yeah, but you had asked

3      for half days for both, so theoretically you

4      could have done both.  I take it you don't

5      want to proceed with Dr. McMenamin, and that's

6      your right.  We will still be billing you for

7      his appearance fee and travel costs.

8              Now, we did rearrange schedules, and we

9      have Mr. Tytell here.  You know, obviously you

10     had -- he had been noticed for Thursday, and

11     you canceled that one midnight the night

12     before, due to the travel difficulties you

13     had.  And so we have rearranged things so that

14     he is here.

15             We made the copies that you have just

16     asked for, but we need to discuss his fee,

17     which we talked about.  His fee is $3400.

18     There is a cancellation fee from his having

19     canceled yesterday.  So are you prepared to --

20     how do you want to arrange for the payment of

21     this?

22          MR. BOLAND:  Well, as I said in the

23     e-mail -- by the way, Mr. LaPorte should have

24     received his payment by now.  Have you gotten

25     confirmation from him that he received his

```
 1                    Proceedings
 2       check?
 3            MR. SOUTHWELL:  Yes, we did get that.
 4       Thank you.
 5            MR. BOLAND:  Okay.  Good.  The day you
 6       had sent me an e-mail saying please send it
 7       overnight mail, give me a confirmation number,
 8       that e-mail didn't get to me before the check
 9       went out in regular mail.  But he got it,
10       which is the point.
11            I propose that the fee that Mr. Tytell
12       indicated was his fee for his deposition, as
13       soon as the deposition is over, I will go and
14       do that one overnight mail, FedEx, and send
15       you the confirmation number so that you'll
16       have it and he'll have it.  And then he'll get
17       it by -- well, actually if it's -- he'll get
18       it by Monday, because there's not going to be
19       on Saturday, typically.
20            The cancellation fee, I don't -- this
21       is the first I'm hearing of a cancellation
22       fee, so I don't know what to tell you about
23       that.  I will have to confer with my client
24       and co-counsel.
25            MR. SOUTHWELL:  I mean it's fairly
```

1                    Proceedings

2        typical, if you reserve an expert witness to

3        be available for deposition and they're not

4        deposed, that they charge either the full fee

5        of half fee.  His fee is the half fee.  So we

6        would ask that you pay that as well.

7             Maybe you can confer during the course

8        of the deposition and then you can make -- as

9        I understand it, you're making -- you're

10       representing on the record that you will pay

11       at a minimum his $3400 fee and that you will

12       put that in a check -- immediately on a check

13       and in a FedEx overnight to Mr. Tytell's

14       direction at the address on his report

15       immediately following this deposition;

16       correct?

17            MR. BOLAND:  Yes, I will do that, and I

18       will even send an e-mail to you so you have

19       the confirmation number that you need as well

20       for the FedEx.  That's not a problem.

21            MR. SOUTHWELL:  The cancellation fee is

22       an additional $1700.  I would ask that you

23       consult about that.  We would ask that you pay

24       that as well.  We won't charge you for the

25       cost of this phone call for the deposition,

```
 1                      Tytell
 2       but I would ask that you do that.  So why
 3       don't you ask -- inquire into that and let us
 4       know as we get to the end.
 5            I'm going to release Dr. McMenamin, and
 6       I'm going to bring Mr. Tytell in and you can
 7       proceed.  Okay.
 8            MR. BOLAND:  Very well.
 9            MR. SOUTHWELL:  All right.  Stand by.
10            (Pause.)
11            (Mr. Tytell joins proceedings.)
12  P E T E R   V.   T Y T E L L ,
13       called as a witness, having been duly sworn
14       by the notary public, was examined and
15       testified as follows:
16  EXAMINATION BY
17  MR. BOLAND:
18       Q.   Mr. Tytell, this is Dean Boland.  I
19  represent Paul Ceglia in this matter.  I think we
20  have at least been in the same room once before at
21  Gibson, Dunn's offices; right?
22       A.   Yes.
23       Q.   And since we're doing this by telephone
24  today, if at any point because of technological
25  issues you can't hear my complete question, please
```

```
 1                        Tytell
 2   let me know and we'll figure out that problem and
 3   make sure you can hear everything I'm saying.
 4            Can you hear me at this point?
 5       A.    Yes, I can.   Thank you.
 6       Q.    If I need to speak up or I'm speaking
 7   too loudly, let me know, since I can't hear what
 8   you're hearing on that side, obviously.
 9       A.    Okay.   I'm sure that the technology
10   will be good to us.
11       Q.    Let's hope.
12            I wanted to talk about -- if the court
13   reporter can hand the witness your report,
14   Mr. Tytell, document Number 330, I believe it is.
15            MR. SOUTHWELL:  Just a minute.  We're
16        getting it out.
17            MR. BOLAND:  What was that, Alex?
18            MR. SOUTHWELL:  I said just a minute,
19        we're getting it out to hand to the court
20        reporter.
21            (Tytell Exhibit 1, expert report of
22        Tytell, marked for identification.)
23            MR. SOUTHWELL:  Mr. Boland, just for
24        the record, this is document 330 in the court
25        file, which is the report of Mr. Tytell.
```

1                    Tytell
2              MR. BOLAND:  It's Mr. Tytell's report,
3       Alex?
4              MR. SOUTHWELL:  Yes, document 330.
5              MR. BOLAND:  Very good.  Very good.
6       Q.    And if he could just identify that for
7    the record when he has it.
8       A.    Yes, I have this document.  There's a
9    front page that says Exhibit F.
10      Q.    Is that the report that you submitted
11   in support of the defendants' motion to dismiss?
12      A.    I'm looking through.  I'll be with you
13   just one sec.
14      Q.    Very well.
15            (Pause.)
16      A.    Okay, Mr. Boland.
17      Q.    Yes.
18      A.    Just because of the distance here, I
19   can't tell if, you know -- I want to catch your
20   attention there.
21            With respect to the document that I
22   have before me marked Tytell 1, on page 10
23   somewhere below the middle of the page, there's a
24   blank space, and the word "redacted" appears
25   there.  That was not -- that's not how it was on

```
 1                      Tytell
 2   page 10 of the report that I submitted.
 3        Q.    To make this easier, Mr. Tytell, I
 4   think both defense counsel and I would agree that
 5   for some of the expert reports that they provided
 6   and some that we had provided, because of court
 7   orders, we have gone ahead and redacted portions
 8   of those reports.
 9             And I would acknowledge that the report
10   actually filed by you, as my recollection, had
11   portions of it redacted that were not redacted by
12   you.  So that's not -- that's not an issue.
13             Other than those redactions, is there
14   anything else that looks incomplete about the
15   report you have in front of you?
16        A.    Well, I was going to add that at the
17   top of the various pages of the report and of the
18   attached exhibits, there is a line that says Case
19   1:10-cv, et cetera, et cetera -- I'm sure you know
20   what that line is -- and the date --
21        Q.    Yes.
22        A.    -- and then some pagination.  So that
23   was not present on the document that I submitted.
24   I'm sure you're aware of that.
25        Q.    Yes.
```

1                        Tytell

2         A.    Okay.  And then also what I'm looking

3    at is obviously a printout of some document that

4    was, I guess -- this line at the top -- I don't

5    know if that was put on by the attorneys or the

6    courthouse or some other system for the documents.

7              But the document I'm looking at

8    obviously has had some changes made to it since I

9    submitted my report.  And then after those changes

10   were made, this document has also been printed

11   out.  So this is not really exactly the thing that

12   I submitted.

13        Q.    Did you submit your report to the

14   defendants in electronic form?  Is that what

15   you're saying?

16        A.    Yes.

17        Q.    And other than those comments you made

18   about the redaction and the printed material

19   across the top of the page, are there any other --

20   and that the document is printed versus

21   electronic, any other differences between the

22   content of that Tytell Exhibit 1 and your report

23   other than those things?

24        A.    Without actually doing a side-by-side

25   comparison, I believe that all the words that are

```
 1                         Tytell
 2    here are words that were in my report, except for
 3    the redacted ones, of course, and the heading that
 4    we've discussed.
 5         Q.    Very well.
 6               Mr. Tytell, are you a qualified
 7    forensic document examiner?
 8         A.    Yes.
 9               MR. SOUTHWELL:  Objection to the form.
10               THE WITNESS:  I'm sorry.
11               MR. SOUTHWELL:  Just wait for my
12         objection.
13         Q.    And are you a trained or qualified
14    handwriting examiner?
15         A.    I have been so accepted by courts.
16         Q.    And about how many times have you --
17    let's break it up.
18               How many times have you actually done
19    handwriting analysis, whether or not you actually
20    had to submit it to a court?
21         A.    By "handwriting analysis," what do you
22    mean by that term, please?
23         Q.    Well, since I'm a layperson, I'll look
24    at it this way:  How many times have you been
25    hired by a client to compare a signature on a
```

1                          Tytell

2    document with known signatures of that person to

3    see if they are consistent with each other?

4         A.    Okay.  I couldn't count them for you,

5    but certainly many hundreds if not thousands of

6    signatures over the years.

7         Q.    And have you been asked to do

8    comparisons of other types of handwriting other

9    than signatures?

10        A.    In the past.

11        Q.    Yes.

12        A.    We're talking about sort of generally

13   my history here, I think?

14        Q.    Yes, sir.

15        A.    Okay.  And the answer would be yes.

16        Q.    And about how many years have you been

17   doing those types of analyses, comparing

18   signatures or comparing a handwriting sample with

19   a known handwriting sample, that kind of thing?

20        A.    Well, going to court for those purposes

21   is 42 years next month for my first court

22   appearance, and obviously training and some

23   casework prior to that.  So a long time.

24        Q.    Had you had any professional

25   relationship with any of the defendants' experts

```
 1                     Tytell
 2   before they became part of this case on the
 3   defendants' side?
 4       A.    Okay, could you tell me which -- could
 5   you give me a list of defendants' experts so I can
 6   check that off?
 7       Q.    Sure.  Let me ask you, have you read
 8   other expert reports involved in this case on
 9   either side?
10       A.    Yes, I have.
11       Q.    Which of the defendants' experts
12   reports have you read?
13       A.    Professor Romano and Mr. Lesnevich.
14       Q.    Have you had conversations with the
15   other experts whose reports you have not read?
16       A.    Which experts would they be, please?
17       Q.    Gerald LaPorte?
18       A.    Well, I've had conversations with
19   Mr. LaPorte, many of them, not necessarily about
20   this case.
21       Q.    Albert Lyter?
22       A.    Well, what kind of conversations are
23   you asking about?  Hi, how are you, how was the
24   flight?
25       Q.    No, I'm asking if you had conversations
```

1                          Tytell

2     with Albert Lyter about his report, since you've

3     indicated that is not one of the ones you've read.

4          A.    Oh.  No.

5          Q.    Have you had conversations with Albert

6     Lyter about your report and the conclusions and

7     results that are in it?

8          A.    No.

9          Q.    Have you had conversations with any of

10    the other experts from the case about the contents

11    of your report?

12         A.    Again, could you be a little more

13    specific, please?

14         Q.    Did you discuss with Gerald LaPorte the

15    contents of your report?

16         A.    No.

17         Q.    Did you discuss it with Frank Romano?

18         A.    This would be after I had written the

19    report, I assume, because how could I discuss the

20    contents until the report was finished.  Would

21    that be correct?

22         Q.    Yes.

23         A.    So the answer -- well, my report was

24    March 25th.  I don't think I've had the pleasure

25    of Professor Romano's company since then.  So I

1                          Tytell
2    couldn't have discussed it with him.
3         Q.    And when were you first contacted by
4    anyone on behalf of the defendants to participate
5    as an expert in this case?
6         A.    That would have been almost two years
7    ago now.
8         Q.    And when you were contacted -- after
9    you were contacted, how long did it take before
10   you were retained by the defendants?
11        A.    Well, the formal retention would have
12   come about two-thirds of a year later.
13        Q.    And what was your understanding at that
14   time as to why you were being retained in this
15   case?
16        A.    My initial understanding was that I was
17   being retained to look at the typography, if you
18   will, the printed portions of a two-page document
19   headed "work for hire" -- "work for hire," in
20   quotation marks, contract.
21        Q.    And had you done that kind of analysis
22   of the typography, as you put it, in prior cases?
23        A.    Yes.
24        Q.    Did there come a time, before you did
25   your analysis of the typography in this case, that

```
 1                        Tytell
 2   you had a conversation with defendants' counsel?
 3   I'm not asking about the contents of it.  I'm
 4   asking did you speak with them before you actually
 5   did your analysis of the contract in this case.
 6        A.    There was an initial phone call to ask
 7   if I would be willing to undertake some work on
 8   behalf of that client.
 9        Q.    Do you remember, again, not what was
10   said but who the person was you spoke to from the
11   defendants' attorneys during that conversation?
12        A.    This would be the first conversation
13   that I had or subsequent?
14        Q.    The first one.
15        A.    A Mr. Orin Snyder, I believe.
16        Q.    And have you had conversations with any
17   of the other lawyers from Gibson, Dunn, again,
18   without telling me what was said?  I just want to
19   know who else you spoke to.
20        A.    Well, looking at the people in the
21   room, I would say the four people sitting here.
22        Q.    Would that include Alex Southwell?
23        A.    That would include Alex Southwell.
24        Q.    Matthew Benjamin?
25        A.    Matthew Benjamin would also be
```

```
 1                        Tytell
 2   included.
 3        Q.    Amanda Aycock?
 4        A.    Yes, she would also be included.
 5        Q.    You said there were four people.  Who
 6   else was in the room?  I can't see, obviously.
 7        A.    Sripriya Nara --
 8              MR. SOUTHWELL:  Narasimhan.
 9        A.    Narasimhan.  It's easier in Hungarian.
10        Q.    At different times since you've been
11   retained in this case, you've had conversations
12   with those individuals from Gibson, Dunn?
13        A.    Yes, I have.
14        Q.    Do you have a written agreement with
15   the defendants for your work in this case?
16        A.    I have submitted to the defendants my
17   standard terms and conditions, as I do with
18   everyone who inquires about retaining me.  And
19   generally if I am retained and I assume those
20   standard terms and conditions apply.  And I
21   believe there was also a letter from Gibson, Dunn
22   which would I guess be their standard document.
23        Q.    Mr. Tytell, do you know --
24        A.    Excuse me, you're breaking up now.  The
25   technology is not being as kind as we had hoped.
```

```
 1                        Tytell
 2    Can you please repeat that?
 3         Q.    Yes.  Can you hear me a little better
 4    now?
 5         A.    Yes, indeed.
 6         Q.    Do you know if any other of -- well,
 7    let me just ask you specifically.  Do you know at
 8    the time you were retained by the defendants was
 9    Gerald LaPorte already retained by them, if you
10    know?
11         A.    I don't know.
12         Q.    How about Mr. Lesnevich, was he already
13    retained by them, if you know?
14         A.    I believe he was.
15         Q.    And then Albert Lyter, was he already
16    retained?
17         A.    I do not know.
18         Q.    And before working on this case, did
19    you know who Mr. Lesnevich was?
20         A.    Yes.
21         Q.    And is he also a qualified forensic
22    document examiner like you are?
23         A.    I don't know about the "like I am"
24    part, but I know that he certainly is a qualified
25    document examiner.  I would, you know, say yes.
```

```
 1                      Tytell
 2      Q.    Do you know if he has any
 3  qualifications to analyze handwriting similar to
 4  the questions I asked you about yourself earlier?
 5      A.    I know that he has been trained in that
 6  field and has been accepted as an expert in courts
 7  on numerous occasions.
 8      Q.    Have you ever been on the opposite side
 9  in a case with Mr. Lesnevich specifically dealing
10  with an analysis of handwriting?
11      A.    Probably.
12      Q.    Do you recall what case or cases that
13  might have been?
14      A.    I think there was a case maybe 30 years
15  ago that involved a signature.
16      Q.    Is that all you can remember about
17  that?
18      A.    I remember that we looked at different
19  known samples of the person's handwriting.
20      Q.    I'm assuming a 30-year old case you
21  don't remember a lot of the details about it?
22      A.    That would be correct.
23            You're breaking up again, Mr. Boland.
24  I don't mean to interrupt you, but you obviously
25  can't hear what's going on at this end.  I may
```

Page 21

```
 1                      Tytell
 2   have to interject when --
 3            MR. SOUTHWELL:  Mr. Boland, it sounds
 4       like it sort of cuts in and out as if you're
 5       on a cell phone or a hand -- some sort of
 6       other device.  Is that right or...
 7            MR. BOLAND:  Well, I have a headset
 8       connected to my phone so I can sort of type
 9       and talk at the same time, and that might be
10       causing a problem.
11            MR. SOUTHWELL:  Yeah, I don't know if
12       you're moving around at that point and maybe
13       that's causing it to break up.  But it sort of
14       comes in and out.  So we'll just have to let
15       you know when it occurs.
16            THE WITNESS:  It sorts of sounds as if
17       you're gargling while speaking.
18       Q.   Well, Mr. Tytell, I don't take it as
19   rude at all if you interrupt me because you can't
20   hear.  I want to make sure you hear the question.
21   So that's not a problem at all.
22       A.   Okay.  Good.
23       Q.   Now, can you hear me clearly at this
24   point?
25       A.   No, it's that jagged kind of
```

Page 22

1                        Tytell

2    interruption again.  But maybe --

3             MR. BOLAND:  Alex, can you give me the

4        number to the conference room there?  I will

5        switch devices and call right back.

6             (Pause.)

7        Q.    Mr. Tytell, did either your assignment

8    or your tasks that you were given in this case

9    change at any point from the time you were

10   retained to when you eventually produced your

11   report?

12       A.    I would say so, yes.

13       Q.    And can you describe how that change

14   occurred?

15       A.    That change occurred about -- shortly

16   after 9 a.m. on July 14th, because I was there to

17   examine the document, mainly with an eye towards

18   the printing on the document.  And when the

19   document showed up, it presented an entire new set

20   of issues that had not been anticipated.

21       Q.    And what were those issues?  What would

22   you summarize those to be?

23       A.    That the -- well, prior to seeing this

24   document, I had the opportunity to review copies

25   of a two-page document headed "work for hire"

                          Tytell

1

2    contract, and these were copies that had been

3    filed with the original papers filed in this

4    matter in I guess mid 2010.

5              I had also seen copies that were

6    attached to the declarations of Mr. Osborn,

7    Mr. John Paul Osborn, and Dr. Valery Aginsky.  And

8    based on the copies I had seen, I had formed an

9    impression of what the document should look like

10   or would look like when I actually saw the

11   original.

12             And when I saw the original on the

13   morning of July 14th, it did not look like the

14   document that I had anticipated.  I had

15   anticipated a document with handwriting and

16   signatures and initials and dates in black

17   ballpoint pen.

18             That black ballpoint pen part was based

19   not just on reviewing the documents but also on

20   reading the declaration of Dr. Aginsky from I

21   guess it was sometime in mid 2011 that that

22   declaration was dated, but prior to July 14th.

23             So based on Dr. Aginsky's description

24   of the writing as being black ballpoint ink and

25   based on the images I had seen, I had expected to

1                          Tytell

2    see black ballpoint ink.  And when the document

3    was presented, it was immediately obvious that the

4    ink was not black.

5              So that raised a whole new set of

6    issues about whether or not this was actually the

7    same document that had been viewed and scanned by

8    Mr. Osborn and Dr. Aginsky, did this agree with

9    the document -- with the images that had been

10   filed, with the initial paperwork -- "paperwork" I

11   guess is a wrong phrase for filing, but I hope

12   you'll understand what I'm talking about, the

13   moving papers, the first papers in the case from

14   mid 2010.

15             And that whole issue then opened up as

16   soon as I saw the ink as to what had happened to

17   the document in that -- prior to its showing up in

18   Buffalo on the morning I guess about 9 -- a little

19   bit after 9 a.m. on the morning of July 14th.  So

20   that's when things changed for me very much so.

21        Q.    And what tasks did you then decide you

22   had to perform that were different than before?

23        A.    Could you repeat that again?  I think I

24   lost the second word there after "what."

25        Q.    Yeah, what tasks did you then decide

```
1                        Tytell
2   you needed to perform that you before that didn't
3   think you were going to have to do?
4        A.    Okay.  I have tasks, T-A-S-K-S, what
5   tasks?
6        Q.    Yes.
7        A.    Okay.  I don't mean to repeat it; I'm
8   just trying to make sure we got -- we understand
9   what's going on here.
10              Okay.  What tasks did I then add?  I
11   then inquired about getting earlier images of the
12   document for comparison with the actual document
13   that was present.  I tried to figure out why the
14   ink looked like this, could it have looked like
15   this previously when the document was scanned for
16   the images that were filed with the moving papers
17   in mid 2010.
18              And then the additional tasks at that
19   stage -- we're now -- we haven't gotten even till
20   9:30 in the morning of July 14th in terms of
21   additional tasks -- would be of course the
22   documentation of this very unusual appearance of
23   the ink, to document it.
24              The scanning of the document that
25   morning was not really an additional task; that
```

1                          Tytell

2    was a routine task.  But subsequently I understood

3    that documentation of the ink in particular would

4    be useful.

5         Q.    And what was your opinion of the

6    condition of the document other than the ink?

7         A.    Well, that would bring us to about --

8    well, almost two hours later, around 11 in the

9    morning, when I first examined the document with

10   ultraviolet illumination and saw that the paper

11   had a very strange reaction under ultraviolet

12   illumination; that the front of the page was dark,

13   nonfluorescing, absorbing under ultraviolet,

14   pretty much uniformly on both pages; and that the

15   reverse, the nontext side of the page, was by

16   contrast brightly fluorescent, which is a normal

17   reaction for most of the paper that you use in

18   copy machines and laser printers and so on; but

19   that this very unusual front dark reverse brightly

20   fluorescing reaction, that sort of added another

21   task.

22              Plus within that overall unusual

23   reaction, on the front of both pages there were

24   little rectangles at the top of each page, two

25   rectangles at the top of each page, which were not

                        Tytell
1
2    dark like the rest of the face of the page but
3    were brightly fluorescing as the back of the page;
4    and that also on the reverse of page 1 in the
5    corner -- the corner with -- well, on the front it
6    would be the top left corner.  When you turn the
7    page over, of course, that becomes the top right
8    corner.  That that corner, which was folded over
9    and had a crease that created a triangle there in
10   that corner, that on the reverse of the page that
11   corner was dark, like the front of the page, and
12   not fluorescent.
13            So those issues all just popped up at
14   that point.
15            Associated with these light and dark
16   front/back tabs triangle on the back was also an
17   overall I guess ivory- or cream-colored cast to
18   the paper on the front, except for the tabs, as
19   opposed to white on the back, just a contrast in
20   the shade of the page.  But that was all
21   coterminous with this very unusual reaction under
22   ultraviolet.
23            So that observation, those facts,
24   presented another set of issues that had to be
25   documented, further examined, during the course of

1                        Tytell

2    the time in Buffalo.

3         Q.    And you were present when Mr. Lesnevich

4    arrived on July 15th?

5         A.    Present where?

6         Q.    At the Buffalo analysis in the offices

7    of Harris Beach.

8         A.    Yes, I was there that morning when

9    Mr. Lesnevich was present.

10        Q.    Did you observe him scanning the "work

11   for hire" document or otherwise making images of

12   it?

13        A.    I know that the document was scanned by

14   Mr. Lesnevich and his associate.  I'm not sure

15   which one of them actually was driving the

16   machine, if you will, was operating the scanner.

17        Q.    Have you ever seen Mr. Lesnevich's scan

18   of the "work for hire" document that he took on

19   July 15th, 2011?

20             MR. SOUTHWELL:  Objection to the form.

21        Do you mean the actual like electronic scan?

22             MR. BOLAND:  Yes, I'm asking Mr. Tytell

23        if he's ever seen what we would call the

24        native format electronic image, whatever you

25        want to call it, of the scan that

1                          Tytell
2          Mr. Lesnevich took of the "work for hire"
3      document on July 15th.
4          A.    I don't recall seeing that, no.  I may
5      have.  I don't know.
6          Q.    Have you reviewed any papers that the
7      plaintiff has filed in this case which included
8      exhibits of your scan on July 14th compared to
9      Lesnevich's scan on July 15th?
10         A.    I can actually hear you very clear; I
11     just don't understand you.
12         Q.    Okay.
13               Have you reviewed a pleading in this
14     case that the plaintiffs filed which included an
15     exhibit showing your scan of the "work for hire"
16     document on July 14th side by side with
17     Mr. Lesnevich's scan of the same document on July
18     15th?  Have you seen that pleading and that
19     exhibit?
20         A.    Well, when -- I'm sorry, when you say
21     "pleading," I'm looking at my -- what's been
22     marked as Tytell 1 for today, which says -- has a
23     whole cover page that says Exhibit F.  I assume
24     that there was an Exhibit A, B, C, D, and E.  And
25     other than those five exhibits, there may have

```
 1                          Tytell
 2   been another string of exhibits beginning with G
 3   going to the end of the alphabet and beyond.
 4             So I really don't know -- and then
 5   there was I guess it would be called a pleading
 6   that was the thing to which all of these exhibits
 7   were attached.
 8             So if you mean have I read the lawyers'
 9   arguments in the form of the pleading to which my
10   report was attached, then the answer would be no,
11   I haven't read that pleading.
12        Q.    No, my question is have you read a
13   document the plaintiffs have filed which included
14   an exhibit comparing what your scan of the "work
15   for hire" document looked like on July 14th to
16   Lesnevich's scan of the same document a day later.
17             Have you seen that exhibit where we
18   compare them?
19        A.    This was filed by whom?  The plaintiff
20   or --
21        Q.    Filed by the plaintiff.  Have you seen
22   that exhibit?
23        A.    Oh, the plaintiff.  I'm sorry, back up
24   for a minute.  I had defendants and plaintiffs
25   confused.  I know that seems weird, but you have
```

```
 1                      Tytell
 2   to remember document examiners are not like
 3   advocates, such as yourself and the wonderful
 4   attorneys sitting here in this room, and that we
 5   tend to be advocates for the documents rather than
 6   the parties.
 7            So maybe if I could look at the
 8   document to which you refer that would make it
 9   easier for me to give you a good answer, a correct
10   answer.
11       Q.   Well, just let me ask it this way:  As
12   you sit here right now, do you recall seeing a
13   comparison, a visual comparison, of your scan of
14   the "work for hire" document on July 14th with
15   Mr. Lesnevich's on July 15th?
16       A.   I -- I don't have anything in front of
17   me.  If maybe you could give me or supply
18   Mr. Southwell with a document number, I'm sure
19   that the people at Gibson, Dunn have kept copies
20   of everything you filed.  I'm sure that's the kind
21   of thing that lawyers do for each other's
22   paperwork.
23       Q.   Yeah, that's fine.  I'll take your
24   invitation there.
25            MR. BOLAND:  Alex, if you could have
```

```
 1                        Tytell
 2      someone just print a one-page document.  It's
 3      document number 263-2 that was filed in the
 4      case.  And I can go on with other questions
 5      while that's happening.
 6              MR. SOUTHWELL:  All right.  We'll do
 7      that.
 8              MR. BOLAND:  Thank you.
 9      Q.    Mr. Tytell, did you originally think
10  when you were hired on this case that you might be
11  asked to provide handwriting analysis?
12      A.    I didn't know.
13      Q.    When you say "know," do you mean
14  K-N-O-W?
15      A.    Correct, "know" with a K.
16      Q.    Did you ever mention or discuss with
17  the defendants' counsel the possibility of
18  analyzing the handwriting on the "work for hire"
19  document?
20      A.    We're now still discussing my original
21  retention in this matter?
22      Q.    No, at any point in this case, have you
23  discussed with the defendants' lawyers the
24  possibility of analyzing the handwriting on the
25  "work for hire" document?
```

1                            Tytell

2          A.     I've made some comments about

3     handwriting.

4          Q.     What were those comments -- well, no,

5     let me back up, because that might be something

6     that's work product that I shouldn't be asking

7     about.  So let me rephrase the question.

8                  MR. SOUTHWELL:  Thank you.  I was about

9          to object.  Thank you.

10                 MR. BOLAND:  Yeah, that's fine.

11         Q.     I'm not asking for the content, but

12    just to confirm the last question I asked, is it a

13    "yes, sir," that you have had conversations about

14    possibly analyzing the handwriting on the "work

15    for hire" document?

16         A.     Well, I'm not sure -- what do you mean

17    by "the possibility of analyzing"?

18         Q.     How would you describe what it is you

19    do in not this case but in previous cases when you

20    have examined handwriting both signatures or just

21    nonsignature handwriting and compared it to

22    samples from a person and tried to make some sort

23    of conclusion about whether -- who wrote some

24    handwriting on a document?  What do you call that?

25    Is that called handwriting analysis or how would

```
 1                         Tytell
 2   you describe it?  What's your term?
 3        A.    Well, generally handwriting
 4   examination.  But no, I understand what you mean
 5   by "handwriting analysis."  I don't quite get the
 6   context of what you're asking about.
 7        Q.    Well, the way I'm looking at it is
 8   this:  You have years and years, as you indicated,
 9   of handwriting examination experience.  Did that
10   topic ever come up in -- did you ever suggest to
11   the defendants' attorneys that you might analyze
12   the handwriting on this document, that might be
13   something helpful for them?
14        A.    Okay, well, so, I want to repeat it to
15   make sure I'm getting this right.  So did I ever
16   suggest that, hey, I could also submit or work on
17   the handwriting side of the matter?  Is that what
18   you're asking about?
19        Q.    Yes.
20        A.    No, then, I'm not looking for an extra
21   task or an extra area in which to perform.
22        Q.    Do you know if the defendants' lawyers
23   were aware that you had qualifications to analyze
24   or examine handwriting?
25        A.    Well, I did submit my résumé to them.
```

1                         Tytell
2    I cannot tell you whether or not they read it; but
3    if they had, I would have hoped they would have
4    garnered that kind of information about my
5    background.
6         Q.    And when you saw the document on July
7    14th, you obviously noticed that along with the
8    typography, which you were going to analyze, that
9    the document had handwriting.  You saw that?
10        A.    Yes, indeed.
11        Q.    Did you discuss with any of the other
12   experts, the defendants' experts, during that
13   examination over those several days the
14   handwriting on the document?
15        A.    Other than the ink of the handwriting,
16   the actual letter formations, line quality,
17   et cetera, I don't recall making -- having any
18   conversations on that topic.
19        Q.    Who did you discuss the letter quality
20   or the line quality and all that that you just
21   mentioned, who did you discuss that with?  Which
22   experts?
23        A.    I think I just said I did not discuss
24   that with defendants' counsel in -- on that -- in
25   July of 2011, July 14 and 15.  I'm sorry, see,

                         Tytell

1

2    this is where technology is not serving us well.

3    The answer is no, I did not discuss these issues

4    with them at that time.

5         Q.    Okay.  And did you -- what I'm asking

6    is did you discuss with the other defendants'

7    experts during the time of the examination

8    anything about the handwriting.

9         A.    I think the only things that we --

10   basically what we discussed was who gets the piece

11   of paper.  That was most of the conversations.

12   And the issues that were discussed I do not

13   believe involved the kinds of topics and

14   characteristics that one focuses on in doing the

15   kind of handwriting examination that I believe

16   you're referring to, topics such as line quality,

17   formation, et cetera.

18             So I don't think those topics were

19   included in the conversations that I might have

20   had during that time frame.

21        Q.    And did you discuss with any of the

22   defendants' experts whether it would be a good

23   idea or whether it could be helpful to your -- to

24   the analysis of the document to have someone

25   analyze or examine the handwriting?

1                            Tytell
2          A.     Did I discuss that -- again, I want to
3     repeat because of what I heard.  Did I discuss
4     that with the other defendants' experts at that
5     time?  That's the question I heard; right?
6          Q.     Yes.
7          A.     Okay.  No.
8          Q.     Did you discuss that with the
9     defendants' experts at any time?
10         A.     Well -- whether or not it would be a
11    good idea to have somebody look at the
12    handwriting?
13         Q.     Yes.
14         A.     Okay.  No, that's I think something
15    that was, as they say, overtaken by events because
16    there was some examination of the handwriting, I
17    believe.
18         Q.     And who do you believe examined -- did
19    some of the examination of the handwriting?
20         A.     Mr. Lesnevich.
21         Q.     Did that examination include trying to
22    determine if the signature on page 2, which
23    appears to be Mark Zuckerberg, is in fact Mark
24    Zuckerberg?  Is that part of the examination
25    you're referring to?

```
 1                      Tytell
 2       A.    That appears on page 2 of which
 3  document?
 4       Q.    The "work for hire" document.
 5       A.    Which "work for hire" document?
 6       Q.    The one you examined on July 14th and
 7  the days thereafter, the few days in Buffalo.
 8       A.    I believe that Mr. Lesnevich's
 9  examination addresses exactly that issue.
10       Q.    Did you examine more than one document
11  that you would call the "work for hire" document?
12       A.    Yes.
13       Q.    When did you -- okay.  So one of them
14  you examined starting on July 14th; correct?
15       A.    Correct.
16       Q.    When did you examine a second "work for
17  hire" document?
18       A.    Well, this is kind of like the line
19  from scripture:  The first shall be last, and the
20  last shall be first.  The second document was the
21  first document.
22       Q.    Can you explain that?  I'm confused by
23  your answer.  What do you mean, "the second
24  document was the first"?
25       A.    I'm sorry, there are two documents
```

1                          Tytell

2    I've -- two documents that have "work for hire" in

3    quotes and "contract" on the top of the page.  One

4    of these I have seen only in electronic form,

5    which is the document or the exhibit, I guess it

6    would have been, that was attached to the moving

7    papers from -- filed by plaintiff -- I guess

8    plaintiff always files the original moving

9    papers -- filed by plaintiff in mid 2010.

10              And I understand that there's also an

11   electronic scan, two pages, I believe two TIFF,

12   T-I-F, files that are color files that I have been

13   informed were e-mailed by a Mr. Paul Ceglia.  I

14   think that's C-E-G-L-I-A -- to Mr. Paul

15   Argentieri, A-R-G-E-N-T-I-E-R-I.  I hope that's

16   the correct spelling of his name.

17              So the document or the images that were

18   e-mailed by Mr. Ceglia to Mr. Argentieri and the

19   copy that was -- or exhibit that was appended to

20   the moving papers, that was the first -- well, the

21   copy appended to the moving papers from mid 2010

22   was the first copy of the "work for hire"

23   document, the first images, that I examined.  And

24   that seems to tie into the color scan from

25   Mr. Ceglia to Mr. Argentieri.  So I would consider

```
                              Tytell
1
2    that one "work for hire" document.
3             Then I also examined the document in
4    Buffalo in July of 2011, and I would consider that
5    to be another "work for hire" document.
6         Q.    All right.  So for the ease of us
7    understanding what we're talking about, I'm going
8    to refer to the document that you examined
9    starting July 14th as the paper contract, because
10   that was two pieces of actual physical paper that
11   you analyzed starting July 14th; correct?
12        A.    Right.
13        Q.    And the other two documents you
14   referred to, the attachment to an e-mail regarding
15   Mr. Argentieri and the document that was attached
16   to the complaint --
17        A.    "Complaint" is the word I was looking
18   for.  Thank you.
19        Q.    Yes, well, let me back up with that
20   question.
21             The document attached to the complaint,
22   you're not -- I don't think you have any dispute
23   that's a photocopy.  No one's arguing that's an
24   original document itself that a party signed.  You
25   agree with me on that?
```

1                          Tytell

2        A.    Let's back up again.  It's a

3   photocopy -- well, I don't know if it's a

4   photocopy.  I've only seen it as one electronic

5   form or another.  I don't know if it's actually

6   been through a photocopy machine.

7              Sadly or interestingly, the term

8   "photocopy" as become to seem quaint.  It's moving

9   up there with "carbon copy."  So I know that --

10       Q.    (Inaudible.)

11       A.    I'm sorry, please.

12       Q.    I guess I'll try it again.  An actual

13   physical paper document purporting to be an

14   original document, there's only one of those that

15   you examined, and that was on July 14th?

16       A.    Right, the Buffalo -- the Buffalo "work

17   for hire" contract, the two physical pieces of

18   paper with the faded ink that Mr. Argentieri

19   brought out of a U.S. Postal Service express mail

20   envelope just after 9 in the morning on July 14th.

21   We actually have two physical objects to discuss

22   there.  That's great.

23       Q.    The TIFF images are digital images;

24   correct?

25       A.    Correct.

```
 1                        Tytell
 2        Q.    Have you ever been qualified as an
 3   expert in the analysis of digital images?
 4        A.    I've -- let's see.  I have provided
 5   expertise based upon examination of digital
 6   images.
 7        Q.    Have you ever been qualified to answer
 8   the question about a digital image whether it has
 9   been -- the digital image itself has been altered
10   or not in a program like Photoshop or something
11   similar to that?
12        A.    No.
13        Q.    Do you feel that you are qualified to
14   visually examine a digital image and tell whether
15   it has been altered in a program like Photoshop or
16   something similar?
17        A.    Within the limitations that would apply
18   to any field of expertise that I might claim to
19   have, I would go as far as I felt comfortable
20   going.  That would be true of my expertise in
21   handwriting that you've referred to in the past or
22   typography.  I do not pretend to be omniscient in
23   any field that I am actually knowledgeable in.
24        Q.    As to the TIFF images that you referred
25   to earlier, in your examination of those, were you
```

1                          Tytell

2    able to determine if those were original images or

3    copies of otherwise original digital images?

4         A.    Well, I did receive -- actually I think

5    it was probably one of the very first images of

6    any document that I received in relation to this

7    matter.  And I asked about the document, and I was

8    informed that I had received the PDF file that had

9    been filed with the complaint -- thank you for

10   that word -- that had been filed with the

11   complaint as it was received by Gibson, Dunn.  So

12   I have seen that -- what has been represented to

13   me as being that particular document -- that

14   particular electronic file.

15              As to the -- now, that PDF file -- A,

16   it's a PDF file; B, it's black and white -- I then

17   saw -- it's black and white what would be called 2

18   bit, the kind of -- the depth of it.  It's just

19   black and just white, not gray, not color.

20              I then have also received these TIFF

21   files, which I have been informed were provided on

22   discovery by Mr. Argentieri.  So I have received

23   what I understand to be -- I have received the

24   files.

25              And when electronic files are moved

Page 44

1                         Tytell
2      from one computer to another, it is considered
3      that you are -- no matter how many times that is
4      copied by moving it from one file to another,
5      that's still the original file, barring some
6      glitch in the electronics, such as happened with
7      your voice earlier today.
8                 So I have these two TIFF files, which I
9      have been informed are duplicate original files of
10     the files provided by Mr. Argentieri to
11     defendants' counsel.  Now, what happened prior to
12     Mr. Argentieri turning that file over, I have no
13     way of knowing, and I can only accept the
14     representation that the file provided by
15     Argentieri is the file forwarded to me by Gibson,
16     Dunn.
17                 So to that extent I am looking at what
18     I have been told is an original file, it is in
19     color, 24-bit color, but I don't know if that
20     reputation is accurate.  I don't know if what was
21     provided by Mr. Argentieri is indeed what he
22     received.
23         Q.    All right.  Let me just ask you a
24     hypothetical about TIFFs as digital images.  Do
25     you feel qualified to GIF an opinion if you were

1                          Tytell

2     given -- I hired you as an expert in a case and I

3     said, Look, Mr. Tytell, here are two TIFF images

4     which purport to be the pages of a document that

5     were scanned in and I want you to look at the TIFF

6     images and tell me if these TIFF images are

7     original -- the original digital image scans of

8     this document or have they somehow been altered

9     before they were created into the TIFF format that

10    I just gave you; not the document itself but was

11    the digital image of the scan somehow altered in

12    Photoshop to make it look different.

13                Would you be qualified to determine

14    what that alteration was to the digital image?

15         A.   I -- based upon my knowledge of how

16    these things work, I would attempt to aid you, to

17    the extent that I could.  I might try to look at

18    the readily available properties of the file,

19    creation dates, so on and so forth.  I'm not sure

20    that I could actually crack into the metadata -- I

21    know those who can -- on a TIFF file.

22                I have done exactly what you described

23    on PDF files that were archived for documents

24    scanned and transmitted some years prior to the

25    dispute arising.  But you're asking about TIFF

Page 46

1                         Tytell
2    files, not PDF files.
3              So I have some experience with getting
4    into the metadata of the PDF files.  And just a
5    very simple explanation of the readily available
6    data can sometimes provide information that could
7    resolve the kind of issue that you have raised in
8    your hypothetical.
9              So hypothetically if somebody such as
10   yourself were to approach me on that, I would say
11   I can look at it, but there are certainly plenty
12   of people around who are much more specialized and
13   much more highly qualified than I to perform that
14   kind of an analysis.
15        Q.    What if I gave you two TIFF images that
16   appear to be, you know, images of some landscape,
17   the Rocky Mountains, for example, and I asked you
18   to tell me if visually you could examine those
19   images and tell me if anything has been altered in
20   that apparent landscape -- rocks moved around,
21   trees added or removed -- do you have any
22   qualifications to do that kind of analysis?
23        A.    Well, you're using the word "TIFF,"
24   which brings us into the twenty-first century and
25   the world of electronics, et cetera, which gives

1                        Tytell
2    you some added clues.
3            But the kind of problem, the kind of
4    photo manipulation, that you're describing
5    hardly -- is a problem that is hardly new and is
6    hardly something exclusive to TIFFs.  This is a
7    class or category of examination that has been
8    performed for many, many years regarding
9    photographs that have been altered and manipulated
10   and photo montage.
11           Now you're talking about a landscape, a
12   snapshot, and that actually might come into play
13   in some kinds of cases where somebody is
14   presenting -- you know, I couldn't have done the
15   measured in New Jersey.  Here, look at me, this is
16   the day I was at, I don't know, someplace in the
17   Rocky Mountains.  My Rocky Mountain geography is
18   very limited but -- just -- Vail, is Vail in the
19   Rocky Mountains somewhere?  I was skiing in Vail.
20   Here you can see I was on the ski slopes.  It just
21   happens somebody is holding up a newspaper next to
22   me giving the date.  So I couldn't possibly have
23   been in New Jersey doing the evil deed.
24           That's the kind of manipulation that
25   was done in the dark room with photographs or with

1                    Tytell

2  a scissors and a photocopier.  And there are a

3  number of things that you look at to try and find

4  those manipulations.  And I have had a certain

5  amount of training in that kind of examination.

6  And nowadays it just involves pixels, and there

7  are things with the pixels you can look at in

8  programs like Photoshop that might help you do

9  that.

10            This is all very interesting as a

11  hypothetical discussion, both in the twenty-first

12  century and probably going back to the nineteenth

13  century, but in this particular case it's not

14  really that relevant to what I did or what use

15  those TIFF files were put to.

16       Q.    All right.  At any point did you

17  request of the defendants' attorneys to get

18  samples of Defendant Zuckerberg's handwriting to

19  do some kind of a comparison to the handwriting on

20  the paper contract you evaluated on July 14th?

21       A.    No.

22       Q.    And why not?

23       A.    Well, several reasons.

24       Q.    Are you still there, Mr. Tytell?

25       A.    Yes, I'm sorry, I'm still here.

```
 1                      Tytell
 2       Q.    What are those reasons why you did not
 3  seek the handwriting samples of Mr. Zuckerberg?
 4       A.    Well, reason one would be that I was
 5  not tasked -- excuse me one moment.  It's a foggy,
 6  humid day in New York, and it's getting to my
 7  throat.
 8            I was not tasked with an examination of
 9  handwriting or signatures specifically.  Number
10  two, although I was not tasked with this
11  examination, after reading the reports of
12  Messrs. Blanco and Stewart, I did become
13  interested in several aspects of what they had
14  discussed and did start taking a look at the
15  writing on page 1 and on page 2 of the I guess
16  we'll call it the Buffalo document or the paper
17  document.
18       Q.    Yes.
19       A.    Fine, the paper document.  And I looked
20  at both the images of the paper document that I
21  myself had captured and also at the images of the
22  paper document that Mr. Osborn and Dr. Aginsky had
23  captured.
24            And in looking at page 2 of the paper
25  document, my curiosity was aroused by the complete
```

```
 1                         Tytell
 2     lack of mention of the fact that there was a
 3     signature on that second page of somebody named
 4     Paul Ceglia.
 5               And I had actually seen one other Paul
 6     Ceglia signature in Buffalo on July 14th, and that
 7     Paul Ceglia signature was on a document -- I
 8     believe it's a six-page document with a
 9     handwritten notation on page 4 that's initialed
10     and also a signature of Mr. Ceglia or that's
11     supposed to be Mr. Ceglia's signature and a
12     signature of apparently Mr. Zuckerberg also, as
13     well as some dates, that appear on page 6 of that
14     six-page document that is called -- I think we've
15     been calling it the specification document.
16               Do you understand what I'm talking
17     about, a six-page specification document?
18          Q.    Yes.
19          A.    Okay.  I mean, I don't remember what
20     the wording is at the very top of the page.  Well,
21     I know it -- actually, that's in my report that's
22     Tytell 1, so let me just get that.  A six-page
23     document headed "StreetFax back-end technical
24     specification" dated April 28, 2003.  Okay.
25               So that six-page document bears the
```

```
 1                        Tytell
 2   exact same date, April 28, 2003, as the "work for
 3   hire" document, and both documents have Paul
 4   Ceglia signatures.
 5             So I was interested in why nobody --
 6   why neither Mr. Stewart nor Mr. Blanco seemed to
 7   notice that there was a Paul Ceglia signature on
 8   page 2.  Now, I know Mr. Blanco did collect
 9   samples of the handwriting of Mr. Ceglia.  That
10   was one of his exhibits something like Exhibit 21
11   or 22, someplace in there.  So Mr. Blanco had
12   collected samples of Mr. Ceglia's writing.  But --
13   excuse me -- yeah, Mr. Ceglia's writing.
14             And unlike the way that samples are
15   often collected by document examiners, Mr. Ceglia,
16   or whoever wrote those samples, did not sign or
17   initial any of the -- I think there were 43
18   separate pages there.  That's just a recollection.
19   Don't hold me to it.
20             But usually when you collect exemplars
21   from somebody, someplace on those exemplars you're
22   going to get:  ask them to please sign it, please
23   initial it.  I know that's the standard practice
24   on the forms that many government agencies use,
25   such as the ATF, Alcohol, Tobacco, Firearms agency
```

1                           Tytell

2     where Mr. Blanco used to work.  I know they have

3     that on their forms.

4                   Anyway, although Mr. Blanco did try to

5     determine whether or not Mr. Ceglia had written

6     the interlineation, we've been calling it, the

7     words on page 1, and collected samples for that

8     specific purpose, he didn't collect any samples of

9     Mr. Ceglia's initials to compare to the PC

10    initials on page 1, nor did he apparently collect

11    any signatures of Mr. Ceglia to compare to the

12    signature on page 2, nor any numerals and writing

13    of dates to compare to the 4/28/03 date that

14    appears on page 2 of the "work for hire" document.

15                  So the absence of any pursuit of that

16    issue was kind of interesting.  If you accept that

17    Mr. Ceglia just signed the document and of course

18    he signed it, okay, well, then you could also

19    accept that Mr. Ceglia just wrote the

20    interlineation, if he has made that statement.

21                  But if you're going to bother to look

22    at one page to see if Mr. Ceglia actually wrote

23    something, I would suggest it might be consistent,

24    if nothing else, to look at the second page.

25                  So I was just interested.  And I looked

1                          Tytell
2    at the second page of the "work for hire" paper
3    document from Buffalo as it had been imaged by
4    Dr. Aginsky and Mr. Osborn.  And I looked at the
5    images that I had made of the papers that showed
6    up in July.
7              And I compared those just to the other
8    signature of Mr. Ceglia that bore the exact same
9    date.  So it would be very contemporaneous.  It's
10   the same day.  The two documents seem to be linked
11   in terms of the fact that they both show up
12   related to this case and to some work that one
13   person --
14             MR. SOUTHWELL:  Let's go off the
15        record, please.
16             (Pause - telephone connection lost.)
17             MR. BOLAND:  Mr. Tytell was in the
18        midst of describing his analysis of
19        Mr. Ceglia's signature on the "work for hire"
20        paper document with the software specification
21        agreement, is I believe what he was describing
22        when it disconnected.
23             MR. SOUTHWELL:  Right.  Okay.  So
24        please proceed.
25        A.   Yeah, the technology is not being easy

                              Tytell

1

2    with us.

3            So I was very curious about this, and I

4    compared the images from Mr. Osborn, who had also

5    seen the specification document and had also

6    captured images of the writing and initials on

7    page 4 and the signatures on page 6 of the

8    specification document, as well as the writing and

9    signatures on the two pages of the "work for hire"

10   document and also the images of the "work for

11   hire" document captured by Dr. Aginsky as well as

12   the images that I had captured of the "work for

13   hire" document pages 1 and 2 and the specification

14   document, specifically page 6, the signature of

15   Mr. Ceglia.

16           The signature of Mr. Ceglia on page 6

17   of the specification document is -- I guess I

18   would compliment Mr. Ceglia on the speed and line

19   quality of his signature:  very nice line quality,

20   rapidly, smoothly written, nice pressure

21   variation, long tailing terminal strokes that --

22   as they leave the page.

23           Now, I don't want to burden the record

24   unnecessarily, but I hope that you're familiar

25   with the term "line quality," Mr. Boland.

```
1                      Tytell
2      Q.     Yeah.
3      A.     So you know that line quality is kind
4  of the nonplus ultra of signatures, that this is
5  the thing that you look for, and this is the
6  giveaway, the place where a careful drawn free-
7  hand simulation of a signature will fall down is
8  in the line quality.
9           This is the problem that trips up
10  people who are doing a very, very careful and
11  precise and accurate tracing of a signature is
12  that they may get all of the forms right but what
13  they're going to have extreme difficulty with is
14  the line quality.
15           So looking at Mr. Ceglia's signature on
16  page 6 of the specification document, it is clear
17  that Mr. Ceglia has very good line quality, the
18  kind of line quality that is just going to play
19  hob with an attempt at simulation or tracing.
20           Then looking at the line quality of the
21  Paul Ceglia signature on page 2 of the paper "work
22  for hire" document as imaged by Dr. Aginsky,
23  Mr. Osborn, myself, that line quality is at
24  virtually the opposite end of the scale from the
25  signature of Mr. Ceglia on the sixth page of the
```

1                        Tytell

2    specification document.

3              That line quality is very poor, shaky.

4    And when you get over to the date next to it and,

5    for instance, those very long, straight diagonals

6    or what are supposed to be straight diagonals that

7    separate the month, day, and year of the date,

8    those have very poor line quality compared to the

9    same formations, the separators between the month,

10   day, and year in the date next to Mr. Ceglia's

11   signature on page 6 of the "work for hire"

12   document.

13             So this is just a contrast night and

14   day, a contrast actually almost as great as the

15   contrast between the fluorescent properties of the

16   front and reverse pages of the "work for hire"

17   document.

18             You just look at that kind of line

19   quality that is seen on page 2 of the "work for

20   hire" document and you say, unless there's a

21   really good explanation for somebody who shows

22   this fine, smooth, rapid writing with good line

23   quality as another document dated the same day,

24   the specification document, unless there's some

25   explanation for that person suddenly not being

```
 1                        Tytell
 2   able to write properly and yet very writing very
 3   precisely, albeit very slowly, I wouldn't even say
 4   a snail's pace -- a snail would lap you if you
 5   were writing that slowly -- that you have a clear
 6   flag, to a document examiner who looks at that,
 7   that something is severely wrong here, that the
 8   first thing that pops into the mind of somebody
 9   who's been examining signatures for a long time is
10   this is a careful simulation or this is a careful
11   tracing.
12            Now, the way you can usually be able to
13   tell the difference between a simulation and a
14   tracing, where you have such terrible line
15   quality, is if by some happenstance you run across
16   the model or another tracing made from the same
17   model.
18            As I'm sure you're aware, having been
19   involved in this case for a while and I'm sure
20   you've studied up on the textbooks supplied to
21   you, that people just don't sign their name
22   exactly the same way twice.
23            We are not printing presses; we are not
24   copy machines; we have variation.  And I believe
25   variation was something discussed by either
```

1                        Tytell

2    Mr. Blanco or Mr. Stewart.  So that is true, we

3    have variation.

4              And when you find something that -- two

5    signatures that have a similarity that exceeds the

6    normal similarity of somebody signing their name

7    twice that lacks the level of variation that would

8    be expected comparing two naturally and freely

9    written signatures, that you are looking at

10   something that either is the model for that

11   tracing or another tracing made from the same

12   model.

13             And in comparing the Ceglia signature

14   on page 2 of the paper copy with the Ceglia

15   signature on page 6 -- excuse me, let me start.

16             When comparing page 2 -- the page 2

17   signature of Paul Ceglia on the paper copy as

18   imaged by Dr. Aginsky, for instance, with the page

19   2 Paul Ceglia signature from the scan provided by

20   Mr. Argentieri, the TIFF file, scanned apparently

21   by -- or I've been informed by Mr. Ceglia himself

22   and then sent to Mr. Argentieri as an e-mail

23   attachment, when you compare that Paul Ceglia

24   signature with the Paul Ceglia signature from page

25   2 of the paper copy of the "work for hire"

                        Tytell

1   document, they are almost identical.  There is

2   almost no variation.

3           However, there is variation.  There are

4   differences.  And the quality, the quantity, the

5   direction in terms of left and right, up and down

6   on the page as well as skew, if you will, the

7   angle relative to 90 degrees or baseline.

8           So the quality, quantity, size,

9   direction, rotation of the differences are not the

10  kind of differences that one would associate with

11  differences caused by scanning.  They are, rather,

12  the kinds of differences in quality and quantity

13  that are typically found when comparing a tracing

14  to its model or to another tracing made from the

15  same model.

16          Having seen -- well, "clear and

17  convincing" is a legal term, but basically

18  essentially overwhelming evidence that the

19  signature on page 2 of the paper copy -- the Paul

20  Ceglia signature on page 2 of the paper copy is a

21  tracing, it then -- and also the date next to the

22  Paul Ceglia signature, I then also looked at the

23  date next to the Mark Zuckerberg signature on page

24  2 of the paper copy in its various scanned images

1                         Tytell

2    and so on and compared that to the date next to

3    Mark Zuckerberg's signature on page 2 of the -- I

4    guess I'll call the mid 2010 images, both the PDF

5    from the complaint and the Ceglia to Argentieri

6    e-mail TIFF files, and found there a number of

7    differences; and similarly with the Zuckerberg

8    signature on page 2, a number of differences

9    qualitatively and quantitatively similar.

10            Now, Mark Zuckerberg's signature as

11   seen on page 6 of the specification document is --

12   well, it's no offense to Mr. Zuckerberg, but it's

13   not nearly as pretty as Mr. Ceglia's signature.

14   Mr. Ceglia has a more developed signature style

15   than Mr. Zuckerberg, more skillfully executed,

16   let's say, more quickly executed, apparently.

17            However, Mr. Zuckerberg's signature on

18   page 6 of the "work for hire" document has better

19   line quality in terms of, let's say, the last

20   stroke at the end of the second name, than does

21   the signature on page 2 of the paper copy of the

22   "work for hire" document.

23            And since Mr. Ceglia's signature is --

24   has gross characteristics of a tracing, the idea

25   that Mr. Zuckerberg's signature is a tracing seems

```
 1                         Tytell
 2   extremely plausible.
 3               I also compared, just because I was in
 4   it at that point, the initials and the
 5   interlineation printing on page 1 of the paper
 6   copy with the interlineation and initials on page
 7   1 of the electronic images from mid 2010 and again
 8   found just many, many differences in detail that
 9   were not compatible with being caused by a
10   difference in scanning.
11               So that was actually a handwriting
12   examination, I guess, a handwriting and signature
13   and numeral comparison that I did although I was
14   not actually tasked with doing it.
15        Q.    How did you come to do that analysis?
16   Was that on your own you decided to embark on
17   that?
18        A.    Well, it grew out of my reading of
19   Mr. Stewart's declaration and Mr. Blanco's
20   declaration.  They had a number of comments
21   concerning some kind of an analysis that
22   Mr. Lesnevich had done.
23               And I was just sort of interested
24   because they were making -- I mean, this is really
25   thirdhand.  This is I'm looking at what Mr. Blanco
```

Page 62

1                        Tytell

2    says about what Mr. Lesnevich says about some

3    handwriting.

4           Everything in this discussion was all

5    about page 1, and I'm saying, Well, this is all

6    very interesting.  There's a critique -- a

7    criticism of Mr. Lesnevich that his illustrations

8    appear to be made from a printout.

9           And there was discussion of the yellow

10   security dots that appear on the output of color

11   copiers and color printers, and therefore we know

12   that this was done using a printout rather than

13   the original electronic file.

14          And I said, Well, okay, that's all very

15   nice as a discussion.  I'm not going to bother

16   with any color printouts.  I have access to the

17   original electronic files.  I will use them.  And

18   those are what I used.

19          Also, as I said, everybody was talking

20   about page 1, and I'm wondering what happened to

21   page 2.  The only discussions of page 2 are -- or

22   the handwriting on page 2 are Mr. Blanco talking

23   about the Mark Zuckerberg signature, not talking

24   at all about the date next to the Mark Zuckerberg

25   signature, and not even mentioning that Paul

```
 1                    Tytell
 2    Ceglia was in any way involved with anything on
 3    the second page.
 4              So my curiosity was piqued, and I
 5    looked.  And what I found was quite interesting, I
 6    felt.
 7         Q.    Have you provided a report to the
 8    defendants regarding those findings?
 9         A.    No.
10         Q.    Have you communicated those findings to
11    them verbally?
12         A.    Yes.
13         Q.    When was that conversation?
14         A.    Well, it would be more than one
15    conversation.
16         Q.    When did you first communicate this to
17    them?
18         A.    After seeing the -- well, obviously
19    after reading the early June reports of
20    Messrs. Blanco and Stewart.  So I'm trying to
21    remember, I think those came in around the first
22    week of June -- is that correct, sir? -- the date
23    on Mr. Blanco's declaration?  Is that like
24    around --
25         Q.    There were declarations filed June 4th
```

1                        Tytell

2   by Mr. Blanco and Mr. Stewart.  They had filed

3   previous declarations, but the June 4th one I

4   think is the one where Mr. Blanco -- well, he

5   talked about the handwriting in two different

6   declarations, one of which was June 4th, the most

7   recent.

8        A.    Okay, so --

9        Q.    That's the one that --

10       A.    Yes, sorry?

11       Q.    Is that the one you read, June 4th,

12  that prompted you to do this analysis?

13       A.    Yes, Mr. Blanco and Mr. Stewart's

14  declarations, both.  I reviewed them -- let's say

15  they're dated June 4th.  I don't know when I

16  actually received them, a couple of days later at

17  the most.  And then I started reading them.

18            I'm pretty -- I will acknowledge people

19  have told me that I tend to be a bit wordy, but I

20  was impressed with their declarations and the

21  detail that they went into.  I think one was 90

22  pages and the other was 99.

23            And so it took me a while to go through

24  them and to consider each of the various issues

25  that they addressed, but, you know, given a number

1                           Tytell

2    of days, a week or two or something thereafter,

3    when I finally got into this.

4              So I can't give you an exact date, but

5    it would be sometime in the weeks between, say,

6    the second week of June and today that I've had

7    these discussions.  I don't really recall when the

8    first one was.

9         Q.    Have you been asked to provide a report

10   on these results?

11        A.    No, I have not been asked to provide a

12   report.

13        Q.    And let's talk about what was a pretty

14   detailed answer to my question, which I

15   appreciate, and is it your conclusion, then, from

16   that analysis that the signature on page 2 of the

17   paper contract, the "work for hire" contract that

18   you analyzed, is actually not an original -- I'm

19   talking about Paul Ceglia's signature -- is not an

20   original signature but a tracing of his signature?

21   Is that your position?

22        A.    Well, when you say "original

23   signature," I'm going to ask you to sort of be a

24   little more specific about that term, because

25   that's kind of a -- you're getting into my

```
 1                       Tytell
 2   term-of-art department.
 3        Q.    Well, tell me how you would describe a
 4   signature that is authentic, that you determined
 5   after you looked at it the person actually wrote
 6   their signature, good line quality, et cetera, it
 7   wasn't a tracing.  What would you call it?  What
 8   is your term?
 9        A.    Okay, thank you.  I would describe that
10   as a freely, naturally written signature by the
11   writer of the knowns, in that case the knowns
12   being the Paul Ceglias of the knowns.  We're
13   discussing his signature.
14        Q.    Did you have access to any of Paul
15   Ceglia's knowns other than that signature on the
16   specification agreement?
17        A.    That was the only original ink
18   signature that I had access to.
19        Q.    Did you have access to any photocopies
20   of his signature?
21        A.    I had --
22        Q.    Or copies --
23        A.    I'm sorry, please.
24        Q.    I didn't mean to use the word
25   "photocopy" necessarily as a restrictive.
```

```
 1                        Tytell
 2            Did you have access to any other
 3   examples of his signature?
 4      A.    I guess in the twenty-first century we
 5   should just say images, whether they're produced
 6   on a copy machine, a scanner, or whatever.
 7            Yes, I did have access to some images
 8   of Mr. Ceglia's signatures that appeared on
 9   documents that had been filed in this case that
10   were part of the -- I don't know if it's the
11   record, the filings, the documents that have
12   numbers at the top, like Tytell 1 has a document
13   number 330 at the top.
14      Q.    Is it your opinion, then, to use your
15   terminology, that the signature on -- Paul
16   Ceglia's signature on page 2 of the paper contract
17   that you analyzed July 14th, starting July 14th,
18   is not a freely written, natural signature; it's a
19   tracing?  Is that your conclusion?
20      A.    Well, it's -- that's two different
21   things that you're asking about.  Number one, it
22   is not a freely and naturally written signature.
23   That is, I think, self-evident.  We've just passed
24   the 4th of July and Declaration of Independence.
25            I think that is self-evident from the
```

1                         Tytell

2    signature itself of -- even from the images that

3    were scanned or the photographic images taken by

4    either Mr. Osborn or Dr. Aginsky, or those that

5    were used, for instance, by Mr. Blanco in his

6    report.

7              The line quality is terrible.  It's not

8    a freely and naturally written signature of the

9    kind typically -- or of the kind seen in the Paul

10   Ceglia signature on the specification document

11   written the same day.  You use that as an example

12   of what Paul Ceglia signs like.

13              Sorry, that's a badly constructed

14   sentence.

15              But you know how he signs by looking at

16   his signatures, for instance, the original

17   signature dated the exact same day on page 6 of

18   the specification document, and you see a nice,

19   freely written signature, and the signature on

20   page 2 of the "work for hire" paper document does

21   not conform to that.  It is not that kind of a

22   freely written, natural signature.

23              It is -- now, to the second part of the

24   question, it is a signature on page 2 of the "work

25   for hire" document, that line quality, that slow-

1                         Tytell

2    drawn appearance, is a hallmark of simulated

3    writing.  It is a hallmark of a slow-drawn line

4    quality, typically of carefully copied signatures,

5    be they simulations looking at something next to

6    where you are or tracings.

7                The reason that it moves to being a

8    tracing is the conformity of that signature, the

9    level of conformity, although it is not total

10   precise conformity, such as one would see in a

11   photocopy transfer or a scanned cut-and-paste

12   transfer.

13               But the level of conformity with the

14   signature on the images from mid 2010 is such that

15   it would be considered a tracing.  As to who

16   traced it, that is something that you usually are

17   unable to tell.  I can't tell if it was traced by

18   the man in the moon, John Doe, Paul Ceglia

19   himself, anybody else.

20        Q.    Did you do a similar comparison to Mark

21   Zuckerberg's signature on page 2 of the "work for

22   hire" agreement with Mark Zuckerberg's signature

23   on whatever page it was on the software

24   specification agreement, those two paper

25   documents?

                            Tytell
1
2        A.    That would have been page 6.  Right
3    next to the Paul Ceglia signature is where the
4    Mark Zuckerberg signature appears.  And yes, I
5    did.
6        Q.    And what was the result of that
7    analysis?
8        A.    I think I had mentioned that earlier is
9    that the Mark Zuckerberg signature on page 6 does
10   not have the same high level of line quality seen
11   in the Paul Ceglia signature on page 6.
12            I don't want to use "page 6" because
13   there's a newspaper in town here, the New York
14   Post, that has a Page Six with -- I don't know if
15   you've ever seen it, but it's a very specific term
16   of art to that.
17            So on the sixth page, the last page,
18   the signature page of the specification document,
19   the Mark Zuckerberg signature on that page,
20   Mr. Zuckerberg just doesn't have the same kind of
21   writing speed and style that you see in the
22   signature on that page of Mr. Ceglia.  But the
23   line quality there is noticeably better than the
24   line quality on page 2 of the paper "work for
25   hire" document.

1                          Tytell

2              And the comparison of the Mark

3    Zuckerberg signature on page 2 of the paper

4    document with the Mark Zuckerberg signature on the

5    page 2 of the images from mid 2010 shows the same

6    kind of qualitative and quantitative deviations

7    that are seen in the Paul Ceglia signature

8    comparison of the paper document to the mid 2010

9    document and similarly with the date next to the

10   Mark Zuckerberg signature, the 4.28.03.

11             Apparently Mr. Zuckerberg uses dots or

12   periods rather than diagonal lines as his date

13   separators.  But the comparison of the numerals in

14   that date next to the Zuckerberg signature gives

15   the same result.

16             All -- each of the four elements that

17   appear on page 2 of the paper "work for hire"

18   document, the Zuckerberg signature, the dates next

19   to the Zuckerberg signature, the Ceglia signature,

20   the date next to the Ceglia signature, each of

21   those four elements compared individually letter

22   by letter, line by line, character by character,

23   as a whole and as a collective whole of those four

24   elements, when doing a comparison of the writing

25   on page 2 of the "work for hire" paper document

1                        Tytell

2   with the writing on page 2 of the "work for hire"

3   mid 2010 electronic document, the results are all

4   very consistent, and the results are all

5   indicative of a tracing.

6          Q.    So is it the same conclusion regarding

7   Mark Zuckerberg's signature, that his signature on

8   page 2 of the paper document, the "work for hire"

9   contract, is also a tracing, in your opinion?

10         A.    Yes.  And again, I don't know who

11  traced it.  Mr. Zuckerberg could have traced it

12  himself, Mr. Ceglia could have traced it, John Doe

13  could have traced it.  Obviously you'd have to

14  have access to that sheet of paper to be able to

15  do it, but that would be pretty much the only

16  limitation.

17         Q.    Do you intend on producing a report

18  with these results to provide to the defendant?

19         A.    Not at the moment.

20         Q.    Did you take notes while you were doing

21  this analysis?

22         A.    I -- not so much notes as working

23  images.

24               I'm sure you're familiar with the

25  technique employed by Mr. Blanco in one of his

1                          Tytell

2      exhibits where he took one image and then

3      superimposed it on the other.  So he did it.

4              I'm not sure that -- actually, I am

5      sure that I didn't do it exactly the same way he

6      did in terms of the -- well, not to get lost in

7      the weeds of Photoshop technicalities.

8              But I did a similar kind of exercise of

9      taking one image and superimposing it on another

10     image of these various elements that I've spoken

11     about on both page 2 and page 1.

12             So I have lots of those images, which

13     essentially constitutes notes, as well as some

14     other images that I prepared that are to compare

15     and contrast the actual formations of, let's say,

16     the Ceglia signature on the paper document with

17     the mid 2010 electronic documents -- electronic

18     images, also some comparisons of different line

19     segments and portions of the signatures of

20     Mr. Ceglia to compare and contrast the line

21     quality of the Ceglia signature from page -- from

22     the last page, the signature page, of the

23     specification with the Ceglia signature on page 2

24     of the paper "work for hire" document.

25                 MR. SOUTHWELL:  Mr. Boland, we have

1                    Tytell

2       this document 262-2 that you asked for.  I

3       don't mean to interrupt, but I just wanted to

4       let you know we have that, if you wanted it.

5            MR. BOLAND:  Very well.  Thank you.

6       We'll get that in a second.

7       Q.    Mr. Tytell, in your business do you

8   carry liability insurance for the work that you do

9   like the work you have done in this case?

10           MR. SOUTHWELL:  Objection.

11           You can answer.

12      A.    Oh, I'm sorry, you objected.  I didn't

13   know if I could answer.

14           MR. SOUTHWELL:  Generally you can

15      answer unless I direct you not to.

16           THE WITNESS:  Okay.

17           No.

18      Q.    And are you aware if any of the

19   experts, while the analysis of the two-page

20   document on July 14th was occurring, if any of

21   them touched that document with their bare hands?

22      A.    Yes.

23      Q.    Do you know who touched it with their

24   bare hands during the examination?

25      A.    I did.

```
 1                          Tytell
 2        Q.     Did you also touch it at times with
 3   gloves on your hands?
 4        A.     Yes.
 5        Q.     And what dictates for you when you
 6   would touch a document that you're examining with
 7   gloves on versus times that it would be
 8   appropriate to touch it with no gloves on?
 9        A.     Well, really nothing in particular.
10   Most documents that I've examined I haven't worn
11   gloves.
12        Q.     Were you aware of the types of analysis
13   that the other experts were going to do on that
14   document after July 4th -- I'm sorry, July 14th
15   when you first had it?  Did you know what was
16   going to happen afterwards as far as the
17   defendants' experts' analysis?
18        A.     To which experts are you referring?
19        Q.     Any of the other experts after you.
20   Did you talk -- did you know -- not talk.
21             Did you know about what their analysis
22   would be for any of the defendants' experts after
23   you?
24        A.     Well, after me I knew that an ESDA
25   analysis was going to be performed, and I
```

1                         Tytell
2    understood that ink samples would be taken for
3    chemical analysis.
4         Q.    And what chemicals did you understand
5    they were going to analyze in those ink samples?
6         A.    I didn't.  Well, the chemical
7    constituents of the ink, which would include the
8    dye stuffs, the dyes that were present, and I
9    didn't know if they were going to also examine any
10   of the resins or solvents or other constituents of
11   the inks.
12        Q.    Do you know what those components or
13   constituents of the inks were?  Did you know what
14   those were on July 14th when you started -- at the
15   time when you were handling the document sometimes
16   without gloves?
17        A.    I did not --
18             MR. SOUTHWELL:  Objection to the
19        form -- or objection, mischaracterizes,
20        rather.
21             You can answer.
22        Q.    I can ask to have a clear answer.  On
23   July 14th when you first were given the document,
24   did you know what chemical -- all the chemical
25   components of the ink were that the other experts

```
 1                        Tytell
 2    were going to analyze?
 3         A.    No.
 4         Q.    Have you read Mr. LaPorte's report?
 5         A.    The LaPorte report?  No.
 6         Q.    Yes.
 7         A.    Yes, no, I have not read the LaPorte
 8    report.
 9         Q.    Okay.  And I'm talking specifically
10    about the declaration/report that he filed
11    attached to the motion to dismiss filed by the
12    defendants, that report.  Have you read that?
13         A.    You're going to have to give me a date
14    because -- I mean, I totally understand that for
15    you a document -- a document examiner's report is
16    something that you stick on the back of legal
17    arguments as an exhibit.  But for me the brilliant
18    legal arguments by either side are the
19    miscellaneous pieces of paper that are on top of
20    the document examiner's report.
21              So if you could give me a date for the
22    document you're referring to or maybe a number so
23    that somebody could show it to me, then I would be
24    able to answer.  But I just can't understand
25    the -- I can't register what document you're
```

1                          Tytell

2     talking about based upon it being attached to some

3     kind of a legal paper.

4          Q.    Do you know whether the report that

5     I've had you identify as Tytell 1, do you know

6     whether that document was ever attached to

7     anything that was filed in this case?

8          A.    Yes.

9          Q.    What do you understand that it was

10    attached to?

11         A.    Some kind of a filing.  I don't know if

12    it was a motion, a response, a counter response, a

13    reply to a response to a motion to a counter

14    motion.  I don't know.  These things are like the

15    Russian grandma dolls.  They just go in layers

16    like an onion.

17              So I couldn't tell you what the

18    document was to which this is an Exhibit F.  I'm

19    sure that if I got the whole stack of paper and I

20    read the little lines to the right of the heading

21    I would be able to tell you what it was.  Whether

22    or not I actually understood what those words

23    meant is something I couldn't promise you at this

24    time.

25         Q.    Have you read any declarations filed by

```
 1                    Tytell
 2  Gerald LaPorte in this case?
 3       A.    I don't believe so.
 4       Q.    Have you been involved in the past with
 5  drafting ASTM standards?
 6       A.    I have.
 7       Q.    Do you know if there are any ASTM
 8  standards which talk about handling documents
 9  during examination and whether gloves should be
10  worn by the examiner or gloves are optional?
11       A.    Could you refer me to a particular
12  standard?
13       Q.    No, sir, I'm just asking if you know of
14  a standard; if you don't, that's fine.  I'm just
15  asking if you know of a standard that talks about
16  the wearing of gloves when you're examining a
17  document.
18       A.    I think that there are some standards
19  which say -- in discussing the handling of a
20  document, is that what you're referring to?
21       Q.    I'm asking if you know if there's an
22  ASTM standard regarding whether you should wear
23  gloves or not when you're examining a document.
24  That's all, if you know that.
25       A.    I don't think that -- I cannot recall
```

1                          Tytell

2    standards that specifically say, Thou shalt wear

3    gloves.  I believe to my recollection now -- and

4    again, I would like to look at the standards

5    before giving you a definite answer.

6                I think that there's a generalized

7    caution to handle the documents with care and that

8    there may be an e.g., a for instance, a gratuitous

9    example of for instance with gloves.

10               And I do recall that there was an issue

11   of -- at one time the wording was with cotton

12   gloves or cloth gloves, and then it was changed to

13   not use cloth gloves.

14               So gloves are not always a good things.

15   Gloves can sometimes did deleterious.

16        Q.    What kind of negative effects can the

17   wearing of gloves have when handling a document

18   during an examination?

19        A.    Well, the wearing of cloth gloves, some

20   experimentation has shown, can -- I don't want to

21   use a term like "mess up" but can have a

22   deleterious effect on the document, disturbing the

23   paper surface such that you don't -- that you

24   would not be able to subsequently visualize latent

25   impressions through the use of technology such as

1                        Tytell
2     the ESDA machine -- and the ESDA, capital E,
3     capital S, capital D, capital A, electrostatic
4     static detection apparatus.
5                  That kind of machine is used, as you
6     may be aware, to determine latent visual
7     impression on documents, indented writing.  And
8     there had been some research done, paper
9     presented, that suggested that cloth gloves can be
10    harmful and can interfere with subsequent ESDA
11    examinations.  So the ASTM recommendation
12    regarding cloth gloves was withdrawn.
13        Q.    What kind of damage can come to a
14    document handling it during an examination with
15    latex gloves like were used in this case?
16        A.    I would -- I don't know.  Are you
17    asking me to speculate on this topic, because --
18        Q.    No, only if you know.  Are there any --
19    is there any literature or any knowledge or
20    experience you have as to the kind of damage that
21    can be done to a document using latex gloves like
22    were used in this case?
23        A.    Well, I'm not sure that the same kind
24    of latex gloves were used universally in this
25    case, first of all.  So can you be a little more

                              Tytell
1
2    specific, please?
3         Q.    Do any type of latex gloves, wearing
4    them on your hands and handling a document, have
5    you had experience with that has caused damage to
6    a document?
7         A.    I have not had experience, but I have
8    heard that some people have said that the kind of
9    powder that is used on certain kinds of latex
10   gloves might be problematic.  I have not had
11   personal experience in that area.
12        Q.    But during portions of the examination
13   of the document in this case, you did wear latex
14   gloves; correct?
15        A.    Correct.
16        Q.    Do you feel that you damaged the
17   document while wearing those latex gloves and
18   handling it?
19        A.    Could you define "damage," please?
20        Q.    Did you contaminate it with some
21   substance that wasn't originally on the document
22   by handling it with latex gloves?
23        A.    Like latex, for instance?
24        Q.    Any substance at all.  You're the
25   expert.  I don't know.  Is there any substance you

1                        Tytell

2    could have contaminated a document with by

3    handling it with latex gloves?

4         A.    I have no idea.  You're asking me to

5    speculate here.  I would be happy to speculate if

6    that's what you want.

7         Q.    No, I'm just saying do you know for a

8    fact whether you did contaminate the document by

9    handling it with latex gloves.  Do you know?

10        A.    I do not know.

11        Q.    What is the purpose -- why did you

12   choose at portions during this examination to wear

13   latex gloves while handling the document?

14        A.    It seemed like a good idea at the time.

15        Q.    Why did it seem like a good idea?

16        A.    An excess of caution, I think.

17        Q.    What were you cautioning against by

18   wearing latex gloves?

19        A.    Leaving my fingerprints on the

20   document.  That's pretty much the reason people

21   wear latex gloves in examinations.

22        Q.    Were you concerned about transferring

23   any contaminants from your fingers, other than a

24   fingerprint, to the document?

25        A.    No, I generally approach not just the

1                          Tytell

2    court but the documents with clean hands.  I --

3    the problem with fingerprints in document

4    examination is that the ESDA machine develops

5    fingerprints.

6               In fact, the original research in the

7    1970s in England that led Messrs. Foster and

8    Freeman to the discovery, if you will, for ESDA

9    for the development of imprinted writing, the

10   original purpose for that research was to develop

11   fingerprints on paper.

12              This is in the midst of what is

13   euphemistically referred to as the troubles in

14   northern Ireland which also spilled over

15   considerably into England.  And they were -- the

16   home office in England had a research project

17   funded to develop fingerprints on paper, and there

18   were many, many different techniques that were

19   developed during this time period.

20              Among them was they were trying to

21   develop it with the ESDA machine.  And the people

22   who were working on it said, Well, you know, we're

23   actually getting some results on fingerprints, but

24   we keep getting this indented writing that is sort

25   of interfering with the fingerprints.

1                       Tytell

2               And when they told that to the right

3    person, who realized -- it wasn't quite like

4    Fleming discovering penicillin, but they realized

5    they had stumbled onto something extremely

6    interesting.

7               Then they redirected their efforts to

8    the development of latent writing as being

9    potentially more useful than the quality of

10   fingerprints they were getting from that side of

11   the research.

12              So it has been known virtually from the

13   very beginning that the ESDA technology, the ESDA

14   machine, will develop fingerprints, and you don't

15   want those fingerprints to interfere with your

16   subsequent ESDA examinations.

17              And that's why document examiners -- I

18   mean, other people in the forensic world have

19   other reasons for doing everything.  But that's

20   the reason that we're essentially watching out for

21   fingerprints is the problem of fingerprints on

22   ESDA.

23       Q.    Do you know of any common household

24   products that have chemicals in them that could be

25   transferred to a document?  For example, if you

```
 1                        Tytell
 2    had lotion on your hands and you touched a
 3    document, do you know if that can transfer
 4    contaminants to the document?
 5         A.     What kind of lotion are you referring
 6    to as the household product?
 7         Q.     Any kind of hand lotion.  As a matter
 8    of your years and years of experience handling
 9    documents, have you ever come across a scenario
10    where someone has something on their hand --
11    lotion or shampoo remnants or whatever -- and they
12    handle a document like that and transfer some of
13    that material to the document?  Can that happen?
14         A.     Well, I do recall a case that was shown
15    to me as a "hey, look at this, this is so cool
16    kind" of case at the Scotland Yard lab back I
17    guess it would be in the 1980s, in the early days
18    of laser work with fingerprints, that they had
19    found that a particular kind of hand cleaner used
20    by car mechanics left a residue on the fingers
21    that could be transferred to other things like
22    steering wheels, guns, paper as well, and that
23    this particular mechanic's hand cleaner did have a
24    strong fluorescence when illuminated with a
25    particular wavelength from a -- I'm trying to
```

1                          Tytell

2     remember if it was a copper vapor laser or a

3     frequency double Nd: YAG laser, anyway, the kind

4     of lasers they were using back then.  It worked

5     out that this worked very well.  So that would be

6     one kind of an instance.

7                (Time noted:  1:00 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2          A F T E R N O O N   S E S S I O N

3               (Time noted:  1:32 p.m.)

4               MR. SOUTHWELL:  I wanted just to make

5          clear you've gone about two hours, and you had

6          asked for and were given the rate for a half

7          day, which is three and a half hours.  So just

8          to keep that in mind.

9               MR. BOLAND:  Yes, I will.

10   P E T E R   V.   T Y T E L L ,

11          resumed as a witness, having been previously

12          sworn by the notary public, was examined and

13          testified further as follows:

14   EXAMINATION CONTINUED BY

15   MR. BOLAND:

16          Q.    Mr. Tytell, can you hear me okay?

17          A.    Yes, at the moment the technology is

18   being good to us.

19          Q.    Okay.  Good.

20               I wanted to go back just a bit about

21   your comment about you come to the court the same

22   way you handle documents, with clean hands.  Do

23   you remember that?

24          A.    Yes.  Excuse me, wait one moment,

25   please.  I'm not sure that is what I said exactly.

```
 1                        Tytell
 2        Q.    Well, let me qualify it, then.  It's
 3   true that while you were handling the document in
 4   this case starting July 14th and for the several
 5   days that you were examining it you washed your
 6   hands regularly to try and be cautious about
 7   contaminating the document?
 8        A.    I wash my hands regularly whether or
 9   not I'm examining documents.
10        Q.    But I'm focused on July 14th and the
11   days while you handled the document.  You washed
12   your hands during that time regularly?
13        A.    I washed my hands when they were -- if
14   they were dirty or if I had been to the lavatory.
15        Q.    And what kind of soap did you use?
16        A.    The soap that was provided there.
17        Q.    And did you wash your hands at the
18   hotel in the morning before you came over to
19   handle the document, I assume?
20        A.    Right.
21        Q.    What kind of soap did you use there?
22        A.    Bar soap.
23        Q.    Do you know what the ingredients were,
24   like specifically the chemical ingredients of the
25   soap at the hotel?
```

1                         Tytell

2        A.     No.

3        Q.     Do you know what the ingredients were

4    of the soap that was provided in the lavatory at

5    the law firm where you were examining the

6    document?

7        A.     No.

8        Q.     Are you aware of whether either one of

9    those soaps contained a chemical called

10   phenoxyethanol?

11             MR. SOUTHWELL:  Objection.  He just

12        said he doesn't know the ingredients.

13       Q.     Do you know what phenoxyethanol is,

14   sir?

15       A.     I've heard the term before.

16       Q.     What do you understand it to be?

17       A.     A solvent.

18       Q.     Do you know if that solvent is found in

19   soaps?

20       A.     No, I don't.

21       Q.     Do you know any other -- do you know

22   where that solvent is found in products that are

23   available to consumers?

24       A.     It is my understanding that it is found

25   in certain ballpoint pen inks.

1                          Tytell

2       Q.    Other than inks do you know of any

3  other products that contain that component?

4       A.    I do not know of any others, but from

5  your questioning I understand that you might think

6  there are.

7       Q.    Well, it's not about what I think.  I'm

8  just wondering what you knew.

9       A.    No, I'm only familiar with that

10 chemical based upon my understanding that it is

11 used in certain inks.

12      Q.    When we talked earlier, you mentioned

13 one of your concerns that causes you to be

14 cautious when handling documents is to try and

15 avoid putting a fingerprint on a document.  Do you

16 recall that?

17      A.    Yes, because of the effect that

18 fingerprints can have on ESDA work.

19      Q.    And it's true, sir, that by putting a

20 fingerprint on a document that happens by causing

21 oils from the skin, in this case it would be your

22 skin if you had accidentally done it -- I'm not

23 saying you did or didn't -- but oils from the skin

24 to be transferred to the document and that makes

25 the imprint of the fingerprint; right?

Page 92

1                         Tytell
2          A.    I am aware that that is one way that
3    fingerprints can occur.
4          Q.    What are other ways they can occur?
5          A.    Well, I guess you're limiting it to
6    documents; right?
7          Q.    Yes, what are other ways fingerprints
8    can appear on documents besides transferring the
9    oil from someone's fingertips to the document?
10          A.    I was thinking about what they're
11    called where a fingerprint is left in a soft
12    substance such as soft wax or clay.  They're
13    called plastic fingerprints sometimes.  I didn't
14    realize you were limiting it to only documents.
15          Q.    You earlier talked about a tracing as a
16    means by which the signatures for both Paul Ceglia
17    and Mark Zuckerberg now appear on the second page
18    of the "work for hire" document.  Do you recall
19    that testimony?
20          A.    I recall discussing tracings and the
21    reasons to understand that this document has all
22    the indicia of having been a tracing, yes.
23          Q.    Is it your conclusion from your
24    analysis that those two signatures on page 2 of
25    the paper document, the "work for hire" document,

1                           Tytell

2    were created by tracing?

3         A.    Everything I've seen to date points in

4    that direction.  I haven't seen anything contrary

5    to that, but I would be interested in some further

6    inquiry to determine whether or not that would be

7    a final definite determination.

8         Q.    And how is a tracing done, in your

9    experience?

10        A.    Well, there are a number of different

11   ways that have been discussed in the literature

12   for doing tracings.  Would you like a catalog of

13   those?

14        Q.    Well, first, how many different ways

15   are there to make a tracing of a signature?

16        A.    I would suggest that's probably almost

17   infinite.

18        Q.    Well, would one of those be someone

19   putting the signature of the writing they want to

20   trace next to a blank piece of paper and then just

21   trying to sort of mimic what they're seeing on the

22   other piece of paper on this new blank piece of

23   paper?  Is that considered a tracing?

24        A.    No.  That would be considered a drawn

25   simulation or a copied simulation.  It's a subset

1                        Tytell

2    or subcategory of free-hand simulations where --

3    another one would be if I just remembered I've

4    seen a signature, I'll remember what it looks

5    like, I'm going to try and imitate it from memory.

6              I've seen a signature, it's sitting

7    right here next to me, I'm going to copy it

8    looking back and forth from the model signature

9    that I'm copying to the page where I'm writing

10   what I see on the signature.

11             There may be elements of practice

12   involved in this kind of simulation, you know, sit

13   and practice it for three weeks, see how good you

14   get at it.

15             These are all different kinds of

16   simulations, but that would be distinct

17   methodologically from a tracing or what is called

18   a tracing.

19        Q.   Well, I'm a layperson, so tell me if

20   this definition of tracing is what you're talking

21   about, and that is someone having the signature

22   they want to trace on a piece of paper and then

23   laying the other piece of paper blank on top of

24   that and trying to look through the top piece of

25   paper to the one underneath and actually trace out

1                        Tytell
2    what they're seeing on the underneath page.
3              Is that what you mean by "tracing"
4    generally?
5         A.    Generally, yes, that is one form of
6    tracing, one of many.
7         Q.    Are there any forms of tracing that do
8    not involve one piece of paper on top of the
9    other, sort of like what I described?
10        A.    Yes.
11        Q.    What form of tracing took place in this
12   case?  What's your opinion there?
13        A.    I don't know which of the many
14   possibilities you described -- just using the
15   particular methodology that you mentioned
16   previously, the model signature -- is it okay to
17   use this term of art, the "the model signature,"
18   the page that has the signature that you want to
19   copy?  Okay?  Can you I use that so you'll
20   understand what I mean?
21        Q.    Yes.
22        A.    You said you have a piece of paper with
23   a signature on it.  Let's just call that the model
24   signature.  That, of course, could be a real
25   signature, an ink signature, or it could be a

1                       Tytell

2     photocopy or anything else.  But it's on a

3     physical piece of paper.

4              So you say there's only one piece of

5     paper on top of the model signature piece of

6     paper.  You can have two pieces of paper on top of

7     the model signature piece of paper.  You're saying

8     you're looking through the top piece of paper, the

9     one you're actually writing on in creating the

10    tracing.  It's not all that easy.

11             It's much easier if you have a light

12    source behind your model signature so that it

13    can -- it can help you see through that.  And that

14    light source could be a light box or that light

15    source could be the window.

16             Actually you can see that in a movie

17    called the Apprenticeship of Duddy Kravitz.  If

18    you ever happen to see that movie, there's a scene

19    there where he traces a signature holding the

20    model up to the window and putting the -- I think

21    it's a check endorsement over it.

22             So that's another way to do it, to have

23    a light source from behind.

24             Nowadays you could probably have an

25    image of a signature on a computer screen and

1                              Tytell

2     trace from that.  And that's still, you know, one

3     page on top of another.

4          Q.    What is your conclusion about how the

5     tracing occurred in this case?

6          A.    Carefully.

7          Q.    I mean, which one of those methods?

8          A.    I have not made a determination about

9     that.  I am just of the opinion it's a careful

10    tracing.  There are also -- there's another method

11    where you can project the signature from above

12    onto a piece of paper, and then it doesn't matter

13    what's underneath the page where you're tracing

14    the signature because the signature is projected

15    from above.  And there were a number of different

16    devices that can be used for that.

17         Q.    Can you identify for me the model

18    signature in this case that you believe was used

19    to complete the tracings of Paul Ceglia's

20    signature specifically?  Let's just go on that

21    one.

22         A.    Well, as I said before the break, the

23    quality and quantity of the agreements and the

24    quality and the quantity of the differences point

25    to the signature of Paul Ceglia on page 2 of the

1                          Tytell

2    mid 2010 images of the "work for hire" document,

3    such as the copy attached to the complaint as

4    being either the model for the signature on page 2

5    of the paper "work for hire" document or another

6    tracing made from the same model.

7              And that document does exhibit, even

8    from the copy we see, some better line quality

9    features than are apparent in the Paul Ceglia

10   signature on page 2 of the paper document.

11        Q.   The document from which -- the model

12   signature from which the tracing was made of Paul

13   Ceglia's signature that now appears on the "work

14   for hire" agreement, according to you, is the page

15   2 of the document that was attached to the

16   complaint in this case, or the amended complaint?

17        A.   Page 2 -- well, the image, the copy

18   that was there, could have been used, a printout

19   of the TIFF file sent by Ceglia to Argentieri,

20   whatever document it was that was scanned to

21   create that TIFF file or whatever document was

22   copied or printed out to create the attachment to

23   the complaint.

24              You know, there's a plethora of

25   possibilities all subsumed in this idea of a mid

                              Tytell

1

2    2010 document.  And as I said, more than once, I'm

3    afraid -- I am getting a bit repetitious here --

4    as I said previously, that signature on the mid

5    2010 document or copies thereof would be a model

6    signature or another tracing or copy made from the

7    same model.

8         Q.    Well, where's the model -- if that is a

9    tracing made from another model, where is that

10   model for that tracing of the 2010 -- mid 2010 one

11   that you're talking about?

12        A.    I don't know.  It could be on the

13   document that I've seen which people call the

14   StreetFax contract.  There's another --

15        Q.    I'm sorry, go ahead.

16        A.    No, I didn't mean to interrupt you.

17        Q.    Did you compare the second page of the

18   so-called StreetFax contract with any other second

19   pages of the "work for hire" contract either in

20   paper or a digital image of it?

21        A.    Yes.

22        Q.    And what was the result of that

23   comparison?

24        A.    It agrees with the second page of the

25   mid 2010 TIFF files, et cetera, et cetera.  I

```
 1                        Tytell
 2   mean, we have to get some kind of I guess a
 3   shortcut phrase for all of that stuff from the
 4   attachment to the complaint and the TIFF file sent
 5   by Mr. Ceglia to Mr. Argentieri.  So if you
 6   understand when I say the mid 2010 images, that's
 7   what I'm talking about, if that's okay with you.
 8        Q.    Yes.
 9        A.    Okay.  Good.  All right.  Page 2 --
10   yes, I'm sorry?
11        Q.    Let me ask some specifics.  Does page 2
12   of the StreetFax contract, based on your analysis,
13   make match -- not match.  Is it the same as page 2
14   of Mr. Osborn's scan that you reviewed?
15             MR. SOUTHWELL:  Objection.  Are you
16        asking about the signature still or are you
17        asking a broader question?  I'm not sure I
18        understand the question.
19        Q.    I'm just asking the signature on page 2
20   of the so-called StreetFax contract of Paul
21   Ceglia, how does that compare to Paul Ceglia's
22   signature as it appears on page 2 of Mr. Osborn's
23   scan of the "work for hire" document.
24        A.    It differs -- okay, page 2 of the
25   tracks differs from page 2 of the Osborn scan of
```

1                         Tytell

2    the paper document qualitatively and

3    quantitatively the same way, to the extent it's

4    possible to see, as the page 2 Paul Ceglia

5    signature from the mid 2010 images differs from

6    the Ceglia signature on the page 2 of the Osborn

7    scans.

8          Q.    I'm asking the same question about

9    Mr. Zuckerberg's signature on the "work for hire"

10   paper contract that you started analyzing July

11   14th, what -- is it the same set of documents that

12   you believe are the potential model signatures

13   from which that tracing of Mr. Zuckerberg's

14   signature was created?

15         A.    I'm sorry, you lost me here.

16         Q.    Mr. Zuckerberg's signature on page 2 of

17   the "work for hire" agreement that you analyzed on

18   July 14th, starting on July 14th, you testified

19   that you believe that's also a tracing, not his

20   original signature, or his free-hand natural

21   signature; right?

22         A.    That's what all of the indicia point

23   to, yes.

24         Q.    And what was the model signature used

25   to create the tracing of Mr. Zuckerberg's

1                     Tytell

2    signature on that two-page paper document you

3    analyzed starting July 14th?

4         A.    Again, all of the features that I've

5    been able to see so far point towards the Mark

6    Zuckerberg signature on page 2 of the mid 2010

7    images as being the model for that signature or

8    another tracing from a common model.

9         Q.    In your opinion was the StreetFax

10   document legible enough to make a scientific

11   conclusion about the handwriting?

12        A.    To the extent that it was possible to

13   see what could be seen, it did agree very closely

14   with the features that I have outlined here.

15        Q.    Do you know if there is any other

16   expert for the defendants that have analyzed any

17   handwriting on the "work for hire" agreement in

18   this case?

19        A.    Yes.

20        Q.    And who else do you know has done that?

21        A.    I don't know about the "else" part,

22   since I'm not sure that I've actually done it to a

23   completion point and I don't believe I've done it

24   because I was asked to do it.  But the -- I

25   believe that Mr. Lesnevich has looked at the

1                         Tytell

2    handwriting issues regarding the "work for hire"

3    contract.

4         Q.    Do you know if he's analyzed the

5    signature of Paul Ceglia on that contract?

6         A.    I don't know what he's done regarding

7    page 2 of the document.  I'm aware of what he has

8    done regarding page 1.

9         Q.    Other than Mr. Lesnevich, do you know

10   of any other defendants' expert who has analyzed

11   the handwriting on either page 1 or page 2 of the

12   "work for hire" agreement?

13        A.    Could you be a little more specific

14   about who we're including as defendants' experts.

15        Q.    Gerald LaPorte?

16        A.    Okay.  And we're talking --

17        Q.    Has he done any analysis of the

18   handwriting on either of the pages of the

19   document, as you know?

20        A.    Not that I'm aware of.

21        Q.    Has Albert Lyter done that, if you

22   know?

23        A.    Not that I'm aware of.

24        Q.    Has Frank Romano done that, if you

25   know?

```
 1                        Tytell
 2       A.    Not that I'm aware of.
 3       Q.    Do you know all of the experts that the
 4  defendants have hired to analyze the document in
 5  this case?
 6       A.    I don't know if I know.
 7       Q.    Can you name all the ones that you're
 8  aware of the defendants have hired to analyze any
 9  part of document in this case?
10       A.    Well, you mentioned several:  Professor
11  Romano, Mr. LaPorte, Mr. Lesnevich, Dr. Lyter.  I
12  became aware, because I ran into him today, of
13  Dr. McMenamin.  Let's see.  LaPorte and Lyter and
14  Lesnevich.  That's the Ls.  McMenamin, Romano.
15             And I'm sure that there are a host of
16  other experts on other subjects related in some
17  way, shape, or form to this document, but I don't
18  know of them -- I don't know, you know, the names
19  of the people specifically who would be involved.
20       Q.    After you were retained, did you
21  suggest to the defendants to hire any of the
22  experts that are currently working for them that
23  you just listed?
24       A.    Let's see.  Let me just run down the
25  inventory here.  Lesnevich, Lyter, LaPorte.  I may
```

```
 1                      Tytell
 2  have given them a list of all of the people I know
 3  who do ink work in the U.S. and Canada.  I'm not
 4  sure if that's a recommendation.  It's a fairly
 5  small number.  So I would have mentioned to them.
 6  Aginsky, Lyter, LaPorte, et cetera.
 7           So, I mean, that's not really a
 8  recommendation; that's a listing of everybody.
 9           I may have also put them in contact or
10  given them the contact information for
11  Dr. McMenamin, but I don't know whether or not I
12  did.
13      Q.    When the July 14th analysis began, was
14  there any one of you experts who was, for lack of
15  a better word, sort of in charge of how the
16  examination would proceed?
17      A.    No, I don't think there was a chain of
18  command situation there.
19      Q.    I asked you before about handling the
20  document without gloves.  Other than yourself, did
21  you notice any other experts handling the document
22  without gloves on?  And if you could list them,
23  please.
24      A.    Mr. Lesnevich and not -- that's the
25  only one who I actually saw handling the document.
```

                              Tytell

1
2        Q.    Do you know if he transferred any
3   contaminants from his hands to the document when
4   he touched it?
5        A.    No.
6        Q.    Is it your opinion that the document
7   you analyzed starting July 14th in Buffalo is the
8   same document that Mr. Aginsky scanned and that
9   you saw a scan of that document?
10       A.    I believe that's so.  That's my opinion
11  as of the material that I've looked at to date,
12  that it was the same document, however, in a
13  radically different condition.
14       Q.    If you could take a look at the exhibit
15  that the Gibson, Dunn's folks were so nice to
16  print out for me, document 240-1.  If we could
17  mark that Tytell 2.
18            MR. SOUTHWELL:  You want just 240-1?
19            MR. BOLAND:  240-1 should be a two-page
20       document, is it not?
21            MR. SOUTHWELL:  Okay, yes.
22            MR. BOLAND:  I'm sorry, a three-page --
23            MR. SOUTHWELL:  Yeah, it's three pages
24       to Exhibit A and then two images of scans.  I
25       have a copy of all of 240 that we have

```
  1                          Tytell
  2         printed, but if you want me to separate it
  3         out, I can do that.
  4              MR. BOLAND:  Yes, I just wanted 240-1.
  5         That was it.
  6              (Tytell Exhibit 2, document labeled
  7         "Exhibit A", marked for identification.)
  8         Q.    Mr. Tytell, if you could identify that
  9    document for the record, please.
 10         A.    I'm looking at a document marked at the
 11    top 240-1.  The first page says page 1 of 3.  It
 12    is a three-page document, and the first page has
 13    "Exhibit A" printed on it, marked Tytell 2.  And
 14    then the next page is some kind of an image of the
 15    "work for hire" contract marked page 2 of 3 with
 16    the faded ink on the interlineation, et cetera.
 17    And then the last page, the third page of this
 18    240-1, Tytell 2, headed page 3 of 3, is some kind
 19    of an image, apparently, of page 2 with the faded
 20    ink of the signatures -- of both signatures and
 21    both dates.
 22         Q.    And is it correct, sir, that these are
 23    printouts of two scans -- two scans that you took
 24    of page 1 and page 2 of the "work for hire" paper
 25    contract?
```

1                       Tytell

2        A.    I believe that's incorrect, but I don't

3   know.

4        Q.    Let's look at the other exhibit that

5   you -- the other item there, which is -- I believe

6   it's document 238-2.

7        A.    Let's start again.  2 -- well, I have

8   in front of me two exhibits, Tytell 1 and Tytell

9   2; right?

10        Q.    Yes.  If you could --

11        A.    Tytell 2 is a document 240-1.  And

12   you're asking me about another document?

13        Q.    Yeah, there should be one other

14   exhibit, if they can hand it to you, which is

15   232-2, which was printed by Gibson, Dunn for me.

16        A.    I'm sorry, I hadn't seen that yet so...

17             MR. SOUTHWELL:  Hold on.

18             (Tytell Exhibit 3, document labeled

19        "Exhibit B", marked for identification.)

20        Q.    If you could just describe that

21   document for the record, Mr. Tytell.

22        A.    Okay.  This is marked Exhibit B, and

23   it's marked -- it's apparently five pages.  Page 1

24   of 5 says Exhibit B, and page 2 of 5 is some kind

25   of image of the "work for hire" contract page 1

                              Tytell

1

2    with the faded ink of the interlineation.  Page 3

3    of 5 appears to be the reverse of page 1 of the

4    paper "work for hire" document, and there does

5    seem to be -- yeah, you can see in the upper right

6    the darker nature of the corner there.

7              Page 4 of 5 appears to be an image of

8    the front of page 2 of the paper "work for hire"

9    document with the brownish, off-color, whatever,

10   ink of the signatures of Mr. Ceglia and Zuckerberg

11   and the dates next to them faded out ink.  And

12   then page 5 of 5 appears to be the reverse of that

13   page.

14             So that's what I have here as Tytell 3.

15        Q.   Do you recognize Tytell 3 as a printout

16   of the scan of the "work for hire" document that

17   you created when you first received it on July

18   14th --

19             MR. SOUTHWELL:  Objection.

20        Q.   -- 2011?

21             MR. SOUTHWELL:  Objection.  Calls for

22        speculation.  I'm not sure how you can expect

23        him to identify this.

24        Q.   Do you recognize those as your scans of

25   that document; "yes" or "no."

1                        Tytell
2        A.    Well, first of all, what I'm looking at
3   are not scans.
4        Q.    Printouts of your scans of the
5   documents.  Do you recognize them as printouts of
6   your scans?
7        A.    Well, my scans did not have this
8   heading at the top, Case 1:10, et cetera,
9   et cetera, page 2 of 5, page 3 of 5.  So that was
10  not part of my scan.
11       Q.    Fair enough.
12             Anything else on there that wouldn't
13  have been part of your scan?
14       A.    I have no idea whether there are
15  additions or subtractions relative to what I had
16  scanned, if these are indeed documents that in
17  some way are traced back -- or traceable back to
18  the scans that I made at -- on one of the several
19  occasions when I did scan page 1 and 2 of the
20  "work for hire" document.  It was scanned several
21  times during that day.
22       Q.    Did you provide copies of the
23  electronic files of those scans to the defendants'
24  attorneys?
25       A.    I provided the copies of the I guess

1                           Tytell

2    what you were calling them before the raw files,

3    the native format files, is that what --

4         Q.    Yes, electronic files of those scans,

5    did you provide those?

6         A.    Right, the actual -- I'm sorry, I don't

7    want to talk over you.

8              MR. SOUTHWELL:  I want to clarify what

9         you're referring to as "those scans," and I

10        don't know if that's clear.

11             MR. BOLAND:  I'll be clearer.

12        Q.    The very -- when the document was first

13   taken out of the envelope and placed on the table

14   on July 14th, were you the first person to scan

15   that two-page "work for hire" document that

16   morning?

17        A.    Yes.

18        Q.    My questions now are referring to the

19   electronic file that would have been created by

20   those scans that we just talked about right just

21   now in that previous question.

22             Did you give copies of the electronic

23   file of those scans to the defendants' attorneys?

24        A.    Yes.

25        Q.    Do you know if the defendants'

```
 1                        Tytell
 2   attorneys printed those scans as an exhibit to
 3   anything they have filed in this case, if you
 4   know?
 5        A.   I don't know, but -- well, I don't
 6   know.
 7        Q.   Looking at Tytell 3 as it's printed out
 8   in front of you, can you look at the
 9   interlineation that appears ton page 1 of that
10   document.
11        A.   Yes.
12        Q.   And do you see the word, although
13   faded, "May," as in the month of May, that is
14   handwritten in that interlineation?
15        A.   Well, when you said page 1, page 1 of 5
16   is just the words "Exhibit B."  I assume you're
17   referring to page 2 of 5 of Tytell 3, which is
18   some kind of an image of the front of page 1 of
19   the "work for hire" contract?
20        Q.   Yes, page 1 of the "work for hire"
21   contract, which is part of this overall exhibit
22   you have.
23        A.   Right, which is --
24        Q.   If you could look at page 1 of the
25   contract itself.
```

1                          Tytell

2          A.    Which is mark as page 2 of 5 in the

3     header.  Okay.

4          Q.    Yeah, I understand that.  But you're on

5     page 1 of the actual contract; right?

6          A.    Well, I'm not on page 1 of the actual

7     contract; I'm on page 2 of the exhibit, which is a

8     picture of something, or an image of something.

9          Q.    Yes.  And do you see the interlineation

10    that is in that -- on that page of that document?

11         A.    Yes, sir.

12         Q.    And do you see specifically the

13    handwritten word "May," as in the month of May,

14    that's in that interlineation?

15         A.    Yes.

16         Q.    Now, can you refer to Tytell 2, which

17    is also, I think you would agree, appears to

18    contain within it pages of a scan of page 1 of the

19    "work for hire" contract?

20         A.    Yes.

21         Q.    Can you look at the interlineation on

22    that Tytell 2 and the word "May" as in the month

23    of May in that interlineation?  Do you see that,

24    sir?

25         A.    I do.

1                              Tytell

2         Q.     How do those words, the month of May,

3    compare as far as the fadedness of their

4    appearance in the exhibits you have in front of

5    you?

6         A.     Well, this is comparing apples with

7    pineapples because --

8         Q.     How so?

9         A.     Well, first of all, the proper

10   comparison would be of -- if you wanted to do such

11   a thing, first of all, I'm looking at what are

12   apparently reduced-size images.  These are not

13   enlargements by any means.

14               These actually seem to have reduced an

15   8.5 by 11 page to something on the order of 8 by

16   10 or maybe even a little smaller.  I don't have a

17   ruler on me.  So that makes it a little tough to

18   compare a letter like the letter M in "May," that

19   I do not know the source of either of these

20   images.

21               But unless they were taken on the

22   scanner with the same settings, albeit at two

23   different time points, then I don't think it would

24   be a useful exercise to compare them for the level

25   of detail that you seem to be requesting.

1                             Tytell

2                There are two different scans of the

3    page 1 of the "work for hire" contract taken on

4    the same scanner with the same computer at the

5    same settings on the morning of July 14th and on

6    the afternoon of July 14th.  Those two scans would

7    be comparable from like -- I remember 9:18 is a

8    number that's in my report and a second scan

9    around 1 p.m.  Those would be comparable.

10               I don't think this exercise is really a

11   valid one.

12       Q.    I want to go over that so I clearly

13   understand your answer.  Is it your opinion that

14   to compare two scans of what purport to be the

15   same document it's important to know the model of

16   scanner that both scans were created from?

17       A.    No.

18       Q.    It's not?  It won't make a difference

19   in the output of that scanning operation if it's a

20   different type of scanner that scans the document?

21       A.    Oh, it can.  It certainly can.

22       Q.    And how --

23       A.    But, you see, that's not -- I'm sorry,

24   Mr. Boland, but that's not what you were asking me

25   to do.  You were not asking me to compare two

                           Tytell
1
2    scans to I believe you're calling them native
3    files.  You're not asking me to do that.  That
4    would be an entirely different exercise.
5            You're asking me to compare a
6    printout -- and I don't know if these were printed
7    out on the same printer or not.  I don't know what
8    the settings might have been at one printing or
9    another.  I'm looking at two printouts.
10           Working backwards towards the
11   underlying native format files that you had
12   referred to, I don't know if the thing that was
13   printed out is a PDF file that was processed by a
14   court or other computer in Buffalo that was
15   processing another PDF file that was submitted to
16   that court or that court computer by some
17   attorney, some law firm's computer, and that that
18   PDF file in turn had been created from a PDF file
19   that I might have submitted or somebody else might
20   have submitted a PDF file which would have been
21   based somewhere on another file going backwards to
22   at some point the file that you referred to as the
23   native format file.
24           So just comparing these two printouts,
25   these two pieces of paper, and a very small,

1                          Tytell

2     reduced detail on those printouts, not even same

3     size as life-size, whatever that might have been,

4     it's just not a valid exercise.

5            But I'm very happy to engage in a

6     completely invalid exercise if that's what you

7     want.  Well, I can't say I'm really happy to do

8     it, but I'm willing to.

9       Q.    So would you say it's an unfair

10    question, then, to ask you to compare a printout

11    to an electronic scan of a document?

12      A.    Not necessarily.

13      Q.    But could it be?  Would there be

14    situations where that would not be an appropriate

15    comparison?

16      A.    We live in such a wonderfully huge and

17    infinite universe that there are situations where

18    virtually anything is appropriate and virtually

19    anything is inappropriate.

20      Q.    So are you comfortable -- have you ever

21    reached a scientific conclusion in one of your

22    reports by comparing a document that was printed

23    versus the claim that that same document you're

24    looking at in electronic format on a computer

25    screen?  Have you ever compared those two to try

                          Tytell
1
2    to make a determination about a document?

3         A.    I think I've gotten lost here.  I'm

4    sorry.  Could you try that again, please?  I

5    apologize.

6         Q.    Let me break it down, because you went

7    through quite a list, and I want to talk about

8    that.

9              When comparing -- you called it apples

10   to pineapples or some such thing.  When comparing

11   the two exhibits you have in front of you, Tytell

12   2 and Tytell 3, you pointed out a bunch of

13   considerations that could result in differences of

14   what you're seeing from front of you right now

15   there on the table; correct?

16        A.    Yes.

17        Q.    Do those differences make it unfair for

18   me to ask you to compare the word "May" in those

19   two documents and how vibrant the ink appears?  Is

20   that still -- can you still come to a

21   scientifically valid conclusion regarding that

22   comparison or not?

23        A.    Well, I'm not sure about the fairness

24   of it.  And certainly I can look at them, although

25   they are reduced in size and anything that small

```
                              Tytell
 1
 2   is the kind of thing that I would usually want to
 3   look at with magnification, just because that's my
 4   habit.
 5             You can compare any two objects, and
 6   you can compare apples and pineapples.  You can
 7   compare apples and oranges.  And there are many
 8   points of similarity and many points of
 9   difference.  Apples and pineapples both have
10   juice.
11             But the comparison that you're asking
12   for -- and I can do it for you, if you wish, but I
13   just don't think that it's a meaningful comparison
14   in terms of getting to the basic issue of whether
15   or not the ink on the paper "work for hire"
16   document was faded out to a very light brown or
17   tan at the moment it was produced on the morning
18   of July 14th.
19        Q.    And when you say "faded," compared to
20   what was that ink faded?
21        A.    Compared to the image that had been --
22   the images that had been captured in January by
23   plaintiff's experts.
24        Q.    So you compared those electronic
25   scanned images of that "work for hire" document to
```

1                          Tytell
2    the actual document on July 14th and concluded
3    that the ink had faded; is that correct?
4          A.    I compared some of the images that had
5    been captured in January to the document on July
6    14th.  I compared the images that were attached to
7    the -- I believe they were June 16th or June 17th,
8    2011, declarations by plaintiff's experts.
9          Q.    Do you feel that's a scientifically
10   valid comparison?
11         A.    Yes.  For the purpose that was involved
12   there, yes.
13         Q.    And can you compare Tytell 2 and Tytell
14   3 that you have in front of you and the letter M
15   in the word "May" and how does -- do they look --
16   do the ink in those two letters M in those two
17   exhibits you have in front of you seem like one is
18   more faded than the other?
19         A.    I can do that, but this is not in any
20   way a parallel kind of comparison.  I believe I'm
21   sitting in a room that you have sat in previously
22   with a very beautiful view of the skyline of New
23   York, and you're asking for a comparison at the
24   distance of, let's say, the length of Manhattan
25   island from midtown to the southern tip, which is

1                          Tytell

2    maybe 5 miles, of a building -- one building is,

3    let's say, 85 stories and the other building is 86

4    stories.  And you're asking me to compare a very

5    subtle difference in a reduced image far away,

6    when you're asking me to compare these -- let me

7    just finish, if I might -- of Tytell 2 and 3.

8              However, the kind of difference that

9    was apparent on July 14th would be the difference

10   between the Empire State Building and a one-story

11   taxpayer.  The differences are order of magnitude

12   separated.  It's the difference between black,

13   dark ink and black as the toner on the images and

14   something that is faded to the point of almost not

15   being there.

16             And now you would suggest that that

17   kind of a comparison, such as -- which is the

18   comparison that took place on July 14th, is in

19   some way analogous to a comparison of dark-medium

20   to medium-medium brown or tan, as these two --

21   whatever is on these two pages.  And it's just --

22   the two kinds of comparisons are not comparable.

23             But again, if you'd like me to do it,

24   I'd be happy to do it.

25        Q.    The two exhibits in front of you, does

1                          Tytell
2    the word M in "May" appear more faded in one of
3    those exhibits than the other?  That's my
4    question.  Not about buildings, not about
5    skylines, just the letter M in those two exhibits.
6         A.    I'm sure there are differences because
7    they are two different images.  However, to be
8    able to quantify the difference without
9    magnification, looking at these reduced images, is
10   not something that I feel comfortable doing.  But
11   I'll try.
12             I just -- I don't -- I don't really see
13   the details.  I would look at it with
14   magnification before I would want to venture an
15   opinion on it but...
16        Q.    I understand, sir, you would prefer to
17   magnify.  I'm saying looking at it just as it is,
18   does the M appear more faded in one of the
19   exhibits?  Just "yes" or "no," looking at it as
20   you can.
21        A.    Well, the overall image appears darker
22   on Tytell 2.
23        Q.    The letter M, sir.  The letter M.  I'm
24   referring to just the letter M, not the whole
25   image.  Does the letter M look more faded in one

1                          Tytell
2    image than the next?  That's it.
3         A.    Portions of it appear darker on Exhibit
4    2 than on Exhibit 3.
5         Q.    Do you have any reason to account for
6    why the M looks darker -- portions of the M looks
7    darker in one exhibit than the other?  How do you
8    account for that?
9         A.    I would suggest any one of a long list
10   of variables, which I think -- and I think I've
11   been over some of them so far, without being
12   overly redundant, that some of those variables
13   might, singly or in combination, account for the
14   M -- portions of the M appearing darker on the
15   scan from Tytell -- on the image which is page 2
16   of 3 of Tytell 2 when compared to the same
17   portions of the M from the image on page 2 of 5 in
18   what has been marked as Tytell 3.
19        Q.    And to be clear, sir, your answers
20   previously were about the letter M in the word
21   "May."  I'm not asking about the letter M in the
22   initials MZ; correct?
23        A.    Correct.
24        Q.    Okay.  Now, you did some work for --
25   you did some analysis of the paper thickness in

1                         Tytell
2    this case; true?
3         A.    Yes.
4         Q.    Did you use a micrometer?
5         A.    Yes.
6         Q.    Do you know if there is an ASTM
7    standard describing the use of a micrometer when
8    measuring paper thickness?
9         A.    I'm not sure that's a whole standard
10   all by itself.
11        Q.    Does any ASTM standard deal with, in
12   part, the use of micrometer when measuring paper
13   thickness?
14        A.    I think there is, for document
15   examination.  I would -- well, all right, what
16   kind of ASTM standard?
17        Q.    Any kind, sir.  Is there any ASTM
18   standard which discusses, in part or in whole, the
19   proper way to use a micrometer?
20        A.    Well, there are --
21        Q.    (Inaudible.)
22        A.    I'm sorry, could you please -- ASTM has
23   a set of volumes of -- of volumes of standards
24   that occupy about half or maybe a third of a
25   floor-to-ceiling bookshelf in the library.

1                          Tytell
2              Of those thousands and thousands of
3      standards covering many dozens of different
4      industries, could you be a little specific about
5      what you're talking about?
6          Q.    I'm asking if you know of, from memory,
7      obviously -- I'm not assuming you had it
8      memorized -- but are you aware of any ASTM
9      standards, in whole or in part, that deal with the
10     use of a micrometer measuring paper thickness, if
11     you know.
12         A.    I know that that is discussed in one of
13     the forensic document examination ASTM standards.
14     And if you want to limit it to that, then I think
15     I am aware of it.
16         Q.    Did you follow that standard when you
17     did your micrometer measurements of the two-page
18     "work for hire" document in this case?
19         A.    As I recall the standard, it suggests
20     measuring away from the very edge of the page, and
21     it suggests taking multiple measurements.  And
22     that is what I did.
23         Q.    Did you record your results of those
24     multiple measurements?
25         A.    I did.

1                        Tytell

2        Q.    Do you recall how many measurements you

3    made of page 1?

4        A.    No.

5        Q.    Do you recall how many measurements you

6    made of page 2?

7        A.    No.

8        Q.    Did you report those findings in your

9    report to the defendants?

10       A.    No.

11       Q.    Why not?

12       A.    They were not clear-cut.

13       Q.    What does that mean, "clear-cut"?

14       A.    The unit that I used measures down --

15   it was an electronic readout unit, and it measures

16   down to thousandths of an inch.  That would be

17   three places to the right of the decimal point of

18   an inch.  And there was some variation where one

19   sheet seemed a little bit thinner than the other.

20   It was not clear-cut when I was measuring at that

21   level.

22            I took into account the appearance of

23   the paper, the condition of the paper at the time

24   that I was measuring it, and I felt that this

25   difference, while it might be a real significant

1                          Tytell

2    difference, at the level of measurement I was

3    engaging in and at the -- and given the condition

4    of the paper that it was not enough to definitely

5    say that the two pages were of a different caliper

6    or a different thickness.  But it was there, so

7    that I really couldn't say that the pages were of

8    the same thickness.

9              So having sort of equally balanced yes

10   and no, thicker or thinner or the same, I felt

11   that it was appropriate not to report.  And -- I

12   mean, this is pretty much what I said at the

13   bottom of page 3, or numbered page 3, which is

14   page 4 of Tytell Exhibit 1, that any limitations

15   of the documents examined were evaluated and,

16   where appropriate, are reflected in the strength

17   of the reported opinion.  And here the strength of

18   the reported opinion is such that there was no

19   reported opinion.

20       Q.    You said you used an electronic readout

21   unit?  What does that mean?

22       A.    That the micrometers measure things.

23   And in order to read the measurement, there are

24   several different technologies that have evolved

25   over the years -- over the centuries, really.

1                          Tytell

2              One is a Vernier caliper style of

3   micrometer where you turn a knob and then you read

4   marks that are engraved on the barrel that you're

5   turning.  This is the oldest style or the most

6   traditional, if you will, style of readout.

7              Then there is a dial readout where you

8   have usually a circular like a clock face with

9   numbers and markings on it and a needle that will

10  move and point to one of the numbers.

11             Sometimes you have two needles like the

12  fancy watches that have a little watch within the

13  watch face.  So very often you'll have two

14  different pointers within the dial face of a dial

15  readout.  Those are -- would be considered analog

16  units.

17             And then there is the kind of unit I

18  have where you have a little electronic display

19  that gives you numbers, you know, 0.010, 0.003,

20  something like that.

21      Q.    Do you feel that your device is more

22  accurate or the same inaccuracy as the other

23  devices you mentioned?

24      A.    It depends on the calibration of the

25  given unit.  There are units that read out in

1                         Tytell
2      tenths of an inch, in hundreds on an inch, and in
3      thousandths of an inch.  So each of these units is
4      calibrated to a finer level.
5              This is a standard manufacturer that I
6      feel is accurate at the level of the readout that
7      is provided.  It has the advantage of a very long
8      throat so that you can take measurements away from
9      the very edge of the page.  But that is just the
10     unit that I've used.
11         Q.    Have you reviewed Mr. LaPorte's
12     findings on his micrometer measurements of the two
13     pieces of paper of the "work for hire" contract?
14         A.    I haven't -- I don't think I've read
15     his report.  I don't know if I've reviewed them.
16         Q.    Do you recall seeing any other experts'
17     micrometer measurements of the two pieces of paper
18     of the "work for hire" contract?
19         A.    I do think at some point I saw
20     Mr. LaPorte's measurements or become aware of them
21     in some way.
22         Q.    Do you agree with what his measurements
23     were of the two pieces of paper?
24         A.    As I recall -- and I could not -- I'm
25     not saying that I'm absolutely certain -- I recall

1                           Tytell
2    he was using an instrument that was measuring in
3    smaller increments than my instruments.  I think
4    one more decimal place to the right -- one more
5    place to the right of the decimal point.
6                And he was able to, therefore, take a
7    more subtle measurement than I was.  And therefore
8    he was measuring on a slightly different scale
9    than I was.  And if his results accurately reflect
10   a difference that I did not find as clear-cut,
11   then that's the nature of the difference in the
12   scale of the two measuring devices.
13        Q.    Do you know if he used his micrometer
14   properly when obtaining his measurements?
15        A.    I don't know.
16        Q.    Now, as to the ink fade generally, you
17   first noticed, I think your report says, that the
18   ink on the first page -- or on either page of the
19   "work for hire" contract was faded virtually
20   immediately when you first looked at it on July
21   14th.  Is that fair to say?
22        A.    It's -- I don't know if it's fair, but
23   it's certainly accurate.
24        Q.    And you made a scan of both pages of
25   the document pretty soon after you first saw the

1                          Tytell

2    document with your eyes that morning; correct?

3         A.    Yes.

4         Q.    And did you retain the metadata related

5    to the electronic file which results from that

6    scan of page 1 and page 2 that morning?

7         A.    Whatever data was saved with the file

8    is still with the file.  I have not stripped any

9    metadata.  I think that's the technical term.  I

10   have not in any way altered the metadata.

11        Q.    Did the metadata of that scan include

12   or have embedded in it the settings of your

13   scanner used while you were making the scan?

14        A.    I don't know.

15        Q.    Do you have any records saved anywhere

16   of the settings for your scanner when it was

17   making the initial scans of page 1 and page 2 of

18   the "work for hire" document that morning?

19        A.    It would be the default settings.

20        Q.    So do you have a record of what those

21   settings were that morning?

22        A.    No.

23        Q.    What's the model or the manufacturer of

24   the scanner you used that morning?

25        A.    Epson, E-P-S-O-N.

1                          Tytell

2        Q.     And do you know what model of Epson

3    scanner it was?

4        A.     Perfection 500 Photo.

5        Q.     Do you know what version of software

6    was being used at the time you did those scans

7    that morning?

8        A.     No.  It would have been the then more

9    or less current edition of the Epson software for

10   that scanner and for Windows 7.

11       Q.     But you don't know the version number?

12       A.     No.

13       Q.     Do you know if that software has

14   settings on it?

15       A.     No.

16       Q.     Do you know the model of any of the

17   scanner that Gerald LaPorte used during his

18   examination of the "work for hire" document when

19   he was there in Buffalo?

20       A.     No.

21       Q.     Do you know the settings for his

22   scanner?

23       A.     No.

24       Q.     Do you know the software that he used?

25       A.     No.

```
 1                        Tytell
 2       Q.    Same question as to the scans that
 3  might have been made by Mr. Lesnevich of the "work
 4  for hire" document.  Do you know any -- do you
 5  know the model or the make of scanner he used?
 6       A.    I do not know for a fact.  I think that
 7  the scanner looked like a Canon scanner, but
 8  that's, you know, like saying a car looks like a
 9  Chrysler.  It just -- you know, it could be
10  another GM car.  I don't know -- no, Chrysler is
11  not a GM car.  I'm sorry, I'm a New Yorker; I
12  don't have a car.
13            No, I don't know -- for any of the
14  other people's scanners, I don't know the make,
15  model, software, software edition, or settings.
16       Q.    As a result of that -- and this is a
17  hypothetical -- if I gave you a scan of the "work
18  for hire" document from one of those other
19  experts' scanners and gave you the actual
20  electronic file and you brought that up on your
21  computer screen alongside the image of your scan
22  from that morning, if those scans appear visually
23  different, what would be your reaction to that?
24       A.    Well, hypothetically that would depend.
25       Q.    What would it depend on?
```

1                         Tytell
2        A.    A number of features, such as how
3    different are they.  If they are --
4        Q.    I'll ask a hypothetical.  What if your
5    scan of the document, let's say page 1, appears
6    white or slightly off-white but one of the other
7    expert's scans taken during those four days
8    appears yellowed, that same page appears yellowed,
9    what would be your reaction to comparing those two
10   scans from those different experts and different
11   scanners?
12       A.    Well, I would be very surprised if
13   looking at any scan taken at any time that day the
14   ink would appear white unless it was taken under
15   infrared luminescence conditions, at which point
16   on the 15th of July we did capture images in which
17   the ink appeared white.  But that wasn't a scan;
18   that was a capture of an image from the VSC 400
19   where the ink appeared white.
20            But I'm not aware even of a
21   hypothetical condition where the ink appeared
22   white on any of my scans.  I guess there are
23   instances where the ink is so faded it is
24   virtually transparent.  So you might consider that
25   as white.

1                          Tytell

2        Q.     My question was unclear.  I'm talking

3    about the overall paper of the document, not the

4    ink, the paper being off-white in your scan and

5    compare it to another one of the other defendants'

6    experts taken a day or two later and the paper of

7    the document now appears discolored, let's say

8    yellow.

9             What would be your reaction to that

10   comparison?  Would you agree with me that shows --

11   if that were true, would you agree with me that

12   shows the document became discolored while it was

13   in the expert's possession because of the

14   comparison of the scan?

15       A.     Well, you're now asking me several

16   questions.  The answer to the last of those

17   questions is no.  The answer to the question about

18   what my reaction would be would be not very much

19   because the color of the paper overall is

20   tertiary.

21             The principal issue that I would focus

22   on as a forensic document examiner is the

23   deteriorated condition of the ink.  The second

24   feature I would focus on, based upon the facts

25   that were brought forth during the examination on

1                           Tytell
2    the morning of July 14th, would be the reaction of
3    the paper to ultraviolet illumination.
4              And I would consider the ultraviolet
5    reaction to be much more significant than any
6    subtle difference in color as recorded on two
7    different scanners, because the very clear and
8    gross difference in ultraviolet reaction is
9    coterminous with the areas of yellowing of the
10   paper and is much easier to see and much more
11   dramatic, very clearly seen in the videos, even,
12   as well as the photographs taken using ultraviolet
13   illumination.
14             So I think that is a much more
15   significant feature to focus on than a subtle
16   difference as seen between two scans from
17   different scanners.  So my reaction to any
18   difference, slight difference, in the images
19   recorded on the scanners would be, well, let's
20   take these and equalize them using the appropriate
21   software settings and see if the differences that
22   we're looking at between the scans are apparent
23   differences that are artifacts of differences in
24   the scanners or the scanning settings or if they
25   are real differences that reflect actual

1                          Tytell

2    differences in the color of the paper.

3              I would suggest to you that they are

4    much more likely to be the former than the latter.

5         Q.    Another hypothetical.  If one of

6    plaintiff's experts scanned the first page of the

7    document days later after your examination was

8    done and the ink appeared more vibrant than your

9    scan on the morning of July 14th, what would your

10   opinion be of that comparison?

11        A.    Pretty much the same.

12        Q.    Meaning what?  What accounts for that

13   would be scanner model, make, software settings,

14   et cetera?

15        A.    Would you define, please, qualitatively

16   and quantitatively what you mean by "more

17   vibrant"?

18        Q.    Well, I'll use your word "faded."

19   Let's hypothetically say the plaintiffs expert

20   scanned page 1 of the document a week after you

21   did on July 14th and that resulting scan showed

22   the ink less faded than how it appears in your

23   scan that you took July 14th.

24              What would be your reaction to that?

25        A.    Well, okay, so on July 21st somebody

```
 1                      Tytell
 2   scanned the document.  I'm not sure -- that seems
 3   to be contrary to fact, even for a hypothetical,
 4   but okay.
 5            And in that scan when you say "less
 6   faded," do you mean black like normal black
 7   ballpoint ink or do you mean a darker shade of
 8   yellow or the difference between light tan Chinos
 9   and medium tan chinos in terms of tan?
10            Can you be a little more specific here
11   as to how much darker it is?  Are we talking about
12   subtle gradations here or are we talking about
13   black versus almost invisible tan or yellow?
14       Q.   My hypothetical, sir, is simply that
15   when you look at these two documents side by side,
16   your scan on July 14th and let's hypothetically
17   say plaintiff's expert's scan a week later, to
18   your eye the ink in the plaintiff's expert's scan
19   appears less faded than your scan.
20            So that takes care -- you're saying in
21   your mind when you look at it in your hypothetical
22   that the ink looks less faded in a scan taken a
23   week later, what would your reaction to that be in
24   the hypothetical?
25            Would you conclude your scanner was not
```

```
 1                        Tytell
 2   set up correctly or would you conclude that the
 3   plaintiff's scanner was not set up correctly?
 4   What would you conclude about that?
 5        A.    I would -- I would start by looking at
 6   the quantitative and qualitative level of
 7   difference.  Your hypothetical is much too vague
 8   to really answer properly.
 9        Q.    Well, you used the word that the ink
10   was faded in your report, did you not?
11        A.    Yes.  And then I proceeded to try to
12   describe the level of fading, and then I included
13   an image of the faded ink.
14        Q.    And in my hypothetical I'm saying you
15   have a scan of that image in front of you where
16   the level of fading was less than what you
17   described in your report.  You looked at it
18   yourself, and you said to yourself, Wow, the level
19   of fading of this scan a week later is much less
20   than what appears in my scan.
21              What's your reaction to that?
22        A.    Well, first of all, when you say "the
23   level of fading," it's like saying, you know, the
24   level of water in the bathtub.  What's the level
25   of water in the bathtub?  Is it flowing over the
```

1                          Tytell

2    top or is it barely enough to get the soles of

3    your feet wet?

4              What's the level we're talking about

5    here?  If it's a level that would cause me to say,

6    Wow, that's a pretty big level, a wow level, and

7    in my mind's eye I'm really having trouble

8    imagining the level of difference that you want me

9    to imagine.  You have to give me the absolute

10   level.

11        Q.    Well, we talked about exhibit --

12   comparing the letter M in Exhibits 2 and 3

13   earlier.  Let's go back to those exhibits.  And

14   assume that Exhibit 2, that scan of the document,

15   was taken after the scan of the first page of the

16   document in Exhibit 3.

17              MR. SOUTHWELL:  Mr. Boland, let me just

18         interrupt for one second.  At the appropriate

19         time, I'd like to take a comfort recess.  You

20         are also at about 3 hours and 15 minutes at

21         this point, just so you know.

22              MR. BOLAND:  Let me just finish this

23         little bit, and then we can take a break.

24         That's fine.  Just this little area.  It won't

25         take long.

1                           Tytell
2        A.      Can you just repeat that, please?
3        Q.      Look at exhibits Tytell 2 and 3.
4        A.      Right.
5        Q.      And for the hypothetical assume that
6   Exhibit 3 is your scan of page 1 of the
7   Facebook -- the "work for hire" contract.  Just
8   assume that.
9        A.      Okay.
10       Q.      And look at Exhibit 2, page 1 of the
11  scan of the document within Exhibit 2, and assume
12  that that scan was taken later after yours.
13       A.      We're on page 2, now, of the "work for
14  hire" document?  Oh, no, I'm sorry --
15       Q.      We're talking about the portion of
16  either one of these two exhibits that depicts page
17  1 of the "work for hire" document.
18       A.      Okay.  I'm with you.
19       Q.      The page 1 printed in each one of them.
20  Tytell Exhibit 3, assume that is your page 1 of
21  the "work for hire" document, and Exhibit 2,
22  assume that that contained a scan of page 1 of the
23  "work for hire" document that was taken after your
24  scan, like a day later or two days later.
25       A.      Okay.  And we'll just assume also that

1                         Tytell
2    these are actually printouts and unknown number of
3    steps removed from the scans when we call them the
4    scans.
5         Q.    Correct.
6         A.    Okay.
7         Q.    Or just assume they're both printed on
8    the same printer, hypothetically.  And I showed
9    these to you and said, Mr. Tytell, how do you
10   account for the fact that the letter M in "May"
11   appears to be not as faded in Exhibit 2 as it is
12   in Exhibit 3.
13        A.    Well, the only comment I could make is
14   that -- you're telling me now that Exhibit 3 I am
15   to assume hypothetically is a result of the scans
16   that I made on the morning of July 14th?
17        Q.    Yes.  You got it.
18        A.    Okay.  Got it.  Thank you.
19              So all I can say about Exhibit 3 is
20   that the scans that I made on the morning of July
21   14th and also on the afternoon of July 14th are
22   true, accurate, fair representations of the
23   condition of the document, of the condition of the
24   ink on pages 1 and 2 as it appeared to me on July
25   14th.

```
 1                        Tytell
 2           I really cannot account for what might
 3   or might not have taken place in the long and
 4   checkered history of scans and electronic files
 5   which has led to the printout before me as part of
 6   Tytell Exhibit 2.
 7           Q.   Well, assuming that Tytell Exhibit 2
 8   was scanned after yours and the ink on the letter
 9   M you already said looks a little less faded than
10   yours, how do you account for that?  How could the
11   ink have gotten more vibrant over time?  Ink
12   doesn't fade the option direction, does it, it
13   gets brighter over time, in your experience?
14           A.   I'm sorry, I don't think I used the
15   word "vibrant" or the words "less faded."
16   Perhaps -- perhaps we could look back and see what
17   words I actually used.  But I'm fairly sure --
18              Excuse me, sir.  Excuse me, Mr. Boland,
19   please, I can't see you, so it's hard to interrupt
20   you properly.
21              I'm fairly sure that those words "more
22   vibrant" and "less faded" are not my words, but
23   you're telling me now they are my words.  I have
24   no problem with my words usually, and I know there
25   are many of them.  But those I don't believe are
```

1                       Tytell

2    among them in my description of the portion of the

3    letter M on page 2 of 3 of Tytell Exhibit 2.

4          Q.    Does the letter M on those two exhibits

5    visually appear the same to you or different?

6          A.    I think we went over this at some

7    length previously, and if you would like to go

8    over it again, let's start from the beginning.

9          Q.    I'm just asking about the letter M.

10   Does the letter M appear visually to you to be the

11   same between those two?  That's all.

12         A.    Which letter M?

13         Q.    The letter M in the word "May" that is

14   in the interlineation.

15         A.    And this is the same question we went

16   over earlier; correct?

17         Q.    No.  I'm asking you if those appear

18   similar or -- do they appear the same to you or

19   different, the letter M in "May," on those two

20   exhibits?

21         A.    Well, the word "same" is kind of a

22   loaded word because no two things are going to

23   appear exactly the same unless they are exactly

24   the same, unless they are -- I'm looking at two

25   different pieces of paper.  They're not the same.

1              Tytell

2    One is on my left; one is on my right.

3              So the word "same" here is not, I

4    think, appropriate.  Perhaps you could help me out

5    some.

6         Q.    What word would you use as an expert to

7    compare two documents like that and look at the

8    quality of the ink or the fadedness or not

9    fadedness -- because you used the word "faded" in

10   your report -- what words would you use to compare

11   the letter M in "May" in those two exhibits?

12        A.    Well, in both of the exhibits before

13   me, the letter M in "May" does appear faded, in

14   both of them.

15        Q.    So would you say that the letter M in

16   "May" appears faded more or less in one of them or

17   the same, it's faded to the same degree, to your

18   eye?

19        A.    Well, you'd have to consider it -- as I

20   said, portions of the M in one appear darker than

21   in the other.

22        Q.    In which one does it appear darker,

23   portions of the M?

24        A.    The portions of the M appear darker in

25   Tytell 2 than they do in Tytell 3.  I believe

1                          Tytell
2     that's what I said previously.
3          Q.     So let's focus on that, and then we can
4     go to the break here.
5          A.     Okay.
6          Q.     If hypothetically the scan of this
7     document which resulted in Tytell 2 was -- that
8     scan was taken after the scan that is printed out
9     in Tytell 3, how is it possible that portions of
10    the M appear darker in the later scan?
11         A.     Well, if you're telling me that they do
12    appear darker, as part of your hypothetical, then
13    I don't have to deal with whether or not it's
14    possible that they appear darker, because part of
15    your hypothetical setup is that they do appear
16    darker.
17                So the word "possible" is inappropriate
18    in that kind of a hypothetical.  Your -- if I
19    could try to clarify, you seem to be asking me
20    that given hypothetically one appears darker --
21    something, some thing, whatever it is, part of the
22    M, part of the R -- if there's an R in there --
23    part of some letter appears darker in one than
24    darker in the other, it's not possible; that's a
25    foundational part of your hypothetical.

1                        Tytell

2             Then what are the possible explanations

3    for that hypothetically factual difference.  And

4    as far as possible explanations are concerned, the

5    break isn't going to happen until sometime

6    tomorrow morning if you want me to actually list

7    all of those possibilities.

8         Q.    Just give me three, the three most

9    likely possibilities that explain why portions of

10   the M appear darker in one exhibit than the other.

11        A.    I couldn't evaluate the likelihood of

12   the possibilities.  I could give you --

13        Q.    Give me the first three to pop into

14   your head.

15        A.    The first three to pop into my head

16   randomly, possibly?

17        Q.    Sure.

18        A.    The printer was out of ink.  The yellow

19   reservoir of ink in the cyan, magenta, yellow, and

20   black ink cartridge in the printer, the yellow was

21   exhausted.  Or one of the other ink cartridges

22   were exhausted.

23             So I could give you four different

24   reasons by going one ink cartridge after another,

25   and then we could combine maybe two of them are

```
 1                        Tytell
 2   exhausted and there are two changes to run.  Those
 3   are well past three different reasons.
 4        Q.    How about give me a difference that
 5   might have been -- that accounts for this that's
 6   related to the scanning process.
 7        A.    Yes, there are differences that could
 8   be related that are related to the scanning
 9   process, as you are setting up in your
10   hypothetical, hypothetically, yes.
11        Q.    So off the top of your head, could you
12   give me two of those, two differences in scanning
13   processes that could account for the ink appearing
14   darker in a later scan of an image -- I mean of a
15   document?
16        A.    Scanning settings.
17        Q.    Okay.  What's one other one, and then
18   we'll go to a break?
19        A.    Features of the scanner other than the
20   settings.
21        Q.    Like what, for example?  What do you
22   mean by that?
23        A.    I don't know what could happen.
24   Anything.  I'm sorry, I'm sort of -- I'm out of my
25   speculating -- the speculating portion of my brain
```

```
1                    Tytell
2    doesn't seem to be coming up with any speculation
3    that I can provide to you.
4         Q.    Okay.  Fair enough.
5         A.    I'm out of imagination.
6              MR. BOLAND:  Alex, let's go ahead and
7         take that break.  How much time do you want?
8              MR. SOUTHWELL:  We just need about five
9         minutes.  You only have a little less than ten
10        minutes left.  We just need to take a quick
11        comfort recess here.
12             MR. BOLAND:  Okay.  Good.
13             (Recess taken from 2:55 to 3:08.)
14        Q.    Mr. Tytell, I neglected to ask you at
15   the beginning, how did you -- how are you charging
16   the defendants for your time working on this case?
17        A.    By the hour.
18        Q.    Do they have a retainer on account with
19   you or do you just bill them monthly and then they
20   pay the bill?
21        A.    I bill them monthly, and I hope they
22   pay the bill.
23        Q.    And what's your hourly rate you're
24   charging them?
25        A.    $425 per hour.
```

1                        Tytell

2        Q.    Do you have any other type of an

3   agreement with them other than that hourly rate?

4        A.    My standard terms and conditions, which

5   have the hourly rate.  There was an initial

6   retainer for one day, which was worked off, eight

7   hours.  And then there are other conditions in

8   there regarding testimony, such as court testimony

9   or depositions where there is a one-day minimum.

10            And also a standby fee for half a day

11   for standby and a cancellation fee if something

12   happens and I'm not informed three days prior.

13   I'm not sure if it's days or business days,

14   although at this point there are seven business

15   days per week -- we've come to that -- that

16   without three business days' prior notice there's

17   a half-day fee.

18        Q.    When you initially got the document on

19   July 14th and noticed some of the differences that

20   we talked about earlier, did you contact anyone

21   from the defendants' attorneys to mention that to

22   them before you continued with your examination?

23        A.    Contact them?  You mean call them from

24   my cell phone to their cell phone when they were

25   on the other side of the room?

1                            Tytell
2        Q.    Or just tell them across the other side
3   of the room that you noticed something -- some
4   problem with the document when you compared it to
5   what you saw in the scans?  Did you tell them
6   before you continued your examination?
7                  MR. SOUTHWELL:  Objection, calls for
8        privileged communication.
9        Q.    I'm not asking what you said -- well,
10  let me just ask.  Did you stop examining the
11  document to have any conversations with anyone
12  when you noticed it was in a different condition
13  than you expected?
14       A.    I noticed it, and then I scanned the
15  document front and back, both pages, to make sure
16  that the condition of the document which I had
17  just noticed was recorded.
18                 I think in the middle there I did look
19  at the ink of page 1 and page 2 under the
20  stereomicroscope.  I did conduct a microscopic --
21  or an examination under the stereomicroscope.
22  This is all within the first, I guess, 20 minutes
23  or 25 minutes after the document was presented.
24                 And then after the scanning and the
25  looking at it, I think there was a brief

                            Tytell

1    conversation initiated by Mr. Argentieri.  But I

2    was busy looking at the document; so I hope he

3    didn't consider me rude, but I had to break off

4    that conversation.

5              And at that point I left the room, and

6    so did Professor Romano leave the room; and we

7    went to another small conference room.  I guess it

8    would be called a breakout room or some term like

9    that.  And in that room with Dr. Romano and myself

10   were the attorneys from Gibson, Dunn.

11             And I have a feeling -- I have a

12   feeling I should stop here, but I don't know.

13        Q.    You used a VSC machine during your

14   examination; correct?

15        A.    Yes.

16        Q.    And an employee of Foster Freeman was

17   in the room having conversation with you while you

18   were using that machine; true?

19        A.    On which day are we talking about now?

20        Q.    Let's say day one, July 14th.

21        A.    Okay, July 14th, the answer would be

22   yes.

23        Q.    That employee of Foster Freeman in fact

24   set up the VSC machine for your use in that room

1                        Tytell

2    that morning, didn't he?

3         A.    I believe so.

4         Q.    And he sat next to you at times while

5    you were using the computer connected to that

6    machine; right?

7         A.    Well, I wasn't actually using the

8    computer connected -- well, "using the computer

9    connected to that machine," that's like saying

10   when you're driving a car you're using the motor

11   connected to the car.  The computer was involved

12   in the use of the machine, yes.

13        Q.    And at some point during your

14   examination on one of those days, that machine was

15   removed from that office and replaced with a

16   different machine, VSC machine; right?

17        A.    There was another VSC machine in use on

18   the 15th, the second day.

19        Q.    And the previous machine was taken out

20   of the room?

21        A.    I don't recall whether it was taken out

22   of the room or not.

23        Q.    And was there something malfunctioning

24   with the machine on July 14th that you started

25   with that had to be replaced with the new machine?

1                          Tytell

2        A.    The machine on July 14th had to be

3   rebooted on one or two occasions, I think, the

4   computer.  Something -- something was problematic

5   there.  I don't exactly recall.

6        Q.    Did you discuss that with the

7   representative of Foster Freeman, the problems you

8   were having with that VSC machine on July 14th?

9        A.    Not that I recall the specifics of.

10       Q.    Does that machine have the capacity to

11  project UV -- to project UV light onto a document?

12       A.    It has that capacity, although that

13  capacity was not utilized on the 14th, or on the

14  15th -- excuse me, or on the 15th, for that

15  matter.

16       Q.    And who are you referring to?  It was

17  not utilized by you or nobody utilized that

18  capacity on the 14th and 15th?

19       A.    Well, that capacity was not utilized on

20  either the 14th or the 15th while any -- while

21  either page of the "work for hire" document was in

22  a VSC machine on the 14th.  And that UV capacity

23  was not utilized on the 15th either, that I

24  recall, but certainly not on the --

25       Q.    How do you know that fact?  How do you

1                           Tytell
2    know that fact?
3        A.    Because when the -- when the document
4    was in the VSC machine on the 14th, which was only
5    for a brief -- a relatively short period on the
6    morning of the 14th, I was operating the machine.
7        Q.    Do you know how to operate that
8    machine?
9        A.    Yes.
10       Q.    Was the Foster & Freeman employee
11   giving you some advice on how to set that machine
12   for its use?
13       A.    Yes, but that wasn't my first rodeo.
14   I've used that -- the software that controls the
15   various VSC machines of that range, of that
16   system, I've used those machines often.
17       Q.    And does the software control the
18   intensity of the light that is projected onto a
19   document that's in the machine?
20       A.    No.  The software turns on the lights,
21   but the lights -- the intensity doesn't really
22   change once the lights are on.
23       Q.    So there's only one setting for the
24   intensity of the light in a VSC machine?
25       A.    There are a number of different lights,

1                          Tytell

2   a number of different light sources.  Well, wait a

3   second.  Is there a dimmer?  On the white light

4   bulbs, there is a dimmer, and, as I recall, those

5   bulbs are just regular clear light bulbs that are

6   probably less powerful than the light bulb in my

7   refrigerator.  I think they are 12 or 13 watt

8   bulbs; they are not even 20 watt bulbs, although

9   there are several of them.  But those are just

10  regular white light bulbs, not ultraviolet.

11        Q.    Do you own a VSC machine for work in

12  your professional capacity?

13        A.    I have two of them, plus the other

14  similar machines that I have built myself, which I

15  have several.

16        Q.    You've built VSC machines?

17        A.    Well, a VSC machine is a specific form

18  of video -- it's a video camera, essentially a

19  closed circuit video camera.  The first ones went

20  to a video monitor.  Nowadays you called that an

21  lag kind of video, like television sets used to be

22  year ago.

23             There was a video camera with a silicon

24  target tube that went to a screen, to a small TV

25  monitor.  And you had filters in front of the lens

1                          Tytell

2    or between the lens and the camera.  And I built a

3    number of those one way or another.

4                    And I participated in the design --

5    back in the late 1970s, around '78, '79, something

6    like that, I participated in the design of the

7    original Foster & Freeman VSC machine.  And I have

8    given them lots of suggestions, some of which they

9    actually acted on, on improvements in the machines

10   over the last two or 30 years.

11                   So yeah, I've built a number of these

12   machines.

13                   I've actually -- I don't know if

14   Mr. Blanco was there.  I did a workshop on

15   building your own video infrared system at a joint

16   meeting of the American Society of Questioned

17   Document Examiners, SAQTE, and SAFDE, Southwestern

18   Association of Forensic Document Examiners.

19                   There was a joint meeting in Colorado

20   back a number of years ago where I gave a

21   workshop -- I'm not sure, I think that Mr. Blanco

22   attended that -- on how to build your own VSC

23   system.

24                   But we did acquire a VSC machine back

25   in I guess the early eighties.  I had worked with

```
 1                      Tytell
 2   one VSC at the crime lab -- the Israeli crime lab
 3   in Jerusalem, one of the very first models.  Then
 4   we subsequently got our own.
 5            Then we upgraded that VSC 1 to a newer
 6   VSC 1 sometime in the -- I guess the early
 7   nineties.  I think that was the same winter as the
 8   first World Trade Center bombing.  That's sort of
 9   the way I keep track of time, unfortunately.
10            And then we -- and then since then I
11   have also, just as we had in Buffalo, arranged for
12   Foster & Freeman to either bring a VSC unit,
13   whatever their current state-of-the-art unit was,
14   to a location to where I would be working with
15   documents or, alternatively, to bring the
16   documents to Foster & Freeman's U.S. office where
17   I would work with their big machines, like the VSC
18   6000.
19            And actually in I guess 2009, in the
20   fall of 2009, I spent a week with a VSC 400 on a
21   location in Washington, D.C., where I got to use
22   that machine.  And various other times.
23            So I am familiar with the equipment.
24            MR. SOUTHWELL:  Mr. Boland, we're now
25       past three and a half hours.
```

1                          Tytell
2              MR. BOLAND:  Okay.  We've got a little
3      bit more to go.
4              MR. SOUTHWELL:  All right.  Hopefully a
5      very little bit.  Go ahead.
6         Q.    Mr. Tytell, do you know what bulbs were
7   in that VSC machine, the first one that was
8   delivered to the law firm's offices?
9         A.    I only know that the white light bulbs,
10  which is what was used most of the time, were the
11  regular bulbs, the 12 or 13 watt bulbs.
12        Q.    How do you know that?
13        A.    Well, that's what's in the specs.  I
14  didn't actually look under the hood and check that
15  the bulbs that were in there were the bulbs that
16  were in the specs.
17        Q.    Are those the only bulbs that can fit
18  in that machine, the ones that are in the specs?
19        A.    I don't know.  I don't know what kind
20  of sockets they use.
21        Q.    How about the replacement machine that
22  came later, whenever that was, when the first one
23  got hauled away, do you know what bulbs were
24  inside of there?
25        A.    Well, I don't know that the first one

                              Tytell
 1
 2    was hauled away.  And the second machine that was
 3    used on the 15th, the white light bulbs there I
 4    believe are the same specification.  But again, I
 5    did not --
 6        Q.    Did you look under the hood?
 7        A.    Again, I did not check under the hood
 8    to see if they had anything different there.  But
 9    these are generally -- because of the sensitivity
10    of the camera, these bulbs are really only very
11    low wattage.
12              I mean, a one AAA battery pocket
13    flashlight, the kind that you have on your key
14    chain, that is more than powerful enough for most
15    of the kinds of examinations that are done with
16    the whited light bulbs.
17        Q.    Do you agree with some of the other
18    experts in this case that have said that on the
19    day you got this document, July 14th, not only did
20    the ink appear faded, which you have stated, but
21    that the document appeared discolored?  Is that
22    your opinion as well, that the document appeared
23    discolored?
24        A.    Could you define "discolored," please?
25        Q.    The common terms some of the other

1                          Tytell
2      experts are using was "yellowed," the document was
3      yellowed from how it appears in the Aginsky scan.
4      Do you agree with that?
5                MR. SOUTHWELL:  Objection,
6           mischaracterizes.
7           A.    Well, I don't know about other experts'
8      opinions and agreeing with them or not.  I do know
9      that when I -- among my observations on July 14th,
10     including the faded nature of the ink and the
11     ultraviolet reactions, was the cream color -- or I
12     guess "yellowish" would be an okay term -- cast of
13     the front of the paper fairly uniformly on both
14     pages, with the exceptions of the tabs at the top,
15     which were white by contrast to the yellow, and
16     then, as I mentioned, the top corner of page 1
17     within the area delineated by the crease of the
18     fold.
19          Q.    Is it your opinion that the yellowing
20     of the tabs of the document that you saw and the
21     ink fading are related?
22          A.    Well, they're concomitant, for sure.
23     And the yellowing or the cast, as I mentioned
24     previously, are coterminous with the areas of
25     unusual lack of fluorescence or presence of normal

                                          Tytell
1
2    fluorescence.

3         Q.    My question is do you think that the

4    same process that caused the ink to fade is also

5    the process that resulted in the yellow cast, as

6    you put it.

7         A.    Things tend to point that way, yes.

8         Q.    Now, the forensic business you run now

9    you took over from your parents; is that true?

10        A.    I'm not sure I took over their

11   business.  There was a separate -- you know,

12   Tytell Questioned Document Labs was my mom's name

13   for doing business, and I had a name Forensic

14   Research.  But it is certainly their practice that

15   I have stepped into.

16        Q.    And would you say your parents were

17   pretty highly regarded in this field when they

18   were running their business?

19        A.    Certainly by me.

20        Q.    I mean by the professional -- their

21   peers.

22        A.    I would hope so.

23        Q.    And did they have government agencies

24   who hired them to do work on cases?

25        A.    My mother certainly -- she was much

1                          Tytell
2    more active over the long haul, and my mom
3    certainly appeared numerous times on behalf of the
4    government, the U.S. attorney's office, in cases
5    like the pizza connection or the case of the
6    government -- the United States versus the
7    Reverend Moon, cases like that.
8         Q.    Have you retained those sort of same
9    government contacts with your business that you're
10   running now?
11        A.    Not the same contacts.  I think she
12   worked much more in the Southern District than I
13   have.  I have appeared a number of times on cases
14   brought by the U.S. attorney's office in the
15   Eastern District but also on some cases brought by
16   the U.S. attorney's office in the Southern
17   District or in the District of New Jersey, and one
18   a while ago in the Northern District of New York
19   and in Vermont.
20        Q.    Go ahead.
21        A.    U.S. attorney's office in Vermont.  But
22   that was an attorney who had gone from Eastern
23   District of New York to district of Vermont.
24        Q.    Have you ever done any work for the
25   CIA?

1                          Tytell
2        A.    Well, I just finished a case for the
3   U.S. Department of State, and their legal counsel
4   is in the offices that were formerly occupied by
5   the CIA in the U.S. navel observatory in
6   Washington.
7             But cases for the CIA is -- I don't
8   think I've ever gotten a paycheck that said CIA on
9   it or U.S. Treasury re CIA work.  I think that
10  would be a fair statement.
11       Q.    Have you ever done any work for the
12  CIA, no matter who paid you?
13            MR. SOUTHWELL:  Objection to relevance.
14       A.    I just don't know how to answer.
15       Q.    It's "yes" or "no."  That will do.
16       A.    I think I would have to respectfully
17  decline to answer.
18       Q.    Did your parents ever work for the CIA?
19            MR. SOUTHWELL:  Objection to the
20        relevance.  What's your point here,
21        Mr. Boland?  You're over your time, and now
22        you're asking questions about Mr. Tytell's
23        parents' work?  I mean, come on.
24            MR. BOLAND:  I am.
25            MR. SOUTHWELL:  What's the relevance?

1                        Tytell

2              MR. BOLAND:  Did your parents ever work

3         for the CIA, that's a pretty simple question.

4              MR. SOUTHWELL:  What's the relevance of

5         that?

6              MR. BOLAND:  I heard your objection.

7         The witness needs to answer the question.

8              MR. SOUTHWELL:  You can answer one more

9         of this.

10        A.    Okay.

11             MR. SOUTHWELL:  To the extent you can.

12             MR. BOLAND:  I object to that on the

13        record.  He can answer whatever question he

14        needs to answer, according to the rules.  So

15        that's it.

16        A.    Well, then, let me ask you -- you

17    mentioned the rules.  I don't know what the rules

18    are.  But let me ask you for some clarification,

19    if I might.  What do you mean by "work for the

20    CIA"?

21        Q.    Were they ever employed by that agency?

22    That is one way of looking at it.

23        A.    Okay.  As employees they were never --

24        Q.    Yes.

25        A.    Well, during World War II there was a

                          Tytell
1
2   predecessor agency to the CIA.  The CIA didn't
3   exist until sometime a couple years after World
4   War II.  So let's stick with the CIA.  And I think
5   I can safely say, no, my parents did not work for
6   that agency.
7        Q.    Are you aware of any ASTM standards
8   relating to ink age determination?
9        A.    No.
10       Q.    Do you know why there isn't any of
11  those standards, if you know?
12       A.    They haven't been written yet.
13       Q.    Do you know if there's agreement
14  amongst experts in the field of ink age
15  determination as to a standard approach to making
16  those -- to doing that analysis, if you know?
17       A.    I don't know.
18       Q.    In the occasions where you participated
19  in writing or drafting ASTM standards, do you
20  recall questions about that?
21       A.    I don't recall any questions about
22  that.
23       Q.    Okay.  Have you ever been involved in
24  drafting ASTM standards?
25       A.    Ah, yes, I recall a question along

                          Tytell

1

2    those lines.  The answer is yes.

3        Q.    And if someone wants to get a new

4    technique standardized, how do they go about that?

5              MR. SOUTHWELL:  Objection to the form.

6        A.    If somebody wants to get a new

7    technique or an old technique or a middle-aged

8    technique put into the format of an ASTM standard,

9    that individual would first have to write a draft

10   standard, hopefully in the appropriate stylistic

11   form as laid out in the ASTM standard -- they have

12   a book.

13             They call it the blue book.  I think

14   "blue book" is a word lawyers also use.  There's

15   an ASTM blue book that gives you the styling of

16   number of paragraphs and so on.

17             And you draft up your standard, and

18   then you put it through the appropriate

19   subcommittee and the appropriate committee.  The

20   first step is that somebody or some group of

21   people have to write a first draft.

22             There are a lot of documents that need

23   to be written for every field.  There are a number

24   of drafts for questioned document standards that

25   have been written that are -- that never made it

1

2    into the ASTM process just because of the logjam,

3    you know, the throughput, how many standards can

4    the ASTM appropriate committee handle in a given

5    time period.

6           But that is the process one would

7    follow for any kind of a method or procedure,

8    whether it's new, old, or in between.

9       Q.    So before we come to an ASTM, the

10   relative folks in the field would have to agree

11   upon a method or methods; true?

12      A.    Before those folks would have a chance

13   to agree, somebody would actually have to write up

14   a draft.  The first step is to sit down and write

15   a draft of the procedure that you would like

16   everybody else to look at and decide whether or

17   not they agree with.  You need to start with a

18   draft of the standard.

19      Q.    And then once that draft goes around to

20   the relevant experts, if they can't agree on what

21   the standard ought to be, it's true you can't

22   reach -- then an ASTM standard will never be

23   established?

24      A.    Well, you were asking about age of ink,

25   and age of ink has never gotten to the point of

1                        Tytell

2    the draft.  So I have no clue what might happen if

3    that were to be circulated among the appropriate

4    people.  You have to have a little fact somewhere

5    in the hypothetical.  This one lacks it.

6         Q.    I'm just talking about ASTM standard

7    approach in general, not ink age determination.

8    In general if you can't get relative people in

9    the --

10              (Unintelligible discussion interrupted

11         by the reporter.)

12         Q.    If you can't get people in the relevant

13   field to agree on a method, then you can't create

14   an ASTM standard; is that true or not?

15         A.    That is incorrect.

16         Q.    Can a single person draft a proposed

17   ASTM standard and somehow get it incorporated into

18   the ASTM manual by themselves without agreement of

19   other people?

20         A.    A single person can draft a standard.

21   There's no problem.  And many standards have been

22   drafted by one person who just feels like drafting

23   it.  That standard then has to achieve a certain

24   level of agreement.  It does not need to achieve

25   unanimity.

```
 1                        Tytell
 2              A consensus standard requires a
 3   consensus of the people who get to vote on the
 4   standard.  This voting population may not
 5   represent the entire population of people of --
 6   who are interested, although it ought to.  And it
 7   does not require unanimity.
 8              If somebody has an objection that they
 9   put forth and it's a valid objection, then usually
10   the standard gets -- or the draft document gets
11   modified.  Somebody comes up and says, Gee, this
12   is wrong and here's why; and everybody goes, Oh,
13   my, we hadn't really thought of that, thank you
14   very much, we'll fix it.  Things get changed.  And
15   that happens quite often.
16              If, however, somebody just digs in
17   their heels and have a particular position and
18   say, I don't like this, I think this is wrong,
19   full stop, and two-thirds of the people who are
20   voting on it say, We appreciate your interest, but
21   we think that you're not correct in your
22   objection, then the standard moves forward.
23              So if one person writes a standard and
24   one person can explain why that standard is
25   correct and modify, where appropriate, and defend
```

1                          Tytell

2    where objections are wrong, then yes, that one

3    person can shepherd a draft document through the

4    entire ASTM process and see it eventually included

5    in the volumes of ASTM standards.

6         Q.    I guess what I'm saying is you have to

7    have, somewhere along the line after a draft is

8    made, at least a majority of people in the

9    relevant field have to agree on a standard before

10   it becomes a standard.  Fair enough?

11        A.    Well, the majority of people who are

12   involved in the subcommittee and the committee

13   dealing with the standard have to agree, not just

14   a majority but usually two-thirds.  Sometimes it

15   is a simple majority, yes.

16              But the first thing that's required is

17   somebody has to commit the idea to I would like to

18   say paper but I would say has to commit the idea

19   to electronics, has to draft a document that could

20   be circulated.  And if you don't draft the

21   document, then everything after that is completely

22   moot.

23        Q.    Do you own Photoshop, the photo editing

24   software?

25        A.    I do.

1                          Tytell

2       Q.    Do you use it in your work?

3       A.    I have been using it recently.

4       Q.    When did you start using it in your

5   work?

6       A.    Sometime I guess in the last six

7   months.

8       Q.    Have you used any photo or digital

9   image editing software before Photoshop?

10      A.    Yes.

11      Q.    What was the name of it?

12      A.    Oh, there were several.  There's a very

13  useful program that Nikon has I think -- I'm not

14  sure if it's Picture Capture.  It is a software

15  that you can get with the newer Nikon digital

16  cameras.  I have been using it with the D70, the

17  old D70, and now the D90.

18            Prior to that software, there was a

19  software -- it seems antique now -- called Picture

20  Publisher.  I believe that came from a company

21  called Micrografx, M-I-C-R-O-G-R-A-F-I-X, I

22  believe.  And they used to be down in Texas.  They

23  have gone, but that was a great software program

24  for the kind of work we do:  overlays and so on.

25  I would still be using it except that it won't run

```
 1                          Tytell
 2   on a 64-bit machine.
 3              Then there's another program called
 4   ImageJ -- Image and then a capital J at the end --
 5   which I think was developed by the -- either the
 6   National Institutes of Health or the National
 7   Academies of Science.  And I think that's what
 8   people call freeware.  And I have used that some
 9   in the past over the last, say, I don't know, four
10   or five years, maybe.
11       Q.    Have you reviewed any of the images you
12   captured in this case using any of that kind of
13   image-editing software?
14       A.    Yes.
15       Q.    Did you keep records of any changes you
16   might have made to the images in that software?
17       A.    Well, I -- as with any enhancement of
18   images to bring out details that might not be
19   readily available on the surface.  You never
20   change the original image.  You are always working
21   with copy images.
22              So when you ask if I've kept any record
23   of changes I have made to the images, there have
24   been no changes made to the original I guess you
25   would talk about native files.
```

1                           Tytell
2              Where I have been using the Photoshop
3     software, I believe there is a feature there
4     called history which is always turned on so I can
5     go back and look at step by step what adjustments
6     have been made.  And that is sort of the record
7     that would be kept.  And also I would save the
8     images as I go so I could look at the images.
9              But I haven't done anything that's
10    really that compound/complex that it couldn't be
11    redone in real time in a matter of a couple of
12    minutes.  Actually that's not true.  Some of the
13    overlays -- some of the overlays require some
14    adjustments.  But the kind of adjustments to
15    levels or brightness and contrast, those are
16    really very basic.
17             A lot of these adjustments are pretty
18    much the kind of adjustments that we used to do to
19    television pictures when they had knobs on the
20    front of televisions.  I don't know if you're old
21    enough to remember that, sir.
22        Q.    I am.
23        A.    Okay.  Well, you remember brightness
24    and contrast knobs on the front of the black-and-
25    white TVs, if you're that old.

                          Tytell

1

2      Q.    Yes.

3      A.    Then when we got to color TVs, you had

4  adjustments for tints and things like that.  Those

5  are pretty much the same adjustments that at least

6  in this case bring out the significant details of

7  the images.

8            For instance, using those kinds of

9  adjustments, just brightness and contrast, you can

10  take a look at the scans taken at 9:18 a.m. and

11  see the two tabs at the top of page 1.  You can

12  use those simple adjustments, the kind that used

13  to be on the old television sets, and see the

14  darkened triangle on the reverse of page 1.

15            So, you know, it's nice to have these

16  wonderful software tools, most of which use

17  algorithms originally developed by NASA 30 or 40

18  years ago.  But it's nice to use all of these

19  things, but the adjustments themselves are really

20  very basic.

21      Q.    Did you produce your report to the

22  defendants in a PDF format?

23      A.    Did I produce my -- well, produce.  I

24  sent it to them as a PDF, yes.

25      Q.    And do you know what they did, if

1                           Tytell
2    anything, to that report before submitting it as
3    part of an exhibit to their motion to dismiss?
4    Did they change it in any way, if you know?
5         A.    I do not know.
6         Q.    Do you know how the quality of the
7    image that -- the images included in your report
8    as it was filed with the court compare to the
9    quality of those images as you have them on your
10   copy of the report in your office?
11        A.    No.
12        Q.    Have you provided to the defendants the
13   electronic files of all the images that are
14   included in the PDF document that you eventually
15   sent to them?
16        A.    Well, since I've given them all the
17   images that I took, that would include the
18   start-up set of images which were included in the
19   report.
20        Q.    And do you have copies of all those
21   images still in your office?
22        A.    What do you mean by "copies of the
23   images"?  Oh, I --
24        Q.    Do you have scans in electronic file
25   format in your office?

1                           Tytell

2        A.    Well, in my office, yes.  I have also

3   on backup external hard drives the scans and the

4   photographs or the images that were acquired with

5   the scanner, the images that were acquired with

6   the digital Nikon -- the Nikon digital camera, and

7   the images that were acquired using the VSC 400.

8   All of those files I have the originals of the

9   native format files of everything, and so does

10  counsel for defendants.

11       Q.    And did you save the adjusted versions

12  of those images?  You know how you were talking

13  about contrast and all that.  Did you save those

14  versions of the images as well?

15       A.    Yes, in different file folders in

16  completely different folders from the original

17  images, of course.

18       Q.    Did you give the defendants' lawyers

19  those adjusted images, copies of those adjusted

20  images?

21       A.    I think I have sent PDF files of some

22  of those to the attorneys for the defendants.

23       Q.    And as part of producing your report in

24  this case, did you review some images, if you

25  know, that were obtained from the plaintiff's

1                        Tytell

2    expert?

3         A.    Yes, I did.  Yes, I did.  Excuse me,

4    let me back up.  Excuse me, Mr. Boland.  Can you

5    please define "plaintiff's experts" for me?

6         Q.    Larry Stewart, did you review some

7    images that you understood came from him and his

8    scanning or imaging work of the document?

9         A.    Yes.

10        Q.    Jim Blanco, did you review some of his

11   images?

12        A.    Yes.

13        Q.    John Osborn?

14        A.    Yes.

15        Q.    And Mr. Aginsky?

16        A.    I believe it's Dr. Aginsky, and yes.

17        Q.    And Mr. Speckin, does that ring a bell?

18        A.    Erich Speckin rings a bell, and I

19   believe that there are images that were acquired

20   by Mr. Speckin on his VSC equipment in I believe

21   Chicago on July 25th.

22              And as I -- it's just my recollection

23   from the video.  I think that Mr. Stewart was

24   standing at his elbow, if you will, when they were

25   acquired.  And those images are attached as

```
 1                        Tytell
 2   Exhibit C to my report, and that would be pages
 3   21, 22, 23, and 24 of document 330, which is
 4   Tytell Exhibit 1.
 5              That's why I know what they were.  I've
 6   got them sitting here.  Those, I believe, are the
 7   Speckin images, or among the Speckin images.
 8        Q.    Let me clarify something.  The adjusted
 9   images that you made of the scans, did you or did
10   you not provide those to defendants?
11        A.    Some.
12        Q.    Counsel?
13        A.    Some, some of them.
14        Q.    You did?  Okay.  Oh, some.  You said
15   you provided some of them.  Do you know which ones
16   you provided to them?
17        A.    Let's see.  Yes, I do.
18        Q.    Can you describe which adjusted images
19   you provided to the defendants?
20        A.    I provided defendant with images
21   showing split channels in CYMK mode and split
22   channels in RGB mode.  And some of those kinds of
23   images with brightness and perhaps contrast
24   adjustments.
25              That is what I recall at the moment.
```

1                         Tytell

2        Q.    And which images -- I understand the

3    types of adjustments that were made to those

4    images.  I'm saying which images, adjusted

5    versions of images of page 1 of the "work for

6    hire," page 2 of the "work for hire," the

7    specification agreement, what images did you

8    adjust and then send to them?

9        A.    Pages 1 and 2 of the "work for hire"

10   document, images taken from the specification

11   document that had portions cropped to illustrate

12   line quality of the signature of Mr. Ceglia.  I

13   think I may have used those images, but they were

14   not necessarily adjusted.

15       Q.    Did you use any of those adjusted

16   images in your report that you filed along with

17   the motion -- not that you filed but that the

18   defendants filed along with the motion to dismiss?

19       A.    I don't believe so.

20             MR. SOUTHWELL:  Mr. Boland, we're now

21        at four hours.  Are you almost done here?

22             MR. BOLAND:  Yeah.

23       Q.    What's your basis for that belief,

24   Mr. Tytell?

25       A.    Exhibit Tytell 1.

 1                         Tytell
 2        Q.     You're saying you reviewed that exhibit
 3  or you reviewed your report since it was filed and
 4  that's your basis for your belief that none of
 5  your adjusted images are in your report?
 6        A.     Not since it was filed.  But again it's
 7  unfortunate that we can't see each other or are
 8  sitting next to each other.  But I'm looking at it
 9  right now as Tytell Exhibit 1.
10        Q.     Right.
11        A.     And on page 4 there are two images in
12  reduced size of the scans from Exhibit -- of page
13  1 and page 2.  And those are just -- those images
14  were dropped in.
15              On page 7 -- excuse me, on page 5,
16  there are cropped portions of those same images at
17  life-size.  They were cut out, but they were not
18  adjusted in any way.
19              Similarly, on page 6 there are images
20  from my scans and from Dr. Aginsky's scans.  You
21  had referred to those earlier.  They were just cut
22  out and dropped into the Word file, into a table
23  in Word.
24              On page 7 and page 8, there are
25  pictures showing the UV fluorescent

1                        Tytell

2    characteristics.  Those are the images.  I am not

3    sure if they are cropped or not, just so they

4    would fit into the format.  But those have not

5    been adjusted in any way.

6              Then finally on page 10 there is an

7    image that was taken from the VSC 400 that is just

8    that image as it was captured on the VSC 400.

9    That's dropped in.

10             And then on page 11 there's the name

11   Paul Ceglia from page 1 and the name Paul Ceglia

12   from page 2.  They are larger than life.  But

13   those images are just cropped from the two scans

14   at page 1 and page 2.

15             And there I think on the picture of the

16   Paul Ceglia from page 2 on that cropped part of

17   the scan, because it's enlarged, you can see the

18   fading of the ink.

19             And actually, I don't know if you have

20   a copy of that document there, but if you take a

21   look at my report of March 25th, 2012, filed March

22   26, document 330, now Tytell 1, if you take a look

23   at page 10 and you look at the right-hand Paul

24   Ceglia image from page 2 of the paper "work for

25   hire" document, you'll notice that there are three

1                          Tytell
2    places where you can see ink.
3              And the ink that goes through the final
4    letter of Ceglia, the last A, and the ink to the
5    right of the comma following the name Ceglia,
6    those are what I was calling a light tan, as I see
7    them on this printout.
8              However, if you look at the bottom of
9    that image below the capital C, just above the
10   printed letter M in the word "document," you'll
11   see a bit of the top of I believe it's the capital
12   P in Paul or the first letter of the signature.
13   And you will see that that is quite a bit darker.
14             So even within the same writing there
15   are differences.  There is variation in the
16   lightening of the ink:  one brown, the other tan.
17   And brown and tan, if you go to proper color
18   science, they'll tell you that these color names
19   are just names of convenience, that brown and tan
20   and all of that is a dark yellow-orange or a dark
21   orange.  But that's another story.
22             So yeah, those are images.  They were
23   not adjusted in any way except to be enlarged
24   slightly and dropped.
25             And then finally the image, which is

1                    Tytell

2    not one of mine, of the staple on page 12, that

3    comes from the mid 2010 image of that version,

4    that electronic version, of the TIFF file attached

5    to the e-mail from Mr. Ceglia to Mr. Argentieri.

6              So my answer as to whether or not any

7    adjusted images were used in my report is based

8    upon looking through the copy of -- or what you

9    have represented to me is a copy of my report

10   which is currently marked as Tytell 1.

11       Q.    We talked before about your -- you

12   don't have any liability coverage for your work on

13   cases, especially this case; true?

14       A.    I don't know why you say "especially

15   this case."

16       Q.    I'm asking about this case.  You didn't

17   have -- you don't have any liability insurance

18   covering your work on this document?

19              MR. SOUTHWELL:  Objection, asked and

20         answered.

21              MR. BOLAND:  Okay.

22       Q.    Suffice it to say, sir, if during the

23   course of your handling of this document you

24   damaged it it would be potentially bankrupting to

25   you financially?

1                           Tytell

2          A.     Well, that's a question that would be,

3     I consider, contrary to fact because if you

4     consider the fading of the document and the

5     yellowish cast of paper of the color of the paper

6     of the two pages of the document -- let's say the

7     fading of the ink, the discoloration of the paper,

8     the tab marks that don't -- that do luminesce at

9     the top of the page and the concomitant

10    indentations that go with those tab marks, which,

11    by the way, could not really have been made by a

12    finger, whether it was contaminated.  But there

13    are indentations there that are not at all

14    consistent with being made by an object shaped

15    like a person's finger.

16         Q.     Sir --

17         A.     Excuse me, sir.  Let me answer.  If

18    you're referring to those things as damage, they

19    were damaged before I actually got to see the

20    document.

21                So whether -- I don't really understand

22    how I might have damaged a document which came

23    predamaged.

24         Q.     No, my question is if you did damage it

25    somehow during its analysis and the document is

```
 1                           Tytell
 2   worth half of whatever Facebook's worth, that's
 3   going to bankrupt you.  That's my point.
 4               MR. SOUTHWELL:  Objection.  This is
 5         harassing at this point, Mr. Boland.  This is
 6         a ridiculous question.
 7         A.    I suppose that might depend on whether
 8   or not the document -- any so-called damage would
 9   have any actual significance, given the nature of
10   the document, although I don't really see that
11   there was in fact any actual damage of any kind of
12   significance at all during the two days that I
13   spent with the document.
14         Q.    Finally, you mentioned something about
15   printers before.  I want to ask a couple last
16   questions about that.
17               Is it true that if two documents -- if
18   a document on your screen is printed, two copies
19   of it are printed from the same printer, will
20   those generally -- those documents be the same,
21   they will look -- they will appear the same?
22         A.    Well, you know, the word "the same" --
23   you mentioned ASTM standards in the past over the
24   course of our question and answer today, and if
25   you look at one of the ASTM standards that
```

1                          Tytell

2    discusses this concept, you'll see that the term

3    "the same" -- "the same," close quote -- is a term

4    that is discouraged when comparing two things in

5    the forensic field.

6              And this goes back -- this borders on a

7    philosophical point that no two things are the

8    same, no two things are absolutely, totally

9    identical at the most minute level.  And indeed,

10   there's a philosophical point that no object is

11   the same as itself over time.  And the ancient

12   Greek wisecrack of the philosophers is you can

13   never swim in the same river twice.

14             So the Exhibit Tytell 1 that was handed

15   to me this morning and has done very little but

16   sit in front of me and be open from time to time

17   is not the same as it was when it was originally

18   marked.

19             So to say the two printouts are going

20   to be the same, besides being the wrong

21   terminology, is is almost a philosophical

22   oxymoron.

23             So perhaps if you would say is it

24   possible, given the proper conditions with the

25   proper printer, that they might be

1                          Tytell
2    indistinguishable at a certain level of analysis,
3    yes.  But that depends on what level of analysis
4    you're talking about.
5              If you take two documents printed out
6    or two pages -- you have a one-page document on
7    your screen.  You go to the "please print," and
8    you say print me two copies and it -- the machine
9    hums and two pieces of paper come out of the
10   printer in compliance with your request to your
11   computer and you then take those two pieces of
12   paper, if you glance at them, they may look to be
13   indistinguishable.
14             If you examined them down to a very
15   minute level, you probably would find numerous
16   differences between them if for no other reason
17   than the paper they're printed on, because paper
18   is a random matting, felting, of different fibers.
19             And if you go to -- you pick out a
20   particular comma in the text, if it's a text
21   document, and you look at the way the paper fibers
22   are meshed in the area immediately above that
23   comma, you will see that they are, under
24   magnification, entirely different from one page to
25   the other.

1                        Tytell
2              So when you say wouldn't the two pages
3    be the same, the answer is what do you mean by
4    "the same."
5         Q.    I mean in the sense -- and, you know --
6    I'm sort of reluctant to ask the question again
7    because I ask what I seem to be a simple question
8    and I get paragraphs.  That's one of the reasons
9    we go on so long here.
10             We talk about comparing images scanned
11   from two different scanners, and you pointed out
12   reasons why that comparison would not be valid.
13   Do you recall those questions?
14        A.    I don't recall pointing out why the
15   comparison would not be valid under any
16   circumstance, no.
17        Q.    You said things like scanner settings
18   can change the resulting image that you scan,
19   depending on the settings of the scanner.  Do you
20   remember that?
21        A.    Well, I would agree that scanner
22   settings can change the image of the scanner.
23   That's what the nature of settings is, that they
24   can change the resultant image, at a certain
25   level.

1                         Tytell

2        Q.    And you talked about the levels of

3   different colors of ink.  I think you mentioned

4   cyan at one point in a printer can change the

5   resulting output that comes out of that printer.

6   Do you remember that?

7        A.    I remember mentioning cyan.  I think --

8   I didn't say the different level.  I said if the

9   computer were -- if the printer were out of cyan.

10  I guess that would be a level.  Zero is a level.

11  I think we were discussing levels of difference in

12  appearance when I used "levels."

13              I think with cyan -- perhaps we should

14  just look back to the record rather than relying

15  on my recall.  But I don't think you're

16  characterizing my answers correctly.

17       Q.    My point is if the same document is

18  printed out of two different printers and those --

19  the way that document appears to your eye, you see

20  some differences, like a text or different yellow

21  text, for example, or one has what appears to be

22  ink that's more faded than the other, those could

23  easily be a result of those two different printers

24  and how they have output that document; true?

25       A.    If you see differences that are

1                          Tytell

2    attributable to the printer are the differences

3    that you see attributable to the printer.

4              Well, it's kind of a circular question.

5    I think the only possible answer is yes.

6         Q.    No, my question is you just see

7    differences in the document.  One has some ink

8    that appears more faded than the other.  You don't

9    know how it happened.  Someone just gave you two

10   documents.  They look identical as far as their

11   text and the writing except one of them looks a

12   little more faded than the other.  The person

13   tells you, Oh, by the way, they were printed on

14   two different printers.

15        A.    Wait a minute.  Back up.  You're

16   talking about getting two different documents, not

17   two different images of the same document.

18   Because if you get two different documents that

19   were printed on the same printer, to me that means

20   that you have the same words that were printed out

21   on two different printers and then as documents

22   they may have been separately executed.

23              So you're actually -- could you please

24   be a little more --

25        Q.    Yeah, that's not what I'm saying.  I'm

1                          Tytell

2     saying the identical electronic file printed on

3     two different printers.  And then you're handed

4     the output of those two different printers, and

5     they appear visually to you to be different,

6     meaning one has a yellow cast, one the ink looks a

7     little faded compared to the other.  Okay?  That's

8     the hypothetical.

9              Obviously one of the causes for that

10    could be differences in how printers output

11    documents.  That's one of the potential reasons

12    they look different; true?

13       A.    Well, I think you used the word

14    "obviously" in your question, so it's kind of a

15    foolish thing for me to deny the obvious.

16              But -- so you're suggesting that if the

17    same file is on my computer screen and somehow my

18    computer is linked to two different printers are

19    these two different printers two different -- like

20    one is a color laser printer and the other is a

21    color ink jet printer and I tell the file to go

22    print one on the laser color printer and the other

23    on the color ink jet printer and the results look

24    different might the difference be due to the fact

25    that two different printers are involved?  That

```
 1                          Tytell
 2    would be one potential answer.
 3              Another potential answer could be the
 4    settings.  When you have a print screen in front
 5    of you, up -- do you use Microsoft Word at all?
 6         Q.   Sir, you've answered the question, and
 7    that's fine.  I'm just -- I was just talking about
 8    what -- if two different printers are used to
 9    print the same document that the resulting output
10    could look different because of the printer.  And
11    is that true?
12         A.   That would be one of the possible
13    reasons, yes.
14         Q.   Okay.  Also the settings on -- the type
15    of computer used and the software used on the
16    computer could cause some differences in the
17    output of those two different printers.  Is that
18    possible as well?
19         A.   Well, if you -- if you send -- let's
20    eliminate the second printer.  Let's go with one
21    printer.  If you have software and you tell the
22    software I'd like to readjust the entire way that
23    I want this document to look, like, for instance,
24    I'd like to print a two-page document so that it
25    all fits -- I have two pages on one piece of
```

1                          Tytell

2    paper, one side of the piece of paper, and then

3    the other one I say, no, just one page to one

4    page, it's going to look differently.  You have

5    adjustments that you can make to the printer

6    preferences button in, for instance, Microsoft

7    Word.

8               Now, I know -- so yeah, you can do any

9    number of things that would make two things look

10   different.

11              If you want to ask me about 11 other

12   things that you know could possibly make things

13   look different, okay, fine, let's go.

14              However, the problem is that when we

15   get back to the images taken of the "work for

16   hire" paper document in the first 20 minutes that

17   it was available for examination on the morning of

18   July 14th, none of this is at all relevant,

19   because the appearance of the document as I saw it

20   was that the ink was faded and the paper was

21   slightly yellowed and that that appearance, as I

22   saw it, was fairly and accurately represented by

23   the scans that I captured at 9:18 a.m. or the

24   files are marked 9:18 a.m. and 9:22 a.m.

25              And you can see the scans being taken

1                          Tytell

2    in the video beginning at 9:15 or so on the video

3    clock at the bottom of the screen.  That records

4    that the document was I believe your term is

5    damaged when it got there in the morning.  So that

6    is all documented.

7                The appearance of the ultraviolet

8    phenomena is visible on the video around 11 a.m.

9    It was documented thoroughly later that day around

10   I guess 5 p.m., which was the next time that a UV

11   light was turned on, and all of that was

12   documented and visible on the video by around 5

13   o'clock that afternoon.

14               So whatever happened that caused that

15   difference in the UV was thoroughly documented and

16   thoroughly visible as early as less than two hours

17   after Mr. Argentieri took the documents out of the

18   envelope.

19               And the white appearance of the tabs at

20   the tops of the two pages and the dark appearance

21   of the triangle on the reverse of page 1 are

22   apparent in the scans taken within the first 25

23   minutes or so of the documents being available for

24   examination on the morning of the 14th with the

25   kinds of basic adjustments that you and I used to

                         Tytell
1
2    do back when we had analog televisions.
3              All of that stuff is on the record, and
4    none of that stuff has really anything to do with
5    printing a single electronic file on two different
6    printers.  But let's continue to discuss the two
7    different printers if you wish.
8         Q.    Would you agree with me that the -- by
9    the time -- between the time you scanned the
10   document at 9 o'clock July 14th and Mr. Lesnevich
11   scanned the document a day later that the
12   document's appearance changed in some respects?
13        A.    Would I agree with you on that?
14        Q.    Yes.
15        A.    Not even a little bit.  Not a
16   scintilla.
17        Q.    Have you seen a comparison side by side
18   of Mr. Lesnevich's scan of the "work for hire"
19   document compared to your scan a day earlier?
20        A.    Your question was whether or not I
21   would agree that the document had some change
22   between the time I first saw it -- well, not at 9
23   o'clock; it would be closer to 10 after -- I think
24   11 after 9.  9:11 is kind of a charged number here
25   in New York.

1                         Tytell

2          But if there was a difference in the

3    document between 9:11 in the morning and when

4    Mr. Lesnevich did -- on the morning of the 14th

5    and when Mr. Lesnevich did his scans, there was no

6    difference in the document.  And my observations,

7    direct observations, of the document at that time

8    would say otherwise.

9          I also took a number of photographs of

10   the document on the afternoon of the 15th, some of

11   them after Mr. Lesnevich had departed.  And you

12   can see the ink -- the condition of the ink of the

13   document in those digital images on the

14   photograph, and you can see that the ink is faded

15   but not necessarily any more faded than it was in

16   the scans at 9:18 and 9:22 a.m. of the 14th.

17          So I just totally -- I don't know how

18   much more I can disagree with you than totally,

19   but I would if I could.

20       Q.    Have you seen Mr. Lesnevich's scans

21   from the morning of the 15th of the "work for

22   hire" document?

23       A.    I don't recall seeing those irrelevant

24   scans.  I have seen images -- excuse me, I have

25   seen images of them, I guess, that have been

1                              Tytell

2    reproduced from time to time, but I don't recall

3    seeing them per se.

4         Q.    In those images of Mr. Lesnevich's

5    scans, it's your opinion that those appear

6    visually the same as your scans of the "work for

7    hire" document 24 hours earlier?

8         A.    I don't know what I'm supposed to be

9    comparing here.

10        Q.    I asked you if you've seen images that

11   Mr. Lesnevich took of the "work for hire" document

12   on July 15th.  Did you see those?

13        A.    I think so.  I think I -- well, I don't

14   know that I've actually seen the native files.  I

15   may have done.  I don't recall at this time.

16        Q.    So would it surprise you to learn that

17   the scan that Mr. Lesnevich took 24 hours after

18   you did appears visually different, the color of

19   the document is different?  Would that surprise

20   you?

21             MR. SOUTHWELL:  Objection,

22        mischaracterizes.

23        Q.    If that were true, would that surprise

24   you that the color of the document between your

25   scan on the 14th and his on the 15th is different

                              Tytell

1

2    visually?

3        A.    I don't know whether -- I think we're

4    going back to before as to the level of difference

5    and the significance of the kind of difference,

6    the qualitative and quantitative difference,

7    between whatever might appear in Mr. Lesnevich's

8    scan and whatever might appear in my scan, whether

9    that would be within the kind of variation that

10   could be expected between any two scans from the

11   same scanner, from different scanners, and then we

12   go through a list of the possible variables.

13            So whether or not I would be surprised

14   would be -- depend upon whether or not there

15   actually was any difference that was detectible

16   and the level of significance of any difference

17   should a difference exist.

18       Q.    Would you be surprised if there was a

19   detectible difference between how the document

20   appeared in Mr. Lesnevich's scan 24 hours after

21   you scanned it?  Would that surprise you is the

22   question.

23       A.    It depends upon the sensitivity of the

24   detecting device as to how large a difference

25   might be detectible.  At the electronic level?  If

1                          Tytell

2     we have two printouts, are you talking about

3     differences at a subatomic quantum level or are

4     you talking about a difference -- are you talking

5     about a difference between black and almost

6     invisible like the difference between the Aginsky

7     scan and the appearance of the actual paper

8     document when I saw it on the morning of July 11?

9     That was a surprising difference.

10               So you would want to have a difference

11    at that level of magnitude at this point in the

12    game.  Considering the shock and surprise that I

13    experienced on the morning of July 11th,

14    surprising me now would require a really, really

15    big difference.

16               And I don't think that any difference

17    that might be detectible between a scan taken by

18    Mr. Lesnevich and a scan taken by myself would

19    rise to that level of difference that would cause

20    me to be surprised at this point after having been

21    so surprised on the morning of July 14th.

22        Q.    I'm talking about a difference that's

23    visible to your eye, that one document appears a

24    different color than the other document.  Would it

25    surprise you to see a scan from Mr. Lesnevich on

                          Tytell
1          the 15th where the document looks like it's a
2    different color than the one you scanned on the
3    14th?
4                MR. SOUTHWELL:  Objection.
5          Q.    Would it surprise you if that's true?
6                MR. SOUTHWELL:  Objection, asked and
7          answered.
8                MR. BOLAND:  No, he did not answer.
9                MR. SOUTHWELL:  He did, he did.  You
10         just don't like his answer, Mr. Boland.  But
11         he did answer it.
12               MR. BOLAND:  No.
13         A.    Okay.  I'll try again.  If one document
14   were bright kelly green such as you see on
15   St. Patrick's Day in New York and the other
16   document were fire engine red, then that would be
17   a difference that I would find somewhat
18   surprising.
19               However, my degree of surprise would be
20   infinitely less than the surprise which I
21   experienced on the morning of July 14th when I saw
22   the paper document taken out of the envelope by
23   Mr. Argentieri and put on the table, comparing
24   that to what I had expected, having previously

                              Tytell

1
2    viewed the scans of -- attached to the complaint
3    from mid 2010 and attached to the June 16th
4    declarations of Mr. Osborn and Dr. Aginsky.
5              That level of surprise would be what I
6    would now consider to be surprising and would be
7    exceedingly difficult to reach based upon the
8    kinds of small differences which might exist
9    between two scans in terms of shades of -- slight
10   shades of yellow difference.
11        Q.   Would you expect any change in the
12   color of that document to occur during your and
13   the other experts' examination of it from July
14   14th forward?  Would that examination cause the
15   document to become discolored, yellow or green or
16   red or whatever?
17        A.   I do not believe that the examination
18   procedures conducted on July 14th and 15th did in
19   fact cause any significant, noticeable change in
20   the appearance of that document.
21        Q.   I'm not saying whether they did.  I'm
22   saying could they.  Could the procedures employed
23   by you and the other experts actually cause the
24   document to change color, slightly or
25   dramatically, either way?

1                         Tytell

2       A.    I don't believe that the procedures

3   employed on those -- on that document that showed

4   up, the actual paper document?  Anything is

5   possible, sir.  Anything could happen.  I do not

6   at this moment believe that any such thing did

7   happen, nor do I believe that the nature of the

8   examination was such that it would have caused any

9   such change.

10      Q.    Okay.  Would you agree with this

11  statement, that there appears to be some

12  discoloration in this document that occurred

13  between July 14th and July 15th?

14      A.    No.

15      Q.    And if the court in this case made that

16  statement on the record, you would disagree with

17  the court, would you not?

18          MR. SOUTHWELL:  Objection,

19      mischaracterizes.

20      A.    I have infinite respect for any and all

21  courts.  But if a court chose to make a statement

22  which is contrary to fact, I would have to

23  disagree with that statement.  I would prefer to

24  believe that no court would ever make a statement

25  contrary to fact.  But anything is possible, as

                          Tytell
1
2     you have asked me to agree with.

3          Q.     And did you alter any of the images

4     that you placed into your report before putting

5     them into your report?

6               MR. SOUTHWELL:   Objection, asked and

7          answered.

8          A.     I altered them by reducing them in size

9     so they would fit into the area allotted to them,

10    such as the overall pictures of the scans of page

11    1 and page 2 had to be reduced considerably so

12    they would fit side by side on -- within the

13    margins of the page and other images were cut out,

14    cropped, and then reproduced one to one.

15               And other images were cropped, such as

16    the name Paul Ceglia, from page 1 and page 2 of

17    the scans of the paper document.  And they were

18    enlarged somewhat.

19               But other than cutting them out and

20    adjusting the overall dimensions, I made no

21    adjustments other than that.

22         Q.     No changes to the contrast in the

23    image?

24         A.     No.

25         Q.     The brightness?

1                           Tytell

2        A.    I picked the image up; I put the image

3   down.  That was what I did with the image.  Drag

4   and drop I think is the technical term.  Or insert

5   picture is another way to do it in Word.

6              MR. BOLAND:  Very well.  I have no

7        further questions.

8   EXAMINATION BY

9   MR. SOUTHWELL:

10       Q.    Mr. Tytell, you were asked earlier

11  about whether during the course of your

12  examination -- and the question I think had --

13  there were a series of questions, and there was

14  some lack of precision as to dates -- whether in

15  the course of your examination you had touched the

16  "work for hire" document but without gloves.

17             Do you remember those general

18  questions?

19       A.    Yes.

20       Q.    Are you aware of when, as in which day,

21  that may have occurred?

22       A.    Yes.

23       Q.    And did that occur that you touched the

24  "work for hire" document without gloves on July

25  14th?

```
 1                        Tytell
 2       A.    No.
 3       Q.    When did it occur?
 4       A.    I think on July 15th on -- I think on
 5   the afternoon.  I'm not sure of the exact time,
 6   but sometime on July 15th.
 7            MR. SOUTHWELL:  Nothing further.
 8            MR. BOLAND:  I have nothing based on
 9        that.
10            MR. SOUTHWELL:  Mr. Boland, I'm just
11        going to put our request on the record for the
12        opportunity to review the transcript or errors
13        and confidentiality designations and to
14        confirm that you are going to be sending the
15        payment out -- we sent you an e-mail with a
16        different address to send it to.  All right?
17            MR. BOLAND:  You just send e-mails from
18        Ms. Aycock or you?
19            MR. SOUTHWELL:  That's correct,
20        Ms. Aycock sent it.
21            MR. BOLAND:  Okay.  I'll send it to the
22        address she gave me, and I'll put it in a
23        FedEx envelope.  I will do that at -- the last
24        pickup is at 7.  I will do it by 7 o'clock
25        today.
```

```
 1                      Tytell
 2            MR. SOUTHWELL:  Great.  It will be the
 3       full amount?
 4            MR. BOLAND:  Correct.
 5            What's the time?  Can you ask the court
 6       reporter to give us how many time we spent?
 7            MR. SOUTHWELL:  Do we have four and a
 8       half hours?
 9            MR. BOLAND:  Is someone recording it,
10       instead of guessing, if you could?
11            (Discussion off the record.)
12            MR. SOUTHWELL:  Four hours and
13       thirty-six minutes.
14            And Mr. Boland, you will send me the
15       tracking number for the payments, as you said
16       you would?
17            MR. BOLAND:  Yes, I will.
18            MR. SOUTHWELL:  All right.
19            MR. BOLAND:  By e-mail.
20            (Continued on the following page.)
21
22
23
24
25
```

1                      Tytell
2            MR. SOUTHWELL:  All right, then.  We're
3      done.
4            MR. BOLAND:  Okay.  We're done.  Thank
5      you.
6            (Time noted:  4:25 p.m.)
7
8       _____
9      PETER V. TYTELL
10
11   Subscribed and sworn to before me
12   this _____ day of _____ 2012.
13
14   _____
15            Notary Public
16
17
18
19
20
21
22
23
24
25

Page 209

1

2                  C E R T I F I C A T E

3      STATE OF NEW YORK     )

4                            : ss.

5      COUNTY OF NEW YORK    )

6

7              I, LAURIE A. COLLINS, a Registered

8          Professional Reporter and Notary Public

9          within and for the State of New York, do

10         hereby certify:

11             That PETER V. TYTELL, the witness

12         whose deposition is hereinbefore set forth,

13         was duly sworn by me and that such

14         deposition is a true record of the

15         testimony given by the witness.

16             I further certify that I am not

17         related to any of the parties to this

18         action by blood or marriage, and that I am

19         in no way interested in the outcome of this

20         matter.

21             IN WITNESS WHEREOF, I have hereunto

22         set my hand this 7th day of August, 2012.

23

24                         _____

25                         LAURIE A. COLLINS, RPR

Page 210

1

2    - - - - - - - - - I N D E X - - - - - - - - - -

3

4    WITNESS:              EXAMINATION BY:           PAGE

5     Peter V. Tytell    Mr. Boland                    7

6                        Mr. Southwell               205

7

8    -------------- TRANSCRIPT MARKINGS ---------------

9    DIRECTIONS:

10   MOTIONS:

11   REQUESTS:

12   RULINGS:

13   TO BE FURNISHED:

14

15   -------------------- EXHIBITS --------------------

16    TYTELL NO.          DESCRIPTION            PAGE

17

18    Exhibit 1, expert report of Tytell        8

19    Exhibit 2, document labeled "Exhibit A"   107

20    Exhibit 3, document labeled "Exhibit B"   108

21

22

23

24

25

1

2                        ERRATA SHEET
              VERITEXT REPORTING COMPANY
3                      1250 Broadway
                 New York, New York 10001
4                      (212) 279-9424
5    CASE:  Ceglia v. Zuckerberg
     DEPOSITION DATE:  August 3, 2012
6    DEPONENT:  Peter V. Tytell
7    PAGE/LINE(S)/     CHANGE              REASON
8    ____/_____/_____/_____
9    ____/_____/_____/_____
10   ____/_____/_____/_____
11   ____/_____/_____/_____
12   ____/_____/_____/_____
13   ____/_____/_____/_____
14   ____/_____/_____/_____
15   ____/_____/_____/_____
16   ____/_____/_____/_____
17   ____/_____/_____/_____
18   ____/_____/_____/_____
19   ____/_____/_____/_____
20
                  _____
21                    PETER V. TYTELL
22
     SUBSCRIBED AND SWORN TO BEFORE ME
23   THIS _____ DAY OF _____, 2012.
24
     _____  _____
25   (NOTARY PUBLIC)    MY COMMISSION EXPIRES:

| **&** |
| --- |
| **&**   1:20 2:12 155:10 157:7 158:12,16 |

| **0** |
| --- |
| **0.003**   128:19 |
| **0.010**   128:19 |
| **00569**   1:7 |

| **1** |
| --- |
| **1**   8:21 9:22 11:22 27:4 29:22 49:15 50:22 52:7,10 54:13 61:5,7 62:5,20 67:12 73:11 78:5 103:8,11 107:11,24 108:8,23,25 109:3 110:19 112:9,15,15 112:18,20,24 113:5 113:6,18 115:3,9 126:3 127:14 131:6 131:17 134:5 137:20 141:6,10,17 141:19,20,22 142:24 151:19 158:5,6 161:16 175:11,14 179:4 180:5,9,25 181:9,13 182:11,14,22 195:21 204:11,16 210:18 |
| **10**   9:22 10:2 114:16 182:6,23 196:23 |
| **10001**   211:3 |
| **10166-0193**   2:15 |
| **107**   210:19 |
| **108**   210:20 |
| **10:56**   1:17 |
| **11**   26:8 114:15 182:10 194:11 195:8 196:24 200:8 |
| **11th**   200:13 |
| **12**   156:7 159:11 184:2 |

| **1250**   211:3 |
| --- |
| **13**   156:7 159:11 |
| **13th**   3:25 |
| **14**   35:25 |
| **1475**   2:6 |
| **14th**   22:16 23:13,22 24:19 25:20 29:8,16 30:15 31:14 35:7 38:6,14 40:9,11 41:15,20 48:20 50:6 67:17,17 74:20 75:14 76:14,23 89:4 89:10 101:11,18,18 102:3 105:13 106:7 109:18 111:14 115:5,6 119:18 120:2,6 121:9,18 130:21 136:2 137:9 137:21,23 138:16 142:16,21,21,25 150:19 152:21,22 153:24 154:2,8,13 154:18,20,22 155:4 155:6 160:19 161:9 194:18 195:24 196:10 197:4,16 198:25 200:21 201:4,22 202:14,18 203:13 205:25 |
| **15**   35:25 140:20 |
| **15th**   28:4,19 29:3,9 29:18 31:15 134:16 153:18 154:14,14 154:18,20,23 160:3 197:10,21 198:12 198:25 201:2 202:18 203:13 206:4,6 |
| **16th**   120:7 202:3 |
| **1700**   6:22 |
| **17th**   120:7 |
| **1970s**   84:7 157:5 |
| **1980s**   86:17 |
| **1:00**   87:7 |

| **1:10**   1:7 10:19 110:8 |
| --- |
| **1:32**   88:3 |

| **2** |
| --- |
| **2**   37:22 38:2 43:17 49:15,24 51:8 52:12 52:14 54:13 55:21 56:19 58:14,16,16 58:19,25 59:20,21 59:25 60:3,8,21 62:21,21,22 65:16 67:16 68:20,24 69:21 70:24 71:3,5 71:17,25 72:2,8 73:11,23 92:24 97:25 98:4,10,15,17 100:9,11,13,19,22 100:24,25 101:4,6 101:16 102:6 103:7 103:11 106:17 107:6,13,15,18,19 107:24 108:7,9,11 108:24 109:8 110:9 110:19 112:17 113:2,7,16,22 118:12 120:13 121:7 122:22 123:4 123:15,16,17 126:6 131:6,17 140:12,14 141:3,10,11,13,21 142:11,24 143:6,7 144:3,3 145:25 146:7 151:19 180:6 180:9 181:13 182:12,14,16,24 204:11,16 210:19 |
| **20**   151:22 156:8 194:16 |
| **200**   1:21 2:14 |
| **2003**   50:24 51:2 |
| **2009**   158:19,20 |
| **2010**   23:4 24:14 25:17 39:9,21 60:4 61:7 69:14 71:5,8 72:3 73:17 98:2 |

| **99:**2,5,10,10,25 100:6 101:5 102:6 184:3 202:3 |
| --- |
| **2011**   23:21 28:19 35:25 40:4 109:20 120:8 |
| **2012**   1:16 182:21 208:12 209:22 211:5,23 |
| **205**   210:6 |
| **21**   51:10 179:3 |
| **212**   211:4 |
| **21st**   137:25 |
| **22**   51:11 179:3 |
| **23**   179:3 |
| **232-2**   108:15 |
| **238-2**   108:6 |
| **24**   44:19 179:3 198:7,17 199:20 |
| **240**   106:25 |
| **240-1**   106:16,18,19 107:4,11,18 108:11 |
| **25**   151:23 195:22 |
| **25th**   15:24 178:21 182:21 |
| **26**   182:22 |
| **262-2**   74:2 |
| **263-2**   32:3 |
| **279-9424**   211:4 |
| **28**   50:24 51:2 |
| **2:55**   149:13 |

| **3** |
| --- |
| **3**   1:16 107:11,15,18 107:18 108:18 109:2,14,15 110:9 112:7,17 118:12 120:14 121:7 123:4 123:16,18 127:13 127:13 140:12,16 140:20 141:3,6,20 142:12,14,19 144:3 145:25 146:9 210:20 211:5 |

**30** 20:14,20 157:10
  175:17
**330** 8:14,24 9:4
  67:13 179:3 182:22
**3400** 4:17 6:11
**3:08** 149:13

**4**

**4** 50:9 54:7 109:7
  127:14 181:11
**4.28.03.** 71:10
**4/28/03** 52:13
**40** 175:17
**400** 134:18 158:20
  177:7 182:7,8
**42** 13:21
**425** 149:25
**43** 51:17
**44107** 2:8
**4:25** 208:6
**4th** 63:25 64:3,6,11
  64:15 67:24 75:14

**5**

**5** 108:24,24 109:3,7
  109:12,12 110:9,9
  112:15,17 113:2
  121:2 123:17
  181:15 195:10,12
**500** 132:4

**6**

**6** 50:13 54:7,14,16
  55:16 56:11 58:15
  60:11,18 68:17 70:2
  70:9,11,12 181:19
**6000** 158:18
**64** 173:2

**7**

**7** 132:10 181:15,24
  206:24,24 210:5
**770724** 2:7
**78** 157:5
**79** 157:5
**7th** 209:22

**8**

**8** 3:12 114:15
  181:24 210:18
**8.5** 114:15
**85** 121:3
**86** 121:3

**9**

**9** 22:16 24:18,19
  41:20 196:10,22,24
**90** 59:8 64:21
**99** 64:22
**9:11** 196:24 197:3
**9:15** 195:2
**9:18** 115:7 175:10
  194:23,24 197:16
**9:22** 194:24 197:16
**9:30** 25:20

**a**

**a.m.** 1:17 2:17 22:16
  24:19 175:10
  194:23,24,24 195:8
  197:16
**aaa** 160:12
**able** 43:2 57:2,12
  72:14 77:24 78:21
  80:24 102:5 122:8
  130:6
**absence** 52:15
**absolute** 140:9
**absolutely** 129:25
  187:8
**absorbing** 26:13
**academies** 173:7
**accept** 44:13 52:16
  52:19
**accepted** 12:15 20:6
**access** 62:16 66:14
  66:18,19 67:2,7
  72:14
**accidentally** 91:22
**account** 123:5,8,13
  126:22 142:10
  143:2,10 148:13

149:18
**accounts** 137:12
  148:5
**accurate** 44:20
  55:11 128:22 129:6
  130:23 142:22
**accurately** 130:9
  194:22
**achieve** 169:23,24
**acknowledge** 10:9
  64:18
**acquire** 157:24
**acquired** 177:4,5,7
  178:19,25
**acted** 157:9
**action** 209:18
**active** 163:2
**actual** 25:12 28:21
  35:16 40:10 41:12
  73:15 111:6 113:5,6
  120:2 133:19
  136:25 186:9,11
  200:7 203:4
**add** 10:16 25:10
**added** 26:20 46:21
  47:2
**additional** 6:22
  25:18,21,25
**additions** 110:15
**address** 6:14 206:16
  206:22
**addressed** 64:25
**addresses** 38:9
**adjust** 180:8
**adjusted** 177:11,19
  177:19 179:8,18
  180:4,14,15 181:5
  181:18 182:5
  183:23 184:7
**adjusting** 204:20
**adjustments** 174:5
  174:14,14,17,18
  175:4,5,9,12,19
  179:24 180:3 194:5
  195:25 204:21

**advantage** 129:7
**advice** 155:11
**advocates** 31:3,5
**afraid** 99:3
**afternoon** 115:6
  142:21 195:13
  197:10 206:5
**age** 166:8,14 168:24
  168:25 169:7
**aged** 167:7
**agencies** 51:24
  162:23
**agency** 51:25 165:21
  166:2,6
**aginsky** 23:7,20
  24:8 49:22 53:4
  54:11 55:22 58:18
  68:4 105:6 106:8
  161:3 178:15,16
  200:6 202:4
**aginsky's** 23:23
  181:20
**ago** 16:7 20:15
  156:22 157:20
  163:18 175:18
**agree** 10:4 24:8
  40:25 102:13
  113:17 129:22
  135:10,11 160:17
  161:4 168:10,13,17
  168:20 169:13
  171:9,13 189:21
  196:8,13,21 203:10
  204:2
**agreeing** 161:8
**agreement** 18:14
  53:21 66:16 69:22
  69:24 98:14 101:17
  102:17 103:12
  150:3 166:13
  169:18,24 180:7
**agreements** 97:23
**agrees** 99:24
**ah** 166:25

**ahead** 10:7 99:15
149:6 159:5 163:20
**aid** 45:16
**albeit** 57:3 114:22
**albert** 14:21 15:2,5
19:15 103:21
**alcohol** 51:25
**alex** 3:3 8:17 9:3
17:22,23 22:3 31:25
149:6
**alexander** 2:16
**algorithms** 175:17
**allotted** 204:9
**alongside** 133:21
**alphabet** 30:3
**alter** 204:3
**alteration** 45:14
**altered** 42:9,15 45:8
45:11 46:19 47:9
131:10 204:8
**alternatively** 158:15
**amanda** 2:19 18:3
**amended** 98:16
**american** 157:16
**amount** 48:5 207:3
**analog** 128:15 196:2
**analogous** 121:19
**analyses** 13:17
**analysis** 12:19,21
16:21,25 17:5 20:10
28:6 32:11 33:25
34:5 36:24 42:3
46:14,22 53:18
61:15,21 64:12
65:16 70:7 72:21
74:19 75:12,17,21
75:25 76:3 92:24
100:12 103:17
105:13 123:25
166:16 185:25
188:2,3
**analyze** 20:3 34:11
34:23 35:8 36:25
76:5 77:2 104:4,8

**analyzed** 40:11
65:18 67:17 101:17
102:3,16 103:4,10
106:7
**analyzing** 32:18,24
33:14,17 101:10
**ancient** 187:11
**angle** 59:8
**answer** 13:15 15:23
30:10 31:9,10 36:3
38:23 42:7 65:14
74:11,13,15 76:21
76:22 77:24 80:5
115:13 135:16,17
139:8 152:22
164:14,17 165:7,8
165:13,14 167:2
184:6 185:17
186:24 189:3 191:5
193:2,3 201:9,11,12
**answered** 184:20
193:6 201:8 204:7
**answers** 123:19
190:16
**anticipated** 22:20
23:14,15
**antique** 172:19
**anybody** 69:19
**anyway** 52:4 87:3
**apologize** 118:5
**apparatus** 81:4
**apparent** 46:20 98:9
121:9 136:22
195:22
**apparently** 50:12
52:10 58:20 60:16
71:11 107:19
108:23 114:12
**appear** 46:16 50:13
62:8,10 71:17 92:8
92:17 122:2,18
123:3 133:22
134:14 144:5,10,17
144:18,23 145:13
145:20,22,24

146:10,12,14,15
147:10 160:20
186:21 192:5 198:5
199:7,8
**appearance** 4:7
13:22 25:22 69:2
114:4 126:22
190:12 194:19,21
195:7,19,20 196:12
200:7 202:20
**appeared** 67:8
134:17,19,21 137:8
142:24 160:21,22
163:3,13 199:20
**appearing** 123:14
148:13
**appears** 9:24 37:23
38:2 52:14 70:4
98:13 100:22 109:3
109:7,12 112:9
113:17 118:19
122:21 134:5,8,8
135:7 137:22
138:19 139:20
142:11 145:16
146:20,23 161:3
190:19,21 191:8
198:18 200:23
203:11
**appended** 39:19,21
**apples** 114:6 118:9
119:6,7,9
**apply** 18:20 42:17
**appreciate** 65:15
170:20
**apprenticeship**
96:17
**approach** 46:10
83:25 166:15 169:7
**appropriate** 75:8
117:14,18 127:11
127:16 136:20
140:18 145:4
167:10,18,19 168:4
169:3 170:25

**april** 50:24 51:2
**archived** 45:23
**area** 34:21 82:11
140:24 161:17
188:22 204:9
**areas** 136:9 161:24
**argentieri** 39:15,18
39:25 40:15 41:18
43:22 44:10,12,15
44:21 58:5 20,22 60:5
98:19 100:5 152:2
184:5 195:17
201:24
**arguing** 40:23
**arguments** 30:9
77:17,18
**arising** 45:25
**aroused** 49:25
**arrange** 4:20
**arranged** 158:11
**arrived** 28:4
**art** 66:2 70:16 95:17
158:13
**artifacts** 136:23
**asked** 4:2,16 13:7
20:4 32:11 33:12
43:7 46:17 65:9,11
74:2 88:6 102:24
105:19 184:19
198:10 201:7 204:2
204:6 205:10
**asking** 14:23,25
17:3,4 28:22 33:6
33:11 34:6,18 36:5
45:25 67:21 79:13
79:15,21 81:17 83:4
100:16,17,19 101:8
108:12 115:24,25
116:3,5 119:11
120:23 121:4,6
123:21 125:6
135:15 144:9,17
146:19 151:9
164:22 168:24
184:16

aspects 49:13
assignment 22:7
associate 28:14
59:11
associated 27:15
association 157:18
assume 15:19 18:19
29:23 89:19 112:16
140:14 141:5,8,11
141:20,22,25 142:7
142:15
assuming 20:20
125:7 143:7
astm 79:5,7,22
81:11 124:6,11,16
124:17,22 125:8,13
166:7,19,24 167:8
167:11,15 168:2,4,9
168:22 169:6,14,17
169:18 171:4,5
186:23,25
atf 51:25
attached 10:18 23:6
30:7,10 39:6 40:15
40:21 77:11 78:2,6
78:10 98:3,15 120:6
178:25 184:4 202:2
202:3
attachment 40:14
58:23 98:22 100:4
attempt 45:16 55:19
attended 157:22
attention 9:20
attorney 116:17
163:22
attorney's 163:4,14
163:16,21
attorneys 2:5,13
11:5 17:11 31:4
34:11 48:17 110:24
111:23 112:2
150:21 152:11
177:22
attributable 191:2,3

august 1:16 209:22
211:5
authentic 66:4
available 3:11 6:3
45:18 46:5 90:23
173:19 194:17
195:23
avenue 1:21 2:14
avoid 91:15
aware 10:24 34:23
57:18 74:18 75:12
81:6 90:8 92:2
103:7,20,23 104:2,8
104:12 125:8,15
129:20 134:20
166:7 205:20
aycock 2:19 18:3
206:18,20

**b**

b 29:24 43:16
108:19,22,24
112:16 210:20
back 22:5 27:3,16
27:16,19 30:23 33:5
40:19 41:2 48:12
50:23 77:16 86:16
87:4 88:20 94:8
110:17,17 140:13
143:16 151:15
157:5,20,24 174:5
178:4 187:6 190:14
191:15 194:15
196:2 199:4
background 35:5
backup 177:3
backwards 116:10
116:21
badly 68:13
balanced 127:9
ballpoint 23:17,18
23:24 24:2 90:25
138:7
bankrupt 186:3

bankrupting 184:24
bar 89:22
bare 74:21,24
barely 140:2
barrel 128:4
barring 44:5
based 23:8,18,23,25
42:5 45:15 78:2
91:10 100:12
116:21 135:24
184:7 202:7 206:8
baseline 59:8
basic 119:14 174:16
175:20 195:25
basically 36:10
59:18
basis 180:23 181:4
bathtub 139:24,25
battery 160:12
beach 28:7
bears 50:25
beautiful 120:22
began 105:13
beginning 30:2
85:13 144:8 149:15
195:2
behalf 16:4 17:8
163:3
belief 180:23 181:4
believe 8:14 11:25
17:15 18:21 19:14
36:13,15 37:17,18
38:8 39:11 50:8
53:21 57:24 79:3
80:3 97:18 101:12
101:19 102:23,25
106:10 108:2,5
116:2 120:7,20
143:25 145:25
153:3 160:4 172:20
172:22 174:3
178:16,19,20 179:6
180:19 183:11
195:4 202:17 203:2
203:6,7,24

bell 178:17,18
benjamin 2:18
17:24,25
better 19:3 60:18
70:23 98:8 105:15
beyond 30:3
big 140:6 158:17
200:15
bill 149:19,20,21,22
billing 4:6
bit 24:19 43:18
44:19 64:19 88:20
99:3 126:19 140:23
159:3,5 173:2
183:11,13 196:15
black 23:16,18,24
24:2,4 43:16,17,19
121:12,13 138:6,6
138:13 147:20
174:24 200:5
blanco 49:12 51:6,8
51:11 52:2,4 58:2
61:25 62:22 63:20
64:2,4,13 68:5
72:25 157:14,21
178:10
blanco's 61:19
63:23
blank 9:24 93:20,22
94:23
blood 209:18
blue 167:13,14,15
boland 2:4,9 3:8,22
4:22 5:5 6:17 7:8,17
7:18 8:17,23 9:2,5
9:16 20:23 21:3,7
22:3 28:22 31:25
32:8 33:10 53:17
54:25 73:25 74:5
88:9,15 106:19,22
107:4 111:11
115:24 140:17,22
143:18 149:6,12
158:24 159:2
164:21,24 165:2,6

165:12 178:4
180:20,22 184:21
186:5 201:9,11,13
205:6 206:8,10,17
206:21 207:4,9,14
207:17,19 208:4
210:5
**bombing** 158:8
**book** 167:12,13,14
167:15
**bookshelf** 124:25
**borders** 187:6
**bore** 53:8
**bother** 52:21 62:15
**bottom** 127:13
183:8 195:3
**box** 96:14
**brain** 148:25
**break** 12:17 21:13
97:22 118:6 140:23
146:4 147:5 148:18
149:7 152:4
**breaking** 18:24
20:23
**breakout** 152:9
**brief** 151:25 155:5
**bright** 201:15
**brighter** 143:13
**brightly** 26:16,19
27:3
**brightness** 174:15
174:23 175:9
179:23 204:25
**brilliant** 77:17
**bring** 7:6 26:7
158:12,15 173:18
175:6
**brings** 46:24
**broader** 100:17
**broadway** 211:3
**brought** 41:19
133:20 135:25
163:14,15
**brown** 119:16
121:20 183:16,17

183:19
**brownish** 109:9
**buffalo** 24:18 28:2,6
38:7 40:4 41:16,16
49:16 50:6 53:3
106:7 116:14
132:19 158:11
**build** 157:22
**building** 121:2,2,3
121:10 157:15
**buildings** 122:4
**built** 156:14,16
157:2,11
**bulb** 156:6
**bulbs** 156:4,5,5,8,8
156:10 159:6,9,11
159:11,15,15,17,23
160:3,10,16
**bunch** 118:12
**burden** 54:23
**business** 74:7
150:13,14,16 162:8
162:11,13,18 163:9
**busy** 152:3
**button** 194:6

**c**

**c** 2:2 29:24 39:14
172:21 179:2 183:9
209:2,2
**calibrated** 129:4
**calibration** 128:24
**caliper** 127:5 128:2
**call** 6:25 17:6 22:5
28:23,25 33:24
38:11 49:16 60:4
66:7 95:23 99:13
142:3 150:23
167:13 173:8
**called** 7:13 30:5
33:25 43:17 50:14
90:9 92:11,13 94:17
96:17 99:18 100:20
118:9 152:9 156:20
172:19,21 173:3

174:4 186:8
**calling** 50:15 52:6
111:2 116:2 183:6
**calls** 109:21 151:7
**camera** 156:18,19
156:23 157:2
160:10 177:6
**cameras** 172:16
**canada** 105:3
**cancel** 3:13
**canceled** 4:11,19
**cancellation** 4:18
5:20,21 6:21 150:11
**canon** 133:7
**capacity** 154:10,12
154:13,18,19,22
156:12
**capital** 81:2,3,3,3
173:4 183:9,11
**capture** 134:16,18
172:14
**captured** 49:21,23
54:6,11,12 119:22
120:5 173:12 182:8
194:23
**car** 86:20 133:8,10
133:11,12 153:10
153:11
**carbon** 41:9
**care** 80:7 138:20
**careful** 55:6,10
57:10,10 97:9
**carefully** 69:4 97:6
**carry** 74:8
**cartridge** 147:20,24
**cartridges** 147:21
**case** 10:18 14:2,8,20
15:10 16:5,15,25
17:5 18:11,15 19:18
20:9,12,14,20 22:8
24:13 29:7,14 32:4
32:10,22 33:19 45:2
48:13 53:12 57:19
66:11 67:9 74:9
78:7 79:2 81:15,22

81:25 82:13 86:14
86:16 89:4 91:21
95:12 97:5,18 98:16
102:18 104:5,9
110:8 112:3 124:2
125:18 149:16
160:18 163:5 164:2
173:12 175:6
177:24 184:13,15
184:16 203:15
211:5
**cases** 16:22 20:12
33:19 47:13 162:24
163:4,7,13,15 164:7
184:14
**casework** 13:23
**cast** 27:17 161:12,23
162:5 185:5 192:6
**catalog** 93:12
**catch** 9:19
**category** 47:7
**cause** 140:5 193:16
200:19 202:14,19
202:23
**caused** 59:12 61:9
82:5 162:4 195:14
203:8
**causes** 91:13 192:9
**causing** 21:10,13
91:20
**caution** 80:7 83:16
**cautioning** 83:17
**cautious** 89:6 91:14
**ceglia** 1:5 7:19 39:13
39:18,25 50:4,6,7
50:10 51:4,7,9,15
52:5,11,17,19,22
53:8 54:15,16,18
55:17,21,25 58:13
58:14,17,19,21,23
58:24 59:21,23 60:5
60:14 63:2 68:10,12
69:18 70:3,11,20
71:7,19,20 72:12
73:16,20,21,23

92:16 97:25 98:9,19
100:5,21 101:4,6
103:5 109:10
180:12 182:11,11
182:16,24 183:4,5
184:5 204:16 211:5
**ceglia's** 50:11 51:12
51:13 52:9 53:19
55:15 56:10 60:13
60:23 65:19 66:15
67:8,16 97:19 98:13
100:21
**ceglias** 66:12
**ceiling** 124:25
**cell** 21:5 150:24,24
**center** 158:8
**centuries** 127:25
**century** 46:24 48:12
48:13 67:4
**certain** 48:4 82:9
90:25 91:11 129:25
169:23 188:2
189:24
**certainly** 13:5 19:24
46:11 115:21
118:24 130:23
154:24 162:14,19
162:25 163:3
**certify** 209:10,16
**cetera** 10:19,19
35:17 36:17 46:25
66:6 99:25,25 105:6
107:16 110:8,9
137:14
**chain** 105:17 160:14
**chance** 168:12
**change** 22:9,13,15
155:22 173:20
176:4 189:18,22,24
190:4 196:21
202:11,19,24 203:9
211:7
**changed** 24:20
80:12 170:14
196:12

**changes** 11:8,9
148:2 173:15,23,24
204:22
**channels** 179:21,22
**character** 71:22,22
**characteristics**
36:14 60:24 182:2
**characterizing**
190:16
**charge** 6:4,24
105:15
**charged** 196:24
**charging** 149:15,24
**check** 5:2,8 6:12,12
14:6 96:21 159:14
160:7
**checkered** 143:4
**chemical** 76:3,6,24
76:24 89:24 90:9
91:10
**chemicals** 76:4
85:24
**chicago** 178:21
**chinos** 138:8,9
**choose** 83:12
**chose** 203:21
**chrysler** 133:9,10
**cia** 163:25 164:5,7,8
164:9,12,18 165:3
165:20 166:2,2,4
**circuit** 156:19
**circular** 128:8 191:4
**circulated** 169:3
171:20
**circumstance**
189:16
**claim** 42:18 117:23
**clarification** 165:18
**clarify** 111:8 146:19
179:8
**class** 47:7
**clay** 92:12
**clean** 84:2 88:22
**cleaner** 86:19,23

**clear** 3:10 29:10
55:16 57:5 59:17
76:22 88:5 111:10
123:19 126:12,13
126:20 130:10
136:7 156:5
**clearer** 111:11
**clearly** 21:23 115:12
136:11
**client** 5:23 12:25
17:8
**clock** 128:8 195:3
**close** 187:3
**closed** 156:19
**closely** 102:13
**closer** 196:23
**cloth** 80:12,13,19
81:9,12
**clue** 169:2
**clues** 47:2
**collect** 51:8,20 52:8
52:10
**collected** 51:12,15
52:7
**collective** 71:23
**collins** 1:22 3:4
209:7,25
**color** 39:12,24 43:19
44:19,19 62:10,11
62:16 109:9 135:19
136:6 137:2 161:11
175:3 183:17,18
185:5 192:20,21,22
192:23 198:18,24
200:24 201:3
202:12,24
**colorado** 157:19
**colored** 27:17
**colors** 190:3
**combination** 123:13
**combine** 147:25
**come** 16:12,24 34:10
47:12 61:15 81:13
86:9 88:21 118:20
150:15 164:23

168:9 188:9
**comes** 21:14 170:11
184:3 190:5
**comfort** 140:19
149:11
**comfortable** 42:19
117:20 122:10
**coming** 149:2
**comma** 183:5
188:20,23
**command** 105:18
**comment** 88:21
142:13
**comments** 11:17
33:2,4 61:20
**commission** 211:25
**commit** 171:17,18
**committee** 167:19
168:4 171:12
**common** 85:23
102:8 160:25
**communicate** 63:16
**communicated**
63:10
**communication**
151:8
**company** 15:25
172:20 211:2
**comparable** 115:7,9
121:22
**compare** 12:25
30:18 52:9,11,13
58:23 73:14,20
99:17 100:21 114:3
114:18,24 115:14
115:25 116:5
117:10 118:18
119:5,6,7 120:13
121:4,6 135:5 145:7
145:10 176:8
**compared** 29:8
33:21 53:7 54:4
56:8 60:2 61:3
71:21 117:25
119:19,21,24 120:4

120:6 123:16 151:4
192:7 196:19
**comparing** 13:17,18
30:14 58:8,13,16
59:14 114:6 116:24
117:22 118:9,10
134:9 140:12 187:4
189:10 198:9
201:24
**comparison** 11:25
25:12 31:13,13
48:19 61:13 69:20
71:2,8,13,24 99:23
114:10 117:15
118:22 119:11,13
120:10,20,23
121:17,18,19
135:10,14 137:10
189:12,15 196:17
**comparisons** 13:8
73:18 121:22
**compatible** 61:9
**complaint** 40:16,17
40:21 43:9,11 60:5
98:3,16,16,23 100:4
202:2
**complete** 7:25 49:25
97:19
**completely** 117:6
171:21 177:16
**completion** 102:23
**complex** 174:10
**compliance** 188:10
**compliment** 54:18
**component** 91:3
**components** 76:12
76:25
**compound** 174:10
**computer** 44:2
96:25 115:4 116:14
116:16,17 117:24
133:21 153:5,8,8,11
154:4 188:11 190:9
192:17,18 193:15
193:16

**concept** 187:2
**concerned** 83:22
147:4
**concerning** 61:21
**concerns** 91:13
**conclude** 138:25
139:2,4
**concluded** 120:2
**conclusion** 33:23
65:15 67:19 72:6
92:23 97:4 102:11
117:21 118:21
**conclusions** 15:6
**concomitant** 161:22
185:9
**condition** 26:6
106:13 126:23
127:3 134:21
135:23 142:23,23
151:12,16 197:12
**conditions** 18:17,20
134:15 150:4,7
187:24
**conduct** 151:20
**conducted** 202:18
**confer** 5:23 6:7
**conference** 22:4
152:8
**confidentiality**
206:13
**confirm** 33:12
206:14
**confirmation** 4:25
5:7,15 6:19
**conform** 68:21
**conformity** 69:8,9
69:10,13
**confused** 30:25
38:22
**connected** 21:8
153:5,8,9,11
**connection** 53:16
163:5
**consensus** 170:2,3

**consider** 39:25 40:4
64:24 134:24 136:4
145:19 152:4 185:3
185:4 202:6
**considerably** 84:15
204:11
**considerations**
118:13
**considered** 44:2
69:15 93:23,24
128:15
**considering** 200:12
**consistent** 13:3
52:23 72:4 185:14
**constituents** 76:7,10
76:13
**constitutes** 73:13
**constructed** 68:13
**consult** 6:23
**consumers** 90:23
**contact** 105:9,10
150:20,23
**contacted** 16:3,8,9
**contacts** 163:9,11
**contain** 91:3 113:18
**contained** 90:9
141:22
**contaminants** 83:23
86:4 106:3
**contaminate** 82:20
83:8
**contaminated** 83:2
185:12
**contaminating** 89:7
**contemporaneous**
53:9
**content** 11:22 33:11
**contents** 15:10,15
15:20 17:3
**context** 34:6
**continue** 196:6
**continued** 88:14
150:22 151:6
207:20

**contract** 16:20 17:5
23:2 39:3 40:9
41:17 48:20 65:17
65:17 67:16 72:9
99:14,18,19 100:12
100:20 101:10
103:3,5 107:15,25
108:25 112:19,21
112:25 113:5,7,19
115:3 129:13,18
130:19 141:7
**contrary** 93:4 138:3
185:3 203:22,25
**contrast** 26:16
27:19 56:13,14,15
73:15,20 161:15
174:15,24 175:9
177:13 179:23
204:22
**control** 155:17
**controls** 155:14
**convenience** 183:19
**conversation** 17:2
17:11,12 63:13,15
152:2,5,18
**conversations** 14:14
14:18,22,25 15:5,9
17:16 18:11 33:13
35:18 36:11,19
151:11
**convincing** 59:18
**cool** 86:15
**copied** 44:4 69:4
93:25 98:22
**copiers** 62:11
**copies** 4:15 22:24
23:2,5,8 31:19 43:3
66:22 99:5 110:22
110:25 111:22
176:20,22 177:19
186:18 188:8
**copper** 87:2
**copy** 26:18 39:19,21
39:22 41:9 57:24
58:14,17,25 59:20

[copy - defendants]

59:21,25 60:21 61:6
67:6 94:7 95:19
98:3,8,17 99:6
106:25 173:21
176:10 182:20
184:8,9
**copying** 94:9
**corner** 27:5,5,6,8,8
27:10,11 109:6
161:16
**correct** 6:16 15:21
20:22 31:9 32:15
38:14,15 39:16
40:11 41:24,25
63:22 82:14,15
107:22 118:15
120:3 123:22,23
131:2 142:5 144:16
152:15 170:21,25
206:19 207:4
**correctly** 139:2,3
190:16
**cost** 6:25
**costs** 4:7
**coterminous** 27:21
136:9 161:24
**cotton** 80:11
**counsel** 5:24 10:4
17:2 32:17 35:24
44:11 164:3 177:10
179:12
**count** 13:4
**counter** 78:12,13
**county** 209:5
**couple** 64:16 166:3
174:11 186:15
**course** 6:7 12:3
25:21 27:7,25 52:17
95:24 177:17
184:23 186:24
205:11,15
**court** 1:2 8:12,19,24
10:6 12:20 13:20,21
84:2 88:21 116:14
116:16,16 150:8

176:8 203:15,17,21
203:24 207:5
**courthouse** 11:6
**courts** 12:15 20:6
203:21
**cover** 29:23
**coverage** 184:12
**covering** 125:3
184:18
**crack** 45:20
**cream** 27:17 161:11
**crease** 27:9 161:17
**create** 98:21,22
101:25 169:13
**created** 27:9 45:9
93:2 101:14 109:17
111:19 115:16
116:18
**creating** 96:9
**creation** 45:19
**crime** 158:2,2
**criticism** 62:7
**critique** 62:6
**cropped** 180:11
181:16 182:3,13,16
204:14,15
**crutcher** 1:20 2:12
**curiosity** 49:25 63:4
**curious** 54:3
**current** 132:9
158:13
**currently** 104:22
184:10
**cut** 69:11 126:12,13
126:20 130:10
181:17,21 204:13
**cuts** 21:4
**cutting** 204:19
**cv** 1:7 10:19
**cyan** 147:19 190:4,7
190:9,13
**cymk** 179:21

**d**

**d** 1:5 29:24 81:3
210:2
**d.c.** 158:21
**d70** 172:16,17
**d90** 172:17
**damage** 81:13,20
82:5,19 185:18,24
186:8,11
**damaged** 82:16
184:24 185:19,22
195:5
**dark** 26:12,19 27:2
27:11,15 47:25
121:13,19 183:20
183:20 195:20
**darkened** 175:14
**darker** 109:6 122:21
123:3,6,7,14 138:7
138:11 145:20,22
145:24 146:10,12
146:14,16,20,23,24
147:10 148:14
183:13
**data** 46:6 131:7
**date** 10:20 47:22
51:2 52:13 53:9
56:4,7,10 59:22,24
60:2 62:24 63:22
65:4 71:9,12,14,20
77:13,21 93:3
106:11 211:5
**dated** 23:22 50:24
56:23 64:15 68:17
**dates** 23:16 45:19
50:13 52:13 71:18
107:21 109:11
205:14
**day** 5:5 30:16 47:16
49:6 53:10 56:7,10
56:14,23 68:11,17
88:7 110:21 134:13
135:6 141:24 150:6
150:9,10,17 152:20

152:21 153:18
160:19 195:9
196:11,19 201:16
205:20 208:12
209:22 211:23
**days** 4:3 35:13 38:7
38:7 64:16 65:2
86:17 89:5,11 134:7
137:7 141:24
150:12,13,13,15,16
153:14 186:12
**deal** 124:11 125:9
146:13
**dealing** 20:9 171:13
**dean** 2:9 7:18
**decide** 24:21,25
168:16
**decided** 61:16
**decimal** 126:17
130:4,5
**declaration** 23:20
23:22 61:19,20
63:23 67:24 77:10
**declarations** 23:6
63:25 64:3,6,14,20
78:25 120:8 202:4
**decline** 164:17
**deed** 47:23
**default** 131:19
**defend** 170:25
**defendant** 48:18
72:18 179:20
**defendants** 1:10
2:13 9:11 11:14
13:25 14:3,5,11
16:4,10 17:2,11
18:15,16 19:8 30:24
32:17,23 34:11,22
35:12,24 36:6,22
37:4,9 44:11 48:17
63:8 75:17,22 77:12
102:16 103:10,14
104:4,8,21 110:23
111:23,25 126:9
135:5 149:16

150:21 175:22
176:12 177:10,18
177:22 179:10,19
180:18
**defense** 10:4
**define** 82:19 137:15
160:24 178:5
**definite** 80:5 93:7
**definitely** 127:4
**definition** 94:20
**degree** 145:17
201:20
**degrees** 59:8
**deleterious** 80:15,22
**delineated** 161:17
**delivered** 159:8
**deny** 192:15
**departed** 197:11
**department** 66:2
164:3
**depend** 133:24,25
186:7 199:14
**depending** 189:19
**depends** 128:24
188:3 199:23
**depicts** 141:16
**deponent** 211:6
**deposed** 6:4
**deposition** 1:19 3:13
3:24 5:12,13 6:3,8
6:15,25 209:12,14
211:5
**depositions** 150:9
**depth** 43:18
**describe** 22:13
33:18 34:2 66:3,9
108:20 139:12
179:18
**described** 45:22
95:9,14 139:17
**describing** 47:4
53:18,21 124:7
**description** 23:23
144:2 210:16

**design** 157:4,6
**designations** 206:13
**detail** 61:8 64:21
114:25 117:2
**detailed** 65:14
**details** 20:21 122:13
173:18 175:6
**detectible** 199:15,19
199:25 200:17
**detecting** 199:24
**detection** 81:4
**deteriorated** 135:23
**determination** 93:7
97:8 118:2 166:8,15
169:7
**determine** 37:22
43:2 45:13 52:5
81:6 93:6
**determined** 66:4
**develop** 84:10,17,21
85:14
**developed** 60:14
84:19 173:5 175:17
**development** 84:9
85:8
**develops** 84:4
**deviations** 71:6
**device** 21:6 128:21
199:24
**devices** 22:5 97:16
128:23 130:12
**diagonal** 71:12
**diagonals** 56:5,6
**dial** 128:7,14,14
**dictates** 75:5
**difference** 57:13
61:10 115:18 119:9
121:5,8,9,12 122:8
126:25 127:2
130:10,11 136:6,8
136:16,18,18 138:8
139:7 140:8 147:3
148:4 190:11
192:24 195:15
197:2,6 199:4,5,6

199:15,16,17,19,24
200:4,5,6,9,10,15,16
200:19,22 201:18
202:10
**differences** 11:21
59:5,10,11,12,13
60:7,8 61:8 97:24
118:13,17 121:11
122:6 136:21,23,23
136:25 137:2 148:7
148:12 150:19
183:15 188:16
190:20,25 191:2,7
192:10 193:16
200:3 202:8
**different** 18:10
20:18 24:22 45:12
64:5 67:20 73:18
84:18 93:10,14
94:15 97:15 106:13
114:23 115:2,20
116:4 122:7 125:3
127:5,6,24 128:14
130:8 133:23 134:3
134:10,10 136:7,17
144:5,19,25 147:23
148:3 151:12
153:16 155:25
156:2 160:8 177:15
177:16 188:18,24
189:11 190:3,8,18
190:20,23 191:14
191:16,17,18,21
192:3,4,5,12,18,19
192:19,24,25 193:8
193:10,17 194:10
194:13 196:5,7
198:18,19,25
199:11 200:24
201:3 206:16
**differently** 194:4
**differs** 100:24,25
101:5
**difficult** 202:7

**difficulties** 4:12
**difficulty** 55:13
**digital** 41:23 42:3,5
42:8,9,14 43:3
44:24 45:7,11,14
99:20 172:8,15
177:6,6 197:13
**digs** 170:16
**dimensions** 204:20
**dimmer** 156:3,4
**direct** 74:15 197:7
**direction** 6:14 59:6
59:10 93:4 143:12
**directions** 210:9
**dirty** 89:14
**disagree** 197:18
203:16,23
**discoloration** 185:7
203:12
**discolored** 135:7,12
160:21,23,24
202:15
**disconnected** 53:22
**discouraged** 187:4
**discovering** 85:4
**discovery** 43:22
84:8
**discuss** 4:16 15:14
15:17,19 32:16
35:11,19,21,23 36:3
36:6,21 37:2,3,8
41:21 154:6 196:6
**discussed** 12:4 16:2
32:23 36:10,12
49:14 57:25 93:11
125:12
**discusses** 124:18
187:2
**discussing** 32:20
66:13 79:19 92:20
190:11
**discussion** 48:11
62:4,9,15 169:10
207:11

**discussions** 62:21
  65:7
**dismiss** 9:11 77:11
  176:3 180:18
**display** 128:18
**dispute** 40:22 45:25
**distance** 9:18
  120:24
**distinct** 94:16
**district** 1:2,3 163:12
  163:15,17,17,18,23
  163:23
**disturbing** 80:22
**document** 8:14,24
  9:4,8,21 10:23 11:3
  11:7,10,20 12:7
  13:2 16:18 18:22
  19:22,25 22:17,18
  22:19,24,25 23:9,14
  23:15 24:2,7,9,17
  25:12,12,15,23,24
  26:6,9 28:11,13,18
  29:3,16,17 30:13,15
  30:16 31:2,8,14,18
  32:2,3,19,25 33:15
  33:24 34:12 35:6,9
  35:14 36:24 38:3,4
  38:5,10,11,17,20,21
  38:24 39:5,17,23
  40:2,3,5,8,15,21,24
  41:13,14 43:6,7,13
  45:4,8,10 49:16,17
  49:19,20,22,25 50:7
  50:8,14,15,17,23,25
  51:3,15 52:14,17
  53:3,20 54:5,8,10
  54:11,13,14,17
  55:16,22 56:2,12,17
  56:20,23,24 57:6
  59:2 60:11,18,22
  67:12 68:10,18,20
  68:25 70:18,25 71:4
  71:8,9,18,25 72:3,8
  73:16,24 74:2,20,21
  75:6,14 76:15,23

77:15,15,20,22,25
78:6,18 79:17,20,23
80:17,22 81:14,21
82:4,6,13,17,21
83:2,8,13,20,24
84:3 85:17,25 86:3
86:4,12,13 89:3,7
89:11,19 90:6 91:15
91:20,24 92:9,18,21
92:25,25 98:2,5,7
98:10,11,15,20,21
99:2,5,13 100:23
101:2 102:2,10
103:7,19 104:4,9,17
105:20,21,25 106:3
106:6,8,9,12,16,20
107:6,9,10,12 108:6
108:11,12,18,21
109:4,9,16,25
110:20 111:12,15
112:10 113:10
115:15,20 117:11
117:22,23 118:2
119:16,25 120:2,5
124:14 125:13,18
130:25 131:2,18
132:18 133:4,18
134:5 135:3,7,12,22
137:7,20 138:2
140:14,16 141:11
141:14,17,21,23
142:23 146:7
148:15 150:18
151:4,11,15,16,23
152:3 154:11,21
155:3,19 157:17,18
160:19,21,22 161:2
161:20 162:12
167:24 170:10
171:3,19,21 176:14
178:8 179:3 180:10
180:11 182:20,22
182:25 183:10
184:18,23 185:4,6
185:20,22,25 186:8

186:10,13,18 188:6
188:21 190:17,19
190:24 191:7,17
193:9,23,24 194:16
194:19 195:4
196:10,11,19,21
197:3,6,7,10,13,22
198:7,11,19,24
199:19 200:8,23,24
201:2,14,17,23
202:12,15,20,24
203:3,4,12 204:17
205:16,24 210:19
210:20
**document's** 196:12
**documentation**
  25:22 26:3
**documented** 27:25
  195:6,9,12,15
**documents** 11:6
  23:19 31:5 38:25
  39:2 40:13 45:23
  51:3 53:10 67:9,11
  69:25 73:17 75:10
  79:8 80:7 81:7 84:2
  86:9 88:22 89:9
  91:14 92:6,8,14
  101:11 110:5,16
  118:19 127:15
  138:15 145:7
  158:15,16 167:22
  186:17,20 188:5
  191:10,16,18,21
  192:11 195:17,23
**doe** 69:18 72:12
**doing** 7:23 11:24
  13:17 36:14 47:23
  55:10 61:14 71:24
  72:20 85:19 93:12
  122:10 162:13
  166:16
**dolls** 78:15
**dots** 62:10 71:11
**double** 87:3

**dozens** 125:3
**dr** 3:11,18,21 4:5
  7:5 23:7,20,23 24:8
  49:22 53:4 54:11
  55:22 58:18 68:4
  104:11,13 105:11
  152:10 178:16
  181:20 202:4
**draft** 167:9,17,21
  168:14,15,18,19
  169:2,16,20 170:10
  171:3,7,19,20
**drafted** 169:22
**drafting** 79:5
  166:19,24 169:22
**drafts** 167:24
**drag** 205:3
**dramatic** 136:11
**dramatically** 202:25
**drawn** 55:6 69:2,3
  93:24
**drives** 177:3
**driving** 28:15
  153:10
**drop** 205:4
**dropped** 181:14,22
  182:9 183:24
**duddy** 96:17
**due** 4:12 192:24
**duly** 7:13 209:13
**dunn** 1:20 2:12
  17:17 18:12,21
  31:19 43:11 44:16
  108:15 152:11
**dunn's** 7:21 106:15
**duplicate** 44:9
**dye** 76:8
**dyes** 76:8

**e**

**e** 2:2,2 3:12,15 4:23
  5:6,8 6:18 7:12,12
  7:12 29:24 39:13,14
  39:15,15,18 40:14
  58:22 60:6 81:2

88:2,2,10,10,10
131:25 184:5
206:15,17 207:19
209:2,2 210:2
**e.g.** 80:8
**earlier** 20:4 25:11
42:25 44:7 70:8
91:12 92:15 140:13
144:16 150:20
181:21 196:19
198:7 205:10
**early** 63:19 86:17
157:25 158:6
195:16
**ease** 40:6
**easier** 10:3 18:9
31:9 96:11 136:10
**easily** 190:23
**eastern** 163:15,22
**easy** 53:25 96:10
**edge** 125:20 129:9
**editing** 171:23 172:9
173:13
**edition** 132:9 133:15
**effect** 80:22 91:17
**effects** 80:16
**efforts** 85:7
**eight** 150:6
**eighties** 157:25
**either** 6:4 14:9 22:7
57:25 58:10 68:4
77:18 90:8 98:4
99:19 103:11,18
114:19 130:18
141:16 154:20,21
154:23 158:12
173:5 202:25
**elbow** 178:24
**electronic** 11:14,21
28:21,24 39:4,11
41:4 43:14,25 61:7
62:13,17 72:3 73:17
73:17 110:23 111:4
111:19,22 117:11
117:24 119:24

126:15 127:20
128:18 131:5
133:20 143:4
176:13,24 184:4
192:2 196:5 199:25
**electronics** 44:6
46:25 171:19
**electrostatic** 81:3
**elements** 71:16,21
71:24 73:10 94:11
**eliminate** 193:20
**elliot** 1:8
**embark** 61:16
**embedded** 131:12
**empire** 121:10
**employed** 72:25
165:21 202:22
203:3
**employee** 152:17,24
155:10
**employees** 165:23
**endorsement** 96:21
**engage** 117:5
**engaging** 127:3
**engine** 201:17
**england** 84:7,15,16
**engraved** 128:4
**enhancement**
173:17
**enlarged** 182:17
183:23 204:18
**enlargements**
114:13
**entire** 22:19 170:5
171:4 193:22
**entirely** 116:4
188:24
**envelope** 41:20
111:13 195:18
201:23 206:23
**epson** 131:25 132:2
132:9
**equalize** 136:20
**equally** 127:9

**equipment** 158:23
178:20
**erich** 178:18
**errata** 211:2
**errors** 206:12
**esda** 75:24 81:2,2,10
84:4,8,21 85:13,13
85:16,22 91:18
**especially** 184:13,14
**esq** 2:9,16,17,18,19
**essentially** 59:19
73:13 85:20 156:18
**established** 168:23
**et** 10:19,19 35:17
36:17 46:25 66:6
99:25,25 105:6
107:16 110:8,9
137:14
**euphemistically**
84:13
**evaluate** 147:11
**evaluated** 48:20
127:15
**event** 3:19
**events** 37:15
**eventually** 22:10
171:4 176:14
**everybody** 62:19
105:8 168:16
170:12
**evidence** 59:19
**evident** 67:23,25
**evil** 47:23
**evolved** 127:24
**exact** 51:2 53:8 65:4
68:17 206:5
**exactly** 11:11 38:9
45:22 57:22 73:5
88:25 144:23,23
154:5
**examination** 7:16
34:4,9 35:13 36:7
36:15 37:16,19,21
37:24 38:9 42:5,25
47:7 48:5 49:8,11

61:12 74:24 79:9
80:18 81:14 82:12
83:12 84:4 88:14
105:16 124:15
125:13 132:18
135:25 137:7
150:22 151:6,21
152:15 153:14
194:17 195:24
202:13,14,17 203:8
205:8,12,15 210:4
**examinations** 81:11
83:21 85:16 160:15
**examine** 22:17
34:24 36:25 38:10
38:16 42:14 46:18
76:9
**examined** 7:14 26:9
27:25 33:20 37:18
38:6,14 39:23 40:3
40:8 41:15 75:10
88:12 127:15
188:14
**examiner** 12:7,14
19:22,25 57:6 79:10
135:22
**examiner's** 77:15,20
**examiners** 31:2
51:15 85:17 157:17
157:18
**examining** 57:9 75:6
79:16,23 89:5,9
90:5 151:10
**example** 46:17
68:11 80:9 85:25
148:21 190:21
**examples** 67:3
**exceedingly** 202:7
**exceeds** 58:5
**exceptions** 161:14
**excess** 83:16
**exclusive** 47:6
**excuse** 18:24 49:5
51:13 58:15 88:24
143:18,18 154:14

178:3,4 181:15
185:17 197:24
**executed** 60:15,16
191:22
**exemplars** 51:20,21
**exercise** 73:8 114:24
115:10 116:4 117:4
117:6
**exhausted** 147:21
147:22 148:2
**exhibit** 8:21 9:9
11:22 29:15,19,23
29:24 30:14,17,22
39:5,19 51:10 77:17
78:18 98:7 106:14
106:24 107:6,7,13
108:4,14,18,19,22
108:24 112:2,16,21
113:7 123:3,4,7
127:14 140:11,14
140:16 141:6,10,11
141:20,21 142:11
142:12,14,19 143:6
143:7 144:3 147:10
176:3 179:2,4
180:25 181:2,9,12
187:14 210:18,19
210:19,20,20
**exhibits** 10:18 29:8
29:25 30:2,6 51:10
73:2 108:8 114:4
118:11 120:17
121:25 122:3,5,19
140:12,13 141:3,16
144:4,20 145:11,12
210:15
**exist** 166:3 199:17
202:8
**expect** 109:22
202:11
**expected** 23:25 58:8
151:13 199:10
201:25
**experience** 34:9
46:3 81:20 82:5,7

82:11 86:8 93:9
143:13
**experienced** 200:13
201:22
**experimentation**
80:20
**expert** 6:2 8:21 10:5
14:8 16:5 20:6 42:3
45:2 82:25 102:16
103:10 137:19
145:6 178:2 210:18
**expert's** 134:7
135:13 138:17,18
**expertise** 42:5,18,20
**experts** 13:25 14:5
14:11,15,16 15:10
35:12,12,22 36:7,22
37:4,9 74:19 75:13
75:17,18,19,22
76:25 103:14 104:3
104:16,22 105:14
105:21 119:23
120:8 129:16
133:19 134:10
135:6 137:6 160:18
161:2,7 166:14
168:20 178:5
202:13,23
**expires** 211:25
**explain** 38:22 147:9
170:24
**explanation** 46:5
56:21,25
**explanations** 147:2
147:4
**explicit** 3:14
**explicitly** 3:17
**express** 41:19
**extent** 44:17 45:17
101:3 102:12
165:11
**external** 177:3
**extra** 34:20,21
**extreme** 55:13

**extremely** 61:2 85:5
**eye** 22:17 138:18
140:7 145:18
190:19 200:23
**eyes** 131:2

**f**

**f** 9:9 29:23 39:12
78:18 88:2 172:21
209:2
**face** 27:2 128:8,13
128:14
**facebook** 1:9 141:7
**facebook's** 186:2
**fact** 37:23 50:2
53:11 83:8 84:6
133:6 138:3 142:10
152:24 154:25
155:2 169:4 185:3
186:11 192:24
202:19 203:22,25
**facts** 27:23 135:24
**factual** 147:3
**fade** 130:16 143:12
162:4
**faded** 41:18 107:16
107:19 109:2,11
112:13 119:16,19
119:20 120:3,18
121:14 122:2,18,25
130:19 134:23
137:18,22 138:6,19
138:22 139:10,13
142:11 143:9,15,22
145:9,13,16,17
160:20 161:10
190:22 191:8,12
192:7 194:20
197:14,15
**fadedness** 114:3
145:8,9
**fading** 139:12,16,19
139:23 161:21
182:18 185:4,7

**fair** 110:11 130:21
130:22 142:22
149:4 164:10
171:10
**fairly** 5:25 105:4
143:17,21 161:13
194:22
**fairness** 118:23
**fall** 55:7 158:20
**familiar** 54:24 72:24
91:9 158:23
**fancy** 128:12
**far** 42:19 75:16
102:5 114:3 121:5
123:11 147:4
191:10
**feature** 135:24
136:15 174:3
**features** 98:9 102:4
102:14 134:2
148:19
**fedex** 5:14 6:13,20
206:23
**fee** 4:7,16,17,18 5:11
5:12,20,22 6:4,5,5,5
6:11,21 150:10,11
150:17
**feel** 42:13 44:25
82:16 120:9 122:10
128:21 129:6
**feeling** 152:12,13
**feels** 169:22
**feet** 140:3
**felt** 42:19 63:6
126:24 127:10
**felting** 188:18
**fibers** 188:18,21
**field** 20:6 42:18,23
162:17 166:14
167:23 168:10
169:13 171:9 187:5
**figure** 8:2 25:13
**file** 8:25 43:8,14,15
43:16 44:4,5,12,14
44:15,18 45:18,21

58:20 62:13 98:19
98:21 100:4 111:19
111:23 116:13,15
116:18,18,20,21,22
116:23 131:5,7,8
133:20 176:24
177:15 181:22
184:4 192:2,17,21
196:5
**filed** 10:10 23:3,3
24:10 25:16 29:7,14
30:13,19,21 31:20
32:3 39:7,9 43:9,10
63:25 64:2 67:9
77:10,11 78:7,25
112:3 176:8 180:16
180:17,18 181:3,6
182:21
**files** 39:8,12,12
43:21,24,25 44:8,9
44:10 45:23 46:2,2
46:4 48:15 60:6
62:17 99:25 110:23
111:2,3,4 116:3,11
143:4 173:25
176:13 177:8,9,21
194:24 198:14
**filing** 24:11 78:11
**filings** 67:11
**filters** 156:25
**final** 93:7 183:3
**finally** 65:3 182:6
183:25 186:14
**financially** 184:25
**find** 3:14 48:3 58:4
130:10 188:15
201:18
**findings** 63:8,10
126:8 129:12
**fine** 31:23 33:10
49:19 56:22 79:14
140:24 193:7
194:13
**finer** 129:4

**finger** 185:12,15
**fingerprint** 83:24
91:15,20,25 92:11
**fingerprints** 83:19
84:3,5,11,17,23,25
85:10,14,15,21,21
86:18 91:18 92:3,7
92:13
**fingers** 83:23 86:20
**fingertips** 92:9
**finish** 121:7 140:22
**finished** 15:20 164:2
**fire** 201:17
**firearms** 51:25
**firm** 90:5
**firm's** 116:17 159:8
**first** 5:21 13:21 16:3
17:12,14 24:13 26:9
38:19,20,21,24
39:20,22,23 43:5
46:24 48:11 57:8
63:16,21 65:8 67:4
75:15 76:23 81:25
93:14 107:11,12
109:17 110:2
111:12,14 114:9,11
130:17,18,20,25
137:6 139:22
140:15 147:13,15
151:22 155:13
156:19 158:3,8
159:7,22,25 167:9
167:20,21 168:14
171:16 183:12
194:16 195:22
196:22
**fit** 159:17 182:4
204:9,12
**fits** 193:25
**five** 29:25 108:23
149:8 173:10
**fix** 170:14
**flag** 57:6
**flashlight** 160:13

**fleming** 85:4
**flight** 14:24
**floor** 124:25
**flowing** 139:25
**fluorescence** 86:24
161:25 162:2
**fluorescent** 26:16
27:12 56:15 181:25
**fluorescing** 26:20
27:3
**focus** 135:21,24
136:15 146:3
**focused** 89:10
**focuses** 36:14
**foggy** 49:5
**fold** 161:18
**folded** 27:8
**folders** 177:15,16
**folks** 106:15 168:10
168:12
**follow** 125:16 168:7
**following** 6:15 183:5
207:20
**follows** 7:15 88:13
**foolish** 192:15
**forensic** 12:7 19:21
85:18 125:13
135:22 157:18
162:8,13 187:5
**form** 11:14 12:9
28:20 30:9 39:4
41:5 76:19 95:5,11
104:17 156:17
167:5,11
**formal** 16:11
**format** 28:24 45:9
111:3 116:11,23
117:24 167:8
175:22 176:25
177:9 182:4
**formation** 36:17
**formations** 35:16
56:9 73:15
**formed** 23:8

**former** 137:4
**formerly** 164:4
**forms** 51:24 52:3
55:12 95:7
**forth** 45:19 94:8
135:25 170:9
209:12
**forward** 170:22
202:14
**forwarded** 44:15
**foster** 84:7 152:17
152:24 154:7
155:10 157:7
158:12,16
**found** 59:14 60:6
61:8 63:5 86:19
90:18,22,24
**foundational** 146:25
**four** 17:21 18:5
71:16,21,23 134:7
147:23 173:9
180:21 207:7,12
**frame** 36:20
**frank** 15:17 103:24
**frankly** 3:14
**free** 55:6 94:2
101:20
**freely** 58:8 66:10
67:18,22 68:8,19,22
**freeman** 84:8
152:17,24 154:7
155:10 157:7
158:12
**freeman's** 158:16
**freeware** 173:8
**frequency** 87:3
**front** 9:9 10:15
26:12,19,23 27:5,11
27:16,18 31:16
56:16 108:8 109:8
112:8,18 114:4
118:11,14 120:14
120:17 121:25
139:15 151:15
156:25 161:13

174:20,24 187:16
193:4
**full** 6:4 170:19
207:3
**funded** 84:17
**furnished** 210:13
**further** 27:25 88:13
93:5 205:7 206:7
209:16

**g**

**g** 30:2 39:14,15
172:21
**game** 200:12
**gargling** 21:17
**garnered** 35:4
**gee** 170:11
**general** 169:7,8
205:17
**generalized** 80:6
**generally** 13:12
18:19 34:3 74:14
83:25 95:4,5 130:16
160:9 186:20
**geography** 47:17
**gerald** 14:17 15:14
19:9 79:2 103:15
132:17
**getting** 8:16,19
25:11 34:15 46:3
49:6 65:25 84:23,24
85:10 99:3 119:14
191:16
**gibson** 1:20 2:12
7:21 17:17 18:12,21
31:19 43:11 44:15
106:15 108:15
152:11
**gif** 44:25
**give** 5:7 14:5 22:3
31:9,17 65:4 77:13
77:21 111:22 140:9
147:8,12,13,23
148:4,12 177:18
207:6

**giveaway** 55:6
**given** 22:8 45:2
64:25 76:23 88:6
105:2,10 127:3
128:25 146:20
157:8 168:4 176:16
186:9 187:24
209:15
**gives** 46:25 71:14
128:19 167:15
**giving** 47:22 80:5
155:11
**glance** 188:12
**glitch** 44:6
**gloves** 75:3,7,8,11
76:16 79:9,10,16,23
80:3,9,12,12,13,14
80:15,17,19 81:9,12
81:15,21,24 82:3,10
82:14,17,22 83:3,9
83:13,18,21 105:20
105:22 205:16,24
**gm** 133:10,11
**go** 3:5,6 5:13 32:4
42:19 53:14 64:23
78:15 88:20 97:20
99:15 115:12
140:13 144:7 146:4
148:18 149:6 159:3
159:5 163:20 167:4
174:5,8 183:17
185:10 188:7,19
189:9 192:21
193:20 194:13
199:12
**goes** 168:19 170:12
183:3 187:6
**going** 3:5,23 5:18
7:5,6 10:16 13:20
20:25 25:3,9 30:3
35:8 40:7 42:20
48:12 51:22 52:21
55:13,18 62:15
65:23 75:13,16,25
76:5,9 77:2,13 94:5

94:7 116:21 144:22
147:5,24 186:3
187:19 194:4 199:4
206:11,14
**good** 3:8 5:5 8:10
9:5,5 21:22 31:9
36:22 37:11 55:17
56:21,22 66:6 80:14
83:14,15 88:18,19
94:13 100:9 149:12
**gotten** 4:24 25:19
118:3 143:11 164:8
168:25
**government** 51:24
162:23 163:4,6,9
**gradations** 138:12
**grandma** 78:15
**gratuitous** 80:8
**gray** 43:19
**great** 41:22 56:14
172:23 207:2
**greek** 187:12
**green** 201:15 202:15
**grew** 61:18
**gross** 60:24 136:8
**group** 167:20
**guess** 3:9 11:4 18:22
23:4,21 24:11,18
27:17 30:5 39:5,7
41:12 49:15 54:17
60:4 61:12 67:4
86:17 92:5 100:2
110:25 134:22
151:22 152:8
157:25 158:6,19
161:12 171:6 172:6
173:24 190:10
195:10 197:25
**guessing** 207:10
**guns** 86:22

**h**

**h** 2:16
**habit** 119:4

**half** 4:3 6:5,5 88:6,7
124:24 150:10,17
158:25 186:2 207:8
**hallmark** 69:2,3
**hand** 8:13,19 21:5
55:7 86:7,10,19,23
94:2 101:20 108:14
182:23 209:22
**handed** 187:14
192:3
**handle** 80:7 86:12
88:22 89:19 168:4
**handled** 89:11
**handling** 76:15 79:8
79:19 80:17 81:14
82:4,18,22 83:3,9
83:13 86:8 89:3
91:14 105:19,21,25
184:23
**hands** 74:21,24 75:3
82:4 84:2 86:2
88:22 89:6,8,12,13
89:17 106:3
**handwriting** 12:14
12:19,21 13:8,18,19
20:3,10,19 23:15
32:11,18,24 33:3,14
33:20,21,24,25 34:3
34:5,9,12,17,24
35:9,14,15 36:8,15
36:25 37:12,16,19
42:21 48:18,19 49:3
49:9 51:9 61:11,12
62:3,22 64:5 102:11
102:17 103:2,11,18
**handwritten** 50:9
112:14 113:13
**happen** 75:16 86:13
96:18 147:5 148:23
169:2 203:5,7
**happened** 24:16
44:6,11 62:20 191:9
195:14
**happening** 32:5

**happens** 47:21
  91:20 150:12
  170:15
**happenstance** 57:15
**happy** 83:5 117:5,7
  121:24
**harassing** 186:5
**hard** 143:19 177:3
**harmful** 81:10
**harris** 28:7
**haul** 163:2
**hauled** 159:23 160:2
**he'll** 5:16,16,17
**head** 147:14,15
  148:11
**headed** 16:19 22:25
  50:23 107:18
**header** 113:3
**heading** 12:3 78:20
  110:8
**headset** 21:7
**health** 173:6
**hear** 7:25 8:3,4,7
  19:3 20:25 21:20,20
  21:23 29:10 88:16
**heard** 37:3,5 82:8
  90:15 165:6
**hearing** 5:21 8:8
**heels** 170:17
**held** 1:19
**help** 48:8 96:13
  145:4
**helpful** 34:13 36:23
**hereinbefore** 209:12
**hereunto** 209:21
**hey** 34:16 86:15
**hi** 14:23
**high** 70:10
**highly** 46:13 162:17
**hire** 16:19,19 22:25
  28:11,18 29:2,15
  30:15 31:14 32:18
  32:25 33:15 38:4,5
  38:11,17 39:2,22
  40:2,5 41:17 51:3

52:14 53:2,19 54:9
  54:11,13 55:22
  56:11,16,20 58:25
  60:18,22 65:17
  68:20,25 69:22
  70:25 71:17,25 72:2
  72:8 73:24 92:18,25
  98:2,5,14 99:19
  100:23 101:9,17
  102:17 103:2,12
  104:21 107:15,24
  108:25 109:4,8,16
  110:20 111:15
  112:19,20 113:19
  115:3 119:15,25
  125:18 129:13,18
  130:19 131:18
  132:18 133:4,18
  141:7,14,17,21,23
  154:21 180:6,6,9
  182:25 194:16
  196:18 197:22
  198:7,11 205:16,24
**hired** 12:25 32:10
  45:2 104:4,8 162:24
**history** 13:13 143:4
  174:4
**hob** 55:19
**hold** 51:19 108:17
**holding** 47:21 96:19
**home** 84:16
**hood** 159:14 160:6,7
**hope** 8:11 24:11
  39:15 54:24 149:21
  152:3 162:22
**hoped** 18:25 35:3
**hopefully** 159:4
  167:10
**host** 104:15
**hotel** 89:18,25
**hour** 149:17,25
**hourly** 149:23 150:3
  150:5
**hours** 26:8 88:5,7
  140:20 150:7

158:25 180:21
  195:16 198:7,17
  199:20 207:8,12
**household** 85:23
  86:6
**huge** 117:16
**humid** 49:6
**hums** 188:9
**hundreds** 13:5
  129:2
**hungarian** 18:9
**hypothetical** 44:24
  46:8 48:11 133:17
  134:4,21 137:5
  138:3,14,21,24
  139:7,14 141:5
  146:12,15,18,25
  148:10 169:5 192:8
**hypothetically** 46:9
  133:24 137:19
  138:16 142:8,15
  146:6,20 147:3
  148:10

**i**

**idea** 36:23 37:11
  60:24 83:4,14,15
  98:25 110:14
  171:17,18
**identical** 59:2 187:9
  191:10 192:2
**identification** 8:22
  107:7 108:19
**identify** 9:6 78:5
  97:17 107:8 109:23
**ii** 165:25 166:4
**illuminated** 86:24
**illumination** 26:10
  26:12 136:3,13
**illustrate** 180:11
**illustrations** 62:7
**image** 28:24 42:8,9
  42:14 45:7,11,14
  73:2,9,10 96:25
  98:17 99:20 107:14

107:19 108:25
  109:7 112:18 113:8
  119:21 121:5
  122:21,25 123:2,15
  123:17 133:21
  134:18 139:13,15
  148:14 172:9 173:4
  173:13,20 176:7
  182:7,8,24 183:9,25
  184:3 189:18,22,24
  204:23 205:2,2,3
**imaged** 53:3 55:22
  58:18
**imagej** 173:4
**images** 23:25 24:9
  25:11,16 28:11
  39:17,23 41:23,23
  42:3,6,24 43:2,3,5
  44:24 45:3,6,6
  46:15,16,19 49:20
  49:21 53:5 54:4,6
  54:10,12 59:25 60:4
  61:7 67:5,7 68:2,3
  69:14 71:5 72:23
  73:12,14,18 98:2
  100:6 101:5 102:7
  106:24 114:12,20
  119:22,25 120:4,6
  121:13 122:7,9
  134:16 136:18
  173:11,16,18,21,23
  174:8,8 175:7 176:7
  176:9,13,17,18,21
  176:23 177:4,5,7,12
  177:14,17,19,20,24
  178:7,11,19,25
  179:7,7,9,18,20,23
  180:2,4,4,5,7,10,13
  180:16 181:5,11,13
  181:16,19 182:2,13
  183:22 184:7
  189:10 191:17
  194:15 197:13,24
  197:25 198:4,10
  204:3,13,15

imagination 149:5
imagine 140:9
imaging 178:8
imagining 140:8
imitate 94:5
immediately 6:12,15
 24:3 130:20 188:22
important 115:15
impressed 64:20
impression 23:9
 81:7
impressions 80:25
imprint 91:25
imprinted 84:9
improvements
 157:9
inaccuracy 128:22
inappropriate
 117:19 146:17
inaudible 41:10
 124:21
inch 126:16,18
 129:2,2,3
include 17:22,23
 37:21 76:7 131:11
 176:17
included 18:2,4 29:7
 29:14 30:13 36:19
 139:12 171:4 176:7
 176:14,18
including 103:14
 161:10
incomplete 10:14
incorporated
 169:17
incorrect 108:2
 169:15
increments 130:3
indentations 185:10
 185:13
indented 81:7 84:24
independence 67:24
indicated 5:12 15:3
 34:8

indicative 72:5
indicia 92:22 101:22
indistinguishable
 188:2,13
individual 167:9
individually 1:8
 71:21
individuals 18:12
industries 125:4
infinite 93:17
 117:17 203:20
infinitely 201:21
information 35:4
 46:6 105:10
informed 39:13 43:8
 43:21 44:9 58:21
 150:12
infrared 134:15
 157:15
ingredients 89:23
 89:24 90:3,12
initial 16:16 17:6
 24:10 51:17,23
 131:17 150:5
initialed 50:9
initially 150:18
initials 23:16 52:9
 52:10 54:6 61:4,6
 123:22
initiated 152:2
ink 23:24 24:2,4,16
 25:14,23 26:3,6
 35:15 41:18 66:17
 76:2,5,7,25 95:25
 105:3 107:16,20
 109:2,10,11 118:19
 119:15,20 120:3,16
 121:13 130:16,18
 134:14,17,19,21,23
 135:4,23 137:8,22
 138:7,18,22 139:9
 139:13 142:24
 143:8,11,11 145:8
 147:18,19,20,21,24
 148:13 151:19

160:20 161:10,21
 162:4 166:8,14
 168:24,25 169:7
 182:18 183:2,3,4,16
 185:7 190:3,22
 191:7 192:6,21,23
 194:20 197:12,12
 197:14
inks 76:11,13 90:25
 91:2,11
inquire 7:3
inquired 25:11
inquires 18:18
inquiry 93:6
insert 205:4
inside 159:24
instance 56:5 58:18
 68:5,16 80:8,9
 82:23 87:6 175:8
 193:23 194:6
instances 134:23
institutes 173:6
instrument 130:2
instruments 130:3
insurance 74:8
 184:17
intend 72:17
intensity 155:18,21
 155:24
interest 170:20
interested 49:13
 51:5 52:25 61:23
 93:5 170:6 209:19
interesting 48:10
 52:16 62:6 63:5
 85:6
interestingly 41:7
interfere 81:10
 85:15
interfering 84:25
interject 21:2
interlineation 52:6
 52:20 61:5,6 107:16
 109:2 112:9,14
 113:9,14,21,23

144:14
interrupt 20:24
 21:19 74:3 99:16
 140:18 143:19
interrupted 169:10
interruption 22:2
invalid 117:6
inventory 104:25
invisible 138:13
 200:6
invitation 31:24
involve 95:8
involved 14:8 20:15
 36:13 57:19 63:2
 79:4 94:12 104:19
 120:11 153:11
 166:23 171:12
 192:25
involves 48:6
ireland 84:14
irrelevant 197:23
island 120:25
israeli 158:2
issue 10:12 24:15
 38:9 46:7 52:16
 80:10 119:14
 135:21
issues 3:16 7:25
 22:20,21 24:6 27:13
 27:24 36:3,12 64:24
 103:2
item 108:5
ivory 27:17

## j

j 173:4
jagged 21:25
january 119:22
 120:5
jersey 47:15,23
 163:17
jerusalem 158:3
jet 192:21,23
jim 178:10

**john**  23:7 69:18
72:12 178:13
**joins**  7:11
**joint**  157:15,19
**juice**  119:10
**july**  22:16 23:13,22
24:19 25:20 28:4,19
29:3,8,9,16,17
30:15 31:14,15 35:6
35:25,25 38:6,14
40:4,9,11 41:15,20
48:20 50:6 53:6
67:17,17,24 74:20
75:14,14 76:14,23
89:4,10 101:10,18
101:18 102:3
105:13 106:7
109:17 111:14
115:5,6 119:18
120:2,5 121:9,18
130:20 134:16
136:2 137:9,21,23
137:25 138:16
142:16,20,21,24
150:19 152:21,22
153:24 154:2,8
160:19 161:9
178:21 194:18
196:10 198:12
200:8,13,21 201:22
202:13,18 203:13
203:13 205:24
206:4,6
**june**  63:19,22,25
64:3,6,11,15 65:6
120:7,7 202:3

**k**

**k**  25:4 32:14,15
**keep**  84:24 88:8
158:9 173:15
**kelly**  201:15
**kept**  31:19 173:22
174:7

**key**  160:13
**kind**  13:19 14:22
16:21 18:25 21:25
31:20 35:4 36:15
38:18 43:18 46:7,14
46:22 47:3,3,24
48:5,19 52:16 55:3
55:18 56:18 59:11
61:21 65:25 68:9,9
68:21 70:20 71:6
73:8 78:3,11 80:16
81:5,13,20,23 82:8
86:5,7,16,19 87:3,6
89:15,21 94:12
100:2 107:14,18
108:24 112:18
119:2 120:20 121:8
121:17 124:16,17
128:17 144:21
146:18 156:21
159:19 160:13
168:7 172:24
173:12 174:14,18
175:12 186:11
191:4 192:14
196:24 199:5,9
**kinds**  36:13 47:13
59:13 82:9 94:15
121:22 160:15
175:8 179:22
195:25 202:8
**knew**  75:24 91:8
**knob**  128:3
**knobs**  174:19,24
**know**  3:10,16 4:9
5:22 7:4 8:2,7 9:19
10:19 11:5 17:19
18:23 19:6,7,10,11
19:13,17,19,23,24
19:25 20:2,5 21:11
21:15 28:13 29:5
30:4,25 32:12,13,15
34:22 41:3,5,9
44:19,20 45:21
46:16 47:14,16

50:21 51:8,23 52:2
55:3 62:11 64:15,25
67:10 68:15 70:14
72:10 74:4,13,23
75:15,20,21 76:9,12
76:13,24 78:4,5,11
78:14 79:7,13,15,21
79:24 81:16,18
82:25 83:7,9,10
84:22 85:23 86:3
89:23 90:3,12,13,18
90:21,21 91:2,4
94:12 95:13 97:2
98:24 99:12 102:15
102:20,21 103:4,6,9
103:19,22,25 104:3
104:6,6,18,18,18
105:2,11 106:2
108:3 111:10,25
112:4,5,6 114:19
115:15 116:6,7,12
124:6 125:6,11,12
128:19 129:15
130:13,15,22
131:14 132:2,5,11
132:13,16,21,24
133:4,5,6,8,9,10,13
133:14 139:23
140:21 143:24
148:23 152:13
154:25 155:2,7
157:13 159:6,9,12
159:19,19,23,25
161:7,8 162:11
164:14 165:17
166:10,11,13,16,17
168:3 173:9 174:20
175:15,25 176:4,5,6
177:12,25 179:5,15
182:19 184:14
186:22 189:5 191:9
194:8,12 197:17
198:8,14 199:3
**knowing**  44:13

**knowledge**  45:15
81:19
**knowledgeable**
42:23
**known**  13:2,19
20:19 85:12
**knowns**  66:11,11,12
66:15
**kravitz**  96:17

**l**

**l**  7:12,12 39:14
88:10,10
**lab**  86:16 158:2,2
**labeled**  107:6
108:18 210:19,20
**labs**  162:12
**lack**  50:2 105:14
161:25 205:14
**lacks**  58:7 169:5
**lag**  156:21
**laid**  167:11
**lakewood**  2:8
**landscape**  46:16,20
47:11
**lap**  57:4
**laporte**  4:23 14:17
14:19 15:14 19:9
77:5,7 79:2 103:15
104:11,13,25 105:6
132:17
**laporte's**  77:4
129:11,20
**large**  199:24
**larger**  182:12
**larry**  178:6
**laser**  26:18 86:18
87:2,3 192:20,22
**lasers**  87:4
**late**  157:5
**latent**  80:24 81:6
85:8
**latex**  81:15,21,24
82:3,9,13,17,22,23
83:3,9,13,18,21

**laurie** 1:22 3:4
 209:7,25
**lavatory** 89:14 90:4
**law** 90:5 116:17
 159:8
**lawyers** 17:17 30:8
 31:21 32:23 34:22
 167:14 177:18
**layers** 78:15
**laying** 94:23
**layperson** 12:23
 94:19
**learn** 198:16
**leave** 54:22 152:7
**leaving** 83:19
**led** 84:7 143:5
**left** 27:6 59:6 86:20
 92:11 145:2 149:10
 152:6
**legal** 2:4 59:18
 77:16,18 78:3 164:3
**legible** 102:10
**length** 120:24 144:7
**lens** 156:25 157:2
**lesnevich** 14:13
 19:12,19 20:9 28:3
 28:9,14 29:2 37:20
 61:22 62:2,7 102:25
 103:9 104:11,14,25
 105:24 133:3
 196:10 197:4,5,11
 198:11,17 200:18
 200:25
**lesnevich's** 28:17
 29:9,17 30:16 31:15
 38:8 196:18 197:20
 198:4 199:7,20
**letter** 18:21 35:16
 35:19 71:21,22
 114:18,18 120:14
 122:5,23,23,24,25
 123:20,21 140:12
 142:10 143:8 144:3
 144:4,9,10,12,13,19
 145:11,13,15

146:23 183:4,10,12
**letters** 120:16
**level** 58:7 69:9,13
 70:10 114:24
 126:21 127:2 129:4
 129:6 139:6,12,16
 139:18,23,24,24
 140:4,5,6,6,8,10
 169:24 187:9 188:2
 188:3,15 189:25
 190:8,10,10 199:4
 199:16,25 200:3,11
 200:19 202:5
**levels** 174:15 190:2
 190:11,12
**liability** 74:8 184:12
 184:17
**library** 124:25
**life** 117:3 181:17
 182:12
**light** 27:15 96:11,14
 96:14,14,23 119:16
 138:8 154:11
 155:18,24 156:2,3,5
 156:6,10 159:9
 160:3,16 183:6
 195:11
**lightening** 183:16
**lights** 155:20,21,22
 155:25
**likelihood** 147:11
**limit** 125:14
**limitation** 72:16
**limitations** 42:17
 127:14
**limited** 47:18
**limiting** 92:5,14
**line** 10:18,20 11:4
 35:16,20 36:16
 38:18 54:18,19,25
 55:3,8,14,17,18,20
 55:23 56:3,8,18,22
 57:14 60:19 66:6
 68:7,25 69:3 70:10
 70:23,24 71:22,22

73:18,20 98:8 171:7
 180:12 211:7
**lines** 71:12 78:20
 167:2
**linked** 53:10 192:18
**list** 14:5 105:2,22
 118:7 123:9 147:6
 199:12
**listed** 104:23
**listing** 105:8
**literature** 81:19
 93:11
**little** 15:12 19:3
 24:18 26:24 65:24
 78:20 81:25 103:13
 114:16,17 125:4
 126:19 128:12,18
 138:10 140:23,24
 143:9 149:9 159:2,5
 169:4 187:15
 191:12,24 192:7
 196:15
**live** 117:16
**llc** 2:4
**llp** 1:20 2:12
**loaded** 144:22
**location** 158:14,21
**logjam** 168:2
**long** 13:23 16:9
 54:21 56:5 57:9
 123:9 129:7 140:25
 143:3 163:2 189:9
**look** 12:23 16:17
 23:9,10,13 31:7
 37:11 45:3,5,12,17
 46:11 47:15 48:3,7
 49:14 52:21,24 55:5
 56:18 80:4 86:15
 94:24 106:14 108:4
 112:8,24 113:21
 118:24 119:3
 120:15 122:13,25
 138:15,21 141:3,10
 143:16 145:7
 151:18 159:14

160:6 168:16 174:5
 174:8 175:10
 182:21,22,23 183:8
 186:21,25 188:12
 188:21 190:14
 191:10 192:12,23
 193:10,23 194:4,9
 194:13
**looked** 20:18 25:14
 25:14 30:15 49:19
 52:25 53:4 59:23
 63:5 66:5 102:25
 106:11 130:20
 133:7 139:17
**looking** 9:12 11:2,7
 17:20 29:21 34:7,20
 40:17 44:17 49:24
 55:15,20 58:9 61:25
 68:15 69:5 94:8
 96:8 107:10 110:2
 112:7 114:11 116:9
 117:24 122:9,17,19
 134:13 136:22
 139:5 144:24
 151:25 152:3
 165:22 181:8 184:8
**looks** 10:14 57:6
 94:4 123:6,6 133:8
 138:22 143:9
 191:11 192:6 201:2
**lost** 24:24 53:16
 73:6 101:15 118:3
**lot** 20:21 167:22
 174:17
**lotion** 86:2,5,7,11
**lots** 73:12 157:8
**loudly** 8:7
**low** 160:11
**ls** 104:14
**luminesce** 185:8
**luminescence**
 134:15
**lyter** 14:21 15:2,6
 19:15 103:21
 104:11,13,25 105:6

| m | | | |
|---|---|---|---|
| **m**  114:18 120:14,16 122:2,5,18,23,23,24 122:25 123:6,6,14 123:14,17,20,21 140:12 142:10 143:9 144:3,4,9,10 144:12,13,19 145:11,13,15,20,23 145:24 146:10,22 147:10 172:21 183:10 | **malfunctioning**  153:23 **man**  69:18 **manhattan**  120:24 **manipulated**  47:9 **manipulation**  47:4 47:24 **manipulations**  48:4 **manual**  169:18 **manufacturer**  129:5 131:23 | **mean**  5:25 12:22 20:24 25:7 28:21 30:8 32:13 33:16 34:4 38:23 50:19 61:24 66:24 74:3 77:14 85:18 95:3,20 97:7 99:16 100:2 105:7 126:13 127:12,21 137:16 138:6,7 148:14,22 150:23 160:12 | 165:17 186:14,23 190:3 **mentioning**  62:25 190:7 **meshed**  188:22 **mess**  80:21 **messrs**  49:12 63:20 84:7 **metadata**  45:20 46:4 131:4,9,10,11 **method**  97:10 168:7 168:11 169:13 |
| **machine**  28:16 41:6 67:6 81:2,5 84:4,21 85:14 152:14,19,25 153:6,9,12,14,16,16 153:17,19,24,25 154:2,8,10,22 155:4 155:6,8,11,19,24 156:11,17 157:7,24 158:22 159:7,18,21 160:2 173:2 188:8 | **march**  15:24 182:21 182:21 **margins**  204:13 **mark**  1:8 37:23,23 59:24 60:3,10 62:23 62:24 69:20,22 70:4 70:9,19 71:2,4,10 72:7 92:17 102:5 106:17 113:2 | 162:20 164:23 165:19 176:22 189:3,5 **meaning**  137:12 192:6 **meaningful**  119:13 **means**  92:16 114:13 191:19 **meant**  78:23 | 94:17 **methodology**  95:15 **methods**  97:7 168:11 **micrografx**  172:21 **micrometer**  124:4,7 124:12,19 125:10 125:17 128:3 129:12,17 130:13 |
| **machines**  26:18 57:24 155:15,16 156:14,16 157:9,12 158:17 | **marked**  8:22 9:22 29:22 107:7,10,13 107:15 108:19,22 108:23 123:18 184:10 187:18 194:24 | **measure**  127:22 **measured**  47:15 **measurement**  127:2 127:23 130:7 **measurements**  125:17,21,24 126:2 | **micrometers**  127:22 **microscopic**  151:20 **microsoft**  193:5 194:6 **mid**  23:4,21 24:14 |
| **magenta**  147:19 **magnification**  119:3 122:9,14 188:24 **magnify**  122:17 **magnitude**  121:11 200:11 | **markings**  128:9 210:8 **marks**  16:20 128:4 185:8,10 **marriage**  209:18 **match**  100:13,13 | 126:5 129:8,12,17 129:20,22 130:14 **measures**  126:14,15 **measuring**  124:8,12 125:10,20 126:20 126:24 130:2,8,12 | 25:17 39:9,21 60:4 61:7 69:14 71:5,8 72:3 73:17 98:2,25 99:4,10,25 100:6 101:5 102:6 184:3 202:3 |
| **mail**  3:12 4:23 5:6,7 5:8,9,14 6:18 40:14 41:19 58:22 60:6 184:5 206:15 207:19 | **material**  11:18 86:13 106:11 **matter**  7:19 23:4 32:21 34:17 43:7 44:3 86:7 97:12 | **mechanic's**  86:23 **mechanics**  86:20 **medium**  121:19,20 121:20 138:9 | **middle**  9:23 151:18 167:7 **midnight**  4:11 **midst**  53:18 84:12 |
| **mailed**  39:13,18 **mails**  3:15 206:17 **majority**  171:8,11 171:14,15 | 154:15 164:12 174:11 209:20 **matthew**  2:18 17:24 17:25 | **meeting**  157:16,19 **memorized**  125:8 **memory**  94:5 125:6 **mention**  32:16 50:2 150:21 | **midtown**  120:25 **miles**  121:2 **mimic**  93:21 **mind**  57:8 88:8 138:21 |
| **making**  6:9 28:11 35:17 61:24 131:13 131:17 166:15 | **matting**  188:18 **mcmenamin**  3:11,18 3:21 4:5 7:5 104:13 104:14 105:11 | **mentioned**  35:21 70:8 91:12 95:15 104:10 105:5 128:23 161:16,23 | **mind's**  140:7 **mine**  184:2 |

**minimum** 6:11
150:9
**minute** 8:15,18
30:24 187:9 188:15
191:15
**minutes** 140:20
149:9,10 151:22,23
174:12 194:16
195:23 207:13
**miscellaneous** 77:19
**mischaracterizes**
76:19 161:6 198:22
203:19
**mode** 179:21,22
**model** 57:16,17
58:10,12 59:15,16
94:8 95:16,17,23
96:5,7,12,20 97:17
98:4,6,11 99:5,7,8,9
99:10 101:12,24
102:7,8 115:15
131:23 132:2,16
133:5,15 137:13
**models** 158:3
**modified** 170:11
**modify** 170:25
**mom** 163:2
**mom's** 162:12
**moment** 49:5 72:19
88:17,24 119:17
179:25 203:6
**monday** 5:18
**monitor** 156:20,25
**montage** 47:10
**month** 13:21 56:7,9
112:13 113:13,22
114:2
**monthly** 149:19,21
**months** 172:7
**moon** 69:18 163:7
**moot** 171:22
**morning** 23:13
24:18,19 25:20,25
26:9 28:8 41:20
89:18 111:16 115:5

119:17 131:2,6,18
131:21,24 132:7
133:22 136:2 137:9
142:16,20 147:6
153:2 155:6 187:15
194:17 195:5,24
197:3,4,21 200:8,13
200:21 201:22
**mother** 162:25
**motion** 9:11 77:11
78:12,13,14 176:3
180:17,18
**motions** 210:10
**motor** 153:10
**mountain** 47:17
**mountains** 46:17
47:17,19
**move** 128:10
**moved** 43:25 46:20
**moves** 69:7 170:22
**movie** 96:16,18
**moving** 21:12 24:13
25:16 39:6,8,20,21
41:8 44:4
**multiple** 125:21,24
**mz** 123:22

**n**

**n** 2:2 32:14 39:15
88:2,2,2 131:25
210:2
**name** 39:16 57:21
58:6 60:20 104:7
162:12,13 172:11
182:10,11 183:5
204:16
**named** 50:3
**names** 104:18
183:18,19
**nara** 18:7
**narasimhan** 2:17
18:8,9
**nasa** 175:17
**national** 173:6,6

**native** 28:24 111:3
116:2,11,23 173:25
177:9 198:14
**natural** 67:18 68:22
101:20
**naturally** 58:8 66:10
67:22 68:8
**nature** 109:6 130:11
161:10 186:9
189:23 203:7
**navel** 164:5
**nd** 87:3
**nearly** 60:13
**necessarily** 14:19
66:25 117:12
180:14 197:15
**need** 4:16 6:19 8:6
149:8,10 167:22
168:17 169:24
**needed** 25:2
**needle** 128:9
**needles** 128:11
**needs** 165:7,14
**negative** 80:16
**neglected** 149:14
**neither** 51:6
**never** 3:14 165:23
167:25 168:22,25
173:19 187:13
**new** 1:3,21,21,23
2:15,15 22:19 24:5
47:5,15,23 49:6
70:13 93:22 120:22
133:11 153:25
163:17,18,23 167:3
167:6 168:8 196:25
201:16 209:3,5,9
211:3,3
**newer** 158:5 172:15
**newspaper** 47:21
70:13
**nice** 54:19,20 62:15
68:18 106:15
175:15,18

**night** 3:12 4:11
56:13
**nikon** 172:13,15
177:6,6
**nineteenth** 48:12
**nineties** 158:7
**nonfluorescing**
26:13
**nonplus** 55:4
**nonsignature** 33:21
**nontext** 26:15
**normal** 26:16 58:6
138:6 161:25
**northern** 84:14
163:18
**notary** 1:23 7:14
88:12 208:15 209:8
211:25
**notation** 50:9
**noted** 87:7 88:3
208:6
**notes** 72:20,22 73:13
**notice** 51:7 105:21
150:16 182:25
**noticeable** 202:19
**noticeably** 70:23
**noticed** 4:10 35:7
130:17 150:19
151:3,12,14,17
**nowadays** 48:6
96:24 156:20
**number** 5:7,15 6:19
8:14 22:4 31:18
32:3 48:3 49:9 60:6
60:8 61:20 64:25
67:13,21 77:22
93:10 97:15 105:5
115:8 132:11 134:2
142:2 155:25 156:2
157:3,11,20 163:13
167:16,23 194:9
196:24 197:9
207:15
**numbered** 127:13

**numbers** 67:12 128:9,10,19
**numeral** 61:13
**numerals** 52:12 71:13
**numerous** 20:7 163:3 188:15

**o**

**o** 32:14 88:2,2,2 131:25 172:21
**o'clock** 195:13 196:10,23 206:24
**object** 33:9 165:12 185:14 187:10
**objected** 74:12
**objection** 12:9,12 28:20 74:10 76:18 76:19 90:11 100:15 109:19,21 151:7 161:5 164:13,19 165:6 167:5 170:8,9 170:22 184:19 186:4 198:21 201:5 201:7 203:18 204:6
**objections** 171:2
**objects** 41:21 119:5
**observation** 27:23
**observations** 161:9 197:6,7
**observatory** 164:5
**observe** 28:10
**obtained** 177:25
**obtaining** 130:14
**obvious** 24:3 192:15
**obviously** 4:9 8:8 11:3,8 13:22 18:6 20:24 35:7 63:18 72:13 125:7 192:9 192:14
**occasions** 20:7 110:19 154:3 166:18
**occupied** 164:4

**occupy** 124:24
**occur** 92:3,4 202:12 205:23 206:3
**occurred** 22:14,15 97:5 203:12 205:21
**occurring** 74:20
**occurs** 21:15
**offense** 60:12
**office** 84:16 153:15 158:16 163:4,14,16 163:21 176:10,21 176:25 177:2
**offices** 1:20 7:21 28:6 159:8 164:4
**oh** 15:4 30:23 74:12 115:21 141:14 170:12 172:12 176:23 179:14 191:13
**ohio** 2:8
**oil** 92:9
**oils** 91:21,23
**okay** 5:5 7:7 8:9 9:16 11:2 13:4,15 14:4 21:22 25:4,7 25:10 29:12 34:14 36:5 37:7,14 38:13 50:19,24 52:18 53:23 62:14 64:8 66:9 74:16 77:9 88:16,19 95:16,19 100:7,9,24 103:16 106:21 108:22 113:3 123:24 137:25 138:4 141:9 141:18,25 142:6,18 146:5 148:17 149:4 149:12 152:22 159:2 161:12 165:10,23 166:23 174:23 179:14 184:21 192:7 193:14 194:13 201:14 203:10 206:21 208:4

**old** 20:20 167:7 168:8 172:17 174:20,25 175:13
**oldest** 128:5
**omniscient** 42:22
**once** 7:20 99:2 155:22 168:19
**one's** 40:23
**ones** 12:3 15:3 104:7 156:19 159:18 179:15
**onion** 78:16
**open** 187:16
**opened** 24:15
**operate** 155:7
**operating** 28:16 155:6
**operation** 115:19
**opinion** 26:5 44:25 67:14 72:9 95:12 97:9 102:9 106:6,10 115:13 122:15 127:17,18,19 137:10 160:22 161:19 198:5
**opinions** 161:8
**opportunity** 22:24 206:12
**opposed** 27:19
**opposite** 20:8 55:24
**option** 143:12
**optional** 79:10
**orange** 183:20,21
**oranges** 119:7
**order** 114:15 121:11 127:23
**orders** 10:7
**original** 23:3,11,12 32:20 39:8 40:24 41:14 43:2,3 44:5,9 44:18 45:7,7 62:13 62:17 65:18,20,22 66:17 68:16 84:6,10 101:20 157:7 173:20,24 177:16

**originally** 32:9 82:21 175:17 187:17
**originals** 177:8
**orin** 17:15
**osborn** 23:6,7 24:8 49:22 53:4 54:4 55:23 68:4 100:25 101:6 178:13 202:4
**osborn's** 100:14,22
**ought** 168:21 170:6
**outcome** 209:19
**outlined** 102:14
**output** 62:10 115:19 190:5,24 192:4,10 193:9,17
**overall** 26:22 27:17 112:21 122:21 135:3,19 204:10,20
**overlays** 172:24 174:13,13
**overly** 123:12
**overnight** 5:7,14 6:13
**overtaken** 37:15
**overwhelming** 59:19
**oxymoron** 187:22

**p**

**p** 2:2,2 7:12 88:10 131:25 183:12
**p.m.** 3:12 87:7 88:3 115:9 195:10 208:6
**pace** 57:4
**page** 9:9,22,23 10:2 11:19 16:18 22:25 26:12,15,24,25 27:2 27:3,4,7,10,11,20 29:23 32:2 37:22 38:2 39:3 49:15,15 49:24 50:3,8,9,13 50:14,17,20,22,25 51:8 52:7,10,12,14 52:22,24 53:2 54:7

54:7,14,16,22 55:16
55:21,25 56:11,19
58:14,15,16,16,18
58:24 59:7,20,21,24
60:3,8,11,18,21
61:5,6 62:5,20,21
62:21,22 63:3 65:16
67:16 68:17,20,24
69:21,23 70:2,9,11
70:12,14,17,17,18
70:19,22,24 71:3,5
71:17,25 72:2,8
73:11,11,21,22,22
73:23 74:19 92:17
92:24 94:9 95:2,18
97:3,13,25 98:4,10
98:14,17 99:17,24
100:9,11,13,19,22
100:24,25 101:4,6
101:16 102:2,6
103:7,8,11,11
106:19,22 107:11
107:11,12,12,14,15
107:17,17,18,19,24
107:24 108:23,24
108:25 109:2,3,7,8
109:12,13 110:9,9
110:19 111:15
112:9,15,15,17,18
112:20,24 113:2,5,6
113:7,10,18 114:15
115:3 123:15,17
125:17,20 126:3,6
127:13,13,14 129:9
130:18,18 131:6,6
131:17,17 134:5,8
137:6,20 140:15
141:6,10,13,16,19
141:20,22 144:3
151:19,19 154:21
161:16 175:11,14
180:5,6 181:11,12
181:13,15,15,19,24
181:24 182:6,10,11
182:12,14,14,16,23

182:24 184:2 185:9
188:6,24 193:24
194:3,4 195:21
204:10,11,13,16,16
207:20 210:4,16
211:7
**pages**   10:17 26:14
26:23 39:11 45:4
51:18 54:9,13 56:16
64:22 99:19 103:18
106:23 108:23
113:18 121:21
127:5,7 130:24
142:24 151:15
161:14 179:2 180:9
185:6 188:6 189:2
193:25 195:20
**pagination**   10:22
**paid**   164:12
**paper**   26:10,17
27:18 36:11 40:9,10
41:13,18 48:20
49:16,19,20,22,24
53:2,20 55:21 58:14
58:17,25 59:20,21
59:25 60:21 61:5
65:17 67:16 68:20
69:24 70:24 71:3,8
71:17,25 72:8,14
73:16,24 77:19 78:3
78:19 80:23 81:8
84:11,17 86:22
92:25 93:20,22,23
94:22,23,25 95:8,22
96:3,5,6,7,8 97:12
98:5,10 99:20 101:2
101:10 102:2
107:24 109:4,8
116:25 119:15
123:25 124:8,12
125:10 126:23,23
127:4 129:13,17,23
135:3,4,6,19 136:3
136:10 137:2
144:25 161:13

171:18 182:24
185:5,5,7 188:9,12
188:17,17,21 194:2
194:2,16,20 200:7
201:23 203:4
204:17
**papers**   23:3 24:13
24:13 25:16 29:6
39:7,9,20,21 53:5
**paperwork**   24:10,10
31:22
**paragraphs**   167:16
189:8
**parallel**   120:20
**parents**   162:9,16
164:18,23 165:2
166:5
**park**   1:21 2:14
**part**   14:2 19:24
23:18 37:24 67:10
68:23 102:21 104:9
110:10,13 112:21
124:12,18 125:9
143:5 146:12,14,21
146:22,23,25 176:3
177:23 182:16
**participate**   16:4
**participated**   157:4,6
166:18
**particular**   26:3
43:13,14 48:13 75:9
79:11 86:19,23,25
95:15 170:17
188:20
**parties**   31:6 209:17
**party**   40:24
**passed**   67:23
**paste**   69:11
**patrick's**   201:16
**paul**   1:5 7:19 23:7
39:13,14 50:4,5,7
51:3,7 55:21 58:17
58:19,23,24 59:20
59:23 62:25 65:19
66:12,14 67:15 68:9

68:12 69:18 70:3,11
71:7 92:16 97:19,25
98:9,12 100:20,21
101:4 103:5 182:11
182:11,16,23
183:12 204:16
**pause**   7:10 9:15
22:6 53:16
**pay**   6:6,10,23
149:20,22
**paycheck**   164:8
**payment**   4:20,24
206:15
**payments**   207:15
**pc**   52:9
**pdf**   43:8,15,16 45:23
46:2,4 60:4 116:13
116:15,18,18,20
175:22,24 176:14
177:21
**peers**   162:21
**pen**   23:17,18 90:25
**penicillin**   85:4
**people**   17:20,21
18:5 31:19 46:12
55:10 57:21 64:18
82:8 83:20 84:21
85:18 99:13 104:19
105:2 167:21 169:4
169:8,12,19 170:3,5
170:19 171:8,11
173:8
**people's**   133:14
**perfection**   132:4
**perform**   24:22 25:2
34:21 46:13
**performed**   47:8
75:25
**period**   84:19 155:5
168:5
**periods**   71:12
**person**   13:2 17:10
33:22 53:13 56:25
66:5 85:3 111:14
169:16,20,22

170:23,24 171:3
191:12
**person's** 20:19
185:15
**personal** 82:11
**peter** 1:19 208:9
209:11 210:5 211:6
211:21
**phenomena** 195:8
**phenoxyethanol**
90:10,13
**philosophers** 187:12
**philosophical** 187:7
187:10,21
**phone** 6:25 17:6
21:5,8 150:24,24
**photo** 47:4,10 132:4
171:23 172:8
**photocopier** 48:2
**photocopies** 66:19
**photocopy** 40:23
41:3,4,6,8 66:25
69:11 96:2
**photograph** 197:14
**photographic** 68:3
**photographs** 47:9
47:25 136:12 177:4
197:9
**photoshop** 42:10,15
45:12 48:8 73:7
171:23 172:9 174:2
**phrase** 24:11 100:3
**physical** 40:10
41:13,17,21 96:3
**pick** 188:19
**picked** 205:2
**pickup** 206:24
**picture** 113:8
172:14,19 182:15
205:5
**pictures** 174:19
181:25 204:10
**piece** 36:10 93:20,22
93:22 94:22,23,24
95:8,22 96:3,4,5,7,8

97:12 193:25 194:2
**pieces** 40:10 41:17
77:19 96:6 116:25
129:13,17,23
144:25 188:9,11
**pineapples** 114:7
118:10 119:6,9
**piqued** 63:4
**pixels** 48:6,7
**pizza** 163:5
**place** 55:6 95:11
121:18 130:4,5
143:3
**placed** 111:13 204:4
**places** 126:17 183:2
**plaintiff** 1:6 2:5
29:7 30:19,21,23
39:7,8,9
**plaintiff's** 119:23
120:8 137:6 138:17
138:18 139:3
177:25 178:5
**plaintiffs** 29:14
30:13,24 137:19
**plastic** 92:13
**plausible** 61:2
**play** 47:12 55:18
**pleading** 29:13,18
29:21 30:5,9,11
**please** 5:6 7:25
12:22 14:16 15:13
19:2 41:11 51:22,22
53:15,24 66:23 82:2
82:19 88:25 105:23
107:9 118:4 124:22
137:15 141:2
143:19 160:24
178:5 188:7 191:23
**pleasure** 15:24
**plenty** 46:11
**plethora** 98:24
**plus** 26:22 156:13
**pocket** 160:12
**point** 5:10 7:24 8:4
21:12,24 22:9 27:14

32:22 48:16 61:4
97:24 101:22 102:5
102:23 116:22
121:14 126:17
128:10 129:19
130:5 134:15
140:21 150:14
152:6 153:13 162:7
164:20 168:25
186:3,5 187:7,10
190:4,17 200:11,20
**pointed** 118:12
189:11
**pointers** 128:14
**pointing** 189:14
**points** 93:3 114:23
119:8,8
**poor** 56:3,8
**pop** 147:13,15
**popped** 27:13
**pops** 57:8
**population** 170:4,5
**portion** 141:15
144:2 148:25
**portions** 10:7,11
16:18 73:19 82:12
83:12 123:3,6,14,17
145:20,23,24 146:9
147:9 180:11
181:16
**position** 65:21
170:17
**possession** 135:13
**possibilities** 95:14
98:25 147:7,9,12
**possibility** 32:17,24
33:17
**possible** 101:4
102:12 146:9,14,17
146:24 147:2,4
187:24 191:5
193:12,18 199:12
203:5,25
**possibly** 33:14 47:22
147:16 194:12

**post** 70:14
**postal** 41:19
**potential** 101:12
192:11 193:2,3
**potentially** 85:9
184:24
**powder** 82:9
**powerful** 156:6
160:14
**practice** 51:23 94:11
94:13 162:14
**precise** 55:11 69:10
**precisely** 57:3
**precision** 205:14
**predamaged** 185:23
**predecessor** 166:2
**prefer** 122:16
203:23
**preferences** 194:6
**prepared** 4:19 73:14
**presence** 161:25
**present** 3:2 10:23
25:13 28:3,5,9 76:8
**presented** 22:19
24:3 27:24 81:9
151:23
**presenting** 47:14
**presses** 57:23
**pressure** 54:20
**presume** 3:20
**pretend** 42:22
**pretty** 26:14 60:13
64:18 65:13 72:15
83:20 127:12
130:25 137:11
140:6 162:17 165:3
174:17 175:5
**previous** 33:19 64:3
111:21 153:19
**previously** 25:15
88:11 95:16 99:4
120:21 123:20
144:7 146:2 161:24
201:25

**principal** 135:21
**print** 32:2 106:16
  188:7,8 192:22
  193:4,9,24
**printed** 11:10,18,20
  16:18 98:22 107:2
  107:13 108:15
  112:2,7 116:6,13
  117:22 141:19
  142:7 146:8 183:10
  186:18,19 188:5,17
  190:18 191:13,19
  191:20 192:2
**printer** 116:7 142:8
  147:18,20 186:19
  187:25 188:10
  190:4,5,9 191:2,3
  191:19 192:20,21
  192:22,23 193:10
  193:20,21 194:5
**printers** 26:18 62:11
  186:15 190:18,23
  191:14,21 192:3,4
  192:10,18,19,25
  193:8,17 196:6,7
**printing** 22:18
  57:23 61:5 116:8
  196:5
**printout** 11:3 62:8
  62:12 98:18 109:15
  116:6 117:10 143:5
  183:7
**printouts** 62:16
  107:23 110:4,5
  116:9,24 117:2
  142:2 187:19 200:2
**prior** 13:23 16:22
  22:23 23:22 24:17
  44:11 45:24 150:12
  150:16 172:18
**privileged** 151:8
**probably** 20:11 43:5
  48:12 93:16 96:24
  156:6 188:15

**problem** 6:20 8:2
  21:10,21 47:3,5
  55:9 84:3 85:21
  143:24 151:4
  169:21 194:14
**problematic** 82:10
  154:4
**problems** 154:7
**procedure** 168:7,15
**procedures** 202:18
  202:22 203:2
**proceed** 3:7,18,20
  4:5 7:7 53:24
  105:16
**proceeded** 139:11
**proceedings** 4:1 5:1
  6:1 7:11
**process** 148:6,9
  162:4,5 168:2,6
  171:4
**processed** 116:13
**processes** 148:13
**processing** 116:15
**produce** 175:21,23
  175:23
**produced** 22:10
  67:5 119:17
**producing** 72:17
  177:23
**product** 33:6 86:6
**products** 85:24
  90:22 91:3
**professional** 1:22
  13:24 156:12
  162:20 209:8
**professor** 14:13
  15:25 104:10 152:7
**program** 42:10,15
  172:13,23 173:3
**programs** 48:8
**project** 84:16 97:11
  154:11,11
**projected** 97:14
  155:18

**promise** 78:23
**prompted** 64:12
**proper** 114:9 124:19
  183:17 187:24,25
**properly** 57:2
  130:14 139:8
  143:20
**properties** 45:18
  56:15
**propose** 5:11
**proposed** 169:16
**provide** 32:11 46:6
  65:9,11 72:18
  110:22 111:5 149:3
  179:10
**provided** 10:5,6
  42:4 43:21 44:10,14
  44:21 58:19 63:7
  89:16 90:4 110:25
  129:7 176:12
  179:15,16,19,20
**public** 1:23 7:14
  88:12 208:15 209:8
  211:25
**publisher** 172:20
**purport** 45:4 115:14
**purporting** 41:13
**purpose** 52:8 83:11
  84:10 120:11
**purposes** 13:20
**pursuit** 52:15
**put** 6:12 11:5 16:22
  48:15 105:9 162:6
  167:8,18 170:9
  201:24 205:2
  206:11,22
**putting** 91:15,19
  93:19 96:20 204:4

**q**

**quaint** 41:8
**qualifications** 20:3
  34:23 46:22
**qualified** 12:6,13
  19:21,24 42:2,7,13

44:25 45:13 46:13
**qualify** 89:2
**qualitative** 71:6
  139:6 199:6
**qualitatively** 60:9
  101:2 137:15
**quality** 35:16,19,20
  36:16 54:19,19,25
  55:3,8,14,17,18,20
  55:23 56:3,8,19,23
  57:15 59:5,9,13
  60:19 66:6 68:7,25
  69:4 70:10,23,24
  73:21 85:9 97:23,24
  98:8 145:8 176:6,9
  180:12
**quantify** 122:8
**quantitative** 71:6
  139:6 199:6
**quantitatively** 60:9
  101:3 137:16
**quantity** 59:5,9,13
  97:23,24
**quantum** 200:3
**question** 7:25 21:20
  30:12 33:7,12 37:5
  40:20 42:8 65:14
  68:24 100:17,18
  101:8 111:21
  117:10 122:4 133:2
  135:2,17 144:15
  162:3 165:3,7,13
  166:25 185:2,24
  186:6,24 189:6,7
  191:4,6 192:14
  193:6 196:20
  199:22 205:12
**questioned** 157:16
  162:12 167:24
**questioning** 91:5
**questions** 20:4 32:4
  111:18 135:16,17
  164:22 166:20,21
  186:16 189:13
  205:7,13,18

quick  149:10
quickly  60:16
quite  34:5 63:5 85:3
  118:7 170:15
  183:13
quotation  16:20
quote  187:3
quotes  39:3

**r**

r  2:2 7:12 39:15,15
  88:2,10 146:22,22
  172:21,21 209:2
radically  106:13
raised  24:5 46:7
ran  104:12
random  188:18
randomly  147:16
range  155:15
rapid  56:22
rapidly  54:20
rate  88:6 149:23
  150:3,5
raw  111:2
reach  168:22 202:7
reached  117:21
reaction  26:11,17,20
  26:23 27:21 133:23
  134:9 135:9,18
  136:2,5,8,17 137:24
  138:23 139:21
reactions  161:11
read  14:7,12,15 15:3
  30:8,11,12 35:2
  64:11 77:4,7,12
  78:20,25 127:23
  128:3,25 129:14
readily  45:18 46:5
  173:19
reading  23:20 49:11
  61:18 63:19 64:17
readjust  193:22
readout  126:15
  127:20 128:6,7,15
  129:6

real  95:24 126:25
  136:25 174:11
realize  92:14
realized  85:3,4
really  3:14 11:11
  25:25 30:4 48:14
  56:21 61:24 65:7
  75:9 105:7 115:10
  117:7 122:12 127:7
  127:25 139:8 140:7
  143:2 155:21
  160:10 170:13
  174:10,16 175:19
  185:11,21 186:10
  196:4 200:14,14
rearrange  4:8
rearranged  4:13
reason  49:4 69:7
  83:20 85:20 123:5
  188:16 211:7
reasons  48:23 49:2
  85:19 92:21 147:24
  148:3 189:8,12
  192:11 193:13
rebooted  154:3
recall  20:12 29:4
  31:12 35:17 65:7
  79:25 80:10 86:14
  91:16 92:18,20
  125:19 126:2,5
  129:16,24,25
  153:21 154:5,9,24
  156:4 166:20,21,25
  179:25 189:13,14
  190:15 197:23
  198:2,15
receive  43:4
received  4:24,25
  43:6,8,11,20,22,23
  44:22 64:16 109:17
recess  140:19
  149:11,13
recognize  109:15,24
  110:5

recollection  10:10
  51:18 80:3 178:22
recommendation
  81:11 105:4,8
record  3:5 6:10 8:24
  9:7 53:15 54:23
  67:11 107:9 108:21
  125:23 131:20
  165:13 173:22
  174:6 190:14 196:3
  203:16 206:11
  207:11 209:14
recorded  136:6,19
  151:17
recording  207:9
records  131:15
  173:15 195:3
rectangles  26:24,25
red  201:17 202:16
redacted  9:24 10:7
  10:11,11 12:3
redaction  11:18
redactions  10:13
redirected  85:7
redone  174:11
reduced  114:12,14
  117:2 118:25 121:5
  122:9 181:12
  204:11
reducing  204:8
redundant  123:12
refer  31:8 40:8
  79:11 113:16
referred  40:14
  42:21,24 84:13
  116:12,22 181:21
referring  36:16
  37:25 75:18 77:22
  79:20 86:5 111:9,18
  112:17 122:24
  154:16 185:18
reflect  130:9 136:25
reflected  127:16
refrigerator  156:7

regarded  162:17
regarding  40:14
  47:8 63:8 72:6
  79:22 81:12 103:2,6
  103:8 118:21 150:8
register  77:25
registered  1:22
  209:7
regular  5:9 156:5,10
  159:11
regularly  89:6,8,12
related  53:12
  104:16 131:4 148:6
  148:8,8 161:21
  209:17
relating  166:8
relation  43:6
relationship  13:25
relative  59:8 110:15
  168:10 169:8
relatively  155:5
release  7:5
relevance  164:13,20
  164:25 165:4
relevant  48:14
  168:20 169:12
  171:9 194:18
reluctant  189:6
relying  190:14
remember  17:9
  20:16,18,21 31:2
  50:19 63:21 87:2
  88:23 94:4 115:7
  174:21,23 189:20
  190:6,7 205:17
remembered  94:3
remnants  86:11
removed  46:21
  142:3 153:15
repeat  19:2 24:23
  25:7 34:14 37:3
  141:2
repetitious  99:3
rephrase  33:7

**replaced** 153:15,25
**replacement** 159:21
**reply** 78:13
**report** 6:14 8:13,21
　8:25 9:2,10 10:2,9
　10:15,17 11:9,13,22
　12:2 15:2,6,11,15
　15:19,20,23 22:11
　30:10 50:21 63:7
　65:9,12 68:6 72:17
　77:4,5,8,10,12,15,20
　78:4 115:8 126:8,9
　127:11 129:15
　130:17 139:10,17
　145:10 175:21
　176:2,7,10,19
　177:23 179:2
　180:16 181:3,5
　182:21 184:7,9
　204:4,5 210:18
**reported** 127:17,18
　127:19
**reporter** 1:23 8:13
　8:20 169:11 207:6
　209:8
**reporting** 211:2
**reports** 10:5,8 14:8
　14:12,15 49:11
　63:19 117:22
**represent** 7:19
　170:5
**representation**
　44:14
**representations**
　142:22
**representative**
　154:7
**represented** 43:12
　184:9 194:22
**representing** 6:10
**reproduced** 198:2
　204:14
**reputation** 44:20
**request** 48:17
　188:10 206:11

**requesting** 114:25
**requests** 210:11
**require** 170:7
　174:13 200:14
**required** 171:16
**requires** 170:2
**research** 81:8 84:6
　84:10,16 85:11
　162:14
**reserve** 6:2
**reservoir** 147:19
**residue** 86:20
**resins** 76:10
**resolve** 46:7
**respect** 9:21 203:20
**respectfully** 164:16
**respects** 196:12
**respond** 3:16
**response** 78:12,12
　78:13
**rest** 27:2
**restrictive** 66:25
**result** 70:6 71:15
　99:22 118:13
　133:16 142:15
　190:23
**resultant** 189:24
**resulted** 146:7 162:5
**resulting** 137:21
　189:18 190:5 193:9
**results** 15:7 65:10
　72:3,4,18 84:23
　125:23 130:9 131:5
　192:23
**resumed** 88:11
**retain** 131:4
**retained** 16:10,14
　16:17 18:11,19 19:8
　19:9,13,16 22:10
　104:20 163:8
**retainer** 149:18
　150:6
**retaining** 18:18
**retention** 16:11
　32:21

**reverend** 163:7
**reverse** 26:15,19
　27:4,10 56:16 109:3
　109:12 175:14
　195:21
**review** 22:24 177:24
　178:6,10 206:12
**reviewed** 29:6,13
　64:14 100:14
　129:11,15 173:11
　181:2,3
**reviewing** 23:19
**rgb** 179:22
**ridiculous** 186:6
**right** 3:21,25 4:6 7:9
　7:21 21:6 22:5 27:7
　31:12 32:6 34:15
　37:5 40:6,12 41:16
　44:23 48:16 53:23
　55:12 59:6 70:2
　78:20 85:2 89:20
　91:25 92:6 94:7
　100:9 101:21 108:9
　109:5 111:6,20
　112:23 113:5
　118:14 124:15
　126:17 130:4,5
　141:4 145:2 153:6
　153:16 159:4 181:9
　181:10 182:23
　183:5 206:16
　207:18 208:2
**ring** 178:17
**rings** 178:18
**rise** 200:19
**river** 187:13
**rja** 1:7
**road** 2:6
**rocks** 46:20
**rocky** 46:17 47:17
　47:17,19
**rodeo** 155:13
**romano** 14:13 15:17
　103:24 104:11,14
　152:7,10

**romano's** 15:25
**room** 7:20 17:21
　18:6 22:4 31:4
　47:25 120:21
　150:25 151:3 152:6
　152:7,8,9,10,18,25
　153:20,22
**rotation** 59:10
**routine** 26:2
**rpr** 209:25
**rude** 21:19 152:4
**ruler** 114:17
**rules** 165:14,17,17
**rulings** 210:12
**run** 57:15 104:24
　148:2 162:8 172:25
**running** 162:18
　163:10
**russian** 78:15
**résumé** 34:25

**s**

**s** 2:2 25:4,4 81:3
　88:2,2,2 131:25
　211:7
**sadly** 41:7
**safde** 157:17
**safely** 166:5
**sample** 13:18,19
**samples** 20:19 33:22
　48:18 49:3 51:9,12
　51:14,16 52:7,8
　76:2,5
**saqte** 157:17
**sat** 120:21 153:4
**saturday** 5:19
**save** 174:7 177:11
　177:13
**saved** 131:7,15
**saw** 23:10,12 24:16
　26:10 35:6,9 43:17
　105:25 106:9
　129:19 130:25
　151:5 161:20
　194:19,22 196:22

200:8 201:22
**saying** 5:6 8:3 11:15
  62:5 83:7 91:23
  96:7 122:17 129:25
  133:8 138:20
  139:14,23 153:9
  171:6 180:4 181:2
  191:25 192:2
  202:21,22
**says** 9:9 10:18 29:22
  29:23 62:2,2 107:11
  108:24 130:17
  170:11
**scale** 55:24 130:8,12
**scan** 28:17,21,25
  29:8,9,15,17 30:14
  30:16 31:13 39:11
  39:24 45:11 58:19
  100:14,23,25 106:9
  109:16 110:10,13
  110:19 111:14
  113:18 115:8
  117:11 123:15
  130:24 131:6,11,13
  133:17,21 134:5,13
  134:17 135:4,14
  137:9,21,23 138:5
  138:16,17,18,19,22
  139:15,19,20
  140:14,15 141:6,11
  141:12,22,24 146:6
  146:8,8,10 148:14
  161:3 182:17
  189:18 196:18,19
  198:17,25 199:8,8
  199:20 200:7,17,18
  200:25
**scanned** 24:7 25:15
  28:13 45:5,24 58:20
  59:25 68:3 69:11
  98:20 106:8 110:16
  110:20 119:25
  137:6,20 138:2
  143:8 151:14
  189:10 196:9,11

199:21 201:3
**scanner** 28:16 67:6
  114:22 115:4,16,20
  131:13,16,24 132:3
  132:10,17,22 133:5
  133:7,7 137:13
  138:25 139:3
  148:19 177:5
  189:17,19,21,22
  199:11
**scanners** 133:14,19
  134:11 136:7,17,19
  136:24 189:11
  199:11
**scanning** 25:24
  28:10 59:12 61:10
  115:19 136:24
  148:6,8,12,16
  151:24 178:8
**scans** 45:7 101:7
  106:24 107:23,23
  109:24 110:3,4,6,7
  110:18,23 111:4,9
  111:20,23 112:2
  115:2,6,14,16,20
  116:2 131:17 132:6
  133:2,22 134:7,10
  134:22 136:16,22
  142:3,4,15,20 143:4
  151:5 175:10
  176:24 177:3 179:9
  181:12,20,20
  182:13 194:23,25
  195:22 197:5,16,20
  197:24 198:5,6
  199:10 202:2,9
  204:10,17
**scenario** 86:9
**scene** 96:18
**schedules** 4:8
**science** 173:7
  183:18
**scientific** 102:10
  117:21

**scientifically** 118:21
  120:9
**scintilla** 196:16
**scissors** 48:2
**scotland** 86:16
**screen** 96:25 117:25
  133:21 156:24
  186:18 188:7
  192:17 193:4 195:3
**scripture** 38:19
**se** 198:3
**sec** 9:13
**second** 24:24 38:16
  38:20,23 50:3 52:24
  53:2 60:20 63:3
  65:6 68:23 74:6
  92:17 99:17,18,24
  115:8 135:23
  140:18 153:18
  156:3 160:2 193:20
**security** 62:10
**see** 13:3 18:6 24:2
  35:25 42:4 47:20
  52:22 68:18 69:10
  70:21 94:10,13
  96:13,16,18 98:8
  101:4 102:5,13
  104:13,24 109:5
  112:12 113:9,12,23
  115:23 122:12
  136:10,21 143:16
  143:19 160:8 171:4
  175:11,13 179:17
  181:7 182:17 183:2
  183:6,11,13 185:19
  186:10 187:2
  188:23 190:19,25
  191:3,6 194:25
  197:12,14 198:12
  200:25 201:15
**seeing** 22:23 29:4
  31:12 63:18 93:21
  95:2 118:14 129:16
  197:23 198:3

**seek** 49:3
**seen** 23:5,8,25 28:17
  28:23 29:18 30:17
  30:21 39:4 41:4
  43:12 50:5 54:5
  56:19 59:17 60:11
  68:9 70:10,15 71:7
  93:3,4 94:4,6 99:13
  102:13 108:16
  136:11,16 196:17
  197:20,24,25
  198:10,14
**segments** 73:19
**self** 67:23,25
**send** 5:6,14 6:18
  180:8 193:19
  206:16,17,21
  207:14
**sending** 206:14
**sense** 189:5
**sensitivity** 160:9
  199:23
**sent** 3:11 5:6 58:22
  98:19 100:4 175:24
  176:15 177:21
  206:15,20
**sentence** 68:14
**separate** 51:18 56:7
  107:2 162:11
**separated** 121:12
**separately** 191:22
**separators** 56:9
  71:13
**series** 205:13
**service** 41:19
**serving** 36:2
**set** 22:19 24:5 27:24
  101:11 124:23
  139:2,3 152:25
  155:11 176:18
  209:12,22
**sets** 156:21 175:13
**setting** 148:9 155:23
**settings** 114:22
  115:5 116:8 131:12

131:16,19,21
132:14,21 133:15
136:21,24 137:13
148:16,20 189:17
189:19,22,23 193:4
193:14
setup  146:15
seven  150:14
severely  57:7
shade  27:20 138:7
shades  202:9,10
shaky  56:3
shalt  80:2
shampoo  86:11
shape  104:17
shaped  185:14
sheet  72:14 126:19
211:2
shepherd  171:3
shock  200:12
short  155:5
shortcut  100:3
shortly  22:15
show  53:11 77:23
showed  22:19 53:5
137:21 142:8 203:3
showing  24:17
29:15 179:21
181:25
shown  80:20 86:14
shows  56:21 71:5
135:10,12
side  8:8 11:24,24
14:3,9 20:8 26:15
29:16,16 34:17
77:18 85:10 138:15
138:15 150:25
151:2 194:2 196:17
196:17 204:12,12
sign  51:16,22 57:21
signature  12:25
20:15 37:22 50:3,6
50:7,10,11,12 51:7
52:12 53:8,19 54:14
54:16,19 55:7,11,15

55:21,25 56:11
58:13,15,17,19,24
58:24 59:20,21,23
59:24 60:3,8,10,13
60:14,17,21,23,25
61:12 62:23,25
65:16,19,20,20,23
66:4,6,10,13,15,18
66:20 67:3,15,16,18
67:22 68:2,8,10,17
68:19,19,22,24 69:8
69:14,21,22 70:3,4
70:9,11,18,19,22
71:3,4,7,10,14,18,19
71:19,20 72:7,7
73:16,21,22,23
93:15,19 94:4,6,8
94:10,21 95:16,17
95:18,23,24,25,25
96:5,7,12,19,25
97:11,14,14,18,20
97:25 98:4,10,12,13
99:4,6 100:16,19,22
101:5,6,9,14,16,20
101:21,24 102:2,6,7
103:5 180:12
183:12
signatures  13:2,6,9
13:18 23:16 33:20
49:9 51:4 52:11
54:7,9 55:4 57:9
58:5,9 67:8 68:16
69:4 73:19 92:16,24
101:12 107:20,20
109:10
signed  40:24 52:17
52:18
significance  186:9
186:12 199:5,16
significant  126:25
136:5,15 175:6
202:19
signing  58:6
signs  68:12,15

silicon  156:23
similar  20:3 42:11
42:16 60:9 69:20
73:8 144:18 156:14
similarity  58:5,6
119:8
similarly  60:7 71:9
181:19
simple  46:5 165:3
171:15 175:12
189:7
simply  138:14
simulated  69:2
simulation  55:7,19
57:10,13 93:25,25
94:12
simulations  69:5
94:2,16
single  169:16,20
196:5
singly  123:13
sir  13:14 33:13
63:22 79:13 90:14
91:19 107:22
113:11,24 122:16
122:23 123:19
124:17 138:14
143:18 174:21
184:22 185:16,17
193:6 203:5
sit  31:12 94:12
168:14 187:16
sitting  17:21 31:4
94:6 120:21 179:6
181:8
situation  105:18
situations  117:14,17
six  50:8,14,17,22,25
70:14 172:6 207:13
sixth  55:25 70:17
size  59:9 114:12
117:3,3 118:25
181:12,17 204:8
skew  59:7

ski  47:20
skiing  47:19
skillfully  60:15
skin  91:21,22,23
skyline  120:22
skylines  122:5
slight  136:18 202:9
slightly  130:8 134:6
183:24 194:21
202:24
slopes  47:20
slow  68:25 69:3
slowly  57:3,5
small  105:5 116:25
118:25 152:8
156:24 202:8
smaller  114:16
130:3
smooth  56:22
smoothly  54:20
snail  57:4
snail's  57:4
snapshot  47:12
snyder  17:15
soap  89:15,16,21,22
89:25 90:4
soaps  90:9,19
society  157:16
sockets  159:20
soft  92:11,12
software  53:20
69:23 132:5,9,13,24
133:15,15 136:21
137:13 155:14,17
155:20 171:24
172:9,14,18,19,23
173:13,16 174:3
175:16 193:15,21
193:22
soles  140:2
solvent  90:17,18,22
solvents  76:10
somebody  37:11
46:9 47:13,21 50:3
51:21 56:21 57:8

58:6 77:23 116:19
137:25 167:6,20
168:13 170:8,11,16
171:17
**someone's** 92:9
**someplace** 47:16
51:11,21
**somewhat** 201:18
204:18
**soon** 5:13 24:16
130:25
**sorry** 12:10 29:20
30:23 35:25 38:25
41:11 48:25 64:10
66:23 68:13 74:12
75:14 99:15 100:10
101:15 106:22
108:16 111:6
115:23 118:4
124:22 133:11
141:14 143:14
148:24
**sort** 13:12 21:4,5,8
21:13 26:20 33:22
61:23 65:23 84:24
93:21 95:9 105:15
127:9 148:24 158:8
163:8 174:6 189:6
**sorts** 21:16
**sounds** 3:8 21:3,16
**source** 96:12,14,15
96:23 114:19
**sources** 156:2
**southern** 120:25
163:12,16
**southwell** 2:16 3:3,3
3:9 4:2 5:3,25 6:21
7:9 8:15,18,23 9:4
12:9,11 17:22,23
18:8 21:3,11 28:20
31:18 32:6 33:8
53:14,23 73:25
74:10,14 76:18 88:4
90:11 100:15
106:18,21,23

108:17 109:19,21
111:8 140:17 149:8
151:7 158:24 159:4
161:5 164:13,19,25
165:4,8,11 167:5
180:20 184:19
186:4 198:21 201:5
201:7,10 203:18
204:6 205:9 206:7
206:10,19 207:2,7
207:12,18 208:2
210:6
**southwestern**
157:17
**space** 9:24
**speak** 8:6 17:4
**speaking** 8:6 21:17
**specialized** 46:12
**specific** 15:13 52:8
65:24 70:15 82:2
103:13 125:4
138:10 156:17
**specifically** 3:15
19:7 20:9 49:9
54:14 77:9 80:2
89:24 97:20 104:19
113:12
**specification** 50:15
50:17,24 53:20 54:5
54:8,13,17 55:16
56:2,24 60:11 66:16
68:10,18 69:24
70:18 73:23 160:4
180:7,10
**specifics** 100:11
154:9
**speckin** 178:17,18
178:20 179:7,7
**specs** 159:13,16,18
**speculate** 81:17 83:5
83:5
**speculating** 148:25
148:25
**speculation** 109:22
149:2

**speed** 54:18 70:21
**spelling** 39:16
**spent** 158:20 186:13
207:6
**spilled** 84:14
**split** 179:21,21
**spoke** 17:10,19
**spoken** 73:10
**sripriya** 2:17 18:7
**ss** 209:4
**st** 201:16
**stack** 78:19
**stage** 25:19
**stand** 7:9
**standard** 18:17,20
18:22 51:23 79:12
79:14,15,22 124:7,9
124:11,16,18
125:16,19 129:5
150:4 166:15 167:8
167:10,11,17
168:18,21,22 169:6
169:14,17,20,23
170:2,4,10,22,23,24
171:9,10,13
**standardized** 167:4
**standards** 79:5,8,18
80:2,4 124:23 125:3
125:9,13 166:7,11
166:19,24 167:24
168:3 169:21 171:5
186:23,25
**standby** 150:10,11
**standing** 178:24
**staple** 184:2
**start** 49:14 58:15
108:7 139:5 144:8
168:17 172:4
176:18
**started** 64:17 76:14
101:10 153:24
**starting** 38:14 40:9
40:11 67:17 89:4
101:18 102:3 106:7

**state** 1:23 121:10
158:13 164:3 209:3
209:9
**stated** 160:20
**statement** 52:20
164:10 203:11,16
203:21,23,24
**states** 1:2 163:6
**static** 81:4
**steering** 86:22
**step** 167:20 168:14
174:5,5
**stepped** 162:15
**steps** 142:3
**stereomicroscope**
151:20,21
**stewart** 49:12 51:6
58:2 63:20 64:2
178:6,23
**stewart's** 61:19
64:13
**stick** 77:16 166:4
**stop** 151:10 152:13
170:19
**stories** 121:3,4
**story** 121:10 183:21
**straight** 56:5,6
**strange** 26:11
**streetfax** 50:23
99:14,18 100:12,20
102:9
**strength** 127:16,17
**string** 30:2
**stripped** 131:8
**stroke** 60:20
**strokes** 54:21
**strong** 86:24
**studied** 57:20
**stuff** 100:3 196:3,4
**stuffs** 76:8
**stumbled** 85:5
**style** 60:14 70:21
128:2,5,6
**styling** 167:15

stylistic 167:10
subatomic 200:3
subcategory 94:2
subcommittee
 167:19 171:12
subjects 104:16
submit 11:13 12:20
 34:16,25
submitted 9:10 10:2
 10:23 11:9,12 18:16
 116:15,19,20
submitting 176:2
subscribed 208:11
 211:22
subsequent 17:13
 81:10 85:16
subsequently 26:2
 80:24 158:4
subset 93:25
substance 82:21,24
 82:25 92:12
subsumed 98:25
subtle 121:5 130:7
 136:6,15 138:12
subtractions 110:15
suddenly 56:25
suffice 184:22
suggest 34:10,16
 52:23 93:16 104:21
 121:16 123:9 137:3
suggested 81:9
suggesting 192:16
suggestions 157:8
suggests 125:19,21
summarize 22:22
superimposed 73:3
superimposing 73:9
supplied 57:20
supply 31:17
support 9:11
suppose 186:7
supposed 50:11 56:6
 198:8
sure 8:3,9 10:19,24
 14:7 21:20 25:8

28:14 31:18,20
33:16 34:15 45:19
57:18,19 72:24 73:4
73:5 78:19 81:23
88:25 100:17
102:22 104:15
105:4 109:22
118:23 122:6 124:9
138:2 143:17,21
147:17 150:13
151:15 157:21
161:22 162:10
172:14 182:3 206:5
surface 80:23
 173:19
surprise 198:16,19
 198:23 199:21
 200:12,25 201:6,20
 201:21 202:5
surprised 134:12
 199:13,18 200:20
 200:21
surprising 200:9,14
 201:19 202:6
swim 187:13
switch 22:5
sworn 7:13 88:12
 208:11 209:13
 211:22
system 11:6 155:16
 157:15,23

**t**

t 7:12,12,12 25:4
 39:12,15 88:2,10,10
 88:10 209:2,2
tab 185:8,10
table 111:13 118:15
 181:22 201:24
tabs 27:16,18
 161:14,20 175:11
 195:19
tailing 54:21
take 4:4 16:9 21:18
 31:23 72:20 106:14

129:8 130:6 136:20
140:19,23,25 149:7
149:10 175:10
182:20,22 188:5,11
taken 68:3 76:2
 111:13 114:21
 115:3 134:7,13,14
 135:6 136:12
 138:22 140:15
 141:12,23 143:3
 146:8 149:13
 153:19,21 175:10
 180:10 182:7
 194:15,25 195:22
 200:17,18 201:23
takes 138:20
talk 8:12 21:9 65:13
 75:20,20 79:8 111:7
 118:7 173:25
 189:10
talked 4:17 64:5
 91:12 92:15 111:20
 140:11 150:20
 184:11 190:2
talking 13:12 24:12
 40:7 47:11 50:16
 62:19,22,23 65:19
 77:9 78:2 94:20
 99:11 100:7 103:16
 125:5 135:2 138:11
 138:12 140:4
 141:15 152:20
 169:6 177:12 188:4
 191:16 193:7 200:2
 200:4,4,22
talks 79:15
tan 119:17 121:20
 138:8,9,9,13 183:6
 183:16,17,19
target 156:24
task 25:25 26:2,21
 34:21
tasked 49:5,8,10
 61:14

tasks 22:8 24:21,25
 25:4,5,10,18,21
taxpayer 121:11
technical 50:23
 131:9 205:4
technicalities 73:7
technique 72:25
 167:4,7,7,8
techniques 84:18
technological 7:24
technologies 127:24
technology 8:9
 18:25 36:2 53:25
 80:25 85:13 88:17
telephone 2:10 7:23
 53:16
television 156:21
 174:19 175:13
televisions 174:20
 196:2
tell 5:22 9:19 14:4
 35:2 42:14 45:6
 46:18,19 57:13 66:3
 69:17,17 78:17,21
 94:19 151:2,5
 183:18 192:21
 193:21
telling 17:18 142:14
 143:23 146:11
tells 191:13
ten 149:9
tend 31:5 64:19
 162:7
tenths 129:2
term 12:22 34:2
 41:7 54:25 59:18
 65:24 66:2,8 70:15
 80:21 90:15 95:17
 131:9 152:9 161:12
 187:2,3 195:4 205:4
terminal 54:21
terminology 67:15
 187:21
terms 18:17,20
 25:20 53:11 59:6

60:19 73:6 119:14
138:9 150:4 160:25
202:9
**terrible** 57:14 68:7
**tertiary** 135:20
**testified** 7:15 88:13
101:18
**testimony** 92:19
150:8,8 209:15
**texas** 172:22
**text** 188:20,20
190:20,21 191:11
**textbooks** 57:20
**thank** 5:4 8:5 32:8
33:8,9 40:18 43:9
66:9 74:5 142:18
170:13 208:4
**theoretically** 4:3
**thereof** 99:5
**thicker** 127:10
**thickness** 123:25
124:8,13 125:10
127:6,8
**thing** 11:11 13:19
30:6 31:21 55:5
57:8 114:11 116:12
118:10 119:2
146:21 171:16
192:15 203:6
**things** 3:6,10 4:13
11:23 24:20 36:9
45:16 48:3,7 67:21
78:14 80:14 86:21
127:22 144:22
162:7 170:14 175:4
175:19 185:18
187:4,7,8 189:17
194:9,9,12,12
**think** 7:19 10:4
13:13 15:24 20:14
24:23 25:3 32:9
35:23 36:9,18 37:14
39:14 40:22 43:4
50:14 51:17 63:21
64:4,21 67:23,25

70:8 79:18,25 80:6
83:16 91:5,7 96:20
105:17 113:17
114:23 115:10
118:3 119:13
123:10,10 124:14
125:14 129:14,19
130:3,17 131:9
133:6 136:14
143:14 144:6 145:4
151:18,25 154:3
156:7 157:21 158:7
162:3 163:11 164:8
164:9,16 166:4
167:13 170:18,21
172:13 173:5,7
177:21 178:23
180:13 182:15
190:3,7,11,13,15
191:5 192:13
196:23 198:13,13
199:3 200:16 205:4
205:12 206:4,4
**thinking** 92:10
**thinner** 126:19
127:10
**third** 107:17 124:24
**thirdhand** 61:25
**thirds** 16:12 170:19
171:14
**thirty** 207:13
**thoroughly** 195:9,15
195:16
**thou** 80:2
**thought** 170:13
**thousands** 13:5
125:2,2
**thousandths** 126:16
129:3
**three** 88:7 94:13
106:22,23 107:12
126:17 147:8,8,13
147:15 148:3
150:12,16 158:25
182:25

**throat** 49:7 129:8
**throughput** 168:3
**thursday** 4:10
**tie** 39:24
**tiff** 39:11 41:23
42:24 43:20 44:8
45:3,5,6,9,21,25
46:15,23 48:15
58:20 60:6 98:19,21
99:25 100:4 184:4
**tiffs** 44:24 47:6
**till** 25:19
**time** 13:23 16:14,24
19:8 21:9 22:9 28:2
36:4,7,20 37:5,9
57:9 76:15 78:24
80:11 83:14 84:19
87:7 88:3 89:12
114:23 126:23
132:6 134:13
140:19 143:11,13
149:7,16 158:9
159:10 164:21
168:5 174:11
187:11,16,16
195:10 196:9,9,22
197:7 198:2,2,15
206:5 207:5,6 208:6
**times** 12:16,18,24
18:10 44:3 75:2,7
110:21 153:4
158:22 163:3,13
**tints** 175:4
**tip** 120:25
**tobacco** 51:25
**today** 3:24 7:24
29:22 44:7 65:6
104:12 186:24
206:25
**told** 44:18 64:19
85:2
**tomorrow** 147:6
**ton** 112:9
**toner** 121:13

**tools** 175:16
**top** 10:17 11:4,19
26:24,25 27:6,7
39:3 50:20 67:12,13
77:19 94:23,24 95:8
96:5,6,8 97:3
107:11 110:8 140:2
148:11 161:14,16
175:11 183:11
185:9
**topic** 34:10 35:18
81:17
**topics** 36:13,16,18
**tops** 195:20
**total** 69:9
**totally** 77:14 187:8
197:17,18
**touch** 75:2,6,8
**touched** 74:21,23
86:2 106:4 205:15
205:23
**tough** 114:17
**town** 70:13
**trace** 93:20 94:22,25
97:2
**traceable** 110:17
**traced** 69:16,17
72:11,11,12,13
110:17
**traces** 96:19
**tracing** 55:11,19
57:11,14,16 58:11
58:11 59:14,15,22
60:24,25 65:20 66:7
67:19 69:8,15 72:5
72:9 92:15,22 93:2
93:8,15,23 94:17,18
94:20 95:3,6,7,11
96:10 97:5,10,13
98:6,12 99:6,9,10
101:13,19,25 102:8
**tracings** 69:6 92:20
93:12 97:19
**track** 158:9

tracking 207:15
tracks 100:25
trade 158:8
traditional 128:6
trained 12:13 20:5
training 13:22 48:5
transcript 206:12
 210:8
transfer 69:11,12
 86:3,12
transferred 85:25
 86:21 91:24 106:2
transferring 83:22
 92:8
transmitted 45:24
transparent 134:24
travel 4:7,12
traveling 3:24
treasury 164:9
trees 46:21
triangle 27:9,16
 175:14 195:21
tried 25:13 33:22
trips 55:9
trouble 140:7
troubles 84:13
true 42:20 58:2 89:3
 91:19 124:2 135:11
 142:22 152:19
 162:9 168:11,21
 169:14 174:12
 184:13 186:17
 190:24 192:12
 193:11 198:23
 201:6 209:14
try 3:23 41:12 45:17
 48:3 52:4 89:6
 91:14 94:5 117:25
 118:4 122:11
 139:11 146:19
 201:14
trying 25:8 37:21
 63:20 84:20 86:25
 93:21 94:24

tube 156:24
turn 27:6 116:18
 128:3
turned 174:4 195:11
turning 44:12 128:5
turns 155:20
tv 156:24
tvs 174:25 175:3
twenty 46:24 48:11
 67:4
twice 57:22 58:7
 187:13
two 16:6,12,18
 22:25 26:8,24 38:25
 39:2,11,11 40:10,13
 41:17,21 44:8 45:3
 46:15 49:10 53:10
 54:9 58:4,8 64:5
 65:2 67:20 69:24
 74:19 88:5 92:24
 96:6 102:2 106:19
 106:24 107:23,23
 108:8 111:15
 114:22 115:2,6,14
 115:25 116:9,24,25
 117:25 118:11,19
 119:5 120:16,16
 121:20,21,22,25
 122:5,7 125:17
 127:5 128:11,13
 129:12,17,23
 130:12 134:9 135:6
 136:6,16 138:15
 141:16,24 144:4,11
 144:19,22,24 145:7
 145:11 147:25
 148:2,12,12 154:3
 156:13 157:10
 170:19 171:14
 175:11 181:11
 182:13 185:6
 186:12,17,18 187:4
 187:7,8,19 188:5,6
 188:8,9,11 189:2,11
 190:18,23 191:9,14

191:16,17,18,21
 192:3,4,18,19,19,25
 193:8,17,24,25
 194:9 195:16,20
 196:5,6 199:10
 200:2 202:9
type 21:8 82:3
 115:20 150:2
 193:14
types 13:8,17 75:12
 180:3
typical 6:2
typically 5:19 59:14
 68:9 69:4
typography 16:17
 16:22,25 35:8 42:22
tytell 1:19 3:2,19 4:9
 5:11 7:1,6,11,18 8:1
 8:14,21,22,25 9:1
 9:22 10:1,3 11:1,22
 12:1,6 13:1 14:1
 15:1 16:1 17:1 18:1
 18:23 19:1 20:1
 21:1,18 22:1,7 23:1
 24:1 25:1 26:1 27:1
 28:1,22 29:1,22
 30:1 31:1 32:1,9
 33:1 34:1 35:1 36:1
 37:1 38:1 39:1 40:1
 41:1 42:1 43:1 44:1
 45:1,3 46:1 47:1
 48:1,24 49:1 50:1
 50:22 51:1 52:1
 53:1,17 54:1 55:1
 56:1 57:1 58:1 59:1
 60:1 61:1 62:1 63:1
 64:1 65:1 66:1 67:1
 67:12 68:1 69:1
 70:1 71:1 72:1 73:1
 74:1,7 75:1 76:1
 77:1 78:1,5 79:1
 80:1 81:1 82:1 83:1
 84:1 85:1 86:1 87:1
 88:16 89:1 90:1
 91:1 92:1 93:1 94:1

95:1 96:1 97:1 98:1
 99:1 100:1 101:1
 102:1 103:1 104:1
 105:1 106:1,17
 107:1,6,8,13,18
 108:1,8,8,11,18,21
 109:1,14,15 110:1
 111:1 112:1,7,17
 113:1,16,22 114:1
 115:1 116:1 117:1
 118:1,11,12 119:1
 120:1,13,13 121:1,7
 122:1,22 123:1,15
 123:16,18 124:1
 125:1 126:1 127:1
 127:14 128:1 129:1
 130:1 131:1 132:1
 133:1 134:1 135:1
 136:1 137:1 138:1
 139:1 140:1 141:1,3
 141:20 142:1,9
 143:1,6,7 144:1,3
 145:1,25,25 146:1,7
 146:9 147:1 148:1
 149:1,14 150:1
 151:1 152:1 153:1
 154:1 155:1 156:1
 157:1 158:1 159:1,6
 160:1 161:1 162:1
 162:12 163:1 164:1
 165:1 166:1 167:1
 168:1 169:1 170:1
 171:1 172:1 173:1
 174:1 175:1 176:1
 177:1 178:1 179:1,4
 180:1,24,25 181:1,9
 182:1,22 183:1
 184:1,10 185:1
 186:1 187:1,14
 188:1 189:1 190:1
 191:1 192:1 193:1
 194:1 195:1 196:1
 197:1 198:1 199:1
 200:1 201:1 202:1
 203:1 204:1 205:1

205:10 206:1 207:1
208:1,9 209:11
210:5,16,18 211:6
211:21
**tytell's**  3:23 6:13 9:2
164:22

**u**

**u.s.**  41:19 105:3
158:16 163:4,14,16
163:21 164:3,5,9
**ultra**  55:4
**ultraviolet**  26:10,11
26:13 27:22 136:3,4
136:8,12 156:10
161:11 195:7
**unable**  69:17
**unanimity**  169:25
170:7
**unclear**  135:2
**underlying**  116:11
**underneath**  94:25
95:2 97:13
**understand**  6:9
24:12 25:8 29:11
34:4 39:10 43:23
50:16 76:4 77:14,24
78:9 90:16 91:5
92:21 95:20 100:6
100:18 113:4
115:13 122:16
180:2 185:21
**understanding**  3:22
16:13,16 40:7 90:24
91:10
**understood**  26:2
76:2 78:22 178:7
**undertake**  17:7
**unfair**  117:9 118:17
**unfortunate**  181:7
**unfortunately**  158:9
**uniformly**  26:14
161:13
**unintelligible**
169:10

**unit**  2:7 126:14,15
127:21 128:17,25
129:10 158:12,13
**united**  1:2 163:6
**units**  128:16,25
129:3
**universally**  81:24
**universe**  117:17
**unknown**  142:2
**unnecessarily**  54:24
**unusual**  25:22 26:19
26:22 27:21 161:25
**upgraded**  158:5
**upper**  109:5
**use**  26:17 48:14
51:24 62:17 66:24
67:14 68:11 70:12
80:13,21,25 89:15
89:21 95:17,19
124:4,7,12,19
125:10 137:18
145:6,10 152:25
153:12,17 155:12
158:21 159:20
167:14 172:2
175:12,16,18
180:15 193:5
**useful**  26:4 85:9
114:24 172:13
**uses**  71:11
**usually**  51:20 57:12
69:16 119:2 128:8
143:24 170:9
171:14
**utilized**  154:13,17
154:17,19,23
**uv**  154:11,11,22
181:25 195:10,15

**v**

**v**  1:19 7:12 88:10
208:9 209:11 210:5
211:5,6,21
**vague**  139:7

**vail**  47:18,18,19
**valery**  23:7
**valid**  115:11 117:4
118:21 120:10
170:9 189:12,15
**vapor**  87:2
**variables**  123:10,12
199:12
**variation**  54:21
57:24,25 58:3,7
59:3,4 126:18
183:15 199:9
**various**  10:17 59:25
64:24 73:10 155:15
158:22
**venture**  122:14
**verbally**  63:11
**veritext**  3:4 211:2
**vermont**  163:19,21
163:23
**vernier**  128:2
**version**  132:5,11
184:3,4
**versions**  177:11,14
180:5
**versus**  11:20 75:7
117:23 138:13
163:6
**vibrant**  118:19
137:8,17 143:11,15
143:22
**video**  156:18,18,19
156:20,21,23
157:15 178:23
195:2,2,8,12
**videos**  136:11
**view**  120:22
**viewed**  24:7 202:2
**virtually**  55:24
85:12 117:18,18
130:19 134:24
**visible**  195:8,12,16
200:23
**visual**  31:13 81:6

**visualize**  80:24
**visually**  42:14 46:18
133:22 144:5,10
192:5 198:6,18
199:2
**voice**  44:7
**volumes**  124:23,23
171:5
**vote**  170:3
**voting**  170:4,20
**vs**  1:7
**vsc**  134:18 152:14
152:25 153:16,17
154:8,22 155:4,15
155:24 156:11,16
156:17 157:7,22,24
158:2,5,6,12,17,20
159:7 177:7 178:20
182:7,8

**w**

**w**  32:14
**wait**  12:11 88:24
156:2 191:15
**want**  3:17,20 4:5,20
9:19 17:18 21:20
28:25 34:14 37:2
45:5 54:23 70:12
80:20 83:6 85:15
93:19 94:22 95:18
106:18 107:2 111:7
111:8 115:12 117:7
118:7 119:2 122:14
125:14 140:8 147:6
149:7 186:15
193:23 194:11
200:10
**wanted**  8:12 74:3,4
88:4,20 107:4
114:10
**wants**  167:3,6
**war**  165:25 166:4
**warren**  2:6
**wash**  89:8,17

washed   89:5,11,13
washington   158:21
   164:6
watch   128:12,13
watches   128:12
watching   85:20
water   139:24,25
watt   156:7,8 159:11
wattage   160:11
wavelength   86:25
wax   92:12
way   4:23 12:24
   31:11 34:7 44:13
   51:14 57:12,22 63:2
   73:5 88:22 92:2
   96:22 101:3 104:17
   110:17 120:20
   121:19 124:19
   129:21 131:10
   157:3 158:9 162:7
   165:22 176:4
   181:18 182:5
   183:23 185:11
   188:21 190:19
   191:13 193:22
   202:25 205:5
   209:19
ways   92:4,7 93:11
   93:14
we've   12:4 50:14
   52:6 67:23 150:15
   159:2
wear   79:22 80:2
   82:13 83:12,21
wearing   79:16 80:17
   80:19 82:3,17 83:18
weeds   73:7
week   63:22 65:2,6
   137:20 138:17,23
   139:19 150:15
   158:20
weeks   65:5 94:13
weird   30:25
went   5:9 64:21
   118:6 144:6,15

152:8 156:19,24
western   1:3
wet   140:3
wheels   86:22
whereof   209:21
white   27:19 43:16
   43:17,19 134:6,6,14
   134:17,19,22,25
   135:4 156:3,10
   159:9 160:3 161:15
   174:25 195:19
whited   160:16
willing   17:7 117:8
window   96:15,20
windows   132:10
winter   158:7
wisecrack   187:12
wish   119:12 196:7
withdrawn   81:12
witness   6:2 7:13
   8:13 12:10 21:16
   74:16 88:11 165:7
   209:11,15,21 210:4
wonderful   31:3
   175:16
wonderfully   117:16
wondering   62:20
   91:8
word   9:24 24:24
   40:17 43:10 46:23
   66:24 105:15
   112:12 113:13,22
   118:18 120:15
   122:2 123:20
   137:18 139:9
   143:15 144:13,21
   144:22 145:3,6,9
   146:17 167:14
   181:22,23 183:10
   186:22 192:13
   193:5 194:7 205:5
wording   50:20
   80:11
words   11:25 12:2
   52:7 78:22 112:16

114:2 143:15,17,21
   143:22,23,24
   145:10 191:20
wordy   64:19
work   16:19,19 17:7
   18:15 22:25 28:10
   28:18 29:2,15 30:14
   31:14 32:18,25 33:6
   33:14 34:16 38:4,5
   38:11,16 39:2,22
   40:2,5 41:16 45:16
   51:2 52:2,14 53:2
   53:12,19 54:9,10,12
   55:21 56:11,16,19
   58:25 60:18,22
   65:17 68:20,24
   69:21 70:24 71:17
   71:25 72:2,8 73:24
   74:8,9 86:18 91:18
   92:18,25 98:2,5,13
   99:19 100:23 101:9
   101:17 102:17
   103:2,12 105:3
   107:15,24 108:25
   109:4,8,16 110:20
   111:15 112:19,20
   113:19 115:3
   119:15,25 123:24
   125:18 129:13,18
   130:19 131:18
   132:18 133:3,17
   141:7,13,17,21,23
   154:21 156:11
   158:17 162:24
   163:24 164:9,11,18
   164:23 165:2,19
   166:5 172:2,5,24
   178:8 180:5,6,9
   182:24 184:12,18
   194:15 196:18
   197:21 198:6,11
   205:16,24
worked   87:4,5
   150:6 157:25
   163:12

working   19:18
   72:22 84:22 104:22
   116:10 149:16
   158:14 173:20
workshop   157:14,21
world   46:25 85:18
   158:8 165:25 166:3
worn   75:10 79:10
worth   186:2,2
wow   139:18 140:6,6
write   57:2 167:9,21
   168:13,14
writer   66:11
writes   170:23
writing   23:24 49:15
   51:12,13 52:12 54:6
   54:8 56:22 57:2,5
   69:3 70:21 71:24
   72:2 81:7 84:9,24
   85:8 93:19 94:9
   96:9 166:19 183:14
   191:11
written   15:18 18:14
   52:5 54:20 58:9
   66:10 67:18,22 68:8
   68:11,19,22 166:12
   167:23,25
wrong   24:11 57:7
   170:12,18 171:2
   187:20
wrote   33:23 51:16
   52:19,22 66:5

|  |
|---|
| **x** |

x   172:21 210:2

|  |
|---|
| **y** |

y   7:12 88:10
yag   87:3
yard   86:16
yeah   4:2 21:11
   24:25 31:23 33:10
   51:13 53:25 55:2
   106:23 108:13
   109:5 113:4 157:11
   180:22 183:22

191:25 194:8
**year**  16:12 20:20
  56:7,10 156:22
**years**  13:6,16,21
  16:6 20:14 34:8,8
  45:24 47:8 86:8,8
  127:25 157:10,20
  166:3 173:10
  175:18
**yellow**  62:9 135:8
  138:8,13 147:18,19
  147:20 161:15
  162:5 183:20
  190:20 192:6
  202:10,15
**yellowed**  134:8,8
  161:2,3 194:21
**yellowing**  136:9
  161:19,23
**yellowish**  161:12
  185:5
**yesterday**  4:19
**york**  1:3,21,21,24
  2:15,15 49:6 70:13
  120:23 163:18,23
  196:25 201:16
  209:3,5,9 211:3,3
**yorker**  133:11

**z**

**zero**  190:10
**zuckerberg**  1:8
  37:23,24 49:3 50:12
  59:24 60:7,12,15
  62:23,24 70:4,9,19
  70:20 71:3,4,10,11
  71:14,18,19 72:11
  92:17 102:6 109:10
  211:5
**zuckerberg's**  48:18
  60:3,10,17,25 69:21
  69:22 72:7 101:9,13
  101:16,25