Page 1

2              UNITED STATES DISTRICT COURT

3              WESTERN DISTRICT OF NEW YORK

5    PAUL D. CEGLIA,                )
                                    )
6                 Plaintiff,        )
                                    )
7              vs.                  )    No. 1:10-cv-00569
                                    )       (RJA)
8    MARK ELLIOT ZUCKERBERG,        )
     Individually, and             )
9    FACEBOOK, INC.,                )
                                    )
10                Defendants.       )
     ------------------------       )

16                         August 9, 2012

17                         10:20 a.m.

19              Deposition of VALERY N. AGINSKY, held

20         at the offices of Gibson, Dunn & Crutcher LLP,

21         200 Park Avenue, New York, New York, before

22         Laurie A. Collins, a Registered Professional

23         Reporter and Notary Public of the State of New

24         York.

Page 2

```
 1
 2   A P P E A R A N C E S:
 3        BOLAND LEGAL, LLC
 4        Attorneys for Plaintiff
 5             1475 Warren Road
 6             Unit 770724
 7             Lakewood, Ohio 44107
 8        BY:  DEAN BOLAND, ESQ.
 9             (via telephone)
10                   - and -
11        PAUL A. ARGENTIERI, ESQ.
12             188 Main Street
13             Hornell, New York 14843
14        BY:  PAUL A. ARGENTIERI, ESQ.
15
16        GIBSON, DUNN & CRUTCHER LLP
17        Attorneys for Defendants
18             200 Park Avenue
19             New York, New York 10166-0193
20        BY:  ALEXANDER H. SOUTHWELL, ESQ.
21             MATTHEW BENJAMIN, ESQ.
22             AMANDA AYCOCK, ESQ.
23
24   ALSO PRESENT:
25        JAMES ROBERTS, Videographer
```

Page 3

1

2          THE VIDEOGRAPHER:  Good morning.  We're

3    now on the record.

4          Please note that microphones are

5    sensitive and may pick up whispering and

6    private conversations.  Please turn off all

7    cell phones or place them away from the

8    microphones, as they can interfere with the

9    deposition audio.  Recording will continue

10   until all parties agree to go off the record.

11         My name is James Roberts representing

12   Veritext with offices in New York City, New

13   York.  Today's date is August 9th, 2012.  The

14   time is approximately 10:20 a.m.

15         This deposition is being held at

16   Gibson, Dunn, located at 200 Park Avenue, New

17   York City, New York, and is being taken by

18   counsel for the defendants.  The caption of

19   the case is Paul D. Ceglia versus Mark Elliot

20   Zuckerberg, et al.  The case is filed in the

21   U.S. District Court, Western District of New

22   York, Case Number 1:10-cv-00569.  The name of

23   the witness is Valery N. Aginsky, Ph.D.

24         At this time the attorneys will please

25   state their appearances for the record.

Page 4

1                              Aginsky

2              MR. ARGENTIERI:  Paul Argentieri for

3       the plaintiff.

4              Dean?

5              THE VIDEOGRAPHER:  Counsel on the

6       phone?

7              MR. BOLAND:  Dean Boland here by phone.

8              MR. SOUTHWELL:  Alex Southwell from

9       Gibson, Dunn.  Along with me is Amanda Aycock

10      and Matthew Benjamin, also Gibson, Dunn, for

11      the defendants.

12             THE VIDEOGRAPHER:  Our court reporter,

13      Laurie Collins, also of Veritext, will please

14      swear in the witness.

15  V A L E R Y   N.   A G I N S K Y ,

16      called as a witness, having been duly sworn

17      by the notary public, was examined and

18      testified as follows:

19             THE VIDEOGRAPHER:  You may proceed.

20             MR. SOUTHWELL:  Thank you.

21  EXAMINATION BY

22  MR. SOUTHWELL:

23      Q.    Good morning, Dr. Aginsky.

24      A.    Good morning.

25      Q.    Have you been deposed before?

```
 1                    Aginsky
 2        A.    Yes.
 3        Q.    The judge presiding over this case has
 4   some particular rules that I need to tell you
 5   about.  The first is that if you need
 6   clarification or a definition or explanation of
 7   any words, questions, or documents throughout the
 8   course of the deposition, you're to ask me as
 9   opposing counsel rather than counsel for the
10   plaintiffs.
11              Do you understand that?
12        A.    Yes.
13        Q.    And you and plaintiff's counsel may not
14   engage in private conversation during the
15   deposition or any breaks in the deposition except
16   to determine whether to assert a privilege.
17              Do you understand that?
18        A.    Yes.
19        Q.    And I'd ask that you try to wait until
20   I finish my question, and I will try and wait
21   until you finish your answer so we don't overlap
22   on the record.  Okay?
23        A.    Okay.
24        Q.    Before we begin, you received your
25   payment for your appearance as well as the travel
```

Page 6

Aginsky

1    costs that we sent; correct?

2    A.    Yes.

3    Q.    And I think, as per your agreement, if

4    there's -- if the travel costs turn out to be

5    less, you will send us back the difference; if

6    they're more, you will let us know and we'll cover

7    that.

8    A.    That's correct.

9    Q.    Right?

10   A.    Yes.

11   Q.    I understand you met with

12   Mr. Argentieri briefly before we began.  Have you

13   met with anyone else to prepare for the deposition

14   other than that?

15   A.    No.

16   Q.    Have you spoken to anybody else to

17   prepare for the deposition other than that?

18   A.    Not today.

19   Q.    When have you?

20   A.    I don't remember the exact date, but it

21   was a telephone conference -- I might wrong -- but

22   maybe like three weeks ago, approximately.

23   Q.    Okay.  And who was on that conference?

24   A.    Dean Boland and I believe Paul Ceglia.

25

1                          Aginsky

2       Q.    Okay.  And was that -- is that the only

3  time that you've spoken to Mr. Ceglia or have you

4  spoken to him on other occasions?

5       A.    I spoke to him only once, I believe,

6  before.  That was on the day when I examined the

7  documents.

8       Q.    I see.  Was he there in person on that

9  day?

10      A.    Yes.

11      Q.    And on that occasion three weeks ago,

12 did he communicate any information about the

13 documents in question?  What was his role in the

14 conversation you had?

15      A.    He asked me some questions as he said

16 to understand better the capabilities of the ink-

17 aging techniques.

18      Q.    I see.  And this was on the

19 conversation three weeks ago or that was in the

20 first conversation?

21      A.    Three weeks ago.

22      Q.    I see.

23            Let me come back to that.  But I guess

24 because it's been I think a long time since you

25 actually worked on the case, I want to just go

1                          Aginsky

2    over your involvement very generally.

3              You were approached at some point about

4    being retained and then ultimately were retained

5    by the plaintiff in this litigation; right?

6         A.    Yes.

7         Q.    And at some point around January of

8    2011, you were provided with some documents at

9    your lab in Michigan, and you conducted an

10   examination; is that right?

11        A.    Yes.

12        Q.    The only exams that you performed were

13   a visual examination and other nondestructive

14   examinations, such as microscopic and UV and

15   infrared examinations; is that correct?

16        A.    Yes, and VSC analysis.

17        Q.    And VSC analysis.  Okay.

18              So you did not take any physical

19   samples of the documents presented to you;

20   correct?

21        A.    No.  I mean, that's correct, I didn't

22   take any samples.

23        Q.    So you did not conduct any chemical

24   testing?

25        A.    No.

1                    Aginsky

2        Q.    And then you provided a declaration in

3   June of 2011 that described the work that you had

4   done as well as your preliminary analysis; right?

5        A.    Yes.

6        Q.    And you provided us, meaning the

7   defendants, along with the plaintiffs, some of

8   your images and responses to interrogatories in

9   the late fall of 2011, around November and

10  December; is that right?

11       A.    Yes.  I provided everything that I had

12  in my computer, and then what I -- I believe I

13  wrote it in my -- the answers to interrogatories

14  that the way I also -- like 13 images that I took

15  using VSC, video spectral comparator, and I didn't

16  include them on the CD.  But I have them now on my

17  jump drive.  If you need them, you can download

18  them from my --

19       Q.    I see.  Do you have them here today?

20       A.    Yes.

21       Q.    Okay.

22       A.    (Indicating.)  It's my jump.

23       Q.    Great.  We'll turn to that in a little

24  bit.

25             Now, other than the examination in

```
 1                         Aginsky
 2    January 2011, did you do any other examination of
 3    any documents in this case?
 4         A.    No.
 5         Q.    So nothing after the January 2011
 6    examination; correct?
 7         A.    That's correct.
 8         Q.    Other than what is in your June 2011
 9    declaration, you haven't offered any other
10    opinions or findings to the court; correct?
11         A.    That's correct.
12         Q.    Have you offered any opinions or
13    findings to your client?
14              MR. ARGENTIERI:  I've got to object.
15       Isn't that work product?
16              MR. SOUTHWELL:  Not yet, no.
17         Q.    You may answer.
18              MR. ARGENTIERI:  Dean?  Dean, can you
19       hear me?
20              Is he on?
21              MR. SOUTHWELL:  He may have us on mute.
22              MR. ARGENTIERI:  Hang on.
23              (Pause.)
24              MR. ARGENTIERI:  Did you hear the last
25       question from Alex?
```

1                          Aginsky
2              MR. BOLAND:  Yeah, I heard it, but it
3       didn't sound like he was asking for the
4       conversation between Dr. Aginsky and us.
5              Is that right, Alex?
6              MR. SOUTHWELL:  Right.  That's why I
7       said not yet.  I'm just asking if it occurred.
8              MR. BOLAND:  Alex and I have been
9       pretty good about that.  Neither one of us
10      have asked for the contents of conversations
11      between experts and witnesses, and I don't
12      expect him to do that here.
13             MR. ARGENTIERI:  He's asking
14      Dr. Aginsky if he has offered any other
15      opinions other than what he has written or
16      provided in the declaration.
17             MR. BOLAND:  And I understand.  But
18      he's just asking if he's offered the opinion,
19      but not what they offer.
20             MR. ARGENTIERI:  Oh, all right.
21             MR. SOUTHWELL:  The answer can be
22      either "yes" or "no."
23         Q.    The question, Dr. Aginsky, is have you
24    offered any opinions or findings to your client
25    other than what's in your June 2011 declaration.

```
 1                        Aginsky
 2        A.    I have some difficulties to understand
 3   what opinions, what opinions or findings mean --
 4   means.
 5        Q.    Okay.  Well, let me ask it to you in a
 6   different way.  Do you have any other conclusions
 7   about the document that was presented to you for
 8   inspection that you have not put in your June 2011
 9   declaration?
10        A.    No, at the time when I prepared my
11   declaration, I only evaluated the results that I
12   obtained personally.  So my declaration relates to
13   only to my results.  And because I have not done
14   any other examination, therefore I couldn't render
15   any other opinion based on my results.
16        Q.    I see.  Have you been asked to review
17   the results of any other experts in this case?
18        A.    No, review, I mean some thorough study.
19   I have not reviewed any report prepared by any of
20   the experts on both sides.
21        Q.    Have you seen any of the reports
22   prepared by any of the experts on either side?
23        A.    Only what I've seen when I accidentally
24   ran across some information on this case in the
25   Internet.
```

```
 1                          Aginsky
 2        Q.    I see.
 3        A.    And simply I've seen that there were
 4   reports.  I'm not even sure that these are
 5   reports.  But I saw names of Gerald LaPorte and
 6   Peter Tytell, I believe Larry Stewart.  And I
 7   assumed that they prepared reports, but I have not
 8   reviewed their reports.
 9        Q.    I see.  Have you -- do you have any
10   understanding about the conclusions of any of
11   those other experts in the case?  Let me ask it a
12   different way.
13             Do you have any knowledge about what
14   those conclusions or findings are by other experts
15   in the case?
16        A.    As I said, I have not reviewed their
17   reports, so I might -- what I've seen in the
18   Internet, I have not reviewed it carefully.
19   Therefore, no, it's better for me not to guess.  I
20   don't -- I don't have any -- I should say that I
21   don't have any knowledge.  I can only guess what
22   their conclusions are.
23        Q.    I don't want you to guess.  I'm trying
24   to just understand whether you in fact have any
25   knowledge which may have been obtained in any
```

```
 1                          Aginsky
 2   number of ways, including reviewing the report, or
 3   in other ways.
 4              My question is do you have any
 5   knowledge about what other experts have concluded
 6   in this case.
 7        A.    No.  Typically in a case I am asked to
 8   review a report if I'm rebuttal witness, but in
 9   this case I was not asked to review.  And I
10   typically don't do any work if I am not being
11   paid.
12        Q.    All right.  I understand that.  Okay.
13              Do you have any other findings related
14   to the documents that you were asked to examine at
15   this point?
16        A.    I'm sorry, I didn't understand.
17        Q.    Do you have any other findings
18   concerning the document you were asked to examine
19   at this point?
20              MR. ARGENTIERI:  Other than what
21        he's --
22        Q.    Other than what's in your declaration,
23   correct.
24        A.    No.
25        Q.    Do you have any other opinions about
```

                              Aginsky
1
2    the document you were asked to examine other than

3    what's in your declaration?

4        A.    No, based on my results, no, I have no

5    other opinions.

6        Q.    Based on anything else, do you have any

7    other opinions?

8        A.    If I am -- if I review anything else, I

9    will probably form an additional opinion based on

10   someone else results.

11       Q.    I see.  So you could potentially form

12   additional opinions if you reviewed others'

13   results, but you haven't to date done that.  Is

14   that a fair assessment?

15       A.    Yes, yes.

16       Q.    You said, for instance, in your

17   interrogatory response that as of October 2011 you

18   were, in your words, unable to respond with

19   respect to the case.  So does that -- does that

20   mean you were no longer involved in the case since

21   at least October 2011?

22       A.    What I said I was unable to respond?

23       Q.    Uh-huh.

24       A.    If I remember correct my -- that

25   document, I think that I was unable to respond by

```
 1                         Aginsky
 2   a particular date because I had not been paid for
 3   my time --
 4        Q.    I see.
 5        A.    -- prior to that date.  So I was asked
 6   to respond, but I said I will do it after I am
 7   paid.
 8        Q.    I guess what I'm getting is were you
 9   involved -- did you remain involved in the case in
10   any way after June of 2011 up until very recently
11   concerning this deposition.
12        A.    Yes, the way I may be -- I don't
13   remember how many, not many, but there were some
14   discussions relating to this case, and there was
15   at least I believe it was one meeting with two
16   lawyers, two new lawyers, that were at that time
17   involved in the case.
18        Q.    I see.  Approximately when was that?
19        A.    I don't remember.  I think the one name
20   of the lawyer was Callahan.
21             MR. ARGENTIERI:  Yeah, Robert Callahan
22        and Sanford Dumain.
23        A.    Yes, Mr. Dumain, yes.
24        Q.    And you met with them as plaintiff's
25   expert; correct?
```

1                         Aginsky

2       A.    Yes.  I don't know which capacity I met

3   with them.  But they came to me to my office to --

4   so I would explain what I know about my results

5   and about the field of ink analysis and dating in

6   general.

7       Q.    And at that time you were an expert for

8   the plaintiff?

9       A.    Yes, that was my understanding, that I

10  was still an expert.

11      Q.    Right.  And do you understand that

12  today you are an expert for the plaintiff?

13      A.    That's not my strength.  I don't know

14  judicial if I am still an expert.  I know I have

15  not been designated as an expert.  So it means

16  that -- I don't know what -- what my position is

17  now.

18      Q.    Okay.  Fair enough.

19            Let's just go back to when you were

20  first contacted for potential involvement in the

21  case.  You had previously explained that that was

22  on November 24th, 2010.  Do you recall who it is

23  that contacted you?

24      A.    I think the name of the lawyer was

25  David Grable from was it Crow Moran [phonetic]?

```
 1                       Aginsky
 2   It's a big firm.  I don't remember which one.
 3        Q.    Fine.
 4              And how did he contact you?  By phone
 5   or --
 6        A.    Yes, he called me by phone, and he said
 7   that I was referred to him by another lawyer from
 8   that firm and I worked on a big case that
 9   previously.
10        Q.    Was that the firm Connors & Vilardo?
11   Does that sound right?
12        A.    No, that was -- oh, Quinn Emanuel.
13        Q.    Right, Quinn Emanuel.
14        A.    Yes.
15        Q.    And you had worked with other lawyers
16   at Quinn Emanuel on another case?
17        A.    Yes.  I worked with Mr. Quinn or
18   Mrs. Diane Hutnyan on a case, MGA versus Mattel.
19        Q.    And when you were first contacted, what
20   did you understand this case was about?
21        A.    Which case?
22        Q.    This case that we're talking about that
23   we're here for today.
24        A.    I think I was retained to do a typical
25   task what I typically do to analyze a certain
```

1                          Aginsky

2    document to see whether it was prepared, was it as

3    old as it purports to be, and whether there were

4    any amendments or changes or page substitutions in

5    the document.

6              So this is almost every other case that

7    I'm retained is similar task.

8         Q.    And in that initial conversation, did

9    you discuss the possibility of conducting an

10   examination?  Was it as detailed as that in that

11   initial discussion about your involvement?

12        A.    I think the only discussion that we had

13   was on the first date -- on the first day when I

14   did the examination.  So my understanding was that

15   day I was asked only to do some preliminary tests,

16   nondestructive, physical, optical analysis.  And

17   at that time my understanding was that at a later

18   time I will be taking samples and doing chemical

19   analysis of the samples.

20        Q.    I guess what I'm trying to get at is

21   you have told us that you were retained on January

22   13, 2011, and this contact was in November.  I

23   guess I'm trying to just get at whether -- so in

24   that initial conversation in November, you were

25   not actually retained.

```
 1                    Aginsky
 2          Was that more of an informational
 3   discussion?
 4      A.    Yes, I was just asked if I am available
 5   to do the analysis, and I -- it was a very general
 6   discussion, no specifics.
 7      Q.    And did you have an understanding of
 8   what the document at issue was based first just on
 9   that conversation in November of 2010?
10      A.    No, I don't remember if any words such
11   as "contract" were mentioned.  It's just a
12   document that needs to be examined to determine
13   whether it's as old as it purports to be.
14      Q.    And were there any other conversations
15   between that November conversation and then when
16   you were in fact retained on January 13, I guess
17   putting aside anything leading up to that meeting
18   on January 13?
19      A.    I don't remember any other
20   conversations.  It might be some other calls to
21   schedule the meeting, but I don't remember if I
22   ever talked to David Grable after that.
23      Q.    As you said, you were then retained
24   January 13, 2011.  And I take it that was the same
25   day there was in fact an examination conducted?
```

1                          Aginsky

2        A.    Yes.

3        Q.    What did you understand were the

4    circumstances that led to you being actually

5    retained on that day?

6        A.    I was given a signed retainer

7    agreement.  It was signed by I believe

8    Mr. Connors.

9        Q.    Mr. Connors?

10        A.    Yes.  And a retainer check, also signed

11    by him.

12        Q.    Do you have any understanding about

13    why -- what the cause of the delay between

14    November 2010 and January 2011 is?

15        A.    No.

16        Q.    What specifically were you engaged to

17    do?

18        A.    On January 13th?

19        Q.    Yes.

20        A.    I was given a two-page contract, "work

21    for hire" contract, and I was asked to examine

22    this two-page document by, as I said, using

23    nondestructive optical methods -- visual,

24    microscopic, and other optical methods -- to

25    determine whether I can see any discrepancies

Page 22

1                          Aginsky
2    between pages 1 and 2.
3         Q.    And we'll come back to your actual
4    examination in a little bit.  First with respect
5    to the agreement, does the agreement include a
6    provision regarding compensation for your
7    services?
8         A.    Does my retainer agreement?
9         Q.    The agreement covers your being paid;
10   correct?
11        A.    Yes, it was a very -- it was a
12   different agreement, not what I typically use.  It
13   was -- like confidentiality was involved there.  I
14   don't remember any specifics that agreement would
15   say that I will be paid for sure for my work, but
16   I assume that I should.
17        Q.    And what was your fee arrangement?
18        A.    My -- the rate is 400 an hour, $400 an
19   hour.
20        Q.    And that's your understanding of your
21   arrangement in this case with the plaintiff?
22        A.    Yes.
23        Q.    Was there ever a suggestion you would
24   work on a contingency basis?
25        A.    I never work on a contingency basis.

1                           Aginsky

2        Q.    Okay.  So my question, though, is was

3    there a suggestion that you would do that in this

4    case.

5              MR. ARGENTIERI:  Go ahead.

6        A.    I think there was something like that,

7    but I -- I disagreed.

8        Q.    I understand that you didn't agree to

9    that.  I guess what I'm trying to understand is

10   what specifically was offered in terms of that.

11       A.    What was offered to me?

12       Q.    Yeah.

13       A.    If I remember correctly, 5 percent.

14       Q.    Of the recovery?

15       A.    I don't know, of something, yes.

16       Q.    And do you have anybody else working on

17   the project that would -- there would be rates

18   for, like an assistant or anything like that that

19   there would be an hourly rate for?

20       A.    I'm sorry, I didn't understand.

21       Q.    Do you have somebody else in your lab

22   that is part of your team for which there are

23   charges?

24       A.    No, I work alone.  I have a

25   corporation, but it's a single-person corporation.

                               Aginsky

1

2     Q.    I see.

3           And in your interrogatory responses you

4     had noted that you had not yet received payment

5     for outstanding invoices, at least as of December

6     2011.  Have you since that time or at any point

7     have you received payment on those invoices?

8     A.    Yes.

9     Q.    Has plaintiff paid for all of your

10    outstanding fees at this point?

11    A.    Yes.

12    Q.    And you mentioned the 5 percent.  Who

13    was it that made that offer to you?

14    A.    The plaintiff.

15    Q.    Mr. Ceglia?

16    A.    Yes.

17    Q.    And that was in the -- on the day that

18    the examination occurred, January 13 --

19    A.    No.

20    Q.    -- 2011, or at a different time?

21    A.    That was at some time before I have --

22    before I was paid eventually the outstanding

23    amount, which I believe was around 5,000.

24    Q.    So there was $5,000 that was

25    outstanding you had not been paid for?

1                          Aginsky

2        A.     Yes.

3        Q.     And what was the form of the

4    communication with plaintiff?

5        A.     E-mail.

6        Q.     By e-mail?

7        A.     Yes.

8        Q.     So he offered 5 percent of something.

9    Was it in lieu of the outstanding balance or --

10       A.     That's correct.

11       Q.     And you don't recall what the 5 percent

12   was of?

13       A.     Of something which -- frankly I don't

14   know what was it, but if -- it's my understanding

15   if it's -- if there is a particular sum of money

16   which is at stake, then probably 5 percent of

17   that.

18       Q.     Right, if there's a recovery of a

19   certain amount, 5 percent of that.  Is that your

20   understanding?

21       A.     There's no way I'm guessing, because I

22   don't remember the context of that e-mail.

23       Q.     Fine.

24       A.     I just said that that's -- I never work

25   on that -- on a contingency basis.

1                        Aginsky

2       Q.    I understand.  So you declined that

3  offer; is that right?

4       A.    Yes.

5       Q.    Do you recall anybody else on that

6  e-mail?

7       A.    I'm sorry?

8       Q.    Was there anybody else copied on that

9  communication?

10      A.    No.

11      Q.    Did you have any conversation with

12 anybody else about this offer that Mr. Argentieri

13 made -- Mr. Ceglia made to you, excuse me?  I'm

14 sorry.

15      A.    No, I didn't talk -- didn't discuss it.

16      Q.    Thank you.

17            Are you aware that plaintiff has had at

18 least nine law firms represent him in this case?

19      A.    No, I understand it's apparently more

20 than one, but I don't know how many.

21      Q.    Right.  So I want to just try to

22 understand which law firms that have since left

23 the case you have had some involvement with.

24            So I understand that your initial

25 conversation was with Mr. Grable of Quinn Emanuel.

1                    Aginsky

2        A.    Yes.

3        Q.    And then when you were in fact

4    retained, that was by the Connors law firm?

5        A.    Yes.

6        Q.    And was somebody from the Connors law

7    firm there on that day?

8        A.    No.

9        Q.    Was there a lawyer with the plaintiffs

10   there on that day?

11       A.    Yes, Mr. Argentieri.

12       Q.    Anyone else other than Mr. Argentieri

13   and Mr. Ceglia?

14       A.    No, only the two of them.

15       Q.    Did you have any other involvement with

16   lawyers from the law firm of Connors & Vilardo?

17       A.    No, I think I sent him in an e-mail,

18   Mr. Connors, when I was going to -- when I wanted

19   to understand who is going to pay me.  And he said

20   that it will not be him; it should be someone

21   else.

22       Q.    That was in the later period when you

23   had the outstanding invoice?

24       A.    Yes.

25       Q.    I see.

```
1                        Aginsky
2            Did you ever speak with a James Grable
3   at Connors & Vilardo, who is the brother of Dave
4   Grable, who I think you spoke to?
5       A.    I might.  I remember David, when he
6   called me, he mentioned the name of his brother.
7   But I don't remember whether he just mentioned his
8   name or he was on the phone in that -- at that
9   telephone conference call.  He might be that.
10      Q.    Now, in March of 2011, plaintiff got a
11  different law firm involved called Kasowitz,
12  Benson.  Did any of those lawyers reach out to you
13  or were you in touch with any of them at that
14  time, Kasowitz, Benson?
15      A.    I don't remember these names.
16      Q.    A lawyer named Adam Marks or Michael
17  Schuster, do those names ring a bell?
18      A.    No, I don't remember that.
19      Q.    Aaron Marks?
20            (Discussion off the record.)
21      A.    No, I don't remember his name.
22      Q.    And when you did your declaration in
23  June of 2011, were you aware that the law firms
24  had changed again and at that time plaintiff was
25  represented by two other law firms:  DLA Piper and
```

```
 1                    Aginsky
 2   Lippes Mathias, L-I-P-P-E-S M-A-T-H-I-A-S?
 3        A.    No, I have not heard of those names.
 4        Q.    In the course of preparing your
 5   declaration in 2011, did you interact with -- what
 6   lawyers did you interact with, if any?
 7        A.    I don't remember was it still
 8   Mr. Connors or was it Mr. Trippitelli.
 9        Q.    So Mr. Trippitelli's a lawyer at DLA
10   Piper, and I believe they were involved by June of
11   2011.  So that would make sense if that's who you
12   dealt with, but it's what your recollection is.
13        A.    I don't remember the name of the firm,
14   his name, Mr. Trippitelli.
15        Q.    You remember his name?
16        A.    Yes.
17        Q.    So was that the lawyer you worked with
18   in the course of preparing your declaration in
19   June of 2011?
20        A.    I'm not positive, but yes, probably.
21        Q.    Do you remember the name Dennis Vacco
22   or Kevin Cross?  Did you have any interaction with
23   those lawyers?
24        A.    No.
25        Q.    Did you have any interactions with
```

Page 30

1                          Aginsky

2    lawyers by the names of Kip Hall or Carrie Parikh

3    or John Allcock or Robert Brownlie?

4          A.    None of them.

5          Q.    Are you aware that after you submitted

6    your declaration in June of 2011, DLA Piper, the

7    law firm where Jerry Trippitelli was, withdrew

8    from the case and a lawyer named Jeff Lake stepped

9    in?

10         A.    I remember the name Jeff Lake, I

11   remember.

12         Q.    Did you have any interactions with

13   Mr. Lake?

14         A.    If I remember correctly, he sent me an

15   e-mail to introduce himself, but I don't remember

16   if we ever spoke.

17         Q.    Did you have any interactions about him

18   having you attend the document examinations in

19   July of 2011?

20         A.    No, I don't remember if I ever

21   discussed it with him, no.

22         Q.    Did you discuss that topic with any of

23   the lawyers for the plaintiff?

24         A.    You said July?

25         Q.    July of 2011.

1                          Aginsky

2        A.    No, I think we only -- Mr. Argentieri

3   and I, we discussed my possible involvement in the

4   taking samples, but that was I believe in June.

5   After that I don't remember if any discussions

6   regarding the examination.

7        Q.    Do you have an understanding of why you

8   did not take samples in this case?

9        A.    I remember I was not available on a

10  particular date to come to Buffalo, and we

11  discussed a different date.  But what happened

12  after that, I understand that someone else was

13  involved, not me.

14       Q.    Did you ever interact with anyone named

15  Nathan Shaman, S-H-A-M-A-N, Shaman or Shaman?

16       A.    No.

17       Q.    Are you aware that later in the case in

18  July of 2011 another law firm called Edelson

19  McGuire got involved on the plaintiff's side?

20       A.    I don't remember the name of the firm.

21       Q.    Did you have any interactions with

22  lawyers by the name of Jay Edelson or Steve

23  Teppler or Rafey Balabanian?

24       A.    No.

25       Q.    I've mangled his last name but...

```
 1                        Aginsky
 2              And then in early of 2012 another law
 3   firm called Milberg came in, and I think you did
 4   mention that you spoke with somebody at the
 5   Milberg law firm, Sanford Dumain?
 6        A.    Yes.
 7        Q.    Did you speak with anybody else from
 8   that law firm, such as Jennifer Young or Melissa
 9   Clark?
10        A.    No, I met with Mr. Dumain and
11   Mr. Callahan, and after that I have not spoken to
12   them.
13        Q.    I see.  And there was another lawyer
14   involved named Peter Skivington.  Did you ever
15   interact with him?
16        A.    No.
17        Q.    Was it the Milberg firm or Mr. Dumain's
18   firm that paid your outstanding bills?
19        A.    Yes.
20        Q.    Did you meet in your offices in
21   Michigan --
22        A.    Yes.
23        Q.    -- with Messrs. Dumain and Callahan?
24        A.    Yes.
25        Q.    And approximately when was that
```

```
 1                    Aginsky
 2   meeting?
 3        A.    I don't remember.  For some reason it
 4   escaped from my memory.  But it was for
 5   approximately two hours -- a three-our meeting,
 6   yes.
 7        Q.    Well, the Milberg firm only entered
 8   into the case in March of 2011, so that would be
 9   this spring.  If we're looking -- sorry, 2012.  If
10   we're looking back from the summer, was it during
11   the summer months when you met with them or maybe
12   more in the spring months that you met with them?
13        A.    Of this year?
14        Q.    Yes.
15        A.    I think it was earlier than that, but
16   it could not be this summer.  It could be spring
17   or before that.  I apologize, but I don't
18   remember.  I have it in my -- I wrote it in my
19   time log, so it is on my computer.  But I don't
20   have this information with me now.
21        Q.    Fine.  Could it have been in the winter
22   of 2012 [sic]?
23        A.    It could be, yes.
24        Q.    I'd like to put a blank in the
25   transcript and ask you that you provide us with
```

1                          Aginsky

2    the approximate date after today.

3    TO BE FURNISHED: _____

4    _____.

5         A.    Yes, yes.

6         Q.    Could you do that?

7         A.    I remember they flew to Detroit; they

8    came to my office.  I remember those particulars,

9    but I don't remember when it was.  It was not

10   snowing, because otherwise they will not be

11   driving.

12        Q.    Yes.

13              Were you asked to do anything further

14   by way of examination in the case based on that

15   meeting?

16        A.    At that meeting I still was thinking I

17   would be involved in the case, based on our

18   conversation.  Apparently I was misled by my own

19   thought.

20        Q.    Did you believe that you were not any

21   longer involved in the case?  I mean, did there

22   come a time that you believed you were not any

23   longer involved in the case?

24        A.    The longer it lasted, the more I were

25   thinking that it's too late for me to be involved.

```
 1                        Aginsky
 2    Especially it was my understanding that the
 3    samples had been taken already and whoever did the
 4    examination, they already did it.  So it's too
 5    late.
 6         Q.    So it was the absence of contact that
 7    led you to that conclusion that you were not going
 8    to be involved rather than anybody saying that to
 9    you or giving you some definitive confirmation.
10    Is that fair to say?
11         A.    Yes.
12               MR. ARGENTIERI:  I guess objection to
13         form.
14               Go ahead.
15         A.    Nobody definitively told me I would not
16    be designated as an expert.
17         Q.    Have you ever met or spoken with
18    somebody named Jason Holmberg?
19         A.    I don't remember the name.
20         Q.    And you mentioned that your thinking
21    was that it was too late for you to be involved --
22               MR. SOUTHWELL:  Let's go off the record
23         a minute.
24               THE VIDEOGRAPHER:  Off the record 11
25         a.m.
```

1                          Aginsky

2               (Pause due to telephone disconnection.)

3               MR. SOUTHWELL:  Mr. Aginsky, I see you

4          brought your VSC images.  I would just ask

5          that if you can provide those images and we

6          make a copy of them.  Thank you very much.

7               MR. ARGENTIERI:  Do you want to mark

8          that or...

9               MR. SOUTHWELL:  No, I mean, he's just

10         giving -- he's just producing them as part of

11         the record.  If we need to, we'll mark them.

12              MR. ARGENTIERI:  I don't know.  I mean,

13         usually -- I don't know.  You've given him

14         something...

15              MR. SOUTHWELL:  Yeah, it's part of the

16         prior production.

17              (Recess taken from 11:00 to 11:07.)

18              THE VIDEOGRAPHER:  Back on the record

19         11:07 a.m.

20         Q.   Dr. Aginsky, I don't recall exactly

21    where we were, but let me just move on to a

22    different question here.

23              You did say that you have met with Paul

24    Ceglia or rather met or spoke with him on two

25    occasions.  Are those the only two occasions?

```
 1                      Aginsky
 2   There are only two occasions; is that right?
 3        A.    Yes, once in person and the other one
 4   on the phone.
 5        Q.    And the once in person, that was
 6   January 13th, 2011; and the once on the phone was
 7   about three weeks ago; correct?
 8        A.    Yes.
 9        Q.    Have you ever spoken with Mr. Ceglia's
10   parents, Carmine or Vera Ceglia?
11        A.    No.
12        Q.    How about his brother, Brendan?
13        A.    No.
14        Q.    And in those conversations did
15   Mr. Ceglia -- well, strike that.
16             Are you aware that plaintiff has
17   retained other document examiners?  You've
18   mentioned some of them, so you're certainly at
19   least aware of them.
20             Let me I guess ask you the more
21   specific question:  Are you aware that John Paul
22   Osborn is involved -- was involved in this case?
23        A.    Yes, I actually -- I recommended him.
24        Q.    And what did you recommend him for?
25        A.    I was asked if I know any qualified
```

1                           Aginsky

2    document examiner, specifically close to the -- in

3    New York area.  And I mentioned -- I said there

4    are several that -- for example, John Paul Osborn

5    and Peter Tytell.

6         Q.    When you say "qualified document

7    examiner," what is your understanding of that role

8    that you're recommending people for?

9         A.    That's people who are known in the

10   profession and have very good reputation.

11        Q.    And specifically we're not talking

12   about chemists for sort of chemistry-like testing

13   but for other types of document examination; is

14   that right?

15        A.    Yes, yes.  There are other people also

16   in that area which are also very well qualified,

17   but I just mentioned the two which are very

18   well-known.

19        Q.    Do you know what Mr. Osborn was

20   retained to do?

21        A.    Typically it's a forensic document

22   examination that involves handwriting analysis,

23   impression, examination, and some other

24   examinations to compare -- like in this case to

25   compare multipage documents to see whether there

```
 1                         Aginsky
 2     is any page substitution.
 3          Q.    Do you know anything about Mr. Osborn's
 4     current involvement, whether he is still involved
 5     in the case?
 6          A.    I am not aware of that.
 7          Q.    Are you aware that plaintiff has also
 8     retained more recently Erich Speckin, Larry
 9     Stewart, and Jim Blanco as document examiners?
10          A.    I've seen their names on the Internet,
11     yes.
12          Q.    Are you aware plaintiffs have retained
13     other experts like Mr. Tytell and Jerry LaPorte?
14          A.    I have seen the names Al Lyter and Gus
15     Lesnevich and Professor Romano, yes.
16          Q.    But are you also aware that Mr. Tytell
17     and Mr. LaPorte have been retained by the
18     defendants?
19          A.    Yes.
20          Q.    And with respect to Mr. Speckin, you
21     know him; correct?
22          A.    Yes.
23          Q.    You've opposed him in other cases; is
24     that right?
25          A.    That's correct.
```

```
 1                        Aginsky
 2        Q.    One of those cases was the 2001 Wang
 3    Wheel case in Hong Kong; right?
 4        A.    Yes.
 5        Q.    What was that case about?
 6        A.    It was a probate with approximately 5
 7    billion at stake, and Mr. Speckin was retained by
 8    the plaintiff and his -- he testified that the
 9    document was backdated, was a backdated fraud, and
10    I was a rebuttal witness.
11              And I testified that his methodology
12    was not good enough to make any conclusion like
13    that, just in two words, actually.  It was a
14    long -- long testimony, so my cross-examination
15    was for eight days.
16        Q.    Wow.
17        A.    Many technical questions were discussed
18    in that case, and eventually the judge rejected
19    his opinion, Mr. Speckin's opinion.
20        Q.    Are there any other cases that you have
21    opposed Mr. Speckin on?
22        A.    Yes.
23        Q.    Do you recall the names or
24    circumstances?
25        A.    The most recent case was in New York.
```

```
 1                     Aginsky
 2   I don't remember the name of the plaintiff.
 3   Rezende, I believe.  And I was retained by
 4   Citigroup.  I know that I or my client won the
 5   case.
 6             But I didn't testify at trial; I
 7   testified at deposition.  And after that the
 8   plaintiff withdrew that portion of Mr. Speckin's
 9   testimony that related to ink-aging analysis.  So
10   he only testified on something that didn't relate
11   to ink analysis and dating.  And as I said, I
12   don't know how much was value was put by the
13   judge.  Mr. Speckin's client lost the case.
14        Q.   Do you recall other cases when you have
15   been on the other side of Mr. Speckin?
16        A.   There were a number of cases.  Would
17   you like me to try to recall each of them?
18        Q.   If you can.
19        A.   I wish I could bring the list of cases.
20   That would be easier.  It was a recent -- another
21   recent case, actually two recent cases.  Both were
22   settled after I submitted -- in one case it was an
23   affidavit that didn't support Mr. Speckin's
24   results.  And that was a case in which Gerald
25   LaPorte also was involved; and Gerald LaPorte and
```

```
 1                      Aginsky
 2   I were on the same side, and Mr. Speckin was on
 3   the other side.
 4             MR. ARGENTIERI:  You don't remember the
 5        name of the case, Doctor?
 6             THE WITNESS:  I don't remember the
 7        name.  I have a list of cases, but I will have
 8        to --
 9             MR. ARGENTIERI:  You don't know where
10        it was located?
11             THE WITNESS:  I think it's in Florida,
12        in Florida, and it was -- the client was -- it
13        was a company from Central America, I believe.
14        Q.    Are there any other cases that you had
15   with Mr. Speckin that jump out at you that are
16   more significant, perhaps, than others?  Maybe
17   that's an easier way.  I don't need you to list
18   them all but for others that are -- that stand out
19   to you.
20        A.    There was one case in which I know that
21   he wrote on his Web site -- he mentioned this case
22   on his Web site, and he lists me there as an
23   unsuccessful expert, meaning that the challenge
24   was not successful to prevent him from testifying.
25   And that was one of the earlier cases.
```

1                          Aginsky

2              I came to the United States in December

3    of 2000, and that was a case in 2002 in Chicago,

4    Yehuda Draiman.  Draiman versus Draiman might be,

5    but one of the names was there.

6              It was a Frye challenge.  I testified

7    at the Frye hearing.  The judge initially allowed

8    him -- allowed Mr. Speckin to testify at trial,

9    but immediately after the Frye hearing the Hong

10   Kong decision was published.

11             And after the lawyers now aside

12   submitted a motion and attached that Hong Kong

13   decision, the judge canceled trial and ruled in

14   the favor of our client.

15        Q.    Now, how about Mr. Stewart, have you

16   been involved in cases with him?

17        A.    Yes, I remember one case in San

18   Francisco.  One of the names was Plant

19   Installation, approximately around 2005,

20   plus/minus one year, or 2006, plus/minus one year.

21   It was a multimillion case.  It's my understanding

22   that the client that retained me won the case, but

23   I have never seen the judgment.

24        Q.    Are there any other cases that you were

25   involved with with Mr. Stewart that stand out to

Page 44

1                          Aginsky

2   you?

3        A.    There was another case in California,

4   but it either didn't come to trial or it was

5   settled.  I don't remember.  I didn't testify at

6   trial.

7        Q.    How about Jim Blanco, are you familiar

8   with him?

9        A.    I only had his name, but I don't know

10  him.

11       Q.    So you've never been in a case in which

12  he's been involved, to your knowledge?

13       A.    No.

14       Q.    And you testified earlier that you had

15  understood that sampling had occurred.  Did you

16  also have the understanding that plaintiff's other

17  experts have in fact tested the ink in this case?

18       A.    Yes, I think that because the samples

19  were taken, and there were at least two ink

20  chemists on the defendants' side and one ink

21  chemist on the plaintiff side, other than the

22  then -- yes, it's my understanding the chemical

23  analysis should have been done.

24       Q.    Do you have any specific information

25  about it being done?  I'm trying to get at whether

1                          Aginsky

2    you actually have a specific knowledge about it

3    being done versus your assuming it was done

4    because of the nature of the experts.

5         A.    Yes, during that telephone conference

6    three weeks ago, I was asked if I can comment on

7    one of Gerald LaPorte's results relating to the

8    ink-aging methodology that he applied in this

9    case, and I said that I can only generally comment

10   on that because I have not reviewed his report.

11        Q.    I see.  And what was your general

12   comment about his analysis?

13        A.    I was asked regarding the capabilities

14   of the method that Gerald LaPorte used, and I said

15   first of all I don't know which method he used.  I

16   assume that he probably used ink-aging method

17   which is called solvent loss ratio method.

18        Q.    Let me come back to this, because I

19   will -- I do want to ask you some more specific

20   questions about this.

21             You mentioned an ink chemist other than

22   you on the plaintiff's side.  Who is that that

23   you're thinking of?

24        A.    Larry Stewart.

25        Q.    Do you consider him an ink chemist?

1               Aginsky

2        A.    I think he is saying that he's both an

3   ink chemist and a writing expert.  I'm not sure

4   about his qualifications as a handwriting expert.

5   But because at some point in time he was

6   laboratory director at U.S. Secret Service.

7             In other words, I don't know what's his

8   background, whether he's a good chemist, but he

9   has some publications relating to ink chemistry.

10  Therefore I assume that he is.

11       Q.    Are you aware that Mr. Stewart was

12  tasked with sort of oversight of the forensic

13  document examinations by plaintiff's experts?

14            MR. ARGENTIERI:  Well, I have to I

15       guess put an objection in.  It sounds -- when

16       you ask that type of question in that form it

17       presumes that that would be like an

18       attorney-client direction, I would think, the

19       way you're phrasing it, Larry Stewart being

20       the --

21            MR. SOUTHWELL:  It's stated in his

22       report.

23            MR. ARGENTIERI:  He hasn't read the

24       report, he testified.

25            MR. SOUTHWELL:  All right.  If

1                        Aginsky

2        Mr. Stewart is stating it in his report, then

3        it is not some sort of privileged knowledge or

4        information.  What I'm asking is simply about

5        that fact.  I will just remind you,

6        Mr. Argentieri --

7                MR. ARGENTIERI:  I don't mind if you

8        ask it that way.

9                MR. SOUTHWELL:  I remind you of the

10       judge's instruction to not put speaking

11       objections on the record.  The judge was clear

12       about that.

13               MR. ARGENTIERI:  Oh, okay.

14               MR. SOUTHWELL:  Okay?

15               MR. ARGENTIERI:  Yeah, sure.

16       Q.    Do you have any knowledge about

17    Mr. Stewart and whether he had a role in

18    overseeing the forensic document examinations by

19    plaintiff's experts?

20       A.    If you -- could you maybe break it down

21    for me.  Because English is my second language,

22    sometimes I have difficulties to understand.

23       Q.    No problem, no problem.

24               Did you ever speak to Mr. Stewart about

25    the examination in this case?

1                        Aginsky

2        A.      Actually we spoke once.

3        Q.      Approximately -- go ahead.

4        A.      It was before taking samples in

5   Buffalo.  He called me and said that he's going to

6   be there.  And as he said, it was my -- it was his

7   understanding that I should be there too.  And he

8   said how many samples do you think we should take

9   so we had enough.

10               So at that point I said that I don't

11  think it's a good idea for two experts on the same

12  side to take samples and split them because we

13  don't have enough.  But that's the only

14  conversation that we had.

15       Q.      Did you talk to him about testing

16  volatile chemicals -- volatile components or

17  phenoxyethanol in ink?

18       A.      No, we didn't discuss any specific test

19  that anybody is going to take, but he knows that I

20  would -- if I would take samples I would do the

21  analysis based on the analysis of all the

22  components, for ink aging, to determine the age of

23  ink.

24       Q.      Do you have an understanding about what

25  Mr. Speckin sampled and for what purpose he

1                         Aginsky

2    sampled the document?

3         A.    No.  I only can guess, but I don't have

4    any knowledge whether even Mr. Speckin took any

5    samples.  I've seen -- in the Internet I've seen I

6    think in the declaration of Dr. Lyter he mentions

7    Speckin.  That's how I knew about Speckin being

8    involved in the case.  But I don't know whether he

9    took samples and analyzed them.

10        Q.    Earlier you were talking about

11   Mr. LaPorte's ink testing, and we'll come back to

12   that.

13             Do you have any understanding of

14   whether any of plaintiff's experts did ink

15   testing?

16        A.    No, I assumed that if any of them took

17   samples -- and again it's my guess -- it could be

18   Larry Stewart.  So if he took samples, he probably

19   analyzed them chemically.

20        Q.    But you don't have any specific

21   knowledge about that?

22        A.    No.

23        Q.    Now, I understand you've at least seen

24   some things about the case on the Internet.  Have

25   you generally kept up with the news in the case?

1                          Aginsky

2       A.    No, it's because I have been busy with

3  other cases.  It's only when I accidentally came

4  across something or also there was some specific

5  interest, because I recently had a case in which I

6  testified in San Francisco area, and the other

7  side expert was Dr. Lyter.

8            So I wanted to know more about his

9  involvement in this case, maybe what he said

10  regarding the ink-aging methodology, because he

11  used the ink-aging methodology in this case in the

12  case in San Francisco and I also.  So we both

13  testified, and the case is old now.

14            Other than that, I didn't do any

15  specific searches in the Internet regarding this

16  case.

17       Q.    Do you understand that Mr. Ceglia,

18  who's the plaintiff, has filed a lawsuit in 2010

19  claiming an 84 percent ownership interest in

20  Facebook based on this purported contract of "work

21  for hire" document that he claims he had with

22  Mr. Zuckerberg?  Do you understand that?

23       A.    Yes, generally I understood that

24  Mr. Ceglia -- I didn't know the specific 84

25  percent, but -- my answer is yes.

Page 51

1                    Aginsky
2        Q.    Are you aware the purported date on
3    that purported contract is April 28, 2003?
4        A.    Yes.
5        Q.    And what we're talking about, the "work
6    for hire" document, as we call it, is a two-page
7    document with purported handwriting with an
8    interlineation and initials on page 1 and
9    signatures and dates on page 2; right?
10       A.    Yes.
11       Q.    Are you aware that it's defendants'
12   position that Paul Ceglia's purported contract,
13   this "work for hire" document, is a recently
14   created forgery, fabricated for the purposes of
15   bringing a lawsuit?
16       A.    That's -- specifically how you
17   formulated it now, yes, as of now I understand
18   that this is the defendants' position.
19       Q.    Are you aware that Facebook and Mark
20   Zuckerberg have moved to dismiss the case as a
21   fraud on the court?
22       A.    That's a very -- that's beyond my area
23   of expertise, so I don't know the meaning of that.
24       Q.    Are you aware that the defendants have
25   moved to dismiss the case?

Page 52

1                         Aginsky

2       A.    Dismiss means stop the case?

3       Q.    Uh-huh.

4       A.    Yeah, I think I've seen something like

5   that in the Internet.

6       Q.    Now, just to turn back to your June

7   2011 sworn declaration, do you recall that that

8   was in support of plaintiff's cross-motion for

9   expedited discovery?

10              MR. ARGENTIERI:  Objection to form.

11              You can answer.

12      A.    I remember these words, "expedited

13  discovery," yes.

14      Q.    Were you aware that the defendants had

15  moved the court for an order allowing them to

16  examine this physical purported contract?

17      A.    Yes.

18      Q.    And then the plaintiff had also sought

19  expedited discovery at the same time, and your

20  declaration was submitted in support of that?

21              MR. ARGENTIERI:  Objection as to form.

22              You can answer.

23      A.    Yes, I believe I knew about that.

24      Q.    Are you aware that the court granted

25  defendants' motion permitting defendants to

1                    Aginsky

2    examine Ceglia's physical purported contract?

3         A.    I haven't seen the judgment because, as

4    I said, all information I know is what I

5    accidentally saw in the Internet.  But yes,

6    apparently it was granted because it was later

7    examined.

8         Q.    Are you aware that as part of that

9    submission Mark Zuckerberg submitted a sworn

10   declaration stating that he never signed the "work

11   for hire" document?

12              MR. ARGENTIERI:  Objection as to form.

13              You can answer.

14        A.    I'm not aware about the specific

15   declaration, no.

16        Q.    And I think, as you've just testified,

17   you're aware that as part of the court ordering

18   the examination the court ordered that the parties

19   be permitted to conduct physical sampling of the

20   document for purposes of chemical testing?  You

21   understand generally that is what was going on?

22              MR. ARGENTIERI:  Objection to form.

23              You can answer.

24        A.    Yes.

25        Q.    Are you aware that in July and August

```
 1                          Aginsky
 2   of 2011 both parties' experts took physical
 3   examples of the ink, paper, and toner from the
 4   purported "work for hire" document?
 5        A.    That's what I read in Dr. Lyter
 6   declaration that I saw on the Internet.
 7        Q.    Are you also aware that among other
 8   tests defendants' expert Mr. LaPorte conducted
 9   GC/MS analysis of the ink on the "work for hire"
10   document?
11             MR. ARGENTIERI:  Objection as to form.
12             You can answer.
13        A.    Yes, because I had this question about
14   his results three weeks ago, then, yes, it's my
15   understanding that Gerald LaPorte had done this
16   examination.
17        Q.    Are you aware that Mr. LaPorte
18   discovered a sufficiently high quantity of
19   2-phenoxyethanol to analyze using the solvent loss
20   ratio method?
21             MR. ARGENTIERI:  Objection as to form.
22             Answer.
23        A.    I'm not aware about that.  I can assume
24   that the level of phenoxyethanol should be
25   sufficient in order to use the technology, the
```

1                           Aginsky

2      method.

3           Q.    Are you aware, based on his analysis,

4      Mr. LaPorte determines that it was highly probable

5      that the interlineation on page 2 -- sorry, the

6      interlineation on page 1 of the purported "work

7      for hire" document was created within two years of

8      the date of testing, which was in August of 2011?

9                MR. ARGENTIERI:  Objection as to form.

10                You can answer.

11      A.    I have not read about this, but this

12      was my understanding, that that was Mr. LaPorte's

13      conclusion based on what I heard during our

14      telephone conference three weeks ago.

15           Q.    Now, in response to Mr. LaPorte's

16      conclusion, are you aware that plaintiff has

17      attacked Mr. LaPorte and the validity of his PE

18      testing?

19                MR. ARGENTIERI:  Objection as to form.

20      A.    Again, I've seen in the Internet -- it

21      looks like I've seen a lot on the Internet -- that

22      there was a kind of -- I don't know whether it's

23      motion or another type of documents mentioning

24      that the methodology is not valid.

25           Q.    So you're aware that plaintiff has

```
 1                        Aginsky
 2   attacked the validity of PE testing itself as a
 3   method to date ink?
 4             MR. ARGENTIERI:  Objection as to form.
 5        A.    Yes.
 6        Q.    Are you aware that in fact plaintiff is
 7   attacking the very scientific principles on which
 8   PE testing is based?
 9             MR. ARGENTIERI:  Objection as to form.
10        A.    I'm not aware of that.
11        Q.    Are you aware that as part of the
12   attack plaintiff's attorney, Dean Boland,
13   challenged the validity of PE testing at a court
14   hearing held before the judge in this case on
15   April 4th, 2012?
16             MR. ARGENTIERI:  Objection as to form.
17        I'm going to expand my objection a little bit.
18        How he answered the last question, you've
19        asked a supplemental question, and it assumes
20        that he answered the first -- the question
21        before that in the affirmative.
22             MR. SOUTHWELL:  I don't think it does.
23        Q.    But you can answers.
24        A.    I'm not aware of that.
25        Q.    So you're not aware that in this court
```

```
 1                        Aginsky
 2   hearing in April of 2012 Mr. Boland said that PE
 3   testing is, quote, junk science, and, quote, has
 4   absolutely no reliability behind it?
 5             MR. ARGENTIERI:  Objection.
 6       A.    I -- I haven't heard about that.  I
 7   hear about that for the first time today.
 8       Q.    So I take it you're also not aware that
 9   Mr. Boland's told the court on that date in that
10   hearing that PE testing is, quote, not even as
11   reliable as astrology?
12             MR. ARGENTIERI:  I have to object.
13       Objection.
14       A.    No, I have not heard about that now.
15       Q.    I take it you're also not aware that in
16   that same oral argument, in response to our
17   observation that you, one of Mr. Ceglia's own
18   experts, have published scholarly articles about
19   this very method, Mr. Boland said, quote,
20   Dr. Aginsky is an expert who took a photograph of
21   this contract, offered some information about
22   nondestructive testing of the ink.  He was not
23   hired, will never be hired to talk in this case
24   about PE testing, close quote?
25             MR. ARGENTIERI:  Objection to form.
```

```
 1                        Aginsky
 2      A.     Never heard about that.
 3      Q.     You did testify, though, that you're
 4   aware of a motion -- I think you referred to it as
 5   a motion to strike that plaintiff submitted
 6   challenging Mr. LaPorte and the validity of PE
 7   testing?
 8           MR. ARGENTIERI:  Objection.  I don't
 9       think he's ever said motion to strike.
10      A.    I have not seen such a document.  I'm
11   not aware about that.
12      Q.     You testified that you had seen some
13   motion challenging Mr. LaPorte, I guess is
14   maybe -- what was the word that you used?
15      A.     I think the only document that I have
16   seen in the Internet that mentioning the
17   methodology -- ink-aging methodology used in this
18   case, the specific phrase that I saw was that this
19   method has never survived a Dalbert challenge.
20   That's the document that I -- that I've seen.
21           MR. SOUTHWELL:  May I have just a
22       moment.
23           (Pause.)
24           MR. SOUTHWELL:  If I could have this
25       marked, please, as Defendants' 42.  Thank you.
```

```
 1                        Aginsky
 2              (Defendants' Exhibit 42, motion to
 3         strike declaration of LaPorte, marked for
 4         identification.)
 5         Q.    Dr. Aginsky, I'm showing you what's now
 6    been marked as Defendants' 42, which is document
 7    Number 386 in this litigation, a motion to strike
 8    declaration report of Gerald LaPorte for fraud
 9    filed on May 24th, 2012.
10              I'm trying to ascertain if this is what
11    you're referring to you saw, and I want to direct
12    your attention to the middle -- sorry, to page 3
13    to the middle of the paragraph at the bottom of
14    page 3.  Could you just review that, please?
15         A.    The second portion of page 3?
16         Q.    Yes -- yeah, I guess --
17              MR. ARGENTIERI:  Starts with
18         "background"?
19         Q.    Yeah, background, sort of halfway
20    through that there's --
21              MR. ARGENTIERI:  Report submission,
22         that one?
23              MR. SOUTHWELL:  Yeah.
24              MR. ARGENTIERI:  I just want to put on
25         the record that -- just a generalized
```

Page 60

```
 1                    Aginsky
 2      objection that obviously the witness has the
 3      opportunity to look at the full document
 4      rather than looking at just one or two
 5      sentences so...
 6           MR. SOUTHWELL:  Of course, if he would
 7      like.
 8           MR. ARGENTIERI:  And I think you have a
 9      question.  Isn't there a standing question now
10      or no?
11           MR. SOUTHWELL:  I've just asked him to
12      review it.  I'm trying to ascertain whether
13      this is the document he's referring to.
14      A.    On page 3.
15      Q.    So on page 3 where it begins sort of
16  halfway down the bottom paragraph on page 3,
17  LaPorte's PE test is a variation of a test
18  originally developed by Valery Aginsky in 1997.
19  Aginsky's version of a PE test had never been
20  admitted over a Dalbert objection in any court in
21  the United States.  Aginsky's version of a PE test
22  had never been used in casework by any government
23  agency.
24           In short, Aginsky's 1997 PE test scheme
25  has never satisfied any court much less the other
```

```
                             Aginsky
 1
 2    experts in Aginsky's field of its validity or
 3    reliability.  Although Aginsky performed
 4    nondestructive testing on the document for
 5    plaintiff more than a year ago, he was never hired
 6    to perform any other testing by plaintiff.
 7             Do you see that?  Is this the portion
 8    that you mentioned you had seen?
 9        A.    No, that's a completely different
10    document.  I have never seen it.
11        Q.    Did you understand, based on your
12    conversation with counsel, that this is
13    plaintiff's view about your PE test scheme?
14             MR. ARGENTIERI:  What view?  Objection.
15        What view?  The whole motion to strike or what
16        he just read or...
17             MR. SOUTHWELL:  Yeah, what we just
18        read.
19             MR. ARGENTIERI:  I'm going to put an
20        objection.  It assumes facts not in evidence
21        with him but otherwise --
22             Do you understand his question, Doctor?
23             THE WITNESS:  No.
24             Would you like me to comment on that?
25        Q.    I guess I'm trying to understand if
```

1                       Aginsky

2    you -- this is a motion filed by plaintiff.  You

3    are an expert for the plaintiff.  I'm trying to

4    understand what your understanding is about

5    plaintiff's view of your testing methodology.

6         A.    I think initially when we discussed my

7    possible involvement in the case we discussed

8    that --

9              MR. ARGENTIERI:  Hang on, Doctor.

10             If you're going to get into attorney-

11        client conversations, then I would object as

12        attorney work product.

13             You're asking what his general view of

14        our position in the case?

15             MR. SOUTHWELL:  I'm not calling for any

16        attorney-client.  You can keep receiving your

17        messages from Mr. Boland on your phone.

18             MR. ARGENTIERI:  He's giving me

19        different messages but -- you went to the

20        motion to strike.  Now we're off that.  Now

21        you want to ask him --

22             MR. SOUTHWELL:  Now you're just

23        interrupting at this point, Mr. Argentieri.  I

24        ask that you cease interrupting and allow the

25        witness to answer the question.

1              Aginsky

2         MR. ARGENTIERI:  What's the question

3     again?

4     Q.    Go ahead.

5     A.    So generally we didn't -- I am not

6  saying about any specifics of the discussion.  But

7  generally we discussed my possible involvement in

8  the case as an ink-aging specialist.  And at that

9  point it was my understanding that I will be using

10  the test that are based on the analysis of PE.

11              It's actually there are two tests, and

12  I don't know whether Gerald LaPorte used both or

13  just one of them.  But I am the author of two

14  tests.  One is called sequential obstruction

15  technique, and the other is called solvent loss

16  ratio method.

17              They both analyze PE, but they

18  analyze -- they measure two different ink-aging

19  parameters that change as ink ages on paper.  And

20  both methods has been published in peer-reviewed

21  journals.  There has never been criticized as junk

22  science in scientific literature.

23              The method -- assuming that Gerald

24  LaPorte used the solvent loss ratio method in this

25  case, that specific method has been reproduced and

```
 1                         Aginsky
 2   used for more than ten years by Canada Border
 3   Services Agency, which is a government lab similar
 4   to FBI lab in the United States.  And they
 5   still -- they are using this method now.  So they
 6   applied it to cases, to criminal cases, in Canada.
 7             I know that the method was used by the
 8   U.S. Secret Service.  I don't know what was the
 9   scope of use of that method.  That was at the time
10   when Gerald LaPorte was with the U.S. Secret
11   Service.
12             But it's better to ask him what was the
13   scope of use of that method.  I don't know.  I
14   simply remember that they used it because there
15   was a conference in Baltimore somewhere around
16   2005 of the American Society of Questioned
17   Document Examiners.
18             And the question was -- someone did a
19   presentation from FBI, and the question from the
20   audience:  When you have ink-aging -- ink-dating
21   cases do you do these cases.  And they said, No,
22   we refer these cases to U.S. Secret Service, and
23   they do it for us.
24             And LaPorte, Gerald LaPorte, was there,
25   and he answered that question.  He stood up, and
```

1                         Aginsky

2    he said that we are doing cases, ink-aging cases,

3    and we -- specifically what he said, like we're

4    close to adopt or something like, with these

5    words, Valery Aginsky's methodology.

6              So that's -- this is how I knew about

7    U.S. Secret Service, whether they use it or not.

8              But other than that, because that's a

9    very specific technology, quite complex, it only

10   can be used by a large laboratory that has

11   necessary equipment or it could be used by people

12   who were trained and then started working in the

13   private sector.

14             So that's why there are only a few

15   people in the world that can -- that are

16   proficient to do it.  So that's regarding the

17   solvent loss ratio method.

18             Then also a version of this method

19   which is called thermal desorption, the use of

20   thermal desorption analysis for ink aging, that's

21   a version of solvent loss ratio method.  It was

22   developed by three Ph.D. chemists from Germany,

23   and their names are Jürgen Bügler, Buchner, and

24   Dallmayer.  And there are other people also.

25   There is a doctor Jan -- from Sweden, Andrasko.

```
 1                        Aginsky
 2            In other words, also there are some
 3   work in China.  They also did -- I'm not sure if
 4   they used the solvent loss method, but they wanted
 5   to monitor the loss of PE in ballpoint inks.  They
 6   used that for determining the approximate age of
 7   ink on a document there.
 8            In other words, there is -- there is
 9   interest in different countries to these methods.
10   People are at different level of proficiency.
11   Therefore I cannot say that everybody in each
12   country can use it at the same level of
13   proficiency, if we're talking about solvent loss
14   ratio method.
15            But as for me, I use both.  I use
16   sequential construction technique, S-C-T, SCT, and
17   solvent loss ratio method together.  I usually use
18   them together.  And I have testified in a number
19   of cases.
20            And the last case in which I testified,
21   I mentioned it previously where Dr. Lyter was on
22   the other side.  We both used the ink-aging
23   methodology there.  The judge preferred my
24   testimony.  The judge said that my science is more
25   rigorous.  But that related to both ink aging and
```

1                      Aginsky

2    comparison ink -- in ink analysis.

3               So in short, I would say that the

4    methodology, if it's done correctly -- if it's

5    done incorrectly, then of course it is not good.

6    But if it's done correctly, then it's far from

7    being junk science.

8               It's a reliable method which has been

9    published in peer-reviewed -- peer-reviewed

10   journals, has been tested, has never been

11   criticized as a junk science.  I mean, there are

12   different views of peers.  In every scientific

13   area, we have different views.  But that's -- as

14   for the Dalbert, I agree that it has never been

15   challenged, but never been challenged doesn't mean

16   that it never survived.  That's a different

17   meaning.

18               So that might be a longer than

19   necessary, but that's my answer.

20       Q.    That's fine.  And as you said, you have

21   in fact been qualified by courts as an expert and

22   offered opinion testimony about ink dating;

23   correct?

24               MR. ARGENTIERI:  Objection to form.

25       A.    Yes.  I have never been disqualified,

```
 1                        Aginsky
 2    so each time I testified, I was qualified as an
 3    ink chemist.
 4         Q.    And related specifically to the methods
 5    you've just talked about that would assist you in
 6    rendering conclusions about the dating of inks?
 7              MR. ARGENTIERI:  Objection as to form.
 8         A.    At least every other case that I
 9    testified involved -- involved the ink-aging
10    analysis, based on the analysis of PE.
11              MR. SOUTHWELL:  If I may have just a
12         minute.
13              (Pause.)
14         Q.    Do you know roughly how many cases you
15    have testified in related to ink-dating analysis?
16         A.    In my career or --
17         Q.    Yeah.
18         A.    Because there are two stages of my
19    life --
20         Q.    I understand.
21         A.    -- before I moved to the United States
22    and later.
23         Q.    I understand.
24         A.    Before I moved to the U.S., when I
25    worked for the government lab in Russia, for the
```

1                         Aginsky

2    former Soviet Union, and Russia, it was a

3    completely different system, law system.  So we

4    didn't testify in court, and we prepared reports,

5    very detailed reports, in lieu of live testimony,

6    under the penalty of perjury.  And those reports

7    were used in court.

8              So I prepared overall like between 500

9    and 600 reports for court.  Difficult to say, at

10   least half of them related to ink-aging analysis.

11   So that would be like roughly 300 court testimony,

12   but I didn't testify in all.

13        Q.    I understand.

14        A.    After -- actually even before after

15   perestroika, we started giving evidence in court

16   and I testified in Russia several times on

17   ink-aging analysis.

18              After I moved to the United States, I

19   testified in the U.S. and abroad, in Canada and

20   Hong Kong -- actually, there was a recent case in

21   Poland.  The amount of cases what relates to

22   ink-aging analysis is more than ten, but I don't

23   remember how many.

24        Q.    And in none of those ten you have been

25   challenged or not allowed to testify; is that

```
 1                        Aginsky
 2   right?
 3        A.    That's right.
 4        Q.    Dr. Aginsky, are you aware that there
 5   has been some controversy regarding the condition
 6   in which the document was presented to defendants
 7   pursuant to the court-ordered inspection on July
 8   14th?  Are you aware of that?
 9              MR. ARGENTIERI:  Objection as to form.
10        Objection to "controversy."
11        A.    If you mean the appearance of the -- of
12   the paper and the ink, yes.
13        Q.    Now, I guess actually let's take a step
14   back first.  Have you ever heard of someone doing
15   something to try to artificially age ink on a
16   document?
17        A.    Generally?
18        Q.    Yeah.
19        A.    Yes.
20        Q.    Like what?
21        A.    I have examined many cases in my career
22   in which people have tried to artificially age
23   documents using many -- many things like from
24   direct sunlight to use an iron, a hot iron, or
25   hair blower.
```

1                          Aginsky

2           Sometimes I receive or many times I

3     receive a call from a potential client, if I can

4     call them this, and they would start asking me

5     questions which I would say I'm not discussing

6     this.  But they would say what happened to the

7     document if I put it in the trunk of my car in the

8     middle of the Sahara Desert or if I put it in the

9     freezer, something like that.

10          But yes, there is -- there have been

11    many cases, relatively many cases, in which

12    documents -- the documents that I examined were

13    artificially aged, and some of the cases I was

14    able to determine that the documents had been aged

15    artificially.

16        Q.    Did questions like those come up in

17    this case?

18        A.    No, my involvement -- my involvement

19    was only on that January 13 examination.  At that

20    time, no, I don't remember anything like that.

21        Q.    And why would someone do something like

22    this, put it in the sun or use a hot iron?  What

23    would that do?

24              MR. ARGENTIERI:  Objection as to form.

25              You can answer.

1                         Aginsky

2       A.    The aging process is a chemical process

3   which can be accelerated by using elevated

4   temperature.  So any chemical reaction is

5   temperature dependent.  That's why we use

6   refrigerators to stop or slow down deterioration

7   in food.  So same -- same goes in ink.

8              If we keep a document in a

9   refrigerator, then the document will look younger

10  than it purports to be at a certain point in time.

11  Or if we use an elevated temperature -- it could

12  be direct sunlight or it could be an oven or

13  something like that -- then we will accelerate the

14  age of the ink and the purpose to make the ink

15  look older than it purports to be.

16      Q.    Or I guess to make it look older than

17  it in fact is?

18      A.    Yes.  I'm sorry, yes.  That's -- in

19  other words, if the task is to prepare a document

20  that should look older and backdated, then, yes,

21  that's what people try to use to accelerate the

22  age of ink, by applying ink.

23      Q.    Are you familiar with sort of popular

24  news accounts or literature that talk about this,

25  that this is possible to do; right?

1                          Aginsky

2              MR. ARGENTIERI:  Objection as to form.

3              Do you understand his question?

4        A.    Are you asking me about scientific

5    literature?

6        Q.    No, I guess, let me rephrase it.  You

7    mentioned that there are a variety of things that

8    someone might do to artificially age a document to

9    make it look older than it in fact is.  And my

10   question to you is are you aware of those ways

11   being reported in, for example, popular news

12   accounts or being -- the information being out

13   there and available.

14             MR. ARGENTIERI:  Objection to form.

15       A.    Yes, it was not available, easily

16   available, at the time when I -- when I worked

17   when I mentioned for the government of Russia.

18       Q.    Right.

19       A.    But now -- no, that's what I mean.  The

20   Internet was not that -- that was -- now we can

21   easily get this information from the Internet, and

22   it will take maybe two minutes to find out.

23       Q.    Okay.  You may remember from our

24   interrogatories to you that we provided you with

25   an image of the "work for hire" document that

```
 1                         Aginsky
 2   appeared to have faded and discolored ink and that
 3   we asked you some questions about the appearance
 4   of the ink when you saw the document and whether
 5   the images we provided reflected the appearance
 6   when you saw that.
 7              Do you remember that?
 8              MR. ARGENTIERI:  Objection to the form.
 9        A.   Yes.
10              (Pause due to telephone disconnection.)
11        Q.   So, Dr. Aginsky, we asked you some
12   questions about this, and you stated in your
13   interrogatory you did not observe yellowed or
14   brown or faded ink on any portion of the document
15   that you examined; correct?
16        A.   Yes.
17              MR. ARGENTIERI:  Objection to form.
18        Are you going to show him the document?
19              MR. SOUTHWELL:  No, I'm asking him the
20        question.  Stop interrupting, please.
21        Q.   Go ahead.
22        A.   Yes, this is what I said in my -- in
23   the answers to interrogatories, yes.
24        Q.   And are you aware that it's defendant's
25   position that when plaintiff produced the "work
```

1                        Aginsky

2    for hire" document to defendants on the morning of

3    July 14th the ink on the document was very faded,

4    almost a light tan or brown?

5              MR. ARGENTIERI:  Objection as to form.

6         A.    Yes, I think that I have seen it in the

7    Internet.

8         Q.    That that is defendants' position?

9         A.    That is defendants' position.

10        Q.    Right.  Do you further understand that

11   it's defendants' position that the paper -- that

12   on the front of the document was discolored and

13   off-white when it was first presented for

14   inspection on July 14th?

15             MR. ARGENTIERI:  Objection.

16        A.    I don't know what specifically what was

17   the position, whether the front or back was

18   discolored, but it's my understanding that at

19   least one side of each page was discolored.

20        Q.    Where you aware that defendants'

21   experts Mr. Tytell and Professor Romano, who were

22   present at the inspection on the morning of July

23   14th when the "work for hire" document was first

24   produced, have submitted sworn statements

25   describing the "work for hire" document as having

```
 1                        Aginsky
 2   faded tannish or brownish ink and tan paper at
 3   that time?
 4              MR. ARGENTIERI:  Objection.
 5        A.    I'm not aware of that, no.
 6        Q.    Are you aware that the image we
 7   provided you with your interrogatories was a
 8   printout of Mr. Tytell's image that he took when
 9   the document was first presented to him?
10              MR. ARGENTIERI:  Objection to form.
11        A.    No, I don't know that it's from
12   Mr. Tytell's report or other documents signed by
13   him.
14        Q.    Are you aware of the fact that none of
15   plaintiff's experts were present at the document
16   examination on July 14th?
17              MR. ARGENTIERI:  Objection as to form.
18        A.    No, I'm not aware of it.  I was not
19   present, for sure.
20        Q.    Are you aware that it's defendants'
21   position that this faded and discolored condition
22   of the document and the ink is due to an attempt
23   by Paul Ceglia or someone working in concert with
24   him to artificially age or otherwise thwart
25   defendants' attempt to date the ink?
```

                              Aginsky
1
2              MR. ARGENTIERI:  Objection as to form.
3      A.    Am I aware --
4      Q.    Are you aware that's defendants'
5  position?
6      A.    That's my understanding, yes, that's
7  defendants' position.
8      Q.    Are you also aware that defendants'
9  experts believe that the damage to the document
10 and its ink was caused by some sort of exposure or
11 photo degradation of the "work for hire" document,
12 such as exposure to sunlight?
13             MR. ARGENTIERI:  Objection to form.
14     A.    I'm not aware of a source that could
15 cause this degradation, but that could be a
16 logical assumption.
17     Q.    So you're not aware of the defendants'
18 experts identifying a particular source, but
19 you're aware that that could be a logical
20 conclusion for how a document could be -- have
21 faded ink; right?
22             MR. ARGENTIERI:  Objection as to form.
23     A.    Yes, what I know from my experience,
24 that temperature doesn't -- typically doesn't
25 cause fading.  What causes fading is light.  And

```
 1                          Aginsky
 2   direct sunlight will be very effective to cause
 3   fading.
 4        Q.     Fading of ink?
 5        A.     Fading of ink and paper.  Paper cannot
 6   fade, but, I mean, change the color of the paper.
 7               MR. SOUTHWELL:  Give me just a moment.
 8        Q.     I wanted to ask you, Dr. Aginsky, just
 9   a few questions about your CV, which you attached
10   to your June 11th declaration.  So I'm going to
11   ask that this be marked as Defendants' Exhibit 43,
12   and then I'll show it to you.
13               (Defendants' Exhibit 43, declaration of
14          Aginsky, marked for identification.)
15        Q.     I'm showing you now Defendants' 43,
16   which is a document -- the top line, I'll
17   represent to you, is simply the line that gets
18   added by the court when this document is filed.
19   This is doc 66, which referred to the docket in
20   this case, and it was filed on June 17th, 2011.
21               If you can just take a moment to look
22   through this 15-page document and let us know when
23   you have done so and whether you recognize it.
24               (Pause.)
25        A.     Yes, that's my declaration.
```

1                         Aginsky

2        Q.    And I'll just refer your attention to

3   Exhibit A starting at page 7 of 15, given -- using

4   the numbers in the top right corner.  Is that your

5   professional CV?

6        A.    Yes, at that time.

7        Q.    It was your CV as of June of last year;

8   correct?

9        A.    Yes.

10        Q.    And have there been any updates,

11   significant updates, to your CV since then, such

12   as additional publications or anything else that

13   we should be aware of?

14        A.    I changed it a little bit but not

15   significantly.

16        Q.    And your title or your position, based

17   on your CV, is forensic chemist/ink and document-

18   dating specialist.  And that's at your firm,

19   Aginsky Forensic Document Dating Laboratory;

20   right?

21        A.    Yes.

22        Q.    And in that position you conduct

23   forensic chemistry relating to substances --

24   strike that.

25             Do you conduct forensic chemistry

Page 80

1                              Aginsky
2    related to substances other than those associated
3    with documents?
4         A.    No.
5         Q.    So the chemical testing is related to
6    ink, paper, toner, or other such artifacts found
7    on documents; is that right?
8         A.    Yes, any material, those that you
9    mentioned, plus ink jet ink, stamp padding, yes.
10        Q.    But you would generally perform
11   chemical testing on all aspects of a document?
12        A.    Yes.
13        Q.    I believe you explained this earlier,
14   but I just want to be clear.  Do you have any
15   other scientists or document examiners working
16   with the Aginsky Forensic Document Dating
17   Laboratory?
18        A.    No.
19        Q.    What equipment do you have in your
20   laboratory, generally speaking?
21        A.    I have GC/MS, gas chromatography/mass
22   spectrometer; it keeps for the TLC analysis, which
23   stands for thin-layer chromatography; a number of
24   optical instruments including VSC, video spectral
25   comparator, from Foster & Freeman; microscopes; UV

```
 1                     Aginsky
 2  cabinet; obviously a scanner; and some other
 3  smaller tools which are used for both physical and
 4  chemical analysis.
 5      Q.   And you previously testified that you
 6  had been a chemist -- well, let's back up.
 7           You have a Ph.D. in analytical
 8  chemistry, and that's from the Military Academy of
 9  Chemical Defense; correct?
10      A.   Yes, in Moscow in the former Soviet
11  Union.
12      Q.   And also a master's in analytical
13  chemistry; correct?
14      A.   Yes.
15      Q.   You testified earlier you had
16  previously worked for the ministry of the interior
17  at the forensic science center in Russia in the
18  former Soviet Republic.  Was that doing ink
19  chemistry solely or other types of chemistry?
20      A.   I did some other types of analysis,
21  mainly the ink -- chemical ink -- ink analysis and
22  dating, but also I did the analysis of explosives
23  and the analysis of narcotics.  That was for the
24  forensic science center.  It's like a federal
25  laboratory for the ministry of the interior.  And
```

1                         Aginsky

2    ministry of the interior is a law enforcement

3    agency which is similar to FBI and police in

4    the -- and U.S. Secret Service.

5         Q.    And on the first page at the bottom,

6    you've got a paragraph here that states, uses

7    reliable ink-dating methods (proven through

8    outside proficiency testing) developed as a result

9    of many years of research of the methodology

10   developed and published by Dr. Antonio Cantu.

11             Did I read that correctly?

12        A.    Yes.

13        Q.    And is that the ink-dating methods that

14   we've talked about before the solvent loss ratio

15   method and the sequential --

16        A.    Sequential construction technique.

17        Q.    Thank you.

18             Those are the methods you are referring

19   to?

20        A.    Yes, I would put sequential

21   construction technique in the first place because

22   that's what Dr. Cantu developed.  At that time he

23   applied it to dye components, not to solvent

24   components.

25             But I simply used his ideas and further

1                          Aginsky

2     developed his methodology, applying it to solvent

3     components, major of which is PE, phenoxyethanol.

4          Q.    And Dr. Cantu was a pioneer in the

5     field of PE analysis; right?

6                MR. ARGENTIERI:   Objection.

7          A.    Not -- he was a pioneer in the field of

8     ink dating and specifically the sequential

9     construction approach.   This is what Dr. Cantu

10    invented and published when he was with the U.S.

11    Secret Service.

12         Q.    Do you have a high opinion of

13    Dr. Cantu?

14         A.    Yes, yes.  He's well-known and highly

15    recognized person in the world.

16         Q.    You mentioned here, in the quote that I

17    read, outside proficiency testing.  What testing

18    are you referring to?

19         A.    The methodology and what I mentioned,

20    the sequential construction technique, I use it in

21    combination with solvent loss ratio method.  But

22    the SCT is what I rely most of all in my ink-aging

23    cases.

24                So this methodology has been subjected

25    to outside proficiency testing, and that means as

1                          Aginsky

2      for -- so I am submitted -- I was submitted

3      samples, so-called blind samples.  These are like

4      portions of a document cut from a document with

5      known date of preparation.  So the date of

6      preparation was not known to me.

7                And it was done -- overall it was four

8      proficiency tests; in my career, three of which

9      were outside proficiency test, which are

10     considered most important and most difficult to

11     survive because you don't know -- you have -- it's

12     a completely blind test.

13               The first test was done in Israel.  I

14     was working for the forensic science center in

15     Moscow, and I was invited by Israel police

16     headquarters to come to Israel and to deliver a

17     lecture on ink-aging analysis to them.

18               And they said that as an option if I

19     want they would like -- not if I want but if I

20     don't object they would give me some samples so I

21     would examine those samples using their equipment

22     in Jerusalem.  And this is what I did.

23               That was the first proficiency test.

24     They gave me three samples in Jerusalem; and then

25     when I was correct on all three of them, they gave

1                          Aginsky

2   me three more; and I took them to Moscow and

3   examined them in Moscow and sent my results to

4   them.  So all six results were correct.

5              When I moved to the United States,

6   there were two additional proficiency tests.  The

7   first one I thought that it was outside

8   proficiency test, but it was given to me by at

9   that time my employer, Tom Riley.  I was with

10  Riley Welch & Associates and became Riley Welch &

11  Aginsky.

12             At that time when it was Riley Welch &

13  Associates, Tom Riley gave me these additional

14  samples that he said that's an outside proficiency

15  test.  We would like to test your method before we

16  are going to put reputation of our firm at

17  stake -- on the line.

18             So when I submitted my results, they

19  were all correct, but I submitted them to him.

20  Therefore he said that was an internal test

21  because I didn't want to take a risk.  So now I

22  will order another test for you that will be

23  completely outside proficiency test, I will not

24  know the results.  So that test also was positive,

25  was good.

```
 1                           Aginsky
 2              And last year it was another test which
 3    is -- which came actually from Russia.  The
 4    samples were prepared by Russia law enforcement
 5    agencies.  And I have not published these results
 6    yet, but I am going to publish.
 7              I was invited as an invited speaker to
 8    Europe to Canary Island conference in October of
 9    this year, and I am going to disclose completely
10    all the results with all the underlying data so
11    people would be able to review the results and it
12    will be completely transparent, the test.  And the
13    results also were correct.
14              So in other words, the methodology
15    works.  It's reliable if it's done correctly.  And
16    obviously I'm the author.  I probably am doing it
17    correctly, hopefully.
18              MR. SOUTHWELL:  I think we have to take
19         a break to change the tape, so let's just take
20         a quick break, please.
21              THE VIDEOGRAPHER:  Going off the record
22         12:17 p.m.  This is the end of Tape 1 of the
23         deposition of Valery N. Aginsky.
24              (Recess taken from 12:17 to 12:25.)
25              THE VIDEOGRAPHER:  Going back on the
```

1                          Aginsky

2          record at 12:25 p.m.  This is the beginning of

3          Disk 2 in the deposition of Valery N. Aginsky.

4                 MR. SOUTHWELL:  Thank you.

5          Q.     Dr. Aginsky, when we broke we were

6     reviewing your CV, and I wanted to turn your

7     attention to page 3 of 6 at the bottom where you

8     start your professional publications.

9          A.     Yes.

10          Q.     And there you indicate that you have

11     more than 20 peer-reviewed articles on ink

12     analysis and dating, including chapters in three

13     books and two encyclopedias; is that right?

14          A.     Yes.

15          Q.     On the pages that follow, there are a

16     number of books and peer-reviewed articles and

17     presentations at scientific conferences, and a

18     number of these are specific to ink dating and

19     analysis of PE and ink and the solvent loss ratio

20     method; correct?

21          A.     Yes.

22          Q.     And the latest paper at least on the CV

23     here is number 34, which is a paper on the solvent

24     loss ratio method presented at the American

25     Society of Questioned Document Examiners meeting

```
 1                    Aginsky
 2   in 2010 that you presented along with
 3   Mr. Gaudreau; correct?
 4       A.    Yes.
 5       Q.    And Mr. Gaudreau was also -- would you
 6   characterize him as a pioneer in the field of PE
 7   analysis?
 8            MR. ARGENTIERI:  Objection.
 9       A.    Mr. Gaudreau -- Mark Gaudreau and Luc
10   Brazeau, these are two ink chemists from Canada
11   Border Services Agency, CBSA, which is what I
12   mentioned earlier similar to FBI in the U.S.  And
13   these are two chemists along with the other from
14   the lab who have been using the solvent loss ratio
15   method for over ten years.
16            MR. ARGENTIERI:  Did he answer your
17       question?
18            MR. SOUTHWELL:  Uh-huh.
19            MR. ARGENTIERI:  You asked him if they
20       were pioneers.  I think that was your
21       phraseology.
22            MR. SOUTHWELL:  Yeah, and he answered
23       it as he answered it.  That's his answer.
24       That's fine.
25            MR. ARGENTIERI:  He answered -- well --
```

1                          Aginsky

2        A.    I wouldn't call him a pioneer, but he

3    is one -- one of those who has been involved in

4    this field for a long time and has been using this

5    method.

6        Q.    Fine.  And what is your opinion of

7    Mr. Gaudreau?

8        A.    He's a qualified forensic document

9    examiner and ink chemist.

10        Q.    I want to ask you some specific

11    questions about the scans, photographs, and other

12    images that you took during your forensic document

13    examination in this case, and you comment on some

14    of this in your interrogatory responses that are

15    dated December 2nd.

16             MR. SOUTHWELL:  So why don't you go

17        ahead and have this marked as Defendants'

18        Exhibit 44.

19             (Defendants' Exhibit 44, interrogatory

20        responses of Aginsky, marked for

21        identification.)

22        Q.    I have put before you Defendants'

23    Exhibit 44 which again has this line up at the top

24    which simply reflective of the document having

25    been filed.  This was filed, this document 332 in

1                       Aginsky

2     this case.

3              Can you just take a moment to look

4     through this and let us know when you have done so

5     and if you recognize it?

6          A.    Yeah, that's the document -- a copy of

7     the document that I prepared and assembled last

8     year.

9          Q.    And on the last page of that is a copy

10    of your signature; correct?

11         A.    Yes.

12         Q.    Now, I'd like to direct your attention

13    to page 5 using the numbers at the bottom of the

14    document.  The paragraph there where you state,

15    The circumstances and manner in which I took each

16    scan and photograph were, A, typical of a

17    nondestructive examination of documents that I

18    have been conducting routinely for about 28 years;

19    and B, in accordance with the recommendation

20    outlined in the American Society for Testing and

21    Materials, ASTM, international standard guide

22    E1422-05.

23              Did I read that correctly?

24         A.    Yes.

25         Q.    So it sounds like, based on your

1                          Aginsky

2    practice as well as the independent international

3    standards, you have developed a standard operating

4    procedure with regard to taking scans and

5    photographs during a forensic document

6    examination; is that correct?

7              MR. ARGENTIERI:  Objection.

8         A.   Yes.

9         Q.   And did you follow this standard

10   operating procedure in this case?

11             MR. ARGENTIERI:  Objection to the form.

12        A.   Yes, I did.

13        Q.   Now, scans, images and photographs of a

14   document such as the ones in this case can be used

15   to record various characteristics of a document;

16   correct?

17        A.   Yes.

18        Q.   So, for instance, photographs could

19   document close-ups of handwritten ink lines, scans

20   could document the placement and appearance of ink

21   and text on a package, and VSC images could

22   document infrared luminescence of ink, for

23   example?

24             MR. ARGENTIERI:  Objection.

25        A.   Yes.

```
 1                         Aginsky
 2        Q.    Is one of the purposes of scanning and
 3   photographing and taking images to record as best
 4   as possible -- and of course understanding the
 5   limitations of each medium -- a true and accurate
 6   representation of characteristics you observe
 7   firsthand?
 8        A.    Yes.
 9        Q.    Another purposes of scans and imagery
10   is to record the condition of a document at the
11   time you receive it for examination; correct?
12              MR. ARGENTIERI:  Objection to form.
13        A.    Yes, that's standard procedure, and I
14   use it to take pictures and/or scans before I do
15   anything to the document and after I complete the
16   examination.
17        Q.    In order to have a record of the
18   document as it came to you and as it left you, so
19   to speak; is that right?
20        A.    Yes.
21        Q.    Now, in November of 2011, you provided
22   the defendants with a CD of all of your scans and
23   photographs, as you mentioned, putting aside the
24   VSC imagery; right?
25        A.    Yes, that's correct.
```

1                          Aginsky
2        Q.    And some of those are discussed here in
3    your interrogatory answer that we've just been
4    reviewing at page 5 of Defendants' Exhibit 44.
5              I'm going to now show you what I'd like
6    to be marked as Defendants' Exhibit 45, which I
7    will represent to you is a copy of -- an exact
8    copy of the CD that you in fact produced to us.
9              (Discussion off the record.)
10             (Defendants' Exhibit 45, copy of CD
11         from Aginsky, marked for identification.)
12       Q.    I'm going to now put this into the
13   computer to pull up the imagery that you provided
14   us so that we can ask you a few questions about
15   that?  Okay?  And it will be displayed on the
16   screen that's right behind you.
17       A.    Okay.
18             MR. ARGENTIERI:  Do you want to move
19        that back?
20             THE VIDEOGRAPHER:  (Complies.)
21             THE WITNESS:  I'll take this
22        opportunity to get some water.
23             MR. ARGENTIERI:  I'll get I.
24       Q.    Now let's just start with the
25   interrogatory responses here on page 5,

1                      Aginsky

2    Defendants' Exhibit 44.  At the top of that page

3    you note the document was scanned using a Canon

4    Canoscan LIDE 200 scanner during a particular time

5    frame.  Do you see that?

6         A.    Yes.

7         Q.    And were those scans taken using your

8    standard settings?

9               MR. ARGENTIERI:  Objection as to form.

10        A.    Yes, yes.  There was a particular

11   resolution which I believe what I typically use.

12        Q.    You have a typical resolution that you

13   use when you conduct an examination?

14        A.    Yes, when I scan a page of a document

15   and I don't need a high resolution, I typically

16   use 300 DPI, or less, maybe 200 DPI.

17        Q.    Do you recall if you changed the

18   contrast setting to be more intense or something?

19        A.    No.  That was a standard.  No, I didn't

20   change any -- I didn't do any what I would call

21   manipulation.  It was not necessary.  Everything

22   was black, so I didn't need to.  Plus everything

23   was standard.

24        Q.    Because the toner you observed was

25   black and the ink was black as well; correct?

1                           Aginsky

2        A.     That's correct.

3        Q.     Now, if you look up on the screen,

4   you'll see that there are four file folders on the

5   disk.  One is labeled two thousand -- well,

6   they're each labeled 2011-1-13.  The top is Canon

7   images, then DiniLitr images, then Scans_QD, and

8   Zarbeco images are the last.

9                THE VIDEOGRAPHER:  I'm sorry, counsel,

10        do you need me to video that or just stay on

11        the witness?

12                MR. SOUTHWELL:  No, just stay on the

13        witness.

14                THE VIDEOGRAPHER:  Thank you.

15        Q.     Do you recall these are the folders on

16   the CD that you provided to us?

17        A.     Yes, I do.

18        Q.     Let's first go to the Canon images,

19   which I understand from your interrogatories are

20   your scanner images.  And as you just said, your

21   scans were taken in accordance with your standard

22   operating procedure; correct?

23                MR. ARGENTIERI:  Well...

24        A.     Yes, at that time I scanned them using

25   Photoshop.  Recently, maybe last year, I tried to

1                       Aginsky

2    scan using the Canon software, not to use

3    Photoshop, because files with PSD extension tend

4    to be too large.

5          Q.    Too large?

6          A.    Too large.  And for the purpose of just

7    recording an image of a document, it was not

8    necessary in most cases to get -- to obtain large

9    files.

10         Q.    So my question with respect to these is

11   what was -- what were you aiming to capture with

12   these specific scans using your Canon scanner?

13         A.    It was simply to scan the document

14   using standard parameters to record the appearance

15   of the document as I received it.

16         Q.    And these scans are true and accurate

17   representations of what you observed when you

18   first received the documents?

19         A.    Yes.

20         Q.    So let's go back to your interrogatory

21   answers on page 5.  The next item is 7 images of

22   portions of the document using -- that you took

23   using your Canon digital camera.  And if we could

24   just go back to the folder.  I just want to make

25   sure we've identified that.

1                          Aginsky

2              Oh, okay so the Canon folder has the

3    Canon digital camera picture.  Let me make sure --

4    I may have messed up.  Let me clarify the record.

5    If we can just go back.  So the scans we referred

6    to before are in that Scans_QD two pages folder.

7    Is that correct, Dr. Aginsky?

8         A.    Yes.

9         Q.    That's the scan that was taken with

10   your Canon Canoscan scanner?

11        A.    That's correct.

12        Q.    Now, the images of portions of the

13   document taken using the Canon digital camera are

14   in the folder that says Canon images; correct?

15        A.    Yes, those are images, if I remember

16   correctly, I compared the paper, specifically the

17   left upper corners of two pages that contained,

18   yes, staple holes, and also the paper -- the

19   appearance of the paper, the opacity, what I

20   called.

21              MR. ARGENTIERI:  Are you sure you don't

22        want this videotaped, what he's looking at?

23              MR. SOUTHWELL:  I think the record

24        is -- the record is clear as to what it is.

25        We're now looking at image 0531.JPG.

1                    Aginsky
2          MR. ARGENTIERI:  I don't mean to ask
3      the question you're going to ask, but are you
4      going to have him comment on what we're
5      looking at without the video shooting it?
6          MR. SOUTHWELL:  I'm asking the
7      questions.
8      Q.    Dr. Aginsky, what was your aim in
9  taking these photographs?  What were you aiming to
10  capture?
11          MR. ARGENTIERI:  Objection, asked and
12      answered.
13      A.    That's what I typically do.  If -- if
14  my task is to compare a two-page document, any
15  two-page document, or multipage document but --
16  and to see whether there's any evidence of page
17  substitution, then I would analyze the examined
18  paper and any other material on the document, like
19  in this case it is toner and ballpoint ink.
20          This specific, particular image, it
21  compares the two pages that show, number one, the
22  staple folds on both pages; number two, it showed
23  that both pages were folded in that corner.  And
24  there is a -- there is like a line that shows that
25  where they were folded.  And I arranged two pages

```
1                        Aginsky
2    so we can see that line on one page on the other
3    page.
4              And also this image, it was taken on a
5    table that has a light from -- a lighting table.
6    Therefore we can see like how the page -- the
7    paper looks trans -- the transparency of the
8    paper.
9              We can compare the opacity like the
10   paper contains what are called on my -- I have
11   work notes, and they call it cloudness on my work
12   note.  I said the cloudness is approximately the
13   same.
14             So this is just a page, because it's
15   impossible to remember what I saw at that time,
16   and therefore I took some notes and I took a
17   picture to use it at a later time if I am called
18   to testify to explain what I -- what that level of
19   analysis allowed me to determine.
20        Q.   Okay.  The image that we've been --
21             MR. ARGENTIERI:  If I can interrupt.
22        I'd like to have the videographer shoot the
23        screen.  He's obviously looking at the screen
24        and commenting on these images, and we don't
25        have that on film, we're just shooting the
```

1                        Aginsky

2        head shot?

3              MR. SOUTHWELL:  I was going to

4        establish that this is IMG_0531.JPG, on

5        Defendants' Exhibit 45, but I am happy to have

6        the videographer pan over and show the screen.

7              MR. ARGENTIERI:  If you don't mind.

8        Q.    Dr. Aginsky, have I identified

9    correctly the image that you're referring to?

10       A.    Yes.

11       Q.    The photographs that you took with your

12   Canon digital camera, did you take those

13   photographs using standard settings that you use

14   on that camera?

15             MR. ARGENTIERI:  Objection as to form.

16       A.    Well, yes, probably I changed it to a

17   settings that is applicable to take pictures in a

18   close proximity.

19       Q.    So were these photographs from your

20   Canon digital camera true and accurate

21   representations of what you observed?

22       A.    Yes.

23       Q.    Let's turn back to Defendants' Exhibit

24   44, your interrogatories.  After the Canon digital

25   camera, you've got a paragraph that describes 24

1                          Aginsky

2     microphotographs of portions of the document taken

3     using a Zarbeco MiScope 2MP digital microscope.

4               Can you explain in a little more detail

5     what a Zarbeco MiScope 2MP digital microscope is?

6          A.    It's a portable digital microscope.  It

7     looks like a mouse computer that we use with

8     computers -- with computers, just a little bigger,

9     and it allows to capture a picture through this

10    microscope at a resolution to 2 megapixel.

11         Q.    And that digital microscope attaches to

12    a computer?

13         A.    Yes.  It has a USB cord.

14         Q.    And what do you use that for

15    specifically as part of your examination?

16         A.    It is very useful tool or microscope

17    that is used as I know by many colleagues in the

18    field.  It is used to take and enhance the image

19    of, for example, a printed element on a document

20    or handwritten element.  Or it also can be used if

21    a document contains some security features.

22               They also can be -- let's say some

23    documents printed on a color printer, they may

24    contain yellow dots which would allow it to

25    determine the type of printer that was used and

```
 1                        Aginsky
 2   even the date when it was done.
 3             So it's a large scale of possibilities
 4   that can be -- can be examined using this small
 5   device.
 6        Q.    Let's look up on the screen --
 7             MR. SOUTHWELL:  If you want to pan.
 8        Q.    -- to the folder that contains Zarbeco
 9   images, these are the images that you took with
10   your Zarbeco microscope; right?  If you can click
11   into that.
12        A.    Yes.
13        Q.    And there are 24 BMP files.  Those are
14   the photographs; is that right?
15        A.    Yes.
16        Q.    So specifically as to these, what were
17   you trying to capture by taking these photographs
18   using your Zarbeco microscope?
19        A.    The reason for this particular image
20   was to capture the image of M and Z to compare it
21   as the appearance of the ink and ink lines with
22   the other handwritten portions on the same page
23   and on the other page.
24             Sometimes if a pen has -- is
25   malfunctioning, has some defect, then that would
```

1                          Aginsky

2     be very good demonstrative to determine that the

3     same pen was used.

4                Unfortunately most pens behave normally

5     and therefore it is -- it cannot be -- like in

6     this case I didn't find any specific defects that

7     would allow it to determine that the same pen was

8     used for the initials, for the interlineation, or

9     on the second page.

10               But I took those images just for

11    comparison so I would remember this if I need to

12    refresh my memory at a later time.

13         Q.    And up on the screen is image file

14    001.BMP in a preview screen to the right, and it's

15    got the letters MZ; is that right?

16         A.    Yes.

17         Q.    And if I could turn to image file

18    002.BMP, that appears to have -- well, I would

19    describe it as a reddish tint.  Can you describe

20    that image and explain it, please?

21         A.    Yes, that -- the second image is the

22    same image as the first one, simply the first one

23    was in the visible range and the second one in the

24    near infrared range.  And we can see that via the

25    ink disappeared, and we only can see some

1                          Aginsky
2    indentations where the ink is on paper.
3         Q.    And that's a setting that you've used
4    with the Zarbeco microscope is to allow the -- to
5    see the imagery only with the near infrared range?
6         A.    Yes, the Zarbeco microscope has a
7    switch I can switch from visible range to near
8    infrared.
9         Q.    And is that true, then, throughout the
10   24 images that are your Zarbeco images, that there
11   is -- there are captures, if you will, of the
12   visible range and then the near infrared range for
13   the image?
14        A.    Not all images have both visible and
15   infrared, but many of them they do have.
16        Q.    And you're referring to I think you
17   called them your work notes in front of you.  Can
18   you just describe what that is?
19        A.    This is just a -- they are two pages of
20   my work notes, and I wrote some information which,
21   again, would be useful if I need to refresh my
22   memory at a later time.
23             So I wrote that I didn't notice any
24   yellow dots on pages 1 or 2, meaning that the
25   printer or copier was not a color printer or

1                        Aginsky

2    copier, because most of them they contain the

3    yellow dots pattern.

4             Then all these 24 images I have some

5    description.  So I would know that, for example,

6    image number 1 is page 1 and then what I captured

7    is MZ.  And resolution is 40 times, 40X.  And it's

8    visible range.

9             And image number 2 is the same but it's

10   in the infrared range.

11       Q.   Great.  Just so that the record is

12   clear, I think -- maybe at a next break I'll ask

13   to make a quick copy of those notes so we can have

14   those as part of the record.

15       A.   Okay.

16       Q.   The images you have here, the 24 that

17   you produced from your Zarbeco digital microscope,

18   are those true and accurate representations of

19   what you observed using the aspects of Zarbeco

20   that you testified to?

21       A.   Yes, this is what I observed using this

22   particular digital microscope.

23       Q.   Now, you also used a DinoLite digital

24   microscope; right?

25       A.   Yes.

1                        Aginsky

2       Q.     Can you explain a little what a

3   DinoLite is and how it's different from the

4   Zarbeco?

5       A.     It's another type of digital

6   microscope, simply it has a different -- different

7   lighting characteristics.  Sometimes it's

8   important because when we change even an angle of

9   incident light we can see more -- we might see

10  different features depending on the angle.

11           And therefore it's better to use

12  different microscopes if the task is to find

13  any -- like any difference between any materials,

14  again, to find out if there is any evidence of

15  page substitution.

16           Also the DinoLite microscope has a

17  larger magnification, so it's possible to capture

18  images at a higher magnification.  And I found it

19  useful for a specific test to determine the

20  sequence of when different materials were placed

21  on the document.  Actually I published a paper in

22  peer-reviewed journals.

23           It uses a different equipment, not a

24  DinoLite microscope, but I used a more

25  sophisticated large microscope when I worked in

1                          Aginsky
2    Moscow, and it allowed me to develop a procedure
3    to determine what came first, what came second
4    when we have toner and ball point ink in case
5    where there is no intersection.  In this case it
6    is easier.  There is an intersection.
7          Q.    Right.
8          A.    But even when there is no intersection,
9    it's possible to determine whether a blank page
10   was signed and then something -- some information
11   was printed on it without an interaction with the
12   signature.
13              But in this case I used this microscope
14   to determine whether the ink was on top of toner
15   or whether the toner was on top of ink.  And I
16   determined that in all instances where we have
17   intersection of ink and toner the ink is on top of
18   toner.
19         Q.    Looking up on the screen, the folder
20   that has the D-I-N-I-L-I-T-R images, that's the
21   folder where you have these 11 microphotographs;
22   correct?
23         A.    Yes.
24         Q.    Those are the names of the portions
25   that you have captured; is that right?

1                          Aginsky
2       A.    Yes.  For each image I -- instead of
3   writing it on work notes on a page, I wrote it as
4   a file, as a name of the file, so it's like
5   self-explanatory what intersection is captured.
6       Q.    The first one which is there on the
7   previous screen on the right is initials PC
8   crossed the S.JPG; is that right?
9       A.    Yes, that's correct.
10      Q.    And were these microphotographs taken
11  in accordance with your standard operating
12  procedure?
13           MR. ARGENTIERI:  Objection as to form.
14      A.    Yes, I not always use DinoLite
15  microscope.  But in a case like this when the task
16  is to determine whether the ink or toner came
17  first on a document, yes, I would use this
18  microscope, and that's part of my standard
19  operating procedure.
20      Q.    The Zarbeco images we looked at before,
21  are those also taken in accordance with your
22  standard operating procedure?
23      A.    Yes.
24      Q.    These DinoLite microphotographs, the 11
25  of them, are they true and accurate

                              Aginsky
1
2    representations of what you observed using the
3    capabilities of the microscope?
4         A.    Yes.
5              MR. SOUTHWELL:  Okay.  We can take that
6         off the screen, then.
7         Q.    I want to go back to your January 13,
8    2011, examination.  The only document you examined
9    was the two-page "work for hire" document; is that
10   correct?
11        A.    That's correct.
12        Q.    Were you aware at the time in January
13   of 2011 there was another questioned document in
14   the case referred to as the technical back-end
15   specifications?
16             MR. ARGENTIERI:  Objection as to form.
17        A.    I don't remember such a name of a
18   document.
19        Q.    Are you aware that this was another --
20   a second questioned document in the case?
21             MR. ARGENTIERI:  Objection.
22        A.    I think another document was mentioned,
23   a six-page document?  Yes, it was, but I have not
24   examined.
25        Q.    When you say it was mentioned, it was

1                        Aginsky

2    mentioned at this January 13th examination?  Is

3    that what you mean?

4                MR. ARGENTIERI:  Objection as to form.

5        A.    I don't remember if we discussed it on

6    that -- on that date.  It could be that we

7    discussed it on the date.  But it was just

8    mentioned to me.  I was not asked to examine it,

9    or I have not seen the document, the original.

10       Q.    Did you have any discussions with

11   plaintiff's other expert, John Paul Osborn, prior

12   to your examination on January 13th or during the

13   examination?

14       A.    Definitely I didn't discuss -- didn't

15   have any discussions before.  I shouldn't say

16   "definitely," because I might forget something.

17   But I doubt it very much that I had any discussion

18   with him before that date.  I spoke to him briefly

19   maybe two times after that, but not before.

20       Q.    Were you aware of the fact that he

21   examined documents in this case, specifically two

22   documents, about a week prior to you on January

23   5th, 2011?

24       A.    I think that -- it wasn't positive, but

25   that was my understanding, because I recommended

```
 1                        Aginsky
 2   John Paul.  Standard procedure is to do first the
 3   indentation analysis.  So that was my
 4   understanding.  I wasn't sure, but that was my
 5   understanding, that John Paul had already done his
 6   examination --
 7        Q.    I see.
 8        A.    -- before January 13 of 2011.
 9        Q.    Just so that it's clear, you don't --
10   do you have a specific knowledge of that or you're
11   assuming that's the case because you understand he
12   would do an indentation analysis and that would
13   typically come before your examination as a
14   chemist?
15             MR. ARGENTIERI:  Objection to form.
16        A.    Because it's a typical procedure, then
17   I don't remember -- as of today I don't remember
18   if I knew for sure that he had done it.  But I
19   would say it is highly probably that he had done
20   it before I did my examination.
21        Q.    And do you recall anything about, as
22   you mentioned, the six-page document?  Do you
23   recall anything about hearing that Mr. Osborn had
24   examined it or what do you recall about that other
25   document?
```

1                        Aginsky

2              MR. ARGENTIERI:  Objection to form.

3        A.    This I don't know at all if he had ever

4   examined it, no.

5        Q.    Who provided you the "work for hire"

6   documents on January 13th, 2011?

7        A.    Mr. Argentieri.

8        Q.    And that's fine.  He's here.  As he

9   provided on July 14th, 2011, when we did our

10  inspection.

11              Now, before Mr. Argentieri handed you

12  the document, had you seen images of the "work for

13  hire" document?

14       A.    I believe that PDF copies were sent to

15  me, yes.

16       Q.    Are you aware if that was the image

17  attached to the complaint in the case?

18       A.    At that time I didn't know anything.  I

19  didn't want to know any specifics.  I wasn't even

20  sure whether I would be involved or retained for

21  the case.

22       Q.    Do you recall at that time whether you

23  had seen the complaint in the case?

24       A.    That I had seen what?

25       Q.    The complaint, the document that begins

1                          Aginsky

2     the lawsuit.

3          A.    No, I don't remember.  And again, as I

4     said, the complaint is a specific judicial --

5          Q.    Yes.

6          A.    -- document.  No, I only just had

7     general discussion about what I could or could not

8     do typically.

9          Q.    Do you recall at any time having seen

10    the complaint in this case, the judicial document

11    that starts the litigation?

12         A.    I'm not positive, but most probably I

13    have not seen it.

14         Q.    You mentioned you thought that prior --

15    was it prior to January 13th that you had seen the

16    PDF of the "work for hire" document or was it on

17    that day?

18         A.    I think that because it was e-mailed to

19    me, so it would be logical to e-mail it to me

20    before we met on January 13th.  So my -- most

21    probably -- again, I don't remember.

22         Q.    That's fine.

23         A.    I could verify it to look at my

24    computer.  But I think that I received -- I had

25    received it before January 13.

1                          Aginsky

2         Q.     Do you recall who sent it to you?

3         A.     No, I don't.

4         Q.     I'm going to put another blank in the

5    transcript here.  I'm going to ask if you could

6    determine when it is you received the PDF and who

7    sent it to you and ask that you provide that

8    information so we could fill that transcript blank

9    in; okay?

10   TO BE FURNISHED:  _____

11   _____.

12        A.     Yes, yes, I will do it.

13        Q.     Do you recall was it a single PDF of

14   the two pages that was sent to you?

15        A.     As I recall, it was a PDF of two

16   page -- of two-page contract, and I believe the

17   other document, which is Street-something fax.  I

18   don't remember the name.  I am just guessing.  But

19   another -- PDF of another document.

20        Q.     Can you describe that document in any

21   other detail?

22        A.     This is what I said like a six-page

23   document, but I am not sure that it was a six-page

24   document.  It's just -- I don't know why I said

25   it.  I apologize if I am -- if I was guessing.

                              Aginsky

1

2          Q.     That's okay.   There was another --

3          A.     There were two documents that were sent

4     to me as PDF.

5          Q.     Okay.

6          A.     And because I have never examined the

7     other document, I just didn't pay much attention

8     to that -- the other document.

9          Q.     Do you recall if the PDF or either PDF

10    that was sent to you was a color or black-and-

11    white PDF?

12         A.     It's a black-and-white.

13         Q.     Do you recall how the "work for hire"

14    document was brought to you?  And by that I mean

15    was it in an envelope, in a plastic sleeve, or

16    what the method by which it was brought to your

17    office and then given to you.

18         A.     Again, I am not positive, but it was in

19    something like an envelope.   It could be a folder.

20         Q.     And describe to me, if you would, how

21    it was presented to you, the "work for hire"

22    document.

23         A.     How?

24         Q.     So let's back up.   I guess you were not

25    yet sure whether you were going to be retained.

1                        Aginsky
2    Was there a discussion at the beginning of the
3    January 13th meeting during which it was confirmed
4    that you were retained and then it was provided to
5    you for examination?  I'm trying to get at what
6    occurred.
7        A.    What occurred -- I think, as far as I
8    remember, Mr. Argentieri -- we were sitting in my
9    office, and he gave me I think a check, retainer
10   check and a retainer agreement, which was modified
11   from mine.  Mine was one page, and that one was
12   like three pages.
13           Then after that he gave me the
14   document.  He opened a folder or envelope and gave
15   me this two-page document and said this is the
16   document that he would like me to examine.
17       Q.    Were you sitting at your desk or was it
18   in a lab?  Maybe you could explain a little more
19   what the setup was.
20       A.    It was in my office.  So I have two
21   rooms, and one is my office.  We were sitting in
22   my office.  So the document and everything, the
23   retainer check, were placed on my desk.  We were
24   sitting opposite each other.  And the laboratory
25   is the other room, the other room.

                            Aginsky

1
2       Q.    Mr. Argentieri took the "work for hire"

3   document out of an envelope or folder and then

4   handed it to you; is that right?

5       A.    Yes.

6       Q.    Was he wearing gloves; do you recall?

7       A.    No, none of us.

8       Q.    Did he ask you to wear gloves?

9       A.    No.  I usually -- sometimes when there

10  is a requirement that the gloves should be worn,

11  yes, I would.  But what I usually do, I handled

12  the document -- like I would use another paper,

13  another page, and I would fold it like this and

14  then will use it -- say if I need, I would move it

15  from a table and take it like this (indicating),

16  so to leave as little fingerprints as possible on

17  page.

18      Q.    After your examination, did you give

19  the "work for hire" document back to

20  Mr. Argentieri?

21      A.    Yes.

22      Q.    And do you recall where he put it?

23      A.    I finished the examination, like it

24  look approximately overall six hours.  Then I

25  returned the document.  And I think Mr. Argentieri

```
 1                         Aginsky
 2    put it in the same envelope or folder.
 3         Q.    Was Mr. Argentieri and Mr. Ceglia there
 4    the whole time during which you were doing your
 5    examination?
 6         A.    No, Mr. Ceglia was not in my lab.  He
 7    was watching TV.  But he wasn't present in my lab.
 8         Q.    Where is the TV in your office?
 9         A.    It's not in my office; it's -- it's
10    like a family room.  He was there.
11         Q.    Your office and your lab are attached
12    to your home?
13         A.    Yes.
14         Q.    So he was in the family -- Mr. Ceglia
15    was in the family room watching TV while you were
16    doing your examination in the lab?
17         A.    Yes.
18         Q.    Where was Mr. Argentieri during this
19    time?
20         A.    He was with me in the lab.
21         Q.    So the document was not left with you
22    overnight or anything like that; correct?
23         A.    No.  It was six-hour examination.
24         Q.    You mentioned how you hold the
25    document.  Was there any discussion of testing the
```

1                          Aginsky

2    document for fingerprints at all?

3        A.    We didn't discuss a possibility for

4    testing, as far as I remember.  But as I said,

5    it's my general procedure, if I'm not wearing

6    gloves, which I try not to because it's not

7    convenient, then I will handle a document very

8    carefully.

9              Like instead of taking a page like this

10   (indicating), I will either take it from here on

11   the angle or, as I mentioned, I would use another

12   page and move it like this (indicating) and then

13   hold it using another paper.  That way I will not

14   leave a fingerprint on the page.

15       Q.    When you first examined the "work for

16   hire" document on January 13th, 2011, did you

17   understand anything about the storage conditions

18   of the document?

19       A.    As far as I remember, we didn't discuss

20   anything regarding the storage conditions.

21       Q.    Did you have any knowledge about the

22   storage conditions of the document?

23       A.    At that time I didn't ask this question

24   because I wasn't asked to do any ink-aging

25   analysis.  And the storage conditions would only

```
 1                    Aginsky
 2   be relevant to know if I was asked to do an
 3   ink-aging analysis.
 4        Q.    And I understand you didn't ask, but
 5   did you have any knowledge about the storage
 6   conditions at that time?
 7        A.    No, I didn't ask about this, and I
 8   wasn't provided any information about this.
 9        Q.    At any point during your engagement up
10   until today, have you -- do you have any
11   understanding about the storage conditions of the
12   "work for hire" document?
13        A.    After my examination in January of last
14   year, I have not been involved very much in this
15   case.  And other than general questions regarding
16   the ink-aging methodology and how it may be
17   affected by storage conditions, I don't remember
18   discussing anything.
19        Q.    You do recall some discussions about
20   how the ink-aging methodology might be affected by
21   storage conditions, but you don't remember having
22   any knowledge -- or you don't have any knowledge
23   about the purported storage conditions for this
24   particular document, the "work for hire" document;
25   right?
```

1                          Aginsky

2              MR. ARGENTIERI:  Objection to the form.

3        A.    What I -- what I remember is that the

4    questions that I received at a later point

5    regarding the storage conditions, they were

6    after -- after I had received I believe five

7    images that Gerald LaPorte took showing some

8    changes of the appearance of the document.

9              And at that point I received e-mails

10   with those -- Gerald LaPorte's images.  And I was

11   asked what in my opinion could cause such

12   discoloration or such a change or fading.  And I

13   answered that fading mainly is caused by excessive

14   light.  And significant fading is usually --

15   that's something like direct sunlight.

16        Q.    And is that what you observed in those

17   images, excessive fading?

18        A.    It was very -- the images were not --

19   at least what I received, PDF images, were not of

20   great quality.  So I couldn't -- I can't even

21   remember whether they were colored, so it was -- I

22   was just asked general questions, if the ink

23   faded -- or if an ink has faded and if a page

24   become yellow then what -- what could be the cause

25   of that.  And I said based on my experience it is

```
 1                         Aginsky
 2   light, excessive light.
 3        Q.    And did you have an understanding about
 4   anything concerning the "work for hire" document's
 5   purported execution, such as where it was it
 6   executed, what date it was executed on?  Did you
 7   have any understanding about those -- that kind of
 8   information?
 9        A.    I don't remember that we discussed on
10   January 13th or any other time the circumstances
11   or location or anything like that where this
12   document was executed.
13        Q.    So you have no knowledge about that,
14   the circumstances of execution; is that correct?
15        A.    No, I have no knowledge.  The only
16   thing I remember is when I compared the two pages
17   I noticed it was obvious, especially under the
18   microscope, that the font is different on pages 1
19   and 2.  And I mentioned it and said so the font is
20   different; is it -- how can this be explained.
21             But I don't remember that there was any
22   explanation to me, so that's -- that's the only
23   discussion that related to -- somehow related to
24   the place or the manner how the documents were
25   executed -- the document was prepared.
```

1                          Aginsky

2        Q.     Do you have any understanding about why

3   there might be two different fonts on the

4   document?

5              MR. ARGENTIERI:  Objection as to form.

6        A.     Different font?  It means that it's

7   either a different printer or, I don't know, there

8   may be more than one different scenarios.  Of

9   course it shows that it is not printed from the

10  same computer on the same printer at the same

11  time.

12       Q.     Now, the document that was presented to

13  you for inspection, was it stapled when you got

14  it?

15       A.     No, it was not.

16       Q.     Was there a staple accompanying the

17  document in any way?

18       A.     No, otherwise I would take a picture.

19       Q.     Do you have any knowledge about what

20  happened to the staple?  Well, let me back up.

21             You documented that there were staple

22  holes; correct?

23       A.     Yes.

24       Q.     Do you have any knowledge about what

25  happened to the staple that may have caused those

1                        Aginsky

2    holes?

3         A.    No, I have no knowledge about that.

4         Q.    And when you received the document, the

5    paper was white; correct?

6         A.    Yes.

7         Q.    The handwriting ink appeared to you to

8    be black ballpoint ink; correct?

9         A.    Yes, it was black.

10         Q.    And you did not notice any fading of

11    the ink or brownish or tannish ink; correct?

12              MR. ARGENTIERI:  Objection to form.

13         A.    No.

14         Q.    Am I correct?

15         A.    You're correct, no fading.

16         Q.    No fading of the ink?

17         A.    No fading of the ink, no.

18         Q.    Did you notice any damage to the

19    document visible to the naked eye?

20              MR. ARGENTIERI:  Objection as to form.

21         A.    There was nothing that would suggest

22    that the document has any, if I use your word,

23    damage, anything that would change the appearance

24    of the document.

25         Q.    And as I understand it, you did not

1                        Aginsky

2    take samples from the document during this

3    examination; right?

4        A.    No, I did not.

5        Q.    And did you have an understanding as to

6    why that was?

7        A.    At that -- on that date -- on that day

8    I was only asked to do the nondestructive physical

9    optical examinations.

10       Q.    And for that examination you used

11   equipment like your microscopes, handheld lamps,

12   the VSC unit, the microscopes you've talked about;

13   is that right?

14            MR. ARGENTIERI:  Objection to form.

15       A.    Yes, all those -- what we discussed,

16   and also I used -- it is not -- there are no

17   images, but I have it on my work note I used a

18   lamp which is called black light.  It's a very

19   primitive type of examination, but sometimes it is

20   effective.

21            Let's say two black inks, they might

22   appear very similar in the visible range of

23   electromagnetic spectrum.  But when we illuminate

24   these two inks using the black light, one might --

25   typically might turn red and the other might stay

1                         Aginsky

2      as it was, without turning red.

3                So in this case both -- all the -- all

4      the handwritten entries, the initials and

5      signatures, that I observed using this black

6      light, they all turned red.

7                But as I said, it's a not very

8      discriminating type of analysis, but sometimes it

9      is very effective; and if it is, then simply by

10     taking a picture, it would have a very nice

11     demonstrative for in court to show.

12        Q.    What equipment did you use to measure

13     the thickness of the paper?

14        A.    For the thickness I only used -- I

15     looked at the edges of the paper using a

16     magnifying glass.  And also probably for that

17     particular -- I said I typically try not to leave

18     my fingerprints, but it is very effective when you

19     use your fingers just to take two pages between

20     your fingers.  And if the pages have different

21     thickness, you might feel it.  This is how many

22     people -- money fraud are detected by cashiers.

23                Again, it's a -- I wouldn't say that

24     that's a very sophisticated type of test, but on

25     that date I looked at many parameters of the paper

                          Aginsky

1

2    other than the thickness.  And the UV responses of

3    the paper in the short -- both short and long UV

4    light were the same, or indistinguishable, I

5    should say.  The opacity was what we saw on one of

6    my pictures was also very similar.

7              So I couldn't say that there is any

8    evidence that these two pages are different based

9    on that particular parameter.

10             Of course the color, I didn't see any

11   difference between white and white.

12             To me that was enough combination to

13   say that at the level of the analysis that I

14   performed, I don't see any difference between page

15   1 and page 2.

16        Q.   For the opacity, you used the

17   transmitted light examination like you saw in

18   those images?

19             MR. ARGENTIERI:  Objection as to form.

20        A.   Yes, the transmitted light in the

21   visible range, and also I used transmitted light

22   using VSC.  I'm not sure if I took those pictures,

23   but I gave you the images.  Probably there I

24   used -- VSC allows to take -- to observe the

25   optical characteristics in UV visible range and

1                          Aginsky

2   the infrared.

3        Q.    And for the thickness measurements, did

4   you take actual measurements, like actual

5   numerical measurements?

6        A.    No.  The only way to do it would be to

7   use a micrometer, and I don't have a micrometer in

8   my lab.

9        Q.    So your equipment was your fingers, if

10  you will?

11       A.    No, as I said -- yeah, the fingers

12  plus --

13            MR. ARGENTIERI:  Skill.

14       A.    -- when I looked at the two pages using

15  some magnifying glasses, because I examined the

16  edges of the pages.

17            What happens when the -- when a typical

18  examination to determine whether there is evidence

19  of page substitution, if a page was substituted at

20  a later time, let's say significantly later, years

21  later, than the previous pages of -- the older

22  pages of the document, they might have some

23  visible or detectible wear and tear

24  characteristics.  And the newer page would not

25  have those characteristics.

1                        Aginsky

2           So I looked at those to see if I see

3    any wear-and-tear characteristics which would be

4    different between page 1 and page 2.

5           Q.    I see.

6           A.    That also included the comparison of

7    the thickness.

8           Q.    Okay.  And then since that January 13th

9    examination, you have not seen the actual physical

10   document again; is that correct?

11          A.    That's correct.

12          MR. SOUTHWELL:  Why don't we break for

13          lunch at this point.  And before we do that, I

14          guess let's on the record still -- I'm going

15          to hand you back your key (handing).

16          THE WITNESS:  Thank you.

17          MR. SOUTHWELL:  I ask for those work

18          notes, and we'll make a copy of them over the

19          lunch break and give them back to you

20          afterwards.  We'll mark them to complete the

21          record.

22          MR. ARGENTIERI:  Make sure you wear

23          gloves.

24          MR. SOUTHWELL:  You too,

25          Mr. Argentieri.

1                          Aginsky

2          And why don't we come back in about --

3          MR. ARGENTIERI:  What time you want?

4     It's 1:30.

5          MR. SOUTHWELL:  Yeah, like maybe 30-45

6     minutes -- let's say 45 minutes, and that

7     allow us to organize.

8          (Discussion off the record.)

9          THE VIDEOGRAPHER:  Going off the record

10    1:28 p.m.  This is the end of Disk 2 of the

11    deposition of Valery Aginsky.

12          (Time noted:  1:28 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2          A F T E R N O O N   S E S S I O N

3              (Time noted:  2:26 p.m.)

4              THE VIDEOGRAPHER:  Going back on the

5         record at 2:26 p.m.  This is the beginning of

6         Disk 3 in the deposition of Valery Aginsky.

7    V A L E R Y   N.   A G I N S K Y ,

8         resumed as a witness, having been previously

9         sworn by the notary public, was examined and

10        testified further as follows:

11   EXAMINATION CONTINUED BY

12   MR. SOUTHWELL:

13        Q.    Great.  Dr. Aginsky, did you speak with

14   Mr. Argentieri over the lunch break at all --

15        A.    No.

16        Q.    -- about the substance of the

17   deposition?

18        A.    No, we didn't speak at all.

19        Q.    Now, I want to turn to your June 2011

20   declaration, which you have in front of you as

21   Defendants' Exhibit 43.  I believe you testified

22   earlier that you had worked with Jerry Trippitelli

23   from DLA Piper on this; is that -- is that right?

24        A.    If I remember correctly, the name of

25   the attorney, if it's him, yes, I worked with him

1                        Aginsky
2    when I was preparing that declaration.
3         Q.    Were there any other attorneys?  Let me
4    ask it to you this way:  Was there just one
5    attorney that you worked with in connection with
6    this attorney --
7         A.    Just one.
8         Q.    -- or was it more than one?
9         A.    Just one.
10        Q.    And your recollection is that it's
11   Mr. Trippitelli; is that right?
12        A.    Yes.  As I said, I'm not positive,
13   but...
14        Q.    Did you meet with the attorney you
15   prepared it with in person at all?
16        A.    No.  That was e-mail.
17        Q.    How did the declaration get put
18   together?  In other words, did you dictate it and
19   they took it down or something else?
20        A.    I for sure did not -- didn't dictate.
21   I think he sent me an e-mail with the format of
22   this and with some preprinted paragraphs taken
23   from my CV and from his understanding of what my
24   results are.  And then I made necessary changes
25   and amendments.

1                          Aginsky

2       Q.    I see.  So did you have a conversation

3   with him prior to that about your examination and

4   results?

5       A.    I don't remember.  It must have if I --

6   if I did have a conversation, it must be in my

7   time log, which I have on my computer.  So I can

8   double-check.

9       Q.    Okay.  So let's put a blank in the

10  transcript for that as well, when you spoke with

11  him, and if you could provide that information,

12  that would be great.

13  TO BE FURNISHED:  _____

14  _____.

15      A.    Yes, I will, yes.

16      Q.    Let me just make sure I understand.

17  Your recollection is you did speak with him, and

18  that is how he was able to put the information

19  into the draft; right?  There wouldn't have been

20  any other way that he would have come up with your

21  conclusions without having spoken to you unless

22  there was somebody else you spoke to about it?

23      A.    Yeah, it's logical to assume that we

24  probably had a conversation with me.  But as I

25  said, I'm not positive.  I need to double-check my

```
 1                          Aginsky
 2    time log.
 3         Q.    Okay.  Do you recall how long it took
 4    you to prepare the declaration or to review it and
 5    then finalize it?
 6         A.    Again, it's on my time log.  Everything
 7    that -- every work that I did, each work is -- and
 8    the time I spent is in my time log.
 9         Q.    Was there any material in the draft
10    that was sent to you that you were not comfortable
11    including that you then took out?
12         A.    Yes, I for sure I changed some
13    positions because he didn't explain correctly
14    technical things.  I didn't see anything that I
15    would consider as -- as something that I would
16    feel uncomfortable, meaning that I would include
17    something which will be not based on my result.
18              But some sentences were technically
19    awkward and didn't reflect what I actually
20    obtained in the examination.  Therefore I just
21    changed everything that should have been changed.
22         Q.    Were there any findings that you had
23    that you were asked not to include in this
24    declaration?
25         A.    No, no.
```

1                          Aginsky

2        Q.    And so I take it you reviewed

3   everything and you made whatever changes are and

4   that you're then comfortable with every word

5   that's in the declaration; correct?

6              MR. ARGENTIERI:  Objection as to form.

7        A.    Yes, I'm comfortable with every

8   sentence.  I'm not sure if I'm comfortable with

9   every word.

10       Q.    Okay.  It is your declaration sworn

11   under penalty of perjury; right?

12       A.    Yes.  But the way I understood it is

13   because, as I said, English is my second language.

14   So the words I sometimes I pick, they are not the

15   best word.  I am comfortable with what I signed --

16       Q.    Okay, fine.

17       A.    Under the penalty of perjury.

18       Q.    I wasn't suggesting otherwise.  I was

19   just trying to understand.

20              Now, we talked about the examination of

21   the "work for hire" document for the purposes of

22   taking physical samples.  Are you familiar with a

23   document in this case called the hard-copy

24   document inspection protocol that governs the

25   examination of hard-copy documents?

```
1                        Aginsky

2              MR. ARGENTIERI:  Objection as to form.

3         A.    Is it a document related to this case

4    or is it general?

5         Q.    A document related to this case from

6    the court that governs how the examination of the

7    hard-copy documents was to proceed.

8         A.    No.

9         Q.    Is that a document you're familiar

10   with?

11        A.    No, I have not reviewed this document.

12        Q.    Were you consulted in any way with

13   respect to the drafting of any protocols or

14   procedures for how the inspection of the hard-copy

15   document would proceed?

16        A.    I'm not sure if I was consulted

17   specifically when this document was prepared.  It

18   could well be that when we met on January 13th and

19   there was some discussion of how the analysis is

20   done, I would typically mention to any client that

21   what tools are used to take samples, how many

22   samples typically should be taken for both, for

23   ink comparison analysis or ink availability test

24   or for ink-aging test.

25        Q.    Did there come a time that you -- well,
```

1                          Aginsky

2      let me back up.

3             You mentioned that you might have

4      provided information about how many samples should

5      be taken.  Do you have a general approach to how

6      many samples you need for analysis that you do?

7           A.    Yes, usually for ink-aging analysis I

8      need approximately 15 samples.  Each sample is 0.5

9      millimeter in diameter.

10          Q.    And did there come a time that you were

11     scheduled to attend and take samples from the

12     document in this case?

13            MR. ARGENTIERI:  Objection, asked and

14        answered.

15            But you can answer.

16          A.    I remember discussion over the phone if

17     I was available to come to Buffalo sometime in

18     June, I believe in June, summertime, and the

19     dates -- on those particular dates I was not

20     available.  After that there was no discussion

21     about the dates or my availability.

22          Q.    I just want to understand.  So the date

23     of inspection started on July 14th, and I had

24     understood that you were planning to attend but

25     you were unavailable until July 22nd.

1                          Aginsky

2             Does that sound familiar to you at all,

3     those dates?

4             MR. ARGENTIERI:  Objection as to form.

5        A.    Yeah, it sounds similar.  I'm -- now

6     you said those dates, July 14th, that's when I was

7     not available, and that week that I was available,

8     then the week of -- maybe next week, which

9     includes July 22nd.

10       Q.    You were not available for a business

11    engagement or vacation or something?  What was the

12    reason for your unavailability?

13       A.    I was -- I needed -- I had previous

14    commitments.  I needed to be in Chicago.  That

15    weekend I was in Chicago.

16       Q.    Did there come a time that you arranged

17    to come the week of the 22nd or -- I'm trying to

18    understand, because I think you testified that you

19    sort of never heard again.  I'm trying to

20    understand that part of it.

21             So let me ask it to you this way:  Was

22    there -- did there come a time when you were

23    scheduled to come the week of the 22nd that you

24    think you were available?

25       A.    And this is again I could verify by

                              Aginsky

1                             Aginsky
2    looking at my e-mails.  I think that I even booked
3    my flight to Buffalo.  But then I was asked to
4    cancel, and I did.
5         Q.    Do you recall how soon before your
6    flight you were asked to cancel?
7         A.    I need to double-check.  I think I have
8    this exchange e-mails on my computer.
9         Q.    Do you recall who you were discussing
10   this issue with?
11        A.    Mr. Argentieri.
12        Q.    Do you have any understanding about why
13   you did not attend to take samples?
14             MR. ARGENTIERI:  Objection.
15             MR. SOUTHWELL:  Your basis?
16             MR. ARGENTIERI:  First of all, he
17        hasn't even testified that -- he has to look
18        at his book about any date -- why he -- I'll
19        just put the objection on the record.  That's
20        fine.  Go ahead.
21             MR. SOUTHWELL:  Okay.  Fine.
22             MR. ARGENTIERI:  You can answer it,
23        Doctor.  I've put the objection on the record.
24        A.    I don't know what was the reason for
25   Mr. Argentieri to advise that I should cancel.

```
 1                     Aginsky
 2       Q.    Are you aware that samples of ink were
 3  taken by plaintiff's experts on July 25th of 2011?
 4            MR. ARGENTIERI:  Objection as to form.
 5       A.    As of today, I don't remember the exact
 6  date, but it sounds like the date that I've
 7  probably seen in my -- in Dr. Lyter's declaration,
 8  which is available on the Internet.
 9       Q.    Just so it's clear, is your only basis
10  for knowing, roughly speaking, when plaintiff's
11  experts took ink samples is Dr. Lyter's report?
12  Do you have any other basis other than that?
13       A.    No, the only source of information is
14  the Internet.
15       Q.    And by "the Internet," you're referring
16  to Dr. Lyter's report, which is available there?
17       A.    Yes, I believe that was from his
18  declaration or affidavit.
19       Q.    And were you in fact available to take
20  samples on the 25th of July, if you recall?
21       A.    It's --
22            MR. ARGENTIERI:  He has to check.
23       A.    It's some time I think one year ago.  I
24  don't remember.  I assume it was.  That's why I
25  said I was not available the previous week but
```

1                        Aginsky

2     will be available next week.

3          Q.    Are you aware that on July 25th the

4     only plaintiff's expert to take ink samples was

5     Mr. Speckin?

6                MR. ARGENTIERI:   Objection as to form.

7          A.    No, I don't know who was the first to

8     take samples.  As I mentioned before, Larry

9     Stewart called me at some point in time, and he

10    said that he was going to fly there.  And he

11    thought that either we together will be there or

12    he will be there.  That's why he asked me what

13    would the strategy to take samples and how many

14    samples I would need for the analysis.  Other than

15    that, I don't remember.

16         Q.    Now, let's turn back to your

17    declaration that's in front of you.  I think it's

18    still there, yes.  Defendants' Exhibit 43.  Can I

19    direct your attention to Exhibit B, which starts

20    at page 14 of 15 in the top right corner.  Do you

21    see that?

22         A.    Okay.

23         Q.    Do you recall whether you yourself

24    attached Exhibit B to your declaration?

25         A.    I need to check to see if I -- I think

1                          Aginsky

2    that I sent the declaration, signed declaration,

3    as an attachment, a scanned document, and I need

4    to check if it was just the text with my signature

5    or whether the attachment with.

6              Based on the title of Exhibit B, I

7    don't think that I prepared it myself.  That's not

8    my style.

9         Q.    Right.  I was going to ask if that's --

10             So looking at page 13 of 15 -- and just

11   so that it's clear -- not suggesting that there's

12   anything wrong with an attorney attaching.  I'm

13   trying to understand the genesis of this document.

14             So if I understand you correctly, your

15   belief, at least as you sit here now, is that this

16   "work for hire" contract was -- these images at

17   pages 14 and 15 was attached to your declaration

18   by the attorneys who submitted it?

19             MR. ARGENTIERI:  Objection as to form.

20        A.    Yes, it looks like there's a horizontal

21   bar in the upper-hand corner which looks like a

22   staple on the document.  And I have never seen a

23   document with this staple.  Therefore I could not

24   scan the document with a staple.  So it's not --

25   it's not my scan.

1                          Aginsky

2        Q.     That was going to be my next question.

3    This is not your scan, as you just said.  I guess

4    are you aware -- was this simple a copy of the

5    "work for hire" contract that was provided to you

6    by the attorneys?

7        A.     I need to double-check.  What I said,

8    that I received a PDF copy before the examination

9    on the 13th of January.  And if it matches the

10   image of this, then it could be.  So I don't

11   remember what for sure I signed the signature page

12   and mailed it.  I'm not sure if the whole document

13   was prepared by myself and mailed to the attorney.

14       Q.     I understand.  So let me put another

15   blank in the transcript and just ask if you can

16   confirm I guess that the PDF that was provided to

17   you in advance of the January 13, 2011,

18   examination, whether that's the same document --

19   same image as is attached here as Exhibit B to

20   your declaration.

21   TO BE FURNISHED: _____

22   _____.

23       A.     I will confirm, yes.

24       Q.     While we're at it, if you can just

25   confirm what the other document was that was

                          Aginsky

1                         Aginsky

2      provided to you along with that PDF --

3          A.    Yes, okay.

4          Q.    -- whether it was that six-page

5      document or something else; okay?

6          A.    How should I confirm it?  In what way?

7          Q.    Why don't you check, and then you

8      can -- I guess depending -- we can talk about this

9      afterwards.  I assume there's a quick and easy

10     one --

11              MR. ARGENTIERI:  You should probably

12         contact us.  We have to comply with the

13         request, unless -- you have to go back and

14         check to see if you even have it; correct?

15              THE WITNESS:  Yes, I believe I have it

16         as an attachment.  So the e-mail, I should

17         have it in the memory of --

18              MR. ARGENTIERI:  I think it should go

19         to Dean and then to you, shouldn't it?

20              MR. SOUTHWELL:  Yeah, I think if you

21         provide it --

22              MR. ARGENTIERI:  To Dean, not to me,

23         because he can electronically transfer it

24         correctly and then --

25              THE WITNESS:  So should I take that

```
 1                    Aginsky
 2      attachment and e-mail it?
 3           MR. ARGENTIERI:  Dean, can you hear us?
 4           MR. BOLAND:  I can hear Dr. Aginsky.  I
 5      can't quite here you, Paul.
 6           MR. ARGENTIERI:  Alex -- or Dr. Aginsky
 7      is asking the process of transferring the
 8      information Alex wants on this line of
 9      questioning and these other questions, and
10      Dr. --
11           MR. SOUTHWELL:  I think it's fine.  You
12      should send it to Mr. Boland and
13      Mr. Argentieri, if he wants.  To the extent --
14      we don't want anything that might be
15      privileged communication in there.
16           MR. ARGENTIERI:  Right.
17           MR. SOUTHWELL:  To the extent there is,
18      he will take that out.  If not, he'll pass it
19      on.
20           MR. BOLAND:  Alex, the witness and I
21      and Paul Argentieri will discuss it with him,
22      and we'll make sure that we respond
23      appropriately.
24           MR. SOUTHWELL:  Okay.
25      Q.    Now let's turn to paragraph 6 of your
```

1                      Aginsky

2    declaration, Defendants' Exhibit 43.  In that

3    paragraph you note in part:  Based on my visual

4    examination of the agreement -- strike that.

5              Based upon my visual examination of the

6    agreement, each page of the document was produced

7    with an office machine system utilizing black

8    toner.

9              Did I read that correctly?

10             MR. ARGENTIERI:  Page 2, paragraph 6,

11        Doctor.

12        A.    Yes, that's correct.

13        Q.    And then you go on to note that there

14   are a variety of such office machine systems, such

15   as laser printers, photocopiers, and some

16   facsimile machines; right?

17        A.    Yes.

18        Q.    And just to be clear, you do not

19   identify any specific type of machine that

20   produced the "work for hire" document; correct?

21        A.    I did not.

22        Q.    And this conclusion is a generic

23   finding that simply means that we're not talking

24   about ink jet or color toner or something like

25   that; right?

1                          Aginsky

2              MR. ARGENTIERI:  Objection as to form.

3        A.    Yes, that's just a type of technology

4    which is used widely and printers copies and

5    facsimile machines used as technology.

6        Q.    I have a question about TLC analysis

7    and toner.  Is it possible to determine the make

8    and model of a printer by doing TLC analysis on

9    black toner?

10             MR. ARGENTIERI:  Objection as to form.

11       A.    I would say that it's very unlikely.

12       Q.    Why is that?

13       A.    Most toners, it's a black toner.  It

14   consists mainly of carbon black, which is a

15   pigment, which all company use.  It contains also

16   polymer resin.  Polymer -- different companies use

17   different -- typically use different resins.  But

18   TLC analysis is not capable in most cases to

19   determine which resin was used.

20             Sometimes some toners contain organic

21   dyes which are added to carbon black.  I don't

22   know -- in this case I didn't do a chemical

23   analysis, so I don't know whether this toner

24   contained an organic dye.

25             But some of Hewlett-Packard's toners,

1                          Aginsky

2    they do contain organic dyes, one of which is of

3    violet color.  I know it from my experience

4    because I have analyzed toners of different

5    companies by TLC, GC/MS, FT-IR, microspectroscopy.

6               So the best method to analyze resins,

7    polymer resins, would be FT-IR method, not TLC.

8    As I said, TLC would be a good method if a toner

9    contains a dye added in addition to carbon black.

10   If it's only carbon black, then TLC is almost

11   useless.

12       Q.    And are most normal -- well, strike

13   that.

14               Are most typical laser printer toners

15   your standard carbon black, and it would be the

16   more, for lack of a better word, esoteric toners

17   that would be able to be discerned using TLC?

18               MR. ARGENTIERI:  Objection as to form.

19       A.    As I said, TLC is only effective for

20   toner comparison if toner contains an organic dye

21   in addition to inorganic carbon black pigment.

22   Carbon clack cannot be analyzed by TLC or by any

23   other chromatographic method because it's not

24   soluble in any solvent.

25               But as I said, if there is a soluble

1                          Aginsky

2    dye added to carbon black, then TLC would be a

3    method of choice.

4         Q.    Now let's go on to the rest of

5    paragraph 6.  You note on page 1 of the agreement

6    there's an interlineation handwritten with black

7    ballpoint ink, and on page 2 of the agreement

8    there are two signatures and the entries of the

9    date all written with black ballpoint ink.

10               Did I read that correctly?

11        A.    Yes.

12        Q.    And you were able to make that

13   determination based on a simple visual inspection;

14   correct?

15               MR. ARGENTIERI:  Objection as to form.

16        A.    Yes, the most important type of

17   analysis is a visual inspection using naked eye

18   and the handheld magnifiers.  Of course the reason

19   why it's important is because ball ballpoint use

20   have very specific appearance which is different

21   from water-based inks used in fountain pen ink or

22   in felt tip pens or even in gel roller ball inks,

23   like this one that I have on the table

24   (indicating).

25               So based on the visual examination and

1                       Aginsky

2      the microscopic examination of the ink on both

3      pages, I came to the conclusion that this is --

4      that this is black ballpoint ink.

5          Q.    You also have a conclusion on paragraph

6      7 that the print and handwritten entries have a

7      logical sequence, and you mentioned that before.

8      This means that the type was printed first and the

9      handwritten entries were made afterwards and on

10     top of the toner; correct?

11         A.    That's correct.

12         Q.    And other than the sequencing, this

13     finding does not say anything about when the

14     document was printed, does it?

15         A.    That's correct.

16         Q.    And it does not say anything about when

17     the handwriting was written other than as to

18     sequencing; correct?

19         A.    That's correct.

20         Q.    In paragraph 8 you discuss your binding

21     with respect to paper.  Specifically you state, My

22     visual UV, IR absorption, and IRL examinations

23     reveal that pages 1 and 2 of the agreement were

24     printed on the same type of 8.5 by 11 inch wide

25     paper.

1                          Aginsky

2              The paper of both pages has matching

3    characteristics, such as color, thickness, short

4    and long-wave UV fluorescence, IR luminescence,

5    opacity, and surface texture?

6              Did I read that correctly?

7         A.    Yes.

8         Q.    Now, when you say the same type and

9    matching characteristics, that means that the

10   paper could not be differentiated at the level of

11   analysis that you conducted; correct?

12             MR. ARGENTIERI:  Objection as to form.

13        A.    That's correct.

14        Q.    It's possible that chemical analysis

15   could reveal differences; correct?

16             MR. ARGENTIERI:  Objection.

17        A.    Yes, chemical analysis is more powerful

18   than the physical, in most cases.

19        Q.    So it's possible, for example, that TLC

20   analysis could reveal the existence of different

21   organic optical brighteners on each page?

22             MR. ARGENTIERI:  Objection as to form.

23        A.    Yes.

24        Q.    It's also possible GC/MS analysis could

25   reveal chemical differences in the chemical

```
 1                        Aginsky
 2   composition of the paper; correct?
 3              MR. ARGENTIERI:  Objection as to form.
 4        A.    That's correct.
 5        Q.    So this finding does not mean that the
 6   two pieces of paper, page 1 and page 2, of the
 7   "work for hire" document are identical, does it?
 8              MR. ARGENTIERI:  Objection as to form.
 9        A.    Of course not.
10        Q.    So to characterize your finding that
11   the two pieces of paper of the "work for hire"
12   document are identical would be to mischaracterize
13   your findings.  Am I correct?
14              MR. ARGENTIERI:  Objection as to form.
15        A.    Yes.
16              MR. SOUTHWELL:  I'm going to ask this
17        be marked --
18              MR. ARGENTIERI:  Let me ask, how much
19        time are you going to go?
20              How much time have we got in the
21        deposition so far?
22              THE VIDEOGRAPHER:  Two hours, three
23        hours -- a little under three hours, plus 30
24        minutes now.  So 3 hours, 20 minutes, 25
25        minutes.
```

1                        Aginsky

2              MR. SOUTHWELL:  We're going to keep

3        going till we're done.  We'll go faster if you

4        stop your --

5              MR. ARGENTIERI:  Go faster.

6              MR. SOUTHWELL:  -- your objections to

7        form after every question that are improper

8        and seemingly meant to disrupt the

9        proceedings.

10             If I could have this marked Defendants'

11       Exhibit 46, please.

12             MR. ARGENTIERI:  That's assuming

13       intent, actually not.

14             MR. SOUTHWELL:  Are you admitting to

15       it?

16             MR. ARGENTIERI:  No.  I might learn

17       something.

18             (Defendants' Exhibit 46, document 189,

19       marked for identification.)

20       Q.    I'm showing you Defendants' Exhibit 46,

21     which is a document filed in this case, document

22     189.  I would direct your attention to page 2.

23     There is a section here that relates to paper

24     testing, which in the second -- I'll just read it.

25             Paper tests can be performed to confirm

1                      Aginsky

2    the consistency of two pieces of paper.  Valerie

3    Aginsky confirmed that the two pieces of paper,

4    page 1 and page 2, of the Facebook contract are

5    identical.

6          Did I read this Defendants' Exhibit 46

7    correctly?

8          A.    Yes, other than my name, everything

9    else is correct.  My name is Valery, not Valerie.

10         Q.    Valery.  Excuse me.  Thank you.

11         So this section of this brief stating

12   that you, Dr. Aginsky, confirmed the two pieces of

13   paper, page 1 and page 2, of this Facebook

14   contract are identical, that is not accurate.  Am

15   I right?

16         MR. ARGENTIERI:  Objection as to form.

17         A.    It's not accurate, no.

18         Q.    Now let's turn back to your

19   declaration.  In paragraph 9 you describe your

20   finding with respect to ink.  Specifically you

21   state, Based on my visual and microscopic UV, IR

22   absorption, and IRL examinations of the agreement,

23   I found no discernible difference in ink used to

24   write the interlineation on page 1 of the

25   agreement and to sign and date the agreement on

1              Aginsky

2    page 2.

3              Did I read that correctly?

4         A.    Yes.

5         Q.    Now, to be clear again, when you say

6    you found no discernible difference, you mean, as

7    you testified, that the inks could not be

8    differentiated at the particular level of analysis

9    that you conducted, which was a visual

10   examination; correct?

11             MR. ARGENTIERI:  Objection as to form.

12        A.    That's correct.

13        Q.    It's possible that chemical analysis

14   could reveal differences; right?

15             MR. ARGENTIERI:  Objection.

16        A.    Of course.

17        Q.    It's possible, for example, TLC

18   analysis could reveal the existence of different

19   colorant components among the inks; correct?

20             MR. ARGENTIERI:  Objection.

21        A.    Yes.

22        Q.    It's also possible GC/MS could reveal

23   other differences in the other components of the

24   inks; correct?

25        A.    Correct.

1                          Aginsky

2          Q.    In fact, later in your declaration you

3     state TLC and GC/MS should be used to learn more

4     about the inks; right?

5          A.    Yes.

6          Q.    So the findings of no discernible

7     difference does not mean the ink used in the

8     interlineation and signatures is the same ink;

9     correct?

10               MR. ARGENTIERI:  Objection to form.

11         A.    Of course.  The level of analysis

12    doesn't allow us to say that the ink is the same.

13         Q.    So to characterize your findings with

14    respect to the ink as confirming that all of the

15    ink on the "work for hire" document is the same

16    ink would be a mischaracterization of your

17    finding; correct?

18               MR. ARGENTIERI:  Objection as to form.

19         A.    That's correct.

20         Q.    Now let's turn back here to Defendants'

21    Exhibit 46, directing your attention to the middle

22    paragraph just right after where I read before.

23               MR. ARGENTIERI:  Page 2?

24         Q.    Yeah, in the middle after doc 56 after

25    paragraph 8.  It starts, He, meaning Valery

```
 1                         Aginsky
 2     Aginsky, confirmed that the ink used to compose
 3     interlineations on page 1 of the agreement was the
 4     same ink used to date the Facebook contract on
 5     page 2.
 6               Did I read that section of the brief
 7     correctly?
 8          A.    Yes.
 9          Q.    And that section of this brief is not
10     an accurate representation of your findings;
11     correct?
12               MR. ARGENTIERI:  Objection as to form.
13          A.    That's correct.
14          Q.    This is in fact a mischaracterization
15     of your findings; right?
16               MR. ARGENTIERI:  Objection as to form.
17          A.    Yes.
18          Q.    Let's turn back in your declaration to
19     paragraph 9.  You describe your finding regarding
20     toner, and specifically you state -- sorry, 10,
21     you state, Based on my visual, microscopic, UV, IR
22     absorption, and IRL examinations of the agreement,
23     I found no discernible difference in the toner on
24     page 1 and 2 of the agreement.
25               And again, finding no discernible
```

1                        Aginsky

2     difference simply means you could not

3     differentiate it at this particular level of

4     analysis, meaning a visual inspection; correct?

5               MR. ARGENTIERI:   Objection to the form.

6          A.   Yes, visual and microscopic, correct.

7          Q.   Thank you.

8               And again, it's possible that chemical

9     analysis such as TLC or GC/MS could reveal

10    differences in various aspects of the toner;

11    correct?

12              MR. ARGENTIERI:   Objection as to form.

13         A.   That's correct, that is what I do

14    typically.  I always reveal differences in toner

15    which are not distinguishable at the level of

16    optical analysis by using GC/MS, TLC, and FT-IR

17    microscopy.

18         Q.   Now, prior to submitting the

19    declaration, had you ever reviewed Larry Stewart's

20    analysis of the toner in this case?

21         A.   I had never reviewed anything that was

22    done by Larry Stewart in this case.

23         Q.   So either before, after, or at any time

24    you've never reviewed anything that Mr. Stewart

25    submitted with respect to analysis of toner;

                              Aginsky

1                            Aginsky

2   correct?

3        A.    That's correct.

4        Q.    So I guess it goes without saying that

5   in making your findings you are not confirming any

6   of Mr. Stewart's findings; correct?

7              MR. ARGENTIERI:  Objection.  Objection.

8        A.    Yes, of course I cannot confirm

9   something that I had never reviewed.  And I

10  understand that my analysis was before his

11  analysis, so I couldn't confirm any analysis that

12  was not done at that time.

13       Q.    So to say that the findings contained

14  in paragraph 10 of your report confirm

15  Mr. Stewart's TLC analysis would not be an

16  accurate statement of your findings; right?

17             MR. ARGENTIERI:  Objection as to form.

18       A.    I agree.

19       Q.    I want to understand a little bit more

20  about what it's in and what is not included in

21  your declaration.  So to be clear, you do not

22  conclude in your declaration that the "work for

23  hire" document is a genuine document; right?

24       A.    That's correct.

25       Q.    You wouldn't say that your findings

1                          Aginsky

2     conclusively establish the authenticity of the

3     "work for hire" document; right?

4              MR. ARGENTIERI:  Objection.

5        A.    That's correct.

6        Q.    You do not conclude that it was

7     actually signed on April 28th, 2003; right?

8              MR. ARGENTIERI:  Objection as to form.

9        A.    That's correct.

10       Q.    Other than the date written on the

11    signature lines, you did not find forensic

12    evidence that it was actually signed on April

13    28th, 2003; correct?

14             MR. ARGENTIERI:  Objection.

15       A.    Correct.

16       Q.    You did not conduct any ink-dating

17    tests of the document?

18             MR. ARGENTIERI:  Objection.

19       A.    I did not.

20             (Discussion off the record.)

21             MR. SOUTHWELL:  Do you have a basis for

22        these objections or are you just doing it for

23        some other reason?

24             MR. ARGENTIERI:  Yeah, I have a basis.

25        It's an objection.

1                   Aginsky
2             MR. SOUTHWELL:  What's your basis?
3             MR. ARGENTIERI:  What, the last
4        question?
5             MR. SOUTHWELL:  Yeah.
6             MR. ARGENTIERI:  You mean this is the
7        part where you really want to ask my opinion
8        rather than ignoring it before?  I mean --
9             MR. SOUTHWELL:  I'd like to know if you
10       actually have a legitimate basis or you're
11       simply saying "objection" after every question
12       to be an obstructionist.
13            MR. ARGENTIERI:  The basis is you're
14       asking him a question about analysis about
15       genuineness of things and you haven't
16       developed -- whatever.  Let's move on.
17            MR. SOUTHWELL:  All right.  I'll take
18       that as a no basis.
19            MR. ARGENTIERI:  No.
20       Q.    Dr. Aginsky, you did not conclude that
21   the document was actually signed by Mark
22   Zuckerberg or Paul Ceglia; correct?
23       A.    That's correct, and I am not a
24   handwriting expert.  I am not qualified to come to
25   any conclusions regarding who signed the document.

1                           Aginsky

2        Q.    Right.   You did not examine the ink

3    handwriting in any way; right?

4        A.    I did not.

5              MR. ARGENTIERI:  Objection.  The basis

6        is he looked at the ink -- when you ask a

7        question in that manner, the basis is you're

8        assuming things that he said -- go ahead.

9        Just so --

10             MR. SOUTHWELL:  He answered the

11       question.

12             MR. ARGENTIERI:  I can state my basis,

13       but I object to the way you ask these

14       questions.

15             MR. SOUTHWELL:  That's fine.

16             MR. ARGENTIERI:  They are generalized

17       questions.  He's giving you generalized

18       answers.

19             MR. SOUTHWELL:  Are you done,

20       Mr. Argentieri?

21             MR. ARGENTIERI:  Yeah, I'm done.

22       Q.    Now, Dr. Aginsky, we discussed a little

23   earlier how the "work for hire" document was

24   faded, the ink was faded, and the document was

25   discolored when it was presented to defendants.

1                         Aginsky
2    And you understand that it is defendants' position
3    that Mr. Ceglia or someone working with him
4    damaged the document prior to its production to
5    the experts.
6               Do you remember we talked about that?
7         A.    I remember talking about that.
8         Q.    And I understand as part of your
9    examination you illuminated the "work for hire"
10   document with UV lamps of varying wavelengths;
11   right?
12        A.    Yes.
13        Q.    During your UV examination, did you
14   observe the back of the document fluoresce any
15   differently than the front?
16        A.    No.
17        Q.    Did you observe the front fluoresce
18   dully or was it fluorescing --
19             MR. ARGENTIERI:  Objection.
20        Q.    Strike that.
21             Did you observe normal fluorescence
22   that one might expect from a white piece of paper
23   with optical brighteners on both the front and
24   back?
25             MR. ARGENTIERI:  Objection.

1                        Aginsky

2        A.    Yes.  And actually I have -- on my work

3    notes I have the actual color of the fluorescence

4    of the page.

5              MR. SOUTHWELL:  Let's mark this,

6         please, as the next exhibit.

7        Q.    And I will hand you back your

8    originals, and then we will have marked this as

9    the next exhibit and discuss it with you.

10              (Defendants' Exhibit 47, handwritten

11         work notes of Aginsky, marked for

12         identification.)

13        Q.    So that is now marked as Defendants'

14    Exhibit 47.  These are your two pages of what

15    you've referred to as your work notes that we made

16    a copy of over the lunch break; is that correct?

17        A.    Yes.

18        Q.    And what was your observation about

19    fluorescence with respect to the two-page "work

20    for hire" document?

21        A.    On the first page you can see the word

22    "paper" then two arrows, P1 and P2, which relates

23    to page 1 and page 2.  And then there is the word

24    "blue" on the page 1 and page 2, and that relates

25    to UV 254.  254 nanometers is a short-wave UV

1                          Aginsky

2    light which is used to -- was used to illuminate

3    the page, both pages.

4              So the pages on the face and on the

5    back, they are being illuminated with this UV

6    light with the 245 nanometers that's wavelengths.

7    They showed blue fluorescence or luminescence, so

8    both face and back.

9              When I switched from short-wave to

10   long-wave fluorescence -- and that's the UV 366

11   nanometers -- the fluorescence of the paper

12   changed to blueish white.  And it was bluish white

13   for both pages on the face and on the back.

14       Q.    Did you observe any uneven fluorescence

15   or anomalies in the fluorescence in any part of

16   the pages?

17              MR. ARGENTIERI:  Objection to the form.

18       A.    No, I didn't observe any changes in the

19   fluorescence pattern along the page.  If I did, I

20   would take a picture and I would take a note.

21       Q.    Now, in your interrogatories,

22   Defendants' Exhibit 44 that you have in front of

23   you, you described on page 6 -- sorry -- yes, on

24   page 6, which in the top right corner is page 9 of

25   38.

                              Aginsky

1                              Aginsky
2                You described here the various UV
3    analyses that you did on the "work for hire"
4    document; is that right?  Why don't you take a
5    minute to read through the two paragraphs under
6    answer on the top of page 6.
7         A.    Is that my declaration?
8         Q.    No, the interrogatory answers.
9               MR. ARGENTIERI:  The interrogatory
10        answers.
11        A.    I'm sorry.
12        Q.    Defendants' Exhibit 44.  That's it.
13              So page 6 as it reads on the bottom,
14   the top half of the page has this answer.  Do you
15   see that?  If you could just read that, please, to
16   yourself.
17        A.    The first paragraph?
18        Q.    Both the first and the second.
19              (Pause.)
20        A.    Yes.
21        Q.    Do these two paragraphs on page 6 of
22   Defendants' Exhibit 44 accurately represent -- or
23   accurately portray all of the UV examination of
24   the "work for hire" document, including the
25   different wavelengths you used and the amount of

1                        Aginsky

2    time that you exposed the document to UV?

3              MR. ARGENTIERI:   Objection.

4         A.    Yes.

5         Q.    Now, in addition to this UV

6    illumination and the other nondestructive visual

7    examination you did, did you conduct an ESDA

8    examination?

9         A.    No, I did not.

10        Q.    Did you do an examination with side

11   lighting at all?

12        A.    I typically do, and I didn't mention it

13   as a separate type.  But when I -- when I said

14   that I examined paper, when you asked me about the

15   thickness of the paper, and I used the magnifying

16   glasses, I also used a source of light.

17              And of course it was done under the

18   sharp angle.  So that can be considered as a side

19   lighting.  And I typically do it -- that's the

20   most effective way to determine the surface

21   texture of the paper or anything -- any material

22   on the paper.

23              So yes, I did.  I did use side lighting

24   examination.

25        Q.    Did you view the document under a

```
 1                          Aginsky
 2    stereomicroscope at all?
 3         A.    No, I did not.
 4         Q.    Now, after these examinations that you
 5    did on July -- sorry, strike that -- January 13th,
 6    2011, did you notice any change in the paper or
 7    ink of the "work for hire" document?
 8               MR. ARGENTIERI:  Objection to the form.
 9         A.    No, nothing was -- nothing changed
10    during my examination on that date.
11         Q.    And as a result of the examinations you
12    performed, including this UV illumination for the
13    times that you detailed here in your answers to
14    interrogatories, Defendants' Exhibit 44, would you
15    expect there to be a change or damage to the paper
16    or ink?
17               MR. ARGENTIERI:  Objection.
18         A.    No, I wouldn't expect any damage to the
19    ink, any fading or any damage to the paper based
20    on the amount of exposure that I used because this
21    is what I typically do and what -- I shouldn't --
22    I cannot say that everybody but that's an accepted
23    routine in the field of forensic document
24    examination.
25               During that type -- during that --
```

1                          Aginsky

2    using those types of analysis, it is not possible

3    to damage the document.  If it was damageable to

4    the document, that would be reflected in ASTM

5    standard or other publications recommending not to

6    use a particular technique because it's too

7    damageable for a document.

8         Q.    So based on the amount of time that you

9    used the equipment that you've detailed, you were

10   not worried about damaging the document; correct?

11              MR. ARGENTIERI:  Objection.

12        A.    That's correct.

13        Q.    I want to talk about the kinds of

14   chemical analysis that can be used to date

15   ballpoint inks, and we've talked about that a

16   minute.

17              Actually, let's take a moment to take a

18   break, a short bathroom break.  We're getting

19   close to the end.

20              THE VIDEOGRAPHER:  Off the record

21        p.m.

22              (Recess taken from 3:16 to 3:37.)

23              THE VIDEOGRAPHER:  Going back on the

24        record at 3:37 p.m.

25        Q.    Dr. Aginsky, let's turn to talk about

1                          Aginsky

2    the kinds of chemical analysis that can be used to

3    date ballpoint ink.  Are you familiar with the

4    term "static method" and "dynamic method"?

5         A.    Yes.

6         Q.    Can you tell us the distinction between

7    the two?

8         A.    The static approach includes methods

9    that analyze the composition of inks, of an ink,

10   to determine -- first of all to identify formula

11   of an ink and to determine when this particular

12   formula or formulation was first manufactured,

13   first came into existence.

14              Therefore, for example, if a document

15   dated, say, ten years ago bears ink that was first

16   manufactured five years ago, that would mean that

17   the document could not be repaired or signed ten

18   years ago because the ink was not -- didn't exist

19   at that time.

20              And the same relates to other

21   materials, paper.  When paper first came into

22   existence or any other material, including toner,

23   ink jetting, or stamp padding.

24        Q.    And for a dynamic method, it's not

25   necessary to identify an ink prior to doing the

1                          Aginsky

2    chemical testing; right?

3               MR. ARGENTIERI:   Objection as to form.

4         A.    If we consider the population of

5    ballpoint inks, then you know that to determine or

6    to evaluate the approximate age of ink on a

7    document based on the particular ink-aging

8    parameters that are measured, it is not necessary

9    to identify the formulation of this ink to

10   determine when this ink or approximately was

11   placed on the document.

12              In other words, if the ink is aging and

13   the document is dated several years ago and it is

14   known that no ink would continue aging if it's

15   older than two years, then if the methodology was

16   applied correctly then that would mean that the

17   ink is younger than it purports to be.

18        Q.    Now, through your deposition you've

19   discussed both thin-layer chromatography, TLC, or

20   gas chromatography/mass spectrometry.   Those

21   methods are widely accepted for use on inks;

22   correct?

23              MR. ARGENTIERI:   Objection.

24        A.    Yes, they are used all over the world.

25   Again, if used properly, the methods are very

1                    Aginsky
2   reliable for ink analysis and comparison.  And
3   this is why they are part of at least two ASTM
4   standards that relate to ink comparison and ink
5   identification.
6        Q.    So it's not a problem to use GC/MS
7   testing on ink; right?
8             MR. ARGENTIERI:  Objection as to form.
9        A.    No, GC/MS is an analytical method which
10  is very reliable and, as I said, used all over the
11  world, not only in forensic labs but in many areas
12  of human activity, like food analysis,
13  pharmaceutical analysis, and many other types of
14  analysis.
15            And the method is most useable
16  analytical method, probably the most useable in
17  the world, as an analytical technique.  We're not
18  talking about a specific procedure, but as a
19  method it's very reliable.
20       Q.    So someone who said it was a problem to
21  use GC/MS testing on ink, that it should only be
22  used for research and not, for example, casework,
23  you would not agree with that; right?
24            MR. ARGENTIERI:  Objection as to form.
25       A.    It depends on what someone that you

1                          Aginsky

2    mentioned meant by this.  GC/MS as an analytical

3    method, as I said, is very reliable, and there are

4    a lot of publications, books, devoted to this

5    method.

6              But this method, analytical method, can

7    be used as a basis for many procedures, specific

8    procedures, like the analysis of pesticides in

9    milk using GC/MS or the analysis of comparison of

10   ink by GC/MS or determine the age of ink using

11   GC/MS.

12             Depending on what that someone that you

13   mentioned meant, that would -- I mean, in other

14   words, the criticism or should be more specific

15   for me to answer this question.

16        Q.    Fair enough.  But GC/MS testing on ink

17   is commonly accepted and used for casework

18   regularly; is that right?

19             MR. ARGENTIERI:  Objection as to form.

20        A.    Yes, the GC/MS analysis of ink and

21   comparison of ink is a part of ASTM standard.  If

22   probably -- if you're asking me about the use of

23   GC/MS for ink aging, if this is the question, then

24   I would answer.

25        Q.    I'm getting to that.

1                        Aginsky

2              So GC/MS is commonly used to analyze

3      noncolorant components of ink, such as solvents or

4      resins; right?

5              MR. ARGENTIERI:  Objection.

6        A.    Yes, that's correct.

7        Q.    And one solvent that can be measured

8      with GC/MS is 2-phenoxyethanol, or PE; correct?

9        A.    Yes.

10        Q.    And a fundamental aspect of GC/MS

11      analysis is that it's important to get good

12      chromatography; right?

13              MR. ARGENTIERI:  Objection as to form.

14        A.    Yes, the analysis should be conducted

15      at a sufficient proficient -- level of

16      proficiency.  In other words, the analyst should

17      be experienced enough to use GC/MS, and he or she

18      should know very well the capabilities and

19      limitations of the GC/MS analysis as well as he or

20      she should know very well the ink chemistry and

21      specifically the composition of inks and how to

22      take samples properly for the analysis, samples of

23      ink for the analysis.

24        Q.    The phrase that I used of "good

25      chromatography," that generally means getting good

1                          Aginsky

2   peak shape and good resolution when doing GC/MS

3   analysis; right?

4              MR. ARGENTIERI:  Objection as to form.

5       A.    Yes, this is one of the aspects of the

6   analysis if we have -- let's say, as an example,

7   if we analyze cheese or perfume which contains two

8   or three hundred components, constructible and

9   analyzable by GC/MS, the analysis should be

10  conducted at a level that would allow to separate

11  all of those components.

12              For this reason the peak shape should

13  be -- should not be a tailing; it should be a

14  symmetrical, sharp, triangle.  So each peak should

15  be represented by a symmetrical, sharp, triangle.

16      Q.    If one obtains good chromatography in

17  whatever the analysis is, that's important for

18  sound results; is that right?

19      A.    Yes, without good chromatographic

20  separation, it is generally impossible to get a

21  reliable result.

22      Q.    Now, different labs could test the same

23  component and use slightly different parameters,

24  such as pressure or timing or temperature, and

25  still get good chromatography; right?

1                          Aginsky

2               MR. ARGENTIERI:  Objection as to form.

3          A.    Yes, that's correct.  In other words,

4     the same procedure can be used by many labs in

5     different countries, and they might use different

6     brand names.  But the results are supposed to be

7     very similar.  The level of their proficiency is

8     similar.

9          Q.    So labs might not use the exact same

10    step-by-step methods but still obtain good

11    chromatography and therefore sound results in

12    their analysis; right?

13              MR. ARGENTIERI:  Objection.

14         A.    Yes, that's correct.  In other words,

15    in order to get from Town A to Town B, we could

16    use Ford or we could use Maserati.  It doesn't

17    matter what we use.  If we are good drivers, we

18    will be there.  It will be simply different time

19    it will take.

20         Q.    As long as you're doing good chemistry,

21    the settings of the machine or the process or the

22    steps could be slightly different.  You'll still

23    get to the same sound result if you do good

24    chemistry.  Is that another way of saying it?

25              MR. ARGENTIERI:  Objection to form.

1                     Aginsky

2        A.    Yes.

3        Q.    Now, you stated in your June 2011

4    declaration and you've mentioned earlier here

5    about the fact that ballpoint ink's age on paper

6    within two years and they age at a rate that can

7    be measured; right?

8        A.    Yes, up to two years.

9        Q.    Up to two years.

10       A.    It could be much less than that, but

11   never longer than two years.

12       Q.    And it's correct that some inks,

13   ballpoint inks, might age more quickly, and some

14   might be slower, but that rate can be measured and

15   it's not longer than two years; right?

16       A.    Yes.

17       Q.    Yes.  Okay.

18       A.    This parameter that is measured for --

19   for the first method I mentioned, SCT, sequential

20   construction technique, this parameter can be

21   measured for up to two years if the ink continues

22   aging during up to two years.

23       Q.    Right.

24       A.    Or the solvent loss ratio method, this

25   parameter can be measured up to approximately one

```
 1                        Aginsky
 2  year and a half.
 3       Q.    In running a PE-based ink-aging
 4  analysis, first one has to determine whether the
 5  particular ink formulation contains PE; right?
 6       A.    Yes.
 7       Q.    And it's not necessary to match a
 8  particular formulation of ink with a known ink in
 9  order to determine if it contains PE; correct?
10            MR. ARGENTIERI:  Objection as to form.
11       A.    That's correct.
12       Q.    If the ink formulation is found to
13  contain PE through a full-scan GC/MS run, then
14  it's possible to conduct the ink-aging analysis of
15  PE assuming there's a sufficient amount of PE;
16  right?
17            MR. ARGENTIERI:  Objection.
18       A.    Yes.
19       Q.    And as you testified, inks generally --
20  or ballpoint inks generally age for up to two
21  years if -- sorry, strike that.
22            If you were given a hypothetical of a
23  particular percentage finding about the amount of
24  evaporation of PE from ink, there are a number of
25  other things you would want to know about the ink
```

1                          Aginsky

2    on the document and the methodology before making

3    a conclusion about what that meant about how old

4    the ink is; is that right?

5              MR. ARGENTIERI:   Objection as to form.

6         A.     In order to determine how old the ink

7    is, the ink -- it should be a ballpoint ink.  It

8    should contain PE, sufficient amount for the

9    analysis.  And the ink-aging parameter that is

10   measured should change.

11             If it's changing, it shows that the ink

12   is aging.  Then depending on the extent at which

13   the parameter is changing, it is possible to

14   determine the time frame within which the ink has

15   been place on the document, assuming the

16   conditions of storage were normal.

17             So, for example, for the solvent loss

18   ratio method, it is possible to determine that the

19   ink is younger than six months if the parameter --

20   it is called R, R percentage -- if that

21   parameter -- if the results obtained for the

22   questioned ink exceeds 50 percent.

23        Q.     And if you were asked just generically

24   about a percentage that is above 50 percent, would

25   that be sufficient for you to conclude that the

1                        Aginsky

2     ink is less than six months old or are there other

3     pieces of information that you would need?

4          A.    I mentioned just solvent loss ratio

5     method.  As I said, I typically use both,

6     sequential construction technique and solvent loss

7     ratio method.  So if both methods would show the

8     result that the ink is aging at a rate showing the

9     ink is younger than six months, then my conclusion

10    will be that the ink is younger than six months.

11             It should be a conditional conclusion

12    because it depends on the storage conditions.

13    What I mentioned sometime at the beginning of this

14    deposition, if someone would put a document in the

15    freezer, then the document which is actually one

16    year old might show the result as if it is younger

17    than six months, simply because it was -- it

18    didn't -- it didn't age at a normal rate; it was

19    aging at a slower rate in the freezer.

20             And vice versa:  If the document was

21    somewhere in middle of the desert in the trunk of

22    a car, then it might look as if it is

23    completely -- the ink has completely aged, aged

24    out.  But in fact the actual age of the ink could

25    be six months.

1                          Aginsky

2              But it may look as if it's completely

3    aged, and the conclusion would be that -- actually

4    it is more difficult to opine in a situation when

5    the ink is not aging.  We cannot say for sure that

6    the document is older than six months or older

7    than two years.

8              It's a conditional conclusion, provided

9    that the document had been stored at normal

10   conditions, the ink is at least six months old

11   if -- if the ink is not aging.  Or it could be

12   older than two years if it's a slow-aging ink.

13        Q.    Right.  And you mentioned if it was --

14   in your hypothetical example the document had been

15   kept in the freezer for a year, it would actually

16   be in freezer for an entire period of a year, that

17   might slow the evaporation process and affect the

18   results?

19        A.    Yes, for sure it will slow -- it's not

20   even the evaporation what is important.  What's

21   important is the -- how the resin -- one of the

22   three major components of ballpoint ink, how this

23   resin is changing over time.

24              Resin is a matrix.  With time, after we

25   have placed ink on paper, the resin -- the ink --

1                        Aginsky

2    the PE or other solvents, they became evaporating,

3    and the resin becomes -- there are some physical

4    and chemical processes, one of which is

5    polymerization.

6              Just for simplicity, if we consider

7    only polymerization process.  So the resin starts

8    polymerizing, and this process can stop as quickly

9    as after six months or it can stop as long as two

10   years.

11             This is what important, not how much of

12   PE is in the ink but how old the resin is.

13        Q.    Right.  And as I think you mentioned,

14   what's also relevant here is whether the ink is

15   slow aging or -- slow drying or fast drying;

16   right?  That's also a factor that would enter into

17   that kind of conclusion; right?

18        A.    Yes, the rate at which resin is

19   polymerizing is -- it could be as slow-aging ink

20   or fast-aging ink.

21        Q.    When you're talking about the lost

22   solvent method, when you're measuring a PE loss

23   ratio, what you're measuring is the amount of PE

24   that was present at the ink at the time of testing

25   and comparing it to the amount of ink present in a

```
 1                          Aginsky
 2   sample after heating; is that right?
 3        A.    Yes.
 4        Q.    So it's not necessary for the test to
 5   know how much PE was in the ink when the pen was
 6   actually put to paper; right?
 7              MR. ARGENTIERI:  Objection.
 8        A.    That's correct, it doesn't matter how
 9   much PE was there.  Assuming that the PE wasn't
10   one of the major solvents, that's what important.
11   Sometimes PE is just a subsidiary, is almost like
12   an impurity to a major solvent, which could be
13   benzoyl alcohol or something like that.
14              But in most ballpoint ink formulations,
15   PE is a major solvent, and it doesn't matter what
16   was the absolute amount of PE used by the ink
17   manufacturer.  It doesn't matter.
18        Q.    And the PE loss ratio does not tell one
19   anything about how much PE was in the ink
20   formulation when the pen was put to paper;
21   correct?
22              MR. ARGENTIERI:  Objection as to form.
23        A.    No, the solvent loss ratio method
24   measures a specific ink-aging parameter that
25   doesn't relate at all to the initial concentration
```

```
 1                        Aginsky
 2   of PE in the fresh ink.
 3        Q.    And you mentioned sort of in the course
 4   of this discussion the storage conditions, and you
 5   have no knowledge about what the storage
 6   conditions were of the "work for hire" document;
 7   correct?
 8        A.    That's correct.
 9        Q.    And you have no knowledge about what
10   the circumstances of execution of this purported
11   document are; correct?
12              MR. ARGENTIERI:   Asked and answered.
13        A.    That's correct.
14        Q.    When I think you testified you spoke
15   with Mr. Ceglia about three weeks ago, did the
16   topic of the storage conditions and what the
17   storage conditions were come up in that
18   conversation?
19        A.    Three weeks ago?  No.
20        Q.    Did that topic come up when you first
21   met with him in January of 2011?
22        A.    No.
23        Q.    Can you pull out your interrogatory
24   answers again.  Give me just a moment to put my
25   hands on it.
```

1                          Aginsky

2              (Pause.)

3      Q.    Can you turn to your response to

4   Interrogatory 10, which is on the last page, page

5   9.  And you testified about this earlier, but I

6   want to ask you some questions about this.

7              You say that you had -- on July 25th

8   you were e-mailed five images, PDF of the evidence

9   copies of portions of the document that had been

10  taken by Mr. Jerry LaPorte using a Foster &

11  Freeman video spectral comparator.

12             That's your answer in this

13  interrogatory; right?

14     A.    Yes.

15     Q.    And what is your -- well, who e-mailed

16  those to you?  Did Mr. LaPorte e-mail them to you

17  or someone else?

18     A.    No.

19     Q.    Do you recall who e-mailed them to you?

20     A.    This is what I said I need to double-

21  check.  I have this e-mail, and I will find out.

22     Q.    Okay.  Let's put another blank in the

23  transcript and you can try to find that one out as

24  well, please.

25  TO BE FURNISHED:  _____

1                        Aginsky

2    _____.

3         Q.    What is your basis for saying that

4    Mr. LaPorte took those images?

5         A.    I think there are two bases for this.

6    One is I believe his name was mentioned to me when

7    we discussed the images over the phone.  And

8    second, I saw some notations that were printed by

9    the machine, and I believe this is consistent with

10   the VSC that he is using.

11        Q.    And who are your --

12        A.    I might be wrong, but just to --

13        Q.    I understand that.

14              Who were your discussions with where

15   Mr. LaPorte's name was mentioned?

16        A.    It was the same person who sent me the

17   e-mail.  I will double-check.  I don't remember

18   right as of today.

19        Q.    You understand that pictures -- that

20   the images were taken on July 25th of 2011; is

21   that right?

22              MR. ARGENTIERI:  Objection as to form.

23        It says he was e-mailed that but...

24        A.    Yes, I was given -- I received the

25   images.  They were e-mailed to me on that -- on

```
 1                        Aginsky
 2   that date, July 25th.
 3        Q.    Right.  So you got the e-mail on July
 4   25th.  Are you aware of the fact that there was an
 5   inspection of the "work for hire" document on July
 6   25th, 2011?
 7        A.    I was aware that there was an
 8   inspection in July, sometime in July.  As of
 9   today, I don't remember if I knew that exactly on
10   that date there was an inspection of the document.
11        Q.    Are you aware that the inspection of
12   the documents was videotaped?
13        A.    Again, I don't remember for sure.  I
14   assume that in a case like this everything should
15   be videotaped.
16        Q.    Are you absolutely sure that these were
17   images taken by Mr. LaPorte?
18             MR. ARGENTIERI:  Objection.  You
19        mean -- objection as to -- we've already gone
20        through the stipulation.  He's just going to
21        give us the PDF.  I don't know how you want
22        him to answer a question he already said he's
23        got to look at the PDF.  I mean...
24             MR. SOUTHWELL:  It's just that
25        Mr. LaPorte was actually not there on the 25th
```

1                        Aginsky

2       and --

3       Q.    Let me ask you this:  Are you aware

4    that a review of the video would show it was

5    Mr. Speckin who was taking images of the document

6    on July 25th using VSC and not Mr. LaPorte?

7             MR. ARGENTIERI:  Objection to the form

8       but if he knows.

9       A.    Yes, it could be.  I think the basis

10   for me to put Mr. LaPorte's name here was, number

11   one, that I most probably was told that it was

12   him; and number two, as I said, the images were

13   consistent -- the titles or what was printed under

14   the images, it was consistent with what I

15   typically see when I review his images.

16            But of course anybody else could use

17   similar equipment, and that would be the same type

18   of printing under the images.

19      Q.    And to be clear, the printing under the

20   images is reflective of the model number of the

21   VSC, not -- there's not some indicator that it's

22   like Jerry LaPorte's VSC; right?

23      A.    Yes, that's correct, that's the model

24   number of VSC.

25      Q.    If someone else was using the same

```
 1                            Aginsky
 2     model VSC, you would perhaps see the same legends?
 3          A.    Yes, that's correct.
 4          Q.    We have up here, which I'm going to
 5     show you, a few VSC printouts that were obtained
 6     in discovery from Mr. Speckin.  We're going to put
 7     up on the screen VSC printout 005, and the camera
 8     can capture that.  I want to ask if you can
 9     recognize these as the images that you saw that
10     you're referring to here in your answer to
11     Interrogatory Number 10.
12          A.    It looks very familiar to what I -- to
13     what -- to one of the five images that I was --
14     that I received via e-mail.
15          Q.    Okay.  Let's look at VSC printout 004,
16     and I'll ask you, after looking at that, whether
17     that also looks familiar to the ones that you
18     received in e-mail on July 25th, 2011.
19          A.    From my memory, it looks familiar, yes.
20          Q.    Okay.  VSC printout 003.
21          A.    It looks familiar.
22          Q.    Just while we're on this image of VSC
23     003, do you see those sort of whitish rectangular
24     pieces there?  When you observed the "work for
25     hire" document, you didn't see anything that
```

1                         Aginsky

2      looked like that; correct?

3                MR. ARGENTIERI:  Objection to form.

4           A.    That's correct.

5           Q.    Let's look at VSC printout 002.  Does

6      that look familiar?

7           A.    It looks familiar.

8           Q.    You're now looking at VSC printout 001.

9           A.    Yes, this is -- looks familiar, yes.

10          Q.    All of these look familiar in relation

11     to what you got by e-mail on July 25th, 2011; is

12     that right?

13          A.    Yes.

14               MR. SOUTHWELL:  Let's take a quick

15          break.  I think we're almost done.

16               MR. ARGENTIERI:  Another break?

17               MR. SOUTHWELL:  Yep.

18               THE VIDEOGRAPHER:  Off the record

19          p.m.

20               (Recess taken from 4:07 to 4:16.)

21               THE VIDEOGRAPHER:  Back on the record

22          4:16 p.m.

23          Q.    So, Dr. Aginsky, you were asked some

24     questions before the break about your answer to

25     Interrogatory Number 10, which has been submitted

1                       Aginsky

2    to the court, and the reference here to PDF copies

3    of portions of the document that have been

4    captured, as you stated, by Mr. Jerry LaPorte

5    using a Foster & Freeman VSC; right?

6         A.    Yes.

7         Q.    And if you determined that those were

8    not images taken by Mr. LaPorte, do you agree that

9    it's appropriate to clarify this interrogatory so

10   that the court is not under the incorrect

11   impression?

12        A.    Yes, of course.  As I said, I -- I

13   didn't know for a fact that it was Gerald LaPorte,

14   so I just assumed, based on the information that I

15   received, and based on what I said I think it was

16   consistent with the equipment that he typically

17   uses.

18        Q.    I understand.  And you're going to go

19   back and check.  And if it turns out that it

20   wasn't, you'll correct this interrogatory;

21   correct?  Yes?

22        A.    Yes.  I don't know how and what should

23   I prepare another document?

24             MR. ARGENTIERI:  Yeah, we can help you

25        with that, amend it, just amend the

1                          Aginsky

2          interrogatory.

3          Q.    Yeah, I think you can simply amend this

4     answer and sign it, and that will probably do.

5                MR. ARGENTIERI:  And his explanation

6          won't need anything further just to change the

7          answer.  We'll find out.  He has to go back

8          and look at the images.

9          Q.    Is there anything else that you've

10    testified to today that upon reflection you would

11    like to clarify or modify?

12               MR. ARGENTIERI:  Do you want the

13         testimony read back, Doctor, the whole day?

14         A.    No, I think -- I don't remember

15    anything that I would like to clarify or amend.

16               MR. SOUTHWELL:  Okay.  Nothing further

17         at this time.

18               MR. ARGENTIERI:  And I have no

19         questions, and I believe -- Dean, you don't

20         have any questions, do you?

21               MR. BOLAND:  No, no, we have no

22         questions.

23               MR. ARGENTIERI:  No questions.

24               MR. SOUTHWELL:  Thank you, Dr. Aginsky,

25         then.  We're done.

1                    Aginsky

2         THE WITNESS:  Thank you.

3         THE VIDEOGRAPHER:  Going off the record

4    4:18 p.m.  This is the end of Disk 3 and

5    concludes today's deposition of Valery

6    Aginsky.

7         (Time noted:  4:18 p.m.)

8              _____

9              VALERY N. AGINSKY

10

11  Subscribed and sworn to before me

12  this ___ day of _____ 2012.

13

14  _____

15         NOTARY PUBLIC

16

17

18

19

20

21

22

23

24

25

Page 194

1

2              C E R T I F I C A T E

3    STATE OF NEW YORK      )

4                          : ss.

5    COUNTY OF NEW YORK     )

6

7              I, LAURIE A. COLLINS, a Registered

8         Professional Reporter and Notary Public

9         within and for the State of New York, do

10        hereby certify:

11             That VALERY N. AGINSKY, the witness

12        whose deposition is hereinbefore set forth,

13        was duly sworn by me and that such

14        deposition is a true record of the

15        testimony given by the witness.

16             I further certify that I am not

17        related to any of the parties to this

18        action by blood or marriage, and that I am

19        in no way interested in the outcome of this

20        matter.

21             IN WITNESS WHEREOF, I have hereunto

22        set my hand this 13th day of August 2012.

23

24                        _____

25                        LAURIE A. COLLINS, RPR

Page 195

1
2      - - - - - - - - - I N D E X - - - - - - - - - -
3
4      WITNESS:              EXAMINATION BY:           PAGE
5       Valery N.           Mr. Southwell                4
6       Aginsky
7
8      ------------- TRANSCRIPT MARKINGS ---------------
9      DIRECTIONS:
10     MOTIONS:
11     REQUESTS:
12     RULINGS:
13     TO BE FURNISHED:  34:3, 114:10, 133:13, 143:21,
14
15
16     ------------------- EXHIBITS -------------------
17      DEFENDANTS' NO.    DESCRIPTION           PAGE
18
19      Exhibit 42, motion to strike            59
20      declaration of LaPorte
21      Exhibit 43, declaration of Aginsky      78
22      Exhibit 44, interrogatory responses of  89
23      Aginsky
24      Exhibit 45, copy of CD from Aginsky     93
25      Exhibit 46, document 189               153

1

2      Exhibit 47, handwritten work notes of      164

3      Aginsky

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 197

```
 1
 2                      ERRATA SHEET
              VERITEXT REPORTING COMPANY
 3                     1250 Broadway
              New York, New York 10001
 4                   (212) 279-9424
 5    CASE:  Ceglia v. Zuckerberg
      DEPOSITION DATE:  August 9, 2012
 6    DEPONENT:  Valery N. Aginsky
 7    PAGE/LINE(S)/    CHANGE            REASON
 8    ____/_____/_____/_____
 9    ____/_____/_____/_____
10    ____/_____/_____/_____
11    ____/_____/_____/_____
12    ____/_____/_____/_____
13    ____/_____/_____/_____
14    ____/_____/_____/_____
15    ____/_____/_____/_____
16    ____/_____/_____/_____
17    ____/_____/_____/_____
18    ____/_____/_____/_____
19    ____/_____/_____/_____
20
                      _____
21                      VALERY N. AGINSKY
22    SUBSCRIBED AND SWORN TO BEFORE ME
      THIS_____DAY OF_____, 2012.
23
24
      _____  _____
25      NOTARY PUBLIC       DATE COMMISSION EXPIRES
```

| & |
| --- |
| **&**   1:20 2:16 18:10 27:16 28:3 80:25 85:10,10,12 185:10 191:5 |

| 0 |
| --- |
| **0.5**   137:8 |
| **001**   190:8 |
| **001.bmp**   103:14 |
| **002**   190:5 |
| **002.bmp**   103:18 |
| **003**   189:20,23 |
| **004**   189:15 |
| **005**   189:7 |
| **00569**   1:7 3:22 |
| **0531.jpg**   100:4 |
| **0531.jpg.**   97:25 |

| 1 |
| --- |
| **1**   22:2 51:8 55:6 86:22 104:24 105:6 105:6 122:18 127:15 129:4 149:5 150:23 152:6 154:4 154:13,24 157:3,24 164:23,24 |
| **10**   157:20 159:14 185:4 189:11 190:25 |
| **10001**   197:3 |
| **10166-0193**   2:19 |
| **10:20**   1:17 3:14 |
| **11**   35:24 107:21 108:24 150:24 |
| **114:10**   195:13 |
| **11:00**   36:17 |
| **11:07**   36:17,19 |
| **11th**   78:10 |
| **1250**   197:3 |
| **12:17**   86:22,24 |
| **12:25**   86:24 87:2 |
| **13**   9:14 19:22 20:16 20:18,24 24:18 71:19 109:7 111:8 |
| 113:25 142:10 143:17 |
| **133:13**   195:13 |
| **13th**   21:18 37:6 110:2,12 112:6 113:15,20 116:3 119:16 122:10 129:8 136:18 143:9 168:5 194:22 |
| **14**   141:20 142:17 |
| **143:21**   195:13 |
| **1475**   2:5 |
| **14843**   2:13 |
| **14th**   70:8 75:3,14,23 76:16 112:9 137:23 138:6 |
| **15**   78:22 79:3 137:8 141:20 142:10,17 |
| **153**   195:25 |
| **164**   196:2 |
| **17th**   78:20 |
| **188**   2:12 |
| **189**   153:18,22 195:25 |
| **1997**   60:18,24 |
| **1:10**   1:7 3:22 |
| **1:28**   130:10,12 |
| **1:30**   130:4 |

| 2 |
| --- |
| **2**   22:2 51:9 54:19 55:5 87:3 101:10 104:24 105:9 122:19 127:15 129:4 130:10 146:10 149:7 150:23 152:6 153:22 154:4,13 155:2 156:23 157:5 157:24 164:23,24 174:8 |
| **20**   87:11 152:24 |
| **200**   1:21 2:18 3:16 94:4,16 |
| **2000**   43:3 |
| **2001**   40:2 |
| **2002**   43:3 |
| **2003**   51:3 160:7,13 |
| **2005**   43:19 64:16 |
| **2006**   43:20 |
| **2010**   17:22 20:9 21:14 50:18 88:2 |
| **2011**   8:8 9:3,9 10:2 10:5,8 11:25 12:8 15:17,21 16:10 19:22 20:24 21:14 24:6,20 28:10,23 29:5,11,19 30:6,19 30:25 31:18 33:8 37:6 52:7 54:2 55:8 78:20 92:21 109:8 109:13 110:23 111:8 112:6,9 119:16 131:19 140:3 143:17 168:6 177:3 184:21 186:20 187:6 189:18 190:11 |
| **2011-1-13**   95:6 |
| **2012**   1:16 3:13 32:2 33:9,22 56:15 57:2 59:9 193:12 194:22 197:5,22 |
| **212**   197:4 |
| **22nd**   137:25 138:9 138:17,23 |
| **24**   100:25 102:13 104:10 105:4,16 |
| **245**   165:6 |
| **24th**   17:22 59:9 |
| **25**   152:24 |
| **254**   164:25,25 |
| **25th**   140:3,20 141:3 185:7 186:20 187:2 187:4,6,25 188:6 189:18 190:11 |
| **279-9424**   197:4 |
| **28**   51:3 90:18 |
| **28th**   160:7,13 |
| **2:26**   131:3,5 |
| **2mp**   101:3,5 |
| **2nd**   89:15 |

| 3 |
| --- |
| **3**   59:12,14,15 60:14 60:15,16 87:7 131:6 152:24 193:4 |
| **30**   152:23 |
| **30-45**   130:5 |
| **300**   69:11 94:16 |
| **332**   89:25 |
| **34**   87:23 |
| **34:3**   195:13 |
| **366**   165:10 |
| **38**   165:25 |
| **386**   59:7 |
| **3:16**   169:22 |
| **3:37**   169:22,24 |

| 4 |
| --- |
| **4**   195:5 |
| **40**   105:7 |
| **400**   22:18,18 |
| **40x**   105:7 |
| **42**   58:25 59:2,6 195:19 |
| **43**   78:11,13,15 131:21 141:18 146:2 195:21 |
| **44**   89:18,19,23 93:4 94:2 100:24 165:22 166:12,22 168:14 195:22 |
| **44107**   2:7 |
| **45**   93:6,10 100:5 130:6 195:24 |
| **46**   153:11,18,20 154:6 156:21 195:25 |
| **47**   164:10,14 196:2 |
| **4:07**   190:20 |
| **4:16**   190:20,22 |
| **4:18**   193:4,7 |

**4th** 56:15

**5**

**5** 23:13 24:12 25:8
25:11,16,19 40:6
90:13 93:4,25 96:21
**5,000** 24:23,24
**50** 179:22,24
**500** 69:8
**56** 156:24
**59** 195:19
**5th** 110:23

**6**

**6** 87:7 145:25
146:10 149:5
165:23,24 166:6,13
166:21
**600** 69:9
**66** 78:19

**7**

**7** 79:3 96:21 150:6
**770724** 2:6
**78** 195:21

**8**

**8** 150:20 156:25
**8.5** 150:24
**84** 50:19,24
**89** 195:22

**9**

**9** 1:16 154:19
157:19 165:24
185:5 197:5
**93** 195:24
**9th** 3:13

**a**

**a.m.** 1:17 3:14 35:25
36:19
**aaron** 28:19
**able** 71:14 86:11
133:18 148:17
149:12
**abroad** 69:19

**absence** 35:6
**absolute** 183:16
**absolutely** 57:4
187:16
**absorption** 150:22
154:22 157:22
**academy** 81:8
**accelerate** 72:13,21
**accelerated** 72:3
**accepted** 168:22
171:21 173:17
**accidentally** 12:23
50:3 53:5
**accompanying**
123:16
**accounts** 72:24
73:12
**accurate** 92:5 96:16
100:20 105:18
108:25 154:14,17
157:10 159:16
**accurately** 166:22
166:23
**action** 194:18
**activity** 172:12
**actual** 22:3 128:4,4
129:9 164:3 180:24
**adam** 28:16
**added** 78:18 147:21
148:9 149:2
**addition** 148:9,21
167:5
**additional** 15:9,12
79:12 85:6,13
**admitted** 60:20
**admitting** 153:14
**adopt** 65:4
**advance** 143:17
**advise** 139:25
**affect** 181:17
**affidavit** 41:23
140:18
**affirmative** 56:21
**age** 48:22 66:6 70:15
70:22 72:14,22 73:8

76:24 171:6 173:10
177:5,6,13 178:20
180:18,24
**aged** 71:13,14
180:23,23 181:3
**agencies** 86:5
**agency** 60:23 64:3
82:3 88:11
**ages** 63:19
**aging** 7:17 41:9 45:8
45:16 48:22 50:10
50:11 58:17 63:8,18
64:20 65:2,20 66:22
66:25 68:9 69:10,17
69:22 72:2 83:22
84:17 119:24 120:3
120:16,20 136:24
137:7 171:7,12,14
173:23 177:22
178:3,14 179:9,12
180:8,19 181:5,11
181:12 182:15,19
182:20 183:24
**aginsky** 1:19 3:23
4:1,23 5:1 6:1 7:1
8:1 9:1 10:1 11:1,4
11:14,23 12:1 13:1
14:1 15:1 16:1 17:1
18:1 19:1 20:1 21:1
22:1 23:1 24:1 25:1
26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1
34:1 35:1 36:1,3,20
37:1 38:1 39:1 40:1
41:1 42:1 43:1 44:1
45:1 46:1 47:1 48:1
49:1 50:1 51:1 52:1
53:1 54:1 55:1 56:1
57:1,20 58:1 59:1,5
60:1,18 61:1,3 62:1
63:1 64:1 65:1 66:1
67:1 68:1 69:1 70:1
70:4 71:1 72:1 73:1
74:1,11 75:1 76:1
77:1 78:1,8,14 79:1

79:19 80:1,16 81:1
82:1 83:1 84:1 85:1
85:11 86:1,23 87:1
87:3,5 88:1 89:1,20
90:1 91:1 92:1 93:1
93:11 94:1 95:1
96:1 97:1,7 98:1,8
99:1 100:1,8 101:1
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1
129:1 130:1,11
131:6,13 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1,4,6 146:1
147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1,3,12
155:1 156:1 157:1,2
158:1 159:1 160:1
161:1,20 162:1,22
163:1 164:1,11
165:1 166:1 167:1
168:1 169:1,25
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
185:1 186:1 187:1
188:1 189:1 190:1
190:23 191:1 192:1
192:24 193:1,6,9
194:11 195:6,21,23
195:24 196:3 197:6
197:21

**aginsky's** 60:19,21
60:24 61:2 65:5
**ago** 6:23 7:11,19,21
37:7 45:6 54:14
55:14 61:5 140:23
170:15,16,18
171:13 184:15,19
**agree** 3:10 23:8
67:14 159:18
172:23 191:8
**agreement** 6:4 21:7
22:5,5,8,9,12,14
116:10 146:4,6
149:5,7 150:23
154:22,25,25 157:3
157:22,24
**ahead** 23:5 35:14
48:3 63:4 74:21
89:17 139:20 162:8
**aim** 98:8
**aiming** 96:11 98:9
**al** 3:20 39:14
**alcohol** 183:13
**alex** 4:8 10:25 11:5
11:8 145:6,8,20
**alexander** 2:20
**allcock** 30:3
**allow** 62:24 101:24
103:7 104:4 130:7
156:12 175:10
**allowed** 43:7,8
69:25 99:19 107:2
**allowing** 52:15
**allows** 101:9 127:24
**amanda** 2:22 4:9
**amend** 191:25,25
192:3,15
**amendments** 19:4
132:25
**america** 42:13
**american** 64:16
87:24 90:20
**amount** 24:23 25:19
69:21 166:25
168:20 169:8

178:15,23 179:8
182:23,25 183:16
**analyses** 166:3
**analysis** 8:16,17 9:4
17:5 19:16,19 20:5
38:22 41:9,11 44:23
45:12 48:21,21 54:9
55:3 63:10 65:20
67:2 68:10,10,15
69:10,17,22 80:22
81:4,20,21,22,23
83:5 84:17 87:12,19
88:7 99:19 111:3,12
119:25 120:3 126:8
127:13 136:19,23
137:6,7 141:14
147:6,8,18,23
149:17 151:11,14
151:17,20,24 155:8
155:13,18 156:11
158:4,9,16,20,25
159:10,11,11,15
161:14 169:2,14
170:2 172:2,12,13
172:14 173:8,9,20
174:11,14,19,22,23
175:3,6,9,17 176:12
178:4,14 179:9
**analyst** 174:16
**analytical** 81:7,12
172:9,16,17 173:2,6
**analyzable** 175:9
**analyze** 18:25 54:19
63:17,18 98:17
148:6 170:9 174:2
175:7
**analyzed** 49:9,19
148:4,22
**andrasko** 65:25
**angle** 106:8,10
119:11 167:18
**anomalies** 165:15
**answer** 5:21 10:17
11:21 50:25 52:11
52:22 53:13,23

54:12,22 55:10
62:25 67:19 71:25
88:16,23 93:3
137:15 139:22
166:6,14 173:15,24
185:12 187:22
189:10 190:24
192:4,7
**answered** 56:18,20
64:25 88:22,23,25
98:12 121:13
137:14 162:10
184:12
**answers** 9:13 56:23
74:23 96:21 162:18
166:8,10 168:13
184:24
**antonio** 82:10
**anybody** 6:17 23:16
26:5,8,12 32:7 35:8
48:19 188:16
**apologize** 33:17
114:25
**apparently** 26:19
34:18 53:6
**appear** 125:22
**appearance** 5:25
70:11 74:3,5 91:20
96:14 97:19 102:21
121:8 124:23
149:20
**appearances** 3:25
**appeared** 74:2
124:7
**appears** 103:18
**applicable** 100:17
**applied** 45:8 64:6
82:23 171:16
**applying** 72:22 83:2
**approach** 83:9
137:5 170:8
**approached** 8:3
**appropriate** 191:9
**appropriately**
145:23

**approximate** 34:2
66:6 171:6
**approximately** 3:14
6:23 16:18 32:25
33:5 40:6 43:19
48:3 99:12 117:24
137:8 171:10
177:25
**april** 51:3 56:15
57:2 160:7,12
**area** 38:3,16 50:6
51:22 67:13
**areas** 172:11
**argentieri** 2:11,14
4:2,2 6:13 10:14,18
10:22,24 11:13,20
14:20 16:21 23:5
26:12 27:11,12 31:2
35:12 36:7,12 42:4
42:9 46:14,23 47:6
47:7,13,15 52:10,21
53:12,22 54:11,21
55:9,19 56:4,9,16
57:5,12,25 58:8
59:17,21,24 60:8
61:14,19 62:9,18,23
63:2 67:24 68:7
70:9 71:24 73:2,14
74:8,17 75:5,15
76:4,10,17 77:2,13
77:22 83:6 88:8,16
88:19,25 91:7,11,24
92:12 93:18,23 94:9
95:23 97:21 98:2,11
99:21 100:7,15
108:13 109:16,21
110:4 111:15 112:2
112:7,11 116:8
117:2,20,25 118:3
118:18 121:2 123:5
124:12,20 125:14
127:19 128:13
129:22,25 130:3
131:14 135:6 136:2
137:13 138:4

139:11,14,16,22,25
140:4,22 141:6
142:19 144:11,18
144:22 145:3,6,13
145:16,21 146:10
147:2,10 148:18
149:15 151:12,16
151:22 152:3,8,14
152:18 153:5,12,16
154:16 155:11,15
155:20 156:10,18
156:23 157:12,16
158:5,12 159:7,17
160:4,8,14,18,24
161:3,6,13,19 162:5
162:12,16,20,21
163:19,25 165:17
166:9 167:3 168:8
168:17 169:11
171:3,23 172:8,24
173:19 174:5,13
175:4 176:2,13,25
178:10,17 179:5
183:7,22 184:12
186:22 187:18
188:7 190:3,16
191:24 192:5,12,18
192:23
**argument** 57:16
**arranged** 98:25
138:16
**arrangement** 22:17
22:21
**arrows** 164:22
**articles** 57:18 87:11
87:16
**artifacts** 80:6
**artificially** 70:15,22
71:13,15 73:8 76:24
**ascertain** 59:10
60:12
**aside** 20:17 43:11
92:23
**asked** 7:15 11:10
12:16 14:7,9,14,18

15:2 16:5 19:15
20:4 21:21 34:13
37:25 45:6,13 56:19
60:11 74:3,11 88:19
98:11 110:8 119:24
120:2 121:11,22
125:8 134:23
137:13 139:3,6
141:12 167:14
179:23 184:12
190:23
**asking** 11:3,7,13,18
47:4 62:13 71:4
73:4 74:19 98:6
145:7 161:14
173:22
**aspect** 174:10
**aspects** 80:11
105:19 158:10
175:5
**assembled** 90:7
**assert** 5:16
**assessment** 15:14
**assist** 68:5
**assistant** 23:18
**associated** 80:2
**associates** 85:10,13
**assume** 22:16 45:16
46:10 54:23 133:23
140:24 144:9
187:14
**assumed** 13:7 49:16
191:14
**assumes** 56:19
61:20
**assuming** 45:3
63:23 111:11
153:12 162:8
178:15 179:15
183:9
**assumption** 77:16
**astm** 90:21 169:4
172:3 173:21
**astrology** 57:11

**attached** 43:12 78:9
112:17 118:11
141:24 142:17
143:19
**attaches** 101:11
**attaching** 142:12
**attachment** 142:3,5
144:16 145:2
**attack** 56:12
**attacked** 55:17 56:2
**attacking** 56:7
**attempt** 76:22,25
**attend** 30:18 137:11
137:24 139:13
**attention** 59:12 79:2
87:7 90:12 115:7
141:19 153:22
156:21
**attorney** 46:18
56:12 62:10,12,16
131:25 132:5,6,14
142:12 143:13
**attorneys** 2:4,17
3:24 132:3 142:18
143:6
**audience** 64:20
**audio** 3:9
**august** 1:16 3:13
53:25 55:8 194:22
197:5
**authenticity** 160:2
**author** 63:13 86:16
**availability** 136:23
137:21
**available** 20:4 31:9
73:13,15,16 137:17
137:20 138:7,7,10
138:24 140:8,16,19
140:25 141:2
**avenue** 1:21 2:18
3:16
**aware** 26:17 28:23
30:5 31:17 37:16,19
37:21 39:6,7,12,16
46:11 51:2,11,19,24

52:14,24 53:8,14,17
53:25 54:7,17,23
55:3,16,25 56:6,10
56:11,24,25 57:8,15
58:4,11 70:4,8
73:10 74:24 75:20
76:5,6,14,18,20
77:3,4,8,14,17,19
79:13 109:12,19
110:20 112:16
140:2 141:3 143:4
187:4,7,11 188:3
**awkward** 134:19
**aycock** 2:22 4:9

**b**

**b** 90:19 141:19,24
142:6 143:19
176:15
**back** 6:6 7:23 17:19
22:3 33:10 36:18
45:18 49:11 52:6
70:14 75:17 81:6
86:25 93:19 96:20
96:24 97:5 100:23
109:7,14 115:24
117:19 123:20
129:15,19 130:2
131:4 137:2 141:16
144:13 154:18
156:20 157:18
163:14,24 164:7
165:5,8,13 169:23
190:21 191:19
192:7,13
**backdated** 40:9,9
72:20
**background** 46:8
59:18,19
**balabanian** 31:23
**balance** 25:9
**ball** 107:4 149:19,22
**ballpoint** 66:5 98:19
124:8 149:7,9,19
150:4 169:15 170:3

171:5 177:5,13
178:20 179:7
181:22 183:14
**baltimore** 64:15
**bar** 142:21
**based** 12:15 15:4,6,9
20:8 34:14,17 48:21
50:20 55:3,13 56:8
61:11 63:10 68:10
79:16 90:25 121:25
127:8 134:17 142:6
146:3,5 149:13,21
149:25 154:21
157:21 168:19
169:8 171:7 178:3
191:14,15
**bases** 186:5
**basis** 22:24,25 25:25
139:15 140:9,12
160:21,24 161:2,10
161:13,18 162:5,7
162:12 173:7 186:3
188:9
**bathroom** 169:18
**bears** 170:15
**began** 6:13
**beginning** 87:2
116:2 131:5 180:13
**begins** 60:15 112:25
**behave** 103:4
**belief** 142:15
**believe** 6:25 7:5 9:12
13:6 16:15 21:7
24:23 29:10 31:4
34:20 41:3 42:13
52:23 77:9 80:13
94:11 112:14
114:16 121:6
131:21 137:18
140:17 144:15
186:6,9 192:19
**believed** 34:22
**bell** 28:17
**benjamin** 2:21 4:10

**benson** 28:12,14
**benzoyl** 183:13
**best** 92:3 135:15
148:6
**better** 7:16 13:19
64:12 106:11
148:16
**beyond** 51:22
**big** 18:2,8
**bigger** 101:8
**billion** 40:7
**bills** 32:18
**binding** 150:20
**bit** 9:24 22:4 56:17
79:14 159:19
**black** 94:22,25,25
115:10,12 124:8,9
125:18,21,24 126:5
146:7 147:9,13,14
147:21 148:9,10,15
148:21 149:2,6,9
150:4
**blanco** 39:9 44:7
**blank** 33:24 107:9
114:4,8 133:9
143:15 185:22
**blind** 84:3,12
**blood** 194:18
**blower** 70:25
**blue** 164:24 165:7
**blueish** 165:12
**bluish** 165:12
**bmp** 102:13
**boland** 2:3,8 4:7,7
6:25 11:2,8,17
56:12 57:2,19 62:17
145:4,12,20 192:21
**boland's** 57:9
**book** 139:18
**booked** 139:2
**books** 87:13,16
173:4
**border** 64:2 88:11
**bottom** 59:13 60:16
82:5 87:7 90:13

166:13
**brand** 176:6
**brazeau** 88:10
**break** 47:20 86:19
86:20 105:12
129:12,19 131:14
164:16 169:18,18
190:15,16,24
**breaks** 5:15
**brendan** 37:12
**brief** 154:11 157:6,9
**briefly** 6:13 110:18
**brighteners** 151:21
163:23
**bring** 41:19
**bringing** 51:15
**broadway** 197:3
**broke** 87:5
**brother** 28:3,6
37:12
**brought** 36:4 115:14
115:16
**brown** 74:14 75:4
**brownish** 76:2
124:11
**brownlie** 30:3
**buchner** 65:23
**buffalo** 31:10 48:5
137:17 139:3
**business** 138:10
**busy** 50:2
**bügler** 65:23

### c

**c** 2:2 66:16 194:2,2
**cabinet** 81:2
**california** 44:3
**call** 28:9 51:6 71:3,4
89:2 94:20 99:11
**callahan** 16:20,21
32:11,23
**called** 4:16 18:6
28:6,11 31:18 32:3
45:17 48:5 63:14,15
65:19 84:3 97:20

99:10,17 104:17
125:18 135:23
141:9 179:20
**calling** 62:15
**calls** 20:20
**camera** 96:23 97:3
97:13 100:12,14,20
100:25 189:7
**canada** 64:2,6 69:19
88:10
**canary** 86:8
**cancel** 139:4,6,25
**canceled** 43:13
**canon** 94:3 95:6,18
96:2,12,23 97:2,3
97:10,13,14 100:12
100:20,24
**canoscan** 94:4 97:10
**cantu** 82:10,22 83:4
83:9,13
**capabilities** 7:16
45:13 109:3 174:18
**capable** 147:18
**capacity** 17:2
**caption** 3:18
**capture** 96:11 98:10
101:9 102:17,20
106:17 189:8
**captured** 105:6
107:25 108:5 191:4
**captures** 104:11
**car** 71:7 180:22
**carbon** 147:14,21
148:9,10,15,21,22
149:2
**career** 68:16 70:21
84:8
**carefully** 13:18
119:8
**carmine** 37:10
**carrie** 30:2
**case** 3:19,20,22 5:3
7:25 10:3 12:17,24
13:11,15 14:6,7,9
15:19,20 16:9,14,17

17:21 18:8,16,18,20
18:21,22 19:6 22:21
23:4 26:18,23 30:8
31:8,17 33:8 34:14
34:17,21,23 37:22
38:24 39:5 40:3,5
40:18,25 41:5,13,21
41:22,24 42:5,20,21
43:3,17,21,22 44:3
44:11,17 45:9 47:25
49:8,24,25 50:5,9
50:11,12,13,16
51:20,25 52:2 56:14
57:23 58:18 62:7,14
63:8,25 66:20 68:8
69:20 71:17 78:20
89:13 90:2 91:10,14
98:19 103:6 107:4,5
107:13 108:15
109:14,20 110:21
111:11 112:17,21
112:23 113:10
120:15 126:3
135:23 136:3,5
137:12 147:22
153:21 158:20,22
187:14 197:5
**cases** 39:23 40:2,20
41:14,16,19,21 42:7
42:14,25 43:16,24
50:3 64:6,6,21,21
64:22 65:2,2 66:19
68:14 69:21 70:21
71:11,11,13 83:23
96:8 147:18 151:18
**casework** 60:22
172:22 173:17
**cashiers** 126:22
**cause** 21:13 77:15
77:25 78:2 121:11
121:24
**caused** 77:10 121:13
123:25
**causes** 77:25

**cbsa** 88:11
**cd** 9:16 92:22 93:8
93:10 95:16 195:24
**cease** 62:24
**ceglia** 1:5 3:19 6:25
7:3 24:15 26:13
27:13 36:24 37:10
37:15 50:17,24
76:23 118:3,6,14
161:22 163:3
184:15 197:5
**ceglia's** 37:9 51:12
53:2 57:17
**cell** 3:7
**center** 81:17,24
84:14
**central** 42:13
**certain** 18:25 25:19
72:10
**certainly** 37:18
**certify** 194:10,16
**challenge** 42:23
43:6 58:19
**challenged** 56:13
67:15,15 69:25
**challenging** 58:6,13
**change** 63:19 78:6
86:19 94:20 106:8
121:12 124:23
168:6,15 179:10
192:6 197:7
**changed** 28:24
79:14 94:17 100:16
134:12,21,21
165:12 168:9
**changes** 19:4 121:8
132:24 135:3
165:18
**changing** 179:11,13
181:23
**chapters** 87:12
**characteristics**
91:15 92:6 106:7
127:25 128:24,25
129:3 151:3,9

**characterize** 88:6
152:10 156:13
**charges** 23:23
**check** 21:10 116:9
116:10,23 133:8,25
139:7 140:22
141:25 142:4 143:7
144:7,14 185:21
186:17 191:19
**cheese** 175:7
**chemical** 8:23 19:18
44:22 53:20 72:2,4
80:5,11 81:4,9,21
147:22 151:14,17
151:25,25 155:13
158:8 169:14 170:2
171:2 182:4
**chemically** 49:19
**chemicals** 48:16
**chemist** 44:21 45:21
45:25 46:3,8 68:3
79:17 81:6 89:9
111:14
**chemistry** 38:12
46:9 79:23,25 81:8
81:13,19,19 174:20
176:20,24
**chemists** 38:12
44:20 65:22 88:10
88:13
**chicago** 43:3 138:14
138:15
**china** 66:3
**choice** 149:3
**chromatographic**
148:23 175:19
**chromatography**
80:21,23 171:19,20
174:12,25 175:16
175:25 176:11
**circumstances** 21:4
40:24 90:15 122:10
122:14 184:10
**citigroup** 41:4

**city** 3:12,17
**clack** 148:22
**claiming** 50:19
**claims** 50:21
**clarification** 5:6
**clarify** 97:4 191:9
192:11,15
**clark** 32:9
**clear** 47:11 80:14
97:24 105:12 111:9
140:9 142:11
146:18 155:5
159:21 188:19
**click** 102:10
**client** 10:13 11:24
41:4,13 42:12 43:14
43:22 46:18 62:11
62:16 71:3 136:20
**close** 38:2 57:24
65:4 91:19 100:18
169:19
**cloudness** 99:11,12
**colleagues** 101:17
**collins** 1:22 4:13
194:7,25
**color** 78:6 101:23
104:25 115:10
127:10 146:24
148:3 151:3 164:3
**colorant** 155:19
**colored** 121:21
**combination** 83:21
127:12
**come** 7:23 22:3
31:10 34:22 44:4
45:18 49:11 71:16
84:16 111:13 130:2
133:20 136:25
137:10,17 138:16
138:17,22,23
161:24 184:17,20
**comfortable** 134:10
135:4,7,8,15
**comment** 45:6,9,12
61:24 89:13 98:4

commenting 99:24
commission 197:25
commitments
138:14
commonly 173:17
174:2
communicate 7:12
communication
25:4 26:9 145:15
companies 147:16
148:5
company 42:13
147:15 197:2
comparator 9:15
80:25 185:11
compare 38:24,25
98:14 99:9 102:20
compared 97:16
122:16
compares 98:21
comparing 182:25
comparison 67:2
103:11 129:6
136:23 148:20
172:2,4 173:9,21
compensation 22:6
complaint 112:17
112:23,25 113:4,10
complete 92:15
129:20
completely 61:9
69:3 84:12 85:23
86:9,12 180:23,23
181:2
complex 65:9
complies 93:20
comply 144:12
component 175:23
components 48:16
48:22 82:23,24 83:3
155:19,23 174:3
175:8,11 181:22
compose 157:2
composition 152:2
170:9 174:21

computer 9:12
33:19 93:13 101:7
101:12 113:24
123:10 133:7 139:8
computers 101:8,8
concentration
183:25
concerning 14:18
16:11 122:4
concert 76:23
conclude 159:22
160:6 161:20
179:25
concluded 14:5
concludes 193:5
conclusion 35:7
40:12 55:13,16
77:20 146:22 150:3
150:5 179:3 180:9
180:11 181:3,8
182:17
conclusions 12:6
13:10,14,22 68:6
133:21 161:25
conclusively 160:2
condition 70:5
76:21 92:10
conditional 180:11
181:8
conditions 119:17
119:20,22,25 120:6
120:11,17,21,23
121:5 179:16
180:12 181:10
184:4,6,16,17
conduct 8:23 53:19
79:22,25 94:13
160:16 167:7
178:14
conducted 8:9 20:25
54:8 151:11 155:9
174:14 175:10
conducting 19:9
90:18

conference 6:22,24
28:9 45:5 55:14
64:15 86:8
conferences 87:17
confidentiality
22:13
confirm 143:16,23
143:25 144:6
153:25 159:8,11,14
confirmation 35:9
confirmed 116:3
154:3,12 157:2
confirming 156:14
159:5
connection 132:5
connors 18:10 21:8
21:9 27:4,6,16,18
28:3 29:8
consider 45:25
134:15 171:4 182:6
considered 84:10
167:18
consistency 154:2
consistent 186:9
188:13,14 191:16
consists 147:14
constructible 175:8
construction 66:16
82:16,21 83:9,20
177:20 180:6
consulted 136:12,16
contact 18:4 19:22
35:6 144:12
contacted 17:20,23
18:19
contain 101:24
105:2 147:20 148:2
178:13 179:8
contained 97:17
147:24 159:13
contains 99:10
101:21 102:8
147:15 148:9,20
175:7 178:5,9

contents 11:10
context 25:22
contingency 22:24
22:25 25:25
continue 3:9 171:14
continued 131:11
continues 177:21
contract 20:11
21:20,21 50:20 51:3
51:12 52:16 53:2
57:21 114:16
142:16 143:5 154:4
154:14 157:4
contrast 94:18
controversy 70:5,10
convenient 119:7
conversation 5:14
7:14,19,20 11:4
19:8,24 20:9,15
26:11,25 34:18
48:14 61:12 133:2,6
133:24 184:18
conversations 3:6
11:10 20:14,20
37:14 62:11
copied 26:8
copier 104:25 105:2
copies 112:14 147:4
185:9 191:2
copy 36:6 90:6,9
93:7,8,10 105:13
129:18 135:23,25
136:7,14 143:4,8
164:16 195:24
cord 101:13
corner 79:4 98:23
141:20 142:21
165:24
corners 97:17
corporation 23:25
23:25
correct 6:2,9 8:15
8:20,21 10:6,7,10
10:11 14:23 15:24
16:25 22:10 25:10

37:7 39:21,25 67:23
74:15 79:8 81:9,13
84:25 85:4,19 86:13
87:20 88:3 90:10
91:6,16 92:11,25
94:25 95:2,22 97:7
97:11,14 107:22
108:9 109:10,11
118:22 122:14
123:22 124:5,8,11
124:14,15 129:10
129:11 135:5
144:14 146:12,20
149:14 150:10,11
150:15,18,19
151:11,13,15 152:2
152:4,13 154:9
155:10,12,19,24,25
156:9,17,19 157:11
157:13 158:4,6,11
158:13 159:2,3,6,24
160:5,9,13,15
161:22,23 164:16
169:10,12 171:22
174:6,8 176:3,14
177:12 178:9,11
183:8,21 184:7,8,11
184:13 188:23
189:3 190:2,4
191:20,21
**correctly** 23:13
30:14 67:4,6 82:11
86:15,17 90:23
97:16 100:9 131:24
134:13 142:14
144:24 146:9
149:10 151:6 154:7
155:3 157:7 171:16
**costs** 6:2,5
**counsel** 3:18 4:5 5:9
5:9,13 61:12 95:9
**countries** 66:9 176:5
**country** 66:12
**county** 194:5

**course** 5:8 29:4,18
60:6 67:5 92:4
123:9 127:10
149:18 152:9
155:16 156:11
159:8 167:17 184:3
188:16 191:12
**court** 1:2 3:21 4:12
10:10 51:21 52:15
52:24 53:17,18
56:13,25 57:9 60:20
60:25 69:4,7,9,11
69:15 70:7 78:18
126:11 136:6 191:2
191:10
**courts** 67:21
**cover** 6:7
**covers** 22:9
**created** 51:14 55:7
**criminal** 64:6
**criticism** 173:14
**criticized** 63:21
67:11
**cross** 29:22 40:14
52:8
**crossed** 108:8
**crow** 17:25
**crutcher** 1:20 2:16
**current** 39:4
**cut** 84:4
**cv** 1:7 3:22 78:9
79:5,7,11,17 87:6
87:22 132:23

**d**

**d** 1:5 3:19 107:20
195:2
**dalbert** 58:19 60:20
67:14
**dallmayer** 65:24
**damage** 77:9 124:18
124:23 168:15,18
168:19 169:3
**damageable** 169:3,7

**damaged** 163:4
**damaging** 169:10
**data** 86:10
**date** 3:13 6:21 15:13
16:2,5 19:13 31:10
31:11 34:2 51:2
55:8 56:3 57:9
76:25 84:5,5 102:2
110:6,7,18 122:6
125:7 126:25
137:22 139:18
140:6,6 149:9
154:25 157:4
160:10 168:10
169:14 170:3 187:2
187:10 197:5,25
**dated** 89:15 170:15
171:13
**dates** 51:9 137:19,19
137:21 138:3,6
**dating** 17:5 41:11
64:20 67:22 68:6,15
79:18,19 80:16
81:22 82:7,13 83:8
87:12,18 160:16
**dave** 28:3
**david** 17:25 20:22
28:5
**day** 7:6,9 19:13,15
20:25 21:5 24:17
27:7,10 113:17
125:7 192:13
193:12 194:22
197:22
**days** 40:15
**dealt** 29:12
**dean** 2:8 4:4,7 6:25
10:18,18 56:12
144:19,22 145:3
192:19
**december** 9:10 24:5
43:2 89:15
**decision** 43:10,13
**declaration** 9:2 10:9
11:16,25 12:9,11,12

14:22 15:3 28:22
29:5,18 30:6 49:6
52:7,20 53:10,15
54:6 59:3,8 78:10
78:13,25 131:20
132:2,17 134:4,24
135:5,10 140:7,18
141:17,24 142:2,2
142:17 143:20
146:2 154:19 156:2
157:18 158:19
159:21,22 166:7
177:4 195:20,21
**declined** 26:2
**defect** 102:25
**defects** 103:6
**defendant's** 74:24
**defendants** 1:10
2:17 3:18 4:11 9:7
39:18 44:20 51:11
51:18,24 52:14,25
52:25 54:8 58:25
59:2,6 70:6 75:2,8,9
75:11,20 76:20,25
77:4,7,8,17 78:11
78:13,15 89:17,19
89:22 92:22 93:4,6
93:10 94:2 100:5,23
131:21 141:18
146:2 153:10,18,20
154:6 156:20
162:25 163:2
164:10,13 165:22
166:12,22 168:14
195:17
**defense** 81:9
**definitely** 110:14,16
**definition** 5:6
**definitive** 35:9
**definitively** 35:15
**degradation** 77:11
77:15
**delay** 21:13
**deliver** 84:16

demonstrative
  103:2 126:11
dennis 29:21
dependent 72:5
depending 106:10
  144:8 173:12
  179:12
depends 172:25
  180:12
deponent 197:6
deposed 4:25
deposition 1:19 3:9
  3:15 5:8,15,15 6:14
  6:18 16:11 41:7
  86:23 87:3 130:11
  131:6,17 152:21
  171:18 180:14
  193:5 194:12,14
  197:5
describe 103:19,19
  104:18 114:20
  115:20 154:19
  157:19
described 9:3
  165:23 166:2
describes 100:25
describing 75:25
description 105:5
  195:17
desert 71:8 180:21
designated 17:15
  35:16
desk 116:17,23
desorption 65:19,20
detail 101:4 114:21
detailed 19:10 69:5
  168:13 169:9
detected 126:22
detectible 128:23
deterioration 72:6
determination
  149:13
determine 5:16
  20:12 21:25 48:22
  71:14 99:19 101:25

103:2,7 106:19
  107:3,9,14 108:16
  114:6 128:18 147:7
  147:19 167:20
  170:10,11 171:5,10
  173:10 178:4,9
  179:6,14,18
determined 107:16
  191:7
determines 55:4
determining 66:6
detroit 34:7
develop 107:2
developed 60:18
  65:22 82:8,10,22
  83:2 91:3 161:16
device 102:5
devoted 173:4
diameter 137:9
diane 18:18
dictate 132:18,20
difference 6:6
  106:13 127:11,14
  154:23 155:6 156:7
  157:23 158:2
differences 151:15
  151:25 155:14,23
  158:10,14
different 12:6 13:12
  22:12 24:20 28:11
  31:11 36:22 61:9
  62:19 63:18 66:9,10
  67:12,13,16 69:3
  106:3,6,6,10,12,20
  106:23 122:18,20
  123:3,6,7,8 126:20
  127:8 129:4 147:16
  147:17,17 148:4
  149:20 151:20
  155:18 166:25
  175:22,23 176:5,5
  176:18,22
differentiate 158:3
differentiated
  151:10 155:8

differently 163:15
difficult 69:9 84:10
  181:4
difficulties 12:2
  47:22
digital 96:23 97:3
  97:13 100:12,20,24
  101:3,5,6,11 105:17
  105:22,23 106:5
dinilitr 95:7
dinolite 105:23
  106:3,16,24 108:14
  108:24
direct 59:11 70:24
  72:12 78:2 90:12
  121:15 141:19
  153:22
directing 156:21
direction 46:18
directions 195:9
director 46:6
disagreed 23:7
disappeared 103:25
discerned 148:17
discernible 154:23
  155:6 156:6 157:23
  157:25
disclose 86:9
discoloration
  121:12
discolored 74:2
  75:12,18,19 76:21
  162:25
disconnection 36:2
  74:10
discovered 54:18
discovery 52:9,13
  52:19 189:6
discrepancies 21:25
discriminating
  126:8
discuss 19:9 26:15
  30:22 48:18 110:14
  119:3,19 145:21
  150:20 164:9

discussed 30:21
  31:3,11 40:17 62:6
  62:7 63:7 93:2
  110:5,7 122:9
  125:15 162:22
  171:19 186:7
discussing 71:5
  120:18 139:9
discussion 19:11,12
  20:3,6 28:20 63:6
  93:9 110:17 113:7
  116:2 118:25
  122:23 130:8
  136:19 137:16,20
  160:20 184:4
discussions 16:14
  31:5 110:10,15
  120:19 186:14
disk 87:3 95:5
  130:10 131:6 193:4
dismiss 51:20,25
  52:2
displayed 93:15
disqualified 67:25
disrupt 153:8
distinction 170:6
distinguishable
  158:15
district 1:2,3 3:21
  3:21
dla 28:25 29:9 30:6
  131:23
doc 78:19 156:24
docket 78:19
doctor 42:5 61:22
  62:9 65:25 139:23
  146:11 192:13
document 12:7
  14:18 15:2,25 19:2
  19:5 20:8,12 21:22
  30:18 37:17 38:2,6
  38:13,21 39:9 40:9
  46:13 47:18 49:2
  50:21 51:6,7,13
  53:11,20 54:4,10

| | | | |
|---|---|---|---|
| 55:7 58:10,15,20 | 167:2,25 168:7,23 | 192:24 | **edelson** 31:18,22 |
| 59:6 60:3,13 61:4 | 169:3,4,7,10 170:14 | **draft** 133:19 134:9 | **edges** 126:15 128:16 |
| 61:10 64:17 66:7 | 170:17 171:7,11,13 | **drafting** 136:13 | **effective** 78:2 |
| 70:6,16 71:7 72:8,9 | 179:2,15 180:14,15 | **draiman** 43:4,4,4 | 125:20 126:9,18 |
| 72:19 73:8,25 74:4 | 180:20 181:6,9,14 | **drive** 9:17 | 148:19 167:20 |
| 74:14,18 75:2,3,12 | 184:6,11 185:9 | **drivers** 176:17 | **eight** 40:15 |
| 75:23,25 76:9,15,22 | 187:5,10 188:5 | **driving** 34:11 | **either** 11:22 12:22 |
| 77:9,11,20 78:16,18 | 189:25 191:3,23 | **drying** 182:15,15 | 44:4 115:9 119:10 |
| 78:22 79:17,19 | 195:25 | **due** 36:2 74:10 | 123:7 141:11 |
| 80:11,15,16 84:4,4 | **document's** 122:4 | 76:22 | 158:23 |
| 87:25 89:8,12,24,25 | **documented** 123:21 | **dully** 163:18 | **electromagnetic** |
| 90:6,7,14 91:5,14 | **documents** 5:7 7:7 | **duly** 4:16 194:13 | 125:23 |
| 91:15,19,20,22 | 7:13 8:8,19 10:3 | **dumain** 16:22,23 | **electronically** |
| 92:10,15,18 94:3,14 | 14:14 38:25 55:23 | 32:5,10,23 | 144:23 |
| 96:7,13,15,22 97:13 | 70:23 71:12,12,14 | **dumain's** 32:17 | **element** 101:19,20 |
| 98:14,15,15,18 | 76:12 80:3,7 90:17 | **dunn** 1:20 2:16 3:16 | **elevated** 72:3,11 |
| 101:2,19,21 106:21 | 96:18 101:23 | 4:9,10 | **elliot** 1:8 3:19 |
| 108:17 109:8,9,13 | 110:21,22 112:6 | **dye** 82:23 147:24 | **emanuel** 18:12,13 |
| 109:18,20,22,23 | 115:3 122:24 | 148:9,20 149:2 | 18:16 26:25 |
| 110:9 111:22,25 | 135:25 136:7 | **dyes** 147:21 148:2 | **employer** 85:9 |
| 112:12,13,25 113:6 | 187:12 | **dynamic** 170:4,24 | **encyclopedias** 87:13 |
| 113:10,16 114:17 | **doing** 19:18 65:2 | **e** | **enforcement** 82:2 |
| 114:19,20,23,24 | 70:14 81:18 86:16 | **e** 2:2,2 4:15 25:5,6 | 86:4 |
| 115:7,8,14,22 | 118:4,16 147:8 | 25:22 26:6 27:17 | **engage** 5:14 |
| 116:14,15,16,22 | 160:22 170:25 | 29:2 30:15 113:18 | **engaged** 21:16 |
| 117:3,12,19,25 | 175:2 176:20 | 113:19 121:9 131:2 | **engagement** 120:9 |
| 118:21,25 119:2,7 | **dots** 101:24 104:24 | 131:2,7 132:16,21 | 138:11 |
| 119:16,18,22 | 105:3 | 139:2,8 144:16 | **english** 47:21 |
| 120:12,24,24 121:8 | **double** 133:8,25 | 145:2 185:8,15,16 | 135:13 |
| 122:12,25 123:4,12 | 139:7 143:7 185:20 | 185:19,21 186:17 | **enhance** 101:18 |
| 123:17 124:4,19,22 | 186:17 | 186:23,25 187:3 | **enter** 182:16 |
| 124:24 125:2 | **doubt** 110:17 | 189:14,18 190:11 | **entered** 33:7 |
| 128:22 129:10 | **download** 9:17 | 194:2,2 195:2 | **entire** 181:16 |
| 135:21,23,24 136:3 | **dpi** 94:16,16 | **e1422-05** 90:22 | **entries** 126:4 149:8 |
| 136:5,9,11,15,17 | **dr** 4:23 11:4,14,23 | **earlier** 33:15 42:25 | 150:6,9 |
| 137:12 142:3,13,22 | 36:20 49:6 50:7 | 44:14 49:10 80:13 | **envelope** 115:15,19 |
| 142:23,24 143:12 | 54:5 57:20 59:5 | 81:15 88:12 131:22 | 116:14 117:3 118:2 |
| 143:18,25 144:5 | 66:21 70:4 74:11 | 162:23 177:4 185:5 | **equipment** 65:11 |
| 146:6,20 150:14 | 78:8 82:10,22 83:4 | **early** 32:2 | 80:19 84:21 106:23 |
| 152:7,12 153:18,21 | 83:9,13 87:5 97:7 | **easier** 41:20 42:17 | 125:11 126:12 |
| 153:21 156:15 | 98:8 100:8 131:13 | 107:6 | 128:9 169:9 188:17 |
| 159:23,23 160:3,17 | 140:7,11,16 145:4,6 | **easily** 73:15,21 | 191:16 |
| 161:21,25 162:23 | 145:10 154:12 | **easy** 144:9 | **erich** 39:8 |
| 162:24 163:4,10,14 | 161:20 162:22 | | **errata** 197:2 |
| 164:20 166:4,24 | 169:25 190:23 | | |

**escaped** 33:4
**esda** 167:7
**esoteric** 148:16
**especially** 35:2
 122:17
**esq** 2:8,11,14,20,21
 2:22
**establish** 100:4
 160:2
**et** 3:20
**europe** 86:8
**evaluate** 171:6
**evaluated** 12:11
**evaporating** 182:2
**evaporation** 178:24
 181:17,20
**eventually** 24:22
 40:18
**everybody** 66:11
 168:22
**evidence** 61:20
 69:15 98:16 106:14
 127:8 128:18
 160:12 185:8
**exact** 6:21 93:7
 140:5 176:9
**exactly** 36:20 187:9
**examination** 4:21
 8:10,13 9:25 10:2,6
 12:14 19:10,14
 20:25 22:4 24:18
 31:6 34:14 35:4
 38:13,22,23 40:14
 47:25 53:18 54:16
 71:19 76:16 89:13
 90:17 91:6 92:11,16
 94:13 101:15 109:8
 110:2,12,13 111:6
 111:13,20 116:5
 117:18,23 118:5,16
 118:23 120:13
 125:3,10,19 127:17
 128:18 129:9
 131:11 133:3
 134:20 135:20,25

136:6 143:8,18
 146:4,5 149:25
 150:2 155:10 163:9
 163:13 166:23
 167:7,8,10,24
 168:10,24 195:4
**examinations** 8:14
 8:15 30:18 38:24
 46:13 47:18 125:9
 150:22 154:22
 157:22 168:4,11
**examine** 14:14,18
 15:2 21:21 52:16
 53:2 84:21 110:8
 116:16 162:2
**examined** 4:17 7:6
 20:12 53:7 70:21
 71:12 74:15 85:3
 98:17 102:4 109:8
 109:24 110:21
 111:24 112:4 115:6
 119:15 128:15
 131:9 167:14
**examiner** 38:2,7
 89:9
**examiners** 37:17
 39:9 64:17 80:15
 87:25
**example** 38:4 73:11
 91:23 101:19 105:5
 151:19 155:17
 170:14 172:22
 175:6 179:17
 181:14
**examples** 54:3
**exams** 8:12
**exceeds** 179:22
**excessive** 121:13,17
 122:2
**exchange** 139:8
**excuse** 26:13 154:10
**executed** 122:6,6,12
 122:25
**execution** 122:5,14
 184:10

**exhibit** 59:2 78:11
 78:13 79:3 89:18,19
 89:23 93:4,6,10
 94:2 100:5,23
 131:21 141:18,19
 141:24 142:6
 143:19 146:2
 153:11,18,20 154:6
 156:21 164:6,9,10
 164:14 165:22
 166:12,22 168:14
 195:19,21,22,24,25
 196:2
**exhibits** 195:16
**exist** 170:18
**existence** 151:20
 155:18 170:13,22
**expand** 56:17
**expect** 11:12 163:22
 168:15,18
**expedited** 52:9,12
 52:19
**experience** 77:23
 121:25 148:3
**experienced** 174:17
**expert** 16:25 17:7,10
 17:12,14,15 35:16
 42:23 46:3,4 50:7
 54:8 57:20 62:3
 67:21 110:11 141:4
 161:24
**expertise** 51:23
**experts** 11:11 12:17
 12:20,22 13:11,14
 14:5 39:13 44:17
 45:4 46:13 47:19
 48:11 49:14 54:2
 57:18 61:2 75:21
 76:15 77:9,18 140:3
 140:11 163:5
**expires** 197:25
**explain** 17:4 99:18
 101:4 103:20 106:2
 116:18 134:13

**explained** 17:21
 80:13 122:20
**explanation** 5:6
 122:22 192:5
**explanatory** 108:5
**explosives** 81:22
**exposed** 167:2
**exposure** 77:10,12
 168:20
**extension** 96:3
**extent** 145:13,17
 179:12
**eye** 124:19 149:17

**f**

**f** 131:2 194:2
**fabricated** 51:14
**face** 165:4,8,13
**facebook** 1:9 50:20
 51:19 154:4,13
 157:4
**facsimile** 146:16
 147:5
**fact** 13:24 20:16,25
 27:3 44:17 47:5
 56:6 67:21 72:17
 73:9 76:14 93:8
 110:20 140:19
 156:2 157:14 177:5
 180:24 187:4
 191:13
**factor** 182:16
**facts** 61:20
**fade** 78:6
**faded** 74:2,14 75:3
 76:2,21 77:21
 121:23,23 162:24
 162:24
**fading** 77:25,25
 78:3,4,5 121:12,13
 121:14,17 124:10
 124:15,16,17
 168:19
**fair** 15:14 17:18
 35:10 173:16

fall  9:9
familiar  44:7 72:23
  135:22 136:9 138:2
  170:3 189:12,17,19
  189:21 190:6,7,9,10
family  118:10,14,15
far  67:6 116:7 119:4
  119:19 152:21
fast  182:15,20
faster  153:3,5
favor  43:14
fax  114:17
fbi  64:4,19 82:3
  88:12
features  101:21
  106:10
federal  81:24
fee  22:17
feel  126:21 134:16
fees  24:10
felt  149:22
field  17:5 61:2 83:5
  83:7 88:6 89:4
  101:18 168:23
file  95:4 103:13,17
  108:4,4
filed  3:20 50:18 59:9
  62:2 78:18,20 89:25
  89:25 153:21
files  96:3,9 102:13
fill  114:8
film  99:25
finalize  134:5
find  73:22 103:6
  106:12,14 160:11
  185:21,23 192:7
finding  146:23
  150:13 152:5,10
  154:20 156:17
  157:19,25 178:23
findings  10:10,13
  11:24 12:3 13:14
  14:13,17 134:22
  152:13 156:6,13
  157:10,15 159:5,6

159:13,16,25
fine  18:3 25:23
  33:21 67:20 88:24
  89:6 112:8 113:22
  135:16 139:20,21
  145:11 162:15
fingerprint  119:14
fingerprints  117:16
  119:2 126:18
fingers  126:19,20
  128:9,11
finish  5:20,21
finished  117:23
firm  18:2,8,10 27:4
  27:7,16 28:11 29:13
  30:7 31:18,20 32:3
  32:5,8,17,18 33:7
  79:18 85:16
firms  26:18,22
  28:23,25
first  5:5 7:20 17:20
  18:19 19:13,13 20:8
  22:4 45:15 56:20
  57:7 70:14 75:13,23
  76:9 82:5,21 84:13
  84:23 85:7 95:18
  96:18 103:22,22
  107:3 108:6,17
  111:2 119:15
  139:16 141:7 150:8
  164:21 166:17,18
  170:10,12,13,15,21
  177:19 178:4
  184:20
firsthand  92:7
five  121:6 170:16
  185:8 189:13
flew  34:7
flight  139:3,6
florida  42:11,12
fluoresce  163:14,17
fluorescence  151:4
  163:21 164:3,19
  165:7,10,11,14,15
  165:19

fluorescing  163:18
fly  141:10
fold  117:13
folded  98:23,25
folder  96:24 97:2,6
  97:14 102:8 107:19
  107:21 115:19
  116:14 117:3 118:2
folders  95:4,15
folds  98:22
follow  87:15 91:9
follows  4:18 131:10
font  122:18,19
  123:6
fonts  123:3
food  72:7 172:12
ford  176:16
forensic  38:21 46:12
  47:18 79:17,19,23
  79:25 80:16 81:17
  81:24 84:14 89:8,12
  91:5 160:11 168:23
  172:11
forgery  51:14
forget  110:16
form  15:9,11 25:3
  35:13 46:16 52:10
  52:21 53:12,22
  54:11,21 55:9,19
  56:4,9,16 57:25
  67:24 68:7 70:9
  71:24 73:2,14 74:8
  74:17 75:5 76:10,17
  77:2,13,22 91:11
  92:12 94:9 100:15
  108:13 109:16
  110:4 111:15 112:2
  121:2 123:5 124:12
  124:20 125:14
  127:19 135:6 136:2
  138:4 140:4 141:6
  142:19 147:2,10
  148:18 149:15
  151:12,22 152:3,8
  152:14 153:7

154:16 155:11
  156:10,18 157:12
  157:16 158:5,12
  159:17 160:8
  165:17 168:8 171:3
  172:8,24 173:19
  174:13 175:4 176:2
  176:25 178:10
  179:5 183:22
  186:22 188:7 190:3
format  132:21
former  69:2 81:10
  81:18
formula  170:10,12
formulated  51:17
formulation  170:12
  171:9 178:5,8,12
  183:20
formulations  183:14
forth  194:12
foster  80:25 185:10
  191:5
found  80:6 106:18
  154:23 155:6
  157:23 178:12
fountain  149:21
four  84:7 95:4
frame  94:5 179:14
francisco  43:18 50:6
  50:12
frankly  25:13
fraud  40:9 51:21
  59:8 126:22
freeman  80:25
  185:11 191:5
freezer  71:9 180:15
  180:19 181:15,16
fresh  184:2
front  75:12,17
  104:17 131:20
  141:17 163:15,17
  163:23 165:22
frye  43:6,7,9
ft  148:5,7 158:16

**full**  60:3 178:13
**fundamental**  174:10
**furnished**  34:3
 114:10 133:13
 143:21 185:25
 195:13
**further**  34:13 75:10
 82:25 131:10 192:6
 192:16 194:16

**g**

**g**  4:15 131:7
**gas**  80:21 171:20
**gaudreau**  88:3,5,9,9
 89:7
**gc**  54:9 80:21 148:5
 151:24 155:22
 156:3 158:9,16
 172:6,9,21 173:2,9
 173:10,11,16,20,23
 174:2,8,10,17,19
 175:2,9 178:13
**gel**  149:22
**general**  17:6 20:5
 45:11 62:13 113:7
 119:5 120:15
 121:22 136:4 137:5
**generalized**  59:25
 162:16,17
**generally**  8:2 45:9
 49:25 50:23 53:21
 63:5,7 70:17 80:10
 80:20 174:25
 175:20 178:19,20
**generic**  146:22
**generically**  179:23
**genesis**  142:13
**genuine**  159:23
**genuineness**  161:15
**gerald**  13:5 41:24,25
 45:7,14 54:15 59:8
 63:12,23 64:10,24
 121:7,10 191:13
**germany**  65:22

**getting**  16:8 169:18
 173:25 174:25
**gibson**  1:20 2:16
 3:16 4:9,10
**give**  78:7 84:20
 117:18 129:19
 184:24 187:21
**given**  21:6,20 36:13
 79:3 85:8 115:17
 178:22 186:24
 194:15
**giving**  35:9 36:10
 62:18 69:15 162:17
**glass**  126:16
**glasses**  128:15
 167:16
**gloves**  117:6,8,10
 119:6 129:23
**go**  3:10 7:25 17:19
 23:5 35:14,22 48:3
 63:4 74:21 89:16
 95:18 96:20,24 97:5
 109:7 139:20
 144:13,18 146:13
 149:4 152:19 153:3
 153:5 162:8 191:18
 192:7
**goes**  72:7 159:4
**going**  27:18,19 35:7
 48:5,19 53:21 56:17
 61:19 62:10 74:18
 78:10 85:16 86:6,9
 86:21,25 93:5,12
 98:3,4 100:3 114:4
 114:5 115:25
 129:14 130:9 131:4
 141:10 142:9 143:2
 152:16,19 153:2,3
 169:23 187:20
 189:4,6 191:18
 193:3
**good**  3:2 4:23,24
 11:9 38:10 40:12
 46:8 48:11 67:5
 85:25 103:2 148:8

174:11,24,25 175:2
 175:16,19,25
 176:10,17,20,23
**government**  60:22
 64:3 68:25 73:17
**governs**  135:24
 136:6
**grable**  17:25 20:22
 26:25 28:2,4
**granted**  52:24 53:6
**great**  9:23 105:11
 121:20 131:13
 133:12
**guess**  7:23 13:19,21
 13:23 16:8 19:20,23
 20:16 23:9 35:12
 37:20 46:15 49:3,17
 58:13 59:16 61:25
 70:13 72:16 73:6
 115:24 129:14
 143:3,16 144:8
 159:4
**guessing**  25:21
 114:18,25
**guide**  90:21
**gus**  39:14

**h**

**h**  2:20 29:2 31:15
**hair**  70:25
**half**  69:10 166:14
 178:2
**halfway**  59:19 60:16
**hall**  30:2
**hand**  129:15 142:21
 164:7 194:22
**handed**  112:11
 117:4
**handheld**  125:11
 149:18
**handing**  129:15
**handle**  119:7
**handled**  117:11
**hands**  184:25

**handwriting**  38:22
 46:4 51:7 124:7
 150:17 161:24
 162:3
**handwritten**  91:19
 101:20 102:22
 126:4 149:6 150:6,9
 164:10 196:2
**hang**  10:22 62:9
**happened**  31:11
 71:6 123:20,25
**happens**  128:17
**happy**  100:5
**hard**  135:23,25
 136:7,14
**he'll**  145:18
**head**  100:2
**headquarters**  84:16
**hear**  10:19,24 57:7
 145:3,4
**heard**  11:2 29:3
 55:13 57:6,14 58:2
 70:14 138:19
**hearing**  43:7,9
 56:14 57:2,10
 111:23
**heating**  183:2
**held**  1:19 3:15 56:14
**help**  191:24
**hereinbefore**  194:12
**hereunto**  194:21
**hewlett**  147:25
**high**  54:18 83:12
 94:15
**higher**  106:18
**highly**  55:4 83:14
 111:19
**hire**  21:21 50:21
 51:6,13 53:11 54:4
 54:9 55:7 73:25
 75:2,23,25 77:11
 109:9 112:5,13
 113:16 115:13,21
 117:2,19 119:16
 120:12,24 122:4

135:21 142:16
143:5 146:20 152:7
152:11 156:15
159:23 160:3
162:23 163:9
164:20 166:3,24
168:7 184:6 187:5
189:25
**hired**  57:23,23 61:5
**hold**  118:24 119:13
**holes**  97:18 123:22
124:2
**holmberg**  35:18
**home**  118:12
**hong**  40:3 43:9,12
69:20
**hopefully**  86:17
**horizontal**  142:20
**hornell**  2:13
**hot**  70:24 71:22
**hour**  22:18,19
118:23
**hourly**  23:19
**hours**  33:5 117:24
152:22,23,23,24
**huh**  15:23 52:3
88:18
**human**  172:12
**hundred**  175:8
**hutnyan**  18:18
**hypothetical**  178:22
181:14

**i**

**idea**  48:11
**ideas**  82:25
**identical**  152:7,12
154:5,14
**identification**  59:4
78:14 89:21 93:11
153:19 164:12
172:5
**identified**  96:25
100:8

**identify**  146:19
170:10,25 171:9
**identifying**  77:18
**ignoring**  161:8
**illuminate**  125:23
165:2
**illuminated**  163:9
165:5
**illumination**  167:6
168:12
**image**  73:25 76:6,8
96:7 97:25 98:20
99:4,20 100:9
101:18 102:19,20
103:13,17,20,21,22
104:13 105:6,9
108:2 112:16
143:10,19 189:22
**imagery**  92:9,24
93:13 104:5
**images**  9:8,14 36:4,5
74:5 89:12 91:13,21
92:3 95:7,7,8,18,20
96:21 97:12,14,15
99:24 102:9,9
103:10 104:10,10
104:14 105:4,16
106:18 107:20
108:20 112:12
121:7,10,17,18,19
125:17 127:18,23
142:16 185:8 186:4
186:7,20,25 187:17
188:5,12,14,15,18
188:20 189:9,13
191:8 192:8
**img**  100:4
**immediately**  43:9
**important**  84:10
106:8 149:16,19
174:11 175:17
181:20,21 182:11
183:10
**impossible**  99:15
175:20

**impression**  38:23
191:11
**improper**  153:7
**impurity**  183:12
**inch**  150:24
**incident**  106:9
**include**  9:16 22:5
134:16,23
**included**  129:6
159:20
**includes**  138:9
170:8
**including**  14:2
80:24 87:12 134:11
166:24 168:12
170:22
**incorrect**  191:10
**incorrectly**  67:5
**indentation**  111:3
111:12
**indentations**  104:2
**independent**  91:2
**indicate**  87:10
**indicating**  9:22
117:15 119:10,12
149:24
**indicator**  188:21
**indistinguishable**
127:4
**individually**  1:8
**information**  7:12
12:24 33:20 44:24
47:4 53:4 57:21
73:12,21 104:20
107:10 114:8 120:8
122:8 133:11,18
137:4 140:13 145:8
180:3 191:14
**informational**  20:2
**infrared**  8:15 91:21
103:24 104:5,8,12
104:15 105:10
128:2
**initial**  19:8,11,24
26:24 183:25

**initially**  43:7 62:6
**initials**  51:8 103:8
108:7 126:4
**ink**  7:16 17:5 41:9
41:11 44:17,19,20
45:8,16,21,25 46:3
46:9 48:17,22,23
49:11,14 50:10,11
54:3,9 56:3 57:22
58:17 63:8,18,19
64:20,20 65:2,20
66:7,22,25 67:2,2
67:22 68:3,9,15
69:10,17,22 70:12
70:15 72:7,14,14,22
72:22 74:2,4,14
75:3 76:2,22,25
77:10,21 78:4,5
79:17 80:6,9,9
81:18,21,21,21 82:7
82:13 83:8,22 84:17
87:11,18,19 88:10
89:9 91:19,20,22
94:25 98:19 102:21
102:21 103:25
104:2 107:4,14,15
107:17,17 108:16
119:24 120:3,16,20
121:22,23 124:7,8
124:11,11,16,17
136:23,23,24 137:7
140:2,11 141:4
146:24 149:7,9,21
150:2,4 154:20,23
156:7,8,12,14,15,16
157:2,4 160:16
162:2,6,24 168:7,16
168:19 170:3,9,11
170:15,18,23,25
171:6,7,9,10,12,14
171:17 172:2,4,4,7
172:21 173:10,10
173:16,20,21,23
174:3,20,23 177:21
178:3,5,8,8,12,14,24

178:25 179:4,6,7,7
179:9,11,14,19,22
180:2,8,9,10,23,24
181:5,10,11,12,22
181:25,25 182:12
182:14,19,20,24,25
183:5,14,16,19,24
184:2
ink's  177:5
inks  66:5 68:6
125:21,24 149:21
149:22 155:7,19,24
156:4 169:15 170:9
171:5,21 174:21
177:12,13 178:19
178:20
inorganic  148:21
inspection  12:8 70:7
75:14,22 112:10
123:13 135:24
136:14 137:23
149:13,17 158:4
187:5,8,10,11
installation  43:19
instance  15:16
91:18
instances  107:16
instruction  47:10
instruments  80:24
intense  94:18
intent  153:13
interact  29:5,6
31:14 32:15
interaction  29:22
107:11
interactions  29:25
30:12,17 31:21
interest  50:5,19 66:9
interested  194:19
interfere  3:8
interior  81:16,25
82:2
interlineation  51:8
55:5,6 103:8 149:6
154:24 156:8

interlineations
157:3
internal  85:20
international  90:21
91:2
internet  12:25 13:18
39:10 49:5,24 50:15
52:5 53:5 54:6
55:20,21 58:16
73:20,21 75:7 140:8
140:14,15
interrogatories  9:8
9:13 73:24 74:23
76:7 95:19 100:24
165:21 168:14
interrogatory  15:17
24:3 74:13 89:14,19
93:3,25 96:20 166:8
166:9 184:23 185:4
185:13 189:11
190:25 191:9,20
192:2 195:22
interrupt  99:21
interrupting  62:23
62:24 74:20
intersection  107:5,6
107:8,17 108:5
introduce  30:15
invented  83:10
invited  84:15 86:7,7
invoice  27:23
invoices  24:5,7
involved  15:20 16:9
16:9,17 22:13 28:11
29:10 31:13,19
32:14 34:17,21,23
34:25 35:8,21 37:22
37:22 39:4 41:25
43:16,25 44:12 49:8
68:9,9 89:3 112:20
120:14
involvement  8:2
17:20 19:11 26:23
27:15 31:3 39:4
50:9 62:7 63:17

71:18,18
involves  38:22
ir  148:5,7 150:22
151:4 154:21
157:21 158:16
irl  150:22 154:22
157:22
iron  70:24,24 71:22
island  86:8
israel  84:13,15,16
issue  20:8 139:10
item  96:21

**j**

james  2:25 3:11
28:2
jan  65:25
january  8:7 10:2,5
19:21 20:16,18,24
21:14,18 24:18 37:6
71:19 109:7,12
110:2,12,22 111:8
112:6 113:15,20,25
116:3 119:16
120:13 122:10
129:8 136:18 143:9
143:17 168:5
184:21
jason  35:18
jay  31:22
jeff  30:8,10
jennifer  32:8
jerry  30:7 39:13
131:22 185:10
188:22 191:4
jerusalem  84:22,24
jet  80:9 146:24
jetting  170:23
jim  39:9 44:7
john  30:3 37:21
38:4 110:11 111:2,5
journals  63:21
67:10 106:22
judge  5:3 40:18
41:13 43:7,13 47:11

56:14 66:23,24
judge's  47:10
judgment  43:23
53:3
judicial  17:14 113:4
113:10
july  30:19,24,25
31:18 53:25 70:7
75:3,14,22 76:16
112:9 137:23,25
138:6,9 140:3,20
141:3 168:5 185:7
186:20 187:2,3,5,8
187:8 188:6 189:18
190:11
jump  9:17,22 42:15
june  9:3 10:8 11:25
12:8 16:10 28:23
29:10,19 30:6 31:4
52:6 78:10,20 79:7
131:19 137:18,18
177:3
junk  57:3 63:21
67:7,11
jürgen  65:23

**k**

k  4:15 131:7
kasowitz  28:11,14
keep  62:16 72:8
153:2
keeps  80:22
kept  49:25 181:15
kevin  29:22
key  129:15
kind  55:22 122:7
182:17
kinds  169:13 170:2
kip  30:2
knew  49:7 52:23
65:6 111:18 187:9
know  6:7 17:2,4,13
17:14,16 23:15
25:14 26:20 36:12
36:13 37:25 38:19

39:3,21 41:4,12
42:9,20 44:9 45:15
46:7 49:8 50:8,24
51:23 53:4 55:22
63:12 64:7,8,13
68:14 75:16 76:11
77:23 78:22 84:11
85:24 90:4 101:17
105:5 112:3,18,19
114:24 120:2 123:7
139:24 141:7
147:22,23 148:3
161:9 171:5 174:18
174:20 178:25
183:5 187:21
191:13,22
**knowing** 140:10
**knowledge** 13:13,21
13:25 14:5 44:12
45:2 47:3,16 49:4
49:21 111:10
119:21 120:5,22,22
122:13,15 123:19
123:24 124:3 184:5
184:9
**known** 38:9,18
83:14 84:5,6 171:14
178:8
**knows** 48:19 188:8
**kong** 40:3 43:10,12
69:20

**l**

**l** 4:15 29:2 107:20
131:7
**lab** 8:9 23:21 64:3,4
68:25 88:14 116:18
118:6,7,11,16,20
128:8
**labeled** 95:5,6
**laboratory** 46:6
65:10 79:19 80:17
80:20 81:25 116:24
**labs** 172:11 175:22
176:4,9

**lack** 148:16
**lake** 30:8,10,13
**lakewood** 2:7
**lamp** 125:18
**lamps** 125:11
163:10
**language** 47:21
135:13
**laporte** 13:5 39:13
39:17 41:25,25
45:14 54:8,15,17
55:4,17 58:6,13
59:3,8 63:12,24
64:10,24,24 121:7
185:10,16 186:4
187:17,25 188:6
191:4,8,13 195:20
**laporte's** 45:7 49:11
55:12,15 60:17
121:10 186:15
188:10,22
**large** 65:10 96:4,5,6
96:8 102:3 106:25
**larger** 106:17
**larry** 13:6 39:8
45:24 46:19 49:18
141:8 158:19,22
**laser** 146:15 148:14
**lasted** 34:24
**late** 9:9 34:25 35:5
35:21
**latest** 87:22
**laurie** 1:22 4:13
194:7,25
**law** 26:18,22 27:4,6
27:16 28:11,23,25
30:7 31:18 32:2,5,8
69:3 82:2 86:4
**lawsuit** 50:18 51:15
113:2
**lawyer** 16:20 17:24
18:7 27:9 28:16
29:9,17 30:8 32:13
**lawyers** 16:16,16
18:15 27:16 28:12

29:6,23 30:2,23
31:22 43:11
**layer** 80:23 171:19
**leading** 20:17
**learn** 153:16 156:3
**leave** 117:16 119:14
126:17
**lecture** 84:17
**led** 21:4 35:7
**left** 26:22 92:18
97:17 118:21
**legal** 2:3
**legends** 189:2
**legitimate** 161:10
**lesnevich** 39:15
**letters** 103:15
**level** 54:24 66:10,12
99:18 127:13
151:10 155:8
156:11 158:3,15
174:15 175:10
176:7
**lide** 94:4
**lieu** 25:9 69:5
**life** 68:19
**light** 75:4 77:25
99:5 106:9 121:14
122:2,2 125:18,24
126:6 127:4,17,20
127:21 165:2,6
167:16
**lighting** 99:5 106:7
167:11,19,23
**limitations** 92:5
174:19
**line** 78:16,17 85:17
89:23 98:24 99:2
145:8 197:7
**lines** 91:19 102:21
160:11
**lippes** 29:2
**list** 41:19 42:7,17
**lists** 42:22
**literature** 63:22
72:24 73:5

**litigation** 8:5 59:7
113:11
**little** 9:23 22:4 56:17
79:14 101:4,8 106:2
116:18 117:16
152:23 159:19
162:22
**live** 69:5
**llc** 2:3
**llp** 1:20 2:16
**located** 3:16 42:10
**location** 122:11
**log** 33:19 133:7
134:2,6,8
**logical** 77:16,19
113:19 133:23
150:7
**long** 7:24 40:14,14
89:4 127:3 134:3
151:4 165:10
176:20 182:9
**longer** 15:20 34:21
34:23,24 67:18
177:11,15
**look** 60:3 72:9,15,16
72:20 73:9 78:21
90:3 95:3 102:6
113:23 117:24
139:17 180:22
181:2 187:23
189:15 190:5,6,10
192:8
**looked** 108:20
126:15,25 128:14
129:2 162:6 190:2
**looking** 33:9,10 60:4
97:22,25 98:5 99:23
107:19 139:2
142:10 189:16
190:8
**looks** 55:21 99:7
101:7 142:20,21
189:12,17,19,21
190:7,9

**loss** 45:17 54:19
63:15,24 65:17,21
66:4,5,13,17 82:14
83:21 87:19,24
88:14 177:24
179:17 180:4,6
182:22 183:18,23
**lost** 41:13 182:21
**lot** 55:21 173:4
**luc** 88:9
**luminescence** 91:22
151:4 165:7
**lunch** 129:13,19
131:14 164:16
**lyter** 39:14 49:6
50:7 54:5 66:21
**lyter's** 140:7,11,16

**m**

**m** 29:2 31:15 102:20
**machine** 146:7,14
146:19 176:21
186:9
**machines** 146:16
147:5
**magnification**
106:17,18
**magnifiers** 149:18
**magnifying** 126:16
128:15 167:15
**mail** 25:5,6,22 26:6
27:17 30:15 113:19
132:16,21 144:16
145:2 185:16,21
186:17 187:3
189:14,18 190:11
**mailed** 113:18
143:12,13 185:8,15
185:19 186:23,25
**mails** 121:9 139:2,8
**main** 2:12
**major** 83:3 181:22
183:10,12,15
**making** 159:5 179:2

**malfunctioning**
102:25
**mangled** 31:25
**manipulation** 94:21
**manner** 90:15
122:24 162:7
**manufactured**
170:12,16
**manufacturer**
183:17
**march** 28:10 33:8
**mark** 1:8 3:19 36:7
36:11 51:19 53:9
88:9 129:20 161:21
164:5
**marked** 58:25 59:3
59:6 78:11,14 89:17
89:20 93:6,11
152:17 153:10,19
164:8,11,13
**markings** 195:8
**marks** 28:16,19
**marriage** 194:18
**maserati** 176:16
**mass** 80:21 171:20
**master's** 81:12
**match** 178:7
**matches** 143:9
**matching** 151:2,9
**material** 80:8 98:18
134:9 167:21
170:22
**materials** 90:21
106:13,20 170:21
**mathias** 29:2
**matrix** 181:24
**mattel** 18:18
**matter** 176:17 183:8
183:15,17 194:20
**matthew** 2:21 4:10
**mcguire** 31:19
**mean** 8:21 12:3,18
15:20 34:21 36:9,12
67:11,15 70:11
73:19 78:6 98:21

110:3 115:14 152:5
155:6 156:7 161:6,8
170:16 171:16
173:13 187:19,23
**meaning** 9:6 42:23
51:23 67:17 104:24
134:16 156:25
158:4
**means** 12:4 17:15
52:2 83:25 123:6
146:23 150:8 151:9
158:2 174:25
**meant** 153:8 173:2
173:13 179:3
**measure** 63:18
126:12
**measured** 171:8
174:7 177:7,14,18
177:21,25 179:10
**measurements**
128:3,4,5
**measures** 183:24
**measuring** 182:22
182:23
**medium** 92:5
**meet** 32:20 132:14
**meeting** 16:15 20:17
20:21 33:2,5 34:15
34:16 87:25 116:3
**megapixel** 101:10
**melissa** 32:8
**memory** 33:4
103:12 104:22
144:17 189:19
**mention** 32:4
136:20 167:12
**mentioned** 20:11
24:12 28:6,7 35:20
37:18 38:3,17 42:21
45:21 61:8 66:21
73:7,17 80:9 83:16
83:19 88:12 92:23
109:22,25 110:2,8
111:22 113:14
118:24 119:11

122:19 137:3 141:8
150:7 173:2,13
177:4,19 180:4,13
181:13 182:13
184:3 186:6,15
**mentioning** 55:23
58:16
**mentions** 49:6
**messages** 62:17,19
**messed** 97:4
**messrs** 32:23
**met** 6:12,14 16:24
17:2 32:10 33:11,12
35:17 36:23,24
113:20 136:18
184:21
**method** 45:14,15,16
45:17 54:20 55:2
56:3 57:19 58:19
63:16,23,24,25 64:5
64:7,9,13 65:17,18
65:21 66:4,14,17
67:8 82:15 83:21
85:15 87:20,24
88:15 89:5 115:16
148:6,7,8,23 149:3
170:4,4,24 172:9,15
172:16,19 173:3,5,6
173:6 177:19,24
179:18 180:5,7
182:22 183:23
**methodology** 40:11
45:8 50:10,11 55:24
58:17,17 62:5 65:5
66:23 67:4 82:9
83:2,19,24 86:14
120:16,20 171:15
179:2
**methods** 21:23,24
63:20 66:9 68:4
82:7,13,18 170:8
171:21,25 176:10
180:7
**mga** 18:18

**michael**  28:16
**michigan**  8:9 32:21
**micrometer**  128:7,7
**microphones**  3:4,8
**microphotographs**
  101:2 107:21
  108:10,24
**microscope**  101:3,5
  101:6,10,11,16
  102:10,18 104:4,6
  105:17,22,24 106:6
  106:16,24,25
  107:13 108:15,18
  109:3 122:18
**microscopes**  80:25
  106:12 125:11,12
**microscopic**  8:14
  21:24 150:2 154:21
  157:21 158:6
**microscopy**  158:17
**microspectroscopy**
  148:5
**middle**  59:12,13
  71:8 156:21,24
  180:21
**milberg**  32:3,5,17
  33:7
**military**  81:8
**milk**  173:9
**millimeter**  137:9
**mind**  47:7 100:7
**mine**  116:11,11
**ministry**  81:16,25
  82:2
**minus**  43:20,20
**minute**  35:23 68:12
  166:5 169:16
**minutes**  73:22 130:6
  130:6 152:24,24,25
**mischaracterization**
  156:16 157:14
**mischaracterize**
  152:12
**miscope**  101:3,5

**misled**  34:18
**model**  147:8 188:20
  188:23 189:2
**modified**  116:10
**modify**  192:11
**moment**  58:22 78:7
  78:21 90:3 169:17
  184:24
**money**  25:15 126:22
**monitor**  66:5
**months**  33:11,12
  179:19 180:2,9,10
  180:17,25 181:6,10
  182:9
**moran**  17:25
**morning**  3:2 4:23,24
  75:2,22
**moscow**  81:10 84:15
  85:2,3 107:2
**motion**  43:12 52:8
  52:25 55:23 58:4,5
  58:9,13 59:2,7
  61:15 62:2,20
  195:19
**motions**  195:10
**mouse**  101:7
**move**  36:21 93:18
  117:14 119:12
  161:16
**moved**  51:20,25
  52:15 68:21,24
  69:18 85:5
**multimillion**  43:21
**multipage**  38:25
  98:15
**mute**  10:21
**mz**  103:15 105:7

**n**

**n**  1:19 2:2 3:23 4:15
  4:15 31:15 86:23
  87:3 107:20 131:2,2
  131:2,7,7 193:9
  194:11 195:2,5
  197:6,21

**naked**  124:19
  149:17
**name**  3:11,22 16:19
  17:24 28:6,8,21
  29:13,14,15,21
  30:10 31:20,22,25
  35:19 41:2 42:5,7
  44:9 108:4 109:17
  114:18 131:24
  154:8,9 186:6,15
  188:10
**named**  28:16 30:8
  31:14 32:14 35:18
**names**  13:5 28:15,17
  29:3 30:2 39:10,14
  40:23 43:5,18 65:23
  107:24 176:6
**nanometers**  164:25
  165:6,11
**narcotics**  81:23
**nathan**  31:15
**nature**  45:4
**near**  103:24 104:5,7
  104:12
**necessary**  65:11
  67:19 94:21 96:8
  132:24 170:25
  171:8 178:7 183:4
**need**  5:4,5 9:17
  36:11 42:17 94:15
  94:22 95:10 103:11
  104:21 117:14
  133:25 137:6,8
  139:7 141:14,25
  142:3 143:7 180:3
  185:20 192:6
**needed**  138:13,14
**needs**  20:12
**neither**  11:9
**never**  22:25 25:24
  43:23 44:11 53:10
  57:23 58:2,19 60:19
  60:22,25 61:5,10
  63:21 67:10,14,15
  67:16,25 115:6

138:19 142:22
  158:21,24 159:9
  177:11
**new**  1:3,21,21,23
  2:13,19,19 3:12,12
  3:16,17,21 16:16
  38:3 40:25 194:3,5
  194:9 197:3,3
**newer**  128:24
**news**  49:25 72:24
  73:11
**nice**  126:10
**nine**  26:18
**noncolorant**  174:3
**nondestructive**  8:13
  19:16 21:23 57:22
  61:4 90:17 125:8
  167:6
**normal**  148:12
  163:21 179:16
  180:18 181:9
**normally**  103:4
**notary**  1:23 4:17
  131:9 193:15 194:8
  197:25
**notations**  186:8
**note**  3:4 94:3 99:12
  125:17 146:3,13
  149:5 165:20
**noted**  24:4 130:12
  131:3 193:7
**notes**  99:11,16
  104:17,20 105:13
  108:3 129:18 164:3
  164:11,15 196:2
**notice**  104:23
  124:10,18 168:6
**noticed**  122:17
**november**  9:9 17:22
  19:22,24 20:9,15
  21:14 92:21
**number**  3:22 14:2
  41:16 59:7 66:18
  80:23 87:16,18,23
  98:21,22 105:6,9

178:24 188:10,12
188:20,24 189:11
190:25
**numbers**   79:4 90:13
**numerical**   128:5

**o**

**o**   131:2,2,2
**object**   10:14 57:12
62:11 84:20 162:13
**objection**   35:12
46:15 52:10,21
53:12,22 54:11,21
55:9,19 56:4,9,16
56:17 57:5,13,25
58:8 60:2,20 61:14
61:20 67:24 68:7
70:9,10 71:24 73:2
73:14 74:8,17 75:5
75:15 76:4,10,17
77:2,13,22 83:6
88:8 91:7,11,24
92:12 94:9 98:11
100:15 108:13
109:16,21 110:4
111:15 112:2 121:2
123:5 124:12,20
125:14 127:19
135:6 136:2 137:13
138:4 139:14,19,23
140:4 141:6 142:19
147:2,10 148:18
149:15 151:12,16
151:22 152:3,8,14
154:16 155:11,15
155:20 156:10,18
157:12,16 158:5,12
159:7,7,17 160:4,8
160:14,18,25
161:11 162:5
163:19,25 165:17
167:3 168:8,17
169:11 171:3,23
172:8,24 173:19
174:5,13 175:4

176:2,13,25 178:10
178:17 179:5 183:7
183:22 186:22
187:18,19 188:7
190:3
**objections**   47:11
153:6 160:22
**observation**   57:17
164:18
**observe**   74:13 92:6
127:24 163:14,21
163:21 165:14,18
**observed**   94:24
96:17 100:21
105:19,21 109:2
121:16 126:5
189:24
**obstruction**   63:14
**obstructionist**
161:12
**obtain**   96:8 176:10
**obtained**   12:12
13:25 134:20
179:21 189:5
**obtains**   175:16
**obvious**   122:17
**obviously**   60:2 81:2
86:16 99:23
**occasion**   7:11
**occasions**   7:4 36:25
36:25 37:2
**occurred**   11:7 24:18
44:15 116:6,7
**october**   15:17,21
86:8
**offer**   11:19 24:13
26:3,12
**offered**   10:9,12
11:14,18,24 23:10
23:11 25:8 57:21
67:22
**office**   17:3 34:8
115:17 116:9,20,21
116:22 118:8,9,11
146:7,14

**offices**   1:20 3:12
32:20
**oh**   11:20 18:12
47:13 97:2
**ohio**   2:7
**okay**   5:22,23 6:24
7:2 8:17 9:21 12:5
14:12 17:18 23:2
47:13,14 73:23
93:15,17 97:2 99:20
105:15 109:5 114:9
115:2,5 129:8 133:9
134:3 135:10,16
139:21 141:22
144:3,5 145:24
177:17 185:22
189:15,20 192:16
**old**   19:3 20:13 50:13
179:3,6 180:2,16
181:10 182:12
**older**   72:15,16,20
73:9 128:21 171:15
181:6,6,12
**once**   7:5 37:3,5,6
48:2
**ones**   91:14 189:17
**opacity**   97:19 99:9
127:5,16 151:5
**opened**   116:14
**operating**   91:3,10
95:22 108:11,19,22
**opine**   181:4
**opinion**   11:18 12:15
15:9 40:19,19 67:22
83:12 89:6 121:11
161:7
**opinions**   10:10,12
11:15,24 12:3,3
14:25 15:5,7,12
**opportunity**   60:3
93:22
**opposed**   39:23
40:21
**opposing**   5:9

**opposite**   116:24
**optical**   19:16 21:23
21:24 80:24 125:9
127:25 151:21
158:16 163:23
**option**   84:18
**oral**   57:16
**order**   52:15 54:25
85:22 92:17 176:15
178:9 179:6
**ordered**   53:18 70:7
**ordering**   53:17
**organic**   147:20,24
148:2,20 151:21
**organize**   130:7
**original**   110:9
**originally**   60:18
**originals**   164:8
**osborn**   37:22 38:4
38:19 110:11
111:23
**osborn's**   39:3
**outcome**   194:19
**outlined**   90:20
**outside**   82:8 83:17
83:25 84:9 85:7,14
85:23
**outstanding**   24:5,10
24:22,25 25:9 27:23
32:18
**oven**   72:12
**overall**   69:8 84:7
117:24
**overlap**   5:21
**overnight**   118:22
**overseeing**   47:18
**oversight**   46:12
**ownership**   50:19

**p**

**p**   2:2,2 29:2,2
**p.m.**   86:22 87:2
130:10,12 131:3,5
169:21,24 190:19
190:22 193:4,7

**p1** 164:22
**p2** 164:22
**package** 91:21
**packard's** 147:25
**padding** 80:9
  170:23
**page** 19:4 21:20,22
  39:2 51:6,8,9 55:5,6
  59:12,14,15 60:14
  60:15,16 75:19
  78:22 79:3 82:5
  87:7 90:9,13 93:4
  93:25 94:2,14 96:21
  98:14,15,16 99:2,3
  99:6,14 102:22,23
  103:9 105:6 106:15
  107:9 108:3 109:9
  109:23 111:22
  114:16,16,22,23
  116:11,15 117:13
  117:17 119:9,12,14
  121:23 127:14,15
  128:19,19,24 129:4
  129:4 141:20
  142:10 143:11
  144:4 146:6,10
  149:5,7 151:21
  152:6,6 153:22
  154:4,4,13,13,24
  155:2 156:23 157:3
  157:5,24 164:4,19
  164:21,23,23,24,24
  165:3,19,23,24,24
  166:6,13,14,21
  185:4,4 195:4,17
  197:7
**pages** 22:2 87:15
  97:6,17 98:21,22,23
  98:25 104:19,24
  114:14 116:12
  122:16,18 126:19
  126:20 127:8
  128:14,16,21,22
  142:17 150:3,23
  151:2 164:14 165:3

165:4,13,16
**paid** 14:11 16:2,7
  22:9,15 24:9,22,25
  32:18
**pan** 100:6 102:7
**paper** 54:3 63:19
  70:12 75:11 76:2
  78:5,5,6 80:6 87:22
  87:23 97:16,18,19
  98:18 99:7,8,10
  104:2 106:21
  117:12 119:13
  124:5 126:13,15,25
  127:3 150:21,25
  151:2,10 152:2,6,11
  153:23,25 154:2,3
  154:13 163:22
  164:22 165:11
  167:14,15,21,22
  168:6,15,19 170:21
  170:21 177:5
  181:25 183:6,20
**paragraph** 59:13
  60:16 82:6 90:14
  100:25 145:25
  146:3,10 149:5
  150:5,20 154:19
  156:22,25 157:19
  159:14 166:17
**paragraphs** 132:22
  166:5,21
**parameter** 127:9
  177:18,20,25 179:9
  179:13,19,21
  183:24
**parameters** 63:19
  96:14 126:25 171:8
  175:23
**parents** 37:10
**parikh** 30:2
**park** 1:21 2:18 3:16
**part** 23:22 36:10,15
  53:8,17 56:11
  101:15 105:14
  108:18 138:20

146:3 161:7 163:8
  165:15 172:3
  173:21
**particular** 5:4 16:2
  25:15 31:10 77:18
  94:4,10 98:20
  102:19 105:22
  120:24 126:17
  127:9 137:19 155:8
  158:3 169:6 170:11
  171:7 178:5,8,23
**particulars** 34:8
**parties** 3:10 53:18
  54:2 194:17
**pass** 145:18
**pattern** 105:3
  165:19
**paul** 1:5 2:11,14
  3:19 4:2 6:25 36:23
  37:21 38:4 51:12
  76:23 110:11 111:2
  111:5 145:5,21
  161:22
**pause** 10:23 36:2
  58:23 68:13 74:10
  78:24 166:19 185:2
**pay** 27:19 115:7
**payment** 5:25 24:4,7
**pc** 108:7
**pdf** 112:14 113:16
  114:6,13,15,19
  115:4,9,9,11 121:19
  143:8,16 144:2
  185:8 187:21,23
  191:2
**pe** 55:17 56:2,8,13
  57:2,10,24 58:6
  60:17,19,21,24
  61:13 63:10,17 66:5
  68:10 83:3,5 87:19
  88:6 174:8 178:3,5
  178:9,13,15,15,24
  179:8 182:2,12,22
  182:23 183:5,9,9,11
  183:15,16,18,19

184:2
**peak** 175:2,12,14
**peer** 63:20 67:9,9
  87:11,16 106:22
**peers** 67:12
**pen** 102:24 103:3,7
  149:21 183:5,20
**penalty** 69:6 135:11
  135:17
**pens** 103:4 149:22
**people** 38:8,9,15
  65:11,15,24 66:10
  70:22 72:21 86:11
  126:22
**percent** 23:13 24:12
  25:8,11,16,19 50:19
  50:25 179:22,24
**percentage** 178:23
  179:20,24
**perestroika** 69:15
**perform** 61:6 80:10
**performed** 8:12
  61:3 127:14 153:25
  168:12
**perfume** 175:7
**period** 27:22 181:16
**perjury** 69:6 135:11
  135:17
**permitted** 53:19
**permitting** 52:25
**person** 7:8 23:25
  37:3,5 83:15 132:15
  186:16
**personally** 12:12
**pesticides** 173:8
**peter** 13:6 32:14
  38:5
**ph.d.** 3:23 65:22
  81:7
**pharmaceutical**
  172:13
**phenoxyethanol**
  48:17 54:19,24 83:3
  174:8

phone   4:6,7 18:4,6
  28:8 37:4,6 62:17
  137:16 186:7
phones   3:7
phonetic   17:25
photo   77:11
photocopiers   146:15
photograph   57:20
  90:16
photographing   92:3
photographs   89:11
  91:5,13,18 92:23
  98:9 100:11,13,19
  102:14,17
photoshop   95:25
  96:3
phrase   58:18 174:24
phraseology   88:21
phrasing   46:19
physical   8:18 19:16
  52:16 53:2,19 54:2
  81:3 125:8 129:9
  135:22 151:18
  182:3
pick   3:5 135:14
picture   97:3 99:17
  101:9 123:18
  126:10 165:20
pictures   92:14
  100:17 127:6,22
  186:19
piece   163:22
pieces   152:6,11
  154:2,3,12 180:3
  189:24
pigment   147:15
  148:21
pioneer   83:4,7 88:6
  89:2
pioneers   88:20
piper   28:25 29:10
  30:6 131:23
place   3:7 82:21
  122:24 179:15

placed   106:20
  116:23 171:11
  181:25
placement   91:20
plaintiff   1:6 2:4 4:3
  8:5 17:8,12 22:21
  24:9,14 25:4 26:17
  28:10,24 30:23
  37:16 39:7 40:8
  41:2,8 44:21 50:18
  52:18 55:16,25 56:6
  58:5 61:5,6 62:2,3
  74:25
plaintiff's   5:13
  16:24 31:19 44:16
  45:22 46:13 47:19
  49:14 52:8 56:12
  61:13 62:5 76:15
  110:11 140:3,10
  141:4
plaintiffs   5:10 9:7
  27:9 39:12
planning   137:24
plant   43:18
plastic   115:15
please   3:4,6,24 4:13
  58:25 59:14 74:20
  86:20 103:20
  153:11 164:6
  166:15 185:24
plus   43:20,20 80:9
  94:22 128:12
  152:23
point   8:3,7 14:15,19
  24:6,10 46:5 48:10
  62:23 63:9 72:10
  107:4 120:9 121:4,9
  129:13 141:9
poland   69:21
police   82:3 84:15
polymer   147:16,16
  148:7
polymerization
  182:5,7

polymerizing   182:8
  182:19
popular   72:23 73:11
population   171:4
portable   101:6
portion   41:8 59:15
  61:7 74:14
portions   84:4 96:22
  97:12 101:2 102:22
  107:24 185:9 191:3
portray   166:23
position   17:16 51:12
  51:18 62:14 74:25
  75:8,9,11,17 76:21
  77:5,7 79:16,22
  163:2
positions   134:13
positive   29:20 85:24
  110:24 113:12
  115:18 132:12
  133:25
possibilities   102:3
possibility   19:9
  119:3
possible   31:3 62:7
  63:7 72:25 92:4
  106:17 107:9
  117:16 147:7
  151:14,19,24
  155:13,17,22 158:8
  169:2 178:14
  179:13,18
potential   17:20 71:3
potentially   15:11
powerful   151:17
practice   91:2
preferred   66:23
preliminary   9:4
  19:15
preparation   84:5,6
prepare   6:14,18
  72:19 134:4 191:23
prepared   12:10,19
  12:22 13:7 19:2
  69:4,8 86:4 90:7

122:25 132:15
  136:17 142:7
  143:13
preparing   29:4,18
  132:2
preprinted   132:22
present   2:24 75:22
  76:15,19 118:7
  182:24,25
presentation   64:19
presentations   87:17
presented   8:19 12:7
  70:6 75:13 76:9
  87:24 88:2 115:21
  123:12 162:25
presiding   5:3
pressure   175:24
presumes   46:17
pretty   11:9
prevent   42:24
preview   103:14
previous   108:7
  128:21 138:13
  140:25
previously   17:21
  18:9 66:21 81:5,16
  131:8
primitive   125:19
principles   56:7
print   150:6
printed   101:19,23
  107:11 123:9 150:8
  150:14,24 186:8
  188:13
printer   101:23,25
  104:25,25 123:7,10
  147:8 148:14
printers   146:15
  147:4
printing   188:18,19
printout   76:8 189:7
  189:15,20 190:5,8
printouts   189:5
prior   16:5 36:16
  110:11,22 113:14

113:15 133:3
158:18 163:4
170:25
**private**  3:6 5:14
65:13
**privilege**  5:16
**privileged**  47:3
145:15
**probable**  55:4
**probably**  15:9 25:16
29:20 45:16 49:18
86:16 100:16
111:19 113:12,21
126:16 127:23
133:24 140:7
144:11 172:16
173:22 188:11
192:4
**probate**  40:6
**problem**  47:23,23
172:6,20
**procedure**  91:4,10
92:13 95:22 107:2
108:12,19,22 111:2
111:16 119:5
172:18 176:4
**procedures**  136:14
173:7,8
**proceed**  4:19 136:7
136:15
**proceedings**  153:9
**process**  72:2,2 145:7
176:21 181:17
182:7,8
**processes**  182:4
**produced**  74:25
75:24 93:8 105:17
146:6,20
**producing**  36:10
**product**  10:15 62:12
**production**  36:16
163:4
**profession**  38:10
**professional**  1:22
79:5 87:8 194:8

**professor**  39:15
75:21
**proficiency**  66:10
66:13 82:8 83:17,25
84:8,9,23 85:6,8,14
85:23 174:16 176:7
**proficient**  65:16
174:15
**project**  23:17
**properly**  171:25
174:22
**protocol**  135:24
**protocols**  136:13
**proven**  82:7
**provide**  33:25 36:5
114:7 133:11
144:21
**provided**  8:8 9:2,6
9:11 11:16 73:24
74:5 76:7 92:21
93:13 95:16 112:5,9
116:4 120:8 137:4
143:5,16 144:2
181:8
**provision**  22:6
**proximity**  100:18
**psd**  96:3
**public**  1:23 4:17
131:9 193:15 194:8
197:25
**publications**  46:9
79:12 87:8 169:5
173:4
**publish**  86:6
**published**  43:10
57:18 63:20 67:9
82:10 83:10 86:5
106:21
**pull**  93:13 184:23
**purported**  50:20
51:2,3,7,12 52:16
53:2 54:4 55:6
120:23 122:5
184:10

**purports**  19:3 20:13
72:10,15 171:17
**purpose**  48:25 72:14
96:6
**purposes**  51:14
53:20 92:2,9 135:21
**pursuant**  70:7
**put**  12:8 33:24
41:12 46:15 47:10
59:24 61:19 71:7,8
71:22 82:20 85:16
89:22 93:12 114:4
117:22 118:2
132:17 133:9,18
139:19,23 143:14
180:14 183:6,20
184:24 185:22
188:10 189:6
**putting**  20:17 92:23

**q**

**qd**  95:7 97:6
**qualifications**  46:4
**qualified**  37:25 38:6
38:16 67:21 68:2
89:8 161:24
**quality**  121:20
**quantity**  54:18
**question**  5:20 7:13
10:25 11:23 14:4
23:2 36:22 37:21
46:16 54:13 56:18
56:19,20 60:9,9
61:22 62:25 63:2
64:18,19,25 73:3,10
74:20 88:17 96:10
98:3 119:23 143:2
147:6 153:7 161:4
161:11,14 162:7,11
173:15,23 187:22
**questioned**  64:16
87:25 109:13,20
179:22
**questioning**  145:9

**questions**  5:7 7:15
40:17 45:20 71:5,16
74:3,12 78:9 89:11
93:14 98:7 120:15
121:4,22 145:9
162:14,17 185:6
190:24 192:19,20
192:22,23
**quick**  86:20 105:13
144:9 190:14
**quickly**  177:13
182:8
**quinn**  18:12,13,16
18:17 26:25
**quite**  65:9 145:5
**quote**  57:3,3,10,19
57:24 83:16

**r**

**r**  2:2 4:15 107:20
131:2,7 179:20,20
194:2
**rafey**  31:23
**ran**  12:24
**range**  103:23,24
104:5,7,12,12 105:8
105:10 125:22
127:21,25
**rate**  22:18 23:19
177:6,14 180:8,18
180:19 182:18
**rates**  23:17
**ratio**  45:17 54:20
63:16,24 65:17,21
66:14,17 82:14
83:21 87:19,24
88:14 177:24
179:18 180:4,7
182:23 183:18,23
**reach**  28:12
**reaction**  72:4
**read**  46:23 54:5
55:11 61:16,18
82:11 83:17 90:23
146:9 149:10 151:6

153:24 154:6 155:3
156:22 157:6 166:5
166:15 192:13
**reads**  166:13
**really**  161:7
**reason**  33:3 102:19
138:12 139:24
149:18 160:23
175:12 197:7
**rebuttal**  14:8 40:10
**recall**  17:22 25:11
26:5 36:20 40:23
41:14,17 52:7 94:17
95:15 111:21,23,24
112:22 113:9 114:2
114:13,15 115:9,13
117:6,22 120:19
134:3 139:5,9
140:20 141:23
185:19
**receive**  71:2,3 92:11
**received**  5:24 24:4,7
96:15,18 113:24,25
114:6 121:4,6,9,19
124:4 143:8 186:24
189:14,18 191:15
**receiving**  62:16
**recess**  36:17 86:24
169:22 190:20
**recognize**  78:23
90:5 189:9
**recognized**  83:15
**recollection**  29:12
132:10 133:17
**recommend**  37:24
**recommendation**
90:19
**recommended**
37:23 110:25
**recommending**  38:8
169:5
**record**  3:3,10,25
5:22 28:20 35:22,24
36:11,18 47:11
59:25 86:21 87:2

91:15 92:3,10,17
93:9 96:14 97:4,23
97:24 105:11,14
129:14,21 130:8,9
131:5 139:19,23
160:20 169:20,24
190:18,21 193:3
194:14
**recording**  3:9 96:7
**recovery**  23:14
25:18
**rectangular**  189:23
**red**  125:25 126:2,6
**reddish**  103:19
**refer**  64:22 79:2
**reference**  191:2
**referred**  18:7 58:4
78:19 97:5 109:14
164:15
**referring**  59:11
60:13 82:18 83:18
100:9 104:16
140:15 189:10
**reflect**  134:19
**reflected**  74:5 169:4
**reflection**  192:10
**reflective**  89:24
188:20
**refresh**  103:12
104:21
**refrigerator**  72:9
**refrigerators**  72:6
**regard**  91:4
**regarding**  22:6 31:6
45:13 50:10,15
65:16 70:5 119:20
120:15 121:5
157:19 161:25
**registered**  1:22
194:7
**regularly**  173:18
**rejected**  40:18
**relate**  41:10 172:4
183:25

**related**  14:13 41:9
66:25 68:4,15 69:10
80:2,5 122:23,23
136:3,5 194:17
**relates**  12:12 69:21
153:23 164:22,24
170:20
**relating**  16:14 45:7
46:9 79:23
**relation**  190:10
**relatively**  71:11
**relevant**  120:2
182:14
**reliability**  57:4 61:3
**reliable**  57:11 67:8
82:7 86:15 172:2,10
172:19 173:3
175:21
**rely**  83:22
**remain**  16:9
**remember**  6:21
15:24 16:13,19 18:2
20:10,19,21 22:14
23:13 25:22 28:5,7
28:15,18,21 29:7,13
29:15,21 30:10,11
30:14,15,20 31:5,9
31:20 33:3,18 34:7
34:8,9 35:19 41:2
42:4,6 43:17 44:5
52:12 64:14 69:23
71:20 73:23 74:7
97:15 99:15 103:11
109:17 110:5
111:17,17 113:3,21
114:18 116:8 119:4
119:19 120:17,21
121:3,21 122:9,16
122:21 131:24
133:5 137:16 140:5
140:24 141:15
143:11 163:6,7
186:17 187:9,13
192:14

**remind**  47:5,9
**render**  12:14
**rendering**  68:6
**repaired**  170:17
**rephrase**  73:6
**report**  12:19 14:2,8
45:10 46:22,24 47:2
59:8,21 76:12
140:11,16 159:14
**reported**  73:11
**reporter**  1:23 4:12
194:8
**reporting**  197:2
**reports**  12:21 13:4,5
13:7,8,17 69:4,5,6,9
**represent**  26:18
78:17 93:7 166:22
**representation**  92:6
157:10
**representations**
96:17 100:21
105:18 109:2
**represented**  28:25
175:15
**representing**  3:11
**reproduced**  63:25
**republic**  81:18
**reputation**  38:10
85:16
**request**  144:13
**requests**  195:11
**requirement**  117:10
**research**  82:9
172:22
**resin**  147:16,19
181:21,23,24,25
182:3,7,12,18
**resins**  147:17 148:6
148:7 174:4
**resolution**  94:11,12
94:15 101:10 105:7
175:2
**respect**  15:19 22:4
39:20 96:10 136:13
150:21 154:20

156:14 158:25
164:19
**respond**  15:18,22,25
16:6 145:22
**response**  15:17
55:15 57:16 185:3
**responses**  9:8 24:3
89:14,20 93:25
127:2 195:22
**rest**  149:4
**result**  82:8 134:17
168:11 175:21
176:23 180:8,16
**results**  12:11,13,15
12:17 15:4,10,13
17:4 41:24 45:7
54:14 85:3,4,18,24
86:5,10,11,13
132:24 133:4
175:18 176:6,11
179:21 181:18
**resumed**  131:8
**retained**  8:4,4 18:24
19:7,21,25 20:16,23
21:5 27:4 37:17
38:20 39:8,12,17
40:7 41:3 43:22
112:20 115:25
116:4
**retainer**  21:6,10
22:8 116:9,10,23
**returned**  117:25
**reveal**  150:23
151:15,20,25
155:14,18,22 158:9
158:14
**review**  12:16,18
14:8,9 15:8 59:14
60:12 86:11 134:4
188:4,15
**reviewed**  12:19 13:8
13:16,18 15:12
45:10 63:20 67:9,9
87:11,16 106:22
135:2 136:11

158:19,21,24 159:9
**reviewing**  14:2 87:6
93:4
**rezende**  41:3
**right**  6:10 8:5,10 9:4
9:10 11:5,6,20
14:12 17:11 18:11
18:13 25:18 26:3,21
37:2 38:14 39:24
40:3 46:25 51:9
70:2,3 72:25 73:18
75:10 77:21 79:4,20
80:7 83:5 87:13
92:19,24 93:16
102:10,14 103:14
103:15 105:24
107:7,25 108:7,8
117:4 120:25 125:3
125:13 131:23
132:11 133:19
135:11 141:20
142:9 145:16
146:16,25 154:15
155:14 156:4,22
157:15 159:16,23
160:3,7 161:17
162:2,3 163:11
165:24 166:4 171:2
172:7,23 173:18
174:4,12 175:3,18
175:25 176:12
177:7,15,23 178:5
178:16 179:4
181:13 182:13,16
182:17 183:2,6
185:13 186:18,21
187:3 188:22
190:12 191:5
**rigorous**  66:25
**riley**  85:9,10,10,12
85:13
**ring**  28:17
**risk**  85:21
**rja**  1:7

**road**  2:5
**robert**  16:21 30:3
**roberts**  2:25 3:11
**role**  7:13 38:7 47:17
**roller**  149:22
**romano**  39:15 75:21
**room**  116:25,25
118:10,15
**rooms**  116:21
**roughly**  68:14 69:11
140:10
**routine**  168:23
**routinely**  90:18
**rpr**  194:25
**ruled**  43:13
**rules**  5:4
**rulings**  195:12
**run**  178:13
**running**  178:3
**russia**  68:25 69:2,16
73:17 81:17 86:3,4

**s**

**s**  2:2 4:15 29:2,2
31:15 66:16 131:2,2
131:2,7 197:7
**s.jpg**  108:8
**sahara**  71:8
**sample**  137:8 183:2
**sampled**  48:25 49:2
**samples**  8:19,22
19:18,19 31:4,8
35:3 44:18 48:4,8
48:12,20 49:5,9,17
49:18 84:3,3,20,21
84:24 85:14 86:4
125:2 135:22
136:21,22 137:4,6,8
137:11 139:13
140:2,11,20 141:4,8
141:13,14 174:22
174:22
**sampling**  44:15
53:19

**san**  43:17 50:6,12
**sanford**  16:22 32:5
**satisfied**  60:25
**saw**  13:5 53:5 54:6
58:18 59:11 74:4,6
99:15 127:5,17
186:8 189:9
**saying**  35:8 46:2
63:6 159:4 161:11
176:24 186:3
**says**  97:14 186:23
**scale**  102:3
**scan**  90:16 94:14
96:2,13 97:9 142:24
142:25 143:3
178:13
**scanned**  94:3 95:24
142:3
**scanner**  81:2 94:4
95:20 96:12 97:10
**scanning**  92:2
**scans**  89:11 91:4,13
91:19 92:9,14,22
94:7 95:7,21 96:12
96:16 97:5,6
**scenarios**  123:8
**schedule**  20:21
**scheduled**  137:11
138:23
**scheme**  60:24 61:13
**scholarly**  57:18
**schuster**  28:17
**science**  57:3 63:22
66:24 67:7,11 81:17
81:24 84:14
**scientific**  56:7 63:22
67:12 73:4 87:17
**scientists**  80:15
**scope**  64:9,13
**screen**  93:16 95:3
99:23,23 100:6
102:6 103:13,14
107:19 108:7 109:6
189:7

**sct** 66:16 83:22
177:19
**searches** 50:15
**second** 47:21 59:15
103:9,21,23 107:3
109:20 135:13
153:24 166:18
186:8
**secret** 46:6 64:8,10
64:22 65:7 82:4
83:11
**section** 153:23
154:11 157:6,9
**sector** 65:13
**security** 101:21
**see** 7:8,18,22 9:19
12:16 13:2,9 15:11
16:4,18 19:2 21:25
24:2 27:25 32:13
36:3 38:25 45:11
61:7 94:5 95:4
98:16 99:2,6 103:24
103:25 104:5 106:9
106:9 111:7 127:10
127:14 129:2,2,5
133:2 134:14
141:21,25 144:14
164:21 166:15
188:15 189:2,23,25
**seemingly** 153:8
**seen** 12:21,23 13:3
13:17 39:10,14
43:23 49:5,5,23
52:4 53:3 55:20,21
58:10,12,16,20 61:8
61:10 75:6 110:9
112:12,23,24 113:9
113:13,15 129:9
140:7 142:22
**self** 108:5
**send** 6:6 145:12
**sense** 29:11
**sensitive** 3:5
**sent** 6:2 27:17 30:14
85:3 112:14 114:2,7

114:14 115:3,10
132:21 134:10
142:2 186:16
**sentence** 135:8
**sentences** 60:5
134:18
**separate** 167:13
175:10
**separation** 175:20
**sequence** 106:20
150:7
**sequencing** 150:12
150:18
**sequential** 63:14
66:16 82:15,16,20
83:8,20 177:19
180:6
**service** 46:6 64:8,11
64:22 65:7 82:4
83:11
**services** 22:7 64:3
88:11
**set** 194:12,22
**setting** 94:18 104:3
**settings** 94:8 100:13
100:17 176:21
**settled** 41:22 44:5
**setup** 116:19
**shaman** 31:15,15,15
**shape** 175:2,12
**sharp** 167:18 175:14
175:15
**sheet** 197:2
**shoot** 99:22
**shooting** 98:5 99:25
**short** 60:24 67:3
127:3,3 151:3
164:25 165:9
169:18
**shot** 100:2
**show** 74:18 78:12
93:5 98:21 100:6
126:11 180:7,16
188:4 189:5

**showed** 98:22 165:7
**showing** 59:5 78:15
121:7 153:20 180:8
**shows** 98:24 123:9
179:11
**sic** 33:22
**side** 12:22 31:19
41:15 42:2,3 44:20
44:21 45:22 48:12
50:7 66:22 75:19
167:10,18,23
**sides** 12:20
**sign** 154:25 192:4
**signature** 90:10
107:12 142:4
143:11 160:11
**signatures** 51:9
126:5 149:8 156:8
**signed** 21:6,7,10
53:10 76:12 107:10
135:15 142:2
143:11 160:7,12
161:21,25 170:17
**significant** 42:16
79:11 121:14
**significantly** 79:15
128:20
**similar** 19:7 64:3
82:3 88:12 125:22
127:6 138:5 176:7,8
188:17
**simple** 143:4 149:13
**simplicity** 182:6
**simply** 13:3 47:4
64:14 78:17 82:25
89:24 96:13 103:22
106:6 126:9 146:23
158:2 161:11
176:18 180:17
192:3
**single** 23:25 114:13
**sit** 142:15
**site** 42:21,22
**sitting** 116:8,17,21
116:24

**situation** 181:4
**six** 85:4 109:23
111:22 114:22,23
117:24 118:23
144:4 179:19 180:2
180:9,10,17,25
181:6,10 182:9
**skill** 128:13
**skivington** 32:14
**sleeve** 115:15
**slightly** 175:23
176:22
**slow** 72:6 181:12,17
181:19 182:15,15
182:19
**slower** 177:14
180:19
**small** 102:4
**smaller** 81:3
**snowing** 34:10
**society** 64:16 87:25
90:20
**software** 96:2
**solely** 81:19
**soluble** 148:24,25
**solvent** 45:17 54:19
63:15,24 65:17,21
66:4,13,17 82:14,23
83:2,21 87:19,23
88:14 148:24 174:7
177:24 179:17
180:4,6 182:22
183:12,15,23
**solvents** 174:3 182:2
183:10
**somebody** 23:21
27:6 32:4 35:18
133:22
**soon** 139:5
**sophisticated**
106:25 126:24
**sorry** 14:16 23:20
26:7,14 33:9 55:5
59:12 72:18 95:9
157:20 165:23

sort  38:12 46:12
47:3 59:19 60:15
72:23 77:10 138:19
184:3 189:23
sought  52:18
sound  11:3 18:11
138:2 175:18
176:11,23
sounds  46:15 90:25
138:5 140:6
source  77:14,18
140:13 167:16
southwell  2:20 4:8,8
4:20,22 10:16,21
11:6,21 35:22 36:3
36:9,15 46:21,25
47:9,14 56:22 58:21
58:24 59:23 60:6,11
61:17 62:15,22
68:11 74:19 78:7
86:18 87:4 88:18,22
89:16 95:12 97:23
98:6 100:3 102:7
109:5 129:12,17,24
130:5 131:12
139:15,21 144:20
145:11,17,24
152:16 153:2,6,14
160:21 161:2,5,9,17
162:10,15,19 164:5
187:24 190:14,17
192:16,24 195:5
soviet  69:2 81:10,18
speak  28:2 32:7
47:24 92:19 131:13
131:18 133:17
speaker  86:7
speaking  47:10
80:20 140:10
specialist  63:8 79:18
specific  37:21 44:24
45:2,19 48:18 49:20
50:4,15,24 53:14

58:18 63:25 65:9
87:18 89:10 96:12
98:20 103:6 106:19
111:10 113:4
146:19 149:20
172:18 173:7,14
183:24
specifically  21:16
23:10 38:2,11 51:16
65:3 68:4 75:16
83:8 97:16 101:15
102:16 110:21
136:17 150:21
154:20 157:20
174:21
specifications
109:15
specifics  20:6 22:14
63:6 112:19
speckin  39:8,20
40:7,21 41:15 42:2
42:15 43:8 48:25
49:4,7,7 141:5
188:5 189:6
speckin's  40:19 41:8
41:13,23
spectral  9:15 80:24
185:11
spectrometer  80:22
spectrometry
171:20
spectrum  125:23
spent  134:8
split  48:12
spoke  7:5 28:4
30:16 32:4 36:24
48:2 110:18 133:10
133:22 184:14
spoken  6:17 7:3,4
32:11 35:17 37:9
133:21
spring  33:9,12,16
ss  194:4
stages  68:18

stake  25:16 40:7
85:17
stamp  80:9 170:23
stand  42:18 43:25
standard  90:21 91:3
91:9 92:13 94:8,19
94:23 95:21 96:14
100:13 108:11,18
108:22 111:2
148:15 169:5
173:21
standards  91:3
172:4
standing  60:9
stands  80:23
staple  97:18 98:22
123:16,20,21,25
142:22,23,24
stapled  123:13
start  71:4 87:8
93:24
started  65:12 69:15
137:23
starting  79:3
starts  59:17 113:11
141:19 156:25
182:7
state  1:23 3:25
90:14 150:21
154:21 156:3
157:20,21 162:12
194:3,9
stated  46:21 74:12
177:3 191:4
statement  159:16
statements  75:24
states  1:2 43:2 60:21
64:4 68:21 69:18
82:6 85:5
static  170:4,8
stating  47:2 53:10
154:11
stay  95:10,12 125:25
step  70:13 176:10,10

stepped  30:8
steps  176:22
stereomicroscope
168:2
steve  31:22
stewart  13:6 39:9
43:15,25 45:24
46:11,19 47:2,17,24
49:18 141:9 158:22
158:24
stewart's  158:19
159:6,15
stipulation  187:20
stood  64:25
stop  52:2 72:6 74:20
153:4 182:8,9
storage  119:17,20
119:22,25 120:5,11
120:17,21,23 121:5
179:16 180:12
184:4,5,16,17
stored  181:9
strategy  141:13
street  2:12 114:17
strength  17:13
strike  37:15 58:5,9
59:3,7 61:15 62:20
79:24 146:4 148:12
163:20 168:5
178:21 195:19
study  12:18
style  142:8
subjected  83:24
submission  53:9
59:21
submitted  30:5
41:22 43:12 52:20
53:9 58:5 75:24
84:2,2 85:18,19
142:18 158:25
190:25
submitting  158:18
subscribed  193:11
197:22

subsidiary 183:11
substance 131:16
substances 79:23
 80:2
substituted 128:19
substitution 39:2
 98:17 106:15
 128:19
substitutions 19:4
successful 42:24
sufficient 54:25
 174:15 178:15
 179:8,25
sufficiently 54:18
suggest 124:21
suggesting 135:18
 142:11
suggestion 22:23
 23:3
sum 25:15
summer 33:10,11,16
summertime 137:18
sun 71:22
sunlight 70:24 72:12
 77:12 78:2 121:15
supplemental 56:19
support 41:23 52:8
 52:20
supposed 176:6
sure 13:4 22:15 46:3
 47:15 66:3 76:19
 96:25 97:3,21 111:4
 111:18 112:20
 114:23 115:25
 127:22 129:22
 132:20 133:16
 134:12 135:8
 136:16 143:11,12
 145:22 181:5,19
 187:13,16
surface 151:5
 167:20
survive 84:11
survived 58:19
 67:16

swear 4:14
sweden 65:25
switch 104:7,7
switched 165:9
sworn 4:16 52:7
 53:9 75:24 131:9
 135:10 193:11
 194:13 197:22
symmetrical 175:14
 175:15
system 69:3,3 146:7
systems 146:14

**t**

t 29:2 66:16 107:20
 131:2 194:2,2
table 99:5,5 117:15
 149:23
tailing 175:13
take 8:18,22 20:24
 31:8 48:8,12,19,20
 57:8,15 70:13 73:22
 78:21 85:21 86:18
 86:19 90:3 92:14
 93:21 100:12,17
 101:18 109:5
 117:15 119:10
 123:18 125:2
 126:19 127:24
 128:4 135:2 136:21
 137:11 139:13
 140:19 141:4,8,13
 144:25 145:18
 161:17 165:20,20
 166:4 169:17,17
 174:22 176:19
 190:14
taken 3:17 35:3
 36:17 44:19 86:24
 94:7 95:21 97:9,13
 99:4 101:2 108:10
 108:21 132:22
 136:22 137:5 140:3
 169:22 185:10
 186:20 187:17

190:20 191:8
talk 26:15 48:15
 57:23 72:24 144:8
 169:13,25
talked 20:22 68:5
 82:14 125:12
 135:20 163:6
 169:15
talking 18:22 38:11
 49:10 51:5 66:13
 146:23 163:7
 172:18 182:21
tan 75:4 76:2
tannish 76:2 124:11
tape 86:19,22
task 18:25 19:7
 72:19 98:14 106:12
 108:15
tasked 46:12
team 23:22
tear 128:23 129:3
technical 40:17
 109:14 134:14
technically 134:18
technique 63:15
 66:16 82:16,21
 83:20 169:6 172:17
 177:20 180:6
techniques 7:17
technology 54:25
 65:9 147:3,5
telephone 2:9 6:22
 28:9 36:2 45:5
 55:14 74:10
tell 5:4 170:6 183:18
temperature 72:4,5
 72:11 77:24 175:24
ten 64:2 69:22,24
 88:15 170:15,17
tend 96:3
teppler 31:23
term 170:4
terms 23:10
test 48:18 60:17,17
 60:19,21,24 61:13

63:10 84:9,12,13,23
 85:8,15,15,20,22,23
 85:24 86:2,12
 106:19 126:24
 136:23,24 175:22
 183:4
tested 44:17 67:10
testified 4:18 40:8
 40:11 41:7,10 43:6
 44:14 46:24 50:6,13
 53:16 58:12 66:18
 66:20 68:2,9,15
 69:16,19 81:5,15
 105:20 131:10,21
 138:18 139:17
 155:7 178:19
 184:14 185:5
 192:10
testify 41:6 43:8
 44:5 58:3 69:4,12
 69:25 99:18
testifying 42:24
testimony 40:14
 41:9 66:24 67:22
 69:5,11 192:13
 194:15
testing 8:24 38:12
 48:15 49:11,15
 53:20 55:8,18 56:2
 56:8,13 57:3,10,22
 57:24 58:7 61:4,6
 62:5 80:5,11 82:8
 83:17,17,25 90:20
 118:25 119:4
 153:24 171:2 172:7
 172:21 173:16
 182:24
tests 19:15 54:8
 63:11,14 84:8 85:6
 153:25 160:17
text 91:21 142:4
texture 151:5
 167:21
thank 4:20 26:16
 36:6 58:25 82:17

87:4 95:14 129:16
154:10 158:7
192:24 193:2
thermal 65:19,20
thickness 126:13,14
126:21 127:2 128:3
129:7 151:3 167:15
thin 80:23 171:19
thing 122:16
things 49:24 70:23
73:7 134:14 161:15
162:8 178:25
think 6:4 7:24 15:25
16:19 17:24 18:24
19:12 23:6 27:17
28:4 31:2 32:3
33:15 42:11 44:18
46:2,18 48:8,11
49:6 52:4 53:16
56:22 58:4,9,15
60:8 62:6 75:6
86:18 88:20 97:23
104:16 105:12
109:22 110:24
113:18,24 116:7,9
117:25 132:21
138:18,24 139:2,7
140:23 141:17,25
142:7 144:18,20
145:11 182:13
184:14 186:5 188:9
190:15 191:15
192:3,14
thinking 34:16,25
35:20 45:23
thorough 12:18
thought 34:19 85:7
113:14 141:11
thousand 95:5
three 6:23 7:11,19
7:21 33:5 37:7 45:6
54:14 55:14 65:22
84:8,24,25 85:2
87:12 116:12
152:22,23 175:8

181:22 184:15,19
thwart 76:24
till 153:3
time 3:14,24 7:3,24
12:10 16:3,16 17:7
19:17,18 24:6,20,21
28:14,24 33:19
34:22 46:5 52:19
57:7 64:9 68:2
71:20 72:10 73:16
76:3 79:6 82:22
85:9,12 89:4 92:11
94:4 95:24 99:15,17
103:12 104:22
109:12 112:18,22
113:9 118:4,19
119:23 120:6
122:10 123:11
128:20 130:3,12
131:3 133:7 134:2,6
134:8,8 136:25
137:10 138:16,22
140:23 141:9
152:19,20 158:23
159:12 167:2 169:8
170:19 176:18
179:14 181:23,24
182:24 192:17
193:7
times 69:16 71:2
105:7 110:19
168:13
timing 175:24
tint 103:19
tip 149:22
title 79:16 142:6
titles 188:13
tlc 80:22 147:6,8,18
148:5,7,8,10,17,19
148:22 149:2
151:19 155:17
156:3 158:9,16
159:15 171:19
today 6:19 9:19
17:12 18:23 34:2

57:7 111:17 120:10
140:5 186:18 187:9
192:10
today's 3:13 193:5
told 19:21 35:15
57:9 188:11
tom 85:9,13
toner 54:3 80:6
94:24 98:19 107:4
107:14,15,17,18
108:16 146:8,24
147:7,9,13,23 148:8
148:20,20 150:10
157:20,23 158:10
158:14,20,25
170:22
toners 147:13,20,25
148:4,14,16
tool 101:16
tools 81:3 136:21
top 78:16 79:4 89:23
94:2 95:6 107:14,15
107:17 141:20
150:10 165:24
166:6,14
topic 30:22 184:16
184:20
touch 28:13
town 176:15,15
trained 65:12
trans 99:7
transcript 33:25
114:5,8 133:10
143:15 185:23
195:8
transfer 144:23
transferring 145:7
transmitted 127:17
127:20,21
transparency 99:7
transparent 86:12
travel 5:25 6:5
trial 41:6 43:8,13
44:4,6

triangle 175:14,15
tried 70:22 95:25
trippitelli 29:8,14
30:7 131:22 132:11
trippitelli's 29:9
true 92:5 96:16
100:20 104:9
105:18 108:25
194:14
trunk 71:7 180:21
try 5:19,20 26:21
41:17 70:15 72:21
119:6 126:17
185:23
trying 13:23 19:20
19:23 23:9 44:25
59:10 60:12 61:25
62:3 102:17 116:5
135:19 138:17,19
142:13
turn 3:6 6:5 9:23
52:6 87:6 100:23
103:17 125:25
131:19 141:16
145:25 154:18
156:20 157:18
169:25 185:3
turned 126:6
turning 126:2
turns 191:19
tv 118:7,8,15
two 16:15,16 21:20
21:22 27:14 28:25
33:5 36:24,25 37:2
38:17 40:13 41:21
44:19 48:11 51:6
55:7 60:4 63:11,13
63:18 68:18 73:22
85:6 87:13 88:10,13
95:5 97:6,17 98:14
98:15,21,22,25
104:19 109:9
110:19,21 114:14
114:15,16 115:3
116:15,20 122:16

123:3 125:21,24
126:19 127:8
128:14 149:8 152:6
152:11,22 154:2,3
154:12 164:14,19
164:22 166:5,21
170:7 171:15 172:3
175:7 177:6,8,9,11
177:15,21,22
178:20 181:7,12
182:9 186:5 188:12
**type** 46:16 55:23
101:25 106:5
125:19 126:8,24
146:19 147:3
149:16 150:8,24
151:8 167:13
168:25 188:17
**types** 38:13 81:19,20
169:2 172:13
**typical** 18:24 90:16
94:12 111:16
128:17 148:14
**typically** 14:7,10
18:25 22:12 38:21
77:24 94:11,15
98:13 111:13 113:8
125:25 126:17
136:20,22 147:17
158:14 167:12,19
168:21 180:5
188:15 191:16
**tytell** 13:6 38:5
39:13,16 75:21
**tytell's** 76:8,12

**u**

**u.s.** 3:21 46:6 64:8
64:10,22 65:7 68:24
69:19 82:4 83:10
88:12
**uh** 15:23 52:3 88:18
**ultimately** 8:4
**unable** 15:18,22,25

**unavailability**
138:12
**unavailable** 137:25
**uncomfortable**
134:16
**underlying** 86:10
**understand** 5:11,17
6:12 7:16 11:17
12:2 13:24 14:12,16
17:11 18:20 21:3
23:8,9,20 26:2,19
26:22,24 27:19
31:12 47:22 49:23
50:17,22 51:17
53:21 61:11,22,25
62:4 68:20,23 69:13
73:3 75:10 95:19
111:11 119:17
120:4 124:25
133:16 135:19
137:22 138:18,20
142:13,14 143:14
159:10,19 163:2,8
186:13,19 191:18
**understanding**
13:10 17:9 19:14,17
20:7 21:12 22:20
25:14,20 31:7 35:2
38:7 43:21 44:16,22
48:7,24 49:13 54:15
55:12 62:4 63:9
75:18 77:6 92:4
110:25 111:4,5
120:11 122:3,7
123:2 125:5 132:23
139:12
**understood** 44:15
50:23 135:12
137:24
**uneven** 165:14
**unfortunately** 103:4
**union** 69:2 81:11
**unit** 2:6 125:12
**united** 1:2 43:2
60:21 64:4 68:21

69:18 85:5
**unsuccessful** 42:23
**updates** 79:10,11
**upper** 97:17 142:21
**ups** 91:19
**usb** 101:13
**use** 22:12 54:25 64:9
64:13 65:7,19 66:12
66:15,15,17 70:24
71:22 72:5,11,21
83:20 92:14 94:11
94:13,16 96:2 99:17
100:13 101:7,14
106:11 108:14,17
117:12,14 119:11
124:22 126:12,19
128:7 147:15,16,17
149:19 167:23
169:6 171:21 172:6
172:21 173:22
174:17 175:23
176:5,9,16,16,17
180:5 188:16
**useable** 172:15,16
**useful** 101:16
104:21 106:19
**useless** 148:11
**uses** 82:6 106:23
191:17
**usually** 36:13 66:17
117:9,11 121:14
137:7
**utilizing** 146:7
**uv** 8:14 80:25 127:2
127:3,25 150:22
151:4 154:21
157:21 163:10,13
164:25,25 165:5,10
166:2,23 167:2,5
168:12

**v**

**v** 4:15 131:7 197:5
**vacation** 138:11

**vacco** 29:21
**valerie** 154:2,9
**valery** 1:19 3:23
60:18 65:5 86:23
87:3 130:11 131:6
154:9,10 156:25
193:5,9 194:11
195:5 197:6,21
**valid** 55:24
**validity** 55:17 56:2
56:13 58:6 61:2
**value** 41:12
**variation** 60:17
**variety** 73:7 146:14
**various** 91:15
158:10 166:2
**varying** 163:10
**vera** 37:10
**verify** 113:23
138:25
**veritext** 3:12 4:13
197:2
**versa** 180:20
**version** 60:19,21
65:18,21
**versus** 3:19 18:18
43:4 45:3
**vice** 180:20
**video** 9:15 80:24
95:10 98:5 185:11
188:4
**videographer** 2:25
3:2 4:5,12,19 35:24
36:18 86:21,25
93:20 95:9,14 99:22
100:6 130:9 131:4
152:22 169:20,23
190:18,21 193:3
**videotaped** 97:22
187:12,15
**view** 61:13,14,15
62:5,13 167:25
**views** 67:12,13
**vilardo** 18:10 27:16
28:3

violet  148:3
visible  103:23 104:7
    104:12,14 105:8
    124:19 125:22
    127:21,25 128:23
visual  8:13 21:23
    146:3,5 149:13,17
    149:25 150:22
    154:21 155:9
    157:21 158:4,6
    167:6
volatile  48:16,16
vs  1:7
vsc  8:16,17 9:15
    36:4 80:24 91:21
    92:24 125:12
    127:22,24 186:10
    188:6,21,22,24
    189:2,5,7,15,20,22
    190:5,8 191:5

**w**

wait  5:19,20
wang  40:2
want  7:25 13:23
    26:21 36:7 45:19
    59:11,24 62:21
    80:14 84:19,19
    85:21 89:10 93:18
    96:24 97:22 102:7
    109:7 112:19 130:3
    131:19 137:22
    145:14 159:19
    161:7 169:13
    178:25 185:6
    187:21 189:8
    192:12
wanted  27:18 50:8
    66:4 78:8 87:6
wants  145:8,13
warren  2:5
watching  118:7,15
water  93:22 149:21
wave  151:4 164:25
    165:9,10

wavelengths  163:10
    165:6 166:25
way  9:14 12:6 13:12
    16:10,12 25:21
    34:14 42:17 46:19
    47:8 119:13 123:17
    128:6 132:4 133:20
    135:12 136:12
    138:21 144:6 162:3
    162:13 167:20
    176:24 194:19
ways  14:2,3 73:10
we've  82:14 93:3
    96:25 99:20 169:15
    187:19
wear  117:8 128:23
    129:3,22
wearing  117:6 119:5
web  42:21,22
week  110:22 138:7,8
    138:8,17,23 140:25
    141:2
weekend  138:15
weeks  6:23 7:11,19
    7:21 37:7 45:6
    54:14 55:14 184:15
    184:19
welch  85:10,10,12
went  62:19
western  1:3 3:21
wheel  40:3
whereof  194:21
whispering  3:5
white  75:13 115:11
    115:12 124:5
    127:11,11 163:22
    165:12,12
whitish  189:23
wide  150:24
widely  147:4 171:21
winter  33:21
wish  41:19
withdrew  30:7 41:8
witness  3:23 4:14,16
    14:8 40:13 42:6,11

60:2 61:23 62:25
    93:21 95:11,13
    129:16 131:8
    144:15,25 145:20
    193:2 194:11,15,21
    195:4
witnesses  11:11
won  41:4 43:22
word  58:14 124:22
    135:4,9,15 148:16
    164:21,23
words  5:7 15:18
    20:10 40:13 46:7
    52:12 65:5 66:2,8
    72:19 86:14 132:18
    135:14 171:12
    173:14 174:16
    176:3,14
work  9:3 10:15
    14:10 21:20 22:15
    22:24,25 23:24
    25:24 50:20 51:5,13
    53:10 54:4,9 55:6
    62:12 66:3 73:25
    74:25 75:23,25
    77:11 99:11,11
    104:17,20 108:3
    109:9 112:5,12
    113:16 115:13,21
    117:2,19 119:15
    120:12,24 122:4
    125:17 129:17
    134:7,7 135:21
    142:16 143:5
    146:20 152:7,11
    156:15 159:22
    160:3 162:23 163:9
    164:2,11,15,19
    166:3,24 168:7
    184:6 187:5 189:24
    196:2
worked  7:25 18:8
    18:15,17 29:17
    68:25 73:16 81:16
    106:25 131:22,25

132:5
working  23:16
    65:12 76:23 80:15
    84:14 163:3
works  86:15
world  65:15 83:15
    171:24 172:11,17
worn  117:10
worried  169:10
wow  40:16
write  154:24
writing  46:3 108:3
written  11:15 149:9
    150:17 160:10
wrong  6:22 142:12
    186:12
wrote  9:13 33:18
    42:21 104:20,23
    108:3

**x**

x  195:2

**y**

y  4:15,15 131:7,7
yeah  11:2 16:21
    23:12 36:15 47:15
    52:4 59:16,19,23
    61:17 68:17 70:18
    88:22 90:6 128:11
    130:5 133:23 138:5
    144:20 156:24
    160:24 161:5
    162:21 191:24
    192:3
year  33:13 43:20,20
    61:5 79:7 86:2,9
    90:8 95:25 120:14
    140:23 178:2
    180:16 181:15,16
years  55:7 64:2 82:9
    88:15 90:18 128:20
    170:15,16,18
    171:13,15 177:6,8,9
    177:11,15,21,22
    178:21 181:7,12

182:10
**yehuda**   43:4
**yellow**   101:24
  104:24 105:3
  121:24
**yellowed**   74:13
**yep**   190:17
**york**   1:3,21,21,24
  2:13,19,19 3:12,13
  3:17,17,22 38:3
  40:25 194:3,5,9
  197:3,3
**young**   32:8
**younger**   72:9
  171:17 179:19
  180:9,10,16

**z**

**z**   102:20
**zarbeco**   95:8 101:3
  101:5 102:8,10,18
  104:4,6,10 105:17
  105:19 106:4
  108:20
**zuckerberg**   1:8 3:20
  50:22 51:20 53:9
  161:22 197:5