1          UNITED STATES DISTRICT COURT

2          WESTERN DISTRICT OF NEW YORK

3

4

5   PAUL D. CEGLIA,

6              Plaintiff,

7        vs.                    No. 1:10-CV-00569

                                   (RJA)

8   MARK ELLIOTT ZUCKERBERG,

    Individually, and FACEBOOK,

9   INC.,

10             Defendants.

    _____/

11

12

13

14

15     Videotaped deposition of HANY FARID, PH.D., taken at

16     the University of California Berkeley, Dwinelle

17     Hall, Room 43, Berkeley, California, commencing at

18     11:13 a.m., on Monday, August 13, 2012, before

19     Leslie Rockwood, RPR, CSR No. 3462.

20

21

22

23

24

25

```
 1    APPEARANCES OF COUNSEL:

 2

 3    FOR THE PLAINTIFF:

 4         BOLAND LEGAL, LLC

 5         BY:  DEAN BOLAND, ESQ. (via speakerphone)

 6         1475 Warren Road, Unit 770724

 7         Lakewood, Ohio 44107

 8         (216) 236-8080

 9

10         BY:  PAUL A. ARGENTIERI, ESQ. (via video conference)

11         188 Main Street

12         Hornell, New York 14843-1526

13         (607) 324-3232

14

15    FOR THE DEFENDANTS:

16         GIBSON DUNN & CRUTCHER LLP

17         BY:  MATTHEW BENJAMIN, ESQ. (via video conference)

18         BY:  ALEXANDER H. SOUTHWELL, ESQ. (via video)

19         200 Park Avenue

20         New York, New York 10166-0193

21         (212) 351-4079 (Mr. Benjamin)

22         (212) 351-3981 (Mr. Southwell)

23         mbenjamin@gibsondunn.com

24         asouthwell@gibsondunn.com

25
```

1    APPEARANCES OF COUNSEL:

2

3         GIBSON, DUNN & CRUTCHER LLP

4         BY:  NICHOLAS J. MUSCOLINO, ESQ.

5         555 Mission Street, Suite 3000

6         San Francisco, California 94105-0921

7         (415) 393-8266

8         nmuscolino@gibsondunn.com

9

10

11   Also Present:

12        Soseh Kevorkian, Videographer

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    I N D E X

2

3

4   MONDAY, AUGUST 13, 2012

5

6   WITNESS                                    EXAMINATION

7   HANY FARID, PH.D.

8

9       BY MR. BENJAMIN                              7

10

11

12       QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:

13                        (NONE)

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1                    DEPOSITION EXHIBITS

2                     HANY FARID, PH.D.

3    NUMBER          DESCRIPTION                IDENTIFIED

4    Exhibit 52      Letter to Dean Boland from        12

5                    Hany Farid, Ph.D., 6/28/12

6    Exhibit 53      Hany Farid, curriculum vitae      13

7    Exhibit 54      Street Fax document               34

8    Exhibit 55      Screen shot, page 1 of 2 for      37

9                    Streetfax contract w Mark

10   Exhibit 58      United States of America v        84

11                   Rudy Frabizio, 8/11/06

12   Exhibit 59      State of Ohio v David L.           89

13                   Harrison, 12/28/07

14   Exhibit 60      State of Ohio v. David L.          90

15                   Harrison, merit brief of

16                   Appellant David L. Harrison

17

18

19

20

21

22

23

24

25

1           Monday, August 13, 2012; Berkeley, California

2                            11:13 a.m.

3                            ---oOo---

4           THE VIDEOGRAPHER:  Good morning.  We're on the

5    record at 11:13 a.m. on August 13, 2012.  This is the

6    video recorded deposition of Dr. Hany Farid.

7           My name is Soseh Kevorkian, here with our court

8    reporter, Leslie Rockwood.  We're here from Veritext

9    National Deposition and Litigation Services at the

10   request of counsel for defendant.

11          This deposition is being held at Room 43,

12   Dwinelle Hall in Berkeley, California.  The caption of

13   this case is Paul D. Ceglia vs. Mark Elliott Zuckerberg,

14   et al., case number 110-CV-00569 (RJA).

15          Please note that audio and video recording will

16   take place unless all parties agree to go off the record.

17   Microphones are sensitive.  They pick up the whispers,

18   private conversations, and all cellular interference.

19          At this time would counsel and all present

20   please identify themselves for the record.

21          MR. BENJAMIN:  Matthew Benjamin of Gibson Dunn

22   for the defendants.  And with me is Alex Southwell, also

23   of Gibson Dunn.  And Nick Muscolino is present in

24   California.

25          MR. ARGENTIERI:  Paul Argentieri for the

1  plaintiff, Paul Ceglia.

2          MR. BOLAND:  Dean Boland for the plaintiff,

3  Paul Ceglia.

4          MR. BENJAMIN:  Thank you.

5          Good morning, Dr. Farid --

6          THE REPORTER:  Excuse me, Counsel.  I'll swear

7  in the witness first.

8          MR. BENJAMIN:  Go ahead.

9          THE REPORTER:  If you raise your right hand,

10  please.

11          You do solemnly state that the evidence you

12  shall give in this matter shall be the truth, the whole

13  truth and nothing but the truth, so help you God.

14          THE WITNESS:  Yes.

15          THE REPORTER:  Thank you.

16          Proceed, Counsel.  Thank you.

17          MR. BENJAMIN:  Thank you.

18

19                    EXAMINATION

20  BY MR. BENJAMIN:

21      Q.  Good morning, Dr. Farid.

22      A.  Good morning.

23      Q.  My name is Matt Benjamin.  I'm an attorney here

24  at Gibson Dunn, and I'll be taking your deposition today.

25      A.  Okay.

1      Q.  Before we begin, I just want to confirm that the

2   video technology is working properly and you can hear and

3   see me well.  Can you?

4      A.  Yes, I can.

5      Q.  If that changes at any point during the

6   deposition, please let me know.

7      A.  Whoever is shuffling papers are interfering with

8   the sound.  So just move away from the mic or knock it

9   off.

10      Q.  I think you're chastising Mr. Argentieri.  So

11   he's going to mute his microphone.

12      A.  Okay.

13          You muted you.  I can't hear you, Matt.  No,

14   nothing.  I mean, your lips are moving, but -- there you

15   go.

16      Q.  How about now?

17      A.  That's better.

18      Q.  Great.  We're stuck in a Verizon commercial.

19      A.  It's going to be a great deposition, I can tell.

20      Q.  Mr. Argentieri is going to keep the paper

21   shuffling to a minimum.  If you can't hear me or see me

22   at any point during the deposition, please just let me

23   know.

24      A.  Sure.

25      Q.  Dr. Farid, have you ever been deposed before?

1      A.   Yes, I have.

2      Q.   Approximately how many times?

3      A.   Maybe half a dozen or so.

4      Q.   And when most recently?

5      A.   I don't recall, but probably within the year.

6      Q.   Having been deposed before, you understand that

7  in a deposition, I will ask questions to which you should

8  provide full and complete answers.

9      A.   Yes.

10     Q.   Is that correct?

11     A.   Yes.

12     Q.   Now, on occasion I may ask a question that I

13 don't state very well or for some reason that you don't

14 understand.  If you don't understand my question for any

15 reason, please don't answer it.  It's my job to ask

16 understandable questions.  So if you say you don't

17 understand, I'll try to ask a better question.

18     A.   Okay.

19     Q.   Does that make sense?

20          If you need a break at any point, please tell

21 me, we'll finish your answer if we're in the middle of

22 it, and then we'll see what we can do about a break.

23 Okay?

24     A.   Sure.

25     Q.   Is there any reason you can think of why you

1   will not be able to answer my questions fully and

2   accurately today?

3        A.   No.

4        Q.   Now, the Judge presiding in this case has some

5   particular rules that I need to tell you about.  First,

6   if you need clarification or an explanation of any words,

7   questions or documents during the deposition, you're to

8   ask me as opposing counsel rather than the plaintiff's

9   counsel.

10            Do you understand?

11       A.   Yes.

12       Q.   Second, you and plaintiff's counsel may not

13  engage in private conversations during the deposition or

14  any breaks except to determine whether to assert a

15  privilege.

16            Do you understand?

17       A.   Yes.

18       Q.   And lastly, particularly given the possible

19  delay attributable to the video technology, I would just

20  ask that we try not to talk over each other.  It will

21  make things easier for our court reporter as well.

22            Sound good?

23       A.   Yes.  Sure.

24       Q.   Thank you.  Dr. Farid, thank you for

25  accommodating us and agreeing to be deposed by videotape.

1          You are a visiting scholar at UC Berkeley; is

2    that right?

3          A.  Yes.

4          Q.  And you've been out in California all summer?

5          A.  Yes.

6          Q.  Did you have an opportunity to meet with anyone

7    to prepare for today's deposition?

8          A.  No.

9          Q.  Did you have an opportunity to speak with anyone

10   by telephone?

11         A.  I spoke with counsel at -- I'm sorry, do you

12   mind if I open my laptop and just check the -- who I

13   spoke with?

14         Q.  Of course.  Yeah.  Are you --

15         A.  I just -- I just forgot her name.  I spoke with

16   Jennifer Young at Milberg when I first received the --

17   the letter from you asking for me to be deposed, and I

18   simply was asking her what this was about.  But we didn't

19   prepare anything for the deposition.

20         Q.  And was Ms. Young your primary contact from

21   plaintiff's counsel during this case?

22         A.  Yes.

23         Q.  So you did not speak to Mr. Boland or

24   Mr. Argentieri to prepare for today's deposition; is that

25   correct?

1      A.  That's correct.

2      Q.  Have you ever spoken to Paul Ceglia?

3      A.  No.

4          MR. BENJAMIN:  I'd ask the court reporter to

5  mark a June 28, 2012 letter that you sent to Mr. Boland

6  as Defendants' Exhibit 52.  I have a copy here for

7  Mr. Argentieri, which I'm handing to him.

8          (Exhibit 52, Letter to Dean Boland from Hany

9          Farid, Ph.D., 6/28/12, marked for

10         identification.)

11     Q.  BY MR. BENJAMIN:  Dr. Farid, you've been handed

12  a copy of Defendants' Exhibit 52.  Do you recognize this

13  as an accurate copy of the letter that you sent to

14  Mr. Boland, dated June 28th, 2012?

15     A.  I'm sorry, did you say June or July?

16     Q.  I said -- I meant to say June.

17     A.  Yes, that's correct.  Yes, I do recognize it.

18     Q.  Thank you.  So Defendants' Exhibit 52 is a

19  June 28, 2012 letter that you sent to Mr. Boland?

20     A.  Yes.

21     Q.  You have not submitted any other documents to

22  counsel; is that right?

23     A.  That's correct.

24     Q.  And you've not prepared any reports; is that

25  correct?

1       A.   That's correct.

2       Q.   And this letter, Defendants' Exhibit 52,

3  contains all of the findings and opinions that you have

4  reached in this case; right?

5       A.   Yes.

6       Q.   Okay.  I'm interested to hear more about your

7  background.  What's your title?

8       A.   I am a professor of computer science at

9  Dartmouth College.

10       Q.   Is it accurate to describe one of your

11  specialties as digital image forensics?

12       A.   Yes.

13            MR. BENJAMIN:  So I went onto your Dartmouth web

14  page and printed a copy of your CV.  I'd ask the court

15  reporter to mark that printout as Defendants' Exhibit 53.

16            (Exhibit 53, Hany Farid, curriculum vitae,

17            marked for identification.)

18       Q.   BY MR. BENJAMIN:  Dr. Farid, you've been handed

19  a copy of Defendants' Exhibit 53.  Take your time to read

20  through it.

21            Do you recognize this as your current CV?

22       A.   Yes, it is.

23       Q.   And all the information contained in that

24  document is accurate?

25       A.   As accurate as can be with 15 pages, yes.

1      Q.  Well, take your time to read through it.

2      A.  Okay.  By "accurate," I just mean there may be

3  typos, but it is my CV, yes.

4      Q.  Understood, typos aside.

5          Now, I've read that the first publications in

6  the field of digital image forensics date back a decade

7  or so.  Would you agree with that estimate?

8      A.  Yeah, that's about right.  And sometimes it's

9  hard to quantify these things, but about a decade is when

10  the field of image forensics started to emerge in a

11  serious way.

12     Q.  And in addition to your team at Dartmouth, who

13  are some of the other respected experts in the field of

14  digital image forensics?

15     A.  I would say there are a handful of groups

16  worldwide.  The ones that immediately come to mind are

17  Jessica Fridrich.  It's spelled F-R-I-D-R-I-C-H at SUNY

18  Binghamton.  Nasir, N-A-S-I-R, Memon, M-E-M-O-N, at -- I

19  don't know what the university is called anymore.  It's

20  Poly Tech/NYU.  Those two universities merged recently.

21         So those are the two that pop to mind

22  immediately.  There are, of course, a number of people

23  worldwide working on this problem.  Those are the ones I

24  happen to be most familiar with.

25     Q.  And you've collaborated with Professor Fridrich;

1    is that right?

2         A.   We have not published any papers together, no.

3         Q.   Oh, I thought you had.  My mistake.

4              In addition to your academic appointments, your

5    CV identifies you as the chief technology officer and

6    co-founder of Fourandsix Technologies, Inc.; is that

7    right?

8         A.   That's correct.

9         Q.   And what is Fourandsix Technologies?

10        A.   It is a software startup -- startup based here

11   in the Silicon Valley, and we are commercializing the

12   forensic technology that I've developed over the last ten

13   years into a commercial product.

14        Q.   By "forensic technology," are you referring to a

15   series of products used to help detect altered digital

16   images?

17        A.   That's correct.

18        Q.   One article I read indicated that your first

19   detection product is scheduled to be released later this

20   year; is that right?

21        A.   That's correct.

22        Q.   Which product is that?

23        A.   I'm not sure I understand the question.  Are you

24   asking for the name of the product or what the product

25   does?

1      Q.  Both.

2      A.  We don't have a formal name for the product yet,

3  but I can describe what it does.  So the product is a

4  piece of software that determines if a digital image was

5  altered in any way from the time of recording.  So an

6  image is recorded at the camera, and we want to know has

7  anything changed from that moment in time, whether it was

8  uploaded to an online service, whether it was edited in

9  Photoshop, whether it was put into iPhoto, we have a

10  mechanism for determining if the actual file has changed

11  in any way from the time of recording.  And that's the

12  first product.

13      Q.  And does that product incorporate more than one

14  of the forensic tools that you and your team have

15  developed?

16      A.  Yes.  It's probably a combination of two or

17  three core ideas.

18      Q.  Does it have a specific release date?

19      A.  We are shooting for early September, but it's

20  not a firm date the way these things go.

21      Q.  Understood.  Dr. Farid, in your June 28th

22  letter, Defendants' 52, you indicate that you were

23  retained by Milberg LLP, and as you previously testified,

24  you contacted Ms. Young after receiving our deposition

25  notice.

1           When were you first contacted regarding

2    potential involvement in this matter?

3           A.   I -- I believe it was early April or late May.

4    I checked my email this morning, but I think the first

5    contact was by phone.  So I don't have an exact date.

6           Q.   You're referring to early April --

7           A.   Sorry, of 2012.

8           Q.   Okay.  And that's late April -- I'm sorry, late

9    April, early May?

10          A.   Sorry.  Late May, early April of 2012 -- oh,

11   sorry.  I got it backwards.  Sorry.

12          Q.   I thought it might be a Continental

13   misunderstanding.

14          A.   No, it's brain fart.  Hold on, let me just

15   check, just make sure I get this right.

16               Sorry.  Late March, early April.

17          Q.   And that's late March, early April, 2012; is

18   that right?

19          A.   That's correct.

20          Q.   And what are you reviewing to refresh your

21   recollection?

22          A.   Sorry, I was just checking my email to see when

23   the first email from Jennifer Young was, and it was --

24   the first email I have from her was April 2nd, 2012.

25          Q.   Thank you.  And you have all of the email that

```
 1    you received related to this case organized on your
 2    computer?
 3         A.  I believe I have all of them.  Sometimes one or
 4    two slips through, but I have -- there's only maybe 14 or
 5    15 emails.  Sorry, that's not right.  Maybe 20 emails.
 6         Q.  And were the majority of those emails exchanged
 7    with Ms. Young at Milberg?
 8         A.  Let's see.  Yes, I think that's fair to say.
 9         Q.  And what's the most recent email that you
10    exchanged in relation to this case?
11         A.  I had an email exchange with -- well -- I had a
12    number of exchanges with your office regarding the
13    deposition.  So pushing back from that, I had an email
14    from Jennifer Young on July 17th simply informing me that
15    they were no longer representing Paul Ceglia.  This was
16    after I talked with her about the deposition, and I think
17    she just wanted to make it clear that they were not going
18    to be representing me in the deposition.  So that was
19    July 17th of 2012.
20         Q.  So you understand that Milberg has withdrawn as
21    counsel for Mr. Ceglia?
22         A.  Yes, I do.
23         Q.  Is that right?
24         A.  Yes.
25         Q.  And when you were contacted on April 2nd, 2012,
```

1    by Ms. Young, what did she -- in what way did she suggest

2    you could be involved in this case?

3         A.  So Jennifer, or Ms. Young, told me that they

4    were representing Paul Ceglia in the case.  I'd actually

5    read about it in the press, of course.  And there was

6    some debate about specific printed documents, and they

7    were looking for an expert in forensic analysis to

8    determine if they were original or not and asked if I

9    would be able to help in the matter.

10        Q.  Now, when you say "printed documents," are you

11   referring to the electronic documents that you received

12   or to hard copy paper documents?

13        A.  Sorry, I'm distinguishing -- I use the term

14   "printed documents" to distinguish from images or video.

15   When I say "printed documents," I mean documents largely

16   containing text as opposed to photographs, videos.

17            So I remain agnostic as to the underlying

18   medium, whether they're actual physical pieces of paper

19   or electronic scanned copies of those papers.

20            Sorry, we can't hear the objection, just for the

21   reporter.

22            MR. ARGENTIERI:  Objection.  Attorney-client

23   work product.

24            MR. BENJAMIN:  What specific attorney-client

25   work product?

1            MR. ARGENTIERI:  Well, you're asking him about

2      what Jennifer's Young's --

3            MR. BENJAMIN:  Let me finish my question.

4            MR. ARGENTIERI:  Yeah, I can finish.

5            MR. BENJAMIN:  What specific attorney-client

6      work product -- with that question?

7            MR. ARGENTIERI:  Your two questions and his

8      answers.  So let's move on.

9        Q.  BY MR. BENJAMIN:  So Dr. Farid, you were

10     distinguishing between hard copy physical documents and

11     electronic documents; is that right?

12       A.  Well, I was trying not to, in fact, distinguish

13     between them.  So when I -- I'm just sort of clarifying

14     what I mean by printed documents.  I just mean documents

15     that contain text.  And the reason I made that

16     distinction is that the forensic techniques used to

17     analyze text-based documents are typically different than

18     the forensic techniques that are used to analyze images.

19       Q.  But to be clear, you were not retained to

20     examine any physical hard copy documents in this case; is

21     that right?

22       A.  I don't -- we never got that far.  There was

23     never a -- sorry, scratch that.

24            I was asked to analyze digital scans of a

25     printed document.

1      Q.   And is that the only analysis that you discussed

2   possibly conducting with counsel?

3      A.   No.

4      Q.   With respect to the other analysis that you

5   discussed conducting with counsel, did that pertain to

6   the same digital scans that you received and analyzed in

7   this case?

8      A.   Sorry, the paper shuffling is interfering again.

9   So can I just ask you to repeat the question?

10     Q.   Of course.

11          The other potential analysis that you just

12   acknowledged having discussed with counsel, that you

13   might conduct in this case, did that pertain to the same

14   digital scans that you received or to other electronic or

15   hard copy documents?

16          MR. ARGENTIERI:   Okay.  I've got to object,

17   attorney-client -- I mean, his report here indicated that

18   he was hired on this digital image.  Now you're getting

19   into a conversation with Jennifer Young.  So I've got to

20   object as attorney-client work product.

21          MR. BENJAMIN:   Are you directing him --

22          MR. ARGENTIERI:   I think I have to.

23          Doctor, I don't think you should answer the

24   question.

25          THE WITNESS:   So can I ask a question?

1          Q.   BY MR. BENJAMIN:  Of course.

2          A.   In my experience in depositions, counsel can

3     object, but there's nothing that can be done.  There's no

4     judge in the room.  So -- and --

5               MR. ARGENTIERI:  It is when it's attorney-client

6     work product, Doctor.

7               THE WITNESS:  Hold on.  Let me -- ask one person

8     a question at a time.  So there's an objection, and so

9     counsel for plaintiff is asking me not to respond?  And

10    what is my obligation?

11              MR. ARGENTIERI:  I'm asking you to not respond

12    because it's attorney-client work -- it's attorney work

13    product with you.  So I understand what you're saying.

14              THE WITNESS:  But I don't have a problem with

15    responding so...

16              MR. ARGENTIERI:  Well, that's not up to you,

17    with all due respect.

18              THE WITNESS:  Well, that's my question.

19              MR. ARGENTIERI:  Oh, okay.  I'm sorry, yeah.

20    No, that's up to me, not up to you.

21              MR. BENJAMIN:  So I'd like the record to be

22    clear on this point.  Mr. Argentieri, are you directing

23    the witness not to answer a question?

24              MR. ARGENTIERI:  That question, yeah.

25         Q.   BY MR. BENJAMIN:  Okay.  So Doctor --

1      A.  Sorry, can I ask a question?

2           MR. ARGENTIERI:  Go ahead.

3           THE WITNESS:  The question I have is that I'm

4      not being retained by you so I'm not clear as to how this

5      relationship is working.  Right?  I was retained by

6      Milberg, not by you.  I'm not currently retained by you.

7      I'm not sure how it is that you're directing -- I mean, I

8      don't have a problem with not answering.  Don't get me

9      wrong.  I just want to understand what the protocol is or

10     what the legal protocol is.

11          MR. ARGENTIERI:  All right.  First things first.

12     One is I am one of plaintiff's counsel, and it's true you

13     did interact with the attorneys at Milberg.  So even

14     though they're not in the case, they did retain you, I

15     guess.  This is a deposition by defense counsel, but

16     because you were retained by the plaintiff's side, I

17     should say, then I have the authority to I guess tell you

18     not to answer a question if it's attorney-client work

19     product.  And just to be clear about that, you've got to

20     give me a chance to answer, plus I've got Mr. --

21          Dean, can you hear me?

22          MR. BOLAND:  Yes, I can hear you.

23          MR. ARGENTIERI:  If you've got any objections,

24     put them on the record now.

25          MR. BOLAND:  No, I think you covered it.  The

1   only thing that we're directing the witness not to answer

2   is what he told plaintiff's counsel or what plaintiff's

3   counsel told him, that's work product.  Any other answers

4   he wants to give, he can give, except those two things.

5           MR. ARGENTIERI:  Did you hear that, Dr. Farid?

6           THE WITNESS:  I did.

7           MR. ARGENTIERI:  Okay.  And not to sound smart,

8   but did you comprehend that, then?  Tell me --

9           THE WITNESS:  Yes.

10          MR. ARGENTIERI:  I mean, the --

11          THE WITNESS:  I understood --

12          MR. ARGENTIERI:  Comprehend.

13          THE WITNESS:  I understood the words coming -- I

14  understood.  Let me just ask a question.

15          So when you direct me not to answer a question,

16  I have to listen to you.  Let's just be very clear about

17  what my question is.

18          Is that true?

19          MR. ARGENTIERI:  That's true or Mr. Boland,

20  unless they call the Court and I get overruled.

21          THE WITNESS:  And Matt, can I ask you if that's

22  true, if you don't mind?

23          MR. BENJAMIN:  Of course.  It's actually not

24  true, Dr. Farid.  The only -- the only basis on which

25  Mr. Argentieri or Mr. Boland can direct you not to answer

1   a question is on the basis of attorney-client privilege.

2   That is the privilege that Mr. Argentieri is asserting

3   applies right now.  He's asserting that incorrectly, but

4   less we get bogged down in the deposition, I'll proceed

5   and ask you some other questions.

6           MR. ARGENTIERI:  Have you got any comment, Dean,

7   on that?

8           MR. BOLAND:  No, that's fine.  We're asserting a

9   work-product privilege, which both sides have asserted

10  throughout the deposition.  So we're perfectly in line

11  with that.

12          MR. BENJAMIN:  Yes.  And just to make the record

13  clear, work-product privilege objections are appropriate

14  when they're based in fact or they're legitimate.

15  Mr. Argentieri's isn't in this case, but I wanted to be

16  respectful of your time.

