Page 1

1

2              UNITED STATES DISTRICT COURT

3              WESTERN DISTRICT OF NEW YORK

4

5   PAUL D. CEGLIA,                    )
                                       )
6                  Plaintiff,          )
                                       )
7              vs.                     )   No. 1:10-cv-00569
                                       )        (RJA)
8   MARK ELLIOT ZUCKERBERG,            )
    Individually, and                  )
9   FACEBOOK, INC.,                    )
                                       )
10                 Defendants.         )
    ------------------------           )

11

12

13

14

15

16                     August 10, 2012

17                     10:05 a.m.

18

19          Deposition of ALBERT LYTER, held at the

20      offices of Gibson, Dunn & Crutcher LLP, 200

21      Park Avenue, New York, New York, before

22      Laurie A. Collins, a Registered Professional

23      Reporter and Notary Public of the State of New

24      York.

25

```
 1
 2   A P P E A R A N C E S:
 3
 4        BOLAND LEGAL, LLC
 5        Attorneys for Plaintiff
 6             1475 Warren Road
 7             Unit 770724
 8             Lakewood, Ohio 44107
 9        BY:   DEAN BOLAND, ESQ.
10             (via telephone)
11
12        GIBSON, DUNN & CRUTCHER LLP
13        Attorneys for Defendants
14             200 Park Avenue
15             New York, New York 10166-0193
16        BY:   ALEXANDER H. SOUTHWELL, ESQ.
17             SRIPRIYA NARASIMHAN, ESQ.
18
19
20
21
22
23
24
25
```

1

2  A L B E R T   L Y T E R ,

3       called as a witness, having been duly sworn

4       by the notary public, was examined and

5       testified as follows:

6  EXAMINATION BY

7  MR. BOLAND:

8       Q.    Dr. Lyter, good morning.  My name is

9  Dean Boland.  I represent the plaintiff, Paul

10  Ceglia, in this matter.

11            You and I haven't met before, have we?

12       A.    No, we have not.

13       Q.    Okay.  Have you had any conversations

14  with the defense attorneys before your deposition

15  today?

16       A.    Yes.

17       Q.    When was the most recent conversation

18  you had with them preparing for your deposition?

19       A.    Yesterday afternoon.

20       Q.    And did you discuss your deposition

21  with them before yesterday afternoon?

22       A.    Yes.

23       Q.    And when was that conversation?

24            MR. SOUTHWELL:  Dean, I assume you're

25       referring to substantive conversations rather

1                      Lyter

2        than, you know, saying, you know, logistical.

3        I guess I'll object to the form.  Maybe if you

4        can clarify that, that will be helpful.

5             MR. BOLAND:  Yeah, I'm just asking a

6        specific conversation other than before

7        yesterday afternoon in preparation for this

8        deposition, that conversation.

9        A.    Yes, I had a similar conversation in

10   preparation for the deposition last week when the

11   deposition was supposed to occur.

12       Q.    Okay.  And you provided at least a

13   declaration in this case, probably more than a

14   year ago.  Do you recall that?

15       A.    I don't recall the date.

16       Q.    But you recall a declaration -- it's

17   around -- I have the date in front of me.  It's

18   August of 2011.  Does that sound familiar to you?

19   Does that ring a bell?

20       A.    Is that the one dated August 15th,

21   2011?

22       Q.    Yes, that would be right.  Yes.

23            MR. BOLAND:  And Alex, by chance did

24        you get my e-mail with those two documents

25        attached, or three documents attached?

```
 1                         Lyter
 2             MR. SOUTHWELL:  Yes.  And I sent you a
 3       response saying I provided those three to
 4       Dr. Lyter.  So he has them in front of him.
 5             MR. BOLAND:  I didn't hear what you
 6       said, Alex.
 7             MR. SOUTHWELL:  Yes, I sent you an
 8       e-mail.  I have printed them, and he has them
 9       in front of him.
10       Q.    Dr. Lyter, if you could just --
11             MR. BOLAND:  Or the court reporter
12       could just mark that declaration dated August
13       15th, 2011, as Exhibit 1, please -- or Lyter,
14       Lyter 1, so we can keep track of it.
15             (Lyter Exhibit 1, declaration of Lyter
16       dated 8/15/11 without exhibits, marked for
17       identification.)
18       Q.    Dr. Lyter, do you recognize this
19   document that's now marked as Lyter 1?
20       A.    Yes, I do.
21       Q.    What do you recognize it to be?
22       A.    It's labeled as my declaration.  It
23   bears my signature and is dated August 15th, 2011,
24   and that it was prepared in Raleigh, North
25   Carolina.
```

```
1                            Lyter
2          Q.     And does that appear to be the
3    declaration you filed -- or that was filed in this
4    case back in August of 2011 and authored by you?
5          A.     Well, it appears to be something that I
6    authored.  I don't know when it was filed.
7    Well --
8          Q.     I'll represent to you the date across
9    the top -- the information printed across the top
10   of the declaration indicates when it was filed.
11   So that's August 15th, 2011.
12         A.     Okay.
13         Q.     Does that sound about right?
14         A.     Yes.
15                MR. SOUTHWELL:  Mr. Boland, I would
16         just note for the record that what you sent us
17         does not actually have the exhibits to this
18         declaration.  So, I mean, that's fine.  I just
19         want to make it clear that this is the five
20         pages of the declaration without the exhibits.
21                MR. BOLAND:  Yes.
22         Q.     Dr. Lyter, to be clear, there were
23   exhibits attached to this declaration, but I've
24   only provided to you as Lyter 1 just your
25   declaration.  Mr. Southwell is correct.
```

Page 7

1                          Lyter
2        A.    That's right.
3        Q.    Okay.  Now, how long have you been
4    analyzing writing inks, Dr. Lyter?
5        A.    Since January of 1975.
6        Q.    So my math, that's more than 30 years;
7    correct?
8        A.    Yes.
9        Q.    And you have a Ph.D. in what field
10   precisely?
11       A.    Analytical chemistry.
12       Q.    Do you know how long Gerald LaPorte has
13   been analyzing writing inks?
14       A.    No, I do not.
15       Q.    And can you tell us if there is an ASTM
16   standard for ink age determination?
17       A.    There are two ASTM standards that
18   relate to the analysis of writing inks.  One of
19   them deals with the comparison of writing ink
20   samples, and the other one deals with the
21   identification of writing ink formulations.  The
22   only one that deals in way with aging is the one
23   that allows for the identification of ink and
24   therefore determination of commercial
25   availability.

                                Lyter

1

2        Q.    Does that ASTM standard cover the type

3   of ink age determination that you perform?

4        A.    I certainly do the analysis that's

5   covered in the ASTM standard that relates to

6   identification of ink formulations and therefore

7   dating by commercial availability.

8        Q.    And that test that you perform is not a

9   dynamic test, is it?

10        A.    That particular standard does not

11   relate to any dynamic test.

12        Q.    Right.  My point is the testing that

13   you perform -- well, can you describe for me --

14   very briefly summarize the name of the type of

15   testing you do for ink age determination?

16        A.    There are a variety of tests that I

17   perform that relate to the aging of ink samples.

18   One of them would be the one defined in that

19   standard that relates to the identification of a

20   particular, in essence, make and model of ink

21   which would allow for determination of commercial

22   availability.

23             It also includes detection of dating

24   tags, which are unique components that have been

25   added to the ink to identify a particular year of

1                          Lyter

2    manufacture.

3             And then there are several dynamic

4    methods that look at either the extractability of

5    the ink or the quantitative measurement of various

6    volatile or semivolatile components.

7         Q.    Okay.  And is there a standard, an ASTM

8    standard, for dynamic testing of ink age?

9         A.    I don't believe so.

10        Q.    Do you know why that is or do you have

11   an opinion as to why that is?

12        A.    Well, the mechanism by which ASTM

13   generated standards was by receiving information

14   from various working groups.  I think one of them

15   was called SWGDOC, S-W-G-D-O-C, which was the

16   scientific group for document examination.

17             And at the present time that group is

18   no longer providing information to ASTM, so that

19   they would not be in a position to generate any

20   standard methods or standard guides that would

21   deal with the dynamic analysis of writing inks.

22        Q.    Are any of the defendants' experts in

23   that group?

24        A.    I don't know.

25        Q.    Are you in that group?

```
 1                        Lyter
 2        A.    No, I'm not.
 3        Q.    Now, are you aware of the type of ink
 4   age testing that Gerald LaPorte performed in this
 5   case?
 6        A.    If you're talking about the measurement
 7   of phenoxyethanol, yes.  I don't recall
 8   specifically what Mr. LaPorte did in this matter.
 9        Q.    Well, no, I'm focusing on -- and for
10   the court reporter's benefit, we'll just call it
11   the PE test.  Is that fair enough, that we'll both
12   understand each other what we're talking about
13   when we refer to LaPorte's test?
14             MR. SOUTHWELL:  Objection.  Are you
15        referring to it generically or are you
16        referring to it as LaPorte's test?  I think
17        it's not clear.
18             MR. BOLAND:  No, I meant I'm just going
19        to refer to it as the PE test.
20        Q.    Is that an accurate way to sort of
21   summarize the type of test that LaPorte did in
22   this case?
23        A.    Well, the literature describes a
24   variety of methods by which 2-phenoxyethanol,
25   which we've called PE, is measured and how that
```

1                        Lyter
2    can be related to the age of writing inks.  But I
3    don't know specifically the methodology that was
4    used by Mr. LaPorte in this case or in any other
5    case, for that matter, regarding the measurement
6    of PE.
7         Q.    Are you aware of that testing method,
8    before your work in this case, where some experts
9    are out there measuring PE as a method of
10   determining the age of ink?
11        A.    I'm certainly familiar with what is in
12   the literature regarding the measurement of PE as
13   a way of determining the age or relative age of
14   writing inks.
15        Q.    And in this case it's true that you did
16   not attempt to do that type of a test measuring
17   PE -- correct? -- in this case?
18        A.    That's correct, I did not.
19        Q.    Have you attempted that test in prior
20   cases?
21        A.    I do use a methodology for the
22   measurement of the amount of phenoxyethanol in
23   writing ink samples as a way of determining the
24   age of that writing.
25        Q.    Have you done that as part of your work

Page 12

                              Lyter
1
2    as an expert witness in prior cases?
3         A.    Yes.
4         Q.    Do you use the same method as Gerald
5    LaPorte when you're doing that type of PE testing?
6              MR. SOUTHWELL:  Objection to the form,
7         calls for speculation.
8         A.    I don't know.  I don't know what
9    Mr. LaPorte uses.
10        Q.    Can you describe briefly what you do --
11   what kind of measurements you take of PE when you
12   performed that test in prior cases?  How do you do
13   your test?
14        A.    I basically use multiple samples, at
15   least two different samples, from an area of
16   writing and an additional two samples that would
17   be artificially aged by placing them in an oven
18   for a period of time.
19              And then I extract the ink with a
20   particular solvent that contains an internal
21   standard.  And then I measure the amount of
22   phenoxyethanol as well as the internal standard
23   using a gas chromatograph/mass spectrometer, or
24   abbreviated GC/MS.
25              And by running standards of the

Page 13

1                          Lyter

2    phenoxyethanol at various concentrations, I can

3    quantify the amount of phenoxyethanol present in

4    the samples and then measure the difference in the

5    amount of PE based on the fact that one set of

6    samples has not been altered or affected by the

7    heating process and the other set has.

8              That provides me with a delta P in a

9    percentage that is related to how much of the

10   phenoxyethanol has been driven off by the heating

11   process, and it relates to the amount that was

12   there.  And the percentage that's been driven off

13   is related to the age of the writing.

14        Q.    And is this a method -- when did you

15   first start using this method in your career that

16   you just described?

17        A.    It's been a number of years.  I don't

18   recall specifically when I started.

19        Q.    And do you know Valery Aginsky,

20   Dr. Valery Aginsky?

21        A.    Yes, I do.

22        Q.    And are you aware whether he uses this

23   method as well, the one you just described, or

24   something similar to it?

25        A.    I know that he has published articles

1                           Lyter

2      that describe methods that are very similar to

3      this.

4           Q.    And in this case you did not use the

5      method that you just described to test the age of

6      the ink; is that correct?

7           A.    That is correct.

8           Q.    Why didn't you use it?

9           A.    I didn't have enough sample.

10          Q.    When did you do your testing and

11     when -- of the ink?

12          A.    The examination of the documents took

13     place in July of 2011 and I believe again in

14     August of 2011, so that the testing would have

15     been done shortly after that time period; I don't

16     recall specifically.

17          Q.    And was it July of 2011 when you

18     determined you did not have enough samples to do

19     the PE testing that you just described?

20          A.    Well, after the initial examination of

21     the document where it was clear that the ink line

22     had been deteriorated and that the amount of

23     sample available would be somewhat less than what

24     might have normally been available, in particular

25     from some of the smaller amounts of writing like

```
                                        Page 15
                              Lyter
 1
 2    the initials on the "work for hire" document, the
 3    first page, or even the interlineation on that
 4    first page.
 5              I was at that point questioning whether
 6    there would be sufficient sample to be able to do
 7    tests for phenoxyethanol using the methodology and
 8    based on the equipment configuration that I have.
 9        Q.    Now, at some point after July 2011 --
10    in fact it's within the exhibit you have in front
11    of you, Lyter 1 -- you submitted a declaration in
12    part asking the court or justifying to the court
13    why more samples needed to be taken from the
14    document; correct?
15              MR. SOUTHWELL:  Object to the form.
16        A.    I'm reviewing Lyter 1.  Just one
17    second.
18        Q.    I'm looking at the bottom of page 3,
19    paragraph 8, it looks like, where you start saying
20    what samples you need.
21        A.    Yes, and I forget your initial
22    question.
23        Q.    I'm just pointing out that after July
24    2011 there was a time when you -- you drafted this
25    declaration, and in part of this declaration it's
```

Page 16

1                           Lyter
2    indicating additional samples that the experts
3    would require, as it says on page 3 there;
4    correct?
5         A.    Yes.
6         Q.    And were those additional samples being
7    sought so you could perform the PE testing that
8    you had previously described in an earlier
9    question?
10        A.    No.  There was not sufficient sample
11   available for me to perform the PE testing.
12        Q.    Can you clarify for me was it -- I
13   thought you said -- and maybe I'm wrong -- in July
14   of 2011 the samples taken then, there were not
15   enough -- there were not sufficient samples for
16   the PE testing.  Is that accurate or did I
17   misunderstand you?
18        A.    Well, it's true, but it's also true
19   that at no point were there sufficient number of
20   samples for me to conduct PE testing based on the
21   methodology that I use and the instrument
22   configuration that I have.
23        Q.    How many samples do you require to do
24   the testing methodology you use regarding PE?
25        A.    Each of the samples that I need would

1                            Lyter
2    contain eight of the little microplugs.  And since
3    I need two samples that would be unheated and two
4    samples that would be heated, that will be 32
5    microplugs from any one area of writing.
6         Q.    Why do you need so many?
7         A.    The instrument that I have is set up
8    with an automatic sampler, and the automatic
9    sampler requires the amount of volume of liquid in
10   each of the samples to be of a certain quantity.
11             And in order to be able to measure the
12   amount of PE in that quantity of liquid, the
13   number of hole punches needs to be increased.  And
14   I found that the minimum number that will provide
15   the ability to quantify the amount of PE in all
16   instances is eight.
17        Q.    What machine are you talking about that
18   you need that many samples to properly run the
19   test?
20        A.    Well, the machine I use is a GC/MS, but
21   it has an automatic sampler on it instead of
22   simply a manual injection.
23        Q.    If you were using manual injection,
24   would you be able to perform the PE test that you
25   described with less samples than the 32 you've

```
 1                          Lyter
 2    just described?
 3         A.    Yes.
 4         Q.    Now, in paragraph 9 of Lyter 1 -- it's
 5    on page 34.  You see that paragraph?
 6         A.    I do.
 7         Q.    What are you referring to in the phrase
 8    written there where it says "extremely sensitive
 9    and precise chemical testing"?  What test are you
10    referring to?
11         A.    Well, all of the tests that I do are
12    precise and extremely sensitive.  Thin-layer
13    chromatography is one of them.  I can do TLC
14    densitometry.  That's another.  It is possible
15    that GC/MS could be used, but there are
16    limitations to that.
17         Q.    You're aware that a second round of
18    samples was approved by the court?
19         A.    Well, I know that I took samples,
20    additional samples, in August of 2011.
21         Q.    What testing did you perform on those
22    additional samples?
23         A.    I did some additional thin-layer
24    chromatography.
25         Q.    Is that all?  Anything else?
```

1                       Lyter

2        A.     No.   I didn't do any additional testing

3    on those samples because of the results of that

4    additional thin-layer chromatography test.

5        Q.     And what were those results that caused

6    you to not do any further testing?

7        A.     They're the results that are described.

8    In my report I believe it's on page 7 where we're

9    talking about the TLC results.

10       Q.     And just can you summarize for me what

11   those results were?

