1

2   UNITED STATES DISTRICT COURT

3   WESTERN DISTRICT OF NEW YORK

4   No. 1:10-cv-00569-RJA

5   ------------------------------x

    PAUL D. CEGLIA,

6

                    Plaintiff,

7

            vs.

8

    MARK ELLIOT ZUCKERBERG,

9   Individually, and

    FACEBOOK, INC.,

10

                    Defendants.

11  ------------------------------x

12

13

14                  August 13, 2012

15                  10:03 a.m.

16

17          Videotaped deposition of JOHN PAUL

18      OSBORN, held at the offices of Gibson, Dunn

19      & Crutcher LLP, 200 Park Avenue, New York,

20      New York, pursuant to notice, before Cary

21      N. Bigelow, Court Reporter, a Notary Public

22      of the State of New York.

23

24

25

1

2    A P P E A R A N C E S :

3

4       BOLAND LEGAL, LLC

5       Attorneys for Plaintiff

6            1475 Warren Road

7            Unit 770724

8            Lakewood, Ohio 44107

9    BY:   DEAN BOLAND, ESQ.

10           (Via telephone)

11             -AND-

12      PAUL A. ARGENTIERI, ESQ.

13           188 Main Street

14           Hornell, New York  14843

15

16      GIBSON, DUNN & CRUTCHER LLP

17      Attorneys for Defendants

18           200 Park Avenue

19           New York, New York 10166-0193

20   BY:   ALEXANDER H. SOUTHWELL, ESQ.

21           AMANDA AYCOCK, ESQ.

22

23

24   ALSO PRESENT:

25      DANIEL McCLUTCHY, Videographer

Page 3

1

2            THE VIDEOGRAPHER:  Good morning.  We

3      are now on the record.  My name is Daniel

4      McClutchy representing Veritext New York.

5            Please note that the microphones are

6      sensitive and may pick up whispering and

7      private conversations.  Please turn off all

8      cell phones or place them away from the mics

9      as they can interfere with the deposition

10     audio.  Recording will continue until all

11     parties agree to go off the record.

12           The date today is August 13, 2012, and

13     the time is approximately 10:03 a.m.

14           This deposition is being held at

15     Gibson, Dunn, & Crutcher, located at 200

16     Park Avenue in New York, New York.

17           The caption of the case is Paul Ceglia

18     versus Mark Zuckerberg and Facebook Inc.

19     This case is filed in the United States

20     District Court, Western District of New

21     York, civil action number 1:10-cv-00569-RJA,

22     and the name of the witness is John Paul

23     Osborn.

24           At this time the attorneys present in

25     the room and by phone will identify

1

2      themselves and the parties they represent

3      and our court reporter, Cary Bigelow,

4      representing Veritext, will swear in the

5      witness and we can proceed.

6          MR. ARGENTIERI:  Paul Argentieri for

7      plaintiff, Paul Ceglia.

8          MR. BOLAND:  (Via telephone) Dean

9      Boland for plaintiff, Paul Ceglia.

10          MS. AYCOCK:  Amanda Aycock for

11      defendants Facebook and Mark Zuckerberg.

12          MR. SOUTHWELL:  Alexander Southwell for

13      the defendants.

14  J O H N    P A U L    O S B O R N,  called as a

15      witness, having been duly sworn by a Notary

16      Public, was examined and testified as

17      follows:

18  EXAMINATION BY

19  MS. AYCOCK:

20      Q.    Mr. Osborn, you've been deposed before;

21  right?

22      A.    Yes.

23      Q.    So having been deposed before, you

24  understand that in the deposition I'll ask

25  questions to which you should provide a full and

```
 1                    J.P. Osborn
 2   complete answer to; right?
 3       A.    Yes.
 4       Q.    Now, on occasion I may ask a question
 5   that I don't state very well or for some other
 6   reason you don't understand.
 7             If you don't understand my question,
 8   don't answer it and let me know.  It's my job to
 9   ask understandable questions, so if you don't
10   understand, I'll try to ask a better question.
11             Make sense?
12       A.    Understood.
13       Q.    And if you need a break at any time
14   please tell me, we will finish your answer if we
15   are in the middle of it and then we'll see what
16   we can do about taking a break.
17             Sound good?
18       A.    Yes.
19       Q.    Is there any reason today that you can
20   think of why you will not be able to answer my
21   questions fully and accurately?
22       A.    No.
23       Q.    Now, the judge presiding over this case
24   has some particular rules I need to tell you
25   about.
```

1                         J.P. Osborn

2              If you need clarification, a

3    definition, an explanation of any words,

4    questions or documents throughout the deposition,

5    you are to ask me as deposing counsel rather than

6    your own counsel.

7              Do you understand?

8         A.    Yes.

9         Q.    And you and plaintiff's counsel may not

10   engage in private conversation during the

11   deposition or any breaks of the deposition except

12   to determine whether to assert a privilege.

13             Does that make sense?

14        A.    Yes.

15        Q.    And the other thing I'd like to mention

16   at the outset is that we shouldn't talk over each

17   other for the court reporter Cary's sake, let's

18   try to let each other finish before we start

19   talking.

20        A.    Understood.

21        Q.    And also for Cary's sake answer

22   questions verbally with a clear yes or no rather

23   than nodding or shaking your head or saying

24   uh-huh.

25        A.    Understood.

Page 7

1                          J.P. Osborn

2      Q.      Great.

3              Now, I know it's been a long time since

4  you've worked on this case, so as an initial

5  matter I just want to go over your involvement

6  very generally.

7              You were approached at some point about

8  being retained and or ultimately retained by

9  plaintiff, Paul Ceglia; is that right?

10     A.      That's right.

11     Q.      At some point in January 2011 you were

12 provided with some documents in your office and

13 you conducted a document examination; right?

14     A.      Also correct.

15     Q.      And the only exams you performed were

16 visual and other nondestructive examinations,

17 like microscopic, UV and infrared examinations;

18 right?

19     A.      That's correct.

20     Q.      You didn't take any physical samples of

21 the document; right?

22     A.      I did not.

23     Q.      Or do any other kind of chemical

24 testing?

25     A.      There was nothing that I did that would

```
 1                    J.P. Osborn
 2  be considered in my field destructive to the
 3  document or that would have permanently changed
 4  the document.
 5      Q.    In June of 2011 you provided a
 6  declaration describing some of the work you had
 7  done in your preliminary analysis; right?
 8      A.    Yes.
 9      Q.    And then you provided us with some of
10  your images and responses to interrogatories in
11  the late fall of 2011, around November and
12  December; right?
13      A.    Also correct.
14      Q.    Now, did you perform any additional
15  work or additional exams other than the January
16  2011 inspection?
17      A.    No, other than to, on occasion, review
18  the file or review the images that I already had
19  collected.
20      Q.    I see.
21            But you didn't actually examine the
22  questioned documents again?
23      A.    Correct.
24      Q.    And other than what is in your June
25  2011 declaration you haven't offered any other
```

Page 9

```
 1                          J.P. Osborn
 2    opinions or findings to the Court; right?
 3        A.    That is correct.
 4        Q.    And now all that you included in your
 5    June 2011 declaration were findings related to
 6    your indentation analysis?
 7        A.    No, that's not correct.
 8        Q.    What other findings did you offer?
 9        A.    There were two findings that I noted in
10    the declaration and both specific to requests to
11    make examinations by plaintiff's counsel.  The
12    first was to determine that the writing,
13    handwriting that appeared on the Work For Hire
14    agreement which was the subject of my
15    examinations or the primary subject of my
16    examinations, contained original writing ink on
17    paper, and then the second was to report
18    conclusions with respect to the indentations, so
19    it was a determination that we were dealing with
20    not copies of writing but original writing and
21    then the indentations.
22        Q.    Right.
23              So indentation analysis and the
24    determination that it was ink writing on paper;
25    correct?
```

```
 1                    J.P. Osborn
 2      A.    Correct.
 3      Q.    So other than those two opinions have
 4   you offered any other opinions or findings to
 5   your client?
 6      A.    No.
 7      Q.    Did there come a time that you were no
 8   longer engaged as an expert in this case?
 9      A.    Not that I'm aware of.
10      Q.    So do you consider yourself to still be
11   actively involved as an expert for plaintiff?
12           MR. ARGENTIERI:  Objection.
13           You can answer.
14      A.    Yes.
15      Q.    Mr. Osborn, when was it that you were
16   first contacted for potential involvement in this
17   case?
18      A.    To the best of my recollection it was
19   sometime during December of 2010.
20      Q.    And do you remember who contacted you
21   at that time?
22      A.    I believe it was Mr. Argentieri.
23      Q.    And was it via phone call, an e-mail --
24      A.    To my best recollection, by phone call.
25      Q.    And you said it was in December.
```

1                          J.P. Osborn

2              Do you have any idea of exactly when

3      that phone call took place?

4          A.    I don't.

5          Q.    At that time what did you understand

6      about what the case was about?

7          A.    I don't recall the specifics of the

8      initial inquiry and the conversation that

9      occurred, so at that point in time I can't say,

10     it wasn't really until I performed examinations

11     in my office when the document was brought to me

12     that I fully understood what it was that I was

13     being asked to examine.

14         Q.    Okay.

15              In that initial call in December 2010

16     was there a thought that you would examine

17     documents?

18         A.    Yes.

19              And I believe that there were some

20     specific arrangements made for the January

21     appointment when the documents were actually

22     brought to me.

23         Q.    In that first call or were there

24     multiple calls?

25         A.    I don't recall, I can't answer that

```
 1                      J.P. Osborn
 2   accurately.
 3       Q.    Were these calls also informational?
 4       A.    To the degree -- as far as I can
 5   recollect, to the degree that I was aware that
 6   there was an issue with respect to the document
 7   that plaintiff's counsel, meaning Mr. Argentieri,
 8   wanted me to conduct examinations of it, that I
 9   would have to examine the original and that there
10   would be issues or there might be issues that
11   would require laboratory equipment that I don't
12   transport so that those examinations would have
13   to take place in my office.
14       Q.    I see.
15             And did you have an understanding at
16   that time, in December of 2010, the nature of the
17   documents that you were to examine?
18       A.    Yes.
19       Q.    Did you understand that there was more
20   than one document?
21             MR. ARGENTIERI:  Objection.
22             You can answer.
23       A.    I believe that the thrust of our
24   conversation had to do with one document,
25   although I believe I also would have, as a matter
```

1                          J.P. Osborn
2     of course, requested any additional documents
3     wherein no genuine signatures appeared in the
4     event that an issue with respect to determination
5     of genuineness or nongenuineness would be
6     requested.
7          Q.    I see.
8                And what was your understanding of what
9     the document you would be examining was?
10         A.    An employment contract called a Work
11    For Hire agreement.
12         Q.    I see.
13               And did you have any understanding of
14    how that document had been stored?
15         A.    No.
16         Q.    Did you have any understanding of the
17    circumstances surrounding the execution of that
18    document?
19         A.    No.
20         Q.    And did you at that time in December of
21    2010, did you mention the types of tests that you
22    might conduct?
23         A.    I believe I would have and the reason
24    why I believe that is that the examinations that
25    I determined I would like to make included

```
 1                      J.P. Osborn
 2   examinations, as I said, involving instruments
 3   that I don't transport and therefore I would have
 4   advised that electrostatic detection apparatus
 5   tests be conducted and that would indicate that
 6   there were indentations involved or potential
 7   indentations involved.
 8        Q.    I see.
 9              And so you don't have a portable ESDA,
10   you have one that you use at the office?
11        A.    Well, any ESDA can be moved from one
12   place to another.  It is my protocol never to
13   remove it from my office.
14        Q.    I see.
15              Did the possibility of dating documents
16   or aging documents come up?
17        A.    Yes.  I don't recall whether or not it
18   was brought up during the initial conversations,
19   but there was a discussion when the document was
20   brought to me wherein I had advised that if that
21   might be an issue or something that plaintiff's
22   counsel would like to consider, that I could
23   recommend a forensic ink chemist, which I did,
24   that would be able to perform the kind of
25   analysis that they were interested in or attempt
```

```
 1                    J.P. Osborn
 2   to do that.
 3       Q.    I see.
 4             And who was it you recommended?
 5       A.    Valery Aginsky.
 6       Q.    So you had these initial calls in
 7   December of 2010.
 8             Was that when you were actually
 9   formally retained or did that happen later?
10       A.    No.  I was actually formally retained
11   when the document was brought to my office, I
12   consider myself formally retained when I receive
13   my initial fee and that's when I received my
14   initial fee.
15       Q.    I see.
16             Was there an agreement that was signed
17   or --
18       A.    There was an agreement that was signed;
19   however, the agreement was not actually signed
20   until about six months later in order to
21   formalize the arrangements.
22             The engagement letter which I use to --
23   for a party, in order for a party to engage my
24   services, was provided to Mr. Argentieri, but for
25   some reason, and I don't recall specifically why,
```

```
1                       J.P. Osborn
2    it wasn't signed that day.
3         Q.    I see.
4               And between December and January, when
5    you were first contacted and actually examined
6    the documents, was there back and forth between
7    you and the attorneys about the examination?
8         A.    I don't specifically recall.  I would
9    assume there was only because we needed to make
10   arrangements for the examination which took place
11   on the 5th of January.
12        Q.    And do you have any understanding of
13   why it took a month before you were examining the
14   documents?
15        A.    I don't know.
16              MR. ARGENTIERI:  Objection as to form.
17              You can answer.
18        Q.    Now, you mentioned that you didn't have
19   a retainer agreement until six months later.
20              Who was that -- once it was signed, who
21   was that agreement with?
22        A.    Mr. Argentieri.
23        Q.    And what was it that you were
24   specifically engaged to do?
25        A.    Conduct an examination of documents.
```

```
 1                    J.P. Osborn
 2      Q.    You had mentioned that there were two
 3 specific questions you looked at in your
 4 declaration.
 5           Was that the extent of your engagement
 6 or it was more generalized?
 7      A.    Well, my engagement as a forensic
 8 document examiner in any case can potentially
 9 involve a number of different types of
10 examinations.
11           Now, at the point in time when the
12 examinations that I made of the original Work For
13 Hire agreement took place I was anticipating
14 seeing that document again and conducting
15 additional examinations and made recommendations
16 towards that end.
17      Q.    You mentioned that you received your
18 retainer in January.
19           Was there an understanding that you
20 would also be receiving further compensation for
21 your services in this matter?
22      A.    Only if the initial amount that I
23 require in advance covers the first eight hours
24 of my work and the understanding was that if my
25 work went beyond that eight hours that I would be
```

```
 1                    J.P. Osborn
 2  charging additional fees.
 3            It did not.
 4       Q.    I see.
 5            Those additional fees, would they have
 6  been an hourly rate?
 7       A.    An hourly rate, yes, at the rate of
 8  $350 for an hour, which is one eighth of $2,800,
 9  which is what I received initially.
10       Q.    I see.
11            And who was obligated to pay this
12  hourly rate if you went over the eight hours?
13       A.    Assuming that the signer of the
14  engagement letter was the responsible party,
15  which was an assumption I would make, then I
16  would be requesting those fees from
17  Mr. Argentieri, but conventionally I receive my
18  fees in advance, so if I had gone over the eight
19  hours and if there had been fees which went
20  beyond that amount he would have known in advance
21  and I would have advised him as to what
22  additional fees I was expecting.
23       Q.    Since you never went past that eight
24  hours, did you ever render any invoices for your
25  services?
```

```
                              J.P. Osborn
 1
 2      A.     No.
 3      Q.     So there's no outstanding balance?
 4      A.     That is correct.
 5      Q.     Mr. Osborn, are you aware that
 6   plaintiff has had at least nine law firms
 7   represent him in this case?
 8             MR. ARGENTIERI:  Objection and
 9      objection to relevance.
10      A.     I was aware that plaintiff had several
11   expert -- several attorneys, I didn't know the
12   specific number.
13      Q.     Okay.
14             Well, I just wanted to see if you
15   coordinated with any of these law firms that have
16   since exited in the course of your involvement in
17   the case.
18             So when you were retained by
19   Mr. Argentieri were you also aware Mr. Ceglia was
20   represented at that time by a law firm called
21   Connors & Vilardo?
22      A.     I don't recall that law firm's name.
23      Q.     Do you remember if you interacted with
24   any attorneys that would be associated with that
25   firm such as Terrence Connors?
```

```
 1                     J.P. Osborn
 2      A.    I don't recall.
 3      Q.    Lawrence Vilardo?
 4      A.    No.
 5      Q.    Randall White?
 6      A.    No.
 7      Q.    James Grable?
 8      A.    I don't recall.
 9      Q.    Do you recall ever interacting with any
10   attorneys from the law firm Quinn Emanuel?
11      A.    I don't recall.
12      Q.    A David Grable?
13      A.    I don't recall.
14      Q.    Now, in March of 2011 plaintiff got a
15   different firm involved, that firm was called
16   Kasowitz Benson.
17            Do you remember whether any attorneys
18   from Kasowitz Benson reached out to you, it may
19   have been in March of 2011?
20      A.    I don't recall.
21            There was a firm that I did interact
22   with, I'm sure if you gave me the name of that
23   firm I would recall it, but without hearing the
24   name thus far, I don't.
25      Q.    So do you remember interacting with any
```

```
 1                    J.P. Osborn
 2   attorneys named Aaron Marks or Michael Schuster?
 3       A.    No.
 4       Q.    Now, when you did your declaration in
 5   June of 2011 the law firms had changed again and
 6   at that time plaintiff was represented by DLA
 7   Piper and Lippes Mathias.
 8             Does that ring a bell?
 9       A.    Yes.
10       Q.    Which one rings a bell?
11       A.    DLA Piper.
12       Q.    So did you, in the course of preparing
13   that declaration, did you communicate with
14   lawyers at DLA Piper?
15       A.    I believe that that is correct and that
16   the preparation of that declaration was a part of
17   that coordination.
18             DLA Piper does ring a bell, if you can
19   give me the name of an attorney --
20       Q.    Would it be Jerry Trippitelli?
21       A.    No.
22       Q.    Kip Hall?
23       A.    No.
24       Q.    Carrie Parikh?
25       A.    No.
```

Page 22

1                    J.P. Osborn

2     Q.    John Alcock?

3     A.    No.

4     Q.    Robert Brownlie?

5     A.    No.

6     Q.    Well, maybe was an attorney from Lippes

7     Mathias like Dennis Vacco?

8     A.    No.  That law firm does not ring a bell

9     with me either.

10    Q.    Kevin Cross?

11    A.    No.

12    Q.    So are you aware that after you

13    submitted your declaration in June 2011 DLA Piper

14    and Lippes Mathias then withdrew and a lawyer

15    named Jeff Lake stepped in?

16    A.    The name Jeff Lake does ring a bell

17    with me, yes.

18    Q.    Did you have any interactions with him,

19    do you remember?

20    A.    Not that I specifically recall.

21    Q.    He may have reached out to you in July

22    of 2011 to discuss the potential of you observing

23    examinations by defendants' experts.

24          Does that sound familiar?

25          MR. ARGENTIERI:  Objection as to form.

```
 1                    J.P. Osborn
 2      A.    No.
 3      Q.    Sorry.  Go on.
 4      A.    The primary contact that I had other
 5 than Mr. Boland, Mr. Argentieri, was one of the
 6 law firms that was retained or where there was an
 7 attempt to retain that firm along the way, and
 8 part of what I did with respect to that part of
 9 the interaction I had with respect to that law
10 firm and a specific lawyer, and I don't recall,
11 was to basically describe my findings verbally
12 over the phone, and that's why I believe that it
13 would have been sometime prior to the issuance of
14 the certification because I don't think that
15 certification would have been produced unless I
16 had verbally reported those findings first.
17      Q.    I see.
18            So you're not talking about DLA Piper
19 there?
20      A.    I'm sorry, I may be.  The name does
21 sound familiar to me, it may have been an
22 attorney -- in fact, it may have been one of the
23 attorneys that you listed specifically, but I do
24 not recall the name.
25      Q.    And are you aware that later in the
```

```
 1                         J.P. Osborn
 2    case, it would have been around July of 2011,
 3    there's another firm called Edelson McGuire that
 4    became involved on the plaintiff's side?
 5         A.    No.
 6         Q.    So do any of these names ring a bell:
 7    Jay Edelson?
 8         A.    No.
 9         Q.    Steve Teppler?
10         A.    No.
11         Q.    Rafey Balabanian?
12         A.    No.
13         Q.    Earlier this year, in March of 2012,
14    there was another firm that entered on Ceglia's
15    side of the case, Milberg LLP.
16         A.    No, I'm not aware of that firm.
17         Q.    Okay.
18               So no one reached out to you this year
19    to discuss your findings in the case?
20         A.    The only person that I have spoken with
21    this year with respect to the case has been
22    Mr. Boland.
23         Q.    So you also haven't spoken with a
24    lawyer named Peter Skivington?
25         A.    No.
```

```
 1                      J.P. Osborn
 2        Q.     Or Robert Calihan?
 3        A.     To the best of my recollection, no.
 4        Q.     And to the best of your recollection
 5   are there any other attorneys for plaintiff that
 6   you interacted with that you can remember at this
 7   time?
 8        A.     Not that I can recall.
 9               I do specifically recall having a
10   conversation with respect to the findings, a
11   verbal conversation, which basically was a verbal
12   report of findings to a specific attorney, but I
13   do not recall the name of that attorney, and it
14   may have been from DLA Piper.
15        Q.     And that would have been prior to you
16   submitting a declaration?
17        A.     I would -- that would make sense to me
18   because, again, I don't think that I would have
19   produced or been asked to produce a written
20   declaration without having first reported
21   verbally.
22        Q.     Have you ever met or spoken with a man
23   named Jason Holmberg?
24        A.     No.
25        Q.     Have you ever met or spoken with Paul
```

1                         J.P. Osborn

2    Ceglia?

3         A.    Yes.

4         Q.    And when was that?

5         A.    On January 11th when the document I

6    examined was brought to me.

7         Q.    January 11th?  I thought it was --

8         A.    I'm sorry, January 5th of 2011.

9         Q.    And have you spoken with any of

10   Ceglia's family like his parents, Carmine or

11   Vera?

12        A.    No.

13        Q.    His brother Brendan?

14        A.    No.

15        Q.    Are you aware that plaintiff has

16   retained other document examiners in this case?

17        A.    Yes.

18        Q.    And who are you -- you are clearly

19   aware that Dr. Aginsky was retained?

20        A.    Yes.

21        Q.    And do you know what Dr. Aginsky was

22   retained to do?

23        A.    Well, I made the recommendation to

24   plaintiff with respect to ink examination, I made

25   the recommendation to Dr. Aginsky, so I would

1                         J.P. Osborn

2    assume that it was the examination of inks, and I

3    believe that -- yes, yes.

4        Q.    And are you aware of whether he was

5    ever actually able to chemically examine the

6    inks?

7        A.    No.

8        Q.    You are not aware or he --

9        A.    I don't know whether -- I believe that

10   he did, but I don't have any specific information

11   with regard to his having done that, I wasn't

12   present other than to offer that recommendation,

13   I wasn't involved with that process.

14       Q.    And when you offer that recommendation,

15   are you aware of whether Mr. Aginsky had already

16   been contacted or retained by plaintiff?

17       A.    No.

18       Q.    And are you aware of any other experts

19   that plaintiff has retained?

20       A.    I believe that a James Blanco was

21   retained and a Larry Stewart was retained.

22       Q.    Are you also aware that Eric Speckin

23   was retained by plaintiff?

