Page 1

1

2    UNITED STATES DISTRICT COURT

3    WESTERN DISTRICT OF NEW YORK

4    No. 1:10-cv-00569-RJA

5    ----------------------------x

     PAUL D. CEGLIA,

6

                         Plaintiff,

7

                 vs.

8

     MARK ELLIOT ZUCKERBERG,

9    Individually, and

     FACEBOOK, INC.,

10

                         Defendants.

11   ----------------------------x

12

13

14                       July 18, 2012

15                       10:09 a.m.

16

17           Videotaped deposition of BRYAN J.

18       ROSE, held at the offices of Gibson, Dunn

19       & Crutcher LLP, 200 Park Avenue, New York,

20       New York, pursuant to notice, before Cary

21       N. Bigelow, Court Reporter, a Notary Public

22       of the State of New York.

23

24

25

1

2  A P P E A R A N C E S:

3

4       BOLAND LEGAL, LLC

5       Attorneys for Plaintiff

6             1475 Warren Road

7             Unit 770724

8             Lakewood, Ohio 44107

9       BY:   DEAN BOLAND, ESQ.

10

11      GIBSON, DUNN & CRUTCHER LLP

12      Attorneys for Defendants

13            200 Park Avenue

14            New York, New York 10166-0193

15      BY:   ALEXANDER H. SOUTHWELL, ESQ.

16            THOMAS H. DUPREE JR., ESQ.

17            MATTHEW BENJAMIN, ESQ.

18            AMANDA AYCOCK, ESQ.

19

20

21  ALSO PRESENT:

22      VILAN TRUB, Videographer

23

24

25

1

2        MR. SOUTHWELL:  This is Alexander

3    Southwell for the defendants along with

4    Matthew Benjamin and Tom Dupree and Amanda

5    Aycock.

6        MR. BOLAND:  I'm Dean Boland for the

7    plaintiff, Paul Ceglia.

8        MR. ROSE:  And I am Bryan Rose from

9    Stroz Friedberg.

10        THE VIDEOGRAPHER:  This is tape 1.

11        (The witness was sworn in.)

12        MR. SOUTHWELL:  Mr. Boland, before we

13    begin, I just want to put on the record our

14    objection to this videographer.  We reserve

15    the right to object to the admissibility of

16    this videotaped deposition.  The

17    videographer is not a certified legal

18    videographer, he doesn't appear, as I asked

19    him previously, to have any familiarity or

20    training in the Federal Rules of Civil

21    Procedure, the Federal Rules of Evidence,

22    the New York C.P.L.R., he has not used the

23    required statutory language to begin a video

24    deposition and he clearly is not following

25    any of the best practices set out by the

1

2     videographer associations, so obviously it's

3     your choice in what you want to do, but we

4     reserve the right to object to the

5     admissibility of this video deposition.

6          I don't know if you have something else

7     in mind with respect to the videoing of the

8     deposition, like are you planning to post

9     them on YouTube like you've done in other

10    cases.

11         MR. BOLAND:  I just have plans for him

12    to videotape it, that's all; that's it so

13    far.

14         MR. SOUTHWELL:  So you are not planning

15    to post that on YouTube?

16         MR. BOLAND:  Not today.

17         MR. SOUTHWELL:  Tomorrow?

18         MR. BOLAND:  I have no plans for

19    tomorrow to post anything on YouTube.

20         MR. SOUTHWELL:  At any point in the

21    future?

22         MR. BOLAND:  I have no current plans to

23    post anything on YouTube.

24         MR. SOUTHWELL:  Or otherwise make them

25    publicly available?

Page 5

1

2          MR. BOLAND:  I have no plans to do

3     that, no.

4          MR. SOUTHWELL:  Okay.

5          MR. BOLAND:  Can you just mark that

6     Exhibit 1, please, using a copy of this as

7     the report.

8          Or do you have one?

9          MR. SOUTHWELL:  We have got our copy,

10    but we will hold on to it right now.

11         MR. BOLAND:  I will also probably end

12    up using some of these exhibits tomorrow

13    again, I'll just use the same ones instead

14    of duplicating them all over again, giving

15    us multiple copies of the same thing.

16         MR. SOUTHWELL:  Just to be clear, you

17    are using the filed version?

18         MR. BOLAND:  I believe so.  It has the

19    file stamp at the top.  I don't have another

20    version.

21         MR. SOUTHWELL:  Well, you have the

22    unredacted version which was provided to

23    you.

24         MR. BOLAND:  Oh, yes, correct.  No, I'm

25    just using the filed version.

```
                                            Page 6

 1

 2              (Exhibit 1, Stroz Friedberg report

 3         dated March 26, 2012, marked for

 4         identification, as of this date.)

 5  B R Y A N   J.   R O S E, called as a witness,

 6         having been duly sworn by a Notary Public,

 7         was examined and testified as follows:

 8  EXAMINATION BY

 9  MR. BOLAND:

10      Q.    Good morning, Mr. Rose.

11      A.    Good morning.

12      Q.    Before we get started here, did you

13  have a conversation with any of the defense

14  counsel before your testimony today in

15  preparation for your testimony today?

16      A.    I did.

17      Q.    And when was that conversation, the

18  most recent one?

19      A.    The most recent one, we had a brief

20  conversation this morning and then we had a

21  meeting yesterday.

22      Q.    And in that conversation did defense

23  counsel alert you to some of the unique rules

24  that the judge in this case has for people

25  sitting for deposition?
```

                              B. Rose

1

2       A.     What rules are you referring to?

3       Q.     Well, let me just go over them.

4              The judge in this case has indicated

5    that anyone being deposed, if they are confused

6    about a question, should direct a request for

7    clarification to the person asking the question,

8    not the lawyers for, you know, the side that you

9    are on.

10      A.     Okay.

11      Q.     And that also, when we take breaks

12   during the deposition that the witness being

13   deposed can't have any conversations with the

14   lawyers from their side of the case about the

15   deposition.

16      A.     I was made aware of that rule, yes.

17      Q.     Those are the rules I'm talking about.

18      A.     Yes.

19      Q.     So I'm going to assume when I ask you

20   questions today that if you answer that question

21   you understood what I was asking, and if you

22   don't understand it -- well, is that a fair

23   approach?

24      A.     That's a fair approach, and if I don't

25   understand your question I will ask for

1                        B. Rose

2   clarification.

3        Q.    Very good.

4              Can you look at what's been handed to

5   you and marked as Rose Exhibit 1 and just

6   identify that for the record.

7        A.    This looks like a filed redacted copy

8   of Stroz Friedberg's report dated March 26, 2012.

9        Q.    And you signed that report?

10       A.    I did.

11       Q.    And one other person signed the report

12   as well?

13       A.    That's correct, Mike McGowan from Stroz

14   Friedberg also signed the report.

15       Q.    And is all of the information you

16   relied on in preparing that report listed in the

17   report?

18       A.    Yes.

19       Q.    And is your CV that's listed in the

20   report current as of today or are there some new

21   additions that might be on a current version?

22       A.    There would be some additional, at

23   least one additional speaking engagement, I

24   believe, but generally it's current.

25       Q.    Is there any other training that you've

```
 1                        B. Rose

 2   received since that CV was produced as part of

 3   Exhibit 1 there?

 4        A.    No.

 5        Q.    In your preparation for today's

 6   deposition were you provided transcripts of any

 7   other witnesses' depositions in this case?

 8        A.    No.

 9        Q.    Did you discuss the testimony of

10   Mr. Broom with the defense counsel?

11        A.    No.

12        Q.    Did you discuss the testimony of

13   Mr. Grant with defense counsel?

14        A.    No.

15        Q.    Can you tell the Court how you were

16   paid for your work in preparing Exhibit 1?

17        A.    Stroz Friedberg is compensated on an

18   hourly basis.

19        Q.    And do you know what that rate was that

20   was charged to defense counsel for the

21   preparation of that report?

22        A.    The rate would vary depending on the

23   person working on the report, so my current

24   billable rate is 650 an hour; Eric Friedberg, who

25   contributed to the report, would be, I believe,
```

```
 1                        B. Rose
 2    950 an hour, and then Mike McGowan and Jason
 3    Novak, who are two of our digital forensic
 4    examiners who contributed significantly to the
 5    report, would be -- I'm not sure of their exact
 6    current rates, but they'd be somewhere in the
 7    range of 400 to 500 dollars an hour.
 8         Q.    And do you know the total that was paid
 9    to Stroz Friedberg by the defendants for the
10    production, for all the work involved in the
11    production of that report?
12         A.    I do not.
13         Q.    Do you know who at Stroz Friedberg
14    would have the answer to that question?
15         A.    I think the -- I'm not sure anyone
16    would have the answer to that question
17    immediately at hand, you could certainly
18    reconstruct it from a look at the invoices.
19         Q.    And when was the last time you read
20    Exhibit 1, the report that you produced in this
21    case?
22         A.    Last night.
23         Q.    Did you read the entire report last
24    night?
25         A.    I did.
```

```
 1                        B. Rose
 2        Q.    And do you agree with all the
 3   conclusions in the report as of that last reading?
 4        A.    I do.
 5        Q.    And can you describe for the Court --
 6   let me ask you this question:  Were you involved
 7   in every page of that, the preparation of every
 8   page of that report or just portions?
 9             You mentioned there were several people
10   involved.
11             Did you have a division of labor in
12   producing that report?
13        A.    It was a collaborative drafting
14   exercise so, you know, at some point in the
15   process I would have, yes, would have read,
16   reviewed and contributed to every section of the
17   report.
18        Q.    So are there any portions of the report
19   that you would feel uncomfortable answering
20   questions about based on that division of labor
21   that you had?
22        A.    No.
23        Q.    Okay.
24             Is there any section of the report that
25   you would identify yourself as sort of the
```

1                        B. Rose

2    primary investigator for?

3        A.    No.

4        Q.    Did anyone -- there were two people

5    whose CVs are included with the report; right?

6        A.    I believe there are four CVs included

7    in the report.

8        Q.    You're right.

9              There's two people who didn't sign the

10   report, but their CVs are attached to the report?

11       A.    That's correct.

12       Q.    And how would you describe the work

13   they did in preparing the report, the folks who

14   didn't sign it, the two of them?

15       A.    Eric Friedberg is the co-president of

16   Stroz Friedberg, he was involved in overall

17   supervision and certainly read drafts of the

18   report and contributed editorial comments and

19   provided overall supervision.

20             Jason Novak, whose CV was also attached,

21   was one of the forensic examiners and he would

22   have assisted in the actual analysis of the

23   Ceglia media.

24       Q.    So did Mr. Friedberg actually do any

25   analysis, get behind a computer and operate

```
                                         Page 13
 1                    B. Rose
 2    software to do analysis?
 3       A.     No, neither Mr. Friedberg nor myself
 4    would have done any actual analysis.
 5       Q.     So what role did you do, then, if you
 6    didn't do actual analysis?
 7       A.     So I am responsible for supervising the
 8    work of Mike McGowan and Jason Novak, discussing
 9    overall strategy with them, reviewing the results
10    of their work and drafting the report.
11       Q.     And you and Mr. McGowan signed the
12    report?
13       A.     Correct.
14       Q.     And the other two, Mr. Friedberg and
15    Mr. Novak, did not?
16       A.     Correct.
17       Q.     What's the reason that Mr. Novak, who
18    did some analysis in this case, did not sign the
19    report?
20       A.     The decision was made that two
21    signatories were sufficient, so it was determined
22    that I would sign the report along with
23    Mr. McGowan.
24       Q.     Is that the practice of Stroz Friedberg
25    to have individuals who do analysis in cases not
```

```
 1                        B. Rose
 2   sign reports?
 3        A.    I don't think that's the practice of
 4   Stroz Friedberg.  It's certainly possible that
 5   when issuing a report not every person who
 6   contributed to the report would be a signatory.
 7        Q.    Now, you are not a certified document
 8   examiner, paper document, I'm talking about?
 9        A.    I am not.
10        Q.    Did you review the paper contract in
11   this case, the two-page paper contract?
12        A.    I've seen it.
13        Q.    How do you mean seen it, an actual --
14        A.    I have seen copies, I don't think I've
15   seen the original.
16        Q.    Did that factor in any part of your
17   analysis or your conclusions in the report,
18   Exhibit 1?
19        A.    No.
20        Q.    Now, would you agree with me that the
21   existence of that paper contract, which you've
22   seen copies of, proves that the StreetFax
23   contract that's talked about in your report is
24   not genuine?
25             MR. SOUTHWELL:  I am just going to
```

```
 1                        B. Rose
 2       object to the form.
 3             Can you specify what you mean by the
 4       paper contract, try to be a little more
 5       specific about what you are referring to?
 6             MR. BOLAND:  Sure.
 7       Q.    Are you aware that a two-page document
 8   is being offered by my client as an authentic --
 9   a two-page paper document is being offered as an
10   authentic contract between him and Mark
11   Zuckerberg?
12       A.    I am.
13       Q.    And are you aware that that two-page
14   paper document was evaluated by a bunch of paper
15   document experts in about July of 2011?
16             MR. SOUTHWELL:  You mean the original
17       of it?
18             MR. BOLAND:  Yes.
19       Q.    The two-page document was evaluated
20   in July 2011.
21       A.    I'm aware that there was paper analysis
22   done in the case.
23       Q.    Okay.
24             So when I'm referring to what I am
25   calling the Facebook contract I'm talking about
```

```
 1                         B. Rose
 2    that two-page paper document that Mr. Ceglia has
 3    attached a copy of to an amended complaint and
 4    his claim obviously rests on that being an
 5    authentic contract between him and Mr. Zuckerberg,
 6    okay, that's what I am talking about.
 7         A.    Okay.
 8              MR. SOUTHWELL:  Just to be clear, I
 9         don't think this witness has seen the actual
10         original document that's been proffered, so
11         you may want to be clear in your questions.
12              MR. BOLAND:  Fair enough.
13         Q.    So you haven't seen the original --
14         A.    I have not.
15         Q.    -- but you've seen copies of that
16    document?
17         A.    Yes.
18         Q.    Fair enough.
19              But you're aware that the original
20    exists?
21         A.    I have not seen it.  I understand some
22    analysis has been done of it, so I have no reason
23    to think it doesn't exist, yes.
24         Q.    Did you read any other expert reports
25    in this case that the plaintiffs have submitted?
```

```
 1                    B. Rose
 2      A.    I read some of the paper analysis but
 3  not the entire report.
 4      Q.    Which report are you referring to?
 5      A.    I don't recall.
 6      Q.    Would you agree with me the existence
 7  of that two-page paper contract, the one we just
 8  referred to, which you read some analysis of,
 9  proves that the StreetFax contract that you
10  identified in Exhibit 1 can't be genuine?
11      A.    I would not agree with that.  I
12  wouldn't begin to speculate on the paper analysis.
13      Q.    Well, assume for a second a
14  hypothetical for me.  Assume that somewhere down
15  the line, tomorrow or the next day, the two-page
16  paper contract that we're talking about is
17  determined by the Court in this case or a jury to
18  be an authentic contract between Mark Zuckerberg
19  and Paul Ceglia, let's assume that.
20           Would you agree with me, then, if
21  that's determined to be an authentic contract
22  between those two parties, that the StreetFax
23  contract as you identified in Exhibit 1 has to be
24  not genuine?
25           MR. SOUTHWELL:  Object to the form.
```

1                        B. Rose

2       Q.     Would you agree with that?

3       A.     Mr. Boland, my expertise is in digital

4   forensics.  I think clearly based on the digital

5   forensics we've conducted that the StreetFax

6   contract is the genuine contract in this case and

7   the Work For Hire contract offered by your client

8   is a fraud.  Beyond that, you know, I wouldn't

9   speculate on what the paper analysis itself

10   would show.

11       Q.     All right.  Well, let's try this

12   hypothetical.

13             Let's say that Mark Zuckerberg is

14   deposed in this case at some point and concedes

15   that the two-page written contract that we're

16   talking about, the Facebook contract, is

17   authentic.

18             Would you then agree that the StreetFax

19   contract that's in your report must not be

20   genuine?

21             MR. SOUTHWELL:  Object to the form.

22       A.     I would think if Mr. Zuckerberg in a

23   deposition testified that the Work For Hire

24   contract was an authentic contract, I would think

25   that would mean that the Work For Hire contract

```
 1                      B. Rose

 2   was an authentic contract.

 3              Beyond that I think that's what it

 4   means, exactly what you say it means, which is

 5   that if Mr. Zuckerberg says that that is an

 6   authentic contract then that is an authentic

 7   contract.  I don't necessarily think that would

 8   affect my analysis of the StreetFax contract

 9   itself as found on the digital forensics side.

10      Q.    Well, let's talk about that.

11              You know there's a conclusion in your

12   report, Exhibit 1, that the StreetFax contract is

13   the authentic contract between the parties;

14   correct?

15      A.    Correct.

16      Q.    How did you arrive at -- let me back

17   up.

18              You are not an expert in digital image

19   analysis; correct?  You are not certified or

20   qualified as an expert to analyze digital images

21   to determine if there are authentic or not?

22      A.    What is digital image analysis, what do

23   you mean by that?

24      Q.    I mean any electronic file that is in a

25   digital format like TIFF, JPEG, GIF, have you
```

1               B. Rose

2   ever been qualified in court to give an opinion

3   as to whether an image of that format is in fact

4   authentic or altered or a copy or an original,

5   things like this?

6       A.      No.

7       Q.      Do you have any training, classes

8   you've gone to, about how to evaluate digital

9   images to determine if they've been altered?

10      A.      No.

11      Q.      So it would be fair to say, then, that

12  the StreetFax contract as you identify it in

13  Exhibit 1 is comprised of two TIFF images?

14      A.      Correct.

15      Q.      It's not paper we're talking about;

16  right?

17      A.      That's correct, it's an electronic file.

18      Q.      And your analysis didn't find any paper

19  predecessor to that, those TIFF images; correct?

20      A.      We were dealing with electronic media,

21  so, yes, that's correct.

22      Q.      Okay.

23              And a TIFF image is a digital image,

24  you would agree with me?

25      A.      Correct.

```
 1                        B. Rose
 2      Q.     As opposed to a Word document, which is
 3  not really typically called by folks in your
 4  industry as a digital image?
 5      A.     That's correct.
 6      Q.     Okay.
 7             So let's talk about that digital image
 8  that is the two TIFF images.
 9             Who found those two TIFF images, by
10  the way?
11             MR. SOUTHWELL:  Can you just clarify
12      what you mean by found?
13             MR. BOLAND:  Well, I will ask him if he
14      doesn't understand.
15             MR. SOUTHWELL:  Object to the form.
16             MR. BOLAND:  Okay.
17      Q.     Who was the person who first said to
18  anyone on your team there are two TIFF images
19  which appear to be a contract between the parties
20  that I've just located on some media?  Someone
21  must have first said that.
22      A.     I was informed of the discovery of the
23  TIFF images by Mike McGowan.
24      Q.     Do you know if he is the one who
25  discovered them?
```

                              B. Rose

1

2    A.    I believe he was.

3    Q.    Okay.

4          Is he a digital image expert in the way

5    we defined it earlier in your testimony, do you

6    know?

7    A.    I don't know.

8    Q.    How long has he worked for Stroz

9    Friedberg?

10   A.    Mike McGowan has worked -- he's been

11   there before I got there, I would say he's worked

12   there approximately 10 years.

13   Q.    How long have you worked there?

14   A.    In November it will be seven years.

15   Q.    And you don't know if he is a digital

16   image expert, as you sit here today?

17   A.    He's a digital forensic expert.

18         I mean, in terms of digital image

19   expert, Mike has been qualified in many courts to

20   offer testimony on the authenticity of electronic

21   documents, including image files, so whether he's

22   a document image expert, I think that term you're

23   using a little loosely, I'm not sure exactly what

24   that means in that context.

25   Q.    Do you know if either one of these two

Page 23

```
 1                      B. Rose
 2    TIFF images that we're talking about that
 3    comprise the StreetFax contract are original
 4    images or copies?
 5         A.    I don't understand that question.
 6         Q.    Do you use a digital camera personally?
 7         A.    Yes, occasionally.
 8         Q.    Okay.
 9               When you capture a picture with your
10    digital camera, I'm calling that an original, you
11    just hit the shutter button and the picture is
12    captured, it's on the card in the camera, that's
13    an original, okay, that's the definition I'm
14    using.
15         A.    Okay.
16         Q.    Have you ever captured digital images
17    like that and put them on a computer?
18         A.    Yes.
19         Q.    Now, once they're on a computer, for
20    example, pictures can have problems like red eye.
21               Are you familiar with that?
22         A.    Yes.
23         Q.    And are you aware that there's photo-
24    editing tools which allow you to correct red eye
25    in images?
```

                          B. Rose

1

2       A.      Yes.

3       Q.      What I'm calling an original would be

4   the picture as you captured it and would you

5   agree with me that if you went in and fixed a

6   red-eye defect in that image that's no longer an

7   original, it's been altered?

8       A.      You've changed it, yes.

9       Q.      You've changed it, right, not

10  significantly, but you've changed it.

11              So what I'm asking you about is these

12  TIFF images that are the StreetFax contract, is

13  it your opinion that those are originals or have

14  they -- were they altered before they landed

15  where they were found on the media where you

16  found them?

17      A.      I think what we know from the digital

18  forensics is that they were created on the hard

19  drive and then e-mailed out within minutes, so I

20  think from the time they were created on the

21  computer there would not have been time to alter

22  them before sending them out.

23      Q.      Fair enough.

24              How about before -- when you say

25  created on a hard drive, it's true that files can

1                              B. Rose

2    be created on a hard drive in many ways; right?

3         A.      True.

4         Q.      They can come from a floppy disk years

5    ago; correct?

6         A.      Sure.

7         Q.      They can be copied off of a CD?

8         A.      They can be, yes.

9         Q.      Copied off of a USB device?

10        A.      Correct.

11        Q.      Copied from another hard drive to that

12   hard drive?

13        A.      Correct.

14        Q.      They could be downloaded from the

15   Internet?

16        A.      Correct.

17        Q.      How did those TIFF files get created on

18   that hard drive?  Your report doesn't say.

19              Which one of those methods was the

20   method that created them on that hard drive?

21        A.      They appear to be scans that we believe

22   were then copied to the hard drive, but that's

23   the extent of what we can determine from the

24   digital forensic evidence that's available.

25        Q.      So you don't know if they were copied

```
 1                        B. Rose
 2     from any of those various methods I just went
 3     through in the previous question?
 4         A.     There is no digital forensic evidence
 5     as to where they were copied from.
 6         Q.    So I understand your answer that when
 7     they landed on the hard drive, from that point to
 8     when you say they were e-mailed there wasn't
 9     enough time really to alter them, I understand
10     what you're saying there.
11                That's your testimony; correct?
12         A.     Correct.
13         Q.     I'm asking you, before they landed on
14     that hard drive were they altered prior to that
15     time?
16         A.     I wouldn't be able to speculate on
17     that.
18         Q.     Do you know?
19         A.     I don't know one way or the other.
20         Q.     Now, did you read Mr. Broom's report,
21     the forensic expert for the plaintiffs?
22         A.     Some time ago, yes.
23         Q.     Do you recall a section of his report
24     where he talked about the physical size of the
25     two TIFF images that you found?
```

```
                                              Page 27

 1                       B. Rose

 2      A.     I do not.

 3      Q.     Do you know what the physical size is

 4   of those two TIFF images?

 5      A.     I do not.

 6      Q.     You did mention in your report that the

 7   resolution of those images was poor, you'd agree

 8   with me?

 9      A.     I would, yes.

10      Q.     And can you go to the page -- I'm going

11   to find it in a moment -- of your report where

12   you actually have a graphic of the TIFF images

13   printed in there?

14           I'm going to go look for the page

15   number, I'm going to make it quick, but if you

16   can just leaf through I think it will stand out.

17           It's page 90 of 102 I think is where I

18   am --

19      A.     You are referring to the top-level

20   numbering?

21      Q.     Yes, I am.  That's a little confusing

22   for all of this, you're right.

23           Yes, page 90 of 102, it's the first

24   page of Exhibit H.

25           Do you see that document?
```

```
 1                    B. Rose
 2      A.    I do.
 3      Q.    Okay.
 4            Does that appear to be or -- what is
 5   it?  Can you describe for the Court what that is
 6   that you put into your report?
 7      A.    That appears to be the StreetFax
 8   contract discovered on the Ceglia media.
 9      Q.    Is that both pages or just one page?
10      A.    It's just the first page.
11      Q.    And can you read that first page of
12   that contract, please.
13      A.    I can't based on this, no.
14      Q.    Why can't you read it?
15      A.    It's a low-quality resolution and it's
16   too small.
17      Q.    Can you read any words on that contract
18   based on the size that it appeared on the media
19   where you found it?
20            MR. SOUTHWELL:  Objection.  There's no
21      evidence that that's the size that he found
22      it.  In fact, my version of that has it much
23      larger, so I'm not sure the version you've
24      handed the witness, it's very small and I am
25      not sure if that's a production issue in
```

```
 1                        B. Rose
 2        terms of the copying.
 3               MR. BOLAND:  I can ask him.
 4        Q.    When you produced your report for
 5    filing is the size that you are looking at on
 6    page 90 of 102, was that the size that document
 7    was produced in the report?
 8        A.    I did not produce this exhibit, so I
 9    don't know.
10        Q.    But you reviewed the report before it
11    was filed?
12        A.    I did.
13        Q.    Do you remember the size of that
14    exhibit?
15        A.    I don't.
16        Q.    Do you have any reason to doubt that
17    that's the size of the exhibit as you produced it
18    in the report that was filed?
19        A.    I don't know one way or the other,
20    Mr. Boland.
21        Q.    Very well.
22               Can you read -- and the size that that
23    is, which I understand Mr. Southwell is disputing
24    whether that's actually the size it was when it
25    was filed, I understand that, but the size that
```

```
 1                        B. Rose
 2    that actually appears there, is that legible, is
 3    any part of that legible?
 4        A.    Parts of it.
 5        Q.    So can you read the parts and describe
 6    where you're reading from for the Court?
 7        A.    I can read the title, which says
 8    StreetFax; I can read section 1, which says
 9    general provisions; I can read certain headings
10    such as payment terms; that's essentially what's
11    legible based on this copy which you've handed me.
12        Q.    And is page 2 of the TIFF -- do you
13    recall if page 2 of these two TIFF images was
14    placed into the report that you filed as an
15    exhibit itself?
16        A.    I do not recall.
17        Q.    And there's no other electronic
18    evidence that you reviewed, or is there
19    electronic evidence you reviewed before issuing
20    this report that is not listed in the report?
21        A.    No.
22        Q.    Is there any electronic evidence that
23    you reviewed -- you know, let me back up that
24    previous question.  I used the phrase that you
25    reviewed.
```

1                         B. Rose

2                 Let me ask you, if you know, is there

3       any other electronic evidence that any of the

4       four people involved in this report reviewed

5       before issuing the report but it's not listed in

6       the report?

7                 MR. SOUTHWELL:  Objection to form.

8                 I'm not sure what the --

9       Q.    Let me break it down.

10      A.    Sure.

11      Q.    You supervised the people who

12      contributed to this report; correct?

13      A.    Correct.

14      Q.    Okay.

15                So that's Mr. Novak and Mr. McGowan,

16      you supervised them?

17      A.    Correct.

18      Q.    And I'm asking you if you know whether

19      those two individuals or you reviewed or analyzed

20      electronic evidence before you issued this report

21      but didn't list that evidence that you analyzed

22      in the report.

23                MR. SOUTHWELL:  Are you talking about

24          any electronic evidence in the world?

25                MR. BOLAND:  Related to this case.

```
 1                        B. Rose
 2            MR. SOUTHWELL:  Related to the report?
 3            MR. BOLAND:  Related to this case.
 4       Q.    Did you analyze any electronic evidence
 5   related to this case before you issued the report
 6   but didn't list that evidence that you reviewed
 7   in the report?
 8       A.    Yes.
 9       Q.    Could you list what that is now,
10   please?
11       A.    So we reviewed copies of Mark
12   Zuckerberg's Harvard e-mail, which I don't
13   believe is covered in the report; we also --
14   there was also a review conducted of certain
15   assets belonging to Mark Zuckerberg.
16       Q.    Can you describe those, please.
17       A.    They were various computers and other
18   hard drives that belonged to a computer or
19   computers that Mr. Zuckerberg had used
20   historically.
21       Q.    When did he use those various other --
22   do you have a better description of those various
23   other?  How many computers are we talking about
24   in that last answer you gave?
25       A.    I don't know exactly.  It was, I would
```

```
 1                       B. Rose
 2   say, somewhere in the neighborhood of 15 to 20,
 3   roughly.
 4       Q.    Who would know the exact answer of how
 5   many computers of Mark Zuckerberg's that he
 6   historically used that your team analyzed before
 7   issuing the report?
 8       A.    Well, I would think it's possible Mike
 9   McGowan would know the exact number from his
10   recollection, but as to who could tell you based
11   on recall, we certainly have an inventory of
12   those assets.
13       Q.    You do have an inventory?
14       A.    Yes, I do.
15             MR. BOLAND:  Mr. Southwell, I will ask
16       you to produce that inventory of those
17       assets that were reviewed.
18             MR. SOUTHWELL:  And your basis for that
19       request is what?
20             MR. BOLAND:  It's part of the work he
21       did and --
22             MR. SOUTHWELL:  It's not related to the
23       Court-ordered expedited discovery in the
24       report.
25       Q.    Let's talk about those computers you
```

Page 34

```
 1                         B. Rose
 2    evaluated.
 3              Why did you evaluate those 15 to 20
 4    computers?
 5         A.    To look for evidence of the
 6    authenticity or inauthenticity of the Work For
 7    Hire contract.
 8         Q.    And do you know who did the analysis of
 9    those 15 or 20 computers on your team?
10         A.    I do not.
11         Q.    And are there notes or any
12    documentation of what was found during the
13    analysis of those 15 or 20 computers?
14         A.    There was nothing found.
15         Q.    That's not my question.
16              Are there notes or documents of what
17    was found, what they --
18         A.    Notes and documents of what was found?
19              Your question is what was found.  I'm
20    telling you nothing was found.
21              In terms of whether there are notes or
22    documents about the analysis itself, I don't know
23    one way or the other.
24         Q.    Would there typically be notes when a
25    computer expert evaluates a piece of media as to
```

1                        B. Rose

2    how they approach that evaluation, for example,

3    search terms they might have used?

4        A.     Typically.

5        Q.     And software tools they might have used

6    to carve out data, would an analyst in your

7    company typically list the steps they went

8    through analyzing a piece of media?

9        A.     Typically.

10       Q.     And do you know if those records were

11   kept related to these 15 or 20 computers?

12       A.     I don't know one way or the other.

13       Q.     And why was the result -- were the

14   results of the analysis, specifically those 15 or

15   20 computers, not discussed in this report?

16       A.     This report is based on the expedited

17   discovery ordered by the Court which covered the

18   Ceglia media and various other information

19   contained pursuant to subpoenas such as the

20   e-mails from Sidley & Austin, that's the focus of

21   this report is expedited discovery, so we limited

22   our report to that.

23              The assets themselves were not part of

24   that, were not part of that, were not part of

25   that expedited discovery, so they are not

1                          B. Rose

2     included in the report.

3          Q.    Why did you bother to evaluate them if

4     they are not part of expedited discovery?

5          A.    We evaluated them well before expedited

6     discovery even started.

7          Q.    Why?

8          A.    Why?

9                Again, because we're looking for

10    evidence of the authenticity or inauthenticity

11    of the contract.

12          Q.    And would you agree with me that the

13    Court-ordered expedited discovery is limited to

14    determining the authenticity or inauthenticity of

15    the contract?

16          A.    I think the expedited discovery's very

17    clear that we are no evaluate the authenticity or

18    inauthenticity of the contract based on our

19    analysis of the Ceglia media.

20          Q.    I'm just asking you do you agree that

21    the court order, multiple court orders have

22    focused on determining the authenticity or the

23    inauthenticity of the contract.

24          A.    Yes.

25          Q.    Okay.

```
 1                       B. Rose
 2              And you just stated that's one of the
 3    things, the reasons why you looked at these 15 or
 4    20 computers; correct?
 5        A.    I mean, that -- I think that underlies
 6    all of the work in this case, I mean, that is the
 7    central issue.
 8        Q.    And approximately what time did that --
 9    what date did that analysis of those 15 or 20
10    computers take place?
11        A.    I don't know.  That was before my
12    involvement in the case.
13        Q.    But you supervised the team members who
14    do it?
15        A.    I did not supervise that portion, no.
16        Q.    Who supervised that portion?
17        A.    I don't know.
18        Q.    And that analysis that we're talking
19    about, was that done on original media or
20    forensic copies of original media?
21        A.    It would have been done -- I don't know
22    the answer to that question, I would speculate.
23        Q.    Would it be practice of Stroz Friedberg
24    typically to not do analysis on original media
25    but to make a forensic image or forensic copy
```

```
 1                      B. Rose
 2  first and analyze that?
 3      A.     In most circumstances you would prefer
 4  to work off a copy, yes, that's correct.
 5      Q.     And do you know if that was the
 6  circumstance for these 15 or 20 computers?
 7      A.     I've already said I don't.
 8      Q.     Do you know if -- okay.
 9             Do you know where those 15 or 20
10  computers, whether they are originals or forensic
11  images, where they are at today?
12      A.     I do not.
13      Q.     Could they be in your locked, secured
14  facility at your offices?  Is that possible?
15      A.     I do not believe we've maintained
16  copies of those, no.
17      Q.     Did you discuss the results of that
18  evaluation or analysis with defense counsel?
19      A.     We did.
20      Q.     And when was that discussion?
21      A.     I don't know.
22      Q.     Do you know who was present for that
23  discussion?
24      A.     I don't know.  There was one discussion
25  and no, I don't know who was present.
```

```
 1                        B. Rose

 2      Q.    But you were there?

 3      A.    Was I personally there?

 4      Q.    Or on the phone, whichever.

 5      A.    I don't recall being there, no.

 6      Q.    And you don't know who from Stroz

 7   Friedberg was there?

 8            MR. SOUTHWELL:  Objection, asked and

 9       answered.

10      A.    I don't.

11      Q.    Do you know which defense counsel were

12   there?

13      A.    I don't.

14      Q.    Okay.

15            Were any reports given to the

16   defendants regarding media that was analyzed but

17   is not listed in the report?

18            MR. SOUTHWELL:  Objection.

19            What are you asking?  I just want to

20       make sure you are not getting into

21       privileged areas.

22      Q.    Did you provide a report?

23            I'm not asking what the report says.

24            Did you provide a report to the

25   defendants regarding the analysis of those 15 or
```

```
 1                        B. Rose
 2  20 computers?
 3            MR. SOUTHWELL:  Can you just specify
 4     what you mean by report?
 5     Q.     Anything from an e-mail to a formal
 6  report like as in Exhibit 1, any communication
 7  whatsoever regarding the results of that
 8  analysis, did you report that to the defendants?
 9     A.     I don't know.
10     Q.     Would there be records at the office
11  that would reflect that if it happened?
12     A.     Yes.
13     Q.     And who would be the person at Stroz
14  Friedberg who would know where those records are?
15     A.     It would be whoever made the report.
16     Q.     Now, is there any other electronic
17  evidence that you or your team reviewed after
18  issuing the report that's Exhibit 1?
19     A.     Related to this case?
20     Q.     Yes.
21     A.     No.
22     Q.     Did you or anyone -- well, first of
23  all, people from Stroz Friedberg have written
24  various articles in professional publications
25  about computer forensics; fair to say?
```

1                          B. Rose

2        A.    That's fair to say, yes.

3        Q.    Have you written articles that have

4    been published in computer forensics publications?

5        A.    No.

6        Q.    Okay.

7              Would you agree with this general

8    statement that it's important for a computer

9    forensics expert to review all the available

10   evidence before producing a report?

11       A.    I would agree that it's important for

12   digital forensic expert to have examined all of

13   the relevant data and certainly, you know, you

14   are sometimes dealing with accessibility issues

15   here, so I think there are times when, you know,

16   I don't know what available means, there are

17   certainly things which might, you know, if you

18   move mountains, be available, but are not

19   certainly worth it in every case, but as a

20   general matter all of the reasonably accessible

21   data should be reviewed.

22       Q.    And early on in -- well, I don't know

23   if it was early on, I shouldn't say that, but

24   your team at least twice either obtained or

25   received copies of Mr. Zuckerberg's Harvard

```
 1                      B. Rose
 2   e-mail account; fair to say?
 3       A.    We have at various times either
 4   collected or received copies of Mr. Zuckerberg's
 5   Harvard e-mail account, yes.
 6       Q.    And the record reflects at least two
 7   times that occurred; true?
 8       A.    Yes.
 9       Q.    Are there more than two?
10       A.    I believe that we received three
11   separate deliveries, so -- and let me just go
12   through them so I can be clear.
13              We collected Mr. Zuckerberg's Harvard
14   e-mail on April 15th of 2011.  We also received a
15   copy of Mr. Zuckerberg's e-mail from Harvard that
16   was made in or that was from October of 2010, I
17   believe that was the second delivery received,
18   and then we received a third delivery from
19   Harvard which included a November 2003 copy of
20   his data, a February 12, 2012 copy of his data,
21   and an additional copy of the October 2010 data,
22   and by additional copy I mean it's a duplicate.
23       Q.    And you're aware that the defendants
24   had a duty under expedited discovery to produce
25   e-mails from Mark Zuckerberg's Harvard e-mail
```

```
 1                       B. Rose
 2    account; correct?
 3               MR. SOUTHWELL:  Objection.
 4       A.    I don't know what their obligations
 5    were.
 6       Q.    Were you or your team involved in
 7    helping the defendants produce a set of
 8    Mr. Zuckerberg's e-mails as part of expedited
 9    discovery?
10       A.    Yes.
11       Q.    And do you know from which one of these
12    three separate deliveries that production came?
13       A.    I do not.
14       Q.    Now, Stroz Friedberg, you or no one
15    from your team analyzed the backup copies of
16    Harvard's e-mail servers; is that true?
17       A.    What do you mean by analyze their
18    backup copies?
19       Q.    Let me ask you a question.
20               Do most large organizations like a
21    university maintain backup copies of e-mail,
22    their e-mail servers, is that --
23       A.    Most large institutions make backup
24    copies for disaster recovery purposes.  Whether
25    they maintain them or not or how long they
```

```
 1                      B. Rose
 2   maintain them varies greatly from organization to
 3   organization.
 4       Q.    Do you know if Harvard in 2003-2004
 5   made backup copies of their e-mail server?
 6       A.    I believe they did, yes.
 7       Q.    Did you obtain a forensic image of any
 8   backup copies of Mr. Zuckerberg's e-mail account
 9   from 2003 or 2004?
10            MR. SOUTHWELL:  Object to the form,
11       just being clear about what backup copies of
12       Mr. Zuckerberg's e-mail account means.
13       Q.    I just asked you and you confirmed that
14   Harvard made backup copies of their e-mail server
15   in 2003 and 2004; correct?
16       A.    I said I believe they did.
17       Q.    Do you have any reason to believe that
18   that excluded Mr. Zuckerberg's e-mail account?
19       A.    No.
20       Q.    I'm asking about those backup copies.
21            Do you know if those were on tape or on
22   disc or what form those backups were in?
23       A.    I don't know whether they would retain
24   them from then.
25       Q.    Did you ask Harvard about whether they
```

1                        B. Rose

2     had backup copies from 2003 and 2004 that were

3     accessible?

4         A.    We asked Harvard to identify all

5     historical copies of Mr. Zuckerberg's e-mail,

6     whether that's on a backup or anywhere else.

7         Q.    Did they produce forensic copies from a

8     backup source to you?

9         A.    Yes.  I've just delineated, I think,

10    the copies they produced for us, so we collected

11    the April 15, 2011 e-mail, they produced data

12    from October 2010, February 2012, and November

13    2003; they said that and they indicated that

14    after a thorough search that was all the copies

15    of this historical e-mail they could identify.

16        Q.    Let me just clarify that for my

17    understanding.

18              The first collection -- I'll use your

19    term -- of April 15, 2011, was that from their

20    actual e-mail server or --

21        A.    Correct.

22        Q.    So it was not from a backup copy?

23        A.    That's correct.

24        Q.    The copy that they -- that you received

25    from them which was you received in October 2010,

Page 46

1                          B. Rose
2    was that from their server or from a backup?
3        A.    I don't know the source of that.
4        Q.    Very well.
5              And then the third delivery from
6    Harvard, was that from their actual server, their
7    live server is the term I'm going to use, their
8    live server, e-mail server, or from a backup
9    copy?
10       A.    Well, from November 2003 it would
11   necessarily not be from their live server, and
12   this is a copy of the e-mail box as it existed in
13   November 2003.
14       Q.    So from a backup you would assume?
15       A.    I don't know whether it was a backup,
16   whether they made a copy for some other reason.
17   I know they had a historical copy of his e-mail,
18   I don't know why it was made or from what the
19   source of it was.
20             Obviously, once you get past the
21   collection of a server on April 15th everything
22   else they provide us historically is a historical
23   copy, I don't know the source.
24       Q.    Now, since we are on that topic, those,
25   at least between two of those copies, you

```
 1                        B. Rose
 2   offered -- well, you've offered many declarations
 3   in this case about different topics?
 4       A.    Correct.
 5       Q.    And one of them, if you recall, that
 6   you offered a declaration about was some
 7   differences that arose between the October 2010
 8   e-mail collection and the April 2011.
 9             Do you recall that declaration?
10       A.    I do.
11       Q.    And correct me if I'm wrong, but there
12   were two main explanations you provided in that
13   declaration as to why what appeared to be missing
14   e-mails actually weren't missing e-mails at all.
15             Do you remember providing explanation
16   for that?
17             MR. SOUTHWELL:  Object to the form.
18       Q.    Do you remember providing an
19   explanation for that?
20       A.    I do.
21       Q.    And you indicated in that declaration
22   that the cause of that apparent deleted e-mails,
23   which wasn't deleted e-mails at all, were minor
24   formatting differences; do you remember saying
25   that?
```

1                            B. Rose

2        A.     Do you have a copy of the declaration?

3        Q.     Hold on a second.  I may have a copy

4    here.

5               You know what, I don't have it handy,

6    Mr. Rose, so if your memory doesn't serve you, we

7    will go from there.

8        A.     I do remember there being minor

9    formatting differences which were part of the

10   discrepancy.

11       Q.     And do you recall using the term, and

12   in addition to minor formatting differences

13   technical issues arose, if you remember using

14   that in your declaration?

15       A.     I don't recall that specific language.

16       Q.     And is it your opinion that some --

17   that Stroz Friedberg somehow was engaged in some

18   fraud which caused the minor formatting

19   differences in those e-mails?

20       A.     Absolutely not.

21               What caused the differences was for

22   some in the collection process, as I recall,

23   there were two issues, one, some minor formatting

24   inconsistencies, for instance, and not even

25   apparent on the surface of the document, if you

Page 49

1                        B. Rose

2    look at it, for instance, it's an extra white

3    space in the subject line, when we compare the

4    two e-mails they were identical except for that

5    minor formatting difference.

6              I believe the technical issue was one

7    e-mail that got split into two different e-mails,

8    so of course it doesn't dedupe out, but I can't

9    imagine how you could equate that to fraud.

10       Q.    How did those minor formatting

11   differences occur?

12       A.    I don't know.

13       Q.    Was it done manually by anyone at Stroz

14   Friedberg?

15       A.    No.

16       Q.    Was it done even in an automated

17   fashion, intentionally by someone at Stroz

18   Friedberg inserting those formatting differences?

19       A.    Why would anyone at Stroz Friedberg

20   insert formatting differences into an e-mail?

21       Q.    Well, the rules here are that I get to

22   ask the questions.

23              Was it done automatically by someone at

24   Stroz Friedberg intentionally trying to create

25   formatting differences?

```
 1                         B. Rose
 2      A.      Absolutely not.
 3      Q.      So those formatting differences do not
 4  indicate fraud by Stroz Friedberg; fair to say?
 5      A.      Mr. Boland, that's an outrageous
 6  accusation, that anyone at Stroz Friedberg would
 7  insert a white space in an e-mail so that it
 8  would not dedupe out against a prior collection
 9  of e-mail.
10      Q.      I'm just asking you if you agree with
11  the statement it's not fair to accuse Stroz
12  Friedberg of committing fraud because minor
13  formatting differences appear in these e-mails.
14              Is that fair to say?
15      A.      I think Stroz Friedberg would have
16  absolutely no motivation to insert an extra white
17  space into a subject line.
18      Q.      Well, my question is not about
19  motivation, my question is, is it fair to say
20  that it is not proof of Stroz Friedberg
21  committing fraud because minor formatting
22  differences occurred in these e-mails.
23      A.      I think given the circumstances you're
24  considering, which is that Stroz Friedberg is
25  engaged in a process of collecting e-mail and
```

1                          B. Rose

2    deduping out against a prior set, so having an

3    aggregate set of data for review, if you're

4    talking about those circumstances, the idea that

5    an extra white space would be inserted so that

6    those documents in fact don't dedupe out, the

7    only effect of that being that there are

8    additional documents which Gibson, Dunn or Stroz

9    Friedberg then has to review, the idea that that,

10   there's any motivation for fraud there, the idea,

11   given those circumstances, that that would be

12   fraudulent conduct, is outrageous.

13       Q.    So is the answer to my question yes,

14   that it is not evidence -- I'll ask it again.

15   It's not -- because the paragraph you just gave

16   me did not answer the question, sir.

17            Would you agree with me that it is not

18   evidence of fraud by Stroz Friedberg merely

19   because in your possession somehow, we don't know

20   how, minor formatting differences appeared in

21   these e-mails?

22            MR. SOUTHWELL:  Objection, asked and

23       answered, he answered the question.

24       A.    What I'm saying is given the

25   circumstances it's clearly not fraud.

```
 1                        B. Rose
 2         Q.    Did you or anyone on your team review
 3    any electronic evidence related to any prior
 4    cases that Mr. Zuckerberg has been involved in as
 5    a defendant or as a party?
 6         A.    Again, we reviewed the assets,
 7    Mr. Zuckerberg's assets, I believe those did
 8    include some forensic images that have been made
 9    in prior litigations.
10         Q.    And what prior litigation were those
11    images involved in?
12         A.    I don't recall.
13         Q.    Are you familiar with the case against
14    Mr. Zuckerberg involving an organization called
15    ConnectU?
16         A.    I recognize the name, yes.
17         Q.    Are you familiar with litigation
18    involving two twins from Harvard named the
19    Winklevoss twins?
20         A.    I am familiar with it, yes.
21         Q.    Do you know if you or anyone on your
22    team reviewed evidence from the ConnectU
23    Winklevoss case?
24         A.    It is my recollection that some of the
25    assets were related to the ConnectU case.
```

1                         B. Rose

2        Q.    Do you know if you reviewed all of the

3   electronic assets related to the ConnectU case?

4        A.    I don't.

5        Q.    Did you ask to see all those assets?

6        A.    We asked to see all of the historical

7   Mark Zuckerberg assets.

8        Q.    And who did you ask that question to?

9        A.    Well, I mean, we were in consultation

10   with Gibson, Dunn and attorneys from McManis

11   Faulkner, Mr. Zuckerberg's personal attorneys.

12        Q.    Did you or anyone from your team review

13   any electronic evidence from a case involving

14   Eduardo Saverin?

15        A.    I don't know.

16        Q.    Does that name ring a bell?

17        A.    It does.

18        Q.    Are you aware that he and

19   Mr. Zuckerberg were involved in litigation years

20   ago regarding Facebook?

21        A.    I've seen "The Social Network," but

22   beyond that --

23        Q.    Did you ask to see any evidence from

24   that case, any electronic evidence from that

25   case?

```
                              B. Rose
 1
 2       A.     We didn't have discussions about
 3   electronic assets for specific cases.  What we
 4   were provided was our understanding was the
 5   existing historical assets for Mr. Zuckerberg.
 6       Q.     You know who Orin Snyder is; right?
 7       A.     I do.
 8       Q.     Have you met with him before?
 9       A.     I have.
10       Q.     Pardon me?
11       A.     I have, yes.
12       Q.     Have you met with him about this, in
13   preparation for your deposition today?
14       A.     No.
15       Q.     Would you agree with the statement that
16   Mr. Snyder made about this issue of the minor
17   formatting differences we were talking about with
18   the Harvard e-mails, can you tell me if you agree
19   with this statement?
20            MR. SOUTHWELL:  Can you just be clear
21       what you are referring to?
22            MR. BOLAND:  A statement from
23       Mr. Snyder December 13, 2011, during the
24       oral argument we had that day.
25       Q.     Mr. Snyder said "It's possible the
```

```
 1                        B. Rose
 2    differences in storage format or the conversion
 3    process can create minor format discrepancies
 4    between two copies of the same e-mail."
 5             Do you agree with that statement?
 6        A.    Can I read that, do you mind?
 7        Q.    Sure.  Page 163 of that, and I started
 8    reading "It's possible."
 9             Do you see where I am pointing there,
10    line 17?
11             MR. SOUTHWELL:  Can we see the page
12        before?  This relates to the issue you are
13        asking about?
14             MR. BOLAND:  It does, I'll represent to
15        you that it does.
16             You can see the page before, that's
17        fine.  It relates to an argument -- well, I
18        will let the witness read that.
19        Q.    Just tell me if you agree with that
20    statement he makes about minor formatting
21    differences.
22        A.    I mean, as a general matter, I would
23    agree with that.
24        Q.    Very well.
25             So the accidental or unintentional
```

1                    B. Rose

2    insertion of a formatting difference into a

3    document, you would agree with me, is not by

4    itself proof of fraud?

5        A.    Accidental -- so accidental and

6    unintentional insertion?

7        Q.    Correct.

8        A.    I would say since fraud involves

9    intent, I would say by definition that would not

10   be fraud.

11       Q.    And we just went over that such

12   formatting differences can be caused

13   unintentionally as Stroz Friedberg unintentionally

14   caused them somehow?

15            MR. SOUTHWELL:   Objection to the form.

16            What are you referring to as such

17       formatting differences?

18       Q.    Formatting differences between the sets

19   of Harvard e-mails that we talked about were

20   caused unintentionally; right?

21       A.    If you are doing forensic collection

22   and you're collecting e-mail, it is possible in

23   the conversion process or based on storage

24   formats for there to be formatting differences

25   introduced.

1                         B. Rose

2       Q.     Now, is that the only way in the whole

3   world of computers is just forensics where these

4   formatting differences can occur?

5       A.     I don't understand that question.

6       Q.     People trading files on CDs or

7   e-mailing files to each other, can formatting

8   differences occur in that process?

9       A.     Can you be specific?  That seems very

10  hypothetical.

11      Q.     You have a Microsoft Word document and

12  you send it to me and I open it in Microsoft

13  Word, can formatting differences occur depending

14  on how you have Microsoft Word set and how I have

15  it set on my computer?

16      A.     I think in general that should not

17  occur.

18      Q.     My question is not whether it should

19  not occur.

20             Does that occur for people, do they

21  get --

22      A.     I am not aware of that occurring.

23      Q.     You have never received a document that

24  somehow the formatting got altered from what the

25  recipient created?

```
 1                        B. Rose
 2              MR. SOUTHWELL:  Objection to form.
 3         Q.    Has that ever happened?
 4         A.    I don't know, Mr. Boland.
 5         Q.    Fair enough.
 6               Can you look at Exhibit 1, page 24, we
 7    are in the upper -- I think we are in the upper
 8    corner still of those page numbers.
 9         A.    Okay.
10         Q.    So fair to say this page is generally
11    some discussion about the Sidley Austin server
12    and there's some header information in the middle
13    of the page; correct?
14         A.    I would say it's a discussion of the
15    StreetFax e-mails found at Sidley & Austin and
16    particularly the Internet header information
17    appended to those e-mails.
18         Q.    And your report notes in footnote 9 --
19    I mean, there's a whole paragraph there, but
20    there is a note there that the server --
21              MR. BOLAND:  Scratch that.
22         Q.    Right at the bottom, the last sentence
23    of that footnote, the time zone setting was
24    incorrectly set to Eastern time.
25              Do you see that sentence, the last half
```

Page 59

                         B. Rose

1

2    of the last sentence of footnote 9?

3        A.    I do see that sentence.

4        Q.    And that's referring to the Sidley

5    Austin e-mail server; correct?

6        A.    It is referring to one of the

7    intermediary Sidley & Austin e-mail servers,

8    specifically Mail 02.

9        Q.    Did your computer forensic analysis

10   reveal any fraud regarding Sidley Austin and

11   e-mails?

12       A.    No.

13       Q.    And did your forensic analysis reveal

14   any fraud by Mr. Zuckerberg in relation to

15   e-mails from his Harvard e-mail account?

16       A.    No.

17       Q.    Now, on that same page, the time stamps

18   regarding the sent items from Mr. Ceglia's

19   parents' computer, this Kole e-mail, and the

20   received time of that e-mail on the Sidley Austin

21   server, this is my calculation, but they differ

22   by more than 144 seconds; is that a fair bit of

23   math?

24            MR. SOUTHWELL:  What are you referring

25       to?  I'm sorry.

```
 1                          B. Rose
 2        Q.    The time stamps on the sent item from
 3   Mr. Ceglia's parents' computer of the Kole e-mail
 4   and the time it was received by Sidley Austin,
 5   they differ by about a little over two minutes.
 6        A.    There are two e-mails, so can we
 7   clarify which one we're talking about?
 8        Q.    Let's start with the first one.
 9        A.    Okay.
10              MR. SOUTHWELL:  By the first one, are
11        you referring to page 24 of the report?
12        A.    Or page 23.
13        Q.    Let's look at where you have detailed
14   when those e-mails were sent.
15              Do you see on page -- yes, go back to
16   page 23 under the number 1.
17              There's an e-mail sent at 10:37 a.m.
18              Do you see that reference?
19        A.    Yes.
20        Q.    So there were two StreetFax e-mails
21   that you talk about being sent here on this page?
22        A.    Yes.
23        Q.    The first one sent at 10:37 a.m.
24   Eastern Standard Time.
25        A.    Yes.
```

```
                                        Page 61
  1                      B. Rose
  2       Q.    And then you talk about it being
  3   received on the top of page 24, it's received by
  4   the Sidley Austin server at 9:38 Central time.
  5       A.    Correct.
  6       Q.    That's a difference of a minute,
  7   roughly, or a little under a minute; is that fair
  8   to say?
  9       A.    That is a difference of 51 seconds.
 10       Q.    And in the second e-mail is in the
 11   middle of page 24, it's sent at 10:39; right?
 12       A.    Correct.
 13       Q.    And it's received, at the bottom of 24
 14   it's received by the Sidley Austin server at 9:41.
 15       A.    Correct.
 16       Q.    So that's a little more than a minute,
 17   a minute and a half, roughly; correct?
 18       A.    Let me just do the math.
 19             Yeah, that's roughly correct.
 20       Q.    Now, on the computer where the Kole
 21   e-mail was found your report identifies it as
 22   part of the Ceglia media; fair to say?
 23       A.    Right.
 24       Q.    And do you know who was the actual
 25   owner and user of that computer?  Was it Paul
```

1                    B. Rose

2   Ceglia?

3       A.      I don't know.

4       Q.      Do you know if he ever used that

5   computer?

6       A.      I don't know one way or the other.

7       Q.      And these e-mails, these two TIFF

8   images that were sent by these two e-mails, you

9   would agree with the notion that from a computer

10  forensic standpoint you can't -- no one can say

11  whose butt was actually in the seat at that

12  computer?

13      A.      So -- and let me maybe amend my last

14  answer a little bit.

15              From a forensic standpoint it is

16  difficult from the forensics to tell who's

17  actually sitting in the seat, so what you have to

18  look for is other contextual evidence.

19              So given the fact that what we have in

20  this case is two e-mails from a computer

21  belonging to -- used by someone at the Ceglias',

22  assuming that, you have one of the e-mails that's

23  signed by Paul that sets forth a phone number

24  that is sent to his attorney at Sidley & Austin,

25  Jim Kole.

1                    B. Rose

2              From those circumstances I would say

3      that, yes, at least for the purpose of sending

4      those StreetFax e-mails, Mr. Ceglia, Paul Ceglia

5      specifically, did use that computer.

6        Q.    Now, in sending that e-mail -- so it's

7      your position that the forensic evidence -- and

8      if I'm using the wrong word correct me -- proves

9      that Paul Ceglia was sitting at the computer that

10     sent those e-mails?

11       A.    I think the forensic evidence is yes,

12     that Mr. -- that the evidence, the forensic

13     evidence and I would say the other evidence, for

14     instance, I don't know whether I would

15     characterize the fact that Paul signed the e-mail

16     as forensic evidence, but it's certainly evidence

17     obtained in a forensic analysis, yes.  I would

18     say that it shows that Paul Ceglia sent those

19     e-mails to Mr. Kole.

20       Q.    Now, when you say the word "signed the

21     e-mail" you're talking about his name was typed

22     at the bottom of the e-mail?

23       A.    Correct.

24       Q.    Not a handwritten signature?

25       A.    Correct.

1                          B. Rose

2        Q.     And not even a scanned image of a

3    handwritten signature?

4        A.     That's correct.

5        Q.     And anyone can type those four letters

6    that are his name; right?

7        A.     Anyone could, yes.

8        Q.     Isn't it true that a person could be

9    sitting at the computer, as you are positing

10   here, and send that e-mail; true?

11       A.     Could you repeat that?

12       Q.     As you said, a person, one of the ways

13   this e-mail could have been sent is Paul Ceglia

14   sitting at the computer typing?

15       A.     Correct.

16       Q.     It could also have been sent by another

17   person sitting at the computer typing everything

18   that was in that e-mail; true?

19       A.     Hypothetically true.  I don't think in

20   the case the evidence supports that, no.

21       Q.     And are there ways -- there are ways

22   for people to get, for example, GoToMyPC is a

23   program you are familiar with, a service you are

24   familiar with?

25       A.     Yes.

                              B. Rose

1

2       Q.     So a person could be in one state and

3   use GoToMyPC and get remote access to their

4   computer; right?

5       A.     You can get remote access, yes.

6       Q.     And using that remote access you can

7   operate that computer as if you're sitting in

8   front of it; true?

9       A.     If you -- yes, that's true.

10      Q.     Including you can send an e-mail from

11  the e-mail program on that computer while you are

12  in another state?

13      A.     Correct.

14      Q.     Did your forensic evidence indicate

15  whether remote access to this computer by

16  GoToMyPC happened with Mr. Ceglia?

17      A.     I think remote access is unlikely given

18  the fact that the scanned documents were copied

19  to the actual physical hard drive, so I think

20  what we are looking at is physical access to the

21  machine, that would be our conclusion from the

22  forensics.

23      Q.     Well, let's talk about that.

24             You testified just earlier that there's

25  a variety of ways that those TIFF images could

Page 66

                              B. Rose

1    have been created on that hard drive.

2            Do you remember testifying about that?

3            MR. SOUTHWELL:   Objection,

4        mischaracterizes the testimony.

5        Q.    Do you remember testifying that there

6    are a variety of ways that those TIFF images

7    could have been created on to that hard drive?

8        A.    I believe your question was a general

9    question about the way in which documents can in

10   fact be created on hard drive, if I'm recalling

11   that correctly.

12       Q.    Well, let me clarify that, then.

13           You agree with me that there's multiple

14   ways that a file in a general sense can be

15   created on a hard drive; right?

16       A.    Correct.

17       Q.    And I asked you this before, they can

18   be copied from a CD?

19           You have to --

20       A.    Yes.

21       Q.    Floppy disk in the old days?

22       A.    Yes.

23       Q.    USB drive?

24       A.    Yes.

```
1                        B. Rose
2      Q.    Another hard drive?
3      A.    Yes.
4      Q.    And the Internet?
5      A.    Yes.
6      Q.    Which one of those ways -- I asked you
7  before, I'm pretty clear on this, but I will do
8  it again.
9            Which one of those ways was the way
10 these two TIFF images got on to that hard drive
11 where you found them?
12     A.    I don't know.
13     Q.    You don't know.
14           So that necessarily means, then, it's
15 correct that a person, Paul Ceglia or whoever
16 using GoToMyPC, for example, can remotely access
17 this computer where you found these TIFF images
18 and put them there; true?
19     A.    I don't know specifically how
20 GoToMeeting operates.  I mean, for instance,
21 there are remote access clients where I can go on
22 and get documents, for instance, on a desktop,
23 but I can't actually save things to my physical
24 hard drive, so I think it would depend on how
25 that actually operated.
```

1                          B. Rose

2        Q.     Do you know if -- and just to correct

3    you, I think you just misspoke, I'm not talking

4    about GoToMeeting, I'm talking about GoToMyPC.

5        A.     Oh, I'm sorry, yes.

6        Q.     Do you know if GoToMyPC does or does

7    not have that function?

8        A.     I don't.

9        Q.     If the product like GoToMyPC allows

10   remote access and has that function allowing you

11   to save files to that remotely accessed computer,

12   that's one way Mr. Ceglia or whoever could have

13   put those TIFF images on that computer; would you

14   agree with me?

15       A.     It's possible that's a way Mr. Ceglia

16   could have saved those to that computer, yes.

17       Q.     Is GoToMyPC the only way to get remote

18   access to a computer?

19       A.     No.

20       Q.     What are the other ways, if you could

21   list them, please?

22       A.     I couldn't list all of them.

23       Q.     List as many as you can, if you would.

24       A.     I mean, there are various clients like

25   that that allow remote access, there is, you

1                        B. Rose

2    know, VPN access to a computer, there -- you

3    know, there are certainly other ways, I mean,

4    there are really innumerable ways to gain remote

5    access.

6         Q.    Now, the ways you just went through,

7    VPN and other clients like that, those aren't

8    hacking tools, are they?

9         A.    They're not, they're generally software

10   actually installed on the computer.

11        Q.    In your experience as a computer

12   forensics expert, you know that individuals

13   around the world have the ability to remotely

14   access other people's computers without their

15   authorization?

16        A.    There are people who do that.  I mean,

17   obviously that would require -- you know, that

18   would require the installation of some kind of

19   software, you know, malware program, depending on

20   how you want to characterize it, that would allow

21   for both that remote access and also the kind of

22   control over the computer itself that you would

23   need to perform those functions, but assuming

24   that that software, malware is installed on the

25   computer, sure, that's a possibility.

```
 1                          B. Rose
 2        Q.    And your report doesn't discuss any
 3   malware on any of the media?
 4        A.    No.
 5              Frankly, I regard the malware
 6   explanation as completely implausible in this
 7   case.
 8        Q.    Well, my question is your report
 9   doesn't indicate -- well, let me ask you that
10   question.
11              Before you produced that report did you
12   scan any of the media for malware?
13        A.    We did not.
14        Q.    Is that standard practice for your firm
15   to not scan media for malware?
16        A.    That is not a standard practice, no.
17        Q.    Have you had a chance to read
18   plaintiff's expert's report in this case?
19        A.    I have.
20              MR. SOUTHWELL:  Can you just clarify
21        which one?
22              MR. BOLAND:  I'm sorry, Mr. Broom.
23        Q.    And you are aware, then, from reviewing
24   that, that he did scan the media in this case for
25   malware?
```

```
 1                        B. Rose
 2      A.    I am aware of that, yes.
 3      Q.    Are you aware that he found malware?
 4      A.    I am.
 5      Q.    And he found something called a rootkit
 6  as well?
 7      A.    I don't --
 8            MR. SOUTHWELL:  Objection to the
 9      specifics of what was found or where.
10      A.    I don't recall that specifically, no.
11      Q.    You don't recall that from reading his
12  report?
13      A.    No.
14      Q.    But generally you recall he found
15  malware?
16      A.    Correct.
17      Q.    What types of malware would allow
18  someone to have remote access to a computer, if
19  you know?
20      A.    I wouldn't even know how to answer that
21  question, I mean, there are all kinds of
22  variations of malware that would permit remote
23  access.
24      Q.    Can you list a few of them?
25      A.    No.
```

1                          B. Rose

2        Q.     Do you know any of them that allow that?

3        A.     I mean, there are kinds, but again,

4    you'd be talking about specific pieces of

5    malware, right, so there are literally tens of

6    thousands of these things cataloged, so I think

7    any analysis of malware would have to start with

8    what is -- not a general analysis, but what is

9    the specific malware found on the computer and

10   what capabilities does that malware provide, so,

11   for instance, you know, what is notably lacking

12   from Mr. Broom's report is any analysis of how

13   any of the malware he actually found would, A,

14   existed in 2003 and, B, would have provided the

15   kind of control over the computer that you would

16   need for remote access to be an explanation for

17   this.

18       Q.     Which ones -- did you or your team

19   evaluate the malware in Mr. Broom's report to

20   determine if it existed in 2004?

21       A.     We researched that malware to both

22   determine whether any of those pieces of malware

23   existed in 2003 and had the capabilities that

24   would provide the kind of remote access necessary.

25       Q.     And what was your evaluation?

                              B. Rose

1

2       A.    That none of those pieces of malware

3    would have provided the ability to do that.

4       Q.    Now, do people, hackers, in general,

5    who gain remote access to a computer, sometimes

6    they leave evidence behind of that intrusion;

7    fair to say?

8       A.    Yes.

9       Q.    Are there occasions where they do not

10   leave evidence behind that can be detected of

11   that intrusion?

12      A.    It's hypothetically possible.  I mean,

13   generally what you would see is either evidence

14   of the access or evidence of the cleanup, but

15   it's certainly possible to have as part of the

16   malware essentially a cleanup of the malware on

17   the machine.

18      Q.    And you don't know, from your

19   evaluation of Paul Ceglia's parents' computer

20   where the Kole e-mail was found, what malware was

21   on that computer in 2004?

22           MR. SOUTHWELL:  Object to the form.

23      Q.    True?

24      A.    No.

25      Q.    You don't know if there was any malware

1                        B. Rose

2    on that computer in 2004?

3        A.    I do not.

4        Q.    And you don't know if it was littered

5    with hundreds of types of malware in 2004?

6        A.    I don't know anything about the state

7    of the computer in 2004.

8        Q.    And do you think it's a reasonable

9    conclusion that if a computer in 2011 has the

10   list of malware on it that you saw on Mr. Broom's

11   report that that makes it more likely that that

12   computer had malware on it sometime prior to 2011?

13       A.    I would not agree with that, no.

14       Q.    Do you know when all that malware

15   landed on that computer?

16       A.    I do not.

17       Q.    Do you know if any of that malware had

18   earlier versions that were in existence in 2004?

19       A.    I'm not sure I understand the question.

20       Q.    Well, you know Microsoft Word --

21       A.    Sure.

22       Q.    -- it's got some version number for the

23   current version of today, let's call it the 2012

24   version, and eight years ago it had a prior

25   version, maybe called Microsoft 2003.

```
1                    B. Rose
2              You are aware that Microsoft works that
3    way?
4         A.    Sure.
5         Q.    So I'm asking about the malware that's
6    currently on the computer that Mr. Broom found,
7    do you have any evidence of what prior versions
8    of that malware existed before?
9         A.    I guess that I don't really understand
10   the premise of the question in the sense that,
11   you know, people who produce malware generally
12   don't version like Microsoft Word does.  They'll
13   create, I guess, what I would consider new
14   malware and maybe it's just a matter of semantics,
15   but, you know, certainly it is possible for, you
16   know, pieces of malware to, you know, once
17   malware, for instance, is discovered and shut
18   down and picked up by the virus scans, they may
19   adapt that and create a new piece of malware, you
20   know, that's a variation off that.
21        Q.    Now, in your report there's -- let me
22   find the page -- you talk about a sent items DBX
23   file in various places in the report; do you
24   recall that?
25              One of them is -- I just found the
```

```
 1                        B. Rose
 2    first one just for purposes of the question, it's
 3    referred to on page 15, you talk about the sent
 4    items DBX file?
 5        A.    Yes.
 6        Q.    And it's other places in the report as
 7    well, you would agree?
 8        A.    Yes.
 9        Q.    Can you look at page 16 of 102 of your
10    report.
11        A.    Are you referring to the top line
12    numbers?
13        Q.    Top line numbers, yeah.
14        A.    Yes.
15        Q.    Now, you have a graphic there of the
16    sent items folder of Vera Ceglia's e-mail
17    account; true?
18              MR. SOUTHWELL:  Object to the form.
19        A.    In terms of what do you mean by Vera
20    Ceglia's e-mail account?
21        Q.    Well, the e-mail associated with --
22    what was the e-mail associated with this account?
23        A.    The user name that resolves when you
24    send an e-mail is Vera Ceglia.
25        Q.    Any reason to believe that that is not
```

1                      B. Rose

2    Vera Ceglia's e-mail account?

3         A.    Well, I believe the account is

4    registered to Carmine Ceglia.

5         Q.    So whose account did your forensic

6    analysis determine that that was, Vera's or

7    Carmine's, or did they both use it?

8         A.    I think our forensic analysis showed

9    and, again, forensics and the information we

10   obtained during the analysis showed the account

11   was registered to Carmine Ceglia, that the user

12   name that resolves is Vera Ceglia and that in the

13   case, at least in the case of the two StreetFax

14   e-mails, the account was used by Paul Ceglia.

15        Q.    So you mention -- you list there five

16   sent items, three of them are blacked out.

17              Do you see that?

18        A.    That's correct.

19        Q.    Did it seem unusual to you that on

20   average only one e-mail was sent per year that

21   that account or that that DBX file existed from

22   Outlook?

23              MR. SOUTHWELL:  Objection.

24        A.    I don't think you can -- I mean, I

25   think that's a faulty premise.  You certainly

1                        B. Rose

2    can't conclude from the fact that only five

3    e-mails are here that that's the extent of the

4    sent e-mails.

5         Q.    Where would other sent e-mails be?

6         A.    They could have been deleted.

7         Q.    Did your forensic analysis find

8    evidence that sent e-mail items were deleted?

9         A.    No.

10        Q.    So where are they, the rest of the ones

11   that -- other than those five that were sent in

12   five years, what evidence do you have?

13        A.    I don't know whether they exist.

14              I'm saying that based on an analysis

15   of the current contents of a mailbox you can't

16   conclude that that is a complete historical

17   record of everything that was sent, nor to the

18   extent e-mails were deleted over time are you

19   necessarily going to be able to recover evidence

20   of those deleted e-mails, so what I'm saying is

21   what this is evidence of is what resided in this

22   mailbox at a particular historical point in time.

23        Q.    Now, would that statement, those series

24   of statements you just gave also apply to Mark

25   Zuckerberg's Harvard e-mail account?

```
 1                    B. Rose
 2       A.    Could you be specific about which
 3  statements you want me to apply to his e-mail
 4  account?
 5       Q.    Let's break them down.
 6       A.    Sure.
 7       Q.    It's true that it's your opinion based
 8  on page 24 there that that's not necessarily all
 9  of the sent items, all of the items that were
10  ever sent from that e-mail account?
11       A.    Again, it is a snapshot, a historical
12  record of a particular point in time.
13       Q.    So it would be true, then, that the
14  items that you found in the equivalent sent items
15  folder of Mark Zuckerberg's Harvard e-mail
16  account, not necessarily all of the e-mails he
17  ever sent?
18       A.    I think that's true of everyone's
19  e-mail, yes.
20       Q.    And there could be e-mails that were
21  deleted that you were not able to recover, that
22  he had sent but then got deleted?
23       A.    There could have been e-mails deleted
24  either through user action or through system
25  processes that we were not able to recover,
```

```
1                        B. Rose
2     that's correct.
3          Q.    Did you ask Mr. Zuckerberg if he
4     deleted any e-mails from his Harvard e-mail
5     account?
6          A.    I have not spoken to Mr. Zuckerberg.
7          Q.    Why didn't you ask him that?
8               MR. SOUTHWELL:  Objection.  He just
9          said he didn't speak to him.
10         A.    I have never spoken to Mr. Zuckerberg.
11         Q.    I understand you've never spoken to him.
12              Why didn't you speak to him and ask him
13    whether he deleted e-mail from his account?
14         A.    Again, I'm doing a forensic analysis.
15    You know, to the extent that others -- the
16    strategy about whether interview Mr. Zuckerberg
17    is beyond what we were charged to do in the
18    expedited discovery.  I was asked to do a
19    forensic analysis of the Ceglia media.
20         Q.    Is it of no value to your forensic
21    analysis to know how somebody who's a user of a
22    computer tells, that actually states how they
23    used it, that's not relevant to your analysis?
24         A.    I don't think that would have been
25    relevant to our report, no.
```

1                        B. Rose

2        Q.    I'm saying is it relevant to your

3    analysis to know how Mark Zuckerberg used his

4    e-mail account.

5        A.    To our expedited discovery analysis

6    or --

7        Q.    Is it relevant to you at all?

8        A.    Look, again, you know, the Harvard

9    e-mail was not included here, it was not part of

10   the expedited discovery, so to the extent we are

11   talking about my report, and that's what I

12   thought we were here talking about is Stroz

13   Friedberg's report, talking to Mr. Zuckerberg

14   about his practices with e-mail would not be

15   relevant.

16           In understanding, you know, the Harvard

17   e-mail, right, our analysis of that was limited

18   to trying to collect it all and provide it in a

19   format that could be reviewed and looking for the

20   existence of the purported e-mails and various

21   correspondence with StreetFax employees, that

22   was our analysis and that was what we were

23   limited to.

24           What we were charged with, knowing

25   Mr. Zuckerberg's historical practices, would not

```
 1                        B. Rose
 2    have been relevant.  Whether that's relevant to
 3    the broader case and whether that's an analysis
 4    that should be done, I mean, that's really a
 5    strategic question that I would leave to the
 6    attorneys.
 7             THE VIDEOGRAPHER:  I need a card
 8        change.
 9             MR. BOLAND:  All right.  We will go off
10        the record for a moment so he can change the
11        card.
12        Q.    Do you want to take a 10-minute break
13    so you can run to the bathroom or whatever?
14        A.    Sure.
15             (Recess taken.)
16             (Rose Exhibit 2, declaration of Neil
17        Broom, marked for identification, as of this
18        date.)
19             MR. BOLAND:  Could we start the video
20        back up again?
21             THE VIDEOGRAPHER:  Recording tape 2.
22             MR. BOLAND:  We are back on the record.
23    BY MR. BOLAND:
24        Q.    Mr. Rose, we just had about a 10 or so
25    minute break.
```

```
                              B. Rose
 1                 Did you chat with defense counsel about
 2
 3     the deposition during the break?
 4        A.    I did not.
 5        Q.    I'm going to back up to a topic briefly
 6     and then we will move ahead to ask you a couple
 7     more questions.
 8                 The 15 or 20 computers that
 9     Mr. Zuckerberg had used historically and you
10     indicated members of your firm had analyzed;
11     true?
12        A.    Correct.
13        Q.    And who at Stroz Friedberg actually
14     obtained that evidence?
15        A.    I do not know.
16        Q.    Where did they physically go
17     geographically to get that evidence?
18                 MR. SOUTHWELL:  Objection.  He just
19         said he doesn't know.
20                 MR. BOLAND:  I asked him who obtained
21         it, he doesn't know.
22        Q.    Where --
23                 MR. SOUTHWELL:  He previously testified
24         he doesn't know about this, so --
25        Q.    Where was that evidence located?
```

1                        B. Rose

2        A.     I believe generically it was in

3    California.

4        Q.     Who supervised that collection of that

5    evidence?

6        A.     I don't know.

7        Q.     And who did the actual work and

8    analyzing those 15 or 20 computers?

9        A.     I don't know.

10       Q.     If you could look at what's been marked

11   Rose Exhibit 2 and tell me if you've seen that

12   before.

13       A.     I have.

14       Q.     And that in fact for the record, for

15   the Court, is Mr. Neil Broom's report, the

16   plaintiff's computer forensics expert; true?

17       A.     That's my understanding, yes.

18       Q.     Could you go to page 21, again, in the

19   upper right-hand corner page numbers in the

20   report.

21            MR. SOUTHWELL:  Can we pause for just a

22       second?  Our computer is not connected to

23       the Livenote.

24            THE COURT REPORTER:  Do you want to go

25       off the record?

                          B. Rose
1
2              MR. BOLAND:  We can go off the record,
3       that's fine, sure.
4              (Discussion off the record.)
5    BY MR. BOLAND:
6       Q.    So we are back on the record.
7              If you could just look at page 21 of
8    Mr. Broom's report.
9              Are you on that page?
10      A.    Yes, referenced by the top-line number,
11   I believe they are the same.
12      Q.    Do you see in the second full paragraph
13   Mr. Broom discusses the dimensions of the scanned
14   documents that would have been needed to create
15   the TIFF images attached to the Kole e-mail?  Do
16   you see that description of the size?
17      A.    I see a description of the dimensions
18   of the scanned documents, yes.
19      Q.    Right.
20              The dimension dimensions he calculated
21   are 2.4 by 3.2 inches in size; correct?
22      A.    That's what he states.
23      Q.    Do you have any different opinion on
24   what size of a document would be needed to be
25   scanned to generate the size of the dimensions

```
 1                      B. Rose
 2   for the TIFF images that you found?  Do you
 3   disagree with his calculation of that size?
 4        A.    Would you repeat that question?
 5        Q.    Do you disagree with his calculation of
 6   2.4 by 3.2 inches in that paragraph?
 7              MR. SOUTHWELL:  Are you talking
 8        about -- object to the form.  Are you
 9        talking about his calculation of the TIFF
10        file?
11              MR. BOLAND:  Yes.
12        A.    As I understand it, that's the
13   dimensions he calculated for the TIFF images.
14        Q.    That's the dimensions he has -- well,
15   I'm just asking you if you disagree with that
16   calculation in that paragraph.
17              Take your time to read that paragraph
18   and tell me if you disagree with the calculation
19   that he has there.
20        A.    I think that paragraph is ambiguous as
21   to what scanned documents means.  I don't know
22   whether he is referring to the scanned images
23   themselves as they appear on the computer or
24   whether he is referring to the dimensions of the
25   pieces of paper that were scanned at some point
```

1                        B. Rose

2     to create the TIFF images.

3         Q.    Well, in that paragraph -- well, let's

4     back up.

5                The TIFF images as they appear on your

6     report, or Exhibit 1 that I have shown you, let's

7     put it that way, Exhibit 1, are much smaller than

8     an 8-1/2-by-11 piece of paper; true?

9                We looked at them earlier.

10               MR. SOUTHWELL:  Objection.  You didn't

11          look at the one that was filed.  You are

12          looking at your printout.  The one that's

13          filed is not that small.

14        Q.    I'm talking about Exhibit 1 that I

15     showed you.

16               MR. SOUTHWELL:  That's your printout of

17          Exhibit 1, that's not what it looked like

18          when it was filed.

19               MR. BOLAND:  Fair enough.

20        Q.    I am saying, on Exhibit 1, the size of

21     that image --

22               MR. SOUTHWELL:  You're on Mr. Boland's

23          printout of Exhibit 1 --

24               MR. BOLAND:  I am not deposing you,

25          Alex, I'm just asking him to look at the

                        B. Rose

1

2        exhibit.

3             MR. SOUTHWELL:  You seem to be implying

4        that the actual exhibit in the record was

5        small.

6             MR. BOLAND:  Whatever I'm implying,

7        though, you can't coach the witness.

8             MR. SOUTHWELL:  I'm just trying to get

9        a clear record about you're talking about.

10            MR. BOLAND:  And I am making very

11       clear.

12       Q.    Exhibit 1, which we looked at before,

13   has an image in it of page 1 of the TIFF?

14       A.    Correct.

15       Q.    And the image in that exhibit -- that's

16   all I'm talking about, is that Exhibit 1 -- makes

17   that image is much smaller than an 8-1/2-by-11

18   piece of paper.

19       A.    The image in the printed copy you've

20   handed me that we've looked at in Exhibit 1 is

21   smaller than 8-1/2 by 11, correct.

22       Q.    And the physical -- did you do a

23   measurement or did anyone from Stroz Friedberg

24   measure the dimensions of the TIFF images that

25   you found?

```
 1                      B. Rose
 2      A.    Not that I know of.
 3      Q.    Do you have any reason to disagree with
 4  Mr. Broom's calculation that the dimensions of
 5  those TIFF images are what he puts in paragraph 2?
 6      A.    I don't have any information to
 7  evaluate that calculation.
 8      Q.    And then in paragraph 4 of that same
 9  page Mr. Broom again calculates that the
10  resulting dimensions of the TIFF file are about
11  30 percent the size of a regular piece of paper.
12           Do you see where he says that?
13      A.    Are you referring to the fourth
14  paragraph?
15      Q.    Yes, fourth full paragraph.
16      A.    Let me read it.
17      Q.    Sure.
18      A.    Okay, I've read it.
19           What's your question, again?
20      Q.    Do you have any reason to disagree with
21  his calculation there that the physical
22  dimensions of the TIFF images you found or your
23  team found are about 30 percent the size of a
24  regular piece of paper?
25      A.    Well, as I understand it, what he's
```

```
 1                         B. Rose
 2    saying is he took an 8-1/2-by-11-inch piece of
 3    paper, he then put it on a copier, copied it at
 4    30 percent the size of the original and then
 5    scanned that with the scan area set to 2.4 by 3.2
 6    inches and the resulting files were 945 kilobytes
 7    and 123 kilobytes.
 8         Q.    Did you look at the metadata related to
 9    the TIFF images attached to the Kole e-mail?
10         A.    Yes.
11         Q.    And isn't it true that that metadata
12    includes the dimensions of the image?
13         A.    I don't specifically recall, but it
14    could.
15         Q.    And do you have any reason to dispute
16    Mr. Broom's reading of that metadata that he,
17    from where he derived those dimensions?
18         A.    Again, I don't have any information in
19    my possession right now that I could evaluate his
20    conclusions one way or the other.
21         Q.    And you -- the version of this report
22    that was actually -- I'm sorry, looking at
23    Exhibit 1 again that I showed you --
24         A.    So you are referring to our report?
25         Q.    Correct.  Well, Exhibit 1 there.
```

Page 91

1                         B. Rose

2              Do you agree or not that the size of

3    that TIFF image as it appears in Exhibit 1, is

4    that different than the size of that TIFF image

5    as it appeared in the report you filed with the

6    Court?

7         A.    I don't know.

8         Q.    Did you or anyone from Stroz Friedberg

9    magnify the TIFF image, magnify it and print it

10   as an exhibit to your report before you filed it?

11        A.    Not that I recall.

12        Q.    The TIFF images attached to the Kole

13   e-mail have -- it's true they have the file names

14   Scan0001.tif for the second page of the contract;

15   true?

16        A.    I would have to refresh the report.  My

17   recollection is that Scan0001 is in fact the

18   first page of the report.

19        Q.    If you could grab your report there, do

20   you see -- I'll get you there quickly.

21              Let's go to page 19 of 102 in the upper

22   right-hand corner, do you see that table that's

23   in the middle of page there, it has a blue top

24   line?

25        A.    Yes.

1                        B. Rose

2        Q.     So does that refresh your recollection

3    as to the page 1 of the StreetFax contract being

4    file name Scan0002.tif?

5        A.     Again, let's -- I don't want to confuse

6    the issue here.

7               What you are referring to is a table

8    that has the subject so that it was denominated

9    by the sender, Paul Ceglia, as page 1 of 2 for

10   StreetFax contract and what was attached to that

11   was Scan0002.tif.  In fact, if you look at the

12   image, that is in fact a copy of page 1 of the

13   contract, in other words, it is a misdescription

14   in the subject line and they were sent out of

15   order, but the names are in fact accurate in

16   terms of 1 and 2 being -- 1 being the first page

17   of the contract and 2 being the second page of

18   the contract.

19       Q.     And that file-naming convention there

20   appears to be a default file name that a scanner

21   would use or scanner software, let's put it that

22   way?

23       A.     Yeah, it's consistent with that.

24       Q.     Did you find any evidence in your

25   analysis different than that that indicated

                              B. Rose
1
2      that's not a default file name from software?
3          A.    I don't know what we would find in a
4      forensic analysis of the Ceglia media that would
5      show us what the default naming scheme for a
6      particular scanner was; that is a typical default
7      naming convention for scanned documents.
8              MR. SOUTHWELL:  Mr. Boland, if I may
9          interrupt, attached as Exhibit F and G to
10         the report are the scans that go along with
11         it.  I just want to make -- I just want to
12         make sure it's clear.  Maybe you are under
13         the misapprehension about the 002 whether it
14         is the first page or second page.
15             MR. BOLAND:  No, I'm fine.  Thank you.
16         Q.    So let's continue on with this table
17     here, Scan0002.tif, was that file scanned, was
18     that the earliest of the two pages that was
19     scanned, based on your report?
20         A.    Yes, so that -- well, I should say what
21     we know is that that would have been the one that
22     was first created on the Seagate hard drive.
23         Q.    And then the Scan001.tif was created
24     later?
25         A.    That's correct.

1                         B. Rose

2        Q.     Now, in your experience with default

3    file names of scanner software, wouldn't you

4    agree with me that if you scan four different

5    jobs, the scanner software by default is going to

6    continue to count forward and not backward?

7        A.     Generally.

8        Q.     And yet here we have the earlier

9    scanned image having a higher number than the

10   later scanned image, as you just testified;

11   correct?

12       A.     I don't believe I testified -- I'm

13   sorry, what was your question?

14       Q.     The file name Scan0002 was created on

15   the hard drive before the file name Scan0001, you

16   just testified to that; correct?

17       A.     That's correct.

18       Q.     So if they were scanned, how did

19   that -- if they were scanned onto that hard

20   drive, that's one way they could have gotten on

21   to that hard drive; true?

22       A.     That's one possible way they could have

23   gotten on the hard drive.

24       Q.     So how would that happen?  If

25   hypothetically they were scanned onto that hard

1                          B. Rose

2    drive, how would that scanner have been counting

3    backwards?

4        A.    The scanner would not have to have been

5    counting backwards, so there are a couple of

6    possibilities; one is that they were copied to

7    the hard drive in a different order than they

8    were scanned so that scan 2 was the second scan

9    but it was copied to the hard drive first, in

10   other words, not a direct scan.  It's also

11   certainly possible that when you put something

12   into a scanner that the first item to be scanned

13   would be the second page; right?  Scanners scan

14   things depending upon how you feed documents in,

15   and it is certainly possible to feed documents in

16   in a backwards order, so it is not the scanner

17   counting backwards, but it's the way in which the

18   user scanned it.

19       Q.    And what evidence did you find in

20   analyzing the Ceglia media of either one of those

21   two things happening?

22       A.    I don't think we found any evidence as

23   to the order of scan, of direct scanning, right,

24   or of how a user was feeding documents into the

25   scanner.  I mean, it seems clear -- the only

```
 1                        B. Rose
 2    thing we can say from the evidence is I would
 3    agree that it appears as if the second page of
 4    the contract was scanned first.
 5         Q.    Well, and it's obvious from your
 6    analysis that the file name Scan0002 was created
 7    first as well?
 8         A.    What do you mean by created?
 9               Scan0002 was created first on the
10    Seagate hard drive.
11         Q.    Yes.  And then the Scan0001 was created
12    second on the Seagate hard drive?
13         A.    Yes.  Which could be a function of them
14    just being copied in that order.
15               Again, I'm not offering an opinion as
16    to, you know, the origination of the document,
17    but rather, what I can tell you from the metadata
18    associated with the creation dates of the files
19    is what order they were copied to that computer in.
20         Q.    Let's ask about those creation dates
21    for a second.
22               The creation dates associated with
23    those two TIFF image files, are those accurate?
24         A.    I believe so, yes.
25         Q.    Based on what?
```

Page 97

1                           B. Rose

2        A.    I think that was the time recorded by

3   the computer and it appears to be an accurate

4   time.

5        Q.    What are all the facts you have that

6   those dates are accurate, the creation dates of

7   those two TIFF images are accurate dates and

8   times?  Can you list for me the facts that

9   support that conclusion?

10       A.    Sure.

11             So we have the creation date of the

12  files, right, so -- and let me refresh my

13  recollection of the report to give you the exact

14  creation dates.

15             So you have an initial creation date of

16  approximately 10:37 for the first e-mail, which

17  again contains the second page of the contract,

18  so that was 10:37 a.m.

19             You then have that being sent out via

20  e-mail and an initial time being appended in the

21  Internet headers by the Adelphia servers which is

22  immediately following which is consistent

23  evidence that in fact that time setting on the

24  computer is correct because then you're dealing

25  with a consistent time set by an independent

```
 1                          B. Rose

 2    server.

 3              You then also have times appended by

 4    two servers at Sidley & Austin, including the

 5    intermediary server and the final server

 6    receiving it.

 7              All of those which are independent of

 8    each other all indicate consistent times, so in

 9    fact I think based on that evidence we can

10    conclude that in fact the creation and the sent

11    time of the e-mail on the computer is the same.

12              I will also say that you also have the

13    e-mails then being forwarded on by Mr. Kole

14    shortly after again with a consistent time, so

15    all of those times appended by servers that are

16    independent of this clock setting demonstrate

17    this time is accurate.

18      Q.    So it's those, the Adelphia e-mail

19    server is one factor that confirms this time in

20    your mind?

21      A.    You have the fact that the system clock

22    has recorded the time and then -- so look for

23    evidence outside of the system clock, right,

24    correct, the first piece of evidence I would look

25    to is the Adelphia server, which is the first
```

1                          B. Rose

2    server it hit after being transmitted.

3         Q.    And then the server at Sidley & Austin?

4         A.    Two servers at Sidley & Austin.

5         Q.    So two e-mail servers?

6         A.    Correct.

7         Q.    So three e-mail servers now, Adelphia

8    and two at Sidley Austin, those help bolster your

9    confidence in the creation date of the two TIFF

10   images?

11        A.    Correct.

12        Q.    Anything else?

13        A.    I think that's it.

14        Q.    Without those e-mail servers,

15   hypothetically, say you had no evidence of e-mail

16   servers at all, would you still be confident in

17   that creation date, that time being accurate?

18        A.    I mean, that's a complete hypothetical,

19   since I have those e-mail servers, so it's a

20   little hard to evaluate that outside the context

21   of having those e-mail servers, which I think

22   clearly demonstrate the times are correct.

23              If all we had was the system clock,

24   which is not the case here, I would say that, you

25   know, we would look for evidence of system clock

```
 1                      B. Rose
 2    manipulation.
 3               Absent that, I think, you know, we
 4    would proceed as if it were the correct time,
 5    but, you know, your confidence of not having all
 6    of those external factors would be much less than
 7    it is when you have external evidence that's all
 8    consistent with the time.
 9         Q.    Well, what about -- okay.
10               And you've been an expert in other
11    cases; right, an expert witness?
12         A.    I have not been an expert witness in
13    other cases.
14         Q.    This is the first time you have ever
15    even sat for a deposition?
16         A.    Well, I have sat for a deposition
17    before.
18         Q.    Have you ever been asked hypotheticals
19    at those depositions?
20         A.    Yes.
21         Q.    Okay.
22               So you know that's a fair question for
23    experts, hypotheticals?
24         A.    Yes.
25         Q.    So the hypothetical I asked you was if
```

1                          B. Rose

2    the three e-mail servers didn't exist, none of

3    that data existed, it's fair to say you'd have

4    less confidence in the creation date of those two

5    TIFF images; true?

6        A.    I mean, again, your hypothetical asks

7    me to discard the servers, it doesn't -- I mean,

8    we would look for other, you know, other evidence

9    outside of that.

10              Assuming the only thing I have -- maybe

11   this is your hypothetical -- the only thing I

12   have is the time appended by the computer

13   itself --

14       Q.    Yes, assume that.

15       A.    -- would I be as confident as I am in a

16   case where I also have consistent evidence from

17   external servers?

18              No, I would not be as confident.

19       Q.    And if you found evidence of a system

20   clock being manipulated along with only having

21   the date appended to that file, would you be even

22   less confident in the accuracy of that creation

23   date?

24       A.    I think that would depend on the system

25   clock manipulation and our evaluation of how it

```
1                        B. Rose
2     would have affected that particular e-mail.
3             These are all very context -- the
4     problem with the hypotheticals is they are all
5     very contextual, so it really depends on the
6     other evidence, you know, in terms of if I have a
7     system clock manipulation that appears to have
8     impacted that time, I wouldn't be confident in it
9     at all.
10        Q.    How would you know if a system clock
11    manipulation affected a particular file's
12    creation date?
13        A.    Well, if you -- I mean, if I can show
14    that at the time the file was created on the
15    computer the system clock was backdated, that
16    would be one way.
17        Q.    Are you aware that Mark Zuckerberg --
18    related to the TIFF images attached to the Kole
19    e-mail, your expert opinion in that report was
20    that that is the authentic contract between the
21    parties; true?
22        A.    The TIFF images, the StreetFax contract,
23    yes.
24        Q.    And you are aware that Mark Zuckerberg
25    has never offered a declaration in this case
```

1                          B. Rose

2      agreeing with that position, that that is the

3      authentic contract between the parties?

4           A.    I am not aware one way or the other of

5      what Mr. Zuckerberg has offered in the way of

6      declarations.

7           Q.    Are you aware that none of the other

8      experts in this entire case have offered an

9      opinion that the StreetFax contract is the

10     authentic contract between the parties?

11          A.    I don't know that one way or the other.

12          Q.    Now, we talked a little bit earlier

13     about rootkits and malware; you remember I was

14     discussing that?

15          A.    Yes.

16          Q.    And rootkits can be used by hackers,

17     you would agree?

18          A.    Rootkits can be used by hackers, I

19     would agree with that.

20          Q.    Can hackers take over the operation of

21     a computer, is that one of the things hackers

22     have the ability to do?

23          A.    It depends, again, on the specific

24     circumstances.  I mean, if they have the proper

25     access and, you know, that the software which

1                         B. Rose

2     would allow that kind of control is in place,

3     yes.

4          Q.    Does that kind of software exist for

5     them to do that, for hackers to do that?

6          A.    Does it exist in the world?

7          Q.    Yes.

8          A.    Yes.

9          Q.    Can hackers take over e-mail programs?

10         A.    What do you mean, take over e-mail

11    programs?

12         Q.    Intrude on someone's computer and send

13    out e-mails on their behalf.

14         A.    Yes.

15         Q.    Can hackers intrude on someone's

16    computer and deposit files onto that person's

17    computer?

18         A.    There's no questions about what hackers

19    are capable of doing in the world today, yes.

20               Yes.

21         Q.    Well, let's talk about back in 2004,

22    then.

23               Would you amend any of my answers if I

24    asked you those questions and said in 2004 can a

25    rootkit be used by a hacker, is there a different

```
 1                      B. Rose

 2    answer?

 3        A.    I think the same general answer would

 4    apply to 2004.

 5        Q.    Very well.

 6              Did your work on this case cause you to

 7    learn that anyone involved in this case has some

 8    ability for computer hacking?

 9              MR. SOUTHWELL:  Object to the form.

10        A.    Could you rephrase that?

11        Q.    You analyzed a bunch of computers in

12    this case; right?

13        A.    Right.

14        Q.    Some were provided or produced by Paul

15    Ceglia; correct?

16        A.    Correct.

17        Q.    Some were produced by Mark Zuckerberg?

18        A.    Correct.

19        Q.    In part of your analysis of those

20    computers did you learn that anyone involved in

21    this case has hacking ability?

22        A.    Nothing in my analysis indicated that

23    anyone involved in the case had hacking ability,

24    no.

25        Q.    Are you aware from things outside of
```

1                       B. Rose

2       your analysis that Mark Zuckerberg has some

3       proficiency as a computer hacker?

4           A.    I am aware in a general sense that

5       Mr. Zuckerberg has been accused of some actions

6       which were called hacking in the past; I do not

7       have any information regarding his proficiencies

8       or his ability to do that.

9           Q.    Are you aware that his company Facebook

10      has a hacking contest every year amongst

11      employees?

12          A.    No.

13          Q.    Are you aware that Mr. Zuckerberg has

14      hired renowned hackers to be employees?

15          A.    I'm not aware of that one way or the

16      other.

17          Q.    Did you look for evidence of hacking on

18      Paul Ceglia's parents' computer where these TIFF

19      images supposedly originated from?

20          A.    We did not.

21          Q.    But even if you looked at it, is it

22      possible that a hacker who accessed a computer

23      could leave no trace of that intrusion?  Isn't

24      that possible?

25          A.    It is theoretically possible for a

1                         B. Rose

2    hacker to leave no trace.

3        Q.    Now, the StreetFax contract that we've

4    been talking about you found on two different

5    pieces of media; correct?  I think you say that

6    at the top of 15, page 15 of Exhibit 21?

7        A.    Yes, that's correct.

8        Q.    And let's just be clear for the Court,

9    because later on on that page -- correct me if

10   I'm wrong -- you say, you clarify that the

11   StreetFax contract was found on a hard drive that

12   you analyzed and a forensic copy of that same

13   hard drive that you analyzed.

14               Is that a fair statement?

15       A.    I don't think we're clarifying anything.

16   I think we're being very clear about the pieces

17   of media we analyzed.  The StreetFax contract was

18   on two different hard drives.  I think we're very

19   clear on that very page; right?  I think actually

20   in the first paragraph in the second sentence

21   that in fact one is a copy of a hard drive that

22   we made and was produced to us in July and the

23   other, again, was a copy we made of StreetFax in

24   July that we determined upon analysis was a

25   actually a forensic image of the hard drive, so

1                      B. Rose

2    we have the Seagate hard drive that's produced to

3    us, we have a Western Digital, we determined the

4    Western Digital hard drive was in fact a forensic

5    copy that had been previously made of that, and I

6    think we're very clear about that in the second

7    sentence.

8         Q.    So the forensic copy was that physical

9    hard drive that had that forensic copy on it,

10   that was not produced by Paul Ceglia, that was a

11   copy made of something he produced; true?

12        A.    Are you referring to the Western

13   Digital hard drive?

14        Q.    I'm referring to the forensic copy that

15   you mentioned on page 15.

16        A.    Okay.

17             The forensic copy was on a Western

18   Digital hard drive that was produced to us in

19   Chicago by Mr. Lake as part of the Ceglia media.

20   To me, that's produced by Paul Ceglia, so I would

21   say that both of them in fact were produced to us

22   by Paul Ceglia.

23        Q.    Now, the computer where these TIFF

24   images were found, did you read Paul Ceglia's

25   father's declaration that was filed in this case

                            B. Rose

1    that was document number 419?

2        A.    I may have read it at one point in

3    time, I don't have a specific recollection of

4    that.

5        Q.    Well, let's assume, since you don't

6    have a recollection of that, that Mr. Ceglia's

7    father declared that his son, Paul Ceglia, the

8    plaintiff, never had access to the computer on

9    which the Kole e-mail originated, let's assume he

10   says that.

11       A.    Rather than assuming it, can we

12   actually look at a copy of the --

13       Q.    This is a hypothetical for now.

14            Let's just assume he said that, which

15   I'll represent to you he did say that in document

16   419, but I'll let you answer the question with an

17   assumption, you don't have to accept the fact as

18   true, we'll just do the hypothetical.

19            Would that change your opinion that

20   Paul Ceglia sent those e-mails if his father

21   declared under the penalty of perjury that Paul

22   Ceglia never had access to that computer?

23            MR. SOUTHWELL:  Mr. Boland, are you

24        referring to document 419?

1                    B. Rose

2           MR. BOLAND:  That's what my notes say,

3      yeah.

4           MR. SOUTHWELL:  Because that's not what

5      it says.  It doesn't say anything about he

6      never had access.  It asserts my son Paul

7      Ceglia never used the computer, which is

8      contrary to some earlier declarations he's

9      provided, but --

10           MR. BOLAND:  Let's clarify that.

11      Q.    Let's just say hypothetically Mr. Ceglia

12   does offer a declaration of the father, Carmine

13   Ceglia, saying that Paul Ceglia never had access,

14   never used, never got anywhere near that

15   computer.

16           Would that declaration change your

17   opinion regarding your conclusion that Paul

18   Ceglia sent those e-mails?

19      A.    Based on the forensic evidence, I think

20   it is clear that Paul Ceglia sent those e-mails.

21   I would not regard a statement like that from

22   Mr. Ceglia to be credible in light of the

23   evidence that's been uncovered in this case, so

24   no, it would not change my opinion.

25      Q.    And how did, in your opinion, based on

1                    B. Rose

2   your forensic analysis, how did Paul Ceglia send

3   this e-mail, meaning was he physically at the

4   computer and hit the keys on the keyboard to send

5   it or did he somehow remotely access the computer

6   and then send the e-mail that way?

7        A.    Again, given the fact that the files

8   were copied physically to the hard drive, I would

9   think the most likely explanation is in fact a

10  physical access to the computer, but, you know, I

11  can't eliminate remote access as a possibility.

12       Q.    So you're saying one's more likely?  Is

13  that your --

14       A.    I believe so.

15       Q.    And define the term "likely."  What

16  does that mean?  How did you rule out the

17  likelihood of remote access?

18       A.    Define likely?

19            I think if I had to from -- if you

20  asked me do I think he had physical access or

21  remote access, I think there's a greater

22  probability, meaning more likely that he had

23  physical access, that's likely.

24       Q.    And what's the forensic evidence that

25  supports that opinion?

1                           B. Rose

2       A.      Again, I think the copying of the

3    scanned image to the hard drive immediately

4    beforehand to me is more consistent with physical

5    access, but, again, you know, you're asking

6    whether remote access is possible?  Yes.

7               And I should say, you know, I mean, I'm

8    talking remote access theoretically.  You know,

9    whether under the circumstances and the

10   capabilities that, you know, Adelphia had at the

11   time in terms of whether it offered Web access

12   and all of that, that's a specific question as to

13   whether in these circumstances remote access is

14   possible, I don't know that.

15              As a general matter, I can't eliminate

16   remote access as a possibility.

17      Q.      Did your investigation reveal where

18   Paul Ceglia resided at the time that e-mail was

19   sent?

20      A.      Our forensic analysis of the Ceglia

21   media did not reveal where Mr. Ceglia resided at

22   the time this was sent.

23      Q.      And did it reveal where Paul Ceglia's

24   parents' computer was physically located at the

25   time those e-mails were sent?

1                          B. Rose

2       A.     There is some evidence that in 2010

3    that IP address was registered to the Buffalo,

4    New York, area, so I think there's some support

5    for the fact that the computer resided somewhere

6    in upstate New York, but in terms of drawing a

7    definitive conclusion about where that resided, I

8    can't do that from the forensics.

9       Q.     Well, you'd agree with me that your

10   conclusion about -- again, another

11   hypothetical -- your conclusion about Paul Ceglia

12   having most probably physical access to the

13   computer to send the e-mails, if he resided

14   outside the state of New York and was physically

15   outside the state of New York at the time those

16   e-mails were sent, the likelihood of him being

17   the one who sent the e-mails is very low, since

18   he wasn't physically accessing the computer at

19   that time; true?

20           MR. SOUTHWELL:  Object to the form.

21      A.     I completely disagree with that.

22           I mean, the question is not where did

23   he reside, the question is where he is at a

24   particular point in time.

25           I reside in New York, I visit my

1                         B. Rose

2    parents frequently in Indiana, so I don't

3    think -- and I use their computer when I'm there,

4    so I don't think you can possibly conclude from

5    where somebody purportedly resides that there's a

6    low likelihood they were at their parents' house

7    or at a location where their parents resided at

8    any particular point in time.

9         Q.    Well, let's not use reside.  I'll be

10   more precise.

11             What if hypothetically on the date and

12   time these e-mails were sent he was not

13   physically in Buffalo, New York, he was in

14   another state, then what's the likelihood he sent

15   the e-mails then, what's the probability he was

16   the one who sent the e-mail?

17        A.    I wouldn't want to put a number on it.

18             Again, you know, remote access is

19   possible.  I think it is more likely explained by

20   physical access, but in terms of if Mr. Ceglia

21   was in a particular location, what's the

22   likelihood he sent the e-mails, I think it is

23   absolutely clear from all of the evidence in this

24   case, from the StreetFax e-mails themselves, from

25   the attempt to manipulate the Work For Hire

1                    B. Rose

2    document, attempt to create fraudulent Work For

3    Hire documents, from all the manipulation of the

4    computer we see in this case I think it is

5    absolutely clear that the StreetFax e-mails, that

6    those e-mails are genuine, were sent by Paul

7    Ceglia and contain the authentic contract, so I

8    think the probability that Mr. Ceglia sent those,

9    regardless of where he was at any particular

10   point in time, is exceedingly high.

11        Q.    So it's your testimony that if at the

12   precise moment those e-mails were sent he was in

13   Florida or New Mexico when these were sent from

14   New York, same probability he sent them as if he

15   was in Buffalo?

16        A.    His location would not change my

17   assessment that Paul Ceglia sent those because I

18   think the evidence is absolutely overwhelming.

19             The only thing that would do would

20   change my conclusion about the form of access to

21   the computer, it would not impact my

22   determination as to who sent it at all because,

23   again, the forensics in this case is absolutely

24   overwhelming.

25        Q.    Outlook Express, which was the e-mail

1                    B. Rose

2    account from which this was sent, has the

3    capacity to synchronize with a Web-based account;

4    true?

5         A.    As a general principle, yes, that's

6    true.

7         Q.    Do you find any evidence that this

8    Outlook Express account was unable to synchronize

9    with a Web-based account?

10        A.    No.  Again, you know, I don't know the

11   specifics in terms of versioning and how and what

12   particular data was syncing, you know, those can

13   vary across time, so I don't know how this version

14   of Outlook Express operated in conjunction with

15   an Adelphia account, but I have no reason to

16   believe that there wasn't some syncing capability

17   because that's generally something that Outlook

18   Express offers.

19        Q.    And when Outlook Express synchronizes,

20   when it's set up that way, with an external

21   e-mail account, it can synchronize and pull down

22   everything, the inbox, the deleted files,

23   attachments, et cetera; true?

24        A.    I think it depends, again, on how it's

25   set up to sync.  There is certainly a possibility

1                          B. Rose

2      that -- and by deleted items I assume you are

3      talking about deleted items that still physically

4      reside in some kind of trash bin or something.

5           Q.    Yes, that is possible.

6           A.    There are certainly programs that sync

7      everything, there are programs that sync only the

8      inbox, there are programs that sync the inbox and

9      the sent mail, there are programs which sync

10     everything, it really depends, and a lot of

11     programs can be configured in different ways, so,

12     I mean, as a general matter, if you're asking me

13     is it possible, do there exist programs in the

14     world that allow you to sync the entire contents

15     of a Web mail account to a program like Outlook

16     Express, yes, that's true.

17          Q.    And I'm asking about Outlook Express

18     specifically, does it have the capability to

19     synchronize with a Web-based e-mail account?

20          A.    It does, again, but, you know, what

21     items specifically are synced I think could vary

22     from version to version and from configuration to

23     configuration, so as to this version of Outlook

24     Express, I don't know.

25               As a general principle, yes, Outlook

```
 1                      B. Rose
 2    Express does sync with Webmail accounts.
 3        Q.    So if I have an Outlook Express account
 4    and I have it synchronizing with my Web-based
 5    account and I'm nowhere near my office computer
 6    which has Outlook Express on it, but I'm here at
 7    the offices of Gibson, Dunn and I get online to
 8    my Web-based e-mail, the one that's synchronizing,
 9    and I send an e-mail out with a couple of
10    attachments.
11            Are you with me so far?
12        A.    Yes.
13        Q.    Okay.
14            And I go back to my office two days
15    later and turn on my computer and Outlook Express
16    is configured to synchronize my entire inbox and
17    sent e-mails with my Web-based account.
18            You'd agree with me that that function
19    would pull down from my Web-based account an
20    e-mail that I sent here at Gibson, Dunn along
21    with the attachments that I sent?
22        A.    So your hypothetical is if you from
23    Gibson, Dunn sent two e-mails using your Webmail
24    account and then you returned to your offices and
25    opened Outlook Express would it sync?
```

1                          B. Rose

2              I mean, I think that would depend on

3      how it was configured.  My guess would be you

4      would actually probably have to access the

5      Webmail account being synced, and I don't know

6      that there's --

7          Q.    But depending on how it was configured,

8      that could happen?

9          A.    Again, I think if you went and you

10     accessed your Webmail account and it was set up

11     to sync, yeah, I would think that certainly would

12     be possible.

13         Q.    Let's talk about the -- you are

14     familiar with the getzuck e-mail account, it's in

15     your report?

16         A.    Yes.

17         Q.    And you claim there that Mr. Ceglia

18     deleted e-mails from that account.

19         A.    Can I go to the part of the report

20     where we discuss that?

21         Q.    Let me ask you, do you recall that

22     conclusion, that he deleted e-mails from the

23     account?

24         A.    I recall the conclusion that e-mails

25     had been deleted from the account, it is in my

```
 1                      B. Rose
 2   recollection that we had evidence that that
 3   account had been in use through 2011 and that
 4   there were no e-mails existing in the account
 5   prior to sometime in January, so the logical
 6   conclusion is that something has been deleted.
 7        Q.    Now, by the phrase you just used, the
 8   account was in use, you mean the account was
 9   opened at a certain date, that's what you're
10   calling in use?
11        A.    That's not what I'm calling in use.
12              What I'm calling in use, I'm saying the
13   account was actually used, not just opened.
14        Q.    And used for -- in what way?
15        A.    I would have to refresh my recollection
16   with the report for the specifics.  I know it was
17   used -- it was used in some way in connection
18   with a receipt of something from Facebook or
19   something like that, we found evidence of that,
20   and so it was evidence of actual use and not just
21   the fact that the account was opened.
22        Q.    Let's look at page 52 of your -- of the
23   Exhibit 21 you have in front of you --
24        A.    52, the top page?
25        Q.    Yes.
```

```
                                        Page 121

 1                      B. Rose
 2              And I think section D is where you talk
 3    about deletion of data from the getzuck Webmail
 4    account.
 5              Do you see that?
 6              MR. SOUTHWELL:  Are you referring to
 7         Exhibit 1?
 8              MR. BOLAND:  What did I say?
 9              MR. SOUTHWELL:  You said Exhibit 21.
10              MR. BOLAND:  I'm sorry, Exhibit 1.
11              Thank you for the correction.
12              MR. SOUTHWELL:  And we're on page 52 in
13         the upper right?
14              MR. BOLAND:  Page 52.
15    A.    Yes.
16    Q.    So the activity that you found --
17    correct me if I'm wrong -- was that the Ceglia
18    media was used to read an e-mail on April 18,
19    2011.
20              Do you see that phrase there?
21    A.    Mm-hm.
22    Q.    And that was an e-mail received from
23    Facebook, actually, on the activation of a
24    Facebook account; right?
25    A.    Yes.
```

                          B. Rose
1
2        Q.     And do you know how Facebook accounts
3    get set up?
4        A.     Not specifically.
5        Q.     Do you know if Mr. Ceglia had to send
6    an e-mail to someone at Facebook to set up that
7    account, if you know?
8        A.     I don't know.
9        Q.     So what you do know is an e-mail was
10   received from Facebook, so there's one; right?
11       A.     Yes.
12       Q.     And there's no evidence you found of
13   any e-mails being sent from that account; true?
14       A.     I believe the evidence we have, again,
15   is the evidence that's outlined here, that that
16   e-mail address was used to receive an e-mail
17   related to the Facebook account, yes.
18       Q.     And so my question is, no evidence that
19   e-mails were ever sent from that account; true?
20       A.     Well, I don't know whether that's the
21   case because I don't know whether in fact the
22   post-January 28, 2012 e-mail included sent
23   e-mails or not.
24       Q.     I'm just saying your report doesn't
25   show any evidence that he ever sent an e-mail

Page 123

1                          B. Rose

2     from that account.

3                True?

4        A.     Again, that's not relevant to our

5     report; right?

6                We received that e-mail data, we looked

7     at it for only two things; one, we reviewed it

8     for presumptively relevant materials that would

9     be produced to you and then subsequently to

10    Gibson, Dunn to pass privilege review.

11               We identified no such data in the

12    existing data.  We did know from an Internet

13    analysis from the Ceglia media that in fact that

14    e-mail was in use for the purposes of receiving

15    an e-mail from Facebook in April 2011 and despite

16    that there was no content for any of 2011 up to

17    January 28th of 2012.  That indicates to me the

18    e-mail's been deleted.  I don't know who deleted

19    it, I don't know what the activity was that led

20    to the deletion, I don't know how much data was

21    received or sent prior to January 28, 2012.

22               Your question to me was do I have any

23    evidence that it was used to send e-mail.

24               What I'm saying is it's possible that

25    we have sent e-mail from after January 28, 2012.

```
 1                       B. Rose
 2    I don't know, because my only analysis of that
 3    media, of that data was to see whether there were
 4    presumptively relevant materials.
 5        Q.     But I'm talking about your conclusion
 6    that my client did have e-mails in that account
 7    and he deleted them.
 8               It's fair to say your report indicates
 9    that he actually had e-mails which he deleted
10    from that account; true?
11        A.     Yes, based on the conclusion, again,
12    that we have evidence it was in use and there's
13    no e-mail.
14        Q.     All right.
15               Let's ask about the Harvard e-mail
16    account of Mr. Zuckerberg.
17               You are aware that there are no e-mails
18    at all in that account from -- related to
19    Mr. Ceglia and Zuckerberg from, the earliest one
20    being June 2003, you are aware of that, that's
21    the earliest e-mail?
22        A.     I have not done a date analysis of that
23    e-mail, no.
24        Q.     Well, your team worked to produce the
25    e-mail that was provided us from that account;
```

Page 125

                            B. Rose

1

2    true?

3        A.    Correct.

4        Q.    And were you aware that the e-mail that

5    your team produced using a variety of search

6    terms which included my client's name and

7    Mr. Zuckerberg didn't produce a single e-mail

8    between those two individuals until June of 2003?

9    Are you aware of that?

10       A.    I am not aware of the content of that

11   production.

12       Q.    All right.

13             Well, let's say that that's what

14   happened, okay, let's use a hypothetical.

15             Are you aware that the contract in this

16   case, the paper contract that's being disputed

17   has a signing date of April 28, 2003?  Are you

18   aware of that?

19       A.    Again, I don't think I've seen the

20   paper contract.

21       Q.    Copies that you've seen.

22       A.    Yes, the copies I've seen have a signing

23   date of that date.

24       Q.    Okay.

25             And April is before June in the

                          B. Rose

 1

 2    calendar; right?

 3        A.    Well, April 2003 is before June 2003.

 4        Q.    Correct.

 5              And would you agree with me, then, if

 6    there are no e-mails that you were able to

 7    recover, your team, from Mr. Zuckerberg's Harvard

 8    account from April to June of 2003, that

 9    Mr. Zuckerberg must have deleted them?

10              MR. SOUTHWELL:  Objection.

11        Q.    I am asking if that's your conclusion

12    based on that hypothetical, if there's no e-mails

13    from April of '03 when the contract was signed

14    between the parties and June of '03, which was

15    the first e-mail that we were provided, they must

16    have been deleted?

17        A.    That would not be my conclusion.

18        Q.    Very well.

19              But it is your conclusion that my

20    client had the getzuck e-mail account in use and

21    because there's no e-mails in it, it's been

22    deleted?

23        A.    Excuse me --

24        Q.    Just let me finish the question.

25        A.    Excuse me, you keep misrepresenting

```
                              B. Rose
 1
 2    what I said.
 3              What I said was --
 4       Q.    Sir, I'm asking the questions.  I
 5    didn't finish my question.
 6       A.    And I'm answering the question.
 7              What I said was that this e-mail
 8    account was in use prior to January 28, 2012,
 9    there was data in there.
10              MR. BOLAND:  I am going to object to
11         this entire answer.  There's no question
12         pending.  I'm going to object to everything
13         he is saying and ask that it all be stricken
14         from the record.
15       A.    I absolutely was clear with you that I
16    can't say who deleted --
17              MR. BOLAND:  You know, if we need to
18         dial up the judge, Mr. Southwell, and ask
19         him to instruct the witness to answer
20         questions, I'll be happy to take a break and
21         do that.
22              MR. SOUTHWELL:  He answered your
23         question.  I'm looking at the transcript
24         right here, he answered your question.
25              Why don't you let him finish.
```

1                         B. Rose

2              MR. BOLAND:  I didn't finish my

3        question before he started speaking.

4              MR. SOUTHWELL:  There was a question, a

5        question mark and then he proceeded.

6        Q.    It's your position that Mr. Ceglia

7    deleted e-mails from the getzuck account?

8        A.    It is my position that e-mail was

9    deleted from the getzuck account.

10       Q.    So your answer is yes?

11       A.    My answer is not yes.

12             Your question was my position is

13   Mr. Ceglia deleted the e-mail.  I am being very

14   clear with you that my position is there was

15   e-mail in that account prior to January 28, 2012

16   that is no longer there, meaning that it was

17   deleted.

18             I'm offering no opinion whatsoever

19   -- let's be clear about this -- as to how that

20   e-mail was deleted or as to who deleted it, so

21   the answer to your question is no.

22       Q.    How many e-mails were deleted?

23       A.    I do not know what was deleted, I do

24   not know what content was in that account.

25             Again, what I know is that that account

1                           B. Rose

2    was in use prior to January 28, 2012, we know it

3    received at least one e-mail.  There is no data

4    in that account, so something has been deleted; I

5    can't tell you who deleted it, I can't tell you

6    what has been deleted because that e-mail is

7    gone.

8         Q.    When were the e-mails deleted from that

9    account?

10        A.    I cannot tell you that except to say

11   that it was prior to January 28th of 2012.

12        Q.    Can a person set up an e-mail account

13   and not ever send an e-mail using that account?

14        A.    Yes.

15        Q.    What evidence do you have that

16   Mr. Ceglia set up this account and actually sent

17   e-mails out to someone?

18        A.    Again, the only evidence we would have

19   is if the post-January 28, 2012 e-mail includes

20   sent e-mail.

21              I don't have that information in front

22   of me, I don't know whether that's the case or

23   not.  I don't have evidence right now that I can

24   rely on to tell you that Mr. Ceglia set up that

25   account and sent e-mail from it.

1                       B. Rose

2       Q.     In your report you talk about a Hex

3   editor.

4              Do you recall that?

5       A.     I do.

6       Q.     And it's true that your analysis did

7   not find -- well, let me back up.

8              A Hex editor is a computer program?

9       A.     Yes.

10      Q.     You did not find any evidence of a

11  computer program in the category of Hex editor

12  installed on any of the media that you analyzed?

13      A.     No.  We found evidence of the use of a

14  Hex editor, but you're correct, we did not find

15  the actual Hex editor installed on the computer,

16  which, frankly, is not surprising given that

17  people who use Hex editors generally delete them.

18      Q.     And the anomalies that you found that

19  you attributed to a Hex editor, is a Hex editor

20  the only program that can create those anomalies,

21  if you know?

22      A.     Can I go to the page where we discussed

23  the --

24      Q.     Very well.

25      A.     So, I mean, so I think it depends on

1                            B. Rose

2    what anomalies you're talking about.  I mean, I

3    think what we discuss is the fact that there are

4    six documents which I think, you know, including

5    ones named test document, including ones which

6    have the content that says I'm going to

7    essentially test how the Hex editor worked, and

8    it's not a direct quote, and I would give you the

9    direct language, but it's been redacted from this

10   report, that leads to our conclusion that in

11   fact, you know, this is consistent with someone

12   using a Hex editor to try to forge a document.

13            As to the second anomaly, which is is

14   in this sfwebworkforhiremz.doc which is an

15   anomaly in the metadata, depending on whether it

16   was viewed through, you know, Metadata Assistant,

17   which is a common tool we use, or a forensic

18   program like EnCase.

19            I think, based on the evidence, the

20   only reasonable conclusion is that this was the

21   result of a Hex editor; whether that is the only

22   possible explanation for that I don't know.

23       Q.    And what other explanations are

24   possible?

25       A.    I don't know.

                            B. Rose

1

2        Q.    The Hex editor in this case you claim

3   was used to manipulate metadata on a file;

4   correct?

5        A.    In one instance.

6        Q.    Well, what was it used for in the other

7   instance?

8        A.    It was actually used to create a

9   fraudulent document, it was used to test how the

10   Hex editor worked, it was used to essentially, I

11   think, merge documents together to try to create

12   a fraudulent document that appeared as if it was

13   one document.

14            I would say, frankly, that based on all

15   the evidence that it was your client's attempt to

16   manipulate the Work For Hire document and create

17   a fraudulent document.

18        Q.    So the Hex editor was used to alter

19   metadata is one of your conclusions; right?

20        A.    Yes.

21        Q.    What other ways can metadata be altered

22   other than a Hex editor, or is that the only way,

23   if that's what your testimony is going to be?

24        A.    Again, I think the anomaly we see here,

25   which is it being -- it's not just manipulated

1                          B. Rose

2    metadata, it's what we see, which is that when

3    you view it in metadata assistant you essentially

4    get no metadata.

5              When you view it in a forensic tool,

6    what you see is the metadata, although it is

7    interspersed with machine code.  I think that

8    particular circumstance -- I don't know that

9    there is any explanation for that other than the

10   use of a Hex editor, but, again, if you are

11   asking me whether anything else is possible, I

12   don't know whether there are any other

13   explanations, I don't think there are any likely

14   explanations given those circumstance.

15        Q.    That's not my question.

16              What other ways can metadata be altered

17   is my question, generally.

18        A.    I mean, there are programs which allow

19   you to manipulate metadata.

20        Q.    For example, can you list some of those?

21        A.    I don't know the names of the programs.

22   I mean, there are some open source tools that do

23   it, I know there are some software versions you

24   can buy that allow you to do it, I don't know the

25   names.

1                        B. Rose

2        Q.     How about if I copy files from my

3    computer on a CD and give them to you and you

4    copy them out of your computer at your office,

5    can metadata change during that process associated

6    with those files?

7        A.     Metadata can change, yes.

8        Q.     And that's not intentional change, it

9    just happened in that process, the hypothetical

10   that I gave you?

11       A.     Are you talking about like an update of

12   a creation date or an access date?

13       Q.     Yes.

14       A.     That can happen through ordinary usage.

15              This particular circumstance cannot

16   happen through ordinary usage.

17       Q.     How did you rule out ordinary usage as

18   not a possible cause of that, how did you rule

19   that out?

20       A.     The ordinary update of a file -- I

21   mean, you're right, if I have last 10 authors

22   metadata and I go on and I change the document, I

23   am going to now be the first last 10 author and

24   one of the names is going to drop off, that is a

25   common alteration if I am going to write the

1                         B. Rose

2    document.

3              To have this, last 10 authors metadata

4    with all of these question marks that essentially

5    metadata assistant is returning me the idea that

6    there's no metadata here, that's an anomaly,

7    that's not caused by ordinary usage of a file,

8    and the fact that I can now view it in EnCase

9    Forensic and see what some of the metadata is,

10   including the file path, that indicates to me a

11   Hex editor was been used.  That is not -- this

12   pattern where metadata assistant cannot give me

13   any metadata does not happen merely because we

14   exchanged a file and somebody modified it.

15        Q.    So the only cause for that is a Hex

16   editor is your opinion?

17        A.    I think the only reasonable explanation

18   for these facts is that a Hex editor was used.

19        Q.    That's not my question.

20              Is that the only way that that happened?

21        A.    Again, I think I've answered this

22   before.  I don't know whether anything else is

23   theoretically possible.  I'm drawing a conclusion

24   based upon the evidence I see.  In this case I

25   don't think there's a reasonable explanation for

1                          B. Rose

2    this other than the fact that a Hex editor was

3    used.

4              Theoretically possible?

5              I don't know one way or the other.

6         Q.    Those 15 to 20 computers of

7    Mr. Zuckerberg's that someone on your team

8    evaluated, was there evidence of Mr. Zuckerberg

9    using those computers to electronically

10   communicate with anyone?

11             MR. SOUTHWELL:  Objection, calls for

12        speculation.  He already said he was not

13        involved with that.

14        Q.    If you know.

15        A.    I am not aware one way or the other.

16             MR. BOLAND:  Can we take it about a

17        10-minute break?

18             MR. SOUTHWELL:  Are you close to being

19        done?

20             MR. BOLAND:  I don't know.  I'm going

21        to take a break and sort of assess where I'm

22        at.

23             MR. SOUTHWELL:  We can go off the

24        record.

25             (Recess taken.)

```
 1                      B. Rose
 2            THE VIDEOGRAPHER:  The tape is rolling.
 3    BY MR. BOLAND:
 4       Q.    Mr. Rose, we are back on the record.
 5            I want to go back over a couple of
 6    things that, just a couple of questions on a
 7    topic or two that we already discussed.
 8            Did your team -- your team evaluated 15
 9    or 20 computers that Mr. Zuckerberg used
10    historically; right?
11       A.    I don't know that I would it call my
12    team; Stroz Friedberg personnel did, yes,
13    correct.
14       Q.    I'll be clear, Stroz Friedberg
15    personnel, right.
16            I am not going to ask you again, but we
17    already determined you don't know who actually
18    did the analysis or who supervised; true?
19       A.    Correct.
20       Q.    Did Stroz Friedberg rely on the
21    analysis of those computers in coming to the
22    conclusions in your report that you filed in this
23    case?
24       A.    Well, we -- I mean, we didn't find
25    anything relevant on those devices so no, the
```

```
 1                    B. Rose
 2   answer is no.
 3        Q.    If you had found something relevant on
 4   those devices would you have inserted it into
 5   this report?
 6        A.    I don't know.  I mean, you know, we
 7   were -- we were asked to look at the authenticity
 8   or inauthenticity of the document and to examine
 9   Ceglia media, so we had to consider how that fit
10   into what the Court had asked us to do, but in
11   general, if we had found something in there that
12   I think, you know, was, it was relevant, I think
13   we would have considered including it, certainly.
14        Q.    The Kole e-mail that we had some
15   discussion about, is it possible that someone
16   other than Paul Ceglia, physically possible that
17   someone else other than Paul Ceglia could have
18   sent that e-mail?
19        A.    Is it physically possible?
20              I suppose anything's possible.
21        Q.    So the answer is yes, it's possible?
22        A.    Yes.
23        Q.    I know you've concluded otherwise;
24   true?
25        A.    I think it's implausible, but it's
```

```
 1                        B. Rose
 2    certainly theoretically possible.
 3         Q.    Have you ever in either your personal
 4    or professional work used the copy-and-paste
 5    function on some content on the Internet and then
 6    pasted into a document?
 7         A.    Yes.
 8         Q.    And are you familiar with one of the
 9    common programming file formats for the Internet
10    is HTML?
11         A.    Yes.
12         Q.    And when you've copied and pasted
13    stuff from the Internet to a document has that
14    process ever resulted in that content's
15    formatting being different in the document from
16    what it looked like on the Internet?
17         A.    Yes.
18         Q.    In the conversation we had about the
19    Hex editor, I need to be a little more precise in
20    my question about one of the areas there.
21              Can you detail for me, list for me the
22    computer forensics evidence that supports your
23    conclusion that the person who used the Hex
24    editor was Paul Ceglia?
25         A.    Can you repeat that question?  I'm
```

```
 1                    B. Rose
 2   sorry.
 3       Q.    Yes.  Let me clarify.
 4       A.    Sure.
 5       Q.    I am aware from your report that you
 6   believe, at the very least, a Hex editor was used
 7   to manipulate some metadata.
 8             Is that a fair statement?
 9       A.    Yes.
10       Q.    It was used?
11       A.    Yes.
12       Q.    And you detailed the forensic evidence
13   that you believe supports that opinion.
14             Now what I'm asking you is not the
15   forensic evidence that supports that it was used,
16   but what, if any, computer forensics evidence
17   supports the conclusion that Paul Ceglia used the
18   Hex editor?
19             And I'm saying forensic evidence.
20       A.    Sure.
21             So the six documents that were created,
22   their names, for instance, document created to
23   copy out of test doc, that I think is very
24   clearly a pattern to try to create a merged
25   forged document.  Whether that was done by -- I
```

1                         B. Rose

2     think that was clearly done by someone with

3     motivation to create a fake document.  In this

4     case the person with the motivation to create a

5     fake document, the person with the greatest

6     motivation is obviously Mr. Ceglia, who is

7     attempting to rely on it to support a claim worth

8     a tremendous amount of money, and whether it was

9     actually Mr. Ceglia did that or somebody working

10    in concert with Mr. Ceglia, I don't know, but I

11    think it's somebody clearly with motivations to

12    create a false document and in this case I think

13    the person with the greatest motivation is

14    Mr. Ceglia.

15        Q.    And how do you know what his motivation

16    is?

17        A.    How do I know what his motivation is?

18        Q.    How did you determine what his

19    motivation is?

20              You just talked about his motivation.

21              How did you determine that?

22        A.    My understanding is he claims to, based

23    on a contract, own half of Facebook.  That seems

24    like clear motivation to me, but --

25        Q.    Clear motivation to do what?

1                          B. Rose

2        A.    He's made a claim for half of Facebook,

3    and clearly your motivation there is money,

4    right?  Facebook's a tremendously valuable

5    organization.  I think the motivation is money.

6             The motivation, then how do you get a

7    claim?

8             Well, he can't base it on the real

9    document, the StreetFax contract, because that

10   doesn't mention Facebook, so I think the

11   motivation to create a false document is to try

12   to create something which is not real and didn't

13   exist in 2003 and is not a contract between Mark

14   Zuckerberg, but which appears to be a contract on

15   which you can support a claim.

16            I mean, your motivation, your ultimate

17   motivation is money.  The actions taken are, you

18   know, all of this, it's not just the Hex editor,

19   but all of this evidence of manipulation of

20   documents and fraud in an attempt to support that

21   claim.

22       Q.    But you don't have any opinion --

23   you're not challenging any of the plaintiff's

24   experts' opinions that the paper, two-page paper

25   document is real?

1                          B. Rose

2       A.     I'm limiting to digital forensics, I

3   haven't considered the paper at all, I have no

4   opinion about that.

5       Q.     You are not challenging any of their

6   claims?

7       A.     I have no opinion about it whatsoever.

8       Q.     Are you challenging any of their claims?

9       A.     I have no opinion about it.

10      Q.     The question is not whether you have an

11  opinion.

12             Do you have any evidence to challenge

13  their claims?

14      A.     I'm not challenging or not challenging

15  their claims, I have no opinion about their

16  claims.

17      Q.     Now, you talk about my client's

18  motivation sort of is outside the realm of

19  computer forensics, it seems to me, wouldn't you

20  agree?

21             His motivation doesn't come out of

22  metadata or applications or whatever, that

23  doesn't communicate someone's motivation?

24      A.     I think that's correct, yes.

25      Q.     And you are speculating about his

1                          B. Rose

2    motive?

3        A.    Well, I'm not sure I understand that

4    question.

5              I mean, I think -- I think it is a

6    clear motive.  Whether that's actually what's

7    motivating him, I mean, I think it's a fairly

8    clear motive, but I'm not inside his head, if

9    that's your question.

10       Q.    If his paper contract, which you have

11   no opinion about -- let's have a hypothetical --

12   if the paper contract's authentic, then you'd

13   agree with me he doesn't have a motive to fake

14   electronic documents because he's got a real

15   contract.

16             Again, it's a hypothetical.  If the

17   paper contract is authentic, he has no motive to

18   create electronic documents?

19       A.    So hypothetically, if his paper

20   contract is authentic, I would say that's

21   correct, given the forensic evidence that in fact

22   all of this fraud was attempted, I would say, you

23   know, that the corollary to that is it seems

24   clear that the paper contract is not the genuine

25   contract.

1                        B. Rose

2       Q.    But my question is if you assume it is,

3   so we're not going to talk about it not being

4   authentic, we are assuming it is authentic, then

5   he has no motivation to manipulate electronic

6   files; right?

7       A.    I would say that no one has the

8   motivation to manipulate the files and we

9   wouldn't see it on here, but we do, so, I mean,

10  that tells me the contract's not real.

11      Q.    Let's talk about motivation.

12            If the paper contract is real you then

13  would agree with me Mark Zuckerberg has a

14  motivation to do something to call into question

15  the authenticity of that paper document.  Don't

16  you think he -- he would lose a lot of money too

17  if the paper contract is authentic, wouldn't he?

18            MR. SOUTHWELL:  Object to the form.

19      A.    I certainly -- I mean, I guess I don't

20  know personally what he would lose versus, you

21  know, Facebook, who owns what in terms of

22  their -- but I assume it would have a very

23  detrimental financial impact on him where he

24  would have to give up half of Facebook.

25      Q.    So my point is about the motivation

1                          B. Rose

2    comment.  If the paper contract's authentic then

3    Mr. Zuckerberg, just like Mr. Ceglia in the

4    opposite conclusion, has a motivation to try and

5    fake evidence to prevent that contract from being

6    enforced; correct?

7         A.    True.  And I do think if we had seen

8    fraud going the other way, right, that the

9    motivation might play in.  If we'd seen, you

10   know, that evidence that the StreetFax contract

11   was in fact apparently a fraudulent document, I

12   would agree with you that, you know, maybe we

13   would factor in the motivation and that my

14   conclusion would be that if the StreetFax

15   contract that we found, if the forensics

16   indicated it was a fake document, I think a

17   logical conclusion would be Mr. Zuckerberg faked

18   it.

19              That's not what the forensics shows.

20   The forensics clearly shows that the StreetFax

21   contract is authentic, there is overwhelming

22   evidence that there's been fraud perpetrated here

23   both in the creation of purported e-mails and the

24   Work For Hire contract relied on by your client.

25              The same holds true there.  Our

1                        B. Rose

2    conclusion is that the likely person who would

3    engage in that kind of fraud is Mr. Ceglia.

4             Now, whether any specific action was

5    actually taken by Mr. Ceglia or was done by

6    someone, you know, sharing the same motivation or

7    working in concert with him such as use of the

8    Hex editor, again, I can't pinpoint an individual

9    for you, but I can say that, you know, I think,

10   again, Mr. Ceglia is a likely candidate just as

11   if the forensics had cut the other way,

12   Mr. Zuckerberg would be a logical candidate, but,

13   you know, it didn't.

14        Q.    Are you aware that Mr. Zuckerberg was

15   provided a signed copy of the agreement he

16   entered into with Mr. Ceglia at the time it was

17   signed?

18        A.    I am not.

19        Q.    Okay.

20             Are you aware that there are e-mails

21   missing from Mr. Zuckerberg's Harvard e-mail

22   account from periods of time where he was in

23   communication with Mr. Ceglia?

24        A.    I am not.

25        Q.    And the two TIFF images that make up

1                    B. Rose

2     the StreetFax contract are digital images.

3               We've already talked about that; right?

4     A.     Yes.

5     Q.     And you don't know where they -- what

6     device they originated from for sure; correct?

7     A.     Again, not beyond saying they appear to

8     be scanned documents which were then created on

9     the hard drive, you know, on the morning of March

10    3rd, yes.

11    Q.     And so they could have been scanned at

12    any point prior to March 3rd?

13    A.     They could have been.

14    Q.     And what computer forensics evidence,

15    specifically computer forensics evidence about

16    those TIFF images tells you they are the

17    authentic contract between the parties?

18              Not all the other stuff, because I know

19    you've gone into that multiple times, just those

20    two TIFF images, what is all the computer

21    forensics data about those images which tells you

22    that's the authentic contract?

23    A.     So, I mean, as an initial matter, let

24    me just say that I think in terms of analysis of

25    the authenticity of the StreetFax contract it is

                              B. Rose

1

2    impossible from our standpoint to divorce that

3    from the other evidence that's on the computer,

4    including evidence that the purported e-mails

5    were fake, that there was manipulation of

6    documents, there's backdating of the system clock

7    on multiple occasions.

8              Having said that, if you just analyze

9    that alone, and it's not what we do, right, we do

10   everything in context, but if you just look at

11   the TIFF images alone I think you have the fact

12   that it was found on a computer belonging to

13   Mr. Ceglia, it was e-mailed to his attorney, it

14   was e-mailed on March 3rd of 2004, it was

15   e-mailed through intermediary servers at Adelphia

16   and Sidley & Austin before residing at Sidley &

17   Austin.

18             The fact that Sidley & Austin

19   maintained a copy of the e-mail, so you have both

20   the sending side and the receiving side of a

21   contract, the fact that it was sent via e-mail

22   that says -- again, typed, but says Paul to his

23   attorney saying this is the contract with Mark,

24   the fact that you have the March 4th and 5th

25   e-mail chain where, again consistent with the

```
 1                        B. Rose
 2    small images you've talked about, Mr. Kole says,
 3    I can't read this, there's a handwritten note,
 4    all of that evidence shows me that this is a
 5    genuine contract.
 6               I mean, frankly, to me, having the
 7    plaintiff produce a piece of media that contains
 8    a contract that does not support his claim and
 9    having the same e-mail that based on a forensic
10    analysis was purportedly sent to Sidley & Austin,
11    to have that be produced by Sidley & Austin, I
12    mean, even if you put all the other evidence
13    aside, that ends this case, I mean, that is clear
14    smoking-gun evidence that the StreetFax contract
15    is the authentic contract e-mailed from your
16    client to his lawyer at Sidley & Austin and
17    you've got both sides of the conversation
18    producing the same identical e-mail chain.
19        Q.    Let me try this way, because you are
20    not answering my question.
21               MR. SOUTHWELL:  Objection.
22        Q.    Here's a hypothetical, trying to make
23    this more precise.
24               If you found an e-mail between Paul
25    Ceglia and Jim Kole that had a photograph
```

1                          B. Rose

2    attached to it that showed Paul Ceglia's mother

3    walking on a wire between two buildings in

4    downtown New York, okay, like a wire walker,

5    would it be -- and you found all of the server

6    information that you just detailed that went from

7    here to here to here, all the servers, and Sidley

8    Austin had a copy of that e-mail on their server,

9    everything you've just said about that, would it

10   be your position that that image of his mother

11   walking on a wire 400 feet in the air is an

12   authentic picture of an event that actually

13   happened?  Would that be your position?

14        A.    Forgive me if I pause for a minute,

15   this is an awfully strange hypothetical.

16             So let's assume -- I mean, if I have an

17   e-mail and the e-mail says, Hey, Jim, this is my

18   mom tightrope walking, Paul --

19        Q.    There you go.

20        A.    -- I mean, I guess the question in my

21   mind would be is there any evidence she is

22   actually a tightrope walker; right?

23             I mean, it's sort of an odd

24   hypothetical because you have posited a photograph

25   of a woman doing something that very few people

1                           B. Rose

2    in the world could actually do, so the fact that

3    the image itself is fairly unrealistic, again,

4    you know, these are all fairly contextual

5    analyses, then I think it would lead me to

6    question whether -- I mean, it wouldn't lead --

7    it would clearly be an e-mail sent from, you

8    know, from, I think -- it wouldn't lead me to

9    question it was sent from Paul to Jim Kole, it

10   would lead me to question whether it was actually

11   a true image, but just because of the

12   strangeness, in this case, you know, it's a

13   hypothetical which is completely off point to the

14   actual case, which is you have a standard

15   contract being e-mailed from, you know, Paul to

16   his lawyer at Sidley & Austin and a subsequent

17   conversation about it.

18       Q.    Well, to be clear, the e-mail was

19   actually e-mailed from an account owned by Vera

20   and Carmine Ceglia; true?

21       A.    Well, let's be careful.

22             It is an account that is registered to

23   Carmine Ceglia.  The user name resolves to Vera

24   Ceglia and the e-mail is signed -- again, as you

25   pointed out, not a signature, but typed, is Paul.

B. Rose

1

2    Q.    So do you feel you're qualified to

3    testify about the authenticity of images

4    generally when you see them attached to e-mails,

5    you can declare which images are authentic and

6    which images are not?

7              MR. SOUTHWELL:   Objection to form.

8    Q.    Just yes or no, are you qualified to

9    testify about it?

10   A.    It is not a yes-or-no question, it

11   would depend on the circumstances.

12             I mean, in a case like this where I

13   think you have obvious evidence of authenticity

14   and obvious evidence of fraud, it's a fairly

15   straightforward case.

16             In other cases I could see, you know,

17   you depending again on what the image was and

18   what the question was, in some cases I would say

19   yes and in some cases no, but it would depend on

20   what analysis was needed.

21   Q.    If I sent an e-mail to Mr. Southwell

22   and typed the message, Hey, check out this

23   contract, Alex, signed, and then typed in Bryan

24   Rose, is it your position that you sent that

25   e-mail?

```
 1                    B. Rose
 2            I would assume not.
 3     A.    So you're -- if you sent an e-mail to
 4  Alex and typed Bryan Rose, is it my position that
 5  I sent that?
 6            No.
 7     Q.    No.  I sent a message saying, Alex,
 8  this is Bryan Rose sending you a contract, and I
 9  typed Bryan Rose, that's not from Bryan Rose is
10  it?
11     A.    Not if you sent it, no.
12     Q.    Correct.
13            Just because your name is typed at the
14  bottom doesn't mean it's sent from you; true?
15     A.    That's true.
16            Again, if you isolate -- if you isolate
17  any individual piece, it's possible to say there
18  are other possibilities, but, again, that's not
19  what we do.  We analyze the forensic evidence in
20  the entire context of the case, and so that is
21  one piece of evidence, the fact that it went to
22  Jim Kole is another piece of evidence, the fact
23  that Jim Kole had a handwritten note where he
24  responds is another piece of evidence, the
25  evidence of backdating is another piece of
```

Page 155

1                           B. Rose
2    evidence.
3              This is all part of building a picture
4    of what happened, and so, I mean, if you pull out
5    any piece of evidence and say what's possible,
6    that's one thing.
7              That's not what we do.  We consider it
8    in the context of the entire case and we say what
9    are the reasonable explanations for this, and
10   given the forensic evidence in this case, the
11   only reasonable explanation is that the StreetFax
12   contract is authentic and that your client was
13   engaged in a massive fraud to attempt to generate
14   a fraudulent contract, that's the only reasonable
15   explanation for the digital forensics taken as a
16   whole.
17       Q.    You've made that clear.
18             Can we go to page 21 of your report,
19   which is Exhibit 11 --
20       A.    You mean the top level?
21       Q.    Yes.
22             You just mentioned a response from Jim
23   Kole.
24             This is the document you were referring
25   to; right?

```
 1                        B. Rose
 2        A.     Correct.
 3        Q.     And can you -- I'm going to be real
 4   specific.
 5               Can you read the date and time of that
 6   e-mail being sent allegedly from Jim Kole?
 7        A.     Friday, March 5th, 2004, 11:44 a.m.
 8        Q.     So that's a day later than the alleged
 9   Kole e-mail was sent to him; true?
10        A.     I believe it's two days later, correct.
11   The Kole e-mails were sent by Mr. Ceglia on March
12   3rd, 2004.  This response appears to be on March
13   5th, 2004, so that's two days.
14        Q.     Even better.
15               Whose handwriting is on the document?
16               What computer forensics evidence tells
17   you who wrote that handwritten note?
18        A.     Based on the context the fact that it's
19   on an e-mail printed out by Jim Kole and the fact
20   that it is giving legal advice about a contract
21   that was put in front of him by Mr. Ceglia, the
22   context indicates to me that it's Mr. Kole's
23   handwriting, but we haven't -- we are not
24   forensic -- we are not handwriting experts and,
25   you know, I couldn't tell you ultimately who
```

```
 1                      B. Rose
 2   wrote that.
 3        Q.    And this is a reply to Paul's -- I'm
 4   sorry, this is an e-mail from paulceglia@msn.com
 5   at the top; right?
 6             MR. SOUTHWELL:  Objection.
 7             Can you just be specific?  You're
 8        referring to the top from Ceglia to Kole on
 9        March 5th or the ones below?
10        Q.    The very top of the e-mail where it
11   says from paulceglia@msn; isn't that correct?
12        A.    Which one, again, the top level e-mail?
13        Q.    The most top level --
14        A.    Yes, that is from paulceglia@msn.com.
15        Q.    Right.
16             Then let's go down into the body of the
17   e-mail, there's another e-mail referenced there
18   and there's the next word "from" and a colon and
19   "to" and a colon.
20             Do you see that?
21        A.    Are we talking about the e-mail
22   immediately below towards the top level, the
23   reply to, yes.
24        Q.    Yes.
25             And that's paulceglia@msn as well?
```

                              B. Rose

1         A.    Correct.

2         Q.    Let's go a little farther down

3    underneath a little portion that says "original

4    message" and under there it says "from," and you

5    see that says paulceglia@msn again?

6              MR. SOUTHWELL:  The one on March 4th?

7         A.    March 4th, 2004 at 9:49 a.m., yes,

8    that's correct.

9         Q.    So this, you would agree with me,

10   appears to be an exchange between, if it's

11   authentic, Mr. Kole and Mr. Ceglia who is

12   communicating using his msn account?

13        A.    Correct.

14        Q.    Okay.

15              And as you pointed out, the

16   communication that is the Kole e-mail came from

17   an account registered to Carmine Ceglia with the

18   user name Vera Ceglia?

19        A.    Correct.

20        Q.    And it's your position that this

21   represents a reply by Mr. Kole two days later to

22   the e-mail that came from the Adelphia account?

23              MR. SOUTHWELL:  Objection,

24        mischaracterizes.

1                        B. Rose

2       A.      That's not my position.

3               That is clearly a separate e-mail

4    chain, so the Kole e-mails -- the Kole e-mails

5    that were sent on March 3rd are not part of this

6    chain, so, you know, what it looks like,

7    Mr. Ceglia sends the March 3rd e-mails to

8    Mr. Kole, then opens up a new e-mail chain using

9    his msn account and they go back and forth based

10   on that, and so this is -- so it's not a direct

11   reply.

12              What I'm saying is based on the

13   content, right, it appears to be discussing the

14   contract that was provided on March 3rd, 2004,

15   including a reference to the fact that it can't

16   be read.

17      Q.      Do you know if it was actually

18   discussing that blurry TIFF image or another

19   blurry TIFF image?  Do you know?

20              Did your forensics analysis tell you

21   what blurry image they're talking about?

22      A.      We only have evidence of one blurry

23   TIFF image, so we have one blurry TIFF image or

24   two blurry TIFF images sent on March 3rd, 2004,

25   and a response here indicating that he's received

1                      B. Rose

2    blurry TIFF images, which we know he received,

3    right, because we know, A, Sidley & Austin still

4    has them and we know he forwarded them on, so,

5    yes, I'm basing that on the context here that

6    when he's referring to blurry TIFF images he's

7    referring to the blurry TIFF images we know he

8    received two days before.

9         Q.    And he is referring to the blurry TIFF

10   images he received from the Adelphia account is

11   your position about when you read this e-mail

12   here?

13        A.    That seems to me to be a reasonable

14   inference based on what we know, yes.

15        Q.    And how did you rule out someone

16   scanning --

17        A.    Again, I'm talking about what --

18        Q.    Let me finish the question, sir.

19        A.    Yes.

20        Q.    How did you rule out additional e-mails

21   with blurry TIFF images sent from Paul Ceglia's

22   msn account to Jim Kole and he's replying

23   regarding that, how did you rule that out?

24        A.    I haven't ruled that out.  What I'm

25   saying is what is the likely and reasonable

1                    B. Rose

2    explanation.

3        Q.    How likely is it that an e-mail was

4    sent by Paul Ceglia from his msn account with

5    blurry attachments that he's responding to here,

6    how likely is that?

7        A.    Well, I think given the fact that we

8    know he sent blurry TIFF images two days before,

9    it's unlikely.

10             I don't know how to --

11       Q.    Why is it unlikely?  What do you know

12   about Mr. Ceglia's personal habits that make it

13   unlikely in that two-day period he did not send

14   blurry TIFF images to his lawyer by his msn

15   account?

16       A.    I think it's probably unlikely he's

17   sending multiple copies of blurry TIFF images,

18   but --

19       Q.    Why is it unlikely?  How did you

20   determine that?

21       A.    It seems to me people don't generally

22   do that, but, you're right, he could have sent a

23   thousand blurry TIFF images, it seems exceedingly

24   unlikely to me, but I have not ruled it out.

25       Q.    Why is it unlikely?

1                           B. Rose

2         A.      Again, I think I've answered that

3    question.  It seems to me that if you have a

4    reference to an attorney having been sent blurry

5    TIFF images and we know that two days before he

6    was sent blurry TIFF images that we know he

7    received, the likely explanation is that he's

8    referring to those TIFF images.  I have not ruled

9    out the fact that he's referring to other TIFF

10   images.

11        Q.      And there's an intervening two-day

12   period between the Kole e-mail and this one;

13   right?

14        A.      Correct.

15        Q.      And the Kole e-mail and this one were

16   sent with two different e-mail accounts?

17                I'm sorry, the Kole e-mail is sent with

18   an Adelphia account; true?

19        A.      The Kole e-mail was sent from -- yes.

20        Q.      And these exchanges with Mr. Kole are

21   sent by Mr. -- are with Mr. Ceglia at his msn

22   account; correct?

23        A.      Correct.

24        Q.      Okay.

25                So for two days some number of

                         B. Rose

1      e-mails we will never know, right, went back and
2      forth between Mr. Kole and Paul Ceglia from his
3      msn account.
4              You don't know how many they sent back
5      and forth during those two days, do you?
6          A.    Well, I know -- I mean, based on the
7      evidence we have, it would appear to be as if the
8      e-mail chain here is four e-mails.
9              Whether, you know, how many more than
10     that, that puts a lower limit on it.  I can't
11     tell you how many e-mails would be in the entire
12     chain.
13         Q.    And they could have simultaneous
14     different threads going back and forth that
15     aren't even included here; right?
16         A.    They could.
17         Q.    So you don't know?
18         A.    I don't.
19         Q.    Now, your report also challenges
20     generally the authenticity -- let me back up.
21             Are you aware that there have been two
22     documents -- two categories of documents
23     submitted to the Court thus far as attachments to
24     pleadings that Mr. Ceglia is claiming are

1                         B. Rose

2    authentic, one of which is the two-page paper

3    contract -- you're aware he's claiming that's

4    authentic; right?

5         A.    Yes.  You are referring to the Work For

6    Hire, what we call the Work For Hire document?

7         Q.    Yes.

8         A.    Yes.

9         Q.    And he's also attached to an amended

10   complaint copies of e-mails that he exchanged

11   with Mr. Zuckerberg which he's claiming are

12   authentic e-mails exchanged with Mr. Zuckerberg.

13             MR. SOUTHWELL:  Objection.  That's not

14        in evidence, he didn't attach any e-mails.

15        Q.    He attached documents to an amended

16   complaint purporting to be copied and pasted

17   e-mails between him and Mr. Zuckerberg.

18             MR. SOUTHWELL:  Take a look at the

19        complaint, there's nothing attached.

20        Q.    It's attached -- well, let's just

21   assume you've evaluated e-mails that he claims to

22   have exchanged with Mr. Zuckerberg; true?  You

23   took a look at them?

24        A.    We have evaluated Word documents

25   containing what appear to be cut and paste --

                              B. Rose

1

2      Q.    Well, my client admits they are copied

3  and pasted into the Word document, does he not?

4      A.    Well, I should say that are claimed to

5  be cut and pasted.

6            I mean, I am aware that Mr. Ceglia

7  claims to have Word documents containing e-mails

8  that purportedly support his claim.  We

9  identified in our forensic analysis three Word

10  documents that we believe to be those e-mails.

11     Q.    And you analyzed them?

12     A.    Correct.

13     Q.    And there's at least two areas of that

14  analysis which support -- and maybe there's more,

15  you can correct me -- your claim and your report

16  that those e-mails are fakes, so let's go over

17  them.

18            One of the areas is the Coordinated

19  Universal Time as it appears in those e-mails is

20  incorrect based on the fact that it was Daylight

21  Savings Time at the time they were sent; right?

22     A.    So, yes --

23     Q.    Is that the e-mails --

24     A.    There is a group of e-mails, I believe

25  it is sent between October 2003 and April 2004 at

1                              B. Rose

2      which point Eastern Standard Time would have been

3      in effect and the offset that's in the e-mails

4      appear to be Eastern Daylight Time which is an

5      anomaly which shouldn't occur.

6           Q.    Right, that's one area.

7                 And the second area you indicate in

8      your report is formatting and differences between

9      these e-mails, for example -- and I think you

10     might remember this one, in one of the e-mails

11     the word "Tuesday" is spelled out and in the

12     other one it's abbreviated, things like this is

13     one of the other ares that you indicate supporting

14     your belief that those are fraudulent; true?

15          A.    Yes, and that's inconsistencies that

16     they both between the way those should appear,

17     for instance, the way, you know, Microsoft

18     Hotmail would abbreviate Tuesday and the way it's

19     actually abbreviated in the e-mails themselves,

20     so Microsoft, you know, abbreviates it T-u-e, if

21     you cut and paste it out it should not say

22     T-u-e-s, and I know you asked questions earlier

23     about whether formatting differences can be

24     introduced during cut and paste; that's true,

25     but, for instance, the addition of an "s" is not

1                        B. Rose

2    a formatting difference that would occur, so I

3    think that's clear evidence of fraud.

4             There's also inconsistencies among the

5    documents themselves, so after the "from," colon,

6    sometimes there's one space, sometimes there's

7    two, after the "to" there are an inconsistent

8    number of spaces, there are various formatting

9    inconsistencies like that and, again, going back

10   to your point about copy and paste, to the extent

11   I copy and paste out Hotmail documents and the

12   formatting change, I would expect it to change in

13   a consistent way, I wouldn't expect the copy-and-

14   paste operation to, for instance, insert two

15   spaces after "to" sometimes and three in another

16   and one in another.

17        Q.    Why would you expect it to do it in a

18   uniform way?

19        A.    Generally -- because, again, when you

20   are cutting and pasting, if you are cutting from

21   the same source to the same source, what you

22   would expect to see is a consistent change.

23        Q.    Did Mr. Ceglia cut from the same source

24   to the same source?

25        A.    My understanding is he's cutting from

```
1                         B. Rose
2    his Hotmail account, yes.
3        Q.    On what computer was he copying that
4    from?
5        A.    He is copying it from his account, it
6    wouldn't matter what computer he's copying it
7    from, you're copying from an Internet Webmail
8    account, the data is residing on Hotmail servers,
9    it wouldn't matter what computer he's using.
10       Q.    Would it matter what browser he's
11   using?
12             All browsers format Web mail the same;
13   is that your position?
14       A.    Well, so for the T-u-e-s, right, that
15   difference and --
16       Q.    No.  I'm asking you do all browsers --
17       A.    You asked me a question, I'm trying to
18   answer the question.
19             MR. BOLAND:  He is rephrasing the
20         question.
21             MR. SOUTHWELL:  He is answering your
22         question.
23       Q.    Do all browsers format Webmail accounts
24   the same?
25       A.    No.
```

1                          B. Rose

2      Q.      What browser was Mr. Ceglia using when

3  he copied and pasted each one of these e-mails?

4      A.      I don't know.

5      Q.      How did Hotmail function when it came

6  to abbreviations of things like Tuesday in 2004?

7      A.      It abbreviated it T-u-e.

8      Q.      How do you know that?

9      A.      I think we've tested, we've seen the

10  way it format, Hotmail formulates Tuesday and it

11  is T-u-e.

12      Q.      In 2004 you ran tests to confirm that?

13      A.      My understanding is that we confirmed

14  that in fact that's the way Hotmail abbreviates

15  T-u-e.

16      Q.      Where do you get that understanding?

17      A.      So that understanding was passed --

18  that information comes from, I believe, directly

19  from Mike McGowan.

20      Q.      So it's your testimony that Mike

21  McGowan in 2004 tested the Hotmail server?

22      A.      No, that's not my testimony.

23      Q.      Okay.

24              How did he determine in 2004 that's how

25  Hotmail worked?

1                        B. Rose

2        A.    I don't know how he determined that.

3        Q.    To the best of your recollection he's

4    the person who told you that that's how it worked

5    in 2004?

6        A.    Yes.

7        Q.    Okay.

8              Did anyone else from Stroz Friedberg

9    conduct any testing on how Hotmail might have

10   worked in 2004?

11       A.    I don't know the answer to that, I

12   don't know if the information came directly from

13   him.

14             I would also just note that how that

15   works in 2004 is one question.

16             I would also note that you would expect

17   it to work the same way in 2004 each time; in

18   other words, you wouldn't expect Hotmail in 2004

19   to sometimes abbreviate T-u-e, sometimes

20   abbreviate T-u-e-s.

21       Q.    Why would you not expect that?

22             Do you know how Hotmail operates?

23       A.    Because they don't configure themselves

24   back and forth like that, right, there's a

25   uniform configuration that they don't just run

```
1                      B. Rose
2    and change willy-nilly.
3        Q.    How do you know there's a uniform
4    configuration, what's your basis for that
5    statement?
6        A.    The Webmail account displays dates in a
7    consistent format.
8        Q.    What's your basis for that in 2004
9    Hotmail consistently displayed Webmail account
10   information?
11       A.    I think it is unquestionable that that
12   would be the way it would operate, but if you
13   feel -- I mean, and the idea somehow that
14   Hotmail, the way they set themselves up, right --
15   and these are all behind-the-scenes configurations
16   -- that they somehow had a configuration which
17   allowed T-u-e sometimes and T-u-e-s other times
18   as the display is completely implausible to me.
19       Q.    What's your basis for it being
20   implausible?
21       A.    I'm saying it's implausible.
22             These are behind-the-scenes
23   configurations that display uniformly over time.
24   Now, that's not -- I just -- it's implausible to
25   me that when you're talking about a series of
```

1                          B. Rose

2    documents from the same time frame, sometimes

3    very close together, that they're going to

4    display inconsistently is just implausible.

5         Q.    Based on what?

6         A.    It's my experience and my understanding

7    of the way they operate.

8         Q.    And do you have any experience with

9    Hotmail back in 2004?

10        A.    I mean, I don't know.  I think I may

11   have been a Hotmail user back in 2004, but --

12        Q.    Were you or were you not?

13        A.    I don't recall.

14        Q.    And the version of Microsoft Word

15   used -- that contains these documents that this

16   data was pasted into, how was Microsoft Word

17   configured back at that time to handle the

18   pasting-in of data from a browser like a Webmail

19   account?

20        A.    I'm not sure I understand that

21   question.

22        Q.    What kind of changes could Microsoft

23   Word's program cause to data that's copied and

24   pasted from a Web mail account back in 2004?

25        A.    I don't know.

1                        B. Rose

2       Q.    Did anyone from Stroz Friedberg try and

3   test the versions of Microsoft Word that these

4   documents were created in to see what changes

5   might occur, if you know?

6       A.    Not that I'm aware of.

7       Q.    Did you ask Microsoft for any advice on

8   how formatting changes might have occurred through

9   that process?

10      A.    We did not have any conversation with

11  Microsoft about that.

12      Q.    Did you contact Hotmail?

13      A.    No.

14      Q.    Did you attempt to configure a Hotmail

15  server the way it would have been configured back

16  in 2004, e-mail server?

17      A.    No.

18      Q.    And did you test even in the current

19  time, 2011, how data copied from different Web

20  browsers in Webmail accounts and then pasted into

21  Microsoft Word might result in different

22  formatting?  Did you run that test?

23      A.    I did not.  I don't know whether it was

24  done.

25      Q.    Now, the Coordinated Universal Time

1                          B. Rose

2      that appears in an e-mail if -- let's just say

3      2011 as a hypothetical, assume this is the case,

4      but I'll just ask you to assume it as a

5      hypothetical, that Daylight Savings Time, we went

6      from Standard Time to Daylight Savings Time

7      somewhere in March of 2011, the date's not

8      relevant to the question, is it the case that if

9      an e-mail is sent before that change of time, but

10     the person doesn't open it until after we've

11     changed into Daylight Savings Time, what

12     Coordinated Universal Time would appear in that

13     e-mail if it's opened at that time?  Is

14     Coordinated Universal Time reflective of when the

15     person actually opens the e-mail or when the

16     e-mail was sent?

17         A.    So it would in general, I think,

18     display based on the time zone of the computer

19     clock being used to view it, but I don't know

20     with Hotmail how that would operate in that

21     hypothetical.

22         Q.    And if that computer clock is set

23     correctly, hypothetically, then the Coordinated

24     Universal Time in that e-mail should be correct,

25     should be accurate?

```
 1                        B. Rose
 2       A.    Again, I don't know how Hotmail
 3  specifically operated there.
 4       Q.    Are there any -- you conclude about
 5  these e-mails that the Coordinated Universal Time
 6  is not consistent with the time of year in which
 7  they were allegedly received, I believe -- I'm
 8  summarizing and if I'm doing it incorrectly,
 9  please put the words in you think make it
10  correct.
11       A.    Okay.
12       Q.    Is it only fraud which could be the
13  cause of that Coordinated Universal Time being
14  apparently in error in these e-mails?  Just the
15  e-mail itself, not considering everything else
16  that you clearly think my client's committing a
17  fraud, just looking at that e-mail and
18  Coordinated Universal Time is off, is the only
19  conclusion for that fraud got to be fraud?
20       A.    So forgetting -- I guess I'm forgetting
21  everything else I know, I just got an e-mail --
22       Q.    If I just give you an e-mail and I say
23  I just got this e-mail today or it was sent today
24  and received today and you look at it and say,
25  Well, Dean, the Coordinated Universal Time is
```

```
                              B. Rose
 1
 2    off, would you then say, in my opinion that
 3    e-mail is a fraud because of that one fact?
 4        A.   I'd say that standing alone, no, not
 5    necessarily.
 6        Q.   And the formatting differences we
 7    talked about before, standing alone, not
 8    indications of fraud necessarily either, they can
 9    just occur sometimes?
10        A.   I think the formatting differences we
11    see here are clear indications that the document
12    has been manipulated, so I would disagree with
13    that.  I don't think there's any plausible
14    explanation that these could be the result of
15    formatting differences introduced as a cut-and-
16    paste operation, so I would disagree with that.
17             You're asking me the mere appending of
18    the wrong time zone to an e-mail standing alone
19    without any other fact surrounding it, there
20    could be other explanations for that.
21        Q.   And are you aware of any e-mails or
22    references to e-mails in this case from a source
23    other than Mr. Ceglia which have the wrong
24    Coordinated Universal Time attached to them?
25        A.   I am aware -- I'm trying to think in
```

```
 1                       B. Rose
 2    terms of the time zones -- there is in, I think,
 3    one of the, again, the intermediary servers in
 4    the Sidley & Austin e-mails had the wrong time
 5    zone setting; those are the only examples I can
 6    think of.
 7        Q.    Let me try and jog your memory a little
 8    bit.
 9             You and I have exchanged e-mails in the
10    past couple of weeks about this Kasowitz letter
11    issue; are you generally familiar with that?
12        A.    Yes.
13        Q.    You sent me a TrueCrypt container on a
14    couple of occasions, and there's an item 379,
15    does that ring a bell, as one of the items we've
16    been corresponding with and --
17        A.    It does.
18        Q.    And you had to evaluate that item to
19    see if it was relevant to put it on a relevant
20    items log in the past; do you recall that?
21        A.    Yes.
22        Q.    I'm not asking you to memorize it, but
23    you did read through it to see if it was
24    relevant, obviously?
25        A.    Yes.  I mean, it is an extremely long
```

1                        B. Rose

2    document --

3         Q.    It is.

4         A.    -- so I may not have read it word for

5    word, but I've reviewed enough of it to know that

6    the contents are relevant.

7         Q.    Right.

8               And let me just state, and this is the

9    record in this case, that that item 379 is a

10   single e-mail with some attachments and then in

11   the body of that e-mail are referenced many more

12   e-mails, it's quite a long document, as you

13   indicated.

14        A.    It's a long chain.

15        Q.    Right.

16              So that's generally what it is.

17              And many of those e-mails referenced in

18   the body of 379 are e-mails that appear to be

19   between lawyers that were working with Mr. Ceglia

20   at that time.

21              Do you recall that?

22        A.    I know there are some, some of those

23   e-mail exchanges are between lawyers working for

24   Mr. Ceglia at the time.

25        Q.    And now here's the hypothetical, and

```
 1                      B. Rose
 2    because I don't have 379 in front of me, I won't
 3    ask you to trust me on this, so I will convert it
 4    to a hypothetical.
 5              Let's say some of those e-mails
 6    referenced in the body of 379, if some of them
 7    were sent at a time where the Coordinated
 8    Universal Time should have been, let's say, minus
 9    500, but it says minus 400, it's wrong, you
10    wouldn't conclude, based on that, that some of
11    those prior lawyers for Paul Ceglia were
12    committing fraud?
13       A.    So this is a hypothetical specifically
14    about 379?
15       Q.    Right.
16              If some of those e-mails have the wrong
17    Coordinated Universal Time that's not an
18    indication of fraud by those lawyers, in your
19    opinion?
20       A.    So given the context, no, I would not
21    conclude that.
22       Q.    And that Kasowitz e-mail you just
23    recently sent it to me in a TrueCrypt container
24    as a native format e-mail.
25              Do you recall sending that to me?
```

```
 1                     B. Rose

 2       A.    Yes.

 3       Q.    Okay.

 4             That native format e-mail itself has

 5   one attachment.  I don't know if you recall that.

 6             Do you recall it?

 7       A.    I thought it had more attachments than

 8   that, but I don't recall.

 9       Q.    And that actual individual e-mail was

10   never included by you on a privilege log in this

11   case by itself, if you recall?

12             MR. SOUTHWELL:  What specifically are

13       you referring to?

14             MR. BOLAND:  The native format

15       individual e-mail dated August -- April 13,

16       2011, which you recently sent to me itself

17       was never included on a privilege log in

18       this case.

19             MR. SOUTHWELL:  I'm just going to

20       object, this doesn't seem to have anything

21       to do with Coordinated Universal Time or the

22       report, so it's an objectionable line, but

23       if you're going to connect it, I'd like to

24       hear that.

25             MR. BOLAND:  I would like to hear the
```

```
 1                        B. Rose
 2       answer of the witness, but I hear your
 3       objection.
 4       A.    I mean, I sent you, as I recall, what I
 5   recently sent you included several -- it was
 6   one -- it was item 379 -- I mean, there were
 7   various items in that, right, there were various
 8   attachments, I don't think it was limited to one
 9   attachment, so I guess I'm not sure exactly which
10   document you're talking about.
11             I mean, it's possible to me -- and, you
12   know, we include, when we include an e-mail, we
13   also include their attachment, so just merely
14   saying dated April 13th I'm not sure I can with
15   precision identify the document which you're
16   talking about.
17       Q.    Fair enough.
18             Let's talk about use of computers
19   generally.
20             Would you agree with me that -- and
21   maybe you've seen this in your work -- that
22   people can lie about how they actually use their
23   computers?
24       A.    Yes, I would agree that people can lie
25   about the way they use their computers.
```

```
 1                         B. Rose
 2        Q.    And as a forensics expert you wouldn't
 3   rely on a witness' statement about how they used
 4   their computer without confirming it through
 5   forensic analysis?
 6        A.    That's correct.
 7        Q.    And would you agree that people who
 8   commit fraud often make self-interested
 9   statements to try and avoid detection for that
10   fraud?
11        A.    As a hypothetical, yes, I think I would
12   agree with that.
13        Q.    And I think I asked you this before.
14              You never spoke with Mark Zuckerberg
15   about how he used his Harvard e-mail account?
16        A.    I've never spoken with Mark Zuckerberg
17   about anything.
18        Q.    Did you ask his lawyers to get
19   information from him telling you how he used his
20   Harvard e-mail account?
21        A.    So let me be clear:  Our role in the
22   Harvard e-mail account was to work with Harvard
23   to make sure we'd gotten all of the historical
24   copies, to perform whatever collections were
25   necessary and then to perform electronic
```

1                          B. Rose

2    discovery processing to create an aggregate data

3    set, to then subject that to certain search terms

4    and provide those to Gibson, Dunn for review as

5    well as to conduct our own review of those, of

6    certain specified documents to determine whether

7    the purported e-mails were found there and to

8    identify communications between Mr. Zuckerberg

9    and various people involved with StreetFax.com,

10   that was our charge with the Harvard e-mail, and

11   so I did not ask Gibson, Dunn to do that, I don't

12   think, given our role, that would have been a

13   relevant consideration for us or appropriate for

14   me to tell Gibson, Dunn to go ask a question

15   that's irrelevant to the work I'm tasked to do.

16       Q.    And did you somehow confirm with anyone

17   that this was all of Mark Zuckerberg's available

18   e-mail that was relevant to expedited discovery?

19       A.    I find that to be a confusing question

20   because my reading of the order in the protocol

21   is that the expedited discovery phase is focused

22   on an analysis of Mr. Ceglia's media and

23   Mr. Ceglia's e-mail, so --

24       Q.    I'm just asking the question, sir.

25            Did you ask someone to have Mark

1                     B. Rose

2      Zuckerberg confirm that you had access to all of

3      his e-mail?  Did you ask someone that question?

4            MR. SOUTHWELL:  Objection.  You are

5         asking -- well, you are asking a different

6         question, but --

7            MR. BOLAND:  That's my question.

8      A.    I did not ask anyone to make sure that

9      we had access to all of Mark Zuckerberg's e-mail.

10     There was, you know, we were involved in

11     conversations with Harvard IT to make sure that

12     we had gotten everything that was available.  We

13     were, as I said, involved early on in analysis of

14     various other assets of Mr. Ceglia that I

15     understood to be comprehensive, but as to that

16     specific question, no, I don't recall asking that

17     specific question.

18     Q.    It's possible, then, that there is

19     additional sources of e-mail relevant to this

20     case which you have not had access to?

21     A.    Is it possible?

22            I mean, again, anything's possible, so

23     I would say yes.

24     Q.    Don't you think it's a prudent thing to

25     do to ask the person who's the custodian of their

```
                              B. Rose
 1
 2    e-mail account if that's everything?
 3         A.    Is that a prudent thing to do in
 4    general?
 5         Q.    In this case don't you think it would
 6    have been a prudent thing to do to ask the
 7    defendants, Hey, ask Mr. Zuckerberg is this is
 8    everything or if he's got e-mails somewhere else?
 9         A.    To me, you're asking me a question that
10    is appropriately a strategy question for
11    attorneys that goes outside what I was charged to
12    do in the case, which involves expedited
13    discovery and to describe the work with
14    Mr. Zuckerberg's e-mails, so as to whether that
15    would be prudent in this case, you know, I
16    haven't really considered that and I don't think
17    I want to offer an opinion on it.
18         Q.    What do you think the likelihood is
19    that there's other e-mail or electronic
20    communications relevant to this case that you
21    have not had access to?
22         A.    I would think, given the thoroughness
23    I've seen of the investigations that I've been
24    party to, I think it unlikely, but it's possible.
25         Q.    You talked about one of the retrievals
```

```
 1                        B. Rose
 2    from the Harvard server was from November 2003,
 3    you got e-mail from that time period?
 4        A.    That's correct.
 5        Q.    Not in that time period, but from that
 6    time period?
 7        A.    From that time period.
 8              In other words, just to be clear, a
 9    historical snapshot of what existed in the
10    mailbox at some point in November 2003.
11        Q.    And did you find any e-mails in that
12    retrieval that were not included in the
13    subsequent productions that you got, either
14    collected or received from Harvard?
15              MR. SOUTHWELL:  Are you asking about
16        Ceglia-Zuckerberg e-mails?
17              MR. BOLAND:  Yes.
18        A.    I believe so.  You're talking about
19    between the November 2003 and the subsequent
20    productions, the first of which would have been
21    in October 2010?
22        Q.    Right.
23        A.    Yes, I believe there were e-mails that
24    were included in that production that were not
25    included, not unsurprisingly, in a production
```

```
 1                        B. Rose
 2    that occurred seven years later.
 3         Q.    And what happened to those e-mails that
 4    were not in that production seven years later?
 5         A.    I don't know.
 6         Q.    Did you ask the defendants to ask
 7    Mr. Zuckerberg what happened to those e-mails?
 8         A.    I did not.
 9         Q.    Did anyone else from Stroz Friedberg
10    ask that question of the defendants, if you know?
11         A.    Again, given our task with the e-mail,
12    I don't think that would be an appropriate
13    question for us to direct to Gibson, Dunn.
14         Q.    Did you see Paul Ceglia's -- a recent
15    declaration of Paul Ceglia stating that he sent
16    e-mails to Mr. Zuckerberg between the time period
17    of March 2003 and June of 2003?
18         A.    I may have, I don't recall that.
19         Q.    And are you aware that your -- that
20    Stroz Friedberg did not recover any e-mails
21    between Mr. Ceglia and Mr. Zuckerberg during that
22    time period?
23         A.    I am not.
24         Q.    Did you see the production that Stroz
25    Friedberg provided to the plaintiff pursuant to
```

1                         B. Rose

2     the expedited discovery order of the Harvard

3     e-mails?

4          A.    Did I see the production itself?

5          Q.    Before it was produced to us did you

6     look at it?

7          A.    No.

8          Q.    Do you think it's -- what's your

9     opinion of the likelihood that this contract

10    signed on April 28, 2003, that the terms of this

11    contract were discussed between Mr. Ceglia and

12    Mr. Zuckerberg using e-mails before the date it

13    was signed?

14         A.    I wouldn't even want to offer an

15    opinion on that.

16         Q.    Assuming, because it is the case, but

17    we will just assume it for this, that there are

18    no e-mails between the parties Ceglia and

19    Zuckerberg from around March of '03 till June of

20    '03, don't you think that's a little odd that

21    they have no e-mail communication before the

22    signing of this contract in April of 2003 and

23    then for another six weeks, 5-1/2 weeks later,

24    still no e-mail communication in Mr. Zuckerberg's

25    Harvard e-mail account?  Don't you find that odd?

Page 189

1                          B. Rose

2        A.    No.

3        Q.    Now, you found -- the report details

4    several different documents that are similar to

5    the paper contract in this case with the Facebook

6    language in it, true, in your report, you talk

7    about those?

8        A.    So we talk about multiple unsigned

9    versions of what we refer to as the Work For Hire

10   contract, yes.

11       Q.    Yes.

12            And did your forensic analysis provide

13   you with which one, if any, of those unsigned

14   versions was the one that was printed and became

15   the paper contract that my client is now offering

16   as the authentic contract between the parties?

17       A.    I think none of them were printed

18   directly because they all vary somewhat in

19   substance from the actual original contract; in

20   other words, they are all similar documents, but

21   there are seven different variations, so the

22   printed copy is ultimately different.

23            We did not identify any exact duplicate

24   copies of the Work For Hire contract save for one

25   that was included in an e-mail from Mr. Argentieri

1                         B. Rose

2    that was post litigation.

3         Q.    And you are aware that Mr. Ceglia has

4    not offered or attached to any pleadings any of

5    those similar versions of the Work For Hire

6    contract?  You are aware of that?

7         A.    I don't believe he has.

8         Q.    And he didn't attach the e-mail from

9    Jim Kole or the TIFF images to any pleadings or

10   anything that he's filed in this case, you are

11   aware of that?

12        A.    I am aware of that, yes.

13        Q.    Now, your forensic report and your

14   analysis is not arguing that the paper contract

15   itself is backdated somehow?

16        A.    I am not offering any opinions on the

17   paper contract at all.

18        Q.    And there's no computer evidence that

19   you found suggesting that Mr. Zuckerberg did not

20   sign page 2 of the paper contract?

21              That's a double negative, I can ask it

22   a little more clearly.

23        A.    Sure, that would help.

24        Q.    Did you find any computer forensics

25   evidence suggesting that Mr. Zuckerberg was not

                              B. Rose

1   the person who signed the second page of the

2   paper contract?

3            MR. SOUTHWELL:  You're talking about

4        the original paper Work For Hire document

5        that was presented for production?

6            MR. BOLAND:  Correct.

7        A.    The forensic evidence that we found

8   overwhelmingly indicates that the StreetFax

9   contract is authentic; therefore -- and the

10  evidence also indicates with all the manipulation

11  that the Work For Hire contract is a fake, so I

12  would say that that evidence would lead me to

13  conclude, without even having to analyze the

14  paper, which I have no opinion on and I am not an

15  expert on, that any paper document presented that

16  purports to be the Work For Hire document signed

17  by Mark Zuckerberg is a fake.

18       Q.    What I'm asking you is, is the computer

19  forensic evidence, is there any that tells you

20  that the person who put a signature on page 2 of

21  the paper contract was not Mark Zuckerberg?  Do

22  you have forensic evidence that points you to

23  that not happening, for example, an e-mail that

24  Mark Zuckerberg says, I never signed page 2 of

Page 192

```
 1                    B. Rose
 2   the contract, did you find anything like that?
 3       A.    We did not find anything like an e-mail
 4   from Mr. Zuckerberg disclaiming that he'd signed
 5   page 2 of that contract.
 6       Q.    Okay.
 7             Did you find any Web history that
 8   supports an argument that Mr. Zuckerberg didn't
 9   sign page 2 of the paper contract?
10       A.    I mean, again, beyond, you know, some
11   of the Internet history providing some evidence
12   that, you know, the StreetFax contract is
13   authentic, the other contract is fake, no.
14       Q.    Did you visually compare a copy of page
15   2 of the paper contract with page 2 of the
16   StreetFax contract, looking at them side by side?
17       A.    I probably have looked at them side by
18   side before.  I don't recall.
19       Q.    Do you recall what your reaction was to
20   that comparison?  Did they look the same to you
21   or different?
22       A.    I don't recall.
23       Q.    Now --
24             MR. SOUTHWELL:  If you are going to a
25       different topic, we are approaching 3-1/2
```

```
 1                    B. Rose
 2     hours.
 3          Do you know how much more you think
 4     you've got planned?
 5          MR. BOLAND:  I don't really know.  I
 6     will probably go over 3-1/2 a little bit.
 7          MR. SOUTHWELL:  When would you like to
 8     take a lunch break?  I would like to take a
 9     little lunch break.
10          MR. BOLAND:  We can do that now.
11          Do you want to?
12          MR. SOUTHWELL:  How much more do you
13     think you have?
14          MR. BOLAND:  Probably an hour, I'm
15     guessing.
16          MR. SOUTHWELL:  Do you want to go off
17     the record, then, at this point?
18          MR. BOLAND:  Let's go off the record,
19     we can do that.
20             (Lunch recess: 2:09 p.m.)
21
22
23
24
25
```

1                    B. Rose

2        A F T E R N O O N    S E S S I O N

3             (Time noted: 3:05 p.m.)

4          MR. BOLAND:  We can start the tape.

5          THE VIDEOGRAPHER:  And we are rolling.

6          MR. DUPREE:  Timewise, I know you

7      requested, I think, three and a half hours,

8      which I think we are probably at about that

9      limit now.  I am not going to shut things

10     down, but I wanted to call that to your

11     attention.

12         MR. BOLAND:  Yes, we are a little bit

13     over.  Probably another hour or so and that

14     will wrap it up, presumably.

15         MR. DUPREE:  Hopefully we can do that

16     quickly.

17         MR. BOLAND:  Yes, I will.

18  B R Y A N   J.   R O S E,   resumed and

19     testified as follows:

20  EXAMINATION BY (Cont'd)

21  MR. BOLAND:

22     Q.    Mr. Rose, in addition to the two TIFF

23  images which were named Scan0001 and 0002, you

24  didn't find any other -- you found those on the

25  computer in one location and that was it,

1                          B. Rose

2      according to your report, if I'm recalling it

3      correctly, you didn't find them anywhere else?

4            I'm saying the Ceglia media, not the

5      Sidley & Austin servers now.

6      A.    So we found -- so we found the TIFF

7      images in the Outlook Express mailbox, we also

8      found what appeared to be deleted versions that

9      had been created on the hard drive immediately

10     before being sent, which is why we determined

11     they appeared to be copied from the hard drive

12     and then sent from the hard drive, but we

13     believed those copies represented those files

14     because the file size and file name, but in terms

15     of an actual copy with content, although one of

16     the deleted files was partially recoverable in

17     terms of content, that was the only location was

18     the Outlook Express file.

19     Q.    And the comment you just made about

20     believing that those files were the same, let's

21     talk about that for a moment.

22            The deleted versions had the same file

23     name as the versions you actually found and they

24     had the same file size?

25     A.    The same file size, in addition to one

1                              B. Rose

2  of them was partially recoverable and the content

3  was the same.

4      Q.    And what's the likelihood that those

5  files that had the same file name and the same

6  file size were in fact versions of the two files

7  that you did find, what would be your opinion on

8  that?

9      A.    I think it's very likely.  Certainly

10  for the one -- I would say for the one -- very

11  likely, particularly given the fact we were able

12  to recover some content, compare that.

13      Q.    Even without the content, is it fairly

14  likely they are same?

15      A.    Yeah.

16      Q.    Is that a common way that forensic

17  experts will reach that conclusion in general is

18  if they have two files with the same name and the

19  same file size, but one of them the content is

20  missing, they will conclude it's likely that

21  that's a copy?

22      A.    I think it depends on the context, but

23  in general, yes.  I mean, you know, the file

24  name, depending on what you're comparing, can be

25  more or less persuasive, depending on the

                              B. Rose

1

2    circumstances.  Comparing the file size, you

3    know, it's one way to reach a conclusion the two

4    files are the same.

5         Q.    Can you, on this similar topic, on page

6    54 of Exhibit 1, which is the version of your

7    report that we provided you today that has the

8    file stamp across the top, do you see on page 54

9    you are talking about a missing USB device and

10   links, link files on a Toshiba laptop that

11   reference two files that your report indicates

12   you believe were on that missing USB device?

13            Do you see where I'm referring to

14   there?

15        A.    So the -- at the top of the page it's a

16   list of USB devices which were attached to

17   various PC media but were not produced.

18        Q.    Right.

19        A.    And then the discussion does include

20   two files which were link files were found on a

21   Toshiba laptop, two files on a USB device, yes.

22        Q.    Right.

23            And those are the files -- those are

24   two files that I believe -- correct me if I'm

25   wrong -- you're saying they were named -- well,

```
 1                      B. Rose
 2   yeah, what's a link file, if you can just
 3   describe that for the Court?
 4       A.    It's essentially like a shortcut, I
 5   mean, it's a file, your computer puts down a link
 6   file so that it can recall a document quicker, it
 7   is a shortcut file, it's a pointer, essentially.
 8       Q.    In about the third full paragraph you
 9   start talking about on the Toshiba satellite
10   laptop.
11             Do you see that?
12       A.    Mm-hm.
13       Q.    And then you name the two link files?
14       A.    Yes.
15       Q.    And the embedded metadata, these link
16   files show that they point, what does that mean,
17   the embedded metadata, what are you referring to
18   there, these link files show that they point to a
19   removable device?  Can you explain that?
20       A.    So if you analyze the link file itself
21   you can see essentially to what it's pointing,
22   generally whether it's an Internet location,
23   whether it is a removable device location, so
24   that would just indicate that the metadata
25   associated with the files, which is just, you
```

1                           B. Rose

2     know, information about the -- data about data,

3     right, so it is data about the files, we were

4     able to determine from that that it pointed to a

5     USB removable device rather than to the Internet

6     or some other location.

7         Q.    And the link is not an actual file,

8     it's just a pointer?

9         A.    Well, it's an actual file, I mean, it's

10    a link file, but it's not -- it is a pointer to

11    another file, yes.

12        Q.    It isn't the file that it is pointing

13    to, it's just a pointer to it?

14        A.    So a link file to the Zuckerberg

15    contract page 1 TIFF is not the actual TIFF

16    document, it's a pointer to that document.

17        Q.    And it's not a copy of the actual

18    document, it's just a pointer?

19        A.    No, yes.

20        Q.    So that file, as you put in your report,

21    is one of the evidence, pieces of evidence under

22    a claim the defendants -- you know the defendants

23    have made a claim of spoliation of evidence

24    against Mr. Ceglia; right?  Are you aware of

25    that?

                          B. Rose

1

2       A.     I don't -- I mean, a formal claim, I

3   know that there have been allegations of

4   spoliation, yes.

5       Q.     And this is in your report two TIFF

6   files which your report indicates existed at one

7   time on removable media; true?

8       A.     Mm-hm.

9       Q.     But yet weren't produced in discovery;

10  true?

11      A.     Correct.

12      Q.     And --

13      A.     I should point out existed on removable

14  media subsequent to the filing of the complaint.

15      Q.     I'm going to show you -- I don't know

16  if I have two copies or not, so your lawyers may

17  have to look over your shoulder.  I thought I

18  did.

19           MR. BOLAND:  Could you mark this as

20      Exhibit -- I think we're on 3.

21           (Rose Exhibit 3, supplemental

22      declaration of Paul D. Ceglia, marked for

23      identification, as of this date.)

24      Q.     And this is document number -- this is

25  Exhibit 3, document number 139-2 filed in this

1                        B. Rose

2    case, it's entitled "Supplemental Declaration of

3    Paul Ceglia."

4              Do you see that, Mr. Rose?

5        A.    I do.

6        Q.    Can you look at paragraph 6 of that

7    document, and it should indicate there that he

8    produced by way of Mr. Argentieri two files with

9    the same file name that we were just talking

10   about from your report.

11             Go ahead and confirm that that's what

12   those files names say.

13       A.    It actually appears to be a different

14   file name in that the file name cited in

15   Mr. Ceglia's affidavit includes underscores and

16   not spaces.

17       Q.    And does the file name that there's a

18   link file to --

19       A.    And just to be clear, in a file-naming

20   convention that's not a small difference; to me

21   they're different file names.

22       Q.    And the file name in your report does

23   not include an underscore?

24       A.    It does not.

25       Q.    And is that the accurate file name for

```
                                        Page 202

 1                      B. Rose

 2    that file?

 3        A.     I believe so.

 4        Q.     Can you check out paragraph 49, please.

 5        A.     Okay.

 6        Q.     Does that file name seem to be the same

 7    two files names as we were just talking about in

 8    your report?

 9        A.     So now we are in paragraph 49 and 50?

10        Q.     Yes.

11        A.     It does appear to be the same file

12    names.

13        Q.     And this is a declaration by Mr. Ceglia

14    of items he has produced; true?

15        A.     I'm just looking at the entire document.

16              So it's not clear to me what he's

17    stating here.  I mean, it appears to be a list

18    of -- initially a list of documents that are in

19    the possession of various groups, as I understand

20    at some point who had been employed or retained

21    by Mr. Ceglia, so he lists documents which are in

22    their possession and then there's a certification

23    in 173 that indicates that all of the above are

24    being produced to defendants on August 29, 2011.

25              To the extent -- I mean, I guess this
```

```
 1                      B. Rose
 2   is a little ambiguous, but to the extent 173
 3   refers to everything listed in the proceeding,
 4   172 paragraphs, that would be the case.
 5        Q.    And do you know the file size of
 6   Zuckerberg, the two files we were just talking
 7   about from your report that were on the USB
 8   drive?
 9        A.    I do not.
10        Q.    Do you know the file size for the two
11   files that were in paragraph 49 of the
12   declaration that you just read?
13        A.    I do not.
14        Q.    Would it surprise you to learn that
15   they are the identical file size?
16        A.    I don't know that it would surprise me
17   or not surprise me.
18        Q.    What's the likelihood that the file in
19   paragraph 49 of his declaration is an exact copy
20   of the files you reference in your report from
21   the USB drive if the file names are the same and
22   the file sizes are the same, what's the
23   likelihood those are the same files?
24             MR. DUPREE:  Just for clarification,
25        you are talking about file size.
```

                          B. Rose

1

2              Are you talking about the linked files

3       or the actual files?

4              MR. BOLAND:  Actual files.

5       A.    So if the actual files have the same

6    name and the same file size, although -- I mean,

7    you couldn't determine file size from the link

8    files themselves, so you'd have to have the files

9    as they existed on the removable media and the

10   files that exist -- is it -- I'm sorry, which

11   expert was this?  Mr. Stewart?

12             If you had the name in the files --

13   well, if you had the files, you could compare the

14   content.  If you just the name and the file sizes

15   and it had the same name and the same file size I

16   guess I would conclude, depending on if there

17   were any other circumstances surrounding that,

18   that it's likely they're the same.

19       Q.    So you're saying a link file cannot

20   tell you the file size of the file it is pointing

21   to?

22       A.    I think generally link files don't show

23   you the size, but --

24       Q.    But can they?

25       A.    I don't know.

Page 205

1                         B. Rose

2              MR. BOLAND:  Can you mark this as

3        Exhibit 4, please.

4              (Rose Exhibit 4, five-page document

5        headed "Shortcut file," marked for

6        identification, as of this date.)

7              MR. DUPREE:  Is this a document that

8        was filed in the case?

9              MR. BOLAND:  No.

10       Q.    Mr. Rose, this is Exhibit 4, this is a

11   document prepared by our expert.

12       A.    Yes.

13       Q.    The first three pages are -- the first

14   two pages are the link file metadata for

15   Zuckerberg contract page 1 TIFF and Zuckerberg

16   contract page 2 TIFF from, as you see there, the

17   removable media, the same link files you refer to

18   in your report.

19              Do you see the file size that's listed

20   on that contract page1.tif that ends in 036?

21       A.    I do.

22       Q.    And on page 2 the file size ends in 172

23   for the second one?

24       A.    Correct.

25       Q.    Can you flip to the second to last page

1                    B. Rose

2    of Exhibit 4.

3        A.    Second to last page, that's the

4    properties screenshot for Zuckerberg contract,

5    page 1, yes.

6        Q.    Exactly, properties screenshot.

7              And do you see the file size for

8    Zuckerberg contract page 1 the actual TIFF file

9    that was produced is referenced in the

10   declaration and it ends in 036 as well, it's the

11   same file size; true?

12       A.    Yes, it appears to be.

13       Q.    And then the last page is a screenshot

14   of the properties of Zuckerberg contract page 2

15   that was produced to defendants and it also ends

16   in 172, but it's the identical file size to the

17   one from the link file; right?

18            MR. DUPREE:  And I'm just going to

19        object to the use of the document because we

20        don't know what it is, it hasn't been

21        verified.

22            MR. BOLAND:  Very well.

23       Q.    You would agree that those file sizes

24   are the same?

25       A.    Yes, in comparing link files to the

1                         B. Rose

2     screenshot you showed me.

3         Q.    So assuming -- we'll go with a

4     hypothetical -- that those, that data on that

5     exhibit you just reviewed is all accurate

6     regarding the link files and the actual files

7     that were produced to the defendants, what is the

8     likelihood that the files that you identified in

9     your report as missing from -- along with a USB

10    device were in fact produced to the defendants?

11              MR. DUPREE:  Object to form, calls for

12         speculation.

13        Q.    Just what's the likelihood,

14    probability, whichever word you choose?

15              MR. DUPREE:  Same objection.

16        A.    I would say it's likely, but, you know,

17    without having the two files to compare, I

18    couldn't say conclusively.

19        Q.    You used the phrase fraud or evidence

20    of fraud several times during your testimony

21    today; is that correct?

22        A.    I believe so, yes.

23        Q.    Are you aware that there is actually a

24    certification for people to obtain if they want

25    to be a fraud examiner or a fraud expert?  Are

1                    B. Rose

2   you aware of that?

3        A.    I am.

4        Q.    Do you have such a certification?

5        A.    Well, I do not.  To my knowledge, the

6   CFE you're talking about is not a digital

7   forensic certification.

8        Q.    Fair enough.

9              I was just asking, you don't have that

10  certification?

11       A.    No, I do not.

12       Q.    Are you aware that plaintiff's expert

13  Mr. Broom does have that certification?

14       A.    I am not aware of that.

15       Q.    Did you review his report and his CV?

16       A.    I don't know that I -- I did review his

17  report, I don't know that I reviewed his CV.

18       Q.    I think I marked his report --

19       A.    I have it.

20       Q.    -- as Exhibit -- could you tell me what

21  exhibit number is on there?

22       A.    Exhibit 2.

23       Q.    Can you look at page 29 of Exhibit 2,

24  again using the numbers in the upper right-hand

25  corner.

                                  B. Rose

1
2        A.    29, yes.
3        Q.    And the third full paragraph, if you
4    could read there where it starts with the U.S.
5    Department of Justice.
6        A.    Mm-hm.
7        Q.    Mr. Broom provides -- by the way, are
8    you familiar with that document that he refers to
9    in that paragraph?
10       A.    I'm not.
11       Q.    You've never read it?
12       A.    Not to my knowledge.
13       Q.    Is the Department of Justice a reliable
14   source for computer forensics guidelines and
15   information, generally speaking?
16       A.    I don't know that I would offer an
17   opinion on that one way or the other.
18       Q.    Are there experts of a different
19   standard than experts outside of the government?
20   Are they not quite as good?  Are they relatively
21   the same?
22       A.    I think it depends on the expert.
23       Q.    Do you see the quote in the next
24   paragraph, if you could read that and tell me if
25   you agree with that quote from that document.

1                        B. Rose

2       A.     I think I would generally agree with

3    that statement.

4       Q.     And on the top of page 30 the quote

5    there which says "Caution.  If the date and time

6    associated with the e-mail are important to the

7    investigation, consider that this received time

8    recorded in the e-mail header comes from the

9    e-mail server and may not be accurate."

10             Do you agree with that caution there?

11      A.     I would hesitate to agree or disagree

12   with that because it appears this received time

13   appears to be referring to something that

14   preceded this statement, and I don't know what

15   that is.  I mean, you've got -- you've got a

16   selected quotation here referring to some prior

17   paragraph that is not included.

18      Q.     Let me ask you, when an e-mail is going

19   through an e-mail server, does the received time

20   of that e-mail come from the server or from the

21   person's computer who receives the e-mail?

22      A.     So if you're looking at the copy -- I

23   mean, it depends on what copy you are looking at,

24   right, so if you're looking at the copy as it

25   flowed, for instance, through the Internet

1                        B. Rose

2    headers as we discussed, it would be appended by

3    the server.  If you're looking at it on the

4    actual machine itself, the received time would

5    appear based on the system clock of the computer

6    used to do it.

7        Q.    And in the e-mails that you evaluated

8    the content of the Word documents which you

9    evaluated where my client copied and pasted

10   e-mails, which is his statement, do you know

11   whether that data you just referred to came from

12   an e-mail server or from my client's computer?

13       A.    Well, I mean, they appear to -- I mean,

14   they purport to be Hotmail e-mails, so they would

15   have been accessed through the Internet and

16   generally would reside on Hotmail servers.

17             Does that -- if I understand your

18   question --

19       Q.    So is the date and time that that

20   e-mail was received as it's reflected in that,

21   those Word documents, is it your opinion that

22   that information, that data came from the Hotmail

23   server or came from my client's computer clock on

24   which -- the computer he was using to copy and

25   paste those e-mails?

1                           B. Rose

2               MR. DUPREE:  Object to form.

3       A.     Specifically with the e-mails that are

4    part of the copy and paste?

5       Q.     Yes.

6       A.     I mean, I don't think those are

7    legitimate e-mails, so I think they've been

8    edited and manipulated and altered, so, I mean, I

9    think the forensic evidence shows that these are

10   Word documents that were generated and altered.

11      Q.     Is it your opinion that no part of

12   those Word documents came from any e-mail between

13   Mr. Ceglia and Mr. Zuckerberg?

14      A.     I think it likely that some e-mail,

15   some underlying Hotmail was used as a template,

16   which is why we see the time zone anomaly.

17      Q.     I'm asking about the content of the

18   e-mail itself.

19              Are you saying that all that content

20   was manually typed into that document by my

21   client or just some of it?

22      A.     I don't know the answer to that

23   question.

24              What I am saying is that the e-mails

25   themselves show clear signs of manipulation, so

                              B. Rose
1

2    whether he's taking e-mails and editing them or

3    generating them out of whole cloth from a

4    template drawn from an msn e-mail he has, I don't

5    know.

6         Q.    And the evidence of manipulation, just

7    to be clear, is the time zone anomaly is one of

8    the elements of the manipulation evidence; true?

9         A.    True.

10        Q.    The formatting issues we discussed,

11   Tuesday being one of the references, that's the

12   other evidence?

13        A.    True.

14        Q.    What else?

15        A.    I mean, you also have the issue that

16   the documents themselves all have been backdated,

17   which is further evidence that they are not

18   genuine documents.

19        Q.    We have backdating.

20              Anything else other than those three

21   items?

22        A.    Not that I can think of right now.

23        Q.    The next quote that's on page 30 --

24        A.    Oh, I -- let me amend myself.

25              I actually think not only do you have

                            B. Rose

1   backdated documents, but you have multiple

2   versions of various documents, which is generally

3   something you would not expect to see and in our

4   experience it is consistent with people trying

5   to -- in forgery cases trying to draft fraudulent

6   documents as they sort of experiment and go

7   through various drafts and versions.

8       Q.    Does Stroz Friedberg have more than one

9   client that you are being paid by currently, just

10  as a general rule?

11      A.    As a general rule, yes.

12      Q.    Do you use fee agreements that are

13  written with those clients?

14      A.    Yes.

15      Q.    Are you here to tell this court that

16  Stroz Friedberg types from a blank page every

17  time they rewrite a fee agreement, they just

18  start out with a blank page and start writing or

19  do you use a previous version and update it for

20  each new client?

21      A.    I wouldn't want to speak for what

22  everybody does.  I think generally you would work

23  off either a template or off a pre-existing

24  agreement and substitute a different client in.


                           B. Rose

1       Q.     So on your computer and the computer of

2   other employees of Stroz Friedberg there are

3   multiple versions of your fee agreement sitting

4   there today; true?

5       A.     True, but there are -- I mean, let's

6   look at the example.

7              There are multiple fee agreements, so,

8   yes, there are multiple versions.  My fee

9   agreement with Gibson, Dunn in one case might be

10  very different with a different law firm in

11  another case, so I would have two copies of those.

12             What you generally would not expect to

13  see is, if this was a true cut-and-paste

14  operation and I was just saving documents, I

15  would cut and paste and I would save the

16  document, I wouldn't have three different

17  versions of it.

18             The reason you have different versions

19  of documents on our system in terms of a fee

20  agreement is because to produce new fee

21  agreements we have to edit it, and so to the

22  extent that there are multiple versions of that

23  contract, yeah, I think that this cut-and-paste

24  operation, I think those multiple versions are

                              B. Rose

1                             B. Rose
2    indications that he's edited this document over
3    time, which frankly shouldn't happen if this was
4    just a true cut-and-paste of those e-mails, he
5    shouldn't be editing them.
6         Q.    Maybe we're talking about different
7    things.  I thought you were discussing the Work
8    For Hire document different versions now.
9         A.    I'm talking about different versions of
10   the three Word documents contained in the
11   purported e-mails.
12        Q.    Did you have a written -- well, let's
13   stay on this topic since I accidentally waded
14   into it.
15             When you negotiate with someone who's
16   hiring your firm do copies of your agreement go
17   back and forth by e-mail until you arrive at a
18   final one that both sides agree to?
19        A.    Occasionally.
20        Q.    And that would result in different
21   versions potentially of that same document being
22   on your computer?
23        A.    Yes.
24        Q.    And that's not an indication of fraud
25   by you guys?

                                B. Rose

1

2     A.     No.

3     Q.     Or by the recipient?

4     A.     No.

5     Q.     It's just how you do business?

6     A.     Contract negotiations, no, I would not

7  view them as evidence of fraud.

8     Q.     But you did find different versions of

9  a contract in this case in electronic form on

10  Mr. -- on media that you analyzed?

11     A.     Of the Work For Hire contract?

12     Q.     Yes.

13     A.     Yes.

14     Q.     And that in and of itself is not

15  evidence of fraud?

16     A.     If you ignore the margin manipulations

17  and the backdating and the other problems

18  associated with those documents, yes, that

19  standing alone, if you put the other evidence

20  aside, is not, the mere existence of versions is

21  not evidence of fraud.

22          I do think, and just to be clear, I do

23  think when you have something like the Word

24  documents containing the purported e-mails, when

25  you have multiple versions, I think in that case

1                          B. Rose

2    that is, given the circumstances, evidence of

3    fraud.

4        Q.    What's your opinion about the

5    reliability of metadata in Microsoft's Windows

6    operating system?

7        A.    I think that is too general a question

8    for me to answer.

9        Q.    Does the Windows -- okay.

10            Metadata associated with files gets

11   placed into those files somehow in relation to

12   the operating system and the computer clock.

13            Am I right?

14       A.    So, yes, I mean, certainly the time and

15   date stamps, for instance, would be dependent on

16   the system clock, yes.

17       Q.    And are you aware that Microsoft

18   generally discredits the reliability of the last

19   accessed time stamp since it's easily altered by

20   system operations that are not sort of user

21   initiated?

22            MR. DUPREE:  Objection, vague.

23       Q.    If you are aware.

24       A.    I am not aware as to Microsoft's

25   opinion on the last access date.

1                        B. Rose

2       Q.    Are you aware of other individuals in

3    the field who have talked about Microsoft's

4    opinion in this way?

5       A.    I am not aware of anyone who has talked

6    about Microsoft's opinion regarding last access

7    dates.

8       Q.    And do you know a computer security

9    expert named Rebecca Mercuri?

10      A.    I do not.

11      Q.    Now, you brought up the concept of

12   backdating that you put into your report and your

13   conclusion is that -- I want to be clear -- that

14   a computer was backdated or that files were

15   backdated or is it both?

16      A.    Well, I think, in the circumstances

17   we're talking about it's taking an action with

18   the system clock to backdate it and then taking

19   an action with the document so that it picks up a

20   date which is not the true date.

21            In other words, if I have a Word document

22   and I want to backdate the creation date, before

23   I saved it on the computer I would backdate the

24   system clock of the computer, save the document

25   onto the file system, it's going to pick up that,

1                         B. Rose

2     the creation date, as, you know, as pursuant to

3     the system clock.

4          Q.    And the way you determine backdating

5     here is by comparing different dates in metadata

6     associated with files; is that a fair statement?

7          A.    Well, I think that's one way in some

8     circumstances you could do it.  You know, there's

9     other ways to do it, looking at system restore

10    points, looking at information regarding the

11    relationship between the system setting on the

12    computer and Microsoft's network time, I mean, so

13    there are other evidence of backdating, but one

14    way is to look at the relationship between

15    different dates.

16         Q.    Well, that's the way you used here, in

17    your report here?

18         A.    We also discuss, of course, the

19    examples of system restore points that are out of

20    order, should be sequential, and we talk about

21    one instance where the system clock was well off

22    of the time recorded by Microsoft, the system

23    generates an error log because it's so far off,

24    so I would say we discussed all three methods of

25    identifying backdating.

Page 221

1                         B. Rose

2        Q.    And all this backdating evidence that's

3   in your report comes exclusively from the Seagate

4   hard drive; true?

5        A.    I think that is not true.

6        Q.    Where else did you find backdating

7   evidence other than the Seagate hard drive, what

8   other computer did you find that on?

9        A.    I know there's evidence of backdated

10  documents on one of the -- I believe it was a

11  floppy disk.

12       Q.    Do you know where in your report you

13  talk about that floppy disk having evidence of

14  backdating?

15       A.    I will try to find it.

16             So on page -- there's a discussion of

17  backdating related to one of the versions of the

18  Work For Hire document that begins -- and I'm

19  using the upper, the page number on page 37.

20       Q.    Where was that file found?  On a CD?

21       A.    It was found on a floppy disk.

22       Q.    It's true that a floppy disk, for

23  evidence of backdating, you have to find out what

24  computer it was actually inserted into, because

25  floppy disks don't have clocks; right?

                                                    Page 222

 1                          B. Rose

 2        A.      Let's be clear.

 3                So the time itself of the files would

 4   be appended by the computer that was used to

 5   essentially save the document onto the floppy

 6   disk; right?   That doesn't mean the floppy disk

 7   itself is not going to contain evidence of

 8   backdating.

 9                For instance, in this case you have two

10   documents, you have documents which are last

11   accessed February 18, 2011 that are deleted

12   documents and you have another document that was

13   created on May 2nd, 2003 that sits on top of

14   those documents, or if that makes no sense, it's

15   inherently inconsistent and could only resolve

16   some system clock anomalies.

17        Q.      The deleted files had no content which

18   you could recover; true?

19        A.      That's correct.

20        Q.      And so there's no way to say whether

21   they connect there the same as the file that sits

22   over top of them?   I mean, you can't say it's the

23   same file as the one you have content from

24   because you don't have the content to compare it?

25        A.      Well, they are different names, so I

```
 1                          B. Rose
 2     think that would be unusual, but it can't do a
 3     content-by-content comparison, that's correct.
 4          Q.    We were talking about the hourly rate
 5     you charged and the hourly rates for everyone
 6     else.
 7               Do you know what your total billable
 8     hours were that went into the work that produced
 9     this report?
10          A.    I don't.
11          Q.    Is that something you could get from
12     your office?  How difficult would that be to get
13     from whoever does accounting at your office?
14          A.    The total billable hours from myself
15     preparing this report?
16          Q.    And everyone else.
17          A.    I mean, you'd have to aggregate it from
18     the invoices, so it's not -- it's not right at
19     hand, but it would be a task that could be
20     completed fairly easily.
21          Q.    I would ask you if you could have
22     someone from your office compile that together.
23               The rules regarding experts, I think,
24     entitle us to a statement of the compensation
25     that you guys were paid for all of your study and
```

```
 1                        B. Rose
 2    your testimony in the case, so --
 3              MR. DUPREE:  We'll see what we can do
 4       on that.
 5       Q.    What were your instructions when you
 6    first started doing this gathering of evidence to
 7    prepare this report?
 8              You said several times in your
 9    testimony we were charged with this, we were
10    charged with that, sort of -- instructed meaning
11    charged.
12              What were you instructed to do generally,
13    as far as your analysis?
14              MR. DUPREE:  I just, for the record, I
15       want to make sure we don't get into
16       privileged areas.
17              I think it's acceptable for him to give
18       a high-level response, but I'm assuming
19       we're not going to get into the specific
20       contents of any communications he's had with
21       Gibson, Dunn lawyers?
22              MR. BOLAND:  You're correct, yes, just
23       the high level.
24       Q.    What was your general approach?  After
25    you had your conversations with the defense
```

1                          B. Rose

2    lawyers, what did you understand you were

3    supposed to do?

4        A.    It has nothing to do with my

5    conversations with the defense attorneys.  I

6    mean, the work to produce this report was done

7    pursuant to Electronic Asset Inspection Protocol,

8    which I'm sure you've read, it was issued by the

9    Court and sets forth what we are to do in terms

10   of an analysis, and the charge based on that was

11   to collect, preserve and analyze the Ceglia media

12   for evidence of the authenticity or

13   inauthenticity of the Work For Hire contract and

14   the purported e-mails and then it sets forth, of

15   course, various other procedural ways to identify

16   presumptively relevant material, produce it to

17   you first for privilege review and then produce

18   it to Gibson, Dunn, so when I talk about what we

19   were charged with doing, I'm talking about that

20   document that was issued by the Court, and my

21   understanding was agreed on between the parties.

22       Q.    In the Word documents that contain the

23   e-mail exchanges between my client and

24   Mr. Zuckerberg, how did you determine which one

25   of the dates in the metadata were the authentic

1                     B. Rose

2    ones and which ones weren't the authentic ones?

3        A.    I'm not sure what you mean.

4        Q.    Well, if a creation date and an access

5    date somehow conflicted, how did you determine

6    which one was the one to rely on and which was

7    the one to say, well, that's obviously the wrong

8    date?

9        A.    I'm not sure I can answer that question

10   in the abstract, I'd have to -- I mean, these are

11   all fact-specific inquiries and depend on

12   circumstances.

13            Do you have a specific example?

14            I mean, for the purported e-mails, in

15   other words, documents, I mean, I think the

16   inaccuracy such as the time zone stamp is

17   something which is fairly clear, right?  I mean,

18   things e-mailed in October should have a time

19   zone consistent with Eastern Standard Time.

20            In terms of the rest of it, you know,

21   these documents, based on our analysis of them,

22   are clearly edited, manipulated documents, so I

23   don't believe they are real e-mails and so making

24   a choice as to which one is the accurate date,

25   right, we don't have to do that and we are not

1                    B. Rose

2    faced with that because frankly, you have a sent

3    and received time on the face of the e-mail and

4    it's a Word document.  I don't have access dates,

5    I don't have modified dates that are sort of the

6    embedded data you would have if it were an e-mail

7    file.

8        Q.    Did you review the report by Jerry

9    Grant, plaintiff's expert?

10       A.    Yes.

11       Q.    And he evaluated exclusively the data

12   on the floppy disks in this case; true?

13       A.    That is what I recall him discussing;

14   whether that's exclusively, I'd have to look back

15   at the reports, but I do remember him focused on

16   that issue.

17       Q.    After reading the report did you have

18   any dispute with the accuracy of the forensic

19   data that he found?

20       A.    I don't recall specific disputes.  I do

21   remember some questions about his analysis, but

22   it's been some time since I looked at that.

23       Q.    Do you recall today any specific

24   forensic data he recovered that you think is

25   somehow not the correct forensic information, not

1                        B. Rose

2    his interpretation of it, but that he pulled the

3    wrong dates or he pulled the wrong information

4    somehow?

5        A.     Not that I recall as I sit here today.

6               (Rose Exhibit 5, article entitled "Real

7        Evidence, Virtual Crimes The Role of

8        Computer Forensic Experts" by Paul H. Luehr,

9        marked for identification, as of this date.)

10       Q.     I'm giving you Exhibit 5, Mr. Rose, it

11   is an article by someone named Paul, I don't know

12   how to pronounce his last name, L-u-e-h-r.

13       A.     Luehr.

14       Q.     Do you know who that is?

15       A.     I do.

16       Q.     Who is that person?

17       A.     He is the managing director of Stroz

18   Friedberg in our Minneapolis office.

19       Q.     Can you look at the -- I guess it's the

20   third page from the end of all of this.

21       A.     Third page from the end?

22       Q.     Yes.

23               In the right-hand column near the

24   bottom, the last full paragraph, the second to

25   last full paragraph starts with the word "While."

                          B. Rose

1                         B. Rose

2              Do you see that?

3        A.    Mm-hm.

4        Q.    It says here "While some computer dates

5    and time stamps will be conclusive, others may be

6    open to interpretation by competing experts.

7    Created, modified and accessed dates may be

8    viewed differently depending on whether a file

9    remained in one place or whether it was copied

10   and saved to several locations.  In addition, log

11   files may vary by time zone, and metadata are

12   generally only as accurate as the underlying

13   computer clock time."

14             Would you agree with that statement

15   from his article?

16             MR. DUPREE:  And just, for the record,

17        this appears to be about a 10-page

18        single-spaced article you have shown the

19        witness and he has not had an opportunity to

20        review the full article, obviously.

21             MR. BOLAND:  True.

22        A.    Let me just read it again, so I can --

23        Q.    Very well.

24        A.    I think I would generally agree with

25   those statements.

Page 230

                              B. Rose

1

2      Q.     Have you ever read that article before?

3      A.     I don't recall if I read it before.

4      Q.     But it's essentially a co-worker of

5   yours in Stroz Friedberg who wrote it; true?

6      A.     It's the managing director in our

7   Minneapolis office.

8      Q.     Do you know that person?

9      A.     I do.

10     Q.     Okay.

11            You mentioned you -- we had talked

12   about a residence in different locations and that

13   you'd go to Indiana occasionally and you'd use

14   your parents computer there; do you remember

15   talking about that?

16     A.     Yes.

17     Q.     Have you ever used your parents'

18   computer to e-mail documents to lawyers in cases

19   that you're working on using their account?

20     A.     I don't recall one way or the other.

21     Q.     So it's possible you've used your

22   parents' e-mail account to send documents to

23   lawyers in cases on which you are working?

24     A.     Is it possible?

25            It's possible.

1                        B. Rose

2        Q.     How many times do you think that might

3    have happened?

4        A.     I don't have any recollection of it one

5    way or the other.

6        Q.     Did you find any forensic evidence in

7    your analysis before or after producing this

8    report to dispute Mr. Ceglia's declaration that

9    he sent as an attachment a copy of the Facebook

10   contract to Mark Zuckerberg before April of 2003?

11            MR. DUPREE:   Object to form.

12       A.     Could you repeat it?

13       Q.     Did you find any evidence before or

14   after you produced your report there to dispute

15   my client's declaration under oath that he sent

16   at least one e-mail to Mark Zuckerberg before

17   April 2003, when they signed the contract, that

18   included as an attachment the Facebook contract

19   in electronic form?

20            MR. DUPREE:   Same objection.

21       A.     And what's the Facebook contract?

22       Q.     The two-page document that my client

23   has presented as an authentic contract between

24   him and Mr. Zuckerberg which mentions Facebook.

25       A.     So during our analysis we did not find

```
 1                       B. Rose
 2    any evidence of that, I don't think we found any
 3    evidence regarding that whatsoever.
 4         Q.    So no evidence to dispute his claim
 5    that he sent that e-mail?
 6         A.    I mean, we didn't find any evidence
 7    regarding that issue at all.
 8         Q.    And regarding the TIFF images and
 9    physical size, et cetera, do you know how to use
10    the metadata associated with those TIFF images
11    and calculate the physical size of that file, the
12    mathematical formula that's used by digital
13    imaging experts to sort of tell you the physical
14    size of the file by using the pixels that are
15    listed in the metadata?
16         A.    No.
17         Q.    And you mentioned a November 2003
18    e-mail production from Harvard; do you recall
19    testifying about that?
20         A.    Yes.
21         Q.    And that there were some e-mails from
22    that production that were not in later productions;
23    true?
24              I think that's what you testified.
25         A.    My recollection is that there were some
```

1                          B. Rose

2    unique e-mails contained in the November 2003

3    collection that were not contained in the October

4    2010 collection and subsequent, obviously

5    subsequent collections.

6         Q.    And were any of those e-mails that

7    weren't in the later collections relevant to this

8    case based upon your evaluation of them?

9         A.    I don't recall.

10               And let me just be clear about that.

11               In identifying unique e-mails, what we

12   were doing is essentially deciding what to add to

13   an aggregate review set, so what I'm working off

14   is essentially an aggregate set, so I don't

15   recall whether, you know, what particular source

16   each e-mail came from.

17        Q.    And the floppy disk which contained

18   these Word documents that my client has said are

19   the copy-and-pasted e-mails, plaintiff's expert

20   Jerry Grant determined that the versions of

21   Microsoft Word that those documents were created

22   in were all contemporaneous with the dates that

23   my client says he created them, 2003 and 2004.

24               Did you find anything to dispute that

25   conclusion of Mr. Grant?

```
 1                         B. Rose
 2       A.    I don't have any information about the
 3  versioning of those Word documents at this point,
 4  so --
 5       Q.    Who would have that amongst the people
 6  who did work for you on this report?
 7       A.    I don't know.  It's certainly possible
 8  that either Mr. McGowan or Mr. Novak would have
 9  that information.
10       Q.    Would Mr. Friedberg have that
11  information?
12       A.    I doubt it.
13            MR. BOLAND:  I just want to take about
14       a five-minute break and then I think we will
15       wrap it up.
16            MR. DUPREE:  Okay.
17            We're off the record.
18            (Recess taken.)
19            THE VIDEOGRAPHER:  The camera is on.
20            MR. BOLAND:  All right.  Back on the
21       record.
22  BY MR. ROSE:
23       Q.    Mr. Rose, just a few last questions.
24            Other than the four people associated
25  with the report there, can you give me the names
```

1                    B. Rose

2    of anyone else who did any work on this case in

3    some way contributing to the report?

4        A.    I don't know that I can give you a full

5    and accurate list from memory.  There are -- the

6    vast majority of the work, including the vast

7    majority of the forensics was done by Mr. McGowan

8    and Mr. Novak and together with them I primarily

9    supervised the matter and the three of us were

10   the primary drafters of the report, so most of

11   the work, the vast majority of the work was done

12   by us.

13            Now, to the extent small projects were

14   done by various people, there were certainly

15   other people who were involved at various stages

16   in other projects and I'm not sure -- I could

17   certainly reconstruct that for you, but I'm not

18   sure I could give you an accurate and

19   comprehensive list today.

20       Q.    Very well.

21            If you could reconstruct that, that

22   would be good.

23            Can give a ballpark on the number of

24   hours you spent?  I know you don't know exactly.

25            I'm assuming it's not a thousand, but

1                       B. Rose

2    maybe it is.

3        A.    I don't think it would be a thousand.

4              On the report, the case itself, I

5    mean --

6        Q.    On everything leading up to the

7    production of the report.

8        A.    So not just -- I mean, I just want to

9    be clear, because there's sort of an expedited

10   discovery phase and there's a pre-expedited

11   discovery phase, so the work, you know, I would

12   say that we were involved in the case prior to

13   the expedited discovery, I think, order which

14   came down on July 1st, I believe, of 2010, and

15   then there's been a significant amount of work

16   since then, so we're talking about everything.

17       Q.    Yes.

18       A.    Okay.

19             I don't.  It would be more than a

20   hundred, it's less than a thousand, but --

21       Q.    Somewhere in there?

22       A.    Yeah, somewhere in there.

23       Q.    Now, is the term "fraud" that's

24   throughout your report, is that defined anywhere

25   in the computer forensics field?  Is there is an

1                      B. Rose

2    agreed definition of that amongst computer

3    forensics experts?

4        A.    I don't know if there's an agreed

5    definition of that among computer forensics

6    experts, I'm not aware of one.

7        Q.    So would it be fair to say that the

8    determination of fraud which you repeat in the

9    report is really your personal opinion, not an

10   expert opinion, since you're not a fraud expert?

11       A.    I would say it's an expert opinion, I

12   mean, it is an opinion based on our analysis of

13   the digital forensics evidence that we as digital

14   forensic experts uncovered, I would regard that

15   as an expert opinion.

16       Q.    And you feel it's appropriate to opine

17   about fraud when you are not a certified fraud

18   expert or fraud examiner?

19            MR. DUPREE:  Object to form.

20       Q.    You feel that's appropriate?

21       A.    Yes.

22            MR. BOLAND:  Can you mark this one last

23       thing, please, I think we are on 6.

24            (Rose Exhibit 6, article entitled

25       "Criminal Defense Challenges in Computer

```
 1                      B. Rose

 2         Forensics" by Rebecca Mercuri, marked for

 3         identification, as of this date.)

 4         Q.    Exhibit 6, Mr. Rose, is an article by

 5    Dr. Rebecca Mercuri, it's actually an excerpt

 6    from a book.

 7         A.    Okay.

 8         Q.    I would like to draw your attention to

 9    the paragraph on page 134 of that document, it is

10    actually the third physical page of the document.

11         A.    Okay.

12         Q.    And in the section 2.3, "Confusing Time

13    Stamps," do you see there's a third full

14    paragraph that reads "Although Microsoft

15    generally discredits the reliability of the last

16    access time stamp, since it is easily altered by

17    system operations that are not directly user

18    initiated, either or both prosecution and defense

19    may choose to use this metadata if it is helpful

20    to their construction.  Best practice should

21    always be to disallow it for any use."

22               What's your opinion -- do you agree or

23    disagree with Ms. Mercuri's statement about --

24         A.    I disagree with that.

25         Q.    Have you had any training from
```

1                         B. Rose

2    Microsoft on that topic?

3        A.    I have not, but let me give you a clear

4    example where I think that paragraph is clearly

5    incorrect.

6              There are examples, for instance, in

7    the report where a last-access date predates a

8    last-written-to date.  That would be a

9    circumstance where, in fact -- it should not be

10   possible, right, you cannot open up a document

11   and modify it without accessing it, and so the

12   inconsistency itself is evidence of an anomaly.

13   In that case I think you could clearly rely on

14   the last-access date.

15             As I understand this, if you're talking

16   about looking at a particular last-access date

17   and saying I can conclusively determine when

18   somebody last accessed that file, I do agree that

19   it is a very fragile time stamp that can be

20   updated by a variety of things including user

21   action and system action, and so to the extent

22   you're talking about using it for that particular

23   purpose I think last-access dates are fragile and

24   should be -- they should be interpreted

25   accordingly.

```
 1                    B. Rose
 2           I do think there are clear examples
 3  where inconsistencies between last-access dates
 4  and last-written dates, for example, there are
 5  times when it should be used, so I would disagree
 6  with that paragraph.
 7      Q.    Has Microsoft ever issued, to your
 8  knowledge, as a computer forensics expert, any
 9  formal statements about relying on the access
10  date that the operating system stamps on the
11  files?
12      A.    I don't know about that one way or the
13  other.
14      Q.    Did you call Microsoft or contact them
15  in preparation of this report to find out if
16  those dates are reliable?
17      A.    No.
18      Q.    You're just assuming that they are?
19      A.    Again, you're going to have to give me
20  a specific example.
21           I don't think we in the report relied
22  on it in the way I just said, that we said we can
23  conclusively tell you that somebody accessed this
24  document on this date because of the last-access
25  date.
```

```
 1                       B. Rose

 2               There are examples of times where we

 3      use a last-access date as -- to inform our

 4      opinion.  I am giving you one example.  If the

 5      last-access date predates the last written-to

 6      date, that's an anomaly which indicates to me

 7      some kind of system clock problem or manipulation,

 8      so, again, depending on the way we used it, I

 9      think you'd have to give me a specific example

10      and I could address that.

11               I don't think we had just gone through

12      and necessarily assumed in all cases that last-

13      access dates are in fact reliable and in fact I

14      think, if you've read the report, we do note on

15      occasion that that is in fact a fragile time

16      stamp and can be updated by system activity.

17          Q.    Is fraud the only way these anomalies

18      that you've attributed to backdating could have

19      occurred?

20          A.    Well, again, I have to deal with

21      specific examples.  I think there are examples,

22      for instance, of flip flopping time stamps, so

23      you're not just dealing with trying to determine

24      when something happened, but you're looking at,

25      you know, time stamps should not go -- should
```

                         B. Rose

1

2    not, you know, toggle back and forth, but when

3    you see that what you're seeing is, I think, an

4    example of some kind of system clock manipulation.

5              Again, you'd have to consider within

6    the circumstances and I think the various

7    motivations and what the documents are being used

8    for and how the particular manipulation affected

9    the interpretation of that document to determine

10   whether I would conclude it was fraud.

11             I mean, fraud is a conclusion that's

12   drawn from a complete analysis of the facts with

13   everything considered, right, so -- and again,

14   this is an overwhelming case of it, so if you

15   look at this case and you look at all of the

16   manipulations of data and you look at the

17   existence of the StreetFax contract and you look

18   at the manipulation of the Work For Hire document

19   and the backdating and the margin manipulation

20   and all of that example, that, I think, is a

21   relatively clear conclusion of fraud.

22             Having said that, if you are looking at

23   a particular metadata anomaly, whether I would

24   conclude that in the context is fraud would

25   depend on each individual example.

1                         B. Rose

2        Q.     My question is, let's put aside the

3    constellation of things that you have brought up

4    many times.  I'm talking about just a document

5    which has the anomaly you've identified, this

6    difference of dates.

7              That alone is not enough to say fraud,

8    just the single document with some anomaly in

9    dates; isn't that true?

10       A.     A single document with -- I mean, this

11   is a very general question.  I don't know what

12   kind of anomaly in dates you're talking about.

13             I think there are examples of documents

14   where you have date anomalies, but if you just

15   had that standing alone you couldn't draw a

16   conclusion of fraud.

17       Q.     And why couldn't you draw fraud from

18   just that alone, a date anomaly?

19       A.     I think there are examples where you

20   couldn't, I think there are probably examples

21   where you could.  It's all fact specific, so --

22       Q.     Tell me about one where you couldn't.

23             You had just a date anomaly on a Word

24   document, but you would not be comfortable saying

25   it's the result of fraud.

                                          Page 244

 1                          B. Rose

 2              Why not?

 3              Isn't every date anomaly fraud?

 4       A.     No.

 5       Q.     Well, how else could a date anomaly

 6  happen if it's not fraud?

 7       A.     Well, let me give you a clear example

 8  because -- in this case.

 9              You have the Sidley & Austin

10  intermediary server which had the time zone

11  setting that's incorrect.  I would not conclude

12  from that that somebody at Sidley & Austin is

13  engaged in fraud because I see no -- it's a

14  misconfiguration which could easily occur, it

15  doesn't affect the actual dating of the document

16  itself because the time's correct, it's an

17  intermediary server, so you have the real time

18  appended by the server after it, it's something

19  which could easily escape notice at a place like

20  Sidley & Austin and I cannot think of any reason

21  that anybody would want to manipulate that time

22  zone stamp and the time zone stamp alone for any

23  purpose, for any fraudulent purpose.

24              So that's an example of one where, I

25  think, if you look at that and the circumstances

1                         B. Rose

2    it would be very difficult to draw the conclusion

3    of fraud from that, I think it's clearly not, but

4    again, you're looking at all the circumstances.

5         Q.    But in reality there could have been

6    someone who was a rogue employee from Sidley &

7    Austin for some other purpose not related to this

8    case who manipulated their clock and was

9    committing a fraud internal to the company or

10   internal to the law firm, that's hypothetically

11   possible; right?

12        A.    I cannot think of a single fraud that

13   you could perpetrate merely by misconfiguring the

14   time zone setting and not the time itself and

15   only doing it on the intermediary server, so I

16   think that is a farfetched hypothetical.

17        Q.    So your opinion in this case that

18   there's -- the reason you think there's

19   backdating and fraud with the backdating isn't

20   because of one specific document that you can

21   conclude fraud from; true?  It's a collection of

22   everything together, it's in context, as you say?

23        A.    No, no.  I think you have to take it

24   case by case.

25             So there are examples, for instance,

```
 1                          B. Rose
 2    you know, you look at some of these, you look at
 3    some of these documents and I think you look at
 4    them alone, they are clearly backdated, the
 5    documents themselves are backdated.  Now -- and
 6    that happens multiple times throughout the thing.
 7              If I see a system clock which generates
 8    an error because it's 94 days off of the
 9    Microsoft time, I know the system clock is off;
10    right?
11              If I see restore points that go --
12    which should be sequential and go from December
13    2010 to September 2010, I know that there's been
14    manipulation of the system clock.
15              So in all these examples we're not
16    saying, Hey, there's been manipulation of the
17    system clock because we're considering this piece
18    of evidence in the context of the entire case.
19              What we're doing is saying, Okay, let's
20    look at this document.  This document is clearly
21    backdated.
22              Let's look at this document.  This
23    document is clearly backdated and has been
24    manipulated.
25              Let's look at this document.  This
```

```
 1                        B. Rose
 2   document has clearly been backdated.
 3             Let's look an example of the error
 4   report, that is a clear example of where the
 5   system clock is off.
 6             So you take each individual evaluation
 7   separately, so you look at a document -- I'm not
 8   necessarily -- I'm looking at the metadata of
 9   that, I'm not evaluating in the context of the
10   case, I'm evaluating that particular document.
11             When I see that's backdated and when I
12   see backdating in multiple versions and I see
13   manipulation of documents, you put all of that
14   together and you draw your ultimate conclusion
15   which in our case is, I think, clear evidence the
16   StreetFax contract is authentic and the Work For
17   Hire contract is not, so that ultimate conclusion
18   is built upon what I think is overwhelming
19   evidence from a variety of different sources that
20   show fraud, but each individual instance is
21   evaluated on its own and then you determine how
22   to interpret that in the broader context of the
23   case.
24        Q.   Whenever you use the word "backdating"
25   is that synonymous with a fraudulent motive?
```

```
 1                      B. Rose
 2      A.    I think it -- in my experience you
 3   generally see backdating in a case of document
 4   manipulation, document fraud, it's certainly not
 5   synonymous with it.
 6      Q.    And the 94-day system clock difference
 7   you just talked about, that's on the Seagate hard
 8   drive, that's what you're referring to in the
 9   report?
10      A.    I believe so.
11            Can I refresh my recollection?
12      Q.    Sure.
13            MR. DUPREE:  Are we about to wrap
14      things up, I hope?
15            MR. BOLAND:  Yes.
16            MR. DUPREE:  Okay.  Thank you.
17      A.    Yes.
18      Q.    And the copy of the StreetFax contract
19   that's in Exhibit 1 there, you would agree with
20   me in large part is not legible, either one of
21   those pages, the way it is in that document?
22            MR. DUPREE:  This is the version you
23      handed him today?
24            MR. BOLAND:  Yes.
25      A.    So we're back to -- so we're back to
```

```
 1                    B. Rose
 2   Exhibit F, second page --
 3       Q.    Exhibit H was the first page.
 4       A.    So Exhibit F is the second page and
 5   Exhibit H is the first page of the StreetFax
 6   contract.
 7       Q.    And in the size that they are in that
 8   report -- I'm sorry, in that exhibit I gave you,
 9   in large part they are not legible?
10       A.    I would say these exhibits, based on
11   size and, you know, the lightness of the ink and
12   other, you know, the way they appear in this
13   report, I mean, there are certain parts of that
14   that are legible, but most of it I would say
15   would be illegible.
16       Q.    And Mr. Southwell had a version where
17   the document was significantly magnified.
18             Have you ever seen that version of the
19   StreetFax images?
20       A.    I saw --
21             MR. DUPREE:  Object to form.
22             I'm not sure what we are talking about,
23       that's all.
24       Q.    Have you ever seen a larger -- a
25   version of that image that you just talked about
```

1                          B. Rose

2      in those two exhibits that was magnified to be

3      close to an 8-1/2-by-11 piece of paper?  Have you

4      ever seen that?

5               MR. DUPREE:  Object to form.

6               Go ahead.

7         A.    I have seen larger versions of this.

8         Q.    Are they legible in all respects?  Can

9      you read all the words of those larger versions,

10     if you know?

11        A.    I don't recall having any difficulty

12     reading it.

13        Q.    Do you know which one was given to the

14     Court, the smaller version of that exhibit or the

15     larger magnified version that you might have

16     seen?

17        A.    I do not.

18        Q.    And finally, in Mr. Broom's report he

19     talked about the BIOS battery.

20               What is that on a computer, a BIOS

21     battery?

22        A.    A BIOS battery?  I am not sure I've

23     ever hear it called a BIOS battery.  It tracks

24     certain information about the computer itself

25     such as the system clock settings and other

1                       B. Rose

2    information.

3        Q.    Well, there's a battery on board the

4    mother board of most desktop computers at least;

5    right?

6        A.    I don't know.

7        Q.    How does a computer know what time it

8    is if you unplug it from the wall, for example?

9    Doesn't it have a battery that helps keep track

10   of the time for a while?

11       A.    I don't know.

12       Q.    Have you ever heard of a CMOS battery?

13       A.    No.

14       Q.    What happens to the time zone setting

15   of a computer if you unplug it from the wall for

16   a year, what will happen to it's ability to know

17   what time it is when you plug it back in?

18       A.    I don't know whether it retains that

19   the entire time or whether when you plug it back

20   in it resyncs with the system clock, network

21   clock, I should say.

22       Q.    This computer that the Seagate hard

23   drive came from, do you know if that computer was

24   ever unplugged for any period of time like a

25   year?

Page 252

1                          B. Rose

2        A.     I don't.

3        Q.     So at this point you're not qualified

4    to give an opinion about a CMOS battery or a BIOS

5    battery?

6        A.     I would not give an opinion about a

7    CMOS or BIOS battery.

8              MR. BOLAND:  I have no further

9        questions, Mr. Dupree.

10             MR. DUPREE:  We don't have any

11       redirect.

12             We are off the record.

13             (Time noted:  4:23 p.m.)

14

15       _____

16       BRYAN J. ROSE

17

18   Subscribed and sworn to before me

19   this _____ day of _____, 2012.

20

21   _____

22             Notary Public

23

24

25

Page 253

1

2                C E R T I F I C A T E

3    STATE OF NEW YORK      )

4                           : ss.

5    COUNTY OF NEW YORK     )

6

7          I, CARY N. BIGELOW, Court Reporter,

8       a Notary Public within and for the State of

9       New York, do hereby certify:

10         That BRYAN J. ROSE, the witness whose

11      testimony is hereinbefore set forth, was

12      duly sworn by me and that such testimony

13      given by the witness was taken down

14      stenographically by me and then transcribed.

15         I further certify that I am not

16      related to any of the parties to this

17      action by blood or marriage, and that I am

18      in no way interested in the outcome of this

19      matter.

20         IN WITNESS WHEREOF, I have hereunto

21      set my hand this 23rd day of July, 2012.

22

23      _____

24                CARY N. BIGELOW

25

Page 254

1

2    ------------------ I N D E X ------------------

3    WITNESS                    EXAMINATION BY            PAGE

4    BRYAN J. ROSE      MR. BOLAND                         6

5

6    ------------------- EXHIBITS -------------------

7    Rose Exhibit 1, Stroz Friedberg report   6

8    dated March 26, 2012

9    Rose Exhibit 2, declaration of Neil     82

10   Broom

11   Rose Exhibit 3, supplemental            200

12   declaration of Paul D. Ceglia

13   Rose Exhibit 4, five-page document      205

14   headed "Shortcut File"

15   Rose Exhibit 5, article entitled "Real  228

16   Evidence, Virtual Crimes The Role of

17   Computer Forensic Experts" by Paul H.

18   Luehr

19   Rose Exhibit 6, article entitled        237

20   "Criminal Defense Challenges in

21   Computer Forensics" by Rebecca Mercuri

22

23

24

25

Page 255

```
 1
 2                    ERRATA SHEET
            VERITEXT REPORTING COMPANY
 3                   1250 BROADWAY
             NEW YORK, NEW YORK 10001
 4                   212-279-9424
 5   NAME OF CASE: CEGLIA VS. ZUCKERBERG
     DATE OF DEPOSITION: JULY 18, 2012
 6   NAME OF DEPONENT:  BRYAN J. ROSE
 7   PAGE   LINE(S)      CHANGE           REASON
 8   ____|_____|_____|_____
 9   ____|_____|_____|_____
10   ____|_____|_____|_____
11   ____|_____|_____|_____
12   ____|_____|_____|_____
13   ____|_____|_____|_____
14   ____|_____|_____|_____
15   ____|_____|_____|_____
16   ____|_____|_____|_____
17   ____|_____|_____|_____
18   ____|_____|_____|_____
19   ____|_____|_____|_____
20   ____|_____|_____|_____
21                    _____
                         BRYAN J. ROSE
22
     SUBSCRIBED AND SWORN TO BEFORE ME
23   THIS _____ DAY OF _____, 20__.
24
     _____     _____
25   (NOTARY PUBLIC)          MY COMMISSION EXPIRES:
```

| & |
|---|

**&**  1:19 2:11 35:20
58:15 59:7 62:24
98:4 99:3,4 149:16
149:16,18 150:10
150:11,16 152:16
160:3 177:4 195:5
244:9,12,20 245:6

| 0 |
|---|

**0002**  194:23
**002**  93:13
**00569**  1:4
**02**  59:8
**03**  126:13,14 188:19
188:20
**036**  205:20 206:10

| 1 |
|---|

**1**  3:10 5:6 6:2 8:5
9:3,16 10:20 14:18
17:10,23 19:12
20:13 30:8 40:6,18
58:6 60:16 87:6,7
87:14,17,20,23
88:12,13,16,20
90:23,25 91:3 92:3
92:9,12,16,16 121:7
121:10 197:6
199:15 205:15
206:5,8 248:19
254:7
**10**  22:12 82:12,24
134:21,23 135:3
136:17 229:17
**10001**  255:3
**10166-0193**  2:14
**102**  27:17,23 29:6
76:9 91:21
**10:09**  1:15
**10:37**  60:17,23
97:16,18
**10:39**  61:11
**11**  87:8 88:17,21
90:2 155:19 250:3

**11:44**  156:7
**12**  42:20
**123**  90:7
**1250**  255:3
**13**  54:23 180:15
**134**  238:9
**139-2**  200:25
**13th**  181:14
**144**  59:22
**1475**  2:6
**15**  33:2 34:3,9,13
35:11,14 37:3,9
38:6,9 39:25 45:11
45:19 76:3 83:8
84:8 107:6,6 108:15
136:6 137:8
**15th**  42:14 46:21
**16**  76:9
**163**  55:7
**17**  55:10
**172**  203:4 205:22
206:16
**173**  202:23 203:2
**18**  1:14 121:18
222:11 255:5
**19**  91:21
**1:10**  1:4
**1st**  236:14

| 2 |
|---|

**2**  30:12,13 82:16,21
84:11 89:5 92:9,16
92:17 95:8 190:20
191:21,25 192:5,9
192:15,15 205:16
205:22 206:14
208:22,23 254:9
**2.3**  238:12
**2.4**  85:21 86:6 90:5
**20**  33:2 34:3,9,13
35:11,15 37:4,9
38:6,9 40:2 83:8
84:8 136:6 137:9
255:23

**200**  1:19 2:13
254:11
**2003**  42:19 44:9,15
45:2,13 46:10,13
72:14,23 74:25
124:20 125:8,17
126:3,3,8 142:13
165:25 186:2,10,19
187:17,17 188:10
188:22 222:13
231:10,17 232:17
233:2,23
**2003-2004**  44:4
**2004**  44:9,15 45:2
72:20 73:21 74:2,5
74:7,18 104:21,24
105:4 149:14 156:7
156:12,13 158:8
159:14,24 165:25
169:6,12,21,24
170:5,10,15,17,18
171:8 172:9,11,24
173:16 233:23
**2010**  42:16,21 45:12
45:25 47:7 113:2
186:21 233:4
236:14 246:13,13
**2011**  15:15,20 42:14
45:11,19 47:8 54:23
74:9,12 120:3
121:19 123:15,16
173:19 174:3,7
180:16 202:24
222:11
**2012**  1:14 6:3 8:8
42:20 45:12 74:23
122:22 123:17,21
123:25 127:8
128:15 129:2,11,19
252:19 253:21
254:8 255:5
**205**  254:13
**21**  84:18 85:7 107:6
120:23 121:9
155:18

**212-279-9424**  255:4
**228**  254:15
**23**  60:12,16
**237**  254:19
**23rd**  253:21
**24**  58:6 60:11 61:3
61:11,13 79:8
**26**  6:3 8:8 254:8
**28**  122:22 123:21,25
125:17 127:8
128:15 129:2,19
188:10
**28th**  123:17 129:11
**29**  202:24 208:23
209:2
**2:09**  193:20
**2nd**  222:13

| 3 |
|---|

**3**  200:20,21,25
254:11
**3-1/2**  192:25 193:6
**3.2**  85:21 86:6 90:5
**30**  89:11,23 90:4
210:4 213:23
**37**  221:19
**379**  177:14 178:9,18
179:2,6,14 181:6
**3:05**  194:3
**3rd**  148:10,12
149:14 156:12
159:5,7,14,24

| 4 |
|---|

**4**  89:8 205:3,4,10
206:2 254:13
**400**  10:7 151:11
179:9
**419**  109:2,17,25
**44107**  2:8
**49**  202:4,9 203:11
203:19
**4:23**  252:13
**4th**  149:24 158:7,8

**5**

**5**  228:6,10 254:15
**5-1/2**  188:23
**50**  202:9
**500**  10:7 179:9
**51**  61:9
**52**  120:22,24 121:12
121:14
**54**  197:6,8
**5th**  149:24 156:7,13
157:9

**6**

**6**  201:6 237:23,24
238:4 254:4,7,19
**650**  9:24

**7**

**770724**  2:7

**8**

**8-1/2**  87:8 88:17,21
90:2 250:3
**82**  254:9

**9**

**9**  58:18 59:2
**90**  27:17,23 29:6
**94**  246:8 248:6
**945**  90:6
**950**  10:2
**9:38**  61:4
**9:41**  61:14
**9:49**  158:8

**a**

**a.m.**  1:15 60:17,23
97:18 156:7 158:8
**abbreviate**  166:18
170:19,20
**abbreviated**  166:12
166:19 169:7
**abbreviates**  166:20
169:14
**abbreviations**  169:6
**ability**  69:13 73:3
103:22 105:8,21,23

106:8 251:16
**able**  26:16 78:19
79:21,25 126:6
196:11 199:4
**absent**  100:3
**absolutely**  48:20
50:2,16 114:23
115:5,18,23 127:15
**abstract**  226:10
**accept**  109:18
**acceptable**  224:17
**access**  65:3,5,6,15
65:17,20 67:16,21
68:10,18,25 69:2,5
69:14,21 71:18,23
72:16,24 73:5,14
103:25 109:9,23
110:6,13 111:5,10
111:11,17,20,21,23
112:5,6,8,11,13,16
113:12 114:18,20
115:20 119:4
134:12 184:2,9,20
185:21 218:25
219:6 226:4 227:4
238:16 239:7,14,16
239:23 240:3,9,24
241:3,5,13
**accessed**  68:11
106:22 119:10
211:15 218:19
222:11 229:7
239:18 240:23
**accessibility**  41:14
**accessible**  41:20
45:3
**accessing**  113:18
239:11
**accidental**  55:25
56:5,5
**accidentally**  216:13
**account**  42:2,5 43:2
44:8,12,18 59:15
76:17,20,22 77:2,3
77:5,10,14,21 78:25

79:4,10,16 80:5,13
81:4 116:2,3,8,9,15
116:21 117:15,19
118:3,5,17,19,24
119:5,10,14,18,23
119:25 120:3,4,8,8
120:13,21 121:4,24
122:7,13,17,19
123:2 124:6,10,16
124:18,25 126:8,20
127:8 128:7,9,15,24
128:25 129:4,9,12
129:13,16,25
147:22 152:19,22
158:13,18,23 159:9
160:10,22 161:4,15
162:18,22 163:4
168:2,5,8 171:6,9
172:19,24 182:15
182:20,22 185:2
188:25 230:19,22
**accounting**  223:13
**accounts**  118:2
122:2 162:16
168:23 173:20
**accuracy**  101:22
227:18
**accurate**  92:15
96:23 97:3,6,7
98:17 99:17 174:25
201:25 207:5 210:9
226:24 229:12
235:5,18
**accusation**  50:6
**accuse**  50:11
**accused**  106:5
**action**  79:24 147:4
219:17,19 239:21
239:21 253:17
**actions**  106:5
142:17
**activation**  121:23
**activity**  121:16
123:19 241:16

**actual**  12:22 13:4,6
14:13 16:9 45:20
46:6 61:24 65:19
84:7 88:4 120:20
130:15 152:14
180:9 189:19
195:15 199:7,9,15
199:17 204:3,4,5
206:8 207:6 211:4
244:15
**adapt**  75:19
**add**  233:12
**addition**  48:12
166:25 194:22
195:25 229:10
**additional**  8:22,23
42:21,22 51:8
160:20 184:19
**additions**  8:21
**address**  113:3
122:16 241:10
**adelphia**  97:21
98:18,25 99:7
112:10 116:15
149:15 158:23
160:10 162:18
**admissibility**  3:15
4:5
**admits**  165:2
**advice**  156:20 173:7
**affect**  19:8 244:15
**affidavit**  201:15
**aggregate**  51:3
183:2 223:17
233:13,14
**ago**  25:5 26:22
53:20 74:24
**agree**  11:2 14:20
17:6,11,20 18:2,18
20:24 24:5 27:7
36:12,20 41:7,11
50:10 51:17 54:15
54:18 55:5,19,23
56:3 62:9 66:14
68:14 74:13 76:7

91:2 94:4 96:3
103:17,19 113:9
118:18 126:5
143:20 144:13
145:13 146:12
158:10 181:20,24
182:7,12 206:23
209:25 210:2,10,11
216:19 229:14,24
238:22 239:18
248:19
**agreed** 225:21 237:2
237:4
**agreeing** 103:2
**agreement** 147:15
214:18,25 215:4,10
215:21 216:16
**agreements** 214:13
215:8,22
**ahead** 83:6 201:11
250:6
**air** 151:11
**alert** 6:23
**alex** 87:25 153:23
154:4,7
**alexander** 2:15 3:2
**allegations** 200:3
**alleged** 156:8
**allegedly** 156:6
175:7
**allow** 23:24 68:25
69:20 71:17 72:2
104:2 117:14
133:18,24
**allowed** 171:17
**allowing** 68:10
**allows** 68:9
**alter** 24:21 26:9
132:18
**alteration** 134:25
**altered** 20:4,9 24:7
24:14 26:14 57:24
132:21 133:16
212:8,10 218:19
238:16

**amanda** 2:18 3:4
**ambiguous** 86:20
203:2
**amend** 62:13 104:23
213:24
**amended** 16:3 164:9
164:15
**amount** 141:8
236:15
**analyses** 152:5
**analysis** 12:22,25
13:2,4,6,18,25
14:17 15:21 16:22
17:2,8,12 18:9 19:8
19:19,22 20:18 34:8
34:13,22 35:14
36:19 37:9,18,24
38:18 39:25 40:8
59:9,13 63:17 72:7
72:8,12 77:6,8,10
78:7,14 80:14,19,21
80:23 81:3,5,17,22
82:3 92:25 93:4
96:6 105:19,22
106:2 107:24 111:2
112:20 123:13
124:2,22 130:6
137:18,21 148:24
150:10 153:20
159:20 165:9,14
182:5 183:22
184:13 189:12
190:14 224:13
225:10 226:21
227:21 231:7,25
237:12 242:12
**analyst** 35:6
**analyze** 19:20 32:4
38:2 43:17 149:8
154:19 191:14
198:20 225:11
**analyzed** 31:19,21
33:6 39:16 43:15
83:10 105:11
107:12,13,17

130:12 165:11
217:10
**analyzing** 35:8 84:8
95:20
**anomalies** 130:18
130:20 131:2
222:16 241:17
243:14
**anomaly** 131:13,15
132:24 135:6 166:5
212:16 213:7
239:12 241:6
242:23 243:5,8,12
243:18,23 244:3,5
**answer** 7:20 10:14
10:16 26:6 32:24
33:4 37:22 51:13,16
62:14 71:20 105:2,3
109:17 127:11,19
128:10,11,21 138:2
138:21 168:18
170:11 181:2
212:22 218:8 226:9
**answered** 39:9
51:23,23 127:22,24
135:21 162:2
**answering** 11:19
127:6 150:20
168:21
**answers** 104:23
**anybody** 244:21
**anything's** 138:20
184:22
**apparent** 47:22
48:25
**apparently** 146:11
175:14
**appear** 3:18 21:19
25:21 28:4 50:13
86:23 87:5 148:7
163:8 164:25 166:4
166:16 174:12
178:18 202:11
211:5,13 249:12

**appeared** 28:18
47:13 51:20 91:5
132:12 195:8,11
**appears** 28:7 30:2
91:3 92:20 96:3
97:3 102:7 142:14
156:12 158:11
159:13 165:19
174:2 201:13
202:17 206:12
210:12,13 229:17
**appended** 58:17
97:20 98:3,15
101:12,21 211:2
222:4 244:18
**appending** 176:17
**applications** 143:22
**apply** 78:24 79:3
105:4
**approach** 7:23,24
35:2 224:24
**approaching** 192:25
**appropriate** 183:13
187:12 237:16,20
**appropriately**
185:10
**approximately**
22:12 37:8 97:16
**april** 42:14 45:11,19
46:21 47:8 121:18
123:15 125:17,25
126:3,8,13 165:25
180:15 181:14
188:10,22 231:10
231:17
**area** 90:5 113:4
166:6,7
**areas** 39:21 139:20
165:13,18 224:16
**ares** 166:13
**argentieri** 189:25
201:8
**arguing** 190:14
**argument** 54:24
55:17 192:8

arose  47:7 48:13
arrive  19:16 216:17
article  228:6,11
229:15,18,20 230:2
237:24 238:4
254:15,19
articles  40:24 41:3
aside  150:13 217:20
243:2
asked  3:18 39:8
44:13 45:4 51:22
53:6 66:18 67:6
80:18 83:20 100:18
100:25 104:24
111:20 138:7,10
166:22 168:17
182:13
asking  7:7,21 24:11
26:13 31:18 36:20
39:19,23 44:20
50:10 55:13 75:5
86:15 87:25 112:5
117:12,17 126:11
127:4 133:11
140:14 168:16
176:17 177:22
183:24 184:5,5,16
185:9 186:15
191:19 208:9
212:17
asks  101:6
asserts  110:6
assess  136:21
assessment  115:17
asset  225:7
assets  32:15 33:12
33:17 35:23 52:6,7
52:25 53:3,5,7 54:3
54:5 184:14
assistant  131:16
133:3 135:5,12
assisted  12:22
associated  76:21,22
96:18,22 134:5
198:25 210:6

217:18 218:10
220:6 232:10
234:24
associations  4:2
assume  7:19 17:13
17:14,19 46:14
101:14 109:6,10,15
117:2 145:2,22
151:16 154:2
164:21 174:3,4
188:17
assumed  241:12
assuming  62:22
69:23 101:10
109:12 145:4
188:16 207:3
224:18 235:25
240:18
assumption  109:18
attach  164:14 190:8
attached  12:10,20
16:3 85:15 90:9
91:12 92:10 93:9
102:18 151:2 153:4
164:9,15,19,20
176:24 190:4
197:16
attachment  180:5
181:9,13 231:9,18
attachments  116:23
118:10,21 161:5
163:24 178:10
180:7 181:8
attempt  114:25
115:2 132:15
142:20 155:13
173:14
attempted  144:22
attempting  141:7
attention  194:11
238:8
attorney  62:24
149:13,23 162:4
attorneys  2:5,12
53:10,11 82:6

185:11 225:5
attributed  130:19
241:18
august  180:15
202:24
austin  35:20 58:11
58:15 59:5,7,10,20
60:4 61:4,14 62:24
98:4 99:3,4,8
149:16,17,18
150:10,11,16 151:8
152:16 160:3 177:4
195:5 244:9,12,20
245:7
authentic  15:8,10
16:5 17:18,21 18:17
18:24 19:2,6,6,13
19:21 20:4 102:20
103:3,10 115:7
144:12,17,20 145:4
145:4,17 146:2,21
148:17,22 150:15
151:12 153:5
155:12 158:12
164:2,4,12 189:16
191:10 192:13
225:25 226:2
231:23 247:16
authenticity  22:20
34:6 36:10,14,17,22
138:7 145:15
148:25 153:3,13
163:21 225:12
author  134:23
authorization  69:15
authors  134:21
135:3
automated  49:16
automatically  49:23
available  4:25 25:24
41:9,16,18 183:17
184:12
avenue  1:19 2:13
average  77:20

avoid  182:9
aware  7:16 15:7,13
15:21 16:19 23:23
42:23 53:18 57:22
70:23 71:2,3 75:2
102:17,24 103:4,7
105:25 106:4,9,13
106:15 124:17,20
125:4,9,10,15,18
136:15 140:5
147:14,20 163:22
164:3 165:6 173:6
176:21,25 187:19
190:3,6,11,12
199:24 207:23
208:2,12,14 218:17
218:23,24 219:2,5
237:6
awfully  151:15
aycock  2:18 3:5

**b**

b  6:5 7:1 8:1 9:1
10:1 11:1 12:1 13:1
14:1 15:1 16:1 17:1
18:1 19:1 20:1 21:1
22:1 23:1 24:1 25:1
26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1
38:1 39:1 40:1 41:1
42:1 43:1 44:1 45:1
46:1 47:1 48:1 49:1
50:1 51:1 52:1 53:1
54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1,14
73:1 74:1 75:1 76:1
77:1 78:1 79:1 80:1
81:1 82:1 83:1 84:1
85:1 86:1 87:1 88:1
89:1 90:1 91:1 92:1
93:1 94:1 95:1 96:1

97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1
190:1 191:1 192:1
193:1 194:1,18
195:1 196:1 197:1
198:1 199:1 200:1
201:1 202:1 203:1
204:1 205:1 206:1
207:1 208:1 209:1
210:1 211:1 212:1
213:1 214:1 215:1
216:1 217:1 218:1
219:1 220:1 221:1
222:1 223:1 224:1
225:1 226:1 227:1
228:1 229:1 230:1

231:1 232:1 233:1
234:1 235:1 236:1
237:1 238:1 239:1
240:1 241:1 242:1
243:1 244:1 245:1
246:1 247:1 248:1
249:1 250:1 251:1
252:1
**back** 19:16 30:23
60:15 82:20,22 83:5
85:6 87:4 104:21
118:14 130:7 137:4
137:5 159:9 163:2,5
163:15,21 167:9
170:24 172:9,11,17
172:24 173:15
216:17 227:14
234:20 242:2
248:25,25 251:17
251:19
**backdate** 219:18,22
219:23
**backdated** 102:15
190:15 213:16
214:2 219:14,15
221:9 246:4,5,21,23
247:2,11
**backdating** 149:6
154:25 213:19
217:17 219:12
220:4,13,25 221:2,6
221:14,17,23 222:8
241:18 242:19
245:19,24 247:12
247:24 248:3
**backup** 43:15,18,21
43:23 44:5,8,11,14
44:20 45:2,6,8,22
46:2,8,14,15
**backups** 44:22
**backward** 94:6
**backwards** 95:3,5
95:16,17
**ballpark** 235:23

**base** 142:8
**based** 11:20 18:4
28:13,18 30:11
33:10 35:16 36:18
56:23 78:14 79:7
93:19 96:25 98:9
110:19,25 116:3,9
117:19 118:4,8,17
118:19 124:11
126:12 131:19
132:14 135:24
141:22 150:9
156:18 159:9,12
160:14 163:7
165:20 172:5
174:18 179:10
211:5 225:10
226:21 233:8
237:12 249:10
**basing** 160:5
**basis** 9:18 33:18
171:4,8,19
**bathroom** 82:13
**battery** 250:19,21
250:22,23 251:3,9
251:12 252:4,5,7
**begins** 221:18
**behalf** 104:13
**belief** 166:14
**believe** 5:18 8:24
9:25 12:6 22:2
25:21 32:13 38:15
42:10,17 44:6,16,17
49:6 52:7 66:9
76:25 77:3 84:2
85:11 94:12 96:24
111:14 116:16
122:14 140:6,13
156:10 165:10,24
169:18 175:7
186:18,23 190:7
197:12,24 202:3
207:22 221:10
226:23 236:14
248:10

**believed** 195:13
**believing** 195:20
**bell** 53:16 177:15
**belonged** 32:18
**belonging** 32:15
62:21 149:12
**benjamin** 2:17 3:4
**best** 3:25 170:3
238:20
**better** 32:22 156:14
**beyond** 18:8 19:3
53:22 80:17 148:7
192:10
**bigelow** 1:21 253:7
253:24
**billable** 9:24 223:7
223:14
**bin** 117:4
**bios** 250:19,20,22,23
252:4,7
**bit** 59:22 62:14
103:12 177:8 193:6
194:12
**blacked** 77:16
**blank** 214:17,19
**blood** 253:17
**blue** 91:23
**blurry** 159:18,19,21
159:22,23,24 160:2
160:6,7,9,21 161:5
161:8,14,17,23
162:4,6
**board** 251:3,4
**body** 157:16 178:11
178:18 179:6
**boland** 2:4,9 3:6,6
3:12 4:11,16,18,22
5:2,5,11,18,24 6:9
15:6,18 16:12 18:3
21:13,16 29:3,20
31:25 32:3 33:15,20
50:5 54:22 55:14
58:4,21 70:22 82:9
82:19,22,23 83:20
85:2,5 86:11 87:19

87:24 88:6,10 93:8
93:15 109:24 110:2
110:10 121:8,10,14
127:10,17 128:2
136:16,20 137:3
168:19 180:14,25
184:7 186:17 191:7
193:5,10,14,18
194:4,12,17,21
200:19 204:4 205:2
205:9 206:22
224:22 229:21
234:13,20 237:22
248:15,24 252:8
254:4
**boland's** 87:22
**bolster** 99:8
**book** 238:6
**bother** 36:3
**bottom** 58:22 61:13
63:22 154:14
228:24
**box** 46:12
**break** 31:9 79:5
82:12,25 83:3
127:20 136:17,21
193:8,9 234:14
**breaks** 7:11
**brief** 6:19
**briefly** 83:5
**broader** 82:3 247:22
**broadway** 255:3
**broom** 9:10 70:22
75:6 82:17 85:13
89:9 208:13 209:7
254:10
**broom's** 26:20
72:12,19 74:10
84:15 85:8 89:4
90:16 250:18
**brought** 219:11
243:3
**browser** 168:10
169:2 172:18

**browsers** 168:12,16
168:23 173:20
**bryan** 1:17 3:8
153:23 154:4,8,9,9
252:16 253:10
254:4 255:6,21
**buffalo** 113:3
114:13 115:15
**building** 155:3
**buildings** 151:3
**built** 247:18
**bunch** 15:14 105:11
**business** 217:5
**butt** 62:11
**button** 23:11
**buy** 133:24

**c**

**c** 2:2 253:2,2
**c.p.l.r.** 3:22
**calculate** 232:11
**calculated** 85:20
86:13
**calculates** 89:9
**calculation** 59:21
86:3,5,9,16,18 89:4
89:7,21
**calendar** 126:2
**california** 84:3
**call** 74:23 137:11
145:14 164:6
194:10 240:14
**called** 6:5 21:3
52:14 71:5 74:25
106:6 250:23
**calling** 15:25 23:10
24:3 120:10,11,12
**calls** 136:11 207:11
**camera** 23:6,10,12
234:19
**candidate** 147:10,12
**capabilities** 72:10
72:23 112:10
**capability** 116:16
117:18

**capable** 104:19
**capacity** 116:3
**capture** 23:9
**captured** 23:12,16
24:4
**card** 23:12 82:7,11
**careful** 152:21
**carmine** 77:4,11
110:12 152:20,23
158:18
**carmine's** 77:7
**carve** 35:6
**cary** 1:20 253:7,24
**case** 6:24 7:4,14 9:7
10:21 13:18 14:11
15:22 16:25 17:17
18:6,14 31:25 32:3
32:5 37:6,12 40:19
41:19 47:3 52:13,23
52:25 53:3,13,24,25
62:20 64:20 70:7,18
70:24 77:13,13 82:3
99:24 101:16
102:25 103:8 105:6
105:7,12,21,23
108:25 110:23
114:24 115:4,23
122:21 125:16
129:22 132:2
135:24 137:23
141:4,12 150:13
152:12,14 153:12
153:15 154:20
155:8,10 174:3,8
176:22 178:9
180:11,18 184:20
185:5,12,15,20
188:16 189:5
190:10 201:2 203:4
205:8 215:10,12
217:9,25 222:9
224:2 227:12 233:8
235:2 236:4,12
239:13 242:14,15
244:8 245:8,17,24

245:24 246:18
247:10,15,23 248:3
255:5
**cases** 4:10 13:25
52:4 54:3 100:11,13
153:16,18,19 214:6
230:18,23 241:12
**cataloged** 72:6
**categories** 163:23
**category** 130:11
**cause** 47:22 105:6
134:18 135:15
172:23 175:13
**caused** 48:18,21
56:12,14,20 135:7
**caution** 210:5,10
**cd** 25:7 66:19 134:3
221:20
**cds** 57:6
**ceglia** 1:5 3:7 12:23
16:2 17:19 28:8
35:18 36:19 61:22
62:2 63:4,4,9,18
64:13 65:16 67:15
68:12,15 76:24 77:4
77:11,12,14 80:19
92:9 93:4 95:20
105:15 108:10,19
108:20,22 109:8,21
109:23 110:7,11,13
110:13,18,20,22
111:2 112:18,20,21
113:11 114:20
115:7,8,17 119:17
121:17 122:5
123:13 124:19
128:6,13 129:16,24
138:9,16,17 139:24
140:17 141:6,9,10
141:14 146:3 147:3
147:5,10,16,23
149:13 150:25
152:20,23,24
156:11,21 157:8
158:12,18,19 159:7

161:4 162:21 163:3
163:25 165:6
167:23 169:2
176:23 178:19,24
179:11 184:14
186:16 187:15,21
188:11,18 190:3
195:4 199:24
200:22 201:3
202:13,21 212:13
225:11 254:12
255:5
**ceglia's** 59:18 60:3
73:19 76:16,20 77:2
106:18 108:24
109:7 112:23 151:2
160:21 161:12
183:22,23 187:14
201:15 231:8
**ceglias** 62:21
**central** 37:7 61:4
**certain** 30:9 32:14
120:9 183:3,6
249:13 250:24
**certainly** 10:17
12:17 14:4 33:11
41:13,17,19 63:16
69:3 73:15 75:15
77:25 95:11,15
116:25 117:6
119:11 138:13
139:2 145:19 196:9
218:14 234:7
235:14,17 248:4
**certification** 202:22
207:24 208:4,7,10
208:13
**certified** 3:17 14:7
19:19 237:17
**certify** 253:9,15
**cetera** 116:23 232:9
**cfe** 208:6
**chain** 149:25 150:18
159:4,6,8 163:9,13
178:14

**challenge** 143:12
**challenges** 163:20
237:25 254:20
**challenging** 142:23
143:5,8,14,14
**chance** 70:17
**change** 82:8,10
109:20 110:16,24
115:16,20 134:5,7,8
134:22 167:12,12
167:22 171:2 174:9
255:7
**changed** 24:8,9,10
174:11
**changes** 172:22
173:4,8
**characterize** 63:15
69:20
**charge** 183:10
225:10
**charged** 9:20 80:17
81:24 185:11 223:5
224:9,10,11 225:19
**chat** 83:2
**check** 153:22 202:4
**chicago** 108:19
**choice** 4:3 226:24
**choose** 207:14
238:19
**circumstance** 38:6
133:8,14 134:15
239:9
**circumstances** 38:3
50:23 51:4,11,25
63:2 103:24 112:9
112:13 153:11
197:2 204:17 218:2
219:16 220:8
226:12 242:6
244:25 245:4
**cited** 201:14
**civil** 3:20
**claim** 16:4 119:17
132:2 141:7 142:2,7
142:15,21 150:8

165:8,15 199:22,23
200:2 232:4
**claimed** 165:4
**claiming** 163:25
164:3,11
**claims** 141:22 143:6
143:8,13,15,16
164:21 165:7
**clarification** 7:7 8:2
203:24
**clarify** 21:11 45:16
60:7 66:13 70:20
107:10 110:10
140:3
**clarifying** 107:15
**classes** 20:7
**cleanup** 73:14,16
**clear** 5:16 16:8,11
36:17 42:12 44:11
54:20 67:7 88:9,11
93:12 95:25 107:8
107:16,19 108:6
110:20 114:23
115:5 127:15
128:14,19 137:14
141:24,25 144:6,8
144:24 150:13
152:18 155:17
167:3 176:11
182:21 186:8
201:19 202:16
212:25 213:7
217:22 219:13
222:2 226:17
233:10 236:9 239:3
240:2 242:21 244:7
247:4,15
**clearly** 3:24 18:4
51:25 99:22 140:24
141:2,11 142:3
146:20 152:7 159:3
175:16 190:22
226:22 239:4,13
245:3 246:4,20,23
247:2

**client** 15:8 18:7
124:6 126:20
146:24 150:16
155:12 165:2
189:15 211:9
212:21 214:10,21
214:25 225:23
231:22 233:18,23
**client's** 125:6
132:15 143:17
175:16 211:12,23
231:15
**clients** 67:21 68:24
69:7 214:14
**clock** 98:16,21,23
99:23,25 101:20,25
102:7,10,15 149:6
174:19,22 211:5,23
218:12,16 219:18
219:24 220:3,21
222:16 229:13
241:7 242:4 245:8
246:7,9,14,17 247:5
248:6 250:25
251:20,21
**clocks** 221:25
**close** 136:18 172:3
250:3
**cloth** 213:3
**cmos** 251:12 252:4,7
**coach** 88:7
**code** 133:7
**collaborative** 11:13
**collect** 81:18 225:11
**collected** 42:4,13
45:10 186:14
**collecting** 50:25
56:22
**collection** 45:18
46:21 47:8 48:22
50:8 56:21 84:4
233:3,4 245:21
**collections** 182:24
233:5,7

colon  157:18,19
  167:5
column  228:23
come  25:4 143:21
  210:20
comes  169:18 210:8
  221:3
comfortable  243:24
coming  137:21
comment  146:2
  195:19
comments  12:18
commission  255:25
commit  182:8
committing  50:12
  50:21 175:16
  179:12 245:9
common  131:17
  134:25 139:9
  196:16
communicate
  136:10 143:23
communicating
  158:13
communication
  40:6 147:23 158:17
  188:21,24
communications
  183:8 185:20
  224:20
company  35:7 106:9
  245:9 255:2
compare  49:3
  192:14 196:12
  204:13 207:17
  222:24
comparing  196:24
  197:2 206:25 220:5
comparison  192:20
  223:3
compensated  9:17
compensation
  223:24
competing  229:6

compile  223:22
complaint  16:3
  164:10,16,19
  200:14
complete  78:16
  99:18 242:12
completed  223:20
completely  70:6
  113:21 152:13
  171:18
comprehensive
  184:15 235:19
comprise  23:3
comprised  20:13
computer  12:25
  23:17,19 24:21
  32:18 34:25 40:25
  41:4,8 57:15 59:9
  59:19 60:3 61:20,25
  62:5,9,12,20 63:5,9
  64:9,14,17 65:4,7
  65:11,15 67:17
  68:11,13,16,18 69:2
  69:10,11,22,25
  71:18 72:9,15 73:5
  73:19,21 74:2,7,9
  74:12,15 75:6 80:22
  84:16,22 86:23
  96:19 97:3,24 98:11
  101:12 102:15
  103:21 104:12,16
  104:17 105:8 106:3
  106:18,22 108:23
  109:9,23 110:7,15
  111:4,5,10 112:24
  113:5,13,18 114:3
  115:4,21 118:5,15
  130:8,11,15 134:3,4
  139:22 140:16
  143:19 148:14,15
  148:20 149:3,12
  156:16 168:3,6,9
  174:18,22 182:4
  190:18,24 191:19
  194:25 198:6

209:14 210:21
  211:5,12,23,24
  215:2,2 216:22
  218:12 219:8,14,23
  219:24 220:12
  221:8,24 222:4
  228:8 229:4,13
  230:14,18 236:25
  237:2,5,25 240:8
  250:20,24 251:7,15
  251:22,23 254:17
  254:21
computers  32:17,19
  32:23 33:5,25 34:4
  34:9,13 35:11,15
  37:4,10 38:6,10
  40:2 57:3 69:14
  83:8 84:8 105:11,20
  136:6,9 137:9,21
  181:18,23,25 251:4
concedes  18:14
concept  219:11
concert  141:10
  147:7
conclude  78:2,16
  98:10 114:4 175:4
  179:10,21 191:14
  196:20 204:16
  242:10,24 244:11
  245:21
concluded  138:23
conclusion  19:11
  65:21 74:9 97:9
  110:17 113:7,10,11
  115:20 119:22,24
  120:6 124:5,11
  126:11,17,19
  131:10,20 135:23
  139:23 140:17
  146:4,14,17 147:2
  175:19 196:17
  197:3 219:13
  233:25 242:11,21
  243:16 245:2
  247:14,17

conclusions  11:3
  14:17 90:20 132:19
  137:22
conclusive  229:5
conclusively  207:18
  239:17 240:23
conduct  51:12 170:9
  183:5
conducted  18:5
  32:14
confidence  99:9
  100:5 101:4
confident  99:16
  101:15,18,22 102:8
configuration
  117:22,23 170:25
  171:4,16
configurations
  171:15,23
configure  170:23
  173:14
configured  117:11
  118:16 119:3,7
  172:17 173:15
confirm  169:12
  183:16 184:2
  201:11
confirmed  44:13
  169:13
confirming  182:4
confirms  98:19
conflicted  226:5
confuse  92:5
confused  7:5
confusing  27:21
  183:19 238:12
conjunction  116:14
connect  180:23
  222:21
connected  84:22
connection  120:17
connectu  52:15,22
  52:25 53:3
consider  75:13
  138:9 155:7 210:7

242:5
**consideration**
183:13
**considered** 138:13
143:3 185:16
242:13
**considering** 50:24
175:15 246:17
**consistent** 92:23
97:22,25 98:8,14
100:8 101:16 112:4
131:11 149:25
167:13,22 171:7
175:6 214:5 226:19
**consistently** 171:9
**constellation** 243:3
**construction** 238:20
**consultation** 53:9
**cont'd** 194:20
**contact** 173:12
240:14
**contain** 115:7 222:7
225:22
**contained** 35:19
216:10 233:2,3,17
**container** 177:13
179:23
**containing** 164:25
165:7 217:24
**contains** 97:17
150:7 172:15
**contemporaneous**
233:22
**content** 123:16
125:10 128:24
131:6 139:5 159:13
195:15,17 196:2,12
196:13,19 204:14
211:8 212:17,19
222:17,23,24 223:3
223:3
**content's** 139:14
**contents** 78:15
117:14 178:6
224:20

**contest** 106:10
**context** 22:24 99:20
102:3 149:10
154:20 155:8
156:18,22 160:5
179:20 196:22
242:24 245:22
246:18 247:9,22
**contextual** 62:18
102:5 152:4
**continue** 93:16 94:6
**contract** 14:10,11
14:21,23 15:4,10,25
16:5 17:7,9,16,18
17:21,23 18:6,6,7
18:15,16,19,24,24
18:25 19:2,6,7,8,12
19:13 20:12 21:19
23:3 24:12 28:8,12
28:17 34:7 36:11,15
36:18,23 91:14 92:3
92:10,13,17,18 96:4
97:17 102:20,22
103:3,9,10 107:3,11
107:17 115:7
125:15,16,20
126:13 141:23
142:9,13,14 144:10
144:15,17,20,24,25
145:12,17 146:5,10
146:15,21,24 148:2
148:17,22,25
149:21,23 150:5,8
150:14,15 152:15
153:23 154:8
155:12,14 156:20
159:14 164:3 188:9
188:11,22 189:5,10
189:15,16,19,24
190:6,14,17,20
191:3,10,12,22
192:2,5,9,12,13,15
192:16 199:15
205:15,16,20 206:4
206:8,14 215:24

217:6,9,11 225:13
231:10,17,18,21,23
242:17 247:16,17
248:18 249:6
**contract's** 144:12
145:10 146:2
**contrary** 110:8
**contributed** 9:25
10:4 11:16 12:18
14:6 31:12
**contributing** 235:3
**control** 69:22 72:15
104:2
**convention** 92:19
93:7 201:20
**conversation** 6:13
6:17,20,22 139:18
150:17 152:17
173:10
**conversations** 7:13
184:11 224:25
225:5
**conversion** 55:2
56:23
**convert** 179:3
**coordinated** 165:18
173:25 174:12,14
174:23 175:5,13,18
175:25 176:24
179:7,17 180:21
**copied** 25:7,9,11,22
25:25 26:5 65:18
66:19 90:3 95:6,9
96:14,19 111:8
139:12 164:16
165:2 169:3 172:23
173:19 195:11
211:9 229:9
**copier** 90:3
**copies** 5:15 14:14,22
16:15 23:4 32:11
37:20 38:16 41:25
42:4 43:15,18,21,24
44:5,8,11,14,20
45:2,5,7,10,14

46:25 55:4 125:21
125:22 161:17
164:10 182:24
189:24 195:13
200:16 215:12
216:16
**copy** 5:6,9 8:7 16:3
20:4 30:11 37:25
38:4 42:15,19,20,21
42:22 45:22,24 46:9
46:12,16,17,23 48:2
48:3 88:19 92:12
107:12,21,23 108:5
108:8,9,11,14,17
109:13 134:2,4
139:4 140:23
147:15 149:19
151:8 167:10,11,13
189:22 192:14
195:15 196:21
199:17 203:19
210:22,23,24
211:24 212:4 231:9
233:19 248:18
**copying** 29:2 112:2
168:3,5,6,7
**corner** 58:8 84:19
91:22 208:25
**corollary** 144:23
**correct** 5:24 8:13
12:11 13:13,16
19:14,15,19 20:14
20:17,19,21,25 21:5
23:24 25:5,10,13,16
26:11,12 31:12,13
31:17 37:4 38:4
43:2 44:15 45:21,23
47:4,11 56:7 58:13
59:5 61:5,12,15,17
61:19 63:8,23,25
64:4,15 65:13 66:17
67:15 68:2 71:16
77:18 80:2 83:12
85:21 88:14,21
90:25 93:25 94:11

94:16,17 97:24
98:24 99:6,11,22
100:4 105:15,16,18
107:5,7,9 121:17
125:3 126:4 130:14
132:4 137:13,19
143:24 144:21
146:6 148:6 154:12
156:2,10 157:11
158:2,9,14,20
162:14,22,23
165:12,15 174:24
175:10 182:6 186:4
191:7 197:24
200:11 205:24
207:21 222:19
223:3 224:22
227:25 244:16
**correction** 121:11
**correctly** 66:12
174:23 195:3
**correspondence**
81:21
**corresponding**
177:16
**counsel** 6:14,23 9:10
9:13,20 38:18 39:11
83:2
**count** 94:6
**counting** 95:2,5,17
**county** 253:5
**couple** 83:6 95:5
118:9 137:5,6
177:10,14
**course** 49:8 220:18
225:15
**court** 1:2,21 9:15
11:5 17:17 20:2
28:5 30:6 33:23
35:17 36:13,21,21
84:15,24 91:6 107:8
138:10 163:24
198:3 214:16 225:9
225:20 250:14
253:7

**courts** 22:19
**covered** 32:13 35:17
**create** 49:24 55:3
75:13,19 85:14 87:2
115:2 130:20 132:8
132:11,16 140:24
141:3,4,12 142:11
142:12 144:18
183:2
**created** 24:18,20,25
25:2,17,20 57:25
66:2,8,11,16 93:22
93:23 94:14 96:6,8
96:9,11 102:14
140:21,22 148:8
173:4 195:9 222:13
229:7 233:21,23
**creation** 96:18,20,22
97:6,11,14,15 98:10
99:9,17 101:4,22
102:12 134:12
146:23 219:22
220:2 226:4
**credible** 110:22
**crimes** 228:7 254:16
**criminal** 237:25
254:20
**crutcher** 1:19 2:11
**current** 4:22 8:20,21
8:24 9:23 10:6
74:23 78:15 173:18
**currently** 75:6
214:10
**custodian** 184:25
**cut** 147:11 164:25
165:5 166:21,24
167:23 176:15
215:14,16,24 216:4
**cutting** 167:20,20,25
**cv** 1:4 8:19 9:2
12:20 208:15,17
**cvs** 12:5,6,10

## d

**d** 1:5 121:2 200:22
254:2,12
**data** 35:6 41:13,21
42:20,20,21 45:11
51:3 101:3 116:12
121:3 123:6,11,12
123:20 124:3 127:9
129:3 148:21 168:8
172:16,18,23
173:19 183:2 199:2
199:2,3 207:4
211:11,22 227:6,11
227:19,24 242:16
**date** 6:4 37:9 82:18
97:11,15 99:9,17
101:4,21,23 102:12
114:11 120:9
124:22 125:17,23
125:23 134:12,12
156:5 188:12
200:23 205:6 210:5
211:19 218:15,25
219:20,20,22 220:2
226:4,5,8,24 228:9
238:3 239:7,8,14,16
240:10,24,25 241:3
241:5,6 243:14,18
243:23 244:3,5
255:5
**date's** 174:7
**dated** 6:3 8:8 180:15
181:14 254:8
**dates** 96:18,20,22
97:6,6,7,14 171:6
219:7 220:5,15
225:25 227:4,5
228:3 229:4,7
233:22 239:23
240:3,4,16 241:13
243:6,9,12
**dating** 244:15
**day** 17:15 54:24
156:8 161:13

162:11 248:6
252:19 253:21
255:23
**daylight** 165:20
166:4 174:5,6,11
**days** 66:22 118:14
156:10,13 158:22
160:8 161:8 162:5
162:25 163:6 246:8
**dbx** 75:22 76:4
77:21
**deal** 241:20
**dealing** 20:20 41:14
97:24 241:23
**dean** 2:9 3:6 175:25
**december** 54:23
246:12
**deciding** 233:12
**decision** 13:20
**declaration** 47:6,9
47:13,21 48:2,14
82:16 102:25
108:25 110:12,16
187:15 200:22
201:2 202:13
203:12,19 206:10
231:8,15 254:9,12
**declarations** 47:2
103:6 110:8
**declare** 153:5
**declared** 109:8,22
**dedupe** 49:8 50:8
51:6
**deduping** 51:2
**default** 92:20 93:2,5
93:6 94:2,5
**defect** 24:6
**defendant** 52:5
**defendants** 1:10
2:12 3:3 10:9 39:16
39:25 40:8 42:23
43:7 185:7 187:6,10
199:22,22 202:24
206:15 207:7,10

defense 6:13,22 9:10
9:13,20 38:18 39:11
83:2 224:25 225:5
237:25 238:18
254:20
define 111:15,18
defined 22:5 236:24
definition 23:13
56:9 237:2,5
definitive 113:7
delete 130:17
deleted 47:22,23
78:6,8,18,20 79:21
79:22,23 80:4,13
116:22 117:2,3
119:18,22,25 120:6
123:18,18 124:7,9
126:9,16,22 127:16
128:7,9,13,17,20,20
128:22,23 129:4,5,6
129:8 195:8,16,22
222:11,17
deletion 121:3
123:20
delineated 45:9
deliveries 42:11
43:12
delivery 42:17,18
46:5
demonstrate 98:16
99:22
denominated 92:8
department 209:5
209:13
depend 67:24
101:24 119:2
153:11,19 226:11
242:25
dependent 218:15
depending 9:22
57:13 69:19 95:14
119:7 131:15
153:17 196:24,25
204:16 229:8 241:8

depends 102:5
103:23 116:24
117:10 130:25
196:22 209:22
210:23
deponent 255:6
deposed 7:5,13
18:14
deposing 87:24
deposit 104:16
deposition 1:17 3:16
3:24 4:5,8 6:25 7:12
7:15 9:6 18:23
54:13 83:3 100:15
100:16 255:5
depositions 9:7
100:19
derived 90:17
describe 11:5 12:12
28:5 30:5 32:16
185:13 198:3
description 32:22
85:16,17
desktop 67:22 251:4
despite 123:15
detail 139:21
detailed 60:13
140:12 151:6
details 189:3
detected 73:10
detection 182:9
determination
115:22 237:8
determine 19:21
20:9 25:23 72:20,22
77:6 141:18,21
161:20 169:24
183:6 199:4 204:7
220:4 225:24 226:5
239:17 241:23
242:9 247:21
determined 13:21
17:17,21 107:24
108:3 137:17 170:2
195:10 233:20

determining 36:14
36:22
detrimental 145:23
device 25:9 148:6
197:9,12,21 198:19
198:23 199:5
207:10
devices 137:25
138:4 197:16
dial 127:18
differ 59:21 60:5
difference 49:5 56:2
61:6,9 167:2 168:15
201:20 243:6 248:6
differences 47:7,24
48:9,12,19,21 49:11
49:18,20,25 50:3,13
50:22 51:20 54:17
55:2,21 56:12,17,18
56:24 57:4,8,13
166:8,23 176:6,10
176:15
different 47:3 49:7
85:23 91:4 92:25
94:4 95:7 104:25
107:4,18 117:11
139:15 162:16
163:15 173:19,21
184:5 189:4,21,22
192:21,25 201:13
201:21 209:18
214:25 215:11,11
215:17,19 216:6,8,9
216:20 217:8 220:5
220:15 222:25
230:12 247:19
differently 229:8
difficult 62:16
223:12 245:2
difficulty 250:11
digital 10:3 18:3,4
19:9,18,20,22,25
20:8,23 21:4,7 22:4
22:15,17,18 23:6,10
23:16 24:17 25:24

26:4 41:12 108:3,4
108:13,18 143:2
148:2 155:15 208:6
232:12 237:13,13
dimension 85:20
dimensions 85:13
85:17,20,25 86:13
86:14,24 88:24 89:4
89:10,22 90:12,17
direct 7:6 95:10,23
131:8,9 159:10
187:13
directly 169:18
170:12 189:18
238:17
director 228:17
230:6
disagree 86:3,5,15
86:18 89:3,20
113:21 176:12,16
210:11 238:23,24
240:5
disallow 238:21
disaster 43:24
disc 44:22
discard 101:7
disclaiming 192:4
discovered 21:25
28:8 75:17
discovery 21:22
33:23 35:17,21,25
36:4,6,13 42:24
43:9 80:18 81:5,10
183:2,18,21 185:13
188:2 200:9 236:10
236:11,13
discovery's 36:16
discredits 218:18
238:15
discrepancies 55:3
discrepancy 48:10
discuss 9:9,12 38:17
70:2 119:20 131:3
220:18

discussed 35:15
130:22 137:7
188:11 211:2
213:10 220:24
discusses 85:13
discussing 13:8
103:14 159:13,18
216:7 227:13
discussion 38:20,23
38:24 58:11,14 85:4
138:15 197:19
221:16
discussions 54:2
disk 25:4 66:22
221:11,13,21,22
222:6,6 233:17
disks 221:25 227:12
display 171:18,23
172:4 174:18
displayed 171:9
displays 171:6
dispute 90:15
227:18 231:8,14
232:4 233:24
disputed 125:16
disputes 227:20
disputing 29:23
district 1:2,3
division 11:11,20
divorce 149:2
doc 140:23
document 14:7,8
15:7,9,14,15,19
16:2,10,16 21:2
22:22 27:25 29:6
48:25 56:3 57:11,23
85:24 96:16 109:2
109:16,25 115:2
131:5,12 132:9,12
132:13,16,17
134:22 135:2 138:8
139:6,13,15 140:22
140:25 141:3,5,12
142:9,11,25 145:15
146:11,16 155:24

156:15 164:6 165:3
176:11 178:2,12
181:10,15 191:5,16
191:17 198:6
199:16,16,18
200:24,25 201:7
202:15 205:4,7,11
206:19 209:8,25
212:20 215:17
216:2,8,21 219:19
219:21,24 221:18
222:5,12 225:20
227:4 231:22 238:9
238:10 239:10
240:24 242:9,18
243:4,8,10,24
244:15 245:20
246:20,20,22,23,25
247:2,7,10 248:3,4
248:21 249:17
254:13
documentation
34:12
documents 22:21
34:16,18,22 51:6,8
65:18 66:10 67:22
85:14,18 86:21 93:7
95:14,15,24 115:3
131:4 132:11
140:21 142:20
144:14,18 148:8
149:6 163:23,23
164:15,24 165:7,10
167:5,11 172:2,15
173:4 183:6 189:4
189:20 202:18,21
211:8,21 212:10,12
213:16,18 214:2,3,7
215:15,20 216:10
217:18,24 221:10
222:10,10,12,14
225:22 226:15,21
226:22 230:18,22
233:18,21 234:3
242:7 243:13 246:3

246:5 247:13
doing 56:21 80:14
104:19 151:25
175:8 224:6 225:19
233:12 245:15
246:19
dollars 10:7
double 190:21
doubt 29:16 234:12
downloaded 25:14
downtown 151:4
dr 238:5
draft 214:6
drafters 235:10
drafting 11:13
13:10
drafts 12:17 214:8
draw 238:8 243:15
243:17 245:2
247:14
drawing 113:6
135:23
drawn 213:4 242:12
drive 24:19,25 25:2
25:11,12,18,20,22
26:7,14 65:19 66:2
66:8,11,16,24 67:2
67:10,24 93:22
94:15,20,21,23 95:2
95:7,9 96:10,12
107:11,13,21,25
108:2,4,9,13,18
111:8 112:3 148:9
195:9,11,12 203:8
203:21 221:4,7
248:8 251:23
drives 32:18 107:18
drop 134:24
duly 6:6 253:12
dunn 1:18 2:11 51:8
53:10 118:7,20,23
123:10 183:4,11,14
187:13 215:10
224:21 225:18

duplicate 42:22
189:23
duplicating 5:14
dupree 2:16 3:4
194:6,15 203:24
205:7 206:18
207:11,15 212:2
218:22 224:3,14
229:16 231:11,20
234:16 237:19
248:13,16,22
249:21 250:5 252:9
252:10
duty 42:24

**e**

e 2:2,2 6:5 24:19
26:8 32:12 35:20
40:5 42:2,5,14,15
42:25,25 43:8,16,21
43:22 44:5,8,12,14
44:18 45:5,11,15,20
46:8,12,17 47:8,14
47:14,22,23 48:19
49:4,7,7,20 50:7,9
50:13,22,25 51:21
54:18 55:4 56:19,22
57:7 58:15,17 59:5
59:7,11,15,15,19,20
60:3,6,14,17,20
61:10,21 62:7,8,20
62:22 63:4,6,10,15
63:19,21,22 64:10
64:13,18 65:10,11
73:20 76:16,20,21
76:22,24 77:2,14,20
78:3,4,5,8,18,20,25
79:3,10,15,16,19,20
79:23 80:4,4,13
81:4,9,14,17,20
85:15 90:9 91:13
97:16,20 98:11,13
98:18 99:5,7,14,15
99:19,21 101:2
102:2,19 104:9,10

104:13 109:10,21
110:18,20 111:3,6
112:18,25 113:13
113:16,17 114:12
114:15,16,22,24
115:5,6,12,25
116:21 117:19
118:8,9,17,20,23
119:14,18,22,24
120:4 121:18,22
122:6,9,13,16,16,19
122:22,23,25 123:6
123:14,15,18,23,25
124:6,9,13,15,17,21
124:23,25 125:4,7
126:6,12,15,20,21
127:7 128:7,8,13,15
128:20,22 129:3,6,8
129:12,13,17,19,20
129:25 138:14,18
146:23 147:20,21
149:4,13,14,15,19
149:21,25 150:9,15
150:18,24 151:8,17
151:17 152:7,15,18
152:19,24 153:4,21
153:25 154:3 156:6
156:9,11,19 157:4
157:10,12,17,17,21
158:17,23 159:3,4,4
159:7,8 160:11,20
161:3 162:12,15,16
162:17,19 163:2,9,9
163:12 164:10,12
164:14,17,21 165:7
165:10,16,19,23,24
166:3,9,10,19,20,22
168:14 169:3,7,11
169:15 170:19,20
171:17,17 173:16
174:2,9,13,15,16,24
175:5,14,15,17,21
175:22,23 176:3,18
176:21,22 177:4,9
178:10,11,12,17,18

178:23 179:5,16,22
179:24 180:4,9,15
181:12 182:15,20
182:22 183:7,10,18
183:23 184:3,9,19
185:2,8,14,19 186:3
186:11,16,23 187:3
187:7,11,16,20
188:3,12,18,21,24
188:25 189:25
190:8 191:24 192:3
194:2,2,18 210:6,8
210:9,18,19,20,21
211:7,10,12,14,20
211:25 212:3,7,12
212:14,18,24 213:2
213:4 216:4,11,17
217:24 225:14,23
226:14,18,23 227:3
227:6 228:12
230:18,22 231:16
232:5,18,21 233:2,6
233:11,16,19 253:2
253:2 254:2
**earlier** 22:5 65:24
74:18 87:9 94:8
103:12 110:8
166:22
**earliest** 93:18
124:19,21
**early** 41:22,23
184:13
**easily** 218:19 223:20
238:16 244:14,19
**eastern** 58:24 60:24
166:2,4 226:19
**edit** 215:22
**edited** 212:8 216:2
226:22
**editing** 23:24 213:2
216:5
**editor** 130:3,8,11,14
130:15,19,19 131:7
131:12,21 132:2,10
132:18,21 133:10

135:11,16,18 136:2
139:19,24 140:6,18
142:18 147:8
**editorial** 12:18
**editors** 130:17
**eduardo** 53:14
**effect** 51:7 166:3
**eight** 74:24
**either** 22:25 41:24
42:3 73:13 79:24
95:20 139:3 176:8
186:13 214:24
234:8 238:18
248:20
**electronic** 19:24
20:17,20 22:20
30:17,19,22 31:3,20
31:24 32:4 40:16
52:3 53:3,13,24
54:3 144:14,18
145:5 182:25
185:19 217:9 225:7
231:19
**electronically** 136:9
**elements** 213:8
**eliminate** 111:11
112:15
**elliot** 1:8
**embedded** 198:15
198:17 227:6
**employed** 202:20
**employee** 245:6
**employees** 81:21
106:11,14 215:3
**encase** 131:18 135:8
**ends** 150:13 205:20
205:22 206:10,15
**enforced** 146:6
**engage** 147:3
**engaged** 48:17
50:25 155:13
244:13
**engagement** 8:23
**entered** 147:16

**entire** 10:23 17:3
103:8 117:14
118:16 127:11
154:20 155:8
163:12 202:15
246:18 251:19
**entitle** 223:24
**entitled** 201:2 228:6
237:24 254:15,19
**equate** 49:9
**equivalent** 79:14
**eric** 9:24 12:15
**errata** 255:2
**error** 175:14 220:23
246:8 247:3
**escape** 244:19
**esq** 2:9,15,16,17,18
**essentially** 30:10
73:16 131:7 132:10
133:3 135:4 198:4,7
198:21 222:5 230:4
233:12,14
**et** 116:23 232:9
**evaluate** 20:8 34:3
36:3,17 72:19 89:7
90:19 99:20 177:18
**evaluated** 15:14,19
34:2 36:5 136:8
137:8 164:21,24
211:7,9 227:11
247:21
**evaluates** 34:25
**evaluating** 247:9,10
**evaluation** 35:2
38:18 72:25 73:19
101:25 233:8 247:6
**event** 151:12
**everybody** 214:23
**everyone's** 79:18
**evidence** 3:21 25:24
26:4 28:21 30:18,19
30:22 31:3,20,21,24
32:4,6 34:5 36:10
40:17 41:10 51:14
51:18 52:3,22 53:13

53:23,24 62:18 63:7
63:11,12,13,13,16
63:16 64:20 65:14
73:6,10,13,14 75:7
78:8,12,19,21 83:14
83:17,25 84:5 92:24
95:19,22 96:2 97:23
98:9,23,24 99:15,25
100:7 101:8,16,19
102:6 106:17
110:19,23 111:24
113:2 114:23
115:18 116:7 120:2
120:19,20 122:12
122:14,15,18,25
123:23 124:12
129:15,18,23
130:10,13 131:19
132:15 135:24
136:8 139:22
140:12,15,16,19
142:19 143:12
144:21 146:5,10,22
148:14,15 149:3,4
150:4,12,14 151:21
153:13,14 154:19
154:21,22,24,25
155:2,5,10 156:16
159:22 163:8
164:14 167:3
190:18,25 191:8,11
191:13,20,23
192:11 199:21,21
199:23 207:19
212:9 213:6,8,12,17
217:7,15,19,21
218:2 220:13 221:2
221:7,9,13,23 222:7
224:6 225:12 228:7
231:6,13 232:2,3,4
232:6 237:13
239:12 246:18
247:15,19 254:16
**exact** 10:5 33:4,9
97:13 189:23

203:19
**exactly** 19:4 22:23
32:25 181:9 206:6
235:24
**examination** 6:8
194:20 254:3
**examine** 138:8
**examined** 6:7 41:12
**examiner** 14:8
207:25 237:18
**examiners** 10:4
12:21
**example** 23:20 35:2
64:22 67:16 133:20
166:9 191:24 215:7
226:13 239:4 240:4
240:20 241:4,9
242:4,20,25 244:7
244:24 247:3,4
251:8
**examples** 177:5
220:19 239:6 240:2
241:2,21,21 243:13
243:19,20 245:25
246:15
**exceedingly** 115:10
161:23
**excerpt** 238:5
**exchange** 158:11
**exchanged** 135:14
164:10,12,22 177:9
**exchanges** 162:20
178:23 225:23
**excluded** 44:18
**exclusively** 221:3
227:11,14
**excuse** 126:23,25
**exercise** 11:14
**exhibit** 5:6 6:2 8:5
9:3,16 10:20 14:18
17:10,23 19:12
20:13 27:24 29:8,14
29:17 30:15 40:6,18
58:6 82:16 84:11
87:6,7,14,17,20,23

88:2,4,12,15,16,20
90:23,25 91:3,10
93:9 107:6 120:23
121:7,9,10 155:19
197:6 200:20,21,25
205:3,4,10 206:2
207:5 208:20,21,22
208:23 228:6,10
237:24 238:4
248:19 249:2,3,4,5
249:8 250:14 254:7
254:9,11,13,15,19
**exhibits** 5:12 249:10
250:2 254:6
**exist** 16:23 78:13
101:2 104:4,6
117:13 142:13
204:10
**existed** 46:12 72:14
72:20,23 75:8 77:21
101:3 186:9 200:6
200:13 204:9
**existence** 14:21 17:6
74:18 81:20 217:20
242:17
**existing** 54:5 120:4
123:12 214:24
**exists** 16:20
**expect** 167:12,13,17
167:22 170:16,18
170:21 214:4
215:13
**expedited** 33:23
35:16,21,25 36:4,5
36:13,16 42:24 43:8
80:18 81:5,10
183:18,21 185:12
188:2 236:9,10,13
**experience** 69:11
94:2 172:6,8 214:5
248:2
**experiment** 214:7
**expert** 16:24 19:18
19:20 22:4,16,17,19
22:22 26:21 34:25

41:9,12 69:12 84:16
100:10,11,12
102:19 182:2
191:16 204:11
205:11 207:25
208:12 209:22
219:9 227:9 233:19
237:10,10,11,15,18
240:8
**expert's** 70:18
**expertise** 18:3
**experts** 15:15
100:23 103:8
142:24 156:24
196:17 209:18,19
223:23 228:8 229:6
232:13 237:3,6,14
254:17
**expires** 255:25
**explain** 198:19
**explained** 114:19
**explanation** 47:15
47:19 70:6 72:16
111:9 131:22 133:9
135:17,25 155:11
155:15 161:2 162:7
176:14
**explanations** 47:12
131:23 133:13,14
155:9 176:20
**express** 115:25
116:8,14,18,19
117:16,17,24 118:2
118:3,6,15,25 195:7
195:18
**extent** 25:23 78:3,18
80:15 81:10 167:10
202:25 203:2
215:23 235:13
239:21
**external** 100:6,7
101:17 116:20
**extra** 49:2 50:16
51:5

**extremely** 177:25
**eye** 23:20,24 24:6

**f**

**f** 93:9 194:2 249:2,4
  253:2
**face** 227:3
**facebook** 1:9 15:25
  18:16 53:20 106:9
  120:18 121:23,24
  122:2,6,10,17
  123:15 141:23
  142:2,10 145:21,24
  189:5 231:9,18,21
  231:24
**facebook's** 142:4
**faced** 227:2
**facility** 38:14
**fact** 20:3 28:22 51:6
  62:19 63:15 65:18
  66:11 78:2 84:14
  91:17 92:11,12,15
  97:23 98:9,10,21
  107:21 108:4,21
  109:18 111:7,9
  113:5 120:21
  122:21 123:13
  131:3,11 135:8
  136:2 144:21
  146:11 149:11,18
  149:21,24 152:2
  154:21,22 156:18
  156:19 159:15
  161:7 162:9 165:20
  169:14 176:3,19
  196:6,11 207:10
  226:11 239:9
  241:13,13,15
  243:21
**factor** 14:16 98:19
  146:13
**factors** 100:6
**facts** 97:5,8 135:18
  242:12

**fair** 7:22,24 16:12
  16:18 20:11 24:23
  40:25 41:2 42:2
  50:4,11,14,19 58:5
  58:10 59:22 61:7,22
  73:7 87:19 100:22
  101:3 107:14 124:8
  140:8 181:17 208:8
  220:6 237:7
**fairly** 144:7 152:3,4
  153:14 196:13
  223:20 226:17
**fake** 141:3,5 144:13
  146:5,16 149:5
  191:12,18 192:13
**faked** 146:17
**fakes** 165:16
**false** 141:12 142:11
**familiar** 23:21 52:13
  52:17,20 64:23,24
  119:14 139:8
  177:11 209:8
**familiarity** 3:19
**far** 4:13 118:11
  163:24 220:23
  224:13
**farfetched** 245:16
**farther** 158:3
**fashion** 49:17
**father** 109:8,21
  110:12
**father's** 108:25
**faulkner** 53:11
**faulty** 77:25
**february** 42:20
  45:12 222:11
**federal** 3:20,21
**fee** 214:13,18 215:4
  215:8,9,20,21
**feed** 95:14,15
**feeding** 95:24
**feel** 11:19 153:2
  171:13 237:16,20
**feet** 151:11

**field** 219:3 236:25
**file** 5:19 19:24 20:17
  66:15 75:23 76:4
  77:21 86:10 89:10
  91:13 92:4,19,20
  93:2,17 94:3,14,15
  96:6 101:21 102:14
  132:3 134:20 135:7
  135:10,14 139:9
  195:14,14,18,22,24
  195:25 196:5,6,19
  196:23 197:2,8
  198:2,5,6,7,20
  199:7,9,10,11,12,14
  199:20 201:9,14,14
  201:17,18,19,21,22
  201:25 202:2,6,11
  203:5,10,15,18,21
  203:22,25 204:6,7
  204:14,15,19,20,20
  205:5,14,19,22
  206:7,8,11,16,17,23
  219:25 221:20
  222:21,23 227:7
  229:8 232:11,14
  239:18 254:14
**file's** 102:11
**filed** 5:17,25 8:7
  29:11,18,25 30:14
  87:11,13,18 91:5,10
  108:25 137:22
  190:10 200:25
  205:8
**files** 22:21 24:25
  25:17 57:6,7 68:11
  90:6 96:18,23 97:12
  104:16 111:7
  116:22 134:2,6
  145:6,8 195:13,16
  195:20 196:5,6,18
  197:4,10,11,20,20
  197:21,23,24
  198:13,16,18,25
  199:3 200:6 201:8
  201:12 202:7 203:6

**field** 219:3 236:25
  203:11,20,23 204:2
  204:3,4,5,8,8,10,12
  204:13,22 205:17
  206:25 207:6,6,8,17
  218:10,11 219:14
  220:6 222:3,17
  229:11 240:11
**filing** 29:5 200:14
**final** 98:5 216:18
**finally** 250:18
**financial** 145:23
**find** 20:18 27:11
  75:22 78:7 92:24
  93:3 95:19 116:7
  130:7,10,14 137:24
  183:19 186:11
  188:25 190:24
  192:2,3,7 194:24
  195:3 196:7 217:8
  221:6,8,15,23 231:6
  231:13,25 232:6
  233:24 240:15
**fine** 55:17 85:3
  93:15
**finish** 126:24 127:5
  127:25 128:2
  160:18
**firm** 70:14 83:10
  215:11 216:16
  245:10
**first** 21:17,21 27:23
  28:10,11 38:2 40:22
  45:18 60:8,10,23
  76:2 91:18 92:16
  93:14,22 95:9,12
  96:4,7,9 97:16
  98:24,25 100:14
  107:20 126:15
  134:23 186:20
  205:13,13 224:6
  225:17 249:3,5
**fit** 138:9
**five** 77:15 78:2,11
  78:12 205:4 234:14
  254:13

fixed   24:5
flip   205:25 241:22
flopping   241:22
floppy   25:4 66:22
   221:11,13,21,22,25
   222:5,6 227:12
   233:17
florida   115:13
flowed   210:25
focus   35:20
focused   36:22
   183:21 227:15
folder   76:16 79:15
folks   12:13 21:3
following   3:24 97:22
follows   6:7 194:19
footnote   58:18,23
   59:2
forensic   10:3 12:21
   22:17 25:24 26:4,21
   37:20,25,25 38:10
   41:12 44:7 45:7
   52:8 56:21 59:9,13
   62:10,15 63:7,11,12
   63:16,17 65:14 77:5
   77:8 78:7 80:14,19
   80:20 93:4 107:12
   107:25 108:4,8,9,14
   108:17 110:19
   111:2,24 112:20
   131:17 133:5 135:9
   140:12,15,19
   144:21 150:9
   154:19 155:10
   156:24 165:9 182:5
   189:12 190:13
   191:8,20,23 196:16
   208:7 212:9 227:18
   227:24,25 228:8
   231:6 237:14
   254:17
forensics   18:4,5
   19:9 24:18 40:25
   41:4,9 57:3 62:16
   65:22 69:12 77:9

84:16 113:8 115:23
   139:22 140:16
   143:2,19 146:15,19
   146:20 147:11
   148:14,15,21
   155:15 156:16
   159:20 182:2
   190:24 209:14
   235:7 236:25 237:3
   237:5,13 238:2
   240:8 254:21
forge   131:12
forged   140:25
forgery   214:6
forgetting   175:20,20
forgive   151:14
form   15:2 17:25
   18:21 21:15 31:7
   44:10,22 47:17
   56:15 58:2 73:22
   76:18 86:8 105:9
   113:20 115:20
   145:18 153:7
   207:11 212:2 217:9
   231:11,19 237:19
   249:21 250:5
formal   40:5 200:2
   240:9
format   19:25 20:3
   55:2,3 81:19 168:12
   168:23 169:10
   171:7 179:24 180:4
   180:14
formats   56:24 139:9
formatting   47:24
   48:9,12,18,23 49:5
   49:10,18,20,25 50:3
   50:13,21 51:20
   54:17 55:20 56:2,12
   56:17,18,24 57:4,7
   57:13,24 139:15
   166:8,23 167:2,8,12
   173:8,22 176:6,10
   176:15 213:10

formula   232:12
formulates   169:10
forth   62:23 159:9
   163:3,6,15 170:24
   216:17 225:9,14
   242:2 253:11
forward   94:6
forwarded   98:13
   160:4
found   19:9 21:9,12
   24:15,16 26:25
   28:19,21 34:12,14
   34:17,18,19,20
   58:15 61:21 67:11
   67:17 71:3,5,9,14
   72:9,13 73:20 75:6
   75:25 79:14 86:2
   88:25 89:22,23
   95:22 101:19 107:4
   107:11 108:24
   120:19 121:16
   122:12 130:13,18
   138:3,11 146:15
   149:12 150:24
   151:5 183:7 189:3
   190:19 191:8
   194:24 195:6,6,8,23
   197:20 221:20,21
   227:19 232:2
four   12:6 31:4 64:5
   94:4 163:9 234:24
fourth   89:13,15
fragile   239:19,23
   241:15
frame   172:2
frankly   70:5 130:16
   132:14 150:6 216:3
   227:2
fraud   18:8 48:18
   49:9 50:4,12,21
   51:10,18,25 56:4,8
   56:10 59:10,14
   142:20 144:22
   146:8,22 147:3
   153:14 155:13

167:3 175:12,17,19
   175:19 176:3,8
   179:12,18 182:8,10
   207:19,20,25,25
   216:24 217:7,15,21
   218:3 236:23 237:8
   237:10,17,17,18
   241:17 242:10,11
   242:21,24 243:7,16
   243:17,25 244:3,6
   244:13 245:3,9,12
   245:19,21 247:20
   248:4
fraudulent   51:12
   115:2 132:9,12,17
   146:11 155:14
   166:14 214:6
   244:23 247:25
frequently   114:2
friday   156:7
friedberg   3:9 6:2
   8:14 9:17,24 10:9
   10:13 12:15,16,24
   13:3,14,24 14:4
   22:9 37:23 39:7
   40:14,23 43:14
   48:17 49:14,18,19
   49:24 50:4,6,12,15
   50:20,24 51:9,18
   56:13 83:13 88:23
   91:8 137:12,14,20
   170:8 173:2 187:9
   187:20,25 214:9,17
   215:3 228:18 230:5
   234:10 254:7
friedberg's   8:8
   81:13
front   65:8 120:23
   129:21 156:21
   179:2
full   85:12 89:15
   198:8 209:3 228:24
   228:25 229:20
   235:4 238:13

**function**  68:7,10
  96:13 118:18 139:5
  169:5
**functions**  69:23
**further**  213:17
  252:8 253:15
**future**  4:21

---

**g**

**g**  93:9
**gain**  69:4 73:5
**gathering**  224:6
**general**  30:9 41:7,20
  55:22 57:16 66:9,15
  72:8 73:4 105:3
  106:4 112:15 116:5
  117:12,25 138:11
  174:17 185:4
  196:17,23 214:11
  214:12 218:7
  224:24 243:11
**generally**  8:24 58:10
  69:9 71:14 73:13
  75:11 94:7 116:17
  130:17 133:17
  153:4 161:21
  163:21 167:19
  177:11 178:16
  181:19 198:22
  204:22 209:15
  210:2 211:16 214:3
  214:23 215:13
  218:18 224:12
  229:12,24 238:15
  248:3
**generate**  85:25
  155:13
**generated**  212:10
**generates**  220:23
  246:7
**generating**  213:3
**generically**  84:2
**genuine**  14:24 17:10
  17:24 18:6,20 115:6
  144:24 150:5

---

213:18
**geographically**
  83:17
**getting**  39:20
**getzuck**  119:14
  121:3 126:20 128:7
  128:9
**gibson**  1:18 2:11
  51:8 53:10 118:7,20
  118:23 123:10
  183:4,11,14 187:13
  215:10 224:21
  225:18
**gif**  19:25
**give**  20:2 97:13
  131:8 134:3 135:12
  145:24 175:22
  224:17 234:25
  235:4,18,23 239:3
  240:19 241:9 244:7
  252:4,6
**given**  39:15 50:23
  51:11,24 62:19
  65:17 111:7 130:16
  133:14 144:21
  155:10 161:7
  179:20 183:12
  185:22 187:11
  196:11 218:2
  250:13 253:13
**giving**  5:14 156:20
  228:10 241:4
**go**  7:3 27:10,14
  42:11 48:7 60:15
  67:21 82:9 83:16
  84:18,24 85:2 91:21
  93:10 118:14
  119:19 130:22
  134:22 136:23
  137:5 151:19
  155:18 157:16
  158:3 159:9 165:16
  183:14 193:6,16,18
  201:11 207:3 214:7
  216:16 230:13

---

241:25 246:11,12
  250:6
**goes**  185:11
**going**  7:19 14:25
  27:10,14,15 46:7
  78:19 83:5 94:5
  127:10,12 131:6
  132:23 134:23,24
  134:25 136:20
  137:16 145:3 146:8
  156:3 163:15 167:9
  172:3 180:19,23
  192:24 194:9
  200:15 206:18
  210:18 219:25
  222:7 224:19
  240:19
**good**  6:10,11 8:3
  209:20 235:22
**gotomeeting**  67:20
  68:4
**gotomypc**  64:22
  65:3,16 67:16 68:4
  68:6,9,17
**gotten**  94:20,23
  182:23 184:12
**government**  209:19
**grab**  91:19
**grant**  9:13 227:9
  233:20,25
**graphic**  27:12 76:15
**greater**  111:21
**greatest**  141:5,13
**greatly**  44:2
**group**  165:24
**groups**  202:19
**guess**  75:9,13 119:3
  145:19 151:20
  175:20 181:9
  202:25 204:16
  228:19
**guessing**  193:15
**guidelines**  209:14
**gun**  150:14

---

**guys**  216:25 223:25

---

**h**

**h**  2:15,16 27:24
  228:8,12 249:3,5
  254:17
**habits**  161:12
**hacker**  104:25 106:3
  106:22 107:2
**hackers**  73:4 103:16
  103:18,20,21 104:5
  104:9,15,18 106:14
**hacking**  69:8 105:8
  105:21,23 106:6,10
  106:17
**half**  58:25 61:17
  141:23 142:2
  145:24 194:7
**hand**  10:17 84:19
  91:22 208:24
  223:19 228:23
  253:21
**handed**  8:4 28:24
  30:11 88:20 248:23
**handle**  172:17
**handwriting**  156:15
  156:23,24
**handwritten**  63:24
  64:3 150:3 154:23
  156:17
**handy**  48:5
**happen**  94:24 119:8
  134:14,16 135:13
  216:3 244:6 251:16
**happened**  40:11
  58:3 65:16 125:14
  134:9 135:20
  151:13 155:4 187:3
  187:7 231:3 241:24
**happening**  95:21
  191:24
**happens**  246:6
  251:14
**happy**  127:20

**hard** 24:18,25 25:2
25:11,12,18,20,22
26:7,14 32:18 65:19
66:2,8,11,16 67:2
67:10,24 93:22
94:15,19,21,23,25
95:7,9 96:10,12
99:20 107:11,13,18
107:21,25 108:2,4,9
108:13,18 111:8
112:3 148:9 195:9
195:11,12 221:4,7
248:7 251:22
**harvard** 32:12
41:25 42:5,13,15,19
42:25 44:4,14,25
45:4 46:6 52:18
54:18 56:19 59:15
78:25 79:15 80:4
81:8,16 124:15
126:7 147:21
182:15,20,22,22
183:10 184:11
186:2,14 188:2,25
232:18
**harvard's** 43:16
**head** 144:8
**headed** 205:5
254:14
**header** 58:12,16
210:8
**headers** 97:21 211:2
**headings** 30:9
**hear** 180:24,25
181:2 250:23
**heard** 251:12
**held** 1:18
**help** 99:8 190:23
**helpful** 238:19
**helping** 43:7
**helps** 251:9
**hereinbefore** 253:11
**hereunto** 253:20
**hesitate** 210:11

**hex** 130:2,8,11,14,15
130:17,19,19 131:7
131:12,21 132:2,10
132:18,22 133:10
135:11,15,18 136:2
139:19,23 140:6,18
142:18 147:8
**hey** 151:17 153:22
185:7 246:16
**high** 115:10 224:18
224:23
**higher** 94:9
**hire** 18:7,23,25 34:7
114:25 115:3
132:16 146:24
164:6,6 189:9,24
190:5 191:5,12,17
216:8 217:11
221:18 225:13
242:18 247:17
**hired** 106:14
**hiring** 216:16
**historical** 45:5,15
46:17,22 53:6 54:5
78:16,22 79:11
81:25 182:23 186:9
**historically** 32:20
33:6 46:22 83:9
137:10
**history** 192:7,11
**hit** 23:11 99:2 111:4
**hm** 121:21 198:12
200:8 209:6 229:3
**hold** 5:10 48:3
**holds** 146:25
**hope** 248:14
**hopefully** 194:15
**hotmail** 166:18
167:11 168:2,8
169:5,10,14,21,25
170:9,18,22 171:9
171:14 172:9,11
173:12,14 174:20
175:2 211:14,16,22
212:15

**hour** 9:24 10:2,7
193:14 194:13
**hourly** 9:18 223:4,5
**hours** 193:2 194:7
223:8,14 235:24
**house** 114:6
**html** 139:10
**hundred** 236:20
**hundreds** 74:5
**hypothetical** 17:14
18:12 57:10 99:18
100:25 101:6,11
109:14,19 113:11
118:22 125:14
126:12 134:9
144:11,16 150:22
151:15,24 152:13
174:3,5,21 178:25
179:4,13 182:11
207:4 245:16
**hypothetically**
64:19 73:12 94:25
99:15 110:11
114:11 144:19
174:23 245:10
**hypotheticals**
100:18,23 102:4

**i**

**idea** 51:4,9,10 135:5
171:13
**identical** 49:4
150:18 203:15
206:16
**identification** 6:4
82:17 200:23 205:6
228:9 238:3
**identified** 17:10,23
123:11 165:9 207:8
243:5
**identifies** 61:21
**identify** 8:6 11:25
20:12 45:4,15
181:15 183:8
189:23 225:15

**identifying** 220:25
233:11
**ignore** 217:16
**illegible** 249:15
**image** 19:18,22 20:3
20:23,23 21:4,7
22:4,16,18,21,22
24:6 37:25 44:7
64:2 87:21 88:13,15
88:17,19 90:12 91:3
91:4,9 92:12 94:9
94:10 96:23 107:25
112:3 151:10 152:3
152:11 153:17
159:18,19,21,23,23
249:25
**images** 19:20 20:9
20:13,19 21:8,9,18
21:23 23:2,4,16,25
24:12 26:25 27:4,7
27:12 30:13 38:11
52:8,11 62:8 65:25
66:7 67:10,17 68:13
85:15 86:2,13,22
87:2,5 88:24 89:5
89:22 90:9 91:12
97:7 99:10 101:5
102:18,22 106:19
108:24 147:25
148:2,16,20,21
149:11 150:2 153:3
153:5,6 159:24
160:2,6,7,10,21
161:8,14,17,23
162:5,6,8,10 190:9
194:23 195:7 232:8
232:10 249:19
**imagine** 49:9
**imaging** 232:13
**immediately** 10:17
97:22 112:3 157:22
195:9
**impact** 115:21
145:23

impacted 102:8
implausible 70:6
  138:25 171:18,20
  171:21,24 172:4
implying 88:3,6
important 41:8,11
  210:6
impossible 149:2
inaccuracy 226:16
inauthenticity 34:6
  36:10,14,18,23
  138:8 225:13
inbox 116:22 117:8
  117:8 118:16
inch 90:2
inches 85:21 86:6
  90:6
include 52:8 181:12
  181:12,13 197:19
  201:23
included 12:5,6 36:2
  42:19 81:9 122:22
  125:6 163:16
  180:10,17 181:5
  186:12,24,25
  189:25 210:17
  231:18
includes 90:12
  129:19 201:15
including 22:21
  65:10 98:4 131:4,5
  135:10 138:13
  149:4 159:15 235:6
  239:20
inconsistencies
  48:24 166:15 167:4
  167:9 240:3
inconsistency
  239:12
inconsistent 167:7
  222:15
inconsistently 172:4
incorrect 165:20
  239:5 244:11

incorrectly 58:24
  175:8
independent 97:25
  98:7,16
indiana 114:2
  230:13
indicate 50:4 65:14
  70:9 98:8 166:7,13
  198:24 201:7
indicated 7:4 45:13
  47:21 83:10 92:25
  105:22 146:16
  178:13
indicates 123:17
  124:8 135:10
  156:22 191:9,11
  197:11 200:6
  202:23 241:6
indicating 159:25
indication 179:18
  216:24
indications 176:8,11
  216:2
individual 147:8
  154:17 180:9,15
  242:25 247:6,20
individually 1:9
individuals 13:25
  31:19 69:12 125:8
  219:2
industry 21:4
inference 160:14
inform 241:3
information 8:15
  35:18 58:12,16 77:9
  89:6 90:18 106:7
  129:21 151:6
  169:18 170:12
  171:10 182:19
  199:2 209:15
  211:22 220:10
  227:25 228:3 234:2
  234:9,11 250:24
  251:2

informed 21:22
inherently 222:15
initial 97:15,20
  148:23
initially 202:18
initiated 218:21
  238:18
ink 249:11
innumerable 69:4
inquiries 226:11
insert 49:20 50:7,16
  167:14
inserted 51:5 138:4
  221:24
inserting 49:18
insertion 56:2,6
inside 144:8
inspection 225:7
installation 69:18
installed 69:10,24
  130:12,15
instance 48:24 49:2
  63:14 67:20,22
  72:11 75:17 132:5,7
  140:22 166:17,25
  167:14 210:25
  218:15 220:21
  222:9 239:6 241:22
  245:25 247:20
institutions 43:23
instruct 127:19
instructed 224:10
  224:12
instructions 224:5
intent 56:9
intentional 134:8
intentionally 49:17
  49:24
interested 182:8
  253:18
intermediary 59:7
  98:5 149:15 177:3
  244:10,17 245:15
internal 245:9,10

internet 25:15 58:16
  67:4 97:21 123:12
  139:5,9,13,16 168:7
  192:11 198:22
  199:5 210:25
  211:15
interpret 247:22
interpretation 228:2
  229:6 242:9
interpreted 239:24
interrupt 93:9
interspersed 133:7
intervening 162:11
interview 80:16
introduced 56:25
  166:24 176:15
intrude 104:12,15
intrusion 73:6,11
  106:23
inventory 33:11,13
  33:16
investigation 112:17
  210:7
investigations
  185:23
investigator 12:2
invoices 10:18
  223:18
involved 10:10 11:6
  11:10 12:16 31:4
  43:6 52:4,11 53:19
  105:7,20,23 136:13
  183:9 184:10,13
  235:15 236:12
involvement 37:12
involves 56:8 185:12
involving 52:14,18
  53:13
ip 113:3
irrelevant 183:15
isolate 154:16,16
issue 28:25 37:7
  49:6 54:16 55:12
  92:6 177:11 213:15
  227:16 232:7

**issued** 31:20 32:5
225:8,20 240:7
**issues** 41:14 48:13
48:23 213:10
**issuing** 14:5 30:19
31:5 33:7 40:18
**item** 60:2 95:12
177:14,18 178:9
181:6
**items** 59:18 75:22
76:4,16 77:16 78:8
79:9,9,14,14 117:2
117:3,21 177:15,20
181:7 202:14
213:21

**j**

**j** 1:17 6:5 194:18
252:16 253:10
254:4 255:6,21
**january** 120:5
122:22 123:17,21
123:25 127:8
128:15 129:2,11,19
**jason** 10:2 12:20
13:8
**jerry** 227:8 233:20
**jim** 62:25 150:25
151:17 152:9
154:22,23 155:22
156:6,19 160:22
190:9
**jobs** 94:5
**jog** 177:7
**jpeg** 19:25
**jr** 2:16
**judge** 6:24 7:4
127:18
**july** 1:14 15:15,20
107:22,24 236:14
253:21 255:5
**june** 124:20 125:8
125:25 126:3,8,14
187:17 188:19

**jury** 17:17
**justice** 209:5,13

**k**

**kasowitz** 177:10
179:22
**keep** 126:25 251:9
**kept** 35:11
**keyboard** 111:4
**keys** 111:4
**kilobytes** 90:6,7
**kind** 69:18,21 72:15
72:24 104:2,4 117:4
147:3 172:22 241:7
242:4 243:12
**kinds** 71:21 72:3
**know** 4:6 7:8 9:19
10:8,13 11:14 18:8
19:11 21:24 22:6,7
22:15,25 24:17
25:25 26:18,19 27:3
29:9,19 30:23 31:2
31:18 32:25 33:4,9
34:8,22 35:10,12
37:11,17,21 38:5,8
38:9,21,22,24,25
39:6,11 40:9,14
41:13,15,16,17,22
43:4,11 44:4,21,23
46:3,15,17,18,23
48:5 49:12 51:19
52:21 53:2,15 54:6
58:4 61:24 62:3,4,6
63:14 67:12,13,19
68:2,6 69:2,3,12,17
69:19 71:19,20 72:2
72:11 73:18,25 74:4
74:6,14,17,20 75:11
75:15,16,16,20
78:13 80:15,21 81:3
81:8,16 83:15,19,21
83:24 84:6,9 86:21
89:2 91:7 93:3,21
96:16 99:25 100:3,5
100:22 101:8 102:6

102:10 103:11,25
111:10 112:5,7,8,10
112:14 114:18
116:10,10,12,13
117:20,24 119:5
120:16 122:2,5,7,8
122:9,20,21 123:12
123:18,19,20 124:2
127:17 128:23,24
128:25 129:2,22
130:21 131:4,11,16
131:22,25 133:8,12
133:21,23,24
135:22 136:5,14,20
137:11,17 138:6,6
138:12,23 141:10
141:15,17 142:18
144:23 145:20,21
146:10,12 147:6,9
147:13 148:5,9,18
152:4,8,12,15
153:16 156:25
159:6,17,19 160:2,3
160:4,7,14 161:8,10
161:11 162:5,6
163:2,5,7,10,18
166:17,20,22 169:4
169:8 170:2,11,12
170:22 171:3
172:10,25 173:5,23
174:19 175:2,21
178:5,22 180:5
181:12 184:10
185:15 187:5,10
192:10,12 193:3,5
194:6 196:23 197:3
199:2,22 200:3,15
203:5,10,16 204:25
206:20 207:16
208:16,17 209:16
210:14 211:10
212:22 213:5 219:8
220:2,8 221:9,12
223:7 226:20
228:11,14 230:8

232:9 233:15 234:7
235:4,24,24 236:11
237:4 240:12
241:25 242:2
243:11 246:2,9,13
249:11,12 250:10
250:13 251:6,7,11
251:16,18,23
**knowing** 81:24
**knowledge** 208:5
209:12 240:8
**kole** 59:19 60:3
61:20 62:25 63:19
73:20 85:15 90:9
91:12 98:13 102:18
109:10 138:14
150:2,25 152:9
154:22,23 155:23
156:6,9,11,19 157:8
158:12,17,22 159:4
159:4,8 160:22
162:12,15,17,19,20
163:3 190:9
**kole's** 156:22

**l**

**l** 228:12
**labor** 11:11,20
**lacking** 72:11
**lake** 108:19
**lakewood** 2:8
**landed** 24:14 26:7
26:13 74:15
**language** 3:23 48:15
131:9 189:6
**laptop** 197:10,21
198:10
**large** 43:20,23
248:20 249:9
**larger** 28:23 249:24
250:7,9,15
**law** 215:11 245:10
**lawyer** 150:16
152:16 161:14

**lawyers** 7:8,14 178:19,23 179:11 179:18 182:18 200:16 224:21 225:2 230:18,23
**lead** 152:5,6,8,10 191:13
**leading** 236:6
**leads** 131:10
**leaf** 27:16
**learn** 105:7,20 203:14
**leave** 73:6,10 82:5 106:23 107:2
**led** 123:19
**legal** 2:4 3:17 156:20
**legible** 30:2,3,11 248:20 249:9,14 250:8
**legitimate** 212:7
**letter** 177:10
**letters** 64:5
**level** 27:19 155:20 157:12,13,22 224:18,23
**lie** 181:22,24
**light** 110:22
**lightness** 249:11
**likelihood** 111:17 113:16 114:6,14,22 185:18 188:9 196:4 203:18,23 207:8,13
**limit** 163:11 194:9
**limited** 35:21 36:13 81:17,23 181:8
**limiting** 143:2
**line** 17:15 49:3 50:17 55:10 76:11 76:13 85:10 91:24 92:14 180:22 255:7
**link** 197:10,20 198:2 198:5,13,15,18,20 199:7,10,14 201:18 204:7,19,22 205:14

205:17 206:17,25 207:6
**linked** 204:2
**links** 197:10
**list** 31:21 32:6,9 35:7 68:21,22,23 71:24 74:10 77:15 97:8 133:20 139:21 197:16 202:17,18 235:5,19
**listed** 8:16,19 30:20 31:5 39:17 203:3 205:19 232:15
**lists** 202:21
**literally** 72:5
**litigation** 52:10,17 53:19 190:2
**litigations** 52:9
**littered** 74:4
**little** 15:4 22:23 27:21 60:5 61:7,16 62:14 99:20 103:12 139:19 158:3,4 177:7 188:20 190:22 193:6,9 194:12 203:2
**live** 46:7,8,11
**livenote** 84:23
**llc** 2:4
**llp** 1:19 2:11
**located** 21:20 83:25 112:24
**location** 114:7,21 115:16 194:25 195:17 198:22,23 199:6
**locations** 229:10 230:12
**locked** 38:13
**log** 177:20 180:10 180:17 220:23 229:10
**logical** 120:5 146:17 147:12

**long** 22:8,13 43:25 177:25 178:12,14
**longer** 24:6 128:16
**look** 8:4 10:18 27:14 34:5 49:2 58:6 60:13 62:18 76:9 81:8 84:10 85:7 87:11,25 90:8 92:11 98:22,24 99:25 101:8 106:17 109:13 120:22 138:7 149:10 164:18,23 175:24 188:6 192:20 200:17 201:6 208:23 215:7 220:14 227:14 228:19 242:15,15 242:16,17 244:25 246:2,2,3,20,22,25 247:3,7
**looked** 37:3 87:9,17 88:12,20 106:21 123:6 139:16 192:17 227:22
**looking** 29:5 36:9 65:20 81:19 87:12 90:22 127:23 175:17 192:16 202:15 210:22,23 210:24 211:3 220:9 220:10 239:16 241:24 242:22 245:4 247:8
**looks** 8:7 159:6
**loosely** 22:23
**lose** 145:16,20
**lot** 117:10 145:16
**low** 28:15 113:17 114:6
**lower** 163:11
**luehr** 228:8,13 254:18
**lunch** 193:8,9,20

**m**

**machine** 65:21 73:17 133:7 211:4
**magnified** 249:17 250:2,15
**magnify** 91:9,9
**mail** 32:12 40:5 42:2 42:5,14,15,25 43:16 43:21,22 44:5,8,12 44:14,18 45:5,11,15 45:20 46:8,12,17 47:8 49:7,20 50:7,9 50:25 55:4 56:22 59:5,7,8,15,19,20 60:3,17 61:10,21 63:6,15,21,22 64:10 64:13,18 65:10,11 73:20 76:16,20,21 76:22,24 77:2,20 78:8,25 79:3,10,15 79:19 80:4,13 81:4 81:9,14,17 85:15 90:9 91:13 97:16,20 98:11,18 99:5,7,14 99:15,19,21 101:2 102:2,19 104:9,10 109:10 111:3,6 112:18 114:16 115:25 116:21 117:9,15,19 118:8,9 118:20 119:14 121:18,22 122:6,9 122:16,16,22,25 123:6,14,15,23,25 124:13,15,21,23,25 125:4,7 126:15,20 127:7 128:8,13,15 128:20 129:3,6,12 129:13,19,20,25 138:14,18 147:21 149:19,21,25 150:9 150:18,24 151:8,17 151:17 152:7,18,24 153:21,25 154:3

156:6,9,19 157:4,10
157:12,17,17,21
158:17,23 159:3,8
160:11 161:3
162:12,15,16,17,19
163:9 168:12
172:24 173:16
174:2,9,13,15,16,24
175:15,17,21,22,23
176:3,18 178:10,11
178:23 179:22,24
180:4,9,15 181:12
182:15,20,22
183:10,18,23 184:3
184:9,19 185:2,19
186:3 187:11
188:21,24,25
189:25 190:8
191:24 192:3 210:6
210:8,9,18,19,20,21
211:12,20 212:12
212:14,18 213:4
216:17 225:23
227:3,6 230:18,22
231:16 232:5,18
233:16
**mail's** 123:18
**mailbox** 78:15,22
186:10 195:7
**mailed** 24:19 26:8
149:13,14,15
150:15 152:15,19
226:18
**mailing** 57:7
**mails** 35:20 42:25
43:8 47:14,14,22,23
48:19 49:4,7 50:13
50:22 51:21 54:18
56:19 58:15,17
59:11,15 60:6,14,20
62:7,8,20,22 63:4
63:10,19 77:14 78:3
78:4,5,18,20 79:16
79:20,23 80:4 81:20
98:13 104:13

109:21 110:18,20
112:25 113:13,16
113:17 114:12,15
114:22,24 115:5,6
115:12 118:17,23
119:18,22,24 120:4
122:13,19,23 124:6
124:9,17 126:6,12
126:21 128:7,22
129:8,17 146:23
147:20 149:4 153:4
156:11 159:4,4,7
160:20 163:2,9,12
164:10,12,14,17,21
165:7,10,16,19,23
165:24 166:3,9,10
166:19 169:3 175:5
175:14 176:21,22
177:4,9 178:12,17
178:18 179:5,16
183:7 185:8,14
186:11,16,23 187:3
187:7,16,20 188:3
188:12,18 211:7,10
211:14,25 212:3,7
212:24 213:2 216:4
216:11 217:24
225:14 226:14,23
232:21 233:2,6,11
233:19
**main** 47:12
**maintain** 43:21,25
44:2
**maintained** 38:15
149:19
**majority** 235:6,7,11
**making** 88:10
226:23
**malware** 69:19,24
70:3,5,12,15,25
71:3,15,17,22 72:5
72:7,9,10,13,19,21
72:22 73:2,16,16,20
73:25 74:5,10,12,14
74:17 75:4,8,11,14

75:16,17,19 103:13
**managing** 228:17
230:6
**manipulate** 114:25
132:3,16 133:19
140:7 145:5,8
244:21
**manipulated** 101:20
132:25 176:12
212:8 226:22 245:8
246:24
**manipulation** 100:2
101:25 102:7,11
115:3 142:19 149:5
191:11 212:25
213:6,8 241:7 242:4
242:8,18,19 246:14
246:16 247:13
248:4
**manipulations**
217:16 242:16
**manually** 49:13
212:20
**march** 6:3 8:8 148:9
148:12 149:14,24
156:7,11,12 157:9
158:7,8 159:5,7,14
159:24 174:7
187:17 188:19
254:8
**margin** 217:16
242:19
**mark** 1:8 5:5 15:10
17:18 18:13 32:11
32:15 33:5 42:25
53:7 78:24 79:15
81:3 102:17,24
105:17 106:2 128:5
142:13 145:13
149:23 182:14,16
183:17,25 184:9
191:18,22,25
200:19 205:2
231:10,16 237:22

**marked** 6:3 8:5
82:17 84:10 200:22
205:5 208:18 228:9
238:2
**marks** 135:4
**marriage** 253:17
**massive** 155:13
**material** 225:16
**materials** 123:8
124:4
**math** 59:23 61:18
**mathematical**
232:12
**matter** 41:20 55:22
75:14 112:15
117:12 148:23
168:6,9,10 235:9
253:19
**matthew** 2:17 3:4
**mcgowan** 8:13 10:2
13:8,11,23 21:23
22:10 31:15 33:9
169:19,21 234:8
235:7
**mcmanis** 53:10
**mean** 14:13 15:3,16
18:25 19:23,24
21:12 22:18 37:5,6
40:4 42:22 43:17
53:9 55:22 58:19
67:20 68:24 69:3,16
71:21 72:3 73:12
76:19 77:24 82:4
95:25 96:8 99:18
101:6,7 102:13
103:24 104:10
111:16 112:7
113:22 117:12
119:2 120:8 130:25
131:2 133:18,22
134:21 137:24
138:6 142:16 144:5
144:7 145:9,19
148:23 150:6,12,13
151:16,20,23 152:6

153:12 154:14
155:4,20 163:7
165:6 171:13
172:10 177:25
181:4,6,11 184:22
192:10 196:23
198:5,16 199:9
200:2 202:17,25
204:6 210:15,23
211:13,13 212:6,8
213:15 215:6
218:14 220:12
222:6,22 223:17
225:6 226:3,10,14
226:15,17 232:6
236:5,8 237:12
242:11 243:10
249:13
**meaning** 111:3,22
128:16 224:10
**means** 19:4,4 22:24
41:16 44:12 67:14
86:21
**measure** 88:24
**measurement** 88:23
**media** 12:23 20:20
21:20 24:15 28:8,18
34:25 35:8,18 36:19
37:19,20,24 39:16
61:22 70:3,12,15,24
80:19 93:4 95:20
107:5,17 108:19
112:21 121:18
123:13 124:3
130:12 138:9 150:7
183:22 195:4
197:17 200:7,14
204:9 205:17
217:10 225:11
**meeting** 6:21
**members** 37:13
83:10
**memorize** 177:22
**memory** 48:6 177:7
235:5

**mention** 27:6 77:15
142:10
**mentioned** 11:9
108:15 155:22
230:11 232:17
**mentions** 231:24
**mercuri** 219:9 238:2
238:5 254:21
**mercuri's** 238:23
**mere** 176:17 217:20
**merely** 51:18 135:13
181:13 245:13
**merge** 132:11
**merged** 140:24
**message** 153:22
154:7 158:5
**met** 54:8,12
**metadata** 90:8,11,16
96:17 131:15,16
132:3,19,21 133:2,3
133:4,6,16,19 134:5
134:7,22 135:3,5,6
135:9,12,13 140:7
143:22 198:15,17
198:24 205:14
218:5,10 220:5
225:25 229:11
232:10,15 238:19
242:23 247:8
**method** 25:20
**methods** 25:19 26:2
220:24
**mexico** 115:13
**microsoft** 57:11,12
57:14 74:20,25 75:2
75:12 166:17,20
172:14,16,22 173:3
173:7,11,21 218:17
220:22 233:21
238:14 239:2 240:7
240:14 246:9
**microsoft's** 218:5,24
219:3,6 220:12
**middle** 58:12 61:11
91:23

**mike** 8:13 10:2 13:8
21:23 22:10,19 33:8
169:19,20
**mind** 4:7 55:6 98:20
151:21
**minneapolis** 228:18
230:7
**minor** 47:23 48:8,12
48:18,23 49:5,10
50:12,21 51:20
54:16 55:3,20
**minus** 179:8,9
**minute** 61:6,7,16,17
82:12,25 136:17
151:14 234:14
**minutes** 24:19 60:5
**misapprehension**
93:13
**mischaracterizes**
66:5 158:25
**misconfiguration**
244:14
**misconfiguring**
245:13
**misdescription**
92:13
**misrepresenting**
126:25
**missing** 47:13,14
147:21 196:20
197:9,12 207:9
**misspoke** 68:3
**mm** 121:21 198:12
200:8 209:6 229:3
**modified** 135:14
227:5 229:7
**modify** 239:11
**mom** 151:18
**moment** 27:11 82:10
115:12 195:21
**money** 141:8 142:3
142:5,17 145:16
**morning** 6:10,11,20
148:9

**mother** 151:2,10
251:4
**motivating** 144:7
**motivation** 50:16,19
51:10 141:3,4,6,13
141:15,17,19,20,24
141:25 142:3,5,6,11
142:16,17 143:18
143:21,23 145:5,8
145:11,14,25 146:4
146:9,13 147:6
**motivations** 141:11
242:7
**motive** 144:2,6,8,13
144:17 247:25
**mountains** 41:18
**move** 41:18 83:6
**msn** 157:11,25
158:6,13 159:9
160:22 161:4,14
162:21 163:4 213:4
**msn.com** 157:4
**msn.com.** 157:14
**multiple** 5:15 36:21
66:14 148:19 149:7
161:17 189:8 214:2
215:4,8,9,23,25
217:25 246:6
247:12

| **n** |
|---|

**n** 1:21 2:2 6:5 194:2
194:2,2,18 253:7,24
254:2
**name** 52:16 53:16
63:21 64:6 76:23
77:12 92:4,20 93:2
94:14,15 96:6 125:6
152:23 154:13
158:19 195:14,23
196:5,18,24 198:13
201:9,14,14,17,22
201:25 202:6 204:6
204:12,14,15
228:12 255:5,6

**named** 52:18 131:5
194:23 197:25
219:9 228:11
**names** 91:13 92:15
94:3 133:21,25
134:24 140:22
201:12,21 202:7,12
203:21 222:25
234:25
**naming** 92:19 93:5,7
201:19
**native** 179:24 180:4
180:14
**near** 110:14 118:5
228:23
**necessarily** 19:7
46:11 67:14 78:19
79:8,16 176:5,8
241:12 247:8
**necessary** 72:24
182:25
**need** 69:23 72:16
82:7 127:17 139:19
**needed** 85:14,24
153:20
**negative** 190:21
**negotiate** 216:15
**negotiations** 217:6
**neighborhood** 33:2
**neil** 82:16 84:15
254:9
**neither** 13:3
**network** 53:21
220:12 251:20
**never** 57:23 80:10
80:11 102:25 109:9
109:23 110:6,7,13
110:14,14 163:2
180:10,17 182:14
182:16 191:25
209:11
**new** 1:3,19,20,22
2:14,14 3:22 8:20
75:13,19 113:4,6,14
113:15,25 114:13

115:13,14 151:4
159:8 214:21
215:21 253:3,5,9
255:3,3
**night** 10:22,24
**nilly** 171:2
**notably** 72:11
**notary** 1:21 6:6
252:22 253:8
255:25
**note** 58:20 150:3
154:23 156:17
170:14,16 241:14
**noted** 194:3 252:13
**notes** 34:11,16,18,21
34:24 58:18 110:2
**notice** 1:20 244:19
**notion** 62:9
**novak** 10:3 12:20
13:8,15,17 31:15
234:8 235:8
**november** 22:14
42:19 45:12 46:10
46:13 186:2,10,19
232:17 233:2
**number** 27:15 33:9
60:16 62:23 74:22
85:10 94:9 109:2
114:17 162:25
167:8 200:24,25
208:21 221:19
235:23
**numbering** 27:20
**numbers** 58:8 76:12
76:13 84:19 208:24

**o**

**o** 6:5 194:2,2,2,18
**oath** 231:15
**object** 3:15 4:4 15:2
17:25 18:21 21:15
44:10 47:17 73:22
76:18 86:8 105:9
113:20 127:10,12
145:18 180:20

206:19 207:11
212:2 231:11
237:19 249:21
250:5
**objection** 3:14 28:20
31:7 39:8,18 43:3
51:22 56:15 58:2
66:4 71:8 77:23
80:8 83:18 87:10
126:10 136:11
150:21 153:7 157:6
158:24 164:13
181:3 184:4 207:15
218:22 231:20
**objectionable**
180:22
**obligations** 43:4
**obtain** 44:7 207:24
**obtained** 41:24
63:17 77:10 83:14
83:20
**obvious** 96:5 153:13
153:14
**obviously** 4:2 16:4
46:20 69:17 141:6
177:24 226:7
229:20 233:4
**occasion** 241:15
**occasionally** 23:7
216:19 230:13
**occasions** 73:9
149:7 177:14
**occur** 49:11 57:4,8
57:13,17,19,20
166:5 167:2 173:5
176:9 244:14
**occurred** 42:7 50:22
173:8 187:2 241:19
**occurring** 57:22
**october** 42:16,21
45:12,25 47:7
165:25 186:21
226:18 233:3
**odd** 151:23 188:20
188:25

**offer** 22:20 110:12
185:17 188:14
209:16
**offered** 15:8,9 18:7
47:2,2,6 102:25
103:5,8 112:11
190:4
**offering** 96:15
128:18 189:15
190:16
**offers** 116:18
**office** 40:10 118:5
118:14 134:4
223:12,13,22
228:18 230:7
**offices** 1:18 38:14
118:7,24
**offset** 166:3
**oh** 5:24 68:5 213:24
**ohio** 2:8
**okay** 5:4 7:10 11:23
15:23 16:6,7 20:22
21:6,16 22:3 23:8
23:13,15 28:3 31:14
36:25 38:8 39:14
41:6 58:9 60:9
89:18 100:9,21
108:16 118:13
125:14,24 147:19
151:4 158:15
162:24 169:23
170:7 175:11 180:3
192:6 202:5 218:9
230:10 234:16
236:18 238:7,11
246:19 248:16
**old** 66:22
**once** 23:19 46:20
75:16
**one's** 111:12
**ones** 5:13 72:18
78:10 131:5,5 157:9
226:2,2,2
**online** 118:7

**open**  57:12 133:22
  174:10 229:6
  239:10
**opened**  118:25
  120:9,13,21 174:13
**opens**  159:8 174:15
**operate**  12:25 65:7
  171:12 172:7
  174:20
**operated**  67:25
  116:14 175:3
**operates**  67:20
  170:22
**operating**  218:6,12
  240:10
**operation**  103:20
  167:14 176:16
  215:15,25
**operations**  218:20
  238:17
**opine**  237:16
**opinion**  20:2 24:13
  48:16 79:7 85:23
  96:15 102:19 103:9
  109:20 110:17,24
  110:25 111:25
  128:18 135:16
  140:13 142:22
  143:4,7,9,11,15
  144:11 176:2
  179:19 185:17
  188:9,15 191:15
  196:7 209:17
  211:21 212:11
  218:4,25 219:4,6
  237:9,10,11,12,15
  238:22 241:4
  245:17 252:4,6
**opinions**  142:24
  190:16
**opportunity**  229:19
**opposed**  21:2
**opposite**  146:4
**oral**  54:24

**order**  36:21 92:15
  95:7,16,23 96:14,19
  183:20 188:2
  220:20 236:13
**ordered**  33:23 35:17
  36:13
**orders**  36:21
**ordinary**  134:14,16
  134:17,20 135:7
**organization**  44:2,3
  52:14 142:5
**organizations**  43:20
**original**  14:15 15:16
  16:10,13,19 20:4
  23:3,10,13 24:3,7
  37:19,20,24 90:4
  158:4 189:19 191:5
**originals**  24:13
  38:10
**originated**  106:19
  109:10 148:6
**origination**  96:16
**orin**  54:6
**outcome**  253:18
**outlined**  122:15
**outlook**  77:22
  115:25 116:8,14,17
  116:19 117:15,17
  117:23,25 118:3,6
  118:15,25 195:7,18
**outrageous**  50:5
  51:12
**outside**  98:23 99:20
  101:9 105:25
  113:14,15 143:18
  185:11 209:19
**overall**  12:16,19
  13:9
**overwhelming**
  115:18,24 146:21
  242:14 247:18
**overwhelmingly**
  191:9
**owned**  152:19

**owner**  61:25
**owns**  145:21

## p

**p**  2:2,2
**p.m.**  193:20 194:3
  252:13
**page**  11:7,8 14:11
  15:7,9,13,19 16:2
  17:7,15 18:15 27:10
  27:14,17,23,24 28:9
  28:10,11 29:6 30:12
  30:13 55:7,11,16
  58:6,8,10,13 59:17
  60:11,12,15,16,21
  61:3,11 75:22 76:3
  76:9 79:8 84:18,19
  85:7,9 88:13 89:9
  91:14,18,21,23 92:3
  92:9,12,16,17 93:14
  93:14 95:13 96:3
  97:17 107:6,9,19
  108:15 120:22,24
  121:12,14 130:22
  142:24 155:18
  164:2 190:20 191:2
  191:21,25 192:5,9
  192:14,15 197:5,8
  197:15 199:15
  205:4,15,16,22,25
  206:3,5,8,13,14
  208:23 210:4
  213:23 214:17,19
  221:16,19,19
  228:20,21 229:17
  231:22 238:9,10
  249:2,3,4,5 254:3
  254:13 255:7
**page1.tif**  205:20
**pages**  28:9 93:18
  205:13,14 248:21
**paid**  9:16 10:8
  214:10 223:25
**paper**  14:8,10,11,21
  15:4,9,14,14,21

16:2 17:2,7,12,16
  18:9 20:15,18 86:25
  87:8 88:18 89:11,24
  90:3 125:16,20
  142:24,24 143:3
  144:10,12,17,19,24
  145:12,15,17 146:2
  164:2 189:5,15
  190:14,17,20 191:3
  191:5,15,16,22
  192:9,15 250:3
**paragraph**  51:15
  58:19 85:12 86:6,16
  86:17,20 87:3 89:5
  89:8,14,15 107:20
  198:8 201:6 202:4,9
  203:11,19 209:3,9
  209:24 210:17
  228:24,25 238:9,14
  239:4 240:6
**paragraphs**  203:4
**pardon**  54:10
**parents**  59:19 60:3
  73:19 106:18
  112:24 114:2,6,7
  230:14,17,22
**park**  1:19 2:13
**part**  9:2 14:16 30:3
  33:20 35:23,24,24
  36:4 43:8 48:9
  61:22 73:15 81:9
  105:19 108:19
  119:19 155:3 159:5
  212:4,11 248:20
  249:9
**partially**  195:16
  196:2
**particular**  78:22
  79:12 93:6 102:2,11
  113:24 114:8,21
  115:9 116:12 133:8
  134:15 233:15
  239:16,22 242:8,23
  247:10

particularly 58:16 196:11
parties 17:22 19:13 21:19 102:21 103:3 103:10 126:14 148:17 188:18 189:16 225:21 253:16
parts 30:4,5 249:13
party 52:5 185:24
pass 123:10
passed 169:17
paste 139:4 164:25 166:21,24 167:10 167:11,14 176:16 211:25 212:4 215:14,16,24 216:4
pasted 139:6,12 164:16 165:3,5 169:3 172:16,24 173:20 211:9 233:19
pasting 167:20 172:18
path 135:10
pattern 135:12 140:24
paul 1:5 3:7 17:19 61:25 62:23 63:4,9 63:15,18 64:13 67:15 73:19 77:14 92:9 105:14 106:18 108:10,20,22,24 109:8,21,22 110:6 110:13,17,20 111:2 112:18,23 113:11 115:6,17 138:16,17 139:24 140:17 149:22 150:24 151:2,18 152:9,15 152:25 160:21 161:4 163:3 179:11 187:14,15 200:22 201:3 228:8,11 254:12,17

paul's 157:3
paulceglia 157:4,11 157:14,25 158:6
pause 84:21 151:14
payment 30:10
pc 197:17
penalty 109:22
pending 127:12
people 6:24 11:9 12:4,9 31:4,11 40:23 57:6,20 64:22 69:16 73:4 75:11 130:17 151:25 161:21 181:22,24 182:7 183:9 207:24 214:5 234:5,24 235:14,15
people's 69:14
percent 89:11,23 90:4
perform 69:23 182:24,25
period 161:13 162:12 186:3,5,6,7 187:16,22 251:24
periods 147:22
perjury 109:22
permit 71:22
perpetrate 245:13
perpetrated 146:22
person 7:7 8:11 9:23 14:5 21:17 40:13 64:8,12,17 65:2 67:15 129:12 139:23 141:4,5,13 147:2 170:4 174:10 174:15 184:25 191:2,21 228:16 230:8
person's 104:16 210:21
personal 53:11 139:3 161:12 237:9
personally 23:6 39:3 145:20

personnel 137:12,15
persuasive 196:25
phase 183:21 236:10 236:11
phone 39:4 62:23
photo 23:23
photograph 150:25 151:24
phrase 30:24 120:7 121:20 207:19
physical 26:24 27:3 65:19,20 67:23 88:22 89:21 108:8 111:10,20,23 112:4 113:12 114:20 232:9,11,13 238:10
physically 83:16 111:3,8 112:24 113:14,18 114:13 117:3 138:16,19
pick 219:25
picked 75:18
picks 219:19
picture 23:9,11 24:4 151:12 155:3
pictures 23:20
piece 34:25 35:8 75:19 87:8 88:18 89:11,24 90:2 98:24 150:7 154:17,21,22 154:24,25 155:5 246:17 250:3
pieces 72:4,22 73:2 75:16 86:25 107:5 107:16 199:21
pinpoint 147:8
pixels 232:14
place 37:10 104:2 229:9 244:19
placed 30:14 218:11
places 75:23 76:6
plaintiff 1:6 2:5 3:7 109:9 150:7 187:25
plaintiff's 70:18 84:16 142:23

208:12 227:9 233:19
plaintiffs 16:25 26:21
planned 193:4
planning 4:8,14
plans 4:11,18,22 5:2
plausible 176:13
play 146:9
pleadings 163:25 190:4,9
please 5:6 28:12 32:10,16 68:21 175:9 202:4 205:3 237:23
plug 251:17,19
point 4:20 11:14 18:14 26:7 78:22 79:12 86:25 109:3 113:24 114:8 115:10 145:25 148:12 152:13 166:2 167:10 186:10 193:17 198:16,18 200:13 202:20 234:3 252:3
pointed 152:25 158:16 199:4
pointer 198:7 199:8 199:10,13,16,18
pointing 55:9 198:21 199:12 204:20
points 191:23 220:10,19 246:11
poor 27:7
portion 37:15,16 158:4
portions 11:8,18
posited 151:24
positing 64:9
position 63:7 103:2 128:6,8,12,14 151:10,13 153:24 154:4 158:21 159:2

160:11 168:13
**possession** 51:19
90:19 202:19,22
**possibilities** 95:6
154:18
**possibility** 69:25
111:11 112:16
116:25
**possible** 14:4 33:8
38:14 54:25 55:8
56:22 68:15 73:12
73:15 75:15 94:22
95:11,15 106:22,24
106:25 112:6,14
114:19 117:5,13
119:12 123:24
131:22,24 133:11
134:18 135:23
136:4 138:15,16,19
138:20,21 139:2
154:17 155:5
181:11 184:18,21
184:22 185:24
230:21,24,25 234:7
239:10 245:11
**possibly** 114:4
**post** 4:8,15,19,23
122:22 129:19
190:2
**potentially** 216:21
**practice** 13:24 14:3
37:23 70:14,16
238:20
**practices** 3:25 81:14
81:25
**pre** 214:24 236:10
**preceded** 210:14
**precise** 114:10
115:12 139:19
150:23
**precision** 181:15
**predates** 239:7
241:5
**predecessor** 20:19

**prefer** 38:3
**premise** 75:10 77:25
**preparation** 6:15
9:5,21 11:7 54:13
240:15
**prepare** 224:7
**prepared** 205:11
**preparing** 8:16 9:16
12:13 223:15
**present** 2:21 38:22
38:25
**presented** 191:6,16
231:23
**preserve** 225:11
**president** 12:15
**presumably** 194:14
**presumptively**
123:8 124:4 225:16
**pretty** 67:7
**prevent** 146:5
**previous** 26:3 30:24
214:20
**previously** 3:19
83:23 108:5
**primarily** 235:8
**primary** 12:2
235:10
**principle** 116:5
117:25
**print** 91:9
**printed** 27:13 88:19
156:19 189:14,17
189:22
**printout** 87:12,16
87:23
**prior** 26:14 50:8
51:2 52:3,9,10
74:12,24 75:7 120:5
123:21 127:8
128:15 129:2,11
148:12 179:11
210:16 236:12
**privilege** 123:10
180:10,17 225:17

**privileged** 39:21
224:16
**probability** 111:22
114:15 115:8,14
207:14
**probably** 5:11
113:12 119:4
161:16 192:17
193:6,14 194:8,13
243:20
**problem** 102:4
241:7
**problems** 23:20
217:17
**procedural** 225:15
**procedure** 3:21
**proceed** 100:4
**proceeded** 128:5
**proceeding** 203:3
**process** 11:15 48:22
50:25 53:3 56:23
57:8 134:5,9 139:14
173:9
**processes** 79:25
**processing** 183:2
**produce** 29:8 33:16
42:24 43:7 45:7
75:11 124:24 125:7
150:7 215:21 225:6
225:16,17
**produced** 9:2 10:20
29:4,7,17 45:10,11
70:11 105:14,17
107:22 108:2,10,11
108:18,20,21 123:9
125:5 150:11 188:5
197:17 200:9 201:8
202:14,24 206:9,15
207:7,10 223:8
231:14
**producing** 11:12
41:10 150:18 231:7
**product** 68:9
**production** 10:10,11
28:25 43:12 125:11

186:24,25 187:4,24
188:4 191:6 232:18
232:22 236:7
**productions** 186:13
186:20 232:22
**professional** 40:24
139:4
**proffered** 16:10
**proficiencies** 106:7
**proficiency** 106:3
**program** 64:23
65:11 69:19 117:15
130:8,11,20 131:18
172:23
**programming** 139:9
**programs** 104:9,11
117:6,7,8,9,11,13
133:18,21
**projects** 235:13,16
**pronounce** 228:12
**proof** 50:20 56:4
**proper** 103:24
**properties** 206:4,6
206:14
**prosecution** 238:18
**protocol** 183:20
225:7
**proves** 14:22 17:9
63:8
**provide** 39:22,24
46:22 72:10,24
81:18 183:4 189:12
**provided** 5:22 9:6
12:19 47:12 54:4
72:14 73:3 105:14
110:9 124:25
126:15 147:15
159:14 187:25
197:7
**provides** 209:7
**providing** 47:15,18
192:11
**provisions** 30:9
**prudent** 184:24
185:3,6,15

**public**  1:21 6:6
  252:22 253:8
  255:25
**publications**  40:24
  41:4
**publicly**  4:25
**published**  41:4
**pull**  116:21 118:19
  155:4
**pulled**  228:2,3
**purport**  211:14
**purported**  81:20
  146:23 149:4 183:7
  216:11 217:24
  225:14 226:14
**purportedly**  114:5
  150:10 165:8
**purporting**  164:16
**purports**  191:17
**purpose**  63:3 239:23
  244:23,23 245:7
**purposes**  43:24 76:2
  123:14
**pursuant**  1:20 35:19
  187:25 220:2 225:7
**put**  3:13 23:17 28:6
  67:18 68:13 87:7
  90:3 92:21 95:11
  114:17 150:12
  156:21 175:9
  177:19 191:21
  199:20 217:19
  219:12 243:2
  247:13
**puts**  89:5 163:11
  198:5

**q**

**qualified**  19:20 20:2
  22:19 153:2,8 252:3
**quality**  28:15
**question**  7:6,7,20,25
  10:14,16 11:6 23:5
  26:3 30:24 34:15,19
  37:22 43:19 50:18

50:19 51:13,16,23
53:8 57:5,18 66:9
66:10 70:8,10 71:21
74:19 75:10 76:2
82:5 86:4 89:19
94:13 100:22
109:17 112:12
113:22,23 122:18
123:22 126:24
127:5,6,11,23,24
128:3,4,5,12,21
133:15,17 135:4,19
139:20,25 143:10
144:4,9 145:2,14
150:20 151:20
152:6,9,10 153:10
153:18 160:18
162:3 168:17,18,20
168:22 170:15
172:21 174:8
183:14,19,24 184:3
184:6,7,16,17 185:9
185:10 187:10,13
211:18 212:23
218:7 226:9 243:2
243:11
**questions**  7:20
  11:20 16:11 49:22
  83:7 104:18,24
  127:4,20 137:6
  166:22 227:21
  234:23 252:9
**quick**  27:15
**quicker**  198:6
**quickly**  91:20
  194:16
**quite**  178:12 209:20
**quotation**  210:16
**quote**  131:8 209:23
  209:25 210:4
  213:23

**r**

**r**  2:2 6:5,5 194:2,18
  194:18 228:12

253:2
**ran**  169:12
**range**  10:7
**rate**  9:19,22,24
  223:4
**rates**  10:6 223:5
**reach**  196:17 197:3
**reaction**  192:19
**read**  10:19,23 11:15
  12:17 16:24 17:2,8
  26:20 28:11,14,17
  29:22 30:5,7,8,9
  55:6,18 70:17 86:17
  89:16,18 108:24
  109:3 121:18 150:3
  156:5 159:16
  160:11 177:23
  178:4 203:12 209:4
  209:11,24 225:8
  229:22 230:2,3
  241:14 250:9
**reading**  11:3 30:6
  55:8 71:11 90:16
  183:20 227:17
  250:12
**reads**  238:14
**real**  142:8,12,25
  144:14 145:10,12
  156:3 226:23 228:6
  244:17 254:15
**reality**  245:5
**really**  21:3 26:9 69:4
  75:9 82:4 102:5
  117:10 185:16
  193:5 237:9
**realm**  143:18
**reason**  13:17 16:22
  29:16 44:17 46:16
  76:25 89:3,20 90:15
  116:15 215:19
  244:20 245:18
  255:7
**reasonable**  74:8
  131:20 135:17,25
  155:9,11,14 160:13

160:25
**reasonably**  41:20
**reasons**  37:3
**rebecca**  219:9 238:2
  238:5 254:21
**recall**  17:5 26:23
  30:13,16 33:11 39:5
  47:5,9 48:11,15,22
  52:12 71:10,11,14
  75:24 90:13 91:11
  119:21,24 130:4
  172:13 177:20
  178:21 179:25
  180:5,6,8,11 181:4
  184:16 187:18
  192:18,19,22 198:6
  227:13,20,23 228:5
  230:3,20 232:18
  233:9,15 250:11
**recalling**  66:11
  195:2
**receipt**  120:18
**receive**  122:16
**received**  9:2 41:25
  42:4,10,14,17,18
  45:24,25 57:23
  59:20 60:4 61:3,3
  61:13,14 121:22
  122:10 123:6,21
  129:3 159:25 160:2
  160:8,10 162:7
  175:7,24 186:14
  210:7,12,19 211:4
  211:20 227:3
**receives**  210:21
**receiving**  98:6
  123:14 149:20
**recess**  82:15 136:25
  193:20 234:18
**recipient**  57:25
  217:3
**recognize**  52:16
**recollection**  33:10
  52:24 91:17 92:2
  97:13 109:4,7 120:2

120:15 170:3 231:4
232:25 248:11
**reconstruct** 10:18
235:17,21
**record** 3:13 8:6 42:6
78:17 79:12 82:10
82:22 84:14,25 85:2
85:4,6 88:4,9
127:14 136:24
137:4 178:9 193:17
193:18 224:14
229:16 234:17,21
252:12
**recorded** 97:2 98:22
210:8 220:22
**recording** 82:21
**records** 35:10 40:10
40:14
**recover** 78:19 79:21
79:25 126:7 187:20
196:12 222:18
**recoverable** 195:16
196:2
**recovered** 227:24
**recovery** 43:24
**red** 23:20,24 24:6
**redacted** 8:7 131:9
**redirect** 252:11
**refer** 189:9 205:17
**reference** 60:18
159:15 162:4
197:11 203:20
**referenced** 85:10
157:17 178:11,17
179:6 206:9
**references** 176:22
213:11
**referred** 17:8 76:3
211:11
**referring** 7:2 15:5
15:24 17:4 27:19
54:21 56:16 59:4,6
59:24 60:11 76:11
86:22,24 89:13
90:24 92:7 108:12

108:14 109:25
121:6 155:24 157:8
160:6,7,9 162:8,9
164:5 180:13
197:13 198:17
210:13,16 248:8
**refers** 203:3 209:8
**reflect** 40:11
**reflected** 211:20
**reflective** 174:14
**reflects** 42:6
**refresh** 91:16 92:2
97:12 120:15
248:11
**regard** 70:5 110:21
237:14
**regarding** 39:16,25
40:7 53:20 59:10,18
106:7 110:17
160:23 207:6 219:6
220:10 223:23
232:3,7,8
**regardless** 115:9
**registered** 77:4,11
113:3 152:22
158:18
**regular** 89:11,24
**related** 31:25 32:2,3
32:5 33:22 35:11
40:19 52:3,25 53:3
90:8 102:18 122:17
124:18 221:17
245:7 253:16
**relates** 55:12,17
**relation** 59:14
218:11
**relationship** 220:11
220:14
**relatively** 209:20
242:21
**relevant** 41:13
80:23,25 81:2,7,15
82:2,2 123:4,8
124:4 137:25 138:3
138:12 174:8

177:19,19,24 178:6
183:13,18 184:19
185:20 225:16
233:7
**reliability** 218:5,18
238:15
**reliable** 209:13
240:16 241:13
**relied** 8:16 146:24
240:21
**rely** 129:24 137:20
141:7 182:3 226:6
239:13
**relying** 240:9
**remained** 229:9
**remember** 29:13
47:15,18,24 48:8,13
66:3,6 103:13
166:10 227:15,21
230:14
**remote** 65:3,5,6,15
65:17 67:21 68:10
68:17,25 69:4,21
71:18,22 72:16,24
73:5 111:11,17,21
112:6,8,13,16
114:18
**remotely** 67:16
68:11 69:13 111:5
**removable** 198:19
198:23 199:5 200:7
200:13 204:9
205:17
**renowned** 106:14
**repeat** 64:11 86:4
139:25 231:12
237:8
**rephrase** 105:10
**rephrasing** 168:19
**reply** 157:3,23
158:22 159:11
**replying** 160:22
**report** 5:7 6:2 8:8,9
8:11,14,16,17,20
9:21,23,25 10:5,11

10:20,23 11:3,8,12
11:17,18,24 12:5,7
12:10,10,13,18
13:10,12,19,22 14:5
14:6,17,23 17:3,4
18:19 19:12 25:18
26:20,23 27:6,11
28:6 29:4,7,10,18
30:14,20,20 31:4,5
31:6,12,20,22 32:2
32:5,7,13 33:7,24
35:15,16,21,22 36:2
39:17,22,23,24 40:4
40:6,8,15,18 41:10
58:18 60:11 61:21
70:2,8,11,18 71:12
72:12,19 74:11
75:21,23 76:6,10
80:25 81:11,13
84:15,20 85:8 87:6
90:21,24 91:5,10,16
91:18,19 93:10,19
97:13 102:19
119:15,19 120:16
122:24 123:5 124:8
130:2 131:10
137:22 138:5 140:5
155:18 163:20
165:15 166:8
180:22 189:3,6
190:13 195:2 197:7
197:11 199:20
200:5,6 201:10,22
202:8 203:7,20
205:18 207:9
208:15,17,18
219:12 220:17
221:3,12 223:9,15
224:7 225:6 227:8
227:17 231:8,14
234:6,25 235:3,10
236:4,7,24 237:9
239:7 240:15,21
241:14 247:4 248:9
249:8,13 250:18

254:7
**reporter** 1:21 84:24
  253:7
**reporting** 255:2
**reports** 14:2 16:24
  39:15 227:15
**represent** 55:14
  109:16
**represented** 195:13
**represents** 158:22
**request** 7:6 33:19
**requested** 194:7
**require** 69:17,18
**required** 3:23
**researched** 72:21
**reserve** 3:14 4:4
**reside** 113:23,25
  114:9 117:4 211:16
**resided** 78:21
  112:18,21 113:5,7
  113:13 114:7
**residence** 230:12
**resides** 114:5
**residing** 149:16
  168:8
**resolution** 27:7
  28:15
**resolve** 222:15
**resolves** 76:23 77:12
  152:23
**respect** 4:7
**respects** 250:8
**responding** 161:5
**responds** 154:24
**response** 155:22
  156:12 159:25
  224:18
**responsible** 13:7
**rest** 78:10 226:20
**restore** 220:9,19
  246:11
**rests** 16:4
**result** 35:13 131:21
  173:21 176:14
  216:20 243:25

**resulted** 139:14
**resulting** 89:10 90:6
**results** 13:9 35:14
  38:17 40:7
**resumed** 194:18
**resyncs** 251:20
**retain** 44:23
**retained** 202:20
**retains** 251:18
**retrieval** 186:12
**retrievals** 185:25
**returned** 118:24
**returning** 135:5
**reveal** 59:10,13
  112:17,21,23
**review** 14:10 32:14
  41:9 51:3,9 52:2
  53:12 123:10 183:4
  183:5 208:15,16
  225:17 227:8
  229:20 233:13
**reviewed** 11:16
  29:10 30:18,19,23
  30:25 31:4,19 32:6
  32:11 33:17 40:17
  41:21 52:6,22 53:2
  81:19 123:7 178:5
  207:5 208:17
**reviewing** 13:9
  70:23
**rewrite** 214:18
**right** 3:15 4:4 5:10
  12:5,8 18:11 20:16
  24:9 25:2 27:22
  54:6 56:20 58:22
  61:11,23 64:6 65:4
  66:16 72:5 81:17
  82:9 84:19 85:19
  90:19 91:22 95:13
  95:23 97:12 98:23
  100:11 105:12,13
  107:19 121:13,24
  122:10 123:5
  124:14 125:12
  126:2 127:24

129:23 132:19
134:21 137:10,15
142:4 145:6 146:8
148:3 149:9 151:22
155:25 157:5,15
159:13 160:3
161:22 162:13
163:2,16 164:4
165:21 166:6
168:14 170:24
171:14 178:7,15
179:15 181:7
186:22 197:18,22
199:3,24 206:17
208:24 210:24
213:22 218:13
221:25 222:6
223:18 226:17,25
228:23 234:20
239:10 242:13
245:11 246:10
251:5
**ring** 53:16 177:15
**rja** 1:4
**road** 2:6
**rogue** 245:6
**role** 13:5 182:21
  183:12 228:7
  254:16
**rolling** 137:2 194:5
**rootkit** 71:5 104:25
**rootkits** 103:13,16
  103:18
**rose** 1:18 3:8,8 6:10
  7:1 8:1,5 9:1 10:1
  11:1 12:1 13:1 14:1
  15:1 16:1 17:1 18:1
  19:1 20:1 21:1 22:1
  23:1 24:1 25:1 26:1
  27:1 28:1 29:1 30:1
  31:1 32:1 33:1 34:1
  35:1 36:1 37:1 38:1
  39:1 40:1 41:1 42:1
  43:1 44:1 45:1 46:1
  47:1 48:1,6 49:1

50:1 51:1 52:1 53:1
54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1
74:1 75:1 76:1 77:1
78:1 79:1 80:1 81:1
82:1,16,24 83:1
84:1,11 85:1 86:1
87:1 88:1 89:1 90:1
91:1 92:1 93:1 94:1
95:1 96:1 97:1 98:1
99:1 100:1 101:1
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1
129:1 130:1 131:1
132:1 133:1 134:1
135:1 136:1 137:1,4
138:1 139:1 140:1
141:1 142:1 143:1
144:1 145:1 146:1
147:1 148:1 149:1
150:1 151:1 152:1
153:1,24 154:1,4,8
154:9,9 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1
190:1 191:1 192:1

193:1 194:1,22
195:1 196:1 197:1
198:1 199:1 200:1
200:21 201:1,4
202:1 203:1 204:1
205:1,4,10 206:1
207:1 208:1 209:1
210:1 211:1 212:1
213:1 214:1 215:1
216:1 217:1 218:1
219:1 220:1 221:1
222:1 223:1 224:1
225:1 226:1 227:1
228:1,6,10 229:1
230:1 231:1 232:1
233:1 234:1,22,23
235:1 236:1 237:1
237:24 238:1,4
239:1 240:1 241:1
242:1 243:1 244:1
245:1 246:1 247:1
248:1 249:1 250:1
251:1 252:1,16
253:10 254:4,7,9,11
254:13,15,19 255:6
255:21
**roughly** 33:3 61:7
61:17,19
**rule** 7:16 111:16
134:17,18 160:15
160:20,23 214:11
214:12
**ruled** 160:24 161:24
162:8
**rules** 3:20,21 6:23
7:2,17 49:21 223:23
**run** 82:13 170:25
173:22

**s**

**s** 2:2 6:5 166:22,25
168:14 170:20
171:17 194:2,2,2,18
255:7

**sat** 100:15,16
**satellite** 198:9
**save** 67:23 68:11
189:24 215:16
219:24 222:5
**saved** 68:16 219:23
229:10
**saverin** 53:14
**saving** 215:15
**savings** 165:21
174:5,6,11
**saw** 74:10 249:20
**saying** 26:10 47:24
51:24 78:14,20 81:2
87:20 90:2 110:13
111:12 120:12
122:24 123:24
127:13 140:19
148:7 149:23 154:7
159:12 160:25
171:21 181:14
195:4 197:25
204:19 212:19,24
239:17 243:24
246:16,19
**says** 19:5 30:7,8
39:23 89:12 109:11
110:5 131:6 149:22
149:22 150:2
151:17 157:11
158:4,5,6 179:9
191:25 210:5 229:4
233:23
**scan** 70:12,15,24
90:5 94:4 95:8,8,10
95:13,23
**scan0001** 91:17
94:15 96:11 194:23
**scan0001.tif** 91:14
**scan0002** 94:14 96:6
96:9
**scan0002.tif** 92:4
93:17
**scan0002.tif.** 92:11

**scan001.tif** 93:23
**scanned** 64:2 65:18
85:13,18,25 86:21
86:22,25 90:5 93:7
93:17,19 94:9,10,18
94:19,25 95:8,12,18
96:4 112:3 148:8,11
**scanner** 92:20,21
93:6 94:3,5 95:2,4
95:12,16,25
**scanners** 95:13
**scanning** 95:23
160:16
**scans** 25:21 75:18
93:10
**scenes** 171:15,22
**scheme** 93:5
**scratch** 58:21
**screenshot** 206:4,6
206:13 207:2
**seagate** 93:22 96:10
96:12 108:2 221:3,7
248:7 251:22
**search** 35:3 45:14
125:5 183:3
**seat** 62:11,17
**second** 17:13 42:17
48:3 61:10 84:22
85:12 91:14 92:17
93:14 95:8,13 96:3
96:12,21 97:17
107:20 108:6
131:13 166:7 191:2
205:23,25 206:3
228:24 249:2,4
**seconds** 59:22 61:9
**section** 11:16,24
26:23 30:8 121:2
238:12
**secured** 38:13
**security** 219:8
**see** 27:25 53:5,6,23
55:9,11,16 58:25
59:3 60:15,18 73:13
77:17 85:12,16,17

89:12 91:20,22
115:4 121:5,20
124:3 132:24 133:2
133:6 135:9,24
145:9 153:4,16
157:20 158:6
167:22 173:4
176:11 177:19,23
187:14,24 188:4
197:8,13 198:11,21
201:4 205:16,19
206:7 209:23
212:16 214:4
215:14 224:3 229:2
238:13 242:3
244:13 246:7,11
247:11,12,12 248:3
**seeing** 242:3
**seen** 14:12,13,14,15
14:22 16:9,13,15,21
53:21 84:11 125:19
125:21,22 146:7,9
169:9 181:21
185:23 249:18,24
250:4,7,16
**selected** 210:16
**self** 182:8
**semantics** 75:14
**send** 57:12 64:10
65:10 76:24 104:12
111:2,4,6 113:13
118:9 122:5 123:23
129:13 161:13
230:22
**sender** 92:9
**sending** 24:22 63:3
63:6 149:20 154:8
161:17 179:25
**sends** 159:7
**sense** 66:15 75:10
106:4 222:14
**sent** 59:18 60:2,14
60:17,21,23 61:11
62:8,24 63:10,18
64:13,16 75:22 76:3

76:16 77:16,20 78:4
78:5,8,11,17 79:9
79:10,14,17,22
92:14 97:19 98:10
109:21 110:18,20
112:19,22,25
113:16,17 114:12
114:14,16,22 115:6
115:8,12,13,14,17
115:22 116:2 117:9
118:17,20,21,23
122:13,19,22,25
123:21,25 129:16
129:20,25 138:18
149:21 150:10
152:7,9 153:21,24
154:3,5,7,11,14
156:6,9,11 159:5,24
160:21 161:4,8,22
162:4,6,16,17,19,21
163:5 165:21,25
174:9,16 175:23
177:13 179:7,23
180:16 181:4,5
187:15 195:10,12
227:2 231:9,15
232:5
**sentence**  58:22,25
  59:2,3 107:20 108:7
**separate**  42:11
  43:12 159:3
**separately**  247:7
**september**  246:13
**sequential**  220:20
  246:12
**series**  78:23 171:25
**serve**  48:6
**server**  44:5,14 45:20
  46:2,6,7,8,8,11,21
  58:11,20 59:5,21
  61:4,14 98:2,5,5,19
  98:25 99:2,3 151:5
  151:8 169:21
  173:15,16 186:2
  210:9,19,20 211:3

211:12,23 244:10
244:17,18 245:15
**servers**  43:16,22
  59:7 97:21 98:4,15
  99:4,5,7,14,16,19,21
  101:2,7,17 149:15
  151:7 168:8 177:3
  195:5 211:16
**service**  64:23
**set**  3:25 43:7 51:2,3
  57:14,15 58:24 90:5
  97:25 116:20,25
  119:10 122:3,6
  129:12,16,24
  171:14 174:22
  183:3 233:13,14
  253:11,21
**sets**  56:18 62:23
  225:9,14
**setting**  58:23 97:23
  98:16 177:5 220:11
  244:11 245:14
  251:14
**settings**  250:25
**seven**  22:14 187:2,4
  189:21
**sfwebworkforhire...**
  131:14
**sharing**  147:6
**sheet**  255:2
**shortcut**  198:4,7
  205:5 254:14
**shortly**  98:14
**shoulder**  200:17
**show**  18:10 93:5
  102:13 122:25
  198:16,18 200:15
  204:22 212:25
  247:20
**showed**  77:8,10
  87:15 90:23 151:2
  207:2
**shown**  87:6 229:18
**shows**  63:18 146:19
  146:20 150:4 212:9

**shut**  75:17 194:9
**shutter**  23:11
**side**  7:8,14 19:9
  149:20,20 192:16
  192:16,17,18
**sides**  150:17 216:18
**sidley**  35:20 58:11
  58:15 59:4,7,10,20
  60:4 61:4,14 62:24
  98:4 99:3,4,8
  149:16,16,18
  150:10,11,16 151:7
  152:16 160:3 177:4
  195:5 244:9,12,20
  245:6
**sign**  12:9,14 13:18
  13:22 14:2 190:20
  192:9
**signatories**  13:21
**signatory**  14:6
**signature**  63:24
  64:3 152:25 191:21
**signed**  8:9,11,14
  13:11 62:23 63:15
  63:20 126:13
  147:15,17 152:24
  153:23 188:10,13
  191:2,17,25 192:4
  231:17
**significant**  236:15
**significantly**  10:4
  24:10 249:17
**signing**  125:17,22
  188:22
**signs**  212:25
**similar**  189:4,20
  190:5 197:5
**simultaneous**
  163:14
**single**  125:7 178:10
  229:18 243:8,10
  245:12
**sir**  51:16 127:4
  160:18 183:24

**sit**  22:16 228:5
**sits**  222:13,21
**sitting**  6:25 62:17
  63:9 64:9,14,17
  65:7 215:4
**six**  131:4 140:21
  188:23
**size**  26:24 27:3
  28:18,21 29:5,6,13
  29:17,22,24,25
  85:16,21,24,25 86:3
  87:20 89:11,23 90:4
  91:2,4 195:14,24,25
  196:6,19 197:2
  203:5,10,15,25
  204:6,7,15,20,23
  205:19,22 206:7,11
  206:16 232:9,11,14
  249:7,11
**sizes**  203:22 204:14
  206:23
**small**  28:16,24
  87:13 88:5 150:2
  201:20 235:13
**smaller**  87:7 88:17
  88:21 250:14
**smoking**  150:14
**snapshot**  79:11
  186:9
**snyder**  54:6,16,23
  54:25
**social**  53:21
**software**  13:2 35:5
  69:9,19,24 92:21
  93:2 94:3,5 103:25
  104:4 133:23
**somebody**  80:21
  114:5 135:14 141:9
  141:11 239:18
  240:23 244:12
**someone's**  104:12
  104:15 143:23
**somewhat**  189:18
**son**  109:8 110:6

**sorry** 59:25 68:5
70:22 90:22 94:13
121:10 140:2 157:4
162:17 204:10
249:8
**sort** 11:25 136:21
143:18 151:23
214:7 218:20
224:10 227:5
232:13 236:9
**source** 45:8 46:3,19
46:23 133:22
167:21,21,23,24
176:22 209:14
233:15
**sources** 184:19
247:19
**southwell** 2:15 3:2,3
3:12 4:14,17,20,24
5:4,9,16,21 14:25
15:16 16:8 17:25
18:21 21:11,15
28:20 29:23 31:7,23
32:2 33:15,18,22
39:8,18 40:3 43:3
44:10 47:17 51:22
54:20 55:11 56:15
58:2 59:24 60:10
66:4 70:20 71:8
73:22 76:18 77:23
80:8 83:18,23 84:21
86:7 87:10,16,22
88:3,8 93:8 105:9
109:24 110:4
113:20 121:6,9,12
126:10 127:18,22
128:4 136:11,18,23
145:18 150:21
153:7,21 157:6
158:7,24 164:13,18
168:21 180:12,19
184:4 186:15 191:4
192:24 193:7,12,16
249:16

**space** 49:3 50:7,17
51:5 167:6
**spaced** 229:18
**spaces** 167:8,15
201:16
**speak** 80:9,12
214:22
**speaking** 8:23 128:3
209:15
**specific** 15:5 48:15
54:3 57:9 72:4,9
79:2 103:23 109:4
112:12 147:4 156:4
157:7 184:16,17
224:19 226:11,13
227:20,23 240:20
241:9,21 243:21
245:20
**specifically** 35:14
59:8 63:5 67:19
71:10 90:13 117:18
117:21 122:4
148:15 175:3
179:13 180:12
212:3
**specifics** 71:9
116:11 120:16
**specified** 183:6
**specify** 15:3 40:3
**speculate** 17:12 18:9
26:16 37:22
**speculating** 143:25
**speculation** 136:12
207:12
**spelled** 166:11
**spent** 235:24
**split** 49:7
**spoke** 182:14
**spoken** 80:6,10,11
182:16
**spoliation** 199:23
200:4
**ss** 253:4
**stages** 235:15

**stamp** 5:19 197:8
218:19 226:16
238:16 239:19
241:16 244:22,22
**stamps** 59:17 60:2
218:15 229:5
238:13 240:10
241:22,25
**stand** 27:16
**standard** 60:24
70:14,16 152:14
166:2 174:6 209:19
226:19
**standing** 176:4,7,18
217:19 243:15
**standpoint** 62:10,15
149:2
**start** 60:8 72:7
82:19 194:4 198:9
214:19,19
**started** 6:12 36:6
55:7 128:3 224:6
**starts** 209:4 228:25
**state** 1:22 65:2,12
74:6 113:14,15
114:14 178:8 253:3
253:8
**stated** 37:2
**statement** 41:8
50:11 54:15,19,22
55:5,20 78:23
107:14 110:21
140:8 171:5 182:3
210:3,14 211:10
220:6 223:24
229:14 238:23
**statements** 78:24
79:3 182:9 229:25
240:9
**states** 1:2 80:22
85:22
**stating** 187:15
202:17
**statutory** 3:23

**stay** 216:13
**stenographically**
253:14
**steps** 35:7
**stewart** 204:11
**storage** 55:2 56:23
**straightforward**
153:15
**strange** 151:15
**strangeness** 152:12
**strategic** 82:5
**strategy** 13:9 80:16
185:10
**streetfax** 14:22 17:9
17:22 18:5,18 19:8
19:12 20:12 23:3
24:12 28:7 30:8
58:15 60:20 63:4
77:13 81:21 92:3,10
102:22 103:9 107:3
107:11,17,23
114:24 115:5 142:9
146:10,14,20 148:2
148:25 150:14
155:11 191:9
192:12,16 242:17
247:16 248:18
249:5,19
**streetfax.com** 183:9
**stricken** 127:13
**stroz** 3:9 6:2 8:8,13
9:17 10:9,13 12:16
13:24 14:4 22:8
37:23 39:6 40:13,23
43:14 48:17 49:13
49:17,19,24 50:4,6
50:11,15,20,24 51:8
51:18 56:13 81:12
83:13 88:23 91:8
137:12,14,20 170:8
173:2 187:9,20,24
214:9,17 215:3
228:17 230:5 254:7
**study** 223:25

**stuff** 139:13 148:18
**subject** 49:3 50:17
 92:8,14 183:3
**submitted** 16:25
 163:24
**subpoenas** 35:19
**subscribed** 252:18
 255:22
**subsequent** 152:16
 186:13,19 200:14
 233:4,5
**subsequently** 123:9
**substance** 189:19
**substitute** 214:25
**sufficient** 13:21
**suggesting** 190:19
 190:25
**summarizing** 175:8
**supervise** 37:15
**supervised** 31:11,16
 37:13,16 84:4
 137:18 235:9
**supervising** 13:7
**supervision** 12:17
 12:19
**supplemental**
 200:21 201:2
 254:11
**support** 97:9 113:4
 141:7 142:15,20
 150:8 165:8,14
**supporting** 166:13
**supports** 64:20
 111:25 139:22
 140:13,15,17 192:8
**suppose** 138:20
**supposed** 225:3
**supposedly** 106:19
**sure** 10:5,15 15:6
 22:23 25:6 28:23,25
 31:8,10 39:20 55:7
 69:25 74:19,21 75:4
 79:6 82:14 85:3
 89:17 93:12 97:10
 140:4,20 144:3

148:6 172:20 181:9
 181:14 182:23
 184:8,11 190:23
 224:15 225:8 226:3
 226:9 235:16,18
 248:12 249:22
 250:22
**surface** 48:25
**surprise** 203:14,16
 203:17
**surprising** 130:16
**surrounding** 176:19
 204:17
**sworn** 3:11 6:6
 252:18 253:12
 255:22
**sync** 116:25 117:6,7
 117:8,9,14 118:2,25
 119:11
**synced** 117:21 119:5
**synchronize** 116:3,8
 116:21 117:19
 118:16
**synchronizes** 116:19
**synchronizing**
 118:4,8
**syncing** 116:12,16
**synonymous** 247:25
 248:5
**system** 79:24 98:21
 98:23 99:23,25
 101:19,24 102:7,10
 102:15 149:6 211:5
 215:20 218:6,12,16
 218:20 219:18,24
 219:25 220:3,9,11
 220:19,21,22
 222:16 238:17
 239:21 240:10
 241:7,16 242:4
 246:7,9,14,17 247:5
 248:6 250:25
 251:20

**t**

**t** 166:20,22 168:14
 169:7,11,15 170:19
 170:20 171:17,17
 194:2 253:2,2
**table** 91:22 92:7
 93:16
**take** 7:11 37:10
 82:12 86:17 103:20
 104:9,10 127:20
 136:16,21 164:18
 193:8,8 234:13
 245:23 247:6
**taken** 82:15 136:25
 142:17 147:5
 155:15 234:18
 253:13
**talk** 19:10 21:7
 33:25 60:21 61:2
 65:23 75:22 76:3
 104:21 119:13
 121:2 130:2 143:17
 145:3,11 181:18
 189:6,8 195:21
 220:20 221:13
 225:18
**talked** 14:23 26:24
 56:19 103:12
 141:20 148:3 150:2
 176:7 185:25 219:3
 219:5 230:11 248:7
 249:25 250:19
**talking** 7:17 14:8
 15:25 16:6 17:16
 18:16 20:15 23:2
 31:23 32:23 37:18
 51:4 54:17 60:7
 63:21 68:3,4 72:4
 81:11,12,13 86:7,9
 87:14 88:9,16 107:4
 112:8 117:3 124:5
 131:2 134:11
 157:21 159:21
 160:17 171:25

181:10,16 186:18
 191:4 197:9 198:9
 201:9 202:7 203:6
 203:25 204:2 208:6
 216:6,9 219:17
 223:4 225:19
 230:15 236:16
 239:15,22 243:4,12
 249:22
**tape** 3:10 44:21
 82:21 137:2 194:4
**task** 187:11 223:19
**tasked** 183:15
**team** 21:18 33:6
 34:9 37:13 40:17
 41:24 43:6,15 52:2
 52:22 53:12 72:18
 89:23 124:24 125:5
 126:7 136:7 137:8,8
 137:12
**technical** 48:13 49:6
**tell** 9:15 33:10 54:18
 55:19 62:16 84:11
 86:18 96:17 129:5,5
 129:10,24 156:25
 159:20 163:12
 183:14 204:20
 208:20 209:24
 214:16 232:13
 240:23 243:22
**telling** 34:20 182:19
**tells** 80:22 145:10
 148:16,21 156:16
 191:20
**template** 212:15
 213:4 214:24
**tens** 72:5
**term** 22:22 45:19
 46:7 48:11 111:15
 236:23
**terms** 22:18 29:2
 30:10 34:21 35:3
 76:19 92:16 102:6
 112:11 113:6
 114:20 116:11

125:6 145:21
148:24 177:2 183:3
188:10 195:14,17
215:20 225:9
226:20
**test** 131:5,7 132:9
140:23 173:3,18,22
**tested** 169:9,21
**testified** 6:7 18:23
65:24 83:23 94:10
94:12,16 194:19
232:24
**testify** 153:3,9
**testifying** 66:3,6
232:19
**testimony** 6:14,15
9:9,12 22:5,20
26:11 66:5 115:11
132:23 169:20,22
207:20 224:2,9
253:11,12
**testing** 170:9
**tests** 169:12
**thank** 93:15 121:11
248:16
**theoretically** 106:25
112:8 135:23 136:4
139:2
**thing** 5:15 96:2
101:10,11 115:19
155:6 184:24 185:3
185:6 237:23 246:6
**things** 20:5 37:3
41:17 67:23 72:6
95:14,21 103:21
105:25 123:7 137:6
166:12 169:6 194:9
216:7 226:18
239:20 243:3
248:14
**think** 10:15 14:3,14
16:9,23 18:4,22,24
19:3,7 22:22 24:17
24:20 27:16,17 33:8
36:16 37:5 41:15

45:9 50:15,23 57:16
58:7 63:11 64:19
65:17,19 67:24 68:3
72:6 74:8 77:8,24
77:25 79:18 80:24
86:20 95:22 97:2
98:9 99:13,21 100:3
101:24 105:3 107:5
107:15,16,18,19
108:6 110:19 111:9
111:19,20,21 112:2
113:4 114:3,4,19,22
115:4,8,18 116:24
117:21 119:2,9,11
121:2 125:19
130:25 131:3,4,19
132:11,24 133:7,13
135:17,21,25
138:12,12,25
140:23 141:2,11,12
142:5,10 143:24
144:5,5,7 145:16
146:7,16 147:9
148:24 149:11
152:5,8 153:13
161:7,16 162:2
166:9 167:3 169:9
171:11 172:10
174:17 175:9,16
176:10,13,25 177:2
177:6 181:8 182:11
182:13 183:12
184:24 185:5,16,18
185:22,24 187:12
188:8,20 189:17
193:3,13 194:7,8
196:9,22 200:20
204:22 208:18
209:22 210:2 212:6
212:7,9,14 213:22
213:25 214:23
215:24,25 217:22
217:23,25 218:7
219:16 220:7 221:5
223:2,23 224:17

226:15 227:24
229:24 231:2 232:2
232:24 234:14
236:3,13 237:23
239:4,13,23 240:2
240:21 241:9,11,14
241:21 242:3,6,20
243:13,19,20
244:20,25 245:3,12
245:16,18,23 246:3
247:15,18 248:2
**third** 42:18 46:5
198:8 209:3 228:20
228:21 238:10,13
**thomas** 2:16
**thorough** 45:14
**thoroughness**
185:22
**thought** 81:12 180:7
200:17 216:7
**thousand** 161:23
235:25 236:3,20
**thousands** 72:6
**threads** 163:15
**three** 42:10 43:12
77:16 99:7 101:2
165:9 167:15 194:7
205:13 213:20
215:17 216:10
220:24 235:9
**tiff** 19:25 20:13,19
20:23 21:8,9,18,23
23:2 24:12 25:17
26:25 27:4,12 30:12
30:13 62:7 65:25
66:7 67:10,17 68:13
85:15 86:2,9,13
87:2,5 88:13,24
89:5,10,22 90:9
91:3,4,9,12 96:23
97:7 99:9 101:5
102:18,22 106:18
108:23 147:25
148:16,20 149:11
159:18,19,23,23,24

160:2,6,7,9,21
161:8,14,17,23
162:5,6,8,9 190:9
194:22 195:6
199:15,15 200:5
205:15,16 206:8
232:8,10
**tightrope** 151:18,22
**till** 188:19
**time** 10:19 24:20,21
26:9,15,22 37:8
58:23,24 59:17,20
60:2,4,24 61:4
78:18,22 79:12
86:17 97:2,4,20,23
97:25 98:11,14,17
98:19,22 99:17
100:4,8,14 101:12
102:8,14 109:4
112:11,18,22,25
113:15,19,24 114:8
114:12 115:10
116:13 147:16,22
156:5 165:19,21,21
166:2,4 170:17
171:23 172:2,17
173:19,25 174:5,6,6
174:9,11,12,13,14
174:18,24 175:5,6
175:13,18,25
176:18,24 177:2,4
178:20,24 179:7,8
179:17 180:21
186:3,5,6,7 187:16
187:22 194:3 200:7
210:5,7,12,19 211:4
211:19 212:16
213:7 214:18 216:3
218:14,19 220:12
220:22 222:3
226:16,18,19 227:3
227:22 229:5,11,13
238:12,16 239:19
241:15,22,25
244:10,17,21,22

245:14,14 246:9
251:7,10,14,17,19
251:24 252:13
**time's** 244:16
**times** 41:15 42:3,7
97:8 98:3,8,15
99:22 148:19
171:17 207:20
224:8 231:2 240:5
241:2 243:4 246:6
**timewise** 194:6
**title** 30:7
**today** 4:16 6:14,15
7:20 8:20 22:16
38:11 54:13 74:23
104:19 175:23,23
175:24 197:7
207:21 215:5
227:23 228:5
235:19 248:23
**today's** 9:5
**toggle** 242:2
**told** 170:4
**tom** 3:4
**tomorrow** 4:17,19
5:12 17:15
**tool** 131:17 133:5
**tools** 23:24 35:5
69:8 133:22
**top** 5:19 27:19 61:3
76:11,13 85:10
91:23 107:6 120:24
155:20 157:5,8,10
157:12,13,22 197:8
197:15 210:4
222:13,22
**topic** 46:24 83:5
137:7 192:25 197:5
216:13 239:2
**topics** 47:3
**toshiba** 197:10,21
198:9
**total** 10:8 223:7,14
**trace** 106:23 107:2

**track** 251:9
**tracks** 250:23
**trading** 57:6
**training** 3:20 8:25
20:7 238:25
**transcribed** 253:14
**transcript** 127:23
**transcripts** 9:6
**transmitted** 99:2
**trash** 117:4
**tremendous** 141:8
**tremendously** 142:4
**trub** 2:22
**true** 24:25 25:3 42:7
43:16 64:8,10,18,19
65:8,9 67:18 73:23
76:17 79:7,13,18
83:11 84:16 87:8
90:11 91:13,15
94:21 101:5 102:21
108:11 109:19
113:19 116:4,6,23
117:16 122:13,19
123:3 124:10 125:2
130:6 137:18
138:24 146:7,25
152:11,20 154:14
154:15 156:9
162:18 164:22
166:14,24 189:6
200:7,10 202:14
206:11 213:8,9,13
215:5,6,14 216:4
219:20 221:4,5,22
222:18 227:12
229:21 230:5
232:23 243:9
245:21
**truecrypt** 177:13
179:23
**trust** 179:3
**try** 15:4 18:11
131:12 132:11
140:24 142:11
146:4 150:19 173:2

177:7 182:9 221:15
**trying** 49:24 81:18
88:8 150:22 168:17
176:25 214:5,6
241:23
**tuesday** 166:11,18
169:6,10 213:11
**turn** 118:15
**twice** 41:24
**twins** 52:18,19
**two** 10:3 12:4,9,14
13:14,20 14:11 15:7
15:9,13,19 16:2
17:7,15,22 18:15
20:13 21:8,9,18
22:25 26:25 27:4
30:13 31:19 42:6,9
46:25 47:12 48:23
49:4,7 52:18 55:4
60:5,6,20 62:7,8,20
67:10 77:13 93:18
95:21 96:23 97:7
98:4 99:4,5,8,9
101:4 107:4,18
118:14,23 123:7
125:8 137:7 142:24
147:25 148:20
151:3 156:10,13
158:22 159:24
160:8 161:8,13
162:5,11,16,25
163:6,22,23 164:2
165:13 167:7,14
194:22 196:6,18
197:3,11,20,21,24
198:13 200:5,16
201:8 202:7 203:6
203:10 205:14
207:17 215:12
222:9 231:22 250:2
**type** 64:5
**typed** 63:21 149:22
152:25 153:22,23
154:4,9,13 212:20

**types** 71:17 74:5
214:17
**typical** 93:6
**typically** 21:3 34:24
35:4,7,9 37:24
**typing** 64:14,17

**u**

**u** 166:20,22 168:14
169:7,11,15 170:19
170:20 171:17,17
228:12
**u.s.** 209:4
**ultimate** 142:16
247:14,17
**ultimately** 156:25
189:22
**unable** 116:8
**uncomfortable**
11:19
**uncovered** 110:23
237:14
**underlies** 37:5
**underlying** 212:15
229:12
**underneath** 158:4
**underscore** 201:23
**underscores** 201:15
**understand** 7:22,25
16:21 21:14 23:5
26:6,9 29:23,25
57:5 74:19 75:9
80:11 86:12 89:25
144:3 172:20
202:19 211:17
225:2 239:15
**understanding**
45:17 54:4 81:16
84:17 141:22
167:25 169:13,16
169:17 172:6
225:21
**understood** 7:21
184:15

uniform  167:18
170:25 171:3
uniformly  171:23
unintentional  55:25
56:6
unintentionally
56:13,13,20
unique  6:23 233:2
233:11
unit  2:7
united  1:2
universal  165:19
173:25 174:12,14
174:24 175:5,13,18
175:25 176:24
179:8,17 180:21
university  43:21
unplug  251:8,15
unplugged  251:24
unquestionable
171:11
unrealistic  152:3
unredacted  5:22
unsigned  189:8,13
unsurprisingly
186:25
unusual  77:19 223:2
update  134:11,20
214:20
updated  239:20
241:16
upper  58:7,7 84:19
91:21 121:13
208:24 221:19
upstate  113:6
usage  134:14,16,17
135:7
usb  25:9 66:24
197:9,12,16,21
199:5 203:7,21
207:9
use  5:13 23:6 32:21
45:18 46:7 63:5
65:3 77:7 92:21
114:3,9 120:3,8,10

120:11,12,20
123:14 124:12
125:14 126:20
127:8 129:2 130:13
130:17 131:17
133:10 147:7
181:18,22,25
206:19 214:13,20
230:13 232:9
238:19,21 241:3
247:24
user  61:25 76:23
77:11 79:24 80:21
95:18,24 152:23
158:19 172:11
218:20 238:17
239:20

**v**

vague  218:22
valuable  142:4
value  80:20
variation  75:20
variations  71:22
189:21
varies  44:2
variety  65:25 66:7
125:5 239:20
247:19
various  26:2 32:17
32:21,22 35:18
40:24 42:3 68:24
75:23 81:20 167:8
181:7,7 183:9
184:14 197:17
202:19 214:3,8
225:15 235:14,15
242:6
vary  9:22 116:13
117:21 189:18
229:11
vast  235:6,6,11
vera  76:16,19,24
77:2,12 152:19,23
158:19

vera's  77:6
verified  206:21
veritext  255:2
version  5:17,20,22
5:25 8:21 28:22,23
74:22,23,24,25
75:12 90:21 116:13
117:22,22,23
172:14 197:6
214:20 248:22
249:16,18,25
250:14,15
versioning  116:11
234:3
versions  74:18 75:7
133:23 173:3 189:9
189:14 190:5 195:8
195:22,23 196:6
214:3,8 215:4,9,18
215:19,23,25 216:8
216:9,21 217:8,20
217:25 221:17
233:20 247:12
250:7,9
versus  145:20
video  3:23 4:5 82:19
videographer  2:22
3:10,14,17,18 4:2
82:7,21 137:2 194:5
234:19
videoing  4:7
videotape  4:12
videotaped  1:17
3:16
view  133:3,5 135:8
174:19 217:7
viewed  131:16 229:8
vilan  2:22
virtual  228:7 254:16
virus  75:18
visit  113:25
visually  192:14
vpn  69:2,7
vs  1:7 255:5

**w**

waded  216:13
walker  151:4,22
walking  151:3,11,18
wall  251:8,15
want  3:13 4:3 16:11
39:19 69:20 79:3
82:12 84:24 92:5
93:11,11 114:17
137:5 185:17
188:14 193:11,16
207:24 214:22
219:13,22 224:15
234:13 236:8
244:21
wanted  194:10
warren  2:6
way  21:10 22:4
26:19 29:19 34:23
35:12 57:2 62:6
66:10 67:9 68:12,15
68:17 75:3 87:7
90:20 92:22 94:20
94:22 95:17 102:16
103:4,5,11 106:15
111:6 116:20
120:14,17 132:22
135:20 136:5,15
146:8 147:11
150:19 166:16,17
166:18 167:13,18
169:10,14 170:17
171:12,14 172:7
173:15 181:25
196:16 197:3 201:8
209:7,17 219:4
220:4,7,14,16
222:20 230:20
231:5 235:3 240:12
240:22 241:8,17
248:21 249:12
253:18
ways  25:2 64:12,21
64:21 65:25 66:7,15

67:6,9 68:20 69:3,4
69:6 117:11 132:21
133:16 220:9
225:15
**we've** 18:5 38:15
88:20 107:3 148:3
169:9,9 174:10
177:15
**web** 112:11 116:3,9
117:15,19 118:4,8
118:17,19 168:12
172:24 173:19
192:7
**webmail** 118:2,23
119:5,10 121:3
168:7,23 171:6,9
172:18 173:20
**weeks** 177:10
188:23,23
**went** 24:5 26:2 35:7
56:11 69:6 119:9
151:6 154:21 163:2
174:5 223:8
**western** 1:3 108:3,4
108:12,17
**whatsoever** 40:7
128:18 143:7 232:3
**whereof** 253:20
**whichever** 39:4
207:14
**white** 49:2 50:7,16
51:5
**willy** 171:2
**windows** 218:5,9
**winklevoss** 52:19,23
**wire** 151:3,4,11
**witness** 3:11 6:5
7:12 16:9 28:24
55:18 88:7 100:11
100:12 127:19
181:2 182:3 229:19
253:10,13,20 254:3
**witnesses** 9:7
**woman** 151:25

**word** 21:2 57:11,13
57:14 63:8,20 74:20
75:12 157:18
164:24 165:3,7,9
166:11 172:14,16
173:3,21 178:4,5
207:14 211:8,21
212:10,12 216:10
217:23 219:21
225:22 227:4
228:25 233:18,21
234:3 243:23
247:24
**word's** 172:23
**words** 28:17 92:13
95:10 170:18 175:9
186:8 189:20
219:21 226:15
250:9
**work** 9:16 10:10
12:12 13:8,10 18:7
18:23,25 33:20 34:6
37:6 38:4 84:7
105:6 114:25 115:2
132:16 139:4
146:24 164:5,6
170:17 181:21
182:22 183:15
185:13 189:9,24
190:5 191:5,12,17
214:23 216:7
217:11 221:18
223:8 225:6,13
234:6 235:2,6,11,11
236:11,15 242:18
247:16
**worked** 22:8,10,11
22:13 124:24 131:7
132:10 169:25
170:4,10
**worker** 230:4
**working** 9:23 141:9
147:7 178:19,23
230:19,23 233:13

**works** 75:2 170:15
**world** 31:24 57:3
69:13 104:6,19
117:14 152:2
**worth** 41:19 141:7
**wrap** 194:14 234:15
248:13
**write** 134:25
**writing** 214:19
**written** 18:15 40:23
41:3 214:14 216:12
239:8 240:4 241:5
**wrong** 47:11 63:8
107:10 121:17
176:18,23 177:4
179:9,16 197:25
226:7 228:3,3
**wrote** 156:17 157:2
230:5

**x**

**x** 1:5,11 254:2

**y**

**y** 6:5 194:18
**yeah** 61:19 76:13
92:23 110:3 119:11
196:15 198:2
215:24 236:22
**year** 77:20 106:10
175:6 251:16,25
**years** 22:12,14 25:4
53:19 74:24 78:12
187:2,4
**yesterday** 6:21
**york** 1:3,19,20,22
2:14,14 3:22 113:4
113:6,14,15,25
114:13 115:14
151:4 253:3,5,9
255:3,3
**youtube** 4:9,15,19
4:23

**z**

**zone** 58:23 174:18
176:18 177:5
212:16 213:7
226:16,19 229:11
244:10,22,22
245:14 251:14
**zones** 177:2
**zuckerberg** 1:8
15:11 16:5 17:18
18:13,22 19:5 32:15
32:19 52:4,14 53:7
53:19 54:5 59:14
80:3,6,10,16 81:3
81:13 83:9 102:17
102:24 103:5
105:17 106:2,5,13
124:16,19 125:7
126:9 136:8 137:9
142:14 145:13
146:3,17 147:12,14
164:11,12,17,22
182:14,16 183:8
184:2 185:7 186:16
187:7,16,21 188:12
188:19 190:19,25
191:18,22,25 192:4
192:8 199:14 203:6
205:15,15 206:4,8
206:14 212:13
225:24 231:10,16
231:24 255:5
**zuckerberg's** 32:12
33:5 41:25 42:4,13
42:15,25 43:8 44:8
44:12,18 45:5 52:7
53:11 78:25 79:15
81:25 126:7 136:7
147:21 183:17
184:9 185:14
188:24