UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

PAUL D. CEGLIA,

Civil Action No. : 1:10-cv-00569-RJA

                                        Plaintiff,

**RESPONSE TO DEFENDANTS'
MOTION FOR DISCOVERY**

v.

MARK ELLIOT ZUCKERBERG, Individually, and
FACEBOOK, INC.

                                        Defendants.

## MEMORANDUM

Defendants' motion seeks production and a declaration. Accepting the Court's suggestion from the Decision and Order, Doc No. 572, Plaintiff has filed Mr. Stewart's Declaration with this response.  Defendants have filed this harassing motion despite being repeatedly told by Plaintiff and Mr. Stewart that there are no further documents to provide.[1]  Declaration of Larry Stewart at ¶3.  This is a harassment tactic, Plaintiff has learned, that seems to be common practice at Gibson Dunn.  Simply put, Mr. Stewart has no documents the Defendants seek and no order from this court will enable such documents to spontaneously generate.  Id. at ¶2-¶3.

## DAUBERT CHALLENGE VIA PLEADINGS

---

[1] Exhibit M

Defendants' misnamed Motion for Production, is in actuality a Daubert challenge of Larry Stewart.  The primary opponent challenging expert Larry Stewart is Gibson Dunn's junior associate, Amanda Aycock.  Doc. No. 556. Defendants are not entitled to a Daubert challenge by pleading.  Should the Court decide that it is appropriate to meticulously review the handwritten notes of Mr. Stewart with the intent of deciding on whether a conclusion he made is admissible for the Court's own consideration, the Plaintiff respectfully requests the Court to apply that same standard of review to all of Defendants' experts as well.  Plaintiff has already requested a full Daubert hearing challenging either the qualifications, methods and/or conclusions of several of Defendants' experts.  Doc. No. 481 at 8.

Despite Defendants' claims, they have not "discovered" anything about Larry Stewart's work in this case.  They have merely advanced a theory, supported by the testimony of their own non-expert lawyer, Amanda Aycock, where she attempts to contradict a qualified expert stating her observations of an unauthenticated video Defendants chose not to file.  Mr. Stewart has confirmed that he sent samples from the two page FB contract for testing by Mr. Rantanen.  Stewart Decl. at ¶7.

Defendants continue to re-iterate, by their written arguments, dueling expert claims in this case, while on the other hand, they continue to simultaneously deny this reality at every opportunity. Their histrionics accompanied by the word "lie" or "lying" have become so commonplace, and irrational, to scarcely require a response. They have proven no lies of any kind by Plaintiff or Stewart.  They have merely

posited dueling expert and dueling fact witness statements.  The US Constitution establishes a method to resolve such disputes - a jury trial.

The British equivalent of the Gibson Dunn law firm's abusive tactics in the 18th century resulted in the 7th Amendment of our Bill of Rights wherein the commoner has a fighting chance against the wealthy and politically connected bully.

Plaintiff fully understands the hidden agenda of this motion.  Defendants' counsel has a "crisis" to manage.  The fact that scientific testing found both pages of the paper in the FB contract to be consistent with originating from the "same mill and production run." (Doc. No. 421 at 2) is devastating to Defendants "page one substitution" theory.  It's completely consistent with the conclusions of Plaintiff's experts that the FB contract is authentic, including:

1   The original Facebook Contract...examined by all of the document experts is an authentic, unaltered document. The sum of the evidence reveals that page one of the Facebook Contract was originally executed together with page two as a companion document. Based on the detailed forensic analysis of this two-page document, there is no justification or support for the defendant's theory of a page one substitution, forgery or fraud. The sum of the evidence shows that page one was not a later inserted page to the original two-page document set. Doc. No. 415 at 232.

2   Based on the forensic analysis of the Facebook Contract, there is no justification or support for the Defendants' theory of a page one substitution, forgery or fraud.  Doc. No. 416-3 at 454.

3   The "Mark Zuckerberg" signature on page 2 of the Facebook Contract was

   written by Mark Zuckerberg.  Doc. No. 415 at 233.

4   The "MZ" initials on page one of the Facebook Contract were written by Mark

   Zuckerberg.  Doc. No. 415 at 233.

5   [T]he staple hole on both pages align demonstrating that these two pages of

   the Facebook Contract have only been stapled one time wherein they were

   actually stapled together.  Doc. No. 415 at 233.

