UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PAUL D. CEGLIA,

                Plaintiff,

      v.

MARK ELLIOT ZUCKERBERG and
FACEBOOK, INC.,

             Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Civil Action No. 1:10-cv-00569-RJA

## REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Thomas H. Dupree, Jr.
Erik R. Zimmerman
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
(202) 955-8500


Terrance P. Flynn
HARRIS BEACH PLLC
726 Exchange Street
Suite 1000
Buffalo, NY 14210
(716) 200-5120

November 9, 2012

Orin Snyder
Alexander H. Southwell
Matthew J. Benjamin
Amanda M. Aycock
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue, 47th Floor
New York, NY 10166-0193
(212) 351-4000

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................... 1

ARGUMENT ..................................................................................................... 4

    I.     THIS COURT HAS THE INHERENT POWER TO DISMISS. ........................ 4

          A.    Ceglia Now Acknowledges This Court's Inherent Power To
              Dismiss................................................................................................ 4

          B.    Ceglia Misstates The "Clear And Convincing" Evidence Standard. .......... 5

    II.    THIS LAWSUIT IS A FRAUD ON THE COURT AND MUST BE
          IMMEDIATELY DISMISSED. .............................................................. 7

          A.    The StreetFax Contract Is Authentic And Proves That The Work
              For Hire Document Is A Forgery................................................................ 7

          B.    The Handwritten Ink On The Work For Hire Document Is Less
              Than Two Years Old............................................................................ 13

          C.    The Font And Formatting Discrepancies In The Work For Hire
              Document Prove That It Is An "Amateurish Forgery." ........................... 18

          D.    The Pages Of The Work For Hire Document Were Printed With
              Different Printers, Using Different Toner, And On Different Paper. ....... 18

          E.    The Conclusions of James Blanco Are Erroneous, Irrelevant, Or
              Both.................................................................................................... 21

          F.    The "Emails" Quoted In The Amended Complaint Are Fabricated. ......... 23

    III.   THIS LAWSUIT MUST BE IMMEDIATELY DISMISSED BECAUSE
          CEGLIA HAS DESTROYED CRITICAL EVIDENCE AND ENGAGED
          IN EGREGIOUS MISCONDUCT. ...................................................... 27

          A.    Ceglia Created Multiple Versions Of The Work For Hire
              Document............................................................................................ 27

           B.    Ceglia "Baked" The Version Of The Work For Hire Document
              That He Presented To Defendants' Experts............................................ 29

          C.    Ceglia Willfully Destroyed Critical Evidence In The Midst Of
              Litigation............................................................................................ 32

          D.    Ceglia Has Engaged In Extensive Litigation Misconduct. ...................... 34

CONCLUSION................................................................................................ 35

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Aoude v. Mobil Oil Corp.*,
  892 F.2d 1115 (1st Cir. 1989) ............................................................................. 6

*Chambers v. NASCO, Inc.*,
  501 U.S. 32 (1991) .............................................................................................. 4

*Colorado v. New Mexico*,
  467 U.S. 310 (1984) ............................................................................................ 5

*DAG Jewish Directories, Inc. v. Y & R Media, LLC*,
  No. 09-7802, 2010 WL 3219292 (S.D.N.Y. Aug. 12, 2010) ............................... 7

*Galloway v. United States*,
  319 U.S. 372 (1943) ............................................................................................ 4

*In re Initial Public Offerings Securities Litigation*,
  471 F.3d 24 (2d Cir. 2006) ................................................................................. 5

*In re Joint E. & S. Dist. Asbestos Litig.*,
  52 F.3d 1124 (2d Cir. 1995) ............................................................................... 5

*In re Omicron Grp., Inc. Secs. Litig.*,
  579 F.3d 501 (2d Cir. 2010) ............................................................................... 5

*In re Visa Check/MasterMoney Antitrust Litigation*,
  280 F.3d 124 (2d Cir. 2001) ............................................................................... 5

*Kronisch v. United States*,
  150 F.3d 112 (2d Cir. 1998) ............................................................................. 32

*Lynch v. United States*,
  162 F.2d 987 (2d Cir. 1947) ............................................................................... 4

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
  542 F.3d 290 (2d Cir. 2008) ............................................................................... 5

*Miller v. Racette*,
  No. 11-cv-0426(MAT), 2012 WL 1999490 (W.D.N.Y. June 4, 2012) ................ 6

*Pension Comm. Of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
  685 F. Supp. 2d 456 (S.D.N.Y. 2010) .............................................................. 32

*Pope v. Fed. Express Corp.*,
  974 F.2d 982 (8th Cir. 1992) ............................................................................. 4

*Raskin v. Wyatt Co.*,
  125 F.3d 55 (2d Cir. 1997) ................................................................................. 5

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

*REP MCR Realty, L.L.C. v. Lynch*,
    363 F. Supp. 2d 984 (N.D. Ill. 2005) ................................................................... 4

*Shangold v. Walt Disney Co.*,
    275 F. App'x 72 (2d Cir. 2008) ........................................................................... 6

*United States v. Chimurenga*,
    760 F.2d 400 (2d Cir. 1985) ............................................................................... 6

*Valdez v. Ward*,
    219 F.3d 1222 (10th Cir. 2000) .......................................................................... 4

**Other Authorities**

Aginsky, *Current Methods for Dating Ink on Documents*,
    60th Annual Conference of the American Society of Questioned Document
    Examiners (August 2002) ................................................................................... 14

Gaudreau and Brazeau, *Ink Dating Using a Solvent Loss Ratio Method*,
    60th Annual Conference of the American Society of Questioned Document
    Examiners (August 2002) ................................................................................... 14

LaPorte, et al., *The Identification of 2-Phenoxyethanol in Ballpoint Inks Using Gas
    Chromatography/Mass Spectrometry—Relevance to Ink Dating*,
    J. FORENSIC SCI., Vol. 49, No. 1 (Jan., 2004) ................................................. 14

LaPorte, G., *A Validated Approach to Ink Dating Using Solvent Analysis*,
    70th Annual Conference of the American Society of Questioned Document
    Examiners (August 2012) ................................................................................... 15

Weyermann, C. and Koenig, A., *Ink Aging on Paper using GC/MS: Perspectives
    for Document Dating*,
    Seventh Congreso Internacional de Peritos en Documentoscopia (October 25,
    2012) .................................................................................................................. 14

**Rules**

Fed. R. Civ. P. 50(a)(1) ........................................................................................... 6

## PRELIMINARY STATEMENT

In their Motion to Dismiss, Defendants provided this Court with overwhelming and dispositive evidence that Ceglia is perpetrating a massive fraud.  Indeed, the Court recognized that Defendants had presented an "avalanche of evidence pointing towards the conclusion . . . that the document on which [Ceglia] is suing is a fake."  Doc. No. 350 at 98.

That evidence is now conclusive—and it confirms that Ceglia fabricated the Work for Hire Document; created fake "emails" to bolster his fraudulent claims; and engaged in an extensive campaign of bad faith evidence destruction and litigation misconduct to conceal his crimes.

Federal prosecutors reviewed the record in this case and determined that the evidence of fraud was so clear-cut that Ceglia should be prosecuted.  *See* Southwell Decl. Ex. A (*United States of America v. Ceglia*, No. 12-MJ-2842, Complaint (S.D.N.Y. October 25, 2012)).  While Ceglia's criminal case is a separate and distinct proceeding, the fact that the United States Attorney for the Southern District of New York made the independent decision to charge Ceglia with two felony counts is a powerful, objective indicator that Ceglia is perpetrating an unprecedented fraud on the federal courts and Defendants.  As United States District Judge Colleen McMahon stated during Ceglia's recent detention hearing, "It appears to me from reading the criminal complaint that the strength of the government's case is overwhelming."  Southwell Decl. Ex. D at 21:24-22:1.

Ceglia's feeble response to Defendants' avalanche of evidence confirms that his fraudulent case must be immediately dismissed.  His brief grossly mischaracterizes the record, ignores many of Defendants' central points, and asks the Court to accept absurd Mission Impossible-style scenarios about Zuckerberg's imagined "hacking" into Ceglia's computer to plant fake documents.

Although Ceglia had previously questioned this Court's authority to order dismissal, he now concedes that dismissal is proper if Defendants prove fraud with clear and convincing evidence.  Doc. No. 481 at 8 ("Opp.").  Defendants have more than satisfied that standard here.

The authentic StreetFax Contract—which Defendants' experts discovered on Ceglia's own hard drive and the email servers of the international law firm Sidley Austin, and which says nothing about Facebook—is conclusive and indisputable evidence that Ceglia's case is a fraud. Ceglia's fantastical tale—that in March 2004 Zuckerberg manufactured the StreetFax Contract, hacked into Ceglia's computer, and emailed the document to Jim Kole at Sidley Austin from Ceglia's email account—is not only preposterous on its face, but directly contradicted by the evidence.  For example, Ceglia and Kole <u>continued to correspond by email</u> regarding the StreetFax Contract after Ceglia sent it to Kole in March 2004.  Ceglia literally has no explanation for how this continued correspondence could possibly have occurred if his fictitious version of events were true.

