UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

PAUL D. CEGLIA,

                            Plaintiff,

        v.

MARK ELLIOT ZUCKERBERG, and
FACEBOOK, INC.,

                            Defendants.
_____

**DECISION
and
ORDER

10-CV-00569A(F)**

APPEARANCES:         PAUL A. ARGENTIERI, ESQ.
                            Attorney for Plaintiff
                            188 Main Street
                            Hornell, New York 14843

                            BOLAND LEGAL LLC
                            Attorneys for Plaintiff
                            DEAN M. BOLAND, of Counsel
                            18123 Sloane Avenue
                            Lakewood, Ohio 44107

                            GIBSON, DUNN & CRUTCHER, LLP
                            Attorneys for Defendants
                            ALEXANDER H. SOUTHWELL, and
                            THOMAS H. DUPREE, of Counsel
                            200 Park Avenue, 47th Floor
                            New York, New York 10166-0193

                            HARRIS BEACH LLP
                            Attorneys for Defendants
                            TERRANCE P. FLYNN, of Counsel
                            Larkin at Exchange
                            726 Exchange Street, Suite 1000
                            Buffalo, New York 14210

## JURISDICTION

    This case was referred to the undersigned by Honorable Richard J. Arcara on

May 27, 2011 for pretrial matters. The action is presently before the court on

Defendants' Motion for Production (Doc. No. 553), filed September 27, 2012.

**BACKGROUND**[1]

Plaintiff Paul D. Ceglia ("Plaintiff" or "Ceglia"), filed the original complaint in this action on June 30, 2010, in New York Supreme Court, Allegany County. On July 9, 2010, Defendants Mark Elliot Zuckerberg ("Zuckerberg") and Facebook, Inc. ("Facebook") (together, "Defendants") removed the action to this court asserting subject matter jurisdiction based on diversity. In an Amended Complaint filed April 11, 2011 (Doc. No. 39), Plaintiff asserts seven claims for relief based on alleged breaches of a purported contract and the partnership established thereunder. Defendants deny the purported contract's authenticity, asserting it is a forgery.

On September 27, 2012, Defendants filed the instant Motion for Production (Doc. No. 553) ("Defendants' motion"), seeking all documents created by one of Plaintiff's experts, Larry Stewart ("Stewart"), in connection with the taking of samples from the purported contract at issue in this action, and a sworn declaration from Plaintiff and Stewart stating that all such documentation has been produced. Defendants' motion is supported by Defendants' Memorandum in Support of Their Motion for Production (Doc. No. 554) ("Defendants' Memorandum"), the Declaration of Alexander H. Southwell, Esq. (Doc. No. 555) ("Southwell Declaration"), with attached exhibits A through NN ("Southwell Declaration Exh(s). __"), and the Declaration of Amanda M. Aycock, Esq. (Doc. No. 556) ("Aycock Declaration"), with attached exhibits A through I ("Aycock Declaration Exh(s). __").

On October 18, 2012, Plaintiff filed his Response to Defendants' Motion for

---

[1] The Facts are taken from the pleadings and motion papers filed in this action.

Discovery (Doc. No. 573) ("Plaintiff's Response"), with attached exhibits 1 through 13 ("Plaintiff's Exh(s). __"), and the Declaration of Larry Stewart Regarding Defendants' Motion for Discovery (Doc. No. 574) ("Stewart Declaration").[2]  In further support of Defendants' Motion, Defendants filed on October 26, 2012, Defendants' Reply Memorandum in Support of Their Motion for Production (Doc. No. 578) ("Defendants' Reply").  Oral argument was deemed unnecessary.

Based on the following, Defendants' motion is DENIED.

