1

2  UNITED STATES DISTRICT COURT

3  WESTERN DISTRICT OF NEW YORK

4  No. 1:10-cv-00569-RJA

5  ------------------------------x

   PAUL D. CEGLIA,

6

                     Plaintiff,

7

              vs.

8

   MARK ELLIOT ZUCKERBERG,

9  Individually, and

   FACEBOOK, INC.,

10

                     Defendants.

11 ------------------------------x

12

13

14                   July 11, 2012

15                   10:03 a.m.

16

17        Videotaped deposition of LARRY F.

18     STEWART, held at the offices of Gibson,

19     Dunn & Crutcher LLP, 200 Park Avenue,

20     New York, New York, pursuant to notice,

21     before Cary N. Bigelow, Court Reporter,

22     a Notary Public of the State of New York.

23

24

25

```
 1
 2    A P P E A R A N C E S:
 3         BOLAND LEGAL, LLC
 4         Attorneys for Plaintiff
 5              1475 Warren Road
 6              Unit 770724
 7              Lakewood, Ohio 44107
 8         BY:   DEAN BOLAND, ESQ.
 9
10         GIBSON, DUNN & CRUTCHER LLP
11         Attorneys for Defendants
12              200 Park Avenue
13              New York, New York 10166-0193
14         BY:   ORIN SNYDER, ESQ.
15              ALEXANDER H. SOUTHWELL, ESQ.
16              MATTHEW BENJAMIN, ESQ.
17              AMANDA AYCOCK, ESQ.
18              SRIPRIYA NARASIMHAN, ESQ.
19
20    ALSO PRESENT:
         PETER TYTELL
21       GERALD LAPORTE
         NADER KHORASSANI, Summer Associate,
22            Gibson, Dunn & Crutcher, LLP
              (a.m. session)
23       ANNA CHASE, Summer Associate,
              Gibson, Dunn & Crutcher, LLP
24            (p.m. session)
         DANIEL McCLUTCHY, Videographer
25
```

1

2          THE VIDEOGRAPHER:  Good morning.  We

3     are now on the record.  Please note that the

4     microphones are sensitive and they pick up

5     whispering and private conversations.

6     Please turn off all cell phones or place

7     them away from the mics as they can

8     interfere with the deposition audio.

9     Recording will continue until all parties

10    agree to go off the record.

11          My name is Daniel McClutchy

12    representing Veritext New York.  The date

13    today is July 11, 2012, and the time is

14    approximately 10:03 a.m.  This deposition is

15    being held at the office of Gibson, Dunn &

16    Crutcher located at 200 Park Avenue in New

17    York, New York.

18          The caption of this case is Paul Ceglia

19    versus Mark Elliot Zuckerberg and Facebook

20    Inc.  This case is filed in the U.S.

21    District Court, Western District of New

22    York, case number 1:10-cv-00569-RJA.  The

23    name of the witness is Larry Stewart.

24          At this time the attorneys present will

25    identify themselves and the parties they

1

2      represent and then our court reporter, Cary

3      Bigelow, representing Veritext, will swear

4      in the witness and we can proceed.

5           MR. SNYDER:  Orin Snyder for the

6      defendants.

7           MS. AYCOCK:  Amanda Aycock for the

8      defendants.

9           MR. SOUTHWELL:  Alexander Southwell for

10     the defendants.

11          MR. BENJAMIN:  Matthew Benjamin for the

12     defendants.

13          MS. NARASIMHAN:  Sripriya Narasimhan

14     for the defendants.

15          MR. SOUTHWELL:  And we have a summer

16     associate with us, Nader Khorassani.

17          MR. BOLAND:  Dean Boland for

18     Mr. Ceglia.

19          MR. SOUTHWELL:  And just for the

20     record, we have Gerry LaPorte and Peter

21     Tytell, defendants' experts, also present.

22   L A R R Y   F.   S T E W A R T, called as a

23     witness, having been duly sworn by a Notary

24     Public, was examined and testified as follows:

25   EXAMINATION BY

```
 1                       L. Stewart
 2    MR. SNYDER:
 3        Q.    Good morning, Mr. Stewart.
 4        A.    Good morning.
 5        Q.    You just swore to tell the truth;
 6    correct?
 7        A.    Yes.
 8        Q.    And you understand that knowingly
 9    making a false statement that's material to the
10    proceedings under oath is a crime?
11        A.    Yes.
12        Q.    And I want to ask you whether you
13    consider yourself bound, sir, by the American
14    Academy of Forensic Science Code of Ethics and
15    Conduct.
16        A.    They have a code of ethics and I'm a
17    member, so yes, I'm bound by that.
18        Q.    So the opinion you give in this case --
19              MR. SNYDER:  Withdrawn.
20        Q.    Are you aware that section 2 of article
21    2 of the code subjects members like you to
22    various penalties, including expulsion, in the
23    event that you provide an expert opinion that
24    falls below the standards set forth by the
25    academy?
```

```
 1                      L. Stewart
 2       A.     I assume it does say that, I hope it
 3   does say that.
 4       Q.     Are you aware that the code of ethics
 5   states that no member, such as you, shall
 6   materially misrepresent data or scientific
 7   principles in reaching a conclusion?
 8       A.     Well, as I mentioned, I don't have the
 9   code in front of me, but I assume it says
10   something like that.
11       Q.     Now, before we get to your opinion,
12   sir, I just want to ask you whether you
13   understand that it's the defendant's position in
14   this case that Mark Zuckerberg never signed the
15   so-called Work For Hire document on which the
16   plaintiff is basing his claim in this lawsuit.
17              Are you aware of that?
18       A.     It's not my understanding of what
19   Mr. Zuckerberg has said, no.  I don't know what
20   he said.
21       Q.     It's your sworn testimony here today,
22   sir, that as you sit here today you have no idea
23   what Mr. Zuckerberg said with regard to whether
24   he did or did not sign the Work For Hire
25   document?
```

```
 1                      L. Stewart
 2      A.    That's my testimony, yes.
 3      Q.    Have you read Mr. Zuckerberg's sworn
 4  declaration in this case?
 5      A.    No.
 6      Q.    Have you asked anyone, Mr. Boland or
 7  Mr. Ceglia, what the defendants' position is with
 8  respect to whether they signed or didn't sign the
 9  Work For Hire document?
10      A.    No, I would not do that, that would not
11  be proper.
12      Q.    Have you conducted a Google search
13  about this case prior to today?
14      A.    About --
15      Q.    About this case.
16      A.    -- anything about this case?
17      Q.    Have you conducted any Google search
18  concerning this case prior to today?
19            That would be a yes-or-no answer.
20            MR. BOLAND:  Objection.
21            He can answer how he wants to answer,
22      Mr. Snyder.
23      A.    I am trying to think.
24            I'm certain in the past year I have
25  done a Google search where I have had Facebook in
```

```
 1                      L. Stewart
 2   the name, yes.
 3       Q.    Do you think I just asked you whether
 4   you conducted a Google search concerning
 5   Facebook?
 6       A.    Concerning this case, and that's one of
 7   the defendants.
 8       Q.    So you have, prior to today, conducted
 9   a Google search about this case?
10       A.    Not specifically about this case.  I
11   have done Google searches where defendant's name
12   was in the search, I'm sure.
13       Q.    Are you aware that the defendants'
14   position in this case that the Work For Hire
15   contract attached to the complaint is a fraud, a
16   fake, a forgery, not authentic?
17       A.    I assume that's your position, yes, I'm
18   aware of that.
19       Q.    You just used two different verbs,
20   assume and aware; is that correct?
21       A.    Yes.
22       Q.    Are you aware that those two words mean
23   very different things?
24       A.    They can.
25       Q.    Do you know, sir, as you sit here
```

```
 1                      L. Stewart
 2   today, that our position is that this contract is
 3   a fraud or are you assuming it?
 4            MR. BOLAND:  Objection.
 5            You are changing the question,
 6       Mr. Snyder.
 7            Are you asking your position or the
 8       defendants by themselves?
 9       A.   It's a common-sense answer.  We
10   wouldn't be having a case if you didn't have a
11   different opinion than us.
12       Q.   As you sit here today, sir, do you have
13   actual knowledge that the defendants have taken
14   the position that the Work For Hire contract is a
15   fake?
16       A.   Actual knowledge?
17       Q.   Yes.
18       A.   I haven't talked to Facebook or
19   Zuckerberg.  I have seen the original documents
20   filed in this case and from that I can say that
21   your position is different than ours, that you
22   feel the document's fraudulent.
23       Q.   What documents have you read that
24   indicate defendants' position that the Work For
25   Hire document is fraudulent?
```

1                    L. Stewart

2        A.    I don't know what the name of the

3    document is.  The original filing in the case

4    where there was a -- the Court case initiated

5    based on two different beliefs, one side felt the

6    document was real, one side felt that it was

7    fake.

8        Q.    Have you read on the Internet

9    statements that I have made, sir, to the effect

10   that this case is a fraud and that Mr. Ceglia is

11   perpetuating a criminal fraud on the court?

12       A.    I read, I believe, an Associated Press

13   article where you said that.

14       Q.    And so do I understand that it's

15   defendants' position that Paul Ceglia is

16   committing a crime in connection with the

17   prosecution of this lawsuit?

18       A.    I believe that article said that as

19   well, yes.

20       Q.    And do you understand, sir, that the

21   defendants have moved to dismiss this lawsuit on

22   the basis that the case is predicated on a

23   fraudulent document?

24       A.    Yes.

25       Q.    And do you understand that Mr. Ceglia

1                          L. Stewart

2     has submitted your report, sir, among others, in

3     response to our allegation that he is committing

4     a criminal fraud on defendants and the Court?

5          A.     Well, that's an interesting way to put

6     it, but yes, he submitted my report to the Court.

7          Q.     Do you understand, sir, that it's the

8     defendants' position that you, sir, have

9     submitted a report which you signed that is being

10    used in furtherance of a crime?

11         A.     I have no way of answering that.  My

12    report has nothing to do with a crime.

13         Q.     You would agree, sir, that if in fact

14    the Work For Hire contract is fraudulent --

15    assume that as a hypothetical -- and that

16    Mr. Ceglia under this hypothetical submitted your

17    report to further that fraud, that your report

18    would, under that hypothetical, serve to further

19    Mr. Ceglia's fraud?

20         A.     I'm not going to assume something I

21    don't believe.

22         Q.     Now, you are not a computer forensic

23    expert, are you, sir?

24         A.     I have supervised computer experts, I

25    have some knowledge in the area, but I don't

```
                                        Page 12
 1                      L. Stewart
 2    consider myself one.
 3        Q.    So the answer is you are not a computer
 4    forensic expert; correct?
 5        A.    I can only answer it the way I have.  I
 6    have quite a bit of knowledge of the subject, I
 7    have supervised the area in my laboratory and I
 8    have technically and administratively reviewed
 9    reports in the area.
10        Q.    Have you ever been certified by any
11    society anywhere in the world as a computer
12    forensic expert?
13        A.    No.  That's why I don't consider myself
14    an expert in the field, although I have
15    supervised it.
16        Q.    So let me ask the question again one
17    more time.
18              Am I correct, sir, that you are not a
19    computer forensic expert?
20        A.    It depends on what you want to refer to
21    as a computer expert.
22              Do I meet the Frye Rule standard?
23              Probably.
24              Do I consider myself an expert?
25              No.
```

```
 1                        L. Stewart
 2            Would I pass a Daubert test?
 3            No.
 4      Q.    No court has ever certified you as an
 5   expert in computer forensics; correct?
 6      A.    That's not true.  I probably -- I have
 7   used computer science in some of the earlier
 8   cases that I've testified in.
 9      Q.    Do you think my question, sir, was
10   whether you ever used computer forensics in a
11   case you testified in?
12      A.    Yes, I do.
13            MR. SNYDER:  Can you please read back
14      the last question, sir.
15            (Record read.)
16            MR. BOLAND:  He's just reading it back.
17      Q.    Can you answer that question?
18            MR. BOLAND:  There you go.
19      A.    I think I did.
20            It was part of testimony, so in that
21   case the Court has certified me.
22      Q.    Which court?
23      A.    I don't know, it was in the early years
24   of my career.
25      Q.    I'm going to leave a blank in the
```

1                    L. Stewart

2    transcript and ask, sir, that you tell the Court

3    in that blank which judge and which court in

4    which year, including the caption of the case,

5    certified you as a computer forensics expert.

6    TO BE FURNISHED: _____

7    _____

8        A.    It will remain blank.

9              As I put in my declaration, there were

10   a number of cases in the early years we did not

11   track and so I'm going based on recollection, so

12   there's no way I can give you that information

13   other rather than my testimony.

14       Q.    We have to take your word for it,

15   right, sir?

16       A.    It's up to you.

17       Q.    And you've been deposed before many

18   times, have you not?

19       A.    Yes, I have.

20       Q.    Are you aware of the Western District

21   of New York's rules concerning your testimony

22   today?

23       A.    I'm aware of the federal rules, I

24   assume that encompasses the western district.

25       Q.    You are not aware of any specific rules

```
 1                        L. Stewart
 2    that govern the proceedings in this court as it
 3    relates to depositions; correct?
 4        A.    That's correct.
 5        Q.    Did you meet with Mr. Boland before
 6    testifying today?
 7        A.    Yes.
 8        Q.    When?
 9        A.    Approximately 9:30 to 9:45.
10        Q.    Did you talk to him on the phone prior
11    to that in preparation for the testimony today?
12        A.    I've talked to him many times prior to
13    that, yes.
14        Q.    And did you talk to Mr. Agentieri?
15        A.    Many times.
16        Q.    And did you meet or speak with
17    attorneys from the Milberg firm?
18        A.    Yes.
19        Q.    Sanford Dumain?
20        A.    Yes.
21        Q.    Jennifer Young?
22        A.    I don't know.
23        Q.    Melissa Clark?
24        A.    I don't know.
25        Q.    Were they involved in helping you
```

```
 1                    L. Stewart
 2    prepare your report, Milberg Weiss, the Milberg
 3    firm?
 4              No longer Weiss, they took his name off
 5    the firm.
 6         A.    No, they were not.
 7         Q.    Did you talk to Paul Ceglia before your
 8    testimony today?
 9         A.    One time.
10         Q.    When was that?
11         A.    A few months ago.
12         Q.    What did he say and what did you say,
13    as best that you can recall?
14         A.    I asked him about the storage
15    conditions of the Facebook contract and he said,
16    he gave me verbally what the storage conditions
17    were and --
18         Q.    What did he say, sir?
19         A.    He told me that it was stored in a home
20    that was a part-year used home up in New York and
21    that the home was not heated, it didn't have --
22    it didn't even have a heating system, from what I
23    understand, and he had to winterize the house
24    whenever he left it.
25         Q.    Have you told us everything you can
```

```
 1                    L. Stewart
 2   recall about what Mr. Ceglia said to you during
 3   this phone call?
 4        A.    Yes.  I asked him to back that up with
 5   a declaration so I could refer to that.
 6        Q.    Did he?
 7        A.    Yes, he did.
 8        Q.    Did he say anything else during this
 9   phone call?
10        A.    Not that I recall.
11        Q.    And how long was the phone call?
12        A.    The call itself, I believe, was a half
13   hour or so.  Mr. Ceglia's part in the call was
14   about two minutes.
15        Q.    Who else was on the call?
16        A.    Mr. Boland and Mr. Blanco.
17        Q.    And that's your partner Mr. Jim Blanco?
18        A.    He is not a partner, no.
19        Q.    You don't run a business with him?
20        A.    No.
21        Q.    You don't have a business that shares
22   your two names?
23        A.    We have a shared office space in
24   Washington, D.C. and he experimented with
25   creating a Web page that showed that office as
```

```
 1                    L. Stewart
 2  being a shared space, but it has never gone
 3  anywhere.
 4      Q.    You hold yourself out to the public as
 5  having a business together, do you not?
 6      A.    No.
 7            Again, I believe there's a Web page out
 8  there that says that, but that's not the truth.
 9      Q.    There's a Web page that says Blanco &
10  Stewart with an ampersand between your names,
11  forensic document examiners; correct?
12      A.    Right, it's advertising the Washington,
13  D.C. space.
14      Q.    It's your testimony that although you
15  hold yourself out to the public as being Blanco &
16  Stewart forensic document examiners, in fact you
17  are not in business together?
18      A.    No, it's not my testimony, it's not
19  what I said.
20            I said that there's a Web page that we
21  experimented with and we set up, but we have
22  never gotten any business that way, we do not
23  conduct business together.  The only thing we're
24  doing is sharing expenses of the office space
25  in D.C.
```

```
 1                      L. Stewart
 2        Q.    You don't conduct business together?
 3        A.    No.
 4        Q.    You don't refer matters to one another?
 5        A.    That's not conducting business
 6   together.  We have referred matters to each
 7   other, yes.
 8        Q.    Is it your sworn testimony you've never
 9   shared a fee?
10        A.    We've never shared a fee.
11        Q.    And is there any signage "Blanco &
12   Stewart Forensic Document Examiners" in or around
13   your offices?
14        A.    No.
15        Q.    Did you speak with Valery Aginsky at
16   any time before submitting your report?
17        A.    Yes.
18        Q.    When?
19        A.    Probably around June or July of last
20   year.
21        Q.    And what did you say and what did the
22   doctor say?
23        A.    I believe I asked him about what his
24   findings were to date, I recall him telling me
25   that he did physical examinations only, I recall
```

```
 1                      L. Stewart
 2    him telling me that he suggested chemical
 3    analysis.
 4        Q.    Did you take notes of that call?
 5        A.    No.
 6        Q.    Did you record the call?
 7        A.    No.
 8        Q.    Anything else you can recall about the
 9    phone call?
10        A.    No.
11        Q.    Did Dr. Aginsky tell you that images
12    were taken of the so-called Work For Hire
13    contract in or around January of 2011?
14        A.    He didn't tell me that, but I believe I
15    had received that from Mr. Argentieri.
16        Q.    Did you ask Mr. Aginsky how they
17    appeared, the Work For Hire document, when he
18    examined it?
19        A.    No.  The call I had to him was before
20    I'd even examined the document.  At that point I
21    high-resolution scanned images that he had taken,
22    so I knew how the document looked.
23        Q.    How about Mr. Osborn, did you ever
24    speak to him?
25        A.    No.
```

```
 1                     L. Stewart
 2      Q.    Do you know whether Mr. Osborn or
 3   Dr. Aginsky are still experts for the plaintiff
 4   in this case?
 5      A.    No.  You'd have to ask Mr. Boland or
 6   Mr. Argentieri.
 7      Q.    Did you review your report before your
 8   testimony today?
 9      A.    Of course.
10      Q.    When did you last read it?
11      A.    I read sections of it about five
12   minutes before I came in.
13      Q.    And did you notice any errors in the
14   report?
15      A.    No.
16      Q.    Before you sign and submit a report, do
17   you read it carefully to make sure that it is
18   accurate and correct?
19      A.    Yes.
20      Q.    And if you see any errors do you
21   correct them?
22      A.    Of course.
23      Q.    Do you consider yourself a careful
24   writer when you are writing your reports?
25      A.    Yes.
```

```
 1                      L. Stewart
 2       Q.     Did you write this report yourself, sir?
 3       A.     Yes.
 4       Q.     Every word?
 5       A.     Yes.
 6       Q.     Every punctuation mark?
 7       A.     Yes.
 8       Q.     Is it your sworn testimony that
 9   Mr. Boland didn't edit it in any respect?
10       A.     I had him read it before I issued it,
11   but he did not edit it.
12       Q.     Is it your sworn testimony that
13   Mr. Boland did not change any words in the report
14   between the time you gave him a draft and it was
15   submitted to the Court?
16       A.     Right.  Mr. Boland did not change any
17   of my words.
18       Q.     So the report that you submitted to
19   Mr. Boland for his review is the exact same as
20   the report that was submitted to the Court?
21       A.     No, I doubt that.  It had many
22   iterations that I made up to the point that I
23   submitted it, there were a number of additions
24   that I made, I made editorial changes to it.
25       Q.     And did Mr. Boland make any suggestions
```

```
 1                    L. Stewart
 2   to you in terms of how to change the report?
 3        A.    I think I recall him making some
 4   general observations about placement of
 5   information, but nothing material.
 6        Q.    When you say nothing material, what do
 7   you mean by that?
 8        A.    Nothing that would have changed any
 9   observation or conclusion, anything that was
10   meaningful in the report.
11        Q.    But you did proofread your report
12   before you submitted it?
13        A.    Yes, I proofread it.
14        Q.    Let me show you a copy of your report
15   which we will mark as Stewart 1.
16              We are going to go sequentially, so
17   this will be Exhibit 13.
18              (Defendants' Exhibit 13, declaration of
19        Larry Stewart in support of plaintiff's
20        forthcoming response to defendants' motion
21        to dismiss for fraud, marked for
22        identification, as of this date.)
23        Q.    This is your report; right, sir?
24        A.    It looks like it.
25        Q.    Let me direct your attention to page 12.
```

```
 1                    L. Stewart
 2            Let's start by looking at the first
 3    paragraph which starts with Q1.
 4            Do you see that?
 5       A.    First paragraph under the section
 6    "Exhibits," yes.
 7       Q.    Yes.
 8            In this paragraph you described the
 9    so-called Work For Hire document; correct?
10       A.    Yes.
11       Q.    And first you describe the document's
12    title; correct?
13       A.    Yes.
14       Q.    Why do you put it in all caps?
15       A.    Because that's what the title of the
16    document is.
17       Q.    Okay.
18            The second sentence of that paragraph
19    reads "Page 1 of the document bears a handwritten
20    interlineation indicating 'Providing Web design
21    is funded by May 24, 2003' along with two sets of
22    witnessing initials."
23            Did I read that correctly?
24       A.    Yes.
25       Q.    Let me hand you the Work For Hire
```

Continuing.

1                          L. Stewart
2    document, which we will mark as Exhibit 14.
3              (Defendants' Exhibit 14, photocopy of
4        Work For Hire contract, marked for
5        identification, as of this date.)
6              MR. BOLAND:  Just to be clear, it is a
7        copy of the Work For Hire document.
8        Q.    That was produced to defendants as
9    scans taken by Valery Aginsky during the
10   expedited discovery phase.
11             Have you seen this scan before?
12       A.    I can't attest it's the one from Valery
13   Aginsky.  I've seen the document before.
14       Q.    Did you ever review Dr. Aginsky's scans?
15       A.    Yes.  I told you that I received them
16   early on from Argentieri.
17       Q.    Let me present you with what I will
18   tell you is a scan of the Work For Hire document
19   created by Dr. Aginsky in January 2011.  I would
20   like to direct your attention to the handwritten
21   interlineation on page 1 of that document.
22       A.    Yes.
23       Q.    Can you read the handwritten
24   interlineation in the bold ink handwriting?
25       A.    It's running together, but it appears

Page 26

                        L. Stewart

1
2    to read providing Web design or designer or
3    designing -- I can't tell -- is finished by May
4    24, 2003, and then it's got two sets of initials.
5         Q.    So let's go back to your report,
6    Defendants' Exhibit 13, where you purport to
7    quote the Work For Hire document.
8         A.    Yes.
9         Q.    You quote it incorrectly, do you not?
10        A.    I don't know.  It's what --
11        Q.    You just read the verb "finished" and
12   your report reads "funded"; correct?
13        A.    If I look at it, it could be funded.
14        Q.    Sir, you just read the document, did
15   you not?
16        A.    I did, and I can read it either way, I
17   can see it reads funded or finished, and just
18   like I said, designer looks like design,
19   designing, designer, I read it as best that I
20   could and I --
21        Q.    What word did you tell the Court you
22   saw when you read that document just now in your
23   testimony, sir?
24        A.    I quoted that it appears to read
25   design.  Just now I read it as design, it looks

```
 1                      L. Stewart
 2   like it has an E at the end, maybe something
 3   else, I don't know.
 4        Q.    What word did you use just in your
 5   testimony right now, sir, that followed the word
 6   "is" and preceded the word "by"?
 7        A.    I'm using multiple words.
 8        Q.    What word did you use when you read it
 9   for the first time for the Court in this
10   deposition, sir?
11        A.    I don't know.
12              Why don't you tell me what I said
13   because --
14        Q.    Sir, it is not my --
15              MR. BOLAND:  Objection.  You don't need
16        to raise your voice.
17              MR. SNYDER:  Excuse me, my voice is not
18        being raised.
19              MR. BOLAND:  It is being raised.
20              MR. SNYDER:  No, sir, it is not.
21        Q.    Sir, I ask the questions, you answer
22   them.
23              Do you understand that?
24              Do you understand that?
25        A.    Yes, I understand.
```

```
 1                       L. Stewart
 2      Q.     Okay.
 3             So don't ask me another question,
 4   please, okay, because I will not answer them.
 5             So what word did you use in your
 6   testimony, sir, when I asked you to read this
 7   handwritten interlineation?
 8      A.     I don't know.
 9      Q.     Well, let's go back and we'll ask the
10   court reporter to remind you.
11             Is it your sworn testimony, sir,
12   sitting here today right now, that you do not
13   recall what word you used when you read the
14   handwritten interlineation?
15      A.     What I recall is reading it and then
16   saying that the words are jumbled, that I can't
17   make them out and read to you what it appears to
18   read under magnification, I did that before for
19   my report and I quoted what it appears to read
20   there.
21             My sworn testimony today is that it
22   appears to read what I've got in my report
23   because that's what I read when I had it under
24   magnification.
25      Q.     Sir, about three to five minutes ago
```

```
 1                        L. Stewart
 2    when I asked you to read this handwritten
 3    interlineation, did you tell the Court that the
 4    word you read was finished or funded?  Which word
 5    did you use?  Do you recall?
 6         A.    No, I don't.  It could have been either
 7    one and I could read both of them right now in
 8    the word.
 9         Q.    So your sworn testimony right now for
10    this court is that you cannot recall in this
11    deposition several minutes ago when you read this
12    handwritten interlineation whether you read the
13    word "finished" or "funded"?
14              Is that your sworn testimony right now,
15    sir, that you cannot recall which word you used
16    when you read it out loud into the record?
17              Do you understand my question, sir?
18         A.    I understand your question.
19         Q.    Let me withdraw the question and break
20    it down.
21              Do you recall, sir, me handing you this
22    document at the deposition?
23         A.    Yes, I do.
24         Q.    Do you recall me directing your
25    attention to the handwriting on the document?
```

```
 1                    L. Stewart
 2      A.    Yes, I do.
 3      Q.    Do you recall me asking you to read the
 4  handwriting out loud?
 5      A.    Yes.
 6      Q.    Do you recall reading it out loud?
 7      A.    Yes.
 8      Q.    Do you recall, in reading it out loud,
 9  that you read and read out loud each word that
10  you saw including indicating for the Court that
11  you saw two sets of initials?
12      A.    Yes.
13      Q.    Do you recall whether you read out loud
14  the word "finished" or "funded" when you read the
15  handwritten interlineation?
16      A.    I believe when I first talked about it
17  I said finished.
18      Q.    And what word do you use in your
19  report, sir?
20      A.    Funded.
21      Q.    Thank you.
22      A.    And as I mentioned --
23      Q.    There is no question pending right now.
24            MR. BOLAND:  Objection.  He is
25      continuing to answer the question.
```

Page 31

```
 1                      L. Stewart
 2      A.    I'd like to finish my answer.
 3            As I mentioned in my testimony, I could
 4   read it either way.  I did my report based on a
 5   microscopic examination and I gave my best read
 6   of what it read.
 7      Q.    When I asked you a few minutes ago
 8   whether you remembered whether you used the word
 9   "funded" or "finished" and you said you can't
10   recall -- do you remember saying that to me?
11      A.    Something like that, yes.
12      Q.    Were you lying when you said you
13   couldn't recall it or were you telling the truth?
14      A.    I was telling the truth and you were
15   taking my words out of sequence and so I was
16   trying to answer your question.
17      Q.    Can you tell the Court how you were
18   telling the truth when you said first that you
19   couldn't recall whether you used the word
20   "finished" or "funded" and then several minutes
21   later recalled that you used the word "finished"
22   when you read the words out loud?
23      A.    What I was trying to describe to you
24   and you kept breaking apart was that when I read
25   it initially I told you the words were together,
```

L. Stewart

1  I told you what it appears to read, and then I

2  told you later on in the laboratory I examined it

3  under a microscope and I quoted what it appeared

4  to read there and so we got two different reads

5  based on what I am using my eyes, which are

6  requiring glasses right now, or my microscope in

7  the office.

8  Q.    Let's turn your attention back to your

9  report and direct your attention to the paragraph

10 after paragraph Q2, the paragraph that begins

11 "Additional items."

12         Do you see that on page 12?

13 A.    Yes.

14 Q.    There you write that one of the other

15 items you reviewed is a two-page nonoriginal

16 StreetFax document presented by plaintiff as the

17 smoking gun.

18         Do you see that?

19 A.    Yes.

20 Q.    Is it your professional expert opinion

21 that the StreetFax document is a smoking gun?

22 A.    No.  It was presented to me by

23 plaintiff's attorneys as being referred to as the

24 smoking gun document.

```
 1                    L. Stewart
 2      Q.    And do you have an understanding as to
 3   why it's being referred to as a smoking gun
 4   document?
 5      A.    I was told that your side indicated
 6   that that was the end of the case because it was
 7   a smoking gun and that's why I referred to it as
 8   that.
 9      Q.    Right.
10            But do you have an understanding as to
11   why it is a smoking gun that ends the case?
12      A.    I would say I have an understanding of
13   what your report indicated, yes.
14      Q.    And what is that understanding?
15      A.    I believe it revolved around the two
16   pages having different margins, different fonts,
17   different appearances.
18      Q.    Do you also understand that the
19   StreetFax contract in fact has different language
20   on the first page than appears on the so-called
21   Work For Hire document?
22      A.    Of course it would, yes.
23      Q.    Do you understand the StreetFax
24   contract makes no reference to Facebook?
25      A.    That's right, it's two different
```

                                                    Page 34

1                          L. Stewart

2    documents.

3         Q.    Do you understand that Mr. Ceglia has

4    said under oath in this case in sworn documents

5    that he signed only one contract with

6    Mr. Zuckerberg?

7         A.    No, I don't know that.

8         Q.    You write that the StreetFax contract

9    document was presented by plaintiff as the

10   smoking gun.

11              What do you mean by presented by

12   plaintiff?

13        A.    I received it from our attorneys and it

14   was provided to me as the smoking gun document.

15        Q.    Okay.

16              Let's go to paragraph 325 and 326 of

17   your report, which is page 65.

18              Do you see that?

19        A.    Yes, sir.

20        Q.    You indicate that Mr. LaPorte testified

21   against you in a federal trial and that trial was

22   the 2004 Martha Stewart-Peter Bacanovic trial in

23   the Southern District of New York.

24              Do you see that?

25        A.    No, he did not testify against me in

```
 1                       L. Stewart
 2    that trial.  He testified against me in a perjury
 3    trial that was brought against me subsequent to
 4    that case.
 5        Q.    You are aware that Mr. LaPorte did not
 6    testify in United States versus Martha Stewart?
 7        A.    Right.  That's not what it says there.
 8        Q.    You didn't intend to create the
 9    impression that he testified in the Martha
10    Stewart case; right?
11        A.    No.  He was not involved in the Martha
12    Stewart case.
13        Q.    Sir, throughout your report, for
14    example, in paragraphs 218 and 226, 249, you
15    offer a series of rhetorical questions; am I
16    correct?
17        A.    218 is a question, 224 is a question --
18    I'm sorry, 226 is a question.
19        Q.    And you are aware that they are -- I
20    don't need to go through them all.
21              You are aware you asked a series of
22    rhetorical questions throughout your report;
23    correct?
24        A.    I am sure that I did, yes.
25        Q.    Did you write those questions?
```

Page 36

L. Stewart

1

2        A.    Yes.

3        Q.    And is that what you've done in

4   previous reports rather than rendering a

5   declarative opinion, just posing a rhetorical

6   question?  Have you ever done that before in a

7   report?

8        A.    I don't recall if I have ever had

9   questions in a report before.

10       Q.    You don't answer those questions, do

11  you?

12       A.    Yes, I do.

13       Q.    Can you direct me to any other forensic

14  laboratory report submitted to a court of law in

15  which you have included rhetorical questions?

16       A.    No.

17       Q.    Can you point me to any report submitted

18  by any expert to any court at any time that posed

19  rhetorical questions?

20       A.    I have to answer that in two parts.

21  First I say no.  Secondly, this isn't rhetorical

22  in that I answer the question.  I'm simply posing

23  a question and then answering it.

24       Q.    Why do you chose in this report for the

25  first time in your career to ask questions of

```
 1                      L. Stewart
 2   this sort?
 3       A.    Probably because it's such a long
 4   report and I'm trying to make it readable and so
 5   I'm posing an issue and then answering it and
 6   then going on to the next one.
 7       Q.    In paragraph 406 you state, sir, that
 8   research discloses no reported decision that an
 9   opinion concerning the age of ballpoint ink
10   writing on paper -- dot, dot, dot -- satisfies
11   Daubert's scientific reliability standards.
12            Do you see that?
13       A.    Yes.
14       Q.    And in paragraph 407 you actually cite
15   cases; is that correct?
16       A.    That's correct.
17       Q.    You are not a lawyer, are you, sir?
18       A.    No, sir.
19       Q.    You have never had any formal legal
20   training at an accredited law school?
21       A.    I've taken law classes from a law
22   school, but I have not had any -- I'm not a
23   lawyer.
24       Q.    Do you conduct legal research?
25       A.    No.
```

```
 1                        L. Stewart
 2        Q.    Do you have a Westlaw or Lexis
 3   password?
 4        A.    Yes, a Lexis password.
 5        Q.    You include a few legal citations,
 6   including one to F Supp 2d.
 7              Do you see that?
 8        A.    Yes.
 9        Q.    What does F Supp 2d stand for, sir?
10        A.    I don't know.
11        Q.    You cite an Ohio case from 2003.
12              Do you see that, paragraph 407?
13        A.    Yes.
14        Q.    Is that a state case or a federal case
15   you cited?
16        A.    I don't know.
17        Q.    You know that this case was filed in
18   federal court in New York; correct?
19        A.    Yes.
20        Q.    Do you know whether Ohio law applies to
21   this case or not?
22        A.    I'm not a lawyer, no.
23        Q.    Why did you choose, sir, to cite a case
24   from Ohio in your report?
25        A.    Because those are cases that have been
```

```
1                      L. Stewart
2    involved in previous cases where this issue has
3    come up and those were the citations used there.
4        Q.    And do you usually include the results
5    of your purported legal research in a forensic
6    laboratory report of your findings?
7        A.    If the purpose of my declaration is to
8    answer questions brought on by opposing experts,
9    yes.
10       Q.    In the next paragraph, 408, you quote a
11   legal standard, the Daubert standard; is that
12   right?
13       A.    Yes.
14       Q.    And in the succeeding paragraphs you
15   proceed to assess the ability of PE testing to
16   satisfy Daubert; is that right?
17       A.    I guess you could say it that way.
18       Q.    You've never been certified by any
19   court as a legal expert, have you?
20       A.    No.
21       Q.    You are not qualified to issue expert
22   legal opinions, are you, sir?
23       A.    No.
24       Q.    Is it your testimony that you have
25   cited legal standards and conducted legal
```

```
 1                      L. Stewart
 2    analysis in prior forensic laboratory reports
 3    that you've submitted to courts?
 4         A.    That wasn't my testimony.
 5         Q.    Have you ever done that before this
 6    case?
 7         A.    In a report, no; in a declaration, I
 8    believe so.
 9         Q.    I'm going to leave a line in the
10    transcript for you to indicate which case, which
11    court you submitted a declaration that contains
12    supposed legal analysis.
13         A.    I need to correct you there.  I did not
14    say I did legal analysis.  I'm referring to
15    quoting the case files that were brought into
16    other courts based on consideration for this 2 PE
17    test.
18         Q.    How many reports have you issued during
19    the course of your career as an expert?
20         A.    Thousands.
21         Q.    Is this the first time out of those
22    thousands that you've ever conducted legal
23    analysis such as is presented in paragraphs 410
24    to 440?
25              MR. BOLAND:  Objection.  The witness
```

```
 1                        L. Stewart
 2        has said twice now he is not doing legal
 3        analysis, you keep inserting it in the
 4        question, that's improper.
 5             MR. SNYDER:  That's a speaking
 6        objection, which is improper --
 7             MR. BOLAND:  I am --
 8             MR. SNYDER:  Excuse me, I am in the
 9        middle of speaking, so please don't
10        interrupt me.
11             Under the rules of this court you're
12        not permitted to coach the witness, which is
13        what you just did.
14             MR. BOLAND:  No, I did not.
15             MR. SNYDER:  Excuse me, I'm not done.
16        When I'm done, you can speak.
17             MR. BOLAND:  You were done with that
18        sentence.  I didn't coach him.
19             MR. SNYDER:  Mr. Boland, if you
20        interrupt me again I will get Judge Foschio
21        on the phone, I will read him the transcript
22        and I will ask him to admonish you.
23             Would you like to do that?
24             MR. BOLAND:  Sir, you are asking him
25        leading questions, you are not permitted to
```

1                    L. Stewart

2       do that.

3             MR. SNYDER:  Sir, I am permitted under

4       the Federal Rules of Civil Procedure to

5       conduct this deposition as I see fit

6       pursuant to those rules and pursuant to the

7       local rules.

8             You are permitted only to object as to

9       form, as to privilege, and you are not

10      permitted to coach the witness by

11      suggesting --

12            MR. BOLAND:  And I objected as to form,

13      precisely what you just said, so you can

14      continue when you want.

15            MR. SNYDER:  If you can confine your

16      objection to form, there will be no problem.

17      If you continue to coach the witness we will

18      get the Court on the phone, we will read the

19      questions, we will read your improper

20      coaching to the Court and we will let the

21      Court decide how he wants to deal with the

22      situation.

23            MR. BOLAND:  There's no coaching, you

24      are falsely stating what happened.

25            MR. SNYDER:  The record speaks for

```
 1                    L. Stewart
 2      itself.
 3             MR. BOLAND:  Indeed it does.
 4             MR. SNYDER:  Please refrain from
 5      speaking objections.  This witness is very
 6      experienced in testimony and does not need
 7      your help.
 8 BY MR. SNYDER:
 9      Q.    Sir, during the course of your career
10 and the thousands of reports or more than the
11 thousands of reports that you have submitted have
12 you ever cited Daubert and then purported to
13 assess whether a certain forensic test satisfies
14 Daubert?
15      A.    And as I mentioned before, my
16 recollection is I have done that in declarations
17 but not in a simplified laboratory report.
18      Q.    So I'm going to leave a blank right
19 there in the transcript for you to indicate which
20 court, which case involved a declaration
21 submitted by you that cited Daubert and then
22 purported to assess whether a certain forensic
23 test satisfies Daubert.
24             We are also going to request that you
25 produce copies of those declarations to us.
```

1                          L. Stewart

2    TO BE FURNISHED: _____

3    _____

4         Q.     You don't want to change -- I am going

5    to give you an opportunity now, sir, to reflect

6    on that testimony and is that --

7         A.     No change --

8         Q.     Is that still your testimony?

9         A.     No change is necessary, that's my

10   recollection.

11        Q.     Your report contains 470 paragraphs; is

12   that correct?

13        A.     I don't think the numbers pertain to

14   paragraphs.  I think they were -- in some cases

15   there were multiple paragraphs under one, but it

16   is 470 numbered sections.

17        Q.     Am I correct, sir, that the findings in

18   your November 2011 declaration and your June 2012

19   report are very similar?

20        A.     I don't know how to answer that.  The

21   June report is much more involved, it goes

22   through many of the questions that were left

23   unanswered in the earlier declaration.

24        Q.     Can you tell the Court what additional

25   findings you made between your November 2011

1                          L. Stewart

2    declaration and your June 2012 submissions?

3         A.    We'll have to go through the entire

4    report, we can start doing that.  The additional

5    findings in a nutshell are the responses based on

6    the 500 or so pages of expert reports from your

7    side.

8         Q.    Can you tell the Court with specificity

9    what additional findings you made in the report

10   that were not contained in your declaration?

11        A.    We can start doing that, yes.

12        Q.    Let me withdraw the question and ask --

13   I can save some time.

14              You do in your report, but not in your

15   declaration, talk about Walter Rantanen's

16   findings; correct?

17        A.    Yes.

18        Q.    Those are not your findings, those are

19   findings that he made on which you rely; correct?

20        A.    Yes.

21        Q.    When you reviewed the expert report of

22   Mr. LaPorte am I correct that you did not, after

23   reviewing his report, test the toner again?

24        A.    That's correct, I did not test it

25   again.

1                    L. Stewart

2       Q.    And you didn't test any of the ink

3   again, did you not, to see if you could

4   differentiate any of the inks?

5       A.    I can't say, again, because I never

6   tested the ink chemically.

7       Q.    And you didn't test the opacity of the

8   paper, correct, after reviewing Mr. LaPorte's

9   report?

10      A.    No, I did not.

11      Q.    You didn't observe it under short-,

12  mid- or long-wave ultraviolet; correct?

13      A.    I don't have the documents, I can't do

14  that again.

15      Q.    Well, you said you don't have the

16  documents, but you understand that your client

17  Mr. Ceglia and/or his counsel had the documents;

18  correct?

19      A.    Right.  I did not request to see them

20  again.

21      Q.    You could have requested to see them

22  again, could you have not?

23      A.    I chose not to.

24      Q.    And you also chose not to look at the

25  ink, after Mr. LaPorte submitted his findings,

1                           L. Stewart

2    with a stereo microscope; correct?

3         A.    I did not look at the ink with a stereo

4    microscope after Mr. LaPorte issued his findings,

5    correct.

6         Q.    And when you reviewed the expert report

7    of Mr. Lesnevich you did not go back and review

8    the interlineation again on the original document;

9    correct?

10        A.    No, I believe that's incorrect.  I

11   reviewed the scanned images based on Lesnevich

12   and Romano and then that led to what's in my

13   report.

14        Q.    You didn't perform any overlays with

15   the interlineations from different scans to test

16   his conclusions, did you?

17        A.    The only overlays are based on

18   indentations.  If that's what you are referring

19   to, I did not do that again, no.

20        Q.    And after reviewing Mr. Lesnevich's

21   report, you also didn't view the line quality of

22   the interlineation under a stereo microscope;

23   correct?

24        A.    No, that's incorrect.

25              Again, I looked at the scanned images

```
 1                      L. Stewart
 2    that were taken from those under -- after
 3    Mr. Lesnevich's report.
 4         Q.    Under a stereo microscope?
 5         A.    No.  Again, you would have to have the
 6    original document for that.
 7         Q.    And Mr. Argentieri has access to that
 8    in the safe-deposit box, correct?
 9         A.    Correct, but I did not need that at
10    that point, so I did review it or ask to see it
11    again.
12         Q.    And you didn't go back to the document
13    to test any of Mr. Tytell's conclusions either,
14    did you?
15         A.    I went back to scanned images.  I did
16    not need to go back to the document.
17         Q.    Or Dr. Lyter's, you didn't go back to
18    the document to test his findings either, did
19    you, after reviewing his report?
20         A.    No.  It would have been a waste of
21    time, there was no reason for me to go back to
22    the document.
23         Q.    Did Mr. Blanco review your report
24    before you signed and submitted it to the Court?
25         A.    Yes.
```

```
 1                        L. Stewart
 2        Q.    You say he did a peer review of your
 3   report; correct?
 4        A.    Correct.
 5        Q.    That's the phrase you used, peer
 6   review; correct?
 7        A.    Correct.
 8        Q.    And when did he conduct this so-called
 9   peer review?
10        A.    I believe it was around the last week
11   before I submitted it.
12        Q.    Did he suggest any changes?
13        A.    My recollection is he suggested
14   placement changes but nothing material.
15        Q.    Nothing substantive?
16        A.    No.
17        Q.    Before I get back to the so-called peer
18   review I just want to ask you a couple of
19   questions.
20              When were you first contacted to be
21   involved in this case for Mr. Ceglia?
22        A.    I have submitted it to you, but I
23   believe the first e-mail from Mr. Argentieri was
24   in June of 2011.
25        Q.    When were you retained?
```

```
                                           Page 50
 1                     L. Stewart
 2        A.     It would have been at that time.
 3        Q.     It's your testimony you were retained
 4   in June 2011?
 5        A.     I don't have the first e-mail in my
 6   report here.  I have submitted it to you.  That
 7   would be my first connection with Mr. Argentieri.
 8             In that e-mail he indicates that I'm
 9   being retained, if my recollection is correct.
10        Q.     Do you have a written retainer
11   agreement with Mr. Argentieri or his client?
12        A.     No, I do not.
13        Q.     Who was contacted first, you or
14   Mr. Blanco, do you know?
15        A.     I was.
16        Q.     And then did you recommend Mr. Blanco
17   for the case?
18        A.     Yes, I did.
19        Q.     Are there areas in which you aren't
20   specialized in which Mr. Blanco does not and vice
21   versa?
22        A.     That's a tough question to answer.  We
23   both have different areas that we are probably
24   better in than the other and I suggested him as a
25   person that could assist in this case.
```

```
 1                        L. Stewart
 2        Q.    For what purpose did you recommend him
 3   specifically?
 4        A.    The handwriting and also the staple
 5   issue I thought he would be good at.
 6        Q.    And how much -- what are the financial
 7   terms of your retention with the plaintiff?
 8        A.    Hourly rate, I believe it's $350 an
 9   hour for casework and $450 an hour for
10   depositions, trial.
11        Q.    Is there a contingency fee component to
12   your retention?
13        A.    No.
14        Q.    Have you received any payment for your
15   services?
16        A.    Yes.
17        Q.    Who's written the checks to you?
18        A.    Mr. Argentieri has written some and
19   some came from Mr. Dumain's office.
20        Q.    Did Mr. Ceglia write any of the checks
21   directly to you?
22        A.    No.
23        Q.    And have you rendered invoices?
24        A.    Yes.
25        Q.    And who do you send the invoices to?
```

1                      L. Stewart

2        A.     In the beginning they went to

3    Mr. Argentieri, later on they went to Mr. Lake,

4    then they went to Mr. Dumain and now they go to

5    Mr. Boland.

6        Q.     And is there any bonus or incentive

7    compensation involved in your retention?

8        A.     No.

9                There's a penalty clause if it's not

10   paid within 30 days.

11       Q.     And in your report you talk about being

12   engaged to oversee the forensic examinations on

13   the part of plaintiff's experts; is that correct?

14       A.     Correct.

15       Q.     Did you oversee Dr. Aginsky's

16   examinations?

17       A.     After the fact, yes.

18       Q.     After what fact?

19       A.     He was brought into the investigation

20   earlier on, so I was -- I looked at his report or

21   looked at his, I don't remember if it was a

22   report or e-mails that he sent, something that

23   had his findings on it, so I did review that

24   early on.

25       Q.     Did Mr. Argentieri ever tell you that

```
 1                        L. Stewart
 2     he contacted Mr. LaPorte to work for the
 3     plaintiff at any time?
 4          A.    No, he did not.
 5          Q.    Were you aware before -- are you aware
 6     that Mr. LaPorte was contacted by the plaintiff's
 7     lawyers to work for the plaintiff?
 8          A.    No, I'm not.
 9          Q.    Are you aware when Dr. Aginsky and
10     Mr. Osborn stopped being part of plaintiffs'
11     team?
12          A.    I am not aware that they have stopped.
13          Q.    When was the last time you spoke with
14     them?
15          A.    As I believe I testified earlier, I
16     talked to Mr. Aginsky very early on, it would
17     have been approximately June of 2011, and I don't
18     believe I've talked to him since then.
19          Q.    Why not?
20          A.    Because there was no need for me to
21     talk to him about this case since then.
22          Q.    Is it your sworn testimony that no one
23     has said anything to you one way or the other
24     about whether those two individuals remain
25     plaintiff's experts on this date one way or
```

```
 1                    L. Stewart
 2   another?
 3       A.    That's correct, that's my testimony.
 4       Q.    What about Eric Speckin, have you ever
 5   spoken with him about this case?
 6       A.    Yes.
 7       Q.    In fact, he examined the original
 8   so-called Work For Hire document with you in July
 9   of 2011; correct?
10       A.    Yes.
11       Q.    And do you know why he didn't provide a
12   report?
13       A.    No.  That's between him and Mr. Boland
14   and Mr. Argentieri.
15       Q.    You never spoke to Mr. Speckin about
16   that?
17       A.    Why he did not issue a report, no.
18       Q.    You both took samples from the
19   documents; correct?
20       A.    Yes.
21       Q.    Did he take samples of paper?
22       A.    I don't recall if he took samples of
23   paper.
24       Q.    Did he take samples of ink?
25       A.    I believe he did, yes.
```

1                    L. Stewart

2        Q.    Did he take samples of attorney?

3        A.    I don't recall.

4        Q.    Are you aware of whether he ran any

5    tests on these samples?

6        A.    Yes, he did tests on the samples.

7        Q.    Did he test the paper?

8        A.    I don't know.

9        Q.    Did he test the toner?

10       A.    I don't know.

11       Q.    Did he test the ink?

12       A.    I believe so.

13       Q.    What kind of test did he subject the

14   ink to?

15       A.    I don't know all of the tests that he

16   conducted.  I know he tried to identify the ink.

17       Q.    Do you know what his results of his

18   examination were?

19       A.    It would be best to come from him, but

20   I believe that his results from our phone calls

21   were that it was deteriorated to the point that

22   he could not identify it.

23       Q.    And do you know why he did not issue a

24   written report to that effect?

25       A.    No, I do not.

1                    L. Stewart

2        Q.    But your task was overseeing the

3    plaintiff's examinations; correct?

4        A.    That's correct.

5        Q.    But you're not aware of what tests he

6    conducted or not; right?

7        A.    As I mentioned, he conducted the tests

8    on the ink to see if he could identify it.

9        Q.    But you weren't sure what other tests

10   he conducted?

11       A.    If I can answer that, I will explain

12   why.

13            When you conduct an ink analysis where

14   you are trying to do an identification, many

15   times you have to do exams on the paper as well,

16   so when you ask the question did he examine the

17   paper, I can't answer that other than to assume

18   that he did when he did the identification of the

19   ink.

20       Q.    As the person tasked with overseeing

21   the plaintiff's examinations didn't you

22   coordinate which tests he would be running and

23   which he wouldn't?

24       A.    Yes.  I asked him to identify the ink.

25       Q.    And did you get the samples he took

```
                          L. Stewart
1
2    back?
3         A.    No.
4         Q.    Does he still have them?
5         A.    I don't know.
6         Q.    Let's go back to this concept of peer
7    review.
8               At paragraph 447 you state toward the
9    end of your report that as part of your original
10   tasking on this case you conducted what you call
11   technical review of the work conducted by
12   Mr. Blanco; is that correct?
13        A.    Correct.
14        Q.    And you reviewed his declaration along
15   with the supporting exhibits?
16        A.    Yes.
17        Q.    And you peer-reviewed Mr. Blanco's
18   declaration before or after it was executed?
19        A.    Before.
20        Q.    Did Mr. Blanco himself provide you with
21   the declaration and its exhibits or did someone
22   else?
23        A.    No.  Mr. Blanco did.
24        Q.    So it's your statement here today under
25   oath that you received Mr. Blanco's declaration
```

```
 1                        L. Stewart
 2    and exhibits and reviewed them before it was
 3    submitted?
 4         A.    That's correct.
 5         Q.    So if Mr. Boland represented that
 6    neither he nor Mr. Blanco had sent Mr. Blanco's
 7    declaration and exhibits to anyone, to any
 8    person, that wouldn't be true; correct?
 9         A.    Well, I don't know what you mean by
10    sent.  I reviewed it electronically, I did not
11    review a hard copy.
12         Q.    Who sent it to you electronically?
13         A.    Mr. Blanco.
14         Q.    And that was before he submitted it to
15    the Court; correct?
16         A.    Correct.
17         Q.    Did you provide Mr. Blanco with
18    comments or feedback?
19         A.    Yes, I did.
20         Q.    How did you provide that?
21         A.    By telephone.
22         Q.    Now, am I correct that your specialty
23    is in the chemistry aspects of document
24    examination?
25         A.    That's one of my specialities, yes.
```

                              L. Stewart
1
2        Q.     Do you consider Mr. Blanco to have
3    expertise in that specific discipline gained
4    through his training and experience?
5        A.     Chemical analysis of documents, no.
6        Q.     His specialty is in handwriting and
7    handwriting identification; correct?
8        A.     Among others.
9        Q.     Do you consider yourself to have
10   expertise in that specific discipline, that is
11   handwriting and handwriting identification gained
12   through documented training and experience?
13       A.     Yes.
14       Q.     With whom did you do your two-year
15   apprenticeship in handwriting as required
16   specifically for that discipline?
17       A.     There was never a two-year training in
18   handwriting, there was a two-year training in
19   document examination, and it included all aspects,
20   that was done between 1982 and 1984 for me.
21       Q.     When was the last time you were
22   certified as an expert in handwriting analysis?
23       A.     I have never been certified as an
24   expert in solely handwriting analysis.  I have
25   been certified as an expert in examination of

```
                                        Page 60
 1                       L. Stewart
 2    questioned documents by the Secret Service and I
 3    have been proficiency tested in handwriting
 4    analysis by outside proficiency groups as
 5    recently as last October.
 6         Q.    So no court has ever admitted you as an
 7    expert to provide handwriting identification
 8    analysis; correct?
 9         A.    No, that's not true.
10         Q.    What court has done that?
11         A.    A few courts have done that.  I don't
12    have that information in front of me.
13         Q.    For actual handwriting identification
14    analysis?
15         A.    Yes.
16         Q.    I'll leave a blank in the transcript
17    for you to provide that information.
18    TO BE FURNISHED: _____
19    _____
20              MR. SNYDER:  Let's take a five-minute
21         break.  I think we have been going, and the
22         tape is about an hour and 10 minutes or so.
23              Let's just take a five-minute bathroom
24         break.
25              THE VIDEOGRAPHER:  Going off the
```

```
 1                      L. Stewart
 2         record.  The time is 11:01.  This ends tape
 3         number 1.
 4              (Recess taken.)
 5              THE VIDEOGRAPHER:  We are back on the
 6         record.  The time is 11:25.  This is tape
 7         number 2.
 8              MR. SNYDER:  I'm going to mark as
 9         Exhibit 15 a printout that we just made off
10         of the Internet during the break.
11              (Defendants' Exhibit 15, two-page
12         printout from Internet of blancostewart.com
13         Web site, marked for identification, as of
14         this date.)
15    BY MR. SNYDER:
16         Q.    Do you see that?
17         A.    Yes, I do.
18         Q.    What is this?
19         A.    This is what you were referring to
20    before, it's a test that Blanco and I did to make
21    a Web page and advertise our new D.C. office.
22         Q.    Are you aware that this remains visible
23    and searchable on the Internet today?
24         A.    I'm sure it does.  Everything stays on
25    the Web.
```

Page 62

                          L. Stewart
1
2        Q.    Well, are you aware that this is an
3    active Web site, www.blancostewart.com?
4        A.    I am not aware that it's active.  I
5    haven't paid to keep it up, so I don't know what
6    the status is of it.
7        Q.    And can you read what is written under
8    the word "Home"?
9        A.    "Blanco and Stewart have joined forces
10   to provide even more comprehensive forensic
11   document examination services."
12       Q.    Is that a true statement?
13       A.    We joined an office together in D.C.,
14   yes.
15       Q.    Is this a true statement?
16       A.    It's a true statement that we joined
17   together, we got an office together.  We have
18   never shared resources, we have never shared a
19   case as far as financially and we are not on each
20   other's payroll.
21       Q.    Is there anything inaccurate about this
22   statement that is present on the Web site
23   blancostewart.com?
24       A.    You are showing me one page.
25             As far as that one sentence goes, no,

```
 1                      L. Stewart
 2   that was accurate at the time.
 3            I would personally take the Web page
 4   down if I knew that I could do that.
 5      Q.    Have you personally taken any steps to
 6   learn if you could take the page down?
 7      A.    I don't know if it is still up.
 8      Q.    I am representing to you that we just
 9   printed this out at 11:15 a.m.
10      A.    And as you asked me before to believe
11   in me, I guess I will believe in you.
12            You know, whether it's on the Web or
13   not is different than whether it's accurate or
14   not.
15      Q.    I'm not going to ask you to believe me.
16            Can you please look at the date stamp
17   on the bottom of this page?
18      A.    I see the date stamp.  As you are aware
19   from computer forensics, date stamps mean
20   nothing, but --
21      Q.    Date stamps mean nothing?
22      A.    Yes.
23      Q.    Is it your testimony that this date
24   stamp here means nothing?
25      A.    My testimony is that date stamps on
```

```
 1                    L. Stewart
 2   computers can be manipulated.
 3        Q.    Do you have any basis to believe that
 4   the date stamp on this document was manipulated
 5   this morning?
 6        A.    No.  You asked me to believe you, so
 7   I'm believing you.
 8        Q.    I'm not asking you to believe me.
 9              Look at this document, and what does
10   the document say?
11        A.    It has typed at the bottom
12   http://www.blancostewart.com, and it has the date
13   7/11/2012 11:15:03 a.m.
14        Q.    And what steps, if any, have you taken,
15   sir, to remove the Blanco & Stewart Web site from
16   the Internet?
17        A.    I haven't taken any to remove it and I
18   haven't taken any to initiate it.  It's not my
19   Web page.
20        Q.    You are Mr. Stewart, are you not?
21        A.    Yes, it is, and as I mentioned before,
22   Mr. Blanco and I created an initial Web page to
23   advertise our D.C. office and that's what this
24   was for.  I have not paid for it, I don't know
25   what the status is of it and I have not gotten
```

```
 1                      L. Stewart
 2   any business from this advertisement.
 3        Q.    Am I correct, sir, that you have not
 4   taken any specialized courses in your area of
 5   expertise for 12 years?
 6        A.    No.
 7        Q.    Let me show you what we'll mark as
 8   Exhibit 16.
 9              Before I mark it, you submitted a copy
10   of your resume or CV to us, did you not?
11        A.    That's correct.
12        Q.    And that was complete and accurate?
13        A.    At the time it was.
14              (Defendants' Exhibit 16, curriculum
15        vitae of Larry F. Stewart, marked for
16        identification, as of this date.)
17        Q.    Here you go, 16.
18              Do you recognize this to be your CV?
19        A.    It appears to be, yes.
20        Q.    And do you see where you list
21   specialized courses?
22        A.    Yes.
23        Q.    And do you see that you don't have any
24   listed since 2000?
25        A.    That's right, I do not have them listed
```

```
 1                      L. Stewart
 2    on this document since 2000.
 3         Q.    So can you tell the Court why you
 4    omitted any courses that you've taken in the past
 5    12 years?
 6         A.    This document would be voluminous if I
 7    had everything listed.
 8               I have included in there all of the
 9    course work that was pertinent to me getting
10    certified and getting my expertise.  Since then
11    I've done continuing education, I've done a
12    number of things that are not listed on there.
13         Q.    What was your security clearance with
14    the United States Secret Service?
15         A.    It was -- it varied through the years,
16    it was a few steps above top secret.
17         Q.    And you retired in 2005; is that
18    correct?
19         A.    Yes.
20         Q.    And that was after your 2004 perjury
21    trial; correct?
22         A.    2005 is after 2004, correct.
23         Q.    Do you think that I asked you whether
24    2005 was after 2004?
25         A.    I believe so, because the two were two
```

```
                            L. Stewart
 1
 2   separate events, but yes.
 3            MR. SNYDER:  Can you please read back
 4       the last question.
 5       Q.    Because that wasn't my question.  I
 6   want to make sure you answer my question.
 7            (Record read.)
 8       Q.    You answered 2005 is after 2004.
 9       A.    Correct, it is.
10       Q.    You retired from the Secret Service
11   after you were indicted and tried for perjury;
12   correct?
13       A.    And found not guilty, yes.
14       Q.    You were acquitted; correct?
15       A.    I was found not guilty and that's also
16   called acquittal.
17       Q.    You left the Secret Service because you
18   had a mutual a disagreement with the Secret
19   Service about the way they handled the Martha
20   Stewart matter; is that correct?
21       A.    That's largely it, yes.
22       Q.    And you also were accused of sexual
23   harassment of a Secret Service employee; correct?
24       A.    By the same person that shown to have
25   lied in the Martha Stewart case, yes, and that
```

```
 1                    L. Stewart
 2   accusation was shown to be a lie and she was
 3   actually reprimanded for that.
 4       Q.    And you were accused to have kissed
 5   her; correct?
 6       A.    Right, which was all retracted and she
 7   was reprimanded.
 8       Q.    She was shown to have lied.
 9             Did the jury in the trial against you
10   make a finding that she lied?
11       A.    No.  I am basing it on the evidence
12   that was presented at the trial.
13       Q.    So your opinion is she was shown to
14   have lied?
15       A.    I know she was shown to have lied
16   because I was there when she was retracted and I
17   was there when she was reprimanded and I was
18   part of her year-long reprimand.
19       Q.    And did you lose your security
20   clearance before you retired, sir?
21       A.    Of course, that has to be removed when
22   you are retired.
23       Q.    Before you retired -- I didn't ask your
24   retirement -- did you lose your security
25   clearance?
```

1                        L. Stewart

2        A.    No.  It would have happened at the same

3    date that I retired.

4        Q.    Are you sure?

5        A.    Yes.

6        Q.    Are you aware that a federal employee

7    security clearance is immediately removed if that

8    employee is arrested for a federal crime related

9    to his or her employment?

10       A.    No, I'm not aware of that.

11       Q.    Is it your sworn testimony that after

12   you were arrested on the criminal complaint filed

13   by David Essex and Steve Pekin and signed by

14   David Kelly that you continued to enjoy a

15   security clearance?

16       A.    I don't know that I enjoyed it.  It's

17   my understanding that the security clearance was

18   maintained until I retired in June of 2005.

19       Q.    And you didn't conduct any casework or

20   review any reports during the pendency of those

21   charges; correct?

22       A.    No.  I never went back into the office

23   after the accusation.

24       Q.    Now let's talk a moment about your

25   publications and presentations.

1                    L. Stewart

2              Let's talk about the prestigious

3     journals and organizations where you published or

4     presented prior to 2004.

5              For instance, you had presented

6     articles a couple of times at the American

7     Academy of Forensic Science meetings; correct?

8        A.    Yes.

9        Q.    And you presented to another esteemed

10    professional organization, the Mid-Atlantic

11    Association of Forensic Scientists; correct?

12       A.    Yes, I have.

13       Q.    You haven't presented to the American

14    Academy of Forensic Sciences since 1996; correct?

15       A.    That appears to be correct, yes.

16       Q.    And you haven't presented to the

17    Mid-Atlantic Association of Forensic Scientists

18    since 1991, 21 years ago; correct?

19       A.    No.  I believe there was one in 1993,

20    according to this.

21       Q.    Okay.

22              Since 1993, 19 years ago; correct?

23       A.    I believe that was the last time, yes.

24       Q.    And you previously presented to the

25    American Society of Questioned Document Examiners;

1                           L. Stewart

2    correct?

3         A.    Yes.

4         Q.    And you haven't presented to them in a

5    decade; correct?

6         A.    Yes.

7         Q.    And you also published in the Journal

8    of Forensic Scientists in the 1980s and early

9    1990s; correct?

10        A.    It's called the Journal of Forensic

11   Sciences, plural, and the last publication with

12   them appears to be 1992.

13        Q.    And am I correct, sir, that you say

14   that you are a fellow of the American Academy of

15   Forensic Sciences right now?

16        A.    Yes.

17        Q.    And you've been a member since 1982?

18        A.    I don't know.

19        Q.    When was the last time you attended an

20   annual meeting of the American Academy of

21   Forensic Sciences?

22        A.    I don't know.

23        Q.    Do you receive their newsletter?

24        A.    Yes.

25        Q.    Are you aware that the American Academy

```
 1                        L. Stewart
 2    of Forensic Sciences ethics committee in 2008
 3    found clear and convincing evidence that
 4    Mr. Blanco submitted an erroneous and misleading
 5    report and violated the code of ethics by
 6    knowingly misrepresenting data?
 7         A.    I'm aware that they brought that
 8    forward and it was vacated.
 9         Q.    Are you aware that after the ethics
10    committee made this finding it recommended to the
11    board of directors that he be expelled from the
12    academy?
13         A.    I'm aware of that and then it was
14    vacated.
15         Q.    Are you aware that in September of 2008
16    the board of directors unanimously accepted the
17    recommendation of the ethics committee and
18    expelled your office mate Mr. Blanco?
19         A.    He's not my office mate and I'm aware
20    that they made that accusation, they came to that
21    decision, he was not present, and it's been
22    vacated since then.
23         Q.    Are you aware that Mr. Blanco appealed
24    his expulsion to the entire membership?
25         A.    I believe that he did, yes.
```

1                    L. Stewart

2       Q.    And are you aware that his expulsion

3    was not reversed by the entire membership when

4    that was brought to it?

5       A.    Until such point as it was vacated.

6       Q.    Did you attend the meeting in Denver,

7    Colorado in February of 2009 when Mr. Blanco's

8    expulsion was taken up by the academy at its

9    annual business meeting?

10      A.    No, I did not.

11      Q.    Did you vote one way or another?

12      A.    No, I did not.

13      Q.    And the membership didn't overrule his

14   expulsion; correct?

15      A.    Until he was vacated.

16            I don't understand your question.  It

17   was vacated.

18      Q.    Do you recall that Mr. Blanco sued the

19   academy?

20      A.    Yes.

21      Q.    And do you recall that the settlement

22   agreement that he signed provided that they would

23   vacate the expulsion, but that he would resign

24   and never apply for membership again?

25      A.    I believe that was the terms, yes.

```
1                    L. Stewart
2      Q.    And while the expulsion was vacated,
3   are you aware that the ethics committee finding
4   was not vacated?
5      A.    No, I am not aware of that.
6      Q.    Do you have any basis, sir, to render
7   an opinion one way or another as to whether
8   Mr. Blanco violated the academy's code of ethics
9   by submitting an erroneous and misleading report
10  to be used in the judicial process?
11     A.    I am not involved in that matter, so
12  I'm not in a position to discuss it.
13     Q.    So you have no information one way or
14  another as to whether he did or didn't submit an
15  erroneous and misleading report?
16     A.    Only the fact that they vacated it and
17  that's enough for me.
18     Q.    But you conducted no examination of the
19  facts and circumstances to determine whether the
20  ethics committee finding was accurate?
21     A.    It would not have been proper for me to
22  do that, no.
23     Q.    Did you ever ask Mr. Blanco about it?
24     A.    We've discussed it.
25     Q.    And what did he say?
```

1                        L. Stewart

2        A.      That he was in the right and that he

3    was happy that they vacated it.

4        Q.      When deciding to recommend Mr. Blanco

5    to the attorneys for Mr. Ceglia did you take into

6    account that an organization that is highly

7    reputable ethics committee found that Mr. Blanco

8    knowingly misrepresented data?

9        A.      And then reversed it.

10               It was a wash to me, so, no, I did not

11   take that into account.

12       Q.      What is the American College of

13   Forensic Examiners?

14       A.      It's believed to be the largest

15   forensic organization in the world right now, it

16   has over 20,000 members.

17       Q.      And you say in your achievement section

18   of your resume that you are a certified forensic

19   consultant; is that right?

20       A.      That's correct.

21       Q.      Did you have to take an exam to be a

22   member of that college?

23       A.      To be a member, no.  To be certified,

24   yes.

25       Q.      And are you aware, sir, of an

1                    L. Stewart

2   article -- I'm sure you've been shown this in

3   prior depositions -- how a graduate student with

4   no background in forensics became certified as a

5   forensics consultant by just paying $495 and

6   registering online and taking 90 minutes of video

7   instruction and answering a hundred multiple

8   choice questions?

9            You know what I'm talking about; right?

10       A.    Yes.   It comes up in every deposition

11   that Mr. LaPorte's on the other side of and it

12   follows with a document that was produced by the

13   American college by their legal team answering

14   that question.   I brought it with me, if you'd

15   like to see it.

16       Q.    I have the article.

17            You think Mr. LaPorte is responsible

18   for the question I just asked you?

19       A.    It comes up every time he's on the

20   other side, yes.

21       Q.    So this question is present, appears in

22   prior deposition transcripts?

23       A.    Yes.

24       Q.    So anyone who had a deposition

25   transcript for a prior case where Mr. LaPorte was

```
 1                    L. Stewart
 2   on the other side would see this question;
 3   correct?
 4       A.     That would be the hard way to do it.
 5   Since you've hired him, I assume you got it done
 6   the easy way.
 7       Q.     Do you have a personal animus towards
 8   Mr. LaPorte?
 9       A.     I don't really know him as a person, so
10   I would say no.
11       Q.     Is it your sworn testimony that you
12   have no negative feelings toward Mr. LaPorte?
13       A.     That's not my testimony.  I do not -- I
14   didn't say that.
15       Q.     Well, what feelings do you have about
16   Mr. LaPorte?
17       A.     I meant personally.
18              As far as business related I believe
19   that he has shown not to be trustworthy, he's
20   shown that he changes his mind, he testifies one
21   way and then a different way, depending upon
22   which side of a case he's on, and I picture him
23   as a person who just wants to win a case as
24   opposed to do what's morally correct.
25       Q.     He's still a member of the United
```

```
 1                    L. Stewart
 2  States Secret Service, is he not?
 3       A.    No, he's not, he doesn't work for the
 4  United States Secret Service anymore.
 5       Q.    United States Department of Justice?
 6       A.    Yes.
 7       Q.    Are you aware that a cat, feline
 8  animal, house cat became certified by this
 9  organization that you have said is the largest
10  organization of forensic examiners in the world?
11       A.    Yes.  I'm aware early on in the
12  organization that somebody misrepresented
13  themselves, filled out a false application and
14  applied for membership and that also's been
15  addressed by the organization and it was in the
16  early years, nothing like that's ever happened
17  since then.
18       Q.    You know that for a fact?
19       A.    I actually queried them after the last
20  time Mr. LaPorte brought this up and I received
21  documents from their legal team that I told you I
22  would give you if you wanted.
23       Q.    Sir, you're certainly aware that the
24  American Bar Association Journal among many
25  others has criticized the ACFE as a certification
```

```
1                    L. Stewart
2   mill?  You know that; right?
3       A.    I know they did that early on.  In the
4   organization now, in the past number of years
5   that's not been the accusation.
6       Q.    Are you aware that in April 2012
7   articles appeared criticizing this so-called
8   college of forensic examiners as a mill?
9       A.    I am not aware of an article in 2012.
10      Q.    So you are proud to be a member of this
11  organization?
12      A.    I would say I'm proud to be a member of
13  an organization because I believe that the
14  organization is built on its people and if
15  they've got good people they become a good
16  organization.
17            I'm aware of other organizations that
18  haven't gotten that type of press that you are
19  referring to and they have very bad people
20  working under those organizations in some cases,
21  so it's not the organization, it's the people
22  within them.
23      Q.    And what's the academy?
24      A.    Oh, my board of directors?
25            That was an organization that had the
```

```
 1                        L. Stewart
 2    idea of creating a school for private
 3    investigators and it has, it's still in the
 4    creation stage, it has never taken off.
 5         Q.    And just to be clear, you are not
 6    intending to mislead anyone into thinking that
 7    you are on the board of directors of the American
 8    Academy of the Forensic Sciences?
 9         A.    No.  If I was, I would say that there.
10    It says the academy.
11         Q.    Right.
12               And have you ever been to the office or
13    physical headquarters of the academy?
14         A.    Yes, I have.
15         Q.    When was your last board meeting?
16         A.    It's been a couple of years.  They
17    pretty much are trying to regroup at this point,
18    they are almost broke.
19         Q.    Who are the members of the board right
20    now?
21         A.    Bill Copeland is the head of the board.
22               As far as active members, I don't know.
23    I know that they were in a situation where some
24    people weren't going to be involved with it
25    anymore, so I don't know who is active anymore.
```

1                      L. Stewart

2        Q.     So the academy hasn't started any

3   classes yet, to your knowledge?

4        A.     I believe they had a few a few years

5   back, but they haven't had any recently.  They

6   still are trying to create books and create the

7   academy and sell the idea.

8        Q.     I saw on the books portion of the

9   academy's Web site that they include your books

10  "Document Examination" and "Identity Theft" in

11  their list of proprietary textbooks.

12       A.     Yes, sir.

13       Q.     And are those the same books you list

14  on your resume as published by A-Z Publishing?

15       A.     Yes, they are.

16       Q.     If I wanted to buy your books, could I

17  buy them on amazon.com?

18       A.     I don't know.  I doubt it.

19       Q.     Would it surprise you to learn that

20  they are not available on amazon.com?

21       A.     No.

22       Q.     Would it surprise you to learn that

23  they can't be found and purchased by searching

24  Google for the books?

25       A.     It's my understanding they are

                        L. Stewart

1

2   available through the academy and I know that I

3   have them available and I have sold them myself

4   before, but I don't believe it's on any Web site

5   like Google or -- it's not being advertised that

6   way.

7        Q.    Are you aware the books are not in the

8   Library of Congress?

9        A.    Well, they have a number.  They should

10  be in the Library of Congress.

11       Q.    Are you aware that A-Z Literary Book

12  Publisher's registration is no longer active?

13       A.    No, I am not aware of that.

14       Q.    Would it surprise you to learn that we

15  tried to contact A-Z Literary Book Publishing's

16  principal and could not find a working phone

17  number?

18       A.    That would not surprise me.  They

19  published in 2009, this is 2012.

20       Q.    Are you aware that the academy doesn't

21  even have a link that allows you to purchase the

22  books on their Web site?

23       A.    No, I'm not aware of that.

24       Q.    So where can I get these books other

25  than from you?

1                    L. Stewart

2        A.    It is my understanding the academy or

3    myself.

4        Q.    How would I contact the academy if I

5    wanted to?

6        A.    I assume you would go to their Web site

7    and contact Bill Copeland, I assume it is still

8    active.

9        Q.    Are you aware -- would it surprise you

10   to learn that the academy's Web site lists a

11   number and if you call that number you get a cell

12   phone of a man who has nothing to do with the

13   academy?

14       A.    Your question is would it surprise me?

15       Q.    Yes.

16       A.    I don't know if that's the case or not.

17       Q.    Why do you think that would be the

18   case?

19       A.    Maybe they've changed phone numbers.  I

20   don't know.

21       Q.    Is the academy a real business?

22       A.    It was when I was there.  I don't know

23   what the status is right now.

24       Q.    So assuming you can't get the books

25   from the academy because apparently it's closed

```
 1                    L. Stewart
 2   for business, is it a fact that you can only get
 3   the books from you?
 4       A.    No.  I can give you Mr. Copeland's
 5   phone number, if you'd like, and I'm not sure
 6   that the academy is defunct; it's my understanding
 7   it's still in business.
 8       Q.    Can you give us Mr. Copeland's phone
 9   number, please.
10       A.    Yes, I can provide it to you.  If you
11   want to give me a blank, I can fill it in.
12   TO BE FURNISHED: _____
13   _____.
14       Q.    Have you published a single scientific
15   article in a single academic journal since 2004?
16       A.    Yes.
17       Q.    Tell us what you've published, what
18   scientific article you have published in an
19   academic journal.
20       A.    I don't know what you are referring to
21   as an academic journal.
22              I have published "Forensic Science -
23   Fake Fingerprints" in the Forensic Expert Witness
24   Association, I published -- that was in 2007.
25              I published "Leveling the Playing
```

```
                              L. Stewart
 1
 2    Field" --
 3        Q.    Sir, my question was an academic
 4    journal, not an online publication in an experts'
 5    directory.
 6        A.    Academic journal is kind of an
 7    oxymoron, I don't know what you mean by that.
 8        Q.    You don't know what I mean by academic
 9    journal?
10              What would you regard as an academic
11    journal?
12        A.    A peer-reviewed publication that has
13    our peers in it and all of these that I am
14    mentioning are those.
15        Q.    Is it your testimony that the online
16    publication where you published "Forensic Science
17    - Fake Fingerprints" is a peer-reviewed academic
18    journal?
19        A.    Yes, of course it is.
20        Q.    All right.
21              Now let's go to the Martha Stewart case.
22              Did you get in any trouble at all for
23    your testimony in the Martha Stewart case?
24        A.    That was asked in a previous LaPorte
25    trial.
```

1                      L. Stewart

2              It depends on what you refer to as

3    trouble.  I was accused of something I did not

4    do, so if you call that trouble, then yes.

5              (Defendants' Exhibit 17, excerpt from

6         trial transcript in Vanderbilt Mortgage

7         case, marked for identification, as of this

8         date.)

9         Q.    Let me hand you what we will mark as

10   Exhibit 17.

11             The first page of this has the trial

12   caption for the Vanderbilt Mortgage case; correct?

13        A.    That's correct.

14        Q.    And it has the date November 15, 2010;

15   correct?

16        A.    That's correct.

17        Q.    And that was the day you testified in

18   that case; correct?

19        A.    I don't know, I'd have to refer to my

20   testimony list.

21        Q.    So this is a copy of your trial

22   transcript, or it appears to be, does it not?

23        A.    I assume my transcript is quite a bit

24   longer than that, but it's a few pages of it.

25        Q.    All right.

```
 1                    L. Stewart

 2            Let me direct your attention to page

 3   291 and ask you to please read out loud the

 4   question at line 18 and your answer at line 20.

 5       A.     "And isn't it true that your testimony

 6   in the Martha Stewart trial got you in trouble;

 7   correct?"

 8            And my answer was "No, I would not say

 9   that."

10       Q.     So were you telling the truth on line

11   20 when you testified "No, I would not say that"?

12       A.     Of course I am, and it's what I just

13   mentioned to you, it depends on what you call

14   trouble.

15            I was accused of something I did not do

16   and, again, this was another LaPorte trial and he

17   brought this out and we talked about it and

18   discussed it.

19       Q.     And the fact is, after you testified

20   that you hadn't gotten into trouble in the

21   Vanderbilt case, the United States district judge

22   admonished you in open court, did she not?

23       A.     She made a statement in open court

24   which we then responded to and cleared everything

25   up.
```

                              L. Stewart

1

2      Q.    In fact, you recanted your testimony

3  the next day claiming that you hadn't understood

4  the question; isn't that right?

5      A.    I don't know exactly what I said.  I

6  repeated what I just told you, which is I was

7  accused of something and I was wrongly accused.

8  I don't consider that getting in trouble, I

9  consider that being accused of something and

10  showing that it wasn't accurate.

11     Q.    Now, in the Martha Stewart case you

12  were a witness for the Government; correct?

13     A.    Yes.

14     Q.    And that's when you were the lab

15  director at the Secret Service; correct?

16     A.    And chief forensic scientist, yes.

17     Q.    And you testified for the Government

18  regarding some ink analysis relevant to the case;

19  correct?

20     A.    Among other things, yes.

21     Q.    And do you recall that the trial

22  occurred in approximately February 2004?

23     A.    Yes.

24     Q.    And do you recall that you testified on

25  two different dates?

1                    L. Stewart

2    A.    Yes.

3    Q.    And you testified that you had

4  personally participated in the forensic document

5  examination of the worksheet listing Martha

6  Stewart's stock holdings on which Peter Bacanovic

7  made a notation; correct?

8    A.    I don't know if I said Peter Bacanovic

9  made the notation; it was a document where he

10  purportedly made the notations, yes.

11    Q.    And on rebuttal did defense counsel ask

12  you about your familiarity with a book proposal;

13  correct?

14    A.    That's correct.

15    Q.    And that book proposal was by

16  Mr. LaPorte and Anthony Cantu, Tony Cantu?

17    A.    That's correct.

18    Q.    And at the time of that question on

19  February 25th, 2004 you were aware of that book

20  proposal; correct?

21    A.    No, and that's not what I answered.

22  That was one of the accusations that was shown to

23  be false in the case, that was something that

24  Mr. LaPorte accused me of and that's what started

25  part of the investigation.

```
 1                    L. Stewart
 2       Q.    And following the Martha Stewart trial
 3   where you testified, as we discussed, you were
 4   charged criminally with false declarations before
 5   the Court otherwise known as perjury; correct?
 6       A.    And found not guilty, yes.
 7       Q.    We'll stipulate that you were found not
 8   guilty, that's a historic fact.
 9             Now, at the time the prosecutors -- the
10   prosecutors met with you the day before they
11   charged you, did they not?
12       A.    No.
13             Prosecutors were in a separate room
14   with an unknown-to-me video link and heard me
15   discussing matters with Secret Service
16   investigators, that they'd never met with me that
17   day, they had an unknown-to-me link into the room
18   and then charged me after they heard what I said.
19       Q.    And is it your sworn testimony that at
20   the time you were charged there was a threat of a
21   wrongful prosecution suit from Martha Stewart and
22   Peter Bacanovic?
23       A.    For two billion dollars.
24       Q.    And it's your testimony that that
25   wrongful prosecution suit threat existed at the
```

```
 1                       L. Stewart
 2   time you were charged?
 3       A.    That's my understanding, yes.
 4       Q.    Can you point to a single piece of
 5   evidence anywhere, sir, that at the time you were
 6   charged there was a threat of a wrongful
 7   prosecution suit from Martha Stewart and Peter
 8   Bacanovic?
 9       A.    I don't know what you mean by evidence.
10   It's something that came out in my preparation
11   for my defense that my lawyers found out.
12       Q.    Are you aware of a single news article
13   or other public disclosure of a threat of
14   wrongful prosecution from Martha Stewart or Peter
15   Bacanovic prior to the time you were charged?
16       A.    My lawyers told me that there were, but
17   at the time I did not read them.
18       Q.    In fact, it was five months after the
19   Martha Stewart trial that you were charged with
20   perjury; correct?
21       A.    Just before they were sentenced, yes.
22       Q.    That's what you say in your affidavit,
23   correct, that it was five months?
24             In fact it was only three months after
25   your testimony; correct?
```

```
                                              Page 92
 1                      L. Stewart
 2      A.    If you are saying that I testified in
 3   February, I don't recall the exact date.  It
 4   would have been the beginning of February, if it
 5   was February, and so it would have been three and
 6   a half, almost four months.
 7            MR. SNYDER:  I just need to take a
 8        two-minute break.  You can stay here or you
 9        can go out.  I need to clarify something.
10            THE VIDEOGRAPHER:  Going off the
11        record.  The time is 12 o'clock.
12            (Recess taken.)
13            THE VIDEOGRAPHER:  We are back on the
14        record.  The time is 12:02.
15   BY MR. SNYDER:
16      Q.    Sir, you were charged based on a
17   criminal complaint filed on May 21st, 2004;
18   correct?
19      A.    I don't know the date; that sounds
20   approximately right.
21      Q.    And are you aware that the Government
22   disclosed the criminal charges against you to the
23   Court in the Martha Stewart case on that same day?
24      A.    No, I'm not aware of what day they did
25   that.
```

Page 93

1                    L. Stewart
2        Q.    Are you aware of a letter that Karen
3    Patton Seymour from the United States Attorney's
4    office sent to Judge Chin disclosing the perjury
5    charge?  Have you ever seen that letter?
6        A.    Yes, I have.
7        Q.    And you are aware that in that letter
8    the Government reveals that they became aware of
9    the facts leading up to the criminal complaint a
10   week prior, on May 14th, from Miss Fortunato?
11       A.    I am not aware of those dates, no.
12       Q.    Let me show you what we will mark as
13   Defendants' Exhibit 18, which is the letter from
14   the Government.
15            (Defendants' Exhibit 18, letter dated
16        May 21, 2004 from U.S. Attorney David N.
17        Kelly, marked for identification, as of this
18        date.)
19       Q.    Does this refresh your recollection,
20   sir, about the sequence of events, namely that
21   the Government notified the Court on May 21st,
22   the day you were charged, of the facts and
23   circumstances leading up to your arrest?
24       A.    It doesn't refresh my recollection.
25   It's a letter by one side of an upcoming matter

Page 94

1                         L. Stewart

2    and so it shows their description of what they

3    believed happened.

4         Q.    And the indictment that followed the

5    complaint charged you with having lied about

6    personally having conducted the ink testing and

7    about being familiar with the book proposal;

8    correct?

9         A.    That's correct.

10        Q.    Let's turn to your report, which is

11   Exhibit 13 in this case, and let me direct your

12   attention to paragraph 327.

13        A.    Yes.

14        Q.    On page 65.

15              You have four paragraphs that you

16   describe what you say happened leading up to your

17   charges, paragraphs 327 to 330; correct?

18        A.    I count more than that, but we can talk

19   about those four if you like.

20        Q.    All right.

21              In these paragraphs that I have

22   highlighted you start by informing the Court of

23   the idea that there was a threat of a

24   multibillion-dollar suit against the Government,

25   correct, and you say nearly five months after

```
 1                      L. Stewart
 2    Martha Stewart and Peter Bacanovic were found
 3    guilty; correct?
 4         A.    That's right.  The --
 5         Q.    And the paragraphs that follow describe
 6    you being questioned about the issues underlying
 7    the charges and your being charged; correct?
 8         A.    That's correct.
 9         Q.    So the point of your reference to the
10    wrongful prosecution suit threat was to imply to
11    the Court that the threat somehow was the cause
12    of your being questioned and ultimately charged;
13    is that right?
14         A.    No.  My point was to indicate
15    everything I was aware of in case it was a
16    contributing cause; I don't know if it was or
17    not.
18         Q.    You would agree that if a threat of a
19    multibillion-dollar suit against the Government
20    didn't occur until after you were charged then
21    such a threat could not be a contributing factor
22    to your arrest?
23              You'd agree with that; correct?
24         A.    No, because I'm not aware that that's
25    what happened.  It's my understanding that it was
```

```
 1                          L. Stewart
 2    before that and it was prior to Martha Stewart
 3    and Peter Bacanovic being sentenced, which
 4    happened, I believe, right after this.
 5         Q.    When do you believe they were sentenced?
 6         A.    I don't know.  It's on the Internet.
 7    It's either late May or -- it's when they were
 8    supposed to be sentenced.
 9         Q.    You mentioned five months in paragraph
10    327.
11              That's incorrect, is it not?
12              In fact, you were charged in May of
13    2004, only three months after your February 2004
14    testimony; correct?
15         A.    As I've testified, I believe it was the
16    beginning of February for one and the end of May
17    for the other, so without checking the dates it's
18    probably more like four months.
19         Q.    Well, it certainly wasn't five months;
20    correct?
21         A.    Since my testimony, no, it was not five
22    months.
23         Q.    Let's turn to what you say actually
24    happened.
25              You mentioned that there was this
```

```
 1                         L. Stewart
 2      threat, then you say in paragraph 328 "I was
 3      questioned about my knowledge of the subject."
 4              What subject?
 5      A.      The prior paragraph where it talks
 6      about the suit and the Government -- against the
 7      Government for wrongful prosecution based in part
 8      on the notoriety of the accused.
 9      Q.      Who questioned you?
10      A.      The Secret Service investigators.
11      Q.      And when was that?
12      A.      That was the days leading up to the
13      arrest.
14      Q.      So it's your sworn testimony that the
15      days leading up to your arrest U.S. Secret
16      Service agents questioned you about the
17      multimillion-dollar suit threat?
18      A.      In part, yes.  It was an inspection
19      being done based on the accusations from
20      Mr. LaPorte and Ms. Fortunato and they were
21      questioning me about a number of things.
22      Q.      And your testimony here today is that
23      those Secret Service agents actually questioned
24      you about a multimillion-dollar threat of a suit?
25      A.      No.  You have to read what's in the
```

                        L. Stewart

1                       L. Stewart
2    paragraph there; they questioned me about my
3    knowledge of that.
4         Q.    Knowledge of a threatened lawsuit?
5         A.    No.   Knowledge of the subject.   It's in
6    328, I was questioned about my knowledge of the
7    subject.
8         Q.    You testified a few minutes ago, just
9    within the past two minutes, that one of the
10   things the Secret Service questioned you about
11   was your knowledge of a threat of a lawsuit?
12        A.    That's right.   Once I brought it up to
13   them that I was aware of that, they questioned me
14   about it, they actually brought up some things
15   pertinent to that and then they discussed it with
16   me and that is at the time when I believe the
17   prosecutors were listening in, and part of my
18   testimony at that time concerned firsthand
19   information that I heard in the prosecutor's
20   office from the chief prosecutor, and that was
21   disclosed at that time, that's what I mean by
22   knowledge of the subject.
23        Q.    When you say you provided firsthand
24   information regarding a meeting in the
25   prosecutor's office, what information did you

```
 1                    L. Stewart
 2    have regarding a meeting in the prosecutor's
 3    office?
 4              THE WITNESS:  Maybe you and I should
 5         talk about this, Dean.  I don't know what I
 6         can talk about here.
 7              MR. BOLAND:  Can you just repeat the
 8         question, Mr. Snyder, so I can determine if
 9         there is an objection for privilege?  I
10         don't know what he's talking about.
11         Q.   In paragraph 328 you say "I was
12    questioned about my knowledge of the subject."
13              Who questioned you?
14         A.   Secret Service investigators.
15         Q.   And you said provided firsthand
16    information regarding a meeting in the
17    prosecutor's office during which the chief
18    prosecutor disclosed pertinent case background
19    information.
20              Who was the prosecutor you are
21    referring to?
22         A.   It was the chief prosecutor in the
23    Martha Stewart trial, I don't remember her name.
24         Q.   At this time I want to remind
25    Mr. Boland and the witness of Judge Foschio's
```

```
1                    L. Stewart
2    particular rules governing depositions in his
3    court.  Rule 1, if you need clarification, a
4    definition or explanation of any words, questions
5    or documents throughout this deposition you are
6    to ask me as deposing counsel rather than your
7    own counsel.
8            Do you understand that?
9       A.   Yes, I do.
10      Q.   You and the plaintiff's counsel may not
11   engage in private conversation during the
12   deposition or any breaks except to determine
13   whether to assert a privilege.
14           Do you understand that?
15      A.   Yes.
16      Q.   Thank you.
17           Now, who was the chief prosecutor in
18   the Martha Stewart trial?
19      A.   I don't recall her name, it's in the
20   Internet and it's in my documents back in the
21   office.
22      Q.   Was it Karen Patton Seymour?
23      A.   That sounds right.
24      Q.   What firsthand information regarding a
25   meeting in Ms. Seymour's office did you provide
```

                          L. Stewart

 1

 2    during the questioning that you refer to in

 3    paragraph 328?

 4        A.    I don't know that I am allowed to

 5    disclose that to you, that's why I was asking for

 6    a break to discuss it.

 7        Q.    Was Ms. Patton Seymour your lawyer?

 8        A.    No.

 9        Q.    Did you sign a confidentiality

10    agreement in connection with that interview?

11        A.    I don't believe so, no.

12        Q.    And at the time you were being

13    questioned as a subject or target of a criminal

14    investigation; correct?

15        A.    No.  At the time of the meeting I was

16    preparing for the Martha Stewart trial.

17        Q.    Certainly, fine, all right.

18            So can you please tell the Court what

19    pertinent case background information are you

20    referring to in paragraph 328?

21        A.    I will try.

22            Leading up to the Martha Stewart trial

23    there were four or five independent meetings that

24    I attended for, in the preparation of the case

25    and trial preparation, those were -- began in, I

1                       L. Stewart

2    believe, late December 2003 and went right up to

3    the trial date.  In one of those meetings -- I

4    believe it was the fourth one, if I'm not

5    mistaken -- there were the chief prosecutor

6    present, there were two attorneys from the office

7    present, there was myself, another Secret Service

8    representative and two FBI agents along -- and I

9    believe I began by saying the chief prosecutor.

10              During that meeting she received a

11   phone call that she took out in the open in front

12   of all of us, she seemed openly excited about the

13   phone call.  At the end of the call she looked at

14   the group of us and she said, I'm so happy that

15   we are taking this case involving Martha Stewart

16   to trial, we need to send a message to the

17   American people that this kind of thing would not

18   be allowed.

19              So as far as that was pertinent to the

20   question at hand in front of me as to whether or

21   not there was some kind of a prosecution based on

22   the notoriety of the people, I felt it was

23   important for me to tell that to the

24   investigators, and unbeknownst to me the

25   prosecution team was listening in on the

```
 1                      L. Stewart
 2    conversation.
 3         Q.    Sir, we established that you were
 4    charged on May 1st, 2004; correct?
 5         A.    That's what you said, yes.
 6         Q.    And you had gone to the prosecutor's
 7    office the day before that on May 20th; correct?
 8         A.    No.
 9         Q.    Secret Service offices the day before?
10         A.    That's correct.
11         Q.    And you were also interviewed the
12    previous day, on May 19th; correct?
13         A.    I believe the previous two days.
14         Q.    Right.
15               And during those days of interview in
16    fact you told the Secret Service that you did not
17    conduct any actual tests in connection with the
18    investigation of Peter Bacanovic and Martha
19    Stewart; isn't that correct?
20         A.    That, that's not correct.
21         Q.    And did you tell the agents that you
22    didn't get involved with the making of the TLC
23    plates?
24         A.    No, that's not correct.
25         Q.    Did you tell the investigators, the
```

1                    L. Stewart

2    agents, that your only involvement was looking at

3    the final test results?

4        A.    No.  I believe you're breaking up the

5    segments of what I discussed with them and you're

6    misinterpreting it.

7        Q.    Did you tell the interviewing agents

8    that you were not aware of the book proposal

9    before it was shown to you on the witness stand

10   during the trial?

11       A.    Correct.  I was not aware of the book

12   proposal, but that's not the question that was

13   posed to me on the stand.

14       Q.    In paragraph 333 you claim in your

15   report submitted in this case that it was made

16   clear to the jury that I had, in fact, testified

17   truthfully.  I was completely exonerated at the

18   trial and found not guilty.

19            Did I read that correctly?

20       A.    That sounds right.

21       Q.    And you were a law enforcement officer

22   for over 26 years; is that correct?

23       A.    No.  I was never a law enforcement

24   officer.

25       Q.    You were an employee of the United

                              L. Stewart
1
2    States Government for over 26 years?
3         A.     I was credited with 27 as commissioned.
4         Q.     You had substantial exposure to the
5    legal system, correct, during that career?
6         A.     Yes.
7         Q.     And you are aware that a finding of not
8    guilty can mean that the Government has not
9    sustained its burden of proof on each element
10   beyond a reason doubt, aren't you?
11        A.     I am aware of that and I am also aware
12   that I am not guilty in this matter, so whether
13   it's an acquittal or not guilty, I am not guilty.
14        Q.     You are aware that a not guilty verdict
15   doesn't mean that the jury found that you
16   testified truthfully at the trial, are you not?
17        A.     I did not testify at the trial, so --
18        Q.     I'm sorry, the Martha Stewart trial.
19               In other words, the jury finding of not
20   guilty isn't a finding that you testified
21   truthfully at the Martha Stewart trial; correct?
22        A.     I believe it is.
23        Q.     Are you aware that a perjury conviction
24   requires a finding of materiality, sir?
25        A.     No, I'm not aware of that law.

                        L. Stewart

1

2       Q.    Are you aware that a perjury conviction

3   requires a finding that the testimony at issue

4   was actually material to the proceedings?

5       A.    I'm not aware of a law, I just know

6   that I did not lie in that case.

7       Q.    Moving to paragraph 334, you also

8   asserted that based on the California case People

9   versus Williams arrests which do not result in

10  convictions are inadmissible either as proof of

11  guilt or for impeachment.

12          Do you see that?

13      A.    Yes, I do.

14      Q.    Did you research that law yourself?

15      A.    No.  That's come out in previous cases

16  where Mr. LaPorte has brought this up.

17      Q.    Who told you about People versus

18  Williams?

19      A.    No one's told me about it, it's just

20  been cited in previous cases.

21      Q.    Where did you get that citation from to

22  insert in your report?

23      A.    From lawyers that have been involved in

24  previous cases where Mr. LaPorte's been on the

25  other side.

                            L. Stewart

1

2      Q.    Are you aware that the Williams case

3   applies to those who have been criminally

4   charged -- are you aware that this case has

5   nothing to do with expert witnesses and whether

6   they can or cannot be impeached?

7      A.    I am not aware of the case.

8      Q.    Why do you put it in your report if you

9   are not aware of it?

10      A.    As assistance to the trier of fact.

11      Q.    But you have no idea what this case

12   actually stands for, do you?

13      A.    I don't believe it's my job to know the

14   law.  I just put it in there because it's been

15   cited before in matters that Mr. LaPorte has

16   brought up concerning the same subject.

17      Q.    So you put a case citation in your

18   report even though you have no idea what the case

19   means; is that correct?

20      A.    No, it's not correct.

21      Q.    Tell the Court what People versus

22   Williams stands for, what legal proposition.

23      A.    It's my understanding from lawyers in

24   the case that it showed that you are not allowed

25   to bring into court information concerning a

```
 1                    L. Stewart
 2   matter that was -- that someone was found not
 3   guilty of.
 4        Q.    When you come to court as an expert
 5   witness your credibility is very much at issue,
 6   isn't it?
 7        A.    Always.
 8        Q.    So if you lied in a prior proceeding or
 9   lied here earlier today in the deposition, you'd
10   agree that that would be relevant to a fact
11   finder in assessing your credibility as an expert?
12        A.    Yes.
13        Q.    And it's certainly relevant for the
14   Court's assessment of your credibility to know
15   that you were charged of perjury and then
16   acquitted; isn't it?
17        A.    I don't know.  To me, what's been
18   presented to me in the past is that the law says
19   it can't be brought up to the Court, but that's
20   for you guys to decide.
21        Q.    Mr. LaPorte's here in this conference
22   room, is he not?
23        A.    Yes, he is.
24        Q.    And you've accused him several times --
25   I'm using your word -- of engineering perjury
```

```
 1                       L. Stewart
 2   charges against you?
 3       A.    I never used the word "engineer."
 4       Q.    Or behind perjury charges in some way?
 5       A.    I don't know that I've accused him.  I
 6   have stated what I understand to be the fact.
 7       Q.    Do you believe that Mr. LaPorte was
 8   behind the bringing of criminal charges against
 9   you?
10       A.    I was told that he was in part behind
11   it, yes.
12       Q.    Who told you that?
13       A.    Lawyers that were preparing for my case.
14       Q.    And do you know what facts or evidence
15   they based that assertion on?
16       A.    Grand jury testimony and individual
17   interviews.
18       Q.    Are you aware that Mr. LaPorte never
19   met with prosecutors prior to your being charged?
20       A.    I don't know who she met with prior to
21   me being charged.
22       Q.    Can you tell the Court every factual
23   basis you have to accuse Mr. LaPorte of being
24   behind the criminal charges that the United
25   States Government brought against you?
```

1                    L. Stewart

2       A.    Well, first, I did not say he was

3   behind it, I said he was a contributor, and I was

4   told that by lawyers that were preparing for the

5   case.

6       Q.    And did the lawyers tell you what facts

7   or evidence, if any, they were basing that

8   assertion on?

9       A.    Grand jury testimony and interviews

10  with the inspection team with people like

11  Mr. LaPorte.

12      Q.    Is there any other time other than the

13  Martha Stewart case in which you have been

14  accused of testifying falsely?

15      A.    Yes.  The case in Germany involving

16  Ivan the Terrible, his real name was John

17  Demjanjuk, D-e-m-j-a-n-j-u-k.

18      Q.    Prosecutors in Munich opened an

19  investigation into allegations of perjury against

20  you; correct?

21      A.    Yes, they did.  The judge found it to

22  be not credible and dismissed it.

23      Q.    When did that happen?

24      A.    When I testified in the case, it's in

25  the list of testimony.

                              L. Stewart

1
2      Q.     And was there a written decision by the
3  Court in --
4      A.     Yes.  I brought that if you'd like to
5  see it.
6      Q.     Your counsel can provide that to us
7  later.
8      A.     I've also brought that up every other
9  time Mr. LaPorte has brought this up and offered
10  it and it's never been accepted.
11      Q.     And now am I correct, sir, that there
12  are times when you have been excluded by courts
13  and not permitted to testify as an expert?
14      A.     That's brought up every time against
15  Mr. LaPorte as well.
16      Q.     I'm going to move to strike all of
17  those gratuitous references.  I understand you've
18  got this animus here, but pretty much every time
19  I ask you a question you mention Mr. LaPorte.  I
20  am not asking you about Mr. LaPorte.
21          We'll stipulate that you don't like him
22  and that you think that all of my questions were
23  supplied by him and whatever else concerning
24  Mr. LaPorte you want to stipulate, us to
25  stipulate to concerning your attitudes about him,

1                     L. Stewart

2    but just I'd ask that you not answer all of my

3    questions with references to Mr. LaPorte, it just

4    delays things.

5              MR. BOLAND:  Objection.

6         A.    I'm just simply trying to explain it to

7    the trier of fact as to what's going on here.

8              I would think, as a witness in these

9    kind of cases, that things that have been done

10   before would be part of a playbook and we could

11   cut through a lot of this, but I will certainly

12   discuss it all, and to correct one thing that you

13   said, I do not have any animosity against

14   Mr. LaPorte as far as an individual, I don't know

15   him that well, I'm talking about him as a

16   forensic scientist.

17        Q.    Let's talk about the Lake Forest case,

18   okay, sir?  You recall that?  It was just two

19   years ago; right?

20        A.    I believe so.

21        Q.    In that case the Court found the method

22   you used didn't meet the Frye standard; correct?

23        A.    That's after I testified in the case

24   they decided that the method did not meet it.

25              Your question earlier was have I been

1                         L. Stewart

2    excluded.

3              No.  I testified in that case, they

4    decided that they did not want to use that aspect

5    of the testimony, they allowed the other aspects

6    of the testimony in.

7         Q.    Didn't the Court say that your

8    testimony not only didn't meet the Frye standard,

9    but that it didn't meet any basic scientific

10   principles studied by the Court?  Wasn't that the

11   Court's finding?

12        A.    That's what they said about one aspect

13   of the analysis, yes.

14        Q.    And as to that aspect of your analysis

15   the Court found that your testimony was to

16   inconclusive as to be useless; correct?

17        A.    I imagine they did.  They excluded that

18   part of the analysis.

19        Q.    And that wasn't the only time that a

20   court excluded a part of your analysis, was it?

21        A.    To my knowledge, it is.

22        Q.    Let's talk about the case in British

23   Columbia, Ellson versus Ellson.

24              Do you remember that case?

25        A.    Yes.

1                        L. Stewart

2        Q.     You were retained by the defendants who

3    alleged that numerous documents were forgeries;

4    correct?

5        A.     I don't remember if I was retained by

6    the defendants or who.  I was retained by

7    Mr. Ellson.

8        Q.     And do you remember the Court rejecting

9    your handwriting analysis that certain signatures

10   were forgeries?

11       A.     No, I don't recall that.

12       Q.     Do you recall the Court noting that in

13   some instances you made a finding of forgery with

14   respect to signatures that the defendants

15   themselves confirmed were their authentic

16   signatures?

17       A.     No, I'm not aware of that.

18       Q.     Are you aware of any criticism --

19              MR. SNYDER:  Withdrawn.

20       Q.     Are you aware of any findings of the

21   court in the British Columbia case where your

22   testimony was rejected?

23       A.     No.  I testified in the case and I'm

24   not aware of the findings after the fact.

25       Q.     You're not aware of them or you don't

```
 1                    L. Stewart
 2  recall them?
 3      A.    I am not aware of them, I have never
 4  been told what the findings were.
 5      Q.    Are you familiar with the protective
 6  order in this case?
 7      A.    No.
 8      Q.    No one ever told you about it?
 9      A.    No.
10      Q.    Do you know what a protective order is?
11      A.    Yes.
12      Q.    Do you know whether you have complied
13  with the protective order in this case with
14  respect to your role as an expert witness?
15      A.    I've never signed a protective order,
16  but had I signed one I believe I have complied
17  with the protective order.
18      Q.    Well, but not knowing its terms you
19  can't tell this court one way or another whether
20  you are in compliance with the protective order?
21      A.    No.  I was trying to elaborate and you
22  cut me off.
23            Understanding what a typical protective
24  order is and understanding what this case is
25  about, I have not disclosed information to anyone
```

```
 1                    L. Stewart
 2   outside of the lawyers in the case, so I believe
 3   I would have complied with a typical protective
 4   order, but I have not signed a protective order
 5   in this case.
 6       Q.    Did Mr. Lake ask you to sign Exhibit A
 7   to the protective order in this case?
 8       A.    I don't believe so.  I could be
 9   mistaken.  I don't recall signing anything with
10   Mr. Lake.
11       Q.    Did anyone at the Milberg firm ask you
12   to sign Exhibit A to the protective order?
13       A.    No.
14       Q.    Did anyone at Mr. Argentieri's office,
15   including Mr. Argentieri, ask you to sign Exhibit
16   A to the protective order?
17       A.    Not that I recall, no.
18       Q.    Did Mr. Boland?
19       A.    No.
20       Q.    Did Mr. Ceglia?
21       A.    No.
22       Q.    Are you familiar with the July 1, 2011
23   hard copy document inspection protocol in this
24   case?
25       A.    I don't know if it was titled that, but
```

1                         L. Stewart

2      I'm familiar with a document where it dictated

3      what we could do.

4          Q.    And you are aware that that document

5      governed the forensic examination of the

6      so-called original Work For Hire document;

7      correct?

8          A.    Yes.

9          Q.    Did you play any role in drafting the

10     language for that order?

11         A.    I don't recall.

12             MR. SNYDER:  Let me mark as Exhibit 19

13         what in the case docket is document number

14         84, which is the hard copy document

15         inspection protocol.

16             (Defendants' Exhibit 19, hard copy

17         document inspection protocol, marked for

18         identification, as of this date.)

19         Q.    I ask if this is the protocol we have

20     been discussing.

21         A.    I believe that's the document I

22     referred to.

23         Q.    When did you first see this document?

24         A.    I assume sometime between July 1st,

25     2011 and July 15th.  It was filed on July 1st and

```
 1                      L. Stewart
 2    the examination was on the 15th.
 3        Q.    And you were not present at the
 4    inspection on July 13th, were you?
 5        A.    No, I was not.
 6        Q.    And you were not present on July 14th,
 7    were you?
 8        A.    I'll have to refer to my dates, they've
 9    been provided to you already, but I was present
10    in Buffalo for part of the examination time there
11    and then my examination occurred in Chicago
12    beginning on the 15th.
13              I'm sorry, not the 15th.  I need to
14    refer to my notes.
15        Q.    You were there on the 16th, just that's
16    when you were there.
17              So you are aware that examination
18    occurred on the 13th and 14th?
19              I'm sorry.
20              The examination occurred on July 14th
21    and 15th and you were not present for either of
22    those days; correct?
23        A.    I would believe I was there at the last
24    day of examination in Buffalo.
25        Q.    And did plaintiff's counsel ask you to
```

                          L. Stewart

1  be present at the inspection on July 14th or 15th?

2     A.    They asked me to coordinate someone

3  being there and I coordinated with Mr. Blanco to

4  be there in the beginning and me to be there at

5  the end.

6     Q.    And why weren't you present at the

7  beginning of this important examination if you

8  are overseeing the experts?

9     A.    Because it would be redundant and a

10 waste of money for us.

11    Q.    And is it your sworn testimony that you

12 told the attorneys to have Mr. Blanco present on

13 July 14th, the first day of the inspection?

14    A.    No.  I asked him to be there for the

15 first day of the inspection, but I understand

16 there was a reason that he couldn't be there and

17 so he wasn't able to get there until a little bit

18 later on.

19    Q.    What were you doing on July 14th, 2011?

20    A.    I don't recall.

21    Q.    Were you working on another case?

22    A.    Probably.

23    Q.    Do you know what case you were working

24 on?

1                          L. Stewart

2          A.     No.

3          Q.     Do you have a calendar or any record

4    that would tell you what you were doing on July

5    14th that prevented you from being present at the

6    inspection?

7          A.     I have to answer that in two ways.

8                 Yes, I have a calendar that would say

9    what I was working on, I do maintain a large

10   number of cases, and secondly, I chose not to be

11   there at the beginning of the examination because

12   of redundancy and I chose to come towards the end

13   of the examination.

14         Q.     So you knew the inspections would begin

15   on July 14th; correct?

16         A.     Yes.

17         Q.     And you knew that no expert from the

18   plaintiff's side would be present that day?

19         A.     No.  I was not aware Mr. Blanco could

20   not be there that day until later on.

21         Q.     When did you learn that Mr. Blanco

22   wouldn't be able to be present on the first day?

23         A.     I recall it being something like the

24   day before, but I don't know.

25         Q.     Did you make any effort to have any

                              L. Stewart

1
2    other expert attend?

3         A.    No.  If my -- if I was told that the

4    day before, it wouldn't have been possible

5    without a private jet to get here in time.

6         Q.    Did you ask to delay it so that someone

7    from the plaintiff's expert team could be

8    present?

9         A.    No.  I thought it was fine for him to

10   be there.  I knew it was being videotaped and I

11   thought it was fine for him to come in a little

12   bit late.

13        Q.    Were you aware there would be two

14   experts inspecting the hard copy documents

15   produced by plaintiff on that first day?

16        A.    Yes, I believe it was.

17        Q.    And were you aware those experts were

18   Peter Tytell and Frank Romano?

19        A.    Yes.

20        Q.    And you were familiar with both

21   Mr. Tytell and Mr. Romano as experts prior to

22   July of 2011; correct?

23        A.    I'm very familiar with Mr. Tytell.

24   Mr. Romano is not a forensic document expert.

25        Q.    You have respect for Mr. Tytell as an

1                    L. Stewart

2    experienced expert, do you not?

3         A.    I have a great deal of respect for

4    Mr. Tytell.

5         Q.    And you were not familiar with

6    Professor Romano prior to July of 2011?

7         A.    Oh, I am familiar with him.  He was

8    part of Rochester Institute of Technology, he was

9    part of classes that I produced for the school

10   and he took over some of those classes after I

11   left, so I'm familiar with him, but he is not a

12   forensic documents expert.

13        Q.    He is a highly regarded expert in his

14   field, though, is he not?

15        A.    On printing methods, yes.

16        Q.    Were you aware that on the second day

17   of inspection, July 15th, Gus Lesnevich would

18   conduct an examination of the questioned

19   documents; correct?

20        A.    Yes.

21        Q.    And Gus Lesnevich is widely regarded as

22   one of the leading handwriting experts in the

23   world; correct?

24        A.    I don't know what you mean by widely.

25   He is regarded as a forensic document expert.

1                     L. Stewart

2          Q.    Sir, you know, do you not, that Gus

3     Lesnevich is regarded widely in the expert

4     community as one of the top handwriting experts

5     around?

6               MR. BOLAND:  Objection.

7          A.    I will try to answer your question a

8     different way.

9               I know of instances where he's regarded

10    and I know of instances where he's not, and so

11    when you say highly regarded, that is your

12    adjective, not mine.

13         Q.    Are you aware that the United States

14    Government over the past two decades has often

15    retained Gus Lesnevich as their primary

16    handwriting expert in their most important high

17    profile cases?  Are you aware of that, sir?

18         A.    As a private citizen I would be

19    surprised, but no, I am not aware of that.

20         Q.    Are you aware that in important cases

21    involving terrorism and potential attacks against

22    the United States of America the Government hires

23    Mr. Lesnevich as their handwriting expert?

24         A.    As a private citizen, I'd be very

25    surprised, but no, I am not aware of that.

1                    L. Stewart

2        Q.    Do you have respect for Mr. Lesnevich

3   as a handwriting expert?

4        A.    I don't know him, I only know of cases

5   he has been involved in and, as I said, there are

6   some that he is respected on and some that I

7   understand he's not.

8        Q.    And which do you understand he's not

9   respected on?

10       A.    I don't have citations for you, I just

11   know the field is a fairly small field and I know

12   of things that have been said in the past.

13       Q.    You are comfortable making that

14   statement --

15            MR. SNYDER:   Withdrawn.

16       Q.    Are you comfortable making a

17   disparaging statement about Mr. Lesnevich's

18   expertise without having a single fact to back

19   that up?

20       A.    What I'm comfortable with is removing

21   your adjective highly when you describe him as

22   being respected.  I don't know that, I don't know

23   him that well, I only know what I've heard.

24       Q.    Tell the Court every fact or piece of

25   evidence that you have to support the notion that

```
 1                      L. Stewart
 2   Mr. Lesnevich is not respected as one of the
 3   leading handwriting experts in the world.
 4       A.    First, I never said he was not
 5   respected; secondly, I don't have facts, I only
 6   have what I have been told.
 7       Q.    Who told you?
 8       A.    Over the years I've heard things at
 9   meetings, I've heard things from people that used
10   to work with him in government agencies.  I don't
11   have names and instances with me.  Again, I don't
12   know the man.
13       Q.    So tell me who at any meeting ever said
14   a negative word about Mr. Lesnevich.
15       A.    I can't give you names and meetings at
16   this point.  Even if you leave a blank, I don't
17   know if I can give it to you.
18             I was answering your question which is
19   a broad question about whether he's highly
20   respected.  I answered it the best that I can.
21   If you want specifics, I have to step back and
22   say that I don't know the man.
23       Q.    Have you heard it being said about
24   Mr. Lesnevich that he is one of the leading
25   handwriting experts in the world?
```

1                          L. Stewart

2        A.    I've heard you say it.

3        Q.    Have you heard anyone else say it?

4        A.    No, I have not.

5        Q.    Who would you regard, sir, as the

6    leading handwriting experts in the world?

7              Names, please.

8        A.    It depends on if you are talking about

9    with the Government or in private practice.

10       Q.    Let's start with private practice.

11       A.    I respect Mr. Tytell as a handwriting

12   expert, I respect Mr. Blanco as a handwriting

13   expert, they are both in private practice.

14       Q.    Do you respect Mr. Lesnevich as a

15   handwriting expert?

16       A.    Again, I don't know him as a

17   handwriting expert.

18       Q.    Others besides Mr. Tytell and

19   Mr. Blanco, two experts in this case?

20       A.    That I respect in the private field,

21   not as much as those two, no.

22       Q.    And in the Government, what handwriting

23   experts do you respect?

24       A.    People that have -- let me break it

25   down to people that have retired from the

1                   L. Stewart

2    Government first.  Dave Crown, ex-CIA postal

3    service, and John Hargett, ex-Secret Service; Ed

4    Alford, ex-Secret Service, I respect all of those

5    guys.

6            As far as people that are currently

7    within the Federal Government, I believe Richard

8    Dusak is still with the Secret Service, I respect

9    him as a handwriting expert.

10       Q.    Have any of the individuals you've

11   mentioned as worthy of your respect as

12   handwriting experts ever made a single

13   disparaging comment about Gus Lesnevich's skills

14   as an expert?

15       A.    My recollection is yes, but I cannot

16   give you a specific statement, I can only tell

17   you that my recollection is that Mr. Hargett,

18   John Hargett did not have a great deal of respect

19   for Mr. Lesnevich.

20       Q.    All right.

21            And what do you base that on?

22       A.    Conversations that he's had with me.

23       Q.    When was the last time you discussed

24   with Lesnevich with this individual?

25       A.    This would have been many years back.

```
 1                    L. Stewart
 2      Q.    So if we called Mr. Hargett on the
 3   phone and speak with him, do you think he'll
 4   remember that conversation?
 5      A.    I doubt he would bring it into a case
 6   like this and discuss it with you without being
 7   subpoenaed, but I don't know if he would remember
 8   it or not.  You are asking me for my recollection,
 9   not his.
10      Q.    You are aware, are you not, that none
11   of the plaintiff's experts were present for the
12   hard copy inspection on July 14, 2011?
13      A.    I would have to check our notes, but I
14   believe that Mr. Blanco showed up late in the day
15   on the 14th.
16      Q.    And what do you base that on?
17      A.    What I believe the notes were, but,
18   again, I don't have that in front of me.
19      Q.    What notes are you referring to?
20      A.    We would have to look at his report
21   where it says when he first got there.
22      Q.    Are you aware that on the third day of
23   inspection Mr. LaPorte was scheduled to conduct
24   an examination of the questioned documents?
25      A.    A physical examination, not a chemical
```

```
 1                         L. Stewart
 2    one, I believe that's correct.
 3         Q.    And you consider Mr. LaPorte to be a
 4    respectable forensic scientist, do you not?
 5         A.    You've asked me not to disparage him.
 6         Q.    Well, I am asking you a simple question.
 7         A.    No, I don't believe he is a respectable
 8    forensic scientist.
 9         Q.    Let me mark what we will say is
10    Defendants' 20.
11              And I did not ask you not to disparage
12    him, you are free to testify as you see fit.  I
13    am not in charge of your testimony, I'm just
14    asking questions.
15              (Defendants' Exhibit 20, excerpt from
16        transcript of deposition of Larry Stewart
17        held on March 15, 2010, marked for
18        identification, as of this date.)
19         Q.    This is a -- do you recall testifying
20    again in Florida in March of 2010?
21         A.    Not really, but I recall the case.
22         Q.    All right.
23              So let's -- you certainly testified as
24    an expert in the Lake Forest Master Community
25    case against Orlando Lake Forest Joint Venture;
```

```
 1                     L. Stewart
 2    correct?
 3         A.    Yes.
 4         Q.    And this was just a little over two
 5    years ago; correct?
 6         A.    That's correct.
 7         Q.    And let's direct your attention to page
 8    67 of the transcript, and line 14 is a question
 9    and then your answer under oath is at line 16.
10              Can you read the question and answer,
11    please.
12         A.    Do you -- I'm sorry, it does not start
13    with the, that's me.
14              I states "Do you consider Mr. LaPorte
15    to be a respectable forensic scientist?."
16              My answer is "Yes, sir, I believe so."
17              That was then, this is now.
18         Q.    Are you aware that on the fourth day of
19    inspection, July 19, 2011, Dr. Al Lyter would
20    examine the questioned documents?
21         A.    Yes.
22         Q.    And you have respect for Dr. Lyter as a
23    forensic examiner, do you not?
24         A.    Yes, I greatly respect him.
25         Q.    And you didn't observe any observations
```

1                        L. Stewart

2      until July 16th, correct, when you observed

3      Mr. LaPorte conduct his exam?

4          A.     Again, I'd have to check the dates.  I

5      was there for Mr. LaPorte and Mr. Lyter, I

6      believe, at the beginning and also in Chicago.

7          Q.     You did not observe in person the

8      examination of Peter Tytell, did you?

9          A.     No, I did not.

10         Q.     And you did not observe Frank Romano's

11     or Mr. Lesnevich's examinations, did you?

12         A.     No, I did not.

13         Q.     You did not observe in person the

14     documents presented for inspection until July

15     16th, the day you were there; right?

16         A.     If that's the first day I was there,

17     yes.

18         Q.     And the first time you saw the Work For

19     Hire document, the original, was on July 16,

20     2011; correct?

21         A.     That's what you're telling me without

22     me referring to my notes, I believe you.

23         Q.     Now, did you speak with Mr. Blanco

24     after he viewed the Work For Hire document on the

25     afternoon of July 15th and before you attended

```
 1                    L. Stewart
 2    the inspection on the morning of July 16th?
 3         A.    I don't remember.
 4              MR. SNYDER:  The tape is over, so we're
 5         going to need to take a break.
 6              THE VIDEOGRAPHER:  Going off the
 7         record.  The time is 12:45.  This ends tape 2.
 8              (Discussion off the record.)
 9              THE VIDEOGRAPHER:  We are back on the
10         record.  This is still tape number 2.
11              MR. SNYDER:  Off the record during the
12         break I offered the witness and his lawyer
13         the opportunity to have lunch whenever they
14         wanted to at their pleasure and discretion.
15              Mr. Stewart off the record said that's
16         fine as long as we're done at 5:30.
17              I just want to make clear that we have
18         seven hours to complete this deposition,
19         that is seven hours of testimony, and it's
20         highly unlikely we will be done by 5:30.  If
21         we can be done, that would be wonderful, but
22         this deposition is not ending at 5:30 if we
23         have not completed what we need to complete
24         and the seven hours hasn't elapsed, so I
25         just want to make that clear.  If anyone has
```

1                    L. Stewart

2      a problem with that, they should speak up

3      now.

4           MR. BOLAND:  I agree with you about the

5      seven-hour rule, Mr. Snyder.  I would just

6      note that we've had two breaks already this

7      morning that your side indicated would be

8      approximately five minutes and one went a

9      half hour and one went 15 minutes, and

10     myself and the witness, while you were out

11     and one of your representatives, I don't

12     know if it was a summer associate or

13     individuals in the back was here, we sat

14     here that entire time except for probably a

15     three-minute break to the bathroom and we

16     assumed it would be a five-minute bathroom

17     break, so we were present and ready for this

18     deposition to continue and the calculation

19     of the seven hours I think in all fairness

20     shouldn't count the decision of your side at

21     your discretion to leave the room for longer

22     than it takes to go 50 feet down the hall to

23     the bathroom and spend a half hour or 40

24     minutes doing whatever you're doing and then

25     expect that the deposition is essentially

```
 1                      L. Stewart
 2        suspended while my client and I sit here and
 3        wait.
 4             So I do respect everyone's need for
 5        bathroom breaks, et cetera, but the
 6        seven-hour calculation, in all fairness,
 7        should go relative to a few breaks here and
 8        there being taken out of that calculation,
 9        it should continue marching on unless my
10        client I have excused ourselves for a half
11        hour or 45 minutes or whatever for whatever
12        purpose.
13             MR. SNYDER:  We disagree.  Thank you.
14             THE WITNESS:  I would like to say that
15        I don't have any problem continuing through
16        lunch as well if it's a time problem for
17        you.  I have brought snacks and I'm fine to
18        continue.
19             MR. BOLAND:  And I'm prepared to
20        continue as well.
21             THE VIDEOGRAPHER:  Going off the
22        record.  The time is 12:48.  This ends tape 2.
23             (Recess taken.)
24             THE VIDEOGRAPHER:  We are back on the
25        record.  The time is 12:58.  This is tape
```

```
 1                     L. Stewart
 2        number 3.
 3             MR. SNYDER:  I will mark as Defendants'
 4        21 a document entitled "STREET FAX."
 5             (Defendants' Exhibit 21, two-page
 6        document entitled "STREET FAX" dated April
 7        28, 2003, marked for identification, as of
 8        this date.)
 9   BY MR. SNYDER:
10        Q.    Are you familiar with this document?
11        A.    Yes, I am.
12        Q.    What is it?
13        A.    A two-page contract bearing the title
14   "STREET FAX" bearing the date of April 28, 2003.
15        Q.    And do you know where this document was
16   found?
17        A.    No.
18        Q.    Did you ever ask anyone about this
19   document?
20        A.    Did I ask about it?
21              No.
22        Q.    You are aware that this is the document
23   that defendants contend is the authentic contract
24   between Mr. Zuckerberg and Mr. Ceglia; correct?
25        A.    Yes.
```

1                    L. Stewart

2      Q.    When did you first see this document?

3      A.    I don't know if I first saw it in

4  Buffalo or if I first saw it by way of a scanned

5  image prior to that, but it was around that time.

6      Q.    And when you saw the document what was

7  your reaction?

8      A.    It's a two-page document and it has the

9  signatures for the same two individuals as the

10 document that's in contention in this case.

11     Q.    But did you have a particular reaction

12 to the fact that page 1 of this contract makes no

13 reference to Facebook and if authentic means that

14 the contract attached to the complaint is a fake?

15     A.    I have no reason to believe that and so

16 no, I cannot say that.

17     Q.    What inquiry, if any, did you make to

18 determine whether this contract was authentic

19 before agreeing to continue as an expert in this

20 case?

21     A.    I made no actions that way, that makes

22 no sense.  It's a document that's in contention

23 in a case and it was submitted as an additional

24 document to look at, but not -- but at the core

25 of this case is a completely different document,

                         L. Stewart
1
2   so I would not have asked to see additional
3   documents relative to the Street Fax.
4       Q.    If you concluded as a matter of --
5            MR. SNYDER:  Withdrawn.
6       Q.    If you concluded that this Street Fax
7   contract was authentic, meaning the contract
8   signed by Mr. Zuckerberg and Mr. Ceglia in March
9   of 2004, would you continue to serve as an expert
10  in this case?
11      A.    Well, first off, I did not conclude it
12  was --
13      Q.    Sir, I'm asking you if hypothetically
14  you were to conclude --
15           MR. SNYDER:  Withdrawn.
16      Q.    If it was demonstrated to you that that
17  was authentic and you so concluded, would you
18  continue to represent Mr. Ceglia in this case?
19      A.    Yes.
20           MR. BOLAND:  Objection.
21      A.    They are two separate documents, so,
22  yes.  It makes no difference to me whether this
23  is an authentic document.  It has no bearing on
24  the other document.  The other document stands on
25  its own.

1                          L. Stewart

2          Q.    Are you aware Mr. Ceglia has submitted

3     a sworn statement to the Court that he signed

4     only a single contract with Mr. Zuckerberg in

5     2004?

6          A.    No, I'm not aware of that.

7          Q.    If you learned of that --

8                MR. SNYDER:   Withdrawn.

9          Q.    Assume Mr. Zuckerberg and Mr. Ceglia

10    signed only one contract in 2004.  Assume further

11    that you concluded that the Street Fax document

12    was authentic, would you still continue to serve

13    as an expert in this case?

14         A.    First off, I can't assume any of that.

15         Q.    I'm asking you to assume as an expert.

16         A.    I can't because I know that the

17    handwriting analysis does not agree with your

18    opinion.

19         Q.    Which handwriting analysis on the

20    Street Fax contract doesn't agree with my

21    opinion?

22         A.    I know the handwriting analysis on the

23    document in contention in this case, the Facebook

24    contract, Work For Hire contract, the handwriting

25    on that has been identified to Ceglia and

```
 1                    L. Stewart
 2   Zuckerberg, so it makes no difference to me what
 3   you say about the Street Fax.
 4        Q.    Sir, do you know where this two-page
 5   scan of the Street Fax contract came from?
 6        A.    A scanner and a computer is all I know,
 7   I don't know where.
 8        Q.    Are you aware that it was attached to
 9   an e-mail sent on March 3rd, 2004 by Paul Ceglia
10   to a lawyer named Jim Kole at the Sidley & Austin
11   law firm?
12             MR. BOLAND:  Objection.
13        A.    No, I'm not aware of that.
14        Q.    Did anyone ever tell you that?
15        A.    Not that I recall.
16        Q.    Did you read that in any of the
17   defendants' papers?
18        A.    Not that I recall.  Again, if I read
19   anything about the Street Fax document I went
20   past it.
21        Q.    Are you aware that it is defendants'
22   position that Paul Ceglia sent that version of
23   the contract to a lawyer at Sidley & Austin in
24   2004?
25        A.    No, I'm not aware of that.
```

1                           L. Stewart

2           Q.      So when you were provided with the

3    Street Fax contract did you ask where it came

4    from?

5                   I'm not asking you to look at your

6    report.

7                   MR. SNYDER:  Let the record reflect the

8        witness is paging through his report.

9           A.      I'm trying to answer you correctly.

10          Q.      I'm asking you based on your

11   recollection, sir.

12          A.      I don't recall where it came from.

13          Q.      Do you recall asking any lawyer where

14   it came from?

15          A.      That's why I was trying to refer to the

16   declaration because under my exhibit list it

17   should show what history I know about the

18   documents.

19          Q.      Well, wouldn't it be important to know

20   where that Street Fax contract came from in

21   assessing its effect on the authenticity of the

22   Work For Hire contract?

23          A.      It's hard to answer your question.

24                  If you're asking me to rely on one side

25   of a disputed document's recollection, no, I'm

                         L. Stewart

1

2    not going to rely on that.

3              If you're asking me to look at the

4    document and analyze it forensically, then it

5    makes no difference where it came from.

6         Q.   If you knew that the Street Fax

7    contract had been sent by e-mail from Paul Ceglia

8    to another individual back in 2004, would that

9    affect your opinion regarding the authenticity of

10   the Work For Hire contract?

11        A.   No.  I don't see why it would.

12        Q.   You are not offering any expert opinion

13   on the authenticity of the Street Fax contract,

14   are you?

15        A.   No, I'm not.

16        Q.   And you're not offering any opinion on

17   whether Mr. Ceglia had the Street Fax contract on

18   his computer in 2004?

19        A.   No, that's not my expertise.

20        Q.   And you're not offering any opinion as

21   to who specifically sent an e-mail attaching the

22   Street Fax contract in 2004; correct?

23        A.   No.  I don't know the history of the

24   document.

25        Q.   And you understand that Mr. Ceglia has

```
 1                      L. Stewart
 2    submitted the Work For Hire contract as the
 3    authentic contract between the parties; correct?
 4         A.    Yes.
 5         Q.    And you're not offering an opinion that
 6    the Work For Hire document is the authentic
 7    contract signed by the parties in 2004, are you?
 8         A.    I think to be accurate we need to read
 9    exactly what my opinion is.
10         Q.    Am I correct that you are offering an
11    opinion that there's no indication to suggest
12    that the document is a fraud but not offering an
13    opinion that it is the authentic contract
14    actually signed by the parties in 2004?
15         A.    That's a fair assessment, yes.
16         Q.    Are you aware that Mr. Ceglia quoted or
17    referenced purported e-mails in an amended
18    complaint he filed in this case supposedly
19    corroborating the authenticity of the Work For
20    Hire document?
21         A.    No.
22         Q.    Are you aware that it's defendants'
23    position that these purported e-mails quoted in
24    the amended complaint are fabricated?
25         A.    No.
```

1                          L. Stewart

2        Q.      So to be clear, you are offering no

3    expert opinion as to whether or not e-mails

4    quoted in the amended complaint are real or fake?

5        A.      That's correct.

6        Q.      Are you aware of what spoliation means

7    in the context of a lawsuit?

8        A.      There's a forensic meaning and there's

9    a legal meaning.  I do not know the legal

10   meaning, I know the forensic meaning.

11       Q.      In your quarter of a century or more of

12   employment by the United States Government are

13   you familiar with the concept that consciousness

14   of guilt can be established by an individual's

15   destruction of evidence?

16       A.      No, I am not aware of that.

17       Q.      Are you aware that in this case USB

18   devices containing relevant evidence were

19   destroyed or otherwise disposed of by the

20   plaintiff or others working in concert with him?

21       A.      No, I'm not aware of that.

22       Q.      If you learned, sir, that USB devices

23   existed in Mr. Ceglia's possession and control

24   during the course of this lawsuit that contained

25   images of the so-called --

1                      L. Stewart

2              MR. SNYDER:  Withdrawn.

3        Q.    -- images of a contract between

4    Mr. Ceglia and Mr. Zuckerberg, but those USB

5    devices no longer exist and cannot be produced by

6    Mr. Ceglia, would that concern you?

7        A.    Only if it's the Work For Hire document

8    and it's different than the document I already

9    had in front of me.

10       Q.    Now, you understand that it's

11   defendants' position that when Mr. Argentieri

12   produced the Work For Hire document on the

13   morning of July 14, 2011, when none of

14   plaintiff's experts were present, the document

15   was already damaged?

16             You know that's our position; correct?

17       A.    That's your position, yes.

18       Q.    And that the ink was faded and the

19   paper was discolored?

20       A.    Yes.

21       Q.    Are you aware that Mr. Southwell was

22   present during that examination?

23       A.    I believe I saw him on the videotape,

24   but I'm not positive.

25       Q.    Are you aware that Ms. Aycock was

1                    L. Stewart

2    present?

3         A.    I believe I saw her as well.

4         Q.    And are you aware that the former

5    United States Attorney for the Western District

6    of New York was present on the 15th on the

7    defense side?

8         A.    No, I don't -- I saw people there, but

9    I didn't recognize them.  I recognized these two

10   because they were present in Chicago as well.

11        Q.    And you understand that it's defendants'

12   position that this degradation or damage to the

13   document was done sometime after its production

14   to Mr. Ceglia's former expert Dr. Valery Aginsky

15   on January 15, 2011?

16        A.    I understand that's your position, yes.

17        Q.    And do you understand that a factual

18   basis for this position is the scan of the Work

19   For Hire document taken by Dr. Aginsky in January

20   of 2011?

21        A.    I understand that his document was

22   scanned on that date, yes.

23        Q.    And you understand that another factual

24   basis for this position is Dr. Aginsky's

25   statements in his June 2011 declaration

1                          L. Stewart

2    describing the appearance of the ink on the

3    handwritten interlineation as black ballpoint ink?

4         A.    He did describe it that way, yes.

5         Q.    And you cannot testify under oath here

6    to this court today, sir, can you, that plaintiff

7    presented his then expert Dr. Aginsky with the

8    same paper document as he produced to defendants'

9    experts in July of 2011, can you?

10        A.    You mean to the chain of custody,

11   whether it's the exact same document, no, I

12   cannot.

13        Q.    So it is possible, sir, that the

14   plaintiff or his lawyers gave Dr. Aginsky one

15   document and gave defendants' experts on July

16   14th a different document in July of 2011?

17        A.    No, I do not believe so.

18        Q.    But you don't know what document was

19   given to Dr. Aginsky because you weren't there?

20        A.    No.  I'm basing that on the scanned

21   image that he took and the alignment of the

22   interlineation between that and the document we

23   have today.

24        Q.    You understand that it's defendants'

25   position that the testing performed by

1                    L. Stewart

2    defendants' experts did not cause any damage to

3    the Work For Hire document?

4         A.    I understand that's your position, yes.

5         Q.    So just to be clear about what your

6    actual opinions are on these issues and the

7    factual basis of your opinions, I just want to

8    ask you a couple of questions.

9              Is it your opinion that when the Work

10   For Hire document was presented to defendants'

11   experts on the morning of July 14th outside the

12   presence of any of plaintiff's experts, it was

13   undamaged other than the normal wear and tear

14   associated with an eight-year-old document?

15        A.    I can't attest to that because I was

16   not there.  I can only go by the evidence that

17   your side has produced which is the videotape and

18   also the images taken by Mr. Tytell and the notes

19   that were taken by the experts.

20        Q.    It is your opinion that the ink was

21   black when it was presented to the defendants at

22   9:11 a.m. on July 14, 2011?

23        A.    That's not my opinion.  The evidence

24   speaks for itself.

25        Q.    You have no idea, sir, what the color

```
 1                    L. Stewart
 2  of the ink was on the original document at 9:11
 3  a.m. on July 14th, do you, sir, because you
 4  weren't there?
 5       A.    No.  All I have are the notes from your
 6  experts and the video and the images.
 7       Q.    The notes of our expert indicate that
 8  the ink was faded the minute that Mr. Argentieri
 9  took it out of his envelope; correct?
10       A.    No.  Mr. Tytell's notes don't indicate
11  that till later on.
12       Q.    You have read Mr. Tytell's report,
13  though?
14       A.    Right.
15       Q.    And what is his position about the
16  color of the ink on the 14th?
17       A.    I believe he said, and I am
18  characterizing because I don't have it in front
19  of me, that he immediately noticed.  However,
20  that's different than his notes.
21       Q.    You have no opinion that the ink was --
22            MR. SNYDER:  Withdrawn.
23       Q.    So it's not your opinion that the ink
24  was --
25            MR. SNYDER:  Withdrawn.
```

1                    L. Stewart

2        Q.    Am I correct that your report does not

3    talk about the condition of the ink when it was

4    presented to our experts at 9:11 a.m.?

5        A.    I believe there are components of my

6    report that do address that, but, again, that's

7    based on the notes, the videotape and the images

8    taken by your experts.

9        Q.    Let's look at the videotape and tell us

10   what on the videotape enables you to conclude

11   that the ink on page 1 of the document presented

12   for inspection was not faded and discolored.

13           So let me direct your attention to

14   the --

15       A.    I don't know that I can do that

16   component from the videotape.

17       Q.    Let's look at the videotape.

18           MR. SNYDER:  Let the record reflect

19       that we are projecting on the screen from

20       the video embedded in document 189 -- my

21       team wants me to do this a little bit later,

22       so let's hold the video.

23       Q.    So is it your opinion that the ink

24   coloration on the morning of July 14th, 2011 was

25   the same as it did in Dr. Aginsky's scans taken

```
 1                    L. Stewart
 2    in January of 2011?
 3        A.    No, that's not my opinion.
 4        Q.    Do you have any opinion about how the
 5    ink differed between the time Mr. Aginsky
 6    photographed the document and the time it was
 7    taken out of the envelope at 9:11 a.m. by
 8    Mr. Argentieri?
 9             MR. SNYDER:  Let the record reflect
10        that the witness is reviewing his report.
11        A.    I believe, to answer your question,
12    there is nothing in my report that describes the
13    appearance of the ink when it was first viewed on
14    the videotape.
15        Q.    So you have no expert opinion about
16    what the ink looked like on the Work For Hire
17    document when Mr. Argentieri removed if from an
18    envelope at 9:11 a.m. on July 14th; correct?
19        A.    No.  I only have the first scan that
20    was taken by your experts which was shortly after
21    that.
22        Q.    So you keep on talking about
23    Dr. Tytell's -- Mr. Tytell's notes.
24             Tell us about those notes, sir.
25        A.    Let me get to that portion of my
```

1                     L. Stewart

2    document.

3              I misstated this a moment ago.  I

4    think, I believe I stated that Mr. Tytell

5    indicated that he immediately saw discoloration,

6    and based on my report here on paragraph 123 it

7    shows Lesnevich stated he immediately saw the

8    documents were discolored and he made high

9    resolution scans.  I then compared that against

10   the scans that Mr. Tytell took and noted that

11   there is a difference.

12        Q.    Sir, you told this court repeatedly

13   this afternoon that you based your opinion about

14   the ink on three pieces of evidence:  Mr. Tytell's

15   notes, the video, and images that were taken at

16   9:11 a.m.  So I'm asking you about the notes.

17             What notes did you base that opinion on?

18        A.    The only notes that I have been

19   provided to date are those that were included in

20   the reports or declarations that were issued by

21   your experts back, I believe, in March.

22        Q.    Sir, can you -- do you recall

23   Dr. Tytell saying that he immediately noticed

24   that the ink was faded in his report?

25        A.    No.  My report indicated Mr. Lesnevich

```
 1                      L. Stewart
 2    stated that --
 3        Q.    Do you recall whether Mr. Tytell did as
 4    well?
 5        A.    No.  If we have his document I can read
 6    it.  I don't have it with me.
 7        Q.    Were you telling the truth when you
 8    said that you reviewed Mr. Tytell's notes?
 9        A.    Yes.  Everything that was included in
10    the reports by all the experts I reviewed.
11        Q.    Were you telling the truth when you
12    told the Court that you reviewed Dr. Tytell's
13    notes?  Not his report, his notes.
14              MR. BOLAND:  Objection.  There is no
15         reason to raise your voice, Mr. Snyder.
16              MR. SNYDER:  I am not raising my voice.
17         I emphasize because I can't use a bold or
18         underscore the word "notes."
19        A.    We may have a different definition.
20              I am referring to as notes everything
21    included in his report as attachments of things
22    that he did during his examination.  I had that
23    for a number of the experts and I reviewed all of
24    that.
25              MR. SNYDER:  Can we please go back, Mr.
```

1              L. Stewart

2        Court Reporter to -- I know your name -- to

3        where he testified about handwritten notes

4        of Mr. Tytell being different than the

5        report, I need to go back to that question.

6              (Record read.)

7        Q.    You testified, sir, that Mr. Tytell's

8    notes don't indicate that he noticed the faded

9    ink until later on, that was your testimony here

10   today.

11            Can you explain what you meant by that?

12       A.    Certainly. I thought I already had.

13            When I referred to my documents

14   directly I corrected that and said that it

15   appears that it was Mr. Lesnevich that I was

16   referring to.

17            As far as Mr. Tytell's notes, I only

18   have what was provided in the March declaration

19   reports.

20       Q.    You testified under oath here today

21   that you reviewed notes that Mr. Lesnevich took

22   during the course of the examination?

23       A.    I can tell you exactly what I reviewed.

24            Referring to Mr. Tytell's document

25   number 238, that document has included with it

1                    L. Stewart

2    whatever you guys submitted through that document

3    as exhibits and that included some of the

4    documentation and scanned images, so I'm

5    referring to all of that as his notes.

6        Q.    Are you aware that Mr. Tytell's report

7    submitted in this case states that it was

8    immediately apparent that the ink was faded brown

9    or light tan, almost transparent in some places?

10            Do you recall that?

11       A.    That's what his report states, yes.

12       Q.    And are you aware that Mr. Tytell's

13   report states that immediately noticeable was the

14   appearance of the writing ink on the document?

15       A.    That's what his report, it's

16   contradicting the other expert in the case on

17   your side.

18       Q.    Which expert?

19       A.    I believe it's Lesnevich, I already

20   referred to that in my report.

21       Q.    Sir, you are aware that Tytell states

22   that surprising to him was that the ink was light

23   tan or faded brown, not at all the kind of

24   appearance that I would expect for black

25   ballpoint ink after eight years, and in total

```
 1                        L. Stewart
 2   accord was Mr. Tytell who said immediately
 3   apparent that the ink of all of the handwriting
 4   material was a faded brown, almost transparent.
 5            Are you aware of that, sir?
 6      A.   I'm not -- I'm assuming you are reading
 7   it correctly, so yes, I am aware of that.
 8      Q.   And are you aware Mr. Lesnevich came to
 9   a contrary conclusion in his report?
10      A.   I already referred to that earlier
11   today; I'll find it again and refer to it again
12   if you give me a moment.
13      Q.   Are you aware that Mr. Lesnevich was
14   not even present at the inspection on July 14th,
15   sir?
16      A.   I'm still trying to answer your
17   previous question.
18            MR. SNYDER:  Withdraw the last
19       question.
20      Q.   You'd agree that if Mr. Lesnevich was
21   not there on the 14th he couldn't offer an
22   opinion what about he saw firsthand on the 14th
23   when the document was removed from the envelope;
24   correct?
25      A.   That would make sense.  That's why I'm
```

1                       L. Stewart

2    trying to refer to my notes and my report so I

3    can give you the accurate information.  You keep

4    stopping me.

5         Q.    Why don't you tell the Court right now

6    which expert from the defense side contradicted

7    Tytell's and Romano's sworn statements that upon

8    visual inspection of the document at 9:11 a.m. on

9    the 14th they were surprised to see that the ink

10   was faded?

11        A.    I will try to do that again.  If I can

12   finish this time, then I'll give you the answer.

13             I'll correct things as we go by reading

14   this.

15             I was there in Buffalo July 16th

16   through the 19th.

17             I refer to the time in the video of one

18   minute and 14 seconds to one minute and 17

19   seconds.

20        Q.    Sir, I'm asking you a simple question.

21             You said that one of our experts

22   contradicted our other experts about the color of

23   the ink when it was taken out of the envelope by

24   Mr. Argentieri at 9:11 a.m.

25             Which defense expert contradicted the

1                    L. Stewart

2   statements of Romano and Tytell that upon

3   immediately inspecting the document visually at

4   9:11 a.m. they saw discolored, faded ink?

5       A.    I'm trying to answer that for you, if I

6   can continue.

7            MR. SNYDER:  Let the record reflect

8        that the witness has been reviewing his

9        declaration for the past several minutes,

10       the video will determine exactly how long.

11      A.    I have 388 pages, so it may take me a

12   while.

13      Q.    Well, you made a very serious charge

14   there, sir, and I'm asking you to tell the Court

15   what you base that testimony on.

16      A.    I'm trying to.

17           MR. BOLAND:  And the record should

18       reflect he is answering your question,

19       attempting to answer your question, and it

20       is taking this effort he is engaged in to do

21       that.

22      A.    I begin discussing what we're talking

23   about here on my paragraph number 119.

24      Q.    Sir, I'm asking you a very specific

25   question.

```
 1                      L. Stewart

 2             You testified here to the Court that

 3  Lesnevich and then later you said an expert

 4  contradicted Romano's and Tytell's observation

 5  that immediately noticeable at 9:11 a.m. on July

 6  14th was the faded discolored appearance of the

 7  writing ink on the document.

 8             I'm asking you now to tell the Court on

 9  what did you base that testimony.

10      A.    I'm trying to and you keep stopping me.

11  I am back to 119 where it begins and that over

12  the next few paragraphs, many paragraphs,

13  discusses it.

14             As I mentioned before -- well, I'm not

15  going to be taken out of context again.

16             What I'd like to do is read that whole

17  segment into the --

18      Q.    No, sir, I am not asking you to read

19  your report into the record.

20      A.    Then I can't answer your question.

21      Q.    Sir, you're going to answer my

22  question, so here's the question:

23             You told this court that Mr. Lesnevich

24  contradicted Tytell and Romano in their opinion

25  that the ink was discolored and faded at 9:11
```

Page 159

                              L. Stewart

 1
 2      a.m. on the 14th.
 3                 What did you base that testimony about
 4      Mr. Lesnevich on?
 5          A.    First, I didn't say any of that about
 6      9:11 or any of that, those are all your words.
 7                 I'm trying to read to you all my
 8      findings concerning that which discusses exactly
 9      what I found and what I can talk about.  I can't
10      talk about anything else out of the scope of my
11      report.
12          Q.    Tell the Court the name of the expert
13      who contradicted our other experts, the name.
14          A.    Okay.  I will start reading --
15          Q.    No, sir, I am not asking you to read
16      your report.
17                 MR. BOLAND:  Objection.
18          Q.    I'm asking you to give the name, first
19      and last name of the expert who you said under
20      oath in this deposition today contradicted other
21      defense experts about the color of the ink.
22          A.    Okay.
23                 We will start with Lesnevich, who
24      stated he immediately saw the documents were
25      discolored at 9:00 a.m., not 9:11 on 7/15/11.

1                        L. Stewart

2        Q.     We are talking about the 14th, sir,

3   July 14th, sir.

4        A.     I can only go by the images and the

5   material that was passed on by you to me.

6        Q.     Sir, what day was the document first

7   examined by Mr. Tytell and Mr. Romano?

8        A.     I believe it was on the 14th.

9        Q.     And are you aware that Mr. Lesnevich

10  did not examine the document until the 15th and

11  was not present physically in Buffalo, New York

12  on the 14th?

13       A.     That's correct, he first examined it on

14  7/15 at 9:00 a.m.

15       Q.     So tell the Court which expert who

16  examined the document on July 14th contradicted

17  defense experts about the color of the ink as you

18  just testified?

19       A.     With your scope you can't do that.  The

20  contradiction occurs on the 15th.

21       Q.     Are you aware that Mr. Lesnevich states

22  in his declaration submitted on November 28, 2011

23  in this case that when I was first presented with

24  the document at approximately 9:00 a.m. on the

25  15th it was clear that the integrity of the

```
 1                    L. Stewart
 2   document was already severely degraded, the paper
 3   had a discolored appearance and the writing pen
 4   ink was very faint?
 5       A.    That's correct, and that's what I'm
 6   referring to when he says he immediately saw the
 7   documents were discolored.
 8       Q.    The day after Tytell and Romano made
 9   the same observation.
10       A.    They didn't make that same observation
11   the day before.
12       Q.    Sir, I will show you the reports of
13   Mr. Tytell and Mr. Romano, if you like, and read
14   for you where they make the exact same finding.
15            Do I need to do that to refresh your
16   memory?
17       A.    I don't need the report, I've got their
18   scanned images, and the scanned images are very
19   telling.
20       Q.    So in fact, sir, none of the expert
21   opinions offered by the defendants contradicted
22   one another with respect to the color of the ink;
23   correct?
24       A.    No, that's completely wrong.  Their own
25   images contradict each other.
```

1                           L. Stewart

2                  MR. SNYDER:  The record will speak for

3        itself.

4        Q.    Did you rely at all on Mr. Argentieri's

5   declaration with regard to any opinion you are

6   rendering about the color of the ink?

7        A.    No.  I'm not even aware that he did a

8   declaration.

9        Q.    Did you read a declaration submitted by

10   the videographer present who took the images,

11   Mr. Gianatto (phonetic)?

12        A.    Yes, I believe I did read that.

13        Q.    And were you relying on Mr. Gianatto's

14   statements at all in forming your expert opinion?

15        A.    No, not at all.

16        Q.    So just for the record, what is your

17   opinion, if any, about the color of the ink at

18   9:11 a.m. on July 14th, 2011?  Was it faded?

19        A.    At 9:00 a.m. --

20        Q.    9:11 a.m. on July 14, 2011.

21        A.    I'm not hard of hearing, I'm right here.

22              At 9:11, I don't know exactly what the

23   appearance was, I can only go by the video

24   scanned images that were submitted to me and the

25   date stamps that are on them.

1                    L. Stewart

2              I know that if we looked at Mr.

3    Tytell's initial scan from July 14th it is white

4    and clear and if you look at the yellowing on

5    Mr. Lesnevich from the day next, the next day,

6    it's completely different.

7         Q.    I'm talking about the ink handwritten

8    interlineation on page 1 on July 14th, 9:11.

9              Was it faded when it was presented at

10   9:11 a.m., the ink?

11        A.    We can't tell that from the cropped

12   image that you guys produced, we can only tell

13   that the document itself was faded and changed.

14        Q.    The image in your report, though, that

15   you present is cropped by you and you cropped out

16   the handwritten portion; correct?

17        A.    This -- you're looking at what I've got

18   in my report.  I don't know if I have for that

19   image what the entire scan was.

20        Q.    I'm going to show you a scan taken by

21   Mr. Tytell and ask you to look at it, please.

22              We'll give you as the next exhibit, 22,

23   which is Exhibit F to our motion and it's the

24   report of Peter Tytell.

25              (Defendants' Exhibit 22, one-page

1                         L. Stewart

2            document labeled "Exhibit F" with attached

3            report by Peter V. Tytell dated March 25,

4            2012, marked for identification, as of this

5            date.)

6            Q.    I will direct your attention to his

7      scan, which is Exhibit A to his report.

8                 And you would agree, would you not,

9      that the ink, the writing pen ink on this scan

10     has an appearance that is faint or faded as

11     opposed to a dark ballpoint pen; correct?

12           A.    Yes, the entire document is miscolored.

13           Q.    Thank you.

14           A.    But to correct your incorrect

15     statement, you just mentioned this is document

16     330 and I'm referring to document 238-2, which is

17     visibly white.

18                 The one you're showing me is visibly

19     orangeish-brown and I referred to the scanned

20     image, the best TIFF image available, not a

21     document that's been produced so many times on a

22     photocopier, so I don't know what you want me to

23     talk about with your document, I can only go on

24     the best evidence which is my scan of 238-2.

25           Q.    Are you telling the Court under oath

1                    L. Stewart

2    today that Mr. Tytell has some scan that he took

3    at 9:11 a.m. that's different than the scan that

4    you are looking at as Exhibit A, sir?

5        A.    Yes.  This is an unmanipulated scan

6    directly from the image that was submitted to me,

7    document 238-2, which is completely white,

8    compared to the document you are showing me with

9    document 330.

10       Q.    And what is the color of the ink on

11   238-2?

12       A.    I don't know.  I've got a cropped image

13   here.

14       Q.    Who cropped that image?

15       A.    I don't -- it could have been me, I

16   could have the full thing in the back here or it

17   could have been when it was submitted to me.  I

18   will have to check.  It is part of --

19       Q.    We are going to get 238-2 in a minute

20   and show it to you.

21             So since you can't see the handwritten

22   interlineation on the cropped image that you have

23   in your report you can't point to a single

24   document of an image taken at 9:11 on July 14th

25   that has ink that is not discolored, can you?

1                    L. Stewart

2      A.    I can only assume that with this much

3   difference between the white and the yellow

4   document there's been some discoloration, but I

5   cannot point to it, I can only go by your own

6   images.

7      Q.    Now, it's your opinion that the Work

8   For Hire document's paper was white when it was

9   presented to defendants' experts on the morning

10   of July 14th; correct?

11      A.    Not in my opinion.  It's Mr. Tytell and

12   what he submitted here.  It's Tytell Exhibit B,

13   document 238-2, it's white.

14      Q.    Sir, are you aware that Dr. Tytell says

15   something to the contrary in his report, namely

16   that the document was not white, it was

17   discolored?

18      A.    That's part of the contradiction I'm

19   talking about.

20      Q.    So you are aware that Mr. Tytell in

21   fact has asserted under oath that he observed

22   that the document was light tan or faded brown?

23      A.    Which corresponds with your document

24   330, but it does not correspond with the document

25   238-2.

```
 1                      L. Stewart
 2              MR. SNYDER:  We are going to take a
 3      break and get that document.
 4              THE VIDEOGRAPHER:  Going off the
 5      record.  The time is 1:43.
 6              (Recess taken.)
 7              THE VIDEOGRAPHER:  We are back on the
 8      record.  The time is 1:53.
 9              MR. SNYDER:  I'm going to mark as
10      Defendants' 23 the declaration of Peter
11      Tytell dated November 28, 2011, document 238
12      on the docket.
13              (Defendants' Exhibit 23, declaration of
14      Peter Tytell dated November 28, 2011, marked
15      for identification, as of this date.)
16 BY MR. SNYDER:
17      Q.    I'm going to hand that to you.
18              Let me direct your attention first to
19 paragraph 29 of Mr. Tytell's declaration.
20              Do you recall this illustration where
21 Mr. Tytell compares an image of the handwriting
22 on page 1 of the Work For Hire document taken
23 from the scanned image of page 1 from Dr. Aginsky
24 in January 2011 with a similar portion of the
25 scanned image at page 1 that he made at 9:18 a.m.
```

```
 1                    L. Stewart
 2   on July 14, 2011?
 3        A.    Yes.
 4        Q.    And do you recall that the condition of
 5   the handwriting appears markedly different in the
 6   two scans?
 7        A.    Yes.
 8        Q.    Now, you said that you have a cropped
 9   image of 238-2 and that was a document you were
10   relying on in providing your expert testimony, so
11   I'm going to direct your attention now to 238-2.
12   If you go toward the back of Mr. Tytell's
13   declaration you'll see his scanned image of the
14   Work For Hire contract that he took immediately
15   after Mr. Argentieri removed the document from
16   the envelope in the Harris Beach offices on July
17   14th, 2011.
18              Do you see the condition of the
19   handwriting ink on page 1 of that scan?
20        A.    Yes.
21        Q.    How would you describe it?
22        A.    It appears faded and the document
23   appears brownish.
24        Q.    You would agree that the appearance of
25   the ink at 9:18 a.m. on July 14, 2011 is markedly
```

```
 1                    L. Stewart
 2   dissimilar from the appearance of the ink that
 3   Dr. Aginsky photographed earlier in the year?
 4       A.    Yes.
 5       Q.    And you are offering no expert
 6   opinion --
 7             MR. SNYDER:  Withdrawn.
 8       Q.    You are offering no expert opinion,
 9   sir, are you, about what happened to this
10   document between 1/13/11 when Dr. Aginsky
11   photographed it and 9:11 a.m. when Mr. Argentieri
12   appeared at the offices of Harris Beach with the
13   document in a Redweld?
14       A.    He says that's on the 14th.
15             No, I'm not reaching any conclusion
16   between Aginsky and the 14th.
17       Q.    And did you ask Mr. Ceglia or
18   Mr. Argentieri what if anything they did to the
19   document between January 2011 and July 14, 2011
20   to cause the handwritten ink to become faded?
21       A.    No, of course I didn't ask them that.
22             Based on the scanned images of your
23   experts, the fading occurred between the 14th and
24   the 15th.
25       Q.    Sir, are you aware that the scan that
```

                              L. Stewart

1

2    you just identified as discolored, faded ink was

3    taken by Mr. Tytell just six and a half minutes

4    after -- or less, after Mr. Argentieri removed it

5    and placed it on the table before any testing was

6    done, any lights were used or anything was done

7    to the document other than it being laid on a

8    table by the lawyer?

9        A.    I am not aware of when this image was

10   taken, I am only aware of the meta tags that are

11   on the images that were submitted and those meta

12   tags indicate that the image produced by Tytell

13   on the 14th was quite a bit whiter than this

14   document that you produced on a 400-dot-per-inch

15   copier.

16           I'm going on a mini megabyte image that

17   is a TIFF image and I imagine my image is clearer

18   than yours.  There has been no change to the

19   image and you can see in the report that it's

20   white when Tytell did it and it's yellow when

21   Lesnevich did it the day after.

22       Q.    I'm talking about the ink, sir.

23       A.    I'm talking about the document.

24       Q.    I'm talking about the ink, sir.

25       A.    You are showing me a brown document

```
 1                    L. Stewart
 2   that doesn't match anything that I was provided.
 3        Q.    Sir, were you provided with Dr. Tytell's
 4   scan?
 5        A.    Mr. Tytell's --
 6        Q.    Were you provided with Dr. Tytell's
 7   scan?
 8        A.    I don't know a Dr. Tytell, I know a
 9   Mr. Tytell and --
10        Q.    Mr. Tytell's scan is before you in
11   238-2; correct?
12        A.    No.  What's before me is your printing
13   of a document.  I was provided the actual
14   document that was filed with the Court and in
15   there are scanned images that I used.
16        Q.    Sir, I just handed you the document
17   that was filed with the Court by Mr. Tytell.
18        A.    No.  You handed me a photocopied
19   version of the file.
20        Q.    Mr. Tytell testified under oath, swore
21   under oath that this image was taken at 9:18 a.m.
22   on July 14th.
23             Do you have any reason to think that
24   Mr. Tytell is not telling the truth?
25        A.    No, not at all.
```

```
 1                      L. Stewart
 2       Q.    And do you see that the image that he
 3  took at 9:18 a.m. shows a discolored faded ink?
 4       A.    It's discolored along with the entire
 5  document.
 6       Q.    What is your opinion about what
 7  happened to the ink between the time that
 8  Mr. Argentieri took it out of the envelope and
 9  the time that Mr. Tytell photographed it minutes
10  later to cause it to become faded?
11       A.    When Mr. Argentieri took it out of the
12  envelope on the 14th the scanned images appear
13  white, when he took it out on the 15th they
14  appear yellow.
15       Q.    Point to a document in the record, sir,
16  that shows the condition of the ink being bold
17  minutes after Mr. Argentieri took it out of the
18  envelope.
19       A.    Again, my images are of the entire
20  document, not strictly the ink, so I don't have
21  an image like that.
22       Q.    Show me an image in your report that
23  shows the condition of the ink being bold on July
24  14th, 2011.
25       A.    I think I just told you I have got a
```

```
 1                    L. Stewart
 2    different segment of a document scanned in here.
 3         Q.    You mean because you cropped the
 4    document in your report to eliminate the
 5    appearance of the ink; right, sir?
 6         A.    Why would I do that?  I've got the
 7    white versus yellow document right here, it
 8    doesn't matter if I include the ink or not, and I
 9    have the scanned images, it's just not in this
10    report.
11         Q.    Where is it, sir?
12         A.    In the images that I provided to you in
13    discovery back in November.
14         Q.    Is it your testimony, sir, under oath
15    here today before this court on the video camera
16    that you saw a version of document 238-2 filed by
17    Mr. Tytell which bears handwriting ink on page 1
18    in bold pen?  Is that your sworn testimony here
19    today?
20         A.    No, it's not.  I have shown you that I
21    don't have the image of the ink there, I only
22    have the top of the document shown there.
23         Q.    Have you ever seen any version of
24    Mr. Tytell's scan from July 14, 2011 that has
25    bold handwriting ink on the first page?
```

```
 1                        L. Stewart
 2        A.    I don't know.  I've got those images
 3   and you've got them as well, so I don't know.
 4        Q.    Isn't it a fact that every single scan
 5   that Mr. Tytell has produced from the 14th is
 6   consistent with his visual finding that the ink
 7   on page 1 was noticeably faded and not bold as it
 8   was when Mr. Aginsky took the scan in January?
 9        A.    I don't know about that particular
10   scope of your statement, I don't know about the
11   ink part.  I'm talking about the document itself
12   being white or yellow.
13        Q.    You are talking about the color of the
14   document, not the condition of the ink; correct?
15        A.    At this point, yes.
16        Q.    So you are offering no opinion here
17   today, sir, about the condition or color of the
18   ink on page 1 as it appeared when Mr. Argentieri
19   took it out of the envelope and put it on the
20   table?
21        A.    No, I can't opine about that.
22        Q.    Now, as we've discussed, defendants'
23   examination began on the morning of July 14,
24   2011; correct?
25        A.    Correct.
```

1                      L. Stewart

2        Q.    And you weren't there, but you've

3    reviewed the video of that day of examination;

4    correct?

5        A.    Correct.

6        Q.    So you are aware, then, that at 9:11

7    a.m. Paul Argentieri removed the Work For Hire

8    document and the specifications document from a

9    United States Postal Service envelope?

10       A.    I don't know the exact time, but I'm

11   aware that he removed it.

12       Q.    Are you aware that he then placed those

13   documents on the black conference room table?

14       A.    It's kind of black.

15       Q.    Did he place them face up or face down?

16       A.    I believe he placed them face up.

17       Q.    And how do you know that?

18       A.    My recollection.

19       Q.    Recollection of what?

20       A.    The videotape.

21       Q.    And you rely on the video for your

22   opinion about the appearance of the Work For Hire

23   document when it was first produced to the

24   defendants' experts; correct?

25       A.    In part, yes.

1                        L. Stewart

2       Q.    As an expert, would you rely on the

3   visual observations of Mr. Tytell as being valid,

4   meaning Mr. Tytell, you know, said he immediately

5   noticed that the paper was discolored and the ink

6   was faded?

7            Do you think Mr. Tytell was telling the

8   truth when he notes his immediate observations?

9       A.    I don't know.  I mean, I assume

10  Mr. Tytell is an honest person.

11      Q.    And you are relying on the video in

12  your report; correct?

13      A.    Video and scanned images, yes.

14      Q.    And prior to making your report you

15  reviewed the video clip; correct?

16      A.    Yes.

17      Q.    And let's look at the video clip in the

18  brief.  We will look at the one embedded in the

19  plaintiff's motions for sanctions, which is

20  document number 189.

21            So am I correct, sir, that you are

22  crediting -- you are disagreeing with

23  Mr. Tytell's visual inspection and conclusions --

24            MR. SNYDER:  Withdrawn.

25      Q.    You're disagreeing with Mr. Tytell's

1                    L. Stewart
2    opinion that the document was discolored, which
3    he bases on his visual inspection, based on your
4    review of the video; is that correct?
5         A.    No, not at all.
6              Mr. Tytell's initial observations were,
7    I believe, that it was a tanned document or it
8    had some coloration to it.  I don't know if that
9    is halfway between white and yellow, I don't know
10   where it occurred, all I know is that he made
11   that observation and that he scanned in the
12   document and now I am relying at that point on
13   the scanned image.
14        Q.    He also concluded, which you are
15   opining on, that the ink was discolored; correct?
16        A.    I don't know if he said discolored,
17   faded or what, I don't recall his exact words at
18   this time.
19              MR. SNYDER:  Let's look at the video.
20              (The video file was played.)
21        Q.    So Mr. Argentieri is opening the
22   envelope, is he not?
23        A.    Yes.
24        Q.    And he is removing what appear to be
25   two U.S. Postal Service envelopes that are in the

                        L. Stewart
 1
 2     larger envelope and he is opening one; correct?
 3          A.     Correct.
 4               MR. BOLAND:  Can you just reiterate
 5          what document this is coming from for the
 6          record?
 7               MR. SNYDER:  I will in a moment.
 8               MR. BOLAND:  Very well.
 9          Q.     And now he's removing something from
10     the envelope; correct?
11          A.     Not yet, but --
12          Q.     He is about to, it is 9:11:40, okay?
13          A.     Yes.
14          Q.     And he's put two pages down.
15               MR. SNYDER:  Can you freeze it there,
16          please.
17          Q.     Can you tell me, do you see the title
18     "Work For Hire Contract" on either of those
19     pieces of paper based on the video at 9:11:51?
20          A.     No.
21          Q.     Can you tell me which piece of paper is
22     page 1 and which is page 2?
23          A.     No.
24          Q.     Can you show me where the handwritten
25     interlineations are on this video still?

                        L. Stewart

1

2       A.      Of course not, I can't tell you which

3   one is page 1 or page 2.

4       Q.      Can you show me where the signature of

5   Mark Zuckerberg and Paul Ceglia are in this?

6       A.      Same answer as before.

7       Q.      You can't see any text on either of

8   those pages based on the video, can you?

9       A.      No.

10      Q.      You can't see any ink, can you?

11      A.      No.  I can see what appears to be

12  little lines on it, but I can't tell what's ink

13  and what's printed.

14      Q.      And to the naked eye these could be

15  blank documents as well as text-laden documents;

16  correct?

17      A.      No, I don't think so.  I see little

18  lines where printing appears to be.

19      Q.      But you can't see any distinct features

20  in these videos, whether it's signatures,

21  handwriting or content of any kind; correct?

22              MR. BOLAND:  Objection.

23      A.      From that stilled frame, no, I can't.

24      Q.      And what's your factual basis for

25  asserting that the document is face up?

1              L. Stewart

2      A.    When you look at the video in its

3  entirety I believe there's a segment where you

4  can see that it's placed face up.

5      Q.    So you agree with me that on the video

6  the pages of the documents are so washed out at

7  the moment that they are produced and laid out on

8  the table that you cannot see the printed text;

9  correct?

10     A.    No.  As I testified before, I can see

11 subtle little lines there, I can't tell what's

12 printing and what's handwriting, and so in that

13 particular still image of the video I cannot make

14 it out.

15     Q.    But it is this video that you're

16 relying on as the factual basis for your opinion

17 that Mr. Tytell's visual observation of the

18 document was invalid and that your conclusion

19 that the Work For Hire document was white when it

20 was produced is valid; is that correct?

21     A.    No, I've never said that.  I have no

22 reason to dispute his initial observation that he

23 was looking at a tanned document with discolored

24 ink.  He had no comparison at that point and he

25 didn't know what it looked like before unless he

```
 1                      L. Stewart

 2    had been shown scanned images, so I have no

 3    reason to dispute that it was tanned at that

 4    point.

 5         Q.    And you just said that Mr. Tytell

 6    didn't know what it looked like before unless he

 7    had been shown scanned images.

 8              Was that your testimony?

 9         A.    Right.  I think that's the first time

10    he saw the original document.

11         Q.    But you know that he had high-quality

12    images taken by a very reputable forensic

13    examiner named Dr. Aginsky who provided us with

14    scans that showed the document not discolored and

15    the ink bold and dark; correct?

16         A.    I don't know what Dr. Aginsky provided

17    Mr. Tytell.

18         Q.    You know what Dr. Aginsky provided to

19    you; correct?

20         A.    That's correct.

21         Q.    And the document had a very distinctly

22    different appearance when he took a photograph of

23    it than when Mr. Tytell did on July 14th; correct?

24         A.    That's correct, at that point it was

25    white with distinct ink.
```

```
 1                    L. Stewart
 2      Q.    Meaning in January?
 3      A.    Yes.
 4      Q.    And were you involved, sir, personally
 5  in any way in putting together the video clip
 6  that was uploaded onto YouTube that was a video
 7  of the July 14th examination?
 8      A.    No.
 9      Q.    Are you aware that a YouTube clip was
10  uploaded onto YouTube?
11            MR. SNYDER:  Withdrawn.
12      Q.    Are you aware that a video clip of the
13  July 14th inspection was uploaded onto YouTube?
14      A.    I'm aware there is a video clip online,
15  I'm not sure if it was YouTube or not.
16      Q.    And you were not involved in its
17  creation or editing at all?
18      A.    No.
19            MR. SNYDER:  We are going let the court
20      reporter get some lunch and then we can
21      proceed whenever as we are all ready.
22            THE VIDEOGRAPHER:  Going off the
23      record.  The time is 2:13.  This ends tape
24      number 3.
25            (Lunch recess: 2:13 p.m.)
```

Page 183

```
 1                           L. Stewart

 2              A F T E R N O O N   S E S S I O N

 3                    (Time noted: 2:51 p.m.)

 4             THE VIDEOGRAPHER:  We are back on the

 5        record.  The time is 2:51.  This is tape

 6        number 4.

 7             MR. SOUTHWELL:  We are back on the

 8        record in the afternoon for Mr. Stewart's

 9        deposition.  I just want to note the

10        appearance of Anna Chase, a summer associate

11        with our firm who is here.

12             MR. BOLAND:  And for Mr. Southwell, I

13        just want to put on the record we are coming

14        back from a break that was made, I think

15        with the agreement of both parties, for the

16        benefit of the court reporter for

17        approximately 20 minutes and that the

18        videographer, the court reporter and the

19        witness and myself were back in this room at

20        2:30 promptly prepared to continue with the

21        deposition and it's now 2:52 and the defense

22        counsel is now back and ready to begin.

23   L A R R Y   F.   S T E W A R T, resumed and

24        testified as follows:

25   EXAMINATION BY
```

1                         L. Stewart

2    MR. SOUTHWELL:

3         Q.    Mr. Stewart, did you have any

4    conversations with Mr. Boland over the lunch

5    break about the substance of this case or the

6    deposition?

7         A.    Not about the case.  I talked about his

8    shoes and I talked to him about some software

9    that he's using.

10        Q.    Did you discuss the substance of

11   deposition with Mr. Boland?

12        A.    Not at all.

13        Q.    You testified earlier about a

14   conversation you had with Mr. Ceglia concerning

15   some facts which you then say that you asked him

16   to put a declaration in to that effect.

17             Do you recall those questions and

18   answers?

19        A.    Yes.

20        Q.    And are you aware that he filed a

21   declaration on approximately June 4th of 2012?

22        A.    Yes, I am.

23        Q.    Your conversation with him was shortly

24   before that; is that right?

25        A.    It was it was quite a bit before that.

1                    L. Stewart

2        Q.      Approximately when was that?

3        A.      A few months before.

4        Q.      A few months before he filed his

5    declaration on June 4th; is that what you are

6    saying?

7        A.      I believe so, yes.

8        Q.      So April of 2012, roughly in that time

9    frame?

10       A.      I believe, if I recall correctly, it

11   was around end of March, beginning of April,

12   right after your experts filed reports.

13       Q.      So if I told you that the defendants

14   experts filed their reports on March 26, 2012,

15   about how soon after that do you think it was

16   you had this conversation with Mr. Ceglia?

17       A.      I believe we had a conference call with

18   them within two weeks, within a week or two weeks

19   of that time.

20       Q.      And it was on that conference call that

21   you say Mr. Ceglia spoke for a couple of minutes

22   and provided his story about where the purported

23   Work For Hire document had been allegedly stored;

24   is that correct?

25       A.      Correct.

1                    L. Stewart

2       Q.    You testified earlier that part of your

3   role was to oversee the plaintiff's experts and

4   that you did that with respect to Dr. Aginsky and

5   you said that you reviewed his report and

6   e-mails, I think is perhaps what you said.

7            What do you recall reviewing of

8   Mr. Aginsky's?

9       A.    I don't recall any e-mails.

10           There was something that he produced, I

11  believe, back in June of 2011 that was filed in

12  the case and I recall reviewing that and I

13  believe that described his physical examination

14  of the document.

15      Q.    If I were to tell you there is

16  declaration in the record filed on June 17, 2011

17  in relation to a motion for expedited discovery

18  by the defendants, does that sound like the

19  document that you were referring to that you

20  reviewed?

21      A.    That sounds like the correct frame,

22  time frame.

23      Q.    Was there anything else of

24  Dr. Aginsky's that you reviewed in your role as

25  overseeing the plaintiff's experts?

1                      L. Stewart
2        A.    I believe his images were provided as
3    the first images that were available and I
4    believe I got that from Mr. Argentieri.
5        Q.    Those were his images of January 2011;
6    is that right?
7        A.    I believe so.
8        Q.    Now, you are not an expert in video or
9    film; correct?
10        A.    No, I'm not.
11        Q.    You are not an expert in forensic video
12    analysis; correct?
13        A.    No.
14        Q.    You are not a videographer?
15        A.    No.
16        Q.    Have you taken a course or seminar on
17    forensic video analysis from any law enforcement
18    association?
19        A.    No.
20        Q.    Ever taken a course or seminar in
21    forensic video analysis from the International
22    Association for Identification?
23        A.    No.
24        Q.    You don't have any specialized training
25    regarding film or video; correct?

                              L. Stewart

1

2       A.      No.

3       Q.      You personally didn't take video of the

4    inspection; correct?

5       A.      That's correct.

6       Q.      Do you know how it was recorded?

7       A.      On a video camera with some kind of a

8    taping system, that's all I know.

9       Q.      Do you know what the taping system was?

10      A.      No.

11      Q.      Do you know if the tape was ever edited

12   by the videographer?

13      A.      No, I do not.

14      Q.      Are you aware of the credentials of the

15   videographer?

16      A.      No.

17      Q.      Do you know whether the videographer

18   did anything to ensure the quality of the

19   recording?

20      A.      No.

21      Q.      Do you know if he set the white

22   balance?

23      A.      No.

24      Q.      Do you know if he used any additional

25   lighting?

                              L. Stewart

1

2        A.    I believe he did not, but that's just

3    my recollection.

4        Q.    Your recollection is that he used

5    whatever the office background lighting was;

6    correct?

7        A.    That's correct.

8        Q.    Are you aware of whether in Buffalo in

9    the conference room the shades were drawn or open?

10       A.    No.  I'd have to look at the videotape.

11       Q.    You don't remember one way or the

12   other?

13       A.    I don't recall, no.

14       Q.    What about in the conference room in

15   the inspection that occurred in Chicago, do you

16   remember whether there were shades there?

17       A.    I don't recall if they were left open

18   or not.

19       Q.    If I were to tell you that in the

20   Buffalo conference room the shades were closed

21   and the lighting was mostly artificial

22   fluorescent lighting, would that refresh your

23   recollection?

24       A.    No.

25       Q.    And although you are not an expert in

```
 1                        L. Stewart
 2    video analysis, you are aware, are you not, that
 3    fluorescent lighting is different than natural
 4    light particularly when it relates to sort of the
 5    color temperatures and the appearance of things;
 6    is that fair to say?
 7              MR. BOLAND:  Objection.
 8        A.    Yes, they're different.
 9        Q.    Mr. Stewart, are you familiar with VSC?
10        A.    Yes.
11        Q.    What is a VSC?
12        A.    Video spectral comparator and it's an
13    acronym that many companies manufacture but one
14    in particular is famous for, a company named
15    Foster + Freeman.
16        Q.    Do you know the difference between a
17    VSC 4, a VSC 40, a VSC 400 and VSC 2000?
18        A.    I know some of the differences.  I
19    don't have a spec sheet in front of me.
20        Q.    Which kind do you personally own?
21        A.    I own a VSC 2000 high-resolution HR.
22        Q.    Where do you keep that?
23        A.    In my office.
24        Q.    Where?
25        A.    In San Luis Obispo.
```

1                          L. Stewart

2         Q.     And when did you purchase that machine?

3         A.     Sometime last year, I don't remember

4    the exact date.

5         Q.     Last year as in the last calendar year?

6         A.     Yes.  I believe it was in early, maybe

7    sometime -- I don't even want to speculate, it

8    was sometime prior to this case, so it would have

9    been either early 2011 or late 2010.

10        Q.     So prior to your involvement in the

11   case or prior to the inspection in the case?

12        A.     Prior to my involvement in the case.

13        Q.     How frequently do you use that in the

14   course of your work?

15        A.     I use that weekly.

16        Q.     Now, in paragraph 108 of your report

17   you state that there was a, quote, "potential

18   problem with the VSC unit on the first day of the

19   examination," and that was -- the nature of the

20   problem was unknown, right?  You say that in your

21   report in paragraph 108?

22        A.     That's not exactly what I say, but it's

23   discussing a potential problem there.

24        Q.     And you didn't inquire into that

25   potential problem; correct?

```
 1                      L. Stewart
 2       A.    I don't know what you mean by inquire.
 3   I wasn't allowed to talk to you guys.
 4       Q.    Did you ask anybody?
 5       A.    I pointed it out to the lawyers for
 6   Mr. Ceglia's side.
 7       Q.    When did you do that?
 8       A.    As soon as I noticed that there was a
 9   problem, that there --
10       Q.    And when was that?
11       A.    It would have been when we first
12   received the information from the experts from
13   the other side, which would have been, I believe,
14   October 2011 is when we first got any of their
15   declarations or any of their information.
16       Q.    What information are you referring to
17   that you first received?
18             MR. SOUTHWELL:  Let me strike that.
19       Q.    You are not referring to when you got
20   the expert reports from the defendants' experts;
21   right?
22       A.    No.  In the early information one of
23   your experts referred to it as a different model
24   than the other, so either they were mistaken or
25   else there was a change in the machine.
```

1                    L. Stewart

2      Q.    I see.

3            And that's when you say that you

4   noticed this and pointed it out to the

5   plaintiff's lawyers?

6      A.    Correct.

7      Q.    And who did you tell that to?

8      A.    At the time it would have been

9   Mr. Argentieri and I believe Mr. Lake.

10     Q.    And in your expert report you also talk

11  about the possibility of paperweights being used

12  in a VSC machine during examination and that

13  those may have caused fluorescent tab marks;

14  right?

15     A.    That's essentially what I said, yes.

16     Q.    Did you see paperweights present at the

17  examination?

18     A.    No.  I was not allowed to go back there.

19     Q.    My question is did you see them present

20  during the defense examination.

21     A.    No, from my vantage point I couldn't

22  see them.

23     Q.    When you say you weren't allowed to go

24  back there, was there a rope that cordoned you

25  off and you could only stay in one corner of the

1                    L. Stewart

2    room?

3        A.    I was given instruction in the

4    beginning that I was to stay back and was not

5    allowed to approach the document.

6        Q.    You were not allowed to approach the

7    document?

8        A.    Correct.

9        Q.    So is it your testimony you never once

10   approached the document during the course of

11   defendants' examinations?

12       A.    That's correct, I did not approach the

13   document until I did my examination.

14       Q.    I remind you you are under oath today.

15   You are sure, your testimony is that you never

16   approached the document in the course of the

17   defendants' examination?

18       A.    I do not recall approaching the

19   document.  I recall the opposite, being told that

20   I cannot approach the document, and the first

21   time that I visually inspected the document was

22   when it was in front of me in Chicago.

23            I do not recall except from at least a

24   few feet away inspecting the document prior to

25   that.

```
 1                      L. Stewart
 2        Q.    So you're referring to an examination
 3   or an inspection that you would be, in other
 4   words, sitting in front of the document.  You
 5   acknowledge that you were a few feet away from
 6   the document earlier than when you started your
 7   examination; is that correct?
 8        A.    Yes, I was a few feet away from the
 9   document.
10        Q.    Okay.
11              So you could observe the document from
12   a few feet; correct?
13        A.    Correct.
14        Q.    And do you know the dimensions of the
15   paperweights that sometimes come with VSC units?
16        A.    Not exactly.  I recall them from the
17   time that I've used a VSC 4 and I believe that I
18   printed out a specification sheet from Foster +
19   Freeman that indicated the size of them, but I
20   don't have it in front of me.
21        Q.    If I were to tell you that the Foster +
22   Freeman brochure specifies that there are
23   paperweights that typically measure 25
24   millimeters by 150 millimeters, does that sound
25   consistent with your recollection?
```

1                        L. Stewart

2        A.      That would be about an inch by four

3    inches, I believe, and no, my recollection is

4    they are smaller than that.

5                You may be referring to a weighted

6    clip.  I'm referring to clips that they had that

7    were not weighted, they are probably not even

8    called a clip, they're just essentially little

9    small white-colored weights that would sit on the

10   document.

11       Q.      And are you referring to something that

12   would be an accessory from Foster + Freeman that

13   goes with the VSC or something else?

14       A.      We had it with our VSC when I had a VSC

15   4 at my disposal.  I assume it came from Foster +

16   Freeman, but I don't have the order sheet, so I

17   don't know, and I do recall going back to them as

18   a result of this case and asking for a

19   specification sheet where it was described on

20   there.  I just don't know the exact size.

21       Q.      And when you are referring to when we

22   had a VSC 4, what are you referring to?

23       A.      Early on in my career that was one of

24   the models that the Secret Service had access to.

25       Q.      And did you ever use that VSC machine

1                          L. Stewart

2       in the course of your work when you were with the

3       Secret Service?

4           A.    Yes.

5           Q.    And you're referring to small white

6       clips; is that how you referred to them?

7           A.    You could argue that they are clips.  I

8       don't know if that's what they at Foster +

9       Freeman refer to them as because they also, I

10      believe, held or had a device that physically

11      kind of put pressure down on the document, and

12      that may be also called a clip.

13               This was, as I said, something like a

14      whitish-colored rectangular-shape piece and there

15      were two of them.

16          Q.    And to be clear, you have no evidence

17      that there were in fact weights of any kind in

18      the room during the defendants' examination of

19      the document in this case; correct?

20          A.    That's correct.

21          Q.    Now, as you testified earlier, you are

22      aware that it's the defendants' position that the

23      Work For Hire document is a recent forgery

24      created for the purposes of bringing this

25      fraudulent lawsuit; correct?

1                        L. Stewart

2          A.    Yes.

3          Q.    And in his report Mr. LaPorte sets

4    forth the basis for his opinion that the document

5    was created recently; right?

6          A.    Yes.

7          Q.    He sets forth the basis for his opinion

8    that the ink in the interlineation on page 1 was

9    less than two years old when he tested the ink in

10   August of 2011; correct?

11         A.    Correct.

12         Q.    And he sets forth his basis for the

13   strength of his opinion, which was highly

14   probable or virtually certain; correct?

15         A.    Correct.

16         Q.    In his report Mr. LaPorte states that

17   he conducted GCMS testing on the inks; right?

18         A.    That's correct.

19         Q.    And he states from this GCMS testing he

20   determined that, among other things, the ink on

21   page 1 of the Work For Hire document contained PE

22   or phenoxyethanol; right?

23         A.    Yes.

24         Q.    And he states that the ink on page 1

25   had an unusually high PE level for a document

1                        L. Stewart

2     that's purported to be eight years old; right?

3          A.     Yes.

4          Q.     And in his report Mr. LaPorte states

5     that he determined that the ink on page 1 of the

6     Work For Hire document contained a sufficiently

7     high level of PE to conduct an ink-dating method

8     which we refer to as PE testing; right?

9          A.     Part of the ink on page 1, yes.

10         Q.     And in fact the amount that Mr. LaPorte

11    found in his opinion was more than double the

12    usual threshold amount for conducting PE testing;

13    right?

14         A.     Correct.

15         Q.     Specifically, he said that the

16    abundance value was over 20,000, which was more

17    than double the usual threshold of 10,000 to

18    conduct PE testing; right?

19         A.     That's what he said, yes.

20         Q.     And in his report Mr. LaPorte states

21    that in order to conduct PE testing he measures

22    the percentage of PE lost when an ink sample is

23    heated; right?

24         A.     Correct.

25         Q.     Mr. LaPorte further provides an opinion

1                    L. Stewart

2   that the loss of PE of 25 percent or more

3   indicates that the ink is less than two years

4   old; right?

5        A.    Correct.

6        Q.    In his report Mr. LaPorte further

7   states that after conducting PE testing on the

8   samples from the ink in the interlineation on

9   page 1 of the Work For Hire document he

10  determined there was an average loss of 64

11  percent of PE from that ink; right?

12       A.    I believe that's what he said, yes.

13       Q.    Now, to be clear, you are not offering

14  an expert opinion that GCMS testing itself is

15  unreliable; correct?

16       A.    Can you specify GCMS testing on what?

17       Q.    Well, what is GCMS testing?

18       A.    It's gas chromatography mass

19  spectrometry, the technique itself has been

20  around for many, many years.

21             GC began in 1903 for the study of

22  chlorophyl.  MS is a way of looking at ions and

23  detecting things, it's an add-on to a GC and has

24  been around for a long time as well, but not

25  nearly as long as GC.

```
 1                    L. Stewart
 2           The technique as far as forensics goes
 3    is used in many different applications and is
 4    reliable.  I'm questioning its use here in ink
 5    age analysis.
 6        Q.    And I understand that and we'll get to
 7    that.
 8           I'm asking a more general question
 9    which is, on its own GCMS testing itself, you are
10    not offering an opinion that it is unreliable;
11    correct?
12        A.    Across the board, no.
13        Q.    And you also do not offer an opinion
14    there's anything wrong with conducting GCMS
15    testing on ink; correct?
16        A.    For research no problem, beyond that
17    there may be a problem.
18        Q.    Okay.
19           Well, you don't offer any opinion about
20    any GCMS testing that you yourself conducted;
21    right?
22        A.    I did not conduct GCMS tests in this
23    case.
24        Q.    In fact you conducted no ink testing in
25    this case; correct?
```

1                          L. Stewart
2          A.    No.   I did physical analysis on the ink
3     and decided at that point to hold off doing any
4     chemical analysis and I still have the ink
5     samples today, I have not tested them.
6          Q.    And why did you hold off on doing the
7     chemical analysis?
8          A.    Because once we -- once I determined
9     that the ink was degraded, I agree at that point
10    that you're very limited what you can do
11    chemically to analyze that ink and held off at
12    that point doing any additional tests so I would
13    not lose the sample that I had.
14         Q.    Did you explain that in your report
15    that you have those ink samples and you decided
16    not to do any ink testing?
17         A.    No.
18         Q.    Any particular reason why you didn't
19    explain that in your report?
20         A.    I'm not asked questions in the report,
21    I am only putting in the report what I found.  If
22    I didn't do a test I didn't find anything.
23         Q.    You explain in the report that you took
24    ink samples from the document, do you not?
25         A.    Yes, I do.  I still have them.

1                          L. Stewart

2        Q.     Right.

3               So you don't explain to the court what

4    you did with those ink samples, you just leave it

5    as an open question?

6        A.     I believe at the end of the report I

7    indicated that I still had -- I would still

8    continue working on the case.  I mean, I may

9    still examine the inks today, I don't know.  At

10   this point I haven't examined those inks because

11   I don't see a need for it at this point.

12       Q.     But you don't explain that to the

13   Court, in other words, you didn't explain that I

14   took ink samples, I still have ink samples, I did

15   not test them because of to my conclusion, you

16   didn't explain that in your report; correct?

17       A.     No.  To me, that's not a place to put

18   that.

19       Q.     Now I want to get into your opinion

20   about PE, but I want to just also to make clear

21   what you are not offering an expert opinion on

22   relating to the general subject, so you are not

23   also offering any expert opinion specifically

24   refuting the propriety of Mr. LaPorte's threshold

25   of an abundance level of 10,000 in order to

```
 1                    L. Stewart
 2    conduct the PE test; is that right?
 3       A.    It depends.  I have to explain that
 4    answer.
 5       Q.    Let me ask you more specifically.
 6             In your report you are not offering any
 7    expert opinion specifically refuting the
 8    propriety of Mr. LaPorte's threshold of an
 9    abundance level of 10,000 in order to conduct the
10    PE testing; correct?
11       A.    In the report, no.
12       Q.    Now, you do not offer an expert opinion
13    in your report that there was no PE contained in
14    the ink on the Work For Hire document at all;
15    right?
16       A.    No.
17       Q.    Because you didn't test the PE in the
18    ink; right?
19       A.    Right.
20       Q.    And so therefore you are not offering
21    an expert opinion that the PE levels in the
22    interlineation on page 1 were not high; right?
23       A.    That's correct.
24       Q.    And you do not offer an opinion in your
25    report specifically refuting the propriety of the
```

                            L. Stewart

1

2    25 percent threshold that Mr. LaPorte uses to

3    make the age determination; right?

4        A.    It goes back to my earlier answer to

5    you which is in the report I don't have that

6    information, but you asked me if I refute that,

7    so it's two different questions.

8        Q.    Well, you submitted an expert report to

9    the Court.

10            You understand this is an important

11   case to your client and to our clients; right?

12       A.    Of course.

13       Q.    And it was not important to include

14   your expert opinions in the expert report?

15       A.    Of course it's -- but that wasn't an

16   opinion and --

17       Q.    If you want the Court to consider your

18   opinion, it should be in your report; would you

19   agree with that?

20       A.    No.  There's many times reports are

21   concise and there may be days' worth of testimony

22   concerning a report or surrounding a report, so

23   in testimony in depositions and in trial much

24   more comes out than is oftentimes found in a

25   report.

1                        L. Stewart

2        Q.    So what other opinions do you have

3    about this case that you're holding back on us

4    that you are not putting in your report?

5        A.    I'm not holding back anything.

6              You asked for something in addition to

7    my report, you asked me for an explanation and

8    when I tried to tell you the explanation you told

9    me to stick strictly to the report.

10       Q.    I'm not asking for an explanation, I'm

11   asking for your opinion, I'm asking for whether

12   you have a particular opinion or not, and the

13   question is, in your report do you state -- you

14   offer an opinion specifically refuting the

15   propriety of the 25 percent threshold Mr. LaPorte

16   uses for making the age determination?

17       A.    And again you asked in your report, so

18   you blocked me from answering the question.

19             If you're asking me the question to

20   refute it --

21       Q.    Well, why don't you answer my question,

22   which is, in the report do you offer any -- an

23   opinion specifically refuting the propriety of 25

24   percent threshold that Mr. LaPorte uses to make

25   the age determination, yes or no?

```
                           L. Stewart
 1
 2        A.     And I've answered that, in the report I
 3   don't have anything concerning that question,
 4   it's a new question.
 5        Q.     Well, you do state an opinion regarding
 6   PE testing and you state it's not a reliable
 7   test; right?
 8        A.     Not categorically I don't state that.
 9   I'm talking about the methodology that Mr. LaPorte
10   used.
11        Q.     And in your report you address some
12   factors that might affect the amount of PE found
13   in an ink on a document; right?
14        A.     Yes.
15        Q.     You mentioned storage or environmental
16   conditions; correct?
17        A.     Correct.
18        Q.     You mentioned other sources of
19   contaminations, which is skin cream or perfume;
20   right?
21        A.     Among others, yes.
22        Q.     And you mentioned that an improperly
23   conducted experiment might have an effect;
24   correct?
25        A.     Correct.
```

                         L. Stewart

1

2      Q.    So storage conditions, contaminants,

3  improperly conducted experiment.

4          Did I miss anything?

5      A.    I believe that's what I included in the

6  report.

7      Q.    So there are no other factors mentioned

8  in your report that might affect the amount of PE

9  found in the ink other than those three things;

10  correct?

11      A.    Well, you didn't give an all-inclusive

12  list.  I listed insect repellent --

13      Q.    I understand.  Other types of

14  contaminants.  I understand you listed others and

15  it was not an exhaustive list, contaminants

16  generally; right?

17      A.    That's correct.

18      Q.    So contaminants generally, improperly

19  conducted experiment, storage and environmental

20  conditions, those are the only factors mentioned

21  in your report that might affect the amount of PE

22  found in the ink; right?

23      A.    Well, the amount that's originally in

24  the ink would affect it.  At that section of the

25  report that's what I'm talking about are those

```
 1                      L. Stewart
 2    three things, but if you're asking me what can
 3    affect it, each ink is an individual formulation
 4    and the manufacturer may put PE in, it may not,
 5    it may put varying amounts in.
 6         Q.    Can you explain what phenoxyethanol is?
 7         A.    It's a chemical.
 8               Can I explain what it is beyond that?
 9         Q.    Yeah.
10         A.    It's used, as I mentioned in the
11    report, for a number of different things; beyond
12    that I can't explain what it's for.
13         Q.    Is it a volatile component?
14         A.    Yes.
15         Q.    What is a volatile component?
16         A.    Something that would evaporate with
17    heat is typically what we call volatile.
18         Q.    Why is it used in ink?
19         A.    It's used in ink as a solvent and when
20    ink is first made it's made as a liquid, it stays
21    liquid until it's applied to paper and then it
22    initially hardens to where you are not going to
23    be able to rub it off and then slowly hardens
24    beyond that.
25         Q.    What else is it used in?
```

                              L. Stewart

1

2       A.      In the world?

3       Q.      Yeah.

4       A.      It's on my list there, everything that

5   I could research, it's insect repellent,

6   fragrances, hand lotion.

7       Q.      And you said that because it's a

8   volatile component a known feature is that it

9   will evaporate with heat; right?

10      A.      That's typically what I mean when I

11  talk about something being volatile, yes.

12      Q.      Why is PE used in ink other than other

13  chemicals?

14      A.      I don't know.  I'm not an ink

15  manufacturer.

16      Q.      You are providing this court with an

17  expert opinion about the ink.

18      A.      Correct.  I know that it's found in

19  some inks.

20      Q.      You don't know why it's included in the

21  inks?

22      A.      No.  I am not a manufacturer.

23      Q.      And you are aware that PE in ink --

24              MR. SOUTHWELL:  Strike that.

25      Q.      You are aware that a known feature of

1                      L. Stewart

2      PE in ink is that it evaporates for roughly two

3      years and then the evaporation more or less

4      ceases; right?

5          A.     No.   There's differing opinions about

6      that.   Some articles talk about it being one

7      year, others talk about it being a few months and

8      then some articles talk about it up to two years,

9      so it's a point of contention.

10         Q.     Well, you are aware that a known

11     feature of PE --

12                MR. SOUTHWELL:   Strike that.

13         Q.     You would agree that a known feature of

14     PE in ink is that it evaporates for some period

15     of time and then the evaporation more or less

16     ceases; right?

17         A.     I would believe that that's the case,

18     yes.

19         Q.     When ink containing PE is fresh or

20     newer it will have a relatively high level of PE;

21     right?

22         A.     It would have its highest level based

23     on that formulation.

24         Q.     And you are aware that it is known to

25     evaporate quickly when first applied to paper;

1                          L. Stewart

2    right?

3         A.    Yes.

4         Q.    And that over time it evaporates more

5    and more slowly; right?

6         A.    That's correct.

7         Q.    Until at some point it levels off;

8    right?

9         A.    Levels off based on the capabilities of

10   the instrument doing the detection.

11        Q.    Fine.

12              So the PE, it will not measurably

13   evaporate much more at that point; is that fair

14   to say?

15        A.    That's fair.

16        Q.    And so ink that is not fresh or new

17   would have less PE, but it still would have a

18   certain level; right?

19        A.    If it had any at all in it.  Some inks

20   don't have it.

21        Q.    Fair enough.

22              If it had any at all, it would have its

23   highest levels when it was freshest on the paper

24   and at some point it would have less and remain

25   at that lower level; right?

1                        L. Stewart

2        A.     That's correct.

3        Q.     Now let's discuss the factors you had

4    identified potentially affecting PE levels

5    putting aside how much was in the ink to start

6    with, all right?

7               It is your opinion storage conditions

8    are a critical factor in fading techniques;

9    right?

10       A.     Yes.

11       Q.     Your opinion relating to the effects of

12   storage conditions is contained in paragraphs 228

13   to 230, somewhere in that area of your report;

14   right?

15       A.     Yes.

16       Q.     And that's your report, Defendants'

17   Exhibit 13; correct?

18       A.     I don't know that my report was entered

19   as a defendants' exhibit, I'm not sure.

20       Q.     It was, it's Defendants' Exhibit 13 at

21   the outset of this deposition.

22              Now, is it your position that it is

23   important to know the storage conditions of a

24   document; right?

25       A.     It's important if you were going to

1                          L. Stewart

2    reach a conclusion about the age of the document.

3         Q.    And that's because its possible storage

4    conditions could have affected the aging rate of

5    the ink; right?

6         A.    That's a known fact, yes.

7         Q.    Let's go to paragraph 235 of your

8    report, Defendants' Exhibit 13.

9              Your opinion that specifically relates

10   to PE and storage conditions is set forth there,

11   correct, and it specifically reads "Without a

12   full understanding of the storage conditions of

13   the Facebook contract as well as a determination

14   as to the cause of his purported unusually high

15   levels of PE in the damaged document, there can

16   be no weight given to his finding"; right?

17        A.    That's part of my finding.  It

18   continues there two paragraphs down where I talk

19   about there's no published standard for using the

20   LaPorte method.

21        Q.    I'm specifically referring to the

22   storage conditions aspect of your opinion.

23        A.    You're correct.

24        Q.    Right?

25              So you do not state an opinion that the

1                        L. Stewart

2    storage conditions of the Work For Hire document

3    actually had an effect on the levels of PE in the

4    ink on the first page; right?

5         A.     No.  It could have had an effect.

6         Q.     It could have, but you are not opining

7    that it actually did have; correct?

8         A.     There's no way of knowing, so, no, I am

9    not opining to that.

10        Q.     What are the factual bases for your

11   opinion that storage conditions could have

12   affected the PE levels?

13        A.     General understanding of chemistry

14   where if something is volatile, if it's heated

15   it's going to evaporate, if it's kept cold it's

16   going to evaporate slower, knowledge of that

17   actually being the case because of experiments

18   and research that I've conducted and published,

19   knowledge that other peers in the field have

20   published where they all warn against making ink

21   age analysis determinations without full

22   knowledge of the storage conditions and

23   appreciation of what they could have done as far

24   as affecting the aging of the document.

25        Q.     And I understand that those are your

1                    L. Stewart

2    bases for your opinion that the storage

3    conditions could have affected the aging rate, in

4    other words, you are speculating about what could

5    have affected the aging rate in the document

6    here; right?

7        A.    Correct.

8        Q.    And what I'm asking, I guess, to be

9    more specific, is what are your factual bases

10   that the storage conditions of the actual

11   document here could have caused the high levels

12   of PE in ink on the first page?

13       A.    Simply the information that Ceglia has

14   brought forward as far as his declaration.

15       Q.    That's the only piece of information

16   you have on which to support your speculation

17   that this could have happened; correct?

18       A.    That's correct.

19       Q.    And that was the, I think you said,

20   roughly two-minute conversation you had with him

21   followed by the declaration that he put in;

22   correct?

23       A.    Followed by review of the weather

24   conditions in that area over a period of time, I

25   looked at that to decide whether or not

                        L. Stewart
1    Mr. Ceglia's response was accurate and I used
2    that as well.
3        Q.    So two pieces of information, what Paul
4    Ceglia told you and the weather reports; right?
5        A.    That's correct.
6        Q.    And what Paul Ceglia told you is then
7    memorialized in the declaration that he filed;
8    right?
9        A.    Yes.
10       Q.    You are not relying on anything other
11   than what he told you in that declaration; right?
12       A.    That's correct.
13       Q.    As you testified, if environmental
14   conditions are hot, for example, you would expect
15   to see evaporation of PE accelerate.
16            Fair enough?
17       A.    We need to define hot, but basically,
18   yes.
19       Q.    So you would not expect to see high
20   levels of PE in ink on a document that was stored
21   in summerlike conditions in the northeast United
22   States in a nonclimate-controlled room; right?
23       A.    We would have to address humidity in
24   the Northeast as a possible contributor that can

1                          L. Stewart

2    affect how quickly something volatilizes or

3    evaporates.

4              Using your scenario in Palm Springs, I

5    would expect that it would evaporate quicker.

6         Q.    And what role would humidity have?

7         A.    It has a role that's been addressed by

8    peers in the field and previous research.  It's

9    actual effect is unclear still and needs to be

10   researched further, but it has shown to have an

11   effect.

12        Q.    And as you state in your report, cold

13   conditions could slow down the aging process;

14   right?

15        A.    It could.

16        Q.    So it might take longer than usual for

17   PE to evaporate from ink if they are stored in

18   what would be considered cold conditions?

19        A.    That's correct.

20        Q.    So, as an example, if a document was

21   stored in a meat refrigerator that was on and

22   cold you might expect the PE to evaporate in the

23   ink more slowly; right?

24        A.    I would expect that, yes.

25        Q.    How long would it be slower?

1              L. Stewart

2         MR. SOUTHWELL:  Sorry.  Let me strike

3     that.

4     Q.    If something was kept in cold

5  conditions and it would cause the PE in the ink

6  to evaporate more slowly, how long -- how much

7  longer would it slow the evaporation?

8     A.    There's no way of answering that

9  without doing experiments on the specific formula

10  of ink, and that has not been done.  Not only was

11  the ink not identified here, we don't know what

12  was in it originally and there's not been any

13  research done on the potential effect of cold on

14  this ink.

15     Q.    Now, you mentioned humidity and that

16  the results or the effects of that on evaporation

17  of PE are unknown.

18         What about the effects of humidity on

19  documents?

20         It's generally known that humidity and

21  moisture might cause mold in documents; right?

22     A.    It could.

23     Q.    You testified that you learned of what

24  Mr. Ceglia has claimed was how he stored the

25  document in roughly April of this year, that was

```
 1                    L. Stewart
 2    roughly nine, 10 months after you actually
 3    examined the documents in question; correct?
 4         A.    After I first examined them, yes.
 5         Q.    So prior to that you did not have any
 6    information about how the Work For Hire document
 7    was stored; correct?
 8         A.    No.  I believe I was told by lawyers
 9    that it was stored in a New York, northerly New
10    York home, but I don't have specifics.
11         Q.    Did you ask those lawyers for more
12    specifics about the environmental conditions or
13    storage conditions?
14         A.    At that point, no.  We did not have an
15    ink age analysis report to look at.
16         Q.    You mentioned you are relying on Paul
17    Ceglia's statements to you in his submission of a
18    declaration sworn under oath and I guess you are
19    referring also to weather reports as another
20    fact.
21               How do you know that Mr. Ceglia's
22    telling you the truth about this?
23         A.    I don't, that's why I referred to the
24    weather reports as a backup.
25         Q.    And what kind of backup does the
```

                                L. Stewart

1
2      weather report show?  It shows that it's cold in
3      Buffalo?
4          A.    Exactly.
5          Q.    And you need a weather report to tell
6      you that?
7          A.    I thought you guys might as a document
8      to support my --
9          Q.    And how does that tell you that Paul
10     Ceglia's telling the truth?
11         A.    It doesn't.
12         Q.    So you don't have anything to tell you,
13     to support Paul Ceglia's testimony other than
14     what he's told you; right?
15         A.    And the weather report.
16         Q.    You just said the weather report
17     doesn't give you independent corroboration of
18     what he's telling you, it just simply says that
19     it's cold in Buffalo in winter, that's hardly
20     corroboration of his story.
21               His story is about how he stored the
22     document; right?
23               How does a weather report provide any
24     support for how he stored the document to give
25     you any confidence that he's telling the truth?

Page 222

1                        L. Stewart

2        A.    I'll tell you why.

3              He told me where and how he stored the

4    document.  I then compared that against the

5    independent weather report and realized that his

6    recollection of the temperatures in the area were

7    spot on and so I did use that as a way of looking

8    at what he said and seeing if I agreed with it or

9    not.

10       Q.    So he told you the average temperatures

11   each year in the months that he was not living in

12   Buffalo and that was corroborated by the weather

13   reports because they were spot on?

14       A.    No, he --

15       Q.    What do you mean by spot on?

16             MR. BOLAND:  Objection.

17             Let him answer the question, Alex.

18       A.    He mentioned the number of months per

19   year that he lived in the facility, he mentioned

20   that the facility was not heated and the city and

21   location of the facility, that I then

22   corroborated with the weather report and then

23   later on I received his declaration that

24   elaborated even more on it.

25       Q.    And does the weather report corroborate

1                    L. Stewart

2    the fact that he claims to have kept the document

3    in a hope chest?

4        A.    No.

5        Q.    The only thing the weather report

6    corroborates is that it's cold in Buffalo in the

7    winter; right?

8        A.    It had the winter weather as well as

9    the summer and the spring and the fall weather,

10   so the entire time it was stored there we had the

11   weather reports.

12       Q.    Okay.

13             Does the weather report provide any

14   corroboration for his claim he kept the document

15   in a hope chest?

16       A.    No.  I already told you that.

17       Q.    Does the weather report provide any

18   corroboration that he kept the document in a hope

19   chest in a room that was not insulated?

20       A.    No.

21       Q.    Does the weather report provide any

22   corroboration to the fact that he asserts that he

23   kept the document in a house that does not have

24   central heating?

25       A.    No.  I assume that's easy to check

```
1                        L. Stewart
2    into, but I don't have --
3         Q.    Did you check into it?
4         A.    No.  I assume that would be something
5    that the lawyers would do.  I don't have that.
6         Q.    You're representing him as his expert;
7    right?  You could have asked him that?
8              MR. BOLAND:  Objection.
9         A.    Not as a plumber-heater expert.  I'm
10   presenting the forensic findings to you.
11        Q.    You just testified that the storage and
12   environmental conditions are a critical factor in
13   providing an opinion, this is critical piece of
14   information about that and you didn't ask him.
15        A.    For independent verification that his
16   house was heated?
17        Q.    To corroborate that he's telling the
18   truth.
19        A.    No, I did not ask him for that.
20        Q.    Have you personally seen the room in
21   which he says the Work For Hire document was
22   stored?
23        A.    No, I have not.
24        Q.    Do you know whether there's carpet in
25   the room?
```

```
 1                     L. Stewart
 2      A.    No.
 3      Q.    Is there insulation?
 4      A.    I don't know.
 5      Q.    Can you tell me anything about the
 6   room?
 7      A.    No.
 8      Q.    You don't have any firsthand knowledge
 9   about that; correct?
10      A.    No.
11      Q.    So you don't know if there is an air
12   conditioning unit in the room; right?
13      A.    I do not know that.
14      Q.    How about the hope chest that he claims
15   the document was stored in, have you seen that?
16      A.    No.
17      Q.    Do you know whether it exists or not?
18      A.    No.  I assume that it's easy to find
19   out, but I don't have that information.
20      Q.    You don't know one way or the other;
21   right?
22      A.    No.
23      Q.    You don't know what it's made out of;
24   right?
25      A.    No.
```

1               L. Stewart

2        Q.    And Mr. Ceglia in his declaration said

3   that the Work For Hire document was stored with a

4   series of other documents dating from the same

5   time.

6              Have you examined those documents?

7        A.    No, I have not.

8        Q.    Did you ask for them?

9        A.    No.

10       Q.    Didn't you think that would be

11   important to examine in rendering an opinion for

12   the Court?

13       A.    No.  It's different documents and, if

14   anything, they contaminated this document, they

15   are not going to add to the result here.

16             The ink on this document is

17   contaminated to the point it can't be tested.

18       Q.    And that could have been caused by

19   other documents in this hope chest; is that what

20   you're saying?

21       A.    No.

22             There could be a transference from

23   documents, there could be all kind of effect from

24   other documents.

25             I don't know.  All I know is that it

1                    L. Stewart

2  makes the document completely unreliable, as far

3  as ink age analysis goes.

4        Q.    Do you have any basis, any factual

5  basis to support your speculation that there

6  could have been ink transference?  Is that in

7  your report?

8        A.    No, it's not in my report, that's not

9  something I --

10       Q.    Do you have any factual basis to assert

11  that?

12       A.    Yes.  Firsthand knowledge.  If a

13  document is moistened, and you mentioned humidity

14  as a factor here, if it's moistened and you've

15  got a water-based ink, of course you could get

16  transfer.

17       Q.    So what firsthand knowledge do you have

18  of the Work For Hire document being stored in a

19  hope chest with other documents?

20       A.    I don't of that.  My firsthand

21  knowledge is experimentation with inks and papers

22  and seeing that there can be a transfer.

23       Q.    So you have no firsthand knowledge

24  about transference with respect to the document

25  in this case, the purported Work For Hire

                              L. Stewart

1
2    document; correct?
3         A.    That's correct.
4         Q.    You are just speculating about this;
5    right?
6         A.    No.  I'm answering your question.
7               You brought up humidity, you brought up
8    what I know and what I don't know, and so my
9    response to you is based on my own research and
10   that's as far as it goes.  I don't know about
11   this case.
12        Q.    I understand.
13              You've got research that says that
14   there can be transference in general.  What I'm
15   asking is, you have no specific factual
16   information that there was transference of any
17   ink here, that's simply speculation; right?
18        A.    I'm not speculating that there was
19   transfer, I'm saying I don't know one way or
20   another.
21        Q.    Right.
22              Meaning that you have no opinion that
23   there was; right?
24        A.    Correct.
25        Q.    Now, as you said, the weather report

1                          L. Stewart

2    establishes that, well, there's winter, spring,

3    summer and fall in Buffalo; is that fair to say?

4         A.    It did establish that, yes.

5         Q.    Okay.

6               And you understand from, I would say,

7    common sense understanding of what weather is

8    like in the Northeast and I guess supposedly the

9    weather reports that it's warmer and milder in

10   the spring, even warmer in the summer and then

11   colder in the winter; right?

12        A.    Correct.

13        Q.    And in Wellsville, New York, where we

14   are talking about, it gets quite cold in the

15   winter, right, freezing temperatures; correct?

16        A.    That's my recollection, yes.

17        Q.    But it's not Antarctica, right, the

18   temperature is not constantly freezing; is that

19   right?

20        A.    That's correct.

21        Q.    And in fact in the summer it can get

22   hot, you can have highs in the upper seventies or

23   eighties, even sometimes the nineties; right?

24        A.    I believe so.

25        Q.    So you would acknowledge that Mr.

Page 230

1              L. Stewart

2    Ceglia's house was not constantly in subzero

3    temperatures; right?

4        A.    That's correct.

5        Q.    It was subject to all the seasons of

6    the year; right?

7        A.    That's correct.

8        Q.    So every year since 2003, since the

9    Work For Hire document was supposedly signed in

10   April of 2003, it was supposedly subjected to the

11   summers of 2003, 2004, 2005, 2006, 2007, 2008,

12   2009 and part of 2010; right?

13       A.    As well as the winters, yes.

14       Q.    So roughly seven summers, seven

15   winters; yes?

16       A.    Again, I don't know if the document was

17   stored there its entire life, but it's been -- it

18   would have been seven years wherever it was

19   stored.

20       Q.    So you would acknowledge that in this

21   area of the country where the document was stored

22   you have substantial periods of time over those

23   seven years where it's hot, which might

24   accelerate the aging of ink, and where it's cold

25   which might decelerate the aging of ink; right?

```
 1                    L. Stewart
 2      A.    I would not refer to 70- to 80-degree
 3  temperatures as being hot as accelerating the
 4  ink, that would be pretty much normal
 5  temperatures that we would consider when we do
 6  research.  Anything above that would be hot.
 7      Q.    So if there's normal temperatures you
 8  are testifying it would not accelerate, it would
 9  just have the normal evaporation?
10      A.    Right.  The age research that's been
11  done on ink typically assumes normal aging as far
12  as temperature and humidity.
13      Q.    Now, as you said before, your factual
14  basis with respect to what Mr. Ceglia told you
15  about how the document was stored and the weather
16  report is your support for providing this
17  possibility that storage conditions could have
18  had some affect; right?
19      A.    No.  Storage conditions having an
20  affect on the aging of a document has been widely
21  reported by peers in the field for decades.
22      Q.    I understand that.  Listen to my
23  question, if you would.
24            My question is about the Work For Hire
25  document here and what you are testifying to and
```

1                        L. Stewart

2      what your report says is that based on

3      Mr. Ceglia's say-so and the weather reports there

4      is a possibility that those storage conditions

5      could have had some effect on this document;

6      right?

7          A.    That's correct.

8          Q.    Now, you're familiar with a forensic

9      document expert named Albert S. Osborn; right?

10         A.    Yes.

11         Q.    And indeed, in your report, Defendants'

12     Exhibit 13, paragraph 32, you cite to a book by

13     Albert Osborn; right?

14         A.    Yes.

15         Q.    And Mr. Osborn is described by some as

16     the grandfather of forensic document examination;

17     right?

18         A.    Yes, I've heard that.

19         Q.    He is one of the esteemed practitioners

20     that document examiners study in the course of

21     their training; right?

22         A.    Yes.

23         Q.    And he wrote a number of leading books

24     in the field; right?

25         A.    Yes.

```
 1                        L. Stewart
 2       Q.    What are their titles?
 3       A.    You're holding "Questioned Documents."
 4   I don't know all of the titles.
 5       Q.    You cite "The Problem of Proof" in your
 6   report, right, that's another one?
 7       A.    Okay.
 8             I've got hundreds of books in my
 9   collection, I believe those two are two of his.
10       Q.    And those documents, "Questioned
11   Documents" by Albert S. Osborn and "The Problem
12   of Proof," those are reliable authorities;
13   correct?
14       A.    I would consider then that, yes.
15       Q.    You have read those books; yes?
16       A.    Yes.
17       Q.    Are all of those books in your library?
18   You said you've got hundreds of books.
19             Are those included in your library?
20       A.    The two that I referred to are, yes.
21       Q.    And the two being "Questioned
22   Documents" and "The Problem of Proof"; right?
23       A.    I don't believe I refer to "The Problem
24   of Proof," do I?
25       Q.    I think you do at -- no, I guess you
```

```
                                    Page 234
 1                    L. Stewart
 2   may not.
 3            And which edition of "Questioned
 4   Documents" do you have in your library?
 5      A.    The 1910 edition.
 6      Q.    Do you have the second edition from
 7   1929?
 8      A.    I believe I do, yes.
 9      Q.    Okay.
10            You don't cite "The Problem With
11   Proof," but you're familiar with the book; right?
12      A.    Yes.  I believe that was one of his
13   books, yes.
14      Q.    You testified a moment ago that you
15   read it?
16      A.    Yes.  I just don't recall the exact
17   title, but I think that's one.
18            MR. SOUTHWELL:  If I could have this
19      marked as our next exhibit, please,
20      Defendants' Exhibit 24.
21            (Defendants' Exhibit 24, excerpts from
22      Albert S. Osborn's book "The Problem of
23      Proof," marked for identification, as of
24      this date.)
25      Q.    I'm showing you now Defendants' Exhibit
```

1                           L. Stewart

2     24, which are some excerpts from Albert S.

3     Osborn's 1922 book "The Problem of Proof."

4              Look at that, please.

5        A.      Thank you.

6        Q.      I'm going to direct your attention to

7     page 32.

8        A.      I believe you said 1924.  It says 1922

9     on the front page.

10       Q.      Thank you.  Yes, that's right.

11       A.      32, did you say?

12       Q.      Yes.

13       A.      Okay.

14       Q.      And there Mr. Osborn is talking about

15    questioned document stories and studies of

16    inherent improbability and provides an example

17    relating to foundling wills.

18              Have you heard of the term, these types

19    of documents, foundling wills?

20       A.      I am trying to find that in the

21    document.

22              I believe he is referring to wills that

23    come in after the fact, after the death.

24       Q.      Are you familiar with the concept of

25    foundling wills?

1                    L. Stewart

2      A.    I recall reading about it in very early

3  books, but I'm not familiar with the concept, no,

4  other than his explanation of what he means by it.

5      Q.    Let's look here in the middle paragraph

6  on page 32, starting with the second sentence,

7  Osborn defines foundling wills as a particular

8  type of questioned document and he says, quote,

9  "One class of stories of this kind are those

10 relating to foundling wills which make a tardy

11 appearance and in effect, at least, are left on

12 the doorstep of the administrator or an executor

13 of an estate.  When these peculiar papers, many

14 of which are spurious, are brought into court

15 they must, of course, be accounted for in some

16 way.  The stories designed to explain the long

17 delay, the unusual appearance and the startling

18 contents of these documents furnish most

19 interesting studies."

20            Is that what this says here?

21      A.    Yes, it is.

22      Q.    And then it goes on:  "When analyzed,

23 these stories often are inherently improbable.

24 This improbability is accentuated when they are

25 compared with the stories relating to similar

1                    L. Stewart

2  papers in other cases.  One of the common

3  similarities in the alleged life histories of

4  these misplaced documents is the utter

5  indifference with which a very valuable paper was

6  handled and kept by those in whose hands it was

7  left and in whose interest it was drawn.  It

8  apparently was tossed about from pillar to post

9  with the utmost unconcern.  It was thrown into

10  some old box or basket or shoved into some old

11  book or almanac or handed over to a witness who

12  is almost a stranger and then entirely forgotten.

13  After the death of the testator, and sometimes

14  long after, it all at once turns up 'accidentally

15  and providentially.'  The accounts of the hiding

16  places of some of these forgotten wills develop

17  some occasional and striking originality, but in

18  numerous ways the stories are strangely alike."

19            Do you see that?

20      A.    Yes.

21      Q.    Now, seeing this description, doesn't

22  the Work For Hire document and the circumstances

23  of its supposed discovery sound an awful lot like

24  a foundling will?

25      A.    Not to me.  I don't know the

1                    L. Stewart

2    circumstances of the discovery completely.  I

3    know that it is at issue between two sides who

4    both have a different opinion about its origin.

5        Q.    Wouldn't you agree that it has

6    startling contents, a two-page contract

7    purporting to entitle someone to half of a

8    multibillion-dollar company, isn't that startling

9    contents to you?

10       A.    It is.

11       Q.    And wouldn't you agree that it has made

12   a tardy appearance, appearing seven years after

13   which it was purportedly signed?

14       A.    That's the document that we're seeing,

15   I believe, is seven years afterwards.  I don't

16   know that there's any earlier e-mails or things

17   that discuss the document and its provenance.

18       Q.    Are you aware of any?

19       A.    No, but I'm not aware that there aren't

20   any.

21       Q.    And that tardy appearance must, of

22   course, be counted in some way, as Osborn says,

23   and the way that it was accounted here was that

24   it was thrown into some old box or basket like a

25   hope chest.

                          L. Stewart
1
2                   Doesn't that sound like what the
3       situation we have for the Work For Hire document?
4           A.    No.  That's what sounds like one side
5       of a party is saying that has then become an
6       issue that forensic scientists have to look at
7       and address and that's what's happening.
8           Q.    And that's precisely what Osborn says,
9       that these stories often alone are sufficient to
10      arouse a strong suspicion that the document is
11      not genuine and it requires examination and
12      analysis; right?
13          A.    Of course.  You always get a one-sided
14      view from one party in a case, you don't trust
15      that.
16          Q.    And Osborn's conclusion as to these
17      types of stories is that they alone are
18      sufficient to arouse a strong suspicion that the
19      document is not genuine; right?
20                  Would you agree with Osborn's
21      conclusion about these foundling will stories?
22          A.    I've never examined any of his wills
23      from 1922 that led to him writing this book.  I
24      have examined numerous wills in recent years and
25      oftentimes they're false.

1                        L. Stewart

2        Q.    And would you agree with the assertion,

3    which is what Osborn also concludes, that when

4    you're presented with a document that is

5    questioned and it comes with a story of tardy

6    appearance and startling contents, that that

7    would arouse a strong suspicion that the

8    document's not genuine, that it would require

9    additional testing; would you agree with that?

10       A.    I would say that any document like that

11   that becomes an issue of a court case requires

12   independent forensic testing and that you

13   shouldn't trust what either side tells you as

14   being accurate.

15       Q.    And you want to seek out solid facts

16   that would address what could be a suspicion the

17   document's not genuine based on the story about

18   how it was discovered; is that fair to say?

19       A.    Correct.

20       Q.    Yes?

21       A.    Yes.

22       Q.    And here you relied, in addition to

23   your examination, which, of course, doesn't go to

24   the question of the storage of the document, you

25   relied on Mr. Ceglia's statement and declaration

```
 1                      L. Stewart
 2   regarding the storage of the document; right?
 3       A.    Well, my examination does go towards
 4   the storage of the document and that I reported
 5   that your expert who's opining about the age of
 6   the document did not consider that in his
 7   opinion, so I do refer to that.
 8            As far as Mr. Ceglia making a comment
 9   about its storage conditions, we got the weather
10   report and the rest I assume is records that we
11   could obtain regarding whether heaters were put
12   in his house, whether he paid services to have
13   the house prepared for winter.  I'm sure there's
14   ways of checking to see if his story is accurate;
15   but that is not part of what I've done.
16       Q.    And you've provided no evidence of
17   that; right?
18       A.    I've provided just his --
19       Q.    His statements, yes, and --
20       A.    And the weather --
21       Q.    -- and the weather report that --
22            MR. BOLAND:  Objection.
23       A.    -- and then my reliance on other
24   research and research I've done to show that it
25   is an important factor.
```

L. Stewart

1

2     Q.     Right.

3            And as you've just agreed, the weather

4     report provides no corroboration as to actually

5     how the document was stored in a hope chest in an

6     uninsulated room; correct?

7     A.     That's correct.

8     Q.     So you weren't suspicious or skeptical

9     of Mr. Ceglia's story, you're perfectly

10    comfortable relying on that?

11    A.     I am suspicious about what both sides

12    are saying.

13    Q.     You also testified about your assertion

14    that other experts in this case did not rely on

15    information about the storage conditions.

16           What is your factual basis for

17    asserting that the defendants' experts did not

18    rely on the available information from plaintiff

19    about the storage conditions?

20    A.     Factually I have Mr. LaPorte's own

21    research that he's published where he talks about

22    the importance of relying on that --

23    Q.     You are not listening to my question.

24           Can you answer my question rather than

25    the question you want to answer?

1                    L. Stewart

2           MR. BOLAND:  Objection.

3      Q.    My question is, what factual basis do

4  you have to assert that the defendants' expert

5  did not rely on information about the storage of

6  this particular document, the Work For Hire

7  document?

8      A.    And I'm trying to answer that for you.

9      Q.    Okay.

10           So try answering that question, please.

11     A.    Okay.

12           If Mr. LaPorte published reality, which

13  is that the storage conditions do affect the

14  aging of the document, then he did not follow

15  that in this case because he would not have

16  tested the document.

17     Q.    That does not answer my question.

18           My question is, you have asserted that

19  there is no -- that defendants' experts have

20  not -- have ignored the evidence of the storage

21  conditions of this particular document.  I'm not

22  talking about published reports, I'm talking

23  about this particular document.

24           What is your factual basis for that

25  assertion?

1                    L. Stewart
2        A.    It's an assumption and it's assumption
3    based on had he followed his own research, he
4    would never have done the test.
5        Q.    So you have no factual basis, you are
6    simple making an assumption and speculating;
7    correct?
8        A.    I'm assuming it based on his original
9    research being accurate; if that's accurate then
10   there should not have been a test here.
11       Q.    So you have no factual basis, you are
12   assuming it; correct?
13       A.    I'm assuming it, correct.
14       Q.    Now let's talk about the other factor
15   you note as potentially having an affect on PE
16   levels, the contamination; right?
17            So in paragraph 223 you state that
18   LaPorte indicates the amounts of PE he found in
19   the Facebook contract was in abundance and more
20   than double the usual threshold for conducting PE
21   testing.  This clearly shows that surprisingly
22   high levels of PE most probably came from some
23   other contamination source or else from an
24   improperly conducted experiment or conclusion
25   reached by LaPorte.

                              L. Stewart

1

2              Did I read that correctly?

3        A.    That's what it said.

4        Q.    And we'll talk about the suggestion of

5   improperly conducted experiment in a moment, but

6   it's your position that a high level of PE in the

7   ink in the Work For Hire document most probably

8   came from some other contamination source; right?

9        A.    No.  It's my finding that it should

10   have been considered.

11        Q.    Could I direct your attention to

12   paragraph 223 of your report, the second

13   sentence, which reads "This clearly shows that

14   the surprisingly high levels of PE most probably

15   came from some other contamination source or else

16   were from an improperly conducted experiment or

17   conclusion reached by LaPorte."

18              Do you see that?

19        A.    Yes.

20        Q.    Do you want to change the answer you

21   just testified to?

22        A.    No.  You're not reading the five

23   paragraphs before that that all pertain to the

24   same thing.  I am leading up to an opinion based

25   on numerous things and you're breaking it apart

1                    L. Stewart

2    in individual components.

3        Q.    So you're saying that the high levels

4    of PE came from a cumulative effect of a variety

5    of things?  Is that what you're saying?

6        A.    No, that's not what I just said.

7              You can go back to early on in that

8    section and you can see a number of different

9    factors that I'm pointing out that may effect the

10   level of PE.  It's not something new I'm coming

11   up with, it's something that's been reported

12   widely in the research.

13       Q.    Let's look then at your sentence in

14   paragraph 223.

15             Can you read the second sentence in

16   paragraph 223?

17       A.    "This clearly shows that the

18   surprisingly high levels of PE most probably came

19   from some other contamination source or else from

20   an improperly conducted experiment or a

21   conclusion reached by LaPorte."

22             That's three separate components that

23   refer to the 10, 12 paragraphs before.

24       Q.    And you mention in 221 the idea that

25   there could be various contaminants and you list

```
 1                        L. Stewart
 2    sunscreens -- skin creams, sunscreens, fragrances
 3    and cosmetics as well as insect repellents; right?
 4         A.    That's correct.
 5         Q.    Those are other contaminants that you
 6    assert have PE as a component; right?
 7         A.    Not I.
 8               Those are assertions by Mr. LaPorte and
 9    then other cited sources that I have.
10         Q.    Okay.  But I'm talking about your
11    report.
12               This is not an assertion of your report
13    where you say it is known to be widely used in
14    skin creams, you're referring to -- you are
15    disclaiming that this is your opinion that you're
16    providing in 221?
17         A.    No.  That was researched and reported
18    by LaPorte earlier on, so I trust that that's
19    true.
20         Q.    Okay.
21               But this is your opinion, I'm talking
22    about your report.
23               So you're saying you don't adopt that,
24    you are just saying that's LaPorte?
25         A.    No, I'm not saying that at all.
```

1                        L. Stewart

2      Q.    I am asking if this is your opinion.

3            Is this not your opinion?

4            221, paragraph 221, look at that,

5  please.

6      A.    Okay.

7            Are you ready?

8      Q.    Go ahead.

9      A.    I am trying to say that if you read

10  that it says that it is found, it is known to be

11  widely used in all of those different things.  I

12  believe four of those came from Mr. LaPorte's

13  research and the fifth one came from a chemistry

14  guidebook called "The Merck Index."

15     Q.    Are you providing this opinion to the

16  Court?

17     A.    Yes.

18     Q.    And how would those products have made

19  their way onto the document such as the Work For

20  Hire document such that they might have this

21  possible effect that you comment upon?

22     A.    A number of people did not use gloves

23  when they examined the document in Buffalo, if

24  they went to the restroom and they put some kind

25  of a lotion on their hands it could affect it; if

```
 1                        L. Stewart
 2    the document was stored in a facility that was
 3    sprayed for bugs it could affect it.
 4             I don't know.  I'm putting it out there
 5    because I'm putting out possibilities that should
 6    have been considered and they weren't.
 7       Q.    And you say a number of people handled
 8    the document without gloves.
 9             Who?
10       A.    I don't know.  We'd have to review the
11    entire tape.  I don't want to point fingers
12    without reviewing it, but I do recall that there
13    people that did not have gloves on when they
14    touched the document.
15       Q.    How many people?
16       A.    I don't have a number.
17       Q.    But you are just speculating that a
18    number of people did?
19       A.    I'm trying to answer your question.  We
20    can stop and review the tape, if you like.
21       Q.    You are prepared to testify here and
22    tell the Court many people, but you don't
23    actually know because you haven't reviewed the
24    tape recently and you don't have that number at
25    the ready; is that right?
```

```
 1                          L. Stewart
 2        A.     My recollection is that there were a
 3   number of people who touched it without gloves on.
 4        Q.     And if they touched the edges of the
 5   document would that have --
 6               MR. SOUTHWELL:  Well, strike that.
 7        Q.     How would touching a document using --
 8   let's use an example -- an arm that had sunscreen
 9   on it, how would that put the contaminant onto
10   the document?  Would it have to be a palm or a
11   forearm, something like that?
12        A.     I don't know that it would.  It would
13   have to be researched.
14               If we know that PE is in that material
15   and somebody had it on their hands and they
16   touched the document without gloves, then there's
17   certainly the possibility of transfer.
18               To get it on the ink there would have
19   to be a specific touch to the area that had the
20   ink on it or it would have to be rubbed over to
21   that area by someone else at a later time.
22        Q.     And just to be clear, you are
23   speculating that these might be options that
24   should be considered; right?
25        A.     Correct.
```

1                    L. Stewart
2        Q.    You didn't find any of these items,
3    these contaminants on the Work For Hire document;
4    correct?
5        A.    No.  We don't know if there's any
6    contaminants on the document.
7        Q.    Well, did you look?
8        A.    I wouldn't know what to look for.  I
9    don't have chemical compositions of these
10   materials.  The mere presence of PE could have
11   come from a number of sources.
12       Q.    Did you conduct any test to determine
13   whether there were contaminants on the page?
14       A.    No.  It would be a permanent position
15   for the rest of my life to try to figure that
16   out.
17       Q.    But the answer is you did not conduct
18   any tests to determine whether there were any
19   contaminants on the page; correct?
20       A.    Correct.
21       Q.    Did you see anyone buy lotion or
22   sunscreen on their hands and then handle the
23   document?
24       A.    No.  I saw people leave the room for
25   restroom breaks and I don't know what they did.

```
                            L. Stewart
 1
 2       Q.     Did you see anyone spray insect
 3   repellent on the document?
 4       A.     No.  That referral was maybe under the
 5   control of the Ceglias when it was in the hope
 6   chest.
 7       Q.     He might have sprayed insect repellent
 8   on it?
 9       A.     He might have.  I don't know.
10       Q.     Do you know who did test the document
11   for contaminants?
12       A.     I don't know if anyone tested it.
13       Q.     Mr. LaPorte tested the document for
14   contaminants.
15              Did you know that?
16       A.     I would love to have the chance to
17   depose him on that.
18       Q.     Oh, okay.
19              You want to depose Mr. LaPorte now?
20              MR. BOLAND:  Objection.
21       A.     No.  I assume when his chance for
22   deposition comes I will be, as he is here with
23   you, I'll be providing questions and I'd love
24   that opportunity.
25       Q.     Do you want to ask the questions in the
```

1                     L. Stewart

2    deposition?

3               MR. BOLAND:  Objection.

4         A.     That would not be my role.  I would

5    just, as your experts are doing, provide

6    information to the lawyers.

7         Q.     You're sure you wouldn't like to ask

8    the questions?

9               MR. BOLAND:  Objection.

10        A.     I think I answered that.

11        Q.     Okay.

12               So you're not aware that it's

13   Mr. LaPorte's standard protocol to run paper

14   blanks prior to GCMS testing and PE testing?

15        A.     Of course that's his protocol, but that

16   would not test for contamination of the area of

17   the ink.

18        Q.     Did you know that he ran paper blanks

19   and found no phenoxyethanol in the paper blanks?

20        A.     A paper blank that had no ink on it

21   having no phenoxyethanol means nothing to me.

22        Q.     It means nothing to you?

23        A.     Right, because it's not the -- what he

24   tested to get phenoxyethanol was ink plus paper.

25        Q.     I see.

1                    L. Stewart

2          So there had to be a tiny dab of

3    sunscreen on exactly that little piece of ink and

4    that could have possibly caused the contamination;

5    is that it?

6      A.    I don't know the amount.  I'm just

7    saying the literature says it is something that

8    should be considered and there's a number of

9    things that could have caused contamination, I

10   just put it in the report.

11     Q.    So it's possible that somebody could

12   have had sunscreen on their arm and they could

13   have brushed against the paper and that would

14   have contaminated only the ink and not the paper;

15   is that right?  Is that what you're saying?

16     A.    You are talking about a microscopic

17   plug of paper sample taken from the paper versus

18   the entirety of an 8-1/2-by-11 sheet, so simply

19   testing a paper blank in relation to this does

20   not mean the document was not contaminated.

21     Q.    You testified that you have provided

22   expert analysis in, I think you said, thousands

23   of cases; right?

24     A.    Yes.

25     Q.    And are those all cases involving ink?

1                    L. Stewart

2      A.    No.

3      Q.    Quite a few of them involved ink;

4  correct?

5      A.    Yes.

6      Q.    And have you ever offered an opinion

7  about ink and about your findings with respect to

8  ink on questioned documents in those reports?

9      A.    Yes.

10      Q.    And in those occasions when you did

11  provide an opinion about ink, did you rule out

12  all possible explanations for the findings that

13  you had?

14      A.    I never testified to GC mass spec, that

15  is a completely different avenue for doing ink

16  analysis than from what I have used in actual

17  casework.

18      Q.    So you've never testified, you have

19  never put in an expert report related to GCMS

20  testing and the results therefrom?

21      A.    I have with GC, not GCMS, and based on

22  the research that's been conducted and reported I

23  would not do that, I would not allow it to be

24  done in casework.

25      Q.    And how would you propose to rule out

1                    L. Stewart
2    every theoretical possibility for chemical
3    results?  Would one have to interview every
4    single person who touched a document?
5         A.    Thus the problem with the technique.
6         Q.    So you're saying it's worth absolutely
7    no weight because you cannot rule out every
8    possible way that you might have certain chemical
9    findings?  Is that what you're saying?
10        A.    I don't know if it is feasible in the
11   future that that could be done.  Today it has not
12   been done.
13        Q.    There is absolutely no way because you
14   cannot rule out every possible alternative
15   explanation; right?
16        A.    To the Federal Government and to my
17   opinion, correct, the federal government is not
18   using the approach and neither am I.
19        Q.    So it's your opinion that you should
20   not use such an approach because you cannot rule
21   out all possible alternative explanations; right?
22        A.    Of course, especially if you are going
23   to issue a finding that something's fraudulent.
24        Q.    Now, you said that you don't do any
25   analysis using a GCMS machine; right?

```
 1                    L. Stewart
 2      A.     No.
 3      Q.     Let me restate that.
 4             You have not issued findings in reports
 5  using GCMS testing; right?
 6      A.     On ink, correct.  I have on other
 7  materials.
 8      Q.     Do you own a GCMS machine?
 9      A.     No, I do not.
10      Q.     Do you know how to use one?
11      A.     Yes.
12      Q.     When was the last time you used one?
13      A.     The last time in casework was back at
14  the Bureau of Alcohol, Tobacco and Firearms
15  between '79 and '82.
16      Q.     Was that the last time you used a GCMS
17  machine for casework?
18      A.     With MS, correct, I believe that's the
19  last time.
20      Q.     Was that for ink analysis?
21      A.     No.  It was for explosives.
22      Q.     When was the last time you issued an
23  expert report based on results of your own work
24  on a GCMS machine?
25      A.     It would have been during that time
```

```
 1                      L. Stewart
 2   period.
 3       Q.     And that was before you were with the
 4   Secret Service?
 5       A.     That's correct.
 6       Q.     Have you ever testified about a GCMS
 7   result when you personally conducted the testing?
 8       A.     I don't recall if any of those old
 9   cases ever went to trial, I'm not sure.
10       Q.     And you were with the Bureau of
11   Alcohol, Tobacco and Firearms up until 1982; is
12   that right?
13       A.     July of 1982, yes.
14       Q.     Okay.
15              So that was back before 1982 that you
16   had done the GCMS testing; correct?
17       A.     Correct.
18       Q.     And not since then; right?
19       A.     No, I have not done that particular
20   approach since then.
21              MR. SOUTHWELL:  Why don't we take a
22       quick break here.
23              MR. BOLAND:  Before you do that, just a
24       note that it's approximately 4:10 p.m. and
25       so we started at 10 o'clock this morning, I
```

1                    L. Stewart

2        think we'd all agree, we took one break for

3        20 minutes, so at 5:20 will be seven hours,

4        just letting you know.

5              MR. SOUTHWELL:  We dispute that that is

6        the correct count of the amount of time.

7              MR. BOLAND:  Well, I got it from the

8        videographer, so he is the guy calculating

9        the time.

10              MS. AYCOCK:  We have seven hours of

11        deposition.

12              MR. BOLAND:  We were back here after

13        the 20-minute break, the court reporter, the

14        witness, myself, the videographer.

15              MR. SOUTHWELL:  I've heard you, I've

16        heard you.  We have a different --

17              MR. BOLAND:  You are on your time.

18              MR. SOUTHWELL:  We have a different

19        perspective on how much time it is, I think

20        it's the correct perspective based on the

21        case law, so if you want to go to the Court

22        on it, I'm more than happy to do that.

23              I have a case in the other room that

24        makes it quite clear that it is deposition

25        time, so you can make all the records you

```
 1                    L. Stewart
 2        want to make about this and if you want to
 3        go see the judge, let's go do it, but we're
 4        going to finish our deposition and we're
 5        going to take our seven hours, if we need
 6        it; I'm not sure we do.
 7              MR. BOLAND:  I'm just letting you know
 8        5:30 is seven hours, anything after that is
 9        a bonus, that's all I wanted to put on the
10        record.
11              THE VIDEOGRAPHER:  Going off the
12        record.  The time is 4:10.  End of tape 4.
13              (Recess taken.)
14              THE VIDEOGRAPHER:  We are back on the
15        record.  The time is 4:25.  This is tape
16        number 5.
17    BY MR. SOUTHWELL:
18        Q.    Now, Mr. Stewart, in your report at
19    page 74 you describe what you believe Gerry
20    LaPorte did as the LaPorte method of PE testing;
21    correct?
22        A.    Yes.
23        Q.    And your description is based on his
24    report and your experience with Mr. LaPorte;
25    right?
```

```
 1                    L. Stewart
 2      A.     In part.
 3      Q.     Well, you weren't present when he ran
 4   his testing, were you?
 5      A.     Well, when he ran his GCMS testing, no.
 6      Q.     Right.
 7             You were not present when he ran any of
 8   his chemical analysis; correct?
 9      A.     That's correct.
10      Q.     Can you explain how the procedure used
11   by the Canada Border Services Agency and the
12   procedure used by Mr. LaPorte differs?
13      A.     I can, if I refer to documents I have
14   back in my office.  I do not have those documents
15   here.
16      Q.     What documents are those?
17      A.     Published research by the Canadians
18   versus published research by Mr. LaPorte and then
19   the notes of his examination in this case.
20      Q.     Your report is offered, it's fair to
21   say, as a rebuttal to Mr. LaPorte's report; right?
22      A.     No.  It was my own independent analysis
23   plus a rebuttal.
24      Q.     Well, right, there may have been your
25   own independent analysis, but in part you were
```

```
                              L. Stewart
 1
 2    offering a counter opinion or a rebuttal to what
 3    Mr. LaPorte's report said; yes?
 4        A.    That's what it ended up being.  It
 5    equally possibly could have been that I agreed
 6    with Mr. LaPorte, I just didn't in this case.
 7        Q.    Well, that -- it seems you two have a
 8    long history, so that seems unlikely, wouldn't
 9    you say?
10        A.    Just in the past couple of years since
11    he's been in private practice, yes.
12        Q.    I see.
13              And you knew you were supposed to be
14    deposed here for a month or so; right?
15        A.    Correct.
16        Q.    And you knew one of the big issues that
17    certainly is in your report is your critique of
18    the LaPorte method; right?
19        A.    That's correct.
20        Q.    And you are aware, are you not, that
21    the Canada Border Services Agency uses a
22    procedure that is quite similar to that used by
23    Mr. LaPorte; right?
24        A.    Oh, it's similar.  It's not the same,
25    though.
```

1                          L. Stewart

2        Q.     I understand.

3               My question was, you are aware that

4    they use a procedure that is quite similar to

5    that used by Mr. LaPorte; correct?

6        A.     I would say similar, not quite similar,

7    but yes.

8        Q.     Okay.

9               But you are not prepared to testify

10   about that because you don't have those documents

11   and you don't have that information in your head;

12   is that right?

13       A.     No.  I did not receive a subpoena duces

14   tecum and I brought everything I thought I would

15   be talking about, which are all of my

16   declarations and depositions and then the

17   additional documents you guys requested.  I did

18   not go beyond that, no.

19       Q.     But you critique Mr. LaPorte's use of

20   his method for ink dating; right?

21       A.     His method in this case for ink dating,

22   yes.

23       Q.     But you are aware that there are a

24   number of agencies, including the Canada Border

25   Services Agency, that uses a procedure which you

```
 1                      L. Stewart
 2    said is similar to the method he used for ink
 3    dating; correct?
 4         A.    Yes.  None of them use his procedure.
 5         Q.    You just testified they use a procedure
 6    that is similar to his; yes?
 7         A.    Similar, yes.
 8         Q.    Now, can you describe step by step what
 9    you call the LaPorte method?
10         A.    Well, it's changed over the years.  I
11    can go through what he originally reported in his
12    research that he published and we can look at
13    what he published in this case as far as his
14    technique.
15         Q.    Why don't we talk about this case; okay?
16         A.    Well, that doesn't answer your
17    question, then.
18         Q.    Well, my question is describe step by
19    step what you describe as the LaPorte method that
20    was used in this case, that's my question.
21         A.    Okay.
22               I can only partially answer that
23    because you did not give full disclosure of his
24    method.  All I have is the printout from his
25    machine, I can only gain certain knowledge from
```

1                    L. Stewart

2    that.

3        Q.     Okay.  Go ahead and describe it.

4        A.     Would you hand me his declaration?

5        Q.     You don't have a copy there?

6        A.     No.  I was not asked to bring that.

7        Q.     Okay.

8               Let me ask -- we are going to hand that

9    to you in a moment -- do you know how many ink

10   samples Mr. LaPorte uses for each extraction

11   vial?

12       A.     It's changed between his point of doing

13   his research and what he's reported he's done in

14   casework, so I don't know, it changes each time I

15   talk to him about it.

16              I do have three pages from his report

17   here that I did bring.

18       Q.     Okay.

19              What pages is that?

20       A.     I have 15, 16 of 26 and then his, one

21   of his exhibits which is the printout from the

22   machine.

23       Q.     And page 15 and 16 is the section that

24   is titled "Ink Dating Analysis of the Writing

25   Inks on the Work For Hire Document"; is that

Page 266

1                    L. Stewart
2    right?
3         A.    That's correct.
4         Q.    So that is what I was going to hand to
5    you, it sounds like you have that in front of
6    you.
7              So you testified a moment ago that his
8    method changes each time you talk to him.
9              How often do you talk to him about his
10   method?  What are you referring to?
11        A.    Only in court cases, and I say talk
12   meaning in depositions and trials.
13        Q.    When you're talking to him in those
14   depositions and trials?
15        A.    No.  I don't talk to him directly.  I
16   am talking about reading his transcripts and
17   listening to him testify.
18        Q.    Okay.
19              So let's focus on the ink-dating
20   analysis in this case outlined on pages 15 and 16.
21              Now, this is a discussion of ink-dating
22   analysis using a PE method that you are referring
23   to as the LaPorte method.
24              Have you had other cases involving PE
25   ink-dating testing with Mr. LaPorte?

```
                                        Page 267
 1                   L. Stewart
 2       A.    Yes, I have.
 3       Q.    What case was that?
 4       A.    There was one in Boston that we were
 5  both involved in a year and a half, two years
 6  ago.
 7       Q.    What was the name of that case?
 8       A.    I don't recall.
 9       Q.    Any others?
10       A.    I may recall it if I think a moment.
11  It had to do with a union dispute for an
12  election, but I don't recall the case name at
13  this point.
14       Q.    Okay.
15             So in this case how many ink samples
16  did he use for his extraction vial?
17       A.    I don't see that he says.
18       Q.    And it's your understanding that some
19  samples are unheated and others are heated under
20  the LaPorte method; right?
21       A.    That's what he's testified to in the
22  past.
23       Q.    Let's talk about the unheated examples
24  first.
25             What is your understanding of what
```

1                        L. Stewart
2      Mr. LaPorte does in order to prepare ink samples
3      for the GCMS?
4          A.    Well, he's very cryptic here.  He says
5      he ran the test twice, that doesn't tell if he
6      ran it on two different samples or if he ran the
7      same vial twice or what twice means, so that I
8      can't define for you.
9          Q.    My question is, what do you understand
10     he does in order to prepare the ink samples for
11     the GCMS?
12         A.    He says absolutely nothing about
13     preparing them here.
14         Q.    Do you know what kind of vial he uses
15     to extract the ink?
16         A.    No, that's not been disclosed.
17         Q.    Do you know what kind of solvent he
18     uses?
19         A.    I know what he has said in the past he
20     uses, but in this case he has not disclosed it.
21         Q.    Do you know how much solvent he uses?
22         A.    No, he does not indicate that.
23         Q.    You are familiar with the fact that
24     Dr. Aginsky also has an ink-dating method
25     involving phenoxyethanol; correct?

1                          L. Stewart

2        A.    Yes.

3        Q.    Can you describe what his method is?

4        A.    It's listed pretty accurately in one of

5   his publications, but I don't have that with me.

6        Q.    How does Dr. Aginsky's method differ

7   from Mr. LaPorte's method?

8        A.    Again, it's difficult to say what

9   Mr. LaPorte's method is, it wasn't disclosed in

10  this case.  I have disclosure in other cases from

11  him where he's testified and I have his own

12  published research and it's changed between

13  those, so --

14       Q.    And I understand that you keep

15  repeating that it's changed and it's difficult to

16  understand because it's not disclosed, but you

17  are providing an expert report that criticizes

18  that method, correct, Mr. LaPorte's method?

19       A.    Yes, I criticize his method in this

20  case.

21       Q.    Okay.

22             But I'm trying to focus in on what

23  exactly you are criticizing.

24             What is it that you think is incorrect

25  or wrong about his method?  Can you be specific,

                              L. Stewart

 1                            L. Stewart
 2    please?
 3        A.    Yes.  The published research and the
 4    method today indicates that a number of factors
 5    have not been properly researched in order to use
 6    it in casework.
 7        Q.    Okay.
 8              Let me pause there.  I want to make
 9    sure I understand exactly what you're saying.
10              The published research and the method
11    today indicates that a number of factors.
12              What -- can you be specific?  What is
13    it that you're saying?
14        A.    Certainly.
15              There are a number of articles, the
16    most recent one was published in 2010 concerning
17    the age method using PE for ink age determination.
18    Those methods outline specific methodology that
19    is not the same as the methodology that
20    Mr. LaPorte has testified that he uses and what
21    he put in his research that he uses.
22        Q.    Right.
23              And so what specifically is your
24    criticism with respect to that article and the
25    LaPorte method?

Page 271

1                    L. Stewart

2        A.    There's numbers.  That article talks

3    about --

4        Q.    Please point them out.

5        A.    That article talks about the inherent

6    dangers are not knowing the effect of paper and

7    age considerations, it talks about

8    contaminations, it also talks about doing

9    studies, blind studies and research studies to

10    determine whether or not the test even works.

11    Those haven't been conducted yet and the studies

12    that have been conducted show that it's riddled

13    with fault, it's very easy to make mistakes, the

14    most recent being one that's --

15        Q.    Let me pause you because you are

16    throwing a whole lot of stuff in there and I want

17    you to be specific.

18            What is the 2010 article that you are

19    referring to?

20        A.    It is by Mr. -- if I can pronounce it

21    correctly -- it's referred to in my report, if

22    you just give me a moment.

23            MR. SOUTHWELL:  The record should

24        reflect the witness is leafing through his

25        declaration.

1                      L. Stewart

2         A.      There's a couple.  The one that just

3    came out in 2010, I'm still looking for that

4    citation, but the same author Weyermann, that's

5    W-e-y-e-r-m-a-n-n, et al., published an earlier

6    article that outlined a lot of the concerns in

7    2007, those same concerns were reiterated in his

8    2010 publication and nowhere in that publication

9    does he even reference Mr. LaPorte's method, he

10   simply talks about other methodology using PE.

11        Q.      And what exactly is the criticism of

12   the PE methodology in the Weyermann article?

13        A.      It's very simple.  If you develop a new

14   test, a new technique, you must do studies to

15   show that that particular technique works before

16   you put it into a forensic scheme.  You certainly

17   would not use it until you understand all the

18   parameters of it, and when you start changing

19   things like columns, ramps, temperatures, amount

20   that you use, that you extract from, solvents,

21   when you start changing things like that, you

22   change a lot and every bit of that needs to be

23   re-examined before put into casework; that's why

24   the Department of Justice, who he currently works

25   for, the Department of Secret Service, none of

```
 1                    L. Stewart
 2   those agencies use the approach.  You're only
 3   going to find it used in some European
 4   laboratories and the Canadians that you mentioned
 5   and Mr. LaPorte and Mr. Aginsky.
 6        Q.    I see.
 7              Mr. Aginsky's is one of plaintiff's
 8   forensic document examiners; correct?
 9        A.    I don't know if he still is, but he was.
10        Q.    Okay.
11              You testified earlier that he was, so I
12   guess I was just going based on what you said.
13        A.    I testified that you would have to ask
14   the lawyers.  I'm not sure if he is still
15   involved in the case.
16        Q.    Okay.
17              I think you testified that you believed
18   he was, but that's fine.
19              And so the Canadians and the Europeans,
20   they apparently don't know what they're doing; is
21   that your opinion?
22        A.    No.  They know exactly what they're
23   doing.  They're actually doing studies on their
24   approach and they're showing many limitations
25   even within their own approach to the point that
```

                          L. Stewart
1
2   they're saying in a lot of cases they would not
3   use it in casework.
4       Q.    And where exactly are they saying in a
5   lot of cases they would not use it in casework?
6            I need you to be very specific, Mr.
7   Stewart, because what you are doing is you are
8   throwing out these very broad generalizations,
9   studies show it's riddled with fault, and you're
10  not being specific, so I don't know how the Court
11  can evaluate your opinion unless you are specific
12  about what you are saying.
13           You can't just paint with a broad brush
14  without being very specific, so I'm asking you,
15  please, to be specific, and not just throw out
16  statements like they said, you know, studies say
17  it's riddled with fault.
18           Can we agree that you can try to do
19  that, please?
20      A.    I am trying to.  I will tell you my
21  limitation.  I have 370-something pages of
22  reports that I've issued and exhibits, I was not
23  given prior knowledge of what to bring to this
24  other than assumption, that we were going to talk
25  about that, and now you're asking me other

1                         L. Stewart

2    questions, so I can either take time to go

3    through my report and my documents and show you

4    those articles there and direct your attention to

5    it, but I believe if you read my report and you

6    see where I cited those articles you'll see

7    exactly what I'm talking about.  I'm trying now

8    to go back to those articles and show them to you

9    again.

10        Q.    I'm trying to ask questions about your

11   report because frankly I found it very nonspecific

12   about what the actual criticisms were other than

13   your claim that the PE tests had not been

14   validated, so let me ask a specific question

15   about that.

16             You criticize the validity of

17   LaPorte's method; right?

18             Can you explain what part of the PE

19   testing that LaPorte conducted you believe has

20   not been validated?

21        A.    None of it has.

22        Q.    None of it has?

23        A.    It's not used by the Federal Government.

24        Q.    So none of the LaPorte method has been

25   validated; is that what you're saying?

1                        L. Stewart

2        A.     That's correct.  There's no standard --

3        Q.     How has it not been validated?

4        A.     -- there is no federal agency using the

5    approach, it's not been validated.

6        Q.     I'm not asking about what agencies are

7    using it or what agencies are not.  Please listen

8    to the question.

9              My question is what part of the tests,

10   the methods you believe have not been validated,

11   and you said all of it; right?

12       A.     That's correct.  That's no --

13       Q.     The next question is, how is the

14   testing method validated?  What's required?

15              MR. BOLAND:  Objection.

16       A.     Well, first you have to have a method

17   that you stick with instead of changing it every

18   couple weeks.  Once you come up with a method

19   that you think works, you have to publish that

20   with sufficient information that people can do

21   peer-reviewed studies.

22              That's never happened with his

23   technique.  The only time he came close to that

24   was in his article, I believe, in 2004, where he

25   outlines his approach, but he's deviated from

```
 1                    L. Stewart
 2    that approach many times since then, as recently
 3    as a couple of months ago in a case that he was
 4    deposed and he deviated from it.
 5        Q.    And your testimony is that he deviates
 6    from it every two weeks?  That's what you just
 7    testified; yes?
 8        A.    No.  I didn't say he.
 9             You asked specifically how do you go
10    through and validate a study or validate an
11    approach.  I'm telling you if you make changes to
12    that approach that means you start all over
13    again.  If you have a consistent approach that
14    you feel is valid, you then put that out to your
15    peers and have it reviewed, you have studies done
16    to show does it work, can it be reproduced in
17    multiple laboratories using that same technique
18    and that has not occurred here, so that, based on
19    my time as a laboratory director for a leading
20    law enforcement agency, that's why it's not used.
21        Q.    I see.
22             And when I asked you how is the testing
23    method validated and you answered you have to
24    stick with a method instead of changing it every
25    couple weeks --
```

```
                              L. Stewart
 1
 2      A.      Right.

 3      Q.      -- you're saying that Mr. LaPorte

 4   changes it every couple weeks?

 5      A.      No.  I did not put his name in there.

 6              I said that if you change a --

 7      Q.      We're talking about Mr. LaPorte's

 8   method.

 9      A.      Okay.

10              And you asked me a specific question,

11   how do you validate an approach.  You can't

12   change that approach.  You have to sit there and

13   come up with a technique you think works.  You

14   then have to put that out there to your peers and

15   you have to show the entire recipe of how it's

16   done and then you have to allow people to see

17   does it works or not work; that hasn't occurred

18   here.

19      Q.      You're saying a part of the LaPorte

20   method uses GCMS; right?

21      A.      Yes.

22      Q.      Are you saying that GCMS is not a valid

23   instrument for testing chemicals?

24      A.      No, I am not saying that.

25      Q.      That has not been validated?
```

                         L. Stewart

1        A.    No.  It has nothing to do with the

2   machine.

3        Q.    Because you just mentioned a few

4   minutes ago that all of Mr. LaPorte's method has

5   not been validated and that, you just testified,

6   is part of Mr. LaPorte's report and in fact it

7   has been validated, so I guess I'm not really

8   clear what exactly is your testimony.

9              Are you saying that all of it has not

10  been validated or are you saying that parts of it

11  have not been validated?

12             Please be specific.

13       A.    I believe his technique for using a

14  microscope has been validated, I believe his

15  technique for using ultraviolet light and

16  infrared light to do chemical analysis has been

17  validated, his method for identifying ink has

18  been validated, those are all things that are

19  discussed in standards.

20       Q.    And what are the parts that you are

21  saying specifically that have not been validated

22  as part of the LaPorte method?

23       A.    Using a GC mass spec to look for

24  2-phenoxyethanol using his specific methodology

1                    L. Stewart

2    has never been validated.

3        Q.    And what is his specific methodology

4    that you are saying has not been validated to

5    look for 2-phenoxyethanol?

6        A.    I can only go by what he put into this

7    report, which is very cryptic, or what he's

8    testified to as recently as a month or two ago.

9    If you would like me to bring that out, we can

10   talk about that.

11       Q.    As you sit here today, you can't say

12   what it is that you think has not been validated

13   in his approach?

14       A.    I can say that his methodology that he

15   testified to recently is not the same as the

16   methodology that's discussed by the most recent

17   articles on the subject and none of them refer to

18   the LaPorte method.

19       Q.    And what specifically about the

20   methodology are you referring to?

21       A.    Again, I have to pull it out to look at

22   it to show you that.

23       Q.    So you don't know, you can't testify to

24   that as you sit here today?

25       A.    Off the top of my head, no; it's a very

```
 1                    L. Stewart
 2   difficult technique.
 3        Q.    Do you understand the difference
 4   between a static and dynamic approach to dating
 5   inks?
 6        A.    Yes.
 7        Q.    And a static approach relies on
 8   characteristics of the document that will not
 9   change and allow for dating; right?
10        A.    Say that again?
11        Q.    A static approach relies on
12   characteristics of the document that will not
13   change and that allows for dating; right?
14              So I will give you an example.
15              You identify the components of a
16   formulation of ink in a static approach; right?
17        A.    Right, but that doesn't date the ink.
18        Q.    I understand.
19              But it could date the ink if perhaps
20   there is ink that has a known introduction date
21   or a marker inserted by the manufacturer; correct?
22        A.    Correct.
23        Q.    And that would be a static approach;
24   right?
25        A.    Yes.
```

1                    L. Stewart

2        Q.    And a dynamic approach relies on how a

3    document changes over time; right?

4        A.    Yes.

5        Q.    In a dynamic approach one measures

6    physical or chemical properties that change over

7    time; right?

8        A.    Correct.

9        Q.    Contrary to the static approach and the

10   dynamic approach, one does not necessarily use a

11   library of standards; right?

12       A.    I disagree with that.

13       Q.    Well, it's not necessary to identify a

14   particular formulation of ink in a dynamic

15   approach; right?

16       A.    I disagree with that.

17       Q.    Let's -- are you familiar with Exhibit

18   20 of your report?

19       A.    Yes, sir.

20       Q.    This is an article by Valery Aginsky in

21   the Journal of Chromatography?

22       A.    Yes, sir.

23       Q.    And you cite this article in your

24   report and you've attached it as Exhibit 20;

25   right?

```
 1                        L. Stewart
 2        A.    Correct.
 3        Q.    And you've read it?
 4        A.    Yes.
 5        Q.    This is a reliable authority; correct?
 6        A.    Yes.  It's dated, but it's reliable at
 7   the time.
 8        Q.    And on the first page of the article
 9   the article states that discrimination between
10   fresh, age less than several months, and old
11   ballpoint ink entries and it does not need dated
12   reference entries written with ink having the
13   same formula as that of the questioned ink.
14              Did I read that correctly?
15        A.    You are cutting off the sentence.
16              He's talking about a specific procedure
17   that he's outlining in this research and he says
18   the procedure allows discrimination between fresh
19   and then forward, so --
20        Q.    And what he says is you do not need a
21   dated reference entry?
22        A.    That's what he's saying, yes.
23        Q.    Right.
24              And so this is a reliable authority
25   that you cite that establishes that one does not
```

1                    L. Stewart

2    need to identify the ink formula in a dynamic

3    approach?

4        A.    No.  I cited it, I cite certain aspects

5    of it, I don't necessarily agree with everything

6    in it.  That's one thing I don't agree with.  I

7    think it is very important to identify the ink

8    composition before you do any of the dynamic

9    approaches.

10       Q.    Do you have any articles that agree

11   with your position that you need to identify the

12   ink before using a dynamic approach to ink

13   dating?

14       A.    It's articles that I publish, but if

15   you want people publishing them, I believe there

16   have been, but I'd have to go and check that, I

17   don't know.

18       Q.    You can't point to any that say that

19   other than the ones that you've written; right?

20       A.    As we sit here right now, no, I cannot

21   point to them.

22       Q.    And the PE test is a dynamic approach;

23   right?

24       A.    Given the scope of your question, it is

25   a portion of a dynamic approach.

1                        L. Stewart

2        Q.    And your report cites to the article by

3    Gerry LaPorte on the identification of

4    2-phenoxyethanol in ballpoint inks, and it goes

5    on, but an example of that is Exhibit 10 to your

6    report, right, you cite to that article?

7        A.    Yes, I cite that article.

8        Q.    You attach it as Exhibit 10; right?

9        A.    Yes.

10       Q.    You also attach part of it as Exhibit

11   11 of your report; right?

12       A.    Yes, that's part of Exhibit 11.

13       Q.    And you also attach part of it as

14   Exhibit 23 to your report; yes?

15       A.    Yes.

16       Q.    Can I ask why it is you are citing and

17   including this article and portions thereof in

18   three different exhibits to your report?

19       A.    Because I thought it was easier for the

20   Court because I would it references in one

21   exhibit as opposed to making the Court go back to

22   two or three different exhibits.

23       Q.    It wasn't meant to bulk up your report?

24       A.    I was trying to make my report smaller,

25   actually.

```
 1                    L. Stewart
 2      Q.    You've read this article; yes?
 3      A.    Yes.
 4      Q.    And the article discusses a dynamic
 5  approach to ink dating; right?
 6      A.    If you want to direct me to where it
 7  talks about dynamic, that it would make it
 8  quicker, otherwise I can read it.
 9      Q.    Well, it talks about the fact of doing
10  ink dating based on how a document changes over
11  time, which, as you agreed earlier, is a dynamic
12  approach; yes?
13      A.    Yes.  I just don't know if he -- he
14  does refer to it as a dynamic approach on page 2,
15  the first line.
16      Q.    And this article talks about using GCMS
17  to detect PE in ink samples; correct?
18      A.    That's correct.
19      Q.    And the method described in the article
20  is extremely similar to the method that LaPorte
21  used here with the Work For Hire contract; right?
22      A.    I have no way of knowing, it's not been
23  discovered or disclosed.
24      Q.    Now let's turn to page -- I am sorry,
25  paragraph 358 of your report.  There you quote
```

```
 1                    L. Stewart
 2    from an article by Berger-Karin which you have
 3    attached as Exhibit 25 of your report; right?
 4        A.    I believe you said 358, it's 357, but
 5    yes.
 6        Q.    All right.
 7              So the cite you have here is 357,
 8    actually, and I take it back, this is commentary
 9    on the Berger-Karin article, but it is actually
10    by Weyermann; correct?
11        A.    That is correct.
12        Q.    Earlier you referred to Weyermann as a
13    male.
14              Was that accurate?
15        A.    I don't know.  I've only spoken with
16    the person via e-mail.  I think I've only seen
17    their first name as an initial, so I'm not sure
18    if it is male or female.
19        Q.    You can see down at the bottom of this
20    article which you have and you cite in your
21    report that her name is Celine.
22              Do you see that?
23        A.    I have seen males named Celine as well.
24    I don't know.
25        Q.    Now, you refer to this article in 357
```

                          L. Stewart

1    and in 358 you purport to quote from it; correct?

2        A.    Yes.

3        Q.    And paragraph 358 of your report, you

4    start "They concluded," and the they here refers

5    back to the article by Weyermann; correct?

6        A.    There's two different referrals there.

7    357 begins with in 2009 there is a notation there

8    about one of their findings, and then that is

9    referred back to a 2008 publication.

10       Q.    Okay.

11             Well, you have a quote here.

12             Where is this quote from?

13       A.    I don't know.  Let me look for it.

14       Q.    Well, maybe I can make it a little

15   easier.

16             Let's look at the last line of this

17   Exhibit 25, which is to the right-hand side of

18   the first page.

19             Do you see that there is a quote or

20   there is a section there in italics and that is

21   in fact what you are purporting to quote from in

22   paragraph 358 of your report?

23       A.    Yes.

24       Q.    And do you see that in paragraph 358 of

```
 1                      L. Stewart
 2   your report you purport to quote from this
 3   article by saying, quote, "Forensic scientists
 4   should not attempt to examine actual criminal or
 5   civil cases until they (the methods to include
 6   unvalidated PE method, e.g., reports) have been
 7   tested"?
 8        A.    That's correct.
 9        Q.    Do you see that?
10        A.    Yes.
11        Q.    And so do you see in 358 of your
12   paragraph you are representing to the Court that
13   this author has made this statement in the
14   article and in fact is criticizing specifically
15   Mr. LaPorte; right?  That's in 358 of your
16   report?
17        A.    If that's the inference, I'm sorry for
18   that.  There should have probably been a quote at
19   the end of "they" and at the beginning of "have."
20             The part in the parentheses is my
21   continuation of the thought of what I was
22   discussing before and after that.
23        Q.    Right.
24             So paragraph 358 of your report is
25   inaccurate; correct?
```

```
 1                      L. Stewart
 2      A.     Grammatically, maybe, not in content.
 3      Q.     Well, if you are purporting to quote
 4   from an article and you have inserted words that
 5   are your own that are not in the article, you
 6   will agree with me that they are not in the
 7   article; right?
 8             The words "the methods to include
 9   unvalidated PE methods, e.g. LaPorte's, those are
10   not in the article Exhibit 25; correct?
11      A.     No.  Those are my words there that
12   probably should have been taken out of the
13   quotation.
14      Q.     Right.
15             You have inserted those into a
16   quotation purporting to be from an article by
17   Weyermann; right?
18      A.     Yes.
19      Q.     And that is inaccurate, correct,
20   because that's not in fact in the article?
21      A.     The part in parentheses is not in the
22   article, those are my words.
23      Q.     So paragraph 358 is inaccurate; correct?
24      A.     No, I think it's very accurate.  It's
25   not accurate as far as what he said.  It's --
```

1                          L. Stewart
2        Q.     It's accurate, huh?  It's accurate --
3        A.     Yes, it's accurate.
4        Q.     -- because it is a quote from a book
5   where you insert -- a quote from an article where
6   you insert your own words into the quote and you
7   are telling the Court that that's accurate?
8        A.     No.  Grammatically this should be been
9   structured differently, so grammatically it's
10  inaccurate.  The content is accurate as far as
11  what they said and what I'm saying in my report.
12       Q.     Grammatically it's inaccurate?
13       A.     Right.
14       Q.     So if I were to quote from your report
15  and put my own words into the middle of it, that
16  would only be grammatically incorrect?
17       A.     I would have to see --
18       Q.     If I were to tell the judge Mr. Stewart
19  testified at his deposition that the Work For
20  Hire document is a fraud, if I told the judge
21  that, but I had inserted the part "was a fraud"
22  that would simply be grammatically incorrect?
23  Wouldn't that be actually incorrect?
24       A.     In that case it would be actually
25  incorrect.  That's not what's happening here.

1                    L. Stewart

2      Q.    It's not what's happening here?

3            Look at 358.  They conclude it by

4  emphasizing that quote and then you purport to

5  have a quote from the article.

6            You are telling us this is not a

7  representation to the Court that this is a quote

8  from an article?

9      A.    It is a quote from an article minus the

10  part that I've got in parentheses and that was

11  done incorrectly.  I should have done that a

12  different way.

13      Q.    So the quote is inaccurate, correct?

14      A.    Yes.

15      Q.    Okay.

16            It's very hard for you to admit that

17  you're wrong; is that right?

18            MR. BOLAND:  Objection.

19      A.    I do not agree that that's a wrong

20  statement.

21      Q.    It's not a wrong statement to quote

22  erroneously from an article, to represent to the

23  Court that they are criticizing the LaPorte

24  method when in fact that's not what they are

25  doing?

1                       L. Stewart

2      A.     That part is wrong and it's the

3   grammatical part that I should have done

4   differently.  The content of the paragraph I do

5   not believe is wrong, I believe it's accurate.

6      Q.     You believe it's accurate that

7   Weyermann in their article published in the

8   Journal of Forensic Science has said that the

9   methods in the specified LaPorte's method, you

10  think that's accurate, huh?

11     A.     What I believe is accurate is that

12  forensic scientists should not attempt to examine

13  actual criminal or civil cases until they have

14  been tested and that is the method that includes

15  LaPorte's unvalidated PE test, I think that that

16  is a very accurate statement.

17     Q.     But paragraph 358 purports to be a

18  quote to the Court, you are representing that

19  this is what someone else has said; right?

20     A.     And I apologize for that, I did that

21  incorrectly there.

22     Q.     Okay.

23            So that is an inaccurate quote; right?

24     A.     Yes, it's an inaccurate quote.

25     Q.     Now, in your report you also stated

1                        L. Stewart

2    that you prohibited Mr. LaPorte from using his

3    methods for ink dating in casework while you

4    supervised him at the Secret Service; right?

5        A.    Our policies prohibited it and I was in

6    charge of the policy, so yes.

7        Q.    You actually say at paragraph 210,

8    quote, "I prohibited him," close quote.

9              Am I being accurate in how I quoted

10   your report?

11       A.    And as I just explained to you, I did

12   prohibit him by being in charge of the system and

13   it was our policy.

14       Q.    How did you prohibit him?

15       A.    We had a policy that any untested and

16   unreliable forensic tests could not be used in

17   actual casework until it was reviewed by our

18   peers and authorized by the laboratory director

19   and that was me.

20       Q.    And did the policy specifically

21   prohibit him from using this test, i.e., the PE

22   test in casework?

23       A.    Yes.

24       Q.    Specifically it referred to the PE test

25   and it prohibited him from doing that?

1                       L. Stewart

2        A.      We referred to any test that was

3    outside of our scope, so that would be one of

4    them.

5        Q.      Let's read paragraph 210 together,

6    okay?

7                "These are the core of the reasons I

8    prohibited him from using this test in casework

9    when I supervised him at the U.S. Secret

10   Service."

11               Did I read that accurately?

12       A.      Yes, that's accurate.

13       Q.      How did you prohibit him from using

14   this test?  What does this test refer to?  This

15   test refers to his ink-dating method that you're

16   referring to in this section of your report;

17   right?

18       A.      That's correct.

19       Q.      So how specifically, please be

20   specific, did you prohibit him from using this

21   test, his ink-dating method in casework?

22       A.      Well, that was included in a recent

23   filing to the Court, it had the actual scope of

24   what was allowed at the Secret Service under my

25   direction, it showed that any technique that was

1                    L. Stewart

2   not within that scope was not allowed until it

3   was peer reviewed and it was accepted for use in

4   tests -- in casework by me.  I included that in a

5   recent filing to the Court.

6        Q.    And what specifically is that that you

7   are referring to?

8        A.    That is the standard operating

9   procedures for the Secret Service questioned

10  document branch.

11       Q.    Does that refer to the ink-dating

12  method with specificity?

13       A.    It refers to any ink-dating method

14  outside of the scope and this was one of those,

15  so, yes, it refers to all ink-dating methods that

16  aren't within the scope.

17       Q.    Listen very carefully to my question

18  and please be specific in your answer.

19             Is it a policy that specifically

20  prohibits Mr. LaPorte or anyone else from using

21  the ink-dating method that you referred to as the

22  LaPorte method, yes or no?

23       A.    Yes.

24       Q.    It specifically says you are prohibited

25  from using the LaPorte ink-dating method?

1                      L. Stewart

2       A.     It specifically says any method and

3    that is a method, so I can't --

4       Q.     I understand what you are saying,

5    but -- okay.

6       A.     I can't anticipate what methods may be

7    thought up in the future by examiners to be used

8    on casework, I can only go by what's in the scope

9    and then they have to be peer reviewed.

10      Q.     You're saying that there was a policy

11   that any method that hadn't been tested and peer

12   reviewed could not be worked in casework, that's

13   what you're pointing to; correct?

14      A.     Yes, any new method.

15      Q.     Any new method.

16             So you're not saying -- well, let me

17   back up.

18             Who wrote that policy?

19      A.     It was written under my predecessor

20   Chief John Hargett at my direction prior to our

21   first ASCLD accreditation, so that would have put

22   it back, I'm guessing, somewhere around 2003 or

23   so.

24      Q.     And the policy prohibits use of any new

25   untested method in casework; correct?

```
 1                        L. Stewart
 2        A.    Yes.
 3        Q.    And you are testifying that that means
 4   that it prohibits the LaPorte ink-dating method
 5   because that falls within the scope; right?
 6   That's your specific statement; correct?
 7        A.    Yes, it prohibited using that in
 8   casework.
 9        Q.    And that's the policy that you provided
10   to the Court in this case; right?
11        A.    Yes.
12        Q.    That is not a policy that prohibits
13   anyone from specifically using the ink-dating
14   method that is discussed in your report; correct?
15        A.    You've got to rephrase that one.
16        Q.    Which part of it don't you understand?
17        A.    I don't understand any of it.
18        Q.    Okay.
19              Your statement here on 210 is I
20   prohibited him from using this test in casework.
21              My question is, how did you prohibit
22   him from using this test, and I guess what I'm
23   hearing you say is there was a general policy
24   that said any untested methods are not to be
25   used.
```

```
 1                      L. Stewart

 2              That's what you are referring to when

 3    you say I prohibited him from using this test; is

 4    that right?

 5        A.    No.  There was not a general policy,

 6    there was a standard operating procedure and that

 7    standard operating procedure dictated what could

 8    and could not be used in casework.

 9              This fell -- his technique falls

10    outside that, it fell outside that while I was

11    there and it was never allowed to be used, so in

12    fact I prohibited him from using it.

13        Q.    And you are saying the standard

14    operating procedure -- you would concede, would

15    you not, that the standard operating procedure

16    does not name this ink-dating test with

17    specificity; yes?

18        A.    No.  It does it in a more universal

19    approach and says any, any technique outside of

20    this.

21        Q.    And so you still believe I prohibited

22    him from using this test is an accurate statement

23    to the Court?

24        A.    Yes, it is, yeah, very accurate.

25        Q.    All right.
```

1                          L. Stewart

2              Now, in the course of your work in the

3     Secret Service you signed off on certain reports

4     that Mr. LaPorte submitted while he was there;

5     right?

6          A.    I wasn't his immediate supervisor, I

7     don't know if I signed off any of his reports,

8     I'm not sure.

9          Q.    You don't know if you did?

10         A.    It would have been unusual for me to

11    sign his reports, so I don't know if I did or not.

12         Q.    I'm not asking you whether you signed

13    his reports specifically, I'm asking whether you

14    signed off on his reports, in other words, you

15    were the supervisor of the lab at the time.

16         A.    I have to explain that.

17              There's an administrative and a

18    technical review that's done on all employees who

19    issue reports; it's possible that I conducted

20    either of those in a case involving him, but it

21    would not have been normal in that I wasn't his

22    first-line supervisor.

23         Q.    Isn't it a fact that among those

24    reports that you signed off on were reports where

25    Mr. LaPorte used PE testing as an ink-dating

Page 301

1                        L. Stewart

2    method; correct?

3        A.    No.   As I just testified, I don't

4    recall ever signing off on any of his reports.

5    If I did, it would be unusual and the only time I

6    ever recall him using the technique under my

7    direction was an after-the-fact situation, in

8    other words, we had already reached a conclusion

9    in a case, we had already reached an opinion and

10   we were looking to see if the technique reached

11   the same opinion or not; that's different than

12   putting it into a report and putting it out there

13   in a case.

14       Q.    I understand the difference you are

15   drawing, then.

16             But you did a technical review of his

17   analysis in at least two cases where he did PE

18   testing for ink dating; right?

19       A.    I don't know that, I don't know.

20       Q.    You don't know that you did a technical

21   review of two cases where you approved of his use

22   of ink dating?

23       A.    I did not approve his use of ink dating

24   in any case to be issued in a report.  There were

25   instances, as I mentioned, in research where he

1                      L. Stewart
2    used it after the fact; that's different than
3    what you are describing, though, with me
4    approving it in a report or in a case.  I did
5    not.
6        Q.    There were instances, then, when it was
7    used, you're distinguishing from when it was used
8    in a report, and there were at least two
9    instances where it was used and you approved it;
10   correct?
11       A.    No.  Those are your numbers and I'm
12   telling you I don't recall that.  It would be
13   highly unusual and if it was, the only
14   recollection I have is allowing him to do it in
15   cases as an after, an after-test when we did not
16   need it and utilize it in reaching the report.
17       Q.    I see.
18             Let me ask you some questions about the
19   examination you did in this case.
20             What were you tasked with in terms of
21   forensic examination of the document?
22       A.    Separate from overseeing the forensics?
23       Q.    Did you have any specific tasks that
24   you were given with respect to forensic
25   examination of the document?

```
 1                         L. Stewart
 2        A.    I wasn't given tasks.  I was -- since I
 3   was directed to put together a forensic team and
 4   an analysis scheme, I directed people within that
 5   group as to what they would conduct and what I
 6   would conduct separately.
 7        Q.    And so you put together the forensic
 8   team, is that right, as you just said?
 9        A.    Midstream I did.  I didn't put together
10   the initial team, I put together the team that we
11   have now.
12        Q.    And who's included in that team?
13        A.    Right now I know of Mr. Blanco, myself,
14   Mr. Rantanen, and there's two computer folks that
15   I do not have any involvement in, but I know that
16   they are the team as well.
17        Q.    How about Mr. Speckin?  He's on the
18   team.  Did you put him on the team?
19        A.    No.  I don't recall if I originally
20   suggested him or if he was already on the team.
21        Q.    What's your opinion of Mr. Speckin?
22        A.    He's a nice gentleman, he's had some
23   controversy in his casework in the past.
24        Q.    What's your opinion of his professional
25   capabilities?
```

1                         L. Stewart

2        A.    I have known him to be very capable,

3    but I've also known instances where he has gone

4    too far and I think that that may be where he has

5    gotten into some situations in the past.

6        Q.    Where he's been sloppy; is that right?

7        A.    No.  Kind of what I'm reporting in this

8    case, using a technique that shouldn't have been

9    used and gone too far with it.

10       Q.    So you did not include Mr. Aginsky and

11   Mr. Osborn as part of the team you selected.

12             Are you aware of why they did not issue

13   a report in this case?

14       A.    No, I'm not.

15       Q.    Are you aware of why Mr. Speckin did

16   not issue a report in this case?

17       A.    No, I'm not.

18       Q.    What was your role for the forensic

19   document examination as contrasted to Blanco or

20   Speckin or the computer forensics experts?

21       A.    I directed Mr. Speckin to do the

22   chemical analysis of the ink with potential

23   follow-up of any age analysis if we went that

24   route.  I directed Mr. Blanco to do the

25   handwriting analysis, the analysis of the staple,

1                    L. Stewart

2      the general analysis of the document, the

3      indentations and the interlineation, I examined

4      the document in general, I looked to see if the

5      two pages were together, bound together, or if

6      they came from two different sources; I also

7      looked at the staple, I also looked at the

8      interlineations and then I addressed the ink

9      issues.  I also did the toner analysis and

10     directed sending the paper out for testing.

11          Q.    Right.

12                And Mr. Speckin, he has got a GCMS

13     machine; right?

14          A.    Yes, he does.

15          Q.    And he does PE ink-dating testing;

16     right?

17          A.    He has in the past.  That's not the

18     direction that I would have had him go in this

19     case if we had chosen to do ink-age determination.

20          Q.    Did he do ink-age determination?

21          A.    I don't know if he did in this case or

22     not.

23          Q.    Did you ask him?

24          A.    No, because his connection to me in

25     this case involving what he did and didn't do has

1                         L. Stewart

2    been disconnected the past number of months, so I

3    don't have a current connection with him on this

4    case.

5        Q.    What exactly do you mean by that, your

6    connection to him has been disconnected?

7        A.    Once we decided that ink-age analysis

8    wasn't feasible, then it wasn't important for him

9    to issue any additional work in the case, so we

10   continued at that point with Mr. Blanco and

11   myself doing the lion's share of the forensic

12   work.

13       Q.    You testified that we decided ink-age

14   analysis wasn't feasible.

15            Who's we?

16       A.    Well, on our side I decided, on your

17   side Mr. Lyter decided.

18       Q.    I'm asking who is we.

19            You said we decided that ink-age

20   analysis wasn't feasible.

21            Who is we?

22       A.    It would have been myself when I was --

23       Q.    You decided that?

24       A.    I shouldn't have included Lyter in

25   that, it should have been just me.

1                      L. Stewart

2        Q.     Okay.

3               And as you said before, I think,

4    Mr. Speckin apparently told you that it was --

5    well, let me ask you this:  Did Mr. Speckin tell

6    you that he had come to any conclusions about ink

7    dating?

8        A.     He told me that he had come to

9    conclusions about ink analysis and identification,

10   and when he told me he could not identify the ink

11   because of its deterioration that is, I believe,

12   the end of the work that he did.  You would have

13   to ask the lawyers for further information;

14   that's the last I know of.

15       Q.     So you didn't interact with him anymore

16   after that?

17       A.     I have on other cases.  I have not

18   interacted with him about his findings in this

19   case.

20       Q.     Is everything you did as part of your

21   examination spelled out in your report?

22       A.     I doubt it.

23       Q.     Are all the tests that you ran detailed

24   in your report?

25       A.     The tests that yielded a finding are

1                         L. Stewart

2    detailed in the report, yes.

3         Q.    So what other tests did you run that

4    didn't yield a finding?

5         A.    Let me think.

6               I examined the interlineation to see if

7    it matched up with the indentations.  I did not

8    include that in the report because it was

9    something that Mr. Blanco had already addressed

10   and so there was no point in me including that.

11        Q.    Did you disagree with Mr. Blanco's

12   results?

13        A.    No.

14              I did not include anything in my report

15   to a great extent regarding the staples because

16   Mr. Blanco addressed that, although I did agree

17   with his results and likewise with the

18   handwriting analysis, he addressed that and I

19   agreed with his results, so it was not important

20   to put in my --

21        Q.    And what specific tests did you run?

22   You did thin-layer chromatography; yes?

23        A.    Yes.

24        Q.    You did not do gas chromatography or

25   mass spectrometry; correct?

```
 1                      L. Stewart
 2      A.     No, I did not.
 3      Q.     You did examination with a video
 4  spectral comparator; yes?
 5      A.     On site Mr. Speckin and I did, yes.
 6      Q.     Who actually did the VSC examination?
 7      A.     We both did.
 8      Q.     Who operated the VSC machine?
 9      A.     Well, we were both there in front of
10  it.  I don't recall who pushed the button.
11      Q.     Did you do that at the same time?
12      A.     Yes.
13      Q.     Did you conduct microscopy?
14      A.     Yes.
15      Q.     You also stated in your report you
16  conducted a physical analysis.
17             What did that include?
18      A.     Visualizing the document, just looking
19  at it using various light sources, scanning in
20  the document, making notations about the
21  document.
22      Q.     And you said also in paragraph 89 that
23  you conducted a chemical analysis of the toner,
24  and that was just a TLC analysis; correct?
25      A.     It was largely a TLC analysis.
```

1                     L. Stewart

2       Q.     When you say largely, what else was it?

3       A.     Well, it starts with a microscopic

4   examination of the document to determine if it is

5   toner, then a determination is made as to whether

6   or not it is single-color toner versus toner from

7   a machine that uses multiple colors of toner, and

8   then there's a physical removal of the toner and

9   then comparison against a library of standards,

10  and that's done using primarily thin layer

11  chromatography.

12      Q.     Let's talk about your opinion about the

13  toner.

14             First of all, the defendants' experts

15  made some comments about toner and printing,

16  Mr. LaPorte in his report stated he was able to

17  chemically differentiate the toners on each page

18  of the Work For Hire document using TLC analysis;

19  right?

20      A.     I believe that's what he said, yes.

21      Q.     And he provides a detailed description

22  of how he differentiated the toners, noting the

23  two differences that he says demonstrate the

24  toners have different ingredients; right?

25      A.     You're reading it.  He said something

1                    L. Stewart

2   like that.

3       Q.    Specifically on page 12 of his report

4   he says the two toners dissolve differently in

5   the same solvent and the two toners streak

6   differently on the developed TLC plate and

7   diffuse differently from the point of origin;

8   right?

9       A.    I believe he said something like that.

10      Q.    And Professor Romano in his report

11  stated that two different laser printers were

12  used to print page 1 and page 2 of the Work For

13  Hire document; right?

14      A.    Yes, that's what he says.

15      Q.    And he states the basis for his

16  conclusion; right?

17      A.    Yes.

18      Q.    Now let's talk about your opinions

19  about the toner and the printing.

20            First of all, you agree with the

21  defendants' experts that the printing was black

22  toner from a laser machine at 600 DPI; right?

23      A.    It could have been a laser -- at the

24  point of the initial examination it could have

25  been a laser printer or it could have been a

```
 1                    L. Stewart
 2   laser copier.
 3        Q.    Well, I just said a laser machine at
 4   600 DPI.
 5              You are not disputing that the printing
 6   was black toner from a laser machine at 600 DPI?
 7        A.    I am not disputing that it was small
 8   size toner, it would have been 600 DPI.
 9        Q.    But you do counter Mr. LaPorte's
10   conclusion that the toner on the two pages was
11   different; right?
12        A.    Yes.
13        Q.    And it's your position that the toners
14   match; right?
15        A.    Yes.
16        Q.    And you state at paragraph 93 that this
17   is based on your, quote, "exhaustive physical and
18   chemical testing"; right?
19        A.    Yes.
20        Q.    And you mentioned specifically TLC and
21   microscopy; right?
22        A.    I believe so, yes.
23        Q.    Was there anything else included in
24   your exhaustive testing?
25        A.    Comparison against the library of
```

1                    L. Stewart

2     standards and creation of the library, that type

3     of thing.

4         Q.    Okay.

5               And in your microscopy examination of

6     the toner did you actually use a stereo

7     microscope?

8         A.    On site, no, I did not.

9         Q.    What did you use on site?

10        A.    I used the VSC scanned image, I used my

11    own eye and some microscopic devices that I took

12    with me.  I do not believe that I took a digital

13    microscope -- I'm trying to think -- and so it

14    would have been scanned images.

15        Q.    I'm talking about the actual document,

16    the physical actual document.  You used a

17    hand-held microscope; right?  That was your

18    microscopy examination of the toner; yes?

19        A.    At that time and then that was

20    furthered when I went back to my laboratory.

21        Q.    Well, you didn't have the original

22    document back in the laboratory, did you?

23        A.    Didn't need it.  I had the plugs that I

24    took.

25        Q.    And what were the -- you had -- you

1                    L. Stewart

2     developed TLC plates of the toner; right?

3          A.    Yes.

4          Q.    And then you claim that you matched the

5     TLC results with the toner from your toner

6     library; is that right?

7          A.    That's correct.

8          Q.    Can you name a study that validates the

9     use of TLC analysis on black toners to identify

10    the manufacturer of a printing device used to

11    produce a questioned document?

12         A.    The standard operating procedures for

13    the Secret Service questioned document laboratory.

14         Q.    Is that a peer-reviewed study?

15         A.    Yes, internally peer reviewed.

16         Q.    Any other study that has been published

17    externally that validates the use of a TLC

18    analysis on black toners to identify the

19    manufacturer of a printing device used to produce

20    a questioned document?

21         A.    Yes, I believe there was one by Cantu

22    where he talks about the use of TLC to analyze

23    and identify toner.

24         Q.    And which article is that?

25         A.    It's in one of my exhibits.  I'll look

                          L. Stewart
1
2    for it.
3        Q.    Let me help you out.
4             You cite Exhibit 5 in your report, you
5    cite to an article by Dr. Cantu in support of
6    your toner identification; right?
7        A.    Do you want to direct me to that,
8    please?
9        Q.    Exhibit 5.
10       A.    Exhibit 5, yes, I believe that's the
11   article.
12       Q.    And the Secret Service study that you
13   are referring to, that's for color toner, not
14   black toner; right?
15       A.    No.  Well before Mr. LaPorte worked
16   there we developed a system for doing black-only
17   toner, we also had a system for doing
18   monochromatic or toners that were specific colors
19   and we developed a library of standards many
20   years back and we used that throughout the years,
21   so it was black-only, it was monochromatic and
22   later on it was three- and four-color systems.
23            It's gotten much easier with the new
24   technology, but in the old days we did it the
25   earlier method.

                    L. Stewart

1    
2        Q.    Now, the Cantu article that you're
3    referring to here is talking about the type of
4    toner, right, it discusses identifying
5    characteristics and features of toner; correct?
6              Let me ask you more specifically.
7              The article talks about characteristics
8    and features of toners, it does not mention
9    identifying a printer, manufacturer or even a
10   cartridge; is that right?
11       A.    It does not mention a cartridge, it
12   talks about how some black toners contain
13   extractible dyes and that those can be identified
14   and characterized by TLC, separated and
15   characterized, I'm sorry, by TLC.
16       Q.    And it recites that most of the
17   chemical information in black toners is in the
18   organic resins used; correct?
19       A.    I agree with that, yes.  I didn't say
20   it was easy.  It's difficult.
21       Q.    And what tests did you conduct to
22   determine the organic resins in the toners on
23   pages 1 and 2 matched?
24       A.    Organic resins?
25             I did not do any tests on the organic

```
 1                    L. Stewart
 2   resins, I did the tests on the extractible
 3   components.
 4       Q.    So when you say the toners matched,
 5   what you actually mean is that they matched at
 6   the level of analysis of TLC; right?
 7       A.    Right.  I followed the protocol of the
 8   federal agency and I stopped at the point of a
 9   match.
10       Q.    But there are other tests that you did
11   not perform; correct?
12       A.    Of course.
13       Q.    And it's possible that these other
14   tests could find differences in other components
15   of the toner; right?
16       A.    Right.  That's why I kept some sample
17   behind.  It may be we go to Hewlett-Packard
18   directly and have them identify it.
19       Q.    And if there are differences in the
20   organic resins or other components then the
21   toners could be said to not match; right?
22       A.    Not if it matches, but yes.
23       Q.    But if it doesn't match, then it
24   wouldn't match?
25       A.    Of course.
```

```
1                        L. Stewart
2        Q.    And you say the toner from this
3   document is consistent with toner from an HP
4   1100/3200 series machine; right?
5        A.    Correct.
6        Q.    Consistent with does not exclude the
7   possibility that it's also consistent with other
8   printers; right?
9        A.    I found none, but there is the
10  possibility of that, yes.
11       Q.    Well, consistent with doesn't strike me
12  as a very strong conclusion.
13             Do you mean it to be a strong
14  conclusion?
15       A.    No.  We are directed by standards on
16  what consistent with means and doesn't mean.  I
17  agree with you it's not a very strong conclusion
18  because there is a possibility that there's some
19  other printer out there we are not aware of.
20       Q.    And how did you do your comparison?
21       A.    A number of years back I developed a
22  library of standards for toners and printers and
23  I had those filed in my collection along with the
24  analysis results.
25       Q.    Let me stop you there for one second.
```

```
 1                    L. Stewart
 2    I'm going to get to the library.
 3             What I'm asking you is how did you do
 4    the comparison.  We are going to get to the
 5    library.
 6             What was the comparison?
 7       A.    You run the questioned sample and you
 8    compare it against the non sample.
 9       Q.    What specifically do you compare?
10       A.    The separation on a thin-layer
11    chromatography plate along with any associated
12    fluorescence characteristics.
13       Q.    Now let's look on paragraph 97 of your
14    report where you say that you compared it against
15    your library of standards.
16             Do you provide a chart or illustration
17    demonstrating this comparison?
18       A.    I can in court.  I don't have a chart
19    with me today.
20       Q.    But your expert report did not include
21    a chart of this comparison; is that right?
22       A.    No, it does not have a chart in my
23    report showing a layperson a thin-layer
24    chromatography separation, no, I did not do that.
25       Q.    You do actually cite something, though,
```

1                          L. Stewart

2    at the end of 97, right, Exhibit 6; right?

3         A.    I'm citing information from, I believe,

4    Hewlett-Packard there.

5              I'm sorry, that citation is the

6    section, I believe, of the Secret Service

7    operating procedures for the questioned documents

8    branch, if I am not mistaken.

9         Q.    So that does not actually provide a

10   specific illustration of your comparison; right?

11        A.    No, I did not -- I purposely did not

12   put an illustration of my comparison in there.

13        Q.    Now, you didn't identify a specific

14   cartridge in your report; right?

15        A.    No.  That would not be possible.

16        Q.    You identified two printer series;

17   right?

18        A.    It's two series that use the same

19   cartridge or same toner.

20        Q.    And what cartridge is that?

21        A.    I believe it's a 92A.

22        Q.    Now, you don't include in your report

23   the fact that a 92A cartridge used in those

24   printer series is still commercially available

25   today, do you?

1                    L. Stewart

2        A.    No, I do not include that.

3        Q.    Are you aware of the fact that the 92A

4    cartridge is still commercially available today?

5        A.    Yes.

6        Q.    I could print a document today using

7    that cartridge, couldn't I?

8        A.    Yes, if you had one of those printers

9    and you had that cartridge, you could.

10        Q.    In fact, the 92A cartridge works in

11    lots of different printers, not just those

12    printer series; right?

13        A.    I believe I listed all of them.  I can

14    find that if you direct me --

15        Q.    You're not providing an opinion that

16    the 92A cartridge works only in those two

17    machines, are you?

18        A.    No.  I do not recall if my list had

19    other machines, but I did not -- I can find that,

20    as I said, if you would like to discuss it.

21        Q.    So, but you agree with me that I could

22    go today to the Staples down the street, assuming

23    they have this, and get a 92A cartridge and then

24    print a document with it; right?

25        A.    You'd probably would have to do that

```
 1                      L. Stewart
 2   online, but yes, you can do that.
 3        Q.    So today someone could purchase that
 4   toner and use it to print a fraudulent document;
 5   correct?
 6        A.    Yes.  I believe I included the printout
 7   from Amazon that lists it as being available
 8   today.
 9        Q.    Now, you also counter Professor
10   Romano's conclusion the two pages were printed on
11   two different printers; right?
12        A.    Yes and no.  I countered his conclusion
13   based on his results he cannot say that.
14        Q.    I see.
15              But as you said, I think, earlier, you
16   are not an expert in typeface, typography or
17   printing technology; right?
18        A.    I disagree.  I taught that at Rochester
19   Institute of Technology and I have been trained
20   in that by the Secret Service, so I disagree with
21   you.
22        Q.    Have you ever been qualified by a court
23   as an expert in typeface, typography and printing
24   technology?
25        A.    Quite often.  The first time was in the
```

```
 1                    L. Stewart
 2   Unibomber case when I worked on that, involved
 3   typeface and typography.
 4       Q.    And what were you qualified as an
 5   expert in that case?
 6       A.    I performed analysis in that case on an
 7   unexploded bomb, the label from an unexploded
 8   bomb, and I identified it to a make and model of
 9   the printer using the same technology I used in
10   this case and then I also performed software
11   analysis on the font to identify the font package
12   that eventually was found in his shed when they
13   arrested him.
14       Q.    Did you testify in that case?
15       A.    No.  It never went to trial.
16       Q.    And you are not specifically refuting
17   Professor Romano's conclusion, you're simply
18   saying you need more information before you can
19   assess his opinion; right?
20       A.    No, I didn't ask for more information.
21   I said that he was unqualified to make an opinion
22   on forgery because he's not a qualified forensic
23   document examiner and based on his findings that
24   the two pages are different and why he says
25   they're different based on scaling and things
```

1                           L. Stewart

2      like that he can't draw that conclusion because

3      there are software packages that were available

4      back then in 2003 that would have done that, so I

5      disagree with his opinion.

6          Q.    And what software packages are those?

7          A.    I had them in my office, a list of the

8      dates on them.  I believe that date --

9          Q.    Did you spell them out in your report?

10         A.    No.  I believe at that time Word

11     Perfect offered it as well as some of the

12     printers, I believe the Laserjet 3 may have

13     offered it as well, which was a Hewlett-Packard.

14              If I am not mistaken, at that time it

15     was Word Perfect 3.1.

16         Q.    And you don't specify any of that in

17     your report, though, do you?

18         A.    No, I was not asked that in the report.

19     You are asking me that now.

20         Q.    You provide an opinion that attempts to

21     refute Professor Romano because you say he's not

22     qualified and you provide an alternative opinion;

23     right?

24         A.    Yes.

25         Q.    But you didn't provide the basis for

                          L. Stewart
1

2    that opinion in your report?

3        A.    Oh, I believe I did.  I didn't include

4    every little reason.  You're asking me for a

5    specific reason and about a specific subject and

6    I am trying to answer your question.

7        Q.    But you agree with me that you didn't

8    include any detail on any software packages in

9    your report; right?

10       A.    No, but I can.  If this goes to trial,

11   I will certainly have it there.

12       Q.    Good.

13             Now, Mr. LaPorte also concluded in his

14   report that the paper used for pages 1 and 2 of

15   the Work For Hire document is different; right?

16       A.    Yes, he did.

17       Q.    And he laid out the basis for that

18   conclusion; correct?

19       A.    Yes.

20       Q.    And the bases are that the paper on

21   page 2 is significantly more tensile than page 1,

22   right, that's one of them?

23       A.    I don't have it in front of me, so I

24   don't know.

25       Q.    Does that sound right?

1                    L. Stewart

2       A.    That sounds correct.

3       Q.    And did he also provide a basis that

4  the difference in thickness between pages 1 and 2

5  is statistically significant; right?

6       A.    If he said statistically significant,

7  he is mistaken, but I think he did address that

8  as well.

9       Q.    We are going to get to statistics.

10            He also said that the opacity was

11  different between pages 1 and 2; yes?

12       A.    I believe so.

13       Q.    And that the UV characteristics on page

14  1 and 2 are different when viewed with shortwave

15  and medium wave light, he also said that; yes?

16       A.    I don't recall him saying that, I'm not

17  sure.

18       Q.    Do you recall that he also said the

19  chemical tests using GCMS revealed the two pieces

20  of paper have different chemical compositions;

21  right?

22       A.    No, I don't recall that either.

23       Q.    Now, in terms of your report, you do

24  not state an opinion that the pages of the Work

25  For Hire document are of the same stiffness or

```
 1                       L. Stewart
 2   tensility; correct?
 3        A.    No, I do not reach that opinion.
 4        Q.    You did not assess the stiffness of the
 5   pages; right?
 6        A.    No, and there's a reason for that.
 7        Q.    Okay.
 8              And you did not state an opinion
 9   stating that the opacity of the Work For Hire
10   pages is the same; right?
11        A.    The opacity of a damaged document, no,
12   I did not address that.
13        Q.    You didn't assess the opacity of the
14   pages; right?
15        A.    No.  It would have been ridiculous to
16   do that.
17        Q.    Okay.
18              And you did not state an opinion that
19   the pages appear the same when viewed with
20   shortwave or medium wave UV light; right?
21        A.    Not since the documents were damaged,
22   no.
23        Q.    Now, your overall conclusion regarding
24   the paper seems to be that defendants' experts
25   claim of different papers is wrong.
```

```
 1                    L. Stewart

 2            Is that your conclusion?

 3       A.    Based on my work and that of

 4   Mr. Rantanen, yes.

 5       Q.    And you don't clearly state that the

 6   papers are definitively the same; right?

 7            Are you concluding that they are the

 8   same?

 9       A.    He did.

10       Q.    What do you say?

11       A.    I say we need to send it to an expert

12   like Mr. Rantanen and that's what I did.

13       Q.    So you are relying on his opinion, you

14   are not providing a particular opinion about

15   that; is that right?

16       A.    My opinion was based on the erroneous

17   measurements that were conducted on the damaged

18   document.

19            As far as a chemical analysis and a

20   fiber analysis, I sent that to one of the most

21   world-renowned experts that we have.

22       Q.    And what is your opinion based on

23   Mr. Rantanen's testing results?

24       A.    My opinion is not based on his test

25   results.  His opinion, if you want me to read it
```

1                        L. Stewart

2    to you, I can go to his report.

3        Q.    Well, what do you believe his opinion

4    to be with respect to whether the pages are the

5    same?

6        A.    I believe he decided that they were not

7    only the same fiber composition, but they were

8    consistent with coming from the same production

9    run, which would be inconsistent with the

10   defendants' theory that the documents were from

11   many years apart.

12       Q.    And do you have a particular opinion as

13   well or are you simply relying, as to that issue,

14   you are simply relying on his opinion?

15       A.    No.  My opinion is that you can't do a

16   chemical or an accurate physical test on damaged

17   documents and that you certainly can't measure

18   them to a 10,000ths of an inch and then say that

19   they are slightly different and that that imparts

20   a difference, that was totally erroneous, and

21   that is something that I do refer to.

22       Q.    Yes, I understand that, and we are

23   going to get to that, but with respect to

24   Rantanen's results you are relying -- the basis

25   for your statements, your opinion about the

```
 1                    L. Stewart
 2   papers being the same is Rantanen's results and
 3   the statistics interpretation; yes?
 4       A.    No.  I don't think I have an opinion in
 5   there showing that I believe the papers are the
 6   same.
 7       Q.    Okay.
 8       A.    I discussed problems with the
 9   procedures that were used by your team and then I
10   included a reference in there that I quoted
11   Mr. Rantanen and what his results were.
12       Q.    I see.
13             And you criticized Mr. LaPorte's use of
14   a handheld micrometer; right?
15       A.    No.  I criticized his finding.
16       Q.    You are aware, are you not, that your
17   partner Mr. Blanco used a handheld micrometer to
18   take measurements of the document; right?
19       A.    That's correct.
20       Q.    And you challenged that the
21   measurements that Mr. LaPorte took actually
22   constitutes a statistically significant
23   difference; right?
24       A.    I don't know if that's the words I
25   would use, but I would stand by that.
```

1                      L. Stewart

2       Q.    And what exactly is your statistics

3  background?

4       A.    I have taken a number of courses in it

5  in college, I've --

6       Q.    What courses specifically?

7       A.    Statistics 101, 201, et cetera.

8       Q.    How many?  You said a number.

9       A.    I believe I took it for three years of

10  the four-year degree, my lower degree.

11            Since then I've used it from time to

12  time when I've been working on research that

13  needed to be published.

14       Q.    And what is a standard deviation

15  measure?

16       A.    Well, you take the mean, the average,

17  and then you can do standard deviation based on

18  different amounts of reliability, whether you

19  want it to be very reliable or not so reliable.

20       Q.    Can you explain the difference between

21  the standard deviation and the variance?

22       A.    Not without referring to my books.

23       Q.    Turn your attention to paragraph 303 of

24  your report.

25            There you state, quote, "Furthermore,

1                        L. Stewart

2      for LaPorte to report a difference in the paper

3      used to create pages by measuring the two pages

4      as 0.0042 plus or minus 0.00005 inches" -- dot,

5      dot, dot -- "is equally ludicrous since the two

6      measurements can be equal based on his own report

7      of variance."

8          A.    Yes.

9          Q.    Right.

10               And then you proceed to show this by

11     adding 0.00005 to 0.0042 and subtracting that

12     from 0.0043; right?

13         A.    Which makes them the same number.

14         Q.    Did you see the footnote in

15     Mr. LaPorte's report on page 11, footnote 19?

16         A.    Not that I recall.

17         Q.    Do you recall the footnote that says

18     that he used students' T-tests to calculate the

19     statistical significance of his results?

20         A.    No.  I don't dispute that he did that.

21         Q.    Do you know what a T-test is?

22         A.    It's a reliability test you can do with

23     statistics to see if it falls within a certain

24     range that we talked about.

25         Q.    Test whether the test statistic follows

1                     L. Stewart

2   normal distribution if a null hypothesis is

3   supported?

4        A.    It has to do with the bell-shaped curve

5   and whether it follows that, yes.

6        Q.    Do you understand the difference

7   between a T-test confidence interval and a

8   Bayesian credible interval?

9        A.    Not without going back to my books, I

10  don't.

11       Q.    A T-test measures the probability that

12  a difference between the two independent data

13  points is not statistically significant; is that

14  right?

15            MR. BOLAND:   Objection.

16       A.    I would have to look at my books before

17  I would quote something like that.  I don't know.

18       Q.    Are you aware that a Bayesian statistic

19  determines the uncertainty distribution of a

20  parameter?

21       A.    No.  What I'm reporting here is simple

22  mathematics.  His report doesn't make sense.

23       Q.    Let's take a look at what you say.

24            Do you recognize that your

25  interpretation of Mr. LaPorte's opinion describes

1                    L. Stewart
2    a Bayesian credible interval when in fact
3    Mr. LaPorte provides a T-test confidence interval?
4        A.    No, I did not report any of that.  I am
5    simply using his numbers, his math, and the fact
6    that he used a very easily changeable device
7    where one thousandth of an inch means nothing.
8        Q.    Let's look at your analysis of the
9    statistical measurements because you point to
10   that as, you know, a claimed error.
11            What's the standard deviation found by
12   Mr. LaPorte in the measurement in mean thickness
13   on page 1?
14       A.    What are you referring to, what page?
15       Q.    Well, I'm referring to your report here
16   on page 62, paragraphs 302 and 303.
17       A.    All right.
18            Please repeat your question.
19       Q.    Hold on one second.
20            I show you page 11 of Mr. LaPorte's
21   report.  If you look up at the top you see in the
22   first paragraph it describes the measurements and
23   that the average of the measurements is .0042 and
24   the standard deviation is .00005.
25            Is that accurate as what he describes

```
 1                    L. Stewart
 2   as the average measurement and the standard
 3   deviation?
 4       A.    In one case.  In the other --
 5       Q.    It's .0043, that's the average, but the
 6   standard deviation he finds in both is .00005;
 7   right?
 8       A.    Which is 1/100th of a thousandth of an
 9   inch, which is well beyond the capability he
10   quoted.
11       Q.    You have to take the square of the
12   deviation to get the variance; right?
13       A.    I don't know.  I'd have to look at my
14   books.
15       Q.    So you don't recall the a variance is
16   simply the square of the standard deviation?
17             MR. BOLAND:  Objection.
18       A.    No.  I'm using simple mathematics here,
19   not statistics.  I'm looking at his numbers and
20   saying they don't follow, his numbers don't
21   follow the capability of the equipment and his
22   numbers don't follow even amongst themselves.
23       Q.    Right.
24             And you're reporting to -- you're
25   pointing to the number, you are saying that
```

1                    L. Stewart

2  Mr. LaPorte's reported variance is .00005 when in

3  fact that's what Mr. LaPorte reports is the

4  standard deviation; correct?

5      A.    What I'm showing is that he is

6  measuring the two pages as .0042 plus or

7  minus .00005 inches and then the same with .0043

8  plus or minus.

9      Q.    Right.

10               And the plus or minus he reports is the

11  standard deviation; right?

12      A.    That's what he's reporting as the

13  standard deviation, which is inaccurate if you

14  are using a machine that goes to ten thousandths,

15  you can't use a hundred thousand.

16      Q.    And in 303 you use that number .00005

17  as the variance, but in point of fact the

18  variance and standard deviation are two very

19  different terms in statistics; right?

20      A.    I think you are using variance as a

21  statistical term and I am using it as a simple

22  term that he is showing that there is a variance

23  between the figures.  I'm not using it

24  statistically.

25      Q.    You're not using it statistically.

```
 1                    L. Stewart
 2    You're criticizing his statistics, but you're
 3    not using the term variance in a statistical way?
 4        A.    I don't criticize his statistics
 5    anywhere.  I'm simply saying that his numbers
 6    don't work and they certainly can't be used with
 7    a machine that only or an instrument that only
 8    goes to ten thousandths of an inch.
 9              MR. SOUTHWELL:  Let's take a quick
10         break.  We are almost done.
11              THE VIDEOGRAPHER:  Off the record.  The
12         time is 5:46.  This ends tape number 5.
13              (Recess taken.)
14              THE VIDEOGRAPHER:  We are back on the
15         record.  The time is 5:56.  This is tape 6.
16    BY MR. SOUTHWELL:
17        Q.    Did you discuss the case or the
18    deposition over the break with Mr. Boland at all?
19        A.    No.
20        Q.    Now, in paragraph 305 of your report --
21        A.    I did talk to him about scheduling
22    problems, but I did not talk about the
23    deposition, as far as what we've been discussing.
24        Q.    Okay.
25              At paragraph 305 of your report you
```

1                    L. Stewart

2    write that LaPorte, Lesnevich, Romano, and Tytell

3    each concluded that page 1 of the two-page

4    Facebook contract was substituted at a later

5    date; is that right?

6         A.    Yes.

7         Q.    And you have referred to this in your

8    report as the, quote, page 1 substitution theory;

9    right?

10        A.    I don't know if I refer to it that way,

11   but that's fine, if you want to refer to it that

12   way.

13        Q.    Well, okay.

14              In paragraph 165 you describe it, you

15   don't describe it quite like that, but that's

16   essentially what you're referring to it as, and

17   that theory that you are advancing suggests that

18   a recently fabricated page 1 was substituted for

19   the genuine page 1 created in 2003 and appended

20   to the genuine page 2 created in 2003.  That

21   would be the general nature of that type of a

22   theory; yes?

23        A.    Yes, that's defendants' theory.

24        Q.    Right.

25              Well, you're advancing that as

```
 1                          L. Stewart
 2     defendants' theory; right?
 3              Can you cite to me where defendants'
 4     experts actually advance that theory?
 5        A.    If we can stop and look for it, it's in
 6     each of their reports where they concluded that
 7     page 1 was substituted at a later date.
 8        Q.    Really?  In each of their reports they
 9     concluded that page 1 was substituted at a later
10     date?
11              Okay.  That's your opinion; yes?
12        A.    I believe that's accurate, yes.
13        Q.    Great.  Okay.  We can move on, then.
14              Now, you advance that Mr. Rantanen's
15     paper composition analysis shows why this
16     conclusion is wrong, and that's at paragraphs 305
17     to 308; right?
18        A.    I'm saying that it's wrong why?
19        Q.    Because Mr. Rantanen's composition
20     analysis demonstrates that the two pages in your
21     view are the same; yes?
22        A.    That's not why I'm saying Mr. LaPorte's
23     math is wrong and his use of equipment is wrong;
24     it's two independent things.
25        Q.    I'm not asking you any questions about
```

```
 1                          L. Stewart
 2      Mr. LaPorte's math or his equipment.
 3           A.    You pointed to that paragraph 303.
 4           Q.    Okay.  I was referring to paragraph
 5      305.
 6                 Maybe I misspoke.  I am referring to
 7      paragraph 305 where you are talking about the
 8      paper composition analysis, and you state in your
 9      report -- and this is actually paragraph 304 --
10      that that paper composition analysis shows
11      defendants are wrong; right?
12           A.    No.  My 304 is a title "Paper
13      Composition Analysis Shows Defendants Are Wrong."
14      There's no finding there, that's a title of a
15      section.
16           Q.    Isn't that your opinion?
17                 That's a title of a section of your
18      report.
19                 That's not your opinion?
20           A.    I'm trying to answer your question
21      based on what you called it.  It is a title.  I
22      then go from that and describe the reason behind
23      that observation.
24           Q.    Did you write that title?
25           A.    Yes.
```

1                         L. Stewart

2        Q.      So these are your words, "Paper

3   Composition Analysis Show Defendants Are Wrong"?

4        A.      Yes.  I stand by the words.

5        Q.      Okay.

6                But it's not your opinion or it is your

7   opinion?

8        A.      You could call it an opinion if you

9   want.

10        Q.      I'm just asking what your expert

11   opinion is that you provided to the Court.

12                It certainly appears to say paper

13   composition analysis shows defendants are wrong.

14        A.      Well, I wouldn't call that an expert

15   opinion, I would call that a statement and then

16   what follows are paragraphs defining the opinion.

17        Q.      Okay.

18                Well, I think you just agreed with me

19   that it's opinion, but that's fine.

20                Now, Mr. Rantanen supposedly

21   contradicts defendants' expert's purported

22   conclusion --

23                MR. SOUTHWELL:  Strike that.

24        Q.      The only relevance Mr. Rantanen's paper

25   composition analysis has is that it supposedly

```
 1                    L. Stewart
 2    contradicts defendants' expert's purported
 3    conclusion that page 1 was substituted at a later
 4    date; correct?
 5        A.    No.
 6        Q.    Its relevance is, in your view, that it
 7    establishes that the two pages were from the same
 8    mill and production run; right?
 9        A.    That's one thing.  It also establishes
10    that they have consistent reactions for starch
11    and pH.  It also allowed us to figure out where
12    an additional contamination on the document came
13    from, which are black particles that are found on
14    the front of the page.
15        Q.    Now, you didn't actually perform the
16    testing there, that was Mr. Rantanen; right?
17        A.    I took the samples and he performed
18    that test.
19        Q.    And what specific samples did you take?
20        A.    I produced this to you.  I sent him
21    plugs that were taken from page 1 of the Work For
22    Hire document out of my -- it was my vial number
23    7 and I sent him plugs from page 2 of the
24    document, which was my vial number 9, I sent
25    those to him on October 30, 2011.
```

1                    L. Stewart

2        Q.    And how do you know that -- what are

3    you referring to when you're giving this

4    information?

5        A.    The TLC worksheet -- not that, that's

6    an analysis worksheet.  There's another one that

7    you have that has --

8        Q.    Can you hold it up so we can see it?

9        A.    That is the top of the page.  You have

10   to go down from that to get the rest.

11             I sent photographs that were broken, so

12   you probably have two or three to make up the

13   document.

14             This is the document, it's different

15   than the document you've got right there.

16       Q.    Right.  I understand.

17             So these are the documents that we have

18   that you provided us, it appears this is one

19   page, it's just the top line of the TLC worksheet

20   form that includes -- I suppose this is vial 1.

21             MR. SOUTHWELL:  Why don't we mark this

22       as the next exhibit, please.

23             (Defendants' Exhibit 25, one-page

24       photograph of document, marked for

25       identification, as of this date.)

1                    L. Stewart

2        Q.    Showing you Defendants' Exhibit 25,

3    that's, you're saying, one page of this, and you

4    are saying that page continues.

5              Why is it you took photographs of these

6    pages rather than simply making a Xerox copy?

7        A.    Trying to give you the best quality, I

8    took high-res digital photographs as opposed to a

9    400-dot-per-inch photocopy.

10       Q.    Okay.

11             I don't believe we have the rest of

12   those pictures or the rest of that sheet, so we

13   would ask that you provide that to us.

14             May I take a quick look at it?

15       A.    Certainly.

16       Q.    And that sheet explains what's in vials

17   7 and 9 and where those come from; yes?

18       A.    In part.

19       Q.    Does this explain where the plugs come

20   from?

21       A.    The -- no.  The video shows where they

22   came from and there's photocopies of the document

23   before and after I took my plugs.  There isn't

24   anything that shows specifically where an

25   individual plug came from, just them in toto.

```
 1                    L. Stewart
 2        Q.    How many paper blanks did you take?
 3        A.    For that particular document?
 4        Q.    How many paper blanks did you take of
 5   the Work For Hire contract document?
 6        A.    Looks like 16 from page 1 and then 16
 7   from page 2 and then an additional 20 from page 1
 8   and an additional 20 from page 2.
 9        Q.    And what vials were those paper blanks
10   in?
11        A.    That would be vial 1, vial 2, vial 7
12   and vial 9.
13        Q.    Those were all paper blanks in those
14   vials?
15        A.    They were paper-only samples.
16        Q.    And of those samples you gave the
17   entirety of vials 7 and 9 to Mr. Rantanen?
18        A.    I believe so.
19              Let me check.
20        Q.    Sir, if you don't mind, if you'd leave
21   that out, I could just have a quick copy made of
22   that.
23        A.    Okay.  I just want to make sure I get
24   it back in the right place.
25        Q.    Is that just that one page?
```

1                        L. Stewart

2        A.      That's all you've asked for.

3        Q.      Well, is there anything else that you

4    haven't produced provided to us?

5        A.      I provided that to you.  You say you

6    didn't have it, but I did provide it to you.

7        Q.      Okay.

8                Is there anything else that you have

9    that you haven't provided to us?

10       A.      I provided you everything.  I don't

11   know whether you have everything.

12       Q.      And what did you do with the rest of

13   the paper blanks?

14       A.      I have them.

15       Q.      Did you do anything with them?

16       A.      I used some for the toner analysis and

17   I have the rest in my laboratory.

18       Q.      How did you use them for the toner

19   analysis?

20       A.      As a paper blank to subtract any

21   influence from the paper from the results of the

22   toner.

23       Q.      You ran those before you ran the TLC of

24   the toner, the TLC analysis on the toner?

25       A.      No.  You run them at the same time.

```
 1                      L. Stewart
 2       Q.    Now, you provide -- you completed a
 3  test services request form for Mr. Rantanen;
 4  right?
 5       A.    Yes.
 6       Q.    And you asked him to determine
 7  consistency of composition with paper in vials 7
 8  and 9; right?
 9       A.    If you want to show me the document, it
10  would be quicker or -- so do you want me to read
11  from that or do you want to read from it?
12       Q.    Sure.
13             So the test requested reads determine
14  consistency -- sorry, hold on -- determine
15  consistency of composition with paper in vials 7
16  and 9 and also determine if paper composition is
17  one that would be affected by exposure to intense
18  ultraviolet light as one side of these paper
19  samples are yellowed and we are trying to
20  determine why.
21             Is that accurate as to what you asked
22  Mr. Rantanen to do?
23       A.    Yes.
24       Q.    You didn't ask him to perform any other
25  tests; correct?
```

                              L. Stewart
1
2       A.     Later on I asked him to identify the
3   black particles that he had observed.
4       Q.     Okay.
5              And with respect to your second request
6   you concluded in your report that the yellow
7   discoloration damage evident in the Facebook
8   contract is, in my opinion, the result of
9   repeated exposure of the document to high
10  intensity or UV light, and in response to that
11  Mr. Rantanen made conclusions about the UV
12  exposure concluding that the paper samples did
13  not have any detectable mechanical high pulp
14  fibers which would be affected by photo
15  degradation from UV light; is that right?
16      A.     No, not entirely.
17      Q.     Isn't that what he concluded?
18      A.     No.  I assume you'll find out when you
19  depose him if it's not in his report, but it's --
20  he requested to be able to analyze the document
21  in person, he said that there wasn't enough in
22  the very small circles that he was provided by me
23  to properly address what caused the UV
24  fluorescence or UV change in the document on one
25  side only, so he asked to be able to look at the

```
 1                    L. Stewart
 2   document.
 3       Q.    I see.
 4             So he could not conclude one way or the
 5   other whether the paper samples were affected by
 6   contact with UV light?
 7       A.    At this point, no, he could not
 8   conclude it.
 9       Q.    Right.
10             And with respect to the first
11   request --
12             MR. SOUTHWELL:  Sorry.  Strike that.
13       Q.    Right.
14             So he determined that the fiber
15   contents of the two samples is consistent with
16   coming from the same mill and production run;
17   correct?
18       A.    I believe that's what he --
19       Q.    And that does not mean the paper
20   samples actually came from the same paper mill
21   and production run; right?
22       A.    No.
23       Q.    It means only that he could not
24   differentiate the paper samples at the level of
25   analysis he performed; right?
```

1                          L. Stewart

2          A.     That seems accurate, yes.

3          Q.     And based on that conclusion one

4    couldn't conclude that the paper samples were

5    actually produced during the same production run;

6    right?

7          A.     Based on a consistent -- the word

8    "consistent," no, you cannot conclude that.

9          Q.     Right.

10                So it would be inappropriate to

11   conclude that the paper samples were produced on

12   the same day; right?

13         A.     I don't want to put words into

14   Mr. Rantanen's mouth, but based on my use of the

15   word "consistent" you would not be able to say

16   that they were done on the same day, no.

17         Q.     And assuming that -- well, a conclusion

18   that the paper came from the same mill and

19   production run would be completely consistent

20   with Mr. Ceglia having created a fraudulent

21   contract and printed it on paper from the same

22   production run; correct?

23         A.     I assume so, yes.

24         Q.     And such a conclusion would be

25   consistent with Mr. Ceglia having created

1                    L. Stewart
2    multiple versions of the fraudulent document and
3    printed them on paper from the same production
4    run; right?
5         A.    Yes.
6         Q.    And you noted also with respect to the
7    paper that it is bond type paper.
8               What do you mean by bond type paper?
9         A.    As opposed to hundred percent wood
10   paper that would be found in poor quality Xerox
11   paper.
12        Q.    I am handing you back your TLC
13   worksheet form which we have now made a copy of.
14              What are the characteristics of bond
15   paper?
16        A.    Typically it would involve some type of
17   rag content, cotton fiber, linen, that type of
18   thing, to make it have a softer feel.
19        Q.    You state in your report that you
20   observed the white fluorescing tab marks on the
21   front of pages 1 and 2 of the Work For Hire
22   document; right?
23        A.    That's correct.
24        Q.    Did you document those tab areas?
25        A.    Yes, I did.

```
 1                        L. Stewart
 2       Q.    How?
 3       A.    In my notes that were taken at the desk
 4  as I was doing the examination.
 5       Q.    Did you measure them?
 6       A.    Yes, I did.
 7       Q.    What were the measurements?
 8       A.    Reading from my notes it says there
 9  were two slightly wider areas on both pages on
10  top edges about 1/2 inch in from left on page 1
11  and one inch from right on page 1.
12            They are -- and this is not in my
13  notes, but just my recollection, they are
14  amorphous in size so that you cannot do an
15  accurate measurement of exactly how big they
16  were.
17       Q.    And what are you -- you're reading from
18  your notes in the case.
19            Can you just hold those up, please?
20       A.    Yes.  It was provided to you, it's got
21  Staples at the top from a Staples --
22       Q.    And how many pages?
23       A.    Just one page.
24       Q.    And how do you know it was provided to
25  us?  Did you provide it to us?
```

1                          L. Stewart

2        A.    Yes.

3        Q.    You did?

4        A.    Yes.

5        Q.    How?

6        A.    It's my recollection it was provided to

7    you back in November and it was provided to you

8    again on Mr. Southwell's request last week when

9    you got that file.

10       Q.    And you provided it to us directly?

11       A.    No.  I don't deal with you directly.  I

12   provided it to the lawyers on Mr. Ceglia's side

13   and they provided it to you.

14       Q.    How do you know they provided it to us?

15       A.    You are showing me some of them, so I

16   assume that they did.

17       Q.    Do you want to look through here,

18   because those notes are not in here, those notes

19   were not provided to us.

20       A.    If you want me to look through there, I

21   will.

22       Q.    Can I make a copy of those notes?

23             Let's look at the TLC worksheet form

24   that you just provided to us today and which we

25   have made a copy of.

                          L. Stewart

1

2               MR. SOUTHWELL:  Why don't we mark this

3         as Defendants' Exhibit 26, please.

4               (Defendants' Exhibit 26, one-page

5         document headed "TLC Worksheet Form," marked

6         for identification, as of this date.)

7         Q.    That's the form you just gave to us,

8    right?

9               It notes Q1 and Q2.

10              What is Q1?

11        A.    That was what I called the Work For

12   Hire document.

13        Q.    Right.

14              And that's in your report, you call Q1

15   the Work For Hire document and you call Q2 the

16   specs document, the specifications document;

17   right?

18        A.    I don't know.  I have to look at my

19   notes back here.  You just took my notes, so --

20        Q.    Well, why don't I refer you to your

21   report on page 12.

22        A.    You are referring to a report that was

23   done afterwards.  I need to look at the original

24   notes when I first made these notations and

25   that's what you just took.

```
 1                      L. Stewart
 2      Q.    Okay.  All right.  We will come back to
 3  that, then.
 4            Now, with respect to your opinions
 5  regarding the staple holes in the Work For Hire
 6  document, your expert opinion with respect to
 7  those staple holes is that the Facebook contract
 8  was only stapled one time; right?
 9      A.    That's Mr. Blanco's opinion and I agree
10  with him.
11      Q.    Well, in paragraph 181 -- would you
12  refer to paragraph 181 of your report.
13      A.    All right.
14      Q.    There's no mention of Mr. Blanco's
15  opinion there.
16            This is your opinion, is it not?
17      A.    Right.
18            As I mentioned, I looked at the same
19  evidence, I agree with that finding, and then he
20  did additional work on it.
21      Q.    So your opinion here is that the
22  Facebook contract was only stapled one time?
23      A.    Yes.
24      Q.    And you state that the basis of your
25  conclusion is a combination of examining the
```

1                        L. Stewart

2    resultant holes from the previously stapled

3    Facebook contract along with the detent markings

4    found on the back or reverse side of each page;

5    right?

6         A.    Right.

7         Q.    Now, you didn't examine the Work For

8    Hire document in its original state or the staple

9    holes with a microscope; correct?

10        A.    I believe I had a handheld microscope

11   at the site.  I don't recall.

12        Q.    When you describe a handheld

13   microscope, are you referring to a magnifying

14   glass?

15        A.    No.  I believe I brought a digital

16   microscope.

17        Q.    Is that the only microscope device that

18   you used in your examination of the original

19   document?

20        A.    I don't recall.  I also had a

21   handheld -- I also had -- I think I may have had

22   two handhelds.

23              I don't recall exactly what I used

24   there, I would have to look at the videotape.

25        Q.    Did you take any photographs of the

```
 1                        L. Stewart
 2   staple holes?
 3       A.    I took scans on site, I did not take
 4   any photographs.
 5       Q.    And you understand that someone who
 6   is -- that it is possible to --
 7             MR. SOUTHWELL:  Strike that.
 8       Q.    Let me actually hand you back your
 9   notes here and if we could have this marked as
10   Defendants' Exhibit 27.
11             (Defendants' Exhibit 27, photocopy of
12        one page of handwritten notes by Mr.
13        Stewart, marked for identification, as of
14        this date.)
15       Q.    Defendants' Exhibit 27 is the notes we
16   were just referring to?
17       A.    Yes, sir.
18       Q.    Yes?
19             So if you refer to that, can you
20   identify what Q1 and Q2 on Defendants' Exhibit 26
21   is?
22       A.    I will try.
23             There I'm calling Q2 the six-page
24   document.  I believe what is going on there, if
25   you look at the worksheet, you'll see that
```

```
1                      L. Stewart
2    there's two pages listed for Q1, two pages listed
3    for Q2, and I just doubled my sampling because at
4    the time of the analysis we were asked -- we were
5    allowed to do additional plugs and so I'm using
6    the same name twice, it appears.
7         Q.   Well, let's discuss this.
8              So Defendants' 27 are your notes from
9    the date of the inspection July 25th, 2011;
10   correct?
11        A.   That's correct.
12        Q.   Those are your contemporaneous notes of
13   what you did; yes?
14        A.   That's correct.
15        Q.   And Q1 is the two-page document that
16   we've been referring to as the Work For Hire
17   document; yes?
18        A.   The six-page document, yes.
19        Q.   Q1 is the two-page document that we
20   referred to as the Work For Hire document on your
21   notes, Defendants' Exhibit 27?
22        A.   I'm sorry.  Yes, Q1 is the Work For
23   Hire document.
24        Q.   Q2 is the six-page document titled
25   "StreetFax Back-End" dot, dot, dot, that we
```

1                        L. Stewart

2      referred to as the specifications document; yes?

3           A.     That's correct.

4           Q.     And if you look in your report at

5      paragraph -- page 12, you refer to, again, Q1 is

6      the Work For Hire contract, Q2 is the Street Fax

7      back-end technical specification; yes?

8           A.     That's correct.

9           Q.     Now, the TLC form that we were

10     referring to as Defendants' Exhibit 26 is also a

11     contemporaneously dated document from July 25,

12     2011, when you conducted this examination;

13     correct?

14          A.     That's correct.

15          Q.     And there vials 1 through 6 reflect

16     your document here, your log reflects that those

17     samples were taken from Q1 and your log reflects

18     that vials 7 through 10 were taken from Q2;

19     correct?

20          A.     That's what that says, yes, and I'm

21     trying to explain that to you.  If you look at

22     the videotape, you'll see where the analysis was

23     taken from.  I was given the authority to take

24     additional plugs and I renamed it.  I

25     unfortunately used the same name there that I

                        L. Stewart
1
2    then used in the report, but you could see that
3    those are both two-page documents and it's just
4    reiteration of the same analysis.
5         Q.    So your testimony is that this
6    inventory is inaccurate with respect to -- well,
7    your inventory uses a different nomenclature than
8    your contemporaneous notes of the same day,
9    that's what you're testifying to?
10        A.    That's not my testimony.  I would have
11   made it clearer to you reading it now if I'd used
12   an A or some other name that I didn't use in the
13   report, so, again, I could have probably
14   clarified it, but it's very clear from reading
15   the worksheet that it's a two-page document in
16   what I did there.
17        Q.    And so you are absolutely certain that
18   vials 7 to 10 which are denominated Q2 are not
19   actually the specs document?
20        A.    Right.  You can see from the pieces of
21   plugs that it's yellow on one side; the specs
22   document was not.
23        Q.    And if we go back and check the
24   videotape do you think that that's going to
25   support your opinion?

1                    L. Stewart
2        A.    For that worksheet, yes.
3        Q.    All right.  We will do that.
4              Now, you understand that it's
5    defendants' position that Paul Ceglia has
6    proffered at least two physical documents as the
7    Work For Hire documents over the course of the
8    lawsuit.
9              Do you understand that?
10       A.    I assume so, yes.
11       Q.    When you testified a few moments ago
12   that you were allowed to take additional plugs,
13   what are you referring to?
14       A.    My recollection of the first time when
15   we were allowed to take plugs, there was quite a
16   bit of discussion about the number of plugs and
17   where they could be taken from and at some point
18   that was cleared up and so I took the maximum
19   number I was allowed and I photographed the
20   document before and after -- I'm sorry,
21   photocopied the document before and after.
22       Q.    Do you recall that there was a protocol
23   document that was handwritten and initialed by
24   the parties that established exactly what plugs
25   they were producing?

1                    L. Stewart

2        A.    I recall that name being used.  I don't

3    recall seeing the document, I was just told what

4    I could do.

5        Q.    And you recall that in fact you were

6    allowed to take only 20 plugs from the Work For

7    Hire document?

8        A.    I don't recall the number, I would have

9    to go back and look.

10       Q.    But your testimony here is that you

11   were allowed to take additional plugs.

12             Are you sure that wasn't later when you

13   had access, exclusive access to the documents

14   that was not part of the authorized examination?

15       A.    No.  My analysis as far as taking plugs

16   was only done in Chicago.

17       Q.    So did you send plugs from the

18   specifications document to Mr. Rantanen?

19       A.    No.  I sent him only the document, the

20   Work For Hire document.

21       Q.    Now, it's your position that the

22   physical document that was used to create the

23   copy that was attached to the complaint of the

24   Work For Hire document is the same physical

25   document as the one produced to experts in this

```
 1                        L. Stewart
 2    case; right?
 3         A.    You are going to have to repeat that.
 4         Q.    Let's turn to page 58 of your report.
 5               MR. BOLAND:  Alex, it's 6:26 p.m., so
 6         we have been here 8-1/2 hours now, which is
 7         more than reasonable to get the seven hours
 8         of deposition time.  I have moved my flight
 9         twice and there's a car going to be waiting
10         for me downstairs, so time's running out.
11               MR. SOUTHWELL:  I understand your
12         position.  We'll be done when we're done.
13         Q.    Let's look at the images that you
14    labeled here on page 58.  You've got Q1, Q2, Q3,
15    Q4 -- let's actually go back to page 56.
16               Do you see the images here on 56?
17               Did you create all of these images and
18    the words around the images?
19         A.    I created that from images that were
20    submitted by your experts, yes.
21         Q.    And the words around the images, those
22    are yours?
23         A.    Yes.
24         Q.    And do you understand that
25    Mr. Lesnevich states his opinion to the highest
```

```
 1                     L. Stewart
 2    degree of certainty that the handwriting is
 3    different between Q1 and Q2 and Q3 and Q4?  Do
 4    you understand that?
 5         A.    That the handwriting is different?
 6         Q.    Yeah.
 7         A.    He's saying that there are differences
 8    between the two.
 9         Q.    Right.
10               And you are in agreement with Jim
11    Blanco's report in this case that in fact these
12    are all the same, the handwriting is the same on
13    Q1, Q2, Q3, and Q4; right?
14         A.    Okay.
15               There's only two questioned documents.
16               Are you referring to Lesnevich's image
17    where he's got Q1, Q2, Q3, and Q4?
18         Q.    I'm referring to page 58 of your report.
19         A.    And the question there is do I believe
20    Mr. Lesnevich or Mr. Blanco?
21         Q.    Well, let's look at page 58.  You've
22    got above the line and you've got below the line,
23    you have got Q1 and Q2 at the top and Q3 and Q4
24    at the bottom.
25               So is it your expert opinion that the
```

1                        L. Stewart

2    handwriting represented here on your page 58 in

3    Q1 and Q2 matches the handwriting from Q3?

4        A.    Using Lesnevich's images they do not

5    appear to match.

6              You're talking about a layperson or

7    after --

8        Q.    My question is, is it your expert

9    opinion that the handwriting represented in Q1

10   and Q2 matches the handwriting in Q3, that's the

11   question.

12       A.    Yes, it's my opinion that they are all

13   from the same document.

14       Q.    So it's your expert opinion that there

15   are no differences between the M's represented in

16   these groups of images?

17       A.    No.  There are many differences to a

18   layperson and that's why you have to look at it

19   forensically.

20       Q.    I see.

21             So there's differences that a layperson

22   might comment upon, but in your expert opinion

23   there's no difference, they are the same?

24       A.    No.  I say that there are differences,

25   but they are explained away if you know what

                           L. Stewart

1

2    you're talking about and you know what you're

3    looking at.

4        Q.    I see.

5              And Mr. Lesnevich doesn't know what

6    he's talking about or what he's looking at; is

7    that your opinion?

8        A.    I think Mr. Lesnevich made a mistake

9    here.

10       Q.    I see.

11             Now, are there any other documents that

12   you have that you have not produced to us?

13       A.    No.  As I've mentioned before, I've

14   produced everything.

15       Q.    And let's look at your TLC plates.

16             You ran the TLC plates on the toner?

17       A.    Yes, sir.

18             MR. SOUTHWELL:  Let me mark this as

19        Defendants' Exhibit 28.

20             (Defendants' Exhibit 28, one-page

21        photograph of TLC plate, marked for

22        identification, as of this date.)

23       Q.    Take a look at Defendants' Exhibit 28.

24             Can you identify for us what those

25   lanes are?

1                         L. Stewart

2              Do you have a document that identifies

3    what the lanes on this TLC plate Defendants'

4    Exhibit 28 is?

5        A.    I'm looking.

6              Yes.  It was provided to you, it has 10

7    lanes described on the left column.

8        Q.    What are you referring to?

9        A.    Another TLC worksheet that you were

10   provided in that package.

11       Q.    Can you hold that up, please?

12       A.    It says "Plate 1" in the upper left and

13   the upper right "Plugs taken from those removed

14   7/25."

15       Q.    And how many sheets do you have here

16   that refer to the different plates?

17             You just have this one sheet that

18   refers to plate 1?

19       A.    Yes, one plate and one sheet.

20       Q.    You only did one plate and you have one

21   sheet that corresponds?

22       A.    Right.  The next page that you've got

23   is the back side of that sheet, the handwritten

24   notes beginning with I-706 in the top part.

25       Q.    I don't think we have that.

1                         L. Stewart

2               Could I make a copy of that?

3               It might be easier if you just give us

4    the whole file and then we can make sure we have

5    a copy of everything.  It seems that there are a

6    number of documents that have not been provided.

7        A.    If it helps you on those type of

8    documents, they were part of a PDF that was sent

9    with the file and there are many pages in the PDF.

10       Q.    I am confident we printed everything

11   that we were provided.  I think that for whatever

12   reason we were not provided those documents.

13              I will want to ask you some questions

14   about that, so you'll have to hold on.

15              Now, with respect to your library of

16   standards, do you have an index to your library

17   of toner standards?

18       A.    I have a logbook that has all of them

19   in there.

20       Q.    And have you been asked for that in

21   other litigations?

22       A.    Yes.

23       Q.    And have you provided that in discovery

24   in other litigations?

25       A.    No, I have not.

1                    L. Stewart

2        Q.    Why not?

3        A.    Because I don't feel it's fair to the

4   companies that I deal with, the agreements that I

5   made with them.

6        Q.    What agreements are those?

7        A.    To not disclose their information to

8   public sources.

9        Q.    Is that a specific written agreement

10  with those companies?

11       A.    No.  It's an understanding that we've

12  had from very early days when I started the

13  library.

14       Q.    When did you start the library?

15       A.    Well, the library came from many

16  sources.  When I was at the Bureau of Alcohol,

17  Tobacco and Firearms I was the person who got it

18  transferred from there to the Secret Service,

19  that was done was around 1983 or 1984, and I made

20  changes to the library, updated it and kept it

21  from that point forward until I left in 2005.

22       Q.    I see.

23             And when you left in 2005 you took the

24  library that was the Secret Service's library of

25  standards with you?

```
 1                       L. Stewart
 2        A.     No.  I took the knowledge of how to
 3   build a library and I created my own.
 4        Q.     I see.
 5              So you took the -- well, you just said
 6   that you had the samples and the standards as
 7   part of your library and then you took that with
 8   you when you left.
 9        A.     No, I didn't say that.
10        Q.     Okay.
11              So what specifically did you take with
12   you when you left the Secret Service?
13        A.     The knowledge of how to do examinations
14   and how to create a library.
15        Q.     After you left the Secret Service
16   everything in your library was collected after
17   that point?
18        A.     In my private laboratory, yes.
19        Q.     Nothing that's in your laboratory today
20   in terms of an actual sample or standard comes
21   from the Secret Service?
22        A.     That's correct.
23        Q.     And you have got no specific written
24   agreement that prohibits you from disclosing that
25   information, that's just what you feel is fair;
```

```
 1                         L. Stewart
 2    is that right?
 3         A.    That's right.  It's a moral agreement
 4    in words that I've had with the industry.
 5         Q.    And what specifically is there that is
 6    proprietary or confidential about the list of the
 7    materials that you have in your library?
 8         A.    Composition and formula information.
 9         Q.    I'm handing you back your notes.
10               There's some sort of, like, on the -- I
11    see.  This was the back of -- this is a color
12    copy of a back of a page; is that what's going on
13    here?
14         A.    Yes, sir.
15               MR. SOUTHWELL:  Let's just take a real
16         quick break.  I want to look at this
17         document.  Mr. Boland, you have to
18         understand that these are documents you have
19         not provided to us previously, so I need the
20         opportunity to look at them.  I understand
21         you have travel arrangements, but let me
22         look at them and let me see if we can do
23         that and we will be right back.
24               MR. BOLAND:  I'm not agreeing that we
25         haven't provided them, but I understand
```

```
 1                      L. Stewart
 2         your position is that we haven't.
 3                 MR. SOUTHWELL:  We'll be back as soon
 4         as we can.
 5                 THE VIDEOGRAPHER:  Going off the
 6         record.  The time is 6:36.
 7                 (Recess taken.)
 8                 THE VIDEOGRAPHER:  We are back on the
 9         record.  The time is 6:41.
10    BY MR. SOUTHWELL:
11         Q.    Mr. Stewart, referring you to
12    Defendants' Exhibit 26, you did not take any
13    samples of ink; is that right?
14         A.    I don't know what Defendants' Exhibit
15    26 is.
16         Q.    That reflects that you did not take any
17    ink samples; right?  Or is there some other
18    inventory sheet?
19         A.    There should be a different one that
20    has ink on it.  This one is just for toner and
21    paper.
22         Q.    A different form, okay.  I see.
23    Another form that we don't have.
24                 Does it look like this form, the
25    worksheet form, but you're saying it includes ink
```

1                         L. Stewart
2    samples?
3        A.    Yes.  It should --
4        Q.    It should look the same?
5        A.    It should look the same, but it would
6    indicate that there's ink samples.
7        Q.    You mentioned that when you were doing
8    the hard copy inspection, you used a digital
9    microscope, right, that was your testimony?
10       A.    I believe I recall that I told you that
11   I would have to review the videotape to see, but
12   I think I recall taking one with me and using it.
13       Q.    And what manufacturer is your digital
14   microscope that you used on that day?
15       A.    I think I took a Pro Scope, but, again,
16   I would have to look at the videotape.
17       Q.    And that would have been attached to
18   the computer; right?  If it's digital, it's
19   attached to the computer to capture images; yes?
20       A.    It would be attached to a laptop
21   computer, yes.
22       Q.    And did you capture images using that?
23       A.    If I had they would have been included.
24   I don't know if I did, I would have to look at
25   the videotape.

1                      L. Stewart

2       Q.     You would have to check the videotape

3   to reflect whether you had images?  You don't

4   have another record of them such as the images?

5       A.     I provided that to you back in

6   November.  I would have to look at the meta tags

7   of each of them to see if they were taken with

8   that device or by a scanner.

9       Q.     Now, you provided some expert opinion

10  regarding the staple holes.

11             Did you ever ask Mr. Argentieri where

12  the staple is?

13      A.     I don't recall asking him that.

14      Q.     Are you aware of where the staple is?

15  Did you take the staple out?

16      A.     No.  Based on the scanned images, we

17  can track when the staple was taken out, but not

18  exactly.

19      Q.     When was the staple taken out, in your

20  opinion?

21      A.     Sometime either as a result of the

22  Aginsky or Osborn examination or sometime between

23  then and when Mr. Argentieri brought it to

24  Buffalo.

25      Q.     So prior to July 14, 2011, but after

1                           L. Stewart

2      January 2011 the staple was removed from the Work

3      For Hire document; is that your opinion?

4          A.    My opinion is that it happened sometime

5      prior to Buffalo.  There is a scanned image from

6      the other experts showing that the staple was

7      still in the document, so at some point after

8      that the staple was removed.

9          Q.    And by the other experts, you are

10     referring to Aginsky and Osborn; yes?

11         A.    Yes.

12         Q.    And you would agree that that's a

13     violation of all evidence collection procedures

14     to take a staple out of a questioned document and

15     not preserve the staple; correct?

16         A.    Yes.  I don't know who did that or why.

17         Q.    But that would be a violation of all

18     generally recognized evidence collection

19     procedures with respect to questioned documents;

20     yes?

21         A.    Yes.  I can't imagine a reason to do

22     that.

23              MR. SOUTHWELL:  Mr. Boland, I

24         understand that you have travel arrangements.

25              I have to say there are quite a few

1                        L. Stewart

2        documents here that Mr. Stewart is relying

3        on and is referring to that have not been

4        produced and so, as an example, if we could

5        just mark this as Defendants' Exhibit 29,

6        these are his notes that we're seeing for

7        the first time just a few moments ago, he's

8        now revealed that there is an inventory of

9        ink, so, you know, I would request that he

10       produce his full file and that we will

11       review that and we are going to hold the

12       deposition open and see what other questions

13       we have of Mr. Stewart.

14            I understand that you've got travel

15       arrangements and I don't -- I want to be

16       accommodating to that, and so short of us

17       going through, making a copy and taking the

18       time to review it, which I think is our due,

19       I would request that you produce that to us

20       or, if you want, you can give that to us now

21       and we can resume on another day.

22            (Defendants' Exhibit 29, one-page

23       photocopy of handwritten notes by Mr.

24       Stewart, marked for identification, as of

25       this date.)

```
                          L. Stewart
 1
 2              MR. BOLAND:  Either way you want it
 3         produced.
 4              Do you have a list of the items you are
 5         saying he has not yet produced or --
 6              MR. SOUTHWELL:  Well, there is this
 7         item, Defendants' 29, which we just got, so
 8         I think we are entitled to some opportunity
 9         to review it and compare how it relates to
10         Mr. Stewart's report and the other
11         documents.  There is his inventory of ink
12         that he says exists that we have not seen
13         and there's the information about the
14         library of standards.
15              MR. BOLAND:  I remember that request
16         and he indicated there were some proprietary
17         issues with providing that because
18         Mr. LaPorte has attempted to sort of
19         construct his own library on his back in
20         several cases.
21              MR. SOUTHWELL:  And the witness has
22         testified that it is based on -- that he is
23         not bound by any written agreements with
24         respect to those, so, I mean, he can have
25         that opinion, I don't know that that's worth
```

```
 1                          L. Stewart
 2        very much weight, and we can litigate that
 3        opinion, if appropriate.
 4             I don't think it contains proprietary
 5        information, it lists the different toners
 6        and the manufacturers.  Maybe Mr. Stewart
 7        could explain what's in that index.
 8             MR. BOLAND:  Obviously, we have a
 9        difference of opinion.  We say we've given
10        you all of the documents, you say we
11        haven't, that's fine, so if you want to
12        finish out the deposition time, then make a
13        motion.
14             MR. SOUTHWELL:  Mr. Stewart is going to
15        be here for other days, we can simply
16        reconvene with him he's here on a day that
17        we're deposing defendants' experts.
18             MR. BOLAND:  I don't know if he's going
19        to be here on other days, but if he is,
20        certainly, if that's convenient.
21             MR. SOUTHWELL:  So I would ask that you
22        produce the documents either now or after
23        you make your flight and then we arrange to
24        reconvene to review those documents with
25        Mr. Stewart.
```

L. Stewart

1
2          MR. BOLAND:  Well, I think he's

3     produced everything.

4          Why don't you just finish up your time

5     with him and then if you guys think he

6     hasn't produced everything, he'll produce

7     it.

8          MR. SOUTHWELL:  I'm fine with stopping

9     at this point based on what we have laid out

10    and given the travel arrangements and we

11    will --

12         MR. BOLAND:  I'm going to make my

13    travel arrangements because your deposition

14    is going to be over in time, I mean, with

15    the time that's left, I would have -- I

16    mean, it is almost that time anyhow.

17         MR. SOUTHWELL:  So let's go.  I am

18    trying to stop so you can make your

19    travel --

20         MR. BOLAND:  I don't want the record to

21    reflect that you cut yourself off for my

22    travel arrangements.  I'm saying the

23    allotted time you have left, you can

24    conclude and I'll still be able to make my

25    car because it's, I don't know, at this

```
 1                    L. Stewart
 2      point, like 10 more minutes or something,
 3      but I appreciate the consideration.
 4           MR. SOUTHWELL:  I am prepared to stop
 5      at this point and use whatever remaining
 6      time we have to question Mr. Stewart about
 7      the additional documents that I am
 8      requesting be produced.
 9           MR. BOLAND:  And for the record, we're
10      not agreeing you can use additional time and
11      bring him back here for 10 minutes of
12      questioning, but whatever happens happens,
13      okay.
14           MR. SOUTHWELL:  Okay.
15           MR. BOLAND:  Very well.
16           THE VIDEOGRAPHER:  Going off the
17      record.  The time is 6:48.
18           (Time noted:  6:48 p.m.)
19
20           _____
             LARRY F. STEWART
21      Subscribed and sworn to before me
22      this ____ day of _____, 2012.
23
24      _____
25           Notary Public
```

Page 381

1

2                    C E R T I F I C A T E

3    STATE OF NEW YORK     )

4                           : ss.

5    COUNTY OF NEW YORK     )

6

7            I, CARY N. BIGELOW, Court Reporter,

8        a Notary Public within and for the State of

9        New York, do hereby certify:

10           That LARRY F. STEWART, the witness

11       whose testimony is hereinbefore set forth,

12       was duly sworn by me and that such

13       testimony given by the witness was taken

14       down stenographically by me and then

15       transcribed.

16           I further certify that I am not

17       related to any of the parties to this

18       action by blood or marriage, and that I am

19       in no way interested in the outcome of this

20       matter.

21           IN WITNESS WHEREOF, I have hereunto

22       set my hand this 12th day of July, 2012.

23

24                    _____

25                        CARY N. BIGELOW

Page 382

1

2    ------------------ I N D E X ------------------

3    WITNESS                 EXAMINATION BY              PAGE

4    LARRY F. STEWART    MR. SNYDER                    5

5                        MR. SOUTHWELL            184

6    ------------------ EXHIBITS ------------------

7    Defendants' Exhibit 13, declaration of  23

8    Larry Stewart in support of

9    plaintiff's forthcoming response to

10   defendants' motion to dismiss for

11   fraud

12   Defendants' Exhibit 14, photocopy of    25

13   Work For Hire contract

14   Defendants' Exhibit 15, two-page        61

15   printout from Internet of

16   blancostewart.com Web site

17   Defendants' Exhibit 16, curriculum      65

18   vitae of Larry F. Stewart

19   Defendants' Exhibit 17, excerpt from    86

20   trial transcript in Vanderbilt

21   Mortgage case

22   Defendants' Exhibit 18, letter dated    93

23   May 21, 2004 from U.S. Attorney David

24   N. Kelly

25   Defendants' Exhibit 19, hard copy       117

Page 383

1

2    document inspection protocol

3    Defendants' Exhibit 20, excerpt from      129

4    transcript of deposition of Larry

5    Stewart held on March 15, 2010

6    Defendants' Exhibit 21, two-page          135

7    document entitled "STREET FAX" dated

8    April 28, 2003

9    Defendants' Exhibit 22, one-page          163

10   document labeled "Exhibit F" with

11   attached report by Peter V. Tytell

12   dated March 25, 2012

13   Defendants' Exhibit 23, declaration of 167

14   Peter Tytell dated November 28, 2011

15   Defendants' Exhibit 24, excerpts from     234

16   Albert S. Osborn's book "The Problem

17   of Proof"

18   Defendants' Exhibit 25, one-page          343

19   photograph of document

20   Defendants' Exhibit 26, one-page          354

21   document headed "TLC Worksheet Form"

22   Defendants' Exhibit 27, photocopy of      357

23   one page of handwritten notes by Mr.

24   Stewart

25   Defendants' Exhibit 28, one-page          366

1

2     photograph of TLC plate

3     Defendants' Exhibit 29, one-page          376

4     photocopy of handwritten notes by Mr.

5     Stewart

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 385

```
 1
 2                    ERRATA SHEET
               VERITEXT REPORTING COMPANY
 3                    1250 BROADWAY
                NEW YORK, NEW YORK 10001
 4                    212-279-9424
 5   NAME OF CASE: CEGLIA VS. ZUCKERBERG
     DATE OF DEPOSITION: JULY 11, 2012
 6   NAME OF DEPONENT:  LARRY F. STEWART
 7   PAGE   LINE(S)      CHANGE              REASON
 8   ____|_____|_____|_____
 9   ____|_____|_____|_____
10   ____|_____|_____|_____
11   ____|_____|_____|_____
12   ____|_____|_____|_____
13   ____|_____|_____|_____
14   ____|_____|_____|_____
15   ____|_____|_____|_____
16   ____|_____|_____|_____
17   ____|_____|_____|_____
18   ____|_____|_____|_____
19   ____|_____|_____|_____
20   ____|_____|_____|_____
21             _____
               LARRY F. STEWART
22
     SUBSCRIBED AND SWORN TO BEFORE ME
23   THIS ____ DAY OF _____, 20__.
24
     _____     _____
25   (NOTARY PUBLIC)          MY COMMISSION EXPIRES:
```

| & |
| --- |
| **&**  1:19 2:10,22,23 |
| 3:15 18:9,15 19:11 |
| 64:15 139:10,23 |

| 0 |
| --- |
| **0.00005**  332:4,11 |
| **0.0042**  332:4,11 |
| **0.0043**  332:12 |
| **00005**  334:24 335:6 |
| 336:2,7,16 |
| **0042**  334:23 336:6 |
| **0043**  335:5 336:7 |
| **00569**  1:4 3:22 |

| 1 |
| --- |
| **1**  23:15 24:19 25:21 |
| 61:3 100:3 116:22 |
| 136:12 149:11 |
| 163:8 167:22,23,25 |
| 168:19 173:17 |
| 174:7,18 178:22 |
| 179:3 198:8,21,24 |
| 199:5,9 200:9 |
| 204:22 311:12 |
| 316:23 325:14,21 |
| 326:4,11,14 334:13 |
| 338:3,8,18,19 339:7 |
| 339:9 342:3,21 |
| 343:20 345:6,7,11 |
| 351:21 352:10,11 |
| 359:15 367:12,18 |
| **1/100th**  335:8 |
| **1/13/11**  169:10 |
| **1/2**  352:10 |
| **10**  60:22 220:2 |
| 246:23 258:25 |
| 285:5,8 359:18 |
| 360:18 367:6 380:2 |
| 380:11 |
| **10,000**  199:17 |
| 203:25 204:9 |
| **10,000ths**  329:18 |
| **10001**  385:3 |

**101**  331:7
**10166-0193**  2:13
**108**  191:16,21
**10:03**  1:15 3:14
**11**  1:14 3:13 254:18
285:11,12 332:15
334:20 385:5
**1100/3200**  318:4
**117**  382:25
**119**  157:23 158:11
**11:01**  61:2
**11:15**  63:9
**11:15:03**  64:13
**11:25**  61:6
**12**  23:25 32:13 65:5
66:5 92:11 246:23
311:3 354:21 359:5
**123**  151:6
**1250**  385:3
**129**  383:3
**12:02**  92:14
**12:45**  132:7
**12:48**  134:22
**12:58**  134:25
**12th**  381:22
**13**  23:17,18 26:6
94:11 213:17,20
214:8 232:12 382:7
**135**  383:6
**13th**  118:4,18
**14**  25:2,3 128:12
130:8 144:13
147:22 156:18
162:20 168:2,25
169:19 173:24
174:23 374:25
382:12
**1475**  2:5
**14th**  93:10 118:6,18
118:20 119:2,14,20
120:5,15 128:15
146:16 147:11
148:3,16 149:24
150:18 155:14,21
155:22 156:9 158:6

**159:2 160:2,3,8,12**
160:16 162:18
163:3,8 165:24
166:10 168:17
169:14,16,23
170:13 171:22
172:12,24 174:5
181:23 182:7,13
**15**  61:9,11 86:14
129:17 133:9
145:15 265:20,23
266:20 382:14
383:5
**150**  195:24
**15th**  117:25 118:2
118:12,13,21 119:2
122:17 131:25
145:6 160:10,20,25
169:24 172:13
**16**  65:8,14,17 130:9
131:19 265:20,23
266:20 345:6,6
382:17
**163**  383:9
**165**  338:14
**167**  383:13
**16th**  118:15 131:2
131:15 132:2
156:15
**17**  86:5,10 156:18
186:16 382:19
**18**  87:4 93:13,15
382:22
**181**  355:11,12
**184**  382:5
**189**  149:20 176:20
**19**  70:22 117:12,16
130:19 332:15
382:25
**1903**  200:21
**1910**  234:5
**1922**  235:3,8 239:23
**1924**  235:8
**1929**  234:7

**1980s**  71:8
**1982**  59:20 71:17
258:11,13,15
**1983**  369:19
**1984**  59:20 369:19
**1990s**  71:9
**1991**  70:18
**1992**  71:12
**1993**  70:19,22
**1996**  70:14
**19th**  103:12 156:16
**1:10**  1:4 3:22
**1:43**  167:5
**1:53**  167:8
**1st**  103:4 117:24,25

| 2 |
| --- |
| **2**  5:20,21 40:16 61:7 |
| 132:7,10 134:22 |
| 178:22 179:3 |
| 279:25 280:5 285:4 |
| 286:14 311:12 |
| 316:23 325:14,21 |
| 326:4,11,14 338:20 |
| 342:23 345:7,8,11 |
| 351:21 |
| **20**  87:4,11 129:10 |
| 129:15 183:17 |
| 259:3,13 282:18,24 |
| 345:7,8 362:6 383:3 |
| 385:23 |
| **20,000**  75:16 199:16 |
| **200**  1:19 2:12 3:16 |
| **2000**  65:24 66:2 |
| 190:17,21 |
| **2003**  24:21 26:4 |
| 38:11 102:2 135:7 |
| 135:14 230:8,10,11 |
| 297:22 324:4 |
| 338:19,20 383:8 |
| **2004**  34:22 66:20,22 |
| 66:24 67:8 70:4 |
| 84:15 88:22 89:19 |
| 92:17 93:16 96:13 |
| 96:13 103:4 137:9 |

138:5,10 139:9,24
141:8,18,22 142:7
142:14 230:11
276:24 382:23
**2005** 66:17,22,24
67:8 69:18 230:11
369:21,23
**2006** 230:11
**2007** 84:24 230:11
272:7
**2008** 72:2,15 230:11
288:10
**2009** 73:7 82:19
230:12 288:8
**201** 331:7
**2010** 86:14 129:17
129:20 191:9
230:12 270:16
271:18 272:3,8
383:5
**2011** 20:13 25:19
44:18,25 49:24 50:4
53:17 54:9 116:22
117:25 119:20
121:22 122:6
128:12 130:19
131:20 144:13
145:15,20,25 146:9
146:16 147:22
149:24 150:2
160:22 162:18,20
167:11,14,24 168:2
168:17,25 169:19
169:19 172:24
173:24 174:24
186:11,16 187:5
191:9 192:14
198:10 342:25
358:9 359:12
374:25 375:2
383:14
**2012** 1:14 3:13
44:18 45:2 79:6,9
82:19 164:4 184:21
185:8,14 380:22

381:22 383:12
385:5
**20th** 103:7
**21** 70:18 93:16
135:4,5 382:23
383:6
**210** 294:7 295:5
298:19
**212-279-9424** 385:4
**218** 35:14,17
**21st** 92:17 93:21
**22** 163:22,25 383:9
**221** 246:24 247:16
248:4,4
**223** 244:17 245:12
246:14,16
**224** 35:17
**226** 35:14,18
**228** 213:12
**23** 167:10,13 285:14
382:7 383:13
**230** 213:13
**234** 383:15
**235** 214:7
**238** 153:25 167:11
**238-2** 164:16,24
165:7,11,19 166:13
166:25 168:9,11
171:11 173:16
**24** 24:21 26:4
234:20,21 235:2
383:15
**249** 35:14
**25** 164:3 195:23
200:2 205:2 206:15
206:23 287:3
288:18 290:10
343:23 344:2
359:11 382:12
383:12,18
**25th** 89:19 358:9
**26** 104:22 105:2
185:14 265:20
354:3,4 357:20
359:10 372:12,15

383:20
**27** 105:3 357:10,11
357:15 358:8,21
383:22
**28** 135:7,14 160:22
167:11,14 366:19
366:20,23 367:4
383:8,14,25
**29** 167:19 376:5,22
377:7 384:3
**291** 87:3
**2:13** 182:23,25
**2:30** 183:20
**2:51** 183:3,5
**2:52** 183:21
**2d** 38:6,9

**3**

**3** 135:2 182:24
324:12
**3.1.** 324:15
**30** 52:10 342:25
**302** 334:16
**303** 331:23 334:16
336:16 340:3
**304** 340:9,12
**305** 337:20,25
339:16 340:5,7
**308** 339:17
**32** 232:12 235:7,11
236:6
**325** 34:16
**326** 34:16
**327** 94:12,17 96:10
**328** 97:2 98:6 99:11
101:3,20
**330** 94:17 164:16
165:9 166:24
**333** 104:14
**334** 106:7
**343** 383:18
**350** 51:8
**354** 383:20
**357** 287:4,7,25
288:8 383:22

**358** 286:25 287:4
288:2,4,23,25
289:11,15,24
290:23 292:3
293:17
**366** 383:25
**370** 274:21
**376** 384:3
**388** 157:11
**3rd** 139:9

**4**

**4** 183:6 190:17
195:17 196:15,22
260:12
**40** 133:23 190:17
**400** 170:14 190:17
344:9
**406** 37:7
**407** 37:14 38:12
**408** 39:10
**410** 40:23
**440** 40:24
**44107** 2:7
**447** 57:8
**45** 134:11
**450** 51:9
**470** 44:11,16
**495** 76:5
**4:10** 258:24 260:12
**4:25** 260:15
**4th** 184:21 185:5

**5**

**5** 260:16 315:4,9,10
337:12 382:4
**50** 133:22
**500** 45:6
**56** 363:15,16
**58** 363:4,14 364:18
364:21 365:2
**5:20** 259:3
**5:30** 132:16,20,22
260:8
**5:46** 337:12

**5:56**  337:15

**6**

**6**  320:2 337:15
  359:15
**600**  311:22 312:4,6
  312:8
**61**  382:14
**62**  334:16
**64**  200:10
**65**  34:17 94:14
  382:17
**67**  130:8
**6:26**  363:5
**6:36**  372:6
**6:41**  372:9
**6:48**  380:17,18

**7**

**7**  342:23 344:17
  345:11,17 347:7,15
  359:18 360:18
**7/11/2012**  64:13
**7/15**  160:14
**7/15/11**  159:25
**7/25**  367:14
**70**  231:2
**706**  367:24
**74**  260:19
**770724**  2:6
**79**  257:15

**8**

**8-1/2**  254:18 363:6
**80**  231:2
**82**  257:15
**84**  117:14
**86**  382:19
**89**  309:22

**9**

**9**  342:24 344:17
  345:12,17 347:8,16
**90**  76:6
**92a**  320:21,23 321:3
  321:10,16,23

**93**  312:16 382:22
**97**  319:13 320:2
**9:00**  159:25 160:14
  160:24 162:19
**9:11:40**  178:12
**9:11:51**  178:19
**9:18**  167:25 168:25
  171:21 172:3
**9:30**  15:9
**9:45**  15:9

**a**

**a.m.**  1:15 2:22 3:14
  63:9 64:13 147:22
  148:3 149:4 150:7
  150:18 151:16
  156:8,24 157:4
  158:5 159:2,25
  160:14,24 162:18
  162:19,20 163:10
  165:3 167:25
  168:25 169:11
  171:21 172:3 175:7
**ability**  39:15
**able**  119:18 120:22
  209:23 310:16
  348:20,25 350:15
  379:24
**absolutely**  256:6,13
  268:12 360:17
**abundance**  199:16
  203:25 204:9
  244:19
**academic**  84:15,19
  84:21 85:3,6,8,10
  85:17
**academy**  5:14,25
  70:7,14 71:14,20,25
  72:12 73:8,19 79:23
  80:8,10,13 81:2,7
  82:2,20 83:2,4,13
  83:21,25 84:6
**academy's**  74:8 81:9
  83:10

**accelerate**  217:16
  230:24 231:8
**accelerating**  231:3
**accentuated**  236:24
**accepted**  72:16
  111:10 296:3
**access**  48:7 196:24
  362:13,13
**accessory**  196:12
**accidentally**  237:14
**accommodating**
  376:16
**accord**  155:2
**account**  75:6,11
**accounted**  236:15
  238:23
**accounts**  237:15
**accreditation**
  297:21
**accredited**  37:20
**accurate**  21:18 63:2
  63:13 65:12 74:20
  88:10 142:8 156:3
  217:2 240:14
  241:14 244:9,9
  287:14 290:24,25
  291:2,2,3,7,10
  293:5,6,10,11,16
  294:9 295:12
  299:22,24 329:16
  334:25 339:12
  347:21 350:2
  352:15
**accurately**  269:4
  295:11
**accusation**  68:2
  69:23 72:20 79:5
**accusations**  89:22
  97:19
**accuse**  109:23
**accused**  67:22 68:4
  86:3 87:15 88:7,7,9
  89:24 97:8 108:24
  109:5 110:14

**acfe**  78:25
**achievement**  75:17
**acknowledge**  195:5
  229:25 230:20
**acquittal**  67:16
  105:13
**acquitted**  67:14
  108:16
**acronym**  190:13
**action**  381:18
**actions**  136:21
**active**  62:3,4 80:22
  80:25 82:12 83:8
**actual**  9:13,16 60:13
  103:17 147:6
  171:13 216:10
  218:9 255:16
  275:12 289:4
  293:13 294:17
  295:23 313:15,16
  370:20
**add**  200:23 226:15
**adding**  332:11
**addition**  206:6
  240:22
**additional**  32:12
  44:24 45:4,9 136:23
  137:2 188:24
  202:12 240:9
  263:17 306:9
  342:12 345:7,8
  355:20 358:5
  359:24 361:12
  362:11 380:7,10
**additions**  22:23
**address**  149:6
  207:11 217:24
  239:7 240:16 326:7
  327:12 348:23
**addressed**  78:15
  218:7 305:8 308:9
  308:16,18
**adjective**  123:12
  124:21

administrative
  300:17
administratively
  12:8
administrator
  236:12
admit 292:16
admitted 60:6
admonish 41:22
admonished 87:22
adopt 247:23
advance 339:4,14
advancing 338:17
  338:25
advertise 61:21
  64:23
advertised 82:5
advertisement 65:2
advertising 18:12
affect 141:9 207:12
  208:8,21,24 209:3
  218:2 231:18,20
  243:13 244:15
  248:25 249:3
affidavit 91:22
afternoon 131:25
  151:13 183:8
age 37:9 201:5 205:3
  206:16,25 214:2
  215:21 220:15
  227:3 231:10 241:5
  270:17,17 271:7
  283:10 304:23
  305:19,20 306:7,13
  306:19
agencies 125:10
  263:24 273:2 276:6
  276:7
agency 261:11
  262:21 263:25
  276:4 277:20 317:8
agentieri 15:14
agents 97:16,23
  102:8 103:21 104:2
  104:7

aging 214:4 215:24
  216:3,5 218:13
  230:24,25 231:11
  231:20 243:14
aginsky 19:15 20:11
  20:16 21:3 25:9,13
  25:19 53:9,16
  145:14,19 146:7,14
  146:19 150:5
  167:23 169:3,10,16
  174:8 181:13,16,18
  186:4 268:24 273:5
  282:20 304:10
  374:22 375:10
aginsky's 25:14
  52:15 145:24
  149:25 186:8,24
  269:6 273:7
ago 16:11 28:25
  29:11 31:7 70:18,22
  98:8 112:19 130:5
  151:3 234:14 266:7
  267:6 277:3 279:5
  280:8 361:11 376:7
agree 3:10 11:13
  95:18,23 108:10
  133:4 138:17,20
  155:20 164:8
  168:24 180:5 202:9
  205:19 211:13
  238:5,11 239:20
  240:2,9 259:2
  274:18 284:5,6,10
  290:6 292:19
  308:16 311:20
  316:19 318:17
  321:21 325:7 355:9
  355:19 375:12
agreed 222:8 242:3
  262:5 286:11
  308:19 341:18
agreeing 136:19
  371:24 380:10
agreement 50:11
  73:22 101:10

183:15 364:10
  369:9 370:24 371:3
agreements 369:4,6
  377:23
ahead 248:8 265:3
air 225:11
al 130:19 272:5
albert 232:9,13
  233:11 234:22
  235:2 383:16
alcohol 257:14
  258:11 369:16
alex 222:17 363:5
alexander 2:15 4:9
alford 127:4
alignment 146:21
alike 237:18
allegation 11:3
allegations 110:19
alleged 114:3 237:3
allegedly 185:23
allotted 379:23
allow 255:23 278:16
  281:9
allowed 101:4
  102:18 107:24
  113:5 192:3 193:18
  193:23 194:5,6
  295:24 296:2
  299:11 342:11
  358:5 361:12,15,19
  362:6,11
allowing 302:14
allows 82:21 281:13
  283:18
almanac 237:11
also's 78:14
alternative 256:14
  256:21 324:22
amanda 2:17 4:7
amazon 322:7
amazon.com 81:17
  81:20
amended 142:17,24
  143:4

america 123:22
american 5:13 70:6
  70:13,25 71:14,20
  71:25 75:12 76:13
  78:24 80:7 102:17
amorphous 352:14
amount 199:10,12
  207:12 208:8,21,23
  254:6 259:6 272:19
amounts 209:5
  244:18 331:18
ampersand 18:10
analysis 20:3 40:2
  40:12,14,23 41:3
  56:13 59:5,22,24
  60:4,8,14 88:18
  113:13,14,18,20
  114:9 138:17,19,22
  187:12,17,21 190:2
  201:5 202:2,4,7
  215:21 220:15
  227:3 239:12
  254:22 255:16
  256:25 257:20
  261:8,22,25 265:24
  266:20,22 279:17
  301:17 303:4
  304:22,23,25,25
  305:2,9 306:7,14,20
  307:9 308:18
  309:16,23,24,25
  310:18 314:9,18
  317:6 318:24 323:6
  323:11 328:19,20
  334:8 339:15,20
  340:8,10,13 341:3
  341:13,25 343:6
  346:16,19,24
  349:25 358:4
  359:22 360:4
  362:15
analyze 141:4
  202:11 314:22
  348:20

analyzed 236:22
animal 78:8
animosity 112:13
animus 77:7 111:18
anna 2:23 183:10
annual 71:20 73:9
answer 7:19,21,21
9:9 12:3,5 13:17
27:21 28:4 30:25
31:2,16 36:10,20,22
39:8 44:20 50:22
56:11,17 67:6 87:4
87:8 112:2 120:7
123:7 130:9,10,16
140:9,23 150:11
155:16 156:12
157:5,19 158:20,21
179:6 204:4 205:4
206:21 222:17
242:24,25 243:8,17
245:20 249:19
251:17 264:16,22
296:18 325:6
340:20
answered 67:8
89:21 125:20 207:2
253:10 277:23
answering 11:11
36:23 37:5 76:7,13
125:18 157:18
206:18 219:8 228:6
243:10
answers 184:18
antarctica 229:17
anthony 89:16
anticipate 297:6
anybody 192:4
anymore 78:4 80:25
80:25 307:15
apart 31:24 245:25
329:11
apologize 293:20
apparent 154:8
155:3

apparently 83:25
237:8 273:20 307:4
appealed 72:23
appear 172:12,14
177:24 327:19
365:5
appearance 146:2
150:13 154:14,24
158:6 161:3 162:23
164:10 168:24
169:2 173:5 175:22
181:22 183:10
190:5 236:11,17
238:12,21 240:6
appearances 33:17
appeared 20:17
32:4 79:7 169:12
174:18
appearing 238:12
appears 25:25 26:24
28:17,19,22 32:2
33:20 65:19 70:15
71:12 76:21 86:22
153:15 168:5,22,23
179:11,18 341:12
343:18 358:6
appended 338:19
application 78:13
applications 201:3
applied 78:14
209:21 211:25
applies 38:20 107:3
apply 73:24
appreciate 380:3
appreciation 215:23
apprenticeship
59:15
approach 194:5,6
194:12,20 256:18
256:20 258:20
273:2,24,25 276:5
276:25 277:2,11,12
277:13 278:11,12
280:13 281:4,7,11
281:16,23 282:2,5,9

282:10,15 284:3,12
284:22,25 286:5,12
286:14 299:19
approached 194:10
194:16
approaches 284:9
approaching 194:18
appropriate 378:3
approve 301:23
approved 301:21
302:9
approving 302:4
approximately 3:14
15:9 53:17 88:22
92:20 133:8 160:24
183:17 184:21
185:2 258:24
april 79:6 135:6,14
185:8,11 219:25
230:10 383:8
area 11:25 12:7,9
65:4 213:13 216:24
222:6 230:21
250:19,21 253:16
areas 50:19,23
351:24 352:9
argentieri 20:15
21:6 25:16 48:7
49:23 50:7,11 51:18
52:3,25 54:14
116:15 144:11
148:8 150:8,17
169:11,18 170:4
172:8,11,17 174:18
175:7 177:21 187:4
193:9 374:11,23
argentieri's 116:14
162:4
argue 197:7
arm 250:8 254:12
arouse 239:10,18
240:7
arrange 378:23

arrangements
371:21 375:24
376:15 379:10,13
379:22
arrest 93:23 95:22
97:13,15
arrested 69:8,12
323:13
arrests 106:9
article 5:20 10:13,18
76:2,16 79:9 84:15
84:18 91:12 270:24
271:2,5,18 272:6,12
276:24 282:20,23
283:8,9 285:2,6,7
285:17 286:2,4,16
286:19 287:2,9,20
287:25 288:6 289:3
289:14 290:4,5,7,10
290:16,20,22 291:5
292:5,8,9,22 293:7
314:24 315:5,11
316:2,7
articles 70:6 79:7
211:6,8 270:15
275:4,6,8 280:17
284:10,14
artificial 189:21
ascld 297:21
aside 213:5
asked 7:6 8:3 16:14
17:4 19:23 28:6
29:2 31:7 35:21
56:24 63:10 64:6
66:23 76:18 85:24
119:3,15 129:5
137:2 184:15
202:20 205:6 206:6
206:7,17 224:7
265:6 277:9,22
278:10 324:18
346:2 347:6,21
348:2,25 358:4
368:20

asking 9:7 30:3
41:24 64:8 101:5
111:20 128:8 129:6
129:14 137:13
138:15 140:5,10,13
140:24 141:3
151:16 156:20
157:14,24 158:8,18
159:15,18 196:18
201:8 206:10,11,11
206:19 209:2 216:8
228:15 248:2
274:14,25 276:6
300:12,13 306:18
319:3 324:19 325:4
339:25 341:10
374:13
aspect 113:4,12,14
214:22
aspects 58:23 59:19
113:5 284:4
assert 100:13
227:10 243:4 247:6
asserted 106:8
166:21 243:18
asserting 179:25
242:17
assertion 109:15
110:8 240:2 242:13
243:25 247:12
assertions 247:8
asserts 223:22
assess 39:15 43:13
43:22 323:19 327:4
327:13
assessing 108:11
140:21
assessment 108:14
142:15
assist 50:25
assistance 107:10
associate 2:21,23
4:16 133:12 183:10
associated 10:12
147:14 319:11

association 70:11,17
78:24 84:24 187:18
187:22
assume 6:2,9 8:17
8:20 11:15,20 14:24
56:17 77:5 83:6,7
86:23 117:24 138:9
138:10,14,15 166:2
176:9 196:15
223:25 224:4
225:18 241:10
252:21 348:18
350:23 353:16
361:10
assumed 133:16
assumes 231:11
assuming 9:3 83:24
155:6 244:8,12,13
321:22 350:17
assumption 244:2,2
244:6 274:24
atlantic 70:10,17
attach 285:8,10,13
attached 8:15
136:14 139:8 164:2
282:24 287:3
362:23 373:17,19
373:20 383:11
attaching 141:21
attachments 152:21
attacks 123:21
attempt 289:4
293:12
attempted 377:18
attempting 157:19
attempts 324:20
attend 73:6 121:2
attended 71:19
101:24 131:25
attention 23:25
25:20 29:25 32:9,10
87:2 94:12 130:7
149:13 164:6
167:18 168:11
235:6 245:11 275:4

331:23
attest 25:12 147:15
attitudes 111:25
attorney 55:2 93:16
145:5 382:23
attorney's 93:3
attorneys 2:4,11
3:24 15:17 32:24
34:13 75:5 102:6
119:13
audio 3:8
august 198:10
austin 139:10,23
authentic 8:16
114:15 135:23
136:13,18 137:7,17
137:23 138:12
142:3,6,13
authenticity 140:21
141:9,13 142:19
author 272:4 289:13
authorities 233:12
authority 283:5,24
359:23
authorized 294:18
362:14
available 81:20 82:2
82:3 164:20 187:3
242:18 320:24
321:4 322:7 324:3
avenue 1:19 2:12
3:16 255:15
average 200:10
222:10 331:16
334:23 335:2,5
aware 5:20 6:4,17
8:13,18,20,22 14:20
14:23,25 35:5,19,21
53:5,5,9,12 55:4
56:5 61:22 62:2,4
63:18 69:6,10 71:25
72:7,9,13,15,19,23
73:2 74:3,5 75:25
78:7,11,23 79:6,9
79:17 82:7,11,13,20

82:23 83:9 89:19
91:12 92:21,24 93:2
93:7,8,11 95:15,24
98:13 104:8,11
105:7,11,11,14,23
105:25 106:2,5
107:2,4,7,9 109:18
114:17,18,20,24,25
115:3 117:4 118:17
120:19 121:13,17
122:16 123:13,17
123:19,20,25
128:10,22 130:18
135:22 138:2,6
139:8,13,21,25
142:16,22 143:6,16
143:17,21 144:21
144:25 145:4 154:6
154:12,21 155:5,7,8
155:13 160:9,21
162:7 166:14,20
169:25 170:9,10
175:6,11,12 182:9
182:12,14 184:20
188:14 189:8 190:2
197:22 210:23,25
211:10,24 238:18
238:19 253:12
262:20 263:3,23
304:12,15 318:19
321:3 330:16
333:18 374:14
awful 237:23
aycock 2:17 4:7,7
144:25 259:10

b

b 166:12
bacanovic 34:22
89:6,8 90:22 91:8
91:15 95:2 96:3
103:18
back 13:13,16 17:4
26:5 28:9 32:9 47:7
48:12,15,16,17,21

49:17 57:2,6 61:5
67:3 69:22 81:5
92:13 100:20
124:18 125:21
127:25 132:9
133:13 134:24
141:8 151:21
152:25 153:5
158:11 165:16
167:7 168:12
173:13 183:4,7,14
183:19,22 186:11
193:18,24 194:4
196:17 205:4 206:3
206:5 246:7 257:13
258:15 259:12
260:14 261:14
275:8 285:21 287:8
288:6,10 297:17,22
313:20,22 315:20
318:21 324:4 333:9
337:14 345:24
351:12 353:7
354:19 355:2 356:4
357:8 358:25 359:7
360:23 362:9
363:15 367:23
371:9,11,12,23
372:3,8 374:5
377:19 380:11
**background**  76:4
99:18 101:19 189:5
331:3
**backup**  220:24,25
**bad**  79:19
**balance**  188:22
**ballpoint**  37:9 146:3
154:25 164:11
283:11 285:4
**bar**  78:24
**base**  127:21 128:16
151:17 157:15
158:9 159:3
**based**  10:5 14:11
31:4 32:6 40:16

45:5 47:11,17 92:16
97:7,19 102:21
106:8 109:15
140:10 149:7 151:6
151:13 169:22
177:3 178:19 179:8
211:22 212:9
227:15 228:9 232:2
240:17 244:3,8
245:24 255:21
257:23 259:20
260:23 273:12
277:18 286:10
312:17 322:13
323:23,25 328:3,16
328:22,24 331:17
332:6 340:21 350:3
350:7,14 374:16
377:22 379:9
**bases**  177:3 215:10
216:2,9 325:20
**basic**  113:9
**basically**  217:18
**basing**  6:16 68:11
110:7 146:20
**basis**  10:22 64:3
74:6 109:23 145:18
145:24 147:7
179:24 180:16
198:4,7,12 227:4,5
227:10 231:14
242:16 243:3,24
244:5,11 311:15
324:25 325:17
326:3 329:24
355:24
**basket**  237:10
238:24
**bathroom**  60:23
133:15,16,23 134:5
**bayesian**  333:8,18
334:2
**beach**  168:16
169:12

**bearing**  135:13,14
137:23
**bears**  24:19 173:17
**began**  101:25 102:9
174:23 200:21
**beginning**  52:2 92:4
96:16 118:12 119:5
119:8 120:11 131:6
185:11 194:4
289:19 367:24
**begins**  32:11 158:11
288:8
**beliefs**  10:5
**believe**  10:12,18
11:21 17:12 18:7
19:23 20:14 30:16
33:15 40:8 47:10
49:10,23 51:8 53:15
53:18 54:25 55:12
55:20 63:10,11,15
64:3,6,8 66:25
70:19,23 72:25
73:25 77:18 79:13
81:4 82:4 96:4,5,15
98:16 101:11 102:2
102:4,9 103:13
104:4 105:22
107:13 109:7
112:20 115:16
116:2,8 117:21
118:23 121:16
127:7 128:14,17
129:2,7 130:16
131:6,22 136:15
144:23 145:3
146:17 148:17
149:5 150:11 151:4
151:21 154:19
160:8 162:12
175:16 177:7 180:3
185:7,10,17 186:11
186:13 187:2,4,7
189:2 191:6 192:13
193:9 195:17 196:3
197:10 200:12

203:6 208:5 211:17
220:8 229:24 233:9
233:23 234:8,12
235:8,22 238:15
248:12 257:18
260:19 275:5,19
276:10,24 279:14
279:15 284:15
287:4 293:5,5,6,11
299:21 307:11
310:20 311:9
312:22 313:12
314:21 315:10
320:3,6,21 321:13
322:6 324:8,10,12
325:3 326:12 329:3
329:6 330:5 331:9
339:12 344:11
345:18 349:18
356:10,15 357:24
364:19 373:10
**believed**  75:14 94:3
273:17
**believing**  64:7
**bell**  333:4
**benefit**  183:16
**benjamin**  2:16 4:11
4:11
**berger**  287:2,9
**best**  16:13 26:19
31:5 55:19 125:20
164:20,24 344:7
**better**  50:24
**beyond**  105:10
201:16 209:8,11,24
263:18 335:9
**big**  262:16 352:15
**bigelow**  1:21 4:3
381:7,25
**bill**  80:21 83:7
**billion**  90:23
**bit**  12:6 86:23
119:18 121:12
149:21 170:13
184:25 272:22

361:16
**black** 146:3 147:21
154:24 175:13,14
311:21 312:6 314:9
314:18 315:14,16
315:21 316:12,17
342:13 348:3
**blanco** 17:16,17
18:9,15 19:11 48:23
50:14,16,20 57:12
57:20,23 58:6,13,17
59:2 61:20 62:9
64:15,22 72:4,18,23
73:18 74:8,23 75:4
75:7 119:4,13
120:19,21 126:12
126:19 128:14
131:23 303:13
304:19,24 306:10
308:9,16 330:17
364:20
**blanco's** 57:17,25
58:6 73:7 308:11
355:9,14 364:11
**blancostewart.com**
61:12 62:23 382:16
**blank** 13:25 14:3,8
43:18 60:16 84:11
125:16 179:15
253:20 254:19
346:20
**blanks** 253:14,18,19
345:2,4,9,13 346:13
**blind** 271:9
**blocked** 206:18
**blood** 381:18
**board** 72:11,16
79:24 80:7,15,19,21
201:12
**boland** 2:3,8 4:17,17
7:6,20 9:4 13:16,18
15:5 17:16 21:5
22:9,13,16,19,25
25:6 27:15,19 30:24
40:25 41:7,14,17,19

41:24 42:12,23 43:3
52:5 54:13 58:5
99:7,25 112:5
116:18 123:6 133:4
134:19 137:20
139:12 152:14
157:17 159:17
178:4,8 179:22
183:12 184:4,11
190:7 222:16 224:8
241:22 243:2
252:20 253:3,9
258:23 259:7,12,17
260:7 276:15
292:18 333:15
335:17 337:18
363:5 371:17,24
375:23 377:2,15
378:8,18 379:2,12
379:20 380:9,15
**bold** 25:24 152:17
172:16,23 173:18
173:25 174:7
181:15
**bomb** 323:7,8
**bond** 351:7,8,14
**bonus** 52:6 260:9
**book** 82:11,15 89:12
89:15,19 94:7 104:8
104:11 232:12
234:11,22 235:3
237:11 239:23
291:4 383:16
**books** 81:6,8,9,13
81:16,24 82:7,22,24
83:24 84:3 232:23
233:8,15,17,18
234:13 236:3
331:22 333:9,16
335:14
**border** 261:11
262:21 263:24
**boston** 267:4
**bottom** 63:17 64:11
287:19 364:24

**bound** 5:13,17
305:5 377:23
**box** 48:8 237:10
238:24
**branch** 296:10
320:8
**break** 29:19 60:21
60:24 61:10 92:8
101:6 126:24 132:5
132:12 133:15,17
167:3 183:14 184:5
258:22 259:2,13
337:10,18 371:16
**breaking** 31:24
104:4 245:25
**breaks** 100:12 133:6
134:5,7 251:25
**brief** 176:18
**bring** 107:25 128:5
265:6,17 274:23
280:9 380:11
**bringing** 109:8
197:24
**british** 113:22
114:21
**broad** 125:19 274:8
274:13
**broadway** 385:3
**brochure** 195:22
**broke** 80:18
**broken** 343:11
**brought** 35:3 39:8
40:15 52:19 72:7
73:4 76:14 78:20
87:17 98:12,14
106:16 107:16
108:19 109:25
111:4,8,9,14 134:17
216:14 228:7,7
236:14 263:14
356:15 374:23
**brown** 154:8,23
155:4 164:19
166:22 170:25

**brownish** 168:23
**brush** 274:13
**brushed** 254:13
**buffalo** 118:10,24
136:4 156:15
160:11 189:8,20
221:3,19 222:12
223:6 229:3 248:23
374:24 375:5
**bugs** 249:3
**build** 370:3
**built** 79:14
**bulk** 285:23
**burden** 105:9
**bureau** 257:14
258:10 369:16
**business** 17:19,21
18:5,17,22,23 19:2
19:5 65:2 73:9
77:18 83:21 84:2,7
**button** 309:10
**buy** 81:16,17 251:21

**c**

**c** 2:2 381:2,2
**calculate** 332:18
**calculating** 259:8
**calculation** 133:18
134:6,8
**calendar** 120:3,8
191:5
**california** 106:8
**call** 17:3,9,11,12,13
17:15 20:4,6,9,19
57:10 83:11 86:4
87:13 102:11,13,13
185:17,20 209:17
264:9 341:8,14,15
354:14,15
**called** 4:22 6:15
20:12 24:9 33:20
49:8,17 54:8 67:16
71:10 79:7 117:6
128:2 143:25 196:8
197:12 248:14

340:21 354:11
**calling** 357:23
**calls** 55:20
**camera** 173:15
  188:7
**canada** 261:11
  262:21 263:24
**canadians** 261:17
  273:4,19
**cantu** 89:16,16
  314:21 315:5 316:2
**capabilities** 212:9
  303:25
**capability** 335:9,21
**capable** 304:2
**caps** 24:14
**caption** 3:18 14:4
  86:12
**capture** 373:19,22
**car** 363:9 379:25
**career** 13:24 36:25
  40:19 43:9 105:5
  196:23
**careful** 21:23
**carefully** 21:17
  296:17
**carpet** 224:24
**cartridge** 316:10,11
  320:14,19,20,23
  321:4,7,9,10,16,23
**cary** 1:21 4:2 381:7
  381:25
**case** 3:18,20,22 5:18
  6:14 7:4,13,15,16
  7:18 8:6,9,10,14
  9:10,20 10:3,4,10
  10:22 13:11,21 14:4
  21:4 33:6,11 34:4
  35:4,10,12 38:11,14
  38:14,17,21,23 40:6
  40:10,15 43:20
  49:21 50:17,25
  53:21 54:5 57:10
  62:19 67:25 76:25
  77:22,23 83:16,18

85:21,23 86:7,12,18
87:21 88:11,18
89:23 92:23 94:11
95:15 99:18 101:19
101:24 102:15
104:15 106:6,8
107:2,4,7,11,17,18
107:24 109:13
110:5,13,15,24
112:17,21,23 113:3
113:22,24 114:21
114:23 115:6,13,24
116:2,5,7,24 117:13
119:22,24 126:19
128:5 129:21,25
136:10,20,23,25
137:10,18 138:13
138:23 142:18
143:17 154:7,16
160:23 184:5,7
186:12 191:8,11,11
191:12 196:18
197:19 201:23,25
203:8 205:11 206:3
211:17 215:17
227:25 228:11
239:14 240:11
242:14 243:15
259:21,23 261:19
262:6 263:21
264:13,15,20
266:20 267:3,7,12
267:15 268:20
269:10,20 273:15
277:3 291:24
298:10 300:20
301:9,13,24 302:4
302:19 304:8,13,16
305:19,21,25 306:4
306:9 307:19 323:2
323:5,6,10,14 335:4
337:17 352:18
363:2 364:11
382:21 385:5

**cases** 13:8 14:10
  37:15 38:25 39:2
  44:14 79:20 106:15
  106:20,24 112:9
  120:10 123:17,20
  124:4 237:2 254:23
  254:25 258:9
  266:11,24 269:10
  274:2,5 289:5
  293:13 301:17,21
  302:15 307:17
  377:20
**casework** 51:9
  69:19 255:17,24
  257:13,17 265:14
  270:6 272:23 274:3
  274:5 294:3,17,22
  295:8,21 296:4
  297:8,12,25 298:8
  298:20 299:8
  303:23
**cat** 78:7,8
**categorically** 207:8
**cause** 95:11,16
  147:2 169:20
  172:10 214:14
  219:5,21
**caused** 193:13
  216:11 226:18
  254:4,9 348:23
**ceases** 211:4,16
**ceglia** 1:5 3:18 4:18
  7:7 10:10,15,25
  11:16 16:7 17:2
  34:3 46:17 49:21
  51:20 75:5 116:20
  135:24 137:8,18
  138:2,9,25 139:9,22
  141:7,17,25 142:16
  144:4,6 169:17
  179:5 184:14
  185:16,21 216:13
  217:5,7 219:24
  226:2 231:14 241:8
  350:20,25 361:5

385:5
**ceglia's** 11:19 17:13
  143:23 145:14
  192:6 217:2 220:17
  220:21 221:10,13
  230:2 232:3 240:25
  242:9 353:12
**ceglias** 252:5
**celine** 287:21,23
**cell** 3:6 83:11
**central** 223:24
**century** 143:11
**certain** 7:24 43:13
  43:22 114:9 198:14
  212:18 256:8
  264:25 284:4 300:3
  332:23 360:17
**certainly** 78:23
  96:19 101:17
  108:13 112:11
  129:23 153:12
  250:17 262:17
  270:14 272:16
  325:11 329:17
  337:6 341:12
  344:15 378:20
**certainty** 364:2
**certification** 78:25
**certified** 12:10 13:4
  13:21 14:5 39:18
  59:22,23,25 66:10
  75:18,23 76:4 78:8
**certify** 381:9,16
**cetera** 134:5 331:7
**chain** 146:10
**challenged** 330:20
**chance** 252:16,21
**change** 22:13,16
  23:2 44:4,7,9
  170:18 192:25
  245:20 272:22
  278:6,12 281:9,13
  282:6 348:24 385:7
**changeable** 334:6

changed 23:8 83:19
163:13 264:10
265:12 269:12,15
changes 22:24 49:12
49:14 77:20 265:14
266:8 277:11 278:4
282:3 286:10
369:20
changing 9:5 272:18
272:21 276:17
277:24
characteristics
281:8,12 316:5,7
319:12 326:13
351:14
characterized
316:14,15
characterizing
148:18
charge 93:5 129:13
157:13 294:6,12
charged 90:4,11,18
90:20 91:2,6,15,19
92:16 93:22 94:5
95:7,12,20 96:12
103:4 107:4 108:15
109:19,21
charges 69:21 92:22
94:17 95:7 109:2,4
109:8,24
chart 319:16,18,21
319:22
chase 2:23 183:10
check 128:13 131:4
165:18 223:25
224:3 284:16
345:19 360:23
374:2
checking 96:17
241:14
checks 51:17,20
chemical 20:2 59:5
128:25 202:4,7
209:7 251:9 256:2,8
261:8 279:17 282:6

304:22 309:23
312:18 316:17
326:19,20 328:19
329:16
chemically 46:6
202:11 310:17
chemicals 210:13
278:23
chemistry 58:23
215:13 248:13
chest 223:3,15,19
225:14 226:19
227:19 238:25
242:5 252:6
chicago 118:11
131:6 145:10
189:15 194:22
362:16
chief 88:16 98:20
99:17,22 100:17
102:5,9 297:20
chin 93:4
chlorophyl 200:22
choice 76:8
choose 38:23
chose 36:24 46:23
46:24 120:10,12
chosen 305:19
chromatography
200:18 282:21
308:22,24 310:11
319:11,24
cia 127:2
circles 348:22
circumstances
74:19 93:23 237:22
238:2
citation 106:21
107:17 272:4 320:5
citations 38:5 39:3
124:10
cite 37:14 38:11,23
232:12 233:5
234:10 282:23
283:25 284:4 285:6

285:7 287:7,20
315:4,5 319:25
339:3
cited 38:15 39:25
43:12,21 106:20
107:15 247:9 275:6
284:4
cites 285:2
citing 285:16 320:3
citizen 123:18,24
city 222:20
civil 42:4 289:5
293:13
claim 6:16 104:14
223:14 275:13
314:4 327:25
claimed 219:24
334:10
claiming 88:3
claims 223:2 225:14
clarification 100:3
clarified 360:14
clarify 92:9
clark 15:23
class 236:9
classes 37:21 81:3
122:9,10
clause 52:9
clear 25:6 72:3 80:5
104:16 132:17,25
143:2 147:5 160:25
163:4 197:16
200:13 203:20
250:22 259:24
279:9 360:14
clearance 66:13
68:20,25 69:7,15,17
cleared 87:24
361:18
clearer 170:17
360:11
clearly 244:21
245:13 246:17
328:5

client 46:16 50:11
134:2,10 205:11
clients 205:11
clip 176:15,17 182:5
182:9,12,14 196:6,8
197:12
clips 196:6 197:6,7
close 276:23 294:8
closed 83:25 189:20
coach 41:12,18
42:10,17
coaching 42:20,23
code 5:14,16,21 6:4
6:9 72:5 74:8
cold 215:15 218:12
218:18,22 219:4,13
221:2,19 223:6
229:14 230:24
colder 229:11
collected 370:16
collection 233:9
318:23 375:13,18
college 75:12,22
76:13 79:8 331:5
color 147:25 148:16
156:22 159:21
160:17 161:22
162:6,17 165:10
174:13,17 190:5
310:6 315:13,22
371:11
colorado 73:7
coloration 149:24
177:8
colored 196:9
197:14
colors 310:7 315:18
columbia 113:23
114:21
column 367:7
columns 272:19
combination 355:25
come 39:3 55:19
106:15 108:4
120:12 121:11

195:15 235:23
251:11 276:18
278:13 307:6,8
344:17,19 355:2
**comes** 76:10,19
205:24 240:5
252:22 370:20
**comfortable** 124:13
124:16,20 242:10
**coming** 178:5
183:13 246:10
329:8 349:16
**comment** 127:13
241:8 248:21
365:22
**commentary** 287:8
**comments** 58:18
310:15
**commercially**
320:24 321:4
**commission** 385:25
**commissioned** 105:3
**committee** 72:2,10
72:17 74:3,20 75:7
**committing** 10:16
11:3
**common** 9:9 229:7
237:2
**community** 123:4
129:24
**companies** 190:13
369:4,10
**company** 190:14
238:8 385:2
**comparator** 190:12
309:4
**compare** 319:8,9
377:9
**compared** 151:9
165:8 222:4 236:25
319:14
**compares** 167:21
**comparison** 180:24
310:9 312:25
318:20 319:4,6,17

319:21 320:10,12
**compensation** 52:7
**complaint** 8:15
69:12 92:17 93:9
94:5 136:14 142:18
142:24 143:4
362:23
**complete** 65:12
132:18,23
**completed** 132:23
347:2
**completely** 104:17
136:25 161:24
163:6 165:7 227:2
238:2 255:15
350:19
**compliance** 115:20
**complied** 115:12,16
116:3
**component** 51:11
149:16 209:13,15
210:8 247:6
**components** 149:5
246:2,22 281:15
317:3,14,20
**composition** 284:8
329:7 339:15,19
340:8,10,13 341:3
341:13,25 347:7,15
347:16 371:8
**compositions** 251:9
326:20
**comprehensive**
62:10
**computer** 11:22,24
12:3,11,19,21 13:5
13:7,10 14:5 63:19
139:6 141:18
303:14 304:20
373:18,19,21
**computers** 64:2
**concede** 299:14
**concept** 57:6 143:13
235:24 236:3

**concern** 144:6
**concerned** 98:18
**concerning** 7:18 8:4
8:6 14:21 37:9
107:16,25 111:23
111:25 159:8
184:14 205:22
207:3 270:16
**concerns** 272:6,7
**concert** 143:20
**concise** 205:21
**conclude** 137:11,14
149:10 292:3 349:4
349:8 350:4,8,11
379:24
**concluded** 137:4,6
137:17 138:11
177:14 288:5
325:13 338:3 339:6
339:9 348:6,17
**concludes** 240:3
**concluding** 328:7
348:12
**conclusion** 6:7 23:9
155:9 169:15
180:18 203:15
214:2 239:16,21
244:24 245:17
246:21 301:8
311:16 312:10
318:12,14,17
322:10,12 323:17
324:2 325:18
327:23 328:2
339:16 341:22
342:3 350:3,17,24
355:25
**conclusions** 47:16
48:13 176:23 307:6
307:9 348:11
**condition** 149:3
168:4,18 172:16,23
174:14,17
**conditioning** 225:12

**conditions** 16:15,16
207:16 208:2,20
213:7,12,23 214:4
214:10,12,22 215:2
215:11,22 216:3,10
216:24 217:15,22
218:13,18 219:5
220:12,13 224:12
231:17,19 232:4
241:9 242:15,19
243:13,21
**conduct** 5:15 18:23
19:2 37:24 42:5
49:8 56:13 69:19
103:17 122:18
128:23 131:3 199:7
199:18,21 201:22
204:2,9 251:12,17
303:5,6 309:13
316:21
**conducted** 7:12,17
8:4,8 39:25 40:22
55:16 56:6,7,10
57:10,11 74:18 94:6
198:17 201:20,24
207:23 208:3,19
215:18 244:24
245:5,16 246:20
255:22 258:7
271:11,12 275:19
300:19 309:16,23
328:17 359:12
**conducting** 19:5
199:12 200:7
201:14 244:20
**conference** 108:21
175:13 185:17,20
189:9,14,20
**confidence** 221:25
333:7 334:3
**confident** 368:10
**confidential** 371:6
**confidentiality**
101:9

confine 42:15
confirmed 114:15
congress 82:8,10
connection 10:16
50:7 101:10 103:17
305:24 306:3,6
consciousness
143:13
consider 5:13 12:2
12:13,24 21:23 59:2
59:9 88:8,9 129:3
130:14 205:17
231:5 233:14 241:6
consideration 40:16
380:3
considerations
271:7
considered 218:18
245:10 249:6
250:24 254:8
consistency 347:7
347:14,15
consistent 174:6
195:25 277:13
318:3,6,7,11,16
329:8 342:10
349:15 350:7,8,15
350:19,25
constantly 229:18
230:2
constitutes 330:22
construct 377:19
consultant 75:19
76:5
contact 82:15 83:4,7
349:6
contacted 49:20
50:13 53:2,6
contain 316:12
contained 45:10
143:24 198:21
199:6 204:13
213:12
containing 143:18
211:19

contains 40:11
44:11 378:4
contaminant 250:9
contaminants 208:2
208:14,15,18
246:25 247:5 251:3
251:6,13,19 252:11
252:14
contaminated
226:14,17 254:14
254:20
contamination
244:16,23 245:8,15
246:19 253:16
254:4,9 342:12
contaminations
207:19 271:8
contemporaneous
358:12 360:8
contemporaneously
359:11
contend 135:23
content 179:21
290:2 291:10 293:4
351:17
contention 136:10
136:22 138:23
211:9
contents 236:18
238:6,9 240:6
349:15
context 143:7
158:15
contingency 51:11
continuation 289:21
continue 3:9 42:14
42:17 133:18 134:9
134:18,20 136:19
137:9,18 138:12
157:6 183:20 203:8
continued 69:14
306:10
continues 214:18
344:4

continuing 30:25
66:11 134:15
contract 8:15 9:2,14
11:14 16:15 20:13
25:4 33:19,24 34:5
34:8 135:13,23
136:12,14,18 137:7
137:7 138:4,10,20
138:24,24 139:5,23
140:3,20,22 141:7
141:10,13,17,22
142:2,3,7,13 144:3
168:14 178:18
214:13 238:6
244:19 286:21
338:4 345:5 348:8
350:21 355:7,22
356:3 359:6 382:13
contradict 161:25
contradicted 156:6
156:22,25 158:4,24
159:13,20 160:16
161:21
contradicting
154:16
contradiction
160:20 166:18
contradicts 341:21
342:2
contrary 155:9
166:15 282:9
contrasted 304:19
contributing 95:16
95:21
contributor 110:3
217:25
control 143:23
252:5
controlled 217:23
controversy 303:23
convenient 378:20
conversation 100:11
103:2 128:4 184:14
184:23 185:16
216:20

conversations 3:5
127:22 184:4
conviction 105:23
106:2
convictions 106:10
convincing 72:3
coordinate 56:22
119:3
coordinated 119:4
copeland 80:21 83:7
copeland's 84:4,8
copier 170:15 312:2
copies 43:25
copy 23:14 25:7
58:11 65:9 86:21
116:23 117:14,16
121:14 128:12
265:5 344:6 345:21
351:13 353:22,25
362:23 368:2,5
371:12 373:8
376:17 382:25
cordoned 193:24
core 136:24 295:7
corner 193:25
correct 5:6 8:20
12:4,18 13:5 15:3,4
18:11 21:18,21 24:9
24:12 26:12 35:16
35:23 37:15,16
38:18 40:13 44:12
44:17 45:16,19,22
45:24 46:8,12,18
47:2,5,9,23 48:8,9
49:3,4,6,7 50:9
52:13,14 54:3,9,19
56:3,4 57:12,13
58:4,8,15,16,22
59:7 60:8 65:3,11
66:18,21,22 67:9,12
67:14,20,23 68:5
69:21 70:7,11,14,15
70:18,22 71:2,5,9
71:13 73:14 75:20
77:3,24 86:12,13,15

86:16,18 87:7 88:12
88:15,19 89:7,13,14
89:17,20 90:5 91:20
91:23,25 92:18 94:8
94:9,17,25 95:3,7,8
95:23 96:14,20
101:14 103:4,7,10
103:12,19,20,24
104:11,22 105:5,21
107:19,20 110:20
111:11 112:12,22
113:16 114:4 117:7
118:22 120:15
121:22 122:19,23
129:2 130:2,5,6
131:2,20 135:24
141:22 142:3,10
143:5 144:16 148:9
149:2 150:18
155:24 156:13
160:13 161:5,23
163:16 164:11,14
166:10 171:11
174:14,24,25 175:4
175:5,24 176:12,15
176:21 177:4,15
178:2,3,10 179:16
179:21 180:9,20
181:15,19,20,23,24
185:24,25 186:21
187:9,12,25 188:4,5
189:6,7 191:25
193:6 194:8,12
195:7,12,13 197:19
197:20,25 198:10
198:11,14,15,18
199:14,24 200:5,15
201:11,15,25
203:16 204:10,23
207:16,17,24,25
208:10,17 210:18
212:6 213:2,17
214:11,23 215:7
216:7,17,18,22
217:6,13 218:19

220:3,7 225:9 228:2
228:3,24 229:12,15
229:20 230:4,7
232:7 233:13
240:19 242:6,7
244:7,12,13 247:4
250:25 251:4,19,20
255:4 256:17 257:6
257:18 258:5,16,17
259:6,20 260:21
261:8,9 262:15,19
263:5 264:3 266:3
268:25 269:18
273:8 276:2,12
281:21,22 282:8
283:2,5 286:17,18
287:10,11 288:2,6
289:8,25 290:10,19
290:23 292:13
295:18 297:13,25
298:6,14 301:2
302:10 308:25
309:24 314:7 316:5
316:18 317:11
318:5 322:5 325:18
326:2 327:2 330:19
336:4 342:4 347:25
349:17 350:22
351:23 356:9
358:10,11,14 359:3
359:8,13,14,19
370:22 375:15
**corrected** 153:14
**correctly** 24:23
104:19 140:9 155:7
185:10 245:2
271:21 283:14
**correspond** 166:24
**corresponds** 166:23
367:21
**corroborate** 222:25
224:17
**corroborated**
222:12,22

**corroborates** 223:6
**corroborating**
142:19
**corroboration**
221:17,20 223:14
223:18,22 242:4
**cosmetics** 247:3
**cotton** 351:17
**counsel** 46:17 89:11
100:6,7,10 111:6
118:25 183:22
**count** 94:18 133:20
259:6
**counted** 238:22
**counter** 262:2 312:9
322:9
**countered** 322:12
**country** 230:21
**county** 381:5
**couple** 49:18 70:6
80:16 147:8 185:21
262:10 272:2
276:18 277:3,25
278:4
**course** 21:9,22
33:22 40:19 43:9
66:9 68:21 85:19
87:12 143:24
153:22 169:21
179:2 187:16,20
191:14 194:10,16
197:2 205:12,15
227:15 232:20
236:15 238:22
239:13 240:23
253:15 256:22
300:2 317:12,25
361:7
**courses** 65:4,21 66:4
331:4,6
**court** 1:2,21 3:21
4:2 10:4,11 11:4,6
13:4,21,22 14:2,3
15:2 22:15,20 26:21
27:9 28:10 29:3,10

30:10 31:17 36:14
36:18 38:18 39:19
40:11 41:11 42:18
42:20,21 43:20
44:24 45:8 48:24
58:15 60:6,10 66:3
87:22,23 90:5 92:23
93:21 94:22 95:11
100:3 101:18
107:21,25 108:4,19
109:22 111:3
112:21 113:7,10,15
113:20 114:8,12,21
115:19 124:24
138:3 146:6 151:12
152:12 153:2 156:5
157:14 158:2,8,23
159:12 160:15
164:25 171:14,17
173:15 182:19
183:16,18 203:3,13
205:9,17 210:16
226:12 236:14
240:11 248:16
249:22 259:13,21
266:11 274:10
285:20,21 289:12
291:7 292:7,23
293:18 295:23
296:5 298:10
299:23 319:18
322:22 341:11
381:7
**court's** 108:14
113:11
**courts** 40:3,16 60:11
111:12
**cream** 207:19
**creams** 247:2,14
**create** 35:8 81:6,6
332:3 362:22
363:17 370:14
**created** 25:19 64:22
197:24 198:5
338:19,20 350:20

350:25 363:19
370:3
**creating** 17:25 80:2
**creation** 80:4
182:17 313:2
**credentials** 188:14
**credibility** 108:5,11
108:14
**credible** 110:22
333:8 334:2
**credited** 105:3
**crediting** 176:22
**crime** 5:10 10:16
11:10,12 69:8
**criminal** 10:11 11:4
69:12 92:17,22 93:9
101:13 109:8,24
289:4 293:13
**criminally** 90:4
107:3
**critical** 213:8
224:12,13
**criticism** 114:18
270:24 272:11
**criticisms** 275:12
**criticize** 269:19
275:16 337:4
**criticized** 78:25
330:13,15
**criticizes** 269:17
**criticizing** 79:7
269:23 289:14
292:23 337:2
**critique** 262:17
263:19
**cropped** 163:11,15
163:15 165:12,14
165:22 168:8 173:3
**crown** 127:2
**crutcher** 1:19 2:10
2:22,23 3:16
**cryptic** 268:4 280:7
**cumulative** 246:4
**current** 306:3

**currently** 127:6
272:24
**curriculum** 65:14
382:17
**curve** 333:4
**custody** 146:10
**cut** 112:11 115:22
379:21
**cutting** 283:15
**cv** 1:4 3:22 65:10,18

**d**

**d** 1:5 110:17 382:2
**d.c.** 17:24 18:13,25
61:21 62:13 64:23
**dab** 254:2
**damage** 145:12
147:2 348:7
**damaged** 144:15
214:15 327:11,21
328:17 329:16
**dangers** 271:6
**daniel** 2:24 3:11
**dark** 164:11 181:15
**data** 6:6 72:6 75:8
333:12
**date** 3:12 19:24
23:22 25:5 53:25
61:14 63:16,18,19
63:21,23,25 64:4,12
65:16 69:3 86:8,14
92:3,19 93:18 102:3
117:18 129:18
135:8,14 145:22
151:19 162:25
164:5 167:15 191:4
234:24 281:17,19
281:20 324:8 338:5
339:7,10 342:4
343:25 354:6
357:14 358:9
366:22 376:25
385:5
**dated** 93:15 135:6
164:3 167:11,14

283:6,11,21 359:11
382:22 383:7,12,14
**dates** 88:25 93:11
96:17 118:8 131:4
324:8
**dating** 199:7 226:4
263:20,21 264:3
265:24 266:19,21
266:25 268:24
281:4,9,13 284:13
286:5,10 294:3
295:15,21 296:11
296:13,15,21,25
298:4,13 299:16
300:25 301:18,22
301:23 305:15
307:7
**daubert** 13:2 39:11
39:16 43:12,14,21
43:23
**daubert's** 37:11
**dave** 127:2
**david** 69:13,14
93:16 382:23
**day** 86:17 88:3
90:10,17 92:23,24
93:22 103:7,9,12
118:24 119:14,16
120:18,20,22,24
121:4,15 122:16
128:14,22 130:18
131:15,16 160:6
161:8,11 163:5,5
170:21 175:3
191:18 350:12,16
360:8 373:14
376:21 378:16
380:22 381:22
385:23
**days** 52:10 97:12,15
103:13,15 118:22
205:21 315:24
369:12 378:15,19
**deal** 42:21 122:3
127:18 353:11

369:4
**dean** 2:8 4:17 99:5
**death** 235:23 237:13
**decade** 71:5
**decades** 123:14
231:21
**decelerate** 230:25
**december** 102:2
**decide** 42:21 108:20
216:25
**decided** 112:24
113:4 202:3,15
306:7,13,16,17,19
306:23 329:6
**deciding** 75:4
**decision** 37:8 72:21
111:2 133:20
**declaration** 7:4 14:9
17:5 23:18 39:7
40:7,11 43:20 44:18
44:23 45:2,10,15
57:14,18,21,25 58:7
140:16 145:25
153:18 157:9
160:22 162:5,8,9
167:10,13,19
168:13 184:16,21
185:5 186:16
216:14,21 217:8,12
220:18 222:23
226:2 240:25 265:4
271:25 382:7
383:13
**declarations** 43:16
43:25 90:4 151:20
192:15 263:16
**declarative** 36:5
**defendant's** 6:13
8:11
**defendants** 1:10
2:11 4:6,8,10,12,14
4:21 7:7 8:7,13 9:8
9:13,24 10:15,21
11:4,8 23:18,20
25:3,8 26:6 61:11

65:14 86:5 93:13,15
114:2,6,14 117:16
129:10,15 135:3,5
135:23 139:17,21
142:22 144:11
145:11 146:8,15,24
147:2,10,21 161:21
163:25 166:9
167:10,13 174:22
175:24 185:13
186:18 192:20
194:11,17 197:18
197:22 213:16,19
213:20 214:8
232:11 234:20,21
234:25 242:17
243:4,19 310:14
311:21 327:24
329:10 338:23
339:2,3 340:11,13
341:3,13,21 342:2
343:23 344:2 354:3
354:4 357:10,11,15
357:20 358:8,21
359:10 361:5
366:19,20,23 367:3
372:12,14 376:5,22
377:7 378:17 382:7
382:10,12,14,17,19
382:22,25 383:3,6,9
383:13,15,18,20,22
383:25 384:3
**defense** 89:11 91:11
145:7 156:6,25
159:21 160:17
183:21 193:20
**define** 217:18 268:8
**defines** 236:7
**defining** 341:16
**definition** 100:4
152:19
**definitively** 328:6
**defunct** 84:6
**degradation** 145:12
348:15

**degraded** 161:2
202:9
**degree** 231:2 331:10
331:10 364:2
**delay** 121:6 236:17
**delays** 112:4
**demjanjuk** 110:17
**demonstrate** 310:23
**demonstrated**
137:16
**demonstrates**
339:20
**demonstrating**
319:17
**denominated**
360:18
**denver** 73:6
**department** 78:5
272:24,25
**depending** 77:21
**depends** 12:20 86:2
87:13 126:8 204:3
**deponent** 385:6
**depose** 252:17,19
348:19
**deposed** 14:17
262:14 277:4
**deposing** 100:6
378:17
**deposit** 48:8
**deposition** 1:17 3:8
3:14 27:10 29:11,22
42:5 76:10,22,24
100:5,12 108:9
129:16 132:18,22
133:18,25 159:20
183:9,21 184:6,11
213:21 252:22
253:2 259:11,24
260:4 291:19
337:18,23 363:8
376:12 378:12
379:13 383:4 385:5
**depositions** 15:3
51:10 76:3 100:2

205:23 263:16
266:12,14
**describe** 24:11
31:23 94:16 95:5
124:21 146:4
168:21 260:19
264:8,18,19 265:3
269:3 338:14,15
340:22 356:12
**described** 24:8
186:13 196:19
232:15 286:19
367:7
**describes** 150:12
333:25 334:22,25
**describing** 146:2
302:3
**description** 94:2
237:21 260:23
310:21
**design** 24:20 26:2
26:18,25,25
**designed** 236:16
**designer** 26:2,18,19
**designing** 26:3,19
**desk** 352:3
**destroyed** 143:19
**destruction** 143:15
**detail** 325:8
**detailed** 307:23
308:2 310:21
**detect** 286:17
**detectable** 348:13
**detecting** 200:23
**detection** 212:10
**detent** 356:3
**deteriorated** 55:21
**deterioration**
307:11
**determination**
205:3 206:16,25
214:13 270:17
305:19,20 310:5
**determinations**
215:21

**determine** 74:19
99:8 100:12 136:18
157:10 251:12,18
271:10 310:4
316:22 347:6,13,14
347:16,20
**determined** 198:20
199:5 200:10 202:8
349:14
**determines** 333:19
**develop** 237:16
272:13
**developed** 311:6
314:2 315:16,19
318:21
**deviated** 276:25
277:4
**deviates** 277:5
**deviation** 331:14,17
331:21 334:11,24
335:3,6,12,16 336:4
336:11,13,18
**device** 197:10
314:10,19 334:6
356:17 374:8
**devices** 143:18,22
144:5 313:11
**dictated** 117:2 299:7
**differ** 269:6
**differed** 150:5
**difference** 137:22
139:2 141:5 151:11
166:3 190:16 281:3
301:14 326:4
329:20 330:23
331:20 332:2 333:6
333:12 365:23
378:9
**differences** 190:18
310:23 317:14,19
364:7 365:15,17,21
365:24
**different** 8:19,23
9:11,21 10:5 32:5
33:16,16,17,19,25

47:15 50:23 63:13
77:21 88:25 123:8
136:25 144:8
146:16 148:20
152:19 153:4 163:6
165:3 168:5 173:2
181:22 190:3,8
192:23 201:3 205:7
209:11 226:13
238:4 246:8 248:11
255:15 259:16,18
268:6 285:18,22
288:7 292:12
301:11 302:2 305:6
310:24 311:11
312:11 321:11
322:11 323:24,25
325:15 326:11,14
326:20 327:25
329:19 331:18
336:19 343:14
360:7 364:3,5
367:16 372:19,22
378:5
**differentiate** 46:4
310:17 349:24
**differentiated**
310:22
**differently** 291:9
293:4 311:4,6,7
**differing** 211:5
**differs** 261:12
**difficult** 269:8,15
281:2 316:20
**diffuse** 311:7
**digital** 313:12 344:8
356:15 373:8,13,18
**dimensions** 195:14
**direct** 23:25 25:20
32:10 36:13 87:2
94:11 130:7 149:13
164:6 167:18
168:11 235:6
245:11 275:4 286:6
315:7 321:14

**directed** 303:3,4
304:21,24 305:10
318:15
**directing** 29:24
**direction** 295:25
297:20 301:7
305:18
**directly** 51:21
153:14 165:6
266:15 317:18
353:10,11
**director** 88:15
277:19 294:18
**directors** 72:11,16
79:24 80:7
**directory** 85:5
**disagree** 134:13
282:12,16 308:11
322:18,20 324:5
**disagreeing** 176:22
176:25
**disagreement** 67:18
**discipline** 59:3,10
59:16
**disclaiming** 247:15
**disclose** 101:5 369:7
**disclosed** 92:22
98:21 99:18 115:25
268:16,20 269:9,16
286:23
**discloses** 37:8
**disclosing** 93:4
370:24
**disclosure** 91:13
264:23 269:10
**discoloration** 151:5
166:4 348:7
**discolored** 144:19
149:12 151:8 157:4
158:6,25 159:25
161:3,7 165:25
166:17 170:2 172:3
172:4 176:5 177:2
177:15,16 180:23
181:14

**disconnected** 306:2
306:6
**discovered** 240:18
286:23
**discovery** 25:10
173:13 186:17
237:23 238:2
368:23
**discretion** 132:14
133:21
**discrimination**
283:9,18
**discuss** 74:12 101:6
112:12 128:6
184:10 213:3
238:17 321:20
337:17 358:7
**discussed** 74:24
87:18 90:3 98:15
104:5 127:23
174:22 279:20
280:16 298:14
330:8
**discusses** 158:13
159:8 286:4 316:4
**discussing** 90:15
117:20 157:22
191:23 289:22
337:23
**discussion** 132:8
266:21 361:16
**dismiss** 10:21 23:21
382:10
**dismissed** 110:22
**disparage** 129:5,11
**disparaging** 124:17
127:13
**disposal** 196:15
**disposed** 143:19
**dispute** 180:22
181:3 259:5 267:11
332:20
**disputed** 140:25
**disputing** 312:5,7

**dissimilar** 169:2
**dissolve** 311:4
**distinct** 179:19
181:25
**distinctly** 181:21
**distinguishing**
302:7
**distribution** 333:2
333:19
**district** 1:2,3 3:21
3:21 14:20,24 34:23
87:21 145:5
**docket** 117:13
167:12
**doctor** 19:22
**document** 6:15,25
7:9 9:25 10:3,6,23
18:11,16 19:12
20:17,20,22 24:9,16
24:19 25:2,7,13,18
25:21 26:7,14,22
29:22,25 32:17,22
32:25 33:4,21 34:9
34:14 47:8 48:6,12
48:16,18,22 54:8
58:23 59:19 62:11
64:4,9,10 66:2,6
70:25 76:12 81:10
89:4,9 116:23 117:2
117:4,6,13,14,17,21
117:23 121:24
122:25 131:19,24
135:4,6,10,15,19,22
136:2,6,8,10,22,24
136:25 137:23,24
137:24 138:11,23
139:19 141:4,24
142:6,12,20 144:7,8
144:12,14 145:13
145:19,21 146:8,11
146:15,16,18,22
147:3,10,14 148:2
149:11,20 150:6,17
151:2 152:5 153:24
153:25 154:2,14

155:23 156:8 157:3
158:7 160:6,10,16
160:24 161:2
163:13 164:2,12,15
164:16,21,23 165:7
165:8,9,24 166:4,13
166:16,22,23,24
167:3,11,22 168:9
168:15,22 169:10
169:13,19 170:7,14
170:23,25 171:13
171:14,16 172:5,15
172:20 173:2,4,7,16
173:22 174:11,14
175:8,8,23 176:20
177:2,7,12 178:5
179:25 180:18,19
180:23 181:10,14
181:21 185:23
186:14,19 194:5,7
194:10,13,16,19,20
194:21,24 195:4,6,9
195:11 196:10
197:11,19,23 198:4
198:21,25 199:6
200:9 202:24
204:14 207:13
213:24 214:2,15
215:2,24 216:5,11
217:21 218:20
219:25 220:6 221:7
221:22,24 222:4
223:2,14,18,23
224:21 225:15
226:3,14,16 227:2
227:13,18,24 228:2
230:9,16,21 231:15
231:20,25 232:5,9
232:16,20 235:15
235:21 236:8
237:22 238:14,17
239:3,10,19 240:4
240:10,24 241:2,4,6
242:5 243:6,7,14,16
243:21,23 245:7

248:19,20,23 249:2
249:8,14 250:5,7,10
250:16 251:3,6,23
252:3,10,13 254:20
256:4 265:25 273:8
281:8,12 282:3
286:10 291:20
296:10 302:21,25
304:19 305:2,4
309:18,20,21 310:4
310:18 311:13
313:15,16,22
314:11,13,20 318:3
321:6,24 322:4
323:23 325:15
326:25 327:11
328:18 330:18
342:12,22,24
343:13,14,15,24
344:22 345:3,5
347:9 348:9,20,24
349:2 351:2,22,24
354:5,12,15,16,16
355:6 356:8,19
357:24 358:15,17
358:18,19,20,23,24
359:2,11,16 360:15
360:19,22 361:20
361:21,23 362:3,7
362:18,19,20,22,24
362:25 365:13
367:2 371:17 375:3
375:7,14 383:2,7,10
383:19,21
**document's** 9:22
24:11 140:25 166:8
240:8,17
**documentation**
154:4
**documented** 59:12
**documents** 9:19,23
34:2,4 46:13,16,17
54:19 59:5 60:2
78:21 100:5,20
114:3 121:14

122:12,19 128:24
130:20 131:14
137:3,21 140:18
151:8 153:13
159:24 161:7
175:13 179:15,15
180:6 219:19,21
220:3 226:4,6,13,19
226:23,24 227:19
233:3,10,11,22
234:4 235:19
236:18 237:4 255:8
261:13,14,16
263:10,17 275:3
320:7 327:21
329:10,17 343:17
360:3 361:6,7
362:13 364:15
366:11 368:6,8,12
371:18 375:19
376:2 377:11
378:10,22,24 380:7
**doing** 18:24 41:2
45:4,11 119:20
120:4 133:24,24
202:3,6,12 212:10
219:9 253:5 255:15
265:12 271:8
273:20,23,23 274:7
286:9 292:25
294:25 306:11
315:16,17 352:4
373:7
**dollar** 94:24 95:19
97:17,24 238:8
**dollars** 90:23
**doorstep** 236:12
**dot** 37:10,10,10
170:14 332:4,5,5
344:9 358:25,25,25
**double** 199:11,17
244:20
**doubled** 358:3
**doubt** 22:21 81:18
105:10 128:5

307:22
**downstairs** 363:10
**dpi** 311:22 312:4,6,8
**dr** 20:11 21:3 25:14
25:19 48:17 52:15
53:9 130:19,22
145:14,19,24 146:7
146:14,19 149:25
150:23 151:23
152:12 166:14
167:23 169:3,10
171:3,6,8 181:13,16
181:18 186:4,24
268:24 269:6 315:5
**draft** 22:14
**drafting** 117:9
**draw** 324:2
**drawing** 301:15
**drawn** 189:9 237:7
**duces** 263:13
**due** 376:18
**duly** 4:23 381:12
**dumain** 15:19 52:4
**dumain's** 51:19
**dunn** 1:19 2:10,22
2:23 3:15
**dusak** 127:8
**dyes** 316:13
**dynamic** 281:4
282:2,5,10,14 284:2
284:8,12,22,25
286:4,7,11,14

**e**

**e** 2:2,2 4:22 27:2
49:23 50:5,8 52:22
110:17 139:9 141:7
141:21 142:17,23
143:3 183:2,2,23
186:6,9 238:16
272:5,5 287:16
381:2,2 382:2
**e.g.** 289:6 290:9
**earlier** 13:7 44:23
52:20 53:15 108:9

112:25 155:10
169:3 184:13 186:2
195:6 197:21 205:4
238:16 247:18
272:5 273:11
286:11 287:12
315:25 322:15
**early** 13:23 14:10
25:16 52:24 53:16
71:8 78:11,16 79:3
191:6,9 192:22
196:23 236:2 246:7
369:12
**easier** 285:19
288:16 315:23
368:3
**easily** 334:6
**easy** 77:6 223:25
225:18 271:13
316:20
**ed** 127:3
**edges** 250:4 352:10
**edit** 22:9,11
**edited** 188:11
**editing** 182:17
**edition** 234:3,5,6
**editorial** 22:24
**education** 66:11
**effect** 10:9 55:24
140:21 184:16
207:23 215:3,5
218:9,11 219:13
226:23 232:5
236:11 246:4,9
248:21 271:6
**effects** 213:11
219:16,18
**effort** 120:25 157:20
**eight** 147:14 154:25
199:2
**eighties** 229:23
**either** 26:16 29:6
31:4 48:13,18 96:7
106:10 118:21
178:18 179:7 191:9

192:24 240:13
275:2 300:20
326:22 374:21
377:2 378:22
**elaborate** 115:21
**elaborated** 222:24
**elapsed** 132:24
**election** 267:12
**electronically** 58:10
58:12
**element** 105:9
**eliminate** 173:4
**elliot** 1:8 3:19
**ellson** 113:23,23
114:7
**embedded** 149:20
176:18
**emphasize** 152:17
**emphasizing** 292:4
**employee** 67:23
69:6,8 104:25
**employees** 300:18
**employment** 69:9
143:12
**enables** 149:10
**encompasses** 14:24
**ended** 262:4
**ends** 33:11 61:2
132:7 134:22
182:23 337:12
**enforcement** 104:21
104:23 187:17
277:20
**engage** 100:11
**engaged** 52:12
157:20
**engineer** 109:3
**engineering** 108:25
**enjoy** 69:14
**enjoyed** 69:16
**ensure** 188:18
**entered** 213:18
**entire** 45:3 72:24
73:14 133:14 163:19
164:12 172:4,19

223:10 230:17
249:11 278:15
**entirely** 237:12
348:16
**entirety** 180:3
254:18 345:17
**entitle** 238:7
**entitled** 135:4,6
377:8 383:7
**entries** 283:11,12
**entry** 283:21
**envelope** 148:9
150:7,18 155:23
156:23 168:16
172:8,12,18 174:19
175:9 177:22 178:2
178:10
**envelopes** 177:25
**environmental**
207:15 208:19
217:14 220:12
224:12
**equal** 332:6
**equally** 262:5 332:5
**equipment** 335:21
339:23 340:2
**eric** 54:4
**errata** 385:2
**erroneous** 72:4 74:9
74:15 328:16
329:20
**erroneously** 292:22
**error** 334:10
**errors** 21:13,20
**especially** 256:22
**esq** 2:8,14,15,16,17
2:18
**essentially** 133:25
193:15 196:8
338:16
**essex** 69:13
**establish** 229:4
**established** 103:3
143:14 361:24

**establishes** 229:2
283:25 342:7,9
**estate** 236:13
**esteemed** 70:9
232:19
**et** 134:5 272:5 331:7
**ethics** 5:14,16 6:4
72:2,5,9,17 74:3,8
74:20 75:7
**european** 273:3
**europeans** 273:19
**evaluate** 274:11
**evaporate** 209:16
210:9 211:25
212:13 215:15,16
218:5,17,22 219:6
**evaporates** 211:2,14
212:4 218:3
**evaporation** 211:3
211:15 217:16
219:7,16 231:9
**event** 5:23
**events** 67:2 93:20
**eventually** 323:12
**everyone's** 134:4
**evidence** 68:11 72:3
91:5,9 109:14 110:7
124:25 143:15,18
147:16,23 151:14
164:24 197:16
241:16 243:20
355:19 375:13,18
**evident** 348:7
**ex** 127:2,3,4
**exact** 22:19 92:3
146:11 161:14
175:10 177:17
191:4 196:20
234:16
**exactly** 88:5 142:9
153:23 157:10
159:8 162:22
191:22 195:16
221:4 254:3 269:23
270:9 272:11

273:22 274:4 275:7
279:9 306:5 331:2
352:15 356:23
361:24 374:18
**exam** 75:21 131:3
**examination** 4:25
31:5 55:18 58:24
59:19,25 62:11
74:18 81:10 89:5
117:5 118:2,10,11
118:17,20,24 119:8
120:11,13 122:18
128:24,25 131:8
144:22 152:22
153:22 174:23
175:3 182:7 183:25
186:13 191:19
193:12,17,20
194:13,17 195:2,7
197:18 232:16
239:11 240:23
241:3 261:19
302:19,21,25
304:19 307:21
309:3,6 310:4
311:24 313:5,18
352:4 356:18
359:12 362:14
374:22 382:3
**examinations** 19:25
52:12,16 56:3,21
131:11 194:11
370:13
**examine** 56:16
130:20 160:10
203:9 226:11 289:4
293:12 356:7
**examined** 4:24
20:18,20 32:3 54:7
160:7,13,16 203:10
220:3,4 226:6
239:22,24 248:23
272:23 305:3 308:6
**examiner** 130:23
181:13 323:23

**examiners** 18:11,16
19:12 70:25 75:13
78:10 79:8 232:20
273:8 297:7
**examining** 355:25
**example** 35:14
217:15 218:20
235:16 250:8
281:14 285:5 376:4
**examples** 267:23
**exams** 56:15
**excerpt** 86:5 129:15
382:19 383:3
**excerpts** 234:21
235:2 383:15
**excited** 102:12
**exclude** 318:6
**excluded** 111:12
113:2,17,20
**exclusive** 362:13
**excuse** 27:17 41:8
41:15
**excused** 134:10
**executed** 57:18
**executor** 236:12
**exhaustive** 208:15
312:17,24
**exhibit** 23:17,18
25:2,3 26:6 61:9,11
65:8,14 86:5,10
93:13,15 94:11
116:6,12,15 117:12
117:16 129:15
135:5 140:16
163:22,23,25 164:2
164:7 165:4 166:12
167:13 213:17,19
213:20 214:8
232:12 234:19,20
234:21,25 282:17
282:24 285:5,8,10
285:12,14,21 287:3
288:18 290:10
315:4,9,10 320:2
343:22,23 344:2

354:3,4 357:10,11
357:15,20 358:21
359:10 366:19,20
366:23 367:4
372:12,14 376:5,22
382:7,12,14,17,19
382:22,25 383:3,6,9
383:10,13,15,18,20
383:22,25 384:3
**exhibits** 24:6 57:15
57:21 58:2,7 154:3
265:21 274:22
285:18,22 314:25
382:6
**exist** 144:5
**existed** 90:25 143:23
**exists** 225:17 377:12
**exonerated** 104:17
**expect** 133:25
154:24 217:15,20
218:5,22,24
**expedited** 25:10
186:17
**expelled** 72:11,18
**expenses** 18:24
**experience** 59:4,12
260:24
**experienced** 43:6
122:2
**experiment** 207:23
208:3,19 244:24
245:5,16 246:20
**experimentation**
227:21
**experimented** 17:24
18:21
**experiments** 215:17
219:9
**expert** 5:23 11:23
12:4,12,14,19,21,24
13:5 14:5 32:21
36:18 39:19,21
40:19 45:6,21 47:6
59:22,24,25 60:7
84:23 107:5 108:4

108:11 111:13
115:14 120:17
121:2,7,24 122:2,12
122:13,25 123:3,16
123:23 124:3
126:12,13,15,17
127:9,14 129:24
136:19 137:9
138:13,15 141:12
143:3 145:14 146:7
148:7 150:15
154:16,18 156:6,25
158:3 159:12,19
160:15 161:20
162:14 168:10
169:5,8 176:2 187:8
187:11 189:25
192:20 193:10
200:14 203:21,23
204:7,12,21 205:8
205:14,14 210:17
224:6,9 232:9 241:5
243:4 254:22
255:19 257:23
269:17 319:20
322:16,23 323:5
328:11 341:10,14
355:6 364:25 365:8
365:14,22 374:9
**expert's** 341:21
342:2
**expertise** 59:3,10
65:5 66:10 124:18
141:19
**experts** 4:21 11:24
21:3 39:8 52:13
53:25 85:4 119:9
121:14,17,21
122:22 123:4 125:3
125:25 126:6,19,23
127:12 128:11
144:14 146:9,15
147:2,11,12,19
148:6 149:4,8
150:20 151:21

152:10,23 156:21
156:22 159:13,21
160:17 166:9
169:23 175:24
185:12,14 186:3,25
192:12,20,23
242:14,17 243:19
253:5 304:20
310:14 311:21
327:24 328:21
339:4 362:25
363:20 375:6,9
378:17
**expires** 385:25
**explain** 56:11 112:6
153:11 202:14,19
202:23 203:3,12,13
203:16 204:3 209:6
209:8,12 236:16
261:10 275:18
300:16 331:20
344:19 359:21
378:7
**explained** 294:11
365:25
**explains** 344:16
**explanation** 100:4
206:7,8,10 236:4
256:15
**explanations** 255:12
256:21
**explosives** 257:21
**exposure** 105:4
347:17 348:9,12
**expulsion** 5:22
72:24 73:2,8,14,23
74:2
**extent** 308:15
**externally** 314:17
**extract** 268:15
272:20
**extractible** 316:13
317:2
**extraction** 265:10
267:16

**extremely** 286:20
**eye** 179:14 313:11
**eyes** 32:6

**f**

**f** 1:17 4:22 38:6,9
65:15 163:23 164:2
183:2,23 380:20
381:2,10 382:4,18
383:10 385:6,21
**fabricated** 142:24
338:18
**face** 175:15,15,16
179:25 180:4
**facebook** 1:9 3:19
7:25 8:5 9:18 16:15
33:24 136:13
138:23 214:13
244:19 338:4 348:7
355:7,22 356:3
**facility** 222:19,20,21
249:2
**fact** 11:13 18:16
33:19 52:17,18 54:7
74:16 78:18 84:2
87:19 88:2 90:8
91:18,24 96:12
103:16 104:16
107:10 108:10
109:6 112:7 114:24
124:18,24 136:12
161:20 166:21
174:4 197:17
199:10 201:24
214:6 220:20 223:2
223:22 229:21
235:23 268:23
279:7 286:9 288:22
289:14 290:20
292:24 299:12
300:23 301:7 302:2
320:23 321:3,10
334:2,5 336:3,17
362:5 364:11

**factor** 95:21 213:8
224:12 227:14
241:25 244:14
**factors** 207:12 208:7
208:20 213:3 246:9
270:4,11
**facts** 74:19 93:9,22
109:14 110:6 125:5
184:15 240:15
**factual** 109:22
145:17,23 147:7
179:24 180:16
215:10 216:9 227:4
227:10 228:15
231:13 242:16
243:3,24 244:5,11
**factually** 242:20
**faded** 144:18 148:8
149:12 151:24
153:8 154:8,23
155:4 156:10 157:4
158:6,25 162:18
163:9,13 164:10
166:22 168:22
169:20 170:2 172:3
172:10 174:7 176:6
177:17
**fading** 169:23 213:8
**faint** 161:4 164:10
**fair** 142:15 190:6
212:13,15,21
217:17 229:3
240:18 261:20
369:3 370:25
**fairly** 124:11
**fairness** 133:19
134:6
**fake** 8:16 9:15 10:7
84:23 85:17 136:14
143:4
**fall** 223:9 229:3
**falls** 5:24 298:5
299:9 332:23
**false** 5:9 78:13
89:23 90:4 239:25

**falsely** 42:24 110:14
**familiar** 94:7 115:5
116:22 117:2
121:20,23 122:5,7
122:11 135:10
143:13 190:9 232:8
234:11 235:24
236:3 268:23
282:17
**familiarity** 89:12
**famous** 190:14
**far** 62:19,25 77:18
80:22 102:19
112:14 127:6
153:17 201:2
215:23 216:14
227:2 228:10
231:11 241:8
264:13 290:25
291:10 304:4,9
328:19 337:23
362:15
**fault** 271:13 274:9
274:17
**fax** 135:4,6,14 137:3
137:6 138:11,20
139:3,5,19 140:3,20
141:6,13,17,22
359:6 383:7
**fbi** 102:8
**feasible** 256:10
306:8,14,20
**feature** 210:8,25
211:11,13
**features** 179:19
316:5,8
**february** 73:7 88:22
89:19 92:3,4,5
96:13,16
**federal** 14:23 34:21
38:14,18 42:4 69:6
69:8 127:7 256:16
256:17 275:23
276:4 317:8

fee 19:9,10 51:11
feedback 58:18
feel 9:22 277:14
351:18 369:3
370:25
feelings 77:12,15
feet 133:22 194:24
195:5,8,12
feline 78:7
fell 299:9,10
fellow 71:14
felt 10:5,6 102:22
female 287:18
fiber 328:20 329:7
349:14 351:17
fibers 348:14
field 12:14 85:2
122:14 124:11,11
126:20 215:19
218:8 231:21
232:24
fifth 248:13
figure 251:15
342:11
figures 336:23
file 171:19 177:20
353:9 368:4,9
376:10
filed 3:20 9:20 38:17
69:12 92:17 117:25
142:18 171:14,17
173:16 184:20
185:4,12,14 186:11
186:16 217:8
318:23
files 40:15
filing 10:3 295:23
296:5
fill 84:11
filled 78:13
film 187:9,25
final 104:3
financial 51:6
financially 62:19

find 82:16 155:11
202:22 225:18
235:20 251:2 273:3
317:14 321:14,19
348:18
finder 108:11
finding 68:10 72:10
74:3,20 105:7,19,20
105:24 106:3
113:11 114:13
161:14 174:6
214:16,17 245:9
256:23 307:25
308:4 330:15
340:14 355:19
findings 19:24 39:6
44:17,25 45:5,9,16
45:18,19 46:25 47:4
48:18 52:23 114:20
114:24 115:4 159:8
224:10 255:7,12
256:9 257:4 288:9
307:18 323:23
finds 335:6
fine 101:17 121:9,11
132:16 134:17
212:11 273:18
338:11 341:19
378:11 379:8
fingerprints 84:23
85:17
fingers 249:11
finish 31:2 156:12
260:4 378:12 379:4
finished 26:3,11,17
29:4,13 30:14,17
31:9,20,21
firearms 257:14
258:11 369:17
firm 15:17 16:3,5
116:11 139:11
183:11
first 24:2,5,11 27:9
30:16 31:18 33:20
36:21,25 40:21

49:20,23 50:5,7,13
86:11 110:2 117:23
119:14,16 120:22
121:15 125:4 127:2
128:21 131:16,18
136:2,3,4 137:11
138:14 150:13,19
159:5,18 160:6,13
160:23 167:18
173:25 175:23
181:9 187:3 191:18
192:11,14,17
194:20 209:20
211:25 215:4
216:12 220:4
267:24 276:16
283:8 286:15
287:17 288:19
297:21 300:22
310:14 311:20
322:25 334:22
349:10 354:24
361:14 376:7
firsthand 98:18,23
99:15 100:24
155:22 225:8
227:12,17,20,23
fit 42:5 129:12
five 21:11 28:25
60:20,23 91:18,23
94:25 96:9,19,21
101:23 133:8,16
245:22
flight 363:8 378:23
florida 129:20
fluorescence 319:12
348:24
fluorescent 189:22
190:3 193:13
fluorescing 351:20
focus 266:19 269:22
folks 303:14
follow 95:5 243:14
304:23 335:20,21
335:22

followed 27:5 94:4
216:21,23 244:3
317:7
following 90:2
follows 4:24 76:12
183:24 332:25
333:5 341:16
font 323:11,11
fonts 33:16
footnote 332:14,15
332:17
forces 62:9
forearm 250:11
forensic 5:14 11:22
12:4,12,19 18:11,16
19:12 36:13 39:5
40:2 43:13,22 52:12
62:10 70:7,11,14,17
71:8,10,15,21 72:2
75:13,15,18 78:10
79:8 80:8 84:22,23
85:16 88:16 89:4
112:16 117:5
121:24 122:12,25
129:4,8 130:15,23
143:8,10 181:12
187:11,17,21
224:10 232:8,16
239:6 240:12
272:16 273:8 289:3
293:8,12 294:16
302:21,24 303:3,7
304:18 306:11
323:22
forensically 141:4
365:19
forensics 13:5,10
14:5 63:19 76:4,5
201:2 302:22
304:20
forest 112:17 129:24
129:25
forgeries 114:3,10
forgery 8:16 114:13
197:23 323:22

**forgotten** 237:12,16
**form** 42:9,12,16
343:20 347:3
351:13 353:23
354:5,7 359:9
372:22,23,24,25
383:21
**formal** 37:19
**former** 145:4,14
**forming** 162:14
**formula** 219:9
283:13 284:2 371:8
**formulation** 209:3
211:23 281:16
282:14
**forth** 5:24 198:4,7
198:12 214:10
381:11
**forthcoming** 23:20
382:9
**fortunato** 93:10
97:20
**forward** 72:8
216:14 283:19
369:21
**foschio** 41:20
**foschio's** 99:25
**foster** 190:15 195:18
195:21 196:12,15
197:8
**found** 67:13,15 72:3
75:7 81:23 90:6,7
91:11 95:2 104:18
105:15 108:2
110:21 112:21
113:15 135:16
159:9 199:11
202:21 205:24
207:12 208:9,22
210:18 244:18
248:10 253:19
275:11 318:9
323:12 334:11
342:13 351:10
356:4

**foundling** 235:17,19
235:25 236:7,10
237:24 239:21
**four** 92:6 94:15,19
96:18 101:23 196:2
248:12 315:22
331:10
**fourth** 102:4 130:18
**fragrances** 210:6
247:2
**frame** 179:23 185:9
186:21,22
**frank** 121:18 131:10
**frankly** 275:11
**fraud** 8:15 9:3 10:10
10:11 11:4,17,19
23:21 142:12
291:20,21 382:11
**fraudulent** 9:22,25
10:23 11:14 197:25
256:23 322:4
350:20 351:2
**free** 129:17
**freeman** 190:15
195:19,22 196:12
196:16 197:9
**freeze** 178:15
**freezing** 229:15,18
**frequently** 191:13
**fresh** 211:19 212:16
283:10,18
**freshest** 212:23
**front** 6:9 60:12
102:11,20 128:18
144:9 148:18
190:19 194:22
195:4,20 235:9
266:5 309:9 325:23
342:14 351:21
**frye** 12:22 112:22
113:8
**full** 165:16 214:12
215:21 264:23
376:10

**funded** 24:21 26:12
26:13,17 29:4,13
30:14,20 31:9,20
**furnish** 236:18
**furnished** 14:6 44:2
60:18 84:12
**further** 11:17,18
138:10 199:25
200:6 218:10
307:13 381:16
**furtherance** 11:10
**furthered** 313:20
**furthermore** 331:25
**future** 256:11 297:7

**g**

**gain** 264:25
**gained** 59:3,11
**gas** 200:18 308:24
**gc** 200:21,23,25
255:14,21 279:24
**gcms** 198:17,19
200:14,16,17 201:9
201:14,20,22
253:14 255:19,21
256:25 257:5,8,16
257:24 258:6,16
261:5 268:3,11
278:20,22 286:16
305:12 326:19
**general** 23:4 201:8
203:22 215:13
228:14 298:23
299:5 305:2,4
338:21
**generalizations**
274:8
**generally** 208:16,18
219:20 375:18
**gentleman** 303:22
**genuine** 239:11,19
240:8,17 338:19,20
**gerald** 2:21
**germany** 110:15

**gerry** 4:20 260:19
285:3
**getting** 66:9,10 88:8
**gianatto** 162:11
**gianatto's** 162:13
**gibson** 1:18 2:10,22
2:23 3:15
**give** 5:18 14:12 44:5
78:22 84:4,8,11
125:15,17 127:16
155:12 156:3,12
159:18 163:22
208:11 221:17,24
264:23 271:22
281:14 344:7 368:3
376:20
**given** 146:19 194:3
214:16 274:23
284:24 302:24
303:2 359:23 378:9
379:10 381:13
**giving** 343:3
**glass** 356:14
**glasses** 32:7
**gloves** 248:22 249:8
249:13 250:3,16
**go** 3:10 13:18 23:16
26:5 28:9 34:16
35:20 45:3 47:7
48:12,16,17,21 52:4
57:6 65:17 83:6
85:21 92:9 133:22
134:7 147:16
152:25 153:5
156:13 160:4
162:23 164:23
166:5 168:12
193:18,23 214:7
240:23 241:3 246:7
248:8 259:21 260:3
260:3 263:18
264:11 265:3 275:2
275:8 277:9 280:6
284:16 285:21
297:8 305:18

**go** 317:17 321:22
329:2 340:22
343:10 360:23
362:9 363:15
379:17
**goes** 44:21 62:25
196:13 201:2 205:4
227:3 228:10
236:22 285:4
325:10 336:14
337:8
**going** 11:20 13:25
14:11 23:16 37:6
40:9 43:18,24 44:4
60:21,25 61:8 63:15
80:24 92:10 111:16
112:7 132:5,6
134:21 141:2
158:15,21 163:20
165:19 167:2,4,9,17
168:11 170:16
182:19,22 196:17
209:22 213:25
215:15,16 226:15
235:6 256:22 260:4
260:5,11 265:8
266:4 273:3,12
274:24 319:2,4
326:9 329:23 333:9
357:24 360:24
363:3,9 371:12
372:5 376:11,17
378:14,18 379:12
379:14 380:16
**good** 3:2 5:3,4 51:5
79:15,15 325:12
**google** 7:12,17,25
8:4,9,11 81:24 82:5
**gotten** 18:22 64:25
79:18 87:20 304:5
315:23
**govern** 15:2
**governed** 117:5
**governing** 100:2

**government** 88:12
88:17 92:21 93:8,14
93:21 94:24 95:19
97:6,7 105:2,8
109:25 123:14,22
125:10 126:9,22
127:2,7 143:12
256:16,17 275:23
**graduate** 76:3
**grammatical** 293:3
**grammatically**
290:2 291:8,9,12,16
291:22
**grand** 109:16 110:9
**grandfather** 232:16
**gratuitous** 111:17
**great** 122:3 127:18
308:15 339:13
**greatly** 130:24
**group** 102:14 303:5
**groups** 60:4 365:16
**guess** 39:17 63:11
216:8 220:18 229:8
233:25 273:12
279:8 298:22
**guessing** 297:22
**guidebook** 248:14
**guilt** 106:11 143:14
**guilty** 67:13,15 90:6
90:8 95:3 104:18
105:8,12,13,13,14
105:20 108:3
**gun** 32:18,22,25
33:3,7,11 34:10,14
**gus** 122:17,21 123:2
123:15 127:13
**guy** 259:8
**guys** 108:20 127:5
154:2 163:12 192:3
221:7 263:17 379:5

**h**

**h** 2:15
**half** 17:12 92:6
133:9,23 134:10

170:3 238:7 267:5
**halfway** 177:9
**hall** 133:22
**hand** 24:25 86:9
102:20 167:17
210:6 265:4,8 266:4
288:18 313:17
357:8 381:22
**handed** 171:16,18
237:11
**handheld** 330:14,17
356:10,12,21
**handhelds** 356:22
**handing** 29:21
351:12 371:9
**handle** 251:22
**handled** 67:19 237:6
249:7
**hands** 237:6 248:25
250:15 251:22
**handwriting** 25:24
29:25 30:4 51:4
59:6,7,11,11,15,18
59:22,24 60:3,7,13
114:9 122:22 123:4
123:16,23 124:3
125:3,25 126:6,11
126:12,15,17,22
127:9,12 138:17,19
138:22,24 155:3
167:21 168:5,19
173:17,25 179:21
180:12 304:25
308:18 364:2,5,12
365:2,3,9,10
**handwritten** 24:19
25:20,23 28:7,14
29:2,12 30:15 146:3
153:3 163:7,16
165:21 169:20
178:24 357:12
361:23 367:23
376:23 383:23
384:4

**happen** 110:23
**happened** 42:24
69:2 78:16 94:3,16
95:25 96:4,24 169:9
172:7 216:17
276:22 375:4
**happening** 239:7
291:25 292:2
**happens** 380:12,12
**happy** 75:3 102:14
259:22
**harassment** 67:23
**hard** 58:11 77:4
116:23 117:14,16
121:14 128:12
140:23 162:21
292:16 373:8
382:25
**hardens** 209:22,23
**hargett** 127:3,17,18
128:2 297:20
**harris** 168:16
169:12
**he'll** 128:3 379:6
**head** 80:21 263:11
280:25
**headed** 354:5
383:21
**headquarters** 80:13
**heard** 90:14,18
98:19 124:23 125:8
125:9,23 126:2,3
232:18 235:18
259:15,16
**hearing** 162:21
298:23
**heat** 209:17 210:9
**heated** 16:21 199:23
215:14 222:20
224:16 267:19
**heater** 224:9
**heaters** 241:11
**heating** 16:22
223:24

**held** 1:18 3:15
  129:17 197:10
  202:11 313:17
  383:5
**help** 43:7 315:3
**helping** 15:25
**helps** 368:7
**hereinbefore** 381:11
**hereunto** 381:21
**hewlett** 317:17
  320:4 324:13
**hiding** 237:15
**high** 20:21 123:16
  151:8 181:11
  190:21 198:25
  199:7 204:22
  211:20 214:14
  216:11 217:20
  244:22 245:6,14
  246:3,18 344:8
  348:9,13
**highest** 211:22
  212:23 363:25
**highlighted** 94:22
**highly** 75:6 122:13
  123:11 124:21
  125:19 132:20
  198:13 302:13
**highs** 229:22
**hire** 6:15,24 7:9
  8:14 9:14,25 11:14
  20:12,17 24:9,25
  25:4,7,18 26:7
  33:21 54:8 117:6
  131:19,24 138:24
  140:22 141:10
  142:2,6,20 144:7,12
  145:19 147:3,10
  150:16 166:8
  167:22 168:14
  175:7,22 178:18
  180:19 185:23
  197:23 198:21
  199:6 200:9 204:14
  215:2 220:6 224:21

226:3 227:18,25
  230:9 231:24
  237:22 239:3 243:6
  245:7 248:20 251:3
  265:25 286:21
  291:20 310:18
  311:13 325:15
  326:25 327:9
  342:22 345:5
  351:21 354:12,15
  355:5 356:8 358:16
  358:20,23 359:6
  361:7 362:7,20,24
  375:3 382:13
**hired** 77:5
**hires** 123:22
**historic** 90:8
**histories** 237:3
**history** 140:17
  141:23 262:8
**hold** 18:4,15 149:22
  202:3,6 334:19
  343:8 347:14
  352:19 367:11
  368:14 376:11
**holding** 206:3,5
  233:3
**holdings** 89:6
**holes** 355:5,7 356:2
  356:9 357:2 374:10
**home** 16:19,20,21
  62:8 220:10
**honest** 176:10
**hope** 6:2 223:3,15
  223:18 225:14
  226:19 227:19
  238:25 242:5 252:5
**hot** 217:15,18
  229:22 230:23
  231:3,6
**hour** 17:13 51:9,9
  60:22 133:5,9,23
  134:6,11
**hourly** 51:8

**hours** 132:18,19,24
  133:19 259:3,10
  260:5,8 363:6,7
**house** 16:23 78:8
  223:23 224:16
  230:2 241:12,13
**hp** 318:3
**hr** 190:21
**http** 64:12
**huh** 291:2 293:10
**humidity** 217:24
  218:6 219:15,18,20
  227:13 228:7
  231:12
**hundred** 76:7
  336:15 351:9
**hundreds** 233:8,18
**hypothesis** 333:2
**hypothetical** 11:15
  11:16,18
**hypothetically**
  137:13

## i

**i.e.** 294:21
**idea** 6:22 80:2 81:7
  94:23 107:11,18
  147:25 246:24
**identification** 23:22
  25:5 56:14,18 59:7
  59:11 60:7,13 61:13
  65:16 86:7 93:17
  117:18 129:18
  135:7 164:4 167:15
  187:22 234:23
  285:3 307:9 315:6
  343:25 354:6
  357:13 366:22
  376:24
**identified** 138:25
  170:2 213:4 219:11
  316:13 320:16
  323:8
**identifies** 367:2

**identify** 3:25 55:16
  55:22 56:8,24
  281:15 282:13
  284:2,7,11 307:10
  314:9,18,23 317:18
  320:13 323:11
  348:2 357:20
  366:24
**identifying** 279:18
  316:4,9
**identity** 81:10
**ignored** 243:20
**illustration** 167:20
  319:16 320:10,12
**image** 136:5 146:21
  163:12,14,19
  164:20,20 165:6,12
  165:14,22,24
  167:21,23,25 168:9
  168:13 170:9,12,16
  170:17,17,19
  171:21 172:2,21,22
  173:21 177:13
  180:13 313:10
  364:16 375:5
**images** 20:11,21
  47:11,25 48:15
  143:25 144:3
  147:18 148:6 149:7
  151:15 154:4 160:4
  161:18,18,25
  162:10,24 166:6
  169:22 170:11
  171:15 172:12,19
  173:9,12 174:2
  176:13 181:2,7,12
  187:2,3,5 313:14
  363:13,16,17,18,19
  363:21 365:4,16
  373:19,22 374:3,4
  374:16
**imagine** 113:17
  170:17 375:21
**immediate** 176:8
  300:6

**immediately** 69:7
148:19 151:5,7,23
154:8,13 155:2
157:3 158:5 159:24
161:6 168:14 176:4
**imparts** 329:19
**impeached** 107:6
**impeachment**
106:11
**imply** 95:10
**importance** 242:22
**important** 102:23
119:8 123:16,20
140:19 205:10,13
213:23,25 226:11
241:25 284:7 306:8
308:19
**impression** 35:9
**improbability**
235:16 236:24
**improbable** 236:23
**improper** 41:4,6
42:19
**improperly** 207:22
208:3,18 244:24
245:5,16 246:20
**inaccurate** 62:21
289:25 290:19,23
291:10,12 292:13
293:23,24 336:13
360:6
**inadmissible** 106:10
**inappropriate**
350:10
**incentive** 52:6
**inch** 170:14 196:2
329:18 334:7 335:9
337:8 344:9 352:10
352:11
**inches** 196:3 332:4
336:7
**include** 38:5 39:4
81:9 173:8 205:13
289:5 290:8 304:10
308:8,14 309:17

319:20 320:22
321:2 325:3,8
**included** 36:15
59:19 66:8 151:19
152:9,21 153:25
154:3 208:5 210:20
233:19 295:22
296:4 303:12
306:24 312:23
322:6 330:10
373:23
**includes** 293:14
343:20 372:25
**including** 5:22 14:4
30:10 38:6 116:15
263:24 285:17
308:10
**inclusive** 208:11
**inconclusive** 113:16
**inconsistent** 329:9
**incorrect** 47:10,24
96:11 164:14
269:24 291:16,22
291:23,25
**incorrectly** 26:9
292:11 293:21
**indentations** 47:18
305:3 308:7
**independent** 101:23
221:17 222:5
224:15 240:12
261:22,25 333:12
339:24
**index** 248:14 368:16
378:7
**indicate** 9:24 34:20
40:10 43:19 95:14
148:7,10 153:8
170:12 268:22
373:6
**indicated** 33:5,13
133:7 151:5,25
195:19 203:7
377:16

**indicates** 50:8 200:3
244:18 270:4,11
**indicating** 24:20
30:10
**indication** 142:11
**indicted** 67:11
**indictment** 94:4
**indifference** 237:5
**individual** 109:16
112:14 127:24
141:8 209:3 246:2
344:25
**individual's** 143:14
**individually** 1:9
**individuals** 53:24
127:10 133:13
136:9
**industry** 371:4
**inference** 289:17
**influence** 346:21
**information** 14:12
23:5 60:12,17 74:13
98:19,24,25 99:16
99:19 100:24
101:19 107:25
115:25 156:3
192:12,15,16,22
205:6 216:13,15
217:4 220:6 224:14
225:19 228:16
242:15,18 243:5
253:6 263:11
276:20 307:13
316:17 320:3
323:18,20 343:4
369:7 370:25 371:8
377:13 378:5
**informing** 94:22
**infrared** 279:17
**ingredients** 310:24
**inherent** 235:16
271:5
**inherently** 236:23
**initial** 64:22 163:3
177:6 180:22

287:17 303:10
311:24
**initialed** 361:23
**initially** 31:25
209:22
**initials** 24:22 26:4
30:11
**initiate** 64:18
**initiated** 10:4
**ink** 25:24 37:9 46:2
46:6,25 47:3 54:24
55:11,14,16 56:8,13
56:19,24 88:18 94:6
144:18 146:2,3
147:20 148:2,8,16
148:21,23 149:3,11
149:23 150:5,13,16
151:14,24 153:9
154:8,14,22,25
155:3 156:9,23
157:4 158:7,25
159:21 160:17
161:4,22 162:6,17
163:7,10 164:9,9
165:10,25 168:19
168:25 169:2,20
170:2,22,24 172:3,7
172:16,20,23 173:5
173:8,17,21,25
174:6,11,14,18
176:5 177:15
179:10,12 180:24
181:15,25 198:8,9
198:20,24 199:5,7,9
199:22 200:3,8,11
201:4,15,24 202:2,4
202:9,11,15,16,24
203:4,14,14 204:14
204:18 207:13
208:9,22,24 209:3
209:18,19,20
210:12,14,17,23
211:2,14,19 212:16
213:5 214:5 215:4
215:20 216:12

217:21 218:17,23
219:5,10,11,14
220:15 226:16
227:3,6,15 228:17
230:24,25 231:4,11
245:7 250:18,20
253:17,20,24 254:3
254:14,25 255:3,7,8
255:11,15 257:6,20
263:20,21 264:2
265:9,24 266:19,21
266:25 267:15
268:2,10,15,24
270:17 279:18
281:16,17,19,20
282:14 283:11,12
283:13 284:2,7,12
284:12 286:5,10,17
294:3 295:15,21
296:11,13,15,21,25
298:4,13 299:16
300:25 301:18,22
301:23 304:22
305:8,15,19,20
306:7,13,19 307:6,9
307:10 372:13,17
372:20,25 373:6
376:9 377:11
**inks** 46:4 198:17
203:9,10 210:19,21
212:19 227:21
265:25 281:5 285:4
**inquire** 191:24
192:2
**inquiry** 136:17
**insect** 208:12 210:5
247:3 252:2,7
**insert** 106:22 291:5
291:6
**inserted** 281:21
290:4,15 291:21
**inserting** 41:3
**inspected** 194:21
**inspecting** 121:14
157:3 194:24

**inspection** 97:18
110:10 116:23
117:15,17 118:4
119:2,14,16 120:6
122:17 128:12,23
130:19 131:14
132:2 149:12
155:14 156:8
176:23 177:3
182:13 188:4
189:15 191:11
195:3 358:9 373:8
383:2
**inspections** 120:14
**instance** 70:5
**instances** 114:13
123:9,10 125:11
301:25 302:6,9
304:3
**institute** 122:8
322:19
**instruction** 76:7
194:3
**instrument** 212:10
278:23 337:7
**insulated** 223:19
**insulation** 225:3
**integrity** 160:25
**intend** 35:8
**intending** 80:6
**intense** 347:17
**intensity** 348:10
**interact** 307:15
**interacted** 307:18
**interest** 237:7
**interested** 381:19
**interesting** 11:5
236:19
**interfere** 3:8
**interlineation** 24:20
25:21,24 28:7,14
29:3,12 30:15 47:8
47:22 146:3,22
163:8 165:22 198:8
200:8 204:22 305:3

308:6
**interlineations**
47:15 178:25 305:8
**internally** 314:15
**international**
187:21
**internet** 10:8 61:10
61:12,23 64:16 96:6
100:20 382:15
**interpretation** 330:3
333:25
**interrupt** 41:10,20
**interval** 333:7,8
334:2,3
**interview** 101:10
103:15 256:3
**interviewed** 103:11
**interviewing** 104:7
**interviews** 109:17
110:9
**introduction** 281:20
**invalid** 180:18
**inventory** 360:6,7
372:18 376:8
377:11
**investigation** 52:19
89:25 101:14
103:18 110:19
**investigators** 80:3
90:16 97:10 99:14
102:24 103:25
**invoices** 51:23,25
**involve** 351:16
**involved** 15:25
35:11 39:2 43:20
44:21 49:21 52:7
74:11 80:24 103:22
106:23 124:5 182:4
182:16 255:3 267:5
273:15 323:2
**involvement** 104:2
191:10,12 303:15
**involving** 102:15
110:15 123:21
254:25 266:24

268:25 300:20
305:25
**ions** 200:22
**issue** 37:5 39:2,21
51:5 54:17 55:23
106:3 108:5 238:3
239:6 240:11
256:23 300:19
304:12,16 306:9
329:13
**issued** 22:10 40:18
47:4 151:20 257:4
257:22 274:22
301:24
**issues** 95:6 147:6
262:16 305:9
377:17
**italics** 288:21
**item** 377:7
**items** 32:12,16
251:2 377:4
**iterations** 22:22
**ivan** 110:16

**j**

**j** 110:17,17
**january** 20:13 25:19
145:15,19 150:2
167:24 169:19
174:8 182:2 187:5
375:2
**jennifer** 15:21
**jet** 121:5
**jim** 17:17 139:10
364:10
**job** 107:13
**john** 110:16 127:3
127:18 297:20
**joined** 62:9,13,16
**joint** 129:25
**journal** 71:7,10
78:24 84:15,19,21
85:4,6,9,11,18
282:21 293:8

**journals** 70:3
**judge** 14:3 41:20
   87:21 93:4 99:25
   110:21 260:3
   291:18,20
**judicial** 74:10
**july** 1:14 3:13 19:19
   54:8 116:22 117:24
   117:25,25 118:4,6
   118:20 119:2,14,20
   120:4,15 121:22
   122:6,17 128:12
   130:19 131:2,14,19
   131:25 132:2
   144:13 146:9,15,16
   147:11,22 148:3
   149:24 150:18
   155:14 156:15
   158:5 160:3,16
   162:18,20 163:3,8
   165:24 166:10
   168:2,16,25 169:19
   171:22 172:23
   173:24 174:23
   181:23 182:7,13
   258:13 358:9
   359:11 374:25
   381:22 385:5
**jumbled** 28:16
**june** 19:19 44:18,21
   45:2 49:24 50:4
   53:17 69:18 145:25
   184:21 185:5
   186:11,16
**jury** 68:9 104:16
   105:15,19 109:16
   110:9
**justice** 78:5 272:24

**k**

**k** 110:17
**karen** 93:2 100:22
**karin** 287:2,9
**keep** 41:3 62:5
   150:22 156:3

158:10 190:22
   269:14
**kelly** 69:14 93:17
   382:24
**kept** 31:24 215:15
   219:4 223:2,14,18
   223:23 237:6
   317:16 369:20
**khorassani** 2:21
   4:16
**kind** 55:13 85:6
   102:17,21 112:9
   154:23 175:14
   179:21 188:7
   190:20 197:11,17
   220:25 226:23
   236:9 248:24
   268:14,17 304:7
**kissed** 68:4
**knew** 20:22 63:4
   120:14,17 121:10
   141:6 262:13,16
**know** 6:19 8:25 10:2
   13:23 15:22,24 21:2
   26:10 27:3,11 28:8
   34:7 38:10,16,17,20
   44:20 50:14 54:11
   55:8,10,15,16,17,23
   57:5 58:9 62:5 63:7
   63:12 64:24 68:15
   69:16 71:18,22 76:9
   77:9 78:18 79:2,3
   80:22,23,25 81:18
   82:2 83:16,20,22
   84:20 85:7,8 86:19
   88:5 89:8 91:9
   92:19 95:16 96:6
   99:5,10 101:4 106:5
   107:13 108:14,17
   109:5,14,20 112:14
   115:10,12 116:25
   119:24 120:24
   122:24 123:2,9,10
   124:4,4,11,11,22,22
   124:23 125:12,17

125:22 126:16
   128:7 133:12
   135:15 136:3
   138:16,22 139:4,6,7
   140:17,19 141:23
   143:9,10 144:16
   146:18 149:15
   153:2 162:22 163:2
   163:18 164:22
   165:12 171:8,8
   174:2,3,9,10 175:10
   175:17 176:4,9
   177:8,9,10,16
   180:25 181:6,11,16
   181:18 188:6,8,9,11
   188:17,21,24
   190:16,18 192:2
   195:14 196:17,20
   197:8 203:9 210:14
   210:18,20 213:18
   213:23 219:11
   220:21 224:24
   225:4,11,13,17,20
   225:23 226:25,25
   228:8,8,10,19
   230:16 233:4
   237:25 238:3,16
   249:4,10,23 250:12
   250:14 251:5,8,25
   252:9,10,12,15
   253:18 254:6
   256:10 257:10
   259:4 260:7 265:9
   265:14 268:14,17
   268:19,21 273:9,20
   273:22 274:10,16
   280:23 284:17
   286:13 287:15,24
   288:14 300:7,9,11
   301:19,19,20
   303:13,15 305:21
   307:14 325:24
   330:24 332:21
   333:17 334:10
   335:13 338:10

343:2 346:11
   352:24 353:14
   354:18 365:25
   366:2,5 372:14
   373:24 375:16
   376:9 377:25
   378:18 379:25
**knowing** 115:18
   215:8 271:6 286:22
**knowingly** 5:8 72:6
   75:8
**knowledge** 9:13,16
   11:25 12:6 81:3
   97:3 98:3,4,5,6,11
   98:22 99:12 113:21
   215:16,19,22 225:8
   227:12,17,21,23
   264:25 274:23
   370:2,13
**known** 90:5 210:8
   210:25 211:10,13
   211:24 214:6
   219:20 247:13
   248:10 281:20
   304:2,3
**kole** 139:10

**l**

**l** 4:22 5:1 6:1 7:1 8:1
   9:1 10:1 11:1 12:1
   13:1 14:1 15:1 16:1
   17:1 18:1 19:1 20:1
   21:1 22:1 23:1 24:1
   25:1 26:1 27:1 28:1
   29:1 30:1 31:1 32:1
   33:1 34:1 35:1 36:1
   37:1 38:1 39:1 40:1
   41:1 42:1 43:1 44:1
   45:1 46:1 47:1 48:1
   49:1 50:1 51:1 52:1
   53:1 54:1 55:1 56:1
   57:1 58:1 59:1 60:1
   61:1 62:1 63:1 64:1
   65:1 66:1 67:1 68:1
   69:1 70:1 71:1 72:1

73:1 74:1 75:1 76:1
77:1 78:1 79:1 80:1
81:1 82:1 83:1 84:1
85:1 86:1 87:1 88:1
89:1 90:1 91:1 92:1
93:1 94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
183:23 184:1 185:1
186:1 187:1 188:1
189:1 190:1 191:1
192:1 193:1 194:1
195:1 196:1 197:1
198:1 199:1 200:1
201:1 202:1 203:1
204:1 205:1 206:1
207:1 208:1 209:1
210:1 211:1 212:1

213:1 214:1 215:1
216:1 217:1 218:1
219:1 220:1 221:1
222:1 223:1 224:1
225:1 226:1 227:1
228:1 229:1 230:1
231:1 232:1 233:1
234:1 235:1 236:1
237:1 238:1 239:1
240:1 241:1 242:1
243:1 244:1 245:1
246:1 247:1 248:1
249:1 250:1 251:1
252:1 253:1 254:1
255:1 256:1 257:1
258:1 259:1 260:1
261:1 262:1 263:1
264:1 265:1 266:1
267:1 268:1 269:1
270:1 271:1 272:1
273:1 274:1 275:1
276:1 277:1 278:1
279:1 280:1 281:1
282:1 283:1 284:1
285:1 286:1 287:1
288:1 289:1 290:1
291:1 292:1 293:1
294:1 295:1 296:1
297:1 298:1 299:1
300:1 301:1 302:1
303:1 304:1 305:1
306:1 307:1 308:1
309:1 310:1 311:1
312:1 313:1 314:1
315:1 316:1 317:1
318:1 319:1 320:1
321:1 322:1 323:1
324:1 325:1 326:1
327:1 328:1 329:1
330:1 331:1 332:1
333:1 334:1 335:1
336:1 337:1 338:1
339:1 340:1 341:1
342:1 343:1 344:1
345:1 346:1 347:1

348:1 349:1 350:1
351:1 352:1 353:1
354:1 355:1 356:1
357:1 358:1 359:1
360:1 361:1 362:1
363:1 364:1 365:1
366:1 367:1 368:1
369:1 370:1 371:1
372:1 373:1 374:1
375:1 376:1 377:1
378:1 379:1 380:1
**lab** 88:14 300:15
**label** 323:7
**labeled** 164:2
  363:14 383:10
**laboratories** 273:4
  277:17
**laboratory** 12:7
  32:3 36:14 39:6
  40:2 43:17 277:19
  294:18 313:20,22
  314:13 346:17
  370:18,19
**laden** 179:15
**laid** 170:7 180:7
  325:17 379:9
**lake** 52:3 112:17
  116:6,10 129:24,25
  193:9
**lakewood** 2:7
**lanes** 366:25 367:3,7
**language** 33:19
  117:10
**laporte** 2:21 4:20
  34:20 35:5 45:22
  46:25 47:4 53:2,6
  76:17,25 77:8,12,16
  78:20 85:24 87:16
  89:16,24 97:20
  106:16 107:15
  109:7,18,23 110:11
  111:9,15,19,20,24
  112:3,14 128:23
  129:3 130:14 131:3
  131:5 198:3,16

199:4,10,20,25
200:6 205:2 206:15
206:24 207:9
214:20 243:12
244:18,25 245:17
246:21 247:8,18,24
252:13,19 260:20
260:20,24 261:12
261:18 262:6,18,23
263:5 264:9,19
265:10 266:23,25
267:20 268:2
270:20,25 273:5
275:19,24 278:3,19
279:23 280:18
285:3 286:20
289:15 292:23
294:2 296:20,22,25
298:4 300:4,25
310:16 315:15
325:13 330:21
332:2 334:3,12
336:3 338:2 377:18
**laporte's** 46:8 76:11
  106:24 108:21
  203:24 204:8
  242:20 248:12
  253:13 261:21
  262:3 263:19 269:7
  269:9,18 272:9
  275:17 278:7 279:5
  279:7 290:9 293:9
  293:15 312:9
  330:13 332:15
  333:25 334:20
  336:2 339:22 340:2
**laptop** 373:20
**large** 120:9
**largely** 67:21 309:25
  310:2
**larger** 178:2
**largest** 75:14 78:9
**larry** 1:17 3:23
  23:19 65:15 129:16
  380:20 381:10

382:4,8,18 383:4
385:6,21
**laser**  311:11,22,23
311:25 312:2,3,6
**laserjet** 324:12
**late**  96:7 102:2
121:12 128:14
191:9
**law**  36:14 37:20,21
37:21 38:20 104:21
104:23 105:25
106:5,14 107:14
108:18 139:11
187:17 259:21
277:20
**lawsuit**  6:16 10:17
10:21 98:4,11 143:7
143:24 197:25
361:8
**lawyer**  37:17,23
38:22 101:7 132:12
139:10,23 140:13
170:8
**lawyers**  53:7 91:11
91:16 106:23
107:23 109:13
110:4,6 116:2
146:14 192:5 193:5
220:8,11 224:5
253:6 273:14
307:13 353:12
**layer**  308:22 310:10
319:10,23
**layperson** 319:23
365:6,18,21
**leading**  41:25 93:9
93:23 94:16 97:12
97:15 101:22
122:22 125:3,24
126:6 232:23
245:24 277:19
**leafing** 271:24
**learn**  63:6 81:19,22
82:14 83:10 120:21

**learned** 138:7
143:22 219:23
**leave**  13:25 40:9
43:18 60:16 125:16
133:21 203:4
251:24 345:20
**led**  47:12 239:23
**left**  16:24 44:22
67:17 122:11
189:17 236:11
237:7 352:10 367:7
367:12 369:21,23
370:8,12,15 379:15
379:23
**legal**  2:3 37:19,24
38:5 39:5,11,19,22
39:25,25 40:12,14
40:22 41:2 76:13
78:21 105:5 107:22
143:9,9
**lesnevich**  47:7,11
122:17,21 123:3,15
123:23 124:2 125:2
125:14,24 126:14
127:19,24 151:7,25
153:15,21 154:19
155:8,13,20 158:3
158:23 159:4,23
160:9,21 163:5
170:21 338:2
363:25 364:20
366:5,8
**lesnevich's** 47:20
48:3 124:17 127:13
131:11 364:16
365:4
**letter**  93:2,5,7,13,15
93:25 382:22
**letting**  259:4 260:7
**level**  198:25 199:7
203:25 204:9
211:20,22 212:18
212:25 245:6
246:10 317:6
349:24

**leveling**  84:25
**levels**  204:21 212:7
212:9,23 213:4
214:15 215:3,12
216:11 217:21
244:16,22 245:14
246:3,18
**lexis**  38:2,4
**library**  82:8,10
233:17,19 234:4
282:11 310:9
312:25 313:2 314:6
315:19 318:22
319:2,5,15 368:15
368:16 369:13,14
369:15,20,24,24
370:3,7,14,16 371:7
377:14,19
**lie**  68:2 106:6
**lied**  67:25 68:8,10
68:14,15 94:5 108:8
108:9
**life**  230:17 237:3
251:15
**light**  154:9,22
166:22 190:4
279:16,17 309:19
326:15 327:20
347:18 348:10,15
349:6
**lighting**  188:25
189:5,21,22 190:3
**lights** 170:6
**likewise** 308:17
**limitation** 274:21
**limitations** 273:24
**limited** 202:10
**line**  40:9 47:21 87:4
87:4,10 130:8,9
286:15 288:17
300:22 343:19
364:22,22 385:7
**linen** 351:17
**lines**  179:12,18
180:11

**link**  82:21 90:14,17
**lion's** 306:11
**liquid** 209:20,21
**list**  65:20 81:11,13
86:20 110:25
140:16 208:12,15
210:4 246:25
321:18 324:7 371:6
377:4
**listed**  65:24,25 66:7
66:12 208:12,14
269:4 321:13 358:2
358:2
**listen**  231:22 276:7
296:17
**listening**  98:17
102:25 242:23
266:17
**listing** 89:5
**lists**  83:10 322:7
378:5
**literary**  82:11,15
**literature** 254:7
**litigate** 378:2
**litigations** 368:21,24
**little**  119:18 121:11
130:4 149:21
179:12,17 180:11
196:8 254:3 288:15
325:4
**lived** 222:19
**living** 222:11
**llc**  2:3
**llp**  1:19 2:10,22,23
**local** 42:7
**located** 3:16
**location** 222:21
**log** 359:16,17
**logbook** 368:18
**long**  17:11 37:3
46:12 68:18 132:16
157:10 200:24,25
218:25 219:6
236:16 237:14
262:8

**longer** 16:4 82:12
86:24 133:21 144:5
218:16 219:7
**look** 26:13 46:24
47:3 63:16 64:9
128:20 136:24
140:5 141:3 149:9
149:17 163:4,21
176:17,18 177:19
180:2 189:10
220:15 235:4 236:5
239:6 246:13 248:4
251:7,8 264:12
279:24 280:5,21
288:14,17 292:3
314:25 319:13
333:16,23 334:8,21
335:13 339:5
344:14 348:25
353:17,20,23
354:18,23 356:24
357:25 359:4,21
362:9 363:13
364:21 365:18
366:15,23 371:16
371:20,22 372:24
373:4,5,16,24 374:6
**looked** 20:22 47:25
52:20,21 102:13
150:16 163:2
180:25 181:6
216:25 305:4,7,7
355:18
**looking** 24:2 104:2
163:17 165:4
180:23 200:22
222:7 272:3 301:10
309:18 335:19
366:3,6 367:5
**looks** 23:24 26:18
26:25 345:6
**lose** 68:19,24 202:13
**loss** 200:2,10
**lost** 199:22

**lot** 112:11 237:23
271:16 272:6,22
274:2,5
**lotion** 210:6 248:25
251:21
**lots** 321:11
**loud** 29:16 30:4,6,8
30:9,13 31:22 87:3
**love** 252:16,23
**lower** 212:25 331:10
**ludicrous** 332:5
**luis** 190:25
**lunch** 132:13 134:16
182:20,25 184:4
**lying** 31:12
**lyter** 130:19,22
131:5 306:17,24
**lyter's** 48:17

**m**

**m** 110:17 272:5
**machine** 191:2
192:25 193:12
196:25 256:25
257:8,17,24 264:25
265:22 279:3
305:13 309:8 310:7
311:22 312:3,6
318:4 336:14 337:7
**machines** 321:17,19
**magnification** 28:18
28:24
**magnifying** 356:13
**mail** 49:23 50:5,8
139:9 141:7,21
287:16
**mails** 52:22 142:17
142:23 143:3 186:6
186:9 238:16
**maintain** 120:9
**maintained** 69:18
**making** 5:9 23:3
103:22 124:13,16
176:14 206:16
215:20 241:8 244:6

285:21 309:20
344:6 376:17
**male** 287:13,18
**males** 287:23
**man** 83:12 125:12
125:22
**manipulated** 64:2,4
**manufacture** 190:13
**manufacturer** 209:4
210:15,22 281:21
314:10,19 316:9
373:13
**manufacturers**
378:6
**march** 129:17,20
137:8 139:9 151:21
153:18 164:3
185:11,14 383:5,12
**marching** 134:9
**margins** 33:16
**mark** 1:8 3:19 6:14
22:6 23:15 25:2
61:8 65:7,9 86:9
93:12 117:12 129:9
135:3 167:9 179:5
343:21 354:2
366:18 376:5
**marked** 23:21 25:4
61:13 65:15 86:7
93:17 117:17
129:17 135:7 164:4
167:14 234:19,23
343:24 354:5 357:9
357:13 366:21
376:24
**markedly** 168:5,25
**marker** 281:21
**markings** 356:3
**marks** 193:13
351:20
**marriage** 381:18
**martha** 34:22 35:6,9
35:11 67:19,25
85:21,23 87:6 88:11
89:5 90:2,21 91:7

91:14,19 92:23 95:2
96:2 99:23 100:18
101:16,22 102:15
103:18 105:18,21
110:13
**mass** 200:18 255:14
279:24 308:25
**master** 129:24
**match** 171:2 312:14
317:9,21,23,24
365:5
**matched** 308:7
314:4 316:23 317:4
317:5
**matches** 317:22
365:3,10
**mate** 72:18,19
**material** 5:9 23:5,6
49:14 106:4 155:4
160:5 250:14
**materiality** 105:24
**materially** 6:6
**materials** 251:10
257:7 371:7
**math** 334:5 339:23
340:2
**mathematics** 333:22
335:18
**matter** 67:20 74:11
93:25 105:12 108:2
137:4 173:8 381:20
**matters** 19:4,6
90:15 107:15
**matthew** 2:16 4:11
**maximum** 361:18
**mcclutchy** 2:24 3:11
**mean** 8:22 23:7
34:11 58:9 63:19,21
85:7,8 91:9 98:21
105:8,15 122:24
146:10 173:3 176:9
192:2 203:8 210:10
222:15 254:20
306:5 317:5 318:13
318:16 331:16

334:12 349:19
351:8 377:24
379:14,16
**meaning** 137:7
143:8,9,10,10 176:4
182:2 228:22
266:12
**meaningful** 23:10
**means** 63:24 107:19
136:13 143:6 236:4
253:21,22 268:7
277:12 298:3
318:16 334:7
349:23
**meant** 77:17 153:11
285:23
**measurably** 212:12
**measure** 195:23
329:17 331:15
352:5
**measurement**
334:12 335:2
352:15
**measurements**
328:17 330:18,21
332:6 334:9,22,23
352:7
**measures** 199:21
282:5 333:11
**measuring** 332:3
336:6
**meat** 218:21
**mechanical** 348:13
**medium** 326:15
327:20
**meet** 12:22 15:5,16
112:22,24 113:8,9
**meeting** 71:20 73:6
73:9 80:15 98:24
99:2,16 100:25
101:15 102:10
125:13
**meetings** 70:7
101:23 102:3 125:9
125:15

**megabyte** 170:16
**melissa** 15:23
**member** 5:17 6:5
71:17 75:22,23
77:25 79:10,12
**members** 5:21 75:16
80:19,22
**membership** 72:24
73:3,13,24 78:14
**memorialized** 217:8
**memory** 161:16
**mention** 111:19
246:24 316:8,11
355:14
**mentioned** 6:8
30:22 31:3 43:15
56:7 64:21 87:13
96:9,25 127:11
158:14 164:15
207:15,18,22 208:7
208:20 209:10
219:15 220:16
222:18,19 227:13
273:4 279:4 301:25
312:20 355:18
366:13 373:7
**mentioning** 85:14
**merck** 248:14
**mere** 251:10
**message** 102:16
**met** 90:10,16 109:19
109:20
**meta** 170:10,11
374:6
**method** 112:21,24
199:7 214:20
260:20 262:18
263:20,21 264:2,9
264:19,24 266:8,10
266:22,23 267:20
268:24 269:3,6,7,9
269:18,18,19,25
270:4,10,17,25
272:9 275:17,24
276:14,16,18

277:23,24 278:8,20
279:5,18,23 280:18
286:19,20 289:6
292:24 293:9,14
295:15,21 296:12
296:13,21,22,25
297:2,3,11,14,15,25
298:4,14 301:2
315:25
**methodology** 207:9
270:18,19 272:10
272:12 279:25
280:3,14,16,20
**methods** 122:15
270:18 276:10
289:5 290:8,9 293:9
294:3 296:15 297:6
298:24
**micrometer** 330:14
330:17
**microphones** 3:4
**microscope** 32:4,7
47:2,4,22 48:4
279:15 313:7,13,17
356:9,10,13,16,17
373:9,14
**microscopic** 31:5
254:16 310:3
313:11
**microscopy** 309:13
312:21 313:5,18
**mics** 3:7
**mid** 46:12 70:10,17
**middle** 41:9 236:5
291:15
**midstream** 303:9
**milberg** 15:17 16:2
16:2 116:11
**milder** 229:9
**mill** 79:2,8 342:8
349:16,20 350:18
**millimeters** 195:24
195:24
**mind** 77:20 345:20

**mine** 123:12
**mini** 170:16
**minus** 292:9 332:4
336:7,8,10
**minute** 60:20,23
92:8 133:15,16
148:8 156:18,18
165:19 216:20
259:13
**minutes** 17:14 21:12
28:25 29:11 31:7,20
60:22 76:6 98:8,9
133:8,9,24 134:11
157:9 170:3 172:9
172:17 183:17
185:21 259:3 279:5
380:2,11
**miscolored** 164:12
**misinterpreting**
104:6
**mislead** 80:6
**misleading** 72:4
74:9,15
**misplaced** 237:4
**misrepresent** 6:6
**misrepresented**
75:8 78:12
**misrepresenting**
72:6
**misspoke** 340:6
**misstated** 151:3
**mistake** 366:8
**mistaken** 102:5
116:9 192:24 320:8
324:14 326:7
**mistakes** 271:13
**model** 192:23 323:8
**models** 196:24
**moistened** 227:13
227:14
**moisture** 219:21
**mold** 219:21
**moment** 69:24 151:3
155:12 178:7 180:7
234:14 245:5 265:9

266:7 267:10
271:22
**moments** 361:11
376:7
**money** 119:11
**monochromatic**
315:18,21
**month** 262:14 280:8
**months** 16:11 91:18
91:23,24 92:6 94:25
96:9,13,18,19,22
185:3,4 211:7 220:2
222:11,18 277:3
283:10 306:2
**moral** 371:3
**morally** 77:24
**morning** 3:2 5:3,4
64:5 132:2 133:7
144:13 147:11
149:24 166:9
174:23 258:25
**mortgage** 86:6,12
382:21
**motion** 23:20
163:23 186:17
378:13 382:10
**motions** 176:19
**mouth** 350:14
**move** 111:16 339:13
**moved** 10:21 363:8
**moving** 106:7
**multibillion** 94:24
95:19 238:8
**multimillion** 97:17
97:24
**multiple** 27:7 44:15
76:7 277:17 310:7
351:2
**munich** 110:18
**mutual** 67:18

**n**

**n** 1:21 2:2 93:16
110:17 183:2,2,2
272:5,5 381:7,25

382:2,24
**nader** 2:21 4:16
**naked** 179:14
**name** 3:11,23 8:2,11
10:2 16:4 99:23
100:19 110:16
153:2 159:12,13,18
159:19 267:7,12
278:5 287:17,21
299:16 314:8 358:6
359:25 360:12
362:2 385:5,6
**named** 139:10
181:13 190:14
232:9 287:23
**names** 17:22 18:10
125:11,15 126:7
**narasimhan** 2:18
4:13,13
**natural** 190:3
**nature** 191:19
338:21
**nearly** 94:25 200:25
**necessarily** 282:10
284:5
**necessary** 44:9
282:13
**need** 27:15 35:20
40:13 43:6 48:9,16
53:20 92:7,9 100:3
102:16 118:13
132:5,23 134:4
142:8 153:5 161:15
161:17 203:11
217:18 221:5 260:5
274:6 283:11,20
284:2,11 302:16
313:23 323:18
328:11 354:23
371:19
**needed** 331:13
**needs** 218:9 272:22
**negative** 77:12
125:14

**neither** 58:6 256:18
**never** 6:14 18:2,22
19:8,10 37:19 39:18
46:5 54:15 59:17,23
62:18,18 69:22
73:24 80:4 90:16
104:23 109:3,18
111:10 115:3,15
125:4 180:21 194:9
194:15 239:22
244:4 255:14,18,19
276:22 280:2
299:11 323:15
**new** 1:3,20,20,22
2:13,13 3:12,16,17
3:21 14:21 16:20
34:23 38:18 61:21
145:6 160:11 207:4
212:16 220:9,9
229:13 246:10
272:13,14 297:14
297:15,24 315:23
381:3,5,9 385:3,3
**newer** 211:20
**news** 91:12
**newsletter** 71:23
**nice** 303:22
**nine** 220:2
**nineties** 229:23
**nomenclature** 360:7
**non** 319:8
**nonclimate** 217:23
**nonoriginal** 32:16
**nonspecific** 275:11
**normal** 147:13
231:4,7,9,11 300:21
333:2
**northeast** 217:22,25
229:8
**northerly** 220:9
**notary** 1:22 4:23
380:25 381:8
385:25
**notation** 89:7,9
288:8

**notations** 89:10
309:20 354:24
**note** 3:3 133:6 183:9
244:15 258:24
**noted** 151:10 183:3
351:6 380:18
**notes** 20:4 118:14
128:13,17,19
131:22 147:18
148:5,7,10,20 149:7
150:23,24 151:15
151:16,17,18 152:8
152:13,13,18,20
153:3,8,17,21 154:5
156:2 176:8 261:19
352:3,8,13,18
353:18,18,22 354:9
354:19,19,24 357:9
357:12,15 358:8,12
358:21 360:8
367:24 371:9 376:6
376:23 383:23
384:4
**notice** 1:20 21:13
**noticeable** 154:13
158:5
**noticeably** 174:7
**noticed** 148:19
151:23 153:8 176:5
192:8 193:4
**notified** 93:21
**noting** 114:12
310:22
**notion** 124:25
**notoriety** 97:8
102:22
**november** 44:18,25
86:14 160:22
167:11,14 173:13
353:7 374:6 383:14
**null** 333:2
**number** 3:22 14:10
22:23 61:3,7 66:12
79:4 82:9,17 83:11
83:11 84:5,9 97:21

117:13 120:10
132:10 135:2
152:23 153:25
157:23 176:20
182:24 183:6
209:11 222:18
232:23 246:8
248:22 249:7,16,18
249:24 250:3
251:11 254:8
260:16 263:24
270:4,11,15 306:2
318:21 331:4,8
332:13 335:25
336:16 337:12
342:22,24 361:16
361:19 362:8 368:6
**numbered** 44:16
**numbers** 44:13
83:19 271:2 302:11
334:5 335:19,20,22
337:5
**numerous** 114:3
237:18 239:24
245:25
**nutshell** 45:5

**o**

**o** 183:2,2,2
**o'clock** 92:11
258:25
**oath** 5:10 34:4 57:25
130:9 146:5 153:20
159:20 164:25
166:21 171:20,21
173:14 194:14
220:18
**obispo** 190:25
**object** 42:8
**objected** 42:12
**objection** 7:20 9:4
27:15 30:24 40:25
41:6 42:16 99:9
112:5 123:6 137:20
139:12 152:14

159:17 179:22
190:7 222:16 224:8
241:22 243:2
252:20 253:3,9
276:15 292:18
333:15 335:17
**objections** 43:5
**observation** 23:9
158:4 161:9,10
177:11 180:17,22
340:23
**observations** 23:4
130:25 176:3,8
177:6
**observe** 46:11
130:25 131:7,10,13
195:11
**observed** 131:2
166:21 348:3
351:20
**obtain** 241:11
**obviously** 378:8
**occasional** 237:17
**occasions** 255:10
**occur** 95:20
**occurred** 88:22
118:11,18,20
169:23 177:10
189:15 277:18
278:17
**occurs** 160:20
**october** 60:5 192:14
342:25
**offer** 35:15 155:21
201:13,19 204:12
204:24 206:14,22
**offered** 111:9
132:12 161:21
255:6 261:20
324:11,13
**offering** 141:12,16
141:20 142:5,10,12
143:2 169:5,8
174:16 200:13
201:10 203:21,23

204:6,20 262:2
**office** 3:15 17:23,25
18:24 32:8 51:19
61:21 62:13,17
64:23 69:22 72:18
72:19 80:12 93:4
98:20,25 99:3,17
100:21,25 102:6
103:7 116:14 189:5
190:23 261:14
324:7
**officer** 104:21,24
**offices** 1:18 19:13
103:9 168:16
169:12
**oftentimes** 205:24
239:25
**oh** 79:24 122:7
252:18 262:24
325:3
**ohio** 2:7 38:11,20,24
**okay** 24:17 28:2,4
34:15 70:21 112:18
159:14,22 178:12
195:10 201:18
223:12 229:5 233:7
234:9 235:13 243:9
243:11 247:10,20
248:6 252:18
253:11 258:14
263:8 264:15,21
265:3,7,18 266:18
267:14 269:21
270:7 273:10,16
278:9 288:11
292:15 293:22
295:6 297:5 298:18
307:2 313:4 327:7
327:17 330:7
337:24 338:13
339:11,13 340:4
341:5,17 344:10
345:23 346:7 348:4
355:2 364:14
370:10 372:22

380:13,14
**old** 147:14 198:9
199:2 200:4 237:10
237:10 238:24
258:8 283:10
315:24
**omitted** 66:4
**once** 98:12 194:9
202:8,8 237:14
276:18 306:7
**one's** 106:19
**ones** 284:19
**online** 76:6 85:4,15
182:14 322:2
**opacity** 46:7 326:10
327:9,11,13
**open** 87:22,23
102:11 189:9,17
203:5 376:12
**opened** 110:18
**opening** 177:21
178:2
**openly** 102:12
**operated** 309:8
**operating** 296:8
299:6,7,14,15
314:12 320:7
**opine** 174:21
**opining** 177:15
215:6,9 241:5
**opinion** 5:18,23
6:11 9:11 32:21
36:5 37:9 68:13
74:7 138:18,21
141:9,12,16,20
142:5,9,11,13 143:3
147:9,20,23 148:21
148:23 149:23
150:3,4,15 151:13
151:17 155:22
158:24 162:5,14,17
166:7,11 169:6,8
172:6 174:16
175:22 177:2
180:16 198:4,7,13

199:11,25 200:14
201:10,13,19
203:19,21,23 204:7
204:12,21,24
205:16,18 206:11
206:12,14,23 207:5
210:17 213:7,11
214:9,22,25 215:11
216:2 224:13
226:11 228:22
238:4 241:7 245:24
247:15,21 248:2,3
248:15 255:6,11
256:17,19 262:2
273:21 274:11
301:9,11 303:21,24
310:12 321:15
323:19,21 324:5,20
324:22 325:2
326:24 327:3,8,18
328:13,14,16,22,24
328:25 329:3,12,14
329:15,25 330:4
333:25 339:11
340:16,19 341:6,7,8
341:11,15,16,19
348:8 355:6,9,15,16
355:21 360:25
363:25 364:25
365:9,12,14,22
366:7 374:9,20
375:3,4 377:25
378:3,9
**opinions** 39:22
147:6,7 161:21
205:14 206:2 211:5
311:18 355:4
**opportunity** 44:5
132:13 252:24
371:20 377:8
**opposed** 77:24
164:11 285:21
344:8 351:9
**opposing** 39:8

**opposite** 194:19
**options** 250:23
**orangeish** 164:19
**order** 115:6,10,13
115:15,17,20,24
116:4,4,7,12,16
117:10 196:16
199:21 203:25
204:9 268:2,10
270:5
**organic** 316:18,22
316:24,25 317:20
**organization** 70:10
75:6,15 78:9,10,12
78:15 79:4,11,13,14
79:16,21,25
**organizations** 70:3
79:17,20
**origin** 238:4 311:7
**original** 9:19 10:3
47:8 48:6 54:7 57:9
117:6 131:19 148:2
181:10 244:8
313:21 354:23
356:8,18
**originality** 237:17
**originally** 208:23
219:12 264:11
303:19
**orin** 2:14 4:5
**orlando** 129:25
**osborn** 20:23 21:2
53:10 232:9,13,15
233:11 235:14
236:7 238:22 239:8
240:3 304:11
374:22 375:10
**osborn's** 234:22
235:3 239:16,20
383:16
**outcome** 381:19
**outline** 270:18
**outlined** 266:20
272:6

**outlines** 276:25
**outlining** 283:17
**outset** 213:21
**outside** 60:4 116:2
147:11 295:3
296:14 299:10,10
299:19
**overall** 327:23
**overlays** 47:14,17
**overrule** 73:13
**oversee** 52:12,15
186:3
**overseeing** 56:2,20
119:9 186:25
302:22
**oxymoron** 85:7

**p**

**p** 2:2,2
**p.m.** 2:24 182:25
183:3 258:24 363:5
380:18
**package** 323:11
367:10
**packages** 324:3,6
325:8
**packard** 317:17
320:4 324:13
**page** 17:25 18:7,9
18:20 23:25 24:19
25:21 32:13,16
33:20 34:17 61:11
61:21 62:24 63:3,6
63:17 64:19,22
86:11 87:2 94:14
130:7 135:5,13
136:8,12 139:4
149:11 163:8,25
167:22,23,25
168:19 173:17,25
174:7,18 178:22,22
179:3,3 198:8,21,24
199:5,9 200:9
204:22 215:4
216:12 235:7,9

236:6 238:6 251:13
251:19 260:19
265:23 283:8
286:14,24 288:19
310:17 311:3,12,12
325:21,21 326:13
332:15 334:13,14
334:16,20 338:3,3,8
338:18,19,20 339:7
339:9 342:3,14,21
342:23 343:9,19,23
344:3,4 345:6,7,7,8
345:25 352:10,11
352:23 354:4,21
356:4 357:12,23
358:15,18,19,24
359:5 360:3,15
363:4,14,15 364:18
364:21 365:2
366:20 367:22
371:12 376:22
382:3,14 383:6,9,18
383:20,23,25 384:3
385:7
**pages** 33:16 45:6
86:24 157:11
178:14 179:8 180:6
265:16,19 266:20
274:21 305:5
312:10 316:23
322:10 323:24
325:14 326:4,11,24
327:5,10,14,19
329:4 332:3,3 336:6
339:20 342:7 344:6
351:21 352:9,22
358:2,2 368:9
**paging** 140:8
**paid** 52:10 62:5
64:24 241:12
**paint** 274:13
**palm** 218:4 250:10
**paper** 37:10 46:8
54:21,23 55:7 56:15
56:17 144:19 146:8

161:2 166:8 176:5
178:19,21 209:21
211:25 212:23
237:5 253:13,18,19
253:20,24 254:13
254:14,17,17,19
271:6 305:10
325:14,20 326:20
327:24 332:2
339:15 340:8,10,12
341:2,12,24 345:2,4
345:9,13,15 346:13
346:20,21 347:7,15
347:16,18 348:12
349:5,19,20,24
350:4,11,18,21
351:3,7,7,8,10,11,15
372:21
**papers** 139:17
227:21 236:13
237:2 327:25 328:6
330:2,5
**paperweights**
193:11,16 195:15
195:23
**paragraph** 24:3,5,8
24:18 32:10,11,11
34:16 37:7,14 38:12
39:10 57:8 94:12
96:9 97:2,5 98:2
99:11 101:3,20
104:14 106:7 151:6
157:23 167:19
191:16,21 214:7
232:12 236:5
244:17 245:12
246:14,16 248:4
286:25 288:4,23,25
289:12,24 290:23
293:4,17 294:7
295:5 309:22
312:16 319:13
331:23 334:22
337:20,25 338:14
340:3,4,7,9 355:11

355:12 359:5
**paragraphs** 35:14
39:14 40:23 44:11
44:14,15 94:15,17
94:21 95:5 158:12
158:12 213:12
214:18 245:23
246:23 334:16
339:16 341:16
**parameter** 333:20
**parameters** 272:18
**parentheses** 289:20
290:21 292:10
**park** 1:19 2:12 3:16
**part** 13:20 16:20
17:13 52:13 53:10
57:9 68:18 89:25
97:7,18 98:17
109:10 112:10
113:18,20 118:10
122:8,9 165:18
166:18 174:11
175:25 186:2 199:9
214:17 230:12
241:15 261:2,25
275:18 276:9
278:19 279:7,23
285:10,12,13
289:20 290:21
291:21 292:10
293:2,3 298:16
304:11 307:20
344:18 362:14
367:24 368:8 370:7
**partially** 264:22
**participated** 89:4
**particles** 342:13
348:3
**particular** 100:2
136:11 174:9
180:13 190:14
202:18 206:12
236:7 243:6,21,23
258:19 272:15
282:14 328:14

329:12 345:3
**particularly** 190:4
**parties** 3:9,25 142:3
142:7,14 183:15
361:24 381:17
**partner** 17:17,18
330:17
**parts** 36:20 279:11
279:21
**party** 239:5,14
**pass** 13:2
**passed** 160:5
**password** 38:3,4
**patton** 93:3 100:22
101:7
**paul** 1:5 3:18 10:15
16:7 139:9,22 141:7
175:7 179:5 217:4,7
220:16 221:9,13
361:5
**pause** 270:8 271:15
**paying** 76:5
**payment** 51:14
**payroll** 62:20
**pdf** 368:8,9
**pe** 39:15 40:16
198:21,25 199:7,8
199:12,18,21,22
200:2,7,11 203:20
204:2,10,13,17,21
207:6,12 208:8,21
209:4 210:12,23
211:2,11,14,19,20
212:12,17 213:4
214:10,15 215:3,12
216:12 217:16,21
218:17,22 219:5,17
244:15,18,20,22
245:6,14 246:4,10
246:18 247:6
250:14 251:10
253:14 260:20
266:22,24 270:17
272:10,12 275:13
275:18 284:22

286:17 289:6 290:9
293:15 294:21,24
300:25 301:17
305:15
**peculiar** 236:13
**peer** 49:2,5,9,17
57:6,17 85:12,17
276:21 296:3 297:9
297:11 314:14,15
**peers** 85:13 215:19
218:8 231:21
277:15 278:14
294:18
**pekin** 69:13
**pen** 161:3 164:9,11
173:18
**penalties** 5:22
**penalty** 52:9
**pendency** 69:20
**pending** 30:23
**people** 79:14,15,19
79:21 80:24 102:17
102:22 106:8,17
107:21 110:10
125:9 126:24,25
127:6 145:8 248:22
249:7,13,15,18,22
250:3 251:24
276:20 278:16
284:15 303:4
**percent** 200:2,11
205:2 206:15,24
351:9
**percentage** 199:22
**perfect** 324:11,15
**perfectly** 242:9
**perform** 47:14
317:11 342:15
347:24
**performed** 146:25
323:6,10 342:17
349:25
**perfume** 207:19
**period** 211:14
216:24 258:2

**periods** 230:22
**perjury** 35:2 66:20
  67:11 90:5 91:20
  93:4 105:23 106:2
  108:15,25 109:4
  110:19
**permanent** 251:14
**permitted** 41:12,25
  42:3,8,10 111:13
**perpetuating** 10:11
**person** 50:25 56:20
  58:8 67:24 77:9,23
  131:7,13 176:10
  256:4 287:16
  348:21 369:17
**personal** 77:7
**personally** 63:3,5
  77:17 89:4 94:6
  182:4 188:3 190:20
  224:20 258:7
**perspective** 259:19
  259:20
**pertain** 44:13
  245:23
**pertinent** 66:9 98:15
  99:18 101:19
  102:19
**peter** 2:20 4:20
  34:22 89:6,8 90:22
  91:7,14 95:2 96:3
  103:18 121:18
  131:8 163:24 164:3
  167:10,14 383:11
  383:14
**ph** 342:11
**phase** 25:10
**phenoxyethanol**
  198:22 209:6
  253:19,21,24
  268:25 279:25
  280:5 285:4
**phone** 15:10 17:3,9
  17:11 20:9 41:21
  42:18 55:20 82:16
  83:12,19 84:5,8

102:11,13 128:3
**phones** 3:6
**phonetic** 162:11
**photo** 348:14
**photocopied** 171:18
  361:21
**photocopier** 164:22
**photocopies** 344:22
**photocopy** 25:3
  344:9 357:11
  376:23 382:12
  383:22 384:4
**photograph** 181:22
  343:24 366:21
  383:19 384:2
**photographed**
  150:6 169:3,11
  172:9 361:19
**photographs** 343:11
  344:5,8 356:25
  357:4
**phrase** 49:5
**physical** 19:25
  80:13 128:25
  186:13 202:2 282:6
  309:16 310:8
  312:17 313:16
  329:16 361:6
  362:22,24
**physically** 160:11
  197:10
**pick** 3:4
**picture** 77:22
**pictures** 344:12
**piece** 91:4 124:24
  178:21 197:14
  216:15 224:13
  254:3
**pieces** 151:14
  178:19 217:4
  326:19 360:20
**pillar** 237:8
**place** 3:6 175:15
  203:17 345:24

**placed** 170:5 175:12
  175:16 180:4
**placement** 23:4
  49:14
**places** 154:9 237:16
**plaintiff** 1:6 2:4
  6:16 21:3 32:17
  34:9,12 51:7 53:3,7
  121:15 143:20
  146:6,14 242:18
**plaintiff's** 23:19
  32:24 52:13 53:6,25
  56:3,21 100:10
  118:25 120:18
  121:7 128:11
  144:14 147:12
  176:19 186:3,25
  193:5 273:7 382:9
**plaintiffs** 53:10
**plate** 311:6 319:11
  366:21 367:3,12,18
  367:19,20 384:2
**plates** 103:23 314:2
  366:15,16 367:16
**play** 117:9
**playbook** 112:10
**played** 177:20
**playing** 84:25
**please** 3:3,6 13:13
  28:4 41:9 43:4
  63:16 67:3 84:9
  87:3 101:18 126:7
  130:11 152:25
  163:21 178:16
  234:19 235:4
  243:10 248:5 270:2
  271:4 274:15,19
  276:7 279:13
  295:19 296:18
  315:8 334:18
  343:22 352:19
  354:3 367:11
**pleasure** 132:14
**plug** 254:17 344:25

**plugs** 313:23 342:21
  342:23 344:19,23
  358:5 359:24
  360:21 361:12,15
  361:16,24 362:6,11
  362:15,17 367:13
**plumber** 224:9
**plural** 71:11
**plus** 253:24 261:23
  332:4 336:6,8,10
**point** 20:20 22:22
  36:17 48:10 55:21
  73:5 80:17 91:4
  95:9,14 125:16
  165:23 166:5
  172:15 174:15
  177:12 180:24
  181:4,24 193:21
  202:3,9,12 203:10
  203:11 211:9 212:7
  212:13,24 220:14
  226:17 249:11
  265:12 267:13
  271:4 273:25
  284:18,21 306:10
  308:10 311:7,24
  317:8 334:9 336:17
  349:7 361:17
  369:21 370:17
  375:7 379:9 380:2,5
**pointed** 192:5 193:4
  340:3
**pointing** 246:9
  297:13 335:25
**points** 333:13
**policies** 294:5
**policy** 294:6,13,15
  294:20 296:19
  297:10,18,24 298:9
  298:12,23 299:5
**poor** 351:10
**portion** 81:8 150:25
  163:16 167:24
  284:25

**portions** 285:17
**posed** 36:18 104:13
**posing** 36:5,22 37:5
**position** 6:13 7:7
  8:14,17 9:2,7,14,21
  9:24 10:15 11:8
  74:12 139:22
  142:23 144:11,16
  144:17 145:12,16
  145:18,24 146:25
  147:4 148:15
  197:22 213:22
  245:6 251:14
  284:11 312:13
  361:5 362:21
  363:12 372:2
**positive** 144:24
**possession** 143:23
**possibilities** 249:5
**possibility** 193:11
  231:17 232:4
  250:17 256:2 318:7
  318:10,18
**possible** 121:4
  146:13 214:3
  217:25 248:21
  254:11 255:12
  256:8,14,21 300:19
  317:13 320:15
  357:6
**possibly** 254:4 262:5
**post** 237:8
**postal** 127:2 175:9
  177:25
**potential** 123:21
  191:17,23,25
  219:13 304:22
**potentially** 213:4
  244:15
**practice** 126:9,10,13
  262:11
**practitioners** 232:19
**preceded** 27:6
**precisely** 42:13
  239:8

**predecessor** 297:19
**predicated** 10:22
**preparation** 15:11
  91:10 101:24,25
**prepare** 16:2 268:2
  268:10
**prepared** 134:19
  183:20 241:13
  249:21 263:9 380:4
**preparing** 101:16
  109:13 110:4
  268:13
**presence** 147:12
  251:10
**present** 2:20 3:24
  4:21 25:17 62:22
  72:21 76:21 102:6,7
  118:3,6,9,21 119:2
  119:7,13 120:5,18
  120:22 121:8
  128:11 133:17
  144:14,22 145:2,6
  145:10 155:14
  160:11 162:10
  163:15 193:16,19
  261:3,7
**presentations** 69:25
**presented** 32:17,23
  34:9,11 40:23 68:12
  70:4,5,9,13,16,24
  71:4 108:18 131:14
  146:7 147:10,21
  149:4,11 160:23
  163:9 166:9 240:4
**presenting** 224:10
**preserve** 375:15
**press** 10:12 79:18
**pressure** 197:11
**prestigious** 70:2
**pretty** 80:17 111:18
  231:4 269:4
**prevented** 120:5
**previous** 36:4 39:2
  85:24 103:12,13
  106:15,20,24

**155:17 218:8
**previously** 70:24
  356:2 371:19
**primarily** 310:10
**primary** 123:15
**principal** 82:16
**principles** 6:7
  113:10
**print** 311:12 321:6
  321:24 322:4
**printed** 63:9 179:13
  180:8 195:18
  322:10 350:21
  351:3 368:10
**printer** 311:25
  316:9 318:19
  320:16,24 321:12
  323:9
**printers** 311:11
  318:8,22 321:8,11
  322:11 324:12
**printing** 122:15
  171:12 179:18
  180:12 310:15
  311:19,21 312:5
  314:10,19 322:17
  322:23
**printout** 61:9,12
  264:24 265:21
  322:6 382:15
**prior** 7:13,18 8:8
  15:10,12 40:2 70:4
  76:3,22,25 91:15
  93:10 96:2 97:5
  108:8 109:19,20
  121:21 122:6 136:5
  176:14 191:8,10,11
  191:12 194:24
  220:5 253:14
  274:23 297:20
  374:25 375:5
**private** 3:5 80:2
  100:11 121:5
  123:18,24 126:9,10
  126:13,20 262:11

**370:18
**privilege** 42:9 99:9
  100:13
**pro** 373:15
**probability** 333:11
**probable** 198:14
**probably** 12:23 13:6
  19:19 37:3 50:23
  96:18 119:23
  133:14 196:7
  244:22 245:7,14
  246:18 289:18
  290:12 321:25
  343:12 360:13
**problem** 42:16
  133:2 134:15,16
  191:18,20,23,25
  192:9 201:16,17
  233:5,11,22,23
  234:10,22 235:3
  256:5 383:16
**problems** 330:8
  337:22
**procedure** 42:4
  261:10,12 262:22
  263:4,25 264:4,5
  283:16,18 299:6,7
  299:14,15
**procedures** 296:9
  314:12 320:7 330:9
  375:13,19
**proceed** 4:4 39:15
  182:21 332:10
**proceeding** 108:8
**proceedings** 5:10
  15:2 106:4
**process** 74:10
  218:13
**produce** 43:25
  314:11,19 376:10
  376:19 378:22
  379:6
**produced** 25:8
  76:12 121:15 122:9
  144:5,12 146:8

147:17 163:12
164:21 170:12,14
174:5 175:23 180:7
180:20 186:10
342:20 346:4 350:5
350:11 362:25
366:12,14 376:4
377:3,5 379:3,6
380:8
**producing** 361:25
**production** 145:13
329:8 342:8 349:16
349:21 350:5,19,22
351:3
**products** 248:18
**professional** 32:21
70:10 303:24
**professor** 122:6
311:10 322:9
323:17 324:21
**proffered** 361:6
**proficiency** 60:3,4
**profile** 123:17
**prohibit** 294:12,14
294:21 295:13,20
298:21
**prohibited** 294:2,5
294:8,25 295:8
296:24 298:7,20
299:3,12,21
**prohibits** 296:20
297:24 298:4,12
370:24
**projecting** 149:19
**promptly** 183:20
**pronounce** 271:20
**proof** 105:9 106:10
233:5,12,22,24
234:11,23 235:3
383:17
**proofread** 23:11,13
**proper** 7:11 74:21
**properly** 270:5
348:23

**properties** 282:6
**proposal** 89:12,15
89:20 94:7 104:8,12
**propose** 255:25
**proposition** 107:22
**proprietary** 81:11
371:6 377:16 378:4
**propriety** 203:24
204:8,25 206:15,23
**prosecution** 10:17
90:21,25 91:7,14
95:10 97:7 102:21
102:25
**prosecutor** 98:20
99:18,20,22 100:17
102:5,9
**prosecutor's** 98:19
98:25 99:2,17 103:6
**prosecutors** 90:9,10
90:13 98:17 109:19
110:18
**protective** 115:5,10
115:13,15,17,20,23
116:3,4,7,12,16
**protocol** 116:23
117:15,17,19
253:13,15 317:7
361:22 383:2
**proud** 79:10,12
**provenance** 238:17
**provide** 5:23 54:11
57:20 58:17,20 60:7
60:17 62:10 84:10
100:25 111:6
221:23 223:13,17
223:21 253:5
255:11 319:16
320:9 324:20,22,25
326:3 344:13 346:6
347:2 352:25
**provided** 34:14
73:22 98:23 99:15
118:9 140:2 151:19
153:18 171:2,3,6,13
173:12 181:13,16

181:18 185:22
187:2 241:16,18
254:21 298:9
341:11 343:18
346:4,5,9,10 348:22
352:20,24 353:6,7
353:10,12,13,14,19
353:24 367:6,10
368:6,11,12,23
371:19,25 374:5,9
**providentially**
237:15
**provides** 199:25
235:16 242:4
310:21 334:3
**providing** 24:20
26:2 168:10 210:16
224:13 231:16
247:16 248:15
252:23 269:17
321:15 328:14
377:17
**public** 1:22 4:24
18:4,15 91:13 369:8
380:25 381:8
385:25
**publication** 71:11
85:4,12,16 272:8,8
288:10
**publications** 69:25
269:5
**publish** 276:19
284:14
**published** 70:3 71:7
81:14 82:19 84:14
84:17,18,22,24,25
85:16 214:19
215:18,20 242:21
243:12,22 261:17
261:18 264:12,13
269:12 270:3,10,16
272:5 293:7 314:16
331:13
**publisher's** 82:12

**publishing** 81:14
284:15
**publishing's** 82:15
**pull** 280:21
**pulp** 348:13
**punctuation** 22:6
**purchase** 82:21
191:2 322:3
**purchased** 81:23
**purport** 26:6 288:2
289:2 292:4
**purported** 39:5
43:12,22 142:17,23
185:22 199:2
214:14 227:25
341:21 342:2
**purportedly** 89:10
238:13
**purporting** 238:7
288:22 290:3,16
**purports** 293:17
**purpose** 39:7 51:2
134:12
**purposely** 320:11
**purposes** 197:24
**pursuant** 1:20 42:6
42:6
**pushed** 309:10
**put** 11:5 14:9 24:14
107:8,14,17 174:19
178:14 183:13
184:16 197:11
203:17 209:4,5
216:21 241:11
248:24 250:9
254:10 255:19
260:9 270:21
272:16,23 277:14
278:5,14 280:6
291:15 297:21
303:3,7,9,10,18
308:20 320:12
350:13
**putting** 182:5
202:21 206:4 213:5

249:4,5 301:12,12

**q**

**q1** 24:3 354:9,10,14
357:20 358:2,15,19
358:22 359:5,17
363:14 364:3,13,17
364:23 365:3,9
**q2** 32:11 354:9,15
357:20,23 358:3,24
359:6,18 360:18
363:14 364:3,13,17
364:23 365:3,10
**q3** 363:14 364:3,13
364:17,23 365:3,10
**q4** 363:15 364:3,13
364:17,23
**qualified** 39:21
322:22 323:4,22
324:22
**quality** 47:21
181:11 188:18
344:7 351:10
**quarter** 143:11
**queried** 78:19
**question** 9:5 12:16
13:9,14,17 28:3
29:17,18,19 30:23
30:25 31:16 35:17
35:17,18 36:6,22,23
41:4 45:12 50:22
56:16 67:4,5,6
73:16 76:14,18,21
77:2 83:14 85:3
87:4 88:4 89:18
99:8 102:20 104:12
111:19 112:25
123:7 125:18,19
129:6 130:8,10
140:23 150:11
153:5 155:17,19
156:20 157:18,19
157:25 158:20,22
158:22 193:19
201:8 203:5 206:13

206:18,19,21 207:3
207:4 220:3 222:17
228:6 231:23,24
240:24 242:23,24
242:25 243:3,10,17
243:18 249:19
263:3 264:17,18,20
268:9 275:14 276:8
276:9,13 278:10
284:24 296:17
298:21 325:6
334:18 340:20
364:19 365:8,11
380:6
**questioned** 60:2
70:25 95:6,12 97:3
97:9,16,23 98:2,6
98:10,13 99:12,13
101:13 122:18
128:24 130:20
233:3,10,21 234:3
235:15 236:8 240:5
255:8 283:13 296:9
314:11,13,20 319:7
320:7 364:15
375:14,19
**questioning** 97:21
101:2 201:4 380:12
**questions** 27:21
35:15,22,25 36:9,10
36:15,19,25 39:8
41:25 42:19 44:22
49:19 76:8 100:4
111:22 112:3
129:14 147:8
184:17 202:20
205:7 252:23,25
253:8 275:2,10
302:18 339:25
368:13 376:12
**quick** 258:22 337:9
344:14 345:21
371:16
**quicker** 218:5 286:8
347:10

**quickly** 211:25
218:2
**quite** 12:6 86:23
170:13 184:25
229:14 255:3
259:24 262:22
263:4,6 322:25
338:15 361:15
375:25
**quotation** 290:13,16
**quote** 26:7,9 39:10
191:17 236:8
286:25 288:2,12,13
288:20,22 289:2,3
289:18 290:3 291:4
291:5,6,14 292:4,5
292:7,9,13,21
293:18,23,24 294:8
294:8 312:17
331:25 333:17
338:8
**quoted** 26:24 28:19
32:4 142:16,23
143:4 294:9 330:10
335:10
**quoting** 40:15

**r**

**r** 2:2 4:22,22,22
183:2,23,23,23
272:5 381:2
**rag** 351:17
**raise** 27:16 152:15
**raised** 27:18,19
**raising** 152:16
**ramps** 272:19
**ran** 55:4 253:18
261:3,5,7 268:5,6,6
307:23 346:23,23
366:16
**range** 332:24
**rantanen** 303:14
328:4,12 330:11
341:20 342:16
345:17 347:3,22

348:11 362:18
**rantanen's** 45:15
328:23 329:24
330:2 339:14,19
341:24 350:14
**rate** 51:8 214:4
216:3,5
**reach** 214:2 327:3
**reached** 244:25
245:17 246:21
301:8,9,10
**reaching** 6:7 169:15
302:16
**reaction** 136:7,11
**reactions** 342:10
**read** 7:3 9:23 10:8
10:12 13:13,15
21:10,11,17 22:10
24:23 25:23 26:2,11
26:14,16,19,22,24
26:25 27:8 28:6,13
28:17,18,19,22,23
29:2,4,7,11,12,16
30:3,9,9,13,14 31:4
31:5,6,22,24 32:2,5
41:21 42:18,19 62:7
67:3,7 87:3 91:17
97:25 104:19
130:10 139:16,18
142:8 148:12 152:5
153:6 158:16,18
159:7,15 161:13
162:9,12 233:15
234:15 245:2
246:15 248:9 275:5
283:3,14 286:2,8
295:5,11 328:25
347:10,11
**readable** 37:4
**reading** 13:16 28:15
30:6,8 155:6 156:13
159:14 236:2
245:22 266:16
310:25 352:8,17
360:11,14

reads   24:19 26:12
  26:17 32:5 214:11
  245:13 347:13
ready   133:17 182:21
  183:22 248:7
  249:25
real   10:6 83:21
  110:16 143:4
  371:15
reality   243:12
realized   222:5
really   77:9 129:21
  279:8 339:8
reason   48:21 105:10
  119:17 136:15
  152:15 171:23
  180:22 181:3
  202:18 325:4,5
  327:6 340:22
  368:12 375:21
  385:7
reasonable   363:7
reasons   295:7
rebuttal   89:11
  261:21,23 262:2
recall   16:13 17:2,10
  19:24,25 20:8 23:3
  28:13,15 29:5,10,15
  29:21,24 30:3,6,8
  30:13 31:10,13,19
  36:8 54:22 55:3
  73:18,21 88:21,24
  92:3 100:19 112:18
  114:11,12 115:2
  116:9,17 117:11
  119:21 120:23
  129:19,21 139:15
  139:18 140:12,13
  151:22 152:3
  154:10 167:20
  168:4 177:17
  184:17 185:10
  186:7,9,12 189:13
  189:17 194:18,19
  194:23 195:16

  196:17 234:16
  236:2 249:12 258:8
  267:8,10,12 301:4,6
  302:12 303:19
  309:10 321:18
  326:16,18,22
  332:16,17 335:15
  356:11,20,23
  361:22 362:2,3,5,8
  373:10,12 374:13
recalled   31:21
recanted   88:2
receive   71:23
  263:13
received   20:15
  25:15 34:13 51:14
  57:25 78:20 102:10
  192:12,17 222:23
recess   61:4 92:12
  134:23 167:6
  182:25 260:13
  337:13 372:7
recipe   278:15
recites   316:16
recognize   65:18
  145:9 333:24
recognized   145:9
  375:18
recollection   14:11
  43:16 44:10 49:13
  50:9 93:19,24
  127:15,17 128:8
  140:11,25 175:18
  175:19 189:3,4,23
  195:25 196:3 222:6
  229:16 250:2
  302:14 352:13
  353:6 361:14
recommend   50:16
  51:2 75:4
recommendation
  72:17
recommended
  72:10

reconvene   378:16
  378:24
record   3:3,10 4:20
  13:15 20:6 29:16
  42:25 61:2,6 67:7
  92:11,14 120:3
  132:7,8,10,11,15
  134:22,25 140:7
  149:18 150:9 153:6
  157:7,17 158:19
  162:2,16 167:5,8
  172:15 178:6
  182:23 183:5,8,13
  186:16 260:10,12
  260:15 271:23
  337:11,15 372:6,9
  374:4 379:20 380:9
  380:17
recorded   188:6
recording   3:9
  188:19
records   241:10
  259:25
rectangular   197:14
redundancy   120:12
redundant   119:10
redweld   169:13
refer   12:20 17:5
  19:4 86:2,19 101:2
  118:8,14 140:15
  155:11 156:2,17
  197:9 199:8 231:2
  233:23 241:7
  246:23 261:13
  280:17 286:14
  287:25 295:14
  296:11 329:21
  338:10,11 354:20
  355:12 357:19
  359:5 367:16
reference   33:24
  95:9 136:13 272:9
  283:12,21 330:10
referenced   142:17

references   111:17
  112:3 285:20
referral   252:4
referrals   288:7
referred   19:6 32:24
  33:3,7 117:22
  153:13 154:20
  155:10 164:19
  192:23 197:6
  220:23 233:20
  271:21 287:12
  288:10 294:24
  295:2 296:21 338:7
  358:20 359:2
referring   40:14
  47:18 61:19 79:19
  84:20 99:21 101:20
  128:19 131:22
  152:20 153:16,24
  154:5 161:6 164:16
  186:19 192:16,19
  195:2 196:5,6,11,21
  196:22 197:5
  214:21 220:19
  235:22 247:14
  266:10,22 271:19
  280:20 295:16
  296:7 299:2 315:13
  316:3 331:22
  334:14,15 338:16
  340:4,6 343:3
  354:22 356:13
  357:16 358:16
  359:10 361:13
  364:16,18 367:8
  372:11 375:10
  376:3
refers   288:5 295:15
  296:13,15 367:18
reflect   44:5 140:7
  149:18 150:9 157:7
  157:18 271:24
  359:15 374:3
  379:21

**reflects** 359:16,17
 372:16
**refrain** 43:4
**refresh** 93:19,24
 161:15 189:22
**refrigerator** 218:21
**refute** 205:6 206:20
 324:21
**refuting** 203:24
 204:7,25 206:14,23
 323:16
**regard** 6:23 85:10
 126:5 162:5
**regarded** 122:13,21
 122:25 123:3,9,11
**regarding** 88:18
 98:24 99:2,16
 100:24 141:9
 187:25 207:5 241:2
 241:11 308:15
 327:23 355:5
 374:10
**registering** 76:6
**registration** 82:12
**regroup** 80:17
**reiterate** 178:4
**reiterated** 272:7
**reiteration** 360:4
**rejected** 114:22
**rejecting** 114:8
**related** 69:8 77:18
 255:19 381:17
**relates** 15:3 190:4
 214:9 377:9
**relating** 203:22
 213:11 235:17
 236:10,25
**relation** 186:17
 254:19
**relative** 134:7 137:3
**relatively** 211:20
**relevance** 341:24
 342:6
**relevant** 88:18
 108:10,13 143:18

**reliability** 37:11
 331:18 332:22
**reliable** 201:4 207:6
 233:12 283:5,6,24
 331:19,19
**reliance** 241:23
**relied** 240:22,25
**relies** 281:7,11
 282:2
**rely** 45:19 140:24
 141:2 162:4 175:21
 176:2 242:14,18
 243:5
**relying** 162:13
 168:10 176:11
 177:12 180:16
 217:11 220:16
 242:10,22 328:13
 329:13,14,24 376:2
**remain** 14:8 53:24
 212:24
**remaining** 380:5
**remains** 61:22
**remember** 31:10
 52:21 99:23 113:24
 114:5,8 128:4,7
 132:3 189:11,16
 191:3 377:15
**remembered** 31:8
**remind** 28:10 99:24
 194:14
**removal** 310:8
**remove** 64:15,17
**removed** 68:21 69:7
 150:17 155:23
 168:15 170:4 175:7
 175:11 367:13
 375:2,8
**removing** 124:20
 177:24 178:9
**renamed** 359:24
**render** 74:6
**rendered** 51:23
**rendering** 36:4
 162:6 226:11

**renowned** 328:21
**repeat** 99:7 334:18
 363:3
**repeated** 88:6 348:9
**repeatedly** 151:12
**repeating** 269:15
**repellent** 208:12
 210:5 252:3,7
**repellents** 247:3
**rephrase** 298:15
**report** 11:2,6,9,12
 11:17,17 16:2 19:16
 21:7,14,16 22:2,13
 22:18,20 23:2,10,11
 23:14,23 26:5,12
 28:19,22 30:19 31:4
 32:10 33:13 34:17
 35:13,22 36:7,9,14
 36:17,24 37:4 38:24
 39:6 40:7 43:17
 44:11,19,21 45:4,9
 45:14,21,23 46:9
 47:6,13,21 48:3,19
 48:23 49:3 50:6
 52:11,20,22 54:12
 54:17 55:24 57:9
 72:5 74:9,15 94:10
 104:15 106:22
 107:8,18 128:20
 140:6,8 148:12
 149:2,6 150:10,12
 151:6,24,25 152:13
 152:21 153:5 154:6
 154:11,13,15,20
 155:9 156:2 158:19
 159:11,16 161:17
 163:14,18,24 164:3
 164:7 165:23
 166:15 170:19
 172:22 173:4,10
 176:12,14 186:5
 191:16,21 193:10
 198:3,16 199:4,20
 200:6 202:14,19,20
 202:21,23 203:6,16

 204:6,11,13,25
 205:5,8,14,18,22,22
 205:25 206:4,7,9,13
 206:17,22 207:2,11
 208:6,8,21,25
 209:11 213:13,16
 213:18 214:8
 218:12 220:15
 221:2,5,15,16,23
 222:5,22,25 223:5
 223:13,17,21 227:7
 227:8 228:25
 231:16 232:2,11
 233:6 241:10,21
 242:4 245:12
 247:11,12,22
 254:10 255:19
 257:23 260:18,24
 261:20,21 262:3,17
 265:16 269:17
 271:21 275:3,5,11
 279:7 280:7 282:18
 282:24 285:2,6,11
 285:14,18,23,24
 286:25 287:3,21
 288:4,23 289:2,16
 289:24 291:11,14
 293:25 294:10
 295:16 298:14
 301:12,24 302:4,8
 302:16 304:13,16
 307:21,24 308:2,8
 308:14 309:15
 310:16 311:3,10
 315:4 319:14,20,23
 320:14,22 324:9,17
 324:18 325:2,9,14
 326:23 329:2
 331:24 332:2,6,15
 333:22 334:4,15,21
 337:20,25 338:8
 340:9,18 348:6,19
 351:19 354:14,21
 354:22 355:12
 359:4 360:2,13

363:4 364:11,18
377:10 383:11
**reported** 37:8
231:21 241:4
246:11 247:17
255:22 264:11
265:13 336:2
**reporter** 1:21 4:2
28:10 153:2 182:20
183:16,18 259:13
381:7
**reporting** 304:7
333:21 335:24
336:12 385:2
**reports** 12:9 21:24
36:4 40:2,18 43:10
43:11 45:6 69:20
151:20 152:10
153:19 161:12
185:12,14 192:20
205:20 217:5
220:19,24 222:13
223:11 229:9 232:3
243:22 255:8 257:4
274:22 289:6 300:3
300:7,11,13,14,19
300:24,24 301:4
336:3,10 339:6,8
**represent** 4:2
137:18 292:22
**representation**
292:7
**representative**
102:8
**representatives**
133:11
**represented** 58:5
365:2,9,15
**representing** 3:12
4:3 63:8 224:6
289:12 293:18
**reprimand** 68:18
**reprimanded** 68:3,7
68:17

**reproduced** 277:16
**reputable** 75:7
181:12
**request** 43:24 46:19
347:3 348:5 349:11
353:8 376:9,19
377:15
**requested** 46:21
263:17 347:13
348:20
**requesting** 380:8
**require** 240:8
**required** 59:15
276:14
**requires** 105:24
106:3 239:11
240:11
**requiring** 32:7
**res** 344:8
**research** 37:8,24
39:5 106:14 201:16
210:5 215:18 218:8
219:13 228:9,13
231:6,10 241:24,24
242:21 244:3,9
246:12 248:13
255:22 261:17,18
264:12 265:13
269:12 270:3,10,21
271:9 283:17
301:25 331:12
**researched** 218:10
247:17 250:13
270:5
**resign** 73:23
**resins** 316:18,22,24
317:2,20
**resolution** 20:21
151:9 190:21
**resources** 62:18
**respect** 7:8 22:9
114:14 115:14
121:25 122:3 124:2
126:11,12,14,20,23
127:4,8,11,18

130:22,24 134:4
161:22 186:4
227:24 231:14
255:7 270:24
302:24 329:4,23
348:5 349:10 351:6
355:4,6 360:6
368:15 375:19
377:24
**respectable** 129:4,7
130:15
**respected** 124:6,9
124:22 125:2,5,20
**responded** 87:24
**response** 11:3 23:20
217:2 228:9 348:10
382:9
**responses** 45:5
**responsible** 76:17
**rest** 241:10 251:15
343:10 344:11,12
346:12,17
**restate** 257:3
**restroom** 248:24
251:25
**result** 106:9 196:18
226:15 258:7 348:8
374:21
**resultant** 356:2
**results** 39:4 55:17
55:20 104:3 219:16
255:20 256:3
257:23 308:12,17
308:19 314:5
318:24 322:13
328:23,25 329:24
330:2,11 332:19
346:21
**resume** 65:10 75:18
81:14 376:21
**resumed** 183:23
**retained** 49:25 50:3
50:9 114:2,5,6
123:15

**retainer** 50:10
**retention** 51:7,12
52:7
**retired** 66:17 67:10
68:20,22,23 69:3,18
126:25
**retirement** 68:24
**retracted** 68:6,16
**revealed** 326:19
376:8
**reveals** 93:8
**reverse** 356:4
**reversed** 73:3 75:9
**review** 21:7 22:19
25:14 47:7 48:10,23
49:2,6,9,18 52:23
57:7,11 58:11 69:20
177:4 216:23
249:10,20 300:18
301:16,21 373:11
376:11,18 377:9
378:24
**reviewed** 12:8 32:16
45:21 47:6,11 57:14
57:17 58:2,10 85:12
85:17 152:8,10,12
152:23 153:21,23
175:3 176:15 186:5
186:20,24 249:23
276:21 277:15
294:17 296:3 297:9
297:12 314:14,15
**reviewing** 45:23
46:8 47:20 48:19
150:10 157:8 186:7
186:12 249:12
**revolved** 33:15
**rhetorical** 35:15,22
36:5,15,19,21
**richard** 127:7
**riddled** 271:12
274:9,17
**ridiculous** 327:15
**right** 14:15 18:12
22:16 23:23 27:5

28:12 29:7,9,14
30:23 32:7 33:9,25
35:7,10 39:12,16
43:18 46:19 56:6
65:25 68:6 71:15
75:2,15,19 76:9
79:2 80:11,19 83:23
85:20 86:25 88:4
92:20 94:20 95:4,13
96:4 98:12 100:23
101:17 102:2
103:14 104:20
112:19 127:20
129:22 131:15
148:14 156:5
162:21 173:5,7
181:9 184:24
185:12 187:6
191:20 192:21
193:14 198:5,17,22
199:2,8,13,18,23
200:4,11 201:21
203:2 204:2,15,18
204:19,22 205:3,11
207:7,13,20 208:16
208:22 210:9 211:4
211:16,21 212:2,5,8
212:18,25 213:6,9
213:14,24 214:5,16
214:24 215:4 216:6
217:5,9,12,23
218:14,23 219:21
221:14,22 223:7
224:7 225:12,21,24
228:5,17,21,23
229:11,15,17,19,23
230:3,6,12,25
231:10,18 232:6,9
232:13,17,21,24
233:6,22 234:11
235:10 239:12,19
241:2,17 242:2
244:16 245:8 247:3
247:6 249:25
250:24 253:23

254:15,23 256:15
256:21,25 257:5
258:12,18 260:25
261:6,21,24 262:14
262:18,23 263:12
263:20 266:2
267:20 270:22
275:17 276:11
278:2,20 281:9,13
281:16,17,24 282:3
282:7,11,15,25
283:23 284:19,20
284:23 285:6,8,11
286:5,21 287:3,6
288:18 289:15,23
290:7,14,17 291:13
292:17 293:19,23
294:4 295:17 298:5
298:10 299:4,25
300:5 301:18 303:8
303:13 304:6
305:11,13,16
310:19,24 311:8,13
311:16,22 312:11
312:14,18,21
313:17 314:2,6
315:6,14 316:4,10
317:6,7,15,16,21
318:4,8 319:21
320:2,2,10,14,17
321:12,24 322:11
322:17 323:19
324:23 325:9,15,22
325:25 326:5,21
327:5,10,14,20
328:6,15 330:14,18
330:23 332:9,12
333:14 334:17
335:7,12,23 336:9
336:11,19 338:5,9
338:24 339:2,17
340:11 342:8,16
343:15,16 345:24
347:4,8 348:15
349:9,13,21,25

350:6,9,12 351:4,22
352:11 354:8,13,17
355:2,8,13,17 356:5
356:6 360:20 361:3
363:2 364:9,13
367:13,22 371:2,3
371:23 372:13,17
373:9,18
**rja** 1:4 3:22
**road** 2:5
**rochester** 122:8
322:18
**role** 115:14 117:9
186:3,24 218:6,7
253:4 304:18
**romano** 47:12
121:18,21,24 122:6
157:2 158:24 160:7
161:8,13 311:10
324:21 338:2
**romano's** 131:10
156:7 158:4 322:10
323:17
**room** 90:13,17
108:22 133:21
175:13 183:19
189:9,14,20 194:2
197:18 217:23
223:19 224:20,25
225:6,12 242:6
251:24 259:23
**rope** 193:24
**roughly** 185:8 211:2
216:20 219:25
220:2 230:14
**route** 304:24
**rub** 209:23
**rubbed** 250:20
**rule** 12:22 100:3
133:5 255:11,25
256:7,14,20
**rules** 14:21,23,25
41:11 42:4,6,7
100:2

**run** 17:19 253:13
308:3,21 319:7
329:9 342:8 346:25
349:16,21 350:5,19
350:22 351:4
**running** 25:25 56:22
363:10

**s**

**s** 2:2 4:22 183:2,2,2
183:23 232:9
233:11 234:22
235:2 383:16 385:7
**safe** 48:8
**sample** 199:22
202:13 254:17
317:16 319:7,8
370:20
**samples** 54:18,21,22
54:24 55:2,5,6
56:25 200:8 202:5
202:15,24 203:4,14
203:14 265:10
267:15,19 268:2,6
268:10 286:17
342:17,19 345:15
345:16 347:19
348:12 349:5,15,20
349:24 350:4,11
359:17 370:6
372:13,17 373:2,6
**sampling** 358:3
**san** 190:25
**sanctions** 176:19
**sanford** 15:19
**sat** 133:13
**satisfies** 37:10 43:13
43:23
**satisfy** 39:16
**save** 45:13
**saw** 26:22 30:10,11
81:8 131:18 136:3,4
136:6 144:23 145:3
145:8 151:5,7
155:22 157:4

159:24 161:6
173:16 181:10
251:24
**saying** 28:16 31:10
92:2 102:9 151:23
185:6 226:20
228:19 239:5
242:12 246:3,5
247:23,24,25 254:7
254:15 256:6,9
270:9,13 274:2,4,12
275:25 278:3,19,22
278:24 279:10,11
279:22 280:4
283:22 289:3
291:11 297:4,10,16
299:13 323:18
326:16 335:20,25
337:5 339:18,22
344:3,4 364:7
372:25 377:5
379:22
**says** 6:9 18:8,9 35:7
80:10 108:18
128:21 161:6
166:14 169:14
221:18 224:21
228:13 232:2 235:8
236:8,20 238:22
239:8 248:10 254:7
267:17 268:4,12
283:17,20 296:24
297:2 299:19
310:23 311:4,14
323:24 332:17
352:8 359:20
367:12 377:12
**scaling** 323:25
**scan** 25:11,18 139:5
145:18 150:19
163:3,19,20 164:7,9
164:24 165:2,3,5
168:19 169:25
171:4,7,10 173:24
174:4,8

**scanned** 20:21 47:11
47:25 48:15 136:4
145:22 146:20
154:4 161:18,18
162:24 164:19
167:23,25 168:13
169:22 171:15
172:12 173:2,9
176:13 177:11,13
181:2,7 313:10,14
374:16 375:5
**scanner** 139:6 374:8
**scanning** 309:19
**scans** 25:9,14 47:15
149:25 151:9,10
168:6 181:14 357:3
**scenario** 218:4
**scheduled** 128:23
**scheduling** 337:21
**scheme** 272:16
303:4
**school** 37:20,22 80:2
122:9
**science** 5:14 13:7
70:7 84:22 85:16
293:8
**sciences** 70:14 71:11
71:15,21 72:2 80:8
**scientific** 6:6 37:11
84:14,18 113:9
**scientist** 88:16
112:16 129:4,8
130:15
**scientists** 70:11,17
71:8 239:6 289:3
293:12
**scope** 159:10 160:19
174:10 284:24
295:3,23 296:2,14
296:16 297:8 298:5
373:15
**screen** 149:19
**search** 7:12,17,25
8:4,9,12

**searchable** 61:23
**searches** 8:11
**searching** 81:23
**seasons** 230:5
**second** 24:18 122:16
234:6 236:6 245:12
246:15 318:25
334:19 348:5
**secondly** 36:21
120:10 125:5
**seconds** 156:18,19
**secret** 60:2 66:14,16
67:10,17,18,23 78:2
78:4 88:15 90:15
97:10,15,23 98:10
99:14 102:7 103:9
103:16 127:3,4,8
196:24 197:3 258:4
272:25 294:4 295:9
295:24 296:9 300:3
314:13 315:12
320:6 322:20
369:18,24 370:12
370:15,21
**section** 5:20 24:5
75:17 208:24 246:8
265:23 288:21
295:16 320:6
340:15,17
**sections** 21:11 44:16
**security** 66:13 68:19
68:24 69:7,15,17
**see** 21:20 24:4 26:17
32:13,19 34:18,24
37:12 38:7,12 42:5
46:3,19,21 48:10
56:8 61:16 63:18
65:20,23 76:15 77:2
106:12 111:5
117:23 129:12
136:2 137:2 141:11
156:9 165:21
168:13,18 170:19
172:2 178:17 179:7
179:10,11,17,19

180:4,8,10 193:2,16
193:19,22 203:11
217:16,20 237:19
241:14 245:18
246:8 251:21 252:2
253:25 260:3
262:12 267:17
273:6 275:6,6
277:21 278:16
287:19,22 288:20
288:25 289:9,11
291:17 301:10
302:17 305:4 308:6
322:14 330:12
332:14,23 334:21
343:8 349:3 357:25
359:22 360:2,20
363:16 365:20
366:4,10 369:22
370:4 371:11,22
372:22 373:11
374:7 376:12
**seeing** 222:8 227:22
237:21 238:14
362:3 376:6
**seek** 240:15
**seen** 9:19 25:11,13
93:5 173:23 224:20
225:15 287:16,23
377:12
**segment** 158:17
173:2 180:3
**segments** 104:5
**selected** 304:11
**sell** 81:7
**seminar** 187:16,20
**send** 51:25 102:16
328:11 362:17
**sending** 305:10
**sense** 9:9 136:22
155:25 229:7
333:22
**sensitive** 3:4
**sent** 52:22 58:6,10
58:12 93:4 139:9,22

141:7,21 328:20
342:20,23,24
343:11 362:19
368:8
**sentence** 24:18
41:18 62:25 236:6
245:13 246:13,15
283:15
**sentenced** 91:21
96:3,5,8
**separate** 67:2 90:13
137:21 246:22
302:22
**separated** 316:14
**separately** 303:6
**separation** 319:10
319:24
**september** 72:15
**sequence** 31:15
93:20
**sequentially** 23:16
**series** 35:15,21
226:4 318:4 320:16
320:18,24 321:12
**serious** 157:13
**serve** 11:18 137:9
138:12
**service** 60:2 66:14
67:10,17,19,23 78:2
78:4 88:15 90:15
97:10,16,23 98:10
99:14 102:7 103:9
103:16 127:3,3,4,8
175:9 177:25
196:24 197:3 258:4
272:25 294:4
295:10,24 296:9
300:3 314:13
315:12 320:6
322:20 369:18
370:12,15,21
**service's** 369:24
**services** 51:15 62:11
241:12 261:11
262:21 263:25

347:3
**session** 2:22,24
**set** 5:24 18:21
188:21 214:10
381:11,22
**sets** 24:21 26:4
30:11 198:3,7,12
**settlement** 73:21
**seven** 132:18,19,24
133:5,19 134:6
230:14,14,18,23
238:12,15 259:3,10
260:5,8 363:7
**seventies** 229:22
**severely** 161:2
**sexual** 67:22
**seymour** 93:3
100:22 101:7
**seymour's** 100:25
**shades** 189:9,16,20
**shape** 197:14
**shaped** 333:4
**share** 306:11
**shared** 17:23 18:2
19:9,10 62:18,18
**shares** 17:21
**sharing** 18:24
**shed** 323:12
**sheet** 190:19 195:18
196:16,19 254:18
344:12,16 367:17
367:19,21,23
372:18 385:2
**sheets** 367:15
**shoes** 184:8
**short** 46:11 376:16
**shortly** 150:20
184:23
**shortwave** 326:14
327:20
**shoved** 237:10
**show** 23:14 65:7
93:12 140:17
161:12 163:20
165:20 172:22

178:24 179:4 221:2
241:24 271:12
272:15 274:9 275:3
275:8 277:16
278:15 280:22
332:10 334:20
341:3 347:9
**showed** 17:25
107:24 128:14
181:14 295:25
**showing** 62:24
88:10 164:18 165:8
170:25 234:25
273:24 319:23
330:5 336:5,22
344:2 353:15 375:6
**shown** 67:24 68:2,8
68:13,15 76:2 77:19
77:20 89:22 104:9
173:20,22 181:2,7
218:10
**shows** 94:2 151:7
172:3,16,23 221:2
244:21 245:13
246:17 339:15
340:10,13 341:13
344:21,24
**side** 10:5,6 33:5 45:7
76:11,20 77:2,22
93:25 106:25
120:18 133:7,20
140:24 145:7
147:17 154:17
156:6 192:6,13
239:4 240:13
288:18 306:16,17
347:18 348:25
353:12 356:4
360:21 367:23
**sided** 239:13
**sides** 238:3 242:11
**sidley** 139:10,23
**sign** 6:24 7:8 21:16
101:9 116:6,12,15
300:11

**signage** 19:11
**signature** 179:4
**signatures** 114:9,14
114:16 136:9
179:20
**signed** 6:14 7:8 11:9
34:5 48:24 69:13
73:22 115:15,16
116:4 137:8 138:3
138:10 142:7,14
230:9 238:13 300:3
300:7,12,14,24
**significance** 332:19
**significant** 326:5,6
330:22 333:13
**significantly** 325:21
**signing** 116:9 301:4
**similar** 44:19
167:24 236:25
262:22,24 263:4,6,6
264:2,6,7 286:20
**similarities** 237:3
**simple** 129:6 156:20
244:6 272:13
333:21 335:18
336:21
**simplified** 43:17
**simply** 36:22 112:6
216:13 221:18
228:17 254:18
272:10 291:22
323:17 329:13,14
334:5 335:16 337:5
344:6 378:15
**single** 84:14,15 91:4
91:12 124:18
127:12 138:4
165:23 174:4 256:4
310:6
**sir** 5:13 6:12,22 8:25
9:12 10:9,20 11:2,7
11:8,13,23 12:18
13:9,14 14:2,15
16:18 22:2 23:23
26:14,23 27:5,10,14

27:20,21 28:6,11,25
29:15,17,21 30:19
34:19 35:13 37:7,17
37:18 38:9,23 39:22
41:24 42:3 43:9
44:5,17 64:15 65:3
68:20 71:13 74:6
75:25 78:23 81:12
85:3 91:5 92:16
93:20 103:3 105:24
111:11 112:18
123:2,17 126:5
130:16 137:13
139:4 140:11
143:22 146:6,13
147:25 148:3
150:24 151:12,22
153:7 154:21 155:5
155:15 156:20
157:14,24 158:18
158:21 159:15
160:2,3,6 161:12,20
165:4 166:14 169:9
169:25 170:22,24
171:3,16 172:15
173:5,11,14 174:17
176:21 182:4
282:19,22 345:20
357:17 366:17
371:14
**sit** 6:22 8:25 9:12
134:2 196:9 278:12
280:11,24 284:20
**site** 61:13 62:3,22
64:15 81:9 82:4,22
83:6,10 309:5 313:8
313:9 356:11 357:3
382:16
**sitting** 28:12 195:4
**situation** 42:22
80:23 239:3 301:7
**situations** 304:5
**six** 170:3 357:23
358:18,24

**size** 195:19 196:20
312:8 352:14
**skeptical** 242:8
**skills** 127:13
**skin** 207:19 247:2
247:14
**slightly** 329:19
352:9
**sloppy** 304:6
**slow** 218:13 219:7
**slower** 215:16
218:25
**slowly** 209:23 212:5
218:23 219:6
**small** 124:11 196:9
197:5 312:7 348:22
**smaller** 196:4
285:24
**smoking** 32:18,22
32:25 33:3,7,11
34:10,14
**snacks** 134:17
**snyder** 2:14 4:5,5
5:2,19 7:22 9:6
13:13 27:17,20 41:5
41:8,15,19 42:3,15
42:25 43:4,8 60:20
61:8,15 67:3 92:7
92:15 99:8 114:19
117:12 124:15
132:4,11 133:5
134:13 135:3,9
137:5,15 138:8
140:7 144:2 148:22
148:25 149:18
150:9 152:15,16,25
155:18 157:7 162:2
167:2,9,16 169:7
176:24 177:19
178:7,15 182:11,19
382:4
**society** 12:11 70:25
**softer** 351:18
**software** 184:8
323:10 324:21

325:8
**sold** 82:3
**solely** 59:24
**solid** 240:15
**solvent** 209:19
268:17,21 311:5
**solvents** 272:20
**somebody** 78:12
250:15 254:11
**something's** 256:23
**soon** 185:15 192:8
372:3
**sorry** 35:18 105:18
118:13,19 130:12
219:2 286:24
289:17 316:15
320:5 347:14
349:12 358:22
361:20
**sort** 37:2 190:4
371:10 377:18
**sound** 186:18
195:24 237:23
239:2 325:25
**sounds** 92:19 100:23
104:20 186:21
239:4 266:5 326:2
**source** 244:23 245:8
245:15 246:19
**sources** 207:18
247:9 251:11 305:6
309:19 369:8,16
**southern** 34:23
**southwell** 2:15 4:9,9
4:15,19 144:21
183:7,12 184:2
192:18 210:24
211:12 219:2
234:18 250:6
258:21 259:5,15,18
260:17 271:23
337:9,16 341:23
343:21 349:12
354:2 357:7 363:11
366:18 371:15

372:3,10 375:23
377:6,21 378:14,21
379:8,17 380:4,14
382:5
**southwell's** 353:8
**space** 17:23 18:2,13
18:24
**speak** 15:16 19:15
20:24 41:16 128:3
131:23 133:2 162:2
**speaking** 41:5,9
43:5
**speaks** 42:25 147:24
**spec** 190:19 255:14
279:24
**specialities** 58:25
**specialized** 50:20
65:4,21 187:24
**specialty** 58:22 59:6
**specific** 14:25 59:3
59:10 127:16
157:24 216:9 219:9
228:15 250:19
269:25 270:12,18
271:17 274:6,10,11
274:14,15 275:14
278:10 279:13,25
280:3 283:16
295:20 296:18
298:6 302:23
308:21 315:18
320:10,13 325:5,5
342:19 369:9
370:23
**specifically** 8:10
51:3 59:16 141:21
199:15 203:23
204:5,7,25 206:14
206:23 214:9,11,21
270:23 277:9
279:22 280:19
289:14 294:20,24
295:19 296:6,19,24
297:2 298:13
300:13 311:3

312:20 316:6 319:9
323:16 331:6
344:24 370:11
371:5
**specification** 195:18
196:19 359:7
**specifications** 175:8
354:16 359:2
362:18
**specificity** 45:8
296:12 299:17
**specifics** 125:21
220:10,12
**specified** 293:9
**specifies** 195:22
**specify** 200:16
324:16
**speckin** 54:4,15
303:17,21 304:15
304:20,21 305:12
307:4,5 309:5
**specs** 354:16 360:19
360:21
**spectral** 190:12
309:4
**spectrometry**
200:19 308:25
**speculate** 191:7
**speculating** 216:4
228:4,18 244:6
249:17 250:23
**speculation** 216:16
227:5 228:17
**spell** 324:9
**spelled** 307:21
**spend** 133:23
**spoke** 53:13 54:15
185:21
**spoken** 54:5 287:15
**spoliation** 143:6
**spot** 222:7,13,15
**spray** 252:2
**sprayed** 249:3 252:7
**spring** 223:9 229:2
229:10

**springs** 218:4
**spurious** 236:14
**square** 335:11,16
**sripriya** 2:18 4:13
**ss** 381:4
**stage** 80:4
**stamp** 63:16,18,24
64:4
**stamps** 63:19,21,25
162:25
**stand** 38:9 104:9,13
330:25 341:4
**standard** 12:22
39:11,11 112:22
113:8 214:19
253:13 276:2 296:8
299:6,7,13,15
314:12 331:14,17
331:21 334:11,24
335:2,6,16 336:4,11
336:13,18 370:20
**standards** 5:24
37:11 39:25 279:20
282:11 310:9 313:2
315:19 318:15,22
319:15 368:16,17
369:25 370:6
377:14
**stands** 107:12,22
137:24
**staple** 51:4 304:25
305:7 355:5,7 356:8
357:2 374:10,12,14
374:15,17,19 375:2
375:6,8,14,15
**stapled** 355:8,22
356:2
**staples** 308:15
321:22 352:21,21
**starch** 342:10
**start** 24:2 45:4,11
94:22 126:10
130:12 159:14,23
213:5 272:18,21
277:12 288:15

369:14
**started** 81:2 89:24
195:6 258:25
369:12
**starting** 236:6
**startling** 236:17
238:6,8 240:6
**starts** 24:3 310:3
**state** 1:22 37:7
38:14 57:8 191:17
206:13 207:5,6,8
214:25 218:12
244:17 312:16
326:24 327:8,18
328:5 331:25 340:8
351:19 355:24
356:8 381:3,8
**stated** 109:6 151:4,7
152:2 159:24
293:25 309:15
310:16 311:11
**statement** 5:9 57:24
62:12,15,16,22
87:23 124:14,17
127:16 138:3
164:15 174:10
240:25 289:13
292:20,21 293:16
298:6,19 299:22
341:15
**statements** 10:9
145:25 156:7 157:2
162:14 220:17
241:19 274:16
329:25
**states** 1:2 6:5 35:6
66:14 78:2,4,5
87:21 93:3 105:2
109:25 123:13,22
130:14 143:12
145:5 154:7,11,13
154:21 160:21
175:9 198:16,19,24
199:4,20 200:7
217:23 283:9

311:15 363:25
**static** 281:4,7,11,16
281:23 282:9
**stating** 42:24 327:9
**statistic** 332:25
333:18
**statistical** 332:19
334:9 336:21 337:3
**statistically** 326:5,6
330:22 333:13
336:24,25
**statistics** 326:9
330:3 331:2,7
332:23 335:19
336:19 337:2,4
**status** 62:6 64:25
83:23
**stay** 92:8 193:25
194:4
**stays** 61:24 209:20
**stenographically**
381:14
**step** 125:21 264:8,8
264:18,19
**steps** 63:5 64:14
66:16
**stereo** 47:2,3,22
48:4 313:6
**steve** 69:13
**stewart** 1:18 3:23
5:1,3 6:1 7:1 8:1 9:1
10:1 11:1 12:1 13:1
14:1 15:1 16:1 17:1
18:1,10,16 19:1,12
20:1 21:1 22:1 23:1
23:15,19 24:1 25:1
26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1
34:1,22 35:1,6,10
35:12 36:1 37:1
38:1 39:1 40:1 41:1
42:1 43:1 44:1 45:1
46:1 47:1 48:1 49:1
50:1 51:1 52:1 53:1
54:1 55:1 56:1 57:1

| | | | |
|---|---|---|---|
| 58:1 59:1 60:1 61:1 | 185:1 186:1 187:1 | 318:1 319:1 320:1 | 215:11,22 216:2,10 |
| 62:1,9 63:1 64:1,15 | 188:1 189:1 190:1,9 | 321:1 322:1 323:1 | 220:13 224:11 |
| 64:20 65:1,15 66:1 | 191:1 192:1 193:1 | 324:1 325:1 326:1 | 231:17,19 232:4 |
| 67:1,20,25 68:1 | 194:1 195:1 196:1 | 327:1 328:1 329:1 | 240:24 241:2,4,9 |
| 69:1 70:1 71:1 72:1 | 197:1 198:1 199:1 | 330:1 331:1 332:1 | 242:15,19 243:5,13 |
| 73:1 74:1 75:1 76:1 | 200:1 201:1 202:1 | 333:1 334:1 335:1 | 243:20 |
| 77:1 78:1 79:1 80:1 | 203:1 204:1 205:1 | 336:1 337:1 338:1 | **stored** 16:19 185:23 |
| 81:1 82:1 83:1 84:1 | 206:1 207:1 208:1 | 339:1 340:1 341:1 | 217:21 218:17,21 |
| 85:1,21,23 86:1 | 209:1 210:1 211:1 | 342:1 343:1 344:1 | 219:24 220:7,9 |
| 87:1,6 88:1,11 89:1 | 212:1 213:1 214:1 | 345:1 346:1 347:1 | 221:21,24 222:3 |
| 90:1,2,21 91:1,7,14 | 215:1 216:1 217:1 | 348:1 349:1 350:1 | 223:10 224:22 |
| 91:19 92:1,23 93:1 | 218:1 219:1 220:1 | 351:1 352:1 353:1 | 225:15 226:3 |
| 94:1 95:1,2 96:1,2 | 221:1 222:1 223:1 | 354:1 355:1 356:1 | 227:18 230:17,19 |
| 97:1 98:1 99:1,23 | 224:1 225:1 226:1 | 357:1,13 358:1 | 230:21 231:15 |
| 100:1,18 101:1,16 | 227:1 228:1 229:1 | 359:1 360:1 361:1 | 242:5 249:2 |
| 101:22 102:1,15 | 230:1 231:1 232:1 | 362:1 363:1 364:1 | **stories** 235:15 236:9 |
| 103:1,19 104:1 | 233:1 234:1 235:1 | 365:1 366:1 367:1 | 236:16,23,25 |
| 105:1,18,21 106:1 | 236:1 237:1 238:1 | 368:1 369:1 370:1 | 237:18 239:9,17,21 |
| 107:1 108:1 109:1 | 239:1 240:1 241:1 | 371:1 372:1,11 | **story** 185:22 221:20 |
| 110:1,13 111:1 | 242:1 243:1 244:1 | 373:1 374:1 375:1 | 221:21 240:5,17 |
| 112:1 113:1 114:1 | 245:1 246:1 247:1 | 376:1,2,13,24 377:1 | 241:14 242:9 |
| 115:1 116:1 117:1 | 248:1 249:1 250:1 | 378:1,6,14,25 379:1 | **strangely** 237:18 |
| 118:1 119:1 120:1 | 251:1 252:1 253:1 | 380:1,6,20 381:10 | **stranger** 237:12 |
| 121:1 122:1 123:1 | 254:1 255:1 256:1 | 382:4,8,18 383:5,24 | **streak** 311:5 |
| 124:1 125:1 126:1 | 257:1 258:1 259:1 | 384:5 385:6,21 | **street** 135:4,6,14 |
| 127:1 128:1 129:1 | 260:1,18 261:1 | **stewart's** 89:6 183:8 | 137:3,6 138:11,20 |
| 129:16 130:1 131:1 | 262:1 263:1 264:1 | 377:10 | 139:3,5,19 140:3,20 |
| 132:1,15 133:1 | 265:1 266:1 267:1 | **stick** 206:9 276:17 | 141:6,13,17,22 |
| 134:1 135:1 136:1 | 268:1 269:1 270:1 | 277:24 | 321:22 359:6 383:7 |
| 137:1 138:1 139:1 | 271:1 272:1 273:1 | **stiffness** 326:25 | **streetfax** 32:17,22 |
| 140:1 141:1 142:1 | 274:1,7 275:1 276:1 | 327:4 | 33:19,23 34:8 |
| 143:1 144:1 145:1 | 277:1 278:1 279:1 | **stilled** 179:23 | 358:25 |
| 146:1 147:1 148:1 | 280:1 281:1 282:1 | **stipulate** 90:7 | **strength** 198:13 |
| 149:1 150:1 151:1 | 283:1 284:1 285:1 | 111:21,24,25 | **strictly** 172:20 |
| 152:1 153:1 154:1 | 286:1 287:1 288:1 | **stock** 89:6 | 206:9 |
| 155:1 156:1 157:1 | 289:1 290:1 291:1 | **stop** 249:20 318:25 | **strike** 111:16 192:18 |
| 158:1 159:1 160:1 | 291:18 292:1 293:1 | 339:5 379:18 380:4 | 210:24 211:12 |
| 161:1 162:1 163:1 | 294:1 295:1 296:1 | **stopped** 53:10,12 | 219:2 250:6 318:11 |
| 164:1 165:1 166:1 | 297:1 298:1 299:1 | 317:8 | 341:23 349:12 |
| 167:1 168:1 169:1 | 300:1 301:1 302:1 | **stopping** 156:4 | 357:7 |
| 170:1 171:1 172:1 | 303:1 304:1 305:1 | 158:10 379:8 | **striking** 237:17 |
| 173:1 174:1 175:1 | 306:1 307:1 308:1 | **storage** 16:14,16 | **strong** 239:10,18 |
| 176:1 177:1 178:1 | 309:1 310:1 311:1 | 207:15 208:2,19 | 240:7 318:12,13,17 |
| 179:1 180:1 181:1 | 312:1 313:1 314:1 | 213:7,12,23 214:3 | **structured** 291:9 |
| 182:1 183:1 184:1,3 | 315:1 316:1 317:1 | 214:10,12,22 215:2 | |

student 76:3
students 332:18
studied 113:10
studies 235:15
236:19 271:9,9,9,11
272:14 273:23
274:9,16 276:21
277:15
study 200:21 232:20
277:10 314:8,14,16
315:12
stuff 271:16
subject 12:6 55:13
97:3,4 98:5,7,22
99:12 101:13
107:16 203:22
230:5 280:17 325:5
subjected 230:10
subjects 5:21
submission 220:17
submissions 45:2
submit 21:16 74:14
submitted 11:2,6,9
11:16 22:15,18,20
22:23 23:12 36:14
36:17 40:3,11 43:11
43:21 46:25 48:24
49:11,22 50:6 58:3
58:14 65:9 72:4
104:15 136:23
138:2 142:2 154:2,7
160:22 162:9,24
165:6,17 166:12
170:11 205:8 300:4
363:20
submitting 19:16
74:9
subpoena 263:13
subpoenaed 128:7
subscribed 380:21
385:22
subsequent 35:3
substance 184:5,10
substantial 105:4
230:22

substantive 49:15
substituted 338:4,18
339:7,9 342:3
substitution 338:8
subtle 180:11
subtract 346:20
subtracting 332:11
subzero 230:2
succeeding 39:14
sued 73:18
sufficient 239:9,18
276:20
sufficiently 199:6
suggest 49:12
142:11
suggested 20:2
49:13 50:24 303:20
suggesting 42:11
suggestion 245:4
suggestions 22:25
suggests 338:17
suit 90:21,25 91:7
94:24 95:10,19 97:6
97:17,24
summer 2:21,23
4:15 133:12 183:10
223:9 229:3,10,21
summerlike 217:22
summers 230:11,14
sunscreen 250:8
251:22 254:3,12
sunscreens 247:2,2
supervised 11:24
12:7,15 294:4 295:9
supervisor 300:6,15
300:22
supp 38:6,9
supplied 111:23
support 23:19
124:25 216:16
221:8,13,24 227:5
231:16 315:5
360:25 382:8
supported 333:3

supporting 57:15
suppose 343:20
supposed 40:12 96:8
237:23 262:13
supposedly 142:18
229:8 230:9,10
341:20,25
sure 8:12 21:17
35:24 56:9 61:24
67:6 69:4 76:2 84:5
182:15 194:15
213:19 241:13
253:7 258:9 260:6
270:9 273:14
287:17 300:8
326:17 345:23
347:12 362:12
368:4
surprise 81:19,22
82:14,18 83:9,14
surprised 123:19,25
156:9
surprising 154:22
surprisingly 244:21
245:14 246:18
surrounding 205:22
suspended 134:2
suspicion 239:10,18
240:7,16
suspicious 242:8,11
sustained 105:9
swear 4:3
swore 5:5 171:20
sworn 4:23 6:21 7:3
19:8 22:8,12 28:11
28:21 29:9,14 34:4
53:22 69:11 77:11
90:19 97:14 119:12
138:3 156:7 173:18
220:18 380:21
381:12 385:22
system 16:22 105:5
188:8,9 294:12
315:16,17

systems 315:22

**t**

t 4:22,22 183:2,23
183:23 332:18,21
333:7,11 334:3
381:2,2
tab 193:13 351:20
351:24
table 170:5,8 174:20
175:13 180:8
tags 170:10,12 374:6
take 14:14 20:4
54:21,24 55:2 60:20
60:23 63:3,6 75:5
75:11,21 92:7 132:5
157:11 167:2 188:3
218:16 258:21
260:5 275:2 287:8
330:18 331:16
333:23 335:11
337:9 342:19
344:14 345:2,4
356:25 357:3
359:23 361:12,15
362:6,11 366:23
370:11 371:15
372:12,16 374:15
375:14
taken 9:13 20:12,21
25:9 37:21 48:2
61:4 63:5 64:14,17
64:18 65:4 66:4
73:8 80:4 92:12
134:8,23 145:19
147:18,19 149:8,25
150:7,20 151:15
156:23 158:15
163:20 165:24
167:6,22 170:3,10
171:21 181:12
187:16,20 254:17
260:13 290:12
331:4 337:13
342:21 352:3

359:17,18,23
361:17 367:13
372:7 374:7,17,19
381:13
**takes** 133:22
**talk** 15:10,14 16:7
45:15 52:11 53:21
69:24 70:2 94:18
99:5,6 112:17
113:22 149:3 159:9
159:10 164:23
192:3 193:10
210:11 211:6,7,8
214:18 244:14
245:4 264:15
265:15 266:8,9,11
266:15 267:23
274:24 280:10
310:12 311:18
337:21,22
**talked** 9:18 15:12
30:16 53:16,18
87:17 184:7,8
332:24
**talking** 76:9 99:10
112:15 126:8
150:22 157:22
160:2 163:7 166:19
170:22,23,24
174:11,13 207:9
208:25 229:14
235:14 243:22,22
247:10,21 254:16
263:15 266:13,16
275:7 278:7 283:16
313:15 316:3 340:7
365:6 366:2,6
**talks** 97:5 242:21
271:2,5,7,8 272:10
286:7,9,16 314:22
316:7,12
**tan** 154:9,23 166:22
**tanned** 177:7 180:23
181:3

**tape** 60:22 61:2,6
132:4,7,10 134:22
134:25 182:23
183:5 188:11
249:11,20,24
260:12,15 337:12
337:15
**taping** 188:8,9
**tardy** 236:10 238:12
238:21 240:5
**target** 101:13
**task** 56:2
**tasked** 56:20 302:20
**tasking** 57:10
**tasks** 302:23 303:2
**taught** 322:18
**team** 53:11 76:13
78:21 102:25
110:10 121:7
149:21 303:3,8,10
303:10,12,16,18,18
303:20 304:11
330:9
**tear** 147:13
**technical** 57:11
300:18 301:16,20
359:7
**technically** 12:8
**technique** 200:19
201:2 256:5 264:14
272:14,15 276:23
277:17 278:13
279:14,16 281:2
295:25 299:9,19
301:6,10 304:8
**techniques** 213:8
**technology** 122:8
315:24 322:17,19
322:24 323:9
**tecum** 263:14
**telephone** 58:21
**tell** 5:5 14:2 20:11
20:14 25:18 26:3,21
27:12 29:3 31:17
44:24 45:8 52:25

66:3 84:17 101:18
102:23 103:21,25
104:7 107:21
109:22 110:6
115:19 120:4
124:24 125:13
127:16 139:14
149:9 150:24
153:23 156:5
157:14 158:8
159:12 160:15
163:11,12 178:17
178:21 179:2,12
180:11 186:15
189:19 193:7
195:21 206:8 221:5
221:9,12 222:2
225:5 249:22 268:5
274:20 291:18
307:5
**telling** 19:24 20:2
31:13,14,18 87:10
131:21 152:7,11
161:19 164:25
171:24 176:7
220:22 221:10,18
221:25 224:17
277:11 291:7 292:6
302:12
**tells** 240:13
**temperature** 229:18
231:12
**temperatures** 190:5
222:6,10 229:15
230:3 231:3,5,7
272:19
**ten** 336:14 337:8
**tensile** 325:21
**tensility** 327:2
**term** 235:18 336:21
336:22 337:3
**terms** 23:2 51:7
73:25 115:18
302:20 326:23
336:19 370:20

**terrible** 110:16
**terrorism** 123:21
**test** 13:2 40:17
43:13,23 45:23,24
46:2,7 47:15 48:13
48:18 55:7,9,11,13
61:20 104:3 202:22
203:15 204:2,17
207:7 244:4,10
251:12 252:10
253:16 268:5
271:10 272:14
284:22 293:15
294:21,22,24 295:2
295:8,14,14,15,21
298:20,22 299:3,16
299:22 302:15
328:24 329:16
332:21,22,25,25
333:7,11 334:3
342:18 347:3,13
**testator** 237:13
**tested** 46:6 60:3
198:9 202:5 226:17
243:16 252:12,13
253:24 289:7
293:14 297:11
**testified** 4:24 13:8
13:11 34:20 35:2,9
53:15 86:17 87:11
87:19 88:17,24 89:3
90:3 92:2 96:15
98:8 104:16 105:16
105:20 110:24
112:23 113:3
114:23 129:23
153:3,7,20 158:2
160:18 171:20
180:10 183:24
184:13 186:2
197:21 217:14
219:23 224:11
234:14 242:13
245:21 254:21
255:14,18 258:6

264:5 266:7 267:21
269:11 270:20
273:11,13,17 277:7
279:6 280:8,15
291:19 301:3
306:13 361:11
377:22
**testifies** 77:20
**testify** 34:25 35:6
105:17 111:13
129:12 146:5
249:21 263:9
266:17 280:23
323:14
**testifying** 15:6
110:14 129:19
231:8,25 298:3
360:9
**testimony** 6:21 7:2
13:20 14:13,21
15:11 16:8 18:14,18
19:8 21:8 22:8,12
26:23 27:5 28:6,11
28:21 29:9,14 31:3
39:24 40:4 43:6
44:6,8 50:3 53:22
54:3 63:23,25 69:11
77:11,13 85:15,23
86:20 87:5 88:2
90:19,24 91:25
96:14,21 97:14,22
98:18 106:3 109:16
110:9,25 113:5,6,8
113:15 114:22
119:12 129:13
132:19 153:9
157:15 158:9 159:3
168:10 173:14,18
181:8 194:9,15
205:21,23 221:13
277:5 279:9 360:5
360:10 362:10
373:9 381:11,13
**testing** 39:15 94:6
146:25 170:5

198:17,19 199:8,12
199:18,21 200:7,14
200:16,17 201:9,15
201:20,24 202:16
204:10 207:6 240:9
240:12 244:21
253:14,14 254:19
255:20 257:5 258:7
258:16 260:20
261:4,5 266:25
275:19 276:14
277:22 278:23
300:25 301:18
305:10,15 312:18
312:24 328:23
342:16
**tests** 55:5,6,15 56:5
56:7,9,22 103:17
201:22 202:12
251:18 275:13
276:9 294:16 296:4
307:23,25 308:3,21
316:21,25 317:2,10
317:14 326:19
332:18 347:25
**text** 179:7,15 180:8
**textbooks** 81:11
**thank** 30:21 100:16
134:13 164:13
235:5,10
**theft** 81:10
**theoretical** 256:2
**theory** 329:10 338:8
338:17,22,23 339:2
339:4
**therefrom** 255:20
**thereof** 285:17
**thickness** 326:4
334:12
**thin** 308:22 310:10
319:10,23
**thing** 18:23 102:17
112:12 165:16
223:5 245:24 284:6
313:3 342:9 351:18

**things** 8:23 66:12
88:20 97:21 98:10
98:14 112:4,9
124:12 125:8,9
152:21 156:13
190:5 198:20
200:23 208:9 209:2
209:11 238:16
245:25 246:5
248:11 254:9
272:19,21 279:19
323:25 339:24
**think** 7:23 8:3 13:9
13:19 23:3 44:13,14
60:21 66:23 76:17
83:17 111:22 112:8
128:3 133:19 142:8
151:4 171:23
172:25 176:7
179:17 181:9
183:14 185:15
186:6 216:19
226:10 233:25
234:17 253:10
254:22 259:2,19
267:10 269:24
273:17 276:19
278:13 280:12
284:7 287:16
290:24 293:10,15
304:4 307:3 308:5
313:13 322:15
326:7 330:4 336:20
341:18 356:21
360:24 366:8
367:25 368:11
373:12,15 376:18
377:8 378:4 379:2,5
**thinking** 80:6
**third** 128:22
**thought** 51:5 121:9
121:11 153:12
221:7 263:14
285:19 289:21
297:7

**thousand** 336:15
**thousands** 40:20,22
43:10,11 254:22
**thousandth** 334:7
335:8
**thousandths** 336:14
337:8
**threat** 90:20,25 91:6
91:13 94:23 95:10
95:11,18,21 97:2,17
97:24 98:11
**threatened** 98:4
**three** 28:25 91:24
92:5 96:13 133:15
151:14 208:9 209:2
246:22 265:16
285:18,22 315:22
331:9 343:12
**threshold** 199:12,17
203:24 204:8 205:2
206:15,24 244:20
**throw** 274:15
**throwing** 271:16
274:8
**thrown** 237:9
238:24
**tiff** 164:20 170:17
**till** 148:11
**time** 3:13,24 12:17
16:9 19:16 22:14
27:9 36:18,25 40:21
45:13 48:21 50:2
53:3,13 59:21 61:2
61:6 63:2 65:13
70:23 71:19 76:19
78:20 89:18 90:9,20
91:2,5,15,17 92:11
92:14 98:16,18,21
99:24 101:12,15
110:12 111:9,14,18
113:19 118:10
121:5 127:23
131:18 132:7
133:14 134:16,22
134:25 136:5 150:5

150:6 156:12,17
167:5,8 172:7,9
175:10 177:18
181:9 182:23 183:3
183:5 185:8,19
186:22 193:8
194:21 195:17
200:24 211:15
212:4 216:24
223:10 226:5
230:22 250:21
257:12,13,16,19,22
257:25 259:6,9,17
259:19,25 260:12
260:15 265:14
266:8 275:2 276:23
277:19 282:3,7
283:7 286:11
300:15 301:5
309:11 313:19
322:25 324:10,14
331:11,12 337:12
337:15 346:25
355:8,22 358:4
361:14 363:8 372:6
372:9 376:7,18
378:12 379:4,14,15
379:16,23 380:6,10
380:17,18
**time's**  363:10
**times**  14:18 15:12
15:15 56:15 70:6
108:24 111:12
164:21 205:20
277:2
**tiny**  254:2
**title**  24:12,15 135:13
178:17 234:17
340:12,14,17,21,24
**titled**  116:25 265:24
358:24
**titles**  233:2,4
**tlc**  103:22 309:24,25
310:18 311:6
312:20 314:2,5,9,17

314:22 316:14,15
317:6 343:5,19
346:23,24 351:12
353:23 354:5 359:9
366:15,16,21 367:3
367:9 383:21 384:2
**tobacco**  257:14
258:11 369:17
**today**  3:13 6:21,22
7:13,18 8:8 9:2,12
14:22 15:6,11 16:8
21:8 28:12,21 57:24
61:23 97:22 108:9
146:6,23 153:10,20
155:11 159:20
165:2 173:15,19
174:17 194:14
202:5 203:9 256:11
270:4,11 280:11,24
319:19 320:25
321:4,6,22 322:3,8
353:24 370:19
**told**  16:19,25 25:15
31:25 32:2,3 33:5
78:21 88:6 91:16
103:16 106:17,19
109:10,12 110:4
115:4,8 119:13
121:3 125:6,7
151:12 152:12
158:23 172:25
185:13 194:19
206:8 217:5,7,12
220:8 221:14 222:3
222:10 223:16
231:14 291:20
307:4,8,10 362:3
373:10
**toner**  45:23 55:9
305:9 309:23 310:5
310:6,6,7,8,13,15
311:19,22 312:6,8
312:10 313:6,18
314:2,5,5,23 315:6
315:13,14,17 316:4

316:5 317:15 318:2
318:3 320:19 322:4
346:16,18,22,24,24
366:16 368:17
372:20
**toners**  310:17,22,24
311:4,5 312:13
314:9,18 315:18
316:8,12,17,22
317:4,21 318:22
378:5
**tony**  89:16
**top**  66:16 123:4
173:22 280:25
334:21 343:9,19
352:10,21 364:23
367:24
**tossed**  237:8
**total**  154:25
**totally**  329:20
**toto**  344:25
**touch**  250:19
**touched**  249:14
250:3,4,16 256:4
**touching**  250:7
**tough**  50:22
**track**  14:11 374:17
**trained**  322:19
**training**  37:20 59:4
59:12,17,18 187:24
232:21
**transcribed**  381:15
**transcript**  14:2
40:10 41:21 43:19
60:16 76:25 86:6,22
86:23 129:16 130:8
382:20 383:4
**transcripts**  76:22
266:16
**transfer**  227:16,22
228:19 250:17
**transference**  226:22
227:6,24 228:14,16
**transferred**  369:18

**transparent**  154:9
155:4
**travel**  371:21
375:24 376:14
379:10,13,19,22
**trial**  34:21,21,22
35:2,3 51:10 66:21
68:9,12 85:25 86:6
86:11,21 87:6,16
88:21 90:2 91:19
99:23 100:18
101:16,22,25 102:3
102:16 104:10,18
105:16,17,18,21
205:23 258:9
323:15 325:10
382:20
**trials**  266:12,14
**tried**  55:16 67:11
82:15 206:8
**trier**  107:10 112:7
**trouble**  85:22 86:3,4
87:6,14,20 88:8
**true**  13:6 58:8 60:9
62:12,15,16 87:5
247:19
**trust**  239:14 240:13
247:18
**trustworthy**  77:19
**truth**  5:5 18:8 31:13
31:14,18 87:10
152:7,11 171:24
176:8 220:22
221:10,25 224:18
**truthfully**  104:17
105:16,21
**try**  101:21 123:7
156:11 243:10
251:15 274:18
357:22
**trying**  7:23 31:16,23
37:4 56:14 80:17
81:6 112:6 115:21
140:9,15 155:16
156:2 157:5,16

158:10 159:7
235:20 243:8 248:9
249:19 269:22
274:20 275:7,10
285:24 313:13
325:6 340:20 344:7
347:19 359:21
379:18
**turn**  3:6 32:9 94:10
96:23 286:24
331:23 363:4
**turns**  237:14
**twice**  41:2 268:5,7,7
358:6 363:9
**two**  8:19,22 10:5
17:14,22 24:21 26:4
30:11 32:5,16 33:15
33:25 36:20 53:24
59:14,17,18 61:11
66:25,25 88:25
90:23 92:8 98:9
102:6,8 103:13
112:18 120:7
121:13 123:14
126:19,21 130:4
133:6 135:5,13
136:8,9 137:21
139:4 145:9 168:6
177:25 178:14
185:18,18 197:15
198:9 200:3 205:7
211:2,8 214:18
216:20 217:4 233:9
233:9,20,21 238:3,6
262:7 267:5 268:6
277:6 280:8 285:22
288:7 301:17,21
302:8 303:14 305:5
305:6 310:23 311:4
311:5,11 312:10
320:16,18 321:16
322:10,11 323:24
326:19 332:3,5
333:12 336:6,18
338:3 339:20,24

342:7 343:12
349:15 352:9
356:22 358:2,2,15
358:19 360:3,15
361:6 364:8,15
382:14 383:6
**type**  79:18 236:8
313:2 316:3 338:21
351:7,8,16,17 368:7
**typed**  64:11
**typeface**  322:16,23
323:3
**types**  208:13 235:18
239:17
**typical**  115:23 116:3
**typically**  195:23
209:17 210:10
231:11 351:16
**typography**  322:16
322:23 323:3
**tytell**  2:20 4:21
121:18,21,23,25
122:4 126:11,18
131:8 147:18 151:4
151:10,23 152:3
153:4 154:21 155:2
157:2 158:24 160:7
161:8,13 163:21,24
164:3 165:2 166:11
166:12,14,20
167:11,14,21 170:3
170:12,20 171:8,9
171:17,20,24 172:9
173:17 174:5 176:3
176:4,7,10 181:5,17
181:23 338:2
383:11,14
**tytell's**  48:13 148:10
148:12 150:23,23
151:14 152:8,12
153:7,17,24 154:6
154:12 156:7 158:4
163:3 167:19
168:12 171:3,5,6,10
173:24 176:23,25

177:6 180:17

---
**u**
---
**u**  110:17
**u.s.**  3:20 93:16
97:15 177:25 295:9
382:23
**ultimately**  95:12
**ultraviolet**  46:12
279:16 347:18
**unanimously**  72:16
**unanswered**  44:23
**unbeknownst**
102:24
**uncertainty**  333:19
**unclear**  218:9
**unconcern**  237:9
**undamaged**  147:13
**underlying**  95:6
**underscore**  152:18
**understand**  5:8 6:13
10:14,20,25 11:7
16:23 27:23,24,25
29:17,18 33:18,23
34:3 46:16 73:16
100:8,14 109:6
111:17 119:16
124:7,8 141:25
144:10 145:11,16
145:17,21,23
146:24 147:4 201:6
205:10 208:13,14
215:25 228:12
229:6 231:22 263:2
268:9 269:14,16
270:9 272:17 281:3
281:18 297:4
298:16,17 301:14
329:22 333:6
343:16 357:5 361:4
361:9 363:11,24
364:4 371:18,20,25
375:24 376:14
**understanding**  6:18
33:2,10,12,14 69:17

81:25 83:2 84:6
91:3 95:25 107:23
115:23,24 214:12
215:13 229:7
267:18,25 369:11
**understood**  88:3
**unexploded**  323:7,7
**unfortunately**
359:25
**unheated**  267:19,23
**unibomber**  323:2
**uninsulated**  242:6
**union**  267:11
**unit**  2:6 191:18
225:12
**united**  1:2 35:6
66:14 77:25 78:4,5
87:21 93:3 104:25
109:24 123:13,22
143:12 145:5 175:9
217:22
**units**  195:15
**universal**  299:18
**unknown**  90:14,17
191:20 219:17
**unmanipulated**
165:5
**unqualified**  323:21
**unreliable**  200:15
201:10 227:2
294:16
**untested**  294:15
297:25 298:24
**unusual**  236:17
300:10 301:5
302:13
**unusually**  198:25
214:14
**unvalidated**  289:6
290:9 293:15
**upcoming**  93:25
**updated**  369:20
**uploaded**  182:6,10
182:13

**upper** 229:22
  367:12,13
**usb** 143:17,22 144:4
**use** 27:4,8 28:5 29:5
  30:18 113:4 152:17
  191:13,15 196:25
  201:4 222:7 248:22
  250:8 256:20
  257:10 263:4,19
  264:4,5 267:16
  270:5 272:17,20
  273:2 274:3,5
  282:10 296:3
  297:24 301:21,23
  313:6,9 314:9,17,22
  320:18 322:4
  330:13,25 336:15
  336:16 339:23
  346:18 350:14
  360:12 380:5,10
**useless** 113:16
**uses** 205:2 206:16
  206:24 262:21
  263:25 265:10
  268:14,18,20,21
  270:20,21 278:20
  310:7 360:7
**usual** 199:12,17
  218:16 244:20
**usually** 39:4
**utilize** 302:16
**utmost** 237:9
**utter** 237:4
**uv** 326:13 327:20
  348:10,11,15,23,24
  349:6

**v**

**v** 164:3 383:11
**vacate** 73:23
**vacated** 72:8,14,22
  73:5,15,17 74:2,4
  74:16 75:3
**valery** 19:15 25:9,12
  145:14 282:20

**valid** 176:3 180:20
  277:14 278:22
**validate** 277:10,10
  278:11
**validated** 275:14,20
  275:25 276:3,5,10
  276:14 277:23
  278:25 279:6,8,11
  279:12,15,18,19,22
  280:2,4,12
**validates** 314:8,17
**validity** 275:16
**valuable** 237:5
**value** 199:16
**vanderbilt** 86:6,12
  87:21 382:20
**vantage** 193:21
**variance** 331:21
  332:7 335:12,15
  336:2,17,18,20,22
  337:3
**varied** 66:15
**variety** 246:4
**various** 5:22 246:25
  309:19
**varying** 209:5
**venture** 129:25
**verb** 26:11
**verbally** 16:16
**verbs** 8:19
**verdict** 105:14
**verification** 224:15
**veritext** 3:12 4:3
  385:2
**versa** 50:21
**version** 139:22
  171:19 173:16,23
**versions** 351:2
**versus** 3:19 35:6
  106:9,17 107:21
  113:23 173:7
  254:17 261:18
  310:6
**vial** 265:11 267:16
  268:7,14 342:22,24

343:20 345:11,11
  345:11,12
**vials** 344:16 345:9
  345:14,17 347:7,15
  359:15,18 360:18
**vice** 50:20
**video** 76:6 90:14
  148:6 149:20,22
  151:15 156:17
  157:10 162:23
  173:15 175:3,21
  176:11,13,15,17
  177:4,19,20 178:19
  178:25 179:8 180:2
  180:5,13,15 182:5,6
  182:12,14 187:8,11
  187:17,21,25 188:3
  188:7 190:2,12
  309:3 344:21
**videographer** 2:24
  3:2 60:25 61:5
  92:10,13 132:6,9
  134:21,24 162:10
  167:4,7 182:22
  183:4,18 187:14
  188:12,15,17 259:8
  259:14 260:11,14
  337:11,14 372:5,8
  380:16
**videos** 179:20
**videotape** 144:23
  147:17 149:7,9,10
  149:16,17 150:14
  175:20 189:10
  356:24 359:22
  360:24 373:11,16
  373:25 374:2
**videotaped** 1:17
  121:10
**view** 47:21 239:14
  339:21 342:6
**viewed** 131:24
  150:13 326:14
  327:19

**violated** 72:5 74:8
**violation** 375:13,17
**virtually** 198:14
**visible** 61:22
**visibly** 164:17,18
**visual** 156:8 174:6
  176:3,23 177:3
  180:17
**visualizing** 309:18
**visually** 157:3
  194:21
**vitae** 65:15 382:18
**voice** 27:16,17
  152:15,16
**volatile** 209:13,15
  209:17 210:8,11
  215:14
**volatilizes** 218:2
**voluminous** 66:6
**vote** 73:11
**vs** 1:7 385:5
**vsc** 190:9,11,17,17
  190:17,17,21
  191:18 193:12
  195:15,17 196:13
  196:14,14,22,25
  309:6,8 313:10

**w**

**w** 4:22 183:23 272:5
**wait** 134:3
**waiting** 363:9
**walter** 45:15
**want** 5:12 6:12
  12:20 42:14 44:4
  49:18 67:6 84:11
  99:24 111:24 113:4
  125:21 132:17,25
  147:7 164:22 183:9
  183:13 191:7
  203:19,20 205:17
  240:15 242:25
  245:20 249:11
  252:19,25 259:21
  260:2,2 270:8

271:16 284:15
286:6 315:7 328:25
331:19 338:11
341:9 345:23 347:9
347:10,11 350:13
353:17,20 368:13
371:16 376:15,20
377:2 378:11
379:20
**wanted** 78:22 81:16
83:5 132:14 260:9
**wants** 7:21 42:21
77:23 149:21
**warmer** 229:9,10
**warn** 215:20
**warren** 2:5
**wash** 75:10
**washed** 180:6
**washington** 17:24
18:12
**waste** 48:20 119:11
**water** 227:15
**wave** 46:12 326:15
327:20
**way** 11:5,11 12:5
14:12 18:22 26:16
31:4 39:17 53:23,25
67:19 73:11 74:7,13
77:4,6,21,21 82:6
109:4 115:19 123:8
136:4,21 146:4
182:5 189:11
200:22 215:8 219:8
222:7 225:20
228:19 236:16
238:22,23 248:19
256:8,13 286:22
292:12 337:3
338:10,12 349:4
377:2 381:19
**ways** 120:7 237:18
241:14
**we've** 19:10 74:24
133:6 174:22
337:23 358:16

369:11 378:9
**wear** 147:13
**weather** 216:23
217:5 220:19,24
221:2,5,15,16,23
222:5,12,22,25
223:5,8,9,11,13,17
223:21 228:25
229:7,9 231:15
232:3 241:9,20,21
242:3
**web** 17:25 18:7,9,20
24:20 26:2 61:13,21
61:25 62:3,22 63:3
63:12 64:15,19,22
81:9 82:4,22 83:6
83:10 382:16
**week** 49:10 93:10
185:18 353:8
**weekly** 191:15
**weeks** 185:18,18
276:18 277:6,25
278:4
**weight** 214:16 256:7
378:2
**weighted** 196:5,7
**weights** 196:9
197:17
**weiss** 16:2,4
**wellsville** 229:13
**went** 48:15 52:2,3,4
69:22 102:2 133:8,9
139:19 248:24
258:9 304:23
313:20 323:15
**western** 1:3 3:21
14:20,24 145:5
**westlaw** 38:2
**weyermann** 272:4
272:12 287:10,12
288:6 290:17 293:7
**whereof** 381:21
**whispering** 3:5
**white** 163:3 164:17
165:7 166:3,8,13,16

170:20 172:13
173:7 174:12 177:9
180:19 181:25
188:21 196:9 197:5
351:20
**whiter** 170:13
**whitish** 197:14
**widely** 122:21,24
123:3 231:20
246:12 247:13
248:11
**wider** 352:9
**williams** 106:9,18
107:2,22
**wills** 235:17,19,22
235:25 236:7,10
237:16 239:22,24
**win** 77:23
**winter** 221:19 223:7
223:8 229:2,11,15
241:13
**winterize** 16:23
**winters** 230:13,15
**withdraw** 29:19
45:12 155:18
**withdrawn** 5:19
114:19 124:15
137:5,15 138:8
144:2 148:22,25
169:7 176:24
182:11
**witness** 3:23 4:4,23
40:25 41:12 42:10
42:17 43:5 84:23
88:12 99:4,25 104:9
108:5 112:8 115:14
132:12 133:10
134:14 140:8
150:10 157:8
183:19 237:11
259:14 271:24
377:21 381:10,13
381:21 382:3
**witnesses** 107:5

**witnessing** 24:22
**wonderful** 132:21
**wood** 351:9
**word** 14:14 22:4
26:21 27:4,5,6,8
28:5,13 29:4,4,8,13
29:15 30:9,14,18
31:8,19,21 62:8
108:25 109:3
125:14 152:18
324:10,15 350:7,15
**words** 8:22 22:13,17
27:7 28:16 31:15,22
31:25 100:4 105:19
159:6 177:17 195:4
203:13 216:4 290:4
290:8,11,22 291:6
291:15 300:14
301:8 330:24 341:2
341:4 350:13
363:18,21 371:4
**work** 6:15,24 7:9
8:14 9:14,24 11:14
20:12,17 24:9,25
25:4,7,18 26:7
33:21 53:2,7 54:8
57:11 66:9 78:3
117:6 125:10
131:18,24 138:24
140:22 141:10
142:2,6,19 144:7,12
145:18 147:3,9
150:16 166:7
167:22 168:14
175:7,22 178:18
180:19 185:23
191:14 197:2,23
198:21 199:6 200:9
204:14 215:2 220:6
224:21 226:3
227:18,25 230:9
231:24 237:22
239:3 243:6 245:7
248:19 251:3
257:23 265:25

277:16 278:17
286:21 291:19
300:2 306:9,12
307:12 310:18
311:12 325:15
326:24 327:9 328:3
337:6 342:21 345:5
351:21 354:11,15
355:5,20 356:7
358:16,20,22 359:6
361:7 362:6,20,24
375:2 382:13
**worked**  297:12
315:15 323:2
**working**  79:20
82:16 119:22,24
120:9 143:20 203:8
331:12
**works**  271:10
272:15,24 276:19
278:13,17 321:10
321:16
**worksheet**  89:5
343:5,6,19 351:13
353:23 354:5
357:25 360:15
361:2 367:9 372:25
383:21
**world**  12:11 75:15
78:10 122:23 125:3
125:25 126:6 210:2
328:21
**worth**  205:21 256:6
377:25
**worthy**  127:11
**write**  22:2 32:15
34:8 35:25 51:20
338:2 340:24
**writer**  21:24
**writing**  21:24 37:10
154:14 158:7 161:3
164:9 239:23
265:24
**written**  50:10 51:17
51:18 55:24 62:7

111:2 283:12
284:19 297:19
369:9 370:23
377:23
**wrong**  161:24
201:14 269:25
292:17,19,21 293:2
293:5 327:25
339:16,18,23,23
340:11,13 341:3,13
**wrongful**  90:21,25
91:6,14 95:10 97:7
**wrongly**  88:7
**wrote**  232:23 297:18
**www.blancostewa...**
62:3 64:12

| x |
|---|

**x**  1:5,11 382:2
**xerox**  344:6 351:10

| y |
|---|

**y**  4:22 183:23 272:5
**yeah**  209:9 210:3
299:24 364:6
**year**  7:24 14:4 16:20
19:20 59:14,17,18
68:18 147:14 169:3
191:3,5,5 211:7
219:25 222:11,19
230:6,8 267:5
331:10
**years**  13:23 14:10
65:5 66:5,15 70:18
70:22 78:16 79:4
80:16 81:4 104:22
105:2 112:19 125:8
127:25 130:5
154:25 198:9 199:2
200:3,20 211:3,8
230:18,23 238:12
238:15 239:24
262:10 264:10
267:5 315:20,20
318:21 329:11
331:9

**yellow**  166:3 170:20
172:14 173:7
174:12 177:9 348:6
360:21
**yellowed**  347:19
**yellowing**  163:4
**yield**  308:4
**yielded**  307:25
**york**  1:3,20,20,22
2:13,13 3:12,17,17
3:22 16:20 34:23
38:18 145:6 160:11
220:9,10 229:13
381:3,5,9 385:3,3
**york's**  14:21
**young**  15:21
**youtube**  182:6,9,10
182:13,15

| z |
|---|

**z**  81:14 82:11,15
**zuckerberg**  1:8 3:19
6:14,19,23 9:19
34:6 135:24 137:8
138:4,9 139:2 144:4
179:5 385:5
**zuckerberg's**  7:3