UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

PAUL D. CEGLIA,

                    Plaintiff,

v.

MARK ELLIOT ZUCKERBERG, Individually, and
FACEBOOK, INC.

                    Defendants.

Civil Action No. : 1:10-cv-
00569-RJA

## PLAINTIFF'S OBJECTION TO THE REPORT AND RECOMMENDATION OF THE

## MAGISTRATE JUDGE, DOC. NO. 651

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................iii

PRELIMINARY STATEMENT .......................................................................................... 1

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS .................................................................................................. 8

STANDARD OF REVIEW ............................................................................................... 16

ARGUMENT ..................................................................................................................... 26

    I.    CONTRARY TO THE ASSERTION OF THE MAGISTRATE, FEDERAL RULE OF EVIDENCE §§ 901 AND 1008 ESTABLISH THE AUTHENTICITY OF THE CONTRACT AND REQUIRE THAT THE CONTENTS IS A FACTUAL MATTER TO BE DETERMINED BY THE JURY ................................................................................. 26

    III.    THE MAGISTRATE ERRED IN FAILING TO APPLY ...................................... 27

    THE CORRECT STANDARD OF REVIEW FOR SPOLIATION ................................. 27

        A.    The Evidence Shows that "Multiple Versions" of the Work for Hire Contract Did Not Exist. ........................................................................................................ 30

        B.    Damage to the Work for Hire Document ................................................... 33

        C.  The Missing USB Drives ........................................................................... 35

        D.    The Reinstallation of the Windows Program ............................................ 35

        E.  The Supposed Deletion of Electronic Copies of the Work for Hire Document and other Electronic Evidence. ............................................................................... 36

    IV.    SPECIFIC OBJECTIONS ................................................................................... 37

        A.    Objection to Magistrate's Finding that the StreetFax Document is Authentic ..... 37

        B.    Objection to Magistrate's Finding that the Work for Hire Documents and Supporting Emails are Fraudulent. ............................................................................. 38

CONCLUSION ................................................................................................................. 48

## TABLE OF AUTHORITIES

**Cases**

*Alliance for Environmental Renewal, Inc. v. Pyramid Crossgates Co.,* ....................... 19, 20
   436 F.3d 82 (2d Cir. 2006)

*Anderson v. Liberty Lobby, Inc.,* ........................................................................................ 21
   477 U.S. 242, 254 (1986)

*Arbaugh v. Y & H Corp.,* ............................................................................................ 6,19,20
   546 U.S. 500 (2006)

*Arista Records LLC v. Usenet.com, Inc.,* ........................................................................... 25
   633 F. Supp. 2d 124 (S.D.N.Y. 2009).

*Barr Rubber Products Co. v. Sun Rubber Co.*
   425 F.2d 1114, 1120 (2d Cir.) ...................................................................................... 23

*Bell Atl. Corp. v. Twombly,* ................................................................................................ 7
   550 U.S. 544, 563 (2007)

*Chambers v. Nasco, Inc.,* ............................................................................................... 27,28
   501 U.S. 32, 50 (1991)

*Chin v. Port Auth. of New York & New Jersey,* ........................................................... passim
   685 F.3d 135 (2d Cir. 2012)

*Courtenay Communs. Corp. v. Hall,* .................................................................................... 7
   334 F.3d 210 (2d Cir. 2003)

*Filetech S.A. v. France Telecom, S.A.,* ............................................................................... 18
   157 F.3d 922 (2d Cir. 1998)

*First Nat'l Bank of Arizona v. Cities Service Co.,* ............................................................ 24
   391 U.S. 253 (1968))

*Fortunato v. Ford Motor Company,* ................................................................................... 24
   464 F. 2d 962 (2nd Cir. 1972)

*Global Network Communs., Inc. v. City of New York,* ......................................................... 7
   458 F.3d 150 (2d Cir. 2006)

iii

*Henderson ex rel. Henderson v. Shinseki* ........................................................................... 6
   131 S. Ct. 1197 (2011)

*In re: Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions,* ......................... 23
   538 F.2d 180 (8th Cir. 1976)

*In re Pfizer,* ........................................................................................................................ 37
   2013 U.S. Dist. LEXIS 2850, *49 (S.D.N.Y. January 8, 2013)

*Kopec v. Coughlin,* .............................................................................................................. 8
   922 F.2d 152 (2d Cir. 1991)

*Parker v. Sullivan,* .............................................................................................................. 22
   891 F. 2d 185 (7th Cir. 1989)

*Reed Elsevier, Inc. v. Muchnick,* ........................................................................................ 6
   130 S.Ct. 1237 (2010).

*Reeves v. Sanderson Plumbing Products, Inc.,* ........................................................... 19,20
   530 U.S 133 (2000)

*Residential Funding Cor. v. DeGeorge Financial Corp.,* .................................................. 29
   306 F.3d 99 (2d Cir. 2002)

*Schiel v. Stop & Shop Co., Inc.,* .................................................................................... 21,32
   2006 U.S. Dist. LEXIS 73508, *21 (D. Conn. Sept. 7, 2006)

*Universal Oil Products Co. v. Root Refining Co.,* ............................................................. 29
   328 U.S. 575 (1946)

*United States v. Chimurenga,* ............................................................................................ 22
   760 F.2d 400 (2d Cir. 1985)

*United States v. Goba,* ....................................................................................................... 22
   220 F. Supp.2d 182, 188 (W.D.N.Y. 2002)

*United States v. International Telephone & Telegraph Corp.,* ........................................... 23
   349 F. Supp. 22, 29 (D.Conn. 1972)

*West v. Goodyear Tire & Rubber Company,* ...................................................................... 27
   167 F.3d 776 (2d Cir. 1999)

iv

## Statutes

28 U.S.C. § 1332 ................................................................................................ 6

Fed. R. Civ. P. 12(b)(1) .............................................................................. 4,5,7

Fed. R. Civ. P. 12(b)(6) ......................................................................... 4,5,17,24

Fed. R. Civ. P. 12(d) ..................................................................................... 5

Fed. R. Civ. P. 38 ...................................................................................... 15,17

Fed. R. Civ. P. 56 ................................................................................... passim

Fed. R. Civ. P. 72(b)(2) ................................................................................ 1

Fed. R. Civ. P. 72(b)(3) ..................................................................... 3,4,16,25

Fed. R. Evid. 901(a) ................................................................................. 1,3,24

Fed. R. Evid. 901(b)(1) ............................................................................ 1,3,26

Fed. R. Evid. 901(b)(3) ............................................................................ 1,3,26

Fed. R. Evid. 1008 ............................................................................ 1,16,24,26

U.S. Const., Amend. VII ............................................................................. 1,17

## PRELIMINARY STATEMENT

Pursuant to Rule 72 (b)(2), the plaintiff Paul Ceglia respectfully objects to the March 26, 2013, Report and Recommendation (hereinafter referred to as "R & R") of the Magistrate, the Honorable Leslie G. Foschio, which recommends that this Court, the Honorable Richard J. Arcara, should grant the defendants' Motion to Dismiss on the basis that the contract in dispute "is a recently created fabrication"; or, in the alternative, on the basis of the "spoliation of the evidence." (R & R, p. 151).

The plaintiff objects on the grounds that the recommendations not only deprive the plaintiff of his constitutional right to trial by jury under the Seventh Amendment and Rule 38 Fed. R. Civ. P., but also they are in complete disregard and contrary to the far greater weight of the evidence (i.e. the testimony of the plaintiff and the forensic experts); the Federal Rules of Evidence (i.e. Rules 901 and 1008); the Federal Rules of Civil Procedure (i.e. Rules 12 and 56); the correct burden of proof; and fundamental principles of analysis which must be applied in the determination of dispositive motions.

## INTRODUCTION

This is a private civil suit brought by the plaintiff, Paul Ceglia, a businessman and entrepreneur, against the defendants, Mark Zuckerberg and Facebook, Inc., alleging Breach of Fiduciary Duty, Constructive Fraud, Actual Fraud, Breach of Contract, Breach of the Implied Covenant of Good Faith and Fair Dealing, and for Declaratory Relief. Trial by jury is demanded.

The central issue and ultimate question of fact in the case is the authenticity of the April 28, 2003 contract, signed and initialed by Ceglia and Zuckerberg, which provides that Ceglia

would pay $1000 to fund Zuckerberg's "The Face Book" project in exchange for "a half interest (50%)" in the project. Ceglia performed. Zuckerberg did not.

The overwhelming evidence that the contract (Work for Hire) is in fact authentic is the specific affidavit of Paul Ceglia, the lie detector test of Paul Ceglia, the expert testimony of experienced forensic experts whose credentials are impeccable and whose findings are unequivocal that the contract is authentic, and the multiple contemporaneous emails between Ceglia and Zuckerberg, which specifically and often refer to and confirm the very terms of the contract.

In addition to the explicit and specific affidavit of Ceglia, who categorically attests that he and Zuckerberg signed and initialed the contract (see Rule 901(a)(b)(1)), the experts testified that the signature and the initial purporting to be Zuckerberg's are in fact Zuckerberg's; that the paper, the staples, the indentations and other indicia all indisputably demonstrate that the contract is indeed authentic and not a forgery. *See* Fed. R. Evid. 901(a)(b)(3)  Furthermore, the experts also witnessed and opined that there was evidence that the defendants' experts (whose qualifications were seriously questioned and who had not been subjected to any Daubert standards) had tampered with the document in such a way as to despoil the evidence.

There is substantial conflict in the evidence by the witnesses and the documents. Ceglia avers under oath that the contract is genuine. Zuckerberg swears under oath that it is a forgery. Ceglia avers under oath that the emails in paragraphs 32-55 of the First Amended Complaint are genuine. Zuckerberg swears that the emails are forgeries. Ceglia has taken a lie detector test, which confirms he is telling the truth. Zuckerberg has not. Ceglia's highly qualified and

experienced experts assert that the contract is genuine.  Zuckerberg's experts whose Daubert

qualifications and experience are in doubt, claim the contract and the emails are forgeries.

Rule 901(b)(1) Fed. R. Evid. provides that the testimony of a witness with knowledge

that an item is what it is claimed to be satisfies the requirements of authentication and

identification.  Ceglia is a witness with knowledge since he is a signatory to the contract and a

witness to the signing and initialing of the contract by Zuckerberg.  He has so testified.

