**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

_____

**PAUL D. CEGLIA,**

                              Plaintiff,                    Civil Action No. 1:10-cv-00569 (RJA)

          vs.

**MARK ELLIOT ZUCKERBERG** and
**FACEBOOK, INC.,**

                              Defendants.

_____


**PLAINTIFF'S REPLY TO DEFENDANTS' MEMORANDUM OF LAW**
**IN OPPOSITION TO CEGLIA'S OBJECTIONS TO MAGISTRATE FOSCHIO'S**
**MARCH 26, 2013, REPORT AND RECOMMENDATION**


**Co-Counsel and Local Counsel for Plaintiff**
Paul Argentieri
PAUL ARGENTIERI & ASSOCIATES
188 Main Street
Hornell, New York 14843
Telephone: (607) 324-3232
Facsimile: (607) 324-6188
paul.argentieri@gmail.com

**Co-Counsel for Plaintiff**
Joseph M. Alioto
THE ALIOTO LAW FIRM
225 Bush Street
San Francisco, California 94104
Telephone: (415) 434-8900
Facsimile: (415) 434-9200
jmalioto@aliotolaw.com
_Admitted Pro Hac Vice_

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I. INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    **A.  Defendants Fail to Justify the Procedural Irregularities Underlying the R&R**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    **B.  Plaintiff Offered Competent and Admissible Evidence to Rebut the Following Charges of Fraud and Spoliation**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        **i.  First, when Defendants' experts examined Ceglia's computer, they made a case-ending discovery: they found the authentic contract between the parties.  (Opposition, p. 1.).** . . . . . . . . . . . . . . 9

        **ii.  … chemical analysis of the handwritten ink on the Work for Hire Document reveal[ed] that the ink was *less than two years old* even though the contract was purportedly signed in 2003. (Opposition, p. 2.).** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        **iii.  In addition, one of the nation's leading document authentication experts examined the typesetting and formatting of the Work for Hire Document and concluded that it was an "amateurish forgery." (Opposition, p. 2.).**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        **iv.  As to Ceglia's purported emails with Zuckerberg, none were located on Harvard University's server, which did contain many genuine emails between the parties concerning StreetFax. (Opposition, p. 2.).**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        **v.  And when ordered to produce them, Ceglia failed to produce any actual emails – all he had were backdated Word documents containing time-stamp anomalies and other indicators of fraud. (Opposition, p. 2.).**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        **vi.  Ceglia destroyed six USB devices, one of which contained files entitled "Zuckerberg Contract page1.tif" and "Zuckerberg Contract page2.tif" that he stored in a folder labeled "Facebook Files." (Opposition, p. 2.).**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**vii.  Moreover, during this litigation, Ceglia created a new physical version of his fraudulent Work for Hire Document to give to Defendants' experts. (Opposition, pp. 2-3.)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18**
**and**
   **This was a new forgery, different from the forgery attached to his Complaint, that he "baked" through extended exposure to light in an effort to frustrate ink analysis and give the document an artificially aged appearance. (Opposition, p. 3.).** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18**

**III.  CONCLUSION.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20**

# TABLE OF AUTHORITIES

<u>Cases</u>                                                                                              <u>Page</u>

*Alliance for Environmental Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82
(2d Cir. 2006).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Arbaugh v. Y & H Corp.*, 546 US 500 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Augustine v. United States*, 704 F.2d 1074 (9th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). . . . . . . . . . . . . . . . . . 14

*Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922 (2d Cir. 1998). . . . . . . . . . . . . . . . . . . 4

*Kumho Tire Co. v. Carmichael*, 526 US 137 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Montez v. Department of Navy*, 392 F.3d 147 (5th Cir., 2004). . . . . . . . . . . . . . . . . . . . . . . 4

*Morrison v. Amway Corp.*, 323 F. 3d 920 (11th Cir., 2003). . . . . . . . . . . . . . . . . . . . . . . . . 4

*Penthouse Intern., Ltd. v. Dominion Federal Sav. & Loan Ass'n*, 855 F.2d 963
(2d Cir., 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Pope v. Fed. Express Corp.*, 974 F.2d 982 (8th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*REP MCR Realty, LLC v. Lynch*, 363 F. Supp. 2d 984 (N.D. Ill., 2005).. . . . . . . . . . . . . . . 7

*Steel Co. v. Citizens for Better Environment*, 523 U.S. 83 (1998).. . . . . . . . . . . . . . . . . . . . 8

*Szanto v. Omnicom Grp. Inc.*, 597 F.3d 501 (2nd Cir., 2010). . . . . . . . . . . . . . . . . . . . . . . . 5

*Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*,
661 F.3d 164 (2nd Cir., 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Wiwa v. Royal Dutch Petroleum Co.*, 626 F. Supp. 2d 377 (S.D. N.Y., 2009). . . . . . . . . . . 5

<u>Acts</u>

Foreign Sovereign Immunities Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Foreign Trade Antitrust Improvements Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Statutes

15 U.S.C. § 6a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

28 U.S.C. § 1332. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

28 U.S.C. § 1602 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Federal Rules of Civil Procedure

Rule 12(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 7

Rule 56. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 5, 7

Rule 56(c)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Rule 56(c)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Rule 56(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Federal Rules of Evidence

Rule 901. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

Rule 1008. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

## I.  INTRODUCTION

Paul D. Ceglia, plaintiff above named, submits this Reply to Defendants' Memorandum of Law in Opposition to Ceglia's Objections to Magistrate Judge Foschio's March 26, 2013, Report and Recommendations ("the Opposition").  The Opposition and the Report and Recommendations ("R&R") both suffer from the same two fatal infirmities:

> (1)  The dismissal of plaintiff's complaint for lack of subject matter jurisdiction is procedurally indefensible.  The proceedings before the Magistrate involved in substance a motion for summary judgment.  It was clearly erroneous for the Magistrate not to treat it as such.  The defendants, although tying themselves in knots to try to justify the dismissal for lack of subject matter jurisdiction, have not come close to doing so, and cannot do so.