17          MR. ARGENTIERI:  You have to understand, I don't

18  have to accept his opinion, all right, Dr. Farid?  I

19  mean, just because Mr. Benjamin wants to express his

20  opinion, I don't have to, you know, observe it.  Okay?

21  So go ahead.

22      Q.  BY MR. BENJAMIN:  Dr. Farid, when you were

23  contacted by Ms. Young in early April 2012, did you sign

24  an engagement letter formalizing your retention?

25      A.  You know, I don't recall.  If you'd like, I can

Page 26

1    check my --

2         Q.   Do you recall whether --

3         A.   Sorry.  I can check my email records to see if

4    there is an engagement letter.

5         Q.   That would be fine.  And less you think I'm

6    asking a more specific question than I mean to, I'm

7    asking whether you signed an engagement letter at any

8    point during the matter, not necessarily only in

9    April 2012.

10        A.   I understand what you're asking.  Let me just

11   check my records, if you don't mind.

12             I don't see an engagement letter.  That doesn't

13   mean it doesn't exist.  I just don't see it.

14        Q.   So as far as you know, you may not in fact have

15   been retained as an expert for Paul Ceglia in this case;

16   is that right?

17        A.   If by retained you mean having signed a document

18   of retention, I'm not sure.  Sorry, let me clarify that.

19   I do not recall signing one, but I am not positive of

20   that.

21        Q.   Okay.  Have you been compensated for your work

22   in this case?

23        A.   I have.

24        Q.   And what is your fee arrangement with Milberg?

25        A.   My fee with Milberg is that I charge 500 an hour

1    for my time, and I bill accordingly.

2        Q.   So you're paid on an hourly basis; is that

3    right?

4        A.   Correct.

5        Q.   Did you have any discussions concerning the

6    possibility of being compensated on a contingency basis?

7        A.   I don't know what you mean by that.

8        Q.   By "contingency basis," I mean that you would

9    receive a percentage of some sum.

10       A.   No, I was not.  We did not have that discussion,

11   rather.

12       Q.   And who's responsible for your compensation?

13       A.   Milberg was.

14       Q.   And is payment current with your invoices?

15       A.   I've been paid.  I submitted one invoice, and it

16   was paid by Milberg, yes.

17       Q.   Did you spend any time on this case after

18   Milberg withdrew?

19       A.   The only time I spent on it was to draft a

20   letter which I sent to Mr. Boland, which is Exhibit 52.

21       Q.   And did you not bill for that time?

22       A.   I did not bill for that.

23       Q.   Dr. Farid, in that letter, Defendants' 52, you

24   write:  I was provided with digital scanned copies of a

25   purported contract in an uncompressed TIFF file format.

1    I was asked to determine if these scanned copies showed

2    signed of manipulation."

3            Did I read that correctly?

4       A.   Correct, yes.

5       Q.   So I'd like to take those two sentences in two

6    parts.  First, how many digital files did you receive?

7       A.   If you don't mind, I'm going to just check my

8    records again.

9       Q.   Not at all.

10      A.   I received two files.

11      Q.   What are the names of those two files?

12      A.   I knew you were going to ask me that.  Hold on

13   one second.

14      Q.   While you're looking -- sure.  While you're

15   looking, if you want to tell me who provided them.

16      A.   I can do that.

17      Q.   And possibly when.

18      A.   I can do that.  So let me just give you the

19   names of the files first.  Okay, they were called Scan,

20   S-C-A-N, 0001.tiff.  Everything is lower case except for

21   the "S" in scan.

22           And the second file was Scan0002.tiff with the

23   same upper and lowercase letters.

24           I was provided these files by -- I'll give you

25   the person's name and then their company name.  The name

1    is Katya, K-A-T-Y-A, Koons, K-O-O-N-S.  And I believe

2    that the company name that she works for is Sylint,

3    S-Y-L-I-N-T, which is a forensics and e-discovery

4    company.

5         Q.   And when did Ms. Koons send those files?

6         A.   On April 12th of 2012.

7         Q.   How were those files provided to you?

8         A.   They were provided through Dropbox.

9         Q.   And those files were provided in an uncompressed

10   TIFF format; is that right?

11        A.   That's correct.

12        Q.   Did you receive any other electronic materials

13   in connection with this case?

14        A.   Yes.

15        Q.   And what are those materials?

16        A.   I received a copy of defense's expert report, I

17   believe it was, by Stroz, S-T-R-O-Z, Friedberg,

18   F-R-I-E-D-B-E-R-G.  And I received -- it looks like an

19   electronic copy of the original Complaint.  Sorry, this

20   is the Amended Complaint.

21             And I received an electronic copy of -- I'll

22   give you the title.  It says "Facebook Declaration of

23   Southwell," S-O-U-T-H-W-E-L-L.  And I believe that's it.

24        Q.   Dr. Farid, Mr. Southwell is one of the attorneys

25   for --

1        A.  Oh.  Hi.

2        Q.  -- the defendants sitting to my right.  He's

3   filed a lot of declarations in this case.

4        A.  Yeah, okay.

5        Q.  Do you happen to know, does the version that you

6   have, is that file stamped?

7        A.  Tell me what you mean by "file stamped."  Oh,

8   yes, it is.

9        Q.  By file stamped I mean --

10       A.  It has a date on it.  Sorry to interrupt you.

11  It's 3/26/12.  And I can tell you the other document says

12  Facebook Ceglia ECF039 Amended Complaint.

13       Q.  And did you review those materials as well?

14       A.  Not exhaustively, but I did review them, yes.

15       Q.  Did you request the opportunity to receive or

16  analyze any other electronic materials?

17       A.  When I received the two images, the Scan001 and

18  002, I asked higher resolution versions, because as I

19  said in the letter, those were of sufficient resolution

20  to be able to perform a forensic examination.

21       Q.  Do you have any understanding of where the

22  specific two scans that you received come from?

23       A.  No.

24       Q.  And what's your understanding of why you were

25  not provided with different versions of those scans?

1      A.  I have no understanding of why I was not

2   provided.

3      Q.  Did you -- when you asked for them, did you not

4   receive a response?

5      A.  Oh, sorry.  I did receive a response.  I was

6   told that they were trying to get them, but they

7   weren't -- I don't know why I was not -- they were not

8   able to obtain them.  And then Milberg dropped out of the

9   case, and the whole thing went away, as far as I knew.

10      Q.  To be clear, your testimony is that you were

11   told that plaintiff's counsel was trying to get higher

12   resolution versions of the two documents that you

13   received; is that right?

14      A.  That's correct.

15      Q.  So the only digital materials that you reviewed

16   in connection with this case were the two scans that you

17   received, the Stroz Friedberg report, the Amended

18   Complaint as filed, and Mr. Southwell's March 26, 2012

19   declaration; is that correct?

20      A.  I believe that's correct.

21      Q.  Dr. Farid, what is your understanding of what

22   the two scans that you received are?

23      A.  So let me preface this by saying I have fairly

24   limited understanding of what they are.  My understanding

25   was that they were a contract between Paul Ceglia and

1   Mike -- Mark Zuckerberg.

2        Q.   Okay.  And taking a step back, given that you

3   have a fairly limited understanding, what's your

4   understanding of the claim that Mr. Ceglia has asserted

5   against Mr. Zuckerberg in this case?

6        A.   So my understanding from talking with Jennifer

7   Young, from reading some of the documents I was provided,

8   and also from just press coverage of it, is that Paul

9   Ceglia is claiming 50 percent ownership of the company

10  Facebook.

11       Q.   Out of curiosity, do you recall any of the

12  specific press coverage that you were familiar with

13  before you were contacted by Ms. Young?

14       A.   Not specific, no.

15       Q.   So you understand that Mr. Ceglia has filed a

16  lawsuit claiming a significant ownership interest in

17  Facebook based on a purported contract with

18  Mr. Zuckerberg; is that right?

19       A.   That's my understanding, yes.

20       Q.   And have you seen the purported contract on

21  which Mr. Ceglia bases that claim?

22       A.   So my understanding was that the two scanned

23  documents that I got, the two TIFF files, were the

24  purported contract.  But they were of such low resolution

25  that not only could you not perform a forensic analysis,

```
 1   I couldn't even read it.
 2           So I guess strictly speaking, the answer is yes,
 3   but more precisely, I have not actually seen the document
 4   in a form that I can read or analyze.
 5       Q.  So your understanding is that the two scans that
 6   you examined were of the purported contract that
 7   Mr. Ceglia has based his lawsuit on; is that correct?
 8           MR. ARGENTIERI:  Objection.
 9           You can answer, Doctor.
10           THE WITNESS:  I'm sorry, I missed the -- I heard
11   the objection, but I didn't hear what you said
12   afterwards.
13           MR. ARGENTIERI:  You may answer, Doctor.
14           THE WITNESS:  Okay, that is my understanding,
15   yes.
16       Q.  BY MR. BENJAMIN:  Dr. Farid, are you aware that
17   the defendants in this case have moved to dismiss it as a
18   fraud in the Federal court?
19       A.  I believe that I read something to that effect,
20   yes.
21       Q.  Has anyone provided you -- I think the answer to
22   this is "no," but has anyone provided you with a copy of
23   that motion to dismiss this case as a fraud?
24       A.  I don't think so, no.
25       Q.  Now, are you aware of defendants' position that
```

1    the purported contract on which Ceglia has sued our

2    clients is a forgery?

3         A.   I am aware of that claim, yes.

4         Q.   Are you aware more specifically that defendants'

5    position is that Mr. Ceglia, acting alone or in concert

6    with others, forged that document within the last two

7    years?

8         A.   Yeah, I believe at least parts of that claim are

9    covered in the Stroz Friedberg -- sorry, I think I'm

10   mispronouncing that -- in the Stroz Friedberg report.

11   Yes, I'm aware of the claim.

12            MR. BENJAMIN:  I'd ask the court reporter to

13   mark as Defense Exhibit 54 printouts of the contract, a

14   copy of which has been handed to Mr. Argentieri.

15            (Exhibit 54, Street Fax document, marked for

16            identification.)

17        Q.   BY MR. BENJAMIN:  So Dr. Farid, you've been

18   handed a copy of Defendants' 54.  These particular

19   printouts are of the scans as filed in this case, which

20   explains the file stamp across the top of each page.

21        A.   Yes.

22        Q.   Since the title on the first page of the

23   contract is Street Fax, we refer to it as the Street Fax

24   contract, and I will refer to it that way in the

25   deposition.

1          Do you understand?

2      A.   Yes.

3      Q.   And for the record the file stamp on the copy on

4  Defendants' Exhibit 54 is the case caption

5  "Document 111-1," filed August 15, 2011.

6      A.   That's correct.

7      Q.   Dr. Farid, do you recognize the Street Fax

8  contract, Defendants' Exhibit 54, as printouts of the two

9  digital scans that you received?

10          MR. ARGENTIERI:  Objection.

11          You may answer, Doctor.

12          THE WITNESS:  They -- they -- I can't say

13  they're exactly the same, but yes, they do appear to be

14  the same.

15      Q.   BY MR. BENJAMIN:  With the exception of the file

16  stamp at the top of the document, in what way are they

17  different?

18      A.   I don't know they're different.  It just -- I

19  haven't looked at those documents in a long time, but

20  they appear to be the same documents.

21      Q.   So this is the, quote, purported contract to

22  which you referred in your June 28th letter; is that

23  right?

24      A.   Yes.

25      Q.   Now, returning to the Amended Complaint that you

1    received that was among the electronic documents that you

2    mentioned a few moments ago.

3        A.   Yes.

4        Q.   Are you aware -- are you aware that there's a

5    different contract attached to that Complaint than

6    Defendants' Exhibit 54?

7        A.   I don't believe I was aware of that.

8        Q.   Now, you received the Stroz Friedberg report; is

9    that correct?

10       A.   Yes.

11       Q.   Are you aware that Defendants' motion to dismiss

12   for fraud was supported by numerous expert reports?

13           MR. ARGENTIERI:  Objection.

14           You may answer, Doctor.

15           THE WITNESS:  I was not aware -- I was provided

16   with a report.  I had heard that there was a motion to

17   dismiss, but I don't know what the grounds for the

18   dismissal were.

19       Q.   BY MR. BENJAMIN:  Having reviewed the Stroz

20   Friedberg report, at least generally, do you recall that

21   Stroz Friedberg described its discovery of the Street Fax

22   contract in that report?

23       A.   I do recall that, yes.

24       Q.   You reviewed that section of the report?

25       A.   Yes, I did.

1      Q.  So you're aware that the Street Fax contract,

2    Defendants' Exhibit 54, the two TIFF files that you

3    received, were discovered as attachments to two emails;

4    is that correct?

5      A.  That's my --

6           MR. ARGENTIERI:  Objection to form.

7           You may answer.

8           Doctor, if you could hesitate a little bit just

9    for me to get --

10          THE WITNESS:  I understand, sorry.

11          Yes, that's my understanding.

12          MR. ARGENTIERI:  That's okay.

13          MR. BENJAMIN:  So I'd ask the court reporter to

14   mark as Defendants' 55 printouts of those two emails,

15   copies of which are being handed to Mr. Argentieri.

16          (Exhibit 55, Screen shot, page 1 of 2 for

17           Streetfax contract w Mark, marked for

18           identification.)

19          MR. ARGENTIERI:  Yeah, I just want to note for

20   the record that Exhibit 54, the reported Street Fax

21   contract, is a larger version than the TIFF or electronic

22   version for the record.  Thanks.

23          MR. BENJAMIN:  Mr. Argentieri, in what way is it

24   larger than the electronic version?

25          MR. ARGENTIERI:  Well, the image from the TIFF

1    is not an eight-and-a-half by 11 document, is it?  I

2    don't think so.

3               Is it, Doctor?

4               MR. BENJAMIN:  Sorry.  Dr. Farid, you can --

5    thank you.

6               MR. ARGENTIERI:  Oh, I'm sorry.

7               MR. BENJAMIN:  Just to be clear, Defendants'

8    Exhibit 54 is a printout of the Street Fax contract,

9    document 111-1, the file stamp at the top as filed.

10        Q.  Dr. Farid, Defendants' Exhibit 55, have you been

11   handed those documents?

12        A.  I have.

13        Q.  Now, these are the particular -- again, these

14   particular printouts are of the emails as filed in this

15   case, which explains the file stamp at the top.

16              Are you aware, Dr. Farid, that these two emails,

17   Defendants' 55, were sent on March 3, 2004, to Jim Cole?

18              MR. ARGENTIERI:  Objection.

19              Doctor, you can answer.

20              THE WITNESS:  I'm sorry, can you just repeat the

21   question.

22        Q.  BY MR. BENJAMIN:  Sure.  Dr. Farid, are you

23   aware that these two emails, Defendants' Exhibit 55, were

24   sent on March 3, 2004 --

25              MR. ARGENTIERI:  Objection.

```
 1              MR. BENJAMIN:  I'm sorry, Dr. Farid, before you
 2    answer my question, Mr. Argentieri, can you let me finish
 3    my question?
 4              MR. ARGENTIERI:  Yeah, I can.  Go ahead.  I'm
 5    sorry.  I thought you were finished.
 6              MR. BENJAMIN:  Please let me finish my question.
 7              MR. ARGENTIERI:  Then, Doctor, give me just a
 8    second.  Okay, sorry.  I didn't mean to interrupt again.
 9              MR. BENJAMIN:  Go ahead, Doctor.
10              THE REPORTER:  We need the full question,
11    please.
12         Q.  BY MR. BENJAMIN:  Dr. Farid, are you aware that
13    Defendants' Exhibit 55, that those two emails were sent
14    on March 3rd, 2004, to a man named Jim Cole?
15              MR. ARGENTIERI:  Okay.  Objection.
16              You may answer, Doctor.
17              THE WITNESS:  Okay.  It's like a little dance
18    here.  I like it.
19              I was not aware before you handed this to me,
20    but I do see that the date is March 3rd, 2004.  So I am
21    aware that that's when the email was purportedly sent.
22         Q.  BY MR. BENJAMIN:  And the two attachments to the
23    two emails at Defendants' Exhibit 55 appear to be the
24    same -- have the same -- strike that.  S.
25              The attachments to Defendants' Exhibit 55
```

1    have the same file names as the two files that you

2    received; is that correct?

3        A.   That's correct.

4        Q.   Are you aware, Dr. Farid, that Jim Cole, an

5    attorney at the law firm of Sidley Austin, was Paul

6    Ceglia's lawyer?

7            MR. ARGENTIERI:   Objection.

8            Doctor, you may answer.

9            THE WITNESS:   I believe I recall that from one

10   of the documents that I reviewed, yes.

11       Q.   BY MR. BENJAMIN:   And Dr. Farid, you can see on

12   the first page of Defendants' Exhibit 55 that in the body

13   text of the email, that email is signed "Paul."   Right?

14       A.   Correct.

15       Q.   Are you aware that these two emails, Defendants'

16   55, were located by Stroz Friedberg in a PBX file

17   contained on a hard drive produced by Paul Ceglia in this

18   case?

19           MR. ARGENTIERI:   Objection.

20           Doctor, you can answer.

21           THE WITNESS:   That is my recollection from the

22   report, yes.

23       Q.   BY MR. BENJAMIN:   And are you aware that these

24   two emails were also located on the servers of Sidley

25   Austin, the law firm for which Mr. Cole worked when he

Page 41

1    received the emails?

2            MR. ARGENTIERI:  Objection.

3            Doctor, you may answer.

4            THE WITNESS:  That's also my recollection, yes.

5        Q.  BY MR. BENJAMIN:  Now, in Defendants' 52, your

6    June 28th letter, you write:  "I was asked to determine

7    if these scanned copies showed signs of manipulation";

8    right?

9            MR. ARGENTIERI:  Objection.

10           You may answer, Doctor.

11           THE WITNESS:  Correct.

12           MR. BENJAMIN:  I'm sorry, Dr. Farid, before you

13   answer, what's your basis for that objection?

14           MR. ARGENTIERI:  I don't have to recite it.

15           MR. BENJAMIN:  You have to have one.

16           MR. ARGENTIERI:  I don't have to give it to you.

17   If you want to call the Judge, let's go.  I can put an

18   objection.  You're introducing facts not in the record,

19   but let's go ahead.

20           MR. BENJAMIN:  I'm sorry, can the court reporter

21   read back my question, please.

22           (The record was read by the reporter

23           as follows:

24           "QUESTION:  Now, in Defendants' 52, your

25           June 28th letter, you write:  "I was asked to

1           determine if these scanned copies showed signs

2           of manipulation"; right?")

3                MR. ARGENTIERI:  Objection.

4                You may answer, Doctor.

5                MR. BENJAMIN:  So what's your basis for that

6     objection?

7                MR. ARGENTIERI:  I don't have to give a basis.

8     Do you have some authority why I have to give you the

9     basis?

10                MR. BENJAMIN:  No, I have authority.

11                MR. ARGENTIERI:  Then call the Judge if you

12    don't like the answer I'm giving you.  Honestly, I don't

13    have to give you a basis.

14                MR. BENJAMIN:  You have to have a basis.

15                MR. ARGENTIERI:  Do you want to jump in here?  I

16    mean, you know --

17                MR. BOLAND:  No, I think it's fine.  You

18    objected and that's it.  If he wants something more, I

19    think he'd have to depose you.

20                MR. ARGENTIERI:  I mean, if you want to

21    overrule, Dean, if you think I'm doing something wrong,

22    go ahead.

23                MR. BENJAMIN:  Just as long as Mr. Boland agrees

24    that we all need to have an actual basis for stating

25    objections on the record, we can proceed.

1           MR. ARGENTIERI:  Did you hear that?

2      Q.  BY MR. BENJAMIN:  So Doctor --

3           MR. BOLAND:  Yeah, I'm not agreeing with

4   anything Mr. Benjamin has to say.  I'm just -- we're

5   noting objections, and Mr. Benjamin, you're doing the

6   deposition.

7      Q.  BY MR. BENJAMIN:  Dr. Farid, sorry about that.

8      A.  That's okay.

9      Q.  So I was asking you about text contained in your

10  letter, Defendants' Exhibit 52.  So you write:  "I was

11  asked to determine if these scanned copies showed signs

12  of manipulation."

13          So that was your charge, so to speak; right?

14     A.  That's correct.

15     Q.  You were not asked to examine the native files,

16  emails to which those two TIFF files were attached; is

17  that right?

18     A.  That's correct.

19     Q.  And you were not asked to analyze any other

20  digital materials in this case; right?

21     A.  That's correct.

22     Q.  Now, Dr. Farid, is it your understanding that

23  Mr. Ceglia is contending that the two scans you were

24  provided have been, quote, manipulated in some way?

25          MR. ARGENTIERI:  Objection as to form.

1           You can answer that.

2           THE WITNESS:  I'm not -- I'm not aware of what

3    Mr. Ceglia has said about the scanned documents, no.

4        Q.  BY MR. BENJAMIN:  Let's take it in smaller

5    chunks.  So you write that you were asked to determine if

6    the scanned copies showed, quote, signs of manipulation.

7        A.  Correct.

8        Q.  So is it your understanding that anyone is

9    claiming that the files you were provided had been

10   manipulated?

11          MR. ARGENTIERI:  Objection as to form.

12          You may answer, Doctor.

13          THE WITNESS:  I'm not sure.  I mean, I was

14   simply asked by Milberg to determine the authenticity or

15   the possible manipulation of the documents.  I don't

16   recall having specific knowledge of what the claims were

17   from either defense or from plaintiff.

18       Q.  BY MR. BENJAMIN:  Now, when you say

19   "manipulation," what do you mean?

20       A.  Right.  So there's a number of ways that a

21   scanned document can be manipulated, and some of those

22   things fall under the type of analysis that I can do and

23   some of them don't.  So let's just talk about the things

24   that I can do because that's sort of the relevant piece

25   here.

1          What we have the ability to do is to determine

2     if different parts of a printed document -- and again,

3     when I say "printed document," I'm referring to something

4     that largely contains text.  So we have the ability to

5     determine whether the various parts of that document, so

6     for example, the first paragraph, the first sentence, the

7     middle paragraph, whether all of those parts were printed

8     on the same device.

9          And so what I spoke -- when I spoke with

10    Jennifer Young at Milberg, I told her that this is one of

11    the main forensic techniques that we have for analyzing

12    printed documents.  We can determine if the various

13    pieces -- the words, the sentences, the paragraphs -- all

14    were created from the same device at approximately the

15    same moment in time.

16         So, for example, to get back to your specific

17    question, when I say "manipulated," I mean, for example,

18    was one paragraph digitally inserted into the document

19    and so that there would be some inconsistency in the text

20    between the document and that one paragraph.

21    Q.   Now, Dr. Farid, I think you used the phrase

22    "printed on the same device."  Is it your understanding

23    that the two TIFF files that you examined are scans of a

24    physical piece of paper that was printed?

25    A.   That is my understanding, yes.

1      Q.   Now, are all quote/unquote signs of manipulation

2   evidence of fraud?

3           MR. ARGENTIERI:  Objection as to form.

4           You may answer, Doctor.

5           THE WITNESS:  I mean, that's a hard question for

6   me to answer.  I'm not -- I'm not -- it seems to me

7   you're mixing a scientific question with a legal

8   question, and the scientific question is, is something

9   manipulated, and the legal question is, is that fraud.

10          I am not qualified to answer the latter part of

11  that question.  I can only answer the first part, and

12  then it's up to the lawyers to determine what the

13  implication of that is.

14     Q.  BY MR. BENJAMIN:  Fair enough.  And I'm just

15  trying to better understand the contours of what, quote,

16  manipulation might mean --

17     A.  Right.

18     Q.  -- in the context of your analysis.

19     A.  Right.

20     Q.  So I'll give you a couple of specific examples,

21  and we'll go from there.

22          Would evidence that a file has been resized

23  necessarily constitute a sign of manipulation?

24     A.  Okay, so let's define what we mean by

25  manipulation.  Okay?  So there are different ways to

1    manipulate a file, an image, a scanned document, any

2    file.  So there are -- and the answer to this question

3    depends on what do you mean by an original.  Okay?

4              So it could be argued, for example, that any

5    electronic digital alteration of a file from the time

6    that it was produced, whether it was photographed or

7    scanned, is a manipulation.

8              Now, that manipulation may alter the underlying

9    truth of the document.  So, for example, splicing in one

10   paragraph over another, and it may not alter the

11   underlying truth, for example, resizing.  They are all

12   some form of a digital manipulation.

13             So again, we're -- you're -- this is a question

14   of what are the implications of the manipulation, which

15   is a second question after what a manipulation is.

16   Q.  That's a very helpful -- it's a very helpful

17   distinction.  So let's ask both of those questions.