12       A.     The samples of ink that were taken from

13   the written notations on the "work for hire"

14   document, both the interlineation, the initials,

15   the signatures, and the dates, the sample -- the

16   samples were so deteriorated that the results of

17   the TLC analysis were not able to be used either

18   for comparison purposes or for any other analyses,

19   such as determining the ink formulations that

20   might have been used or looking at the relative

21   age of the ink through measuring of extraction

22   characteristics.

23       Q.     And did you get similar results from

24   the testing that you did in July?

25              MR. SOUTHWELL:  Objection to form.

```
 1                        Lyter
 2       A.    I don't recall if I did testing in
 3  July, waiting because of the possibility of
 4  getting additional samples.  I just don't recall.
 5       Q.    Do you have your notes with you that
 6  might refresh your memory on that?
 7       A.    No, I do not.
 8       Q.    Did you bring them with you to New
 9  York?
10       A.    Yes.
11       Q.    Where are they located now?
12       A.    They're in another conference room.
13             MR. BOLAND:  Okay.  Can we just take a
14       brief break so that Dr. Lyter can go grab his
15       notes, please?
16             MR. SOUTHWELL:  What is your intention
17       with respect to the notes?  As you know, this
18       is the subject of an ongoing dispute that you
19       have now raised with the court.
20             MR. BOLAND:  I'm going to ask him to
21       read his notes and refresh his recollection
22       about what testing he did back in July.
23       That's all.
24             MR. SOUTHWELL:  Okay.  I mean, you want
25       to keep going and at the next break he can get
```

```
 1                    Lyter
 2      them or...
 3           MR. BOLAND:  Is it a long walk back and
 4      forth to where his notes are?  If it's going
 5      to take him 20 minutes, we can do it at a
 6      break.
 7           MR. SOUTHWELL:  No, it's not a long
 8      walk.  We'll take a break now then.
 9           MR. BOLAND:  Very well.
10           (Recess taken from 10:32 to 10:35.)
11      Q.    Dr. Lyter, can you hear my question
12   still?  I'm just checking the technology to make
13   sure we're still connected.
14      A.    Yes, I can hear you fine.
15      Q.    Do you have your notes in front of you
16   from the testing that you did in July of 2011?
17      A.    Yes, I reviewed that particular
18   testing.
19      Q.    And can you tell us now what tests you
20   performed in July of 2011?
21      A.    I did in fact do thin-layer
22   chromatography of the interlineation from page 1
23   of the "work for hire" document and the signatures
24   and dates appearing on page 2 of the "work for
25   hire" documents.
```

Lyter

1

2          And the results were as listed in my

3    report in that those analyses were not conclusive.

4    It was clear that the ink lines had deteriorated,

5    and so it was not possible to determine whether

6    those particular entries were similar or different

7    from each other because of the degree of

8    deterioration.

9        Q.    When you say "similar or different from

10   each other," do you mean the ink formulations

11   being similar or different from each other?

12       A.    Yes, the actual results were such that

13   they were uncharacteristic of what we expect to

14   see when we examine ballpoint ink with thin-layer

15   chromatography.

16       Q.    Do you have an image of the two-page

17   contract you analyzed within your notes?

18       A.    I'll have to check.

19       Q.    Very well.

20            (Pause.)

21       A.    I have what appears to be an image of

22   the two pages of the "work for hire" contract, but

23   I'm not -- I don't know where these images came

24   from, so I don't know what they're associated

25   with.

```
 1                        Lyter
 2           MR. BOLAND:  If the court reporter
 3      could hand to Dr. Lyter a copy of his report.
 4      It should be the document in front of him that
 5      was filed in this case.  I'm looking for the
 6      document number.  Document 328 should be
 7      stamped across the top of it.
 8           THE WITNESS:  Yes, I have that.
 9           MR. BOLAND:  If that could be marked
10      Lyter 2, just for convenience.
11           (Lyter Exhibit 2, redacted report of
12      Lyter, marked for identification.)
13      Q.   Dr. Lyter, could you just describe what
14   that appears to be for the record?
15      A.   Lyter 2 is labeled as Exhibit D.  It
16   says that there are 13 pages.  It appears to be my
17   report, and attached to it is a copy of my CV.
18   And it's dated March 24th, 2011.
19      Q.   Does this appear to be the report that
20   you submitted to the defendants for them to then
21   eventually file in this case?
22           MR. SOUTHWELL:  Mr. Boland, just so the
23      record is clear, this is the redacted version
24      that was publicly filed, just so that that's
25      clear.
```

```
                              Lyter
 1
 2              MR. BOLAND:  Alex, I'm having a hard
 3        time hearing you.
 4              MR. SOUTHWELL:  I just wanted the
 5        record to be clear that this is the redacted
 6        version which was filed, just so that that's
 7        clear.
 8              MR. BOLAND:  Yes, fair enough.
 9        Q.    Dr. Lyter, we've had this incident --
10   not incident -- this situation with several other
11   witnesses.  And to be clear, so there's no
12   misunderstanding, the report you submitted to the
13   defendants based on some court rulings, they
14   redacted portions of it out that weren't allowed
15   to be publicly filed.
16              So I understand that this report will
17   have the word "redacted" all over it in different
18   places and that those are not things that you put
19   into the report?
20              But other than the redacted sections
21   that were redacted by the lawyers, does the rest
22   of it appear to be the report you filed in this
23   case in March of 2011?
24        A.    Yes, it does.
25        Q.    Could you go to page 10 of the report,
```

Page 25

1                          Lyter

2    please.  And when I'm using the page numbers,

3    Dr. Lyter, I'm using the page number in the upper

4    right-hand corner of the page, the thing that's

5    been stamped by the court.

6         A.    Okay.  Is that the page that bears my

7    signature?

8         Q.    Yes.

9         A.    Okay, I have it.

10        Q.    Do you see paragraph 2 there that you

11   talked about the deterioration of the "work for

12   hire" document?

13        A.    Yes, paragraph 2 says, The intentional

14   deterioration of the "work for hire" document

15   thwarted my ability to assess the authenticity of

16   the questioned documents using TLC analysis and

17   ink identification and relative aging

18   methodologies.

19        Q.    And when did you make that

20   determination?  Was that in July of 2011 or

21   sometime later?

22        A.    My initial suspicion was in July.  I

23   believe that I actually comment.  I'm looking for

24   the -- I guess on page number 3 where it says my

25   initial observations I comment on the

1                        Lyter
2    deterioration aspect and that I was concerned
3    about what might be the results of that analysis.
4        Q.    Dr. Lyter, could you look at page 9 of
5    that exhibit.  There's -- the first full paragraph
6    on page 9 which starts with the words "the results
7    of the TLC analysis."  Do you see that?
8        A.    Yes.
9        Q.    When you say in this paragraph the very
10   next sentence that you were unable to obtain
11   satisfactory TLC results and you talk about the
12   document was deteriorated in a way that changed
13   the chemical composition of the dye components in
14   the ink, can you list what are the dye components
15   in ink?
16       A.    You mean in this particular ink?
17       Q.    I guess what I'm asking is PE is not
18   considered a dye component; it's considered a
19   solvent; right?
20       A.    Yes, it's characterized as a solvent or
21   semivolatile component.
22       Q.    And is it your position that the
23   deterioration of the document had no effect on the
24   PE that might have been in the ink?
25       A.    I don't know.  That's not something

1                          Lyter

2     that I tested.

3          Q.    Is there a test to do to determine

4     if -- well, how would you know if the PE in the

5     ink was somehow damaged by the deterioration of

6     the document?  What test would you run to

7     determine that?

8          A.    You've asked me two questions.  The

9     first -- the answer to the first question is that

10    if you did a test that normally is able to detect

11    and quantify PE and you don't find any of it there

12    and you know it's supposed to be there, then

13    there's been deterioration of it.

14                On the other hand, the test that is

15    most listed in the literature as the appropriate

16    method for both detecting and quantifying PE is

17    GC/MS.

18         Q.    Okay.  My question is if you use GC/MS

19    and you detected some quantity of PE in this

20    document in this case, how would you then

21    determine if the quantity you detected was

22    accurate given that the document was, as you put

23    it, deteriorated.

24         A.    If the PE had been deteriorated by the

25    condition of the document, then you wouldn't be

```
1                        Lyter
2    able to detect it.
3        Q.    Okay.  Let's talk about the word
4    "deteriorated," then, because I'm not
5    understanding it.  Are you saying it's either an
6    all-or-nothing proposition, that if a document is
7    slightly deteriorated, it will eliminate all the
8    PE, you won't be able to detect any?
9             MR. SOUTHWELL:  Object to the form.
10       A.    When you use the word "deteriorated,"
11   I'm referring to it and using it in the manner
12   that describes initially what the appearance is,
13   meaning that the written line was deteriorated
14   because it no longer contained a complete coverage
15   of ink from within the confines of the lines that
16   the ballpoint pen would lay down.
17            And number two, the appearance of the
18   line, in addition to there not being complete
19   coverage, what was there had changed.  It had
20   either become discolored and that it was now
21   yellow to brown-colored as opposed to black
22   colored.
23            And number two, because of the testing
24   I performed that would measure what dye components
25   were present and how those dye components reacted
```

```
 1                         Lyter
 2   to thin-layer chromatography, it gave me results
 3   that indicated that the dye components had in fact
 4   been impacted by whatever method was used to cause
 5   the deterioration on the document.
 6             And it -- I don't -- it would be my
 7   opinion that if we're dealing with a semivolatile
 8   component such as PE that if you can measure it,
 9   then you know that there's some of it there.  If
10   you measure a difference that is present after
11   you've artificially aged or heated a sample, then
12   you know that there was a quantity of PE that was
13   present that was higher than what would be present
14   in writing that would be greater than two years
15   old.
16             So the deterioration that I was talking
17   about was evident with the dye components.  I
18   didn't do any testing for PE, so I don't know what
19   that testing would have shown.
20        Q.    What I'm saying is when you use the
21   phrase in that paragraph "deteriorated in a way
22   that changed the chemical composition of the dye
23   components" is it your position that that
24   deterioration that was sufficient to change the
25   chemical composition after the dye components,
```

```
 1                        Lyter
 2   would it or would it not also change the amount of
 3   PE in the sample, if you know.
 4        A.    Well, I know that dyes are susceptible
 5   to photodegradation based on the structure that
 6   exists.  I'm not aware that PE is susceptible to
 7   photodegradation.
 8             So from that standpoint it would not be
 9   surprising to find dyes that would be altered
10   chemically or altered so that when you examined
11   for them chemically they would give you skewed
12   results versus the fact that you might be able to
13   look at PE and get a perfectly reliable
14   measurement of how much is there.
15        Q.    Is there any way to know whether PE --
16   have you seen anything in the literature whether
17   PE levels are affected by UV light exposure of a
18   document that has ink on it with PE in it?
19        A.    I don't know of any literature that
20   addresses that issue.
21        Q.    Do you know of any way -- outside of
22   the literature, do you know of any way to figure
23   that out, whether PE has been deteriorated as a
24   result of photodegradation?
25        A.    Well, clearly there are
```

1                          Lyter
2     experimentations that can be performed.
3          Q.    Do you know if any experts in your
4     field have ever done such experiments and
5     published their results?
6          A.    I'm not aware, as I silt here today, of
7     any such results.  It's not to say that they're
8     not published; I just don't know of them.
9          Q.    Have you heard of the term "the ink
10    matrix" before?
11         A.    Yes.
12         Q.    And how would the deterioration of the
13    document that you observed and you reported in
14    your report, how would that have changed the ink
15    matrix?
16         A.    Well, what I mean when I say "ink
17    matrix" is basically the resin component of the
18    ink.  And my knowledge of resins would not
19    indicate that they are going to be very
20    susceptible, if at all, to photodegradation.
21         Q.    Can you describe the sort of layers of
22    the ink matrix or is it just one thing, the
23    resins, as you described?
24         A.    Well, when I talk about the resins, I'm
25    talking about the -- basically the component of

1                           Lyter
2    the ink into which all of the other components are
3    incorporated, which lays on top of the paper when
4    you're talking about ball pen inks.
5         Q.    Is PE part of that ink matrix?
6         A.    Well, all of the components are
7    incorporated into the matrix.  In other words, the
8    resins basically keep everything together.
9         Q.    If that matrix gets damaged somehow,
10   let's say through UV degradation or some other
11   deterioration, can PE be released out of that
12   matrix which ordinarily would be trapped in that
13   matrix?
14        A.    I don't know.
15        Q.    Is that possible?
16             MR. SOUTHWELL:  Objection.
17        A.    Anything is possible.  Without actually
18   seeing some research data or performing some
19   experimentation, I wouldn't know.  It would be
20   speculation to say that it was or wasn't.
21        Q.    Could you look at the letter P that's
22   on the first page of the Facebook contract that
23   you have there connected to your notes in the
24   initials PC on the first page.
25        A.    Okay.

```
                              Lyter
1
2        Q.    And would you agree that the ink in
3   that P is darker than the ink on the
4   interlineation itself or no?
5              MR. SOUTHWELL:  I'm going to object to
6         this line of inquiry if you're not -- I mean,
7         it's not clear --
8              MR. BOLAND:  I can't make out what
9         you're saying, Alex.  You're far from the
10        microphone, I guess.
11             MR. SOUTHWELL:  I don't know.  I'm
12        right in front of it.
13             I'm going to object to this -- the way
14        that you're conducting this inquiry, because
15        it's not -- I'm not sure what you're asking
16        him about on a document that's -- I mean, if
17        you want to use one of the scans that's in the
18        record, we could get a copy of that, we can
19        put it up on the screen.
20             Asking him to look at something and
21        comment on the differentiation of the inks
22        without his knowledge -- as he said, he's not
23        sure what the image is that he has.  I just
24        think that it's improper.
25        Q.    Well, Dr. Lyter, can you comment on the
```

```
 1                         Lyter
 2   apparent darkness of the ink in the letter P in
 3   the initials PC compared to the rest of the
 4   interlineation?  What's your opinion of that?
 5        A.    I can't tell much from the copy that I
 6   have because I believe that it's smaller than the
 7   normal -- in other words, it's not a one-to-one
 8   copy, number one.  And number two, it's -- I'm not
 9   sure when it was taken.  It almost appears like
10   there might be -- that it was taken after there
11   were hole punches taken, sampling of it.
12             I know that there were varying degrees
13   of ink coverage on various parts of the writing
14   that appeared on the "work for hire" document.
15   Specifically I don't have a recollection about the
16   initials PC.
17        Q.    This conclusion we were just talking
18   about on page 10 of your report, did you know this
19   or did you reach this conclusion about the
20   deterioration and the change in the chemical
21   composition of the dye components after the July
22   testing?
23             MR. SOUTHWELL:  Objection, asked and
24        answered.
25        A.    I certainly had performed some
```

Page 35

1                          Lyter
2    thin-layer chromatography on some samples from the
3    "work for hire" document after the July sampling
4    in 2011, and at that point in time what I saw
5    indicated deterioration.
6              After getting additional samples in
7    August and doing additional testing, those results
8    were confirmed and expanded to include all of the
9    writing on the "work for hire" document.
10        Q.   Can you please describe why you could
11   not perform relative aging analysis as a result of
12   that deterioration?
13        A.   Relative aging is actually a technique
14   by which the amount of color that is extracted in
15   the solution is measured.  And when you can see
16   that the amount of color is being unreliably
17   displayed on a thin-layer chromatograph, then it's
18   not appropriate to be able to or to try to measure
19   quantitatively that amount of color.
20              There's just too much going on, too
21   much that's been affected by whatever method that
22   was used to deteriorate the ink to be able to try
23   to measure something quantitatively and use,
24   therefore, as a measure of the age.
25        Q.   Do you know who Erich Speckin is?

```
 1                         Lyter
 2        A.    Yes.
 3        Q.    Are you aware whether he uses the ink-
 4   aging method that you use regarding
 5   extractability?  Does he use that method too?
 6        A.    You're talking about relative aging?
 7        Q.    Yes.
 8        A.    I believe he does, yes.
 9        Q.    Going back a second, when you talk
10   about the GC/MS machine, there was manual
11   injection and I think automatic injection.  Do you
12   remember that topic we were talking about?
13        A.    Yes, I do.
14        Q.    Why don't you use manual injection?
15        A.    The instrumentation that I use is at
16   Duke University.  I rent time on it.  I do not own
17   it.  And it is set up to use automatic sampling,
18   and that's the way the instrument is set up.
19        Q.    What's your opinion of the use of
20   manual injection as compared to the automatic
21   sampling that you just talked about?
22        A.    There's nothing wrong with manual
23   injection.  A lot of individuals and/or
24   organizations don't decide to spend the additional
25   funds necessary to buy an automatic sampler and/or
```

1                       Lyter

2   may not do sufficient number of samples so that

3   the automatic sampler is not required.

4           But both methods of injection will give

5   reliable results.

6       Q.    Have you opposed Gerald LaPorte in

7   previous cases regarding ink aging?

8       A.    We have been retained on opposite sides

9   of matters.  I don't know that those issues have

10  revolved around ink aging.  I can only recall one

11  matter, and I don't believe there was any ink

12  aging performed in that case.