24       A.    Yes.  Well, I wasn't aware specifically

25   that he was retained, only that he was being

```
1                    J.P. Osborn
2   considered.  Whether or not he was retained I
3   don't know.
4        Q.    I see.
5              And are you aware of any defendants'
6   experts on this case?
7        A.    Yes.
8        Q.    And who are you aware of?
9        A.    Peter Tytell, Gus Lesnevich and, I'm
10  sorry, I know him, he is an ink and document
11  expert, but I don't recall the name off the top
12  of my head.
13       Q.    Would that be Gerry LaPorte?
14       A.    Gerry LaPorte, yes.
15       Q.    Now, do you know Mr. Speckin?
16       A.    I have met him.
17       Q.    Have you been involved in cases with
18  him?
19       A.    I don't believe directly, no, no.
20       Q.    And what was the context in which you
21  met him?
22       A.    A number of years ago at one of the
23  meetings of the professional organizations to
24  which I belong, he was present and I met him at
25  that time.  I don't recall the name of the
```

1            J.P. Osborn

2    organization or the specific meeting, but it was

3    several years ago.

4       Q.   So you haven't had any recent

5    involvement with Mr. Speckin?

6       A.   I may have seen reports that he had

7    written, but I have no -- I can't recall for you

8    any specific case or instance and I don't believe

9    that he worked on the same side of the case I was

10   working on nor the opposing side in a case that I

11   was working on to the best of my recollection.

12      Q.   What about Mr. Stewart?  Do you know

13   him?

14      A.   Again, Larry Stewart I have heard of

15   before, I may have met him a number of years ago,

16   but certainly not recently and I haven't seen any

17   of his work product to the extent that I can

18   remember.

19      Q.   So you don't know whether or you

20   haven't been involved in any cases with him?

21      A.   I would say to you, again, to the best

22   of my recollection, no, I haven't been involved

23   in any cases that he's been involved in.

24      Q.   And what about Mr. Blanco?  Are you

25   familiar with him?

                          J.P. Osborn

1

2      A.     I've heard of him before and I've

3   actually visited his Web site, but I don't

4   believe that I have been in any cases where he

5   was on the other side or working on the same side

6   of a case with me.

7      Q.     Have you otherwise interacted with him

8   professionally?

9      A.     I would say probably about a year and a

10  half ago I sent him an e-mail inquiring with

11  respect to a Web site that he had established and

12  a -- I think it was a trademark that he had

13  registered called Osbornian wherein I had

14  inquired as to what his intents were with respect

15  to my family name, but I did not receive a

16  response.

17            MR. ARGENTIERI:  Osbornian?

18            THE WITNESS:  Osbornian.

19     A.     Is it okay if I explain what that is?

20     Q.     Yes.  Please do.

21     A.     A number of years ago a paper was

22  published by Pennsylvania Law Review which

23  involved an examination of document examination

24  and its reliability, one of the authors was

25  Michael Saks and there were two others, I

Page 31

1                         J.P. Osborn

2    believe.  In that article I believe the term

3    "Osbornian" was coined to refer to the

4    conservative document examination community which

5    was primarily based with the American Society of

6    Questioned Document Examiners.

7               Since that time it's been kind of used

8    to describe that sort of document examiner and

9    the use of it even got to be humorous in that at

10   one meeting several years ago there was a button

11   that was produced with a picture of my

12   great-grandfather and the words "I am an

13   Osbornian" on the button, so --

14               (Telephone disconnection.)

15               MS. AYCOCK:  Let's pause for a moment.

16       It seems we have lost Mr. Boland.

17               THE VIDEOGRAPHER:  Going off the

18       record.  The time is 10:32.

19               (Discussion off the record.)

20               (Telephone reconnection.)

21               THE VIDEOGRAPHER:  We are back on the

22       record.  The time is 10:34.

23   BY MS. AYCOCK:

24       Q.    You mentioned there was a button with

25   your great-grandfather.

Page 32

1                       J.P. Osborn

2              Was that Albert S. Osborn?

3       A.    Yes, that's correct.  And the term

4    informally, again, was reference to conservative

5    document examination founded on the teachings of

6    Albert S. Osborn.

7              The term "Osbornian" had never been in

8    any way protected, so I was rather surprised when

9    I found out that it had been registered as a

10   trademark or service mark, I don't recall

11   specifically what, and that a Web site had been

12   established osbornian.org or osbornian.com, which

13   was under construction at the time that I looked

14   at it, so I e-mailed Mr. Blanco asking him what

15   his intentions were out of curiosity more than

16   anything else, but never received a response.

17      Q.    I see.

18            Do you know whether or not that Web

19   site ever went live?

20      A.    Well, as far as I'm aware and the last

21   time I checked, I don't remember how long it was,

22   it was still under construction, so there was

23   nothing, there was no major content on it.  I

24   don't know whether it's gone live in the sense

25   that it has a significant amount of content.

1                          J.P. Osborn

2        Q.     I see.

3               Would you consider Mr. Blanco an

4    Osbornian document examiner?

5        A.     I don't know him well enough to make

6    that judgment, he is not part of the

7    organizations that I belong to, but there are

8    those that are good document examiners that don't

9    necessarily belong to the organizations that I

10   belong to, so I really don't know that much about

11   him to be able to make comment.

12       Q.     Well, you said he's not a member of the

13   organizations you belong to.

14              You belong to the American Academy of

15   Forensic Sciences; right?

16       A.     Yes.

17       Q.     So are you aware of Mr. Blanco's

18   involvement with that organization?

19       A.     I am not.  And he may be a member of

20   the AAFS.  I was more thinking of the

21   certification board and the society that focused

22   specifically on document examination.  The

23   American Board of Forensic Document Examiners and

24   the American Society of Questioned Document

25   Examiners.

1                         J.P. Osborn

2              The AAFS is a much broader organization

3     involving a number of different forensic

4     disciplines and I don't believe that their

5     membership requirements are quite as stringent as

6     those other organizations, but I am a member of

7     that organization and both Larry Stewart and

8     James Blanco may be as well, I don't know.

9         Q.    I see.

10             Now, are you aware that Mr. Stewart was

11    tasked with oversight of the forensic document

12    examinations by plaintiff's experts?

13        A.    No.

14        Q.    So you didn't do any coordinating with

15    him when you were conducting your exam?

16        A.    No.

17        Q.    Did Mr. Stewart ever speak with you

18    about the examinations that you performed?

19        A.    No.

20        Q.    And have you read any of the expert

21    reports in this case, either plaintiff's or

22    defendants'?

23        A.    No.

24        Q.    Since it's been a while since you've

25    had formal involvement in the case I just want to

```
 1                      J.P. Osborn
 2   see your understanding of where the case stands.
 3            Have you kept up with the case at all
 4   on the news or on the Internet?
 5       A.    Occasionally I would see news reports,
 6   but I have not made any concerted effort to keep
 7   up with it.  It's certainly a case that has
 8   appeared in the newspaper several times and in
 9   reading newspapers, if I saw an article, I would
10   certainly read it.
11       Q.    I see.
12            Well, do you understand that Mr. Ceglia
13   filed the lawsuit in 2010 claiming an 84 percent
14   ownership interest in Facebook based on this
15   purported contract with Mark Zuckerberg?
16       A.    I was aware that the contract was a
17   central issue and I was aware that Mr. Ceglia was
18   the plaintiff in the case, but the specific
19   numbers and what he was seeking I don't know.
20       Q.    Were you aware that the purported date
21   of that purported contract was April 28, 2003?
22       A.    The date that appears on it, yes.
23       Q.    Now, that document is a two-page
24   document with purported handwriting with
25   interlineation and initials on page 1 and
```

Page 36

1                    J.P. Osborn

2    signatures and dates on page 2.

3            We call that the Work For Hire

4    document.

5            Do you understand that?

6        A.    Yes.

7        Q.    And are you aware that it's defendants'

8    position that Paul Ceglia's purported contract,

9    this Work For Hire document, is a recently

10   created forgery that was fabricated for the

11   purposes of bringing this lawsuit?

12       A.    That's my understanding based on the

13   news reports that I've read.

14       Q.    And are you aware that Facebook and

15   Mark Zuckerberg have moved to dismiss this case

16   as a fraud on the federal courts?

17       A.    I believe that I had read that as well.

18       Q.    Were you ever provided with or did you

19   find on the Internet the motion to dismiss that

20   defendants filed?

21       A.    I don't believe that I saw the motion,

22   no.

23       Q.    I would just like to understand your

24   role better in the case.

25            Now in June of 2011, as you mentioned

```
 1                    J.P. Osborn
 2    previously, you submitted the sworn declaration
 3    in this case; right?
 4        A.    Yes.
 5        Q.    And do you recall that this June 2011
 6    declaration was in support of plaintiff's
 7    cross-motion for expedited discovery?
 8        A.    Yes.  That was the title that was given
 9    to me as the appropriate title for the
10    certification.
11        Q.    And do you understand that at that time
12    defendants had moved the Court for an order
13    allowing them to examine Ceglia's physical Work
14    For Hire document?
15        A.    No, I wasn't specifically aware of that.
16        Q.    Are you aware that in the course of
17    this motion Mark Zuckerberg submitted a sworn
18    declaration saying that he had never signed the
19    Work For Hire document?
20        A.    No.
21        Q.    And are you aware that the Court did
22    ultimately grant the defendants' motion and
23    permitted defendants to, among other things,
24    examine Ceglia's physical purported Work For Hire
25    document?
```

```
 1                         J.P. Osborn
 2       A.    I was aware that the document was
 3   examined by several of defendants' experts and I
 4   think it was reasonable to assume that that
 5   examination occurred as a result of a court
 6   order.
 7       Q.    Are you aware that this examination by
 8   defendants' experts took place starting on July
 9   14, 2011?
10       A.    No.  I don't know when specifically the
11   examinations took place.
12       Q.    And were you ever contacted to
13   participate in those examinations in July of 2011?
14       A.    No.
15       Q.    So let's go back to that June 2011
16   declaration.
17             In that declaration do you recall
18   explaining that a forensic ink chemist could
19   conduct further analysis in order -- in an
20   attempt to determine the age of the ink entries
21   on the Work For Hire document?
22       A.    Yes.
23       Q.    And as you noted in the declaration,
24   that kind of testing involves taking of physical
25   samples of the document; right?
```

1                    J.P. Osborn

2        A.    That's my understanding, yes.

3        Q.    Now, you personally don't perform these

4   kind of tests since you are not a chemist, but

5   you generally know about these kind of tests and

6   that they can be performed?

7        A.    Yes, I'm generally aware of the tests

8   and in fact I have on at least one other occasion

9   actually taken the extractions of ink, but I've

10  never actually performed the chemical analysis,

11  I'm not trained to do that.

12       Q.    Right.

13             That would require a chemist; correct?

14       A.    Correct.

15       Q.    Now, as I mentioned before, defendants'

16  motion for expedited discovery of the Work For

17  Hire was granted.  Are you aware that as part of

18  that, the court order, that the parties be

19  permitted to conduct physical sampling of the

20  document for the purposes of conducting this kind

21  of chemical analysis?

22       A.    Not specifically, no, I was not aware

23  of that.

24       Q.    Were you aware that in July and August

25  of 2011 both parties' experts did in fact take

```
 1                      J.P. Osborn
 2  physical samples of the ink, paper and toner of
 3  the Work For Hire document?
 4      A.    No, I was not aware that it occurred at
 5  that time.
 6      Q.    Now, are you aware that among other
 7  tests defendants' ink chemist Mr. LaPorte
 8  conducted a chemical analysis of the ink on the
 9  Work For Hire document?
10      A.    No.
11      Q.    And are you aware that despite the
12  apparent damage to dye components in the ink,
13  Mr. LaPorte was able to run tests on his GCMS?
14           MR. ARGENTIERI:  Objection as to form.
15           You can answer.
16      A.    No.
17      Q.    And are you aware that he conducted
18  tests on the volatile components of the ink?
19      A.    No.
20      Q.    And you may be aware from news
21  accounts, but are you aware that based on his
22  analysis Mr. LaPorte determined that it was
23  highly probably that the interlineation on page 1
24  was created within two years of the date of
25  testing?
```

Page 41

```
 1                    J.P. Osborn

 2            MR. ARGENTIERI:  Objection as to form.

 3            You can answer.

 4       A.    No.

 5       Q.    Mr. Osborn, I would just like to talk

 6   very briefly about your background and

 7   credentials.

 8            I'm showing you a copy of your June

 9   17th, 2011 declaration and I would like to have

10   this marked as Defendants' 48.

11            (Defendants' Exhibit 48, declaration of

12       John Paul Osborn in support of plaintiff's

13       opposition to defendants' motion for

14       expedited discovery and in support of

15       plaintiff's cross-motion for mutual

16       expedited discovery, marked for

17       identification, as of this date.)

18       Q.    Mr. Osborn, if you could just give that

19   to the court reporter briefly so he can mark it.

20       A.    Oh, I'm sorry.

21            Thanks.

22       Q.    Do you recognize this as your June 17th

23   declaration?

24       A.    Yes.

25       Q.    And if you turn to Exhibit A on page 5
```

```
 1                    J.P. Osborn
 2   of 19 do you recognize this as your professional
 3   CV?
 4        A.    Yes.  It's in two parts.  The first
 5   part is a narrative, one page, that is marked
 6   within this exhibit as Exhibit A, and then the
 7   second part -- I'm sorry, it is collectively
 8   marked as Exhibit A.
 9             The first page is a single page
10   narrative of qualifications and that is followed
11   by a multipage more detailed resume of
12   qualifications.
13        Q.    I know this was filed in June of last
14   year.
15             Have there been any updates to your CV
16   since then?
17        A.    Yes.
18        Q.    And what are those updates?
19        A.    I believe I have a copy with me, but
20   they basically were just more recent workshops
21   and other professional educational activities
22   that took place in 2011.
23        Q.    I see.
24             Do you have that copy with you now?
25        A.    I do.
```

                        J.P. Osborn

1          Q.     Can you provide that to defendants,

2     please.

3                Do you have more than one copy,

4     Mr. Osborn --

5          A.     I may.

6          Q.     -- or just a copy that we can mark as

7     an exhibit?

8          A.     I have two copies with me.

9          Q.     Great.

10         A.     I just want to note that this includes

11    one page, one additional page which is a

12    description of the practice that I run, and that

13    last page that you're looking at right now, which

14    is a description of the different national

15    professional organizations, which is not included

16    in this, these items within Exhibit 48.

17         Q.     I see.  Thank you.

18              MS. AYCOCK:  Can we mark this as

19         Defendants' 49, please.

20              (Defendants' Exhibit 49, document

21         entitled "Qualifications of John Paul

22         Osborn," marked for identification, as of

23         this date.)

24         Q.     Now, let's see, you received your

```
 1                    J.P. Osborn
 2   bachelor's degree in 1982; right?
 3        A.    Correct.
 4        Q.    Then you trained with your father, the
 5   late Mr. Paul Osborn?
 6        A.    That's correct.
 7        Q.    And that was from 1982 to 1984?
 8        A.    Correct.
 9              Well, I should say that the initial
10   required 24 months of training occurred during
11   that time period which enabled me to become
12   eligible for certification and ASQDE membership,
13   but my training continued on from there for many
14   more years.
15        Q.    And your great-grandfather you
16   mentioned before, Albert S. Osborn, he's somewhat
17   of an icon in document examination; right?
18        A.    Yes.
19        Q.    And he wrote many of the leading texts
20   in the field like "Questioned Documents"?
21        A.    Yes.  I mean, those texts were produced
22   back in the early part of the 1900s and obviously
23   there are much more recent texts that are much
24   more comprehensive with respect to issues that
25   document examiners deal with today, but in
```

```
 1                      J.P. Osborn
 2   particular the book "Questioned Documents" was
 3   and continues to be highly regarded.
 4       Q.    We may come back to your resume and
 5   will review it on a break.
 6            Mr. Osborn, I'd like to ask you a few
 7   questions about taking scans, photographs and
 8   other images during the course of the document
 9   examination.
10            As a general matter, you do take scans
11   and photographs during a questioned document
12   examination; right?
13       A.    Yes.
14       Q.    And like many document examiners, you
15   do this as kind of the standard operating
16   procedure; right?
17       A.    Yes.
18       Q.    And the purposes of these scans, images
19   and photographs, they can be used to record your
20   observations of various characteristics of the
21   document; right?
22       A.    They can be, yes.
23       Q.    For instance, they could -- photographs
24   could document a close-up of a handwritten line?
25       A.    Correct.
```

1                    J.P. Osborn

2        Q.    A scanned document of placement and

3    appearance of ink and text on a page?

4        A.    Correct.

5        Q.    And the images taken with filters could

6    show the way that ink reacts to infrared

7    luminescence; for example?

8        A.    Also true.

9        Q.    So the purposes of these scans or

10   document images is to record as best as possible

11   and understanding that there are limitations with

12   those mediums, a true and accurate representation

13   of characteristics that you observed firsthand;

14   right?

15       A.    Among other reasons, yes.

16       Q.    And what are the other reasons for

17   taking those photographs?

18       A.    A second, second to all of those other

19   things I would say would be a primary purpose is

20   to maintain a relatively accurate file with

21   respect to material that's examined, in other

22   words, a record of what was examined, and lastly,

23   potentially to be used for the creation of

24   illustrations for reports and/or testimony.

25       Q.    And so as you mentioned it's creating a

                              J.P. Osborn

1
2    record so another purpose of these scans,
3    photographs and images would be to create an
4    accurate record of the condition of the document
5    as you received it for examination?
6        A.    To the extent possible with the media
7    used, yes.
8        Q.    And so, as best as possible and
9    understanding the limitations of each medium,
10   these scans and photographs and images are
11   intended to capture a true and accurate
12   representation of the document that you observed
13   firsthand?
14       A.    Correct.
15       Q.    Now, you took scans and photographs and
16   other images in this case particularly; right?
17       A.    Yes, I did.
18       Q.    And in November of 2011 you provided us
19   with a CV of these scans and photographs; right?
20       A.    Correct.
21       Q.    And you took all of these images during
22   your January 5th, 2011 examination?
23       A.    Correct.
24       Q.    Now, Mr. Osborn, I believe this is the
25   original of the CD you provided us; is that right?

1                          J.P. Osborn

2       A.    It does appear to be, yes, I believe

3    that's my writing on the disc itself.

4       Q.    I'm going to represent to you that this

5    is an exact copy of that CD and we will go on and

6    have this marked as Defendants' 50.

7             (Defendants' Exhibit 50, CD labeled

8         "10-cv-00569-RJA-LGF Facebook/Ceglia Osborn

9         Materials," marked for identification, as of

10        this date.)

11            MR. ARGENTIERI:  Are you going to want

12        the videographer to capture the screen?

13            MS. AYCOCK:  I mean, the images will

14        all be on the record as the exhibit.

15            MR. ARGENTIERI:  I know, but if he's

16        going to turn around and --

17      Q.    Thank you for providing this CD.

18            Now I just want to walk through the

19    photos and scans that you provided so that we can

20    understand what we are looking at a little bit

21    better.

22            (Information from the CD marked as

23        Defendants' Exhibit 50 was projected on the

24        large video screen at this time.)

25      Q.    Based on your interrogatory responses

```
 1                    J.P. Osborn
 2   it's my understanding that you captured images
 3   with three different types of equipment.
 4           You used a Brother MFC-6490CW scanner?
 5      A.    Yes.
 6      Q.    A Canon Image Runner C10221 scanner?
 7      A.    Yes.
 8      Q.    And your Olympus C5050Z digital camera?
 9      A.    Correct.
10      Q.    Now, on page 2 -- let's mark as Exhibit
11   51 your interrogatory responses.
12           (Defendants' Exhibit 51, document
13       entitled "Answers to Interrogatory
14       Responses" dated December 6, 2011, marked
15       for identification, as of this date.)
16      Q.    Do you recognize this as your responses
17   to defendants' interrogatories?
18      A.    Yes.
19      Q.    And that is your signature on the last
20   page?
21      A.    Yes, it is.
22      Q.    Now, if you look at these interrogatory
23   responses on page 2, your response 3-B, in that
24   response you indicate that you used the Brother
25   scanner to take three TIFF images; right?
```

1                    J.P. Osborn

2        A.    Correct, yes.

3        Q.    And those three TIFF images are

4    untitled 1 through 3?

5        A.    Yes.

6        Q.    And does this look like the images you

7    captured?

8        A.    Yes.

9        Q.    And did you take these scans using your

10   standard settings on your Brother scanner?

11             MR. ARGENTIERI:   Objection as to form.

12       Q.    You can answer.

13       A.    Okay.

14             No.  I believe that I increased the

15   resolution to 600 DPI.  I believe the standard

16   setting is 200 DPI.

17       Q.    I see.

18             So you took these scans at a higher

19   resolution?

20       A.    Yes.

21       Q.    You didn't change anything about the

22   contrast or color settings, did you?

23       A.    No.

24       Q.    Now, these scans were taken in

25   accordance with your standard operating

1                         J.P. Osborn

2     procedures; right?  You usually take scans of a

3     document?

4         A.    Yes.

5         Q.    Why did you take these specific scans

6     using your Brother scanner?

7         A.    Because the Brother scanner has an

8     11-by-17-inch or larger plate or scan bed which

9     allows you to take a larger image and I wanted to

10    be able to capture the entire document, any

11    portion of the document that, for instance, might

12    be cut off on a scanner like the Canon, which

13    scans at 8-1/2-by-11 or specifically with 8-1/2.

14        Q.    I see.

15              So that's why you took scans with both

16    your Canon and your Brother scanner?

17        A.    Yes.

18        Q.    And did these scans taken with your

19    Brother scanner, are they true and accurate

20    representations of what you observed of the

21    document?