6   The impression from the hand printed interlineation from page one of the

   Facebook Contract was discovered on page two of the Facebook Contract

   demonstrating that page one was over the top of page two of the Facebook

   Contract when the hand printed interlineation was written on page 1 of the

   Facebook Contract.  Doc. No. 415 at 233.

7   Both sheets of paper of page one and page two of the Facebook Contract

   pages measured at 0.11 mm and visual inspection revealed that the opacity

   and cockling features of both pages were the same.  Doc. No. 415 at 233.

8   The toner on both pages is the same and dates from the 2000-2005 time

   period and not later than that. Doc. No. 416 at 92, 103.

   The crisis Defendants are attempting to circumnavigate is that their own

experts' depositions have contradicted their own experts' reports in ways more than

conclusive of Plaintiff's right to a trial.  Coupled with that are the obvious contrary

evidence in Plaintiff's experts' reports.

## THE PAGE ONE SUBSTITUTION THEORY FALLS

The devastating conclusions of Plaintiff's experts, and Defendants' own expert's deposition testimony, have required Defendants to manufacture a new defense.  At the outset of this case, Defendants consistently asserted that the case was about the contents of page one of the FB contract.  Gibson Dunn partner and "Vice-Chair of the Crisis Management Practice Group" for Gibson Dunn[2] Orin Snyder declared there was no dispute about the signatures on page two of the FB contract.  Hearing Transcript, June 30, 2011 at 56.

As the case progressed, a combination of Defendants' own experts' reports and Defendants' expert depositions and Plaintiff's experts' reports exposed that Defendants' "page one substitution" theory was untenable to obtain a pre-trial dismissal relying on the court as the jury.  Defendants' now claim they never advanced such a theory.

The court can read their numerous expert reports and dispatch with that ruse.  Those reports are replete with efforts by their experts to distinguish the ink, paper type, toner, fonts and other features between page one and page two.  All that effort is nonsense if Defendants' theory had been the FB contract was a two page forgery all along.

## DEFENDANTS' HAVE ALREADY CONDUCTED RANTANEN'S TESTS

There is little doubt that Defendants have already conducted the precise tests on pages one and two of the FB contract that Mr. Rantanen conducted.  They know Rantanen's results are correct.  Plaintiff can confidently make this assertion

---

[2] http://www.gibsondunn.com/lawyers/osnyder

because it would be malpractice of the highest order for Defendants' counsel to have omitted such testing given their "page one substitution" theory and the fact they had and have access to paper samples from page one and page two of the FB contract to test for more than a year.  Or, are they withholding those test results from the court?[3]  It wouldn't be the first time Gibson Dunn lawyers were exposed for such unethical conduct as an apparent firm ethos.[4]  It would be shocking and an affront to common sense for Defendants' counsel to now admit they are in amateur hour, ... "we sort of messed up on that one.  We didn't think before we advanced the motion to dismiss for fraud to actually test the authenticity of the two pieces paper concerning the Work for Hire contract at the epicenter of a lawsuit threatening our client's ownership of his billion dollar technology company."  Despite Gibson Dunn's history of botching billion dollar litigation mired in unethical and abusive litigation practices,[5] one presumes they did not set their firm's resources on this case and omit testing the paper of the FB contract.  No countervailing paper test proffered by Gibson Dunn, a priori, equates to an admission of fact regarding Rantanen's results.

Because Rantanen's test results are accurate, it renders their needless and useless voyage through yet another stack of pleadings all the more egregious.  The motivation to cover up their incompetence at not having performed this obvious and simple paper test, Defendants now move to seek documents delay in a frivolity

---

[3] Exhibit E at 14 and 21.

[4] Exhibit F.

[5] Exhibit A.

which will end the same way it ended multiple times already before they involved the court.  Mr. Stewart has no further documents to provide.  Stewart Decl. at ¶ 2 - ¶3.

It is important to note that Defendants are not challenging **any** of Mr. Stewart's conclusions in his report.  They are not challenging his toner analysis, font discussions, ink conclusions, etc.  They are challenging the <u>results obtained by Mr. Rantanen</u>.  If Defendants omitted performing any paper tests of their own, their solution, now long overdue and unjustified for further delay, was to have another expert of Mr. Rantanen's caliber perform their own paper tests on samples they have had for more than a year.