Ceglia also has no answer to the dispositive evidence that the document on which he relies—the so-called "Work for Hire" Document—is a fake.  Ceglia fails, for example, to rebut the conclusion of Defendants' expert, Gerald LaPorte, that the handwritten ink on the first page of the Work for Hire Document is <u>less than two years old</u>.  Ceglia's only response is to launch desperate attacks on LaPorte's methodology that have no scientific or factual basis, and to reprise his bad-faith mischaracterizations of LaPorte's previous work—a strategy that this Court has already found appears to warrant sanctions.  Doc. No. 457 at 15, 42-43.

Ceglia also does not refute Defendants' showing that the purported "emails" quoted in his First Amended Complaint are fabrications.  Among other things, the "emails" appear only in

backdated Microsoft Word documents and contain numerous formatting inconsistencies and erroneous time-zone stamps that would not appear in authentic emails.

Ceglia's egregious misconduct during this lawsuit provides an independently sufficient ground for dismissal.  Ceglia has abused this Court and its rules.  Among other intentional bad faith and deceptive acts, Ceglia created multiple versions of the Work for Hire Document, "baked" the version he produced to Defendants' experts, destroyed USB devices containing critical evidence, and erased data from the hard drive that contained the StreetFax Contract. Standing alone, any one of these outrageous acts of misconduct would justify dismissal; taken together, they compel the immediate termination of this fraudulent lawsuit.

Ceglia's last-gasp hope of continuing his fraud is to insist that his rogue's gallery of "experts"—publicly discredited and desperate men who have been cast out of their professional communities—have created a legitimate factual dispute among "dueling experts" over the Work for Hire Document's authenticity.  But as one of those experts cynically remarked, someone willing to pay "can pretty much get experts to say anything."  *See* Southwell Decl. Ex. G.  The fact that Ceglia (or those bankrolling his criminal scheme) hired several "experts" to offer their unreliable and unscientific interpretations of the evidence does not change the evidence itself— which clearly and convincingly demonstrates that Ceglia is perpetrating a fraud.  The law does not require this Court to suspend its common sense and accept as truth the factually-unsupported speculation of "experts" so lacking in credibility.[1]

The Court should immediately dismiss this lawsuit with prejudice.

---

[1]  A chart identifying some of the more egregious and bizarre falsehoods and misstatements in Ceglia's brief that are not directly addressed herein is attached to the Declaration of Alexander H. Southwell as Exhibit B.

**ARGUMENT**

## I.   THIS COURT HAS THE INHERENT POWER TO DISMISS.

### A.   Ceglia Now Acknowledges This Court's Inherent Power To Dismiss.

Ceglia no longer disputes what this Court has ruled in clear terms:  it has the "inherent power to dismiss an action for fraud."  Doc. No. 457 at 30 (citing, *e.g.*, *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991)).  Although Ceglia had previously argued that this Court lacked that authority (*see, e.g.*, Doc. No. 427), and although he initially suggests in his response that the inherent power to dismiss conflicts with various legal doctrines (Opp. 3-8), he ultimately concedes that "[t]he court has the inherent power to dismiss a case for fraud on the court" so long as Defendants prove the fraud by "clear and convincing" evidence.  *Id.* at 8.  Ceglia's effort to circumscribe this Court's inherent authority fails.

- Numerous courts have rejected Ceglia's argument that a dismissal for fraud violates the Seventh Amendment right to a jury trial, *see, e.g.*, *Pope v. Fed. Express Corp.*, 974 F.2d 982, 984 (8th Cir. 1992); *REP MCR Realty, L.L.C. v. Lynch*, 363 F. Supp. 2d 984, 1015 (N.D. Ill. 2005), and Ceglia cites no case supporting his position.  He relies on the <u>dissenting</u> opinion in *Galloway v. United States*, 319 U.S. 372 (1943), and on *Lynch v. United States*, 162 F.2d 987 (2d Cir. 1947), *see* Opp. 6, but neither case even addressed the inherent power to dismiss for fraud.

- The Federal Rules of Evidence do not limit the Court's dismissal power.  Opp. 6-7.  Ceglia completely ignores Defendants' showing, *see* Defs. Br. 24-25, that Rule 1008 does not apply here because it governs the admissibility of evidence <u>at trial</u>—it has absolutely no bearing on a court's inherent power to protect the integrity of its own proceedings by dismissing a lawsuit as fraudulent.  The same is true with respect to Rule 901, which governs the authentication of evidence that is to be admitted at trial.

- Ceglia wrongly contends that only the jury can "weigh and assess the credibility of dueling experts."  Opp. 4.  The cases cited by Ceglia involve <u>post-trial</u> challenges to the sufficiency of the evidence, *see Valdez v. Ward*, 219 F.3d 1222 (10th Cir. 2000); *In re Joint E. & S. Dist.*

*Asbestos Litig.*, 52 F.3d 1124 (2d Cir. 1995), or challenges to class certification rulings. Ceglia's reliance on *In re Visa Check/MasterMoney Antitrust Litigation*, 280 F.3d 124 (2d Cir. 2001), is particularly off-base because he fails to advise the Court that the case was <u>overruled</u> by *In re Initial Public Offerings Securities Litigation*, 471 F.3d 24 (2d Cir. 2006), which held that district courts <u>are</u> required to resolve factual disputes at the class certification stage. *Id.* at 41-42.

- Second Circuit precedent makes clear that Ceglia cannot avoid dismissal simply by filing baseless expert reports and proclaiming that this case involves "dueling experts." In an analogous context, the Second Circuit has held that "an expert's report is not a talisman against summary judgment." *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997). A district court must instead exercise its "gatekeeper" function and disregard expert opinions "that are without factual basis and are based on speculation or conjecture." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (internal quotation marks omitted). Thus, the Second Circuit consistently holds that summary judgment is warranted in cases in which both parties introduce expert opinions, but the court determines that the opinions of one party's experts are irrelevant or unreliable and thus fail to create a material issue of fact. *See, e.g.*, *Raskin*, 125 F.3d at 67-68 (affirming summary judgment because expert's report "lack[ed] probative value"); *In re Omicron Grp., Inc. Secs. Litig.*, 597 F.3d 501, 513 (2d Cir. 2010) (expert's testimony was "unsustainable" and "irrelevant"); *Major League Baseball Props., Inc.*, 542 F.3d at 311 (expert's report was "entirely conclusory").

- Finally, Ceglia recycles his frivolous argument that the Court's inherent power is limited by New York substantive law under *Erie*. Opp. 7. This Court has already rejected that argument as "without any foundation in law" and ordered Ceglia to show cause why he should not be sanctioned for advancing it. Doc. No. 457 at 32, 43.

### B.    Ceglia Misstates The "Clear And Convincing" Evidence Standard.

Although Ceglia agrees that dismissal is proper if Defendants prove his fraud by clear and convincing evidence, he misstates the burden imposed by that standard. The Supreme Court and this Court have held that clear and convincing evidence is equivalent to a "highly probable" standard of proof. *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984); *Miller v. Racette*, No.

11-cv-0426(MAT), 2012 WL 1999490, at *8 (W.D.N.Y. June 4, 2012).  The Second Circuit is in accord, holding that the clear and convincing evidence standard requires proof "with a high degree of certainty"—"something more than 'preponderance of the evidence,' and something less than 'beyond a reasonable doubt.'"  *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985).  Ceglia nevertheless urges the Court to apply a different standard.  He asserts that "[c]lear and convincing is defined as evidence such that no reasonable jury could find in favor of the non-moving party."  Opp. 8 (emphasis omitted).  But that is the standard for judgment as a matter of law, *see* Fed. R. Civ. P. 50(a)(1), not the clear and convincing evidence standard.

Ceglia argues that Defendants cannot satisfy the clear-and-convincing standard because they have supposedly "presented only expert opinions in support of their fraud on the court claim" and "were unable to identify even one fact disputing the authenticity of the [Work for Hire Document] or the emails."  Opp. 9.  This contention cannot be taken seriously.  Defendants have identified <u>numerous</u> objective and indisputable facts establishing that Ceglia's lawsuit is a fraud—including (among many other things) the existence of the authentic StreetFax Contract, and the many factual impossibilities in Ceglia's purported "emails."  Ceglia thus errs in attempting to distinguish *Shangold v. Walt Disney Co.*, 275 F. App'x 72 (2d Cir. 2008), and *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115 (1st Cir. 1989), on this basis.

Ceglia also insists that he has "countered each and every expert opinion" introduced by Defendants.  Opp. 9.  He has not.  The majority of Defendants' expert opinions are not even addressed by Plaintiff's purported "experts," leaving Defendants' expert reports un-rebutted.  Instead, as described below, Plaintiff's experts engage in side issues, rank speculation, and add nothing of dispositive force to the record.  In any event, even if Ceglia's experts disagreed with Defendants' experts (and they do not), that would not prevent this Court from exercising its

inherent power to dismiss if it finds clear and convincing evidence of fraud. Indeed, in *DAG Jewish Directories, Inc. v. Y & R Media, LLC*, No. 09-7802, 2010 WL 3219292 (S.D.N.Y. Aug. 12, 2010), there was evidence supporting the plaintiff's argument that the document supporting its claims was authentic, not forged—yet the court rejected this evidence as "entirely unconvincing," and held that "plaintiff's forgery ha[d] been proven by clear and convincing evidence." *Id.* at *3-4.