## **FACTS**[3]

At the center of this action is the authenticity of a "Work for Hire" contract ("the Work for Hire Document")[4] allegedly executed between Plaintiff Paul D. Ceglia ("Plaintiff") and Defendant Mark Elliot Zuckerberg ("Zuckerberg"), on April 28, 2003, pursuant to which Plaintiff and Zuckerberg, then a student at Harvard University ("Harvard"), established a partnership for the development and commercialization of two separate internet business ventures, including the social-networking website now known as Defendant Facebook, Inc. ("Facebook"), and StreetFax ("StreetFax"), an on-line database project which Plaintiff was developing and hoped to market for profit.  The

---

[2] For unknown reasons, Plaintiff, on October 24, 2012, filed a second Response to Defendants' Motion for Discovery (Doc. No. 577) ("Second Response") with attached exhibits 1 through 13.  Except for some editorial differences, this Second Response is essentially identical to Plaintiff's Response.  Because the Second Response was filed after the Plaintiff's deadline for filing a response and without the court's permission, the court refers only to Plaintiff's Response which, as stated, is essentially identical to the Second Response.

[3] Taken from the pleadings and motion papers filed in this action.

[4] A copy of the Work for Hire Document is attached as Exhibit A to the Amended Complaint (Doc. No. 39).

Work for Hire Document provides that Plaintiff would hire Zuckerberg to perform web programming for StreetFax, and Plaintiff would help fund the development of Facebook in exchange for a one-half interest in Facebook. The details governing the web programming work Plaintiff was to perform for StreetFax are set forth in a separate document signed by Plaintiff and Zuckerberg on April 28, 2003, titled "StreetFax Back-End Technical Specification" ("the Specifications Document").[5] Defendants contend the Work for Hire Document is a forgery, and that the true contract containing the agreement reached by Plaintiff and Zuckerberg on April 28, 2003, is a two-page document titled "StreetFax" ("the StreetFax Document"), executed on April 28, 2003, and providing that Zuckerberg, in exchange for monetary payment from Plaintiff, would perform programming work for Plaintiff's StreetFax project, without mentioning Facebook.[6]

In June 2011, both Plaintiff and Defendants filed motions to stay general discovery, but to permit expedited discovery limited to that necessary to determine the issue of the Work for Hire Document's authenticity (Docs. Nos. 44 and 56). As relevant to the instant motion, by order filed July 1, 2011 (Doc. No. 83) ("July 1, 2011 Expedited Discovery Order"), the undersigned directed Plaintiff to produce on or before July 15, 2011, "all original signed versions of the Work for Hire Document attached to the Amended Complaint" the examination of which was to proceed pursuant to the Hard-

---

[5] Southwell Declaration Exh. MM (Doc. No. 555-39).

[6] A copy of the StreetFax Document was located as an attachment to an email within the memory of one of Plaintiff's computers during a forensic examination performed by Defendants' digital forensics and electronic evidence experts Stroz Friedberg, LLC ("Stroz Friedberg"), in July 2011 in connection with this action. Plaintiff maintains the StreetFax Document is fraudulent, and that Defendants' digital forensic experts planted such document on Plaintiff's computer.

4

Copy Document Inspection Protocol filed July 1, 2011 (Doc. No. 84) ("Hard-Copy Protocol").  July 1, 2011 Expedited Discovery Order at 1.

As relevant to the instant motion, the Hard-Copy Protocol provides (1) the time and date for physical inspection of the Work for Hire Document and Specifications Document ("the Hard-Copy Documents"); (2) Plaintiff's counsel and three additional representatives designated by Plaintiff may observe Defendants' examination of the Hard-Copy Documents; (3) Defendants must notify Plaintiff of their experts' specific testing of the Hard-Copy Documents; (4) any testing requiring the extraction of a physical sample from the Hard-Copy Documents was to be performed in the presence of representatives from both parties; and (5) an audiovisual recording of Defendants' examination of the purported contract may be made by the parties.  Hard-Copy Protocol ¶¶ 1-5.  Neither the July 1, 2011 Expedited Discovery Order nor the Hard-Copy Protocol limited the examination, testing, or sampling Defendants' experts were permitted to perform on the Hard-Copy Documents; rather, the Hard-Copy Protocol required Defendants provide notice of such testing, and any physical sampling, including the extraction of tiny samples of ink, toner, and paper from the Hard-Copy Documents, be taken in the presence of representatives from both parties.  Hard-Copy Protocol ¶¶ 3-4.