Rules 901(a) and (b)(3) Fed. R. Evid. provide that the testimony of an expert witness who

compares the item with an authenticated specimen satisfies the requirement of authentication or

identification.  Ceglia's qualified experts are witnesses who have compared authenticated

specimens of the handwriting and initials of Zuckerberg and other indicia satisfying the

requirement of authentication or identification.

Notwithstanding the very substantial evidence showing that the contract and the emails

are genuine, the Magistrate, after denying the plaintiff the right to general discovery, including

the deposition of Zuckerberg, filed a Report and Recommendation which stated that the contract

was not authentic and that the *plaintiff and his experts* had despoiled the evidence!  The premise

which served as the foundation and basis for the Magistrate's outré conclusions, and

which permeated the entire 155 page Report of the Magistrate, is the following admission which,

the Plaintiff submits, by itself, requires a rejection of the Magistrate's Report pursuant to this

Court's *de novo* review under Rule 72(b)(3):

> Because copious evidence has been submitted by both Defendants in support of
> their challenge to the Work for Hire Document's authenticity ans (sic) by Plaintiff
> in opposition, including expert witness reports, affidavits, exhibits and deposition
> transcripts, *a thorough discussion of all the evidence* [Footnote: "In total, the

> parties have submitted almost 4,500 pages supporting and opposing Defendants'
> Motion to Dismiss."] *would be overwhelming* to the reader and unnecessary.  As
> such, **the court discusses _only_ the evidence _most favorable to Defendants'_**
> **_Motion to Dismiss_**  and any rebuttal evidence submitted by Plaintiff.

(R&R, p. 32, ll. 15-21; Emphasis added.)

In addition to viewing the evidence in the light most favorable to the moving defendants, in complete derogation of all law and standards of analysis regarding dispositive motions, the Magistrate also repeatedly usurped the function and the right of the jury and substituted himself as the trier of all facts, including the ultimate fact in this case. In order to avoid the rigors of analysis required by Rule 12(b)(6) and Rule 56, dealing with dispositive motions, the Magistrate asserts that his recommendations are based upon the Rule 12(b)(1) requirement of subject matter jurisdiction in order to have a case or controversy.  Consequently, the Magistrate decided the credibility of witnesses. He decided conflicting evidence to the extent he considered the plaintiff's evidence at all. He viewed all inferences in the light most favorable to the defendants. He attempted to answer irrefutable scientific evidence of the Plaintiff's experts with rampant speculation and conjecture, even to the point of inventing the possibility of mysterious and unknown accomplices[1]!

---

[1] For example, in response to the expert's opinion that the lack of any similarity between the signatures of Ceglia and Zuckerberg made it impossible for Ceglia to forge Zuckerberg's signature, the Magistrate calls the opinion "sophomoric," "blink[ing] at the essence of the Defendant's Motion to Dismiss," and "ignoring the distinct possibility that someone other than the Plaintiff may have perpetrated the asserted forgeries which, again, would explain a lack of similarities between Plaintiff's signature and the purported Zuckerberg signature. The argument also ignores the reality that anyone attempting to forge another's handwriting would be unlikely to use his own handwriting." (R&R pp. 84, 85).

The erroneous syllogism recommended by the Magistrate is that this Court should determine that the contract forgery, notwithstanding the plethora of evidence to the contrary. Then, according to the Magistrate, the Court should find that there is no case or controversy. And then again, according to the Magistrate, this Court should dismiss the case for lack of subject matter jurisdiction pursuant to 12(b)(1).  In order to accept this syllogism, the Court would be required to decide the credibility of the percipient witnesses and the expert witnesses; and to view all the evidence and all reasonable inferences from the evidence in the light most favorable to the defendants, ignoring all the evidence of the plaintiff to the contrary.  This would manifestly be in contravention to the Seventh Amendment, Rule 38, and the required analysis of Rules 12(b)(6) and12(d), and Rule 56.

The Magistrate's dismissal of this action for lack of subject matter jurisdiction confuses the concepts of proof of an essential element of a claim and the Court's power to hear a

---

Nor is this an isolated incident. In order to refute the damning scientific evidence against Zuckerberg that showed a "latent impression" (the indentation created on a piece of paper placed underneath another piece of paper on which something is handwritten) on the "signature" page which was identical to an interlineation from the "initial" page, the Magistrate simply concocted a fable: "As such, Plaintiff could have created an 'original' by printing the scanned copy of the authentically executed document, in which case the handwritten interlineation, signatures, and initials would have appeared printed using ink jet toner, rather than handwritten with ballpoint ink, and then printed an unsigned copy of the same document that Plaintiff allegedly printed on April 25, 2003, to be signed by Plaintiff and Zuckerberg, and then traced from the print-out of the scanned, executed copy both Plaintiff's and Zuckerberg's signatures onto the newly printed unsigned copy." (R&R p. 85.)

There is no such evidence for this speculation, indeed, there is no such evidence that would even support a hypothetical of what the Magistrate is surmising.

claim.  It improperly turns a motion for summary judgment under Rule 56 into a motion to

dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), and thus constitutes an

impermissible "drive-by jurisdictional ruling," which the Supreme Court has expressly

prohibited.  *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 511 (2006); *Reed Elsevier, Inc. v.

Muchnick*, 130 S.Ct. 1237, 1243-44 (2010); *Henderson ex rel. Henderson v. Shinseki*, 131 S. Ct.

1197, 1202 (2011).  Under the cited cases, the Supreme Court has made clear that a federal court

cannot dismiss a case for lack of subject matter jurisdiction unless there has been an express

articulation by Congress that failure to establish an element is indeed jurisdictional.  As the Court

made clear in *Arbaugh*,  "If the Legislature clearly states that a threshold limitation on a statute's

scope shall count as jurisdictional, then courts and litigants will be duly instructed and will not

be left to wrestle with the issue. But when Congress does not rank a statutory limitation on

coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in

character." 546 U.S., at 515-516.

There is no question of the jurisdiction of the federal court to hear this case, where there

is complete diversity of citizenship between the parties and the amount in controversy far

exceeds the $75,000 amount in controversy required by 28 U.S.C. § 1332.  The Magistrate did

not dismiss the case on either of these jurisdictional grounds, the only ones properly available

under § 1332.  Although couched in terms of a motion to dismiss for fraud on the Court, the

defendants' motion in essence challenged the ability of the plaintiff to prove the existence of the

contract at issue, obviously an essential element of the plaintiff's claim, notwithstanding the

testimony of the plaintiff and expert witnesses that the contract existed and was genuine.  Rather

than treat the motion as one for summary judgment, which clearly required denial because of

genuine issues of material fact, the Magistrate erroneously converted the motion into a 12(b)(1)

jurisdictional motion, and thereby improperly arrogated to himself the role of fact-finder

empowered to resolve issues of credibility and decide disputed questions of fact.  This was a

clear error of law under any applicable standard of review.

Where the plaintiff and his experts, whose qualifications are not in question, all testify

that the contract between the parties exists and is genuine, and the defendants and their experts

testify otherwise, the only proper way to resolve the dispute is through a trial, not by a

unsanctioned motion under Rule 12(b)(1).

Thus, the Magistrate's recommendation is governed by Rule 12(b) which requires that

the matter "be treated as one for summary judgment under Rule 56.  All parties must be given a

reasonable opportunity to present all the material that is pertinent to the motion."  As described

by the Second Circuit, the Rule 12(d) conversion requirement "deters trial courts from engaging

in factfinding when ruling on a motion to dismiss and ensures that when a trial judge considers

evidence dehors the complaint, a plaintiff will have an opportunity to contest defendant's relied-

upon evidence by submitting material that controverts it."  *Global Network Communs., Inc. v.

City of New York*, 458 F.3d 150, 155 (2d Cir. 2006) (reversing because "district court

consider[ed] external material in its ruling" and "relied on those materials to make a finding of

fact that controverted the plaintiff's . . . factual assertions . . . in its complaint"); see also *Bell Atl.

Corp. v. Twombly*, 550 U.S. 544, 563 (2007) ("[W]hen a complaint adequately states a claim, it

may not be dismissed based on a district court's assessment that the plaintiff will fail to find

evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder.");

*Courtenay Communs. Corp. v. Hall*, 334 F.3d 210, 213-14 (2d Cir. 2003) (reversing dismissal

7

where "the court . . . . failed to view the allegations in [the] complaint in a light most favorable to [the plaintiff], and engaged in premature fact-finding - thereby depriving [plaintiff] of an opportunity to present evidence to support its claims"). Courts may not bypass the Rule 12(d) conversion procedure in the interest of expediency.  *Kopec v. Coughlin*, 922 F.2d 152, 155 (2d Cir. 1991) ("We decline to uphold bypassing that procedure for the sake of expedience.").

## STATEMENT OF FACTS

In 2002 and 2003, a 29-year old businessman and entrepreneur, Paul Ceglia, was developing an on-line database that would be, and was, deployed through a website known as StreetFax.com. StreetFax.com compiled into a database photographs and other information related to traffic intersections that were intended to allow insurance adjusters to easily obtain such information to assist them in handling claims.  (FAC ¶ 13.)

From time-to-time, Ceglia hired programmers, web developers and other individuals to assist him with developing StreetFax.com. He frequently located such individuals through on-line, help wanted advertisements on craigslist.com.  (FAC ¶ 14.)

In 2003, Ceglia posted advertisements seeking programmers who would be able to develop the search engine feature for StreetFax.com that would provide non-specific name searching, synonymous term linking and the ability to comment on specific photographs. Those features, along with others, would allow someone with an account to search for and find the name and location of a specific intersection, and offering the top closest results if an exact match could not be found. This allowed a user to find the right name even if the user misspelled that name or used an abbreviation that did not match what was entered into the database.  (FAC ¶ 15.)

8

In early 2003, Zuckerberg, a 19-year old freshman college student, responded to Ceglia's craigslist.com advertisement.  (FAC ¶ 16.)

Upon learning Ceglia's requirements, and after several lengthy conversations about the possibility and strategy of creating a search engine that could find a specific name as long as the spelling was "close," in a telephone conversation in April 2003, Zuckerberg told Ceglia that he was working on a great project. Zuckerberg told Ceglia if Ceglia hired him to work on the StreetFax.com project and helped fund the development of his other project, Zuckerberg would give Ceglia a one-half interest in Zuckerberg's other project.  (FAC ¶ 17.)