> (2)  There is competent and admissible evidence to disprove and refute each and every accusation, smear, and innuendo in the Opposition and every alleged fact found by the Magistrate to support his recommendation of dismissal.  It was clearly erroneous for the Magistrate not to leave resolution of these disputed issues of fact to the jury.

The essence of the defendants' motions was that the contract on which plaintiff brought suit and his supporting evidence were forgeries, and that plaintiff could not prove an essential element of his claim – that he had entered into an agreement with defendant Mark Zuckerberg for a half-interest in what became defendant Facebook – regardless of whether the motions were styled as a motion to dismiss for fraud on the Court, or as a motion to dismiss for spoliation of evidence.  The defendants asked the Magistrate to decide the central issue of fact in the case: the authenticity of what has been called the "Work for Hire" contract between plaintiff and Zuckerberg.  The Magistrate should have treated these proceedings as a motion for summary judgment, inasmuch as they involved extensive evidentiary submissions outside the pleadings, including expert testimony, and required resolution of the basic issue of fact in the case.

Had the Magistrate treated the proceedings as a motion for summary judgment, as he was required to do, he would necessarily have found genuine issues of material fact mandating submission of this case to a jury.  Plaintiff himself testified to the existence of the Work for Hire

contract and its authenticity; and reputable and distinguished experts retained by plaintiff authenticated the contract, as well as Zuckerberg's signature and initials, and rebutted the assertions of defendants' experts.[1]/  This evidence by itself precluded any finding that the Work for Hire contract was not genuine.

## II.  ARGUMENT

### A.  Defendants Fail to Justify the Procedural Irregularities Underlying the R&R

To support dismissal of this action, the Magistrate was asked to find, was required to find, and did find that the Work for Hire contract was false and fraudulent; in other words, that plaintiff would not be able to prove an essential element of his case, that the contract was authentic.  As the Magistrate acknowledged, "**…the authenticity of the Work for Hire Document is critical to this action…**"  (R&R, p. 3; emphasis added.)[2]/  The Magistrate further

---

[1] Indeed, as the Court will see, virtually every fact found by the Magistrate in the R&R involved the resolution of irreconcilably conflicting expert testimony, contrary to the representation of defense counsel, made in requesting and obtaining expedited discovery, that they expected "all the experts are going to be in agreement it's a fraud."  (Doc. 94, June 30, 2011, Transcript of Hearing, T.32:10-15.)  These transcript pages and other evidentiary materials referenced in this Reply are being submitted as courtesy copies to the Court and counsel as Appendix exhibits to the Declaration of Paul Argentieri.  The exhibits themselves, to the extent they are already in the record, are not being refiled on ECF with the declaration, but are incorporated by reference.

[2] The full sentence states: "Because the authenticity of the Work for Hire Document is critical to this action, in lieu of general discovery the parties agreed to participate in discovery limited to the purported contract's authenticity and on July 1, 2011, the undersigned granted expedited discovery (Doc. 83) ("July 1, 2011 Expedited Discovery Order"), limited to determining whether the Work for Hire Document and e-mails referenced in and attached as exhibits to the Amended Complaint to demonstrate that Zuckerberg breached the Contract ('the supporting e-mails'), are authentic, as Plaintiff claims, or forgeries, as Defendants maintain." (*Id.*)  What the Magistrate neglects to mention, however, is that plaintiff in no way agreed to the scope of discovery as limited by the Magistrate.  The discovery was grossly one-sided in favor of defendants, in that the Magistrate refused to allow plaintiff to take the deposition of Zuckerberg, clearly one of the two people with direct knowledge of this "critical" issue.  Instead of being subjected to cross-examination, "the crucible of truth," *Penthouse Intern., Ltd. v. Dominion Federal Sav. & Loan Ass'n*, 855 F.2d 963, 974 (2d Cir., 1988), Zuckerberg was allowed to hide behind affidavit testimony and the reports of his paid experts.  On this ground alone, this Court can reject the R&R.  There is no plausible justification for dismissing plaintiff's complaint on the ground that he cannot prove a "critical" element, without allowing him the opportunity to cross-examine the other party to the transaction, Zuckerberg, while allowing Zuckerberg to present his evidence through an affidavit crafted by and with his counsel.  Even with the scope of discovery limited to "the purported contract's

recognized that this was the issue of fact he was deciding, and the issue on which the parties were submitting their evidence. "Here, Plaintiff's filing of numerous exhibits and affidavits in opposition to Defendants' Motion to Dismiss is properly construed as an attempt to authenticate the Work for Hire Document as the authentic contract that governed the business relationship into which Plaintiff and Zuckerberg entered on April 28, 2003." (*Id.*, pp. 19-20.) There can thus be no dispute that proceedings before the Magistrate involved deciding the central issue of fact in this case, an essential element of plaintiff's claims on the merits; and that the Magistrate did so on the basis of conflicting evidence outside the pleadings. As such, he was required to treat the motion as one for summary judgment under Fed. R. Civ. P. 56. He did not.

Moreover, not only did the Magistrate fail to treat the motion as one for summary judgment, as it surely was, but he took a leap into procedural limbo by deciding the motion as one for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), although, as he admitted, the ground was "not addressed by the parties." (*Id.*, p. 24.) The reasoning in which he engaged in reaching his ruling is circular, puzzling, and without support in the case law:

> Insofar as Plaintiff seeks a jury determination that the Work for Hire Document grants him an ownership interest in Facebook, such request presumes the Work for Hire Document is authentic. Defendants, by challenging the Work for Hire Document's authenticity, have injected into the case a factual issue which, if decided in Defendants' favor, would establish there is no actionable case or controversy, such that the court is without jurisdiction over the matter. Simply put, because the viability of the instant action is wholly dependent on the validity of an agreement memorialized in a document, i.e., the Work for Hire Document, a determination that such document is a fabrication would establish there is no case or controversy but, rather, only a 'feigned case' is presented over which the court has no jurisdiction. [*Id.*, p. 25.]