18             Would evidence that a file -- would you consider

19   evidence that a file has been resized a sign of

20   manipulation?

21   A.  Yes, in the strictest definition of the term

22   "manipulation," yes.

23   Q.  But if I understand you correctly, that wouldn't

24   necessarily constitute evidence of fraud or an intent to

25   change the underlying meaning of the document.

1          MR. ARGENTIERI:  Objection as to form.

2          You can answer, Doctor.

3          THE WITNESS:  Right.  So it depends.  So, for

4    example, if we are talking about an image and only part

5    of the image was resized, then that could very well be a

6    fraud.  So, for example, I caught a fish this big, and

7    you resized the fish, you are changing the underlying

8    truth.

9          If you, of course, change the size of the entire

10   image as one entity, that's less likely to rise to the

11   level of something that could be considered fraudulent.

12         I'm sorry, I'm sorry, can I interrupt?  We're

13   still getting some feedback from the shuffling of the

14   papers and the sighing.

15         MR. BENJAMIN:  Mr. Argentieri has muted his

16   microphone.  So hopefully that will take care of the

17   problems.

18         MR. BOLAND:  Understood.

19    Q.  BY MR. BENJAMIN:  So Dr. Farid, if I understand

20   you correctly, evidence that the contrast in an image has

21   been adjusted would also constitute a sign of

22   manipulation; is that right?

23    A.  That's correct.

24         MR. ARGENTIERI:  Objection.

25         You can answer, Doctor.

1              THE WITNESS:  Sorry.  Sorry.

2              Yes, that's correct.

3         Q.   BY MR. BENJAMIN:  Similarly, evidence that the

4    brightness in an image had been adjusted would constitute

5    a sign of manipulation; is that right?

6         A.   That's correct.  Let me just state, however,

7    that determining whether the contrast or the brightness

8    in an image had been altered is incredibly difficult

9    because that tends to happen in the imaging device

10   itself.

11             You didn't ask the question, but I just want to

12   be clear.  Those things are very hard to determine after

13   the fact.

14        Q.   And would evidence that a file has been

15   compressed necessarily constitute a sign of manipulation?

16        A.   It depends what you mean by "compressed."  So

17   there are two basic forms of compression.  There are

18   lossless and lossy, L-O-S-S-Y.

19             So lossless compression is, for example, what

20   happens when you just take a file and you can reduce the

21   underlying file size, but there's absolutely no loss of

22   information.  That is, you can go back and forth from the

23   compressed to the uncompressed, and you can do it for a

24   million times, and the file will remain the same, bit for

25   bit.

1        Lossy compression, for example, the JPEG image

2    standard, that is not true.  When you compress an image,

3    you literally throw away some information, and repeated

4    compressions continually degrade the underlying medium.

5    So we have to be a little careful on what you mean by

6    "compression."

7        Q.  I think so if I understand you correctly,

8    several of the adjustments that we have discussed may

9    constitute signs of manipulation, but those quote/unquote

10   manipulations don't necessarily constitute evidence of an

11   intention to misleadingly present the content of the

12   file?

13            MR. ARGENTIERI:  Objection.

14            You may answer, Doctor.

15            THE WITNESS:  Okay.

16            So that's a tough question to answer.  And let

17   me just give you an example of why that's a hard question

18   to answer.

19            If you remember many years ago, when O.J.

20   Simpson was arrested, his image was put on the cover of

21   Time Magazine, and it was deeply contrast-enhanced to

22   make him look much darker.  And it was claimed that that

23   was an editorializing of the photograph, to make him look

24   more menacing and, if you will, blacker.  And that was a

25   fairly simple color and contrast adjustment.

1          So adjusting things as simple as contrast can

2    have very significant consequences that one could argue

3    is a form of deception.

4          So in general, I would say the answer is no.

5    But we have seen evidence that even very simple

6    manipulations -- look, cropping an image can change the

7    underlying meaning.

8          An Israeli newspaper was -- sorry, a Palestinian

9    newspaper was accused of editorializing when they cropped

10   a photograph to show a weapon that had been removed.

11         So, you know, really simple manipulations that

12   don't seem to be dangerous can sometimes still be a

13   little tricky.  So we just have to be a little careful.

14   And as a forensic scientist, I don't want to be in the

15   business of making -- of determining what the intention

16   was or whether it's a fraud or not.  I'm simply in the

17   business at that front end of determining what has

18   happened.

19      Q.  Yeah, that's helpful.  I think -- and you

20   answered -- you answered the opposite question that I was

21   trying to ask, which may have been my fault.

22         If I understand you correctly, signs of

23   manipulation do not necessarily equate to an intention to

24   deceive about the content of the image.  Would you agree?

25         MR. ARGENTIERI:  You may answer that.

1          THE WITNESS:  I apologize, and yes, I agree.

2     Q.  BY MR. BENJAMIN:  So when you were asked to

3  determine if the scanned copies showed, quote, signs of

4  manipulation, was it your understanding that you could

5  consider all evidence relevant to the files'

6  authenticity?

7          MR. ARGENTIERI:  Objection as to form.

8          You may answer, Doctor.

9          THE WITNESS:  That was my understanding.

10    Q.  BY MR. BENJAMIN:  Would that include something

11 as basic as the file system metadata associated with the

12 scans?

13    A.  Yes.

14    Q.  Do you recall reviewing the section of the Stroz

15 Friedberg report in which they discussed the file system

16 metadata associated with those two files?

17    A.  Yes, but I don't remember the details of it.

18    Q.  And it's possible that we can analyze that very

19 simple metadata and assess whether it's consistent with

20 those files being authentic or inauthentic; right?

21          MR. ARGENTIERI:  Objection.

22          You may answer, Doctor.

23          THE WITNESS:  Yeah, image metadata can be

24 helpful in determining authenticity, absolutely.

25    Q.  BY MR. BENJAMIN:  I'm just really trying to

1    understand here, Dr. Farid, the scope of your charge,

2    whether you were restricted to signs of manipulation,

3    understanding that that's a fairly broad definition, or

4    whether you were permitted and considered it within your

5    analysis to consider all electronic evidence pertaining

6    to the files authenticity.

7              MR. ARGENTIERI:  Objection to form.

8              You may answer, Doctor.

9         Q.  BY MR. BENJAMIN:  So did you -- when you

10   received the two -- when you received the two scans, did

11   you analyze the file system metadata?

12             MR. ARGENTIERI:  Objection.

13             You may answer.

14             THE WITNESS:  I did not.  When I received the

15   images, the first thing I said is these are simply of too

16   low quality for me to do a sufficient analysis, and I

17   requested a higher resolution copy, and I did no actual

18   analysis of the images at all.

19        Q.  BY MR. BENJAMIN:  And when you -- I'm just

20   taking you literally at your word.  You opened the files,

21   clicked on them, looked at them, and said, I need higher

22   resolution copies to do anything else?

23        A.  That's correct.

24        Q.  Thank you.

25             How much time elapsed from when you received the

1    files from the technician at Sylint, Ms. Koons, and your

2    communication of that opinion to anyone?

3         A.   I don't recall offhand, but I don't imagine it

4    was more than a few days.  I don't know if I looked at

5    them right when I got them, but it was probably within a

6    few days I opened them up and realized that it was going

7    to be very hard to do anything.

8         Q.   Did you -- did you discuss with anyone the

9    possibility that your analysis might result in an expert

10   report?

11        A.   I don't recall.  I think it's possible that

12   Ms. Young asked that if I did do an analysis, whether I

13   would be able to provide a report.  I mean, I'm saying

14   that mainly because most attorneys ask me that question.

15   So I think it's possible, but I just don't recall

16   offhand.

17        Q.   You obviously didn't provide a report in this

18   case.

19        A.   Except with the letter Exhibit 52, that's

20   correct.

21        Q.   And when you opened those files and clicked

22   through them when you initially received them,

23   approximately how long did you take eyeballing them?

24        A.   Let's call it less than half an hour.  I'm only

25   saying that because I just want to be safe, but very

1    little time.

2         Q.   That's a generous estimate.

3         A.   Yeah, I think that's correct.

4         Q.   It could have been a few minutes; is that right?

5         A.   Yeah.

6         Q.   So the -- so the fourth sentence in Defendants'

7    Exhibit 52 reads:  "The digital copies are, in my

8    opinion, of too low quality to perform a reliable

9    forensic examination."

10             Did I read that correctly?

11        A.   Yes, you did.

12        Q.   And as you previously testified, you arrived at

13   that opinion within a few days of having received the

14   files and after having spent no more than 30 minutes

15   eyeballing them; is that right?

16        A.   That's correct.

17        Q.   And I just want to be clear about this, when you

18   received the files, between the time that you received

19   the files and arrived at that opinion, you opened them up

20   on your computer, looked at them, and that was it?

21        A.   That's correct.

22        Q.   Right?

23        A.   That's correct.

24        Q.   So after taking a quick look at the two files,

25   you determined that you could not, quote, perform a

1  reliable forensic examination; is that right?

2      A.  That's correct.

3      Q.  And to be clear, the, quote, examination that

4  you were asked to perform, as reflected in the third

5  sentence of your letter, was to determine if the TIFF

6  files showed signs of manipulation; is that right?

7      A.  That's correct.

8      Q.  So this letter explains that you could not

9  perform an examination to determine if the TIFF files

10  showed signs of manipulation; is that right?

11      A.  That's correct.  And I'm sorry, just let me just

12  add one thing just to be clear.  As you said, one can

13  analyze the metadata, which is independent of the

14  underlying resolution.  I was particularly interested in

15  actually being able to see what the document said in

16  order to do an examination.

17          I may very well have gotten around to looking at

18  the metadata afterwards, but it just seemed to me to do a

19  full examination of a document, you need to at least be

20  able to read the document.  And since I wasn't, it just

21  feels like, you know, it's not a safe bet.

22      Q.  Having reviewed some of your scholarship in

23  publications, it seems like you and your team have

24  developed a series of forensic tools to detect

25  manipulation or tampering of digital images.

1          Is that a fair characterization?

2     A.   We've -- it's mostly fair, yes.  We've also

3  developed techniques to analyze video, audio, and printed

4  documents, yes.

5     Q.   It was under-inclusive?

6     A.   Yes.

7     Q.   But yet you have developed several techniques to

8  detect tampering of digital images?

9     A.   Absolutely.

10    Q.   If I understand the general approach correctly,

11  those tools are designed to detect disturbances of the

12  underlying statistical properties that result when

13  natural or raw images are manipulated; is that right?

14          MR. ARGENTIERI:  Objection.

15          You may answer, Doctor.

16          THE WITNESS:  It's partially right, and I'm

17  saying partially because you used the word "statistical."

18  So we do look for statistical disturbances, but we also

19  look for both physical and geometric disturbances as well

20  in an image.  I'm just being a little nitpicky on the

21  language.  Those are technically slightly different

22  things.

23    Q.   BY MR. BENJAMIN:  By considering those

24  properties, your analysis is obviously not restricted to

25  the plain text or appearance of a digital image; right?

1      A.   Sorry, I didn't understand the question.

2      Q.   You've mentioned a couple times your reaction to

3  the fact that some of the text in these scans was

4  difficult to read.

5           What I'm trying to establish is I think an

6  undisputed point that your analysis is not limited to

7  what you can read on a document.  You actually focus on

8  the underlying statistical or mathematical or geometric

9  properties of that electronic image; is that right?

10          MR. ARGENTIERI:  Objection.

11          You may answer, Doctor.  Sorry.

12          THE WITNESS:  I think the answer to your

13  question is "yes."  I'm still a little unclear about it.

14  So let me ask a clarifying question.

15          So are you asking whether we can perform certain

16  forensic analysis even when there are things in the image

17  that are not actually clearly visible?

18     Q.   BY MR. BENJAMIN:  I'd be interested in knowing

19  your answer to that question.

20     A.   This is great.  I get to ask the question and

21  answer the question.  It's a professor's dream.

22          MR. BENJAMIN:  That's every lawyer's dream.

23  Apparently, it's every academic's dream, too.

24          THE WITNESS:  Let's face it.  It's everybody's

25  dream.

1      Q.  BY MR. BENJAMIN:  Go ahead.

2      A.  Yes, the answer to the question is "yes," is

3  that there are things that we can analyze that are simply

4  not available to the visual system.  And that can be

5  either because the quality of the image is poor, but also

6  because it sort of falls under the radar screen of what

7  the visual system is able to see.

8      Q.  Obviously you're not offering the opinion that

9  the TIFF files in fact show signs of manipulation; right?

10          MR. ARGENTIERI:  Objection as to form.

11          You may answer, Doctor.

12          THE WITNESS:  I have no opinion about those TIFF

13  files whatsoever except that they're very low resolution.

14      Q.  BY MR. BENJAMIN:  And you're not offering the

15  opinion that the resolution of those scans suggest that

16  they've been manipulated in any way; right?

17          MR. ARGENTIERI:  Objection as to form.

18          Doctor, go ahead.

19          THE WITNESS:  I am not -- I am not claiming

20  that, no.

21      Q.  BY MR. BENJAMIN:  And you're not offering the

22  opinion that the scans can't be accurately examined;

23  right?

24          MR. ARGENTIERI:  Objection.

25          You may answer, Doctor.

1           THE WITNESS:  It depends on what the examination

2    is.  So I think strictly speaking, the answer to your

3    question is no.  I would claim -- sorry, strike that.

4           It depends on what you mean by "examined."

5       Q.  BY MR. BENJAMIN:  There is some information

6    about the files that can be accurately determined and

7    analyzed.  Would you agree?

8           MR. ARGENTIERI:  Objection.

9           You may answer, Doctor.

10          THE WITNESS:  I'll agree with that, yes, there

11   are some aspects to the image -- to the files that can be

12   analyzed accurately.

13          MR. BENJAMIN:  Just ask the videographer, since

14   we're not in the same room, approximately how much time

15   is left on the tape?

16          THE VIDEOGRAPHER:  45 minutes.

17          MR. BENJAMIN:  Oh, you guys use longer tapes in

18   California than we use in New York.  Thank you.

19          THE WITNESS:  Or we record slower.

20          MR. BENJAMIN:  I hope not.

21      Q.  BY MR. BENJAMIN:  So Dr. Farid, when you suggest

22   that the scans are, quote, of too low quality for you to

23   perform the examination that you were asked to do, are

24   there specific tests that you were unable to conduct

25   because of that purported quality?

1        A.   Yes.

2        Q.   And what are those tests?

3        A.   I was particularly interested in trying to

4    determine if the various parts of the document originated

5    with the same underlying device or printer in this case.

6    And that -- mainly that's one of our most powerful

7    forensic tools for determining if the -- if the text

8    document is a composite of multiple splicing, copying and

9    splicing.

10            So that was the first analysis that I wanted to

11    perform.  There may have been subsequent analysis.  This

12    thing is typically you work in stages.  But there was

13    really nothing else that I could do at that point, given

14    the resolution.  So that was the first analysis I wanted

15    to do and simply was not able to.

16        Q.   Were there any other tests that you wanted to

17    perform that you were unable to?

18        A.   There was nothing specific in mind.  Usually

19    what drives a forensic examination is you do -- you

20    figure out what you want to do first, you take the

21    results of that, and that drives what you're going to do

22    next.  And so it's hard for me to answer that question

23    because it would have depended on what the results of the

24    first analysis would have been.

25            And with the exception of the metadata, there

1    was essentially -- none of my forensic techniques would

2    have been applicable in this case to actually analyze the

3    underlying document.

4        Q.   And understanding the objective of that initial

5    test, which was to determine whether the text originated

6    from the same device, were there specific tests that you

7    felt you were unable to perform to conduct the

8    examination that you had been tasked to perform?

9        A.   Yes.

10       Q.   And what were those specific tests?

11       A.   There's a technique that we developed that

12   allows us to isolate, for example, all of the letter A's

13   in a document, or the letter E, or actually any letter,

14   just a commonly occurring letter, and to do an analysis

15   of those isolated letters to determine if the -- how do I

16   describe this?  To determine if the slight errors in the

17   way the letter is printed is consistent throughout the

18   document.

19            So, for example, if you print a document and

20   scan it and then put it into a photo editing software and

21   just zoom in quite a bit, you'll see that the letters

22   aren't these perfect, clear-cut around like they are on

23   your screen.  There's imperfections.  And those

24   imperfections result from the underlying physical device

25   of a printer.  It's the way that the laser printer or the

1    ink jet operates.  They create imperfections.

2            And those imperfections turn out to be fairly

3    distinct to different printers.  So an HP printer will

4    introduce different imperfections than, for example, an

5    Epson printer.  And even the same printer over its

6    lifetime will produce different imperfections, both in

7    terms of how the drum starts to degrade, how the toner

8    level starts to change.

9            And so if a document, for example, two pages was

10   printed at one instance in time -- sorry, we're getting

11   some noise again from something.

12           If it was -- if it was printed at one instance

13   in time, those imperfections should be consistent

14   throughout the document.  And inconsistencies, specific

15   types of inconsistencies can be used to show that it's

16   not emerging from a single device.

17           And sorry, that was a long-winded answer to say

18   that is the analysis I wanted to perform.

19       Q.  And that analysis would focus on whether certain

20   characters appearing in the two scans appear at different

21   places inconsistently; is that right?

22           MR. ARGENTIERI:  Objection.

23           You may answer, Doctor.

24           THE WITNESS:  Correct.

25       Q.  BY MR. BENJAMIN:  Now, before providing the

1    June 28th letter, Defendants' 52, to Mr. Boland, did you

2    inform plaintiff or any of his attorneys about the

3    opinion you had reached in this matter?

4         A.  I believe that I spoke -- well, sorry, I'm sure

5    I spoke with Jennifer Young of Milberg.  I don't remember

6    if there was somebody else on the call at that time,

7    including Mr. Boland, but I did inform at least Jennifer

8    Young and possibly others.

9         Q.  And was that the same conversation in which you

10   requested higher resolution scans of those two documents?

11        A.  Yes.

12        Q.  And before being asked to provide the June 28th

13   letter to Mr. Boland, did you have any subsequent

14   communications with plaintiff or plaintiff's counsel?

15        A.  I believe that Ms. Young of Milberg contacted me

16   once or twice just saying that they were trying to get

17   the scans, just to sort of update me, but that there was

18   no news.  I believe that was the only correspondence.

19        Q.  So it's your understanding that in a subsequent

20   communication, plaintiff's counsel updated you that they

21   were trying to get higher resolution versions of those

22   scans; is that right?

23             MR. ARGENTIERI:  Objection as to form.

24             You may answer, Doctor.

25             THE WITNESS:  That's correct.

1       MR. BENJAMIN:  Again, Mr. Argentieri, I'd just

2  ask please if you'd let me finish my question before

3  stating your objection.

4       MR. ARGENTIERI:  I apologize.  I have to time

5  the end of your question.  You tend to add something,

6  say, kind of get the rhythm down a bit.

7       Q.  BY MR. BENJAMIN:  Dr. Farid, do you understand

8  why you provided -- what is your understanding of why

9  Mr. Boland requested this letter?

10      A.  I don't know.

11      Q.  When did he ask you to provide it?

12      A.  Sorry, I'm just going to look through my record

13  to see if I can give you a precise date.  Okay.  Okay.  I

14  received an email from Mr. Boland on June 26th requesting

15  the letter.  Sorry, June 26th of 2011.

16      Q.  And in any of the conversations that you had

17  with plaintiff's counsel regarding your opinion, did you

18  discuss how that opinion would be presented or

19  characterized?

20      A.  No.

21      MR. BENJAMIN:  Okay.  Dr. Farid, I'd like to

22  take a short break here.

23      THE WITNESS:  Okay.

24      MR. BENJAMIN:  Thanks.

25      THE WITNESS:  Thank you.

1          THE VIDEOGRAPHER:  We're going off the record at
2     12:36 p.m.  This is the end of tape 1.

3          (Recess.)

4          THE VIDEOGRAPHER:  We're on the record at
5     12:57 p.m.  This is the beginning of tape 2 in the
6     deposition of Dr. Hany Farid.

7          MR. SOUTHWELL:  Dr. Farid, before we start, this
8     is Alex Southwell.  I just want to put on the record that
9     I am handing to Mr. Argentieri something that was from a
10    deposition in this case earlier in the day, which is a CD
11    of materials provided by John Paul Osborne, who is the --
12    that scans images of the SLFs and the one-page of notes.

13         MR. ARGENTIERI:  Thank you.  I acknowledge
14    receipt of the exhibits.

15         MR. BENJAMIN:  Thank you, both.

16    Q.  Dr. Farid in order to better understand your
17    opinion, I'd like to get a better sense of what you have
18    been able to determine with respect to the two scans you
19    have received.

20         So you previously testified the two files were
21    provided in an uncompressed TIFF file format; is that
22    right?

23    A.  That's correct.

24    Q.  And in addition, you agree that the resolution
25    of both files is 200 DPI?

1            MR. ARGENTIERI:  Objection as to form.

2            THE WITNESS:  I'm sorry, your mic just skipped

3    out for a second in the question.  So can I ask you to

4    repeat it?

5        Q.  BY MR. BENJAMIN:  Of course.

6            Do you agree that the resolution of both files

7    is 200 DPI?

8        A.  I don't recall what the resolution was.  That

9    seems high to me.  I don't think it's actually that high.

10       Q.  And as you previously testified, you examined

11   the files by opening them, and that's it; right?

12       A.  That's correct.

13       Q.  So your estimate of the resolution of the files

14   would be based on that visual inspection; right?

15       A.  That's correct.

16       Q.  So do you know what the bit depth of the files

17   is?

18       A.  I -- they were either -- I don't remember if

19   they were color or not.  So they're either 8 or 24-bit

20   depth.  They weren't grayscale, for example, 1 bit.  So

21   they had -- they had sort of full range of gray value.

22   They're either eight, if it's a grayscale image, or 24,

23   if it's a color.  I just don't recall.

24       Q.  And do you recall whether both scans have

25   approximately the same dimensions?

Page 68

1       A.   I think that's correct, yes.

2       Q.   That they do have approximately the same

3   dimensions?

4       A.   Yes, yes.

5       Q.   So Dr. Farid, let's return to Defendants' 54,

6   the printouts of the Street Fax contract that we

7   discussed earlier.

8            Do you have those handy?

9       A.   I do.

10      Q.   On the second page of Defendants' 54, do you see

11  the top -- the two columns of text that span from the top

12  to the bottom of the page?

13      A.   I'm sorry, the -- at the top, the first page

14  says page 2 of 3.  So I just want to be clear which page

15  we're talking about.

16      Q.   Yes.  Thank you for the clarification.  We're

17  talking about the piece of paper that says page 3 of 3 on

18  it.

19      A.   (Witness nods head.)

20      Q.   The second page of Defendants' 54.

21      A.   Got it.

22      Q.   Now, on that piece of paper, do you see the two

23  columns of text that span from the top to the bottom of

24  the page?

25      A.   I do.

1      Q.  At the top of the first page of Defendants' 54,

2  so that's page 2 of 3, the other piece of paper, do you

3  see the words "general conditions of purchase and Street

4  Fax"?

5      A.  Yes.

6      Q.  Now, looking still looking at page 2 of 3,

7  underneath those words "general conditions of purchase

8  and Street Fax," do you see what appears to be very faint

9  text that appears to be text from page 2 that is bleeding

10  through to page 1?

11          MR. ARGENTIERI:  Objection as to form.

12          You may answer, Doctor.

13          THE WITNESS:  Yes.

14      Q.  BY MR. BENJAMIN:  That appears to be text from

15  page 2 that's bled through to page 1 as page 1 was

16  scanned; right?

17          MR. ARGENTIERI:  Objection as to form.

18          You may answer, Doctor.

19          THE WITNESS:  I don't -- so let me, if I can

20  rephrase the question and then answer it, as I'm prone to

21  do, it does appear to be text bleeding over.  It's not

22  immediately obvious that it's actually the text from

23  page 3 of 3.  I'm not saying it's not; it's just not

24  immediately obvious.

25      Q.  BY MR. BENJAMIN:  Right.  It does appear to be

1   some text -- you agree that it appears to be text that's

2   bled through from a different page to the first page of

3   the scan; right?

4          MR. ARGENTIERI:  Objection.

5          You can answer, Doctor.

6          THE WITNESS:  That is what it appears to be.

7      Q.  BY MR. BENJAMIN:  Let's look back at the second

8   page, which is labeled page 3 of 3 at the top.

9      A.  Yes.

10     Q.  Do you see the very faint text in the gutter

11  between the two columns approximately 1 to 2 inches from

12  the top of the printed page?

13     A.  Yeah.  It looks like I see the "E" and the "T"

14  and maybe part of the "F."