13      Q.    Would you agree with the statement

14  that -- well, is it appropriate to describe the

15  relative ink aging that you do most commonly as

16  accelerated aging with rate of extraction?

17      A.    No.

18      Q.    What is that method or is that even a

19  method that you've heard of?

20      A.    Well, I know what accelerated aging is,

21  and I know what the rate of extraction is.  It

22  might be best to define those.  Rate of extraction

23  and extent of extraction are different measurement

24  methodologies.  In other words, they're different

25  parameters that are being measured.  They both

1                          Lyter

2    relate to how easily an ink sample is dissolved in

3    a solution.

4              Relative aging will use either one or

5    both of those measurement methodologies and

6    compare various writings, some of them being

7    questioned in nature as far as when they were

8    prepared and others being known as to when they

9    were prepared.

10             Accelerated aging as a technique will

11   use either the rate of extraction or the extent of

12   extraction and compare two different samples from

13   the same writing, and that writing is questioned

14   as far as its age.

15             One of the samples is not treated in

16   any way, and the other sample is heated.  And the

17   conclusions are derived by looking at how those

18   two samples differ.  And if they provide differing

19   results, in other words, different rates of

20   extraction or different extents of extraction,

21   then they are -- the writing on the document is

22   considered to be less than a certain number of

23   months or years old.

24             It's not relative aging because it has

25   no controls.  There's nothing other than the

```
 1                        Lyter
 2   questioned writing that's being examined.  And
 3   that is not a procedure that I use.
 4        Q.    Do you use a procedure that measures
 5   the extractability of some components of ink to
 6   try and determine their age?
 7        A.    Yes, I do relative aging.  In other
 8   words, in order for me to measure the age of
 9   writing by measuring an extraction
10   characteristic -- and the two extraction
11   characteristics are rate of extraction and extent
12   of extraction -- I have to have some known dated
13   writing, in other words, writing that I know was
14   done on a particular date, by which I can compare
15   that with the questioned writing.  And that's
16   known as relative aging.
17        Q.    And would you agree with the statement
18   that other than you Mr. Speckin is the only other
19   person in the world who performs that kind of
20   measurement of extractability?
21              MR. SOUTHWELL:  Object to the form.
22        A.    I don't know if that's a correct
23   statement or not.
24        Q.    Would you agree with the statement that
25   that method you just described that you use is not
```

```
                                        Page 40

 1                       Lyter
 2   scientifically reliable?
 3        A.    No.
 4        Q.    And if Mr. LaPorte has said that in a
 5   prior deposition, you would disagree with his
 6   statement on that point?
 7             MR. SOUTHWELL:  Objection,
 8         mischaracterizes.
 9        A.    I would have to know exactly what he's
10   saying and why, because I know that what's in the
11   literature and I know that some of the stuff
12   that's in the literature is not correct.
13        Q.    Give me an example of something that's
14   not correct in the literature.  What do you mean
15   by that?
16        A.    There's an article that describes some
17   experimentation that was done involving relative
18   aging, which is the extraction methodology.  And
19   some of the conclusions that were reached were
20   based on data that clearly provided the opposite
21   results to the conclusions that were reached.  The
22   conclusions said the technique did not work; the
23   data clearly illustrated that it did.
24        Q.    Do you recall who the authors of that
25   published article were?
```

Page 41

1                        Lyter

2        A.    I don't remember.  It seems to me they

3    were from Germany, but I don't recall.

4              MR. BOLAND:  Alex, at this point, I

5         would like to take about a ten-minute break,

6         if we could, and the court reporter and

7         everyone can run to the restroom or whatever

8         they need to do.

9              MR. SOUTHWELL:  All right.

10             (Recess taken from 11:09 to 11:23.)

11       Q.    Dr. Lyter, I asked you some questions

12   before about the GC/MS machine, and you responded

13   that you use one at Duke University; right?

14       A.    That's correct.

15       Q.    And it's not a machine you own; you

16   sort of just rent time on it, I guess, is the way

17   to say it; right?

18       A.    That's correct.

19       Q.    And that machine is set up to do auto

20   sampling as opposed to manual injection for

21   purposes of PE testing; right?

22             MR. SOUTHWELL:  Objection to form.

23       A.    Well, it's set up with an automatic

24   sampler for all kinds of analyses, and as opposed

25   to having manual injection.

1                         Lyter

2        Q.     An auto sampler is an add-on for that

3    GC/MS machine; correct?

4        A.     Yes, it is.  It's made to be used on

5    it, but it's not something that has to be

6    purchased when the machine is purchased.

7        Q.     And it's true, sir, you could have

8    chosen at any time, using that machine, to have

9    performed a manual injection, if you wanted to?

10       A.     No, I could not.  It was under the

11   control of Duke University, and the configuration

12   of the equipment was to be used as it is.

13       Q.     I guess my point is if you got the

14   permission from Duke University, the machine --

15   the machine itself in the abstract was capable of

16   being switched over to manual injection; true?

17       A.     Yes, that's right, the automatic

18   sampler can be taken off.

19       Q.     And you never asked Duke to do that as

20   part of your testing or thoughts of testing in

21   this case?

22       A.     I had asked them in previous matters to

23   do it, and they said no.

24       Q.     Do you need more samples when you're

25   using an auto sampler as opposed to if you did

```
 1                          Lyter
 2   manual injection or used manual injection?
 3        A.    The automatic sampler requires a
 4   certain volume of liquid in order to reliably
 5   inject a certain amount.  And when you increase
 6   the amount of volume in your sample, you have to
 7   increase the amount of analyte, which in this case
 8   were the ink samples.
 9             And so yes, it requires a larger number
10   of microplugs from any one area of writing that's
11   going to be analyzed.
12        Q.    Does the use of more samples provide
13   you with more accurate results?
14        A.    No, I don't believe it has anything to
15   do with accuracy.  It's just you're -- you're
16   increasing the concentration of the analyte within
17   the volume to the point where it is most
18   measurable and reliably measured.
19        Q.    Are you aware that Mr. LaPorte in his
20   testing only used two samples from the document to
21   perform his PE test?
22        A.    I'm not familiar with the specifics of
23   his analysis, so I don't know.
24        Q.    And when I said "samples," I should
25   have used the technical term.  I meant two plugs
```

                              Lyter
1
2    from the document.
3              Were you aware of that or not?
4         A.    No, I wasn't aware of that.
5         Q.    Have you read his report in this case
6    and the results that he has in his report?
7         A.    I have read his report.
8         Q.    Do you agree with his results about the
9    ink is two years old or newer?
10        A.    I neither agree nor disagree.  I
11   haven't reviewed his data, so I don't have an
12   opinion.
13        Q.    Isn't all the data you need to assess
14   his conclusions within his report?
15        A.    Well, I would have to review his report
16   to see if it contains any data.
17        Q.    You don't recall, when you read his
18   report, if it contained data necessary to support
19   his conclusion?
20        A.    No, I frankly don't.
21        Q.    What kind of data would be necessary to
22   be in that report to -- for you to review to
23   verify his conclusions?  I'm not understanding
24   what kind of data you mean.
25              MR. SOUTHWELL:  Mr. Boland, can you

Page 45

```
 1                         Lyter
 2        just be more specific?  Are you referring
 3        specifically to PE conclusions or all of his
 4        conclusions?
 5                MR. BOLAND:  I'm just asking the
 6        witness if he agrees with the conclusions in
 7        LaPorte's report, and he said he couldn't
 8        agree or disagree.  And I asked -- and he said
 9        he would need to review the data.
10                And now I'm asking him what data would
11        he need to review in order to determine if he
12        agrees or disagrees with any of the
13        conclusions in LaPorte's report.
14        A.    Well, I would have to see any images
15   that he may have taken.  I would have to see any
16   examination results that he had, whether they were
17   results of a visual examination, whether they were
18   results from examination by VSC, whether they were
19   thin-layer chromatography results, or whether they
20   were GC/MS results.
21        Q.    About how many cases in the past have
22   you done PE testing and produced a report for a
23   client?
24        A.    I don't know.  I don't remember.
25        Q.    Well, can you ballpark it for me?
```

                        Lyter

1    Would it be more than a hundred times?

2         A.    No, probably less than that, but it's a

3    guess.

4         Q.    Wouldn't you agree with me that if

5    someone's doing testing of ink and they're using

6    75 percent less number of plugs as part of their

7    testing that that test would be -- that there's a

8    higher potential for human error in that test when

9    they're using so few plugs?

10             MR. SOUTHWELL:  Objection to form.

11        A.    No, I wouldn't agree.  You'd have to

12   know more specifically about what the specific

13   methodology was and where the particular points of

14   error may occur.  And then also there's the

15   question of the competency of the individual doing

16   the test.

17        Q.    Do you have an opinion as to whether

18   Gerald LaPorte is a competent ink analyst using PE

19   testing?

20        A.    I have no reason to believe that he's

21   not.

22        Q.    And what causes you to decide whether

23   you're going to use PE testing on ink or not in a

24   given case?

1                           Lyter
2          A.    Well, in this case the first
3   consideration is the amount of ink that's
4   available; secondly, the circumstances surrounding
5   the document regarding the purported date of
6   preparation and the supposed date of preparation
7   relative to when the examination was done; and
8   then of course the particular kind of ink that's
9   used, because a lot of inks -- or at least a fair
10  number of them do not contain PE.
11         Q.    Did you consider using PE in this case
12  when you were first retained?  PE testing, I mean.
13         A.    It is certainly one of the types of
14  testing that is in my repertoire.  As to whether
15  it was going to be used or not depended on what
16  the condition of the documents were and what kind
17  of inks were being used.
18         Q.    So did you assess those two factors you
19  just mentioned in this case before deciding what
20  ink age testing to do?
21         A.    As I mentioned in my report, because of
22  the condition of the document, it was clear to me
23  that there would be insufficient sample for me to
24  do PE testing, given the methodology that I use
25  and the instrument configuration that I have.

1                           Lyter
2          Q.     And what methodology do you use?  How
3     do you distinguish your methodology from
4     Mr. LaPorte's?
5          A.     I don't know what Mr. LaPorte's
6     methodology is.  I don't think that I've ever seen
7     it in writing or seen him describe specifically
8     step by step what his methodology is.
9          Q.     Do you recall a paper that Mr. LaPorte
10    wrote in 2004 describing the PE methodology he
11    uses?
12         A.     No.
13         Q.     Have you ever seen his methodology
14    published by anyone in any of the scientific
15    literature?
16         A.     I don't know.  I certainly am aware of
17    some of the articles that he's written, and I know
18    he's addressed measuring PE by GC/MS from
19    ballpoint ink samples.  But I don't know how that
20    particular article relates to the methodology he
21    uses in casework.
22         Q.     Would you agree that his method has or
23    has not been peer-reviewed?
24                MR. SOUTHWELL:  Objection as to form.
25         A.     I don't know one way or the other.  I

Page 49

```
 1                        Lyter
 2    would have to see what particular article he
 3    references as containing his methodology.
 4        Q.    But as you sit here today, you have
 5    never seen such an article?
 6            MR. SOUTHWELL:  Objection to the form.
 7        A.    I've never had somebody point out to me
 8    an article that says this is the method that Jerry
 9    LaPorte uses.  Therefore I don't know whether the
10    methodology that he uses has been peer-reviewed or
11    not.
12        Q.    Okay.  Well, let's focus on your
13    methodology, the two points you made, the
14    methodology and the condition of the document,
15    which were decision points on why you didn't do PE
16    testing.
17            What about your methodology as applied
18    to the document in this case caused you to not do
19    PE testing?
20        A.    There was nothing about the methodology
21    that caused me not to do PE testing.  Once I could
22    not get past the sample size restriction, it
23    didn't make any difference what methodology I
24    used.  I wasn't going to be able to do the
25    testing.
```

```
 1                         Lyter
 2        Q.     And what sample size restriction are
 3   you referring to?
 4        A.     The one that I had previously described
 5   where I need at least 32 hole punches of ink in
 6   order to be able to analyze any one area of
 7   writing.
 8        Q.     And when did you know you needed 32
 9   plugs to perform PE testing using your sort of
10   methodology?
11        A.     Well, that's -- that's the methodology
12   that I use, so even before I went into the
13   examination, I knew that I would need that much.
14        Q.     Did you tell the defendants' attorneys
15   that you needed that many samples -- or plugs, I
16   should say, plugs?
17        A.     I don't recall whether I did or not.  I
18   just don't remember.
19        Q.     Did you discuss doing PE testing with
20   the defendants' attorneys?
21        A.     When?  I don't recall discussing it
22   once the documents were examined.  We may have
23   talked about it briefly in the very early
24   discussions regarding my involvement in this case,
25   but I don't remember.
```

1                          Lyter

2        Q.    Sir, what were you hired to do?  What

3    was your understanding you were hired to do by the

4    defendants' attorneys in this case?

5        A.    As I listed on my report, I was engaged

6    for the analysis of ink and paper.  I was going to

7    inspect two different documents, the "work for

8    hire" document, a specifications document.  And I

9    was asked to determine whether there were any

10   inconsistencies in the document and to determine

11   if I could the date or time period of preparation

12   of the document.

13       Q.    Did you ever suggest to the defendants

14   that you could do PE testing if you had sufficient

15   samples from the document -- I mean the

16   defendants' lawyers?

17            MR. SOUTHWELL:  I'm going to object,

18        Mr. Boland.  You're calling for privileged

19        communications at this point.  I mean, you can

20        probably ask it in a different way.

21       Q.    Dr. Lyter, did you make it known to

22   anyone how many samples you would need to do PE

23   testing, without telling me who?  Did you tell

24   anyone involved many this case how many samples

25   you would need to do testing, the 32 plugs?

Page 52

1                              Lyter

2         A.    I don't remember that I did.

3         Q.    How did you determine that you weren't

4    going to be permitted to get 32 plugs out of a

5    sample and do PE testing, then, if you didn't ask

6    anybody?

7         A.    I could tell by looking at the

8    documents and the condition of the writing that

9    there were clearly areas of writing where that

10   amount of sample would not have been available,

11   given the fact that the ink line had been

12   deteriorated and that there were multiple experts

13   involved, both from defendants and plaintiffs,

14   that would desire to take samples of ink and that

15   there simply wasn't going to be enough ink

16   available.

17        Q.    Can you explain to me how Gerald

18   LaPorte reached a completely different conclusion

19   that he could do PE testing in this case?

20             MR. SOUTHWELL:   Objection, calls for

21        speculation.

22        A.    I don't know.

23        Q.    If you know.

24        A.    Yeah, I don't know other than he does

25   not have the same sample size restrictions that I

1                        Lyter

2    do.

3        Q.    Does that change the reliability of his

4    test compared to yours?

5        A.    I don't think so.

6        Q.    So you could have done PE testing with

7    less samples if you had used a machine that

8    allowed manual injection; is that accurate?

9              MR. SOUTHWELL:  Objection, asked and

10         answered.

11        A.    Yes, that's correct.

12        Q.    Are you more experienced than

13    Mr. LaPorte in doing ink age analysis?

14        A.    I don't know.  I certainly have more

15    years doing the testing, but I don't know

16    whether -- how you would measure that parameter.

17        Q.    And using your type of PE testing, what

18    effect does storage conditions have on a document

19    and the type of -- what effect would storage

20    conditions have on PE testing results, in your

21    opinion?

22        A.    You mean in general?

23        Q.    Yes, the storage conditions of a

24    document, can it affect PE testing results?

25        A.    Certainly if a document is stored in

```
 1                        Lyter
 2   what I'll characterize as harsh conditions, it may
 3   make the amount of PE that's present less than
 4   what would normally be present.
 5        Q.    What kind of storage conditions would
 6   cause that?
 7        A.    Well, considering the fact that part of
 8   the methodology for PE testing is to artificially
 9   age or heat samples, I would say exposure to
10   excessive heat conditions.
11        Q.    What's the freezing point of PE,
12   Dr. Lyter?
13             MR. SOUTHWELL:  Objection to form.
14        A.    I don't know.
15        Q.    If a document is stored at a
16   temperature that puts it at or below the freezing
17   point of PE, how would that affect the PE testing
18   result?
19        A.    I wouldn't think it would affect it at
20   all.
21        Q.    It's your position that PE would
22   evaporate at the same rate if the document is kept
23   at a temperature where PE is at its freezing
24   point?  It would still evaporate at the same rate
25   as room temperature?
```

```
 1                         Lyter
 2        A.    I believe that -- first off, I have no
 3   knowledge of what PE may or may not do at
 4   different temperatures because I don't know what
 5   the freezing point is and I don't know what the
 6   boiling point is for PE.
 7              But I know that because it's a
 8   component that was within a matrix that includes
 9   resins and other materials that there's going to
10   be synergistic effect within that matrix that's
11   going to be different than what might occur with
12   PE just sitting in a beaker on top of a desk or
13   something.
14        Q.    Well, when you test PE, you test it
15   within an ink matrix; you don't test it sitting
16   placed in a beaker.  Am I right?
17        A.    It depends on what test you're doing.
18   If I do a standard, yes, the PE comes directly out
19   of a beaker.  But generally speaking we're testing
20   ink samples that presumably have PE in them.
21        Q.    And in this case we don't know the ink
22   formulation; true?
23        A.    That's correct.
24        Q.    And would you agree with Gerald LaPorte
25   that we also don't know whether this ink is a
```

```
 1                        Lyter
 2   fast-aging or slow-aging ink when it comes to PE?
 3   Would you agree with that?
 4            MR. SOUTHWELL:  Objection to form.
 5        A.    I don't know what Mr. LaPorte said
 6   about this ink one way or the other.  I have no
 7   personal knowledge as to how this ink would be
 8   characterized regarding whether it's a fast aging
 9   or a slow aging.
10        Q.    You've heard of that terminology,
11   though, before, fast aging and slow aging, as it
12   relates to PE evaporation?
13        A.    Yes, I have.
14        Q.    Do fast-aging and slow-aging inks
15   generate the same test results when you do PE
16   testing with regard to them?
17        A.    What samples are you talking about?
18   Are you talking about samples that are the same
19   age or purported to be the same age?  I don't
20   understand your question.
21        Q.    Let me give you a hypothetical.
22   Assuming we have two different inks and we agree
23   that one of them is a fast-aging ink when it comes
24   to PE evaporation and the other one is a slow-
25   aging ink, and we take each one of those pens and
```

1                          Lyter

2    we make a mark on a piece of paper all the way

3    down the side of the piece of paper on the same

4    day for both of those inks, then a year later you

5    went ahead and ran your PE tests on those two

6    inks.