22        A.    Yes.

23        Q.    And in that same interrogatory response

24    3-B you indicate that you captured some JPEG- and

25    PDF-scanned images with your Canon Image Runner

```
 1                    J.P. Osborn
 2   scanner; right?
 3        A.    Correct.
 4        Q.    And did you take these scans using the
 5   standard settings of the scanner or did you
 6   increase the DPI also?
 7              MR. ARGENTIERI:  Objection.
 8              You may answer.
 9        A.    I don't recall.  If you can widen the
10   screen and let me see the size of the files, I
11   can probably tell you.
12              There you go, just pull it out.
13              If you can just widen that one panel.
14        Q.    There you go.
15        A.    Yes, I did increase the resolution.
16   The standard resolution is 300, I increased it to
17   600.
18        Q.    But you didn't change any contrast or
19   coloration settings?
20        A.    No.
21        Q.    Now, these are the PDF and JPEG scans
22   you were referring to, right, that you took with
23   your Canon?
24        A.    Yes, they are.
25        Q.    And the PDF is labeled 0731_0001.pdf;
```

```
 1                         J.P. Osborn
 2   correct?
 3        A.    Correct.
 4        Q.    And the JPEGs are labeled 0732_0001
 5   through 5?
 6        A.    Also correct.
 7        Q.    Now, what about these PDFs and JPEGs
 8   immediately underneath those?
 9        A.    I use a backup program on the computer
10   that I have in the office and, for some reason,
11   and I don't know why, the backup creates these
12   oddly numbered files, so they are a product of
13   this backup software; I don't know why it does
14   that, but I have seen that on more than one
15   occasion within folders designated for other
16   cases as well.
17        Q.    I see.
18              But these appear to be different --
19   they don't appear to be the questioned documents,
20   they appear to be different documents?
21        A.    Yes.  But they are also included or
22   images were taken of those other documents as
23   well.  For each one of those backup image files I
24   suspect you will be able to find a matching file
25   somewhere among the other -- among the other
```

```
 1                        J.P. Osborn
 2    images within the folder.
 3        Q.    I see.
 4              So are these documents, are these hard-
 5    copy documents you were provided and then took
 6    scans of or are these something you were e-mailed?
 7        A.    I don't recall.
 8              I believe that there was three
 9    documents provided to me on January 5th of 2011,
10    one was a copy of a document with a Mark
11    Zuckerberg signature on it or what was submitted
12    to me as bearing a Mark Zuckerberg signature that
13    was either provided to me on January 5th of 2011
14    or I received an e-mail later on, but it was
15    received in the form of a reproduction not an
16    original.
17              The other one was another document, and
18    I don't recall the name of the document, but
19    again, it should be in image form somewhere in
20    that folder.
21        Q.    Are you referring to the specifications
22    document?
23        A.    If you could put it up on the screen it
24    would be helpful in terms of recollecting.
25        Q.    This looks like it's a page from the
```

```
 1                    J.P. Osborn
 2   specifications document.
 3       A.    Yeah, I believe that that was the other
 4   of the documents that was provided to me and I
 5   believe that this was provided on the 5th of
 6   January 2011 and was provided in its original
 7   form and, I'm sorry, this -- the check that
 8   you're showing right now is another document with
 9   a copy of a signature, a signature purportedly of
10   Mark Zuckerberg.
11       Q.    I see.
12             And you were provided with this
13   document in hard copy form and then scanned it?
14       A.    Yes, I believe I did.
15       Q.    And so these four images which are
16   labeled 999999997-05-0232361 and the three
17   following PDFs and JPEGs, these are -- you are
18   not sure whether you were provided with a hard
19   copy and scanned them or whether they were
20   provided to you electronically?
21       A.    Well, once again, with respect to those
22   particular file numbers, they are not numbers
23   that my scanning devices created nor that I
24   created, they were created by a backup program
25   that for some reason replicates files and dumps
```

1                          J.P. Osborn

2      them into the same folders in which those files

3      appear, why I don't know, but to the best of my

4      recollection, at a minimum, on the 5th of January

5      2011 I was provided with the original of the --

6      and again, you'll have to remind me the name of

7      the document --

8           Q.     The specifications document?

9           A.     The specifications document --

10          Q.     That's a six-page document; right?

11          A.     Right.

12                 -- as well as the Work For Hire

13     document and the reproduction of the check and

14     the government form that you also had on the

15     screen were provided to me in the form of

16     reproductions.

17          Q.     I see.

18                 Now, these scans that you took with

19     your Canon Image Runner scanner, they were taken

20     in accordance with your standard operating

21     procedure you usually take scans with that

22     scanner; right?

23          A.     With respect to making, attempting to

24     make accurate reproductions using those devices

25     and media, yes.

1                        J.P. Osborn

2       Q.    And why did you take these specific

3    scans using your Canon scanner?

4              You mentioned you liked your Brother

5    scanner because it's larger.

6              Is there some reason you took them also

7    with your Canon scanner?

8       A.    The Canon device creates images at

9    resolution, according to the device itself, at

10   600 DPI, which tend to be smaller in terms of

11   file size than the Brother, and also I produce

12   those JPEGs, the file type, which is a compressed

13   file format.

14             The TIFF files are considered to be, at

15   least to my knowledge, better quality, less

16   compressed images, and because of the apparent

17   importance of this particular document and my

18   desire to create -- go one step further in

19   creating better quality images, I took the TIFFs.

20             The Canon device will not do color

21   TIFFs, only color JPEGs.

22      Q.    I see.

23             And these scans you took with your

24   Canon scanner are true and accurate

25   representations of what you observed firsthand?

1                    J.P. Osborn

2        A.    Yes.

3        Q.    Next in your interrogatory response

4   number 3 you indicate that you took a series of

5   photographs of portions of the documents with

6   your Olympus camera; right?

7        A.    Correct.

8        Q.    Okay.

9              And these would be those photographs

10  you took, those are file names P1050026 to

11  P1050058; correct?

12       A.    Yes.

13       Q.    It looks like some of these

14  photographs -- for instance, 34 and 35 -- were

15  taken using transmitted light; right?

16       A.    Yes.

17       Q.    And some of the photographs -- let's

18  see, 257 and 58 were taken using side lighting;

19  correct?

20       A.    Correct, oblique lighting, correct.

21       Q.    And you take others with what appears

22  to be normal lighting or ambient room lighting,

23  for example, with 40 and 41?

24       A.    Yes.

25       Q.    Why did you take these particular

1                         J.P. Osborn

2    photographs with transmitted light, oblique

3    lighting and ambient room lighting with your

4    Olympus camera?

5        A.    Ambient room lighting utilizing the

6    Olympus camera allows me to capture photographic

7    quality digital images at a macro setting,

8    close-up images, which to some degree affords a

9    better reproduction to examine features, for

10   instance, of writing at a later point in time

11   when I don't have that original any longer, so,

12   for instance, if I were going to eventually be

13   asked to look at the genuineness or

14   nongenuineness of the Zuckerberg signature, I

15   could utilize these images.  I may have to see

16   the original once again, but it provides me with

17   a more accurate reproduction than I would say

18   even the scans do.

19           The side light images were taken to

20   attempt to capture, to the extent possible, any

21   indentations in the surface of the paper which is

22   a more rudimentary method accomplishing basically

23   the same purpose as the ESDA tests.

24           The transmitted light photographs were

25   taken to capture things like the quality of the

1                     J.P. Osborn

2    paper, which might be more evident utilizing

3    transmitted light as opposed to ambient light.

4        Q.    And these photographs were taken in

5    accordance with your standard operating

6    procedures?

7        A.    As they would apply in a situation like

8    this where there were limitations to what I was

9    examining initially but wherein I at that point

10   in time anticipated doing other examinations, I

11   wanted to have images, for instance, macro images

12   of the signature which would allow me, if I was

13   asked to later on, to look at the genuineness or

14   nongenuineness of the signature, perhaps not

15   needing at least initially the original document

16   back again.

17       Q.    I see.

18             And so these photographs were true and

19   accurate representations of what you observed?

20       A.    Yes.

21       Q.    And you produced all of your

22   photographs and images of the documents, the

23   specifications and the Work For Hire document, in

24   response to the subpoena in November; right?

25       A.    Yes.

Page 61

1                        J.P. Osborn

2        Q.     Why don't take a break for just a quick

3   second.

4        A.     Yes.

5               THE VIDEOGRAPHER:   Going off the

6        record.  The time is 11:09.  This ends tape

7        number 1.

8               (Recess taken.)

9               THE VIDEOGRAPHER:   We are back on the

10       record.  The time is 11:20.  This is tape

11       number 2.

12  BY MS. AYCOCK:

13       Q.     Now, Mr. Osborn, having reviewed your

14  images which you've confirmed accurately

15  represent what you saw in January of 2011, I

16  would like to talk about the appearance and other

17  aspects of the document when you examined it.

18               Now, as you mentioned previously,

19  January 5th, 2011 is the only time that you saw

20  or examined the physical Work For Hire document;

21  right?

22       A.     Correct.

23       Q.     And when you first received the Work

24  For Hire document was it stapled?

25       A.     I don't recall.  My best recollection

1                        J.P. Osborn

2    was that it was unstapled only because I don't

3    recall asking for permission to remove the staple

4    and that's something that I would do.

5              It may have been, but in order to run

6    an ESDA test I would have had to have unstapled

7    it if it had been.  I don't specifically recall

8    whether it was or wasn't; to the best of my

9    recollection, it was not.

10       Q.    And based on your images it appears

11   that when you examined the specifications

12   document it was stapled.

13             Do you remember?

14       A.    I believe so, yes.

15       Q.    And do you remember whether you

16   unstapled that document at any point or did you

17   just take images with the document stapled?

18       A.    I believe that I just simply took

19   images with the document stapled.  There would

20   have been no need to remove the staple and the

21   primary need to remove the staple had I done that

22   with the Work For Hire would have been to conduct

23   ESDAs.

24       Q.    Now, on January 5th, 2011 you observed

25   the ink writing on the Work For Hire document to

1                    J.P. Osborn

2    be black ink; right?

3        A.    Yes, black ballpoint pen ink, right.

4        Q.    And you observed the paper of the Work

5    For Hire document to be white paper?

6        A.    Correct.

7        Q.    And you didn't notice any fading or

8    brownish ink on the Work For Hire document; right?

9             MR. ARGENTIERI:  Objection as to form.

10            You can answer.

11       A.    Nothing that was very obvious, no.

12       Q.    And as you mentioned, you also examined

13   the specifications document, the ink on that

14   document was black; right?

15       A.    To the best of my recollection and

16   based on reviewing the images, yes.

17       Q.    And the paper was white paper?

18       A.    Yes.

19       Q.    Did you notice any damage to the Work

20   For Hire document that would have been visible

21   with the naked eye?

22       A.    Nothing that was obvious.  Certainly it

23   appeared to have been handled, certainly there

24   were staple holes in it, certainly it wasn't a

25   brand-new sheet of paper, but nothing that was

1                       J.P. Osborn

2    immediately obvious or something that I would

3    have -- that would have caught my attention.

4         Q.    And I understand that as part of your

5    examination you illuminated the Work For Hire

6    document with a UV lamp; right?

7         A.    That's correct.

8         Q.    Now, during this UV examination did you

9    observe the back of the document to fluoresce any

10   differently than the front of the document?

11        A.    No.

12              I do not believe that I conducted VSC

13   examinations, examinations utilizing ultraviolet

14   light on the reverse of the document because the

15   purpose of these preliminary examinations

16   utilizing ultraviolet light was to see if I could

17   make any differentiation in the writing ink

18   between the first page and the second page.

19              Had there been some kind of unusual

20   appearance with respect to the paper I certainly

21   would have noted it, but I did not examine it

22   using VSC on the reverse of either of the two

23   pages.

24        Q.    I see.

25              But you didn't notice -- you said if

1                    J.P. Osborn

2    you had observed anything unusual about the

3    fluorescence of the document you would have noted

4    it; right?

5        A.    Yes.

6        Q.    So you didn't observe the front of the

7    pages fluoresce very dully, did you?

8             MR. ARGENTIERI:  Objection to the form.

9             You can answer.

10       A.    Well, I don't know if we can

11   necessarily define what you mean by fluoresced

12   dully.  It reacted in a fashion that I would

13   anticipate with respect to white bond paper and

14   there was nothing unusual in terms of extreme

15   brightness or extreme dullness.

16            Again, however, the focus of these

17   examinations that I performed was on the writing

18   ink, not the paper.

19       Q.    I see.

20            But you -- I mean, you didn't observe

21   any uneven fluorescence throughout the front of

22   the page --

23            MR. ARGENTIERI:  Objection as to form.

24       Q.    -- that would be something you would

25   have noted; right?

```
 1                    J.P. Osborn
 2          MR. ARGENTIERI:  Objection as to form.
 3          You can answer.
 4     A.    Not necessarily because, once again,
 5  the focus of my examination was on the area where
 6  the signature appeared so, for instance, with
 7  respect to the face of either of the pages of the
 8  document I did not examine under UV or any
 9  filtration or any kind of specialized lighting
10  utilizing a VSC the entire front page, I was
11  focused on the writing ink, so it was in those
12  two areas.
13          Within those two areas, no, I did not
14  see anything.
15     Q.    Let's talk a little bit more about your
16  examination.
17          My understanding is that you only did
18  these nondestructive examinations of the Work For
19  Hire document as you mentioned; right?
20     A.    Yes.
21     Q.    And you conducted these examinations
22  with nondestructive equipment like hand-held
23  lamps, a microscope, a VSC unit?
24     A.    Yes.
25     Q.    You mentioned in your interrogatory
```

```
 1                    J.P. Osborn
 2   that you utilized a CamCom C-IT250 video spectral
 3   device?
 4        A.    Yes.
 5        Q.    Is that like a Foster + Freeman VSC
 6   unit?
 7        A.    Yes.  And I probably misspoke when I
 8   referred to my device as a VSC.
 9              Document examiners refer to VSC the way
10   many people refer to tissue as Kleenex, it's
11   kind of become a generic term, so the device that
12   you just recited is the device that I used to
13   examine spectrally documents and writing ink.
14        Q.    So basically it would do -- I'm
15   familiar with the Foster + Freeman version.
16              Is it just the same thing but a
17   different brand?
18        A.    Correct.
19        Q.    And you conducted an ESDA exam; right?
20        A.    That's correct.
21        Q.    Do you have those ESDA lifts with you
22   today?
23        A.    Yes, I do.
24        Q.    Great.
25              So at the next break, can we take
```

```
 1                    J.P. Osborn
 2   those, make a high-resolution scan of them?
 3       A.    Yes.
 4       Q.    And do you also have your case notes
 5   here with you?
 6       A.    I only have one page of handwritten
 7   notes with one line of writing, but you're
 8   welcome to take it.
 9       Q.    Great.  We will take those when we take
10   the ESDA lifts.
11            Now, is there any other equipment you
12   used to examine the questioned documents, like a
13   microscope hand-held magnifier?
14       A.    Yes.  I believe that I conducted
15   examinations utilizing a macroscope, at least
16   that's how it's referred among most of my
17   colleagues, and it is a Pentax magnification
18   device that is sort of a magnifier-microscope
19   hybrid, it is a monocular device and it simply
20   allows you to look at a magnified image of what
21   you are examining.
22            I do not believe I used the microscope
23   in my office, which is a stereoscopic microscope,
24   to examine this document; I may have, I didn't
25   make any reference to it, nor did I make any
```

Page 69

1                        J.P. Osborn

2    notes about those examinations, it might have

3    been something that I used, but I don't recall

4    using it.

5              I do recall using a Pentax macroscope,

6    though, and hand-held magnifiers, hand-held lamps

7    for viewing things with oblique lighting, side

8    lighting, a small light table to look at things

9    with transmitted light prior to taking the images.

10        Q.    Now, when you were conducting an

11   examination with the macroscope, what aspect of

12   the document were you focusing on?

13        A.    The signature.

14        Q.    And is that also true with respect to

15   your use of the CamCom video spectral device?

16        A.    I shouldn't say just the signature, the

17   signature and the interlineation that appears on

18   the first page, and the answer to your question

19   is yes.

20        Q.    So other than the ESDA and the side

21   lighting were your other examinations geared

22   towards looking at the ink signatures?

23        A.    Yes.

24        Q.    And after all of your examinations with

25   UV, infrared, the video spectral device,

```
 1                    J.P. Osborn
 2   microscopes, hand-held lenses, did you notice any
 3   change in the paper or the ink of the Work For
 4   Hire document?
 5        A.    No.
 6        Q.    And would you expect there to be any
 7   significant change based on the examinations you
 8   conducted on the document?
 9             MR. ARGENTIERI:  Objection as to form.
10        A.    No.
11             THE WITNESS:  I'm sorry.
12        Q.    You can answer.
13        A.    My answer is no.
14        Q.    Mr. Osborn, are you aware that there is
15   an issue regarding the condition in which the
16   document was presented to defendants' experts in
17   July of 2011?
18        A.    Yes.
19        Q.    What's your understanding of what that
20   issue is?
21        A.    That there is an assertion, I believe,
22   by both plaintiff and defense that something was
23   done to the document which caused a change in the
24   appearance of the face of the pages,
25   specifically, I don't know what it was, but I am
```

                              J.P. Osborn

1
2    aware that that assertion is being made.

3        Q.    Let's take a step back for a moment.

4              Have you ever heard of someone doing

5    something to a document in an attempt to

6    artificially age the document or its ink?

7        A.    Yes.

8        Q.    What sort of things do people try to

9    do?

10       A.    Well, rudimentary methods of trying to

11   age a document would include simply putting it

12   out on a windowsill and exposing it to bright

13   sunlight for a significant period of time, any

14   kind of bright light or heat might cause a

15   document to artificially age, but the end result

16   would be something that in most instances would

17   be relatively obvious even to the naked eye.

18             As an example, you might have a

19   document that has been exposed in that way and

20   perhaps the reverse of the document wasn't

21   exposed in the same way and you would have a

22   stark difference between the face and the

23   reverse.

24       Q.    Right.

25             And it take -- it would take a while

1                        J.P. Osborn

2      for such sunlight to cause effects on the front

3      of the document; right?

4                MR. ARGENTIERI:  Objection to form.

5          A.    I couldn't tell you specifically how

6      long.  I mean, I would anticipate that it would

7      -- I mean, you could probably fade to some

8      degree, some noticeable degree a document sitting

9      on a windowsill in bright sunlight over the

10     course of an entire day, but specifically how

11     long, you know, the average person who is trying

12     to do that might do that, I don't know.

13         Q.    And is there any literature or popular

14     news accounts about this on the Internet or

15     otherwise that you are aware of?

16         A.    Not news accounts.  I mean, I'm sure

17     there are news accounts on the Internet, I'm sure

18     that there are other stories on the Internet

19     about this sort of thing.  I can't point you to

20     any specific reference, but it's certainly

21     something that is written about in the text that

22     is part of this field.

23         Q.    And has this topic ever come up during

24     your involvement with this case?

25                MR. ARGENTIERI:  Objection as to form.

1                          J.P. Osborn

2        A.     I'm sorry, I misunderstood the question.

3        Q.     Has this topic, artificially aging

4    documents, has that come up in the course of your

5    involvement in this case?

6        A.     Only to the extent that I was aware

7    that there were assertions being made with

8    respect to the document about artificial aging.

9        Q.     You haven't discussed artificial aging

10   with anyone?

11       A.     No.

12       Q.     Now, are you aware that it's

13   defendants' position that when plaintiff produced

14   the Work For Hire document to defendants on the

15   morning of July 14, 2011 after the Court had

16   ordered it be produced, the ink on the document

17   was very faded almost to a light tan or brown?

18             MR. ARGENTIERI:  Objection as to form.

19             You can answer.

20       A.     Yes, I had understood that that was an

21   assertion being made.

22       Q.     And that the paper on the front of the

23   document that morning was also discolored and

24   off-white?

25       A.     Yes.

```
 1                        J.P. Osborn
 2            MR. ARGENTIERI:  Objection as to form.
 3       Q.    Are you aware that defendants' experts,
 4   Mr. Tytell and also a Professor Frank Romano, who
 5   were there on the morning of July 14th when the
 6   Work For Hire was produced, have submitted sworn
 7   statements describing this condition of the Work
 8   For Hire document as having faded, tannish or
 9   brownish ink and discolored paper at the time it
10   was presented?
11            MR. ARGENTIERI:  Objection as to form.
12            You can answer.
13       A.    No.
14       Q.    So you haven't reviewed these
15   declarations?
16       A.    No.
17       Q.    And are you aware that none of
18   plaintiff's experts were present at the document
19   examination on July 14, 2011?
20       A.    No.
21       Q.    No, you're not aware of that?
22       A.    I'm not aware of whether they were or
23   were not present.
24       Q.    And are you aware that it's defendants'
25   position that this faded and discolored condition
```

1                          J.P. Osborn

2    of the document and its ink was due to an attempt

3    by Paul Ceglia or someone working in concert with

4    him to artificially age or otherwise thwart

5    defendants' attempts to date the ink?

6              MR. ARGENTIERI:  Objection as to form.

7              You can answer.

8         Q.    You can answer.

9         A.    That's my understanding as to what

10   plaintiff -- what defendants' assertion is, yes.

11             MR. ARGENTIERI:  You just got to kind

12        of give me a pause.

13             THE WITNESS:  Okay.  Sorry.  I'm moving

14        along with my answers too quickly.

15        Q.    And are you aware that after

16   defendants' attorneys revealed in open court that

17   the document produced to them was produced in

18   this condition with faded ink and discolored

19   paper that plaintiff for the first time accused

20   defendants' experts Mr. Tytell and Mr. Lesnevich

21   of having caused the damage through their use of

22   VSC, UV lamps, other light sources and ESDA

23   during the course of their document examination?

24             MR. ARGENTIERI:  Objection as to form.

25             You can answer.

```
1                    J.P. Osborn
2      A.    No.
3      Q.    So you're not aware that that is
4   plaintiff's accusation that the document
5   examiners damaged the document?
6           MR. ARGENTIERI:  Objection as to form.
7           Go ahead.
8      A.    Yes, I am aware of that.
9      Q.    And are you aware that defendants'
10  experts believed that this visible damage to the
11  document, the discoloration of the ink and the
12  paper, were caused by some sort of exposure or
13  photo degradation of the Work For Hire document
14  such as sunlight?
15          MR. ARGENTIERI:  Objection.
16     A.    Not specifically what the cause was,
17  but just aware that the assertion was being made.
18     Q.    Now, along with our interrogatories to
19  you we included as exhibits two printed scans of
20  the Work For Hire document.
21          Do you recall that?
22     A.    Yes.
23     Q.    And I'll represent to you that one of
24  those printouts was the scan of the Work For Hire
25  document that you had provided to us and the other
```

1                          J.P. Osborn

2    was a printout of a scan of the Work For Hire

3    document that Mr. Tytell had captured on the

4    morning of July 14, 2011.

5                    Now, as you stated previously, you take

6    scans and photographs as part of your standard

7    practice in order to capture various

8    characteristics of the document and create a

9    record of the condition of the document at the

10   time you received it; right?

11       A.    Correct.

12       Q.    So understanding the limitations of

13   each medium, you generally consider the native

14   scans or photographs of a document to be a

15   reliable source of information about the

16   document; right?

17       A.    Keeping in mind the limitations, yes.

18       Q.    And -- but printing these scans or

19   photographs it introduces a new limitation to the

20   image, for instance, the printer may not print in

21   as many DPIs as the image was recorded in or

22   there may be a difference in color range; is that

23   right?

24       A.    Yes.

25       Q.    So if you can turn to your

1                    J.P. Osborn

2    interrogatory responses on page 2 to your

3    response to interrogatory number 4 and then on

4    page 3 to your response to interrogatory number

5    6, can you review those responses?

6        A.    Yes, I have.

7        Q.    You have reviewed them?

8              Now, in both of those responses you

9    indicate that the printout we provided is a copy

10   that you would not consider to be an accurate

11   means to assess the overall condition of the

12   document; right?

13       A.    Correct.

14       Q.    But viewing the native format scans or

15   photographs of the document would be a more

16   accurate means to assess the condition of the

17   document; right?

18             MR. ARGENTIERI:  Objection as to form.

19             You can answer.

20       A.    It would, but my response, if I had

21   viewed electronic images, would have been the

22   same because with respect to the condition of a

23   document with respect to fading of either ink or

24   some kind of discoloration of the paper, I would

25   not be inclined to offer a conclusion or an

1                          J.P. Osborn

2    opinion until I had seen the original again.

3         Q.    Now, if you're not making a conclusion

4    or a specific finding you're just saying this is

5    what I observed or this is not what I observed,

6    is that something you'd be more comfortable doing

7    with a native format?

8              MR. ARGENTIERI:  Objection as to form.

9         A.    If I am offering an opinion I'm

10   offering an expert opinion, and in order to be

11   comfortable in offering an opinion with regard to

12   something like an alteration to a document, I

13   would be inclined not to offer any opinion until

14   I had once again seen the original, and likely

15   what I would do is take a look at the images that

16   I had originally taken and take a look at the

17   original and note whether or not in fact I felt,

18   based on that image and the newly examined

19   original, that there was some kind of noticeable

20   significant discoloration or fade -- of the paper

21   or fading of the ink.

22             I would not be inclined to offer that

23   kind of opinion based on at least one set of

24   images that I had no control over and really,

25   with respect to the issue of alteration of the

1                         J.P. Osborn

2    documents, in viewing the original and the

3    advantages of viewing the original is really not

4    going to be replaced by looking at any image no

5    matter how accurate.