## FAILURE TO MEET AND CONFER

Defendants never met and conferred about this issue.  Their repeated emails simply demanded documents that Plaintiff repeatedly told them were not available. No matter, they demanded them anyhow never stating that they were concerned that Mr. Stewart had submitted the wrong samples for testing.  During those weeks of back and forth, demands and responses, they could have run their own paper tests ten times.  I think the court sees here that Defendants' motion for discovery is not a search for the truth about what samples were submitted by Mr. Stewart to Mr. Rantanen for testing.  If it were, Defendants could have answered that question for themselves and not involved the court at all.

## THE INFORMATION FLOW DOUBLE STANDARD

During depositions, events Defendants claimed were "not Rule 26 depositions", they instructed their experts to hide their notes in their hotel rooms like children playing keep away.

> **[BOLAND] Did you bring any of your notes or anything with you to the deposition?**
> **[LAPORTE] I did not.**
> **[BOLAND] Why didn't you bring any of that stuff with you?**
> **[LAPORTE] I was instructed by the Gibson, Dunn attorneys that there was an ongoing dispute and to leave my notes back at my hotel.** [6]

Meanwhile, Defendants have spent hours reviewing videos, dragging this court around and needlessly wasting everyone's time on an issue they could have resolved in a single day - testing their own paper samples of the two pages of the FB Contract.  This hypocrisy is not merely a point of fact, it is an abuse of the court system by a wealthier client[7] to the prejudice of a Plaintiff seeking his day in court.

Defendants are asking this Court to meticulously review Stewart's handwritten notes based on the speculation of Amanda Aycock - a lawyer for Defendants who is entirely incompetent to challenge an ink expert, or any expert, in their field.  If there were no disagreements about material facts in this case, Defendants would not be volunteering their junior attorney to be a sacrificial lamb in this way.  But, as is known nation wide, Gibson Dunn often taps younger, inexperienced associates for such bullet catching duties.  Id.

_____

[6] Exhibit L, Excerpt of Deposition of Gerald LaPorte at 144-145.

[7] Exhibit A.

The proper time for determining the admissibility of each expert finding is during regular discovery.  Plaintiff finds himself twenty eight months into litigation without yet seeing a scheduling order for regular discovery.  Defendants have masterfully delayed this case causing all involved to bend to their will to simply continue the litigation, billing of their billionaire clients and back and forth on matters of no consequence while minimizing the obvious dueling experts and factual disputes in an attempt to bankrupt Plaintiff to a win.  Snyder and Southwell's firm, Gibson Dunn, has employed these tactics many times before resulting in million dollar sanction awards against them.[8]  That is the only possible explanation for their hostile opposition to any delay, even seven days, back in July 2012 and now their hours of preparation applied to their desire to have this court infinitely delay this case.  Plaintiff should not be forced to spend his money to clarify his already clear conclusion just because Defendants' expensive legal team dislikes the devastating conclusions.

## THE GIBSON DUNN WAY

Gibson Dunn lawyers are steeped in the kind of mindless, time wasting litigation they have employed throughout this case already.  Their firm website advertises their skill at "crisis management."[9]  Defendants' counsel Snyder, is Gibson Dunn's New York leader in crisis management cases.[10]  Defendants' counsel

---

[8] Exhibit C.

[9] http://www.gibsondunn.com/practices/pages/CMT.aspx

[10] http://www.gibsondunn.com/lawyers/osnyder

Snyder props up his reputation with published falsehoods like this: "Worst thing ever said to me In the Facebook case, lawyers for the Plaintiff sought to prevent Snyder from participating in calls with them.  'They said I was too aggressive. The judge denied their request."[11]  Of course, this event never occurred.

Gibson Dunn's history and firm wide policy of handling such "crisis management" litigation matters is stained with sanctions, abusive threats to judges and the sacrificing of lower level associates to the unethical ends their clients' demand.  Gibson Dunn, including Southwell and Snyder, defended Chevron in what courts have found in several instances was unethical conduct worthy of severe sanctions.[12]  The Chevron case, a comically mishandled piece of litigation involved a list of fraud, bribery, threats and sanctions of Gibson Dunn lawyers too long for this brief.  At the bottom of this conduct - money - as it always is.

In all, Gibson Dunn was billing Chevron an estimated $250 million per year in 2010 and 2011 as the company launched lawsuits against the plaintiffs in 16 different federal courts, helped to litigate an international arbitration action against Ecuador's government, filed a fraud case against the Ecuadorians and their lawyers in U.S. federal court, and supervised Chevron's battery of local lawyers in Ecuador as they faced multiple setbacks that culminated in the adverse judgment against Chevron, said Hinton.[13] The basic Gibson Dunn template is to attack victims to distract from the evidence, said Hinton. When that doesn't work, the firm resorts to outright intimidation to silence any lawyer or advocate who stands up to the firm.  Id.