## II.    THIS LAWSUIT IS A FRAUD ON THE COURT AND MUST BE IMMEDIATELY DISMISSED.

### A.    The StreetFax Contract Is Authentic And Proves That The Work For Hire Document Is A Forgery.

The authentic StreetFax Contract destroys Ceglia's case and proves that the Work for Hire Document is a recently-manufactured fraud. Ceglia's arguments do not refute this dispositive and damning fact.

Ceglia's March 2004 Emails. In their Motion to Dismiss, Defendants established that Ceglia sent two emails on March 3, 2004 to his lawyer and business partner, Jim Kole. Attached to those emails were electronic images of the StreetFax Contract—a document that does not mention Facebook. Although Ceglia attempted to hide the evidence, Defendants' experts ultimately found those emails and images on Ceglia's Seagate hard drive—and on the servers of the international law firm of Sidley Austin, where Kole worked at the time.

On March 4 and 5, 2004, Ceglia and Kole corresponded by email about the StreetFax Contract. That correspondence—which Ceglia does not dispute is genuine—confirms that he sent the StreetFax Contract to Kole, and that the StreetFax Contract was the agreement executed by the parties. *See* Defs. Br. 33-34. Numerous emails exchanged between Zuckerberg, Ceglia, and other representatives of StreetFax in 2003 and 2004—emails that Ceglia himself produced and has acknowledged are authentic communications—refer to and quote the terms of the

7

StreetFax Contract, not the Work for Hire Document.  *See id.* at 35-38.  For example, the authentic emails quote the term "late thereafter," which appears only in the StreetFax Contract.  *See* Doc. No. 224-1 at 33.  Similarly, the emails repeatedly state that Ceglia had agreed to pay Zuckerberg $18,000—the precise payment amount specified by the StreetFax Contract, not the Work for Hire Document, which states that Ceglia would pay Zuckerberg only $2,000.  *See id.* at 73-74.  This is exactly what Zuckerberg has stated from the beginning of this case: although he and Ceglia did sign a contract, it was not the Work for Hire Document, and it did not mention Facebook.  Zuckerberg Decl. (Doc. No. 46) ¶¶ 5-10.

Ceglia's Conspiracy Theory.  Ceglia ignores the dispositive evidence of his fraud, and instead spins a preposterous and delusional conspiracy theory that makes alien-abduction stories seem plausible by comparison.  According to Ceglia, in March 2004—six years before Ceglia reappeared out of the blue and claimed ownership of Facebook—Zuckerberg created the StreetFax Contract by manipulating the Work for Hire Document and removing all references to Facebook, then hacked into Ceglia's computer and caused the computer to email the StreetFax Contract to Kole.  No rational individual could credit this fantastical scenario.

Ceglia's Prior Sworn Representations—Privilege.  Ceglia told the Court—before the Ceglia-to-Kole emails had been produced—that those emails were authentic privileged communications "from Paul Ceglia to his attorney Jim Kole, Esq."  Defs. Br. 34-35.  It was only when the Court rejected Ceglia's bogus privilege claim and ordered him to produce the documents to Defendants that Ceglia abruptly changed his position and announced that the emails were forgeries created by Zuckerberg.  Ceglia literally has no answer to this point, so his opposition simply ignores it.

Ceglia's Prior Representations—Seagate Hard Drive.  In another sleight of hand, Ceglia now claims that the Seagate hard drive belonged to his parents, and that he did not "purchase, own, use or access" it.  Opp. 50.  But that conflicts with his repeated representations that the Seagate hard drive was his own.  In March 2011, Ceglia produced his electronic assets, including the Seagate hard drive, to the Kasowitz firm and the forensics firm Capsicum; their discovery of the StreetFax Contract on the Seagate drive led the Kasowitz firm to conclude that the Work for Hire Document is "fabricated" and to withdraw from the case.  Southwell Decl. Ex. R (the April 13, 2011 "Kasowitz Letter").  Ceglia then produced the Seagate drive to his next forensics firm, Project Leadership Associates, and specifically identified it "as being in his possession."  Doc. No. 61 ¶ 5.  Four months later, Ceglia produced the Seagate drive to Defendants, identifying it as "electronic media in my possession, custody, or control."  Doc. No. 88 ¶ 2 (July 15, 2011 Ceglia Declaration).  It was only after Defendants discovered the StreetFax Contract on August 2, 2011, and notified the Court of that discovery two days later, that Ceglia first asserted that the Seagate hard drive actually belonged to his parents.  See Doc. No. 176-1 ¶143 (August 29, 2011 Ceglia Declaration).  Most recently, Ceglia described the Seagate hard drive to United States District Judge McMahon—the federal judge presiding over his detention hearing—as "my personal computer."  Southwell Decl. Ex. D at 25:4-5 (emphasis added).  In any event, the contents of the Seagate drive itself refute Ceglia's claim that he did not "purchase, own, use or access" it.  The hard drive contains files related to this litigation named "emails with mark and jeff 091803 incl email list.doc;" "mark emails 082903.doc;" and "emails with mark and jeff 102003.doc." Southwell Decl. ¶ 5.  These files have the same names as files found on other media that Ceglia admits are his own.

Ceglia's Prior Representations—Adelphia Email Account.  Ceglia asserts that the Adelphia email account from which the Ceglia-to-Kole emails were sent belonged to his parents, and that he never sent an email from that account.  *See* Opp. 56-57; Doc. No. 230 ¶ 16.  But Ceglia has previously attested under oath that he has sent emails from the Adelphia account, *see* Doc. Nos. 176-1 ¶¶ 178-179, 176-3 ¶ 8(c), 339 ¶ 3(c), and his use of the account is independently confirmed by the fact that his business associate, Robert Frykberg, sent three emails to Ceglia at the account in 2006.  Southwell Decl. ¶ 7.

Ceglia's Telephone Number In 2004.  Ceglia admits that the telephone number in the first Ceglia-to-Kole email, which was signed by "Paul," was his personal contact number at the time the email was sent—an admission that further establishes that Ceglia personally sent the Ceglia-to-Kole emails.  Opp. 57.  Ceglia states that this telephone number was a "land line phone number" with a Florida area code, and it would be "illogical" for him to include that number in an email that he sent from his parents' computer in New York.  Opp. 57.  But this telephone number was not a traditional landline number—it was owned by a Voice over Internet Protocol, or VoIP, provider.  VoIP numbers are portable and can be used anywhere with an Internet connection.  Thus, the area code for the telephone number has no bearing on Ceglia's physical location when the Ceglia-to-Kole emails were sent.  Southwell Decl. ¶ 8.  The fact that Ceglia— who obviously is aware that he had set up and was using a VoIP number—attempted to deceive this Court by falsely asserting that it was a landline establishing his physical presence in Florida is further evidence of his fraud and utter disrespect for this Court.

Dr. Farid Does Not Help Ceglia.  In attacking the StreetFax Contract, Ceglia grossly mischaracterizes the record by asserting that Dr. Hany Farid, a digital imaging expert who did not produce an expert report in this case, concluded that the images of the StreetFax Contract

10

"are too low quality to reach any opinion about their authenticity."  Opp. 52.  This assertion is false.  Farid testified at his deposition that he intended to perform an initial, visual examination to determine whether the images of the StreetFax Contract "showed signs of manipulation." After receiving the images, Farid spent less than thirty minutes "eyeballing" them.  Farid Tr. (Doc. No. 487) 55:12-16.  Because the images are low-resolution and difficult to read in places, Farid requested higher-resolution scans from Ceglia's former lawyers at Milberg.  But Milberg withdrew from the case shortly before Ceglia's expert reports were due, and did not provide those scans to Farid.  *Id.* at 64:4-25.  Thus, Farid decided that he could not perform the particular examination that he wanted to conduct.  However, Farid never suggested that it is impossible "to reach any opinion" about the document's authenticity.

The Size Of The Electronic Image.  Ceglia falsely asserts that the StreetFax Contract cannot be authentic because "the actual size" of the two images is 2.4 inches by 3.2 inches, Opp. 55, and because the original StreetFax Contract was therefore "smaller than a postcard."  Doc. No. 454-2 (capitalization altered).  Because the size of electronic images of a document can easily be reduced after the document is scanned, the size of the electronic images does not necessarily reflect the actual size of the scanned documents.  Ceglia's own expert, Neil Broom, acknowledged that there are several reasons why one might reduce the dimensions of an electronic image, including limitations on the maximum file-size of email attachments or the maximum capacity of floppy disks.  *See* Broom Tr. (Doc. No. 495) 149:3-151:13.  Indeed, Ceglia indisputably used floppy disks, and Broom testified that, if the images of the StreetFax Contract were not reduced in size, they could not have been stored on a standard floppy disk.  *Id.* at 152:11-153:25.  It thus makes perfect sense that Ceglia would have scanned the standard-size StreetFax Contract and reduced the dimensions of the electronic scans.  Ceglia's hypothesis—

11

that Zuckerberg manufactured a tiny, "postcard"-sized document, scanned it, and planted the electronic images on Ceglia's computer—is preposterous.[2]

There Is No Evidence Of Viruses Or Malware In 2004.  Ceglia asserts that the Seagate hard drive is "infested with viruses" and other "malware," and that Zuckerberg was therefore able to hack into Ceglia's computer and send the Ceglia-to-Kole emails on March 3, 2004.  Opp. 58-60.  However, Ceglia's own expert, Broom, admitted that Ceglia's theory cannot be credited unless the malware files at issue (1) existed on or before March 3, 2004, (2) had infected the hard drive on or before that date, and (3) were capable of permitting remote access.  Ceglia has not identified a single shred of evidence that a malware file that meets these conditions existed— Broom simply identified malware present on the hard drive when it was imaged in 2011, and included files in his list that did not even exist in 2004 or that do not permit remote access.  He also conceded that his analysis was "speculation" confined to the "potential impact" of those malware files, and that he had not identified any evidence that the Seagate hard drive could be remotely accessed on March 3, 2004 or at any other time.