The parties met on July 16, 2011, to commence, through the use of a tiny hole-punch type tool, taking samples of paper and ink or "sample plugs" from the Hard-Copy Documents, agreeing on the specific number and general locations from which each party initially would be permitted to extract ink, paper and toner sample plugs from the Hard-Copy Documents ("Hard-Copy Inspection").  In particular, it was agreed that each party initially was authorized to take the following sample plugs:

    (1)    20 paper sample plugs from each page of the Hard-Copy Documents;
    (2)    20 toner sample plugs from each page of the Hard-Copy Documents; and
    (3)    34 sample plugs of handwritten ink from various locations on the Hard-Copy Documents.

Defendants' Memorandum at 5.

In light of the perceived importance of the handwritten ink to establish the Work for Hire Document's authenticity, the parties further negotiated that the handwritten ink sample plugs would be taken as follows:

    (1)    10 ink sample plugs from the interlineations in each document, located on page 1 of the Work for Hire Document, and on page 4 of the Specifications Document;
    (2)    2 ink sample plugs from each letter of the initials "PC" appearing next to the interlineation in each of the Hard-Copy Documents;
    (3)    2 ink sample plugs from each letter of the initials "MZ" appearing next to the interlineation in each of the Hard-Copy Documents;
    (4)    10 ink sample plugs from the "Paul Ceglia" signature and date on each of the Hard-Copy Documents; and
    (5)    10 ink sample plugs from the "Mark Zuckerberg" signature and date on each of the Hard-Copy Documents.

Defendants' Memorandum at 5-6.

Each party was further permitted to determine how to apportion among their respective experts the taking of the allotted number of sample plugs.

    In connection with the Hard-Copy Inspection, Defendants' forensic document examiner and chemist Gerald M. LaPorte ("LaPorte"), and forensic document examiner and chemist Albert H. Lyter, III ("Lyter"), took sample plugs from the Hard-Copy Documents in Buffalo, New York on, respectively, July 16 and 19, 2011. Plaintiff's forensic document and ink experts Larry Stewart ("Stewart") and Erich Speckin ("Speckin"), in accordance with the Hard-Copy Protocol, took sample plugs from the Hard-Copy Documents in Chicago, Illinois on July 25, 2011. Defendants maintain

Speckin took Plaintiff's entire allotment of ink sample plugs extracted from both Hard-Copy Documents with him following completion of the takings of sample plugs on July 25, 2011, and Stewart took none, Aycock Declaration ¶¶ 14-15, but Stewart gave deposition testimony that some of Plaintiff's allotted ink sample plugs were taken by Stewart who retains them. Stewart Dep. Tr. at 202.[7] It is undisputed that Speckin conducted tests on some of the ink sample plugs, but did not report the results of such testing, and Stewart has not conducted any tests on any of the ink sample plugs extracted from the Hard-Copy Documents.

Each sample plug Stewart extracted from the Hard-Copy Documents on July 25, 2011, was placed in a vial with Stewart contemporaneously recording the contents of each vial on a "TLC[8] Worksheet Form" ("First Inventory Worksheet").[9] According to Stewart's handwritten notes ("Stewart's Handwritten Notes")[10] made contemporaneously with his completion of the First Inventory Worksheet on July 25, 2011, Q1 consists of the 2-page Work for Hire Document, whereas Q2 is the 6-page Specifications Document. A handwritten notation on the First Inventory Worksheet indicates Vials 7 and 9 each contain 20 paper sample plugs which were "sent for testing to IPS on 10/30/11." The paper sample plugs in Vial 7 were taken from the first page of

---

[7] References to "Stewart Dep. Tr." are to the transcript of the deposition of Stewart, portions of which are filed as Southwell Declaration Exh. G (Doc. No. 555-7).

[8] "TLC" is an acronym for "thin layer chromatography" which, according to Stewart, is an ink analysis technique in which complex substances such as writing ink are separated into their various components for analysis and comparison to other components. Report of Defendants' Expert Albert H. Lyter III (Doc. No. 328) at 6.