Zuckerberg explained to Ceglia that the other project would involve an on-line, interactive yearbook, which initially would be targeted at students attending Harvard University, where Zuckerberg was also a student. Zuckerberg told Ceglia that this project was inspired by the on-line year book used at the boarding school that he attended. Zuckerberg further explained to Ceglia that the project could be expanded beyond Harvard University. Zuckerberg told Ceglia that the project's working title was "The Face Book."  (FAC ¶ 18.)

Ceglia accepted Zuckerberg's offer and agreed to pay Zuckerberg $1,000 for his work on StreetFax.com and $1,000 for work to be performed to continue to develop "The Face Book."  (FAC ¶ 19.)

Ceglia and Zuckerberg agreed to meet at the Radisson Hotel in Boston, Massachusetts, on April 28, 2003 to sign a written contract.  (FAC ¶ 20.)

From his home office in Wellsville, New York, Ceglia prepared the agreement on his computer, combining two different forms of agreements that were given to him in the past and modifying them to capture the terms that Zuckerberg and Ceglia agreed to over the telephone.

The agreement covered both the work Zuckerberg agreed to do for StreetFax.com and their agreement concerning The Face Book. Ceglia printed and saved the agreement.  (FAC ¶ 21.)

On April 28, 2003, Ceglia, accompanied by Karin Petersen, met Zuckerberg in the lobby of the Radisson Hotel in Boston. Ceglia provided the agreement to Zuckerberg, who spent a significant amount of time reviewing the agreement. Zuckerberg asked for one change on the first page of the agreement, which was handwritten on to the first page of the document and initialed by Zuckerberg and Ceglia. Zuckerberg and Ceglia then signed the Agreement, which is attached hereto as Exhibit A. Except for the handwritten interlineations made on April 28, 2003, Ceglia made no changes to the agreement after printing it.  (FAC ¶ 22.)

The Agreement provides in pertinent part that:

> [I]t is for the continued development of the software, program and for the purchase and design of a suitable website for the project Seller has already initiated that is designed to offer the students of Harvard university (sic) access to a wesite (sic) similar to a live functioning yearbook with the working title of "The Face Book" It is agreed that Purchaser will own a half interest (50%) in the software, programming language and business interests derived from the expansion of that service to a larger audience.

(FAC ¶ 23.)

The Agreement defines "Seller" as "Mark Zuckerberg, his agents, employees, suppliers, or sub-contractors, furnishing materials equipment, or services." The Agreement defines "Purchaser" as "Paul Ceglia."  (FAC ¶ 24.)

The Agreement further provides that:

> The Agreed upon Cost that the Seller and the Buyer (sic) have agreed upon are as follows: Buyer (sic) agrees to pay the seller

> (sic) the Sum of $1000 a piece for the work to be performed for
> Streetfax and $1,000 for the work to be performed for "The Page
> Book" (sic).

(FAC ¶ 25.)

During their conversations before the execution of the Agreement and thereafter,

Ceglia and Zuckerberg discussed using the name "The Face Book" and "The Page Book" for

their venture and, thus, the terms were synonymous. Indeed, when viewed in the context of the

Agreement (along with the other typographical errors, misspellings and failures to consistently

use defined terms found in the Agreement), in this provision, the Agreement's reference to "The

Page Book" clearly is to the same "The Face Book" venture, which is referenced in other parts of

the Agreement.  (FAC ¶ 26.)

The Agreement provides immediately below the interlineations on the first page

of the agreement and adjacent to Zuckerberg's initials:

> The agreed upon completion for the expanded project with
> working title "The Face Book" shall be Janruary (sic) 1 (sic) 2004
> and an additional 1% interest in the business will be due the buyer
> for each day the website is delayed from that date.  (FAC ¶ 27.)

The Agreement provides continued performance as follows:  For "The Face Book" Seller

agrees to maintain and act as the sites (sic) webmaster and to pay for all domain and hosting

expenses from the funds received under this contract, and Seller agrees that he will maintain

control of these services at all times.  (FAC  ¶ 28.)

Ceglia paid Zuckerberg the $1000 called for in the Agreement for the continued

development of The Face Book. Ceglia also paid Zuckerberg for the work on StreetFax.com,

some of which was used for The Face Book.  (FAC ¶ 29.)

11

As a matter of law, the Agreement created a general partnership (defined above as the "General Partnership") between Zuckerberg and Ceglia. Zuckerberg's and Ceglia's contributions to the General Partnership became, and would become, property of the General Partnership. The fruits of those contributions — such as the creation of the software, program, the purchase and design of a suitable website and business interests derived from the expansion of that service or website to a larger audience — also became property of the General Partnership. Further, as a result of the formation of the General Partnership, Zuckerberg and Ceglia owed each other fiduciary duties of, among other things, candor, loyalty and good faith. (FAC ¶ 30.)

After Zuckerberg and Ceglia signed the Agreement, they began to communicate with each other concerning both the StreetFax.com project and The Face Book project. Those communications occurred over the telephone and through the use of emails. In particular, Zuckerberg and Ceglia communicated with each other concerning the design and functionality of The Face Book website, various ways that they could generate income from The Face Book website, various ways they could expand The Face Book to a larger audience beyond Harvard University, and technical and other challenges in developing The Face Book website.  FAC ¶ 31.

On July 30, 2003, Zuckerberg sent an email to Ceglia informing Ceglia that he wanted to use the source code of StreetFax for The FaceBook.  (FAC ¶ 32.)

On September 2, 2003, Zuckerberg sent an email to Ceglia informing him that he anticipated having 300 people on the system.  (FAC ¶ 33.)

On the same date, Ceglia responded and suggested the possibility of using Facebook as a site to sell college merchandise.  (FAC ¶ 34.)

Ceglia provided Zuckerberg an additional $1000 in November 2003.  (FAC ¶ 35.)

On November 22, 2003, Zuckerberg sent Ceglia an email that read in the subject line, "Urgent! Let's Talk." The email informed Ceglia that Zuckerberg was conducting conversations with other students who were considering the same business as The Face Book. (FAC ¶ 36.)

Communications between Zuckerberg and Ceglia concerning their development of The Face Book and the website planned by the Harvard upperclassmen described in Zuckerberg's November 22, 2003 email continued through the balance of 2003.  (FAC ¶ 37.)

On January 1, 2004, the date on which the The Face Book website was due to be launched, Zuckerberg sent an email to Ceglia informing him that he was not able to launch it at that time and requested not to be penalized for it.  (FAC ¶ 38.)

Ceglia responded on the same day with an email explaining to Zuckerberg that he could not remember the relevant terms of the Agreement and did not have access to it. Consequently, he could not respond to Zuckerberg's request for a waiver. Zuckerberg replied by email to Ceglia, informing him that he would scan the Agreement and send it to him.   (FAC ¶ 39.)

On the same day, Ceglia then responded by email questioning the request.  (FAC ¶ 40.)

Zuckerberg replied: "I'll just get this site online as quickly as I can ..."  (FAC ¶ 41.)

On January 5, 2004, Ceglia sent an email to Zuckerberg, asking him when The Face Book website would be launched.  (FAC ¶ 42.)

Zuckerberg responded on January 6, 2004, advising Ceglia that he would have "something live for you to view soon."  (FAC ¶ 43.)

On January 13, 2004 and January 16, 2004, Ceglia and Zuckerberg exchanged emails concerning the functionality of The Face Book's website and whether they should adapt the search engine built for StreetFax.com to it.  (FAC ¶ 44.)

Recognizing that the delay in launching The Face Book website had the potential to seriously dilute his interest in the venture, Zuckerberg sent an email to Ceglia on February 2, 2004, that claimed at the delay penalties were not fair and that he wanted to "return to 50-50 ownership."  (FAC ¶ 45.)

On February 3, 2004, Ceglia agreed to return to the "50/50 just as long as we start making some money from this thing."  (FAC ¶ 46.)

After finally learning that Ceglia would waive the provision in the Agreement for delivering The Face Book website late, Zuckerberg then informed Ceglia on February 4, 2004 that the website was live: "Paul, [¶] 'thefacebook.com' opened for students today, when you get a chance take a look at it. I'll let you know how it goes."  (FAC ¶ 47.)

Ceglia responded on February 4, 2004, congratulating Zuckerberg on the launch of the site.  (FAC ¶ 48.)

On February 6, 2004, Zuckerberg then writes to Ceglia and advises him that "the site is cool as it is an I don't care about making any money on it right now."  (FAC ¶ 49.) Taken aback by Zuckerberg's February 6 email, Ceglia responded that making money was an important part of the program and that he thought that the site would be useful for the members

of the college to get important information but that the site needed to "get some advertising."
(FAC ¶ 50.)

On April 6, 2004, Zuckerberg wrote Ceglia an email, representing to him that he
is considering abandoning The Face Book website, claiming he was too busy to work on it and
there was a lack of interest in it among students.  (FAC ¶ 51.)

Ceglia responded almost immediately, claiming that the site should not be shut down.
(FAC ¶ 52.)

Contrary to Zuckerberg's representations to Ceglia, and unknown to Ceglia,
thefacebook.com website was an immediate success and well received by the students at
Harvard. In fact, the website was so well received that other Harvard students and other
individuals expressed an interest in investing in the website and participating in its development.
Beginning with Zuckerberg's February 6, 2004 email to Ceglia, Zuckerberg was intentionally
attempting to sour their business relationship in order to convince Ceglia to abandon it.  (FAC ¶
54.)

On July 22, 2004, Zuckerberg wrote to Ceglia an email in which he claimed that he was
too busy with other businesses and that he offered to return to Ceglia the $2000 that Ceglia had
invested in the enterprise.   (FAC ¶ 55.)

At the time Zuckerberg wrote his July 22, 2004 email, he had received or was
about to receive funding from angel investors and was in the process of meeting with venture
capital funds to provide additional capital. At no time did Zuckerberg inform Ceglia of these
facts.  (FAC ¶ 56.)

On July 29, 2004, Zuckerberg either incorporated or participated in the

incorporation of an entity under the laws of the State of Delaware now known as Facebook, Inc. Zuckerberg misappropriated the General Partnership's (1) opportunity to expand the website and the Face Book project beyond Harvard University students and (2) assets, and contributed them to Facebook, Inc., but never informed Ceglia or accounted for them to the General Partnership or Ceglia. To the contrary, Zuckerberg misrepresented to Ceglia that he was not continuing to work on further development of The Face Book, further expanding of The Face Book to a larger audience or commercializing The Face Book for profit. In exchange for contributing the General Partnership's assets to Facebook, Inc. and in taking the General Partnership's opportunity for himself, Zuckerberg received and/or was promised to later receive cash, stock, stock options, restricted stock units and/or other consideration.  (FAC ¶ 57.)