The Magistrate then used his treatment of the motion under Rule 12(b)(1) to bootstrap his consideration of matters outside the pleadings, in an *ad hoc* proceeding of his own devising,

---

authenticity," forbidding the taking of Zuckerberg's deposition was a clear abuse of discretion. There could be no better witness on this "critical" issue. If the purpose of proceedings before the Magistrate was to find the truth as to the authenticity of the Work for Hire contract, then Zuckerberg's testimony, subject to cross-examination, was indispensable.

without regard to the requirements of summary judgment proceedings under Rule 56.  (*Id.*, pp. 25-27.)[3]/  In doing so, however, the Magistrate ignored black letter law that where the existence of subject matter jurisdiction requires fact-finding on an issue central to the merits of the case, as it did here, "the Court must leave the jurisdictional issue for the trial."  *Alliance for Environmental Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 (2d Cir. 2006); *Morrison v. Amway Corp.*, 323 F. 3d 920, 925 (11th Cir., 2003) ("We have cautioned, however, that the district court should only rely on Rule 12(b)(1) '[i]f the facts necessary to sustain jurisdiction *do not implicate the merits of plaintiff's cause of action*.'" [Emphasis in original.]); *Montez v. Department of Navy*, 392 F.3d 147, 150 (5th Cir., 2004) ("However, where issues of fact are central both to subject matter jurisdiction and the claim on the merits, we have held that the trial court must assume jurisdiction and proceed to the merits."); *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983) ("However, where the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits, the jurisdictional determination should await a determination of the

---

[3] "Accordingly, it is unquestionable that this court has the inherent authority to resolve the disputed issue of the Work for Hire Document's authenticity, an issue of fact that is critical to establishing whether Plaintiff has presented an actionable case or controversy over which the court may exercise its jurisdiction, that in making such determination the court may rely on matters outside the pleadings, including 'all submissions by the parties,' and may, but is not required to, hold an evidentiary hearing if necessary….Here, the court finds no such hearing is necessary."  [*Id.*, pp. 26-27.]

The Magistrate principally relied on *Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922, 932 (2d Cir. 1998), to justify the procedure he intended to follow.  He could not have chosen a more inapposite decision, which reversed a district court's dismissal of an antitrust case against France Telecom.  The district court had dismissed on the ground of international comity.  The Second Circuit held that the real issue was whether the court was deprived of jurisdiction under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, *et seq.*, because the conduct challenged was that of a foreign sovereign, or the Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a, because the challenged conduct did not have a sufficient effect on United States commerce.  Neither the Second Circuit nor the district court was concerned with whether the plaintiff was able to prove an essential element of the underlying antitrust claim, *i.e.*, whether France Telecom had in fact engaged in the conduct challenged as anticompetitive.  This is far different from the situation here, which involves whether plaintiff can prove the authenticity of the underlying contract, an essential element of his cause of action, which this Court clearly has jurisdiction to hear under 28 U.S.C. § 1332.

relevant facts on either a motion going to the merits or at trial."); *Wiwa v. Royal Dutch Petroleum Co.*, 626 F. Supp. 2d 377, 382 (S.D. N.Y., 2009) ("However, where the overlap between jurisdictional and merits evidence 'is such that fact-finding on the jurisdictional issue will adjudicate factual issues required by the Seventh Amendment to be resolved by a jury, then the Court must leave the jurisdictional issue for the trial.'").

Finally, as the Ninth Circuit made clear in *Augustine, id.*, "In ruling on a jurisdictional motion involving factual issues which also go to the merits, the trial court should employ the standard applicable to a motion for summary judgment, as a resolution of the jurisdictional facts is akin to a decision on the merits."  Here, the Magistrate compounded his errors by expressly ***not*** following the requirement that in deciding a defense motion for summary judgment, the Court must 'construe the evidence in the light most favorable to the plaintiff, drawing all reasonable inferences and resolving all ambiguities in [its] favor.'"  *Szanto v. Omnicom Grp. Inc.*, 597 F.3d 501, 504 (2nd Cir., 2010); *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 171 (2nd Cir., 2011).  Instead, he did the opposite: "Because copious evidence has been submitted by both Defendants in support of their challenge to the Work for Hire Document's authenticity and by Plaintiff in opposition….the court discusses only the evidence most favorable to Defendants' Motion to Dismiss and any relevant rebuttal evidence submitted by Plaintiff."  (R&R, p. 32.)[4]/

Try as they might in their Opposition, defendants cannot pull the R&R out of the procedural swamp into which the Magistrate has fallen.  To justify the discussion of "only the evidence most favorable to Defendants' Motion to Dismiss and any relevant rebuttal evidence

---

[4] In addition, had the motion been treated as one for summary judgment under Rule 56, plaintiff could have obtained Zuckerberg's deposition under Rule 56(d):  "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may…allow time to obtain affidavits or declarations or ***to take discovery***."  (Emphasis added.)

submitted by Plaintiff," defendants argue that if the Magistrate had done otherwise, "the opinion would likely have exceeded 200 pages."[5]/ (Opposition, p. 33.) There are two answers to this: first, avoiding an excessively lengthy opinion is not a justification for ignoring what the law requires; and, second, had the Magistrate construed "the evidence in the light most favorable to the plaintiff, drawing all reasonable inferences and resolving all ambiguities" in his favor, as the law requires, the R&R undoubtedly would have been much shorter, inasmuch as the Magistrate could simply have stated that plaintiff and his experts all testified to the authenticity of the Work for Hire contract, and thereby created a disputed issue of fact requiring trial to the jury; or he could have stated that inasmuch as the motion to dismiss for lack of subject matter jurisdiction involved an issue of fact "central both to subject matter jurisdiction and the claim on the merits," as it indeed did, the motion must be treated as a motion for summary judgment and denied.