15     Q.  When you say the "E" and the "T" and part of the

16  "F," what are you referring to?

17     A.  Pardon me.  From the first page, the big bold

18  letter -- the big typed-faced letter "Street Fax," it

19  appears to be that part of that is bleeding over into the

20  middle of the column.

21     Q.  It appears that the title "Street Fax" from

22  page 1 of Defendants' 54 is bleeding through to the

23  second page of Defendants' 54; is that right?

24         MR. ARGENTIERI:  Objection.

25         You may answer that.

1          THE WITNESS:  That's correct.

2      Q.  BY MR. BENJAMIN:  So I'm going to refer to that

3  text that's bleeding through from the other pages on the

4  images as ghost text.  Does that make -- do you

5  understand?

6      A.  I do.

7      Q.  The presence of that ghost text in each page of

8  the scan suggests that the scans were created when both

9  pieces of paper were on top of each other; right?

10          MR. ARGENTIERI:  Objection.

11          You may answer, Doctor.

12          THE WITNESS:  Let me rephrase a little bit.

13  I'll agree that it is consistent with that, yes.

14      Q.  BY MR. BENJAMIN:  And my question was whether it

15  suggests that the two pages were on top of each other

16  when they were scanned?

17          MR. ARGENTIERI:  Objection.

18          You may answer.

19      Q.  BY MR. BENJAMIN:  Do you agree with that?

20      A.  I'm hesitating because it could be argued that

21  there are several reasons why you could get what you're

22  calling ghost text, and that is one of the reasons.  Is

23  that the only explanation?  No.  And so does it suggest

24  it?  I'm not sure.  I'm just -- sorry, I'm being a little

25  finicky with the words.  I am just saying it is

1    consistent, but I don't know if it suggests that's what

2    it is.

3         Q.   No, your job is to be finicky with the words.

4         A.   Okay.

5         Q.   It's your answer.  That's fine.

6         A.   Okay.

7         Q.   But I just want to be clear.  You do agree that

8    it appears that portions of three of the letters in the

9    title on page 1 appear to have bled through to the second

10   page of the document in a similar position on each page.

11            Would you agree?

12            MR. ARGENTIERI:  Objection.

13            You may answer.

14            THE WITNESS:  I agree.

15        Q.   BY MR. BENJAMIN:  Now, you said earlier that

16   your analysis in this case basically consisted of a few

17   minutes of visual observation, but I'm going to ask you a

18   couple of questions about some other forms of

19   examination.

20            So I know that you didn't perform a histogram

21   equalization, but are you familiar with the concept?

22        A.   Sure.

23        Q.   So what's a histogram equalization?

24        A.   So let's -- well, yeah, so let me describe it by

25   just giving a little background.  Let's just define what

1   we mean by "histogram."

2          So the -- a digital image is made up of a bunch

3   of pixels, P-I-X-E-L.  Those pixels in an eight-bit image

4   have a value between zero and 255.  Zero is black, 255 is

5   white, 128 is mid-level gray.

6          Okay?  So every pixel with the building block of

7   the image has some value.  So if I asked you to create a

8   histogram of an image, what you will tell me are how many

9   pixels have a value of zero, how many pixels will have a

10  value of one, up to 255.  Okay?

11         You could do the same thing with a color image,

12  but let's just keep it simple.  Let's say it's a

13  grayscale image, one channel.  Okay?

14         So now I have a histogram, which is a

15  distribution of the pixel values from black, zero, to

16  white, 255.  Now, typically what those histograms look

17  like is that there will be a few things that are black, a

18  few things that are white, but the majority of the sort

19  of energy, if you will, in the histogram is somewhere in

20  the middle, like a bell curve.  That's typically what

21  things look like.  It can -- it can vary.

22         So what histogram equalization is, it says take

23  the image and modify each pixel value so that when you

24  compute a histogram, it's completely flat or almost flat.

25  That is, that the number of black pixels is exactly or

1    very similar to the number of gray and white pixels.

2    Okay?

3           So that's -- and there's a sort of standard

4    mathematical way that you do that which probably is not

5    very interesting right now.

6           Now, why do you do a histogram equalization?

7    You do it typically as a form of contrast enhancement.

8    It's a way of -- so when I say that there's not a lot of

9    values that are black and white, it means that those

10   values tend to be sort of underrepresented and are hard

11   to see.  When you do histogram equalization, it sort of

12   increases the contrast.

13          You can achieve the same basic effect using

14   other manipulations that are sort of similar in nature.

15   But what histogram equalization does is it levels the

16   histogram, and then it creates a contrast-enhanced

17   version of the image.

18          Is that clear?

19   Q.   Yes.  It's a method of global contrast

20   adjustment; is that right?

21   A.   It can be applied both locally or globally.

22   Depends on how you do it.  You can select a part of the

23   image and only histogram equalize that part.  So you can

24   define the histogram on either the entire image or just a

25   part of the image.

1      Q.   It's a method of contrast adjustment; is that

2   right?

3      A.   Correct.

4      Q.   And contrast adjustment can be performed on

5   grayscale images as well as color images; right?

6      A.   Yeah.  There's a few extra details in color

7   images that you have to worry about how you handle the

8   color channels separately, but yes, you can do them in

9   either color or grayscale.

10      Q.   Is it possible to perform a histogram

11   equalization on the two files that you received?

12      A.   Yes.

13      Q.   Is it possible that that method of contrast

14   adjustment could reveal the surface and texture of the

15   scanned paper?

16      A.   Can I ask you to define what you mean by the

17   surface texture and -- I forgot what the second word was.

18      Q.   Sure.  I believe you previously testified that

19   the two scans you received are digital scans of two

20   pieces of paper; is that right?

21      A.   Correct.

22      Q.   And those pieces of paper were three-dimensional

23   objects when they were scanned; is that right?

24      A.   Well, it depends if you're a mathematician or a

25   physicist, the answer to that question.  So if you're a

1    mathematician --

2         Q.  You can answer as you.

3         A.  The answer from a mathematical point of view is

4    that there are two-dimensional.  The answer from a

5    physicist's point of view is that they're

6    three-dimensional.  And the distinction I'm -- so there

7    are clearly at least two dimensions.  Let's agree on

8    that, this part, the height and the width.

9             The question is, is the text -- the height of

10   the text rising to a third dimension in and of itself.

11   And that depends on, again, sort of the precision in

12   which you're -- God, this is such an annoying answer.

13            Did you get that on the record?

14        Q.  Dr. Farid's own opinion in a deposition is

15   annoying.

16        A.  It would not be the first time.  Sorry, I'm

17   finicky about the definition of dimensions because I'm a

18   mathematician.

19            So, I mean, so let's agree that the cup is

20   three-dimensional.  The paper is two-dimensional.  There

21   is a third dimension, which is the lifting of the text.

22   And the only reason this is relevant is that I think that

23   may be what you're getting at is the sort of the bumps

24   and the grooves on the surface of the paper.

25        Q.  Well, paper has a thickness as well; right?

1      A.   It absolutely has a thickness, but when you scan

2    it, you are -- sorry, let me ask the question.  So when

3    you say the third dimension, are you talking about the

4    thickness of the paper?

5      Q.   I am.

6      A.   Then I will agree it's three-dimensional.

7      Q.   Thank you.

8      A.   God, that was a long way to get there, wasn't

9    it?

10      Q.   Better that we understand each other.

11           So I think the question was, is it possible that

12    histogram equalization could clarify the surface and

13    texture of the physical paper that was scanned?

14      A.   I swear to you I'm not trying to be difficult.

15    So tell me what you mean by the surface and the texture,

16    please.

17      Q.   Sure.  So paper can be -- a piece of paper can

18    be smooth or it can be wrinkled; right?

19      A.   Yes.

20      Q.   So when I say the texture of the paper, if a

21    piece of paper is wrinkled, that's what I think of as the

22    texture.

23      A.   Okay.

24      Q.   So let's just be more specific.  So can a

25    histogram equalization reveal wrinkling in the physical

1   piece of paper that was scanned to create an image?

2       A.   Yes, it is possible that it could do that.

3       Q.   Now, generally speaking, is it possible to test

4   the effects of copying and pasting new text into digital

5   images?

6       A.   What do you mean by "new text"?  Do you mean

7   text from a different document?

8       Q.   I think we discussed earlier the fact that your

9   analysis considers whether new text, text that did not

10  originate with the image, has been sliced or subsequently

11  added to a digital image.

12          So when I say "new text," I'm referring to text

13  that does not originate with the image.  Is it possible,

14  generally speaking, to test the effects of splicing new

15  text into a digital image?

16      A.   Under certain circumstances, yes.

17      Q.   What are the circumstances under which that

18  would be possible?

19      A.   It depends on -- okay, so when you splice two

20  images together or two documents together, there are

21  several different types of traces that you could

22  potentially leave behind.  Okay?  So one of them is at

23  the border of the splice; the other is, as we talked

24  about earlier, the actual text was printed on a different

25  device, it leaves some artifacts behind.

1          So the answer to the question -- so those are

2     two very different types of perturbations in the image

3     that you could look for, and whether you're able to find

4     them or not, again depends on the resolution and the

5     quality and the compression.

6          So if they were saved as JPEG versus TIFF.  So

7     there's a number of things that sort of depend on what

8     specific forensic analysis you can apply.

9     Q.  Is it possible -- you mentioned two effects that

10    splicing new text into a digital image might have.  Is it

11    possible that a third effect would be perturbations in

12    the surface texture of the paper that we just discussed?

13    A.  It depends.  So if I'm understanding your

14    question, I think what you're asking is could you use the

15    fact that the surface texture is different in one part of

16    the document -- sorry.

17         Can you use the fact that the surface texture is

18    different on one part of the document from another as

19    evidence of splicing.  Is that the question?

20    Q.  It's another way of asking the question.  Yeah,

21    from the same, from the same point, you've testified that

22    it's possible to test the effects of splicing new text

23    into a digital image; right?  So I'm asking you if one of

24    the effects of splicing new text into a digital image

25    could be inconsistencies in the surface texture of the

1    paper that's revealed in the scan.

2         A.   Right.  So here's why I'm hedging the answer.

3    So let me just describe my concern with saying "yes" to

4    that.

5              There are a number of things that can create

6    differences across a document.  Right?  So, for example,

7    a document can be darker on one side and lighter on the

8    other.  That can be because of the way the scanner works.

9    That can be because there are toner imperfections in the

10   printer, or it can be because the image was manipulated.

11             So there are perfectly valid explanations for

12   differences across a document that have nothing to do

13   with manipulation.  And so one simply has to be careful

14   when you do find a difference that you can pinpoint it to

15   a manipulation and not to some other underlying physical

16   effect.

17             So, for example, when I say that the

18   imperfections in the letter "A" vary across a document,

19   as far as we know, there is no explanation for how that

20   can happen other than a manipulation.

21        Q.   I'm going to ask a more specific question

22   because I think we might be talking slightly past each

23   other in terms of the type of testing that I'm asking you

24   about.

25        A.   Okay.  I apologize.

1      Q.   No, no, that's okay.  The Street Fax contract,

2   Defendants' 54, do you have it in front of you?

3      A.   Yes.

4      Q.   Okay.  So this is a digital image that we could

5   manipulate using Photoshop; right, you could open this on

6   Photoshop and test the effects of splicing new text into

7   it; right?

8      A.   Correct.

9      Q.   Now, let's say that you replaced the word

10   "Street Fax" in a digital image that you were testing

11   with the word "elephant."  Is it possible that replacing

12   the word "Street Fax" with the word "elephant" would have

13   effects that you could observe on the surface texture of

14   the image?

15      A.   The answer to that -- I do think I understand

16   your question.  The answer to the question is "yes," that

17   you can detect it, differences, but there's another step

18   which you are wanting to take, which is can you

19   conclusively then say that the only way that could have

20   happened is the result of digital splicing?  That's a

21   different question; right?

22           So I'll answer the first question that you can

23   detect under certain circumstances that --

24   inconsistencies in the underlying texture.

25      Q.   So I just want to be clear.  I know that the

1    amount of information that you have about the underlying

2    documents in the case is limited, and I just want you to

3    understand I'm not asking these questions with -- from

4    the perspective of someone who's arguing that this

5    document is manipulated or unmanipulated.

6         A.   I understand.

7         Q.   Let's even forget about this document, frankly.

8    So we've discussed the fact that you can test the effects

9    of copying and pasting new text into a digital image;

10   right?

11        A.   (Witness nods head.)

12        Q.   There would be effects of that modification;

13   right?

14        A.   Correct.

15        Q.   I'm just asking if among those effects, it's

16   possible -- is it possible that among those effects would

17   be changes that you would observe in the surface features

18   of the document?

19        A.   Yes.   Sorry.   That took a long time to get

20   there, didn't it?

21        Q.   However long it takes.

22             And you did not test the effects of splicing new

23   text into these digital images; is that right?

24        A.   I did not.

25        Q.   And you didn't check the saturation of the two

1   scans; is that right?

2       A.  I did not.

3       Q.  And you didn't perform any adjustments to the

4   contrast or brightness of the two scans; right?

5       A.  I may have contrast enhanced it at one point,

6   but it certainly was not a -- sort of a detailed

7   analysis.

8       Q.  And you didn't find any signatures resulting

9   from the use of any digital imaging editors; right?

10      A.  I did not and I did not look.

11          MR. BENJAMIN:  Just one moment.

12          THE WITNESS:  Sure.

13      Q.  BY MR. BENJAMIN:  Dr. Farid, I want to ask you a

14  few questions about a Federal case in which you were

15  involved, United States vs. Frabizio in the District of

16  Massachusetts.

17          Do you recall that case?

18      A.  Yeah, I think it was -- what was it, '90 --

19  let's see, it was about eight years ago, maybe; is that

20  right?  Does that sound about right?

21      Q.  I think more or less, yeah.

22      A.  2004 or so?  Yeah.

23      Q.  Yeah.  The Frabizio case was criminal

24  prosecution for illegal possession of child pornography;

25  right?

1      A.  I think that's right, yes.

2      Q.  Initially the Government identified you as a

3  possible trial witness; is that right?

4      A.  That's correct.

5      Q.  And your testimony was to concern the issue of

6  whether images were real or computer generated; is that

7  right?

8      A.  That's correct.

9      Q.  Ultimately the Government decided not to offer

10  you as a trial witness; right?

11      A.  That's correct.

12      Q.  Instead, the Government sought to introduce the

13  testimony of a man named Thomas Musheno, an FBI examiner

14  of photographic evidence; is that right?

15      A.  I honestly don't know what happened after I

16  stopped working on the case.  So I'm not sure.

17          MR. BENJAMIN:  Fair enough.  I'd ask the court

18  reporter to mark a Memorandum and Order as Defendants'

19  Exhibit 58, a copy of which is being handed to

20  Mr. Argentieri.

21          (Exhibit 58, United States of America v Rudy

22          Frabizio, 8/11/06, marked for identification.)

23          THE WITNESS:  Did you say 58?

24          MR. BENJAMIN:  I did.

25      Q.  Dr. Farid, you're being handed a copy of

1   Defendants' 58, the District Court's Memorandum and Order

2   excluding Mr. Musheno's testimony?

3        A.   I'm sorry, did you say excluding?

4        Q.   Mr. Musheno's testimony?

5        A.   Yes.

6        Q.   If you could turn to page 4 of the printout,

7   using the numbers in the upper right-hand corner.

8        A.   Yes.

9        Q.   Do you see at the bottom left -- at the bottom

10  of the left-hand column, where it says footnote 2?

11       A.   Yes.

12       Q.   Do you see that?

13       A.   (Witness nods head.)  Yes.

14       Q.   In that footnote, the District Court wrote:

15  "Musheno offers testimony that is the polar opposite of

16  the type of expert testimony the Government first

17  proposed.  The Government initially offered Professor

18  Hany Farid, a Dartmouth College professor of computer

19  science and neuroscience.  Professor Farid sought to

20  distinguish real and computer-generated images through a

21  computer rather than using a visual inspection."

22            Did I read that correctly?

23       A.   Yes.

24       Q.   And is the trial court's description of the

25  difference between your approach and Mr. Mucheno's

1   approach accurate, so far as you know?

2       A.   No, it is not accurate.  But with a footnote,

3   first of all, I don't know what Musheno testified as to

4   so I can't state what the difference between what he

5   testified and what I did.

6            What is inaccurate here is that we -- it is

7   accurate to say that we had developed software to

8   distinguish real from computer generated.  It is

9   inaccurate to say that that was the only way in which we

10  rely on distinguishing computer generated from real.

11           We absolutely use visual inspection with an

12  understanding of what the current limits of computer

13  graphics technology are in order to assess realism.

14           So those -- the software and the visual

15  inspection absolutely come in pairs.  And in fact, we've

16  written a number of papers on both the human performance

17  of distinguishing as well as the computer performance.

18           So it's what they wrote about what I did is

19  accurate but incomplete, and I don't -- I don't know what

20  Musheno testified to so I can't state about the

21  differences.

22      Q.   Okay.  So the record is clear, I think that

23  Defendants' 57 is a motion.

24      A.   58?

25      Q.   I'm sorry, Defendants' 58, yes, is a motion

1    granting the defense -- it's an order granting the

2    defense motion to exclude Mr. Musheno's testimony.  So

3    Mr. Musheno didn't actually end up giving testimony in

4    that case.  I think the District Court's footnote

5    describes differences in approach rather than testimony.

6              Does that make sense?

7         A.   Sure.

8         Q.   Now, when the U.S. Attorney's Office decided not

9    to have you testify at trial, they didn't renounce your

10   approach; right?

11        A.   Not to my knowledge, no.

12        Q.   And they didn't indicate in any way that your

13   methodology was unreliable; right?

14        A.   So, sorry, I'm trying to think of how to answer

15   the question.  I don't know what they said -- are you

16   saying -- sort of publicly or to the Court or to me or,

17   I'm not sure what specifically --

18        Q.   Let me ask -- let me ask a clearer question.

19        A.   Yeah.

20        Q.   When the Government decided not to have you

21   testify at trial, did they reject you as discredited?

22        A.   No.

23        Q.   Is it your understanding that they made a

24   tactical decision and took a different approach to

25   proving that the images were of real children?

1       A.   That was my understanding.  So, look, this is

2   eight years ago so it's a pretty fuzzy remembering, but

3   my understanding was that we were trying to introduce at

4   the time a very new technology, and the thinking was that

5   it was more complicated than was going to be -- than

6   effective, and that there was simply a better way of

7   dealing with the prosecution of this particular case.

8       Q.   It was a tactical decision based on the limits

9   of the technology?

10      A.   That was my understanding, yes.

11      Q.   It would not be accurate to say that the

12  Government rejected you as discredited; right?

13      A.   It would not.  I've testified in a number of

14  State and Federal cases since that time and have been

15  qualified as an expert in Federal and State courts.

16      Q.   One of those cases was a criminal prosecution in

17  Ohio called State vs. Harrison.

18           Do you recall that case?

19      A.   Sorry, I'm getting some noise again from the

20  papers, and I'm having trouble hearing you.  Sorry, can

21  you -- we can't hear you.

22      Q.   One of those cases -- one of those cases was

23  called State vs. Harrison.  It was a criminal prosecution

24  in Ohio.

25           Do you recall that case?

1      A.  I believe so.  I did a couple of cases in Ohio.

2   Was this the police chief?

3      Q.  Yeah, I think you wrote about this case in a

4   couple of different -- a couple of different news

5   articles, the town in Ohio where the police chief was

6   running a video recorder.

7          Do you recall that case?

8      A.  I think I remember the case, yes.

9      Q.  Now, and the defendant in Harrison was convicted

10  at trial; right?

11     A.  I believe so, yes.

12     Q.  In fact, you testified at trial as an expert

13  witness for the Government; right?

14     A.  Correct.

15     Q.  Do you recall whether that conviction was

16  appealed?

17     A.  I don't have any knowledge about that.

18         MR. BENJAMIN:  Can I ask the court reporter to

19  mark this Decision of the Court of Appeals in Ohio as

20  Defendants' 59, a copy of which is being handed to

21  Mr. Argentieri.

22         (Exhibit 59, State of Ohio v David L. Harrison,

23         12/28/07, marked for identification.)

24     Q.  BY MR. BENJAMIN:  So Dr. Farid, you've been

25  handed a copy of Defendants' 59, the intermediate

1    appellate court's decision affirming Mr. Harrison's

2    conviction?

3         A.  Yes.

4         Q.  And on the first page of Defendants' 59,

5    Mr. Boland is listed as appellate counsel for the

6    defendant; right?

7         A.  Yes.

8         Q.  So there appears to have been an appeal of

9    Mr. Harrison's trial conviction; right?

10        A.  Yes, I'll take your word for it since I don't

11   know what -- I have a hard time reading these documents,

12   to be honest with you.

13             MR. BENJAMIN:  Understood.

14             I'd ask the court reporter to mark as

15   Defendants' Exhibit 60 a brief that was filed in that

16   case, a copy of which is also being handed to

17   Mr. Argentieri.

18             (Exhibit 60, State of Ohio v. David L. Harrison,

19             merit brief of Appellant David L. Harrison,

20             marked for identification.)

21        Q.  BY MR. BENJAMIN:  Dr. Farid, have you been

22   handed that document, Defendants' Exhibit 60?

23        A.  I have.

24        Q.  So Dr. Farid, Defendants' Exhibit 60 is the

25   appellate brief that Mr. Boland filed with the Supreme

1   Court of Ohio after the intermediate Appellate Court in

2   Ohio affirmed Mr. Harrison's conviction.

3       A.   Okay.

4       Q.   Do you see where it says the Supreme Court of

5   Ohio at the top of the page?

6       A.   I do.

7       Q.   That's the highest State Court in Ohio.

8       Please turn to page 8.  You'll see the numbers

9   at the bottom of Defendants' Exhibit 60.

10      A.   Yes.

11      Q.   And do you see the proposition of law 5V at the

12   top concerns the purportedly ineffective assistance of

13   counsel that Mr. Harrison received at trial?

14      A.   Yes.

15      Q.   Please turn to page 9 of Defendants' 60, the

16   brief that Mr. Boland filed with the Supreme Court of

17   Ohio in Harrison.

18      A.   Yes.

19      Q.   Subsection A reads:  "Failure to seek Farid's

20   exclusion or challenge his unscientific methodology."

21   Right?

22      A.   Yes.

23      Q.   If you could read aloud for the record the first

24   sentence of that subsection, please.

25      A.   Sure.

1              "Effective counsel in child pornography cases

2    knows that the State's digital imaging expert in the

3    trial of this matter, Hany Farid, has been exposed as a

4    fraud in prior cases."

5         Q.   The final sentence of that paragraph reads:

6    "The Government expert whom replaced the defunct

7    Government expert Farid in a notable Federal case

8    conceded that Farid's visual examination methodology is

9    unreliable."

10             Did I read that correctly?

11        A.   Yes, you did.

12        Q.   And that sentence is followed with a citation to

13   United States vs. Frabizio, 2006 WESTLAW 2385236, August

14   11, 2006, District of Massachusetts.  Is that right?

15        A.   That's correct.

16        Q.   Dr. Farid, I ask you to return to Defendants'

17   Exhibit 58, the District Court's Memorandum and Order in

18   Frabizio, please.

19        A.   Yes.

20        Q.   The date of that Memorandum and Order is

21   August 11, 2006; right?

22        A.   Yes.

23        Q.   So it would appear that the citation to Frabizio

24   in Mr. Boland's Harrison brief, Defendants' Exhibit 60,

25   refers to this same Memorandum and Order; right?

1      A.   I don't know how you guys do citations in the

2    legal world, but it certainly seems that way.

3      Q.   The two dates are the same; right?

4      A.   Yes.

5      Q.   And I'll represent to you on the record that

6    they're the same decisions.

7      A.   I'll take your word for it.

8      Q.   Thank you.  Now, in his Harrison brief,

9    Defendants' Exhibit 60, Mr. Boland proceeds to discuss

10   your role in the Frabizio case.  In the second full

11   paragraph on page 9 of Defendants' 60, Mr. Boland writes:

12   "The Frabizio court characterized Farid's approach and

13   that of other Government experts as 'eyeballing the

14   evidence,' a technique that has never been tested.  It's

15   error rate is unknown and therefore does not support a

16   finding of reliability.  His technique is not generally

17   accepted."

18          Do you see that?

19     A.   I do.

20     Q.   Now, as we previously discussed, the Government

21   decided to replace you as an expert witness with

22   Mr. Musheno; right?

23     A.   Correct.

24     Q.   And Mr. Musheno's approach to image

25   authentication was different from yours; right?