7              Would you -- do you assume that the

8    results you would get would be identical for the

9    amount of PE that's driven off by heating,

10   et cetera, or would it be different between the

11   slow-aging and the fast-aging ink?

12        A.    I would expect that if you did multiple

13   samples of that ink that the actual average delta

14   P value would be different for the two writings,

15   but they would both fall within the -- or above or

16   below the appropriate threshold value that would

17   be used to determine the age of the writing.

18        Q.    So it doesn't matter if you have a

19   fast-aging ink or a slow-aging ink, you're still

20   going to get an accurate estimate of how old it is

21   using PE testing?

22        A.    Within certain criteria, yes.

23        Q.    What criteria would those be?

24        A.    You have to realize that if you have a

25   fast-aging ink you may not be able to distinguish

```
 1                        Lyter
 2   between a writing that is two years old versus one
 3   that's one year old, whereas with a slow-aging ink
 4   you probably will be able to distinguish that.
 5        Q.    Have you ever heard of a thing called
 6   The Merck Index, M-E-R-C-K?
 7        A.    Yes.
 8        Q.    And are you aware that The Merck Index
 9   shows that PE is commonly used in bug spray and
10   hand lotion?
11        A.    I don't know.  I certainly haven't read
12   The Merck Index regarding PE, so I don't know what
13   it says.
14        Q.    Do you know what other common household
15   products contain PE?
16        A.    No.
17        Q.    Now, when you were handling this
18   document during the examination, did you handle
19   the document wearing gloves or just with your bare
20   hands?
21        A.    I don't remember.  I think that for a
22   portion of the time I had gloves on and another
23   portion I didn't.
24        Q.    The portion where you had gloves on,
25   why did you bother to wear gloves?
```

```
 1                         Lyter
 2        A.    Well, I don't remember that I did.  I
 3   just -- that seems to be in my mind, but I'm not
 4   certain.
 5        Q.    And do you think it's important to
 6   handle a document with gloves that you're
 7   examining, if you're intending to do PE testing
 8   on?
 9        A.    No.
10        Q.    Is it possible ever that handling a
11   document without gloves could cause contamination
12   of that document as it relates to PE?
13        A.    I'm not aware of any circumstances in
14   which that would be problematic.  I know
15   personally I don't use lotions and stuff on my
16   hand, so that it wouldn't be a problem in that
17   regard.
18        Q.    What about somebody that does use
19   lotions on their hand or bug spray that contains
20   PE, wouldn't you agree that if they handled a
21   document without gloves they could transfer PE to
22   the document?
23        A.    Well, I guess that's possible.  I would
24   propose that or question whether or not the amount
25   that was transferred and the form that it took
```

1                        Lyter

2     would be problematic regarding the testing of the

3     ink.  So I would look at that as being something

4     that is speculative and would need to be tested in

5     order to determine the viability of it presenting

6     any problems.

7          Q.    But there's no literature on that, is

8     there?

9          A.    I'm not aware of any.

10          Q.    Is it fair to say that during the time

11     you were testing this document if you went to the

12     restroom or when you woke up in the morning and

13     before you came in to test you washed your hands

14     with soap?  Would that be a fair assessment?

15          A.    I generally have pretty good hygiene,

16     so I would guess yes.

17          Q.    And do you know if the soap you washed

18     your hands with had PE in it?

19          A.    I would think not, but I don't know.

20          Q.    So there's another possibility:  if a

21     person washes their hands in soap that has PE in

22     it that if they touch a document they could

23     transfer PE to the document.  You agree that's

24     possible?

25          A.    I would say you're dealing with the

```
 1                        Lyter
 2    realm of possibilities and not probabilities, and
 3    I tend to deal in probabilities.  And as far as
 4    that being very probable, I would say that it's
 5    not.
 6         Q.    What data or studies are you pointing
 7    to to base your comment that it's not probable
 8    that PE could be transferred from hand soap used
 9    by a person handling a document?
10         A.    Just my personal experience in
11    examining documents and examining paper blanks
12    from documents, in particular from the areas on
13    the documents where people would normally handle
14    them.  And I don't recall that in those instances
15    I've ever found a measurable amount of PE.
16         Q.    So you've run testing of this type,
17    washing your hands with soap that had PE in it,
18    handling a document, and then seeing how much PE
19    you might have added to it?  You've done that kind
20    of test?
21         A.    No, I have never done a specific test.
22    Number one, I don't know that PE is used in soap.
23    Like I said, it seems to me kind of
24    counterproductive.
25                 But I've tested blank samples of paper
```

Page 62

                         Lyter
1
2    that have been handled by a variety of
3    individuals, and I've never detected any PE.  So
4    that to me says that the likelihood of finding a
5    contaminant of PE on a document because of the
6    handling process is extremely limited if -- even
7    if -- if it even exists.
8         Q.    Are you aware that there's published
9    articles that have talked about the contamination
10   of documents regarding PE and people touching them
11   with their hands?  Are you aware of literature on
12   this point?
13        A.    No, I'm not.
14        Q.    Here's a hypothetical for you.  Let's
15   imagine you're back in July 2011 and you're at the
16   offices of that law firm and you're handling this
17   document without gloves and someone told you there
18   was a huge sign above the soap dispenser, which
19   was the only one you could use in the bathroom you
20   could use to wash your hands with, and it says, By
21   the way, this soap contains PE, would that cause
22   you to use gloves when you went back to handle the
23   document; do you know?
24        A.    No, I probably would have only used
25   water to wash my hands.

1                        Lyter

2        Q.    Okay.   Let's assume you used the soap,

3    though, and you saw the sign and went ahead and

4    used the soap, would you still go handle the

5    document with your bare hands, knowing that you

6    just washed your hands with soap with PE in it?

7        A.    I don't know.   I'd have to think about

8    it.

9              MR. BOLAND:   Alex, at this point, I

10         would like to take one more break.   I think

11         we're close to be done.   But how about we take

12         15 minutes.

13             MR. SOUTHWELL:   Okay.

14             (Recess taken from 11:54 to 12:14.)

15       Q.    Dr. Lyter, can you hear me still?

16       A.    I can.

17       Q.    Did you provide a list of cases in

18   which you have testified in the past four years as

19   part of providing your report in March of 2011?

20       A.    I don't know if I did.   I frankly don't

21   remember.

22       Q.    Do you know if you did that -- I'm

23   sorry, go ahead.

24       A.    I frankly don't remember if I did that

25   or not.

1                           Lyter

2         Q.     Do you remember if you did that with

3    any prior declaration that you submitted in the

4    case?

5         A.     No, I don't have any recollection as to

6    whether that was submitted prior to this.

7         Q.     Do you maintain such a list of cases in

8    which you've testified in the past, at your

9    office, for example?

10        A.     Yes, I do.

11        Q.     And if you reviewed that list, would

12   you be able to tell me in how many of those cases

13   you issued a report and Gerald LaPorte was hired

14   by the other side's lawyers in that particular

15   case?

16        A.     Maybe.

17        Q.     Okay, well, I'll just leave a little

18   blank in the deposition and ask that you review

19   that list and provide that information to answer

20   that question within seven days, please.

21   TO BE FURNISHED: _____

22   _____.

23              MR. SOUTHWELL:  All right.  I'll ask

24        that Dr. Lyter provide that to us, and we'll

25        discuss that with you.

1                          Lyter

2          Q.     The GC/MS machine that you use at Duke

3    University, can you tell me the make and model of

4    that machine?

5          A.     The manufacturer is Schmidazu

6    Schmidazu, S-C-H-M-I-D-A-Z-U, and I believe it's

7    2010 is the model number.

8          Q.     And that's the machine, just to be

9    clear, that is set up to do auto sampling, and you

10   were not able to change the settings -- you were

11   not allowed to change the settings to a manual

12   injection; right?

13         A.     That's correct.

14         Q.     Do you have a copy -- do you have that

15   list -- that list I was just asking you about of

16   cases in which you testified previously, do you

17   have that list with you today?

18         A.     No, I do not.

19         Q.     Okay.  You didn't bring it to New York?

20         A.     I did not.

21   RQ   Q.     And then I'd also ask that the notes

22   that you brought with you that we've been talking

23   about today, if you can provide a copy of those to

24   us within seven days as well, because we've never

25   seen those.

1              Lyter
2         MR. SOUTHWELL:  All right.  Well, we
3     can discuss that along with all the notes that
4     you've been withholding from us.
5         MR. BOLAND:  I mean, yeah, that's up to
6     you, Alex, if you want to provide it to us.  I
7     ask he provide them to you, and if you guys
8     want to withhold them, there's nothing I can
9     say about that.
10      Q.    And just to clarify that, the GC/MS
11   machine in Duke, if Duke permitted you, do you
12   have the ability to alter the settings of that
13   machine so you could use it with a manual
14   injection?  Do you know how to change that
15   setting?
16      A.    Well, it involves removing a physical
17   piece of hardware, and then there are some changes
18   to the software as well, just some settings in the
19   software.  I'm sure that, given sufficient amount
20   of time, I'd be able to do that.
21      Q.    Have you ever done that before with any
22   GC/MS machine?
23      A.    Well, I certainly have used the GC/MS
24   in the past where I was using an individual --
25   well, it wasn't a GC/MS; it was just the GC part,

```
 1                         Lyter
 2    where I was making manual injections.
 3         Q.    You were present in July 2011 for the
 4    inspection of the actual two-page document at
 5    issue in this case?
 6              MR. SOUTHWELL:  Objection to the form.
 7         Do you want to specify which day?
 8              MR. BOLAND:  I couldn't hear that,
 9         Alex.  Objection what?
10              MR. SOUTHWELL:  I'm asking if you want
11         to specify the day.  The examination lasted
12         for multiple days.
13         Q.    Dr. Lyter, what day in July of 2011, or
14    days, plural, perhaps, were you present in Buffalo
15    examining the two-page contract?
16         A.    July 19th.
17         Q.    And do you know what day the
18    examination started by the defendants' experts?
19         A.    I don't remember.
20         Q.    How did the document appear to you when
21    you first saw it on July 19th?  How would you
22    describe it?
23         A.    Which document are you talking about?
24         Q.    The two-page contract that's the main
25    document in this case.
```

```
 1                        Lyter
 2        A.    Is that the one we referred to as the
 3    "work for hire" document?
 4        Q.    Yes, that's how the defendants'
 5    attorneys and everyone referred to it, that's
 6    correct.
 7        A.    The pages were -- the paper of the two
 8    pages was somewhat yellowed on the front, and
 9    there were certainly deterioration of the ink
10    samples, ink entries, that appeared on both pages
11    so that the ink line was not consistent from side
12    to side or along the length of the writing.  And
13    it was discolored, being more yellow to brown than
14    it was black.  And then it was -- contained
15    toner-based printing on it that was dark in color.
16        Q.    Did you capture any images of the
17    document before your examination began?
18        A.    I believe I did, yes.
19        Q.    And how did you capture those?  What
20    type of devices?
21        A.    Flatbed scanner.
22        Q.    And did you record what the settings
23    were on that scanner when you used it for those
24    scans?
25        A.    I didn't make any specific recording of
```

```
 1                         Lyter
 2    the settings that I believe it's maintained in the
 3    software as default settings so that I could
 4    identify what they were.
 5         Q.    And approximately how many scans did
 6    you take before you started examining the
 7    document?
 8         A.    I believe just one each, each page
 9    front side.  I don't believe I took a scan of the
10    back side.
11         Q.    And when you observed the yellow --
12    yellowing, I guess you called it, of the front of
13    the two pages, did you discuss that with any of
14    the other experts that were present on July 19th?
15         A.    I don't recall there were any other
16    experts present.
17         Q.    Fair enough.  Was there anyone else
18    present?  Were you by yourself in the room doing
19    your examination?
20         A.    No, there was both defense counsel and
21    I believe Mr. Argentieri was there, and there was
22    a videographer there.  And I don't believe anybody
23    else, or I don't recall anybody else, anyway.
24         Q.    And about how long did your examination
25    take that day?
```

1                          Lyter
2          A.    I don't remember specifically.  I think
3    somewhere in the neighborhood of four to five
4    hours.
5          Q.    Did you provide copies of all the
6    images you captured of that two-page contract to
7    the defendants' lawyers?
8          A.    I don't believe so, but I don't recall
9    specifically.
10         Q.    Did you retain copies of those to this
11   day in your office?
12         A.    Yes, I think so.
13         Q.    And what type of an agreement did you
14   have or do you have with the defendants or the
15   defendants' lawyers as far as your work in this
16   case and how much you are to be paid?
17         A.    I'm compensated for my time at the rate
18   of $400 an hour.
19         Q.    Is that from a retainer that you keep
20   on account with you or do you bill them
21   periodically and then receive a payment on that
22   invoice?
23         A.    I did receive a retainer, and I billed
24   against it.  And then I send monthly invoices.
25         Q.    And approximately how much have you

Page 71

1                        Lyter
2    been paid for your work thus far in the case from
3    the first time you started working on anything
4    related to this case?
5         A.    I don't know.  I would have to check my
6    billing records that are back in the office.  I
7    know that my initial retainer is $4,000.
8         Q.    Well, what would you estimate you've
9    billed them thus far, again, like a ballpark?  Is
10   it $500,000 or something less than that?
11        A.    I wish.  No, I would say maybe $40,000.
12   That's a guess.
13        Q.    And since you submitted your
14   declaration's last report in March of 2011, have
15   you done any other work on this case, analysis-
16   type work, not just conversations with lawyers?
17        A.    Since I submitted the report?
18        Q.    Yes.
19        A.    No, I have not done any additional
20   examinations.
21        Q.    Do you know if any of the other
22   defendants' experts have done additional
23   examination since March of 2011?
24        A.    I haven't spoken with any of the other
25   experts, so I don't know.

1                           Lyter

2          Q.      Are there examinations you performed or

3    conclusions that you reached that are not

4    reflected in your report?

5          A.      Yes.

6          Q.      Well, let's break that up, then.  What

7    examinations have you done that are not reflected

8    in your report?

9          A.      I list in my report having done --

10   having used a VSC 4C on page 2 regarding the

11   ultraviolet.  And I used the VSC through both the

12   visible and near infrared region as well to

13   characterize the inks that were on the "work for

14   hire" document, and those results were not

15   reported in the report.

16              And then I also did some testing, in

17   essence experimentation, to determine the effect

18   that ultraviolet light and heat had on paper

19   samples, in particular how they affected the

20   optical brighteners.

21              And then I also did an experiment with

22   determining how exposure to sunlight affected both

23   optical brighteners in paper as well as black ball

24   pen ink writings.