6              If you present me with two images and

7    one is darker than the other, I can say to you

8    that, yes, one image is darker than the other

9    image, but I would not be ready to opine that

10   that is actually what is the case on the document

11   until I actually saw the document.

12   Q.     And to be clear, what was the case on

13   the document when you reviewed it was that the

14   ink was black; correct?

15             MR. ARGENTIERI:  Objection, asked and

16        answered, objection to form.

17   A.     The ink was what I would characterize

18   as black ballpoint pen ink; that it was an

19   intense completely dark black would actually be

20   uncharacteristic of a ballpoint pen black writing

21   instrument.

22             It was, from my view when I examined

23   it, and I think to some degree accurately

24   represented in the images that I took, a standard

25   form of black ballpoint oil-based ink that is not

1                    J.P. Osborn

2  quite stark black but certainly would be

3  described by someone as black ballpoint pen ink.

4       Q.    Right, what you would expect for black

5  ballpoint pen ink?

6       A.    Correct.

7       Q.    Now, on January 5, 2011, that's when

8  you examined both the Work For Hire document, the

9  specifications document and the other photocopies

10  of various signatures; right?

11       A.    Yes.

12       Q.    Now, as far as you were aware at the

13  time that you examined the document, were you

14  aware that Ceglia had -- of whether Ceglia had

15  engaged any other experts other than yourself?

16       A.    No.

17       Q.    And you had mentioned earlier that you

18  recommended some document examiners to plaintiff.

19            Was the only one you recommended

20  Dr. Aginsky or did you make other recommendations?

21       A.    I believe that the only person I

22  specifically recommended was Dr. Aginsky and for

23  the limited purposes of chemical examination.

24       Q.    And who provided you with the Work For

25  Hire document on January 5, 2011?

1                    J.P. Osborn

2        A.    It was brought to my office by both

3    Mr. Ceglia and Mr. Argentieri.  I don't know who

4    physically handed me the document, but they

5    brought it to me.

6        Q.    And before you received the document

7    had you seen images of it?

8        A.    I don't believe so.

9        Q.    So do you remember whether you had seen

10   the complaint that was filed in this case that

11   attached an image of the Work For Hire document?

12       A.    No, I don't believe that I had read the

13   complaint before seeing it.

14       Q.    And how did Mr. Argentieri or

15   Mr. Ceglia, how did they provide you with the

16   document?  Was it in an envelope or a folder or

17   something like that, do you recall?

18       A.    I don't recall.

19       Q.    And do you recall whether the person

20   who handed you the document was wearing gloves?

21       A.    It is possible, because it was January,

22   that when they came in they were wearing gloves

23   for the protection of cold, but if you're

24   referring to gloves for the protection of things

25   that are being touched, I don't believe anybody

```
 1                    J.P. Osborn
 2  was using gloves.
 3      Q.   And during the course of your
 4  examination of documents did Mr. Argentieri or
 5  Mr. Ceglia suggest that you wear gloves?
 6      A.   I don't recall any of that kind of
 7  suggestion, no.
 8      Q.   And did you wear gloves?
 9      A.   I don't believe I did, no.
10      Q.   And after your examination do you
11  remember who you gave the Work For Hire document
12  back to, whether that was Mr. Argentieri or
13  Mr. Ceglia?
14      A.   I don't recall; one of the two of them.
15      Q.   Do you recall where they put it,
16  whether it was in an envelope or a folder or
17  anything like that?
18      A.   No.
19      Q.   No, you don't recall?
20      A.   No, I do not recall.
21      Q.   And do you recall whether at that time
22  whoever was handling the document was wearing
23  gloves?
24      A.   Again, I assume you are referring to
25  protective gloves --
```

1                    J.P. Osborn

2      Q.     Yes.

3      A.     -- and no, I don't recall that anybody

4  was using gloves.

5      Q.     And the document was only at your

6  office for the course of the day, right, it

7  didn't stay overnight or anything like that?

8      A.     That's correct.  I believe they arrived

9  my office at about 8:00 a.m. and left at about

10  1:00 p.m.

11     Q.     And during that time where were

12  Mr. Argentieri and Mr. Ceglia?

13     A.     I believe that they were in, certainly

14  in my office, they may have been at times in the

15  laboratory with me.  Specifically where each of

16  them were, to the best of my recollection, they

17  were nearby.

18     Q.     Were they watching your examination or

19  were they doing something else: watching TV,

20  reading --

21     A.     I think that they were watching what I

22  was doing, whether, you know, from the other room

23  or -- I don't think either one of them was

24  looking over my shoulder, but I think that they

25  were, you know, within a distance that would

```
 1                      J.P. Osborn
 2   allow them to see what I was doing.
 3       Q.    Now, while Mr. Argentieri and Mr. Ceglia
 4   were there did you note what kind of indications
 5   a fraudulently created document would have?
 6             MR. ARGENTIERI:  Objection.
 7       A.    No.  I may have described to them why I
 8   was doing certain things, why I was running the
 9   ESDA tests, why I was examining the documents
10   utilizing the CamCom C-IT250, but I don't believe
11   we had any discussion with regard to the
12   specifics of, you know, why certain evidence
13   might occur or why it might not.
14       Q.    And was it at that time that you
15   suggested that the document could be tested, the
16   ink dated, and recommended Dr. Aginsky?
17       A.    Yes, I believe that during the course
18   of those examinations that was something that I
19   mentioned.
20       Q.    Did anything about testing the document
21   for fingerprints come up while you were examining
22   the document?
23       A.    No.
24             The only thing that might have -- and I
25   don't specifically recall it, is that ESDA,
```

```
 1                      J.P. Osborn
 2   electrostatic detection apparatus, was originally
 3   developed by Foster + Freeman as a means to
 4   capture fingerprints on paper, it didn't prove to
 5   be successful, and from what I understand, quite
 6   by accident, the purpose that it's being marketed
 7   for now was discovered, and I may have during the
 8   course of the examinations, as I sometimes will,
 9   discuss that history of the ESDA with one or
10   both of -- I don't recall specifically, but it's
11   something that I often do when I'm conducting a
12   test in describing why I'm doing what I'm doing.
13       Q.   But it is never your understanding that
14   this particular document would be tested for
15   fingerprints?
16       A.   No.
17       Q.   Now, at this time when you were
18   examining the document, did you learn anything
19   about how either the Work For Hire or the
20   specifications document had been stored?
21           MR. ARGENTIERI:  Objection as to form.
22       A.   I don't have any recollection with
23   regard to any specifics in that regard, no.
24       Q.   And do you remember if you had asked
25   how they had been stored?
```

```
1                        J.P. Osborn
2        A.    No.
3        Q.    Did you learn anything about how the
4    document had been located or found?
5        A.    No.
6        Q.    During the course of this examination
7    did you learn anything about how either the Work
8    For Hire document or the specifications document
9    had been signed, such as when it was signed, the
10    circumstances of its signing?
11        A.    I don't recall having any kind of
12    conversation in that regard.
13        Q.    And do you recall any information about
14    the signing of the document here today?
15            MR. ARGENTIERI:  Objection as to form.
16        A.    No.
17        Q.    And did you get any other information
18    about the document or the circumstances
19    surrounding the document, the Work For Hire
20    document, when it was provided to you for
21    examination?
22            MR. ARGENTIERI:  Objection as to form.
23        Q.    You can answer.
24        A.    Yes.  One of the things that in
25    examining the document I noted was that it
```

```
 1                    J.P. Osborn
 2   appeared that there was a varying marginal
 3   formatting and made mention of it and it was
 4   indicated to me that it was, if you will, a kind
 5   of a slapped-together-boilerplate-type document,
 6   and I recommended that in order to explain why
 7   that malformatting was present, which would raise
 8   suspicion for anyone looking at the document,
 9   that other Work For Hire contracts should be
10   produced which would -- dated from that time
11   period which would show that same formatting, you
12   know, problem, and I believe that that was the
13   primary discussion with respect to, you know, the
14   preparation of the document and things that I
15   noticed about the document other than noting to
16   them what appears in the certification or what is
17   noted in the certification.
18        Q.    So these marginal formatting issues,
19   the discrepancies between the first page and the
20   second page of the Work For Hire document, to you
21   that's something that would arouse suspicion of a
22   questioned document when you are examining it?
23             MR. ARGENTIERI:  Objection as to form.
24        A.    Yes.
25        Q.    Now I'd like to talk for a moment about
```

```
 1                    J.P. Osborn
 2   something that your great-grandfather addresses,
 3   actually, in his book "Questioned Documents," and
 4   it's another aspect of documents that can arouse
 5   suspicion.
 6             So are you aware that in June of this
 7   year, subsequent to Mr. LaPorte's finding that
 8   the ink was less than two years old, Mr. Ceglia
 9   issued a declaration stating for the first time
10   that the Work For Hire document had been stored
11   in a hope chest on the north wall of an
12   unclimate-controlled spare room often subjected
13   to subzero temperatures in one of his Buffalo,
14   New York, homes?
15             MR. ARGENTIERI:  Objection as to form.
16        A.    No.
17        Q.    No, you are not aware of that
18   declaration?
19        A.    That's correct.
20        Q.    Now, as you probably know, your
21   great-grandfather wrote about foundling wills;
22   right?
23        A.    Yes.
24        Q.    Are you familiar with this concept?
25        A.    Generally, yes.
```

```
 1                      J.P. Osborn
 2      Q.    And this concept of foundling wills is
 3  that they are inherently improbable documents
 4  because they show up after a long delay after
 5  apparently being forgotten in some old box
 6  despite their apparently great value and have
 7  unusual stories surrounding their discovery?
 8           That's the concept you are familiar
 9  with; right?
10           MR. ARGENTIERI:  Objection as to form.
11           You can answer.
12      A.    Yes.
13      Q.    And in fact those documents are often
14  found accidentally and providentially under
15  peculiar conditions with minutely detailed
16  circumstances; right?
17           MR. ARGENTIERI:  Objection.
18           You can answer.
19      A.    Yes, that's something that my
20  grandfather did write about or great-grandfather
21  did write about.
22           MR. ARGENTIERI:  Great-grandfather?
23           THE WITNESS:  Yes.
24      Q.    And your great-grandfather also
25  suggested that the stories associated with such
```

1                      J.P. Osborn

2    documents are surprisingly alike in many ways and

3    alone are likely to arouse suspicion that a

4    document is not genuine; right?

5              MR. ARGENTIERI:   Objection.

6        A.    Yes.

7        Q.    You can answer.

8        A.    Yes.

9        Q.    Now assume the hypothetical of the

10   storage conditions and the late discovery of this

11   document in this case, so it is a document that

12   was found seven years after it was purportedly

13   signed in a hope chest in a freezing unclimate-

14   controlled spare room on the north wall in a

15   folder with other documents dating back to that

16   time, that sounds like a foundling will story;

17   right?

18             MR. ARGENTIERI:   Objection.

19       A.    It sounds like the type of thing that

20   my great-grandfather was describing, yes.

21       Q.    Now, before we talked more specifically

22   about the findings you made during your January

23   5th examination and that you put in your

24   declaration.

25             I'd like to talk a little bit more

```
 1                      J.P. Osborn
 2   about your involvement in the case generally.
 3            Do you recall after January 5th, when
 4   you examined the documents, when the next time
 5   you were contacted regarding the case was?
 6      A.    Not specifically, no.
 7      Q.    Do you remember whether it was a few
 8   weeks after or whether it was several months that
 9   elapsed before you were contacted again?
10      A.    To the best of my recollection it was a
11   few months later and I believe that it was in
12   relation to the preparation of the certification.
13      Q.    I see.
14            So there was no contact prior to the
15   suggestion that you prepare that declaration or
16   certification as you're calling it?
17      A.    To the -- I don't specifically recall.
18      Q.    So you don't recall whether you ever
19   served as a consultant or provided advice as an
20   expert outside of the examination and preparation
21   of the declaration?
22      A.    I do recall at one point in time with
23   one of the law firms that Mr. Ceglia was either
24   considering or who was considering taking on his
25   case describing the examinations that I performed
```

1                    J.P. Osborn

2  and my findings verbally, but specifically, no, I

3  don't recall.

4      Q.    And do you remember when it was that

5  you were asked to provide your June 16th

6  declaration?

7      A.    I guess shortly before, within a few

8  weeks, I believe.

9      Q.    So it would have been early June, late

10 May?

11     A.    In all likelihood, yes.

12           Specifically, I don't know the date,

13 but sometime around that time period because I

14 would have had to take the time to prepare it.

15     Q.    And I think you said you don't, but

16 just to be clear, you don't remember exactly

17 which attorney contacted you?

18     A.    No.

19     Q.    And you don't remember what firm they

20 came from, whether it was DLA Piper or some other

21 firm?

22     A.    As I stated before, DLA Piper sounds

23 very familiar to me, I suspect that that's where

24 the attorney was from, but I'm not absolutely

25 sure.  I know that there was at least one other

```
 1                     J.P. Osborn
 2    attorney that I spoke with directly other than
 3    Mr. Boland and Mr. Argentieri.
 4         Q.    How did the drafting process work?
 5               It sounds like you might have given an
 6    oral report and did they record this and send you
 7    a draft declaration or did you type up the
 8    declaration in the first instance?
 9         A.    If you give me a moment just to review
10    the declaration itself --
11         Q.    Okay.
12         A.    I don't recall specifically whether or
13    not we went through a drafting process or not.
14    The language that appears in the certification
15    appears to be largely my kind of language, so
16    certainly if there was a drafting process, if I
17    was provided with some kind of draft, then I
18    would have inserted a lot of my language.
19               Certainly the caption itself was
20    something that would have had to have been sent
21    to me or specifically where I was told how the
22    caption should appear, but I don't recall the
23    specifics of the drafting process, only that,
24    again, a lot of this language is my language.
25         Q.    And do you recall whether the attorneys
```

Page 95

```
 1                     J.P. Osborn
 2   you were working with asked you to add anything
 3   specifically to your declaration?
 4              MR. ARGENTIERI:  Objection.  That
 5       presumes --
 6              Do you understand the question?
 7       A.    I understand the question to be was I
 8   added to -- was I asked to provide anything more
 9   than what I had intended on producing, and no.
10       Q.    Were you asked -- specifically in
11   paragraph 11 you talk about the ink chemistry.
12   Was that something you were asked to add in your
13   declaration or was that something you would have
14   put in there yourself?
15              MR. ARGENTIERI:  Objection.
16              You can answer.
17       A.    The issue of -- no, I believe it was
18   something that I put in.
19       Q.    Did the plaintiff's attorneys ask you
20   to take anything out of your declaration that you
21   had put in?
22       A.    No, I don't believe so, no.
23       Q.    And just to be clear, do you recall
24   whether or not you ever worked with an attorney
25   named Sanford Dumain?
```

                         J.P. Osborn

1

2              He would have been with a law firm

3    Milberg LLP.

4        A.    It's possible.  The first name Sanberg

5    rings a bell, but to be quite honest, there were

6    a number of firms that were mentioned to me over

7    the course of time and I know that I did speak

8    with one attorney in particular, but I do not

9    recall which attorney it was other than, you

10   know, Mr. Boland and Mr. Argentieri, and the

11   discussion did involve, you know, either

12   Mr. Ceglia deciding to take this firm on or vice

13   versa with respect to the case, and I have always

14   thought, because of the recollection of the name,

15   that it was DLA Piper, but it might have been

16   another firm.

17       Q.    Okay.

18             In this discussion it was your

19   understanding that the law firm you were speaking

20   with was considering whether to take the case on,

21   and that's why they were talking to you?

22       A.    Yes.

23       Q.    Did anyone else review your declaration

24   before it was final other than the attorneys you

25   were working with and yourself?

```
 1                    J.P. Osborn
 2     A.    Not that I'm aware of.
 3     Q.    Did Mr. Ceglia review it, to your
 4  knowledge?
 5     A.    I'm trying to recall because it would
 6  have been -- I don't believe so.
 7     Q.    And do you know whether Mr. Stewart
 8  would have reviewed your declaration?
 9           MR. ARGENTIERI:  Larry Stewart?
10           MS. AYCOCK:  Yes.
11     A.    At any point in time?
12           I don't know for a fact that
13  Mr. Stewart ever looked at my declaration.
14     Q.    And you mentioned you were contacted in
15  late May-early June, somewhere around there.
16           Do you recall when you started writing
17  the declaration and how long it took?
18     A.    No, I don't.
19     Q.    Now, as we discussed previously in July
20  of 2011 defendants' experts were permitted to
21  examine the physical Work For Hire document under
22  the Court's orders and they were permitted to
23  extract physical samples from the Work For Hire
24  document for the purposes of chemical analysis.
25           Are you familiar with a document called
```

```
1                    J.P. Osborn
2    the hard-copy document inspection protocol in
3    this case?
4            MR. ARGENTIERI:  Objection as to form.
5        A.    No.
6            THE WITNESS:  Sorry.
7        A.    No.
8        Q.    So do you recall whether around the end
9    of June -- it would have been June 30th, July
10   1 -- whether plaintiff's attorney Jeff Lake
11   contacted you?
12       A.    The name Jeff Lake sounds very familiar
13   to me, yes.
14       Q.    Do you recall whether he contacted you
15   for assistance in drafting a court order?
16       A.    I don't recall.
17       Q.    Did Mr. Lake ever contact you, if you
18   recall, to be present at defendants' experts'
19   examinations in this case?
20       A.    Not that I recall.
21           MR. ARGENTIERI:  Can I take a short
22       break to hit the bathroom, is that all
23       right?  Have you got a natural break coming?
24           MS. AYCOCK:  I've got a natural break
25       coming.
```

1                    J.P. Osborn

2             Why don't we go just a few more

3        minutes.

4             MR. ARGENTIERI:   Okay.

5        Q.    Now, do you recall whether you were

6   ever contacted by any representative of

7   plaintiff -- whether it was Mr. Lake,

8   Mr. Argentieri or someone else -- in July of

9   2011?

10       A.    No, I don't recall.

11       Q.    And at any time were you asked for your

12  availability to conduct further examinations of

13  the Work For Hire and/or specifications document?

14       A.    To the best of my recollection, no.

15       Q.    And was there ever an indication that

16  you would be provided with more handwriting

17  samples to conduct a further analysis in that

18  regard?

19             MR. ARGENTIERI:   Objection as to form.

20       A.    In January of 2011, when the

21  examinations of the original took place, I made

22  recommendations with respect to examining the

23  signature to determine genuineness or

24  nongenuineness and had recommended that specimens

25  of Mark Zuckerberg be provided for purposes of --

```
 1                        J.P. Osborn
 2   for that purpose beyond what I had been provided
 3   at that session.
 4        Q.    But there was never any indication that
 5   you would actually be provided with such samples?
 6        A.    There was no communication that
 7   indicated that.  I assumed that at some point I
 8   would be asked to do it, to make those
 9   examinations and would receive those materials,
10   but as is often the case, collection or
11   compelling the production of that material can
12   take time and I didn't think it was that unusual
13   that it wasn't provided to me immediately.
14        Q.    But to be clear, you were never
15   provided with handwriting samples?
16        A.    That's correct, other than what was
17   given to me at that meeting.
18             MS. AYCOCK:  All right, we can break
19        here.
20             MR. ARGENTIERI:  Thank you.
21             THE VIDEOGRAPHER:  Going off the
22        record.  The time is 12:06.
23             (Recess taken.)
24             THE VIDEOGRAPHER:  We are back on the
25        record.  The time is 12:19.
```

```
 1                    J.P. Osborn

 2   BY MS. AYCOCK:

 3       Q.    Mr. Osborn, if you can direct your

 4   attention back to your June declaration, first of

 5   all, as an initial matter, if you can turn to

 6   page 2, paragraph 4, and there you indicate that

 7   a copy of the agreement is attached hereto as

 8   Exhibit B; is that right?

 9       A.    Yes.

10       Q.    Do you recall whether you yourself

11   attached Exhibit B to your report or whether you

12   allowed attorneys to handle the assembly of

13   exhibits?

14       A.    No.  I believe that the exhibit that

15   was provided as an exhibit that I provided and I

16   believe it's a printout of my PDF of that

17   document.

18       Q.    And was it you that added the Exhibit B

19   two pages to the top of that document?

20       A.    Yes.

21       Q.    Now, as we discussed earlier, your

22   examination consisted of nondestructive

23   techniques and this included your indentation

24   analysis; right?

25       A.    Yes.
```

1                       J.P. Osborn

2       Q.    Okay.  Let's talk about this

3    indentation analysis.

4              You state in paragraph 6 on page 3,

5    there you say "I was aware that should the second

6    page of the agreement bear indentations caused by

7    the interlineations and handwritten initials on

8    the first page of the agreement, then the second

9    page of the agreement was necessarily underneath

10   the first page of the agreement when the

11   interlineations and initials were written."

12             Did I read that correctly?

13      A.    Yes, you did.

14      Q.    Now, isn't it true that a forger,

15   knowing that indentations are something that

16   questioned document examiners inspect, could

17   forge indentations?

18      A.    Forgive me for this, but, first of all,

19   forgery is a legal determination, I don't make

20   determinations of forgery.

21             If the question is is it possible for

22   someone to be aware of indentations, their

23   importance in connection with a document and to

24   create a document bearing indentations where

25   indentations didn't actually occur when the

1                        J.P. Osborn

2     document was executed, the answer to your

3     question is yes.

4         Q.    So, for example, someone could use a

5     copy of the first page, place it over the second

6     page and trace the handwriting, which would leave

7     indentations on the second page; right?

8               MR. ARGENTIERI:  Objection as to form.

9               You can answer.

10        A.    That would be possible to do, yes.

11        Q.    And it would also be possible to use an

12    empty ballpoint pen to trace the handwriting on

13    the first page thereby leaving indentations on

14    the second page; right?

15              MR. ARGENTIERI:  Objection as to form.

16        Q.    You can answer.

17        A.    That would be possible to do.

18        Q.    So it doesn't necessarily mean that the

19    second page was underneath the first page when

20    the interlineation was written, right, it could

21    be -- it's suggestive of that?

22              MR. ARGENTIERI:  Objection to form.

23        A.    We suspected -- in this particular

24    case, my answer to your question would be no,

25    only because I would anticipate that if someone

1                         J.P. Osborn

2    had attempted to trace or if someone had

3    attempted to create the indentations by using,

4    for instance, an empty ballpoint pen and just

5    going over, that there would be variations in

6    terms of -- resulting indentations that would be

7    noticeable when one overlaid the ESDA test result

8    on top of the interlineation, and I did not

9    notice any significant enough variation that I

10   would opine that that had occurred.

11           I believe that the indentations that

12   occur on the first page were the things that

13   caused the indentations on the second page, that

14   they were not the result of the kind of action

15   that you described.

16       Q.    In the next two paragraphs, paragraphs

17   7 and 8, you describe your oblique lighting

18   analysis and your ESDA analysis respectively;

19   right?

20       A.    Yes.

21       Q.    And for each one of these you conclude

22   that the second page of the Work For Hire had

23   indentations that were caused by the

24   interlineations and handwritten initials on the

25   first page; right?

1                          J.P. Osborn

2          A.     Yes.

3          Q.     And this leads you to conclude in

4    paragraph 10 that the second page of the

5    agreement was underneath the first page of the

6    agreement when the interlineations and

7    handwritten initials were made on the first page

8    of the agreement; right?

9          A.     Correct.

10         Q.     Okay.

11                But these conclusions are entirely

12   consistent with page 1 being a recently created

13   forgery or just a recently created document with

14   the interlineation being written while page 1 was

15   on top of page 2?