These tactics seem particular familiar to Plaintiff here.

---

[11] http://www.hollywoodreporter.com/lists/orin-snyder-350379

[12] Exhibit G at 5.

[13] Exhibit H.

And, to dispel any notion that only a rogue few at Gibson Dunn are engaged in such practices, note the following list below of partners and associates of Gibson Dunn sanctioned for abusive conduct in other cases.  In essence, it is the DNA of Gibson Dunn to conduct themselves in the way they have in this motion and others in this case, demanding documents that Plaintiff and his expert have repeatedly said do not exist.

In 2010, a federal court in Colorado sanctioned Gibson Dunn partner Andrew Neumann, a partner, who worked with Southwell and Snyder on the Chevron case, for harassing an expert witness in that case.[14] This is identical to Gibson Dunn's repeated questions to Larry Stewart here which have been answered multiple times that Mr. Stewart has no additional documents to provide, yet spawning Defendants' harassing motion.

A federal appellate court panel in New York rebuked Gibson Dunn Partner Mastro (who worked with Southwell and Snyder on the Chevron case) for attempting, without any legal precedent, to use the U.S. court system to block the Ecuadorian rainforest communities from enforcing a judgment from their courts in any country in the world.[15]  Mastro was so rude to the appellate panel that he had to be ordered to sit down during appellate argument.   "Mr. Mastro, you may take notice of the fact that the presiding judge has told you to sit down."[16]

---

[14] Exhibit B.

[15] Exhibit F.

[16] See Exhibit J at 19.

Partners working with Southwell and Snyder on the Chevron case mislead Congress sparking an investigation of the Gibson Dunn lawyers.[17]

While Southwell, Snyder and other partners were advising Chevron, their client attempted to bribe Ecuador's government to turn their failed case in their favor.[18]

While Southwell and Snyder were advising Chevron along with other Gibson Dunn partners and associates, it was caught lying to its own expert witnesses to benefit their case.  See Exhibit A, Gibson Dunn Associates Begin to Flee as Firms Ethical Problems in Chevron's Ecuador Case Deepen.  Southwell and Snyder's Chevron defense designed along with other Gibson Dunn partners fell apart after mounting evidence revealed it was based on fraudulent science designed to hide evidence of life-threatening amounts of contamination.[19]  Here, while insisting on orders compelling documents from Larry Stewart that Snyder and Southwell know do not exist, they have persuaded the court to permit withholding of evidence (e.g. 28 analyzed electronic assets), including communications of Defendant Zuckerberg, from times relevant to the events of this litigation.

Gibson Dunn and its partners are notorious for unethical litigation practices in other cases as well. The entire Gibson Dunn law firm, which would include all its partners (i.e. Southwell and Snyder) were sanctioned $9.9 million dollars by a court

---

[17] Exhibit F.

[18] Exhibit F.

[19] Exhibit F.

in Montana for harassing an expert witness in similar ways to their harassment of

Larry Stewart here.[20]   The Montana Supreme Court in upholding the huge sanction

against the Gibson Dunn firm called Gibson Dunn practices "thuggery."  Id.

> In short, [Gibson Dunn's] use of the judicial system amounts to legal
> thuggery. This behavior is truly repugnant to Montana's foundational notions of
> justice and is therefore highly reprehensible. Thus, in accordance with Montana's
> legitimate interest in punishment and deterrence, we conclude that a particularly
> severe sanction comports with due process.  Exhibit E at 92.

## THE GIBSON DUNN WAY APPLIED TO THIS MATTER

The conduct the Montana Supreme Court identified in upholding a multi

million dollar sanction on Gibson Dunn lawyers may look familiar to this court.

Gibson Dunn's practices in that Montana case are reminiscent of some of the

contentions in this litigation.

The Montana Supreme Court found sanctions justified for Gibson Dunn's

failure to disclose evidence adverse to their claims. Id at 14 and 21.  In this case,

Gibson Dunn analyzed twenty eight electronic assets and failed to mention the

existence of those items to the court or reveal the results of their analysis of those

assets.  Obviously, if that analysis of those twenty-eight devices was favorable to

Defendants, Snyder and Southwell would have not only revealed that fact, but

trumpeted it at every opportunity.  The inescapable presumption is, there is

something on those devices Gibson Dunn wants withheld from this court and

Plaintiff.