Ceglia Ignores Contemporaneous Emails Between Zuckerberg And Streetfax.  Ceglia is completely silent about the authentic emails between Zuckerberg, Ceglia, and Karin Peterson of StreetFax from 2003 and 2004 that prove the StreetFax Contract is genuine and the Work for

---

[2]   Ceglia also falsely claims that "Stroz has no explanation" for why Scan0002.tif, the electronic image of the second page of the StreetFax Contract, was created on the Seagate hard drive before Scan0001.tif, the electronic image of the first page.  Opp. 55.  In fact, Defendants' expert Bryan Rose provided two explanations—the pages were copied to the hard drive in a different order than they were scanned, or the second page of the contract was scanned first.  Doc. No. 498 at 95:4-95:18.  (A third possibility is that Ceglia named the scans to reflect that Scan0002.tif is the second page and Scan0001.tif is the first page).  Ceglia also suggests that the "column measurements" on the two pages of the StreetFax Contract are "substantially different from one another."  Opp. 54.  But as Defendants' expert Romano explained, *see* Doc. No. 327 at 9 n.1, the image of the second page of the StreetFax Contract "appears to be slightly enlarged," and the column measurements of the physical StreetFax Contract thus likely do not differ at all.

Hire Document is a forgery.  These authentic emails refer to, and in some cases quote directly

from, the StreetFax Contract, using language that appears in the StreetFax Contract but not the

Work for Hire Document.  *See* Defs. Br. 35-38.  Nor does Ceglia have any explanation as to why

both Facebook and "StreetFax LLC" are mentioned in the Work for Hire Document, when

neither entity existed in April 2003—the date on which Ceglia claims the document was

executed.  Similarly, Ceglia fails to address the three checks totaling $9,000 that he wrote to

Zuckerberg—payments that are fully consistent with the terms of the StreetFax Contract and

utterly inconsistent with the terms of the Work for Hire Document.  *See* Defs. Br. 36-37.  Ceglia

admits, as he must, that these emails are authentic—indeed, he produced them to this Court as

contemporaneous communications between the parties.  *See* Doc. No. Doc. No. 224-1 at 33, 73,

74.  But he is unable to explain away this further damning proof of his fraud.

**B.    The Handwritten Ink On The Work For Hire Document Is Less Than
         Two Years Old.**

Defendants established in their Motion to Dismiss that the Work for Hire Document is a

forgery because (among other things) the highly respected forensic ink chemist Gerald LaPorte

concluded that the handwritten ink on the first page of the Work for Hire Document was less

than two years old in August 2011.  *See* Defs. Br. 39-40.  None of Ceglia's arguments overcome

LaPorte's fatal scientific conclusion that the ink on page 1 was added at or around the time this

lawsuit was filed—and not in 2003, as Ceglia fraudulently alleges in this lawsuit.

The Ink Dating Test Is Scientifically Valid And Has Been Used By Ink Chemists For

More Than A Decade.  Ceglia argues that LaPorte's ink-dating method, a solvent loss ratio

method that involves the measurement of phenoxyethanol (PE) in the ink, is unreliable.  Opp. 22-

24.  But Ceglia's own expert, Valery Aginsky, developed this very method along with a

community of international scientists over the past two decades, and Aginsky and many others

regularly use this method in casework.  *See*, *e.g.*, Aginsky Tr. (Doc. No. 486) 88:9-15.  Indeed,

shortly after Aginsky submitted a declaration stating that chemical ink dating could determine

whether the Work for Hire Document was created within the last two years, Doc. No. 66 ¶ 14,

Ceglia sidelined him.

The literature establishes that the test is scientifically valid.  *See* Southwell Decl. ¶ 9.  For

example, it is a fundamental principle of ink chemistry that the dynamic solvent loss ratio

method determines the age of ink by measuring components that change over time.  *See*, *e.g.*,

Aginsky, *Current Methods for Dating Ink on Documents*, 60th Annual Conference of the

American Society of Questioned Document Examiners (August 2002); Gaudreau and Brazeau,

*Ink Dating Using a Solvent Loss Ratio Method*, 60th Annual Conference of the American

Society of Questioned Document Examiners (August 2002); LaPorte, et al., *The Identification of*

*2-Phenoxyethanol in Ballpoint Inks Using Gas Chromatography/Mass Spectrometry—Relevance*

*to Ink Dating*, J. FORENSIC SCI., Vol. 49, No. 1 (Jan., 2004) at 1.  It is also well-established

that PE evaporates at a measurable rate, decreasing rapidly at first and then stabilizing, and that

the evaporation is insignificant after two years.  *See*, *e.g.*, Gaudreau and Brazeau 2002 at 3;

Aginsky 2002 at 7.  It is this characteristic of PE that permits ink dating analysis:  if PE is still

evaporating above a particular rate, it can be conclusively determined that the ink is still aging

and is therefore less than two years old.   Ceglia relies on the theories of a Swiss academic,

Celine Weyermann, to suggest that PE analysis has not reached sufficient acceptance levels,

Opp. 24.  But Weyermann—an academic who does not herself conduct any studies on PE—has

recently changed her opinion about PE analysis and now acknowledges its validity.  *See*

Weyermann, C. and Koenig, A., *Ink Aging on Paper using GC/MS: Perspectives for Document*

*Dating*, Seventh Congreso Internacional de Peritos en Documentoscopia (October 25, 2012).

Ceglia's Attacks On Laporte Are Baseless.  Ceglia falsely asserts that LaPorte's

methodology has not been published or peer-reviewed.  Opp. 23.  Just this summer, LaPorte

presented his methodology to his peers at the 70th Annual Meeting of the American Society of

Document Examiners in Charleston, South Carolina.  *See* LaPorte, G., *A Validated Approach to

Ink Dating Using Solvent Analysis*, 70th Annual Conference of the American Society of

Questioned Document Examiners (August 2012).  Ceglia further argues that the test used by

LaPorte has not been subjected to "blind reproducibility studies."  Opp. 22.  However, as

LaPorte explained, a blind study is useful only when there is a <u>subjective</u> determination to be

made that could result in human prejudice.  *See* LaPorte Tr. (Doc. No. 497) 251:8-20.  In the

case of PE testing, there is no potential for bias:  a gas chromatography/mass spectrometry

(GC/MS) machine objectively measures the levels of PE in the ink.  Indeed, LaPorte has never

found a discrepancy between the results of his PE testing and the known age of an ink sample,

thus confirming the accuracy of the test.  *See id.* at 348:22-250:22.  While Ceglia contends that

there is no "reported decision finding LaPorte's PE testing method satisfies Daubert," Opp. 24,

he cites no decision addressing this issue at all, much less one holding that PE testing does not

satisfy *Daubert*.  And in fact, in an October 19, 2012 reported decision, a Utah court found that

LaPorte's PE methodology clearly satisfies *Daubert*.  *See* Southwell Decl. Ex. F.  In that

decision, the court found that LaPorte is "extremely qualified and is arguably one of the foremost

experts in the specific area of GC/MS"; that GC/MS analysis is "generally accepted by the

relevant scientific community"; that the reliability of "the dynamic approach to ink-dating by

GC/MS analysis" is "demonstrated through extensive peer reviewed research and literature"; and

that LaPorte's testimony was "not only helpful, but necessary" to the trier of fact.  *See* Southwell

Decl. Ex. F at 7-12.

This Court previously reprimanded Ceglia for distorting LaPorte's previous work through a "gross misrepresentation which would be detected by even the marginally literate."  Doc. No. 457 at 15.  Ceglia is at it again.  He now asserts that, in an April 2012 report in another case, LaPorte found that an average PE loss ratio of 71% meant the ink was less than three months old, and that LaPorte therefore should have concluded in this case that the ink on the Work for Hire Document was less than three months old.  Opp. 28.  But Ceglia ignores that LaPorte's finding in the other case was explicitly based on other evidence specific to that case—such as the sequence and dates of ledger entries.  *See* April 2012 report (Doc. No. 497-3) at 18.  In fact, LaPorte expressly stated that his PE analysis, standing alone, could only demonstrate that the ink was less than two years old (*see id.* at 13, 17)—a conclusion entirely consistent with his methodology and conclusions in this case.

Ceglia criticizes LaPorte for not taking into account the purported "storage conditions" of the Work for Hire Document.  Opp. 25-27.  However, Ceglia misleadingly omits that LaPorte testified that his conservative, two-year threshold takes into account unknown factors such as storage conditions; he gives a conditional conclusion ("highly probable" rather than definitive) to account for unknown storage conditions; and even crediting Ceglia's account of the storage conditions (which, tellingly, he never mentioned until after LaPorte filed his report), those conditions would not affect the results of LaPorte's analysis.  *See* LaPorte Tr. (Doc. No. 497) 190:13-192:24.