[9] Southwell Declaration Exh. H (Doc. No. 555-8).

[10] Southwell Declaration Exh. I (Doc. No. 555-9).

"Q2" and the paper sample plugs in Vial 9 were taken from the second page of "Q2." First Inventory Worksheet. On a second Inventory Worksheet ("Second Inventory Worksheet")[11] prepared by Stewart on July 29, 2011, Stewart records testing he performed on toner on the paper sample plugs in Vials 12, 14, 16, and 18, which Stewart further notes were extracted on July 25, 2011 from pages 3 through 6 of "Q2." An IPS Testing Services Request Form ("Testing Request Form")[12] indicates Stewart requested analysis by Integrated Paper Services, Inc. ("IPS"), a commercial paper testing facility in Appleton, Wisconsin, of the paper sample plugs contained in Vials 7 and 9 to determine their consistency with each other, as well as whether the "paper composition is one that would be affected by exposure to intense ultraviolet light as one side of these paper samples is yellowed and we are trying to determine why?"

On March 26, 2012, Defendants filed two dispositive motions, including a motion to dismiss (Doc. No. 318) ("Motion to Dismiss"), and for judgment on the pleadings (Doc. No. 320) ("Motion for Judgment") (together, "Defendants' Dispositive Motions"). In their Motion to Dismiss, Defendants argue the Work for Hire Document is a forgery and seek dismissal of the action on the basis that Plaintiff, by pursuing the instant litigation, is perpetrating a fraud on the court.[13]

Plaintiff's papers filed on June 4, 2012, in opposition to Defendants' Motion to Dismiss include, *inter alia*, expert reports from Stewart and fiber analyst Walter J.

---

[11] Southwell Declaration Exh. K (Doc. No. 555-11).

[12] Southwell Declaration Exh. NN (Doc. No. 555-40).

[13] Defendants' Motion for Judgment seeks dismissal of the action as time-barred or, alternatively, barred by laches.

Rantanen ("Rantanen"), IPS Technical Leader in Fiber Science, who had conducted fiber identification analysis and other testing on the paper sample plugs Stewart had extracted from the Hard-Copy Documents. According to Rantanen's expert report (Doc. No. 421) ("Rantanen's Report"), the paper sample plugs he analyzed were contained in vials Stewart had labeled "7" and "9." Rantanen's Report at 2. Rantanen concluded, based on his analysis, that the paper sample plugs in Vials 7 and 9 were "consistent with coming from the same mill and production run." Rantanen Report at 2.

In his report filed June 4, 2012 in connection with Plaintiff's response in opposition to Defendants' Motion to Dismiss (Doc. No. 416) ("Stewart's Report"), Stewart specifically describes Exhibit Q1 as "One, two-page original document bearing the title, '"WORK FOR HIRE' CONTRACT,'" and Exhibit Q2 as "One, six-page document bearing a FAX header and the title 'StreetFax Back-End Technical Specification.'" Stewart's Report at 12 (capitalization and underlining in original). Stewart incorporates Rantanen's finding that the paper used for both pages on the Work for Hire Document came "from the same mill and production run." Stewart Report at 62-63 and Exh. 18.

Prior to deposing expert witnesses, the parties exchanged expert materials to allow for their use at depositions. By letter to Plaintiff's counsel Dean M. Boland, Esq. ("Boland") dated June 13, 2012 ("June 13, 2012 letter"),[14] Defendants requested Plaintiff produce, *inter alia*, Stewart's notes detailing the contents of all sampling vials Stewart provided to Rantanen for analysis, reflecting how many sample plugs were

---

[14] Southwell Declaration Exh. A (Doc. No. 555-1).