Ceglia never accepted a repayment of investment in The Face Book project and never relinquished his 50% interest in the General Partnership.  (FAC ¶ 58.)

## STANDARD OF REVIEW

The standard of review under Rule 72(b)(3) to objections to the recommendations by a Magistrate regarding a dispositive motion is *de novo*.

The standard of analysis by the Magistrate with regard to a dispositive motion is clear and convincing.

Rule 1008 of the Federal Rules of Evidence provides that the existence of an asserted writing and whether evidence of the content accurately reflects the content is a matter that "the jury determines."

16

The Seventh Amendment to the Constitution of the United States and Rule 38 of the Federal Rules of Civil Procedure provide for the right to trial by jury and that that right, according to Rule 38, "is preserved to the parties inviolate."

Notwithstanding the conflicting testimony, expert opinions, and evidence, the Magistrate suggests that this Court adopt his recommendations based upon his analysis in which he admits that he "discusses only the evidence most favorable to defendants motions to dismiss and any rebuttal evidence submitted by plaintiff."

Plaintiff submits that when the Magistrate ruled on the authenticity of the contract at the center of the litigation in order to determine whether a "case or controversy" actually exists, his decision was *necessarily* dispositive of the merits of the dispute and he was therefore required to treat the motion to dismiss as the Court would a Rule 56 motion or a Rule 12(b)(6) motion where extrinsic evidence is considered by the Court.  Consequently, the Magistrate should have treated all the averments in the complaint as true (including the documents attached to it) and given plaintiff the benefit of all reasonable inferences.  This the Magistrate categorically failed to do. He ignored the abundance of competent evidence which vitiated the defendants' assertions of fraud and proceeded, instead, to rule on the essential merits of the litigation under the guise of deciding whether the Court has subject matter jurisdiction.

The Magistrate assessed his task as follows:

Defendants, by challenging the Work for Hire Document's authenticity, have injected a *factual issue* which, if decided in Defendants' favor, would establish

17

there is no actionable case or controversy, such that the court is *without
jurisdiction* over the matter[2].

R&R p.25 (emphases added).

He considered deciding the authenticity of the Work for Hire Document to be part and
parcel of his "obligat[ion] to establish jurisdiction exists." *Id.* The document's authenticity was
considered by him to be a "'disputed jurisdictional fact'" to be decided "'by reference to
evidence outside the pleadings, such as affidavits.'" *Id.* (quoting *Filetech S.A. v. France
Telecom, S.A.*, 157 F.3d 922, 932 (2d Cir. 1998) (other internal quotation and citation omitted).
To establish jurisdiction, he reasoned, "'the district court should resolve the disputed factual
matters by means of findings of fact.'" *Id.* Finally, the Magistrate cited authority for the
proposition that the Court may "consult evidence" to decide a Rule 12(b)(1) motion. R&R p.26.

The fundamental error in the Magistrate's decision is summed up in the following
passage from his Report and Recommendation:

> Accordingly, it is unquestionable that this court has the inherent authority to
> *resolve the disputed issue of the Work for Hire Document's authenticity*, an issue
> of fact that is critical to establishing whether Plaintiff has presented an actionable
> case or controversy over which the court may exercise its jurisdiction, that in
> making such determination the court may rely on matters outside the pleadings ,
> including 'all submissions by the parties,' and may, but is not required to, hold an
> evidentiary hearing as necessary. *Filetech S.A.,* 157 F.3d at 932. Neither
> Plaintiff's Seventh Amendment right to a jury trial, nor Rules 901 or 1008 of the
> Federal Rules of Evidence pose any impediment to the court's authority to resolve
> the issue of the Work for Hire Document's authenticity on Defendant's Motion to
> Dismiss. Moreover, such determination may be based on matters outside the
> pleadings, including expert evidence submitted by the parties, aided by an

---

[2] Were this type of analysis to spread, every case would be subject to a pretrial factual finding of
the ultimate facts by the court, resulting in a wholesale abolition of the Seventh Amendment.

evidentiary hearing only if necessary.  Here, the court finds no such hearing is necessary.

R&R pp.26-27.

The Magistrate's understanding that he had the inherent authority to decide, as a matter of fact, the central, underlying, factual dispute in the case – the authenticity of the Work for Hire Document – in order to establish whether a case or controversy is both erroneous on its face, a substantial and immediate to the jury system, and contrary to all controlling law.  It is facially erroneous because to hold that the District Court *must* find disputed facts that go to the heart of the case or controversy to determine whether the case or controversy actually exists allows the Court to act as a factual clearing house to decide which cases will be permitted to go to a jury. The Court has the pretrial power to do this only under principles that are applicable to Rule 56 motions or, in appropriate circumstances, a Rule 12(b)(6) motion that is treated like the former. In such cases, the Court decides whether, based upon the evidence, there exists a genuine issue of material fact for the jury.  As discussed below, the case law is clear that where a critical issue of fact is bound up with the Court's determination of its jurisdiction, that issue must be left for the jury.  At the very least, plaintiff submits, it must be decided in accordance with the protections afforded by Rule 56.[3]/

While it is true that in proper cases the Court may look to extrinsic evidence under Rule 12(b)(1) and make findings to determine that subject matter jurisdiction exists, "[i]f satisfaction

---

[3] Plaintiff has been unable to find any case in which the trial Court, when deciding subject matter jurisdiction, determined that a case or controversy did not exist based upon the judge's view of the contested, ultimate facts of the case.

of an essential element of a claim for relief is at issue, however, the jury is the proper trier of contested facts." *Arbaugh v. Y&H Corp.* 546 U.S. 500, 514 (2006) (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S 133, 150-51 (2000). *See also, Alliance for Environmental Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82 (2d Cir. 2006):

> If ... the overlap in the evidence is such that the fact-finding on the jurisdictional issue will adjudicate factual issues required by the Seventh Amendment to be resolved by a jury, then the Court must leave the jurisdictional issue for the trial.

*Id.* at 88.

The Supreme Court was particularly critical of the very approach taken by the Magistrate here in *Arbaugh*, which the Court described as "drive-by jurisdictional rulings."

> On the subject-matter jurisdiction/ingredient-of-claim-for-relief dichotomy, this Court and others have been less than meticulous. ... . Judicial opinions, the Second Circuit incisively observed, "often obscure the issue by stating that the court is dismissing 'for lack of jurisdiction' when some threshold fact has not been established, without explicitly considering whether the dismissal should be for lack of subject matter jurisdiction or for failure to state a claim." *Da Silva* [*v. Kinsho International Corp.*], 229 F.3d [358,] 361 [2d Cir. 2000)]. We have described such unrefined dispositions as "drive-by jurisdictional rulings" that should be accorded "no precedential effect" on the question whether the federal court had authority to adjudicate the claim in suit. *Steel Co.* [*v. Citizens for Better Environment*], 523 U.S. [93,] 91 [(1998]).

*Arbaugh, supra,* 546 U.S. at 511

The Magistrate did not explain the rules that would circumscribe his decision other than to acknowledge that defendants bore the burden to prove by clear and convincing evidence that the Work for Hire Document was a forgery. He did not apply the standards which govern Rule 56 motions although he had the obligation to do at least that much.

Our holding that the clear-and-convincing standard of proof should be taken into account in ruling on summary judgment motions does not denigrate the role of the jury.  It by no means authorizes trial on affidavits.  *Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge,* whether he is ruling on a motion for summary judgment or for a directed verdict. *The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).  [Emphasis added.]

The Magistrate made a finding, which is utterly inexplicable in view of the quality and quantity of evidence presented by plaintiff, when he found there was an "absence of any evidence" by plaintiff to refute defendants' claim that the Work for Hire Document is not authentic.  R&R pp.23-24.  This can only be explained if the Magistrate either overlooked plaintiff's evidence or ignored it.  The objections to the Magistrate's findings which are set out below are supported by the record evidence which he failed to accept as true and from which he failed to draw justifiable inferences favorable to plaintiff, as he was required to do.  *Anderson v. Liberty Lobby, supra.*

The defendants rely entirely upon "expert" evidence, much of which is *Daubert*-proscribed and contradictory, and the entirety of which was countered by Plaintiff's experts.  The Magistrate chose to credit Defendants' expert evidence and to discredit or ignore Plaintiff's.

As the Magistrate recognized, the defendants had the burden to establish plaintiff's supposed fraud upon the Court by clear and convincing evidence.  It has been held that expert testimony alone is insufficient to meet that "high burden" under Rule 60(b)(3). *Schiel v. Stop & Shop Co., Inc.*, 2006 U.S. Dist. LEXIS 73508, *21 (D. Conn. Sept. 7, 2006).  If affirmative expert evidence is *per se* not clear and convincing, then, *a fortiori*, the evidence that was

submitted in opposition by Plaintiff's experts, which is *Daubert*-qualified, *required* the conclusion that defendants failed to meet their "high burden" of clear and convincing evidence. Yet, the Magistrate concluded otherwise.

Further, the Magistrate clearly erred in his understanding of the clear and convincing evidence standard and when conducting its *de novo* review, the Court should apply the correct standard.

The Magistrate defined "clear and convincing" to mean "highly probable" (R&R p.29), as requested by Defendants, rather than the more rigorous "no reasonable jury could find in favor of the non-moving party" standard advocated by Plaintiff. The Magistrate erred in relying on *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985) because there, the moving party failed to meet the high standard of clear and convincing, regardless of whether it was interpreted to mean highly probable or that no reasonable jury could find in favor of the non-moving party.

The Magistrate ignored the cases cited by Plaintiff which define clear and convincing consistent with Plaintiff's definition (Doc. 610 par. 14-19). "Clear and convincing evidence" has been defined in different settings involving civil litigation as well as in criminal cases and the generally accepted definition is "'evidence which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the fact finder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.'" *United States v. Goba*, 220 F. Supp.2d 182, 188 (W.D.N.Y. 2002) (quoting *Cruzan v. Missouri Dep't of Health*, 497 U.S. 261, 285 n.11 (1990). *See also*, *Parker v. Sullivan*, 891 F. 2d 185 (7th Cir. 1989) (clear and convincing evidence defined as "the quantum of proof which leaves no reasonable doubt in the

mind of the trier of fact as to the truth of the proposition in question" (citations and internal

quotation marks omitted)).