Defendants also harp on the inherent authority of the Court to dismiss a fraudulent lawsuit, and argue that dismissal is an appropriate sanction for proffering a forged document. Defendants ignore, however, that, as the Magistrate recognized, "the authenticity of the Work for Hire Document is critical to this action," in fact the central issue on the merits of plaintiff's claim, and as such was necessarily for the jury. The defendants (mis-)cite *Pope v. Fed. Express Corp.*, 974 F.2d 982 (8th Cir. 1992), as authority for dismissal without trial, but neglect to advise that in Pope, the Eighth Circuit observed, "Appellants concede, however, that Exhibit 203 [the

---

[5] "Discussing all the evidence in the record would have made an 155-page opinion even longer. And as that comprehensive opinion makes clear, he did not ignore Plaintiff's rebuttal evidence but carefully analyzed and evaluated all of it." (Opposition, p. 3.) Carefully analyzing and evaluating plaintiff's evidence, however, is demonstrably ***not*** the same as viewing it in the light most favorable to plaintiff and drawing all reasonable inferences and resolving all ambiguities in his favor. Instead, defendants essentially concede that the Magistrate ***weighed*** the evidence and made himself the finder of fact – neither of which was permissible. That is the role of the jury.

forgery at issue] was a manufactured document. Therefore there is no jury issue." *Id.* at 984.[6]/

Defendants further argue, without authority, that Rules of Evidence 901 and 1008, and presumably any other Federal Rule of Evidence, had no application to proceedings before the Magistrate because they relate to admissibility "at trial," and say "nothing about the type of evidence a court must consider when exercising its inherent power to dismiss an action for fraud." (Opposition, pp. 29-30.) They also claim that plaintiff suffered no harm because the rules "merely allow the Court to consider such evidence. And Judge Foschio did just that." (*Id.*, p. 30.) They cannot expect the Court to accept this argument.

First, defendants' premise, stated or unstated, is that the Magistrate was not required to treat their motion as one for summary judgment under Rule 56, with all the protections the rule affords. Plaintiff has already shown this to be wrong, particularly insofar as the Magistrate decided the motion as a Rule 12(b)(1) motion for lack of subject matter jurisdiction involving resolution of a "critical" issue on the merits.

Second, under procedures applicable to a Rule 56 motion for summary judgment, the Magistrate would have had to deny the motion. That the Magistrate "***consider[ed]***" plaintiff's evidence, as defendants contend, falls far short of the requirement of Rule 56 that the court view the evidence in the light ***most favorable*** to the non-moving party. Further, Rule 56 requires that all evidence considered on a motion for summary judgment be competent and admissible. Rule 56(c)(2) ("party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.") and Rule 56(c)(4) ("An affidavit or declaration

---

[6] In *REP MCR Realty, LLC v. Lynch*, 363 F. Supp. 2d 984, 1015 (N.D. Ill., 2005), the other case relied on by defendants for this point, the Court observed, "Lynch does not argue that a grant of the sanctions motion would conflict with the Seventh Amendment. The Court therefore considers the issue waived." The discussion that follows is therefore *dictum*. Moreover, the decision rendered by the Court came after an extended evidentiary hearing featuring live witnesses and cross-examination, a process that the Magistrate here expressly declined to employ.

used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."). Thus, the Federal Rules of Evidence are not merely limited to trial, but apply equally to summary judgment proceedings. Rule 901 provides that "Testimony of a Witness with Knowledge…that an item is what it is claimed to be" is "sufficient to support a finding that the item is what the proponent claims it is." Plaintiff, obviously a person with knowledge, testified to the authenticity of the Work for Hire contract – all that is required to establish authenticity and admissibility. Given that the evidence is to be viewed in the light most favorable to plaintiff, only the jury is empowered to find otherwise, as provided by Rule 1008.

Third, plaintiff cannot possibly have fewer and lesser procedural safeguards on a motion to dismiss for fraud on the Court, where dismissal, monetary and other sanctions, and permanent personal stigma are all possible outcomes, than on a motion for summary judgment, where only dismissal is at stake. Rather, greater protections should attach on a motion to dismiss for fraud. Defendants' arguments would create a kangaroo court whenever fraud on the Court is claimed.

In conclusion, defendants cannot defend the irremediable procedural irregularities in the R&R. The Supreme Court has repeatedly admonished lower courts not to engage in "drive-by jurisdictional rulings." *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 91 (1998); *Arbaugh v. Y & H Corp.*, 546 US 500, 514 (2006); *Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237, 1244 (2010). That admonition was flagrantly violated here, and requires the Court to reject the R&R.

## B.  Plaintiff Offered Competent and Admissible Evidence to Rebut the Following Charges of Fraud and Spoliation

Every accusation, so-called fact, and aspersion contained in the Opposition and the R&R was fully refuted by competent and admissible evidence tendered by plaintiff in proceedings

before the Magistrate, notwithstanding his unjustified refusal to allow plaintiff to take

Zuckerberg's deposition.[7]/  Hereafter, plaintiff will refute allegation-by-allegation the major

so-called facts contained in the Preliminary Statement of defendants' Opposition, which purports

to summarize the major findings of the R&R.

### i. First, when Defendants' experts examined Ceglia's computer, they made a case-ending discovery: they found the authentic contract between the parties.  (Opposition, p. 1.)

This is perhaps the principal canard on which the defense relies.  It begins with the

misrepresentation that defendants' experts examined "Ceglia's computer."  What they examined

was not plaintiff's computer, or even a computer he used or had access to: **it was his parents'**

**computer**.[8]/  Second, what defendants' experts found was an illegible TIFF image of the alleged

"Street Fax" contract that defendants now contend is the authentic contract between plaintiff and

---

[7] As indicated, had the Magistrate treated defendants' motion as one for summary judgment, as he was required, his consideration of matters outside the pleadings would have been limited to *admissible* evidence.  Accordingly, plaintiff will not respond to the clearly inadmissible evidence with which defendants have larded the Opposition in a reprehensible effort improperly to prejudice the Court against plaintiff and his expert witnesses (*e.g.*, statements on pages 4-5 regarding plaintiff's personal history that are plainly inadmissible; "Relying on James Blanco, a discredited expert whose deceptive practices got him expelled from the American Academy of Forensic Sciences in 2008," etc. (p. 40).)  The last aspersion against Blanco is typical of defendants' lackadaisical approach to the facts.  As stated in Blanco's declaration presented to the Magistrate, defendants' reference to Blanco's expulsion "intentionally leaves out the important resolution to this event – that the very expulsion which he cites was *vacated* by a Settlement Agreement as the result of my federal lawsuit against AAFS for expelling me in violation of my legal rights. My claims are detailed in my First Amended Federal Complaint against the AAFS.  Federal Judge Susan Illston signed the Stipulation For Dismissal With Prejudice And Order which affirms that 'the Parties have entered into an agreement setting forth the terms and conditions of settlement.' ***The Settlement Agreement vacating the AAFS's expulsion order expressly stated that the vacation of the expulsion was without a finding of wrongdoing or fault on my part.***" [Pp. 16-17, ¶ 33, Doc. 459, filed July 2, 2012; emphasis added.]  Defense counsel have clearly been around long enough to know what is admissible and what is not.