1      A.   I honestly don't know what his approach was.   So

2   it's hard for me to actually say.   I believe that to be

3   the case, but I don't know for sure.

4      Q.   Okay.   In Defendants' Exhibit 58, the District

5   Court's order in Frabizio, Judge Gertner characterized

6   Mr. Musheno's approach as, quote, the polar opposite of

7   the type of expert testimony that you offered; right?

8      A.   Yes.

9      Q.   If you could just read the first page.   So the

10   first page of the opinion, page 4 of the printout, and

11   then let me know when you're done.

12      A.   I'm sorry --

13      Q.   I'm now on Defendants' Exhibit 58.

14      A.   Oh, 58.   Page 4?

15      Q.   Right underneath Memorandum in Order Re:   Motion

16   to Exclude Expert Testimony.

17      A.   Yes.

18      Q.   Right through the bottom of the page.   And just

19   let me know when you're finished.

20      A.   Both columns?

21      Q.   Yep.

22      A.   Yes.   I'm done.   Thank you.

23      Q.   So it appears that the District Court's

24   Memorandum in Order on this defense motion to exclude

25   expert testimony concerned Mr. Musheno's expert

1    testimony, not yours; right?

2         A.   That's correct.

3         Q.   So this is very important.  So let's deal with

4    it step-by-step.

5              In his Harrison brief, Defendants' Exhibit 60,

6    Mr. Boland wrote:  "The Frabizio court characterized

7    Farid's approach and that of other Government experts as

8    eyeballing the evidence."

9              Right?

10        A.   Correct.

11        Q.   I'm sorry for all the page shuffling here, but

12   let's turn to page 9 using the numbers at the top of that

13   Frabizio order.

14        A.   I'm sorry, can you give me the exhibit number?

15        Q.   58.

16        A.   Yes.  Yes, I'm there.

17        Q.   Do you see the paragraph in the right-hand

18   column near the bottom of the page right before

19   Section A?

20        A.   "Even if the Government"?

21        Q.   Yes.

22        A.   Yes.

23        Q.   You anticipated my next question.  Would you

24   mind reading it aloud for the record.

25        A.   Sure.  "Even if the Government established that

1    the images here were not wholly virtual, Musheno's

2    methodology does not meet the Daubert standard.  His

3    technology amounts to little more than eyeballing the

4    evidence and recording his conclusions on a checklist.

5    Indeed, the Daubert discussion below underscores the

6    limitation of Musheno's" -- then there's an asterisk --

7    "approach, especially with respect to sophisticated

8    downloaded computer graphics."

9        Q.   So when the District Court in Frabizio talked

10   about, quote, "eyeballing the evidence," it was referring

11   to Mr. Musheno; right?

12       A.   Yes.

13       Q.   Again, Mr. Musheno's methodology was

14   characterized by the District Court in that same opinion

15   as the polar opposite of yours; right?

16       A.   Correct.

17       Q.   And yet in his Harrison brief, Mr. Boland said

18   that the Frabizio court characterized your approach as

19   eyeballing the evidence; right?

20       A.   Correct.

21       Q.   And that is inaccurate; right?

22       A.   That is inaccurate, yes.

23       Q.   Next in his Harrison brief, Mr. Boland wrote:

24   "The Frabizio court characterized Farid's approach and

25   that of other Government experts as, quote, 'a technique

1   that has never been tested.  It's error rate is unknown

2   and therefore does not support a finding of reliability."

3          Right?

4      A.  Yes.

5      Q.  Now, let's turn to page 16 at the top of

6   Defendants; 58, the District Court's Memorandum in Order

7   in Frabizio?

8      A.  Yes.

9      Q.  Do you see the sentence in the left-hand column

10  right before footnote 30?

11     A.  Yes.

12     Q.  Please read that sentence aloud for the record.

13     A.  "Because Musheno's technique has never been

14  tested, its error rate is unknown and therefore does not

15  support a finding of reliability."

16     Q.  So when the District Court in Frabizio talked

17  about a technique that had, quote, never been tested and

18  whose unknown error rate did not, quote, support a

19  finding of reliability, it was referring to -- explicitly

20  referring to Mr. Musheno's methodology and not yours;

21  right?

22     A.  That's correct.

23     Q.  And yet in his Harrison brief, Mr. Boland said

24  that the Court characterized your approach that way;

25  right?

1        A.    That's correct.

2        Q.    And again, that's a complete falsehood; right?

3        A.    Yes.

4        Q.    Finally in his Harrison brief, Mr. Boland wrote

5    that the Frabizio court characterized your approach and

6    that of other Government experts as, quote, a technique

7    that is not generally accepted.

8              Right?

9        A.    Yes.

10       Q.    Let's turn to page 18 of Defendants' Exhibit 58,

11   the District Court's Memorandum in Order of Frabizio.

12       A.    I'm sorry, what page was it?

13       Q.    18 at the top.

14       A.    Yes.

15       Q.    Do you see the two sentences in the left-hand

16   column, right before footnote 36?

17       A.    Yes.

18       Q.    Starting with the word "it"?

19       A.    Yes.  Should I read it into the record?

20       Q.    Will you please read -- please.

21       A.    Sorry.  "It is clear, then, that Musheno's

22   technique cannot claim a history of general acceptance.

23   Rather this technique is apparently the product of a

24   group of FBI employees who endorse one another's work."

25       Q.    So when the District Court in Frabizio talked

1    about a technique that was not generally accepted, it was

2    referring again to Mr. Musheno's methodology, not yours;

3    right?

4         A.  Yes.

5         Q.  Let's return one final time, I promise, to

6    page 9 of Mr. Boland's Harrison brief, Defendants'

7    Exhibit 60?

8         A.  Yes.

9         Q.  Mr. Boland wrote:  "His technique is not

10   generally accepted."  Right?

11        A.  Sorry.  Yes.

12        Q.  Again, Mr. Boland wrote:  "His technique is not

13   generally accepted."  Right?

14        A.  Yes.

15        Q.  And that is, again, another complete falsehood;

16   right?

17        A.  Yes.

18        Q.  So Dr. Farid, your scholarship has been

19   characterized as restoring trust in photojournalism, and

20   in an interview you stressed the importance of

21   journalistic ethics and a zero tolerance policy for

22   photographic fakes.  Your work frequently discusses the

23   integrity of images and the trust we have in them.

24             Would you agree your work has a strong ethical

25   dimension?

1      A.  Yes, I would.

2      Q.  What's your reaction to Mr. Boland's

3  characterization in his Harrison brief of your role in

4  the Frabizio case?

5          MR. ARGENTIERI:  I have to put an objection on

6  the record.

7          Go ahead, Doctor.

8          THE WITNESS:  Sorry.  I was just waiting for the

9  objection.

10         What's my reaction?  Is the question what's my

11 reaction?

12     Q.  BY MR. BENJAMIN:  Yes.

13     A.  I think it's inaccurate.

14     Q.  Thank you.  That's your only reaction to being

15 called a fraud?

16         MR. ARGENTIERI:  I object.  Doctor, you don't

17 have to answer that.  You're being coached right now.

18         THE WITNESS:  Look --

19         MR. BENJAMIN:  Dr. Farid, I'm sorry, just for

20 the sake of the record, Mr. Argentieri --

21         MR. ARGENTIERI:  What's for the record?  Go

22 ahead.

23         MR. BENJAMIN:  My question isn't trying to coach

24 the witness.  My question --

25         MR. ARGENTIERI:  Oh, it isn't?  Okay.

1          MR. BENJAMIN:  My question is to ask the witness

2     for his reaction to being called a fraud by plaintiff's

3     counsel, who is offering him as an expert in this case.

4          MR. ARGENTIERI:  There weren't even in the same

5     techniques used in that case and our case.  So who's

6     frauding who?

7          MR. BENJAMIN:  Okay.

8          MR. ARGENTIERI:  So okay, what?

9          THE WITNESS:  Can I answer the question?  Okay.

10          So first of all, I don't take these things

11     personally.  I've been an academic for a long time, and

12     we're in the business of being criticized.  And that is

13     the nature of science, and I think it's good.

14          You guys are lawyers, and you have a job to do,

15     and your job is to defend your client.  Right?  And I

16     understand that job, and I don't take criticism of my

17     work and what I do personally.

18          I think it's inaccurate.  It's surprisingly

19     inaccurate, given that the record clearly states what the

20     technology was and what we were able and not able to do.

21     So it's surprisingly inaccurate.

22          It's one thing to say I'm not reliable or I'm

23     not smart or something like that.  That's fine.  I don't

24     care.  Right?  But these are simply factually incorrect

25     statements.

1          So beyond the fact that they're factually

2    incorrect, I don't -- I honestly don't have an emotional

3    response to it.  It's not personal.  I understand he was

4    doing his job.  It's fine.

5          MR. BENJAMIN:  Nothing further at this time.

6          MR. ARGENTIERI:  I have to take a short break to

7    see if they want some questions asked.

8          MR. BENJAMIN:  So we'll just go off the record

9    for a short break.

10          THE WITNESS:  Okay.

11          THE VIDEOGRAPHER:  Going off the record at

12    1:46 p.m.

13          (Recess.)

14          THE VIDEOGRAPHER:  We're going back on the

15    record at 1:54 p.m.

16          MR. ARGENTIERI:  We have no questions for

17    Dr. Farid.  And thank you, Dr. Farid, for being judicious

18    in your comments.

19          THE WITNESS:  Thank you.

20          MR. BENJAMIN:  I'm sure plaintiff's counsel

21    appreciates your judiciousness.  Dr. Farid, we appreciate

22    your time.  And we have nothing further at this time.

23    Thank you.

24          THE WITNESS:  Thank you.

25          THE VIDEOGRAPHER:  We're off the record at

1    1:54 p.m., and this concludes today's testimony given by

2    Dr. Hany Farid.  The total number of media used was three

3    and will be retained by Veritext, LLC.

4              (Time noted:  1:55 p.m.)

5                        ---oOo---

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 104

1           ACKNOWLEDGMENT OF DEPONENT

2               I, HANY FARID, PH.D., do hereby certify

3      that I have read the foregoing transcript of my

4      testimony, and further certify that it is a true

5      and accurate record of my testimony (with the

6      exception of the corrections listed below):

7      Page    Line                    Correction

8      ____|_____|_____|_____

9      ____|_____|_____|_____

10     ____|_____|_____|_____

11     ____|_____|_____|_____

12     ____|_____|_____|_____

13     ____|_____|_____|_____

14     ____|_____|_____|_____

15     ____|_____|_____|_____

16     ____|_____|_____|_____

17     ____|_____|_____|_____

18     ____|_____|_____|_____

19     ____|_____|_____|_____

20

21                    _____

                        HANY FARID, PH.D.

22

       SUBSCRIBED AND SWORN TO BEFORE ME

23     THIS _____ DAY OF _____, 20___.

24

       _____      _____

25     (NOTARY PUBLIC)           MY COMMISSION EXPIRES:

1   STATE OF CALIFORNIA     ) ss:

2   COUNTY OF MARIN         )

3

4         I, LESLIE ROCKWOOD, CSR NO. 3452, do hereby

5   certify:

6         That the foregoing deposition testimony was

7   taken before me at the time and place therein set forth

8   and at which time the witness was administered the oath;

9         That testimony of the witness and all objections

10  made by counsel at the time of the examination were

11  recorded stenographically by me, and were thereafter

12  transcribed under my direction and supervision, and that

13  the foregoing pages contain a full, true and accurate

14  record of all proceedings and testimony to the best of my

15  skill and ability.

16        I further certify that I am neither counsel for

17  any party to said action, nor am I related to any party

18  to said action, nor am I in any way interested in the

19  outcome thereof.

20        IN WITNESS WHEREOF, I have subscribed my name

21  this 15th day of August, 2012.

22

23

24  _____

25                        LESLIE ROCKWOOD, RPR, CSR NO. 3462

[& - adjusted]                                                                                          Page 1

| & | | | |
|---|---|---|---|

**&**   2:16 3:3

**0**

**0001.tiff.**   28:20
**002**   30:18
**00569**   1:7 6:14

**1**

**1**   5:8 37:16 66:2
67:20 69:10,15,15
70:11,22 72:9
**10166-0193**   2:20
**11**   38:1 92:14,21
**110**   6:14
**111-1**   35:5 38:9
**11:13**   1:18 6:2,5
**12**   5:4
**12/28/07**   5:13 89:23
**128**   73:5
**12:36**   66:2
**12:57**   66:5
**12th**   29:6
**13**   1:18 4:4 5:6 6:1,5
**14**   18:4
**1475**   2:6
**14843-1526**   2:12
**15**   13:25 18:5 35:5
**15th**   105:21
**16**   97:5
**17th**   18:14,19
**18**   98:10,13
**188**   2:11
**1:10**   1:7
**1:46**   102:12
**1:54**   102:15 103:1
**1:55**   103:4

**2**

**2**   5:8 37:16 66:5
68:14 69:2,6,9,15
70:11 85:10
**20**   18:5 104:23
**200**   2:19 66:25 67:7
**2004**   38:17,24 39:14
39:20 83:22

**2006**   92:13,14,21
**2011**   35:5 65:15
**2012**   1:18 4:4 6:1,5
12:5,14,19 17:7,10
17:17,24 18:19,25
25:23 26:9 29:6
31:18 105:21
**212**   2:21,22
**216**   2:8
**236-8080**   2:8
**2385236**   92:13
**24**   67:19,22
**255**   73:4,4,10,16
**26**   31:18
**26th**   65:14,15
**28**   12:5,19
**28th**   12:14 16:21
35:22 41:6,25 64:1
64:12
**2nd**   17:24 18:25

**3**

**3**   38:17,24 68:14,17
68:17 69:2,6,23,23
70:8,8
**3/26/12**   30:11
**30**   55:14 97:10
**3000**   3:5
**324-3232**   2:13
**34**   5:7
**3452**   105:4
**3462**   1:19 105:25
**351-3981**   2:22
**351-4079**   2:21
**36**   98:16
**37**   5:8
**393-8266**   3:7
**3rd**   39:14,20

**4**

**4**   85:6 94:10,14
**415**   3:7
**43**   1:17 6:11
**44107**   2:7
**45**   60:16

**5**

**50**   32:9
**500**   26:25
**52**   5:4 12:6,8,12,18
13:2 16:22 27:20,23
41:5,24 43:10 54:19
55:7 64:1
**53**   5:6 13:15,16,19
**54**   5:7 34:13,15,18
35:4,8 36:6 37:2,20
38:8 68:5,10,20
69:1 70:22,23 81:2
**55**   5:8 37:14,16
38:10,17,23 39:13
39:23,25 40:12,16
**555**   3:5
**57**   86:23
**58**   5:10 84:19,21,23
85:1 86:24,25 92:17
94:4,13,14 95:15
97:6 98:10
**59**   5:12 89:20,22,25
90:4
**5v**   91:11

**6**

**6/28/12**   5:5 12:9
**60**   5:14 90:15,18,22
90:24 91:9,15 92:24
93:9,11 95:5 99:7
**607**   2:13

**7**

**7**   4:9
**770724**   2:6

**8**

**8**   67:19 91:8
**8/11/06**   5:11 84:22
**84**   5:10
**89**   5:12

**9**

**9**   91:15 93:11 95:12
99:6
**90**   5:14 83:18

**5**

**94105-0921**   3:6

**a**

**a.m.**   1:18 6:2,5
**ability**   45:1,4
105:15
**able**   10:1 19:9 30:20
31:8 54:13 56:15,20
59:7 61:15 66:18
79:3 101:20,20
**absolutely**   49:21
52:24 57:9 77:1
86:11,15
**academic**   15:4
101:11
**academic's**   58:23
**accept**   25:18
**acceptance**   98:22
**accepted**   93:17 98:7
99:1,10,13
**accommodating**
10:25
**accurate**   12:13
13:10,24,25 14:2
86:1,2,7,19 88:11
104:5 105:13
**accurately**   10:2
59:22 60:6,12
**accused**   51:9
**achieve**   74:13
**acknowledge**   66:13
**acknowledged**
21:12
**acknowledgment**
104:1
**acting**   34:5
**action**   105:17,18
**actual**   16:10 19:18
42:24 53:17 78:24
**add**   56:12 65:5
**added**   78:11
**addition**   14:12 15:4
66:24
**adjusted**   48:21 49:4

**adjusting** 51:1
**adjustment** 50:25
   74:20 75:1,4,14
**adjustments** 50:8
   83:3
**administered** 105:8
**affirmed** 91:2
**affirming** 90:1
**agnostic** 19:17
**ago** 36:2 50:19
   83:19 88:2
**agree** 6:16 14:7
   51:24 52:1 60:7,10
   66:24 67:6 70:1
   71:13,19 72:7,11,14
   76:7,19 77:6 99:24
**agreeing** 10:25 43:3
**agrees** 42:23
**ahead** 7:8 23:2
   25:21 39:4,9 41:19
   42:22 59:1,18 100:7
   100:22
**al** 6:14
**alex** 6:22 66:8
**alexander** 2:18
**allows** 62:12
**aloud** 91:23 95:24
   97:12
**alter** 47:8,10
**alteration** 47:5
**altered** 15:15 16:5
   49:8
**amended** 29:20
   30:12 31:17 35:25
**america** 5:10 84:21
**amount** 82:1
**amounts** 96:3
**analysis** 19:7 21:1,4
   21:11 32:25 44:22
   46:18 53:5,16,18
   54:9,12 57:24 58:6
   58:16 61:10,11,14
   61:24 62:14 63:18
   63:19 72:16 78:9
   79:8 83:7

**analyze** 20:17,18,24
   30:16 33:4 43:19
   52:18 53:11 56:13
   57:3 59:3 62:2
**analyzed** 21:6 60:7
   60:12
**analyzing** 45:11
**annoying** 76:12,15
**another's** 98:24
**answer** 4:12 9:15,21
   10:1 21:23 22:23
   23:18,20 24:1,15,25
   33:2,9,13,21 35:11
   36:14 37:7 38:19
   39:2,16 40:8,20
   41:3,10,13 42:4,12
   44:1,12 46:4,6,10
   46:11 47:2 48:2,25
   50:14,16,18 51:4,25
   52:8,22 53:8,13
   57:15 58:11,12,19
   58:21 59:2,11,25
   60:2,9 61:22 63:17
   63:23 64:24 69:12
   69:18,20 70:5,25
   71:11,18 72:5,13
   75:25 76:2,3,4,12
   79:1 80:2 81:15,16
   81:22 87:14 100:17
   101:9
**answered** 51:20,20
**answering** 23:8
**answers** 9:8 20:8
   24:3
**anticipated** 95:23
**anymore** 14:19
**apologize** 52:1 65:4
   80:25
**apparently** 58:23
   98:23
**appeal** 90:8
**appealed** 89:16
**appeals** 89:19
**appear** 35:13,20
   39:23 63:20 69:21

69:25 72:9 92:23
**appearance** 57:25
**appearances** 2:1 3:1
**appearing** 63:20
**appears** 69:8,9,14
   70:1,6,19,21 72:8
   90:8 94:23
**appellant** 5:16
   90:19
**appellate** 90:1,5,25
   91:1
**applicable** 62:2
**applied** 74:21
**applies** 25:3
**apply** 79:8
**appointments** 15:4
**appreciate** 102:21
**appreciates** 102:21
**approach** 57:10
   85:25 86:1 87:5,10
   87:24 93:12,24 94:1
   94:6 95:7 96:7,18
   96:24 97:24 98:5
**appropriate** 25:13
**approximately** 9:2
   45:14 54:23 60:14
   67:25 68:2 70:11
**april** 17:3,6,8,9,10
   17:16,17,24 18:25
   25:23 26:9 29:6
**argentieri** 2:10 6:25
   6:25 8:10,20 11:24
   12:7 19:22 20:1,4,7
   21:16,22 22:5,11,16
   22:19,22,24 23:2,11
   23:23 24:5,7,10,12
   24:19,25 25:2,6,17
   33:8,13 34:14 35:10
   36:13 37:6,12,15,19
   37:23,25 38:6,18,25
   39:2,4,7,15 40:7,19
   41:2,9,14,16 42:3,7
   42:11,15,20 43:1,25
   44:11 46:3 48:1,15
   48:24 50:13 51:25

52:7,21 53:7,12
   57:14 58:10 59:10
   59:17,24 60:8 63:22
   64:23 65:1,4 66:9
   66:13 67:1 69:11,17
   70:4,24 71:10,17
   72:12 84:20 89:21
   90:17 100:5,16,20
   100:21,25 101:4,8
   102:6,16
**argentieri's** 25:15
**argue** 51:2
**argued** 47:4 71:20
**arguing** 82:4
**arrangement** 26:24
**arrested** 50:20
**arrived** 55:12,19
**article** 15:18
**articles** 89:5
**artifacts** 78:25
**aside** 14:4
**asked** 19:8 20:24
   28:1 30:18 31:3
   41:6,25 43:11,15,19
   44:5,14 52:2 54:12
   56:4 60:23 64:12
   73:7 102:7
**asking** 11:17,18
   15:24 20:1 22:9,11
   26:6,7,10 43:9
   58:15 79:14,20,23
   80:23 82:3,15
**asouthwell** 2:24
**aspects** 60:11
**assert** 10:14
**asserted** 25:9 32:4
**asserting** 25:2,3,8
**assess** 52:19 86:13
**assistance** 91:12
**associated** 52:11,16
**asterisk** 96:6
**attached** 36:5 43:16
**attachments** 37:3
   39:22,25

**attorney** 7:23 19:22
19:24 20:5 21:17,20
22:5,12,12 23:18
25:1 40:5
**attorney's** 87:8
**attorneys** 23:13
29:24 54:14 64:2
**attributable** 10:19
**audio** 6:15 57:3
**august** 1:18 4:4 6:1
6:5 35:5 92:13,21
105:21
**austin** 40:5,25
**authentic** 52:20
**authentication**
93:25
**authenticity** 44:14
52:6,24 53:6
**authority** 23:17
42:8,10
**available** 59:4
**avenue** 2:19
**aware** 33:16,25 34:3
34:4,11 36:4,4,7,11
36:15 37:1 38:16,23
39:12,19,21 40:4,15
40:23 44:2

**b**

**b** 29:18
**back** 14:6 18:13
32:2 41:21 45:16
49:22 70:7 102:14
**background** 13:7
72:25
**backwards** 17:11
**based** 15:10 20:17
25:14 32:17 33:7
67:14 88:8
**bases** 32:21
**basic** 49:17 52:11
74:13
**basically** 72:16
**basis** 24:24 25:1
27:2,6,8 41:13 42:5

42:7,9,13,14,24
**beginning** 66:5
**believe** 17:3 18:3
29:1,17,23 31:20
33:19 34:8 36:7
40:9 64:4,15,18
75:18 89:1,11 94:2
**bell** 73:20
**benjamin** 2:17,21
4:9 6:21,21 7:4,8,17
7:20,23 12:4,11
13:13,18 19:24 20:3
20:5,9 21:21 22:1
22:21,25 24:23
25:12,19,22 33:16
34:12,17 35:15
36:19 37:13,23 38:4
38:7,22 39:1,6,9,12
39:22 40:11,23 41:5
41:12,15,20 42:5,10
42:14,23 43:2,4,5,7
44:4,18 46:14 48:15
48:19 49:3 52:2,10
52:25 53:9,19 57:23
58:18,22 59:1,14,21
60:5,13,17,20,21
63:25 65:1,7,21,24
66:15 67:5 69:14,25
70:7 71:2,14,19
72:15 83:11,13
84:17,24 89:18,24
90:13,21 100:12,19
100:23 101:1,7
102:5,8,20
**berkeley** 1:16,17 6:1
6:12 11:1
**best** 105:14
**bet** 56:21
**better** 8:17 9:17
46:15 66:16,17
77:10 88:6
**beyond** 102:1
**big** 48:6 70:17,18
**bill** 27:1,21,22

**binghamton** 14:18
**bit** 37:8 49:24,25
62:21 65:6 67:16,19
67:20 71:12 73:3
**black** 73:4,15,17,25
74:9
**blacker** 50:24
**bled** 69:15 70:2 72:9
**bleeding** 69:9,21
70:19,22 71:3
**block** 73:6
**body** 40:12
**bogged** 25:4
**boland** 2:4,5 5:4 7:2
7:2 11:23 12:5,8,14
12:19 23:22,25
24:19,25 25:8 27:20
42:17,23 43:3 48:18
64:1,7,13 65:9,14
90:5,25 91:16 93:9
93:11 95:6 96:17,23
97:23 98:4 99:9,12
**boland's** 92:24 99:6
100:2
**bold** 70:17
**border** 78:23
**bottom** 68:12,23
85:9,9 91:9 94:18
95:18
**brain** 17:14
**break** 9:20,22 65:22
102:6,9
**breaks** 10:14
**brief** 5:15 90:15,19
90:25 91:16 92:24
93:8 95:5 96:17,23
97:23 98:4 99:6
100:3
**brightness** 49:4,7
83:4
**broad** 53:3
**building** 73:6
**bumps** 76:23
**bunch** 73:2