25          Q.      And why didn't you put those -- the

1                          Lyter
2    fact that you did those examinations in your
3    report?
4         A.    Well, the VSC analysis was not
5    really -- was not included because I was going to
6    do chemical testing, and the results of the
7    chemical testing is normally more significant, in
8    particular the ability to identify the ink
9    formulations that were present on the
10   specifications document in this case.
11             And the experimentation was not
12   included in order -- because the results of that
13   testing was actually included in the conclusions
14   that were given regarding what had occurred to the
15   "work for hire" document, what had caused its
16   deterioration, and what we were seeing as regards
17   the ultraviolet examination.
18             And then the fact that the experience
19   that I had had relative to the effect of
20   examination equipment in causing deterioration of
21   documents, I had not had that experience.  And the
22   length of time that was required to cause that
23   kind of effect simply validated that experience.
24        Q.    Did you provide those conclusions to
25   the defendants' lawyers?

```
 1                      Lyter
 2      A.    I told them about it.
 3            MR. BOLAND:  Very well.  Alex, I have
 4      no further questions.
 5            MR. SOUTHWELL:  Okay.  I've got no
 6      questions either.  I guess I just wanted want
 7      to put a couple things on the record,
 8      Mr. Boland.
 9            I should have raised this at the
10      outset, but we had communicated the fee for
11      Dr. Lyter, and I'm just double-checking what
12      the amount is.  I would ask that you write the
13      check today and put it in an overnight, you
14      know, delivery service for Monday delivery to
15      Dr. Lyter's address, which is on the first
16      page of his report, Lyter 2.
17            THE WITNESS:  Yeah, that's a P.O. box.
18      I can give you a street address, which would
19      be --
20            MR. BOLAND:  Yes, go ahead.  What's
21      that street address?  FedEx won't go to a P.O.
22      box.
23            THE WITNESS:  It's 7425 Capstone,
24      C-A-P-S-T-O-N-E, Drive, Raleigh, North
25      Carolina, and the ZIP code is 27615.
```

```
 1                      Lyter
 2           MR. BOLAND:  Okay.  I have the address,
 3       Alex.
 4           And then we'll talk about getting his
 5       notes, copies of his notes, and the other
 6       information from his case log as well so we
 7       can conclude the deposition that way.
 8           MR. SOUTHWELL:  All right, yeah, we can
 9       certainly talk about that in consultation with
10       Mr. Stewart's items that he has withheld.
11       There's seemingly a large amount of materials
12       that your experts have that have not given us
13       and that you have abrogated the agreement that
14       we had about mutual exchange.  So once we can
15       resolve that --
16           MR. BOLAND:  Stewart is the only one
17       left.  I have responded to everything,
18       including Larry Stewart, what we will and will
19       not give you.  Maybe we haven't given you
20       everything.  The responses are all in.
21       There's nothing left hanging regarding the
22       responses from any of the experts from us, as
23       far as I know.
24           MR. SOUTHWELL:  Well, okay, you may
25       have responded and said that you're not going
```

1                    Lyter

2        to give us the things that were plainly -- no,

3        I take it back.  Your response was we gave it

4        to you, and what we have pointed out is that

5        is incorrect.

6             So, frankly, I am waiting for a

7        response on how you square your claim that

8        you've given us everything with the reality of

9        the situation as it's detailed in the

10       deposition transcript.

11            MR. BOLAND:  Oh, no, let's be clear.

12       We've given you everything that we think is

13       appropriate to provide, and there's other

14       things you've asked for that we felt, just

15       like you did, that they were more

16       appropriately obtained during deposition.

17            The same answer you gave to me on a

18       bunch of those questions, which I accepted,

19       and I went after a bunch of that stuff in

20       deposition, and so did you.

21            So we've responded to everything.  You

22       got everything that we think is appropriate

23       just like you have given us everything that

24       you think is appropriate at this point, I

25       assume.

```
 1                        Lyter
 2            MR. SOUTHWELL:  No, Mr. Boland, that is
 3       incorrect.  Mr. Stewart testified that he
 4       provided us with a PDF which included
 5       everything including, for instance, his ink
 6       inventory.  He did not.  You represented on
 7       the record that you provided that to us.  You
 8       did not.
 9            We provided you exactly what we got
10       from Mr. Stewart, which was not a PDF but a
11       series of images, and it did not include that
12       inventory, which both he and you claim to have
13       given us, and you have not.
14            So it is not a case of something
15       different where you're saying, you know, these
16       are things that we are saying are not
17       appropriate.
18            So I think there is still an issue here
19       that we need to get resolved, and I anticipate
20       that we will get it resolved so that we can
21       continue to depose Mr. Stewart about it.  But
22       in any event, we don't need to take up the
23       record on all of this.
24            And the only other thing I wanted to
25       add is we are requesting a review of the
```

1                        Lyter

2        transcript.  I will -- I'll have to just

3        e-mail you confirmation of the amount for

4        Dr. Lyter, but you're representing on the

5        record here that you will provide the check

6        for the amount as we had previously discussed,

7        overnighted to the address Dr. Lyter provided

8        for Monday delivery; correct?

9             MR. BOLAND:  Right, and you're going to

10       give me the amount, though.

11            MR. SOUTHWELL:  Yeah.  We had

12       previously communicated to it.  I just can't

13       get my fingers on it right now.  So I will

14       send it to you by e-mail shortly.

15            MR. BOLAND:  And what about Larry

16       Stewart's payment?  It's probably way over 30

17       days now.  Can you guys put that in an

18       envelope today for Monday delivery as well?

19            MR. SOUTHWELL:  I e-mailed you about

20       that yesterday.  I don't think it is over 30

21       days.  There's not a specific time frame.  But

22       yes, I'm expecting the check today, and I was

23       planning to send it out.

24            MR. BOLAND:  Oh, you're sending it out

25       today.  Okay.

1                    Lyter

2            MR. SOUTHWELL:  As I told you

3      yesterday.

4            MR. BOLAND:  All right.  I just heard

5      yesterday in the e-mail was an accounting

6      issue, and I wasn't certain when you were

7      sending it.  That's fine.

8            MR. SOUTHWELL:  Well, I'm waiting for

9      the check.  I believe I will have the check

10     today.  And if I have the check today, then

11     I'll send it out.

12            MR. BOLAND:  Very well.

13            MR. SOUTHWELL:  So we're concluded for

14     today?

15            MR. BOLAND:  Yes.

16            (Time noted:  12:36 p.m.)

17

18      _____

19      ALBERT LYTER

20

21  Subscribed and sworn to before me

22  this _____ day of _____, 2012.

23

24  _____

25            Notary Public

1

2                C E R T I F I C A T E

3    STATE OF NEW YORK      )

4                           : ss.

5    COUNTY OF NEW YORK     )

6

7              I, LAURIE A. COLLINS, a Registered

8         Professional Reporter and Notary Public

9         within and for the State of New York, do

10        hereby certify:

11             That ALBERT LYTER, the witness whose

12        deposition is hereinbefore set forth, was

13        duly sworn by me and that such deposition

14        is a true record of the testimony given by

15        the witness.

16             I further certify that I am not

17        related to any of the parties to this

18        action by blood or marriage, and that I am

19        in no way interested in the outcome of this

20        matter.

21             IN WITNESS WHEREOF, I have hereunto

22        set my hand this 13th day of August, 2012.

23

24                        _____

25                        LAURIE A. COLLINS, RPR

Page 81

1

2    - - - - - - - - - I N D E X - - - - - - - - - -

3

4    WITNESS:                EXAMINATION BY:              PAGE

5     Albert Lyter        Mr. Boland                     3

6

7    -------------- TRANSCRIPT MARKINGS ----------------

8    DIRECTIONS:

9    MOTIONS:

10   REQUESTS:  65:21

11   RULINGS:

12   TO BE FURNISHED:  64:21

13

14   -------------------- EXHIBITS --------------------

15    LYTER NO.               DESCRIPTION           PAGE

16

17    Exhibit 1, declaration of Lyter dated      5

18    8/15/11 without exhibits

19    Exhibit 2, redacted report of Lyter       23

20

21

22

23

24

25

Page 82

ERRATA SHEET

VERITEXT REPORTING COMPANY

1250 Broadway

New York, New York 10001

(212) 279-9424

CASE:  Ceglia v. Zuckerberg

DEPOSITION DATE:  August 10, 2012

DEPONENT:  Albert Lyter

PAGE/LINE(S)/     CHANGE              REASON

____/_____/_____/_____

____/_____/_____/_____

____/_____/_____/_____

____/_____/_____/_____

____/_____/_____/_____

____/_____/_____/_____

____/_____/_____/_____

____/_____/_____/_____

____/_____/_____/_____

____/_____/_____/_____

____/_____/_____/_____

____/_____/_____/_____

_____

ALBERT LYTER

SUBSCRIBED AND SWORN TO BEFORE ME

THIS _____ DAY OF _____, 2012.

_____   _____

(NOTARY PUBLIC)     MY COMMISSION EXPIRES:

**&**

**&**   1:20 2:12

**0**

**00569**   1:7

**1**

**1**   5:13,14,15,19 6:24
  15:11,16 18:4 21:22
  81:17
**10**   1:16 24:25 34:18
  82:5
**10001**   82:3
**10166-0193**   2:15
**10:05**   1:17
**10:32**   21:10
**10:35**   21:10
**11:09**   41:10
**11:23**   41:10
**11:54**   63:14
**1250**   82:3
**12:14**   63:14
**12:36**   79:16
**13**   23:16
**13th**   80:22
**1475**   2:6
**15**   63:12
**15th**   4:20 5:13,23
  6:11
**1975**   7:5
**19th**   67:16,21 69:14
**1:10**   1:7

**2**

**2**   10:24 21:24 23:10
  23:11,15 25:10,13
  72:10 74:16 81:19
**20**   21:5
**200**   1:20 2:14
**2004**   48:10
**2010**   65:7
**2011**   4:18,21 5:13
  5:23 6:4,11 14:13
  14:14,17 15:9,24
  16:14 18:20 21:16
  21:20 23:18 24:23

25:20 35:4 62:15
  63:19 67:3,13 71:14
  71:23
**2012**   1:16 79:22
  80:22 82:5,23
**212**   82:4
**23**   81:19
**24th**   23:18
**27615**   74:25
**279-9424**   82:4

**3**

**3**   15:18 16:3 25:24
  81:5
**30**   7:6 78:16,20
**32**   17:4,25 50:5,8
  51:25 52:4
**328**   23:6
**34**   18:5

**4**

**4,000**   71:7
**40,000**   71:11
**400**   70:18
**44107**   2:8
**4c**   72:10

**5**

**5**   81:17
**500,000**   71:10

**6**

**64:21**   81:12
**65:21**   81:10

**7**

**7**   19:8
**7425**   74:23
**75**   46:7
**770724**   2:7

**8**

**8**   15:19
**8/15/11**   5:16 81:18

**9**

**9**   18:4 26:4,6

**a**

**a.m.**   1:17
**abbreviated**   12:24
**ability**   17:15 25:15
  66:12 73:8
**able**   15:6 17:11,24
  19:17 27:10 28:2,8
  30:12 35:18,22
  49:24 50:6 57:25
  58:4 64:12 65:10
  66:20
**abrogated**   75:13
**abstract**   42:15
**accelerated**   37:16
  37:20 38:10
**accepted**   76:18
**account**   70:20
**accounting**   79:5
**accuracy**   43:15
**accurate**   10:20
  16:16 27:22 43:13
  53:8 57:20
**action**   80:18
**actual**   22:12 57:13
  67:4
**add**   42:2 77:25
**added**   8:25 61:19
**addition**   28:18
**additional**   12:16
  16:2,6 18:20,22,23
  19:2,4 20:4 35:6,7
  36:24 71:19,22
**address**   74:15,18,21
  75:2 78:7
**addressed**   48:18
**addresses**   30:20
**affect**   53:24 54:17
  54:19
**afternoon**   3:19,21
  4:7
**age**   7:16 8:3,15 9:8
  10:4 11:2,10,13,13
  11:24 13:13 14:5
  19:21 35:24 38:14

39:6,8 47:20 53:13
  54:9 56:19,19 57:17
**aged**   12:17 29:11
**aging**   7:22 8:17
  25:17 35:11,13 36:4
  36:6 37:7,10,12,15
  37:16,20 38:4,10,24
  39:7,16 40:18 56:2
  56:2,8,9,11,11,14,14
  56:23,25 57:11,11
  57:19,19,25 58:3
**aginsky**   13:19,20
**ago**   4:14
**agree**   33:2 37:13
  39:17,24 44:8,10
  45:8 46:5,12 48:22
  55:24 56:3,22 59:20
  60:23
**agreement**   70:13
  75:13
**agrees**   45:6,12
**ahead**   57:5 63:3,23
  74:20
**albert**   1:19 79:19
  80:11 81:5 82:6,21
**alex**   4:23 5:6 24:2
  33:9 41:4 63:9 66:6
  67:9 74:3 75:3
**alexander**   2:16
**allow**   8:21
**allowed**   24:14 53:8
  65:11
**allows**   7:23
**alter**   66:12
**altered**   13:6 30:9,10
**amount**   11:22 12:21
  13:3,5,11 14:22
  17:9,12,15 30:2
  35:14,16,19 43:5,6
  43:7 47:3 52:10
  54:3 57:9 59:24
  61:15 66:19 74:12
  75:11 78:3,6,10
**amounts**   14:25

analyses  19:18 22:3
  41:24
analysis  7:18 8:4
  9:21 19:17 25:16
  26:3,7 35:11 43:23
  51:6 53:13 71:15
  73:4
analyst  46:19
analyte  43:7,16
analytical  7:11
analyze  50:6
analyzed  22:17
  43:11
analyzing  7:4,13
answer  27:9 64:19
  76:17
answered  34:24
  53:10
anticipate  77:19
anybody  52:6 69:22
  69:23
anyway  69:23
apparent  34:2
appear  6:2 23:19
  24:22 67:20
appearance  28:12
  28:17
appeared  34:14
  68:10
appearing  21:24
appears  6:5 22:21
  23:14,16 34:9
applied  49:17
appropriate  27:15
  35:18 37:14 57:16
  76:13,22,24 77:17
appropriately  76:16
approved  18:18
approximately  69:5
  70:25
area  12:15 17:5
  43:10 50:6
areas  52:9 61:12
argentieri  69:21

article  40:16,25
  48:20 49:2,5,8
articles  13:25 48:17
  62:9
artificially  12:17
  29:11 54:8
asked  27:8 34:23
  41:11 42:19,22 45:8
  51:9 53:9 76:14
asking  4:5 15:12
  26:17 33:15,20 45:5
  45:10 65:15 67:10
aspect  26:2
assess  25:15 44:13
  47:18
assessment  60:14
associated  22:24
assume  3:24 57:7
  63:2 76:25
assuming  56:22
astm  7:15,17 8:2,5
  9:7,12,18
attached  4:25,25
  6:23 23:17
attempt  11:16
attempted  11:19
attorneys  2:5,13
  3:14 50:14,20 51:4
  68:5
august  1:16 4:18,20
  5:12,23 6:4,11
  14:14 18:20 35:7
  80:22 82:5
authenticity  25:15
authored  6:4,6
authors  40:24
auto  41:19 42:2,25
  65:9
automatic  17:8,8,21
  36:11,17,20,25 37:3
  41:23 42:17 43:3
availability  7:25 8:7
  8:22
available  14:23,24
  16:11 47:4 52:10,16

avenue  1:21 2:14
average  57:13
aware  10:3 11:7
  13:22 18:17 30:6
  31:6 36:3 43:19
  44:3,4 48:16 58:8
  59:13 60:9 62:8,11

b

b  3:2
back  6:4 20:22 21:3
  36:9 62:15,22 69:10
  71:6 76:3
ball  32:4 72:23
ballpark  45:25 71:9
ballpoint  22:14
  28:16 48:19
bare  58:19 63:5
base  61:7
based  13:5 15:8
  16:20 24:13 30:5
  40:20 68:15
basically  12:14
  31:17,25 32:8
bathroom  62:19
beaker  55:12,16,19
bears  5:23 25:6
began  68:17
believe  9:9 14:13
  19:8 25:23 34:6
  36:8 37:11 43:14
  46:21 55:2 65:6
  68:18 69:2,8,9,21
  69:22 70:8 79:9
bell  4:19
benefit  10:10
best  37:22
bill  70:20
billed  70:23 71:9
billing  71:6
black  28:21 68:14
  72:23
blank  61:25 64:18
blanks  61:11

blood  80:18
boiling  55:6
boland  2:4,9 3:7,9
  4:5,23 5:5,11 6:15
  6:21 10:18 20:13,20
  21:3,9 23:2,9,22
  24:2,8 33:8 41:4
  44:25 45:5 51:18
  63:9 66:5 67:8 74:3
  74:8,20 75:2,16
  76:11 77:2 78:9,15
  78:24 79:4,12,15
  81:5
bother  58:25
bottom  15:18
box  74:17,22
break  20:14,25 21:6
  21:8 41:5 63:10
  72:6
brief  20:14
briefly  8:14 12:10
  50:23
brighteners  72:20
  72:23
bring  20:8 65:19
broadway  82:3
brought  65:22
brown  28:21 68:13
buffalo  67:14
bug  58:9 59:19
bunch  76:18,19
buy  36:25

c

c  2:2 9:15 58:6 65:6
  74:24 80:2,2
call  10:10
called  3:3 9:15
  10:25 58:5 69:12
calling  51:18
calls  12:7 52:20
capable  42:15
capstone  74:23
capture  68:16,19