16                MR. ARGENTIERI:  Objection as to form.

17                You can answer.

18         A.     Regardless of how or when the

19   interlineation on page 1 came to cause

20   indentations on page 2, I believe it was those

21   interlineations which caused those indentations.

22                I have not made any opinion with regard

23   to the genuineness or nongenuineness of the

24   interlineations or the initials themselves, only

25   that those particular, in my opinion, writings

1                    J.P. Osborn

2   were what caused indentations on page 2.

3       Q.    Right.

4            So page 1 could have been created many

5   years after page 2, hypothetically speaking, and

6   then the interlineation could have been written

7   on page 1 creating the indentations on page 2?

8            MR. ARGENTIERI:   Objection.

9            You can answer.

10      Q.    You may answer.

11      A.    That is possible.

12      Q.    And it's also -- your findings are also

13  entirely consistent with both pages 1 and 2

14  having recently been fraudulently created; isn't

15  that true?

16           MR. ARGENTIERI:   Objection as to form.

17      Q.    You can answer.

18      A.    You're going to have to describe to me

19  or define for me what you mean by entirely

20  consistent with.

21           It's not an opinion that I have

22  reached, it is an opinion that could only be

23  reached as a product of looking at other

24  evidence.

25           Is it possible that that could have

```
 1                       J.P. Osborn
 2   occurred?
 3              Yes, it is possible, but the evidence
 4   that I have seen up to this point is not
 5   sufficient to allow me to reach that conclusion,
 6   so it's something that's possible.
 7       Q.    Right.
 8              So hypothetically speaking, these
 9   documents, this two-page document could have been
10   created in 2009 and your findings with respect to
11   the indentations would be completely consistent
12   with that?
13              MR. ARGENTIERI:  Objection as to form.
14              You can answer.
15       A.    Yes, yes.
16       Q.    And so these -- just to be clear, these
17   conclusions about the indentations do not say
18   anything about when the document as a whole or
19   when page 1 was created?
20              MR. ARGENTIERI:  Objection as to form.
21       Q.    Isn't that right?
22       A.    That's correct.
23       Q.    And they don't say anything about the
24   authenticity of the document or its signatures;
25   is that correct?
```

```
 1                    J.P. Osborn
 2           MR. ARGENTIERI:  Objection as to form.
 3      A.    Also correct.
 4      Q.    Now, Mr. Osborn, I just want to
 5   understand a little more about what is and what
 6   is not included in your declaration.
 7           You do not conclude in your declaration
 8   that the Work For Hire document is a genuine or
 9   authentic document, do you?
10      A.    No.
11      Q.    And you wouldn't say that your findings
12   conclusively establish the authenticity of the
13   Work For Hire document, would you?
14           MR. ARGENTIERI:  Objection as to form.
15      A.    No.
16      Q.    And you do not conclude that the
17   document was actually signed on April 28, 2003,
18   do you?
19      A.    No.
20      Q.    And other than the date written on the
21   signature lines you did not find any forensic
22   evidence indicating that it was actually signed
23   or was not actually signed on April 29, 2003,
24   did you?
25           MR. ARGENTIERI:  Objection as to form.
```

1                         J.P. Osborn

2       A.    No.

3       Q.    No, you didn't find any forensic

4    evidence?

5       A.    That is correct.

6       Q.    And you did not conduct any dating

7    tests on the document, right, as you mentioned

8    before?

9       A.    That is correct.

10      Q.    So you have no conclusion or opinion as

11   to the actual date that the document was created,

12   do you?

13      A.    That is correct.

14      Q.    And you do not conclude that the

15   document was actually signed by Mark Zuckerberg

16   or Paul Ceglia; right?

17      A.    That is correct.

18      Q.    And you don't identify Paul Ceglia as

19   the author of his purported signature and date on

20   page 2, do you?

21      A.    No.

22      Q.    And you do not identify Mark Zuckerberg

23   as the author of his purported signature and date

24   on page 2, do you?

25      A.    No, I do not.

1                        J.P. Osborn

2        Q.     You mentioned that you were never

3    provided with further handwriting exemplars for

4    the signatures on page 2.

5              Did you conduct any sort of examination

6    with regard to the handwriting on the Work For

7    Hire document?

8        A.     I conducted very limited comparison of

9    the signatures that I did have with the

10   questioned signature coming to only the

11   conclusion that in order to make any kind of

12   reasonably accurate assessment I'd have to have

13   more.

14       Q.     So were there any other findings or

15   conclusions that you had about the document that

16   were not included in your declaration?

17       A.     The only other thing was more or less

18   of an inconclusive in that in examining the

19   writing ink utilizing the VSC I noted that the

20   two inks reacted the same under different

21   ultraviolet lighting and infrared filtering to

22   the extent that I could not differentiate the

23   writings in the interlineation on page 1 and the

24   writings of the signature, but that conclusion or

25   that finding, if you will, is inconclusive

1                    J.P. Osborn

2    because I can't make determinations of sameness

3    of ink utilizing those methods, I can only

4    differentiate between two inks that to the naked

5    eye looked alike, and because I couldn't make

6    that differentiation I really couldn't say

7    anything at all.

8        Q.    Right.

9              And just to be clear, when you say the

10   two inks, you are referring to the ink on page 1

11   versus the ink on page 2?

12       A.    Yes.

13       Q.    And when you say you couldn't

14   differentiate those inks, that just means you

15   couldn't differentiate them at that level of

16   analysis; correct?

17       A.    That is correct.

18       Q.    So something like chemical tests might

19   be able to differentiate those inks?

20       A.    Correct.

21       Q.    All right.  I'm almost done.

22             Why don't we just take one more quick

23   break and I will get your ESDA lifts back to you

24   and we will come back and finish up.

25       A.    Okay.  Great.

```
 1                    J.P. Osborn
 2            THE VIDEOGRAPHER:  Going off the
 3       record.  The time is 12:31.
 4            (Recess taken.)
 5            THE VIDEOGRAPHER:  We are back on the
 6       record.  The time is 12:44.
 7  BY MS. AYCOCK:
 8       Q.    Mr. Osborn, we're almost finished.  I
 9  just have a few more questions for you.
10            You mentioned that you spoke with
11  Mr. Ceglia on the day of July 5, 2011, when you
12  examined the documents; right?
13       A.    Yes.
14       Q.    Was there any other occasion on which
15  you spoke to Mr. Ceglia?
16       A.    It's -- we might have spoken over the
17  phone prior to that date.  I don't recall, as a
18  part of the inquiry process, I don't have any
19  specific recollection of that, but I wouldn't
20  view it as unusual, given the fact that, you
21  know, it was his case, but I don't recall
22  specifically.
23       Q.    And do you recall whether or not you
24  spoke with him after that January 5th examination?
25       A.    No, I don't.
```

1               J.P. Osborn

2       Q.    Other than what you have already

3   testified to here today, are there any particular

4   opinions that you are planning to offer based

5   upon your review of any expert reports from

6   defendants or plaintiffs?

7       A.    No.  I haven't been provided with any

8   reports and from what I understand I'm not going

9   to be, so, no.

10      Q.    Are there any particular opinions you

11  are planning to offer that are not described in

12  your June 2011 declaration?

13      A.    No.

14      Q.    And are there any answers you provided

15  earlier in your deposition that you have since

16  recalled are incorrect or have you recalled

17  anything further that could supplement any of

18  your previous answers?

19      A.    The only thing that I noted when we

20  were talking about the use of protective gloves,

21  I don't specifically remember, it is possible

22  that I used gloves in the examination.  I don't

23  believe I did, I think it would have been

24  something that I would have remembered because

25  it's unusual, so I'm not absolutely sure that I

1                        J.P. Osborn

2    didn't use gloves, but -- and I had been a little

3    bit more firm, perhaps, than I should have been

4    giving that answer.

5              Again, I think I would have recalled it

6    if I had and that was the reason for my response,

7    but I don't specifically recall.

8         Q.   And you would have recalled it if you

9    had because wearing gloves is unusual in the

10   course of an ordinary forensic document

11   examination?

12             MR. ARGENTIERI:  Objection as to form.

13        A.   Yes, it's unusual, at least in my

14   experience.

15        Q.   Now, Mr. Osborn, we provided you with a

16   check in advance of this deposition.

17             Just for the record, you received that

18   check; right?

19        A.   Yes, I did.

20        Q.   That covered your deposition time for

21   today and any travel time; correct?

22        A.   That is correct.

23        Q.   And if there are any outstanding fees

24   or expenses you'll direct those to our attention?

25        A.   I will, but there are none.

1                    J.P. Osborn

2         MS. AYCOCK:  Great.

3         I have nothing further at this time.

4         MR. ARGENTIERI:  No questions.

5         THE VIDEOGRAPHER:  Going off the

6     record.  The time is 12:47.

7         (Time noted:  12:47 p.m.)

8

9         _____

10        JOHN PAUL OSBORN

11

12  Subscribed and sworn to before me

13  this _____ day of _____, 2012.

14

15  _____

16        Notary Public

17

18

19

20

21

22

23

24

25

Page 116

1

2                    C E R T I F I C A T E

3    STATE OF NEW YORK       )

4                              : ss.

5    COUNTY OF NEW YORK       )

6

7              I, CARY N. BIGELOW, Court Reporter,

8         a Notary Public within and for the State of

9         New York, do hereby certify:

10             That JOHN PAUL OSBORN, the witness

11        whose testimony is hereinbefore set forth,

12        was duly sworn by me and that such

13        testimony given by the witness was taken

14        down stenographically by me and then

15        transcribed.

16             I further certify that I am not

17        related to any of the parties to this

18        action by blood or marriage, and that I am

19        in no way interested in the outcome of this

20        matter.

21             IN WITNESS WHEREOF, I have hereunto

22        set my hand this 15th day of August, 2012.

23

24        _____

25                   CARY N. BIGELOW

1

2   ------------------ I N D E X ------------------

3   WITNESS                  EXAMINATION BY            PAGE

4   JOHN PAUL OSBORN    MS. AYCOCK                    4

5

6   ------------------ EXHIBITS ------------------

7   Defendants' Exhibit 48, declaration of  41

8   John Paul Osborn in support of

9   plaintiff's opposition to defendants'

10   motion for expedited discovery and in

11   support of plaintiff's cross-motion

12   for mutual expedited discovery

13   Defendants' Exhibit 49, document        43

14   entitled "Qualifications of John Paul

15   Osborn"

16   Defendants' Exhibit 50, CD labeled      48

17   "10-cv-00569-RJA-LGF Facebook/Ceglia

18   Osborn Materials"

19   Defendants' Exhibit 51, document        49

20   entitled "Answers to Interrogatory

21   Responses" dated December 6, 2011

22

23

24

25

Page 118

ERRATA SHEET
VERITEXT REPORTING COMPANY
1250 BROADWAY
NEW YORK, NEW YORK 10001
212-279-9424

NAME OF CASE: CEGLIA VS. ZUCKERBERG

DATE OF DEPOSITION: AUGUST 13, 2012

NAME OF DEPONENT:  JOHN PAUL OSBORN

PAGE    LINE(S)        CHANGE              REASON

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

                _____
                JOHN PAUL OSBORN


SUBSCRIBED AND SWORN TO BEFORE ME

THIS ____ DAY OF _____, 20__.


_____    _____

(NOTARY PUBLIC)        MY COMMISSION EXPIRES:

| & |
| --- |
| **&**   1:19 2:16 3:15 19:21 |

| 0 |
| --- |
| **0001**   53:4 |
| **0001.pdf**   52:25 |
| **00569**   1:4 3:21 48:8 117:17 |
| **0731**   52:25 |
| **0732**   53:4 |

| 1 |
| --- |
| **1**   35:25 40:23 50:4 61:7 98:10 105:12 105:14,19 106:4,7 106:13 107:19 110:23 111:10 |
| **10**   48:8 105:4 117:17 |
| **10001**   118:3 |
| **10166-0193**   2:19 |
| **10:03**   1:15 3:13 |
| **10:32**   31:18 |
| **10:34**   31:22 |
| **11**   51:8,13 95:11 |
| **11:09**   61:6 |
| **11:20**   61:10 |
| **11th**   26:5,7 |
| **1250**   118:3 |
| **12:06**   100:22 |
| **12:19**   100:25 |
| **12:31**   112:3 |
| **12:44**   112:6 |
| **12:47**   115:6,7 |
| **13**   1:14 3:12 118:5 |
| **14**   38:9 73:15 74:19 77:4 |
| **1475**   2:6 |
| **14843**   2:14 |
| **14th**   74:5 |
| **15th**   116:22 |
| **16th**   93:5 |
| **17**   51:8 |

| 17th   41:9,22 |
| --- |
| **188**   2:13 |
| **19**   42:2 |
| **1900s**   44:22 |
| **1982**   44:2,7 |
| **1984**   44:7 |
| **1:00**   84:10 |
| **1:10**   1:4 3:21 |

| 2 |
| --- |
| **2**   36:2 49:10,23 61:11 78:2 101:6 105:15,20 106:2,5,7 106:13 109:20,24 110:4 111:11 |
| **2,800**   18:8 |
| **20**   118:23 |
| **200**   1:19 2:18 3:15 50:16 |
| **2003**   35:21 108:17 108:23 |
| **2009**   107:10 |
| **2010**   10:19 11:15 12:16 13:21 15:7 35:13 |
| **2011**   7:11 8:5,11,16 8:25 9:5 20:14,19 21:5 22:13,22 24:2 26:8 36:25 37:5 38:9,13,15 39:25 41:9 42:22 47:18,22 49:14 54:9,13 55:6 56:5 61:15,19 62:24 70:17 73:15 74:19 77:4 81:7,25 97:20 99:9,20 112:11 113:12 117:21 |
| **2012**   1:14 3:12 24:13 115:13 116:22 118:5 |
| **212-279-9424**   118:4 |
| **24**   44:10 |
| **257**   58:18 |
| **28**   35:21 108:17 |

| 29   108:23 |
| --- |

| 3 |
| --- |
| **3**   49:23 50:4 51:24 58:4 78:4 102:4 |
| **300**   52:16 |
| **30th**   98:9 |
| **34**   58:14 |
| **35**   58:14 |
| **350**   18:8 |

| 4 |
| --- |
| **4**   78:3 101:6 117:4 |
| **40**   58:23 |
| **41**   58:23 117:7 |
| **43**   117:13 |
| **44107**   2:8 |
| **48**   41:10,11 43:17 117:7,16 |
| **49**   43:20,21 117:13 117:19 |

| 5 |
| --- |
| **5**   41:25 53:5 81:7,25 112:11 |
| **50**   48:6,7,23 117:16 |
| **51**   49:11,12 117:19 |
| **58**   58:18 |
| **5th**   16:11 26:8 47:22 54:9,13 55:5 56:4 61:19 62:24 91:23 92:3 112:24 |

| 6 |
| --- |
| **6**   49:14 78:5 102:4 117:21 |
| **600**   50:15 52:17 57:10 |
| **6490cw**   49:4 |

| 7 |
| --- |
| **7**   104:17 |
| **770724**   2:7 |

| 8 |
| --- |
| **8**   104:17 |
| **8-1/2**   51:13,13 |

| 84   35:13 |
| --- |
| **8:00**   84:9 |

| 9 |
| --- |
| **999999997-05-02...**   55:16 |

| a |
| --- |
| **a.m.**   1:15 3:13 84:9 |
| **aafs**   33:20 34:2 |
| **aaron**   21:2 |
| **able**   5:20 14:24 27:5 33:11 40:13 51:10 53:24 111:19 |
| **absolutely**   93:24 113:25 |
| **academy**   33:14 |
| **accident**   86:6 |
| **accidentally**   90:14 |
| **accomplishing** 59:22 |
| **accounts**   40:21 72:14,16,17 |
| **accurate**   46:12,20 47:4,11 51:19 56:24 57:24 59:17 60:19 78:10,16 80:5 110:12 |
| **accurately**   5:21 12:2 61:14 80:23 |
| **accusation**   76:4 |
| **accused**   75:19 |
| **action**   3:21 104:14 116:18 |
| **actively**   10:11 |
| **activities**   42:21 |
| **actual**   109:11 |
| **add**   95:2,12 |
| **added**   95:8 101:18 |
| **additional**   8:14,15 13:2 17:15 18:2,5 18:22 43:12 |
| **addresses**   89:2 |
| **advance**   17:23 18:18,20 114:16 |

**advantages**  80:3
**advice**  92:19
**advised**  14:4,20
  18:21
**affords**  59:8
**age**  38:20 71:6,11,15
  75:4
**aging**  14:16 73:3,8,9
**aginsky**  15:5 26:19
  26:21,25 27:15
  81:20,22 85:16
**ago**  28:22 29:3,15
  30:10,21 31:10
**agree**  3:11
**agreement**  9:14
  13:11 15:16,18,19
  16:19,21 17:13
  101:7 102:6,8,9,10
  105:5,6,8
**ahead**  76:7
**albert**  32:2,6 44:16
**alcock**  22:2
**alexander**  2:20 4:12
**alike**  91:2 111:5
**allow**  60:12 85:2
  107:5
**allowed**  101:12
**allowing**  37:13
**allows**  51:9 59:6
  68:20
**alteration**  79:12,25
**amanda**  2:21 4:10
**ambient**  58:22 59:3
  59:5 60:3
**american**  31:5
  33:14,23,24
**amount**  17:22 18:20
  32:25
**analysis**  8:7 9:6,23
  14:25 38:19 39:10
  39:21 40:8,22 97:24
  99:17 101:24 102:3
  104:18,18 111:16
**answer**  5:2,8,14,20
  6:21 10:13 11:25

12:22 16:17 40:15
41:3 50:12 52:8
63:10 65:9 66:3
69:18 70:12,13
73:19 74:12 75:7,8
75:25 78:19 87:23
90:11,18 91:7 95:16
103:2,9,16,24
105:17 106:9,10,17
107:14 114:4
**answered**  80:16
**answers**  49:13 75:14
  113:14,18 117:20
**anticipate**  65:13
  72:6 103:25
**anticipated**  60:10
**anticipating**  17:13
**anybody**  82:25 84:3
**apparatus**  14:4 86:2
**apparent**  40:12
  57:16
**apparently**  90:5,6
**appear**  48:2 53:18
  53:19,20 56:3 94:22
**appearance**  46:3
  61:16 64:20 70:24
**appeared**  9:13 13:3
  35:8 63:23 66:6
  88:2
**appears**  35:22 58:21
  62:10 69:17 88:16
  94:14,15
**apply**  60:7
**appointment**  11:21
**approached**  7:7
**appropriate**  37:9
**approximately**  3:13
**april**  35:21 108:17
  108:23
**area**  66:5
**areas**  66:12,13
**argentieri**  2:12 4:6,6
  10:12,22 12:7,21
  15:24 16:16,22
  18:17 19:8,19 22:25

23:5 30:17 40:14
41:2 48:11,15 50:11
52:7 63:9 65:8,23
66:2 70:9 72:4,25
73:18 74:2,11 75:6
75:11,24 76:6,15
78:18 79:8 80:15
82:3,14 83:4,12
84:12 85:3,6 86:21
87:15,22 88:23
89:15 90:10,17,22
91:5,18 94:3 95:4
95:15 96:10 97:9
98:4,21 99:4,8,19
100:20 103:8,15,22
105:16 106:8,16
107:13,20 108:2,14
108:25 114:12
115:4
**arouse**  88:21 89:4
  91:3
**arrangements**  11:20
  15:21 16:10
**arrived**  84:8
**article**  31:2 35:9
**artificial**  73:8,9
**artificially**  71:6,15
  73:3 75:4
**asked**  11:13 25:19
  59:13 60:13 80:15
  86:24 93:5 95:2,8
  95:10,12 99:11
  100:8
**asking**  32:14 62:3
**aspect**  69:11 89:4
**aspects**  61:17
**asqde**  44:12
**assembly**  101:12
**assert**  6:12
**assertion**  70:21 71:2
  73:21 75:10 76:17
**assertions**  73:7
**assess**  78:11,16
**assessment**  110:12

**assistance**  98:15
**associated**  19:24
  90:25
**assume**  16:9 27:2
  38:4 83:24 91:9
**assumed**  100:7
**assuming**  18:13
**assumption**  18:15
**attached**  82:11
  101:7,11
**attempt**  14:25 23:7
  38:20 59:20 71:5
  75:2
**attempted**  104:2,3
**attempting**  56:23
**attempts**  75:5
**attention**  64:3 101:4
  114:24
**attorney**  21:19 22:6
  23:22 25:12,13
  93:17,24 94:2 95:24
  96:8,9 98:10
**attorneys**  2:5,17
  3:24 16:7 19:11,24
  20:10,17 21:2 23:23
  25:5 75:16 94:25
  95:19 96:24 101:12
**audio**  3:10
**august**  1:14 3:12
  39:24 116:22 118:5
**authentic**  108:9
**authenticity**  107:24
  108:12
**author**  109:19,23
**authors**  30:24
**availability**  99:12
**avenue**  1:19 2:18
  3:16
**average**  72:11
**aware**  10:9 12:5
  19:5,10,19 22:12
  23:25 24:16 26:15
  26:19 27:4,8,15,18
  27:22,24 28:5,8
  32:20 33:17 34:10

35:16,17,20 36:7,14
37:15,16,21 38:2,7
39:7,17,22,24 40:4
40:6,11,17,20,21
70:14 71:2 72:15
73:6,12 74:3,17,21
74:22,24 75:15 76:3
76:8,9,17 81:12,14
89:6,17 97:2 102:5
102:22
**aycock**  2:21 4:10,10
4:19 31:15,23 43:19
48:13 61:12 97:10
98:24 100:18 101:2
112:7 115:2 117:4

**b**

**b**  4:14 49:23 51:24
101:8,11,18
**bachelor's**  44:2
**back**  16:6 31:21
38:15 44:22 45:4
60:16 61:9 64:9
71:3 83:12 91:15
100:24 101:4
111:23,24 112:5
**background**  41:6
**backup**  53:9,11,13
53:23 55:24
**balabanian**  24:11
**balance**  19:3
**ballpoint**  63:3 80:18
80:20,25 81:3,5
103:12 104:4
**based**  31:5 35:14
36:12 40:21 48:25
62:10 63:16 70:7
79:18,23 80:25
113:4
**basically**  23:11
25:11 42:20 59:22
67:14
**bathroom**  98:22
**bear**  102:6

**bearing**  54:12
102:24
**bed**  51:8
**believe**  10:22 11:19
12:23,25 13:23,24
21:15 23:12 27:3,9
27:20 28:19 29:8
30:4 31:2,2 34:4
36:17,21 42:19
47:24 48:2 50:14,15
54:8 55:3,5,14
62:14,18 64:12
68:14,22 70:21
81:21 82:8,12,25
83:9 84:8,13 85:10
85:17 88:12 92:11
93:8 95:17,22 97:6
101:14,16 104:11
105:20 113:23
**believed**  76:10
**bell**  21:8,10,18 22:8
22:16 24:6 96:5
**belong**  28:24 33:7,9
33:10,13,14
**benson**  20:16,18
**best**  10:18,24 25:3,4
29:11,21 46:10 47:8
56:3 61:25 62:8
63:15 84:16 92:10
99:14
**better**  5:10 36:24
48:21 57:15,19 59:9
**beyond**  17:25 18:20
100:2
**bigelow**  1:21 4:3
116:7,25
**bit**  48:20 66:15
91:25 114:3
**black**  63:2,3,14
80:14,18,19,20,25
81:2,3,4
**blanco**  27:20 29:24
32:14 33:3 34:8
**blanco's**  33:17