---

[20] Exhibit C and E.

Gibson Dunn lawyers sought a witness to swear to a "pure misrepresentation of his professional [expert] opinion" in order to avoid crushing litigation expenses. Id. at 86.  In this case, Snyder sent threatening letters to all counsel seeking their reversal of their support of Plaintiff.[21]

"Consistent with its tactics in the underlying suit, [Gibson Dunn] has...continued to disregard fundamental litigation rules and basic principles of professional conduct. For example, [Gibson Dunn] **<u>blatantly misrepresented an important fact</u>** in one of its motions filed with the District Court."  Id. at 89, fn 26. Emphasis added.  This conduct, this court will note, is identical to Gibson Dunn's conduct in this case falsely representing to this court that the Kasowitz email and attachments were disclosed to a third party when it has been conclusively proven not to be the case.  When challenged to have a computer expert refute Plaintiff's claim on this issue, Snyder and Southwell were mute.  Plaintiff is seeking a full hearing on this matter before the District Court and still, Snyder and Southwell are mute.  They both know that a hearing on this matter with experts from both sides and the court's adviser, Mr. Healy, present, would be a suicidal mission for them.

Snyder and Southwell have also asserted that there are no competing experts - a misrepresentation of a second important fact.  Snyder and Southwell have knowingly told the court that any expert disputes are "insignificant," a third misrepresentation of an important fact.  "To be clear, the information is not

---

[21] Exhibit K.

complicated in that it suggests factual disputes (of which there remain <u>none</u> of any

consequence)...", Doc. No. 525 at 10.

Snyder's threats to all counsel in this case attempt to end this litigation short

of a trial.[22]  His threatening letter ends with a condescending but laughable attempt

to be ominous.  "Guide your conduct accordingly," Snyder paternalistically advises.

Obviously, if Plaintiff and his counsel guided their conduct in accordance with a

review of Gibson Dunn's conduct as detailed above, it would lead to the "legal

thuggery" the Montana court identified.  In this case, however, Snyder and

Southwell have guided their conduct in accordance with a variety of other Gibson

Dunn lawyers.

Southwell and Snyder's firm, Gibson Dunn, is awash in a history of unethical

practices including cases in which Southwell and Snyder were partners involved.

Yet, they seek an order that will result in no production, not because of defiance of

this court's order, but because the they seek documents they know Stewart does not

possess.  Stewart Decl. at ¶2-¶3.  We have all seen this movie before.  The Chevron

case unraveled on Gibson Dunn, descending into the largest civil damage award in

toxic spill history, all with lawyers including Southwell and Snyder at the helm.

Certainly, Gibson Dunn is keenly aware that another perceived loss in yet another

billion dollar boondoggle case will be detrimental to the firm's attempt to position

itself as a "crisis management" specialist.  Plaintiff is bearing the brunt of Gibson

Dunn's desperation handling their own crisis.

---

[22] Exhibit K.

## CONCLUSION

Larry Stewart submitted the correct samples for testing.  Stewart Decl. at ¶7-¶8. Stewart has, on multiple previous occasions before the filing of Defendants' motion, produced all documents in his possession on this matter.  Id. at ¶3. Defendants' only claim to the contrary is the testimony of an unqualified, non-expert, and lawyer for Defendants, Amanda Aycock.  The video she claims as the source of her declaration is not in evidence in this case, has never been authenticated and cannot be relied upon by this court short of that authentication.

It was important for Plaintiff to outline the history of Gibson Dunn, and Southwell and Snyder, to provide this court insight into the identical practices to which it is being subjected in this case, along with Plaintiff.  The similarities noted above are not merely coincidental.  They represent a pattern and practice by Southwell and Snyder, along with other Gibson Dunn lawyers, that this court needs to keep in mind when reviewing Defendants' motions, arguments and claims of facts which, in many instances, turn out to be false.

This Daubert hearing disguised as a motion for discovery is improper, unnecessary, harassing and should be summarily denied.

Respectfully submitted,

/s/Dean Boland
_____

Paul A. Argentieri
188 Main Street
Hornell, NY 14843
607-324-3232 phone
607-324-6188
paul.argentieri@gmail.com

Dean Boland
1475 Warren Road
Unit 770724
Lakewood, Ohio 44107
216-236-8080 phone
866-455-1267 fax
dean@bolandlegal.com