Finally, Ceglia hypothesizes that "one possible explanation" for LaPorte's conclusion is that the Work for Hire Document "could have [been] contaminated" if someone used a "household product[]" containing PE and then touched the Work for Hire Document with bare hands.  Opp. 30-31.  This is rank speculation:  Ceglia's experts did not test the document to

determine whether it had been contaminated, did not see anyone use a product containing PE and then touch the document, and did not verify that any products that might have been near the Work for Hire Document contained PE.  *See* Southwell Decl. Ex. N ("Stewart Tr.") 251:12-252:9.  In any event, as part of his standard procedure, LaPorte tested a paper "blank" to ensure that no PE was present in the paper, and concluded that there was no PE contamination that might affect his results.  *See* LaPorte Tr. (Doc. No. 497) 212:6-213:9, 218:14-219:3, 220:6-16.

<u>Larry Stewart Is Irrelevant</u>.  Ceglia relies on the opinion of the discredited Larry Stewart in claiming that it is "not possible to perform ink age determination" on the Work for Hire Document.  Opp. 22.  But Stewart is <u>not</u> an expert on this subject.  He admitted, for example, that he has not used GC/MS—the gold standard for chemically testing compound substances that is widely used in forensic laboratories across the nation and world—in thirty years.  *See* Stewart Tr. 258:15-20.  Moreover, Stewart has not published an article in an academic journal since he was indicted for perjury by the United States Department of Justice in 2004.  *See* Doc. No. 416-4 at 12 (showing, since 2004, only publications in newsletters, online expert witness directories, and two books published by a non-functioning school (*see* Stewart Tr. 80:2-4) that are not publicly available).

<u>Ceglia Misrepresents Dr. Lyter's Opinion</u>.  Ceglia falsely asserts that Dr. Lyter opined that the ink on the Work for Hire Document was not "suitable" for ink-age testing and that he "chose" not to perform ink-age testing.  Opp. 1, 21, 25.  As Dr. Lyter explained in his report, he attempted to perform ink analysis by conducting Thin-Layer Chromatography (TLC) of the ink—an entirely different test than the PE analysis conducted by LaPorte.  Lyter Report (Doc. No. 328) at 8.  But Dr. Lyter could not ultimately perform TLC testing because Ceglia's spoliation of the Work for Hire Document rendered his TLC results unusable.  *Id.* at 8.  Dr. Lyter

added that there are chemical tests other than TLC that can be performed to analyze the age of ink, including the analysis of PE. *See id.* at 6 n.2; Lyter Tr. (Doc. No. 488) 8:16-11:14. Dr. Lyter was unable to perform PE testing simply because there was insufficient ink available for the equipment he uses. *See* Lyter Tr. (Doc. No. 488) 14:8-18:3.

### C. The Font And Formatting Discrepancies In The Work For Hire Document Prove That It Is An "Amateurish Forgery."

Professor Frank Romano concluded that the Work for Hire Document is an "amateurish forgery" because there are numerous discrepancies in the font and formatting of the two pages of the document. *See* Defs. Br. 40-41. Ceglia argues that these discrepancies are "indicative of laypersons creating a contract." Opp. 15. That argument is specious. Ceglia identifies no reason why a "layperson" would, as here, use different fonts for the first and second pages of a two-page document, use different margins on the two pages, and use spacing that varies on one page but is uniform on the second page. Indeed, Ceglia's own expert, John Paul Osborn, has himself admitted that the "varying marginal formatting" and "malformatting" in the Work for Hire Document are the type of features that "would raise suspicion" about the authenticity of a document. *See* Osborn Tr. (Doc. No. 489) 87:24-88:24. Moreover, many of these formatting irregularities, such as the spacing variations, appear only on the bogus page 1 of the Work for Hire Document—whereas no similar irregularities appear on page 1 of the authentic StreetFax Contract. And the font and formatting of page 2 of the Work for Hire Document are the same as the font and formatting of page 2 of the StreetFax Contract. All of this demonstrates fraud.

### D. The Pages Of The Work For Hire Document Were Printed With Different Printers, Using Different Toner, And On Different Paper.

Defendants established that Ceglia's account of his creation of the Work for Hire Document—that he "printed and saved" the Work for Hire Document on April 25, 2003—is

false because pages 1 and 2 of the document were printed using <u>different</u> printers, <u>different</u> toner, and <u>different</u> paper.  *See* Defs. Br. 41-42.  Once again, Ceglia's response goes nowhere.

<u>Rantanen Is Irrelevant</u>.  Ceglia asserts that his expert, Walter Rantanen, found that both pages of the Work for Hire Document were printed on "the same" paper.  Opp. 14.  But Rantanen's opinion is worthless.  As Defendants explained in their Motion for Production, the evidence conclusively demonstrates that Rantanen did not even analyze paper samples from the Work for Hire Document.  *See* Doc. Nos. 554, 578.  Instead, another of Ceglia's experts, Stewart, sent Rantanen samples from a <u>different</u> document—the six-page, "StreetFax Back-End Technical Specification" document that the parties agree Ceglia and Zuckerberg did sign on April 28, 2003.  Because that document does not mention Facebook, and because its authenticity is not in dispute, Rantanen's analysis is irrelevant.

But even Rantanen himself testified that Ceglia wholly mischaracterizes his findings.  Southwell Decl. Ex. O ("Rantanen Tr.") 207:15-217:11.  Rantanen found that the paper samples were "consistent with coming from same mill and production run."  However, during his deposition, he explained that this finding meant only that it is not "factually impossible" for the samples to have come from the same mill and production run.  *Id*. at 149:4-9.  In fact, he explained that his findings were also consistent with the paper having come from <u>different</u> runs or mills.  *Id*. at 149:10-16.  Stewart similarly acknowledged in his deposition that Rantanen's opinion does not mean that the paper samples actually came from the same paper mill and production run.  Stewart Tr. 349:19-350:8.  Thus, contrary to Ceglia's mischaracterization, Opp. 14, Rantanen did <u>not</u> conclude that "the two sheets of paper" comprising the Work for Hire Document "are the same."

Stewart Does Not Help Ceglia.  Ceglia asserts that Stewart found that "[t]he toner on both pages . . . dates from the 2000-2005 time period and not later than that."  Opp. 17.  Not so. Stewart purported to find only that the toner was <u>consistent with</u> toner from two series of Hewlett Packard printers, which were manufactured between 2000 and 2005.  Stewart's deposition testimony does not help Ceglia. Stewart testified that "consistent with" is "not a very strong conclusion" and does not exclude the possibility that the toner is also consistent with "some other printer."  Stewart Tr. 318:2-19.  Ceglia also erroneously states that Stewart found that "the toner on both pages is the same."  Opp. 17, 19.  In fact, Stewart found only that "[t]est results indicate that the toner found on page 1 matches that found on page 2."  Stewart Report (Doc. No. 416) ¶ 92.  The forensic determination of "match" does not mean "the same."  Rather, as Stewart acknowledged, it means that the toner could not be differentiated at his level of analysis.  *See* Stewart Tr. 317:4-18.

In the final analysis, it does not even matter whether pages 1 and 2 of the Work for Hire Document were printed on the same printer, with the same toner, on the same paper.  As Ceglia's experts themselves acknowledged, Ceglia's theory—that the paper, ink, and toner of the two pages are the same—is <u>entirely consistent</u> with a finding that page 1 of the Work for Hire Document is a recently created forgery.  *See, e.g.*, Stewart Tr. 350:24-351:5; Southwell Decl. Ex. P ("Blanco Tr.") 159:18-160:8; Osborn Tr. (Doc. No. 489) 105:11-107:22.  All of the credible expert testimony is consistent:  <u>both</u> pages of the Work for Hire Document are frauds.  Peter Tytell concluded that both pages of the version of the Work for Hire Document that he inspected in July 2011 are traced forgeries.  Tytell Tr. (Doc. No. 485) 70:8-72:16.  And Gus Lesnevich has concluded that both pages of the Work for Hire Document that Ceglia produced in July 2011 are

forgeries, based on line quality and a comparison to earlier images of the document.  *See* Doc.

Nos. 329, 472-1.[3]

### E.    The Conclusions of James Blanco Are Erroneous, Irrelevant, Or Both.

In an effort to save his doomed case, Ceglia relies heavily on James Blanco, a discredited

expert whose shoddy work got him expelled from the American Academy of Forensic Sciences

in 2008.  Far from helping Ceglia, Blanco's opinions further undermine Ceglia's claims and

confirm that Blanco is not credible.