9

contained in each vial, documentation as to the location on which page of which document the sample plugs were taken, and documentation as to the size of each sample plug and any other identifying information relevant to the sample plugs. June 13, 2012 Letter ¶ 6.  In an email to Southwell dated June 22, 2012 ("June 22, 2012 email"),[15] Boland indicated his intention to provide all the information Defendants had requested.  On July 5, 2012, Plaintiff produced by email to Southwell an electronic file to be downloaded from an internet website "WeTransfer," much of which Southwell, after downloading and viewing the electronic file, found to be either incomplete or useless.  Southwell Declaration ¶¶ 11-12, and Exh. F.  By email sent July 8, 2012, Southwell advised Boland that the WeTransfer file was deficient and failed to provide the information requested by Defendants in the June 13, 2012 Letter.  Southwell Declaration Exh. F.  Although Plaintiff failed to respond to the July 8, 2012 email, Defendants went forward with Stewart's July 13, 2012 deposition.

It was during his July 13, 2012, deposition that Stewart, for the first time, produced the single page handwritten First Inventory Worksheet on which Stewart had contemporaneously recorded the contents of the sampling vials on July 25, 2011.  Because the First Inventory Worksheet indicates Vials 7 and 9 contain, respectively, paper sample plugs from pages 1 and 2 of Q2, which Stewart had consistently referred to and identified in his Handwritten Notes and Stewart's Report as the Specifications Document, while referring to the Work for Hire Document as Q1, Defendants suspected the First Inventory Worksheet indicated the sample plugs in Vials 7 and 9 were from the

---

[15] Southwell Declaration Exh. B (Doc. No. 555-2).

Specifications Document rather than the Work for Hire Document.

Upon deposition questioning by Defendants' counsel about the belated production of the First Inventory Worksheet, Stewart steadfastly insisted the sample plugs Stewart sent to IPS for analysis by Rantanen were from the Work for Hire Document, and not from the Specifications Document, explaining that the contents of Vials 7 and 9 came from "additional" and "doubled" sampling for which Stewart maintained he had received authority to take.  Stewart Dep. Tr. at 358, 362.  According to Stewart, after taking the additional or double sample plugs, he "unfortunately" used the "same name" *i.e.*, Q2, for the Work for Hire Document that he previously used for the Specifications Document.  *Id.* at 359-60 ("I was given the authority to take additional plugs and I renamed [the Work for Hire Document].  I unfortunately used the same name there that I used in the report [for the Specifications Document], but you could see that those are both two-page documents and it's just reiteration of the same analysis." (bracketed text added)).  Stewart further maintained that the sample plugs from Vials 7 and 9 were yellow on one side, which was consistent with the Work for Hire Document for which the front of each page was yellowed, whereas no page of the Specifications Document was similarly yellowed.  *Id.* at 360.  Stewart further stated that with the extraction of the "additional" sample plugs, a total of 36 paper samples were taken from each page of the Work for Hire Document, including "16 from page 1 and then 16 from page 2 and then an additional 20 from page 1 and an additional 20 from page 2."  *Id.* at 345.  Stewart thus testified he extracted more than the 20 sample plugs from each page of the Work for Hire Document the parties had previously agreed would be permitted to be taken.  Stewart, however, never identified the source of the

"authority" to take additional sample plugs from any of the Hard-Copy Documents, and Defendants maintain they were never consulted about nor consented to the taking of any additional sample plugs.  Southwell Declaration ¶ 51.  As such, Defendants assert that any additional sample plugs taken by Stewart were unauthorized and in violation of the Hard-Copy Protocol. *Id.*

Stewart gave further deposition testimony that he took ink sample plugs from the Work for Hire Document, that although Stewart physically analyzed the ink sample plugs, he performed no chemical analysis on them, and that such sample plugs remain in Stewart's possession.  Stewart Dep. Tr. at 201-02; 372-73.  When Stewart was questioned as to why the First Inventory Worksheet on which the various vials and their contents were recorded by Stewart does not list any vials containing ink sample plugs, Stewart testified the First Inventory Worksheet reflected only the vials containing paper and toner sample plugs, and that he had recorded the extraction of ink sample plugs on a separate worksheet, similar in form to the First Inventory Worksheet, but listing only vials containing ink sample plugs ("Third Inventory Worksheet").  *Id.* at 372-73.  Subsequent to Stewart's deposition, Defendants requested Plaintiff provide a copy of the Third Inventory Worksheet but, to date, have not received it, nor has Plaintiff produced any other documentation substantiating Stewart's assertion that he took ink sample plugs from the Work for Hire Document.