> Fraud on the court, though not easily defined, can be characterized as a
> scheme to interfere with the judicial machinery performing the task of impartial
> adjudication, as by preventing the opposing party from fairly presenting his case
> or defense. *Kupferman v. Consolidated Research & Manufacturing Corp.*, 459
> F.2d 1072, 1078 (2d Cir. 1972); *England v. Doyle*, 281 F.2d 304, 309 (9th Cir.
> 1960); see Annot., 19 A.L.R. Fed. 761 (1974). *A finding of fraud on the court is*
> *justified only by the most egregious misconduct directed to the court itself, such*
> *as bribery of a judge or jury or fabrication of evidence by counsel*, *United States*
> *v. International Telephone & Telegraph Corp.*, 349 F. Supp. 22, 29 (D.Conn.
> 1972), *aff'd sub nom. Nader v. United States*, 410 U.S. 919 [] (1973); 7 J. Moore,
> FEDERAL PRACTICE P60.33, at 515 (2d ed. 1976), and must be supported by clear,
> unequivocal and convincing evidence. *Barr Rubber Products Co. v. Sun Rubber*
> *Co.*, 425 F.2d 1114, 1120 (2d Cir.), *cert. denied*, 400 U.S. 878, 27 L. Ed. 2d 115,
> 91 S. Ct. 118 (1970).

*In re: Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 538 F.2d 180, 195 (8th

Cir. 1976) (emphasis added).  It is significant that the Eighth Circuit relied upon the Second

Circuit's decision in *Barr Rubber Products Co. v. Sun Rubber Co., supra*, stating that fraud on

the court "must be supported by clear, unequivocal and convincing evidence."  Further, "[l]ess

egregious misconduct, such as nondisclosure to the court of facts allegedly pertinent to the

matter before it, will not ordinarily rise to the level of fraud on the court." *International*

*Telephone & Telegraph Corp, supra* at 29 (*citing Kupferman v. Consolidated Research & Mfg.*

*Co., supra* and *England v. Doyle, supra,* 281 F.2d at 310).

> Defendants presented no uncontested, incontrovertible, undisputed, evidence which could

be said will leave no reasonable doubt in the mind of the trier of fact.  Further, it is reasonable to

believe that a jury will believe Plaintiff's experts, one of whom, the former chief forensic

scientist for the U.S. Secret Service, has attested to the Work for Hire contract's authenticity.

The Magistrate's error of law resulted in his recommendation that the complaint be

dismissed without finding that Defendants' evidence would allow of no reasonable doubt in the

minds of a jury or that the evidence presented was so clear, direct and weighty and convincing

that a jury could come to a clear conviction, without hesitancy, of the truth of the facts asserted

by Defendants.  *Goba* and *Sullivan*, *supra*.  This fundamental error by the Magistrate brings his

Report and Recommendation in conflict with (a) Plaintiff's 7th amendment rights; (b) the

"Physical Facts Rule" (*Fortunato v. Ford Motor Company*, 464 F. 2d 962 (2nd Cir. 1972); (c)

Fed. R. Civ. P. 12(b)(6) (requiring inferences to be drawn in favor of the non-moving party); (d)

Fed. R. Civ. P. 56 ("[i]t is true that the issue of material fact required by Rule 56(c) to be present

to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the

party asserting its existence; rather, all that is required is that sufficient evidence supporting the

claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

versions of the truth at trial."  *First Nat'l Bank of Arizona v. Cities Service Co.*, 391 U.S. 253,

288-89 (1968)); (e) Fed. R. Evid. 1008 (it is for jury to determine existence, originality and

evidence of content of an asserted writing); and (f) Fed. R. Evid. 901 (whether the proponent has

produced sufficient evidence to authenticate evidence), to name a few.

Application of the proper standard for "clear and convincing" evidence would have

prevented the Magistrate from considering inadmissible evidence.  In considering what a jury

would reasonably do, the Magistrate could only consider evidence that would have been

presented to such jury.  This should have precluded the Magistrate's reliance on numerous,

24

inadmissible, non-*Daubert*-qualified, expert opinions offered by Defendants (Doc. 50, 326, 327, 328, 329 & 330).  "Under *Daubert* and its progeny, the district court must perform this gate-keeping function to ensure that 'any and all scientific testimony or evidence admitted is not only relevant, but reliable.'  *Daubert* [*v. Merrell Dow Pharms.*], 509 U.S. [579,] 589 [(1993)]."  *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124 (S.D.N.Y. 2009).

Plaintiff was not obligated to request a *Daubert* hearing, as the Magistrate suggested (R&R p.50 n.30), because the Court had previously assured the parties that "[The experts] will either agree or disagree, and the methodology they will use is, for want of a better term, and scientific, if you will, *Daubert* qualified, scientific, reliable, accepted within the field, methodology for making such tests."  (6-30-11 Hearing T.91:24-92:6).  The Magistrate erred by accepting non-*Daubert*-qualified expert opinions, contrary to the rule he had established.  This could – and should – have been remedied by an evidentiary hearing given the Magistrate's intention to give such preclusive weight to Defendants' experts, especially Lesnevich, who stands alone in his opinion that multiple Work for Hire contracts exist.  Plaintiff chose not to perform certain tests that would not pass *Daubert* scrutiny, based on the Magistrate's assurance that the experts' methodologies would be *Daubert*-qualified and he was, therefore, prejudiced by the Magistrate's error.

When reviewing plaintiff's objections, "[t]he district judge must determine *de novo* any part of the Magistrate judge's disposition that has been properly objected to.  The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the Magistrate judge with instructions."  Fed. R. Civ. P. 72(b)(3).

25

Plaintiff respectfully submits that defendants did not meet their burden to show the Work for Hire Document was not authentic by clear and convincing evidence and the Magistrate clearly erred when he found they had done so.  In so doing, he violated plaintiff's Seventh Amendment right to a trial by jury of *the* central fact issue in this case.

## ARGUMENT

## I.  CONTRARY TO THE ASSERTION OF THE MAGISTRATE, FEDERAL RULE OF EVIDENCE §§ 901 AND 1008 ESTABLISH THE AUTHENTICITY OF THE CONTRACT AND REQUIRE THAT THE CONTENTS IS A FACTUAL MATTER TO BE DETERMINED BY THE JURY

The Magistrate has plainly misconstrued the applicability of rule 901 and 1008 to the facts in this particular case.  Rule 901(b) specifically states that the illustrations that the examples of evidence that "satisfies the requirement" of authentication and identification are the testimony of a witness with knowledge that the items is what it is claimed to be and 901(b)(3) a comparison by an expert witness with an authenticated specimen.  In this case, the plaintiff has averred that the contract is genuine, satisfying 901(b)(1).  In addition, the expert witnesses have averred that the contract is genuine.  The Magistrate ignored both 901(b)(1) and 901(b)(3).

The Magistrate misconstrued Rule 1008.  According to the Magistrate, the requirement that the existence of an asserted writing and evidence of the contents are jury questions applies only during the course of a trial, but not before.  This is directly contrary to the Note explaining that 1008 to be an addition in order to prevent the situation where the judge would decide a "central issue" "without ever going to a jury."  "The latter portion of the instant rule is designed to insure treatment of these situations as raising jury questions."  Fed. R. Evid. 1008, advisory comm. nn.  The misinterpretation by the Magistrate would completely subvert 1008 by the

simple expedience of withdrawing these issues from the trier of fact before the trial starts, the very same danger warned of by the Advisory Committee Notes.

### III.   THE MAGISTRATE ERRED IN FAILING TO APPLY THE CORRECT STANDARD OF REVIEW FOR SPOLIATION

As stated, the standard of review by the District Judge to review the Magistrate's finding that plaintiff engaged in the spoliation of evidence is *de novo*.  Although the Court has the inherent power to impose sanctions, that power is to be exercised with caution and restraint and must comply with the mandates of due process, particularly where the most severe sanction of dismissal is imposed.  *Chambers v. Nasco, Inc.*, 501 U.S. 32, 50 (1991).  Dismissal is appropriate if there is a showing of willfulness, bad faith, or fault on the part of the sanctioned party. *West v. Goodyear Tire & Rubber Company*, 167 F.3d 776, 779 (2d Cir. 1999).  "However, because dismissal is a drastic remedy, it should be imposed only in extreme circumstances, usually after consideration of alternative, less drastic sanctions."  *Id.* (citation and internal quotation omitted).

In this case, the Magistrate failed to discharge that responsibility by crediting incompetent and controverted expert evidence and ignoring the competent, admissible evidence that (1) plaintiff had not spoliated relevant evidence; (2) evidence which was supposedly "lost" had actually been previously produced to Defendants and they were not, therefore, prejudiced; and (3) the loss of any evidence is not attributable to Plaintiff.  Given the absence of evidence to support these criteria, there was no basis to find willfulness, bad faith or fault on Plaintiff's part sufficient to warrant dismissal.

A party seeking sanctions based on the destruction of evidence must establish that (1) the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the evidence was destroyed with a culpable state of mind; and (3) the destroyed evidence was relevant to the party's claim or defense such that a reasonable finder of fact could find that it would support the claim or defense.  *Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 162 (2d Cir. 2012).  When deciding these issues, the Court's discretion is subject to reversal for "errors of law and clearly erroneous assessments of evidence."  *Id.* (citation omitted).  Plaintiff submits that the Magistrate's recommendation is erroneous as a matter of law and resulted from a manifestly erroneous assessment of the evidence before him.  In short, the Magistrate was not constrained by caution and restraint (*Chambers, supra,* 501 U.S. at 50) and he imposed the most severe sanction of dismissal without the due process protections to which plaintiff was entitled.[4]/  This is best exemplified by the Magistrate's acknowledgment in the Report and Recommendation that he discusses only the evidence "*most favorable*" to the *Defendants* and "any relevant rebuttal evidence submitted by Plaintiff."  R&R p.32 (emphasis added).  This turned the burden of proof on its head and lead him to an erroneous assessment of evidence which, in turn, lead him to the errors of law that resulted in his recommendation to dismiss the complaint.

---

[4] Plaintiff was denied effective discovery when the magistrate entered an order restricting discovery so that he could render a decision on the limited, but ultimate, question of the authenticity of Plaintiff's Work for Hire contract   He repeatedly refused Plaintiff the opportunity to depose Defendant Zuckerberg, refused Plaintiff's experts access to Defendants' computers, refused to require Defendants' experts to produce their underlying notes and data upon which they based their opinions, and refused to consider the spoliation of important evidence by Defendants that Plaintiff's experts had found and documented.