[8] See expert declaration of Neil Broom, Certified Computer Examiner, Certified Fraud Examiner, and Certified Information Security Systems Professional: "This item of evidence was not owned by the Plaintiff, was not used by the Plaintiff, and was not controlled by the Plaintiff, however this is only the location where a copy of the 'low quality resolution' StreetFax Contract was found."  (P. 5, Doc. 417, filed June 4, 2012.)  See, also, Declaration of Carmine Ceglia, plaintiff's father: "My son, Paul Ceglia, never used the computer."  (P. 2, ¶ 8, Doc. 419, filed June 4, 2012.)

Zuckerberg.  Plaintiff had nothing to do with this image or putting it on his parents' computer. (Paul Ceglia Declarations (Doc. 230) Para. 8-20; Doc. 654-1 Para. 15 & 11.)  There has also never been an original of the alleged Street Fax contract located anywhere and made available for expert analysis, unlike the Work for Hire contract.  Thus, although this purportedly "authentic" contract has never been shown to exist other than as an illegible image on two computers never used by plaintiff, as discussed below, it is the keystone of the entire defense of this action.

The answer to how the TIFF image appeared on the computer of plaintiff's parents instead must lie with Zuckerberg, whose deposition the Magistrate unfortunately blocked, as well as a forensic analysis of his computers.  What is known is that when Zuckerberg launched Facebook, he lied to plaintiff, as he did to others, about what he was doing, claiming he was abandoning the project.  He knew, however, that he had a contract providing plaintiff at least half of Facebook.  (Ceglia Declarations (Doc. 230) ¶ 10; (Doc. 654-1) ¶¶ 2-6.)   What happened next is necessarily a matter of inference, largely because of the Magistrate's curtailing of plaintiff's discovery.  A reasonable inference, however, is that Zuckerberg himself created the "Street Fax" document, and aware of its dire implications for him, he planted the Street Fax TIFF image on plaintiff's parents' computer.  (Broom Declaration (Doc. 417) pp. 15-24.; Ceglia Declaration (Doc. 654-1) ¶¶ 22-29.)

Illegally hacking into computers is a practice in which Zuckerberg was both skilled and experienced at the time, as he had already demonstrated by hacking into the Harvard University computer system, which he regarded as mere "child's play."  (Broom Declaration (Doc. 417) p. 15.)  Indeed, on February 28, 2004, only five days before the "Street Fax" contract turned up on the computer of plaintiff's parents, Zuckerberg hacked into and disabled certain functionality of the Street Fax computer at plaintiff's business out of pique at not receiving timely payment, after expressly threatening to do just that and more.  (Exhibit A to Declaration of Paul Argentieri, Doc.

623, filed December 5, 2012.)  Zuckerberg's exact language in his threatening email is

noteworthy and graphic in giving a picture of his true character:[9]/

> It seems a little ridiculous to me that you're suggesting I accept $1500 on the month that I need prompt payment when you were supposed to be paying $2000 each month all along.
>
> ***At this point I must follow through and remove the scroll search capability from the site.  I will do this after midnight tonight.*** [He in fact did so.]
>
> I should note, however, that the payment you owe me is not only for the scroll search, but also for the rest of the site.  ***From this point forward, if for any month you fail to meet your monthly payment of $2000, I will shut down the entire site.***  I will extend the deadline for this month's payment until March 14.  [*Id.*, emphasis added.]

These are chilling words from an inveterate, proficient, and unscrupulous hacker, made at the

actual time of the events in question.

Of equal significance is that Zuckerberg's incriminating email, the authenticity of which

is not disputed, is entirely ***absent*** from the Harvard server.  It was instead recovered from the

server at Sidley & Austin as an attachment to an email sent by plaintiff's assistant to plaintiff's

attorney at the time.  The absence of the email on the Harvard server is further proof that

Zuckerberg hacked into and deleted emails from the Harvard server documenting his dealings

with plaintiff.  It also refutes defendants' charge that plaintiff must have fabricated emails

between himself and Zuckerberg that were not found on the Harvard server.[10]/

Next, after hacking into and planting the "Street Fax" contract on the computer of

plaintiff's parents, Zuckerberg forwarded the contract from that computer to plant it on the server

at Sidley & Austin, addressed to James Kole, who Zuckerberg knew was doing legal work for

plaintiff.  Ceglia Declaration (Doc. 654-1) ¶¶ 23-28 (and references therein to record).

---

[9] This further highlights the gross injustice of the Magistrate refusing to allow his deposition.

[10] On two other occasions in proceedings before the Magistrate, plaintiff demonstrated deletion of emails from Zuckerberg's email account on the Harvard server.  Each time, plaintiff presented emails sent by Zuckerberg, the authenticity of which was not disputed, that were absent from the Harvard server. (Memo in Support of Mot. for Sanctions (Doc. 199), Memo in Support of Mot. for Discovery (Doc. 397).

Another highly suspicious feature of the TIFF image of the alleged Street Fax contract is its small size and illegibility. Plaintiff's expert, Neil Broom, determined that the document was deliberately scanned as a very small and illegible TIFF image. This led him to conclude that it would defy logic for plaintiff to have gone to the trouble intentionally to reduce the size of the document to render it illegible, scan it, and then send it to his lawyer in an unreadable form for the purpose of seeking legal advice, as defendants claim. (Broom Declaration (Doc.417) pp. 21-22.) The more plausible inference is that Zuckerberg was behind the Street Fax contract and its planting in plaintiff's parents' computer and the Sidley & Austin server – an inference plaintiff was entitled to have drawn in his favor.