**business** 51:15,17
101:12

**c**

**c** 14:17 28:20
**california** 1:16,17
3:6 6:1,12,24 11:4
60:18 105:1
**call** 24:20 41:17
42:11 54:24 64:6
**called** 14:19 28:19
88:17,23 100:15
101:2
**calling** 71:22
**camera** 16:6
**caption** 6:12 35:4
**care** 48:16 101:24
**careful** 50:5 51:13
80:13
**case** 6:13,14 10:4
11:21 13:4 18:1,10
19:2,4 20:20 21:7
21:13 23:14 25:15
26:15,22 27:17
28:20 29:13 30:3
31:9,16 32:5 33:17
33:23 34:19 35:4
38:15 40:18 43:20
54:18 61:5 62:2
66:10 72:16 82:2
83:14,17,23 84:16
87:4 88:7,18,25
89:3,7,8 90:16 92:7
93:10 94:3 100:4
101:3,5,5
**cases** 88:14,16,22,22
89:1 92:1,4
**caught** 48:6
**cd** 66:10
**ceglia** 1:5 6:13 7:1,3
12:2 18:15,21 19:4
26:15 30:12 31:25
32:4,9,15,21 33:7
34:1,5 40:17 43:23
44:3

ceglia's 40:6
cellular 6:18
certain 58:15 63:19
  78:16 81:23
certainly 83:6 93:2
certify 104:2,4
  105:5,16
challenge 91:20
chance 23:20
change 47:25 48:9
  51:6 63:8
changed 16:7,10
changes 8:5 82:17
changing 48:7
channel 73:13
channels 75:8
characterization
  57:1 100:3
characterized 65:19
  93:12 94:5 95:6
  96:14,18,24 97:24
  98:5 99:19
characters 63:20
charge 26:25 43:13
  53:1
chastising 8:10
check 11:12 17:15
  26:1,3,11 28:7
  82:25
checked 17:4
checking 17:22
checklist 96:4
chief 15:5 89:2,5
child 83:24 92:1
children 87:25
chunks 44:5
circumstances
  78:16,17 81:23
citation 92:12,23
citations 93:1
claim 32:4,21 34:3,8
  34:11 60:3 98:22
claimed 50:22
claiming 32:9,16
  44:9 59:19

claims 44:16
clarification 10:6
  68:16
clarify 26:18 77:12
clarifying 20:13
  58:14
clear 18:17 20:19
  22:22 23:4,19 24:16
  25:13 31:10 38:7
  49:12 55:17 56:3,12
  62:22 68:14 72:7
  74:18 81:25 86:22
  98:21
clearer 87:18
clearly 58:17 76:7
  101:19
clicked 53:21 54:21
client 19:22,24 20:5
  21:17,20 22:5,12
  23:18 25:1 101:15
clients 34:2
coach 100:23
coached 100:17
cole 38:17 39:14
  40:4,25
collaborated 14:25
college 13:9 85:18
color 50:25 67:19,23
  73:11 75:5,6,8,9
column 70:20 85:10
  95:18 97:9 98:16
columns 68:11,23
  70:11 94:20
combination 16:16
come 14:16 30:22
  86:15
coming 24:13
commencing 1:17
comment 25:6
comments 102:18
commercial 8:18
  15:13
commercializing
  15:11

commission 104:25
commonly 62:14
communication
  54:2 64:20
communications
  64:14
company 28:25 29:2
  29:4 32:9
compensated 26:21
  27:6
compensation 27:12
complaint 29:19,20
  30:12 31:18 35:25
  36:5
complete 9:8 98:2
  99:15
completely 73:24
complicated 88:5
composite 61:8
comprehend 24:8
  24:12
compress 50:2
compressed 49:15
  49:16,23
compression 49:17
  49:19 50:1,6 79:5
compressions 50:4
compute 73:24
computer 13:8 18:2
  55:20 84:6 85:18,20
  85:21 86:8,10,12,17
  96:8
conceded 92:8
concept 72:21
concern 80:3 84:5
concerned 94:25
concerning 27:5
concerns 91:12
concert 34:5
concludes 103:1
conclusions 96:4
conclusively 81:19
conditions 69:3,7
conduct 21:13 60:24
  62:7

conducting 21:2,5
conference 2:10,17
confirm 8:1
connection 29:13
  31:16
consequences 51:2
consider 47:18 52:5
  53:5
considered 48:11
  53:4
considering 57:23
considers 78:9
consisted 72:16
consistent 52:19
  62:17 63:13 71:13
  72:1
constitute 46:23
  47:24 48:21 49:4,15
  50:9,10
contact 11:20 17:5
contacted 16:24
  17:1 18:25 25:23
  32:13 64:15
contain 20:15
  105:13
contained 13:23
  40:17 43:9
containing 19:16
contains 13:3 45:4
contending 43:23
content 50:11 51:24
context 46:18
continental 17:12
contingency 27:6,8
continually 50:4
contours 46:15
contract 5:9 27:25
  31:25 32:17,20,24
  33:6 34:1,13,23,24
  35:8,21 36:5,22
  37:1,17,21 38:8
  68:6 81:1
contrast 48:20 49:7
  50:21,25 51:1 74:7
  74:12,16,19 75:1,4

75:13 83:4,5
**conversation**  21:19
  64:9
**conversations**  6:18
  10:13 65:16
**convicted**  89:9
**conviction**  89:15
  90:2,9 91:2
**copies**  19:19 27:24
  28:1 37:15 41:7
  42:1 43:11 44:6
  52:3 53:22 55:7
**copy**  12:6,12,13
  13:14,19 19:12
  20:10,20 21:15
  29:16,19,21 33:22
  34:14,18 35:3 53:17
  84:19,25 89:20,25
  90:16
**copying**  61:8 78:4
  82:9
**core**  16:17
**corner**  85:7
**correct**  9:10 11:25
  12:1,17,23,25 13:1
  15:8,17,21 17:19
  27:4 28:4 29:11
  31:14,19,20 33:7
  35:6 36:9 37:4 40:2
  40:3,14 41:11 43:14
  43:18,21 44:7 48:23
  49:2,6 53:23 54:20
  55:3,16,21,23 56:2
  56:7,11 63:24 64:25
  66:23 67:12,15 68:1
  71:1 75:3,21 81:8
  82:14 84:4,8,11
  89:14 92:15 93:23
  95:2,10 96:16,20
  97:22 98:1
**correction**  104:7
**corrections**  104:6
**correctly**  28:3 47:23
  48:20 50:7 51:22
  55:10 57:10 85:22

92:10
**correspondence**
  64:18
**counsel**  2:1 3:1 6:10
  6:19 7:6,16 10:8,9
  10:12 11:11,21
  12:22 18:21 21:2,5
  21:12 22:2,9 23:12
  23:15 24:2,3 31:11
  64:14,20 65:17 90:5
  91:13 92:1 101:3
  102:20 105:10,16
**county**  105:2
**couple**  46:20 58:2
  72:18 89:1,4,4
**course**  11:14 14:22
  19:5 21:10 22:1
  24:23 48:9 67:5
**court**  1:1 6:7 10:21
  12:4 13:14 24:20
  33:18 34:12 37:13
  41:20 84:17 85:14
  87:16 89:18,19
  90:14 91:1,1,4,7,16
  93:12 95:6 96:9,14
  96:18,24 97:16,24
  98:5,25
**court's**  85:1,24 87:4
  90:1 92:17 94:5,23
  97:6 98:11
**courts**  88:15
**cover**  50:20
**coverage**  32:8,12
**covered**  23:25 34:9
**create**  63:1 73:7
  78:1 80:5
**created**  45:14 71:8
**creates**  74:16
**criminal**  83:23
  88:16,23
**criticism**  101:16
**criticized**  101:12
**cropped**  51:9
**cropping**  51:6

**crutcher**  2:16 3:3
**csr**  1:19 105:4,25
**cup**  76:19
**curiosity**  32:11
**current**  13:21 27:14
  86:12
**currently**  23:6
**curriculum**  5:6
  13:16
**curve**  73:20
**cut**  62:22
**cv**  1:7 6:14 13:14,21
  14:3 15:5

### d

**d**  1:5 4:1 6:13 14:17
  29:18
**dance**  39:17
**dangerous**  51:12
**darker**  50:22 80:7
**dartmouth**  13:9,13
  14:12 85:18
**date**  14:6 16:18,20
  17:5 30:10 39:20
  65:13 92:20
**dated**  12:14
**dates**  93:3
**daubert**  96:2,5
**david**  5:12,14,16
  89:22 90:18,19
**day**  66:10 104:23
  105:21
**days**  54:4,6 55:13
**deal**  95:3
**dealing**  88:7
**dean**  2:5 5:4 7:2
  12:8 23:21 25:6
  42:21
**debate**  19:6
**decade**  14:6,9
**deceive**  51:24
**deception**  51:3
**decided**  84:9 87:8
  87:20 93:21

**decision**  87:24 88:8
  89:19 90:1
**decisions**  93:6
**declaration**  29:22
  31:19
**declarations**  30:3
**deeply**  50:21
**defend**  101:15
**defendant**  6:10 89:9
  90:6
**defendants**  1:10
  2:15 6:22 12:6,12
  12:18 13:2,15,19
  16:22 27:23 30:2
  33:17,25 34:4,18
  35:4,8 36:6,11 37:2
  37:14 38:7,10,17,23
  39:13,23,25 40:12
  40:15 41:5,24 43:10
  55:6 64:1 68:5,10
  68:20 69:1 70:22,23
  81:2 84:18 85:1
  86:23,25 89:20,25
  90:4,15,22,24 91:9
  91:15 92:16,24 93:9
  93:11 94:4,13 95:5
  97:6 98:10 99:6
**defense**  23:15 34:13
  44:17 87:1,2 94:24
**defense's**  29:16
**define**  46:24 72:25
  74:24 75:16
**definition**  47:21
  53:3 76:17
**defunct**  92:6
**degrade**  50:4 63:7
**delay**  10:19
**depend**  79:7
**depended**  61:23
**depends**  47:3 48:3
  49:16 60:1,4 74:22
  75:24 76:11 78:19
  79:4,13
**deponent**  104:1

**depose** 42:19
**deposed** 8:25 9:6
10:25 11:17
**deposition** 1:15 5:1
6:6,9,11 7:24 8:6,19
8:22 9:7 10:7,13
11:7,19,24 16:24
18:13,16,18 23:15
25:4,10 34:25 43:6
66:6,10 76:14 105:6
**depositions** 22:2
**depth** 67:16,20
**describe** 13:10 16:3
62:16 72:24 80:3
**described** 36:21
**describes** 87:5
**description** 5:3
85:24
**designed** 57:11
**detailed** 83:6
**details** 52:17 75:6
**detect** 15:15 56:24
57:8,11 81:17,23
**detection** 15:19
**determine** 10:14
19:8 28:1 41:6 42:1
43:11 44:5,14 45:1
45:5,12 46:12 49:12
52:3 56:5,9 61:4
62:5,15,16 66:18
**determined** 55:25
60:6
**determines** 16:4
**determining** 16:10
49:7 51:15,17 52:24
61:7
**developed** 15:12
16:15 56:24 57:3,7
62:11 86:7
**device** 45:8,14,22
49:9 61:5 62:6,24
63:16 78:25
**difference** 80:14
85:25 86:4

**differences** 80:6,12
81:17 86:21 87:5
**different** 20:17
30:25 35:17,18 36:5
45:2 46:25 57:21
63:3,4,6,20 70:2
78:7,21,24 79:2,15
79:18 81:21 87:24
89:4,4 93:25
**difficult** 49:8 58:4
77:14
**digital** 13:11 14:6
14:14 15:15 16:4
20:24 21:6,14,18
27:24 28:6 31:15
35:9 43:20 47:5,12
55:7 56:25 57:8,25
73:2 75:19 78:4,11
78:15 79:10,23,24
81:4,10,20 82:9,23
83:9 92:2
**digitally** 45:18
**dimension** 76:10,21
77:3 99:25
**dimensional** 75:22
76:4,6,20,20 77:6
**dimensions** 67:25
68:3 76:7,17
**direct** 24:15,25
**directing** 21:21
22:22 23:7 24:1
**direction** 105:12
**discovered** 37:3
**discovery** 29:3
36:21
**discredited** 87:21
88:12
**discuss** 54:8 65:18
93:9
**discussed** 21:1,5,12
50:8 52:15 68:7
78:8 79:12 82:8
93:20
**discusses** 99:22

**discussion** 27:10
96:5
**discussions** 27:5
**dismiss** 33:17,23
36:11,17
**dismissal** 36:18
**distinct** 63:3
**distinction** 20:16
47:17 76:6
**distinguish** 19:14
20:12 85:20 86:8
**distinguishing**
19:13 20:10 86:10
86:17
**distribution** 73:15
**district** 1:1,2 83:15
85:1,14 87:4 92:14
92:17 94:4,23 96:9
96:14 97:6,16 98:11
98:25
**disturbances** 57:11
57:18,19
**doctor** 21:23 22:6
22:25 33:9,13 35:11
36:14 37:8 38:3,19
39:7,9,16 40:8,20
41:3,10 42:4 43:2
44:12 46:4 48:2,25
50:14 52:8,22 53:8
57:15 58:11 59:11
59:18,25 60:9 63:23
64:24 69:12,18 70:5
71:11 100:7,16
**document** 5:7 13:24
20:25 26:17 30:11
33:3 34:6,15 35:5
35:16 38:1,9 44:21
45:2,3,5,18,20 47:1
47:9,25 56:15,19,20
58:7 61:4,8 62:3,13
62:18,19 63:9,14
72:10 78:7 79:16,18
80:6,7,12,18 82:5,7
82:18 90:22

**documents** 10:7
12:21 19:6,10,11,12
19:14,15,15 20:10
20:11,14,14,17,20
21:15 31:12 32:7,23
35:19,20 36:1 38:11
40:10 44:3,15 45:12
57:4 64:10 78:20
82:2 90:11
**doing** 42:21 43:5
102:4
**downloaded** 96:8
**dozen** 9:3
**dpi** 66:25 67:7
**dr** 6:6 7:5,21 8:25
10:24 12:11 13:18
16:21 20:9 24:5,24
25:18,22 27:23
29:24 31:21 33:16
34:17 35:7 38:4,10
38:16,22 39:1,12
40:4,11 41:12 43:7
43:22 45:21 48:19
53:1 60:21 65:7,21
66:6,7,16 68:5
76:14 83:13 84:25
89:24 90:21,24
92:16 99:18 100:19
102:17,17,21 103:2
**draft** 27:19
**dream** 58:21,22,23
58:25
**drive** 40:17
**drives** 61:19,21
**dropbox** 29:8
**dropped** 31:8
**drum** 63:7
**due** 22:17
**dunn** 2:16 3:3 6:21
6:23 7:24
**dwinelle** 1:16 6:12

---

**e**

**e** 4:1 14:18 29:3,18
29:18,23 62:13

70:13,15 73:3
**earlier** 66:10 68:7
72:15 78:8,24
**early** 16:19 17:3,6,9
17:10,16,17 25:23
**easier** 10:21
**ecf039** 30:12
**edited** 16:8
**editing** 62:20
**editorializing** 50:23
51:9
**editors** 83:9
**effect** 33:19 74:13
79:11 80:16
**effective** 88:6 92:1
**effects** 78:4,14 79:9
79:22,24 81:6,13
82:8,12,15,16,22
**eight** 38:1 67:22
73:3 83:19 88:2
**either** 44:17 59:5
67:18,19,22 74:24
75:9
**elapsed** 53:25
**electronic** 19:11,19
20:11 21:14 29:12
29:19,21 30:16 36:1
37:21,24 47:5 53:5
58:9
**elephant** 81:11,12
**elliott** 1:8 6:13
**email** 17:4,22,23,24
17:25 18:9,11,13
26:3 39:21 40:13,13
65:14
**emails** 18:5,5,6 37:3
37:14 38:14,16,23
39:13,23 40:15,24
41:1 43:16
**emerge** 14:10
**emerging** 63:16
**emotional** 102:2
**employees** 98:24
**endorse** 98:24

**energy** 73:19
**engage** 10:13
**engagement** 25:24
26:4,7,12
**enhanced** 50:21
74:16 83:5
**enhancement** 74:7
**entire** 48:9 74:24
**entity** 48:10
**epson** 63:5
**equalization** 72:21
72:23 73:22 74:6,11
74:15 75:11 77:12
77:25
**equalize** 74:23
**equate** 51:23
**error** 93:15 97:1,14
97:18
**errors** 62:16
**especially** 96:7
**esq** 2:5,10,17,18 3:4
**essentially** 62:1
**establish** 58:5
**established** 95:25
**estimate** 14:7 55:2
67:13
**et** 6:14
**ethical** 99:24
**ethics** 99:21
**everybody's** 58:24
**evidence** 7:11 46:2
46:22 47:18,19,24
48:20 49:3,14 50:10
51:5 52:5 53:5
79:19 84:14 93:14
95:8 96:4,10,19
**exact** 17:5
**exactly** 35:13 73:25
**examination** 4:6
7:19 30:20 55:9
56:1,3,9,16,19 60:1
60:23 61:19 62:8
72:19 92:8 105:10
**examine** 20:20
43:15

**examined** 33:6
45:23 59:22 60:4
67:10
**examiner** 84:13
**example** 45:6,16,17
47:4,9,11 48:4,6
49:19 50:1,17 62:12
62:19 63:4,9 67:20
80:6,17
**examples** 46:20
**exception** 35:15
61:25 104:6
**exchange** 18:11
**exchanged** 18:6,10
**exchanges** 18:12
**exclude** 87:2 94:16
94:24
**excluding** 85:2,3
**exclusion** 91:20
**excuse** 7:6
**exhaustively** 30:14
**exhibit** 5:4,6,7,8,10
5:12,14 12:6,8,12
12:18 13:2,15,16,19
27:20 34:13,15 35:4
35:8 36:6 37:2,16
37:20 38:8,10,23
39:13,23,25 40:12
43:10 54:19 55:7
84:19,21 89:22
90:15,18,22,24 91:9
92:17,24 93:9 94:4
94:13 95:5,14 98:10
99:7
**exhibits** 5:1 66:14
**exist** 26:13
**experience** 22:2
**expert** 19:7 26:15
29:16 36:12 54:9
85:16 88:15 89:12
92:2,6,7 93:21 94:7
94:16,25,25 101:3
**experts** 14:13 93:13
95:7 96:25 98:6

**expires** 104:25
**explains** 34:20
38:15 56:8
**explanation** 10:6
71:23 80:19
**explanations** 80:11
**explicitly** 97:19
**exposed** 92:3
**express** 25:19
**extra** 75:6
**eyeballing** 54:23
55:15 93:13 95:8
96:3,10,19

**f**

**f** 14:17 29:18 70:14
70:16
**face** 58:24
**facebook** 1:8 29:22
30:12 32:10,17
**faced** 70:18
**fact** 20:12 25:14
26:14 49:13 58:3
59:9 78:8 79:15,17
82:8 86:15 89:12
102:1
**facts** 41:18
**factually** 101:24
102:1
**failure** 91:19
**faint** 69:8 70:10
**fair** 18:8 46:14 57:1
57:2 84:17
**fairly** 31:23 32:3
50:25 53:3 63:2
**fakes** 99:22
**fall** 44:22
**falls** 59:6
**falsehood** 98:2
99:15
**familiar** 14:24 32:12
72:21
**far** 20:22 26:14 31:9
80:19 86:1

**farid** 1:15 4:7 5:2,5
5:6 6:6 7:5,21 8:25
10:24 12:9,11 13:16
13:18 16:21 20:9
24:5,24 25:18,22
27:23 29:24 31:21
33:16 34:17 35:7
38:4,10,16,22 39:1
39:12 40:4,11 41:12
43:7,22 45:21 48:19
53:1 60:21 65:7,21
66:6,7,16 68:5
83:13 84:25 85:18
85:19 89:24 90:21
90:24 92:3,7,16
99:18 100:19
102:17,17,21 103:2
104:2,21
**farid's** 76:14 91:19
92:8 93:12 95:7
96:24
**fart** 17:14
**fault** 51:21
**fax** 5:7 34:15,23,23
35:7 36:21 37:1,20
38:8 68:6 69:4,8
70:18,21 81:1,10,12
**fbi** 84:13 98:24
**features** 82:17
**federal** 33:18 83:14
88:14,15 92:7
**fee** 26:24,25
**feedback** 48:13
**feels** 56:21
**felt** 62:7
**field** 14:6,10,13
**figure** 61:20
**file** 16:10 27:25
28:22 30:6,7,9
34:20 35:3,15 38:9
38:15 40:1,16 46:22
47:1,2,5,18,19
49:14,20,21,24
50:12 52:11,15
53:11 66:21

**filed** 30:3 31:18
32:15 34:19 35:5
38:9,14 90:15,25
91:16
**files** 28:6,10,11,19
28:24 29:5,7,9
32:23 37:2 40:1
43:15,16 44:9 45:23
52:5,16,20 53:6,20
54:1,21 55:14,18,19
55:24 56:6,9 59:9
59:13 60:6,11 66:20
66:25 67:6,11,13,16
75:11
**final** 92:5 99:5
**finally** 98:4
**find** 79:3 80:14 83:8
**finding** 93:16 97:2
97:15,19
**findings** 13:3
**fine** 25:8 26:5 42:17
72:5 101:23 102:4
**finicky** 71:25 72:3
76:17
**finish** 9:21 20:3,4
39:2,6 65:2
**finished** 39:5 94:19
**firm** 16:20 40:5,25
**first** 7:7 10:5 11:16
14:5 15:18 16:12
17:1,4,23,24 23:11
23:11 28:6,19 34:22
40:12 45:6,6 46:11
53:15 61:10,14,20
61:24 68:13 69:1
70:2,17 76:16 81:22
85:16 86:3 90:4
91:23 94:9,10
101:10
**fish** 48:6,7
**flat** 73:24,24
**focus** 58:7 63:19
**followed** 92:12
**follows** 41:23

**footnote** 85:10,14
86:2 87:4 97:10
98:16
**foregoing** 104:3
105:6,13
**forensic** 15:12,14
16:14 19:7 20:16,18
30:20 32:25 45:11
51:14 55:9 56:1,24
58:16 61:7,19 62:1
79:8
**forensics** 13:11 14:6
14:10,14 29:3
**forged** 34:6
**forgery** 34:2
**forget** 82:7
**forgot** 11:15 75:17
**form** 33:4 37:6
43:25 44:11 46:3
47:12 48:1 51:3
52:7 53:7 59:10,17
64:23 67:1 69:11,17
74:7
**formal** 16:2
**formalizing** 25:24
**format** 27:25 29:10
66:21
**forms** 49:17 72:18
**forth** 49:22 105:7
**founder** 15:6
**fourandsix** 15:6,9
**fourth** 55:6
**frabizio** 5:11 83:15
83:23 84:22 92:13
92:18,23 93:10,12
94:5 95:6,13 96:9
96:18,24 97:7,16
98:5,11,25 100:4
**francisco** 3:6
**frankly** 82:7
**fraud** 33:18,23
36:12 46:2,9 47:24
48:6 51:16 92:4
100:15 101:2

**frauding** 101:6
**fraudulent** 48:11
**frequently** 99:22
**fridrich** 14:17,25
**friedberg** 29:17
31:17 34:9,10 36:8
36:20,21 40:16
52:15
**front** 51:17 81:2
**full** 9:8 39:10 56:19
67:21 93:10 105:13
**fully** 10:1
**further** 102:5,22
104:4 105:16
**fuzzy** 88:2

**g**

**g** 29:18
**general** 51:4 57:10
69:3,7 98:22
**generally** 36:20 78:3
78:14 93:16 98:7
99:1,10,13
**generated** 84:6
85:20 86:8,10
**generous** 55:2
**geometric** 57:19
58:8
**gertner** 94:5
**getting** 21:18 48:13
63:10 76:23 88:19
**ghost** 71:4,7,22
**gibson** 2:16 3:3 6:21
6:23 7:24
**gibsondunn.com**
2:23,24 3:8
**give** 7:12 23:20 24:4
24:4 28:18,24 29:22
39:7 41:16 42:7,8
42:13 46:20 50:17
65:13 95:14
**given** 10:18 32:2
61:13 101:19 103:1
**giving** 42:12 72:25
87:3