captured  70:6
career  13:15
carolina  5:25 74:25
case  4:13 6:4 10:5
10:22 11:4,5,8,15
11:17 14:4 23:5,21
24:23 27:20 37:12
42:21 43:7 44:5
46:25 47:2,11,19
49:18 50:24 51:4,24
52:19 55:21 64:4,15
67:5,25 70:16 71:2
71:4,15 73:10 75:6
77:14 82:5
cases  11:20 12:2,12
37:7 45:21 63:17
64:7,12 65:16
casework  48:21
cause  29:4 54:6
59:11 62:21 73:22
caused  19:5 49:18
49:21 73:15
causes  46:23
causing  73:20
ceglia  1:5 3:10 82:5
certain  17:10 38:22
43:4,5 57:22 59:4
79:6
certainly  8:4 11:11
34:25 47:13 48:16
53:14,25 58:11
66:23 68:9 75:9
certify  80:10,16
cetera  57:10
chance  4:23
change  29:24 30:2
34:20 53:3 65:10,11
66:14 82:7
changed  26:12
28:19 29:22 31:14
changes  66:17
characteristic  39:10
characteristics
19:22 39:11

characterize  54:2
72:13
characterized  26:20
56:8
check  22:18 71:5
74:13 78:5,22 79:9
79:9,10
checking  21:12
74:11
chemical  18:9 26:13
29:22,25 34:20 73:6
73:7
chemically  30:10,11
chemistry  7:11
chosen  42:8
chromatograph
12:23 35:17
chromatography
18:13,24 19:4 21:22
22:15 29:2 35:2
45:19
circumstances  47:4
59:13
claim  76:7 77:12
clarify  4:4 16:12
66:10
clear  6:19,22 10:17
14:21 22:4 23:23,25
24:5,7,11 33:7
47:22 65:9 76:11
clearly  30:25 40:20
40:23 52:9
client  45:23
close  63:11
code  74:25
collins  1:22 80:7,25
color  35:14,16,19
68:15
colored  28:21,22
comes  55:18 56:2,23
comment  25:23,25
33:21,25 61:7
commercial  7:24 8:7
8:21

commission  82:25
common  58:14
commonly  37:15
58:9
communicated
74:10 78:12
communications
51:19
company  82:2
compare  38:6,12
39:14
compared  34:3
36:20 53:4
comparison  7:19
19:18
compensated  70:17
competency  46:16
competent  46:19
complete  28:14,18
completely  52:18
component  26:18,21
29:8 31:17,25 55:8
components  8:24
9:6 26:13,14 28:24
28:25 29:3,17,23,25
32:2,6 34:21 39:5
composition  26:13
29:22,25 34:21
concentration  43:16
concentrations  13:2
concerned  26:2
conclude  75:7
concluded  79:13
conclusion  34:17,19
44:19 52:18
conclusions  38:17
40:19,21,22 44:14
44:23 45:3,4,6,13
72:3 73:13,24
conclusive  22:3
condition  27:25
47:16,22 49:14 52:8
conditions  53:18,20
53:23 54:2,5,10

conduct  16:20
conducting  33:14
conference  20:12
configuration  15:8
16:22 42:11 47:25
confines  28:15
confirmation  78:3
confirmed  35:8
connected  21:13
32:23
consider  47:11
consideration  47:3
considered  26:18,18
38:22
considering  54:7
consistent  68:11
consultation  75:9
contain  17:2 47:10
58:15
contained  28:14
44:18 68:14
containing  49:3
contains  12:20
44:16 59:19 62:21
contaminant  62:5
contamination
59:11 62:9
continue  77:21
contract  22:17,22
32:22 67:15,24 70:6
control  42:11
controls  38:25
convenience  23:10
conversation  3:17
3:23 4:6,8,9
conversations  3:13
3:25 71:16
copies  70:5,10 75:5
copy  23:3,17 33:18
34:5,8 65:14,23
corner  25:4
correct  6:25 7:7
11:17,18 14:6,7
15:14 16:4 39:22
40:12,14 41:14,18

42:3 53:11 55:23
65:13 68:6 78:8
**counsel**  69:20
**counterproductive**
61:24
**county**  80:5
**couple**  74:7
**course**  47:8
**court**  1:2 5:11 10:10
15:12,12 18:18
20:19 23:2 24:13
25:5 41:6
**cover**  8:2
**coverage**  28:14,19
34:13
**covered**  8:5
**criteria**  57:22,23
**crutcher**  1:20 2:12
**cv**  1:7 23:17

**d**
**d**  1:5 9:15 23:15
65:6 81:2
**damaged**  27:5 32:9
**dark**  68:15
**darker**  33:3
**darkness**  34:2
**data**  32:18 40:20,23
44:11,13,16,18,21
44:24 45:9,10 61:6
**date**  4:15,17 6:8
39:14 47:5,6 51:11
82:5
**dated**  4:20 5:12,16
5:23 23:18 39:12
81:17
**dates**  19:15 21:24
**dating**  8:7,23
**day**  57:4 67:7,11,13
67:17 69:25 70:11
79:22 80:22 82:23
**days**  64:20 65:24
67:12,14 78:17,21
**deal**  9:21 61:3

**dealing**  29:7 60:25
**deals**  7:19,20,22
**dean**  2:9 3:9,24
**decide**  36:24 46:23
**deciding**  47:19
**decision**  49:15
**declaration**  4:13,16
5:12,15,22 6:3,10
6:18,20,23,25 15:11
15:25,25 64:3 81:17
**declaration's**  71:14
**default**  69:3
**defendants**  1:10
2:13 9:22 23:20
24:13 50:14,20 51:4
51:13,16 52:13
67:18 68:4 70:7,14
70:15 71:22 73:25
**defense**  3:14 69:20
**define**  37:22
**defined**  8:18
**degradation**  32:10
**degree**  22:7
**degrees**  34:12
**delivery**  74:14,14
78:8,18
**delta**  13:8 57:13
**densitometry**  18:14
**depended**  47:15
**depends**  55:17
**deponent**  82:6
**depose**  77:21
**deposition**  1:19 3:14
3:18,20 4:8,10,11
40:5 64:18 75:7
76:10,16,20 80:12
80:13 82:5
**derived**  38:17
**describe**  8:13 12:10
14:2 23:13 31:21
35:10 37:14 48:7
67:22
**described**  13:16,23
14:5,19 16:8 17:25
18:2 19:7 31:23

39:25 50:4
**describes**  10:23
28:12 40:16
**describing**  48:10
**description**  81:15
**desire**  52:14
**desk**  55:12
**detailed**  76:9
**detect**  27:10 28:2,8
**detected**  27:19,21
62:3
**detecting**  27:16
**detection**  8:23
**deteriorate**  35:22
**deteriorated**  14:22
19:16 22:4 26:12
27:23,24 28:4,7,10
28:13 29:21 30:23
52:12
**deterioration**  22:8
25:11,14 26:2,23
27:5,13 29:5,16,24
31:12 32:11 34:20
35:5,12 68:9 73:16
73:20
**determination**  7:16
7:24 8:3,15,21
25:20
**determine**  22:5 27:3
27:7,21 39:6 45:11
51:9,10 52:3 57:17
60:5 72:17
**determined**  14:18
**determining**  11:10
11:13,23 19:19
72:22
**devices**  68:20
**differ**  38:18
**difference**  13:4
29:10 49:23
**different**  12:15 22:6
22:9,11 24:17 37:23
37:24 38:12,19,20
51:7,20 52:18 55:4
55:11 56:22 57:10

57:14 77:15
**differentiation**
33:21
**differing**  38:18
**directions**  81:8
**directly**  55:18
**disagree**  40:5 44:10
45:8
**disagrees**  45:12
**discolored**  28:20
68:13
**discuss**  3:20 50:19
64:25 66:3 69:13
**discussed**  78:6
**discussing**  50:21
**discussions**  50:24
**dispenser**  62:18
**displayed**  35:17
**dispute**  20:18
**dissolved**  38:2
**distinguish**  48:3
57:25 58:4
**district**  1:2,3
**document**  5:19 9:16
14:21 15:2,14 19:14
21:23 23:4,6,6
25:12,14 26:12,23
27:6,20,22,25 28:6
29:5 30:18 31:13
33:16 34:14 35:3,9
38:21 43:20 44:2
47:5,22 49:14,18
51:8,8,10,12,15
53:18,24,25 54:15
54:22 58:18,19 59:6
59:11,12,21,22
60:11,22,23 61:9,18
62:5,17,23 63:5
67:4,20,23,25 68:3
68:17 69:7 72:14
73:10,15
**documents**  4:24,25
14:12 21:25 25:16
47:16 50:22 51:7
52:8 61:11,12,13

62:10 73:21
**doing**   12:5 35:7 46:6
  46:16 50:19 53:13
  53:15 55:17 69:18
**double**   74:11
**dr**   3:8 5:4,10,18
  6:22 7:4 13:20
  20:14 21:11 23:3,13
  24:9 25:3 26:4
  33:25 41:11 51:21
  54:12 63:15 64:24
  67:13 74:11,15 78:4
  78:7
**drafted**   15:24
**drive**   74:24
**driven**   13:10,12
  57:9
**duke**   36:16 41:13
  42:11,14,19 65:2
  66:11,11
**duly**   3:3 80:13
**dunn**   1:20 2:12
**dye**   26:13,14,18
  28:24,25 29:3,17,22
  29:25 34:21
**dyes**   30:4,9
**dynamic**   8:9,11 9:3
  9:8,21

**e**

**e**   2:2,2 3:2,2 4:24
  5:8 58:6 74:24 78:3
  78:14,19 79:5 80:2
  80:2 81:2
**earlier**   16:8
**early**   50:23
**easily**   38:2
**effect**   26:23 53:18
  53:19 55:10 72:17
  73:19,23
**eight**   17:2,16
**either**   9:4 19:17
  28:5,20 38:4,11
  74:6

**eliminate**   28:7
**elliot**   1:8
**engaged**   51:5
**entries**   22:6 68:10
**envelope**   78:18
**equipment**   15:8
  42:12 73:20
**erich**   35:25
**errata**   82:2
**error**   46:9,15
**esq**   2:9,16,17
**essence**   8:20 72:17
**estimate**   57:20 71:8
**et**   57:10
**evaporate**   54:22,24
**evaporation**   56:12
  56:24
**event**   77:22
**eventually**   23:21
**evident**   29:17
**exactly**   40:9 77:9
**examination**   3:6
  9:16 14:12,20 45:16
  45:17,18 47:7 50:13
  58:18 67:11,18
  68:17 69:19,24
  71:23 73:17,20 81:4
**examinations**   71:20
  72:2,7 73:2
**examine**   22:14
**examined**   3:4 30:10
  39:2 50:22
**examining**   59:7
  61:11,11 67:15 69:6
**example**   40:13 64:9
**excessive**   54:10
**exchange**   75:14
**exhibit**   5:13,15
  15:10 23:11,15 26:5
  81:17,19
**exhibits**   5:16 6:17
  6:20,23 81:14,18
**exists**   30:6 62:7
**expanded**   35:8

**expect**   22:13 57:12
**expecting**   78:22
**experience**   61:10
  73:18,21,23
**experienced**   53:12
**experiment**   72:21
**experimentation**
  32:19 40:17 72:17
  73:11
**experimentations**
  31:2
**experiments**   31:4
**expert**   12:2
**experts**   9:22 11:8
  16:2 31:3 52:12
  67:18 69:14,16
  71:22,25 75:12,22
**expires**   82:25
**explain**   52:17
**exposure**   30:17 54:9
  72:22
**extent**   37:23 38:11
  39:11
**extents**   38:20
**extract**   12:19
**extractability**   9:4
  36:5 39:5,20
**extracted**   35:14
**extraction**   19:21
  37:16,21,22,23
  38:11,12,20,20 39:9
  39:10,11,12 40:18
**extremely**   18:8,12
  62:6

**f**

**f**   80:2
**facebook**   1:9 32:22
**fact**   13:5 15:10
  21:21 29:3 30:12
  52:11 54:7 73:2,18
**factors**   47:18
**fair**   10:11 24:8 47:9
  60:10,14 69:17

**fall**   57:15
**familiar**   4:18 11:11
  43:22
**far**   33:9 38:7,14
  61:3 70:15 71:2,9
  75:23
**fast**   56:2,8,11,14,23
  57:11,19,25
**fedex**   74:21
**fee**   74:10
**felt**   76:14
**field**   7:9 31:4
**figure**   30:22
**file**   23:21
**filed**   6:3,3,6,10 23:5
  23:24 24:6,15,22
**find**   27:11 30:9
**finding**   62:4
**fine**   6:18 21:14 79:7
**fingers**   78:13
**firm**   62:16
**first**   13:15 15:3,4
  26:5 27:9,9 32:22
  32:24 47:2,12 55:2
  67:21 71:3 74:15
**five**   6:19 70:3
**flatbed**   68:21
**focus**   49:12
**focusing**   10:9
**follows**   3:5
**forget**   15:21
**form**   4:3 12:6 15:15
  19:25 28:9 39:21
  41:22 46:11 48:24
  49:6 54:13 56:4
  59:25 67:6
**formulation**   55:22
**formulations**   7:21
  8:6 19:19 22:10
  73:9
**forth**   21:4 80:12
**found**   17:14 61:15
**four**   63:18 70:3
**frame**   78:21

**frankly**  44:20 63:20
  63:24 76:6
**freezing**  54:11,16,23
  55:5
**front**  4:17 5:4,9
  15:10 21:15 23:4
  33:12 68:8 69:9,12
**full**  26:5
**funds**  36:25
**furnished**  64:21
  81:12
**further**  19:6 74:4
  80:16

**g**

**g**  9:15
**gas**  12:23
**gc**  12:24 17:20 18:15
  27:17,18 36:10
  41:12 42:3 45:20
  48:18 65:2 66:10,22
  66:23,25,25
**general**  53:22
**generally**  55:19
  60:15
**generate**  9:19 56:15
**generated**  9:13
**generically**  10:15
**gerald**  7:12 10:4
  12:4 37:6 46:19
  52:17 55:24 64:13
**germany**  41:3
**getting**  20:4 35:6
  75:4
**gibson**  1:20 2:12
**give**  30:11 37:4
  40:13 56:21 74:18
  75:19 76:2 78:10
**given**  27:22 46:25
  47:24 52:11 66:19
  73:14 75:12,19 76:8
  76:12,23 77:13
  80:14
**gloves**  58:19,22,24
  58:25 59:6,11,21

62:17,22
**go**  20:14 24:25 63:4
  63:23 74:20,21
**going**  10:18 20:20
  20:25 21:4 31:19
  33:5,13 35:20 36:9
  43:11 46:24 47:15
  49:24 51:6,17 52:4
  52:15 55:9,11 57:20
  73:5 75:25 78:9
**good**  3:8 60:15
**grab**  20:14
**greater**  29:14
**group**  9:16,17,23,25
**groups**  9:14
**guess**  4:3 25:24
  26:17 33:10 41:16
  42:13 46:4 59:23
  60:16 69:12 71:12
  74:6
**guides**  9:20
**guys**  66:7 78:17

**h**

**h**  2:16 65:6
**hand**  23:3 25:4
  27:14 58:10 59:16
  59:19 61:8 80:22
**handle**  58:18 59:6
  61:13 62:22 63:4
**handled**  59:20 62:2
**handling**  58:17
  59:10 61:9,18 62:6
  62:16
**hands**  58:20 60:13
  60:18,21 61:17
  62:11,20,25 63:5,6
**hanging**  75:21
**hard**  24:2
**hardware**  66:17
**harsh**  54:2
**hear**  5:5 21:11,14
  63:15 67:8
**heard**  31:9 37:19
  56:10 58:5 79:4

**hearing**  24:3
**heat**  54:9,10 72:18
**heated**  17:4 29:11
  38:16
**heating**  13:7,10 57:9
**held**  1:19
**helpful**  4:4
**hereinbefore**  80:12
**hereunto**  80:21
**higher**  29:13 46:9
**hire**  15:2 19:13
  21:23,25 22:22
  25:12,14 34:14 35:3
  35:9 51:8 68:3
  72:14 73:15
**hired**  51:2,3 64:13
**hole**  17:13 34:11
  50:5
**hour**  70:18
**hours**  70:4
**household**  58:14
**huge**  62:18
**human**  46:9
**hundred**  46:2
**hygiene**  60:15
**hypothetical**  56:21
  62:14

**i**

**identical**  57:8
**identification**  5:17
  7:21,23 8:6,19
  23:12 25:17
**identify**  8:25 69:4
  73:8
**illustrated**  40:23
**image**  22:16,21
  33:23
**images**  22:23 45:14
  68:16 70:6 77:11
**imagine**  62:15
**impacted**  29:4
**important**  59:5
**improper**  33:24

**incident**  24:9,10
**include**  35:8 77:11
**included**  73:5,12,13
  77:4
**includes**  8:23 55:8
**including**  75:18
  77:5
**inconsistencies**
  51:10
**incorporated**  32:3,7
**incorrect**  76:5 77:3
**increase**  43:5,7
**increased**  17:13
**increasing**  43:16
**index**  58:6,8,12
**indicate**  31:19
**indicated**  29:3 35:5
**indicates**  6:10
**indicating**  16:2
**individual**  46:16
  66:24
**individually**  1:8
**individuals**  36:23
  62:3
**information**  6:9
  9:13,18 64:19 75:6
**infrared**  72:12
**initial**  14:20 15:21
  25:22,25 71:7
**initially**  28:12
**initials**  15:2 19:14
  32:24 34:3,16
**inject**  43:5
**injection**  17:22,23
  36:11,11,14,20,23
  37:4 41:20,25 42:9
  42:16 43:2,2 53:8
  65:12 66:14
**injections**  67:2
**ink**  7:16,19,21,23
  8:3,6,15,17,20,25
  9:5,8 10:3 11:10,23
  12:19 14:6,11,21
  19:12,19,21 22:4,10
  22:14 25:17 26:14