**blood**  116:18
**board**  33:21,23
**boilerplate**  88:5
**boland**  2:4,9 4:8,9
23:5 24:22 31:16
94:3 96:10
**bond**  65:13
**book**  45:2 89:3
**box**  90:5
**brand**  63:25 67:17
**break**  5:13,16 45:5
61:2 67:25 98:22,23
98:24 100:18
111:23
**breaks**  6:11
**brendan**  26:13
**briefly**  41:6,19
**bright**  71:12,14 72:9
**brightness**  65:15
**bringing**  36:11
**broader**  34:2
**broadway**  118:3
**brother**  26:13 49:4
49:24 50:10 51:6,7
51:16,19 57:4,11
**brought**  11:11,22
14:18,20 15:11 26:6
82:2,5
**brown**  73:17
**brownish**  63:8 74:9
**brownlie**  22:4
**buffalo**  89:13
**button**  31:10,13,24

**c**

**c**  2:2 67:2 85:10
116:2,2
**c10221**  49:6
**c5050z**  49:8
**calihan**  25:2
**call**  10:23,24 11:3
11:15,23 36:3
**called**  4:14 13:10
19:20 20:15 24:3
30:13 97:25

**calling**  92:16
**calls**  11:24 12:3 15:6
**camcom**  67:2 69:15
85:10
**camera**  49:8 58:6
59:4,6
**canon**  49:6 51:12,16
51:25 52:23 56:19
57:3,7,8,20,24
**caption**  3:17 94:19
94:22
**capture**  47:11 48:12
51:10 59:6,20,25
77:7 86:4
**captured**  49:2 50:7
51:24 77:3
**carmine**  26:10
**carrie**  21:24
**cary**  1:20 4:3 116:7
116:25
**cary's**  6:17,21
**case**  3:17,19 5:23
7:4 10:8,17 11:6
17:8 19:7,17 24:2
24:15,19,21 26:16
28:6 29:8,9,10 30:6
34:21,25 35:2,3,7
35:18 36:15,24 37:3
47:16 68:4 72:24
73:5 80:10,12 82:10
91:11 92:2,5,25
96:13,20 98:3,19
100:10 103:24
112:21 118:5
**cases**  28:17 29:20,23
30:4 53:16
**caught**  64:3
**cause**  71:14 72:2
76:16 105:19
**caused**  70:23 75:25
76:12 102:6 104:13
104:23 105:21
106:2
**cd**  47:25 48:5,7,17
48:22 117:16

**ceglia** 1:5 3:17 4:7,9
7:9 19:19 26:2
35:12,17 48:8 75:3
81:14,14 82:3,15
83:5,13 84:12 85:3
89:8 92:23 96:12
97:3 109:16,18
112:11,15 117:17
118:5
**ceglia's** 24:14 26:10
36:8 37:13,24
**cell** 3:8
**central** 35:17
**certain** 85:8,12
**certainly** 29:16 35:7
35:10 63:22,23,24
64:20 72:20 81:2
84:13 94:16,19
**certification** 23:14
23:15 33:21 37:10
44:12 88:16,17
92:12,16 94:14
**certify** 116:9,16
**change** 50:21 52:18
70:3,7,23 118:7
**changed** 8:3 21:5
**characteristics**
45:20 46:13 77:8
**characterize** 80:17
**charging** 18:2
**check** 55:7 56:13
114:16,18
**checked** 32:21
**chemical** 7:23 39:10
39:21 40:8 81:23
97:24 111:18
**chemically** 27:5
**chemist** 14:23 38:18
39:4,13 40:7
**chemistry** 95:11
**chest** 89:11 91:13
**circumstances**
13:17 87:10,18
90:16

**civil** 3:21
**claiming** 35:13
**clarification** 6:2
**clear** 6:22 80:12
93:16 95:23 100:14
107:16 111:9
**clearly** 26:18
**client** 10:5
**close** 45:24 59:8
**coined** 31:3
**cold** 82:23
**colleagues** 68:17
**collected** 8:19
**collection** 100:10
**collectively** 42:7
**color** 50:22 57:20,21
77:22
**coloration** 52:19
**come** 10:7 14:16
45:4 72:23 73:4
85:21 111:24
**comfortable** 79:6,11
**coming** 98:23,25
110:10
**comment** 33:11
**commission** 118:25
**communicate** 21:13
**communication**
100:6
**community** 31:4
**company** 118:2
**comparison** 110:8
**compelling** 100:11
**compensation** 17:20
**complaint** 82:10,13
**complete** 5:2
**completely** 80:19
107:11
**components** 40:12
40:18
**comprehensive**
44:24
**compressed** 57:12
57:16

**computer** 53:9
**concept** 89:24 90:2
90:8
**concert** 75:3
**concerted** 35:6
**conclude** 104:21
105:3 108:7,16
109:14
**conclusion** 78:25
79:3 107:5 109:10
110:11,24
**conclusions** 9:18
105:11 107:17
110:15
**conclusively** 108:12
**condition** 47:4
70:15 74:7,25 75:18
77:9 78:11,16,22
**conditions** 90:15
91:10
**conduct** 12:8 13:22
16:25 38:19 39:19
62:22 99:12,17
109:6 110:5
**conducted** 7:13 14:5
40:8,17 64:12 66:21
67:19 68:14 70:8
110:8
**conducting** 17:14
34:15 39:20 69:10
86:11
**confirmed** 61:14
**connection** 102:23
**connors** 19:21,25
**conservative** 31:4
32:4
**consider** 10:10
14:22 15:12 33:3
77:13 78:10
**considered** 8:2 28:2
57:14
**considering** 92:24
92:24 96:20
**consisted** 101:22

**consistent** 105:12
106:13,20 107:11
**construction** 32:13
32:22
**consultant** 92:19
**contact** 23:4 92:14
98:17
**contacted** 10:16,20
16:5 27:16 38:12
92:5,9 93:17 97:14
98:11,14 99:6
**contained** 9:16
**content** 32:23,25
**context** 28:20
**continue** 3:10
**continued** 44:13
**continues** 45:3
**contract** 13:10
35:15,16,21 36:8
**contracts** 88:9
**contrast** 50:22
52:18
**control** 79:24
**controlled** 89:12
91:14
**conventionally**
18:17
**conversation** 6:10
11:8 12:24 25:10,11
87:12
**conversations** 3:7
14:18
**coordinated** 19:15
**coordinating** 34:14
**coordination** 21:17
**copies** 9:20 43:9
**copy** 41:8 42:19,24
43:4,7 48:5 54:5,10
55:9,13,19 78:9
98:2 101:7 103:5
**correct** 7:14,19 8:13
8:23 9:3,7,25 10:2
19:4 21:15 32:3
39:13,14 44:3,6,8
45:25 46:4 47:14,20

47:23 49:9 50:2
52:3 53:2,3,6 58:7
58:11,19,20,20
61:22 63:6 64:7
67:18,20 77:11
78:13 80:14 81:6
84:8 89:19 100:16
105:9 107:22,25
108:3 109:5,9,13,17
111:16,17,20
114:21,22
**correctly** 102:12
**counsel** 6:5,6,9 9:11
12:7 14:22
**county** 116:5
**course** 13:2 19:16
21:12 37:16 45:8
72:10 73:4 75:23
83:3 84:6 85:17
86:8 87:6 96:7
114:10
**court** 1:2,21 3:20
4:3 6:17 9:2 37:12
37:21 38:5 39:18
41:19 73:15 75:16
98:15 116:7
**court's** 97:22
**courts** 36:16
**covered** 114:20
**covers** 17:23
**create** 47:3 57:18
77:8 102:24 104:3
**created** 36:10 40:24
55:23,24,24 85:5
105:12,13 106:4,14
107:10,19 109:11
**creates** 53:11 57:8
**creating** 46:25
57:19 106:7
**creation** 46:23
**credentials** 41:7
**cross** 22:10 37:7
41:15 117:11
**crutcher** 1:19 2:16
3:15

**curiosity** 32:15
**cut** 51:12
**cv** 1:4 3:21 42:3,15
47:19 48:8 117:17

**d**

**d** 1:5 117:2
**damage** 40:12 63:19
75:21 76:10
**damaged** 76:5
**daniel** 2:25 3:3
**dark** 80:19
**darker** 80:7,8
**date** 3:12 35:20,22
40:24 41:17 43:24
48:10 49:15 75:5
93:12 108:20
109:11,19,23
112:17 118:5
**dated** 49:14 85:16
88:10 117:21
**dates** 36:2
**dating** 14:15 91:15
109:6
**david** 20:12
**day** 16:2 72:10 84:6
112:11 115:13
116:22 118:23
**deal** 44:25
**dealing** 9:19
**dean** 2:9 4:8
**december** 8:12
10:19,25 11:15
12:16 13:20 15:7
16:4 49:14 117:21
**deciding** 96:12
**declaration** 8:6,25
9:5,10 17:4 21:4,13
21:16 22:13 25:16
25:20 37:2,6,18
38:16,17,23 41:9,11
41:23 89:9,18 91:24
92:15,21 93:6 94:7
94:8,10 95:3,13,20
96:23 97:8,13,17

101:4 108:6,7
110:16 113:12
117:7
**declarations** 74:15
**defendants** 1:10
2:17 4:11,13 22:23
28:5 34:22 36:7,20
37:12,22,23 38:3,8
39:15 40:7 41:10,11
41:13 43:2,20,21
48:6,7,23 49:12,17
70:16 73:13,14 74:3
74:24 75:5,10,16,20
76:9 97:20 98:18
113:6 117:7,9,13,16
117:19
**defense** 70:22
**define** 65:11 106:19
**definition** 6:3
**degradation** 76:13
**degree** 12:4,5 44:2
59:8 72:8,8 80:23
**delay** 90:4
**dennis** 22:7
**deponent** 118:6
**deposed** 4:20,23
**deposing** 6:5
**deposition** 1:17 3:9
3:14 4:24 6:4,11,11
113:15 114:16,20
118:5
**describe** 23:11 31:8
104:17 106:18
**described** 81:3 85:7
104:15 113:11
**describing** 8:6 74:7
86:12 91:20 92:25
**description** 43:13
43:15
**designated** 53:15
**desire** 57:18
**despite** 40:11 90:6
**destructive** 8:2
**detailed** 42:11 90:15

**detection** 14:4 86:2
**determination** 9:19
9:24 13:4 102:19
**determinations**
102:20 111:2
**determine** 6:12 9:12
38:20 99:23
**determined** 13:25
40:22
**developed** 86:3
**device** 57:8,9,20
67:3,8,11,12 68:18
68:19 69:15,25
**devices** 55:23 56:24
**difference** 71:22
77:22
**different** 17:9 20:15
34:3 43:15 49:3
53:18,20 67:17
110:20
**differentiate** 110:22
111:4,14,15,19
**differentiation**
64:17 111:6
**differently** 64:10
**digital** 49:8 59:7
**direct** 101:3 114:24
**directly** 28:19 94:2
**disc** 48:3
**disciplines** 34:4
**discoloration** 76:11
78:24 79:20
**discolored** 73:23
74:9,25 75:18
**disconnection** 31:14
**discovered** 86:7
**discovery** 37:7
39:16 41:14,16 90:7
91:10 117:10,12
**discrepancies** 88:19
**discuss** 22:22 24:19
86:9
**discussed** 73:9
97:19 101:21

discussion  14:19
  31:19 85:11 88:13
  96:11,18
dismiss  36:15,19
distance  84:25
district  1:2,3 3:20
  3:20
dla  21:6,11,14,18
  22:13 23:18 25:14
  93:20,22 96:15
document  7:13,21
  8:3,4 11:11 12:6,20
  12:24 13:9,14,18
  14:19 15:11 17:8,14
  26:5,16 28:10 30:23
  31:4,6,8 32:5 33:4,8
  33:22,23,24 34:11
  35:23,24 36:4,9
  37:14,19,25 38:2,21
  38:25 39:20 40:3,9
  43:21 44:17,25 45:8
  45:11,14,21,24 46:2
  46:10 47:4,12 49:12
  51:3,10,11,21 54:10
  54:17,18,22 55:2,8
  55:13 56:7,8,9,10
  56:13 57:17 60:15
  60:23 61:17,20,24
  62:12,16,17,19,25
  63:5,8,13,14,20
  64:6,9,10,14 65:3
  66:8,19 67:9 68:24
  69:12 70:4,8,16,23
  71:5,6,11,15,19,20
  72:3,8 73:8,14,16
  73:23 74:8,18 75:2
  75:17,23 76:4,5,11
  76:13,20,25 77:3,8
  77:9,14,16 78:12,15
  78:17,23 79:12
  80:10,11,13 81:8,9
  81:13,18,25 82:4,6
  82:11,16,20 83:11
  83:22 84:5 85:5,15
  85:20,22 86:14,18

86:20 87:4,8,8,14
  87:18,19,20,25 88:5
  88:8,14,15,20,22
  89:10 91:4,11,11
  97:21,24,25 98:2
  99:13 101:17,19
  102:16,23,24 103:2
  105:13 107:9,18,24
  108:8,9,13,17 109:7
  109:11,15 110:7,15
  114:10 117:13,19
documents  6:4 7:12
  8:22 11:17,21 12:17
  13:2 14:15,16 16:6
  16:14,25 44:20 45:2
  53:19,20,22 54:4,5
  54:9 55:4 58:5
  60:22 67:13 68:12
  73:4 80:2 83:4 85:9
  89:3,4 90:3,13 91:2
  91:15 92:4 107:9
  112:12
doing  60:10 71:4
  79:6 84:19,22 85:2
  85:8 86:12,12
dpi  50:15,16 52:6
  57:10
dpis  77:21
dr  26:19,21,25
  81:20,22 85:16
draft  94:7,17
drafting  94:4,13,16
  94:23 98:15
due  75:2
dullness  65:15
dully  65:7,12
duly  4:15 116:12
dumain  95:25
dumps  55:25
dunn  1:18 2:16 3:15
dye  40:12

e

e  2:2,2 10:23 30:10
  32:14 54:6,14 116:2

116:2 117:2
earlier  24:13 81:17
  101:21 113:15
early  44:22 93:9
  97:15
edelson  24:3,7
educational  42:21
effects  72:2
effort  35:6
eight  17:23,25 18:12
  18:18,23
eighth  18:8
either  22:9 34:21
  54:13 64:22 66:7
  78:23 84:23 86:19
  87:7 92:23 96:11
elapsed  92:9
electronic  78:21
electronically  55:20
electrostatic  14:4
  86:2
eligible  44:12
elliot  1:8
emanuel  20:10
employment  13:10
empty  103:12 104:4
enabled  44:11
ends  61:6
engage  6:10 15:23
engaged  10:8 16:24
  81:15
engagement  15:22
  17:5,7 18:14
entered  24:14
entire  51:10 66:10
  72:10
entirely  105:11
  106:13,19
entitled  43:22 49:13
  117:14,20
entries  38:20
envelope  82:16
  83:16
equipment  12:11
  49:3 66:22 68:11

eric  27:22
errata  118:2
esda  14:9,11 59:23
  62:6 67:19,21 68:10
  69:20 75:22 85:9,25
  86:9 104:7,18
  111:23
esdas  62:23
esq  2:9,12,20,21
establish  108:12
established  30:11
  32:12
event  13:4
eventually  59:12
evidence  85:12
  106:24 107:3
  108:22 109:4
evident  60:2
exact  48:5
exactly  11:2 93:16
exam  34:15 67:19
examination  4:18
  7:13 16:7,10,25
  26:24 27:2 30:23,23
  31:4 32:5 33:22
  38:5,7 44:17 45:9
  45:12 47:5,22 64:5
  64:8 66:5,16 69:11
  74:19 75:23 81:23
  83:4,10 84:18 87:6
  87:21 91:23 92:20
  101:22 110:5
  112:24 113:22
  114:11 117:3
examinations  7:16
  7:17 9:11,15,16
  11:10 12:8,12 13:24
  14:2 17:10,12,15
  22:23 34:12,18
  38:11,13 60:10
  64:13,13,15 65:17
  66:18,21 68:15 69:2
  69:21,24 70:7 85:18
  86:8 92:25 98:19
  99:12,21 100:9

**examine**  8:21 11:13
11:16 12:9,17 27:5
37:13,24 59:9 64:21
66:8 67:13 68:12,24
97:21
**examined**  4:16 16:5
26:6 38:3 46:21,22
61:17,20 62:11
63:12 79:18 80:22
81:8,13 92:4 112:12
**examiner**  17:8 31:8
33:4
**examiners**  26:16
31:6 33:8,23,25
44:25 45:14 67:9
76:5 81:18 102:16
**examining**  13:9
16:13 60:9 68:21
85:9,21 86:18 87:25
88:22 99:22 110:18
**example**  46:7 58:23
71:18 103:4
**exams**  7:15 8:15
**executed**  103:2
**execution**  13:17
**exemplars**  110:3
**exhibit**  41:11,25
42:6,6,8 43:8,17,21
48:7,14,23 49:10,12
101:8,11,14,15,18
117:7,13,16,19
**exhibits**  76:19
101:13 117:6
**exited**  19:16
**expect**  70:6 81:4
**expecting**  18:22
**expedited**  37:7
39:16 41:14,16
117:10,12
**expenses**  114:24
**experience**  114:14
**expert**  10:8,11 19:11
28:11 34:20 79:10
92:20 113:5

**experts**  22:23 27:18
28:6 34:12 38:3,8
39:25 70:16 74:3,18
75:20 76:10 81:15
97:20 98:18
**expires**  118:25
**explain**  30:19 88:6
**explaining**  38:18
**explanation**  6:3
**exposed**  71:19,21
**exposing**  71:12
**exposure**  76:12
**extent**  17:5 29:17
47:6 59:20 73:6
110:22
**extract**  97:23
**extractions**  39:9
**extreme**  65:14,15
**eye**  63:21 71:17
111:5

**f**

**f**  116:2
**fabricated**  36:10
**face**  66:7 70:24
71:22
**facebook**  1:9 3:18
4:11 35:14 36:14
48:8 117:17
**fact**  23:22 39:8,25
79:17 90:13 97:12
112:20
**fade**  72:7 79:20
**faded**  73:17 74:8,25
75:18
**fading**  63:7 78:23
79:21
**fall**  8:11
**familiar**  22:24 23:21
29:25 67:15 89:24
90:8 93:23 97:25
98:12
**family**  26:10 30:15
**far**  12:4 20:24 32:20
81:12

**fashion**  65:12
**father**  44:4
**features**  59:9
**federal**  36:16
**fee**  15:13,14
**fees**  18:2,5,16,18,19
18:22 114:23
**felt**  79:17
**field**  8:2 44:20 72:22
**file**  8:18 46:20 53:24
55:22 57:11,12,13
58:10
**filed**  3:19 35:13
36:20 42:13 82:10
**files**  52:10 53:12,23
55:25 56:2 57:14
**filtering**  110:21
**filters**  46:5
**filtration**  66:9
**final**  96:24
**find**  36:19 53:24
108:21 109:3
**finding**  79:4 89:7
110:25
**findings**  9:2,5,8,9
10:4 23:11,16 24:19
25:10,12 91:22 93:2
106:12 107:10
108:11 110:14
**fingerprints**  85:21
86:4,15
**finish**  5:14 6:18
111:24
**finished**  112:8
**firm**  19:20,25 20:10
20:15,15,21,23 22:8
23:7,10 24:3,14,16
93:19,21 96:2,12,16
96:19 114:3
**firm's**  19:22
**firms**  19:6,15 21:5
23:6 92:23 96:6
**first**  9:12 10:16
11:23 16:5 17:23
23:16 25:20 42:4,9

61:23 64:18 69:18
75:19 88:19 89:9
94:8 96:4 101:4
102:8,10,18 103:5
103:13,19 104:12
104:25 105:5,7
**firsthand**  46:13
47:13 57:25
**fluoresce**  64:9 65:7
**fluoresced**  65:11
**fluorescence**  65:3
65:21
**focus**  65:16 66:5
**focused**  33:21 66:11
**focusing**  69:12
**folder**  54:2,20 82:16
83:16 91:15
**folders**  53:15 56:2
**followed**  42:10
**following**  55:17
**follows**  4:17
**forensic**  14:23 17:7
33:15,23 34:3,11
38:18 108:21 109:3
114:10
**forge**  102:17
**forger**  102:14
**forgery**  36:10
102:19,20 105:13
**forgive**  102:18
**forgotten**  90:5
**form**  16:16 22:25
40:14 41:2 50:11
54:15,19 55:7,13
56:14,15 63:9 65:8
65:23 66:2 70:9
72:4,25 73:18 74:2
74:11 75:6,24 76:6
78:18 79:8 80:16,25
86:21 87:15,22
88:23 89:15 90:10
98:4 99:19 103:8,15
103:22 105:16
106:16 107:13,20
108:2,14,25 114:12

formal 34:25
formalize 15:21
formally 15:9,10,12
format 57:13 78:14
79:7
formatting 88:3,11
88:18
forth 16:6 116:11
foster 67:5,15 86:3
found 32:9 87:4
90:14 91:12
founded 32:5
foundling 89:21
90:2 91:16
four 55:15
frank 74:4
fraud 36:16
fraudulently 85:5
106:14
freeman 67:5,15
86:3
freezing 91:13
front 64:10 65:6,21
66:10 72:2 73:22
full 4:25
fully 5:21 11:12
further 17:20 38:19
57:18 99:12,17
110:3 113:17 115:3
116:16

**g**

gcms 40:13
geared 69:21
general 45:10
generalized 17:6
generally 7:6 39:5,7
77:13 89:25 92:2
generic 67:11
genuine 13:3 91:4
108:8
genuineness 13:5
59:13 60:13 99:23
105:23

gerry 28:13,14
gibson 1:18 2:16
3:15
give 21:19 41:18
75:12 94:9
given 37:8 94:5
100:17 112:20
116:13
giving 114:4
gloves 82:20,22,24
83:2,5,8,23,25 84:4
113:20,22 114:2,9
go 3:11 7:5 23:3
38:15 48:5 52:12,14
57:18 76:7 99:2
going 31:17 48:4,11
48:16 59:12 61:5
80:4 100:21 104:5
106:18 112:2 113:8
115:5
good 3:2 5:17 33:8
government 56:14
grable 20:7,12
grandfather 31:12
31:25 44:15 89:2,21
90:20,20,22,24
91:20
grant 37:22
granted 39:17
great 7:2 31:12,25
43:10 44:15 67:24
68:9 89:2,21 90:6
90:20,22,24 91:20
111:25 115:2
guess 93:7
gus 28:9

**h**

h 2:20 4:14
half 30:10
hall 21:22
hand 66:22 68:13
69:6,6 70:2 116:22
handed 82:4,20

handle 101:12
handled 63:23
handling 83:22
handwriting 9:13
35:24 99:16 100:15
103:6,12 110:3,6
handwritten 45:24
68:6 102:7 104:24
105:7
happen 15:9
hard 54:4 55:13,18
98:2
head 6:23 28:12
heard 29:14 30:2
71:4
hearing 20:23
heat 71:14
held 1:18 3:14 66:22
68:13 69:6,6 70:2
helpful 54:24
hereinbefore 116:11
hereto 101:7
hereunto 116:21
high 68:2
higher 50:18
highly 40:23 45:3
hire 9:13 13:11
17:13 36:3,9 37:14
37:19,24 38:21
39:17 40:3,9 56:12
60:23 61:20,24
62:22,25 63:5,8,20
64:5 66:19 70:4
73:14 74:6,8 76:13
76:20,24 77:2 81:8
81:25 82:11 83:11
86:19 87:8,19 88:9
88:20 89:10 97:21
97:23 99:13 104:22
108:8,13 110:7
history 86:9
hit 98:22
holes 63:24
holmberg 25:23

homes 89:14
honest 96:5
hope 89:11 91:13
hornell 2:14
hour 18:8
hourly 18:6,7,12
hours 17:23,25
18:12,19,24
huh 6:24
humorous 31:9
hybrid 68:19
hypothetical 91:9
hypothetically
106:5 107:8