Mark Zuckerberg's Initials.  Blanco asserts that the "MZ" initials on page 1 of the Work

for Hire Document were written by Zuckerberg.  Opp. 13.  But this Court should reject Blanco's

opinion because he considers only the general similarities between the "MZ" initials on the Work

for Hire Document and samples of other initials written by Zuckerberg—general similarities that

one would expect to find in the forged Work for Hire Document because those initials were

traced in an effort to make them look like Zuckerberg's.  *See* Lesnevich Supplemental Report

(Doc. No. 472-1) at 16-18.  Blanco's opinion is bankrupt because it simply ignores the many

significant differences between the initials on the Work for Hire Document and the samples of

Zuckerberg's initials—each of which, standing alone, forecloses the conclusion that Zuckerberg

wrote the "MZ" initials on the Work for Hire Document.  Those numerous differences were

documented by Gus Lesnevich in his supplemental report.  *See* Doc. No. 472-1 at 16-18.  Blanco

---

[3]  Ceglia argues that Defendants' "theory has changed since reviewing [Ceglia's] reports," and that the conclusion that both pages are recent forgeries is inconsistent with Defendants' purported "page 1 substitution theory," under which page 2 of the Work for Hire Document is authentic and only page 1 is a forgery.  Opp. 1; *see also id.* at 12, 15, 20, 36, 37, 65.  That argument attacks a straw man and should easily be cast aside.  As this Court has recognized, Defendants have never taken the position that page 2 of the Work for Hire Document is authentic.  Doc. No. 583 at 14, 16.  In fact, Defendants explicitly stated in their Motion to Dismiss that "Ceglia appended the doctored page 1 to the authentic page 2 of the StreetFax Contract (or a close facsimile thereof)."  Defs. Br. 2 (emphasis added).

also disregards the evidence that the "MZ" initials on page 1 of the Work for Hire Document were slowly drawn, as opposed to being naturally written.  *See id.* at 16.

Staple Holes.  Blanco claims that the pages of the Work for Hire Document were stapled only once, and that the interlineation on page 1 made indentations on page 2.  Opp. 14.  But even assuming *arguendo* that this is true, it suggests only that both pages of the Work for Hire Document are recent forgeries, and does not refute Defendants' showing that page 1 is a fabrication.  *See* Osborn Tr. (Doc. No. 489) 107:8-22.

Blanco's Checkered Past.  Blanco has little regard for accuracy and has been ostracized by the forensic scientific community.  In a deposition in another case, Blanco asserted that one could hire an expert to "testify to the exact contrary" to his handwriting analysis, because one "can pretty much get experts to say anything."  *See* Southwell Decl. Ex. G.  Moreover, three professional forensic societies—the American Board of Forensic Document Examiners ("ABFDE"), the Southwest Association of Forensic Document Examiners ("SWAFDE"), and the American Academy of Forensic Sciences ("AAFS")—have launched investigations into alleged ethical violations by Blanco.  *See* Southwell Decl. ¶ 12, Exs. H-K.  While investigations were pending in the ABFDE and the SWAFDE, Blanco "resigned" from both professional societies. *Id*.  The thorough AAFS investigation resulted in the Ethics Committee, chaired by a former judge and composed of preeminent document examiners, finding unanimously that Blanco had violated multiple sections of the AAFS's Code of Ethics.  Among other things, it determined that he had submitted "an erroneous and misleading report to be used in the judicial process, thereby diminishing confidence in forensic scientists and their disciplines," and that he had "knowingly misrepresent[ed] the data used to arrive at the conclusions in his report."  *See* Southwell Decl. Ex. K.  The Ethics Committee recommended that Blanco be expelled from AAFS, and the Board

adopted the Ethics Committee's findings after allowing Blanco an opportunity to be heard.

Blanco appealed the Board's expulsion to the AAFS membership in 2009, and the membership

overwhelmingly approved the expulsion.  *See* Southwell Decl. Ex. H.  Blanco then sued the

AAFS.  Although the AAFS settled the litigation by agreeing to rescind Blanco's expulsion if he

resigned and never applied for membership again, *see* Doc. No. 459-1 at 17-21, the settlement

agreement did not disturb the findings of the Ethics Committee that Blanco had submitted an

"erroneous and misleading report" and "knowingly misrepresent[ed]" data, *see* Southwell Decl.

Ex. K.

### F.     The "Emails" Quoted In The Amended Complaint Are Fabricated.

Defendants presented overwhelming evidence in their Motion to Dismiss that the

purported "emails" quoted in Ceglia's Amended Complaint are fake.  These "emails" exist only

in the form of text in Microsoft Word documents that were created on a computer with a

backdated system clock (Defs. Br. 45-46)—a fact that Ceglia does not dispute.  The "emails"

also contain incorrect time zone stamps and inconsistent abbreviations and formatting in fields

that should be automatically generated.  *Id.* at 46-47.  Nor does Ceglia dispute that the "emails"

contradict matters of historical fact, such as the timing of Facebook's initial launch.  *Id.* at 47-48.

Finally, Zuckerberg's Harvard email account does not contain any of Ceglia's "emails"

mentioning Facebook, but does contain numerous <u>genuine</u> emails between Zuckerberg, Ceglia,

and other representatives of StreetFax that directly contradict Ceglia's claims.  *Id.* at 48-50.

<u>Ceglia Misrepresents Grant's Opinion</u>.  Ceglia asserts that his expert, Jerry Grant,

"confirmed that the copies of the emails were placed into the MS Word files in which they were

found in the 2003-2004 time frame."  Opp. 39.  In his deposition, however, Grant denied

"confirm[ing]" anything of the sort.  Southwell Ex. Q ("Grant Tr.") 86:11-14, 89:8-20.  In March

2011, Grant received 41 floppy disks from Paul Argentieri; he identified two as relevant and

examined only those disks.  Throughout his deposition, Grant repeatedly emphasized that his examination focused exclusively on identifying "impossibilities"—such as the use of a font that did not exist in 2003—and that he was <u>not</u> offering a definitive opinion about the authenticity of the purported "emails."  Grant Tr. 87:18-21, 89:4-20, 176:15-16.  Indeed, Grant acknowledged that he is <u>not</u> claiming that Ceglia's purported "emails" are real; that they were actually sent or received; or that they were actually copied-and-pasted into Word documents.  *See* Grant Tr. 69:5-11, 70:4-20.

<u>The Harvard Emails</u>.  Ceglia asserts that 51 of the copied-and-pasted emails on his floppy disks exist in Zuckerberg's Harvard account, and that the presence of these emails in that account "demonstrates they represent authentic communications between the two parties."  Opp. 39. This makes no sense.  Defendants acknowledge that Zuckerberg and Ceglia had email communications about StreetFax, not Facebook.  The 51 emails that appear in Zuckerberg's Harvard email account are perfectly consistent with this factual narrative:  they do not mention Facebook, and instead relate only to StreetFax.  Ceglia's purported "emails" with Zuckerberg that <u>do</u> mention Facebook, in contrast, are <u>not</u> in the Harvard email account.

Ceglia argues that Defendants have not produced certain emails from Zuckerberg's Harvard email account from November of 2003.  This is false.  *See* Southwell Decl. Ex. L; Doc. No. 333.  Ceglia also falsely suggests that Stroz Friedberg failed to produce relevant documents from devices belonging to Zuckerberg that were preserved from prior litigation.  *Compare* Opp. 42 (claiming McGowan "acknowledged" finding emails), *with* McGowan Tr. (Doc. No. 496) at 66:20-25 (McGowan testimony that he does not recall finding any emails sent or received by Zuckerberg).  Ceglia asserts, without citing any evidence, that McGowan's and Rose's testimony "proves there is substantial relevant evidence being concealed by Defendants" on Zuckerberg's

24

other electronic devices. Opp. 43. In truth, neither McGowan nor Rose testified that these devices contain any relevant evidence whatsoever—and they do not.

Formatting Inconsistencies. Ceglia attempts to minimize the significance of the many formatting inconsistencies in his "emails" by trivializing them as "differences in the amount of white space following the word 'to' in the header of the emails." Opp. 43. But this "white space" corresponds to the number of spaces following the colons in the header. Because those spaces are automatically generated in an authentic email, the inconsistent number of spaces in Ceglia's "emails" confirms that he did not copy-and-paste authentic emails (which would have resulted in consistent formatting), but rather manually typed fabricated "emails" into his backdated Microsoft Word documents, making careless errors as he went.

The Telling Abbreviation Of Tuesday. Ceglia cannot explain away the fact that the word "Tuesday" is inconsistently abbreviated in his purported "emails." Instead, Ceglia accuses Stroz Friedberg of "conceal[ing] from the court" that it compared "two emails dated February 3, 2004 and April 6, 2004—more than two months apart." Opp. 44. Again, untrue: Stroz Friedberg reproduced the email headers containing those very dates at Figures 12 and 13 in its Report. Doc. No. 325 at 30-31. Ceglia offers no evidence to support his theory that this inconsistency could be explained by MSN having "changed its computer programming and attendant abbreviation scheme between February and April 2004." Opp. 44. In fact, as Stroz Friedberg explained in its Report, MSN abbreviated Tuesday as "Tue" throughout 2003 and 2004. Doc. No. 325 at 31. And while Ceglia asserts that his purported use of "different internet browsers . . . could well account" for the inconsistent abbreviation of the word "Tuesday," Opp. 44, he again offers no evidence that he actually used different internet browsers between February and April 2004, or that using different browsers could cause inconsistent abbreviations.

Time Zone Evidence.  Ceglia admits that his purported "emails" contain inaccurate time zone stamps, and speculates that these electronic fingerprints of his fraud could have been caused by a "computer with either an 'inaccurate system clock' or an incorrectly set clock time."  Opp. 46.  But modern computer clocks automatically toggle between standard time and daylight savings time.  Thus, even if Ceglia's system clock had been incorrectly set, it would have been inaccurate during both standard time and daylight savings time.  Tellingly, Ceglia's fake emails do not toggle:  they contain the time zone stamp for Eastern Daylight Time, "-0400," on dates when Daylight Savings Time both was and was not in effect.  *Compare* Doc. No. 325 at 94 (email with "-0400" dated Nov. 30, 2003, during Eastern Standard Time), *with id.* at 92 (email with "-0400" dated April 6, 2004, during Eastern Daylight Time).