In contrast, Defendants' counsel, Amanda Aycock, Esq. ("Aycock"), who was present in Chicago on July 25, 2011 when Plaintiff's experts extracted their sample plugs from the Hard-Copy Documents, observed that ink sample plugs were taken only by Speckin, whereas Stewart took only paper and toner sample plugs.  Aycock

12

Declaration ¶ 14. Speckin gave deposition testimony consistent with Aycock's recollection, *i.e.*, that all of the ink sample plugs were extracted by Speckin and Stewart took no ink sample plugs. Speckin Dep. Tr.[16] at 51 (stating Stewart told Speckin to take all the ink sample plugs), 73 (confirming Speckin's testimony was that Speckin took all the ink sample plugs Plaintiff was permitted to take). Aycock further maintains that she observed Stewart prepare a total of 18 vials of paper and toner sample plugs from the Hard-Copy Documents, including

| | |
|---|---|
| Vial 1 | 1 paper sample plug, each tab mark on Work for Hire Document p. 1 |
| Vial 2 | 16 paper sample plugs, various locations on Work for Hire Document p. 1 |
| Vial 3 | 10 toner sample plugs, top portion Work for Hire Document p. 1 |
| Vial 4 | 10 toner sample plugs, bottom portion Work for Hire Document p. 1 |
| Vial 5 | 16 paper sample plugs, lower right side Work for Hire Document p. 2 |
| Vial 6 | 20 toner sample plugs, lower right side Work for Hire Document p. 2 |
| Vial 7 | 20 paper sample plugs, middle of Specification Document p. 1 |
| Vial 8 | 20 toner sample plugs, Specifications Document p. 1 |
| Vial 9 | 20 paper sample plugs, right side Specifications Document p. 2 |
| Vial 10 | 20 toner sample plugs, Specifications Document p. 2 |
| Vials 11-18 | paper and toner sample plugs, Specifications Document pp. 3-6. |

Nevertheless, the First Inventory Worksheet Plaintiff produced to Defendants contains only one page and reflects only Vials 1 through 10.

Although Stewart gave deposition testimony that one side of the paper sample plugs from Vials 7 and 9 were yellowed, Rantanen's expert report does not reflect any yellowing on either side of the paper sample plugs from either Vial 7 or 9, which is consistent with Rantanen's deposition testimony that no differences were observed in the ultraviolet characteristics of the papers sample plugs, whether between the front and the back of the sample plugs, or the sample plugs between Vials 7 and 9.

---

[16] References to "Speckin Dep. Tr." are to the transcript of the deposition of Speckin, portions of which are filed as Aycock Declaration Exh. G (Doc. No. 556-7).

Rantanen Dep. Tr.[17] at 105-06; 237.

### **DISCUSSION**

In Defendants' motion, filed September 27, 2012, Defendants seek an order compelling Plaintiff to produce (1) documents regarding Stewart's sampling of the Work for Hire Document and the Specifications Document including documents reflecting any ink sampling by Stewart, and both pages of First Inventory Worksheet on which Stewart recorded the contents of all sampling vials taken during the July 25, 2011 Hard-Copy Inspection, and (2) a sworn declaration by Stewart stating (a) whether the paper sample plugs Stewart sent to IPS Testing on October 30, 2011 for analysis by Rantanen were extracted from the Work for Hire Document or the Specifications Document, (b) whether Stewart took ink sample plugs from the Work for Hire Document and the Specifications Document and, if so, specifying how many, when, from where, and how many sample plugs remain in Stewart's possession; and (c) confirming that Stewart has produced directly to Defendants any and all inventories of the vials of sample plugs Stewart took from the Work for Hire and Specifications Documents, including both pages of the two page inventory-worksheet on which Stewart recorded the contents of the sampling vials during the July 25, 2011 inspection, or at any other time when Defendants were not present.  Notice of Defendants' Motion for Production ¶¶ 1-2.  Defendants maintain all of the evidence Plaintiff has made available to Defendants contradict's Stewart's assertion that the sample plugs Stewart sent to IPS Testing for paper analysis by

---

[17] References to "Rantanen Dep. Tr." are to the transcript of the deposition of Rantanen, portions of which are filed as Aycock Declaration Exh. I (Doc. No. 556-9).