Just as importantly, although the Magistrate viewed and skewed the evidence favorably to Defendants, his finding *still* did not satisfy the three elements needed to support a finding of spoliation which warrants dismissal.

The Magistrate's preferential consideration of Defendants' experts' opinions and the disregard of the opinions of Plaintiff's highly qualified experts on the critical issue of the authenticity of the Work for Hire Document which are based on objective, scientific facts, requires the conclusion that the Magistrate's assessment of the evidence was one-sided and clearly erroneous. The truncated discovery which was designed for the benefit of Defendants, followed by the Magistrate's recommendation to dismiss the complaint for fraud, fell *far* short of the "opportunity to be heard in a proper contest" to which Plaintiff was entitled. *Universal Oil Products Co. v. Root Refining Co.*, 328 U.S. 575, 580 (1946).

Although there is a substantial body of unassailable evidence, including some from Defendants' own experts, that relevant evidence had not been lost because it was previously produced, the Magistrate chose instead to *speculate* that relevant evidence may have been lost and that the loss was attributable to Plaintiff's acts. Apart from the clear error in the Magistrate's analysis, defendants failed to show that the unavailable evidence "would have been of the nature alleged by the party affected by its destruction." *Residential Funding Cor. v. DeGeorge Financial Corp.*, 306 F.3d 99, 108-09 (2d Cir. 2002) (internal quotation and citation omitted). "'[R]elevant' in this context means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence." *Id.*

The Magistrate erroneously found five incidents of spoliation for which he held Plaintiff responsible. The first was the failure to produce a second Work for Hire contract which the Magistrate erroneously found to exist (R&R pp.121-22); second, was damage to ("baking") the

29

original Work for Hire contract (R&R 122-33) which, the evidence shows, was attributable to the actions of Defendants' experts; third, was missing USB drives (R&R 133-137), although some were never owned or used by Plaintiff and the others likely contained evidence that was already produced; fourth, was the reinstallation of a Windows operating system (R&R 137-140) onto a computer to which Plaintiff did not have access, by someone other than Plaintiff, and whose hard drive had already been examined and copied by Defendants; and fifth, was the supposed deletion of electronic copies of the Work for Hire contract and "other electronic evidence" (R&R 140-43).

### A.    The Evidence Shows that "Multiple Versions" of the Work for Hire Contract Did Not Exist.

At R&R, p.121, the Magistrate found that two versions of the Work for Hire Document existed but that Plaintiff had produced only one.  The Magistrate's error in considering the evidence "*most favorable*" to the *Defendants* is readily apparent here.  Not only did he accept all the material opinions by Defendants' expert Lesnevich (at R&R pp.75-86), but his R&R is replete with his own purely speculative notions about what the evidence *could* mean in order to reach the conclusions sought by Defendants and their expert.[5]/  At the same time, he essentially dismissed the well-founded opinions of Plaintiff's expert, James Blanco.[6]/

---

[5] At footnote 52 in R&R p.77, the magistrate "conceives" an elaborate series of *possible* explanations for what he and Defendants speculate Plaintiff might have done: "one plausible explanation"; "could have been created"; "would then have presented"; "would have appreciated"; "could have printed"; "would have perceived."

[6] Not only did the magistrate discuss only Defendants' most favorable evidence, he went further and allowed Defendants to submit Supplemental Expert Reports, over Plaintiff's objections, in violation of his April 6, 2012 Order, which were intended to rebut the relevant rebuttal evidence from Plaintiff the magistrate says he considered.   This compounded the unfairness inherent in considering Defendants' most favorable evidence and then permitting

·      James Blanco's Declaration (Doc. 459 at pp. 27-37) factually refutes the multiple versions theory proposed by Defendants' expert Lesnevich and accepted by the Magistrate [7]/.

·      Plaintiff's First Motion to Compel (Doc. 390) was denied even though it requested (a) all reports documenting Defendants' experts' findings, as required by the magistrate's Order (Doc. 83), and (b) access to the data underlying Defendants' expert reports.  Plaintiff has been denied access to this evidence even though it is essential to expert discovery. Fed. R. Civ. P. 26(a)(2)(B). Yet, the unsupported test results by Defendants' experts are the bases for the magistrate's recommendation to dismiss the complaint.

In his R&R, the Magistrate states that Defendants' expert Lesnevich's findings were "unsuccessfully rebutted by Plaintiff, *see* Discussion, *supra*, at 76-86, establish that multiple copies of the Work for Hire Document were created," and "the evidence persuasively establishes that other versions of the Work for Hire Document did exist, but have not been produced.   At page 86, the Magistrate made the following finding:

> Accordingly, the handwriting analysis performed by Blanco, as reported in the Blanco Report, fails to establish the authenticity of the Work for Hire Document.  In contrast, the findings in the Supplemental Lesnevich Report *support* Defendants' argument that Zuckerberg's initials and signatures on the Work for Hire Document were forged.

*Id.* (emphasis added).

---

them to sur-rebut Plaintiff's rebuttal with supplemental reports.  This did not meet the due process requirement of allowing Plaintiff to be "heard in a proper contest."  *Universal Oil Products Co. v. Root Refining Co.*, *supra*, 328 U.S. at 580.

[7] Mr. Blanco's impeccable credentials are described at pp.1-2 of his declaration (Doc. No. 459).  He has rendered expert opinions regarding questioned documents on over 7,000 occasions, has qualified and testified as an expert witness concerning questioned documents in excess of two hundred times in both federal and superior courts in numerous States and also abroad in Mexico, Singapore, and the High Court of South Africa.  He has never been prevented from testifying in any jurisdiction.

This finding by the Magistrate is clearly erroneous for several reasons.  First, it is the finding of forgery upon which the fraud on the Court argument is based and it must, therefore, be based on clear and convincing evidence.  The best the Magistrate could find was that the Lesnevich Report "supports" Defendants' argument.  One would expect a party's expert's report to do at least that much, but it does not come close to finding the disputed fact by clear and convincing evidence.  Second, it illustrates the harm caused by the erroneous burden with which the Magistrate saddled the Plaintiff by "discuss[ing] only the evidence most favorable to Defendants' Motion to Dismiss and any relevant rebuttal evidence submitted by Plaintiff." Defendants were not entitled to a booster seat from which to present their evidence and the Magistrate should not have considered "rebuttal evidence" without regard to the affirmative evidence Plaintiff presented which independently shows the authenticity of the Work for Hire contract, as well as the affirmative evidence of Defendant Zuckerberg's fraud.[8]/  While Plaintiff's evidence was sufficient to defeat the fraud on the court claim as a matter of law, it was also sufficient to defeat the notion that there were "two different physical versions of the Work for Hire Document" and that for some unexplained reason, that "fact" is somehow evidence of an act of spoliation or destruction.

There was nothing presented from which the Magistrate could conclude – and indeed he did not conclude – that the existence of two Work for Hire contracts (1) constituted the destruction of evidence with (2) a culpable state of mind and (3) that any destroyed evidence was

---

[8] Plaintiff submits that the mere consideration of  Plaintiff's "rebuttal evidence" against the Defendants "most favorable" evidence could not have allowed the magistrate to conclude that the Work for Hire Contract was a forgery.  *Schiel v. Stop & Shop Co., Inc.*, *supra*, 2006 U.S. Dist. LEXIS 73508, *21 (D. Conn. Sept. 7, 2006) (expert testimony alone is insufficient to meet "high burden" of clear and convincing evidence under Rule 60(b)(3)).

relevant to Defendants' defense such that a reasonable finder of fact could find that it would support the claim or defense. *Chin v. Port Auth. of New York & New Jersey*, *supra,* 685 F.3d at 162.

The evidence presented by Plaintiff effectively rebutted even the "evidence most favorable to Defendants" that the Magistrate considered exclusively.

## B.  Damage to the Work for Hire Document

The Magistrate erroneously found that the Work for Hire Document was damaged by Plaintiff (R&R p.122), whereas the overwhelming, documented evidence supports the conclusion that the discoloration of the Work for Hire Document was caused by Defendants' experts' malfeasance or gross negligence in handling that critical piece of evidence during their testing in Buffalo, New York.  Plaintiff filed a Motion for Spoliation by Defendants (Doc. 214), seeking sanctions against Defendants for spoliation of the Work for Hire contract.  At the hearing on that motion the Magistrate concluded that the discoloration did not mean the document was spoliated. (12/13/11 Hearing Transcript at T.184:14-25).  Nonetheless, in his R&R, the Magistrate, in a dramatic reversal, decided that the Work for Hire contract was spoliated *because* of the discoloration.  The Magistrate failed to address evidence presented in Plaintiff's spoliation motion (Doc. 189, 214) and that Defendants' experts were responsible for the spoliation and, instead, he erroneously concluded it had been spoliated and Plaintiff was responsible for it.  In so doing, he ignored the substantial contrary evidence presented by Plaintiff referred to in James Blanco's Declaration in opposition to Defendants' motion to dismiss (Doc. 459, ¶¶ 169, 172, 173, 174, 175, 176.)

Plaintiff's expert, Larry Stewart, the former Chief, Questioned Document Branch and Laboratory Director/Chief Forensic Scientist for the United States Secret Service, also submitted

a declaration (Doc. 416 ¶¶ 26-30, 39-39, 41-43.) in which set out the facts showing that the defendants were responsible for the spoliation of the document.

After reciting and *documenting* facts in further support of his opinion, Mr. Stewart states: "This leads to the logical conclusion that the discoloration and deterioration of the Facebook Contract occurred as a result of the work conducted in Buffalo by the Defendants' experts." *Id.* ¶ 53.

The Magistrate simply chose to ignore or disregard this evidence.  He criticizes Blanco for not performing a test to replicate the damage caused by Defendants' experts' overexposure of the Work for Hire document to intense light.  R&R p.129 n.70.  In fact, Blanco did perform such a test and it confirmed his opinion.  (Doc. 459 ¶¶ 182, 183.)

Blanco's declaration (Doc. 459), Stewart's declaration (Doc. 416), and Paul Argentieri, Esq.'s declaration (Doc.193), all establish that Defendants' experts damaged the Work for Hire Document by Tytell's and Lesnevich's overuse of two VSC machines for approximately 18 hours on July 14 and July 15, 2011.  In spite of this evidence, the Magistrate relied upon the report and declaration of Tytell (R&R 125), even though Tytell is not qualified as either an ink or videograph expert (Doc. 330, p.3) and Tytell had every reason to misrepresent the facts given that the evidence documents his responsibility for the damage caused the document and Tytell and Lesnevich never produced a report of the results of their 18 hours of excessive UV exposure that damaged the Work for Hire contract.