Plaintiff's experts also found numerous other deficiencies in defendants' proffered theory that the Street Fax contract was the "authentic contract" between the parties, while the Work for Hire agreement was a recent forgery. For example, the Street Fax contract consists of two separately-scanned files, each one containing a page of the "Street Fax" contract. The computer numbering assigned to the files, however, suggests that they were not placed on the computer by someone operating an attached scanner; but were planted in the computer from another computer by someone who had previously scanned the document onto that computer – an indication of the work of a hacker. (Michael F. McGowan Deposition (Doc. 496) T.39:21-45:25; Bryan J. Rose Deposition (Doc. 498) T.91:19-96:19.) In addition, plaintiff's parents' computer lacked antivirus protection against a hacker and was found to be infected with multiple viruses, including a "Root Kit" virus, which allowed the computer to be invaded and controlled by a hacker. (Broom Declaration (Doc. 417), pp. 7-14.) Also, the "Street Fax" contract was found in an email account belonging to plaintiff's *mother*, which contained only three other items, a distinctly suspicious circumstance indicative of intrusion by a hacker. (*Id.*, p. 19: "It is highly unusual that so few 'Sent' messages would be found on a computer and specifically, that two of these emails work to

12

disprove the Plaintiff's contentions, yet they are the ones that were retained.")[11]/

Finally, there is defendants' noteworthy shift of position with regard to their defense, which demonstrates that if there is any forgery in this case, it is Zuckerberg's creation of the Street Fax contract.  Defendants originally contended that the second page of the Work for Hire contract with Zuckerberg's signature was authentic, but the first page was not.  Plaintiff's experts concluded that (1) both pages of the Work for Hire contract came from the same paper mill run; (2) the fonts and ink on the two pages did not support a finding that the first page was forged; (3) there was only one set of staple holes attaching the two pages, which established that the two pages were in fact part of the same original document; and (4) the handwritten interlineation on the first page, with initials by plaintiff and Zuckerberg, was impressed through on to the second page, another strong indication of the authenticity of the document.  These conclusions, following the detailed expert analysis by James Blanco, are found at Blanco Declaration (Doc. 459) pp.87-90 and the report of Walter Rantanen (Doc. 421).  Only then, after plaintiff's experts had demolished the page-one-forgery defense, did the defendants reverse direction and claim that **both** pages of the Work for Hire contract were forgeries and the Street Fax contract was the authentic contract.[12]/  In other words, defendants backed the wrong horse in formulating their defense, and, when they saw it would not run, scrambled to switch mounts in mid-race.

The claim of defendants and finding of the Magistrate that the "Street Fax" contract is the "authentic" agreement between the parties is thus full of holes and contradicted by substantial compelling evidence in favor of the Work for Hire contract.  It was clearly erroneous for the

---

[11] Zuckerberg's lawyers' request to examine plaintiff's parents' computer also points to Zuckerberg's hacking to plant the "Street Fax" contract, and then advising his lawyers to ask for it.

[12] The handwriting on the first page of the Street Fax contract did not match the impressions on the second page.  Defendants have still not been able to refute the evidence that the two pages of the Work for Hire contract came from the same paper mill run, and that the impression on the second page of the "Street Fax" contract does not match the first page.  Blanco Declaration (Doc. 459) pp.90-91.

Magistrate to dismiss this case in the face of such extensive and persuasive countervailing evidence, particularly after limiting plaintiff's discovery.

**ii. … chemical analysis of the handwritten ink on the Work for Hire Document reveal[ed] that the ink was *less than two years old* even though the contract was purportedly signed in 2003. (Opposition, p. 2.)**

No statement is more typical of defendants' propensity to proclaim as gospel truth a genuinely disputed issue of fact than this. The so-called "chemical analysis" was the work of a single so-called "expert," Gerald LaPorte, whose credibility, expertise, and analysis were vigorously disputed, if not decimated, by plaintiff's expert, Larry Stewart, who rebutted at length and in detail LaPorte's work and conclusions. (Stewart Declaration (Doc. 416-3) ¶¶ 342-440.)

After stating that "Laporte's Use of an Unvalidated and Unsupported Technique for the Analysis of the Ink is Wrong," Stewart methodically exposed the numerous shortcomings, errors, and scientific missteps in LaPorte's analysis. Stewart's declaration reviews the development of scientific tests to determine the age of ink, and demonstrates that the test developed and used by LaPorte has never been generally accepted and considered scientifically reliable, as required by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 US 137 (1999). (*Id.*, ¶¶ 343-405.)[13]/ Stewart also thoroughly explains the basis for the unreliability inherent in LaPorte's methods. (*Id.*, ¶¶ 409-439.)[14]/ Stewart summarizes the

---

[13] "383. Laporte uses a method he developed that has not been independently evaluated and properly peer reviewed. His approach is not used in any state or federal forensic laboratory. Likewise, his approach is not used in any foreign laboratory."
"405. The main forensic laboratory for the U.S. Department of Justice is the Federal Bureau of Investigations (FBI). The FBI does not use the Laporte PE test. In fact, in the FBI's Handbook of Forensic Services, they specifically state, 'Examinations cannot determine how long ink has been on a document.'"

[14] "411…There has been a failure to validate the Laporte PE ink dating methodology to determine its reliability so as to exclude factors other than the passage of time and to ascertain an actual and potential rate of error."
"423. As applied in this case, the *Daubert* standards have not been met at least in the following respects: 1. There has been a failure to publish the details of the technique in the scientific literature to enable the scientific community to independently validate or invalidate it by attempting to replicate results.

problems with LaPorte's work in paragraph 428 of his declaration:

> 428.  In this case, Laporte's opinion also fails to satisfy several *Daubert* criteria in the following respects:
> 1. Failure to exclude the effect of factors other than the passage of time on the rate and results of evaporation of 2-Phenoxyethanol after ink has been written onto paper.
> 2. Failure to exclude the effect of the differences in paper on which the ballpoint ink is written on the evaporation rate, and the amount remaining, of 2- Phenoxyethanol.
> 3. Failure to exclude the conditions under which the questioned documents were stored as a factor that affects the evaporation rate, and amount remaining of 2-Phenoxyethanol.
> 4. Failure to exclude the variable composition of ballpoint ink.