**global**  74:19
**globally**  74:21
**go**  6:16 7:8 8:15
  16:20 23:2 25:21
  39:4,9 41:17,19
  42:22 46:21 49:22
  59:1,18 100:7,21
  102:8
**god**  7:13 76:12 77:8
**going**  8:11,19,20
  18:17 28:7,12 54:6
  61:21 65:12 66:1
  71:2 72:17 80:21
  88:5 102:11,14
**good**  6:4 7:5,21,22
  10:22 101:13
**gotten**  56:17
**government**  84:2,9
  84:12 85:16,17
  87:20 88:12 89:13
  92:6,7 93:13,20
  95:7,20,25 96:25
  98:6
**granting**  87:1,1
**graphics**  86:13 96:8
**gray**  67:21 73:5 74:1
**grayscale**  67:20,22
  73:13 75:5,9
**great**  8:18,19 58:20
**grooves**  76:24
**grounds**  36:17
**group**  98:24
**groups**  14:15
**guess**  23:15,17 33:2
**gutter**  70:10
**guys**  60:17 93:1
  101:14

**h**

**h**  2:18 14:17 29:23
**half**  9:3 38:1 54:24
**hall**  1:17 6:12
**hand**  7:9 85:7,10
  95:17 97:9 98:15

**handed**  12:11 13:18
  34:14,18 37:15
  38:11 39:19 84:19
  84:25 89:20,25
  90:16,22
**handful**  14:15
**handing**  12:7 66:9
**handle**  75:7
**handy**  68:8
**hany**  1:15 4:7 5:2,5
  5:6 6:6 12:8 13:16
  66:6 85:18 92:3
  103:2 104:2,21
**happen**  14:24 30:5
  49:9 80:20
**happened**  51:18
  81:20 84:15
**happens**  49:20
**hard**  14:9 19:12
  20:10,20 21:15
  40:17 46:5 49:12
  50:17 54:7 61:22
  74:10 90:11 94:2
**harrison**  5:13,15,16
  88:17,23 89:9,22
  90:18,19 91:13,17
  92:24 93:8 95:5
  96:17,23 97:23 98:4
  99:6 100:3
**harrison's**  90:1,9
  91:2
**head**  68:19 82:11
  85:13
**hear**  8:2,13,21 13:6
  19:20 23:21,22 24:5
  33:11 43:1 88:21
**heard**  33:10 36:16
**hearing**  88:20
**hedging**  80:2
**height**  76:8,9
**held**  6:11
**help**  7:13 15:15 19:9
**helpful**  47:16,16
  51:19 52:24

**hesitate**  37:8
**hesitating**  71:20
**hi**  30:1
**high**  67:9,9
**higher**  30:18 31:11
  53:17,21 64:10,21
**highest**  91:7
**hired**  21:18
**histogram**  72:20,23
  73:1,8,14,19,22,24
  74:6,11,15,16,23,24
  75:10 77:12,25
**histograms**  73:16
**history**  98:22
**hold**  17:14 22:7
  28:12
**honest**  90:12
**honestly**  42:12
  84:15 94:1 102:2
**hope**  60:20
**hopefully**  48:16
**hornell**  2:12
**hour**  26:25 54:24
**hourly**  27:2
**hp**  63:3
**human**  86:16

**i**

**ideas**  16:17
**identification**  12:10
  13:17 34:16 37:18
  84:22 89:23 90:20
**identified**  5:3 84:2
**identifies**  15:5
**identify**  6:20
**illegal**  83:24
**image**  13:11 14:6,10
  14:14 16:4,6 21:18
  37:25 47:1 48:4,5
  48:10,20 49:4,8
  50:1,2,20 51:6,24
  52:23 57:20,25 58:9
  58:16 59:5 60:11
  67:22 73:2,3,7,8,11
  73:13,23 74:17,23

  74:24,25 78:1,10,11
  78:13,15 79:2,10,23
  79:24 80:10 81:4,10
  81:14 82:9 93:24
**images**  15:16 19:14
  20:18 30:17 53:15
  53:18 56:25 57:8,13
  66:12 71:4 75:5,5,7
  78:5,20 82:23 84:6
  85:20 87:25 96:1
  99:23
**imagine**  54:3
**imaging**  49:9 83:9
  92:2
**immediately**  14:16
  14:22 69:22,24
**imperfections**  62:23
  62:24 63:1,2,4,6,13
  80:9,18
**implication**  46:13
**implications**  47:14
**importance**  99:20
**important**  95:3
**inaccurate**  86:6,9
  96:21,22 100:13
  101:18,19,21
**inauthentic**  52:20
**inches**  70:11
**include**  52:10
**including**  64:7
**inclusive**  57:5
**incomplete**  86:19
**inconsistencies**
  63:14,15 79:25
  81:24
**inconsistency**  45:19
**inconsistently**  63:21
**incorporate**  16:13
**incorrect**  101:24
  102:2
**incorrectly**  25:3
**increases**  74:12
**incredibly**  49:8
**independent**  56:13

indicate  16:22 87:12
indicated  15:18
  21:17
individually  1:8
ineffective  91:12
inform  64:2,7
information  13:23
  49:22 50:3 60:5
  82:1
informing  18:14
initial  62:4
initially  54:22 84:2
  85:17
ink  63:1
inserted  45:18
inspection  67:14
  85:21 86:11,15
instance  63:10,12
instructed  4:12
integrity  99:23
intent  47:24
intention  50:11
  51:15,23
interact  23:13
interest  32:16
interested  13:6
  56:14 58:18 61:3
  105:18
interesting  74:5
interference  6:18
interfering  8:7 21:8
intermediate  89:25
  91:1
interrupt  30:10 39:8
  48:12
interview  99:20
introduce  63:4
  84:12 88:3
introducing  41:18
invoice  27:15
invoices  27:14
involved  19:2 83:15
involvement  17:2
iphoto  16:9

isolate  62:12
isolated  62:15
israeli  51:8
issue  84:5

**j**

j  3:4
jennifer  11:16 17:23
  18:14 19:3 21:19
  32:6 45:10 64:5,7
jennifer's  20:2
jessica  14:17
jet  63:1
jim  38:17 39:14 40:4
job  9:15 72:3 101:14
  101:15,16 102:4
john  66:11
journalistic  99:21
jpeg  50:1 79:6
judge  10:4 22:4
  41:17 42:11 94:5
judicious  102:17
judiciousness
  102:21
july  12:15 18:14,19
jump  42:15
june  12:5,14,15,16
  12:19 16:21 35:22
  41:6,25 64:1,12
  65:14,15

**k**

k  29:1,1
katya  29:1
keep  8:20 73:12
kevorkian  3:12 6:7
kind  65:6
knew  28:12 31:9
knock  8:8
know  8:6,23 14:19
  16:6 25:20,25 26:14
  27:7 30:5 31:7
  35:18 36:17 42:16
  51:11 54:4 56:21
  65:10 67:16 72:1,20
  80:19 81:25 84:15

86:1,3,19 87:15
  90:11 93:1 94:1,3
  94:11,19
knowing  58:18
knowledge  44:16
  87:11 89:17
knows  92:2
koons  29:1,5 54:1

**l**

l  5:12,14,16 29:3,23
  29:23 49:18 73:3
  89:22 90:18,19
labeled  70:8
lakewood  2:7
language  57:21
laptop  11:12
largely  19:15 45:4
larger  37:21,24
laser  62:25
lastly  10:18
late  17:3,8,8,10,16
  17:17
law  40:5,25 91:11
lawsuit  32:16 33:7
lawyer  40:6
lawyer's  58:22
lawyers  46:12
  101:14
leave  78:22
leaves  78:25
left  60:15 85:9,10
  97:9 98:15
legal  2:4 23:10 46:7
  46:9 93:2
legitimate  25:14
leslie  1:19 6:8 105:4
  105:25
letter  5:4 11:17 12:5
  12:8,13,19 13:2
  16:22 25:24 26:4,7
  26:12 27:20,23
  30:19 35:22 41:6,25
  43:10 54:19 56:5,8
  62:12,13,13,14,17

64:1,13 65:9,15
  70:18,18 80:18
letters  28:23 62:15
  62:21 72:8
level  48:11 63:8 73:5
levels  74:15
lifetime  63:6
lifting  76:21
lighter  80:7
limitation  96:6
limited  31:24 32:3
  58:6 82:2
limits  86:12 88:8
line  25:10 104:7
lips  8:14
listed  90:5 104:6
listen  24:16
literally  50:3 53:20
litigation  6:9
little  37:8 39:17 50:5
  51:13,13 55:1 57:20
  58:13 71:12,24
  72:25 96:3
llc  2:4 103:3
llp  2:16 3:3 16:23
locally  74:21
located  40:16,24
long  35:19 42:23
  54:23 63:17 77:8
  82:19,21 101:11
longer  18:15 60:17
look  50:22,23 51:6
  55:24 57:18,19
  65:12 70:7 73:16,21
  79:3 83:10 88:1
  100:18
looked  35:19 53:21
  54:4 55:20
looking  19:7 28:14
  28:15 56:17 69:6,6
looks  29:18 70:13
loss  49:21
lossless  49:18,19
lossy  49:18 50:1

**lot** 30:3 74:8
**low** 32:24 53:16
  55:8 59:13 60:22
**lower** 28:20
**lowercase** 28:23

**m**

**m** 14:18,18
**magazine** 50:21
**main** 2:11 45:11
**majority** 18:6 73:18
**making** 51:15
**man** 39:14 84:13
**manipulate** 47:1
  81:5
**manipulated** 43:24
  44:10,21 45:17 46:9
  57:13 59:16 80:10
  82:5
**manipulation** 28:2
  41:7 42:2 43:12
  44:6,15,19 46:1,16
  46:23,25 47:7,8,12
  47:14,15,20,22
  48:22 49:5,15 50:9
  51:23 52:4 53:2
  56:6,10,25 59:9
  80:13,15,20
**manipulations**
  50:10 51:6,11 74:14
**march** 17:16,17
  31:18 38:17,24
  39:14,20
**marin** 105:2
**mark** 1:8 5:9 6:13
  12:5 13:15 32:1
  34:13 37:14,17
  84:18 89:19 90:14
**marked** 12:9 13:17
  34:15 37:17 84:22
  89:23 90:20
**massachusetts**
  83:16 92:14
**materials** 29:12,15
  30:13,16 31:15

43:20 66:11
**mathematical** 58:8
  74:4 76:3
**mathematician**
  75:24 76:1,18
**matt** 7:23 8:13
  24:21
**matter** 7:12 17:2
  19:9 26:8 64:3 92:3
**matthew** 2:17 6:21
**mbenjamin** 2:23
**mean** 8:14 14:2
  19:15 20:14,14
  21:17 23:7 24:10
  25:19 26:6,13,17
  27:7,8 30:7,9 39:8
  42:16,20 44:13,19
  45:17 46:5,16,24
  47:3 49:16 50:5
  54:13 60:4 73:1
  75:16 76:19 77:15
  78:6,6
**meaning** 47:25 51:7
**means** 74:9
**meant** 12:16
**mechanism** 16:10
**media** 103:2
**medium** 19:18 50:4
**meet** 11:6 96:2
**memon** 14:18
**memorandum**
  84:18 85:1 92:17,20
  92:25 94:15,24 97:6
  98:11
**menacing** 50:24
**mentioned** 36:2
  58:2 79:9
**merged** 14:20
**merit** 5:15 90:19
**metadata** 52:11,16
  52:19,23 53:11
  56:13,18 61:25
**method** 74:19 75:1
  75:13

**methodology** 87:13
  91:20 92:8 96:2,13
  97:20 99:2
**mic** 8:8 67:2
**microphone** 8:11
  48:16
**microphones** 6:17
**mid** 73:5
**middle** 9:21 45:7
  70:20 73:20
**mike** 32:1
**milberg** 11:16 16:23
  18:7,20 23:6,13
  26:24,25 27:13,16
  27:18 31:8 44:14
  45:10 64:5,15
**million** 49:24
**mind** 11:12 14:16,21
  24:22 26:11 28:7
  61:18 95:24
**minimum** 8:21
**minutes** 55:4,14
  60:16 72:17
**misleadingly** 50:11
**mispronouncing**
  34:10
**missed** 33:10
**mission** 3:5
**mistake** 15:3
**misunderstanding**
  17:13
**mixing** 46:7
**modification** 82:12
**modify** 73:23
**moment** 16:7 45:15
  83:11
**moments** 36:2
**monday** 1:18 4:4 6:1
**morning** 6:4 7:5,21
  7:22 17:4
**motion** 33:23 36:11
  36:16 86:23,25 87:2
  94:15,24
**move** 8:8 20:8

**moved** 33:17
**moving** 8:14
**mucheno's** 85:25
**multiple** 61:8
**muscolino** 3:4 6:23
**musheno** 84:13
  85:15 86:3,20 87:3
  93:22 96:11
**musheno's** 85:2,4
  87:2 93:24 94:6,25
  96:1,6,13 97:13,20
  98:21 99:2
**mute** 8:11
**muted** 8:13 48:15

**n**

**n** 4:1 14:18,18 28:20
  29:1,3
**name** 6:7 7:23 11:15
  15:24 16:2 28:25,25
  28:25 29:2 105:20
**named** 39:14 84:13
**names** 28:11,19 40:1
**nasir** 14:18
**national** 6:9
**native** 43:15
**natural** 57:13
**nature** 74:14 101:13
**near** 95:18
**necessarily** 26:8
  46:23 47:24 49:15
  50:10 51:23
**need** 9:20 10:5,6
  39:10 42:24 53:21
  56:19
**neither** 105:16
**neuroscience** 85:19
**never** 20:22,23
  93:14 97:1,13,17
**new** 1:2 2:12,20,20
  60:18 78:4,6,9,12
  78:14 79:10,22,24
  81:6 82:9,22 88:4
**news** 64:18 89:4

newspaper   51:8,9
nicholas   3:4
nick   6:23
nitpicky   57:20
nmuscolino   3:8
nods   68:19 82:11
   85:13
noise   63:11 88:19
notable   92:7
notary   104:25
note   6:15 37:19
noted   103:4
notes   66:12
notice   16:25
noting   43:5
number   5:3 6:14
   14:22 18:12 44:20
   73:25 74:1 79:7
   80:5 86:16 88:13
   95:14 103:2
numbers   85:7 91:8
   95:12
numerous   36:12
nyu   14:20

**o**

o   14:18 29:1,1,17,23
   49:18
o.j.   50:19
oath   105:8
object   21:16,20 22:3
   100:16
objected   42:18
objection   19:20,22
   22:8 33:8,11 35:10
   36:13 37:6 38:18,25
   39:15 40:7,19 41:2
   41:9,13,18 42:3,6
   43:25 44:11 46:3
   48:1,24 50:13 52:7
   52:21 53:7,12 57:14
   58:10 59:10,17,24
   60:8 63:22 64:23
   65:3 67:1 69:11,17
   70:4,24 71:10,17

72:12 100:5,9
objections   23:23
   25:13 42:25 43:5
   105:9
objective   62:4
objects   75:23
obligation   22:10
observation   72:17
observe   25:20 81:13
   82:17
obtain   31:8
obvious   69:22,24
obviously   54:17
   57:24 59:8
occasion   9:12
occurring   62:14
offer   84:9
offered   85:17 94:7
offering   59:8,14,21
   101:3
offers   85:15
offhand   54:3,16
office   18:12 87:8
officer   15:5
oh   15:3 17:10 22:19
   30:1,7 31:5 38:6
   60:17 94:14 100:25
ohio   2:7 5:12,14
   88:17,24 89:1,5,19
   89:22 90:18 91:1,2
   91:5,7,17
okay   7:25 8:12 9:18
   9:23 13:6 14:2 17:8
   21:16 22:19,25 24:7
   25:20 26:21 28:19
   30:4 32:2 33:14
   37:12 39:8,15,17
   43:8 46:24,25 47:3
   50:15 65:13,13,21
   65:23 72:4,6 73:6
   73:10,13 74:2 77:23
   78:19,22 80:25 81:1
   81:4 86:22 91:3
   94:4 100:25 101:7,8
   101:9 102:10

once   64:16
ones   14:16,23
online   16:8
ooo   6:3 103:5
open   11:12 81:5
opened   53:20 54:6
   54:21 55:19
opening   67:11
operates   63:1
opinion   25:18,20
   54:2 55:8,13,19
   59:8,12,15,22 64:3
   65:17,18 66:17
   76:14 94:10 96:14
opinions   13:3
opportunity   11:6,9
   30:15
opposed   19:16
opposing   10:8
opposite   51:20
   85:15 94:6 96:15
order   56:16 66:16
   84:18 85:1 86:13
   87:1 92:17,20,25
   94:5,15,24 95:13
   97:6 98:11
organized   18:1
original   19:8 29:19
   47:3
originate   78:10,13
originated   61:4 62:5
osborne   66:11
outcome   105:19
overrule   42:21
overruled   24:20
ownership   32:9,16

**p**

p   73:3
p.m.   66:2,5 102:12
   102:15 103:1,4
page   5:8 13:14
   34:20,22 37:16
   40:12 66:12 68:10
   68:12,13,14,14,17

68:20,24 69:1,2,6,9
   69:10,15,15,15,23
   70:2,2,8,8,12,17,22
   70:23 71:7 72:9,10
   72:10 85:6 90:4
   91:5,8,15 93:11
   94:9,10,10,14,18
   95:11,12,18 97:5
   98:10,12 99:6 104:7
pages   13:25 63:9
   71:3,15 105:13
paid   27:2,15,16
pairs   86:15
palestinian   51:8
paper   8:20 19:12,18
   21:8 45:24 68:17,22
   69:2 71:9 75:15,20
   75:22 76:20,24,25
   77:4,13,17,17,20,21
   78:1 79:12 80:1
papers   8:7 15:2
   19:19 48:14 86:16
   88:20
paragraph   45:6,7
   45:18,20 47:10 92:5
   93:11 95:17
paragraphs   45:13
pardon   70:17
park   2:19
part   46:10,11 48:4
   70:14,15,19 74:22
   74:23,25 76:8 79:15
   79:18
partially   57:16,17
particular   10:5
   34:18 38:13,14 88:7
particularly   10:18
   56:14 61:3
parties   6:16
parts   28:6 34:8 45:2
   45:5,7 61:4
party   105:17,17
pasting   78:4 82:9
paul   1:5 2:10 6:13
   6:25 7:1,3 12:2

18:15 19:4 26:15
31:25 32:8 40:5,13
40:17 66:11
**payment**  27:14
**pbx**  40:16
**people**  14:22
**percent**  32:9
**percentage**  27:9
**perfect**  62:22
**perfectly**  25:10
80:11
**perform**  30:20
32:25 55:8,25 56:4
56:9 58:15 60:23
61:11,17 62:7,8
63:18 72:20 75:10
83:3
**performance**  86:16
86:17
**performed**  75:4
**permitted**  53:4
**person**  22:7
**person's**  28:25
**personal**  102:3
**personally**  101:11
101:17
**perspective**  82:4
**pertain**  21:5,13
**pertaining**  53:5
**perturbations**  79:2
79:11
**ph.d.**  1:15 4:7 5:2,5
12:9 104:2,21
**phone**  17:5
**photo**  62:20
**photograph**  50:23
51:10
**photographed**  47:6
**photographic**  84:14
99:22
**photographs**  19:16
**photojournalism**
99:19
**photoshop**  16:9 81:5
81:6

**phrase**  45:21
**physical**  19:18
20:10,20 45:24
57:19 62:24 77:13
77:25 80:15
**physicist**  75:25
**physicist's**  76:5
**pick**  6:17
**piece**  16:4 44:24
45:24 68:17,22 69:2
77:17,21 78:1
**pieces**  19:18 45:13
71:9 75:20,22
**pinpoint**  80:14
**pixel**  73:6,15,23
**pixels**  73:3,3,9,9,25
74:1
**place**  6:16 105:7
**places**  63:21
**plain**  57:25
**plaintiff**  1:6 2:3 7:1
7:2 22:9 44:17 64:2
64:14
**plaintiff's**  10:8,12
11:21 23:12,16 24:2
24:2 31:11 64:14,20
65:17 101:2 102:20
**please**  6:15,20 7:10
8:6,22 9:15,20 39:6
39:11 41:21 65:2
77:16 91:8,15,24
92:18 97:12 98:20
98:20
**plus**  23:20
**point**  8:5,22 9:20
22:22 26:8 58:6
61:13 76:3,5 79:21
83:5
**polar**  85:15 94:6
96:15
**police**  89:2,5
**policy**  99:21
**poly**  14:20
**poor**  59:5

**pop**  14:21
**pornography**  83:24
92:1
**portions**  72:8
**position**  33:25 34:5
72:10
**positive**  26:19
**possession**  83:24
**possibility**  27:6 54:9
**possible**  10:18 44:15
52:18 54:11,15
75:10,13 77:11 78:2
78:3,13,18 79:9,11
79:22 81:11 82:16
82:16 84:3
**possibly**  21:2 28:17
64:8
**potential**  17:2 21:11
**potentially**  78:22
**powerful**  61:6
**precise**  65:13
**precisely**  33:3
**precision**  76:11
**preface**  31:23
**prepare**  11:7,19,24
**prepared**  12:24
**presence**  71:7
**present**  3:11 6:19,23
50:11
**presented**  65:18
**presiding**  10:4
**press**  19:5 32:8,12
**pretty**  88:2
**previously**  16:23
55:12 66:20 67:10
75:18 93:20
**primary**  11:20
**print**  62:19
**printed**  13:14 19:6
19:10,14,15 20:14
20:25 45:2,3,7,12
45:22,24 57:3 62:17
63:10,12 70:12
78:24

**printer**  61:5 62:25
62:25 63:3,5,5
80:10
**printers**  63:3
**printout**  13:15 38:8
85:6 94:10
**printouts**  34:13,19
35:8 37:14 38:14
68:6
**prior**  92:4
**private**  6:18 10:13
**privilege**  10:15 25:1
25:2,9,13
**probably**  9:5 16:16
54:5 74:4
**problem**  14:23
22:14 23:8
**problems**  48:17
**proceed**  7:16 25:4
42:25
**proceedings**  105:14
**proceeds**  93:9
**produce**  63:6
**produced**  40:17
47:6
**product**  15:13,19,22
15:24,24 16:2,3,12
16:13 19:23,25 20:6
21:20 22:6,13 23:19
24:3 25:9,13 98:23
**products**  15:15
**professor**  13:8
14:25 85:17,18,19
**professor's**  58:21
**promise**  99:5
**prone**  69:20
**properly**  8:2
**properties**  57:12,24
58:9
**proposed**  85:17
**proposition**  91:11
**prosecution**  83:24
88:7,16,23
**protocol**  23:9,10

**provide** 9:8 54:13
54:17 64:12 65:11
**provided** 27:24
28:15,24 29:7,8,9
30:25 31:2 32:7
33:21,22 36:15
43:24 44:9 65:8
66:11,21
**providing** 63:25
**proving** 87:25
**public** 104:25
**publications** 14:5
56:23
**publicly** 87:16
**published** 15:2
**purchase** 69:3,7
**purported** 27:25
32:17,20,24 33:6
34:1 35:21 60:25
**purportedly** 39:21
91:12
**pushing** 18:13
**put** 16:9 23:24
41:17 50:20 62:20
66:8 100:5

**q**

**qualified** 46:10
88:15
**quality** 53:16 55:8
59:5 60:22,25 79:5
**quantify** 14:9
**question** 9:12,14,17
15:23 20:3,6 21:9
21:24,25 22:8,18,23
22:24 23:1,3,18
24:14,15,17 25:1
26:6 38:21 39:2,3,6
39:10 41:21,24
45:17 46:5,7,8,9
46:11 47:2,13,15
49:11 50:16,17
51:20 54:14 58:1,13
58:14,19,20,21 59:2
60:3 61:22 65:2,5

67:3 69:20 71:14
75:25 76:9 77:2,11
79:1,14,19,20 80:21
81:16,16,21,22
87:15,18 95:23
100:10,23,24 101:1
101:9
**questions** 4:12 9:7
9:16 10:1,7 20:7
25:5 47:17 72:18
82:3 83:14 102:7,16
**quick** 55:24
**quite** 62:21
**quote** 35:21 43:24
44:6 46:1,15 50:9
52:3 55:25 56:3
60:22 94:6 96:10,25
97:17,18 98:6