26:15,16,24 27:5
28:15 30:18 31:9,14
31:16,18,22 32:2,5
33:2,3 34:2,13
35:22 36:3 37:7,10
37:11,15 38:2 39:5
43:8 44:9 46:6,19
46:24 47:3,8,20
48:19 50:5 51:6
52:11,14,15 53:13
55:15,20,21,25 56:2
56:6,7,23,25 57:11
57:13,19,19,25 58:3
60:3 68:9,10,11
72:24 73:8 77:5
**inks**   7:4,13,18 9:21
11:2,14 32:4 33:21
47:9,17 56:14,22
57:4,6 72:13
**inquiry**   33:6,14
**inspect**   51:7
**inspection**   67:4
**instance**   77:5
**instances**   17:16
61:14
**instrument**   16:21
17:7 36:18 47:25
**instrumentation**
36:15
**insufficient**   47:23
**intending**   59:7
**intention**   20:16
**intentional**   25:13
**interested**   80:19
**interlineation**   15:3
19:14 21:22 33:4
34:4
**internal**   12:20,22
**inventory**   77:6,12
**invoice**   70:22
**invoices**   70:24
**involved**   51:24
52:13
**involvement**   50:24

**involves**   66:16
**involving**   40:17
**issue**   30:20 67:5
77:18 79:6
**issued**   64:13
**issues**   37:9
**items**   75:10

### j

**january**   7:5
**jerry**   49:8
**july**   14:13,17 15:9
15:23 16:13 19:24
20:3,22 21:16,20
25:20,22 34:21 35:3
62:15 67:3,13,16,21
69:14
**justifying**   15:12

### k

**k**   58:6
**keep**   5:14 20:25
32:8 70:19
**kept**   54:22
**kind**   12:11 39:19
44:21,24 47:8,16
54:5 61:19,23 73:23
**kinds**   41:24
**knew**   50:13
**know**   4:2,2 6:6 7:12
9:10,24 11:3 12:8,8
13:19,25 18:19
20:17 22:23,24
26:25 27:4,12 29:9
29:12,18 30:3,4,15
30:19,21,22 31:3,8
32:14,19 33:11
34:12,18 35:25 37:9
37:20,21 39:13,22
40:9,10,11 43:23
45:24 46:13 48:5,16
48:17,19,25 49:9
50:8 52:22,23,24
53:14,15 54:14 55:4
55:5,7,21,25 56:5
58:11,12,14 59:14

60:17,19 61:22
62:23 63:7,20,22
66:14 67:17 71:5,7
71:21,25 74:14
75:23 77:15
**knowing**   63:5
**knowledge**   31:18
33:22 55:3 56:7
**known**   38:8 39:12
39:16 51:21

### l

**l**   3:2,2
**labeled**   5:22 23:15
**lakewood**   2:8
**laporte**   7:12 10:4,8
10:21 11:4 12:5,9
37:6 40:4 43:19
46:19 48:9 49:9
52:18 53:13 55:24
56:5 64:13
**laporte's**   10:13,16
45:7,13 48:4,5
**large**   75:11
**larger**   43:9
**larry**   75:18 78:15
**lasted**   67:11
**laurie**   1:22 80:7,25
**law**   62:16
**lawyers**   24:21 51:16
64:14 70:7,15 71:16
73:25
**lay**   28:16
**layer**   18:12,23 19:4
21:21 22:14 29:2
35:2,17 45:19
**layers**   31:21
**lays**   32:3
**leave**   64:17
**left**   75:17,21
**legal**   2:4
**length**   68:12 73:22
**letter**   32:21 34:2
**levels**   30:17

**light**   30:17 72:18
**likelihood**   62:4
**limitations**   18:16
**limited**   62:6
**line**   14:21 28:13,18
33:6 52:11 68:11
82:7
**lines**   22:4 28:15
**liquid**   17:9,12 43:4
**list**   26:14 63:17 64:7
64:11,19 65:15,15
65:17 72:9
**listed**   22:2 27:15
51:5
**literature**   10:23
11:12 27:15 30:16
30:19,22 40:11,12
40:14 48:15 60:7
62:11
**little**   17:2 64:17
**llc**   2:4
**llp**   1:20 2:12
**located**   20:11
**log**   75:6
**logistical**   4:2
**long**   7:3,12 21:3,7
69:24
**longer**   9:18 28:14
**look**   9:4 26:4 30:13
32:21 33:20 60:3
**looking**   15:18 19:20
23:5 25:23 38:17
52:7
**looks**   15:19
**lot**   36:23 47:9
**lotion**   58:10
**lotions**   59:15,19
**lyter**   1:19 3:8 4:1
5:1,4,10,13,14,15,15
5:18,19 6:1,22,24
7:1,4 8:1 9:1 10:1
11:1 12:1 13:1 14:1
15:1,11,16 16:1
17:1 18:1,4 19:1
20:1,14 21:1,11

22:1 23:1,3,10,11
23:12,13,15 24:1,9
25:1,3 26:1,4 27:1
28:1 29:1 30:1 31:1
32:1 33:1,25 34:1
35:1 36:1 37:1 38:1
39:1 40:1 41:1,11
42:1 43:1 44:1 45:1
46:1 47:1 48:1 49:1
50:1 51:1,21 52:1
53:1 54:1,12 55:1
56:1 57:1 58:1 59:1
60:1 61:1 62:1 63:1
63:15 64:1,24 65:1
66:1 67:1,13 68:1
69:1 70:1 71:1 72:1
73:1 74:1,11,16
75:1 76:1 77:1 78:1
78:4,7 79:1,19
80:11 81:5,15,17,19
82:6,21
**lyter's** 74:15

**m**

**m** 58:6 65:6
**machine** 17:17,20
36:10 41:12,15,19
42:3,6,8,14,15 53:7
65:2,4,8 66:11,13
66:22
**mail** 4:24 5:8 78:3
78:14 79:5
**mailed** 78:19
**main** 67:24
**maintain** 64:7
**maintained** 69:2
**making** 67:2
**manner** 28:11
**manual** 17:22,23
36:10,14,20,22
41:20,25 42:9,16
43:2,2 53:8 65:11
66:13 67:2
**manufacture** 9:2

**manufacturer** 65:5
**march** 23:18 24:23
63:19 71:14,23
**mark** 1:8 5:12 57:2
**marked** 5:16,19
23:9,12
**markings** 81:7
**marriage** 80:18
**mass** 12:23
**materials** 55:9
75:11
**math** 7:6
**matrix** 31:10,15,17
31:22 32:5,7,9,12
32:13 55:8,10,15
**matter** 3:10 10:8
11:5 37:11 57:18
80:20
**matters** 37:9 42:22
**mean** 6:18 20:24
22:10 26:16 31:16
33:6,16 40:14 44:24
47:12 51:15,19
53:22 66:5
**meaning** 28:13
**meant** 10:18 43:25
**measurable** 43:18
61:15
**measure** 12:21 13:4
17:11 28:24 29:8,10
35:18,23,24 39:8
53:16
**measured** 10:25
35:15 37:25 43:18
**measurement** 9:5
10:6 11:5,12,22
30:14 37:23 38:5
39:20
**measurements**
12:11
**measures** 39:4
**measuring** 11:9,16
19:21 39:9 48:18
**mechanism** 9:12

**memory** 20:6
**mentioned** 47:19,21
**merck** 58:6,8,12
**met** 3:11
**method** 11:7,9 12:4
13:14,15,23 14:5
27:16 29:4 35:21
36:4,5 37:18,19
39:25 48:22 49:8
**methodologies**
25:18 37:24 38:5
**methodology** 11:3
11:21 15:7 16:21,24
40:18 46:14 47:24
48:2,3,6,8,10,13,20
49:3,10,13,14,17,20
49:23 50:10,11 54:8
**methods** 9:4,20
10:24 14:2 37:4
**microphone** 33:10
**microplugs** 17:2,5
43:10
**mind** 59:3
**minimum** 17:14
**minute** 41:5
**minutes** 21:5 63:12
**mischaracterizes**
40:8
**misunderstand**
16:17
**misunderstanding**
24:12
**model** 8:20 65:3,7
**monday** 74:14 78:8
78:18
**monthly** 70:24
**months** 38:23
**morning** 3:8 60:12
**motions** 81:9
**multiple** 12:14
52:12 57:12 67:12
**mutual** 75:14

**n**

**n** 2:2 74:24 81:2
**name** 3:8 8:14
**narasimhan** 2:17
**nature** 38:7
**near** 72:12
**necessary** 36:25
44:18,21
**need** 15:20 16:25
17:3,6,18 41:8
42:24 44:13 45:9,11
50:5,13 51:22,25
60:4 77:19,22
**needed** 15:13 50:8
50:15
**needs** 17:13
**neighborhood** 70:3
**neither** 44:10
**never** 42:19 49:5,7
61:21 62:3 65:24
**new** 1:3,21,21,23
2:15,15 20:8 65:19
80:3,5,9 82:3,3
**newer** 44:9
**normal** 34:7
**normally** 14:24
27:10 54:4 61:13
73:7
**north** 5:24 74:24
**notary** 1:23 3:4
79:25 80:8 82:25
**notations** 19:13
**note** 6:16
**noted** 79:16
**notes** 20:5,15,17,21
21:4,15 22:17 32:23
65:21 66:3 75:5,5
**number** 13:17 16:19
17:13,14 23:6 25:3
25:24 28:17,23 34:8
34:8 37:2 38:22
43:9 46:7 47:10
61:22 65:7

**numbers** 25:2

**o**

**o** 9:15 74:24
**object** 4:3 15:15
 28:9 33:5,13 39:21
 51:17
**objection** 10:14 12:6
 19:25 32:16 34:23
 40:7 41:22 46:11
 48:24 49:6 52:20
 53:9 54:13 56:4
 67:6,9
**observations** 25:25
**observed** 31:13
 69:11
**obtain** 26:10
**obtained** 76:16
**occur** 4:11 46:15
 55:11
**occurred** 73:14
**office** 64:9 70:11
 71:6
**offices** 1:20 62:16
**oh** 76:11 78:24
**ohio** 2:8
**okay** 3:13 4:12 6:12
 7:3 9:7 20:13,24
 25:6,9 27:18 28:3
 32:25 49:12 63:2,13
 64:17 65:19 74:5
 75:2,24 78:25
**old** 29:15 38:23 44:9
 57:20 58:2,3
**once** 49:21 50:22
 75:14
**ongoing** 20:18
**opinion** 9:11 29:7
 34:4 36:19 44:12
 46:18 53:21
**opposed** 28:21 37:6
 41:20,24 42:25
**opposite** 37:8 40:20
**optical** 72:20,23

**order** 17:11 39:8
 43:4 45:11 50:6
 60:5 73:12
**ordinarily** 32:12
**organizations** 36:24
**outcome** 80:19
**outset** 74:10
**outside** 30:21
**oven** 12:17
**overnight** 74:13
**overnighted** 78:7

**p**

**p** 2:2,2 13:8 32:21
 33:3 34:2 57:14
 74:24
**p.m.** 79:16
**p.o.** 74:17,21
**page** 15:3,4,18 16:3
 18:5 19:8 21:22,24
 22:16 24:25 25:2,3
 25:4,6,24 26:4,6
 32:22,24 34:18 67:4
 67:15,24 69:8 70:6
 72:10 74:16 81:4,15
 82:7
**pages** 6:20 22:22
 23:16 68:7,8,10
 69:13
**paid** 70:16 71:2
**paper** 32:3 48:9
 51:6 57:2,3 61:11
 61:25 68:7 72:18,23
**paragraph** 15:19
 18:4,5 25:10,13
 26:5,9 29:21
**parameter** 53:16
**parameters** 37:25
**park** 1:21 2:14
**part** 11:25 15:12,25
 32:5 42:20 46:7
 54:7 63:19 66:25
**particular** 8:10,20
 8:25 12:20 14:24
 21:17 22:6 26:16

39:14 46:14 47:8
 48:20 49:2 61:12
 64:14 72:19 73:8
**parties** 80:17
**parts** 34:13
**paul** 1:5 3:9
**pause** 22:20
**payment** 70:21
 78:16
**pc** 32:24 34:3,16
**pdf** 77:4,10
**pe** 10:11,19,25 11:6
 11:9,12,17 12:5,11
 13:5 14:19 16:7,11
 16:16,20,24 17:12
 17:15,24 26:17,24
 27:4,11,16,19,24
 28:8 29:8,12,18
 30:3,6,13,15,17,18
 30:23 32:5,11 41:21
 43:21 45:3,22 46:19
 46:24 47:10,11,12
 47:24 48:10,18
 49:15,19,21 50:9,19
 51:14,22 52:5,19
 53:6,17,20,24 54:3
 54:8,11,17,17,21,23
 55:3,6,12,14,18,20
 56:2,12,15,24 57:5
 57:9,21 58:9,12,15
 59:7,12,20,21 60:18
 60:21,23 61:8,15,17
 61:18,22 62:3,5,10
 62:21 63:6
**peer** 48:23 49:10
**pen** 28:16 32:4
 72:24
**pens** 56:25
**people** 61:13 62:10
**percent** 46:7
**percentage** 13:9,12
**perfectly** 30:13
**perform** 8:3,8,13,17
 16:7,11 17:24 18:21
 35:11 43:21 50:9

**performed** 10:4
 12:12 21:20 28:24
 31:2 34:25 37:12
 42:9 72:2
**performing** 32:18
**performs** 39:19
**period** 12:18 14:15
 51:11
**periodically** 70:21
**permission** 42:14
**permitted** 52:4
 66:11
**person** 39:19 60:21
 61:9
**personal** 56:7 61:10
**personally** 59:15
**ph.d.** 7:9
**phenoxyethanol**
 10:7,24 11:22 12:22
 13:2,3,10 15:7
**photodegradation**
 30:5,7,24 31:20
**phrase** 18:7 29:21
**physical** 66:16
**piece** 57:2,3 66:17
**place** 14:13
**placed** 55:16
**places** 24:18
**placing** 12:17
**plainly** 76:2
**plaintiff** 1:6 2:5 3:9
**plaintiffs** 52:13
**planning** 78:23
**please** 5:13 20:15
 25:2 35:10 64:20
**plugs** 43:25 46:7,10
 50:9,15,16 51:25
 52:4
**plural** 67:14
**point** 8:12 15:5,9
 16:19 35:4 40:6
 41:4 42:13 43:17
 49:7 51:19 54:11,17
 54:24 55:5,6 62:12
 63:9 76:24

pointed  76:4
pointing  15:23 61:6
points  46:14 49:13
  49:15
portion  58:22,23,24
portions  24:14
position  9:19 26:22
  29:23 54:21
possibilities  61:2
possibility  20:3
  60:20
possible  18:14 22:5
  32:15,17 59:10,23
  60:24
potential  46:9
precise  18:9,12
precisely  7:10
preparation  4:7,10
  47:6,6 51:11
prepared  5:24 38:8
  38:9
preparing  3:18
present  9:17 13:3
  28:25 29:10,13,13
  54:3,4 67:3,14
  69:14,16,18 73:9
presenting  60:5
presumably  55:20
pretty  60:15
previous  37:7 42:22
previously  16:8 50:4
  65:16 78:6,12
printed  5:8 6:9
printing  68:15
prior  11:19 12:2,12
  40:5 64:3,6
privileged  51:18
probabilities  61:2,3
probable  61:4,7
probably  4:13 46:3
  51:20 58:4 62:24
  78:16
problem  59:16
problematic  59:14
  60:2

problems  60:6
procedure  39:3,4
process  13:7,11 62:6
produced  45:22
products  58:15
professional  1:22
  80:8
properly  17:18
propose  59:24
proposition  28:6
provide  17:14 38:18
  43:12 63:17 64:19
  64:24 65:23 66:6,7
  70:5 73:24 76:13
  78:5
provided  4:12 5:3
  6:24 40:20 77:4,7,9
  78:7
provides  13:8
providing  9:18
  63:19
public  1:23 3:4
  79:25 80:8 82:25
publicly  23:24 24:15
published  13:25
  31:5,8 40:25 48:14
  62:8
punches  17:13
  34:11 50:5
purchased  42:6,6
purported  47:5
  56:19
purposes  19:18
  41:21
put  24:18 27:22
  33:19 72:25 74:7,13
  78:17
puts  54:16

**q**

quantify  13:3 17:15
  27:11
quantifying  27:16
quantitative  9:5

quantitatively  35:19
  35:23
quantity  17:10,12
  27:19,21 29:12
question  15:22 16:9
  21:11 27:9,18 46:16
  56:20 59:24 64:20
questioned  25:16
  38:7,13 39:2,15
questioning  15:5
questions  27:8
  41:11 74:4,6 76:18