**i**

icon 44:17
idea 11:2
identification 41:17
43:23 48:9 49:15
identify 3:25 109:18
109:22
illuminated 64:5
illustrations 46:24
image 49:6 51:9,25
53:23 54:19 56:19
68:20 77:20,21
79:18 80:4,8,9
82:11
images 8:10,18 45:8
45:18 46:5,10 47:3
47:10,16,21 48:13
49:2,25 50:3,6
51:25 53:22 54:2
55:15 57:8,16,19
59:7,8,15,19 60:11
60:11,22 61:14
62:10,17,19 63:16
69:9 78:21 79:15,24
80:6,24 82:7
immediately 53:8
64:2 100:13
importance 57:17
102:23

**improbable** 90:3
**inch** 51:8
**inclined** 78:25 79:13
  79:22
**include** 71:11
**included** 9:4 13:25
  43:16 53:21 76:19
  101:23 108:6
  110:16
**includes** 43:11
**inconclusive** 110:18
  110:25
**incorrect** 113:16
**increase** 52:6,15
**increased** 50:14
  52:16
**indentation** 9:6,23
  101:23 102:3
**indentations** 9:18
  9:21 14:6,7 59:21
  102:6,15,17,22,24
  102:25 103:7,13
  104:3,6,11,13,23
  105:20,21 106:2,7
  107:11,17
**indicate** 14:5 49:24
  51:24 58:4 78:9
  101:6
**indicated** 88:4 100:7
**indicating** 108:22
**indication** 99:15
  100:4
**indications** 85:4
**individually** 1:9
**informally** 32:4
**information** 27:10
  48:22 77:15 87:13
  87:17
**informational** 12:3
**infrared** 7:17 46:6
  69:25 110:21
**inherently** 90:3
**initial** 7:4 11:8,15
  14:18 15:6,13,14
  17:22 44:9 101:5

**initially** 18:9 60:9
  60:15
**initials** 35:25 102:7
  102:11 104:24
  105:7,24
**ink** 9:16,24 14:23
  26:24 28:10 38:18
  38:20 39:9 40:2,7,8
  40:12,18 46:3,6
  62:25 63:2,3,8,13
  64:17 65:18 66:11
  67:13 69:22 70:3
  71:6 73:16 74:9
  75:2,5,18 76:11
  78:23 79:21 80:14
  80:17,18,25 81:3,5
  85:16 89:8 95:11
  110:19 111:3,10,11
**inks** 27:2,6 110:20
  111:4,10,14,19
**inquired** 30:14
**inquiring** 30:10
**inquiry** 11:8 112:18
**inserted** 94:18
**inspect** 102:16
**inspection** 8:16 98:2
**instance** 29:8 45:23
  51:11 58:14 59:10
  59:12 60:11 66:6
  77:20 94:8 104:4
**instances** 71:16
**instrument** 80:21
**instruments** 14:2
**intended** 47:11 95:9
**intense** 80:19
**intentions** 32:15
**intents** 30:14
**interact** 20:21
**interacted** 19:23
  25:6 30:7
**interacting** 20:9,25
**interaction** 23:9
**interactions** 22:18
**interest** 35:14

**interested** 14:25
  116:19
**interfere** 3:9
**interlineation** 35:25
  40:23 69:17 103:20
  104:8 105:14,19
  106:6 110:23
**interlineations**
  102:7,11 104:24
  105:6,21,24
**internet** 35:4 36:19
  72:14,17,18
**interrogatories** 8:10
  49:17 76:18
**interrogatory** 48:25
  49:11,13,22 51:23
  58:3 66:25 78:2,3,4
  117:20
**introduces** 77:19
**invoices** 18:24
**involve** 17:9 96:11
**involved** 10:11 14:6
  14:7 20:15 24:4
  27:13 28:17 29:20
  29:22,23 30:23
**involvement** 7:5
  10:16 19:16 29:5
  33:18 34:25 72:24
  73:5 92:2
**involves** 38:24
**involving** 14:2 34:3
**issuance** 23:13
**issue** 12:6 13:4
  14:21 35:17 70:15
  70:20 79:25 95:17
**issued** 89:9
**issues** 12:10,10
  44:24 88:18
**it250** 67:2 85:10
**items** 43:17

**j**

**j** 4:14
**j.p.** 5:1 6:1 7:1 8:1
  9:1 10:1 11:1 12:1

13:1 14:1 15:1 16:1
  17:1 18:1 19:1 20:1
  21:1 22:1 23:1 24:1
  25:1 26:1 27:1 28:1
  29:1 30:1 31:1 32:1
  33:1 34:1 35:1 36:1
  37:1 38:1 39:1 40:1
  41:1 42:1 43:1 44:1
  45:1 46:1 47:1 48:1
  49:1 50:1 51:1 52:1
  53:1 54:1 55:1 56:1
  57:1 58:1 59:1 60:1
  61:1 62:1 63:1 64:1
  65:1 66:1 67:1 68:1
  69:1 70:1 71:1 72:1
  73:1 74:1 75:1 76:1
  77:1 78:1 79:1 80:1
  81:1 82:1 83:1 84:1
  85:1 86:1 87:1 88:1
  89:1 90:1 91:1 92:1
  93:1 94:1 95:1 96:1
  97:1 98:1 99:1
  100:1 101:1 102:1
  103:1 104:1 105:1
  106:1 107:1 108:1
  109:1 110:1 111:1
  112:1 113:1 114:1
  115:1
**james** 20:7 27:20
  34:8
**january** 7:11 8:15
  11:20 16:4,11 17:18
  26:5,7,8 47:22 54:9
  54:13 55:6 56:4
  61:15,19 62:24 81:7
  81:25 82:21 91:22
  92:3 99:20 112:24
**jason** 25:23
**jay** 24:7
**jeff** 22:15,16 98:10
  98:12
**jerry** 21:20
**job** 5:8
**john** 1:17 3:22 22:2
  41:12 43:22 115:10

116:10 117:4,8,14
  118:6,21
**jpeg**  51:24 52:21
**jpegs**  53:4,7 55:17
  57:12,21
**judge**  5:23
**judgment**  33:6
**july**  22:21 24:2 38:8
  38:13 39:24 70:17
  73:15 74:5,19 77:4
  97:19 98:9 99:8
  112:11
**june**  8:5,24 9:5 21:5
  22:13 36:25 37:5
  38:15 41:8,22 42:13
  89:6 93:5,9 97:15
  98:9,9 101:4 113:12

**k**

**kasowitz**  20:16,18
**keep**  35:6
**keeping**  77:17
**kept**  35:3
**kevin**  22:10
**kind**  7:23 14:24
  31:7 38:24 39:4,5
  39:20 45:15 64:19
  66:9 67:11 71:14
  75:11 78:24 79:19
  79:23 83:6 85:4
  87:11 88:4 94:15,17
  104:14 110:11
**kip**  21:22
**kleenex**  67:10
**know**  5:8 7:3 16:15
  19:11 26:21 27:9
  28:3,10,15 29:12,19
  32:18,24 33:5,10
  34:8 35:19 38:10
  39:5 42:13 48:15
  53:11,13 56:3 65:10
  70:25 72:11,12 82:3
  84:22,25 85:12
  88:12,13 89:20
  93:12,25 96:7,10,11

97:7,12 112:21
**knowing**  102:15
**knowledge**  57:15
  97:4
**known**  18:20

**l**

**l**  4:14
**labeled**  48:7 52:25
  53:4 55:16 117:16
**laboratory**  12:11
  84:15
**lake**  22:15,16 98:10
  98:12,17 99:7
**lakewood**  2:8
**lamp**  64:6
**lamps**  66:23 69:6
  75:22
**language**  94:14,15
  94:18,24,24
**laporte**  28:13,14
  40:7,13,22
**laporte's**  89:7
**large**  48:24
**largely**  94:15
**larger**  51:8,9 57:5
**larry**  27:21 29:14
  34:7 97:9
**lastly**  46:22
**late**  8:11 44:5 91:10
  93:9 97:15
**law**  19:6,15,20,22
  20:10 21:5 22:8
  23:6,9 30:22 92:3
  96:2,19
**lawrence**  20:3
**lawsuit**  35:13 36:11
**lawyer**  22:14 23:10
  24:24
**lawyers**  21:14
**leading**  44:19
**leads**  105:3
**learn**  86:18 87:3,7
**leave**  103:6

**leaving**  103:13
**left**  84:9
**legal**  2:4 102:19
**lenses**  70:2
**lesnevich**  28:9 75:20
**letter**  15:22 18:14
**level**  111:15
**lgf**  48:8 117:17
**lifts**  67:21 68:10
  111:23
**light**  58:15 59:2,19
  59:24 60:3,3 64:14
  64:16 69:8,9 71:14
  73:17 75:22
**lighting**  58:18,20,22
  58:22 59:3,3,5 66:9
  69:7,8,21 104:17
  110:21
**liked**  57:4
**likelihood**  93:11
**limitation**  77:19
**limitations**  46:11
  47:9 60:8 77:12,17
**limited**  81:23 110:8
**line**  45:24 68:7
  118:7
**lines**  108:21
**lippes**  21:7 22:6,14
**listed**  23:23
**literature**  72:13
**little**  48:20 66:15
  91:25 108:5 114:2
**live**  32:19,24
**llc**  2:4
**llp**  1:19 2:16 24:15
  96:3
**located**  3:15 87:4
**long**  7:3 32:21 72:6
  72:11 90:4 97:17
**longer**  10:8 59:11
**look**  49:22 50:6
  59:13 60:13 68:20
  69:8 79:15,16
**looked**  17:3 32:13
  97:13 111:5

**looking**  43:14 48:20
  69:22 80:4 84:24
  88:8 106:23
**looks**  54:25 58:13
**lost**  31:16
**lot**  94:18,24
**luminescence**  46:7

**m**

**macro**  59:7 60:11
**macroscope**  68:15
  69:5,11
**magnification**  68:17
**magnified**  68:20
**magnifier**  68:13,18
**magnifiers**  69:6
**mail**  10:23 30:10
  54:14
**mailed**  32:14 54:6
**main**  2:13
**maintain**  46:20
**major**  32:23
**making**  56:23 79:3
**malformatting**  88:7
**man**  25:22
**march**  20:14,19
  24:13
**marginal**  88:2,18
**mark**  1:8 3:18 4:11
  32:10 35:15 36:15
  37:17 41:19 43:7,19
  49:10 54:10,12
  55:10 99:25 109:15
  109:22
**marked**  41:10,16
  42:5,8 43:23 48:6,9
  48:22 49:14
**marketed**  86:6
**marks**  21:2
**marriage**  116:18
**matching**  53:24
**material**  46:21
  100:11
**materials**  48:9
  100:9 117:18

mathias 21:7 22:7 22:14
matter 7:5 12:25 17:21 45:10 80:5 101:5 116:20
mcclutchy 2:25 3:4
mcguire 24:3
mean 44:21 48:13 65:11,20 72:6,7,16 103:18 106:19
meaning 12:7
means 78:11,16 86:3 111:14
media 47:6 56:25
medium 47:9 77:13
mediums 46:12
meeting 29:2 31:10 100:17
meetings 28:23
member 33:12,19 34:6
membership 34:5 44:12
mention 6:15 13:21 88:3
mentioned 16:18 17:2,17 31:24 36:25 39:15 44:16 46:25 57:4 61:18 63:12 66:19,25 81:17 85:19 96:6 97:14 109:7 110:2 112:10
met 25:22,25 28:16 28:21,24 29:15
method 59:22
methods 71:10 111:3
mfc 49:4
michael 21:2 30:25
microphones 3:5
microscope 66:23 68:13,18,22,23
microscopes 70:2
microscopic 7:17

mics 3:8
middle 5:15
milberg 24:15 96:3
mind 77:17
minimum 56:4
minutely 90:15
minutes 99:3
misspoke 67:7
misunderstood 73:2
moment 31:15 71:3 88:25 94:9
monocular 68:19
month 16:13
months 15:20 16:19 44:10 92:8,11
morning 3:2 73:15 73:23 74:5 77:4
motion 36:19,21 37:7,17,22 39:16 41:13,15 117:10,11
moved 14:11 36:15 37:12
moving 75:13
multipage 42:11
multiple 11:24
mutual 41:15 117:12

n

n 1:21 2:2 4:14,14 116:7,25 117:2
naked 63:21 71:17 111:4
name 3:3,22 19:22 20:22,24 21:19 22:16 23:20,24 25:13 28:11,25 30:15 54:18 56:6 96:4,14 98:12 118:5 118:6
named 21:2 22:15 24:24 25:23 95:25
names 24:6 58:10
narrative 42:5,10

national 43:15
native 77:13 78:14 79:7
natural 98:23,24
nature 12:16
nearby 84:17
necessarily 33:9 65:11 66:4 102:9 103:18
need 5:13,24 6:2 62:20,21
needed 16:9
needing 60:15
never 14:12 18:23 32:7,16 37:18 39:10 86:13 100:4,14 110:2
new 1:3,19,20,22 2:14,19,19 3:4,16 3:16,20 63:25 77:19 89:14 116:3,5,9 118:3,3
newly 79:18
news 35:4,5 36:13 40:20 72:14,16,17
newspaper 35:8
newspapers 35:9
nine 19:6
nodding 6:23
nondestructive 7:16 66:18,22 101:22
nongenuineness 13:5 59:14 60:14 99:24 105:23
normal 58:22
north 89:11 91:14
notary 1:21 4:15 115:16 116:8 118:25
note 3:5 43:11 79:17 85:4
noted 9:9 38:23 64:21 65:3,25 87:25 88:17 110:19 113:19 115:7

notes 68:4,7 69:2
notice 1:20 63:7,19 64:25 70:2 104:9
noticeable 72:8 79:19 104:7
noticed 88:15
noting 88:15
november 8:11 47:18 60:24
number 3:21 17:9 19:12 28:22 29:15 30:21 34:3 58:4 61:7,11 78:3,4 96:6
numbered 53:12
numbers 35:19 55:22,22

o

o 4:14,14,14
objection 10:12 12:21 16:16 19:8,9 22:25 40:14 41:2 50:11 52:7 63:9 65:8,23 66:2 70:9 72:4,25 73:18 74:2 74:11 75:6,24 76:6 76:15 78:18 79:8 80:15,16 85:6 86:21 87:15,22 88:23 89:15 90:10,17 91:5 91:18 95:4,15 98:4 99:19 103:8,15,22 105:16 106:8,16 107:13,20 108:2,14 108:25 114:12
obligated 18:11
oblique 58:20 59:2 69:7 104:17
observations 45:20
observe 64:9 65:6 65:20
observed 46:13 47:12 51:20 57:25 60:19 62:24 63:4 65:2 79:5,5

**observing** 22:22
**obvious** 63:11,22
  64:2 71:17
**obviously** 44:22
**occasion** 5:4 8:17
  39:8 53:15 112:14
**occasionally** 35:5
**occur** 85:13 102:25
  104:12
**occurred** 11:9 38:5
  40:4 44:10 104:10
  107:2
**oddly** 53:12
**offer** 9:8 27:12,14
  78:25 79:13,22
  113:4,11
**offered** 8:25 10:4
**offering** 79:9,10,11
**office** 7:12 11:11
  12:13 14:10,13
  15:11 53:10 68:23
  82:2 84:6,9,14
**offices** 1:18
**oh** 41:20
**ohio** 2:8
**oil** 80:25
**okay** 11:14 19:13
  24:17 30:19 50:13
  58:8 75:13 94:11
  96:17 99:4 102:2
  105:10 111:25
**old** 89:8 90:5
**olympus** 49:8 58:6
  59:4,6
**once** 16:20 55:21
  59:16 66:4 79:14
**open** 75:16
**operating** 45:15
  50:25 56:20 60:5
**opine** 80:9 104:10
**opinion** 79:2,9,10,11
  79:13,23 105:22,25
  106:21,22 109:10
**opinions** 9:2 10:3,4
  113:4,10

**opposed** 60:3
**opposing** 29:10
**opposition** 41:13
  117:9
**oral** 94:6
**order** 15:20,23
  37:12 38:6,19 39:18
  62:5 77:7 79:10
  88:6 98:15 110:11
**ordered** 73:16
**orders** 97:22
**ordinary** 114:10
**organization** 29:2
  33:18 34:2,7
**organizations** 28:23
  33:7,9,13 34:6
  43:16
**original** 9:16,20
  12:9 17:12 47:25
  54:16 55:6 56:5
  59:11,16 60:15 79:2
  79:14,17,19 80:2,3
  99:21
**originally** 79:16
  86:2
**osborn** 1:18 3:23
  4:20 5:1 6:1 7:1 8:1
  9:1 10:1,15 11:1
  12:1 13:1 14:1 15:1
  16:1 17:1 18:1 19:1
  19:5 20:1 21:1 22:1
  23:1 24:1 25:1 26:1
  27:1 28:1 29:1 30:1
  31:1 32:1,2,6 33:1
  34:1 35:1 36:1 37:1
  38:1 39:1 40:1 41:1
  41:5,12,18 42:1
  43:1,5,23 44:1,5,16
  45:1,6 46:1 47:1,24
  48:1,8 49:1 50:1
  51:1 52:1 53:1 54:1
  55:1 56:1 57:1 58:1
  59:1 60:1 61:1,13
  62:1 63:1 64:1 65:1
  66:1 67:1 68:1 69:1

70:1,14 71:1 72:1
  73:1 74:1 75:1 76:1
  77:1 78:1 79:1 80:1
  81:1 82:1 83:1 84:1
  85:1 86:1 87:1 88:1
  89:1 90:1 91:1 92:1
  93:1 94:1 95:1 96:1
  97:1 98:1 99:1
  100:1 101:1,3 102:1
  103:1 104:1 105:1
  106:1 107:1 108:1,4
  109:1 110:1 111:1
  112:1,8 113:1 114:1
  114:15 115:1,10
  116:10 117:4,8,15
  117:18 118:6,21
**osbornian** 30:13,17
  30:18 31:3,13 32:7
  33:4
**osbornian.com**
  32:12
**osbornian.org** 32:12
**outcome** 116:19
**outset** 6:16
**outside** 92:20
**outstanding** 19:3
  114:23
**overall** 78:11
**overlaid** 104:7
**overnight** 84:7
**oversight** 34:11
**ownership** 35:14

**p**
**p** 2:2,2 4:14
**p.m.** 84:10 115:7
**p1050026** 58:10
**p1050058** 58:11
**page** 35:23,25 36:2
  40:23 41:25 42:5,9
  42:9 43:12,12,14
  46:3 49:10,20,23
  54:25 56:10 64:18
  64:18 65:22 66:10
  68:6 69:18 78:2,4

**88**:19,20 101:6
  102:4,6,8,9,10
  103:5,6,7,13,14,19
  103:19 104:12,13
  104:22,25 105:4,5,7
  105:12,14,15,19,20
  106:2,4,5,7,7 107:9
  107:19 109:20,24
  110:4,23 111:10,11
  117:3 118:7
**pages** 64:23 65:7
  66:7 70:24 101:19
  106:13
**panel** 52:13
**paper** 9:17,24 30:21
  40:2 59:21 60:2
  63:4,5,17,17,25
  64:20 65:13,18 70:3
  73:22 74:9 75:19
  76:12 78:24 79:20
  86:4
**paragraph** 95:11
  101:6 102:4 105:4
**paragraphs** 104:16
  104:16
**parents** 26:10
**parikh** 21:24
**park** 1:19 2:18 3:16
  33:6 39:17 42:5,7
  44:22 64:4 72:22
  77:6 112:18
**participate** 38:13
**particular** 5:24 45:2
  55:22 57:17 58:25
  86:14 96:8 103:23
  105:25 113:3,10
**particularly** 47:16
**parties** 3:11 4:2
  39:18,25 116:17
**parts** 42:4
**party** 15:23,23
  18:14
**paul** 1:5,17 2:12
  3:17,22 4:6,7,9 7:9

25:25 36:8 41:12
43:22 44:5 75:3
109:16,18 115:10
116:10 117:4,8,14
118:6,21
**pause** 31:15 75:12
**pay** 18:11
**pdf** 51:25 52:21,25
101:16
**pdfs** 53:7 55:17
**peculiar** 90:15
**pen** 63:3 80:18,20
81:3,5 103:12 104:4
**pennsylvania** 30:22
**pentax** 68:17 69:5
**people** 67:10 71:8
**percent** 35:13
**perform** 8:14 14:24
39:3
**performed** 7:15
11:10 34:18 39:6,10
65:17 92:25
**period** 44:11 71:13
88:11 93:13
**permanently** 8:3
**permission** 62:3
**permitted** 37:23
39:19 97:20,22
**person** 24:20 72:11
81:21 82:19
**personally** 39:3
**peter** 24:24 28:9
**phone** 3:25 10:23,24
11:3 23:12 112:17
**phones** 3:8
**photo** 76:13
**photocopies** 81:9
**photographic** 59:6
**photographs** 45:7
45:11,19,23 46:17
47:3,10,15,19 58:5
58:9,14,17 59:2,24
60:4,18,22 77:6,14
77:19 78:15

**photos** 48:19
**physical** 7:20 37:13
37:24 38:24 39:19
40:2 61:20 97:21,23
**physically** 82:4
**pick** 3:6
**picture** 31:11
**piper** 21:7,11,14,18
22:13 23:18 25:14
93:20,22 96:15
**place** 3:8 11:3 12:13
14:12 16:10 17:13
38:8,11 42:22 99:21
103:5
**placement** 46:2
**plaintiff** 1:6 2:5 4:7
4:9 7:9 10:11 19:6
19:10 20:14 21:6
25:5 26:15,24 27:16
27:19,23 35:18
70:22 73:13 75:10
75:19 81:18 99:7
**plaintiff's** 6:9 9:11
12:7 14:21 24:4
34:12,21 37:6 41:12
41:15 74:18 76:4
95:19 98:10 117:9
117:11
**plaintiffs** 113:6
**planning** 113:4,11
**plate** 51:8
**please** 3:5,7 5:14
30:20 43:3,20
**point** 7:7,11 11:9
17:11 59:10 60:9
62:16 72:19 92:22
97:11 100:7 107:4
**popular** 72:13
**portable** 14:9
**portion** 51:11
**portions** 58:5
**position** 36:8 73:13
74:25
**possibility** 14:15

**possible** 46:10 47:6
47:8 59:20 82:21
96:4 102:21 103:10
103:11,17 106:11
106:25 107:3,6
113:21
**potential** 10:16 14:6
22:22
**potentially** 17:8
46:23
**practice** 43:13 77:7
**preliminary** 8:7
64:15
**preparation** 21:16
88:14 92:12,20
**prepare** 92:15 93:14
**preparing** 21:12
**present** 2:24 3:24
27:12 28:24 74:18
74:23 80:6 88:7
98:18
**presented** 70:16
74:10
**presiding** 5:23
**presumes** 95:5
**previous** 113:18
**previously** 37:2
61:18 77:5 97:19
**primarily** 31:5
**primary** 9:15 23:4
46:19 62:21 88:13
**print** 77:20
**printed** 76:19
**printer** 77:20
**printing** 77:18
**printout** 77:2 78:9
101:16
**printouts** 76:24
**prior** 23:13 25:15
69:9 92:14 112:17
**private** 3:7 6:10
**privilege** 6:12
**probably** 30:9 40:23
52:11 67:7 72:7
89:20