But there is more.  The fake "emails" containing incorrect time zone stamps were allegedly sent by both Ceglia and Zuckerberg, and thus purportedly reflect the time zone settings of at least two computers.  It is implausible that both Ceglia's and Zuckerberg's computers were incorrectly set in precisely the same way.

The truth is confirmed by the authentic emails from the Harvard account, some of which Ceglia himself has produced.  *See* Doc. No. 224-1.  These authentic communications between the parties confirm that, during the relevant period, both Ceglia's and Zuckerberg's computers were accurately set and automatically adjusted for daylight savings time. For example, on November 19, 2003, Ceglia responded to Zuckerberg's November 19, 2003 email; Ceglia's response includes Zuckerberg's original email and correctly represents the time that Zuckerberg's email was sent as "Wed, 19 Nov 2003 03:23:13 -0500 (EST)," a date on which standard time was in effect.  Southwell Decl. Ex. M.  Emails forwarded by Zuckerberg also show that his computer was set to automatically adjust for daylight savings time.  For example, on July 30, 2003,

Zuckerberg forwarded an email to Ceglia; Zuckerberg's email correctly represents the time of the forwarded email as "Wed, 30 Jul 2003, 05:45:19 -0400," a date on which daylight savings time was in effect.  Southwell Decl. Ex. M.[4]

## III.   THIS LAWSUIT MUST BE IMMEDIATELY DISMISSED BECAUSE CEGLIA HAS DESTROYED CRITICAL EVIDENCE AND ENGAGED IN EGREGIOUS MISCONDUCT.

This case should be dismissed for the independent reason that Ceglia has deliberately destroyed key evidence and repeatedly engaged in extreme, bad faith litigation misconduct.

### A.   Ceglia Created Multiple Versions Of The Work For Hire Document.

Defendants have established that Ceglia spoliated evidence by creating at least two different physical versions of the Work for Hire Document.  Gus Lesnevich, one of the nation's preeminent handwriting experts, examined images of four versions of the Work for Hire Document:  the version Ceglia emailed to Argentieri on June 27, 2010 (Q-1); the version attached to Ceglia's Complaint on June 30, 2010 (Q-2); the version scanned by Ceglia's expert, Aginsky, during his inspection of a hard copy of the document in January 2011 (Q-3); and the version produced to Defendants' experts and scanned by Peter Tytell on July 14, 2011 as part of the Court-ordered inspection process (Q-4).  Lesnevich found 20 significant differences on the first page of these four images.  Defs. Br. 52-54.  In his Supplemental Report, Lesnevich also found 12 significant differences on the second page of these four images.  *See* Doc. No. 472-1 at 6. Lesnevich concluded that Ceglia has proffered multiple different physical versions of his forged Work for Hire Document as the same document.  Defs. Br. 52-54; Doc. No. 472-1 at 73.

---

[4]  Ceglia misleadingly asserts that the March 3, 2004 Ceglia-to-Kole emails also have the wrong time zone stamp.  Opp. 47.  But Ceglia is discussing the reproduction of those emails in Item 379, an email sent from Argentieri to Ceglia in 2011.  As both the metadata in the native-file emails themselves and the Internet headers reproduced at pages 20-21 of the Stroz Friedberg Report confirm, the Ceglia-to-Kole emails have the correct time zone stamp for an email sent on March 3, 2004 from New York:  "-0500," the stamp associated with Eastern Standard Time.

Ceglia argues that Lesnevich has previously stated that the scanned version of the Work for Hire Document attached to the Complaint (Q-2) was "unsuitable for expert examination." Opp. 33.  That is false.  Lesnevich explained that he would be unable to "determine the authenticity of the questioned written text and signatures" on page 2 of the Work for Hire Document using only a scanned image.  Doc. No. 52 ¶ 18 (emphasis added).   He did not state that the scanned image was unsuitable for handwriting examination altogether.

Because Ceglia has no valid explanation for the existence of multiple copies of the Work for Hire Document, his opposition brief contains a brand new story: that the version of the Work for Hire Document attached to the Complaint (Q-2) was a "grossly altered version" purportedly darkened by Argentieri.  Opp. 33-35.  Even if this newly-concocted story were true, any such darkening by Argentieri is irrelevant to Lesnevich's conclusions.  Lesnevich found discrepancies in letter formation and design of the handwriting—for example, the slant and slope of the legs of the letter "M" in "May" on page 1—as well as in the relative placements of the individual letters and numerals in the handwriting as compared to the typed text.  *See* Doc. Nos. 329 and 472-1. Ceglia does not even try to explain how darkening a document through copying would produce these sorts of differences.  In any event, even excluding the purportedly darkened copy of the Work for Hire Document, Q-2, Lesnevich still identified differences between the three other versions of the Work for Hire Document that he examined—confirming that Ceglia created at least two different physical versions of the document.  If, as Ceglia suggests, the images of Q-1, Q-2, Q-3, and Q-4 were made from the same physical document, none of the differences Lesnevich observed would exist at all.

Ceglia asserts, without any explanation, that Lesnevich's methodology is "completely subjective and spurious."  Opp. 35.  Lesnevich, who has more than 40 years of experience in

handwriting analysis and is regularly called upon by the United States government and the

nation's leading companies, visually examined the letter formation and placement of the

handwriting on the four images of the Work for Hire Document.  This straightforward analysis

plainly does not involve a new scientific technology or theory.  *See* Doc. No. 329 at 3-30; Doc.

No. 472-1 at 6-10.

> **B.     Ceglia "Baked" The Version Of The Work For Hire Document That
> He Presented To Defendants' Experts.**

Defendants established that, during this litigation, Ceglia "baked" the version of the

Work for Hire Document he produced to Defendants' experts by exposing it to light—likely

sunlight—for extended periods.  Defs. Br. 55-57.  Ceglia's response is absurd.

Ceglia falsely asserts that "Defendants do not claim any harm came from their allegation

of Plaintiff's baking of the contract" or that "the condition of the [Work for Hire Document]

prevented any testing they intended to conduct."  Opp. 63.  As Dr. Lyter explained, "[d]ue to the

physical condition of the 'Work for Hire' document and the manner and degree of deterioration

of the ink appearing on the document, the examination I intended to perform was thwarted. . . .  I

could not perform Ink Identification, TLC Densitometry, or Relative Aging."  Lyter Report

(Doc. No. 328) at 8.  LaPorte experienced the same problem:  due to the degradation of the inks,

he was unable to differentiate or identify them using TLC analysis.  LaPorte Report (Doc. No.

326) at 13-14.

Like a broken record, Ceglia again tries to blame <u>Defendants'</u> experts for the damage

Ceglia himself inflicted on the Work for Hire Document.  Opp. 63-64.  But the Work for Hire

Document was already damaged when Argentieri presented it to Defendants and their experts on

the morning of July 14, 2011.  Indeed, the sworn, first-hand accounts from Tytell and Professor

Romano, both of whom were present the moment the document was produced, confirm that the

Work for Hire Document had an off-white cast and faded, tan-colored ink at the time.  *See* Tytell

Report (Doc. No. 330) at 4-10; Tytell Decl. (Doc. No. 238) ¶¶ 15-25; Romano Report (Doc. No.

327) at 3.  Although Ceglia's experts Blanco and Stewart assert that the Work for Hire

Document had not been altered when Argentieri first withdrew it from the envelope, neither of

them was present at the time—and both have conceded that they have no reason to dispute

Tytell's firsthand observations.  *See* Stewart Tr. 168:18-169:4, 171:20-25, 180:21-24; Blanco Tr.

117:21-119:4.

Ceglia's own expert destroys his false claim that the Work for Hire Document "was

damaged by Defendants' experts in July of 2011 via excessive exposure to various sources of

light over four days," Opp. 19 (emphasis added).  Blanco testified that he observed, by 5:00 p.m.

on the second day of testing, "deterioration (fading/yellowing)" of the Work for Hire Document

and that "the writing pen inks were virtually gone," Blanco Report (Doc. No. 459) ¶ 173, and

admitted that he accepts Tytell's first-hand representation that the document was in that

condition when Argentieri first produced it on the morning of July 14, 2011, Blanco Tr. 117:21-

119:4.

Moreover, Stewart's claim that the Work for Hire Document was "white" when

Argentieri first produced it at the July 14 inspection (Doc. No. 192 ¶ 23) is worthless:  he was

not present at the time and bases his claim on watching a video of the inspection—a video that

was not made for the purpose of recording the condition of the paper.  Stewart admitted that he

does not know any of the settings the videographer used, and that fluorescent versus natural

lighting can change the color of objects in a video.  *See* Stewart Tr. 187:8-190:8.  Stewart also

admitted that, in the video, he could not even read the title of the Work for Hire Document.  *See*

*id.* at 178:17-20.