Rantanen came from the Work for Hire Document, rather than from the Specifications Document.  Defendants' Memorandum at 1.  Because the Specifications Document's authenticity is not in dispute, Rantanen's analysis of such document is irrelevant to the basic question presented in this case. *Id.*  According to Defendants, such requested documents would likely confirm Stewart made false statements under oath and that Rantanen's paper analysis, from which Rantanen concluded the paper sample plugs contained in Vials 7 and 9 were from the same paper mill and production run, was conducted based on sample plugs from the Specifications Document, rather than from the Work for Hire Document, the document at issue. *Id.* 13-14.

Such evidence includes that the First Inventory Worksheet Stewart first produced at Stewart's July 13, 2012 deposition indicates that Vials 7 and 9 sent to Rananen at IPS Testing contained paper sample plugs from Q2.  Defendants' Memorandum at 14; Stewart Report at 12; Handwritten Notes.  In Stewart's Handwritten Notes, recorded contemporaneously with the First Inventory Worksheet, Q2 is identified as the six-page Specifications Document, rather than the two-page Work for Hire Document which is identified at Q1.  Defendants' Memorandum at 14-15.  In his expert report, Stewart specifies that "Q1" is a two-page document titled "Work for Hire" and "Q2" is a six-page document titled StreetFax Back-End Technical Specification."  Stewart's Report at 12.  The Second Inventory Worksheet indicates that Stewart, on July 29, 2011, analyzed the toner ink on sample plugs extracted on July 25, 2011, and contained in Vials 12, 14, 16, and 18, which were taken from, respectively, Q2 pages 3 through 6.  Second Inventory Worksheet. Further, the video of the July 25, 2011 Hard-Copy Inspection, as described by Aycock, shows Stewart taking sample plugs from the Specifications Document when

filling Vials 7 and 9, and recording the filling of sample vials taken from pages 3 through 6 of the Specifications Document on a second page of the First Inventory Worksheet, which has not been produced to Defendants.[18]  Defendants' Memorandum at 16.  Rantenan's Report is also consistent with a finding that the Vial 7 and 9 samples were taken from the Specifications Document insofar as the front side of both pages comprising the Work for Hire Document was yellowed, yet Rantanen detected no such discoloration or other anomalies upon analyzing, under ultraviolet light, the paper sample plugs from Vials 7 and 9.  *Id.* at 16-17.

Nor is there any evidence supporting Stewart's strained explanation, made during his deposition, that he received authorization to take additional paper sample plugs, and then ineptly "renamed" the Work for Hire Document as "Q2" when labeling the vials containing such sample plugs, despite having previously named the Specifications Document as "Q2."  Defendants' Memorandum at 18.  Stewart's assertion regarding the taking of additional sample plugs is further belied by the fact that a plain review of the Work for Hire Document after the extraction of the sample plugs reveals only a total of 42 paper sample plugs were taken from page 1, and 40 paper sample plugs were taken from page 2 of the document, a result that, given that Defendants' experts took 20 sample plugs from each page of the Work for Hire Document, is impossible to reconcile with Stewart's assertion that he took additional

---

[18] Although Defendants have not provided the video to the court, and Plaintiff asserts the video is has not been authenticated and, thus, cannot be considered as evidence, Plaintiff's Response at 2, 16, Plaintiff does not challenge Defendants' description of the video.  Of course, Aycock's description of Stewart's sampling on July 25, 2011, is based on personal knowledge.  Aycock Declaration ¶ 7 ("On July 25, 2011, in Chicago, Illinois, at the offices of Edelson McGuire, LLC, I observed the inspection and sampling by Plaintiff's experts Mr. Stewart and Erich Speckin of the Hard Copy Documents.").

sample plugs after receiving further authorization from an unnamed source. *Id.* at 18-19.