Even if the Magistrate had not clearly erred by refusing to credit Plaintiff's substantial evidence that Defendants' experts were responsible for "baking" the Work for Hire contract, there is nothing to support the conclusion that the yellowed contract somehow amounted to spoliation of evidence where the document was nonetheless able to be examined by Defendants'

experts and they were able to render opinions as to its authenticity, flawed as those opinions may be.  In other words, without a finding of *destruction of evidence relevant to Defendants' defense,* there cannot be a finding of sanctionable spoliation.   *Chin v. Port Auth. of New York & New Jersey*, *supra,* 685 F.3d at 162.

### C.   The Missing USB Drives

The Magistrate erroneously found that Plaintiff willfully destroyed six USB devices. Defendants failed to present proof that the six USB drives were all either owned by, accessed by, or within the custody or control of Plaintiff.  Thus, Defendants failed to show that Plaintiff had control over the USB drives.  *Chin v. Port Auth. of New York & New Jersey, supra*, 685 F.3d at 162.

USB devices are computer-removable devices.  Anyone can easily insert one into a computer and remove it after downloading data, leaving an electronic record of having done so. The fact that USB devices were inserted into Plaintiff's or his father's computer is indicative of nothing but that fact.  Given the fact that the Magistrate found that the only ostensibly relevant data were two files which were likely produced to defendants vitiates any claim of prejudice or that relevant evidence was destroyed.  Again, there is nothing to support a sanctionable act of spoliation by the Plaintiff under *Chin v. Port Auth. of New York & New Jersey, supra*.

### D.   The Reinstallation of the Windows Program

The Magistrate erroneously found that the reinstallation of a Windows operating program on Plaintiff's parents' computer was an act of spoliation by Plaintiff warranting dismissal of the complaint.

Although the evidence utterly fails to disclose destruction of evidence by Plaintiff, there is, again, no evidence that evidence relevant to Defendants' defenses was destroyed (because

they have it) and the spoliation finding by the Magistrate was erroneous.  (Broom Decl. Doc 417 at 33.)

### E.   The Supposed Deletion of Electronic Copies of the Work for Hire Document and other Electronic Evidence.

The Magistrate erroneously concluded that "Plaintiff's failure to produce such copy [of the Work for Hire Document], and Stroz Friedberg's inability to locate one, can only be explained by Plaintiff's destruction or concealment of the electronic copy," (R&R 140), even though the Magistrate's knowledge of "such copy" derives directly from Plaintiff's production of an identical electronic copy.  The Defendants presented no proof that additional electronic copies existed other than from the source from which they were actually obtained.  The Magistrate, relying upon Defendants' rank speculation, concluded that spoliation which requires dismissal of the complaint had occurred.

The Magistrate erred in relying on Defendants' expert Stroz Friedberg's claim that additional relevant electronic files were deleted while this action was pending, based on the alleged "last accessed" dates.

· Plaintiff's computer forensic expert, Jerry Grant, explained that, "Microsoft generally discredits the reliability of the 'last accessed' timestamp, since it is easily altered by system operations that are not directly user-initiated."  Doc. 418 ¶ 8.

· Defendants' experts Stroz Friedberg have published the same opinion, that "metadata are generally only as accurate as the underlying computer clock time" (*Id.*), which, incredibly, was unknown to Stroz Friedberg's expert Rose.  (Doc. 498  T.251:7-13).

Contrary to the Magistrate's findings, the evidence shows that Defendants were not denied production of any email account or potentially relevant emails.

· As soon as Plaintiff was made aware of additional, potentially relevant, email accounts, he gave Defendants full access, as explained in Plaintiff's declaration.

(Doc. 310-6).  Defendants' expert Stroz Friedberg acknowledged they "received data from this [landlubber39@yahoo.com] account from Yahoo!" (Doc. 325 p.48).  No data was lost.

The Magistrate further erred by concluding that the absence of emails proves emails were deleted, without any evidence that emails were actually sent from Plaintiff's account, much less that he sent emails that are relevant to this case.

The Magistrate's Report and Recommendation is bereft of evidence sufficient to support the drastic remedy of dismissal.  Yet, "a court should never impose spoliation sanctions of any sort unless there has been a showing – inferential or otherwise – that the movant has suffered prejudice." *In re Pfizer*, 2013 U.S. Dist. LEXIS 2850, *49 (S.D.N.Y. January 8, 2013) (citation and internal quotation omitted).  The absence of prejudice can be shown by demonstrating that the other party was able to obtain the same evidence from another source.  *Id.* at *50 (quoting *R.F.M.A.S., Inc. v. So*, 271 F.R.D. 13, 24-25 (S.D.N.Y. 2010).  Here, the facts clearly establish an absence of prejudice.  That essential ingredient cannot be satisfied by resort to speculation and wishful thinking.  There was insufficient evidence to support the Magistrate's recommendation to dismiss the complaint because the essential standards enunciated in *Chin v. Port Auth. of New York & New Jersey*, *supra,* 685 F.3d at 162, are absent.

### IV.    SPECIFIC OBJECTIONS

#### A.    Objection to Magistrate's Finding that the StreetFax Document is Authentic

Plaintiff objects to the Magistrate's finding that the StreetFax Document is the authentic agreement between Plaintiff and Zuckerberg.  R&R p.48.  This is plainly refuted by the Declaration of James Blanco, Doc. 459, pp. 90-91; Doc. 417, pp. 21-24.

**B.   Objection to Magistrate's Finding that the Work for Hire Documents and Supporting Emails are Fraudulent.**

Plaintiff objects to the Magistrate's finding that Defendants have established that the Work for Hire contract and supporting emails are fraudulent.  R&R p.49.

The Magistrate found that the Work for Hire contract and supporting emails are fraudulent because he first found – erroneously – that the StreetFax document is authentic and that finding "requires finding fraudulent both the Work for Hire Document and the supporting e-mails ... ."  In addition, he found his first finding to be essentially superfluous because, he concluded, the evidence "clearly and convincingly establishes the fraudulent nature of the Work for Hire Document and supporting e-mails."  *Id.*  The evidence does not support the findings and the Magistrate erred by using an incorrect standard of review and proof.

### 1.   The Work for Hire Contract is not Fraudulent

·       The Magistrate erroneously found that Plaintiff "failed to rebut LaPorte's ink-dating of the ballpoint ink used for the handwritten notations on the Work for Hire Document, such that LaPorte's conclusion that it is highly probable the ink is less than two-years old and, this, could not have been placed on the Work for Hire Document on April 28, 2003 is unchallenged."  R&R p.61.  Plaintiff presented compelling evidence that Defendants did not and could not prove the fact found by the Magistrate.

·       Defendants' expert Lyter concluded the "TLC results were not useable and [he] could not perform ink identification, TLC Densitometry or Relative Aging," (Doc. 328 p.9) and LaPorte concluded the ink formulation could not be determined.  Doc. 326 p.25.

·     Plaintiff's expert Stewart found that "it is not possible to perform 'ink age'

determination on the Facebook Contract."  Doc. 416-3 at 23.

·   The Magistrate erroneously concluded that "inconsistencies with the fonts,

typesetting, and formatting observed between pages 1 and 2 of the Work for Hire

Document, absent satisfactory explanation by Plaintiff, *call the document's*

*authenticity into question*."  R&R p.64 (emphasis added).  The Magistrate applied

the wrong standard and made factual findings that are exclusively within the

province of the jury.  Plaintiff's expert Blanco concluded that "the difference in

font between page 1 and page 2 is readily explained by the common occurrence

that when documents are pieced together by means of 'cutting and pasting'

sections from other source documents, the fonts of those other sections that were

cropped from other documents come along in the transposition and when inserted

into sections of the new document being created, may or may not match the other

fonts of the document being typed."  Doc. 459 pp.91-92 (citing relevant technical

authorities in addition).

·     Blanco concluded that the font (or typestyle) of page 1 is obviously

different than the font of page 2 and this is merely indicative of a

layperson creating a contract on his own and "does not provide indicia of a

forged document."  Doc. 459 p.89.

·   The Magistrate erroneously concluded that, with respect to the disputed facts

relating to the use of the same printer, paper and toner for both pages of the Work

for Hire contract, "Plaintiff's argument on this issue does not require Defendants'

motion be denied."  R&R p.69.  This implies use of a standard not remotely akin

to clear and convincing evidence and further, it placed the burden of proof on
Plaintiff.  The evidence did not permit the Magistrate to find as he did.

- Plaintiff's expert Walter Rantanen concluded "[t]he fiber content of the
  two vials is consistent with coming from the same mill and production
  run."  Doc. 421 p.2.Plaintiff's expert Larry Stewart found "[t]est results
  indicate the toner found on page 1 matches that found on page 2," and
  "[e]xhaustive chemical and physical testing failed to detect differences
  between the toner samples."  Doc. No. 416 p.24.

- Stewart also found from physical analysis that "both pages 1 and 2 ... were
  printed with an office machine that utilized toner, e.g. a laserjet printer"
  Doc. 416 p.23.

- Blanco concluded that "[c]ontrary to [Defendants' expert] Romano's
  claim, my Figure 8 and Figure 9 photographic enlargements are produced
  here to demonstrate that there is no perceivable difference in 'edge
  definition' as alleged by Romano."  Doc. 459 p.23.

- The Magistrate erroneously found that nothing in the record establishes that
  Defendants' fraud argument is predicated on the "page 1 substitution theory
  articulated by Defendants' experts" (R&R pp.72-73) and that "Blanco's staple-
  hole theory is not probative of anything relevant to the authenticity of the Work
  for Hire Document." R&R p.75.

  - Plaintiff was not required to prove the authenticity of the Work for Hire
    contract in this proceeding.

  - *Defendants* were required to prove that the Work for Hire was a fake by

clear and convincing evidence. The history in this case is clear that Defendants pursued a "page 1 substitution theory" in this case until the evidence accumulated to belie that fact.  The Defendants' substitution theory was advanced by their experts in the manner set out – and refuted – in Larry Stewart's declaration.  Doc. 416 ¶¶ 158-181.  The Magistrate erred in finding that "nothing in the record establishes that Defendants' fraud argument is predicated on the page 1 substitution theory ... ."  R&R pp.72-73.