He concludes, "Any finding based on Laporte's PE testing should be excluded as the science nor methodology are proven.  (*Id.*, ¶ 440.)  The Magistrate, however, improperly accepted this and other contested testimony of defendants' "experts" without a *Daubert* hearing, notwithstanding plaintiff's request for such a hearing.  (R&R, p. 50, n. 30.)

All of this was before the Magistrate and clearly demonstrated a genuine issue of material fact not just on the issue of the age of the ink on the Work for Hire document, but on the reliability, scientific underpinnings, and admissibility of LaPorte's testimony.  The Magistrate was neither qualified nor authorized to resolve this conflict of the experts, and it was error for him to do so.

### iii.  In addition, one of the nation's leading document authentication experts examined the typesetting and formatting of the Work for Hire Document and concluded that it was an "amateurish forgery." (Opposition, p. 2.)

This reference is to Frank Romano, who, plaintiff's expert James Blanco pointed out, "lacks the industry standard qualifications to opine as a Forensic Document Examiner – particularly in regard to his assertion that page 1 of the Facebook Contract was an 'amateurish forgery.'"  (Blanco Declaration (Doc. 459) p. 23, n. 23.)[15]/  Both Blanco and Stewart dispute and

---

2. The hypothesis has not been properly tested.
3. No rate of error has been determined.
4. External factors known to affect ink-aging rates, *e.g.* storage temperature and humidity have not been properly addressed."

[15] Commenting on the same lack of qualifications, Stewart observed, "To reach any conclusion regarding 'forgery' is both reckless and unsupported by Romano's background and training."  (Stewart

refute Romano's findings and conclusions regarding the typesetting and formatting of the Work for Hire contract.  (*Id.*, ¶¶ 45-46, 50; Stewart Declaration (Doc. 416-1) ¶¶ 238- 252.)  Romano's credibility is also undercut by his support of defendants' discredited first line of defense: that the first page of the Work for Hire contract was a recent forgery, not part of the original two-page document – a position defendants abandoned after the Street Fax contract was "found" on plaintiff's parents' computer and Sidley & Austin's server during discovery.  Again, the Magistrate was not permitted to appoint himself trier of fact and pick sides in this battle of experts.

**iv.  As to Ceglia's purported emails with Zuckerberg, none were located on Harvard University's server, which did contain many genuine emails between the parties concerning StreetFax. (Opposition, p. 2.)**

The absence of the emails on the Harvard server has already been fully answered by the absence on the same server of Zuckerberg's email of February 28, 2004, threatening to hack into the Street Fax web site.  There is no issue as to the authenticity of Zuckerberg's February 28 email, and there can be no explanation for its absence from the Harvard server other than Zuckerberg's hacking into the Harvard site, as he had done in the past, and deleting the February 28 email and any other emails supporting plaintiff's claim or rebutting his defense.  At the very least, the absence of the February 28 Zuckerberg email from the Harvard server shows that not all emails between the parties remain on the server, and refutes defendants' contention that because emails between plaintiff and Zuckerberg are not on the Harvard server, they must be forgeries. By itself, Zuckerberg's February 28 email creates an issue of fact precluding any finding that emails not on the Harvard server are not authentic.  (See also, Docs. 199 and 397, referenced *supra*.)

**v.  And when ordered to produce them, Ceglia failed to produce any actual emails – all he had were backdated Word documents containing time-stamp anomalies and other indicators of fraud. (Opposition, p. 2.)**

---

Declaration (Doc. 416-1) ¶ 248.)

Defendants ignore that preservation of emails on floppy disks, which is what plaintiff did, was a common and accepted method of preserving email at the time the emails were sent and received in 2003-04.  In addition, Jerry Grant, an expert Certified Access Data Forensic Examiner with more than 25 years' experience, examined the disks containing the emails.  He found that all the emails were saved on the disks using products "commercially available during the 2003/2004 time period," a finding that refutes defendants' contention that plaintiff created the emails around the time he commenced suit in 2010, or filed his Amended Complaint in 2011. (Jerry Grant Declaration (Doc. 418) pp. 10-11, ¶ 14.)  Grant also rebutted all of the allegations of back-dating and other so-called anomalies claimed by defendants' experts to be indicative of fraud in the creation of the emails.  Quite simply, no scientifically reliable and credible opinion of fraud is possible without access to the hardware and software programs used in creating the disks, which are no longer available; and the formatting, time-stamping, and other characteristics of the disks themselves provide no basis to conclude that the emails are not genuine.  (*Id.*, pp. 10-16, ¶¶ 15-24.)[16]/  Significantly, Grant also found that the "total editing time is 2 minutes on each document that contains the relevant e-mail messages. This minimum editing time is more consistent with a copy/paste function than individual typing/editing of a document due to the amount of text."  (*Id.*, p. 14, ¶ 23.)  Hence, according to Grant, "Even the smallest file would require a high level typing skill if the contents of were typed manually.  The others would be humanly impossible."  (*Id.*)[17]/

_____

[16] *E.g.*: "Without having the actual environment that the documents were created in, other possibilities for these anomalies cannot be ruled out." (*id.*, p. 13, ¶ 20); "Without having the actual computer, word processor, clock and program settings, authenticity cannot be discredited." (*id.*, p. 13, ¶ 21).

[17] Plaintiff's expert Broom also rebutted defense expert opinions that time- and date-stamp "anomalies" were indicative of fraud.  (Broom Declaration, pp. 26-30.)  Broom pointed out that defendants' experts have a substantial credibility problem in finding no issue with such anomalies in emails produced by Sidley & Austin, while claiming that these same anomalies in emails produced by

This is unfortunately another instance where the Magistrate impermissibly assumed the mantle of fact-finder to resolve conflicts in expert testimony bristling with genuine issues of material fact requiring resolution by a jury.