**r**

**r** 14:17,17,18 29:17
29:18,18
**radar** 59:6
**raise** 7:9
**range** 67:21
**rate** 93:15 97:1,14
97:18
**raw** 57:13
**reached** 13:4 64:3
**reaction** 58:2 100:2
100:10,11,14 101:2
**read** 13:19 14:1,5
15:18 19:5 28:3
33:1,4,19 41:21,22
55:10 56:20 58:4,7
85:22 91:23 92:10
94:9 97:12 98:19,20
104:3
**reading** 32:7 90:11
95:24
**reads** 55:7 91:19
92:5
**real** 84:6 85:20 86:8
86:10 87:25

**realism** 86:13
**realized** 54:6
**really** 51:11 52:25
61:13
**reason** 9:13,15,25
20:15 76:22
**reasons** 71:21,22
**recall** 9:5 25:25 26:2
26:19 32:11 36:20
36:23 40:9 44:16
52:14 54:3,11,15
67:8,23,24 83:17
88:18,25 89:7,15
**receipt** 66:14
**receive** 27:9 28:6
29:12 30:15 31:4,5
**received** 11:16 18:1
19:11 21:6,14 28:10
29:16,18,21 30:17
30:22 31:13,17,22
35:9 36:1,8 37:3
40:2 41:1 53:10,10
53:14,25 54:22
55:13,18,18 65:14
66:19 75:11,19
91:13
**receiving** 16:24
**recess** 66:3 102:13
**recite** 41:14
**recognize** 12:12,17
13:21 35:7
**recollection** 17:21
40:21 41:4
**record** 6:5,16,20
22:21 23:24 25:12
35:3 37:20,22 41:18
41:22 42:25 60:19
65:12 66:1,4,8
76:13 86:22 91:23
93:5 95:24 97:12
98:19 100:6,20,21
101:19 102:8,11,15
102:25 104:5
105:14

**recorded** 6:6 16:6
105:11
**recorder** 89:6
**recording** 6:15 16:5
16:11 96:4
**records** 26:3,11 28:8
**reduce** 49:20
**refer** 34:23,24 71:2
**referred** 35:22
**referring** 15:14 17:6
19:11 45:3 70:16
78:12 96:10 97:19
97:20 99:2
**refers** 92:25
**reflected** 56:4
**refresh** 17:20
**regarding** 17:1
18:12 65:17
**reject** 87:21
**rejected** 88:12
**related** 18:1 105:17
**relation** 18:10
**relationship** 23:5
**release** 16:18
**released** 15:19
**relevant** 44:24 52:5
76:22
**reliability** 93:16
97:2,15,19
**reliable** 55:8 56:1
101:22
**rely** 86:10
**remain** 19:17 49:24
**remember** 50:19
52:17 64:5 67:18
89:8
**remembering** 88:2
**removed** 51:10
**renounce** 87:9
**repeat** 21:9 38:20
67:4
**repeated** 50:3
**rephrase** 69:20
71:12

**replace** 93:21
**replaced** 81:9 92:6
**replacing** 81:11
**report** 21:17 29:16
  31:17 34:10 36:8,16
  36:20,22,24 40:22
  52:15 54:10,13,17
**reported** 37:20
**reporter** 6:8 7:6,9
  7:15 10:21 12:4
  13:15 19:21 34:12
  37:13 39:10 41:20
  41:22 84:18 89:18
  90:14
**reports** 12:24 36:12
**represent** 93:5
**representing** 18:15
  18:18 19:4
**request** 6:10 30:15
**requested** 53:17
  64:10 65:9
**requesting** 65:14
**resized** 46:22 47:19
  48:5,7
**resizing** 47:11
**resolution** 30:18,19
  31:12 32:24 53:17
  53:22 56:14 59:13
  59:15 61:14 64:10
  64:21 66:24 67:6,8
  67:13 79:4
**respect** 21:4 22:17
  66:18 96:7
**respected** 14:13
**respectful** 25:16
**respond** 22:9,11
**responding** 22:15
**response** 31:4,5
  102:3
**responsible** 27:12
**restoring** 99:19
**restricted** 53:2
  57:24
**result** 54:9 57:12
  62:24 81:20

**resulting** 83:8
**results** 61:21,23
**retain** 23:14
**retained** 16:23
  20:19 23:4,5,6,16
  26:15,17 103:3
**retention** 25:24
  26:18
**return** 68:5 92:16
  99:5
**returning** 35:25
**reveal** 75:14 77:25
**revealed** 80:1
**review** 30:13,14
**reviewed** 31:15
  36:19,24 40:10
  56:22
**reviewing** 17:20
  52:14
**rhythm** 65:6
**right** 7:9 11:2 12:22
  13:4 14:8 15:1,7,20
  17:15,18 18:5,23
  20:11,21 23:5,11
  25:3,18 26:16 27:3
  29:10 30:2 31:13
  32:18 35:23 40:13
  41:8 42:2 43:13,17
  43:20 44:20 46:17
  46:19 48:3,22 49:5
  52:20 54:5 55:4,15
  55:22 56:1,6,10
  57:13,16,25 58:9
  59:9,16,23 63:21
  64:22 66:22 67:11
  67:14 69:16,25 70:3
  70:23 71:9 74:5,20
  75:2,5,20,23 76:25
  77:18 79:23 80:2,6
  81:5,7,21 82:10,13
  82:23 83:1,4,9,20
  83:20,25 84:1,3,7
  84:10,14 85:7 87:10
  87:13 88:12 89:10
  89:13 90:6,9 91:21

92:14,21,25 93:3,22
  93:25 94:7,15,18
  95:1,9,17,18 96:11
  96:15,19,21 97:3,10
  97:21,25 98:2,8,16
  99:3,10,13,16
  100:17 101:15,24
**rise** 48:10
**rising** 76:10
**rja** 1:7 6:14
**road** 2:6
**rockwood** 1:19 6:8
  105:4,25
**role** 93:10 100:3
**room** 1:17 6:11 22:4
  60:14
**rpr** 1:19 105:25
**rudy** 5:11 84:21
**rules** 10:5
**running** 89:6

**s**

**s** 14:18 28:20,21
  29:1,3,17,23 39:24
  49:18,18
**safe** 54:25 56:21
**sake** 100:20
**san** 3:6
**saturation** 82:25
**saved** 79:6
**saying** 22:13 31:23
  54:13,25 57:17
  64:16 69:23 71:25
  80:3 87:16
**says** 29:22 30:11
  68:14,17 73:22
  85:10 91:4
**scan** 28:19,21 62:20
  70:3 71:8 77:1 80:1
**scan0002.tiff** 28:22
**scan001** 30:17
**scanned** 19:19 27:24
  28:1 32:22 41:7
  42:1 43:11 44:3,6
  44:21 47:1,7 52:3

69:16 71:16 75:15
  75:23 77:13 78:1
**scanner** 80:8
**scans** 20:24 21:6,14
  30:22,25 31:16,22
  33:5 34:19 35:9
  43:23 45:23 52:12
  53:10 58:3 59:15,22
  60:22 63:20 64:10
  64:17,22 66:12,18
  67:24 71:8 75:19,19
  83:1,4
**scheduled** 15:19
**scholar** 11:1
**scholarship** 56:22
  99:18
**science** 13:8 85:19
  101:13
**scientific** 46:7,8
**scientist** 51:14
**scope** 53:1
**scratch** 20:23
**screen** 5:8 37:16
  59:6 62:23
**second** 10:12 28:13
  28:22 39:8 47:15
  67:3 68:10,20 70:7
  70:23 72:9 75:17
  93:10
**section** 36:24 52:14
  95:19
**see** 8:3,21 9:22
  17:22 18:8 26:3,12
  26:13 39:20 40:11
  56:15 59:7 62:21
  65:13 68:10,22 69:3
  69:8 70:10,13 74:11
  83:19 85:9,12 91:4
  91:8,11 93:18 95:17
  97:9 98:15 102:7
**seek** 91:19
**seen** 32:20 33:3 51:5
**select** 74:22
**send** 29:5

sense   9:19 66:17
  87:6
sensitive   6:17
sent   12:5,13,19
  27:20 38:17,24
  39:13,21
sentence   45:6 55:6
  56:5 91:24 92:5,12
  97:9,12
sentences   28:5
  45:13 98:15
separately   75:8
september   16:19
series   15:15 56:24
serious   14:11
servers   40:24
service   16:8
services   6:9
set   105:7
shooting   16:19
short   65:22 102:6,9
shot   5:8 37:16
show   51:10 59:9
  63:15
showed   28:1 41:7
  42:1 43:11 44:6
  52:3 56:6,10
shuffling   8:7,21
  21:8 48:13 95:11
side   23:16 80:7
sides   25:9
sidley   40:5,24
sighing   48:14
sign   25:23 46:23
  47:19 48:21 49:5,15
signatures   83:8
signed   26:7,17 28:2
  40:13
significant   32:16
  51:2
signing   26:19
signs   41:7 42:1
  43:11 44:6 46:1
  50:9 51:22 52:3
  53:2 56:6,10 59:9

silicon   15:11
similar   72:10 74:1
  74:14
similarly   49:3
simple   50:25 51:1,5
  51:11 52:19 73:12
simply   11:18 18:14
  44:14 51:16 53:15
  59:3 61:15 80:13
  88:6 101:24
simpson   50:20
single   63:16
sitting   30:2
size   48:9 49:21
skill   105:15
skipped   67:2
slfs   66:12
sliced   78:10
slight   62:16
slightly   57:21 80:22
slips   18:4
slower   60:19
smaller   44:4
smart   24:7 101:23
smooth   77:18
software   15:10 16:4
  62:20 86:7,14
solemnly   7:11
somebody   64:6
sophisticated   96:7
sorry   11:11 12:15
  17:7,8,10,11,11,16
  17:22 18:5 19:13,20
  20:23 21:8 22:19
  23:1 26:3,18 29:19
  30:10 31:5 33:10
  34:9 37:10 38:4,6
  38:20 39:1,5,8
  41:12,20 43:7 48:12
  48:12 49:1,1 51:8
  56:11 58:1,11 60:3
  63:10,17 64:4 65:12
  65:15 67:2 68:13
  71:24 76:16 77:2
  79:16 82:19 85:3

86:25 87:14 88:19
  88:20 94:12 95:11
  95:14 98:12,21
  99:11 100:8,19
sort   20:13 44:24
  59:6 64:17 67:21
  73:18 74:3,10,11,14
  76:11,23 79:7 83:6
  87:16
soseh   3:12 6:7
sought   84:12 85:19
sound   8:8 10:22
  24:7 83:20
southwell   2:18,22
  6:22 29:23,24 66:7
  66:8
southwell's   31:18
span   68:11,23
speak   11:9,23 43:13
speakerphone   2:5
speaking   33:2 60:2
  78:3,14
specialties   13:11
specific   16:18 19:6
  19:24 20:5 26:6
  30:22 32:12,14
  44:16 45:16 46:20
  60:24 61:18 62:6,10
  63:14 77:24 79:8
  80:21
specifically   34:4
  87:17
spelled   14:17
spend   27:17
spent   27:19 55:14
splice   78:19,23
splicing   47:9 61:8,9
  78:14 79:10,19,22
  79:24 81:6,20 82:22
spoke   11:11,13,15
  45:9,9 64:4,5
spoken   12:2
ss   105:1
stages   61:12

stamp   34:20 35:3,16
  38:9,15
stamped   30:6,7,9
standard   50:2 74:3
  96:2
start   66:7
started   14:10
starting   98:18
starts   63:7,8
startup   15:10,10
state   5:12,14 7:11
  9:13 49:6 86:4,20
  88:14,15,17,23
  89:22 90:18 91:7
  105:1
state's   92:2
statements   101:25
states   1:1 5:10 83:15
  84:21 92:13 101:19
stating   42:24 65:3
statistical   57:12,17
  57:18 58:8
stenographically
  105:11
step   32:2 81:17 95:4
  95:4
stopped   84:16
street   2:11 3:5 5:7
  34:15,23,23 35:7
  36:21 37:1,20 38:8
  68:6 69:3,8 70:18
  70:21 81:1,10,12
streetfax   5:9 37:17
stressed   99:20
strictest   47:21
strictly   33:2 60:2
strike   39:24 60:3
strong   99:24
stroz   29:17 31:17
  34:9,10 36:8,19,21
  40:16 52:14
stuck   8:18
submitted   12:21
  27:15

subscribed   104:22
  105:20
subsection   91:19,24
subsequent   61:11
  64:13,19
subsequently   78:10
sued   34:1
sufficient   30:19
  53:16
suggest   19:1 59:15
  60:21 71:23
suggests   71:8,15
  72:1
suite   3:5
sum   27:9
summer   11:4
suny   14:17
supervision   105:12
support   93:15 97:2
  97:15,18
supported   36:12
supreme   90:25 91:4
  91:16
sure   8:24 9:24 10:23
  15:23 17:15 23:7
  26:18 28:14 38:22
  44:13 64:4 71:24
  72:22 75:18 77:17
  83:12 84:16 87:7,17
  91:25 94:3 95:25
  102:20
surface   75:14,17
  76:24 77:12,15
  79:12,15,17,25
  81:13 82:17
surprisingly   101:18
  101:21
swear   7:6 77:14
sworn   104:22
sylint   29:2 54:1
system   52:11,15
  53:11 59:4,7

**t**

t   29:1,3,17,23 70:13
  70:15
tactical   87:24 88:8
take   6:16 13:19 14:1
  28:5 44:4 48:16
  49:20 54:23 61:20
  65:22 73:22 81:18
  90:10 93:7 101:10
  101:16 102:6
taken   1:15 105:7
takes   82:21
talk   10:20 44:23
talked   18:16 78:23
  96:9 97:16 98:25
talking   32:6 48:4
  68:15,17 77:3 80:22
tampering   56:25
  57:8
tape   60:15 66:2,5
tapes   60:17
tasked   62:8
team   14:12 16:14
  56:23
tech   14:20
technically   57:21
technician   54:1
technique   62:11
  93:14,16 96:25
  97:13,17 98:6,22,23
  99:1,9,12
techniques   20:16,18
  45:11 57:3,7 62:1
  101:5
technologies   15:6,9
technology   8:2
  10:19 15:5,12,14
  86:13 88:4,9 96:3
  101:20
telephone   11:10
tell   8:19 9:20 10:5
  23:17 24:8 28:15
  30:7,11 73:8 77:15

ten   15:12
tend   65:5 74:10
tends   49:9
term   19:13 47:21
terms   63:7 80:23
test   62:5 78:3,14
  79:22 81:6 82:8,22
tested   93:14 97:1,14
  97:17
testified   16:23 55:12
  66:20 67:10 75:18
  79:21 86:3,5,20
  88:13 89:12
testify   87:9,21
testimony   31:10
  84:5,13 85:2,4,15
  85:16 87:2,3,5 94:7
  94:16,25 95:1 103:1
  104:4,5 105:6,9,14
testing   80:23 81:10
tests   60:24 61:2,16
  62:6,10
text   19:16 20:15,17
  40:13 43:9 45:4,19
  57:25 58:3 61:7
  62:5 68:11,23 69:9
  69:9,14,21,22 70:1
  70:1,10 71:3,4,7,22
  76:9,10,21 78:4,6,7
  78:9,9,12,12,15,24
  79:10,22,24 81:6
  82:9,23
texture   75:14,17
  77:13,15,20,22
  79:12,15,17,25
  81:13,24
thank   7:4,15,16,17
  10:24,24 12:18
  17:25 38:5 53:24
  60:18 65:25 66:13
  66:15 68:16 77:7
  93:8 94:22 100:14
  102:17,19,23,24
thanks   37:22 65:24

thereof   105:19
thickness   76:25 77:1
  77:4
thing   24:1 31:9
  53:15 56:12 61:12
  73:11 101:22
things   10:21 14:9
  16:20 23:11 24:4
  44:22,23 49:12 51:1
  57:22 58:16 59:3
  73:17,18,21 79:7
  80:5 101:10
think   8:10 9:25 17:4
  18:8,16 21:22,23
  23:25 26:5 33:21,24
  34:9 38:2 42:17,19
  42:21 45:21 50:7
  51:19 54:11,15 55:3
  58:5,12 60:2 67:9
  68:1 76:22 77:11,21
  78:8 79:14 80:22
  81:15 83:18,21 84:1
  86:22 87:4,14 89:3
  89:8 100:13 101:13
  101:18
thinking   88:4
third   56:4 76:10,21
  77:3 79:11
thomas   84:13
thought   15:3 17:12
  39:5
three   16:17 72:8
  75:22 76:6,20 77:6
  103:2
throw   50:3
tiff   27:25 29:10
  32:23 37:2,21,25
  43:16 45:23 56:5,9
  59:9,12 66:21 79:6
time   6:19 13:19 14:1
  16:5,7,11 22:8
  25:16 27:1,17,19,21
  35:19 45:15 47:5
  50:21 53:25 55:1,18
  60:14 63:10,13 64:6

65:4 76:16 82:19
88:4,14 90:11 99:5
101:11 102:5,22,22
103:4 105:7,8,10
**times** 9:2 49:24 58:2
**title** 13:7 29:22
34:22 70:21 72:9
**today** 7:24 10:2
**today's** 11:7,24
103:1
**told** 19:3 24:2,3 31:6
31:11 45:10
**tolerance** 99:21
**toner** 63:7 80:9
**tools** 16:14 56:24
57:11 61:7
**top** 34:20 35:16 38:9
38:15 68:11,11,13
68:23 69:1 70:8,12
71:9,15 91:5,12
95:12 97:5 98:13
**total** 103:2
**tough** 50:16
**town** 89:5
**traces** 78:21
**transcribed** 105:12
**transcript** 104:3
**trial** 84:3,10 85:24
87:9,21 89:10,12
90:9 91:13 92:3
**tricky** 51:13
**trouble** 88:20
**true** 23:12 24:18,19
24:22,24 50:2 104:4
105:13
**trust** 99:19,23
**truth** 7:12,13,13
47:9,11 48:8
**try** 9:17 10:20
**trying** 20:12 31:6,11
46:15 51:21 52:25
58:5 61:3 64:16,21
77:14 87:14 88:3
100:23

**turn** 63:2 85:6 91:8
91:15 95:12 97:5
98:10
**twice** 64:16
**two** 14:20,21 16:16
18:4 20:7 24:4 28:5
28:5,10,11 30:17,22
31:12,16,22 32:22
32:23 33:5 34:6
35:8 37:2,3,14
38:16,23 39:13,22
39:23 40:1,15,24
43:16,23 45:23
49:17 52:16 53:10
53:10 55:24 63:9,20
64:10 66:18,20
68:11,22 70:11
71:15 75:11,19,19
76:4,7,20 78:19,20
79:2,9 82:25 83:4
93:3 98:15
**type** 44:22 80:23
85:16 94:7
**typed** 70:18
**types** 63:15 78:21
79:2
**typically** 20:17
61:12 73:16,20 74:7
**typos** 14:3,4

**u**

**u** 29:23
**u.s.** 87:8
**uc** 11:1
**ultimately** 84:9
**unable** 60:24 61:17
62:7
**unclear** 58:13
**uncompressed**
27:25 29:9 49:23
66:21
**underlying** 19:17
47:8,11,25 48:7
49:21 50:4 51:7
56:14 57:12 58:8

61:5 62:3,24 80:15
81:24 82:1
**underneath** 69:7
94:15
**underrepresented**
74:10
**underscores** 96:5
**understand** 9:6,14
9:14,17 10:10,16
15:23 18:20 22:13
23:9 25:17 26:10
32:15 35:1 37:10
46:15 47:23 48:19
50:7 51:22 53:1
57:10 58:1 65:7
66:16 71:5 77:10
81:15 82:3,6 101:16
102:3
**understandable**
9:16
**understanding**
30:21,24 31:1,21,24
31:24 32:3,4,6,19
32:22 33:5,14 37:11
43:22 44:8 45:22,25
52:4,9 53:3 62:4
64:19 65:8 79:13
86:12 87:23 88:1,3
88:10
**understood** 14:4
16:21 24:11,13,14
48:18 90:13
**undisputed** 58:6
**unit** 2:6
**united** 1:1 5:10
83:15 84:21 92:13
**universities** 14:20
**university** 1:16
14:19
**unknown** 93:15
97:1,14,18
**unmanipulated**
82:5
**unquote** 46:1 50:9

**unreliable** 87:13
92:9
**unscientific** 91:20
**update** 64:17
**updated** 64:20
**uploaded** 16:8
**upper** 28:23 85:7
**use** 19:13 60:17,18
79:14,17 83:9 86:11
**usually** 61:18

**v**

**v** 5:10,12,14 84:21
89:22 90:18
**valid** 80:11
**valley** 15:11
**value** 67:21 73:4,7,9
73:10,23
**values** 73:15 74:9,10
**various** 45:5,12 61:4
**vary** 73:21 80:18
**veritext** 6:8 103:3
**verizon** 8:18
**version** 30:5 37:21
37:22,24 74:17
**versions** 30:18,25
31:12 64:21
**versus** 79:6
**video** 2:10,17,18 6:6
6:15 8:2 10:19
19:14 57:3 89:6
**videographer** 3:12
6:4 60:13,16 66:1,4
102:11,14,25
**videos** 19:16
**videotape** 10:25
**videotaped** 1:15
**view** 76:3,5
**virtual** 96:1
**visible** 58:17
**visiting** 11:1
**visual** 59:4,7 67:14
72:17 85:21 86:11
86:14 92:8

**vitae** 5:6 13:16
**vs** 1:7 6:13 83:15
88:17,23 92:13

**w**

**w** 5:9 29:23 37:17
**waiting** 100:8
**want** 8:1 16:6 23:9
28:15 37:19 41:17
42:15,20 49:11
51:14 54:25 55:17
61:20 66:8 68:14
72:7 81:25 82:2
83:13 102:7
**wanted** 18:17 25:15
61:10,14,16 63:18
**wanting** 81:18
**wants** 24:4 25:19
42:18
**warren** 2:6
**way** 14:11 16:5,11
16:20 19:1 34:24
35:16 37:23 43:24
59:16 62:17,25 74:4
74:8 77:8 79:20
80:8 81:19 86:9
87:12 88:6 93:2
97:24 105:18
**ways** 44:20 46:25
**we've** 57:2,2 82:8
86:15
**weapon** 51:10
**web** 13:13
**went** 13:13 31:9
**western** 1:2
**westlaw** 92:13
**whatsoever** 59:13
**whereof** 105:20
**whispers** 6:17
**white** 73:5,16,18
74:1,9
**wholly** 96:1
**width** 76:8
**winded** 63:17

**withdrawn** 18:20
**withdrew** 27:18
**witness** 4:6,12 7:7
7:14 21:25 22:7,14
22:18,23 23:3 24:1
24:6,9,11,13,21
33:10,14 35:12
36:15 37:10 38:20
39:17 40:9,21 41:4
41:11 44:2,13 46:5
48:3 49:1 50:15
52:1,9,23 53:14
57:16 58:12,24
59:12,19 60:1,10,19
63:24 64:25 65:23
65:25 67:2 68:19
69:13,19 70:6 71:1
71:12 72:14 82:11
83:12 84:3,10,23
85:13 89:13 93:21
100:8,18,24 101:1,9
102:10,19,24 105:8
105:9,20
**word** 53:20 57:17
75:17 81:9,11,12,12
90:10 93:7 98:18
**words** 10:6 24:13
45:13 69:3,7 71:25
72:3
**work** 19:23,25 20:6
21:20 22:6,12,12
23:18 24:3 25:9,13
26:21 61:12 98:24
99:22,24 101:17
**worked** 40:25
**working** 8:2 14:23
23:5 84:16
**works** 29:2 80:8
**world** 93:2
**worldwide** 14:16,23
**worry** 75:7
**wrinkled** 77:18,21
**wrinkling** 77:25
**write** 27:24 41:6,25
43:10 44:5

**writes** 93:11
**written** 86:16
**wrong** 23:9 42:21
**wrote** 85:14 86:18
89:3 95:6 96:23
98:4 99:9,12

**x**

**x** 4:1 73:3

**y**

**y** 29:1,3 49:18
**yeah** 11:14 14:8
20:4 22:19,24 30:4
34:8 37:19 39:4
43:3 51:19 52:23
55:3,5 70:13 72:24
75:6 79:20 83:18,21
83:22,23 87:19 89:3
**year** 9:5 15:20
**years** 15:13 34:7
50:19 83:19 88:2
**yep** 94:21
**york** 1:2 2:12,20,20
60:18
**young** 11:16,20
16:24 17:23 18:7,14
19:1,3 21:19 25:23
32:7,13 45:10 54:12
64:5,8,15
**young's** 20:2

**z**

**z** 29:17
**zero** 73:4,4,9,15
99:21
**zoom** 62:21
**zuckerberg** 1:8 6:13
32:1,5,18