**r**

r  2:2 3:2,2 58:6 80:2
raised  20:19 74:9
raleigh  5:24 74:24
ran  57:5
rate  37:16,21,22
  38:11 39:11 54:22
  54:24 70:17
rates  38:19
reach  34:19
reached  40:19,21
  52:18 72:3
reacted  28:25
read  20:21 44:5,7,17
  58:11
reality  76:8
realize  57:24
really  73:5
realm  61:2
reason  46:21 82:7
recall  4:14,15,16
  10:7 13:18 14:16
  20:2,4 37:10 40:24
  41:3 44:17 48:9
  50:17,21 61:14
  69:15,23 70:8
receive  70:21,23
receiving  9:13
recess  21:10 41:10
  63:14
recognize  5:18,21

recollection  20:21
  34:15 64:5
record  6:16 23:14
  23:23 24:5 33:18
  68:22 74:7 77:7,23
  78:5 80:14
recording  68:25
records  71:6
redacted  23:11,23
  24:5,14,17,20,21
  81:19
refer  10:13,19
references  49:3
referred  68:2,5
referring  3:25 10:15
  10:16 18:7,10 28:11
  45:2 50:3
reflected  72:4,7
refresh  20:6,21
regard  56:16 59:17
regarding  11:5,12
  16:24 36:4 37:7
  47:5 50:24 56:8
  58:12 60:2 62:10
  72:10 73:14 75:21
regards  73:16
region  72:12
registered  1:22 80:7
relate  7:18 8:11,17
  38:2
related  11:2 13:9,13
  71:4 80:17
relates  8:5,19 13:11
  48:20 56:12 59:12
relative  11:13 19:20
  25:17 35:11,13 36:6
  37:15 38:4,24 39:7
  39:16 40:17 47:7
  73:19
released  32:11
reliability  53:3
reliable  30:13 37:5
  40:2
reliably  43:4,18

remember 36:12
41:2 45:24 50:18,25
52:2 58:21 59:2
63:21,24 64:2 67:19
70:2
removing 66:16
rent 36:16 41:16
repertoire 47:14
report 19:8 22:3
23:3,11,17,19 24:12
24:16,19,22,25
31:14 34:18 44:5,6
44:7,14,15,18,22
45:7,13,22 47:21
51:5 63:19 64:13
71:14,17 72:4,8,9
72:15 73:3 74:16
81:19
reported 31:13
72:15
reporter 1:23 5:11
23:2 41:6 80:8
reporter's 10:10
reporting 82:2
represent 3:9 6:8
represented 77:6
representing 78:4
requesting 77:25
requests 81:10
require 16:3,23
required 37:3 73:22
requires 17:9 43:3,9
research 32:18
resin 31:17
resins 31:18,23,24
32:8 55:9
resolve 75:15
resolved 77:19,20
respect 20:17
responded 41:12
75:17,25 76:21
response 5:3 76:3,7
responses 75:20,22
rest 24:21 34:3

restriction 49:22
50:2
restrictions 52:25
restroom 41:7 60:12
result 30:24 35:11
54:18
results 19:3,5,7,9,11
19:16,23 22:2,12
26:3,6,11 29:2
30:12 31:5,7 35:7
37:5 38:19 40:21
43:13 44:6,8 45:16
45:17,18,19,20
53:20,24 56:15 57:8
72:14 73:6,12
retain 70:10
retained 37:8 47:12
retainer 70:19,23
71:7
review 44:15,22
45:9,11 64:18 77:25
reviewed 21:17
44:11 48:23 49:10
64:11
reviewing 15:16
revolved 37:10
right 4:22 6:13 7:2
8:12 25:4 26:19
33:12 41:9,13,17,21
42:17 55:16 64:23
65:12 66:2 75:8
78:9,13 79:4
ring 4:19
rja 1:7
road 2:6
room 20:12 54:25
69:18
round 18:17
rpr 80:25
rq 65:21
rulings 24:13 81:11
run 17:18 27:6 41:7
61:16
running 12:25

s

s 2:2 9:15 65:6 74:24
82:7
sample 14:9,23 15:6
16:10 19:15 29:11
30:3 38:2,16 43:6
47:23 49:22 50:2
52:5,10,25
sampler 17:8,9,21
36:25 37:3 41:24
42:2,18,25 43:3
samples 7:20 8:17
11:23 12:14,15,16
13:4,6 14:18 15:13
15:20 16:2,6,14,15
16:20,23,25 17:3,4
17:10,18,25 18:18
18:19,20,22 19:3,12
19:16 20:4 35:2,6
37:2 38:12,15,18
42:24 43:8,12,20,24
48:19 50:15 51:15
51:22,24 52:14 53:7
54:9 55:20 56:17,18
57:13 61:25 68:10
72:19
sampling 34:11 35:3
36:17,21 41:20 65:9
satisfactory 26:11
saw 35:4 63:3 67:21
saying 4:2 5:3 15:19
28:5 29:20 33:9
40:10 77:15,16
says 16:3 18:8 23:16
25:13,24 49:8 58:13
62:4,20
scan 69:9
scanner 68:21,23
scans 33:17 68:24
69:5
schmidazu 65:5,6
scientific 9:16 48:14
scientifically 40:2

screen 33:19
second 15:17 18:17
36:9
secondly 47:4
sections 24:20
see 18:5 22:14 25:10
26:7 35:15 44:16
45:14,15 49:2
seeing 32:18 61:18
73:16
seemingly 75:11
seen 30:16 48:6,7,13
49:5 65:25
semivolatile 9:6
26:21 29:7
send 70:24 78:14,23
79:11
sending 78:24 79:7
sensitive 18:8,12
sent 5:2,7 6:16
sentence 26:10
series 77:11
service 74:14
set 13:5,7 17:7 36:17
36:18 41:19,23 65:9
80:12,22
setting 66:15
settings 65:10,11
66:12,18 68:22 69:2
69:3
seven 64:20 65:24
sheet 82:2
shortly 14:15 78:14
shown 29:19
shows 58:9
side 57:3 68:11,12
69:9,10
side's 64:14
sides 37:8
sign 62:18 63:3
signature 5:23 25:7
signatures 19:15
21:23
significant 73:7

silt   31:6
similar   4:9 13:24
  14:2 19:23 22:6,9
  22:11
simply   17:22 52:15
  73:23
sir   42:7 51:2
sit   49:4
sitting   55:12,15
situation   24:10 76:9
size   49:22 50:2
  52:25
skewed   30:11
slightly   28:7
slow   56:2,9,11,14,24
  57:11,19 58:3
smaller   14:25 34:6
soap   60:14,17,21
  61:8,17,22 62:18,21
  63:2,4,6
software   66:18,19
  69:3
solution   35:15 38:3
solvent   12:20 26:19
  26:20
somebody   49:7
  59:18
someone's   46:6
somewhat   14:23
  68:8
sorry   63:23
sort   10:20 31:21
  41:16 50:9
sought   16:7
sound   4:18 6:13
southwell   2:16 3:24
  5:2,7 6:15,25 10:14
  12:6 15:15 19:25
  20:16,24 21:7 23:22
  24:4 28:9 32:16
  33:5,11 34:23 39:21
  40:7 41:9,22 44:25
  46:11 48:24 49:6
  51:17 52:20 53:9
  54:13 56:4 63:13

64:23 66:2 67:6,10
  74:5 75:8,24 77:2
  78:11,19 79:2,8,13
speaking   55:19
specific   4:6 45:2
  46:13 61:21 68:25
  78:21
specifically   10:8
  11:3 13:18 14:16
  34:15 45:3 46:13
  48:7 70:2,9
specifications   51:8
  73:10
specifics   43:22
specify   67:7,11
speckin   35:25 39:18
spectrometer   12:23
speculation   12:7
  32:20 52:21
speculative   60:4
spend   36:24
spoken   71:24
spray   58:9 59:19
square   76:7
sripriya   2:17
ss   80:4
stamped   23:7 25:5
standard   7:16 8:2,5
  8:10,19 9:7,8,20,20
  12:21,22 55:18
standards   7:17 9:13
  12:25
standpoint   30:8
start   13:15 15:19
started   13:18 67:18
  69:6 71:3
starts   26:6
state   1:23 80:3,9
statement   37:13
  39:17,23,24 40:6
states   1:2
step   48:8,8
stewart   75:16,18
  77:3,10,21

stewart's   75:10
  78:16
storage   53:18,19,23
  54:5
stored   53:25 54:15
street   74:18,21
structure   30:5
studies   61:6
stuff   40:11 59:15
  76:19
subject   20:18
submitted   15:11
  23:20 24:12 64:3,6
  71:13,17
subscribed   79:21
  82:22
substantive   3:25
sufficient   15:6 16:10
  16:15,19 29:24 37:2
  51:14 66:19
suggest   51:13
summarize   8:14
  10:21 19:10
sunlight   72:22
support   44:18
supposed   4:11 27:12
  47:6
sure   21:13 33:15,23
  34:9 66:19
surprising   30:9
surrounding   47:4
susceptible   30:4,6
  31:20
suspicion   25:22
swgdoc   9:15
switched   42:16
sworn   3:3 79:21
  80:13 82:22
synergistic   55:10

**t**

t   3:2,2 74:24 80:2,2
tags   8:24
take   12:11 20:13
  21:5,8 41:5 52:14

56:25 63:10,11 69:6
  69:25 76:3 77:22
taken   15:13 16:14
  19:12 21:10 34:9,10
  34:11 41:10 42:18
  45:15 63:14
talk   26:11 28:3
  31:24 36:9 75:4,9
talked   25:11 36:21
  50:23 62:9
talking   10:6,12
  17:17 19:9 29:16
  31:25 32:4 34:17
  36:6,12 56:17,18
  65:22 67:23
technical   43:25
technique   35:13
  38:10 40:22
technology   21:12
telephone   2:10
tell   7:15 21:19 34:5
  50:14 51:23 52:7
  64:12 65:3
telling   51:23
temperature   54:16
  54:23,25
temperatures   55:4
ten   41:5
tend   61:3
term   31:9 43:25
terminology   56:10
test   8:8,9,11 10:11
  10:13,16,19,21
  11:16,19 12:12,13
  14:5 17:19,24 18:9
  19:4 27:3,6,10,14
  43:21 46:8,9,17
  53:4 55:14,14,15,17
  56:15 60:13 61:20
  61:21
tested   27:2 60:4
  61:25
testified   3:5 63:18
  64:8 65:16 77:3

**testimony** 80:14
**testing** 8:12,15 9:8
  10:4 11:7 12:5
  14:10,14,19 16:7,11
  16:16,20,24 18:9,21
  19:2,6,24 20:2,22
  21:16,18 28:23
  29:18,19 34:22 35:7
  41:21 42:20,20
  43:20 45:22 46:6,8
  46:20,24 47:12,14
  47:20,24 49:16,19
  49:21,25 50:9,19
  51:14,23,25 52:5,19
  53:6,15,17,20,24
  54:8,17 55:19 56:16
  57:21 59:7 60:2,11
  61:16 72:16 73:6,7
  73:13
**tests** 8:16 15:7 18:11
  21:19 57:5
**thin** 18:12,23 19:4
  21:21 22:14 29:2
  35:2,17 45:19
**thing** 25:4 31:22
  58:5 77:24
**things** 24:18 74:7
  76:2,14 77:16
**think** 9:14 10:16
  33:24 36:11 48:6
  53:5 54:19 58:21
  59:5 60:19 63:7,10
  70:2,12 76:12,22,24
  77:18 78:20
**thought** 16:13
**thoughts** 42:20
**three** 4:25 5:3
**threshold** 57:16
**thwarted** 25:15
**time** 9:17 12:18
  14:15 15:24 24:3
  35:4 36:16 41:16
  42:8 51:11 58:22
  60:10 66:20 70:17
  71:3 73:22 78:21

79:16
**times** 46:2
**tlc** 18:13 19:9,17
  25:16 26:7,11
**today** 3:15 31:6 49:4
  65:17,23 74:13
  78:18,22,25 79:10
  79:10,14
**told** 62:17 74:2 79:2
**toner** 68:15
**top** 6:9,9 23:7 32:3
  55:12
**topic** 36:12
**touch** 60:22
**touching** 62:10
**track** 5:14
**transcript** 76:10
  78:2 81:7
**transfer** 59:21 60:23
**transferred** 59:25
  61:8
**trapped** 32:12
**treated** 38:15
**true** 11:15 16:18,18
  42:7,16 55:22 80:14
**try** 35:18,22 39:6
**two** 4:24 7:17 12:15
  12:16 17:3,3 22:16
  22:22 27:8 28:17,23
  29:14 34:8 38:12,18
  39:10 43:20,25 44:9
  47:18 49:13 51:7
  56:22 57:5,14 58:2
  67:4,15,24 68:7
  69:13 70:6
**type** 8:2,14 10:3,21
  11:16 12:5 53:17,19
  61:16 68:20 70:13
  71:16
**types** 47:13

**u**

**u** 65:6
**ultraviolet** 72:11,18
  73:17

**unable** 26:10
**uncharacteristic**
  22:13
**understand** 10:12
  24:16 56:20
**understanding** 28:5
  44:23 51:3
**unheated** 17:3
**unique** 8:24
**unit** 2:7
**united** 1:2
**university** 36:16
  41:13 42:11,14 65:3
**unreliably** 35:16
**upper** 25:3
**use** 11:21 12:4,14
  14:4,8 16:21,24
  17:20 27:18 28:10
  29:20 33:17 35:23
  36:4,5,14,15,17,19
  38:4,11 39:3,4,25
  41:13 43:12 46:24
  47:24 48:2 50:12
  59:15,18 62:19,20
  62:22 65:2 66:13
**uses** 12:9 13:22 36:3
  48:11,21 49:9,10
**uv** 30:17 32:10

**v**

**v** 82:5
**valery** 13:19,20
**validated** 73:23
**value** 57:14,16
**variety** 8:16 10:24
  62:2
**various** 9:5,14 13:2
  34:13 38:6
**varying** 34:12
**verify** 44:23
**veritext** 82:2
**version** 23:23 24:6
**versus** 30:12 58:2
**viability** 60:5

**videographer** 69:22
**visible** 72:12
**visual** 45:17
**volatile** 9:6
**volume** 17:9 43:4,6
  43:17
**vs** 1:7
**vsc** 45:18 72:10,11
  73:4

**w**

**w** 9:15
**waiting** 20:3 76:6
  79:8
**walk** 21:3,8
**want** 6:19 20:24
  33:17 66:6,8 67:7
  67:10 74:6
**wanted** 24:4 42:9
  74:6 77:24
**warren** 2:6
**wash** 62:20,25
**washed** 60:13,17
  63:6
**washes** 60:21
**washing** 61:17
**water** 62:25
**way** 7:22 10:20
  11:13,23 26:12
  29:21 30:15,21,22
  33:13 36:18 38:16
  41:16 48:25 51:20
  56:6 57:2 62:21
  75:7 78:16 80:19
**we've** 10:25 24:9
  65:22,24 76:12,21
**wear** 58:25
**wearing** 58:19
**week** 4:10
**went** 50:12 57:5
  60:11 62:22 63:3
  76:19
**western** 1:3
**whereof** 80:21

**wish**   71:11
**withheld**   75:10
**withhold**   66:8
**withholding**   66:4
**witness**   3:3 12:2
  23:8 45:6 74:17,23
  80:11,15,21 81:4
**witnesses**   24:11
**woke**   60:12
**word**   24:17 28:3,10
**words**   26:6 32:7
  34:7 37:24 38:19
  39:8,13
**work**   11:8,25 15:2
  19:13 21:23,24
  22:22 25:11,14
  34:14 35:3,9 40:22
  51:7 68:3 70:15
  71:2,15,16 72:13
  73:15
**working**   9:14 71:3
**world**   39:19
**write**   74:12
**writing**   7:4,13,18,19
  7:21 9:21 11:2,14
  11:23,24 12:16
  13:13 14:25 17:5
  29:14 34:13 35:9
  38:13,13,21 39:2,9
  39:13,13,15 43:10
  48:7 50:7 52:8,9
  57:17 58:2 68:12
**writings**   38:6 57:14
  72:24
**written**   18:8 19:13
  28:13 48:17
**wrong**   16:13 36:22
**wrote**   48:10

### x

**x**   81:2

### y

**y**   3:2
**yeah**   4:5 52:24 66:5
  74:17 75:8 78:11

**year**   4:14 8:25 57:4
  58:3
**years**   7:6 13:17
  29:14 38:23 44:9
  53:15 58:2 63:18
**yellow**   28:21 68:13
  69:11
**yellowed**   68:8
**yellowing**   69:12
**yesterday**   3:19,21
  4:7 78:20 79:3,5
**york**   1:3,21,21,24
  2:15,15 20:9 65:19
  80:3,5,9 82:3,3

### z

**z**   65:6
**zip**   74:25
**zuckerberg**   1:8 82:5