**problem** 88:12
**procedure** 45:16
56:21
**procedures** 51:2
60:6
**proceed** 4:5
**process** 27:13 94:4
94:13,16,23 112:18
**produce** 25:19
57:11
**produced** 23:15
25:19 31:11 44:21
60:21 73:13,16 74:6
75:17,17 88:10
**producing** 95:9
**product** 29:17 53:12
106:23
**production** 100:11
**professional** 28:23
42:2,21 43:16
**professionally** 30:8
**professor** 74:4
**program** 53:9 55:24
**projected** 48:23
**protected** 32:8
**protection** 82:23,24
**protective** 83:25
113:20
**protocol** 14:12 98:2
**prove** 86:4
**provide** 4:25 43:2
82:15 93:5 95:8
**provided** 7:12 8:5,9
15:24 36:18 47:18
47:25 48:19 54:5,9
54:13 55:4,5,6,12
55:18,20 56:5,15
76:25 78:9 81:24
87:20 92:19 94:17
99:16,25 100:2,5,13
100:15 101:15,15
110:3 113:7,14
114:15
**providentially**
90:14

**provides** 59:16
**providing** 48:17
**public** 1:21 4:16
15:16 116:8
118:25
**published** 30:22
**pull** 52:12
**purported** 35:15,20
35:21,24 36:8 37:24
109:19,23
**purportedly** 55:9
91:12
**purpose** 46:19 47:2
59:23 64:15 86:6
100:2
**purposes** 36:11
39:20 45:18 46:9
81:23 97:24 99:25
**pursuant** 1:20
**put** 54:23 83:15
91:23 95:14,18,21
**putting** 71:11

**q**

**qualifications** 42:10
42:12 43:22 117:14
**quality** 57:15,19
59:7,25
**question** 5:4,7,10
69:18 73:2 95:6,7
102:21 103:3,24
**questioned** 8:22
31:6 33:24 44:20
45:2,11 53:19 68:12
88:22 89:3 102:16
110:10
**questions** 4:25 5:9
5:21 6:4,22 17:3
45:7 112:9 115:4
**quick** 61:2 111:22
**quickly** 75:14
**quinn** 20:10
**quite** 34:5 81:2 86:5
96:5

**r**

**r** 2:2 4:14 116:2
**rafey** 24:11
**raise** 88:7
**randall** 20:5
**range** 77:22
**rate** 18:6,7,7,12
**reach** 107:5
**reached** 20:18 22:21
24:18 106:22,23
**reacted** 65:12
110:20
**reacts** 46:6
**read** 34:20 35:10
36:13,17 82:12
102:12
**reading** 35:9 84:20
**ready** 80:9
**really** 11:10 33:10
79:24 80:3 111:6
**reason** 5:6,19 13:23
15:25 53:10 55:25
57:6 114:6 118:7
**reasonable** 38:4
**reasonably** 110:12
**reasons** 46:15,16
**recall** 11:7,25 14:17
15:25 16:8 19:22
20:2,8,9,11,13,20,23
22:20 23:10,24 25:8
25:9,13 28:11,25
29:7 32:10 37:5
38:17 52:9 54:7,18
61:25 62:3,7 69:3,5
76:21 82:17,18,19
83:6,14,15,19,20,21
84:3 85:25 86:10
87:11,13 92:3,17,18
92:22 93:3 94:12,22
94:25 95:23 96:9
97:5,16 98:8,14,16
98:18,20 99:5,10
101:10 112:17,21
112:23 114:7

**recalled** 113:16,16
114:5,8
**receive** 15:12 18:17
30:15 100:9
**received** 15:13
17:17 18:9 32:16
43:25 47:5 54:14,15
61:23 77:10 82:6
114:17
**receiving** 17:20
**recess** 61:8 100:23
112:4
**recited** 67:12
**recognize** 41:22
42:2 49:16
**recollect** 12:5
**recollecting** 54:24
**recollection** 10:18
10:24 25:3,4 29:11
29:22 56:4 61:25
62:9 63:15 84:16
86:22 92:10 96:14
99:14 112:19
**recommend** 14:23
**recommendation**
26:23,25 27:12,14
**recommendations**
17:15 81:20 99:22
**recommended** 15:4
81:18,19,22 85:16
88:6 99:24
**reconnection** 31:20
**record** 3:3,11 31:18
31:19,22 45:19
46:10,22 47:2,4
48:14 61:6,10 77:9
94:6 100:22,25
112:3,6 114:17
115:6
**recorded** 77:21
**recording** 3:10
**refer** 31:3 67:9,10
**reference** 32:4
68:25 72:20

**referred** 67:8 68:16
**referring** 52:22
54:21 82:24 83:24
111:10
**regard** 27:11 79:11
85:11 86:23,23
87:12 99:18 105:22
110:6
**regarded** 45:3
**regarding** 70:15
92:5
**regardless** 105:18
**registered** 30:13
32:9
**related** 9:5 116:17
**relation** 92:12
**relatively** 46:20
71:17
**relevance** 19:9
**reliability** 30:24
**reliable** 77:15
**remember** 10:20
19:23 20:17,25
22:19 25:6 29:18
32:21 62:13,15 82:9
83:11 86:24 92:7
93:4,16,19 113:21
**remembered** 113:24
**remind** 56:6
**remove** 14:13 62:3
62:20,21
**render** 18:24
**replaced** 80:4
**replicates** 55:25
**report** 9:17 25:12
94:6 101:11
**reported** 23:16
25:20
**reporter** 1:21 4:3
6:17 41:19 116:7
**reporting** 118:2
**reports** 29:6 34:21
35:5 36:13 46:24
113:5,8

**represent** 4:2 19:7
48:4 61:15 76:23
**representation**
46:12 47:12
**representations**
51:20 57:25 60:19
**representative** 99:6
**represented** 19:20
21:6 80:24
**representing** 3:4 4:4
**reproduction** 54:15
56:13 59:9,17
**reproductions** 56:16
56:24
**requested** 13:2,6
**requesting** 18:16
**requests** 9:10
**require** 12:11 17:23
39:13
**required** 44:10
**requirements** 34:5
**resolution** 50:15,19
52:15,16 57:9 68:2
**respect** 9:18 12:6
13:4 23:8,9 24:21
25:10 26:24 30:11
30:14 44:24 46:21
55:21 56:23 64:20
65:13 66:7 69:14
73:8 78:22,23 79:25
88:13 96:13 99:22
107:10
**respectively** 104:18
**response** 30:16
32:16 49:23,24
51:23 58:3 60:24
78:3,4,20 114:6
**responses** 8:10
48:25 49:11,14,16
49:23 78:2,5,8
117:21
**responsible** 18:14
**result** 38:5 71:15
104:7,14

**resulting** 104:6
**resume** 42:11 45:4
**retain** 23:7
**retained** 7:8,8 15:9
15:10,12 19:18 23:6
26:16,19,22 27:16
27:19,21,21,23,25
28:2
**retainer** 16:19 17:18
**revealed** 75:16
**reverse** 64:14,22
71:20,23
**review** 8:17,18
30:22 45:5 78:5
94:9 96:23 97:3
113:5
**reviewed** 61:13
74:14 78:7 80:13
97:8
**reviewing** 63:16
**right** 4:21 5:2 7:9,10
7:13,18,21 8:7,12
9:2,22 33:15 37:3
38:25 39:12 43:14
44:2,17 45:12,16,21
46:14 47:16,19,25
49:25 51:2 52:2,22
55:8 56:10,11,22
58:6,15 60:24 61:21
63:2,3,8,14 64:6
65:4,25 66:19 67:19
71:24 72:3 77:10,16
77:23 78:12,17 81:4
81:10 84:6 89:22
90:9,16 91:4,17
98:23 100:18 101:8
101:24 103:7,14,20
104:19,25 105:8
106:3 107:7,21
109:7,16 111:8,21
112:12 114:18
**ring** 21:8,18 22:8,16
24:6
**rings** 21:10 96:5

**rja** 1:4 3:21 48:8
117:17
**road** 2:6
**robert** 22:4 25:2
**role** 36:24
**romano** 74:4
**room** 3:25 58:22
59:3,5 84:22 89:12
91:14
**rudimentary** 59:22
71:10
**rules** 5:24
**run** 40:13 43:13
62:5
**runner** 49:6 51:25
56:19
**running** 85:8

## s

**s** 2:2 4:14 32:2,6
44:16 118:7
**sake** 6:17,21
**saks** 30:25
**sameness** 111:2
**samples** 7:20 38:25
40:2 97:23 99:17
100:5,15
**sampling** 39:19
**sanberg** 96:4
**sanford** 95:25
**saw** 35:9 36:21
61:15,19 80:11
**saying** 6:23 37:18
79:4
**scan** 51:8 68:2 76:24
77:2
**scanned** 46:2 51:25
55:13,19
**scanner** 49:4,6,25
50:10 51:6,7,12,16
51:19 52:2,5 56:19
56:22 57:3,5,7,24
**scanning** 55:23
**scans** 45:7,10,18
46:9 47:2,10,15,19

48:19 50:9,18,24
51:2,5,13,15,18
52:4,21 54:6 56:18
56:21 57:3,23 59:18
76:19 77:6,14,18
78:14
**schuster** 21:2
**sciences** 33:15
**screen** 48:12,24
52:10 54:23 56:15
**second** 9:17 42:7
46:18,18 61:3 64:18
88:20 102:5,8 103:5
103:7,14,19 104:13
104:22 105:4
**see** 5:15 8:20 12:14
13:7,12 14:8,14
15:3,15 16:3 18:4
18:10 19:14 23:17
28:4 32:17 33:2
34:9 35:2,5,11
42:23 43:18,25
50:17 51:14 52:10
53:17 54:3 55:11
56:17 57:22 58:18
59:15 60:17 64:16
64:24 65:19 66:14
85:2 92:13
**seeing** 17:14 82:13
**seeking** 35:19
**seen** 29:6,16 53:14
79:2,14 82:7,9
107:4
**send** 94:6
**sense** 5:11 6:13
25:17 32:24
**sensitive** 3:6
**sent** 30:10 94:20
**series** 58:4
**served** 92:19
**service** 32:10
**services** 15:24 17:21
18:25
**session** 100:3

**set** 79:23 116:11,22
**setting** 50:16 59:7
**settings** 50:10,22
 52:5,19
**seven** 91:12
**shaking** 6:23
**sheet** 63:25 118:2
**short** 98:21
**shortly** 93:7
**shoulder** 84:24
**show** 46:6 88:11
 90:4
**showing** 41:8 55:8
**side** 24:4,15 29:9,10
 30:5,5 58:18 59:19
 69:7,20
**signature** 49:19
 54:11,12 55:9,9
 59:14 60:12,14 66:6
 69:13,16,17 99:23
 108:21 109:19,23
 110:10,24
**signatures** 13:3 36:2
 69:22 81:10 107:24
 110:4,9
**signed** 15:16,18,19
 16:2,20 37:18 87:9
 87:9 91:13 108:17
 108:22,23 109:15
**signer** 18:13
**significant** 32:25
 70:7 71:13 79:20
 104:9
**signing** 87:10,14
**simply** 62:18 68:19
 71:11
**single** 42:9
**site** 30:3,11 32:11,19
**sitting** 72:8
**situation** 60:7
**six** 15:20 16:19
 56:10
**size** 52:10 57:11
**skivington** 24:24

**slapped** 88:5
**small** 69:8
**smaller** 57:10
**society** 31:5 33:21
 33:24
**software** 53:13
**somewhat** 44:16
**sorry** 23:3,20 26:8
 28:10 41:20 42:7
 55:7 70:11 73:2
 75:13 98:6
**sort** 31:8 68:18 71:8
 72:19 76:12 110:5
**sound** 5:17 22:24
 23:21
**sounds** 91:16,19
 93:22 94:5 98:12
**source** 77:15
**sources** 75:22
**southwell** 2:20 4:12
 4:12
**spare** 89:12 91:14
**speak** 34:17 96:7
**speaking** 96:19
 106:5 107:8
**specialized** 66:9
**specific** 9:10 11:20
 17:3 19:12 23:10
 25:12 27:10 29:2,8
 35:18 51:5 57:2
 72:20 79:4 112:19
**specifically** 15:25
 16:8,24 22:20 23:23
 25:9 27:24 32:11
 33:22 37:15 38:10
 39:22 51:13 62:7
 70:25 72:5,10 76:16
 81:22 84:15 85:25
 86:10 91:21 92:6,17
 93:2,12 94:12,21
 95:3,10 112:22
 113:21 114:7
**specifications** 54:21
 55:2 56:8,9 60:23
 62:11 63:13 81:9

86:20 87:8 99:13
**specifics** 11:7 85:12
 86:23 94:23
**specimens** 99:24
**speckin** 27:22 28:15
 29:5
**spectral** 67:2 69:15
 69:25
**spectrally** 67:13
**spoke** 94:2 112:10
 112:15,24
**spoken** 24:20,23
 25:22,25 26:9
 112:16
**ss** 116:4
**standard** 45:15
 50:10,15,25 52:5,16
 56:20 60:5 77:6
 80:24
**stands** 35:2
**staple** 62:3,20,21
 63:24
**stapled** 61:24 62:12
 62:17,19
**stark** 71:22 81:2
**start** 6:18
**started** 97:16
**starting** 38:8
**state** 1:22 5:5 102:4
 116:3,8
**stated** 77:5 93:22
**statements** 74:7
**states** 1:2 3:19
**stating** 89:9
**stay** 84:7
**stenographically**
 116:14
**step** 57:18 71:3
**stepped** 22:15
**stereoscopic** 68:23
**steve** 24:9
**stewart** 27:21 29:12
 29:14 34:7,10,17
 97:7,9,13

**storage** 91:10
**stored** 13:14 86:20
 86:25 89:10
**stories** 72:18 90:7
 90:25
**story** 91:16
**street** 2:13
**stringent** 34:5
**subject** 9:14,15
**subjected** 89:12
**submitted** 22:13
 37:2,17 54:11 74:6
**submitting** 25:16
**subpoena** 60:24
**subscribed** 115:12
 118:22
**subsequent** 89:7
**subzero** 89:13
**successful** 86:5
**sufficient** 107:5
**suggest** 83:5
**suggested** 85:15
 90:25
**suggestion** 83:7
 92:15
**suggestive** 103:21
**sunlight** 71:13 72:2
 72:9 76:14
**supplement** 113:17
**support** 37:6 41:12
 41:14 117:8,11
**sure** 20:22 55:18
 72:16,17 93:25
 113:25
**surface** 59:21
**surprised** 32:8
**surprisingly** 91:2
**surrounding** 13:17
 87:19 90:7
**suspect** 53:24 93:23
**suspected** 103:23
**suspicion** 88:8,21
 89:5 91:3
**swear** 4:4

**sworn**  4:15 37:2,17
  74:6 115:12 116:12
  118:22

**t**

**t**  116:2,2
**table**  69:8
**take**  7:20 12:13
  39:25 45:10 49:25
  50:9 51:2,5,9 52:4
  56:21 57:2 58:21,25
  61:2 62:17 67:25
  68:8,9,9 71:3,25,25
  77:5 79:15,16 93:14
  95:20 96:12,20
  98:21 100:12
  111:22
**taken**  39:9 46:5
  50:24 51:18 53:22
  56:19 58:15,18
  59:19,25 60:4 61:8
  79:16 100:23 112:4
  116:13
**talk**  6:16 41:5 61:16
  66:15 88:25 91:25
  95:11 102:2
**talked**  91:21
**talking**  6:19 23:18
  96:21 113:20
**tan**  73:17
**tannish**  74:8
**tape**  61:6,10
**tasked**  34:11
**teachings**  32:5
**techniques**  101:23
**telephone**  2:10 4:8
  31:14,20
**tell**  5:14,24 52:11
  72:5
**temperatures**  89:13
**tend**  57:10
**teppler**  24:9
**term**  31:2 32:3,7
  67:11

**terms**  54:24 57:10
  65:14 104:6
**terrence**  19:25
**test**  62:6 86:12
  104:7
**tested**  85:15 86:14
**testified**  4:16 113:3
**testimony**  46:24
  116:11,13
**testing**  7:24 38:24
  40:25 85:20
**tests**  13:21 14:5 39:4
  39:5,7 40:7,13,18
  59:23 85:9 109:7
  111:18
**text**  46:3 72:21
**texts**  44:19,21,23
**thank**  43:18 48:17
  100:20
**thanks**  41:21
**thing**  6:15 67:16
  72:19 85:24 91:19
  110:17 113:19
**things**  37:23 46:19
  59:25 69:7,8 71:8
  82:24 85:8 87:24
  88:14 104:12
**think**  5:20 23:14
  25:18 30:12 38:4
  80:23 84:21,23,24
  93:15 100:12
  113:23 114:5
**thinking**  33:20
**thought**  11:16 26:7
  96:14
**three**  49:3,25 50:3
  54:8 55:16
**thrust**  12:23
**thwart**  75:4
**tiff**  49:25 50:3 57:14
**tiffs**  57:19,21
**time**  3:13,24 5:13
  7:3 10:7,21 11:5,9
  12:16 13:20 17:11
  19:20 21:6 25:7

  28:25 31:7,18,22
  32:13,21 37:11 40:5
  44:11 48:24 59:10
  60:10 61:6,10,19
  71:13 74:9 75:19
  77:10 81:13 83:21
  84:11 85:14 86:17
  88:10 89:9 91:16
  92:4,22 93:13,14
  96:7 97:11 99:11
  100:12,22,25 112:3
  112:6 114:20,21
  115:3,6,7
**times**  35:8 84:14
**tissue**  67:10
**title**  37:8,9
**today**  3:12 5:19
  44:25 67:22 87:14
  113:3 114:21
**told**  94:21
**toner**  40:2
**top**  28:11 101:19
  104:8 105:15
**topic**  72:23 73:3
**touched**  82:25
**trace**  103:6,12 104:2
**trademark**  30:12
  32:10
**trained**  39:11 44:4
**training**  44:10,13
**transcribed**  116:15
**transmitted**  58:15
  59:2,24 60:3 69:9
**transport**  12:12
  14:3
**travel**  114:21
**trippitelli**  21:20
**true**  46:8,12 47:11
  51:19 57:24 60:18
  69:14 102:14
  106:15
**try**  5:10 6:18 71:8
**trying**  71:10 72:11
  97:5

**turn**  3:7 41:25 48:16
  77:25 101:5
**tv**  84:19
**two**  9:9 10:3 17:2
  30:25 35:23 40:24
  42:4 43:9 64:22
  66:12,13 76:19 80:6
  83:14 89:8 101:19
  104:16 107:9
  110:20 111:4,10
**type**  57:12 88:5
  91:19 94:7
**types**  13:21 17:9
  49:3
**tytell**  28:9 74:4
  75:20 77:3

**u**

**u**  4:14
**uh**  6:24
**ultimately**  7:8 37:22
**ultraviolet**  64:13,16
  110:21
**uncharacteristic**
  80:20
**unclimate**  89:12
  91:13
**underneath**  53:8
  102:9 103:19 105:5
**understand**  4:24 5:6
  5:7,10 6:7 11:5
  12:19 35:12 36:5,23
  37:11 48:20 64:4
  86:5 95:6,7 108:5
  113:8
**understandable**  5:9
**understanding**
  12:15 13:8,13,16
  16:12 17:19,24 35:2
  36:12 39:2 46:11
  47:9 49:2 66:17
  70:19 75:9 77:12
  86:13 96:19
**understood**  5:12
  6:20,25 11:12 73:20

uneven  65:21
unit  2:7 66:23 67:6
united  1:2 3:19
unstapled  62:2,6,16
untitled  50:4
unusual  64:19 65:2
  65:14 90:7 100:12
  112:20 113:25
  114:9,13
updates  42:15,18
use  14:10 15:22 31:9
  53:9 69:15 75:21
  103:4,11 113:20
  114:2
usually  51:2 56:21
utilize  59:15
utilized  67:2
utilizing  59:5 60:2
  64:13,16 66:10
  68:15 85:10 110:19
  111:3
uv  7:17 64:6,8 66:8
  69:25 75:22

**v**

vacco  22:7
valery  15:5
value  90:6
variation  104:9
variations  104:5
various  45:20 77:7
  81:10
varying  88:2
vera  26:11
verbal  25:11,11
verbally  6:22 23:11
  23:16 25:21 93:2
veritext  3:4 4:4
  118:2
versa  96:13
version  67:15
versus  3:18 111:11
vice  96:12
video  48:24 67:2
  69:15,25

videographer  2:25
  3:2 31:17,21 48:12
  61:5,9 100:21,24
  112:2,5 115:5
videotaped  1:17
view  80:22 112:20
viewed  78:21
viewing  69:7 78:14
  80:2,3
vilardo  19:21 20:3
visible  63:20 76:10
visited  30:3
visual  7:16
volatile  40:18
vs  1:7 118:5
vsc  64:12,22 66:10
  66:23 67:5,8,9
  75:22 110:19

**w**

walk  48:18
wall  89:11 91:14
want  7:5 34:25
  43:11 48:11,18
  108:4
wanted  12:8 19:14
  51:9 60:11
warren  2:6
watching  84:18,19
  84:21
way  23:7 32:8 46:6
  67:9 71:19,21
  116:19
ways  91:2
wear  83:5,8
wearing  82:20,22
  83:22 114:9
web  30:3,11 32:11
  32:18
weeks  92:8 93:8
welcome  68:8
went  17:25 18:12,19
  18:23 32:19 94:13
western  1:3 3:20

whereof  116:21
whispering  3:6
white  20:5 63:5,17
  65:13 73:24
widen  52:9,13
wills  89:21 90:2
windowsill  71:12
  72:9
withdrew  22:14
witness  3:22 4:5,15
  30:18 70:11 75:13
  90:23 98:6 116:10
  116:13,21 117:3
words  6:3 31:12
  46:22
work  8:6,15 9:13
  13:10 17:12,24,25
  29:17 36:3,9 37:13
  37:19,24 38:21
  39:16 40:3,9 56:12
  60:23 61:20,23
  62:22,25 63:4,8,19
  64:5 66:18 70:3
  73:14 74:6,7 76:13
  76:20,24 77:2 81:8
  81:24 82:11 83:11
  86:19 87:7,19 88:9
  88:20 89:10 94:4
  97:21,23 99:13
  104:22 108:8,13
  110:6
worked  7:4 29:9
  95:24
working  29:10,11
  30:5 75:3 95:2
  96:25
workshops  42:20
write  90:20,21
writing  9:12,16,20
  9:20,24 48:3 59:10
  62:25 64:17 65:17
  66:11 67:13 68:7
  80:20 97:16 110:19
writings  105:25
  110:23,24

written  25:19 29:7
  72:21 102:11
  103:20 105:14
  106:6 108:20
wrote  44:19 89:21

**x**

x  1:5,11 117:2

**y**

yeah  55:3
year  24:13,18,21
  30:9 42:14 89:7
years  28:22 29:3,15
  30:21 31:10 40:24
  44:14 89:8 91:12
  106:5
york  1:3,19,20,22
  2:14,19,19 3:4,16
  3:16,21 89:14 116:3
  116:5,9 118:3,3

**z**

zuckerberg  1:8 3:18
  4:11 35:15 36:15
  37:17 54:11,12
  55:10 59:14 99:25
  109:15,22 118:5