The fluorescing tab marks at the top of each page of the Work for Hire Document establish that Ceglia hung the Work for Hire Document with clips or clothespins when he "baked" it.  *See* Defs. Br. 57.  The evidence is clear.  The fluorescing tab marks were <u>already present</u> when Ceglia (through Argentieri) produced the purported Work for Hire Document to Defendants' experts on the morning of July 14, 2011.  *See* Tytell Tr. (Doc. No. 485) 195:7-196:16; Blanco Tr. 264:6-12.  As Tytell thoroughly documented with high-resolution digital photographs on July 14, 2011, the tabs are roughly square-shaped.  *See* Defs. Br. 57.  Tytell also confirmed, using side lighting and a stereoscopic microscope, that these square-shaped tab marks have corresponding straight-edge indentations.  This evidence precludes Ceglia's fanciful argument (Opp. 14-15) that the square fluorescent tab marks were somehow caused by Defendants' experts' handling of the document during their examination of the document.  In other words, the evidence proved that the tab marks were not caused by a finger, but rather clips or some other square object.  *See* Tytell Report (Doc. No. 330) at 7; Tytell Tr. (Doc. No. 485) 184:22-186:13; *see also* Lyter Report (Doc. No. 328) at 4-5; LaPorte Report (Doc. No. 326) at 11-12.

Blanco himself acknowledges that he had no factual basis for his speculation that someone's fingers transferred suntan lotion or some other product to the Work for Hire Document.  Blanco Tr. at 262:17-263:7.  This is not surprising, because he did not even examine the document with a stereomicroscope.  *See id.* at 82:16-18.  Stewart also admitted that it was pure speculation to suggest that a substance like sunscreen might have contaminated the document.  *See* Stewart Tr. 250:22-251:25.  Even though he is a chemist, he ran no tests to determine whether there were any contaminants on the page.  *Id.*

C.     **Ceglia Willfully Destroyed Critical Evidence In The Midst Of Litigation.**

Defendants demonstrated in their Motion to Dismiss that, during the pendency of this litigation, Ceglia willfully destroyed several pieces of critical electronic evidence, including USB devices containing documents that Ceglia himself named "Zuckerberg Contract page 1.tif" and "Zuckerberg Contract page 2.tif."  It is difficult to imagine more relevant or important evidence in a case concerning the authenticity of a contract between Zuckerberg and Ceglia.  *See* Defs. Br. 57-59.  Ceglia does not dispute that he destroyed these devices while this litigation was pending, or that they contained evidence that is critical to this case.  Instead, he brazenly argues that his knowing destruction of evidence should be excused because the files on one of the missing USB devices were images of the Work for Hire Document, and those same images were supposedly independently produced to Defendants.  Opp. 62-63.  But of course, the evil of spoliation is that the victim (here, Defendants) can never know what was destroyed.  *See Kronisch v. United States*, 150 F.3d 112, 127 (2d Cir. 1998) ("[W]e can only venture guesses with varying degrees of confidence as to what that missing evidence may have revealed."); *Pension Comm. Of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 685 F. Supp. 2d 456, 466 (S.D.N.Y. 2010) ("It is often impossible to know what lost documents would have contained.").

Ceglia's argument amounts to a devastating, binding admission that he did, in fact, intentionally destroy a USB device that contained highly relevant evidence.  His "no harm, no foul" approach is outrageous.  There is no basis for finding that the files on the destroyed USB device were "duplicates" simply because those files have the "same file name and file size" as the images of the Work for Hire Document that Argentieri produced as an attachment to a June 27, 2010 email.  Opp. 63.  The destroyed files could have been, for example, different scans of the document that would have further confirmed Ceglia's fraud.  And of course there is no way

to determine what <u>other</u> critical documents might have been on the USB devices that Ceglia intentionally destroyed—documents that are now gone forever.

Ceglia contends that "[o]nly two of the six USB drives identified were ever attached to a computer owned" by him.  Opp. 62.  But all six USB devices at issue were, at some point, inserted into computers that were in Ceglia's possession, custody, and control, and that he produced pursuant to the Court's expedited discovery orders.  Defs. Br. 57-59.  Consequently, the Court's orders required Ceglia to produce the USB drives as well.

Ceglia fails to rebut the other evidence of his extreme litigation misconduct.  For example, he cannot explain why the Seagate hard drive that contained copies of the authentic StreetFax Contract was <u>twice</u> overwritten by reinstalling Windows during the pendency of this litigation.  Defs. Br. 59-61.  The recently-produced Kasowitz Letter now reveals Ceglia's motivations for reinstalling Windows the second time.  *See* Southwell Decl. Ex. R.  As the Kasowitz Letter reveals, on March 29, 2011, Ceglia's forensic experts, Capsicum Group, along with Ceglia's then-counsel at the Kasowitz firm, imaged Ceglia's media and discovered the authentic StreetFax Contract on the Seagate hard drive.  *See id*. at 1.  The next day, the Kasowitz lawyers withdrew from their representation of Ceglia, citing Capsicum's report and conclusion that the Work for Hire Document was "fabricated."  *Id*.  Apparently seeking to conceal the smoking-gun evidence of fraud, Ceglia (or someone working in concert with him) reinstalled Windows on the Seagate hard drive sometime after Capsicum's March 2011 discovery, in a clumsy and unsuccessful attempt to destroy the scans of the authentic StreetFax Contract and the March 3, 2004 Kole emails.  Ceglia (and/or his co-conspirators) attempted to conceal this second reinstallation by backdating the hard drive to December 2010, when the previous re-installation had occurred.  But the second reinstallation was detected because the computer was erroneously

backdated to December 27, 2010, rather than December 29, the date of the previous

reinstallation.  *See* Stroz Friedberg Report (Doc. No. 325) at 46-47.

Ceglia argues that, because "[t]he re-installation was done after the Seagate hard drive

had already been imaged for use in the case, . . . there could not have been any spoliation."  Opp.

63.  But that ignores the evidence that Ceglia reinstalled Windows twice, and that the first

reinstallation occurred before Ceglia's experts imaged the hard drive in March 2011.  That first

reinstallation likely destroyed data related to the authentic StreetFax Contract (and any other

documents detrimental to Ceglia's case) that had been created prior to December 2010.  And the

second reinstallation likely caused additional prejudice to Defendants by destroying any data

created between December 29, 2010 and March 2011.  *See* Stroz Friedberg Report at 46-47.

Defendants also established in their Motion to Dismiss that Ceglia has committed

numerous other acts of bad faith evidence destruction during this lawsuit.  Among other things,

he deleted all electronic copies of the version of the Work for Hire Document that is attached to

his Amended Complaint, deleted additional relevant files with names such as "Work for Hire

ContractMZ.doc," and deleted data in his email accounts.  *See* Defs. Br. 61-62.  Ceglia does not

even respond to—much less rebut—the shocking evidence of his serial acts of spoliation.

### D.      Ceglia Has Engaged In Extensive Litigation Misconduct.

Defendants have previously catalogued the extensive litany of Ceglia's many acts of

litigation misconduct during this case.  *See* Defs. Br. 62-65.  Standing alone, this misconduct

provides a sufficient basis for dismissal.  Ceglia erroneously argues that Defendants are seeking

to duplicate the sanctions already imposed by this Court.  *See* Opp. 64.  Defendants do not seek

dismissal based on any of the misconduct that has already been the subject of Court-ordered

sanctions.  Rather, Defendants seek dismissal based on Ceglia's numerous acts of misconduct

that have not yet been sanctioned, including his discovery misconduct and obstructionist

stonewalling, which has necessitated Defendants' numerous other motions to compel, *see* Doc. Nos. 95, 155, 245, 295, 382, 512, 522; his many false declarations filed in support of his fraudulent claims, *see*, *e.g.*, Doc. Nos. 88, 225, 482; his frivolous assertions of privilege and confidentiality made in an effort to conceal critical evidence, most of which have since been overruled, *see*, *e.g.*, Doc. Nos. 107, 357; his filing of frivolous motions in an effort to bury Defendants in paper on the eve of holidays, *see, e.g.*, Doc. No. 228; his trickery of witnesses, *see* Doc. No. 218 ¶ 9; and his egregious mischaracterizations of witness testimony, *see*, *e.g.*, Doc. No. 386.

## CONCLUSION

This lawsuit is a massive fraud on the federal courts and Defendants.  It has now descended into farce.  Ceglia's arrest—and his latest lawyer's attempt to withdraw in the wake of the arrest (which would represent the <u>tenth</u> law firm to withdraw from representing Ceglia in this case)—underscore the need to put an immediate end to this fraud by dismissing the case.  The Court should dismiss the Amended Complaint with prejudice, award Defendants their reasonable costs and attorneys' fees, and award all other relief to which Defendants may be justly entitled.

Dated:          New York, New York
                November 9, 2012

                                        Respectfully submitted,

                                        /s/ Orin Snyder_____
Thomas H. Dupree, Jr.                   Orin Snyder
Erik R. Zimmerman                       Alexander H. Southwell
GIBSON, DUNN & CRUTCHER LLP             Matthew J. Benjamin
1050 Connecticut Avenue, NW             Amanda M. Aycock
Washington, DC 20036                    GIBSON, DUNN & CRUTCHER LLP
(202) 955-8500                          200 Park Avenue, 47th Floor
                                        New York, NY 10166-0193
                                        (212) 351-4000

Terrance P. Flynn
HARRIS BEACH PLLC
726 Exchange Street
Suite 1000
Buffalo, NY 14210
(716) 200-5120


        *Attorneys for Defendants Mark Zuckerberg and Facebook, Inc.*