Additionally, contradicting Stewart's insistence that he took ink sample plugs from the Hard-Copy Documents, the First Inventory Worksheet indicates that Vials 1 through 10 contained only paper and toner sample plugs. Defendants' Memorandum at 20. This is consistent both with Speckin's deposition testimony that only Speckin took ink sample plugs, and Aycock's description of the video of the July 25, 2011 Hard-Copy Inspection as depicting all ink sample plugs as being taken by Speckin. *Id.* at 20-21. Furthermore, despite insisting the ink sample plugs he took remain in his possession, Stewart has not produced any such sample plugs to Defendants. *Id.* at 21.

Plaintiff's Response filed in opposition to Defendants' motion largely consists of irrelevant arguments and exhibits, characterizing Defendants' motion as a *Daubert*[19] challenge to the admissibility of Stewart's opinion as an expert, Plaintiff's Response at 2, and asserting Defendants have a "hidden agenda" in bringing the motion, to wit, Defendants are in crisis management mode because Plaintiff's experts have concluded the Work for Hire Document is authentic. *Id.* at 3-4. According to Plaintiff, because his experts have established the authenticity of the Work for Hire Document, Defendants have been forced to abandon their "page one substitution theory" in favor of arguing both pages of the Work for Hire Document are forgeries.[20] *Id.* at 4-5. Plaintiff further

---

[19] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

[20] Plaintiff relies on Rantanen's conclusion that the paper plugs in Vials 7 and 9 were "consistent with coming from the same mill and production run," Rantanen Report at 2, as supporting Plaintiff's argument in opposition to Defendants' Motion to Dismiss that both pages of the Work for Hire Document were created at the same time, although Defendants maintain other evidence establishes the paper plugs contained in Vials 7 and 9 were taken from the Specifications Document, rather than from the Work for

maintains the instant motion establishes Defendants failed to conduct similar testing on both pages of the Work for Hire Document, such that Defendants now seek to attack Plaintiff's experts' analysis of the document to discredit Plaintiff's experts' reports. *Id.* at 5-7. The myriad of exhibits Plaintiff submits in opposition to Defendants' motion largely consist of references to unrelated litigation in which the Gibson, Dunn law firm has been involved. In further support of Defendants' motion, Defendants point to the lack of substance in Plaintiff's Response, and reiterate the arguments ser forth in support of their motion. *See* Defendants' Reply, *passim*.

In light of Stewart's averments that all documents in his possession, custody or control responsive to Defendants' discovery requests pertaining to the paper sampling of the Hard-Copy Documents at issue on Defendants' motion have been provided to Defendants, and that Stewart has no other documents to provide Defendants, Stewart Declaration ¶¶ 2-3, an order from the court directing Stewart to produce further documentation in accordance with Defendants' motion would be futile. Further, that Defendants, despite the absence of such documentation, filed their reply in further support of Defendants' Motion to Dismiss on November 9, 2012 (Doc. No. 588) ("Defendants' Reply - Motion to Dismiss"), demonstrates the lack of such information did not hinder Defendants' preparation of their reply, but that Defendants have incorporated their arguments on the instant motion into the Reply, such that the instant

---

Hire Document. This conclusion is facially inconsistent with the theory that page 2 of the Work for Hire Document, on which both Plaintiff's and Zuckerberg's signatures appear, may be authentic, whereas page 1 of the Work for Hire Document, on which the only references to Facebook appear in handwritten interlineations, was created later and substituted for the Work for Hire Document's original first page, which Plaintiff refers to as the "page one substitution theory."

motion is more properly construed as a rebuttal to Rantanen's Report.[21]  *See* Defendants' Reply - Motion to Dismiss at 19-20.  Accordingly, Defendants' motion is DENIED.

## CONCLUSION

Based on the foregoing, Defendants' motion to produce (Doc. No. 553) is DENIED.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:   November 20, 2012
         Buffalo, New York

---

[21] As such, striking any of Plaintiff's submissions for spoliation, a disposition which Defendants do not seek, is unwarranted.