· The Magistrate's decision makes clear that he disregarded Plaintiff's evidence because it did not prove to his satisfaction the Work for Hire contract was authentic when he should have assumed the truth of Plaintiff's evidence and given Plaintiff the benefit of all reasonable inferences to be drawn therefrom.

· Blanco concluded that "[t]he staple holes and secondary staple hole impressions/detent marks of page 1 of the Facebook Contract match the staple holes and secondary staple hole impressions/detent marks of page 2 of the Facebook Contract," demonstrating that the two pages were stapled only once, at the time they were stapled together.  Doc. 459 p.88.

· Blanco concluded the evidence does not support any theory that page 1 was attached to page 2 with a staple by hand.  *Id.*

· Stewart concluded "after a thorough and exhaustive forensic testing" there is no indication the Work for Hire contract is "anything other than genuine.  Doc. 416-3 p.21.

41

· The Magistrate used an erroneous standard by finding that Plaintiff's expert failed to establish the authenticity of the Work for Hire contract – which was not his duty to so – and that Defendants' expert's findings "support Defendants' argument that Zuckerberg's initials and signatures on the Work for Hire Document were forged.

　　· Plaintiff's expert Blanco performed detailed analyses of the documents and concluded they were four different copies of the same document. Doc. 459 p.27.

　　· Blanco concluded that Zuckerberg's signature "was written rapidly revealing free flowing and spontaneous rhythm" and there was "no evidence of a trace forgery." Doc. 459 p.38.

　　· Blanco concluded the handwriting in the questioned "MZ" initials "represent the natural, normal and genuine handwriting characteristics of Mark Zuckerberg as demonstrated by his EXHIBIT 19 known specimen initials." Doc. 459 p.46.

　　· Blanco concluded the Work for Hire contract "is an authentic, unaltered document." There is no justification or support for Defendants' theory of a page 1 substitution, forgery or fraud. Doc. 459 p. 232.

· The Magistrate's finding that Plaintiff referred to his company as "StreetFax LLC" before the company filed to become an LLC "does point toward determining the document is fraudulent." R&R pp. 86-87.

　　· Although the Magistrate acknowledged that this fact alone was not sufficient to find the Work for Hire document a forgery, its weight is so

slight that it does not nudge the evidence into the realm of clear and convincing as required, especially in light of the substantial evidence presented by Plaintiff that the Work for Hire contract is authentic.  The Magistrate contemplated that the LLC reference could have signified Plaintiff's intention to incorporate the business.   R&R p. 87 n. 55. Although the Magistrate elsewhere surmises about how Defendants' evidence could support the Defendants' arguments (R&R p. 77 n. 52), he does not give Plaintiff the same benefit.

· The Magistrate's finding that other versions of the Work for Hire contract were backdated by Plaintiff is not supported by clear and convincing evidence for the reasons stated below, where back-dating and formatting anomalies are shown to have been addressed by Plaintiff's experts.

· The Magistrate's findings with respect to the use of a "hex editor" (R&R p.94) are inconclusive precisely because Defendants' evidence is vague and inconclusive regarding the subject.  Whether or not a hex editor was used by Plaintiff for some undetermined reason or reasons is not evidence, much less clear and convincing evidence, that the Work for Hire contract is not authentic, especially given the countervailing evidence presented by Plaintiff.

## 2.   Plaintiff's "Supporting E-mails are not Fraudulent

· Plaintiff objects to the Magistrate's finding (R&R p.108) that Defendants have established it is "highly probable or reasonably certain that the supporting e-mails were created on a computer with a back-dated system clock."

· The Magistrate acknowledges that the UTC time zone stamps are

43

indicative of an incorrectly set system clock and do not necessarily indicate fraud.  R&R 107 n.65.

· Despite the finding that the computer on which the Seagate Hard Drive was not produced by Plaintiff, the evidence shows that the computer was an HP Pavilion computer that belonged to Vera and Carmine Ceglia and Plaintiff did not own, use or control it.  Doc. 417 p.5 (Broom Decl.).Anomalies in computer forensics is a neutral term denoting an unexpected finding and is not, of itself, indicative of fraud.  *Id.* p.26

· Defendants cite anomalies in Sidley Austin's servers which they simply explain away as a server with the time correctly set but the time zone incorrectly entered, but where similar anomalies appear to work in Defendants' favor, they are not similarly dismissed, but instead are considered to indicate fraud.

· The Magistrate's practice of considering only Defendants' most favorable evidence, not taking Plaintiff's evidence as true and not affording Plaintiff favorable inferences, lead him to erroneously conclude that emails with incorrect dates or times signified deliberate "back-dating" by Plaintiff, which is not supported by the evidence.  *Id.* pp.25-30.

· Plaintiff objects to the Magistrate's finding that "numerous formatting inconsistencies ... are best explained as indicative of fraud."  R&R p.111.

· Plaintiff's experts Jerry Grant and Neil Broom explained that the formatting inconsistencies are not indicative of fraud (Doc. 418 ¶¶ 21 and Doc. 417 p.31, respectively) and that Defendants' experts had insufficient

information from which to draw their conclusions.

·    Grant's examination of the floppy disks confirmed that copies of the emails were were placed within MS Word files in 2003-2004, consistent with Plaintiff's sworn declarations.  Doc. 418 ¶10.

·    The Magistrate could not conclude that Defendants met the burden of clear and convincing evidence based on Defendants' experts whose opinions were directly refuted by Plaintiff's experts, unless the Magistrate did, as he said he would do, consider Defendants' most favorable evidence and then fail to credit Plaintiff with the facts established by his experts and the inferences to which he was entitled.

·   Plaintiff objects to the Magistrate's finding that "unexplained factual inaccuracies are more evidence that the Work for Hire Document and the associated supporting e-mails alleged by Plaintiff are recently created fabrications."  R&R p.112.

·    The Magistrate again erroneously placed the burden of proof on Plaintiff and concluded that Plaintiff had not offered an explanation for the Defendants' contention that Plaintiff viewed TheFacebook website on the morning of February 4, 2004, when the site did not go "live" until that afternoon.

·    The Magistrate refers to Defendant Zuckerberg's declaration (Doc. 29-2 ¶ 25) in support of Defendants' argument.  Notably, Zuckerberg *never* stated that TheFacebook went live on the *afternoon* of February 4, 2004.  He stated only that it was "launched" on that date.

·    The evidence one would have expected was a simple declaration by

Zuckerberg, under oath, that TheFacebook website was not launched until the afternoon of February 4, 2004 *and* that it could not be *viewed* by Plaintiff – whether it was "launched" or not and whether or not one was a Harvard student – on the morning of February 4, 2004.  Such a simple assertion by Zuckerberg is conspicuously absent and, in addition, the hearsay evidence by Defendants from third parties that the site went "live" that afternoon is neither admissible nor relevant.

· Plaintiff objects to the Magistrate's finding that "the absence of such e-mails [from the Harvard server and upon which Plaintiff relies] corroborates Defendants' assertions that the supporting e-mails purportedly from that period of time were fake."  R&R p.115.

· It both defies logic and serves to exemplify the Magistrate's failure to give Plaintiff the benefit of reasonable inferences for him to conclude that the unexplained absence of *all* emails on Harvard's server between Plaintiff and Zuckerberg during the period from March 2003 until June 2003 – the period during which Zuckerberg admits signing a contract with Plaintiff and the inception of their relationship – "corroborates *Defendants'* assertions" that Plaintiff's emails are fakes.

· Defendants' experts Rose and McGowan are not certified fraud experts (Rose Dep.Tr. 208 and McGowan Dep. Tr. 7).  Plaintiff's computer forensics expert, Neil Broom, is a certified fraud expert.  Doc. 417 at 2.

· Rose's testimony discloses the unexplained absence of emails from the Harvard server during the critical time period and concludes that it does

not signify that Defendants have concealed evidence.  R&R 115.  That is

entirely beside the point.  First, because Plaintiff did not have a burden to

prove the Defendants concealed evidence, but second, the suspicious

absence of all such emails cannot logically support the conclusion that

*Plaintiff's* emails are fake.  This is not clear and convincing evidence to

support the Magistrate's finding regardless of how the burden of proof is

defined.

·   Plaintiff objects to the Magistrate's finding that "stylistic differences [between

known and questioned emails] point to a highly probable conclusion that the

Questioned writings were not authored by Zuckerberg."  R&R p.118.

   ·   The methodology of Defendants' expert Gerald McMenamin in the

      specific report upon which Defendants rely was described by the president

      of the International Association of Forensic Linguists, Ronald R. Butters,

      as lacking "standards for reliability and methodology."  Doc. 481 pp.49-

      50.

   ·   Whereas the Magistrate credited hearsay media reports to find that

      Plaintiff could not have accessed TheFacebook website before the

      afternoon of February 4, 2004, he is dismissive of Butters' criticism that

      McMenamin's report is unreliable.

   ·   Although expert reports – especially questioned reports – are inadequate to

      meet the clear and convincing evidence standard, the Magistrate decided

      that McMenamin's was not merely reliable, but supported his "highly

      probable conclusion."  This was, by any standard a usurpation of the jury's

function.

## **CONCLUSION**

The Magistrate is recommending that this Court decide whether Ceglia is telling the truth or Zuckerberg is telling the truth; whether Ceglia's experts are telling the truth or Zuckerberg's experts are telling the truth; whether the contract is genuine or whether the contract is a forgery; whether the emails are genuine or whether the emails are a forgery. These questions are classic jury issues. The Court should not usurp the function of the jury nor substitute itself for that of the jury.

For the reasons and authorities stated and based upon the complete record in this case, the plaintiff respectfully submits that the Court should and must reject the recommendations of the Magistrate, remand the case to another Magistrate for the scheduling of discovery, including the deposition of Zuckerberg and then set the case for trial on the merits.

Dated:   April 15, 2013

Respectfully submitted,

*/s/ Paul A. Argentieri*

Paul A. Argentieri
188 Main Street
Hornell, NY 14843
607-324-3232 phone
607-324-6188
*Attorney for Plaintiff Paul D. Ceglia*

## CERTIFICATION PURSUANT TO LOCAL RULE 72(c)

I hereby certify that this Objection does not raise any new legal/factual arguments.

Dated:   April 15, 2013

/s/ Paul A. Argentieri

Paul A. Argentieri
188 Main Street
Hornell, NY 14843
607-324-3232 phone
607-324-6188
Attorney for Plaintiff Paul D. Ceglia