**vi.  Ceglia destroyed six USB devices, one of which contained files entitled "Zuckerberg Contract page1.tif" and "Zuckerberg Contract page2.tif" that he stored in a folder labeled "Facebook Files."  (Opposition, p. 2.)**

The defense accusations of spoliation and the findings of spoliation in the R&R are all false and unfounded.  To begin with, the allegedly destroyed USB drives were attached only to the computer owned by plaintiff's parents, which plaintiff never used or had access to.  Nor is there any evidence that plaintiff ever owned or possessed the drives, or that they were subject to his control.  He denies ever having had them.  Finally, the Magistrate found that only two of the drives contained potentially relevant evidence; and the record indicates that the files on the drives were otherwise produced to defendants (R&R p.136 n.76).  Thus, defendants suffered no prejudice from not having the drives.  A USB drive is simply a storage device for data that can be taken from a computer or transferred to a computer.  If defendants otherwise obtained the data from the computer, as they did here, the unavailability of the USB devices has no significance.

**vii.  Moreover, during this litigation, Ceglia created a new physical version of his fraudulent Work for Hire Document to give to Defendants' experts. (Opposition, pp. 2-3.) and**
**This was a new forgery, different from the forgery attached to his Complaint, that he "baked" through extended exposure to light in an effort to frustrate ink analysis and give the document an artificially aged appearance. (Opposition, p. 3.)**

Both of these statements are untrue.  The multiple versions story comes from defendants' expert Gus Lesnevich, who claims to have found four versions of the Work for Hire contract. Plaintiff's expert Blanco made short work of this erroneous supposition: "I have performed detailed analysis of these different documents and have determined that they are just four

plaintiff prove fraud.  (*id.*, p. 27.)

different copies of the same document page, only scanned/copied and reprinted by various different machine processes." (Blanco Declaration (Doc. 459) p. 27, ¶ 51.) Blanco's refutation of Lesnevich's speculation is extensive, detailed, and painstaking. (*Id.*, pp. 27-37, ¶¶ 51-85.) It is also compelling and persuasive, although apparently not to the Magistrate, who again appointed himself fact-finder to resolve a disagreement among experts that should have been left to the jury. This usurpation of the jury's function was particularly egregious, inasmuch as Lesnevich was the *only* defense expert that climbed out on this shaky bough to opine that plaintiff created multiple versions of the Work for Hire document, as Blanco pointed out. (*Id.*, p. 37, ¶ 85.)[18]/

As to the allegation of "baking" a document, defendants and their experts should look in the mirror. This baseless accusation arises from the discoloration by yellowing of the Work for Hire contract at some point in the discovery authorized by the Magistrate. That point, however, occurred **when the document was in the possession of defendants' experts**, who over-exposed the contract to ultraviolet light. Both Blanco and Stewart so found based on their own personal involvement with the document and after a thorough review of the evidence. (Blanco Declaration, pp. 65-86, ¶¶ 166-230[19]/; Stewart Declaration, pp. 39-42, ¶¶ 182-201.) Blanco in particular was actually present during the physical inspection of the Work for Hire contract by defendants' experts, saw first-hand their excessive exposure of the document to ultraviolet and other light sources that cause degradation of documents, and expressed his concerns to those present, although with no effect. (*Id.*, pp. 65-66, ¶¶ 169-74.) His conclusion:

> The imagery of the scans that I took show the discoloration now evident in the Facebook Contract, and my imagery also shows the writing pen ink damage, the likely causation

---

[18] "It is telling that none of the other defense experts have made any statements or even a single comment in support of Lesnevich's 'two different physical documents' theory."

[19] "Over the course of my attendance at the document inspection I found the repeated examinations of the questioned documents by the Facebook experts to be excessive, especially in respect to UV and other lighting exposures and ESDA processing." (*id.* ¶ 181.)

attributed to extended exposure of the documents to UV and other light sources during the testing by Defense experts as well as, and in conjunction with the other examinations, testing and imaging of the Facebook Contract by the Defense experts.  [*Id.*, p. 67, ¶ 176.]

Nonetheless, the Magistrate again determined that he was the proper party to find the facts and resolve the conflict in the testimony of the experts, rather than leaving the issue for the jury.  In this, as in his other findings of fact, he far exceeded his proper role and committed clear error.[20]/

The foregoing discussion deals only with the major factual assertions and accusations in the Preliminary Statement in defendants' Opposition, which summarizes what defendants claim to be the controlling facts supporting the R&R.  What plaintiff has shown is that for each and every "fact" stated by defendants and by the Magistrate in the R&R, the record contains extensive admissible, compelling evidence to the contrary, creating at the very least genuine issues of material fact, which require resolution by a jury, and not by the Magistrate on a so-called motion to dismiss for fraud on the court or for lack of subject matter jurisdiction.  Had plaintiff more time and pages for this Reply, plaintiff could have shown the same for each and every other purported statement of fact in the Opposition, just as plaintiff has done with the summary "facts" in the Preliminary Statement.

### III.  CONCLUSION

Both procedurally and substantively, the R&R is replete with error and cannot stand.  The proceedings below should have been treated as a motion for summary judgment, which should have been denied on the basis of numerous material issues of fact.  It is not, therefore,

---

[20]  Indeed, plaintiff presented extensive additional evidence that defendants' experts were responsible for this spoliation in his Motion for Sanctions (Docs. 188-197), and although the Magistrate denied the motion without prejudice, he acknowledged the strength of plaintiff's evidence stating, "I don't know how one can explain what appeared to be to me on the screen that it was – which seems to have a contrast along the lines of what you [plaintiff's counsel] attribute to it, but the Defendants say otherwise, and I'm not going to make a ruling about that." (December 13, 2011 Hearing (T.188:18-23).) Yet, he did just that.

sustainable.  On the basis of the foregoing arguments and authorities, and those in plaintiff's original Objections, plaintiff respectfully requests the Court to reject the R&R and schedule this matter expeditiously for trial.

Dated:  May 22, 2013.

Respectfully submitted,

s/  Joseph M. Alioto
Joseph M. Alioto, Esq,
*Admitted Pro Hac Vice*

s/  Paul Argentieri
Paul Argentieri, Esq.
*Attorneys for Plaintiff*